UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| **Timothy Jackson**,<br><br>                Plaintiff,<br><br>v.<br><br>**Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**,<br><br>                Defendants. | Case No. 4:21-cv-00033 |

## COMPLAINT AND JURY DEMAND

Plaintiff Timothy Jackson is a professor at the University of North Texas and a scholar of the music theorist Heinrich Schenker. After a fellow music scholar named Philip Ewell published a paper and delivered a prominent talk that denounced Schenker as "an ardent racist," Professor Jackson organized a symposium and invited music scholars to submit papers responding to Ewell's thesis. Many (though not all) of these symposium papers were highly critical of Ewell's attacks on Schenker. Professor Jackson also contributed his own piece to the symposium, which defended Schenker and

sharply criticized Ewell for quoting Schenker out context and refusing even to mention that Schenker was Jewish and experienced anti-Semitism in Nazi Germany. Professor Jackson then arranged for these symposium papers to be published in the Journal of Schenkerian Studies, a journal that Professor Jackson founded almost 20 years ago and operates at the University of North Texas.

Professor Jackson's defense of Schenker and criticisms of Ewell—as well his role in publishing a symposium that was largely (though not entirely) critical of Ewell's denunciations of Schenker—incited an academic mob. Allies of Ewell have been demanding that the University of North Texas fire Professor Jackson and shut down his Journal for Schenkerian Studies, as well as the Center for Schenkerian Studies that Professor Jackson runs at the university. Numerous individuals defamed Professor Jackson by publishing statements calling him "racist"—merely because he organized a symposium to defend a music theorist accused of being a racist and because he criticized a colleague, Philip Ewell, who happens to be black.

Rather than defend Professor Jackson's academic freedom, the University of North Texas and its administrators joined the witch hunt. They launched an investigation into Professor Jackson, and commissioned an "ad hoc review panel" to determine "whether the standards of best scholarly practice were followed" in publishing the symposium. The panel issued its report on November 25, 2020, published on the University of North Texas website, which makes baseless criticisms of the "editorial and review practices" of the Journal for Schenkerian Studies. Professor Jackson's department chair is now using this report as an excuse to exclude Professor Jackson from any continued involvement with the journal.

All of this—the investigation, the criticisms of Professor Jackson in the ad hoc panel's report, and the threats to remove Professor Jackson from the Journal for Schenkerian Studies—was done to retaliate against Professor Jackson for exercising

his constitutional rights under the Speech Clause. He sues to undo these unconstitutional actions and enjoin the university from any further retaliatory action against him. Professor Jackson is also seeking relief against the individuals who defamed him by publishing and propagating baseless statements that he is "racist."

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Professor Jackson alleges that the university and its Board of Regents are violating his constitutional rights under the First and Fourteenth Amendments. The Court has supplemental jurisdiction over Professor Jackson's state-law defamation claims under 28 U.S.C. § 1367(a).

2. Venue is proper under 28 U.S.C. § 1391(b)(1) because at least one of the defendants resides in this district, and all of the defendants reside in the state of Texas. Venue is equally proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Professor Jackson's claims occurred in this district.

## PARTIES

3. Plaintiff Timothy Jackson is Distinguished University Research Professor of Music Theory at the University of North Texas. He is a founding member of the Journal of Schenkerian Studies, published by the UNT Press, and director of the Center for Schenkerian Studies which has distinguished the University of North Texas and its music program for almost 20 years.

4. Defendant Laura Wright is chair of the Board of Regents for the University of North Texas System. Ms. Wright is sued in her official capacity.

5. Defendant Milton B. Lee is vice-chair of the Board of Regents for the University of North Texas System. Mr. Lee is sued in his official capacity.

6. Defendant Melisa Denis is a member of the Board of Regents for the University of North Texas System. Ms. Denis is sued in her official capacity.

7. Defendant Mary Denny is a member of the Board of Regents for the University of North Texas System. Ms. Denny is sued in her official capacity.

8. Defendant Daniel Feehan is a member of the Board of Regents for the University of North Texas System. Mr. Feehan is sued in his official capacity.

9. Defendant A.K. Mago is a member of the Board of Regents for the University of North Texas System. Mr. Mago is sued in his official capacity.

10. Defendant Carlos Munguia is a member of the Board of Regents for the University of North Texas System. Mr. Munguia is sued in his official capacity.

11. Defendant G. Brint Ryan is a member of the Board of Regents for the University of North Texas System. Mr. Ryan is sued in his official capacity.

12. Defendant Rachel Gain is a resident and citizen of Texas.

13. Defendant Ellen Bakulina is a resident and citizen of Texas.

14. Defendant Andrew Chung is a resident and citizen of Texas.

15. Defendant Diego Cubero is a resident and citizen of Texas.

16. Defendant Steven Friedson is a resident and citizen of Texas.

17. Defendant Rebecca Dowd Geoffroy-Schwinden is a resident and citizen of Texas.

18. Defendant Benjamin Graf is a resident and citizen of Texas.

19. Defendant Frank Heidlberger is a resident and citizen of Texas.

20. Defendant Bernardo Illari is a resident and citizen of Texas.

21. Defendant Justin Lavacek is a resident and citizen of Texas.

22. Defendant Peter Mondelli is a resident and citizen of Texas.

23. Defendant Margaret Notley is a resident and citizen of Texas.

24. Defendant April L. Prince is a resident and citizen of Texas.

25. Defendant Cathy Ragland is a resident and citizen of Texas.

26. Defendant Gillian Robertson is a resident and citizen of Texas.

27. Defendant Hendrik Schulze is a resident and citizen of Texas.

28. Defendant Vivek Virani is a resident and citizen of Texas.

29. Defendant Brian F. Wright is a resident and citizen of Texas.

## FACTS

### I. Professor Ewell Delivers An Address That Condemns Heinrich Schenker As "An Ardent Racist"

30. On or around November 9, 2019, Professor Philip Ewell of Hunter College of the City University of New York delivered a plenary address at the Society for Music Theory.

31. Ewell titled his plenary talk, "Music Theory's White Racial Frame." The video of Ewell's talk is available at https://vimeo.com/372726003. Ewell published a paper based on this talk in Music Theory On-line 26/2, available at https://mtosmt.org/issues/mto.20.26.2/mto.20.26.2.ewell.pdf (last visited on January 14, 2021). In his paper, Ewell describes himself as "a black person—the only associate professor who self-identified as such in the 2018 SMT [Society for Music Theory] demographic report—but . . . a practitioner of what I call 'white music theory.'"

32. Ewell complained that "music theory is white" because whites account for 84.2% of the membership of the Society for Music Theory and 93.9% of the associate and full professors in music theory. Ewell also denounced the "figurative and even more deep-seated whiteness in music theory" that "manifests itself in the composers we choose to represent our field . . . and in the music theories that we elevate to the top of our discipline." In his plenary speech to the Society for Music Theory, Ewell said, "There can be no question that white persons hold the power in music theory—music theory's white racial frame entrenches and institutionalizes that power."

33. Ewell then denounced as "an ardent racist and German nationalist" the late-19th century/early-20th century Jewish music theorist Heinrich Schenker, sometimes referred to as the "Albert Einstein of music theory." In his plenary address, Ewell complained, "Indeed, the only thing that has been completely off the table in our White racial frame is simply calling Schenker the virulent racist he was." He also claimed that "our white racial frame seeks to shield Schenker from unwanted criticism."

34. Ewell also lamented that "no one has clearly linked [Schenker's] repugnant views on people to his music theories." Ewell also claimed that Schenker "believed in biological racism" and praised Hitler, without mentioning that Schenker was Jewish and lost many family members in the Holocaust. Ewell averred that "Schenker's racist views infected his music theoretical arguments." Ewell wrote: "I argue that Schenkerian theory is an institutionalized racial structure—a crucial part of music theory's white racial frame—that exists to benefit members of the dominant white race of music theory."

35. Ewell criticized Schenkerian scholars for "whitewashing" his supposedly racist views, and accused them of "Schenkerian apologia—in which white persons severed Schenker's racist convictions from his music theories in order to promote Schenkerism."

II. **Professor Jackson Organizes A Symposium In Response To Professor Ewell's Attacks on Schenker And Schenkerism**

36. Professor Jackson has dedicated his 40-year career in scholarship to the study of Heinrich Schenker, who is the namesake of the Center for Schenkerian Studies that Professor Jackson directs at the University of North Texas ("the Center").

37. Professor Jackson is also a founding member of the Journal of Schenkerian Studies ("the Journal"), which is published by the University of North Texas Press.

38. The focus of Professor Jackson's scholarship, Heinrich Schenker, developed a system of music theory that became influential in music in the United States after the Second World War.

39. Schenker was an Austrian Jew born in 1868 into a provincial family of Talmudic scholars at the contested periphery of the Austrian and Russian Empires. By the end of his life, he had moved to Vienna, the Austrian capital and the capital of classical music.

40. Typical of many Jews who traveled this path of assimilation after the European Enlightenment, Schenker deeply loved German culture. At the same time, he was forever excluded by Germans and Austrians due to anti-Semitism.

41. However much Schenker loved German culture and however much Western classical music nurtured his system of music theory, he was never considered a proper Austrian (let alone German). He suffered racism firsthand through pervasive anti-Semitism, including from other well-known musicians.

42. Schenker died in 1935, just three years before the National Socialists annexed Austria. His wife, as well as many of his students and family members, were subsequently persecuted and perished in the Holocaust.

43. Remarkably, at the end of his life, Schenker was full of hope for the power of music to reach across human hatreds and unify humankind. He declared: "*[M]usic is accessible to all races and creeds alike.* He who masters such progressions in a creative sense, or learns to master them, produces art which is genuine and great" (emphasis added). Despite his enthusiasm for German culture, Schenker also found some forms of music traditionally associated with black American culture to be superior to German composers of his day.

44. In late 2019, Professor Jackson and the editorial staff of the Journal decided to organize a symposium in response to Professor Ewell's address to the Society of Music Theory. The Journal sent a call for papers to members of the Society for Music

Theory, including Professor Ewell. The journal received all submissions by March of 2020 and published them on July 24, 2020.

45. The symposium contributions reflect a range of views. Five of the 15 symposium pieces discuss Ewell's arguments favorably. Other articles published in the symposium, however, are quite critical of Ewell and his thesis. A copy of the symposium is attached as Exhibit C to Professor Jackson's affidavit.

46. Professor Jackson authored one of the articles, entitled "A Preliminary Response to Ewell," which criticizes Ewell's thesis on numerous grounds. Jackson Aff. Ex. C at JACKSON000154–000163.

47. First, Professor Jackson accused Ewell of quoting Schenker's articles, books, letters, and diary out of context, in a manner that "falsifies or misconstrues their meaning." Jackson Aff. Ex. C at JACKSON000154. *See also id*. ("[B]y cherry-picking short phrases out of their full textual and historical environments, he is able to misinterpret them, employing a technique similar to today's political attack ads that employ video editing of speeches by adversaries to make them appear to say things they never· intended."); *id*. at JACKSON000155 ("The Schenker Documents Online (SDO) English translations are very helpful, but at the same time, they must be used with caution and require exegesis.").

48. Professor Jackson also faulted Ewell for failing to acknowledge that Schenker changed his views on race and nationality throughout the course of his life. *See* Jackson Aff. Ex. C at JACKSON000154 ("Although Schenker did not lack self-assurance, he did pivot very significantly from a typical German racist to an egalitarian viewpoint, and from a staunch German patriot who hated everything English and American, to one who saw new hope for Schenkerian analysis in America").

49. Most of all, Professor Jackson sharply criticized Ewell for refusing to acknowledge that Schenker was Jewish and a victim of anti-Semitism. The rise of Nazi Germany "forced him to change his views of race." *Id*. *See also id*. at

JACKSON000154 ("Influenced by growing Jew-hatred in the culture in which he lived, Schenker even internalized some of its stigmata when having to endure the unveiled anti-Semitism of a famous conductor like Furtwangler."). Professor Jackson also questioned whether the so called "white frame" can be applied to a Jewish music theorist such as Schenker. *See id.* at JACKSON000157 ("[M]any white-skinned Jews do not identify with 'Whiteness' as defined by WASPs. As Jews, diary entries prove that Schenker and his wife knew very well that they were considered 'Other' by mainstream German-speaking Viennese society, as his Jewish students would be later in America. Therefore, simply to assume that Jewish Schenkerians are 'White' and therefore participate in 'White Privilege' in America is surely a naïve, unnuanced, and overly simplistic viewpoint at best.").

50. Perhaps most controversially, Professor Jackson suggested that Ewell's attack on Schenker might be the product of anti-Semitism, and Professor Jackson cited studies showing that blacks are more likely than whites to hold anti-Semitic views. Jackson Aff. Ex. C at JACKSON000159 ("Ewell's scapegoating of Schenker, Schenkerians, and Schenkerian analysis, occurs in the much larger context of Black-on-Jew attacks in the United States. . . . Ewell's denunciation of Schenker and Schenkerians may be seen as part and parcel of the much broader current of Black anti-Semitism."). Professor Jackson also criticized the willingness to excuse or downplay anti-Semitism in the black community:

> Given the history of racism against African Americans, there is a strong tendency today to excuse or downplay these phenomena, but they are real—and toxic. They currently manifest themselves in myriad ways, including the pattern of violence against Jews, the obnoxious lyrics of some hip hop songs, etc. . . . Of course, the reason that Black anti-Semitism is soft-pedaled, excused, ignored, and even applauded, is that for too long Blacks themselves have been the object of racism. Yet history does not absolve African Americans of anti-Semitism. What we are seeing now in NYC and its environs, and increasingly across the US and

> Europe — especially in France — and in academia, are the lethal fruits of this slowly gestating disease.

*Id.*

51. Professor Jackson closed his article by explaining the paucity of black music-theory professors. *See* Jackson Aff. Ex. C at JACKSON000160–000162. Professor Jackson rejected Ewell's claim that blacks have been deterred from entering music theory because of "racist Schenkerians practicing their inherently racist analytical methodology." *Id.* at JACKSON000163. Instead, Professor Jackson argued that "a fundamental reason for the paucity of African American women and men in the field of music theory is that few grow up in homes where classical music is profoundly valued, and therefore they lack the necessary background." *Id.* at JACKSON000161. Professor Jackson wrote:

> [S]uccess in classical music is a matter of setting priorities, and summoning inner resources to succeed, no matter what it takes: first and foremost, young African Americans must want to be classical musicians, and their families must be supportive. But admittedly that is not enough. If we are to achieve true social justice in music theory, then we will be compelled to engage with the real issues. We must address African American students' lack of foundation, especially music-theoretical, by facilitating their early training with appropriate resources, and by demolishing institutionalized racist barriers; *this* is the solution, not blaming Schenker, his students and associates, and practitioners of Schenkerian analysis.

*Id.* at JACKSON000161–000162.

### III.  The Aftermath

52. After the Journal published this symposium, Ewell's supporters began to clamor on social media and elsewhere for Professor Jackson to be censored and fired. These attacks were orchestrated by Ewell's supporters within the Society for Music Theory, and at least partially orchestrated by Ewell himself.

53. Professors at the University of Michigan (where the leadership of the Society for Music Theory serves on faculty) led the social-media charge. The chair of the

music theory department circulated e-mails encouraging everyone to sign on, as did faculty at other universities such as CUNY, Yale, and Indiana University.

54. On July 29, 2020—only five days after the publication of the symposium—the Executive Board of the Society for Music Theory issued a letter condemning the symposium that had been published in the Journal of Schenkerian Studies:

> The Executive Board of the Society for Music Theory condemns the anti-Black statements and personal ad hominem attacks on Philip Ewell perpetuated in several essays included in the "Symposium on Philip Ewell's 2019 SMT Plenary Paper" published by the *Journal of Schenkerian Studies*.
>
> The conception and execution of this symposium failed to meet the ethical, professional, and scholarly standards of our discipline. Some contributions violate our Society's policies on harassment and ethics.
>
> As reported by participants, the journal's advisory board did not subject submissions to the normal processes of peer review, published an anonymously authored contribution, and did not invite Ewell to respond in a symposium of essays that discussed his own work. Such behaviors are silencing, designed to exclude and to replicate a culture of whiteness. These are examples of professional misconduct, which in this case enables overtly racist behavior. We humbly acknowledge that we have much work to do to dismantle the whiteness and systemic racism that deeply shape our discipline. The Executive Board is committed to making material interventions to foster anti-racism and support BIPOC scholars in our field, and is meeting without delay to determine further actions.

Jackson Aff. Ex. D (JACKSON000225).

55. Around the same time, some graduate students at UNT circulated a statement, which said:

> We are appalled by the journal's platforming of racist sentiments in response to Dr. Philip Ewell's plenary address at the Society of Music Theory annual meeting in 2019. Furthermore, we condemn the egregious statements written by UNT faculty members within this publication. We stand in solidarity with Dr. Philip Ewell and his goals to address systemic racism in and beyond the field of music theory.

Jackson Aff. Ex. D (JACKSON000226). The graduate students' statement called upon the University of North Texas to "dissolve" the Journal of Schenkerian Studies and demanded that the university "[h]old accountable every person responsible for the direction of the publication." Then the students wrote:

> This should also extend to investigating past bigoted behaviors by faculty and, by taking this into account, the discipline and potential removal of faculty who used the JSS platform to promote racism. *Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable*.

Jackson Aff. Ex. D (JACKSON000227) (emphasis added). The letter also says: "We sincerely apologize to Dr. Philip Ewell for these racist attacks on his scholarship and character." *Id*.

56. On July 27, 2020, Defendant Rachel Gain published this defamatory attack on Professor Jackson on her twitter feed. *See* https://bit.ly/3sm3QWx (last visited on January 14, 2021).

57. Finally, on July 31, 2020, almost all of Professor Jackson's colleagues in the Division of Music History, Theory, and Ethnomusicology signed a letter that endorsed the contents of the graduate students' defamatory letter and provided a link to it:

> We, the undersigned faculty members of the University of North Texas Division of Music History, Theory, and Ethnomusicology, stand in solidarity with our graduate students in their letter of condemnation of the *Journal of Schenkerian Studies*. We wish to stress that we are speaking for ourselves individually and not on behalf of the university. The forthcoming issue—a set of responses to Dr. Philip Ewell's plenary lecture at the 2019 Society for Music Theory annual meeting (https://vimeo.com/372726003)—is replete with racial stereotyping and tropes, and includes personal attacks directed at Dr. Ewell. To be clear, not all responses contain such egregious material; some were thoughtful, and meaningfully addressed and amplified Dr. Ewell's remarks about systemic racism in the discipline. But the epistemic center of the journal issue lies in a racist discourse that has no place in any publication, especially an academic journal. The fact that he was not

> afforded the opportunity to respond in print is unacceptable, as is the lack of a clearly defined peer-review process.
>
> We endorse the call for action outlined in our students' letter (https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view), which asks that the College of Music "publicly condemn the issue and release it freely online to the public" and "provide a full public account of the editorial and publication process, and its failures." Responsible parties must be held appropriately accountable.
>
> The treatment of Prof. Ewell's work provides an example of the broader system of oppression built into the academic and legal institutions in which our disciplines exist. As faculty at the College of Music we must all take responsibility for not only publicly opposing racism in any form, but to address and eliminate systematic racism within our specific disciplines.

Jackson Aff. Exhibit D (JACKSON000228).

58. That same day, July 31, 2020, John W. Richmond, dean of the College of Music at the University of North Texas, issued the following statement:

> The University of North Texas College of Music has begun a formal investigation into the conception and production of the twelfth volume of the Journal of Schenkerian Studies, which is published by the Center for Schenkerian Studies and UNT Press. The University, the College of Music, and the Division of Music History, Theory, and Ethnomusicology reaffirm our dedication to combatting racism on campus and across all academic disciplines. We likewise remain deeply committed to the highest standards of music scholarship, professional ethics, academic freedom, and academic responsibility.

Jackson Aff. Exhibit N. Within a week, an "Ad Hoc Panel" was formed to carry out this investigation.

59. The Ad Hoc Panel issued its report on November 30, 2020, which declared that its members "do not find that the standards of best practice in scholarly publication were observed in the production of Volume 12 of the [Journal of Schenkerian Studies]." *See* Jackson Aff. Exhibit D (JACKSON000222). That same day, Provost Jennifer Cowley sent Professor Jackson a letter instructing Professor Jackson, "as the

Director of the Center for Schenkerian Studies, to develop a plan to address the recommendations by December 18th and submit the plan to Chair Benjamin Brand and Dean John Richmond for review and approval." Jackson Aff. Exhibit T.

60.   On December 11, 2020—more than a week before the deadline that the provost had imposed—Dr. Benjamin Brand (Professor Jackson's department chair) informed Professor Jackson that he would be removed from the Journal and that the university would eliminate resources previously provided to the Journal and Center for Shenkerian Studies.

61.   Dr. Brand stated: "I cannot support a plan according to which you would remain involved in the day-to-day operations of the journal, and its editorial process in particular, given the panel's findings of editorial mismanagement at JSS." Jackson Aff. Exhibit U.

## Count 1: Violation Of 42 U.S.C. § 1983
## (Board of Regents Defendants Only)

62.   The University of North Texas and its officials are retaliating against Professor Timothy Jackson for his criticisms of Philip Ewell, in violation of Professor Jackson's rights under the First and Fourteenth Amendments.

63.   The commissioning of the "ad hoc review panel," the issuance of its report that criticizes the editorial practices of the Journal of Schenkerian Studies, and the department chair's decision to block Professor Jackson from any future involvement in the journal were all done in retaliation for Professor Jackson's article that defended Schenker against Ewell's attacks, and in retaliation for Professor Jackson's decision to organize and publish a symposium that was largely (though not entirely) critical of Ewell and his racial grievances.

64.   The court should declare that the university and its officials are violating Professor Jackson's rights under 42 U.S.C. § 1983, and it should enjoin the Board of

Regents from taking any adverse action against Professor Jackson in response to the publication of the symposium or his criticisms of Professor Ewell.

### Count 2: Defamation
### (All Remaining Defendants)

65. Defendant Rachel Gain defamed Professor Jackson by publishing the graduate students' letter on her Twitter feed. *See* https://bit.ly/3sm3QWx (last visited on January 14, 2021). This letter defamed Professor Jackson by accusing him of engaging in "particularly racist" actions. It further defames Professor Jackson by accusing him of "platforming . . . racist sentiments" in the Journal of Schenkerian Studies.

66. Defendants Ellen Bakulina, Andrew Chung, Diego Cubero, Steven Friedson, Rebecca Dowd Geoffroy-Schwinden, Benjamin Graf, Frank Heidlberger, Bernardo Illari, Justin Lavacek, Peter Mondelli, Margaret Notley, April L. Prince, Cathy Ragland, Gillian Robertson, Hendrik Schulze, Vivek Virani, and Brian F. Wright defamed Professor Jackson by publishing a statement that "endorses" and provides a link to the defamatory statement published by the University of North Texas graduate students.

67. The statement that these defendants signed and published not only "endorses" the "call to action" in this defamatory student letter, it also announces that the signatories "stand in solidarity with our graduate students in their letter of condemnation."

68. By endorsing and propagating the contents of this student letter—and by providing a link to those contents in the statement that they signed—these defendants have published the defamatory statements of their students and are legally responsible for their slander.

69. Each of the elements of defamation is satisfied. The defendants published a statement calling Professor Jackson a "racist" who engaged in "racist actions," which is false statement of fact.

70. The defendants also published a statement that Professor Jackson was "platforming . . . racist sentiments" in the Journal of Schenkerian Studies. This statement is also false.

71. The defendants' false statements of fact were published on the internet for all to see.

72. The defamatory statements concerned Professor Jackson, who is called out by name in the graduate students' letter.

73. On information and belief, the defendants knew that their defamatory statements were false when made. And, at the very least, each defendant acted with negligence in publishing these false accusations of racism.

74. Finally, Professor Jackson suffered damages in the form of ostracism, emotional distress, harm to his professional reputation, and discipline from his university on account of the defendants' false and defamatory accusations of racism.

75. The Court should award Professor Jackson appropriate relief to remedy the damage that the defendants have inflicted on his reputation.

## DEMAND FOR JUDGMENT

76. Professor Jackson respectfully requests that the court:

   i. declare that the university and its administrators are violating Professor Jackson's rights under the First and Fourteenth Amendments by retaliating against him for his criticism of Philip Ewell;

   ii. enjoin the members of the Board of Regents, along with their employees and subordinates, from taking any adverse action against Professor Jackson in response to the publication of the symposium or his criticisms of Professor Ewell;

   iii. award Professor Jackson nominal, compensatory, and punitive damages to the full extent authorized by law;

   iv. award all other relief that the Court deems just, proper, or equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted.

 /s/ Jonathan F. Mitchell

| | |
|---|---|
| MICHAEL THAD ALLEN* | JONATHAN F. MITCHELL |
| *Lead Attorney* | Texas Bar No. 24075463 |
| Connecticut Bar No. 435762 | Mitchell Law PLLC |
| Allen Law, LLC | 111 Congress Avenue, Suite 400 |
| Post Office Box 404 | Austin, Texas 78701 |
| Quaker Hill, Connecticut 06375 | (512) 686-3940 (phone) |
| (860) 772-4738 (phone) | (512) 686-3941 (fax) |
| (860) 469-2783 (fax) | jonathan@mitchell.law |
| m.allen@allen-lawfirm.com | |

\* *pro hac vice* application pending

Dated: January 14, 2021                         *Counsel for Plaintiff*