IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| **Timothy Jackson**,<br><br>Plaintiff,<br><br>v.<br><br>**Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**,<br><br>Defendants. | |

**AFFIDAVIT OF TIMOTHY JACKSON IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

I, Timothy Jackson, do hereby depose and swear that the following is true based upon my personal knowledge and experience:

1.      I am the Plaintiff in the above-captioned action, and I am Distinguished University Research Professor of Music Theory, Professor of Music Theory in the College of Music, currently employed by Defendant University of North Texas ("UNT") in the Division of Music History, Theory, and Ethnomusicology ("MHTE").

2.      UNT is a state owned and operated university and an agency of the State of Texas.

3.      Defendant Benjamin Brand is my Department Chair and Defendant John Richmond is the Dean of the College of Music.  Defendant Jennifer Cowley is the Provost of UNT.  All individual Defendants are paid salaries funded by the generous taxpayers of Texas, and UNT is a publicly funded university.

4.      I am the director of the Center for Schenkerian Studies ("Center").  In 2003 I founded the Journal of Schenkerian Studies ("Journal"or "JSS") and currently serve as a member of its editorial staff.

5.      I am the object of a Report, discussed below, made public by UNT and its so-called "Ad Hoc Panel" ("Panel"), which UNT convened to investigate me and the Journal for so-called editorial mismanagement.  This was a pretext for the suppression of viewpoints published by me and other authors in Volume 12 of the JSS in direct violation of UNT policies insuring academic freedom, in direct violation of the Constitution of the State of Texas, in direct violation of the First Amendment to United States Constitution.

## I.    PROFESSOR PHILIP EWELL'S AND THE SMT'S CONDEMNATION OF SCHENKER, SCHENKERIANS AND SCHENKERIAN THEORY AS "RACIST"

6.      The suppression of free speech and academic Freedom at UNT begins with the current frenzy among academic faculty nationwide to demonstrate that they are "anti-racist," which has assumed ever more bizarre proportions in the absence of actual evidence that anyone in the field of music theory harbors demonstrably racist views or engages in the discrimination of black students, faculty, staff, or other individuals who belong to protected groups.

7.      On November 7-9, 2019, Dr. Philip Ewell of Hunter College in New York delivered a plenary address at the Society for Music Theory ("SMT").  There was no "response" invited or allowed to this plenary address.  Dr. Ewell delivered the plenary address as a policy statement of the SMT.

8.      The SMT's first principle of "ethics" reads as follows: "The Society for Music Theory upholds and promotes the following basic principles of ethical conduct in our profession … freedom of inquiry and the widest possible access to information of use to scholars."  (See https://societymusictheory.org/administration/ethics_policy.)

9.      The substance of Dr. Ewell's talk would not otherwise be important in this litigation but for UNT's suppression of free and open scholarly discourse, academic freedom, and free speech; in consequence a brief summary is necessary.  Dr. Ewell's talk was titled, "Music Theory's White Racial Frame."  This paper can be found here: https://vimeo.com/372726003.  Dr. Ewell's plenary address condemned Heinrich Schenker, the namesake of the Journal and Center, as "an ardent racist" and condemned music theory as "racist" to the extent that it continues to teach the tradition of Western music rooted in the great achievements of composers like Johan Sebastian Bach, Ludwig van Beethoven, Wolfgang Amadeus Mozart, to name only a few of the most well-known.  There are many others.  Because there is an underrepresentation of black students in music theory programs, so Dr. Ewell's argument goes, this is incontrovertible evidence that this tradition is "racist."

10.      In particular, Ewell's presentation attacked Heinrich Schenker, the namesake of the Journal and Center.  He contends that Schenker was a "virulent racist."  By association, he accuses scholars who have promoted and established the study of Schenker in the United States of being equally "racist"; moreover, he argues, they have conspired to conceal Schenker's racial supremacist views.

11.      Heinrich Schenker was a late 19th and early 20th century scholar who developed a system of music theory that became influential in the academic and practical study of music in the United States after the Second World War.

12.      Schenker was an Austrian Jew born in 1868 into a family of Talmudic scholars in the pale of settlement at the contested periphery of the Austrian and Russian Empires.  By the end of his life, he had moved to the Austrian capital city and the capital of classical music, Vienna.  Typical of many Jews who traveled this path of assimilation after the European Enlightenment, Schenker had a deep love of German culture.  He was undoubtedly a German cultural supremacist and

sometimes obnoxiously so.  At the same time, he was forever excluded by Germans and Austrians due to anti-Semitism.

13.     However much Schenker's love of German culture and Western classical music nurtured his system of music theory, he was never considered a proper Austrian (let alone a German).  He suffered racism firsthand through pervasive anti-Semitism, including from other well-known musicians.  He also experienced racism directly rather than as "implicit bias."

14.     Schenker died in 1935, just three years before the National Socialist annexation of Austria.  His wife, many of his students, and family members were subsequently persecuted and perished in the Holocaust.  Remarkably, at the end of his life, he was full of hope for the power of music to reach across human hatreds and unify humankind. He declared:  "*[M]usic is accessible to all races and creeds alike*.  He who masters such progressions in a creative sense, or learns to master them, produces art which is genuine and great" (emphasis added).  Schenker found some forms of music traditionally associated with black American culture to be superior to contemporary German composers of his day.

## II.    VOLUME 12 OF THE JOURNAL ADDRESSES EWELL'S PLENARY TALK TO THE SMT

15.     Schenker's system of music theory and the serious study of music theory is the very reason for the existence of the Journal and Center.

16.     Until UNT began to single out me and the JSS for "investigation" to suppress viewpoints published in Volume 12 of the JSS, the editorial staff of the Journal included Professor Stephen Slottow, Lecturer Benjamin Graf, and graduate student Levi Walls.  The editorial staff collaborated and felt that a response in an open and honest forum should be made to Professor Ewell's plenary address to the SMT and his blanket denunciation of music theory as "racist."

17.     I attach as **Exhibit A** and **Exhibit B** a true copy of internal correspondence of the editorial staff of the Journal, which I provided to UNT after it convened its so-called "Ad Hoc

Panel" to investigate me and the Journal.  This correspondence documents the collaboration of the editorial staff to publish a symposium of papers responding to Professor Ewell's talk in Volume 12 of the JSS, which appeared on or around July 24, 2020 (the "Symposium").

18.     The purpose of the Symposium, as worked out amongst the editorial staff as well as other members of the MTHE faculty, was to express various unmediated viewpoints by established scholars on Dr. Ewell's condemnation of music theory as "racist" and his idea that classical music perpetuates racial supremacy through what he calls a "White Racial Frame."  The Symposium included five contributions positively disposed towards Dr. Ewell's claims.

19.     A true copy of the Symposium is attached as **Exhibit C**.

20.     Publication of the Symposium was relatively swift by academic standards.  The editorial staff, with the participation of music theory faculty from UNT, worked out a call for papers which was sent through the server list of the SMT, including to Dr. Ewell, on December 31, 2019.  At the very least, Defendant Chair Benjamin Brand had actual knowledge of this effort.  Neither he nor Defendant Dean John Richmond ever expressed to me or any other members of the editorial staff that it was objectionable in any way.  The JSS had received all submissions by mid-March 2020 and delivered them to the UNT Press, which publishes the Journal.  Publication was then delayed by the COVID-19 pandemic, causing Volume 12 to be delayed until on or around July 24, 2020.

21.     All opinions expressed in Volume 12 fall within the mainstream of American discourse and academic thought.

22.     I published an article in the Symposium, titled "A Preliminary Response to Ewell."

23.     In addition to the Symposium, three peer-reviewed articles appeared in Volume 12 of the JSS.  The quality and importance of the scholarship published in these three articles has never been questioned, nor has the review process applied by the JSS editorial staff in approving these or any other peer-reviewed articles for publication.  It is only the Symposium that has been singled out,

and especially my article, for accusations of "racism" because of the viewpoints expressed in opposition to Dr. Ewell's presentation.

24.     My arguments in response to Ewell's presentation draw on my forty years of experience in music theory more generally, the work of Heinrich Schenker specifically, and painstaking work at the intersection of Jewish identity, the arts, and civil liberties.

25.     My critique of Ewell's presentation was an analysis of how race and music are complex and multidimensional, and that "whiteness" (whatever Ewell means by that) is not monolithic, something that is demonstrated by the case of Schenker, the man.  I demonstrate that Schenker's Jewishness complicates any simplistic reduction of "whiteness" to a monolithic concept, and I also explore the extent to which antisemitism may implicitly, if not explicitly, underlie attacks on Schenker's legacy now, just as it has in the past.

26.     Supporters of Professor Ewell's arguments have targeted their harshest criticism at my contribution to the Symposium.  For example, I suggest that music theory is not successfully recruiting black students—something that everyone involved in the Symposium recognized and wants to rectify—because very few black students from an early age are introduced to the appreciation of the classical musical tradition.  I called for additional resources to be dedicated to that effort.  My critics, however, have decried my call for additional resources to be dedicated to the education of underprivileged minorities as "fascist shit."

III.    **THE GENESIS AND PUBLICATION OF THE SYMPOSIUM DEMONSTRATES NO COERCION TO PUBLISH SO-CALLED "RACISM"**

27.     Scholarly disputes over Professor Ewell's ideas would have remained a quaint and perhaps, to most, an unimportant academic debate, but for the mob-like denunciation of me personally and the JSS.  Immediately, on social media and elsewhere, Ewell's supporters began to clamor for me to be censored and fired.  UNT has now backed these calls for censorship with the

6

full weight of its administration and faculty, all of whom are paid by the generous taxpayers of Texas.

## A. Levi Walls' Denunciation

28.     An accurate account of these events should begin in the middle, with Student Editor Levi Walls, who buckled almost the moment that this illiberal and repressive attack on free and open expression began.  Mr. Walls was hired as the Student Editor of JSS on April 22, 2019, effective September 2019, to be supervised by the then outgoing Editor Dr. Benjamin Graf.  In its Report made public on November 25, 2020, and attached as **Exhibit D**, UNT asserts that only my students are appointed editor, insinuating that they are somehow dominated by me.

29.     Yet, as clearly known to the Panel, my department Chair Benjamin Brand, Dean of the College of Music John Richmond, and others, Mr. Walls elected to do his dissertation with me ***over a year after*** he was appointed editor and was completely free to choose another dissertation advisor.  He was selected independently of any decision to work with me on his dissertation.  Up until the public assault on the JSS because of the viewpoints expressed critical of Professor Ewell's presentation, Mr. Walls also did excellent work for the Journal.

30.     Yet on July 27, 2020, Mr. Walls repudiated his own hard work and posted the following public statement on his Facebook page, a true copy of which I attach as **Exhibit E**:

> I have written the following statement in an attempt to share my experiences and shed light on the situation regarding the Journal of Schenkerian Studies. Furthermore, the purpose of this statement is to emphasize how deeply sorry I am for my involvement in the journal….
>
> For the first few months, the job seemed fine, as I got to work with three articles on various topics, typesetting and offering clarity-related edits. However, after Philip Ewell's SMT presentation, Timothy Jackson decided that it was the responsibility of the journal to "protect Schenkerian analysis, [sic.] Although—after serious thought—I essentially agreed with Ewell's talk, it was not up to me what did or did not go into the journal. After seeing some of the responses, I started to become incredibly worried. I gave comments to one author, including that they seemed to devalue other fields of study, that they cherrypicked information to make Schenker appear in a better light, and that they confused cultural appropriation with

7

egalitarianism. Shortly after, I was told by Timothy Jackson (my superior in at least three senses: a tenured faculty member who ran the journal and also served as my academic advisor) that it was not my job to censor people. After this, things continued to go in a direction that I found to be disgusting.

I set up a secret meeting with my department chair, specifically acknowledging that I was coming to him as a whistleblower because I was worried about the potential dangers that the journal posed for the College of Music and for rational discourse in music theory. My warning was not heeded and—although I feel that he had the best of intentions—he expressed reluctance to step in and control the actions of the journal. Furthermore, after my warning that Dr. Jackson was woefully ignorant about politically correct discourse and race relations, he rebutted that "Dr. Jackson did very well in the recent diversity and inclusion workshops."

After this, I feared that I would remain powerless and voiceless … Despite this—as well as my worry about losing the financial means to support my family—I am ashamed to say that I stayed in the position. I continued to do the administrative tasks assigned to me, to typeset the articles, provide basic copyediting, and to correspond with authors about their edits via email. Eventually, I read Timothy Jackson's response, which left me dumbfounded by it's disgusting and harmful rhetoric. Even after that, I feared to do anything other than grin and bear a job that I knew was harmful to UNT, the field of music theory, people of color, and basic human decency. For that cowardice, I am truly sorry.

Sincerely,

Levi Walls

31.     In this denunciation of me (and his own work), Mr. Walls remade himself, in his own words, as someone who understood "politically correct discourse and race relations" and claimed to be a "whistleblower."  UNT's Report reproduces this in even more lurid terms, suggesting that I was somehow a gangster-like figure:

Mr. Walls reported to the panel that he raised concerns to Dr. Jackson about the content of the pieces as well as the quality of writing in February 2020.  He stated that after raising concerns, he was taken into Dr. Jackson's car, where Dr. Jackson told him that it was not his "job to censor people" and was told not to do it again.

**Exhibit D** at JACKSON000216.

32.     The UNT Report also claims, without producing (or apparently consulting) any evidence, that Mr. Walls "said he shared these concerns with [Defendant] Dr. Benjamin Brand (the Division Head of MHTE) and [outgoing editor] Dr. Graf, and then directly with Dr. Jackson.

8

However, he said these concerns were dismissed by Dr. Jackson" and that "Dr. Brand confirmed this meeting with Levi Walls when we interviewed him. Dr. Graf confirmed the existence of email communications between him and Mr. Walls about Mr. Walls' concerns." Id. and n.8.  These emails were never shared with me, nor to my knowledge, with Dr. Slottow, nor with anyone else.

33.     There is no indication these emails were ever shared with the so-called "Ad Hoc Panel" that generated UNT's Report condemning me and the journal of editorial "mismanagement" (that is, publishing unpalatable viewpoints).  But, as will become clear below, evidence did not matter to the Ad Hoc Panel, whose purpose in "investigating" the JSS was to castigate me for publishing viewpoints impermissible to UNT's administration and faculty.

34.     The main problem with Mr. Walls' "whistleblower" account is, of course, that it is counterfactual and contradicted by the paper trail of the Journal's internal correspondence, which was provided to UNT's Panel before it generated the Report.

35.     I requested UNT to allow me to disclose these emails to defend myself against the malicious defamation of Mr. Walls and, now, by UNT and the Panel.  UNT, however, forbids me expressly from doing so on the grounds that Mr. Walls' education records are protected by the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g; 34 CFR Part 99.

36.     On October 14, 2020, the attorney of UNT, Reynaldo Stowers, wrote: "Dr. Jackson is not authorized to disclose information from any UNT student's education record" even though Walls, and now UNT and the Report, have put the substance of these records at issue.  A true copy of Attorney Stower's letter is attached here as **Exhibit F**.

37.     In the meantime, UNT has selectively disclosed personal identifying information concerning Mr. Walls' work on the Journal and made statements about supposed communications with me and others by publishing the Report on its website here:

https://vpaa.unt.edu/sites/default/files/%5Bfile%3Aoriginal%3Atype%3Aname%5D/jss_review_

panel_final_report1.pdf.  By contrast, at the time of this filing, UNT has refused to make public my response to the Report, with its evidence and exhibits, which I submitted on December 18, 2020 (as discussed below).

38.     UNT now uses FERPA as a sword, rather than a shield of confidentiality.  UNT insists that I remain muzzled and cannot show what these individuals said at the time while promulgating statements about me that UNT knows from the evidentiary record to be false.  This is another example of the pretextual nature of UNT's so-called "investigation" of the Journal and of me.  It is also another manifestation of UNT's retaliation against me for publishing unpopular viewpoints in Volume 12.

**B.  What Really Happened: The Symposium Originates in Email Discussions with Mr. Walls**

39.     One obvious falsehood that the internal correspondence of the JSS clearly shows is that I somehow forced my ideas upon Mr. Walls, Dr. Graf, or any other graduate student or junior colleague.  At no time did I censor Mr. Walls' or others' ideas.

40.     Shortly after Professor Ewell delivered his plenary address at the SMT, Mr. Walls asked to meet with me to discuss the presentation.  On November 15, 2019, Mr. Walls wrote:

> I would also be very interested in discussing a particular Schenker paper from SMT. You've likely heard about it, as it caused quite a stir. I was very ambivalent about it because it suggested that analysis that utilizes levels of hierarchy is inherently racist, which strikes me as naive.

**Exhibit B** at JACKSON000005.

41.     Mr. Walls' first impression of Professor Ewell's plenary address was thus not to "essentially agree[] with Ewell's talk" but to consider Ewell naïve.  These emails were provided to the so-called Ad Hoc Panel that UNT assembled to condemn me and the Journal but ignored.

42.     In that first week after Professor Ewell's plenary talk at SMT, I had not yet listened

to his talk and had not attended the SMT conference that year.  I learned about it, among other

sources, from Mr. Walls.  I wrote back to Mr. Walls on November 16, 2019:

> The fact of Schenker's Jewishness, and that of most of his students, came up
> repeatedly in all of these conversations [between me and Schenker's student Felix
> Salzer] in different contexts.  It is of central importance to understanding the
> reception of Schenkerian Analysis first in Europe, in the period of the rise of
> Nazism, and then in early post-war America.  I need to listen to Ewell's talk before
> reacting.  However, if it is indeed true that he does not mention Schenker's own
> Jewish identity, that raises questions.

**Exhibit G** at JACKSON000242.

43.     Mr. Walls laid out his views of Ewell's talk, noting: "I personally carry an

extraordinary amount of white guilt and disgust for the state of my own country's politics.  Despite

these caveats, and the fact that Ewell and I obviously share political views, I find some of his points

to be extremely suspect."  Id. at JACKSON000240.

44.     I responded, mentioning that my children are mixed-race, and we began to discuss

race:

> As you know, my children are also mixed race: 'white' and Asian (Korean).  I put
> 'white' in quotes because many Jews don't consider themselves to be 'white-white.'

A true copy of this email is attached as **Exhibit H**.  I also sent a reference to "Blacks, Whites, and

Anti-Semitism," Lee Sigelman, The Sociological  Quarterly, Vol. 36, No. 4 (Autumn, 1995), pp. 649-

656, discussing Black anti-Semitism in America.  On November 18, 2019 Walls replied:

> Yes, the [Ewell] paper's willful ignorance of Schenker's Jewish identity is indeed
> troubling.  That seems to mark it as implicitly antisemitic, at the very least.  I think
> that, had he limited his criticisms to Schenker the man, it would have been slightly
> less problematic.  But his claim that the entire theoretical world view—and by
> extension those who helped spread it—is racist becomes very problematic when
> we consider the intimate connection between schenkerian [sic] analysis and the
> Jewish identity.  I think that it is possible to address biases in Schenker studies (and
> academia in general) and advocate for increased transparency without demonizing
> an entire methodology (especially one with strong Jewish roots).  Ewell's talk
> certainly failed in that regard.

A true copy of this email is attached as **Exhibit I**.

45.     Clearly these were not the words of a coerced student editor who "agreed" with Ewell's views but was forced to publish views critical of Ewell's presentation against his will.  They were the words of a spirited and freethinking student exploring ideas of race in music theory.  The idea for the symposium grew out of this free exchange of ideas, which was still possible at UNT at that time.

46.     On November 19, 2019, I watched Professor Ewell's plenary speech to the SMT and took up the issue with Mr. Walls again:

> It occurred to me that it might be appropriate for the Journal to solicit responses to Ewell from a  number prominent Schenkerians - if they would be willing to reply - and publish a small collection.  What do you think of this idea?
>
> In my view, some of Ewell's comments about Schenker are an example of intellectual dishonesty.  I believe that this contention should be - politely - proven, and a "Response" to be justified and  appropriate.

**Exhibit A** at JACKSON000008.

47.     My original proposal was to solicit comments on Professor Ewell's plenary address only from Schenkerian scholars, whom he had more or less denounced as "racist" by definition, because they valued Schenker, Western classical music, and Schenker's system of music theory.  Mr. Walls then proposed the following on November 19, 2019:

> I agree that a response in the JSS would be very appropriate. It would be nice to have it for the upcoming issue, although it is very forthcoming (around mid-December).  A response in issue 13 would of course be quite late.
>
> Did you have any particular schenkerians [sic] in mind?  Dr. Graf and I can discuss some candidates tomorrow at our weekly meeting and get requests out as early as tomorrow evening.  Perhaps we should also set a page limit for each respondent, though we have room in the upcoming issue, so I don't think there's any need to be particularly restrictive.

**Exhibit A** at JACKSON000009-10.

48.     This internal correspondence, completely disregarded by the Panel, sheds light on the internal processes of the Journal.  It shows that the Symposium project was born of a joint commitment of Mr. Walls, myself, and the other editorial staff in response to Professor Ewell's blanket condemnation of the Journal's subject matter as "racist."  There was no coercion or domination of Mr. Walls; in fact, he suggested the budding Symposium be included in Volume 12.

**C.  The JSS Solicits Responses from the Entire SMT, Including Professor Ewell**

49.     It is one of the most persistent misrepresentations about the Symposium, from the earliest so-called "petition" of the SMT forward, that Professor Ewell was not invited to participate.  This is simply untrue.  He received the Journal's Call for Papers as did every other scholar in the Society for Music Theory, but he declined to respond.

50.     As the editorial staff of the JSS worked collectively toward the Symposium, we sent the Call for Papers because the JSS and Center has always been committed to open scholarly discourse rather than the repression and censorship of others' viewpoints.

51.     By contrast, Professor Ewell has said in public media: "I won't read them [the Symposium papers] because I will not participate in my own dehumanization."  See e.g., https://dentonrc.com/education/higher_education/a-unt-professor-challenged-claims-of-racism-in-music-theory-and-now-hes-facing-the/article_e7cdab75-c6cb-5972-878d-fea7e2fb8b9d.html.

52.     Sadly, this refusal to engage in open scholarly discourse with colleagues begs the question, what obligation should a Journal have to an individual who not only smears its very existence and subject matter as "institutionalized racism" but also refuses to engage in reasoned discussion?  UNT's Report omits Professor Ewell's refusal to participate in free and open scholarly exchange and instead condemns me and the journal for failing to "invite" Professor Ewell (ignoring that the JSS did invite Ewell along with the entire SMT).  See **Exhibit D** at JACKSON000217-218.

53.     The JSS editorial staff drafted the call for papers inclusively, drawing upon all of the following faculty at UNT, Drs. Ellen Bakulina, Diego Cubero, Andrew Chung, Stephen Slottow, Benjamin Graf, Levi Walls, and myself.

54.     With the exception of Professor Slottow, all of these individuals later signed some form of the petitions calling for my cancellation, the demise of the JSS, and the end of the Center. As the internal correspondence of the Journal shows, however, not one of these individuals, including allies of Dr. Ewell within the MHTE such as Professor Ellen Bakulina, raised the idea that Professor Ewell needed a personalized invitation in addition to the Call for Papers.  It simply did not come up.

55.     Nor did anyone object to the editorial structure of the Symposium or the review process during the entire process, even though there were plenty of opportunities to do so.  As with Levi Walls, those who eventually turned on the JSS did so only after the SMT and UNT began to clamor for its censorship and cancelation.  However, the UNT, its Report, and Chair Brand blame only me for supposed editorial mismanagement.  See e.g., **Exhibit D** at JACKSON000210.

56.     It should also be noted that no standards invoked by the Panel, those of COPE or other authorities, require that a keynote presenter or other subject of a Symposium be personally invited to respond.  The Panel cites no standards requiring personal invitations for such responses. **Exhibit D**.  But the point of the Panel was not to apply objective standards but to condemn me and the Journal for impermissible expression.

57.     In terms of scheduling, the JSS already had three peer-reviewed articles in the pipeline.  Volume 12 was scheduled to be published in March 2020.  The Report expresses no criticism of the review processes concerning these other articles, none of which focused on the issue of Ewell's assertion of a "white racial frame."  It is only the Symposium that aired views critical of Professor Ewell's viewpoint that UNT singled out for criticism.

14

58.     Furthermore, JSS also recently published a "*Festschrift*" in the past, also without peer review.  This appeared in JSS Vols. 9-10, in 2017 and 2018 respectively.  As the Panel was fully aware, *Festschriften*, are common in academic publishing.  A *Festschrift* is a kind of special symposium that provides the scholarly community with an unmediated explanation by its authors of the influence that an elder, recently retired, or recently deceased distinguished scholar, in this case Edward Laufer, has had on their careers and thought.  Importantly, the Panel raised no objection to this practice.  It was only to the Symposium in Volume 12 that drew baseless condemnations of editorial "mismanagement," due to its unacceptable dissent from Professor Ewell's blanket condemnation of Heinrich Schenker and music theory more generally as "racist."

59.     The practice of organizing Symposia of this nature is not uncommon in scholarly journals, as the Panel and UNT are well aware.

60.     By December 5, 2019 we were ready to send out the call for responses to Ewell's plenary talk.  Dr. Bakulina, a professional ally of Professor Ewell's who had invited him to campus to speak, raised the question as to whether we should wait for Volume 13 given the possibility that another version of Ewell's talk might be published later.  I responded, supporting the student-editor Levi Walls' earlier concerns about timing, "if others are interested in responding but wish to wait for the published version of Ewell's talk, then they are welcome to do so, and we should be open to publishing additional responses to that version in a subsequent issue (after the upcoming one) of the Journal of Schenkerian Studies."  **Exhibit B** at JACKSON000080.

61.     Benjamin Graf responded, "I agree with Tim.  We should go forward with the call and be open to publishing more on this matter in future publications."  Id.

62.     As this internal correspondence makes clear, had Professor Ewell ever offered a response as part of open and rational scholarly debate, this would obviously have been treated in the same manner as any other Symposium submission: the JSS would have published it.

15

63.     The JSS collectively decided to submit the call for papers to the entire SMT List.  I

wrote:

> To close out this discussion of the Call [for Papers], I want to draw attention to my
> own comment on Dec. 3: "We still have to address the issue of why the JSS in
> particular is asking for responses.  I thought that Andrew's point was very well
> taken, namely that we don't want to be seen to be disagreeing with Ewell's broader
> point of advocating inclusion of different ethnicities in the discipline of music
> theory, which I assume that we all support and is not contentious, at least here, but
> rather focus on his central example of  racism in music theory, namely on Schenker,
> Schenkerian scholars, and Schenkerian analysis.  As you know, independently I
> came to exactly the same conclusion as Andrew.  We need to judge the call carefully,
> and make it clear that Ewell's hypothesis of Schenkerian racism is the primary focus.

**Exhibit B** at JACKSON000081.

64.     Everyone agreed.  The primary motivation was not to dispute the need to include

underprivileged racial and ethnic minorities in music theory, but to discuss Ewell's denunciation of

Heinrich Schenker and Schenkerians as contributing to "systemic racism" and his charge that

Schenkerian methodology itself was inherently "racist."

65.     The junior members of the editorial staff, namely Dr. Graf and Mr. Walls, acted as

full participants in the editorial process.  Their contributions were valued and adopted.  They were

hardly part of some sort of "resistance" to criticism of Professor Ewell.

66.     I attach a true copy of the Call for Papers as **Exhibit J**, which the JSS sent to the

entire SMT.  I note that the Panel expressed no criticism of its language, the process of its

formulation, or its dissemination to the SMT, including to Professor Ewell.

### D.  "Whistleblower" Levi Walls

67.     The idea that Mr. Walls was some sort of "whistleblower" is, of course, absurd.  It is

a blatant misrepresentation disproven by numerous contemporary emails made available to UNT

and its so-called "Ad Hoc Panel."  UNT and the Ad Hoc Panel knew these representations to be

false.

68.     Indeed, the Report foregrounds the defamatory story that Mr. Walls was somehow forced to accept manuscripts against his will and even "taken into Dr. Jackson's car, where Dr. Jackson told him that it was not his 'job to censor people' and was told not to do it again." **Exhibit D** at JACKSON000216.  This misrepresentation was perpetuated by the Panel and UNT in defiance of plain evidence.

69.     As we began to receive submissions, Mr. Walls wrote on January 9, 2020:

> Would you be so kind as to send us the Ewell responses you have gotten thus far?  Of course, we understand that they may need to be workshopped a bit, so it would be best to get an idea of  what we are working with.  As we discussed previously, the content of responses will be kept confidential until such a time as they are deemed ready.  It goes without saying that there are good ways and bad ways for these responses to be framed, and it will be important for us to screen them for tone and misinformation (***lest we allow the JSS to fall into some of the same pitfalls that Ewell himself fell into***).

A true copy of this email is attached as **Exhibit K** (emphasis added).

70.     I shared responses of Schenkerians critical of Professor Ewell's presentation that I had received at this time, namely those of David Beach, Charles Burkhart, and Nicholas Cook.  All four members of the editorial staff, Professor Slottow, myself, Dr. Graf and Mr. Walls agreed that our task was to edit for tone but not to censor, whether we agreed or disagreed, whether the responses were pro or con.

71.     This is precisely the tenor of Mr. Walls correspondence prior to the supposed coercive meeting he alleges took place in my car.  Furthermore, although I shared the pro-Schenker manuscripts I had received by this time, no one voiced any concerns about them.  They did, however, express agreement.

72.     It was the responsibility of all four members of the editorial board to read all responses, which they received on or around March 9, 2020, prior to formulating the introduction.  The Panel faults me alone for some of the editorial staffs' later claims (of Slottow and Graf) that they did not do their job and review them.  See **Exhibit D** at JACKSON000215-216.  This is

another example of the Ad Hoc Panel's pretextual assault on me personally.  I am faulted for other editors' alleged failure and even for their outright misrepresentations of their editorial work.

73.    My assumption was perfectly reasonable that everyone had done their due diligence in reading all of the responses prior to final submission to UNT Press.  In addition, all members of the editorial staff worked on the introduction to the Symposium, first drafted by Mr. Walls on or around March 9.  Again, however, it is me alone whom UNT pretextually singled out for alleged editorial mismanagement.

74.    After going through the entire editorial correspondence and my personal correspondence with Mr.  Walls, I have found only one example where Mr. Walls and Dr. Graf asked me a question about censoring content.  This email was also provided to the Panel but was ignored.  The reason is obvious: it does not show any intent to censor content favorable to Professor Ewell's presentation.  It does not fit the narrative of "editorial mismanagement" that UNT has determined to fasten upon me.

75.    Mr. Walls and Dr. Graf asked not whether to condemn and exclude allegedly "racist," **pro-Schenker** statements critical of Professor Ewell's presentation but whether we should publish **pro-Ewell, anti-Schenkerian viewpoints**.  In an email dated February 13, 2020, Mr.  Walls states:

> Dr.  Graf and I were wondering what your thoughts were concerning the submissions from Clark, Beaudoin, and Lett. **As you may have seen, these responses are (at least) implicitly anti-Schenkerian.  Despite disagreeing with much of what they have to say Dr. Graf and I think it is important to publish these responses** along with the others that we have received (Wiener, Pomeroy, Wen, Cadwallader, etc.).  We wouldn't want the JSS's account of the debate to appear one-sided, and having a mixture of opinions will lend more credibility to those responses that we do agree with.  Just want to check in with you before we proceed!  And thank you for all your time and effort in getting responses from prominent names in the field!

**Exhibit A** at JACKSON000058 (emphasis added.)  As Mr. Walls makes clear in this email, his concern was with any perceived censorship of **pro-Ewell** contributions, which he expressly

disagreed with.  This was the only context in which censorship came up.  Of course, I agreed with Mr. Walls, as was the consensus among all the editorial staff.  These responses were also published in the Symposium.  See **Exhibit C**.  UNT's misrepresentation of this fact in the Report defies contemporaneous evidence plainly provided to the Panel but ignored.

76.     Again, the issue was not forcing Mr. Walls to accept supposedly "racist," pro-Schenkerian papers against his will.  The issue was to abide by the standards of open scholarship and publish viewpoints even when Mr. Walls disagreed "with much of what they have to say."  The so-called Report turns this discussion on its head.  UNT disregards plain proof in the emails that Mr. Walls obviously misrepresented the facts as they actually occurred in order to remake himself as a "whistleblower" and devotee of Professor Ewell's views.

77.     As this email also makes clear, and contrary to Dr. Graf's statements to the Panel, Dr. Graf had indeed read at least seven of the responses by that date (February 13, 2020).  By later claiming that he had not, Dr. Graf also misrepresented the facts, apparently to distance himself from the supposed contamination of contributions critical of Ewell's talk that UNT now condemns and censors.

**E.  Mr. Walls Meeting with Chair Benjamin Brand Was Not About "Whistleblowing"**

78.     Mr. Walls' public apologia on Facebook claimed that he met with Dr. Brand as a "whistleblower."  I had no way of knowing when this supposedly took place until a much later communication with Dr. Brand on December 1, 2020.  I learned from Brand that this meeting took place on January 13, 2020.  Coincidentally, I myself met with Dr. Brand on January 14, 2020, the day after Walls.  Brand never mentioned his meeting with Mr. Walls the day prior.

79.     There is also another reason Mr. Walls could not have "blown" a "whistle" on January 13, 2020.  The timing simply does not add up.  In particular, at the time of the meeting with Brand (January 13, 2020) and with me in my car (February 7, 2020, discussed below), he could not

have objected to the content of my own response or some of the other pro-Schenker/anti-Ewell responses because he would not have been able to read them until a significantly later date.  The Panel Report does not address the plain evidence of this fact.

80.     Walls had also met Chair Dr. Brand only four days after writing to the editorial staff, "It goes without saying that there are good ways and bad ways for these responses to be framed, and it will be important for us to screen them for tone and misinformation (*lest we allow the JSS to fall into some of the same pitfalls that Ewell himself fell into*)" (emphasis added).  **Exhibit K**.

81.     In a phone conversation on December 1, 2020, Dr. Brand stated, "When I met with him (Levi), he did not claim to have seen them (critical responses to Ewell's presentation).  In fact, he explicitly stated that he had not."  There is obviously no way Mr. Walls could have "blown" the "whistle" on papers he had not even seen.

82.     The detailed timeline of these events is important because it demonstrates that claims to have "protested," "blown the whistle," or "not to have read" critical viewpoints defending Schenker from spurious charges of "ardent racism" were invented after the fact.  These were themselves responses to the extreme pressure for censorship and the condemnation as "racist" of anyone who dared to criticize Professor Ewell's opinions, which UNT has now endorsed as the official policy of a Texas state-funded university.

83.     Neither Mr. Walls nor Dr. Graf saw one of the most pro-Schenker pieces until later, because it came in January 29, 2020 (by Dr. Barry Wiener).  Furthermore, I did not circulate my own draft to all of the other editors until March 5, 2020.  Thus, there is no way that Mr. Walls could have seen the most polemical anti-Ewell pieces, especially my own, prior to the so-called "whistleblower" visit to Brand.  The simplest explanation is the correct one: there was no "editorial mismanagement" to blow the whistle on and no "whistleblower" communications have ever been disclosed.  In

addition, Defendant Chair Dr. Brand never raised this serious issue with me or any other member of the editorial staff, either with Dr. Slottow or with Mr. Walls' immediate supervisor Dr. Graf.

**F.  There Was No Coercive Meeting in My Car with Mr. Walls**

84.     One of the most defamatory allegations in the Report is that I somehow coerced Mr. Walls not to censor submissions with which he disagreed by forcing him into my car.  I did meet with Mr. Walls in my car, on or around Feb. 7, 2020.  This was nothing like how Mr. Walls now presents it.

85.     The incident occurred as follows:  Towards the end of that day, I met Walls by chance in the parking lot opposite the main Music Building at UNT.  It was the week after he had delivered a paper on Berlioz's opera *Les Troyens* at the UNT Graduate Student GAMUT Conference on Feb. 1, 2019.  As is all too common in North Texas, all of a sudden it started raining heavily. Walls and I were both standing right next to my car, so I offered, "why don't we just sit in my car for a minute rather than getting soaked."

86.     Our main purpose was not to discuss the Journal at all, but to speak about Walls' conference presentation the previous Saturday.  Indeed, after Walls finished his masters thesis, I suggested that he study Berlioz's *Les Troyens*, and I had proposed to guide him in an analysis of this opera.  Walls had chosen to work on this project with me over the previous summer.

87.     The only thing that I recall saying to Walls that late afternoon in my car about the Journal was to apologize that I had not yet sent him, Dr. Graf, and Dr. Slottow, all of the submissions that I had been collecting, including my own.  At no time, either before it or subsequently, until his Facebook apologia of July 27, 2020, did Walls express concerns about censoring opinions favorable to Schenker.  At no time did he raise concerns that any of the submissions, pro or con, were "disgusting."

88.     As his email of February 13, 2020 demonstrates, we discussed including, not excluding, anti-Schenker, pro-Ewell viewpoints, and all agreed these should be included.  **Exhibit A** at JACKSON000058.

89.     On February 5, 2020, two days before the meeting in my car, Mr. Walls had also sent Dr. Barry Wiener, one of the other most pro-Schenkerian contributions, a message from the Journal's editorial email, telling him:

> Hi Barry, Congratulations! We like your response and would be happy to include it in the upcoming JSS, with the possibility of some revisions. We've included some comments on your response that you may wish to address. It is not a "must change" situation, but merely some suggested things to think about. ... We can give you a week to make any changes you think appropriate (by midnight on Feb 12) and, of course, feel free to email me about questions/concerns you may have. Don't worry about the 3000 word limit as you make any adjustments, just try to keep it under or near 4000 and it will be fine. Thanks very much! Regards, Levi Walls

**Exhibit B** at JACKSON000098.  Similarly, outgoing editor Benjamin Graf sent Dr. Wiener an email from the official email account of JSS on March 20, 2020, congratulating him:

> Thank you Barry!  I should note that I enjoyed reading your response to Ewell.  I am so glad you could contribute to this volume.
>
> Best
>
> Ben

A true copy of this email is attached as **Exhibit K**.

90.     As known to UNT and the Panel, voluminous emails such as this exchanged amongst the editorial staff make it inconceivable that a subject as explosive as censoring allegedly "racist" or "disgusting" contributions to the JSS would have gone undiscussed.  Furthermore, if Walls had concerns about my "editorial mismanagement," he could have turned to Dr. Slottow, but he never did.

### G.  Publication of the Symposium

91.     The responses in the Symposium in JSS, Volume 12 were ready for publication by approximately mid-March 2020.  I received critiques of my own response from Mr. Walls, Dr. Graf, and Dr. Slottow on or around March 9-11, 2020 and adopted their requested changes prior to final publication.  Due to COVID-19 and other factors, it was not released by UNT Press until around July 24, 2020.  The UNT Press, on which Defendant Provost Cowley serves as a member of the UNT Press Editorial Board, has always provided excellent support for the JSS.  No one raised objections to any of the frontmatter describing the Symposium, the editorial review process, or any other aspect of the Symposium at that time or at any time prior to the Panel issuing its pretextual Report.

92.     After July 24, 2020, however, vicious attacks on the JSS, upon me personally, and upon the Center erupted immediately across social media, especially Twitter.  These attacks were orchestrated by Ewell's supporters within the SMT, and at least partially orchestrated by Professor Ewell.  In particular, professors centered at the University of Michigan, where the leadership of the SMT is on faculty, led the social media charge.  The University of Michigan Department Chair of Music Theory circulated emails encouraging everyone to sign on, as did important figures at other universities such as CUNY, Yale, and Indiana University.

93.     Attached as **Exhibit L** is a true copy of an email that is an example of Ewell's supporters' tactics.  In this case, it is an email circulated by the Chair of Music Theory at the University of Michigan, Alexksandra Vojcic, and President of the SMT, Patricial Hall, dated August 7, 2020.  It is euphemistically captioned, "anti-racism petition" and instructs all faculty and graduate students to "make a stand":

> As I am struggling with excavating many messages, I plead one of you resend the petition supporting SMT statement condemning JSS latest issue.

> I encourage all of you to make a stand. Personally, I am proud of Pat Hall and SMT leadership for taking such a strong stand for the benefit of all.
>
> Sandra

94.     This shows the lengths to which enthusiasts of Ewell's condemnation of music theory as "institutional racism" were willing to go to drum up support for petitions circulating against me, the Journal, and the Center.  It was, without doubt, coercive.

95.     Ironically, UNT's Report, parroting condemnations made by the SMT singles out for special opprobrium JSS's publication of one contribution published anonymously (from a younger scholar).  See **Exhibit C**.  The reason the JSS published a young author anonymously is self-evident: every author has faced coercion and a professional smear campaign orchestrated at the highest levels of academic departments at major United States universities and the SMT.

96.     I have personally received correspondence from other members of the University of Michigan faculty indicating they were coerced to join in the condemnation of me and the JSS and felt exposed if they did not.

97.     I also attach a true copy of an email I have received as **Exhibit M**, sent to me anonymously for reasons that are obvious and explained by the author.  The author perfectly captures the illiberal atmosphere promoted by the supporters of Professor Ewell's views and now endorsed as official state censorship by UNT:

> Hey I'm writing this email anonymously I registered a new email for this. I'm sorry I signed that letter [i.e. the SMT petition] too. I resisted signing it but my advisor is super involved in this (one of the most active people) and everyday he checks that letter to look for people he knows. My name is among one of the last ones. I saw that pretty much everyone signed, so for a moment there I thought "he's got tenure but I still need to build a career" I'm sorry I been feeling like a coward since I signed I'm so weak and I owe you one. I'll remember that I owe you one and I'll make it up to you some day
>
> A few more things:
>
> Even last year at SMT I didn't agree with prof Ewell's plenary but I ended up standing up and clapping anyway. When you're in the middle of a standing ovation

> it's kind of hard to remain seated, especially when you're surrounded by people who know you... I did resist the standing ovation for as long as I could and was probably the last person who stood. Even then people looked at Me all mean. Just saying I do despise myself but not as much as I despise the dozens of people who were involved in the making of the journal but later posted on the internet and blamed it ALL on you. "Jackson made me do it" says the editor the vice editor the authors ... all these people! who are you, the president? Did you kidnap their families? It's ridiculous.

98.    This anonymous comment shows the stifling of free expression, not only as official policy as imposed by UNT but also far beyond UNT.

## IV.   THE AFTERMATH: THE PANEL, THE REPORT, AND MY REPRESSED RESPONSE

### A.  UNT Administration, Faculty, and Graduate Students Endorse the Call for Censorship and Make Retaliation against Me and the JSS an Official State Action of Texas

99.    The very act of publishing a Symposium with any contributions critical of Professor Ewell's accusations of "racism" was immediately denounced as "racist," including by the SMT -- in open violation of its principles of ethics.

100.    An SMT petition calling for my cancelation and the demise of the Center and Journal can be found appended to the Report as Exhibit 2.  **Exhibit D** at JACKSON000225.

101.    At UNT, protecting the anonymity of a young scholar who objects to baseless accusations of "racism" in the pages of JSS is somehow editorial mismanagement.

102.    Some graduate students at UNT quickly circulated a petition likewise condemning free and open scholarly debate as "racist" and calling for me and my life's work to be canceled.  The Report appended this as Exhibit 3.  **Exhibit D** at JACKSON000226-227.  The UNT students' petition demanded, among other things, that UNT:

> Hold accountable every person responsible for the direction of the publication. This will involve recognizing both whistleblowers and those who failed to heed them in this process. This should also extend to investigating past bigoted behaviors by faculty and, by taking this into account, the discipline and potential removal of faculty who used the JSS platform to promote racism. Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable.

25

Id.

103.    Finally, almost the entire faculty of UNT's Division of MHTE retaliated against me,

in clear violation of UNT's rules and policies that safeguard academic freedom.

104.    Seventeen faculty endorsed the graduate student petition.  The Report appended the

faculty's demands for cancelation as Exhibit 4, which basically parrots their students' rhetoric:

> We, the undersigned faculty members of the University of North Texas Division of Music History, Theory, and Ethnomusicology, stand in solidarity with our graduate students in their letter of condemnation of the *Journal of Schenkerian Studies*. We wish to stress that we are speaking for ourselves individually and not on behalf of the university. The forthcoming issue— a set of responses to Dr. Philip Ewell's plenary lecture at the 2019 Society for Music Theory annual meeting (https://vimeo.com/372726003)—is replete with racial stereotyping and tropes, and includes personal attacks directed at Dr. Ewell. To be clear, not all responses contain such egregious material; some were thoughtful, and meaningfully addressed and amplified Dr. Ewell's remarks about systemic racism in the discipline. But the epistemic center of the journal issue lies in a racist discourse that has no place in any publication, especially an academic journal. The fact that he was not afforded the opportunity to respond in print is unacceptable, as is the lack of a clearly defined peer-review process.

> We endorse the call for action outlined in our students' letter (https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view), which asks that the College of Music "publicly condemn the issue and release it freely online to the public" and "provide a full public account of the editorial and publication process, and its failures." Responsible parties must be held appropriately accountable.

> The treatment of Prof. Ewell's work provides an example of the broader system of oppression built into the academic and legal institutions in which our disciplines exist. As faculty at the College of Music we must all take responsibility for not only publicly opposing racism in any form, but to address and eliminate systematic racism within our specific disciplines.

**Exhibit D** at JACKSON000228.

105.    This was an express call for viewpoint discrimination.  It also violated UNT policy.

Based solely on the kinds of accusations made in the petition, the majority of the division faculty, 17

out of 23, signed it, including faculty who had participated in conceiving Volume 12—essentially

condemning their own documented hard work.

106.    The faculty and student petitions were drawn up and signed within just a few days.

And no sooner did the call go out for me to be fired, the Journal to be eliminated, and the Center to

be closed, then Dean John Richmond issued the following statement on July 31, 2020:

> The University of North Texas College of Music has begun a formal investigation
> into the conception and production of the twelfth volume of the Journal of
> Schenkerian Studies, which is published by the Center for Schenkerian Studies and
> UNT Press. The University, the College of Music, and the Division of Music
> History, Theory, and Ethnomusicology reaffirm our dedication to combatting
> racism on campus and across all academic disciplines. We likewise remain deeply
> committed to the highest standards of music scholarship, professional ethics,
> academic freedom, and academic responsibility.

A true copy of this email is attached as **Exhibit N**.

107.    Thus, Defendant Dean Richmond unambiguously announced an investigation of me

and the Journal less than a week after its publication in the name of "combatting racism."

108.    Dean Richmond made clear that this was a direct response to viewpoints expressed

in Volume 12, which had somehow transgressed what he and others perceived as "dedication to

combating racism on campus and across all academic disciplines"—without ever identifying exactly

how or why what was published in Volume was somehow "racist."

109.    The so-called "Ad Hoc Panel" was the result of Dean Richmond's call to action.

110.    I have repeatedly asked UNT to begin grievance proceedings according to UNT's

established policies and rules, including UNT's Policy 06.035 Academic Freedom and Academic

Responsibility, which states that UNT will "assure and protect academic freedom within the

governing framework of the institution, and it is the responsibility of faculty members to ensure that

their actions fall under appropriate academic responsibility…" …"  Policy 06.035 can be found

here: https://policy.unt.edu/policy/06-035.

111.    Policy 06.035 promises "[t]he right to academic freedom and the demands of

academic responsibility apply equally to all faculty members at UNT."  It defines, "Academic

Freedom" as "the right of members of the academy to study, discuss, investigate, teach, conduct

research and/or creative activity, and publish, perform, and/or display their scholarship freely as appropriate to their respective UNT-assigned roles and responsibilities." Among other things, Policy 06.035 requires "respect for diverse personalities, perspectives, styles and demographic characteristics, and maintenance of an atmosphere of civility." Id.

112.    I have repeatedly submitted a grievance to UNT under Policy 02.1400 Reporting Suspected Wrongdoing.  A copy of this policy is promulgated by UNT here:

https://www.untsystem.edu/sites/default/files/documents/View_Chancellor/02.1400_reporting_suspected_wrongdoing_final_pdf_version.pdf.

113.    I have also asked that UNT act on the retaliation and viewpoint discrimination against me according to its Policy 03.1001 Employee Grievances.  This policy can be found here:

https://www.untsystem.edu/sites/default/files/documents/View_Chancellor/03.1001_employee_grievances.pdf.

114.    UNT has ignored all of my requests in violation of UNT's express promises and policies.

115.    Instead, on August 6, 2020 and only a week after Dean Richmond announced the investigation of the Journal for "racism," Defendant Provost Jennifer Cowley announced the formation of what she fashioned the "Ad Hoc Panel."  **Exhibit D** at JACKSON000211.

116.    At the same time, Provost Cowley claimed she "could not identify the policy under which [I] was filing a grievance."  This was clearly false.  My attorney's letter to UNT in response to Dean Richmond's so-called "investigation," dated July 31, 2020, a true copy of which is attached here as **Exhibit O**, directly identified all of the policies above.

117.    I sent this letter of July 31, 2020 to UNT's President, Trustees, Provost Cowley, Dean Richmond, and Department Chair Benjamin Brand.  Id.

118.    Another example of Provost Cowley's pretextual approach to calls for my censorship and condemnation for expressing unpopular viewpoints was her announcement that the "university is investigating neither you nor the Journal of Schenkerian Studies."  Yet in the same letter she announced, "A panel of faculty with experience editing peer-reviewed journals has been appointed to … look into these circumstances [of the Journal's publication]"; yet again she insisted that this was "not to investigate you or the journal."  In other words, UNT was investigating me and the JSS but claiming that it was not doing so and, to this end, constituted a special "Ad Hoc Panel" whose very name indicated that UNT formed the Panel outside the rules, policies, and procedures of UNT. A true copy of Provost Cowley's letter is attached as **Exhibit P**.

119.    As stated in the Report, Provost Cowley appointed the "Ad Hoc Panel" on August 6, 2020 to make good on Dean Richmond's announcement.  **Exhibit D** at JACKSON000211.

120.    I have repeatedly asked UNT to identify what policy or rules the Panel is supposed to apply and what established rules and policies the Journal has allegedly violated.  None have ever been identified.  Thus, UNT ignores its existing policies in favor of pretextual "ad hoc" investigations, the processes and standards for which were made up as it goes along.

121.    The Panel eventually disclosed that it would consult various guidance documents published by the Committee on Publication Ethics ("COPE").  COPE is a serious institution largely targeted at scientific journals whose research results and publications are funded by federal research grants and subject to their regulatory requirements, not humanities journals which must survive without such extensive funding.

122.    UNT has never previously required that the JSS follow COPE guidelines during the twenty years prior to the JSS's expression of unpalatable viewpoints in Volume 12.

123.    To my knowledge, no publication of the UNT Press has ever been subjected to the kind of interrogation that Provost Cowley has now imposed upon the JSS following the call for censorship of Volume 12 in the name of purported anti-racism.

**B.  The Atmosphere of Censorship and UNT's Assault on First Amendment Rights**

124.    The sort of pressure felt by the anonymous correspondent quoted above in **Exhibit M** have been experienced by UNT's own students, and undoubtedly felt by Levi Walls, who could not withstand the organized professional repression of UNT's faculty and his peers.

125.    UNT's music theory faculty held an emergency meeting on July 26, 2020.  As shown above, this resulted in the MHTE's endorsement of calls for the censorship of the Journal and my termination as a professor, which Dean Richmond swiftly acted on.  **Exhibit N**.

126.    Vulnerable as he was, Mr. Walls' attitude suddenly changed within 24 hours.  He posted the public denunciation of me on his Facebook page (the next day, July 27, 2020).  **Exhibit E**.  As soon as UNT made clear that anyone associated with the JSS would be condemned, Mr. Walls fell into line with the faculty's, graduate students', and SMT's bad-faith condemnation of open scholarly discourse.

127.    The email trail he left with the Journal and its editorial staff (and provided to the purported "Ad Hoc Panel") clearly shows the statements made in his public apologia to be untrue.  UNT ignored the evidence, however, and endorsed Walls' defamatory story, including an account of a gangster-like threat I supposedly made to Walls in my car.

128.    The most defamatory and troubling allegation in the Report is that I bullied Mr. Walls to publish material to which he somehow morally objected as "disgusting" and "racist."  Not only do his emails show the opposite to be true; Mr. Walls actions between March and July 2020 further demonstrate the opposite.

30

129.    Between March 2020 and his sudden self-debasement on Facebook in late July 2020, Mr. Walls asked me to be his dissertation advisor.  UNT and the Panel also had direct knowledge of this fact, as well as but not limited to Defendants Brand and Richmond.  At the time the submissions of the Symposium were sent to the press, Levi Walls was not my dissertation student.

130.    Only on May 19, 2020—after the contributions to the Symposium had been vetted and delivered to the UNT Press for final publication—did Mr. Walls ask me to be his dissertation advisor.  A true copy of the email in which he did so is attached as **Exhibit Q**.  Mr. Walls wrote:

> Would you mind signing my degree plan?  Just the "major professor" line near the bottom of the front page. You'll have to do it electronically, which should be straightforward using the "annotate" tool of whatever PDF program it opens in. I attached it. Let me know if it gives you trouble. Thanks!

131.    Until forced to defend myself from Walls' and the UNT's defamatory accusations as indicated above, I have also done everything I could to support Mr. Walls.

132.    If, prior to the publication date in July 2020, Mr. Walls felt that I was guilty of "editorial mismanagement" or otherwise unethical behavior, it is simply inconceivable that he would have asked me to be my faculty advisor on the eve of the appearance of JSS, Volume 12.

133.    Indeed, on July 23, just four days prior to his Facebook posting, Walls wrote me this email about Beethoven:

> Ah, yes, I remember from my first semester at UNT that you were working on the late quartets (op. 131, to be specific).  That was back when I barely knew what Schenkerian analysis was.  Hard to believe it was only 4 years ago!  Let's hope I come just as far in another 4 years.  I'd be interested in seeing your Beethoven work, as with anything.  Studying Beethoven will always be important, even if I don't ever plan on presenting/publishing work on him.  I always feel a little apprehension at doing Beethoven research.  He's been done so much over the years (for good reason, to be sure, as he is without a doubt one of the greatest composers that ever lived).  But still, I inwardly groan a little when I see paper after paper on Beethoven at conferences.  I think you know what I mean, since you were sitting right next to me when I heard you say something to a similar effect in response to a Beethoven paper at TSMT 2018.  But, I'm glad to see what you have to say since, as I said, it's very important to continue studying Beethoven.  Something  new and valuable might come out of it, and it would be an awful shame if Beethoven research stopped  entirely.

A true copy of this email is attached as **Exhibit R**.

134.    No one can seriously contend that this kind of email or Mr. Walls' request to have me supervise his dissertation (which he since revoked) resulted from a "power imbalance" between me and Mr. Walls or demonstrates his "agreement" with Professor Ewell's condemnation of music theory as "institutionalized racism."

135.    Levi Walls sent another email on July 25, 2020, just as social media and emails began to circulate clamoring for my and the Journal's cancelation.  This was a mere two days prior to Walls' taking to Facebook to write out his confessional.  In this email, he denied Professor Ewell's followers' accusation against the JSS, and his first response was confusion:

> I just heard about this. It's very worrying, especially as I don't want my career to be ruined before it properly began. I have a family to take care of now.  I'm also confused about what exactly people want.  The responses were to Ewell's paper.  Did Ewell want to respond to his own  paper?  If he wants to respond to the responses to his paper, then that is perfectly reasonable, and I don't think anyone would have a problem with that.  We could publish something in the upcoming volume, if that is what people want.  But he couldn't have responded to responses that hadn't yet come out...!

A true copy of this email is attached as **Exhibit S**.

136.    This email was probably his last communication as JSS editor, and it again shows that he, like all the editorial staff, was perfectly receptive to Ewell publishing a response (contradicting another malicious untruth circulated by the SMT and other petitions as well as in the Report).

137.    Two days later, Walls came out as a victim and posed as a model "anti-racist" on Facebook, condemning me and the Journal.  **Exhibit E**.

138.    Likewise, Mr. Walls' nominal supervisor, outgoing editor Benjamin Graf took to social media on or around July 26, 2020 to protest his own alleged editorial oppression before the newly ardent Ewellian "anti-racist" and Associate Professor of Music Theory at the University of Cincinnati, Chris Segall, "I appreciate your note about not blaming the young editorial team for the

issues you raise.  As young editors, we indeed have obligations to the advisory board and editorial board.  That is why we wanted to make a clear distinction…"  See **Exhibit S** at PPP.

### C.  The Pretextual Report

139.    Not only has the Panel whitewashed the background to UNT's investigation of the JSS (as expressed in defamatory and counterfactual accusations of "racism"), it also presents its so-called investigation as an investigation of the JSS rather than an investigation and condemnation of me for publishing unpopular viewpoints in the JSS.

140.    This pretext is made perfectly clear, not only in the findings and conclusions of the Report which are frankly defamatory of me and defy plain evidence presented to the Panel; UNT also expressed the pretextual nature of its investigation in the arbitrary process itself.

141.    After ensuring that I could not defend myself by making public the internal correspondence of the Journal—and thus make the internal editorial process more transparent as the Panel itself supposedly advocates—the Panel published its Report to the internet on November 25, 2020.  **Exhibit D**.

142.    This disclosed information directly identifying the student Levi Walls and referring to his educational records as the student editor of the Journal.  In other words, UNT finds it perfectly acceptable to disclose confidential student information so long as this may serve the purpose of condemning me, but UNT forbids me from doing the same to defend myself.  See e.g., **Exhibit F**.

143.    Provost Cowley sent me, and me alone the letter dated November 30, 2020, at true copy of which is attached here as **Exhibit T**.  This letter instructed me alone, "as the Director of the Center for Schenkerian Studies, to develop a plan to address the recommendations by December 18th and submit the plan to Chair Benjamin Brand and Dean John Richmond for review and approval."  Id.

144.     This letter was not sent to the editorial staff, or even to Dr. Slottow or Dr. Graf. This further indicates the pretextual nature of the investigation, which was convened solely for the purpose of falsely condemning me and perpetuating statements known to be false by the Panel, UNT, and the individual Defendants in this case.

145.     The adverse consequences were immediate and make clear that UNT had no intention of waiting for my Response, which Defendant Provost Cowley instructed me to submit by December 18.

146.     More than a week before the deadline to respond to the Report, Dr. Brand called me to a meeting to make clear UNT was removing me from the Journal and eliminating resources previously provided to the Journal and Center to do the work of free and open scholarship.  Chair Brand then sent the following directive on December 11, 2020 as a record of our discussion, a true copy of which is attached as **Exhibit U**.  Among other things, he stated: "I cannot support a plan according to which you would remain involved in the day-to-day operations of the journal, and its editorial process in particular, given the panel's findings of editorial mismanagement at JSS."

147.     On December 18, 2020, I submitted the attached Response, a true copy of which is attached as **Exhibit V**.  I have not attached the extensive documentation submitted with the Response because these are duplicative of the exhibits attached to this Affidavit.  I denied editorial mismanagement of the Journal and made clear that UNT's condemnation of me in the Report was a pretextual assault on academic freedom and free speech in violation of UNT policies.  I also demanded that UNT make my Response public as it had its defamatory Report.

148.     UNT has, at the time of this filing, refused to make public my Response and the evidence contained in it that the Panel disregarded.

149.     The removal of me from the Journal threatens to bring its existence at UNT to an end and threatens to eliminate the Journal entirely.  However, without the resources provided to the

Journal by UNT and due to the harassment and coercion of Mr. Walls, Dr. Graf, and Professor Slottow, whom public pressure and UNT's complete abandonment of support for academic freedom and constitutional speech have forced from the Journal and the Center, the Journal cannot survive. UNT's open support for the illiberal suppression of academic freedom now threatens to prevent the Journal and prevent me from continuing work.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _7_ DAY OF ~~DECEMBER 2020~~, Jan. 2021

Timothy Jackson

Jan. 7, 2021

State of _Texas_ County of _Denton_
Subscribed and sworn before me on _January 7, 2021_ (Date)

(Notary Signature)

MARK DICKSON
NOTARY PUBLIC STATE OF TEXAS
MY COMM. EXP. 02/24/2022
NOTARY ID 12549454-3

35