# EXHIBIT V

***

## RESPONSE TO THE AD HOC PANEL REPORT DIRECTED TO

## DISTINGUISHED UNIVERSITY RESEARCH PROFESSOR OF MUSIC THEORY TIMOTHY JACKSON

### I.   INTRODUCTION

This Response was requested of me, and me alone, by Provost Jennifer Cowley after a Report by an Ad Hoc Panel (Panel), which condemned me (but no one else) of editorial mismanagement.  The Panel convened at the request of Provost Cowley and Dean John Richmond to investigate me and the *Journal of Schenkerian Studies* (JSS or the Journal) and issued various recommendations on November 25, 2020.  The Response is organized as follows:

Section II presents a plan for reorganization of the JSS.  This plan indicates what the JSS should adopt from the Report.  Many suggestions identify common sense practices that the Journal has been following since its inception in 2003.  Nevertheless, the Journal will benefit from codifying these practices and making them more transparent.  In addition, a reform of the editorial structure is clearly necessary now because, unexpectedly and precipitously, the Journal has become the focus of an assault on academic freedom and free expression which render the position of any student or junior faculty editor untenable.  This section also indicates those recommendations of the Panel that the JSS should respectfully decline and that I plan to remain on the editorial board of the JSS, albeit in a role that wards off accusations recently leveled at the JSS of alleged "power imbalance."

Section III, IV and V use solid evidence, that was provided to the Panel but not considered, demonstrating that the Report is itself a pretext for viewpoint discrimination.  I explain why the Report endorses the inaccurate and reductive claims, leading to defamation of me, that have circulated in social media, been promoted by the Society for Music Theory, and officially adopted by the Division of MHTE since the publication of a special Symposium in Volume 12 of the JSS.

Section III summarizes the broader cultural and ideological context surrounding the publication of the Symposium, which should have been, but was not considered by the authors of the Report. This involves the scholarly dispute addressed in Volume 12 between me, along with other Schenkerian scholars, and Dr. Philip Ewell of Hunter College in New York, who has accused scholars dedicated to Schenkerian analysis of "racism."  My opposition to Ewell's view became the catalyst for petitions labeling me, the Journal, and the Center for Schenkerian Studies (Center) as "racist," "institutionalized racism," "whitewashers of music theory," and other malicious slurs.  Next, this Section III explains the genesis of the Symposium.

Section IV then explains the role of Levi Walls, the student editor of the JSS appointed April 22, 2019 (effective September 2019), and who was supervised by the outgoing Editor Dr. Benjamin Graf.  Unfortunately, this must be addressed because of public claims, now perpetuated by the Panel, that I coerced Mr. Walls to publish "racist" content in the JSS.  Rather than rely on social media accounts and hearsay, this section relies on evidence in contemporary emails of the JSS's editorial staff.  This evidence demonstrates that Mr. Walls' claim to be "coerced" and to be some sort of "whistleblower" is simply untrue.

1

JACKSON000273

Section IV follows the editorial process from the first Call for Papers vetted by the Music Theory Faculty Drs. Ellen Bakulina, Diego Cubero, and Andrew Chung and the editorial staff of the Journal, which included Drs. Benjamin Graf, Stephen Slottow, Levi Walls, and myself.  This pays special attention to Levi Walls' and the Panel's accusations of editorial "mismanagement," insinuating that I somehow forced Walls to publish articles against his will and even threatened him in my car.

Section V concludes with the illiberal assault on the JSS as well as with the process followed by the UNT, explaining why this has been a pretext for the suppression of academic freedom.

## II.    A PLAN FOR REORGANIZATION OF THE JSS IS NECESSARY

I propose to adopt four of the main recommendations of the Report as necessary for the survival of the JSS in order to assure that there is no perception of conflict of interests or "power imbalance." Unfortunately, this necessarily eliminates the opportunity for talented graduate students to gain the same experience that the Journal provided in the past, but the current climate has simply rendered this no longer possible.  Before proceeding, I would like to summarize the accomplishments of the student editors of the JSS, in whose footsteps Levi Walls would no doubt have followed but for the current assault on the JSS for publishing unpopular viewpoints.

### A.   The Former Position of Graduate Student Editor

In terms of the history of the Journal, previous student editors were always outstanding graduate students interested in Schenkerian analysis, who could, through the JSS, gain editorial experience and network in the field for the purpose of training and promoting their careers.  They enjoyed considerable leeway, and past editors Jennifer Sadoff Auerbach, Colin Davis, and Benjamin Graf had extensive autonomy.  Levi Walls was somewhat of an exception, but not because he was subordinated to me.  The exception was that Dr. Graf supervised and mentored him in his transition to editor.

This model has been a resounding success.  With the exception of the first student editor, who left academics to start her own successful music business, all editors of the JSS have leveraged their experience to establish themselves in professional positions at universities and colleges, including Drs. Colin Davis, Alex Amato, Benjamin Graf, and (very soon) Dr. Jason Patterson.

Coincidentally, this was explained to the Chair Benjamin Brand on April 2, 2019, attached as **Exhibit A**.  In April 2019, Dr. Slottow and I also raised the issue with Brand that the Journal should depart from this model and keep Dr. Graf as editor.  Brand rejected this idea and insisted that we appoint a new graduate student editor, which led to the selection of Levi Walls.  Dr. Brand did not raise any concerns over "power imbalances" at that time.  This was, of course, before it was made clear that Journal editors would be subjected to remorseless attack and discriminated against on the basis of viewpoints published by the JSS's authors.

### B.   JSS's Plan for Reorganization Necessary to Confront Viewpoint Discrimination

There are several suggestions that the JSS will adopt in the interest of preserving a unique venue for serious Schenkerian scholarship.  Working on such a plan in good faith, I propose the following:

2

JACKSON000274

- The JSS Will Publish Transparent Explanations of the Editorial Process

First, the JSS can certainly benefit by publishing a clear and transparent explanation of its editorial processes on the website of the Journal.  Importantly, however, the Panel had no criticism of any reviewed scholarly publications that have appeared in the JSS since its inception almost 20 years ago.

- The JSS Will Restructure the Editor-in-Chief Position and Editorial Board

It is now absolutely necessary that the editor-in-chief be a full time, tenured faculty member whether at UNT or at an outside institution.

The current controversy demonstrates that the Journal can no longer succeed with a student editor.  It must be protected from attack by the kinds of specious and untrue accusations that have been leveled against it -- and against me.  Only a senior, tenured faculty member can withstand baseless accusations of "editorial mismanagement" when unpopular opinions are published.

I have solicited and received positive responses from the following respected Schenkerian senior scholars at other institutions, who would be happy to collaborate with me on formulating a new Editorial Board: Prof. Wayne Petty (University of Michigan), Eric Wen (Curtis Institute), Prof. Nicolas Meuus (The Sorbonne, Paris), Hedi Siegel (Mannes College of Music), and Prof. Kerri Kotta (Estonian Academy of Music).  I have already extended an invitation to a potential Editor-in-Chief at another university.  With their help and corporation,  we can draw up a new editorial structure for the Journal going forward, which will be published on the website of the journal.

An Editorial Board of senior faculty and an Editor-in-Chief who will likewise be a peer, rather than a student, with strong expertise in the field of Schenkerian theory, will eliminate any controversy concerning "editorial independence."

- Conflict of Interest Statements

The JSS can easily include a "conflict of interest" statement as recommended by the Panel whenever a member of the editorial board or the Editor-in-Chief publishes an article in its pages.  However, every journal of any note publishes articles by members of its editorial board and occasionally by its editor-in-chief.  In fact, it is usually a prerequisite that an editor publish at least at one time or another in a journal in order to be qualified to assume editorial duties.  This is not ordinarily considered a conflict of interest but a demonstration that the editor is knowledgeable and competent to judge publications in the field, particularly in a specialized journal like the JSS.  As the Panel is aware from the evidence provided to it, the JSS never handled publications by members of its editorial board in any special manner different from those of other publications.  But an express statement of how such publications are handled can easily be included in the future to avoid controversy.

- The Journal Will Not Publish Anonymous Contributions in Future

The Report condemns me in particular and by extension, the Journal, for publishing a contribution anonymously.  This is despite the fact that the Panel "acknowledges [this] is ultimately up to the editor" (p. 12)  It is also self-evident why any active scholar in the field of Music Theory cannot

3

publish reasoned arguments defending Schenkerian analysis from spurious charges of "racism" without paying a steep cost in professional reputation. For younger scholars, this would also mean sacrificing career opportunity. The assault on the JSS and the example of Levi Walls' confessional discussed below make this clear. The publication of one junior scholar's response to Professor Ewell was therefore justified.

Yet there can be no serious dispute that the defense of Schenkerian analysis, as in any other field, will succeed best if scholars come forward and engage their peers rather than remain anonymous. Furthermore, although thankfully, the anonymous author in Volume 12 remains anonymous, the JSS should not incur any potential liability or take risks to safeguard the anonymity of authors. The Journal will therefore commit itself to publishing only contributions under the name of the author in the future. The single anonymous contribution in the Symposium, although valuable, was the lone exception to this general policy that the JSS had observed since its inception.

- The Journal Reserves the Right to Engage in Free and Open Exchange of Ideas with or without Peer Review

Peer review of the Symposium in Volume 12 would have undermined its purpose, which was to express the unmediated responses of established scholars to the attack on Schenkerian analysis as so-called "systemic racism" in a plenary talk before the Society for Music Theory by Professor Philip Ewell in November 2019. The JSS has also published a "Festschrift" in the past, also without peer review, for much the same reason: this was to be the unmediated explanation of the influence that the distinguished scholar Edward Laufer had on their careers and thought. Importantly, no objection was raised at that time to this practice. This practice is not uncommon in scholarly journals. The Panel makes a distinction between "commentaries" and "symposia," and suggests that I disingenuously tried to present the Symposium as a Commentary, which is untrue. I have used these labels interchangeably, as well as "responses." The Panel provides no basis in the standards of COPE or other authorities other than their own opinions for this distinction. Given the pretextual nature of the Panel's attack on me, the Journal will not for that reason alone limit itself to such a narrow conception of scholarly discourse.

At the same time, the Panel makes a useful suggestion concerning the Symposium, however. Should the Journal elect to publish a Symposium (or "Commentary") in the future (which will always represent the exception rather than the rule), the JSS should publish a brief explanation for the Symposium and how the process for reviewing submissions are handled. This would serve the interests of transparency as the Panel recommends.

## III.   BACKGROUND TO THE CONDEMNATION OF VOLUME 12 AS "RACIST" OMITTED BY THE PANEL

### A.  Philip Ewell's and the SMT's Condemnation of Schenker, Schenkerians and Schenkerian Theory as "Racist"

On November 7-9, 2019, Dr. Philip Ewell of Hunter College in New York delivered a plenary address at the Society for Music Theory ("SMT"). There was no "response" invited or allowed to this plenary address. Dr. Ewell delivered the plenary address as a policy statement of the SMT.

4

This is ironic, because the SMT's first principle of "ethics" reads as follows: "The Society for Music Theory upholds and promotes the following basic principles of ethical conduct in our profession … freedom of inquiry and the widest possible access to information of use to scholars." (See https://societymusictheory.org/administration/ethics_policy.)

Dr. Ewell's talk, "Music Theory's White Racial Frame," can be found here: https://vimeo.com/372726003. Put simply, Dr. Ewell condemns music theory as "racist" to the extent that it continues to teach the tradition of Western music rooted in the great achievements of composers like Johan Sebastian Bach, Ludwig van Beethoven, Wolfgang Amadeus Mozart, to name only some of the most well-known. There are many others. Because there is an underrepresentation of black students in music theory programs, according to Dr. Ewell this is incontrovertible evidence that this tradition is "racist."

In particular, Ewell singled out Heinrich Schenker, the namesake of the Journal and Center. He contends that Schenker was a "virulent racist." By association, he accuses scholars who have promoted and established the study of Schenker in the United States of being equally "racist;" moreover, he argues, they have conspired to conceal Schenker's racial supremacist views.

Heinrich Schenker was an Austrian Jew born in 1868 into a family of Talmudic scholars in the pale of settlement at the contested periphery of the Austrian and Russian Empires. By the end of his life, he had moved to the Austrian capital city and the capital of classical music, Vienna. Typical of many Jews who traveled this path of assimilation after the European Enlightenment, Schenker had a deep love of German culture. He was undoubtedly a German cultural supremacist and sometimes obnoxiously so. At the same time, he was forever excluded by Germans and Austrians due to anti-Semitism. However much Schenker's love of German culture and Western classical music nurtured his system of music theory, he was never considered a proper Austrian (let alone German). He suffered racism firsthand through pervasive anti-Semitism, including from other well-known musicians. He also experienced racism directly rather than as "implicit bias." He died in 1935, just three years before the National Socialist annexation of Austria. His wife, many of his students, and family members were subsequently persecuted and perished in the Holocaust. Remarkably, at the end of his life, he was full of hope for the power of music to reach across human hatreds and unify humankind. He declared: "*[M]usic is accessible to all races and creeds alike*. He who masters such progressions in a creative sense, or learns to master them, produces art which is genuine and great" (emphasis added).

### B. Volume 12 of the Journal Addresses Ewell's Plenary Talk to the SMT

Given that Schenker and the serious study of music theory is the very reason for the existence of the Journal and Center, the editorial staff of the Journal including Dr. Slottow, Dr. Graf, and Mr. Walls, felt that a response should be made to Professor Ewell's plenary address to the SMT in an open and honest forum. After many suggested revisions, there was a consensus on the text of the Call for Papers. See **Exhibit B** and **Exhibit C**, provided to the Panel.

As a result, the JSS published a Symposium in Volume 12 in July 2020. The Symposium expressed various unmediated viewpoints by established scholars on Dr. Ewell's idea of the "White Racial Frame," including five contributions positively disposed towards Dr. Ewell.

JACKSON000277

As explained in more detail below, publication of the Symposium was relatively swift by academic standards.  The editorial staff with the participation of theory faculty from UNT worked out a call for papers which was sent through the server list of the SMT, including to Dr. Ewell, on 31 December 2019.  All submissions were received by March 2020.  Publication was then delayed by the COVID-19 pandemic.  Volume 12 did not appear until July 24, 2020.

Upon publication, Ewell's supporters immediately began to demand my firing and cancellation of the Journal and Center.  Ironically, however, all opinions expressed in Volume 12 fall within the mainstream of American discourse.  My arguments in response to Dr. Ewell draw on my forty years of experience in music theory more generally, the work of Heinrich Schenker specifically, and painstaking work at the intersection of Jewish identity and the arts.  My critique was an analysis of how race and music are complex and multidimensional, and that whiteness is not a monolithic construct, as in the case of Schenker, I demonstrate that his Jewishness complicates a reductive construction of whiteness and the extent to which antisemitism may implicitly, if not explicitly, underlie such unnuanced constructions of Schenker's legacy.

My contribution in particular was singled out for the harshest criticism for suggesting that music theory is not successfully recruiting black students because very few black students from an early age are introduced to the appreciation of the classical musical tradition.  I called for additional resources to be dedicated to that effort.  My critics, however, condemned my call for additional resources to be dedicated to the education of underprivileged minorities "racist."

## IV. THERE WAS NO COERCION OF THE EDITORIAL STAFF BY ME: THE GENESIS AND PUBLICATION OF THE SYMPOSIUM

The Report attacks my personal and academic integrity, reputation, and freedom chiefly by misrepresenting the facts concerning the publication of the Symposium in Volume 12 of the JSS.  These facts are demonstrated by contemporaneous emails between myself, Dr. Benjamin Graf, Mr. Levi Walls, Prof. Stephen Slottow, and others.  I provided these to the panel, and they are attached here as **Exhibit B** and **Exhibit C**.  Yet this documentation was dismissed by the Panel as "only generally discuss[ing] the special section in Volume 12."  In fact, these emails demonstrate exactly how the Symposium project was handled, and handled responsibly, from Mr. Walls' first suggestions that the JSS host a response to Ewell's keynote address to the SMT through its publication.

The contemporaneous emails conclusively prove the following points on which this Response will now concentrate:

1) There was no "whistleblowing,"

2) There was no coercion or domination of the editorial staff by me,

3) I did not corral Mr. Walls in my car in what is insinuated to have been a gangster-like effort to repress his control of the Journal or his will to censor allegedly "racist" views,

4) Prior to the public assault upon me and the Journal, Dr. Graf, Mr. Walls and the whole editorial staff supported and shared in the open scholarly critique of Professor Ewell,

JACKSON000278

5) Dr. Graf and Mr. Walls changed their position only after the SMT's assault on the project (and UNT's division faculty and graduate students' condemnation of me and JSS, Volume 12),

6) Every member of the editorial board, including the student editor Levi Walls, commented on my contribution, and I accepted their criticism.

## A. Levi Walls' Denunciation

An accurate account of these events should begin in the middle, with Student Editor Levi Walls. Mr. Walls was hired as an Assistant Editor of JSS on April 22, 2019, effective September 2019, to be supervised by the existing Editor Dr. Graf. The Report suggests that only my students are appointed editor, making them somehow dominated by me. Yet, as clearly known to the Panel, Chair Benjamin Brand, and others, Mr. Walls elected to do his dissertation with me *over a year after* he was appointed editor and was completely free to choose another dissertation advisor.

On July 27, 2020, Mr. Walls, posted the following public statement on his Facebook page, which is attached as **Exhibit D**.

> I have written the following statement in an attempt to share my experiences and shed light on the situation regarding the Journal of Schenkerian Studies. Furthermore, the purpose of this statement is to emphasize how deeply sorry I am for my involvement in the journal….
>
> For the first few months, the job seemed fine, as I got to work with three articles on various topics, typesetting and offering clarity-related edits. However, after Philip Ewell's SMT presentation, Timothy Jackson decided that it was the responsibility of the journal to "protect Schenkerian analysis, [sic.] Although—after serious thought—I essentially agreed with Ewell's talk, it was not up to me what did or did not go into the journal. After seeing some of the responses, I started to become incredibly worried. I gave comments to one author, including that they seemed to devalue other fields of study, that they cherrypicked information to make Schenker appear in a better light, and that they confused cultural appropriation with egalitarianism. Shortly after, I was told by Timothy Jackson (my superior in at least three senses: a tenured faculty member who ran the journal and also served as my academic advisor) that it was not my job to censor people. After this, things continued to go in a direction that I found to be disgusting.
>
> I set up a secret meeting with my department chair, specifically acknowledging that I was coming to him as a whistleblower because I was worried about the potential dangers that the journal posed for the College of Music and for rational discourse in music theory. My warning was not heeded and—although I feel that he had the best of intentions—he expressed reluctance to step in and control the actions of the journal. Furthermore, after my warning that Dr. Jackson was woefully ignorant about politically correct discourse and race relations, he rebutted that "Dr. Jackson did very well in the recent diversity and inclusion workshops."

7

After this, I feared that I would remain powerless and voiceless … Despite this— as well as my worry about losing the financial means to support my family—I am ashamed to say that I stayed in the position. I continued to do the administrative tasks assigned to me, to typeset the articles, provide basic copyediting, and to correspond with authors about their edits via email. Eventually, I read Timothy Jackson's response, which left me dumbfounded by it's disgusting and harmful rhetoric. Even after that, I feared to do anything other than grin and bear a job that I knew was harmful to UNT, the field of music theory, people of color, and basic human decency. For that cowardice, I am truly sorry.

Sincerely,

Levi Walls

In this denunciation of me (and his own work), Mr. Walls remade himself, in his own words, as someone who understood "politically correct discourse and race relations" and a "whistleblower." The Report reproduces this in even more lurid terms, suggesting that I was somehow a gangster-like figure:

> Mr. Walls reported to the panel that he raised concerns to Dr. Jackson about the content of the pieces as well as the quality of writing in February 2020. He stated that after raising concerns, he was taken into Dr. Jackson's car, where Dr. Jackson told him that it was not his "job to censor people" and was told not to do it again.

(See p. 8.)  The Panel Report also claims, without producing any evidence, that Mr. Walls "said he shared these concerns with Dr. Benjamin Brand (the Division Head of MHTE) and Dr. Graf, and then directly with Dr. Jackson.  However, he said these concerns were dismissed by Dr. Jackson" and that "Dr. Brand confirmed this meeting with Levi Walls when we interviewed him. Dr. Graf confirmed the existence of email communications between him and Mr. Walls about Mr. Walls' concerns."  See p. 8 and n. 8.  These emails were never shared with me, nor to my knowledge, with Dr. Slottow.

The problem with the Panel's and Mr. Walls' "whistleblower" account is that it is counterfactual and contradicted by the paper trail of the Journal's internal correspondence.  I have asked UNT to allow me to disclose these emails to defend myself against the malicious defamation of Mr. Walls and, now, by the Panel.  UNT, however, forbid me expressly from doing so because Mr. Walls' education records are protected by the Family Educational Rights and Privacy Act.  On October 14, 2020, the attorney of UNT, Reynaldo Stowers, wrote: "Dr. Jackson is not authorized to disclose information from any UNT student's education record" even though Walls, and now the Panel, have put the substance of these records at issue.  See his letter attached here as **Exhibit E**.  Yet in the meantime, the Panel has selectively disclosed personal identifying information concerning Mr. Walls' work on the Journal and made statements about supposed communications with me and others by publishing the Report.  UNT now uses FERPA as a sword, rather than a shield of confidentiality; it insists that I remain unable to defend myself and cannot show what these individuals said at the time.  This is another example of the pretextual nature of the Panel's work and of UNT's retaliation against me for publishing unpopular viewpoints in Volume 12.

JACKSON000280

**B.  What Really Happened: The Symposium Originates in Email Discussions with Mr. Walls**

One obvious falsehood that the internal correspondence clearly shows is that I somehow forced my ideas upon Mr. Walls, Dr. Graf, or any other graduate student or junior colleague.  At no time did I censor Mr. Walls' ideas.

Shortly after Professor Ewell delivered his plenary address, Mr. Walls asked to meet with me to discuss the presentation at the SMT.  On November 15, 2019, Mr. Walls wrote:

> I would also be very interested in discussing a particular Schenker paper from SMT. You've likely heard about it, as it caused quite a stir. I was very ambivalent about it because it suggested that analysis that utilizes levels of hierarchy is inherently racist, which strikes me as naive.

Mr. Walls' first impression of Professor Ewell's plenary address was thus not to "essentially agree[] with Ewell's talk," but to consider Ewell naïve.  These emails are attached to this Response as **Exhibit B** and previously provided to the Panel.

In that first week after Professor Ewell's plenary talk at SMT, I had not yet listened to his talk and had not attended the SMT conference that year.  I learned about it, among other sources, from Mr. Walls.  I wrote back to Mr. Walls on November 16, 2019:

> The fact of Schenker's Jewishness, and that of most of his students, came up repeatedly in all of these conversations [between me and Schenker's student Felix Salzer] in different contexts.  It is of central importance to understanding the reception of Schenkerian Analysis first in Europe, in the period of the rise of Nazism, and then in early post-war America.  I need to listen to Ewell's talk before reacting.  However, if it is indeed true that he does not mention Schenker's own Jewish identity, that raises questions.

See **Exhibit F**.  Mr. Walls then laid out his views of Ewell's talk.  He suggested that we might both agree and disagree, noting: "I personally carry an extraordinary amount of white guilt and disgust for the state of my own country's politics.  Despite these caveats, and the fact that Ewell and I obviously share political views, I find some of his points to be extremely suspect."  See **Exhibit F**.

I responded, mentioning that my children, like Mr. Walls own daughter, are mixed-race, and we began to discuss race:

> As you know, my children are also mixed race: 'white' and Asian (Korean).  I put 'white' in quotes because many Jews don't consider themselves to be 'white-white.'

See **Exhibit G**.  I also sent a reference to "Blacks, Whites, and Anti-Semitism," Lee Sigelman, The Sociological  Quarterly, Vol. 36, No. 4 (Autumn, 1995), pp. 649-656, discussing Black anti-Semitism in America.  On November 18, 2019 Walls replied:

> Yes, the [Ewell] paper's willful ignorance of Schenker's Jewish identity is indeed troubling.  That seems to mark it as implicitly antisemitic, at the very least.  I think

JACKSON000281

> that, had he limited his criticisms to Schenker the man, it would have been slightly less problematic.  But his claim that the entire theoretical world view—and by extension those who helped spread it—is racist becomes very problematic when we consider the intimate connection between schenkerian [sic] analysis and the Jewish identity.  I think that it is possible to address biases in Schenker studies (and academia in general) and advocate for increased transparency without demonizing an entire methodology (especially one with strong Jewish roots).  Ewell's talk certainly failed in that regard.

See **Exhibit H**.  Clearly these were not the words of a coerced student editor who "agreed" with Ewell but was forced to publish views of critical of Ewell against his will.  They were the words of a spirited and freethinking student exploring ideas of race in music theory.  The idea for the symposium grew out of this free exchange of ideas.

On November 19, 2019, I watched Professor Ewell's plenary speech to the SMT and again took up the issue with Mr. Walls again:

> It occurred to me that it might be appropriate for the Journal to solicit responses to Ewell from a  number prominent Schenkerians - if they would be willing to reply - and publish a small collection.  What do you think of this idea?

> In my view, some of Ewell's comments about Schenker are an example of intellectual dishonesty.  I believe that this contention should be - politely - proven, and a "Response" to be justified and  appropriate.

See **Exhibit B**.  My original proposal was to solicit comments on Professor Ewell's plenary address only from Schenkerian scholars, whom he had more or less accused of being racist by virtue of valuing Schenker.  Mr. Walls then proposed the following on November 19, 2020:

> I agree that a response in the JSS would be very appropriate. It would be nice to have it for the  upcoming issue, although it is very forthcoming (around mid-December).  A response in issue 13 would of course be quite late.

> Did you have any particular schenkerians [sic] in mind?  Dr. Graf and I can discuss some candidates tomorrow at our weekly meeting and get requests out as early as tomorrow evening.  Perhaps we should also set a page limit for each respondent, though we have room in the upcoming issue, so I don't think  there's any need to be particularly restrictive.

See **Exhibit B**.  Thus, contrary to the Report, this internal correspondence sheds quite a bit of light on the internal processes of the Journal.  It shows that the Symposium project was born of a joint commitment of Mr. Walls, myself, and the other editorial staff to responding to Professor Ewell's condemnation of the Journal's subject matter as "racist."  There was no domination of Mr. Walls; in fact, he suggested the budding Symposium be included in Volume 12.

JACKSON000282

### C.  The JSS Solicits Responses from the Entire SMT, Including Professor Ewell

It is one of the most persistent misrepresentations about the Symposium, from the earliest so-called "petition" forward, that Professor Ewell was not invited to participate.  In retrospect, it would have perhaps been preferable to invite Ewell personally, but it is simply untrue that he was not invited. He received the Journal's Call for Papers but chose not to respond.  As the editorial staff worked collectively toward the Symposium, we sent the Call for Papers because we felt it would be one-sided to solicit responses only from Schenkerians.  The JSS and Center has always been committed to open discourse rather than the repression and censorship of others' viewpoints.

In the meantime, however, Professor Ewell has said in the media and elsewhere that "I won't read them [the Symposium papers] because I will not participate in my own dehumanization."  See e.g., https://dentonrc.com/education/higher_education/a-unt-professor-challenged-claims-of-racism-in-music-theory-and-now-hes-facing-the/article_e7cdab75-c6cb-5972-878d-fea7e2fb8b9d.html. Sadly, this refusal to engage in open scholarly discourse with colleagues begs the question, what obligation should a Journal have to an individual who not only condemns its very existence and subject matter as "institutionalized racism" but also refuses to engage in reasoned discussion?  In other words, what would have been the point of inviting Professor Ewell, whether personally or not?

As outlined above, the editorial staff drafted the call for papers inclusively, drawing upon all of the following faculty at UNT, Drs. Ellen Bakulina, Diego Cubero, Andrew Chung, Stephen Slottow, Benjamin Graf, Levi Walls, and myself.  With the exception of Professor Slottow, all of these individuals later signed some form of the petitions calling for my cancellation, the demise of the JSS, and Center.  As the internal correspondence of the Journal shows, however, not one of these individuals, including allies of Dr. Ewell within the MHTE such as Professor Ellen Bakulina, raised the idea that Professor Ewell needed a personalized invitation.  It simply did not come up.  Nor did anyone object to the editorial structure of the Symposium or the review process during the entire process, even though there were plenty of opportunities to do so.  As with Levi Walls, those who eventually turned on the JSS, did so only after the SMT and UNT began to clamor for its censorship.

It should also be noted that no standards of COPE or elsewhere *require* that a keynote presenter or other subject of a Symposium be invited to respond.  The Panel cites no standards requiring personal invitations for responses.

In terms of scheduling, the JSS already had three peer-reviewed articles in the pipeline, and Volume 12 was scheduled to be published in March 2020 (about whose publication processes the Report expresses no criticism, but these were not focused on the issue of Ewell's "white racial frame").  By December 5, 2019 we were ready to send out the call.  Dr. Bakulina, a professional friend of Professor Ewell's who had invited him to campus to speak, raised the question as to whether we should wait for Volume 13 given the possibility that another version of Ewell's talk might be published later.  I responded, echoing the student-editor Levi Walls' earlier concerns about timing, "if others are interested in responding but wish to wait for the published version of Ewell's talk, then they are welcome to do so, and we should be open to publishing additional responses to that version in a subsequent issue (after the upcoming one) of the Journal of Schenkerian Studies."  See **Exhibit C**.  Benjamin Graf responded, "I agree with Tim.  We should go forward with the call and be open to publishing more on this matter in future publications."  Id.

JACKSON000283

As this internal correspondence makes clear, had Professor Ewell ever decided to respond to anything published in the JSS, this would have been treated in the same manner as any other Symposium submission and published.

The JSS collectively decided to submit the call for papers to the entire SMT List. I wrote:

> To close out this discussion of the Call [for Papers], I want to draw attention to my own comment on Dec. 3: "We still have to address the issue of why the JSS in particular is asking for responses.  I thought that Andrew's point was very well taken, namely that we don't want to be seen to be disagreeing with Ewell's broader point of advocating inclusion of different ethnicities in the discipline of music theory, which I assume that we all support and is not contentious, at least here, but rather focus on his central example of racism in music theory, namely on Schenker, Schenkerian scholars, and Schenkerian analysis.  As you know, independently I came to exactly the same conclusion as Andrew.  We need to judge the call carefully, and make it clear that Ewell's hypothesis of Schenkerian racism is the primary focus.

See **Exhibit C**.  Again, my comment—which everyone agreed with—shows that the primary motivation was not to dispute the need to include underprivileged racial and ethnic minorities in music theory, but to discuss Ewell's denunciation of Schenker and Schenkerians as contributing to "systemic racism" and his charge that Schenkerian methodology itself was "racist."  Far from presenting themselves as members of some sort of "resistance," junior members of the editorial staff such as Dr. Graf and Mr. Walls were full participants.  Their contributions were valued and, in most cases, adopted.

The Call for Papers is attached as **Exhibit I**, which the JSS sent to the entire SMT.  I note that the Panel expressed no criticism of its language, the process of its formulation, or its dissemination to the SMT, including to Professor Ewell.

### D.  Whistleblower Levi Walls

The idea that Mr. Walls was some sort of "whistleblower" is, of course, a blatant misrepresentation disproven by numerous contemporary emails made available to the Panel, but knowingly perpetuated by the Panel in spite of the evidence.  Indeed, the Report foregrounds this defamatory story that Mr. Walls was somehow forced to accept manuscripts against his will and even "taken into Dr. Jackson's car, where Dr. Jackson told him that it was not his 'job to censor people' and was told not to do it again." (p. 8.)

As we began to receive submissions, Mr. Walls wrote on January 9, 2020:

> Would you be so kind as to send us the Ewell responses you have gotten thus far? Of course, we understand that they may need to be workshopped a bit, so it would be best to get an idea of  what we are working with.  As we discussed previously, the content of responses will be kept confidential until such a time as they are deemed ready.  It goes without saying that there are good ways and bad ways for these responses to be framed, and it will be important for us to screen them for

JACKSON000284

tone and misinformation (***lest we allow the JSS to fall into some of the same pitfalls that Ewell himself fell into***).

See **Exhibit J** (emphasis added.)  I shared responses of Schenkerians critical of Professor Ewell that I had received at this time, namely those of David Beach, Charles Burkhart, and Nicholas Cook.  All four members of the editorial staff, Professor Slottow, myself, Dr. Graf and Mr. Walls agreed that our task was to edit for tone but not to censor, whether responses were pro or con, as they came in.  This is precisely the tenor of Mr. Walls correspondence prior to the supposed "coercive" meeting he alleges took place in my car.  Furthermore, although I shared the pro-Schenker manuscripts I had received by this time, no one voiced any concerns about them.  It was the responsibility of all four members of the editorial board to read all responses, which they all received.  The Panel faults me alone for some (Slottow and Graf) who later claimed that they did not do their job and review them.  But my assumption was perfectly reasonable that everyone had done their due diligence in reading all of the responses prior to final submission to UNT Press.  In addition, all members of the editorial staff worked on the introduction to the Symposium, first drafted by Mr. Walls.  Yet I alone was singled out for alleged editorial mismanagement for these as well.

After going through the entire editorial correspondence and my personal correspondence with Mr. Walls, I have found only one example where Mr. Walls and Dr. Graf asked me a question about censoring content.  This email was also provided to the Panel but was ignored.  The reason seems obvious: it does not show any intent to censor content favorable to Professor Ewell.  It does not fit the narrative of "editorial mismanagement" that UNT has determined to fasten upon me.

Mr. Walls and Dr. Graf asked not whether to condemn and exclude ***pro-Schenker*** statements critical of Professor Ewell but whether we should publish ***pro-Ewell, anti-Schenkerian*** viewpoints.  In his email dated February, 13, 2020, which must have been within days of our meeting in my car, which I will explain briefly below, Mr. Walls states:

> Dr. Graf and I were wondering what your thoughts were concerning the submissions from Clark, Beaudoin, and Lett.  As you may have seen, these responses are (at least) implicitly anti-Schenkerian.  ***Despite disagreeing with much of what they have to say*** Dr. Graf and I think it is important to publish these responses along with the others that we have received (Wiener, Pomeroy, Wen, Cadwallader, etc.).  We wouldn't want the JSS's account of the debate to appear one-sided, and having a mixture of opinions will lend more credibility to those responses that we do agree with.  Just want to check in with you before we proceed!  And thank you for all your time and effort in getting responses from prominent names in the field!

**Exhibit B** (emphasis added.)  As Mr. Walls makes clear in this email, his concern was with any perceived censorship of pro-Ewell contributions, which he expressly disagreed with.  This was the only context in which censorship came up.  Of course, I agreed with Mr. Walls, as was the consensus among all the editorial staff.

Again, the issue was not forcing Mr. Walls to accept pro-Schenkerian papers against his will; the issue was to abide by the standards of open scholarship and publish viewpoints even when Mr. Walls disagreed "***with much of what they have to say***."  The Panel Report turns this discussion on its head, disregarding the proof in the emails that Mr. Walls was obviously misrepresenting the facts

13

as they actually occured.  (As this email also makes clear, and contrary to Dr. Graf's statements to the Panel, Dr. Graf had indeed read at least seven of the responses by that date.  By later claiming that he had not read all of the responses, Dr. Graf was insinuating to the Panel that he had not read contributions critical of Ewell.

### E.  Mr. Walls Meeting with Chair Benjamin Brand Could Not Have Been About "Whistleblowing"

I knew from Mr. Walls' public apologia on Facebook that he claimed to have met with Dr. Brand as a "whistleblower."  I had no way of knowing when until a recent communication with Dr. Brand.  I learn from him that this meeting took place on January 13, 2020.  I myself met with Dr. Brand on January 14, 2020, the day after Walls.  Brand never mentioned his meeting with Mr. Walls the day prior.

Walls therefore met Dr. Brand only four days after he had written to the editorial staff, "It goes without saying that there are good ways and bad ways for these responses to be framed, and it will be important for us to screen them for tone and misinformation (lest we allow the JSS to fall into *some of the same pitfalls that Ewell himself fell into*)" (emphasis added).  In a phone conversation on December 1, 2020, Dr. Brand stated, "When I met with him (Levi), he did not claim to have seen them (critical responses to Ewell).  In fact, he explicitly stated that he had not." So there is no way Mr. Walls could have "blown" the "whistle" on papers he had not even seen.

Mr. Walls and Dr. Graf did not see the first version of one of the most pro-Schenker pieces until later, because it came in January 29, 2020 (by Dr. Barry Wiener), and I did not circulate my own first draft until March 5, 2020.  I bring this up only because there is no way that Mr. Walls could have seen the most polemical anti-Ewell pieces, especially my own, prior to his so-called "whistleblower" visit to Brand.  Why would the chair of the department, Dr. Brand, not raise such a serious issue? The simplest explanation is the correct one: there was no "editorial misconduct" to blow the whistle on and no "whistleblower" communications have ever been disclosed.

Thus, there is also another reason he could not have "blown" a "whistle" to Dr. Brand on January 13, 2020.  The timing simply does not add up.  In particular, at the time of the meeting with Brand (January 13, 2020) and with me in my car (February 7, 2020), he could not have objected to the content of my own response or some of the other pro-Schenker/anti-Ewell responses because he would not have been able to read them until a significantly later date. The Panel Report does not address the plain evidence of this fact.

### F.  The Meeting in the Car

I did meet with Walls in my car, probably on Feb. 7, 2020.  This was nothing like how Mr. Walls now presents it.

The incident occurred as follows: Towards the end of that day, I met Walls by chance in the parking lot opposite the main Music Building at UNT.  It was the week after he had delivered a paper on Berlioz's opera *Les Troyens* at the UNT Graduate Student GAMUT Conference on Feb. 1, 2019.  As is all too common in North Texas, all of a sudden it started raining heavily.  Walls and I were both standing there right next to my car, so I offered, "why don't we just sit in my car for a minute rather than getting soaked."

JACKSON000286

Our main purpose was not to discuss the Journal at all, but to speak about Walls' conference presentation the previous Saturday.  Indeed, after Walls finished his masters thesis on Bertin's opera under my direction, I thought that it would be beneficial for him to study Berlioz's *Les Troyens*, and therefore, I had proposed that he analyze this opera under my guidance.  Walls had chosen to work on this project with me over the previous summer.  In any case, the only thing that I recall saying to Walls that late afternoon in my car about the Journal was to apologize that I had not yet sent him, Dr. Graf, and Dr. Slottow, all of the Responses that I had been collecting, including my own.  At no time during that conversation, either before it or subsequently, until his Facebook apologia of July 27, 2020, did Walls express concerns about censoring opinions favorable to Schenker.  As his email of February 13, 2020 demonstrates, we discussed ***including***, not excluding, anti-Schenker, pro-Ewell viewpoints, and we agreed these ***should be included***.

On February 5, 2020, two days before the meeting in my car, Mr. Walls had also sent Dr. Barry Wiener, one of the other most pro-Schenkerian contributions, a message from the Journal's editorial email, telling him,

> Hi Barry, Congratulations! We like your response and would be happy to include it in the upcoming JSS, with the possibility of some revisions. We've included some comments on your response that you may wish to address. It is not a "must change" situation, but merely some suggested things to think about. ... We can give you a week to make any changes you think appropriate (by midnight on Feb 12) and, of course, feel free to email me about questions/concerns you may have. Don't worry about the 3000 word limit as you make any adjustments, just try to keep it under or near 4000 and it will be fine. Thanks very much! Regards, Levi Walls

See **Exhibit C**.  Given the voluminous emails exchanged amongst the editorial staff, it is simply inconceivable that a subject as explosive as censoring allegedly "racist" contributions would have gone undiscussed.  Furthermore, if he had concerns about my "editorial misconduct," Mr. Walls could have turned to Dr. Slottow, but he never did.

### G.  Publication of the Symposium

The JSS, Volume 12 was ready for publication by approximately mid-March 2020.  Due to COVID-19 and other factors, it was not released by UNT Press until around July 24, 2020.  Vicious attacks on the JSS, upon me personally, and upon the Center erupted immediately.  These attacks were orchestrated by Professor Ewell's supporters in the SMT, especially those centered at the University of Michigan where the leadership of the SMT is on the faculty.  The University of Michigan Department Chair of Music circulated emails encouraging everyone to sign on, as did important figures at other universities such as CUNY, Yale, and Indiana University.

Ironically, the Report sees no reason for publishing one contribution in the Symposium (from a younger scholar) anonymously.  But the reason is self-evident: there was a lot of coercion.  I have personally received correspondence from other members of the University of Michigan faculty indicating they were coerced to join in the condemnation of me and the JSS, and that they felt exposed if they did not condemn all of Schenkerian studies as "racist."

15

JACKSON000287

I attach one email as **Exhibit K**, sent to me anonymously under a pseudonym for reasons explained by the author, reasons that are also self-evident.  The author perfectly captures the illiberal atmosphere promoted by the supporters of Professor Ewell:

> Hey I'm writing this email anonymously I registered a new email for this. I'm sorry I signed that letter [i.e. the SMT petition] too. I resisted signing it but my advisor is super involved in this (one of the most active people) and everyday he checks that letter to look for people he knows. My name is among one of the last ones. I saw that pretty much everyone signed, so for a moment there I thought "he's got tenure but I still need to build a career" I'm sorry I been feeling like a coward since I signed I'm so weak and I owe you one. I'll remember that I owe you one and I'll make it up to you some day

> A few more things:

> Even last year at SMT I didn't agree with prof Ewell's plenary but I ended up standing up and clapping anyway. When you're in the middle of a standing ovation it's kind of hard to remain seated, especially when you're surrounded by people who know you... I did resist the standing ovation for as long as I could and was probably the last person who stood. Even then people looked at Me all mean. Just saying I do despise myself but not as much as I despise the dozens of people who were involved in the making of the journal but later posted on the internet and blamed it ALL on you. "Jackson made me do it" says the editor the vice editor the authors ... all these people! who are you, the president? Did you kidnap their families? It's ridiculous.

This comment shows that coercion that is stifling free expression extends far beyond UNT.

## V.   THE AFTERMATH

### A.   UNT Faculty and Graduate Students Endorse the Society for Music Theory's Call for Censorship

The very act of publishing a Symposium with any contributions critical of Professor Ewell was immediately denounced as "racist," including by the SMT -- in open violation of its principles of ethics.  An SMT petition calling for my cancelation and the demise of the Center and Journal can be found appended to the Report as Exhibit 2.  Ironically, one of the chief complaints is that the Journal published one contribution anonymously, yet this SMT petition was organized anonymously, something the Report declines to mention.

Some graduate students at UNT quickly followed the SMT, circulating a petition likewise condemning free and open scholarly debate as "racist" and calling for me and my life's work to be canceled.  The Report appended this as Exhibit 3.  The UNT students' petition demanded, among other things, that UNT:

> Hold accountable every person responsible for the direction of the publication. This will involve recognizing both whistleblowers and those who failed to heed them in this process. This should also extend to investigating past bigoted

16

behaviors by faculty and, by taking this into account, the discipline and potential removal of faculty who used the JSS platform to promote racism. Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable.

Finally, almost the entire faculty of the Division of MHTE retaliated against me, in clear violation of UNT's rules and policies that safeguard academic freedom. Seventeen faculty endorsed the graduate student petition. The Report appended the faculty's demands for cancelation as Exhibit 4, which basically parrots their students' rhetoric.

This was an express call for viewpoint discrimination and was a violation of UNT policy. Based solely on the kinds of accusations made in the petition, the majority of the division faculty signed it, *including* faculty who had participated in conceiving Volume 12—essentially condemning their own documented record of extensive participation in its realization.

It did not matter that this type of reaction directly violated UNT's policies and rules. Instead, there was a rush to judgement. The faculty and student petitions were drawn up and signed within just a few days. And no sooner did the call go out for me to be fired, the Journal to be eliminated, and the Center to be closed, than Dean John Richmond issued the following statement on July 31, 2020:

> The University of North Texas College of Music has begun a formal investigation into the conception and production of the twelfth volume of the Journal of Schenkerian Studies, which is published by the Center for Schenkerian Studies and UNT Press. The University, the College of Music, and the Division of Music History, Theory, and Ethnomusicology reaffirm our dedication to combatting racism on campus and across all academic disciplines. We likewise remain deeply committed to the highest standards of music scholarship, professional ethics, academic freedom, and academic responsibility

This email is attached as **Exhibit L**. Thus Dean Richmond unambiguously announced an investigation of me and the Journal less than a week after its publication.

Dean Richmond made clear that this was a direct response to the viewpoints expressed in Volume 12, which had somehow transgressed what he and others perceived as "dedication to combating racism on campus and across all academic disciplines"—without ever identifying exactly how or why what was published in Volume was somehow "racist." Rather than protect scholarly debate on these issues or call for evidence, the faculty, Dean Richmond, and UNT's administration all rushed to judgment, calling for me and the Journal to be investigated in the name of "combating" racism. The Ad Hoc Panel was the eventual result of Dean Richmond's "call to action."

I repeatedly asked the university to begin grievance proceedings according to UNT's established policies and rules, including UNT's Policy 06.035 Academic Freedom and Academic Responsibility, which states that UNT will "assure and protect academic freedom within the governing framework of the institution, and it is the responsibility of faculty members to ensure that their actions fall under appropriate academic responsibility…" …" Policy 06.035 also ensures "[t]he right to academic freedom and the demands of academic responsibility apply equally to all faculty members at UNT." It defines, "Academic Freedom" as "the right of members of the academy to study, discuss, investigate, teach, conduct research and/or creative activity, and publish, perform, and/or

display their scholarship freely as appropriate to their respective UNT-assigned roles and responsibilities." Among other things, Policy 06.035 requires "respect for diverse personalities, perspectives, styles and demographic characteristics, and maintenance of an atmosphere of civility."

I have repeatedly submitted a grievance to UNT under Policy 02.1400 Reporting Suspected Wrongdoing and 03.1001 Employee Grievances. These were all ignored in violation of UNT's policies.

On July 7, 2020, approximately a week after Dean Richmond announced the investigation of the Journal for "racism," Provost Cowley announced the formation of what became the "Ad Hoc Panel." At the same time, she claimed she "could not identify the policy under which [I] was filing a grievance." This was clearly false, as my attorney's letter to UNT in response to Dean Richmond's investigation, dated July 31, 2020 and attached here as **Exhibit M**, directly identified all of the policies above. These policies were all expressly identified in the letter of July 31, 2020, which I sent to UNT's President, Trustees, Provost Cowley, Dean Richmond, and Department Chair Benjamin Brand.

Another example of Provost Cowley's pretextual approach to calls for my censorship was her confusing announcement that the "university is investigating neither you nor the Journal of Schenkerian Studies." And yet, in the same letter, she announced, "A panel of faculty with experience editing peer-reviewed journals has been appointed to … look into these circumstances [of the Journal's publication of Volume 12]"; yet again insisted that this was "not to investigate you or the journal." In other words, UNT was investigating me and the JSS but claiming that it was not doing so and, to this end, constituted a special "Ad Hoc Panel" whose very name indicated that it was formed outside the rules, policies, and procedures of the UNT. Provost Cowley's letter is attached as **Exhibit N**.

As stated in the report, Provost Cowley appointed the "Ad Hoc Panel" on August 6, 2020 to make good on Dean Richmond's announcement. Although I have repeatedly asked UNT to identify what policy or rules the Panel is supposed to apply and what established rules and policies the Journal has allegedly violated, none have ever been identified. Thus, UNT ignores its existing policies in favor of an "ad hoc" investigation, the processes and standards for which are being made up as it goes along.

The Panel eventually disclosed that it would consult various guidance documents published by the Committee on Publication Ethics ("COPE"). COPE is a serious institution largely targeted at scientific journals whose research results and publications are funded by federal research grants and subject to their regulatory requirements, not humanities journals which must survive without such extensive funding. UNT has not required that COPE guidelines be followed during the twenty years prior to the JSS's expression of unpalatable viewpoints in Volume 12. In fact, no publication of the UNT Press has yet, to my knowledge, been subjected to the kind of interrogation that Provost Cowley has now imposed upon the JSS.

Of course, as discussed above, some suggestions made by the Panel *are* clearly sensible and necessary, but not for the reasons the Panel suggests in its defamatory attack on me for alleged "editorial misconduct." Changes to the Journal are now ***absolutely*** necessary precisely to protect academic freedom and also prevent pretextual abrogation of that right.

JACKSON000290

### B.  The Atmosphere of Censorship

This is no doubt the sort of pressure felt by the anonymous correspondent quoted above have been experienced by UNT's own students like Levi Walls, who could not stand up to this organized professional repression.  UNT's music theory faculty held an emergency meeting on July 26, 2020, which resulted in their endorsement of calls for the censorship of the Journal and my termination as a professor, which Dean Richmond swiftly acted on.

Vulnerable as he was, Mr. Walls' attitude suddenly changed.  He posted the public denunciation of me on his Facebook page (the next day, July 27, 2020) in addition to other false and defamatory statements.  The email trail he left with the Journal and its editorial staff (and provided to the Panel) clearly shows the statements made in his public apologia to be untrue.  The Panel ignored this evidence and endorsed Walls' defamatory story.  As soon as UNT made clear that anyone associated with the JSS would be censured, Mr. Walls joined in the faculty's, graduate student', and SMT's bad-faith condemnation of open scholarly discourse.

The most defamatory and troubling allegation in the Report is that I bullied Mr. Walls to publish material to which he somehow morally objected.  Not only do his emails show the opposite to be true; Mr. Walls actions between March and July 2020 also demonstrate the opposite.

And what had Levi Walls done between March 2020 and his sudden change of position on Facebook?  On May 19, 2020—after the contributions to the Symposium had been vetted and delivered to the UNT Press for final publication—he asked me to be his dissertation advisor in the following email attached as **Exhibit O**.  Mr. Walls wrote:

> Would you mind signing my degree plan?  Just the "major professor" line near the bottom of the front page. You'll have to do it electronically, which should be straightforward using the "annotate" tool of whatever PDF program it opens in. I attached it. Let me know if it gives you trouble. Thanks!

UNT, especially Department Chair Benjamin Brand (the recipient of the supposed "whistleblower" complaint), knew this.  Until forced to defend myself from Walls' and the UNT's defamatory accusations as indicated above, I have also done everything I could to support Mr. Walls.

If, prior to the publication date in July 2020, Mr. Walls felt that I was guilty of "editorial misconduct" or otherwise unethical behavior, it is simply inconceivable that he would have asked me to be his faculty advisor on the eve of the appearance of JSS, Volume 12.  Indeed, on July 23, just four days prior to his Facebook posting, Walls wrote me this email about Beethoven, which was included in the materials provided to the Panel:

> Ah, yes, I remember from my first semester at UNT that you were working on the late quartets (op. 131, to be specific).  That was back when I barely knew what Schenkerian analysis was.  Hard to believe it was only 4 years ago!  Let's hope I come just as far in another 4 years.  I'd be interested in seeing your Beethoven work, as with anything.  Studying Beethoven will always be important, even if I don't ever plan on presenting/publishing work on him.  I always feel a little apprehension at doing Beethoven research.  He's been done so much over the years (for good reason, to be sure, as he is without a doubt one of the greatest composers that ever

JACKSON000291

lived).  But still, I inwardly groan a little when I see paper after paper on Beethoven at conferences.  I think you know what I mean, since you were sitting right next to me when I heard you say something to a similar effect in response to a Beethoven paper at TSMT 2018.  But, I'm glad to see what you have to say since, as I said, it's very important to continue studying Beethoven.  Something  new and valuable might come out of it, and it would be an awful shame if Beethoven research stopped  entirely."

See **Exhibit P**.  No one can seriously contend that this kind of email or Mr. Walls' request to have me supervise his dissertation (which he has since revoked) resulted from a "power imbalance" between me and my student.

Levi Walls sent another email on July 25, 2020 as social media and emails to the College of Music called for my and the Journal's cancelation.  This was a mere two days prior to Walls' taking to Facebook.  In this email, he denied Professor Ewell's followers' accusation against the JSS, and his first response was confusion:

> I just heard about this. It's very worrying, especially as I don't want my career to be ruined before it properly began. I have a family to take care of now.  I'm also confused about what exactly people want.  The responses were to Ewell's paper. Did Ewell want to respond to his own  paper?  If he wants to respond to the responses to his paper, then that is perfectly reasonable, and I don't think  anyone would have a problem with that.  We could publish something in the upcoming volume, if that is what people want.  But he couldn't have responded to responses that hadn't yet come out...!

See **Exhibit Q**.  This email was probably his last communication as JSS's editor, and it shows that he was perfectly receptive to Ewell publishing a response (contradicting another malicious untruth circulated by the SMT and other petitions).  Two days later, he tried to present himself as a victim and ardent "anti-racist" on Facebook.

### C.  The Pretextual Nature of the Report

Not only has the Panel whitewashed the background to UNT's investigation of the JSS (the charge of "racism"), it also presents its investigation as an investigation of the Journal rather than an investigation and condemnation of me.  This pretext has been made perfectly clear, not only in the findings and conclusions of the Report which are frankly defamatory of me; it is also expressed in the process itself.

After ensuring that I could not defend myself with the internal correspondence of the Journal—and make the internal process more transparent as the Panel itself supposedly advocates—the Panel published its Report to the internet on November 25, 2020.  This disclosed information directly identifying the student Levy Walls and referring to his educational records as the student editor of the Journal.  In other words, UNT finds it perfectly acceptable to disclose confidential student information if used to condemn me, but UNT forbids me from doing the same to defend myself.

Provost Cowley sent me, and me alone the letter attached here as **Exhibit R**, dated November 30, 2020.  This was not sent to the editorial staff, or even to Dr. Slottow or Dr. Graf.  This further

JACKSON000292

indicates the pretextual nature of the investigation, which was convened for the purpose of falsely condemning me.

Provost Cowley's letter instructed me alone, "as the Director of the Center for Schenkerian Studies, to develop a plan to address the recommendations by December 18th and submit the plan to Chair Benjamin Brand and Dean John Richmond for review and approval."

The adverse consequences were immediate and make clear that UNT had no intention of waiting for my Response.  More than a week *before* the deadline to respond to the Report, Dr. Brand called me to a meeting.  He then sent the following directive on December 11, 2020, attached as **Exhibit S**. Among other things, he stated: "I cannot support a plan according to which you would remain involved in the day-to-day operations of the journal, and its editorial process in particular, given the panel's findings of editorial mismanagement at JSS."

### D.  Next Step

Rather than forcing me to resign from the Editorial Board of the JSS, which I founded, I look forward to a positive outcome of this ad hoc process by implementing the points recommended by the Panel as agreed to in Section II of this Response and by UNT making this Response public and undertaking to make good on the guarantees in its policies to ensure that the faculty and administration protect academic freedom and free expression.  It is in that spirit of carrying on the Journal's and the University's important work, both nationally and internationally, that I submit this Response.

Sincerely,

Timothy L. Jackson
Distinguished University Research Professor of Music Theory
Professor of Music Theory
College of Music
University of North Texas

JACKSON000293