## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033 |
| | § | |
| LAURA WRIGHT, MILTON B. LEE, | § | |
| MELISA DENIS, MARY DENNY, | § | |
| DANIEL FEEHAN, A.K. MAGO, | § | |
| CARLOS MUNGUIA, AND G. | § | |
| BRINT RYAN, each in their official | § | |
| capacities as members of the board of | § | |
| regents for the University of North | § | |
| Texas System; RACHEL GAIN; | § | |
| ELLEN BAKULINA; ANDREW | § | |
| CHUNG; DIEGO CUBERO; | § | |
| STEVEN FRIEDSON; REBECCA | § | |
| DOWD GEOFFROY-SCHWINDEN; | § | |
| BENJAMIN GRAF; FRANK | § | |
| HEIDLBERGER; BERNARDO | § | |
| ILLARI; JUSTIN LAVACEK; PETER | § | |
| MONDELLI; MARGARET | § | |
| NOTLEY; APRIL L. PRINCE; | § | |
| CATHY RAGLAND; GILLIAN | § | |
| ROBERTSON; HENDRIK | § | |
| SCHULZE; VIVEK VIRANI; AND | § | |
| BRIAN F. WRIGHT, | § | |
|     *Defendants*. | § | |

---

## DEFENDANTS' MOTION TO DISMISS

---

Defendants, Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, and G. Brint Ryan, each in their official capacities as members of the Board of Regents for the University of North Texas ("UNT") System ("Board Defendants"); Rachel Gain; Ellen Bakulina; Andrew Chung; Diego Cubero; Steven Friedson; Rebecca Dowd Geoffroy-Schwinden; Benjamin Graf; Frank Heidlberger; Bernardo Illari; Justin Lavacek; Peter Mondelli; Margaret Notley; April L. Prince; Cathy Ragland; Gillian Robertson; Hendrik Schulze; Vivek Virani; and Brian F. Wright ("Defamation Defendants") (collectively "Defendants"), file this Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and respectfully show as follows:

## I.     INTRODUCTION

Professor Timothy Jackson is a UNT faculty member who brings this lawsuit against members of the UNT System Board of Regents claiming retaliation in violation of the First Amendment to the U.S. Constitution, as well as against seventeen professors and a graduate student teaching fellow claiming defamation. This controversy started as a debate among music scholars about the views on race of Heinrich Schenker, a late 19th century/early 20th century music theorist. After a professor from another university, Philip Ewell, delivered a talk and published a paper that highlighted Schenker's use of racist language and examined the impact of such views on Schenker's music theories, Jackson—a devotee of Schenker—organized a response. He invited music scholars to submit papers responding to Ewell as part of Volume 12 in UNT's Journal of Schenkerian Studies (the "Journal").

2

What might have been an elevated discourse on an esoteric topic went a different direction when Jackson included ad hominem attacks on Ewell in his article contribution in the Journal. Among other things, Jackson accused Ewell of "African American anti-Semitism." Jackson did not identify any of Ewell's comments he viewed as anti-Semitic but instead supported his charge on the grounds that Schenker was Jewish, Ewell is black, and "American Blacks were increasingly more inclined to hold anti-Semitic prejudices" as evidenced in part by "the obnoxious lyrics of some hip hop songs." Jackson wrote of the need in "the African American Community [to] establish[] different priorities" because "few grow up in homes where classical music is profoundly valued." Such commentary resulted in broad condemnation, including in statements from the executive board of the Society of Music Theory, nearly all of Jackson's colleagues in UNT's Division of Music History, Theory, and Ethnomusicology ("MHTE"), and a group of MHTE graduate students. The graduate student statement named Jackson specifically and characterized his comments as "racist."

In response to questions raised about the practices used in publication of Volume 12 of the Journal, UNT appointed an ad hoc panel (the "Panel") to review the conception and production of the volume to understand whether the standards of best practice in scholarly publication were observed and whether strategies could be recommended to improve the editorial processes. The Panel found several structural and managerial flaws and editorial shortcomings associated with the Journal generally and with the publication of Volume 12 in particular. The Panel recommended changes and Jackson broadly agreed with the proposed changes.

As set forth below, all of Jackson's claims must be dismissed. Jackson lacks standing to bring his First Amendment retaliation claims against the Board Defendants and the claims are barred by sovereign immunity. Further, Jackson suffered no adverse employment action and thus has failed to state a claim for First Amendment retaliation. His defamation claims against the Defamation Defendants must be dismissed because supplemental jurisdiction does not attach to those claims and because the Defamation Defendants' statements are protected by the First Amendment as nonactionable opinions.

## II.   FACTUAL BACKGROUND

**A.   Professor Ewell's discussion of Heinrich Schenker.**

On or around November 9, 2019, Professor Phillip Ewell of Hunter College of the City University of New York delivered a plenary address at the Society for Music titled "Music Theory's White Racial Frame." Dkt. 1 ¶30-31 (citing video of Ewell's address available at https://vimeo.com/372726003). He also published a paper based on the address. *Id.* (citing Ewell's paper available at https://mtosmt.org/issues/mto.20.26.2/mto.20.26.2.ewell.pdf); Exhibit A. In his address and paper, Ewell argued for rethinking and restructuring some of the institutions in the field of music theory "in hopes of increasing the number of persons of color in music theory, thus enriching the racial diversity of our field." Exhibit A at 2.

Ewell discussed Schenker at length, whom Ewell views as an example of music theory's "white racial frame." *Id.* at 6–16. Specifically, Ewell quoted Schenker on the topics of German nationalism and race, including Schenker writing:

4

- about the "Slavic half-breed" and stating "There will be no peace on earth until . . . the German race crushes the Slavs on the grounds of superiority";

- that the League of Nations "placed the filthy French in such oafish control of Germany's Saarland, and permitted in the region occupied by them the ignominy of its black troops—the advance party of its genitalitis [i.e., genitals], of the flesh of its flesh, of the cannibal spirit of its spirits";

- that the "white race" will need to adapt in order to "annihilate" the Japanese "animals"; and

- that "'Race' is good, 'inbreeding' of race, however, is murky."

Exhibit A at 8–9.

Ewell argued that "[h]ow exactly Schenker's racism seeped into his musical theories is a question ripe for exploration" and that "we who teach Schenkerian techniques . . . must present Schenker's work to our students in full view of his racist beliefs, and let our students decide what to do with that information." *Id.* at 13, 15.

**B.    Professor Jackson's Response to Ewell.**

In late 2019, Professor Jackson decided to organize response to Professor Ewell's address to the Society of Music Theory. Dkt. 1 ¶44. The Journal sent a call for papers to members of the Society for Music Theory. *Id.* On July 24, 2020, the Journal published fifteen pieces that were largely critical of Ewell's views. Jackson authored one of the articles entitled "A Preliminary Response to Ewell." *See* Dkt. 1-4 at 33–42.

5

Jackson's article created controversy by personally attacking Ewell. Specifically, Jackson accused Ewell of being anti-Semitic for criticizing Schenker. Dkt. 1-4 at 38–39. Jackson did not identify any comments he viewed as anti-Semitic and acknowledged that Ewell never mentioned that Schenker was Jewish. *Id.* at 33. Instead, Jackson supported his charge of anti-Semitism on the grounds that Schenker was Jewish, Ewell is black, and "American Blacks were increasingly more inclined to hold anti-Semitic prejudices." *Id.* at 38–39. On that premise alone, Jackson described Ewell's comments critical of Schenker's racist remarks as an example of "African American anti-Semitism" and "Black-on-Jew attacks." *Id.* at 38. Jackson characterized Ewell's discussion of Schenker as "part and parcel of the much broader current of Black anti-Semitism," including "the obnoxious lyrics of some hip hop songs." *Id.*

In addressing the lack of diversity in the field of music theory, Jackson argued that Ewell "is uninterested in bringing Blacks up to 'standard' so they can compete." *Id.* at 39. He suggested that "African Americans have the right to embrace their own culture as precious—i.e. rap music, hip hop, etc.—and study and teach it in universities, so that the products of the 'defective,' 'racist' White culture—i.e., classical music—can be shunted aside" but that the real solution lies in part with "the African American Community establishing different priorities" because "few grow up in homes where classical music is profoundly valued." *Id.* at 40. Jackson concluded by accusing Ewell of "demagoguery," and "racism." *Id.* at 41.

## C.    Public Condemnation of the Journal of Schenkerian Studies.

The Journal was broadly condemned for its response to Ewell. Among the early public condemnation from outside UNT included a statement issued by the Executive Board of the

6

Society of Music Theory issued on July 29, 2020. Dkt. 1 at ¶54 (citing Dkt. 1-5 at 19). The statement condemned the "anti-Black statements and ad hominem attacks on Phillip Ewell." *Id.* It asserted that the symposium "failed to meet the ethical, professional, and scholarly standards of our discipline." *Id.* It further stated that "[a]s reported by participants, the journal's advisory board did not subject submissions to the normal processes of peer review, published an anonymously authored contributions, and did not invite Ewell to respond in a symposium of essays that discussed his own work." *Id.*

Around the same time, graduate students at UNT circulated a statement echoing the concerns of the Executive Board of the Society of Music Theory. Dkt. 1 at ¶55 (citing Dkt.1-5 at 20–26). The graduate student statement accused the Journal of "platforming . . . racist sentiments" in response to Dr. Philip Ewell's plenary address. *Id.* The statement also characterized the actions of Jackson as "particularly racist and unacceptable." *Id.* On or about July 27, Defamation Defendant Rachel Gain, a graduate student and teaching fellow, published the statement on her twitter feed. *Id.*

On July 31, 2020, almost all of Jackson's colleagues in the Division of Music History, Theory, and Ethnomusicology—seventeen in all—signed a letter critical of the Journal's response to Ewell. Dkt. 1 at ¶57 (citing Dkt. 1-5 at 22–23). The statement described the volume as "replete with racial stereotyping and tropes, and includes personal attacks directed at Dr. Ewell." *Id.* The statement echoed the concerns about the professional and scholarly standards of the response raised in both the Society of Music Theory statement and the graduate students' statement. *Id.* It stated that the "epistemic center of the journal issue lies in a racist discourse that has no place in

any publication, especially an academic journal." *Id.* The statement further endorsed "the call for action outlined in our students' letter . . . which asks that the College of Music 'publicly condemn the issue and release it freely online to the public' and 'provide a full public account of the editorial and publication process, and its failures.' " *Id.*

### D.    The Ad Hoc Panel review of the Journal's Symposium.

On July 31, 2020, John W. Richmond, dean of the College of Music at the University of North Texas, issued a statement that the College of Music "has begun a formal investigation into the conception and production of the twelfth volume of the Journal of Schenkerian Studies, which is published by the Center for Schenkerian Studies and UNT Press." Dkt.1 ¶58. On August 6, 2020, Dr. Jennifer Cowley, the university Provost and Vice President for Academic Affairs, sent an email to UNT faculty members who were to serve on an ad hoc review panel (the "Panel") that described the Panel's charge:

> The university has appointed a five-member multidisciplinary panel of University of North Texas faculty experienced in the editing and production of scholarly journals. The panel members, who are outside the College of Music, will examine objectively the processes followed in the conception and production of volume 12 of the Journal of Schenkerian Studies. The panel will seek to understand whether the standards of best practice in scholarly publication were observed, and will recommend strategies to improve editorial processes where warranted. Upon completion of its investigation, the panel will issue a report to UNT Provost Jennifer Cowley. The report will be made public.

Dkt. 1-5 at 18.

Between September 1 and October 15 of 2020, the Panel interviewed a total of eleven individuals who had knowledge about the production of Volume 12, as well as the general editorial and review processes employed by the journal. Dkt. 1-5 at 5. Those individuals included the

Journal's most recent editors, members of the editorial advisory team (including Jackson), representatives of UNT press, the Division Head of MHTE, and the Dean of the UNT College of Music. *Id.* The Panel structured it's review around three issues: (1) whether the journal's editorial team subjected the submissions in Volume 12 to a process of peer review consistent with the standards of best practice in scholarly publication; (2) the circumstances surrounding the journal's publication of an anonymously authored contribution; and (3) the circumstances surrounding the Journal's decision not to invite Ewell to respond. *Id.* at 6.

In reviewing the Journal's managerial structure and general review process, the Panel found that the managerial structure typically includes a graduate student editor and an "editorial advisory board" comprised of Jackson and another professor, who provide "guidance" for the journal, and the editorial board is made up of scholars in the field who are often asked to review manuscripts. Dkt. 1-5 at 7. Historically, all the editors of the Journal have been students of Jackson. *Id.* Those interviewed by the Panel reported being uncomfortable in making decisions and recommendations that ran counter to the preferences of Jackson, their major faculty advisor. *Id.*

The Panel found a "structural flaw in the power disparity" between the Journal's editor and the editorial advisor, Jackson. *Id.* at 11. The other editorial advisor, Professor Stephen Slottow, acknowledged that "this 'power imbalance' was a major problem with the journal." *Id.* Both of the editors interviewed reported feeling unable to voice their concerns about the editorial process in general and that this was especially true for Volume 12. *Id.* at 11–12. The student editor who worked on Volume 12's response to Ewell reported to the panel that he raised concerns to Jackson about

the content of the pieces as well as the quality of writing but his concerns where dismissed by Jackson who told him that it was not his job to "censor people." *Id.* at 10.

The Panel determined that the Journal lacked any written procedure to ensure that transparent review processes are conducted and that regarding Volume 12, "there appears to have been no peer or complete editorial review of the pieces published." *Id.* at 12–14. The Panel found that the Journal had no clear procedures to ensure that potential conflicts of interest in the review process are avoided regarding editor or editorial advisor, like Jackson, self-publishing in the Journal. *Id.* at 12. The Panel concluded that the review of, and criteria for inclusion for, the articles in Volume 12 did not meet "an established or accepted criterion for judging publishable merit in a reputable academic journal." *Id.* at 14.

Regarding the publication of an anonymous article and the decision not to invite Ewell to respond to the pieces in Volume 12, the Panel also found shortcomings. The Panel concluded that the reasoning behind publishing an anonymous article should have been communicated through an editorial note. *Id.* The panel also found that it is the general practice in academic journals that when there are specific sections of a journal that are devoted to discussing a particular author's works, the author whose work is being discussed is generally invited to provide a rejoinder. *Id.* at 15. The Panel determined, however, there is no indication that the Journal editorial team intended on inviting Ewell to provide such a rejoinder in the initial planning for Volume 12. *Id.* at 11, 15. Both Jackson and Slottow told the panel "that they believed that since Dr. Ewell had been given an uninterrupted opportunity to express his viewpoints at the SMT conference, commentators on Dr. Ewell's talk should also have the opportunity to express their views freely." *Id.* at 11. Those

involved in the Journal discussed inviting Ewell to respond in the Journal's next volume, "[h]owever, that was not part of the original plan and was only considered as an option once the controversy over the contents of Volume 12 escalated." *Id.*

The Panel recommended that the Journal continue but that it should implement necessary reforms, including: (1) changing the editorial structure; (2) making clear and transparent all editorial and review processes; (3) defining clearly the relationship between the editors of the journal and the editorial board, MHTE, and the UNT Press. *Id.* at 15–16. The Panel recommended that the changes be implemented before another volume is published. *Id.* at 16.

**E.     Jackson's Agreement with the Panel Recommendations.**

On November 30, 2020, Cowley sent Jackson a letter instructing him to develop a plan to address the recommendations of the Panel. Dkt. 1 ¶ 59. Jackson responded by submitting a proposal that adopted the main recommendations of the Panel. *See* Dkt. 1-23. He agreed that the Journal should publish transparent explanations of the editorial process. *Id.* at 4. He agreed that the Journal should restructure the editor-in-chief position and editorial board. *Id.* This restructuring would adopt the Panel's recommendation that the editor-in-chief not be a student but a tenured faculty member "whether at UNT or at an outside institution." *Id.* Jackson agreed that the Journal should include a "conflict of interest" statement as recommended by the Panel whenever a member of the editorial board or the Editor-in-Chief publishes an article in its pages. *Id.* Jackson confirmed that the Journal will not in the future publish anonymous contributions. *Id.* Finally, Jackson proposed that should the Journal publish a "symposium" in the future, it should publish an

explanation for the symposium and how the process for reviewing submissions were handled in order to serve the interests of transparency the Panel commended. *Id.* at 5.

### III.   STATEMENT OF THE ISSUES

1.   Whether Jackson has standing for his First Amendment retaliation claims against the Board Defendants. (pp. 13–16.)

2.   Whether Jackson's First Amendment retaliation claims against the Board Defendants are barred by sovereign immunity. (pp. 16–19.)

3.   Whether Jackson has failed to state a claim for First Amendment retaliation. (pp. 19–21.)

4.   Whether the Court lacks, or should decline to exercise, supplemental jurisdiction over Jackson's defamation claims against the Defamation Defendants. (pp. 21–23.)

5.   Whether Jacksons has failed to state a claim for defamation because the Defamation Defendants' statements were constitutionally protected expressions of opinions. (pp. 23–27.)

### IV.   STANDARD OF REVIEW

Federal Rule of Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). When the court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). A motion to dismiss pursuant to Rule 12(b)(1) is analyzed under the same plausibility standard as a motion to dismiss under Rule 12(b)(6). *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *see also infra*. The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming v. U.S.*,

281 F.3d 158, 161 (5th Cir. 2001).

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While the Court must accept all factual allegations as true, the Court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

## V.   BOARD DEFENDANTS' MOTION TO DISMISS

### A.   Jackson lacks standing to sue the Board Defendants.

Standing is an indispensable element of federal court jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must show: (1) an injury-in-fact that is (2) fairly traceable to the defendant's challenged action (causation) and that is (3) redressable by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). All three requirements are "an indispensable part of the plaintiff's case," and the party seeking to invoke federal jurisdiction bears the burden to establish them. *Lujan*, 504 U.S. at 561. Here, Jackson fails to establish all three requirements.

13

1.      **Jackson's alleged harm does not establish an injury-in-fact.**

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal quotation marks omitted). "'[S]tanding is not dispensed in gross'; a party must have standing to challenge each 'particular inadequacy in government administration.'" *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357-58 & n. 6 (1996)); *see also* U.S. Const. art. III, § 2, cl. 1.

"Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). "Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id.* (internal quotation marks and citations omitted). For an alleged future injury to support standing to seek equitable relief based on past conduct, a plaintiff must demonstrate that "there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Here, Jackson's First Amendment retaliation claim rests entirely on past events: (1) the commissioning of the ad hoc panel to review the publication practices of a UNT journal; (2) the issuance of the Panel's report; and (3) the alleged "decision to block" Jackson from involvement in the Journal of Schenkerian Studies based on that report.[1] Dkt.1 at ¶63. Jackson does not allege facts to show any ongoing or

---

[1] As Jackson's declaration makes clear, he was never removed from the Journal and

future injury.

Jackson's request for an injunction against unspecified future "adverse actions" does not demonstrate the existence of a future injury because he pleads no facts to satisfy the "imminence requirement" by showing a "substantial risk" any such unnamed injuries will occur. *Stringer*, 942 F.3d at 720; *see also Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 (5th Cir. 1998) (noting that the plaintiff "has alleged only a single, past statutory violation and does not assert any likelihood that he will be subjected to a similar violation in the future"). Having identified no future harm to be enjoined, Jackson seeks "nothing more than an injunction to 'follow the law.'" *See Does 1–7 v. Round Rock Ind. Sch. Dist.*, 540 F. Supp. 2d 735, 745 (W.D. Tex. 2007) (citing *Lyons*, 461 U.S. at 105). "[S]uch an injunction is inappropriate," *id.*, and reveals that he can identify no imminent threatened injury. He fails to satisfy the injury prong for standing.

### 2.   Jackson's alleged harm is neither traceable to, nor redressable by, the Board Defendants.

Jackson claims injuries arising from the Panel's review of the publication practices of UNT's Journal of Schenkerian studies. Jackson pleads no facts, however, to show that the Board Defendants are involved with the Journal or the Panel's activities. Jackson's alleged injuries are not traceable to the Board Defendants nor can the Board Defendants redress any claimed injury. *See Stringer*, 942 F.3d at 720 ("The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries."). And as previously discussed, past injuries are not redressable through the declaratory and injunctive relief Plaintiff

---

remains as before a member of its editorial board. Dkt. 1-1 at ¶4.

seeks against the Board Defendants.[2] Jackson fails to satisfy the traceability and redressability prongs for standing.

Because Jackson fails all three requirements for standing, his First Amendment retaliation claims against the Board Defendants must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

**B.** **Sovereign immunity bars Jackson's claims against the Board Defendants.**

Even if Jackson had standing to bring his claims against the Board Defendants, the Court should dismiss his claims for lack of subject-matter jurisdiction because Jackson's claims are barred by sovereign immunity. An official-capacity suit against a state officer is a suit against the state, and the official is entitled to the state's sovereign immunity absent a clearly stated waiver or consent to suit by the State of Texas or valid abrogation by Congress.[3] *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Sovereign immunity squarely applies to the official-capacity claim brought here against the Board Defendants. Plaintiffs may seek to avoid sovereign immunity by invoking the *Ex parte Young* doctrine, which provides a limited exception for claims seeking prospective injunctive relief, 209 U.S. 123 (1983), but that limited exception does not apply here.

---

[2] The Board Defendants are sued in their official capacities and are thus immune from monetary damages.

[3] While the Supreme Court has "sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity' . . . [as] convenient shorthand," the phrase is "something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). For the sake of consistency and accuracy, this brief will utilize the phrase "sovereign immunity" and will internally alter quoted material to follow this convention.

For *Ex parte Young* to apply, three general criteria must be satisfied: (1) a "plaintiff must name individual state officials as defendants in their official capacities," *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); (2) the plaintiff must "allege[ ] an ongoing violation of federal law," *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); and (3) the relief sought must be "properly characterized as prospective," *id.* The *Ex parte Young* doctrine "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011).

The Board Defendants are not proper defendants under *Ex Parte Young*. "In conducting [the] *Ex parte Young* analysis, [the court] first consider[s] whether the plaintiff has named the proper defendant or defendants." *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019). Jackson pleads no facts to show that the Board Defendants have any role with the Journal or the Panel's review and recommendation, nor whether campus officials act on those recommendations. Jackson thus fails to plead facts to show that the Board Defendants are "state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. at 437.

Likewise, even if the Board Defendants were proper parties under *Ex parte Young*, Jackson fails to allege any *ongoing* violation of his rights. *Cantu Servs., Inc. v. Roberie*, 535 F. App'x. 342, 345 (5th Cir. 2013) (holding that *Ex parte Young* requires Plaintiff to plead an "ongoing violation" as opposed to a "one-time, past event."). As previously discussed, *supra* Part A., Jackson complains of past events only. The *Ex parte Young* doctrine requires, however, that a Plaintiff identify "a

17

continuing violation of federal law" because "compensatory or deterrence interests are insufficient to overcome the dictates of [State sovereign immunity]." *Green v. Mansour*, 474 U.S. 64, 68, 106 (1985); *see also Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020) (finding that plaintiff failed to overcome immunity where "the investigation and SOAH proceedings forming the basis of the allegations in this case are completed" and the "injunctive relief sought focuses on past behavior but does not allege an 'ongoing violation of federal law.'").

Finally, Jackson does not seek relief that falls within the *Ex parte Young* exception. The *Ex parte Young* doctrine does not permit declarations regarding past conduct. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("[T]he [*Young*] exception is narrow: It applies only to prospective relief, [and] does not permit judgments against state officers declaring that they violated federal law in the past."). Because Jackson alleges only past violations, his request for declaratory relief is improper. And the only injunctive relief Jackson requests is to enjoin the Board Defendants from taking any future "adverse action" against Jackson. Dkt. 1 ¶76. Jackson's request to enjoin future unspecified actions does not describe permissible prospective relief. *Spec's Family Partners, Ltd.*, 972 F.3d at 681 (finding improper under *Ex parte Young* an injunction prohibiting officials from repeating various acts plaintiff alleged violated its rights). Again, the vagueness of Jackson's request for injunctive relief merely reveals that he can identify no ongoing violation of federal law.

Moreover, to the extent Jackson's requested injunction would require the Board Defendants to take affirmative action on discretionary matters, such relief exceeds the limits of the *Ex parte Young* exception to sovereign immunity. *Richardson v. Texas Secretary of State*, 978 F.3d

220, 242 (5th Cir. 2020) (holding that *Ex parte Young* does not authorize a court "to compel officers to take affirmative official actions that are discretionary.").

Because Jackson's First Amendment claim against the Board Defendants is barred by sovereign immunity, the claim must be dismissed for lack of jurisdiction pursuant to Rule (12)(b)(1).

## C.    Jackson fails to state a claim for First Amendment retaliation because he suffered no adverse employment action.

To state a claim for First Amendment retaliation, Jackson's allegations must establish the following: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the speech precipitated the adverse employment action. *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016). This motion challenges the first element.

The Fifth Circuit has explained that for purposes of a First Amendment retaliation claim, "adverse employment actions" include "discharges, demotions, refusals to hire, refusals to promote, [] reprimands," and in some instances, transfers. *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (citing *Pierce v. Tex. Dep't of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1149–50 (5th Cir. 1994)). The Fifth Circuit has "declined to expand the list of actionable actions," *id.* (quoting *Bennefield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998)), and has never applied the broader Title VII definition of "adverse employment action" to First Amendment retaliation cases.[4]  Indeed, the court has expressly held that the following types of actions "are *not* adverse

---

[4]  *See Gibson v. Kilpatrick*, 734 F.3d 395, 400 n.4 (5th Cir. 2013), *cert. granted, judgment vacated on other grounds*, 573 U.S. 942 (2014); *Depree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009).

19

employment actions: (1) mere accusations or criticism; (2) investigations; (3) psychological testing; (4) false accusations; and (5) polygraph examinations that do not have adverse results for the plaintiff." *Id.* at 157–58 (citations omitted). In the University setting, courts in the Fifth Circuit are even less likely to find employment decisions to be actionable because the Fifth Circuit:

> ha[s] been particularly reluctant to interfere with decisionmaking in the academic context. Many of the decisions made at schools and universities—such as decisions 'concerning teaching assignments, pay increases, administrative matters, and departmental procedures'—are not the kinds of adverse actions that 'rise to the level of a constitutional deprivation' under [Fifth Circuit] jurisprudence.

*Oller v. Roussel*, 609 F. App'x 770, 773 (5th Cir. 2015) (quoting *Dorsett v. Bd. of Trs. For State Colls. & Univs.*, 940 F.2d 121, 123 (5th Cir. 1991)).

In *Breaux*, the plaintiffs complained of multiple adverse employment actions, including investigations that were conducted against them, criticisms, public reprimands (subsequently withdrawn by their employer), psychological and polygraph testing, suspension (with pay), and a (non-punitive) transfer to another department. *Breaux*, 205 F.3d at 151–55, 164. The jury found for the plaintiffs, but the Fifth Circuit reversed and rendered judgment against the plaintiffs. *Id.* at 151, 164. The court held that all the actions alleged by the plaintiffs "do not, either individually or collectively, constitute adverse employment actions." *Id.* at 164.

If the laundry list of actions in *Breaux* does not rise to the level of an adverse employment action as a matter of law, then certainly none of events about which Jackson complains qualify as adverse employment actions. UNT's review of the practices of a journal that it publishes and that

---

It is far from clear that the statutory standard for Title VII retaliation, *see* U.S.C. § 2000e-3(a), even *could* carry over to whether government action has "abridge[ed] the freedom of speech," U.S. Const. amend. I.

bears its name is not an adverse employment action. *Breaux*, 205 F.3d at 157–58 (holding that "investigations" are not actionable). Nor is the Panel's report stating the findings of that investigation, even if the report contains "criticisms" of the journal or those involved in publishing Volume 12. *Id.*; *see also Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997) (noting that "mere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment."). And Jackson certainly cannot complain about the review and its findings as being adverse when he himself endorses the implementation of the Panel's main recommendations. Finally, to the extent that Jackson claims his department chair threatened to block his future involvement in the journal, Dkt. 1 at ¶60-61, that is also not actionable under Fifth Circuit precedent. Indeed, a threat of termination is not actionable, much less an alleged threat of removal from an advisory role in a UNT publication. *See Breaux*, 205 F.3d at 159 (holding that "[s]ome benefit must be denied or some negative consequence must impinge on the Plaintiff's employment before a threat of discharge is actionable.").

Because Jackson's allegations do not establish that he suffered an adverse employment action, his First Amendment retaliation claim against the Board Defendants must be dismissed pursuant to Rule 12(b)(6).

## VI.   DEFAMATION DEFENDANTS' MOTION TO DISMISS

### A.   The Court lacks, or should decline to exercise, supplemental jurisdiction over Jackson's defamation claims against the Defamation Defendants.

Jackson claims jurisdiction over his state-law defamation claims pursuant to Section 1367. Section 1367 provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form a

part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Claims are so related to the original claims that they form part of the same case or controversy when they "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966).

Even if a court has supplemental jurisdiction pursuant to Section 1367(a), it has discretion to decline supplemental jurisdiction under Section 1367(c) based on the statutory factors set forth therein and on the common law factors of judicial economy, convenience, fairness, and comity. *Enochs v. Lampasas County*, 641 F.3d 155, 159 (5th Cir. 2011). The Court may decline jurisdiction if: (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

Section 1367(a) does not confer supplemental jurisdiction because Jackson's defamation claims and First Amendment retaliation claims do not "derive from a common nucleus of operative fact." *Gibbs*, 383 U.S. at 725. Jackson's state-law claims are brought against entirely different defendants than his constitutional claim and "the events that allegedly trigger the [Defamation Defendants'] potential liability for the defamation claims occurred on different dates and are completely separate from the events that allegedly trigger [the Board Defendants'] liability for the constitutional claims." *Torres v. El Paso Police Dep't*, No. EP20CV00149DCGATB, 2020 WL 4726999, at *6 (W.D. Tex. Aug. 14, 2020).

Additionally, the elements of Jackson's First Amendment retaliation claim "are completely separate and distinct from the elements of the defamation claims" so facts needed to prove the defamation claim "would offer no insight into the facts needed to prove the constitutional claim." *Id.; see also Taylor v. District of Columbia*, 262 F.Supp.2d 25, 29 (D.D.C. 2009) (supplemental jurisdiction not conferred when "[t]he event that trigger[ed] liability for [the defamation claim] and [constitutional claims were] completely separate."); *Singh v. George Washington Univ.*, 368 F. Supp. 2d 58, 72 (D.D.C. 2005) (finding no supplemental jurisdiction over state-law defamation claim because facts needed to prove defamation claim "would offer no insight" into facts needed to prove the federal claim) *vacated on other grounds*, 508 F.3d 2097 (D.C. Cir. 2007). Finally, while Jackson's federal and state claims may share some background information, that is not the same as "operative facts." *Burgess v. Omar*, 345 F. Supp. 2d 369, 370-72 (S.D.N.Y. 2004) (no supplemental jurisdiction existed because "while facts relevant to one claim might provide background with respect to the other, more is required.").

Regardless, the Court should decline to exercise supplemental jurisdiction because the defamation claims—against eighteen different defendants—substantially predominate over Jackson's First Amendment claim. And if the Court dismisses that constitutional claim, as urged in this motion, then the basis for declining supplemental jurisdiction is that much more compelling. Jackson's defamation claims should be dismissed pursuant to Rule 12(b)(1).

## B.     Jackson fails to state a claim for defamation because the Defamation Defendants' statements were constitutionally protected expressions of opinion.

 "Both the U.S. Constitution and the Texas Constitution robustly protect freedom of speech . . .[and] also impose substantive limits on defamation law." *Dallas Morning News, Inc. v.*

*Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) (internal quotations marks and citations omitted). "Among these limits, to avoid the threat to free speech that unrestrained defamation liability poses, the U.S. Constitution 'imposes a special responsibility on judges whenever it is claimed that a particular communication is [defamatory].'" *Id.* (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984)). Judges must be sure to "confine the perimeters of any unprotected category [of speech] within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp.*, 466 U.S. at 505.

Under Texas law, "statements that are not verifiable as false cannot form the basis of a defamation claim." *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794 (Tex. 2019) (quoting *Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013)). In distinguishing between fact (verifiable as false) and opinion, the court's inquiry will "focus on a statement's verifiability." *Id.* at 795 (citing *Bently v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). To be actionable, the statement must be "provable as false" based on "a core of objective evidence." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–21 (1990). In other words, the requirement is satisfied if the alleged defamatory statement is "subject to empirical verification." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 697 (11th Cir. 2016). Further, "the 'entire context in which [a statement] was made" must be analyzed to determine whether a verifiable statement of fact is nonetheless an opinion for purposes of defamation." *Tatum*, 554 S.W.3d at 640-41 (quoting *Bently*, 94 S.W.3d at 581). "The question of whether a statement is non-actionable opinion is a question of law." *Id.*

An alleged defamatory statement is generally not provable as false "when it labels the plaintiff with a term that has an imprecise and debatable meaning." *Coral Ridge Ministries Media,*

*Inc. v. Amazon.com, Inc.*, 406 F.Supp.3d 1258, 1276 (M.D. Ala. 2019) (finding the meaning of the term "hate group" to be so "debatable, loose and varying" that labeling the plaintiff church as one is "insusceptible to proof of truth or falsity." (quoting *Buckley v. Littell*, 539 F.2d 882, 894 (2nd Cir. 1976)). The requirement that defamatory statements be "objectively capable of proof or disproof" safeguards important free speech interests:

> [I]nsofar as a statement is unverifiable, the First Amendment is endangered when attempts are made to prove the statement true or false. Lacking a clear method of verification with which to evaluate a statement . . . the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject.

*Ollman v. Evans*, 750 F.2d 970, 981 (D.C. Cir. 1984) (en banc).

Jackson complains that statements accusing him of "racist" actions and "platforming . . . racist sentiments" are defamatory. Dkt. 1 ¶¶65-70. He is incorrect. Any accusations of racism leveled against Jackson necessarily contain the type of "loosely definable, variously interpretable statement[s]" made in the context of "political, social or philosophical debate" that are not actionable as defamation. *Ollman*, 750 F.2d at 987. Indeed, Jackson appears to adopt a nuanced meaning of the term "racism" when he argues against its application to Schenker's writings and explicitly applies it to Ewell's. *Compare, e.g.,* Dkt. 1-4 at 37 (Jackson refusing to label as "racist" Schenker's writings he characterizes instead as "pseudo-scientific and philosophical speculations") *with* Dkt.1-4 at 41 (Jackson accusing Ewell of "racism").[5]

---

[5] An obvious tension would exist should Jackson need to argue that accusing Ewell of "racism" is constitutionally protected speech, but the same accusation leveled against him is not. Whether Jackson's remarks about Ewell were defamatory are not currently before the Court.

As for Jackson's article, reasonable minds might believe that he deployed racial stereotypes and tropes when he characterized Ewell as engaging in "Black-on-Jew attacks" that are "part and parcel of the much broader current of Black anti-Semitism"; when he invoked "obnoxious lyrics of hip hop songs"; when he wrote about the need of the African American Community to change "priorities" to "bring[] Blacks up to 'standard' so they can compete"; or when he argued that "a fundamental reason for the paucity of African American women and men in the field of music theory is that few grow up in homes where classical music is profoundly valued, and therefore they lack the necessary background." Dkt. 1-4 at 38–40. While Jackson may opine that the language he used to attack Ewell was not racist, the opposite opinion was broadly voiced both within and outside UNT. Because there is no objective test to determine that Jackson's article was devoid of "racist" sentiments, the viewpoint that it contained such sentiments is not "provably false" and must "receive full constitutional protection" from Jackson's defamation claim. *Milkovich*, 497 U.S. at 20. That result is well supported in the caselaw.

Courts across the country consistently hold that accusations of "racism" or similar statements are not actionable as defamation. *E.g.*, *Cummings v. City of New York*, No. 19-cv-7723, 2020 WL 882335, *21 (S.D.N.Y Feb. 24, 2020) (holding that terms "racist" and "racism" appearing in news article describing teacher's actions were nonactionable as "pure statements of opinion based on disclosed facts."); *Edelman v. Croonquist*, No.09-1938, 2010 WL 1816180, *6 (D.N.J. May 4, 2010)("The defendant's characterization of her in-laws as racists is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation."); *Coral Ridge Ministries Media*, 406 F.Supp.3d at 1276 (term "hate group" not defamatory) *Russell*

*v. Davies*, 948 N.Y.S.2d 394, 395–96 (2d Dep't 2012) (statements interpreting an essay by a local electoral candidate as racist and anti-Semitic were opinions based on disclosed facts); *Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St. 3d 279, 649 N.E.2d 182 (Ohio 1995) (editorial accusing politician of "gaybashing" and fostering "homophobia" not defamatory because the statements did not describe verifiable facts); *Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988) (Action of PTA president calling principal "racist" was not actionable as defamation); *Ollman*, 750 F.2d at 987 (accusation of "political Marxism" too "hopelessly imprecise and indefinite" to be a statement of a verifiable fact); *Buckley v. Littell*, 539 F.2d 882, 893 (2nd Cir. 1976) (holding that statements comparing conservative author to radical and fascist groups such as the Ku Klux Klan and Nazis were to ideological and amorphous to be actionable.).

This Court should likewise hold that the Defamation Defendants' statements are constitutionally protected and not actionable as defamation. Jackson's defamation claims must be dismissed pursuant to Rule (12)(b)(6).

## VII.   <u>PRAYER</u>

Defendants respectfully request that the Court grant its motion and dismiss Jackson's claims with prejudice.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Matthew Bohuslav*
MATTHEW BOHUSLAV
Texas Bar No. 24069395
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
matthew.bohuslav@oag.texas.gov
***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of March, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which automatically provided notice to the following CM/ECF participants:

Jonathan F. Mitchell
Mitchell Law, PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
jonathan@mitchell.law

Michael Thad Allen, Esq.
Allen Law, LLC
PO BOX 404
Quaker Hill, CT 06375
m.allen@allen-lawfirm.com
***Attorneys for Plaintiff***

*/s/ Matthew Bohuslav*
MATTHEW BOHUSLAV
Assistant Attorney General