UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

**Timothy Jackson**,

                    Plaintiff,

v.

**Laura Wright**, et al.,

                    Defendants.

Case No. 4:21-cv-00033-ALM

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION TO DISMISS

Plaintiff Timothy Jackson respectfully submits this brief in opposition to the defendants' motion to dismiss (ECF No. 8).

## FACTUAL BACKGROUND

### I.    THIS CASE IS ABOUT STATE CENSORSHIP

This is a case of state censorship. Yet the defendants' motion asks the Court to decide what kinds of music and which music scholars really are or are not "racists" as a ground to dispose of this case. Defendants invite the Court to join their side in an academic dispute between City University of New York Professor Philip Ewell and plaintiff Professor Timothy Jackson, over an article Jackson published in the Journal of Schenkerian Studies (Journal). The State even thrusts before the Court evidence extraneous to the Complaint, a Ewell article. *See* Exhibit A, ECF No. 8-1.[1]

---

1.  Compare *Williams v. Lakeview Loan Servicing LLC*, No. 4:20-cv-01900, 2020 U.S. Dist. LEXIS 240472, at *5 (S.D. Tex. Dec. 22, 2020) (holding on 12(b)(6) motion, defendant "isn't entitled to introduce facts extraneous to the complaint at this procedural juncture").

But this case is not about the merits of a scholarly debate. The Court should allow scholarship to run its course, as should any state institution, especially the University of North Texas (UNT), which holds itself out as an institution of higher learning.

This case is really about UNT's demotion and disciplining of Timothy Jackson for expressing viewpoints currently out of vogue in academia and UNT's hostile take-over of the Journal in which Jackson dared to publish these viewpoints. UNT did so through Regents Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, and G. Brint Ryan (the Board defendants) and other state actors for whom the Board defendants are directly responsible.

On July 24, 2020, under Jackson's direction and with full participation of its ed-itorial board and staff (including Defamation defendants Ellen Bakulina, Andrew Chung, Benjamin Graf, and Diego Cubero who later renounced this very work as "racist"), Volume 12 of the Journal published a series of 15 articles in a symposium (Symposium). Complaint (ECF No. 1), ¶¶ 44–45. Defendants misconstrue the Sym-posium as publishing only articles "largely critical of Ewell's views." ECF No. 8 at 5. Defendants also aver that the Journal "did not invite Ewell to respond"—another objectively false statement that the Defamation defendants endorsed and UNT prop-agated. *Id.* at 10. At the time, Defamation Defendant Chung enthused over the Jour-nal's Call for Papers, "I think it's great that [the Journal] is looking to engage Ewell's [Society for Music Theory] talk." ECF No. 1-3 at JACKSON000073.

In December 2019, the Journal issued a Call for Papers to the entire Society for Music Theory, *including* Professor Ewell, who refused to respond.[2] Complaint, ¶ 44; *see also* ECF No. 1-11. The Journal published all the pro-Ewell papers it received,

---

2.  Professor Ewell later announced, "I won't read them [the Symposium papers] be-cause I will not participate in my own dehumanization." ECF No. 1-23 at JACKSON000283. To Professor Ewell and his devotees, dissent from race-based orthodoxy is "dehumanizing." UNT swiftly endorsed this stultifying approach to protected speech.

even over the objections of its Student Editor Levi Walls, who considered Ewell's viewpoints "naïve." ECF No. 1-23 at JACKSON000287.

Of course, the Journal also published articles critical of Ewell's assault on classical music as "systematic racism," and authors defended the Journal's namesake, the 19th-century/early 20th-century Jewish music scholar Heinrich Schenker. *See* ECF No. 1-4. These anti-Ewell authors included Timothy Jackson. *Id*. at JACKSON000154.

## II.   THE DEFAMATION OF TIMOTHY JACKSON

No sooner did the Symposium appear in print, however, than Rachel Gain, Ellen Bakulina, Andrew Chung, Diego Cubero, Steven Friedson, Rebecca Dowd Geoffroy-Schwinden, Benjamin Graf, Frank Heidlberger, Bernardo Illari, Justin Lavacek, Peter Mondelli, Margaret Notley, April L. Prince, Cathy Ragland, Gillian Robertson, Hendrik Schulze, Vivek Virani, and Brian F. Wright (the Defamation defendants) circulated open letters and endorsed petitions to get Timothy Jackson fired, the Journal eliminated, and the Center for Schenkerian Studies, which Jackson directs, canceled. ECF No. 1-5 at JACKSON000226 – JACKSON000226.

Defendants aver that the Defamation defendants merely expressed "Constitutionally protected expressions of opinion." ECF No. 8 at 23-27. The State takes the position that Defendants get constitutionally protected speech, but Timothy Jackson does not. Defendants neglect to direct the Court to what they actually said. All Defamation defendants stated, either directly or by express endorsement: "Specifically, the ***actions*** of Dr. Jackson—both past and present—are particularly racist and unacceptable." ECF No. 1-5 at JACKSON000227. Yet Defendants identify no "actions." They identify only Timothy Jackson's protected speech and publications, which apparently hurt their feelings.

This proves the point that the Defamation defendants made objectively refutable statements of fact, which they cannot substantiate, and which they knew were false

when made. Furthermore, the distinction between speech—even as advocacy—and action, and the distinction between speech and the advocacy of action, is bedrock in First Amendment jurisprudence. The Defamation defendants now propose to collapse these distinctions and ask the Court to count Timothy Jackson's protected speech as "action." The radical left, as the Defendants appear to fancy themselves, used to think these distinctions protected them.[3] But it cannot be disputed that false statements about actions, subject to objective refutation, are actionable in defamation.

## III.   UNT's DEMOTION AND DISCIPLINING OF TIMOTHY JACKSON

So the Defamation defendants clamored for state censorship, and UNT readily responded. Ironically, UNT has promulgated policies that nominally protect academic freedom and free speech. These were disregarded. Rather than enforce them, UNT immediately placed its heavy thumb on the scales of scholarly debate to punish Timothy Jackson for his unpopular views. Already on July 31, 2020, days after the Symposium appeared, UNT Dean John Richmond announced an investigation of Timothy Jackson and the Journal as part of a crusade to "combat[ ] racism on campus and across all academic disciplines." ECF No. 1-15.

Timothy Jackson objected to this retaliation by submitting grievances under the established policies and rules of UNT. ECF No. 1-16. UNT repeatedly ignored Professor Jackson's grievances. ECF NO. 1-17. Instead of enforcing its own policies guaranteeing protected speech, and just one week after Dean Richmond announced UNT's "anti-racist" crusade, Defendant Provost Jennifer Cowley announced a so-called "Ad Hoc Panel" ("Panel"). ECF No. 1-5 at JACKSON000211. Its very name betrayed its operation outside of UNT's ordinary rules, policies, and procedures. *Id*.

---

3.  *See, e.g.*, *Yates v. United States*, 354 U.S. 298, 340 (1957) (reversing convictions of Communist Party members for advocacy, with Justice Black dissenting because the decision did not go far enough: "First Amendment forbids [the state] to punish people for talking about public affairs, whether or not such discussion incites to action, legal or illegal").

Provost Cowley refused to identify what policy, standards, or rules of UNT the Panel purported to apply. *Id*. Provost Cowley convened the Panel solely to repress Timothy Jackson's speech and punish him and the Journal for publishing the Symposium.

Provost Cowley's so-called "investigation" was a pretext from the start. One indication of her pretextual approach was the announcement, from one side of her mouth, that the "university is investigating neither you nor the Journal of Schenkerian Studies." ECF No. 1-17. The same letter then announced that UNT would "look into these circumstances [of the publication]." *Id*. Thus, UNT would investigate Professor Jackson and the Journal but would deny doing so.

The first casualty of UNT's open repression of free expression was graduate student editor Levi Walls. *Id*., ¶¶ 28–98. The Symposium owed much to his initiative and tireless work. *Id*., ¶¶ 40–47. Between Professor Ewell's talk in November 2019 and UNT's full-throated embrace of the Twitter mob in the name of "combating racism," Mr. Walls had criticized Professor Ewell, praised the ***anti***-Ewell contributions to Journal, and expressed his love of the classical music tradition excoriated by Ewell and his acolytes as white supremacy. This is demonstrated in the following statements by Mr. Walls:

- "[Ewell] suggested that analysis that utilizes levels of hierarchy is inherently racist, which strikes me as naive." (November 15, 2019.)  ECF NO. -3 at JACKSON000005.

- "… the fact that Ewell and I obviously share political views, I find some of his points to be extremely suspect." (November 16, 2019.)  ECF No. 1-8 at JACKSON000240.

- "[Ewell] paper's willful ignorance of Schenker's Jewish identity is indeed troubling. That seems to mark it as implicitly antisemitic, at the very least." (November 18, 2019.)  ECF No. 1-10.

- "…it is possible to address biases in Schenker studies (and academia in general) and advocate for increased transparency without demonizing an entire methodology (especially one with

strong Jewish roots). Ewell's talk certainly failed in that regard." (November 18, 2019.)  *Id*.

- "I agree that a response in the JSS would be very appropriate." (November 19, 2019.)  ECF No. 1-2 at JACKSON000009-10.

- "It goes without saying that there are good ways and bad ways for these responses [in the Symposium] to be framed, and it will be important for us to screen them for tone and misinformation (lest we allow the JSS to fall into some of the same pitfalls that Ewell himself fell into)." (January 9, 2020.)  ECF No. 1-12.

- To emphatically and still unrepentantly anti-Ewell author Dr. Barry Wiener: "Hi Barry, Congratulations! We like your response and would be happy to include it in the upcoming JSS, with the possibility of some revisions." (February 5, 2020.)  ECF No. 1-3 at JACKSON000098.

- "Dr. Graf and I were wondering what your thoughts were concerning the submissions [that] are (at least) implicitly anti-Schenkerian [i.e. pro-Ewell]. Despite disagreeing with much of what they have to say Dr. Graf and I think it is important to publish these responses along with the others ..." (emphasis added, February 13, 2020.)  ECF No. 1-2 at JACKSON000058.

- "Would you mind signing my degree plan? Just the 'major professor' line near the bottom of the front page" (asking Jackson to be his dissertation advisor). (May 19, 2020.)  ECF No. 1-18.

- ". . . as I said, it's very important to continue studying Beethoven [emphatically condemned by Professor Ewell as perpetuating white supremacy]." (July 23, 2020.)  ECF No. 1-19.

(These anti-Ewell statements made by Mr. Walls in the internal correspondence of the Journal were known to UNT and to the Ad Hoc Panel. See ECF No. 1-2, 1-3.)

As soon as it became clear that UNT would actively repress free expression, however, Mr. Walls immediately turned turtle and confessed "how deeply sorry I am for my involvement in the journal" (on July 27, 2020). ECF No. 1-6. Walls denounced Timothy Jackson as "woefully ignorant about politically correct discourse and race relations"; he condemned Timothy Jackson's piece in the Symposium as "disgusting

and harmful rhetoric"; and he suddenly professed "essential agree[ment]" with Professor Ewell. *Id*. Walls even claimed to be a "whistleblower," who had allegedly run to Division Chair Benjamin Brand to expose Timothy Jackson for forcing him to publish allegedly "disgusting" viewpoints against his will. *Id*.

Mr. Walls' contemporary editorial correspondence belied his prostrate cowering before the Twitter mob and UNT's faculty and graduate students. ECF No. 1-1, ¶ 17, 67. But facts did not matter in UNT's "investigation." The Panel Report even reproduced new defamatory allegations, in defiance of the evidence, knowing that they were false. In particular, the Panel condemned Timothy Jackson (alone among the editorial staff) for supposedly threatening Mr. Walls like a gangster. Exhibit D at JACKSON000216. The Report foregrounds a story that Timothy Jackson somehow forced Mr. Walls to accept manuscripts against his will and had even "taken [Mr. Walls] into Dr. Jackson's car, where Dr. Jackson told him that it was not his 'job to censor people' and . . . told [Mr. Walls] not to do it again." ECF No. 1-5 at JACKSON000216.

Contemporary documents provided to the Ad Hoc Panel conclusively demonstrate this and many other statements in Mr. Walls' apologia to be false. ECF No. 1-1, ¶ 68-90. By way of example, the only "censorship" discussed by Mr. Walls within Journal correspondence was the express commitment ***not to censor*** pro-Ewell authors, with whom Mr. Walls openly disagreed. ECF No. 1-1, ¶¶ 74–76, ECF No. 1-2 at JACKSON000058.

The Panel published its so-called "Report" to UNT's website on November 25, 2020. ECF No. 1-5. Another example of UNT's pretextual "investigation" was Provost Cowley's notification to Timothy Jackson (and he alone was singled out) by letter of November 30, 2020 that he was required to submit a "response" by December 18, 2020. ECF No. 1-21. Had the so-called "investigation" been focused on the Journal rather than on Timothy Jackson, UNT would have addressed the entire editorial staff.

But the investigation's true purpose was to condemn, punish, and defame Timothy Jackson for his impermissible views.

Events soon showed that UNT was also completely uninterested in Jackson's Response, another pretextual aspect of the so-called "investigation." The adverse consequences for Timothy Jackson were immediate. ECF No. 1-22. Before Provost Cowley's deadline of December 18, 2020, without waiting for Timothy Jackson to defend himself, and with actual knowledge that the Report was based upon false and defamatory statements, Division Chair Benjamin Brand called Professor Jackson to a meeting to fire him from the Journal. *Id*. UNT also eliminated Jackson's, the Journal's, and the Center's resources. *Id*.; Affidavit of Timothy Jackson in Support of Opposition (Second Affidavit), ¶¶ 8–9. UNT has now executed on Dr. Brand's promise. Affidavit of Timothy Jackson in Support of His Opposition to Defendants' Motion to Dismiss (2d Jackson Aff.), ¶¶ 6, Exhibits A and B.

In response to these defamatory attacks, Timothy Jackson asked that UNT make public the internal correspondence of the Journal, including Mr. Walls's correspondence. ECF No. 1-1, ¶ 35. Yet on October 14, 2020, Attorney Reynaldo Stowers of UNT's General Counsel's Office forbade this: "Dr. Jackson is not authorized to disclose information from any UNT student's education record." ECF No. 1-7. Mr. Walls, and subsequently UNT through its Report, put the substance of Mr. Walls's student records at issue by selectively disclosing them to the public — while withholding evidence clearly refuting Mr. Walls's demonstrably false claims. ECF No. 1-1, ¶¶ 36–38. Thus, not only did UNT retaliate against Timothy Jackson for protected speech; it also muzzled him to prevent him from speaking publicly to defend his reputation and the Journal.

UNT's adverse actions have been devastating. Although he has not been fired, UNT removed him from the Journal and staged a hostile takeover of the Journal. Second Affidavit, ¶ 2. The Journal and Center are Professor Jackson's life's work, and

UNT has indeed fired him from *this* job. ECF No. 1-22; 2d Jackson Affidavit, ¶¶ 2–7. Until UNT's assault on academic freedom and protected speech, UNT had praised Jackson, the Center, and the Journal, whose work had even attracted a Grammy nomination. 2d Jackson Aff., ¶ 11.

UNT has also defunded the Journal and Center and now blocks the Journal's further publication until a hostile takeover can be completed. Id., ¶ 12. The resources directed to the Journal not only benefited UNT and the larger community of Texas, they were also direct benefits to Timothy Jackson and his work. *Id.* The graduate student assistant formally assigned to the Journal and Center has been removed. *Id.*

In the few short months following UNT's assault on protected speech and academic freedom, Timothy Jackson's reputation suffered irreparably. UNT's actions have made Timothy Jackson a pariah among graduate students. *Id.*, ¶ 9. Formerly he had been a leader in graduate student training at UNT, praised as such, and placed students in enviable jobs all over the world. *Id.* Now, even students who wish to work with Professor Jackson are afraid because of UNT's overt hostility toward anyone who shares or even appears to associate with Professor Jackson's suddenly impermissible viewpoints. *Id.*

The targeted, intentional ruination of Timothy Jackson's career by UNT has also made it harder for him to gain access to reputable publications which formally accepted his work. *Id.*, ¶ 14. His advancement and evaluation as a professor depend upon the assessment of the Center and Journal among his faculty peers, almost all of whom have now signed defamatory statements calling for the suppression of academic freedom, for Jackson to be fired, for the Journal to be hijacked, and the Center to be canceled. *Id.*, ¶ 13.

UNT has also retaliated by continued refusal to follow its own policies and procedures, which nominally protect and guarantee academic freedom and free speech. *Id.*, ¶ 15. And while UNT has reproduced defamatory materials in its so-called "Ad

Hoc Panel" report of November 25, 2020—which UNT immediately published to his website—UNT still muzzles Timothy Jackson and refuses to publish his Response, depriving him of any avenue to defend himself except before this Court. *Id.*, ¶ 7.

## ARGUMENT

The defendants seek dismissal on five separate grounds, but none of their arguments have merit. We will address each of the defendants' arguments in turn.

## I. PROFESSOR JACKSON HAS INDISPUTABLY ALLEGED ARTICLE III STANDING

A plaintiff needs only to *allege* and not prove Article III standing at the motion-to-dismiss stage. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The defendants do not dispute Jackson's standing to pursue his defamation claims, but they say that Professor Jackson lacks standing to seek prospective relief against the Board defendants. *See* Mot. to Dismiss (ECF No. 8) at 13–16. The defendants' arguments are meritless. The university has *banned* Professor Jackson from involvement in the Journal of Schenkerian Studies;[4] that undeniably establishes present and future "injury" that can be redressed with prospective relief directed at the Board of Regents.

### A. Professor Jackson Has Alleged Injury In Fact That Gives Him Standing To Sue The Board Defendants

The defendants correctly observe that Professor Jackson is seeking only prospective relief and not damages from the board defendants. *See* Mot. to Dismiss (ECF No. 8) at 13–16. The defendants are also correct in asserting that Jackson must therefore allege a continuing or future injury to establish Article III standing. *See id.* at 14 (quoting *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019)).

Yet Professor Jackson has done exactly that by alleging that the university has banned him from any future involvement in the Journal of Schenkerian Studies. *See*

_____

4. *See* Complaint (ECF No. 1) at ¶¶ 60–61.

Complaint (ECF No. 1) at ¶¶ 60–61. Professor Jackson has also alleged that the university will "eliminate resources previously provided to the Journal and Center for Shenkerian Studies." *Id.* at ¶ 60; *see also* Affidavit of Timothy Jackson at ¶¶ 6–16. Professor Jackson's exclusion from the Journal is an ongoing injury that is inflicting immediate harm—and it is certain to continue inflicting harm on Professor Jackson into the future. The same is true of the university's removal of support for the Journal and the center that Professor Jackson operates. These are present-day and future injuries that confer standing to seek prospective relief. *See Stringer*, 942 F.3d at 720 (requiring plaintiffs seeking prospective relief to allege "a continuing injury or threatened future injury.").

The defendants claim that Professor Jackson is alleging nothing more than past injury because their *decisions* to block Professor Jackson from involvement in the Journal were made in the past. *See* Mot. to Dismiss (ECF No. 8) at 14. But those past decisions continue to inflict present and future injury on Professor Jackson, as he remains unable to participate in the Journal both now and into the future. That the *decisions* to exclude Professor Jackson were made in the past does not mean that the *injuries* resulting from those decisions are exclusively in the past. The situation is no different from a President who decides to exclude travelers from designated foreign countries from entering the United States. The affected individuals still have standing to challenge the *implementation* of that past decision and seek prospective relief against its enforcement, even though they are challenging the legality of a past decision. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2415–16 (2018).

The defendants also claim that Professor Jackson "does not allege facts to show any ongoing or future injury." Mot. to Dismiss (ECF No. 8) at 14–15. But that is transparently false. Paragraph 60 of the complaint states:

> On December 11, 2020—more than a week before the deadline that the provost had imposed—Dr. Benjamin Brand (Professor Jackson's

> department chair) informed Professor Jackson that he would be re-
> moved from the Journal and that the university would eliminate re-
> sources previously provided to the Journal and Center for Shenkerian
> Studies.

Complaint (ECF No. 1) at ¶ 60. Professor Jackson's "remov[al] from the Journal"
and the university's intent to "eliminate resources previously provided to the Journal
and Center for Shenkerian Studies" describe ongoing and future injuries. Professor
Jackson's banishment from the Journal will continue into the future unless it is en-
joined by this Court, and the university will eliminate future resources for the Journal
and Center for Shenkerian Studies absent judicial intervention. All of these allegations
must be assumed true at this stage of the litigation, and they indisputably describe
continuing and future injuries that confer standing to seek prospective relief. *See Man-
hattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019) ("Because
this case comes to us on a motion to dismiss, we accept the allegations in the com-
plaint as true.").

### B.  Professor Jackson Has Alleged That These Injuries Are "Fairly Traceable" To The Board Defendants

The defendants also deny that Professor Jackson's injuries are traceable to the
Board defendants. *See* Mot. to Dismiss (ECF No. 8) at 15–16. But at the motion-to-
dismiss stage, plaintiff needs only to allege (and not prove) that his injuries are "fairly
traceable" to a defendant's conduct. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control
Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a re-
quirement of Article III standing, which requires only that the plaintiff's injury be
*fairly traceable* to the defendant's conduct." (emphasis added)). Professor Jackson's
allegations easily meet this requirement.

Professor Jackson has alleged that his department chair, Dr. Benjamin Brand, in-
formed him that he would be removed from the Journal and that the university would
eliminate resources previously provided to the Journal and Center for Shenkerian

Studies. *See* Complaint (ECF No. 1) at ¶ 60. This conduct is "fairly traceable" to the Board of Regents, which serves as the governing body for the University of North Texas System, and is responsible for the decisions and actions of university officials, as well as its failure to establish and enforce policies sufficient to protect Professor Jackson's academic freedom. *See* https://www.untsystem.edu/board-regents ("The Board of Regents [is] the governing body for the University of North Texas System").

The defendants complain that Professor Jackson "pleads no facts . . . to show that the Board Defendants are involved with the Journal or the Panel's activities." Mot. to Dismiss (ECF No. 8) at 15. But no such allegations are necessary. Professor Jackson does not need to allege that the members of the Board of Regents directly caused his injuries; he needs only to allege that his injuries are "fairly traceable" to them. *See Lexmark*, 572 U.S. at 134 n.6. A university's affirmative-action policies, for example, are "fairly traceable" to its Board of Regents, even though the regents are not personally involved in admissions decisions or in the policies established by the admissions office. *See, e.g., Fisher v. University of Texas at Austin*, 758 F.3d 633, 637 (5th Cir. 2014). The traceability element is satisfied by the brute fact of the Board of Regents governing authority over the university; it does not require any additional showing of personal involvement on the part of the individual regents.

### C.     Professor Jackson's Ongoing And Future Injuries Are Redressable

The Board of Regents' governing authority over the university is all that is needed to establish redressability. An injunction that directs the Board of Regents to halt and undo the retaliatory actions taken against Professor Jackson will redress the alleged injuries, because the Board of Regents can countermand the decisions of Dr. Brand and other university officials. *See Larson v. Valente,* 456 U.S. 228, 244, n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself."). The defendants do not even try to

argue that the Board of Regents is *powerless* to restore Professor Jackson to his role on the Journal, or that the Board of Regents is impotent to prevent university officials from taking future retaliatory actions against Professor Jackson.

## II. Professor Jackson's Claims Against The Board Defendants Fall Within The Ex Parte Young Exception To Sovereign Immunity

The defendants' sovereign-immunity objections are meritless because Professor Jackson is seeking prospective relief to enjoin an ongoing violation of his First Amendment rights. *See* Complaint (ECF No. 1) at ¶ 76(ii) (asking the Court to "enjoin the members of the Board of Regents, along with their employees and subordinates, from taking any adverse action against Professor Jackson in response to the publication of the symposium or his criticisms of Professor Ewell"). That falls squarely within the *Ex parte Young* exception to sovereign immunity. *See Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" (citation omitted)); *Raj v. Louisiana State University*, 714 F.3d 322, 328 (5th Cir. 2013) ("[T]he Eleventh Amendment does not bar suits for injunctive or declaratory relief against individual state officials acting in violation of federal law.").

The defendants try to escape *Ex parte Young* by denying that they are "proper defendants." Mot. to Dismiss (ECF No. 8) at 17. But an *Ex parte Young* lawsuit requires only that a defendant have "some connection"[5] with the enforcement of the

---

5. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("[I]t is plain that such officer must have *some connection with* the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party. . . . The fact that the state officer, by virtue of his office, has *some connection with* the enforcement of the act, is the important and material fact . . . ." (emphasis added)).

challenged policy or practice, and Board of Regents easily meets this test. The defendants complain that Professor Jackson "pleads no facts to show that the Board Defendants have any role with the Journal or the Panel's review and recommendation, nor whether campus officials act on those recommendations." *Id.* at 17. But Professor Jackson is not required to make any "showing" of this sort. The Board of Regents, as the governing authority of the university, will by definition have "some connection" to the retaliatory actions that Professor Jackson has alleged, because the Board of Regents has the authority to oversee and countermand the decisions of university officials. Again, the situation is no different from a lawsuit challenging a public university's affirmative-action programs, which is properly brought against the individual regents even when the challenged policies are made and implemented by lower-level university officials. *See Fisher*, 758 F.3d 633. The defendants do not even acknowledge the "some connection" test from *Ex parte Young*, let alone explain how the Board defendants fail to satisfy that standard.

The defendants also claim that Professor Jackson has failed to allege an "ongoing violation" of federal law, and they insist that he "complains about past events only." Mot. to Dismiss (ECF No. 8) at 17. That is flatly wrong for the reasons provided in Part I, *supra*. Professor Jackson's banishment from the Journal of Schenkerian Studies is an ongoing injury that will continue absent relief from this Court. *See supra* at 10–12. The initial *decision* to exclude Professor Jackson from the Journal was made in the past, but the *implementation* of that decision will continue indefinitely into the future unless the university changes its stance. That is all that Professor Jackson needs to allege an "ongoing" violation of federal law.

The defendants' claim that Professor Jackson is seeking declaratory relief only with respect to "past conduct" is equally off base. Mot. to Dismiss (ECF No. 8) at 18. Professor Jackson is seeking to prevent the university from *implementing* its decision to exclude him from the Journal, which seeks relief against present-day and future

conduct. That is subsumed in Professor Jackson's request to enjoin the Board defendants (and their employees and subordinates) from "taking any adverse action against Professor Jackson in response to the publication of the symposium or his criticisms of Professor Ewell." Complaint (ECF No. 1) at ¶ 76(ii). And it is entirely proper for Professor Jackson to seek a prohibition against all "adverse actions" taken in response to his criticisms of Philip Ewell; otherwise the university and its officials could evade an injunction from this Court by retaliating against Professor Jackson in other ways. The defendants' citation of *Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671 (5th Cir. 2020), has no bearing on this case, because there was no allegation of future injury in *Spec's. See id.* at 681 ("Spec's does not allege that TABC or its officials are currently engaged in any of those behaviors or that any such actions are imminent. It is undisputed that the investigation and SOAH proceedings forming the basis of the allegations in this case are completed. The injunctive relief sought focuses on past behavior but does not allege an 'ongoing violation of federal law.'"). Professor Jackson, by contrast, has alleged that the university is *currently* excluding him from the Journal on account of his past criticisms of Philip Ewell, and that is all that is needed to allege an ongoing violation of federal law.

Finally, the defendants are wrong to accuse Professor Jackson of seeking an injunction that would "require the Board Defendants to take affirmative action on discretionary matters." Mot. to Dismiss (ECF No. 8) at 18 (citing *Richardson v. Texas Secretary of State*, 978 F.3d 220 (5th Cir. 2020). Professor Jackson is merely asking for an injunction that will *prevent* the university from taking "adverse actions" against him in response to his criticisms of Philip Ewell; he is not asking or even suggesting that the court usurp discretionary functions that have been vested in the Board defendants by statute. *See Richardson*, 978 F.3d at 243 (holding that *Ex parte Young* is inapplicable when "[s]ection 31.005 grants the Secretary discretion to take enforcement actions" and the plaintiff's lawsuit sought an injunction to compel enforcement

action despite the statutory grant of discretion). And the defendants do not identify any statute that purports to vest "discretionary" tasks in the Board defendants, nor do they explain how Professor Jackson's lawsuit might countermand that statutorily conferred discretion.

### III.  PROFESSOR JACKSON HAS ALLEGED THAT THE BOARD DEFENDANTS HAVE VIOLATED HIS FIRST AMENDMENT RIGHTS

The defendants try to defeat Professor Jackson's First Amendment claim by denying that he suffered "adverse employment action,"[6] but their efforts are unavailing. Professor Jackson's banishment from the Journal of Shenkerian Studies indisputably qualifies as a "demotion" and alleges a retaliation claim under the precedent of this Court. *See Pierce v. Texas Dep't of Criminal Justice, Institutional Div.,* 37 F.3d 1146, 1149 (5th Cir. 1994) ("Adverse employment actions are discharges, *demotions*, refusals to hire, refusals to promote, and *reprimands*." (emphasis added)). And the Ad Hoc Panel's report qualifies as a "reprimand," which likewise meets the definition of an "adverse employment action." *Id*; *see also* Complaint (ECF No. 1) at ¶ 59 (alleging that the Ad Hoc Panel's report "declared that its members 'do not find that the standards of best practice in scholarly publication were observed in the production of Volume 12 of the [Journal of Schenkerian Studies].'").

It is hard for us to fathom how the defendants could believe that Professor Jackson has failed even to *allege* an adverse employment action. The defendants cite *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000), but the defendants in *Breaux* had *rescinded* the reprimands that they had previously imposed on the plaintiffs—a crucial fact about *Breaux* that the defendants never mention. *See id*. at 158 ("However, this court recognizes that a rescinded reprimand does not rise to the level of an adverse employment action. . . . After becoming Chief of Police, Barnett "nonsustained" the charges against Breaux and Ambrogio. . . . Neither Plaintiff has been

---

6.  *See* Mot. to Dismiss (ECF No. 8) at 19–21.

discharged from the Garland Police Department. Neither Plaintiff has been demoted, denied a promotion, suffered a reduction in pay, or lost seniority as a result of his speech.") *Breaux* is nothing at all like this case, where the reprimands from the Ad Hoc Panel remain in effect, and where Professor Jackson remains unable to manage and participate in the Journal of Schenkerian Studies on account of the university's actions.

More importantly, Professor Jackson has clearly and indisputably alleged a violation of his constitutional rights under the governing standard for First Amendment retaliation claims.

### A.   The *Pickering–Connick* Standard Applies

The State's Motion avoids the standard for First Amendment retaliation that the Supreme Court and Fifth Circuit applies to free speech in academic scholarship. Instead, the State characterizes Jackson's censorship as a customary case of workplace speech. This ignores the central facts: namely, UNT's hostile takeover of an academic journal and its punishment of Timothy Jackson for daring to oppose a specious, blanket condemnation of classical music and music theory as "white supremacy."

The Supreme Court developed its customary workplace speech doctrine for public-sector employees in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *Garcetti* expanded state authority over workplace speech "when public employees make statements pursuant to their official duties." *Id.* at 421. Yet the Court clearly carved out the kind of academic scholarship at issue here. *See e.g.*, *Meriwether v. Trustees of Shawnee State University*, No. 20-3289, --- F.3d ---, 2021 WL 1149377, *6 (6th Cir. Mar. 26, 2021) (finding reversible error where District Court rejected *Garcetti's* carve out for academic teaching and scholarship, recognizing "expansive freedoms of speech and thought associated with the university environment" (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)).

The carveout applies to professors such as Jackson because their core "official duty" is to speak and teach on matters of public concern. *Garcetti* therefore distinguished scholarly publication in particular as a category of workplace speech that "implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Garcetti* 547 U.S. at 425. *See also Buchanan v. Alexander*, 919 F.3d 847, 852–53 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 432 (2019) (holding "academic freedom is a special concern of the First Amendment" and declining to apply *Garcetti* workplace speech doctrine); *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (holding, "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court"); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) ("*Garcetti* would not apply in the academic context of a public university"); *Meriwether*, 2021 WL 1149377, *7 (joining "three of our sister circuits: the Fourth, Fifth, and Ninth" in declining to apply *Garcetti* to academic speech).

*Garcetti* also left the Supreme Court's previous academic-speech cases undisturbed. *See, e.g.*, *Pickering v. Bd. of Ed.*, 391 US 563, 572 (1968) (holding, "[o]n . . . question [of] free and open debate . . . it is essential that [teachers] be able to speak out freely on such questions without fear of retaliatory dismissal"); *Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned . . . First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (a governmental enquiry into the contents of a scholar's lectures at a state university "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression--areas in which government should be extremely reticent to tread").

Sidestepping these clear and binding precedents, Defendants' Motion reduces state censorship of a scholarly publication to administrative trivia. Defendants attempt to distinguish the hostile takeover of the Journal from the kinds of "adverse employment actions" necessary for customary workplace speech cases, such as firing an employee. Mot. to Dismiss (ECF No. 8) at 19–21. *Cf. Oller v. Roussel*, 609 F. App'x 770 (5th Cir. 2015) (professor claimed First Amendment retaliation over administrative minutia of teaching assignments, textbook selection, discretionary and competitive endowment awards, and other matters not at issue here). Defendants aver that, so long as UNT does not fire Jackson, the university can restrict his speech and do what it wants with the Journal. *See* Mot. to Dismiss (ECF No. 8) at 21.

This is not the law. The Fifth Circuit made clear that it is not *Garcetti* or Defendants' customary employee-speech cases that apply here, but the "the well-known *Pickering-Connick* balancing test." *Id*. at 853 (citing *Pickering* and *Connick v. Myers*, 461 U.S. 138 (1983)). Under the *Pickering–Connick* test, "[t]o establish a § 1983 claim for violation of the First Amendment right to free speech, [Timothy Jackson] must show that [1] [he] w[as] disciplined or fired for speech [2] that is a matter of public concern, and [3] [his] interest in the speech outweighed the university's interest in regulating the speech." *Buchanan*, 919 F.3d at 853 (citing *Connick v. Myers*, 461 U.S. at 147-50).

### 1.    Timothy Jackson and the Journal Spoke on a Matter of Public Concern

The threshold question is whether "a matter of public concern" is at issue. *Id*. This is undisputed here. *See* Mot. to Dismiss (ECF No. 8) at 6–8. The State merely argues that the Defamation Defendants enjoy protected speech on matters of public

concern,[7] whereas UNT should be allowed to censor the Journal and Timothy Jackson's speech on the same subject matter.

### 2.    The UNT Disciplined and Demoted Jackson

The second step of the *Pickering-Connick* test is to determine whether UNT has disciplined Jackson or otherwise stifled his protected speech. The "quantum of retaliation necessary to support [a] §1983 claim" need be no more than "adverse acts that 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Morris v. Powell*, 449 F.3d 682, 687 (5th Cir. 2006) (quoting *Crawford-El v. Britton*, 320 U.S. App. D.C. 150, 93 F.3d 813, 826 (D.C. Cir. [*686]  1996) (en banc), *vacated on other grounds*, 523 U.S. 574, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)).

This too is easily shown. For example, when Defendants made clear their intention to censor the Journal and discipline anyone who, like Jackson, dared to express anti-Ewell viewpoints, the student editor Mr. Walls immediately recanted his work, declared himself Ewell's acolyte, denounced Jackson, and issued a public apologia because, in his words, "I don't want my career to be ruined." *See* Complaint Ex. 6 (ECF No. 1-6) at 1–20. Furthermore, even a government investigation, especially a pretextual one such as UNT's "Ad Hoc Panel," is "capable of encroaching upon the constitutional liberties of individuals" and has an "inhibiting effect in the flow of democratic expression." *Sweezy v. New Hampshire*, 354 U.S. 234, 245, 248 (1957). The mere "threat of invoking legal sanctions and other means of coercion, persuasion, and

---

7.  It is also undisputed that defamation is not protected by the First Amendment, so it is unclear why the State advances this argument. Nor is Timothy Jackson a state actor. *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017) (Kennedy concurring, "Those few categories of speech that the government can regulate or punish—for instance, fraud, defamation, or incitement—are well established within our constitutional tradition").

intimidation" can itself violate the First Amendment. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

### 3.   Jackson Satisfies the Workplace-Speech Standard, Even if Garcetti Applied, which It Does Not

Even if Defendants' customary workplace-speech cases applied, which they do not, Jackson can still show "adverse employment action." UNT forcibly removed him from the Journal, where he served as a founding member since 2005. 2d Jackson Affidavit, ¶¶ 2, 7. This was clearly a demotion, even if he has kept his job. *Id*. Compare *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (defining "[a]dverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands"). It was also the direct outcome and the desired result of the defamatory campaign against Jackson, which UNT endorsed, for alleged "particularly racist" actions. Complaint (ECF No. 1) at ¶¶ 52–57. As the State's Motion concedes, Jackson's supposed "actions" consisted of nothing more than publishing unpalatable opinions. *Id*. The inevitable result was the Journal's hostile takeover and Jackson's ejection from its editorial board. Complaint (ECF No. 1) at ¶ 61; 2d Jackson Aff., ¶¶ 3–7.

### 4.   The Balance of Interests Favors Jackson

Finally, the last prong of the test is easily satisfied, which requires the Court to "'balance . . . the interests of the [professor], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" 2021 WL 1149377, *11 (quoting *Pickering*, 391 U.S. at 568).

Jackson's interests are particularly strong because "the First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. However much Timothy Jackson's viewpoints may hurt his colleagues' feelings, the "proudest boast of our free speech jurisprudence is that we protect the

freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929)).

In addition, students also have an interest in hearing contrary views. See *Sweezy*, 354 U.S. at 250 ("Teachers and students must always remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding"). Jackson has already brought forward evidence of the pressure placed upon his students and others to knuckle under UNT's estate-sponsored orthodoxy. *See, e.g.*, Complaint Ex. 14 (ECF No. 1-14).

By contrast, UNT has little to no interest in censorship and the hostile takeover of the Journal. There is no administrative efficiency served by UNT's actions. To the contrary, the Journal's publication has been suspended so that UNT may demote and punish Jackson for refusing to tow the line. See Complaint Ex. 22 (ECF No. 1-22); 2d Jackson Affidavit, ¶ 6 and Ex. B. Furthermore, not even UNT's pretextual Report faults the quality of scholarship in the Symposium (or any other volume of the Journal). *Cf.* Complaint Ex. 5 (ECF No. 1-5).

The Journal and Jackson's scholarship has brought renown to UNT and represents Jackson's life's work. Yet UNT's only articulated interest is to impose never-before-asserted standards of "publication ethics," *post hoc*, in the name of "combating racism." In fact, in 2017 and 2018 the Journal published a Festschrift,[8] without peer review (Volume 9–10). First Affidavit, ¶ 58. No one at UNT lost sleep over it. No social media mob nor the University of North Texas Press cried "editorial misconduct." *Id*. This was because, obviously, the *Festschrift*, like other symposia, was and is a normal part of scholarship. But Jackson had not (yet) committed any thought crimes. First Affidavit, ¶ 58. Indeed, not even the "Ad Hoc Panel" expressed dyspepsia over the Festschrift's "publication ethics." Complaint Ex. 5 (ECF No. 1-5).

---

8.  A special symposium to honor a senior scholar.

UNT also wishes to outlaw anonymous publications. But there is no administrative justification for this either. Even the "Ad Hoc Panel" acknowledges that anonymous publications do not contravene established editorial practices.[9] *See* Complaint Ex. 5 (ECF No. 1-5) at 8.

These are all pretext for UNT's suppression of Timothy Jackson for "platforming" (as they construe speech) improper viewpoints. The State papers over this censorship by invoking the need to discipline and punish "managerial flaws and editorial shortcomings." Complaint (ECF No. 1) at ¶ 63; 1st Affidavit of Timothy Jackson, ¶¶ 5, 38, 72-73, 118, 120; *compare* Mot. to Dismiss (ECF No. 8) at 7. UNT's pretext does not justify overriding Supreme Court and Fifth Circuit law to apply the workplace speech doctrine to overt academic censorship.

## IV.   THE COURT HAS SUPPLEMENTAL JURISDICTION OVER THE DEFAMATION CLAIMS

The Court has supplemental jurisdiction over the defamation claims so long as they arise out of a "common nucleus of operative fact" with the First Amendment claims. *See* 28 U.S.C. § 1367(a); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966). All of these claims arise from the same *nucleus* of operative facts: Professor Jackson's criticisms of Philip Ewell and the social-media mob that emerged in response to these criticisms. That is what triggered the "Ad Hoc Panel" report and the retaliatory actions taken by the university. *See* Complaint (ECF No. 1) at ¶¶ 52–61. And that is also what triggered the defamatory utterances from would-be activist students and colleagues. *See id*. This is what the complaint has alleged, and its allegations must be assumed true at the motion-to-dismiss stage. *See Manhattan Community Access Corp.*, 139 S. Ct. at 1927.

---

9.  UNT's pretextual panel opining that "anonymous contributions . . . are not unprecedented in academic journal publishing." Complaint Ex. 5 (ECF No. 1-5) at 8.

The defendants observe that the defamation claims are brought against "different defendants" than the constitutional claims.[10] But that has nothing to do with whether those claims arise from a "common *nucleus* of operative fact." Section 1367(a)[11] extends the Court's supplemental jurisdiction to the maximum extent permitted by Article III, and it overruled previous cases that had frowned on the notion of pendent-party jurisdiction. *See, e.g., Aldinger v. Howard,* 427 U.S. 1 (1976), overruled in part by 28 U.S.C. § 1367(a). Section 1367(b) provides a statutory carveout for pendent-party jurisdiction, but that carveout applies only when original jurisdiction is founded solely on 28 U.S.C. § 1332, which is not this case. *See* 28 U.S.C. § 1367(b). The defendants also observe that the First Amendment violations and defamatory utterances occurred on different dates, but the claims still arise out of the same *nucleus* of operative facts—even though the claims themselves implicate differing sets of facts (as all distinct claims do). All of the retaliatory and defamatory actions taken against Professor Jackson arose out of his publication of a symposium that criticized Philip Ewell, and that is all that is needed to establish supplemental jurisdiction under the "common *nucleus* of operative fact" test.

The defendants also suggest that the Court should decline supplemental jurisdiction under 28 U.S.C. § 1367(c)(2) because (in their view) the state-law defamation claims "substantially predominate" over the First Amendment retaliation claims. *See* Mot. to Dismiss (ECF No. 8) at 22–23. This claim is baseless. The First Amendment

---

10. *See* Mot. to Dismiss (ECF No. 8) at 22.

11. 28 U.S.C. 1367(a) states in relevant part: ". . . In any civil action of which the district courts have original jurisdiction, the district courts shall apply, and the have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

retaliation claims are as substantial and as likely to "predominate" as the defamation claims, and the defendants present no *reason* for thinking the defamation claims will predominate other than observing that there are 18 defamation defendants. But they have all been sued for publishing the same statements, so the mere number of defendants does nothing to imply that the defamation claims will "substantially predominate" if they are litigated alongside the First Amendment retaliation claims.

## V.   Calling Someone A "Racist" Is Not A Constitutionally Protected Statement Of Opinion In Texas

Texas law is clear that baseless accusations of "racism" are actionable. For example, in *Freedom Newspapers v. Cantu*, 126 S.W.3d 185 (Tex. App.—Corpus Christi Edinburgh 2003), the Sheriff of Cameron County sued the *Brownsville Herald*, its editor, and a reporter over a mischaracterization of the Sheriff's comments in a political debate. The Sheriff "testified that he was humiliated, and that he was frequently referred to as the 'racist' sheriff." *Id*. at 195. The trial court denied summary judgment to the newspaper. The court of appeals affirmed. *See also Baker v. Orange Panda*, LLC, No. 04-19-00846-CV, 2020 WL 6293150, at *9 (Tex. App.—San Antonio, Oct. 28, 2020) ("[S]tatement[] that 'Webb is . . . a racist' constitute[s] defamation *per quod*"); *City of Brownsville v. Pena*, 716 S.W.2d 677, 681 (Tex. App.—Corpus Christi Edinburgh 1986) (finding labeling someone "racist" defamatory), *rev'd on other grounds*, *Davis v. City of San Antonio*, 752 S.W.2d 518 (Tex. 1988).

Furthermore, false statements that someone's actions or behaviors "are particularly racist" are actionable in any state. *See e.g.*, *Como v. Riley*, 731 N.Y.S.2d 731 (N.Y. App. Div. 2001) (holding publication that plaintiff engaged in a "racist" act was false, and therefore "defendants' views premised on such statement, published under the heading 'Racism,' are not immune from redress for defamation as non-actionable statements of opinion"). Here, the Defamation Defendants falsely and knowingly attributed "racist" actions to Timothy Jackson. Statements that a defamed person has

"done things . . . [a]re verifiable." *Miller v. Watkins*, 2021 Tex. App. LEXIS 1879, at *27 (affirming trial court's finding of prima facie case for defamation).

The Defamation Defendants cannot hide behind a traditional opinion defense. They published statements that Timothy Jackson engaged in racist "action," engaged in "ad hominem" and "personal attacks directed at Dr. Ewell" (which the Symposium objectively did not), and refused to invite Professor Ewell to contribute to the Symposium, among other statements subject to objective disproof. Compare Mot. to Dismiss (ECF No. 8) at 7–8.

Furthermore, the allegations of the complaint are sufficient to support a finding that the defamation defendants acted with actual malice, rather than mere negligence. For example, defamation defendants Diego Cubero, Ellen Bakulina, Benjamin Graf, and Andrew Chung all worked on the Call for Papers sent to everyone in the Society for Music Theory to solicit papers for the Symposium. The recipients undisputedly included Ewell; but these defendants then turned around and condemned Timothy Jackson as "racist" for not "inviting" Ewell. *See e.g.*, Complaint Ex. 3 (ECF No. 1-3 at JACKSON000073 (Defendant Chung enthusing, "I think it's great that [the Journal] is looking to engage Ewell's . . . talk"). *Compare Thorpe v. Alsaeed*, NO. 01-99-00549-CV, 2000 Tex. App. LEXIS 3085, at *21 (Tex. App. May 11, 2000) ("In the defamation context, a statement is made with actual malice when it is made with knowledge that it is false, or with reckless disregard to whether it is false").

The Court should reject the defendants' argument that Texas defamation law does not apply to baseless, knowingly false claims identifying non-existent actions and behaviors of Timothy Jackson as "racist."

## CONCLUSION

The defendants' motion to dismiss should be denied.

Respectfully submitted.

 /s/ Michael Thad Allen 

Jonathan F. Mitchell                              Michael Thad Allen*
Texas Bar No. 24075463                        *Lead Attorney*
Mitchell Law PLLC                                  Connecticut Bar No. 435762
111 Congress Avenue, Suite 400              Allen Law, LLC
Austin, Texas 78701                              Post Office Box 404
(512) 686-3940 (phone)                          Quaker Hill, Connecticut 06375
(512) 686-3941 (fax)                              (860) 772-4738 (phone)
jonathan@mitchell.law                          (860) 469-2783 (fax)
                                                        m.allen@allen-lawfirm.com
* admitted *pro hac vice*

Dated: April 12, 2021                            *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on April 12, 2021, I served this document through CM/ECF upon:

Matthew Bohuslav
Assistant Attorney General
General Litigation Division
Post Office Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)
(512) 320-0667 (fax)
matthew.bohuslav@oag.texas.gov

*Counsel for the Defendants*

 /s/ Michael Thad Allen 
Michael Thad Allen
*Counsel for Plaintiff*