# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TIMOTHY JACKSON | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 4:21-CV-00033 |
| | § | Judge Mazzant |
| LAURA WRIGHT, et al. | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Dismiss (Dkt. #8). Having considered the motion and the relevant pleadings, the Court finds it requires supplemental factual information from the parties before it can rule on the motion. A hearing on the matter is scheduled for **Friday, October 29, 2021 at 2:00pm.**

## BACKGROUND

Dr. Timothy Jackson is a professor and scholar of music theory at the University of North Texas ("UNT") (Dkt. #1 ¶¶ 60–61). He has dedicated much of his 40-year career to studying Heinrich Schenker ("Schenker"), an Austrian Jew who developed a system of music theory that became influential in the United States after World War II (Dkt. #1 ¶¶ 36, 38–42). UNT is home to, and Plaintiff directs, the Center for Schenkerian Studies (the "Center") (Dkt. #1 at p. 3). Plaintiff is also a founding member of the Journal of Schenkerian Studies (the "Journal"), which is published by the UNT Press (Dkt. #1 at p. 3).

In November 2019 at the Society for Music Theory, Philip Ewell, a Black professor at Hunter College of the City University of New York, delivered a plenary address titled "Music Theory's White Racial Frame" (Dkt. #1 ¶¶ 30–31). During this talk, Professor Ewell critiqued the discipline of music theory for its "deep-seated whiteness" and described Schenker as "an ardent racist and German nationalist" (Dkt. #1 ¶ 33). In a paper later published on this talk, Professor

Ewell argued that "Schenkerian theory is an institutionalized racial structure . . . that exists to benefit members of the dominant white race of music theory" (Dkt. #1 ¶¶ 31, 34).

As a lead editor of the Journal (of which Schenker is the namesake), Plaintiff organized a symposium and invited music scholars to submit papers in response to Professor Ewell's talk and publication (Dkt. #1 ¶ 44). The Journal sent a call for papers to members of the Society for Music Theory, including Professor Ewell (Dkt. #1 ¶ 44). The symposium contributions, reflecting a range of views on Professor Ewell's arguments, were published in July 2020 (Dkt. #1 ¶¶ 44–45). Plaintiff contributed one of the pieces, which accuses Professor Ewell of quoting Schenker without context, failing to discuss the evolution of Schenker's views on race during his lifetime, and refusing to acknowledge that Schenker was a victim of anti-Semitism (Dkt. #1 ¶¶ 46–49). Notably, Plaintiff also suggested Professor Ewell's criticisms of Schenker might themselves have constituted anti-Semitism; in support of this contention, Plaintiff cited studies purportedly classifying Black people as more likely to hold anti-Semitic views than whites (Dkt. #1 ¶ 50). Plaintiff closed his article by asserting that the paucity of African American involvement in music theory discipline results from "few grow[ing] up in homes where classical music is profoundly valued, and therefore . . . lack[ing] the necessary background" (Dkt. #1 ¶ 51).

The backlash was swift. Professors across the country circulated emails and "led [a] social media charge" condemning the symposium (Dkt. #1 ¶¶ 53–54). The Executive Board of the Society for Music Theory issued a letter, stating, among other things, "[t]he conception and execution of [the] symposium failed to meet the ethical, professional, and scholarly standards of our discipline" (Dkt. #1 ¶ 54). Further, a number of UNT graduate students circulated a statement (the "Student Statement") denouncing the Journal's "platforming of racist sentiments" and calling for potential removal of Plaintiff from the Journal for his "actions . . . both past and present" that

were "particularly racist and unacceptable" (Dkt. #1 ¶ 55). One Defendant published the Student Statement on her Twitter feed (Dkt. #1 ¶ 56). In response, a majority of Plaintiff's colleagues in UNT's Division of Music History, Theory, and Ethnomusicology signed a letter endorsing the Student Statement and included a link for viewers to access it (Dkt. #1 ¶ 57). In a fourth statement, John Richmond, Dean of the College of Music at UNT, announced the College of Music's launch of a "formal investigation into the conception and production of the twelfth volume of the Journal" (Dkt. #1 ¶ 58). UNT officials formed an ad hoc panel (the "Panel") to carry out this investigation (Dkt. #1 ¶ 58).

In its report, the Panel found the Journal did not observe "the standards of best practice in scholarly publication" in producing Volume 12 and, accordingly, made recommendations the Journal was expected to implement (Dkt. #1 ¶ 59). Provost Jennifer Cowley then sent Plaintiff a letter instructing him "to develop a plan to address the recommendations . . . and submit the plan to Chair Benjamin Brand and Dean John Richmond for review and approval" by a particular date (Dkt. #1 ¶ 59). Approximately seven days prior to the plan submission deadline, Dr. Brand, Chair of Plaintiff's department, "informed [Plaintiff] that he would be removed from the Journal and that the university would eliminate resources previously provided to the Journal and Center for Schenkerian Studies" (Dkt. #1 ¶ 60).

Plaintiff filed suit against two classes of defendants: (1) members of the Board of Regents of UNT in their official capacities (the "Board Defendants") for unlawful First Amendment retaliation under 42 U.S.C. § 1983; and (2) signatories of the Student Statement for the tort of defamation (the "Defamation Defendants"). As against the Board Defendants, Plaintiff seeks only declaratory and injunctive relief. Defendants filed their Motion to Dismiss (Dkt. #8) asserting first, that this Court lacks subject matter jurisdiction over the claims under Federal Rule of Civil

Procedure 12(b)(1) and, second, that Plaintiff has failed to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court has neither statutory nor constitutional power to adjudicate the case. *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). Addressing a facial attack on the complaint, the court accepts as true all well-pleaded allegations set forth in the complaint and construes those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994).

However, "where subject matter jurisdiction is [] challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004) (citing *Land v. Dollar,* 330 U.S. 731, 735, n. 4 (1947). When there is a factual attack to the complaint that "challenges the existence of subject matter jurisdiction in fact," the court, irrespective of the pleadings, considers "matters outside the pleadings, such as testimony and affidavits." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891–92 (3d Cir. 1977). "Moreover, a factual attack under Rule 12(b)(1) may

4

occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist." *Id.*; *McLain v. Real Est. Bd. of New Orleans, Inc.*, 583 F.2d 1315, 1318 n. 1 (5th Cir. 1978), *vacated and remanded on other grounds*, 444 U.S. 232 (1980). *See* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, at 555 (1969). To be sure, "no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact . . . to determine whether or not it has jurisdiction to hear the case." *Montez*, 392 F.3d at 149.

When a defendant invokes sovereign immunity, the court has a heightened duty to determine its power to hear the case before proceeding to the merits. "[B]ecause sovereign immunity . . . is immunity from suit, not just from liability, 'postponing the determination of subject matter jurisdiction until some point during or after trial would be inappropriate.'" *Montez*, 392 F.3d at 150 (quoting *Moran*, 27 F.3d at 172). In resolving factual disputes that affect subject matter jurisdiction, including sovereign immunity, the court is given the authority and "discretion to devise a method for making a determination with regard to the jurisdictional issue." *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (citing *Dollar*, 330 U.S. at 735); *see also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981), *cert. denied*, 454 U.S. 897 (1981). "The court's authority to consider evidence presented beyond the pleadings allows it to devise a procedure which may include considering affidavits, allowing further discovery, hearing oral testimony, [or] conducting an evidentiary hearing." *Moran*, 27 F.3d at 172.

## ANALYSIS

Defendants' Motion asserts that Plaintiff cannot properly invoke this Court's federal jurisdiction for three reasons: (1) Plaintiff lacks Article III standing to bring this suit against the Board Defendants; (2) Eleventh Amendment sovereign immunity shields the Board Defendants from suit; and (3) the Court cannot—or, in the alternative—should not exercise supplemental

jurisdiction as to the defamation claim. Because there is a key factual dispute that affects standing, sovereign immunity, and supplemental jurisdiction, the Court schedules a hearing to resolve this dispute. Accordingly, the Court does not yet reach the 12(b)(6) argument in Defendants' motion.

### A. Standing

To satisfy standing requirements under Article III, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief. *Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992)). To meet this threshold, the party seeking to invoke federal jurisdiction—here, the Plaintiff—bears the burden of establishing three elements: injury in fact, causation, and redressability. *Stringer*, 942 F.3d at 720.

Defendants assert Plaintiff lacks standing to pursue any claims against the Board Defendants because he has suffered no cognizable injury that the Board Defendants caused, nor one this Court can redress (Dkt. #8 at p. 13–16). Plaintiff argues he must only allege standing at this stage and has done so on the face of his complaint (Dkt. #16 at p. 10).

### 1. Injury in fact

"To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical." *Stringer*, 942 F.3d at 720 (internal quotations omitted). "The purpose of the requirement that the injury be 'imminent' is 'to ensure that the alleged injury is not too speculative for Article III purposes.'" *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 564 n.2). "For a threatened future injury to satisfy the imminence requirement, there must be at least a substantial risk that the injury will occur." *Id.*

6

(citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5)).

"Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury in fact requirements." *Id.* "The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries." *Id.* "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95 (1983)). "That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)).

In his complaint, Plaintiff alleges in injury stemming from Dr. Benjamin Brand's announcement that he would remove Plaintiff from the Journal (Dkt. #1 ¶¶ 60–61).[1] Defendants maintain that Plaintiff has suffered no cognizable harm because he was only threatened with removal from the Journal but was not actually removed (Dkt. #8 at pp. 14–16). They further assert that Plaintiff seeks "nothing more than an injunction to follow the law" (Dkt. #8 p. 15). As Defendants note, in Plaintiff's affidavit, he identifies himself as director of the Center and editorial member of the Journal (Dkt. #1-1 ¶ 4). But in his response to the Motion to Dismiss, Plaintiff asserts UNT "removed" him from the Journal and that he remains "banished" (Dkt. #16 at pp. 8, 12, 15, 17).

---

[1] The Court recognizes that Plaintiff has asserted additional injuries—particularly the commissioning of the Panel and the issuance of its report criticizing the Journal's editorial practices. These alleged injuries do not satisfy the Article III injury-in-fact standard. "If, as here, a plaintiff seeks injunctive relief, it must also show that 'there is a real and immediate threat of repeated injury.'" *Legacy Cmty. Health Servs. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (quoting *Lyons*, 461 U.S. at 102). "Past injury alone is insufficient; the plaintiff must show a 'real or immediate threat that the plaintiff will be wronged again.'" *Id.* (quoting *Lyons*, 461 U.S. at 111). Plaintiff has not alleged any threat of repeated injury as to these specific occurrences.

If Plaintiff had alleged merely past injury, rather than injury that is ongoing, Defendants' argument that Plaintiff lacks standing would likely carry the day because he seeks only injunctive relief. But he appears to allege more. If Dr. Brand removed him from the Journal of which he is a founding member, Plaintiff has alleged a cognizable, ongoing injury sufficient to satisfy the injury in fact requirement (Dkt. #1 ¶ 60); *see Stringer*, 942 F.3d at 720. If Dr. Brand's words were simply a threat—or a promise that went unfulfilled—Plaintiff has likely not alleged a sufficient injury. *See Clapper*, 568 U.S. at 414 n.5. Without the resolution of this factual dispute, the Court cannot determine the existence of an injury sufficient to establish Article III standing.

### 2.      Redressability

Likewise, the Court cannot yet determine whether Plaintiff's alleged injury is redressable. As mentioned, "[r]equests for injunctive and declaratory relief implicate the intersection of the redressability and injury in fact requirements." *Stringer*, 942 F.3d at 720. "The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries." *Id.* Plaintiff seeks to enjoin Defendants from continuing to block his involvement on the Journal (Dkt. #16 at pp. 13–14). An injunction that directs the Board of Regents to lift this alleged block would plausibly redress Plaintiff's "banishment" from the Journal he helped found ((Dkt. #16 at pp. 8, 12, 15, 17). But because redressability and injury are inextricable intertwined for matters of injunctive relief, if Plaintiff has not in fact been banished, the Court cannot redress his past harm. *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to [unlawful] conduct does not in itself show a present case or controversy regarding injunctive relief.").

Consequently, the Court seeks to resolve this factual dispute before it rules on whether Plaintiff has alleged a redressable injury.

### B.  Sovereign Immunity

The Eleventh Amendment shields from suit nonconsenting states and state actors in their official capacities. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993). In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court carved out an exception to Eleventh Amendment sovereign immunity. It held that enforcement of an unconstitutional law is not an official act because a state cannot confer authority on its officers to violate the Constitution or federal law. *See Am. Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir. 1993). To qualify for the *Ex parte Young* exception, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect. *See Saltz v. Tennessee Dep't of Emp. Sec.*, 976 F.2d 966, 968 (5th Cir. 1992).

Futher, the state official sued must have "some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Young*, 209 U.S. at 157. However, whether a suit may proceed under *Ex parte Young* does "not require an analysis of the merits of the claim. Rather, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Plaintiff seeks prospective relief in the form of an injunction against the Board Defendants in their official capacities (Dkt. #1 ¶ 64). But, as previously noted, the parties dispute the factual basis for an injury—that is, whether Dr. Brand removed Plaintiff from the Journal or he merely threatened to remove Plaintiff. This injury also affects the prospective relief required for Plaintiff

to satisfy the *Ex parte Young* exception. If Plaintiff in fact remains "banished" from the Journal, he has alleged an ongoing violation of federal law. *See Paxton*, 943 F.3d at 998. As mentioned, Plaintiff seeks an injunction that directs the Board of Regents to undo the alleged banishment (Dkt. #16 at pp. 8, 12, 15, 17). Such relief is properly characterized as prospective in nature. But if UNT never removed Plaintiff from his position, as Defendants assert, there is no ongoing violation, and therefore, no relief the Court can provide. Consequently, the *Ex parte Young* exception would not apply, and sovereign immunity would shield the Board Defendants from suit. *Verizon Md. Inc.*, 535 U.S. at 645. Thus, without the resolution of this factual dispute, the Court cannot determine whether Plaintiff qualifies for the *Ex parte Young* exception to sovereign immunity.

## CONCLUSION

For the foregoing reasons, the Court finds it cannot rule on Defendants' Motion to Dismiss (Dkt. #8) until it resolves the factual issue regarding Plaintiff's current state of involvement on the Journal. It is, therefore, **ORDERED** that the Court schedules a hearing on Defendants' Motion to Dismiss for **Friday, October 29, 2021 at 2:00pm at the Paul Brown United States Courthouse located at 101 East Pecan Street in Sherman, Texas.**

**IT IS SO ORDERED.**
**SIGNED this 22nd day of October, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

10