# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| *Plaintiff*, | § | |
| v. | § | Civil Action No. 4:21-CV-00033 |
| | § | Judge Mazzant |
| LAURA WRIGHT, *et al*., | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Motion to Dismiss (Dkt. #8). Having considered the motion and the relevant pleadings, the Court finds the motion should be **DENIED**.

## BACKGROUND

This case stems from the suppression of academic scholarship at the University of North Texas ("UNT"). UNT is a public institution that hales itself as an academy through which students and faculty may, among other things, "publish . . . and/or display their scholarship freely as appropriate to their respective UNT-assigned roles and responsibilities" (Dkt. #1 Exhibit V at p. 18). But as the Plaintiff in this matter is now aware, pressures from offended constituents can overshadow promises of academic freedom.

Plaintiff Dr. Timothy Jackson is a professor and scholar of music theory at UNT (Dkt. #1 ¶¶ 60–61). He has dedicated much of his 40-year career to studying Heinrich Schenker ("Schenker"), an Austrian Jew who developed a system of music theory that became influential in the United States after World War II (Dkt. #1 ¶¶ 36, 38–42). Prior to this lawsuit, UNT was home to, and Plaintiff directed, the Center for Schenkerian Studies (the "Center") (Dkt. #1 at p. 3). Plaintiff was also a founding member of the Journal of Schenkerian Studies (the "Journal"), which was formerly published by the UNT Press (Dkt. #1 at p. 3).

Plaintiff's area of expertise became a topic of controversy in November 2019 at a convention of the Society for Music Theory. Philip Ewell, a Black professor at Hunter College of the City University of New York, delivered for the Society a plenary address titled "Music Theory's White Racial Frame" (Dkt. #1 ¶¶ 30–31). During this talk, Professor Ewell critiqued the discipline of music theory for its "deep-seated whiteness" and described Schenker as "an ardent racist and German nationalist" (Dkt. #1 ¶ 33). In a paper later published on this talk, Professor Ewell argued that "Schenkerian theory is an institutionalized racial structure . . . that exists to benefit members of the dominant white race of music theory" (Dkt. #1 ¶¶ 31, 34).

As a lead editor of the Journal (of which Schenker is the namesake), Plaintiff—with the help of his colleagues and his assistant editor, Levi Walls—organized a symposium and invited music scholars to submit papers in response to Professor Ewell's talk and publication (Dkt. #1 ¶ 44). The Journal sent a call for papers to members of the Society for Music Theory, including Professor Ewell (Dkt. #1 ¶ 44). Walls assisted with the symposium in nearly every aspect, from its inception to its publication. Notably, the idea for the symposium originated in an email chain between Plaintiff and Walls (Dkt. #1 Exhibit A).

The symposium contributions reflected a range of views on Professor Ewell's arguments and were published in the Journal in July 2020 (Dkt. #1 ¶¶ 44–45). Plaintiff contributed one of the pieces, which accuses Professor Ewell of quoting Schenker without context, failing to discuss the evolution of Schenker's views on race during his lifetime, and refusing to acknowledge that Schenker was a victim of anti-Semitism (Dkt. #1 ¶¶ 46–49). Plaintiff also suggested Professor Ewell's criticisms of Schenker might themselves have constituted anti-Semitism. In support of this contention, Plaintiff cited studies purportedly classifying Black people as more likely to hold anti-Semitic views than whites (Dkt. #1 ¶ 50). Plaintiff closed his article by asserting that the paucity

of African American involvement in music theory discipline results from "few grow[ing] up in homes where classical music is profoundly valued, and therefore . . . lack[ing] the necessary background" (Dkt. #1 ¶ 51).

The backlash was swift. Professors across the country circulated emails and "led [a] social media charge" condemning the symposium (Dkt. #1 ¶¶ 53–54). The Executive Board of the Society for Music Theory issued a letter, stating, among other things, "[t]he conception and execution of [the] symposium failed to meet the ethical, professional, and scholarly standards of our discipline" (Dkt. #1 ¶ 54). Further, a number of UNT graduate students circulated a statement (the "Student Statement") denouncing the Journal's "platforming of racist sentiments" and calling for potential removal of Plaintiff from the Journal for his "actions . . . both past and present" that were "particularly racist and unacceptable" (Dkt. #1 ¶ 55). One defendant in this case published the Student Statement on her Twitter feed (Dkt. #1 ¶ 56). In response, a majority of Plaintiff's colleagues in UNT's Division of Music History, Theory, and Ethnomusicology signed a letter endorsing the Student Statement and included a link for viewers to access it (Dkt. #1 ¶ 57). In addition, John Richmond, Dean of the College of Music at UNT, announced the College of Music's launch of a "formal investigation into the conception and production of the twelfth volume of the Journal" (Dkt. #1 ¶ 58). UNT officials formed an ad hoc panel (the "Panel") to carry out this investigation (Dkt. #1 ¶ 58).

When the backlash began, Walls himself was "confused about what exactly people want" because they "seem[ed] to be speculating about the [J]ournal without actually reading it" (Dkt. #1 Exhibit S at p. 1). He further expressed that "the [J]ournal printed every response" it received, and

the editors "emphasized in the [call for papers] that [they] wanted a wide range of views" (Dkt. #1 Exhibit S at p. 1).[1]

Despite what Plaintiff and (initially) Walls believed about the Journal's publication process, the Panel issued a report (the "Report") in which it found the Journal did not observe "the standards of best practice in scholarly publication" in producing Volume 12 and, accordingly, made recommendations the Journal was expected to implement (Dkt. #1 ¶ 59). Provost Jennifer Cowley then sent Plaintiff a letter instructing him "to develop a plan to address the recommendations . . . and submit the plan to Chair Benjamin Brand and Dean John Richmond for review and approval" by a particular date (Dkt. #1 ¶ 59). A portion of the recommendations included: "1. Changing the editorial structure" of the Journal; "2. Making clear and transparent all editorial and review processes[; and] 3. Defining clearly the relationships between the [J]ournal editorial team and the editorial board . . . ." (Dkt. #1 Exhibit D at p. 4). Notably, Provost Cowley did not send the letter to any other faculty members associated with the Journal (Dkt. #1 Exhibit 1 ¶ 144).

Prior to the plan submission deadline, Dr. Brand, Chair of Plaintiff's department, "informed [Plaintiff] that he would be removed from the Journal and that the university would eliminate resources previously provided to the Journal and Center for Schenkerian Studies" (Dkt. #1 ¶ 60). Dr. Brand stated he "c[ould] not support a plan according to which [Plaintiff] would

---

[1] Under the continued pressure, however, Walls' tune quickly changed. He posted an apology on his Facebook page stating he "had no control over the content of the [J]ournal, or over the decisions regarding review processes," but was "guilty of complicity" (Dkt. #1 Exhibit A at p. 70). In his apology, Walls described himself as an eager, young graduate student who wound up in a "shameful position" that he feared he "could not leave without significant damage to [his] career" (Dkt. #1 Exhibit A at p. 70). However, the extensive email chain between Plaintiff and Walls paints a different picture of their professional relationship and Walls' involvement in the symposium (see Dkt. #1 Exhibit A at pp. 1–69). The email chain includes messages sent between Plaintiff and Walls discussing topics ranging from music theory to international travel to Walls' newborn child. Additionally, after completion of the symposium, Walls asked Plaintiff to serve as his dissertation advisor (Dkt. #1 Exhibit A). These communications indicate that Walls' account of events on his Facebook posts may not reflect the entire story.

remain involved in the day-to-day operations of the [J]ournal, and its editorial process in particular, given the panel's findings of editorial mismanagement" (Dkt. #1 ¶ 61).

A week later, Plaintiff submitted his response (the "Response") to Dr. Brand and Dean Richmond, addressing the Panel's findings, proposing a plan, and defending his actions and reputation. Plaintiff "plan[ned] to remain on the editorial board of the [Journal], albeit in a role that [would] ward[] off accusations recently leveled at the [Journal] of alleged 'power imbalance'"(Dkt. #1 Exhibit V at p. 2). Plaintiff expressed that, "to protect academic freedom and also prevent pretextual abrogation of that right," it had become "absolutely necessary that the editor-in-chief be a full time, tenured faculty member whether at UNT or at an outside institution" (Dkt. #1 Exhibit V at pp. 4, 19). Plaintiff concluded his Response by indicating he would not be forced to resign from the Journal's editorial board but "look[ed] forward to a positive outcome of [the] ad hoc process by implementing the points recommended by the Panel" (Dkt. #1 Exhibit V at p. 22).

Since then, the Journal has been "on ice."[2] No editorial board currently exists, and no one has applied for the position of editor-in-chief. Because of this indefinite suspension, Plaintiff has been de facto removed from the Journal.

Following these events, Plaintiff filed suit against two groups of defendants (collectively, "Defendants"): (1) members of the Board of Regents of UNT in their official capacities (the "Board Defendants") under 42 U.S.C. § 1983 for violation of the First Amendment; and (2) signatories of the Student Statement for defamation (the "Defamation Defendants"). As against the Board Defendants, Plaintiff seeks only declaratory and injunctive relief. On March 15, 2021, Defendants filed their Motion to Dismiss (Dkt. #8) asserting first, that this Court lacks subject

---

[2] UNT used this terminology at the Hearing to describe the current state of the Journal. Prior to the Hearing, the Court was unsure as to Plaintiff's specific status or involvement with the Journal.

matter jurisdiction over the claims under Federal Rule of Civil Procedure 12(b)(1) and, second, that Plaintiff has failed to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Plaintiff filed a response on April 12, 2021 (Dkt. #16). On April 19, 2021, Defendants filed their reply (Dkt. #21). On October 29, 2021, the Court held a hearing (the "Hearing") to make factual findings that would dictate whether the Court had subject matter jurisdiction over this case. After the Hearing, Plaintiff filed supplemental briefing (Dkt. #44).

The Court will briefly summarize the facts as developed at the Hearing. Both Plaintiff and Dr. Brand, on behalf of UNT, testified about the aftermath of this controversy. Plaintiff explained that he currently has no involvement with the Journal he founded and has suffered severe damage to his reputation. Pieces set for publication in the thirteenth volume of the Journal are frozen in the editing stages because, as UNT put it, the Journal is "on ice," or, in other words, at a functional standstill. Plaintiff further testified that at least one other UNT funded journal had engaged in the same scholarly practices with which the Panel expressed disapproval in its Report. Specifically, Plaintiff named a journal that had previously published anonymous work and foregone a peer review process but testified that UNT took no action against that journal or its leading faculty member. Additionally, Plaintiff explained that UNT had posted the Panel's Report to the UNT website but never published Plaintiff's Response. The Response did not become public record until Plaintiff filed the present case.

Defendants maintained that UNT did not remove Plaintiff from his role or banish him from the Journal; rather, the Journal's inactive status results from the restructuring of the Journal's editorial board that Plaintiff agreed to when he adopted the Panel's recommendations. Specifically, the Journal is now expected to be led by an editor-in-chief who holds a full-time faculty position at either UNT or another university. However, Defendants contended that since Plaintiff's

adoption of the Panel's recommendations, the Journal's editor-in-chief position has been vacant because no one has applied for the position. Until someone applies for and is offered that position, the Journal will remain "on ice." Further, Defendants noted that Plaintiff has not applied for the position but that he is welcome to. Defendants also claimed that Plaintiff is still technically on the editorial board—but in the same breath indicated there is no editorial board until the editor-in-chief appoints board members. This circular reasoning, Plaintiff responded, has left him essentially removed from the Journal he founded because neither he, nor anyone, can publish scholarship in it.

## I.     Subject Matter Jurisdiction

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court has neither statutory nor constitutional power to adjudicate the case. *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). Addressing a facial attack on the complaint, the court accepts as true all well-pleaded allegations set forth in the complaint and construes those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994).

However, "where subject matter jurisdiction is [] challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004) (citing *Land v. Dollar,* 330 U.S. 731, 735 n. 4 (1947). When there is a factual attack to the complaint that "challenges the existence of subject matter jurisdiction in fact," the court, irrespective of the pleadings, considers "matters outside the pleadings, such as testimony and affidavits." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891–92 (3d Cir. 1977). "Moreover, a factual attack under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist." *Id.*; *McLain v. Real Est. Bd. of New Orleans, Inc.*, 583 F.2d 1315, 1318 n. 1 (5th Cir. 1978), *vacated and remanded on other grounds*, 444 U.S. 232 (1980). *See* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, at 555 (1969). To be sure, "no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact . . . to determine whether or not it has jurisdiction to hear the case." *Montez*, 392 F.3d at 149.

## ANALYSIS

Defendants' Motion to Dismiss asserts that Plaintiff cannot properly invoke this Court's federal jurisdiction for three reasons: (1) Plaintiff lacks Article III standing to bring this suit against the Board Defendants; (2) Eleventh Amendment sovereign immunity shields the Board Defendants from suit; and (3) the Court cannot—or, in the alternative—should not exercise supplemental jurisdiction as to the defamation claim. The Court will address each point in turn.

### A. Standing

"Under Article III of the Constitution, the federal courts have jurisdiction over a claim between a plaintiff and a defendant only if it presents a 'case or controversy.'" *Okpalobi v. Foster*,

244 F.3d 405, 425 (5th Cir. 2001) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "In this way, the power granted to federal courts under Article III 'is not an unconditioned authority to determine the constitutionality of legislative or executive acts.'" *Id.* (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). One limitation requires that a plaintiff show he has standing sufficient to establish a case or controversy. *See Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019).

To satisfy standing requirements under Article III, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief. *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)). To meet this threshold, the party seeking to invoke federal jurisdiction bears the burden of establishing three elements: injury in fact, causation, and redressability. *Stringer*, 942 F.3d at 720. A plaintiff "need show that only one of his alleged injuries would be redressed by a favorable ruling." *Cramer v. Skinner*, 931 F.2d 1020, 1028 (5th Cir. 1991).

However, the Supreme Court has explained that standing requirements are somewhat relaxed in First Amendment cases:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). In *Laird v. Tatum*, the Court noted it had, in recent years "found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." 408 U.S. 1, 11 (1972); *see, e.g.*,

*Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965); *Baggett v. Bullitt*, 377 U.S. 360 (1964); *see also* Michael N. Dolich, *Alleging A First Amendment "Chilling Effect" to Create A Plaintiff's Standing: A Practical Approach*, 43 DRAKE L. REV. 175, 176 (1994) ("[A]n official action may abridge First Amendment rights without directly proscribing a protected activity. This is the so-called 'chilling effect.'"). Three circuit courts have noted that "when a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements," *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010), in a way that "tilt[s] dramatically toward a finding of standing." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (quoting *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010)); *see also Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (favorably quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

In the present case, Defendants assert Plaintiff lacks standing to pursue any claims against the Board Defendants because he has suffered no cognizable injury that the Board Defendants caused nor one this Court can redress (Dkt. #8 at pp. 13–16). Plaintiff argues that his removal and continued banishment from the Journal is a cognizable injury that the Court may redress by issuing an injunction and a declaratory judgment against the Board Defendants.

### 1. Injury in fact

"To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical." *Stringer*, 942 F.3d at 720 (internal quotations omitted). "The purpose of the requirement that the injury be 'imminent' is 'to ensure that the alleged injury is not too speculative for Article III purposes.'" *Id.* (first citing *Clapper v. Amnesty Int'l USA*, 568

10

U.S. 398, 409 (2013) and then quoting *Lujan*, 504 U.S. at 564 n.2). A litigant must demonstrate "a claim of specific present objective harm or a threat of specific future harm." *Meese v. Keene*, 481 U.S. 465, 472 (1987) (quoting *Laird*, 408 U.S. at 14 (internal quotations omitted)). "For a threatened future injury to satisfy the imminence requirement, there must be at least a substantial risk that the injury will occur." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5)).

"Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury in fact requirements." *Id.* "The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries." *Id.* "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95 (1983)). "That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact." *Id.* (citing *Driehaus*, 573 U.S. 149).

The Supreme Court's "relaxed" standing requirement in First Amendment cases "manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235; *see also Munson*, 467 U.S. at 956. The Fifth Circuit has consistently reasoned that "government action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury." *Glass v. Paxton*, 900 F.3d 233, 238 (5th Cir. 2018) (quoting *Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018)); *see also, e.g.*, *Hous. Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007); *Freedom Path, Inc. v. I.R.S.*, 913 F.3d 503, 507 (5th Cir. 2019); *Fairchild v. Liberty ISD*, 597 F.3d 747, 754–55 (5th Cir. 2010); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006).

11

However, the chilling effect cannot "arise merely from the . . . individual's concomitant fear that . . . the [government] might in the future take some other and additionl [sic] action detrimental to that individual." *Laird*, 408 U.S. at 11. In other words, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14. Rather, governmental activity constitutes an injury in fact when "the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Id.* at 11.

The Fifth Circuit has expressly indicated that, in the First Amendment context, "[a] plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'" *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quoting *Driehaus*, 573 U.S. at 161–64).

Plaintiff claims an ongoing injury in his continued banishment from the Journal. Defendants assert Plaintiff only suffered past harm—not an ongoing injury—because he was not banished from the Journal—the Journal is simply on pause until an editor-in-chief is appointed who can restart its operations. Further, Defendants claim that any threat of future injury is purely speculative, and the current state of Journal affairs does not constitute a cognizable injury suffered by Plaintiff.

The Court finds that, given the relaxed standing requirements in First Amendment cases, Plaintiff has established a cognizable injury. Plaintiff has been de facto removed from the Journal he founded and therefore cannot engage in the speech he wishes to express. When the Panel issued

its recommendations, Provost Cowley expected Plaintiff to adhere to the recommendations, imposing a deadline by which Plaintiff would respond to the recommendations with a plan for implementation. Additionally, Dr. Brand wrote to Plaintiff stating he could not "support a plan according to which [Plaintiff] would remain involved in the day-to-day operations of the [J]ournal, and its editorial process in particular" (Dkt. #1 ¶ 61). When Plaintiff responded to the recommendations, he explicitly stated that he "plan[ned] to remain on the editorial board" of the Journal and submitted the Response "in that spirit of carrying on the Journal's and the University's important work" (Dkt. #1 Exhibit V at pp. 4, 22).

Since then, the Journal has been frozen, and no editorial board exists that would allow it to operate. At the Hearing, when the Court asked Defendants if Plaintiff could continue working on the Journal, Defendants responded "he could go back, but there is nothing to go back to." Thus, even Defendants recognize that Plaintiff cannot publish scholarship in the Journal he founded.

The harm from which Plaintiff continues to suffer constitutes, at a minimum, chilled speech. Specifically, Plaintiff can no longer publish scholarship in the Journal that he considers a trademark of his life's work, and if he took action to publish the work that is currently "on ice,"[3] he would face negative consequences imposed by UNT officials.

To be sure, the injury in this case presents slightly differently than in other Fifth Circuit chilled speech cases. As previously noted, "[a] plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'" *Speech First*, 979 F.3d at 330 (quoting *Driehaus*, 573 U.S. at 161–64). Plaintiff satisfies the first inquiry here. He has alleged

---

[3] The work described as currently "on ice" refers specifically to the pieces stalled in the publication process that Plaintiff planned to publish in the Journal's thirteenth volume.

in both his pleadings and at the Hearing that he intends to engage in publication of scholarly works through the Journal he founded.

The Court recognizes, though, in this case, there is no unequivocal policy proscribing his intended conduct. But the implicit policy creating the stagnant Journal arguably proscribes Plaintiff's intended conduct, which is all the standard requires. *See* Dolich, *supra* p. 10 at 176 ("[A]n official action may abridge First Amendment rights without directly proscribing a protected activity. This is the so-called 'chilling effect.'"). After demands from students and UNT faculty calling for Plaintiff's removal,[4] UNT, pursuant to its authority (*see* Dkt. #1 Exhibit U at p. 2), created the Panel to investigate the scholarly practices of the Journal. In its Report, the Panel reprimanded the Journal for publishing an anonymous author and foregoing the peer review process. Plaintiff testified that at least one other UNT journal had engaged in identical scholarly practices without reprimand of any sort. Additionally, Dr. Brand, the head of Plaintiff's department at UNT, indicated he would not support Plaintiff's continued involvement with the editorial process of the Journal. Now the Journal is at a functional standstill. The accumulation of these events has created an implicit policy: UNT will not allow Plaintiff, on his own accord, to publish work in the Journal he founded. The implicit policy proscribes his conduct.

Further, for reasons similar to those articulated above, the threat of future enforcement of this proscription is substantial. Dr. Brand, Provost Cowley, and other UNT officials have exhibited authority over Plaintiff throughout this controversy.[5] Through the accumulation of events

---

[4] (*See* Dkt. #42 Exhibit 1 at p. 47) (drafters of the Student Statement writing "Dr. Jackson should be removed from the UNT faculty because he has shown that his values are diametrically opposed to those of our division . . . and the university at large").

[5] The threat of future enforcement can be substantial even if the threat is implicit. *See Cooksey*, 721 F.3d 226. Further, the injury need not constitute a complete restriction of speech. *Id.* In *Cooksey*, a state board issued guidance pertaining to a website and subsequently sent the plaintiff a notice requesting that he "make any necessary changes to [his] site, and moreover, going forward, align [his] practices with the guidance provided." *Id.* at 236. The plaintiff "was told, in effect, that he would remain under the watchful eye of the [s]tate [b]oard" which would "continue to monitor th[e] situation." *Id.* at 236–37. The Fourth Circuit, in reasoning derived from *Laird* and *N.C. Right to Life v. Bartlett*, 168

described above, UNT officials constrained Plaintiff into stepping down from his role, stripping him of his ability to publish scholarship through the Journal. Indeed, Plaintiff believed that disregarding the Panel's Recommendations and continuing as the Journal's operational head would result in the complete discontinuance of the Journal:

> Rather than forcing me to resign from the Editorial Board of the J[ournal], which I founded, I look forward to a positive outcome of this ad hoc process by implementing the points recommended by the Panel as agreed to in Section II of this Response and by UNT making this Response public and undertaking to make good on the guarantees in its policies to ensure that the faculty and administration protect academic freedom and free expression. It is in that spirit of carrying on the Journal's and the University's important work, both nationally and internationally, that I submit this Response.

(Dkt. #1 Exhibit V at p. 22). Plaintiff's hopes were to no avail. UNT's actions resulted in the discontinuance of the Journal despite Plaintiff's Response.[6]

A case from the Second Circuit is instructive on the issue of injury in a factually similar situation. *See Levin v. Harleston*, 966 F.2d 85. In *Levin*, a tenured professor at a public college in New York State published three writings that "contained a number of denigrating comments concerning the intelligence and social characteristics of [B]lack[ people]" that "elicited a mixed response, much of it critical in nature." 966 F.2d at 87. After this, a dean of the college "created an 'alternative' section of Philosophy 101 for those of [the professor]'s students who might want to transfer out of his class." *Id.* The college's president then "formally announced the appointment

---

F.3d 705 (4th Cir. 1999), found that the plaintiff's speech was chilled because he would have to "take significant . . . compliance measures" to comport with the government's expectations. *Id.* The Court further found that the state board's actions would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." 721 F.3d at 236 (internal quotation marks and alteration omitted).

[6] Even if Dr. Brand could not alone punish Plaintiff if he now engaged in publication of scholarship through his Journal, "[t]hat an official or regulator lacks actual authority to punish an individual, although relevant to the question of concrete harm, is not dispositive. Even if an official lacks actual power to punish, the threat of punishment from a public official who appears to have punitive authority can be enough to produce an objective chill." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963); *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *Levin v. Harleston*, 966 F.2d 85, 88–89 (2d Cir. 1992). Dr. Brand, the chair of Plaintiff's department at UNT, has exhibited such authority.

of [an] Ad Hoc Committee," which would "review the question of when speech both in and outside the classroom may go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty, or some other form of misconduct." *Id.* at 89. The Second Circuit noted that "[s]imilar action [had] never before been taken in the history" of the college. *Id.* at 87–88. Upon reading this announcement, the plaintiff feared he might be fired and opted to turn down invitations to discuss his controversial views. *Id.* at 89.

The college contended that "[s]ince, by definition, alternative class sections presuppose that [the plaintiff] w[ould] continue to teach a class section, the creation of such sections [could] not, as a matter of law, constitute an infringement of . . . First Amendment rights." *Id.* at 88. The Second Circuit disagreed, emphasizing that "[w]here . . . basic constitutional values have been infringed" the Court would "not remain silent." *Id.* The Court reasoned that the colleges' "encouragement of the continued erosion in the size of [the plaintiff]'s class if he does not mend his extracurricular ways [was] the antithesis of freedom of expression." *Id.*

The college also argued that "any chilling effect caused by the creation of the Ad Hoc Committee did not satisfy the requirements of *Laird* because the Committee was purely advisory, utterly lacking any power to take action against the plaintiff." *Id.* The Second Circuit rejected this contention, declaring that "[w]hether an implicit threat is sufficient to create a chill is substantially a fact-based inquiry." *Id.* The Court went on to address the claims on the merits and granted plaintiff declaratory relief. *Id.* at 90–91.

Plaintiff here has, likewise, stated an injury in the First Amendment context. He "has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'" *Speech First*, 979 F.3d at 330

(quoting *Driehaus*, 573 U.S. at 161–64). "It is not fatal that [UNT] never explicitly stated that disciplinary charges would be brought if [Plaintiff] continued to voice his views. It is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat." *Levin*, 966 F.2d at 89–90 (citing *Trotman v. Bd. of Trustees of Lincoln Univ.*, 635 F.2d 216, 228 (3d Cir. 1980), *cert. denied*, 451 U.S. 986 (1981).

### 2.  Causation

In addition to injury, Plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, (1976)). "Traceability . . . requires that the injury 'resulted' in some 'concretely demonstrable way' from the challenged practice—that the injury is 'the consequence of the defendants' actions, or that prospective relief will remove the harm.'" *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 668 (S.D. Tex. 2020) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).

Defendants claim that Plaintiff cannot meet causation for two main reasons. First, Plaintiff pleads no facts "to show that the Board Defendants are involved with the Journal or the Panel's activities" (Dkt. #8 at p. 15). Second, Plaintiff adopted the recommendation to restructure the Journal by his own accord—no one at UNT forced him to do anything. Plaintiff responds that he need not show "proximate causation"—rather he must only show his "injury [is] fairly traceable to the defendant's conduct" (Dkt. #16 at p. 12) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014)). He asserts that, because the Board Defendants serve as part of the governing body for the UNT System, the ongoing injury stemming from the

challenged action is fairly traceable to those Defendants (Dkt. #16 at pp. 12–13). Plaintiff also contends that UNT did force the Journal's restructuring through the Panel's pretextual suppression of viewpoints (Dkt. #1 Exhibit 1 ¶ 5).

In support of their contentions, Defendants cite to an unpublished district court case that found no "causal connection between [plaintiff's] injury—dismissal from [the university program]—and any action by the Board [of Regents]" because the plaintiff did not "identify any conduct or act by the Board that affected" him. *Doe v. Bd. of Regents of the Univ. of Tex. Sys.*, No. 1:19-cv-00415-LY at 7–8 (W.D. Tex. Oct. 24, 2019).[7] This case would be persuasive if it did not conflict with the plethora of case law in which the Supreme Court and Fifth Circuit exercised subject matter jurisdiction over nearly identical claims.[8]

For example, in *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), the Supreme Court addressed the difference between suit against a board of regents as an entity compared to suit against university board members in their official capacities. The student-plaintiff in *Ewing* was dismissed from his six-year degree program and subsequently sued the Regents of the University Michigan. *Id.* The defendant invoked its Eleventh Amendment sovereign immunity because the plaintiff had sued the "corporate body" of the board, rather than members in their official capacities. *Id.* at 221 n.6. This distinction can be fatal. A "[b]oard itself is immune from" suit for injunctive relief, "absent waiver or abrogation" because "only state officials—not state agencies—can be prospectively enjoined consistent with state sovereign immunity." *Doe*, 841 F.

---

[7] On appeal, the Fifth Circuit affirmed the district court but did not address standing in its reasoning. Rather, the Fifth Circuit found it lacked subject matter jurisdiction because sovereign immunity shielded the Board of Regents as a "state agency." The Court did not address members of the Board of Regents in their official capacity. *Doe v. Harrell*, 841 F. App'x 663, 668 n.7 (5th Cir. 2021).

[8] *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 637 (5th Cir. 2014), *aff'd*, 136 S. Ct. 2198 (2016); *Glass*, 900 F.3d 233.

App'x at 668 (citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). To avoid this issue, the Supreme Court in *Ewing* "allow[ed] Ewing to name as defendants the individual members of the Board of Regents in their official capacities" rather than just the board as an entity. 474 U.S. at 221 n.6 (citing *Patsy v. Fla. Bd. of Regents*, 457 U.S. 496, 516 n.19 (1982)). Notably, standing was not an issue. *Id.* at 214–28 (addressing the claims on the merits).

So it goes, Defendants in this case seek to put Plaintiff in a Catch-22: if he sues the Board of Regents as an entity, sovereign immunity likely bars the federal claim. But if Plaintiff sues members of the Board of Regents in their official capacities, Defendants claim he cannot satisfy causation sufficient for Article III standing. Though the doctrines of standing and sovereign immunity remain somewhat convoluted, it cannot be that, absent literal causation between named defendants and a plaintiff's injury, a constitutional claim is dead on arrival.

Further, federal courts routinely address the merits of claims against university board members—as well as claims against governors, attorney generals, etc.—in their official capacities, as opposed to claims against the officials who directly caused the alleged injury. *See, e.g.*, *Gratz*, 539 U.S. 244 (holding petitioner had standing); *Bakke*, 438 U.S. at 281 n.14 (noting that "Petitioner [did] not object to Bakke's standing, but inasmuch as this charge concerns our jurisdiction under Art. III, it must be considered and rejected"); *Grutter*, 539 U.S. 306 (addressing claims on the merits); *Fisher*, 758 F.3d at 637, *aff'd*, 136 S. Ct. 2198 (addressing claims on the merits); *Glass*, 900 F.3d 233 (addressing two of three claims on the merits).

Nonetheless, Defendants attempt to distinguish this case from those that have addressed "constitutional challenges to university policies, such as affirmative action, because [Plaintiff] does not complain about any policy adopted or implemented by the UNT Board of Regents" (Dkt. #21 at p. 4). Plaintiff does not directly respond to this argument. Statements that Provost

19

Cowley sent to Plaintiff appear to cut against this contention, however. During the Panel's investigation, Provost Cowley wrote:

> The *university is investigating* neither you nor the Journal of Schenkerian Studies. I think it is fair to presume that we agree the [J]ournal is a UNT publication, since it is housed in the Center for Schenkerian Studies and is *funded by the university*. As such, *the university has an interest* in the complaints about the circumstances surrounding Volume 12 that have come from all corners, and ensuring the [J]ournal meets the standards of a peer reviewed, academic publication. *The university has the discretion, if not the obligation*, to look into these circumstances. A panel of faculty with experience editing peer-reviewed journals *has been appointed* to do just that; not to investigate you or the [J]ournal, or to look into whether a particular policy has been violated.

(Dkt. #1 Exhibit U at p. 2) (emphasis added). Provost Cowley consistently highlights the university's stake in the process and emphasizes the university's discretion and obligation to investigate the circumstances. The university could not have such discretion or obligation without the policies implemented by its governing body. Further, if Plaintiff published the thirteenth volume of the Journal on his own accord, university officials would likely seek enforcement of disciplinary action against Plaintiff for his continued involvement in the publication of the Journal. Likewise, whether Dr. Brand, Provost Cowley, or the Board Defendants themselves sought such enforcement, the authority to do so would stem from the policies implemented by the Board Defendants who maintain and delegate the power to govern the university.

The Board Defendants also argue that Plaintiff played a role in his ongoing injury, implying that Plaintiff caused the injury by his own accord. Specifically, Defendants highlight that, in Plaintiff's Response to the Panel's Report, he "propose[d] to adopt four of the main recommendations" and voluntarily stepped down from his leadership role on the Journal's editorial board (Dkt. #1 Exhibit V at p. 3). Plaintiff contends that UNT forced the Journal's restructuring through the Panel's pretextual suppression of viewpoints (Dkt. #1 Exhibit 1 ¶ 5).

To be sure, "standing cannot be conferred by a self-inflicted injury." *Zimmerman*, 881 F.3d at 389. "An injury is 'self-inflicted' so as to defeat standing only if 'the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *Kinetica Partners*, 505 F. Supp. 3d at 668 (quoting *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015)); 13 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.5, at 457 (2d ed. 1984). "Standing doctrine thus does not require a plaintiff to show that it made no choice that put it at risk of injury." *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 51 (D.D.C. 2020).

Any self-inflicted injury in this case does not break the causal chain. Plaintiff may have stepped down from his leadership role, but he did so only after enduring serious backlash, multiple calls for his removal from graduate students and his own colleagues, UNT's investigation of his Journal's editorial practices, and a threat of removal from his leadership position on the Journal. Plaintiff's decision to partially succumb to this pressure may have "'put [Plaintiff] at risk of injury,' but that fact alone does not defeat standing." *Kinetica Partners*, 505 F. Supp. 3d at 669 (quoting *Ciox Health*, 435 F. Supp. 3d at 51). Further, Plaintiff's decisions were made with reliance on UNT's "guarantees in its policies to ensure that the faculty and administration protect academic freedom and free expression" and with the understanding that he would "carry[] on the Journal's and the University's important work" (Dkt. #1 Exhibit V at p. 22). Now, because of circumstances in UNT's control, Plaintiff can no longer carry on this work.

For all these reasons, the Court finds the cause of Plaintiff's injury is fairly traceable to the Board Defendants.

### 3. Redressability

Plaintiff has demonstrated an injury in fact caused by the Board Defendants, but he must also show his injury is "likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at

472; *Meese*, 481 U.S. at 477. As mentioned, "[r]equests for injunctive and declaratory relief implicate the intersection of the redressability and injury in fact requirements." *Stringer*, 942 F.3d at 720. "The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries." *Id.*

In his pleadings, Plaintiff asked this Court to enjoin Defendants from continuing to block his involvement on the Journal (Dkt. #16 at pp. 13–14). But at the Hearing, the Board Defendants testified that there is no ongoing block because Plaintiff was welcome to apply for the new position of editor-in-chief or resume his role as an editor without a leadership component. The Court recognizes the bleak reality of this offer. As Defendants themselves stated, there is no Journal for Plaintiff to return to because "there is nothing to go back to." Further, given the details of this lawsuit, the Court does not foresee UNT allowing Plaintiff to serve as the Journal's editor-in-chief. As a result, Plaintiff clarified his requested relief, asking this Court to enjoin the Board Defendants to "restore the Journal to its former" structure and "restore [Plaintiff] to head the editorial board" (Dkt. #44 at p. 5).

If the Court later determines that the Board Defendants violated Plaintiff's First Amendment rights, the Court could conceivably enjoin UNT from preventing Plaintiff's leadership role in the editorial publication process of the Journal. This would allow Plaintiff to continue the Journal's work without future fear of employment consequences, even if he could find no other faculty members or graduate student editors to join the Journal's editorial board. *See, e.g.*, *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000) (Posner, J.) ("It is not uncommon for an injunction to repeat a statutory or equivalent prohibition . . . and this is proper relief, as the Supreme Court emphasized in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191–92 (1949), in order to prevent the defendant from repeating his violation in slightly different form.").

The Court also notes that, even in the absence of injunctive relief, it may issue a declaratory judgment. "[A] federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Zwickler v. Koota*, 389 U.S. 241, 254 (1967); see also *Powell v. McCormack*, 395 U.S. 486, 499 (1969); *Poe v. Gerstein*, 417 U.S. 281, 281 (1974) (holding that the district court properly refused to issue an injunction when "it was anticipated that the State would respect the declaratory judgment"). The Declaratory Judgment Act was "expressly designed to provide a milder alternative to the injunction remedy." *Robinson v. Hunt Cty., Tex.*, 921 F.3d 440, 450 (5th Cir. 2019) (quoting *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985) (quotation omitted)). Specifically, the Court could declare that the Board Defendants are presently in violation of the First Amendment through their suppression of Plaintiff's speech. The Court, at this stage, need not determine the specific relief it would grant Plaintiff if he proved a First Amendment violation. It is enough, at this juncture, that Plaintiff's injury is "likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472; *Meese*, 481 U.S. at 477. The Court determines that redressability of Plaintiff's injury is likely.

For these reasons, the Court finds that Plaintiff's injury is redressable. Accordingly, Plaintiff has standing.

**B.  Sovereign Immunity**

Eleventh Amendment sovereign immunity shields from suit nonconsenting states and state actors in their official capacities. *Metcalf*, 506 U.S. at 141. In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court carved out an exception to Eleventh Amendment sovereign immunity. It held that enforcement of an unconstitutional law is not an official act because a state cannot confer authority on its officers to violate the Constitution or federal law. *See Am. Bank & Trust Co. of*

*Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir. 1993). "Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief . . . gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Milliken v. Bradley*, 433 U.S. 267 (1977)).

Thus, to qualify for the *Ex parte Young* exception, a plaintiff alleging a violation of federal law must sue individual persons in their official capacities as agents of the state and seek relief that is declaratory or injunctive in nature and prospective in effect. *See Saltz v. Tenn. Dep't of Emp. Sec.*, 976 F.2d 966, 968 (5th Cir. 1992). Further, the state official sued must have "some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Young*, 209 U.S. at 157. However, whether a suit may proceed under *Ex parte Young* does "not require an analysis of the merits of the claim. Rather, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Plaintiff seeks prospective relief in the form of an injunction against the Board Defendants in their official capacities (Dkt. #1 ¶ 64). The Court determined in its standing analysis that Plaintiff has demonstrated injury, causation, and redressability. These elements also affect Plaintiff's ability to satisfy the *Ex parte Young* exception. Plaintiff cannot publish scholarship in the Journal he founded, an injury he alleges resulted from UNT's investigation of the Journal and the subsequent restructuring of the Journal's editorial board. He alleges this amounts to a First Amendment

violation. Thus, Plaintiff has alleged an ongoing violation of federal law. *See Paxton*, 943 F.3d at 998.

Further, Plaintiff seeks an injunction that directs the Board of Regents to restore the Journal to its previous structure or a declaration that the Board Defendants are in violation of the First Amendment (Dkt. #16 at pp. 8, 12, 15, 17). Such relief is properly characterized as prospective in effect because it would likely resolve the alleged violation going forward. *See Power*, 226 F.3d at 820 ("And so an injunction that orders a state employee who has been demoted because of his exercise of a federally protected right to be restored to his previous position is not barred by the Eleventh Amendment."). *See also e.g.*, *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986); *Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1985).

Lastly, Plaintiff has shown "some connection" between the Board Defendants and the alleged ongoing violation of Plaintiff's First Amendment rights. The Fifth Circuit "has not spoken with conviction about all relevant details of the 'connection' requirement." *Texas Dem. Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021).[9] However, "[a] 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Id.* (quoting *Paxton*, 943 F.3d at 1002).

As discussed in the Court's causation analysis, the Board Defendants serve as part of the governing body for the UNT System. Pursuant to their authority (*see* Dkt. #1 Exhibit U at p. 2),

---

[9] Other federal courts have considered "some connection" and "fairly traceable" to be equivalent standards. That is, when a plaintiff meets the "fairly traceable" standard, he also meets the "some connection" standard. *See S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 615 (9th Cir.1980) (holding plaintiffs must show that their asserted injury was "fairly traceable" or had "some connection" to defendants to satisfy standing); *Final Exit Network, Inc. v. Ellison*, 370 F. Supp. 3d 995, 1011 (D. Minn. 2019) ("Whether a defendant possesses enforcement authority sufficient for standing purposes turns on whether he has some connection with the enforcement of [the] state law.") (internal citations and quotations omitted).

UNT officials prompted an investigation of the Journal's editorial practices, which led to the restructuring of the Journal's editorial board. Ultimately, the restructuring left the Journal without any sort of editorial board, so the work of the Journal remains indefinitely on ice. Based on the accumulation of these events, if Plaintiff published the thirteenth volume of the Journal on his own accord, university officials would likely seek enforcement of disciplinary action against Plaintiff for his continued involvement in the publication of the Journal. The Board Defendants, in their official capacities as members of UNT's governing board, are connected to that threat of enforcement.[10] Therefore, the Board Defendants have some connection to the challenged action. *See Verizon Md. Inc.*, 535 U.S. at 645 ("The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our straightforward inquiry."). Consequently, the *Ex parte Young* exception applies, and sovereign immunity does not shield the Board Defendants from suit.

### C.  Supplemental Jurisdiction

While Plaintiff's First Amendment claim is a question of federal law, his defamation claims arise solely under state law. Thus, this Court may only hear such claims if exercising supplemental jurisdiction is proper. 28 U.S.C. § 1367. Section 1367 provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Claims are so related to the original claims that they form part of the same case or controversy when they "derive from a common nucleus of operative fact." *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

---

[10] *See supra pp.* 15–17 for the Court's analysis on the threat of enforcement.

This Court may exercise supplemental jurisdiction over the defamation claims. As Plaintiff alleges in his Complaint, all claims in this suit arise from Plaintiff's criticisms of Professor Ewell's scholarly stance in Volume 12 of the Journal. The publication sparked the social media responses condemning Plaintiff for his "racist sentiments," and, as Plaintiff contends, ultimately led to his de facto removal from the Journal (Dkt. #1 ¶¶ 65–69). Accordingly, both the First Amendment and the defamation claims arise from a common nucleus of operative fact—the criticisms published in the Volume 12 symposium.

Nonetheless, even if a district court has the power to hear a supplemental claim, it may decline to exercise supplemental jurisdiction if: (1) the state claims raise novel or complex issues of state law; (2) the state claims substantially predominate over the federal claims; (3) the federal claims have been dismissed; or (4) there are exceptional circumstances or other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). A court may also consider the common law factors of judicial economy, convenience, fairness, and comity. *Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011).

Defendants only address subsections (2) and (3) in their motion. They argue that, based on the sheer number of Defamation Defendants, the state law claim substantially predominates over the federal claim (Dkt. #8 at pp. 21–23). Further, they contend that if the Court dismisses the First Amendment claim, "the basis for declining supplemental jurisdiction is that much more compelling" (Dkt. #8 at p. 22).

The Court finds the quantity of defendants to be immaterial to the substantial predomination inquiry. As the Third Circuit has written:

> Generally, a district court will find substantial predomination where a state claim constitutes the real body of a case, to which the federal claim is only an appendage—only where permitting litigation of all claims in the district court can

accurately be described as allowing a federal tail to wag what is in substance a state dog.

*De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003); *see also Baxter v. Broome*, No. 3:07-CV-2036-M, 2008 WL 11425405, at *2 (N.D. Tex. May 20, 2008). Evident from the extensive standing, sovereign immunity, and First Amendment (*see infra*) analyses in this Order, the federal claims in this case constitute the real body. The essence of the defamation claims, though brought against a greater number of defendants, do not substantially predominate over the constitutionally complex federal matters.

Additionally, the Court does not today dismiss the First Amendment claims. Accordingly, the Court will exercise supplemental jurisdiction.

## II.    Failure to State a Claim

### LEGAL STANDARD

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). [11]

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the

---

[11] For purposes of the 12(b)(6) motion, the Court must disregard any factual assertions made at the Hearing but not alleged in the "the complaint, any documents attached to the complaint, [or] any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund*, 594 F.3d at 387. The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

### A.  First Amendment Claim

The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Supreme Court precedent in the realm of academia could not be clearer:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. *Particularly is that true in the social sciences*, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957) (emphasis added); *see also, e.g.*, *Keyishian*, 385 U.S. at 603 ("The classroom is peculiarly the marketplace of ideas. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection."); Robert A. Sedler, *The Unconstitutionality of Campus Bans on "Racist Speech:" the View from Without and Within*, 53 U. PITT. L. REV. 631, 647 (1992) (recognizing the "heightened protection of expression in the academic context").

Plaintiff asserts a claim against the Board Defendants for "adverse action" in violation of Plaintiff's First Amendment rights (Dkt. #1 ¶¶ 62–64). He alleges that UNT took specific actions in retaliation for Plaintiff's critical article and publication of the entire symposium in the Journal. Defendants contend that Plaintiff has not and cannot allege facts sufficient "to plead an adverse employment action that supports a claim for a violation of the First Amendment" (Dkt. #21 at p. 6).

The parties disagree on the proper test or standard the Court should apply in assessing Plaintiff's First Amendment claim. Defendants assert that the Court should apply the test for customary retaliation cases. To survive a motion to dismiss under this test, Plaintiff must allege facts that plausibly show: "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) (quoting *Nixon v. City of Hous.*, 511 F.3d 494, 497 (5th Cir. 2007) (internal citations omitted)). Contrarily, Plaintiff argues that, because this case involves academic scholarship, the *Pickering-Connick* standard applies (Dkt. #16 at p. 18). Under this test, "[t]o establish a § 1983 claim for violation of the First Amendment right to free speech" a professor must show he or she was (1) "disciplined or fired for speech that is a matter of public concern, and (2) [his or her] interest in the speech outweighed the university's interest in regulating the speech." *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir.) *cert. denied*, 140 S. Ct. 432 (2019). Defendant responds that, under either standard, Plaintiff has not alleged facts that plausibly state a retaliation claim.

The Court attributes part of this disagreement to Plaintiff's muddled characterization of his claim. In his Complaint, Plaintiff appears to assert a First Amendment retaliation claim (Dkt. #1); however, in his response, Plaintiff seems to confound a First Amendment claim for suppression of speech with a retaliation claim for adverse employment action following protected speech (Dkt. #16). Whether Plaintiff seeks to bring a retaliation claim, a First Amendment speech claim, or both, Plaintiff has alleged facts in his Complaint sufficient to survive a motion to dismiss.

As mentioned, under the test for customary First Amendment workplace retaliation, Plaintiff must allege facts that plausibly show: "(1) he suffered an adverse employment action;

(2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson*, 845 F.3d at 590. Defendants only contest the first element. Specifically, Defendants argue that Plaintiff has not alleged facts that show an adverse employment action (Dkt. #8 at p. 19). The Fifth Circuit defines adverse employment as "discharges, demotions, refusals to hire, refusals to promote, [] reprimands, and in some instances, transfers." *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000)).

Plaintiff alleges he was de facto removed from the Journal in retaliation for the symposium's criticisms of Professor Ewell. This is a plausible assertion that states a legal claim. UNT, responding to backlash from its displeased students and faculty, took immediate action. It created the Panel to investigate the Journal and its editorial practices and later issued recommendations regarding the Journal that Plaintiff was expected to implement. Dr. Brand then threatened Plaintiff with removal from the Journal. Plaintiff alleges these actions have left him banished from the Journal he founded. Plaintiff also alleges UNT removed him from the Journal for his speech. The Court at the 12(b)(6) stage views the alleged facts in the light most favorable to Plaintiff, and, accordingly, can reasonably infer that Plaintiff was disciplined as a result of the controversial remarks published in Volume 12 of the Journal.

The test is slightly different for claims of suppression of speech in violation of the First Amendment in the university context. In *Buchanan*, the Fifth Circuit held that for public university professors:

> [t]o establish a § 1983 claim for violation of the First Amendment right to free speech, they must show that (1) they were disciplined or fired for speech that is a matter of public concern, and (2) their interest in the speech outweighed the university's interest in regulating the speech. The first question, asking whether the professor's speech is protected as a matter of public concern, is a question of law.

919 F.3d at 853. Part one of the test comprises two distinct elements—that is, whether the speech constitutes a matter of public concern and whether "the protected expression was a substantial or motivating factor" in the discipline or termination. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Defendants do not dispute that this case involves speech that is a matter of public concern. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Buchanan*, 919 F.3d at 853 (quoting *Adams v. Tr. of the Univ. of N.C.– Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011)). Plaintiff alleges he took part in publishing a symposium that, given the response, clearly interests the music theory community and other academics. With respect to the second element, Plaintiff alleges he was de facto removed from the Journal in retaliation for the symposium's criticisms of Professor Ewell. As reasoned previously, this is a plausible assertion.[12]

The second component of the First Amendment free speech test is known as the *Pickering-Connick* balancing test: "[i]f Plaintiff's interests in the prohibited speech outweigh the [university's] interests, then Plaintiff's First Amendment rights have been violated." *Id.* (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 810 (6th Cir. 2001)) (internal citations omitted). Plaintiff's Complaint alleges a sincere interest in defending Schenker, "the namesake of the Center for Schenkerian Studies that Professor Jackson directs" at UNT, and publishing material in the Journal of which he is a founding member (Dkt. #1 ¶¶ 36–37). Accordingly, this Court finds it plausible that Plaintiff's interest in his speech outweighs Defendants' interests in regulating it.

---

[12] In *Buchanan*, the Fifth Circuit contended that the *Pickering-Connick* test, *see infra*, includes inquiring into whether "the First Amendment violation was a substantial or motivating factor in Defendants' disciplinary action against Plaintiff." 919 F.3d at 853. If so, "Defendants may present evidence that they would have disciplined Plaintiff" regardless of his speech. *Id.* However, in *Buchanan*, the case had reached the summary judgement stage of litigation. Consequently, in considering Defendants' Motion to Dismiss, it is premature for the Court to account for Defendants' assertions as to the substantial or motivating factors at play.

For the foregoing reasons, this Court finds Plaintiff has successfully shown a plausible First Amendment violation—for either retaliation or for the unconstitutional stifling of speech—under § 1983.

**B. Defamation**

Accepting as true all well-pleaded facts in Plaintiff's Complaint, and viewing them in the light most favorable to Plaintiff, the Court finds that Plaintiff's defamation claims plausibly suggest an entitlement to relief. Absent a claim which is obviously insufficient, a court should not grant a Rule 12(b)(6) motion to dismiss, thereby denying Plaintiff an opportunity to develop facts to support his Complaint. Issues pertaining to Plaintiff's defamation claims are better resolved at the summary judgment stage. Thus, Defendants' motion to dismiss for failure to state a claim of defamation is denied.

## CONCLUSION

For the foregoing reasons, the Court orders that Defendants' Motion to Dismiss (Dkt. #8) is hereby **DENIED.**

**IT IS SO ORDERED.**

 **SIGNED this 18th day of January, 2022.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE