1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                    SHERMAN DIVISION

4
TIMOTHY JACKSON,                    )
5        Plaintiff,                 )
                                    )
6  VS.                              )   Civil No. 4:21CV33
                                    )
7  LAURA WRIGHT, et al              )
        Defendants.                 )
8

9                    MOTION HEARING

10       BEFORE THE HONORABLE AMOS L. MAZZANT

11           UNITED STATES DISTRICT JUDGE

12                  OCTOBER 29, 2021

13
APPEARANCES:
14
FOR THE PLAINTIFF:
15                     MICHAEL THAD ALLEN
                       ALLEN LAW, LLC
16                     P.O. BOX 404
                       QUAKER HILL, CT 06375
17
FOR THE DEFENDANTS:
18                     COURTNEY BROOKE CORBELLO
                       OFFICE OF THE ATTORNEY GENERAL
19                     DEFENSE DIVISION
                       P.O. BOX 12548
20                     MC 012
                       AUSTIN, TX 78711-2548
21

22  COURT REPORTER:
                       LORI BARNETT, CSR, RPR
23                     130 JARON DRIVE
                       POTTSBORO, TX 75076
24

25

BARNETT COURT REPORTING
903.821.3200

1    Proceedings recorded by mechanical stenography, transcript
2    produced by CAT

1                        I N D E X

2                                              PAGE

3    PLAINTIFF'S WITNESSES

4    TIMOTHY JACKSON
     Direct Examination by Mr. Allen........................ 6
5    Cross-Examination by Ms. Corbello......................46
     Redirect Examination by Mr. Allen......................53
6
     DEFENDANT'S WITNESSES
7
     JOHN RICHMOND
8    Direct Examination by Ms. Corbello.....................58
     Cross-Examination by Ms. Corbello......................65
9
     Certificate of Reporter................................87
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         E X H I B I T S
2    EXHIBITS REFERRED TO.                              PAGE
3    Plaintiff's Exhibit 2                               12
4    Plaintiff's Exhibit 3                               18
5    Plaintiff's Exhibit 5                               22
6    Plaintiff's Exhibit 8                               25
7    Plaintiff's Exhibit 6                               29
8    Plaintiff's Exhibit 7                               31
9    Defendant's Exhibit 1                               47
10   Defendant's Exhibit 2                               50
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2          THE COURT:  We're here in case 4:21CV33, Timothy
 3   Jackson vs. UNT, et al.
 4          And for the Plaintiff?
 5          MR. ALLEN:  Michael Allen for the plaintiff, Your
 6   Honor.
 7          THE COURT:  Just make sure your mic is on, just
 8   because of the acoustics in here, and for the court
 9   reporter.
10          But for the defense?
11          MS. CORBELLO:  Courtney Corbello, Your Honor.
12          THE COURT:  Okay.  Very good.
13          And of course, you know why we're here, because of
14   my order.  I'm just trying to decide an issue, and it's
15   unclear.  There was conflict in the paperwork on the
16   motion.  So I assume you have evidence you want to
17   present?
18          MR. ALLEN:  Yes, Your Honor.
19          THE COURT:  Is there a factual dispute about this
20   issue, in terms of what his status with the journal was
21   or is?
22          MR. ALLEN:  Opposing counsel and I have not talked
23   about it.  I assume they still dispute this fact, so we
24   came prepared to put on evidence.  If they would like to
25   concede the fact, of course we would of course accept
```

1    that result.  But --

2         THE COURT:  I don't think they are going to do

3    that, are they?

4         MS. CORBELLO:  No, Your Honor.

5         THE COURT:  Okay.  So go ahead and put your

6    evidence on, and then we'll have a discussion about it.

7         MR. ALLEN:  All right.  Your Honor, I would like

8    to call Timothy Jackson, the Plaintiff, to the stand.

9         THE COURT:  Okay.  Very good, sir.  Would you

10   raise your right hand and be sworn in.

11        THE CLERK:  You do solemnly swear the testimony

12   you shall give in the case now on hearing shall be the

13   truth, the whole truth, and nothing but the truth so help

14   you God.

15        THE WITNESS:  I do.

16        THE COURT:  Thank you.  Go ahead and have a seat.

17        Go ahead and proceed.

18                    TIMOTHY JACKSON,

19   after having been sworn, testified as follows:

20                  DIRECT EXAMINATION

21   BY MR. ALLEN:

22   Q     So, Professor Jackson, can you just state your

23   full name for the record, please.

24   A     Timothy Lynn Jackson.

25   Q     And can you explain to the Court your position at

1    the University of North Texas?

2       A       I'm a full professor of music theory with tenure,

3    and I am also a distinguished research professor of music

4    theory.  There are about 10, or slightly more now,

5    distinguished research professors.

6       Q       And as a distinguished research professor, you

7    said there were about 10.  Do you mean in the entire

8    University or in the college of music?

9       A       I mean in the entire University.

10      Q       And of course, we're here to discuss the Journal

11   of Schenkerian Studies, and I was going to ask you to explain

12   who publishes the Journal of Schenkerian Studies.

13      A       Well, as of 2009, the University of North Texas

14   was our official publisher and we had a contract with them to

15   publish the journal.

16      Q       And the University of North Texas press is a unit

17   of the University of North Texas, correct?

18      A       Correct.

19      Q       When did you publish Volume 12 of the Journal of

20   Schenkerian Studies?

21      A       It was published at the end of July 2020, but the

22   actual issue was assembled in March of 2020.

23      Q       By "assembled" what do you mean by that?

24      A       I mean that we put together all of the

25   contributions and formatted the journal and sent it to the

1  publisher.  And then the publisher took about three months to
2  produce the journal.  There were problems because of COVID.
3      Q      I see.  And has there been a Volume 13?
4      A      A Volume 13 was well in hand because during those
5  three months we were already well advanced in -- in producing
6  that next volume.
7      Q      All right.  And has there been a Volume 13 then?
8      A      No.
9      Q      Why hadn't the JSS --
10             MR. ALLEN:  Or if it pleases the Court, JSS is a
11      common abbreviation for the journal.
12             THE COURT:  That's fine.
13  BY MR. ALLEN:
14      Q      All right.  Why hasn't the JSS published another
15  volume since July 2020?
16      A      Because the journal has been essentially on ice
17  since that time.
18      Q      All right.  And that's been over 15 months,
19  correct?
20      A      Correct.
21      Q      If you could just give the Court some background
22  about what resources UNT provided to you in your position as a
23  faculty member on the editorial staff of the JSS.
24      A      Well, the journal started publishing around 2005.
25  And at that time the then Dean of the school gave me a

1    research assistant to help me produce the journal.  And that

2    continued up through 2020.  The definition of the position was

3    changed however, but that was the main resource that was

4    provided to the journal.

5         Q      All right.  And is there any other individual at

6    the University of North Texas who has been continuously

7    associated with the journal besides yourself?

8         A      Yes, there was Professor Steven Slottow.  He --

9    he's now a full professor.

10        Q      When did he join the journal?

11        A      Well, we worked on it together actually since

12   about 2003, and we were serving together throughout that whole

13   period until 2020 as faculty advisers to -- to the journal.

14        Q      And just briefly, you mentioned a position had

15   been redefined.  What -- what position were you talking about?

16        A      I was talking about the editorship of the journal.

17        Q      And --

18        A      So earlier, previously up until 2019 the journal

19   had been edited by a doctoral student.  That position was

20   voluntary, not paid.  And the student assistant would help the

21   editor with certain tasks like mailings and so forth.  But

22   then the position was redefined so that the person who

23   occupied that TA position would now be actually editing the

24   journal.  So that was a major change of policy.  And it was

25   discussed at various levels and there was some disagreement as

1    to whether we should follow that course, but that was the
2    course that we followed.  And at that point there was a new
3    editor in training who occupied the position.  That is when
4    the journal stopped publishing.
5         Q      And was that Levi Walls?
6         A      Yes, his name was Levi Walls.  He was a graduate
7    student -- doctoral student.
8         Q      And can you explain your relationship, your
9    obligations and duties as a faculty member on the editorial
10   staff of the journal?
11        A      Sure.  So until that changed, the students, the
12   doctoral students who occupied that position actually had
13   quite a bit of leeway.  They accepted and solicited articles,
14   they sent out articles to experts for a review.  We did not
15   always suggest to them the people who would serve as leaders.
16   They had quite a bit of latitude there.
17             They also had latitude in evaluating the
18   responses, the readers responses.  We served really as an
19   advisory role, and we were primarily concerned to help them if
20   there -- there were certain difficult, let's say, decisions
21   that had to be made, maybe where one reader was in favor to or
22   against, that kind of thing.  So we were more advisers.
23             Or, for example, when there were book reviews and
24   the review was very negative we -- we sometimes advised the
25   editors on how to tone down the reviews, things like that.

1    But we did not micro manage the journal.

2         Q     And when you refer to "we" who are you referring?

3         A     I'm referring to myself and Professor Slottow.

4         Q     I see.

5               MR. ALLEN:  And I believe the Court is aware from

6         the papers of the change in July of 2020.  And to save

7         time, I would ask him about the aftermath of the 2020

8         incident, if it pleases the Court.  Otherwise, we can

9         also --

10              THE COURT:  Yes, you don't need to go into the

11        incident.

12   BY MR. ALLEN:

13        Q     All right.  So -- so I'm going to fast forward to

14   the latter part of 2020 after the ad hoc panel report came out

15   on November 25, 2020.  And what was the fall out?  What

16   changed with regards to the journal after that time, Professor

17   Jackson?

18        A     Well, I can't really answer the question because I

19   feel that I was removed from the journal completely, so I had

20   nothing further to do with the journal.

21        Q     And did you make any suggestions for how the

22   journal could be reorganized, or strengthened, or somehow make

23   a response to the impulses that were coming from the

24   University of North Texas at that time?

25        A     I did.  In my response to the ad hoc report I made

1    various suggestions.  I proposed a set of scholars who would
2    possibly be willing and interested -- and in fact, I knew they
3    were -- in helping to take over the editorship.  Because we
4    felt that in the current climate, the current, I would like to
5    say, repressive climate where academic freedom is challenged,
6    we needed somebody who was tenured to be the editor of the
7    journal, to protect its academic freedom and integrity.
8          Q     And did you propose that you remain involved in
9    the journal yourself?
10         A     I did.
11         Q     All right.  And I -- I'm going to direct your
12   attention to the document that's on the screen.
13               MR. ALLEN:  And, Your Honor, this had been marked
14         as Exhibit 2.
15   BY MR. ALLEN:
16         Q     And do you recognize this document, Professor
17   Jackson?
18         A     Yes, I do.
19         Q     What is this document, please, for the Court?
20         A     This was my response to the ad hoc committee
21   report.
22         Q     And you were -- were you directed to make this
23   response?
24         A     I was.
25         Q     By whom?

1      A      By Professor -- by Provost Cowley.

2      Q      Jennifer Cowley?

3      A      Yes.

4      Q      All right.  And if you could turn to the second

5   page of that document, please.  I'm sorry, it's a little bit

6   crooked, I understand.

7          Do you see the paragraph that begins on the

8   bottom of that page?

9      A      Yes.

10     Q      Is this the plan for reorganization that you had

11  just discussed?

12     A      Yes.

13     Q      And this is also in the record as part of your

14  affidavit, so it's already before the Court.  But I was just

15  going to ask you to summarize as briefly as you can, the main

16  points of your reorganization plan.

17     A      So the essential point was to find a scholar or a

18  group of scholars who were tenured professors who would help

19  re-establish the journal and transition to a new type of model

20  for editing it.  My earlier model had been based on the idea

21  of helping graduate students to network and gain academic

22  experience in the field, and it had proven very successful in

23  helping scholars to get their names known, name recognition

24  with major scholars.  But it seemed because of the oppressive

25  atmosphere that we were now in, which had really changed since

1   the founding of the journal back in 2005, that a new model was

2   needed.

3          And so I proposed some professors, full professors

4   at various institutions who had expressed interest in helping

5   to take over the journal and work with me and other members of

6   the already existing editorial board to ensure a smooth

7   transition to a new -- a slightly new model, I would say.

8       Q     I'm glad you brought up the editorial board again.

9   Because besides you and Professor Slottow, you had many other

10  members of -- of the editorial board, correct?

11      A     Right.

12      Q     And what was their -- what were their obligations

13  to the journal?

14      A     So they served as readers.  Primarily we -- we

15  would send out articles that we received for consideration.

16      Q     I see.

17      A     And those members of the board were essentially

18  readers who would report back to the editorial staff and send

19  us reports, readers reports.  And then we would discuss those

20  and see if we were willing to publish or not publish an

21  article.

22          And I might add that it took quite a long time to

23  assemble that editorial board.  It -- it includes probably I

24  would say about 80 percent of the most distinguished scholars

25  in the field.  And I thought that certainly for purposes of

1    continuity, we needed to keep that editorial board mainly in

2    tact.

3         Q        And drawing your attention back to the document

4    you submitted to the University as a kind of reorganization

5    plan at least in the section with the heading Roman Numeral

6    II, under the second bullet point on the third page it says:

7    The JSS will restructure the editor-in-chief position and

8    editorial board.

9              And I -- I believe that was what you were talking

10   about earlier, correct?

11        A        Correct.

12        Q        And are these individuals; Hedi Segal, Eric Wen,

13   Professor Wayne Petty -- and I believe there's a Professor

14   Kerri Kotta.

15        A        Yes.

16        Q        And you list their institutions there.  Were they

17   some of the individuals who had expressed interest in

18   supporting the journal?

19        A        Absolutely.  Yes.

20        Q        And are any of those individuals to your knowledge

21   currently involved in the journal?

22        A        No.

23        Q        And there's also a conflict of interest statement.

24   Why was that included in your reorganization plan?

25        A        There had been complaints that I had contributed

1    to the symposium, and there were other complaints that were

2    aired to the ad hoc committee that I had published -- in

3    previous volumes I had published an article, actually two

4    articles with another scholar, for my teacher Edward Lawford

5    who passed away a few years before that.  And because I had

6    been one of his students, I -- I published in that as well.

7         Q      Are you aware of any other journal published in

8    the area of music theory by the University of North Texas

9    press that has also published orders by its editor?

10        A      Yes.  Theoria.

11        Q      What is Theoria?

12        A      Theoria is a history of music theory journal

13   that's published by the same press.

14        Q      Who's -- who's the editor?

15        A      Professor Frank Heidlberger, my colleague.

16        Q      And I believe he's a defendant in this case,

17   correct?

18        A      Correct.

19        Q      Do you know of any time in which he was criticized

20   for publishing in his own journal?

21        A      No.

22               MR. ALLEN:  And, Your Honor, we're happy to brief

23        that in addition, but I believe that we will move on to

24        other -- other issues.

25   BY MR. ALLEN:

1    Q     And let's skip over the anonymity issue, but the

2  last section is "the journal reserves the right to engage in

3  free and open exchange."

4          Do you see that bullet point on page four?

5    A     Yes.

6    Q     What was the purpose of including that bullet

7  point in your proposal?

8    A     We want the journal to be able to publish

9  different viewpoints rather than be just be a kind of mirror

10 of a light -- light-think type of environment, where everybody

11 has the same ideology and the same perspective.  So that was

12 put in there because we wanted the possibility down the road

13 to have more symposia on controversial issues and allow

14 scholars to express themselves without fear of censorship.

15   Q     And -- and are you aware of any other journals at

16 the University of North Texas that have published special

17 articles or symposia without peer review?

18   A     Yes.

19   Q     What journal would that be?

20   A     Theoria.

21   Q     Again, the journal edited by Frank Heidlberger?

22   A     Correct.

23   Q     All right.  And has there ever been any fall out

24 or disciplinary investigation, any action against that

25 journal --

1        A       No.

2        Q       -- for -- for publishing un-peer reviewed

3    collections of articles?

4        A       No.

5        Q       So after you submitted this proposal, what

6    happened next?

7        A       Well, there was some wondering and concern on the

8    part of various individuals, both inside the faculty at UNT

9    and especially outside, wondering what the future of the

10   journal would be, and whether it would continue to be

11   published at all.  And I really couldn't answer the question

12   because I wasn't privy to any of the ongoing discussions.

13              But then an announcement was made first by the

14   division chair, Dr. Brand, and then confirmed by Dr. Bakulina,

15   another one of my colleagues, that a committee -- a search

16   committee would be formed with membership named by the Dean

17   that would search for a new editor who was supposedly to be

18   from outside UNT, also tenured at another institution who

19   would actually be paid some kind of fee or salary for taking

20   on this project of editing the journal.  And that person then

21   once appointed by this committee, would completely reorganize

22   the editorial board.  So there was no guarantee of any kind of

23   continuity in the editorial board.

24       Q       And I'm going to put Exhibit 3 up on the screen.

25   We'll -- we'll come to talk about the search committee in a --

1    in a bit.

2              But I want to ask you if you recognize this

3    letter and I'll see if we get the first part of it.

4        A    Yes.

5        Q    And at the bottom here, do you recognize that

6    signature?

7        A    I do.

8        Q    Who -- who is that?

9        A    Professor -- well, it's -- I don't know if she's a

10   professor, but it's the Provost.

11       Q    Jennifer Cowley?

12       A    Yes.

13       Q    And do you recall getting this letter on March 2,

14   2021?

15       A    I do.

16       Q    What did Jennifer Cowley tell you in this letter,

17   Professor Jackson?

18       A    Well, the gist of the letter was that the

19   University would set up a committee as I just explained, to

20   hire a new editor.  And then as the letter states, this new

21   editor would decide who would be on the new editorial board.

22       Q    And so what happened to the old editorial board at

23   this time?

24       A    Well, that's a good question.  The edit -- some of

25   the old editorial board members have written to me asking

1   what's happening, and I can't answer the question because I

2   don't know.

3        Q     And do you see where it says the last two

4   sentences I believe of the first paragraph, Provost Cowley

5   says: I also note that you did not address the panel's fourth

6   recommendation, which concerns issues of governance and

7   oversight.  Furthermore, you reserve the right for the journal

8   to publish contributions that are not peer reviewed.

9              Do you see where that --

10       A     Yes, I see that.

11       Q     And was it true that you did not address issues of

12  governance and oversight?

13       A     I absolutely did.  I said that -- that the journal

14  should continue under an editor and that that editor should be

15  assisted by a small editorial board and also have an editorial

16  board composed of outside readers.  That -- that's exactly

17  what I said.

18       Q     And did Provost Cowley ever address your concerns

19  for the academic freedom and independence of the journal?

20       A     This is a crucial question, and the answer is

21  absolutely not.

22       Q     I would just like to direct your attention to the

23  sentence that begins "This editor then will determine."  It's

24  a -- it's right in the middle of the second paragraph.  Do you

25  see that, where this begins?

1      A      Yes.

2      Q      And Provost Cowley says:  This editor then will

3   determine the membership of the JSS editorial board,

4   recruiting new members as needed, and renewing existing

5   members as appropriate.  In close collaboration with the

6   board, the new editor will establish clear and transparent

7   guidelines concerning the governing structure of the journal

8   and its editorial review and publication practices, and so

9   forth.

10          How did you understand this announcement that a

11  new editorial board would be appointed to an as yet unnamed

12  editor?

13     A      I understood it as a removal of me from the

14  journal.  I think that's a reasonable inference, I would

15  think.

16          MR. ALLEN:  And, Your Honor, should I mark these

17     for the record?  Do I need to ask that they be entered

18     into the record?

19          THE COURT:  You can move when you're done, move

20     them all in.

21          MR. ALLEN:  Okay.

22  BY MR. ALLEN:

23     Q      Now I -- I wanted to return to something you had

24  raised before, Professor Jackson.  You said that there was

25  a -- an effort to form some kind of committee to hire a new

1   editor?

2        A       Correct.

3        Q       Was that in response to Provost Cowley's

4   initiative?

5        A       Yes.

6        Q       The initiative she announced on March 3rd in that

7   letter?

8        A       Right.

9        Q       And I'm going to ask if you recognize this

10  document, Professor Jackson.

11       A       I do.

12               MR. ALLEN:  And, Your Honor, this is Exhibit 5,

13       premarked.

14  BY MR. ALLEN:

15       Q       And what -- what is this document, Professor

16  Jackson?

17       A       So this document is an advertisement for the

18  position of editor of the Journal of Schenkerian Studies,

19  which is now deemed to be vacant.

20       Q       And if you turn to the second page, who were the

21  members of that committee?

22       A       So if you move the screen down.

23       Q       Oh, I'm sorry.

24       A       The members of the committee are Dr. Ellen

25  Bakulina, Mr. Ron Chrisman, Dr. Graham Hunt, Dr. John

1    Ishiyama, and Dr. Jessica Napoles.

2         Q    And who's the chair of the committee?

3         A    Dr. -- Dr. Napoles.

4         Q    And what relationship did she have to music theory

5    and Schenkerian Studies?

6         A    None.

7         Q    What's her position?

8         A    Her area is choral music education.

9         Q    And John Ishiyama -- just going from backwards to

10   forwards, John Ishiyama, he appears to be a distinguished

11   research professor as well?

12        A    Yes.

13        Q    What is his relationship to the college of music?

14        A    Well, I -- I can only tell you that I don't know

15   of one.

16        Q    Does he have any -- to your knowledge, does he

17   have any familiarity with Schenkerian analysis or even music

18   theory more generally?

19        A    No.

20        Q    Who on this list was even participating in the

21   editorial board before July, 2020?

22        A    Dr. Bakulina and Dr. Hunt were both readers.  They

23   were both on the board as possible -- possible readers of

24   manuscripts.

25        Q    And I believe earlier you described yourself and

1  Professor Slottow as the -- for lack of a better term -- the
2  working members of the editorial board who oversaw
3  publications of the journal.  Is that accurate?
4      A    Yes, it is.
5      Q    Were either of you included in this committee?
6      A    No.
7      Q    Were either of you consulted in this committee?
8      A    I was not.
9      Q    And of course Ron Chrisman is the director of the
10 UNT press, right?
11     A    Right.
12     Q    Does the UNT press specialize in music theory
13 publication?
14     A    They've published a few music theory books
15 actually in the past, but I wouldn't say that they specialize
16 in music theory.  No, it's a much broader -- their catalog is
17 much broader than just music theory.
18     Q    So he's not a specialist in that area either?
19     A    No, no, no.
20     Q    All right.  And turning to the first name on the
21 list, Ellen Bakulina.  Has she made any pronouncements about
22 the Journal of Schenkerian Studies in the July 2020 timeframe?
23     A    Yes, she did.
24     Q    And what did she say about the journal at that
25 time?

1        A      Well, she signed a manifesto or a document stating
2   that the journal should be dissolved, and -- or -- or
3   recommending the dissolution of the journal.  Maybe I should
4   be even more precise.  I should say that she signed an
5   endorsement of the statement saying that I should be removed
6   from my position and that the journal should be dissolved.
7        Q      All right.  And I -- I understand that peer review
8   was a major concern of -- at least of Provost Cowley that you
9   were able to discuss in that letter that we showed from
10  March 3, 2021.  Are you aware if Ellen Bakulina had ever
11  published un-peer reviewed articles in a UNT journal?
12       A      Yes, I am.
13       Q      And what journal did she publish in?
14       A      She published in Theoria.
15       Q      And do you remember when that was?
16       A      Yes.  I believe it was in 2018 but I -- I'm not
17  sure.  I think it was about that time, yes.
18       Q      A list of Theoria's publications are available on
19  the website of UNT as part of their official announcements of
20  the University, correct?
21       A      Correct.
22              MR. ALLEN:  I'm going to put up, Your Honor,
23       Exhibit 8.
24  BY MR. ALLEN:
25       Q      All right.  And ask -- you -- you said she had

1    signed a manifesto, Ellen Bakulina.  And I wanted to direct

2    your attention to this document, Professor Jackson.  Do you

3    recognize this document?

4        A    Yes, I do.

5        Q    Is this that manifesto you were referring to?

6        A    No, I don't -- well, wait a second.  I -- there

7    are different versions of this manifesto, so -- or this

8    petition.

9        Q    Uh-huh.

10       A    So I'm not quite sure exactly which one of them it

11   is.  But -- but definitely overlaps with the two -- at least

12   two different versions that we have.

13       Q    And this is the fac -- a faculty version, correct?

14       A    Yes.  This is the faculty version.  So there was

15   two student versions, and then one faculty version that

16   endorsed the student version.

17       Q    Uh-huh.

18       A    And this is the faculty version.

19       Q    And I just wanted to direct the Court's attention

20   and your attention, Professor Jackson, to the very

21   top right -- excuse me, left hand corner, where it says the

22   date there, 10/27/2021 --

23       A    Yes.

24       Q    -- at 9:15 a.m. even.  And this seems to be taken

25   from a -- a website?

1        A        Yes.

2        Q        Do you recognize that website?

3        A        I do.

4        Q        And what is it?

5        A        It's the Society for Ethnomusicology.

6        Q        Is that a professional society in the area of

7    Ethnomusicology?

8        A        It is.  And I also believe that this is still

9    posted.

10        Q        In fact, at least as of 10/27/21, correct?

11        A        Oh, yes.  Right.

12        Q        And look at the second paragraph please in that --

13    in that -- what they are calling here I believe a statement of

14    UNT faculty on the Journal -- on the Journal of Schenkerian

15    Studies.  Do you see that second paragraph?

16        A        Yes, I do.

17        Q        Can you read it for the Court, please?

18        A        Yes.  We endorse the call for action outlined in

19    our student's letter -- and then there's a URL given -- which

20    asks that the college of music, quote, publicly condemn the

21    issue and release it freely online to the public.  And, quote,

22    provide a full public account of the editorial and publication

23    process and its failures, end quote.  Responsible parties must

24    be held appropriately accountable.

25        Q        And who is the first name in the time list of

1    signatories?

2            MS. CORBELLO:  Your Honor --

3    A       Dr. Ellen Bakulina.

4            MS. CORBELLO:  Your Honor, I would like to object.

5    At this point we're so far outside the scope of the

6    singular question the Court has called us here for,

7    whether he was banished from the journal or not.

8            MR. ALLEN:  Your Honor, this is someone they

9    placed on the committee to decide the future of the

10   journal, which they are claiming did not remove my

11   client.  And we have a -- one of the only people that was

12   ever involved in the journal previously, denouncing the

13   journal, denouncing the journal over and over again even

14   into the present day.

15           THE COURT:  I'll give you some leeway.  Go ahead.

16   BY MR. ALLEN:

17   Q       By the way, Professor Jackson, we know that the ad

18   hoc panel report was published on the UNT website, and I

19   believe it's even still there.  Did -- did UNT ever publish

20   your response and make it public?

21   A       No.

22   Q       How did your response become public with your

23   proposal for the reorganization of the journal?

24   A       It became public when we filed the lawsuit against

25   UNT.

1      Q      All right.  And just to -- before I go on, what --
2  what is Professor Bakulina referring to there when she says
3  "outlined in our student's letter"?
4      A      She's calling attention to probably the second
5  later version of the student petition.  The first version was
6  probably toned down a little bit.  The first version also
7  accused me not only of racism and other things, but also
8  extortion.  But the second version was limited to -- to racism
9  and other -- other --
10     Q      How did you first learn about the student
11 petition, its specific demands, its specific content?
12     A      It was sent to me by the head of the student
13 association at UNT.
14            MR. ALLEN:  And I'm going to put before the Court
15     Exhibit 6, Your Honor.
16 BY MR. ALLEN:
17     Q      And ask -- Professor Jackson, do you recognize
18 this document?
19     A      I do.
20     Q      What is this document?
21     A      This document is a copy of the email that was sent
22 to me on July 29th at 3:17 p.m --
23     Q      And --
24     A      -- from -- from Mr. Peter Kohanski, who was at
25 that time the president of the Graduate Association of

1  Musicology and Theory Students at UNT.

2      Q      And is that an official association of the

3  University?

4      A      It is.

5      Q      I would just like to draw your attention to some

6  of the contents of this document.  If you could look to the

7  bottom of page two.  Let's see, I've got to keep on my game

8  here.

9              What does it call for?

10     A      It calls for UNT to dissolve the Journal of

11  Schenkerian Studies.

12     Q      So at least one member of the committee charged

13  with finding a new editor for the journal has publicly called

14  for it to be dissolved?

15     A      That is correct.

16     Q      And I believe there are other calls in there --

17  for instance, if we just skip down to number three, what's the

18  last demand -- excuse me, to number four.  What's the last

19  demand in number four?

20     A      Hold accountable every person responsible for the

21  direction of the publication.  This should extend -- this

22  should also extend to investigating past bigoted behaviors by

23  faculty.  And by taking this into account, the discipline and

24  potential removal of faculty who used the JSS to platform --

25  sorry -- who used the JSS platform to promote racism.

1      Q      And then as if to make sure there's no ambiguity,
2  do you see the bold?
3      A      Uh-huh.
4      Q      What does that say?
5      A      It says, calling for Dr. Jackson's dismissal.
6      Q      And that's you, correct?
7      A      Correct.
8      Q      All right.
9             MR. ALLEN:  I will also turn to Exhibit 7, Your
10      Honor.
11  BY MR. ALLEN:
12      Q      And I believe, Professor Jackson, you said there
13  were at least two known versions of the student letter that
14  you knew of, correct?
15      A      Correct.
16      Q      And do you recall --
17             MR. ALLEN:  And it's already in the court record I
18      believe, Your Honor, as one of the exhibits in Professor
19      Jackson's extensive affidavit.  But there's one appended
20      to the ad hoc panel report as well, and I believe we will
21      talk briefly about that.
22  BY MR. ALLEN:
23      Q      Do you recognize this document, Professor Jackson,
24  that I've marked as Exhibit 7?
25      A      Yes.

1      Q      And what is this?

2      A      This is one of the versions of the student

3  petition that was endorsed by the faculty.

4      Q      And does it condemn anyone in particular?

5      A      Yes.  Me, and also Dr. Slottow.

6      Q      The two working faculty who were involved in the

7  journal, correct?

8      A      Correct.

9      Q      And again, Ellen Bakulina signed on to this?

10     A      Correct.

11     Q      And do you see in number one there --

12     A      Uh-huh.

13     Q      -- the first numbered section right after, it says

14  "to this end" right here?

15     A      Yes.

16     Q      And do you see where it says:  We believe that all

17  contributors should be held fully accountable for their

18  comments?

19     A      We did.  I do see that, yes.

20     Q      Did that include you?

21     A      Yes.

22     Q      And again then, if you skip down to page -- I'm

23  sorry, skip to the bottom of that page under number one.  The

24  second number one on that page, what does it call for?

25     A      It calls for the University of North Texas and the

1    college of music to dissolve the Journal of Schenkerian

2    Studies.

3         Q     And it even says at the end, "there is no reason

4    for it to exist."

5              Did I read that correctly?

6         A     Yes.

7         Q     And then if you skip to number three, if you can

8    just read that for the Court.

9         A     Hold every -- sorry.  "Hold accountable every

10   person responsible for the direction of the publication."

11        Q     And again, that would be you, correct?

12        A     Yes.

13        Q     And so again, it appears Ellen Bakulina at -- at

14   least endorsed one or the other of these student letters?

15        A     Yes, she did.

16        Q     And did she ever say anything else publicly about

17   the journal prior to being put on this committee?

18        A     Yes.  She -- she sent around the ad, so -- for the

19   new editorship.  So it came up -- it was brought up in the

20   faculty meeting at which she and I were present, and every --

21   I believe most of the faculty.  And the -- the -- the

22   advertisement had been sent out on the Society of Music Theory

23   list.

24             May I add one other point?  And that is that

25   everybody in this Society of Music Theory knew that I had

1    started this journal and that I had overseen it for

2    approximately 15, 16 years.

3          Q        Uh-huh.

4          A        And that there was great concern in certain

5    quarters about the condemnation, or the effect that it's now

6    called cancellation of both me and the journal.  And so that

7    this was a way of signaling that I was no longer involved with

8    the journal, that the journal had essentially been subjected

9    to a hostile takeover.  And it was also a way of essentially

10   publicly shaming me in front of -- in front of the

11   professional society.

12         Q        And do you recognize this document, Professor

13   Jackson?

14         A        I do.

15         Q        What is this document?

16         A        This was a letter that was -- an open letter that

17   was circulated by the SMT, Society of Music Theory, in

18   response to the publication of the symposium in the journal's

19   last issue.

20         Q        And it also says here, right:  The journal's

21   violation of academic standards of peer review, its singling

22   out of Professor Ewell while denying him a chance to respond,

23   and the language of many of its essays constitute anti-Black

24   racism.

25                   Did I read that correctly?

1        A      You did.

2        Q      And of course, you testified earlier that

3    Professor Ellen Bakulina had also published articles without

4    peer review in another UNT journal, correct?

5        A      Correct.

6        Q      And without getting in too far afield, is it true

7    that the journal under your tutelage had denied Professor

8    Ewell a chance to respond?

9        A      Nobody was denied a chance to respond.  And in

10   fact, all the pro Ewell statements that we received were

11   published and no change was made to their editorial position.

12   In other words, there was no censorship of pro Ewell responses

13   either.

14       Q      And could I draw your attention to number four on

15   that list of -- it's on the second page, I believe.

16              Could you explain that to the Court, please --

17       A      Number four says that any member of the Society of

18   Music Theory who is on the editorial board should resign.

19       Q      And would that include you?

20       A      Yes.

21       Q      And last, if you look at number six, can you

22   explain that bullet point to the Court, please?

23       A      So what this is saying, is that they believe that

24   the advisory board of the journal has violated their mission

25   statement on ethics, and policy, and harassment.  That seems

1    to be what they are talking about.  But you'll notice here

2    that the policy states that "cases of proven offenses" will

3    result in "revocation of membership and honors."

4            But I fail to see where any case of such offenses

5    was proven in this case.

6        Q     And I just want to direct your attention to -- I

7    believe it's the fourth page.

8        A     Yes.

9        Q     Has Ellen Bakulina signed this petition as well?

10       A     She did.

11       Q     In fact, she seems to have signed it twice?

12       A     That is true.

13       Q     Thank you.

14             Has anyone from the current committee charged

15   with hiring a new editor contacted you for your input?

16       A     No.

17       Q     So just to -- to transition to where the journal

18   is now, Professor Jackson, I believe you testified earlier

19   what the journal would be doing now if you had remained in

20   control of the journal.  And could you just restate briefly

21   where the journal would be now but for the incidents of July

22   2020?

23       A     Probably the next issue would already be

24   published.  We had at least three -- I think three articles

25   ready to go that had gone through the peer review process.

1    And then we had at least two or three already, articles and

2    remanences concerning Professor Rothgade.  I would not

3    contribute to this issue.  In fact, we had a guest -- we had

4    invited two guest editors for the next issue.  One was Hedi

5    Siegel and the other was Wayne Petty, actually.  Because both

6    of them had worked closely with Professor Rothgade and they

7    had solicited contributions from major scholars, students,

8    former students, and associates of Professor Rothgade to write

9    either scholarly articles in his honor, or contribute

10   recommend remanences of him.

11         Q      And to your knowledge, has the University of North

12   Texas appointed a new editor to replace those individuals, or

13   to replace anyone at the journal?

14         A      No, I don't know.  I have no knowledge of that.

15         Q      Is that the kind of information that you would

16   learn about as a -- as a full faculty member of the UNT

17   College of Music if it had happened?

18         A      Well, it depends.  I mean if the -- if the -- if

19   the journal was functioning and I was still involved with it,

20   I would certainly know.

21              One thing that -- that also strikes me as strange,

22   is that Professor Slottow and I have been working in this

23   field for many, many years.  I would -- started working in

24   this field when I was 21, and I'm now 63, so that's 42 years.

25   And when I gave a talk at the -- my last talk at the SNT

1   meeting -- national meeting, I was introduced as a scholar who

2   needed no introduction in the field.  So I find it kind of

3   surprising that I don't know anything.  But that's the truth.

4   I -- I have no knowledge of what's happening with the journal.

5        Q       All right.  And do you believe the SNT would now

6   tolerate your presence on the journal?

7        A       I don't know.

8                MS. CORBELLO:  Objection.  Speculation.

9                THE COURT:  Well, overruled.

10  BY MR. ALLEN:

11       Q       Have you in your experience -- what appears to be

12  20 years as a faculty member at UNT -- did I get that correct?

13               THE COURT:  Let me just ask the question of UNT.

14       We're going around this a little way.  I mean, is he

15       welcome back?  Can he run the journal?  Can he go back

16       and just keep running the journal as it is, or are you

17       preventing him from doing that?  If he's allowed to go

18       back and do the journal, then maybe that ends this.  But

19       if he's somehow restricted -- I mean if he has the free

20       ability to go back and take control and do whatever he

21       was doing with the journal before, can he do that?

22               MS. CORBELLO:  Your Honor, two things.  We have

23       Dean Richmond here to testify as to the current state of

24       where the journal is at in the applications.  There is no

25       restriction on Professor Jackson going back to the

1        journal.  The journal doesn't exist right now.  As he
2        testified, it's on ice.  There's no editorial board to go
3        back to, there's no journal to write on.  They're still
4        searching for a new editor, and as the letter that
5        counsel showed states, the editor is the one picking the
6        new editorial board.  So therefore, no editorial board
7        exists.
8             THE COURT:  So the answer though is -- you say he
9        can go back, but he can't because the University has put
10       an ice on the journal.
11            MS. CORBELLO:  There's nothing to go back to, Your
12       Honor.  The ad hoc committee issued recommendations,
13       Professor Jackson agreed with those recommendations, and
14       those recommendations are now being put into place which
15       means the journal doesn't go forward until the
16       recommendations are complete.
17            MR. ALLEN:  Your Honor, I would submit that this
18       is an admission that they've killed the journal.  I mean
19       sure, they want to revive it in some ideologically more
20       pure form that conforms to their ideology, but she said
21       herself that the journal exists no more.
22            MS. CORBELLO:  Your Honor, it is not a claim of an
23       injury that a university decided to restructure the
24       editorial-ship of its journal.  The journal might exist
25       in the future, but the fact that it doesn't now, means

1    the Court has nothing -- no ability to address the

2    injury.  There is no one to appoint Mr. Jackson back to a

3    journal that is on ice, that is not issuing any sort of

4    journals or volumes.

5         MR. ALLEN:  Well, I would suggest that Your Honor

6    turn the Court's attention to the letter of Provost

7    Cowley.  There was a rejection of Timothy Jackson's

8    proposals to safeguard the academic freedom of the

9    journal, and then they turned the journal over into the

10   hands of people who were sworn foes of the tradition that

11   had been carried on by Timothy Jackson.  So I -- I don't

12   really understand the point of this argument.

13        THE COURT:  Let me ask this of the University.

14   His role has changed has it not?  I mean you say it's the

15   same, but he was on the editorial board before.  He

16   wasn't the editor or the --

17        MS. CORBELLO:  He was never the editor, Your

18   Honor.

19        THE COURT:  He was on the editorial board,

20   correct?

21        MS. CORBELLO:  Yes, when it existed.

22        THE COURT:  Okay.  So tell me why is it not in

23   existence now?  What has happened?

24        MS. CORBELLO:  Because based on the last volume of

25   the journal that was issued, an ad hoc committee that was

1    created -- as counsel has been talking about, since then

2    the recommendations that came out, and then the Provost

3    required those recommendations to come out from the

4    committee.  And Mr. Jackson was asked to be a part of

5    that recommendation creation and proposals.  That's what

6    happened.  And now the University is looking for an

7    editor.  Since the applications have been open in March I

8    believe of this year -- or later in the spring of this

9    year, University hasn't received any applications for

10   editor.  And so without the editor, there can't be any

11   appointment of anyone on the editorial board, Professor

12   Jackson or otherwise.  I would also point out that

13   Professor Jackson has not applied for that editor

14   position.

15           MR. ALLEN:  Well, Your Honor, this is almost like

16   saying if we cut off his hands so he can't write but he

17   doesn't bleed to death, then he hasn't really been

18   harmed.  But he cannot do anything with the journal.  As

19   they said, they designed the structure of the search to

20   almost ensure that they get no applications.  Anyone

21   serious about Schenkerian studies -- as Professor Jackson

22   could tell the Court -- is not going to apply to this

23   position in the current climate of ideological

24   suppression of viewpoints.

25           THE COURT:  So let me ask you, sir, how would the

1    Court redress this -- I mean what relief would you seek
2    from the Court to address this?
3          MR. ALLEN:  I believe the Court could be asked,
4    and has the authority to order the state institution to
5    restore the journal to its former form, and to restore
6    Professor Jackson to his former role in organizing,
7    shepherding this journal, and also in this case
8    safeguarding it from the kind of ideological motivated
9    attacks that have resulted in the assault on academic
10   freedom at the University of North Texas.  This journal
11   has been killed.  The Court can order it to come back to
12   life.
13         MS. CORBELLO:  Your Honor, two things.  The Court
14   cannot force the University under allowable remedies
15   under 42, U.S.C. 1983 to create a journal that currently
16   does not exist and then require it to offer Professor
17   Jackson a spot on the editorial board.  That is not
18   injunctive relief that is permitted by the Fifth Circuit
19   or the Supreme Court in this area of law.
20         THE COURT:  Well, you agree since whatever steps
21   the University has taken, the journal is defunct or on
22   ice?  So I guess --
23         MS. CORBELLO:  I apologize.  I didn't hear that
24   second part.
25         THE COURT:  I guess my question is you're still --

1    since you said the journal is not -- no longer really in

2    existence, how is he still on the editorial board?  He

3    was on the editorial board, that's a change if he's no

4    longer on the editorial board.  So that's a move the

5    University did take against him.

6              MS. CORBELLO:  Your Honor, under the claim that

7    Professor Jackson has brought, he has to show that the --

8    that the editorial board being dissolved was a result of

9    him exercising a First Amendment right.  Here the

10   timeline is the ad hoc committee issued recommendations,

11   Professor Jackson agrees with those recommendations and

12   proposes his own.  Either there's some disagreement as to

13   who agrees with what recommendations, whether Professor

14   Jackson agrees with them all or wants something more.

15             In January of 2021, a month later, he writes an

16   affidavit to this Court stating "I am on the editorial

17   board."  Any injury thereafter where the editorial board

18   was dissolved because a new restructuring took place and

19   the University is now looking for an editor, is not

20   related to his exercising a First Amendment right eight

21   months earlier and the pursuing recommendations that

22   happened two months earlier.

23             THE COURT:  And let me just ask, did the

24   University ever threaten to remove him from the editorial

25   board?

1      MS. CORBELLO:  No, Your Honor.

2      MR. ALLEN:  Your Honor, please.  The idea that
3   Professor Jackson somehow agreed with the ad hoc panel
4   that accused him of being some kind of gangster who
5   forces graduate students into cars and things of this
6   nature is simply -- I don't believe it's being advanced
7   in -- I understand the State of Texas has a very
8   honorable core of attorneys, but I just simply do not
9   believe that can be advanced in good faith.

10      The -- the second part, Your Honor, he proposed
11   things that they rejected.  He put -- as opposed to that
12   affidavit when he said I'm on the editorial board, he was
13   on an editorial board that he was no longer being
14   informed of had been killed, had been simply squeezed out
15   of existence by this new initiative that they had also
16   shoved him to the side.  He had support from graduate
17   students, TAs, he was allowed course reductions because
18   of his work on this journal which he is no longer
19   entitled to.  I think it's probably ordinary in -- in
20   most areas where someone quits their job, that they don't
21   take their funding with them.  That was not the case
22   here.

23      THE COURT:  Go ahead.  I didn't mean to cut you
24   off.  If you have additional evidence, go ahead and
25   present it.

1          MR. ALLEN:  All right.  We were just wrapping up,
2     Your Honor.
3 BY MR. ALLEN:
4     Q     And I was going to bring up this point, Timothy --
5 or excuse me -- Professor Jackson, throughout your tenure
6 shepherding the journal through these many years of
7 publication, what other benefits did you receive from the
8 University of North Texas attendant to that service to the
9 University?
10     A     I received one course remission for most of my
11 tenure as the adviser and as the director of the Center for
12 Schenkerian Studies, and I no longer receive any kind of
13 compensation, and have not since -- since the attack on the
14 journal.
15     Q     And how about administrative duties in the
16 University -- in the department of -- or excuse me, the school
17 of music?
18     A     Well, basically for the first time in my 20 years
19 at the school I've been removed from all faculty committees
20 within the college of music.  This is now the second year of
21 which I have been removed from all participation in faculty
22 governments at the college of music.
23     Q     So for lack of a better term, is it safe to say
24 they won't let you play in any reindeer games?
25     A     Absolutely.

1          MR. ALLEN:  Your Honor, I think we've put on the

2      evidence.  I think the State has admitted that the

3      University has killed the journal.  I -- I don't know

4      what other arguments that we could make, so we will rest.

5          THE COURT:  Let me see if she has any questions.

6          Do you have any questions?

7          MS. CORBELLO:  Yes, Your Honor.  We do.

8          THE COURT:  Go ahead.

9                    CROSS-EXAMINATION

10  BY MS. CORBELLO:

11      Q      Professor Jackson, just to clarify, you were never

12  editor of the journal, correct?

13      A      Correct.  I was the adviser.

14      Q      And you are still currently the director of the

15  Center for Schenkerian Studies, correct?

16      A      Yes.

17      Q      You have not been removed from that position?

18      A      Correct.

19      Q      Do you remember the document your counsel showed

20  you just a little while ago?  The letter you wrote?

21      A      Yes.

22      Q      Did you write this sentence:  It is now absolutely

23  necessary that the editor-in-chief be a full-time tenured

24  faculty member, whether at UNT or at an outside institution?

25      A      I did.

1     Q      Did you also write this sentence a few paragraphs

2  below:  I have already extended an invitation to a potential

3  editor-in-chief at another university?

4     A      I did.

5     Q      So at least in this letter it appears that you

6  were on board with having a new editor take the spot at the

7  journal -- at the JSS, right?

8     A      Correct.  That was in my letter of recommendations

9  to Provost Cowley in response to the ad hoc committee.

10    Q      Yes.  Thank you, Professor Jackson.

11           I'm showing you what has been marked and

12 submitted to the Court as Defense Exhibit 1.  It's an

13 affidavit by Dr. Benjamin Brand.  I'm showing you here

14 paragraph four.

15           Dr. Brand states under penalty of perjury:  I

16 have not removed Dr. Jackson as editor of the Journal of

17 Schenkerian Studies, nor have I removed him as a member of

18 the journal's advisory or editorial boards.

19           Do you see that?

20    A      I do.

21    Q      Do you believe Dr. Brand is not telling the truth

22 in this statement?

23    A      I do.

24           MR. ALLEN:  And I'm going to object, Your Honor,

25      because Dr. Brand is not here to submit to

1    cross-examination.

2         MS. CORBELLO:  I'm sorry, I didn't hear the

3    objection.

4         THE COURT:  He's objecting to you using an

5    affidavit at the hearing.

6         MS. CORBELLO:  Your Honor, the affidavit was

7    issued under penalty of perjury, it's admissible under

8    the federal rules of evidence, it's valid evidence for a

9    12(b)(1) motion, and counsel has been permitted to obtain

10   and present multiple hearsay statements for people that

11   have not been brought to testify as well.

12        MR. ALLEN:  I would say, Your Honor, there have

13   been many hearsay statements, but they are admissions of

14   the University.  They are actually not hearsay, they are

15   statements by the University by its agents, by it's

16   institutional website and things of that nature.

17        THE COURT:  Well, normally in an evidentiary

18   hearing you wouldn't be bringing in an affidavit unless

19   the other side didn't object to it.  I mean it's still --

20   it's hearsay, is it not, to offer an affidavit at an

21   evidentiary hearing?

22        MS. CORBELLO:  Your Honor, my understanding was

23   this was a supplement to the 12(b)(1), which affidavits

24   are perfectly acceptable evidence in support of or in

25   argument for lack thereof.

1          THE COURT:  I understand you're trying to school

2     me on the procedures that are appropriate, but we're

3     not -- this is not a 12(b)(1) motion.  It is in terms of

4     what you submitted to the Court.  I didn't ask for

5     supplemental briefing or supplemental affidavits, this is

6     an evidentiary hearing.

7          MS. CORBELLO:  If the Court refuses to take

8     consideration of the affidavits, defense will simply

9     object to that.  However, these affidavits were written

10    under penalty of perjury, they were the people who were

11    --

12         THE COURT:  Let me ask you this.

13         MS. CORBELLO:  -- submitting these affidavits on

14    behalf of --

15         THE COURT:  When I'm talking, you stop.  Okay?

16         MS. CORBELLO:  Yes, Your Honor.

17         THE COURT:  So if all affidavits are hearsay at a

18    hearing, I mean could you offer an affidavit at trial as

19    evidence?

20         MS. CORBELLO:  No, Your Honor.

21         THE COURT:  Well, why would this be any different?

22    This is an evidentiary hearing.

23         MS. CORBELLO:  I understand the Court's position.

24    And again, if the Court would like to refuse to admit the

25    exhibits the defense has provided, we would also object

1    to the use of Plaintiff's exhibits that are not written

2    under penalty of perjury and are not submitted by all

3    members of the state.

4         THE COURT:  Okay.  Well, this is not tit-for-tat

5    here, but I mean, he utilized those without any

6    objection.  He objected when you used this one.

7         MS. CORBELLO:  Yes, Your Honor, because it was our

8    understanding that on a jurisdictional question the Court

9    is permitted to review evidence such as affidavits issued

10   under penalty of perjury.

11        THE COURT:  Okay.  I totally understand that in

12   terms of the briefing and affidavits that are submitted

13   as part of the briefing.  I'm just dealing with the fact

14   that we're at an evidentiary hearing, which is unusual to

15   have an evidentiary hearing but that's what we're having

16   here.

17        MS. CORBELLO:  I'm happy to ask for leave to

18   supplement the MTD, Your Honor, if that would be better

19   procedurally.

20        THE COURT:  Well, I'll let you submit it.  I don't

21   know if I'm going to allow it in or not, but I'll submit

22   it for purposes of the hearing for now.

23        MS. CORBELLO:  I have one more.

24   BY MS. CORBELLO:

25        Q    All right.  Defense Exhibit 2, do you know a

1  Jamaica Chapple, Mr. Jackson?

2      A      No.

3      Q      I'll represent to you that she is currently the

4  acting secretary for the UNT Assistant Board of Regents.  Do

5  you see that there?

6      A      I do.

7      Q      Do you see that Ms. Chapple stated:  I reviewed

8  the minutes and official actions of the board from June 2020

9  to the present.  There is no record of the board directing or

10 recommending that any administrator, official, or employee of

11 the University of North Texas took any adverse action against

12 Dr. Timothy Jackson, including removing him from any editorial

13 position or responsibilities associated with the journal.

14         MR. ALLEN:  I'm going to renew my objection to any

15     statements coming in, not subject to cross-examination.

16         THE COURT:  I understand.  I'll give you a running

17     objection.  I'm receiving them, I didn't say I'm

18     accepting it.

19         MR. ALLEN:  For the purposes of the record, Your

20     Honor.

21         THE COURT:  I understand.

22         MR. ALLEN:  And also, there's been no discovery on

23     this.  We think Professor Cowley's submissions --

24     certainly she didn't look at those.  But maybe she's

25     arguing that the board -- the members we've named somehow

1        aren't proper defendants.  I'm not sure where she's going

2        with this, but thank you.

3                THE COURT:  Go ahead.

4    BY MS. CORBELLO:

5        Q        Professor Jackson, you're asking the Court to

6    reinstate the journal, correct?

7        A        That's a hypothetical question I would say because

8    it depends under what conditions the journal is going to be

9    reinstated.  If it's going to be just a mouthpiece for one

10   side of the equation, then no, I'm not asking for that.  I'm

11   asking for the journal to be a free academic journal which

12   promotes academic integrity and allows for freedom of speech

13   and for freedom of opinion.  That's why my grandmother came

14   here in 1924 at the age of 21.  She wanted to be free, and I

15   would like the same privilege.

16       Q        Professor Jackson, I'll ask the question one more

17   time.  Are you asking the Court to reinstate the Journal of

18   Schenkerian Studies?

19       A        As I said, I'm not asking for it under

20   circumstances which I can't accept.

21       Q        Are you asking under any circumstances?

22       A        I don't know what that question means.

23       Q        Well, you just said you're not asking for it under

24   certain circumstances.  Are there any circumstances that you

25   would ask that of the Court?

1      A      Yes, there are.

2      Q      Are you asking the Court to reinstate you to the

3  editorial board after reinstating the journal?

4      A      Yes.

5              MS. CORBELLO:  Nothing further, Your Honor.

6              THE COURT:  Anything else of this witness?

7              MR. ALLEN:  Just a very brief question, Your

8      Honor.

9                     REDIRECT EXAMINATION

10  BY MR. ALLEN:

11     Q      Two questions, Professor Jackson, and bringing

12  this hearing to an end as I hope.

13            Why will none of the editors that you reached out

14  to personally join the journal in its current form, in its

15  current incarnation of this search committee headed by people

16  like Ellen Bakulina who have called for the destruction of

17  the journal?

18     A      Well, to be accurate, I haven't spoken to people

19  about this question and I didn't know that nobody had applied

20  for the job.  But if I'm -- if that is indeed the case, I

21  would say that everybody in the field of Schenkerian theory

22  who is a very serious person and a very serious scholar would

23  be very leary of taking on the journal without some kind of

24  guarantee of academic freedom and integrity.

25     Q      And it was precisely that guarantee of academic

1    freedom and integrity that Provost Cowley rejected in her

2    letter to you, correct?

3         A       Correct.

4         Q       Opposing counsel has asked you if you would like

5    to be reinstated to the editorial board.  Could you explain

6    the kind of position within the editorial board that you are

7    asking to be reinstated to since you've already described the

8    editorial board had different functions, sort of different

9    positions within the editorial board?

10        A       Well, it would depend also if we were to continue

11   the journal at UNT.  Because as I had originally conceived it,

12   it was an organ that was designed to promote UNT and promote

13   UNT students and -- and give them a head up or a leg up on

14   their careers.

15               But if the -- it sounds like given the current

16   climate that that might not be possible, so I would have to

17   give that more thought.  But essentially I would like to

18   continue in an advisory role, as I have over the past years.

19   I think that the journal was exceptionally successful.

20   Articles appeared in bibliographies by speakers at major

21   conferences all over the world.  UNT was known as a center for

22   serious Schenkerian Studies, it was known as a repository for

23   original Schenker documents, documents that were preserved

24   miraculously in spite of the Holocaust and brought to America.

25   Through my own efforts, by the way, in the year 2000, the

1   collection was brought here to the United States after being

2   hidden in Germany, and then subsequently other collections

3   have arrived.

4           And I would also add in all honestly, that part of

5   the reason for this is the prestige of the people at the

6   college of music who were teaching Schenkerian analysis.  For

7   many years it was me and Dr. Slottow and we wanted to hire

8   some younger people who could continue the tradition.

9       Q    And the position you're describing is a leadership

10  position, correct?

11      A    It is, yes.

12      Q    Not -- not just a reader position.

13      A    No, exactly.  It was -- it was a shepherding

14  position, a leadership shepherding position.

15      Q    And by that, you mean you would have some modicum

16  of control over the journal, correct?

17      A    Within reason, yes.  It was always within reason.

18  There were always dissenting viewpoints.  We always amicably

19  resolved disagreements among the two faculty advisers and the

20  students who were involved in editing the journal over the

21  past 20 years -- or 15 years, I mean.  There were no

22  situations where there were serious disagreements.

23          And contrary to statements that were promulgated

24  in the -- in the petitions claiming that the students had no

25  power, as I said before they -- the editors -- the student

1  editors actually were taken very seriously and often made
2  decisions on their own about which articles to accept or
3  reject.  We did not intervene in that process except when we
4  were asked to consider a problematic situation where we had a
5  disagreement between the readers.  But otherwise, actually the
6  students who served in that position made decisions about
7  whether to accept or reject articles.
8       Q     And would you describe your relationship to them
9  as a mentor?
10      A     Exactly.  Both Slottow and -- and the reason that
11 it worked out well, was that there were two of us.  So
12 sometimes we didn't agree, and the two faculty advisers didn't
13 necessarily agree, or sometimes the student and one of the
14 faculty advisers didn't agree and we -- we would discuss
15 amicably how to find a resolution to the problem.  But I think
16 that the resulting product on the whole was -- was really
17 quite excellent and was seen as such in the academic world.
18      Q     And my last question before the Court, would be
19 what -- what has been the effect of UNT's approach to the
20 journal after the July 2020 incident on that mentoring
21 building relationship?
22      A     Well, it's been devastating.  It's been
23 devastating to the students.  Some of the students who were
24 involved abandoned me as a faculty adviser because they felt
25 that I was tainted.  Some cried.  One -- one student called me

1    and spoke to me for I would say about three hours.  And that

2    student was weeping continuously throughout the conversation

3    and saying that the person said that they could not --

4              MS. CORBELLO:  Objection.  Hearsay.

5              THE COURT:  Sustained.

6       A     Okay.  Well, anyway, that -- it's been

7    devastating, let's put it that way.

8              MR. ALLEN:  Thank you, Your Honor.

9              THE COURT:  Any additional questions?

10             MS. CORBELLO:  No, Your Honor.

11             THE COURT:  Okay.  You may step down.

12             Do you have -- that was all the evidence from the

13        Plaintiff, correct?

14             MR. ALLEN:  I have no further evidence, Your

15        Honor, unless in rebuttal if something comes up.

16             THE COURT:  And did you have some evidence you

17        want to offer, or any witnesses?

18             MS. CORBELLO:  Yes, Your Honor.  We have Dean

19        Richmond to offer as a witness.

20             THE COURT:  Okay.  Thank you.

21             Sir, if you'll raise your right hand and be sworn

22        in.

23             THE CLERK:  You do solemnly swear the testimony

24        you shall give in the case now on hearing shall be truth,

25        the whole truth, and nothing but the truth so help you

```
 1        God.
 2                THE WITNESS:  I do.
 3                THE COURT:  Have a seat -- and let him wipe it
 4        down first.
 5                        (Brief pause)
 6                THE COURT:  Go ahead and proceed.
 7                        JOHN RICHMOND,
 8        after having been sworn, testified as follows:
 9                        DIRECT EXAMINATION
10        BY MS. CORBELLO:
11           Q      Can you give your full name for the record,
12        please.
13           A      John William Richmond.
14           Q      What's your current position, Dean Richmond?
15           A      Professor and Dean of the College of Music.
16           Q      And during the events giving rise to this suit in
17        2020, what was your position at UNT at that point?
18           A      Professor and Dean of the College of Music.
19           Q      Are you familiar with the -- the events giving
20        rise to this suit, Dean?
21           A      I am.
22           Q      Are you familiar with the JSS as we're calling it?
23           A      Yes.
24           Q      Can you explain to the Court why the ad hoc
25        committee was convened in this case after the publication of
```

1  the volume at issue here?

2     A     Yes.  Because the -- the incident as it's been

3  referred to, recommended -- given it's national attention and

4  controversy and examination, the ad hoc committee was convened

5  in order to provide some measure of objectivity from

6  experienced journal editors across the institution outside the

7  college of music.

8     Q     Was the point of the ad hoc committee to figure

9  out who was in the wrong on the editorial board?

10    A     I think the purpose of the ad hoc committee was to

11 determine what happened, and to understand the extent to which

12 best practices were observed, and opportunity for improvement.

13    Q     Was the point of the ad hoc committee to have the

14 journal dissolved?

15    A     No.

16    Q     Who required the creation of the ad hoc committee?

17    A     Provo.

18    Q     Anyone else?

19    A     It was the Provost.

20    Q     And did the Provost -- you saw counsel kind of

21 talking about the members of the committee being outside of

22 UNT or outside of the Center for Schenkerian Studies.  Was

23 that the Provost's decision making, do you know?

24    A     It was the Provost's decision to make it -- to

25 constitute the committee as she did, to recruit experienced

1    journal editors from disciplines outside music in order to
2    ensure some measure of objectivity given the controversy
3    swirling in the music community as a consequence of the
4    publication of Volume 12 of the JSS.
5        Q        One of the recommendations of the ad hoc committee
6    was they recommended an outside editor be placed at the JSS,
7    right?
8        A        They did.
9        Q        Okay.  Is that application process ongoing?
10       A        It is.
11       Q        And when did it first -- when did the application
12   process open?
13       A        I'm not certain of that.  I remember it as being
14   late spring of 2021.
15       Q        And it's still open to this day?
16       A        It was open through the summer, and we received no
17   applications.  And so it was extended through November 19th.
18   It is open as we speak.
19       Q        And based on the restructuring recommended by the
20   ad hoc committee, who is now responsible for creating the
21   editorial board for the JSS?
22       A        The editor, once -- once an editor is identified
23   and recruited, that editor will -- well, I can't quote, but to
24   paraphrase the provost's charge, recruit new members and
25   affirm the membership of current members if appropriate.  So

1    it would be a mix of -- presumably, a mix of new and returning
2    board members.
3         Q     Are you aware of the Board of Regents' members
4    that are sued as defendants in this lawsuit?
5         A     Am I aware that they are sued?
6         Q     Yes.
7         A     Yes, I am aware.
8         Q     Do you know if any of them will become the new
9    editor-in-chief of the JSS?
10        A     I do not, no.
11        Q     Do you know if any of them has applied for
12   editor -- for the editor spot at JSS?
13        A     The regents?
14        Q     Yes.
15        A     No.  No none.  No.
16        Q     So as we sit here today, is the JSS dissolved?
17        A     No.
18        Q     What is it?
19        A     It is on pause while we seek a new editor and a
20   reconstituting.  In other words, while we comport with the --
21   to the charge of the Provost for the reconstituting of the
22   journal, in order to ensure its viability moving forward.
23        Q     Did you hear Professor Jackson testify earlier, he
24   called it the journal is on ice?
25        A     I did hear him say that, yes.

1      Q      Would you agree with that?

2      A      I don't know that I would use that metaphor.  I

3   would say it's on pause.

4      Q      Is there a board of editors for the JSS currently

5   in existence?

6      A      Yes, in -- insofar as there -- there has been no

7   action taken about board membership at all.  That board

8   presumably is still that board.

9      Q      But the journal is on pause, right?

10     A      It is on pause seeking an editor, yes.

11     Q      And the functions of an editorial board are to

12  review and essentially compile articles for the journal,

13  right?

14             MR. ALLEN:  I'm going to object.  She's leading

15      this witness.  He's a direct witness, not a cross.

16             THE COURT:  Rephrase the question.

17             MS. CORBELLO:  I'm sorry, Your Honor.  More so as

18      just a time saving mechanism.

19  BY MS. CORBELLO:

20     Q      But what are the functions of the editorial board,

21  Dean?

22     A      To receive, review, and recommend for publication

23  or not, submissions to the journal.

24     Q      Fair to say if the journal is on pause, what does

25  that mean for the editorial board members at this point?  Are

1    they working or not?

2         A      No, they are not.  Presumably not.

3         Q      Has the editorial board dissolved?

4         A      No.

5         Q      Are you aware of any Board of Regents meeting

6    where it was decided that the editorial board of JSS would be

7    dissolved?

8         A      No.

9         Q      Are you aware of any way in which Professor

10   Jackson has been disciplined by UNT since the events giving

11   rise to this issue?

12        A      No.

13        Q      Do you know of any way in which Professor Jackson

14   has been reprimanded because of the events giving rise to this

15   case?

16        A      By the University?

17        Q      Yes.

18        A      No.

19        Q      Are you aware of any termination of Professor

20   Jackson from UNT?

21        A      No.

22        Q      Have you -- has anyone at UNT removed him as

23   director of the Center for Schenkerian Studies?

24        A      No.

25        Q      Has anyone from the University as far as you know

1    told him that he is no longer a part of the Journal of
2    Schenkerian Studies?
3         A       No.
4         Q       Has anyone at UNT taken action to close the Center
5    for Schenkerian Studies?
6         A       No, just the opposite, actually.  The Center is up
7    for its usual periodic review and the University has been very
8    patient in light of Dr. Jackson's request to provide
9    extensions for the submission of material in support of that
10   renewal of standing.
11        Q       Has Professor Jackson received any accommodations,
12   promotions, benefits, since the events giving rise to this
13   suit?
14        A       His designation as Distinguished Research
15   Professor has been renewed.  Reaffirmed.
16        Q       When was it reaffirmed?
17        A       Either the fall of 2020 or the spring of 2021.  It
18   was -- yeah, during that period.  I don't remember the exact
19   day.
20        Q       What was the title you said, Dean?
21        A       Distinguished Research Professor.
22        Q       And has that title been taken away from Professor
23   Jackson, to your knowledge?
24        A       No.  Again, it's been reaffirmed.
25        Q       It's been reaffirmed?

```
1        A       Yes.
2                MS. CORBELLO:  Nothing further, Your Honor?
3                THE COURT:  Any questions?
4                        CROSS-EXAMINATION
5   BY MR. ALLEN:
6        Q       Good afternoon, Dean Richmond.
7        A       Good afternoon.
8        Q       Early evening.  You said it was not the intent of
9   the ad hoc panel to put the journal on pause.  Is that the way
10  you put it?
11       A       Well --
12               MS. CORBELLO:  Objection.  Misstates the
13          testimony.
14               THE COURT:  Overruled.
15  BY MR. ALLEN:
16       Q       I'll ask you to state the testimony in your own
17  words.  You said it was not the intent of the journal --
18  excuse me -- the ad hoc panel to end the journal?
19       A       The -- the report recommendations begin with the
20  recommendation of the journal continuing, not that it be
21  dissolved.
22       Q       Did the journal continue, however?
23       A       It -- it is continuing.  We are -- there are
24  subsequent recommendations we are now following in order to
25  ensure that it continues in a manner --
```

```
 1      Q      Is a journal that doesn't publish anything for 15
 2  months despite having a pipeline of articles, continuing?
 3              MS. CORBELLO:  Objection.  Assumes evidence not in
 4      the record about a pipeline of articles.
 5              MR. ALLEN:  Professor Jackson testified to this.
 6              THE COURT:  Overruled.  Overruled.
 7              THE WITNESS:  So I'm happy to answer the question,
 8      but it will take a little bit.  So may I just unpack
 9      this?  So I think it has to do with timeline.  Your
10      Honor, may I?
11              THE COURT:  Go ahead.
12              THE WITNESS:  Okay.  Because I didn't want to
13      overstep.
14              THE COURT:  Go ahead.
15      A      So there -- there was some time that was required
16  simply for the ad hoc committee to be recruited, and for them
17  to do their work and to fashion their report.  And that took
18  some number of those months that you just referenced, that are
19  the pause.
20              Then there was the time for the report to be
21  received, a response from Dr. Jackson to be fashioned and
22  submitted, and a response then back to Dr. Jackson and to the
23  college, keeping in mind this is all outside the college.  So
24  that represents even more of those months, past all the way
25  through to March.  So it -- that -- we then needed to
```

1    understand how best to proceed with searching for a new editor
2    and mount a call for a new editor, et cetera.
3            So it is true that it has taken some time.  That
4    is true, I can confirm that.
5    BY MR. ALLEN:
6        Q    Despite the intent of the panel, would you agree
7    that it has simply put a stop to the publications of the
8    journal?
9        A    I would submit that the journal has not published
10   since Volume 12, yes, sir.
11       Q    Thank you.  Is there any intent now to publish the
12   articles that are in the pipeline on the part of the
13   University of North Texas press?
14       A    There is an intent to reconstitute the editorial
15   process so that it can resume its work.
16       Q    Is that no?  Do you mean "no" by that?
17       A    I'm sorry?
18       Q    Do you mean no, there is no intent to publish the
19   pipeline of articles?
20       A    No, I don't mean that at all.  I'm trying to
21   describe the process as it's unfolding.  I'm trying to do
22   justice to the question you're requesting.
23       Q    All right.  You also said that you know of no
24   statement to remove Timothy Jackson from the operations of the
25   journal.  I believe something to that effect you testified

1    when your counsel asked you that question.

2        A      Counsel asked me if I knew of any action on the
3    part of the -- I believe you said the board or any University
4    officer to remove him from -- I know of none.

5        Q      And who's Benjamin Brand?

6        A      He's the chair of music history, theory, and
7    ethnomusicology.

8        Q      And is he an officer of the University?

9        A      He's the chair of that division in the college of
10   music.

11       Q      Does that mean yes, he is an officer of the
12   University?

13       A      I don't know his legal standing.  If it's officer,
14   I don't know.

15       Q      He's under your supervision as Dean?

16       A      He's under my supervision as Dean.

17       Q      And your counsel and presumably you brought to
18   court today an affidavit by Dr. Brand, correct?

19       A      Counsel brought that to you, yes.

20       Q      And are you aware that in paragraph four of that
21   affidavit it states in a subparagraph a -- a statement that he
22   made in December of 2020:  I cannot support a plan according
23   to which you -- referring to my client, Timothy Jackson --
24   would remain involved in the day-to-day operations of the
25   journal, and its editorial process in particular, given the

 1   panel's findings of editorial mismanagement at JSS.

 2           Is that stated in the affidavit that you brought

 3   to court today?

 4       A     That statement -- I believe that statement is in

 5   the affidavit that counsel brought today.

 6       Q     Isn't that a statement by an officer of the

 7   University of North Texas indicating that Timothy Jackson

 8   should be removed from the journal?

 9           MS. CORBELLO:  Objection.  Misstates the evidence.

10           THE COURT:  Overruled.  He can answer whatever it

11       means to him.

12       A     It means that he is representing his own position

13   on a question.

14   BY MR. ALLEN:

15       Q     But his own position is also a position as an

16   officer of the University, correct?  As a department chair of

17   the University?

18       A     As a department chair -- well, as a division

19   chair.  We use a different terminology in the college, but

20   it's a reasonable synonym, yes.

21       Q     Also, considering Ellen Bakulina signed multiple

22   petitions that called for the destruction of the journal,

23   would you as an overseer of the college of music -- and I

24   assume you care about music deeply is that a safe assumption?

25       A     It is a safe assumption, yes, sir.

1       Q       Would you appoint someone to a search committee,
2   say for a department chair or the Dean, who had already sworn
3   to destroy the college of music?
4               MS. CORBELLO:  Objection, vague, misstates the
5       evidence.
6               THE COURT:  Well, I'm not sure it misstates the
7       evidence, it's a hypothetical.  It's overruled.
8       A       No.
9   BY MR. ALLEN:
10      Q       You said no, am I right?
11      A       Yeah, no.
12              MR. ALLEN:  No further questions, Your Honor.
13              THE COURT:  Anything else?
14              MS. CORBELLO:  No, Your Honor.
15              THE COURT:  Let me ask a couple of questions and
16      make sure I know what's going on.
17              So the ad hoc committee in the process had been
18      replaced by the University, I assume by the order of the
19      Provost --
20              THE WITNESS:  Yes.
21              THE COURT:  -- to reconstitute the board with a
22      new editor who will then go ahead and appoint the
23      editorial board.
24              THE WITNESS:  Let me -- let me -- may I just amend
25      that slightly, Your Honor?

1          THE COURT:  Yes, go ahead.

2          THE WITNESS:  Thank you.

3          So I think you -- you conflated the charge with

4     the outcome.  If I could just kind of separate those a

5     little bit.

6          So the charge of the committee was to determine

7     the processes that were followed in the production of

8     Volume 12 in the Journal of Schenkerian Studies, and to

9     make recommendations going forward and -- and the

10    recommendations then were in part what you just

11    summarized.  But the charge is slightly different, so I

12    just wanted to make that clarification if I could.

13         THE COURT:  But the process going on now is you're

14    taking applications for an editor position for JSS

15    that -- of course, there's been no applications for that,

16    but once the editor position is filled, the editor will

17    appoint additional -- the editor-in-chief will appoint

18    editors, and then the journal will continue at that

19    point.

20         THE WITNESS:  It's an important and crucial point.

21    So the -- the editorial board will be constituted per the

22    recommendations of the editor as opposed to the -- I mean

23    that's not a -- that those decisions would not abused,

24    nor would it be the chair, or other persons that -- those

25    decisions will be vested in the editor.

1          THE COURT:  But as things currently stand, until
2     an editor-in-chief is -- applies and gets appointed, the
3     journal isn't going to be published.
4          THE WITNESS:  That's correct.
5          THE COURT:  So although you indicated that
6     Mr. Jackson is still an editor, as it currently stands --
7          THE WITNESS:  He's a board member as it currently
8     stands.  Right.
9          THE COURT:  But he has no power to do anything.
10    He can't publish anything.  They can't do -- they are
11    not -- the University does not permit another volume of
12    the journal or chapter to be published.
13         THE WITNESS:  The journal is on pause, yes, sir,
14    until a new editor is identified and retained.
15         THE COURT:  So to be clear, the University
16    wouldn't allow Mr. Jackson to do another issue of the
17    journal until this other process plays out.  I mean --
18         THE WITNESS:  That's the position of the
19    institution as I understand it.  We're on pause.
20         THE COURT:  Thank you.
21         THE WITNESS:  You're welcome.  Thank you.
22         THE COURT:  Anything else from the University?
23         MS. CORBELLO:  No, Your Honor.
24         THE COURT:  Okay.  Anything else you want to put
25    on?

1          MR. ALLEN:  We have no further evidence, but just
2     like to say, Your Honor --
3          THE COURT:  If you can go to the podium.
4          MR. ALLEN:  -- briefly in closing, and I want to
5     say thank you, Your Honor, I was extremely delayed in
6     getting to the court.  I apologize to that and I
7     appreciate the Court's time.
8          THE COURT:  I can't imagine flying in all this
9     wind.  So I don't know if the Defendants flew up or drove
10     up.  I'm sure it was kind of bumpy coming from Dallas.
11          MR. ALLEN:  My younger brother did graduate from
12     Plano High School and it's been 30 years since I've lived
13     in this area.
14          THE COURT:  I know it's changed significantly in
15     the last 30 years, I can tell you that.
16          MR. ALLEN:  And I was so clueless at that time, I
17     wouldn't have even known where to begin anyway.
18          But if Your Honor were to hold that there was no
19     harm done to Timothy Jackson in this instance, you would
20     have to hold that someone who had worked his whole life
21     and had a position of importance and had built a
22     mentoring institution around this journal could be
23     deprived of that position in a cancellation attack.  And
24     --
25          THE COURT:  Let me ask you a question.

1          MR. ALLEN:  Yes.

2          MR. CAMPOS:  He agreed to some of the

3    recommendations and agreed to this process for the ad

4    hoc, or endorsed it.  How does that impact the decision

5    here?

6          MR. ALLEN:  Well, first of all, I don't believe

7    that he did endorse the ad hoc panel's --

8          THE COURT:  So how would you describe what he did?

9          MR. ALLEN:  I would say he was proposing a

10   solution that would safeguard academic freedom and the

11   freedom of speech, which has been simply overruled and

12   rolled over by Provost Cowley, Dean Richmond, and other

13   officers of the University.  Because they are not

14   concerned about the freedom of speech, they were

15   concerned about proving Timothy Jackson a racist and

16   somehow creating a search committee that by its very

17   constitution would never -- would never find anyone, and

18   thus -- thus eliminate the journal.

19         And the context down the line, Your Honor, I'll

20   come back to your point, but he's going to be

21   evaluated -- the Center is going to be evaluated based on

22   the fact that he can no longer maintain the journal.  And

23   he -- he will die by a thousand cuts.  It will be an

24   administrative suffocation at the end of his career,

25   which quite frankly we see throughout the industry at

1    this time.

2          But -- but to your point, he wanted to reach out

3    to people who were dedicated to Schenkerian analysis.  He

4    was doing that as an -- on an individual basis to recruit

5    as he did at the beginning of the foundation of the

6    journal, the editorial board who was committed to this

7    very specialized areas of scholars.  But we understand,

8    Your Honor, that outside this specialized world, no one

9    has ever heard of Schenkerian analysis.  But that's kind

10   of how scholarship works.  That's why there's a protected

11   sphere for tenured professors to pursue things that are

12   not of interest to the larger community.  What the

13   University of North Texas has done is not just put things

14   on pause, not even just put them on ice.  They've

15   eliminated this journal based on spurious claims of

16   racism.

17         THE COURT:  How does the Court redress -- just

18   assume there is an injury, how does the Court redress

19   that injury?

20         MR. ALLEN:  I would think the Court can order the

21   University of North Texas to restore Timothy Jackson --

22         THE COURT:  Well, doesn't the University have a

23   lot of discretion in terms of the process of setting

24   up -- you know, I mean it's giving up their own

25   editor-in-chief and doing that and --

1          MR. ALLEN:  Well, the University does have --
2          THE COURT:  The only relief the Court has -- and I
3     mean I'm just -- does the Court have the power to tell
4     them they have to -- until they reconstitute it, he has
5     to -- he's allowed to continue to publish?  I mean I'm
6     just trying to figure out what the remedy is if you can
7     show the injury.
8          MR. ALLEN:  Well, Your Honor, first of all the ad
9     hoc panel is purely retaliation against Timothy Jackson
10    for the exercise of his free speech.  There are other
11    journalists at the University of North Texas such as
12    Theoria, and I -- I recognize this gets us beyond the
13    evidence that's available in this hearing, but would be
14    happy to supplementally brief that for the Court.  They
15    did exactly what Timothy Jackson's journal was accused of
16    doing; publishing without peer review, publishing your
17    own articles, even citing Wikipedia -- all of these
18    things.  There's absolutely no interest in disciplining,
19    investigating, any of those people.  They constituted the
20    ad hoc panel outside of any recognizable policies or
21    procedures of the University simply to target Timothy
22    Jackson.  He was the sole person who the ad hoc panel
23    addressed.  Not the editorial board, not Steven Slottow
24    who's fellow managerial editor.  And the University could
25    be ordered by the Court to restore Timothy Jackson to his

1    previous position.  Restore the resources which have been
2    now taken away from Timothy Jackson.
3           THE COURT:  But he's still in the same position.
4    He was on the board, he's still on the board, albeit to a
5    journal that has been put on pause.
6           MR. ALLEN:  Using the University's euphonism.
7           THE COURT:  Isn't his position the same?  Yes, the
8    journal has been put on pause, but he's still on the
9    board technically.
10          MR. ALLEN:  Well, I would -- I would suggest to
11   the Court that his position on the board was not simply
12   of a equal member with all the other members of the
13   board.  There was a clear division between readers, who
14   were certainly associated with the board, and the two
15   professors who were, for lack of a better term, managing
16   board members.  They were managing the publication.  And
17   the way that academia works to -- a very junior scholar
18   is very exposed.  Exposed for some of the reasons why
19   Levi Walls felt compelled to issue apologia to the world
20   when he was attacked for his activities on the journal,
21   and Steven Slottow and Timothy Jackson stood there as a
22   wall to protect them, to give them authority.  But they
23   could have never assumed or carried out those positions
24   without that authority standing behind them, in the
25   structure that Timothy had organized for the journal.

1        And quite frankly, that had produced several waves of
2    very successful scholars who were launched in their
3    careers by the journal.  It was a formula that worked and
4    a structure that worked, which the attack on academic
5    freedom that the University of North Texas under this
6    man's guidance simply allowed to happen without doing
7    anything to stop it.  Instead, they aided and abetted it
8    by organizing an ad hoc panel that simply shut the
9    journal down.  That's what's happened here.
10       So I think he could be ordered to reassume his
11   position.  He could -- the University could be ordered to
12   restore the resources to the journal and the Center that
13   has been now taken away.  Certainly, the Court's have
14   intervened much more deeply in say, the prison system,
15   and that would require the University to intervene in --
16   in the journal or in UNT.
17       THE COURT:  And then what did the Board of Regents
18   do to cause Mr. Jackson or Professor Jackson's injury?
19       MR. ALLEN:  I believe this goes to a
20   jurisdictional question under the ex parte young
21   doctrine, Your Honor.  And the Board of Regents stand in
22   for the highest authority of the University who had the
23   authority to rectify the -- the -- the wrong that has
24   been done to my client.  And I think it's very common
25   under ex parte Young to sue people who are not directly

1    involved in the commission of a wrong, simply to cast a
2    wide net and make sure you get people who are themselves
3    responsible.
4         So for instance, in another context, Your Honor, I
5    have sued the University of Connecticut.  I named the low
6    level administrator who had actually wronged my client,
7    but I was told I had to amend the complaint to add an
8    individual who had the authority to change the situation
9    under the ex parte Young doctrine.  Counsel and I agreed
10   who that could be, and that was rectified that way.  But
11   on my fee petition I never got any payment for making
12   that mistake.
13        But Your Honor, the board members stand in for
14   those who have the authority to rectify the mismanagement
15   of the University.  If we were to need to amend to add
16   another party, we could certainly do that.  For instance,
17   Dean Richmond who has appeared today, or perhaps the
18   chair of the department.  The problem is often the
19   defense runs into court and says they don't have ultimate
20   authority, and then you have to sue the board anyway.
21   That's why they are there.  They are there as the
22   ultimate supervising authority of the University.
23        THE COURT:  Then can I ask you a question not
24   related to -- anything else you want to say on -- for
25   purposes of the hearing?

1          Okay.  I do have a question on the -- I have
2     pending -- it got transferred from miscellaneous case to
3     a Motion to Quash subpoenas, and Motion for Protective
4     Order.  I was curious why you were asking things be
5     produced in Fort Worth which have no ties whatsoever to
6     anything here.
7          MR. ALLEN:  Oh, I believe that was done by my
8     co-counsel, Your Honor, to have the documents produced
9     there so that -- I think that was a law firm that he uses
10    to receive documents in that way.  I can't answer for
11    Jonathan Mitchell to answer that more precisely, but I
12    think that was simply a formality, especially in a pure
13    document discovery that it was never expected that an
14    actual deposition or appearance at that location would
15    take place.  I do believe it was within the -- within the
16    rules to have a person appear within that distance.
17    Isn't it 100 miles I believe under the federal rules?
18    That was never --
19         THE COURT:  Well, neither the parties, movants, or
20    counsel are in that region, so that's why I was just
21    curious.
22         MR. ALLEN:  And I believe Jonathan Mitchell's law
23    office is in Austin and that's -- that's another reason
24    why it was -- he has no office here in the Dallas/Fort
25    Worth area.  Nor do I, unfortunately.

1          THE COURT:  No, I know.

2          Okay.  Then I'll give --

3          MS. CORBELLO:  Would you like me at the podium,

4     Your Honor?

5          THE COURT:  Yeah, that would be great.

6          Let me just ask -- the Board of Regents is the

7     governing body for UNT, correct?

8          MS. CORBELLO:  Yes, Your Honor.  However, given

9     that that's the Court's first question, I'll go ahead to

10    the ex parte Young argument that counsel made a second

11    ago.  He conceded a very important point, that they've

12    been placed here as a standard for some higher authority

13    that they don't know what that is at this point.  That is

14    the opposite of what the ex parte Young doctrine allows.

15         In many cases -- City of Austin v Paxton, In Re

16    Abbott out of the Fifth Circuit, both of which -- both of

17    which have addressed this issue, both require the

18    enforcement after themselves to be the ones that the

19    Court issues relief against.

20         In City of Austin the Court said for the ex parte

21    Young exception to apply, the state official must have

22    some connection with the enforcement of the challenged

23    act or as the suit is merely making him a party as a

24    representative of the State, and thereby attempting to

25    make the State a party.  It's essentially what counsel is

1    doing here, having some State actor stand in, and then
2    have the Court figure out who would actually provide Mr.
3    Jackson the relief.  Ex parte Young does not go that far.
4        As to the ad hoc panel retaliation claim that
5    Mr. Jackson has now raised for the first time, that's not
6    a claim in this case that the ad hoc panel creation is
7    somehow retaliation for First Amendment rights.  I'll
8    point out that it was the Provost that created that ad
9    hoc committee, not any defendant in this suit currently,
10   and it was the ad hoc committee that issued
11   recommendations.  Again, none of which are defendants in
12   this suit.  That is not a claim that is viable or that
13   can go forward at this point.
14       What Mr. Jackson has told this Court today is that
15   he is currently on an editorial board, and it's on ice
16   because the journal needs an editor.  He never told this
17   Court that he is allowed to as an editorial board member
18   publish articles as he wants.  The journal needs an
19   editor.  And until an editor comes to power, there can be
20   no editorial board that is helping publish a volume under
21   the JSS.
22       THE COURT:  So you admit that his position has
23   changed.  Maybe he's still on the board, but he has no
24   ability to actually publish anything.
25       MS. CORBELLO:  No, Your Honor, there was never any

1    testimony that Mr. Jackson could publish something under
2    the JSS without an editor at the helm.  As he told this
3    Court, there was an editor at all times when they were
4    publishing volumes under the JSS.  And as that continues,
5    an editor needs to be appointed before publications can
6    occur again.  Nothing --
7          THE COURT:  Who was the editor before, when the
8    last issue came out?
9          MS. CORBELLO:  I don't recall the name off the top
10   of my head.  I'm sure Professor Jackson knows.  I believe
11   it was student editors at that point.
12         THE COURT:  Right.  But what I'm saying is
13   Professor Jackson doesn't have the power at this point to
14   have someone else serve as the editor, pending the
15   process to get a permanent one.
16         MS. CORBELLO:  Your Honor, Professor Jackson
17   didn't have the power to require someone to serve as the
18   editor before this lawsuit or before the events.
19         THE COURT:  Well, who appointed the previous
20   editors?
21         MS. CORBELLO:  I don't believe Professor Jackson
22   testified to that.
23         THE COURT:  No, I'm asking you.
24         MS. CORBELLO:  I'm not aware, Your Honor.  The
25   jurisdictional burden rests with Plaintiff.  Plaintiff

1    did not testify to this Court that he had the power to
2    appoint editors to the JSS
3         THE COURT:  I understand that.  But I asked you a
4    question.  If you don't know the answer, that's fine.
5    Tell me you don't know the answer.  But you don't know
6    the answer?
7         MS. CORBELLO:  No, Your Honor.
8         THE COURT:  Okay.  That's all you have to say.
9         MS. CORBELLO:  Well, this just goes back to the
10   Court's question as to whether his obligations or duties
11   have changed moving forward.  No, there's been no
12   evidence to this Court, there's no evidence in the
13   briefing or exhibits before the Court that anything in
14   Professor Jackson's function as an editorial board member
15   has changed since the events.  He was not -- there's no
16   evidence he was able to appoint an editor, there was no
17   evidence that he was able to publish without an editor.
18   So those are not injuries that are cognizable in this
19   case.  The only injury that Professor Jackson has alleged
20   is that he made recommendations that the ad hoc committee
21   didn't fully adopt.  That is again not a cognizable
22   injury.  It's a disappointment, but it is not retaliation
23   for exercise of First Amendment rights.
24        To clarify, the Court cannot issue the relief that
25   Professor Jackson is requiring.  If the Court were to

1    essentially force UNT to maybe hire an editor, or just
2    allow the journal to start publishing without an editor,
3    either way that's compelled speech.  An injunction cannot
4    compel the University to speak by requiring a journal to
5    exist and to publish.  And because the journal can't be
6    required to quicken its editor search or publish without
7    an editor, Professor Jackson can't be -- well, he's on
8    the editorial board so the Court can't put him on the
9    editorial board either.  There's no action, there's no
10   reject ability in this case at this point.  And so for
11   these reasons, defendants ask the Court to grant the
12   12(b)(1).
13            THE COURT:  Okay.  Thank you.
14            Okay.  Anything else from anybody?
15            I know this is longer or later than we thought we
16   would because of starting late.  And I apologize for my
17   jury coming back late.  But I have another hearing after
18   your hearing, I had to bump that.  I wasn't going to get
19   to that, some discovery disputes.
20            MR. ALLEN:  It's the nature of the process that we
21   always want to get the last word in, Your Honor, but we
22   appreciate your time today and I think we should rest.
23            THE COURT:  Okay.  Very good.
24            Well, I'm going to take the matter under
25   advisement, but I appreciate -- it's unusual -- usually

1    if you have a factual dispute about -- and I'm not sure
2    there's really a dispute, it's kind of a nuance, and it's
3    a question of whether or not -- I'm just not sure how I
4    evaluate that legally.  That's the issue.  I don't know
5    that the facts are really in disagreement, I think it's a
6    question -- although he's still on the editorial board,
7    nothing is happening and the journal is on ice.  The
8    question is how do I apply the law to that.  I'll
9    certainly look at that and see where we go.
10        And we're also at the beginning stages, too,
11   that's a question I have is, you know, at 12(b)(1) stage
12   versus later in the case.  I just don't know.
13        So thank y'all for your arguments, I appreciate
14   it.  You both have zealously represented your clients, I
15   like that.  So it was a good discourse and I'll take it
16   under advisement.
17        Anything else I can do for the parties?
18        MS. CORBELLO:  No, Your Honor.
19        THE COURT:  Okay.  Well, y'all have safe travels
20   back to your destinations, and we'll be in recess.
21             (End of proceedings)
22
23
24
25

```
1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4    /s/ Lori Barnett                    4/5/22
     COURT REPORTER                      DATE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```