UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033-ALM |
| | § | |
| LAURA WRIGHT, et al., | § | JURY |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' CORRECTED OPPOSED MOTION TO STRIKE PLAINTIFF'S EXPERT CASEY BORMAN

TO THE HONORABLE U.S. DISTRICT JUDGE AMOS L. MAZZANT:

Defendants[1] respectfully file this Corrected Opposed Motion to Strike Plaintiff's Expert Casey Borman. It is undisputed that Plaintiff Timothy Jackson ("Jackson") has received his full salary since the events underlying this lawsuit. Nevertheless, Jackson has designated an expert to opine that Jackson should have been paid for work he never performed. Further, the various contours and sub-parts of that basic opinion lack any reliable methodology and are not relevant to the actual questions that may be presented to the jury in this case. Instead, Borman's opinions are nothing more than conclusory, speculative lay opinions. Far from helping the jury, Borman's

---

[1] Defendants include the following: Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny (deceased), Daniel Feehan, A.K. Mago, Carlos Munguia, and G. Brint Ryan, all in their official capacities as members of the Board of Regents for the University of North Texas System ("Board Defendants"); and Rachel Gain, Ellen Bakulina, Andrew Chung, Diego Cubero, Steven Friedson, Rebecca Dowd Geoffroy-Schwinden, Benjamin Graf, Frank Heidlberger, Bernardo Illari, Justin Lavacek, Peter Mondelli, Margaret Notley, April L. Prince, Cathy Ragland, Gillian Robertson, Hendrik Schulze, Vivek Virani, and Brian F. Wright ("Individual Defendants").

opinions would merely confuse and mislead them. For the many alternative reasons discussed below, this Court should strike Borman as an expert and exclude his testimony.

## BACKGROUND

Plaintiff Timothy Jackson has been on faculty at the University of North Texas' ("UNT") College of Music since 1998.[2] He serves as the director of the Center for Schenkerian Studies, and at the time of the events underlying this lawsuit, he was also overseeing the publication of the Journal for Schenkerian Studies (the "JSS"). *See* ECF No. 1 ¶¶ 36–37. Although a full discussion of the disputed facts regarding the merits of this litigation is not necessary for this Motion, Defendants briefly note the following pertinent points.

The events underlying this lawsuit occurred in late 2019 and throughout 2020. It is undisputed that Jackson has remained a full-time tenured professor at UNT since that time, and that he has continued to receive his full salary and benefits.

Jackson brings two claims against two different sets of Defendants. First, he pleads a claim against the members of UNT's Board of Regents in their official capacities (the "Board Defendants") under 42 U.S.C. § 1983, alleging violations of his constitutional rights. *Id.* ¶¶ 62–64. Jackson seeks no economic or compensatory damages under this claim, but only prospective injunctive relief. *Id.* ¶ 64; *see also* ECF No. 47 at 24–25.

Second, Jackson also pleads a claim for defamation (under Texas law) against eighteen individuals (seventeen colleagues on the faculty at UNT and one graduate student Teaching Assistant at UNT, collectively the "Individual Defendants"). Jackson's defamation claim is based solely on written statements that the various Individual Defendants signed. *See* ECF No. 1 ¶¶ 65–

---

[2] *See* https://music.unt.edu/faculty-and-staff/timothy-jackson (last visited July 30, 2024).

75. Any attempt by Jackson to seek economic damages in this lawsuit arises solely under his defamation claim against the Individual Defendants.

On June 19, 2024, Jackson's counsel served Defendants' counsel with the "Expert Report of Casey Borman," a copy of which is attached to this Motion, pursuant to the Court's direction.[3] *See* ECF No. 58 at 2. Defendants now timely file this Motion within six weeks of being provided with Borman's report. *See id.* For the various alternative reasons set forth below, Defendants request the Court to strike Borman's expert designation, report, and opinions, and to exclude Borman from providing any expert testimony in this case.

## STANDARD OF REVIEW

Under Federal Rule of Evidence 702, a qualified expert may provide opinion testimony if the party offering such testimony can prove the following by a preponderance of the evidence:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Notably, these elements must be proved "to the Court," not to the jury. *Id.* This is because Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*,

---

[3] Jackson has not yet provided Defendants with many of the documents and other information listed by Borman in his report as facts and data upon which he relied in forming his opinions. For example, Jackson has not provided Defendants with a recording or transcript of the personal interview between Jackson and Borman, a signed affidavit supposedly executed by Jackson several weeks ago, and numerous other documents. *See* Ex. A (Borman's Report) at 14–15. Defendants reserve the right to raise additional objections to Borman's testimony based on Defendants' review of those facts and data after Jackson provides them to Defendants.

509 U.S. 579, 597 (1993).  This fundamental "'gatekeeping' obligation" is a critical function of the trial court for all types of expert testimony offered under Rule 702.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147 (1999).

The purpose of this gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.  In short, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable." *Daubert*, 509 U.S. at 589.

As this Court has noted, it is the burden of "[t]he party offering the expert's testimony" to prove the basic prerequisites for the admissibility of that testimony: "(1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable." *SB IP Holdings, LLC v. Vivint, Inc.*, No. 4:20-CV-00886, 2023 WL 6601415, at *1 (E.D. Tex. Oct. 10, 2023) (citing *Daubert*, 509 U.S. at 590–91).

As this Court has also summarized, the Supreme Court has directed trial courts to consider "the following, non-exclusive list of factors . . . when evaluating the reliability of expert testimony":

> (1) whether the expert's theory or technique can be or has been tested;
> (2) whether the theory or technique has been subjected to peer review and publication;
> (3) the known or potential rate of error of the challenged method; and
> (4) whether the theory or technique is generally accepted in the relevant scientific community.

*Id.* at *2.

## ARGUMENT & AUTHORITIES

I.  **Borman's methodologies are not reliable.**

   A.  **Borman has no reliable methodology to support his opinions regarding additional compensation for Jackson's teaching.**

Borman opines that Jackson should receive compensation for teaching a fourth class after Jackson no longer had supervisory duties to perform for the JSS. *See* Ex. A at 1–2, 9–12. This is not an expert opinion derived from a careful application of accounting formulas or theories to economic data. Borman bases this conclusory assertion on nothing but the following assumption: a professor who has a certain job duty replaced by another job duty should receive undiminished compensation for his old duty (i.e., the duty he is no longer required to perform) *plus* additional compensation for his new duty. But that is not an opinion based on principles of accounting, mathematical formulas, economic theories, or any other scientifically valid methodology. It is simply a lay opinion masquerading as an expert opinion. As such, it does not meet the legal standard under Rule 702 for expert testimony and should be excluded.[4]

Further, even if Borman could somehow show that his opinion was in fact scientific, or otherwise based on objectively verifiable principles of accounting or economics, he still has no reliable methodology for calculating the *amount* of money purportedly owed to Jackson for teaching a fourth class during a nine-month academic year. Even on Borman's own (unsupported and unreasonable) assumption that the fourth class assigned to Jackson *in lieu of* his JSS supervisory duties was somehow an "extra" job duty requiring extra pay, Borman still cannot show a reliable method for calculating the proper pay rate for this supposedly "extra" duty. Borman has no explanation to justify his cavalier assumption that a full-time professor who teaches an "extra"

---

[4] As previously noted, it is undisputed that UNT has not withheld, reduced, or otherwise diminished Jackson's pay or benefits as a full-time professor.

class during an academic year is somehow entitled to a 25% pay raise. Perhaps Borman could have researched and cited data regarding how various universities reimburse professors who take on an extra teaching load during a particular semester. Perhaps he could have simply ascertained what UNT pays full-time professors who teach an extra course over the summer or during a regular semester, or what UNT pays an adjunct professor who teaches only a single course. But Borman did not research or consider any of this potentially informative data. Instead, he merely opined that a professor who teaches an "extra" class (when in fact it was simply part of a standard faculty workload) is entitled to a pay raise matching the ratio of the "extra" class to the professor's existing, regular, full-time course load. Borman cites no scientific, economic, accounting, industry standard, or any other verifiable data or principles to support this raw assumption. He certainly demonstrates no methodology whatsoever for how he arrived at this "conclusion." Thus, this opinion is nothing more than a lay opinion. It is not an expert opinion based on any demonstrably reliable methodology, and this Court should therefore exclude it.

      **B.**    **Borman has no reliable methodology to support his opinions regarding additional compensation for the lack of a research assistant.**

Borman further opines that Jackson should receive the full compensation that previously went to the research assistant ("RA") allegedly assigned to Jackson when he was responsible for fulfilling supervisory duties for the JSS. *See* Ex. A at 1–2, 12–14. This opinion is not based on any reliable methodology. There are only two possible ways to categorize the work of the previous RA position allegedly assigned to Jackson: either (1) the RA's duties related to the operations of the JSS, or (2) the RA's duties related to the personal research of Jackson unconnected to the publication of the JSS. Borman never identifies any data, let alone any reliable methodology, showing how he concluded which of those categories best fits the work of the former RA. Even

further, Borman would be unable to reliably support his ultimate opinion (i.e., that Jackson should be paid the former RA's salary) *either way*.

To the extent the former RA's duties related to the operations of the JSS, Jackson (on his own allegations) has not been fulfilling those duties ever since the former RA left. Thus, Jackson is not entitled to the former RA's salary for performing such duties. On the other hand, to the extent the former RA's duties related to the personal research of Jackson unconnected to the publication of the JSS, Jackson was never entitled to any additional remuneration (or support staff) for performing his personal research. Regardless, Borman never shows how he used any reliable or generally accepted methods of accounting, mathematics, economics, or any other area of expertise to move from the simple assertion that Jackson formerly had the assistance of an RA when Jackson had supervisory duties for the JSS to the unsupported conclusion that Jackson is entitled to the *full salary* previously paid to that RA now that Jackson no longer has *any* supervisory duties for the JSS. Such a leap is logically puzzling, to say the least, and Borman has certainly not demonstrated any reliable methodology based on his areas of purported expertise to justify this leap. Thus, his opinion fails to meet the reliability requirement of Rule 702 and must be excluded.

Moreover, even if Borman had somehow shown a reliable basis for his general opinion that Jackson should be paid the additional salary formerly paid to his RA, Borman still fails to show any reliable methodology for calculating that salary. Borman's report does not represent that he obtained or considered any data regarding the actual salary/wages paid for the particular RA position at issue. Further, Borman's report does not reflect that he even obtained or considered data regarding the range of pay for various RA positions within UNT and then proffered an opinion regarding how a supposed average (or other approximate) pay rate for RAs should be calculated.

Rather, Borman simply took a single, random pay rate for an unknown RA—not the RA position previously assigned to Jackson—and based his entire calculation for what Jackson's previous RA would have been paid based on that single other random RA. Such an "analysis" is not based on any reliable method whatsoever.

Even further, Borman then opined that if UNT paid the other (random, unidentified) RA a certain amount for working 75% of the time, then UNT must have paid Jackson's previous RA exactly two-thirds of that same amount for working 50% of the time. To the extent such a calculation is reasonable, it is reasonable only because everyone generally knows that 50% is two-thirds of 75%. It is not based on *any* specialized knowledge, complex data, advanced formulas, or other esoteric principles requiring the expertise of an accountant, economist, or mathematician. As such, this opinion is again a mere lay opinion masquerading as an expert opinion. Borman offers no explanation or justification for why this particular calculation is based on any specific principles of any of his alleged areas of expertise. Thus, the Court should exclude Borman's opinion for failure to meet the requirements of Rule 702.

Lastly, this opinion of Borman fails for yet another alternative reason—he fails to show any reliable methodology for one more leap of reasoning. Once he arrives at his assertion that an RA assisting Jackson with his duties would be paid a certain sum, he then leaps to the conclusion that Jackson is entitled to that same sum. Borman simply assumes that a university offering a student a paid position to perform various academic duties that will aid the student's career objectives would pay *that same amount* to one of its full-time professors who simply did the work himself. That is yet another assumption Borman makes without demonstrating any data or reliable methodology to support it. As such, his opinion is inadmissible for this alternative reason as well.

\*   \*   \*   \*   \*   \*   \*

Because Borman's proffered opinions in this case consistently rest on nothing more than the *ipse dixit* of Borman himself, this Court should exclude Borman's testimony. *See Kumho Tire*, 526 U.S. at 157 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

**II.     Borman's opinions are not relevant and would be confusing and misleading to the jury.**

**A.     Borman's opinions are not relevant to either of Jackson's two pleaded causes of action.**

While not directly naming UNT as a defendant, Jackson has pleaded a cause of action against all the members of UNT's Board of Regents in their official capacities—his § 1983 claim for alleged violation of constitutional rights. ECF No. 1 ¶¶ 62–64. Of course, sovereign immunity bars any claim for money damages against the Board Defendants in their official capacities. *See, e.g., Carver v. Atwood*, 18 F.4th 494, 498 (5th Cir. 2021); *Alvarez v. Akwitti*, 997 F.3d 211, 214–15 (5th Cir. 2021). Thus, Jackson cannot recover any economic damages for his § 1983 claim. Instead, Jackson seeks prospective injunctive relief under this claim. ECF No. 1 ¶ 64; ECF No. 47 at 24–25. Accordingly, Borman's calculations of economic damages are not relevant to Jackson's § 1983 claim.

Jackson's only other claim in this lawsuit is one for defamation (under Texas law) against all the Individual Defendants. As noted, this claim is based solely on written statements that the various Individual Defendants signed. *See* ECF No. 1 ¶¶ 65–75. Critically, *none* of the Individual Defendants were involved in *any* of the decisions by UNT's administration underlying Borman's opinions, nor does Jackson allege they were. No Individual Defendant was involved in the decision-making regarding Jackson's teaching workload (i.e., whether Jackson would be required to teach a fourth class as a substitute for his supervisory JSS duties) or regarding whether Jackson

would continue to work with an RA. All those decisions were made independently by other individuals within UNT's administration who are not parties to this lawsuit. Because the Individual Defendants had no part in those administrative decisions by UNT's leadership, they cannot be held personally liable (i.e., for money damages in their individual capacities) for those decisions. Thus, even if Borman could accurately measure the economic effect of UNT's administrative decisions affecting Jackson's teaching and RA assignments (which he cannot), none of those measurements are relevant to Jackson's defamation claim against the Individual Defendants.

In short, this Court should not permit Jackson to shoehorn a measure of economic loss allegedly caused by UNT's internal administrative decisions into a case where Jackson is barred by law from recovering any economic damages from UNT. The Individual Defendants (the only Defendants from whom Jackson could theoretically seek economic damages) had nothing to do with any of UNT's administrative decisions that Borman opines resulted in certain economic losses to Jackson. Thus, Borman's purported measures of economic loss are not relevant to any of Jackson's pleaded claims in this lawsuit—neither his claim against UNT (the Board Defendants) nor his claim against the Individual Defendants.

Of course, Borman's own expressly stated assumption at the outset of his report fatally undermines his entire analysis. Borman explicitly says that his damage calculations are based on "an assumption of liability arising from the alleged actions and omissions by" each of the named Board Defendants, in addition to each of the named Individual Defendants. The fact that Borman directly acknowledges his calculations are based on an assumption of liability by the Board Defendants negates the relevance (and reliability) of his opinions. It is undisputed that economic damages *will not* (and cannot) be based on any liability of the Board Defendants in this case. Thus,

the express contrary assumption by Borman renders his calculations and opinions inadmissible as a matter of law.

Even further, as a practical matter, Borman's opinions are simply not relevant to any potential legal claim or theory Jackson could possibly invoke. Despite the simple fact that *Jackson was fully paid for all the work UNT required him to perform* as a regular full-time professor, Borman nevertheless opines that Jackson should be paid for work *he was never required to do*. Not only is that odd assertion not based on any reliable methodology or other expertise (as discussed above), but it is also not relevant to any legal cause of action, any valid legal theory, or indeed any version of common sense. "I deserve to be paid for work I never had to do" is simply not a proposition that is legally relevant to anything Jackson might plead or allege in this case. It is certainly not admissible as an "expert" opinion.

> **B.  Even if Borman's opinions were somehow relevant to Jackson's legal claims, Borman's opinions are still inadmissible because they would not be helpful to the jury but would rather confuse and mislead the jury.**

Part of the necessary relevance analysis is Rule 702's requirement "that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702(a)). If Borman's testimony will not actually help the jury to understand complex evidence or determine a particular fact that calls for expert guidance, then his testimony is not admissible. Further, as the Supreme Court has also explained, an expert's opinion should not be admitted simply because it is technically relevant to the case: "[Federal] Rule [of Evidence] 403 permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* at 595 (cleaned up) (quoting Fed. R. Evid. 403). In fact, a court should *more readily* exclude expert testimony under Rule 403 than lay testimony. *See id.* ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.

Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." (internal quotation marks omitted)).

Borman's testimony will not help the jury in this case. The jury is prohibited from awarding money damages against UNT (the Board Defendants). Thus, the jury should not hear about how UNT's administrative decisions regarding Jackson's teaching workload and RA assignments allegedly caused economic loss to Jackson. At most, the jury will be asked to award money damages based on any loss to Jackson's reputation allegedly caused by the written statements signed by the Individual Defendants (i.e., Jackson's defamation claim). Borman does not purport to measure *that* alleged loss. Accordingly, at a minimum, Borman's opinions are unhelpful to the jury because his testimony provides no expert guidance on the actual questions the jury might consider.

Further, Borman's testimony will not merely be unhelpful; it will also actively confuse and mislead the jury. If the jury hears all about how to measure the alleged economic losses caused by UNT's rearranging of Jackson's faculty workload and RA assignments, the jury will naturally think that they should consider awarding these calculated damages to Jackson if they believe that UNT wrongfully rearranged Jackson's workload or his RA assignments (i.e., that UNT did so in retaliation for Jackson's exercise of constitutional rights). But that will not be the proper measure of damages under the law, as Jackson can obtain economic damages only from the Individual Defendants for *their own* alleged wrongdoing, not from UNT for the alleged wrongdoing of its internal administration.

For all these various reasons, Borman's opinions are not helpful for resolving the issues that will be properly before the jury. Rather, his opinions will needlessly confuse and mislead the jury on what is actually before them. Thus, this Court should exclude his opinions.

## CONCLUSION & PRAYER

Borman's opinions fail almost every requirement for expert testimony under Rule 702. His opinions are not based on any reliable methodology. They are mere personal beliefs masquerading as expert opinions. Further, Borman's opinions are not relevant to any of the claims actually pleaded by Jackson. Even if they were, they would not help the jury resolve the specific issues presented in this case but would merely confuse and mislead the jury.

For all the foregoing reasons, Defendants request this Court to strike the designation, report, and opinions of Plaintiff's expert witness Casey Borman, to exclude Borman from providing expert testimony in this matter, and to grant Defendants such other relief to which they may be entitled.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

           /s/ Benjamin S. Walton
**BENJAMIN S. WALTON**
*Lead Attorney*
Texas Bar No. 24075241
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF CONFERENCE

      I hereby certify that I have complied with the meet-and-confer requirement in Local Rule CV-7(h), and that this motion is opposed.  On July 31, 2024, I spoke via telephone with Michael Allen, lead counsel for Plaintiff, and we spent meaningful time discussing our respective views concerning the various substantive arguments presented in this motion.  Our conference complied with the requirements of Local Rule CV-7(h), but we were unable to reach an agreement due to genuine differences of opinion regarding the merits of each of the arguments presented in this motion.  Our discussions have conclusively ended in an impasse, leaving an open issue for the Court to resolve.

                                                        */s/ Benjamin S. Walton*
                                                    **BENJAMIN S. WALTON**
                                                    Assistant Attorney General

## CERTIFICATE OF SERVICE

      I hereby certify that on July 31, 2024, a true and correct copy of this document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

Michael Thad Allen, Esq.
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff*

                                                        */s/ Benjamin S. Walton*
                                                     **BENJAMIN S. WALTON**
                                                   Assistant Attorney General