# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

|  |  |  |
|---|---|---|
| Timothy Jackson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| **Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia,** and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain; Ellen Bakulina; Andrew Chung; Diego Cubero; Steven Friedson; Rebecca Dowd Geoffroy-Schwinden; Benjamin Graf; Frank Heidlberger; Bernardo Illari; Justin Lavacek; Peter Mondelli; Margaret Notley; April L. Prince; Cathy Ragland; Gillian Robertson; Hendrik Schulze; Vivek Virani;** and **Brian F. Wright** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 4:21-cv-00033-ALM |
| Defendants. | | |

## EXPERT REPORT OF CASEY BORMAN

## JUNE 19, 2024

## I. SUMMARY OF OPINIONS

I set forth the following opinions to a reasonable degree of accounting certainty:

1. Timothy Jackson's work on the Journal of Schenkerian Studies (JSS) was previously compensated with a one-course teaching load remission, and the monetary value of this one-course remission indicates the economic value to the University of North Texas of Timothy Jackson's work on JSS, which is quantifiable.

2. The loss of a course remission has required Timothy Jackson to do additional teaching work over the past four academic years for which he has not been compensated.

3. Unless rectified (restoration of JSS and course remission), the ongoing loss of a course remission will require Timothy Jackson to do additional work for a forecasted 6.53 to 12.5 years, for which he deserves additional compensation.

4. The loss of research and teaching assistance (RA/TA) previously funded by the University of North Texas has required Timothy Jackson to do additional work without compensation.

5. Unless rectified (restoration of RA/TA), the ongoing loss of the RA/TA (funded by the University of North Texas) will require Timothy Jackson to do additional work, uncompensated, for a forecasted 6.53 to 12.5 years.

Borman Report
Prepared at the Request of Counsel in Preparation for Testimony

6. Timothy Jackson has suffered compensable damages due to putting the JSS "on ice"

(as summarized by the Fifth Circuit Court of Appeals) within the following range

(see explanation and calculations below):

| | | | |
|---|---|---|---|
| Lost Comp for withdrawn course remission in past 4 academic years | $98,962.76 | | |
| Lost Comp for withdrawn benefit of TA/RA over past 4 academic years | $78,506.56 | | |
| Lost Comp for withdrawn TA/RA over WLE | $128,161.96 | to | $245,333.00 |
| Lost Comp for withdrawn course remission over WLE | $164,680.59 | to | $315,238.50 |

## II.  ASSIGNMENT

I was retained by Timothy Jackson to calculate damages sustained by him under an assumption of liability arising from the alleged actions and omissions by Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, and G. Brint Ryan, each in their official capacities as members of the Board of Regents for the University of North Texas System; Rachel Gain; Ellen Bakulina; Andrew Chung; Diego Cubero; Steven Friedson; Rebecca Dowd Geoffroy-Schwinden; Benjamin Graf; Frank Heidlberger; Bernardo Illari; Justin Lavacek; Peter Mondelli; Margaret Notley; April L. Prince; Cathy Ragland; Gillian Robertson; Hendrik Schulze; Vivek Virani; and Brian F. Wright (all of the above may be inclusively referred to as "Defendants").

I have been asked to analyze data regarding Timothy Jackson's worklife expectancy (WLE), his past compensation, his job responsibilities as a tenured University Senior Research Professor and Full Professor of Music Theory at the College of Music of the University of North Texas in the Division of History, Theory, and Ethnomusicology, the value of an ongoing course remission, and the value of research assistance provided by the University of North Texas. Specifically, I have been asked to utilize this data to calculate the monetary value of the loss and

damages that Mr. Jackson sustained as the result of Defendants' alleged actions under an assumption of liability.

To calculate loss and damages, I was provided with compensation information from 2016 to the end of 2023, including paystubs, W2 tax forms, salary notifications. See § V below.  I was also provided a copy of the complaint, an email regarding the pay for a UNT research assistant position, and a notice of termination for a research assistant.  Id.

Lastly, I conducted a Zoom interview with Timothy Jackson on May 17, 2024, lasting approximately one and one-half hour, in which I made inquiry on all of the factors related to worklife expectancy and compensation. During this interview, I also learned about Timothy Jackson's passion and love for 1) conducting academic research on music theorist Heinrich Schenker, 2) his role as director of the Center for Schenkerian Studies and 3) published scholarship on Schenker and music theory more generally, including serving as editorial staff for the Journal of Schenkerian Studies.

Section V below lists the materials I reviewed in performing my calculation and analysis in preparing this report. My work in this matter is ongoing and, if asked, I may modify or update my conclusions here pending the receipt of additional information through discovery. I also reserve the right to respond to any additional report(s) or opinions offered by any expert for Defendants.

## III.    QUALIFICATIONS

I earned a BA from Claremont McKenna College in 1996, a JD from Loyola Law School in 2001, and an MBA from UCLA Anderson School of Management in 2003. I am a member of the California Bar. Prior to joining academia, my professional experience in asset management was focused on the valuation using fundamental analysis.

Starting in January of 2018, I serve as an ongoing faculty member at UCLA's Anderson School of Management, where I have taught eight different courses, including courses in financial statement analysis, professional ethics, intermediate accounting, personal taxation, business taxation, entrepreneurial accounting & finance, and general business law. Several of these courses value a forecasted stream of future cash flow, consider statistical analysis, and teach spreadsheet calculations. I have taught classes on calculating the value of annuities, perpetuities, and the net present value of future cash flow to roughly a thousand UCLA students. Further, I am familiar with employment opportunities at a state university as a result of having worked at one for more than six years.

My CV is attached to this report.

## IV. FACTUAL BACKGROUND

I have assumed these allegations and factual background to be true in performing my analysis.

Timothy Jackson is a Distinguished University Research Professor of Music Theory at the University of North Texas. He founded the Journal of Schenkerian Studies, published by the University of North Texas Press, and serves as the director of the Center for Schenkerian Studies. He is a world renown scholar of the music theorist Heinrich Schenker, to which he has dedicated much of his 40 years in academia.

During 2019, Professor Phillip Ewell published a paper and delivered a talk in which he attacked Heinrich Schenker as a racist. In 2020, Professor Timothy Jackson responded with his own scholarly work in defense of Heinrich Schenker in the pages of the JSS, which is published (or was published) by the University of North Texas Press, an administrative sub-unit of the University of North Texas.

In addition to the global pandemic, 2020 was a year of inflamed racial tension, especially after the death of George Floyd and subsequent violent protests. Although focused on a music theorist who is little known outside of the specialized field of music theory, Jackson's scholarly work proved controversial not only in his department, but also at the broader University of North Texas and among other academics. As it addressed racism, the disagreement between Professors Jackson and Ewell extended beyond the Society for Music Theory and even garnered some national attention.

In July of 2020, The University of North Texas College of Music responded to the controversy by publicly endorsing defamatory statements published in an ongoing online format indicating that Timothy Jackson was not only a "racist"; but Defendants also announced through various publications that Timothy Jackson was responsible for "racist actions" and even "extortion." They vociferously denounced Timothy Jackson because, among other things, his viewpoints expressed in the JSS hurt their subjective feelings, which they found intolerable. And they demanded that the University of North Texas, as a state institution, punish Timothy Jackson for expressing protected speech.

As a result, the University of North Texas initiated an investigation into Timothy Jackson and the Journal of Schenkerian Studies. The investigation concluded when a UNT panel issued a report critical of Timothy Jackson. It is alleged that in response to the investigation and report, the Journal of Schenkerian Studies has been effectively cancelled or forced to cease publication. Timothy Jackson alleges that as a result of this report he was stripped of his leadership role at the Journal of Schenkerian Studies. This included the university withholding or otherwise denying Timothy Jackson a one-course teaching remission.

Timothy Jackson also alleges that he was the direct beneficiary of a half-time research assistant that was associated with the Journal of Schenkerian Studies and the Center.  UNT withdrew this benefit, thereby increasing the work required of Timothy Jackson in order to continue with his work and research, the work of the Center for Schenkerian Studies, and publication. Indeed, the JSS has now ceased publication and remains suppressed at the University of North Texas, at least in part due to the withdrawal of these resources.

Despite the loss of this course remission and research assistant, Timothy Jackson continues to perform scholarly research on Heinrich Schenker. He has expressed his intention to continue such work for the rest of his professional career.  Without a course remission, Timothy Jackson alleges he has been and will continue teaching one more class per academic year than similarly situated colleagues who perform the same scholarly work but benefit from a course remission due to work on an academic journal.

An example given by Timothy Jackson is his colleague Frank Heidlberger, under whose leadership another music theory journal, *Theoria*, is published by the University of North Texas Press.  Timothy Jackson stated that he has direct knowledge that Frank Heidleberger receives a one-course teaching remission due to labor on the journal *Theoria*.

In order to ascertain Timothy Jackson's worklife expectancy, I gathered the following information, which I assume to be truthful. When possible, I confirmed it through independent sources by reviewing Timothy Jackson's tax return and other financial records. Timothy Jackson provides the majority of financial support for his household, which includes his wife and two dependent children. His income and ongoing employment is essential for the financial security of his family. He also relies on his job for subsidized health insurance. Timothy Jackson answered

several questions and shared anecdotes indicating he also received "high psychic income" from his job as a professor.

In addition to relying on his job as a tenured professor for his family's financial security, Timothy Jackson shows a minimal chance of changing his job by choice. He has been continuously employed in education since graduate school. He has not sought other employment in roughly a decade other than to apply to the University of Austin, which was not successful. He lives a life that most would describe as predictable and stable. There is no mandatory retirement age for his position and similar faculty at the University of North Texas College of Music continue working into their 80s. The job is sedentary and lacking any physical impediments to continuous working.

Timothy Jackson appears to be in fine health, which if his health continues or even declines somewhat, he will be able to continue working as a college professor. He does not drink or smoke or consume drugs. He exercises and should not be described as obese. He had no complaints of chronic illness or history of medical problems. Beyond his need for compensation, Timothy Jackson loves his job and views it as a calling. He values both the teaching and research components.

## V.    OVERVIEW OF DAMAGES: METHODS AND THE APPLICATION OF STANDARD ACCOUNTING METHODS TO THE DATA AND FACTS

### 1. Markov Assumption for Worklife Expectancy

My opinions rely upon standard accounting/actuarial principles that have been long established to a reasonable degree of accounting certainty in my field.

In the Journal of Forensic Economics, Edward M. Foster and Gary R. Skoog examine the factors that impact an individual's worklife expectancy beyond the sex, race, and age data compiled by the US Department of Labor's Bureau of Labor Statistics (BLS). Markov had used

this BLS data to determine worklife expectancy. Foster and Skoog build upon his table to consider an employees' level of education and type of work. Their table indicates that an employed 66-year-old male with a professional or doctoral degree will continue to be employed on average for 6.53 additional years.

Foster and Skoog provide other factors that impact the worklife expectancy, including

    a. Continuous longevity in work force (degree of attachment to labor force)
    b. Continuous longevity in current position (degree of attachment to job)
    c. Health, including drinking, smoking, and drug use
    d. Motivation to work – both financial and psychological
    e. Family (marital status and dependents both increase worklife expectancy)
    f. Mandatory retirement age – either required by position or physical requirements

All the Foster and Skoog factors indicate Timothy Jackson would be at the high end of worklife expectations according to the Markov tables.

Applying these factors, it would be reasonable to conclude that Timothy Jackson has a worklife expectancy in the top 25% of employed 66-year-old males with a professional or doctoral degree, which would mean it is not unreasonable to expect that he will continue working for at least 9.5 additional years. If one concluded that, due to these Foster and Skoog factors, Timothy Jackson had a longer worklife expectancy than 90% of employed 66-year-old males with a professional or doctoral degree, he should continue to work for at least 12.5 additional years.

"Discounting" is a standard method and accounting practice. As used by professional accountants, discounting means the process of estimating the present value of future cash flows or payments based on the time value of money. In other words, as is intuitive to most people, a given sum of money is worth more today than it will be tomorrow; people will rationally and routinely opt to receive the dollar today rather than delay and receive the same dollar tomorrow. Thus, a

dollar today is worth more than a dollar deferred. "Discounting" is a systematic way of calculating this enhanced value of the present worth of money.

One typical method is to adjust the present value of a stream of payments which will continue into the future based on the expected erosion in value due to inflation (or, potentially, other known factors that erode the value of a sum of money over time), offset by fluctuating interest rates. Thus, when inflation increases, the minimum return on investments due to market interest rates also increases. Yet, the future rate of inflation and fluctuating interest rates are necessarily unknown. However, accountants have developed accepted methods for avoiding speculation about future interest rates, etc.

To avoid speculation on Timothy Jackson's future pay increases, I have made the reasonable assumption, which is established among professional accountants to a reasonable degree of accounting certainty, that fluctuations in market interest rates/inflation have been and will be fully offset by wage inflation.

In 1983, this method for offsetting inflation and market interest rates was endorsed by the US Supreme court in *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S. Ct. 2541 (1983) as an accepted method to simplify and avoid speculation in these kind of established discounting calculations. Therefore, in formulating my opinions and calculations, I neither increased Timothy Jackson's future monetary damages by forecasting pay raises nor applied a discount rate to reduce Timothy Jackson's future earnings to their present value.

## 2. Past Loss of Course Remission

The loss of a course remission has required Timothy Jackson to do additional teaching work over the past four academic years for which he has not been compensated. The one-course teaching remission was a benefit that Timothy Jackson received, which has a quantifiable,

Borman Report
Prepared at the Request of Counsel in Preparation for Testimony

monetary value, but which has now been withdrawn/cancelled. In performing this calculation of monetary value, I assumed both liability and that editorial services, such as those that Timothy Jackson provided for the JSS, would entitle him to the course remission and had entitled him to this course remission in the past.

I also assumed that Timothy Jackson continued to do/would have done the same amount of scholarly work had UNT not deprived him of his role as editor of the JSS. Whether Timothy Jackson has expended the same amount of time in editorial labors or whether he has redirected his labor toward other scholarly activities is immaterial. Timothy Jackson continues to orient his career toward a high level of scholarly output, expending the same amount of time in scholarly work as he did when the work of the JSS absorbed this labor. If anything, the damage done by Defendants has increased the labor required of Timothy Jackson to achieve the same scholarly output due to interference with his ability to publish freely in the face of the reputational harm done to him and the elimination of the JSS.

Based on these assumptions, I calculated that one of Timothy Jackson's four classes was additional work for which he would otherwise be owed 25% additional compensation but for the cancelation of the JSS. As he both did the scholarly work for which he had previously received a course remission and taught four classes, I determined that Timothy Jackson was owed compensation for this extra class. In Timothy Jackson's department, annual salary for a faculty member is compensation for teaching four classes. The calculation is therefore straightforward: each class counts as 25% (one fourth) of a professor's compensation.

I divided Jackson's salary in each year by four in order to calculate a salary or compensation *per class*. Over the past four years, this would have resulted in the following additional compensation if this had been paid in monetary compensation:

Borman Report
Prepared at the Request of Counsel in Preparation for Testimony

| Academic Year | Salary of T. Jackson | Salary per class |
|---|---|---|
| 2020 - 21 | $93,221.88 | $23,305.47 |
| 2021 - 22 | $100,876.51 | $25,219.13 |
| 2022 - 23 | $100,876.32 | $25,219.08 |
| 2023 - 24 | $100,876.32 | $25,219.08 |
| | **Lost Comp extra class in past four years** | **$98,962.76** |

### 3. Future Loss of Course Remission

Unless rectified (restoration of JSS & remission), the ongoing loss of a course remission will require Timothy Jackson to do additional work for a forecasted 6.53 to 12.5 years, for which he deserves additional compensation.

In performing this calculation, I assumed both liability and that editorial services, such as those that Timothy Jackson provided for the JSS, would continue to entitle him to a course remission, but for the journal's cancellation. I also assume that Timothy Jackson would continue to do the same amount of scholarly work as he would have done if he had not been deprived of his role on the JSS. I also assumed that Timothy Jackson would not be reinstated as editor to the JSS, and therefore, the University of North Texas' withdrawal of a future course remission will continue into the indefinite future.

Based on these assumptions, I calculated that one of Timothy Jackson's four classes was additional work for which he deserved 25% additional compensation going forward. For the reasons explained previously, using standard accounting principles established to a reasonable degree of professional certainty, I projected three different possible worklife expectancies for Timothy Jackson. I multiplied those three worklife expectancies by Jackson's most recent salary per class, which resulted in a range of future additional compensation owed between $164,681 and $315,239 as follows:

| Salary per Class | $25,219.08 | | |
|---|---|---|---|
| Worklife Expectancy (WLE) | Mean | Top 25% | Top 10% |
| Number of Years | 6.53 | 9.50 | 12.50 |
| **Lost Comp for Extra Class over WLE** | **$164,680.59** | **$239,581.26** | **$315,238.50** |

### 4. Past Loss of Research Assistance

The loss of research/teaching assistance that the University of North Texas previously funded has required Timothy Jackson to do additional work without compensation. The research/teaching assistant was a direct benefit to Timohty Jackson, and Timothy Jackson was the intended beneficiary of the research/teaching assistant in his work on the Center and JSS. Like fringe benefits of employment, including health insurance, the research/teaching assistant was a benefit bestowed upon Timothy Jackson to enhance/augment his work and the value of his career. I determined that much like health insurance, Timothy Jackson was the primary beneficiary of this research assistant, whose contributions had been dedicated to Timothy Jackson's scholarly pursuits through the Center and through the JSS.

The value of this labor/benefit is known and calculable due to the monetary value that the University of North Texas assigns to research/teaching assistant compensation. In performing this calculation, I assumed both liability and that Timothy Jackson had to perform the work that was previously performed by his half-time research assistant in order to continue the same level of scholarly work as he had previously performed as a professor and scholar prior to the cancelation of the JSS.

I calculated the monetary damage for this additional work based on the compensation of a half-time (.5 FTE) research assistant as established by UNT and utilized by Timothy Jackson. To do so, I used the only compensation records available to me. This was for a different research assistant who was classified as .75 FTE, which means this RA works 50% more hours than the RA

previously assigned to Professor Jackson.  Therefore, the calculation of a .50 FTE is straightforward arithmetic.

I divided the .75 FTE RA's annual compensation of $29,439.96 by 75% to establish the annual compensation for a full time RA of $39,253.28.

I then divided the compensation of this full time salary for an RA in half because Professor Jackson's RA was only a half-time RA and classified by the University as .5 FTE.

Although the records available to me indicated the compensation for a different research assistant at University of North Texas College of Music, I have assumed that the compensation for research/teaching assistants at the University of North Texas is the same for all FTE's dedicated to research/teaching assistants in the College of Music and that the .5 FTE dedicated to the JSS and Center was paid at the same standard rate for RA/TA FTEs.

I then multiplied by four as Professor Jackson has been deprived of his assistance over the past four years.

This resulted in the following additional compensation owed to Timothy Jackson:

| FTE = Full Time Employee | |
|---|---|
| Compensation for .75 FTE per UNT_004980 | $29,439.96 |
| Annual Compensation for Full Time Research Assistant | $39,253.28 |
| Compensation for Half Time Research Assistant | $19,626.64 |
| **Lost Comp extra research over past 4 academic years** | **$78,506.56** |

### 3.  Future Loss of Research Assistance

Unless rectified (restoration of RA), the ongoing loss of research/teaching assistance (funded by the University of North Texas) will require Timothy Jackson to do additional work/lose the benefit of a research/teaching assistant for a forecasted 6.53 to 12.5  years.

In performing this calculation, I assumed both liability and that Timothy Jackson will continue to perform the work that was previously performed by his half-time research assistant in

order to continue performing at the same level of scholarly work and productivity as he performed previously in his career as a professor prior to the cancellation of the JSS.  I assumed (and my discussions with Timothy Jackson confirmed this assumption) that Timothy Jackson would have delegated work to the research assistant which he must now do himself in order to maintain his previous scholarly productivity but for the withdrawal of this benefit by the University of North Texas.

I calculated the monetary damage for this additional work based on the compensation of a half-time (.5 FTE) research assistant that was previously provided to Timothy Jackson and utilized the only compensation records available to me for a different research assistant at University of North Texas College of Music.

For the reasons explained previously, I assumed three different possible worklife expectancies for Timothy Jackson. I multiplied those three different work life expectancies by the compensation for a half-time (.5 FTE) research assistant, which resulted in a range of future additional compensation owed between $128,162 and $245,333 as follows:

| Compensation for Half Time Research Assistant | $19,626.64 | | |
| Worklife Expectancy (WLE) | Mean | Top 25% | Top 10% |
| Number of Years | 6.53 | 9.50 | 12.50 |
| **Lost Comp for Extra Research Work over WLE** | **$128,161.96** | **$186,453.08** | **$245,333.00** |

## VI.   FACTS AND DATA THAT THE EXPERT RELIED ON IN FORMING THE OPINIONS

Interview of Timothy Jackson, May 17, 2024.

UNT_002539-UNT_002546

2021-02-14 New York Times Article

2021-08-15 Cindy Breeding, Article Denton, Record Chronicle

2020-08-02 Article in Denton Record-Chronicle

2020-08-04 Denton Record-Chronicle Jackson Editorial

2021-02-08 Article in Denton Record-Chronicle

ECF No. 1 (E.D.Tex.)

ECF No. 47 (E.D.Tex.)

UNT-004980

ECF No. 89-1 (5th Cir.)

UNT_04993

Timothy Jackson Paystubs, University of North Texas, February 2020-May 2024

Timothy Jackson, W-2 Form, 2020-2023

Timohty Jackson, 2023 Tax Return

Jackson Pay Raise Spreadsheet

2021-11-01 Jackson Adjusted Salary Effective November 1, 2021

Jackson Annual Salary Notification, 2018-2019, 2019-2020, 2020-2021, 2021-2022, 2022-2023, 2023-2024

Affidavit of Timothy Jackson, June 11, 2024

Email of David Heetderks to Timothy Jackson, June 11, 2024, 10:19 AM

Journal of Forensic Economics, Table 10, Characteristics for Initially Active Men, Professional or Doctoral Degree

Edward Foster and Gary Skoog, The Markov Assumption for Worklife Expectancy, Journal of Forensic Economics 17(2) 2004, 167-183.

## VII.    TESTIMONY IN PRIOR CASES

I have not previously testified as an expert in any cases at trial or in deposition.

## VIII.    COMPENSATION

I have been compensated a fixed fee of $1,500 for my independent review of this information, my analysis of this data, my calculations and my preparation of this report. All of the opinions, calculations, and conclusions stated in this report are my own. My compensation is not contingent upon my opinions, conclusions or the outcome of this matter.

My consulting agreement also sets forth additional provision for compensation for deposition or trial testimony.  A copy of my consulting agreement is attached to this report.

No compensation in the category of deposition or trial testimony has been received as of the time of disclosure of this report.

Date: June 19, 2024

I set forth all opinions in this report to a reasonable degree of professional accounting certainty.

Casey Borman

# Casey J. Borman
CJBorman@BormanCapital.com
(310) 200-8215

PROFESSIONAL SUMMARY:

Highly successful business professional and educator. Faculty member at UCLA's Anderson School of Management. Licensed attorney. Founder of real estate investment firm. Extensive experience in asset management, financial analysis, consulting, construction, real estate development and real estate management.

EDUCATION:

**UCLA Anderson School of Management**
*M.B.A., June 2003 – Accounting and Finance*
Academic Honors: Robert A. Rogers Fellowship in Accounting, Dean's List in Various Quarters
Activities: Entrepreneur Association – Owner/Manager, Investment & Finance Club, Challenge 4 Charity

**Loyola Law School**
*J.D., May 2001 Licensed to Practice Law in California*
Academic Honors: Dean's Honor List and First Honors Awards in Various Classes

**Claremont McKenna College**
*B.A., in Government / Literature, December 1996*
Academic Honors: Cum Laude, Dean's List & Distinguished Scholar

CAREER EXPERIENCE:

**University of California Los Angeles** January 2018 – present
*Lecturer in Accounting and Entrepreneurship at UCLA Anderson School of Management*
- Personally taught and professionally mentored more than a thousand students.
- Courses / Topics taught include:
  - Financial Statement Analysis & Equity Valuation
  - Professional Ethics with focus on Accounting and Law
  - Entrepreneurial Accounting and Finance
  - Business Law
  - Personal and Business Taxation
  - Adviser on Capstone Internship Program
  - Intermediate Accounting

**Borman Capital** August 2008 – present
*Real Estate Investor, Financial Advisor, Consultant & Attorney*  Los Angeles, CA
- Managed four real estate partnerships with investments in more than $100MM of retail space. Acquired and divested numerous properties, including 1031 exchanges. Negotiated loan documents. Drew up leases. Oversaw merger. Collaborated with local property managers.
- Acquired, developed and divested nine residential properties, including serving as the general contractor on a 10,000 square foot new construction project in Beverly Hills. Negotiated loan documents and brokerage agreements. Managed rentals, including leasing and tenant relations.
- Advised family offices on limited partner investments in multi-family residential commercial properties.
- Manage portfolio of stocks based on intensive fundamental research. Perform detailed analysis of financial statements, including review of public filings and monitoring earnings. Model future cash flow under varying industry assumptions and macroeconomic environments. Assess quantitative metrics and qualitative aspects of businesses. Compared proprietary and sell side research.
- Analyzed financial statements and scrutinized projections for dozens of prospective angel investments. Weighed financial, operational, and legal concerns to strategically structure deals.

- Developed internal controls, budgets, and financial reporting for family office, including account classifications, reconciliation and expense verification. Improved partnership projections and distribution procedures. Tied partnership financials to personal financial statements.
- Calculated discounted present value of future cash flow from numerous private and public investments.
- Advised high net worth individuals on activist investing in a private company with over $500MM in revenue. Persuaded CEO and Board of Directors to issue dividend and institute a stock buyback. Scrutinized EBITDA, including reclassification of leases, to improve price of nearly $100M buyback.
- Oversaw forensic accounting at pet food company with over $25MM in revenue, including analysis of expenses and accounts payable. Served on Board of Directors, corresponded with senior managers, and counsel. Advised founder of business on formation, capital raising, and sale of minority interest.

**Strome Investment Management, LP** April 2004 – August 2008
*Portfolio Manager*  Santa Monica, CA
- Managed a $140 million fund of energy investments, including direct P&L responsibility. Constructed concentrated portfolio of Master Limited Partnerships. Timed exposure and trading.
- Influenced firm's macroeconomic forecast as a member of Investment Committee. Integrated CIO's predictions into energy sector analysis, including commodity price projections.
- Contributed to risk assessment of portfolio, including statistical analysis and stress testing.
- Negotiated, structured, and analyzed more than $100 million of private placement investments.
- Interfaced with senior executives of all portfolio companies and countless comparables. Assessed business strategies, growth plans, commodity exposure, operational skill, and credibility.
- Participated in fund marketing activities, including presentations to prospects, quarterly investor correspondence, and executive meetings. Facilitated due diligence process for fund of funds and other institutional investors. Managed relationships with family offices and other private investors.
- Monitored earnings, acquisitions, public filings, and other events at dozens of energy corporations and more than 30 MLPs in five subsectors of this niche asset class.
- Represented firm at industry conferences and other events, including public speaking on MLP sector.
- Managed an analyst, including hiring, training, evaluation, mentorship, and compensation.
- Interfaced with in-house trading team and sell side brokers. Executed electronic trades using algorithms.

*Financial Analyst: MLPs, Energy, and Mining* April 2004 – May 2006
- Evaluated investments related to energy and commodities, in particular Master Limited Partnerships.
- Made investment recommendations for two portfolio managers on different strategies with well tracked accountability. Transitioned to energy focus after entering firm as a generalist.
- Created, updated, and presented financial model analyzing more than 30 Master Limited Partnerships on numerous metrics. Ranked each partnership against its comparables. Assessed arbitrage opportunities when one operating business had multiple publicly traded securities. Automated links to Bloomberg.
- Authored research reports on under-followed commodities such as uranium, palladium, and potash, including investment analysis and recommendations on related publicly traded equities.
- Monitored news and earnings releases. Conducted in-depth research on public filings. Analyzed financial statements. Participated in earnings conference calls.
- Attended industry conferences, including countless one-on-one meetings with senior executives.

# CONSULTING AGREEMENT

This consulting agreement is entered into between Casey Borman ("Consultant") and Timothy Jackson ("Client") on April 1, 2024.

The parties hereby agree that Casey Borman shall provide investigatory, forensic, litigation consulting, and/or testimonial services with respect to the matter *Jackson v. Wright, et al.,* No. 4:21-CV-033-ALM (E.D.Tex.) (the "Matter"). Client is represented in the Matter by Michael Thad Allen, Esq. of Allen Harris PLLC ("Counsel"), who will act as agent of Client for all purposes pursuant to this agreement.

The Consultant agrees to diligently provide the above-described services and warrants that he has no known conflict of interest with the opposing party, parties to this action, or with the other party's counsel. Client understands that Consultant shall independently reach opinions that may or may not be consistent with the interests of Client with respect to the Matter.

Consultant will provide an expert report in the Matter and may testify in the Matter at deposition or trial, upon the request of Client pursuant to the terms of this agreement. In all respects relating to the Matter, Consultant shall act at the direction of and in consultation with Counsel and other experts or consultants designated by Counsel.

Consultant agrees to keep all communications, reports, and other documents generated during the course of this engagement confidential, unless he is compelled to divulge such information by law. Consultant further recognizes that some documents may contain information that is protected under the attorney-client privilege or attorney work product doctrine. Consultant agrees to deliver to the Client or Counsel, upon request, all copies of work-product and data relating to the Matter to the extent that it contains information provided by Client or its agents, including Counsel or other consultants or experts. Consultant also agrees to abide by the terms of any Protective Order that governs the confidentiality of documents disclosed in connection with this Matter.

Based on the Consultant's estimate that 15-20 hours of accounting services will be required, the Consultant agrees to charge a flat fee of $1500 for his analysis and the production of his expert report in this Matter. He will also charge $125 per hour for any travel time or waiting time required in the Matter. In addition, Consultant will be compensated at the rate of $400 per hour for all services rendered that include live testimony at depositions or trial with a minimum compensation of one day of testimony (eight hours).

The Client shall reimburse Consultant for all reasonable expenses incurred, including but not limited to travel, parking, photocopies, and consultation with other professionals whose skills and expertise assist Consultant in forming accurate opinions regarding this matter. Any such expenses will be discussed with the Client ahead of time.

Doc ID: 1364cb50fcf02c5bc158de40d5380ba4c05ca9e6

Client shall remit the flat fee to Consultant at the outset of this consultancy. Furthermore, all unpaid and estimated fees for deposition and/or trial testimony and related preparation must be paid in full prior to Consultant rendering testimony at deposition or trial. Consultant may delegate tasks, both ministerial and skilled, in his sole discretion to others under his direct supervision.

Consultant will forward invoices on a periodic basis to Client for payment, with copies to Counsel. Consultant acknowledges that Client is solely responsible for payment of his invoices, and Counsel shall not be responsible for such payment.

IT IS HEREBY AGREED:

_____
Casey Borman


_____
On behalf of "Client"

2

Doc ID: 1364cb50fcf02c5bc158de40d5380ba4c05ca9e6

**Dropbox** Sign                                                    Audit trail

| | |
|---|---|
| **Title** | Hello |
| **File name** | 1714597546-2024-0...ing_Agreement.pdf |
| **Document ID** | 1364cb50fcf02c5bc158de40d5380ba4c05ca9e6 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested on allenharrislaw.cliogrow.com and signed on allenharrislaw.cliogrow.com**

## Document History

| | | |
|---|---|---|
| SENT | **05 / 01 / 2024**<br>21:06:09 UTC | Sent for signature to Casey Borman (cjborman@bormancapital.com) from mallen@allenharrislaw.com<br>IP: 24.60.129.7 |
| VIEWED | **05 / 02 / 2024**<br>00:35:39 UTC | Viewed by Casey Borman (cjborman@bormancapital.com)<br>IP: 68.170.69.62 |
| SIGNED | **05 / 02 / 2024**<br>00:36:21 UTC | Signed by Casey Borman (cjborman@bormancapital.com)<br>IP: 68.170.69.62 |
| COMPLETED | **05 / 02 / 2024**<br>00:36:21 UTC | The document has been completed. |