UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| <u>Timothy Jackson,</u><br><br>          <u>Plaintiff,</u><br><br><u>v.</u><br><br><u>**Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**, Defendants.</u> | <u>Case No. 4:21-cv-00033-ALM</u> |

**TIMOTHY JACKSON'S OPPOSITION TO THE STATE'S DAUBERT MOTION
(MOTION TO STRIKE PLAINTIFF'S EXPERT CASEY BORMAN)**

Plaintiff Timothy Jackson respectfully opposes the State's Motion to Strike Plaintiff's Expert Casey Borman ("Daubert Motion") in compliance with E.D. Tex. Local Rule CV-7(a)(2). The Daubert Motion basically asks for a ruling of law that there are no damages in this case. This is clearly not true and not appropriate at this stage of litigation. The Court should not take the bait. Professor Borman satisfies all the relevant criteria for admissions under *Daubert/Kumho Tire*.

## I. BACKGROUND

Plaintiff Timothy Jackson was and is a Senior Distinguished University Research Professor of Music Theory in University of North Texas' College of Music ("UNT") in the Division of Music History, Theory, and Ethnomusicology ("MHTE"). ECF No. 1-1 (Affidavit of Timothy Jackson, dated January 7, 2021 ("First Jackson Aff"), ¶ 1. As the title awarded to Professor Jackson, "Distinguished Research Professor," indicates, "[t]he purpose of this award is to recognize tenured faculty at the rank of professor who have achieved a truly exceptional record of creative activities or research productivity and who demonstrate a record of continued extraordinary productivity."[1] In this position, Timothy Jackson is required to produce scholarship at the highest level, and UNT evaluates him upon his scholarly productivity in research and publication in his periodic evaluations. Affidavit of Timothy Jackson, dated August 20, 2024 ("Third Jackson Aff"), ¶ 3.

In July 2020, Professor Jackson became the target of a vicious cancellation campaign. First Jackson Aff, ¶¶ 124-138. The cancel campaign focused on his publication in Volume 12 of the Journal of Schenkerian Studies ("JSS"). *Id.*, ¶ 5 and ECF No. 1-4 (JSS, v. 12). Professor Jackson founded the JSS approximately 20 years ago. *Id.*, ¶ 4. He also serves as the director of the Center for Schenkerian Studies ("CSS"). Professor Jackson was the leading member of the JSS Editorial

---

[1] The Court may take judicial notice of UNT's own description of this title, available at https://vpaa.unt.edu/fs/recognition/list/research.

Board, and the graduate student editor, Levi Walls, "report[ed] to Timothy Jackson." ECF No. 1-6 (Facebook apologia of Levi Walls).

Despite the fact that Professor Jackson worked with other faculty editorial board members (including Defendants Ellen Bakulina, Diego Cubero, and Andrew Chung) and with Mr. Walls on the JSS, UNT exclusively targeted Timothy Jackson through a so-called "Ad Hoc Panel" which investigated his supposed "editorial mismanagement" of the JSS, which issued a Report of November 25, 2020. ECF No. 1-5. The "mismanagement" consisted of Jackson's display of courage, but in UNT's view, enormous bad taste, in publishing in Volume 12 that the entire tradition of Western Classical Music *is not* systemically racist. *Id.* UNT maintains and enforces a state-sponsored orthodoxy of "anti-racism" or what student editor Levi Walls called "politically correct discourse." ECF No. 1-2 at PageID # 122. Professor Jackson dissented from this state-sponsored orthodoxy and quickly paid the price. ECF No. 1-1, First Jackson Aff, ¶¶ 99-149. The price was censorship.

Based on various misrepresentations that need not be recounted here, graduate students at the University of North Texas, including Defendant Rachel Gain, circulated a petition accusing Professor Jackson of "racist actions" and even "extortion." Compare Affidavit of Michael Thad Allen, Exhibit 1 (UNT_001169).[2] What specific "actions" have never been identified, much less "extortion." *Id.*, Exhibit 2 (Defendants Answer to Request for Admissions No. 4, admitting Defendants had knowledge of "extortion"). The petition called for Professor Jackson to be fired, the JSS censored, and the CSS closed. *Id.*

The seventeen faculty co-defendants in this case circulated a petition of their own July 31, 2020 endorsing the student petition and incorporating it by reference.

---

[2] This exhibit was marked "confidential"; however, the parties have agreed to its disclosure on the condition that student names other than Defendant Rachel Gain our redacted.

2

> We endorse the call for action outlined in our students' letter (https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view), which asks that the College of Music "publicly condemn the issue and release it freely online to the public" and "provide a full public account of the editorial and publication process, and its failures." Responsible parties must be held appropriately accountable.

ECF No. 1-5 at PageID #284. Thus Defendants "endorse[d]" factual statements that Professor Jackson had committed non-existent "racist actions" and "extortion." These were not mere "opinions" but affirmative, false assertions subject to objective disproof. Since Timothy Jackson never committed any "racist actions" or "extortion," the real reason for the petitions calling for his cancellation was his article suggesting that classical music is not systemically racist, protected speech that hurt Defendants' subjective feelings about race relations in America.

In response, UNT censored the JSS, and it remains censored to this day, as confirmed in this Court's hearing on jurisdiction. "[A]s UNT put it, the Journal is 'on ice,' or, in other words, at a functional standstill." *Jackson v. Wright*, Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *9 (E.D. Tex. Jan. 18, 2022).

Directly after Professor Jackson was accused of "racist actions" and "extortion," Dean John Richmond (who would testify in open court that he had placed the JSS "on ice" (*Id.*)) announced on July 31, 2020 that

> The University of North Texas College of Music has begun a formal investigation into the conception and production of the twelfth volume of the Journal of Schenkerian Studies, which is published by the Center for Schenkerian Studies and UNT Press. The University, the College of Music, and the Division of Music History, Theory, and Ethnomusicology reaffirm our dedication to combatting racism on campus and across all academic disciplines. We likewise remain deeply committed to the highest standards of music scholarship, professional ethics, academic freedom, and academic responsibility.

ECF No. 1-15 at PageID #320. And on December 11, 2020, Professor Jackson's department chair, Dr. Benjamin Brand, informed him that he would be removed from the JSS due to supposed "findings of editorial mismanagement." First Jackson Aff, ¶ 146; ECF No. 1-22 at PageID #345.

3

Thus, there was a clear causal connection between the Defendants' defamatory statements and the censorship of the JSS as well as Professor Jackson's removal from the JSS, all of which was, in Dean Richmond's words, part of putting the JSS "on ice." *Jackson*, 2022 U.S. Dist. LEXIS 8684, at *9.

The student editor of the JSS, Levi Walls, quit without consequences, although it was plain that he lied continually about his role on the JSS, and this was known or easily knowable to all Defendants. First Jackson Aff, ¶¶ 30, 67-90. Levi Walls had been compensated with a graduate student research assistantship which was paid at a one-half full-time equivalent salary ("FTE"). Third Jackson Aff, ¶ 5 and **Exhibit A** (UNT_002539). As Levi Walls worked for Professor Jackson, who was his immediate report, and Jackson was the direct and intended beneficiary of the one-half FTE paid to Levi Walls, which promoted and enhanced Professor Jackson's scholarly productivity. *Id.*, ¶ 7. Records produced in discovery indicate that UNT values a graduate-student FTE at $39,253.28. Third Jackson Aff, ¶ 6, **Exhibit B**. Timothy Jackson discussed all of these facts with the expert Casey Borman prior to his expert disclosure. *Id.*, ¶ 12.

The State's brief equivocates over this compensation paid to a graduate student FTE. Yet the State provides no evidence suggesting any other figure. Daubert Motion at Page ID #1216-1217. No other evidence of Levi Walls' compensation has been provided to date by Defendants; so the deficiency (if any) in the data is entirely due to Defendants' withholding. It is certainly not caused by the expert's lack of diligence.

For Professor Jackson's work on the JSS and to promote his scholarship as a Distinguished Research Professor, Professor Jackson was also given a one-course teaching load reduction. Affidavit of Timothy, dated June 11, 2024 ("Second Jackson Aff"), ¶¶ 4-11. This is called a "remission" in UNT's administrative parlance. *Id.* Ordinarily, UNT faculty are required to teach two courses each semester, or a 2-2 load, indicating a total teaching workload of 4 classes. *Id.* Professor Jackson received the benefit of a course reduction which he should have enjoyed, had the

JSS not been suppressed.  *Id.*  But after the cancellation of the JSS, this was stripped from him, and he is required to teach a full 2-2 load.  *Id.*  Defendants do not dispute that the course reduction was taken away from Professor Jackson.  They merely dispute that he was damaged economically by his altered employment arrangement in which he now works more for the same pay.

Being a Distinguished Research Professor depends upon Professor Jackson doing at least as much work in research and publication as he did before.  Third Jackson Aff, ¶ 8.  Unfortunately, the reputational harm done by Defendants has caused Professor Jackson to work harder than before.  *Id.*, ¶ 9  Professor Jackson has also worked to seek other venues for the publication of the JSS, unfortunately without success and without being paid.  *Id.*, ¶ 10.  Professor Jackson's annual salary in 2024 was 100,876.32.  *Id.*, ¶ 11 and **Exhibit C**.  Thus, after his cancellation and the censorship of the JSS, Professor Jackson works more not less.  But his salary has stayed flat.  *Id.*

In sum, UNT took the cookie jar away from Professor Jackson.  The beloved JSS which he had founded and nurtured through 20 years, and through which he launched the careers of a half-dozen graduate students, including Defendant Benjamin Graf, is now shuttered.  The State now argues that the JSS, Professor Jackson's work on the JSS, and the benefits he drew from this work (e.g., graduate student assistance and the one-course remission) has no monetary value.  Therefore, the State avers, Jackson's cancellation cannot be monetized in any way.  Yet what is clear is that UNT made a monetary investment in the work Professor Jackson did for the JSS.  This was equivalent to a one-course reduction in teaching **and** a .50 FTE research assistant, of which Professor Jackson was the direct beneficiary.

Defendants do not dispute that the student editor of the JSS, Levi Walls, was simply allowed to quit his post and lie about it without any consequences (except to damage Timothy Jackson), or that the .50 FTE increased Timothy Jackson's scholarly productivity, or that Timothy Jackson had to increase his effort and time spent on scholarly output to make up for this loss.

5

UNT now comes to Court arguing that Professor Jackson has no damages simply because the university did not short his pay. In other words, after UNT not only took the cookie jar away, but they also insisted that Professor Jackson basically eat warmed over spinach and tuna casserole in place of his former diet—and more of it. Notwithstanding the meritless nature of this argument, this is no reason to strike a competent expert on damages.

## II. ARGUMENT AND AUTHORITIES

### A. Legal Standard

The State alternates between two contradictory arguments. First, the State argues that Casey Borman applies no reliable methodology. Second, they argue that Professor Borman applies nothing more than straightforward arithmetic — indicating that his methods are **too reliable**. Whatever calculations Professor Borman performs should, in their view, be left to the Jury, apparently to scribble on a napkin.

*1) The Broad Standard for Defamation Damages*

Under any standard the testimony of Professor Casey Borman is admissible. But, importantly, defamation law admits broader evidence of damages than other tort claims because reputational harm is at issue. This is because the principal damage is to "reputation and standing in the community, personal humiliation, and mental anguish and suffering,' for which "there is plainly no logical method for expressing . . . in dollars and cents." Sack on Defamation, § 10:1 (5th ed. 2017) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–49 (1974)); *see also Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002) ("Non-economic damages like [damage to character and reputation] cannot be determined by mathematical precision.").

Because the defamatory harm to reputation is often intangible, evidence as to defamation's impact on the Plaintiff is particularly relevant, and one example is diminished job opportunity. *See e.g. Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 427 (Tex. 2022) (explaining that "[t]he

evidence must show that people believed the statements and the plaintiff's reputation was actually affected" and surveying cases in which damages were based on evidence of lost job opportunities). Likewise, loss of time (or, here, the damage caused by Defendants in terms of Professor Jackson's need to devote **more time** and personal resources to maintain his research and scholarship) is compensable. "[H]arm to earning capacity" counts as "damages for pecuniary harm"; and it may be measured by "[t]ime losses." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014). It makes no sense, as the State maintains, that the time lost by forcing Professor Jackson to work **more** for the same compensation may not be recovered as damages. And the State does not dispute that Professor Jackson has suffered an increased teaching load and the withdrawal of the .50 FTE on which he relied to formally sustain his scholarly productivity. The State simply argues that the Defendants can do this to Professor Jackson if they want to.

There are two categories of defamation. Under Texas law, "defamation *per se* refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed." *Klocke v. Watson*, No. 20-10103, 2021 U.S. App. LEXIS 36482, at *18 (5th Cir. Dec. 10, 2021). The plaintiff need not prove monetary damages at all. *See also ProPublica, Inc. v. Frazier*, No. 01-22-00281-CV, 2024 Tex. App. LEXIS 2883, at *21 (Tex. App. Apr. 25, 2024) (defamation *per se* damages may be presumed). "Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred." *Gertz v. Robert Welch*, 418 U.S. 323, 349, 94 S. Ct. 2997, 3011-12 (1974). "Suffice it to say that actual injury is not limited to out-of-pocket loss." *Id.* at 350. But a Plaintiff may also recover for defamation *per quod*, where "[d]efamation . . . is apparent but not . . . actionable *per se*," and in such a case, "[n]ominal damages are not recoverable, and actual damages must be proven." *Klocke,* 2021 U.S. App. LEXIS 36482, at *19.

7

Defendants defamatory statements that Professor Jackson had committed "racist actions" and "extortion" are clearly defamation *per se*. *See e.g. NRA of Am. v. Ackerman McQueen, Inc.*, No. 3:19-CV-2074-G, 2021 U.S. Dist. LEXIS 153421, at *32 (N.D. Tex. Aug. 16, 2021) ("allegations of extortion may give rise to defamation per se"). But even if the defamation of Timothy Jackson were only *per quod*, the standard for what counts as evidence of damages is lenient. "As explained by the Texas Supreme Court,

> in a defamation case, when the damages are for non-economic losses, such as mental anguish or lost reputation, the jury must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure. But the evidence of loss of reputation should be more than theoretical — there must be evidence that people believed the statements and the plaintiff's reputation was actually affected.

*Klocke*, 2021 U.S. App. LEXIS 36482, at *20 (internal quotations omitted). Thus, Plaintiff should be able to put in evidence of the monetary value of Defendants' reputational damages, in this case the monetary value of the "cookie jar" that Defendants stripped away from Professor Jackson.

*2) The Well-Established Daubert Standard*

Throughout, the State's brief is extremely light on legal authority. There is little more than boilerplate reference to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147 (1999). And the State simply recites the standard under F.R.E. 702.

To meet the Rule 702 standard, "[t]he party offering the expert's testimony has the burden to prove [by a preponderance] that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. A proffered expert witness is qualified to testify by virtue of his or her 'knowledge, skill, experience, training, or education.'" *Kim v. Am. Honda Motor Co.*, Civil Action No. 4:19-CV-00332, 2022 U.S. Dist. LEXIS 90443, at *3 (E.D. Tex. May 19, 2022) (citing *Daubert*, 509 U.S. at 590-91 and quoting FRE 702).

8

"[T]he rejection of expert testimony is the exception rather than the rule." *Mullenix v. Univ. of Tex. at Austin*, No. 1-19-CV-1203-LY-SH, 2021 U.S. Dist. LEXIS 180630, at *4 (W.D. Tex. Sep. 21, 2021) (quoting FRE 702 advisory committee's note to 2000 amendment). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* at *21-22 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Even protestations that an expert's opinions are "unsupported or conclusory" are best addressed by "vigorous cross examination." *Mobility Workx, LLC v. Cellco P'ship*, 4:17-CV-00872, 2019 U.S. Dist. LEXIS 191345, at *23 (E.D. Tex. Nov. 5, 2019). *See also Mullenix*, 2021 U.S. Dist. LEXIS 180630, at *21-23 (admitting expert despite protestations that he simply "parrots a variety of calculations he arrived at using simple math applied to assumptions he was asked to make by [p]laintiff's counsel" because this was not a basis for disqualification but the proper subject of cross-examination).

### B. Borman's Qualifications Are Not Challenged

Understandably, the State has no objection to Professor Borman's qualifications. See ECF No. 70-1, PageID 1207-1208, 1221-1222. Professor Borman's expert knowledge, skill, experience, training, and education should therefore be accepted by the Court.

### C. Net Present Value and Worklife Expectancy Calculations Are Not Questioned

Furthermore, at no point does the State challenge Casey Borman's calculation of the net present value of Professor Jackson's loss over his future working life or Borman's data for making these calculations. Professor Borman has applied the accepted, established methods of calculating the net present value (also called "discounting") of the damage done to Professor Timothy Jackson based on the Markov Assumption for work-life expectancy. *Id.*, PageID 1211-1213.

9

In fact, this is the heart of Professor Borman's opinion on damages, which will instruct the jury in the proper financial estimates of value necessary to compensate Timothy Jackson for the damage done to him over time, especially where the accumulated and accumulating damage is non-obvious. See Opinion 5 at *Id.*, PageID 1205. These calculations, the data upon which they are based, and the application of the methods must therefore be admitted.

### D. The State's Objections Boil Down to an Argument that UNT Is Free to Damage Professor Jackson without Consequences

Without a single authority[3] addressing the suitability of methods, the accuracy of the data, or Professor Borman's application of methods to the data, the State argues that Professor Jackson may not be compensated for the benefits taken away from him by UNT. These are disputes of fact, more properly briefed on summary judgment, not in a challenge to Borman's admissibility.

First, the State gets the standard wrong. Indeed, the only application of *Daubert* within this District that the State invokes, *SB IP Holdings, LLC v. Vivint, Inc.*, Civil Action No. 4:20-cv-00886, 2023 U.S. Dist. LEXIS 181910, (E.D. Tex. Oct. 10, 2023), illustrates the error. *SB IP Holdings* involved a raft of objections to multiple experts, almost all of which this Court overruled. This is because it is well established that even "if the underlying reasoning for [an expert's] methodology is flawed, absurd, or even irrational, then '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' will serve as the proper antidote for attacking these potentially 'shaky' arguments." *Id.* (quoting *Mobility Workx, LLC v. Cellco P'ship*, No. 4:17-CV-00872, 2019 U.S. Dist. LEXIS 191345, at *44 (E.D. Tex. Nov. 5, 2019)).

Second , the objection that Borman's calculations are somehow obvious arithmetic and therefore inadmissible is erroneous. In *United States ex rel. Mitchell v. CIT Bank*, N.A., Civil Action

---

[3] The State's argument (from PageID 1193-1201) is devoid of any legal authority on point other than boilerplate invocations of Federal Rule of Evidence 403 and 702 and *Daubert*. Cf. ECF No. 70, PageID 1199-1120 and an irrelevant argument about sovereign immunity (PageID 1197), which is not at issue and appears to be an effort to relitigate the decision against the State by the Fifth Circuit. *Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023).

10

No. 4:14-CV-00833, 2022 U.S. Dist. LEXIS 75850, at *17 (E.D. Tex. Apr. 26, 2022), a party argued that an expert's "damages opinions should be excluded because they do not reflect any expertise— they consist of nothing more than simple arithmetic." The court disagreed. Just as with Professor Borman's calculations here, although the "damages calculations ultimately involve simple arithmetic, [the expert's] opinion is not limited to these bare mathematical calculations. To be sure, [the expert's] performance of these tasks amounts to more than mere addition, subtraction, and multiplication, and his expertise in compiling and analyzing the data and documentation given provides the jury with valuable and necessary assistance." *Id.* at *18.

This is also the reasoning of the higher courts. The Eighth Circuit Court of Appeals addressed this exact issue. "There is not . . . an implicit requirement in Fed. R. Evid. 702 for the proffered expert to make complicated mathematical calculations." *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) (citing *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 831 (8th Cir. 2008) (holding district court did not abuse discretion in failing to exclude expert testimony that represented "an exercise in basic math using simple deductive reasoning")). *See also City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 566-567 (11th Cir. 1998) (finding reversible error, where a lower court excluded in its entirety an expert statistician's testimony because expert "generated the statistics underlying his testimony through simple compilation of data . . . and his testimony regarding estimated damages, are the products of simple arithmetic and algebra and of multiple regression analysis, a methodology that is well-established as reliable").[4]

Finally, the State repeatedly makes a strawman of Borman's methods. Professor Jackson is not, as the State presumes, "a professor who has a certain job duty replaced by another job duty." ECF No.70 at PageID #1193. Timothy Jackson has continued to do the same amount of scholarly

---

[4] The court affirmed the partial exclusion of an expert on a finding that "a portion of McClave's data in testimony is fundamentally flawed." *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 566 (11th Cir. 1998).

11

work and more, but he is now required to teach more. See Borman Report, ECF No.70-1 at PageID #1214. "If anything, the damage done by Defendants has increased the labor required of Timothy Jackson to achieve the same scholarly output due to interference with his ability to publish freely in the face of the reputational harm done to him and the elimination of the JSS." *Id.*

The value of Professor Jackson's work is, moreover, best assessed by the value of Professor Jackson's work. It is not, as the State suggests, best determined by comparing apples to oranges, for instance the teaching of a Distinguished Research Professor such as Professor Jackson to some random adjunct Professor who teaches summer courses. The State quibbles over whether teaching 25% more should be valued at 25% more of Jackson's salary, but this is yet another issue of fact properly left to cross-examination. "[C]ross-examination, rather than exclusion, is . . . a more appropriate means to establish the weight of the evidence." *Mobility Workx, LLC*, 2019 U.S. Dist. LEXIS 191345, at *23. Furthermore, when discovery yields additional information, Professor Borman is entitled to supplement and update his stated opinions.[5]

### E. Timothy Jackson Is Entitled to Damages as a Third-Party Beneficiary of an RA

Texas law clearly establishes that a third-party beneficiary of a contract is entitled to damages for breach of that contract. *Davis v. Centurytel Broadband Servs.*, LLC, No. 3:22-cv-038, 2023 U.S. Dist. LEXIS 136892, at *6 (S.D. Tex. July 12, 2023). "[T]hird-party-beneficiary status is conferred solely through the contracting parties' intent." *Id.* Importantly, even if this were not the case, UNT's violation of Timothy Jackson's First Amendment rights is reflected in the monetary value of the RAship, which Professor Jackson formerly enjoyed and which formerly enhanced his scholarly productivity, but which UNT has now stripped away because of Defendants' defamation.

---

[5] Experts are entitled to supplement opinions based on new information revealed in discovery. See e.g. *McCord v. United States*, Civil Action No. 4:22-cv-00251, 2024 U.S. Dist. LEXIS 102623, at *13 (E.D. Tex. June 10, 2024) (allowing plaintiff to supplement expert disclosure). Furthermore, according to this Court's amended scheduling order, Casey Borman was disclosed far in advance of the deadline. Plaintiff's expert disclosure deadline will not lapse until after the briefing of this motion (October 18, 2024). ECF No. 71.

Here, documents produced in discovery clearly indicate that UNT assigned Timothy Jackson a .50 FTE to assist with his work at the CSS and JSS -- funding which predated 2004. This was Levi Walls in July 2020. Levi Walls himself stated that he worked for and reported to Timothy Jackson. The clearly stated compensation for this position was a ".50 FTE." Timothy Jackson relied on the .50 FTE RA-ship to increase his scholarly productivity, not least by bringing out the JSS, which UNT censored after Volume 12 wounded Defamation Defendants' subjective feelings about "antiracism." The value of an RA-ship FTE is therefore established in the record.

Here, the State once again advances a strawman argument against Borman's report. The State presumes that Jackson's scholarly output and productivity do not include his duties and work dedicated to the JSS. ECF No.70 at PageID #1199. This ignores the fact that Professor Jackson's work on the JSS was reported annually in his reviews and assessed as part of his status as Distinguished Research Professor. Third Jackson Affidavit, ¶ 8.

What Borman actually states is that the benefit bestowed by the research assistantship enabled Professor Jackson to "enhance/augment his work and the value of his career." ECF No. 70-1 at PageID #1216. This was a fringe benefit with a monetary value bestowed upon him no less than health insurance or other fringe benefits. *Id.* And once again, to the extent the State wishes to dispute these facts, this is a matter left to cross-examination and the development of disputed facts through evidence. *See e.g. Mobility Workx, LLC, supra.*

The State also spills a great deal of ink challenging whether Borman's calculation of a .50 FTE is accurate (while simultaneously objecting that it is simple math). Notably, the State provides no evidence of any alternative value of an FTE, and for obvious reasons: because the calculation is correct. Nor is there any representation, through affidavit or otherwise, that a .50 FTE for Levi Walls was somehow different in value from the value of an FTE paid for another graduate student who worked for Timothy Jackson. However, should Defendants provide a different value, Casey

13

Borman should be allowed to supplement his opinion based on (purportedly) more accurate figures. Moreover, this is a matter of fact reserved for trial or, at the very least, summary judgment. The Court should not decide this issue on an incomplete record here.

Finally, the State is upset that Borman has made certain assumptions. As a damages expert, Borman is entitled to assume liability, and any expert may make assumptions concerning disputed facts. See *United States ex rel. Mitchell v. CIT Bank, N.A.*, Civil Action No. 4:14-CV-00833, 2022 U.S. Dist. LEXIS 75850, at *9 (E.D. Tex. Apr. 26, 2022) (holding expert is permitted to rely on disputed facts in formulating damages opinions and "[w]hen the parties dispute the facts underlying the expert's opinions, they may address these issues on cross-examination in light of the facts that emerge at trial"); *BHI Energy I Power Servs. LLC v. KVP Holdings, LLC*, No. 3:22-cv-1981-L-BN, 2024 U.S. Dist. LEXIS 75043, at *9 (N.D. Tex. Apr. 24, 2024) (holding, "Experts are permitted to rely on assumptions when reaching their opinions"); *Robroy Indus. Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 U.S. Dist. LEXIS 54230, at *12 (E.D. Tex. Apr. 10, 2017) (holding damages expert "is allowed to assume liability and address only the issue of damages" is "principle . . . expressed in numerous cases, and it is beyond serious challenge") (collecting cases).

### III. THE STATE'S RELEVANCE ARGUMENTS HAVE NO MERIT

The State argues that Borman's testimony is not relevant. In support, however, the State reprises an irrelevant argument about sovereign immunity. The State claims, propping up yet another strawman, that Borman's report is some sort of effort to make individual state actors liable.

Borman is proffered to testify to defamation damages, not sovereign immunity issues. To address this, the State argues that, if the Defamation Defendants did not personally make the administrative decisions to strip Timothy Jackson of benefits he had previously enjoyed, then there can be no defamation damages. Of course the State provides no authority for this proposition—that damage in the form of reputational harm must be imposed directly by the individual

14

Defamation Defendants. This is never the case in defamation. Where, for example, a plaintiff's reputation in a business interest is destroyed, the defendants need not be the customers who desert the business, which is the immediate cause of pecuniary loss in the form of lost revenue. *See e.g. Butowsky v. Folkenflik*, Civil Action No. 4:18CV442, 2020 U.S. Dist. LEXIS 256374, at *17 (E.D. Tex. Sep. 1, 2020) (defamation plaintiff pleading damage done by defendant due to losses that defendant caused non-party customer to inflict on him as a direct result).

No case law indicates that a defamation defendant must be an academic administrator whose "administrative decisions" imposed the negative consequences of the defamation. True enough. UNT's administration did the exact thing that the Defamation Defendants clamored for in their petitions. It was not the Defamation Defendants who acted directly to do so. They simply defamed Timothy Jackson through their petitions and agitation. As soon as the Defamation Defendants hollered for Timothy Jackson to be fired for "racist actions" and "extorsion" and for the JSS to be put "on ice," Dean Richmond announced that there would be an "investigation" in the name of "combatting racism." The JSS was shuttered immediately, just what the Defamation Defendants clamored for.

It is not Professor Borman's math that is simple, as the State maintains; it is the straight-line causal relationship between the Defamation Defendants' defamation and UNT's response that is simple. Of course, there is likewise absolutely no authority to support the State's contention that Borman's opinions cannot aid the jury but will instead confuse and mislead the jury. This argument is tossed into the end of their brief as a kind of Hail Mary, and it should also be rejected.

## IV.   CONCLUSION

For the foregoing reasons, the State's Motion to Strike Plaintiff's Expert Casey Borman should be denied in full.

        Respectfully submitted,

        /s/Michael Thad Allen

        Michael Thad Allen, Esq.
        D. Conn. Bar No. CT29813
        admitted *pro hac vice*
        Lead Attorney
        ALLEN LAW, LLC
        PO Box 404
        Quaker Hill, CT  06375
        (860) 772-4738 (phone)
        (860) 469-2783 (fax)
        m.allen@allen-lawfirm.com

        Jonathan Mitchell
        Texas Bar No. 24075463
        MITCHELL LAW PLLC
        111 Congress Avenue, Suite 400
        Austin, Texas 78701
        (512) 686-3940 (phone)
        (512) 686-3941 (fax)
        jonathan@mitchell.law

        for PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the date specified in the caption of this document, I electronically filed the foregoing with the Clerk of Court, to be served on all parties of record via the CM/ECF system.

        /s/Michael Thad Allen
        Michael Thad Allen