UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| *Plaintiff,* | § § § | |
| v. | § § | Civil Action No. 4:21-cv-00033-ALM |
| LAURA WRIGHT, et al., | § § | JURY |
| *Defendants.* | § § | |

### DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S EXPERT CASEY BORMAN

TO THE HONORABLE U.S. DISTRICT JUDGE AMOS L. MAZZANT:

Defendants respectfully file this Reply in Support of Motion to Strike Plaintiff's Expert Casey Borman. Nothing in Plaintiff's Response (ECF No. 74) negates the fundamental deficiencies in Borman's analysis outlined in Defendants' Motion to Strike (ECF No. 70).

**1.   Borman offers *no* reliable basis or methodology for his opinion that Jackson is entitled to be paid for a non-existent increase in job duties.**

The heart of Borman's opinion rests on the foundational proposition that Jackson should be paid for the monetary value (whatever that may be) of work he was not actually required to perform. Borman does not even *attempt* to offer any expert methodology or explanation for such a counter-intuitive proposition.

Jackson's Response first attempts to sidestep this problem by equivocating. Jackson argues that because UNT assigned him a fourth course to teach in lieu of his previous supervisory editorial work for the JSS, he is somehow now required to work more than a full-time professor and should thus be paid more than his regular full-time salary. *See* ECF No. 74 at 4–5, 11–12. But this

argument equivocates on *why* UNT had given Jackson the course remission in the first place, which is an undisputed fact. UNT gave Jackson a course remission *because of his supervisory editorial work on the JSS*, **not** because of his personal research and scholarship activities that earned him the "Distinguished Research Professor" designation. Jackson does not allege or show otherwise. In other words, it is undisputed that UNT never changed any requirements regarding Jackson's personal research or scholarship activities, nor did UNT require Jackson to work more than the 100% workload upon which his annual salary is based. The only thing UNT did to modify Jackson's required job duties was ask him to teach a full courseload (two courses each semester) after he was no longer performing any supervisory editorial duties for the JSS. Accordingly, the only thing Borman can properly claim to be calculating is the economic value of *that* difference in job duties. Jackson's equivocations do not avoid the central flaw in Borman's analysis.[1]

The foundation for Borman's entire testimony is the proposition that **the lack of a course remission caused economic loss to Jackson**. Of course, for this opinion to be reliable or relevant, it must be based on *some* sort of expert methodology that permits an economist, accountant, mathematician, or other type of expert to demonstrate how certain principles in their respective fields of expertise lead them to opine that when a professor whose responsibilities include teaching, research, and service is asked to perform X job duty instead of Y job duty, he is entitled to a 25% (or any percentage) pay increase, even though the amount of his professional responsibilities remains 100%. Borman completely fails to make this showing—critically, ***he does not even try***. Nothing in his expert report contains any scientifically verifiable principles or data explaining how

---

[1] Disturbingly, Jackson suggests that he was using the JSS and the accompanying part-time Research Assistant ("RA") for his own personal research and scholarship, rather than strictly for JSS editorial functions. Thus, Jackson maintains that when all editorial functions of the JSS ceased and the RA was accordingly removed, that somehow decreased his own personal scholarly productivity. *If* Jackson was indeed using the RA for his own personal benefit, then he created his own problem and certainly cannot claim that UNT is somehow requiring him to work harder.

a professor who has a course remission to allow him to perform supervisory editorial duties for a journal is economically harmed when that professor is required to teach a full courseload once he is no longer performing supervisory duties. Borman never offers any explanation for how such a reassignment of job duties can be said to result in economic loss. Thus, Borman's "opinion" on this foundational point is based on nothing more than "ipse dixit," which means it is not admissible as expert testimony. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999).

2. **Borman offers no basis for opining that Jackson is entitled to the economic value of a part-time Research Assistant.**

Borman's opinion that Jackson is entitled to compensation for a part-time Research Assistant ("RA") is flawed for similar reasons. If the previous RA's duties were to assist with the editing and publication of the JSS, then those duties no longer exist, and Jackson is patently not performing them himself or entitled to any remuneration for allegedly performing them. On the other hand, if Jackson was using the RA *not* simply for publishing the JSS, but also to further his own personal research and scholarship, then he created his own problem and cannot blame UNT for an increased workload. *See supra* n.1. Indeed, Jackson acknowledges that the RA was hired to be the "editor of the JSS," not his own personal RA. ECF No. 74-2 at 2 ¶ 4. There is no allegation that UNT ever had any obligation or intention to provide Jackson with an RA to assist with his personal scholarship.[2] If that is how Jackson had previously been using the part-time RA for the JSS, that is his own fault, not UNT's.

Again, the only thing Borman could (in theory) properly opine on is economic loss due to changed or increased job duties for Jackson. And the only change in Jackson's job duties, as far as what UNT required of him, was the fact that he was required to teach a fourth class in the absence of any supervisory editorial duties for the JSS (just as other professors were routinely

---

[2] Jackson's invocation of contract law is inapposite for this reason and because there are no breach-of-contract claims.

expected to do). Because Borman ***does not even try*** to connect *that* change in job duties with *any* alleged functions of the previous RA (whose duties were tied to the JSS), his opinion that Jackson is entitled to the previous RA's salary is baseless and unreliable. Borman has certainly not offered any verifiable principle or objective methodology based in economics, accounting, mathematics, or any other scientific or professional discipline to show how Jackson is entitled to be paid what a former RA was paid to assist with the publication of a journal that is not currently being published. Because Borman offers no reliable methodology or basis for his opinion, it is inadmissible.

3.     **None of Jackson's other arguments overcome these fatal deficiencies.**

Jackson's Response contains many factual representations that are hotly disputed and legal arguments that are simply irrelevant to Defendants' challenges to Borman's opinions. Due to page limits for this Reply, Defendants will content themselves with a few further brief comments.

First, Jackson conveniently ignores the extensive precedent establishing the Individual Defendants' right to express their personal opinions criticizing the JSS as constitutionally protected speech, which means that it cannot constitute defamation as a matter of law. *See* ECF No. 8 at 23–27. Jackson's vain attempt to cite generic case law regarding defamation completely fails to address (much less overcome) this fatal deficiency in his defamation claims.

Second, Jackson argues that the appearance of the word "extortion" in the graduate students' statement means he has a claim for defamation *per se*. ECF No. 74 at 8. That is incorrect. On its face, the students' statement complains that Jackson acted in an "abusive" way towards students, but it never indicates any accusation of *criminal* behavior (a separate use of the word "extortion"). Thus, Jackson's invocation of case law regarding defamation *per se* is inapposite.

Third, Jackson suggests that excluding Borman is somehow equivalent to ruling that Jackson has no damages. That is also incorrect. The parties will vigorously dispute at a later stage whether the Individual Defendants can be said to have caused any "reputational harm" to Jackson

that would support an award of money damages under traditional defamation law. The question now before the Court is simply whether *Borman* has shown how to calculate such "reputational loss" based on established, verifiable principles of economics. He has not. Jackson may not use Borman as a mouthpiece for his own lay opinions and theories regarding damages and causation.

Fourth, Jackson tries to preserve Borman's ability to testify regarding "net present value" and "work-life expectancy." ECF No. 74 at 9–10. Because those aspects of Borman's testimony are completely contingent on his fundamental opinions (i.e., that Jackson is entitled to the value of the course remission and the part-time RA), they are inadmissible by themselves.

Fifth, Jackson cites various cases for the proposition that experts may perform mathematical calculations for juries. ECF No. 74 at 10–11. That is not the issue here. Borman is not showing a jury how to do math. He is simply making up numbers without providing any mathematical formulae or other support. For example, Borman looks at a professor who moved from teaching three classes and supervising the student editor of a journal to teaching four classes and having no journal supervisory duties. Borman then claims that such a professor is entitled to an additional 25% of his salary. But that is not math. That is simply being a mouthpiece for a random number that Jackson wants the jury to accept—which *Daubert* definitively proscribes.

Sixth, Jackson faults Defendants for not providing certain data that might possibly have informed some of Borman's calculations. But Jackson does not show where he ever requested this information from Defendants. Jackson is not entitled to proffer faulty and unreliable expert testimony simply because he failed to gather pertinent information for that expert to review.

## CONCLUSION & PRAYER

For all the reasons set forth above and in Defendants' Motion to Strike, Defendants request the Court to grant the Motion to Strike and exclude Borman's proposed testimony.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

_/s/ Benjamin S. Walton_
**BENJAMIN S. WALTON**
*Lead Attorney*
Texas Bar No. 24075241
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

      I hereby certify that on August 28, 2024, a true and correct copy of this document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

Michael Thad Allen, Esq.
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff*

                                      */s/ Benjamin S. Walton*
                                    **BENJAMIN S. WALTON**
                                    Assistant Attorney General