UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **Timothy Jackson**, <br><br> Plaintiff, <br><br> v. <br><br> **Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**, Defendants. | Case No. 4:21-cv-00033-ALM |

**TIMOTHY JACKSON'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY FOR DEFAMATION**

**TABLE OF CONTENTS**

TIMOTHY JACKSON'S MOTION FOR SUMMARY JUDGMENT AS TO  LIABILITY FOR DEFAMATION ........................................................................................................................ i

Table of Contents ............................................................................................................... ii

Table of Authorities .......................................................................................................... iii

I.    Factual background ................................................................................................... 1

    A.   First Student Petition ................................................................................... 6

    B.   Second Student Petition ............................................................................... 6

    C.   The Faculty Petition .................................................................................... 7

    D.   Defendant Geoffrey-Schwinden Crafts the Faculty Petition to Fully Endorse the Student's Defamatory Statements ................................................................ 8

    E.   UNT Admits There Is No Evidence of Extortion ........................................ 11

    F.   Jackson UNT Cannot Produce Evidence that Timothy Jackson Engaged in "Racist Actions" or "Racist Behaviors" ................................................................. 12

II.   Argument ................................................................................................................ 14

    A.   Summary Judgment Standard ..................................................................... 14

    B.   Undisputed Facts Show that Timothy Jackson Satisfies the Standard for Defamation ...... 15

        1)   Texas Defamation Law ..................................................................... 15

        2)   Defamation Per Se and Defamation Per Quod .................................. 15

    C.   Defendants Are Liable for Defamation Per Se ............................................ 16

    D.   Faculty Defendants Endorsed the Student Petition as their Own .................. 18

    E.   Protected Speech and "Actions" or "Behaviors" Are Legally Distinct ............ 22

    F.   No Defense of "Opinion" ........................................................................... 24

    G.   Timothy Jackson Has Suffered Damages .................................................... 26

III.  Conclusion ............................................................................................................. 28

Certificate of Service ......................................................................................................... 28

Certificate of Conference ................................................................................................... 29

TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)...........................14

*Baker v. Orange Panda, LLC*, No. 04-19-00846-CV, 2020 Tex. App. LEXIS 8456 (Tex. App. Oct. 28, 2020).......................................................................................................................................... 17, 18

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .............................................................................................23

*Beneficient v. Gladstone*, No. 6:23-cv-376-JDK, 2024 U.S. Dist. LEXIS 91703 (E.D. Tex. May 22, 2024) ...........................................................................................................................................20

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002).......................................................................................25

*Brady v. Klentzman*, 515 S.W.3d 878 (Tex. 2017)..................................................................................27

*Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408 (5th Cir. 1993).........................................................15

*Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598 (5th Cir. 1981) .......................................14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .....................................14

*City of Brownsville v. Pena*, 716 S.W.2d 677 (Tex. App. 1986) ...............................................................17

*Como v. Riley*, 731 N.Y.S.2d 731 (N.Y. App. Div. 2001) ......................................................................16

*D Magazine Partners, LP. v. Rosenthal*, 529 S.W.3d 429 (Tex. 2018)........................................................27

*Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018) ....................................................15, 18, 20

*Davis v. City of San Antonio*, 752 S.W.2d 518 (Tex. 1988) ...................................................................17

*Dixon v. Transp. Am. & Hireright*, LLC, Civil Action No. 3:22-CV-325-L, 2023 U.S. Dist. LEXIS 238837 (N.D. Tex. Feb. 17, 2023) ...............................................................................................18

*Freedom Newspapers v. Cantu*, 126 S.W.3d 185 (Tex. App. 2003).............................................................17

*Freiheit v. Stubbings*, No. 03-12-00243-CV, 2014 Tex. App. LEXIS 13889 (Tex. App. Dec. 31, 2014)15

*Gertz v. Robert Welch*, 418 U.S. 323, 349, 94 S. Ct. 2997 (1974)........................................................ 16, 26

*Glassdoor, Inc. v. Andra Grp., L.P.*, 575 S.W.3d 523 (Tex. 2019) .........................................................19

*Gruver v. Allstate Ins. Co. of Canada, Inc.*, No. 23-30431, 2024 U.S. App. LEXIS 27879 (5th Cir. Nov. 4, 2024)..........................................................................................................................................14

*Hayes v. Locke Supply Co.*, Civil Action No. 4:22-cv-767, 2024 U.S. Dist. LEXIS 48242 (E.D. Tex. Mar. 19, 2024) ........................................................................................................................14

*In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436 (5th Cir. 1982) .....................................14

*Infowars, LLC v. Fontaine*, No. 03-18-00614-CV, 2019 Tex. App. LEXIS 9303 (Tex. App. Oct. 24, 2019)..............................................................................................................................................19

*Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023)...............................................................................2

*Jackson v. Wright*, Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex. Jan. 18, 2022) ................................................................................................................................... 2, 3, 4

*Klocke v. Watson*, No. 20-10103, 2021 U.S. App. LEXIS 36482 (5th Cir. Dec. 10, 2021).............. 16, 27

*McDonald v. Raycom TV Broad., Inc.*, 665 F. Supp. 2d 688 (S.D. Miss. 2009)...........................20

*Means v. ABCABCO, Inc.*, 315 S.W.3d 209 (Tex. App. 2010) ....................................................15

*Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415 (Tex. 2022).........................................26

*Miller v. Watkins*, No. 02-20-00165-CV, 2021 Tex. App. LEXIS 1879 (Tex. App. Mar. 11, 2021) .................................................................................................................................... 15, 16

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) .....................................................................23

*Morrison v. Quarrington*, No. 12-22-00302-CV, 2024 Tex. App. LEXIS 3996 (Tex. App. May 15, 2024) .................................................................................................................................................18

*Networks v. Edwards*, 2016 Tex. Dist. LEXIS 46393 (Tex. Dist. Ct., 61st JD 2016) ................................17

*NRA of Am. v. Ackerman McQueen, Inc.*, No. 3:19-CV-2074-G, 2021 U.S. Dist. LEXIS 153421 (N.D. Tex. Aug. 16, 2021) .............................................................................................................16

*O'Brien.  Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969) .............................................23

*Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840 (N.D. Cal. 2020) ...........................................19

*ProPublica, Inc. v. Frazier*, No. 01-22-00281-CV, 2024 Tex. App. LEXIS 2883 (Tex. App. Apr. 25, 2024)................................................................................................................................................16

*Sabal v. Anti-Defamation League*, Civil Action No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 78354 (N.D. Tex. Apr. 30, 2024) ................................................................................... 17, 19, 20, 25

*Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912 (W.D. Ky. 2009) ....................................19

*Thorpe v. Alsaeed*, NO. 01-99-00549-CV, 2000 Tex. App. LEXIS 3085 (Tex. App. May 11, 2000) .....25

*United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968)....................................................22

*Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142 (Tex. 2014) .........................26

*Webber v. Ohio Dep't of Pub. Safety*, 2017-Ohio-9199, 103 N.E.3d 283 (Oh. Ct. App. 2017) .................17

**Statutes**

Tex. Civ. Prac. & Rem. Code § 73.001 ...........................................................................................15

**Other Authorities**

Lucinda Breeding, A UNT Professor Challenged Claims of Racism in Music Theory, and Now
   He's Facing the Music, Denton Record-Chronicle, August 2, 2020, available at
   https://dentonrc.com/education/higher_education/a-unt-professor-challenged-claims-of-
   racism-in-music-theory-and-now-hes-facing-the/article_e7cdab75-c6cb-5972-878d-
   fea7e2fb8b9d.html ........................................................................................................................18

Michael Powell, Obscure Musicology Journal Sparks Battles Over Race and Free Speech, New York
   Times, February 14, 2021 available at https://www.nas.org/blogs/article/a-canceled-music-
   theorist-responds.........................................................................................................................18

**Rules**

E.D.Tex. L.R. CV-7................................................................................................................................1

Fed. R. Civ. P. 56 ......................................................................................................................... 1, 14

**Treatises**

Sack on Defamation, § 10:1 (5th ed. 2017) ....................................................................................26

Plaintiff Timothy Jackson moves for partial summary judgment under Fed. R. Civ. P. 56 and E.D.Tex. L.R. CV-7(a)(1) (the "Motion."). The Motion seeks partial judgment as a matter of law that Defendants are liable for Defamation under Texas law (Count 2). (ECF No. 1 at Page ID 15.)

Timothy Jackson has sued, in defamation, Rachel Gain, a graduate student, and UNT faculty Ellen Bakulina, Andrew Chung, Diego Cubero, Steven Friedson, Rebecca Dowd Geoffroy-Schwinden, Benjamin Graf, Frank Heidlberger, Bernardo Illari, Justin Lavacek, Peter Mondelli, Margaret Notley, April L. Prince, Cathy Ragland, Gillian Robertson, Hendrik Schulze Vivek Virani, and Brian F. Wright (the "Faculty Defendants"; or collectively with Rachel Gain, the "Individual Defendants"). Resolving summary judgment on liability will dispense with the need to put on 18 witnesses in succession, the vast majority of whom would be repetitive, but nevertheless necessary to show liability as to each Individual Defendant.

Timothy Jackson does not seek partial summary judgment on the amount of defamation damages he has suffered.

## I.    FACTUAL BACKGROUND

Timothy Jackson is Distinguished University Research Professor of Music Theory at the University of North Texas (UNT), in the College of Music. (Affidavit of Timothy Jackson, ECF No. 1-1 ("First Jackson Affidavit," attached to these papers as **Exhibit A**), ¶ 1; **Exhibit** B ("Jackson Dep"), 32:5-34:5.) Approximately 25 years ago, he started the Journal of Schenkerian Studies (JSS), published by the UNT Press until its abrupt cancellation after July 25, 2020. (Jackson Dep., 155:1-18; 173:17-22; ECF No. 1-5, attached for convenience as **Exhibit C,** at Page ID#: 267.) The JSS has traditionally been run by a graduate student editor, under the supervision of its Advisory Board consisting of Professor Jackson and his colleague Stephen Slottow. (**Exhibit D** at UNT_000848; Jackson Dep, 168:21-169:11.)

1

On July 25, 2020, Volume 12 of the JSS appeared, which included a special "Symposium" in which Timothy Jackson published an article, "A Preliminary Response to Ewell." (**Exhibit E**, also avail. at ECF No. 1-4 at Page ID: 209-218.) Jackson addressed the plenary presentation at an annual conference of the Society for Music Theory delivered by City University of New York Professor Philip Ewell. (*Id.*) Ewell's plenary paper was subsequently published without peer review (and without controversy) in a journal of the Society for Music Theory called Spectrum. (**Exhibit F**, ("Ewell Dep"), 33:17-34:9; 35:25-42:9; 122:22-23; 256:5-258:10; **Exhibit G** ("Bakulina Dep"), 45:6-47:7; 49:1-50:7; 51:1-25 and **Exhibit H** (un-peer-reviewed Ewell article in Spectrum).)

The substance of Professor Jackson and Philip Ewell's debate has been summarized to this Court and by this Court as well as by the Fifth Circuit Court of Appeals. (See e.g., ECF No. 16 at Page ID 545-546; *Jackson v. Wright*, Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *2-5 (E.D. Tex. Jan. 18, 2022); *Jackson v. Wright*, 82 F.4th 362, 365 (5th Cir. 2023).) It need not be further summarized here because its substance is not relevant to the defamation claims.

What is relevant is Individual Defendants' defamatory smear campaign against Timothy Jackson immediately after the Symposium became public. UNT graduate students and faculty claimed that Timothy Jackson's article in particular, and the "epistemic center" of the JSS in general, was "racist." (See e.g., **Exhibit I** (July 27, 2020-July 30, 2020 tweets between Defendant Virani and Defendant Gain).)

No one who attacked Professor Jackson and the JSS took up the pen to refute Professor Jackson's ideas. For example, no evidence indicates that any Individual Defendant published a scholarly article to refute Professor Jackson or criticize his ideas. That would require evidence and rational argument, in short, knowledge, which Defendants displayed in very limited quantity. (See e.g., **Exhibit J** ("Geoffrey-Schwinden Dep"), 64:14-65:8 (unable to testify as to whether hip-hop, rap, or jazz originated as an African American art form); *id.*, 113:6-16 (professing "I don't

understand" what she meant by writing "epistemic center of Volume 12 of the Journal of

Schenkerian Studies" being "racist discourse"); **Exhibit K** ("Chung Dep"), 95:5-96:11 (after

equivocation about the meaning of "empirical evidence" admitting he knows of no empirical

evidence that there was an intention to exclude Philip Ewell from publishing in the JSS); **Exhibit G**

("Bakulina Dep"), 64:24-65:17 (admitting to no knowledge of statistical or empirical evidence that

black families as a whole in the United States do or do not expose their children to classical music).

　　　　Instead, Defendants took their cue from social media like Twitter and Facebook.  In short,

they indulged in a moral panic.  (See e.g., Chung Dep, 57:17-25; **Exhibit M** (email  thread of July 25,

2020) at UNT_000302; **Exhibit I**.)  No known editorial policy of UNT makes Twitter or other

social media some sort of editorial authority over journals published by the UNT press.  (See e.g.,

Chung Dep, 60:12-17.)

　　　　First graduate students and then faculty circulated petitions calling for Professor Jackson to

be fired, the JSS to be shuttered, and the Center for Schenkerian Studies, a center maintained by

UNT that housed the JSS, to be closed.  (**Exhibit I**, **Exhibit C** at Page ID#: 282-283 (Graduate

Student Petition); Page ID#: 284-285 (Faculty Petition).)   As the Dean of the College of Music

testified in open court, the JSS has been put "on ice," never to be thawed—in other words, censored

by the State of Texas.  (*Jackson*, 2022 U.S. Dist. LEXIS 8684, at *8 and n.2.)

　　　　A student petition first circulated online on July 27, 2020, two days after the publication of

the Symposium and then again in a different form (at least by July 30, 2020) to the Dean of the

College of Music, John Richmond, and Jackson's immediate Department Chair, Benjamin Brand.

(**Exhibit I**; **Exhibit L** ("Brand Dep"), 121:15-123:18 and **Exhibit M** (email of July 30, 2020 with

petition attached).)  The student petition had been sent on July 29, 2020 to all graduate students,

probably about forty people.  (**Exhibit N** ("Kohanski Dep"), 18:2-19 and **Exhibit O** (email of July

29, 2020 distributing student petition).)   Defendant Rachel Gain participated in drafting and

circulating the student petition.  (Kohanski Dep, 23:9-15; **Exhibit P** ("Gain Dep"), 40:25-41:3.)

Gain was a UNT graduate student who had no direct interaction with Timothy Jackson other than

to see him in UNT's hallways.  (Gain Dep, 6:4-7.)  She nevertheless signed and endorsed the student

petition.  (*Id.*, 41:4-5; Brand Dep, 121:15-123:18 and **Exhibit M**.)  Then Gain blasted out a version

on Twitter as early as July 27, 2020.  (Gain Dep, 9:6-20, **Exhibit I**.)

    The faculty petition was first circulated shortly thereafter (at least by July 30, 2020).

(**Exhibit I**, Geoffrey-Schwinden Dep, 86:9-15 and **Exhibit Q** (Ex. 7 to Geoffrey-Schwinden Dep)

at UNT_000417; Exhibit R (Dean Richmond response to Geoffrey-Schwinden of July 31, 2020).)

The faculty petition republish the student petition via hyperlink to a version posted online, which

can still be found at

    https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/
    view

(**Exhibit C** at Page ID# 284; Geoffrey Schwinden Dep, 97:21-99:17 and **Exhibit S** (Ex. 9 Ewell to

Geoffrey-Schwinden Dep).)

    Almost immediately, Dean John Richmond of the School of Music and Timothy Jackson's

Department Chair, Benjamin Brand, announced a "formal investigation … concerning the

conception and production of the most recent issue of JSS" in the name of "combating racism on

campus and across all academic disciplines."  (**Exhibit R**; **Exhibit T**.)  This announcement was

published on UNT's website.  (*Id.*)  Benjamin Brand subsequently removed Timothy Jackson from

the Journal, and the Journal has been shuttered ever since.  (ECF No. 1-22 at Page ID 345 (attached

as **Exhibit U** for convenience); see also *Jackson*, 2022 U.S. Dist. LEXIS 8684, at *8 and n.2.)

    In consequence, Timothy Jackson was forced to teach an extra class each year, from which

he had formerly been released to free his time for the JSS's scholarly activities, activities on which he

is evaluated every year.  (**Exhibit V**.)  For example, before his faculty, Dean, and department chair

decided to defame him and the JSS as "racist," Department chair Benjamin Brand's three-year evaluation of Timothy Jackson noted:

> Dr. Jackson is an active scholar engaged with an impressive variety of topics and repertoires. Among his most important contributions were his article published in the *Journal of Schenkerian Studies*, of which one was the length of a small monograph and another was co-authored.

(*Id.*; **Exhibit W;** see also **Exhibit X** (evaluating Jackson's direction of CSS and JSS).)

Also at the end of July 2020, Research Assistant Levi Walls, who served as student editor of the journal, quit, whereupon UNT rewarded Walls. (Chung Dep, 138:15-140:14.) He was transferred to other duties and continued to get paid. (*Id.*) The evidence indicates that the value of the RA-ship stripped from the service to Timothy Jackson and the JSS was compensated as a .50 Full-Time Equivalent (FTE), or $12,800.00-19,626.64 per year, depending on the year. (**Exhibit W** ("2d Affidavit of Jackson"), ¶¶ 4-8, and exhibits; ECF Note.70-1 at Page ID# 1216-1217; Brand Dep, 89:14-25.)

In addition, the Individual Defendants' smear campaign damaged Timothy Jackson's reputation, making it harder for him to publish. (2d Affidavit of Jackson, ¶¶ 8-10.) Graduate students who had signed up to work with Timothy Jackson now shun him, whether out of sincere belief in the defamatory accusations lodged against him or out of fear that the social media mob and ideologues who targeted Timothy Jackson will target them by association. (Jackson Dep, 89:11-21; 238:9-14.)

In other words, UNT has done exactly what the student and faculty petitions whined and pleaded for the school to do. The petitioners demanded the JSS be censored and eliminated so that the ideas expressed in the Journal would no longer hurt their subjective feelings. They demanded that Timothy Jackson be disciplined and punished. UNT made sure that the State of Texas did their bidding.

But, to be clear, Timothy Jackson's critics were never content to criticize his ideas. His critics were not even content to call him a "racist." This smear campaign went further and accused him of specific (nonexistent) actions, (fictitious) behaviors, even the crime of "extortion," as well as other falsehoods subject to objective confirmation or disproof.

## A. First Student Petition

The first student petition announced "moral imperatives that can no longer be ignored" and an express call for action to "dissolve the JSS, dismiss Dr. Timothy Jackson, make substantial changes to the Center for Schenkerian Studies (CSS), [and] implement consequences for those involved in the publication of the most recent issue of the JSS." (**Exhibit O** at Page ID#: 451.)

The first student petition included the following defamatory statements, each of which asserts objective facts, subject to proof or disproof, for which no evidence has ever been presented and for which Defendants admit no evidence exists:

- "Dr. [Philip] Ewell was neither notified nor asked to respond, as is standard academic practice."

- Timothy Jackson was guilty of "past bigoted behaviors"— what specific "behaviors" have never been identified other than Jackson's publishing views that hurt the graduate students' subjective feelings.

- Timothy Jackson "has a history of racist, sexist, and abusive behavior in his many capacities"—what specific behavior has never been identified other than Jackson's publishing views that hurt the graduate students' subjective feelings.

- Timothy Jackson committed "Extortion."

(*Id.* at Page ID#: 451-452.)

## B. Second Student Petition

The second student petition likewise issued a call to action for UNT to "immediately take the following steps," which included dissolving the JSS as well as a call for "the discipline and potential removal of faculty who used the JSS platform to promote racism." (**Exhibit C** at Page ID 282-283.)

6

The second student petition made the following defamatory statements, each of which asserts objective facts, subject to proof or disproof, for which no evidence has ever been produced in discovery and for which the Defendants admit no evidence exists:

- Timothy Jackson had committed "past bigoted behaviors"—what specific "behavior" has never been identified other than publishing views that hurt students' subjective feelings.

- "Specifically, the actions of Dr. Jackson— both past and present— are particularly racist and unacceptable"—what specific actions have never been identified other than publishing views that hurt students' subjective feelings.

(**Exhibit C** at Page ID#: 283.)

### C. The Faculty Petition

The faculty petition, which UNT published to its official website and which was published elsewhere by the Society for Ethnomusicology to the broader public,[1] begins, "We, the undersigned faculty members of the University of North Texas Division of Music History, Theory, and Ethnomusicology, stand in solidarity with our graduate students in their letter of condemnation of the Journal of Schenkerian Studies." (**Exhibit C** at Page ID#: 284.)  All Faculty Defendants signed. (**Exhibit C** at Page ID#: 284-285.)

The Faculty Defendants expressly "endorse[d] the call for action outlined in our students' letter." (**Exhibit C** at Page ID#: 284.)  It therefore could not be more clear that they expressly endorsed the second student petition referenced above.  The faculty petition then reiterated, "Responsible parties must be held appropriately accountable."  The faculty petition not only republished the second student petition by incorporated it by reference; the Faculty Defendants redoubled their emphatic endorsement of the graduate students' defamatory statements, including

---

[1] Avail. at https://www.ethnomusicology.org/news/519784/Statement-of-UNT-Faculty-on-Journal-of-Schenkerian-Studies.htm

the express call for action clamoring for Jackson to be disciplined and punished and for the JSS to be shut down— all of which the State of Texas executed.

In addition, the faculty petition stated the following false statement as objective fact: "The fact that he [Philip Ewell] was not afforded the opportunity to respond in print." (*Id.*)

### D. Defendant Geoffrey-Schwinden Crafts the Faculty Petition to Fully Endorse the Student's Defamatory Statements

The faculty petition went through several drafts, a process guided by Defendant Geoffrey-Schwinden, although she could not manage to testify with any specificity about the four drafts of the faculty petition she had crafted. (Geoffrey-Schwinden Dep, 92:21-116:4 and **Exhibit Y**; Bakulina Dep, 174:23-175:20.) She could not even say if her colleagues commented on her drafts. (Geoffrey-Schwinden Dep, 104:19-25.) Like so many people who badmouth close colleagues, she was suddenly struck by amnesia when challenged to explain the substance of her statements. (*Id.*)

Whatever Geoffrey-Schwinden's deficits of memory, what is clear is that each of her drafts strengthened the Faculty Defendants' endorsement of the student petition. Geoffrey-Schwinden's first draft stated: "We support and we believe our graduate students. Read their statement and demands here: [URL link]." (**Exhibit Y** at UNT_00427.) The first draft did not include any statement that the Faculty Defendants stood "in solidarity" with the student petitioners as did the final, signed draft. (*Id.*) There was no call that "[r]esponsible parties must be held appropriately accountable." (*Id.*; compare **Exhibit C** at Page ID# 284.) The first draft merely said, "Continued action is necessary," and, "We invite you to be in dialogue with us…" (*Id.*)

The second draft escalated the language. (*Id.* at UNT 000428.) Now Geoffrey-Schwinden led off with:

> We, the undersigned faculty members from the University of North Texas Division of Music History, Theory, and Ethnomusicology, are dismayed by the uncritical, unscholarly, and racist treatment that Prof. Philip Ewell and his pioneering work endured in the recent issue of the Journal of Schenkerian Studies, published by the Center for Schenkerian Studies and the University of North Texas Press.

(*Id.*)  Geoffrey-Schwinden dropped the "believe our graduate students" language.  (*Id.* at UNT_000427.)  The invitation to remain "in dialogue" disappeared.  (Id.)  However, the hyperlink to the student petition and the faculty's express "support" remained, and Geoffrey-Schwinden mentioned an unspecified "mandatory administrative process to address this internally"; the petition also stated that "continued action is necessary," which she later claimed to know nothing about.  (*Id.* at UNT_000428; Geoffrey-Schwinden Dep, 108:24-109:2.)

By the third draft, Geoffrey-Schwinden began, "We, the undersigned faculty members . . . denounce. . ."; but she retained the relatively weak language "support[ing]" the graduate student petition.  (**Exhibit Y** at UNT_000429.)

The fourth and final draft began with a full-throated declaration that the Faculty Defendants "***stand in solidarity with*** our graduate students in their letter of condemnation…" (emph. added).  (*Id.* at UNT_000430.)  It was this endorsement that the Faculty Defendants all signed.  (*Id.* at UNT_000430-UNT_000431.)

This is not a metaphor.  As noted above, the signed statement expressly "endorse[s] the call for action outlined in our students' letter." (*Id.*; Geoffrey-Schwinden Dep, 113:17-114:3.)  The plain language indicates that the Faculty Defendants gave their unambiguous endorsement; they endorsed, at the very least, that part of the student petition which is a call for action, clamoring for Jackson, **by name**, to be disciplined and punished and attributing (never specified) "especially" racist "actions" and "behaviors."  (*Id.*)

In fact, this specific section of the Student Petition (which the final faculty petition incorporated by reference) is headlined: "We also call on the University of North Texas . . . to take the following actions."  (**Exhibit C** at Page ID 283.)  It is literally a "call for action."

The graduate students' call for action has three numbered paragraphs:

  1)    "**Dissolve the JSS**" (which UNT swiftly accomplished);

2)    "**Critically examine the culture in UNT, the CoM [College of Music], and the MHTE division, and act to change our culture**"; and

3)    "**Hold accountable every person responsible for the direction of the publication**" (which UNT also swiftly accomplished by removing Timothy Jackson from the Journal).

(Emph. in orig.; *id.*)  In its final form, the Faculty Petition's newly included language demanded, "Responsible parties must be held appropriately accountable"— tracking almost verbatim the students' call for action Nr. 3, which expressly identifies Timothy Jackson by name.  (*Id.*)

As Deponents, Defendants have placed special emphasis on the following dependent clause:

. . . which asks that the College of Music 'publicly condemn the issue and release it freely online to the public' and 'provide a full public account of the editorial and publication process, and its failures.'

(**Exhibit Y** at UNT_000430.)  Suddenly, after being sued and obtaining free legal services from the Texas Attorney General's Office, defendants now aver that this dependent clause somehow qualifies their endorsement.  (See e.g., Geoffrey-Schwinden Dep, 114:11-115:17 (testifying dependent clause "would appear" to limit the faculty endorsement.)

The Faculty Defendants' plain language contains no such limitations.  "Which," without more, merely lends emphasis to some (if not all) of the student petition's content.  (**Exhibit Y** at UNT_000430.)  Furthermore, the Faculty Defendants' redoubled their emphasis in the final sentence of this important paragraph, calling for UNT to hold "responsible parties" [i.e. Timothy Jackson] "appropriately accountable."  (*Id.*)  This removes any doubt, if there could be any, that the Faculty Defendants unambiguously endorsed that part of the students' "call for action" that clamored for the discipline and punishment of Timothy Jackson due to (nonexistent) "especially racist" actions and behaviors.

The faculty petition's author, Defendant Geoffrey-Schwinden, also testified that the faculty did not insist on any language, such as "only" or "partially," which might have specifically limited their endorsement.  (Geoffrey-Schwinden Dep, 115:18-21.)  And Defendant Geoffrey-Schwinden

10

could not remember any discussion among the Faculty Defendants about limitations on their endorsement.  (*Id.* at 115:25-116:4.)

What we do have are contemporaneous documents discussing the faculty's concerns about the breadth and comprehensiveness of their endorsement.  These documents evince **no** preoccupation with limitations or qualifications on the condemnation of Timothy Jackson or calls for his professional destruction.  (**Exhibit Z**.)  The Faculty Defendants were simply unconcerned to limit their endorsement of the students' "call to action"; they wanted Timothy Jackson to be disciplined, terminated, and condemned for supposed "racist" actions and behaviors.  (*Id.*)  They endorsed the student petition without qualification, without dissent.  They were unified by their enthusiasm to destroy their colleague because of nothing more than words and ideas that he had published against UNT's state-sponsored orthodoxy.

### E.  UNT Admits There Is No Evidence of Extortion

Before Defendant Gain even arrived at UNT, she predetermined that Professor Jackson was a "piece of shit."  (Gain Dep, 52:6-8.)  This was based on rumors, and she had no direct experience of Professor Jackson's classes, which she avoided.  (*Id.* at 52:9-54:4.)  Gain testified that she had no direct knowledge of the following specific factual information:

- The specific "procedures used to publish Volume 12 of JSS."

- "[B]igoted behaviors of UNT faculty."

- "Dr. Jackson's actions, both past and present, [that] are racist and unacceptable."

- "Extortion through grade manipulation, threats to students' careers and reputations."

(*Id.* at 56:20-57:2; 57:6-9; 57:18-24; 58:3-10.)  In fact, she averred that she "wasn't in the country at the time."  (*Id.* at 58:10.)  She endorsed the various student petitions simply because she "trust[ed]

[her] colleagues." (*Id.* at 28:17-23; 41:4-5 (specifically referring to **Exhibit AA**, Kohanski_000107-Kohanski_000110).)

All other defendants admit that they have no knowledge of any extortion committed by Timothy Jackson. (**Exhibit BB**, Defendants Answer to Request for Admission No. 4.) This includes former Department chair Frank Heidelberger. (**Exhibit CC**, Heidlberger Dep, 9:9-14; 81:14-83:2.) Defendant Heidlberger knew of no racist, sexist, or misogynistic behavior committed by Jackson that he could identify either. (*Id.*)

### F. Jackson UNT Cannot Produce Evidence that Timothy Jackson Engaged in "Racist Actions" or "Racist Behaviors"

Likewise, UNT Department Chair Benjamin Brand, who removed Timothy Jackson from the JSS, "cannot identify any of Dr. Jackson's actions or behavior that I know to be racist." (Brand Dep, 125:21-22.) The same holds for every Defendant who testified in this civil action. Defendant Geoffrey-Schwinden "d[id]n't recall specific people calling Tim [Jackson] a racist"—although her own draft documents indicate she was perfectly comfortable calling him a racist herself in July 2020. (Geoffrey-Schwinden Dep, 62: 19-20.) She did testify that "maybe some of the writing in the article" was "particularly racist"; but she could not identify any specific actions that Dr. Jackson had committed that were "particularly racist." (*Id.* at 120:25-121:7.) She did not experience or witness any "bigoted behaviors" either. (*Id.* at 121:8-14.) Andrew Chung did not do anything to confirm that Timothy Jackson had committed some sort of racist action before he signed the faculty petition. (Chung Dep, 130:12-18.)

After equivocating, Provost Jennifer Cowley could only identify "publication" as a specific activity that could be deemed "racist"; in other words, she could only identify protected speech on a matter of public concern. (**Exhibit DD** ("Cowley Dep"), 57:15-58:3.) Defendant Benjamin Graf (a prior editor of the JSS, who was sure enough about what "racist" meant in 2020 to accuse Jackson, his former dissertation advisor and mentor, of "racism"), testified that he needed to "review the

whole situation in context," to answer whether burning a cross on someone's lawn was a racist act. (**Exhibit EE** ("Graf Dep"), 34:23-36:5.)  Defendant Graf spent pages and pages of deposition testimony evading the simple question of whether he could identify any "racist" actions committed by Timothy Jackson..  But in the end, the only thing Graf could think of was that "there could be some statements that could be considered racist" attributed to Timothy Jackson— in other words *speech*.  (*Id.* at 34:14-39:22.)  However, even then Graf could not enumerate a single, specific "racist" statement attributed to Timothy Jackson.  (*Id.* at 39:20-22.)

Timothy Jackson also served the following Interrogatory No. 12:

> Not limited as to time, for each Individual Defendant, identify any specific action or behavior of Plaintiff Timothy Jackson that the Individual Defendant claims is or was "racist," and for each such Individual Defendant, please state the following:
>
>> a. The specific action or behavior that the Individual Defendant identifies as "racist";
>>
>> b. The specific time, date, and location that the supposed "racist" action or behavior occurred;
>>
>> c. The nature of the action that the Individual Defendant claims is "racist"; and
>>
>> d. Any documents that the Individual Defendant claims substantiate the assertion that the specific action was "racist."

(**Exhibit FF**, No. 12.)

Defendants Answers identified no specific racist actions, because there were and are none. (*Id.*)  The only thing Defendants could identify was Timothy Jackson's protected speech, by way of example, "Sections of Timothy Jackson's response in Vol. 12 of the Journal of Schenkerian Studies base[d] his argument on [unspecified] racial stereotypes and tropes"—for which there is also no evidence.  (*Id.*, Response to Interrogatory No. 12 of Diego Cubero.)

Similar answers were given by defendants Steven Friedson, Frank Heidlberger, Justin Lavacek, April Prince, Cathy Ragland, Hendrik Schulze, Vivek Virani, and Brian Wright.  (*Id.*)  In

other words, Defendants all admit that their attack on Timothy Jackson solely targeted his protected speech (if they identify anything at all).

## II.  ARGUMENT

### A.  Summary Judgment Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is proper under Fed. R. Civ. P. 56(a) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).  However, Defendants may prevail only if they present affirmative evidence to defeat Jackson's properly supported motion.  *Anderson*, 477 U.S. at 257.  "Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires 'significant probative evidence' from the nonmovant to dismiss a request for summary judgment." *Hayes v. Locke Supply Co.*, Civil Action No. 4:22-cv-767, 2024 U.S. Dist. LEXIS 48242, at *6 (E.D. Tex. Mar. 19, 2024) (quoting *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982).)

"Partial summary judgments are meant to narrow the issues for trial." *Gruver v. Allstate Ins. Co. of Canada, Inc.*, No. 23-30431, 2024 U.S. App. LEXIS 27879, at *13 (5th Cir. Nov. 4, 2024) (quotations omitted).  A partial summary judgment "serves to root out, narrow, and focus the issues, if not resolve them completely [so that] the length and complexity of trial on the remaining

issues are lessened." *Id.* (quoting *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993).)

### B. Undisputed Facts Show that Timothy Jackson Satisfies the Standard for Defamation

#### 1) *Texas Defamation Law*

To prove defamation in Texas, Timothy Jackson must show Defamation Defendants:

1) published "a false statement to a third party";

2) that the statement "was defamatory concerning" Jackson

3) with the "requisite degree of fault, at least amounting to negligence"; and

4) that Jackson suffered damages.

*Miller v. Watkins*, No. 02-20-00165-CV, 2021 Tex. App. LEXIS 1879, at *24 (Tex. App. Mar. 11, 2021). "In Texas, a statement is defamatory libel by statute if it 'tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation.'" *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 637-38 (Tex. 2018) (quoting Tex. Civ. Prac. & Rem. Code § 73.001). "Whether a statement is defamatory is a question of law" and thus suitable for resolution on summary judgment; and the Court must construe "allegedly libelous statements . . . as a whole, in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Freiheit v. Stubbings*, No. 03-12-00243-CV, 2014 Tex. App. LEXIS 13889, at *4-*5 (Tex. App. Dec. 31, 2014); see also *Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App. 2010) (same).

#### 2) *Defamation Per Se and Defamation Per Quod*

There are two categories of defamation, *per se* and *per quod*. Under Texas law, "defamation *per se* refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed." *Klocke v. Watson*, No. 20-10103, 2021 U.S. App. LEXIS

15

36482, at *18 (5th Cir. Dec. 10, 2021).  The plaintiff need not prove monetary damages at all.  *See also ProPublica, Inc. v. Frazier*, No. 01-22-00281-CV, 2024 Tex. App. LEXIS 2883, at *21 (Tex. App. Apr. 25, 2024) (defamation *per se* damages may be presumed).  "Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred."  *Gertz v. Robert Welch*, 418 U.S. 323, 349, 94 S. Ct. 2997, 3011-12 (1974).  "Suffice it to say that actual injury is not limited to out-of-pocket loss."  *Id.* at 350.

Unlike defamation *per se*, defamation *per quod* requires proof of damages.  A Plaintiff may recover for defamation *per quod*, where "[d]efamation . . . is apparent but not . . . actionable *per se*," and in such a case, "[n]ominal damages are not recoverable, and actual damages must be proven." *Klocke,* 2021 U.S. App. LEXIS 36482, at *19.

### C.  Defendants Are Liable for Defamation *Per Se*

Defendants defamatory statements that Professor Jackson had committed "extortion" and "racist" actions and behaviors are defamation *per se.  See e.g., NRA of Am. v. Ackerman McQueen, Inc.*, No. 3:19-CV-2074-G, 2021 U.S. Dist. LEXIS 153421, at *32 (N.D. Tex. Aug. 16, 2021) ("allegations of extortion may give rise to defamation per se").  The Individual Defendants falsely and knowingly attributed extortion as well as "racist" actions and behaviors to Timothy Jackson.  Statements that a defamed person has "done things … [a]re verifiable."  *Miller v. Watkins*, 2021 Tex. App. LEXIS 1879, at *27 (Tex. App. 2021) (affirming trial court's finding of prima facie case for defamation).  Yet Defendants can verify no "actions" or "behaviors" let alone the preposterous accusation of "extortion" that Timothy Jackson committed.

Furthermore, false statements that some non-existent, imaginary actions or behaviors "are particularly racist" would be actionable in any state.  *See e.g., Como v. Riley*, 731 N.Y.S.2d 731 (N.Y. App. Div. 2001) (holding publication that plaintiff engaged in a "racist" act was false, and therefore "defendants' views premised on such statement, published under the heading 'Racism,' are not

immune from redress for defamation as non-actionable statements of opinion"); *Webber v. Ohio Dep't of Pub. Safety*, 2017-Ohio-9199, 103 N.E.3d 283, 287-88 (Oh. Ct. App. 2017) (reversing grant of summary judgment where plaintiff claimed defamation *per se* due to false accusation of acting as a "racist" for "refusing or failing to perform her job duties based on the ethnicity of individuals").

Furthermore, Texas law is clear that false accusations of "racism" are actionable and not mere opinion. In *Freedom Newspapers v. Cantu*, 126 S.W.3d 185 (Tex. App. 2003), the Sheriff of Cameron County sued the *Brownsville Herald*, its editor, and a reporter over the mischaracterization of the Sheriff's comments in a political debate. The Sheriff "testified that he was humiliated, and that he was frequently referred to as the 'racist' sheriff." *Id.* at 195. The trial court denied summary judgment to the newspaper and the Texas Appeals Court affirmed. *Id.* See also *Baker v. Orange Panda*, LLC, No. 04-19-00846-CV, 2020 WL 6293150, at *9 (Tex. App. Oct. 28, 2020) ("statement[] that 'Webb is … a racist' constitute[s] defamation *per quod*"); *City of Brownsville v. Pena*, 716 S.W.2d 677, 681 (Tex. App. 1986) (finding labeling someone "racist" defamatory), *rev'd on other grounds*, *Davis v. City of San Antonio*, 752 S.W.2d 518 (Tex. 1988); *Sabal v. Anti-Defamation League*, Civil Action No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 78354, at *14 (N.D. Tex. Apr. 30, 2024) (finding "ADL's accusation that Sabal espouses abhorrent [anti-Semitic] beliefs is plausibly harmful to his reputation and occupation—just like calling someone 'corrupt' in certain contexts carries the same potential harm").

There is a split among courts as to whether this constitutes *per se* or *per quod* defamation. In *Networks v. Edwards*, 2016 Tex. Dist. LEXIS 46393, *1 (Tex. Dist. Ct., 61st JD 2016), a bench trial-verdict found liability, where the defendant "unlawfully published defamatory statements about plaintiff on the internet, which are false, defamatory, and constitute **libel per se**, and that his doing so was wanton, willful, and malicious" including railing against plaintiff's alleged "Incompetence, Racist, and Bipolar Owners" (emph. added). But see *Baker v. Orange Panda, LLC*, No. 04-19-00846-

CV, 2020 Tex. App. LEXIS 8456, at *25-26 (Tex. App. Oct. 28, 2020) (finding on motion to dismiss that accusation that plaintiff "'is a racist' . . . constitute[s] defamation *per quod*").

Here, the Court should hold that Defendants' baseless accusations of "racism" caused Jackson *per se* reputational harm.  The evidence could not be more clear that Defendants' defamatory statements were "so obviously detrimental to [Jackson's] good name that a jury may presume general damages, such as for loss of reputation or for mental anguish."  *Morrison v. Quarrington*, No. 12-22-00302-CV, 2024 Tex. App. LEXIS 3996, at *23 (Tex. App. May 15, 2024) (citing *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018).)  Defendants attacked Jackson's professional competence, and he was ostracized throughout the community of his chosen academic specialty, music theory.  In fact, the Court may take judicial notice that charges of racism in the wake of the "Schenker" controversy made Timothy Jackson the reluctant, unintentional focus of local and national news.[2]

### D.  Faculty Defendants Endorsed the Student Petition as their Own

There can be no defense for the Faculty Defendants that their petition did not mention Jackson by name or state that he had committed racist "actions" and "behaviors."  By the plain language of the faculty petition, the Faculty Defendants republished and endorsed these statements in the student petition.

First, the republication of defamatory statements is itself a separate and distinct tort of defamation.  *Dixon v. Transp. Am. & Hireright*, LLC, Civil Action No. 3:22-CV-325-L, 2023 U.S. Dist. LEXIS 238837, at *17 (N.D. Tex. Feb. 17, 2023) (noting "each transmission or republication of a report . . . that contains the same alleged defamatory matter is a separate and distinct tort").  "[O]ne

---

[2] Michael Powell, Obscure Musicology Journal Sparks Battles Over Race and Free Speech, New York Times, February 14, 2021 available at https://www.nas.org/blogs/article/a-canceled-music-theorist-responds; Lucinda Breeding, A UNT Professor Challenged Claims of Racism in Music Theory, and Now He's Facing the Music, Denton Record-Chronicle, August 2, 2020, available at https://dentonrc.com/education/higher_education/a-unt-professor-challenged-claims-of-racism-in-music-theory-and-now-hes-facing-the/article_e7cdab75-c6cb-5972-878d-fea7e2fb8b9d.html.

who repeats a defamatory statement attributed to another cannot avoid liability merely by showing that the statement was made by the other person because, under the republication rule of defamation, one who repeats slander or libel from another endorses it." *Infowars, LLC v. Fontaine*, No. 03-18-00614-CV, 2019 Tex. App. LEXIS 9303, at *12 (Tex. App. Oct. 24, 2019) (finding allegations of false statements imputing that plaintiff was "CONFIRMED LIBERAL COMMIE" and identifying him as Parkland shooter pleaded *prima facie* case of defamation *per se*).

Whether publishing links to defamatory online content is republication is not extensively developed. But see *Glassdoor, Inc. v. Andra Grp., L.P.*, 575 S.W.3d 523, 529 (Tex. 2019) (holding "just as continuing to make a defamatory book available from a print publisher's stock is not republication, neither is continuing to make a defamatory article available on a website"). Typically, simply linking to or citing a defamatory publication is not enough to republish. See *Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840, 851 (N.D. Cal. 2020) (reposting hyperlink to defamatory material not necessarily republication without circulation to reach new audience or addition of new material); *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 913-14 (W.D. Ky. 2009) (merely referencing a prior article is not a republication).

However, the Faculty Defendants cannot hide behind a hyperlink. They did more than merely cite to or refer to the student petition. The faculty petition, at the very least, makes the Faculty Defendants liable for defamation by implication. "Texas law holds that '[f]or a court to subject a publisher to liability for defamation by implication, the 'plaintiff must make an especially rigorous showing' of the publication's defamatory meaning.'" *Sabal v. Anti-Defamation League*, Civil Action No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 78354, at *9, *11-*12 (N.D. Tex. Apr. 30, 2024) (finding actionable publication of statements that plaintiff was "known to peddle anti-Semitic beliefs") (quoting *Tatum*, 554 S.W.3d at 633). Specifically, to qualify as defamation by implication, Timothy Jackson must "point to 'all additional, affirmative evidence' within the publication itself

that suggests the defendant '***intends*** or ***endorses*** the defamatory inference'" (emph. added.)  *Id.* at *9 (quoting *Tatum* 554 S.W.3d at 635).

In this analysis "a court should examine the publication's 'gist,' that is, 'constru[ing] the publication "as a whole."'" *Beneficient v. Gladstone*, No. 6:23-cv-376-JDK, 2024 U.S. Dist. LEXIS 91703, at *10 (E.D. Tex. May 22, 2024) (quoting *Tatum*, 554 S.W.3d at 620).  The "gist" refers to a publication's "main theme, central idea, thesis, or essence."  *Id.*  And a "publication's gist can still be defamatory if the publication 'omit[s] material facts or juxtapos[es] facts in a misleading way.'" *Id.* at *11 (quoting *Tatum* at 627).

Here, Timothy Jackson does not hang his hat on simply showing that Faculty Defendants posted a hyperlink to the student's defamatory petition.  Clear, convincing, and undisputed evidence shows that the Faculty Defendants expressly endorsed the students' defamatory publication as their own.  Where a defendant not only links to defamatory content but expressly endorses or ratifies it—as the Faculty Defendants did here—this constitutes defamatory republication.  See e.g., *Tatum* at 635.

Here, Jackson can "also 'point to "additional, affirmative evidence" within the publication itself that suggests the defendant "intends or endorses the defamatory inference."'" *Sabal*, 2024 U.S. Dist. LEXIS 78354, at *9.  See also *McDonald v. Raycom TV Broad., Inc.*, 665 F. Supp. 2d 688, 690 (S.D. Miss. 2009) ("as a general rule, one who repeats a defamatory statement attributed to another cannot avoid liability merely by showing that the statement was made by the other person because, under the republication rule of defamation, one who repeats slander or libel from another ***endorses it***" (emphasis added)).

No complicated exegesis is required.  The Faculty Defendants' petition literally states: "***We endorse*** the call for action outlined in our students' letter" (emph. added).  (**Exhibit C** at Page ID 284.)  Thus, because Jackson can show that the Faculty Defendants expressly endorsed and ratified

the student petition in plain language, they are equally liable for the students' defamatory petition. And the Faculty Defendants did not just expressly "endorse" the student petition. The Faculty Defendants specifically repeated, "Responsible parties must be held appropriately accountable," where the "gist" indicates that the only responsible party identified by name in the student's call for action was Timothy Jackson. (**Exhibit C** at Page ID 284.) The Faculty Defendants also proclaimed their "solidarity with our graduate students in their letter of condemnation of the Journal of Schenkerian Studies." (*Id.*)

There is no ambiguity. The "gist" indicates that the Faculty Defendants' statements targeted and smeared their colleague, Jackson, who was personally associated with the foundation of the JSS and its mission of Schenkerian analysis. Notably absent is any factual support for their smear campaign; in fact, all they do is rely on and endorse the student petition. (*Id.*)

The Faculty Defendants also added additional defamatory material of their own, claiming, for example, that Ewell was not allowed to respond in the pages of the JSS. (*Id.*) All defendants had affirmative knowledge that Philip Ewell received the call for papers for Volume 12 just like any other member of the Society for Music Theory. (See e.g. **Exhibit F**, Ewell Dep, 138:1-21.) Signatories to the faculty petition (Chung, Cubero, Graf, and Bakulina) had personally participated in drafting the call for papers, but they signed onto the statement that Ewell was not permitted to participate, notwithstanding affirmative knowledge that this was false. Moreover, Ewell also declared that he would not read anything in Volume 12 and refused to participate, which he expressly told a journalist of the Denton Record-Chronicle.[3] So what could have been the point of issuing an engraved invitation to Ewell in any case?

---

[3] Lucinda Breeding, A UNT Professor Challenged Claims of Racism in Music Theory, and Now He's Facing the Music, Denton Record-Chronicle, August 2, 2020, available at https://dentonrc.com/education/higher_education/a-unt-professor-challenged-slick furthermore, this claims-of-racism-in-music-theory-and-now-hes-facing-the/article_e7cdab75-c6cb-5972-878d-fea7e2fb8b9d.html.

The fundamental principle underlying Texas defamation law is that the faculty's express endorsement is republication.  Here, the Faculty Defendants literally endorsed the defamatory material of their graduate students, indicating republication of the students' defamatory statements as their own.

### E.  Protected Speech and "Actions" or "Behaviors" Are Legally Distinct

Defendants have no defense in truth.  First, there is no truth to their baseless accusations of "racist" actions and behavior.  The only "action" or "behavior" that Defendants can come up with is that Jackson said things they don't like to hear, i.e., protected speech, which they call "racist." (Exhibit FF, No. 12.)  It is irrelevant that this claim is also baseless because "actions" and "behavior" are distinct from speech.  Defendants' complaints about speech provides no affirmative defense.

This Court cannot allow Defendants to dissolve the distinction between "actions" and speech or expression, long established in American jurisprudence.  For example, in *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968), the United States Supreme Court distinguished speech and action as well as incidents in which "'speech' and 'nonspeech' elements are combined in the same course of conduct."  *Id.* at 376.  There, a protester, O'Brien, publicly burned his draft card and claimed this was symbolic opposition to the Vietnam War.  *Id.* at 369-370.  He was prosecuted under an Ohio statute that prohibited the mutilation of draft cards, which were issued to promote administrative efficiency in the draft.  *Id.*  There, the court distinguished "the action"--burning the draft card--from expression.  O'Brien, the court held, was arrested and convicted "[f]or this noncommunicative impact of his conduct, and for nothing else."  *Id.* at 382.  In that case, O'Brien could well be accused of something like an "unpatriotic action."  O'Brien did in fact engage in recognizable "action" such as burning a draft card.  Yet here, all Professor Jackson has done is speak through the pages of the JSS—which is precisely why Defendants have clamored for his censorship.

22

That expression cannot be action (not only in the law but in common sense) becomes clearer in a case decided the year after *O'Brien*. *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969). In *Brandenburg*, the State of Ohio convicted a Ku Klux Klan leader under a criminal statute for publicly holding forth at an organizers' meeting. Unlike Professor Jackson, the Ku Klux Klan leader was a real "racist" rather than merely a purveyor unpopular ideas in academia. But however repugnant the Klansman's speech, all he did was speak, e.g., "[I]f our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [sic.] taken." *Id.* at 446.

Unlike *O'Brien*, who engaged in overt action (public draft-card burning); here there was no overt action. There was nothing more than "mere abstract teaching of the moral propriety or even moral necessity for resort to force and violence"; it was not action itself. *Id.* at 448 (quoting *Noto v. United States*, 367 U.S. 290, 297-298 (1961)). The Ku Klux Klan's maundering was not even "preparing a group for violent action and steeling it to such action." *Id.* In short, speech is not action. Under the First and Fourteenth Amendments, the state may not "punish mere advocacy" nor "assembly with others merely to advocate . . ." *Id.* at 449.

Thus, Professor Jackson's speech, which was not racist in any case, cannot be reasonably or legally construed as "action" or "behavior." First, creating or disseminating speech is also a form of speech. *Bartnicki v. Vopper*, 532 U.S. 514, 526-527 (2001) (holding that the disclosure and publication of information are forms of speech). So too are editorial functions—e.g., decisions that go into "select[ing] and shap[ing] other parties' expression" into one's "own curated speech product[]." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2024).

Defendants could have attacked Jackson's ideas. Defendants could have published rebuttals. Instead they simply accused him of being a racist based on non-existent, imaginary actions and behaviors.

They could have, by way of example, tried to show with facts that black families typically ***do teach*** their children classical music, if this was something that they found objectionable. (Compare, **Exhibit E** (Jackson article) at 164.) Defendants never did, no doubt because Timothy Jackson's statements are actually true. As black intellectuals and musicians such as Coleman Hughes have noted, minorities such as Asians are overrepresented in classical music because they are disproportionately exposed to classical music from an early age whereas black Americans are not.[4]

Defendants could have also tried to refute Jackson's factual assertions that anti-Semitism and misogyny is prevalent in Black cultural forms of music such as rap and hip-hop. They have not, likely because this is also true, as Kareem Abdul-Jabbar has also argued.[5] Defendants have always avoided engaging Jackson's ideas in favor of assassinating his character and posturing on social media. This is precisely because their character assassination has always been based on magical thinking rather than fact.

Identifying Jackson's protected speech as "actions" or "behaviors" to justify defaming him flies in the face American law that clearly distinguishes "action" from "speech."

## F. No Defense of "Opinion"

Defendants cannot hide behind a traditional opinion defense.

Defendants published statements that, at the very least, implied that Timothy Jackson engaged in racist "behavior" and "action"--of which there was none--not to mention "extortion." Yet all Defendants can point to is Professor Jackson's publication in the Symposium that they disagreed with, or more accurately, wished were not true. The Faculty Defendants also aver that

---

[4] Coleman Hughes, The End of Race Politics: Arguments for a Colorblind America (2024), 112 ("Why are approximately 80% of the world's pianist Chinese, when the Chinese comprise only 18% of the world population?… The answer has to do with culture: mastery of classical concert piano is highly valued in modern Chinese culture. A higher proportion of parents start the kids on piano at a young age, and those kids are reinforced by the fact that many of their friends play piano as well").

[5] "Where Is the Outrage over Anti-Semitism in Sports and Hollywood?" The Hollywood Reporter, July 14, 2020, Available at https://www.hollywoodreporter.com/lifestyle/lifestyle-news/kareem-abdul-jabbar-is-outrage-anti-semitism-sports-hollywood-1303210/.

Professor Ewell was not invited to contribute to the Symposium, a statement known to be false when made. These are not opinions. All are statements of objective fact, subject to disproof.

Furthermore, "Texas law makes clear that this determination depends on context, which may reveal that an opinion instead functions as a factual assertion." *Sabal v. Anti-Defamation League*, Civil Action No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 78354, at *12 (N.D. Tex. Apr. 30, 2024) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 582, 585 (Tex. 2002) (holding that calling someone "corrupt" is actionable defamation based on defamatory publication's context because a reasonable reader could view the statement as an assertion of fact).

Furthermore, the Defamation Defendants defamed Professor Jackson with actual malice. *Thorpe v. Alsaeed*, NO. 01-99-00549-CV, 2000 Tex. App. LEXIS 3085, at *21 (Tex. App. May 11, 2000) ("In the defamation context, a statement is made with actual malice when it is made with knowledge that it is false, or with reckless disregard to whether it is false"). The Individual Defendants have all admitted to no knowledge of racist actions or behavior, let alone "extortion." Furthermore, Defendants Diego Cubero, Ellen Bakulina, Benjamin Graf, and Andrew Chung all worked on the Call for Papers sent to everyone in the Society for Music Theory to solicit papers for the Symposium. The recipients of the call undisputedly included Ewell. There is no evidence that anyone opposed publishing Ewell in the pages of the JSS. Yet these Defendants said nothing while working with Timothy Jackson to generate the call for papers, but they then turned on him to call him "racist" for not "inviting" Ewell, knowing full well that Ewell received the call for papers like everyone else.

The Court should reject Defendants' argument that an opinion defense shields baseless, knowingly false claims conjuring sinister, non-existent actions and behaviors as "racist."

### G.  Timothy Jackson Has Suffered Damages

The broad standard for defamation damages has already been briefed to this Court in Plaintiff's Opposition to the State's Daubert Motion, which is hereby incorporated by reference. ECF No.74.

Defamation law admits broader evidence of damages than other tort claims because reputational harm is at issue.  This is because the principal damage is to "reputation and standing in the community, personal humiliation, and mental anguish and suffering,' for which 'there is plainly no logical method for expressing . . . in dollars and cents.'"  Sack on Defamation, § 10:1 (5th ed. 2017) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–49 (1974)); *see also Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002) ("Non-economic damages like [damage to character and reputation] cannot be determined by mathematical precision.").

Because reputational harm is often intangible, evidence as to defamation's impact on the Plaintiff is particularly relevant.  One example is diminished job opportunity.  *See e.g. Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 427 (Tex. 2022) (explaining that "[t]he evidence must show that people believed the statements and the plaintiff's reputation was actually affected," surveying cases in which damages were based on evidence of lost job opportunities).  Likewise, loss of time (or, here, the damage caused by Defendants in terms of Professor Jackson's need to devote **more time** and personal resources to maintain his research and scholarship) is compensable.  "[H]arm to earning capacity" counts as "damages for pecuniary harm"; and it may be measured by "[t]ime losses."  *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014).

It makes no sense, as the State maintains, that the time lost by forcing Professor Jackson to work **more** for the same compensation may not be recovered as damages.  And the State does not dispute that Professor Jackson has suffered an increased teaching load and the withdrawal of a .50

FTE on which he formerly relied to sustain his scholarly productivity.  The State has merely argued that Defendants can do this to Professor Jackson if they want to.

Moreover, even if the defamation of Jackson is considered only *per quod*, the standard for what counts as evidence of damages is lenient.  As explained by the Texas Supreme Court,

> . . . in a defamation case, when the damages are for non-economic losses, such as mental anguish or lost reputation, the jury must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure.  But the evidence of loss of reputation should be more than theoretical — there must be evidence that people believed the statements and the plaintiff's reputation was actually affected.

*Klocke*, 2021 U.S. App. LEXIS 36482, at *20 (internal quotations omitted); *Brady v. Klentzman*, 515 S.W.3d 878, 886-87 (Tex. 2017) (defining broad standard for evidence of reputational harm where the court "assume[d] . . . that actual damages are an essential element of [plaintiff's] claim," i.e. as in defamation *per quod*.)

There can be no dispute that Timothy Jackson has suffered damage to his reputation.  He has also suffered the extinguishment of his life's work, the JSS.  Defendants caused UNT to increase Jackson's teaching load, and Defendants caused UNT to strip him of a .5 FTE Research Assistant, not to mention imposing increased difficulty on Jackson that he has faced publishing his work due to Defendants' malicious lies.

Although the **amount** of Timothy Jackson's damages will remain a triable issue of fact, Timothy Jackson clearly satisfies the last element of defamation.  Furthermore, at the very least on the false accusation of "extortion," he need not prove specific or special damages because this falsely accused Jackson of a crime and is defamation *per se*.  *Klocke*, 2021 U.S. App. LEXIS 36482, at *18 ("Examples of defamation *per se* are accusing someone of a crime"); *D Magazine Partners, LP. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2018) (same).

## III.  CONCLUSION

For the foregoing reasons, the Court should rule as a matter of law that all Individual

Defendants are liable for defamation and order trial on the issue of damages.

Respectfully submitted,

DATE: December 20, 2024

/s/Michael Thad Allen
_____
Michael Thad Allen, Esq.
D. Conn. Bar No. CT29813
admitted *pro hac vice*
Lead Attorney
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT  06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
m.allen@allen-lawfirm.com

Jonathan Mitchell
Texas Bar No. 24075463
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

for PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the date specified in the caption of this document, I electronically filed the foregoing with the Clerk of Court, to be served on all parties of record via the CM/ECF system.

/s/Michael Thad Allen
_____
Michael Thad Allen

28

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel has complied with the meet and confer requirement in Eastern District of Texas Local Rule CV-7(h).  The instant motion is opposed.

/s/Michael Thad Allen
Michael Thad Allen