| | |
|---|---|
| **Timothy Jackson**,<br><br>Plaintiff,<br><br>v.<br><br>**Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**,<br>Defendants. | Case No. 4:21-cv-00033-ALM<br><br>Date: December 20, 2024 |

**TIMOTHY JACKSON'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY FOR DEFAMATION**

**I.   UNDISPUTED FACTS CONCERNING THE "SCHENKER" CONTROVERSY**

1. Old relevant times to this litigation, Timothy Jackson was Distinguished University Research Professor of Music Theory at the University of North Texas (UNT), in the College of Music.  (Affidavit of Timothy Jackson, ECF No. 1-1 ("First Jackson Affidavit," attached to these papers as **Exhibit A**), ¶ 1; **Exhibit** B ("Jackson Dep"), 32:5-34:5.)

2. Approximately 25 years ago, Timothy Jackson started the Journal of Schenkerian Studies (JSS).  (Jackson Dep., 155:1-18; 173:17-22; ECF No. 1-5, attached for convenience as **Exhibit C,** at Page ID#: 267.)

3. Bill Gates insulation after July 25, 2020, the University of North Texas press published the JSS.  (Id.)

1

4. The JSS has traditionally been run by a graduate student editor, under the supervision of its Advisory Board consisting of Professor Jackson and his colleague Stephen Slottow. (**Exhibit D** at UNT_000848; Jackson Dep, 168:21-169:11.)

5. On July 25, 2020, Volume 12 of the JSS appeared, which included a special "Symposium" in which Timothy Jackson published an article, "A Preliminary Response to Ewell." (**Exhibit E**, also avail. at ECF No. 1-4 at Page ID: 209-218.)

6. Timothy Jackson's article in volume 12 of the JSS addressed the 2019 plenary presentation at an annual conference of the Society for Music Theory delivered by City University of New York Professor Philip Ewell. (*Id.*)

7. The 2019 plenary paper delivered by Philip Ewell at the annual conference of the Society for Music Theory was subsequently published without peer review (and without controversy) in a journal of the Society for Music Theory called Spectrum. (**Exhibit F**, ("Ewell Dep"), 33:17-34:9; 35:25-42:9; 122:22-23; 256:5-258:10; **Exhibit G** ("Bakulina Dep"), 45:6-47:7; 49:1-50:7; 51:1-25 and **Exhibit H** (un-peer-reviewed Ewell article in Spectrum).)

8. Immediately after the Symposium in Volume 12 of the JSS became public, UNT graduate students and faculty claimed that Timothy Jackson's article in particular, and the "epistemic center" of the JSS in general, was "racist." (See e.g., **Exhibit I** (July 27, 2020-July 30, 2020 tweets between Defendant Virani and Defendant Gain).)

9. No one who attacked Professor Jackson and the JSS took up the pen to refute Professor Jackson's ideas. (No record evidence can be cited to prove the negative on this undisputed fact; Defendants can produce no record evidence to refute this fact.)

10. No evidence indicates that any Individual Defendant published a scholarly article to refute Professor Jackson or criticize his ideas which would require evidence and rational argument. (See e.g., **Exhibit J** ("Geoffrey-Schwinden Dep"), 64:14-65:8 (unable to testify as to whether hip-

hop, rap, or jazz originated as an African American art form); *id.*, 113:6-16 (professing "I don't understand" what she meant by writing "epistemic center of Volume 12 of the Journal of Schenkerian Studies" being "racist discourse"); **Exhibit K** ("Chung Dep"), 95:5-96:11 (after equivocation about the meaning of "empirical evidence" admitting he knows of no empirical evidence that there was an intention to exclude Philip Ewell from publishing in the JSS); **Exhibit G** ("Bakulina Dep"), 64:24-65:17 (admitting to no knowledge of statistical or empirical evidence that black families as a whole in the United States do or do not expose their children to classical music).

11. Instead, pressing Timothy Jackson in traditional venues of scholarship, Defendants instead reacted to Volume 12 of the JSS via Twitter and Facebook in a moral panic. (See e.g., Chung Dep, 57:17-25; **Exhibit M** (email thread of July 25, 2020) at UNT_000302; **Exhibit I**.)

12. No known editorial policy of UNT makes Twitter or other social media some sort of editorial authority over journals published by the UNT press. (See e.g., Chung Dep, 60:12-17.)

13. After publication of Volume 12 of the JSS, graduate students and then faculty circulated petitions calling for Professor Jackson to be fired, the JSS to be shuttered, and the Center for Schenkerian Studies, a center maintained by UNT that housed the JSS, to be closed. (**Exhibit I**, **Exhibit C** at Page ID#: 282-283 (Graduate Student Petition); Page ID#: 284-285 (Faculty Petition).)

14. The Dean of the College of Music testified in open court that the JSS has been put "on ice"—in other words, censored by the State of Texas. (*Jackson*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *8 and n.2 (E.D. Tex. Jan. 18, 2022).)

15. A graduate student petition first circulated online on July 27, 2020, two days after the publication of the Symposium and then again in a different form (at least by July 30, 2020) to the Dean of the College of Music, John Richmond, and Jackson's immediate Department Chair,

Benjamin Brand.  (**Exhibit I**; **Exhibit L** ("Brand Dep"), 121:15-123:18 and **Exhibit M** (email of July 30, 2020 with petition attached).)

16. A student petition was sent on July 29, 2020 to all graduate students, probably about forty people.  (**Exhibit N** ("Kohanski Dep"), 18:2-19 and **Exhibit O** (email of July 29, 2020 distributing student petition).)

17. Defendant Rachel Gain participated in drafting and circulating the student petition. (Kohanski Dep, 23:9-15; **Exhibit P** ("Gain Dep"), 40:25-41:3.)

18. Defendant Gain was a UNT graduate student who had no direct interaction with Timothy Jackson other than to see him in UNT's hallways.  (Gain Dep, 6:4-7.)

19. Defendant Gain signed and endorsed the student petition.  (*Id.*, 41:4-5; Brand Dep, 121:15-123:18 and **Exhibit M**.)

20. Defendant Gain circulated a version of the student petition on Twitter as early as July 27, 2020.  (Gain Dep, 9:6-20, **Exhibit I**.)

21. A faculty petition first circulated at least by July 30, 2020.  (**Exhibit I**, Geoffrey-Schwinden Dep, 86:9-15 and **Exhibit Q** (Ex. 7 to Geoffrey-Schwinden Dep) at UNT_000417; Exhibit R (Dean Richmond response to Geoffrey-Schwinden of July 31, 2020).)

22. The faculty petition circulated on July 30, 2020 republish the student petition via hyperlink to a version posted online, which can still be found at

> https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view

(**Exhibit C** at Page ID# 284; Geoffrey Schwinden Dep, 97:21-99:17 and **Exhibit S** (Ex. 9 Ewell to Geoffrey-Schwinden Dep).)

23. Almost immediately after receiving the student petition and faculty petition, Dean John Richmond of the School of Music and Timothy Jackson's Department Chair, Benjamin Brand, announced a "formal investigation … concerning the conception and production of the most recent

issue of JSS" in the name of "combating racism on campus and across all academic disciplines." (**Exhibit R**; **Exhibit T**.)

24. The announcement of a formal investigation concerning the conception and production of the most recent issue of the JSS was published on UNT's website. (*Id.*)

25. Benjamin Brand removed Timothy Jackson from the JSS, and the Journal has been shuttered ever since. (ECF No. 1-22 at Page ID 345 (attached as **Exhibit U** for convenience); see also *Jackson*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *8 and n.2 (E.D. Tex. Jan. 18, 2022).)

26. After the JSS was put on ice by UNT, Timothy Jackson was forced to teach an extra class each year, from which he had formerly been released to free his time for the JSS's scholarly activities, activities on which he is evaluated every year. (**Exhibit V**.)

27. Department chair Benjamin Brand's three-year evaluation of Timothy Jackson noted:

> Dr. Jackson is an active scholar engaged with an impressive variety of topics and repertoires. Among his most important contributions were his article published in the *Journal of Schenkerian Studies*, of which one was the length of a small monograph and another was co-authored.

(*Id.*; **Exhibit W;** see also **Exhibit X** (evaluating Jackson's direction of CSS and JSS).)

28. Prior to July 2020, Research Assistant Levi Walls served as student editor of the JSS. (**Exhibit A**, ¶¶ 16, 28-30.)

29. After July 25, 2020, Research Assistant Levi Walls quit his job as student editor of the JSS. (Chung Dep, 138:15-140:14.)

30. After July 25, 2020, when Research Assistant Levi Walls quit, he was never punished for quitting his job. (Id)

31. After July 25, 2020, Research Assistant Levi Walls was transferred to other duties and continued to get paid. (*Id.*)

32.     The value of the RA-ship stripped from the service to Timothy Jackson and the JSS was compensated as a .50 Full-Time Equivalent (FTE), or $12,800.00-19,626.64 per year, depending on the year.  (**Exhibit W** ("2d Affidavit of Jackson"), ¶¶ 4-8, and exhibits; ECF Note.70-1 at Page ID# 1216-1217; Brand Dep, 89:14-25.)

33.     Since July 25, 2020, there is no .50 FTE research Assistant assigned to the Center for Schenkerian Studies and Journal of Schenkerian Studies, which has ceased publication.  (**Exhibit W**, ¶¶ 4, 7; **Exhibit A**, ¶¶ 124-138; *Jackson*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *8 and n.2 (E.D. Tex. Jan. 18, 2022).)

34.     The Defendants' smear campaign damaged Timothy Jackson's reputation, making it harder for him to publish.  (2d Affidavit of Jackson, ¶¶ 8-10.)

35.     Graduate students who had signed up to work with Timothy Jackson now shun him, whether out of sincere belief in the defamatory accusations lodged against him or out of fear that the social media mob and ideologues who targeted Timothy Jackson will target them by association. (Jackson Dep, 89:11-21; 238:9-14; ECF No. 1-14 at Page ID#: 318.)

36.     In their smear campaign, Defendants accused Timothy Jackson of specific (nonexistent) actions, (fictitious) behaviors, even the crime of "extortion," as well as other falsehoods subject to objective confirmation or disproof.  (**Exhibit C**, page ID #282-285.)

## II. THE PETITIONS DEFAMING TIMOTHY JACKSON

### A. The First Student Petition

37.     The first student petition announced, "moral imperatives that can no longer be ignored."  (**Exhibit O** at Page ID#: 451.)

38.     The first student petition called for action to "dissolve the JSS, dismiss Dr. Timothy Jackson, make substantial changes to the Center for Schenkerian Studies (CSS), [and] implement

consequences for those involved in the publication of the most recent issue of the JSS." (**Exhibit O** at Page ID#: 451.)

39. The first student petition included the following defamatory statements, each of which asserts objective facts, subject to proof or disproof, for which no evidence has ever been presented and for which Defendants admit no evidence exists:

- "Dr. [Philip] Ewell was neither notified nor asked to respond, as is standard academic practice."

- Timothy Jackson was guilty of "past bigoted behaviors"— what specific "behaviors" have never been identified other than Jackson's publishing views that hurt the graduate students' subjective feelings.

- Timothy Jackson "has a history of racist, sexist, and abusive behavior in his many capacities"—what specific behavior has never been identified other than Jackson's publishing views that hurt the graduate students' subjective feelings.

- Timothy Jackson committed "Extortion."

(*Id.* at Page ID#: 451-452.)

### B. Second Student Petition

40. The second student petition issued a call to action for UNT to "immediately take the following steps," which included dissolving the JSS as well as a call for "the discipline and potential removal of faculty who used the JSS platform to promote racism." (**Exhibit C** at Page ID 282-283.)

41. The second student petition made the following defamatory statements, each of which asserts objective facts, subject to proof or disproof, for which no evidence has ever been produced in discovery and for which the Defendants admit no evidence exists:

- Timothy Jackson had committed "past bigoted behaviors"—what specific "behavior" has never been identified other than publishing views that hurt students' subjective feelings.

- "Specifically, the actions of Dr. Jackson— both past and present— are particularly racist and unacceptable"—what specific actions have never been identified other than publishing views that hurt students' subjective feelings.

(**Exhibit C** at Page ID#: 283.)

    **C. The Faculty Petition**

42. UNT published the faculty petition to its official website, and it was published elsewhere by the Society for Ethnomusicology to the broader public.[1] (**Exhibit C** at Page ID#: 284-285.)

43. The faculty petition begins, "We, the undersigned faculty members of the University of North Texas Division of Music History, Theory, and Ethnomusicology, stand in solidarity with our graduate students in their letter of condemnation of the Journal of Schenkerian Studies." (**Exhibit C** at Page ID#: 284.)

44. All Faculty Defendants signed the faculty petition. (**Exhibit C** at Page ID#: 284-285.)

45. In the faculty petition, the Faculty Defendants expressly "endorse[d] the call for action outlined in our students' letter." (**Exhibit C** at Page ID#: 284.)

46. The faculty petition reiterated, "Responsible parties must be held appropriately accountable." (Id.)

47. the faculty petition stated the following false statement as objective fact: "The fact that he [Philip Ewell] was not afforded the opportunity to respond in print." (*Id.*)

**III.   DEFENDANT GEOFFREY-SCHWINDEN CRAFTS THE FACULTY PETITION TO FULLY ENDORSE THE STUDENT'S DEFAMATORY STATEMENTS**

48. The faculty petition went through four drafts. (Geoffrey-Schwinden Dep, 92:21-116:4 and **Exhibit Y.)**

49. Defendant Geoffrey-Schwinden illegal role among the Faculty Defendants in drafting the faculty petition. (Id.)

---

[1] Avail. at https://www.ethnomusicology.org/news/519784/Statement-of-UNT-Faculty-on-Journal-of-Schenkerian-Studies.htm

50. Defendant Geoffrey-Schwinden could not testify with any specificity about the four drafts of the faculty petition she had crafted. (Geoffrey-Schwinden Dep, 92:21-116:4 and **Exhibit Y**; Bakulina Dep, 174:23-175:20.)

51. Defendant Geoffrey-Schwinden could not even say if her colleagues commented on her drafts. (Geoffrey-Schwinden Dep, 104:19-25.)

52. Each of Geoffrey-Schwinden's drafts of the faculty petition strengthened the Faculty Defendants' endorsement of the student petition.

53. Geoffrey-Schwinden's first draft of the faculty petition stated: "We support and we believe our graduate students. Read their statement and demands here: [URL link]." (**Exhibit Y** at UNT_00427.)

54. The first draft of the faculty petition did not include any statement that the Faculty Defendants stood "in solidarity" with the student petitioners as did the final, signed draft. (*Id.*)

55. The first draft of the faculty petition include a call for action that "[r]esponsible parties must be held appropriately accountable." (*Id.*; compare **Exhibit C** at Page ID# 284.)

56. The first draft of the faculty petition said, "Continued action is necessary," and "We invite you to be in dialogue with us…" (*Id.*)

57. The second draft of the faculty petition led off with:

> We, the undersigned faculty members from the University of North Texas Division of Music History, Theory, and Ethnomusicology, are dismayed by the uncritical, unscholarly, and racist treatment that Prof. Philip Ewell and his pioneering work endured in the recent issue of the Journal of Schenkerian Studies, published by the Center for Schenkerian Studies and the University of North Texas Press.

(*Id.*)

58. In the second draft of the faculty petition, Geoffrey-Schwinden dropped the "believe our graduate students" language. (*Id.* at UNT_000427.)

59. In the second draft of the faculty petition, the invitation to remain "in dialogue" disappeared. (Id.)

60. In the second draft of the faculty petition, the hyperlink to the student petition and the faculty's express "support" remained

61. In the second draft of the faculty petition, Geoffrey-Schwinden referred to an unspecified "mandatory administrative process to address this internally"; the petition also stated that "continued action is necessary," which she later claimed to know nothing about. (*Id.* at UNT_000428; Geoffrey-Schwinden Dep, 108:24-109:2.)

62. By the third draft of the faculty petition, Geoffrey-Schwinden began with, "We, the undersigned faculty members . . . denounce. . ." (**Exhibit Y** at UNT_000429.)

63. In the third draft of the faculty petition, Defendant Geoffrey-Schwinden retained the relatively weak language "support[ing]" the graduate student petition. (Id.)

64. The fourth and final draft of the faculty petition began with a declaration that the Faculty Defendants "**stand in solidarity with** our graduate students in their letter of condemnation…" (emph. added). (*Id.* at UNT_000430.)

65. The Faculty Defendants all signed the fourth and final draft of the faculty petition. (*Id.* at UNT_000430-UNT_000431.)

66. The signed, four draft of the faculty petition expressly "endorse[s] the call for action outlined in our students' letter." (*Id.*; Geoffrey-Schwinden Dep, 113:17-114:3.)

67. The plain language of the fourth faculty petition indicates that the Faculty Defendants gave their unambiguous endorsement of the student petition which was incorporated by reference by URL link. (*Id.*)

68.     The fourth faculty petition endorsed, at the very least, that part of the student petition which is a call for action, clamoring for Jackson, by name, to be disciplined and punished and attributing (never specified) "especially" racist "actions" and "behaviors."  (Id.)

69.     A specific section of the Student Petition (which the final faculty petition incorporated by reference) is headlined: "We also call on the University of North Texas . . . to take the following actions."  (**Exhibit C** at Page ID 283.)

70.     The headline of the student petition which reads, "We also call on the University of North Texas . . . to take the following actions."  is literally a "call for action."  (Id.)

71.     The graduate students' call for action has three numbered paragraphs:

> 1)    "**Dissolve the JSS**" (which UNT swiftly accomplished);
>
> 2)    "**Critically examine the culture in UNT, the CoM [College of Music], and the MHTE division, and act to change our culture**"; and
>
> 3)    "**Hold accountable every person responsible for the direction of the publication**" (which UNT also swiftly accomplished by removing Timothy Jackson from the Journal).

(Emph. in orig.; *id.*)

72.     In its fourth draft and final form, the Faculty Petition included language demanding, "Responsible parties must be held appropriately accountable"— tracking almost verbatim the students' call for action Nr. 3, which expressly identifies Timothy Jackson by name.  (*Id.*)

73.     The faculty petition contains the following clause following their endorsement of the student petition:

> . . . which asks that the College of Music 'publicly condemn the issue and release it freely online to the public' and 'provide a full public account of the editorial and publication process, and its failures.'

(**Exhibit Y** at UNT_000430.)

74.     After being sued and obtaining free legal services from the Texas Attorney General's Office, defendants now aver that the dependent clause in Undisputed Fact No. 72 somehow

qualifies their endorsement of the student petition.  (See e.g., Geoffrey-Schwinden Dep, 114:11-115:17 (testifying dependent clause "would appear" to limit the faculty endorsement.)

75. The Faculty Defendants' plain language in the fourth and final draft of the faculty petition contains no express limitations on their endorsement of the student petition.  (**Exhibit Y** at UNT_000430.)

76. In the fourth and final draft of the faculty petition, the Faculty Defendants' redoubled their emphasis in the final sentence of the paragraph endorsing the student petition, calling for UNT to hold "responsible parties" [i.e. Timothy Jackson] "appropriately accountable."  (*Id.*)

77. The faculty petition's author, Defendant Geoffrey-Schwinden, testified that the faculty did not insist on any language, such as "only" or "partially," which might have specifically limited their endorsement of the student petition.  (Geoffrey-Schwinden Dep, 115:18-21.)

78. Defendant Geoffrey-Schwinden could not remember any discussion among the Faculty Defendants about limitations on their endorsement.  (*Id.* at 115:25-116:4.)

79. Contemporaneous documents discuss the faculty's concerns about the breadth and comprehensiveness of their endorsement.  (**Exhibit Z**.)

80. Contemporaneous documents evince **no** preoccupation among the Faculty Defendants with limiting or qualifying their condemnation of Timothy Jackson or calls for his professional destruction.  (Id.)

81. Contemporary documents in which the Faculty Defendants discussed limitations on their endorsement of the student petition were not concerned to limit their endorsement of the students' "call to action."  (Id.)

82. Contemporaneous documents and the fourth and final draft of the faculty petition clearly wanted Timothy Jackson to be disciplined, terminated, and condemned for supposed "racist" actions and behaviors. (*Id.*)

83. The Faculty Defendants endorsed the student petition without qualification, without dissent. (Id.)

### IV. UNT ADMITS THERE IS NO EVIDENCE OF EXTORTION

84. Before Defendant Gain even arrived at UNT, she predetermined that Professor Jackson was a "piece of shit." (Gain Dep, 52:6-8.)

85. Defendant Gain based her determination that Timothy Jackson was a "piece of shit" on rumors. (*Id.* at 52:9-54:4.)

86. Defendant Gain had no direct experience of Professor Jackson's classes, which she avoided. (Id.)

87. Defendant Gain testified that she had no direct knowledge of the following specific factual information:

- The specific "procedures used to publish Volume 12 of JSS."

- "[B]igoted behaviors of UNT faculty."

- "Dr. Jackson's actions, both past and present, [that] are racist and unacceptable."

- "Extortion through grade manipulation, threats to students' careers and reputations."

(*Id.* at 56:20-57:2; 57:6-9; 57:18-24; 58:3-10.)

88. Defendant Gain averred that she "wasn't in the country at the time." (*Id.* at 58:10.)

89. Defendant Gain endorsed the various student petitions simply because she "trust[ed] [her] colleagues." (*Id.* at 28:17-23; 41:4-5 (specifically referring to **Exhibit AA**, Kohanski_000107-Kohanski_000110).)

90. All Faculty Defendants admit that they have no knowledge of any extortion committed by Timothy Jackson. (**Exhibit BB**, Defendants Answer to Request for Admission No. 4.)

91. Former Department chair Frank Heidelberger admits that he has no knowledge of any extortion committed by Timothy Jackson. (**Exhibit CC**, Heidlberger Dep, 9:9-14; 81:14-83:2.)

92. Defendant Heidlberger testified that he knows of no racist, sexist, or misogynistic behavior committed by Jackson that he could identify either. (*Id.*)

### V. JACKSON UNT CANNOT PRODUCE EVIDENCE THAT TIMOTHY JACKSON ENGAGED IN "RACIST ACTIONS" OR "RACIST BEHAVIORS"

93. UNT Department Chair Benjamin Brand, who removed Timothy Jackson from the JSS, "cannot identify any of Dr. Jackson's actions or behavior that I know to be racist." (Brand Dep, 125:21-22.)

94. Defendant Geoffrey-Schwinden "d[id]n't recall specific people calling Tim [Jackson] a racist"—although her own draft documents indicate she was perfectly comfortable calling him a racist herself in July 2020. (Geoffrey-Schwinden Dep, 62: 19-20; **Exhibit Y**.)

95. Defendant Geoffrey-Schwinden testified that "maybe some of the writing in the article" was "particularly racist"; but she could not identify any specific actions that Dr. Jackson had committed that were "particularly racist." (*Id.* at 120:25-121:7.)

96. Defendant Geoffrey-Schwinden did not experience or witness any "bigoted behaviors" of Timothy Jackson. (*Id.* at 121:8-14.)

97. Defendant Andrew Chung did not do anything to confirm that Timothy Jackson had committed some sort of racist action before he signed the faculty petition. (Chung Dep, 130:12-18.)

98. Provost Jennifer Cowley could only identify "publication" as a specific activity Jackson's that could be deemed "racist"; in other words, she could only identify protected speech on a matter of public concern. (**Exhibit** DD ("Cowley Dep"), 57:15-58:3.)

99. Defendant Benjamin Graf (a prior editor of the JSS, who was sure enough about what "racist" meant in 2020 to accuse Jackson, his former dissertation advisor and mentor, of "racism"), testified that he needed to "review the whole situation in context," to answer whether burning a cross on someone's lawn was a racist act. (**Exhibit EE** ("Graf Dep"), 34:23-36:5.)

100. Defendant Graf spent pages and pages of deposition testimony evading the simple question of whether he could identify any "racist" actions committed by Timothy Jackson. (*Id.* at 34:14-39:22.)

101. The only thing Defendant Graf could think of as a "racist" actions committed by Timothy Jackson was that "there could be some statements that could be considered racist" attributed to Timothy Jackson— in other words ***speech***. (*Id.* at 34:14-39:22.)

102. Defendant Graf could not enumerate a single, specific "racist" statement attributed to Timothy Jackson. (*Id.* at 39:20-22.)

103. Timothy Jackson also served the following Interrogatory No. 12:

> Not limited as to time, for each Individual Defendant, identify any specific action or behavior of Plaintiff Timothy Jackson that the Individual Defendant claims is or was "racist," and for each such Individual Defendant, please state the following:
>
> > a. The specific action or behavior that the Individual Defendant identifies as "racist";
> >
> > b. The specific time, date, and location that the supposed "racist" action or behavior occurred;
> >
> > c. The nature of the action that the Individual Defendant claims is "racist"; and
> >
> > d. Any documents that the Individual Defendant claims substantiate the assertion that the specific action was "racist."

(**Exhibit FF**, No. 12.)

104. Defendants Answers to Interrogatory No.12 identified no specific racist actions, because there were and are none. (*Id.*)

105. The only thing Defendants could identify as "racist" action or behavior was Timothy Jackson's protected speech, by way of example, "Sections of Timothy Jackson's response in Vol. 12 of the Journal of Schenkerian Studies base[d] his argument on [unspecified] racial stereotypes and tropes"—for which there is also no evidence. (*Id.*, Response to Interrogatory No. 12 of Diego Cubero.)

106. Similar answers to that set forth in Undisputed Fact No. 104 were given by defendants Steven Friedson, Frank Heidlberger, Justin Lavacek, April Prince, Cathy Ragland, Hendrik Schulze, Vivek Virani, and Brian Wright. (*Id.*)

107. Defendants all admit that their attack on Timothy Jackson as a "racist" solely targeted his protected speech (if they identify anything at all) and none could identify "racist" actions for "racist" behaviors. (*Id.*)

|  |  |
|---|---|
| DATE: December 20, 2024 | Respectfully submitted, /s/Michael Thad Allen |
| | Michael Thad Allen, Esq. |
| | D. Conn. Bar No. CT29813 |
| | admitted *pro hac vice* |
| | Lead Attorney |
| | ALLEN LAW, LLC |
| | PO Box 404 |
| | Quaker Hill, CT  06375 |
| | (860) 772-4738 (phone) |
| | (860) 469-2783 (fax) |
| | m.allen@allen-lawfirm.com |
| | |
| | Jonathan Mitchell |
| | Texas Bar No. 24075463 |
| | MITCHELL LAW PLLC |
| | 111 Congress Avenue, Suite 400 |
| | Austin, Texas 78701 |
| | (512) 686-3940 (phone) |
| | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |
| | |
| | for PLAINTIFF |

## CERTIFICATE OF SERVICE

I hereby certify that on the date specified in the caption of this document, I electronically filed the foregoing with the Clerk of Court, to be served on all parties of record via the CM/ECF system.

/s/Michael Thad Allen
Michael Thad Allen

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel has complied with the meet and confer requirement in Eastern District of Texas Local Rule CV-7(h). The instant motion is opposed.

/s/Michael Thad Allen
Michael Thad Allen