UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. |
| VS. | § | |
| | § | 4:21-cv-00033-ALM |
| LAURA WRIGHT, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY JACKSON, Ph.D.

SEPTEMBER 24, 2024

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Oral and Videotaped Deposition of

TIMOTHY JACKSON, Ph.D., produced as a witness at the

instance of the defendants, and duly sworn, was taken in

the above-styled and numbered cause on SEPTEMBER 24,

2024, from 9:07 a.m. to 6:22 p.m., before Nicole A.

Hatler, CSR No. 11275 in and for the State of Texas,

reported by machine shorthand, at the University of

North Texas System, 801 North Texas Blvd, Gateway Suite

308, Denton, TX 76201.


---oOo---

1    APPEARANCES

2    For the Plaintiff:

3         MICHAEL THAD ALLEN, J.D., Ph.D
          Allen Harris PLLC
4         PO Box 404
          Quaker Hill, CT 06375
5         (860) 772-4738
          MAllen@AllenHarrisLaw.com

6
     For the Defendant:

7
          BEN WALTON
8         Assistant Attorney General
          General Litigation Division
9         P.O. Box 12548, Capitol Station
          Austin, Texas 78711-2548
10        (512) 463-0447
          Benjamin.Walton@oag.texas.gov

11
     Also present:

12
          Renaldo Stowers
13        Phil Hall, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2                                                    PAGE

3  Appearances....................................2

4

5  WITNESS:

   TIMOTHY JACKSON, Ph.D.

6

       Examination by MR. WALTON.................6

7

       Examination by MR. ALLEN.................281

8

9

10 Signature and Changes..........................293

11 Reporter's Certificate.........................296

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Timothy Jackson - 9/24/2024

4

1                  E X H I B I T S

2                                          PAGE

3    DEFENDANTS'

4    Exhibit 1   Bates UNT_001168 to '1170..........212

5    Exhibit 2   Bates UNT_000220 to '221............243

6    Exhibit 3   Bates UNT_000171 to '196............244

7    Exhibit 4   A Preliminary Response to Ewell by..269
                 Timothy Jackson
8
     Exhibit 5   Theoria Historical Aspects of.......287
9                 Music Theory Vol. 24 - 2017

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    TIMOTHY JACKSON

2    sworn as a witness

3    testified as follows:

4    THE VIDEOGRAPHER:  Today is Tuesday,

5  September 24th, 2024.  The time is 9:07 a.m.  We are on

6  the record.

7    This is the video-recorded deposition of

8  Timothy Jackson relative to a case styled Timothy

9  Jackson versus Laura Wright, et al., filed in the United

10  States District Court, Eastern District of Texas,

11  Sherman division.  Civil action number

12  4:21-CV-00033-ALM.

13    Counsel, at this time would you, please,

14  state your appearances for the record.

15    MR. WALTON:  Ben Walton on behalf of the

16  defendants.

17    MR. ALLEN:  Michael Thad Allen on behalf of

18  Plaintiff Timothy Jackson.

19    MR. STOWERS:  Renaldo Stowers, UNT system

20  offices general counsel.

21    THE VIDEOGRAPHER:  Thank you.  Would the

22  court reporter please -- please swear in the witness.

23    THE REPORTER:  Good morning.  My name is

24  Nicole Hatler, Texas Certified Shorthand Reporter No.

25  11275.  This deposition will be stenographically

1  reported pursuant to the rules governing depositions in

2  the State of Texas.

3       Q.  EXAMINATION BY MR. WALTON:  Good morning,

4  Dr. Jackson.  I know that we have previously met just

5  earlier this morning, but could you please state your

6  full name for the record?

7       A.  Timothy L. Jackson.

8       **Q.  And I'm sure that your attorney has discussed**

9  **with you some of the basic ground rules for depositions.**

10 **I wanted to go over just a few to make sure that we're**

11 **all operating on the same understanding here today.**

12           **The first and most important is you do**

13 **realize that now that you've been placed under oath,**

14 **that oath is the same oath that you would take if you**

15 **were in a real courtroom with a real judge and a jury,**

16 **and you're under the same obligation to tell the truth**

17 **to the best of your ability.**

18           **Do you understand that?**

19      A.  I do.

20      **Q.  And you're prepared to do that today?**

21      A.  Yes.

22      **Q.  Another general rule of depositions is -- one**

23 **that you're doing very well with so far, is we want to**

24 **speak and enunciate verbally so that the court reporter**

25 **can make a clean, written transcript.  Since that's the**

1    official record, we want to make sure to respond clearly

2    in words instead of using bodily gestures or uh-huh or

3    huh-uh, which are a little harder to pick up and read on

4    a transcript.

5         A.   Uh-huh.

6         Q.   So if you could try to answer with "yes" or

7    "no" or other words to clarify your answers, that would

8    be ideal.

9              Does that make sense to you?

10        A.   Totally.

11        Q.   And then another implication of having a court

12   reporter here is you and I need to try our very best not

13   to talk at the same time.  So if you will allow me to

14   finish articulating a question before you begin to

15   answer, I will do my very best to let you finish your

16   answer before jumping in with another question.

17        A.   Yes.

18        Q.   Does that sound reasonable?

19        A.   Sounds reasonable.

20        Q.   All right.  And then if I ask a particular

21   question and you're not sure what I'm talking about,

22   please ask me to clarify.  I'm happy to do that to the

23   best of my ability so that we understand each other and

24   are speaking clearly today.  All right?

25        A.   All right.

1  Q.  And last but not least, if you want to take a
2  break at any time during today, you're certainly welcome
3  to do that.  The only question I would ask is, if
4  there's already a question on the table, please answer
5  the question.  And then at the end of any of your
6  questions, you can say, "Hey, I'd like a break now," and
7  we'll be happy to take one.  Okay?

8  A.  Sounds good.

9  Q.  All right.  Have you ever given a deposition
10 before?

11 A.  No.

12 Q.  All right.  Well, welcome to your first time.

13      What did you do to prepare for today's
14 deposition?

15      And I will go ahead and say I'm not asking
16 for to you divulge anything you discussed with your
17 attorney.

18      But without divulging any of that
19 discussion, what did you do to prepare for today's
20 testimony?

21 A.  I looked over some of the documents.  There are
22 so many, obviously, I couldn't look over all of them,
23 but I just, basically, looked over a few of them to get
24 a sense of -- remind myself of certain things.  And I
25 just discussed briefly with my lawyer the -- the --

Timothy Jackson - 9/24/2024

9

1           MR. WALTON:  Timothy --

2           THE WITNESS:  Uh-huh.

3           MR. WALTON:  -- I'm going to ask you not to

4  discuss what we've talked about.

5           THE WITNESS:  Oh, okay.

6           MR. ALLEN:  That is privileged.

7           THE WITNESS:  Okay.

8      Q.  BY MR. WALTON:  Yes.  So going back to just the

9  documents you looked over, were those documents that had

10  already been produced in this case --

11      A.  Yes.

12      **Q.  -- between the parties?**

13      A.  Yes.

14      **Q.  Okay.  Does any particular document stand out**

15  **at your -- in your mind that you happened to review**

16  **getting ready for today?**

17      A.  No.

18      **Q.  Okay.  Do you recall whether they were**

19  **documents produced by UNT or whether they were your own**

20  **file that you had given to your lawyer?**

21      A.  I think they're both.

22      **Q.  Other than talking to your lawyer, did you**

23  **speak with anyone else to prepare for your testimony**

24  **today?**

25      A.  No.

Timothy Jackson - 9/24/2024

1    **Q.  And are you under any medications that would**

2  **affect your ability to remember and testify to the best**

3  **of your memory here today?**

4    A.  No.

5    **Q.  Well, let's go through a little bit of your**

6  **personal background, since I haven't had the pleasure of**

7  **getting to know you yet.  Could you describe for me**

8  **where you grew up and then what made you choose music as**

9  **a career?**

10    A.  I grew up in Halifax, Nova Scotia, Canada, so

11  I'm actually an immigrant to the United States.  I

12  studied music from the age of six, and in Canada we have

13  the British music education system, so it's called the

14  Royal Conservatory education.  And I went through all

15  the different grades of that education as a young boy

16  and in becoming a high school student.

17        Along the way, I spent some time in New

18  York because my father was a professor and he was on

19  sabbatical.  And I applied to and got into the Juilliard

20  prep school for musicians.  So I spent a year and a

21  half -- or two years, really, attending Juilliard as a

22  pianist

23    **Q.  How old were you when you got into Juilliard?**

24    A.  I was 11.  And I got in on a full scholarship,

25  so I think I was actually not bad for a little kid.

Timothy Jackson - 9/24/2024

11

Q.  Well, it's -- as a laymen, it's my understanding that Juilliard is -- is one of the probably top three prestigious music schools in America. Is that consistent with your understanding?

A.  Yeah.

Q.  How many other 11-year old were you going to school with at Juilliard?

A.  Oh, I can't remember, but not many.  Not --

Q.  Were most of the students older than you?

A.  Yes.

Q.  When did you move from Canada to the United States?

A.  So I came here when I was -- well, when I was a student, I came here in 1979 -- '80.  I moved to Queens in New York to study at the Queens College Music School.

Q.  And how old were you at that time?

A.  I was about -- let's see.  Okay.  So I was about 21, 22.

Q.  Are you a U.S. citizen today?

A.  Today, I am, yes.

Q.  When did you become a U.S. citizen?

A.  I became a U.S. citizen around, let's see, 1989.  And the way this happened was that my mother was born in America.  And so, I needed -- there was a time when you could -- a window of opportunity where, if you

Timothy Jackson - 9/24/2024

12

 1  were born to an American mother, you could claim

 2  American citizenship.  So while I was studying in New

 3  York, I went to the embassy -- to the American

 4  consulate, I mean, and applied for the American

 5  citizenship and I got it.

 6      **Q.  I see.  And that was -- forgive me.  I'm trying**

 7  **to go back to the dates.  You said that was roughly ten**

 8  **years after you had moved to Queens, New York to --**

 9      A.  Well, I hadn't really -- so let me put it more

10  precisely.  I commuted from Canada.  During the school

11  year, I was in New York, but during the summers, I went

12  home to Nova Scotia.

13      **Q.  I see.**

14      A.  So I didn't live full time in the U.S.  I was

15  back and forth, basically.  And when the opportunity

16  came to claim the citizenship through my mother and

17  through my descent from my mother, that's when I claimed

18  it, and that's when I eventually got it.

19      **Q.  I see.**

20      A.  So until that time, I was only a Canadian

21  citizen.

22      **Q.  Okay.**

23      A.  But then I became an American citizen, through

24  that process.

25      **Q.  And do you still maintain your Canadian**

1  citizenship, as well?

2      A.  I do, but I don't use it.  I travel on an

3  American passport.

4      Q.  Sure.  Are there any other countries in which

5  you're a citizen?

6      A.  No.

7      Q.  Okay.

8      A.  I'm dual U.S. Canadian citizen.

9      Q.  All right.  When did you graduate from

10  Juilliard?

11      A.  I didn't graduate from Juilliard.  I was there

12  for two years as a kid.  So between 11 and 13, that's

13  when I was at Juilliard back and forth a bit.

14      Q.  I see.

15      A.  And then I went back to Nova Scotia for high

16  school because my father's sabbatical and his grant work

17  expired.  So I went back to Halifax and I finished high

18  school in Halifax, and then I applied for composition to

19  McGill University in Montreal.  I don't know if you've

20  heard of it.  It's -- it's quite famous in Canada.  They

21  had a -- they call themselves the Harvard of Canada.

22      Q.  Oh.

23      A.  So they -- and they had a very famous science

24  department back in the day.  The -- the Salk vaccine was

25  invented -- for polio was invented in the McGill medical

14

1  school.  It's, sort of, like a vast -- it's very similar

2  to Harvard.

3      **Q.  Okay.**

4      A.  So I spent three years there getting a

5  bachelor's degree in composition.

6      **Q.  So you got your bachelor's degree in three**

7  **years?**

8      A.  Yes.

9      **Q.  And then -- now, it seems that at Juilliard you**

10 **were more focused on piano performance --**

11     A.  Right.

12     **Q.  -- and in college, you were more focused on**

13 **composition by then.**

14     A.  Right.

15     **Q.  Why the shift?**

16     A.  I always wanted to be a composer, but unlike

17 Mozart, who was already a composer at the age of 6, I

18 was just a pianist as a kid, all right.  And I wanted to

19 learn how to compose.

20          So I had composed a little bit on the side,

21 and I remember that, in order to apply to McGill, I had

22 to provide a portfolio of compositions.  And I did, and

23 I got in.  And it was a very, very challenging program,

24 I can tell you.  The first day I was in classes, the

25 professor sat with six students who were accepted down

1  at a table just like this one -- and this was my very

2  first day at university -- and he said, "At the end of

3  the first year, there will be one of you sitting at this

4  table."

5          So everybody looked at everybody else like

6  they were on a sinking ship, but I was the only

7  survivor.

8      **Q.  And after three years, when you graduated with**

9  **your bachelor's, did you go into another graduate study**

10  **program or did you obtain employment somewhere?**

11      A.  No.  I -- I -- it's very hard to get a

12  degree -- I mean to get a job just with a bachelor's

13  degree, especially in this field.  So no, I -- I thought

14  about what I wanted to do, and I -- I decided to go to

15  Toronto -- University of Toronto for a year to begin a

16  master's degree.

17          And I started studying Schenkerian analysis

18  in Toronto with a very, very amazing teacher by the name

19  of Edward Laufer.  And unfortunately, Laufer didn't have

20  his doctorate, so he wasn't allowed to teach graduate

21  courses.  So I studied surreptitiously with him.  And

22  that's when I decided, with his help, to apply to go to

23  Queens College in New York City.

24          And that's when I -- I went, basically.

25  That's when I immigrated from Canada, sort of, de facto.

1    Q.  Sure.

2    A.  So I went to the Queens College for two years

3    to get a master's degree.

4    Q.  So you did get a master's degree from Queens?

5    A.  Yes.

6    Q.  And what was that master's degree in?

7    A.  It was in music theory, but I began in

8    composition.  I actually originally applied in

9    composition, but while I was at Queens, I studied with a

10   very famous -- another Schenkerian who was there by the

11   name of Carl Schachter, and I realized that my real

12   interest was in music theory and Schenkerian theory, in

13   particular, so I switched.

14   Q.  What was it about Schenkerian theory that

15   attracted you?

16   A.  Well, I believe that Schenker was the Einstein

17   of music theory and that his approach makes it possible

18   to understand music in a certain way that allows us to

19   really understand what the composers were thinking when

20   they wrote the music.  So what is the underlying

21   compositional idea?  What is the underlying

22   philosophical idea behind the music?  That was

23   fascinating to me, so I decided that that was going to

24   be my life's vocation.

25   Q.  And, sort of, for a laymen who is a

1  **nonmusician, certainly a nontheorist, how would you**

2  **describe Schenkerian analysis in just a couple of**

3  **sentences?**

4      A.  Well, it's impossible to really describe it.  I

5  mean, it's like saying how would you describe

6  Einsteinian physics in a couple of sentences, right.

7  You're not going to learn it while standing on one foot,

8  I can tell you that.  And there's an enormous learning

9  curve.  It's not something that you can pick up in one

10  semester.

11          So it really is a very intricate and

12  technical understanding of music that requires, really,

13  years of study with the very best teachers.  And so,

14  some of my teachers said to me that it takes about six

15  years of intense study to get to the point where you're

16  an independent scholar in this field, and I found that

17  to be, basically, true.  So it took me about six years

18  of intense study before I really could feel that I knew

19  something about Schenkerian analysis.  And I'm still

20  learning, actually.

21      **Q.  So -- so is it fair to say that, in your**

22  **understanding, Schenkerian analysis is -- is really not**

23  **something that -- that the average person could**

24  **understand until they studied it for a long time?**

25      A.  Right.

1    Q.  Okay.

2    A.  That's true.  It's like quantum mechanics.  You

3 know, you can't just walk off the street and understand

4 it.

5    **Q.  So after you graduated with your master's at**

6 **Queens, did you pursue any other education or did you**

7 **pursue employment?**

8    A.  No.  I was still not ready for the job market.

9 So I continued into the graduate center at CUNY, which

10 is their doctoral program in music theory.  And also

11 after spending two -- doing two years of course work

12 there, I decided that I wanted to write my dissertation

13 on the composer Richard Strauss, who was a famous German

14 composer, and also that I wanted to study in Europe

15 because I felt that the American system -- or American

16 education system, as wonderful as it was, didn't offer a

17 full perspective on German music, and that was my main

18 interest.

19          So I decided to go to Bavaria in Germany,

20 and I got a scholarship from the -- it's called the

21 German Academic Exchange Fellowship Program.  And the

22 scholarship allowed me to go to Munich.  I lived in the

23 Olympic village, that -- they took the little houses

24 that were made for the athletes and converted them into

25 student housing.  So I lived there for a year.

 1              And at the same time, I -- I took a

 2    course -- or courses at the Bavarian Academy of Arts and

 3    Sciences, and I also pursued my research for my

 4    dissertation in Garmisch-Partenkirchen, in Richard

 5    Strauss' personal house.  I -- I had made arrangements

 6    to study there.  And so, I actually had the great

 7    privilege of working at his desk and going through his

 8    private papers for my dissertation.

 9         Q.  And just for the record, is it fair to say that

10    Richard Strauss was a German composer from the romantic

11    era?

12         A.  Well, he -- he died in 1948, but some people

13    talk about the long 19th century.  He was, basically,

14    a -- some people saw him as a relic of the 19th century,

15    but I thought he was very interesting and worthy of

16    study.  So that's why I wrote my dissertation on his

17    last work.

18         Q.  So would you classify Richard Strauss as

19    romantic or post romantic?

20         A.  Post romantic would be good.  That's a good

21    point, yeah.

22         Q.  Okay.  Okay.  And it's your understanding he

23    was a German composer?

24         A.  Oh, yes.

25         Q.  All right.  How long did you study in Munich?

Timothy Jackson - 9/24/2024

20

1    A.  So I spent a year there and then I went back to

2  New York to finish my doctorate and wrap up everything.

3  I've oversimplified a little bit because I commuted

4  sometimes between New York and Germany.

5    Q.  Sure.

6    A.  But I finished my doctoral degree at CUNY, and

7  while I was in Germany doing my doctoral research, I was

8  already thinking that I'd like to -- to go back to

9  Europe, but this time I wanted to go to Austria.  And

10  so, what I did was I had spied out manuscripts for Anton

11  Bruckner, another well-known 19-century composer, and I

12  had come up with a research project based on Bruckner.

13  And so, I applied for another year, but this time from

14  the Austrian government, to spend a year looking at

15  Bruckner manuscripts.

16           So I was very lucky to win that, and I

17  spent a year in Vienna.  And that was a very wonderful

18  year, because by that time, my German was getting

19  better, really pretty good.  And that was good because

20  Austria speaks a slightly different German than --

21  than -- than Germany does.  They have a -- it's almost

22  like Texas, but even more so.

23           So if people from Germany, especially

24  northern Germany, hear Austrians speaking, the

25  difference is even bigger than people, let's say, from

Timothy Jackson - 9/24/2024

21

1   Boston coming down here and hearing a Texas accent.
2   It's quite different, and my ears became attuned to
3   Austrian dialect and to Viennese dialect, which is quite
4   different.  And so, that was good -- so I could navigate
5   my way through Austria.
6          And it was a very, very wonderful
7   experience for me, I have to say.  I -- I didn't just
8   look at Bruckner there.  I did a lot of things.  And I
9   traveled also.  I went to the communist part of Europe
10  because Europe was still communist at that time.  And I
11  went to Poland and looked at manuscripts there and so
12  forth.
13         And then I went back to Canada and I taught
14  for a year at the University of Toronto.  My mentor,
15  Edward Laufer, helped me win another grant, which was a
16  teaching and research grant.  So I taught part-time at
17  the university and I worked on my project -- on my
18  Bruckner project.
19     **Q.  And when --**
20     A.  And then in 1998 -- no.  Sorry earlier than
21  that.  1994 or '3.  I can't remember now exact time, but
22  I got my first job, finally.
23     **Q.  Okay.  What year was it that you earned your**
24  **doctorate degree?**
25     A.  1988.

1    Q.  Okay.  And then --

2    A.  Sorry.  1990, I got my first job.

3    Q.  Okay.  So 1988, you finished your doctoral?

4    A.  Yes.

5    Q.  And just to clarify for the record, what was

6  your doctoral degree in?

7    A.  It was in music -- it was in music, actually.

8  At the grad center, they didn't actually have a degree

9  in music theory at that time.  So it combined musicology

10  and music theory.

11    Q.  Okay.  But it had a strong music theory

12  component?

13    A.  Yes.  But it also had a strong history

14  component.  Like -- at that time the doctoral program in

15  music at the grad center was ranked third in the

16  country.  And one of the ways they achieved that was by

17  having an amazing musicology faculty, as well as a

18  theory faculty.

19    Q.  And this was at CUNY?

20    A.  Right.  Grad center.

21    Q.  And for the record, what does CUNY stand for?

22    A.  It stands for City University of New York.

23    Q.  And after you finished your doctoral degree,

24  you went to teach in Toronto, you said?

25    A.  Well, after -- immediately after finishing

Timothy Jackson - 9/24/2024

1    that, I -- I existed on these grants.  So I went to

2    Austria for a year, did my Bruckner research.  Then I

3    went to Canada for a year, taught at the University of

4    Toronto and wrote up my Bruckner project and other

5    things.  And that's -- at that point, I finally got my

6    first job.

7        Q.  And where was that first job?

8        A.  At Connecticut College in New -- in New London,

9    Connecticut.

10       Q.  And what was your position there?

11       A.  Assistant -- well, first it was visiting

12   assistant professor for a year, and then it was

13   assistant professor.

14       Q.  What were you a professor of?

15       A.  Music theory, but it was a small college -- a

16   small liberal arts college, so -- with a very small

17   music faculty.  So I ended up teaching courses in music

18   history, as well as music theory.

19       Q.  Was that a tenured track position?

20       A.  Yes.

21       Q.  Did you gain tenure at that college?

22       A.  No.

23       Q.  And why not?

24       A.  A combination of factors, okay.  There were

25   various people who -- on the faculty who didn't want me

Timothy Jackson - 9/24/2024

24

1    to stay.  And also --

2        Q.  Do you know why?

3        A.  Yes.

4        Q.  Why did they not want you to be there?

5        A.  It's hard to say, actually.  I don't know -- I

6    should rephrase that.  I don't really know why they

7    didn't want me to be there, but they didn't.  I think

8    there were -- there were some personal

9    incompatibilities.  Let's put it like that.

10              And also, I was unhappy there because I

11   didn't have any grad students and I didn't have, really,

12   a great music library and I didn't have a lot of things.

13   So I had been, applying -- and also I should mention

14   that while I was teaching at Connecticut College, I won

15   a Fulbright grant to go away to Germany again for

16   another year to teach this time.

17              So I taught for a year at the University of

18   Erlangen.  And I also did guest lectures at pretty big

19   named schools under the Fulbright scholar program.  So I

20   taught at Oxford University for two weeks, I taught at

21   the Sibelius Academy for two weeks, and so on.

22              So I traveled a lot and I did a lot of

23   teaching in Europe.  And so, I wasn't so happy at

24   Connecticut College when I came back.  And I applied and

25   applied and applied, and finally I got this job here.

1    Q.  At UNT?

2    A.  Yes.

3    Q.  How many years did you spend at Connecticut

4  College before you came to UNT?

5    A.  Five.

6    Q.  And what was --

7    A.  Well, you see, we have to subtract the year

8  that I was in Germany.

9    Q.  I see.  So how many -- when would you have gone

10  up for tenure had you stayed at Connecticut College?

11    A.  I would have gone up in my -- I went up in my

12  sixth year.

13    Q.  Okay.  So you did go up.  And what was the

14  decision?

15    A.  No.

16    Q.  I see.

17            Did anybody explain to you why that

18  decision was made?

19    A.  I think a lot of the faculty there -- in fact,

20  all -- the music people, were not happy with my

21  position, and that's why they helped me find another

22  job.

23    Q.  Do you believe that was -- that was in any way

24  an infringement on your academic freedom?

25    A.  No.

1    Q.  Okay.  Were there specific people at

2  Connecticut College that you remember not having a good

3  relationship with on the faculty?

4    A.  There was one person, the chair.

5    Q.  Okay.  And what was that person's name?

6    A.  Noel Zahler.

7    Q.  And what was the -- what was the relationship

8  like with Professor Zahler?

9    A.  Poor.  He -- he -- he -- I think -- the reason

10 that -- the official reason was that -- that I didn't

11 get the tenure at that point was the -- the allegation

12 that I hadn't done enough service, that I had been away

13 too much, you know, on all these lecturing tours and

14 on -- like Fulbright.  And that was the reason that was

15 given.

16        So the reason was not lack of scholarship

17 or lack of teaching -- you know, poor teaching.  That

18 wasn't the reason given.  The reason was lack of service

19 or not -- insufficient service.  I didn't think it was

20 the right reason, but that -- that's what the excuse

21 was.

22    Q.  Was there anybody at the -- at Connecticut

23 College on the faculty that you felt was a -- was an

24 advocate for you?

25    A.  Yes, many people.

Timothy Jackson - 9/24/2024

27

Q.  Okay.  Who are some of the first ones that come
to mind?

A.  Well, there was a professor by the name of Tom
Stoner, who has now passed away, unfortunately, but he
was my -- he was a wonderful teacher.  And he wasn't a
great scholar, but he did some work and he was a very
strong advocate.  That's for most of the people in
the -- in the music department -- the small, very small,
music department.

But there was really a schism between the
chair of the department and the faculty.  And so, that's
part of what the dynamics were.

Q.  So when you were -- when you were looking to --
to transfer --

A.  To -- well, to find another job.

Q.  To find another job.

A.  Yeah.

Q.  Just ballpark estimate, about how many other
colleges and universities did you apply to?

A.  Oh, that's hard.  Maybe something like ten.

Q.  Okay.  And then UNT was one of them?

A.  Yeah.

Q.  Did you get any interviews at any other of
those colleges that you applied to?

A.  Yes.

1    Q.   Which ones?

2    A.   Oh, you know, I can't remember.  I'm sorry.  I

3 don't remember all the details of that job search.

4         But what really mattered to me was that I

5 got this job.  And I really wanted this job because this

6 job had grad students and it also had an amazing music

7 library.  And so, I felt really -- I was really thrilled

8 to get this job.  This is where -- I think that if you

9 look -- if I look back now in the past to my previous

10 career and -- Connecticut College wasn't the right fit

11 for me, you know, because I was very ambitious, and I

12 was publishing a lot and I had done a lot of research.

13 I was -- I felt that I was a world-class scholar by that

14 point, and they didn't need a world-class scholar there.

15 It wasn't -- that wasn't the right fit for me.

16         But when I came here, I was much happier

17 because I was teaching grad student who were working on

18 their doctorates, and I immediately was accepted into

19 the Toulouse Graduate School to teach and supervise

20 doctoral students.  There wasn't any waiting period

21 because I came here with three books with Cambridge --

22 or no, two books with Cambridge and another one in

23 preparation for advancement.  So --

24    Q.   And just to clarify, those are books on music

25 that you had written and published?

```
1        A.  One was a monograph, and the other one with

2   Cambridge that I had in the hand, so to speak, was an

3   edited volume.  Yeah.  And plus, I published about five

4   or six really prestigious articles in addition to that.

5   So when I actually came to UC, when I came here, I

6   already had enough for tenure in terms of publication.

7        Q.  Who hired you at UNT?

8        A.  So I was hired by the hiring committee, which

9   interviewed me in the usual way.  And I came here and I

10  gave some classes and I met with the hiring committee,

11  and then I met with the dean and I met with -- it was

12  very nice, I met with the then head of research at UNT.

13  His -- there was a pavilion named after him.  I don't

14  know if it's still named after him.  His name was

15  Raleigh Schaffer [phonetic], and I really liked him.

16            And the reason was that he was very

17  ambitious about research.  He was a scientist himself,

18  but he was really supportive of faculty research.  And

19  when I started telling him about all of my research in

20  Europe, he was very, very interested and very

21  supportive.

22            So I met with him.  I met with the

23  president, actually.  I believe it was with the

24  president -- yes, this book -- Hurley building.  Yeah,

25  Hurley.  I met with Hurley.
```

Timothy Jackson - 9/24/2024

1      Q.  Okay.

2      A.  He hes a nice person, too.  I respected him.

3  So I was very happy.

4      Q.  And what was your entry level position at -- or

5  your first position in turn at UNT?

6      A.  Assistant professor.

7      Q.  Okay.

8      A.  But with a faster tenure track.

9      Q.  That's what I was going to ask.  So --

10      A.  Yeah.

11      Q.  -- what was your tenure track?

12          What did it look like at UNT?

13      A.  It was three years probation period, given the

14  fact that I already had a lot of teaching experience

15  both at Toronto and at Connecticut College and I had

16  good teaching reviews from both places, and I had a lot

17  of faculty backing from both universities -- so it was

18  three years.

19      Q.  And did you go up for tenure after three years?

20      A.  Yes.

21      Q.  And were you granted tenure?

22      A.  I was.

23      Q.  And did that coincide with a promotion to

24  associate professor?

25      A.  Yes.

Timothy Jackson - 9/24/2024

31

1    Q.  And then at some point, were you promoted to

2  full professor?

3    A.  Yes.

4    Q.  When was that?

5    A.  That was, I think, four years later.  I'll have

6  to go back and look exactly the date, but I was very

7  productive.  And so, I came up for -- for full

8  professor.

9    Q.  What year did you become tenured?

10    A.  Let's see.  I think it was 2003, but I'd have

11  to check that.

12    Q.  Okay.  And then, approximately, what year did

13  you become a full professor?

14    A.  Oh, yeah.  I should have looked this up before

15  I came here.  I think it was 2000 -- I don't know.  I'd

16  have to look.  Would you mind if I check that for you

17  before I say?  It's just a basic fact, but it's gone out

18  of my head.

19    Q.  Sure.  That's fine.

20        It -- is it fair to say it was in the first

21  decade --

22    A.  Oh, yes.

23    Q.  -- of the 2000s?

24    A.  Absolutely, yeah.

25    Q.  Okay.  That you achieved both tenure and full

1  professor?

2      A.   Right.

3      Q.   **Okay.**

4      A.   And then I received one more promotion.

5      Q.   **One more promotion.  What was that?**

6      A.   That was to distinguished research professor.

7      Q.   **And when was that?**

8      A.   Again, I'd have to look it up.  I think it's

9  2009.

10     Q.   **Okay.  So not --**

11     A.   So a couple of years after full professor.

12     Q.   **Okay.  And what was -- what did that promotion**

13 **or what did that mark as distinguished research**

14 **professor mean?**

15     A.   Okay.  So there -- there's a committee that

16 looks at applications for distinguished research

17 professor, and you need to provide -- you needed -- this

18 I do remember.  You needed to provide something like

19 five or six or maybe even more of the most distinguished

20 figures in the field, in my case of music theory.  And

21 they were asked -- they were invited by the university

22 to write assessments of my scholarship, which I believe

23 they must have done, right.

24          And then the committee would decide on a

25 recommendation to the provost.  And then the provost

1   would make a decision.  There would be several

2   recommendations -- I think there were limitations on how

3   many there could be.  I think there were some, like, ten

4   across the university when that happened.  And actually,

5   in my car outside parked in our parking lot, I have a

6   picture of Warren Bergrem, who is the provost of UNT,

7   giving me my certificate at a special award ceremony

8   where I was named distinguished research professor.

9       Q.  And is that -- is that something that's, like,

10  tenure in the sense that, once you have it, you

11  generally hold onto it?

12      A.  Well, no.  Actually, it's not.  Because what

13  you have to do is you have to -- I think it's every four

14  to six years -- I think it's actually four or five --

15  I -- again, I don't remember the exact number of years.

16  But they -- there's -- this same committee looks at

17  you -- you can't go to the beach and put your feet up.

18  You have to maintain your -- your publications.

19           So I've been put up -- I believe it's been

20  two times since I -- twice, two renewals.

21      Q.  I see.

22      A.  So --

23      Q.  Do you know when the third renewal is coming

24  up?

25      A.  Oh, God.  Yeah, fairly recently.  Like, it was

1  in 2021, I think was the -- was the most recent

2  reevaluation.

3      **Q.  And you were -- you still retain that title,**

4  **right?**

5      A.  Yes.  Because --

6      **Q.  Okay.**

7      A.  And not -- I -- I would say that -- this --

8  that you have to -- each time you have to document the

9  publications that have been published between the last

10 evaluation and the present one.  So you can't just say,

11 Oh, well, I published this, you know, five years ago,

12 and now I need to be renewed, right.  You have to come

13 forward with just those publications that you produced

14 within the evaluation period.

15     **Q.  I see.  So in 2021, approximately --**

16     A.  Yeah.

17     **Q.  -- your most recent evaluation, do you recall**

18 **how many publications you listed that you had done since**

19 **the last evaluation?**

20     A.  No, I don't.

21     **Q.  Yeah.  But --**

22     A.  But it was four or five major things, okay.

23 Like, they weren't little things.  They -- they were

24 not.

25     **Q.  I see.**

Timothy Jackson - 9/24/2024

1    A.  That anybody who looked at it would say, Yeah,

2    this guy is not sitting on the beach.

3    **Q.  How many -- well, did -- did you identify any**

4    **of your articles that you had published in the journal**

5    **of Schenkerian studies?**

6    A.  See, the first article that I published there,

7    I think, was in 2018.  So that would have appeared among

8    the various things that I did, but certainly that was

9    not the only thing.  No.

10   **Q.  Sure.  And I may be recollecting this wrong.  I**

11   **thought I had seen somewhere where you had also**

12   **published another article in the Journal of Schenkerian**

13   **Studies -- not as part of volume 12 --**

14   A.  Yeah.

15   **Q.  -- but that there were maybe two articles that**

16   **you had published sometime between 2015 and 2020.**

17          **Do you -- do you recall that?**

18   A.  So the -- the -- yes.  There was an article --

19   that's right.  There was an article in the Laufer

20   festschrift.

21   **Q.  I see.**

22   A.  And there was one that I coauthored as well

23   that was part of that festschrift.

24   **Q.  And would those all have been listed on your**

25   **list of those things?**

1      A.  If it was -- yes, probably.  Because 2021 --

2  yes.

3      Q.  Sorry.

4      A.  Those were -- those were probably in there,

5  yeah.

6      **Q.  Just to finish the question for the record,**

7  **would that have been included on the scholarly**

8  **publications that you listed in order to retain the**

9  **distinguished research professor title?**

10     A.  And the answer is yes.

11     Q.  Okay.

12     A.  If it was published by 2021, yes.  And probably

13  if it was between, I don't know, 2016 and 2021, yes.

14     Q.  Did you --

15     A.  But there were other articles, if I may say

16  so -- very significant other articles that were not

17  published in JSS that went into that evaluation.

18     **Q.  And -- and do you recall about how many other**

19  **significant articles not published in JSS that went into**

20  **that evaluation?**

21     A.  Probably three, approximately.  I know two for

22  sure because I did -- I recently looked it up, but maybe

23  another one, too.

24     Q.  Okay.

25     A.  And I worked on a book also with a colleague --

1  an edited book, as well.

2      Q.  And would that have been published by 2021?

3      A.  Yes, I think so.

4      Q.  Do you remember the name of the book?

5      A.  It's called -- it's about Sibelius.  And --

6  it's a book on Sibelius, yes.

7      Q.  And he's a composer, right?

8      A.  Yes.  Finnish composer, right.

9      Q.  Do you recall whether your essay from volume 12

10 of the Journal of Schenkerian Studies was also on that

11 list considered by the committee for distinguished

12 research professor?

13     A.  Because it was published in 2020, probably it

14 was.  Probably, yes.

15          You mean my opinion piece in the symposium?

16 Yes.

17     Q.  That's right.

18     A.  Yes.  Right.  That -- any -- anything that was

19 published, let's say, between 2016 and 2021, let's say,

20 was probably on that list.

21     Q.  Okay.

22     A.  You also had, of course, to submit everything

23 that you published.

24     Q.  Okay.  So give copies of it?

25     A.  No, no, no.  What I mean is that it's

1    cumulative.  The decision is based on cumulative

2    contributions, as well as, let's say, within the

3    evaluation period.

4              So it's not like they can say, Oh, well,

5    you know, we'll forget everything you published until

6    2016 in making the decision whether to renew or not.

7    The point is that you have a complete dossier.  They

8    require a complete dossier with a full bibliography of

9    everything that you published.

10             And the way they make the decision is that

11   they balance out both things, what have you done and

12   then what have you done since the last evaluation.

13        Q.  I see.

14        A.  Right.

15        Q.  Yes.

16        A.  So it's not solely based on -- on what you've

17   done in the evaluation period.  It's a cumulative thing,

18   as well.  And that's very clearly stated, actually, in

19   the rules.

20        Q.  Sure.  Other than obtaining the distinguished

21   research professor title, is there any other promotion

22   or special distinction that you have gained while at UNT

23   that we haven't talked about yet?

24        A.  It depends.  Do you include awards?

25             Like, do -- do you include all kinds of

1  research awards and things like that --

2      **Q.  For purposes --**

3      A.  -- or do you --

4      **Q.  -- of my question, only if they were awarded by**

5  **UNT.**

6      A.  Well, yeah, I got a lot of awards for research.

7      **Q.  Okay.**

8      A.  A lot.

9      **Q.  And were that -- was that awarded by the**

10  **college of music or the faculty of the university more**

11  **broadly?**

12      A.  The second, more broadly.  Yeah.

13      **Q.  And were those --**

14      A.  And both -- both, actually.

15      **Q.  Okay.  And were those related to your research**

16  **or --**

17      A.  Yes.

18      **Q.  I see.**

19              **Have you ever gotten any special awards**

20  **relating to your teaching or service at UNT?**

21      A.  No.

22      **Q.  What was the last award that you received from**

23  **UNT?**

24      A.  Oh, my gosh.  Well, it was a $5,000 grant for

25  typesetting my graphs -- my Schenkerian graphs, and I

1    think it was in 2023, I think.

2              MR. ALLEN:  Could I just break in?  I'm

3    going to ask you not to talk into the table.

4              THE WITNESS:  Right.  Sorry.

5              MR. ALLEN:  Remember to speak from --

6    this --

7              THE WITNESS:  Yes, yes.  I'm sorry.  I --

8              MR. ALLEN:  I didn't want to interrupt your

9    flow --

10             THE WITNESS:  No, no.  I --

11             MR. ALLEN:  -- but I'm afraid it won't be

12   recorded.

13             THE WITNESS:  Right.  Okay.

14             So the answer is 2022 or 2023, I got an

15   award of $5,000 to typeset graphs.

16        Q.  BY MR. WALTON:  Sure.  Okay.  And did that come

17   from the college of music?

18        A.  Yes.  That was from the college of music.

19        **Q.  Any other awards in the last few years that you**

20   **specifically recall?**

21        A.  Not really, no.

22        **Q.  Okay.**

23        A.  Not in the last few years.

24        **Q.  I think I, kind of, skipped over some of your**

25   **personal background, but I'm operating on the assumption**

 1  that once you came to UNT, you've stayed at UNT.

 2              Is that fair?

 3      A.  Fair.

 4      Q.  And have you lived full time in the greater

 5  Denton/Dallas/Fort Worth area since that time?

 6      A.  Yes.

 7      Q.  Okay.  Are you married?

 8      A.  Yes.

 9      Q.  What is your wife's name?

10      A.  Her name is Heejung, H-E-E-J-U-N-G.  She's

11  Korean.

12      Q.  And when did you get married?

13      A.  Oh, boy.  Okay.  Now I just --

14      Q.  It's okay.  We won't show her this part of the

15  transcript.

16      A.  Oh, yeah, don't show her.  My -- my -- for some

17  reason, my memory of dates -- we've been married

18  20 years.

19      Q.  Okay.

20      A.  Okay?  So probably -- yeah.  20 -- 2003, I

21  believe, right.

22      Q.  Did you have any previous marriages?

23      A.  One, yes.

24      Q.  And what was the name of your former spouse?

25      A.  Her name was Debbie Estrin, E-S-T-R-I-N.

1    Q.  And when were you married to her?

2    A.  For 18 years previously to that and -- with a

3  break of about two years between the two marriages.

4    Q.  I see.  So just rough timelines here --

5    A.  Okay.  We got married -- I believe in 1986,

6  that was my first marriage.  Yes.

7    Q.  And were you still married to your first spouse

8  when you came to UNT?

9    A.  Yes.

10    Q.  Okay.  And then it -- how did that first

11  marriage end?

12    A.  So there was a -- I had a very problematic

13  child, and it created a lot of tension in the marriage.

14  We were unable to really -- it was very difficult to

15  deal with that child, and I became very unhappy and very

16  depressed.  And so, that was how the marriage more or

17  less broke apart.

18    Q.  And just very briefly, without going into

19  details, what was the nature of the problems that you

20  were experiencing?

21    A.  My daughter -- my oldest daughter we now know,

22  but we didn't know it at the time or understand it,

23  suffered from ADHD.  And so, she was a very difficult

24  child, and we didn't really know how to deal with it.

25    Q.  Do you recall -- well, let's go back to my

Timothy Jackson - 9/24/2024

43

1    other question.  How did your first marriage end?

2              Was it -- did it end in divorce or death or

3    otherwise?

4        A.  Divorce.

5        Q.  Do you recall what year that was?

6        A.  Probably 2001 or '2, I would say.  Yeah.

7        Q.  Do you still have a relationship with your

8    oldest daughter?

9        A.  Very much so.  Yes.

10       Q.  Where does she live?

11       A.  She lives in Toronto.

12       Q.  Did you have any other children from your first

13   marriage?

14       A.  No.

15       Q.  Do you have children from your second marriage?

16       A.  Yes, I have two children.

17       Q.  And what are their ages?

18       A.  14 and 16 -- 16, but don't ask me when they

19   were born.

20       Q.  Okay.  Your -- your first wife, was she a

21   musician, as well?

22       A.  No.

23       Q.  Did she have any type of career of her own?

24       A.  Yes.

25       Q.  What was that?

1    A.  She worked for the Jewish community as a

2    fundraiser and as a director of -- well, she worked for

3    the Jewish community services as a fundraiser.

4        Q.  In Denton?

5        A.  No.  Actually, in Dallas.  Well, when we were

6    here, she worked in Dallas.

7        Q.  I see.

8        A.  When we were in Toronto, she worked in Toronto

9    in the same kind of organization.

10       Q.  So did she identify as Jewish?

11       A.  Yes.  And so do I.

12       Q.  That was going to be my next question.

13            What about your current wife?

14       A.  She converted to Judaism.

15       Q.  Around the time she married you?

16       A.  Yes.

17       Q.  Do your -- do all three of your children

18   identify as Jewish?

19       A.  Yes.

20       Q.  Okay.

21       A.  But they're mixed race, so that's a little

22   interesting.

23       Q.  All three of them?

24       A.  No.  My first daughter is 100 percent Jewish

25   ethnically.  My two children are mixed race.

1    Q.  I see.  And that is, roughly, half Jewish and

2  half Korean?

3    A.  Right.

4    Q.  Okay.

5    A.  So they got both backgrounds.

6    Q.  Is your current wife a musician?

7    A.  Yes.

8    Q.  How so?

9    A.  She's a pianist.

10    Q.  Does she perform?

11    A.  Yes.  She also records and she teaches both

12  privately and also at UNT.

13    Q.  What does she teach?

14    A.  She teaches piano literature and sight reading,

15  and she used to teach -- at UNT, she used to teach score

16  reading and figure-based realization.  These are all

17  technical disciplines.

18    Q.  And is -- are those undergraduate or graduate

19  classes?

20    A.  Both.  She taught at both levels.

21    Q.  What is her title?

22    A.  She is -- now, today, she's a senior adjunct

23  lecturer.  That's right.  Senior adjunct lecturer.

24    Q.  And is that a nontenured tract position?

25    A.  Yes.

1    Q.  Are any of your children musicians?

2    A.  Yes, both of them.

3    Q.  And how so?

4    A.  They both play the violin.

5    Q.  They didn't go with the piano, huh?

6    A.  No.  They were reluctant.  They're both

7    reluctantly -- but they're in the GDYO orchestra.  I

8    didn't know if you know about it.  But it -- my son, who

9    hates to practice, is actually quite gifted, and he made

10   it to the top orchestra for kids in Dallas, which is

11   GDYO.  My daughter is in the one below that.  She also

12   doesn't like to practice, but she's -- she's also -- I

13   mean, she's also -- not as gifted as my son, but she's

14   diligent.  So she makes up for lack of talent with

15   diligence.

16   Q.  And just for the record, DGYO, is that the

17   Greater Dallas Youth Orchestra?

18   A.  It is.

19   Q.  Is your wife a Schenkerian scholar?

20   A.  No, but she studied Schenker a little bit with

21   me when she was a student.

22   Q.  Was she a student here at UNT?

23   A.  Yes.

24   Q.  How many classes did she have with you?

25   A.  Just one, I think.  Yeah.  The Schenker class,

1    I think.  Yeah.

2              No.  Two -- two classes.  She took

3    counterpoint with me, as well.  So counterpoint and

4    Schenker, I think, yeah..  it was a long time ago.

5    20 years ago.

6         Q.  So --

7         A.  21 years ago, I think.

8         Q.  21, okay.

9         A.  Yeah.

10        Q.  When did y'all start dating?

11        A.  Oh, after I was separated from my first wife.

12   It was during -- I think around 2001, 2002, that area --

13   that time frame.

14        Q.  And when had she had her classes with you?

15        A.  Oh, 1999, I think.  1999, yeah.  I still have

16   some of her assignments, so I could check it exactly.

17        Q.  Had she already graduated when y'all started

18   dating?

19        A.  Not quite, but she was in piano, not in music

20   theory.  So she wasn't my -- in my department.

21        Q.  Did she graduate?

22        A.  Yes.

23        Q.  And what -- what was her degree in?

24        A.  Her degree was in piano.  She has a DMA in

25   piano.

1    Q.  And a DMA is?

2    A.  Doctoral of musical arts.  So we offer -- it's

3  not an academic degree as much as Ph.D., but like many

4  schools, the performers -- like her field was piano

5  performance, so she got a DMA.

6    Q.  These are some other questions that I have to

7  ask.  It's not personal, all right?

8          Have you ever been arrested or charged with

9  any crime?

10    A.  Yes.

11    Q.  How many?

12    A.  One.

13    Q.  All right.  Tell me about that.

14    A.  No, not charged, but arrested.

15    Q.  Arrested.  Okay.  Thank you for the

16  clarification.

17    A.  Yeah, not charged.

18    Q.  Why were you arrested?

19    A.  I was arrested because of my daughter.  And she

20  drew a picture at school, and her teacher felt that the

21  drawing showed that I was molesting my daughter.

22    Q.  So were you arrested by police?

23    A.  Yes.

24    Q.  What happened?

25    A.  I went to jail for a night.  I was bailed out

1  by my parents, and then we hired a lawyer and the lawyer

2  defended me.  And the upshot was I was no billed, I

3  guess -- I don't know what you -- exactly what it means.

4            But actually, when -- when I first got the

5  questionnaire for this case, there was a question about

6  the arrest.  And so, I filled it in and I called the

7  lawyer's office who had represented me at that time --

8            MR. ALLEN:  Timothy, I don't want you to

9  disclose any communications you've had with an attorney

10  who represented you.

11            THE WITNESS:  Oh, okay.  Okay.

12            But anyway, I was no billed, and that was

13  the end of it.

14      Q.  BY MR. WALTON:  Okay.  And do you recall what

15  year that was?

16      A.  I think it was 2000 -- the no bill was, like,

17  maybe 2003.

18      **Q.  And was that the same year as the arrest?**

19      A.  No.  It was two years later.

20      **Q.  Okay.  So the arrest would have been, roughly,**

21  **2001?**

22      A.  Yeah.  It was around -- you know, when did the

23  Challenger fall?  Do you remember the date of the -- the

24  failed launch of the Challenger, when people -- I think

25  it was 2001.

Timothy Jackson - 9/24/2024

50

1       Q.  Around that same time?

2       A.  Yeah.  And that was exactly the time when this

3  happened, yeah.

4       Q.  And have you ever been charged with any other

5  type of criminal offense?

6       A.  No.

7       Q.  Have you ever been part of a lawsuit other than

8  this one?

9       A.  No.

10      Q.  Have you ever given testimony in a courtroom?

11      A.  No.

12      Q.  Have you ever been part of a bankruptcy

13  proceeding?

14      A.  No.

15      Q.  And then other than the divorce with your first

16  wife, have you ever been part of any other divorce

17  proceeding?

18      A.  No.

19      Q.  How many of your children are financially

20  dependent upon you?

21      A.  Two.

22      Q.  You mentioned somebody earlier by the name of

23  Laufer.  Am I saying that right?

24      A.  Yes, Professor Laufer.

25      Q.  Did you -- did you consider him as a mentor?

1    A.  Yes.

2    **Q.  Is there anyone throughout your years at UNT**

3  **that you have considered as a mentor while you've been**

4  **here at UNT?**

5    A.  Yes.  There was -- his name was Lester

6  Brothers.  He was the chair of the department when I was

7  first hired, and I considered him to be a wonderful

8  mentor, but he left to chair another department --

9  actually to become -- no.  It was a promotion to become

10  the head of the music school at another university.  And

11  it was, I think, in Missouri.

12             Again, I don't remember the exact name of

13  it.

14    **Q.  Do you remember what -- around what year he**

15  **left UNT?**

16    A.  Shortly after I got tenured, so -- no, even

17  more -- it was later than that.  Again, I don't remember

18  the exact year, but it was around -- it was after I got

19  tenured and around the time that I was coming up for

20  full professor.  I don't remember the exact date, but we

21  can -- I can get that information.

22    **Q.  Sure.  Early 2000s?**

23    A.  Yes.

24    **Q.  After that time, has there been anyone else at**

25  **UNT that you have viewed as a mentor?**

1    A.  Well, I should add that Raleigh Schaffer was a

2    mentor.  And he was a great mentor because he was in

3    a -- he was in a different realm.  He was a scientist.

4    And I went to talk with him a lot about my research and

5    about the best way of pursuing it.  And I also did work

6    for him in the sense that I was on the university

7    research committee that he chaired that vetted proposals

8    from faculty all across the university, including a lot

9    of the sciences.

10            He was a wonderful mentor, and I was

11   terribly disappointed when he retired.

12       Q.  **When did he retire?**

13       A.  Oh, God.  Again, I can't remember the exact

14   date, but it must have been around 2006, maybe.  I'd

15   have to check that.  I mean, it's easy to find out --

16       Q.  **Sure.**

17       A.  -- when he retired.

18       Q.  **Since both of those gentlemen left --**

19       A.  Yes.

20       Q.  **-- has there been anyone else at UNT that you**

21   **have viewed as a mentor?**

22       A.  Not really, no.

23       Q.  **Would you describe yourself as a mentor to**

24   **others --**

25       A.  Oh, one other person.

Timothy Jackson - 9/24/2024

53

1       Q.  Yes, please.

2       A.  One other person.  There was -- it was brief,

3  but he was the person who was hired I believe after --

4  yes.  After Raleigh Schaffer left, there -- his name was

5  Perhat.  I forget his first name.  He was an Indian

6  professor who took over the research department, and I

7  was very fond of him and -- and really admired him.

8           He also was a scientist, and he was,

9  basically, the replacement for Shaffer.  And he was --

10  but he was only here for something like -- in that role,

11  for two years.  But yes, I admired him as a mentor, as

12  well.

13      Q.  Okay.  Thank you for that addition.

14      A.  Yeah.

15      Q.  And did that jog your memory of anybody else

16  that you viewed as a mentor while you've been here at

17  UNT?

18      A.  No.

19      Q.  Would you describe yourself as having been or

20  being a mentor to other faculty members at UNT?

21      A.  Yes.

22      Q.  Who within the last ten years or so would you

23  say that you have been a mentor to on the faculty at

24  UNT?

25      A.  I was a mentor to Steven Slottow, who was my

1    colleague hired to create the Center for Schenkerian

2    Studies.

3             So when the center was established, the

4    president at the time -- I'm just trying to remember his

5    name.  One of the buildings here is named after him.

6    Oh, gosh, it's gone out of my head right now.  But he

7    created a position especially for Slottow, basically.

8    Well, it wasn't for Slottow.  I mean, Slottow went

9    through a rigorous hiring procedure.  But for another

10   Schenkerian to help me with the center, and Slottow was

11   hired.

12            And so, I would say ever since Slottow

13   came, I was a kind of mentor to him.

14       **Q.  Do you recall what year that was when the**

15   **center started and --**

16       A.  Well, the center started around 2001, 2002.  It

17   was established officially, I think, in 2000.

18       **Q.  Okay.**

19       A.  And so, Slottow would have come around that

20   time, too, or later than that.

21       **Q.  And did he come as assistant?**

22       A.  Yes.  He went through the whole tenure track

23   thing.

24       **Q.  So he started brand new, as an assistant**

25   **professor?**

1    A.  Yes.

2        Q.  And did he have a full tenure tract or a short

3    one like you?

4        A.  No.  He was hired, basically, without any real

5    experience.  And he -- although he had some teaching

6    experience, but he didn't have enough and he didn't have

7    enough teaching -- I mean publications to justify any

8    kind of early tenure because he hadn't the record at

9    that point.

10       Q.  So Dr. Slottow, did he achieve tenure within

11   the normal time frame at UNT?

12       A.  He did.

13       Q.  And then was he ever promoted to full

14   professor?

15       A.  Yes.

16       Q.  Do you recall when that was?

17       A.  I want to say, let's see, maybe 2018, 2019.

18       Q.  And was he ever made a distinguished research

19   professor?

20       A.  No.

21       Q.  Was that an aspiration of his?

22       A.  I don't know.  You'd have to ask him.

23       Q.  Okay.  Did he ever apply for it?

24       A.  No.

25       Q.  Okay.  And where is he today?

Timothy Jackson - 9/24/2024

56

```
 1        A.  He's here.

 2        Q.  Okay.  Do you still consider yourself a mentor

 3   for him?

 4        A.  I'm not a mentor because he's not -- he doesn't

 5   need any mentoring, but we're still friendly.

 6        Q.  When would you say your -- your role or your

 7   perception of yourself as his mentor faded into more of

 8   just an equal colleagues with you?

 9        A.  Well, when he was promoted to full professor --

10        Q.  Okay.

11        A.  -- that was really the end of it.  But already,

12   when he had tenure, I mean, I would say he was a senior

13   colleague anyway.  So, yeah.

14               MR. WALTON:  We've been going for about an

15   hour.  Why don't we take a break?

16               MR. ALLEN:  Can we go off the record?

17               THE VIDEOGRAPHER:  We're off the record at

18   10:10 a.m.

19     (A recess was held from 10:10 a.m. to 10:30 a.m.)

20               THE VIDEOGRAPHER:  We're back on the record

21   at 10:30 a.m.

22        Q.  BY MR. WALTON:  Dr. Jackson, we're back after a

23   brief break.  Are you ready to proceed?

24        A.  Ready.

25        Q.  So we'll talk about the allegations in this
```

Timothy Jackson - 9/24/2024

57

1  particular lawsuit later.  Right now, I want to ask you

2  some questions related to your experience in academia

3  other than the allegations of this lawsuit.

4              I guess before volume 12 of the JSS, had

5  you ever experienced anything in your career that you

6  felt was in violation of your academic freedom?

7      A.  No.

8      Q.  Had you ever experienced anything that you felt

9  was censorship?

10     A.  No.

11     Q.  Had you ever experienced anything that you felt

12 was an attempt to limit your freedom of speech?

13     A.  No.

14     Q.  Had you ever observed anything at UNT that you

15 thought was a violation of someone else's academic

16 freedom?

17     A.  Oh, that's -- that's a difficult question,

18 really.  Because it involves other people, I'm not sure.

19 Can I register that as an answer, that I'm not sure?

20     Q.  Yeah, that's fine.  And I don't want to, you

21 know, put words in your mouth.  I just want to know if

22 you -- I think I'm understanding you correctly that --

23 that right now, you're not able to identify another

24 example of what you would say is UNT taking away someone

25 else's academic freedom.  Is that --

Timothy Jackson - 9/24/2024

58

1      A.   Exactly.  I'm not sure, no.

2      **Q.   Okay.  Are you aware -- there again, other than**

3  **your allegations in this case, are you aware of any**

4  **other instance where you believe UNT took action against**

5  **somebody in retaliation for their free speech?**

6      A.   I am aware of one case.  Yes.

7      **Q.   And what would that be?**

8      A.   So while I was here, I also taught in the --

9  what was called the Jewish and Israel studies program,

10 and that was headed up by Dr. -- or Professor Richard

11 Golden.

12     **Q.   Was that outside the college of music?**

13     A.   Yes.  It was in the college of arts and

14 sciences, I believe.  And he was in charge of the

15 program in which I taught two courses.  So while I

16 didn't know Dr. Golden well, I was in touch with him

17 over probably about a ten-year period.

18              And the situation arose in 2020, which was

19 around the same time as my situation, where he was at a

20 conference that was organized I believe by the DEI

21 department UNT.  And they invited a Palestinian speaker

22 to come and speak here who was not a professor at any

23 institution but had spent some time in what's called the

24 west bank.  And she came and gave a presentation, and

25 after that presentation, Dr. Golden asked some

1  questions, and he was then subjected to an

2  investigation.

3       Q.  By whom?

4       A.  I believe -- well, I have documentation that --

5  that he gave me, and the documentation shows that he was

6  investigated -- it looks to me like a person who was

7  affiliated with the police on UNT campus, or at least

8  became affiliated with them.  He was an investigator,

9  and he was working for the -- I believe for the DEI

10 department.

11      Q.  Of UNT?

12      A.  Yes.

13      Q.  Or of the UNT, please?

14      A.  I believe UNT -- the DEI.  I would have to

15 check the correspondence, but I have a copy of the

16 letter concerning that matter.  So I do believe that he

17 was attacked for expressing a question for -- for --

18 let's put it this way, he -- he was attacked for

19 questioning the speaker --

20      Q.  What was the question?

21      A.  -- after her presentation.

22           There were actually two issues, as far as I

23 can recall.  One of them concerned the reasons for the

24 barrier that Israel erected between the west bank and

25 Israel proper, and the other concerned whether or not

1   the Palestinians had celebrated after the attack of

2   September 11th.  And he had asked questions on those --

3   or he had asked questions of the speaker regarding her

4   statements on those two matters at after her speech at

5   the conference.

6       **Q.  Did you see any responses from the audience**

7   **while --**

8       A.  I wasn't present.

9       **Q.  Okay.**

10      A.  I wasn't present, but I do have copies of

11  documents of these what I just said.

12      **Q.  Sure.**

13          **So then just to be clear, for the record,**

14  **you did not hear Dr. Golden ask the questions?**

15      A.  No, but I have read the references to the

16  questions in the documentation that I received from

17  Dr. Golden.

18      **Q.  And are those his characterizations of the**

19  **questions or someone else's?**

20      A.  Someone else's, I believe.

21      **Q.  Okay.  And do you know how the investigation**

22  **was prompted?**

23      A.  Exactly after this happened, Dr. Golden was was

24  told that he was under investigation.  And he contacted

25  various legal -- legal advices and also several Jewish

1  institutions to seek advice on how to handle the

2  allegations and how to respond to them.

3     **Q.  And is Dr. Golden Jewish?**

4     A.  Yes.

5     **Q.  How was that investigation ultimately resolved?**

6     A.  From what I see in the documents, they -- they

7  decided to eventually drop it.

8     **Q.  Do you know who made that decision?**

9     A.  I don't know who made the decision, but the

10  retaliation against Dr. Golden was multifaceted.

11     **Q.  How so?**

12     A.  So it wasn't just the investigation, but it was

13  the -- there was a dean in the art of and sciences here

14  by the name of Tamara Brown, and she seems to have taken

15  a part in the situation regarding Dr. Golden.

16     **Q.  At what part?**

17     A.  Well, certain decisions were taken about

18  shutting down the Jewish studies program and also, more

19  specifically, removing the name of Israel from the title

20  of the program.

21         So in other words, the -- the program had

22  an office in the main academic building in -- at UNT,

23  all right.  It was an -- it was a very nice office.  I

24  had been there on multiple occasions.  It had a library

25  of books on Jewish subjects, Jewish history, philosophy,

1   religion, and all -- and many, many -- it was a very

2   extensive library, and it had been donated by various

3   people.  It also had a meeting room and an officer for

4   the director and for the director's assistant.

5              So over a period of about two years, all of

6   this was dismantled.  And also what happened was that

7   Dr. Golden lost permission to fundraise to support the

8   program.  So Dean Brown told him that he was no longer

9   allowed to solicit donations from, let's say, people in

10  the Jewish community.

11             She cut his budget for solicitations, and

12  she also cut the budget for his research assistant --

13  for his executive secretary.  And she was absolutely

14  crucial to the running of this program because

15  Dr. Golden's main focus was, let's say, how -- how the

16  program was working academically, but her job was to

17  organize all the different courses and make sure that

18  all the courses within the program were running smoothly

19  and that we had students enrolled in all the courses and

20  so forth.  And Dean Brown cut her position.

21             So what happened was that Richard Golden

22  went to the Jewish community, two sources of funding,

23  and stated that he really needed the assistant to help

24  him run the program, and they came up with $150,000 to

25  support two years of him having this assistantship.  And

1  Dean Brown, according to Richard Golden and other

2  faculty I have consulted with on this -- and I have also

3  asked the funders -- she prevented him from taking the

4  money to hire the assistant.

5              So the university, essentially, declined a

6  gift from the Jewish community of $150,000 to support

7  the Jewish studies -- Jewish and Israel studies program.

8       Q.  Have you heard any explanation from Dean Brown

9  as to why she took those actions?

10      A.  No.

11      Q.  Have you heard any explanation from UNT as to

12  why those actions were taken?

13      A.  No.

14      Q.  Other than Dean Brown, do you know anyone else

15  who may have been involved in the decision to take those

16  actions?

17      A.  I believe the president was involved because

18  I'm -- I was told that a number of people -- donors to

19  UNT from the Jewish community across the country wanted

20  to go and see Dr. Smatresk to discuss this with him, but

21  that he refused to meet with them.

22      Q.  Do you know if he was involved in the

23  decision-making?

24      A.  No.

25      Q.  I take it you don't know that anybody from the

1  college of music was involved in the decisionmaking,

2  right?

3      A.  I don't know that they weren't.  I simply

4  know -- I don't know that they were either.

5      Q.  That was my question.

6      A.  One thing I might mention is that Dr. Golden

7  did take the dean of the music faculty to Israel to

8  visit Israeli institutions of music in the hope of

9  establishing connections between Israeli universities

10  and our faculty of music.  I do -- I know that for a

11  fact.

12          Not the present dean, but the previous one,

13  Dr. Scott.

14      Q.  Other than the incident with Dr. Golden, are

15  you aware of any other incidents where you believe that

16  UNT took negative action against a faculty member

17  because of their speech?

18      A.  No.

19      Q.  And are you aware of any other incident where

20  you believe UNT infringed the academic freedom of any of

21  its faculty members?

22      A.  Apart from Dr. Golden, no.

23      Q.  At UNT, is it customary to get some sort of

24  annual evaluation?

25      A.  Yes.

Timothy Jackson - 9/24/2024

```
 1       Q.  What is that called?

 2       A.  What you just said.

 3       Q.  Oh, okay.  All right.  An annual evaluation?

 4       A.  Yes.

 5       Q.  All right.  And it's based on your performance

 6  as a professor?

 7       A.  Yes.  Well, not just as a teaching professor,

 8  but as a research professor, and in terms of your

 9  service.

10       Q.  I see.  So it's based on three main components,

11  teaching, research, and service?

12       A.  Yes, yes.

13       Q.  I know you've been at UNT for a while, but are

14  there any specific evaluations that you've received by

15  the university that you thought were unfairly low?

16       A.  Yes.

17       Q.  Could you describe those for me?

18       A.  So I believe that the latest chair -- no,

19  not -- not the current chair, but the previous chair who

20  you interviewed, Dr. Brand.

21       Q.  Dr. Benjamin Brand?

22       A.  Yes.  That he undervalued my research.

23       Q.  And how so?

24       A.  He argued, if you read the evaluation, that my

25  research wasn't peer reviewed.
```

Timothy Jackson - 9/24/2024

66

1     Q.  And which evaluation was this?

2     A.  It was probably, let's see, 2020 or 2021, after

3  the -- after this case arose.

4     Q.  Okay.  After volume 12 --

5     A.  Right.

6     Q.  -- of the JSS?

7     A.  That's right.

8     Q.  And -- and we'll do this probably a lot later

9  throughout the day, but when I say "JSS," do you

10  understand that I'm referring to the Journal of

11  Schenkerian Studies?

12     A.  I do.

13     Q.  All right.  So at some point after volume 12 of

14  the JSS was published, Dr. Brand gave you an evaluation

15  that you felt did not properly take into account the

16  value of your research.  Is that --

17     A.  Absolutely.

18     Q.  Okay.  What specifically was in that evaluation

19  that you thought was mistaken or inaccurate?

20     A.  So this gets to the heart of the issue about

21  different types of publications, okay.

22          In scholarship, especially in our field,

23  there are different genres or different types of

24  publications, okay.  So -- so the first type is the one

25  that probably Dr. Brand was the most familiar with,

1  okay.  Which is where you submit an article to a

2  journal, seemingly anonymously, okay, and the journal

3  sends it out to two or three readers.  They read the

4  article, and they decide whether or not they like it.

5  And if they don't, they write a critique, and then the

6  journal makes a decision whether they want the author to

7  revise it or they just reject it.

8              That's one genre.  And that's probably the

9  main genre of most peer-reviewed academic journals.

10      **Q.  And is that generally referred to as the double**

11  **blind peer review?**

12      A.  Yeah.

13      **Q.  Okay.**

14      A.  Okay.  Or triple if you have three readers,

15  which is quite common.

16      **Q.  Okay.**

17      A.  But -- but the thing is there are other genres,

18  okay, including in the same journal -- type of journal

19  as JSS, okay.

20              So the other genres are the following.

21  Let's say you -- you want to put together a book like I

22  did with my Cambridge volumes, right.  So what I did was

23  I approached the authors in the field who I note to be

24  experts in the field.  I said, "I want to do a book of

25  Bruckner studies.  Would you like to contribute?"

1            If they say yes, I say, "Put in -- write me

2    up a blurb or an abstract of the chapter that you want

3    to contribute."  Okay?

4            You gather those together, you write a

5    about the book, why the book is important, why these

6    particular scholars are worthy of contributing, why you

7    think the book will make an impact, and those kinds of

8    things.  You submit that to the publisher.

9            The publisher now has the names of the

10   people who are involved, so it's not blind.  Okay.  And

11   they look at the whole project and they decide, do we or

12   do we not want to do this?  And they send it out to

13   readers.  The readers are probably familiar with the

14   work of all these scholars because they're usually

15   established scholars.  And that term is important,

16   established scholars, okay.

17       **Q.  What does that mean?**

18       A.  It means that they have built up reputations in

19   their field, right, or that they have the requisite

20   credentials, let's say a doctorate in music theory,

21   or -- but -- but usually for books, it's more than just

22   having a degree.  It's having published already in the

23   field.  All right?

24            So for example, when I was putting together

25   Bruckner studies and Sibelius studies for Cambridge, I

Timothy Jackson - 9/24/2024

69

1  went through exactly the procedure that we're talking

2  about right now.  The -- they had three readers.  The

3  readers came back and said, okay, we think the project

4  is good, but we want so and so to do such and such,

5  right.  We want -- we want you to convey to the writers

6  these concerns about these things.  Okay.

7              So then the editor goes back to the writers

8  and says, Okay, the whole project is going forward.

9  We'd like to include your chapter, and we want you to

10  make these changes in your topic.

11              And so, that's how the project goes

12  forward, and then you do all the editing and

13  proofreading and all of that.  And it's a long process,

14  but in the end, you get a book, all right, where

15  everybody contributed chapters.

16      **Q.  And in the process that you've been involved in**

17  **where that has happened, do you recall whether the --**

18  **the readers -- the editor -- the publisher's readers**

19  **gave feedback that advocated changing or modifying the**

20  **substance of the articles or --**

21      A.  Yeah, sometimes there were comments about that,

22  but -- but rarely.

23      **Q.  Okay.**

24      A.  Rarely.  Usually, they were more about just the

25  project as a whole.  Okay.  So they didn't say you can't

1    say this or you can't say that.  No.  That wasn't the

2    tenor of it.  Okay.

3        **Q.  And just to clarify, you know, an editor could**

4    **come back with a -- with a comment such as, what you**

5    **have is good, but please expand a little bit further to**

6    **fill out a picture.  Or an editor could come back and**

7    **say, I don't think what you have works because I don't**

8    **think it is a -- I don't think it's a good argument.**

9    **You need to -- you need to, you know, beef this up.**

10               **Do you recall -- or an editor may have**

11   **other kinds of feedback.  Do you recall what specific**

12   **types of feedback that reviewers were giving to the**

13   **articles that you collecting in the role as the editor?**

14       A.  It was never about content in the sense of,

15   let's say, you can't say this or you can't say that.  It

16   was always about more, like, You can beef this up by

17   doing such and such.

18       **Q.  I see.  Do you --**

19       A.  But there was no censorship.  There was no

20   attempt at censorship.

21       **Q.  Sure.  Did you consider that process to be a**

22   **form of peer review or different?**

23       A.  Well, it is a form of peer review, but it's not

24   the same as, let's say, the journal reviews where

25   supposably the people don't know who the author is.

Timothy Jackson - 9/24/2024

1   Often they do because they know what the person's

2   expertise is -- if they know anything about their field,

3   they can guess, but they don't know for sure.  Okay.

4   But in the case of the book proposals, they know for

5   sure because they see the name of the authors, right.

6              And the other thing was that for all the

7   books that I edited, I had to submit the -- the CVs of

8   the authors with the list of publications.  So that was

9   crucial, yeah.  They would look at the list of

10  publications and say, Okay, this guy really or this

11  woman really knows what they're doing, you know, because

12  they have a track record.

13             But that's only another genre.  And then

14  there's another genre which has to do with where you

15  don't actually peer review people, or you don't peer

16  review them in the same way.  And that has to do with

17  festschrift -- what are called festschrift where you

18  are, basically, doing homage to a scholar with a

19  particular interest.  Let's say, in this case, of

20  Laufer.  He was a -- known to be one of the really truly

21  great scholars of Schenkerian analysis.

22             And so, what you would do is you would look

23  for people who were closely associated with him, either

24  as a professor or in a professional way, a colleague of

25  his, who had worked closely with him, or people who had

1  studied with him or people who in some way could shed

2  light on his contribution, all right.  And that is

3  exactly what we did in the case of a Festschrift.  And

4  that is very often the way that festschrift are

5  published.

6            And in this case, Laufer had died two years

7  before.  So this was not just an festschrift of a living

8  person, but actually a kind of a memorial festschrift to

9  honor the memory of this particular scholar.

10      **Q.  And to clarify for the record, this festschrift**

11  **was a previous volume of the JSS?**

12      A.  It was.  It was a volume that we decided to

13  devote to honoring really a foundational figure in our

14  field.

15      **Q.  And is it your understanding then that a**

16  **festschrift, sort of, by it's very nature, is recognized**

17  **in academia as a non-peer reviewed thing?**

18      A.  It's -- it's very different from a peer

19  reviewed article because you're -- right from the

20  get-go, you're already restricting the people who can

21  contribute because the people who are chosen to

22  contribute are people who have a special reason for

23  being in the festschrift.  So that's already baked into

24  the -- into the genre.

25      **Q.  Sure.  So I think I'm understanding you right.**

1  Correct me if I'm wrong.

2       A.  Okay.

3       Q.  But generally, in your experience, if you see

4  something published as an festschrift, people understand

5  that's not the same as a peer-reviewed publication.  Is

6  that fair or is that --

7       A.  Well, the prestige of the publication is kind

8  of independent of whether it's being peer reviewed.

9            Do you follow?

10      Q.  Yes.  And --

11      A.  In other words -- yeah.

12      Q.  -- that was not really what I was asking.  I

13 was more asking if someone sees a group of articles --

14      A.  Right.

15      Q.  -- that are published in some kind of

16 journal --

17      A.  Right.

18      Q.  -- they may not know whether those articles are

19 peer reviewed or not.

20      A.  Oh, right.

21      Q.  But if they see them published and labeled as

22 an festschrift, does that tell the reader these are

23 likely not peer reviewed because of the nature of an

24 festschrift?

25      A.  To some degree, yes, I would say.  Yes.

Timothy Jackson - 9/24/2024

74

1  Q.  Okay.

2  A.  Like we didn't specifically say that in the

3  introduction to the -- the festschrift in the articles,

4  but -- but what we did provide was a very clear

5  statement that this was a festschrift in the honor of

6  and memorializing Edward Laufer.  That was the point.

7  Q.  Yes.

8  A.  So anyone reading it would understand the

9  genre.

10  Q.  I see.  Yeah.  They would understand this is

11  different from what you --

12  A.  Normally publish.

13  Q.  -- normally publish --

14  A.  Right.

15  Q.  -- as double blind peer-reviewed articles?

16  A.  Right.  Correct.

17  Q.  Okay.

18  A.  And can I add one other genre to the list?

19  Q.  Yeah, please do.  Go back to your list.

20  A.  So the fourth thing on the list are what are

21  called opinion pieces, all right, really.  Although I

22  wasn't fully aware of that when I did it -- when I used

23  the -- when I wrote -- organized the symposium, okay.

24  But -- but these are, essentially, opinion pieces.  And

25  it's become clear to me now, for example, that other

 1  journals that we took as our model do exactly the same

 2  thing.

 3          So for example, Ewell 's presentation,

 4  which was then published in Music Theory Spectrum, which

 5  is regarded as the industry standard in our field,

 6  published four of these speeches without any peer

 7  review.  So in other words, we did nothing differently

 8  from what Music Theory Spectrum did -- or at exactly the

 9  same time, might I add.  The publications appeared more

10  or less at the same time.

11          And there was no statement, so we didn't

12  know that they weren't peer reviewed either until

13  Dr. Ewell's testimony.

14      **Q.  Is -- that was going to be my question.  Is**

15  **your knowledge of everything you just mentioned now what**

16  **was published in the Music Theory Spectrum, does that**

17  **come from Dr. Ewell's testimony in his deposition in**

18  **this case?**

19      A.  Not entirely.  Prior to his dep.  Yeah.

20      **Q.  Okay.  So what other knowledge do you have?**

21      A.  So I knew, from other accounts from other

22  scholars, that the four plenary session speeches of

23  which Ewell -- Ewell's was one was not peer-reviewed,

24  from testimony -- from talking with and communicating

25  with other scholars.  So I knew that the -- that the

1 presentation that was given, the one in contention here,

2 that that was not peer reviewed, okay.

3            I knew that there was no control by outside

4 scholars of that.  What I didn't know when we published

5 the symposium was that it would be published

6 simultaneously -- almost simultaneously without peer

7 review in Spectrum.  That's what I didn't know.  Do you

8 understand?

9      Q.  **When you say "it," you're referring to**

10 **Professor Ewell's --**

11      A.  Yes.  In other words, what happened was that we

12 published our symposium almost at the same time as

13 Spectrum published his talk, okay.  What I didn't know

14 at the time of publishing our symposium was that Ewell's

15 talk also wasn't reviewed in any way before it was in

16 print in Spectrum.

17            What I did know was that the choice of his

18 talk for that conference meeting had not been peer

19 reviewed.  That, I knew because I had heard that from

20 other people.

21      Q.  **Okay.  So we'll come back to volume 12 of the**

22 **JSS in a -- in a few moments.  But just regarding your**

23 **knowledge about Ewell's -- the transcript of Ewell's**

24 **talk that was published in Spectrum --**

25      A.  Right.

1      Q.  -- who did you find out from?

2           Who did you talk to, to learn whether that

3  was peer reviewed or not?

4      A.  I learned that two or three days ago, when

5  Ewell gave his deposition.

6      Q.  Was that --

7      A.  I did not know that Spectrum had published the

8  talk more or less verbatim without any kind of peer

9  review.  That I didn't know, at the time when we

10 published our thing, which was more or less

11 contemporary.

12     Q.  If -- well, in your experience, do you believe

13 that if an academic journal is going to publish the

14 transcripts of talks that have been delivered at some

15 kind of plenary meeting, do you believe that they should

16 submit those transcripts for peer review before they

17 publish them?

18     A.  No.

19           MR. ALLEN:  Objection.

20           THE WITNESS:  Oh, can I answer or not?

21           MR. ALLEN:  You must answer, yes.

22           THE WITNESS:  Okay.  So I don't think they

23 are required to do that.  There's no law that says they

24 should.  Why?

25     Q.  BY MR. WALTON:  Are you aware of any academic

1  journal that has taken the transcript of a talk, a

2  presentation that was given orally, and then subjected

3  that transcript to peer review before publishing it?

4      A.  There must be because there's no laws about

5  doing it or not doing it, so I'm not -- I haven't done a

6  thorough search of all talks given and then published,

7  and I couldn't answer you.  But I would suspect that

8  there are some where there was peer review and changes

9  were mandated, and there are probably others which were

10  not.

11      **Q.  Sure.  I'm just asking whether you know of any**

12  **specific examples that -- where a transcript of a talk**

13  **was subjected to peer review before publication?**

14      A.  I think I do, but I'd have to look it up in my

15  records.

16      **Q.  Okay.**

17      A.  But I'm not sure.  I want to -- my answer

18  should be I'm not sure.  I'm sure that somewhere in this

19  wide universe of scholarship that both situations have

20  occurred and frequently, I would imagine.

21      **Q.  I understand what you're saying.  I just want**

22  **it to be clear.  Do you -- are you thinking of a**

23  **specific example in your mind that you might not be sure**

24  **of, but you're pretty sure was --**

25      A.  Well, what happened was after this broke --

Timothy Jackson - 9/24/2024

79

1  after this controversy arose, I did a thorough

2  investigation myself to see if opinion pages were

3  subjected to peer review, and I came up with examples of

4  both yes -- what seemed to me both yes and no.

5      **Q.  Okay.  And just --**

6      A.  So there's no law.  In other words, there's no

7  law that says you must subject them to peer review or

8  you mustn't.  And some people do, and some don't.

9      **Q.  And I want to be careful that we're talking**

10 **about the same thing here.**

11     A.  Uh-huh.

12     **Q.  So my question was not about opinion pieces in**

13 **general, but only about those kinds of pieces that are**

14 **transcripts of oral presentations.**

15             MR. ALLEN:  Objection.

16     Q.  BY MR. WALTON:  So if someone gives a

17 presentation and then after that presentation a

18 transcript of what they said is going to be published,

19 do you have any specific examples that you're aware of

20 where that transcript was subjected to peer review

21 before being presented?

22     A.  Not off the top of my head.

23     **Q.  Okay.  And then, now let's zoom out to opinion**

24 **pieces.  How would you describe a difference between an**

25 **opinion piece and a transcript of an oral presentation?**

1    A.  Well, they're -- they're actually two different

2  things logically, okay.  You can give an oral

3  presentation which is not an opinion piece.  And in

4  fact, most of the presentations at the SMP are not

5  opinion pieces at all.  They're -- or shouldn't be

6  opinion pieces.  They should be scholarly presentations

7  that are based on factual evidence, right.  And you can

8  have the converse.

9           So I'm not sure what you're getting at.

10  Can you explain the question a little more?

11    **Q.  Yeah, let me -- let me get even -- I'll try to**

12  **get even more specific.  Okay?**

13    A.  Okay.

14    **Q.  What is your understanding of an opinion piece?**

15    A.  So an opinion piece is where the author

16  expresses his views or her views of a -- on a certain

17  topic.  And, for example, let me give you some

18  correspondence that I had with CUNY about Ewell's piece.

19  So -- or actually I didn't have the correspondence, a

20  colleague of mine.

21           So the colleague of mine wrote to CUNY's

22  ethics officer, a woman named -- I think Bobbi or

23  something like that.  I have a copy of this.  And he

24  said -- he provided very specific instances where Ewell

25  is expressing ungrounded opinions and opinions that --

1  that were based on false quotations, quotations that

2  were incomplete and misleadingly so.

3      Q.  And who was this colleague?

4      A.  His name is Scott Thruwald [phonetic], and he's

5  also a CUNY graduate.  He's an alum of the same program

6  at the graduate center in --

7      Q.  And were you --

8      A.  He's also a lawyer, by the way.

9      Q.  Is he on faculty at a university?

10     A.  No, he's not.  He's a lawyer by training -- by

11 training also.  So he has degrees -- he has a doctorate

12 in musicology from CUNY grad center, like me.  He was

13 ahead of me a little bit.  And then he also has a law

14 degree, and he earned his living as a lawyer.

15         So he sent a letter to the ethics officer

16 at CUNY about Ewell's presentation, which -- and the --

17 the -- the people at CUNY took a look at Ewell's

18 presentation and they responded more or less as

19 follows -- I'll quote -- but Ewell's piece does not

20 constitute research but is an opinion, and therefore is

21 not liable for the academic standards that are applied

22 to scholarly work.  So --

23     Q.  And what piece were they talking about?

24     A.  They were talking about his piece published in

25 Spectrum and also delivered as a talk.

Timothy Jackson - 9/24/2024

82

1    Q.   Okay.  And when --

2    A.   And also his MTO article.  So that -- those

3  three things were all brought up in the letter, and the

4  response was to those -- to the problems that were cited

5  in those -- in those three things.

6    Q.   And the MNO article is the --

7    A.   Music theory online article.  That was the

8  expanded version of the talk.

9            So this lawyer, Scott Thruwald, sent CUNY a

10  very clear document outlining the false statements and

11  also egregious omissions from Ewell's quotations, and he

12  cited CUNY's own ethics standards for scholarship in the

13  letter.  And so, the response to his letter was that

14  Ewell's piece is not to be held to those standards

15  because it's opinion, not research.  That's almost a

16  literal quotation.

17            And that -- I don't know if that was

18  produced in the -- in the documentation that we

19  submitted, but it's in the record.  It should be in the

20  record.

21    Q.   And do you agree or disagree with that opinion?

22    A.   I agree.  It's not -- it's not scholarship

23  because it's not based on fact.  And also it violates

24  basic scholarly ethics, which are in the -- the ethical

25  rules of quotation which say that you must not admit

1  contrary statements that contradict your thesis or your

2  hypothesis.

3      **Q.  Well, I guess do you agree with CUNY's**

4  **statement that because this was an opinion, therefore**

5  **it's not held to the same standards?**

6      A.  I do.

7      **Q.  Okay.**

8      A.  In other words, he's free to express his

9  opinion.  No sanctions, no retaliation of any form

10  should be taken as long as it's understood that this is

11  his opinion.

12      **Q.  And when did you first become aware of that --**

13  **that final category that you described for us of opinion**

14  **pieces.**

15      A.  Well, I was always aware of it.  That's why I

16  asked for the -- I mean, that -- I didn't come up with

17  the idea of the symposium, but -- myself, but I thought

18  it was a good idea.

19      **Q.  And we'll get into this a little bit later.**

20  **But is it your understanding then that the symposium**

21  **that was published in volume 12 of the JSS was comprised**

22  **of opinion pieces?**

23      A.  Yes.  People were asked specifically for their

24  response to his contentious statements.  I mean, it was

25  very controversial statements, so we asked for opinion

1    pieces.

2        Q.  Do you recall whether the call for papers used

3    the word "opinion piece"?

4        A.  It did not.

5        Q.  Okay.

6        A.  But what it did say was we wanted your reaction

7    to the talk.  And they were not intended to be full

8    scholarly papers because we said that they -- we wanted

9    only short responses, and turnaround time was also

10   short.  They weren't intended to be, you know, full

11   articles, although some people did submit pretty long

12   articles.  But that wasn't the intention.

13       Q.  So the intention all along wasn't to have the

14   double blind peer review process?

15       A.  Never.  Never.

16       Q.  Okay.  I want to go back to the -- all the way

17   back to the annual evaluations.  I think that's where we

18   first got on this --

19       A.  Right, right.

20       Q.  -- this rabbit trail.  Yeah, yeah, yeah.

21   Several pages back.

22       A.  Yes.

23       Q.  You mentioned that -- that Dr. Brand you

24   believe did not properly value your research?

25       A.  Right.

Timothy Jackson - 9/24/2024

85

```
 1      Q.  What specific rating did he give you for
 2  research on that evaluation?
 3      A.  I believe it was a two.
 4      Q.  Out of?
 5      A.  Four.
 6      Q.  Okay.  And what were your -- what were your
 7  previous evaluations?
 8              How had they rated -- rated you for
 9  research?
10      A.  Throughout my career, I got mostly threess.
11  But it --
12      Q.  Had you ever had a two before?
13      A.  No.
14      Q.  Have you ever had a four?
15      A.  Once.
16      Q.  Okay.  When was that?
17      A.  That was the year that I was put up for the
18  distinguished research professorship.
19      Q.  For the first time?
20      A.  Yeah.  And I only got a four once, I believe,
21  in research.  But to be honest, I really didn't care
22  because I felt that my research is what it is, you know,
23  and people can take it or leave it.  But I -- as long as
24  it was adequate, that was fine with me.  If they want to
25  give me a four, that's nice; if they don't, that's okay.
```

1    Q.  How did you feel when you got a two?

2    A.  Well, I've been here, as I said, since 1998,

3   right.  I started in -- at UNT in 1998, and the whole

4   time I had been at UNT, that was the first time I ever

5   got a two.

6            And I'm a research professor, so it

7   particularly hurt because, although I'm not a -- I'm not

8   a stellar teacher maybe, but I'm a pretty good teacher,

9   and I think I am a stellar scholar in my own way.  And

10  for the first time, I got a two, that seemed like a real

11  outlier.

12           And it was even more hurtful because at

13  that point I could no longer be evaluated by the PAC --

14  the PAC faculty academic affairs committee of the

15  division.  Which the reason I couldn't be evaluated by

16  them any more was because some of the members of that

17  committee -- in fact, most of them -- were defendants in

18  this case.

19    Q.  So after you -- after you received or saw a

20  rating of two, did you talk to Dr. Brand about it?

21    A.  Not immediately, no.

22    Q.  Did you talk to anybody else about it?

23    A.  Yes, I think so.

24    Q.  Describe those conversations for me.

25    A.  Oh, gosh.  I spoke -- I think I spoke to

1 Dr. Slottow about it, yeah.

2    Q.  And what did he think?

3    A.  I want to be careful what I say because I don't

4 want to misrepresent what he might remember of that, but

5 I think that he saw it as part of retaliation against me

6 for having published the symposium.

7    Q.  Did he use the word "retaliation"?

8    A.  I can't remember.

9    Q.  Okay.  What did he say that -- that led you to

10 believe that was his impression?

11    A.  Oh, gosh.  I -- I can't remember the exact

12 words, to be honest, because that conversation took

13 place maybe three years ago.  But the gist of the

14 conversation was that I was on the outs.  I was

15 canceled, basically, as a professor, and that this was

16 just another ramification of my cancellation.

17    Q.  Did anything -- did anything negative happen to

18 you because you got a two rating that year?

19    A.  I don't know.  And the reason I don't know is

20 because I don't know how the decision about my merit was

21 made.  Usually the dean has a two-pronged procedure

22 where the -- the committee makes their recommendation

23 and the chair makes a recommendation, and the -- then

24 the dean's job is to sort of make a decision based on

25 those two inputs.

1    But in my case, there was no such second

2  input to compensate for the chairs, you see.  Like for

3  example, if the committee felt that my research was --

4  was normal, then perhaps that would have mitigated the

5  decision.  But I don't know because I don't know what

6  the process for a canceled professor is.

7    **Q.  And when you talk about the decision making by**

8  **the dean, what decision are you referring to?**

9    A.  Salary, merit -- merit increase and salary.

10  Okay.

11    **Q.  Did you receive a merit increase that year?**

12    A.  I'm not sure, to be honest.  I think there were

13  a lot of things going on because of COVID.  COVID had

14  hit, and then there was a massive surge of inflation, so

15  everybody got huge -- got huge raises, but they were

16  just automatic raises because of the inflation problem,

17  not -- it wasn't justified what was due to merit or not

18  due to merit.  So I can't say.

19    And I don't have access to he clear

20  documentation of what everybody else was awarded, so I

21  can't -- I can't comment.  I don't know.

22    **Q.  Okay.**

23    A.  But the point of this whole process of annual

24  review by both the chair and the PAC committee, which I

25  also chaired, so I know this, is that they make

Timothy Jackson - 9/24/2024

89

1  recommendations about how well the person is doing, and

2  then the dean makes a decision -- a recommendation to

3  the provost about how merit should be allocated.  So I

4  have no further knowledge other than that.

5          And that, in my case, there was no input

6  from the PAC.  That I know.

7      Q.  So it's your understanding is that that year,

8  you and your colleagues got significant raises, but you

9  don't know if it was related to merit or not?

10     A.  Right.

11     Q.  Okay.  Other than that, are you aware of any

12  negative consequences that may have resulted from your

13  evaluation including a two rating on your research for

14  that year?

15     A.  Well, I used to serve on various committees

16  where my research product credentials were valued, and

17  that would include the doctoral dissertation committee,

18  which looks at doctoral students and evaluates their

19  progress and evaluates their proposals for

20  dissertations.  And I was removed from all committees

21  like that.

22     Q.  Who removed you from that committee?

23     A.  I assume that Brand and -- in conjunction with

24  the Dean -- or in consultation with the Dean would have

25  made it so that I didn't serve any more on any of those

1  committees.

2      Q.  And you say "I assume."  I just want to ask to

3  clarify, are you aware of any specific -- specific facts

4  that led you to make that assumption?

5      A.  Well, the fact was that I was censored by the

6  SMT, I was censored by my colleagues, and in that

7  capacity of being censored, and I would not -- I was

8  removed from all committees, I assume that there is some

9  kind of connection between those two things.

10 Wouldn't -- wouldn't you?

11     Q.  Okay.  Well, we'll talk about that a little

12 bit -- a little bit later.

13          Has anyone ever told you who it was that

14 made the decision to remove you from any of those

15 committees?

16     A.  No.

17     Q.  Has anyone ever provided you with the reasons

18 why you were removed from those committees?

19     A.  No.

20     Q.  How many committees do you believe you were

21 removed from?

22     A.  I was on various committees for the division,

23 and gradually, I was shunted off them, but -- but after

24 this whole scandal broke, I didn't serve on any

25 committee at all in the colleague of music.

Timothy Jackson - 9/24/2024

91

Q.  Do you recall, approximately, how many committees you were serving on before all --

A.  Sometimes I served on two.  For many years, I was actually the chair of the lecture committee, which is an important one because it decides who's invited.  But I was gradually let off of that committee.

And I was also serving now and again, more on and off, on the doctoral committee that I was telling you about, the graduate committee that was supervising dissertations.  I was on and off that, but then I was completely removed.  Like -- so I wasn't serving on any committees, at all.

And I also served, by the way, on job searches, quite a few.  And that all stopped, too.

Q.  In spring of 2020, were you on the -- the -- the lecture committee or whatever committee it was you said brings in outside speakers?

A.  You know, I can't remember.  It's on all the annual reports.  It's all the -- you have to list all the committee work that you do.

So sometimes I was on the -- sometimes I was on university committees, but not on college of music committees, sometimes the other way around.  But I was always doing something in the -- in the college of music because, I mean, they want to hit you up for --

Timothy Jackson - 9/24/2024

1  for various things.  And so, assuming that I was a

2  member of the college of music in good standing,

3  quote/unquote, I would assume that I was on a college of

4  music committee, a search committee, which is also a lot

5  of work.  One of those three are the committee works I

6  did.

7       Q.  Let me ask it another way.

8           Other than the committee that reviews

9  student dissertations, is there another committee that

10  you recall being on in the spring or summer of 2020?

11      A.  I can't remember all the details, but I was on

12  the PAC.  In fact, I was chairing it.

13      Q.  In the summer of 2020?

14      A.  Not summer, but in the regular semester, before

15  the -- the whole crisis, I was actually the chair of the

16  PAC.  I was chairing that committee, which is the

17  personnel affairs committee, which makes decisions about

18  tenure.  So it's -- it's an important committee.  So not

19  only was I on it, I was on it for a long time, by the

20  way.

21      Q.  And when did you get off of that committee?

22      A.  After the whole thing with the journal.

23      Q.  And how did you come to no longer be on that

24  committee?

25      A.  I really don't know.  Maybe I was rotated off

Timothy Jackson - 9/24/2024

93

1    or taken off.  I don't know.  I don't -- I think that

2    the chair in consultation with the dean would make

3    decisions about who was appointed to these committees

4    and when, right.

5         Q.  But --

6         A.  All I know is that I was the chair and then I

7    stopped being on the chair.  But that seemed fair to me

8    because -- because of what happened.

9         Q.  **Have you served on any committees since the**

10   **summer of 2020 at UNT?**

11        A.  Yes.

12        Q.  **What committee?**

13        A.  I served on the awards committee for a number

14   of years for the whole university.  That would award

15   faculty members for their service for teaching, not for

16   their research.

17        Q.  **Any other committees that you recall?**

18        A.  No.

19        Q.  **When you were on the PAC, do you recall whether**

20   **the members of that committee were on some kind of cycle**

21   **that they served for certain terms?**

22        A.  Yes, yes.

23        Q.  **How long was a term on that committee?**

24        A.  I think it could be three years.

25        Q.  **And how many terms did you serve on that**

1  committee?

2      A.  I don't remember, to be honest, but it could

3  have been a good time to get me off.  I'm not disputing

4  that.  All I'm saying is that I was off and never back

5  on in the four years since then.

6      Q.  And --

7      A.  There was never any committee that I

8  participated in.

9      Q.  **What about the committee that reviews**

10  **dissertations, what is the name of that committee?**

11      A.  It's called GADCOM.

12      Q.  **Okay.**

13      A.  G-A-D-C-O-M.  And there are also some rotations

14  on that depending on people being on leave, being -- you

15  know, in other words, there were also on this -- all the

16  committees that are affected by people going on leave

17  and so on.  Like right now, I'm on a committee for the

18  first time in the college of music since my cancellation

19  in 2020, and I'm replacing somebody who's on leave.

20      Q.  **And what committee is that?**

21      A.  I'm on the committee that evaluates DMA

22  projects and prequalifications.

23      Q.  **And what does DME stand for?**

24      A.  DMA, doctorate in musical arts.  I mentioned it

25  earlier.  It's for performers.

Case 4:21-cv-00033-ALM    Document 82-2    Filed 12/20/24    Page 95 of 296 PageID #: 1491

Timothy Jackson - 9/24/2024

95

1     **Q.  That's right.**

2     A.  Right.

3     **Q.  And what is that term for that you're on that**

4 **committee?**

5     A.  You know, I don't know how -- I would probably

6 be -- if I'm still deemed to replacing somebody on

7 leave, it would be one semester if that person is on

8 leave for one semester, which I don't know.

9     **Q.  Do you know what the term for the other members**

10 **for that committee is?**

11     A.  No.

12     **Q.  What about the GADCOM --**

13     A.  Committee.

14     **Q.  -- committee, what is the term for those**

15 **committee members?**

16     A.  I think it could be three years, but I'm not

17 100 percent sure.  And again, there's been a lot of

18 fluctuation in who's being on the committees, when.

19     **Q.  And how many terms did you serve on that**

20 **committee?**

21     A.  Oh, God.  Over the years -- like, remember,

22 I've been there 25 years, right.  So I must have served

23 on there maybe -- on and off, on and off, God knows,

24 what, ten times.

25     **Q.  Okay.**

1    A.   Ten semesters.  I really can't tell you because

2    it's been 25 years since I came.

3              But what I can say is that I was on that

4    committee from the get-go, when I first came to UNT,

5    which is not always the case with new faculty.  And the

6    reason that I was put on immediately was they needed

7    somebody with my credentials -- my publication

8    credentials and who was -- it was called -- at the time

9    it was called Category 3 professor.  Okay.  The -- the

10   Toulouse Graduate School had different categories, so --

11   and the highest was Category 3.  And when I first

12   started at UNT, I was immediately on that committee.

13        Q.   Who put you on the GADCOM committee?

14        A.   I don't know.  I got the committee assignment,

15   and whenever I was named to do something, I did it.

16        Q.   And do you know who it was who decided to put

17   you on the PAC?

18        A.   I think that, at that time, it was an election,

19   and the committee elected me -- I only served one

20   semester because the chair who been chairing it -- it

21   was for the spring semester -- he went on leave.  And so

22   the committee was asked to vote in a chair for the

23   semester that he went away.

24        Q.   And the committee voted you as the chair?

25        A.   They did, unfortunately.

1    **Q.  And so, what was your understanding -- when**
2    **they voted you as the chair, were you simply there to**
3    **fill in until the previous chair came back or were you**
4    **there for --**

5        A.  It wasn't clear actually to me.  Nobody ever
6    said anything to me about it, and I just did my duty as
7    was prescribed.

8    **Q.  Okay.  And -- and just to go back to what we**
9    **said earlier, if you'll allow me to finish the question**
10   **before you start answering, it will make our court**
11   **reporter's job much easier.**

12              MR. ALLEN:  Ben, can I interject?  We're at
13   about 11:30, and I don't want to interrupt your flow,
14   but maybe you'll come to an end of a line of
15   questioning, I was going to suggest a break and then
16   maybe we go till 1:00 and break for lunch.

17              MR. WALTON:  That sounds reasonable.

18              MR. ALLEN:  Does that sound reasonable?

19              MR. WALTON:  Yeah, let -- yeah.  I'll get
20   to a stopping point very soon.

21              MR. ALLEN:  Please.  And then I don't want
22   to interrupt, but -- go ahead.

23              MR. WALTON:  Good suggestion.  Thanks.

24       Q.  BY MR. WALTON:  After the one rating by
25   Dr. Brand of a two for your research, did Dr. Brand give

1 you any other annual evaluations after that?

2     A.  I think there was one more before he stepped

3 down as chair.

4     **Q.  And what did he rate you as research for that**

5 **evaluation?**

6     A.  I believe I got a three again, but I'd have to

7 check.

8     **Q.  Do you recollect any other evaluations that**

9 **you've received that you perceived as negative or**

10 **unfairly low in any category?**

11     A.  Yes.

12     **Q.  How many?**

13     A.  One.

14     **Q.  Okay.  Because if you were going to tell me 20,**

15 **I'd say let's break, but since there's only one, let's**

16 **go ahead and discuss that.**

17     A.  Oh, actually, my answer is no, because the --

18 the -- the rating was not -- not low, okay.  So the

19 answer -- I have to revise my answer then.

20     **Q.  Sure.**

21     A.  Is there was no -- no.  So the answer is no,

22 because there was discussion between the faculty member

23 me and the chair, Brand, and he revised his rating.

24 So --

25     **Q.  I see.**

Timothy Jackson - 9/24/2024

99

1        A.  So that doesn't count.  That doesn't answer

2   your -- in other words, it answers your question there

3   was no dispute.

4        Q.  No other one?  Okay.

5        A.  No.  Yeah.

6        Q.  And was that after the evaluation where you had

7   gotten the two?

8        A.  No, that was before.

9        Q.  It was before?

10       A.  Right.

11       Q.  Do you recall what year that was?

12       A.  It may have been the year before, but I'm not

13  sure.  It could have been two years before that.

14       Q.  Do you recall whether it was before or after

15  volume 12 of the JSS --

16       A.  It was before.

17       Q.  -- was published?

18       A.  Before.

19       Q.  I see.  So -- and do you recall what the -- the

20  initial negative number was that was revised?

21       A.  It was a two that was revised up to a three.

22       Q.  And what category was it?

23       A.  That was in teaching.

24       Q.  In teaching?

25       A.  Yes.

1    Q.  Okay.  So let me make sure I understand this

2    straight.

3                At some point before the publication of

4    volume 12 of the JSS --

5    A.  Right.

6    Q.  -- Dr. Brand gave you an annual evaluation

7    indicating that -- that he was initially going to give

8    you two rating on teaching --

9    A.  Right.

10    Q.  -- but then you went to discuss that with

11    him --

12    A.  Right.

13    Q.  -- and he revised that to a three?

14    A.  Correct.

15    Q.  I got that straight?

16    A.  You did.

17    Q.  Okay.

18    A.  And more information was provided, I think.

19    Q.  By you to Dr. Brand?

20    A.  Yes.

21    Q.  I see.  What information did you provide him?

22    A.  I think it was about my teaching and it was

23    about certain concerns that he had raised, and I showed

24    that I tried to address them.

25    Q.  Okay.  And how did that --

1      A.  But -- but that didn't -- I mean, that -- in

2  other words, based on that discussion, he decided to

3  revise it to a three.

4      **Q.  I see.**

5      A.  So he never actually registered the two.

6      **Q.  I see.  And -- and how did that discussion go**

7  **with Dr. Brand, to the best of your recollection?**

8      A.  It was a discussion in which we both were civil

9  and both presented our concerns, and eventually, it was

10  resolved.

11      **Q.  Other than what we've already discussed, do**

12  **you -- do you have any other -- any other instances**

13  **where you believe on an evaluation that you were**

14  **initially or ultimately ranked unfairly?**

15      A.  No.

16          MR. WALTON:  All right.  Let's go ahead and

17  take a break.

18          THE VIDEOGRAPHER:  We're off the record at

19  11:31 a.m.

20     (A recess was held from 11:31 a.m. to 11:51 a.m.)

21          THE VIDEOGRAPHER:  We're back on the record

22  at 11:51 a.m.

23      Q.  BY MR. WALTON:  Dr. Jackson, we're back after a

24  brief break.  Are you ready to proceed?

25      A.  I am.  And I did remember one other situation

Timothy Jackson - 9/24/2024

102

1   that arose --

2        Q.  Sure.

3        A.  -- about a faculty member being disciplined for

4   expressing his viewpoint.

5        Q.  And what was that situation?

6        A.  And that was in the math department.  There

7   was --

8        Q.  I'm sorry.  What department?

9        A.  Mathematics.

10       Q.  And what college is that in?

11       A.  Sciences, I would imagine.  Arts and sciences,

12  as well.

13       Q.  But not college of music?

14       A.  I'm not sure -- no.  But it happened shortly

15  before the situation with me, and it involved an adjunct

16  professor in that department who was fired because he

17  pushed back against some people who had left fliers

18  indicating a certain point of view in the faculty

19  lounge, and he had removed those flyers.

20       Q.  Who's the name of the professor?

21       A.  I'm trying to remember his name.  I spoke with

22  William Cherry, who was the chair of the department at

23  that time, about it, so I'm -- I'm very clear about the

24  facts.  In fact, William Cherry was involved in that

25  case.

1    Q.  Does your understanding of that situation come
2  from what you learned in Cherry?
3    A.  It came from him and also from other people and
4  reports in the news and so forth.
5    Q.  Okay.  Any other direct knowledge from a
6  particular faculty member of UNT?
7    A.  No, but it was from reading press reports and
8  talking with William Cherry about it.
9    Q.  What were the -- what were the what was the
10  nature of the flyers that the professor picked up?
11    A.  So they were -- I'd rather not go into the
12  details of what the flyers said because it's a little
13  bit, you know, off -- off the wall.  But it was, kind
14  of, bathroom humor about -- you know, about what's
15  regarded as proper and improper in academia now.
16    Q.  And I -- I understand that some things are
17  uncomfortable to discuss.
18    A.  Yeah.
19    Q.  But since this is a legal proceeding, we have
20  to go ahead and discuss it.  If you want to use your
21  discretion in describing what happened, that's fine.
22  But could you describe for us, generally, what was the
23  nature of the content contained on those flyers?
24    A.  So the -- the -- I need to -- I need to think
25  back to the -- to the incident itself, but the -- the

Timothy Jackson - 9/24/2024

1  upshot of the whole thing was that he considered these

2  worthy of being trashed -- these flyers worthy of being

3  trashed.  They were advocating a position that seemed

4  oppressive to this faculty member.

5      Q.  What position was that?

6      A.  Well, that faculty members had to toe certain

7  lines about politically correct discourse, and

8  especially as it applies to mathematics.

9      Q.  What lines?

10     A.  So let's say the -- part of the issue here was

11 whether or not the principles, let's say, of DEI applied

12 to mathematics, okay.  And this faculty member obviously

13 disagreed, and he collected these flyers and said that

14 they have no place in the faculty lounge -- I think it

15 was the faculty lounge -- and so, he treated them as

16 trash that needed to be thrown away.  That's what I'd

17 like to say.

18     Q.  And were the flyers prepared by a student or

19 another faculty?

20     A.  You know, I really don't know who prepared

21 them.  I really don't know.  But what seems to have

22 caused the whole controversy was that he picked them up

23 and threw them in the trash.

24     Q.  He picked up flyers that someone else had

25 made --

1      A.   Yes.

2      Q.   -- and threw them in the trash?

3      A.   Yes.

4      Q.   Do you know why he did that?

5      A.   He obviously thought they were not appropriate

6    to be left in the faculty lounge.

7      Q.   Well -- and I should clarify, when I say do you

8    know, did you ever discuss with him his reasons for --

9      A.   No.  I never discussed with him.  I didn't --

10   in other words, this is -- the reason I didn't remember

11   it from the beginning is that I wasn't directly

12   involved.  Okay.  I was directly -- or -- I was much

13   closer to Richard Golden, for example, because I taught

14   in the Jewish studies program, than I was with this math

15   professor who I've never met and I wouldn't know even if

16   I met him.  But I heard about the situation.

17     Q.   The flyers, did they contain any language that

18   you felt was inappropriate?

19     A.   Yeah, I thought so.  Well, no.  I thought his

20   reaction was probably a little bit over the top, maybe.

21   But I understood that he was expressing his right to

22   dissent from the views that were expressed there.

23     Q.   Other than collecting flyers that someone else

24   had prepared and throwing them in the trash, are you

25   aware of any other ways where that professor expressed

1    his dissent?

2        A.  No.

3        Q.  So going back to what's on the flyers, I

4    understand you have --

5        A.  I don't remember the exact words on the flyers,

6    to be honest, because, as I said, I wasn't -- it wasn't

7    my purview.  It wasn't my -- the math department is not

8    my area.  Like I don't hang out in the math department.

9    But I knew about this case, so that's why I'm just

10   mentioning it to you.  And I know that the university

11   settled the case.

12       Q.  Do you -- do you recall any language that was

13   on those flyers?

14       A.  Not right now, no.

15       Q.  Do you recall -- do you know whether there were

16   any offensive images on the flyers?

17       A.  No, I don't know that.  All I know is that --

18   that this math professor did something that offended the

19   powers that be, if you want to call them that, and that

20   he was disciplined.  He was fired, basically.  He sued,

21   and the university settled the case.

22       Q.  Do you know who made the decision to fire that

23   professor?

24       A.  Not really.  I know that William Cherry,

25   though, was involved because he told me.

1    Q.  Do you know if it was his decision?

2    A.  Not -- I don't know if it was his decision or

3    his decision solely, no.  I only know what was reported

4    in the press.

5    Q.  Going back to the committees that we were

6    talking about before we last broke, I believe I asked

7    you what committees you recall being on in 2020, and I

8    think you told me that for the spring semester --

9    A.  I believe that is when I chaired the PAC

10   committee.

11   Q.  Okay.  And you were chairing it because the

12   existing members of that committee had voted you to

13   serve --

14   A.  To replace -- to replace somebody on the --

15   Q.  Okay.  Had you ever served on the PAC before?

16   A.  Oh, yeah, many times --

17   Q.  And how were you --

18   A.  -- over the years.

19   Q.  How were you chosen?

20   A.  Not many times.  Let's say maybe three or four

21   years over the course of my time.

22   Q.  So before 2020, when was the most recent time

23   before that you had served on the PAC?

24   A.  I think I had been on there for a while -- for

25   two years, maybe, before that.  I'm not quite sure of

Timothy Jackson - 9/24/2024

108

1    the rotation schedule.

2              And also one thing I do remember is that

3    these positions used to be appointed, but then there was

4    a change where people's names were put forward and the

5    faculty voted who would be on the committee.  In other

6    words, it used to be a rotational system where people

7    were regularly -- let's say, had certain terms and

8    rotated, and then there was an effort, I believe, to

9    make these positions voted positions.

10             So there were --

11        Q.  **When did that shift happen?**

12        A.  It happened before the whole crisis with --

13   with me because I seem to recall that there was a vote

14   for people to continue and, in fact, on one cycle I was

15   actually revoted to continue by the faculty.

16        Q.  **What year was that?**

17        A.  Oh, God.  Again, it was before 2020 for sure.

18   Maybe 2018, maybe 2019.

19             I don't know if that's continued.  That's

20   the other thing, is I'm not aware about whether that --

21   that policy was implemented and continued.

22        Q.  **And when you say there was a shift from**

23   **appointments to --**

24        A.  Election.

25        Q.  **-- election --**

1      A.  Yeah.

2      Q.  -- was that for committees within the college

3  of music only or more broadly UMT?

4      A.  No.  It was only for the PAC committee in our

5  division.

6      Q.  And the PAC committee is within the college of

7  music?

8      A.  Exactly.  And it was the committee that made

9  all the crucial recommendations regarding promotion and

10  tenure.  And I think maybe the -- the rationale for

11  making that change was the fact that they wanted people

12  who would represent the faculty.  And so, instead of

13  appointment or rotations, there would be some input from

14  the faculty about that.

15      Q.  So is it your understanding that, for the last

16  several years, the members of the PAC have been elected

17  by the faculty within the?

18      A.  I have not seen such an election.  Only one

19  time, and I've been at a fair number -- most of the

20  meetings.  So it's curious to me, but I don't know, to

21  be honest.

22      Q.  So you don't know whether those members are

23  elected or appointed today?

24      A.  Right.  I don't know.  Probably I should, but I

25  don't.  Right.

Timothy Jackson - 9/24/2024

110

1     Q.  In 2018, what committees do you recall serving

2  on?

3     A.  Oh, I know I served on that committee, on the

4  PAC committee.  And I'd have to -- again, I'd have to

5  look back through all the annual reports to see which

6  committees I was -- was on in a given year.  But one

7  thing I can tell you is that there was never a year,

8  never, in all 25 years, except for the last four, where

9  I didn't serve on any committee.  In other words, there

10 was always service in my annual reports, as far as I can

11 recall.

12    Q.  And -- and the -- for most of those 25 years,

13 it's your general understanding that those committees

14 were by appointment, not election; is that fair?

15    A.  I think so.  Yeah.

16    Q.  And then at some point within the last,

17 roughly, five years, there's been a shift to election

18 rather than appointment comprised --

19    A.  That, I'm not sure of.  You see, I saw a move

20 in that direction, but I didn't -- I don't know if it's

21 continued to be implemented.

22    Q.  The -- do you recall -- other than the PAC, do

23 you recall serving on any other committees in 120?

24    A.  I think I may have served on a search

25 committee.

Timothy Jackson - 9/24/2024

1    Q.   For the college of music or --

2    A.   Yeah, for the college of music.

3    Q.   And how did you come to get on that committee?

4    A.   Well, the chair would ask the people, but I

5  think the dean and the chair, together, selected the

6  membership of the search committees.

7    Q.   And so --

8    A.   And so, there was never a time when I was asked

9  to serve on a search committee when I said no.  There

10 was no instance where I ever refused a committee.

11   Q.   What was the most recent time where you were

12 asked to serve on -- on that particular committee?

13   A.   Which one, the PAC?

14   Q.   Sorry, the other committee that you said you

15 may have been on in 2018.

16   A.   I was on a search committee.

17   Q.   That's what it was?

18   A.   I haven't been on any searches since then --

19   Q.   How long --

20   A.   -- as far as I know.

21        Yeah, I don't recall.

22   Q.   How long, generally, does service on a search

23 committee last?

24   A.   One semester.  Well, it depends.  Usually I

25 think it's one semester, not really -- no, no, no, no.

Timothy Jackson - 9/24/2024

1          So one semester -- usually in the fall

2  semester you start.  You issue the search call, and then

3  you -- you wait for the spring semester to get all the

4  applications.  Then you sit -- the committee sits and

5  goes through all the applications and makes decisions

6  about short lists.  That happens in the spring usually.

7  Not always, though, because sometimes positions come

8  open and they have to be filled really quickly.  So

9  sometimes it will happen much more quickly, sometimes

10  even in the summertime.

11          **Q.  And these search committees are for the purpose**

12  **of hiring open faculty positions within the college of**

13  **music?**

14          A.  Exactly, yeah.  So I have served on a fair

15  number of those up until my cancellation, yes.

16          **Q.  Do you know how much search committees have**

17  **been form within the college of music in 2020?**

18          A.  Not in total, no way.

19          **Q.  Do you --**

20          A.  There have been quite a few, though.

21          **Q.  How many are you, personally, aware of?**

22          A.  Oh, my, I would think something, like, ten.

23          **Q.  And do you --**

24          A.  In different departments, you see, they've

25  hired -- in fact, in the past four years, let's say,

Timothy Jackson - 9/24/2024

 1  they've hired quite a few new people.

 2      Q.  And how many within your department?

 3      A.  Oh, I think at least two or three, depending on

 4  how you count.

 5      Q.  Do you know who served on those search

 6  committees?

 7      A.  Not me.

 8      Q.  Do you know who did?

 9      A.  No.

10      Q.  Do you know --

11      A.  I know some of the people who did, but I don't

12  know all of them.  I think that information may be kept

13  under wraps.  I'm not sure.

14      Q.  Well, your personal knowledge here today, who

15  do you know who served on a search committee within your

16  division?

17      A.  I know that Heidlberger and Schwartz served on

18  search committees in our area, I believe.  Yeah.

19      Q.  Do you know how they got on the search

20  committees?

21      A.  Probably the same way that all the search

22  committees are formed.  The dean, in conjunction with

23  the chair, would nominate the committee.  They're not

24  elected positions, as far as I know.  No.

25      Q.  Since 2020, do you know, one way or the other,

1    whether the search committees have been formed through

2    the appointment process or the election process?

3         A.  Appointment, I think.  I'm pretty sure

4    appointment.  Yeah.

5         Q.  What about 2019, what committees do you recall

6    serving on during that year?

7         A.  I was on the PAC for sure, and that was a lot

8    of work because we -- we had to deal with a very, very

9    difficult situation.

10        Q.  How did you come to be on the PAC for 2018 or

11   '19?

12        A.  I think the same way everybody else did, the

13   appointment process.  Although -- maybe there was some

14   kind of election in the spring.  I'm not sure about

15   that.  I can't remember the exact process.

16        Q.  So were you serving as a regular member of the

17   PAC at the time that you were elected to serve as the

18   interim chair of that committee?

19        A.  Yes.  So basically, I was promoted.

20        Q.  Do you recall serving on any other committees

21   in 2019?

22        A.  No, not right now.  Except for search

23   committees in 2018, 2019, I think I did serve.

24        Q.  How many?

25        A.  A least one, I think.  But again, I'd have to

Timothy Jackson - 9/24/2024

1  go back and look at the evaluation.

2      Q.  And do you recall that search committee

3  being -- you being appointed to that or elected to it?

4      A.  Appointed, I think.  Sure.

5      Q.  Okay.  By whom?

6      A.  The chair, probably in consultation with the

7  dean.

8      Q.  Would that have been Dr. Brand?

9      A.  Yeah.  I'd have to -- again, I'd have to go --

10  look back.  And I know I've been on a number of search

11  committees, but they've tapered off.  They tapered off.

12      Q.  What about 2021, do you recall being on any

13  committees?

14      A.  No.  No committees.

15      Q.  And in 2022, were you on any committees?

16      A.  Not in the college of music, no.

17      Q.  What about the university, at large?

18      A.  Yes.  I was on that -- I think I mentioned

19  already I was on the awards committee.

20      Q.  I see.

21          And how did you come to be put on that

22  committee?

23      A.  So they -- there was a letter sent out saying

24  that we need -- we need somebody from the music area to

25  serve on the awards committee.  And because I realized

Timothy Jackson - 9/24/2024

116

1    that I had no -- no committees to serve on at the

2    college of music, I was kind of desperate to serve -- to

3    do some service because we are evaluated on our service,

4    as well, and I had -- since I would have nothing to show

5    for -- for service, I was desperate.

6            So I wrote a letter to the response,

7    responded that I was willing to serve on that committee.

8    And I sent them my CV and all that stuff, and they said

9    come aboard.

10   **Q.  During 2018, '19, the years before volume 12**

11   **happened, do you recall volunteering, asking, inquiring,**

12   **offering to serve on any various committees?**

13       A.  I would -- I would say that I was always

14   waiting for my assignments.  They were called committee

15   assignments, and at the beginning of each academic year,

16   the chair would send out a list of committee

17   assignments.  And as I told you already, I never refused

18   any assignment.

19   **Q.  So before 2020, you don't recall being**

20   **proactive to go and seek out an assignment to a**

21   **particular committee?**

22       A.  Right, I did not.  But what I would say is

23   that, after 2020, these lists would appear and my name

24   was not on them.  So in other words, I had no committee

25   assignment.

Timothy Jackson - 9/24/2024

117

1      Q.  Do you know -- do you know whether there were

2   any other faculty members in the college of music that

3   also went for a year without serving on a committee?

4      A.  I don't know that, but it was more than one

5   year.  It was four years, actually.  So each time the --

6   the assignments would appear, Tim Jackson would not

7   appear on that list.

8      Q.  The -- your participation in the -- the awards

9   committee --

10     A.  Right.

11     Q.  -- did that begin in 2022 or 2023?

12     A.  I think it was 2022, but I'm not sure.  I'll

13  have to check.  2022 or 20 -- yeah, or '23.

14     Q.  And how long did you serve on that committee?

15     A.  Two years.

16     Q.  Are you still on it?

17     A.  No.

18     Q.  Why not?

19     A.  I wasn't invited back.

20     Q.  So was it for a two-year term?

21     A.  I'm not sure.

22     Q.  Do you know whether other colleagues who were

23  previously serving on that committee are still serving

24  on that committee?

25     A.  No.  Because I haven't kept up on the

Timothy Jackson - 9/24/2024

118

1    membership of the committee.

2        Q.  Have you -- have you inquired or volunteered to

3    serve on any other committees other than that awards

4    committee?

5        A.  Yes.

6        Q.  Which ones?

7        A.  So I recently -- not -- yeah, recently got an

8    invitation to join the committee that actually looks at

9    distinguished research professors.  I thought maybe

10   that's something that will be of interest.  I got a note

11   back saying, "Thank you for applying.  We already have

12   somebody from music in the committee.  If we need you,

13   we'll call you."

14       Q.  Do you know who else from music is on that

15   committee?

16       A.  There's only one other distinguished research

17   professor, so I think I know who it is.

18       Q.  And who is that?

19       A.  What's his name?  Steven -- Steve Friedson.

20       Q.  And your --

21       A.  He's the other -- he was the other -- the only

22   other -- I believe the only other distinguished research

23   professor in the college of music.  So it could only be

24   him, as far as I -- I know, unless there's another one.

25       Q.  Have you ever served on that particular

1    committee before?

2        A.   No.

3        Q.   **Do you know if Dr. Friedson had previously**

4    **served on that committee?**

5        A.   No.  In fact, I don't know for a fact that it's

6    him, but since she wrote -- that's a deduction on my

7    part, not -- not --

8        Q.   **Fair enough.**

9        A.   --- not knowledge.

10       Q.   **Fair enough.  Whoever this colleague is in**

11   **the -- in the college of music who was recently on that**

12   **committee, do you know how long they've been on that**

13   **committee?**

14       A.   No.

15       Q.   **Do you know how many people are on the**

16   **committee, total?**

17       A.   It can't be a lot because there aren't a lot of

18   distinguished research professors.  So if that is the

19   make up of the committee -- but it -- my guess is that

20   there are other people on it besides them.  So I don't

21   know exactly how many people are on it.  No.

22       Q.   **Before 2020, had you ever?**

23       A.   I had served on that committee once before

24   2020.

25       Q.   **All right.  When was that?**

1          A.   That's right.  Oh, that's going back.  It

2   was -- I want to say around 2014.

3          **Q.   So that was after you had obtained the**

4   **distinguished research --**

5          A.   Yeah.

6          **Q.   -- professorship?**

7          A.   For sure.  Because only -- my understanding was

8   that the only faculty who are allowed to be on that

9   committee were people who had that.  And that's how I

10  know, for example, the process of nominations.

11         **Q.   How are people chosen to be on that committee?**

12         A.   Not of the committee, but of the title.

13         **Q.   Of course.  How -- how did you come to be on**

14  **that committee in 2014?**

15         A.   I believe that the provost probably assigned me

16  to do it or asked me to do it because I was already a

17  distinguished research professor.

18         **Q.   And at that time, when you served on that**

19  **committee --**

20         A.   Yeah.

21         **Q.   -- was there any other member of the committee**

22  **who was from the college of music?**

23         A.   No.  I was Mr. Music.

24         **Q.   All right.  So within the last couple of years,**

25  **you responded to an invitation asking to be put back on**

Timothy Jackson - 9/24/2024

1  that committee, right?

2      A.  No.  It wasn't an invitation.  It was a call

3  for people who are interested to serve on that

4  committee.

5      Q.  Are there any other committees within the last

6  few years that you have expressed interest in?

7      A.  No.  Because I served on the -- I served on the

8  awards committee, and that was quite enough, I thought.

9      Q.  And was it earlier this year that that service

10 ended?

11     A.  Yeah, it was this academic year that service

12 ended, I think.

13     Q.  So you're currently serving on a committee?

14     A.  Right now, no.

15     Q.  Do you have any anticipation of serving on a

16 committee for next spring?

17     A.  Oh, wait a minute.  I am serving on a committee

18 now, in the college of music.  Yes.

19     Q.  And what is that committee?

20     A.  That committee, I think I said, is the DMA

21 committee.

22     Q.  That's right.

23     A.  And I'm replacing somebody who is on leave, and

24 that is the first time in four years that I have done

25 anything of committee work in the college of music,

Timothy Jackson - 9/24/2024

122

```
 1  okay.  I think I already said that.
 2       Q.  Are there any other committees that you have
 3  served on in the last four years?
 4       A.  No.
 5       Q.  And are there any other -- is there anything
 6  else you've done in the last four years to respond to a
 7  call or otherwise express interest in serving on a
 8  committee that we haven't already talk about?
 9       A.  That we haven't talked about, no.
10       Q.  And forgive me if I already asked this, but --
11  right -- the DMA committee that you're currently serving
12  on --
13       A.  Yes.
14       Q.  -- were you appointed or elected?
15       A.  Probably appointed because I don't know of any
16  election that took place to do that.  I think that the
17  chair -- the current chair who replaced Brand wanted to
18  make use of my expertise because I serve as the faculty
19  advisor for a number of students taking DMA degrees at
20  UNT, and I have a lot of experience directing those
21  kinds of dissertations.  He wanted to get me on that
22  committee for that reason.
23       Q.  And has he expressed that to you?
24       A.  No.
25       Q.  So just to be clear, do you know, one way or
```

Timothy Jackson - 9/24/2024

123

1   the other, whether you were appointed or elected?

2       A.   I believe that he appointed me to replace a

3   person who is on leave.

4       Q.   And I'm just trying to understand, what is it

5   that makes you believe that you were appointed instead

6   of elected?

7       A.   Because I don't recall any election.  There's

8   no election, that I know of, that resulted me -- these

9   were all decided by the administrators.

10      Q.   As far as you know?

11      A.   As far as I know.

12      Q.   Okay.

13      A.   With the one exception, it may be that the PAC,

14  at some point, was an elected position, but I don't have

15  the evidence in front of me.

16      Q.   Okay.  The attorney who contacted CUNY

17  suggesting that there were insufficiencies with Ewell's

18  research, how did you learn that he had contacted CUNY?

19      A.   Because he told me, and he had sent me a copy

20  of the letter that he had sent to them.

21      Q.   When was your first communication with -- what

22  was his name again?  I'm sorry.

23      A.   Scott Thruwald.

24      Q.   Scott Thruwald?

25      A.   We went to school together.  So it would have

1    been, I don't know, 30 years ago.

2        Q.  When was --

3        A.  30 -- 35 years ago.

4        Q.  Sure.  Let me be more specific.

5            When was your first communication with him

6    about concerns with Ewell's research?

7        A.  It was after Ewell gave his talk.

8        Q.  In 2019?

9        A.  Yes.  Because Thruwald and I were both alumni

10   of the same program because, and although Thruwald was

11   not a music theorist, he was very appalled by what Ewell

12   was claiming to be fact.  And so, he actually wrote an

13   article of his own which he published on the -- on the

14   web about it, and in this article he makes various

15   points about the facts -- the historical facts that

16   Ewell had distorted.  And so --

17       Q.  This is something that Freewall self-published

18   on the web?

19       A.  I think so.  Yes.  I believe so.  I don't

20   remember whether he actually published anything in a

21   journal or in a -- you know, in as -- in a magazine.  I

22   don't know.  But -- but I do know that he sent me a copy

23   of his critique.

24       Q.  Did you edit that --

25       A.  There were several -- several critiques that he

Timothy Jackson - 9/24/2024

1  published, actually.

2      Q.  Did you edit or give any feedback on that?

3      A.  No.  He -- he did it on his own recognizance,

4  so to speak.

5      Q.  Did you see a draft of what he submitted to

6  CUNY before he sent it?

7      A.  Of the letter?

8      Q.  Yes.

9      A.  Yes.

10      Q.  Did you give any feedback on that draft?

11      A.  Not really.  It, basically, said what I would

12  have said, too.

13      Q.  Did he ever express to you why he wanted to

14  take it upon himself to contact CUNY with that letter?

15      A.  Yes.

16      Q.  What did he say?

17      A.  He said that he felt that Ewell had behaved in

18  a manner that was academic fraud and that he felt --

19  that was his term, actually -- that it was important to

20  point out to CUNY that -- that what Ewell was -- was

21  saying and was publicizing about Schachter and

22  Schenkerians was, in fact, a form of -- of fraud.

23      Q.  Did you agree with that?

24      A.  Yes.  And also, that -- the reason that he did

25  that was that -- I guess I can provide more detailed

Timothy Jackson - 9/24/2024

126

1  information about this.

2          The reason that he did that was because he

3  was a student of Barry S. Brook, which was the chairman

4  of the department when we were both students there.  And

5  Barry was a very -- Barry Brook was a very distinguished

6  musicologist.  And so, there is a center at CUNY named

7  after Barry S. Brook.  Barry was also one of my

8  teachers, and I respected him a lot.  And so, when Barry

9  died, they -- they named the center after him.

10          On its website, the center published an

11 interview with Ewell and a, kind of, fluff piece about

12 Ewell and made statements about Schenker that were, in

13 our view, patently false.  And that was the reason why

14 Scott Thruwald wrote the letter to CUNY.  And he also

15 asked them to -- if my memory serves me correctly, to

16 investigate the matter and also to remove this article

17 which claimed falsely that Schenker was a enthusiastic

18 supporter of Hitler.

19     **Q.  In your opinion, did -- did Freewalled [sic] --**

20     A.  Thruwald.

21     **Q.  Thruwald?**

22     A.  Yeah.

23     **Q.  Did Mr.  Thruwald do anything to defame Philip**

24 **Ewell?**

25     A.  No.  He simply stated what Ewell said.

1      **Q.  And in your opinion, did Philip Ewell do**

2  **anything to defame Heinrich Schenker?**

3      A.  Yes, absolutely.

4      **Q.  How so?**

5      A.  So in his various articles and communications,

6  he claims that Schenker was a virulent racist.  Those

7  are his words.  And he also claimed that he was a

8  supporter of Hitler.  Those are also words that he said

9  in this interview that was published on CUNY's website.

10          Perhaps my experience as a student and as a

11  professor in Germany is relevant to this is because I

12  can read and speak German fairly well.  And I read

13  Schenker's -- most of it, before it was even put on the

14  web, in the original German.

15          And so, with having read those 4,000 page

16  diary, I knew that what Ewell was saying was absolutely

17  false because there are clear statements in Schenker's

18  diary and clear statements in his letters that he was

19  not a supporter of Hitler.  On the contrary, as a Jewish

20  person, he recognized that Hitler was very dangerous.

21          And this is true at a very early page --

22  sorry -- stage in Hitler's career, already in 1923,

23  when -- when Schenker saw the begins of the Nazi party,

24  he made a clear statement that he was afraid of what

25  this could portend to the Jewish people.

Timothy Jackson - 9/24/2024

128

1    Q.  So let me go back to something -- I think we

2  touched on this earlier, but --

3    A.  May I interrupt just for one second?

4    Q.  If there's something you'd like to add, that's

5  fine.

6    A.  Yeah, there is.  That these statements in

7  Schenker's diary and his -- are absolutely crystal

8  clear.  There's no doubt about them, not at all.  And if

9  you read Schenker's writings in the original, not in

10  translations that may contain errors, you will have no

11  doubt in your mind about the truth of what I just said.

12    Q.  So -- so that leads me to ask, if someone were

13  to submit to an academic journal an article that says

14  Heinrich Schenker was pro Nazi, what should the editors

15  of that journal do?  Should they publish it or not?

16    A.  They have every right to publish it, okay.

17  That's his opinion.  They -- they -- they do have every

18  right to publish it.  I would not suppress opposite

19  points of view.  What -- what I think is important is to

20  allow full public debate as to whether or not what Ewell

21  has alleged is true.

22    Q.  And -- and then just to circle back to it, do

23  you believe those statements, though -- for example,

24  Heinrich Schenker was pro Nazi, do you believe that

25  those statements are false?

 1    A.  Absolutely.

 2    **Q.  And are they defamatory?**

 3    A.  To some degree they are, yes.  Because --

 4  because Schenker was Jewish, and as a Jew, he was very

 5  sensitive about anti-Semitism.  And since the Nazis,

 6  right from the beginning, were very anti-Semitic, saying

 7  that Schenker as a Jew was a supporter of the very

 8  people that ended up murdering his wife is defamatory.

 9  And the same is true for his students, most of whom were

10  Jewish.

11          And the same, may I add, with all due

12  respect, is true of my entire family on my mother's

13  side, which was murdered in the Holocaust.  So I do

14  believe that the statement were false and defamatory at

15  the same time.

16    **Q.  Is that part of what motivated volume 12 of the**

17  **JSS?**

18    A.  It was part of it, to allow people who

19  disagreed to -- to say something because no questioning

20  or no push back of any kind was allowed after Ewell's

21  speech.

22          So when Ewell says that his work was well

23  received, it reminds me of Stalin.  You know, people

24  were afraid to stop clapping after Stalin gave his

25  speech.  No one wanted to be the first person to do that

Timothy Jackson - 9/24/2024

1  because they were afraid, and the same thing was true

2  here.  His speech was well received by certain people.

3  But by people who were in the know and who knew that the

4  speech was -- contained defamatory and false statements,

5  it was not well received.  But there was no way for

6  those people to stand up and question his assertions.

7      **Q.  Were any of those people present at the live**

8  **plenary lecture that Ewell gave in the fall of 2019?**

9      A.  Yes.

10     **Q.  Who?**

11     A.  Various colleagues of mine and students.

12     **Q.  Roughly, in estimate, how many people do you**

13 **know who were at that plenary address live who strongly**

14 **disagreed with Ewell's presentation?**

15     A.  About three that I can say for sure.

16     **Q.  Okay.  And are those three --**

17     A.  But there were more than I knew, because people

18 came forward to participate in the symposium, but they

19 weren't all there.  They -- they -- the thing was put

20 online -- the speech was put online.  And so, all of

21 these people who disagreed were not necessarily present

22 in the room, but they watched it later.  And then some

23 people contacted me about it.  Yes.

24     **Q.  These three individuals that you happen to know**

25 **about who were actually present during the live**

1   presentation but disagreed --

2       A.  Yeah.

3       Q.  -- were they faculty members or students?

4       A.  Both.

5       Q.  Well, then let's walk through each of the three

6   of them.  Can you just give me their name and whether

7   they were --

8       A.  I don't want to give names.  I'm sorry about

9   that, but I don't.  Because one of them is a student or

10  was a student at the time, and, I'm sorry, I don't want

11  to endanger these people.

12      Q.  Well -- and if your attorney wants to designate

13  this portion of a transcript as confidential for

14  reasons, then he certainly has right to ask the court to

15  do that.  But for purposes of your testimony here today,

16  you are under oath, and you are required to say what you

17  know.

18      A.  Okay.  Well, I don't know what --

19              MR. ALLEN:  And even though your question

20  is pending, can we go off the record briefly?

21              MR. WALTON:  Yeah.  That's fine.

22              MR. ALLEN:  Because I think we can solve

23  this --

24              THE VIDEOGRAPHER:  Counsel, let me go off

25  the record.  We're off the record at 12:32 p.m.

1      (A recess was held from 12:32 p.m. to 12:34 p.m.)

2                THE VIDEOGRAPHER:  We're back on the record

3   at 12:34 p.m.

4                MR. ALLEN:  And just for the record, I

5   have -- this is Attorney Allen.  I have consulted with

6   Attorney Walton in this brief intermission, and we have

7   agreed to designate the subsequent part of the

8   transcript confidential, subject to a confidentiality

9   order that we will negotiate after this deposition

10   within a reasonable time frame.  And I will ask that we

11   also undesignate it when this part of the testimony is

12   through.

13    (Confidential beginning on Page 132 line 15 and ending

14                  on page 134 line 18.)

15      Q.

16

17

18

19

20

21

22

23

24

25

Timothy Jackson - 9/24/2024

134

19      (Confidential beginning on Page 132 line 15 and ending

20                  on page 134 line 18.)

21      Q.  BY MR. WALTON:  And, Dr. Jackson, do you want

22  to go for a few more minutes or would you like to take a

23  break?

24      A.  Sure.  I'm ready -- I'm happy to go on.

25                  MR. WALTON:  Okay.  All right.

1            MR. ALLEN:  I think we're only at, what,

2  12:37 or so.  Unless it's convenient to you to break

3  now.  It's really up to you.

4            MR. WALTON:  Yeah, let's go a little bit --

5  a little bit further.

6            MR. ALLEN:  Yep.

7            THE WITNESS:  By the way, the -- the person

8  that wrote to me anonymously did say that they were

9  afraid to stop clapping, that they had felt very

10  compelled to show support when they were very confused

11  and very concerned about it.  And I had received other

12  letters somewhat similar to that in tenor, not from

13  people who were there, but from people who read about it

14  later.

15     Q.  BY MR. WALTON:  And have you provided a copy of

16  those letters to your attorneys?

17     A.  Not all -- well, they have had access to them,

18  but I don't -- I don't know if they're all included

19  because these were people that wrote to me just like,

20  you know, I saw what's happened to you, and I'm sorry

21  it's happened to you, that kind of thing.  They don't

22  have any direct bearing on the case, I don't think.

23     **Q.  But if you -- if you have not yet provided them**

24  **to your attorneys, it would be possible for you to go**

25  **and do so?**

1     A.  I could.  Yeah.

2     Q.  Okay.  Besides the JSS, have you ever served

3 either as an editor or a faculty advisor for another

4 academic journal?

5     A.  No.

6     Q.  Other than in connection with the JSS, what

7 experience have you had editing and/or peer reviewing

8 other works of scholarship for publication in an

9 academic journal?

10    A.  Well, I've had a lot of such experience from

11 the point of view of submitting to journals, okay.  I

12 don't know if that's what you're asking.

13    Q.  Yeah.  Fair.  Let me clarify.  I'm asking about

14 editorial experience you have on things where you are

15 not the author.

16    A.  Yeah, a lot, because I edited all these books.

17    Q.  Okay.  How many books?

18    A.  Oh, five.

19    Q.  And did the --

20    A.  Wait.  Four of them were edited books.  Yeah.

21    Q.  And then the fifth was a monograph, you said?

22    A.  Right.

23    Q.  That you wrote?

24    A.  Right.

25    Q.  And describe for me the -- what editorial

1  **feedback you received on your monograph before it was**

2  **printed?**

3      A.  Oh, gosh.  So my -- my book that you're

4  referring to, I think, is my Cambridge volume on

5  Tchaikovsky's 6th symphony, right, which grew out of an

6  article that I published in the Oxford Music Journal

7  called Music Analysis in England.

8          So I published a -- you would probably call

9  it a peer-reviewed article in that journal, and as a

10  result of having published that article, my name was put

11  forward by the editor of that journal to Cambridge

12  University Press as a potential author for the Cambridge

13  book on Tchaikovsky.  And then I was approached by

14  Cambridge to do that book, and I worked very closely

15  with a very famous British musicologist by the name of

16  Julian Rushton, whose series the book appeared in.

17          So I got comments from Julian Rushton and

18  also from Derrick Puffett, who was a very famous music

19  theory professor at the University of Cambridge.

20      Q.  **Were any of those comments critical?**

21      A.  Of my work?

22      Q.  **Yes.**

23      A.  Yeah, some of them were.

24      Q.  **And how did you respond to the critical**

25  **comment?**

1    A.  By backing up my assertions and my claims with

2  facts.

3    **Q.  Did you change any of your claims or assertions**

4  **in response to critical commentary?**

5    A.  Yes.

6    **Q.  And this --**

7    A.  But only if the facts supported it.  In other

8  words, I went back to look at the research that I had

9  done and also the research of other scholars and made an

10  evaluation always based on the facts -- the historical

11  records, so to speak.

12    **Q.  So -- so if I'm understanding correctly, there**

13  **was a process during the publication of that book where**

14  **you had done your initial research then received some**

15  **critical feedback from other scholars in the field that**

16  **caused you to go back to further research and make some**

17  **modifications based on an enlarged understanding of the**

18  **facts.**

19          **Is that fair?**

20    A.  Almost.

21    **Q.  Okay.  Correct it for me.**

22    A.  Well, it was a process where -- actually, I

23  wrote the book in sections and Derrick would read each

24  section, section by section and send me comments --

25  sorry, not Derrick, but Juliann.

1          Juliann Rushton would send me comments

2    based on each section, and then I would go back and make

3    any revisions that he deemed necessary.  That -- that

4    was the way it happened in that particular case.

5          **Q.  But you do recall making revisions to your**

6    **claims or assertions based on an enlarged understanding**

7    **of the fact and the research at -- and in response to**

8    **the --**

9          A.  Not an enlarged -- I don't like that word --

10   word, "enlarged."

11         **Q.  Feel free to choose a different word.**

12         A.  I like the -- checking the facts, let's put it

13   that way.

14         **Q.  Sure.**

15         A.  Checking the facts so that everything that I

16   claimed I could back up with historical facts.

17         **Q.  Got you.**

18              **So after you received some editorial**

19   **feedback, you went back to do some addition the checking**

20   **of the facts and modified what you were writing**

21   **accordingly?**

22         A.  If necessary, yeah.

23         **Q.  And -- but you do recall some instances where**

24   **that actually happened?**

25         A.  Not too many, actually, but some.

1    Q.  Okay.

2    A.  Probably some.

3    Q.  Fair.

4    A.  I think that's fair -- that's like what editors

5  do, right?  They -- they want to ensure a good

6  product -- a good final product.  So if they see

7  something that they think is weak, they'll go back and

8  have the author look at it and discuss it.  And if the

9  author -- you know, sometimes I would say to Derrick --

10  to Juliann that -- that this was just my view of it, and

11  that was it.

12    Q.  For the other four books that you've been a

13  part of producing --

14    A.  Editing.

15    Q.  -- editing, was your role -- well, I guess was

16  that your role, as the editor of the books?

17    A.  Yeah.  Well, all of the above.  All of the

18  above.  So basically, if I could enlarge a little bit,

19  my relationship with JSS was a little different,

20  actually.

21    Q.  I know, and we'll get to JSS.  But I'm just

22  talking about the books right now.

23    A.  Okay.  But these books was that I would read

24  all the contributions, and I would edit them based --

25  not to change their content, but to make sure that they

 1  were all on as high a level as possible and that -- also

 2  that sometimes because the contributors were not native

 3  English speakers, I would also have to almost rewrite

 4  their contributions, which was time consuming, but

 5  necessary.

 6       Q.  Did you modify any of their content?

 7       A.  Not really.  Not really.  Even if I didn't

 8  agree with it, I felt that they -- which was often,

 9  actually.  But I felt they had the right to express

10  their own ideas.

11       Q.  Did you ever challenge them to go back and do

12  further research to support the assertions they were

13  making?

14       A.  No, not really.  Most of the time I allowed

15  them to state their opinions as they formulated them,

16  more or less.

17       Q.  And did -- did any of the --

18       A.  I can give you an interesting example of that.

19       Q.  That's fine.  Please do.

20       A.  So one of the points of contention with

21  Sibelius was was he a Nazi sympathizer.  And there are

22  some authors who think yes and some who think no, and we

23  published both.  So there wasn't -- I didn't feel it was

24  my responsibility as editor to censor or to force anyone

25  to modify their positions, and I think that's important,

Timothy Jackson - 9/24/2024

142

1    actually.

2        Q.   So the -- I believe it's four books you said

3    that you were editor?

4        A.   Involved with as an editor.

5        Q.   Involved with as an editor?

6        A.   Yeah.

7        Q.   Did you have any chapters or articles or essays

8    within those books that you yourself authored?

9        A.   I did, yes.  All of them except for one, I

10   think.

11       Q.   Who would review or edit or provide feedback on

12   your chapters?

13       A.   The same -- so in the case of the -- in the

14   case of the publications by Cambridge, the same readers

15   who critiqued the other contributions also critiqued

16   mine.  In -- in the case of a book I published with

17   Ashgate press, the same, I think, yeah.

18       Q.   Do you recall receiving any critical commentary

19   or feedback on your articles or chapters?

20       A.   Yes.

21       Q.   And how did you respond to that feedback?

22       A.   If it -- if I agreed with it, I implemented it.

23       Q.   Can you give us an example of a time that you

24   agreed with and implemented it?

25       A.   Oh, God.  Well, these things happened a while

1  ago, I would have to say.  Right off the top of my head,

2  I can't right now, but I know I did.

3      **Q.  Okay.**

4      A.  But --

5      **Q.  Did you ever receive any feedback that anything**

6  **you had written or drafted needed to be further**

7  **researched or supported with additional citations?**

8      A.  No, because I'm a careful scholar and my

9  articles and books all have a lot of scholarly

10  apparatus.

11      **Q.  And I think so far we've been talking about the**

12  **books, the one monograph that you wrote completely and**

13  **the other four that you edited and may have made some**

14  **additional contributions to.  Am I correct in**

15  **understanding that other than those other five books,**

16  **there aren't any other books that you've been either the**

17  **author or general editor for?**

18      A.  Well, there's some intermediary things.

19  Again -- so for example, the -- the dictionary of music,

20  which is called Grove Dictionary, which is sort of like

21  a really important musical dictionary, the main composer

22  argument -- the maim composer articles were considered a

23  bit like monographs, okay.  So in other words, some of

24  them have actually been published separately as

25  monographs.

1          And I wrote the music part of that Bruckner

2    article with Paul Hawkshaw, who was a professor at Yale

3    University.  So we collaborated on that, and that is a

4    kind of monograph.

5          Q.  Let me ask you if you -- well, one more

6    question.

7               Rough estimate, how many publications would

8    you say that you have authored in scholarly academic

9    journals?

10         A.  Maybe 50 to 60.  Depends how you count, but

11   between 50 and 60, let's say.

12         Q.  And do you have any idea of how many of those

13   were peer reviewed?

14         A.  Again, it depends how you describe it, right,

15   and it depends on the genre.

16         Q.  Let just say do you have an idea of how many of

17   those published articles were reviewed -- whether

18   anonymously or not --

19         A.  Yeah.

20         Q.  -- were reviewed by someone else in the field

21   who provided some substantive feedback?

22         A.  Okay.  I think at least half, maybe.

23         Q.  That's fine.  And --

24         A.  Because as I explained to you already, there

25   are different genres of publication, right.  But at

Timothy Jackson - 9/24/2024

1    least half of them.

2    Q.  And with respect to the more stricter version

3    of a double blind peer review, about how many of your

4    articles have gone through that process?

5    A.  About half, I would say.

6    Q.  Fair enough.

7    A.  Like -- I can give you examples.  I mean, we

8    could go through my CV, I guess, and you could pick

9    them.

10    Q.  No.  That's fine.  Did -- what -- do you

11    recollect a time -- I'm going to ask you a few questions

12    similar to what I asked about the books about the

13    articles now.  All right?  So speaking broadly here, for

14    your published articles, do you recollect receiving the

15    specific type of feedback that suggested you add

16    citations or additional research to support any of your

17    assertions?

18    A.  No, actually.  That was never really the issue

19    because, as I explained to you, I was always careful

20    about that.

21    Q.  Do you --

22    A.  The issues that would come up were different

23    ones.

24    Q.  Do you recollect receiving any feedback

25    requesting you to change or modify any of the claims or

1  **the assertions that you were making in the draft of your**

2  **articles?**

3       A.  Not really.  I was surprised sometimes about

4  that.  For example, my article on sexuality and

5  structure in Tchaikovsky, which I told you led to the

6  book, I thought that would get all kinds of such

7  suggestions.  When I read it at the national meeting of

8  the SMT in California, I think people booed.  And then I

9  submitted it to music analysis, and it was accepted

10  with -- with hardly any changes.  Because you know what

11  the editor said?  "There's only one thing I want you to

12  change, and that's the title."

13       Q.  **And what did you change it to?**

14       A.  Something like aspects of sexuality and

15  structure in the orchestral works of Tchaikovsky,

16  something like that.

17       Q.  **What year did you present that at the SMT**

18  **conference?**

19       A.  Let's see.  That was probably 1998, I think.

20  Around then.

21       Q.  **And was it published within a year or so after**

22  **that?**

23       A.  Yeah.

24       Q.  **In what journal?**

25       A.  The Oxford Music Analysis Journal, which some

1   people consider to be the journal.

2       Q.   And it is that journal associated with the SMT?

3       A.   No.  It's based in England, where SMT is an

4   American publication.  It's published by Blackwells of

5   Oxford, which is a very ancient and distinguished

6   bookstore actually in Oxford.  And that's probably why I

7   was invited to go there as a guest lecturer.

8       Q.   Have the -- the various articles that you've

9   published -- I know there are a lot of them -- have they

10  all been related in some way or another to music?

11      A.   Uh-huh.  Except recently.

12      Q.   Please describe, what have you published

13  recently not related to music?

14      A.   Well, they're all related to music in one way

15  or another, but recently, they became more political.

16  So I wanted to push back, quote/unquote, against certain

17  trends in music education as a result of this

18  controversy.

19      Q.   So after 2020, you've authored some

20  publications that are more political in nature?

21      A.   Yeah.

22      Q.   Where have they been published?

23      A.   They've been published in White Rose magazine,

24  which is based in Boston and New York, I believe.  They

25  were published in Quillet Magazine, which is based in

1  about five different cities, but I think their home

2  office is in Australia.  And also I published something

3  on the American -- what is it?  National Association of

4  Scholars.  They have a journal which I published an

5  article in.

6          But these articles are more -- they're not

7  really academic -- they're not as academic as, let's

8  say, publishing an article in Spectrum or publishing an

9  article in what used to be the JSS, right.

10  **Q.  Are they -- to your understanding, were they**

11  **peer reviewed before they were published?**

12  A.  I know that the one in -- I believe that the

13  one in Quillet was shared with various editors at that

14  journal.

15  **Q.  And did you receive any feedback from your**

16  **reviewers?**

17  A.  Yes.  From the editors, yes, I did.  In fact,

18  they did give me some very specific critiques, which I

19  incorporated.

20  **Q.  Regarding the substance of your article?**

21  A.  Yeah.  In this case, yes.

22  **Q.  Any criticisms on insufficient citations or**

23  **research?**

24  A.  No, no.  That wasn't the issue.  No.

25  **Q.  Did they ask you to change or modify some of**

1  the assertions you were making?

2      A.  No, they asked me to clarify them.

3      **Q.  Oh, okay.  So to further explain what you were**

4  **saying?**

5      A.  Right, right.  Or explain it more clearly,

6  let's put it that way.

7      **Q.  Okay.**

8              MR. ALLEN:  Ben, it's about top of the

9  hour.

10             MR. WALTON:  Yeah.  Do you want --

11             MR. ALLEN:  I don't know if you were at a

12  stopping point, but I was just going to ask that we

13  break at some point in a -- at a time of your choosing.

14             MR. WALTON:  Sure.  Get there quickly.

15             MR. ALLEN:  Yes.

16             MR. WALTON:  Yes.

17     Q.  BY MR. WALTON:  I take it you've described for

18  us three articles that you've published since 2020 that

19  were more political in nature?

20     A.  They all deal with music, but they all deal

21  with the politics of music.

22     **Q.  I see.  And it's the number three?**

23     A.  Three or four.  It depends, again, on how you

24  count.

25     **Q.  That's fine.**

1    A.  I also published -- now that I think about it,

2  I published an article in the Jewish Voice, so that's

3  one.  Maybe five or six, actually, things.  I can't

4  remember all the details.  But something in the Jewish

5  Voice, something in The Times of Israel, as well.  The

6  Jewish Voice is published in California and The Times of

7  Israel is produced in Israel.

8    **Q.  Have any of your publications discussed**

9  **anti-Semitism?**

10    A.  You bet.  All of them in some way, shape, or

11  form.  Not a -- that's an over exaggeration.  Some of

12  them, for sure.

13    **Q.  Some before 2020 and some after?**

14    A.  Yeah, yeah.

15    **Q.  Okay.  Do you consider yourself -- do you**

16  **consider that part of your field of expertise --**

17    A.  Yes.

18    **Q.  -- the subject of anti-Semitism?**

19    A.  I taught two courses on it within that Israel

20  and Jewish studies program here.  I taught one called

21  Nazism classical -- it was called Nazism classical

22  music -- sorry, Nazism, Judaism, and the Politics of

23  Classical Music.  That was one course.  And then the

24  other course that I taught was Jews in opera -- the

25  representation of Jews in opera.

1       Q.  And I think I know the answer to this question,

2  but just to clarify --

3       A.  Yes.

4       Q.  -- are you a sociologist?

5       A.  No.  I'm a music theorist and musicologist.

6       Q.  Have you --

7       A.  However -- however, let me say this, that I do

8  possess specialized knowledge about Judaism and Jewish

9  history because I received an education in Sheba in

10 Israel and also when I was in Canada.  I have not

11 mentioned that, but I spent a summer as a student where

12 I was studying Hebrew, Aramaic, and also Jewish history.

13 And those studies were very important to the formation

14 of my knowledge about topics involving Jewish history

15 and anti-Semitism.

16      Q.  Have any of your publications ever discussed

17 beliefs or trends in the African-American community?

18      A.  No, not really.  I'm trying to think if there

19 were any such publications, and I don't think so.  I

20 don't think I've ever touched that subject except for my

21 response to Ewell.

22      Q.  In volume 12?

23      A.  Right.

24      Q.  Okay.  Outside of -- I think we're almost ready

25 for a break here.  Outside of volume 12, do you recall

Timothy Jackson - 9/24/2024

152

1  ever having included a citation in any of your published

2  works that referenced Wikipedia?

3      A.  No.  I don't think so.  I use Wikipedia a

4  lot --

5      Q.  Sure.

6      A.  -- but as a guide.  So when I use Wikipedia, I

7  use their bibliographies, and then I use that to go and

8  read the actual citation.

9      Q.  And do you recall -- and in any articles where

10  you are not the author but you've served as a reviewer,

11  do you recall seeing another author citing Wikipedia

12  and, if so, did you give any feedback about that?

13      A.  I'm trying to think back.  Because you see, my

14  scholarly career goes back --

15      Q.  I understand.

16      A.  -- quite far, and Wikipedia didn't even

17  exist -- I don't know how old Wikipedia is, but -- I

18  really don't know.  I -- I think probably not --

19  probably my answer would have to be no, but -- but

20  again, maybe in some of the Sibelius books there is some

21  references to Wikipedia.  I'm not sure.  I'd have to

22  look.  But Wikipedia has not been along for -- for that

23  long.

24      Q.  Have you ever seen students try to cite

25  Wikipedia in their dissertations that you've reviewed?

Timothy Jackson - 9/24/2024

153

1    A.  Yeah, sure.

2    **Q.  And -- and how did you give feedback to that?**

3    A.  It depends on -- everything depends on how you

4    use it, right.  So if you use it by itself without any

5    kind of look at the materials being cited, right -- if

6    you just use it by itself in isolation, I think that

7    could be problematic.  But if you actually read the

8    articles that are listed in the bibliography, then, yes,

9    it's a fine and legitimate tool.

10             And I've never disputed that.  I've never

11   said to students, you can't cite Wikipedia.  What I've

12   always said to them is cite Wikipedia and then cite one

13   or two items from that source.  In other words, they

14   usually -- at the end of the Wikipedia article, they

15   contain other articles, right, references.

16             So you can cite the Wikipedia article, but

17   then you must cite -- I've always said to them, you must

18   cite actual articles.

19   **Q.  I see.**

20   A.  In other words, don't rely exclusively upon

21   Wikipedia.  That's a mistake.

22             But one thing that Wikipedia is useful for

23   is seeing where people's interests lie, because

24   sometimes Wikipedia actually shows that in the general

25   public, something is a topic, right.  So if you look it

Timothy Jackson - 9/24/2024

154

 1  up, you see a long article, you know that it's a topic,

 2  then you go down to the bibliography and you see a whole

 3  bunch of citations, then what you do is you look those

 4  up.  And it's not very hard now on the internet to do

 5  that, right.  And then you read those, and you can cite

 6  those in addition to the Wikipedia citation.  That's --

 7  that's my advice.

 8            But no, I never told students you can't use

 9  Wikipedia or cite it if you want.

10            MR. WALTON:  Fair enough.  Let's go ahead

11  and take a lunch break.

12            MR. ALLEN:  Yep.

13            THE VIDEOGRAPHER:  We're off the record at

14  1:06 p.m.

15      (A recess was held from 1:06 p.m. to 2:05 p.m.)

16            THE VIDEOGRAPHER:  We're back on the record

17  at 2:05 p.m.

18      Q.  BY MR. WALTON:  Dr. Jackson, we're back after a

19  lunch break.  Are you ready to proceed?

20      A.  I am.

21      **Q.  I want to shift gears a little bit and talk**

22  **with you now about the JSS, which we've previously**

23  **agreed is the acronym for the journal of Schenkerian**

24  **studies.**

25      A.  Right.

Q.  Before we talk about -- just to set the stage,
before we talk about volume 12, I want to spend some
time discussing the history of the JSS before volume 12
happened, and then we'll move into the specifics about
volume 12 and events that happened after that.

So how did the journal start?

A.  So the journal started in conjunction with a
gift to the university of papers that were preserved by
one of Schenker's association by the name of Reinhard
Oppel that I had discovered in Germany.

And Oppel came here to, personally, see the
beginnings of the center, and the university president
hosted a special event for him coming and we also
founded this new professorship for -- which was
eventually assumed by Slottow.  And one of the duties
that Slottow would take on was helping to get the
journal started and run the journal.  And that's how the
whole thing happened.

Q.  So what was the relationship between the center
and the journal?

A.  So the center was responsible for bringing in
gifts of various kinds.  So we solicited and received
various gifts mostly to do with documents from early
Schenkerians.  So we had a gift of the Oppel collection,
which is really an amazing collection.  I won't go into

1  the whole history of it right now, because -- it's

2  fascinating, but it's a long story.

3           And then we got more gifts from various

4  early Schenkerian, so Allen Forte.  You probably don't

5  know who these people are, but they were very

6  distinguished early -- early Schenkerians, and we got

7  their papers.

8       Q.  **Were most of the gifts that the center has**

9  **received received in the first few years of its**

10 **operation?**

11      A.  Not necessarily.  We -- just last summer, I

12 went and picked up all of Allen Forte's private

13 correspondence, which is a huge thing because Allen

14 Forte was a very prominent theorist who taught Yale.  He

15 was -- Mr. Patel, professor of music theory.  In fact,

16 Ewell wrote his dissertation under -- under Forte.

17          And so, I managed to get a gift from the

18 widow -- from Allen Forte's window for the -- all of his

19 correspondence covering a 20-year period.  I mean, it's

20 hundreds -- thousands of pages of correspondence.  So

21 yeah, we've been continuing.

22      Q.  **And where are these gifts stored once received?**

23      A.  Well, they go to -- right now they're going to

24 a special storage place, but there's also an effort to

25 digitize all these documents and make them available.

Timothy Jackson - 9/24/2024

157

1  And a whole bunch of them are already online, but the

2  plan is to put all of them -- eventually all of them

3  online so that people can access them.

4       Q.  And who is digitizing them?

5       A.  UNT.

6       Q.  Since 2020, how many gifts have been received

7  by the center?

8       A.  Just this one.

9       Q.  And during the three or four years before 2020,

10  how many gifts were received by the center?

11      A.  Oh, more.  More.  I can't tell you exactly how

12  many, but -- but more.  Like more than one.  Maybe about

13  four or five.

14      Q.  Okay.

15      A.  And then before that, there were also cash

16  gifts and stuff like that.  So it really also -- a lot

17  of that fell on me.

18      Q.  Meaning you were the one soliciting --

19      A.  Right.

20      Q.  -- soliciting the gifts?

21      A.  Exactly.

22      Q.  Would you say you did the majority of

23  solicitation to try to get these gift?

24      A.  Yeah.

25      Q.  Who else was involved in that?

1      A.   Steven Slottow, and he did get one major gift.

2      **Q.   When was that?**

3      A.   Actually, two major gifts.  One was from the

4  Kessler papers, and the other was the Burckhardt papers.

5  So Steven did two, and I did about five or six different

6  gifts like that.

7      **Q.   And when Mr. Dr. Slottow's gifts obtained?**

8      A.   Oh, okay.  So the Kessler papers, I would think

9  over a decade ago, and the Burckhardt papers came in

10 probably about -- just after the whole business with the

11 journal, so in 2021.

12     **Q.   Okay.  How were articles solicited for the JSS**

13 **pre volume 12?**

14     A.   So in different ways.  Sometimes the student

15 editors would go to conferences and listen to papers and

16 say to the people who gave the papers, "It would be nice

17 if you would submit it to our journal," and that seems

18 to have generated quite a bit of material.  Sometimes

19 people just sent the articles in on their own.  They --

20 they saw the website with its call for papers and they

21 would submit things.  There were different ways.

22          The second year of the journal we -- we

23 gave it over to two editors who were not UNT people, and

24 they put together a special issue on Schenkerian theory

25 and Raymanian theory.

1    Q.  And were these students or faculty?

2    A.  These were faculty at another university.

3    Q.  At the same university?

4    A.  No, at a different one.

5    Q.  What two institutions were they?

6    A.  I think one guy, he was on our board of

7    readers.  He's at UT -- I want to say UT Dallas.  Either

8    UT Dallas or UT Arlington, I can't remember which.

9    Q.  And the other --

10    A.  And I can't remember the other one's

11    affiliations.  But they basically -- I don't know how

12    they got these papers, whether they, you know,

13    commissioned them, so to speak, or -- you know, I'm not

14    sure how they got them.  But they -- they commissioned

15    or got these papers on this very narrow topic.  And so,

16    we devoted an issue to that and they edited that volume

17    so that was another way of getting it -- in a way, it

18    was like a festschrift.  Because instead of being

19    devoted to a person or a scholar, it was devoted to a

20    topic.  And that's another way that many journals

21    operate is they'll -- they'll put forward a topic and

22    then they'll solicit people to submit articles on that

23    topic.

24    Q.  Who was responsible for deciding whether a

25    certain submission was or wasn't going to get printed?

1    A.  Well, in their case -- in that case, they were.

2    Q.  **Just generally.**

3    A.  But they -- they were for that issue.

4    Q.  **Of course.  Other than that issue, generally in**

5    **the volumes, where there were --**

6    A.  In the volumes, about -- it was generally the

7    student editor who made that decision.  I did not -- in

8    other words, neither Slottow nor I made decisions about

9    who to publish.

10    Q.  **Did the student editors ever approach you to**

11    **seek your opinion as to whether certain pieces should or**

12    **should not be published?**

13    A.  Not very much.  I can't --

14    Q.  **Do you recall any examples?**

15    A.  Not really.  The main problem that we had was

16    that we would commission book reviews and, you know,

17    there it's a different things thing.  It's not like

18    their -- the book reviewer is quite submitting it blind.

19    We pick the reviewer, and sometimes the reviews came

20    back very harsh.  So what we had to do was because the

21    reviewers were usually distinguished scholars of one

22    kind or another, we sometimes had to intervene a little

23    bit to get them to tone their reviews down a little bit.

24    Q.  **And when you --**

25    A.  But without altering the substance.

Timothy Jackson - 9/24/2024

 1    Q.  Sure.  When you say "reviews," you're talking

 2  about those who were --

 3    A.  Book reviews.

 4    Q.  -- who were reviewing the book review to be

 5  published or those who were writing the book review?

 6    A.  The writers of the book review.

 7    Q.  I see.

 8    A.  So in other words, what I'm saying is that the

 9  main intervention on my part and Professor Slottow's

10  part was not in deciding who got published, but in

11  deciding how to deal with situations that arose where

12  one scholar was, kind of, beating up another one a

13  little too much, okay.  So then we told the -- we

14  intervened and said, Well, why don't you -- we'll smooth

15  things over and we'll help you get this toned down a

16  little bit.

17    Q.  Do you recall ever having a situation where one

18  of the student editors decided that a particular

19  submission was not worthy of publication?

20    A.  Yes.

21    Q.  How often did that happen?

22    A.  I don't think it happened a lot.  Again, I

23  didn't take such a hands on approach.  I didn't

24  micromanage, and neither did Dr. Slattow.

25    Q.  Was there ever a situation that you learned

1    **about where a student editor had determined that a**

2    **particular submission should not be published that,**

3    **whether you expressed it or not, you disagreed with that**

4    **decision?**

5        A.   Yes.   That happened after the blow up with JSS,

6    I think, with a paper by David Beech.

7        **Q.   Explain how -- how that is an example.**

8        A.   Well, David Beech's article was sent out to

9    reviewers, and I didn't know who the reviewers were.

10   And I got a letter from David at one point saying that

11   his paper had been refused and that was okay with him,

12   but he didn't like the way it had been refused.

13            So I wrote to Ben Graf -- first, I wanted

14   to find out how and why this had happened.  And then

15   once I found out, I was concerned because the people --

16   one of the people who had been selected as a reviewer

17   was -- was known to be hostile to the way of -- to

18   David.

19            So I -- what I said was that I wanted to

20   send the paper out again for another opinion before

21   definitively rejecting it.  That was the decision that I

22   suggested and that I wanted to follow, but by that time,

23   the journal was defunct de facto.

24       **Q.   So was Beech's article ever published?**

25       A.   No, not in our journal.

1    Q.  And to be clear, he had written a response that

2    was originally intended to be part of the symposium?

3        A.  He -- that was a completely different thing.

4        Q.  I see.

5        A.  He -- he -- he did write a response in the

6    symposium, but this was an article about Hubert, not

7    about Ewell.

8        Q.  Okay.

9        A.  So that was the only time that I can remember

10   where I intervened in the sense of saying that we don't

11   really want to reject this at this point, we want to get

12   another opinion.

13       Q.  And was the student editor amenable to that

14   suggestion?

15       A.  I don't know because we never had a chance to

16   follow through.

17       Q.  Do you recall any examples of when you would

18   make suggestions to the student editors that they

19   decided not to follow?

20       A.  No.

21       Q.  Do you recall any time where Dr. Slottow would

22   make a suggestion to the student editors and they

23   decided not to follow his suggestion?

24       A.  I don't know about that because if he did that,

25   I won't know.

Timothy Jackson - 9/24/2024

164

1    Q.  Okay.  That's fine.

2    A.  I mean, what I would know about is when we had

3    meetings between us and the editor, which we did have

4    from time to time, right, editorial board meetings, we

5    would sit down and discuss things.  But as I said, most

6    of the time it had to do with the book reviews.

7    Q.  And -- and when you published the book reviews,

8    were they peer reviewed?

9    A.  No.  Book reviews generally are not peer

10   reviewed.

11   Q.  That's what I thought.  I just wanted to

12   clarify.

13   A.  How -- how could you do that?  Because it's

14   really one scholar's opinion about another scholar's

15   book or whatever, right.  You can't -- you can't do

16   that, at least in our field.

17   Q.  Generally speaking, would you describe the

18   majority of the work published by the JSS over the years

19   as peer reviewed or no?

20   A.  Yeah, like I would say at least 60 percent of

21   what was published was peer reviewed.  That was, sort

22   of, like the -- the standard procedure because of what

23   we said before about the genres.  But obviously, there

24   were issues that were not because they were different

25   things.

Timothy Jackson - 9/24/2024

1    Q.  Sure.

2    A.  Sometimes there were issues that were a mix of

3  both, like -- like the 12th volume --

4    Q.  Like volume 12?

5    A.  Right.  Which had two -- if I'm not mistaken,

6  two or three -- I think it was two peer reviewed

7  articles and then the symposium.

8    Q.  The book reviews, who decided to commission a

9  specific book review on behalf of the JSS?

10    A.  That was decided by consensus.  Like the -- we

11  would get sent -- the publishers would send us books,

12  and they would go to the student editors, and the

13  student editors would sit down with us, like, at one of

14  our meeting and say, Well, we got this book and it looks

15  like something we ought to review.  And then we sit

16  around and discuss, well, who might we get to review

17  such a book.  And then we would decide on -- to approach

18  so and so, and if he could -- or she would decide to do

19  it, that's great.  And if not, we would approach someone

20  else.

21    Q.  And who would generally -- well, when you say

22  meetings, who was present at those meetings?

23    A.  Me -- or I myself and Slattow and the student

24  editors, whoever they were.

25    Q.  Okay.  And who would typically make suggestions

Timothy Jackson - 9/24/2024

166

1  as to who should be commissioned to do a particular book

2  review?

3      A.  All three of us.

4      Q.  Were -- were the student editors in a position

5  to suggest other people in the field --

6      A.  Yes.

7      Q.  -- who should review books?

8      A.  Yes.

9      Q.  So sometimes this -- those recommendations

10  would come from the student editors, sometimes they'd

11  come from Professor Slottow, and sometimes from you?

12      A.  Right.  We would talk about, among ourselves,

13  who might be good for doing anything.  Like who in the

14  field is active in this particular sub field, if you

15  will.

16      Q.  Do you recall any instances where -- where a

17  student editor disagreed with either you or Professor

18  Slottow over who should be commissioned to write a book

19  review?

20      A.  No.

21      Q.  Would the --

22      A.  These -- can I add something there?  That --

23  that these meeting were remarkably collegial.

24      Q.  Well, I'm glad to hear that.

25      A.  Nobody was forcing or kind of like you -- you

1    got to listen -- just because you're a student, you got

2    to do what we say.  That -- that wasn't the atmosphere.

3         Q.  Do you recall any instances where a student

4    editor wanted to publish -- wanted to accept for

5    publication a submission where you or Professor Slottow

6    disagreed?

7         A.  No.  Except for that one case which I

8    mentioned, the David Beech situation.

9         Q.  I see.

10              And was that an example of where a student

11   editor was going to reject it, but you asked them to --

12        A.  Right.

13        Q.  -- to wait?

14              Okay.  Let me flip the -- the previous

15   question and ask it the other way.  Are you aware of any

16   instances other than that where a student editor was

17   inclined to reject a submission for publication but you

18   or Dr. Slottow disagreed with that?

19        A.  No.

20        Q.  Okay.  For submissions that were going to be

21   published as peer reviewed submissions in the JSS, who

22   decided how many reviewers to put on an article and who

23   those reviewers were going to be?

24        A.  Usually that was the student editors who were

25   doing that, and they were receiving the comments, not me

1  or Slottow.  I think that in a few cases where there

2  were -- we weren't sure, that we looked at the comments,

3  all of us.  But usually it was pretty clear cut.

4      **Q.  The student editors, would they send -- would**

5  **they send submissions to other members of the editorial**

6  **board for peer review?**

7      A.  Uh-huh.  If it was appropriate.

8      **Q.  I see.**

9      A.  In other words, if it was in their sphere of

10  interest.

11      **Q.  Sure.**

12      A.  That was the preferred thing.

13      **Q.  Are you aware of -- of when articles would be**

14  **peer reviewed by reviewers that were not on the**

15  **editorial board of the JSS?**

16      A.  There were has a few cases, I think, where that

17  happened because we didn't have anybody on the board who

18  was a specialist in that particular field.  So I'm

19  pretty sure that in one or two cases, people were asked

20  to review things who weren't on the board officially.

21      **Q.  Sure.  How did the student editors know,**

22  **basically, how to do their job?**

23          **Were there -- were there some sort of**

24  **written procedures for them to follow?**

25      A.  Not really.  We -- we supervised them.  So

1    let's say you were asking about how did they know where

2    to send their things out for review.  So when we had our

3    meetings, we would brainstorm, this article is probably

4    good for these readers.  And they, basically, learned

5    how to do it on the job.  They didn't have like a code

6    of conduct or a code of rule book.

7              We didn't have a rule book that said, you

8    know, now you must do this, now you must do that.  But

9    we -- that was our job.  Our job, like Slottow and me,

10   was to supervise and make sure that things went well in

11   terms of the protocols.

12       **Q.  Who chose the editorial board members?**

13       A.  Well, Slottow and I did it at the very outset,

14   when we -- when we set up the journal.  And then over

15   the years -- over the 20 years that we published the

16   journal, some people died and other people were added.

17       **Q.  So when a -- when someone was appointed to --**

18   **accepted the invitation to serve on the editorial board**

19   **for the JSS, were there any term limits on that?**

20       A.  No.

21       **Q.  Was there ever any period of reevaluation?**

22       A.  Not really.  The -- we thought, though, that it

23   was -- it was too big.  After a while it -- we decided

24   it that it was too big, and I think our intention was to

25   prune it down.  But we didn't really do that.

```
 1        Q.  Who decided it was too big?

 2        A.  Well, we, kind of, selectively felt that way,

 3   especially Slottow seemed to think it was too big.  I

 4   really didn't mind one way or the other because I think

 5   that the more people you have, the better because you

 6   can have more specialties.

 7        Q.  How many -- well, was there ever anyone who

 8   asked or chose to leave or resign from the editorial

 9   board?

10        A.  After the appearance of the Ewell symposium, if

11   we want to call it that, I received -- I think two or

12   three people wrote in saying they wanted to resign.

13        Q.  And about how many editors were on the board at

14   that time?

15        A.  Well, it wasn't editors.  These were on the

16   editorial board -- they were like the advisory board.

17   Yeah.

18        Q.  Excuse me.

19        A.  Yeah.

20        Q.  How many people were on the editorial board at

21   that time?

22        A.  So you mean me, Slottow, or -- Lavi Wells and

23   Benjamin Grand -- Benjamin Graf -- I mean.  I'm sorry --

24   Benjamin Graf.

25        Q.  And what was the --
```

1      A.  So there was the four of us were -- who were

2  like permanent kind of fixtures working on this project,

3  and then we had maybe about 12 or 15 people who were,

4  let's say, affiliated with the journal who were now and

5  again serving as readers of articles, right.

6      **Q.  And is it fair to refer to those people as the**

7  **editorial board?**

8      A.  I suppose, yeah, because they were -- we -- we

9  used -- we drew upon them as needed.

10      **Q.  So with regard to that group of individuals**

11  **before 2020, do you -- do you recall a time where any of**

12  **them stepped down from or asked to be excused from their**

13  **affiliation with the JSS?**

14      A.  No.  No.

15      **Q.  When did you and Professor Slottow initially**

16  **set up that group of people and -- and choose the**

17  **original members?**

18      A.  I think it was around 2002.

19      **Q.  Do you recall how many people you chose at that**

20  **time?**

21      A.  No, but their names would appear in the first

22  volume.

23      **Q.  And once you made that decision and invited**

24  **those people and they accepted, was there any other sort**

25  **of approval that you had to obtain for them to serve in**

1    that capacity?

2        A.  No, they just remained.  But as I said, we

3    added some people.  And nobody resigned, but a few

4    people died.  I guess when you die you resign, right.

5        **Q.  Do you recall how many people died?**

6        A.  No.  But some did, I think.

7        **Q.  And then you and Dr. Slottow would extend**

8    **additional invitations to other people?**

9        A.  Yeah, yeah.  If there were people around who

10   seemed to be really good and who wanted -- you know, who

11   we thought would be really good readers, we would ask

12   them.

13       **Q.  And you may have already shared this a few**

14   **minutes ago, but who chose you and Dr. Slottow to be the**

15   **faculty advisors for the journal?**

16       A.  I suppose we did when we set up the journal,

17   right.

18       **Q.  Okay.**

19       A.  I mean, my idea from the beginning was that

20   the -- the purpose of this project was to train a new

21   generation of Schenkerian scholars.  That was the whole

22   purpose, not to professionalize the journal.  Now, that

23   was our ideal, and if things had just stayed as they

24   were, I would have preferred to keep it that way.

25       **Q.  How did you and Dr. Slottow share or split**

1    **responsibilities for the operation of the journal?**

2        A.  Well, we -- we would communicate between

3    each -- with each other and with the editor.  Mostly

4    the -- the editors did a lot of this themselves or

5    their -- but we kept -- we would meet them and talk with

6    them and find out what was going on and, you know, how

7    many articles we had out for review and what they were

8    about.  And so, we constantly kept our fingers on the

9    pulse of the journal, even though we weren't making

10   the -- we weren't micromanaging.

11       **Q.  What was your and Dr. Slottow's official title**

12   **with respect to the journal?**

13       A.  We were faculty advisors.  So we were advising,

14   yes.

15       **Q.  Has there ever been a written description of**

16   **what the role of the faculty advisors are for the JSS?**

17       A.  Maybe, but I don't recall where it -- where it

18   is now because when we -- we set it up 25 years ago,

19   right -- remember, that's a quarter of a century.  So

20   really this is hard to recall, I have to say.  But I

21   think we must have done some things when we -- when we

22   started the journal.

23       **Q.  But you don't recollect any of the details?**

24       A.  I'd have to go back and look in my files and

25   see if I can find what is there, but my feeling is, you

 1  know, all this was done over about a two-year period.

 2  It took quite a while to get the journal started.  It

 3  was quite labor intensive, I can say.  Like we had to

 4  design the journal -- all kinds of things that we

 5  learned on the job.

 6       **Q.  When you invited someone to be on the editorial**

 7  **board -- not a student editor, but another individual to**

 8  **serve as a reader reviewer in that capacity -- what**

 9  **information would you typically provide that person**

10  **describing what it was you were inviting them to do?**

11       A.  I think what would happen would be that the

12  student editor would write to these people and ask them

13  if they were willing to read manuscripts once in a while

14  and send us their feedback.

15       **Q.  Do you --**

16       A.  And that was about it.

17       **Q.  Did you -- was there some sort of script that**

18  **the student editor was supposed to send?**

19       A.  I don't think so.  I think there was a letter

20  whereby the -- the student editor would write to the

21  reviewer -- potential reviewer and say, you know, "We

22  have -- we're starting this journal, and we need people

23  with expertise to read manuscripts.  Are you willing to

24  do that?"

25            And then if they said yes, then we -- can

 1   we add your name to the mast head?  And they would say

 2   yes.

 3          Or no.  Some -- a few times people said no,

 4   but -- or they were too busy, but...

 5       **Q.  And did you either draft or review and provide**

 6   **feedback on that letter that would go out?**

 7       A.  No, I don't think so.

 8       **Q.  You just left that to the student editor?**

 9       A.  Right.  They would -- yeah, that's -- they

10   would indicate agreement or disagreement with what --

11   whether they would read or not read.

12       **Q.  How many times did you publish -- let me re-ask**

13   **that question.**

14          **How many times did the JSS publish a piece**

15   **that you had written?**

16       A.  Okay.  So I think we already covered that.  It

17   was one time when we published a session from the SMT,

18   okay.  And then it was one time in the --

19              (Reporter clarification.)

20              THE WITNESS:  Laufer festschrift.  Okay.

21              Right?  Didn't we already cover this?  And

22   then --

23       Q.  BY MR. WALTON:  It sounds familiar.

24       A.  Yeah.  And then there was one time where I

25   shared an article in the Laufer festschrift.  That's

1    three.

2              And then there was the -- if you want to

3    count this as an article -- or as publishing in the

4    journal, then I actually contributed to the symposium,

5    as well.  So that's four things.  But let's say three

6    and a half, because one of those times was really -- I

7    was only half the article.  The other half was

8    published -- the other part was published by a different

9    scholar.

10        Q.  So was it -- you were co-authoring?

11        A.  Yes, yes.

12        Q.  Okay.  And I think --

13        A.  And both of those were in the festschrift.

14        Q.  I see what volume was that?

15        A.  So it -- I can't remember.  The festschrift was

16   volumes, I want to say, 9 and 10.

17        Q.  I see.

18        A.  And then there was one article which came in

19   late, which was the Vale Mertilmecky [phonetic] where I

20   helped him.  So my name was on that too because I helped

21   him, but part of that is because he's a Finnish-speaking

22   author, so I had to do a lot of editorial work on it.

23        Q.  How was the decision made for someone serving

24   as the faculty advisor for the journal to have their own

25   work published in the journal?

Timothy Jackson - 9/24/2024

177

1    A.  So the -- the decision was made when we decided

2    to publish the session from the SMT.  We decided that if

3    the session was accepted by the program committee, that

4    all the papers that were in the session would be

5    published, just like in Spectrum, where they published

6    all of the plenary speeches, right.  That we would have

7    an issue that was devoted to that section because it was

8    a Schenker session at the SMT.

9    Q.  And when you say "we," just to clarify for the

10   record, who are you referring to?

11   A.  Yeah, I'm referring to all -- me, Slottow, and

12   the student editor at that time.

13   Q.  And that was based on discussions that y'all

14   would have?

15   A.  Yeah.  Like we -- we thought that it was

16   important because if we got the special Schenker session

17   accepted by the SMT and the people who were speaking

18   were all experts on Schenker, that it would be nice to

19   publish that special session in the journal.  And so,

20   when we did get it accepted by the program committee and

21   the speeches and the papers were delivered, once we

22   heard the papers and we -- we said, Okay, we thought it

23   was important, and we would publish that.

24           So among those four or five papers -- I

25   think it was maybe five -- mine was one, okay.  So there

1  was never a decision actually made to say, Okay, now

2  we're going to publish Tim Jackson's paper.  That's not

3  what happened.  What happened was that Tim Jackson's

4  paper was part of that session where there were five

5  papers given.

6       **Q.  And --**

7       A.  So that was the first one.

8       **Q.  Sure.**

9            **And just to clarify, when the decision was**

10  **made to publish that set of papers --**

11      A.  Yeah.

12      **Q.  -- it was already known that you would be**

13  **presenting one of them, right?**

14      A.  Right.

15      **Q.  Okay.**

16      A.  Well, it wasn't known, no.

17      **Q.  Was it known by you and Professor Slottow and**

18  **the student editor?**

19      A.  No.  Because the -- I think what happened was

20  that we only thought it would work out if we actually

21  got the thing accepted by the SMT.  You see, there is

22  another dimension to this which you may not be fully

23  aware of, okay.  It's something to do with me, which is

24  that I never publish anything that I haven't already

25  presented at a conference.

1    Q.  When were you accepted to make a presentation

2    at the SMT meeting?

3        A.  Well, usually the acceptance notices come out

4    in the spring for the next fall.

5        Q.  And had you already decided at that point --

6        A.  No.  I think that we hadn't made a decision

7    because we wanted to see if the papers would be

8    accepted.

9        Q.  So --

10       A.  In other words, there's a peer review of the

11   papers that takes place outside of UNT.  We thought if

12   SMT accepts that special session, then that would have

13   the premature of these papers to having been accepted

14   for the national meeting, which is an honor, right,

15   and -- and not easy to do, okay.  So that's when we made

16   the decision to go ahead.

17       Q.  So what I'm -- and I'm slow, so help me out

18   here.  Which came first on the part of the knowledge and

19   understanding that you and Professor Slottow and the

20   student editors had?  Were you first made aware of the

21   fact that you had been accepted to be one of the

22   presenters or were you first -- had you first made --

23       A.  I believe --

24       Q.  Sorry.  Let me finish.

25       A.  Sorry.

Timothy Jackson - 9/24/2024

180

1    Q.  Or had you first made the decision that whoever

2    is accepted, we're going to publish them?

3    A.  We -- I don't know if we made any firm

4    decisions, but the firm decision was made after the

5    paper had been accepted.  Okay.

6    Q.  Okay.

7    A.  Because a bird in the hand is worth many, many

8    birds in the bush.

9         Do you agree.

10   Q.  Well, I -- I'm not answering questions here

11   today.

12   A.  But, I mean, that's why we -- we did it that

13   way.

14   Q.  You -- you referred to those papers as -- I

15   think I'm understanding correct -- as they were peer

16   reviewed, but not peer reviewed by the editorial staff

17   of the JSS?

18   A.  Exactly.

19   Q.  For the -- so when that particular contribution

20   of yours was included for publication in the JSS, it's

21   your understanding that it had been peer reviewed, but

22   not by the editorial processes of the JSS?

23   A.  Exactly.  Like all the other papers in that

24   issue.

25   Q.  Okay.  What about the other materials that you

1  published?  I believe you said they were included in the

2  festschrift?

3       A.  Right.

4       Q.  Were those peer reviewed?

5       A.  Elsewhere, yes.

6       Q.  How so?

7       A.  So every four years, there used to be what was

8  called the International Schenker Symposium that was

9  held at the Mannes College of music and the new school

10 in New York City.  And this was a major -- this was the

11 major conference in the field.

12            So I put in -- because my teacher was dying

13 at the time of cancer, I put in a proposal to give a

14 talk about the significance of his work on 20th century

15 music.  And I asked Professor Laufer if he would be

16 willing to appear by Zoom.  He was too weak to come and

17 he was too weak to participate, but he was well enough

18 that he could watch it.

19            And so, what I did was I went to see him

20 because he was very ill.  I sent him what I wanted to

21 talk about and asked him to review it and see if he

22 agreed with it, make sure that he agreed, because I was

23 using some of his own analytical work in the talk.  And

24 he did, and I submitted my proposal to the program

25 committee, and it was accepted.

1          And so, I did give the talk and Laufer was

2    present, and then Laufer passed away not long after

3    that.  And so, that was how I ended up giving that talk.

4          **Q.  And did -- did that paper undergo any further**

5    **review that you considered to be peer reviewed?**

6          A.   No.  I did send it to a number of scholars in

7    the field and got criticism from them, but I didn't

8    blindly send it out to any more people.

9          **Q.  And who decided to publish the festschrift in**

10   **the JSS?**

11         A.   Okay.  So that was me and Steven Slottow and

12   the editor at the time.

13         **Q.  And how was it --**

14         A.   But in consultation with other scholars in the

15   field.  The -- the reason I mention that is that I kind

16   of broached the idea with a number of Laufer's former

17   friends and colleagues and said that we wanted to do

18   something in his honor since he had passed away, and

19   what did they think of this and would they contribute if

20   we did such a thing?  And they said that that would be a

21   beautiful way to memorialize his life and work.  And so,

22   that's how we decided.

23         **Q.  And when was it first considered that you would**

24   **write an article contributing to that festschrift?**

25         A.   From the beginning, because I had given that

Timothy Jackson - 9/24/2024

183

1  talk in New York about his work, and because I was the

2  person who had studied with Laufer longer than anyone

3  else.  I was probably the -- I had studied with him

4  formally and informally for 35 years, which is a long

5  time.  I also wrote the obituary for him in the SMT

6  newsletter.

7      **Q.  Before volume 12, had the JSS ever published a**

8  **piece anonymously?**

9      A.  No.  In fact, that's the -- those two pages --

10 I believe it's only two or three pages -- are the only

11 anonymous publication.  And the person who submitted it

12 pleaded to be included anonymously because he was a

13 young recent graduate who was afraid that if his

14 identity were known, he would never be able to get a

15 job.

16     **Q.  The student editor or editors, if there were**

17 **more than one at a given time for the JSS --**

18     A.  Yeah.

19     **Q.  -- were they paid?**

20     A.  No.

21         Well, see, there was a change that

22 Dr. Brand insisted upon, which was that for the first I

23 think 15 or 16 years of the journal, no.  But then there

24 was a change whereby the editor was then paid, which was

25 a very different idea than what I had had.

1    Q.  When did the editor first start get paid?

2    A.  I believe it was around 2018.

3    Q.  Was the student editor at that time Dr. Graf?

4    A.  Yes.

5    Q.  What is your understanding of why Dr. Brand

6    wanted to make that paid position?

7    A.  Because what he wanted to do was to take away

8    my research assistant, who was responsible for two

9    things.  One was to help me as a research assistant, and

10   also to do extra work that was needed around the journal

11   so that the research assistant that was helping me was

12   not editing the journal, but was really helping me with

13   my work and also helping the journal with things that

14   needed to be done, right.  And the editor of the journal

15   was a different student.  Okay.

16          So I had a paid position where the --

17   called a research assistant where the student was

18   actually helping me with my work and the journal work.

19   Like if somebody had an article that needed typesetting

20   or something like that, they could do it.  And then

21   the -- the -- the editor of the journal was a student

22   who volunteered to do that.  So they were different.

23          And what Brant wanted to do and did do was

24   to switch things so that I no longer had a research

25   assistant, but the position of editor of the journal was

1  a paid one.

2      Q.  And did that happen around 2018?

3      A.  Yes.

4      Q.  When were you first given a research assistant?

5      A.  I believe that it was around 2008.

6      Q.  And why?

7      A.  Because I was a distinguished research

8  professor -- or I became one, and I really needed the

9  help from the student research assistant.  Like many

10  research professors, that's one of the few perks that a

11  research -- research professor gets, is a research

12  assistant.

13          Now, I had had help earlier from various

14  students who -- who assisted me in different ways.  Like

15  from the very beginning of my stint at UNT, I always had

16  students helping me in one way or another.  But what

17  happened then under Brant was that I basically lost my

18  research assistant, who now became the paid editor of

19  the journal.

20      Q.  In 2018, are you aware of any other of your

21  colleagues in the college of music who had a research

22  assistant that was shifted or reorganized in some way?

23      A.  No.

24      Q.  Are you aware of any other professor within the

25  college of music in 2018 that had a research assistant?

Timothy Jackson - 9/24/2024

186

1     A.  Yes.

2     **Q.  Who?**

3     A.  I believe Frank Heidlberger had a research

4  assistant to help him with Theoria.

5     **Q.  Do you know whether this research assistant**

6  **also helped Dr. Heidlberger with his personal research?**

7     A.  I don't think they did.  I think their main

8  thing was to help him with the journal.

9     **Q.  And were they paid?**

10    A.  Yes.

11    **Q.  Are you aware of anyone else in the college --**

12    A.  But you see, they didn't edit the journal in

13 the way -- Frank edited the journal, you see, but our

14 journal was different, right.

15    **Q.  Yes.  So Dr. Heidlberger was the editor of the**

16 **journal, right?**

17    A.  Right.

18    **Q.  And -- and then there was a student assigned**

19 **that helped him that got paid?**

20    A.  Right.

21    **Q.  Okay.  Did any of your other colleagues within**

22 **the college of music have a paid research assistant**

23 **assigned to them, personally?**

24    A.  I don't know.

25    **Q.  Since 2020, are you aware of any of your**

1    colleagues within the college of music who had a

2    research assistant to work with them?

3         A.   Again, I don't know because there's so many --

4    there's over 100 faculty, and I haven't gone knocking on

5    doors to see whose got one and who doesn't.

6         Q.   Sure.  That's fine.

7              Was your role as a faculty advisor for the

8    JSS, was that counted in some way towards your overall

9    faculty workload?

10        A.   Yes.

11        Q.   How so?

12        A.   So it was among my responsibilities -- my

13   official responsibilities to -- to supervise the -- the

14   journal.

15        Q.   Was it counted towards teaching research,

16   service, or something else?

17        A.   Research, really.

18        Q.   Research?

19        A.   Yeah.

20        Q.   Okay.

21        A.   That's why I had a research assistant.

22   Research.

23        Q.   At some point were you given a one-course

24   remission on your teaching load in light of the advisory

25   work you were doing for the journal?

1      A.  Yes.

2      Q.  **When did that start?**

3      A.  I believe it started around 2009, 2000 -- yes,

4  2009, thereabouts.  Maybe a little bit earlier than

5  that.  I can't remember exactly -- we must have some

6  documentation somewhere.

7      Q.  **And at that point what was the general**

8  **allocation between your research, teaching, and service**

9  **workload?**

10     A.  So my main emphasis was, generally, on research

11 and teaching, and my service was -- was quite low.

12     Q.  **Do you recall any rough percentages that**

13 **were --**

14     A.  Yeah, something like 40 -- maybe 40/40/20, or

15 even more, 40 -- or 50/40/10, that kind of thing.  So my

16 research was really my driving -- my main thing, so to

17 speak.

18     Q.  **But the teaching component was, roughly,**

19 **40 percent?**

20     A.  Yes.

21     Q.  **And did that remain more or less steady as a**

22 **percentage up until 2020?**

23     A.  Uh-huh.

24     Q.  **I'm sorry.  Is that a yes?**

25     A.  Yes, yes, yes.

Timothy Jackson - 9/24/2024

189

1    Q.  Okay.  Thanks.

2              Are you aware of any other colleague within

3    the college of music that had a one-course remission on

4    their teaching load?

5    A.  Yes.

6    Q.  Who is that?

7    A.  Frank Heidlberger.

8    Q.  Are you aware of any other colleague that had a

9    similar remission?

10   A.  No.

11   Q.  And what is your understanding of why

12   Dr. Heidlberger had the one-course remission?

13   A.  Because he was supervising and editing Theoria.

14   Q.  Immediately before the publication of volume

15   12, what was your teaching load?

16   A.  It was two plus two.

17   Q.  Did that include the course remission?

18   A.  No.

19   Q.  So before you published volume 12, your course

20   remission had been taken away?

21   A.  Yes.

22   Q.  How so?

23   A.  Well, here's the situation is that shortly

24   before that, a couple -- maybe two years before that, or

25   a year, everybody in the theory area was teaching three

1  plus two.  So there was a change in load from three plus

2  two to two plus two.

3        Q.  I see.

4        A.  And I should have been -- I should have been

5  teaching two plus one like Frank was, but I wasn't.

6        Q.  And when did --

7        A.  And then --

8        Q.  -- did Dr. Hidleberger move to two plus one?

9        A.  That, I'm not sure, because I'm not him.

10       Q.  Was it before 2020?

11       A.  I can't say because I'm not him.

12       Q.  When did the faculty, generally, move from a

13  three plus two to a two plus two?

14       A.  So it wasn't the faculty, generally.  What

15  happened was that the musicology people had a two plus

16  two for some time, and the theory people were upset and

17  felt that they deserved a two plus two, as well.  So

18  that was changed.  And I looked it up at one point.  I

19  could tell you exactly when that was changed.

20       Q.  Yeah, when was it?

21       A.  It was about 2018, I think.

22       Q.  Okay.  And in 2018 -- so before that change,

23  your colleagues in theory were teaching a three plus

24  two?

25       A.  Exactly.

1    Q.  And were you teaching a two plus two?

2    A.  Yes.

3    Q.  Because of the one course remission?

4    A.  Yes.

5    Q.  And then after the rest of your colleagues in

6  theory were reduced to a two plus two, what was your

7  teaching load then?

8    A.  It was still two plus two.

9    Q.  And that was in 2018?

10    A.  I think so.  Well, yeah, I know it was two plus

11  two, but I wanted to get another course remission

12  because I was still doing my work on the journal and I

13  felt that was right, but I didn't get that.

14    Q.  Did you discuss that with Dr. Brand?

15    A.  No.

16    Q.  Why not?

17    A.  I really can't tell you why I didn't do it, but

18  I didn't.

19    Q.  So have you been teaching --

20    A.  It wasn't -- can I -- I'm sorry.  It wasn't --

21  in other words, it wasn't that long that I was teaching

22  more than I should have been.  It was only like maybe

23  two semesters.

24    Q.  Since 2018, have you been teaching a two plus

25  two course load?

1    A.  Yes.  And then for those -- before the journal

2  was -- or before I was canceled, I was managing the

3  journal and teaching two plus two.  So I was doing

4  both/and.

5    **Q.  And is that -- going back to roughly 2008 or '9**

6  **when you first received a one-course remission, is it**

7  **your recollection that since that time, you were**

8  **teaching a two plus two course load?**

9        **Is that your recollection?**

10    A.  Oh, yeah, yeah.

11    **Q.  Okay.**

12    A.  Not only is it my recollection.  It's a fact.

13    **Q.  Okay.  All right.**

14        MR. WALTON:  I think we've been going

15  almost an hour.  I'm about to shift gears, so why don't

16  we just take a quick break here?

17        MR. ALLEN:  It's exactly on the button

18  3:00.

19        THE VIDEOGRAPHER:  We're off the record at

20  3:00 p.m.

21    (A recess was held from 3:00 p.m. at 3:11 p.m.)

22        THE VIDEOGRAPHER:  We're back on the record

23  at 3:00 p.m.

24    Q.  BY MR. WALTON:  Dr. Jackson --

25    A.  Could I clarify my last response a little bit

Timothy Jackson - 9/24/2024

1    to your last question?

2        Q.  You know, for sake of time, your attorney will

3    certainly have an opportunity to ask you questions after

4    I'm through.

5        A.  Okay.  Sure.

6        Q.  But since I'm already a little bit behind my

7    own schedule --

8        A.  Okay.  Go ahead.  Go ahead.

9        Q.  -- I want to make sure we'll get through it as

10    efficiently as possible.

11        A.  Yeah.

12        Q.  But rest assured, your attorney will have

13    whatever opportunity that he --

14        A.  Well, it's not him so much as me.

15        Q.  And -- but I wanted to just ask you a few

16    questions now about volume 12 --

17        A.  Right.

18        Q.  -- of JSS.

19                Whose -- whose idea -- or how did the idea

20    for the symposium originate?

21        A.  So it actually came from my student, Ravi

22    Walls, actually.

23        Q.  And why do you say that?

24        A.  Because he suggested it --

25        Q.  How so?

1    A.  -- and I thought about it, and I thought it was

2    a good idea.

3              Because we were communicating back and

4    forth about the symposium -- I mean about the plenary

5    speeches.  He asked me if I had heard about the speech

6    by Ewell because he knew that I was a Schenkerian

7    scholar, and he asked me if -- what I thought of it.

8    And I said I had to look at it, watch the speech, and

9    then I would respond.

10             And so, I did, and then he and I, kind of,

11   tossed some ideas and he -- about symposium talking

12   about getting different people to respond.  First, the

13   idea was different than what happened.

14       **Q.  The -- the initial idea where he first proposed**

15   **it, was that an oral conversation or in writing?**

16       A.  Both written and oral.

17       **Q.  Do you recall which came first?**

18       A.  No.

19       **Q.  Okay.**

20       A.  But probably written.

21       **Q.  Okay.  And how did that idea -- well, how did**

22   **it start, and how did it end up with what the symposium**

23   **was?**

24       A.  Well, the initial concept was for me to contact

25   Schenkerian scholars and get their input, but the more I

Timothy Jackson - 9/24/2024

1  thought about it, the more I thought that in the -- in

2  the speaking of -- in the spirit of dialectics, which I

3  consider essential for all serious scholarship, there

4  should be pros and cons.

5          So I thought that it wasn't be great if I

6  just contacted the cons, but that we would send out a

7  general call for contributions to the symposium, and

8  that would enable people who were in favor of Ewell's

9  talk and his points and his point of view, and that we

10  would publish both without censorship and let the public

11  decide.  Because I'm of the view more speech is better

12  is the way to get to the truth, not censoring people.

13    **Q.  And how was it determined whether those**

14  **responses would or would not be peer reviewed?**

15    A.  Well, we -- we weren't -- you see, we were

16  asking for people to respond in a sense of not writing

17  an article about it -- not writing a peer reviewed

18  article about it, but just expressing their opinions

19  about Ewell's thesis because it was really quite

20  controversial, and that was the spirit of the call.

21    **Q.  I see.**

22          **Do you recall having any conversations with**

23  **Mr. Walls about whether these responses would be peer**

24  **reviewed?**

25    A.  No.

Timothy Jackson - 9/24/2024

196

1    Q.  Okay.  Do you recall Dr. Slottow ever

2  mentioning the idea of peer reviewing them?

3    A.  No.

4    Q.  Who -- when you refer to the call, are you

5  referring to the written call for submissions that was

6  sent out through the SMT list serve?

7    A.  Yes.

8    Q.  Who drafted that call?

9    A.  Not me.  It was drafted I think by other

10  people.  Probably by Ben Graf and Levy Walls, and

11  maybe -- we had input in it.  We -- we they began with

12  the draft, and then Dr. Slottow and I gave our two cents

13  worth.  I don't believe they took all of our

14  suggestions, but they basically sent it out having

15  absorbed some thoughts from us and from other faculty,

16  actually.

17        I -- I wanted to -- because I knew this

18  would be controversial, although I never had any inkling

19  of how controversy it would be, I wanted to consult all

20  the faculty in the music theory area who had any

21  experience with Schenkerian analysis.  And so I asked

22  Diego Cubero and Olga, who calls herself Ellen,

23  Velikanova for their input.  And also we asked some

24  other people in the faculty for their input into the

25  call and how to frame it so that it would be as neutral

1  but also -- yeah, as neutral and properly focused as

2  possible.  So that it would attract pros and cons.

3       **Q.  Do you recall any specific edits or suggestions**

4  **that you suggested that call that were not incorporated?**

5       A.  I think there was a few, but you know what?  I

6  wasn't going to quibble about it.

7       **Q.  Do you recall what they were?**

8       A.  No.

9       **Q.  Okay.**

10       A.  We just -- I just -- I remember saying to

11  myself, well, maybe this isn't quite what we should do,

12  but let's let it go.  Let -- let -- let the chips fall

13  where they may.

14       **Q.  Had you discussed the idea of publishing**

15  **responses to Ewell's address with any Schenkerian**

16  **scholars before that call went out?**

17       A.  Yes.

18       **Q.  Who had you discussed it with?**

19       A.  Oh, a whole bunch of people.  A whole group of

20  scholars.

21       **Q.  And was that through one-on-one contact with**

22  **them --**

23       A.  Yes.

24       **Q.  -- or was it through a group communication?**

25       A.  No, it was through one-on-one.

1    Q.  And did --

2    A.  And, you see, what happened was that -- that

3   was the initial plan, was to, in fact, ask the

4   Schenkerian scholars what they thought.  And then I --

5   in the course of doing that, I recognized that that was

6   unfair.  I thought that was unfair.  So that's when I

7   felt that we should really branch out and -- and issue

8   the call through the SMT for all sundry to respond.

9    Q.  **Before the SMT call went out, had you discussed**

10  **this idea of responses with anyone who was sympathetic?**

11   A.  I don't know who was sympathetic exactly,

12  really.  I didn't have any idea, and I still don't

13  because not all the Schenkerians that I contacted wanted

14  to submit responses.  So some of them may well be

15  sympathetic.

16   Q.  **You just don't know?**

17   A.  I can guess a few of them, but I'm not sure.

18  But they declined.

19   Q.  **So you don't know what their response would**

20  **have been had they agreed to write one?**

21   A.  I'm not a prophet.  No.

22   Q.  **All right.**

23   A.  But once we decided to go with the call, I felt

24  very comfortable about the whole thing because I thought

25  it was fair.  In other words, I thought that once we had

Timothy Jackson - 9/24/2024

199

1  issued the call, that people who were strongly

2  supportive of Ewell would have every opportunity to

3  respond.

4      Q.  How were these responses -- once they were

5  received, how were they to be edited?

6      A.  So we decided on a division of labor.  Because

7  I had already started the process with the Schenkerians

8  who were largely antithetical, I'd say, to -- to Ewell's

9  point, I would continue gathering all those.  And

10  Slottow -- I'm not sure how much work he actually did on

11  this, but Slottow was responsible with working with Ben

12  and Lavi on collecting all of the responses that came in

13  as a result of the call.

14      Q.  And were some of those responses that came in

15  as a result of the call, were some of those antithetical

16  to Ewell, as well?

17      A.  Not really.  Most of them were pro Ewell.

18      Q.  Do you recall any examples that were

19  sympathetic to Ewell --

20      A.  Oh, yeah.  They were --

21      Q.  -- as a response to the SMT call?

22      A.  Oh, yeah, they mostly were.  So most of the

23  responses that we got as the result of the call were pro

24  Ewell.

25      Q.  I see.  And when you say --

1      A.   Not all of them, but most.

2      **Q.   I'm just trying to clarify.**

3      A.   Yeah.

4      **Q.   Do you recall a specific example of a response**

5  **obtained in response to the call that was antithetical**

6  **to Ewell?**

7      A.   No.  So the vast majority, I think -- well, we

8  published all of the responses that we got.  So my guess

9  is that the vast majority that came in that way were all

10 pro Ewell -- or maybe it's too much to say pro Ewell.

11 Some of them were sympathetic, but not entirely pro.

12     **Q.   Fair enough.**

13     A.   Yeah.

14     **Q.   But not overly critical?**

15     A.   Right, right.

16     **Q.   Okay.  Are you aware of any response published**

17 **in the symposium to -- in volume 12 that had previously**

18 **been delivered as an oral presentation?**

19     A.   No.

20     **Q.   As far as you know, these were written**

21 **specifically for publication in the JSS?**

22     A.   Sure.

23          I think that some of them, because I did

24 read them all eventually, contained material that the

25 author had prepared for other purposes.  I'm sure that's

1  true because some of them wrote about Russian music

2  theory.  I wasn't really convinced that that was germane

3  to the issue, but -- but they did.  And I thought

4  probably this is material that was destined for

5  something else, but they thought it was relevant for

6  this.  So yeah.

7      Q.  Who were the individuals that you specifically

8  contacted one-on-one to solicit a response from?

9      A.  So I must have contacted about 15 people, and

10 of those, only about the ones who were actually

11 published actually said yes.  A common refrain among the

12 public -- among people that I contacted was this is so

13 ludicrous that I don't want to waste my time with it.

14     Q.  Among those that you contacted, how many were

15 tenured professors?

16     A.  God knows.  I don't know.  Most of them were, I

17 think.  Most of them, yeah.

18     Q.  Do you recall any specific individuals who

19 were -- that you know were not tenured?

20     A.  No.  I think the vast majority were all

21 tenured.  Yeah.  I tend to know the older guys,

22 unfortunately, because I'm getting on myself.

23     Q.  Was this the first time that the JSS had

24 published a collection of responses in -- in response to

25 a -- an oral presentation?

1    A.  Yes.  The first and only time.

2    **Q.  The -- the contribution that you authored that**

3  **was included in the symposium, who edited that?**

4    A.  The other editors.

5    **Q.  Do you know, specifically, who edited yours?**

6    A.  Yes.  So Slottow edited mine.

7    **Q.  And what --**

8    A.  And Graf -- and, yeah, Graf made some

9  suggestions also, which I took mostly.

10    **Q.  Do you recall rejecting any suggestions from**

11  **either of those individuals?**

12    A.  No.  I followed what they said, actually.

13    **Q.  Do you recall receiving feedback or input on**

14  **your response from any other reviewer?**

15    A.  No.  But I do have written documentation of all

16  of these comments and critiques of my article by Slottow

17  and Graf.

18    **Q.  How was --**

19    A.  But -- oh, wait a second.  I also sent my

20  response to a number of scholars outside of UNT.  That's

21  right.

22    **Q.  Did you ask them to review it?**

23    A.  Yes.  Yes, I did, actually.

24    **Q.  Did you receive any feedback?**

25    A.  Yes, I did.  I have all that correspondence, as

1 well.

2    **Q.  Who did you send it to?**

3    A.  So I sent it to professor Aton Agmine, who is a

4 very distinguished Schenkerian at Kharline University

5 [phonetic] in Israel.  And I sent it to one other

6 person.  I'm trying to think who it was.  I can't

7 remember right now.  And I also got detailed feedback.

8 So from those two scholars, I did.  Yeah.

9    **Q.  Was any of that feedback what you regarded as**

10 **critical?**

11    A.  Yes.

12    **Q.  And how did you respond to their critical**

13 **feedback?**

14    A.  So none of it was critical insofar as my

15 critique of Ewell, but some of it was more like, you

16 need to change this or fix that, or there were little

17 mistakes and things in my -- in my paper -- in my

18 response which needed correcting.

19          So they, very kindly, went through

20 carefully with a fine tooth comb -- tooth comb and

21 corrected all those things.  And we did -- they did talk

22 about my -- my paper, but nobody ever said anything

23 about it being racist.  There was never any indication

24 that these readers thought it was racist.

25    **Q.  Was there ever any suggestion or request made**

Timothy Jackson - 9/24/2024

204

1   to provide additional citations or sources?

2       A.  Nope.  It wasn't a scholarly paper in the same

3   sense that a journal article would be.

4       **Q.  Who -- who came up with the idea of calling it**

5   **a symposium?**

6       A.  I think it was a joint idea because it was

7   based on Plato's symposium.  I don't know if you're

8   aware of that, but there's a famous dialogue -- well,

9   it's more than a dialogue about Love by Plato, which is

10  called the symposium.

11      **Q.  Are you familiar with how the word "symposium"**

12  **is used within modern academia?**

13      A.  Yes.  To a certain degree, but -- but --

14      **Q.  And what is your --**

15      A.  -- I felt that the -- the title that we came up

16  was more in the spirit of Plato's symposium --

17      **Q.  I see.**

18      A.  -- where -- where you have different points of

19  view.  You see, that -- that's what the whole purpose of

20  Plato's dialogues really is, is that you have different

21  speakers and each speaker comes to the symposium with a

22  different idea of what love is.  And so, they're all

23  fighting among themselves and arguing among themselves.

24  So that was the reason for the title.

25      **Q.  And in your opinion, did the word "symposium"**

1  **communicate whether the submissions were or were not**

2  **peer reviewed?**

3      A.  No.  That was never an issue because, as I

4  think I've said several times already, that the whole

5  point of it was not to write articles that would be peer

6  reviewed, but to solicit reactions to a very

7  controversial paper and very controversial thesis.  That

8  was the point, not to write scholarly articles that need

9  to be peer reviewed.

10     **Q.  Who decided to accept or publish the anonymous**

11  **submission?**

12     A.  We all did.  I mean, nobody objected.

13     **Q.  Who received that submission?**

14     A.  I did.

15     **Q.  Was it made by a student?**

16     A.  It was made by somebody who just finished.

17     **Q.  Were they yet on faculty at an institution?**

18     A.  No.  And that was the reason that they wanted

19  to remain anonymous, was because they were very worried

20  that, if they were identified, they would never find a

21  job.

22     **Q.  Other than the call through the SMT list serve,**

23  **did you have any communications with Phillip Ewell**

24  **regarding the intention to publish responses in a**

25  **symposium?**

Timothy Jackson - 9/24/2024

206

1    A.  No.

2    Q.  **Why did you not reach out to Phillip Ewell**

3  **individually or personally?**

4    A.  I didn't feel that that was my responsibility.

5    Q.  **The author of the anonymous piece, what was**

6  **that individual's reputation in the music theory**

7  **community as you understood it to exist at the time?**

8    A.  Who, the person who want anonymity?

9    Q.  **That's right.**

10    A.  Well, he had just finished his doctoral

11  dissertation and was hooking for jobs, so that was

12  his -- he was the most junior person who responded to

13  this, in other words, by a long shot.  Because almost

14  all the other people were either assistant professors or

15  associate professors or full professors.  He was the

16  only person who responded and who wanted to respond who

17  did not have a job.

18    Q.  **Are you aware of any scholarly publications**

19  **that that individual had previously published?**

20    A.  I'm trying to think.  Right now, I can't think

21  of any.

22    Q.  **That's fine.**

23    A.  He was fresh out of graduate school.

24    Q.  **As you sit here today, is there anything about**

25  **the publication process for the symposium that you would**

Timothy Jackson - 9/24/2024

207

1   do differently?

2       A.  No.

3       Q.  How did you first hear about criticism against

4   volume 12?

5       A.  Oh, I think some colleagues of mine started

6   forwarding Twitter commentary.

7       Q.  Do you recall which colleagues?

8       A.  No.  And then --

9       Q.  I'm sorry.  Just to clarify, are you on

10  Twitter?

11      A.  No.

12      Q.  Okay.  Have you ever had a Twitter account?

13      A.  No.

14      Q.  And have you ever had a Facebook account?

15      A.  I have one, but I've never used it.

16      Q.  Okay.  Do you have any other social media

17  accounts?

18      A.  I do not and never have.

19      Q.  Okay.  Then -- I'm sorry.

20              Go back to how did you first hear about

21  criticism against volume 12?

22      A.  I think I just said that friends of mine

23  contacted me and said there -- it looks like there's a

24  Twitter -- an attack on Twitter against the symposium.

25      Q.  And what was your understanding of where these

Timothy Jackson - 9/24/2024

208

1  criticisms were coming from?

2      A.  What do you mean?

3      Q.  Were they coming from people within UMT or

4  outside of UNT?

5      A.  Outside.

6      Q.  Was it your understanding that they were coming

7  from the SMT or just from individual -- individuals at

8  large?

9      A.  They were coming mostly what I thought was from

10 Ewell's friends and colleagues and students at other

11 places and people, generally, sympathetic to his point

12 of view.

13     Q.  What did you do in response to that?

14     A.  Nothing.

15     Q.  Did you discuss any of those criticisms with

16 Dr. Slottow?

17     A.  At some point, yes, but I can't remember

18 exactly when.

19     Q.  Did you --

20     A.  Yes, actually, they were discussed.  Because I

21 got a message from Lavi Walls of all people that said,

22 what do they want?  Do they want us to have Ewell

23 respond to himself?  He -- in other words, the question

24 really was he was complaining that he wasn't invited

25 specially to participate.  And we had never said that he

1 couldn't.  In fact, if he had wanted to, he could have.

2 But we -- we felt it was kind of strange for someone to

3 respond to themselves.

4     Q.  When did you first hear that the -- that there

5 were graduate students that were putting forth a

6 statement in -- in response to volume 12?

7     A.  You know, I can't -- it's all a bit of a blur

8 at that point, but it was shortly after the Twitter

9 storm started, right.

10     Q.  And do you recall whether you became aware of

11 the student statements or the faculty statement first?

12     A.  No.

13     Q.  After you were made aware of those statements,

14 did you discuss them with anyone?

15     A.  My wife mostly.

16     Q.  Did you discuss them with Dr. Slottow?

17     A.  A little bit.  We -- we were both kind of

18 surprised, to say the least.

19     Q.  What was your understanding of how Dr. Slottow

20 responded?

21     A.  He was very freighted.  I think he was very

22 afraid.

23     Q.  Was that your response?

24     A.  In the very beginning, yes.

25     Q.  And then how did that change over time?

1     A.  Well, I decided that I should seek expert

2  advice -- legal advice.  I communicated with my sister,

3  who's also a professor, and it seemed like there were

4  other professors around the country at that time --

5  because it was just after the Floyd situation -- that I

6  should consult with them and see what was the best way

7  forward.

8          So I called the professor in California who

9  had been canceled and who had sought legal counsel, and

10 he gave me the name of Michael Allen's firm.  And so, I

11 called Michael and --

12     Q.  And without -- and without divulging any

13 conversations you had with his firm at that point --

14     A.  Right.  Okay.

15     Q.  -- let me just ask you, do you recall when you

16 first contacted Mr. Allen's firm?

17     A.  It was shortly after the Twitter storm.  So

18 probably -- well, a couple of days later.  So it

19 happened around, if I -- I'm trying to remember -- maybe

20 July of 2020, the end of July.  So probably around that

21 time, I contacted Michael Allen's firm.

22     Q.  Do you recall whether it was before or after

23 you learned of the student or faculty statement?

24     A.  No.

25     Q.  And do you recall whether it was before or

1  **after you learned that the university was putting**

2  **together a panel?**

3      A.  Oh, that was before.  I definitely remember

4  that it was before that happened.

5      **Q.  Okay.**

6      A.  Yeah.

7              MR. ALLEN:  Ben, can you just clarify what

8  you mean by "panel"?

9              Are you referring to the ad hoc panel that

10  was convened to investigate the journal.

11              MR. WALTON:  That's right.  That's,

12  ultimately, what the panel was -- was called.

13              THE WITNESS:  Right.

14              MR. WALTON:  I don't know what it was

15  called originally when it was announced.

16              THE WITNESS:  Right.  It was called the ad

17  hoc.

18              MR. WALTON:  The ad hoc review panel, I

19  believe, was the title on the document that we may look

20  at that in a moment.

21              THE WITNESS:  Right.  Right.

22              MR. WALTON:  But that's what I was

23  referring to, so thanks for clarifying.

24      Q.  BY MR. WALTON:  And then how did you first hear

25  about -- well, how did you first hear that the

1  university was going to be putting together a panel that

2  became the ad hoc review panel?

3      A.  I think I heard about it from a letter from

4  Callie, Provost Callie.

5      **Q.  And did you -- did you speak to Provost Callie**

6  **in response to that letter?**

7      A.  I've never spoken with her ever.

8      **Q.  Did you talk to Dr. Brand about the panel?**

9      A.  Not really, no.  No.

10     **Q.  Did you speak with Dean Richmond about the**

11 **panel?**

12     A.  No.  They never reached out to ask me -- you

13 know, to give me any advice or any -- you know, there

14 was no outreach to me, and I didn't reach out to them,

15 either.

16     **Q.  Finally made it to the point of the day where**

17 **we can look at an exhibit.**

18         (Exhibit 1 was marked for identification.)

19     Q.  BY MR. WALTON:  Dr. Jackson, I'm handing you

20 what's been marked as Exhibit 1 to your deposition.

21 It's my understanding that this is a statement that was

22 signed by several graduate students at UNT, as reflected

23 on the last page of this document.

24         Have you seen this statement before?

25     A.  I don't think I've seen the signatures, and to

1  be honest, I don't know a fair enough of the people on

2  this.  I don't know who they are, except that they were

3  students.

4      **Q.  Do you recognize the name of Lavi Walls in**

5  **that?**

6      A.  Yes, I see his name.

7      **Q.  Do you recognize the name of Yee Yee Gough**

8  **[phonetic]?**

9      A.  Yes.

10     **Q.  Had she formally worked under you?**

11     A.  Yes.

12     **Q.  Was she an editor of the journal?**

13     A.  No.

14     **Q.  And what capacity had she worked for you?**

15     A.  She was supposed to do sort of -- she was my

16 research assistant, so she was supposed to do various

17 tasks, typesetting and what else -- whatever was needed

18 for me and for the journal.

19     **Q.  Do you recognize any of the other names on**

20 **this?**

21     A.  Well, I recognize Rachel Gain because -- but I

22 didn't know her and she had never taken any courses from

23 me.

24     **Q.  So is your recognition of her based on the fact**

25 **that she publicized a statement?**

1       A.  Yes.  This -- if it was this statement, I'm not

2   sure, but yes, she did.

3       **Q.  Okay.**

4       A.  And I recognize another name on here.  That

5   says Matthew Oliver.

6       **Q.  Okay.**

7       A.  He was my advisee for a number of years.  He

8   was a blind student who I advised.  I am quite

9   disappointed to see that he included his name here.

10          I recognize Bryan Steven.  He was in one of

11  my classes for a semester.  But the other students,

12  except for Peter Kohanski, who also I only know because

13  he never took a class with me.  Most of these never took

14  a class with me.  So I don't know them.

15      **Q.  You've sued Rachel gain in this lawsuit, right?**

16      A.  Correct.

17      **Q.  Why did you sue her and not any of these other**

18  **students?**

19          MR. ALLEN:  Objection.

20          THE WITNESS:  But answer?

21      Q.  BY MR. WALTON:  You can respond.

22          MR. ALLEN:  Yes.

23          THE WITNESS:  Okay.  Because she

24  disseminated this on the web.

25      Q.  BY MR. WALTON:  And other than the way that

Timothy Jackson - 9/24/2024

215

1  Ms. Gain disseminated the statement on the web, are you

2  aware of any other actions by any of these other

3  students that disseminated statements about volume 12?

4      A.  I don't know.

5      **Q.  Okay.**

6      A.  In the case of Gain, I know.  So that was

7  probably the main reason that we decided to include her.

8      **Q.  Here's what I'd like to do, to take a few**

9  **moments with this document, and you can take -- take**

10 **some time to look at it.  But I would like to know, in**

11 **your opinion, are there any statements that are made in**

12 **this document that you believe are false?**

13         **So we can -- we can take it one paragraph**

14 **at a time as needed, but why don't you go ahead and read**

15 **at least the first opening section there and then let me**

16 **know if you believe that there are any false inaccurate**

17 **statements in that section.**

18         MR. ALLEN:  You're suggesting we go

19 paragraph by paragraph, is that it?

20         MR. WALTON:  Well, if you have another

21 suggestion, I'm open to that.

22         MR. ALLEN:  No, no.  I'm just --

23         MR. WALTON:  Yeah, kind of section by

24 section.

25         MR. ALLEN:  Yep.

1              MR. WALTON:  Yes.  Actually, let's go off

2    the record.

3              THE VIDEOGRAPHER:  We're off the record at

4    3:45 p.m.

5        (A recess was held from 3:45 p.m. to 4:09 p.m.)

6              THE VIDEOGRAPHER:  We're back on the record

7    at 4:09 p.m.

8        Q.  BY MR. WALTON:  Dr. Jackson, we're back after a

9    brief break.  Are you ready to proceed?

10       A.  Ready.

11       **Q.  A couple of preliminary questions before we**

12   **look at Exhibit 1.**

13              **You've brought claims in this lawsuit for**

14   **defamation, correct?**

15       A.  Correct.

16       **Q.  What is your understanding of something that is**

17   **defamatory?**

18       A.  Something that is false that is publicly

19   disseminated.

20       **Q.  Do you know whether this document as Exhibit 1**

21   **was publicly disseminated?**

22       A.  I don't believe that this particular version of

23   it was.

24              MR. ALLEN:  I'm going to object to that on

25   the grounds that he's not required to know what

1  publishing means for the purpose of a legal defamation

2  claim.

3           But you can go ahead and answer.  I'm

4  sorry.

5           THE WITNESS:  It's marked -- the document

6  is marked confidential, so I'm not sure that this

7  particular document was the one that was disseminated.

8     Q.  BY MR. WALTON:  Have -- before today, in July

9  of 2020, did you see -- did you see a statement that was

10 disseminated by any of the graduate students whose name

11 appears on the end of this exhibit?

12    A.  So I don't think I saw these names.  It's

13 possible that they were redacted or withheld.  I'm not

14 sure.

15    **Q.  How do you believe that the -- that the**

16 **statement of the graduate students was disseminated?**

17    A.  Well, I know it was disseminated online because

18 it was referred to by multiple people.

19    **Q.  Do you go online to see where and how it was**

20 **disseminated?**

21    A.  Yes, after it was -- after I was alerted to its

22 existence, yes.

23    **Q.  And can you just describe briefly what you did**

24 **to go online to find this statement?**

25    A.  I just Googled it.

Timothy Jackson - 9/24/2024

218

1     Q.   And did it come up in a search result?

2     A.   Yes.

3     Q.   And the link that you clicked on -- I'm

4  assuming you clicked on a link to open the statement?

5     A.   Yes.

6     Q.   Did it have student names at the bottom of it?

7     A.   No, I don't think so.  I think those were

8  withheld.

9     Q.   Do you know who put this statement online, the

10  version that you accessed?

11    A.   I'm not sure that I do, actually.  I believe,

12  though, that there was statements -- I've seen

13  statements that were put online by Rachel Gain.

14    Q.   What other statements have you seen online by

15  Rachel Gain?

16    A.   Well, I'd have to think back to the various

17  documents because there were different versions that

18  were publicized in different places and some were put on

19  Facebook.

20    Q.   Did you go on --

21    A.   I'm not a regular reader of Facebook, so I

22  didn't get a, you know, direct -- I didn't look at the

23  Facebook ones, but I was sent a copy of that.

24    Q.   Did you go on Facebook at any point to see what

25  students were saying?

1    A.  Yeah.

2    **Q.  And what did you find?**

3    A.  I found all kinds of statements about me that I

4  thought were incorrect.

5    **Q.  Statements by other student besides Rachel**

6  **Gain?**

7    A.  Right.

8    **Q.  And -- and did you not sue those other**

9  **students?**

10   A.  I think that the feeling was that they were not

11 quite as complicit in disseminating the -- the petition

12 or the essence of these documents as she was.  I felt

13 that she really did take a leading role in that.

14   **Q.  Are there any -- are there any statements**

15 **that -- that Rachel Gain either made or disseminated**

16 **that you felt were defamatory other than what we have**

17 **here as Exhibit 1?**

18              MR. ALLEN:  Objection.

19              THE WITNESS:  Yeah.

20   Q.  BY MR. WALTON:  Can you describe what

21 statements Rachel Gain made that you're suing her for?

22   A.  The statements that she made -- well, I'm

23 talking about these statement that were disseminated by

24 Rachel Gain, okay.  But there are other statements that

25 she made that were disseminated online that were not

1  only defamatory, but also insulting.

2      Q.  **Can you describe for the jury what statements**

3  **that Rachel Gain -- what statements you're suing her for**

4  **making?**

5              MR. ALLEN:  Objection.

6              THE WITNESS:  I'm suing her for

7  disseminating the statements that are contained in the

8  petition, this being a kind of petition.  Okay.

9      Q.  BY MR. WALTON:  I see.

10     A.  Along with the faculty who endorsed that

11  petition.  So it's really a double whammy.

12     Q.  **Who -- who sent you information about Rachel**

13  **Gain's statements?**

14     A.  Various colleagues.

15     Q.  **Did any of them indicate that they agreed with**

16  **what she's saying?**

17     A.  No.  They were astonished.

18     Q.  **Are you aware of anyone else that has reshared**

19  **Rachel Gain's comments online?**

20     A.  I believe so.  There are people who have

21  reshared all that.

22     Q.  **And why did you not also sue them?**

23     A.  Because I didn't -- as I said before, I didn't

24  feel that they had played a crucial role in the initial

25  dissemination of these allegations.

1    Q.  In Exhibit 1 -- I'm sure there's a lot of stuff

2  in here that you disagree with, but what -- what do you

3  believe in Exhibit 1 constitutes defamation against you?

4              MR. ALLEN:  Objection.

5              THE WITNESS:  So I would say that there are

6  different degrees and types of defamation.  There are

7  just statements here which are plain false but just

8  untrue.  And then there are statements which are

9  interpretive of what I wrote or I would consider

10  misinterpretive of what I and other people wrote, and

11  deliberately so.

12              So there are different levels, let's say,

13  of defamation here.  There are some where I -- where

14  they impute to me false statements -- or they're

15  false -- factually false statements about me.  I can

16  give you some examples, if you want.

17    Q.  BY MR. WALTON:  Sure.  Let's just -- is there

18  anything in the -- in the opening two paragraphs that

19  you believe is defamatory?

20    A.  Yes.

21    Q.  What do you believe is defamatory?

22    A.  Okay.  So recent perpetuation of anti-black

23  racism.  Where -- I'm trying to figure out what that

24  refers to.

25              If I might answer you this way, my article

Timothy Jackson - 9/24/2024

222

1  was read by the most distinguished black music theorist

2  in this country, Cofegawa, who Ewell cites on a number

3  of occasions.  And I have a letter from him stating that

4  he read my article and found nothing objectionable in

5  it.  So I consider that statement, "perpetuation of

6  anti-black racism," to be false.

7      **Q.  Did you --**

8      A.  Can I continue a little bit or not?

9      **Q.  In just a moment.  I just -- did you interpret**

10  **this statement to be regarding your article in the**

11  **symposium?**

12      A.  Not just mine, but all -- all the negative

13  ones -- let's say all those critical of Professor Ewell.

14  I don't see how that, necessarily -- a criticism of

15  another scholar's work, black or white, constitutes

16  anti-black racism.

17      **Q.  So just to step back for a moment, if someone**

18  **believes that something is racist, are they -- are they**

19  **free to say so?**

20      A.   I suppose they can.  There's no law that says

21  they can't, right.  But when they assert something as a

22  fact that may not be a fact or isn't a fact, then it

23  becomes -- it can add up.  Like there's a lot of things

24  here that can add up to defamation.

25      **Q.  Is -- if -- if Rachel Gain had believed that**

223

**there was content in the symposium that she believed was**

**racist, should she be allowed to express that opinion?**

                    MR. ALLEN:  Objection.  Are you asking

about a legal standard defamation --

                    MR. WALTON:  I'm just asking --

                    MR. ALLEN:  -- or are you asking as part of

scholarly culture?

                    Do you have an objection?

                    MR. STOWERS:  Yes, the rules are you can

only object as to form.  You cannot coach your witness

by giving a talking objection.

                    MR. ALLEN:  Do you want to call the court

and --

                    MR. STOWERS:  Well, we can do that.

                    MR. ALLEN:  Well, I'm posing an

objection -- I'm trying to clarify what --

                    MR. STOWERS:  Well, it's objection, form,

in the Eastern District of Texas.

                    MR. ALLEN:  We can -- we can call the

judge, if you want.

                    MR. WALTON:  No.

                    MR. ALLEN:  I don't want him confused when

you're going to try to ask him questions of law.

                    MR. WALTON:  I will restate the question,

and if you have an objection, you can state it under the

1  local rules --

2          MR. ALLEN:  And are you making the

3  objections or is Renaldo?

4          MR. WALTON:  I will make the objections.  I

5  will object to sidebar comments of counsel, for purposes

6  of the record, as outside the local rules.  Let me go

7  ahead and re-ask the question --

8          MR. ALLEN:  Please.

9          MR. WALTON:  -- and if you have any further

10 clarification, you and I can discuss it.

11         MR. ALLEN:  Sure.

12     Q.  BY MR. WALTON:  Dr. Jackson?

13     A.  Huh?  Yes?

14     **Q.  In your understanding of -- of free speech, do**

15 **you believe that people should be able to say whenever**

16 **they think that something is racist?**

17         MR. ALLEN:  Objection.

18         THE WITNESS:  People can say what they

19 like, all right, under the rules of free speech.  But

20 when they start making statements which are false or

21 which are demonstratively false about another person to

22 their detriment, that becomes, in my opinion,

23 defamation.

24     Q.  BY MR. WALTON:  And what are the -- what are --

25 that's what I'm trying to direct our attention to now?

Timothy Jackson - 9/24/2024

225

1      A.  Right.  I asked you.

2      **Q.  And what are the statements that you believe**

3  **are demonstrably false?**

4      A.  Okay.  So can we go through them?

5      **Q.  Sure.**

6      A.  Because I asked you before, and you said you

7  did not want to.

8      **Q.  Well, not yet, but please proceed.**

9      A.  Okay.  All right.  Let's go through a few -- a

10  few statements that I think are not fair or false.

11  Okay?

12              So "the call for papers gave a two-week

13  deadline for responses," false.  The call for papers

14  gave a 20 -- if I'm not mistaken, a 21-day deadline, and

15  it was also -- the call for papers was extended.  And no

16  paper that was received after the deadline was turned

17  down.  So all papers received got a fair shake and, in

18  fact, were published.  So that is a misstatement of

19  fact.  Okay.

20              "Deadlines were selectively enforced."

21  False.  Absolutely false.  No deadline was selectively

22  enforced.  All papers were allowed to proceed to

23  publication.

24      **Q.  Was there any response that you received after**

25  **the deadline?**

1    A.   That I received, no.   And I think that most of

2   the papers that were pro Ewell were also received before

3   the -- in fact, almost all of them, if not all of them,

4   were received before.   But some -- maybe there was one

5   or two pro Ewell things that came after the deadline,

6   and they were accepted.   It's possible.   Remember, I

7   wasn't handling that side of it.   All right.

8    **Q.   And how do you -- yes.   How do you believe that**

9   **these statements that you believe were false, defamed**

10  **you?**

11   A.   Because they suggest that I, personally,

12  intervened to enforce a deadline so that people didn't

13  have an opportunity in a timely manner to respond to the

14  criticism.

15   **Q.   What other examples --**

16   A.   Do you understand my response?

17   **Q.   Yes, sir.**

18   A.   Good.

19   **Q.   What other examples of false statements can you**

20  **point us to here in this exhibit?**

21   A.   Okay.   "There was coordination between six of

22  the anti-Ewell papers, produced a markedly skewed bias

23  before or toward the anti-Ewell response."

24       Coordination means that the people who

25  wrote the responses did so in a collaborative manner.

Timothy Jackson - 9/24/2024

227

1   That is false.  Every person who submitted a critique of
2   Ewell did so separately, and I did not share the
3   critiques of other authors with other authors.  In other
4   words, everybody worked on their own and submitted their
5   own commentary.
6           The only indication was at the very end of
7   the editorial process, I added some references to
8   other -- in other words, if there was overlap between
9   papers, I -- I added some references.
10      **Q.  The -- the interpretation you just gave of that**
11  **word, "coordination:  Did you speak to any of the**
12  **students to ask them what they meant by the word**
13  **"coordination"?**
14      A.  I wasn't consulted by the students.  No student
15  came to ask me -- to show me this document and say, what
16  do you mean by coordination?  Or what do I -- what do --
17  no student came and asked me anything about this
18  document, so there's no way I could have done it.
19      **Q.  That wasn't my question.  Sorry.**
20      A.  Okay.
21      **Q.  To clarify, when you were made aware that**
22  **Rachel Gain was disseminating material, did you go to**
23  **her or any of the other students and say, what does**
24  **mean, "coordination"?**
25      A.  No, no.  Okay.  Shall we go on?

1     **Q. Yes, please.**

2     A. So "Lavi Walls was completely powerless to edit

3 content and ideas or to provide substantive feedback

4 during the editorial process." False.

5     **Q. And do you believe that is false?**

6     A. He is not powerless. There is evidence in the

7 document -- documentary record that show that he had

8 agency in the editorial process and that nobody --

9 nobody on that -- on the board ever told him or forced

10 him to do anything on the contrary. He made suggestions

11 to a number of the authors, which some of them accepted

12 and implemented.

13     **Q. Do you know if any of the suggestions were**

14 **editing content or ideas?**

15     A. Yes, I believe they were. And I think that

16 he -- he was treated like an equal in the whole process.

17 He was not treated in any way -- if you look at the

18 documentation, there was never a sense that he was

19 actually a junior person. We always treated our student

20 as younger colleagues.

21     **Q. Did Mr. Walls ever express a desire to provide**

22 **a certain type or level of editorial feedback that you**

23 **advised him not to provide?**

24     A. No.

25           MR. ALLEN: Objection.

Timothy Jackson - 9/24/2024

229

1                THE WITNESS:  Now, the -- the statement

2    that I exercised control over editorial decisions is

3    actually false because I did not decide what was

4    published.

5                In other words, my role, as I saw it, was

6    to prevent these the publications of these statements

7    with false statements, literally false.  Other than

8    that, my role was to make sure that they were all

9    properly edited for grammar and that all of the

10   footnotes and bibliography and all of that scholarly

11   apparatus was -- was in good shape.

12               But I never made any -- I never exercised

13   any kind of control over the content of the opinions

14   because I felt that would be censorship.

15       Q.  BY MR. WALTON:  Are there any other examples

16   you have?

17       A.  Oh, yeah.  Many.

18       **Q.  Please proceed.**

19       A.  Okay.  Okay.  So "the JSS has demonstrated that

20   it does not meet the standards of a peer-reviewed

21   publication."

22               False.  We have seen that all of the

23   journals that we modeled our publication on followed

24   exactly the same procedures that we have.  So --

25       **Q.  And what were those other journals?**

1    A.  Spectrum.  Music Theory Spectrum.  They

2 followed exactly the same procedures that we have.

3 Okay.  Let's go over the page.

4           All right.  Well, under the -- this is

5 under what they are asking for, what they are

6 petitioning for.  "Provide a full detailed and public

7 account of the editorial and publication process and its

8 failures."

9           We don't -- we don't accept the view that

10 it failed, but we did publish a full -- well, no.  Let

11 me back up.

12           We submitted to the president's office --

13 or to the -- actually to the provost's office a full

14 detailed account of the editorial and publication

15 process, and that was not made public by the -- by the

16 provost.

17    **Q.  Was that what you submitted in response to the**

18 **panel report?**

19    A.  No.  I think it was before that.  We -- it was

20 before the panel issued its report because we wanted to

21 make sure that the panel had an available full and

22 complete account with all the e-mail correspondence that

23 went into the editing of the symposium, and that is

24 exactly what we provided.

25    **Q.  And was that provided after the panel was in**

1  existence?

2      A.  No.  It was before.

3      **Q.  Was that provided before or after you became**

4  **aware of the statements being circulated by Rachel Gain?**

5      A.  It was after.

6      **Q.  Okay.  You can go to the next example.**

7      A.  Okay, sure.  Okay.  So here we go to the next

8  thing, "investigating past bigoted behavior by faculty

9  and taking this into account."

10          Now, I'm not sure what they're referring to

11 past bigoted behavior by faculty.  That's a very vague

12 statement, and it's a very broad statement.  But if it's

13 used -- if it occurred under the context of this

14 particular document, this petition, it could be applied

15 to me personally.  So I don't know what they're

16 referring to here, but I deny that I have -- that I have

17 made past bigoted behavior -- that I had promulgated

18 such bigoted behavior.

19     **Q.  So how would you -- how would you determine**

20 **whether this statement is true or false?**

21          MR. ALLEN:  Objection.

22          THE WITNESS:  I would have to know what the

23 behaviors were that are being referenced here okay.

24     Q.  BY MR. WALTON:  But this statement doesn't

25 describe what behaviors they're referring to?

1          MR. ALLEN:  Objection.

2          THE WITNESS:  No.

3          Sorry.  I didn't mean to --

4     Q.  BY MR. WALTON:  No.  That's fine.

5          What is the next statement you believe is

6  false?

7     A.  Okay.  Okay.  All right now we get to another

8  thing.  This is calling for my dismissal.  And this

9  statement, "He has a history of racist, sexist, and

10 abusive behavior in his many capacities."

11         That is false.  Where is any documentation

12 or proof of racist, sexist, and abusive behavior?  I

13 deny it.

14    **Q.  Do you see in this statement any specific**

15 **examples provided of what these student believed**

16 **constituted examples of that behavior?**

17    A.  No.

18         MR. ALLEN:  Objection.

19         THE WITNESS:  I -- I would like to know

20 what my racist -- it says a history.  That's also an

21 important word here because it implies more than one

22 instance, right.  This is not just about the issue of

23 the journal.  This is going back in time.

24         And I would like to add in this context

25 that, while I've been at UNT for 20 years, I've

Timothy Jackson - 9/24/2024

233

1  supervised the doctoral and master's dissertations of a

2  large number of Asian, South American, non-white

3  students over the years.  And so, this statement implies

4  that my mentorship of all these non-white students

5  counts for nothing.

6      Q.  BY MR. WALTON:  What is --

7      A.  So I object to that.

8          I also object to the idea that I'm racist

9  based on the fact that my wife is Asian and my children

10  are of mixed race.  So I'm wondering how this evidence

11  is a history of racist, sexist, and abusive behavior in

12  my many capacities.

13      **Q.  What is the next example of a false statement**

14  **that you see here?**

15      A.  All right.  All right.  Using the center for

16  Schenkerian studies research assistant to aid with my

17  personal research.  That is true in the sense that they

18  did, but that was their job, as well as aiding me with

19  the -- with the -- with the journal and other center

20  projects.

21      **Q.  I'll sorry.  Where was that particular**

22  **statement?**

23      A.  Under point 1, calling for Dr. Jackson's

24  dismissal.

25      **Q.  Oh, I see now.  Okay.**

1      A.   Yeah.   "Using the CSSR aide to aid with his

2  personal research."

3          Now, personal research is also a little

4  problematic here because my personal research was also

5  intertwined with my research, period, right, which was

6  also intertwined with the Schenkerian research.  So by

7  helping me with my personal research, they were also

8  helping me with my general search.

9          And the job of a research assistant, which

10  was the job description, was that they were supposed to

11  help with my personal research and assist me with work

12  on the journal as needed.  That was the job.

13      Q.   So is -- is it -- was it a false statement to

14  say that you were using the RA to help with your

15  personal research?

16      A.   So it's not a false statement to say that I

17  expected that person to do that, but what is a false

18  statement here is that was a grounds for my dismissal.

19      Q.   I see.

20      A.   I was simply following the rules in the sense

21  that the research assistant was supposed to be a

22  research assistant.  That's what a research assistant

23  does.

24      Q.   What is the next false statement you see?

25      A.   Okay.   "Requiring a student -- requiring

Timothy Jackson - 9/24/2024

235

1  student work during the summer without pay."

2          I had a research assistant who didn't work

3  during the semester -- during the long semester, and

4  this person was unable to work because they were

5  suffering from certain issues, okay.  And so, the

6  agreement was that during the summer, they would do the

7  work that they had not done during the long semester.

8      Q.  Who was that student?

9      A.  Yee Yee Gough.

10     Q.  Did you -- did you discuss that arrangement

11  with Dr. Brand?

12     A.  No.

13     Q.  Did you discuss that arrangement with whoever

14  the department chair may have been at the time?

15     A.  No.  Not before, this -- this situation arose.

16     Q.  Yes.

17     A.  Afterwards, yes.  However, I did take steps to

18  try to mitigate the situation for the student for the

19  student's own benefit, and I have documentary proof of

20  all of that.

21     Q.  So was the arrangement that the student would

22  perform some of her work over the summer?

23     A.  Yes.

24     Q.  Do you know if she was being paid over the

25  summer?

1    A.  She was not, but the point was that she didn't

2  do the work during the long semester so -- and she

3  couldn't do it for various reasons.  So I had a choice,

4  fire her or let her do this.  And so, my choice was to

5  try to help her by not making her work during the

6  summer.

7      **Q.  What about the --**

8    A.  I mean by not making her -- by allowing her to

9  make up for work that she had not done during the year

10  or done improperly, let's say.  To let her do it over

11  the summer.

12     **Q.  What about the next statement?**

13    A.  "Extortion through grade manipulation and

14  threats to students' careers and reputations."

15          We need to have some proof of that grade

16  manipulation.  What does that mean?  It means probably

17  that I would change a grade based on nothing.  In other

18  words, just, you know, say, well, this -- this

19  student -- whatever, didn't -- I can't imagine what that

20  is, actually.

21     **Q.  Do you know what the grad students were**

22  **referring to here?**

23    A.  Not entirely.  I have a suspicion about it, but

24  I can't prove it, so I'm not sure.

25     **Q.  Does this statement --**

1      A.   Threats --

2      Q.   -- provide any examples of that?

3      A.   No.

4      Q.   Proceed to the next part you were about to talk

5  about.

6      A.   All right.   "These abuses were eventually

7  addressed."   I don't know that.

8           "It took college administrators years to

9  attempt to remedy these problems."

10          Anyway -- all right.   And then we get back

11 to, "His present offenses concerning the issue of the

12 JSS are part of a pattern of harmful behavior that have

13 disproportionately affected marginalized students and

14 faculty."

15          Who are the marginalized students and who

16 are the faculty that my pattern of harmful behavior has

17 affected?   That is a false statement because there is no

18 such pattern of harmful behavior that have affect

19 marginalized students.   All of my students who were

20 quote/unquote, let's say, non-white have more or less

21 graduated and earned their degrees under my supervision.

22     Q.   If there were a -- a minority student that

23 testified that they felt harmed by your behavior, would

24 they be lying?

25          MR. ALLEN:   Objection.

```
 1              THE WITNESS:  I suppose so.  Because I --

 2   and also, the problem is what do you mean by

 3   marginalized student?  Because I'm not sure who they

 4   are.

 5        Q.  BY MR. WALTON:  Okay.  Next false statement?

 6        A.  Okay.  Power imbalances.

 7        Q.  And where do you see that?

 8        A.  Under point 2.

 9        Q.  And how is that a statement?

10        A.  Well, it says that because I'm a professor, I

11   have facilitated past abuses, and therefore I must be

12   prohibited from teaching required courses, advising

13   students, serving on committees, and so on, wielding

14   power over students and faculty.

15              So I'm not sure how my position has

16   facilitated past abuses, but I believe the allegation

17   that it has to be false.

18        Q.  Do you see any examples of what the student are

19   referring to in this statement?

20        A.  You mean in terms of my past abuses?

21        Q.  Sure.

22        A.  I don't know what -- no.  I don't see any

23   definition or specificity in what those past abuses were

24   that I facilitated -- that were facilitated through my

25   position of power, but if they existed, I'm not sure
```

1  that my position was the thing that facilitated it.

2  It's a kind of tricky argument there.

3             Do you see that?

4       Q.  **What about the next statement that you believe**

5  **is false?**

6       A.  All right.  All right.  "Lack of understanding

7  of issues of diversity."

8             That is false that I have a lack of

9  understanding of issues of diversity.

10      Q.  **And --**

11      A.  I have never exhibited any such lack of

12  understanding.  On the contrary, I've had a few black

13  students, for example, and I've had -- definitely had

14  South American students, Korean students, Japanese

15  students, and so forth, and I've been very keenly

16  attuned to issues of diversity.

17      Q.  **If any minority student were to testify that**

18  **they felt you did not properly understand issues of**

19  **diversity, would they be lying?**

20             MR. ALLEN:  Objection.

21             THE WITNESS:  Lying, no, but the statement

22  would be false.

23      Q.  BY MR. WALTON:  Why did you understand the

24  statement to be targeting you, personally?

25      A.  Because it's surrounded by statements about

1  Dr. Jackson.

2      **Q.  Do you know the other faculty members that this**

3  **statement is referring to?**

4      A.  No.  So there's only one doctor -- there's only

5  one faculty member mentioned here, which is me.  And --

6      **Q.  If --**

7      A.  -- you -- you have here my name as illustrated

8  "in both Dr. Jackson's previous and current behaviors,

9  problems were ignored" -- well, Dr. Jackson's current

10  and previous behavior.  That's a focus on me, wouldn't

11  you agree?

12      **Q.  Are there any examples provided of what**

13  **behaviors they're referring to?**

14              MR. ALLEN:  Objection.

15              THE WITNESS:  I don't know what behaviors

16  they're referring to.  They're -- they're obviously very

17  negative behaviors, right.

18      Q.  BY MR. WALTON:  If a graduate student believed

19  that you had engaged in inappropriate or improper

20  behavior, should they be free to express that opinion?

21      A.  Yes.

22              MR. ALLEN:  Objection.

23      Q.  BY MR. WALTON:  Okay.  What's the next false

24  statement?

25      A.  I don't see any more false statements about me.

1    Q.  So I know we've talked about a lot so far, but

2    as -- as you sit here now, are you able to identify any

3    other statements within these few pages that we haven't

4    talked about yet that you believe were false statements?

5                MR. ALLEN:  Objection.

6                THE WITNESS:  I think I've presented the

7    ones that I've noticed at this point.

8        Q.  BY MR. WALTON:  Okay.  And as you sit here now,

9    are you -- after going through these statements here,

10   are you able to recall any additional statements that

11   were made or disseminated by Rachel Gain that you

12   believe are defamatory but that are not contained here?

13       A.  There are statements in the -- online that are

14   defamatory --

15       Q.  And --

16       A.  -- from Rachel Gain.

17       Q.  And to the extent that they go beyond what's

18   here, can you please tell us the content of those

19   statements?

20       A.  I'm not sure I want to because they're very

21   derisive towards me.

22       Q.  Well, you sued Rachel Gain for making derisive

23   statements to you, so I'm asking you to describe the

24   statements that you believe fall into that category.

25       A.  So on an online post, ,she refers to me as a

1  POS.  I don't know if you know what that means.

2      Q.  And did she spell that out?

3      A.  Yes.

4      Q.  And is that -- well, for the record, what is

5  it?

6      A.  Piece of shit.

7      Q.  Is that --

8      A.  Do you -- do you think that that's the right

9  way to refer to a professor that you've never studied

10 with?

11     Q.  Well, if a student feels that way about a

12 professor, should they have a right to say so?

13          MR. ALLEN:  Objection.

14          THE WITNESS:  I suppose they have the right

15 to say so, but it still constitutes defamation, I think,

16 in combination with all of this.

17     Q.  BY MR. WALTON:  Are there any other students

18 [sic] that Rachel Gain made that you believe are

19 defamatory that are reflected in Exhibit 1?

20     A.  Besides what I mentioned?

21     Q.  That's right.

22     A.  And there are some other things on -- in the

23 online correspondence which I don't like but which are,

24 more or less, repetitions of what is here.

25     Q.  Is there anything that you can recall that

 1  **Rachel Gain said that you believe was defamatory that**

 2  **was different from what we've talked about already?**

 3      A.  Not really.

 4      **Q.  Okay.**

 5      A.  I would have to go through all of the many

 6  e-mails that have been provided to the court and also

 7  the Twitter feeds and Facebook statements.  There's

 8  other statements, but I don't carry those all around in

 9  my head.

10      **Q.  Nothing stands out to you in your memory right**

11  **now?**

12      A.  Right now, no, but there's quite a bit here any

13  way.

14      **Q.  Dr. Jackson, I'm going to share with you what's**

15  **been marked as Exhibit 2.**

16      (Exhibit 2 was marked for identification.)

17      Q.  BY MR. WALTON:  It's -- for a second time, it's

18  my understanding that this is a copy of the statement

19  that was released by certain faculty members within the

20  college and music.

21           Is that your understanding?

22      A.  Correct.

23      **Q.  Do you believe that anything in this statement**

24  **is defamatory against you?**

25      A.  I do.

1    Q.  What?

2    A.  So the problem here is we endorse the call for

3  action outlined in our student's letter, and then the --

4  the address is given to the statements that the student

5  generated.  So when you endorse something, you endorse

6  it.  So that means that you agree with it and that you

7  undersign it, so to speak.  That's what endorsement

8  means.

9    Q.  That's what you believe endorsement means?

10    A.  It's not what I believe it means.  It's what it

11  means.  To endorse a statement is to affix your seal of

12  approval to that statement.

13    Q.  Now, this -- these words here say "we enforce

14  the call for action."

15           What is your understanding of the call for

16  action?

17    A.  So that was the version of -- it's not the same

18  thing as this letter here.

19    Q.  I see.

20    A.  It's a different document.

21    Q.  Let me see if we can figure out what that

22  document is.

23      (Exhibit 3 was marked for identification.)

24    Q.  BY MR. WALTON:  There we go.  I'm going to hand

25  you what has been marked as Exhibit 3 to your

1   deposition.  And I know --

2        A.  But this is not the document either.

3        Q.  I understand.  We'll get there.  This --

4   this -- the cover page here is the report produced by

5   the ad hoc review panel.

6        A.  Right.

7        Q.  I'm going to ask you to turn to the page number

8   at the bottom right-hand corner --

9        A.  Right.

10       Q.  -- that says UNT 00189.

11       A.  Right.

12       Q.  And it continues on to 190.

13       A.  Right.

14       Q.  This is marked as Exhibit 3 that was attached

15  to that panel report.  Is this the document that you

16  believe was linked by this URL in the faculty statement?

17       A.  I believe it was, yes.

18       Q.  Okay.  So what is your understanding then of

19  the call for action that the faculty statement is

20  referring to?

21       A.  I believe it's Exhibit 3.

22       Q.  Is there any -- is there any part of this

23  Exhibit 3 that you believe constitutes a call for

24  action?

25       A.  Well, it's not labeled that here, but I believe

1    that's what they're referring to, unless I've confused

2    the different variants of these documents.

3        Q.  Okay.  You can go back to our Exhibit 2, the

4    faculty statement --

5        A.  Right.

6        Q.  -- for just a moment.

7            Other than the sentence that you described,

8    is there any other statement in -- within this statement

9    that you believe is a false statement of fact?

10       A.  Yes.

11       Q.  What?

12       A.  "A set of responses to Dr. Philip Ewell's

13   plenary lecture at the 2019 society for music theory

14   annual meeting is" replete -- "replete with racial

15   stereotyping and tropes."

16           I disagree.  I think it's false.

17       Q.  If someone were to believe that there is

18   content within the symposium that constituted a racial

19   stereotype, should they be allowed to express that

20   opinion?

21           MR. ALLEN:  Objection.

22           THE WITNESS:  I think they should.  But can

23   I add one thing or not?

24       Q.  BY MR. WALTON:  Well, I have one more follow-up

25   question to that.

1          And if they were to express that opinion,

2   do you believe that that opinion is objectively false?

3       A.  The opinion --

4               MR. ALLEN:  Objection.

5               THE WITNESS:  -- is not false that they

6   want to express.  In other -- it's not false that they

7   should -- or could express that opinion.  What is false

8   here is the actual statement that the articles are

9   replete with racial stereotyping and tropes.  That is

10  the false statement.  They are not.

11      Q.  BY MR. WALTON:  If someone -- if someone

12  believed that they were, how would you go about proving

13  that that is wrong?

14              MR. ALLEN:  Objection.

15              THE WITNESS:  Well, the word "replete"

16  means that there are many such statements, and you would

17  have to show -- it seems to me that what they should

18  have done if they had used scholarly -- had taken a

19  scholarly approach to this, they would have gone through

20  each and every statement to prove their point, but they

21  have not.  And I do not believe they can because I

22  believe the statement is false.

23      Q.  BY MR. WALTON:  If someone came to you and said

24  privately, "I read the symposium and I believe that

25  there are racial stereotypes within that symposium,"

 1   what would you do to show that untrue?

 2       A.  I would --

 3              MR. ALLEN:  Objection.

 4              THE WITNESS:  Sorry.  Should I answer?

 5              MR. ALLEN:  Go ahead.

 6              THE WITNESS:  I would go -- would say to

 7   that person, "Go through the symposium, find all --

 8   every -- all -- each and every statement that you think

 9   is racial stereotyping, and please demonstrate to me

10   that it is.  Provide evidence.  Provide evidence for

11   your opinion.  Be evidentiary."

12       Q.  BY MR. WALTON:  If there is -- if there is a

13   statement that one person believes it's a racial

14   stereotype and another person says it is not, how should

15   that disagreement be resolved?

16              MR. ALLEN:  Objection.

17              THE WITNESS:  So I believe in a free

18   society that people should have the right to express

19   their views without censorship.  And I think that, in

20   this case, what they're trying to do is censor those

21   people who were critical of Ewell by accusing them of

22   racism.  And therefore, if I could add to assist, that

23   you accuse somebody of racism without any kind of

24   evidence, then it becomes defamation.

25       Q.  BY MR. WALTON:  So to clarify, if I believe

1   that someone else has expressed an opinion that I

2   believe is racist, in order for me to say tell the rest

3   of the world I believe that opinion is racist, am I

4   required to do research to back it up or can I just say

5   my opinion?

6       A.  Well --

7              MR. ALLEN:  Objection.  This has been asked

8   and answered, so I'm going to give you one more try, but

9   I'm instructing him not to answer.  If you want to

10  rephrase the question in terms of him as a witness --

11             MR. WALTON:  I want to get one clear answer

12  and then we can move on.

13             THE WITNESS:  You're getting a clear answer

14  from me in this.

15             All right.  Let's say you think the world

16  is flat.  All right.  Let's say that you -- you really

17  believe the world is flat and you think that anybody who

18  thinks it's round is a racist, okay.  So even though the

19  world is not flat but you still come back to that person

20  and you say, well, because you've expressed this

21  opinion, you are an a racist, are you not free to

22  express that opinion?  Of course you are free to express

23  that opinion.  But you have to back it up.

24      Q.  BY MR. WALTON:  Well, and that's what I was

25  asking for you to clarify.  If you don't back it up, are

1  you still free to express the opinion?

2          MR. ALLEN:  Objection.

3          THE WITNESS:  Okay.  We're going around in

4  circles.  I said that you are free to express that

5  opinion, but what I said also is that something moves

6  towards defamation when you don't have any evidence and

7  it becomes a kind of generalized smear, let's put it

8  that way, of a person with whom you disagree.

9      Q.  BY MR. WALTON:  Are there any other statements

10 in Exhibit 2 that you believe are false statements of

11 fact?

12     A.  Yes.

13     **Q.  What are they?**

14     A.  So "the treatment of Professor Ewell's work

15 provides an example of the broader system of oppression

16 built into the academic and legal institutions in which

17 our disciplines exist."

18          I have never seen any current example of

19 the broader system of oppression built into the academic

20 and legal institutions in which our disciplines exist.

21 I have not seen any clear evidence of that provided by

22 anybody.  In my own personal experience, I have never

23 seen that.

24     **Q.  If someone sincerely believed that volume 12**

25 **was an example of a system of oppression, should they be**

1    free to say so?

2                MR. ALLEN:  Objection.

3                THE WITNESS:  I think I've answered that

4    already.

5        Q.  BY MR. WALTON:  Well, with respect to the other

6    statements, I just wanted to see if your answer was the

7    same for this one.

8        A.  It's the same.

9        Q.  Okay.

10       A.  They can express that opinion.

11       Q.  Any other false statements in Exhibit 2 that

12   you see?

13       A.  No, not that I would argue with.

14       Q.  And there are -- there are quite a number of

15   names here attached to this statement.

16       A.  They're all faculty members at UMT.

17       Q.  Okay.  And it's my understanding that -- that

18   each of these individuals has been made a defendant in

19   this lawsuit.

20                Is that consistent with your understanding?

21       A.  Correct.

22       Q.  Did you speak to any of these individuals about

23   this statement after you have seen it?

24                MR. ALLEN:  Objection.

25                THE WITNESS:  No.

1    Q.  BY MR. WALTON:  Why not?

2    A.  Nobody reached out to talk to me, and just like

3 Ewell, I didn't reach out to them either.

4    **Q.  Do you recall being included on e-mails where**

5 **the faculty were discussing edits to this statement?**

6    A.  No.  I was not included on those discussions,

7 but I was included on a few e-mails where they were

8 voting to accept this statement.

9    **Q.  So the e-mails you recall being included on**

10 **were the e-mails about voting, not editing?**

11    A.  Mostly, yes.

12    **Q.  Okay.  But at that point, you didn't reach out**

13 **to any of these individuals to discuss what they were**

14 **doing as far as this statement was concerned?**

15            MR. ALLEN:  Objection.

16            THE WITNESS:  No.

17    Q.  BY MR. WALTON:  Do you know why they included

18 you on those e-mails?

19    A.  Probably by mistake.

20    **Q.  And what makes you say that?**

21    A.  Why would I want to vote on my own censor?

22            Why would I want to contribute to my own

23 censoring.

24    **Q.  So you didn't view this as an invitation for**

25 **you to respond and offer feedback?**

1    A.  No.

2              MR. ALLEN:  Objection.

3    Q.  BY MR. WALTON:  Other than what is contained in

4    this faculty statement by Exhibit 2, do you believe that

5    these individuals have defamed you in any other way?

6    A.  Yes.

7    **Q.  How so?**

8    A.  I think that, by offering to assume the

9    editorship of the journal in my place, that Ellen

10   Velikanova suggested that she believed all of these

11   allegations and that she thought it was her place to

12   indicate to the field her endorsement of them by taking

13   my place.

14   **Q.  And --**

15   A.  And I feel that -- that's maybe a personal

16   feeling, rather than an objective one, like what we've

17   been talking about so far, but that's my -- the way I

18   see it.

19   **Q.  And did Professor Velikanova make any**

20   **statements in that regard that you felt were defamatory**

21   **statements?**

22   A.  Not the statements --

23              MR. ALLEN:  Objection.

24              THE WITNESS:  -- themselves, no.  But the

25   very fact that she chaired the search for my

Timothy Jackson - 9/24/2024

254

1    replacement, which was publicly shared, suggested that

2    she herself believed these statements to be true.

3        Q.  BY MR. WALTON:  Other than that what you just

4    described, is there anything else that any of these

5    individuals have said or disseminated that you believe

6    is defamatory against you?

7                    MR. ALLEN:  Objection.

8                    THE WITNESS:  There are, but I don't know

9    them all.  I don't know all the statements that were

10   disseminated, so I can't answer that question fully.

11       Q.  BY MR. WALTON:  Are you able to -- right now to

12   identify any of such statements?

13                   MR. ALLEN:  Objection.

14                   THE WITNESS:  Right now, no.

15       Q.  BY MR. WALTON:  Where do you believe such

16   statements exist?

17       A.  Online.

18       **Q.  On social media or otherwise?**

19       A.  Yeah, social media.

20       **Q.  Have you seen any of them?**

21       A.  Yes.

22       **Q.  Whose accounts?**

23       A.  That, I can't tell you right now.  I'd have to

24   go back and look.

25       **Q.  Of these individual faculty members whose names**

1    appear in Exhibit 2, do you recall any specific

2    statements that any of them made outside of Exhibit 2

3    that you believe are defamatory?

4        A.  They did make some statements online, but as I

5    just told you, I don't have them all at hand, so I can't

6    answer them -- I can't define them.  But -- but people

7    who -- as I told you earlier -- I don't like social

8    media, and therefore, I've never really used it.  But

9    people who use it told me that some of these individuals

10   did make statements online.

11       Q.  I know you can't recall the details of any of

12   the statements, but have you, personally, viewed any of

13   them?

14       A.  Yes.

15       Q.  When have you viewed them?

16       A.  Oh, different times, because they were issued

17   at different times.  Or they were things like liking

18   where somebody would say something negative about me.

19   For example, there was a statement published online that

20   I abused Lavi Walls and that he -- he was heroic for

21   exposing the abuse.  And those statements online also

22   received likes from certain people that I know.

23       Q.  Any of these individual faculty members?

24       A.  Maybe.  I'd have to go back and look.  There

25   were people I know who -- who also pressed like.

Timothy Jackson - 9/24/2024

256

1    Q.  And do you view those likes as defamatory?

2    A.  Yes.

3    Q.  Other than likes, do you recall any --

4    A.  But likes of statements.

5    Q.  Yes.  The -- the statements themselves --

6    A.  Were defamatory.

7    Q.  -- were they made by UNT faculty members?

8    A.  I'm trying to think back about who made what

9    statements.  So one of these was -- one of these was a

10   comment on the -- if I'm not mistaken, the -- the report

11   came out.  Your example -- what is it, three?

12   Q.  Exhibit 3, yes.

13   A.  Yeah.  The report came out and contained a

14   statement about Lavi Walls being coerced into my car to

15   be forced into publishing articles with which he

16   disagreed.  And that statement was made by another

17   person not in the university, but received likes from

18   people who I believed were in the university and are in

19   the university.  So I consider that statement about

20   pressuring Lavi Walls to come in my car and receive

21   private instructions from me to be defamatory.

22   Q.  But that statement was originally made about

23   you or posted online by a non-UNT faculty member?

24   A.  Yes.  In response to the publication of this

25   report.

1          Q.   They were, essentially, repeating something

2     that was in the panel report?

3          A.   Yes, yes.

4          Q.   How have these -- well, for any of these

5     statements that you believe are defamatory, do you

6     believe that they are connected to any actions that the

7     university took?

8                    MR. ALLEN:   Objection.

9                    THE WITNESS:   Yes.

10         Q.   BY MR. WALTON:   How so?

11                   MR. ALLEN:   Same objection.

12                   THE WITNESS:   So the publication of this

13    panel report without the publication of any

14    exculpatory -- exculpatory documentation led people in

15    the field to believe that I was guilty of the crimes

16    indicated here in this document.

17         Q.   BY MR. WALTON:   And how are the -- well, let me

18    just back --

19         A.   So --

20         Q.   Do you -- just to clarify some groundwork

21    here --

22         A.   Yeah.

23         Q.   -- do you believe that the -- that the

24    allegedly defamatory statement by the students and the

25    faculty members, do you believe that played a role in

1  the institution of the ad hoc review panel?

2              MR. ALLEN:  Objection.

3              THE WITNESS:  I don't know what you mean by

4  the institution of UNT --

5      Q.  BY MR. WALTON:  Do you know why UNT set up the

6  ad hoc review panel?

7      A.  Yes.

8              MR. ALLEN:  Objection.

9      Q.  BY MR. WALTON:  Why did they do it?

10     A.  In --

11             MR. ALLEN:  Objection.

12             THE WITNESS:  Well, in response to the call

13  for an investigation.

14     Q.  BY MR. WALTON:  Which call for investigation?

15     A.  The call that was issued here and also by the

16  dean.  I believe the dean sent out a message early on

17  saying that the college of music stood for anti-racism

18  and that it would investigate all the charges.

19     Q.  And do you know why the dean issued that

20  statement?

21     A.  Probably because he wanted to respond to

22  this -- this petition.

23     Q.  And what documents or --

24     A.  But I don't know that for a fact.

25     Q.  Okay.  Do you -- do you have any specific

1    **conversations to base that on?**

2        A.   No.

3        **Q.   Okay.**

4        A.   Because the dean never consulted me before

5    issuing that statement.

6        **Q.   And just for the record, do you have any**

7    **specific document to support that belief?**

8                MR. ALLEN:  Objection.

9                THE WITNESS:  No, I don't.  I don't think

10   so.  I have the dean's statement, which I received along

11   with all the other people in the school of music.

12       Q.   BY MR. WALTON:  Similar question for -- I'll

13   just say for the dean statement, but the decision by the

14   university, whoever made the decision to institute this

15   ad hoc review panel, did anyone ever tell you that that

16   was done in response to the student statement or the

17   faculty statement?

18       A.   I don't think it was explicitly indicated in

19   the document, although I can't remember that for sure.

20   In other words, nobody came and said, okay, because of

21   these publicized statements, we are going to create the

22   ad hoc committee to do this investigation.

23                But what happened was that the students and

24   faculty called for such a committee, and the

25   administration succeeded to that demand and did call the

1  committee into effect.  So could I say that there's a

2  kind of logic there between the call for the

3  investigation and the issuing of the promise to -- to

4  have an investigation and then the actual investigation?

5  It would seem like there is a connection, you know.

6          **Q.  And I'm just asking, in addition to what you've**

7  **just described, are there any specific conversations or**

8  **documents that you believe exist that make that**

9  **connection explicit?**

10              MR. ALLEN:  Objection.

11              THE WITNESS:  I don't know of those because

12  the Dean never contacted me --

13      Q.  BY MR. WALTON:  Okay.

14      A.  -- to ask me about anything.

15      **Q.  When you got the -- when you saw the report**

16  **from the panel --**

17      A.  Yes.

18      **Q.  -- did you have any conversations with anyone**

19  **about whether or how to implement the recommendations in**

20  **that report?**

21      A.  Yes.

22      **Q.  What were those conversations?**

23      A.  Well, I -- I actually talked with various

24  people about the -- the recommendations for the journal

25  going forward on, because it wasn't clear that -- at

1  this point, if I'm not mistaken, it wasn't clear that

2  they were actually going to shut the journal down.  That

3  was made clear later by Dr. Brand.

4      Q.  And how did Dr. Brand communicate that?

5      A.  He communicated it in writing as well as

6  verbally.  So in one of our legal documents here we

7  actually quoted Dr. Brand's statement saying that I was

8  no longer going to be connected to the journal in any

9  way, shape, or form because of my editorial malpractice,

10  if you will, and that that was a decision that had been,

11  obviously, taken by the administration.

12      Q.  You took Dr. Brand's e-mail to mean that that

13  was already a hard and fast decision?

14      A.  Yes, it was expressed in that manner.

15      Q.  And did you have any --

16      A.  That I was removed from the journal.

17      Q.  And did you ever hear any or see any statement

18  from Dr. Brand that -- that a decision had been made not

19  simply to remove you, but to shut the whole journal

20  down?

21      A.  No.  I did not receive such a statement.  It

22  seemed like they wanted to hire a new editor, which was

23  what they tried to do.

24      Q.  Okay.  After you got that e-mail from Dr. Brand

25  about your ongoing involvement in the journal that you

1  just described, did you attempt to have any further

2  conversation with him about that?

3      A.  No.

4      Q.  Why not?

5      A.  It seemed like -- I mean, it didn't just seem

6  like it.  A decision was taken.  What -- what would I

7  have gone to see him about?

8              MR. WALTON:  Let's go ahead and go off the

9  record and take a break.

10             MR. ALLEN:  Okay.

11             THE VIDEOGRAPHER:  We're off the record at

12  5:17 p.m.

13      (A recess was held from 5:17 p.m. to 5:33 p.m.)

14             THE VIDEOGRAPHER:  We're back on the record

15  at 5:33 p.m.

16      Q.  BY MR. WALTON:  Dr. Jackson, we're back after a

17  break.  Are you ready to proceed?

18      A.  Ready.

19      Q.  If you look at Exhibit 3, the ad hoc review

20  panel report, and you flip back to Exhibit 3 -- to the

21  Exhibit 3.

22      A.  Wait a second.  I'm confused.

23      Q.  Page 189.

24      A.  Oh, here.  Yes, yes.

25      Q.  And this is the -- this is a version of a

1  student statement that I believe you testified you

2  believe this may have been the statement that Rachel

3  Gain was disseminating in some form?

4      A.  And it was then disseminated here.

5      Q.  Okay.  Is there -- is there anything in this

6  statement that you feel is a false statement of fact

7  that is not contained in the examples we already talked

8  about?

9      A.  All right.  That wasn't already in an earlier

10  stage?

11      Q.  That's right.  That we haven't already

12  discussed based on another document.

13      A.  All right.  Well, where it says "we would like

14  to make it clear that the JSS is not a graduate student

15  journal," I think that's only true in terms of the later

16  version of it, when Dr. Graf was made the editor.  You

17  see, because he was no longer a student when Dr. Graf

18  was made the editor.  So that was true, but before that,

19  it's false.

20      Q.  So do you believe that this statement was

21  defamatory against you?

22      A.  I'm not sure that it's defamatory against me,

23  but it's not true.

24      Q.  Okay.

25      A.  Or let's put it this way.  It needed

Timothy Jackson - 9/24/2024

264

1  qualification.

2      Q.  Sure.

3      A.  It was only true for a short time.

4      Q.  Are there any other false statements in here

5  that --

6      A.  So -- yes.  So "Many of us recently discovered

7  the journal is presented as a graduate student run in

8  some context.  In fact, there is little student

9  involvement beyond copy editing, and students have

10  absolutely no say in the context of JSS."

11          False.  Students did have a lot of say.  In

12  fact, up until quite recently, they were making the

13  decisions, really.  We weren't micromanaging as you

14  know, as I already told you.

15      Q.  Do you believe that this false statement was

16  defamatory against you?

17      A.  It is slightly so because we did not determine

18  the content of the articles that were published.  We

19  advised the students, but we did not determine it.  That

20  is why this statement is problematical.

21      Q.  Any other false statements in this version?

22      A.  So "Allowed faculty to platform racism in our

23  name."  That's only true if you accept that the -- that

24  this issue of the journal did platform racism.  But if

25  it didn't, then that's not true.

1          All right.  So clear lack of academic

2  rigor.  So because of the horrendous lack of peer review

3  publication of anonymous response and clear lack of

4  academic rigor, this issue of JSS should release an

5  apology, blah, blah, blah.

6          Lack of academic rigor.  Well, then you

7  would have to say the same about Ewell's publication in

8  Spectrum.  It wasn't peer reviewed either.  And you'd

9  have to say the say thing about his presentation in the

10  SMT.  It wasn't peer reviewed either.  So you'd have to

11  say the same thing about those journals and

12  presentations.

13      **Q.  So do you believe this statement is false or**

14  **merely unfair to only apply to the volume 12?**

15      A.  Well, I think that the demand is -- to publicly

16  condemn the issue is based on a false -- is a false

17  statement about academic rigor because the journal

18  proceeded in the same way that the so-called industry

19  standard journal proceeded in this very case.

20      **Q.  Are there any other statements in this document**

21  **that you believe are false that are above and beyond**

22  **doubt the statements we've already looked at?**

23      A.  Well, under point one at the bottom of the

24  page --

25      **Q.  Yes.**

Timothy Jackson - 9/24/2024

266

1  A.  -- "The JSS has demonstrated that it does not

2  meet the standards of a peer-reviewed publication."  No,

3  the JSS did not demonstrate that.  That's not an

4  argument that the JSS made.  That's false.

5  **Q.  All right.  Any other false statements in here?**

6  A.  No.  The rest are already --

7  **Q.  Okay.**

8  A.  -- we've already covered them.

9        Let's look at the last page.  Sorry.

10  **Q.  Of course.  Of course.**

11  A.  Go to page 190.  "UNT has gained a reputation

12  as an institution with a toxic culture when it comes to

13  issues of race, gender, and other aspects of diversity."

14        I think that's false.

15  **Q.  Are you aware of the reputation that UNT has on**

16  **social media?**

17  A.  Well, I don't know, but I have to say that I

18  don't -- I don't -- I've never heard that UNT has a

19  reputation as an institution with a toxic culture.  No

20  one's ever told me that.  I have no evidence for that.

21  I don't -- I don't know if it's true or false, but I

22  somehow doubt it.

23  **Q.  Any other false statements here?**

24  A.  So not beyond what we already talked about.

25  But the past bigoted behavior by faculty, and then we

1  have the -- specifically the actions Dr. Jackson, both

2  past and present, are particularly racist and

3  unacceptable.  So I'd like to know what actions -- I

4  believe this to be a false statement because there are

5  no actions, past or present, that are racist and

6  unacceptable.

7      **Q.  And you would have the same contentions about**

8  **these statements as you had about the --**

9      A.  Previous --

10     **Q.  -- statements in Exhibit 1?**

11     A.  Yes.

12     **Q.  Okay.  Anything else on this page?**

13     A.  I'm trying to determine -- well, the last

14 penultimate sentence, "We will strive to change the

15 toxic culture at UNT."  I don't know that -- I don't

16 agree that there is a toxic culture at UNT.  I think

17 that's a false charge.

18          I believe that -- I've never seen any --

19 any action, past or present, by any faculty member

20 against any student of color within my department.  I

21 have never heard any racist statements against black

22 people, against Hispanics, against Asians, against Jews

23 from any member of the faculty or from any student, for

24 that matter.  So I challenge that statement.  I do not

25 believe it to be true.  I believe it to be false.

1      Q.  And for the record, similar to some of the
2  questions that I asked you earlier, with regard to this
3  statement, if there was a student that believed the
4  culture at UNT was toxic, would you agree that the
5  student should be able to express that opinion?

6                  MR. ALLEN:  Objection.

7                  THE WITNESS:  I would agree that the
8  student should object or express the objection, but that
9  the student should bring concrete evidence of, let's
10 say, actions.  This -- this says the actions of Dr.
11 Jackson are both -- past and present, are particularly
12 racist and unacceptable.

13                  Which actions did I take against students
14 that were racist?  For me, that implies -- saying, you
15 know, that -- making statements against students who
16 were on the basis of race or taking any kind of adverse
17 action against a student on the basis of race, I would
18 find that unacceptable.  As a professor, I would find
19 that totally unacceptable.  But I haven't found any
20 documentation that shows any such actions on my part.

21      Q.  BY MR. WALTON:  For the -- so for the
22 defendants that you've named in this lawsuit for
23 defamation, except for Rachel Gain, it's my
24 understanding that all of those other defendants are
25 faculty members or were faculty members at UNT at the

1  time of July 2020.

2           Is that consistent with your understanding?

3      A.  Yes.

4      **Q.  As of -- well, has any of those individuals**

5  **ever called you a racist?**

6      A.  Only through the endorsement of the document,

7  but that's enough.  In my opinion, if you endorse a

8  document that state somebody is a racist, that means

9  you, personally, endorse that document.

10     **Q.  I think we're getting close here.  I have one**

11  **more -- oops, there we go -- exhibit for you.**

12         (Exhibit 4 was marked for identification.)

13             MR. ALLEN:  What am I marking?  I'm sorry.

14  Up to --

15             MR. WALTON:  We are marking as Exhibit 4.

16             MR. ALLEN:  Thanks.

17             MR. WALTON:  I'm handing this to the

18  witness.

19     Q.  BY MR. WALTON:  And I apologize.  It's not a

20  Bates numbered copy.  But, Dr. Jackson, it's my

21  understanding that this is a copy of your response that

22  appeared in volume 12 of the JSS.  If you want to take a

23  quick minute to verify that, that's perfectly fine.

24     A.  Uh-huh.

25     **Q.  Does this appear to be a copy of your article?**

1    A.  It does.

2    **Q.  I want to ask you to turn to page 164 on --**

3         MR. ALLEN:  164, you're going to?

4    Q.  BY MR. WALTON:  Yes.  On the -- the top of the

5    page, the internal journal pagination numbers, since we

6    don't have Bates labels.  Page 164, the -- at the very

7    top of the page, this sentence that first begins there

8    says, "African-Americans have the right to embrace their

9    own culture as precious."

10        What do you mean by "their own culture"?

11   A.  So I mean there what I specify, rap music, hip

12   hop, et cetera.  That's what I mean.  In other words,

13   genres -- especially genres that come out of the

14   African-American culture.  And I should have included

15   jazz there, too, and other forms of music that

16   originated in the black community here in America.

17   **Q.  And I guess what research did you perform to --**

18   **to verify what aspects of music are or are not aspects**

19   **of African-American culture?**

20   A.  Well, I'm not an expert in African-American

21   music, but definitely I think there's a broad consensus

22   that jazz, rap music, and certain kinds of hip hop music

23   as well are all genres that originated in the

24   African-American community and which are widely regarded

25   as the culture that has grown up in the African-American

1    community.

2              So what I'm saying is that -- that

3    African-Americans do have the right, but he's claiming

4    that -- that these aspects should be introduced in such

5    a way that the products of white culture, which he

6    denegrates, should be moved aside to a certain degree.

7        **Q.  So just to back up -- I want to make sure I'm**

8    **clear.  Your -- your representation here that -- that**

9    **rap music, hip hop, and then you mentioned jazz as well**

10   **as originating in African-American culture, what**

11   **specific research have you done to support those**

12   **beliefs?**

13       A.  What I just told you was that I'm not a

14   specialist in American music, but there are -- I think

15   there's a universal consensus that jazz began in the

16   African-American community in Louisiana and migrated

17   into other communities in America, but -- but that it

18   was always -- that it was born and bred, so to speak, in

19   Louisiana.  And I have, actually, done some research on

20   this, on --

21       **Q.  Well, that -- that's what I was getting to.**

22       A.  Yeah.

23       **Q.  Other than a generalized understanding, what**

24   **specific --**

25       A.  No, no, no.  I actually do have a large

Timothy Jackson - 9/24/2024

272

1  collection --

2      Q.  Sorry.  Let me finish.

3      A.  Go on.  Go on.

4      Q.  Other than a general understanding --

5      A.  Yeah.

6      Q.  -- what specific research have you performed

7  that tells you that these particular music forms

8  originated in African-American culture?

9      A.  Okay.  So I've done a lot of reading and

10  listening to not rap music and hip hop, but to jazz,

11  okay.  I have a very large jazz collection of music at

12  home, and I have books on jazz.  And it's, just

13  generally, known and acknowledged that jazz, rap, and

14  hip hop all originated in the African-American community

15  and that they are considered to be part of the

16  African-American culture.

17      Q.  So as you sit here now, is there any particular

18  source that you can cite to support the assertion that

19  rap music arose from African-American culture?

20      A.  There are studies that show that the first rap

21  artists emerged in the inner city ghettos and that that

22  style then spread all around the world to other

23  communities.  So now rap is actually an international

24  phenomenon.

25      Q.  And what are --

1    A.   It remains -- it still remains one of the

2  favorite genres in African-Americans today.

3    **Q.   And what studies is that based on?**

4    A.   It's based on my reading about rap music.  I

5  mean, it's just -- there -- there's -- okay.  So

6  there -- I didn't speak out of ignorance, let me put it

7  that way.  There's a lot behind this statement and

8  behind my scholarship that -- that go -- went into this

9  article.  Okay?

10         Are you listening?  I'm just wondering.

11   **Q.   Please proceed.**

12   A.   So -- so I've done a lot of reading about this

13  subject, especially jazz, but -- and less so about rap

14  and hip hop because I'm not as interested in them,

15  but --

16   **Q.   And to clarify, my question was only about rap**

17  **and hip hop.**

18   A.   Okay.  So I have read some articles about rap

19  and hip hop.  There's actually a center for rap and hip

20  hop in Bielefeld, Germany.  And that's interesting

21  because rap has actually morphed from just being an

22  African-American phenomenon to being popular in France

23  and Germany, as well.  And --

24   **Q.   As of today --**

25   A.   Yeah.

Timothy Jackson - 9/24/2024

274

Q.  -- do you know the -- the broad consumer base for rap music, is it predominantly white or black or otherwise?

A.  No.  I'd say it's probably across the board now.  And not only that, but that it exists in Europe and France and in Germany and even in Africa and -- of course in Africa and the Middle, East Israel and so forth.  Yes.

Q.  Are you familiar with the artist Eminem?

A.  Yes.

Q.  Do you know whether he identifies as black or white?

A.  I don't know how he identifies himself.

Q.  How does he appear to you?

A.  I'm trying to think.  I think he's black, but I can't -- I don't remember exactly.  I don't -- you know, to be honest with you, I don't really look at people that way.

Q.  That's fine.  Let me go back to --

A.  But could I add something about the rap and my knowledge of rap?  Because it may not be as insignificant as you might think.

Q.  Well, if -- if there's something that your attorney believes is significant, he's free to ask that.

A.  Okay.  Let's leave it as is.

Timothy Jackson - 9/24/2024

275

1    Q.  For purposes of time, I'm going to move on --

2    A.  Right, right, right.  Sure.  Sure.

3    Q.  -- to the next paragraph here.

4    A.  Sure.

5    Q.  The -- the -- the next paragraph on page 164 --

6    A.  Uh-huh.  Sure.

7    Q.  -- it says, "Be that as it may, I would like to

8    propose that genuine solutions lie elsewhere else,

9    specially by the African-American community establishing

10   different priorities."

11           What different priorities do you believe

12   the African-American community should establish?

13   A.  The -- so this sentence occurs in the

14   discussion of why there aren't more African-Americans in

15   the music theory field, right, which is one of Ewell's

16   main issues, right.  And what I am saying here is that

17   parents of African-American children need to establish

18   the priority of educating their children in classical

19   music so that they can grow up and become professors of

20   music theory.

21           And without that background -- you see,

22   music is different from a lot of other arts.  You can't

23   really come to music -- classical music.  Not rap or hip

24   hop, that's a different thing.  But classical music, you

25   cannot come to it later in life.  You have to start

 1  whether you're about six.

 2      Q.  So when that sentence goes on to say "by

 3  addressing the deficiency of background in classical

 4  music," what deficiency of background do you believe

 5  exists in the African-American community?

 6      A.  So there are a lot of children who come from

 7  the African-American background who do not grow up in

 8  households where classical music is valued and they do

 9  not have lessons and they don't have serious training,

10  which is what I said, so that they can't go on to become

11  academic trained musicians because they don't have the

12  skill set necessary to get into the top programs or even

13  any program in academic music theory.

14          You need a certain skill set, certain

15  expertise and competency.  And what I'm saying is that

16  without those being developed and fostered at an early

17  age, that they can never reach the level that they need

18  to get to get positions in music theory.  That's why

19  there are so few.

20      Q.  So when you say a sentence or two later that,

21  speaking of African-American women and men, "few grow up

22  in homes where classical music is profoundly valued,"

23  how do you know that?

24      A.  Well, I know that by living in America and also

25  by talking with my students who -- the few stew

 1  accidents that I had who were black over the years.  Do

 2  you want me to explain to you what I mean by that?

 3      **Q.  No.  That's fine.  I just didn't know if you**

 4  **had --**

 5      A.  I had --

 6      **Q.  -- had -- read any studies or statistical**

 7  **analysis?**

 8      A.  Yes.  Also studies of this, but --

 9      **Q.  What studies?**

10      A.  -- first-hand experiences -- mostly first-hand

11  experiences and talking with other professors at

12  universities all across the countries.

13          I ask my friends, all the academics I

14  know -- because I agree with Ewell that there aren't

15  enough black professors in music theory.  We are totally

16  in agreement.  The problem is you can't magically wave a

17  magic wand and say, okay, now we're going to have

18  20 percent American -- African-American professors in

19  music theory.  Why?  It's not because -- it's not really

20  because of systemic racism, it's because that the

21  children need to get this training very early in life

22  and their parents need to consider it a priority and

23  really do it.  Make sure the children get the

24  instruments they need and the training that they need.

25              It's the same in basketball.  My son plays

1  basketball.  If you look at the -- the make up of the

2  teams where he's playing, most of the kids are black,

3  actually.  And most of the parents are very serious

4  about the training of their children in basketball.

5           So if you want black children to grow up

6  and become music theorists, which is what I would like

7  to see, then you have to train them from the age of six

8  or younger, you have to pay for their lessons, you have

9  to make them practice.  It's a big investment.

10      **Q.  Sure.  Do you know how many members of the**

11  **white community profoundly value classical music?**

12      A.  I can't tell you an exact figure.  I mean,

13  that's -- that's hard to do.  But I would say that

14  judging from what I see in the schools of music across

15  the country, there's a certain number -- certainly a

16  majority of, let's say, white students or not black

17  students at our music schools, and that is a problem.  I

18  agree that's a problem.

19      **Q.  Sure.  And so, I -- very specific question**

20  **here.  Have you read or reviewed any published articles**

21  **or books doing a historical or statistical analysis on**

22  **the percentage of white families that profoundly value**

23  **classical music versus that percentage of**

24  **African-American families?**

25      A.  When I was doing the research for this little

1   paper here, I did look at some of those facts and
2   figures, yes.
3        **Q.  And why did you not include citations to that**
4   **in this article?**
5        A.  Maybe it was on oversight, but I would say that
6   I stand by my conclusions.  And I would also add that,
7   after my article was published, I received some letters
8   from various leaders of -- I received some letters of
9   various conductors of student orchestras who -- who
10  stated to me that I was absolutely right about this.
11             And when I look at the orchestra in which
12  my children play -- I think I mentioned that they play
13  in the GDYO -- do you know how many black students there
14  are playing in that orchestra?
15       **Q.  Well --**
16       A.  Take a guess.
17       **Q.  We'll -- we'll get to that --**
18       A.  Three.  Three or four.  And most of the
19  students are either white or Asian.  Mostly Asian, I
20  would say.
21             MR. WALTON:  At this point I'd like to go
22  ahead and pass the witness while stating for the record
23  that defendants will reserve the right to reopen the
24  deposition should -- should the plaintiff wish to make
25  additional allegations that certain statements

1  constitute a defamation that have not yet been produced

2  to the defendant, such as some of the online statements

3  he was referencing earlier.

4         MR. ALLEN:  Oh, okay.  So just to be clear,

5  like there's discovery that hasn't been produced or

6  something of that nature, or do you mean --

7         MR. WALTON:  To the extent there are --

8  that there are -- may be testimony later --

9         MR. ALLEN:  That's fine.

10         MR. WALTON:  -- that other statements --

11         MR. ALLEN:  Yep.

12         MR. WALTON:  -- that we don't have forms of

13  are also defamatory, we just reserve the right to

14  question the witness about those statements.

15         MR. ALLEN:  Yes, uh-huh.

16         MR. WALTON:  On that understanding, I'll

17  pass it witness.

18         THE VIDEOGRAPHER:  Counsel, we need to take

19  a quick break.

20         MR. ALLEN:  Off the record.

21         THE VIDEOGRAPHER:  We're off the record at

22  6:01 p.m.

23     (A recess was held from 6:01 p.m. to 6:07 p.m.)

24         THE VIDEOGRAPHER:  We're back on the record

25  at 6:07 p.m.

1       Q.   EXAMINATION BY MR. ALLEN:  Professor Jackson, I

2   just have a few follow-up questions.  And I'm going to

3   start with Exhibit 4, the last exhibit introduced by

4   Attorney Walton.

5            This was your article in the journal of

6   Schenkerian studies in the special symposium in volume

7   12.  He was having you examine some statements that you

8   had made about African-Americans not -- in your purview

9   of various literature and your personal experience, not

10  training their children from an early age in classical

11  music.

12           Is that fair?

13      A.   That's fair.

14      **Q.  Do you draw any conclusions about**

15  **African-Americans as a, quote, race from that**

16  **observation?**

17      A.   None.  I don't make a value judgment about

18  African-Americans as people or as a society from this

19  observation.  My point was, and I repeat my point, that

20  if you want to have a career in classical music, you

21  have to train your children from an early age.  That was

22  what I said.  I didn't draw any other conclusions from

23  that.

24      **Q.  Do you draw the conclusion in your article that**

25  **a culture is inferior if it does not train their**

Timothy Jackson - 9/24/2024

282

1   children from an early age in classical music?

2       A.  I make no such statement, and I don't believe

3   that is true, that people are inferior because they

4   don't -- they don't play classical music.  There's no

5   statement to that here -- to that effect here.

6           The issue is solely why aren't there more

7   African-American professors of music theory.  And what I

8   am saying is, if you want more professors of music

9   theory, you better start training the children.  That

10  was my point.

11      Q.  **Based on your direct experience of University**

12  **of North Texas College of Music, has there been an**

13  **increased recruitment of black graduate students since**

14  **the Journal of Schenkerian Studies was taken out of**

15  **existence?**

16      A.  No, not that I can tell.

17      Q.  **Has it been easier to recruit black professors**

18  **in music theory in the college of music at the**

19  **University of North Texas since the Journal of**

20  **Schenkerian Studies stopped publication?**

21      A.  No.  May I express an opinion?  I wish I had

22  more.  I don't have any -- I don't have any black

23  students in -- in my -- who are studying music theory.

24  I've had some black instrumentalists at the

25  undergraduate level, but -- and some of them are very,

1  very talented, but I haven't had any in my master's or

2  doctoral courses in a long time.

3      Q.  I want to call your attention to Exhibit 1.

4  This was the exhibit that was introduced as the DRD

5  enrichment statement with the signatures of the graduate

6  students at the end?

7      A.  Yes.

8      Q.  Just a couple things.  Under number two,

9  illicit collaboration, do you -- can I just call your

10  attention to that paragraph again?

11      A.  Okay, wait a sec.  Let me just -- where is it

12  on the page?

13      Q.  Under the heading "dishonesty and a lack of

14  academic rigor," do you see that heading on one --

15      A.  Page 2?

16      Q.  It's page 1168 by the Bates stamps.

17      A.  Oh, okay.

18      Q.  And there's a number two, elicit collaboration.

19  Do you see that paragraph?

20      A.  Oh, yes, yes, yes.

21      Q.  Sorry about that.

22      A.  Okay.

23      Q.  There's a sentence there, "After co-opting the

24  JSS in order to mount an attack on Dr. Ewell, Dr.

25  Jackson proceeded to solicit responses from his close

1  Schenkerian colleagues."

2              Did I read that correctly?

3      A.  You did.

4      Q.  Can you express your view about the factual

5  statements in that sentence?

6      A.  Well, it says that I co-opted the JSS to mount

7  an attack on Dr. Ewell.  And that word, co-opting, seems

8  to me false because as the record will demonstrate, I

9  was approached by my doctoral student, Lavi Wells, with

10  the idea of this symposium.  And I found it a good one,

11  and it was discussed with the other members involved and

12  with my colleagues in the -- in the school.

13              So I didn't co-opt -- personally, I did not

14  co-opt the JSS in order to mount an attack on Dr. Ewell.

15  Rather, I consulted with my colleagues and we

16  collectively decided to issue the call for papers in

17  order to get a symposium of pros and cons.  That's --

18  that's just a fact.

19      Q.  It also refers to your close Schenkerian

20  colleagues.  Do you see that at the end of that

21  sentence?

22      A.  Oh, yes.

23      Q.  Can you describe your relationship to the

24  Schenkerian colleagues that you approached to provide --

25      A.  Oh, I approached --

1    Q.  Let me finish my question.

2    A.  Sorry.

3    Q.  That you approached to provide contributions to

4    volume 12?

5    A.  So that also contains a false statement here

6    because I contacted a wide range of Schenkerian

7    scholars, including people I didn't know, personally,

8    or -- or who I only know through their publications.  I

9    did not -- and I also contacted people whose work I

10   don't particularly like who are Schenkerians.

11           And so, describing them as my close

12   Schenkerian colleagues is not true, actually.

13   Q.  Okay.

14   A.  I approached many people in the field who are

15   not close colleagues.

16   Q.  Can you turn the page?  I just have one more

17   sentence I want to examine.  Now we're on UNT1169.

18   Under the heading "calling for Dr. Jackson's dismissal,"

19   there is a sentence -- I think it's the second sentence

20   that begins in that introductory paragraph, "He was

21   removed from the oversight of the RA for the CSS due to

22   his treatment of previous RAs."

23           Did I read that correctly?

24   A.  You did.

25   Q.  Can you express your knowledge of the truth or

Timothy Jackson - 9/24/2024

286

1   falsity of that statement?

2       A.  I don't believe that I was removed from the

3   oversight of the RA for anything that happened

4   previously.  I was removed from supervising an RA or

5   having an RA because I was removed from the journal.

6   Because at that point, I didn't have a personal RA any

7   more.  I was without an RA, actually, technically.

8       **Q.  And you had earlier testified that you at one**

9   **point did have an RA assigned to you, personally?**

10      A.  Yes.  Right.

11      **Q.  Was that RA removed from you for your**

12  **mistreatment of the RA?**

13      A.  No.

14      **Q.  Who would have made that decision at that time?**

15      A.  Probably the chair would have had to make a

16  decision like that.

17      **Q.  Benjamin Brand?**

18      A.  Well, no -- yes.  Benjamin Brand, or before

19  him, Frank Heidlberger would have had to have made that

20  determination.  But the fact that I didn't have any kind

21  of assistant any more is false because I didn't have an

22  assistant any more.  The person was, in fact, now the

23  editor of the journal.

24      **Q.  Was that the same time as the relationship of**

25  **Benjamin Graf was restructured?**

1       A.  Yes.  So --

2       **Q.  And he became -- sorry, go ahead.**

3       A.  Yeah, no, no.  Benjamin first became a paid

4   editor and then --

5       **Q.  Okay.**

6       A.  -- Lavi Walls.

7           So I didn't lose my RA because of anything

8   that happened before.

9       **Q.  So --**

10      A.  In other words, that's a false statement.

11      **Q.  Okay.  That's what I was going to ask.  All**

12  **right.  I have a last exhibit to introduce into the**

13  **record, which makes us on to Exhibit No. 5.**

14      (Exhibit 5 was marked for identification.)

15      Q.  BY MR. ALLEN:  What volume do we have, 24 on

16  the first page?

17      A.  Right 2017.

18      **Q.  So I'm marking for the record two title pages**

19  **and brief excerpts of articles from the journal Theoria,**

20  **which we've discussed.**

21          **Do you recognize these documents?**

22      A.  Yes.  This is an issue of the Theoria magazine,

23  which is also published by UNT press and which is

24  supervised by Frank Heidlberger.  And I see on the title

25  page an article published by Frank Heidlberger in his

Timothy Jackson - 9/24/2024

288

1   own journal.

2       Q.   Are you aware of any conflict of interest

3   statement --

4       A.   No.

5       Q.   Let me finish my question, sir.

6       A.   Sorry.

7       Q.   I'm going to strike that.

8             Are you aware of any conflict of interest

9   statement promulgated by the journal Theoria?

10      A.   No.

11      Q.   Aware in 2017?

12      A.   No.

13      Q.   To this day?

14      A.   To this day, I'm not aware of such statement.

15      Q.   And I want to call your attention to the

16  article by Gesine Schroder.

17            Do you see that listed in the title page?

18      A.   I do.

19      Q.   Or excuse me.  On the table of contents.

20      A.   I do.  Wait a minute.  I'm looking for her

21  article here.

22      Q.   Look on --

23      A.   It's on page 2, yeah.

24      Q.   Do you see it begins on 173 and runs,

25  apparently, to 195 --

1     A.  Yes.

2         Q.  And then there's a page -- the cover page of

3     her article is the next page.

4                  Do you see that?

5     A.  Yes.

6         Q.  And then if you turn the page, can you read

7     footnote 29 into the record --

8     A.  Yes.

9         Q.  -- for me, please.

10        A.  "A longer list of Dahlhaus students can be

11    found on the discussion page of the German Wikipedia

12    article on Dahlhaus," and then it gives the URL accessed

13    on the 22nd of September 2017.

14        Q.  Do you recall in 2017 any criticism of Theoria

15    because it somehow cited Wikipedia?

16        A.  No.

17        Q.  Do you recall anyone accusing Theoria in 2017

18    of systemic racism because there was a quote of

19    Wikipedia?

20        A.  No.

21        Q.  Today?

22        A.  No.

23        Q.  Can I call your attention to the next page in

24    Exhibit No. 5.  It is the 2018 volume 25 of Theoria.

25                 Did I read that correctly?

1    A.  Yes.

2    Q.  And can you identify an article by Gilad

3  Rabinovitch?

4    A.  Yes.

5    Q.  What page does that one start, according to the

6  table of contents?

7    A.  Let's go back -- sorry.  I need to -- let's

8  see.  Yeah, it start on page 35.

9    Q.  And runs to what?

10    A.  62, I guess.

11    Q.  Okay.  And is that the title of the next

12  page --

13    A.  Yes.

14    Q.  -- of Gilad Rabinovitch's article?

15    A.  Yes.

16    Q.  And can I call your attention to page 38 of the

17  journal of Theoria, volume 25, 2018.  And can you read

18  for me that highlighted portion of footnote number five?

19    A.  "The source for Wikipedia's birth date of 1799

20  is unclear to me and might represent an error on its

21  editor's part."  And then there's a citation of the

22  Wikipedia article.  This birth year is also replicated

23  in the Russian Wikipedia entry, both accessed July 2018.

24  The brief biography in Damschroder 2008, 258, seems to

25  be Fetis;s account, as well.

Timothy Jackson - 9/24/2024

291

1    Q.    So this footnote also seemed to cite Wikipedia?

2    A.    True.

3    Q.    Do you recall in 2018 any objection to Theoria

4    because there was a citation of Wikipedia?

5    A.    No.

6    Q.    Did anyone accuse Theoria of systemic racism in

7    2018 because of a citation of to Wikipedia?

8    A.    No.

9    Q.    Did anyone accuse Theoria in 2018 of editorial

10   mismanagement?

11   A.    No.

12   Q.    Was Professor Hidleberger, the editor of

13   Theoria, ever placed under investigation?

14   A.    No.

15   Q.    Was the editorial board of Theoria ever placed

16   under investigation?

17   A.    No.

18   Q.    Can you comment on whether or not that seems to

19   be standard practice at the University of North Texas

20   for journals edited by the -- under the aegis of the

21   University of North Texas Press, please?

22              MR. WALTON:  Form.

23              MR. ALLEN:  Yeah.  Let me strike that

24   question.  That was awful.

25              THE WITNESS:  What do -- I don't know what

Timothy Jackson - 9/24/2024

292

1    that means.

2                   MR. ALLEN:  I know.  I don't blame you.

3    I'm sorry.  It's late in the day.

4                   MR. WALTON:  Sorry.

5        Q.  BY MR. ALLEN:  I just want to -- I just am

6    going to ask one last question.  This really is the last

7    question.

8        A.  Okay.

9        **Q.  Can you comment on the standard practices of**

10   **the University of North Texas Press with regard to**

11   **journals that it publishes, at least those in the**

12   **college of music, with regard to citations of Wikipedia,**

13   **to the best of your knowledge?**

14       A.  To the best of my knowledge --

15                  MR. WALTON:  Form.

16                  You can answer.

17                  THE WITNESS:  To the best of my knowledge,

18   there's no -- there's no rule or regulation that

19   prevents any author from referring to Wikipedia.

20                  MR. ALLEN:  I don't have any further

21   questions.

22                  MR. WALTON:  Nothing further at this time.

23                  THE VIDEOGRAPHER:  Do you need to --

24                  MR. ALLEN:  Before we go off, did you want

25   to put your reservation on the record?

Timothy Jackson - 9/24/2024

293

1            MR. WALTON:  I believe I already did.

2            THE VIDEOGRAPHER:  Did we -- were we on the

3  record when that reservation went on?

4            MR. WALTON:  Yes.  So that's on the record.

5  I won't repeat it.  We'll just -- yeah.  We can go off

6  now.

7            MR. ALLEN:  Okay.

8            THE REPORTER:  Would you like a copy,

9  Counsel?

10            MR. ALLEN:  Most certainly.  Electronic

11  copy.  You will take the exhibits, correct?

12            THE WITNESS:  So do I -- well --

13            THE VIDEOGRAPHER:  We're off the record at

14  6:22 p.m.

15       (Whereupon proceedings concluded at 6:22 p.m.)

16

17

18

19

20

21

22

23

24

25

294

1                          CHANGES AND SIGNATURE

2          DEPOSITION OF:  Timothy Jackson, Ph.D.

3          September 24, 2024

4  PAGE  LINE  CHANGE                        REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 Signature: _____  Date: _____

Timothy Jackson - 9/24/2024

295

```
1        I, TIMOTHY JACKSON, Ph.D., have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5

6               _____

                TIMOTHY JACKSON, Ph.D.
7

8   THE STATE OF _____)

9   COUNTY OF _____)

10       Before me _____ on this day

11  personally appeared TIMOTHY JACKSON, Ph.D., known to me

12  (or proved to me under the oath or through

13  _____) (description of identity card or

14  other document) to be the person whose name is

15  subscribed to the foregoing instrument and acknowledged

16  to me that they executed the same for the purposes and

17  consideration therein expressed.

18       Given under my hand and seal of office this

19  _____ day of _____, 2024.

20

21

22               _____

                 NOTARY PUBLIC IN AND FOR
23

24               THE STATE OF _____

25
```

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF TEXAS

3                 SHERMAN DIVISION
       TIMOTHY JACKSON,          §
4                                §
                 Plaintiff,      §
5                                § Civil Action No.
            VS.                  §
6                                §  4:21-cv-00033-ALM
       LAURA WRIGHT, et al.,     §
7                                §
                 Defendants.     §
8                                §

9

10            REPORTER'S CERTIFICATION

11            ORAL AND VIDEOTAPED

12       DEPOSITION OF TIMOTHY JACKSON, Ph.D.

13            SEPTEMBER 24, 2024

14

15         I, Nicole A. Hatler, Certified Shorthand

16  Reporter No. 11275 in and for the State of Texas, hereby

17  certify to the following:

18         That the witness, TIMOTHY JACKSON, Ph.D., was

19  duly sworn by the officer and that the transcript of the

20  oral deposition is a true record of the testimony given

21  by the witness;

22         That the original deposition transcript was

23  delivered to October 17, 2024;

24         That the copy of this certificate was served

25  on all parties and/or the witness shown herein on

1    November 16, 2024;

2         I further certify that pursuant to FRCP Rule

3    30(f)(1) that the signature of the deponent:

4         __X__ was requested by the deponent or a part

5    before the completion of the deposition and that the

6    signature is to be before any notary public and returned

7    within 30 days from the date of receipt of the

8    transcript.  If returned, the attached Changes and

9    Signature Page contains any changes and the reasons

10   therefore:

11        _____ was not requested by the deponent or a

12   part before the completion of the deposition.

13        I further certify I am neither counsel for,

14   related to, nor employed by any of the parties or

15   attorneys in the action in which this proceeding was

16   taken, and further that I am not financially or

17   otherwise interested in the outcome of the action.

18        Certified to by me this 17th day of OCTOBER,

19   2024.

20

21

22        *Nicole Hatler*

23   Nicole A. Hatler, Texas CSR 11275
     Expiration Date:  11/30/24
     Integrity Legal Support Solutions

24   9901 Brodie Ln., #160-400
     Austin, TX 78748

25   (512) 320-8609
     www.integritylegal.support