<pre>
 1                UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF
 2                      SHERMAN DIVISION

 3  TIMOTHY JACKSON,              )
                                  )
 4       Plaintiff,               )
                                  )
 5  vs.                           )  CASE NO. 4:21-CV-00033-ALM
                                  )
 6  LAURA WRIGHT, et al.,         )
                                  )
 7       Defendants.              )

 8  *********************************************************

 9           VIDEOTAPED ZOOM ORAL DEPOSITION OF

10                ELLEN BAKULINA, PH.D.

11                   October 16, 2024

12                  (Reported Remotely).

13

14  *********************************************************

15      VIDEOTAPED ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.,

16  produced as a witness at the instance of the Plaintiff

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 16th day of October, 2024,

19  from 9:03 a.m. to 3:54 p.m., before Kim D. Carrell,

20  Certified Shorthand Reporter in and for the State of

21  Texas, reported remotely by computerized stenotype

22  machine at the physical location of the Witness, Ellen

23  Bakulina, Ph.D., in Montreal, Canada, pursuant to the

24  Federal Rules of Civil Procedure and the provisions

25  stated on the record or attached hereto.
</pre>

```
 1                         APPEARANCES

 2   FOR THE PLAINTIFF:

 3        Michael Thad Allen
          ALLEN LAW, LLC
 4        P.O. Box 404
          Quaker Hill, CT 06375
 5        Telephone: 860.772.4738
          Fax: 860.469.2783
 6        E-mail: M.allen@allen-lawfirm.com

 7

 8   FOR THE DEFENDANTS:

 9        Mary Quimby
          Assistant Attorney General
10        General Litigation Division
          P.O. Box 12548, Capital Station
11        Austin, Texas 78711
          Telephone: 512.463.2120
12        Fax: 512.320.0667
          E-mail: Mary.Quimby@oag.texas.gov
13

14             - and -

15        Renaldo Stowers  (Appearing Live)
          Cari Jacoby
16        University of North Texas System
          Office of General Counsel
17        801 North Texas Boulevard
          Denton, Texas 76201
18        Telephone: 940.565.2717
          Fax: 940.369.7026
19        E-mail: Renaldo.Stowers@untsystem.edu
                    cari.jacoby@untsystem.edu
20

21   ALSO PRESENT:

22        Timothy Jackson, Plaintiff

23        VIDEOGRAPHER:

24        Mr. Jason Warner
          Legal Video Group
25        lvg.dallas@gmail.com
          214-598-5229
```

```
 1                    I N D E X

 2                                      PAGE

 3  Appearances.................................  2

 4  Stipulations................................  5

 5  ELLEN BAKULINA, PH.D.

 6       Direct Examination by Mr. Allen........  6

 7  Reporter's Certificate...................... 227

 8                    EXHIBITS

 9    NUMBER          DESCRIPTION          MARKED

10  Exhibit 1   Re-Notice of Taking Deposition..... 13

11  Exhibit 2   Bakulina CV
                (UNT 005258 - 005267)............. 14
12
    Exhibit 3   Bakulina CV with Highlights
13              (UNT 005257 - 005267)............. 31

14  Exhibit 4   Title Page, List of Articles,
                Theoria, Volume 26, 2020.......... 35
15
    Exhibit 5   Excerpt from SMT Website, Oxford
16               University Press Academic, and
                Ewell Article..................... 45
17
    Exhibit 6   Email, Not everyone was
18              enthusiastic about Ewell's talk
                (JACKS 086826).................... 85
19
    Exhibit 7   Email, Material for the Committee
20              (UNT 0002645 - 002782)............ 88

21  Exhibit 8   Email, 12-11-19, Jackson to
                Bakulina, et al.
22              (UNT 000563 - 000566)............106

23  Exhibit 9   Email, 7-25-20, Slottow
                to Jackson, et al.
24              (UNT 000300 - 000303)............137

25
```

```
 1   Exhibit 10   Email Chain Ending Jackson to
                  Cubero, et al.
 2                (UNT 000304 - 000309)..............144

 3   Exhibit 11   Letter, 7-29-20, Bakulina to
                  Richmond
 4                (UNT 000116 - 000309)..............150

 5   Exhibit 12   Email, 7-29-20, Bakulina to
                  Brand, et al.
 6                (UNT 000488)......................158

 7   Exhibit 13   Email, 7-31-20, Richmond to
                  Music Faculty, et al.
 8                (UNT 000568)......................160

 9   Exhibit 14   Ad Hoc Review Panel Report
                  (Exhibit D)
10                (JACKSON000208 - 000233)..........164

11   Exhibit 15   Email Chain, Re: Statement on
                  JSS Issue
12                (UNT 000361 - 000363)..............175

13   Exhibit 16   Email Chain Re: Meeting with
                  Journal Review Panel, Wed.
14                Sept. 16
                  (UNT 002509)......................186
15
     Exhibit 17   Email Chain Re: Talk with the
16                UNT Ad Hoc Journal Review Panel
                  (UNT 002555)......................196
17
     Exhibit 18   Undated Letter, Bakulina to
18                Richmond
                  (UNT 002559 - 002561)..............203
19
     Exhibit 19   Email Chain Ending 5-17-21,
20                Brand to Cowley, et al.
                  (UNT 005054 - 005055)..............208
21

22

23

24

25
```

```
 1              A G R E E M E N T S

 2  DEPOSITION OF:  ELLEN BAKULINA, PH.D.

 3  DATE:  October 16, 2024

 4  CAUSE NO. 4:21-CV-00033-ALM

 5


 6  THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:

 7       (X)  Notice
         ( )  Agreement
 8       ( )  Court Order
         ( )  Subpoena
 9       (X)  Rules of Federal Civil Procedure

10

11  ORIGINAL TO:

12       ( )  Witness
         (X)  Witness's attorney        (Mary Quimby)
13       ( )  Producing attorney
         ( )  Signature waived
14

15

16  NUMBER OF DAYS FOR SIGNATURE
         ( )  20 days
17       (X)  30 days
         ( )  Other:
18

19
    MISCELLANEOUS:
20       ( )  Any objection made by one party good for
              all parties.
21
         ( )  An unsigned copy may be used at any trial,
22            hearing, or arbitration proceedings.

23

24

25
```

1                P R O C E E D I N G S

2                THE VIDEOGRAPHER:  Today is Wednesday,

3    October 16th, 2024.  The time is 9:03 a.m.  We are on

4    the record.

5                ELLEN BAKULINA, Ph.D.,

6    having been first duly sworn, testified as follows:

7                         EXAMINATION

8    BY MR. ALLEN:

9        Q.    Good morning, Professor Bakulina.  Can I ask

10   you to state your name for the record, please?

11       A.    My legal name is Olga Bakulina.  That's the

12   name on my passport.

13       Q.    Um-hum.

14       A.    My publishing or professional name and social

15   name is Ellen, E-L-L-E-N, Bakulina.

16       Q.    Thank you.  Have you ever been deposed before,

17   Professor Bakulina?

18       A.    No, I haven't.

19       Q.    Okay.  I just wanted to go over some of the

20   rules of the road.

21       A.    Um-hum.

22       Q.    As you probably understand, this is a very

23   formal conversation meant to create a record for the

24   Court.  Therefore, we have to follow certain

25   conventions that are not usually followed in ordinary

*ELLEN BAKULINA, PH.D.    10/16/2024*

1  conversations.

2           So, for example, if I can ask you to answer

3  audibly to every question.  This is important for the

4  court reporter to take an accurate record.  So things we

5  do all the time in ordinary conversations, like nodding

6  as you just did or saying um-hum and uh-huh, although

7  there's obviously nothing wrong with that, for the

8  purposes of the record today, I'm going to ask you to

9  answer audibly, so that an accurate record can be kept

10 by the court reporter.  Is that clear?

11     A.    Yes, it is.  But I'm still going to nod just

12 because it's part of my behavior, not because I'm

13 replacing my verbal answer.

14     Q.    There's obviously nothing wrong with nodding.

15 I just want you to answer audibly as I will try to as

16 well.

17           Likewise, we'll have to try not to talk over

18 each other or interrupt each other.  If I can (audio

19 distortion), we'll try to do the same.

20     A.    Yes.

21     Q.    In addition, please feel free to interrupt me

22 at any time if you should need to clarify a question or

23 anything of that nature.  I don't want you answering a

24 question that you are not clear about.  So there will be

25 nothing held against you for doing so obviously; is that

*ELLEN BAKULINA, PH.D.    10/16/2024*

```
 1  clear?
 2      A.    Yes.  I have a request, or maybe this is not
 3  the right time to make a request.  I'm not comfortable
 4  sitting in front of a computer for too long or actually
 5  sitting for too long.  It's not necessarily the computer.
 6  I need breaks.  And I was told that it's okay to request
 7  breaks.
 8      Q.    Um-hum.
 9      A.    Maybe, I don't know, if I could ask, I'm not
10  sure if 30 or 40 minutes would be okay.
11      Q.    Let me get to that in a second, because I just
12  want to make clear if you don't ask for a clarification
13  of a question, I'm going to assume that you understood
14  the question as asked.  Is that also clear?
15      A.    Yes.
16      Q.    And I was also going to say after that, that
17  feel free to request a break at any time.  Obviously, we
18  want you to be able to testify truthfully today and not
19  be under any pressure or discomfort when you're answering
20  questions.  The only rule as regards that is that you
21  must answer the question that is before you; is that
22  clear?
23      A.    Yes.
24      Q.    There will be objections from time to time from
25  your attorney, Mary Quimby.  That's also a normal part of
```

*ELLEN BAKULINA, PH.D.      10/16/2024*

```
 1  building a record for the Court.  This does not relieve
 2  you of the obligation to answer the question, however.
 3  There are some few exceptions.  Those will be very clear
 4  if they come up.  Usually, what happens in those cases,
 5  which are not very common, for instance, issues of
 6  attorney-client privilege, your attorney will instruct
 7  you directly not to answer.
 8       A.    Okay, I understand.
 9       Q.    Thank you.  Are you in the room alone today?
10       A.    No.  I'm with my cat.
11       Q.    Okay.  Your cat doesn't speak English, I
12  assume?
13       A.    No, he does not.
14       Q.    Possibly Russian?
15       A.    Also doesn't.
16       Q.    All right.  So a few questions before we get
17  going.  Is there anything, to your knowledge, that would
18  interfere with your ability to answer questions
19  truthfully today?
20       A.    Not to my knowledge.  There is nothing like
21  that.
22       Q.    You are not on any medications that would
23  affect your clarity or memory?
24       A.    No.
25       Q.    Are you subject to any mental condition or
```

1  illness that would affect your ability to testify today?

2      A.    No, I'm not.

3      Q.    Thank you.  Can you please explain for the

4  record what you did to prepare for today's deposition?

5  With one exception.  If you've consulted with your

6  attorneys, I don't want to -- I don't want you to

7  answer what you've discussed with your attorneys.  But

8  the fact that you may have discussed something with your

9  attorneys is not privileged, but your communications with

10  your attorneys is.  So with that caveat, I want to ask

11  you to explain what you've done to prepare for today's

12  deposition.

13      A.    I have reread the faculty letter, the letter

14  that the UNT faculty members signed, including myself.

15  I have reread the student letter, the letter that the

16  UNT graduate students in music theory ethnomusicology

17  signed.  And I have reread parts of Volume 12 of JSS.

18      Q.    Okay.  Are there any other documents that you

19  read besides Volume 12 of the Journal of Schenkerian

20  Studies, the student statement, and the faculty

21  statement?

22      A.    Oh, yes.  I have also looked at the Ad Hoc

23  Committee Report from 2020, yes.  I looked at parts of

24  it.  I didn't reread the whole thing.

25      Q.    Did you read the whole thing when it was issued

 1  in November of 2020?

 2       A.    To be honest, I don't recall.  Probably.

 3       Q.    Okay.  So in addition to those, I believe you

 4  identified four documents or let's say categories of

 5  documents.

 6       A.    Um-hum.

 7       Q.    Are there any other documents that you reviewed

 8  in preparation for your deposition?

 9       A.    No.

10       Q.    Did you discuss your deposition today with your

11  attorneys?  It's just a yes or no question.

12       A.    Did I discuss today?

13       Q.    Yes.

14       A.    Today, no.  I haven't discussed anything today.

15  This is my first interview.

16       Q.    No, no.  I'm sorry.  My question was unclear.

17           Did you discuss the deposition that you will

18  be giving today with your attorneys in preparation for

19  the deposition?

20       A.    Yes.

21       Q.    And approximately how long did you meet with

22  your attorneys?

23       A.    I think it was maybe three hours and a half.

24       Q.    Okay.  Have you discussed -- excuse me, strike

25  that, please.

1          Have you discussed the deposition today with
2    anyone else besides your attorney?
3         A.    No.
4         Q.    Sorry.  One second.  Another thing we will be
5    doing today, Ms. Bakulina -- I'm sorry.  I think I
6    mispronounced your name.  Bakulina, correct?
7         A.    Yes.
8         Q.    We will be introducing exhibits from time to
9    time for you to examine and for me to ask you questions.
10   I'm going to introduce the first exhibit right now.
11          Another instruction as part of the deposition
12   is if you need time to review an exhibit, we're obviously
13   taking a virtual deposition today, so I can only show you
14   one page at a time.  But if you want me to navigate, your
15   attorney, Mary Quimby, has suggested a process, which I
16   have found very convenient, which is I'm going to also
17   place the exhibit in the group chat for our Zoom meeting
18   over which this virtual deposition is taking place, so
19   you'll have access to the exhibit in that way as well, as
20   will your attorney.  But if you need time to look at any
21   deposition, you want me to navigate to a separate place,
22   just tell me.  Obviously, no one wants you to answer
23   questions by asking you about something you didn't see
24   or something of that nature.  Okay?
25        A.    Okay.

1      Q.    So where is my -- here's the share button.
2  I'm going to mark for the record as Exhibit 1.
3      A.    Um-hum.
4                  (Deposition Exhibit Number 1 marked.)
5                  MR. ALLEN:  Let me -- I'm going to, one
6  second here.  Let me take it back down, because I want to
7  put it in the group chat first.
8      Q.    Okay.  Are you able to see this exhibit,
9  Professor Bakulina?
10     A.    Yes.
11     Q.    Do you recognize this exhibit?
12     A.    Yes, I got it in an email.
13     Q.    Thank you.  And it's captioned Re-Notice of
14 Taking Deposition, addressed to you, Ellen Bakulina,
15 correct?
16     A.    Um-hum.
17     Q.    And is it your understanding that you've
18 appeared today to give testimony in response to this
19 Re-Notice of Taking Deposition?
20     A.    Yes, I understand that.
21     Q.    So I have no further questions about this one.
22 And we'll put the exhibits to the side.  They'll be kept
23 by the court reporter and will be collected as part of
24 your transcript.
25     A.    Okay.

(Deposition Exhibit Number 2 marked.)

MR. ALLEN: I'm going to introduce for the record a second exhibit. I'm marking Exhibit 2 for the record as a document captioned Ellen Bakulina, Bakulina CV.

Q. Do you see this document, Exhibit 2?

A. Yes.

Q. Do you recognize Exhibit 2?

A. Yes, it's one of the versions of my CV. It's probably not the current version because I haven't sent the current version to anyone, but it's an old version.

Q. I understand. You'll see it's 10 pages. I don't want to go through all of it for understandable reasons, but we will go through some of it. Was this document, your CV, marked as Exhibit 2, compiled by you?

A. Yes.

Q. And is all of the information you listed in your CV, in Exhibit 2, accurate to the best of your knowledge?

A. Yes, definitely.

Q. Do you recall when approximately you composed Exhibit 2?

A. No, because it depends on which publications I listed, and I can't see them on this page.

1        Q.    I'm scrolling down to page 2 --

2        A.    I see it.

3        Q.    -- of Exhibit 2, and this is page --

4   incidentally, do you see these little numbers in the

5   lower left-hand corner?

6        A.    Yeah, this is enough, because page 2 gives

7   me enough.  So this was compiled between January 2021 and

8   May 2022, because that's when I moved away from Texas,

9   and this still lists my Texas address.

10       Q.    Okay.  And we'll get to that in a second.

11       A.    Um-hum.

12       Q.    I was going to ask you if you still work at the

13  University of North Texas.

14       A.    I do not.

15       Q.    And could you explain -- the information listed

16  here from 2007 to present under the heading Employment on

17  page 1 of Exhibit 2 is accurate, is it

18  not?

19       A.    Yes, it is.

20       Q.    After the time you composed this CV, which

21  I believe you said was sometime in early 2021?

22       A.    '21 or '22, because in '22, I was still in

23  Texas, yeah.

24       Q.    Explain what happened next after 2022 and when.

25       A.    I moved away permanently from Texas and the

 1  United States in -- well, on June 1st of 2022, because

 2  I got a job at McGill University, Montreal, Canada.

 3      Q.    And that was the university where you completed

 4  your bachelor's degree?

 5      A.    And master's, yes.

 6      Q.    And master's in 2010, correct?

 7      A.    Yes.

 8      Q.    And then you went on to a Ph.D. in music theory

 9  at the CUNY Graduate Center, correct?

10      A.    Yes, CUNY.

11      Q.    And your advisor was William Rothstein?

12      A.    Yes.

13      Q.    What's your position at McGill University?

14  Or let me scratch that question.

15            Can you tell me what position you were hired

16  to at McGill University in June of 2022?

17      A.    Associate professor of music theory.

18      Q.    And have you been promoted since that time?

19      A.    No.

20      Q.    You remain an associate professor at McGill?

21      A.    Yes.

22      Q.    In addition to the employment you've listed

23  here from 2007 to 2016 and your McGill position that you

24  still hold, are there any other (audio distortion)

25  involved in that intervening time period?

1      A.    No.

2      Q.    Now, you list various grants and awards here at

3   the bottom of page 2 of exhibit -- excuse me, page 1 of

4   Exhibit 2.  Is this a complete list of the grants and

5   awards you've received?

6      A.    Yes, it is.  Yes.

7      Q.    Okay.  And a final question about this

8   employment and grants and awards.

9           Have you ever received a fellowship to teach

10  as either a visiting professor or some kind of honorary

11  professor at a different institution than UNT?

12     A.    No, never.

13     Q.    Okay.  So I wanted to ask you a few questions

14  about your publications.  Have you published any articles

15  or publications of any kind since 2021?

16     A.    Actually, I haven't.  I have not published, no.

17     Q.    Okay.  So this is a complete list of your

18  publications in Exhibit 2?

19     A.    Yes, not counting forthcoming.

20     Q.    Okay.  And can you tell me if you have

21  published any articles that are not peer-reviewed?

22           MS. QUIMBY:  Objection, form.

23     A.    In my entire career?

24     Q.    Yes.

25     A.    I have one article that is editor reviewed,

 1  which is listed here under 2020.  The Brigade Textbook:

 2  Disseminating the Riemannian Legacy.  This was editor

 3  reviewed.

 4       Q.   This one?

 5       A.   Yes.

 6            MR. ALLEN:  I've highlighted for the

 7  record the publication indicated by the witness, The

 8  Brigade Textbook:  Disseminating the Riemannian Legacy

 9  in the Soviet -- excuse me, Russian-Soviet Theoretical

10  Tradition.

11            Did I read that correctly with perhaps some

12  mispronunciation?

13       A.   Yes.

14       Q.   Any other article that was not peer reviewed?

15       A.   "The Concept of Mutability in Russian Theory,"

16  2014, was peer reviewed by the SMT program committee and

17  by the editor, but it was peer reviewed by the Journal,

18  so --

19       Q.   Okay.

20       A.    -- it was not peer reviewed through a

21  journal process, but it was peer reviewed by the

22  program committee of SMT, which is somewhat different,

23  but it's still peer reviewed.

24       Q.   So SMT stands for the Society for Music Theory,

25  right?

1    A.   Yes.

2    Q.   And program committee in 2013 as listed in the

3 2014 entry on your CV, does that refer to the SMT program

4 committee for its annual conference of that year?

5    A.   Yes.

6    Q.   What did you submit for the program committee

7 in 2013?

8    A.   A conference proposal for a slightly shorter

9 version of this paper, because conference papers are

10 shorter.

11    Q.   Did you submit the entire paper or just the

12 proposal?

13    A.   Proposal.

14    Q.   And just -- I know you probably don't have your

15 proposal from 2013 fresh in your memory.  But

16 approximately how long was the submission to the

17 program committee in 2013?

18    A.   The rules for SMT haven't changed for many

19 years.  It was -- it's been -- for many years, including

20 that year, the word limit has been 500 words, not

21 counting musical examples and bibliographies, and

22 that's what it was.

23    Q.   Basically, 500 words of text, plus references

24 or whatnot.  Yeah?

25    A.   And musical examples, yes.

*ELLEN BAKULINA, PH.D.    10/16/2024*

```
 1       Q.    And just for the record, because you have to
 2  understand this may come before a jury which has very
 3  little background in music, what kind of musical
 4  examples?  What do you mean by that?
 5       A.    Annotated score examples.
 6       Q.    I'm sorry.  What?  I just didn't hear.
 7       A.    Annotated score examples.
 8       Q.    Approximately how long was the article that you
 9  published in 2014, "The Concept of Mutability in Russian
10  Theory"?
11       A.    I can't -- I can't recall right now.  I'd
12  have to go back to the article and count and look at the
13  word count.  I don't remember it now.
14       Q.    Is it longer than 500 words?
15       A.    Definitely, yes.
16       Q.    Is it longer than 10 pages?
17       A.    There are no pages because it's an online
18  publication.  It's edited in paragraphs, not pages, which
19  is why it's harder to say the word count.
20       Q.    Okay.  And let's go to The Brigade Textbook,
21  the 2020 article that's highlighted here.  You also said
22  that this -- I believe you referred to this as reviewed
23  by the editor, and that's what you put in your CV, right?
24       A.    Yes.
25       Q.    Can you describe the process of reviewing by
```

 1  the editor?

 2      A.    Let's see.  He read my article and gave

 3  comments.  Well, first of all, when he read my article,

 4  he -- by the way, this was not just my article, but a

 5  group of the articles.  So when he received those three,

 6  he agreed to have them published and gave comments and

 7  suggestions for changes.  And I made some changes.

 8  And usually, there are multiple steps of changes and

 9  revisions when something goes to publication.  So that's

10  what happened.  Yes, so this is -- yeah, I think that's

11  it.  Yes.

12      Q.    Who was -- you referred to "he."  I assume that

13  refers to the editor of Theoria?

14      A.    Correct.  Frank Heidlberger.

15      Q.    Frank Heidlberger is your colleague at the

16  University of North Texas, correct?

17      A.    He was.  I'm no -- I'm no longer at UNT.

18      Q.    Correct.  Do you still consider him a

19  colleague?

20      A.    I still consider him a colleague in terms

21  of SMT, in terms of the Society For Music Theory.  I

22  consider all theorists my colleagues.

23      Q.    In music, you mean, right?

24      A.    Well, music theorist like SMT members.

25      Q.    Did Frank Heidlberger, who's also a defendant

*ELLEN BAKULINA, PH.D.    10/16/2024*

1  in this civil action, did he solicit these papers that

2  you've just described?

3      A.    What do you mean, solicit?

4      Q.    Well, let me ask a clarifying question.

5      A.    Um-hum.

6      Q.    As -- in your experience as an academic who's

7  published, what, two, four, six, eight, nine, at least

8  nine articles and presumably has others in progress --

9      A.    Um-hum.

10     Q.    -- is it your understanding that editors of

11 journals sometimes solicit papers for their journals?

12           MS. QUIMBY:  Objection, form.

13     A.    You mean -- solicit, you mean ask, correct?

14     Q.    Correct.  Did Frank Heidlberger approach you

15 and invite you to submit your paper to Theoria?

16     A.    I think it went like this.  We talked about

17 my presentation because this started as a presentation

18 in the Russian theory interest group at SMT.  We talked

19 about my presentation, and he asked what the presentation

20 was about.  I told him some of the details.  And at that

21 point, I think he offered to see the three articles, mine

22 and Philip Ewell's and Christopher Segall's.  I'm not

23 sure if it counts as solicit.  I think that's how it

24 happened.

25           May I add something else?

1        Q.    Please.

2        A.    I just noticed that the introduction to the

3    Russian Music Theory Panel in that same volume, 2020,

4    it's listed right below.  It's also not peer reviewed, of

5    course, because that's not even an article.  That's an

6    introduction.  But I guess I wasn't completely clear when

7    I didn't say that, because that is --

8        Q.    This is approximately five pages here, right?

9        A.    It's maybe three or four, something like that.

10   It's actually not an article.  It's an introduction.

11       Q.    I understand.  I understand.

12       A.    Okay.

13       Q.    And this was approximately, it looks like,

14   15 -- 26 pages here?

15       A.    I guess so.  That's what it says, yes.

16       Q.    Referring to the Brigade Textbook paper that

17   was approximately 26 pages, give or take, correct?

18       A.    Yes.

19       Q.    All right.  And that's far longer than a

20   500-word conference panel submission, correct?  Or a

21   paper proposal to a conference?

22       A.    Yes.

23       Q.    And this is the same conference as is listed in

24   the 2014 entry, the Concept of Mutability in Russian

25   Theory?

1           MS. QUIMBY:  Objection, form.

2      A.   It's actually not the same.  Well, I will

3  explain what's not the same.

4      Q.   Please.

5      A.   The 2014 paper was presented at the conference,

6  SMT conference.

7      Q.   Um-hum.

8      A.   The paper that resulted in the 2020 Theoria

9  paper was presented at the interest group for Russian

10  Music Theory, which is part of SMT, but it's a smaller --

11  it's an interest group.

12      Q.   Can I just interrupt for just a second?  So

13  just so I understand, there's an organization that puts

14  on an annual conference, the SMT, right?

15      A.   Yes.

16      Q.   And it sounds like there's a -- there are

17  general submissions which let's say just come in as

18  part of the general population of music theorists,

19  correct?

20           MS. QUIMBY:  Objection, form.

21      A.   I don't understand what general population is.

22  I'm sorry.

23      Q.   Well, that's what I'm kind of trying to

24  understand, too.  This difference between a special

25  interest group and other submissions by scholars in your

1    field.  So it sounds like there's two different tracks

2    for submitting paper proposals to the SMT conference.

3          A.    SMT --

4                MS. QUIMBY:  Objection, form.

5          A.    -- has many interest groups.  At this point,

6    I think around 20 or perhaps more than 20.  The papers

7    presented at the interest group don't go through the

8    SMT program committee.

9          Q.    I see.

10         A.    Because an interest group has its own process,

11   its own program committee.

12         Q.    And how big is -- how big is the Russian

13   interest group in the SMT?

14         A.    Well, it's changed a lot in this five years.

15   I don't remember how big it was in 2018.  This was

16   presented, by the way, in 2018.

17         Q.    Um-hum.

18         A.    In fact, I don't even know now.  How big is --

19   well, it depends on how you define the membership of the

20   interest group, because there is a way to define the

21   membership by the people who have joined -- joined the

22   group online.

23         Q.    Um-hum.

24         A.    And I don't know how many there are right now,

25   and I don't remember how many there were in 2018.

1      Q.    Okay.

2      A.    But another way is to count the attendance,

3  so there's different ways to define membership.

4      Q.    And incidentally, if I don't know, you don't

5  know, and that's a perfectly acceptable answer.

6      A.    Um-hum.

7      Q.    So describe for the record the review process

8  for a submission of a panel to the interest group or

9  however you define that, the Russian interest group or

10 committee.

11          MS. QUIMBY:  Objection, form.

12     Q.    Go ahead, Dr. Bakulina.

13     A.    In general or for that year?

14     Q.    Why don't we stick to the 2020 publication that

15 grew out of, what did you say, the 2018 panel paper?

16     A.    Um-hum.  That was reviewed by the chair of that

17 interest group.  My proposal was reviewed by the interest

18 group chair.

19     Q.    That was a single individual?

20     A.    Yes.

21     Q.    All right.  You don't happen to know his name

22 at this time from back then, do you?

23     A.    Christopher Segall.

24     Q.    And he was one of the people presenting in your

25 panel as well, right?

1        A.    Yes.

2        Q.    How long was -- well, describe your proposal

3   for the panel that was submitted to Christopher Segall as

4   the head of the Russian interest group.

5              MS. QUIMBY:  Objection, form.

6        A.    To be honest, I don't recall.

7        Q.    Did Christopher Segall review the entire paper,

8   the Brigade Textbook:  Dissemination -- Disseminating the

9   Riemannian Legacy?

10             MS. QUIMBY:  Objection, form.

11       A.    Review it at what point?  Prior to the -- prior

12  to my presentation?

13       Q.    Yeah, that's a good question.  I'm talking

14  about getting the proposals accepted to the SMT

15  conference to the extent they were presented in an

16  interest group.

17       A.    That's what I unfortunately don't recall how

18  that was reviewed in that year.

19       Q.    Okay.

20       A.    Yeah.

21       Q.    Would you have remembered if you submitted an

22  entire 26-page manuscript for review by Christopher

23  Segall?

24             MS. QUIMBY:  Objection, form.

25       A.    I definitely did not.

*ELLEN BAKULINA, PH.D.    10/16/2024*

```
1              MS. QUIMBY:  Go ahead, Dr. Bakulina.
2         A.    The 26-page paper did not exist at the time,
3    because with conference proposals, including interest
4    group presentations, the first thing that one sends is a
5    proposal.  And it's not a paper.  It's a proposal.  It's
6    not a paper.  The paper is bigger.  The proposal was
7    smaller.
8         Q.    Okay.
9         A.    The paper is written later.  And in my case,
10   the paper for the interest group was written first, but
11   after the proposal, and the enlarged version for the
12   journal was written still later.
13        Q.    Thank you.  And would your contribution to
14   the proposal have been something similar in nature to
15   what you provided to the SMT program committee for the
16   2013 conference?  In other words, something in the nature
17   of 500 words, basically an abstract or a proposal?
18              MS. QUIMBY:  Objection, form.
19        A.    It's possible.  But it's also possible that it
20   was less formal, because as I said, interest groups don't
21   have the same rules as SMT program committee.  So it's
22   not as formalized and it's not as standardized.
23        Q.    If you know, was Christopher Segall aware of
24   your identity as the author of the proposal when you
25   submitted it to the 2018 program committee Russian
```

1   interest group?

2        A.    I think he was, yes.

3        Q.    Okay.  And you certainly knew that he was

4   the chair of the Russian interest group at that time,

5   correct?

6        A.    Yes, definitely.

7        Q.    Thanks.  And can you describe for the record

8   what you understand by peer review in academic journals?

9        A.    Definitely.  A peer review is very formalized.

10  It consists of this process.  First, if an article, full

11  article, not a proposal, but a full article is sent to

12  the editor, unless there is a website where you submit,

13  where you don't actually literally send an email to an

14  editor, so that depends on the journal.

15       Q.    Um-hum.

16       A.    But the editor is the person who gets the

17  article.  Next, the editor finds peer reviewers, which

18  are normally two and which are normally involved in

19  double-blind.  That's the most normative process,

20  double-blind peer-review process, which means that the

21  editors don't know the identity of the article's author

22  and the author doesn't know the identity of the two

23  reviewers who are -- I don't know.  Sometimes, there

24  could be more than two.  And the reviewers read the

25  article, and they write reports.  And there's usually a

1  deadline.

2      Q.    Um-hum.

3      A.    And the reports are sent to the editor, and the

4  editor makes a decision based on the reports.  And if the

5  decision is difficult to make, for example, if the two

6  reports have yielded conflicting results, the editor may

7  ask a third person, a third reviewer, to write the

8  report.  And so it goes until the editor can actually

9  give a single answer as opposed to conflicting answers.

10 A single answer based on the reports.

11     Q.    A single answer refers to?

12     A.    A single answer.

13     Q.    Accepted or rejected or whatnot?

14     A.    Yes.  It's usually one of three answer -- kinds

15 of answers, which is accept, revise and resubmit, or

16 reject, although I have heard about some journals that

17 they have a fourth option, which is revise and resubmit

18 somewhere else, but I have never seen that.

19     Q.    Where you always have the option to revise and

20 resubmit somewhere else, right?

21         Okay.  I think I get what you're -- what

22 you're saying.  And thank you for that description.

23         So that's what you -- if an academic

24 publishing in music theory says a peer-reviewed journal,

25 that's what they mean, referring to that process as you

1  understand it, correct?

2           MS. QUIMBY:  Objection, form.

3       A.   Yes.  And by the way, if it is revise and

4  resubmit, there will be a second submission.

5       Q.   Okay.

6       A.   And usually, the same process will recur with

7  the second -- with the resubmission.

8           MR. ALLEN:  And Professor Bakulina, I have

9  taken the liberty of circulating to you and your counsel

10  and to  the court reporter Exhibit 3, which I intend to

11  mark for the record.

12           (Exhibit Deposition Number 3 marked.)

13           MR. ALLEN:  Exhibit 3 is the same as

14  Exhibit 2, with the only exception being that the

15  highlights are now included that we've just discussed

16  in your testimony.

17       Q.   Can I just get you to examine Exhibit 3?

18  I've marked this as Exhibit 3 for the record.  And

19  are these highlighted sections the 2020 and 2014

20  publications that we've been discussing in your

21  testimony today?

22       A.   Yes.  What's the question?

23       Q.   That's the question.  I just -- this is going

24  to be a formal exhibit in the record.  And I just

25  want  to make a record, that as we've discussed and

1  highlighted, these specific publications in your CV,

2  which was formerly Exhibit 2.

3          Exhibit 3 now (audio distortion) with the

4  articles that you've identified as not subject to this

5  formal peer-review process that you've just described

6  is now highlighted.

7      A.    Yes.

8      Q.    And I just want you to certify as the witness

9  that I haven't done anything other than highlight those

10  articles that we've discussed, the 2020, the Brigade

11  Textbook article, the 2020 Introduction to Russian Music

12  Theory panel article, and the 2014 Concept of Mutability

13  in Russian Theory; is that correct?

14          MS. QUIMBY:  Objection, form.

15      A.    Yes, that's correct.

16      Q.    Thank you.  Do you recall any objection in your

17  field to the fact that you published these three articles

18  without formal peer review?

19          MS. QUIMBY:  Objection, form.

20      A.    Objection from whom or in what form?

21  Objection to them being published?

22      Q.    Did anyone -- well, let me strike that and

23  ask another question.

24          Did you list these articles in your annual

25  review at UNT?

1            MS. QUIMBY:  Objection, form.

2      A.    Well, the one from 2014 would not have been

3  listed because that was way before I came to UNT.

4      Q.    Okay.  So the 2000 --

5      A.    The one --

6      Q.    Let me ask the question more precisely, and

7  thank you for that clarification.

8      A.    Um-hum.

9      Q.    The two 2020 publications, the Brigade Textbook

10 and Introduction to Russian Music Theory published in

11 Theoria --

12     A.    Um-hum.

13     Q.    -- the journal edited by your colleague at that

14 time, Frank Heidlberger, also on faculty at UNT, were

15 those listed your submissions for annual review

16 at the University of North Texas?

17            MS. QUIMBY:  Objection, form.

18     A.    Yes.  The -- the article was the introduction.

19 I actually don't remember because, as I said, it's not an

20 article.  I don't recall if I included it.  Maybe I

21 didn't.

22     Q.    Um-hum.  Did you --

23     A.    But the article is, yes.

24     Q.    The 26-page article, the Brigade Textbook,

25 you would have submitted for your annual review at the

 1  University of North Texas?

 2      A.   Yes.

 3      Q.   Do you recall who was the department head at

 4  that time?

 5      A.   Benjamin Brand.

 6      Q.   Did Benjamin Brand criticize this publication,

 7  the Brigade Textbook, because it was not peer reviewed?

 8           MS. QUIMBY:  Objection, form.

 9      A.   No, he did not criticize.

10      Q.   Was there ever any petition or letter -- let me

11  strike that question.

12           Was there any open letter published by the

13  Society for Music Theory objecting to Theoria publishing

14  papers that were not subjected to formal peer review?

15           MS. QUIMBY:  Objection, form.

16      A.   Sorry.  Was there any -- I'm sorry.  Could

17  you repeat?

18      Q.   Sure.  Was there ever any open letters

19  circulated by members of the Society for Music Theory

20  objecting that Theoria published articles without peer

21  review?

22           MS. QUIMBY:  Objection, form.

23      A.   To my knowledge, there was not.

24      Q.   Were you ever accused of being a racist for

25  publishing articles without peer review?

1           MS. QUIMBY:  Objection, form.

2      A.    I have not been.

3      Q.    And in your experience, is it well within

4 the norm of the practice of academic music theorists to

5 publish articles such as you published in 2020 in Theoria

6 and in 2014 in the Journal for Music Theory online?

7           MS. QUIMBY:  Objection, form.

8      A.    Yes, it can happen.  It is within the practice.

9 It is less often.  It happens less often than peer --

10 than a standard peer review.  But it does happen,

11 particularly when the paper to be published was first

12 presented at a conference.  Not absolutely everything

13 that gets published in journals is peer reviewed through

14 the process that I have described.

15     Q.    And let's -- let's discuss Theoria just a

16 little bit even though you've already testified quite

17 extensively on how that one publication came to be.

18           MR. ALLEN:  And I'm going to mark for the

19 record as Exhibit 4 a title page and some other pages

20 associated with the journal, Theoria.  But first, I will

21 dutifully put them in the chat.

22           (Deposition Exhibit Number 4 marked.)

23     Q.    So Professor Bakulina, I'm going to publish to

24 the record Exhibit 4.  This is, as I said, a title page

25 of the journal, Theoria, Historical Aspects of Music

 1 | Theory, Volume 26, from 2020.

 2 |         Did I read that correctly?

 3 |     A.    Yes.

 4 |     Q.    And you are familiar with this journal because

 5 | you published in it, correct?

 6 |     A.    Yes.

 7 |     Q.    And here is the editor named Frank Heidlberger

 8 | as listed on the editor page, right?

 9 |     A.    Yes.

10 |     Q.    Do you recognize this as the title page of that

11 | volume in which you published the articles we just

12 | discussed as part of your CV?

13 |     A.    Yes.  I recognize it as the contents page, yes.

14 |     Q.    And then I've also included the Directions to

15 | Contributors.  That's a page from -- the same journal,

16 | page 157.  Do you see that?

17 |     A.    Yes.  It's very small.  I can't read it.

18 |     Q.    Is that a bit better?  I tried to expand the

19 | view.

20 |     A.    Could you expand -- oh, actually, if chat has

21 | posted it, I will download.

22 |         MS. QUIMBY:  I don't think you shared this

23 | one in the chat.

24 |         THE WITNESS:  Yes.

25 |         MS. QUIMBY:  I don't see it yet.  Oh,

```
 1   there it is.  Never mind.  I'm sorry.
 2                 MR. ALLEN:  Did it come through?
 3                 MS. QUIMBY:  I see it.
 4                 MR. ALLEN:  Thanks.
 5                 MS. QUIMBY:  No, my fault.
 6                 MR. ALLEN:  It might be there was a lag.
 7   I don't know.
 8        A.   Can I take a minute and open it on my own
 9   computer?
10        Q.   Please.  And I'm just asking you to read the
11   last page.
12        A.   The last page.
13        Q.   Which would be page 3 of Exhibit 4.
14        A.   I'm almost there.  One second.  Um-hum.  I'm
15   ready now, yes.
16        Q.   Okay.  And do you see where it's about one,
17   two, three, four, five, six, the seventh paragraph on
18   that page, it says, "All submissions will be peer
19   reviewed for their scholarly quality, clarity, and
20   originality"?
21        A.   Yes.
22        Q.   Is it your understanding as a reader of --
23   well, let me back up.
24             You are also a reader of Theoria as a scholar,
25   correct?
```

1                    MS. QUIMBY:  Objection, form.

2        A.    Reader?  What do you mean by reader?

3        Q.    Sure.  Do you make it a practice to regularly

4   read the articles published in Theoria as a scholar?

5        A.    Not regularly.  I have just joined the

6   editorial board last month.

7        Q.    Congratulations.  So you are very familiar with

8   Theoria, right?

9                    MS. QUIMBY:  Objection, form.

10       A.    I'm not very familiar.  I have just started.

11  In fact, I haven't been -- I have been on the editorial

12  board for only one month, so I'm not very familiar.

13       Q.    Have you reviewed any of their policies for

14  review and submissions?

15       A.    Yes.

16       Q.    What is their formal policy for reviewing

17  submissions?

18                    MS. QUIMBY:  Objection, form.

19       A.    I don't remember the entire policy, but I've

20  discussed it with the editor, with Dr. Heidlberger.  And

21  he said that I'm going to serve as peer reviewer in the

22  usual way.  I will receive anonymous articles and write

23  reports in the usual way, anonymous reports.  Not -- they

24  will not be anonymous for the editor, but write reports

25  in the double-blind peer-review process.

1      Q.    That you described earlier, correct?

2      A.    Yes.

3      Q.    To your knowledge, does Theoria have any

4  expressed policy against self-publication by the editor

5  in the pages of Theoria?

6            MS. QUIMBY:  Objection, form.

7      A.    Actually, quite honestly, I don't recall.  I'd

8  have to -- I'd have to review.  I know you are showing me

9  part of the rules, but it's not all of the rules.  To be

10 honest, I haven't read this before the deposition, so I

11 can't really -- at this point, I don't know.

12     Q.    Okay.  Do you -- do you know if Theoria has any

13 expressed policy governing self-publication by the editor

14 in the pages of Theoria in anywhere?

15           MS. QUIMBY:  Objection, form.

16     A.    I don't know because, as I said, I haven't

17 reviewed the entire policy for today.  So the --

18     Q.    Sure.

19     A.    -- answer is I don't know.

20     Q.    Again, this is from volume -- well, now,

21 we're --

22     A.    Yes, it's from a few years ago.

23     Q.    This is Volume 26 of 2020, which is the sample

24 that constitutes Exhibit 4.

25           Were you aware, in the Volume 26 from 2020,

1  the volume in which you yourself were published as an

2  author, whether there was any expressed indication that

3  the article which you published was not subjected to

4  double-blind peer review?

5          MS. QUIMBY:  Objection, form.

6      A.   Just to make sure I'm responding correctly, I'm

7  so sorry.

8      Q.   Please.

9      A.   Can you repeat?

10     Q.   Sure.  Let's just try to break it down.

11          You published in this volume, Volume 26, in

12  2020, of Theoria, correct?

13     A.   Yes.

14     Q.   And this Directions to Contributors page

15  says, "All submissions will be peer reviewed for their

16  scholarly quality, clarity, and originality."

17          Right?  It doesn't say some will be and some

18  will not be, right?

19     A.   Correct.

20     Q.   So my question is, are you aware of any

21  indication in Volume 26 of Theoria that your particular

22  article was not subjected to double-blind peer review?

23          MS. QUIMBY:  Objection, form.

24     A.   I know it was not subjected to peer review.

25     Q.   I know you were.  I'm asking, was there any

```
 1   indication -- indication in the pages of Theoria --
 2       A.   I see.  I see.
 3       Q.   -- that it was not subjected to double-blind
 4   peer review?
 5            Let me ask that question once more --
 6       A.   I get it.
 7       Q.   -- just to get a clear record.
 8            No, no.  And this is a perfect example of
 9   you coming back at me to try to get me to ask a clear
10   question, and I very much appreciate it.  But let me try
11   to see if I can pose the question clearly, and then we
12   can get a clear answer and move on.
13            So are you aware of any statement in the 2020,
14   Volume 26 of Theoria, indicating that your article was
15   subjected -- or excuse me -- that your article was not
16   subjected to double-blind peer review?
17       A.   Right, I understand now.  No, there is no
18   such indication.
19       Q.   Thank you.
20            I want to talk now about the 2019 plenary
21   address by your colleague, Philip Ewell, a professor at
22   Hunter College, at the SMT annual conference.
23       A.   Um-hum.
24       Q.   Did you attend the 2019 annual conference of
25   the Society for Music Theory?
```

```
 1        A.    Yes.

 2        Q.    Did you attend the plenary session at the

 3   2019 conference?

 4        A.    Yes.

 5        Q.    And if you remember, do you remember on what

 6   days that plenary session -- or excuse me -- on what day

 7   the plenary session took place?

 8        A.    I think it was a Saturday.  The plenary session

 9   is usually Saturday, early afternoon.  So the conference

10   is usually Thursday, Friday, Saturday, and Sunday, and

11   it's usually on a Saturday.

12        Q.    And do you remember the specific dates, if you

13   know?  I've had trouble figuring that out.

14        A.    Not the date, but that would be in the program.

15        Q.    Is it usually the first weekend in November

16   that the SMT conference takes place every year?

17              MS. QUIMBY:  Objection, form.

18        A.    Yes, but the program is published online.

19        Q.    So it was a Saturday afternoon plenary session,

20   right?

21        A.    Um-hum.

22        Q.    And Philip Ewell gave his paper with other

23   scholars, correct?

24              MS. QUIMBY:  Objection, form.

25        A.    His paper was his own.  But there was more than
```

1  one paper in the plenary session, yes.

2       Q.   Okay, thank you.  What was the reception of

3  Philip Ewell's paper?

4            MS. QUIMBY:  Objection, form.

5       A.   The reception at the -- at the plenary meeting,

6  quite positive.

7       Q.   Do you recall a standing ovation?

8       A.   Yes.

9       Q.   Was there any criticism of Philip Ewell's paper

10 at the Society for Music Theory at the plenary address in

11 2019?

12           MS. QUIMBY:  Objection, form.

13      A.   At the plenary address, no.

14      Q.   Was any criticism allowed of Philip Ewell's

15 paper at the plenary session in 2019?

16           MS. QUIMBY:  You cut out.  I'm sorry.  I

17 didn't hear the first part of that question.

18           MR. ALLEN:  Sure.

19      Q.   Still talking about the 2019 plenary session,

20 did the SMT allow for any criticism of Philip Ewell's

21 paper in the 2019 conference?

22           MS. QUIMBY:  Objection, form.

23      A.   I don't think it's possible for the SMT to

24 allow or not allow criticism.  Everybody is free to

25 criticize.  It's not something that SMT can allow or

 1  prohibit.

 2      Q.    Was there any part of the program dedicated

 3  to a scholar who was critical of Philip Ewell's address

 4  to the 2019 SMT plenary session?

 5      A.    Was the -- could you repeat the question?

 6      Q.    Yeah, sure.  Did the SMT program committee

 7  organize any formal response of criticism to Philip

 8  Ewell's talk at the SMT conference in 2019?

 9              MS. QUIMBY:  Objection, form.

10      A.    No.  I think my answer is no.

11      Q.    Yeah.  Now, were you aware that the

12  plenary address delivered by Philip Ewell was

13  published eventually in Spectrum?

14      A.    At the time of his presentation, no.

15      Q.    Are you aware of the journal, Spectrum?

16      A.    Yes.  It's one of our major journals.

17      Q.    Who publishes Spectrum?

18      A.    SMT.

19      Q.    Is it published under the guidance of SMT

20  through the Oxford University Press?

21              MS. QUIMBY:  Objection, form.

22      A.    I don't remember which press, to my -- to my

23  shame.  I don't remember.

24              MR. ALLEN:  Well, I don't know if you need

25  to be ashamed.  It's okay.  And that wasn't my purpose to

1 try to catch you out.  But why don't we mark for the

2 record Exhibit 5.

3                    (Deposition Exhibit Number 5 marked.)

4        Q.    Actually, I will put it in the chat here.

5        A.    Exhibit 5.  Okay.

6        Q.    Now, I'm going to represent to you that this

7 Exhibit 5 is made up of three different documents.  One

8 is a printout of the SMT website, which addresses the

9 Spectrum.  That's on page 1.  On page 2 is a printout

10 from the website of the Oxford University Press Academic,

11 which addresses the same journal, Spectrum.

12        A.    Um-hum.

13        Q.    And then the rest, page 5 through 11, is

14 taken from Spectrum itself, including the title page and

15 Professor Ewell's article titled Music Theory's White

16 Racial Frame.

17        A.    Um-hum.

18        Q.    Are you able to see that?

19        A.    I can't read it.  I see, but it's very small.

20        Q.    Yeah.  And we're not going to read the entire

21 article at this time, but my question for you is, was

22 it your understanding that Philip Ewell and the other

23 plenary speakers at the 2019 conference would be

24 publishing their articles in Spectrum?

25        A.    I learned about the Spectrum publication only

1    when this specific issue came out.

2        Q.    Okay.

3        A.    I didn't know about this.  No, wait.  So

4    different versions of Philip Ewell's talk was published

5    in two different places.  Wait.  I did know about this,

6    or was it the other one?  Because the other one is MTO,

7    Music Theory Online.

8        Q.    Yes.

9        A.    Sorry.  Give me one second.

10        Q.    Um-hum.

11        A.    This one, I think -- I think this one was

12    announced at the conference, at the SMT conference.

13        Q.    Um-hum.  But the plenary session would be

14    published?

15        A.    Would be published.  But I can't recall

16    100 percent.  It's a little bit mixed in my memory

17    right now.

18        Q.    Sure.

19        A.    I think that the other journal, which is MTO,

20    which also published a version of --

21        Q.    MTO stands for Music Theory Online, correct?

22        A.    Correct, yes.  Music Theory Online also

23    published a version of Ewell's paper, but that was

24    separate.  But this Spectrum publication, I think,

25    was announced at the -- well, maybe soon after the

1  conference.

2      Q.    Okay.

3      A.    So I don't recall at which -- exact which

4  moment in time.  Maybe it was announced at the SMT

5  conference in 2019, or maybe it was announced a little

6  bit later.  But now, I remember that it was announced in

7  some way around that time.

8      Q.    Sure, thank you.  What do you, as a scholar,

9  know about the editorial practices of review at Spectrum?

10      A.    My experience with Spectrum is very limited,

11  and my experience with Music Theory Spectrum is only as

12  someone who submitted, but was not accepted.

13      Q.    Okay, I'm sorry.

14      A.    I never served on their -- no, no bad feelings.

15          I've never served on their board.  I've

16  reviewed anything for them.  And I've never published

17  anything for them.  I submitted.  And yeah, it was not

18  accepted, so...

19      Q.    When did -- when did you submit this -- sorry

20  for talking over you.  Are you done?  I apologize.

21      A.    I'm done.

22      Q.    All right.  I wanted to ask when you submitted

23  an article to Spectrum.

24      A.    I submitted twice or kind of three times.

25  The first one was around 2019.  No, not around.  Wait.

 1  The first one was around 2018 or '19.

 2      Q.   Um-hum.

 3      A.   And the second time, which was a completely

 4  different article, was in 2023.

 5      Q.   More recent?

 6      A.   Yes.  And that was completely different.

 7  The first time, I actually submitted twice, because I

 8  got a revise and resubmit, and I resubmitted.  And the

 9  resubmitted one was also not accepted, so...

10      Q.   I'm sorry.

11      A.   So it went kind of, shall I say, twice around

12  2018 and '19, because it was a submit and then a

13  resubmit.  And that was one paper.  And the second --

14  a completely different one came in 2023, yes.

15      Q.   Did you read Philip Ewell's publication of

16  his plenary address in Spectrum?

17      A.   Probably.  I don't specifically remember

18  reading it.  Maybe I read parts of it.

19      Q.   Um-hum.

20      A.   I knew already that I was familiar with the

21  plenary address presentation, so I don't recall if I

22  read the entire Spectrum article or not.

23      Q.   Okay.  And you have read articles in Spectrum

24  before, right?

25      A.   Yes.

ELLEN BAKULINA, PH.D.    10/16/2024

1      Q.    Is it your understanding that Spectrum is a

2  peer-reviewed journal?

3      A.    Yes.

4            MS. QUIMBY:  Objection, form.

5      Q.    And here on the Oxford University Press

6  website, in fact, you can tell.  If you skip down to

7  the bottom of page 3, you'll see a URL, a website address

8  here.  Do you see that?  Do I need to expand that a

9  little bit?

10     A.    Please expand, because I can't read.  It's too

11 small.

12     Q.    I understand.  Is that a little better?

13     A.    Yes.

14     Q.    So you see where it says academic.oup.com as

15 the website prefix?

16     A.    Yes, yes.

17     Q.    And as an academic, you understand that OUP is

18 the abbreviation for Oxford University Press, right?

19     A.    Yes.

20     Q.    So again, this is from their website addressing

21 the publication of Spectrum.

22            And it says here, "Music Theory Spectrum

23 practices blind review.  For this reason, authors should

24 avoid identifying themselves directly or indirectly in

25 the submission itself, confining such identification to

*ELLEN BAKULINA, PH.D.    10/16/2024*

1  an accompanying cover letter."

2          Right?

3      A.   Yes.

4      Q.   Was that your understanding of the practice

5  when you submitted articles to Spectrum?

6      A.   Yes, definitely.

7      Q.   Okay.

8          MS. QUIMBY:  Are we at a good point to

9  take a break?  It's been about an hour.

10         MR. ALLEN:  Sure.  I just have another few

11 questions about this, but I'm perfectly happy to take a

12 break, Professor Bakulina, if that is something that

13 would help you.

14         THE WITNESS:  Yes, thank you.  That

15 would very much help.

16         MR. ALLEN:  Let's -- let's go off the

17 record.

18         MS. QUIMBY:  Thank you.

19         THE WITNESS:  Thank you.

20         THE VIDEOGRAPHER:  The time is 10:04 a.m.

21 We're off the record.

22              (Recess taken)

23         THE VIDEOGRAPHER:  It's 10:11 a.m.

24 We're on the record.

25     Q.   Professor Bakulina, I'm going to put up Exhibit

*ELLEN BAKULINA, PH.D.    10/16/2024*

```
 1  5 once again.  I just have one or two more questions
 2  about Exhibit 5.
 3          Again, I'm looking here at page 6 of the
 4  exhibit is Philip Ewell's actual article that begins on
 5  page 324 of the journal, Music Theory's White Racial
 6  Frame.
 7          Do you recognize that article?
 8  A.    Yes.
 9  Q.    When this article came out, do you recall any
10  discussion in the field that this article was not peer
11  reviewed?
12          MS. QUIMBY:  Objection, form.
13  A.    I do not recall discussions of it being not
14  peer reviewed.  I recall discussions about the article.
15  Ewell's work was discussed a lot at the time.
16  Q.    Um-hum.
17  A.    But not the fact that it was not peer reviewed.
18  Q.    Just one more question.  Do you recall any
19  indication in the pages of Spectrum that this article was
20  not peer reviewed?
21          MS. QUIMBY:  Objection, form.
22  A.    I don't remember seeing such an indication.
23  But I can't say for sure if such an indication exists.
24  I would have to read the whole volume.  You know, I don't
25  know if --
```

1      Q.    I understand.

2      A.    Not necessarily on the first page of the

3    article or somewhere else.  But I don't recall seeing

4    such a -- such an indication.

5      Q.    In your experience as an academic and an author

6    of academic journal articles, where would such an

7    indication typically be expressed in the pages of a

8    journal?

9              MS. QUIMBY:  Objection, form.

10     A.    That's a good question.  Where such an

11   indication.  I don't know where it would be.

12     Q.    That's fine.  Now, you mentioned an article by

13   Philip Ewell in the pages of Music Theory Online, right?

14     A.    Yes.

15     Q.    Is it fair to say that was an expanded version

16   of his plenary address?

17             MS. QUIMBY:  Objection, form.

18     A.    I think it's a somewhat difficult question

19   because a full and -- like full, real answer, to answer

20   fully, I would need to reread both.  I would need to

21   reread the entire MTO article by Ewell and relisten to

22   his 2019 plenary address.  I know they are related.  I

23   don't know if it would be fair to say that they're

24   versions of the same thing, but they definitely have

25   the same topic.

1       Q.    Okay, okay.  And the Music Theory Online

2  article was a much longer article than the Spectrum

3  article?

4              MS. QUIMBY:  Objection, form.

5       A.    I don't know.  I...

6       Q.    Are you familiar with the database called

7  Schenker Documents Online?

8       A.    I know it exists.  I've never used it.

9       Q.    Okay.  I want to ask you a few questions about

10  your relationship to Timothy Jackson.

11             Well, before we move off of the Schenker

12  Documents Online topic, do you consider yourself a

13  Schenkerian scholar of music theory?

14       A.    Yes.

15       Q.    I'm not asking you to compare yourself to

16  anyone, but do you consider yourself an expert on

17  Schenkerian analysis?

18       A.    Yes, and I would like to qualify this.  I

19  consider myself an expert on Schenkerian analysis, not

20  on Schenker as a person, not on his biography, which I

21  don't know very well.  But on his analytical system, yes.

22       Q.    Okay.  Now, I want to talk to you about your

23  relationship to Timothy Jackson.  You know the Plaintiff

24  in this civil action, Timothy Jackson, correct?

25       A.    Yes.

1     Q.    Can you explain for the record your

2    relationship to Timothy Jackson?

3                MS. QUIMBY:  Objection, form.  Go ahead.

4    Sorry.

5     A.    We were colleagues between 2016 and '22 at UNT.

6    And as I said, I probably consider music theorists in

7    SMT, you know, members of SMT my colleagues in a more

8    general sense.  So in that sense, yes, my colleague as

9    a music theorist.  We generally had a good collegial

10   relationship most of those years, of course, until this

11   lawsuit began, yes.

12    Q.    Okay.  And when you took your position at the

13   University of North Texas in, I believe that was 2016,

14   you joined the faculty as an assistant professor,

15   correct?

16    A.    Yes.

17    Q.    You were without tenure?

18    A.    Yes, correct.

19    Q.    And when did you achieve tenure?

20    A.    2022, in May.

21    Q.    Did Timothy Jackson oppose your appointment

22   to tenure?

23    A.    No.  To my knowledge, he did not.

24    Q.    Did you ever publish anything together with

25   Timothy Jackson?

1        A.    No.

2        Q.    Did you ever visit Timothy Jackson at his

3    house?

4              MS. QUIMBY:  Objection, form.

5        A.    Yes, once.  I was together with my friend,

6    Gillian Robertson.

7        Q.    And what was the occasion?

8        A.    We were invited.  There was no occasion really.

9    It was just a friendly visit, I guess.

10       Q.    How would you describe your interactions

11   with Timothy Jackson at that time?

12       A.    Colleagues and friends.

13       Q.    Um-hum.  Did you serve on any dissertation

14   committees together?

15       A.    Oh, for that, I would need to review my

16   materials.  Wait, I have to think.  I served on so

17   many committees at UNT.  This is a generally difficult

18   question.  Dissertation committees.  Do you mean -- so

19   Ph.D. dissertation or master's?

20       Q.    Ph.D. committees.

21       A.    Ph.D. dissertations.

22       Q.    With graduate students.

23       A.    You know, I want to say no.  But I'm not

24   100 percent sure, because I know we've been on committees

25   together.

1      Q.    Um-hum.

2      A.    And I'm like maybe 85 percent sure that we were

3    not actually on Ph.D. dissertation committees together.

4      Q.    Okay.

5      A.    But I'd have to review my service at UNT --

6      Q.    Okay.

7      A.    -- to answer 100 percent.

8      Q.    Did you ever observe directly the way Timothy

9    Jackson treated graduate students?

10              MS. QUIMBY:  Objection, form.

11     A.    Yes.  At meetings, like lectures.

12     Q.    Um-hum.

13     A.    I saw their interactions, yes.

14     Q.    And based on your direct observations of

15   Timothy Jackson, how did he treat graduate students to

16   the extent that you were able to see?

17     A.    To the extent that I was able to see, it was

18   all good and friendly and okay in my experience.

19     Q.    And you mentioned serving on various committees

20   with Timothy Jackson.  And it's not

21   important for the record right now that you identify

22   the committees.  I just would like you to state for the

23   record your experience of Timothy Jackson as a colleague

24   in his service with you on those committees.

25     A.    Let's see.  I actually don't remember that many

1  committees where Tim Jackson and I were on together.

2       Q.    Um-hum.

3       A.    But in terms of service on committees, I don't

4  recall anything problematic.  It was okay.

5       Q.    Thank you.  Do you have any knowledge of

6  Timothy Jackson committing extorsion at the University

7  of North Texas?

8              MS. QUIMBY:  Objection, form.

9       A.    I don't know the word "extorsion."  May I

10  be allowed to look it up in a dictionary?  What is

11  extorsion?  I can look it up --

12      Q.    Well, do you know the -- do you know the

13  English word "blackmail"?

14      A.    Could you -- I think, but I'm not 100 percent.

15      Q.    It's a similar --

16      A.    Could you try to explain?  Is it an anonymous

17  thing?

18      Q.    Well, it's a legal term, but it's also

19  generally colloquial term.  So usually what I do in this

20  situation is ask you if you have an understanding of it,

21  and you are telling me you don't know what the word

22  "extortion" means, right?

23      A.    Correct, I don't.

24      Q.    Okay.  Do you have any knowledge of Timothy

25  Jackson mistreating graduate students in any way?

1              MS. QUIMBY:  Objection, form.

2         A.    I have to think.  Possibly, yes.  Yiyi Gao.

3         Q.    Please state for the record how you think

4    Timothy Jackson mistreated Yiyi Gao.

5         A.    I don't know how he mistreated or whether he

6    did.  But I know that she was his student for some time.

7    And in 2000, I think, 18, she switched advisors.

8    Actually, she switched to me.  I know she didn't want

9    to stay with Jackson, Dr. Jackson, as her advisor

10   anymore.  I don't know what happened.

11        Q.    Okay.  And was she a doctoral student?

12        A.    Yes.

13        Q.    Did she complete her dissertation with you?

14        A.    Yes.

15        Q.    And to the extent that you knew about her

16   relationship with Timothy Jackson, you heard that from

17   her?

18             MS. QUIMBY:  Objection, form.

19        A.    Actually, I haven't heard anything from her.

20   She didn't tell me.  I just know the fact that she left

21   Timothy Jackson as her advisor, and that's highly unusual

22   to leave an advisor.  More often than not, a graduate

23   student stays with the same advisor.  So just the fact

24   alone that she had left him as an advisor stands out.

25   It's very unusual.

1        Q.    At the time that she switched from Timothy

2   Jackson to you as her advisor, did you have any suspicion

3   that Timothy Jackson had engaged in any criminal activity

4   that led her to switch?

5              MS. QUIMBY:  Objection, form.

6        A.    Definitely not.  I was not.

7        Q.    Okay.  Can you identify any specific actions

8   that Timothy Jackson committed that you identify as

9   racist?

10             MS. QUIMBY:  Objection, form.

11       A.    I have to think.  Could you repeat the

12  question?

13       Q.    Sure.  Can you -- or please identify for the

14  record any specific actions that you claim were racist

15  that were committed by Timothy Jackson.

16       A.    Is a journal article -- does a journal article

17  count as an action?

18       Q.    Well, it would be what you understand it to be.

19  If you want to say that publishing a journal article was

20  something that he did that was racist, you can say that

21  for the record.

22             MS. QUIMBY:  Objection, form.

23       A.    Yes.  Some of the things that Timothy Jackson

24  published in his 2020 Journal of Schenkerian Studies

25  article, I believe are racist.  That is my own opinion.

1  That's not something that I shared with, you know,

2  anyone.  It's my personal opinion.

3      Q.   I understand that.  And we'll talk about that

4  in a second.

5      A.   Um-hum.

6      Q.   In addition to publishing an article in the

7  2020 volume of the Journal of Schenkerian Studies, are

8  there any other actions that Timothy Jackson engaged in

9  that you would identify as racist actions?

10     A.   No.

11     Q.   Are there any behaviors that Timothy Jackson

12 has engaged in that, to your knowledge, are racist?

13     A.   No.

14          MS. QUIMBY:  Objection, form.

15     Q.   Have you ever been told by any individual

16 that Timothy Jackson engaged in specific actions that

17 were racist?

18          MS. QUIMBY:  Objection, form.

19     A.   I think the best answer would be I don't

20 remember.

21     Q.   Okay.  Do you not remember because it didn't

22 happen, or do you not remember because it may have

23 happened and you just can't recall the specifics of it?

24     A.   Yes, it's the latter.  There has been a lot

25 of discussion of what happened in SMT and writings and

1  behavior of many people, including Philip Ewell,

2  including many, many people, including Timothy Jackson.

3  And I cannot remember everything that was said.

4      Q.   Okay.  But as you sit here today, you can't

5  give specific testimony about behaviors that someone

6  told you about that were racist regarding Timothy

7  Jackson?

8      A.   No.  I cannot, no.

9           MS. QUIMBY:  Objection, form.

10     Q.   Thank you.  Let's go back to what you said

11 about the 2020 article in the Journal of Schenkerian

12 Studies.  Are you referring to the article he published

13 in the Symposium of Volume 12?

14     A.   Yes.

15     Q.   What -- and I understand you're stating that

16 it's your opinion.  So what, in your opinion, was racist

17 that Timothy Jackson published in his 2020 article?

18     A.   So I'm going to go by my memory, which means

19 that it may not be exact wording.

20     Q.   That's fine.

21     A.   But the statement about the paucity of the

22 Black women and men being due to the fact that these

23 people grow up in homes that don't have enough -- that

24 don't value classical music enough.  So that's an

25 approximate quote from Timothy Jackson's article.

1       Q.    Um-hum.

2       A.    And in my personal opinion, that is racist,

3  because the implication of this statement, of this

4  sentence, is that music theory is inherently based on

5  classical music, on the culture of classical music, of

6  the principles and history of classical music.  And

7  Dr. Jackson doesn't actually say which classical music.

8            Because, in fact, Europe is not the only

9  place on earth that has classical music.  There are many

10  different cultures that have music that they would call

11  classical.  For example, there is such a thing as Indian

12  classical music.  But I'm going to infer from context

13  that Dr. Jackson refers to European classical music.

14      Q.    Um-hum.

15      A.    And so this statement by him, that music theory

16  depends or the practice of music theory depends

17  on how much classical music or how much exposure to

18  classical music its practitioners have had in their

19  childhood ties the discipline of music theory to music

20  by -- primarily by white people.  I understand that

21  European classical music includes some nonwhite persons,

22  composers before and so on, but it is primarily culture

23  of white European people.

24            And that, I think, is a racist idea, because

25  music theory as a field, in my opinion, is and should

1    be a theory of all music, not only classical, not only

2    European, not only white people, not only nonwhite

3    people.  Music theory, as a discipline, should be based

4    or related to any music from this planet.  So the

5    practice of music theory and the disciplinary basis of

6    music theory should not be understood in relation to

7    European classical music alone.

8        Q.    So I'm sorry.  Were you done?

9        A.    To understand it that way, in my view, is

10   racist.

11       Q.    Um-hum.  And have you published on that

12   subject?

13       A.    No.

14       Q.    It sounds like you have just made an argument

15   that music theory should address all music, correct?

16            MS. QUIMBY:  Objection, form.

17       A.    I didn't say that.  Music theory, as a

18   discipline, should be open to addressing music from

19   anywhere on the planet.

20       Q.    So wouldn't that mean that a Black scholar who

21   wanted to enter the field of music theory should address

22   the field of Western classical music?

23            MS. QUIMBY:  Objection, form.

24       A.    Could you repeat?  I think I'm confused by

25   the formulation wouldn't, because if it's like yes or

1 | no, I'm confused about the positive versus negative.

2     Q.    Well, let's -- let's take Philip Ewell as

3 | an example.

4     A.    Sure.

5     Q.    He was a colleague of yours, right?

6     A.    In terms of music theory as a field, yes.

7     Q.    And you know him personally, correct?

8     A.    Oh, yes, I know him quite closely.

9     Q.    And you know him to have engaged with the field

10 | of Western classical music as well, right?

11     A.    Yes, if you include Russian in the category

12 | of Western, which, in my opinion, is somewhat ambiguous.

13     Q.    Should a Black musical scholar such as Philip

14 | Ewell, to be a practicing academic, be in a position to

15 | address Western classical music?

16           MS. QUIMBY:  Objection, form.

17     A.    I'm in no position to dictate whether someone

18 | should address something.  So if I say that a Black

19 | person should address something or should not address

20 | something would be extremely arrogant because I think a

21 | Black scholar, just like any scholar, should address

22 | whatever they feel like addressing.  They should not be

23 | limited.

24     Q.    Do you recall Timothy Jackson making an

25 | argument that on average, Black families did or did not

```
 1  expose their children to classical music?

 2       A.    I -- he wrote it in the article, yes.

 3       Q.    Do you know of any statistical or empirical

 4  evidence that Black families as a whole in the United

 5  States exposed their children to classical music?

 6             MS. QUIMBY:  Objection, form.

 7       A.    I'm not familiar with any statistical studies,

 8  but also I'm not a statistical scholar, no.

 9       Q.    You have no basis to state that what he wrote

10  is not true then?

11             MS. QUIMBY:  Objection, form.

12       A.    I have no basis.  But my argument is not about

13  statistical truth.  My argument is about the relationship

14  that he has created between the discipline of music

15  theory and exposure to classical European music.  My

16  argument is not about statistics.  My argument is about

17  the relationship.

18       Q.    In addition to -- I think you said in

19  identifying what you found racist in the 2020 article was

20  that the paucity of Black scholars in music theory was

21  due to the -- I suppose however you want to characterize

22  it, the lack of Black scholars' engagement or Black

23  citizens' perhaps engagement with Western classical

24  music.  I'm not trying to put words in your mouth.  But

25  that's one of the racist things you found in the article,
```

1  right?

2            MS. QUIMBY:  Objection, form.

3       A.    Yes.  And what I'm finding racist is the

4  relationship that Timothy Jackson creates between

5  practicing music theory as a discipline and classical

6  European music specifically.  That's what I find

7  problematic.

8       Q.    In addition to that claim, what other

9  statements by Timothy Jackson in his 2020 article did

10  you find, quote, racist?

11       A.    There are two more, and I want to qualify.

12  One is actually not by Timothy Jackson himself.  It's

13  actually by Schenker, and Dr. Jackson quotes Schenker at

14  some point in the 2020 article.  And the quote is, and

15  again, I'm paraphrasing, that Schenker is saying that any

16  person who practices the rules -- not rules.  Any person

17  who practices the laws of classical music or something

18  like that can be a great musician, something to that

19  effect.  And that's actually an example of a colorblind

20  racism, which is when someone says I don't care which

21  race this or that person is.  I just care what they do.

22  That's colorblind racism.  But that's actually a code

23  from Schenker.  It's not what Jackson himself wrote.

24  However, I do think that Dr. Jackson quoted that as sort

25  of a way to try to absolve Schenker.  That, you know,

1  Schenker, towards the end of his life, thought that

2  everyone was equal, so he became less racist.  I don't

3  know if it's true.  Maybe it's true that Schenker

4  became less racist towards the end of his life.  That's

5  possible.  But I'm not actually making that claim.  But

6  I don't think that this specific quote, that anyone who

7  practices the laws of, you know, of tonal music can

8  become a great musician.  I don't think that this

9  removes racism.  I think that this actually exemplifies

10  colorblind racism.

11      Q.    Do you understand Timothy Jackson to be arguing

12  that Black Americans cannot master classical music?

13              MS. QUIMBY:  Objection, form.

14      A.    No, that's not what he ever saw or what he ever

15  said.

16      Q.    And by this colorblind racism idea, do you mean

17  that, for instance, judging musicians on the basis of

18  their merit alone, whether they're Black, white, BIPOC,

19  whatever, from whatever country, from whatever historical

20  national background, that's racist?

21              MS. QUIMBY:  Objection, form.

22      A.    I'm not saying it.  But it has been argued.

23  And yes, I -- for the moment, I think I would adopt that,

24  yes.  I think the concept of colorblind racism, I got

25  that from the work of Ibram Kendi, one of the theorists

1  of critical race theory.

2       Q.   Um-hum.

3       A.   And that is the idea of colorblind racism; that

4  judging someone solely on the basis of merit without

5  considering their race is colorblind racism.

6       Q.   And do you believe Timothy Jackson was

7  expressing this, quote, colorblind racism in his 2020

8  article in the Journal of Schenkerian Studies?

9       A.   He endorsed --

10            MS. QUIMBY:  Objection, form.

11            THE WITNESS:  I'm so sorry.  I constantly

12 speak too fast.

13            MS. QUIMBY:  That's okay.

14      A.   Jackson quotes Schenker who exhibits colorblind

15 racism.  And in my understanding, Jackson -- the purpose

16 of this quote was to show that Schenker became less

17 racist towards the end of his life.

18      Q.   And that's also something, in your opinion,

19 is racist in the 2020 article, right?

20            MS. QUIMBY:  Objection, form.

21      A.   It would depend on how to define racism, in

22 my opinion.

23      Q.   Well, that's what I'm trying to get at.

24 We're trying to identify in Timothy Jackson's 2020

25 article what, in your opinion, is racist, which is

1  something you've already testified to; that you found

2  the article to have committed thoughts or utterances

3  that you found racist.  And I'm trying to identify

4  specifically what you mean.

5          So far, you've identified what you call the

6  paucity of Black scholars in the academic discipline of

7  music.  You've also identified this quote from Schenker

8  that seems to be used by Professor Jackson to endorse

9  colorblind racism in your view.

10          Did I get that right so far?

11     A.    Yes, that's correct.  Yes, yes, yes.

12     Q.    You also mentioned that there were three and

13  we've gone through two.  So I was going to ask if you can

14  identify the third concept or utterance that you found

15  racist in Timothy Jackson's 2020 article.

16     A.    The third one, I won't say -- I will not say

17  that it is racist, but I find it highly problematic.

18  It's the passage where Timothy Jackson discusses the

19  Black on Jew antisemitism.  And I know that this problem

20  exists, but the problem in Jackson's article is that he

21  places Ewell's -- Philip Ewell's ideas in the context of

22  antisemitism.  And I think I should not say that, in

23  itself, is racist.  But the objective here seems to be

24  to show that Philip Ewell is antisemitic.  And that, in

25  itself, is not racism.  But it is an attack on Philip

1  Ewell.  And in my opinion, that's a problem.  So I guess

2  I should not say that, in itself, it's racist, but I find

3  it to be problematic.

4      Q.    Was it problematic when Philip Ewell attacked

5  Timothy Jackson as racist?

6            MS. QUIMBY:  Objection, form.

7      A.    I don't remember that Philip Ewell ever did

8  that.

9      Q.    Was it racist for others to attack Timothy

10  Jackson as racist?

11            MS. QUIMBY:  Objection, form.

12      A.    I cannot speculate like that.  I'd have to see

13  specific context, a specific piece of writing.  I cannot

14  hypothesize like this.

15      Q.    Were you aware that the SMT graduate students

16  who signed the statement calling for the cancellation of

17  the Journal and that a discipline of Timothy Jackson

18  accused him of being racist?

19            MS. QUIMBY:  Objection, form.

20      A.    If I might look at the letter again right now,

21  then I might be able to answer more precisely.

22      Q.    Okay.  We'll get to that later.  But just the

23  three things that you've identified as -- I guess you

24  said racist, but also problematic in the 2020 article

25  is that he discussed Black American antisemitism towards

1  Jews.  Did I get that right?

2        A.    Yes.

3        Q.    He discussed a quote from Schenker that you

4  felt problematically endorsed colorblind racism?

5        A.    Yes.

6        Q.    And also, he identified the paucity of the

7  Black scholars in music as due to a failure of the Black

8  community to value classical music.

9        A.    Yes.

10        Q.    About the third element, identifying

11  antisemitism in the Black community --

12        A.    Um-hum.

13        Q.    -- are you aware of any articles published, any

14  scholarship indicating that his statements about

15  antisemitism in the Black community are empirically

16  false?

17              MS. QUIMBY:  Objection, form.

18        A.    I'm not stating that it is empirically false.

19  In fact, Dr. Jackson cites articles about this topic,

20  about Black antisemitism.  So there are publications.

21  I haven't read them, but I remember that they exist.

22  He cites them.  So it's not empirically false.  The

23  problem that I see is not empirical.  The problem that I

24  see is that he connects a specific scholar who is arguing

25  for changes in music theory to deal with antisemitism.

1   That is the problem.  It's not empirical.

2        Q.    Is that -- the problems that you identified in

3   the 2020 article by Timothy Jackson, do those justify

4   stopping the publication of the Journal of Schenkerian

5   Studies?

6                 MS. QUIMBY:  Objection, form.

7        A.    Do they justify stopping the publication of the

8   Journal?  I'm not sure.  It's a very big question.

9   The stopping of the publication of the Journal of

10  Schenkerian Studies was related to many problems.

11  They're very complicated.  I cannot relate of the

12  stopping of that publication to a single problem.

13       Q.    Well, why don't you name the problems with

14  the publishing of the Journal that you think led to this

15  stopping of its publication?

16       A.    Okay.  In my opinion, so this is not in -- this

17  is not someone else's opinion, right?  This is not

18  something that I share with others.  It's my own opinion.

19            In my honest opinion, what led to the stopping

20  of Journal of Schenkerian Studies publication -- by the

21  way, I don't know if it has -- if it has been stopped

22  forever.  I don't know what's going on right now.

23            But what led to the interruption of its

24  publication in the year 2020 was the fact that many

25  authors, not all, but many authors in the 2020 Symposium

1  positioned themselves in -- as antagonists of Ewell.

2  And in so doing, they positioned themselves as

3  antagonists of changes in the discipline.  And I'm not

4  speaking of just any one article or any one person,

5  but more as the sort of philosophical core of that

6  volume.  And so to understand what I just said, we need

7  to understand what was happening in music theory around

8  that time, right before the pandemic in 2019.

9        What Ewell, in his keynote address in 2019

10  did was he argued in favor of changes in the field.  And

11  those changes would be to make the field more inclusive.

12        Q.    Um-hum.

13        A.    And the fact that so many authors in the 2020

14  JSS Symposium positioned themselves in a position to

15  this, showed that these authors were opposed to these

16  changes.  They were opposed or at least they did not like

17  to see someone arguing for changes and for inclusivity

18  and to make the field more open.

19        Q.    Um-hum.

20        A.    So the problems are really disciplinary and

21  they're quite broad.  So it's not any one article.

22        Q.    Okay.  And in addition to -- I think what you

23  called a philosophical core of the volume, what other

24  problems were there with the Journal that, in your view,

25  justified its stopping publication?  Or I think you

 1  characterized it the interruption of the Journal in
 2  2020.
 3       A.    Yes.
 4             MS. QUIMBY:   Objection, form.
 5       A.    Yes.  I do think that the lack of peer review
 6  for those articles --
 7       Q.    Um-hum.
 8       A.    -- in the Symposium were also part of the
 9  problem.  So let me explain more.
10             Yes.  I completely understand that sometimes,
11  even in journals that are generally peer reviewed, some
12  articles are not peer reviewed.  We've already discussed
13  that.  And yes, that is true.  I don't know if it's a
14  good thing, but it's a realty.  Most articles are peer
15  reviewed, some aren't.
16             The problem in this case is not only the fact
17  that those articles were not peer reviewed.  It is sort
18  of a combination of several things.  It's the fact that
19  these articles, this Symposium, most articles in the
20  2020 JSS Symposium remained polemically in relation to
21  Philip Ewell's keynote.  They were directed at a specific
22  person who identifies as Black, Philip Ewell, they're
23  meant in opposition, and they're arguing against things
24  that Philip Ewell said.  In this sense, they are
25  polemical.  So that's one problem.

1          The second problem is that they're polemical

2    in relation to an extremely sensitive issue, which is the

3    issue of race, identity, inclusion, belonging.  And with

4    all of that, with this extremely painful and sensitive

5    topic, these articles were not peer reviewed.  So the

6    problem is not simply the lack of peer review.  The

7    problem is the combination of the lack of peer review

8    with the sensitive and painful and polemical nature of

9    many of these articles.  Not all, but many.

10        Q.   All right.  Now, in your experience as a

11   scholar and some -- well, let me back up.

12             You've reviewed articles for journals before

13   yourself, haven't you?

14        A.   Yes.

15        Q.   So you know the entire process, from the front

16   end to the back end, as an author and as a reviewer, and

17   now as a member of the editorial board of at least one

18   journal, right?

19        A.   Correct.

20        Q.   So in your view, how would peer review have

21   changed the Volume 20 Symposium of the Journal of

22   Schenkerian Studies?

23             MS. QUIMBY:  Form.

24        A.   You are asking me to speculate.  And I should

25   not do it, but I can say what I would have done if I was

1  asked to peer review, if you tell me which specific

2  article.

3       Q.    Well, let's take Timothy Jackson's article.

4  How do you think it would be different if it was

5  subjected to peer review?

6            MS. QUIMBY:  Objection, form.

7       A.    To my peer review or someone else's peer

8  review?  Because every person is different.

9       Q.    Well, you've said that it was especially

10 important to peer review the articles, because they were

11 addressing polemically controversial ideas published by

12 a Black person, Philip Ewell, arguing against a Black

13 person on issues of race that are very sensitive and

14 painful.  So how would that be different?  How would

15 Timothy's journal article and -- how would Timothy

16 Jackson's Journal article in 2020 in the Symposium of

17 the Journal of Schenkerian Studies be different if it

18 was subjected to peer review?

19           MS. QUIMBY:  Objection, form.

20      A.    I think that unfortunately, the question is too

21 general, and it asks me to hypothesize about what would

22 have happened, but I don't know who would do it.

23 If you ask me about what I specifically would do, I

24 could actually answer.

25      Q.    If you were asked to peer review Timothy

1  Jackson's Journal article, how would it turn out

2  differently, the Journal article?

3            MS. QUIMBY:  Objection, form.

4       A.    I primarily would have suggested to soften

5  the language when it comes to the discussion of race.

6       Q.    Um-hum.

7       A.    And the specific discussion of Ewell.

8       Q.    Is that more of a matter of tone?

9            MS. QUIMBY:  Objection, form.

10      A.    No.  It's both a matter of tone and substance.

11      Q.    So as a peer reviewer, you would have urged him

12  to change the very substance of his article, correct?

13            MS. QUIMBY:  Objection, form.

14      A.    I would have suggested changes.  And of course,

15  the -- normally, the process of peer review involves more

16  than just reviewers.  It would also

17  involve an editor, which, in this case, is another

18  problem.  But I would have made suggestions about it,

19  which is completely normal, by the way.  I have reviewed

20  many articles, and I always make suggestions for

21  substantive changes.  Yes, that's completely normal.

22      Q.    So I'm just trying to make a list based on your

23  testimony of the reasons which you've said are complex,

24  why the Journal's publication was interrupted

25  in 2020, as you've characterized it.  And now, we've got

1    the philosophical core of the Journal was one reason, and

2    the lack of peer review is another.  What other reasons

3    would you identify as reasons for interrupting the

4    publication of the Journal of Schenkerian Studies?

5                MS. QUIMBY:  Objection, form.

6        A.    Okay.  Let's see.  The lack of peer review

7    and the -- I think I would identify a third problem, but

8    that third problem is not only about Volume 12 of this

9    article, it's more general.

10       Q.    Um-hum.

11       A.    The editorial structure of the Journal was

12   extremely unclear.  I was on its editorial board for

13   several years, and I never knew what was expected of me.

14   Nobody ever gave me clear instructions of what to do.  By

15   the way, at this point, and this is some years later,

16   I know much more clear with what a peer reviewer is

17   supposed to do.  But the first time I entered the

18   editorial board of JSS was when I was in my early

19   thirties.  And at that time, I knew much less.  And I

20   was never explained clearly what to do.  And generally,

21   the process and the principles of how the Journal looked

22   felt chaotic and disorder, like it didn't have clear

23   order or rules.  And that's another reason why I

24   personally think that the Journal needed to be --

25   needed to change, needed to be restructured, needed to

1  be rethought.

2      Q.    And the unclear editorial structure you've

3  now identified as another reason why the Journal of

4  Schenkerian Studies should have been interrupted in 2020,

5  are there any additional reasons that you can identify?

6              MS. QUIMBY:  Objection, form.

7      A.    Could you remind me what the first was?

8      Q.    Sure.  There was -- you identified many of the

9  authors took a position that was critical of Ewell, and

10  this was the philosophical core of the volume.  There was

11  a lack of peer review.  We'll just leave it at that.  And

12  there was this editorial structure, which was unclear.

13  Those are the three reasons I have so far.  Can you

14  identify any other reasons?

15      A.    No, that's it.

16      Q.    Okay.  So as you sit here today, you can't

17  identify any other than those three reasons?

18              MS. QUIMBY:  Objection, form.

19      Q.    I just want to tie a bow in it.  That's all.

20      A.    I cannot identify right now.  Maybe if I had

21  more information, maybe I would see more reasons.  Right

22  now, I can't.

23              MR. ALLEN:  Okay.  Thank you.  It's been

24  another hour.  I was just going to suggest that maybe we

25  go off the record, please.

1              THE VIDEOGRAPHER:  The time is 10:59 a.m.

2  We're off the record.

3                    (Recess taken)

4              THE VIDEOGRAPHER:  The time is 11:11 a.m.

5  We are on the record.

6      Q.    Thank you, Professor Bakulina.  I wanted to

7  transition to talking about the call for papers in the

8  Journal of Schenkerian Studies in that winter of 2019,

9  early months of 2020.  But before I do that, I wanted to

10  ask if you were aware that there were three peer-reviewed

11  articles published alongside the Symposium in the Journal

12  of Schenkerian Studies in 2020?

13      A.    I did not know how many, but I was definitely

14  aware that there would be other journals -- other

15  articles of the Journal, in fact.  Yes, I did.  Yeah,

16  I knew that.

17      Q.    Did you learn of any objections to those three

18  articles?

19              MS. QUIMBY:  Objection, form.

20      A.    I think that one of the letters, I forget

21  which, but not the one that UNT faculty signed, one of

22  the other letters mentioned that they had a problem with

23  the entire issue of the Journal, and that's actually a

24  problem because the entire issue of the Journal is

25  larger; that it contains more than just the Symposium

1  on Ewell's.

2      Q.    Right.  Were there any -- but my question is

3  has anyone, to your knowledge, ever attacked those three

4  articles?

5      A.    To my knowledge, no, never.  No one.

6      Q.    The structural problems you've identified with

7  the editorial process at the Journal did not affect those

8  three articles?

9              MS. QUIMBY:  Objection, form.

10      A.    To my knowledge, it didn't.  I actually don't

11  know about all of those, all of those three articles.  I

12  don't know about how each of them was reviewed or not or

13  how it was -- how it made its way into the Journal.  I

14  know about one.

15      Q.    Which one is that?

16      A.    Nicholas Stoia, I was one of the reviewers.

17      Q.    Did you recommend it for publication?

18      A.    Yes.

19      Q.    Do you think it's a valid scholarly article?

20              MS. QUIMBY:  Objection, form.

21      A.    Well, I recommended it for publication.  My

22  report was sent to the -- to Ben Graf.

23      Q.    Benjamin Graf being the editor of the Journal

24  of Schenkerian Studies at the time?

25      A.    At the time, yes.  I sent my report in 2019, in

1  the fall of 2019.

2      Q.    And just for purposes of the record,

3  Mr. Benjamin Graf is a teaching professor at the

4  University of North Texas, correct?

5              MS. QUIMBY:  Objection, form.

6      Q.    If you know?

7      A.    I think he's a lecturer.

8      Q.    Okay.  So some of this, you've already done for

9  the record.  But can you reprize or just review briefly

10  your relationship to the Journal of Schenkerian Studies

11  while you were an employee at the University

12  of North Texas?

13      A.    I became a member of its editorial board.  I

14  don't remember which year, but maybe 2017 or so.  And

15  that was my only involve -- my only type of involvement

16  with the Journal.  I never published in the Journal.

17  Yes, that's it.

18      Q.    Did you resign from the Journal of Schenkerian

19  Studies editorial board at some point?

20      A.    Yes, I did.

21      Q.    When was that?

22      A.    2020.

23      Q.    Was it following the publication of Volume 12?

24      A.    Yes.

25      Q.    Can you explain your role in the publication of

1    Volume 12 of the Journal of Schenkerian Studies?

2                    MS. QUIMBY:  Objection, form.

3        A.    My role in the publication process?

4        Q.    Um-hum.

5        A.    I participated in reviewing the call for

6    papers.  And I was the recipient of several emails from

7    Timothy Jackson of some of the materials that later in

8    the revised form became part of his article in Volume 12.

9        Q.    In addition to reviewing these emails and

10   participating in the formulation of the call for papers,

11   did you have any other role in the publication process

12   for Volume 12 of the Journal of Schenkerian Studies?

13                   MS. QUIMBY:  Objection, form.

14       A.    Let's see.  There was also a verbal discussion.

15   And the topic -- topics of the verbal discussions were

16   very similar to those of the emails.

17   And I mean discussions with Timothy Jackson, who would

18   sometimes come into my office and talk about these

19   topics.  That's it.  Nothing else.

20       Q.    I was going to ask you where these

21   conversations took place.  They were in your office?

22       A.    Um-hum.

23       Q.    One-on-one with Professor Jackson or also

24   sometimes with others or --

25       A.    To be honest, I don't recall right now.

1  I think that sometimes he came into my office on -- by

2  himself, so that would be him and me.  I don't remember

3  much more than that.

4      Q.    Okay.  What initiated your -- let's just take

5  the process that led to issuing the call for papers.

6      A.    Um-hum.

7      Q.    As you sit here today, can you identify a

8  beginning point?  I know that there was a paper by

9  Philip Ewell sometime in the early weeks of November

10 2019, but I'm talking about UNT.  What was the initiation

11 of this process with the Journal that led to the issuing

12 of a call for papers?

13         MS. QUIMBY:  Objection, form.

14     A.    The initiation came from Timothy Jackson.  He

15 began to discuss Ewell's key -- sorry.  Ewell's 2019

16 thing, the paper from SMT, keynote.  And that was the

17 initiation.  And so did Stephen Slottow.  Both of them

18 initiated, I'd say.

19     Q.    Is that normal in academic life, to discuss a

20 paper like that?

21         MS. QUIMBY:  Objection, form.

22     A.    I have no idea what is normal.  I cannot

23 represent normal.

24     Q.    Was it unusual for you to discuss papers

25 that were given at the STM with your colleagues?

1          A.    No.  That, in itself, was not unusual, no.

2                MR. ALLEN:  Okay.  Madam Court Reporter,

3    are we up to Exhibit 6?

4                THE REPORTER:  Yes, that's right.

5                (Deposition Exhibit Number 6 marked.)

6          Q.    I'm going to mark for the record an exhibit,

7    Professor Bakulina.  I'm putting it in the chat now, and

8    I'm going to publish it to the record here.  This is an

9    email, Exhibit 6, which is entitled, Not everyone was

10   enthusiastic about Ewell's talk.  It's Bates stamped

11   JACKS 86826.  It's dated November 15th, 2019, and it is

12   an email from Timothy Jackson to you, among other people.

13         A.    Um-hum.

14         Q.    Have I characterized the email correctly?

15         A.    Yes.

16         Q.    And just for the record, this is your email

17   address while you were an employee at the University of

18   North Texas?

19         A.    Yes.

20         Q.    In this "To" line?

21         A.    Yes, yes.

22         Q.    So if we see a document that has that email in

23   it, it would have been either sent or received by you?

24         A.    Yes.

25         Q.    So this is November 15th, 2019.  Is this the

1 email that you remember initiating this conversation

2 about the Ewell paper and maybe addressing this through

3 the pages of the Journal of Schenkerian Studies?

4                   MS. QUIMBY:  Objection, form.

5       A.   I don't remember if it was this specific

6 email that initiated it.  In fact, I don't recall what

7 initiated, was it an in-person conversation first or

8 email first.  I can't recall.  It was too long ago.

9       Q.   Okay.  Is it accurate to say this conversation

10 began around this time, the middle of November of 2019?

11                  MS. QUIMBY:  Objection, form.

12      A.   Yes.

13      Q.   Did you consider anything racist about this

14 email?

15                  MS. QUIMBY:  Objection, form.

16      A.   So I would need to read it.  And because it's

17 very small right now, may I ask to make it bigger, and I

18 will read?

19      Q.   I want to make it as big as I can, but I'm

20 mindful that we don't want it to -- I think that's -- can

21 you read that?

22      A.   Yes.  Wait, don't move.  Let's see.  Yes, yes,

23 I can read it.  Okay.

24      Q.   Just ask me when you need me to scroll down.

25 I understand that it's not helpful for me to scroll all

1  over the place while you are trying to focus.

2       A.    Sure.  Can you please move up a little as well?

3       Q.    Absolutely.

4       A.    Okay.  Not everyone (reading softly)...

5       Q.    And Professor Bakulina, can I ask you not to

6  read out loud?  Because I don't want the court reporter

7  to record what may or may not be even audible.  Thank

8  you.

9       A.    Okay.  I'll try not to.  Okay.  You can scroll.

10      Q.    And that's just the very end of the email.

11 Just so you know, there's nothing else.  See?  There you

12 go.

13      A.    Okay.  Just one minute.

14      Q.    Have you been able to review it?

15      A.    Yes.

16      Q.    Okay.

17      A.    Remind me of the question.  I think I'm ready

18 to answer now.

19      Q.    Okay.  So my question for you is, is it your

20 opinion that there is something racist in this email?

21      A.    No, it's not my opinion.

22      Q.    Can you explain in as much detail as you can

23 remember the process of formulating the call for papers?

24      A.    The -- so it was formulated in email.  And the

25 people involved in the emails were Timothy Jackson, Levi

1  Walls who was the student editor at the time, Benjamin

2  Graf who was the outgoing editor.  Yes, outgoing.

3      Q.    Um-hum.

4      A.    Let's see.  I was on those emails and maybe

5  other people.  I don't remember.

6      Q.    Um-hum.

7      A.    And so it was, you know, back and forth.  I

8  can't recall who formulated what, but it's all in the

9  emails, so...

10     Q.    Okay.

11     A.    That can be -- you know, one can follow in

12 the emails.

13     Q.    Let's see if we can't get a clear picture

14 from some of the contemporary emails.

15                   (Deposition Exhibit Number 7 marked.)

16     Q.    I'm going to introduce into the record as

17 Exhibit 7 a rather large document, Professor Bakulina.

18 This is a document that Timothy Jackson submitted to

19 the so-called ad hoc panel that was convened to

20 investigate the Journal of Schenkerian Studies.  I don't

21 have any expectation that you know all of these emails,

22 but it was an attempt.  I'm just going to represent to

23 you it was an attempt by my client to provide the

24 committee with the internal correspondence related to

25 the publication of Volume 12.  So I'll also dump this

1  into the chat, so everyone can have it.  That's not the

2  right one.  Hang on.  One second.  I just want to make

3  sure.  Yeah, this is the right one.  Okay, good.  It's

4  rather large, so it's almost two megabytes.  It may take

5  some time to arrive.

6      A.   Um-hum.

7      Q.   Now, I'm going to help us navigate.  Do you see

8  in the lower left-hand corner, there are page numbers

9  that are UNT five digits?  Four digits?  Do you see

10  those?

11     A.   138?  No.

12     Q.   Do you see in the bottom left-hand corner,

13 there's UNT 2645?

14     A.   Yes.

15     Q.   Those are called Bates numbers.  And the

16 attorneys assigned those numbers to documents.  They

17 form a continuous series, so that the entire series of

18 documents produced in the case have a continuous run of

19 page numbers.

20     A.   Um-hum.

21     Q.   So I'd like to direct you to Bates

22 number 2657.  Do you see that on your screen here?

23     A.   Yes.

24     Q.   And this is a -- excuse me -- a series of

25 emails in which you are participating?

1         A.    Um-hum.

2         Q.    And this is your email here at the top,

3    correct?

4         A.    Yes.

5         Q.    And this is an email from December 1st, 2019 at

6    the top, and it continues on down.  Did I characterize

7    that correctly for the record?

8         A.    Um-hum, yes.

9         Q.    In this first email on December 1st, 2019,

10   at about 6:53 p.m., it looks like you're discussing the

11   SMT plenary session.  Is that fair to say?

12        A.    Yes.

13        Q.    And I believe you testified to this earlier;

14   that it was announced right before the presentation that

15   the plenary talks would be published in Music Theory

16   Spectrum, right?

17        A.    Yes.

18        Q.    Do you recall this discussion, Professor

19   Bakulina?

20        A.    Yes.  I recall these emails, yes.

21        Q.    Um-hum.  And what was your purpose in writing

22   this first email on December 1st at 6:53 p.m.?

23        A.    Please give me a minute to read.

24        Q.    Absolutely.

25        A.    Yes.  So the purpose of this email was to

1  suggest that we should not publish the call for papers or

2  call for responses at that time; that instead, we should

3  wait for Ewell's paper -- Ewell's -- the publication of

4  Ewell's article in Music Theory Spectrum.  I thought that

5  the call for papers was premature.

6      Q.    And what was the reasons of other people

7  working on the Journal at that time?

8            MS. QUIMBY:  Objection, form.

9      A.    Well, one of the responses is right in front of

10  us.  Levi Walls seems to say that this complicates the

11  matter.

12      Q.    Okay.

13      A.    That it suggests that Levi also knew about

14  this, and he thought it would also make sense to wait

15  with the call for --

16            UNIDENTIFIED MALE VOICE:  No, it doesn't

17  say that.

18            MR. ALLEN:  Who is speaking right now?

19  I'm sorry, Professor Bakulina.  Whoever is speaking, you

20  are not the witness.  The witness is Ellen Bakulina.

21      Q.    I'm sorry, Professor Bakulina, can you

22  continue?

23      A.    That's all.  So the response by Levi agrees

24  that the forthcoming article by Ewell complicates the

25  matters.

```
 1        Q.    And that's an email on Sunday, December 1st,
 2   2019, at 7:51 p.m.?
 3        A.    Yes.
 4        Q.    Okay.  And then it looks like the discussion
 5   continues.  There's an email which appears to be from
 6   Timothy Jackson on Sunday, December 1st, even later in
 7   the evening, at 10:06 p.m.  Right?
 8        A.    Yes.
 9        Q.    And Timothy says to you all, "All things
10   considered, JSS should go forward with the call as
11   planned."
12         Right?
13        A.    Yes.
14        Q.    Do you remember getting that email?
15        A.    Quite honestly, I don't remember getting this
16   email.  I remember reading it at some point later on.  I
17   don't remember getting this email.
18        Q.    And do you see after that, there's a response
19   from Benjamin Graf on December 2nd, 2019, at 9:14 in the
20   morning?
21        A.    Yes, I see it.
22        Q.    And what did Benjamin Graf say?
23        A.    Do you want me to quote?
24        Q.    Sure.  Can you just please read that into
25   the record?
```

1          A.    "From Benjamin Graf's email."

2          Q.    Um-hum.

3          A.    "I agree with Tim.  We should go forward with

4    the call and be open to publishing more on this matter in

5    future publications."

6          Q.    And just to back up to the email Timothy

7    Jackson had sent the day before, he also addressed

8    whether there could be the possibility of additional

9    responses, correct?

10         A.    Let's see.  Give me a minute.  Yes.

11               MS. QUIMBY:  I'm sorry.  Before we

12   continue, can we take a moment to clarify who spoke on

13   the record just a minute ago?  It's my understanding

14   that it wasn't Renaldo, and I'm not sure.

15               MR. ALLEN:  I honestly don't know.  If

16   they want -- I mean, it was a male voice.

17               MS. QUIMBY:  I'd just like to clarify for

18   the record who that was.

19               MR. ALLEN:  It wasn't -- Timothy, are you

20   on?  Did you speak?  Or was it Cari Jacoby?  Cari Jacoby

21   is probably a female?

22               MS. QUIMBY:  It was not Cari.

23               MS. JACOBY:  I'm a female.

24               MR. ALLEN:  Thank you.  Sorry.

25               MR. JACKSON:  I didn't speak.  I did not

 1  speak.

 2              MR. ALLEN:  Adam Scozzari would be the

 3  videographer, and I can't believe that --

 4              THE VIDEOGRAPHER:  I've been muted.

 5              MR. STOWERS:  This is Renaldo Stowers.

 6  I was muted, and it wasn't me.

 7              MR. ALLEN:  I'm the only one in my house

 8  right now, and I think you all are familiar with my

 9  voice, so it certainly wasn't me.  So I don't know.

10              MR. STOWERS:  Is there anybody else who

11  has access who is on here other than T --

12              MS. QUIMBY:  I was going to ask you who

13  TLJ is.  I saw that earlier.

14              MR. ALLEN:  That should be Timothy, right?

15  Timothy, are you TJ -- TLJ0019?

16              MR. JACKSON:  I am.  But I don't know if

17  my audio was off.  I can only say that it wasn't me who

18  spoke.

19              MR. ALLEN:  All right.  Well, I'm not sure

20  who else it would have been then, but there is no one

21  else in my home.  I don't -- Dr. Bakulina testified that

22  the only one else with her is her cat, so...

23              MS. QUIMBY:  Yeah.

24              MR. ALLEN:  Mary, if you want -- for

25  the record, if you want to have that stricken from the

1 record -- or I don't know what you want to do to address

2 that.  I'm open to suggestions.

3           MS. QUIMBY:  I was just trying to clarify.

4           MR. ALLEN:  No, obviously.  I asked at

5 that time if the person would identify themselves, and

6 no one spoke, so I'm not sure what was going on there.

7     Q.   Sorry.  I'm trying to pick up where we left

8 off, Professor Bakulina.  I want to get you back on

9 screen.  There we go.

10           "So I was just going to say that the day

11 before Timothy Jackson had addressed the issue that

12 more responses have promise."

13           I'm just reading into the record a portion of

14 that email on Bates page UNT 2658.

15           "More responses have promised and have even

16 been -- and even been requested.  Therefore, if others

17 are interested in responding, but wish to wait for the

18 published version of Ewell's talk, then they are welcome

19 to do so, and which should be open to publishing

20 additional responses to that version in a subsequent

21 issue after the upcoming one of the Journal of

22 Schenkerian Studies."

23           Did I read that right?

24     A.   I think so, yes.

25     Q.   Was there any objection at this time that

1  Philip Ewell had not been personally invited?

2              MS. QUIMBY:  Objection, form.

3       A.   As much as I recall, no.  And that's very

4  unfortunate.  I regret this personally.

5       Q.   You didn't object to Philip Ewell not being

6  personally invited in 2019, did you?

7              MS. QUIMBY:  Objection, form.

8       A.   I think I might have mentioned something

9  verbally, and I don't recall if it was in any of the

10  emails.  But I mentioned Philip Ewell to one of the

11  people involved, maybe to Timothy Jackson, maybe to

12  Stephen Slottow.  I don't recall what I said, but I

13  think that I mentioned something.  I greatly regret at

14  this point that I did not explicitly ask to wait or to --

15  that I did not explicitly suggest to ask for Philip

16  Ewell's response to the responses.

17      Q.   Did you speak to Philip Ewell before

18  the publication of the Volume 12 of the Journal of

19  Schenkerian Studies after his plenary talk and before

20  its publication?

21      A.   I have to think, because Philip Ewell and I had

22  a lot of exchanges about many things because we

23  share an important research area.

24      Q.   Um-hum.

25      A.   And I didn't recall the details, but it is

1  possible that we interacted between his plenary address

2  and the publication of Volume 12 of JSS, yes.

3      Q.   Did anything prevent you from reaching out to

4  Philip Ewell individually and inviting him to participate

5  in Volume 12 of the Journal of Schenkerian Studies?

6              MS. QUIMBY:  Objection, form.

7      A.   I think my membership on the Journal of

8  Schenkerian Studies board prevented me from inviting him

9  personally to.  So I would not -- I felt I could not

10  invite him and say like, hey, Phil, do you want to write

11  a response to the responses or response to something?  I

12  could not.  I felt I could not invite him on my own like

13  this because I was a member of JSS board.

14      Q.   What prevented you, as a member of the JSS

15  board, from inviting Philip Ewell personally?

16      A.   What prevented me was that as a board member, I

17  was -- I thought at least, maybe it was a wrong

18  perception, but I felt like as a board member, JSS

19  board member, I was sort of under the directions of its

20  advisory board, which, at that time, was Timothy Jackson

21  and Stephen Slottow.  And because I was less empowered

22  in the division, meaning that I did not have tenure and

23  they both did and still do --

24      Q.   Uh-huh.

25      A.   -- I didn't feel enough independence to do what

1  I wanted to do.  I felt like I needed to -- obey is not

2  the right word.  To -- I felt submissive, I guess,

3  because I was afraid basically of being too independent.

4  I was afraid to say things to the advisory board, that

5  they would not -- I thought they would not necessarily

6  like what I did.

7      Q.    That didn't prevent you from raising the

8  issue that they should delay the publication of

9  Volume 12 because the plenary session was going to be

10 published in Music Theory Spectrum, did it?

11          MS. QUIMBY:  Objection, form.

12     A.    That did not prevent me, correct.

13     Q.    And you had just been at a talk in November

14 of 2019 where Philip Ewell received a standing ovation,

15 right?

16          MS. QUIMBY:  Objection, form.

17     A.    Yes.

18     Q.    Did you feel an inability to speak to Philip

19 Ewell in any way?

20          MS. QUIMBY:  Objection, form.

21     A.    No.

22     Q.    Did you feel there was a, quote, power

23 differential, between you and Philip Ewell as scholars

24 in the field?

25          MS. QUIMBY:  Objection, form.

1        A.    In the scholars of the field, yes.  I think,
2   yes.
3        Q.    But yet you felt that you could speak to him
4   about issues concerning publication in Theoria, right?
5                MS. QUIMBY:  Objection, form.
6        A.    Wait.  Was it the same year?
7        Q.    The Theoria article came out in 2020, right?
8                MS. QUIMBY:  Objection, form.
9        Q.    The same year?
10               MS. QUIMBY:  Objection, form.
11       A.    Yes.  But it doesn't mean that the discussion
12   happened at the same time.
13       Q.    Well, any discussions you had with Philip Ewell
14   over anything related to the publication in Theoria, did
15   you feel somehow intimidated by him?
16               MS. QUIMBY:  Objection, form.
17       A.    No, I did not feel intimidated by Philip Ewell
18   with respect to publication in Theoria mostly because he
19   was not in a position to give me any directions.  His
20   article and my article in Theoria were on par with each
21   other and the third one by Segall.  We were on par with
22   each other.  And I might not remember perfectly well,
23   but I don't think Philip Ewell and I discussed much with
24   respect to articles in Theoria.  I would not discuss with
25   him.  I would discuss it with the editor.

*ELLEN BAKULINA, PH.D.     10/16/2024*

```
 1         Q.    Were you intimidated by Frank Heidlberger as
 2   the editor of the journal Theoria?
 3              MS. QUIMBY:  Objection, form.
 4         A.    Intimidated by the fact that he was the
 5   editor or by something that he said?
 6         Q.    By the fact that he was the editor.
 7         A.    No, not really.
 8         Q.    Okay.
 9         A.    I was not in any situation with respect to my
10   publication in Theoria that would create any problematic
11   events, no.
12         Q.    When you were formulating the call for papers
13   of the Journal of Schenkerian Studies to solicit articles
14   for the Symposium --
15         A.    Um-hum.
16         Q.    -- do you recall any discussion about whether
17   there should be a specific ideological focus of the
18   submissions?
19              MS. QUIMBY:  Objection, form.
20         A.    I remember that the call for responses.  Now, I
21   don't actually remember the final form of the call for
22   responses.
23         Q.    Um-hum.
24         A.    But one of the drafts of the call for
25   responses, I remember seeing that email stated
```

1  explicitly that the Journal welcomed different

2  viewpoints and different opinions; that it was

3  not committed to any specific viewpoint.

4      Q.    Did you think that was appropriate?

5      A.    I certainly thought that was appropriate,

6  yes.

7      Q.    Do you recall that being raised by Timothy

8  Jackson as well, that the call for papers should be open

9  to different viewpoints?

10         MS. QUIMBY:  Objection, form.

11      A.    I don't remember who wrote that.  I remember

12  that this was in the draft of the call for responses.

13  I don't remember who drafted that specific document.

14      Q.    And I'm just talking about the principle of

15  soliciting papers that were open to different viewpoints.

16  Was that discussed amongst the people formulating the

17  call for papers?

18         MS. QUIMBY:  Objection, form.

19      A.    Yes, it was.

20      Q.    And do you remember Timothy Jackson opposing

21  the openness to different viewpoints in the pages of the

22  Journal of Schenkerian Studies?

23      A.    No, I don't remember him opposing it at all.

24      Q.    Did he support the call for papers in its

25  form that asked for open -- well, was open to different

1  viewpoints?

2      A.    I think he did, although I would like to see

3  the specific wording.  I think you have it in the email,

4  but I think he did support that, yes.

5      Q.    Sure.  Let's slip down to UNT 2659.  Do

6  you see this is -- well, I'm going to peek up on the

7  previous page, UNT 2658, because that's where the e-mail

8  begins.

9          Do you see this?

10     A.    Yes.

11     Q.    And apparently, Diego, Andrew -- Diego Cubero,

12 Andrew Chung, and some others.  I'm not sure.  I'm sorry.

13         Now, I'm going to just focus on the first

14 paragraph.  You'll see -- and I'm not trying to hide the

15 ball, but that is an email that spans one and maybe a

16 quarter pages.

17     A.    Um-hum.

18     Q.    But I'd just like to focus on the first

19 paragraph.  I'm happy to give you time to review the

20 entire email, if you'd like.

21     A.    Okay.  I read the first paragraph now.

22     Q.    Should I expand the view?

23     A.    Expand.

24     Q.    Yes.  How is that?  Readable?

25     A.    Very good.  Thank you.  Okay.  Give me...

1        Q.    Please.

2        A.    Okay.  I have read it.

3        Q.    And so is this consistent, this email on

4    December 3rd, 2019, is this consistent with your

5    understanding that Timothy Jackson supported a call

6    for papers that was open to different viewpoints?

7                    MS. QUIMBY:  Objection, form.

8        A.    I think that it is consistent, but there's an

9    underlying problem.

10        Q.    Let's discuss that in a second.

11              But he does say, "We don't want to be seen to

12    be disagreeing with Ewell's broader point of advocating

13    inclusion of different ethnicities in the discipline of

14    music theory."

15              Right?

16        A.    Yes.  So this is consistent --

17        Q.    What's the problem that you have identified

18    in this paragraph?

19                    MS. QUIMBY:  Objection, form.

20        A.    The problem is that this paragraph, it's not

21    such a huge problem, because this wouldn't be published,

22    so it's not in the call for papers.  But the problem is

23    that -- let's see.  Dr. Jackson is also on this email,

24    right?  Yeah.

25        Q.    Yes.

1          A.    That he's attracting everyone's attention to
2    Ewell calling Schenker racist, and this suggests that
3    the focus is on -- let's see.  So the focus is on Ewell
4    calling Schenker racist.  The problem is not that
5    Schenker made racist statements.  The problem for
6    Jackson is that Ewell called Schenker racist.  So the
7    fact that Schenker -- the fact that Jackson is drawing
8    everyone's attention to this perhaps suggests that
9    Jackson sees this as a problem.  So he sees Ewell's
10    views of Schenker as racist as a problem.  I'm not saying
11    that he directly says it here, but he definitely attracts
12    everyone's attention to that in this email.  And that
13    suggests that there will be people agreeing with Ewell's
14    thoughts.  There will be people disagreeing with Ewell's
15    thoughts.  So Jackson seems to be open to different
16    viewpoints.  But at the same time, he seems to be willing
17    to contest Ewell's statement that Schenker was racist.
18    And I'm not sure it was necessary at that point, because
19    I think at that point, everyone knew that Schenker was
20    racist and everyone knew why Ewell focused on that
21    problem, because Ewell wanted to change the field.
22          But you're right, that Jackson is open to
23    different viewpoints according to this email.
24          Q.    And he also says, "I thought that Andrew's
25    point was very well taken."

1              Do you see where he says that in this email?

2      A.    Yes.

3      Q.    Who is he referring to?

4      A.    Andrew Chung.

5      Q.    Does that -- did you understand him to

6  be receptive to a junior colleague's point in the

7  formulation of the call for papers of the Journal of

8  Schenkerian Studies?

9      A.    Yes.

10              MS. QUIMBY:  Objection, form.

11              MR. ALLEN:  We may come back to this

12  exhibit because it has so many emails, Professor

13  Bakulina, but I'm taking it down for the moment.  I am

14  going to mark for the record -- are we up to Exhibit 8?

15              THE REPORTER:  Yes.

16              MR. ALLEN:  Thank you.  I'm putting it

17  in the chat.

18              (Deposition Exhibit Number 8 marked.)

19      Q.    And I'm going to publish it to the record.

20  This is -- Exhibit 8, for the record, is an email of

21  December 11th, 2019, sent by Timothy Jackson to various

22  colleagues, including you as well, correct, Professor

23  Bakulina?

24      A.    Yes.

25      Q.    Do you recognize this email?  And let me --

1  it's a four-paged document, so I'm happy to give you

2  time to review it.

3      A.   I recognize my own email address.  I don't

4  remember reading it, though.

5      Q.   Okay.  And I wanted to call your attention

6  to -- well, let's just read the -- the email that is at

7  the head of this chain says, "Dear Colleagues," including

8  you.  "I have approached a number of Schenkerians

9  directly with request for comment on Ewell's SMT

10 presentation.  We will receive publishable replies

11 from at least four outside distinguished scholars.

12 Not from Eric Wen, however, see below."

13      And then I think you'll agree that the next

14 email seems to be forwarded.  And it's an email from the

15 previously mentioned Eric Wen who is apparently at

16 Juilliard from the email, right?

17      MS. QUIMBY:  Objection, form.

18      A.   I don't know because I...

19      Q.   Yeah, that's fine.  I'm not trying to pull a

20 fast one on you.  I'm going to expand this a little bit.

21      Do you see how the next email in the thread is

22 actually  a forwarded message here?

23      A.   Yes, I see it.

24      Q.   And it is from Eric Wen?

25      A.   Okay.  Yes, okay.

1    Q.    And his email is ewen@juilliard.edu?

2    A.    Yes.  Okay, so it's him.  Yes.

3    Q.    Do you recognize that as an email from the

4    institution Juilliard?

5    A.    Yes.

6    Q.    What's Juilliard, for the record?

7    A.    It's a conservatory.

8    Q.    A rather famous one, right?

9         And then it follows another email that Timothy

10   Jackson has apparently forwarded again with Mr. Wen, and

11   it has this lengthy thread to it.  Did I characterize

12   that correctly?

13              MS. QUIMBY:  Objection, form.

14   A.    Yes.

15   Q.    So I just have a few brief questions about

16   this, the first being -- I think I asked this before, but

17   I can't remember.  Do you recognize getting this email?

18              MS. QUIMBY:  Objection, form.

19   A.    I'm sorry.  But the question is probably vague.

20   Q.    Do you remember receiving this email?

21              MS. QUIMBY:  Objection, form.

22   A.    No, but it's probably my fault.  No, I don't

23   remember this email.

24   Q.    That's all right.  Okay.

25   A.    But I did get a lot of emails.  It doesn't

1  surprise me.

2       Q.   Do you know who Eric Wen is?

3       A.   Yes.

4       Q.   Who is Eric Wen, for the record?

5            MS. QUIMBY:  Objection, form.

6       A.   He's a music theorist.  Judging from this

7  email, he was employed at Juilliard at the time, although

8  I wouldn't actually remember it myself.  I think that

9  now, he's retired.  But again, I'm not sure.  I have only

10 met him once or twice.  We don't know each other closely,

11 so I don't know much about his -- I don't know much about

12 his biography.  But yes, he is a music theorist, and he's

13 recognized as a Schenkerian specialist.

14      Q.   Is it accurate to say that Timothy Jackson

15 is sending you this email indicating people he's been

16 contacting to solicit papers for the Journal of

17 Schenkerian Studies, Volume 12?

18           MS. QUIMBY:  Objection, form.

19      A.   I'm so sorry.  Could you repeat?

20      Q.   Sure.  Is it accurate to say that this email

21 informs you of at least one individual, Eric Wen, that

22 he's contacted to solicit a paper from for Volume 12 of

23 the Journal of Schenkerian Studies?

24           MS. QUIMBY:  Objection, form.

25      A.   Yes, yes.

1      Q.    Did you raise any objection at this time that
2    Timothy Jackson was directly soliciting papers for the
3    Journal of Schenkerian Studies?
4                MS. QUIMBY:  Objection, form.
5      A.    I did not.
6      Q.    Did Timothy Jackson ask you to approach
7    your dissertation advisor whose name, I believe, was
8    Rothstein?
9      A.    I don't recall if Timothy Jackson asked me to
10   do so, but I recall that I emailed William Rothstein and
11   I received an answer from him.
12     Q.    And he declined to participate in Volume 12,
13   right?
14                MS. QUIMBY:  Objection, form.
15     A.    That's right.
16     Q.    Do you remember when that was that you
17   contacted him?
18     A.    It was in November or December 2019.
19     Q.    Okay.  Did you object to being asked to
20   approach William Rothstein at that time?
21                MS. QUIMBY:  Objection, form.
22     A.    No.  I did not object in an email, no.
23     Q.    Okay.  I'm going to slip back to Exhibit Number
24   7, which is that compendium of emails we discussed
25   before.  And if you'd just give me one second.  I'd like

1  to direct your attention to UNT page 2663.  This is --

2  it begins in the middle of that page.  Well, let's go to

3  the top of the page.

4          "Call for papers originally sent to the whole

5  SMT list network on December 17, 2019."

6          Did I read that caption correctly?

7      A.    Yes.

8      Q.    So this section of Exhibit 8 refers to an

9  email apparently sent to this email address.  Do you

10 recognize the email address in the "To" line,

11 SMT-announce@lists.societymusictheory.org?

12     A.    Yes.

13     Q.    What is that email?

14     A.    I think that email sent to this address go

15 to the -- what's the status of that person?  Not the

16 president.  It's Jennifer Diaz now.  Director?  To one

17 person, and then that person normally publishes the email

18 for SMT membership.  I think it's that email address.

19     Q.    So to sum up --

20     A.    No.  That actually is SMT announce.  No, that

21 would be SMT announce.  The SMT list, I'm not sure.

22 Maybe that's where it automatically goes to the entire

23 SMT membership, although that would be strange.  So what

24 I'm not sure about is when one sends an email to this

25 address, lists, right?  Lists something, whether it

1 goes to one person or whether it goes to entire SMT

2 membership.  That's what I don't remember.  Otherwise,

3 of course, I know this address.

4      Q.    This address is meant to communicate to whoever

5 is managing the list for SMT, that this is an

6 announcement that should go to the entire membership

7 of the SMT, correct?

8      A.    I think so.  It would be Jennifer.  I think so.

9      Q.    And do you have any reason to believe that the

10 call for papers did not go to everyone on the SMT list?

11           MS. QUIMBY:  Objection, form.

12      A.    Let's see.  Let me just look for a minute.

13      Q.    Yeah.  So I'm just going to -- we will go

14 from the top.  This was the first email.  It seems to

15 have gone out on December 17th, 2019.

16           It says, "Please find attached a CFP for the

17 Journal of Schenkerian Studies."

18           Right?

19      A.    Yes.  So would it go to everyone?  So you are

20 asking me was this sent to the entire SMT membership?

21      Q.    Well, let's -- let's take it one step at a time

22 just for the record since the audience here may

23 have no idea what CFP is.  CFP means call for papers,

24 correct?

25      A.    Yes.

*ELLEN BAKULINA, PH.D.     10/16/2024*

1          Q.    And now, back to who gets the list and who

2    doesn't, the second message is December 31st to someone

3    named Bob Kosovsky.  Do you know who Bob Kosovsky is?

4          A.    No.  But I think he might have been one

5    of the authors involving 12.  I don't know him.

6          Q.    But was it your understanding that the call for

7    papers was going to be sent out through the SMT list,

8    which would go to every member of the Society for Music

9    Theory?

10               MS. QUIMBY:  Objection, form.

11         A.    Yes, that was my understanding.

12         Q.    And is this the actual call for papers that had

13   been collectively drafted by the members who were working

14   on the call for papers of the course of the winter

15   2019-2020?

16               MS. QUIMBY:  Objection, form.

17         A.    Give me a minute.

18         Q.    Yep.  And let me know if you want me to scroll

19   down.

20         A.    Scroll up slightly.

21         Q.    Oh, sorry.

22         A.    Thank you.  Stop.  Very good.  Please give

23   me a minute.

24         Q.    Yes, please.

25         A.    Okay.  I have read.  Could you repeat your

1    question, please?

2        Q.    Is this the call for papers that was compiled

3    by the group that was working on the call for papers in

4    November-December of 2019 for Volume 12 of the Journal of

5    Schenkerian Studies?

6                MS. QUIMBY:  Objection, form.

7        A.    I would have to reread all emails related to

8    the call for papers between members of the journal board,

9    if this is the version.  But it seems similar.  I

10   don't --

11       Q.    Okay.

12       A.    Yeah, I would have to read all of the emails to

13   see if this is the exact version that we collectively

14   came up with.

15       Q.    Okay.  As you sit here today, having read

16   the first half page of this, do you have any reason to

17   believe that this is not the call for papers that was

18   sent by the Journal of Schenkerian Studies calling for

19   papers for Volume 12?

20       A.    No, I have not.

21               MS. QUIMBY:  Objection, form.

22       Q.    Okay.  So do you have any reason to believe

23   that Philip Ewell did not receive the call for papers

24   that was sent by the Journal soliciting contributions

25   for the Symposium?

1        MS. QUIMBY:  Objection, form.

2        A.    I have no such reason to believe, but I

3   don't know if he actually received it.

4        Q.    And can you define for the record what a call

5   for papers is in academic publishing?

6        A.    It's a text and definitely goes in that

7   category.  Call for papers is a text that states things

8   like, for example, such and such a journal, such and

9   such conference or symposium or something like that

10  welcomes -- usually, it welcomes proposals.  But as we

11  said, as we discussed before, things are not always peer

12  reviewed in the usual way.  So a call for papers, a call

13  for proposals, is a text that explicitly invites sending

14  papers or sending proposals to a journal or to the

15  problem committee of a conference.

16       Q.    And this says -- just here, it says, "As a

17  journal dedicated to Schenkerian studies, we find it

18  important to foster discussion of these issues.  As a

19  part of Volume 12, we invite interested parties to

20  submit essay responses to Ewell's paper."

21            Right?

22       A.    Yes.

23       Q.    And it says we hope -- in the next sentence,

24  just skipping forward, "We hope to publish a variety of

25  thoughts and perspectives."

 1            Right?

 2      A.    Yes.

 3      Q.    So a call for papers is an invitation to submit

 4  contributions, correct?

 5      A.    Yes.

 6      Q.    In the eventual Journal of Schenkerian Studies,

 7  Volume 12, the Symposium, were a variety of viewpoints

 8  published?

 9      A.    Yes.

10      Q.    They weren't all ideologically opposed to

11  Ewell, correct?

12      A.    You're right, yes.

13      Q.    Do you know of any contributions that supported

14  Ewell's position that were rejected?

15            MS. QUIMBY:  Objection, form.

16      A.    I don't know of any that were reflected, no.

17      Q.    Okay.  All right.  I want to transition to

18  talking briefly about Mr. Levi Walls.  And I'll just

19  start by asking if you had any direct relationship with

20  Mr. Walls?

21            MS. QUIMBY:  Objection, form.

22      A.    Levi Walls was my student in at least one

23  class, which was Music Theory Pedagogy.  I was on his

24  master's thesis committee.  What year would that be?

25  Oh, my God, now, I -- I can't remember.

1        Q.    That's okay.

2        A.    I was on his master's thesis committee.  And by

3   the way, you asked a few hours ago if I was on the same

4   committee with Dr. Jackson ever on a Ph.D.

5   committee, and I couldn't remember one, but I was on

6   a master's thesis committee.

7        Q.    So I was going to follow up and ask if

8   Timothy Jackson was on that master's committee, too.

9        A.    Yes.  I think Jackson was the advisor.

10       Q.    Okay.

11       A.    So anyway, I know Levi Wells quite well.

12       Q.    That would have been before 2020 then, correct?

13       A.    Yes.

14       Q.    And how did Mr. Walls perform in his master's

15   thesis?

16       A.    He performed well.

17       Q.    Was -- let's just focus on your relationship

18   with Mr. Walls.  When you said you know quite well, did

19   you believe there was a power differential between you

20   and Mr. Walls?

21            MS. QUIMBY:  Objection, form.

22       A.    Yes, because -- yes, of course.  Yes.

23       Q.    Did you ever experience Mr. Walls to have any

24   kind of inability to speak his mind to you?

25            MS. QUIMBY:  Objection, form.

1      A.    I have no idea.  These things are never
2  explicit.  A person might seem completely okay with --
3  for example, with me.  And I will never actually know if
4  they feel intimidated.  But in reality, they might have
5  big problems in their mind, and they might be afraid and
6  not okay.  But I will never know, because these things
7  are something that nobody can ever fully know.
8      Q.    Did Mr. Walls discuss ideas related to his
9  master's thesis with you directly?
10     A.    Yes.
11     Q.    Did you experience him to be nervous in doing
12 so?
13              MS. QUIMBY:  Objection, form.
14     A.    No.
15     Q.    Fearful?
16     A.    No.
17     Q.    Did you find him incapable of articulating
18 his own ideas in that relationship?
19              MS. QUIMBY:  Objection, form.
20     A.    Articulating his own ideas, one's own ideas,
21 when it comes to thesis or dissertation writing is a
22 complicated topic.  I did not feel anything was
23 problematic.  But exchange of ideas, no, it's just a
24 complicated topic.  Everyone expresses ideas when
25 discussing a thesis or dissertation or -- yeah.

```
 1        Q.   Well, how would you describe your dialogue with

 2   Mr. Walls as you supervised his master's thesis,

 3   as a member of his master's thesis committee?

 4             MS. QUIMBY:  Objection, form.

 5        A.   He seemed, what's the word?  It was productive.

 6   And he had enough substance in his

 7   thesis.

 8        Q.   And did that inform your decision to approve

 9   his eventual master's thesis?

10             MS. QUIMBY:  Objection, form.

11        A.   Yes, it did.

12        Q.   And were you able to observe Professor

13   Jackson's relationship to Mr. Walls in the master's

14   thesis committee?

15        A.   I don't recall seeing how Dr. Jackson

16   interacted and Levi Walls interacted, but I do know

17   that the ideas -- no, I did not see them interact.

18        Q.   Did Mr. Walls ever complain to you that he felt

19   intimidated by Professor Jackson?

20        A.   During his master's, no.

21        Q.   Did he ever after that?

22        A.   He did not complain to me, but he reported

23   in the -- the report by the ad hoc committee in 2020

24   included his description of their interaction.  And

25   that's when I learned that their interaction was quite
```

1  problematic.

2      Q.   What about their interaction was quite

3  problematic that you learned about later?

4      A.   So I haven't actually reread that part of the

5  report recently.  So my recollection is from several

6  years ago, but Walls said that Dr. Jackson forced him

7  to make certain decisions.  I don't remember if those

8  decisions were about his actual ideas in his thesis or

9  his Ph.D. work or was it about something else.  But I

10 think some of those aspects were, according to Walls,

11 Jackson forced certain things upon him related to

12 Volume 12.

13     Q.   Do you remember the Ad Hoc Panel Report saying

14 that Mr. Walls was instructed not to censor people?

15          MS. QUIMBY:  Objection, form.

16     A.   I don't recall that.

17     Q.   Okay.

18          MS. QUIMBY:  Are we at the good point to

19 take a break or at least soon?

20          THE WITNESS:  That would be good.

21          MR. ALLEN:  Yeah, let's take a break.  I

22 have no problem taking a break now.

23          MS. QUIMBY:  Can we --

24          MR. ALLEN:  How much time do you want,

25 Mary?  I'm mindful that it's -- what is it?  12 -- well,

1  are you on East Coast time?  You're in Montreal, correct?

2                THE WITNESS:  Yes.  It's 1:16 for me.  I

3  would benefit from a break now.

4                MR. ALLEN:  Of course.  Mary, when do you

5  want to come back?

6                MS. QUIMBY:  Dr. Bakulina, would you like

7  to take a more --

8                MR. ALLEN:  Oh, do you mean lunch?

9                MS. QUIMBY:  Lunch break or -- we're

10  certainly able to do that.

11                THE WITNESS:  Sure.  We could take a lunch

12  break now, yes.

13                MR. ALLEN:  Maybe come back at a quarter

14  till?

15                MS. QUIMBY:  Okay.  That's fine, yeah.

16                MR. ALLEN:  Okay.  We'll see you then.

17  Thank you, Professor Bakulina.

18                THE VIDEOGRAPHER:  The time is 12:16 p.m.

19  We're off the record.

20                    (Recess taken)

21                THE VIDEOGRAPHER:  The time is 12:52 p.m.

22  We're on the record.

23      Q.    So Professor Bakulina, before we broke for

24  lunch, we were talking about Mr. Levi Walls.

25      A.    Yes.

1      Q.    And I just had a few more questions about that,

2 and then we'll move on to talking about the Schenker

3 controversy.

4      A.    Sure.

5      Q.    But I just -- if you could, for the record, can

6 you identify anytime before July of 2020 when you were

7 the direct witness to Professor Jackson exercising

8 disproportionate power over Mr. Walls?

9            MS. QUIMBY:  Objection, form.  Excuse me.

10 Only indirectly.  And so this is a little  bit of a

11 guess.  But I will say, because I think it is relevant,

12 I'm speaking of Walls' master's thesis.  So  his

13 master's thesis is an analysis of an opera, Schenkerian

14 analysis of an opera by a woman composer, French, from

15 the nineteenth century.  Schenkerian analysis of large

16 portions of music.  First of all, it's very difficult.

17 And I applaud Levi for doing that.  It's hard to do.

18     Q.    Um-hum.

19     A.    It seemed to be very strongly influenced by Dr.

20 Jackson's thinking and intellectual style.

21     Q.    Um-hum.

22     A.    Because Jackson did an analysis of an opera

23 around that time.  I think he did -- well, I won't.  I

24 won't say things that I don't remember exactly.  But he

25 did an analysis of an opera.  And he genuinely likes

1  doing Schenkerian analysis of extremely large portions

2  of music, including operas.  And when I was working with

3  Levi, it occurred to me more than once.  I was thinking,

4  is it possible that he did all of this on his own?  Like

5  how much is this influenced by Jackson?  So this is the

6  only thing I can say.  It looked like it was heavily

7  influenced by Jackson.  How much it was -- how much, you

8  know, was it influenced or was it more Dr. Jackson sort

9  of dictating more what to do to Levi Walls, I don't know.

10      Q.    Okay.

11      A.    So it's not about, you know, a specific

12  interaction that I witnessed.  It's something that I can

13  only guess based on the intellectual substance of that

14  thesis.

15      Q.    And in your interactions with the editorial

16  staff of the Journal of Schenkerian Studies leading up to

17  the issuing of call for papers, did you have any direct

18  knowledge of Levi Walls being affected by a so-called

19  power differential between him and Timothy Jackson?

20      A.    The power differential was obvious.  I

21  was not aware of any incidents, no.  But the power

22  differential was obvious because the fact that the

23  Journal editor was the student of someone on the advisory

24  board, Timothy Jackson, it was obvious that Jackson at

25  least would have an influence on the editor.  So it was

1  obvious that the editor, Walls, would not be independent
2  in making his decisions.  He was obviously dependent on
3  his -- on Jackson primarily because Jackson was his
4  advisor.
5      Q.    Was he so dependent on Professor Jackson as his
6  advisor that it prohibited him from expressing
7  independent views on Philip Ewell's work?
8              MS. QUIMBY:  Objection, form.
9      A.    I don't know.  I can't speculate about that.
10     Q.    Okay.
11     A.    But I think it's possible, because the
12 topic is extremely sensitive.  And I know from personal
13 experience that it's not easy to have objective opinions,
14 and it's easy to sort of feel intimidated when it comes
15 to sensitive topics.
16     Q.    Do you think Professor Walls -- strike that.
17           Do you think Mr. Walls was more intimidated by
18 Timothy Jackson or more intimidated by the Society for
19 Music Theory's open letter condemning the Journal of
20 Schenkerian Studies that he edited as a student editor?
21              MS. QUIMBY:  Objection, form.
22     A.    I don't know.  I am in no position to judge
23 about his -- how he feels or felt.  I don't know.
24     Q.    You said you were close to Mr. Walls.  Did
25 he ever discuss feeling unable to express his views on

1  Timothy Jackson with you?

2              MS. QUIMBY:  Objection, form.

3      A.    No, never.

4      Q.    Thank you.  Let's talk about the Schenker

5  controversy.  And by Schenker controversy, do you

6  understand I mean the controversy that erupted in July

7  of 2020 when Volume 12, and especially the Symposium,

8  came to light for the first time?

9      A.    Um-hum.

10     Q.    Okay.  When did you personally realize there

11  was going to be a controversy surrounding Volume 12 of

12  the Journal of Schenkerian Studies?

13             MS. QUIMBY:  Objection, form.

14     A.    When I saw Facebook post that described the

15  Volume 12 as -- as problematic.  It used the word

16  "racist."  Racist, yeah.

17     Q.    Who was the -- who was the author of the

18  Facebook post that you read, if you recall?

19     A.    Christopher Segall.

20     Q.    Um-hum.  Was Christopher Segall a contributor

21  to Volume 12?

22     A.    Yes.

23     Q.    Do you remember Christopher Segall complaining

24  that there was anything racist about the process before

25  he published?

1            MS. QUIMBY:  Objection, form.

2       A.    Not that I'm aware, no, no.

3       Q.    Before this time, when you first realized, I

4  guess, through a post by Christopher Segall that the

5  Journal of Schenkerian Studies was going to be accused

6  of racism or whatever it said in that post, had you

7  objected to any of the -- what you considered structural

8  problems with the Journal that you enumerated before,

9  that there were many authors positioning themselves in

10 a way that was antagonistic to Ewell, that there was a

11 lack of peer review, and that there was unclear editorial

12 structure?

13           MS. QUIMBY:  Objection, form.

14      A.    I did not object partly because I had not seen

15 any of those contributions, because I was not

16 reviewing them.  I never saw them except for Jackson's

17 contribution, parts of which I saw in emails.  But not

18 counting that, I didn't know about what the offers would

19 be.

20      Q.    Okay.  But you didn't object before July of

21 2020 to the lack of peer review?

22           MS. QUIMBY:  I'm sorry.  Can you repeat

23 that?

24      Q.    Before July of 2020, you did not object to

25 the absence of peer review of the Symposium, correct?

1                    MS. QUIMBY:  Objection, form.

2         A.    I did not object.

3         Q.    And you did not object to the unclear editorial

4    structure before July of 2020, right?

5                    MS. QUIMBY:  Objection, form.

6         A.    Unfortunately, I did not.

7         Q.    And do you -- are you aware of any objection to

8    the unclear editorial structure made by Diego Cubero

9    before July of 2020?

10                    MS. QUIMBY:  Objection, form.

11         A.    I am not aware, no.

12         Q.    Are you aware of any objection made by Diego

13    Cubero to the lack of peer review of the Symposium before

14    July of 2020?

15                    MS. QUIMBY:  Objection, form.

16         A.    I'm not aware, no.

17         Q.    Are you aware of any objection made by Diego

18    Cubero to the absence of a personal invitation to Philip

19    Ewell before July of 2020?

20                    MS. QUIMBY:  Objection, form.

21         A.    I think I shouldn't answer because there might

22    be objections in the email correspondence from the early

23    2020.  There might be something that I have forgotten.

24    But right now, I don't remember such objections, no.

25         Q.    I think I asked you about Diego Cubero in

 1 | that question, right?

 2 |     A.    Yes.

 3 |     Q.    So I was going to ask the same question of

 4 | Andrew Chung.  Are you aware of any objection made by

 5 | Andrew Chung before July of 2020 to the supposed lack

 6 | of an invitation to Philip Ewell to participate in the

 7 | symposium?

 8 |               MS. QUIMBY:  Objection, form.

 9 |     A.    No, I'm not aware.

10 |     Q.    Thank you.  Did you learn after July 25th,

11 | 2020, that Philip Ewell announced that he refused to

12 | read Volume 12 of the Journal of Schenkerian Studies?

13 |               MS. QUIMBY:  Objection, form.

14 |     A.    Yes.  I know that after, yes.

15 |     Q.    Where did you learn that?

16 |               MS. QUIMBY:  Objection, form.

17 |     A.    I don't recall.  But it might have been a

18 | Facebook post.  A lot happened on Facebook.  Maybe on

19 | Facebook.

20 |     Q.    Is Facebook a particularly scholarly medium?

21 |               MS. QUIMBY:  Objection, form.

22 |     A.    No.  It's a way to communicate, especially

23 | during the pandemic.  All of this was taking place during

24 | the pandemic.  And for me, Facebook remained the main

25 | way to stay connected to humans at that time, not just

1  scholars, but humans.  There was email, too.  But

2  Facebook remained more important throughout that time.

3      Q.    Are you on Twitter?

4      A.    No, I have never been.

5      Q.    Now known as X just for the record.  You knew

6  that, right?

7      A.    I forgot.  But I guess now, I don't know.

8      Q.    So you are not on X either.  That would be

9  my follow-up question.

10     A.    No.

11     Q.    Okay.  Thank you.  And you don't know of any

12  policy of the University of North Texas Press making

13  Facebook some sort of authority for editorial practices

14  of its journals, do you?

15            MS. QUIMBY:  Objection, form.

16     A.    No, not at all.  I want to clarify.  I -- my

17  colleagues and I don't use Facebook as an authorized

18  platform to publish.  We use Facebook to stay connected.

19  This is how we are together.  Like in pre-pandemic world

20  or even pre-internet world, the equivalent of Facebook

21  would be to physically get together in a physical

22  place which, you know, it's not -- it's not publishing

23  something scholarly.  It's a place to be together with

24  other people.

25     Q.    Um-hum.  Do you think it's particularly

1  professional for a scholar to refuse to read the

2  publications of his or her critics?

3          MS. QUIMBY:  Objection, form.

4      A.    I think it depends on a specific situation.

5  I don't think there's a single answer to that question in

6  general.

7      Q.    What about the specific situation of Philip

8  Ewell announcing that he refused to read Volume 12 of the

9  Journal of Schenkerian Studies?

10     A.    I think that in this case, to me, Philip Ewell

11 seems entirely justified to say this.  Because reading so

12 many articles that disagreed with him on topics relevant

13 to his identity and his race would probably be extremely

14 painful.  But of course, I cannot speak for him.  I'm

15 only -- unfortunately, I'm speculating.  But that's the

16 kind of situation where I think refusing to read

17 something on emotional grounds, to me, looks justified.

18     Q.    Is that because Philip Ewell is Black?

19         MS. QUIMBY:  Objection, form.

20     A.    No.  It's because the article has to do with

21 his identity.  It doesn't matter what kind of identity.

22 It could be racial identity.  It could be gender

23 identity.  It could be national identity.  It's not

24 about a specific type of identity.  It's more about the

25 fact that the subject is relevant to his identity, and it

1  is his identity that was also the subject of his keynote

2  address initially.  So he's emotionally invested.  He's

3  more emotionally vulnerable.

4      Q.    I'm sorry.  You froze.  Could you repeat that?

5  Just the last part.  You just froze.  The last part of

6  your sentence cut off.  I don't know if everyone else's

7  did.  Can you hear me?  No.

8      A.    Should I repeat?

9            MS. QUIMBY:  I heard the last part of it.

10  Did the court reporter get it?

11            THE REPORTER:  Yes.

12            MR. ALLEN:  Okay.  We'll just go on.

13  It's okay.

14      Q.    What I wanted to ask you, so what specific part

15  of Philip Ewell's identity was implicated in the

16  critiques that you're identifying here?

17            MS. QUIMBY:  Objection, form.

18      A.    His race.

19      Q.    And what race is that, according to you?

20      A.    That's not according to me.  That's according

21  to him.  It is his race is Black.

22      Q.    Okay.  But you understood his race to be Black.

23  And that was what --

24      A.    I understand that this is how he identifies

25  according to his writings.

1      Q.    Okay.  Do you think it was -- let me strike

2  that question.

3             Would it be appropriate for someone to refuse

4  to read Philip Ewell because they were white?

5             MS. QUIMBY:  Objection, form.

6      A.    No, not at all, because as I said, the problem

7  is not a specific type of identity.  The problem is not

8  because something is white or someone is white or someone

9  is Black or someone is Hispanic or someone is a man or a

10 woman or transgender or whatever.  It's not about the

11 type of identity.  It's more because the topic of

12 controversy was related to the identity of the specific

13 person.

14     Q.    You don't think titling a paper, The White

15 Facial Frame, or however it was characterized, somehow

16 would be understood as implicating white identity?

17             MS. QUIMBY:  Objection, form.

18     A.    I don't know what you mean by implicating white

19 identity.  But white people are dominant in our fields,

20 so it would be a completely different situation.

21     Q.    So it's okay to harangue white people, but not

22 okay to harangue Black people in the same way?  Is that

23 your view of it?

24             MS. QUIMBY:  Objection, form.

25     A.    I unfortunately don't know the word "harangue."

1   May I use a dictionary?

2        Q.   Sure.  Insult.

3        A.   Can you rephrase your question, please?

4        Q.   Sure.  I'm going to go back to -- I'm just

5   going to share again Exhibit 8, which was Music Theory's

6   White Racial Frame by Philip Ewell, which he published

7   in the pages of Music Theory Spectrum.

8        A.   Um-hum.

9        Q.   Do you remember looking at Exhibit 8 together?

10       A.   Yes.

11       Q.   And this was a publication of the plenary

12   address he gave at the 2019 Society for Music Theory?

13       A.   Um-hum.

14       Q.   So could I ask you just to answer audibly,

15   please?

16       A.   Yes.  Go ahead.

17       Q.   Okay.  And so did you understand by this that

18   he was basically criticizing the whole of white people as

19   a race in the practice of music theory?

20            MS. QUIMBY:  Objection, form.

21       A.   I don't think he criticized the white people as

22   a race.  I think he criticized the practices within music

23   theory that privileged the music and ideas of white

24   people because whites were and remain in the majority in

25   the field.

1    Q.    And he could -- would it be -- strike that.

2             Is it legitimate for a white music theory

3    scholar to refuse to read Philip Ewell just because it

4    implicates his or her race?

5             MS. QUIMBY:  Objection, form.

6    A.    Is -- is it?

7    Q.    Well, let me strike that and ask it a different

8    way.

9             Can we agree that it would be unprofessional

10   for a scholar of music theory to refuse to read Philip

11   Ewell simply because he was criticizing what he calls

12   white supremacy or structural whiteness in music theory?

13            MS. QUIMBY:  Objection, form.

14   Q.    That would be -- that would be completely

15   unprofessional, wouldn't it?

16            MS. QUIMBY:  Objection, form.

17   Q.    To refuse to read a Black critic of white

18   supremacy in music theory?

19            MS. QUIMBY:  Objection, form.

20   A.    Perhaps it would be objectionable not to read.

21   I don't think it's nonprofessional.  Nobody can read

22   everything.  There are many things that I don't read.

23   And it's not unprofessional simply not to read something.

24            But in this case, I agree that it would not

25   be -- it would be objectionable for someone not to read

1  Ewell's publication because Ewell's publication is

2  directed -- the purpose of Ewell's publication is to

3  change the field and make it more inclusive.  And that

4  is something for which everybody in the society is

5  responsible.

6      Q.    But it is okay for Philip Ewell, as a Black

7  man, to refuse to read Volume 12 of the Journal of

8  Schenkerian Studies?

9          MS. QUIMBY:  Objection, form.

10     A.    Surprisingly, I will say yes, because of the

11  power differential between white people and Black people

12  in the field.  What I mean is the fact that someone who

13  is in minority, and Black people in music theory right

14  now are not simply minority, they're a very tiny

15  minority.  And someone who identifies as Black, and they

16  are reading publications that are somehow engaging with

17  a race and that are against them, that's going to be

18  more painful, and they're going to feel more vulnerable

19  compared to someone who's in the majority simply because

20  it's majority versus minority.

21     Q.    You've already testified that you know Philip

22  Ewell personally, correct?

23     A.    Yes.

24     Q.    And you've praised Philip Ewell as

25  courageous, correct?

1          MS. QUIMBY:  Objection, form.

2      A.    I have never done that.

3      Q.    You've never praised Philip Ewell as

4  courageous?

5      A.    In fact, I have -- no.

6      Q.    Do you know him to be -- sorry.  I talked

7  over you.  I apologize.

8      A.    I never called him courageous so far.

9      Q.    Do you know Philip Ewell to be especially a

10  weak man?

11          MS. QUIMBY:  Objection, form.

12      A.    I'm so sorry, but I really disagree with the

13  wording.  I think everybody is allowed to be weak.  I

14  think it's very human to be weak.  In fact, I think it's

15  very human to show one's weakness.  And you seem to imply

16  that to be weak is somehow bad, but I don't agree with

17  that at all.

18      Q.    So my question was different.  Do you know

19  Philip Ewell to be an especially weak man?  I'm asking.

20          MS. QUIMBY:  Objection, form.

21      A.    I don't know.  I cannot answer this

22  question.  It's phrased in a way that conflicts with

23  my understanding of the word "weak."

24      Q.    And can we agree that there's nothing about

25  being Black that makes Philip Ewell especially vulnerable

1  or fragile or weak, right?

2            MS. QUIMBY:  Objection, form.

3      A.   Can we agree that being Black makes Ewell

4  more vulnerable within the context of music theory?

5      Q.   I would never say such a thing.  I said could

6  we agree that being Black does not make Philip Ewell

7  weaker than other scholars.  We can agree on that, can't

8  we?

9            MS. QUIMBY:  Objection, form.

10     A.   His race itself does not make him weak, no.

11           MR. ALLEN:  Okay.  I'm go to mark for the

12 record -- I'm going to mark for the record as Exhibit 9.

13           (Deposition Exhibit Number 9 marked.)

14     Q.   You can see this email from Stephen Slottow to

15 Timothy Jackson, Levi Walls, you, as well as others?

16     A.   Yes.

17     Q.   And it's dated July 25th, 2020?

18     A.   Yes.

19     Q.   Now, it's in the nature of this email, it sort

20 of begins at the end and goes to the beginning as this

21 is the way that email threads are often produced to us.

22 So I'm going to go to the end.  But if, at any time,

23 Professor Bakulina, if you want to review the documents,

24 just say so.

25           This is an email from Andrew Chung to,

1  again, you as well as others on July 25th, 2020.  Do

2  you remember getting this email from Andrew Chung?

3  This is on page UNT 0302.

4       A.    Okay.  One minute for reading.  Okay, yeah.

5       Q.    Do you remember getting this email from

6  Andrew Chung?

7       A.    For some reason, I don't.  I thought that my

8  first -- I first was in contact with the scandal that

9  erupted on Facebook.

10      Q.    Um-hum.

11      A.    But I don't remember this email.

12      Q.    Oh, well.  In fact, you respond, it looks like,

13  relatively quickly.  This is at 7:00 p.m. that Andrew

14  Chung sends you this email in this thread that is Exhibit

15  10.

16      A.    Um-hum.

17      Q.    And then you answer at 8:31 p.m., right?

18      A.    Um-hum.

19      Q.    And you say, "Thanks so much for alerting us.

20  I see something similar on Facebook."

21            Right?

22      A.    Yes.

23      Q.    So my question for you, is it accurate that

24  this is the first time, reflected in these emails, that

25  you were becoming aware of a controversy surrounding

 1  Volume 12 of the Journal of Schenkerian Studies?

 2      A.    Yes.

 3      Q.    Okay.  And then if we -- yeah, Andrew Chung

 4  asks in the next email, I think he's asked if you

 5  should forward it.  By you, they should be informed and

 6  involved.  You say about Tim Jackson and Stephen Slottow,

 7  right?

 8      A.    Um-hum.

 9      Q.    And he responds, "Yes, please forward this

10  message to anyone you think would be appropriate."

11          Right?

12      A.    Yes.

13      Q.    And then you do so in the following e-mail on

14  Saturday, July 25th, at 6:37 p.m.  Right?

15      A.    Okay, yes.

16      Q.    And you emphasize that you completely agree

17  with Andrew, that the social media response is getting

18  serious and should somehow be addressed.  Right?

19      A.    Yes, yes.

20      Q.    Thank you.  And then Mr. Walls chimes in,

21  correct?

22          MS. QUIMBY:  Objection, form.

23      A.    Uh-huh.  Okay, yes.

24      Q.    Do you remember getting this email on

25  July 25th from Mr. Levi walls?

1        A.    In fact, I don't.  But I can't deny the
2   existence of this email.  I just don't remember reading
3   it, hum-um.
4        Q.    Okay.  Do you remember Mr. Walls being
5   concerned for his career at this time?
6        A.    Oh, yes, absolutely.  He even -- yes,
7   definitely, yes.
8        Q.    And so in this email, in the thread, he writes,
9   "I just heard about this.  It's very worrying especially
10  as I don't want my career to be ruined before it properly
11  began.  I have a family to take care of now. I'm also
12  confused about what exactly people want."
13           Did I read the first sentences of this email
14  correctly?
15       A.    Yes.
16       Q.    Was it your understanding -- is it your
17  understanding now that he feared some sort of reaction
18  because of the power differential between him and Timothy
19  Jackson at this time?
20              MS. QUIMBY:  Objection, form.
21       Q.    That he's expressing here?
22              MS. QUIMBY:  Objection, form.
23       A.    Let's see.  It is clear that he's afraid
24  for his career in general.  It's not clear that he's
25  specifically afraid of Dr. Jackson, no.

1        Q.    Is he afraid of the reaction of the Society for

2    Music Theory and the community of scholars that are

3    objecting to the Journal of Schenkerian Studies at this

4    time?

5              MS. QUIMBY:  Objection, form.

6        A.    What is the previous email?  If I read the

7    previous email, let's see.  Yeah, okay, okay.  Could we

8    go back to Levi?

9        Q.    Yes.  So just to be clear, this previous email

10   sent by you on July 25th, you did send it to Levi Walls

11   as well, right?

12       A.    Yes.

13       Q.    And then this is the next email in the thread?

14       A.    Um-hum.

15       Q.    So it's reasonable to understand that he's

16   reacting to your email, correct?

17       A.    Yes.

18             MS. QUIMBY:  Objection, form.

19       Q.    And my question is, do you understand from

20   reading this email by Levi Walls, that he's concerned

21   that he will be the victim of a reaction by the people

22   who are objecting to the Journal of Schenkerian Studies?

23             MS. QUIMBY:  Objection, form.

24       A.    I think that is fair to say, yes.

25       Q.    And then Timothy responds in the next email --

1    A.    Um-hum.

2    Q.    -- at about 9:47 p.m.

3         And he says, "I think that whether the Journal

4    wants to publish responses to the responses is something

5    we on the editorial team will need to discuss.  My

6    feeling is that we should consider such second level

7    responses as long as they are factual and focused and

8    have scholarly merit.  As I said, MTO asked that we

9    consider publishing more responses to Ewell's article."

10        Did I read that right?

11   A.    Yes.  Could you make it a little bigger?

12   Q.    Yes, I'm sorry.  Please feel free to ask

13   that I make it bigger at any time.

14   A.    Please.

15   Q.    Let me get it a little bit.  It all fits on the

16   page.  Is that readable to you, Professor Bakulina?

17   A.    Yes, that's very good.  Thank you.

18   Q.    So -- and you got this email?

19   A.    Apparently, I'm on the receiving list.

20   Q.    Yes.  And do you understand from this email

21   that Timothy Jackson was opposed to publishing any

22   response by Ewell?

23        MS. QUIMBY:  Objection, form.

24   A.    Jackson is not objecting to publishing anything

25   in this -- in this email.

1        Q.    Okay.  Just the -- this is from Stephen Slottow
2   who responds to the thread again.  And this is the last
3   email in the thread.  He refers to you calling him,
4   correct?
5             "Ellen called me," he says.
6        A.    Yes.
7        Q.    Do you remember getting a call from Stephen
8   Slottow?  Or calling him?  Excuse me.
9        A.    I don't remember the actual call.  But Stephen
10  and I often exchanged phone calls when I -- when I lived
11  in Texas.
12       Q.    And if you could read the second paragraph here
13  and just tell me when you've had a chance to review it?
14       A.    Okay, sure.  Uh-huh.  Yes, I'm ready to
15  discuss.
16       Q.    So is there anything that you understand
17  is inaccurate about the way that Stephen Slottow has
18  characterized the decisions of the editorial staff at
19  the time based on your direct experience with the whole
20  process?
21             MS. QUIMBY:  Objection, form.
22       A.    I think this is a fair description of what the
23  editorial board did.  But I do think -- I now think there
24  is a real problem with not inviting Ewell because this
25  is, of course, the substance of this email.  So I'm

1  thinking of another symposium, which was also in

2  response to one scholar, and I'm talking about Music

3  Theory Spectrum in the year 2011.  There was a symposium

4  in response to something by Richard Taruskin.  And

5  Richard Taruskin himself responded to the responses at

6  the end of that symposium.  Now, I understand that this

7  is how it should have been done.  So the problem is not

8  that Ewell -- that, you know, other scholars -- that

9  various people did not have an opportunity to respond

10 to Ewell's talk.  The problem was more about the way it

11 should have been organized is that there should have been

12 responses followed by response to responses.  That would

13 be fair.

14     Q.    Um-hum.  Was it ever -- did you ever receive an

15 email stating that people would refuse Philip Ewell

16 an opportunity to respond in the pages of the Journal of

17 Schenkerian Studies to the Symposium?

18          MS. QUIMBY:  Objection, form.

19     A.    No, I never heard about that.  Did I respond

20 incompletely?

21     Q.    No, no.  I'm looking at a new exhibit.  I'm

22 sorry.  Sometimes, I'm fumbling with my own exhibits.  I

23 apologize.

24          MR. ALLEN:  I'm going to mark for the --

25 hold on.  Let me -- because I want to publish these at

1   the same time.  I'm just going to mark for the record now

2   as Exhibit 10.

3                    (Deposition Exhibit Number 10 marked.)

4        Q.    And also publish to the chat here.  This is

5   an email thread that I believe you'll find shares in

6   common multiple emails with the previous thread we just

7   examined.  I'm going to go through that with you in one

8   second.  This is a string of emails, the top of which

9   appears to be from Timothy Jackson to Diego and

10  colleagues.  And it follows on an email of Sunday,

11  July 26th, 2020, at 12:52 p.m.  I'm just scanning down.

12            And do you see, I've scanned down to UNT 0307.

13  And this is one of the emails we just examined, correct?

14       A.    Yes.

15       Q.    And it's an email from Levi Walls on

16  July 25th, 2020, saying, "I just heard about this."

17            Correct?

18       A.    Yes.

19       Q.    And you'll see that this is then -- from here

20  on down, it's the same thread, I believe.  But I'm happy

21  to give you more time to examine this, if you would like.

22       A.    Okay.

23       Q.    And do you see here, it begins with Andrew

24  Chung's first email in the previous thread, Exhibit 9?

25       A.    Yes.

1      Q.    Okay.  So I just did that because as often
2  happens with emails, someone will pick a thread up, and
3  it will go in a different direction in cases.  So I just
4  want to talk about the emails that are unique and new to
5  this thread in Exhibit Number 10.

6          So picking that up from where we left off,
7  here, Andrew Chung responds on Saturday, July 25th, with
8  you on the email, correct?

9      A.    Um-hum, yes.

10     Q.    This is on UNT Bates number 0307.  And he
11  says he agrees with Levi Walls, that a well considered
12  and timely response seems important.

13          Did I characterize that correctly?

14              MS. QUIMBY:  Objection, form.

15     A.    Could you make it bigger?

16     Q.    Yes.  Sorry about that.  I think I can get
17  one more in there.

18     A.    Very good.

19     Q.    Is that more easy to read?

20     A.    Yes.

21     Q.    Sorry about that.

22     A.    Um-hum.  So Andrew writes, "I agree with
23  Levi, that a well considered and timely response seems
24  important."  Okay.

25     Q.    And did you agree with that?

1              MS. QUIMBY:  Objection, form.

2        A.    Did I agree at that time?  I don't remember

3    this email string at all.

4        Q.    And then Benjamin Graf writes again, with you

5    included here, right?

6        A.    Um-hum.

7        Q.    The next in line is an email of July 25th,

8    2020, at 9:47 p.m.?

9        A.    Um-hum.

10       Q.    And he also agreed, "Yes, we need to respond."

11            Right?

12       A.    Uh-huh, yes.

13       Q.    Do you know if Benjamin Graf reached out to

14   Philip Ewell to invite him to respond to the Symposium?

15              MS. QUIMBY:  Objection, form.

16       A.    No, I don't know if he ever reached out.

17       Q.    Then Diego Cubero writes back, correct?

18       A.    Yes.

19       Q.    Do you remember getting this email?

20       A.    I don't remember much about the emails.

21       Q.    Okay.  And Benjamin Brand writes on Sunday,

22   July 26th, at 10:17 a.m., UNT 0305, that he would like

23   to call an emergency meeting at 4:00 p.m.?

24       A.    Okay.

25       Q.    Do you remember Benjamin Brand calling an

 1  emergency meeting at 4:00 p.m. on Sunday, July 26th,

 2  2020?

 3      A.    Vaguely.

 4      Q.    Did you participate in that meeting?

 5      A.    Actually, I don't recall if I did.  That's very

 6  strange.  But so much had happened at that time, that I

 7  don't remember that specific meeting.

 8      Q.    And do you remember talking to Benjamin Brand

 9  about the Schenker controversy shortly after you became

10  aware of it?

11              MS. QUIMBY:  Objection, form.

12      A.    Maybe not specifically.  I know that I talked

13  with almost every colleague, whether on the phone.  By

14  the way, I was in Montreal at the time, so -- but it was

15  the time of the pandemic anyway, so we couldn't meet in

16  person.  So I know I talked with many of them.  I don't

17  remember the details.

18      Q.    Okay.  So you don't remember the details of

19  your conversations with Benjamin Brand dating back to

20  July of 2020?

21              MS. QUIMBY:  Objection, form.

22      A.    I don't know.

23      Q.    Did you have any conversations with Dean

24  Richmond?

25      A.    As far as I recall, no.

1      Q.    Did you have any conversations with Frank

2  Heidlberger at this time, July -- end of July 2020?

3      A.    Yes.

4      Q.    And what did you discuss with Frank Heidlberger

5  concerning the Journal of Schenkerian

6  Studies in, you know, the end of July 2020, beginning

7  of August?

8              MS. QUIMBY:  Objection, form.

9      A.    I think we mostly exchanged information from

10  like who saw what on Facebook, because our friends, you

11  know, set of friends is not the same.  So we would

12  exchange information and tell each other what, you know,

13  who said what.  And I think the same happened between

14  Stephen Slottow and me.

15      Q.    And I'm just going to draw your attention to

16  this top email by Timothy Jackson.

17      A.    Um-hum.

18      Q.    And I'm just going to ask if you remember

19  getting this email or you remember reading it at the

20  time.

21      A.    Give me a second.

22      Q.    Yeah, please.

23      A.    Yes.  I think I remember this one, yes.

24      Q.    Did you react in any way to this email by

25  Timothy Jackson by writing to him?

1                    MS. QUIMBY:  Objection, form.

2          A.    I don't recall what I did.  I guess the email

3     copy answers your question.

4          Q.    Okay.  And do you find this email to be an

5     accurate description of the editorial process of

6     Volume 12 as much as you know?

7          A.    One minute.

8                    MS. QUIMBY:  Objection, form.  Yes, it

9     looks like it.

10         Q.    Okay.  Thank you.  I apologize if I already

11    asked you this, but I think I asked if you had spoken to

12    Dean Richmond.  But I would like to ask you if you recall

13    writing a letter to Dean Richmond?

14                    MS. QUIMBY:  Objection, form.

15         A.    I don't recall writing a letter to Dean

16    Richmond.

17                    (Deposition Exhibit Number 11 marked.)

18                    MR. ALLEN:  I'm going to mark for the

19    record as Exhibit 11 a document captioned July 29th,

20    2020, Dear Dr. Richmond.

21         A.    Who wrote this?

22         Q.    We'll get to that in a second.  I just want

23    to publish it to the chat, and then we'll examine it.

24                    So I'm marking for the record as Exhibit 11,

25    again, a document dated July 29th, 2020.  And I'm just

 1 going to scan to the bottom of the document, which is

 2 five pages.

 3       A.    Um-hum.

 4       Q.    And it has, "Sincerely, Ellen Bakulina,

 5 Assistant Professor, UNT College of Music," as the

 6 signature line.

 7       A.    Oh, I see.  I didn't remember this.

 8       Q.    So I'm -- well, this is the point I'm going

 9 to ask.  Do you remember composing this letter to Dean

10 Richmond?

11       A.    I don't remember.  The thing is that once I

12 left UNT, so much has happened that I -- my memories have

13 been somewhat unclear.  I'm not denying facts.  I just

14 say that it seems like it happened in a different

15 lifetime unfortunately.  I'm very sorry.

16       Q.    Well, and my purpose isn't to catch you out.

17 I'm just trying to understand what you were writing to

18 Dean Richmond, if this was received by Dean Richmond,

19 things of that nature.

20       A.    Sorry.  I'm reading.  What was your question?

21       Q.    Sure.  So I want to -- I want to walk through

22 the letter.  Now, let me do this, for you, too, because I

23 know the size of text is also an issue.  Is that readable

24 to you?

25       A.    Yes.

1    Q.    So I'm going to try to go through it, if you

2   don't mind.

3    A.    Go ahead.

4    Q.    And I'm just going to ask you if what you wrote

5   here corresponds to your memory, your experience, and

6   whether this was sent to Dean -- was actually sent

7   to Dean Richmond.  To start with, do you know if this

8   letter was actually sent to Dean Richmond?

9    A.    You know, I completely don't remember anything.

10   I honestly don't remember anything about

11   this letter.  I don't know if it was sent.

12    Q.    Okay.

13    A.    Oh, I see.  It's like a report.

14    Q.    It does read like a report, yes.  Do you need

15   some more time to scroll through it or --

16    A.    Why don't you give me a minute to read what's

17   on the screen right now.

18    Q.    I'll start with this.  How's that?

19    A.    Okay, okay.  One second.  I'm sorry.

20    Q.    Um-hum, please.

21    A.    Uh-huh, yes.  So I'm reporting what happened,

22   yes.

23    Q.    Okay.  And so I'm just going to scan up a

24   little bit.

25          It says, "I appreciate your concern regarding

1   the latest issues of the Journal of Schenkerian Studies

2   and its reception by the scholarly community.  I will

3   address your questions in two separate categories."

4        A.    Um-hum.

5        Q.    "In addition, I will also express my own

6   reflections on the situation."

7             Did I read the first paragraph of your letter

8   correctly?

9        A.    Yes.

10       Q.    So it refers to Dr. Richmond's questions?

11       A.    Um-hum.

12       Q.    What questions did you receive from

13  Dr. Richmond at this time and in what form?

14       A.    With my huge apologies, I have to say I have no

15  memory about this.  I -- yeah.

16       Q.    Okay.

17       A.    And I can even explain why I don't have much

18  memory about this.

19       Q.    Please do.

20       A.    I think everything felt extremely confused, and

21  it was an explosion of a huge amount of email, social

22  media posts, phone calls, conversations.  And it just

23  felt so chaotic.  And I don't blame anyone.  It just --

24  yeah, that's, I think, the reason why I feel it so --

25       Q.    Okay.

1      A.    I remember sort of like a flow of a huge amount

2   of everything.

3      Q.    Um-hum.

4      A.    Yeah, but not the details.  Anyway, I'm ready

5   for your more specific question.

6      Q.    Well, I think since you don't remember anything

7   about this, we might go on.  I understand your testimony.

8   I just want to scan through it just to give you a sense.

9            There's a first part, which you promised in

10  the introduction.

11     A.    Um-hum.

12     Q.    And like a good report, then you move on to the

13  second part, right?

14     A.    Um-hum.

15     Q.    "Does the board endorse these essays?"

16            And then it comes to a conclusion.

17            And you say, "I do not endorse the way these

18  essays were put together at the end."

19            Correct?

20     A.    Okay.

21     Q.    And I want to show that -- I just want to see

22  if this refreshes your memory.  You do say you endorse

23  Suzanne Clark's essay -- or Suzannah Clark's essay,

24  right?

25     A.    Yes.  Suzannah Clark's is one of the supportive

1  essays of Ewell.

2      Q.    So that's pro Philip Ewell?  Suzannah Clark?

3              MS. QUIMBY:  Objection, form.

4      A.    I don't think the essays are necessarily pro

5  Ewell or against Ewell.  They rather take different

6  attitudes towards issues of inclusion in the field.

7      Q.    But you used the word "supportive."

8              "I endorse Suzannah Clark's essay."

9              When you say supportive, you mean it was

10  supportive of Professor Ewell's point, I guess, in your

11  idea to -- or in your conception to increase inclusion

12  in the field?

13      A.    Clark supported Ewell's call to -- for being

14  more inclusive, and I endorsed her essay.  That's what I

15  said in this essay -- in this report.

16      Q.    And you also endorsed Christopher Segall's

17  essay?

18      A.    Yes.

19      Q.    And then you say you endorsed Stephen Slottow's

20  essay as well, right?

21      A.    I guess so.  That's what it says.  Let's see.

22  Yes.  I still agree with what I said at the time, yes.

23      Q.    Okay.  And here, as you've even testified

24  today, you did not endorse Timothy Jackson's essay,

25  right?

1        A.    Correct.  And I still feel the same way.

2        Q.    Um-hum.  And finally, we will go on to this

3    in a second.  You endorsed the content of the anonymous

4    essay, right?

5        A.    Well, that is what it says now.  I actually,

6    right now, I don't recall much on the anonymous essay.

7        Q.    Right.  But here, it -- that's okay.  But here,

8    it says you didn't agree that it would be

9    published anonymously, summarizing what you say here,

10   right?

11       A.    Yes.

12       Q.    And you say, "It is unethical to publish

13   anonymous work."

14            Why is that?

15       A.    It's because everybody should be held

16   responsible for what they say.  And when something is

17   anonymous, there is no one to hold responsible, so other

18   people become responsible, and that's not fair.

19       Q.    And given that almost the entire Society for

20   Music Theory attacked the Journal of Schenkerian Studies

21   in an open letter, which you yourself also signed, don't

22   you think the anonymous author was rightly afraid?

23                 MS. QUIMBY:  Objection, form.

24       A.    Of course, they were rightly afraid.  But

25   that's not a good reason to be anonymous, to stay

 1  anonymous in a publication.

 2      Q.    And then you write, the five essays that you

 3  had just discussed above, you had read completely, and

 4  you said, "have not had enough time to read and form a

 5  clear opinion of the rest of the Symposium essays."

 6          Right?

 7      A.    I guess that's what it says, yes.

 8      Q.    And of course, this is July 29th, 2020.  It

 9  seems from the record, the volume became available only

10  on July 25th, 2020, right?

11      A.    Yeah.

12      Q.    Okay.  So this is more or less four days later?

13      A.    Um-hum.

14      Q.    And then you criticize the way in which the

15  essays were put together, right?

16      A.    Yes, correct.

17          MR. ALLEN:  Okay.  So I just want to

18  then mark -- this is the wrong -- hold on.  Let me take

19  this down.

20          MS. QUIMBY:  It's been about an hour.

21  Before we move on to the next exhibit, would you -- can

22  we take another break?

23          MR. ALLEN:  Oh, that's a great idea.

24  Yeah, sorry.  I was losing track of time.

25          MS. QUIMBY:  I just noticed it.

 1                  MR. ALLEN:  Would you like a break,
 2    Professor Bakulina?
 3                  THE WITNESS:  Sure.  Thank you, Mary.
 4    Thank you.
 5                  MR. ALLEN:  Let's go off the record,
 6    please.
 7                  THE VIDEOGRAPHER:  The time is 1:48 p.m.
 8    We're off the record.
 9                      (Recess taken)
10                  THE VIDEOGRAPHER:  It's 1:58 p.m.  We're
11    back on the record.
12                      (Deposition Exhibit Number 12 marked.)
13        Q.    Professor Bakulina, I've taken the liberty,
14    while you were on your break, to pre-mark Exhibit
15    Number 12 for the record.  It's an email from you to
16    Benjamin Brand, among others, on July 29th, 2020.
17            Do you see this Exhibit 12?
18        A.    Yes, I have just read it.
19        Q.    Do you recognize this email as one that you
20    wrote to Mr. Brand?
21        A.    Yes.
22        Q.    And it refers to the emergency meeting that was
23    on a Sunday previous to this, right?
24        A.    I don't know what year, but it refers to a
25    previous email, yes.

ELLEN BAKULINA, PH.D.      10/16/2024

1         Q.    Not an email, an emergency meeting, right?

2         A.    Emergency meeting.  Okay, sure.  Yes, yes.

3         Q.    Does that help refresh your memory, that you

4  did attend that emergency meeting on Sunday that Benjamin

5  Brand had called for and that we examined in a previous

6  exhibit?

7         A.    Unfortunately, no.  But I believe what the

8  email says.  That's -- that's good.

9         Q.    Okay.  And the email continues.

10             "I said that my contribution to the 'call for

11  responses to Ewell' formulation was to suggest that the

12  call should be inclusive; that we must welcome different

13  kinds of perspectives.  I have just reviewed those emails

14  one more time and this is actually untrue.  The idea of

15  inclusivity was already there in Levi's original draft,

16  and it was further mentioned by Andrew Chung."

17             Did I read that correctly?

18         A.    Yes.

19         Q.    Does that help refresh your memory of what

20  you said at the emergency meeting on that Sunday in July

21  of 2020?

22         A.    I have no idea what I said at the emergency

23  meeting.  I apologize for this.

24         Q.    You don't have any reason to believe that what

25  this email recorded in July of 2029 [sic] was false, do

1  you?

2       A.    No, it should not be false.  I usually say what

3  actually happened.  I don't usually lie.

4       Q.    Sure.  So you wouldn't misrepresent something

5  like that to your division chair, right?

6       A.    I don't remember misrepresenting anything.

7       Q.    Sure, okay.  Thank you.  And I think this is

8  also consistent with your testimony today, that the call

9  for papers included discussions about including different

10 viewpoints, correct?

11      A.    Yes.  In fact, I don't think that the call for

12 papers was very problematic, with the exception of

13 the --

14      Q.    Um-hum.

15      A.    That he didn't ask Ewell, as I said.  But other

16 than that, I think the call for papers itself was

17 a call for responses.  It was not problematic.

18      Q.    Sure.  Do you remember what happened next in

19 the controversy that was erupting at the University of

20 North Texas at the end of July of 2020?

21      A.    I do not.

22            MS. QUIMBY:  Objection, form.

23                (Deposition Exhibit Number 13 marked.)

24            MR. ALLEN:  Okay.  And I'm going to

25 mark the next exhibit for the record, which will be

1   Exhibit 13.  And I'm putting that into the chat as well.

2        Q.     Professor Bakulina, I've marked for the record

3   Exhibit 13.  This is an email from John Richmond to Music

4   Faculty, Music Staff, Music Adjunct, and also Jennifer

5   Cowley, on July 31st, 2021.

6             Did I characterize that email correctly?

7        A.     Yes.  Could you make it bigger?

8        Q.     Of course.

9        A.     Okay.  Uh-huh.

10       Q.     And it says that "The University of North Texas

11  College of Music has begun a formal investigation into

12  the conception and production of the twelfth volume of

13  the Journal of Schenkerian Studies, which is published by

14  the Center for Schenkerian Studies and the UNT Press."

15            Did I read that right?

16       A.     Yes, you did.

17       Q.     And that "The University, the College of Music,

18  and the Division of Music History, Theory, and

19  Ethnomusicology reaffirm our dedication to combating

20  racism on campus and across all academic disciplines."

21  We remain -- excuse me.  "We likewise remain deeply

22  committed to the highest standards of music scholarship,

23  professional ethics, academic freedom, and academic

24  responsibility."

25            Did I read that correctly?

```
 1         A.   Yes.
 2         Q.   I have just one -- well, a couple of questions.
 3    You would have received this email as well, right?
 4              MS. QUIMBY:  Objection, form.
 5         A.   I don't know.  I'm not listed -- oh, I'm
 6    listed.  I think so.  As I said, it's difficult to
 7    remember everything.
 8         Q.   What is the musicfaculty@unt.edu, if you
 9    know?
10         A.   I should have been part of that, yes.
11         Q.   Okay.  Is it your understanding that these
12    are collective emails that go out to all members of
13    faculty, all members of music staff, music adjuncts?
14         A.   Yes.
15         Q.   And you're, of course, on faculty at this time,
16    right?
17         A.   Yes.
18         Q.   And you said you were in Montreal?
19         A.   Yes.
20         Q.   Did you retire there because of -- not
21    retire, but did you remove yourself to Montreal
22    because of COVID?
23         A.   No.  It's because I spent every summer in
24    Montreal.  In fact, anytime I was not teaching, I spent
25    in Montreal, because of my family.
```

1       Q.    Oh, great.  And so, of course, it was

2   summertime.  It was the end of July?

3       A.    Um-hum, yes.

4       Q.    You weren't on a faculty appointment up there

5   of any kind, right?

6       A.    I was on faculty at UNT.  I did not work

7   anywhere else.

8       Q.    Okay.  I meant in Montreal, so thanks.

9             All right.  So there is no reason to believe

10  that you would not have received this email?

11      A.    No, there is no reason.

12      Q.    Okay.  When Dean Richmond writes that the

13  College of Music reaffirms the dedication to combating

14  racism, what was your understanding of what he was

15  referring to?

16            MS. QUIMBY:  Objection, form.

17      A.    My understanding was that he confirmed that

18  inclusion was important at UNT.

19      Q.    And why was he, as you understood it,

20  reaffirming this dedication to combating racism in

21  this announcement?

22            MS. QUIMBY:  Objection, form.

23      A.    This is because Volume 12 of JSS created an --

24  what's the word -- not unpleasant, objectionable public

25  image of UNT.

1          Q.    Um-hum.

2          A.    Because it's important not only what every

3    individual thinks what inclusion means, what racism

4    means, and so on, but also the public image of something.

5    So when Volume 12 of JSS came out, the public image of

6    UNT was affected, and this is what this email was about.

7          Q.    Um-hum.  Was the Journal of Schenkerian Studies

8    ever published again after July 31st, 2020, to your

9    knowledge?

10         A.    To my knowledge, no.

11         Q.    Do you think that reflected well on the

12   University of North Texas?

13               MS. QUIMBY:  Objection, form.

14         A.    I don't know.  It's -- the question is too

15   general.  I don't know.

16         Q.    I'm going to transition to talking about what

17   two documents that you referred to.  Well, actually, all

18   three documents besides some of the email correspondence

19   that you referred to when I asked you what documents you

20   had looked at to prepare for your deposition.  This would

21   be the petition signed by faculty, the petition signed by

22   students, and the Ad Hoc Panel Report of November 25th,

23   2020.  So I'm going to mark for the record the Ad Hoc

24   Panel Report.

25               (Deposition Exhibit Number 14 marked.)

1          MR. ALLEN:  And you'll have to give me a

2   second here.  I seem to have lost it.  Where did it go?

3   I'm going to need a second to -- sorry.  I had this

4   exhibit, and now I don't seem to have it anymore.  I

5   think this is it.  Okay.  I apologize, Professor

6   Bakulina.  One of the deposition exhibits I was going

7   to show you, I misplaced, and I'm finding it again.

8        Q.    So I'm marking for the record as Exhibit 14,

9   the Ad Hoc Panel Report.  And I'm also going to publish

10  that into the chat.  We're just going to wing this.

11         All right.  So we're not going to go through

12  the entire report.  But the report had attached to it

13  certain exhibits of its own that I have marked as part

14  of the entire report.  I'm only doing this because that

15  keeps them all in one place.  But for our purposes, I

16  want to call your attention to a document that was

17  attached to the Ad Hoc Panel Report.  And again, I'm not

18  trying to hide anything.

19         Do you recognize this document as the Ad Hoc

20  Panel Report of Review of Conception and Production of

21  Volume 12 of the Journal of Schenkerian Studies dated

22  November 25, 2020, correct?

23       A.    Yes.  Yes, I do.

24       Q.    And do you recall that various documents

25  were appended to the end of that report, including

 1  this statement of UNT faculty on Journal of Schenkerian
 2  Studies?
 3       A.   Yes.
 4       Q.   And the first signature on this document is
 5  yours, Ellen Bakulina, correct?
 6       A.   Yes.
 7       Q.   And it says, "We the undersigned faculty
 8  members of the University of North Texas Division of
 9  Music History, Theory, and Ethnomusicology stand in
10  solidarity with our graduate students in their letter
11  of condemnation of the Journal of Schenkerian Studies."
12            Correct?
13       A.   Yes.
14       Q.   And then it goes on to say, "We endorse the
15  call for action outlined in our students' letter."
16            Do you see that in the second paragraph?
17       A.   Yes.
18       Q.   And what document is linked here?
19       A.   The student letter.
20       Q.   And is that also appended to the Ad Hoc Panel
21  Report as, quote, Exhibit 3 to the Ad Hoc Panel Report
22  here?
23       A.   It looks like it.  We have -- yes, that's the
24  student letter, it seems, yes.
25       Q.   Do you want some more time to review it?

1          A.    If you ask a specific question, I will review
2    it.
3          Q.    Okay.  We will get to it, but I'm just
4    trying to authenticate that this has been incorporated
5    by reference at least through this link, in your letter
6    that you signed.
7          A.    Yes.
8                MS. QUIMBY:  Form.
9          Q.    And that you say, "We enforce the call for
10   action outlined in our students' letter," right here,
11   right?
12               And this also asserts in the last sentence of
13   this paragraph, "The fact that he was not afforded the
14   opportunity to respond in print is unacceptable, as is
15   the lack of a clearly defined peer-review process."
16               Did I read that last sentence correctly?
17         A.    Yes.
18         Q.    Who is "he" in this sentence?
19         A.    "He" would be referring to the last person
20   named by name, which is Ewell.
21         Q.    So that should be understood to read the fact
22   that Philip Ewell was not afforded the opportunity to
23   respond in print is unacceptable?
24         A.    Yes.
25         Q.    And you knew that Philip Ewell was going to

1  receive the call for papers just like anyone else,

2  correct?

3               MS. QUIMBY:  Objection, form.

4       A.    Yes.  But the call for papers did not include

5  him.  Yes, of course, Ewell would have received the call

6  for papers, the call for responses.  What the call for

7  responses says, however, is we are asking whatever --

8  we're inviting whatever responses to Ewell's paper.

9               Now, Ewell would not normally respond to his

10  own paper, to his own presentation.  What we should

11  have done as, you know, people who drafted the call

12  for responses or call for papers, was to give Ewell a

13  specific opportunity to respond to the responses.  That's

14  something to which he could have properly said, you know,

15  yes, I want to respond to the responses, or no, I don't

16  want to respond to the responses.

17      Q.    And all of that which you just explained, is

18  that stated anywhere in this Statement of UNT Faculty on

19  Journal of Schenkerian Studies?

20      A.    It is implied where it says -- can you make

21  it bigger?

22      Q.    Um-hum.  Is that readable?  I can make it

23  bigger one more click, I believe --

24      A.    I can --

25      Q.    -- but it starts to come out of the screen if I

1   do it any bigger.  Let me make it just a little wider.

2        A.    -- explain to you.  Thank you.

3              So what I just said is not stated in the

4   letter.

5              To me, what I just said is implied in the

6   statement, "He was not afforded the opportunity to

7   respond in print."

8        Q.    I believe you've already testified that no

9   one expressed the intention of excluding Philip Ewell's

10  response to the Symposium, correct?

11             MS. QUIMBY:  Objection, form.

12       A.    The call for papers was not phrased so as to

13  include Philip Ewell himself, so as to include him in

14  terms of response to responses.

15       Q.    But it doesn't say that the fact is that the

16  call for papers didn't mention Philip Ewell explicitly,

17  right?  That's not what this says.

18             It says, "The fact that he was not afforded

19  the opportunity to respond in print is unacceptable."

20             Right?

21             MS. QUIMBY:  Objection, form.

22       A.    Well, you quoted correctly.  What's the

23  question again?

24       Q.    Well, this doesn't say something to the effect

25  of the call for papers didn't mention Philip Ewell by

1  name, does it?

2           MS. QUIMBY:  Objection, form.

3       A.    So this letter states that he was not

4  afforded an opportunity to respond.  To me, this refers

5  to the fact that the call for responses did not offer an

6  opportunity for Ewell to write a response to responses.

7       Q.    And did you participate in the drafting of this

8  UNT Faculty Statement on Journal of Schenkerian Studies?

9       A.    I remember reading a draft and maybe making

10 small suggestions, but I was not the one who drafted the

11 letter.

12      Q.    Did you ever suggest that anyone add all of the

13 verbiage that you just testified was implied in this

14 statement to the letter in actual words?

15      A.    No, I did not suggest that.

16      Q.    Now, I want to go to the students' statement,

17 and we'll ask some questions about that.  Let me see.  I

18 think this is a better -- I'm just trying to make this

19 easy for you to read.  But if I make it just a bit wider,

20 is it possible for you to see all of this now?

21      A.    Yes.  Very good, thank you.

22      Q.    Is this a good size for the font?

23      A.    Yes, excellent.

24      Q.    Okay.  So what, in this student letter, is

25 the call for action?

1                   MS. QUIMBY:  Objection, form.

2          A.    Call for action.  It's a little bit later, if

3     you scroll a little bit down.

4          Q.    Okay.  Here it says, "We also call on the

5     University of North Texas and the UNT College of Music to

6     take the following action:"

7               Is that part of the students' call for action?

8          A.    I think so.  Scroll further.

9          Q.    And then they have three bullet points, if you

10    want to call them that, or three numbered paragraphs in

11    here, right?

12         A.    Right.

13         Q.    One is dissolve the JSS, correct?

14         A.    Yes.  That's one of the actions, yes.  So

15    that's the call for actions, correct.

16         Q.    And also, critically examine the culture of

17    UNT, the COM, which I think means College of Music, and

18    the MHTE, which means School of Musicology [sic] History,

19    Theory, and Ethnomusicology; is that right?

20         A.    Yes.

21         Q.    And they want something to do with changing our

22    culture, right?

23         A.    Yes.

24         Q.    And is this also part of the call for action?

25              "Hold accountable every person responsible for

1   the direction of the publication."

2        A.    Yes, definitely.

3        Q.    And that includes, "This should also extend to

4   investigating past bigoted behaviors by faculty and by

5   taking this into account, the discipline and potential

6   removal of faculty who used the JSS platform to promote

7   racism.  Specifically, the actions of Dr. Jackson, both

8   past and present, are particularly racist and

9   unacceptable."

10            Did I read that correctly?

11       A.    You read that correctly.

12       Q.    Okay.  Do you recall any internal

13  correspondence between you and other faculty discussing

14  limitations on your endorsement of the faculty petition?

15            MS. QUIMBY:  Objection, form.

16       A.    I don't recall discussing specifically

17  limitations.

18       Q.    Do you have any memory of any limitations on

19  the faculty endorsement that you insisted on at the time?

20            MS. QUIMBY:  Objection, form.

21       A.    No, I don't remember.  I don't recall.

22       Q.    If there are emails that are discussing that

23  subject, namely, limitations on the endorsements of the

24  students' letter, do you have any reason to believe that

25  they would give a misleading account of the faculty

1    discussions at that time?

2                MS. QUIMBY:  Objection, form.

3        A.    Limitations?  What limitations?  Could you

4    rephrase the question, please?

5        Q.    Sure.  Did you -- were there any discussions

6    among the faculty, for instance, saying I don't want to

7    sign the students' statement because I don't want to go

8    this full distance, or I don't want to endorse that

9    specific part of the letter, or I want to choose this to

10   emphasize and not that?  Any discussions of that nature

11   that you recall from that time period in July of 2020?

12               MS. QUIMBY:  Objection, form.

13       A.    We certainly discussed the details.  I don't

14   recall what the details were.  But the -- we -- when the

15   faculty let us say that we support the call for action,

16   I remember that we agreed that people should be

17   accountable.

18       Q.    Um-hum.

19       A.    Responsible parties should be held accountable.

20   And to me, accountable is responsible.

21       Q.    Okay.

22       A.    And the examining the culture of UNT was

23   definitely a part of what we discussed for sure.

24               MR. ALLEN:  Okay.  I'm going to mark for

25   the record -- well, let's see again.  I'll publish this

1 to the chat as well.  This will now be -- oh, my

2 goodness.  Where are we in the -- Exhibit 15?

3                THE REPORTER:  You marked the last one?

4                MR. ALLEN:  The last one was Exhibit 14,

5 for the record.  I had intended, and I thought I did,

6 but I may have made a mistake.  I wanted to mark for

7 the record as Exhibit 14 the Ad Hoc Panel Report of the

8 University of North Texas dated November 25th, 2020,

9 which is what the witness and I have been discussing and

10 which incorporates as attachments a statement of UNT

11 faculty on the Journal of Schenkerian Studies dated, in

12 this version, July 31st, 2020, and a student letter or

13 petition, which is attached to the Exhibit 14 as its own

14 Exhibit 3, which is an undated statement or petition by

15 the students.

16      Q.   Did I characterize that correctly, Professor

17 Bakulina?

18                MS. QUIMBY:  Objection, form.

19      A.   I'm sorry.  I was not following.

20      Q.   Yeah.  Did I characterize Exhibit 14

21 correctly in my statement to the court reporter?

22                MS. QUIMBY:  Objection, form.

23      A.   I'm sorry.  I'm beginning to be a little tired.

24      Q.   That's okay.

25      A.   I didn't know you were addressing me.

1          Q.    That's all right.  I'm just trying to create

2    a record, that we've marked as Exhibit 14 the Ad Hoc

3    Review Panel's Report of Review of Conception and

4    Production of Volume 12 of the Journal of Schenkerian

5    Studies, dated November 25th, 2020.

6          A.    That's correct.

7          Q.    Okay.  And that's the document we were

8    discussing that incorporated the student letter and the

9    faculty letter, correct?

10         A.    Yes.

11               MR. ALLEN:  Okay.  Now, I'm marking as

12   Exhibit 15 --

13               (Deposition Exhibit Number 15 marked.)

14         Q.    -- an email from Diego Cubero to Rebecca

15   Geoffroy-Schwinden of 7-30-2020 or July 30th, 2020.

16   And it's captioned Statement on JSS Issue.

17               Did I read that correctly?

18         A.    Yes.

19         Q.    I know you are not on this email, Professor

20   Bakulina, but it refers to you right here.  Can I ask

21   you to read that section in purple letters?

22         A.    If you would make it bigger.

23         Q.    Oh, of course.  Okay.  Do you recall having

24   a discussion about these issues having to do with the

25   faculty statement around the time of July 30th, 2020?

*ELLEN BAKULINA, PH.D.*          *10/16/2024*

1       A.   Yes, I remember the discussions.

2       Q.   Were you discussing those issues directly

3   with Rebecca Geoffroy-Schwinden?

4       A.   I remember the discussion with Rebecca and

5   others, yes.

6       Q.   What was Rebecca Geoffroy-Schwinden's role in

7   the formulation of the faculty statement?

8       A.   She prepared one of the drafts.  I forget

9   which.  I don't remember if it was the first or the

10  last, but she drafted one of the drafts.

11      Q.   Do you know if she was the faculty member who

12  circulated the final signed statement to Dean Richmond?

13      A.   I don't.

14           MS. QUIMBY:  Objection, form.

15      A.   I don't recall who that was, her or someone

16  else.

17      Q.   And was it -- was it Rebecca Geoffroy-Schwinden

18  that you gave permission to put

19  your name to the faculty statement?

20      A.   Yes.

21      Q.   So this is from Diego Cubero.

22           And he says, "Below, I have compiled the

23  responses I have received so far."

24           Do you know what that refers to, if you do?

25      A.   I think that we had sent her reactions to one

1  of the drafts of the faculty letter.

2      Q.    Okay.  And is this an accurate description of

3  your reactions to the faculty letter that you had seen

4  at that time?

5      A.    I don't remember, but I will trust this email.

6      Q.    Okay.  Do you know of any other written record

7  of your reactions to endorsing or not endorsing the

8  faculty letter at this time?

9      A.    They would all be in these emails.  I don't

10  think there are any others.

11      Q.    Okay.  So in the first paragraph, From Ellen,

12  after this statement, From Ellen -- and you understand

13  that refers to you, right?

14      A.    Yes, it does.

15      Q.    There's no one else in the faculty who signed

16  the statement named Ellen, correct?

17      A.    Correct.

18      Q.    All right.  You take issue with some phrasing.

19          "Look at us and witness this reality.  Let

20  us be an example," or words to that effect, right?

21      A.    Um-hum.  Those are the words, yes.

22      Q.    Do you know if they took your suggested changes

23  to heart?

24          MS. QUIMBY:  Objection, form.

25      A.    Meaning like did they make changes based on

1  what I said?  I think they did because --

2      Q.    Okay.

3      A.    -- this wording is not in the final draft.

4      Q.    Okay.

5      A.    I guess, yes.

6      Q.    And then second, you take issue apparently with

7  the last phrase, "Dismantle and to rebuild our shared

8  institutions," which you found unclear, right?

9      A.    Yes.

10      Q.    Third, you say, "I cannot sign in support of

11  the student statement.  For one reason, that statement

12  mentions, 'We condemn the egregious statements written by

13  UNT faculty members within this publication.'"

14          Right?

15      A.    Okay.  Give me one second.  We condemn the

16  egregious... I see.  Yes, okay.  Yeah, correct.

17      Q.    And so there, that was in line with the

18  July 29, 2020 letter we reviewed earlier in which you

19  had analyzed five different contributions to the

20  Symposium, right?

21      A.    Yes.

22      Q.    And you felt some were worthy publications

23  and some were not?

24          MS. QUIMBY:  Objection, form.

25      A.    I don't think worthy of publication is what I

1  meant.  I meant more my personal agreement.

2      Q.    Okay.  And from the looks of the final

3  statement, we just examined in Exhibit 14 --

4      A.    Um-hum.

5      Q.    -- it sounds like this change was also

6  adopted by the faculty in their final statement,

7  correct?

8              MS. QUIMBY:  Objection, form.

9      A.    Yes, because -- sorry.

10     Q.    But the final statement did maintain its

11 endorsement of the condemnation of Timothy Jackson in

12 particular, correct?

13             MS. QUIMBY:  Objection, form.

14     A.    We never endorsed the condemnation of Timothy

15 Jackson.  I don't know if there was such a thing as

16 condemnation of Timothy Jackson.

17     Q.    So if you look at Exhibit 14 where it says,

18 "Hold accountable every person responsible," and it

19 specifically states, "the actions of Dr. Jackson,

20 both pass and present, are particularly racist and

21 unacceptable," you don't think that specifically

22 condemns Professor Jackson?

23             MS. QUIMBY:  Objection, form.

24     A.    The faculty letter does not endorse his

25 opinion.  The faculty letter endorses a call for action,

1  and that's not the same as condemnation of something.

2      Q.    You don't think specifically the actions of Dr.

3  Jackson, both past and present, are particularly racist

4  and unacceptable is a condemnation?

5              MS. QUIMBY:  Objection, form.

6      A.    I mean that our faculty letter does not endorse

7  that.

8      Q.    Well, I understand you're saying that after

9  talking to your lawyers.  I'm asking you a specific

10  question, whether stating in this letter, "The actions

11  of Dr. Jackson, both pass and present, are particularly

12  racist and unacceptable," to the condemnation of

13  Professor Jackson?

14              MS. QUIMBY:  Objection, form.

15      A.    I'm not sure, because people can change.

16  What if Timothy Jackson changes and we -- I don't think

17  it's -- I don't think this condemns a person.  I think

18  this definitely gives an opinion about the actions of a

19  person, but condemn the person is something different.

20  You know, I have changed through the years, and another

21  person can change through the years.  I don't think

22  this is -- I don't agree that this is condemnation of

23  a person.

24      Q.    Okay.  So it's your testimony today that

25  declaring "the actions of Dr. Jackson, both past and

1  present, to be particularly racist and unacceptable,"

2  does not condemn him, his past actions, both past and

3  present?

4      A.    Correct.  I think this does not condemn him

5  as a person.

6      Q.    Okay.  So we will go back now to Exhibit 15.

7  What you were saying here, or at least what it summarizes

8  you having said, is there anything in this that limits --

9  I don't know, maybe we'll call it criticism then, of

10 Professor Jackson's racism and his actions, both past

11 and present, is that ever addressed in any of this right

12 here?

13          MS. QUIMBY:  Objection, form.

14     A.    Let's see.  Okay.  So please repeat your

15 question.

16     Q.    Is there anything in this statement that limits

17 the criticism of Dr. Jackson's specific --

18 excuse me.  Strike that.

19          Is there anything in this discussion that

20 expresses the intention to limit the endorsement of the

21 student's criticism of Dr. Jackson's, quote, racist

22 actions, both past and present?

23          MS. QUIMBY:  Objection, form.

24     A.    Is there anything that limits -- no, there is

25 nothing that limits.  This talks about the articles and

1  the journal.  No, the answer is no.

2      Q.    In fact, this summary says, "I do support its

3  main message."

4          Correct?

5      A.    Students' statement.  Yes, but I don't think

6  that the main message is to condemn somebody.  I think

7  the main message is to change how we do things.  I say

8  we, at UNT.

9      Q.    Is that stated anywhere in this letter, this

10  statement, what you just said?

11      A.    I think this is implied in the phrase, "We

12  stand in solidarity with our graduate students in their

13  letter of condemnation of the Journal of Schenkerian

14  Studies."

15      Q.    There, you actually used the word

16  "condemnation" of the Journal of Schenkerian Studies,

17  right?

18      A.    Yes, but it is not a condemnation of a

19  person.  It's a condemnation of a journal, a Schenkerian

20  journal.

21      Q.    And you also talk about systemic racism in

22  the discipline, correct?

23      A.    Yes.

24      Q.    That was important to the faculty, to condemn

25  systemic racism?

```
 1                    MS. QUIMBY:  Objection, form.
 2         A.    Most definitely.
 3                    THE WITNESS:  Sorry, Mary.
 4                    MS. QUIMBY:  That's okay.  You can answer.
 5         A.    Yeah, yes.  The answer is yes.
 6         Q.    And you also say, "The forthcoming issue,"
 7    meaning Volume 12, "is replete the racial stereotypes
 8    and tropes."
 9              Did I read that correctly?
10         A.    Yes.
11         Q.    And are there racial stereotyping and tropes
12    that you're referring to in this faculty statement, those
13    in the article that you claim were written by Timothy
14    Jackson in this Symposium?
15                    MS. QUIMBY:  Objection, form.
16         A.    Yes, some of them.
17         Q.    Okay.  So I just have one more -- well, two
18    more series of questions, but the first will be about
19    the ad hoc panel itself.  You were interviewed by the
20    so-called ad hoc panel?
21         A.    Yes, I was.
22                    MS. QUIMBY:  Objection, form.
23         Q.    What did you tell the ad hoc panel?
24                    MS. QUIMBY:  Objection, form.
25         A.    About what?
```

1          Q.    Do you know what I mean when I say the ad hoc

2    panel that wrote the report that we just examined as

3    Exhibit 14?

4          A.    Definitely, but you question was not specific

5    enough.

6          Q.    Sure, sure.  You've also testified that you met

7    with the so-called ad hoc panel, right?

8          A.    On Zoom, yes.

9          Q.    Yeah.  And my question is when you met with the

10   ad hoc panel, what did you tell them?

11              MS. QUIMBY:  Objection, form.

12         Q.    Is it -- are you unable to testify to what

13   you told the ad hoc panel?  I know your attorney seems

14   to object to that question.

15         A.    I think that you're expecting me to summarize

16   everything that I said.  And right now, I don't feel

17   prepared to do that.  But I -- as I mentioned, I reread

18   the panel -- the panel report.

19         Q.    Um-hum.

20         A.    And I did that yesterday.  And I -- so it's all

21   there.  I'm not sure if you're testing my memory or what.

22         Q.    Well, one of the purposes is to find out what

23   you will say at trial.  That's one of the purposes of a

24   deposition, Professor Bakulina.  And that's why I'm

25   asking you what you remember that you told to the ad

1    hoc panel.  Let me back up and maybe I can ask a few

2    questions that will help focus us.

3             Did you meet with them more than once?

4        A.    I met with them once.

5        Q.    And I wouldn't expect you to remember the day,

6    but it was in 2020?

7        A.    I think it was either November or December.

8    I think it was December 2020.

9        Q.    Okay.  And the documents will reflect when the

10   actual meeting was, right?

11       A.    Yes.

12             MS. QUIMBY:  Objection, form.

13       Q.    And do you know why they wanted to meet with

14   you?  Did they tell you why they wanted to meet with you?

15             MS. QUIMBY:  Objection, form.

16       A.    I think the reason for writing that report was,

17   one, a response to the call for action.  Because

18   the call for action ultimately says, you know, hold the

19   responsible parties accountable, right?

20       Q.    Um-hum.

21       A.    And to me, accountable means responsible,

22   able to respond.  So that panel examination was part of

23   this sort of commitment to hold people responsible,

24   including myself.

25       Q.    How were you held responsible, Professor

 1  Bakulina?

 2      A.    How was I held responsible?

 3      Q.    Um-hum.

 4      A.    I was asked to honestly answer all of the

 5  questions, and I did.

 6      Q.    Okay.

 7      A.    I also will say that I have changed a lot.

 8  And in that year, 2020, I certainly read more on racism

 9  and antiracism than I had ever known before.  And I have

10  changed my teaching as the result.

11      Q.    Um-hum.

12      A.    And to me, that's also part of being

13  responsible, because we're responsible to what we do

14  to our students.

15                  (Deposition Exhibit Number 16 marked.)

16      Q.    I'm going to mark for the record Exhibit 16.

17  And I've just published that in the chat as well.  Let me

18  put it back up.  I'm going to represent for the record

19  that is an email thread with the Bates number UNT 2509

20  from Benjamin Brand to John Ishiyama on September 17th,

21  2020.

22            Did I read that correctly?

23      A.    Yes.

24      Q.    Now, I don't believe you are on this email

25  thread.  But it is between your division head, Benjamin

*ELLEN BAKULINA, PH.D.*        *10/16/2024*

1  Brand, and the members of the ad hoc panel.  Do you

2  recognize John Ishiyama as the member of the ad hoc

3  panel?

4       A.    Yes, I do.

5       Q.    What role did he play, as far as you understand

6  it, on the ad hoc panel?

7       A.    He -- well, first of all, he was one of the

8  people asking the questions.

9       Q.    Um-hum.

10      A.    And I don't know if he helped draft the final

11 report.  Beyond that, I don't know.

12      Q.    Okay.

13      A.    I haven't met members of that panel beyond my

14 meeting with them on Zoom.

15      Q.    Was all of your correspondence with the ad hoc

16 panel through John Ishiyama?

17             MS. QUIMBY:  Objection, form.

18      A.    That, I actually can't recall.  Can I look --

19 could you please make it slightly bigger?  Yes, thank

20 you.  That's fine.  I actually don't recall if I got

21 emails from any of these other people.

22      Q.    Okay.

23      A.    Okay.

24      Q.    When you say these other people, do you mean

25 the other people in the cc line of Exhibit 16?

1          A.    Correct.

2          Q.    You do know that you received emails from time

3    to time from John Ishiyama while the ad hoc panel was

4    doing its work?

5          A.    Yes.  I remember his name, yes.

6          Q.    And here, Benjamin Brand says -- I'll just read

7    this into the record from this point.

8                "I would reiterate my suggestion that you ask

9    to speak to my colleague, Dr. Ellen Bakulina.  As I

10   mentioned, she would be able to give you insight into

11   the internal dynamics of the Journal and the Center."

12         A.    Um-hum.

13         Q.    Did I read that right?

14         A.    Yes, you did.

15         Q.    All right.  Now, have you talked to

16   Professor Brand about your role in the Journal prior

17   to September 17th, 2020?

18         A.    Not on -- yes, I talked with him.  Moreover,

19   there were actually meetings in which he would be

20   present.  Or maybe wait, not him, but there were meetings

21   of the Center for Schenkerian Studies through the years.

22   I don't recall.  I'm not sure I remember if Benjamin

23   Brand would be there, but we certainly talked, yes.

24         Q.    And is what he said here to the ad hoc panel

25   accurate, that you would be able to give insight into

*ELLEN BAKULINA, PH.D.    10/16/2024*

1  the internal dynamics of the Journal and the Center?

2       A.    Yes, of course, because I was part of the

3  Center, and I was on the editorial board of the journal.

4       Q.    But as you sit here today, you don't have

5  any memory of what you discussed with the ad hoc panel

6  specifically?

7       A.    I remember the ad hoc panel relatively well

8  as opposed to -- like in July 2020, it's a little vague.

9  But this I -- so if you -- like if you pose specific

10 questions, what answer to what -- like I can talk about

11 that.  Just if you try to make your questions a little

12 more specific.  We definitely talked about the Journal.

13 We definitely talked about how my relationship with

14 Dr. Jackson worked.

15      Q.    Um-hum.

16      A.    So what specific thing would you like to know?

17 I will definitely answer.

18      Q.    What objections to the way the ad hoc -- excuse

19 me.  Strike that, please.

20           What objections to the way in which the

21 Journal of Schenkerian Studies was run did you raise

22 with the ad hoc panel?

23                MS. QUIMBY:  Objection, form.

24      A.    I think I said that -- first of all, I did

25 say that the organization of the panel and the process

1  in the Journal was not clear.  I said that.  I also --

2  let's see.  I think I would have talked about the Center

3  for Schenkerian Studies because, of course, that was

4  causally related to the journal.  I also talked about

5  some of my interactions with Timothy Jackson that are, in

6  my opinion, irrelevant to the journal.  But I said it

7  nonetheless, because they asked questions about how my

8  relationship with Jackson as my colleague were.

9      Q.    And what was that you mentioned about your

10 colleague, Timothy Jackson?

11     A.    I mean, for -- in many ways, our relationship

12 was just fine.  But I did mention two things that

13 happened in October 2016.  And I mentioned them as

14 ethically inappropriate, and I still think that.  And I

15 still feel frustrated by what happened, and I said that

16 to the panel.

17     Q.    What was ethically inappropriate?  Can you

18 describe that?

19     A.    Yes, definitely.  One was Timothy Jackson was

20 asking me about my medical insurance which, in itself,

21 is okay, but he started talking about diseases and he

22 started insisting that I might get a disease later on

23 that, you know, that would be dangerous and potentially

24 lethal.  And for this reason, I need to do something with

25 the insurance.  I don't remember what it was about the

1  insurance, but he kept talking about the disease, which
2  made me quite uncomfortable.  That's a relatively small
3  thing.
4      Q.    Was this a disease you actually had or one he
5  was afraid you might get?
6      A.    I was afraid I might get.  No.  Thank God, I do
7  not have it.
8      Q.    Um-hum.
9      A.    The second interaction that I described
10  to the panel, and that interaction happened in
11  October 2016, Timothy Jackson, without me asking him
12  about it, talked about the proceedings of the search
13  committee that interviewed me at UNT in February of
14  2016.  And Timothy Jackson said to me that members of
15  that committee were unwilling to hire me or to vote for
16  hiring me, which I think is entirely inappropriate.  I
17  think that the proceedings of a search committee must
18  be confidential.  And the fact that he said this to me
19  felt extremely personal, but was unethical and felt very
20  awkward and painful, because it made me feel like he
21  wanted me to feel bad about my colleagues.  So he said
22  that the rest of the search committee, with the exception
23  of one other member, which was Paul Warwick who is now
24  retired, the search committee did not want to vote for me
25  because they did not want any women.  That's what Timothy

1  Jackson said.  I have no idea if this is true.  But these

2  things must remain confidential.  And the fact that he

3  said this to me in my first semester at UNT made me

4  extremely uncomfortable.  And I thought this was

5  unethical, and I still think this is unethical.

6      Q.    Sorry, are you finished?  I didn't mean to --

7      A.    This is unrelated to the journal.  But

8  perhaps it's related in a way that Timothy Jackson can

9  do inappropriate things that just were unexpected.

10     Q.    And this hiring committee thing, was Timothy

11 Jackson communicating to you that he voted against you

12 because you were a women?

13     A.    He communicated to me that he and Paul Warwick

14 were the only two of the committee that voted for me.

15 Now, I don't know if that's the truth, but that's what

16 he said.

17     Q.    Do you have any information to suggest that

18 he was not telling you the truth?

19     A.    I have no idea, because no one else did the

20 breach of confidence.

21     Q.    And wouldn't you want to know if people in your

22 department had it out for you simply because you were a

23 woman?

24           MS. QUIMBY:  Objection, form.

25     A.    I don't want to know, because I think these

 1  things must be confidential.

 2       Q.    Is there a policy at UNT that these things have

 3  to be kept confidential?

 4       A.    They normally are confidential everywhere, and

 5  it's not even about policy.  It's a human ethical thing.

 6  Ethics is not about policy.  Ethics is about universal

 7  understanding of, you know, hurting someone or not

 8  hurting someone.

 9       Q.    And you felt hurt because Timothy Jackson told

10  you some of your colleagues might have had it out for you

11  because you were a woman?

12            MS. QUIMBY:  Objection, form.

13       A.    I felt hurt because Timothy Jackson wanted me,

14  I thought, to have enmity against my colleagues, which I

15  never had.  The problem for me was I couldn't understand

16  why he said this to me.  Did he said this to me because

17  he wanted me to feel like I have enemies?  I'm not

18  asking.  This is a rhetorical question.  The main

19  problem for me with this incident is why he said this.

20  And --

21       Q.    And you don't think the simplest explanation,

22  that he was trying to help you?

23            MS. QUIMBY:  Objection, form.

24       A.    No, because I was not having problems.  I

25  was not having problems.  Nobody would need to help me

*ELLEN BAKULINA, PH.D.    10/16/2024*

```
 1   because I was not having problems.  And I wouldn't even
 2   know if I would have problems because that was -- I was
 3   two months into my position.  I -- yeah.  At that point,
 4   I definitely did not have problems.
 5        Q.    Do you know that the ad hoc panel filed a Title
 6   IX claim on your behalf against Timothy Jackson?
 7        A.    No.
 8        Q.    Did you ask them to?
 9        A.    No.
10        Q.    And do you remember telling them that Timothy
11   Jackson had told them that other people had opposed your
12   appointment because of sex?
13              MS. QUIMBY:  Objection, form.
14        A.    The word "sex" was never mentioned.
15        Q.    Well, I'm sorry.  Do you know what a Title IX
16   is?  I'm sorry.  I should have backed up.  I'm not asking
17   you for a legal understanding.  I'm just asking if you
18   know what Title IX is.
19        A.    I have a general understanding.  I'm afraid
20   my knowledge is very limited.
21        Q.    So I'm just going to represent to you that
22   Title IX forbids discrimination on the basis of sex and
23   education.
24        A.    Okay.
25        Q.    So when I said sex, that's what I meant, not
```

1 | anything else.

2 |     A.    Okay, okay.

3 |     Q.    The fact that you are a woman.  And so Timothy

4 | Jackson told you that members of your search committee

5 | had opposed your appointment because --

6 |     A.    Because I'm a woman.

7 |     Q.    A woman.  And you then apparently relayed this

8 | to the ad hoc panel?

9 |     A.    I did.

10 |     Q.    And on the basis of these other issues that you

11 | claim made you feel, quote, uncomfortable, they filed a

12 | Title IX complaint on your behalf?

13 |     A.    I did not know that.  This is the first time

14 | I hear about it.

15 |     Q.    And you didn't ask them to, huh?

16 |     A.    No.

17 |     Q.    Okay.  Do you know if they filed a Title IX

18 | complaint against anyone else on the search committee

19 | that had actually opposed your appointment because you're

20 | a women?

21 |     A.    I don't know.  No, I have not heard of anything

22 | like that.

23 |     Q.    And you would agree, wouldn't you, that

24 | opposing someone's appointment solely because they were

25 | a woman would be discrimination on the basis on sex,

1  right?

2            MS. QUIMBY:  Objection, form.

3      A.    Right.

4            MS. QUIMBY:  Can we take a break?  It's

5  been another hour.

6            MR. ALLEN:  Has it been?  I'm sorry.  I

7  was getting away from myself.  I think we're almost done.

8  So when we come back, we'll finish up, Professor

9  Bakulina.  Can he go off the record, please?

10            THE VIDEOGRAPHER:  The time is 2:55 p.m.

11  We're off the record.

12                  (Recess taken)

13            THE VIDEOGRAPHER:  The time is 3:06.  We

14  are back on the record.

15                  (Deposition Exhibit Number 17 marked.)

16            MR. ALLEN:  Good afternoon, Professor

17  Bakulina.  I'm hoping this is our last session, so we'll

18  try to begin with Exhibit 17, which I'm marking for the

19  record as an email from Ellen Bakulina to John Ishiyama,

20  with the other members of the ad hoc panel cc'd.  And the

21  date is October 2nd, 2020.

22      Q.    Is this an email you sent, Professor Bakulina?

23      A.    Yes, yes.

24      Q.    It looks like you had your discussion with them

25  on this day.

1          "Thank you for your discussion today," at the

2   signature line.

3          A.    Yes.

4          Q.    Okay.  It also attaches Bakulina JSS

5   Response.docx here.  Do you know what that attachment

6   was?

7          A.    No, unless I could look in my documents.

8   It was possibly the report that I sent to John Richmond,

9   but I --

10         Q.    That's what is referred to the first sentence

11  here, right?

12         A.    I see.  A portion of the record I sent to Dean

13  Richmond.  Okay.  Well, that explains it.

14         Q.    That's just my question, because I don't know.

15  So why did you send him only a portion of the document

16  and not the whole document?

17         A.    I don't remember this email exchange.  It

18  was an answer to a specific question, I'm sure.

19         Q.    Okay.  And it says here, "The other portion

20  deals with the assessment of Volume 12 content."

21         Right?

22         A.    I don't know.  I guess they asked me to send

23  something about the production of Volume 12 rather than

24  my opinion about Volume 12.  I don't know.  I don't know.

25         Q.    Okay.  All right.  And then you go on to say in

1  this email of October 2nd, 2020, "I have one other point

2  in addition to what I said earlier today.  If the Journal

3  of Schenkerian Studies continues to exist, it would be a

4  good idea to involve people of color as a

5  form of recompense after the racist content of some of

6  the Volume 12 articles in two ways:  As part of the

7  journal's leadership, there are non-white Schenkerians

8  and also women Schenkerians who have not yet been

9  involved with JSS, and as part of the content encourage

10  analysis of music by POC composers.  As my other points,

11  this one is only a suggestion since I don't know what

12  the outcome of the journal review will be."

13          Did I read that correctly into the record?

14    A.    Yes.

15    Q.    Can you just state for the record what POC

16  means?

17    A.    People of color.

18    Q.    Okay.  And you're advocating for hiring

19  people on the basis of race to the Journal's leadership?

20          MS. QUIMBY:  Objection, form.

21    A.    It would not be hiring, because people on the

22  editorial board of a journal, they're not hired.  It's

23  not for money.

24    Q.    Was the editor of the Journal of Schenkerian

25  Studies paid?

1        A.    Actually, I don't know.  That's a good

2   question, a very good question.

3        Q.    So -- because you are talking about the

4   Journal's leadership, right?  Not just the board of

5   editors, right?

6              MS. QUIMBY:  Objection, form.

7        Q.    Journal's leadership?

8        A.    Journal's leadership is a rather inclusive

9   term.  It would include --

10       Q.    Um-hum.

11       A.    It would include both editor and editorial

12  board in mine.  That's what I meant.

13       Q.    And you're advocating appointing individuals to

14  the Journal's leadership on the basis of race, right?

15       A.    Could you make this slightly bigger?

16       Q.    Oh, I apologize.  I forgot to do that again.

17       A.    No problem.  Don't worry.

18       Q.    I think we've got it here.

19       A.    Yes, very good.  As part -- so I didn't

20  recommend to appoint someone, although I think it would

21  be possible.  I say here involved people of color, and I

22  can explain what I mean.

23       Q.    Sure.

24       A.    One way would be for -- for UNT because the

25  Journal is published -- was published by UNT, would be

ELLEN BAKULINA, PH.D.     10/16/2024

 1  to invite a -- or even better perhaps, to invite

 2  applications for this position -- and again, I don't

 3  know if it was ever a paid position -- from women and

 4  nonwhite people.

 5       Q.    Um-hum.

 6       A.    And I don't mean that the appointment or

 7  selection of a new editor or editorial board members

 8  would be solely on the basis of race or gender.  It

 9  would be selection on the basis of many things, including

10  the experience, have they ever had editorial experience,

11  their knowledge of Schenkerian techniques.  I mean, many

12  criteria would be involved.

13       Q.    And just if you know, besides Philip Ewell, who

14  I believe has a background in Schenkerian analysis,

15  correct?

16       A.    I'm not sure.

17       Q.    You don't know?

18       A.    I don't remember.  I haven't looked at his

19  transcript.

20       Q.    Do you know of any people of color who are

21  Schenkerians?

22       A.    So first of all, I don't think I should limit

23  this to people I know.  It's true that I do actually know

24  relatively many people in my field, but it doesn't mean

25  that I know everyone.  And even someone --

1        Q.    I'm not suggesting that you know everyone.

2   I'm just asking if you know any Schenkerians who are

3   people of color.

4        A.    I think that it's not necessarily the best way

5   to put it.  I think someone who may be -- someone who has

6   the necessary qualifications, but who is less well-known

7   in the field.  So you know, maybe it's somebody who I

8   don't know because they're less well-known because they

9   have had the privilege to have an important position or

10  something.  Maybe something like that.

11       Q.    Sure, maybe.  But I'm asking a specific

12  question, not about those things.  I'm asking the

13  specific question, if you know if there are any

14  Schenkerians who are people of color.

15       A.    So there is one who is on faculty at -- give me

16  one second.  Is it Emory University?  And I don't

17  remember his name.  He's Black.

18       Q.    Um-hum.

19       A.    Emory University.  And then there are people

20  who are currently or were at that time students.  There

21  are -- of course, I shouldn't say of course, but there

22  are people from Asia or people of Asian origin who are

23  Schenkerians.  Now, I should know some of their names.

24       Q.    Um-hum.

25       A.    Last name Mak.  I don't actually know them in

1  person.  But I know -- sorry, I should know the lat name

2  Mak, M-A-K or M-A-C, is an Asian person.

3        Q.    Um-hum.

4        A.    Eric Wen, of course.

5        Q.    And do you have any direct knowledge of Timothy

6  Jackson excluding people of color from the leadership of

7  the Journal of Schenkerian Studies because they were

8  people of color?

9        A.    No, no.

10            MS. QUIMBY:  Objection, form.

11        A.    I don't know.

12        Q.    And you do know that he involved Diego Cubero

13  in the formulation of the call for papers in 2019, right?

14            MS. QUIMBY:  Objection, form.

15        A.    That's true.  And Diego Cubero, I think,

16  was -- now, I'm not absolutely sure.  But I think he was

17  on the editorial board.  Yes, I think that's correct.  So

18  yes, there were some people of color.  And by the way, I

19  don't know if Diego identifies as a person of color

20  anyway.  I think he's Hispanic, but they were certainly

21  in the minority.  And by the way, this letter also talks

22  about gender, and that would refer to women Schenkerians.

23        Q.    And he involved you in the call for papers

24  about production as well, right?

25        A.    Yes.  And I'm not saying people who are not

1    white men were completely excluded.  What I meant is that

2    they  could be more highlighted in the field or subfield.

3        Q.    You also know that Timothy Jackson and the

4    editorial staff involved Andrew Chung, correct?

5                MS. QUIMBY:  Objection, form.

6        A.    I actually don't know if Andrew Chung was

7    involved, or maybe I don't recall well.

8        Q.    Do you know if Andrew Chung identifies

9    himself as a person of color?

10        A.    I don't know how he identifies, but I think

11    both his -- I don't know how he identifies.  I think both

12    of his parents are Asian.

13                (Deposition Exhibit Number 18 marked.)

14        Q.    Okay.  I'm going to mark for the record Exhibit

15    18, which has also been dropped into the chat. This is a

16    document captioned, Dear Dean Richmond.  It

17    has no signature line, but I'm just going to ask you to

18    read -- I know this is -- I'm going to try to anticipate

19    your next question is that I should expand it.

20        A.    Thank you.

21        Q.    I don't want to spend too much time on this,

22    but I think we've already discussed it in some degree.

23    It starts with the first paragraph.

24                "I appreciate your concern with our latest

25    Journal of Schenkerian Studies and its reception by the

1 scholarly community.  I will address your questions in

2 two separate categories," and so forth.

3          I'm just going to ask -- and please take as

4 much time as you would like to review it.  As far as I

5 can tell, this is the exhibit referred to in Exhibit 17

6 as "a portion of the letter I sent to Dean Richmond on

7 July 29th, 2020."  And I'm just going to ask you to

8 read it and ask if that is something that you can state

9 for the record?

10          MS. QUIMBY:  Objection, form.

11     A.    Okay.  One minute.  So let me...

12     Q.    Um-hum.

13     A.    Okay.  So what's your question?

14     Q.    Is this the exhibit that you attached, or let

15 me say -- scratch that.

16          Is this the attachment that you included as

17 part of your email of October 2nd, 2020, which has been

18 introduced into the record as Exhibit 17, the "portion

19 of the letter I sent to Dean Richmond on July 29, 2020"?

20     A.    This seems like something that I wrote, but I

21 don't know if it was that attachment.

22     Q.    And remember the previous exhibit, when we

23 discussed the July 29, 2020 letter had these two points,

24 A and B.

25     A.    Yes.

1        Q.    "Beginning on November 15th, I participated
2   in an email exchange," and so forth?
3        A.    Yes.
4        Q.    To me, this looks like the identical language
5   except for your analysis of the content of the Journal of
6   Schenkerian Studies.
7              MS. QUIMBY:  Objection, form.
8        A.    Yes.  So that was attachment B about -- about
9   the process, editorial process.
10       Q.    Okay.  And you'll see this has Bates number UNT
11  2559 as the first page, Exhibit 18.
12             And Exhibit 19 has the first page, UNT 2555.
13             So they're very close in the documentary
14  production that was given to us as part of discovery in
15  this case.
16       A.    Sorry.  May I ask?  This one, where does it
17  come from?  Is it an email?
18       Q.    When you say where does this come from, are you
19  referring to Exhibit 18?
20       A.    The thing that I see in front of my eyes
21  right now.
22       Q.    Yes.  This is Exhibit 18, and this comes from
23  the document production given to us by the University of
24  North Texas in response for our request for documents
25  that are relevant to this case.

1        A.    Okay.

2        Q.    And the fact is that's why I'm asking, because

3   I don't know.  It's in close proximity to Exhibit 17,

4   which is an email, including an attachment, that is

5   referred to in the letter -- excuse me, in the email

6   as "the letter I sent to Dean Richmond on July 29th,

7   2020."

8             Okay.  And then later in the record, but a

9   few pages only, we find this.  But of course, if it was

10  an attachment, it doesn't say I am an attachment.  Do

11  you know what I mean?  I'm just trying to see --

12       A.    Oh, I see, I see, I see.  So you are asking if

13  this is part of my report.  Can I look once again at my

14  report to Dean Richmond?

15       Q.    Absolutely.

16       A.    Whatever that was the report for, I don't know.

17       Q.    The previous exhibit?

18       A.    I'm sorry.  My English is getting --

19       Q.    I understand.

20       A.    The thing that I wrote for the Dean Richmond.

21       Q.    I'm sorry.  Yes.  Sorry, I'm trying to find it.

22  It is just going to take me one second.  That is not the

23  correct one.  I know it's in here.  Hold on.

24             Here it is.  I believe it's Exhibit 11.  Do

25  you recall examining --

1       A.    Yes.   I recall examining it like an hour or two

2  ago.

3       Q.    And I would represent to you that at least

4  the portions I've highlighted from July 29th, 2020 to

5  subparagraph (a), beginning on November 15th, 2019, are

6  more or less identical except for the date which somehow

7  got lost to this exhibit?

8       A.    Yes.   It's part of the same thing.   I agree.

9       Q.    Okay.   Thank you.

10      A.    Yes.

11      Q.    I don't have any further questions about that.

12  I just wanted to authenticate that for the record,

13  Professor Bakulina.

14           So after the ad hoc panel issued its report,

15  which we've already examined to some extent and has been

16  introduced as an exhibit in this deposition, what

17  happened next?

18              MS. QUIMBY:   Objection, form.

19      A.    I understand you are asking about the Journal.

20      Q.    Yes.   What first activities did you engage in

21  concerning the Journal of Schenkerian Studies after

22  November 2020?

23      A.    I see.   I was invited by the dean, I think, the

24  dean to serve on a search committee that looked for

25  a new editor.   And I served on that until the time I left

1  UNT.

2      Q.    And what did you do as a person on the search

3  committee?

4      A.    So first, we formulated a description of the

5  position.

6      Q.    Um-hum.

7      A.    And then we received, I think, two

8  applications.  I don't have it anymore.  And we

9  reviewed the applications.

10                 (Deposition Exhibit Number 19 marked.)

11                 MR. ALLEN:  I do want to ask you about

12  that.  I just want to mark for the record Exhibit 19.

13  Exhibit 19 is an email string from Benjamin Brand and

14  Jennifer Cowley, Renaldo Stowers, John Richmond.  And

15  then it looks like it attaches a call for applications,

16  Editor of Journal of Schenkerian Studies.

17              Do you recognize this email?

18                 MS. QUIMBY:  Objection, form.

19      A.    I see.  I don't recognize this email.  I

20  don't know if I received it.

21      Q.    And I see that you are not on the string.  So

22  if your answer is no, that's a perfectly fine answer.

23      A.    Um-hum.

24      Q.    Do you see this next email is, in Exhibit 19 is

25  --

1      A.    Yes.

2      Q.    -- from SMT-announce on behalf of Bakulina,

3  Ellen.  And this is your email, correct?

4      A.    Yes, so I guess I was the one who sent it to

5  SMT-announce.

6      Q.    And it's dated May 15th, 2021, right?

7      A.    Yes.

8      Q.    And I know this is small, so I'm going to blow

9  it up a little bit here.  Can you read that?

10     A.    Yes, I can.

11     Q.    It starts UNT 5054, and it continues over

12 the next page, right?  And I'm going to get rid of this

13 highlight.  What is this Dear Colleagues document that

14 you have circulated to the SMT-announce list?

15     A.    Sorry.  Let me read.  One minute.

16     Q.    Yeah.

17     A.    Seeking applications.

18     Q.    Hold on.  I just -- I'm sorry.  That wasn't

19 intentional.

20     A.    No problem.  Okay.  That's a different

21 document, right?

22     Q.    My apologies.  This should be it.  I'm sorry.

23 I opened a new document, and it jumped out of the way.

24 It's one of the perils of virtual depositions, so please

25 have as much time as you want to examine this document.

1          A.    Okay.  Yes, I am ready for questions.

2          Q.    Okay.  And I just want to scan down to the next

3    page, which goes over to UNT 5055.

4          A.    Um-hum.

5          Q.    And I just -- to highlight here, your name is

6    at the bottom where it says, "Inquiries, nominations, and

7    application materials should be directed to the search

8    committee chair Jessica Nápoles via email.  Search

9    committee members include:"

10          And your name is listed as the first member,

11    correct?

12          A.    Yes.

13          Q.    What is this document?

14          A.    It's the call for applications.

15          Q.    Call for applications for a new editor?

16          A.    Yes.

17          Q.    And was it your understanding that Timothy

18    Jackson could not serve on the Journal of Schenkerian

19    Studies editorial staff?

20          A.    No.  It was not my understanding that he

21    could not serve on this.

22          Q.    That was not communicated to you by Benjamin

23    Brand?

24          MS. QUIMBY:  Objection, form.

25          A.    It was never formulated that Timothy Jackson

1  cannot apply for this.

2      Q.   Okay.  And it says -- I'm just looking at the

3  second sentence that begins, "We hope."

4           Do you see that?

5      A.   Yes.

6      Q.   Right here?

7      A.   Yes, yes.  I do, I do.

8      Q.   I just wanted to read that into the record.

9           "We hope that the new editor or editors will

10  help rejuvenate the journal, redefine it in light of the

11  current state of music theory as a field, and restructure

12  and rebrand it to promote its long term viability."

13           Did I read that correctly?

14      A.   Yes.

15      Q.   Can you tell me, as a member of the search

16  committee, what you meant by redefine the Journal in the

17  light of the current state of music theory as a field?

18      A.   Because Volume 12 of the Journal was involved

19  with Philip Ewell's ideas, I think that redefining the

20  journal would deal with redefining it in relation to

21  ideas of antiracism and redefining it with respect to

22  the growing diversity of SMT.  And also, redefining it

23  with respect to the growing globalization of our field.

24      Q.   Uh-huh.

25      A.   Because our field -- I mean, JSS is an American

*ELLEN BAKULINA, PH.D.    10/16/2024*

1  publication.  And for a time, American music theory was

2  relatively, not entirely, but relatively isolated.  And

3  there were real reasons for it.  I'm

4  not criticizing it right now.  But there came a time

5  gradually, but especially maybe, I will say maybe 20

6  years ago, 15 years, where it was no longer just American

7  music theory.

8       Q.    Um-hum.

9       A.    And the field was changing and is still

10 changing globally around the world.  And so there are

11 music theorist societies now in many countries.  There

12 are some in Asia, and those are some of the youngest

13 ones.  There is one in Russia.  There are some in Europe.

14 And some of them are older and some are  those are newer.

15      Q.    Um-hum.

16      A.    And more -- more than all of that, there's more

17 and more interaction.  So the field is being globalized.

18 And to me, the rejuvenation of the Journal mentioned in

19 this call for applications means that Schenkerian

20 analysis, if it is to continue existing,

21 it will continue existing in this new and much larger

22 cultural context.

23      Q.    Um-hum.

24      A.    Not the context -- not necessarily or not only

25 the context, you know, of former Schenker followers or

1    Schenker students coming to the U.S.  That was extremely

2    important to the twentieth century, but no longer there.

3    You know, how does the Journal and how does the area of

4    Schenkerian studies exist in a more globalized world, in

5    a world where all of these different cultures and all of

6    these different countries and societies in the different

7    countries interact and languages interact and ideas

8    interact.  And there is, of course, also, yes, greater

9    racial and gender and other diversity in SMT itself in

10   America.  And that's really a context that simply did

11   not exist some time ago.  And I don't think this ever

12   says that Timothy Jackson cannot do it or cannot apply

13   for it.  This is more about really two things:  The role

14   of the Journal in the new universe, may I say, and the

15   role of the new universe or the changing universe,

16   changing global intellectual context, in relation to

17   what exists in Schenkerian studies nowadays.

18        Q.   Okay.  And following after the clause that

19   calls for the redefining of the Journal in the current

20   state of music theory as a field -- in the light of the

21   current state of -- it says, "restructure and rebrand

22   the Journal to promote its long term viability."

23             If I asked you what that meant, would your

24   answer be more or less the same?

25        A.   Yes, but it also would be more, and I can --

1      Q.    Please.

2      A.    Rebrand.  I think I -- somebody did not come up

3   with this word, but I can tell you what I understand by

4   it.

5                    (Cat sounds)

6      Q.    She's tired at the end of the day, too, I

7   think.  Sorry, I interrupted you.  So we were asking --

8   you were going to define what your understanding of

9   rebranding a journal was.  I apologize.  I couldn't

10  resist with the cat sound.

11     A.    No problem.  The contents of a journal -- and

12  I'm not specifically talking about JSS, any journal or

13  any conference, there are things that are being analyzed,

14  pieces that are being analyzed, sources that are being

15  cited.  In a way, that is the branding.  You know, so if

16  I read a journal whose latest issue analyzes, let's say,

17  I don't know, Stravinsky, Bartók, and I don't know,

18  Rochberg or somebody like that, my first thought would

19  be that it's a journal on twentieth century art music.

20  If I need a journal that, you know, has in its latest

21  issue, I don't know, seven articles out of which six

22  are on various genres of popular music, I will probably

23  think that it's a journal on popular music or something

24  like that.

25                    And I think that -- so I haven't reviewed

1  the last issues of JSS, of course, not counting

2  Volume 12.  But I think that most people agree that

3  existing materials in JSS up to Volume 12 are mostly on

4  European music of the tonal era.  Is that logical?  Well,

5  that's the things that Schenker analyzed primarily.  So

6  yes, a Journal of Schenkerian studies following in the

7  traditional Schenker logically seems completely good.

8          However, I also think that if the readership

9  of the journal made an effort to include pieces that go

10  beyond the, you know, white male, European composers of

11  certain centuries and made greater effort to publish

12  about the book of women, for example, or to publish

13  about, I don't know, an article about perhaps fully

14  tonal work by a -- non-like composer or American

15  composers.  You know, there's more diversity there than

16  Europe.  And that would also encourage more diversity in

17  future volumes.  So to me, rebranding means, you know,

18  changing the contents of -- let's say, one volume or

19  two volumes would change how these journals would be

20  perceived in the future and showing the direction.

21      Q.   So the new direction really had to embrace

22  new content of the kind you've described?

23      A.   Yes, to me.

24      Q.   Yes.  And sorry.  To follow up on something you

25  said earlier, you said to your knowledge, the committee

1   received two applications?

2       A.    Yes.

3       Q.    Who applied?

4       A.    I don't remember the names.  I am so very

5   sorry.  I honestly don't recall the names.  Both of

6   them are not well-known scholars in the field, which I

7   personally like that fact.  That means that, you know,

8   people who haven't yet had an opportunity to show their

9   work a lot or their qualifications a lot would have an

10  opportunity to work.  That's all I can say.  I wish I

11  could recall the names.

12      Q.    Were there documents reflecting the

13  applications of these individuals?

14      A.    They were CDs in both cases.

15      Q.    Were there any other documents that concerned

16  these two applications that you know of?

17      A.    Let's see.  There would be a -- there would

18  be the -- I don't remember if the cover of the CD would

19  be a separate documents.  Or maybe the cover was simply

20  the email itself.  Give me one minute, please.

21      Q.    Can you just describe what you are doing there?

22      A.    I'm reading the exhibit, the document that

23  you've shared, because I'm trying to see if we asked for

24  cover letter and CD separately or were they the same.

25  Okay.  It would be here.  Correct, thank you.  At least

 1  up to there, I'm sorry.  I guess the cover letter for CD
 2  was separate, okay, but I don't recall the details.
 3      Q.   Do you recall internal communications of the
 4  committee about these two applications?
 5      A.   Yes.  We -- yes.
 6      Q.   Would you have met to discuss them in person?
 7      A.   No.  It was during the pandemic.
 8      Q.   Uh-huh.  By Zoom?
 9      A.   It was by email.
10      Q.   Okay.  And so there would also be email
11  correspondence among the committee members reflecting
12  these two allocations, right?
13           MS. QUIMBY:  Objection, form.
14      A.   I think so.
15      Q.   Okay.  And you read those emails yourself,
16  correct?
17           MS. QUIMBY:  Objection, form.
18      Q.   At least as long as you were at the University
19  of North Texas, right?
20      A.   As long as I was at UNT, yes.
21      Q.   And are you -- do you have any knowledge of why
22  neither of these applicants were appointed?
23      A.   I remember that one of them didn't have enough
24  experience in editorial work, or maybe both, but the
25  other one, I don't recall.

*ELLEN BAKULINA, PH.D.    10/16/2024*

1       Q.    Were these applicants sent rejection letters,
2    to your knowledge?
3       A.    Jessica Nápoles would know more.  Actually, I
4    don't know.
5       Q.    In your experience, wouldn't that be the usual
6    practice to send applicants for a position like this a
7    rejection letter if they weren't going to be appointed?
8               MS. QUIMBY:  Objection, form.
9       A.    In my experience, well, that was a very unusual
10   experience.  I don't know what would be normal. Because
11   my other experience serving on such committees included a
12   search committee for faculty, and that's very different.
13      Q.    And search committees for faculty, if someone
14   was not invited to campus for an interview, wouldn't they
15   be sent a rejection letter?
16              MS. QUIMBY:  Objection, form.
17      A.    In my experience, not always, because I have
18   certainly applied for jobs for which I never heard again.
19   I'm not saying that this is the universal practice.  I
20   think partly, it depends on the amount of -- number of
21   applications they received.
22      Q.    About the makeup of the committee, Jessica
23   Nápoles is associate professor of choral music education?
24      A.    Um-hum.
25      Q.    Right?

1        A.    Yes.

2        Q.    Do you know her personally?

3              MS. QUIMBY:   Objection, form.

4        A.    Sorry.

5        Q.    Let me rephrase my question.  I'm looking at

6   the description of the search committee at the bottom of

7   Exhibit 19.

8        A.    Yes, very good.

9        Q.    Do you see this?

10       A.    Yes.

11       Q.    And I'm asking about Jessica Nápoles?

12       A.    Um-hum.

13       Q.    Associate professor of choral music education?

14       A.    Yes.

15       Q.    Does Dr. Nápoles have any grounding in

16   Schenkerian studies?

17       A.    Actually, I don't know.  I don't know much

18   about her training.

19       Q.    Is choral music -- Well, let me put it this

20   way.  As someone on the faculty at UNT MHTE, do you have

21   an understanding of what choral music education is at the

22   University of North Texas?

23       A.    I have never reviewed their program.  But

24   it's not like choral education.  A specialist does or

25   does not know, or is or is not expected to know, certain

1  analytical tools.  It's possible, but I don't know

2  exactly that Jessica was trained in Schenkerian analysis.

3  I don't know.  But I mean, Schenker analyzed choral

4  music, too, among other things.

5      Q.    What is typically taught in the choral music

6  education program?

7      A.    That, I don't know.  I really don't.

8      Q.    Choral music?  Could that be one thing that's

9  taught?

10          MS. QUIMBY:  Objection, form.

11      A.    I thought you were asking in more -- in more in

12  depth.

13      Q.    Well, I sort of do want to know more in depth.

14  But you don't seem to know what choral music education

15  teaches at all.  Is that your testimony?

16      A.    No.  Choral music and choral music education

17  are not the same thing.  I know a little bit about choral

18  music partly because I had written my dissertation on it.

19  But music education as a field is unfortunately something

20  that I'm less knowledgeable about.  I do know that they

21  work a lot in groups, and that a lot of their practices

22  are sort of hands-on and practical like having teaching

23  practicums and mock teaching, things like that.  I --

24  this is all speculation, because I have taught music

25  theory and pedagogy, and I think music ed teaches that,

1  too.  But I never reviewed their program.

2      Q.    Have you ever had a single conversation with

3  Jessica Nápoles about Schenkerian analysis?

4      A.    Yes, at the time when we were both on the

5  search committee.

6      Q.    And did your discussion lead you to believe

7  that she understands how to conduct the Schenkerian

8  analysis of a piece of music?

9              MS. QUIMBY:  Objection, form.

10     A.    We did not talk about pieces of music.

11 We talked about the qualifications of the applicant.

12     Q.    Did you talk about the application of

13 Schenkerian analysis in scholarship?

14             MS. QUIMBY:  Objection, form.

15     A.    No.

16     Q.    Did anything you discussed with Jessica Nápoles

17 give you reason to believe that she understood how to

18 apply Schenkerian analysis in scholarship?

19             MS. QUIMBY:  Objection, form.

20     A.    Please repeat the question.

21     Q.    Sure.  I'm trying to figure out if, in your

22 discussions with Jessica Nápoles concerning the search

23 committee, you had reason to believe that she understood

24 how to take the methods and techniques of Schenkerian

25 analysis and apply it to music and scholarship?

*ELLEN BAKULINA, PH.D.    10/16/2024*

```
1                MS. QUIMBY:  Objection, form.
2        A.   I did not have a reason to believe whether
3   she did or did not understand how to apply them.
4        Q.   Okay.
5        A.   Because I can't say that somebody does not
6   understand something simply because we haven't talked
7   about it.
8        Q.   And you didn't think it was necessary to
9   talk to Jessica Nápoles about whether or how deeply she
10  understood Schenkerian analysis?
11               MS. QUIMBY:  Objection, form.
12       A.   No, because in my opinion, to find an editor
13  for a journal is not to analyze the piece of music.
14       Q.   And let's talk about John Ishiyama.  We know
15  that you've already corresponded with him as part of the
16  ad hoc committee, correct?
17       A.   Yes.
18       Q.   You know that he's a political scientist,
19  right?
20       A.   I guess I knew that.
21               MS. QUIMBY:  Objection, form.
22       A.   I forgot.
23       Q.   You know -- let me strike that question.
24            Have you ever discussed John Ishiyama's
25  knowledge of Schenkerian studies?
```

```
 1        A.    No.

 2        Q.    Do you know if John Ishiyama understands

 3   anything about Schenkerian analysis?

 4        A.    No.

 5        Q.    Graham Hunt, I believe, was formerly on the

 6   board of the Journal of Schenkerian Studies, correct?

 7        A.    I don't know.

 8        Q.    Do you know if -- do you know if he is a

 9   scholar of Schenkerian analysis?

10        A.    He has grounded in Schenkerian analysis as well

11   as other things, like form analysis.

12        Q.    And Ron Chrisman is the director of the

13   University of North Texas Press, correct?

14        A.    Yes.

15        Q.    But other than that, does he have any knowledge

16   of music scholarship?

17              MS. QUIMBY:  Objection, form.

18        A.    I don't know what his knowledge of scholarship

19   is at all.

20        Q.    Do you know if Ron Chrisman has any knowledge

21   of Schenkerian analysis?

22              MS. QUIMBY:  Objection, form.

23        A.    I don't know.

24        Q.    And of course, there's you, Ellen Bakulina.

25   So we've talked about you enough, Professor Bakulina.
```

1          MR. ALLEN:  I believe I have no further

2   questions, and I'm going to pass the witness.

3          MS. QUIMBY:  Can we take five, please?

4          MR. ALLEN:  Absolutely.

5          THE VIDEOGRAPHER:  The time is 3:48 p.m.

6   We're off the record.

7                (Recess taken)

8          THE VIDEOGRAPHER:  The time is 3:54 p.m.

9   We're on the record.

10         MS. QUIMBY:  Thank you.  I have no

11  questions.  I will reserve my questions for trial.

12         MR. ALLEN:  Okay.  We can go back off.

13         THE VIDEOGRAPHER:  The time is 3:54 p.m.

14  We are off the record.

15

16

17             (Proceedings concluded at 3:54 p.m.)

18

19

20

21

22

23

24

25

1                    CHANGES AND SIGNATURE

2    WITNESS:  ELLEN BAKULINA, PH.D.

3    DATE:  10-16-24

4

5    PAGE/LINE              CHANGE                REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1  _____

2  _____

3      I, ELLEN BAKULINA, have read the foregoing

4  deposition and hereby affix my signature that same

5  is true and correct, except as noted above.

6

7                          _____

8                          ELLEN BAKULINA

9

10 THE STATE OF _____)

11 COUNTY OF _____)

12

13     Before me, _____, on this

14 day personally appeared ELLEN BAKULINA, known to me or

15 proved to me on the oath of _____ or

16 through _____ (description of

17 identity card or other document) to be the person whose

18 name is subscribed to the foregoing instrument and

19 acknowledged to me that he/she executed the same for

20 the purpose and consideration therein expressed.

21     Given under my hand and seal of office on this

22 _____ day of _____, _____.

23

24                          _____

                           NOTARY PUBLIC IN AND FOR
25                         THE STATE OF _____
                           My Commission Expires: _____

1              UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF
2                    SHERMAN DIVISION

3   TIMOTHY JACKSON,               )
                                   )
4       Plaintiff,                 )
                                   )
5   vs.                            )   CASE NO. 4:21-CV-00033-ALM
                                   )
6   LAURA WRIGHT, et al.,          )
                                   )
7       Defendants.                )

8       _____

9              REPORTER'S CERTIFICATION OF

10       ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.

11                  October 16, 2024

12      _____

13      I, KIM D. CARRELL, a Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16      That the witness, ELLEN BAKULINA, was duly sworn

17  and that the transcript of the oral deposition is a

18  true record of the testimony given by the witness;

19      That the deposition transcript was duly submitted

20  on November, 12, 2024, to Mary Quimby, attorney for the

21  witness,for examination, signature, and return to me by

22  December 16, 2024;

23      That pursuant to the information given to the

24  deposition officer at the time said testimony was taken,

25  the following includes all partes of record and the

1  amount of time used by each party at the time of the

2  deposition;

3      Michael Thad Allen - 05 HRS: 49 MIN
       Mary Quimby -  00 HRS: 00 MIN

4

5  FOR THE PLAINTIFF:

6      Michael Thad Allen
       ALLEN LAW, LLC
7      P.O. Box 404
       Quaker Hill, CT 06375
8      Telephone: 860.772.4738
       Fax: 860.469.2783
9      E-mail: M.allen@allen-lawfirm.com

10

11 FOR THE DEFENDANTS:

12     Mary Quimby
       Assistant Attorney General
13     General Litigation Division
       P.O. Box 12548, Capital Station
14     Austin, Texas 78711
       Telephone: 512.463.2120
15     Fax: 512.320.0667
       E-mail: Mary.Quimby@oag.texas.gov

16

17        - and -

18     Renaldo Stowers  (Appearing Live)
       Cari Jacoby
19     University of North Texas System
       Office of General Counsel
20     801 North Texas Boulevard
       Denton, Texas 76201
21     Telephone: 940.565.2717
       Fax: 940.369.7026
22     E-mail: Renaldo.Stowers@untsystem.edu
               cari.jacoby@untsystem.edu

23

24     I further certify that I am neither counsel for,

25 related to, nor employed by any of the parties or

1   attorneys in the action in which this proceeding was

2   taken, and further that I am not financially or

3   otherwise interested in the outcome of the action.

4        Certified to by me on this 12th day of November,

5   2024.

6

7

8

9

10

11   _____
         Kim D. Carrell, CSR NO. 1184
12       Date of Expiration: 7-31-26
         **JULIA WHALEY & ASSOCIATES, INC.**
13       2012 Vista Crest Drive
         Carrollton, Texas  75007-1640
14       214-668-5578/Fax 972-236-6666
         JulieTXCSR@gmail.com
15       Firm registration No. 436
         Firm registration Expires 5-31-25
16

17

18

19

20

21

22

23

24

25

'

**'19** [2] - 48:1, 48:12
**'21** [1] - 15:22
**'22** [3] - 15:22, 54:5
**'call** [1] - 158:10
**'We** [1] - 177:12

**0**

**00** [2] - 227:3
**000116** [1] - 4:4
**000233**)............
**164** [1] - 4:10
**0002645** [1] - 3:20
**000300** [1] - 3:24
**000303**)............
**..137** [1] - 3:24
**000304** [1] - 4:2
**000309**)............
**..144** [1] - 4:2
**000309**)............
**..150** [1] - 4:4
**000361** [1] - 4:12
**000363**)............
**..175** [1] - 4:12
**000488**)............
**...........158** [1] - 4:6
**000563** [1] - 3:22
**000566**)............
**..106** [1] - 3:22
**000568**)............
**...........160** [1] - 4:8
**002509**)............
**...........186** [1] - 4:14
**002555**)............
**...........196** [1] - 4:16
**002559** [1] - 4:18
**002561**)............
**..203** [1] - 4:18
**002782**)............
[1] - 3:20
**005054** [1] - 4:20
**005055**)............
**..208** [1] - 4:20
**005257** [1] - 3:13
**005258** [1] - 3:11
**005267**)............
**.** [2] - 3:11, 3:13
**0302** [1] - 137:3
**0305** [1] - 146:22

**0307** [2] - 144:12, 145:10
**05** [1] - 227:3
**06375** [2] - 2:4, 227:7
**086826**)............
**........** [1] - 3:18

**1**

**1** [6] - 3:10, 13:2, 13:4, 15:17, 17:3, 45:9
**10** [7] - 4:1, 14:12, 20:16, 137:15, 144:2, 144:3, 145:5
**10-16-24** [1] - 224:3
**100** [4] - 46:16, 55:24, 56:7, 57:14
**10:04** [1] - 50:20
**10:06** [1] - 92:7
**10:11** [1] - 50:23
**10:17** [1] - 146:22
**10:59** [1] - 80:1
**11** [6] - 4:3, 45:13, 149:17, 149:19, 149:24, 205:24
**1184** [1] - 228:11
**11:11** [1] - 80:4
**11th** [1] - 105:21
**12** [49] - 4:5, 10:17, 10:19, 61:13, 78:8, 82:23, 83:1, 83:8, 83:12, 88:25, 96:18, 97:2, 97:5, 98:9, 108:17, 108:22, 109:12, 112:5, 113:4, 113:19, 114:19, 115:7, 119:12, 119:25, 124:7, 124:11, 124:15, 124:21, 127:12, 129:8, 134:7, 138:1, 149:6, 157:12, 157:15, 157:17, 162:23, 163:5, 164:21, 174:4, 182:7, 196:20, 196:23, 196:24, 197:6, 210:18, 214:2, 214:3, 226:20

**12-11-19** [1] - 3:21
**12548** [2] - 2:10, 227:13
**12:16** [1] - 120:18
**12:52** [2] - 120:21, 144:11
**12th** [1] - 228:4
**13** [5] - 3:10, 4:7, 159:23, 160:1, 160:3
**138** [1] - 89:11
**14** [12] - 3:11, 4:9, 163:25, 164:8, 173:4, 173:7, 173:13, 173:20, 174:2, 178:3, 178:17, 183:3
**15** [7] - 4:11, 23:14, 173:2, 174:12, 174:13, 180:6, 211:6
**157** [1] - 36:16
**15th** [5] - 85:11, 85:25, 204:1, 206:5, 208:6
**16** [8] - 1:11, 4:13, 4:14, 5:3, 185:15, 185:16, 186:25, 226:11
**16th** [2] - 1:18, 6:3
**17** [7] - 4:15, 110:5, 195:15, 195:18, 203:5, 203:18, 205:3
**17th** [3] - 111:15, 185:20, 187:17
**18** [7] - 4:17, 58:7, 202:13, 202:15, 204:11, 204:19, 204:22
**19** [7] - 4:19, 204:12, 207:10, 207:12, 207:13, 207:24, 218:7
**1:16** [1] - 120:2
**1:48** [1] - 157:7
**1:58** [1] - 157:10
**1st** [6] - 16:1, 90:5, 90:9, 90:22, 92:1, 92:6

**2**

**2** [19] - 3:3, 3:11,

**14:1, 14:3, 14:6,**
14:8, 14:15, 14:19, 14:23, 15:1, 15:3, 15:6, 15:17, 17:3, 17:4, 17:18, 31:14, 32:2, 45:9
**20** [5] - 5:16, 25:6, 75:21, 211:5
**2000** [2] - 33:4, 58:7
**2007** [2] - 15:16, 16:23
**2010** [1] - 16:6
**2011** [1] - 143:3
**2012** [1] - 228:13
**2013** [5] - 19:2, 19:7, 19:15, 19:17, 28:16
**2014** [9] - 18:16, 19:3, 20:9, 23:24, 24:5, 31:19, 32:12, 33:2, 35:6
**2016** [6] - 16:23, 54:5, 54:13, 189:13, 190:11, 190:14
**2017** [1] - 82:14
**2018** [7] - 25:15, 25:16, 25:25, 26:15, 28:25, 48:1, 48:12
**2019** [38] - 41:20, 41:24, 42:3, 43:11, 43:15, 43:19, 43:21, 44:4, 44:8, 45:23, 47:5, 47:25, 52:22, 73:8, 73:9, 80:8, 81:25, 82:1, 84:10, 84:15, 85:11, 85:25, 86:10, 90:5, 90:9, 92:2, 92:19, 96:6, 98:14, 103:4, 105:21, 109:18, 110:5, 111:15, 113:4, 132:12, 201:13, 206:5
**2019-2020** [1] - 112:15
**2020** [96] - 10:23, 11:1, 18:1, 20:21, 23:3, 24:8, 26:14, 31:19, 32:10, 32:11, 33:9, 35:5, 36:1, 39:23, 39:25,

**40:12, 41:13,**
59:24, 60:7, 61:11, 61:17, 65:19, 66:9, 66:14, 68:7, 68:19, 68:24, 69:15, 70:24, 72:3, 72:24, 72:25, 73:13, 74:2, 74:20, 76:16, 77:25, 79:4, 80:9, 80:12, 82:22, 99:7, 116:12, 118:23, 121:6, 124:7, 125:21, 125:24, 126:4, 126:9, 126:14, 126:19, 126:23, 127:5, 127:11, 136:17, 137:1, 144:11, 144:16, 146:8, 147:2, 147:20, 148:2, 148:6, 149:20, 149:25, 156:8, 156:10, 157:16, 158:21, 159:20, 163:8, 163:23, 164:22, 172:11, 173:8, 173:12, 174:5, 174:15, 174:25, 177:18, 184:6, 184:8, 185:8, 185:21, 187:17, 188:8, 195:21, 197:1, 203:7, 203:17, 203:19, 203:23, 205:7, 206:4, 206:22
**2020**.......... [1] - 3:14
**2021** [5] - 15:7, 15:21, 17:15, 160:5, 208:6
**2022** [5] - 15:8, 15:24, 16:1, 16:16, 54:20
**2023** [2] - 48:4, 48:14
**2024** [8] - 1:11, 1:18, 5:3, 6:3, 226:11, 226:20, 226:22, 228:5
**2029** [1] - 158:25
**214-598-5229** [1] - 2:25
**214-668-5578/**
**Fax** [1] - 228:14
**227** [1] - 3:7

**25** [1] - 164:22
**2509** [1] - 185:19
**2555** [1] - 204:12
**2559** [1] - 204:11
**25th** [13] - 127:10, 136:17, 137:1, 138:14, 138:25, 140:10, 144:16, 145:7, 146:7, 156:10, 163:22, 173:8, 174:5
**26** [9] - 3:14, 23:14, 23:17, 36:1, 39:23, 39:25, 40:11, 40:21, 41:14
**26-page** [3] - 27:22, 28:2, 33:24
**2645** [1] - 89:13
**2657** [1] - 89:22
**2658** [2] - 95:14, 102:7
**2659** [1] - 102:5
**2663** [1] - 110:1
**26th** [3] - 144:11, 146:22, 147:1
**29** [3] - 177:18, 203:19, 203:23
**29th** [7] - 149:19, 149:25, 156:8, 157:16, 203:7, 205:6, 206:4
**2:55** [1] - 195:10
**2nd** [4] - 92:19, 195:21, 197:1, 203:17

**3**

**3** [12] - 3:12, 31:10, 31:12, 31:13, 31:17, 31:18, 32:3, 37:13, 49:7, 165:21, 173:14, 226:22
**30** [2] - 5:17, 8:10
**30th** [2] - 174:15, 174:25
**31** [1] - 3:13
**31st** [4] - 112:2, 160:5, 163:8, 173:12
**324** [1] - 51:5

**35** [1] - 3:14
**3:06** [1] - 195:13
**3:48** [1] - 223:5
**3:54** [4] - 1:19,
223:8, 223:13,
223:17
**3rd** [1] - 103:4

## 4

**4** [6] - 3:14,
35:19, 35:22,
35:24, 37:13,
39:24
**40** [1] - 8:10
**404** [2] - 2:4,
227:7
**436** [1] - 228:15
**45** [1] - 3:16
**49** [1] - 227:3
**4:00** [2] - 146:23,
147:1
**4:21-CV-00033-
ALM** [3] - 1:5, 5:4,
226:5

## 5

**5** [9] - 3:4, 3:15,
45:2, 45:3, 45:5,
45:7, 45:13, 51:1,
51:2
**5-17-21** [1] -
4:19
**5-31-25** [1] -
228:15
**500** [4] - 19:20,
19:23, 20:14,
28:17
**500-word** [1] -
23:20
**5054** [1] - 208:11
**5055** [1] - 209:3
**512.320.0667** [2]
- 2:12, 227:15
**512.463.2120** [1]
- 2:11, 227:14

## 6

**6** [6] - 3:6, 3:17,
51:3, 85:3, 85:5,
85:9
**6:37** [1] - 138:14
**6:53** [2] - 90:10,
90:22

## 7

**7** [4] - 3:19,
88:15, 88:17,
109:24
**7-25-20** [1] -
3:23
**7-29-20** [2] - 4:3,
4:5
**7-30-2020** [1] -
174:15
**7-31-20** [1] - 4:7
**7-31-26** [1] -
228:12
**75007-1640** [1] -
228:13
**76201** [2] - 2:17,
227:20
**78711** [2] - 2:11,
227:14
**7:00** [1] - 137:13
**7:51** [1] - 92:2

## 8

**8** [7] - 3:21,
105:14, 105:18,
105:20, 110:8,
132:5, 132:9
**801** [2] - 2:17,
227:20
**85** [2] - 3:18,
56:2
**860.469.2783** [2]
- 2:5, 227:8
**860.772.4738** [2]
- 2:5, 227:8
**86826** [1] - 85:11
**88** [1] - 3:20
**8:31** [1] - 137:17

## 9

**9** [4] - 3:23,
136:12, 136:13,
144:24
**940.369.7026** [2]
- 2:18, 227:21
**940.565.2717** [2]
- 2:18, 227:21
**972-236-6666** [1]
- 228:14
**9:03** [2] - 1:19,
6:3
**9:14** [1] - 92:19
**9:47** [1] - 141:2,
146:8

## A

**a.m** [7] - 1:19,
6:3, 50:20, 50:23,
80:1, 80:4,
146:22
**abbreviation** [1]
- 49:18
**ability** [2] - 9:18,
10:1
**able** [12] - 8:18,
13:8, 45:18,
56:16, 56:17,
70:21, 87:14,
118:12, 120:10,
184:22, 187:10,
187:25
**above-styled** [1]
- 1:17
**absence** [2] -
125:25, 126:18
**Absolutely** [4] -
87:3, 90:24,
205:15, 223:4
**absolutely** [3] -
35:12, 139:6,
201:16
**absolve** [1] -
66:25
**abstract** [1] -
28:17
**Academic** [2] -
3:16, 45:10
**academic** [14] -
22:6, 29:8, 30:23,
35:4, 49:17, 52:5,
52:6, 64:14, 69:6,
84:19, 114:5,
160:20, 160:23
**academic.oup.
com** [1] - 49:14
**accept** [1] -
30:15
**acceptable** [1] -
26:5
**Accepted** [1] -
30:13
**accepted** [4] -
27:14, 47:12,
47:18, 48:9
**access** [2] -
12:19, 94:11
**accompanying**
[1] - 50:1
**according** [6] -
104:23, 119:10,
130:19, 130:20,
130:25
**account** [2] -

171:5, 171:25
**accountable** [7]
- 170:25, 172:17,
172:19, 172:20,
178:18, 184:19,
184:21
**accurate** [11] -
7:4, 7:9, 14:19,
15:17, 86:9,
108:14, 108:20,
137:23, 149:5,
176:2, 187:25
**achieve** [1] -
54:19
**acknowledged**
[1] - 225:19
**action** [16] -
22:1, 53:24,
59:17, 165:15,
166:10, 169:25,
170:2, 170:6,
170:7, 170:24,
172:15, 178:25,
184:17, 184:18,
228:1, 228:3
**actions** [16] -
59:7, 59:14, 60:8,
60:9, 60:16,
170:14, 170:15,
171:7, 178:19,
179:2, 179:10,
179:18, 179:25,
180:2, 180:10,
180:22
**activities** [1] -
206:20
**activity** [1] -
59:3
**actual** [6] - 51:4,
112:12, 119:8,
142:9, 169:14,
184:10
**ad** [25] - 88:19,
118:23, 182:19,
182:20, 182:23,
183:1, 183:7,
183:10, 183:13,
183:25, 186:1,
186:2, 186:6,
186:15, 187:3,
187:24, 188:5,
188:7, 188:18,
188:22, 193:5,
194:8, 195:20,
206:14, 221:16
**Ad** [13] - 4:9,
4:16, 10:22,

119:13, 163:22,
163:23, 164:9,
164:17, 164:19,
165:20, 165:21,
173:7, 174:2
**Adam** [1] - 94:2
**add** [2] - 22:25,
169:12
**addition** [10] -
7:21, 11:3, 16:22,
60:6, 65:18, 66:8,
73:22, 83:9,
152:5, 197:2
**additional** [3] -
79:5, 93:8, 95:20
**address** [34] -
15:9, 41:21,
43:10, 43:13,
44:3, 44:12,
48:16, 48:21,
49:7, 52:16,
52:22, 63:15,
63:16, 64:15,
64:18, 64:19,
64:21, 73:9,
85:17, 95:1, 97:1,
106:3, 110:9,
110:10, 110:14,
110:18, 110:25,
111:3, 111:4,
130:2, 132:12,
152:3, 203:1
**addressed** [5] -
13:14, 93:7,
95:11, 138:18,
180:11
**addresses** [2] -
45:8, 45:11
**addressing** [6] -
49:20, 63:18,
64:22, 76:11,
86:2, 173:25
**Adjunct** [1] -
160:4
**adjuncts** [1] -
161:13
**adopt** [1] - 67:23
**adopted** [1] -
178:6
**advisor** [11] -
16:11, 58:9,
58:21, 58:22,
58:23, 58:24,
59:2, 109:7,
116:9, 123:4,
123:6
**advisors** [1] -
58:7
**advisory** [3] -
97:20, 98:4,

122:23
**advocating** [3] -
103:12, 197:18,
198:13
**affect** [3] - 9:23,
10:1, 81:7
**affected** [2] -
122:18, 163:6
**affix** [1] - 225:4
**afforded** [5] -
166:13, 166:22,
168:6, 168:18,
169:4
**afraid** [11] -
98:3, 98:4, 117:5,
139:23, 139:25,
140:1, 155:22,
155:24, 190:5,
190:6, 193:19
**afternoon** [3] -
42:9, 42:19,
195:16
**ago** [8] - 39:22,
86:8, 93:13,
116:3, 119:6,
206:2, 211:6,
212:11
**agree** [19] - 93:3,
106:13, 133:9,
133:24, 135:16,
135:24, 136:3,
136:6, 136:7,
138:16, 145:22,
145:25, 146:2,
154:22, 155:8,
179:22, 194:23,
206:8, 214:2
**agreed** [3] -
21:6, 146:10,
172:16
**agreeing** [1] -
104:13
**Agreement** [1] -
5:7
**agreement** [1] -
178:1
**agrees** [2] -
91:23, 145:11
**ahead** [5] -
26:12, 28:1, 54:3,
132:16, 151:3
**al** [8] - 1:6, 3:21,
3:23, 4:1, 4:5,
4:7, 4:20, 226:6
**alerting** [1] -
137:19
**Allen** [3] - 2:3,
227:3, 227:6
**ALLEN** [55] -
2:3, 6:8, 13:5,

*ELLEN BAKULINA, Ph.D.    10/16/2024*    3

14:2, 18:6, 31:8,
31:13, 35:18,
37:2, 37:4, 37:6,
43:18, 44:24,
50:10, 50:16,
79:23, 85:2,
91:18, 93:15,
93:19, 93:24,
94:2, 94:7, 94:14,
94:19, 94:24,
95:4, 105:11,
105:16, 119:21,
119:24, 120:4,
120:8, 120:13,
120:16, 130:12,
136:11, 143:24,
149:18, 156:17,
156:23, 157:1,
157:5, 159:24,
164:1, 172:24,
173:4, 174:11,
195:6, 195:16,
207:11, 223:1,
223:4, 223:12,
227:6

**Allen.......** [1] -
3:6
**allocations** [1] -
216:12
**allow** [4] - 43:20,
43:24, 43:25
**allowed** [3] -
43:14, 57:10,
135:13
**almost** [5] -
37:14, 89:4,
147:13, 155:19,
195:7
**alone** [4] - 9:9,
58:24, 63:7,
67:18
**alongside** [1] -
80:11
**ALSO** [1] - 2:21
**ambiguous** [1] -
64:12
**America** [1] -
212:10
**American** [5] -
70:25, 210:25,
211:1, 211:6,
214:14
**Americans** [1] -
67:12
**amount** [4] -
152:21, 153:1,
217:20, 227:1
**analysis** [24] -
53:17, 53:19,
121:13, 121:14,

121:15, 121:22,
121:25, 122:1,
197:10, 199:14,
204:5, 211:20,
219:2, 220:3,
220:8, 220:13,
220:18, 220:25,
221:10, 222:3,
222:9, 222:10,
222:11, 222:21
**analytical** [2] -
53:21, 219:1
**analyze** [1] -
221:13
**analyzed** [5] -
177:19, 213:13,
213:14, 214:5,
219:3
**analyzes** [1] -
213:16
**AND** [2] - 224:1,
225:24
**Andrew** [18] -
102:11, 102:12,
105:4, 127:4,
127:5, 136:25,
137:2, 137:6,
137:13, 138:3,
138:17, 144:23,
145:7, 145:22,
158:16, 202:4,
202:6, 202:8
**Andrew's** [1] -
104:24
**Annotated** [2] -
20:5, 20:7
**announce** [5] -
110:20, 110:21,
208:2, 208:5,
208:14
**announce@
lists.
societymusictheory
.org** [1] - 110:11
**announced** [7] -
46:12, 46:25,
47:4, 47:5, 47:6,
90:14, 127:11
**announcement**
[2] - 111:6, 162:21
**announcing** [1]
- 129:8
**annual** [7] -
19:4, 24:14,
32:24, 33:15,
33:25, 41:22,
41:24
**anonymous** [11]
- 38:22, 38:23,
38:24, 57:16,

155:3, 155:6,
155:13, 155:17,
155:22, 155:25,
156:1
**anonymously**
[1] - 155:9
**answer** [42] -
7:2, 7:9, 7:13,
7:15, 8:21, 9:2,
9:7, 9:18, 10:7,
12:22, 26:5, 30:9,
30:10, 30:11,
30:12, 30:14,
39:19, 41:12,
44:10, 52:19,
56:7, 60:19,
70:21, 76:24,
87:18, 109:11,
126:21, 129:5,
132:14, 135:21,
137:17, 181:1,
182:4, 182:5,
185:4, 188:10,
188:17, 196:18,
207:22, 212:24
**answering** [2] -
7:23, 8:19
**answers** [3] -
30:9, 30:15,
149:3
**antagonistic** [1]
- 125:10
**antagonists** [2] -
73:1, 73:3
**anticipate** [1] -
202:18
**antiracism** [2] -
185:9, 210:21
**antisemitic** [1] -
69:24
**antisemitism** [7]
- 69:19, 69:22,
70:25, 71:11,
71:15, 71:20,
71:25
**anytime** [2] -
121:6, 161:24
**anyway** [3] -
116:11, 147:15,
201:20
**Anyway** [1] -
153:4
**apologies** [2] -
152:14, 208:22
**apologize** [8] -
47:20, 135:7,
143:23, 149:10,
158:23, 164:5,
198:16, 213:9
**APPEARANCE**

**S** [1] - 2:1
**Appearances...
...........................
.....** [1] - 3:3
**appeared** [2] -
13:18, 225:14
**Appearing** [2] -
2:15, 227:18
**appended** [2] -
164:25, 165:20
**applaud** [1] -
121:17
**applicant** [1] -
220:11
**applicants** [3] -
216:22, 217:1,
217:6
**application** [2] -
209:7, 220:12
**applications**
[13] - 199:2,
207:8, 207:9,
207:15, 208:17,
209:14, 209:15,
211:19, 215:1,
215:13, 215:16,
216:4, 217:21
**applied** [2] -
215:3, 217:18
**apply** [5] -
210:1, 212:12,
220:18, 220:25,
221:3
**appoint** [1] -
198:20
**appointed** [2] -
216:22, 217:7
**appointing** [1] -
198:13
**appointment** [7]
- 54:21, 162:4,
193:12, 194:5,
194:19, 194:24,
199:6
**appreciate** [3] -
41:10, 151:25,
202:24
**approach** [3] -
22:14, 109:6,
109:20
**approached** [1]
- 106:8
**appropriate** [4] -
101:4, 101:5,
131:3, 138:10
**approve** [1] -
118:8
**approximate** [1]
- 61:25
**arbitration** [1] -

5:22
**area** [2] - 96:23,
212:3
**argued** [2] -
67:22, 73:10
**arguing** [5] -
67:11, 71:24,
73:17, 74:23,
76:12
**argument** [6] -
63:14, 64:25,
65:12, 65:13,
65:16
**arrive** [1] - 89:5
**arrogant** [1] -
64:20
**art** [1] - 213:19
**article** [85] -
17:25, 18:14,
20:8, 20:12,
20:21, 21:2, 21:3,
21:4, 23:5, 23:10,
29:10, 29:11,
29:17, 29:25,
32:11, 32:12,
33:18, 33:20,
33:23, 33:24,
40:3, 40:22,
41:14, 41:15,
45:15, 45:21,
47:23, 48:4,
48:22, 51:4, 51:7,
51:9, 51:10,
51:14, 51:19,
52:3, 52:12,
52:21, 53:2, 53:3,
59:16, 59:19,
59:25, 60:6,
61:11, 61:12,
61:17, 61:25,
65:2, 65:19,
65:25, 66:9,
66:14, 68:8,
68:19, 68:25,
69:2, 69:15,
69:20, 70:24,
72:3, 73:4, 73:21,
76:2, 76:3, 76:15,
76:16, 77:1, 77:2,
77:12, 78:9,
81:19, 83:8, 91:4,
91:24, 99:7,
99:20, 129:20,
141:9, 182:13,
214:13
**article's** [1] -
29:21
**Article..............
........** [1] - 3:16
**articles** [44] -

17:14, 17:21,
21:5, 22:8, 22:21,
32:4, 32:10,
32:17, 32:24,
34:20, 34:25,
35:5, 36:11, 38:4,
38:22, 45:24,
48:23, 50:5, 52:6,
71:13, 71:19,
74:6, 74:12,
74:14, 74:17,
74:19, 75:5, 75:9,
75:12, 76:10,
77:20, 80:11,
80:15, 80:18,
81:4, 81:8, 81:11,
99:24, 100:13,
129:12, 180:25,
197:6, 213:21
**Articles** [1] -
3:14
**articulating** [1] -
117:17
**Articulating** [1] -
117:20
**ashamed** [1] -
44:25
**Asia** [2] -
200:22, 211:12
**Asian** [3] -
200:22, 201:2,
202:12
**aspects** [1] -
119:10
**Aspects** [1] -
35:25
**asserts** [1] -
166:12
**assessment** [1]
- 196:20
**assigned** [1] -
89:16
**assistant** [1] -
54:14
**Assistant** [3] -
2:9, 150:5,
227:12
**Associate** [2] -
16:17, 218:13
**associate** [2] -
16:20, 217:23
**associated** [1] -
35:20
**ASSOCIATES**
[1] - 228:12
**assume** [3] -
8:13, 9:12, 21:12
**attached** [5] -
1:25, 111:16,
164:12, 164:17,

173:13, 203:14
**attaches** [2] - 196:4, 207:15
**attachment** [7] - 196:5, 203:16, 203:21, 204:8, 205:4, 205:10
**attachments** [1] - 173:10
**attack** [2] - 69:25, 70:9
**attacked** [3] - 70:4, 81:3, 155:20
**attempt** [2] - 88:22, 88:23
**attend** [3] - 41:24, 42:2, 158:4
**attendance** [1] - 26:2
**attention** [7] - 104:1, 104:8, 104:12, 106:5, 110:1, 148:15, 164:16
**attitudes** [1] - 154:6
**attorney** [10] - 5:12, 5:13, 8:25, 9:6, 12:2, 12:15, 12:20, 183:13, 226:20
**Attorney** [2] - 2:9, 227:12
**attorney-client** [1] - 9:6
**attorneys** [9] - 10:6, 10:7, 10:9, 10:10, 11:11, 11:18, 11:22, 89:16, 228:1
**attracting** [1] - 104:1
**attracts** [1] - 104:11
**audible** [1] - 87:7
**audibly** [4] - 7:3, 7:9, 7:15, 132:14
**audience** [1] - 111:22
**audio** [4] - 7:18, 16:24, 32:3, 94:17
**August** [1] - 148:7
**Austin** [2] - 2:11, 227:14
**authenticate** [2]

- 166:4, 206:12
**author** [8] - 28:24, 29:21, 29:22, 40:2, 52:5, 75:16, 124:17, 155:22
**authority** [1] - 128:13
**authorized** [1] - 128:17
**authors** [8] - 49:23, 72:25, 73:13, 73:15, 79:9, 112:5, 125:9
**automatically** [1] - 110:22
**available** [1] - 156:9
**average** [1] - 64:25
**avoid** [1] - 49:24
**awards** [3] - 17:2, 17:5, 17:8
**aware** [21] - 28:23, 39:25, 40:20, 41:13, 44:11, 44:15, 70:15, 71:13, 80:10, 80:14, 122:21, 125:2, 126:7, 126:11, 126:12, 126:16, 126:17, 127:4, 127:9, 137:25, 147:10
**awkward** [1] - 190:20

# B

**bachelor's** [1] - 16:4
**backed** [1] - 193:16
**background** [3] - 20:3, 67:20, 199:14
**bad** [3] - 47:14, 135:16, 190:21
**BAKULINA** [11] - 1:10, 1:15, 3:5, 5:2, 6:5, 224:2, 225:3, 225:8, 225:14, 226:10, 226:16
**Bakulina** [60] - 1:23, 3:11, 3:12, 3:21, 4:3, 4:5,

4:17, 6:9, 6:11, 6:15, 6:17, 12:5, 12:6, 13:9, 13:14, 14:4, 26:12, 28:1, 31:8, 35:23, 50:12, 50:25, 80:6, 85:7, 87:5, 88:17, 90:19, 91:19, 91:20, 91:21, 94:21, 95:8, 105:13, 105:23, 120:6, 120:17, 120:23, 136:23, 141:16, 150:4, 157:2, 157:13, 160:2, 164:6, 165:5, 173:17, 174:20, 183:24, 185:1, 187:9, 195:9, 195:17, 195:19, 195:22, 196:4, 206:13, 208:2, 222:24, 222:25
**ball** [1] - 102:15
**Bartók** [1] - 213:17
**based** [9] - 30:4, 30:10, 56:14, 62:4, 63:3, 77:22, 122:13, 142:19, 176:25
**basis** [12] - 63:5, 65:9, 65:12, 67:17, 68:4, 193:22, 194:10, 194:25, 197:19, 198:14, 199:8, 199:9
**Bates** [7] - 85:10, 89:15, 89:21, 95:14, 145:10, 185:19, 204:10
**BE** [1] - 5:6
**became** [7] - 67:2, 67:4, 68:16, 82:13, 83:8, 147:9, 156:9
**become** [2] - 67:8, 155:18
**becoming** [1] - 137:25
**began** [4] - 54:11, 84:15, 86:10, 139:11
**begin** [1] - 195:18
**beginning** [5] - 84:8, 136:20,

148:6, 173:23, 206:5
**Beginning** [1] - 204:1
**begins** [6] - 51:4, 102:8, 110:2, 136:20, 144:23, 210:3
**begun** [1] - 160:11
**behalf** [3] - 193:6, 194:12, 208:2
**behavior** [2] - 7:12, 61:1
**behaviors** [3] - 60:11, 61:5, 171:4
**belonging** [1] - 75:3
**Below** [1] - 175:22
**below** [2] - 23:4, 106:12
**Ben** [1] - 81:22
**benefit** [1] - 120:3
**Benjamin** [22] - 34:5, 34:6, 81:23, 82:3, 88:1, 92:19, 92:22, 93:1, 146:4, 146:13, 146:21, 146:25, 147:8, 147:19, 157:16, 158:4, 185:20, 185:25, 187:6, 187:22, 207:13, 209:22
**best** [3] - 14:19, 60:19, 200:4
**better** [4] - 36:18, 49:12, 169:18, 199:1
**between** [15] - 15:7, 24:24, 54:5, 65:14, 66:4, 97:1, 98:23, 113:8, 116:19, 122:19, 134:11, 139:18, 148:13, 171:13, 185:25
**Beyond** [1] - 186:11
**beyond** [2] - 186:13, 214:10
**bibliographies** [1] - 19:21
**big** [7] - 25:12, 25:15, 25:18, 72:8, 86:19,

117:5
**bigger** [12] - 28:6, 86:17, 141:11, 141:13, 145:15, 160:7, 167:21, 167:23, 168:1, 174:22, 186:19, 198:15
**bigoted** [1] - 171:4
**biography** [2] - 53:20, 108:12
**BIPOC** [1] - 67:18
**bit** [14] - 35:16, 36:18, 46:16, 47:6, 49:9, 106:20, 121:10, 141:15, 151:24, 169:19, 170:2, 170:3, 208:9, 219:17
**Black** [37] - 61:22, 63:20, 64:13, 64:18, 64:21, 64:25, 65:4, 65:20, 65:22, 67:12, 67:18, 69:6, 69:19, 70:25, 71:7, 71:11, 71:15, 71:20, 74:22, 76:12, 129:18, 130:21, 130:22, 131:9, 131:22, 133:17, 134:6, 134:11, 134:13, 134:15, 135:25, 136:3, 136:6, 200:17
**blackmail** [1] - 57:13
**blame** [1] - 152:23
**blind** [8] - 29:19, 29:20, 38:25, 40:4, 40:22, 41:3, 41:16, 49:23
**blow** [1] - 208:8
**board** [27] - 38:6, 38:12, 47:15, 75:17, 78:12, 78:18, 82:13, 82:19, 97:8, 97:13, 97:15, 97:16, 97:18, 97:19, 97:20, 98:4, 113:8, 122:24, 142:23, 153:15,

188:3, 197:22, 198:4, 198:12, 199:7, 201:17, 222:6
**Bob** [2] - 112:3
**book** [1] - 214:12
**bottom** [6] - 17:3, 49:7, 89:12, 150:1, 209:6, 218:6
**Boulevard** [2] - 2:17, 227:20
**bow** [1] - 79:19
**Box** [4] - 2:4, 2:10, 227:7, 227:13
**Brand** [18] - 4:5, 4:20, 34:5, 34:6, 146:21, 146:25, 147:8, 147:19, 157:16, 157:20, 158:5, 185:20, 186:1, 187:6, 187:16, 187:23, 207:13, 209:23
**branding** [1] - 213:15
**breach** [1] - 191:20
**break** [14] - 8:17, 40:10, 50:9, 50:12, 119:19, 119:21, 119:22, 120:3, 120:9, 120:12, 156:22, 157:1, 157:14, 195:4
**breaks** [2] - 8:6, 8:7
**brief** [1] - 107:15
**briefly** [2] - 82:9, 115:18
**Brigade** [9] - 18:1, 18:8, 20:20, 23:16, 27:8, 32:10, 33:9, 33:24, 34:7
**broad** [1] - 73:21
**broader** [1] - 103:12
**broke** [1] - 120:23
**building** [1] - 9:1
**bullet** [1] - 170:9
**button** [1] - 13:1
**BY** [1] - 6:8

# C

**campus** [2] - 160:20, 217:14
**Canada** [2] - 1:23, 16:2
**cancellation** [1] - 70:16
**cannot** [14] - 61:3, 61:8, 67:12, 70:12, 70:13, 72:11, 79:20, 84:22, 129:14, 135:21, 177:10, 210:1, 212:12
**Capital** [2] - 2:10, 227:13
**caption** [1] - 110:6
**captioned** [5] - 13:13, 14:4, 149:19, 174:16, 202:16
**card** [1] - 225:17
**care** [3] - 66:20, 66:21, 139:11
**career** [4] - 17:23, 139:5, 139:10, 139:24
**Cari** [5] - 2:15, 93:20, 93:22, 227:18
**cari.jacoby@ untsystem.edu** [2] - 2:19, 227:22
**Carrell** [2] - 1:19, 228:11
**CARRELL** [1] - 226:13
**Carrollton** [1] - 228:13
**case** [8] - 28:9, 74:16, 77:17, 89:18, 129:10, 133:24, 204:15, 204:25
**CASE** [2] - 1:5, 226:5
**cases** [3] - 9:4, 145:3, 215:14
**Cat** [1] - 213:5
**cat** [4] - 9:10, 9:11, 94:22, 213:10
**catch** [2] - 45:1, 150:16
**categories** [3] - 11:4, 152:3, 203:2

**category** [2] - 64:11, 114:7
**causally** [1] - 189:4
**CAUSE** [1] - 5:4
**caveat** [1] - 10:10
**cc** [1] - 186:25
**cc'd** [1] - 195:20
**CD** [3] - 215:18, 215:24, 216:1
**CDs** [1] - 215:14
**censor** [1] - 119:14
**Center** [7] - 16:9, 160:14, 187:11, 187:21, 188:1, 188:3, 189:2
**centuries** [1] - 214:11
**century** [3] - 121:15, 212:2, 213:19
**certain** [6] - 6:24, 119:7, 119:11, 164:13, 214:11, 218:25
**certainly** [9] - 29:3, 94:9, 101:5, 120:10, 172:13, 185:8, 187:23, 201:20, 217:18
**Certificate........ ................** [1] - 3:7
**CERTIFICATIO N** [1] - 226:9
**Certified** [3] - 1:20, 226:13, 228:4
**certify** [3] - 32:8, 226:14, 227:24
**CFP** [3] - 111:16, 111:23
**Chain** [5] - 4:1, 4:11, 4:13, 4:15, 4:19
**chain** [1] - 106:7
**chair** [5] - 26:16, 26:18, 29:4, 159:5, 209:8
**chance** [1] - 142:13
**CHANGE** [1] - 224:5
**change** [9] - 77:12, 78:25, 104:21, 134:3, 178:5, 179:15, 179:21, 181:7,

214:19
**changed** [6] - 19:18, 25:14, 75:21, 179:20, 185:7, 185:10
**CHANGES** [1] - 224:1
**changes** [14] - 21:7, 21:8, 71:25, 73:3, 73:10, 73:11, 73:16, 73:17, 77:14, 77:21, 176:22, 176:25, 179:16
**changing** [6] - 170:21, 211:9, 211:10, 212:15, 212:16, 214:18
**chaotic** [2] - 78:22, 152:23
**characterize** [7] - 65:21, 90:6, 107:11, 145:13, 160:6, 173:16, 173:20
**characterized** [5] - 74:1, 77:25, 85:14, 131:15, 142:18
**chat** [16] - 12:17, 13:7, 35:21, 36:20, 36:23, 45:4, 85:7, 89:1, 105:17, 144:4, 149:23, 160:1, 164:10, 173:1, 185:17, 202:15
**childhood** [1] - 62:19
**children** [2] - 65:1, 65:5
**chimes** [1] - 138:20
**choose** [1] - 172:9
**choral** [10] - 217:23, 218:13, 218:19, 218:21, 218:24, 219:3, 219:5, 219:14, 219:16, 219:17
**Choral** [2] - 219:8, 219:16
**Chrisman** [2] - 222:12, 222:20
**Christopher** [11] - 22:22, 26:23, 27:3, 27:7, 27:22, 28:23, 124:19, 124:20, 124:23,

125:4, 154:16
**Chung** [14] - 102:12, 105:4, 127:4, 127:5, 136:25, 137:2, 137:6, 137:14, 138:3, 145:7, 158:16, 202:4, 202:6, 202:8
**Chung's** [1] - 144:24
**circulated** [3] - 34:19, 175:12, 208:14
**circulating** [1] - 31:9
**cited** [1] - 213:15
**cites** [2] - 71:19, 71:22
**citizens'** [1] - 65:23
**civil** [2] - 22:1, 53:24
**Civil** [2] - 1:24, 5:9
**claim** [6] - 59:14, 66:8, 67:5, 182:13, 193:6, 194:11
**clarification** [2] - 8:12, 33:7
**clarify** [5] - 7:22, 93:12, 93:17, 95:3, 128:16
**clarifying** [1] - 22:4
**clarity** [3] - 9:23, 37:19, 40:16
**Clark** [2] - 154:2, 154:13
**Clark's** [4] - 153:23, 153:25, 154:8
**class** [1] - 115:23
**classical** [25] - 61:24, 62:5, 62:6, 62:7, 62:9, 62:11, 62:12, 62:13, 62:17, 62:18, 62:21, 63:1, 63:7, 63:22, 64:10, 64:15, 65:1, 65:5, 65:15, 65:23, 66:5, 66:17, 67:12, 71:8
**clause** [1] - 212:18
**clear** [20] - 7:10,

7:24, 8:1, 8:12, 8:14, 8:22, 9:3, 23:6, 41:7, 41:9, 41:12, 78:14, 78:16, 78:22, 88:13, 139:23, 139:24, 140:9, 156:5, 189:1
**clearly** [3] - 41:11, 78:20, 166:15
**click** [1] - 167:23
**client** [2] - 9:6, 88:23
**close** [3] - 123:24, 204:13, 205:3
**closely** [2] - 64:8, 108:10
**Coast** [1] - 120:1
**code** [1] - 66:22
**colleague** [12] - 21:15, 21:19, 21:20, 33:13, 41:21, 54:8, 56:23, 64:5, 147:13, 187:9, 189:8, 189:10
**colleague's** [1] - 105:6
**Colleagues** [3] - 55:12, 106:7, 208:13
**colleagues** [10] - 21:22, 54:5, 54:7, 84:25, 105:22, 128:17, 144:10, 190:21, 192:10, 192:14
**collected** [1] - 13:23
**collective** [1] - 161:12
**collectively** [2] - 112:13, 113:13
**College** [7] - 41:22, 150:5, 160:11, 160:17, 162:13, 170:5, 170:17
**collegial** [1] - 54:9
**colloquial** [1] - 57:19
**color** [11] - 197:4, 197:17, 198:21, 199:20, 200:3, 200:14, 201:6, 201:8, 201:18, 201:19,

202:9
**colorblind** [11] - 66:19, 66:22, 67:10, 67:16, 67:24, 68:3, 68:5, 68:7, 68:14, 69:9, 71:4
**COM** [1] - 170:17
**combating** [3] - 160:19, 162:13, 162:20
**combination** [2] - 74:18, 75:7
**comfortable** [1] - 8:3
**coming** [2] - 41:9, 212:1
**comment** [1] - 106:9
**comments** [2] - 21:3, 21:6
**Commission** [1] - 225:25
**commitment** [1] - 184:23
**committed** [5] - 59:8, 59:15, 69:2, 101:3, 160:22
**committee** [47] - 18:16, 18:22, 19:2, 19:4, 19:6, 19:17, 25:8, 25:11, 26:10, 28:15, 28:21, 28:25, 44:6, 88:24, 114:15, 115:24, 116:2, 116:4, 116:5, 116:6, 116:8, 118:3, 118:14, 118:23, 190:13, 190:15, 190:17, 190:22, 190:24, 191:10, 191:14, 194:4, 194:18, 206:24, 207:3, 209:8, 209:9, 210:16, 214:25, 216:4, 216:11, 217:12, 217:22, 218:6, 220:5, 220:23, 221:16
**Committee** [2] - 3:19, 10:23
**committees** [13] - 55:14, 55:17, 55:18, 55:20, 55:24, 56:3, 56:19, 56:22,

56:24, 57:1, 57:3, 217:11, 217:13
**committing** [1] - 57:6
**common** [2] - 9:5, 144:6
**communicate** [2] - 111:4, 127:22
**communicated** [2] - 191:13, 209:22
**communicating** [1] - 191:11
**communications** [2] - 10:9, 216:3
**community** [6] - 71:8, 71:11, 71:15, 140:2, 152:2, 203:1
**compare** [1] - 53:15
**compared** [1] - 134:19
**compendium** [1] - 109:24
**compiled** [4] - 14:15, 15:7, 113:2, 175:22
**complain** [2] - 118:18, 118:22
**complaining** [1] - 124:23
**complaint** [2] - 194:12, 194:18
**complete** [3] - 17:4, 17:17, 58:13
**completed** [1] - 16:3
**completely** [15] - 23:6, 48:3, 48:6, 48:14, 74:10, 77:19, 77:21, 117:2, 131:20, 133:14, 138:16, 151:9, 156:3, 202:1, 214:7
**complex** [1] - 77:23
**complicated** [3] - 72:11, 117:22, 117:24
**complicates** [2] - 91:10, 91:24
**composed** [2] - 14:22, 15:20
**composer** [2] - 121:14, 214:14
**composers** [4] -

62:22, 197:10, 214:10, 214:15
**composing** [1] - 150:9
**computer** [3] - 8:4, 8:5, 37:9
**computerized** [1] - 1:21
**concept** [2] - 67:24, 69:14
**Concept** [4] - 18:15, 20:9, 23:24, 32:12
**Conception** [2] - 164:20, 174:3
**conception** [2] - 154:11, 160:12
**concern** [2] - 151:25, 202:24
**concerned** [3] - 139:5, 140:20, 215:15
**concerning** [4] - 99:4, 148:5, 206:21, 220:22
**concluded** [1] - 223:17
**conclusion** [1] - 153:16
**condemn** [7] - 177:12, 177:15, 179:19, 180:2, 180:4, 181:6, 181:24
**condemnation** [12] - 165:11, 178:11, 178:14, 178:16, 179:1, 179:4, 179:12, 179:22, 181:13, 181:16, 181:18, 181:19
**condemning** [1] - 123:19
**condemns** [2] - 178:22, 179:17
**condition** [1] - 9:25
**conduct** [1] - 220:7
**conference** [29] - 19:4, 19:8, 19:9, 23:20, 23:21, 23:23, 24:5, 24:6, 24:14, 25:2, 27:15, 28:3, 28:16, 35:12, 41:22, 41:24, 42:3, 42:9, 42:16, 43:21, 44:8,

45:23, 46:12, 47:1, 47:5, 114:9, 114:15, 213:13
**confidence** [1] - 191:20
**confidential** [5] - 190:18, 191:2, 192:1, 192:3, 192:4
**confining** [1] - 49:25
**confirmed** [1] - 162:17
**conflicting** [2] - 30:6, 30:9
**conflicts** [1] - 135:22
**confused** [4] - 63:24, 64:1, 139:12, 152:20
**Congratulations** [1] - 38:7
**connected** [2] - 127:25, 128:18
**connects** [1] - 71:24
**conservatory** [1] - 107:7
**consider** [10] - 21:18, 21:20, 21:22, 53:12, 53:16, 53:19, 54:6, 86:13, 141:6, 141:9
**consideration** [1] - 225:20
**considered** [4] - 92:10, 125:7, 145:11, 145:23
**considering** [1] - 68:5
**consistent** [5] - 103:3, 103:4, 103:8, 103:16, 159:8
**consists** [1] - 29:10
**constantly** [1] - 68:11
**constitutes** [1] - 39:24
**consulted** [1] - 10:5
**contact** [1] - 137:8
**contacted** [2] - 108:22, 109:17
**contacting** [1] - 108:16
**contains** [1] -

80:25
**contemporary** [1] - 88:14
**content** [6] - 155:3, 196:20, 197:5, 197:9, 204:5, 214:22
**contents** [3] - 36:13, 213:11, 214:18
**contest** [1] - 104:17
**context** [9] - 62:12, 69:21, 70:13, 136:4, 211:22, 211:24, 211:25, 212:10, 212:16
**continue** [4] - 91:22, 93:12, 211:20, 211:21
**continues** [5] - 90:6, 92:5, 158:9, 197:3, 208:11
**continuous** [2] - 89:17, 89:18
**contribution** [3] - 28:13, 125:17, 158:10
**contributions** [5] - 113:24, 115:4, 115:13, 125:15, 177:19
**contributor** [1] - 124:20
**Contributors** [2] - 36:15, 40:14
**controversial** [1] - 76:11
**controversy** [9] - 121:3, 124:5, 124:6, 124:11, 131:12, 137:25, 147:9, 159:19
**convened** [1] - 88:19
**convenient** [1] - 12:16
**conventions** [1] - 6:25
**conversation** [5] - 6:23, 86:1, 86:7, 86:9, 220:2
**conversations** [7] - 7:1, 7:5, 83:21, 147:19, 147:23, 148:1, 152:22
**copy** [2] - 5:21, 149:3

**core** [4] - 73:5, 73:23, 78:1, 79:10
**corner** [3] - 15:5, 89:8, 89:12
**Correct** [16] - 21:14, 21:18, 22:14, 40:19, 46:22, 57:23, 75:19, 144:17, 153:19, 155:1, 165:12, 176:17, 180:4, 181:4, 187:1, 215:25
**correct** [72] - 12:6, 13:15, 16:6, 16:9, 21:16, 22:13, 23:17, 23:20, 24:19, 29:5, 31:1, 32:13, 32:15, 36:5, 37:25, 39:1, 40:12, 42:23, 46:21, 53:24, 54:15, 54:18, 63:15, 64:7, 69:11, 77:12, 82:4, 90:3, 93:9, 98:12, 105:22, 111:7, 111:24, 115:4, 115:11, 116:12, 120:1, 125:25, 134:22, 134:25, 138:21, 140:16, 142:4, 144:13, 145:8, 146:17, 156:16, 159:10, 164:22, 165:5, 167:2, 168:10, 170:13, 170:15, 174:6, 174:9, 176:16, 177:16, 178:7, 178:12, 181:22, 199:15, 201:17, 202:4, 205:23, 208:3, 209:11, 216:16, 221:16, 222:6, 222:13, 225:5
**correctly** [24] - 18:11, 36:2, 40:6, 85:14, 90:7, 107:12, 110:6, 139:14, 145:13, 152:8, 158:17, 160:6, 160:25, 166:16, 168:22, 171:10, 171:11, 173:16, 173:21,

174:17, 182:9, 185:22, 197:13, 210:13
**corresponded** [1] - 221:15
**correspondence** [6] - 88:24, 126:22, 163:18, 171:13, 186:15, 216:11
**corresponds** [1] - 151:5
**Counsel** [2] - 2:16, 227:19
**counsel** [2] - 31:9, 227:24
**count** [5] - 20:12, 20:13, 20:19, 26:2, 59:17
**counting** [4] - 17:19, 19:21, 125:18, 214:1
**countries** [3] - 211:11, 212:6, 212:7
**country** [1] - 67:19
**counts** [1] - 22:23
**COUNTY** [1] - 225:11
**couple** [1] - 161:2
**courageous** [3] - 134:25, 135:4, 135:8
**course** [25] - 23:5, 54:10, 77:14, 111:3, 112:14, 116:22, 120:4, 129:14, 142:25, 155:24, 156:8, 160:8, 161:15, 162:1, 167:5, 174:23, 188:2, 189:3, 200:21, 201:4, 205:9, 212:8, 214:1, 222:24
**COURT** [2] - 1:1, 226:1
**court** [7] - 7:4, 7:10, 13:23, 31:10, 87:6, 130:10, 173:21
**Court** [4] - 5:8, 6:24, 9:1, 85:2
**cover** [5] - 50:1, 215:18, 215:19,

215:24, 216:1
**COVID** [1] - 161:22
**Cowley** [3] - 4:20, 160:5, 207:14
**create** [3] - 6:23, 100:10, 174:1
**created** [2] - 65:14, 162:23
**creates** [1] - 66:4
**Crest** [1] - 228:13
**criminal** [1] - 59:3
**criteria** [1] - 199:12
**critic** [1] - 133:17
**critical** [3] - 44:3, 68:1, 79:9
**critically** [1] - 170:16
**criticism** [8] - 43:9, 43:14, 43:20, 43:24, 44:7, 180:9, 180:17, 180:21
**criticize** [4] - 34:6, 34:9, 43:25, 156:14
**criticized** [2] - 132:21, 132:22
**criticizing** [3] - 132:18, 133:11, 211:4
**critics** [1] - 129:2
**critiques** [1] - 130:16
**CSR** [1] - 228:11
**CT** [2] - 2:4, 227:7
**Cubero** [11] - 4:1, 102:11, 126:8, 126:13, 126:18, 126:25, 146:17, 174:14, 175:21, 201:12, 201:15
**cultural** [1] - 211:22
**culture** [5] - 62:5, 62:22, 170:16, 170:22, 172:22
**cultures** [2] - 62:10, 212:5
**CUNY** [2] - 16:9,

16:10
**current** [6] - 14:10, 14:11, 210:11, 210:17, 212:19, 212:21
**cut** [2] - 43:16, 130:6
**CV** [11] - 3:11, 3:12, 14:5, 14:9, 14:15, 14:19, 15:20, 19:3, 20:23, 32:1, 36:12

**D**

**dangerous** [1] - 189:23
**database** [1] - 53:6
**Date** [1] - 228:12
**DATE** [2] - 5:3, 224:3
**date** [3] - 42:14, 195:21, 206:6
**dated** [8] - 85:11, 136:17, 149:25, 164:21, 173:8, 173:11, 174:5, 208:6
**dates** [1] - 42:12
**dating** [1] - 147:19
**DAYS** [1] - 5:16
**days** [4] - 5:16, 5:17, 42:6, 156:12
**deadline** [1] - 30:1
**deal** [2] - 71:25, 210:20
**deals** [1] - 196:20
**Dean** [19] - 147:23, 149:12, 149:13, 149:15, 150:9, 150:18, 151:6, 151:7, 151:8, 162:12, 175:12, 196:12, 202:16, 203:6, 203:19, 205:6, 205:14, 205:20
**dean** [2] - 206:23, 206:24
**Dear** [4] - 106:7, 149:20, 202:16, 208:13
**December** [16] -

90:5, 90:9, 90:22, 92:1, 92:6, 92:19, 103:4, 105:21, 109:18, 110:5, 111:15, 112:2, 113:4, 184:7, 184:8, 226:22
**decision** [3] - 30:4, 30:5, 118:8
**decisions** [4] - 119:7, 119:8, 123:2, 142:18
**declaring** [1] - 179:25
**declined** [1] - 109:12
**dedicated** [2] - 44:2, 114:17
**dedication** [3] - 160:19, 162:13, 162:20
**deeply** [2] - 160:21, 221:9
**defendant** [1] - 21:25
**Defendants** [2] - 1:7, 226:7
**DEFENDANTS** [2] - 2:8, 227:11
**define** [7] - 25:19, 25:20, 26:3, 26:9, 68:21, 114:4, 213:8
**defined** [1] - 166:15
**Definitely** [4] - 20:15, 29:9, 59:6, 183:4
**definitely** [18] - 14:21, 27:25, 29:6, 50:6, 52:24, 80:13, 104:11, 114:6, 139:7, 171:2, 172:23, 179:18, 182:2, 188:12, 188:13, 188:17, 189:19, 193:4
**degree** [2] - 16:4, 202:22
**delay** [1] - 98:8
**delivered** [1] - 44:12
**Denton** [2] - 2:17, 227:20
**deny** [1] - 139:1
**denying** [1] - 150:13
**department** [2] - 34:3, 191:22

**dependent** [2] - 123:2, 123:5
**deposed** [1] - 6:16
**Deposition** [21] - 13:4, 13:14, 13:19, 14:1, 31:12, 35:22, 45:3, 85:5, 88:15, 105:18, 136:13, 144:3, 149:17, 157:12, 159:23, 163:25, 174:13, 185:15, 195:15, 202:13, 207:10
**deposition** [21] - 10:4, 10:12, 11:8, 11:10, 11:17, 11:19, 12:1, 12:11, 12:13, 12:18, 12:21, 39:10, 163:20, 164:6, 183:24, 206:16, 225:4, 226:17, 226:19, 226:24, 227:2
**DEPOSITION** [5] - 1:9, 1:15, 5:2, 5:6, 226:10
**Deposition....** [1] - 3:10
**depositions** [1] - 208:24
**depth** [2] - 219:12, 219:13
**describe** [8] - 20:25, 26:7, 27:2, 29:7, 55:10, 118:1, 189:18, 215:21
**described** [7] - 22:2, 32:5, 35:14, 39:1, 124:14, 190:9, 214:22
**description** [8] - 30:22, 118:24, 142:22, 149:5, 176:2, 207:4, 218:6, 225:16
**DESCRIPTION** [1] - 3:9
**detail** [1] - 87:22
**details** [8] - 22:20, 96:25, 147:17, 147:18, 153:4, 172:13, 172:14, 216:2
**dialogue** [1] - 118:1
**Diaz** [1] - 110:16

**dictate** [1] - 64:17
**dictating** [1] - 122:9
**dictionary** [2] - 57:10, 132:1
**Diego** [13] - 102:11, 126:8, 126:12, 126:17, 126:25, 144:9, 146:17, 174:14, 175:21, 201:12, 201:15, 201:19
**difference** [1] - 24:24
**different** [40] - 17:11, 18:22, 25:1, 26:3, 45:7, 46:4, 46:5, 48:4, 48:6, 48:14, 62:10, 76:4, 76:8, 76:14, 76:17, 101:1, 101:2, 101:9, 101:15, 101:21, 101:25, 103:6, 103:13, 104:15, 104:23, 131:20, 133:7, 135:18, 145:3, 150:14, 154:5, 158:12, 159:9, 177:19, 179:19, 208:20, 212:5, 212:6, 217:12
**differential** [7] - 98:23, 116:19, 122:19, 122:20, 122:22, 134:11, 139:18
**differently** [1] - 77:2
**difficult** [5] - 30:5, 52:18, 55:17, 121:16, 161:6
**digits** [2] - 89:9
**direct** [8] - 56:14, 89:21, 110:1, 115:19, 121:7, 122:17, 142:19, 201:5
**Direct** [1] - 3:6
**directed** [3] - 74:21, 134:2, 209:7
**direction** [4] - 145:3, 171:1, 214:20, 214:21
**directions** [2] - 97:19, 99:19

**Directions** [2] - 36:14, 40:14
**directly** [8] - 9:7, 49:24, 56:8, 104:11, 106:9, 109:2, 117:9, 175:2
**director** [1] - 222:12
**Director** [1] - 110:16
**disagree** [1] - 135:12
**disagreed** [1] - 129:12
**disagreeing** [2] - 103:12, 104:14
**disciplinary** [2] - 63:5, 73:20
**discipline** [11] - 62:19, 63:3, 63:18, 65:14, 66:5, 69:6, 70:17, 73:3, 103:13, 171:5, 181:22
**disciplines** [1] - 160:20
**discomfort** [1] - 8:19
**discovery** [1] - 204:14
**discrimination** [2] - 193:22, 194:25
**discuss** [16] - 11:10, 11:12, 11:17, 35:15, 84:15, 84:19, 84:24, 99:24, 99:25, 103:10, 117:8, 123:25, 141:5, 142:15, 148:4, 216:6
**discussed** [26] - 10:7, 10:8, 11:14, 11:24, 12:1, 31:15, 31:25, 32:10, 36:12, 38:20, 51:15, 70:25, 71:3, 74:12, 99:23, 101:16, 109:24, 114:11, 156:3, 172:13, 172:23, 188:5, 202:22, 203:23, 220:16, 221:24
**discusses** [1] - 69:18
**discussing** [9] -

31:20, 90:10,
117:25, 171:13,
171:16, 171:22,
173:9, 174:8,
175:2
  **discussion** [16]
- 51:10, 60:25,
77:5, 77:7, 83:14,
90:18, 92:4,
99:11, 100:16,
114:18, 174:24,
175:4, 180:19,
195:24, 196:1,
220:6
  **discussions** [11]
- 51:13, 51:14,
83:15, 83:17,
99:13, 159:9,
172:1, 172:5,
172:10, 175:1,
220:22
  **disease** [3] -
189:22, 190:1,
190:4
  **diseases** [1] -
189:21
  **Dismantle** [1] -
177:7
  **disorder** [1] -
78:22
  **disproportiona
te** [1] - 121:8
  **Disseminating**
[3] - 18:2, 18:8,
27:8
  **Dissemination**
[1] - 27:8
  **dissertation** [8]
- 55:13, 55:19,
56:3, 58:13,
109:7, 117:21,
117:25, 219:18
  **Dissertation** [1]
- 55:18
  **dissertations** [1]
- 55:21
  **dissolve** [1] -
170:13
  **distance** [1] -
172:8
  **distinguished**
[1] - 106:11
  **distortion** [3] -
7:19, 16:24, 32:3
  **DISTRICT** [4] -
1:1, 1:1, 226:1,
226:1
  **diversity** [4] -
210:22, 212:9,
214:15, 214:16

**division** [3] -
97:22, 159:5,
185:25
  **Division** [4] -
2:10, 160:18,
165:8, 227:13
  **DIVISION** [2] -
1:2, 226:2
  **doctoral** [1] -
58:11
  **document** [27] -
14:4, 14:6, 14:15,
85:22, 88:17,
88:18, 101:13,
106:1, 149:19,
149:25, 150:1,
164:16, 164:19,
165:4, 165:18,
174:7, 196:15,
196:16, 202:16,
204:23, 208:13,
208:21, 208:23,
208:25, 209:13,
215:22, 225:17
  **documentary**
[1] - 204:13
  **documents** [18]
- 10:18, 11:4,
11:5, 11:7, 45:7,
89:16, 89:18,
136:23, 163:17,
163:18, 163:19,
164:24, 184:9,
196:7, 204:24,
215:12, 215:15,
215:19
  **Documents** [2] -
53:7, 53:12
  **dominant** [1] -
131:19
  **done** [11] -
10:11, 32:9,
47:20, 47:21,
63:8, 75:25, 82:8,
135:2, 143:7,
167:11, 195:7
  **double** [7] -
29:19, 29:20,
38:25, 40:4,
40:22, 41:3,
41:16
  **double-blind** [7]
- 29:19, 29:20,
38:25, 40:4,
40:22, 41:3,
41:16
  **down** [15] - 13:6,
15:1, 40:10, 49:6,
86:24, 90:6,
102:5, 105:13,

112:19, 144:11,
144:12, 144:20,
156:19, 170:3,
209:2
  **download** [1] -
36:21
  **Dr** [31] - 26:12,
28:1, 38:20, 58:9,
62:7, 62:13,
66:13, 66:24,
71:19, 94:21,
103:23, 116:4,
118:15, 119:6,
120:6, 121:19,
122:8, 139:25,
149:20, 152:10,
152:13, 171:7,
178:19, 179:2,
179:11, 179:25,
180:17, 180:21,
187:9, 188:14,
218:15
  **draft** [5] -
101:12, 158:15,
169:9, 177:3,
186:10
  **drafted** [5] -
101:13, 112:13,
167:11, 169:10,
175:10
  **drafting** [1] -
169:7
  **drafts** [4] -
100:24, 175:8,
175:10, 176:1
  **draw** [1] -
148:15
  **drawing** [1] -
104:7
  **Drive** [1] -
228:13
  **dropped** [1] -
202:15
  **due** [3] - 61:22,
65:21, 71:7
  **duly** [4] - 1:17,
6:6, 226:16,
226:19
  **dump** [1] - 88:25
  **During** [1] -
118:20
  **during** [3] -
127:23, 216:7
  **dutifully** [1] -
35:21
  **dynamics** [2] -
187:11, 188:1

# E

**e-mail** [2] -
102:7, 138:13
  **E-mail** [6] - 2:6,
2:12, 2:19, 227:9,
227:15, 227:22
  **early** [6] - 15:21,
42:9, 78:18, 80:9,
84:9, 126:22
  **earth** [1] - 62:9
  **East** [1] - 120:1
  **EASTERN** [2] -
1:1, 226:1
  **easy** [4] -
123:13, 123:14,
145:19, 169:19
  **ed** [1] - 219:25
  **edited** [3] -
20:18, 33:13,
123:20
  **Editor** [1] -
207:16
  **editor** [39] -
17:25, 18:2,
18:17, 20:23,
21:1, 21:13,
29:12, 29:14,
29:16, 29:17,
30:3, 30:4, 30:6,
30:8, 36:7, 36:8,
38:20, 38:24,
39:4, 39:13,
77:17, 81:23,
88:1, 88:2, 99:25,
100:2, 100:5,
100:6, 122:23,
122:25, 123:1,
123:20, 197:24,
198:11, 199:7,
206:25, 209:15,
210:9, 221:12
  **editorial** [31] -
38:6, 38:11, 47:9,
75:17, 78:11,
78:12, 78:18,
79:2, 79:12, 81:7,
82:13, 82:19,
122:15, 125:11,
126:3, 126:8,
128:13, 141:5,
142:18, 142:23,
149:5, 188:3,
197:22, 198:11,
199:7, 199:10,
201:17, 202:4,
204:9, 209:19,
216:24
  **editors** [4] -

22:10, 29:21,
198:5, 210:9
  **education** [9] -
193:23, 217:23,
218:13, 218:21,
218:24, 219:6,
219:14, 219:16,
219:19
  **effect** [3] -
66:19, 168:24,
176:20
  **effort** [2] - 214:9,
214:11
  **egregious** [1] -
177:12
  **egregious..** [1] -
177:16
  **eight** [1] - 22:7
  **either** [4] -
17:10, 85:23,
128:8, 184:7
  **element** [1] -
71:10
  **ELLEN** [12] -
1:10, 1:15, 3:5,
5:2, 6:5, 6:15,
224:2, 225:3,
225:8, 225:14,
226:10, 226:16
  **Ellen** [15] - 1:22,
6:15, 13:14, 14:4,
91:20, 142:5,
150:4, 165:5,
176:11, 176:12,
176:16, 187:9,
195:19, 208:3,
222:24
  **email** [141] -
13:12, 29:13,
85:9, 85:12,
85:14, 85:16,
85:22, 86:1, 86:6,
86:8, 86:14,
87:10, 87:20,
87:24, 90:2, 90:5,
90:9, 90:22,
90:25, 92:1, 92:5,
92:14, 92:16,
92:17, 93:1, 93:6,
95:14, 100:25,
102:3, 102:15,
102:20, 103:3,
103:23, 104:12,
104:23, 105:1,
105:20, 105:25,
106:3, 106:6,
106:14, 106:16,
106:21, 107:1,
107:3, 107:9,
107:17, 107:20,

107:23, 108:7,
108:15, 108:20,
109:22, 110:9,
110:10, 110:13,
110:14, 110:17,
110:18, 110:24,
111:14, 126:22,
128:1, 136:14,
136:19, 136:21,
136:25, 137:2,
137:5, 137:11,
137:14, 138:4,
138:24, 139:2,
139:8, 139:13,
140:6, 140:7,
140:9, 140:13,
140:16, 140:20,
140:25, 141:18,
141:20, 141:25,
142:3, 142:25,
143:15, 144:5,
144:10, 144:15,
144:24, 145:8,
146:3, 146:7,
146:19, 148:16,
148:19, 148:24,
149:2, 149:4,
152:21, 157:15,
157:19, 157:25,
158:1, 158:8,
158:9, 158:25,
160:3, 160:6,
161:3, 162:10,
163:6, 163:18,
174:14, 174:19,
176:5, 185:19,
185:24, 195:19,
195:22, 196:17,
197:1, 203:17,
204:2, 204:17,
205:4, 205:5,
207:13, 207:17,
207:19, 207:24,
208:3, 209:8,
215:20, 216:9,
216:10
  **Email** [11] - 3:17,
3:19, 3:21, 3:23,
4:1, 4:5, 4:7,
4:11, 4:13, 4:15,
4:19
  **emailed** [1] -
109:10
  **emails** [32] -
83:6, 83:9, 83:16,
87:25, 88:4, 88:9,
88:12, 88:14,
88:21, 89:25,
90:20, 96:10,
105:12, 107:25,
109:24, 113:7,

113:12, 125:17,
137:24, 144:6,
144:8, 144:13,
145:2, 145:4,
146:20, 158:13,
161:12, 171:22,
176:9, 186:21,
187:2, 216:15
**embrace** [1] -
214:21
**emergency** [7] -
146:23, 147:1,
157:22, 158:1,
158:4, 158:20,
158:22
**Emergency** [1] -
158:2
**Emory** [2] -
200:16, 200:19
**emotional** [1] -
129:17
**emotionally** [2] -
130:2, 130:3
**emphasize** [2] -
138:16, 172:10
**empirical** [3] -
65:3, 71:23, 72:1
**empirically** [3] -
71:15, 71:18,
71:22
**employed** [2] -
108:7, 227:25
**employee** [2] -
82:11, 85:17
**employment** [2]
- 16:22, 17:8
**Employment** [1]
- 15:16
**empowered** [1] -
97:21
**encourage** [2] -
197:9, 214:16
**end** [16] - 67:1,
67:4, 68:17,
75:16, 87:10,
136:20, 136:22,
143:6, 148:2,
148:6, 153:18,
159:20, 162:2,
164:25, 213:6
**Ending** [2] - 4:1,
4:19
**endorse** [10] -
69:8, 153:15,
153:17, 153:22,
154:8, 154:24,
165:14, 172:8,
178:24, 179:6
**endorsed** [7] -
68:9, 71:4,

154:14, 154:16,
154:19, 155:3,
178:14
**endorsement**
[4] - 171:14,
171:19, 178:11,
180:20
**endorsements**
[1] - 171:23
**endorses** [1] -
178:25
**endorsing** [2] -
176:7
**enemies** [1] -
192:17
**enforce** [1] -
166:9
**engage** [1] -
206:20
**engaged** [5] -
59:3, 60:8, 60:12,
60:16, 64:9
**engagement** [2]
- 65:22, 65:23
**engaging** [1] -
134:16
**English** [3] -
9:11, 57:13,
205:18
**enlarged** [1] -
28:11
**enmity** [1] -
192:14
**enter** [1] - 63:21
**entered** [1] -
78:17
**enthusiastic** [2]
- 3:18, 85:10
**entire** [21] -
17:23, 19:11,
27:7, 27:22,
38:19, 39:17,
45:20, 48:22,
52:21, 75:15,
80:23, 80:24,
89:17, 102:20,
110:22, 111:1,
111:6, 111:20,
155:19, 164:12,
164:14
**entirely** [3] -
129:11, 190:16,
211:2
**entitled** [1] -
85:9
**entry** [2] - 19:3,
23:24
**enumerated** [1]
- 125:8
**equal** [1] - 67:2

**equivalent** [1] -
128:20
**era** [1] - 214:4
**Eric** [7] - 106:12,
106:15, 106:24,
108:2, 108:4,
108:21, 201:4
**erupted** [2] -
124:6, 137:9
**erupting** [1] -
159:19
**especially** [8] -
76:9, 124:7,
127:22, 135:9,
135:19, 135:25,
139:9, 211:5
**essay** [11] -
114:20, 153:23,
154:8, 154:14,
154:15, 154:17,
154:20, 154:24,
155:4, 155:6
**essays** [7] -
153:15, 153:18,
154:1, 154:4,
156:2, 156:5,
156:15
**et** [8] - 1:6, 3:21,
3:23, 4:1, 4:5,
4:7, 4:20, 226:6
**ethical** [1] -
192:5
**ethically** [2] -
189:14, 189:17
**ethics** [1] -
160:23
**Ethics** [2] -
192:6
**ethnicities** [1] -
103:13
**ethnomusicolo
gy** [1] - 10:16
**Ethnomusicolo
gy** [3] - 160:19,
165:9, 170:19
**Europe** [3] -
62:8, 211:13,
214:16
**European** [9] -
62:13, 62:21,
62:23, 63:2, 63:7,
65:15, 66:6,
214:4, 214:10
**evening** [1] -
92:7
**events** [1] -
100:11
**eventual** [2] -
115:6, 118:9
**eventually** [1] -

44:13
**everywhere** [1] -
192:4
**evidence** [1] -
65:4
**Ewell** [85] - 3:16,
41:21, 42:22,
44:12, 45:22,
52:13, 52:21,
61:1, 64:2, 64:14,
69:24, 70:1, 70:4,
70:7, 73:1, 73:9,
74:22, 74:24,
76:12, 77:7, 79:9,
84:9, 86:2, 91:24,
96:1, 96:5, 96:10,
96:17, 96:21,
97:4, 97:15,
98:14, 98:19,
98:23, 99:13,
99:17, 99:23,
104:2, 104:3,
104:6, 104:20,
104:21, 113:23,
115:11, 125:10,
126:19, 127:6,
127:11, 129:8,
129:10, 129:18,
131:4, 132:6,
133:3, 133:11,
134:6, 134:22,
134:24, 135:3,
135:9, 135:19,
135:25, 136:3,
136:6, 141:22,
142:24, 143:8,
143:15, 146:14,
154:1, 154:2,
154:5, 159:15,
166:20, 166:22,
166:25, 167:5,
167:9, 167:12,
168:13, 168:16,
168:25, 169:6,
199:13
**Ewell'** [1] -
158:11
**Ewell's** [46] -
3:18, 22:22, 43:3,
43:9, 43:14,
43:20, 44:3, 44:8,
45:15, 46:4,
46:23, 48:15,
51:4, 51:15,
69:21, 74:21,
81:1, 84:15,
85:10, 91:3, 91:4,
95:18, 96:16,
103:12, 104:9,
104:13, 104:14,

104:17, 106:9,
114:20, 115:14,
123:7, 130:15,
134:1, 134:2,
141:9, 143:10,
154:10, 154:13,
167:8, 168:9,
210:19
**ewen@juilliard
.edu** [1] - 107:1
**exact** [3] - 47:3,
61:19, 113:13
**exactly** [3] -
121:24, 139:12,
219:2
**Examination** [1]
- 3:6
**EXAMINATION**
[1] - 6:7
**examination** [2]
- 184:22, 226:21
**examine** [6] -
12:9, 31:17,
144:21, 149:23,
170:16, 208:25
**examined** [6] -
144:7, 144:13,
158:5, 178:3,
183:2, 206:15
**examining** [3] -
172:22, 205:25,
206:1
**example** [10] -
7:2, 30:5, 41:8,
62:11, 64:3,
66:19, 114:8,
117:3, 176:20,
214:12
**examples** [5] -
19:21, 19:25,
20:4, 20:5, 20:7
**excellent** [1] -
169:23
**except** [4] -
125:16, 204:5,
206:6, 225:5
**exception** [4] -
10:5, 31:14,
159:12, 190:22
**exceptions** [1] -
9:3
**Excerpt** [2] -
3:15
**exchange** [4] -
117:23, 148:12,
196:17, 204:2
**exchanged** [2] -
142:10, 148:9
**exchanges** [1] -
96:22

**excluded** [1] -
202:1
**excluding** [2] -
168:9, 201:6
**Excuse** [2] -
121:9, 142:8
**excuse** [10] -
11:24, 17:3, 18:9,
41:15, 42:6,
89:24, 160:21,
180:18, 188:18,
205:5
**executed** [1] -
225:19
**exemplifies** [1] -
67:9
**exercising** [1] -
121:7
**Exhibit** [116] -
3:10, 3:11, 3:12,
3:14, 3:15, 3:17,
3:19, 3:21, 3:23,
4:1, 4:3, 4:5, 4:7,
4:9, 4:9, 4:11,
4:13, 4:15, 4:17,
4:19, 13:2, 13:4,
14:1, 14:3, 14:6,
14:8, 14:15,
14:19, 14:23,
15:3, 15:17, 17:4,
17:18, 31:10,
31:12, 31:13,
31:14, 31:17,
31:18, 32:2, 32:3,
35:19, 35:22,
35:24, 37:13,
39:24, 45:2, 45:3,
45:5, 45:7, 50:25,
51:2, 85:3, 85:5,
85:9, 88:15,
88:17, 105:14,
105:18, 105:20,
109:23, 110:8,
132:5, 132:9,
136:12, 136:13,
137:14, 144:2,
144:3, 144:24,
145:5, 149:17,
149:19, 149:24,
157:12, 157:14,
157:17, 159:23,
160:1, 160:3,
163:25, 164:8,
165:21, 173:2,
173:4, 173:7,
173:13, 173:14,
173:20, 174:2,
174:12, 174:13,
178:3, 178:17,
180:6, 183:3,

185:15, 185:16,
186:25, 195:15,
195:18, 202:13,
202:14, 203:5,
203:18, 204:11,
204:12, 204:19,
204:22, 205:3,
205:24, 207:10,
207:12, 207:13,
207:24, 218:7
**exhibit** [24] -
12:10, 12:12,
12:17, 12:19,
13:8, 13:11, 14:3,
17:3, 31:24, 51:4,
85:6, 105:12,
143:21, 156:21,
158:6, 159:25,
164:4, 203:5,
203:14, 203:22,
205:17, 206:7,
206:16, 215:22
**EXHIBITS** [1] -
3:8
**exhibits** [6] -
12:8, 13:22,
68:14, 143:22,
164:6, 164:13
**exist** [5] - 28:2,
71:21, 197:3,
212:4, 212:11
**existence** [1] -
139:2
**existing** [3] -
211:20, 211:21,
214:3
**exists** [4] -
51:23, 53:8,
69:20, 212:17
**Expand** [1] -
102:23
**expand** [7] -
36:18, 36:20,
49:8, 49:10,
102:22, 106:20,
202:19
**expanded** [1] -
52:15
**expect** [1] -
184:5
**expectation** [1] -
88:21
**expected** [2] -
78:13, 218:25
**expecting** [1] -
183:15
**experience** [21] -
22:6, 35:3, 47:10,
47:11, 52:5,
56:18, 56:23,

75:10, 116:23,
117:11, 123:13,
142:19, 151:5,
199:10, 216:24,
217:5, 217:9,
217:10, 217:11,
217:17
**expert** [2] -
53:16, 53:19
**Expiration** [1] -
228:12
**Expires** [2] -
225:25, 228:15
**explain** [12] -
10:3, 10:11,
15:15, 24:3, 54:1,
57:16, 74:9,
82:25, 87:22,
152:17, 168:2,
198:22
**Explain** [1] -
15:24
**explained** [2] -
78:20, 167:17
**explains** [1] -
196:13
**explanation** [1] -
192:21
**explicit** [1] -
117:2
**explicitly** [5] -
96:14, 96:15,
101:1, 114:13,
168:16
**explosion** [1] -
152:21
**expose** [1] -
65:1
**exposed** [1] -
65:5
**exposure** [2] -
62:17, 65:15
**express** [2] -
123:25, 152:5
**expressed** [6] -
39:4, 39:13, 40:2,
52:7, 168:9,
225:20
**expresses** [2] -
117:24, 180:20
**expressing** [3] -
68:7, 123:6,
139:21
**extend** [1] -
171:3
**extensively** [1] -
35:17
**extent** [5] -
27:15, 56:16,
56:17, 58:15,

206:15
**extorsion** [3] -
57:6, 57:9, 57:11
**extortion** [1] -
57:22
**extremely** [11] -
64:20, 75:2, 75:4,
78:12, 122:1,
123:12, 129:13,
152:20, 190:19,
191:4, 212:1
**eyes** [1] - 204:20

# F

**Facebook** [15] -
124:14, 124:18,
127:18, 127:19,
127:20, 127:24,
128:2, 128:13,
128:17, 128:18,
128:20, 137:9,
137:20, 148:10
**Facial** [1] -
131:15
**fact** [41] - 10:8,
25:18, 32:17,
38:11, 49:6,
51:17, 58:20,
58:23, 61:22,
62:8, 71:19,
72:24, 73:13,
74:16, 74:18,
80:15, 86:6,
100:4, 100:6,
104:7, 122:22,
129:25, 134:12,
135:5, 135:14,
137:12, 139:1,
159:11, 161:24,
166:13, 166:21,
168:15, 168:18,
169:5, 181:2,
190:18, 191:2,
194:3, 205:2,
215:7
**facts** [1] -
150:13
**factual** [1] -
141:7
**Faculty** [4] - 4:7,
160:4, 167:18,
169:8
**faculty** [42] -
10:13, 10:14,
10:20, 33:14,
54:14, 80:21,
161:13, 161:15,
162:4, 162:6,
163:21, 165:1,

165:7, 171:4,
171:6, 171:13,
171:14, 171:19,
171:25, 172:6,
172:15, 173:11,
174:9, 174:25,
175:7, 175:11,
175:19, 176:1,
176:3, 176:8,
176:15, 177:13,
176:8, 178:24,
178:25, 179:6,
181:24, 182:12,
200:15, 217:12,
217:13, 218:20
**failure** [1] - 71:7
**fair** [7] - 52:15,
52:23, 90:11,
140:24, 142:22,
143:13, 155:18
**fall** [1] - 82:1
**false** [5] - 71:16,
71:18, 71:22,
158:25, 159:2
**familiar** [8] -
36:4, 38:7, 38:10,
38:12, 48:20,
53:6, 65:7, 94:8
**families** [2] -
64:25, 65:4
**family** [2] -
139:11, 161:25
**famous** [1] -
107:8
**far** [9] - 23:19,
69:5, 69:10,
79:13, 135:8,
147:25, 175:23,
186:5, 203:4
**fast** [2] - 68:12,
106:20
**fault** [2] - 37:5,
107:22
**favor** [1] - 73:10
**Fax** [6] - 2:5,
2:12, 2:18, 227:8,
227:15, 227:21
**feared** [1] -
139:17
**Fearful** [1] -
117:15
**February** [1] -
190:13
**Federal** [2] -
1:24, 5:9
**feelings** [1] -
47:14
**fellowship** [1] -
17:9
**felt** [17] - 71:4,

78:22, 97:9,
97:12, 97:18,
98:1, 98:2, 99:3,
118:18, 123:23,
152:20, 152:23,
177:22, 190:19,
192:9, 192:13
**female** [2] -
93:21, 93:23
**few** [11] - 9:3,
9:16, 17:13,
39:22, 50:10,
53:9, 107:15,
116:3, 121:1,
184:1, 205:9
**field** [31] - 25:1,
32:17, 51:10,
62:25, 63:21,
63:22, 64:6, 64:9,
73:10, 73:11,
73:18, 98:24,
99:1, 104:21,
132:25, 134:3,
134:12, 154:6,
154:12, 199:24,
200:7, 202:2,
210:11, 210:17,
210:23, 210:25,
211:9, 211:17,
212:20, 215:6,
219:19
**fields** [1] -
131:19
**figure** [1] -
220:21
**figuring** [1] -
42:13
**filed** [3] - 193:5,
194:11, 194:17
**final** [8] - 17:7,
100:21, 175:12,
177:3, 178:2,
178:6, 178:10,
186:10
**finally** [1] -
155:2
**financially** [1] -
228:2
**fine** [7] - 52:12,
61:20, 106:19,
120:15, 186:20,
189:12, 207:22
**finish** [1] - 195:8
**finished** [1] -
191:6
**Firm** [2] -
228:15, 228:18
**first** [53] - 6:6,
11:15, 12:10,
13:7, 21:3, 28:4,

28:10, 35:11,
35:20, 42:15,
43:17, 47:25,
48:1, 48:7, 52:2,
78:17, 79:7, 86:7,
86:8, 90:9, 90:22,
102:13, 102:18,
102:21, 107:16,
111:14, 113:16,
124:8, 125:3,
137:8, 137:24,
139:13, 144:24,
152:7, 153:9,
165:4, 175:9,
176:11, 182:18,
186:7, 188:24,
191:3, 194:13,
196:10, 199:22,
202:23, 204:11,
204:12, 206:20,
207:4, 209:10,
213:18
**First** [2] - 29:10,
121:16
**fits** [1] - 141:15
**five** [8] - 23:8,
25:14, 37:17,
89:9, 150:2,
156:2, 177:19,
223:3
**flow** [1] - 153:1
**focus** [8] - 87:1,
100:17, 102:13,
102:18, 104:3,
116:17, 184:2
**focused** [2] -
104:20, 141:7
**follow** [5] - 6:24,
88:11, 116:7,
128:9, 214:24
**follow-up** [1] -
128:9
**followed** [2] -
6:25, 143:12
**followers** [1] -
211:25
**following** [8] -
82:23, 138:13,
170:6, 173:19,
212:18, 214:6,
226:15, 226:25
**follows** [3] - 6:6,
107:9, 144:10
**font** [1] - 169:22
**FOR** [8] - 1:1,
2:2, 2:8, 5:16,
225:24, 226:1,
227:5, 227:11
**forbids** [1] -
193:22

forced [2] - 119:6, 119:11

foregoing [2] - 225:3, 225:18

forever [1] - 72:22

forget [2] - 80:20, 175:8

forgot [3] - 128:7, 198:16, 221:22

forgotten [1] - 126:23

form [258] - 17:22, 22:12, 24:1, 24:20, 25:4, 26:11, 27:5, 27:10, 27:24, 28:18, 31:2, 32:14, 32:19, 32:20, 33:1, 33:17, 34:8, 34:15, 34:22, 35:1, 35:7, 38:1, 38:9, 38:18, 39:6, 39:15, 40:5, 40:23, 42:17, 42:24, 43:4, 43:12, 43:22, 44:9, 44:21, 49:4, 51:12, 51:21, 52:9, 52:17, 53:4, 54:3, 55:4, 56:10, 57:8, 58:1, 58:18, 59:5, 59:10, 59:22, 60:14, 60:18, 61:9, 63:16, 63:23, 64:16, 65:6, 65:11, 66:2, 67:13, 67:21, 68:10, 68:20, 70:6, 70:11, 70:19, 71:17, 72:6, 74:4, 76:6, 76:19, 77:3, 77:9, 77:13, 78:5, 79:6, 79:18, 80:19, 81:9, 81:20, 82:5, 83:2, 83:8, 83:13, 84:13, 84:21, 86:4, 86:11, 86:15, 89:17, 91:8, 96:2, 96:7, 97:6, 98:11, 98:16, 98:20, 98:25, 99:5, 99:8, 99:10, 99:16, 100:3, 100:19, 100:21, 101:10,

101:18, 101:25, 103:7, 103:19, 105:10, 106:17, 107:13, 107:18, 107:21, 108:5, 108:18, 108:24, 109:4, 109:14, 109:21, 111:11, 112:10, 112:16, 113:6, 113:21, 114:1, 115:15, 115:21, 116:21, 116:25, 117:13, 117:19, 118:4, 118:10, 119:15, 121:9, 123:8, 123:21, 124:2, 124:13, 125:1, 125:13, 126:1, 126:5, 126:10, 126:15, 126:20, 127:8, 127:13, 127:16, 127:21, 128:15, 129:3, 129:19, 130:17, 131:5, 131:17, 131:24, 132:20, 133:5, 133:13, 133:16, 133:19, 134:9, 135:1, 135:11, 135:20, 136:2, 136:9, 138:22, 139:20, 139:22, 140:5, 140:18, 140:23, 141:23, 142:21, 143:18, 145:14, 146:1, 146:15, 147:11, 147:21, 148:8, 149:1, 149:8, 149:14, 152:13, 154:3, 155:23, 156:4, 159:22, 161:4, 162:16, 162:22, 163:13, 167:3, 168:11, 168:21, 169:2, 170:1, 171:15, 171:20, 172:2, 172:12, 173:18, 173:22, 175:14, 176:24, 177:24, 178:8, 178:13, 178:23, 179:5, 179:14, 180:13, 180:23, 182:1, 182:15, 182:22, 182:24, 183:11, 184:12, 184:15, 186:17, 188:23, 191:24,

192:12, 192:23, 193:13, 195:2, 197:5, 197:20, 198:6, 201:10, 201:14, 202:5, 203:10, 204:7, 206:18, 207:18, 209:24, 216:13, 216:17, 217:8, 217:16, 218:3, 219:10, 220:9, 220:14, 220:19, 221:1, 221:11, 221:21, 222:11, 222:17, 222:22

Form [2] - 75:23, 166:8

formal [9] - 6:23, 28:20, 31:24, 32:5, 32:18, 34:14, 38:16, 44:7, 160:11

formalized [2] - 28:22, 29:9

former [1] - 211:25

formerly [2] - 32:2, 222:5

formulated [4] - 87:24, 88:8, 207:4, 209:25

formulating [3] - 87:23, 100:12, 101:16

formulation [6] - 63:25, 83:10, 105:7, 158:11, 175:7, 201:13

forth [3] - 88:7, 203:2, 204:2

forthcoming [3] - 17:19, 91:24, 182:6

forward [5] - 92:10, 93:3, 114:24, 138:5, 138:9

forwarded [3] - 106:14, 106:22, 107:10

foster [1] - 114:18

four [7] - 11:4, 22:7, 23:9, 37:17, 106:1, 106:11, 156:12

Four [1] - 89:9

four-paged [1] - 106:1

fourth [1] -

30:17

fragile [1] - 136:1

Frame [4] - 45:16, 51:6, 131:15, 132:6

Frank [9] - 21:14, 21:15, 21:25, 22:14, 33:14, 36:7, 100:1, 148:1, 148:4

free [4] - 7:21, 8:17, 43:24, 141:12

freedom [1] - 160:23

French [1] - 121:14

fresh [1] - 19:15

Friday [1] - 42:10

friend [1] - 55:5

friendly [2] - 55:9, 56:18

friends [3] - 55:12, 148:10, 148:11

front [4] - 8:4, 75:15, 91:9, 204:20

froze [2] - 130:4, 130:5

frustrated [1] - 189:15

full [5] - 29:10, 29:11, 52:19, 172:8

fully [3] - 52:20, 117:7, 214:13

fumbling [1] - 143:22

future [3] - 93:5, 214:17, 214:20

---

## G

Gao [2] - 58:2, 58:4

gender [4] - 129:22, 199:8, 201:22, 212:9

General [6] - 2:9, 2:10, 2:16, 227:12, 227:13, 227:19

general [11] - 24:17, 24:18, 24:21, 26:13,

54:8, 76:21, 78:9, 129:6, 139:24, 163:15, 193:19

generally [5] - 54:9, 55:17, 57:19, 74:11, 78:20

genres [1] - 213:22

genuinely [1] - 121:25

Geoffroy [4] - 174:15, 175:3, 175:6, 175:17

Geoffroy-Schwinden [3] - 174:15, 175:3, 175:17

Geoffroy-Schwinden's [1] - 175:6

Gillian [1] - 55:6

given [6] - 84:25, 155:19, 204:14, 204:23, 226:18, 226:23

Given [1] - 225:21

global [1] - 212:16

globalization [1] - 210:23

globalized [2] - 211:17, 212:4

globally [1] - 211:10

God [2] - 115:25, 190:6

goodness [1] - 173:2

governing [1] - 39:13

gradually [1] - 211:5

Graduate [1] - 16:9

graduate [9] - 10:16, 55:22, 56:9, 56:15, 57:25, 58:22, 70:15, 165:10, 181:12

Graf [8] - 81:22, 81:23, 82:3, 88:2, 92:19, 92:22, 146:4, 146:13

Graf's [1] - 93:1

Graham [1] - 222:5

grants [3] - 17:2,

17:4, 17:8

great [4] - 66:18, 67:8, 156:23, 162:1

greater [2] - 212:8, 214:11

greatly [1] - 96:13

grew [1] - 26:15

grounded [1] - 222:10

grounding [1] - 218:15

grounds [1] - 129:17

Group [1] - 2:24

group [23] - 12:17, 13:7, 21:5, 22:18, 24:9, 24:11, 24:25, 25:7, 25:10, 25:13, 25:20, 25:22, 26:8, 26:9, 26:17, 26:18, 27:4, 27:16, 28:4, 28:10, 29:1, 29:4, 113:3

groups [3] - 25:5, 28:20, 219:21

grow [1] - 61:23

growing [2] - 210:22, 210:23

guess [19] - 23:6, 23:15, 55:9, 70:1, 70:23, 98:2, 121:11, 122:13, 125:4, 128:7, 149:2, 154:10, 154:21, 156:7, 177:5, 196:22, 208:4, 216:1, 221:20

guidance [1] - 44:19

---

## H

half [2] - 11:23, 113:16

hand [1] - 15:5, 89:8, 89:12, 225:21

hands [1] - 219:22

hands-on [1] - 219:22

Hang [1] - 89:2

happy [4] -

*ELLEN BAKULINA, PH.D.    10/16/2024*    12

50:11, 102:19,
106:1, 144:20
  **harangue** [3] -
131:21, 131:22,
131:25
  **hard** [1] - 121:17
  **harder** [1] -
20:19
  **he/she** [1] -
225:19
  **head** [4] - 27:4,
34:3, 106:7,
185:25
  **heading** [1] -
15:16
  **hear** [4] - 20:6,
43:17, 130:7,
194:14
  **heard** [9] -
30:16, 58:16,
58:19, 130:9,
139:9, 143:19,
144:16, 194:21,
217:18
  **hearing** [1] -
5:22
  **heart** [1] -
176:23
  **heavily** [1] -
122:6
  **Heidlberger** [10]
- 21:14, 21:15,
21:25, 22:14,
33:14, 36:7,
38:20, 100:1,
148:2, 148:4
  **held** [5] - 7:25,
155:15, 172:19,
184:25, 185:2
  **help** [9] - 50:13,
50:15, 89:7,
158:3, 158:19,
184:2, 192:22,
192:25, 210:10
  **helped** [1] -
186:10
  **helpful** [1] -
86:25
  **hereby** [2] -
225:4, 226:14
  **hereto** [1] - 1:25
  **hide** [2] -
102:14, 164:18
  **highest** [1] -
160:22
  **highlight** [3] -
32:9, 208:13,
209:5
  **highlighted** [7] -
18:6, 20:21,

31:19, 32:1, 32:6,
202:2, 206:4
  **highlights** [1] -
31:15
  **Highlights** [1] -
3:12
  **highly** [2] -
58:21, 69:17
  **Hill** [2] - 2:4,
227:7
  **himself** [6] -
66:12, 66:23,
84:2, 143:5,
168:13, 202:9
  **hire** [1] - 190:15
  **hired** [2] - 16:15,
197:22
  **hiring** [4] -
190:16, 191:10,
197:18, 197:21
  **Hispanic** [2] -
131:9, 201:20
  **historical** [1] -
67:19
  **Historical** [1] -
35:25
  **History** [3] -
160:18, 165:9,
170:18
  **history** [1] - 62:6
  **hoc** [25] - 88:19,
118:23, 182:19,
182:20, 182:23,
183:1, 183:7,
183:10, 183:13,
184:1, 186:1,
186:2, 186:6,
186:15, 187:3,
187:24, 188:5,
188:7, 188:18,
188:22, 193:5,
194:8, 195:20,
206:14, 221:16
  **Hoc** [13] - 4:9,
4:16, 10:22,
119:13, 163:22,
163:23, 164:9,
164:17, 164:19,
165:20, 165:21,
173:7, 174:2
  **hold** [6] - 16:24,
143:25, 155:17,
156:18, 184:18,
184:23
  **Hold** [4] -
170:25, 178:18,
205:23, 208:18
  **home** [1] - 94:21
  **homes** [1] -
61:23

  **honest** [5] -
11:2, 27:6, 39:10,
72:19, 83:25
  **honestly** [6] -
39:7, 92:15,
93:15, 151:10,
185:4, 215:5
  **honorary** [1] -
17:10
  **hope** [4] -
114:23, 114:24,
210:3, 210:9
  **hoping** [1] -
195:17
  **hour** [5] - 50:9,
79:24, 156:20,
195:5, 206:1
  **hours** [2] -
11:23, 116:3
  **house** [2] - 55:3,
94:7
  **HRS** [2] - 227:3,
227:3
  **huge** [4] -
103:21, 152:14,
152:21, 153:1
  **hum** [120] - 6:13,
6:21, 7:6, 8:8,
11:6, 13:3, 13:16,
15:11, 22:5, 22:9,
24:7, 25:17,
25:23, 26:6,
26:16, 29:15,
30:2, 33:8, 33:12,
33:22, 37:14,
41:23, 42:21,
45:12, 45:17,
46:10, 46:13,
48:2, 48:19,
51:16, 55:13,
56:1, 56:12, 57:2,
60:5, 62:1, 62:14,
63:11, 68:2,
71:12, 73:12,
73:19, 74:7, 77:6,
78:10, 83:4,
83:22, 84:6,
85:13, 88:3, 88:6,
89:6, 89:20, 90:1,
90:8, 90:21, 93:2,
96:24, 100:15,
100:23, 102:17,
121:18, 121:21,
124:9, 124:20,
128:25, 132:8,
132:13, 137:10,
137:16, 137:18,
138:8, 139:3,
140:14, 141:1,
143:14, 145:9,

145:22, 146:6,
146:9, 148:17,
150:3, 151:20,
152:4, 152:11,
153:3, 153:11,
153:14, 155:2,
156:13, 159:14,
162:3, 163:1,
163:7, 167:22,
172:18, 176:21,
178:4, 183:19,
184:20, 185:3,
185:11, 186:9,
187:12, 188:15,
190:8, 198:10,
199:5, 200:18,
200:24, 201:3,
203:12, 207:6,
207:23, 209:4,
211:8, 211:15,
211:23, 217:24,
218:12
  **hum-um** [1] -
139:3
  **human** [3] -
135:14, 135:15,
192:5
  **humans** [2] -
127:25, 128:1
  **Hunt** [1] - 222:5
  **Hunter** [1] -
41:22
  **hurt** [2] - 192:9,
192:13
  **hurting** [2] -
192:7, 192:8
  **hypothesize** [2]
- 70:14, 76:21

---

**I**

---

  **I..** [2] - 53:5,
106:18
  **Ibram** [1] - 67:25
  **idea** [13] - 62:24,
67:16, 68:3,
84:22, 111:23,
117:1, 154:11,
156:23, 158:14,
158:22, 191:1,
191:19, 197:4
  **ideas** [14] -
69:21, 76:11,
117:8, 117:18,
117:20, 117:23,
117:24, 118:17,
119:8, 132:23,
210:19, 210:21,
212:7
  **identical** [2] -

204:4, 206:6
  **identification**
[1] - 49:25
  **identified** [11] -
11:4, 32:4, 69:5,
69:7, 70:23, 71:6,
72:2, 79:3, 79:8,
81:6, 103:17
  **identifies** [7] -
74:22, 130:24,
134:15, 201:19,
202:8, 202:10,
202:11
  **identify** [17] -
56:21, 59:7, 59:8,
59:13, 60:9,
68:24, 69:3,
69:14, 78:3, 78:7,
79:5, 79:14,
79:17, 79:20,
84:7, 95:5, 121:6
  **identifying** [4] -
49:24, 65:19,
71:10, 130:16
  **identity** [20] -
28:24, 29:21,
29:22, 75:3,
129:13, 129:21,
129:22, 129:23,
129:24, 129:25,
130:1, 130:15,
131:7, 131:11,
131:12, 131:16,
131:19, 225:17
  **ideological** [1] -
100:17
  **ideologically**
[1] - 115:10
  **illness** [1] - 10:1
  **image** [3] -
162:25, 163:4,
163:5
  **implicated** [1] -
130:15
  **implicates** [1] -
133:4
  **implicating** [2] -
131:16, 131:18
  **implication** [1] -
62:3
  **implied** [4] -
167:20, 168:5,
169:13, 181:11
  **imply** [1] -
135:15
  **important** [13] -
7:3, 56:21, 76:10,
96:23, 114:18,
128:2, 145:12,
145:24, 162:18,

163:2, 181:24,
200:9, 212:2
  **IN** [1] - 225:24
  **in-person** [1] -
86:7
  **inability** [2] -
98:18, 116:24
  **inaccurate** [1] -
142:17
  **inappropriate**
[4] - 189:14,
189:17, 190:16,
191:9
  **INC** [1] - 228:12
  **incapable** [1] -
117:17
  **incident** [1] -
192:19
  **incidentally** [2] -
15:4, 26:4
  **incidents** [1] -
122:21
  **include** [8] -
64:11, 167:4,
168:13, 198:9,
198:11, 209:9,
214:9
  **included** [8] -
31:15, 33:20,
36:14, 118:24,
146:5, 159:9,
203:16, 217:11
  **includes** [3] -
62:21, 171:3,
226:25
  **including** [15] -
10:14, 19:19,
28:3, 45:14, 61:1,
61:2, 105:22,
106:7, 122:2,
159:9, 164:25,
184:24, 199:9,
205:4
  **inclusion** [6] -
75:3, 103:13,
154:6, 154:11,
162:18, 163:3
  **inclusive** [5] -
73:11, 134:3,
154:14, 158:12,
198:8
  **inclusivity** [2] -
73:17, 158:15
  **incompletely** [1]
- 143:20
  **incorporated** [2]
- 166:4, 174:8
  **incorporates** [1]
- 173:10
  **increase** [1] -

154:11
**independence**
[1] - 97:25
**independent** [3]
- 98:3, 123:1,
123:7
**Indian** [1] -
62:11
**indicated** [1] -
18:7
**indicating** [3] -
41:14, 71:14,
108:15
**indication** [11] -
40:2, 40:21, 41:1,
41:18, 51:19,
51:22, 51:23,
52:4, 52:7, 52:11
**indirectly** [2] -
49:24, 121:10
**individual** [4] -
26:19, 60:15,
108:21, 163:3
**individually** [1] -
97:4
**individuals** [2] -
198:13, 215:13
**infer** [1] - 62:12
**influence** [1] -
122:25
**influenced** [4] -
121:19, 122:5,
122:7, 122:8
**inform** [1] -
118:8
**information** [7] -
14:18, 15:15,
79:21, 148:9,
148:12, 191:17,
226:23
**informed** [1] -
138:5
**informs** [1] -
108:21
**inherently** [1] -
62:4
**initiated** [4] -
84:4, 84:18, 86:6,
86:7
**initiating** [1] -
86:1
**initiation** [3] -
84:10, 84:14,
84:17
**Inquiries** [1] -
209:6
**insight** [2] -
187:10, 187:25
**insisted** [1] -
171:19

**insisting** [1] -
189:22
**instance** [4] -
1:16, 9:5, 67:17,
172:6
**instead** [1] -
91:2
**institution** [2] -
17:11, 107:4
**institutions** [1] -
177:8
**instruct** [1] - 9:6
**instructed** [1] -
119:14
**instruction** [1] -
12:11
**instructions** [1]
- 78:14
**instrument** [1] -
225:18
**Insult** [1] - 132:2
**insurance** [3] -
189:20, 189:25,
190:1
**intellectual** [3] -
121:20, 122:13,
212:16
**intend** [1] -
31:10
**intended** [1] -
173:5
**intention** [2] -
168:9, 180:20
**intentional** [1] -
208:19
**interact** [4] -
118:17, 212:7,
212:8
**interacted** [3] -
97:1, 118:16
**interaction** [7] -
118:24, 118:25,
119:2, 122:12,
190:9, 190:10,
211:17
**interactions** [4]
- 55:10, 56:13,
122:15, 189:5
**interest** [20] -
22:18, 24:9,
24:11, 24:25,
25:5, 25:7, 25:10,
25:13, 25:20,
26:8, 26:9, 26:17,
27:4, 27:16, 28:3,
28:10, 28:20,
29:1, 29:4
**interested** [3] -
95:17, 114:19,
228:3

**interfere** [1] -
9:18
**internal** [5] -
88:24, 171:12,
187:11, 188:1,
216:3
**internet** [1] -
128:20
**interrupt** [3] -
7:18, 7:21, 24:12
**interrupted** [3] -
77:24, 79:4,
213:7
**interrupting** [1] -
78:3
**interruption** [2] -
72:23, 74:1
**intervening** [1] -
16:25
**interview** [2] -
11:15, 217:14
**interviewed** [2] -
182:19, 190:13
**intimidated** [8] -
99:15, 99:17,
100:1, 117:4,
118:19, 123:14,
123:17, 123:18
**Intimidated** [1] -
100:4
**introduce** [3] -
12:10, 14:2,
88:16
**introduced** [2] -
203:18, 206:16
**introducing** [1] -
12:8
**introduction** [5]
- 23:2, 23:6,
23:10, 33:18,
153:10
**Introduction** [2]
- 32:11, 33:10
**invested** [1] -
130:2
**investigate** [1] -
88:20
**investigating** [1]
- 171:4
**investigation** [1]
- 160:11
**invitation** [3] -
115:3, 126:18,
127:6
**invite** [7] -
22:15, 97:10,
97:12, 114:19,
146:14, 199:1
**invited** [5] -
55:8, 96:1, 96:6,

206:23, 217:14
**invites** [1] -
114:13
**inviting** [5] -
97:4, 97:8, 97:15,
142:24, 167:8
**involve** [3] -
77:17, 82:15,
197:4
**involved** [13] -
16:25, 29:18,
87:25, 96:11,
138:6, 197:9,
198:21, 199:12,
201:12, 201:23,
202:4, 202:7,
210:18
**involvement** [1]
- 82:15
**involves** [1] -
77:15
**involving** [1] -
112:5
**irrelevant** [1] -
189:6
**Ishiyama** [7] -
185:20, 186:2,
186:16, 187:3,
195:19, 221:14,
222:2
**Ishiyama's** [1] -
221:24
**isolated** [1] -
211:2
**Issue** [2] - 4:11,
174:16
**issue** [14] - 46:1,
75:2, 75:3, 80:23,
80:24, 95:11,
96:11, 97:20,
101:8, 101:20,
103:5, 103:23,
104:6, 104:7,
104:9, 104:15,
104:22, 105:21,
107:10, 108:14,
109:2, 109:6,
109:9, 116:4,
116:8, 116:9,
118:15, 118:19,
119:6, 119:11,
121:7, 121:22,
122:5, 122:7,
122:8, 122:19,
122:24, 123:3,
123:5, 123:18,
124:1, 136:15,
138:6, 139:19,
139:25, 141:21,
141:24, 144:9,
148:16, 148:25,

212:9, 215:20
**IX** [6] - 193:6,
193:15, 193:18,
193:22, 194:12,
194:17

---

**J**

---

**JACKS** [2] -
3:18, 85:11
**Jackson** [143] -
2:22, 3:21, 3:23,
4:1, 53:10, 53:23,
53:24, 54:2,
54:21, 54:25,
55:2, 55:11, 56:9,
56:15, 56:20,
56:23, 57:1, 57:6,
57:25, 58:4, 58:9,
58:16, 58:21,
59:2, 59:3, 59:8,
59:15, 59:23,
60:8, 60:11,
60:16, 61:2, 61:7,
61:17, 62:7,
62:13, 64:24,
66:4, 66:9, 66:12,
66:13, 66:23,
66:24, 67:11,
68:6, 68:14,
68:15, 69:8,
69:18, 70:5,
70:10, 70:17,
71:19, 72:3, 83:7,
83:17, 83:23,
84:14, 85:12,
87:25, 88:18,
92:6, 93:7, 95:11,
96:11, 97:20,
101:8, 101:20,
103:5, 103:23,
104:6, 104:7,
104:9, 104:15,
104:22, 105:21,
107:10, 108:14,
109:2, 109:6,
109:9, 116:4,
116:8, 116:9,
118:15, 118:19,
119:6, 119:11,
121:7, 121:22,
122:5, 122:7,
122:8, 122:19,
122:24, 123:3,
123:5, 123:18,
124:1, 136:15,
138:6, 139:19,
139:25, 141:21,
141:24, 144:9,
148:16, 148:25,
**JACKSON** [4] -
1:3, 93:25, 94:16,
226:3
**Jackson's** [14] -
61:25, 68:24,
69:15, 69:20,
76:3, 76:16, 77:1,
118:13, 121:20,
125:16, 154:24,
180:10, 180:17,
180:21
**JACKSON
000208** [1] - 4:10
**Jacoby** [4] -
2:15, 93:20,
227:18
**JACOBY** [1] -
93:23
**January** [1] -
15:7
**Jason** [1] - 2:24
**Jennifer** [4] -
110:16, 111:8,
160:4, 207:14
**Jessica** [9] -
209:8, 217:3,
217:22, 218:11,
219:2, 220:3,
220:16, 220:22,
221:9
**Jew** [1] - 69:19
**Jews** [1] - 71:1
**job** [1] - 16:2
**jobs** [1] - 217:18
**John** [11] -
160:3, 185:20,
186:2, 186:16,
187:3, 195:19,
196:8, 207:14,
221:14, 221:24,
222:2
**joined** [4] -
25:21, 38:5,
54:14

171:7, 178:11,
178:15, 178:16,
178:19, 178:22,
179:3, 179:11,
179:13, 179:16,
179:25, 182:14,
188:14, 189:5,
189:8, 189:10,
189:19, 190:11,
190:14, 191:1,
191:8, 191:11,
192:9, 192:13,
193:6, 193:11,
194:4, 201:6,
202:3, 209:18,
209:25, 212:12

journal [46] - 18:21, 28:12, 29:14, 30:24, 33:13, 35:20, 35:25, 36:4, 36:15, 44:15, 45:11, 46:19, 49:2, 51:5, 52:6, 52:8, 59:16, 59:19, 75:18, 76:15, 100:2, 113:8, 114:8, 114:14, 114:17, 181:1, 181:19, 181:20, 188:3, 189:4, 189:6, 191:7, 197:12, 197:22, 210:10, 210:20, 213:9, 213:11, 213:12, 213:16, 213:19, 213:20, 213:23, 214:9, 221:13

Journal [115] - 4:13, 4:16, 10:19, 18:17, 35:6, 59:24, 60:7, 61:11, 68:8, 70:17, 72:4, 72:8, 72:9, 72:14, 72:20, 73:24, 74:1, 75:21, 76:16, 76:17, 77:1, 77:2, 78:1, 78:4, 78:11, 78:21, 78:24, 79:3, 80:8, 80:11, 80:15, 80:23, 80:24, 81:7, 81:13, 81:23, 82:10, 82:16, 82:18, 83:1, 83:12, 84:11, 86:3, 88:20, 91:7, 95:21, 96:18, 97:5, 97:7, 100:13, 101:1, 101:22, 105:7, 108:16, 108:23, 109:3, 111:17, 113:4, 113:18, 113:24, 115:6, 122:16, 122:23, 123:19, 124:12, 125:5, 125:8, 127:12, 129:9, 134:7, 138:1, 140:3, 140:22, 141:3, 143:16, 148:5, 152:1, 155:20, 160:13,

163:7, 164:21, 165:1, 165:11, 167:19, 169:8, 173:11, 174:4, 181:13, 181:16, 187:11, 187:16, 188:1, 188:12, 188:21, 189:1, 197:2, 197:24, 198:25, 201:7, 202:25, 204:5, 206:19, 206:21, 207:16, 209:18, 210:16, 210:18, 211:18, 212:3, 212:14, 212:19, 212:22, 214:6, 222:6

Journal's [6] - 77:24, 197:19, 198:4, 198:7, 198:8, 198:14

journal's [1] - 197:7

journals [11] - 22:11, 29:8, 30:16, 35:13, 44:16, 74:11, 75:12, 80:14, 128:14, 214:19

JSS [21] - 4:11, 10:17, 73:14, 74:20, 78:18, 92:10, 97:2, 97:13, 97:14, 97:18, 162:23, 163:5, 170:13, 171:6, 174:16, 196:4, 197:9, 210:25, 213:12, 214:1, 214:3

judge [1] - 123:22

Judging [1] - 108:6

judging [2] - 67:17, 68:4

Juilliard [4] - 106:16, 107:4, 107:6, 108:7

JULIA [1] - 228:12

JulieTXCSR@gmail.com [1] - 228:14

July [47] - 121:6, 124:6, 125:20, 125:24, 126:4, 126:9, 126:14, 126:19, 127:5,

127:10, 136:17, 137:1, 138:14, 138:25, 140:10, 144:11, 144:16, 145:7, 146:7, 146:22, 147:1, 147:20, 148:2, 148:6, 149:19, 149:25, 156:8, 156:10, 157:16, 158:20, 158:25, 159:20, 160:5, 162:2, 163:8, 172:11, 173:12, 174:15, 174:25, 177:18, 188:8, 203:7, 203:19, 203:23, 205:6, 206:4

jumped [1] - 208:23

June [2] - 16:1, 16:16

junior [1] - 105:6

jury [1] - 20:2

justified [3] - 73:25, 129:11, 129:17

justify [1] - 72:3, 72:7

## K

keeps [1] - 164:15

Kendi [1] - 67:25

kept [4] - 7:9, 13:22, 190:1, 192:3

key [1] - 84:15

keynote [4] - 73:9, 74:21, 84:16, 130:1

Kim [2] - 1:19, 228:11

KIM [1] - 226:13

kind [11] - 17:10, 17:15, 20:3, 24:23, 47:24, 48:11, 116:24, 126:9, 129:21, 162:5, 214:22

kinds [2] - 30:14, 158:13

knowledge [25] - 9:17, 9:20, 14:20, 34:23, 39:3, 54:23, 57:5, 57:24, 60:12, 81:3, 81:5, 81:10,

122:18, 163:9, 163:10, 193:20, 199:11, 201:5, 214:25, 216:21, 217:2, 221:25, 222:15, 222:18, 222:20

knowledgeable [1] - 219:20

known [6] - 128:5, 185:9, 200:6, 200:8, 215:6, 225:14

Kosovsky [2] - 112:3

## L

lack [12] - 65:22, 74:5, 75:6, 75:7, 78:2, 78:6, 79:11, 125:11, 125:21, 126:13, 127:5, 166:15

lag [1] - 37:6

language [2] - 77:5, 204:4

languages [1] - 212:7

large [4] - 88:17, 89:4, 121:15, 122:1

larger [2] - 80:25, 211:21

Last [1] - 200:25

last [16] - 37:11, 37:12, 38:6, 130:5, 130:9, 142:2, 166:12, 166:16, 166:19, 173:3, 173:4, 175:10, 177:7, 195:17, 214:1

lat [1] - 201:1

latest [4] - 152:1, 202:24, 213:16, 213:20

latter [1] - 60:24

LAURA [2] - 1:6, 226:6

LAW [2] - 2:3, 227:6

lawfirm.com [2] - 2:6, 227:9

laws [2] - 66:17, 67:7

lawsuit [1] - 54:11

lawyers [1] -

179:9

lead [1] - 220:6

leadership [7] - 197:7, 197:19, 198:4, 198:7, 198:8, 198:14, 201:6

leading [1] - 122:16

learn [3] - 80:17, 127:10, 127:15

learned [3] - 45:25, 118:25, 119:3

least [14] - 22:7, 73:16, 75:17, 97:17, 106:11, 108:21, 115:22, 119:19, 122:25, 166:5, 180:7, 206:3, 215:25, 216:18

leave [2] - 58:22, 79:11

lecturer [1] - 82:7

lectures [1] - 56:11

led [6] - 59:4, 72:14, 72:19, 72:23, 84:5, 84:11

left [9] - 15:5, 58:20, 58:24, 89:8, 89:12, 95:7, 145:6, 150:12, 206:25

left-hand [3] - 15:5, 89:8, 89:12

Legacy [3] - 18:2, 18:8, 27:9

legal [4] - 2:24, 6:11, 57:18, 193:17

legitimate [1] - 133:2

lengthy [1] - 107:11

less [14] - 28:20, 35:9, 67:2, 67:4, 68:16, 78:19, 97:21, 156:12, 200:6, 200:8, 206:6, 212:24, 219:20

lethal [1] - 189:24

letter [53] - 10:13, 10:15, 34:10, 34:12,

50:1, 70:20, 123:19, 149:13, 149:15, 150:9, 150:22, 151:8, 151:11, 152:7, 155:21, 165:10, 165:15, 165:19, 165:24, 166:5, 166:10, 168:4, 169:3, 169:11, 169:14, 169:24, 171:24, 172:9, 173:12, 174:8, 174:9, 176:1, 176:3, 176:8, 177:18, 178:24, 178:25, 179:6, 179:10, 181:9, 181:13, 201:21, 203:6, 203:19, 203:23, 205:5, 205:6, 215:24, 216:1, 217:7, 217:15

Letter [2] - 4:3, 4:17

letters [5] - 34:18, 80:20, 80:22, 174:21, 217:1

level [1] - 141:6

Levi [21] - 87:25, 91:10, 91:13, 91:23, 115:18, 115:22, 116:11, 118:16, 120:24, 121:17, 122:3, 122:9, 122:18, 136:15, 138:25, 140:8, 140:10, 140:20, 144:15, 145:11, 145:23

Levi's [1] - 158:15

liberty [2] - 31:9, 157:13

lie [1] - 159:3

life [4] - 67:1, 67:4, 68:17, 84:19

lifetime [1] - 150:15

light [4] - 124:8, 210:10, 210:17, 212:20

likewise [1] - 160:21

Likewise [1] - 7:17

limit [3] - 19:20,

180:20, 199:22
**limitations** [5] -
171:14, 171:17,
171:18, 171:23,
172:3
**Limitations** [1] -
172:3
**limited** [3] -
47:10, 64:23,
193:20
**limits** [4] -
180:8, 180:16,
180:24, 180:25
**line** [8] - 85:20,
110:10, 146:7,
150:6, 177:17,
186:25, 196:2,
202:17
**link** [1] - 166:5
**linked** [1] -
165:18
**list** [13] - 17:2,
17:4, 17:17,
32:24, 77:22,
110:5, 110:21,
111:5, 111:10,
112:1, 112:7,
141:19, 208:14
**List** [1] - 3:14
**listed** [14] -
14:18, 14:25,
15:15, 16:22,
18:1, 19:2, 23:4,
23:23, 33:3,
33:15, 36:8,
161:5, 161:6,
209:10
**Lists** [1] -
110:25
**lists** [2] - 15:9,
110:25
**literally** [1] -
29:13
**Litigation** [2] -
2:10, 227:13
**Live** [2] - 2:15,
227:18
**lived** [1] - 142:10
**LLC** [2] - 2:3,
227:6
**location** [1] -
1:22
**logical** [1] -
214:4
**logically** [1] -
214:7
**look** [10] - 12:20,
20:12, 57:10,
57:11, 70:20,
111:12, 178:17,

186:18, 196:7,
205:13
**Look** [1] -
176:19
**looked** [7] -
10:22, 10:23,
78:21, 122:6,
163:20, 199:18,
206:24
**looking** [5] -
51:3, 132:9,
143:21, 210:2,
218:5
**looks** [11] -
23:13, 90:10,
92:4, 129:17,
137:12, 149:9,
165:23, 178:2,
195:24, 204:4,
207:15
**losing** [1] -
156:24
**lost** [2] - 164:2,
206:7
**loud** [1] - 87:6
**lower** [2] - 15:5,
89:8
**lunch** [3] -
120:8, 120:11,
120:24
**Lunch** [1] -
120:9
**lvg.dallas@
gmail.com** [1] -
2:25

# M

**m.allen@allen**
[2] - 2:6, 227:9
**m.allen@allen-
lawfirm.com** [2] -
2:6, 227:9
**MAC** [1] - 201:2
**machine** [1] -
1:22
**Madam** [1] -
85:2
**mail** [8] - 2:6,
2:12, 2:19, 102:7,
138:13, 227:9,
227:15, 227:22
**main** [5] -
127:24, 181:3,
181:6, 181:7,
192:18
**maintain** [1] -
178:10
**major** [1] - 44:16

**majority** [3] -
132:24, 134:19,
134:20
**Mak** [2] - 200:25,
201:2
**MAK** [1] - 201:2
**makeup** [1] -
217:22
**MALE** [1] - 91:16
**male** [2] - 93:16,
214:10
**man** [4] - 131:9,
134:7, 135:10,
135:19
**managing** [1] -
111:5
**manuscript** [1] -
27:22
**mark** [20] - 13:2,
31:11, 35:18,
45:1, 85:6,
105:14, 136:11,
136:12, 143:24,
144:1, 149:18,
156:18, 157:14,
159:25, 163:23,
172:24, 173:6,
185:16, 202:14,
207:12
**MARKED** [1] -
3:9
**marked** [25] -
13:4, 14:1, 14:15,
31:12, 31:18,
35:22, 45:3, 85:5,
88:15, 105:18,
136:13, 144:3,
149:17, 157:12,
159:23, 160:2,
163:25, 164:13,
173:3, 174:2,
174:13, 185:15,
195:15, 202:13,
207:10
**marking** [5] -
14:3, 149:24,
164:8, 174:11,
195:18
**Mary** [12] - 2:9,
5:12, 8:25, 12:15,
94:24, 119:25,
120:4, 157:3,
182:3, 226:20,
227:3, 227:12
**Mary.Quimby@
oag.texas.gov** [2]
- 2:12, 227:15
**master** [1] -
67:12
**master's** [16] -

16:5, 16:6, 55:19,
115:24, 116:2,
116:6, 116:8,
116:14, 117:9,
118:2, 118:3,
118:9, 118:13,
118:20, 121:12,
121:13
**Material** [1] -
3:19
**materials** [4] -
55:16, 83:7,
209:7, 214:3
**matter** [5] - 77:8,
77:10, 91:11,
93:4, 129:21
**matters** [1] -
91:25
**McGill** [5] - 16:2,
16:13, 16:16,
16:20, 16:23
**me..** [2] - 102:25,
203:11
**mean** [31] - 20:4,
21:23, 22:3,
22:13, 30:25,
38:2, 55:18,
63:20, 67:16,
69:4, 83:17,
93:16, 99:11,
120:8, 124:6,
131:18, 134:12,
154:9, 179:6,
183:1, 186:24,
189:11, 191:6,
198:22, 199:6,
199:11, 199:24,
205:11, 210:25,
219:3
**Meaning** [1] -
176:25
**meaning** [2] -
97:22, 182:7
**means** [13] -
29:20, 57:22,
61:18, 111:23,
163:3, 163:4,
170:17, 170:18,
184:21, 197:16,
211:19, 214:17,
215:7
**meant** [11] -
6:23, 74:23,
111:4, 162:8,
178:1, 193:25,
198:12, 202:1,
210:16, 212:23
**media** [2] -
138:17, 152:22
**medical** [1] -

189:20
**medications** [1]
- 9:22
**medium** [1] -
127:20
**meet** [5] - 11:21,
147:15, 184:3,
184:13, 184:14
**Meeting** [1] -
4:13
**meeting** [14] -
12:17, 43:5,
146:23, 147:1,
147:4, 147:7,
157:22, 158:1,
158:2, 158:4,
158:20, 158:23,
184:10, 186:14
**meetings** [3] -
56:11, 187:19,
187:20
**megabytes** [1] -
89:4
**member** [14] -
75:17, 82:13,
97:13, 97:14,
97:16, 97:18,
97:19, 112:8,
118:3, 175:11,
186:2, 190:23,
209:10, 210:15
**members** [18] -
10:14, 21:24,
34:19, 54:7,
112:13, 113:8,
161:12, 161:13,
165:8, 177:13,
186:1, 186:13,
190:14, 194:4,
195:20, 199:7,
209:9, 216:11
**membership** [9]
- 25:19, 25:21,
26:3, 97:7,
110:18, 110:23,
111:2, 111:6,
111:20
**memories** [1] -
150:12
**memory** [13] -
9:23, 19:15,
46:16, 61:18,
151:5, 152:15,
152:18, 153:22,
158:3, 158:19,
171:18, 183:21,
188:5
**men** [2] - 61:22,
202:1
**mental** [1] - 9:25

**mention** [3] -
168:16, 168:25,
189:12
**mentioned** [15] -
52:12, 56:19,
69:12, 80:22,
96:8, 96:10,
96:13, 106:15,
158:16, 183:17,
187:10, 189:9,
189:13, 193:14,
211:18
**mentions** [1] -
177:12
**merit** [3] - 67:18,
68:4, 141:8
**message** [6] -
106:22, 112:2,
138:10, 181:3,
181:6, 181:7
**met** [6] - 108:10,
183:6, 183:9,
184:4, 186:13,
216:6
**methods** [1] -
220:24
**MHTE** [2] -
170:18, 218:20
**Michael** [3] - 2:3,
227:3, 227:6
**middle** [2] -
86:10, 110:2
**might** [17] -
37:6, 70:20,
70:21, 96:8,
99:22, 112:4,
117:2, 117:4,
117:5, 126:21,
126:23, 127:17,
153:7, 189:22,
190:5, 190:6,
192:10
**MIN** [2] - 227:3,
227:3
**mind** [4] - 37:1,
116:24, 117:5,
151:2
**mindful** [2] -
86:20, 119:25
**mine** [2] - 22:21,
198:12
**minority** [5] -
134:13, 134:14,
134:15, 134:20,
201:21
**minute** [14] -
37:8, 87:13,
90:23, 93:10,
93:13, 111:12,
112:17, 112:23,

137:4, 149:7,
151:16, 203:11,
208:15, 215:20
**minutes** [1] -
8:10
**MISCELLANEO
US** [1] - 5:19
**misleading** [1] -
171:25
**misplaced** [1] -
164:7
**mispronounce
d** [1] - 12:6
**mispronunciati
on** [1] - 18:12
**misrepresent**
[1] - 159:4
**misrepresentin
g** [1] - 159:6
**mistake** [1] -
173:6
**mistreated** [2] -
58:4, 58:5
**mistreating** [1] -
57:25
**mixed** [1] -
46:16
**mock** [1] -
219:23
**moment** [4] -
47:4, 67:23,
93:12, 105:13
**money** [1] -
197:23
**month** [2] - 38:6,
38:12
**months** [2] -
80:9, 193:3
**Montreal** [9] -
1:23, 16:2, 120:1,
147:14, 161:18,
161:21, 161:24,
161:25, 162:8
**Moreover** [1] -
187:18
**morning** [2] -
6:9, 92:20
**Most** [2] - 74:14,
182:2
**most** [4] - 29:19,
54:10, 74:19,
214:2
**mostly** [3] -
99:18, 148:9,
214:3
**mouth** [1] -
65:24
**move** [7] -
41:12, 53:11,
86:22, 87:2,

121:2, 153:12,
156:21
**moved** [2] -
15:8, 15:25
**MR** [57] - 6:8,
13:5, 14:2, 18:6,
31:8, 31:13,
35:18, 37:2, 37:4,
37:6, 43:18,
44:24, 50:10,
50:16, 79:23,
85:2, 91:18,
93:15, 93:19,
93:24, 93:25,
94:2, 94:5, 94:7,
94:10, 94:14,
94:16, 94:19,
94:24, 95:4,
105:11, 105:16,
119:21, 119:24,
120:4, 120:8,
120:13, 120:16,
130:12, 136:11,
143:24, 149:18,
156:17, 156:23,
157:1, 157:5,
159:24, 164:1,
172:24, 173:4,
174:11, 195:6,
195:16, 207:11,
223:1, 223:4,
223:12
**MS** [280] - 17:22,
22:12, 24:1,
24:20, 25:4,
26:11, 27:5,
27:10, 27:24,
28:1, 28:18, 31:2,
32:14, 32:19,
33:1, 33:17, 34:8,
34:15, 34:22,
35:1, 35:7, 36:22,
36:25, 37:3, 37:5,
38:1, 38:9, 38:18,
39:6, 39:15, 40:5,
40:23, 42:17,
42:24, 43:4,
43:12, 43:16,
43:22, 44:9,
44:21, 49:4, 50:8,
50:18, 51:12,
51:21, 52:9,
52:17, 53:4, 54:3,
55:4, 56:10, 57:8,
58:1, 58:18, 59:5,
59:10, 59:22,
60:14, 60:18,
61:9, 63:16,
63:23, 64:16,
65:6, 65:11, 66:2,
67:13, 67:21,

68:10, 68:13,
68:20, 70:6,
70:11, 70:19,
71:17, 72:6, 74:4,
75:23, 76:6,
76:19, 77:3, 77:9,
77:13, 78:5, 79:6,
79:18, 80:19,
81:9, 81:20, 82:5,
83:2, 83:13,
84:13, 84:21,
86:4, 86:11,
86:15, 91:8,
93:11, 93:17,
93:22, 93:23,
94:12, 94:23,
95:3, 96:2, 96:7,
97:6, 98:11,
98:16, 98:20,
98:25, 99:5, 99:8,
99:10, 99:16,
100:3, 100:19,
101:10, 101:18,
103:7, 103:19,
105:10, 106:17,
107:13, 107:18,
107:21, 108:5,
108:18, 108:24,
109:4, 109:14,
109:21, 111:11,
112:10, 112:16,
113:6, 113:21,
114:1, 115:15,
115:21, 116:21,
116:25, 117:13,
117:19, 118:4,
118:10, 119:15,
119:18, 119:23,
120:6, 120:9,
120:15, 121:9,
123:8, 123:21,
124:2, 124:13,
125:1, 125:13,
125:22, 126:1,
126:5, 126:10,
126:15, 126:20,
127:8, 127:13,
127:16, 127:21,
128:15, 129:3,
129:19, 130:9,
130:17, 131:5,
131:17, 131:24,
132:20, 133:5,
133:13, 133:16,
133:19, 134:9,
135:1, 135:11,
135:20, 136:2,
136:9, 138:22,
139:20, 139:22,
140:5, 140:18,
140:23, 141:23,

142:21, 143:18,
145:14, 146:1,
146:15, 147:11,
147:21, 148:8,
149:1, 149:8,
149:14, 154:3,
155:23, 156:20,
156:25, 159:22,
161:4, 162:16,
162:22, 163:13,
166:8, 167:3,
168:11, 168:21,
169:2, 170:1,
171:15, 171:20,
172:2, 172:12,
173:18, 173:22,
175:14, 176:24,
177:24, 178:8,
178:13, 178:23,
179:5, 179:14,
180:13, 180:23,
182:1, 182:4,
182:15, 182:22,
182:24, 183:11,
184:12, 184:15,
186:17, 188:23,
191:24, 192:12,
192:23, 193:13,
195:2, 195:4,
197:20, 198:6,
201:10, 201:14,
202:5, 203:10,
204:7, 206:18,
207:18, 209:24,
216:13, 216:17,
217:8, 217:16,
218:3, 219:10,
220:9, 220:14,
220:19, 221:1,
221:11, 221:21,
222:17, 222:22,
223:3, 223:10
**MTO** [5] - 46:6,
46:19, 46:21,
52:21, 141:8
**multiple** [2] -
21:8, 144:6
**music** [106] -
10:16, 16:8,
16:17, 20:3,
21:23, 21:24,
24:18, 30:24,
35:4, 53:13, 54:6,
54:9, 61:24, 62:4,
62:5, 62:6, 62:7,
62:9, 62:10,
62:12, 62:13,
62:15, 62:16,
62:17, 62:18,
62:19, 62:21,
62:25, 63:1, 63:4,

63:5, 63:6, 63:7,
63:15, 63:18,
63:21, 63:22,
64:6, 64:10,
64:15, 65:1, 65:5,
65:14, 65:15,
65:20, 65:24,
66:5, 66:6, 66:17,
67:7, 67:12, 69:7,
71:7, 71:8, 71:25,
73:7, 103:14,
108:6, 108:12,
121:16, 122:2,
132:19, 132:22,
132:23, 133:2,
133:10, 133:12,
133:18, 134:13,
136:4, 160:22,
161:13, 197:10,
210:11, 210:17,
211:1, 211:7,
211:11, 212:20,
213:19, 213:22,
213:23, 214:4,
217:23, 218:13,
218:19, 218:21,
219:4, 219:5,
219:8, 219:14,
219:16, 219:18,
219:19, 219:24,
219:25, 220:8,
220:10, 220:25,
221:13, 222:16
**Music** [47] - 4:7,
18:24, 21:21,
23:3, 24:10,
32:11, 33:10,
34:13, 34:19,
35:6, 35:25,
41:25, 43:10,
45:15, 46:7,
46:21, 46:22,
47:11, 49:22,
51:5, 52:13, 53:1,
63:3, 63:17,
90:15, 91:4,
98:10, 112:8,
115:23, 123:19,
132:5, 132:7,
132:12, 140:2,
143:2, 150:5,
155:20, 160:3,
160:4, 160:11,
160:17, 160:18,
162:13, 165:9,
170:5, 170:17
**musical** [4] -
19:21, 19:25,
20:3, 64:13
**musicfaculty@
unt.edu** [1] -

161:8
**musician** [2] -
66:18, 67:8
**musicians** [1] -
67:17
**Musicology** [1] -
170:18
**must** [5] - 8:21,
158:12, 190:17,
191:2, 192:1
**Mutability** [4] -
18:15, 20:9,
23:24, 32:12
**muted** [2] - 94:4,
94:6

**N**

**name** [19] - 6:10,
6:11, 6:12, 6:14,
6:15, 12:6, 26:21,
72:13, 109:7,
166:20, 169:1,
175:19, 187:5,
200:17, 200:25,
201:1, 209:5,
209:10, 225:18
**named** [4] -
36:7, 112:3,
166:20, 176:16
**namely** [1] -
171:23
**names** [4] -
200:23, 215:4,
215:5, 215:11
**national** [2] -
67:20, 129:23
**nature** [8] - 7:23,
12:24, 28:14,
28:16, 75:8,
136:19, 150:19,
172:10
**navigate** [3] -
12:14, 12:21,
89:7
**necessarily** [6] -
8:5, 52:2, 98:5,
154:4, 200:4,
211:24
**necessary** [3] -
104:18, 200:6,
221:8
**need** [19] - 7:22,
8:6, 12:12, 12:20,
44:24, 49:8,
52:20, 55:15,
73:6, 86:16,
86:24, 141:5,
146:10, 151:14,
164:3, 189:24,

192:25, 213:20
**needed** [5] -
78:24, 78:25,
98:1
**negative** [1] -
64:1
**nervous** [1] -
117:11
**network** [1] -
110:5
**never** [28] -
17:12, 30:18,
47:14, 47:15,
47:16, 53:8,
78:13, 78:20,
81:5, 82:16,
117:1, 117:3,
117:6, 124:3,
125:16, 128:4,
135:2, 135:3,
135:8, 136:5,
143:19, 178:14,
192:15, 193:14,
209:25, 217:18,
218:23, 220:1
**Never** [1] - 37:1
**new** [12] -
143:21, 145:4,
199:7, 206:25,
208:23, 209:15,
210:9, 211:21,
212:14, 212:15,
214:21, 214:22
**newer** [1] -
211:14
**Next** [1] - 29:17
**next** [16] - 15:24,
106:13, 106:21,
114:23, 138:4,
140:13, 140:25,
146:7, 156:21,
159:18, 159:25,
202:19, 206:17,
207:24, 208:12,
209:2
**Nicholas** [1] -
81:16
**nine** [2] - 22:7,
22:8
**nineteenth** [1] -
121:15
**NO** [4] - 1:5, 5:4,
226:5, 228:11
**nobody** [1] -
117:7
**Nobody** [3] -
78:14, 133:21,
192:25
**nominations** [1]
- 209:6

**non** [2] - 197:7,
214:14
**non-like** [1] -
214:14
**non-white** [1] -
197:7
**nonetheless** [1]
- 189:7
**nonprofession
al** [1] - 133:21
**nonwhite** [3] -
62:21, 63:2,
199:4
**norm** [1] - 35:4
**normal** [7] -
8:25, 77:19,
77:21, 84:19,
84:22, 84:23,
217:10
**normally** [6] -
29:18, 77:15,
110:17, 167:9,
192:4
**normative** [1] -
29:19
**North** [24] - 2:16,
2:17, 15:13,
21:16, 33:16,
34:1, 54:13, 57:7,
82:4, 82:12,
85:18, 128:12,
159:20, 160:10,
163:12, 165:8,
170:5, 173:8,
204:24, 216:19,
218:22, 222:13,
227:19, 227:20
**NOTARY** [1] -
225:24
**noted** [1] - 225:5
**Nothing** [1] -
83:19
**nothing** [7] -
7:7, 7:14, 7:25,
9:20, 87:11,
135:24, 180:25
**Notice** [4] - 3:10,
5:7, 13:13, 13:19
**noticed** [2] -
23:2, 156:25
**November** [19] -
11:1, 42:15, 84:9,
85:11, 85:25,
86:10, 98:13,
109:18, 113:4,
163:22, 164:22,
173:8, 174:5,
184:7, 204:1,
206:5, 206:22,
226:20, 228:4

**November-
December** [1] -
113:4
**nowadays** [1] -
212:17
**Number** [22] -
13:4, 14:1, 31:12,
35:22, 45:3, 85:5,
88:15, 105:18,
109:23, 136:13,
144:3, 145:5,
149:17, 157:12,
157:15, 159:23,
163:25, 174:13,
185:15, 195:15,
202:13, 207:10
**number** [6] -
89:22, 106:8,
145:10, 185:19,
204:10, 217:20
**NUMBER** [2] -
3:9, 5:16
**numbered** [2] -
1:18, 170:10
**numbers** [5] -
15:4, 89:8, 89:15,
89:16, 89:19
**Nápoles** [9] -
209:8, 217:3,
217:23, 218:11,
218:15, 220:3,
220:16, 220:22,
221:9

**O**

**oath** [1] - 225:15
**obey** [1] - 98:1
**object** [9] - 96:5,
109:19, 109:22,
125:14, 125:20,
125:24, 126:2,
126:3, 183:14
**objected** [1] -
125:7
**objecting** [5] -
34:13, 34:20,
140:3, 140:22,
141:24
**objection** [8] -
5:20, 32:16,
95:25, 109:1,
126:7, 126:12,
126:17, 127:4
**Objection** [251] -
17:22, 22:12,
24:1, 24:20, 25:4,
26:11, 27:5,
27:10, 27:24,
28:18, 31:2,

32:14, 32:19,
32:20, 32:21,
33:1, 33:17, 34:8,
34:15, 34:22,
35:1, 35:7, 38:1,
38:9, 38:18, 39:6,
39:15, 40:5,
40:23, 42:17,
42:24, 43:4,
43:12, 43:22,
44:9, 44:21, 49:4,
51:12, 51:21,
52:9, 52:17, 53:4,
54:3, 55:4, 56:10,
57:8, 58:1, 58:18,
59:5, 59:10,
59:22, 60:14,
60:18, 61:9,
63:16, 63:23,
64:16, 65:6,
65:11, 66:2,
67:13, 67:21,
68:10, 68:20,
70:6, 70:11,
70:19, 71:17,
72:6, 74:4, 76:6,
76:19, 77:3, 77:9,
77:13, 78:5, 79:6,
79:18, 80:19,
81:9, 81:20, 82:5,
83:2, 83:13,
84:13, 84:21,
86:4, 86:11,
86:15, 91:8, 96:2,
96:7, 97:6, 98:11,
98:16, 98:20,
98:25, 99:5, 99:8,
99:10, 99:16,
100:3, 100:19,
101:10, 101:18,
103:7, 103:19,
105:10, 106:17,
107:13, 107:18,
107:21, 108:5,
108:18, 108:24,
109:4, 109:14,
109:21, 111:11,
112:10, 112:16,
113:6, 113:21,
114:1, 115:15,
115:21, 116:21,
116:25, 117:13,
117:19, 118:4,
118:10, 119:15,
121:9, 123:8,
123:21, 124:2,
124:13, 125:1,
125:13, 126:1,
126:5, 126:10,
126:15, 126:20,
127:8, 127:13,

127:16, 127:21,
128:15, 129:3,
129:19, 130:17,
131:5, 131:17,
131:24, 132:20,
133:5, 133:13,
133:16, 133:19,
134:9, 135:1,
135:11, 135:20,
136:2, 136:9,
138:22, 139:20,
139:22, 140:5,
140:18, 140:23,
141:23, 142:21,
143:18, 145:14,
146:1, 146:15,
147:11, 147:21,
148:8, 149:1,
149:8, 149:14,
154:3, 155:23,
159:22, 161:4,
162:16, 162:22,
163:13, 167:3,
168:11, 168:21,
169:2, 170:1,
171:15, 171:20,
172:2, 172:12,
173:18, 173:22,
175:14, 176:24,
177:24, 178:8,
178:13, 178:23,
179:5, 179:14,
180:13, 180:23,
182:1, 182:15,
182:22, 182:24,
183:11, 184:12,
184:15, 186:17,
188:23, 191:24,
192:12, 192:23,
193:13, 195:2,
197:20, 198:6,
201:10, 201:14,
202:5, 203:10,
204:7, 206:18,
207:18, 209:24,
216:13, 216:17,
217:8, 217:16,
218:3, 219:10,
220:9, 220:14,
220:19, 221:1,
221:11, 221:21,
222:17, 222:22
**objectionable**
[3] - 133:20,
133:25, 162:24
**objections** [6] -
8:24, 80:17,
126:22, 126:24,
188:18, 188:20
**objective** [2] -
69:23, 123:13

**obligation** [1] -
9:2
**observations** [1]
- 56:14
**observe** [2] -
56:8, 118:12
**obvious** [4] -
122:20, 122:22,
122:24, 123:1
**obviously** [6] -
7:7, 7:14, 7:25,
12:12, 95:4,
123:2
**Obviously** [2] -
8:17, 12:22
**occasion** [2] -
55:7, 55:8
**occurred** [1] -
122:3
**October** [10] -
1:11, 1:18, 5:3,
6:3, 189:13,
190:11, 195:21,
197:1, 203:17,
226:11
**OF** [11] - 1:1,
1:9, 1:15, 5:2,
5:16, 225:10,
225:11, 225:25,
226:1, 226:9,
226:10
**offer** [1] - 169:5
**offered** [1] -
22:21
**offers** [1] -
125:18
**Office** [2] - 2:16,
227:19
**office** [4] -
83:18, 83:21,
84:1, 225:21
**officer** [1] -
226:24
**often** [6] - 35:9,
58:22, 136:21,
142:10, 145:1
**old** [1] - 14:11
**older** [1] -
211:14
**Olga** [1] - 6:11
**once** [9] - 41:5,
51:1, 55:5,
108:10, 122:3,
150:11, 184:3,
184:4, 205:13
**One** [15] - 12:4,
37:14, 45:7,
66:12, 83:23,
89:2, 137:4,
149:7, 151:19,

164:6, 170:13,
189:19, 198:24,
203:11, 208:15
**one** [120] - 5:20,
10:5, 12:14,
12:22, 13:5,
13:21, 14:9,
17:25, 18:4,
26:24, 28:4,
30:14, 33:2, 33:5,
35:17, 36:23,
37:16, 38:12,
43:1, 44:16, 46:6,
46:9, 46:11,
47:25, 48:1, 48:9,
48:13, 48:14,
51:1, 51:18,
65:25, 67:25,
69:16, 73:4,
73:21, 74:25,
75:17, 78:1,
80:20, 80:21,
81:5, 81:14,
81:15, 81:16,
83:23, 87:13,
88:11, 89:2, 89:3,
91:9, 94:7, 94:20,
94:22, 95:6,
95:21, 96:10,
99:21, 100:24,
102:15, 106:20,
107:8, 108:21,
109:25, 110:16,
110:24, 111:1,
111:21, 112:4,
115:22, 116:5,
143:2, 144:7,
144:13, 145:17,
148:23, 153:25,
155:17, 157:19,
158:14, 161:2,
164:15, 167:23,
168:9, 169:10,
170:14, 173:3,
173:4, 175:8,
175:10, 175:25,
176:15, 177:11,
177:15, 182:17,
183:22, 183:23,
184:17, 186:7,
190:4, 190:23,
191:19, 197:1,
197:11, 200:15,
200:16, 204:16,
205:22, 205:23,
208:4, 208:24,
211:13, 214:18,
215:20, 216:23,
216:25, 219:8
**one's** [2] -
117:20, 135:15

**One-on-one** [1]
- 83:23
**ones** [1] -
211:13
**Online** [7] -
46:7, 46:21,
46:22, 52:13,
53:1, 53:7, 53:12
**online** [4] -
20:17, 25:22,
35:6, 42:18
**open** [17] -
34:12, 34:18,
37:8, 63:18,
73:18, 93:4, 95:2,
95:19, 101:8,
101:15, 101:25,
103:6, 104:15,
104:22, 123:19,
155:21
**opened** [1] -
208:23
**openness** [1] -
101:21
**opera** [4] -
121:13, 121:14,
121:22, 121:25
**operas** [1] -
122:2
**opinion** [23] -
59:25, 60:2,
61:16, 62:2,
62:25, 64:12,
68:18, 68:22,
68:25, 70:1,
72:16, 72:17,
72:18, 72:19,
87:20, 87:21,
156:5, 178:25,
179:18, 189:6,
196:24, 221:12
**opinions** [2] -
101:2, 123:13
**opportunity** [11]
- 143:9, 143:16,
166:14, 166:22,
167:13, 168:6,
168:19, 169:4,
169:6, 215:8,
215:10
**oppose** [1] -
54:21
**opposed** [9] -
30:9, 73:15,
73:16, 115:10,
141:21, 188:8,
193:11, 194:5,
194:19
**opposing** [3] -
101:20, 101:23,

194:24
**opposition** [1] -
74:23
**option** [2] -
30:17, 30:19
**oral** [1] - 226:17
**ORAL** [3] - 1:9,
1:15, 226:10
**Order** [1] - 5:8
**order** [1] - 78:23
**ordinary** [2] -
6:25, 7:5
**organization** [2]
- 24:13, 188:25
**organize** [1] -
44:7
**organized** [1] -
143:11
**origin** [1] -
200:22
**original** [1] -
158:15
**ORIGINAL** [1] -
5:11
**originality** [2] -
37:20, 40:16
**originally** [1] -
110:4
**otherwise** [1] -
228:3
**Otherwise** [1] -
111:2
**OUP** [1] - 49:17
**outcome** [2] -
197:12, 228:3
**outgoing** [2] -
88:2
**outlined** [2] -
165:15, 166:10
**outside** [1] -
106:11
**ovation** [2] -
43:7, 98:14
**own** [18] - 25:10,
25:11, 37:8,
42:25, 59:25,
72:18, 97:12,
106:3, 117:18,
117:20, 122:4,
143:22, 152:5,
164:13, 167:10,
173:13
**Oxford** [5] -
3:15, 44:20,
45:10, 49:5,
49:18

**P**

**p.m** [22] - 1:19,
90:10, 90:22,
92:2, 92:7,
120:18, 120:21,
137:13, 137:17,
138:14, 141:2,
144:11, 146:8,
146:23, 147:1,
157:7, 157:10,
195:10, 223:5,
223:8, 223:13,
223:17
**P.O** [4] - 2:4,
2:10, 227:7,
227:13
**page** [42] -
12:14, 14:25,
15:1, 15:3, 15:6,
15:17, 17:3,
35:19, 35:24,
36:8, 36:10,
36:13, 36:15,
36:16, 37:11,
37:12, 37:13,
37:18, 40:14,
45:9, 45:13,
45:14, 49:7, 51:3,
51:5, 52:2, 89:8,
89:19, 95:14,
102:7, 110:1,
110:2, 110:3,
113:16, 137:3,
141:16, 204:11,
204:12, 208:12,
209:3
**PAGE** [1] - 3:2
**Page** [1] - 3:14
**PAGE/LINE** [1] -
224:5
**paged** [1] -
106:1
**pages** [21] -
14:12, 20:16,
20:17, 20:18,
23:8, 23:14,
23:17, 35:19,
39:5, 39:14, 41:1,
51:19, 52:7,
52:13, 86:3,
101:21, 102:16,
132:7, 143:16,
150:2, 205:9
**paid** [2] -
197:25, 199:3
**painful** [6] -
75:4, 75:8, 76:14,
129:14, 134:18,
190:20

**pandemic** [6] -
73:8, 127:23,
127:24, 128:19,
147:15, 216:7
**Panel** [13] - 4:9,
4:13, 4:16, 23:3,
119:13, 163:22,
163:24, 164:9,
164:17, 164:20,
165:20, 165:21,
173:7
**panel** [35] -
23:20, 26:8,
26:15, 26:25,
27:3, 32:12,
88:19, 182:19,
182:20, 182:23,
183:2, 183:7,
183:10, 183:13,
183:18, 184:1,
184:22, 186:1,
186:3, 186:6,
186:13, 186:16,
187:3, 187:24,
188:5, 188:7,
188:22, 188:25,
189:16, 190:10,
193:5, 194:8,
195:20, 206:14
**Panel's** [1] -
174:3
**paper** [37] -
19:9, 19:11,
22:15, 23:16,
23:21, 24:5, 24:8,
24:9, 25:2, 26:15,
27:7, 28:2, 28:5,
28:6, 28:9, 28:10,
35:11, 42:22,
42:25, 43:1, 43:3,
43:9, 43:15,
43:21, 46:23,
48:13, 84:8,
84:16, 84:20,
86:2, 91:3,
108:22, 114:20,
131:14, 167:8,
167:10
**papers** [54] -
19:9, 22:1, 22:11,
25:6, 34:14, 80:7,
83:6, 83:10, 84:5,
84:12, 84:24,
87:23, 91:1, 91:5,
100:12, 101:8,
101:15, 101:17,
101:24, 103:6,
103:22, 105:7,
108:16, 109:2,
110:4, 111:10,

111:23, 112:7,
112:12, 112:14,
113:2, 113:3,
113:8, 113:17,
113:19, 113:23,
114:5, 114:7,
114:12, 114:14,
115:3, 122:17,
159:9, 159:12,
159:16, 167:1,
167:4, 167:6,
167:12, 168:12,
168:16, 168:25,
201:13, 201:23
**par** [2] - 99:20,
99:21
**paragraph** [12] -
37:17, 102:14,
102:19, 102:21,
103:18, 103:20,
142:12, 152:7,
165:16, 166:13,
176:11, 202:23
**paragraphs** [2] -
20:18, 170:10
**paraphrasing**
[1] - 66:15
**parents** [1] -
202:12
**part** [37] - 7:12,
8:25, 12:11,
13:23, 24:10,
24:18, 36:12,
39:9, 43:17, 44:2,
74:8, 83:8,
114:19, 119:4,
130:5, 130:9,
130:14, 153:9,
153:13, 161:10,
164:13, 170:7,
170:24, 172:9,
172:23, 184:22,
185:12, 188:2,
197:6, 197:9,
198:19, 203:17,
204:14, 205:13,
206:8, 221:15
**partes** [1] -
226:25
**participate** [5] -
97:4, 109:12,
127:6, 147:4,
169:7
**participated** [2]
- 83:5, 204:1
**participating** [2]
- 83:10, 89:25
**particular** [2] -
40:21, 178:12
**particularly** [8] -

35:11, 127:20,
128:25, 171:8,
178:20, 179:3,
179:11, 180:1
**parties** [5] -
5:20, 114:19,
172:19, 184:19,
227:25
**partly** [3] -
125:14, 217:20,
219:18
**parts** [4] - 10:17,
10:23, 48:18,
125:17
**party** [2] - 5:20,
227:1
**pass** [3] -
178:20, 179:11,
223:2
**passage** [1] -
69:18
**passport** [1] -
6:12
**past** [8] - 171:4,
171:8, 179:3,
179:25, 180:2,
180:10, 180:22
**paucity** [4] -
61:21, 65:20,
69:6, 71:6
**Paul** [2] -
190:23, 191:13
**Pedagogy** [1] -
115:23
**pedagogy** [1] -
219:25
**peek** [1] - 102:6
**peer** [65] - 17:21,
18:14, 18:16,
18:17, 18:20,
18:21, 18:23,
23:4, 29:8, 29:9,
29:17, 29:20,
30:24, 32:5,
32:18, 34:7,
34:14, 34:20,
34:25, 35:9,
35:10, 35:13,
37:18, 38:21,
38:25, 40:4,
40:15, 40:22,
40:24, 41:4,
41:16, 49:2,
51:10, 51:14,
51:17, 51:20,
74:5, 74:11,
74:12, 74:14,
74:17, 75:5, 75:6,
75:7, 75:20, 76:1,
76:5, 76:7, 76:10,

76:18, 76:25,
77:11, 77:15,
78:2, 78:6, 78:16,
79:11, 80:10,
114:11, 125:11,
125:21, 125:25,
126:13, 166:15
**peer-review** [4] -
29:20, 32:5,
38:25, 166:15
**peer-reviewed**
[4] - 17:21, 30:24,
49:2, 80:10
**people** [63] -
25:21, 26:24,
61:1, 61:2, 61:23,
62:20, 62:23,
63:2, 63:3, 85:12,
87:25, 88:5, 91:6,
96:11, 101:16,
104:13, 104:14,
108:15, 119:14,
128:24, 131:19,
131:21, 131:22,
132:18, 132:21,
132:24, 134:11,
134:13, 139:12,
140:21, 143:9,
143:15, 155:18,
167:11, 172:16,
179:15, 184:23,
186:8, 186:21,
186:24, 186:25,
191:21, 193:11,
197:4, 197:19,
197:21, 198:21,
199:4, 199:20,
199:23, 199:24,
200:3, 200:14,
200:19, 200:22,
201:6, 201:8,
201:18, 201:25,
214:2, 215:8
**People** [1] -
197:17
**perceived** [1] -
214:20
**percent** [5] -
46:16, 55:24,
56:2, 56:7, 57:14
**perception** [1] -
97:18
**perfect** [1] - 41:8
**perfectly** [4] -
26:5, 50:11,
99:22, 207:22
**perform** [1] -
116:14
**performed** [1] -
116:16

**Perhaps** [1] -
133:20
**perhaps** [7] -
18:11, 25:6,
65:23, 104:8,
191:8, 199:1,
214:13
**perils** [1] -
208:24
**period** [2] -
16:25, 172:11
**permanently** [1]
- 15:25
**permission** [1] -
175:18
**person** [38] -
29:16, 30:7,
53:20, 64:19,
66:16, 66:21,
73:4, 74:22, 76:8,
76:12, 76:13,
86:7, 95:5,
110:15, 110:17,
111:1, 117:2,
131:13, 147:16,
166:19, 170:25,
178:18, 179:17,
179:19, 179:21,
179:23, 180:5,
181:19, 201:1,
201:2, 201:19,
202:9, 207:2,
216:6, 225:17
**personal** [6] -
60:2, 62:2,
123:12, 126:18,
178:1, 190:19
**personally** [12] -
64:7, 78:24, 96:1,
96:4, 96:6, 97:9,
97:15, 124:10,
134:22, 215:7,
218:2, 225:14
**persons** [1] -
62:21
**perspectives** [2]
- 114:25, 158:13
**petition** [6] -
34:10, 163:21,
171:14, 173:13,
173:14
**Ph.D** [9] - 1:23,
6:5, 16:8, 55:19,
55:20, 55:21,
56:3, 116:4,
119:9
**PH.D** [6] - 1:10,
1:15, 3:5, 5:2,
224:2, 226:10
**Phil** [1] - 97:10

**Philip** [74] -
22:22, 41:21,
42:22, 43:3, 43:9,
43:14, 43:20,
44:3, 44:7, 44:12,
45:22, 46:4,
48:15, 51:4,
52:13, 61:1, 64:2,
64:13, 69:21,
69:24, 69:25,
70:4, 70:7, 74:21,
74:22, 74:24,
76:12, 84:9, 96:1,
96:5, 96:10,
96:15, 96:17,
96:21, 97:4,
97:15, 98:14,
98:18, 98:23,
99:13, 99:17,
99:23, 113:23,
123:7, 126:18,
127:6, 127:11,
129:7, 129:10,
129:18, 130:15,
131:4, 132:6,
133:3, 133:10,
134:6, 134:21,
134:24, 135:3,
135:9, 135:19,
135:25, 136:6,
143:15, 146:14,
154:2, 166:22,
166:25, 168:9,
168:13, 168:16,
168:25, 199:13,
210:19
**philosophical**
[4] - 73:5, 73:23,
78:1, 79:10
**phone** [3] -
142:10, 147:13,
152:22
**phrase** [2] -
177:7, 181:11
**phrased** [2] -
135:22, 168:12
**phrasing** [1] -
176:18
**physical** [2] -
1:22, 128:21
**physically** [1] -
128:21
**pick** [2] - 95:7,
145:2
**picking** [1] -
145:6
**picture** [1] -
88:13
**piece** [3] - 70:13,
220:8, 221:13

**pieces** [3] -
213:14, 214:9,
220:10
**place** [12] -
12:17, 12:18,
12:21, 42:7,
42:16, 62:9,
83:21, 87:1,
127:23, 128:22,
128:23, 164:15
**places** [2] - 46:5,
69:21
**Plaintiff** [5] -
1:4, 1:16, 2:22,
53:23, 226:4
**PLAINTIFF** [2] -
2:2, 227:5
**planet** [2] - 63:4,
63:19
**planned** [1] -
92:11
**platform** [2] -
128:18, 171:6
**play** [1] - 186:5
**plenary** [26] -
41:20, 42:2, 42:6,
42:7, 42:8, 42:19,
43:1, 43:5, 43:10,
43:13, 43:15,
43:19, 44:4,
44:12, 45:23,
46:13, 48:16,
48:21, 52:16,
52:22, 90:11,
90:15, 96:19,
97:1, 98:9,
132:11
**plus** [1] - 19:23
**POC** [2] -
197:10, 197:15
**point** [22] -
22:21, 25:5,
27:11, 39:11,
50:8, 66:14,
78:15, 82:19,
84:8, 92:16,
96:14, 103:12,
104:18, 104:19,
104:25, 105:6,
119:18, 150:8,
154:10, 187:7,
193:3, 197:1
**points** [3] -
170:9, 197:10,
203:23
**polemical** [3] -
74:25, 75:1, 75:8
**polemically** [2] -
74:20, 76:11
**policies** [1] -

38:13
**policy** [9] -
38:16, 38:19,
39:4, 39:13,
39:17, 128:12,
192:2, 192:5,
192:6
**political** [1] -
221:18
**popular** [2] -
213:22, 213:23
**population** [2] -
24:18, 24:21
**portion** [6] -
95:13, 196:12,
196:15, 196:19,
203:6, 203:18
**portions** [3] -
121:16, 122:1,
206:4
**pose** [2] - 41:11,
188:9
**position** [17] -
16:13, 16:15,
16:23, 54:12,
64:14, 64:17,
73:14, 79:9,
99:19, 115:14,
123:22, 193:3,
199:2, 199:3,
200:9, 207:5,
217:6
**positioned** [3] -
73:1, 73:2, 73:14
**positioning** [1] -
125:9
**positive** [2] -
43:6, 64:1
**possibility** [1] -
93:8
**possible** [10] -
28:19, 43:23,
67:5, 97:1, 122:4,
123:11, 169:20,
198:21, 219:1
**Possibly** [2] -
9:14, 58:2
**possibly** [1] -
196:8
**post** [5] -
124:14, 124:18,
125:4, 125:6,
127:18
**posted** [1] -
36:21
**posts** [1] -
152:22
**potential** [1] -
171:5
**potentially** [1] -

189:23
**power** [8] -
98:22, 116:19,
121:8, 122:19,
122:20, 122:21,
134:11, 139:18
**practical** [1] -
219:22
**practice** [9] -
35:4, 35:8, 38:3,
50:4, 62:16, 63:5,
132:19, 217:6,
217:19
**practices** [8] -
47:9, 49:23,
66:16, 66:17,
67:7, 128:13,
132:22, 219:21
**practicing** [2] -
64:14, 66:5
**practicums** [1] -
219:23
**practitioners** [1]
- 62:18
**praised** [2] -
134:24, 135:3
**pre** [3] - 128:19,
128:20, 157:14
**pre-internet** [1] -
128:20
**pre-mark** [1] -
157:14
**pre-pandemic**
[1] - 128:19
**precisely** [2] -
33:6, 70:21
**prefix** [1] - 49:15
**premature** [1] -
91:5
**preparation** [2] -
11:8, 11:18
**prepare** [3] -
10:4, 10:11,
163:20
**prepared** [2] -
175:8, 183:17
**present** [10] -
15:16, 171:8,
178:20, 179:3,
179:11, 180:1,
180:3, 180:11,
180:22, 187:20
**PRESENT** [1] -
2:21
**presentation**
[10] - 22:17,
22:19, 27:12,
44:14, 48:21,
90:14, 106:10,
167:10

**presentations**
[1] - 28:4
**presented** [6] -
24:5, 24:9, 25:7,
25:16, 27:15,
35:12
**presenting** [1] -
26:24
**president** [1] -
110:16
**Press** [8] - 3:16,
44:20, 45:10,
49:5, 49:18,
128:12, 160:14,
222:13
**press** [1] - 44:22
**pressure** [1] -
8:19
**presumably** [1] -
22:8
**prevent** [3] -
97:3, 98:7, 98:12
**prevented** [3] -
97:8, 97:14,
97:16
**previous** [11] -
102:7, 140:6,
140:7, 140:9,
144:6, 144:24,
157:23, 157:25,
158:5, 203:22,
205:17
**previously** [1] -
106:15
**primarily** [5] -
62:20, 62:22,
77:4, 123:3,
214:5
**principle** [1] -
101:14
**principles** [2] -
62:6, 78:21
**print** [4] -
166:14, 166:23,
168:7, 168:19
**printout** [2] -
45:8, 45:9
**privilege** [2] -
9:6, 200:9
**privileged** [2] -
10:9, 132:23
**pro** [2] - 154:2,
154:4
**problem** [40] -
69:19, 69:20,
70:1, 71:23, 72:1,
72:12, 74:9,
74:16, 74:25,
75:1, 75:6, 75:7,
77:18, 78:7, 78:8,

80:22, 80:24,
103:9, 103:17,
103:20, 103:21,
103:22, 104:4,
104:5, 104:9,
104:10, 104:21,
114:15, 119:22,
131:6, 131:7,
142:24, 143:7,
143:10, 192:15,
192:19, 198:17,
208:20, 213:11
**problematic** [13]
- 57:4, 66:7,
69:17, 70:3, 70:4,
70:24, 100:10,
117:23, 119:1,
119:3, 124:15,
159:12, 159:17
**problematicall
y** [1] - 71:4
**problems** [13] -
72:2, 72:10,
72:13, 73:20,
73:24, 81:6,
117:5, 125:8,
192:24, 192:25,
193:1, 193:2,
193:4
**Procedure** [2] -
1:24, 5:9
**proceeding** [1] -
228:1
**Proceedings** [1]
- 223:17
**proceedings** [3]
- 5:22, 190:12,
190:17
**process** [29] -
12:15, 18:21,
20:25, 25:10,
26:7, 29:10,
29:19, 29:20,
30:25, 31:6, 32:5,
35:14, 38:25,
75:15, 77:15,
78:21, 81:7, 83:3,
83:11, 84:5,
84:11, 87:23,
124:24, 142:20,
149:5, 166:15,
188:25, 204:9
**produced** [3] -
1:16, 89:18,
136:21
**Producing** [1] -
5:13
**production** [5] -
160:12, 196:23,
201:24, 204:14,

204:23
**Production** [2] -
164:20, 174:4
**productive** [1] -
118:5
**professional** [3]
- 6:14, 129:1,
160:23
**professor** [9] -
16:17, 16:20,
17:10, 17:11,
41:21, 54:14,
82:3, 217:23,
218:13
**Professor** [48] -
6:9, 6:17, 13:9,
31:8, 35:23,
45:15, 50:12,
50:25, 69:8, 80:6,
83:23, 85:7, 87:5,
88:17, 90:18,
91:19, 91:21,
95:8, 105:12,
105:22, 118:12,
118:19, 120:17,
120:23, 121:7,
123:5, 123:16,
136:23, 141:16,
150:5, 154:10,
157:2, 157:13,
160:2, 164:5,
173:16, 174:19,
178:22, 179:13,
180:10, 183:24,
184:25, 187:16,
195:8, 195:16,
195:22, 206:13,
222:25
**program** [18] -
18:16, 18:22,
19:2, 19:3, 19:6,
19:17, 25:8,
25:11, 28:15,
28:21, 28:25,
42:14, 42:18,
44:2, 44:6,
218:23, 219:6,
220:1
**progress** [1] -
22:8
**prohibit** [1] -
44:1
**prohibited** [1] -
123:6
**promise** [1] -
95:12
**promised** [2] -
95:15, 153:9
**promote** [3] -
171:6, 210:12,

212:22
**promoted** [1] -
16:18
**properly** [2] -
139:10, 167:14
**proposal** [14] -
19:8, 19:12,
19:15, 23:21,
26:17, 27:2, 28:5,
28:6, 28:11,
28:14, 28:17,
28:24, 29:11
**Proposal** [1] -
19:13
**proposals** [6] -
25:2, 27:14, 28:3,
114:10, 114:13,
114:14
**proved** [1] -
225:15
**provide** [1] -
88:23
**provided** [1] -
28:15
**provisions** [1] -
1:24
**proximity** [1] -
205:3
**public** [3] -
162:24, 163:4,
163:5
**PUBLIC** [1] -
225:24
**publication** [47]
- 18:7, 20:18,
21:9, 26:14, 34:6,
35:17, 39:4,
39:13, 45:25,
46:24, 48:15,
49:21, 72:4, 72:7,
72:9, 72:12,
72:15, 72:20,
72:24, 73:25,
77:24, 78:4,
81:17, 81:21,
82:23, 82:25,
83:3, 83:11,
88:25, 91:3,
96:18, 96:20,
97:2, 98:8, 99:4,
99:14, 99:18,
100:10, 132:11,
134:1, 134:2,
156:1, 171:1,
177:13, 177:25,
211:1
**publications**
[12] - 14:24,
17:14, 17:15,
17:18, 31:20,

32:1, 33:9, 71:20,
93:5, 129:2,
134:16, 177:22
**publish** [17] -
35:5, 35:23,
54:24, 85:8, 91:1,
105:19, 114:24,
128:18, 141:4,
143:25, 144:4,
149:23, 155:12,
164:9, 172:25,
214:11, 214:12
**publishable** [1] -
106:10
**published** [50] -
17:14, 17:16,
17:21, 20:9, 21:6,
22:7, 32:17,
32:21, 33:10,
34:12, 34:20,
35:5, 35:11,
35:13, 36:5,
36:11, 38:4, 40:1,
40:3, 40:11,
42:18, 44:13,
44:19, 46:4,
46:14, 46:15,
46:20, 46:23,
47:16, 59:24,
61:12, 61:17,
63:11, 71:13,
76:11, 80:11,
82:16, 90:15,
95:18, 98:10,
103:21, 115:8,
124:25, 132:6,
155:9, 160:13,
163:8, 185:17,
198:25
**publishes** [2] -
44:17, 110:17
**publishing** [15] -
6:14, 30:24,
34:13, 34:25,
45:24, 59:19,
60:6, 72:14, 93:4,
95:19, 114:5,
128:22, 141:9,
141:21, 141:24
**pull** [1] - 106:19
**purple** [1] -
174:21
**purpose** [7] -
44:25, 68:15,
90:21, 90:25,
134:2, 150:16,
225:20
**purposes** [5] -
7:8, 82:2, 164:15,
183:22, 183:23

**pursuant** [2] -
1:23, 226:23
**PURSUANT** [1] -
5:6
**put** [13] - 13:7,
13:22, 20:23,
35:21, 45:4,
50:25, 65:24,
153:18, 156:15,
175:18, 185:18,
200:5, 218:19
**puts** [1] - 24:13
**putting** [3] -
85:7, 105:16,
160:1

**Q**

**Quaker** [2] - 2:4,
227:7
**qualifications**
[3] - 200:6, 215:9,
220:11
**qualify** [2] -
53:18, 66:11
**quality** [2] -
37:19, 40:16
**quarter** [2] -
102:16, 120:13
**questions** [30] -
8:20, 9:16, 9:18,
12:9, 12:23,
13:21, 17:13,
50:11, 51:1, 53:9,
107:15, 121:1,
152:3, 152:10,
152:12, 161:2,
169:17, 182:18,
184:2, 185:5,
186:8, 188:10,
188:11, 189:7,
203:1, 206:11,
209:1, 223:2,
223:11
**quickly** [1] -
137:13
**QUIMBY** [279] -
17:22, 22:12,
24:1, 24:20, 25:4,
26:11, 27:5,
27:10, 27:24,
28:1, 28:18, 31:2,
32:14, 32:19,
33:1, 33:17, 34:8,
34:15, 34:22,
35:1, 35:7, 36:22,
36:25, 37:3, 37:5,
38:1, 38:9, 38:18,
39:6, 39:15, 40:5,
40:23, 42:17,

42:24, 43:4,
43:12, 43:16,
43:22, 44:9,
44:21, 49:4, 50:8,
50:18, 51:12,
51:21, 52:9,
52:17, 53:4, 54:3,
55:4, 56:10, 57:8,
58:1, 58:18, 59:5,
59:10, 59:22,
60:14, 60:18,
61:9, 63:16,
63:23, 64:16,
65:6, 65:11, 66:2,
67:13, 67:21,
68:10, 68:13,
68:20, 70:6,
70:11, 70:19,
71:17, 72:6, 74:4,
75:23, 76:6,
76:19, 77:3, 77:9,
77:13, 78:5, 79:6,
79:18, 80:19,
81:9, 81:20, 82:5,
83:2, 83:13,
84:13, 84:21,
86:4, 86:11,
86:15, 91:8,
93:11, 93:17,
93:22, 94:12,
94:23, 95:3, 96:2,
96:7, 97:6, 98:11,
98:16, 98:20,
98:25, 99:5, 99:8,
99:10, 99:16,
100:3, 100:19,
101:10, 101:18,
103:7, 103:19,
105:10, 106:17,
107:13, 107:18,
107:21, 108:5,
108:18, 108:24,
109:4, 109:14,
109:21, 111:11,
112:10, 112:16,
113:6, 113:21,
114:1, 115:15,
115:21, 116:21,
116:25, 117:13,
117:19, 118:4,
118:10, 119:15,
119:18, 119:23,
120:6, 120:9,
120:15, 121:9,
123:8, 123:21,
124:2, 124:13,
125:1, 125:13,
125:22, 126:1,
126:5, 126:10,
126:15, 126:20,
127:8, 127:13,

127:16, 127:21,
128:15, 129:3,
129:19, 130:9,
130:17, 131:5,
131:17, 131:24,
132:20, 133:5,
133:13, 133:16,
133:19, 134:9,
135:1, 135:11,
135:20, 136:2,
136:9, 138:22,
139:20, 139:22,
140:5, 140:18,
140:23, 141:23,
142:21, 143:18,
143:14, 146:1,
146:15, 147:11,
147:21, 148:8,
149:1, 149:8,
149:14, 154:3,
155:23, 156:20,
156:25, 159:22,
161:4, 162:16,
162:22, 163:13,
166:8, 167:3,
168:11, 168:21,
169:2, 170:1,
171:15, 171:20,
172:2, 172:12,
173:18, 173:22,
175:14, 176:24,
177:24, 178:8,
178:13, 178:23,
179:5, 179:14,
180:13, 180:23,
182:1, 182:4,
182:15, 182:22,
182:24, 183:11,
184:12, 184:15,
186:17, 188:23,
191:24, 192:12,
192:23, 193:13,
195:2, 195:4,
197:20, 198:6,
201:10, 201:14,
202:5, 203:10,
204:7, 206:18,
207:18, 209:24,
216:13, 216:17,
217:8, 217:16,
218:3, 219:10,
220:9, 220:14,
220:19, 221:1,
221:11, 221:21,
222:17, 222:22,
223:3, 223:10
**Quimby** [7] -
2:9, 5:12, 8:25,
12:15, 226:20,
227:3, 227:12
**quite** [10] -

35:16, 39:7, 43:6,
64:8, 73:21,
116:11, 116:18,
118:25, 119:2,
190:2
**Quite** [1] - 92:15
**quote** [13] -
61:25, 66:10,
66:14, 67:6, 68:7,
68:16, 69:7, 71:3,
92:23, 98:22,
165:21, 180:21,
194:11
**quoted** [2] -
66:24, 168:22
**quotes** [2] -
66:13, 68:14

**R**

**race** [19] - 66:21,
68:1, 68:5, 75:3,
76:13, 77:5,
129:13, 130:18,
130:19, 130:21,
130:22, 132:19,
132:22, 133:4,
134:17, 136:10,
197:19, 198:14,
199:8
**racial** [4] -
129:22, 182:7,
182:11, 212:9
**Racial** [3] -
45:16, 51:5,
132:6
**racism** [24] -
66:20, 66:22,
67:9, 67:10,
67:16, 67:24,
68:3, 68:5, 68:7,
68:15, 68:21,
69:9, 69:25, 71:4,
125:6, 160:20,
162:14, 162:20,
163:3, 171:7,
180:10, 181:21,
181:25, 185:8
**racist** [51] -
34:24, 59:9,
59:14, 59:20,
59:25, 60:9,
60:12, 60:17,
61:6, 61:16, 62:2,
62:24, 63:10,
65:19, 65:25,
66:3, 66:10, 67:2,
67:4, 67:20,
68:17, 68:19,
68:25, 69:3,

69:15, 69:17,
69:23, 70:2, 70:5,
70:9, 70:10,
70:18, 70:24,
104:2, 104:4,
104:5, 104:6,
104:10, 104:17,
104:20, 124:16,
124:24, 171:8,
178:20, 179:3,
179:12, 180:1,
180:21, 197:5
**Racist** [1] -
124:16
**raise** [2] - 109:1,
188:21
**raised** [1] -
101:7
**raising** [1] - 98:7
**rather** [6] -
88:17, 89:4,
107:8, 154:5,
196:23, 198:8
**Re** [6] - 3:10,
4:11, 4:13, 4:15,
13:13, 13:19
**Re-Notice** [3] -
3:10, 13:13,
13:19
**reached** [2] -
146:13, 146:16
**reaching** [1] -
97:3
**react** [1] -
148:24
**reacting** [1] -
140:16
**reaction** [3] -
139:17, 140:1,
140:21
**reactions** [3] -
175:25, 176:3,
176:7
**read** [86] - 10:19,
10:25, 18:11,
21:2, 21:3, 29:24,
36:2, 36:17,
37:10, 38:4,
39:10, 45:19,
45:20, 48:15,
48:18, 48:22,
48:23, 49:10,
51:24, 71:21,
86:16, 86:18,
86:21, 86:23,
87:6, 90:23,
92:24, 95:23,
102:21, 103:2,
106:6, 110:6,

112:25, 113:12,
113:15, 124:18,
127:12, 129:1,
129:8, 129:16,
131:4, 133:3,
133:10, 133:17,
133:20, 133:21,
133:22, 133:23,
133:25, 134:7,
139:13, 140:6,
141:10, 142:12,
145:19, 151:14,
151:16, 152:7,
156:3, 156:4,
157:18, 158:17,
160:15, 160:25,
166:16, 166:21,
169:19, 171:10,
171:11, 174:17,
174:21, 182:9,
185:8, 185:22,
187:6, 187:13,
197:13, 202:18,
203:8, 208:9,
208:15, 210:8,
210:13, 213:16,
216:15, 225:3
**readable** [3] -
141:16, 150:23,
167:22
**Readable** [1] -
102:24
**reader** [3] -
37:22, 37:24,
38:2
**Reader** [1] - 38:2
**readership** [1] -
214:8
**reading** [14] -
48:18, 87:4,
92:16, 95:13,
106:4, 129:11,
134:16, 137:4,
139:2, 140:20,
148:19, 150:20,
169:9, 215:22
**ready** [5] -
37:15, 87:17,
142:14, 153:4,
209:1
**reaffirm** [1] -
160:19
**reaffirming** [1] -
162:20
**reaffirms** [1] -
162:13
**real** [3] - 52:19,
142:24, 211:3
**reality** [2] -
117:4, 176:19

**realize** [1] - 124:10
**realized** [1] - 125:3
**really** [9] - 39:11, 55:8, 73:20, 100:7, 135:12, 212:10, 212:13, 214:21, 219:7
**realty** [1] - 74:14
**REASON** [1] - 224:5
**reason** [21] - 49:23, 78:1, 78:23, 79:3, 111:9, 113:16, 113:22, 114:2, 137:7, 152:24, 155:25, 158:24, 162:9, 162:11, 171:24, 177:11, 184:16, 189:24, 220:17, 220:23, 221:2
**reasonable** [1] - 140:15
**reasons** [11] - 14:14, 77:23, 78:2, 78:3, 79:5, 79:13, 79:14, 79:17, 79:21, 91:6, 211:3
**Rebecca** [5] - 174:14, 175:3, 175:4, 175:6, 175:17
**rebrand** [2] - 210:12, 212:21
**Rebrand** [1] - 213:2
**rebranding** [2] - 213:9, 214:17
**rebuild** [1] - 177:7
**receive** [6] - 38:22, 106:10, 113:23, 143:14, 152:12, 167:1
**received** [17] - 17:5, 17:9, 21:5, 85:23, 98:14, 109:11, 114:3, 150:18, 161:3, 162:10, 167:5, 175:23, 187:2, 207:7, 207:20, 215:1, 217:21
**receiving** [2] - 107:20, 141:19

**recent** [1] - 48:5
**recently** [1] - 119:5
**reception** [4] - 43:2, 43:5, 152:2, 202:25
**receptive** [1] - 105:6
**Recess** [6] - 50:22, 80:3, 120:20, 157:9, 195:12, 223:7
**recipient** [1] - 83:6
**recognize** [15] - 13:11, 14:8, 36:10, 36:13, 51:7, 105:25, 106:3, 107:3, 107:17, 110:10, 157:19, 164:19, 186:2, 207:17, 207:19
**recognized** [1] - 108:13
**recollection** [1] - 119:5
**recommend** [2] - 81:17, 198:20
**recommended** [1] - 81:21
**recompense** [1] - 197:5
**record** [102] - 1:25, 6:4, 6:10, 6:23, 7:4, 7:8, 7:9, 9:1, 10:4, 13:2, 14:3, 14:4, 18:7, 20:1, 26:7, 29:7, 31:11, 31:18, 31:24, 31:25, 35:19, 35:24, 41:7, 45:2, 50:17, 50:21, 50:24, 54:1, 56:21, 56:23, 58:3, 59:14, 59:21, 79:25, 80:2, 80:5, 82:2, 82:9, 85:6, 85:8, 85:16, 87:7, 88:16, 90:7, 92:25, 93:13, 93:18, 94:25, 95:1, 95:13, 105:14, 105:19, 105:20, 107:6, 108:4, 111:22, 114:4, 120:19, 120:22, 121:5,

128:5, 136:12, 144:1, 149:19, 149:24, 156:9, 157:5, 157:8, 157:11, 157:15, 159:25, 160:2, 163:23, 164:8, 172:25, 173:5, 173:7, 174:2, 176:6, 185:16, 185:18, 187:7, 195:9, 195:11, 195:14, 195:19, 196:12, 197:13, 197:15, 202:14, 203:9, 203:18, 205:8, 206:12, 207:12, 210:8, 223:6, 223:9, 223:14, 226:18, 226:25
**recorded** [1] - 158:25
**recur** [1] - 31:6
**redefine** [2] - 210:10, 210:16
**redefining** [5] - 210:19, 210:20, 210:21, 210:22, 212:19
**refer** [2] - 19:3, 201:22
**reference** [1] - 166:5
**references** [1] - 19:23
**referred** [7] - 20:22, 21:12, 163:17, 163:19, 196:10, 203:5, 205:5
**referring** [7] - 30:25, 61:12, 105:3, 162:15, 166:19, 182:12, 204:19
**Referring** [1] - 23:16
**refers** [12] - 21:13, 30:11, 62:13, 110:8, 142:3, 152:10, 157:22, 157:24, 169:4, 174:20, 175:24, 176:13
**reflect** [1] - 184:9
**reflected** [3] - 115:16, 137:24, 163:11

**reflecting** [2] - 215:12, 216:11
**reflections** [1] - 152:6
**refresh** [2] - 158:3, 158:19
**refreshes** [1] - 153:22
**refuse** [7] - 129:1, 131:3, 133:3, 133:10, 133:17, 134:7, 143:15
**refused** [2] - 127:11, 129:8
**refusing** [1] - 129:16
**regarding** [2] - 61:6, 151:25
**regards** [1] - 8:20
**registration** [2] - 228:15, 228:15
**regret** [2] - 96:4, 96:13
**regularly** [2] - 38:3, 38:5
**reiterate** [1] - 187:8
**reject** [1] - 30:16
**rejected** [2] - 30:13, 115:14
**rejection** [3] - 217:1, 217:7, 217:15
**rejuvenate** [1] - 210:10
**rejuvenation** [1] - 211:18
**relate** [1] - 72:11
**related** [12] - 52:22, 63:4, 72:10, 88:24, 99:14, 113:7, 117:8, 119:11, 131:12, 189:4, 191:8, 227:25
**relation** [5] - 63:6, 74:20, 75:2, 210:20, 212:16
**relationship** [16] - 53:10, 53:23, 54:2, 54:10, 58:16, 65:13, 65:17, 66:4, 82:10, 115:19, 116:17, 117:18, 118:13, 188:13, 189:8, 189:11
**relatively** [6] -

137:13, 188:7, 190:2, 199:24, 211:2
**relayed** [1] - 194:7
**relevant** [4] - 121:11, 129:12, 129:25, 204:25
**relieve** [1] - 9:1
**relisten** [1] - 52:21
**remain** [5] - 16:20, 132:24, 160:21, 191:2
**remained** [3] - 74:20, 127:24, 128:2
**remember** [104] - 20:13, 25:15, 25:25, 33:19, 38:19, 42:5, 42:12, 44:22, 44:23, 47:6, 48:17, 51:22, 56:25, 60:20, 60:21, 60:22, 61:3, 70:7, 71:21, 82:14, 84:2, 86:1, 86:5, 87:23, 88:5, 92:14, 92:15, 92:16, 92:17, 99:22, 100:20, 100:21, 100:25, 101:11, 101:13, 101:20, 101:23, 106:4, 107:17, 107:20, 107:23, 108:8, 109:16, 111:2, 115:25, 116:5, 119:7, 119:13, 121:24, 124:23, 126:24, 132:9, 137:2, 137:5, 137:11, 138:24, 139:2, 139:4, 142:7, 142:9, 146:2, 146:19, 146:20, 146:25, 147:7, 147:8, 147:17, 147:18, 148:18, 148:19, 148:23, 150:7, 150:9, 150:11, 151:9, 151:10, 153:1, 153:6, 159:6, 159:18, 161:7, 169:9, 171:21, 172:16, 175:1, 175:4, 175:9,

176:5, 183:25, 184:5, 187:5, 187:22, 188:7, 189:25, 193:10, 196:17, 199:18, 200:17, 203:22, 215:4, 215:18, 216:23
**remembered** [1] - 27:21
**Remind** [1] - 87:17
**remind** [1] - 79:7
**remotely** [1] - 1:21
**Remotely)** [1] - 1:12
**removal** [1] - 171:6
**remove** [1] - 161:21
**removes** [1] - 67:9
**Renaldo** [5] - 2:15, 93:14, 94:5, 207:14, 227:18
**Renaldo.Stowers@untsystem.edu** [2] - 2:19, 227:22
**repeat** [12] - 34:17, 40:9, 44:5, 59:11, 63:24, 108:19, 112:25, 125:22, 130:4, 130:8, 180:14, 220:20
**rephrase** [3] - 132:3, 172:4, 218:5
**replacing** [1] - 7:13
**replete** [1] - 182:7
**replies** [1] - 106:10
**report** [22] - 30:8, 81:22, 81:25, 118:23, 119:5, 151:13, 151:14, 153:12, 154:15, 164:12, 164:14, 164:25, 183:2, 183:18, 184:16, 186:11, 196:8, 205:13, 205:14, 205:16, 206:14
**Report** [12] - 4:9, 10:23, 119:13,

163:22, 163:24,
164:9, 164:17,
164:20, 165:21,
173:7, 174:3
  **Reported** [1] -
1:12
  **reported** [2] -
1:21, 118:22
  **REPORTER** [4] -
85:4, 105:15,
130:11, 173:3
  **Reporter** [3] -
1:20, 85:2,
226:13
  **reporter** [7] -
7:4, 7:10, 13:23,
31:10, 87:6,
130:10, 173:21
  **Reporter's** [1] -
3:7
  **REPORTER'S**
[1] - 226:9
  Response.
**reporting** [1] -
151:21
  **reports** [8] -
29:25, 30:3, 30:4,
30:6, 30:10,
38:23, 38:24
  **represent** [6] -
45:6, 84:23,
88:22, 185:18,
193:21, 206:3
  **reprize** [1] - 82:9
  **request** [6] - 8:2,
8:3, 8:6, 8:17,
106:9, 204:24
  **requested** [1] -
95:16
  **reread** [9] -
10:13, 10:15,
10:17, 10:24,
52:20, 52:21,
113:7, 119:4,
183:17
  **research** [1] -
96:23
  **reserve** [1] -
223:11
  **resign** [1] -
82:18
  **resist** [1] -
213:10
  **respect** [5] -
99:18, 99:24,
100:9, 210:21,
210:23
  **respond** [16] -
137:12, 143:9,
143:16, 143:19,
146:10, 146:14,

166:14, 166:23,
167:9, 167:13,
167:15, 167:16,
168:7, 168:19,
169:4, 184:22
  **responded** [1] -
143:5
  **responding** [2] -
40:6, 95:17
  **responds** [4] -
138:9, 140:25,
142:2, 145:7
  **response** [19] -
13:18, 44:7,
91:23, 92:18,
96:16, 97:11,
138:17, 141:22,
143:2, 143:4,
143:12, 145:12,
145:23, 168:10,
168:14, 169:6,
184:17, 204:24
  Response.
**docx** [1] - 196:5
  **responses** [33] -
91:2, 91:9, 93:9,
95:12, 95:15,
95:20, 96:16,
97:11, 100:20,
100:22, 100:25,
101:12, 114:20,
141:4, 141:7,
141:9, 143:5,
143:12, 158:11,
159:17, 167:6,
167:7, 167:8,
167:12, 167:13,
167:15, 167:16,
168:14, 169:5,
169:6, 175:23
  **responsibility**
[1] - 160:24
  **responsible** [14]
- 134:5, 155:16,
155:17, 155:18,
170:25, 172:20,
178:18, 184:19,
184:21, 184:23,
184:25, 185:2,
185:13
  **Responsible** [1]
- 172:19
  **rest** [3] - 45:13,
156:5, 190:22
  **restructure** [2] -
210:11, 212:21
  **restructured** [1]
- 78:25
  **resubmission**
[1] - 31:7

  **resubmit** [6] -
30:15, 30:17,
30:20, 31:4, 48:8,
48:13
  **resubmitted** [2]
- 48:8, 48:9
  **result** [1] -
185:10
  **resulted** [1] -
24:8
  **results** [1] - 30:6
  **rethought** [1] -
79:1
  **retire** [2] -
161:20, 161:21
  **retired** [2] -
108:9, 190:24
  **return** [1] -
226:21
  **review** [58] -
12:12, 26:7, 27:7,
27:22, 29:8, 29:9,
29:20, 32:5,
32:18, 32:25,
33:15, 33:25,
34:14, 34:21,
34:25, 35:10,
38:14, 38:25,
39:8, 40:4, 40:22,
40:24, 41:4,
41:16, 47:9,
49:23, 55:15,
56:5, 74:5, 75:6,
75:7, 75:20, 76:1,
76:5, 76:7, 76:8,
76:10, 76:18,
76:25, 77:15,
78:2, 78:6, 79:11,
82:9, 87:14,
102:19, 106:2,
125:11, 125:21,
125:25, 126:13,
136:23, 142:13,
165:25, 166:1,
166:15, 197:12,
203:4
  **Review** [7] - 4:9,
4:13, 4:16, 27:11,
164:20, 174:3
  **reviewed** [44] -
11:7, 17:21,
17:25, 18:3,
18:14, 18:16,
18:17, 18:20,
18:21, 18:23,
20:22, 23:4,
26:16, 26:17,
27:18, 30:24,
34:7, 35:13,
37:19, 38:13,

39:17, 40:15,
47:16, 49:2,
51:11, 51:14,
51:17, 51:20,
74:11, 74:12,
74:15, 74:17,
75:5, 75:12,
77:19, 80:10,
81:12, 114:12,
158:13, 177:18,
207:9, 213:25,
218:23, 220:1
  **reviewer** [5] -
30:7, 38:21,
75:16, 77:11,
78:16
  **reviewers** [5] -
29:17, 29:23,
29:24, 77:16,
81:16
  **reviewing** [5] -
20:25, 38:16,
83:5, 83:9,
125:16
  **revise** [5] -
30:15, 30:17,
30:19, 31:3, 48:8
  **revised** [1] -
83:8
  **revisions** [1] -
21:9
  **rhetorical** [1] -
192:18
  **Richard** [2] -
143:4, 143:5
  **Richmond** [26] -
4:3, 4:7, 4:18,
147:24, 149:12,
149:13, 149:16,
149:20, 150:10,
150:18, 151:7,
151:8, 152:13,
160:3, 162:12,
175:12, 196:8,
196:13, 202:16,
203:6, 203:19,
205:6, 205:14,
205:20, 207:14
  **Richmond's** [1]
- 152:10
  **rid** [1] - 208:12
  **Riemannian** [3]
- 18:2, 18:8, 27:9
  **rightly** [2] -
155:22, 155:24
  **road** [1] - 6:20
  **Robertson** [1] -
55:6
  **Rochberg** [1] -
213:18

  **role** [8] - 82:25,
83:3, 83:11,
175:6, 186:5,
187:16, 212:13,
212:15
  **Ron** [2] - 222:12,
222:20
  **room** [1] - 9:9
  **Rothstein** [4] -
16:11, 109:8,
109:10, 109:20
  **ruined** [1] -
139:10
  **rule** [1] - 8:20
  **Rules** [2] - 1:24,
5:9
  **rules** [8] - 6:20,
19:18, 28:21,
39:9, 66:16,
78:23
  **run** [2] - 89:18,
188:21
  **Russia** [1] -
211:13
  **Russian** [17] -
9:14, 18:9, 18:15,
20:9, 22:18, 23:3,
23:24, 24:9,
25:12, 26:9, 27:4,
28:25, 29:4,
32:11, 32:13,
33:10, 64:11
  **Russian-Soviet**
[1] - 18:9

## S

  **sample** [1] -
39:23
  **Saturday** [7] -
42:8, 42:9, 42:10,
42:11, 42:19,
138:14, 145:7
  **saw** [7] - 56:13,
67:14, 94:13,
124:14, 125:16,
125:17, 148:10
  **scan** [4] - 150:1,
151:23, 153:8,
209:2
  **scandal** [1] -
137:8
  **scanned** [1] -
144:12
  **scanning** [1] -
144:11
  **Schenker** [31] -
53:7, 53:11,
53:20, 66:13,

66:15, 66:23,
66:25, 67:1, 67:3,
68:14, 68:16,
69:7, 71:3, 104:2,
104:4, 104:5,
104:6, 104:7,
104:10, 104:17,
104:19, 121:2,
124:4, 124:5,
147:9, 211:25,
212:1, 214:5,
214:7, 219:3
  **Schenkerian**
[101] - 10:19,
53:13, 53:17,
53:19, 59:24,
60:7, 61:11, 68:8,
72:4, 72:10,
72:20, 75:22,
76:17, 78:4, 79:4,
80:8, 80:12,
81:24, 82:10,
82:18, 83:1,
83:12, 86:3,
88:20, 95:22,
96:19, 97:5, 97:8,
100:13, 101:22,
105:8, 108:13,
108:17, 108:23,
109:3, 111:17,
113:5, 113:18,
114:17, 115:6,
121:13, 121:15,
122:1, 122:16,
123:20, 124:12,
125:5, 127:12,
129:9, 134:8,
138:1, 140:3,
140:22, 143:17,
148:5, 152:1,
155:20, 160:13,
160:14, 163:7,
164:21, 165:1,
165:11, 167:19,
169:8, 173:11,
174:4, 181:13,
181:16, 181:19,
187:21, 188:21,
189:3, 197:3,
197:24, 199:11,
199:14, 201:7,
202:25, 204:6,
206:21, 207:16,
209:18, 211:19,
212:4, 212:17,
214:6, 218:16,
219:2, 220:3,
220:7, 220:13,
220:18, 220:24,
221:10, 221:25,
222:3, 222:6,

222:9, 222:10, 222:21

**Schenkerians** [8] - 106:8, 197:7, 197:8, 199:21, 200:2, 200:14, 200:23, 201:22

**scholar** [17] - 37:24, 38:4, 44:3, 47:8, 53:13, 63:20, 64:13, 64:21, 65:8, 71:24, 75:11, 129:1, 133:3, 133:10, 143:2, 222:9

**scholarly** [8] - 37:19, 40:16, 81:19, 127:20, 128:23, 141:8, 152:2, 203:1

**scholars** [13] - 24:25, 42:23, 65:20, 69:6, 71:7, 98:23, 99:1, 106:11, 128:1, 136:7, 140:2, 143:8, 215:6

**scholars'** [1] - 65:22

**scholarship** [7] - 71:14, 160:22, 220:13, 220:18, 220:25, 222:16, 222:18

**School** [1] - 170:18

**Schwinden** [3] - 174:15, 175:3, 175:17

**Schwinden's** [1] - 175:6

**scientist** [1] - 221:18

**score** [2] - 20:5, 20:7

**Scozzari** [1] - 94:2

**scratch** [2] - 16:14, 203:15

**screen** [4] - 89:22, 95:9, 151:17, 167:25

**scroll** [6] - 86:24, 86:25, 87:9, 112:18, 151:15, 170:3

**Scroll** [2] - 112:20, 170:8

**scrolling** [1] -

15:1

**seal** [1] - 225:21

**search** [15] - 190:12, 190:17, 190:22, 190:24, 194:4, 194:18, 206:24, 207:2, 209:7, 210:15, 217:12, 217:13, 218:6, 220:5, 220:22

**Search** [1] - 209:8

**second** [35] - 8:11, 12:4, 13:6, 14:3, 15:10, 24:12, 31:4, 31:7, 37:14, 46:9, 48:3, 48:13, 60:4, 75:1, 89:2, 103:10, 109:25, 112:2, 141:6, 142:12, 144:8, 148:21, 149:22, 151:19, 153:13, 155:3, 164:2, 164:3, 165:16, 177:6, 177:15, 190:9, 200:16, 205:22, 210:3

**section** [2] - 110:8, 174:21

**sections** [1] - 31:19

**see** [91] - 12:23, 13:8, 14:6, 14:12, 14:25, 15:2, 15:4, 21:2, 22:21, 25:9, 36:16, 36:25, 37:3, 37:16, 41:2, 41:11, 45:18, 45:19, 49:7, 49:8, 49:14, 56:16, 56:17, 56:25, 70:12, 71:23, 71:24, 73:17, 78:6, 79:21, 83:14, 85:22, 86:22, 88:4, 88:13, 89:7, 89:9, 89:12, 89:22, 92:18, 92:21, 93:10, 102:2, 102:6, 102:9, 102:14, 103:23, 104:3, 105:1, 106:12, 106:21, 106:23, 111:12, 113:13, 118:17, 120:16, 136:14,

137:20, 139:23, 140:7, 144:12, 144:19, 144:23, 150:7, 151:13, 153:21, 154:21, 157:17, 165:16, 169:17, 169:20, 172:25, 177:16, 180:14, 189:2, 196:12, 204:10, 204:20, 205:11, 205:12, 206:23, 207:19, 207:21, 207:24, 210:4, 215:17, 215:23, 218:9

**See** [1] - 87:11

**seeing** [4] - 51:22, 52:3, 100:25, 118:15

**Seeking** [1] - 208:17

**seem** [5] - 117:2, 135:15, 164:2, 164:4, 219:14

**sees** [2] - 104:9

**Segall** [10] - 26:23, 27:3, 27:7, 27:23, 28:23, 99:21, 124:19, 124:20, 124:23, 125:4

**Segall's** [2] - 22:22, 154:16

**selection** [2] - 199:7, 199:9

**self** [2] - 39:4, 39:13

**self-publication** [2] - 39:4, 39:13

**semester** [1] - 191:3

**send** [5] - 29:13, 140:10, 196:15, 196:22, 217:6

**sending** [3] - 108:15, 114:13, 114:14

**sends** [3] - 28:4, 110:24, 137:14

**sense** [5] - 54:8, 74:24, 91:14, 153:8

**sensitive** [6] - 75:2, 75:4, 75:8, 76:13, 123:12, 123:15

**sent** [30] - 14:10, 29:11, 30:3,

81:22, 81:25, 85:23, 93:7, 105:21, 110:4, 110:9, 110:14, 111:20, 112:7, 113:18, 113:24, 140:10, 151:6, 151:8, 151:11, 175:25, 195:22, 196:8, 196:12, 203:6, 203:19, 205:6, 208:4, 217:1, 217:15

**sentence** [8] - 62:4, 114:23, 130:6, 166:12, 166:16, 166:18, 196:10, 210:3

**sentences** [1] - 139:13

**separate** [6] - 12:21, 46:24, 152:3, 203:2, 215:19, 216:2

**separately** [1] - 215:24

**Sept** [1] - 4:14

**September** [2] - 185:20, 187:17

**series** [4] - 89:17, 89:24, 182:18

**serious** [1] - 138:18

**serve** [5] - 38:21, 55:13, 206:24, 209:18, 209:21

**served** [4] - 47:14, 47:15, 55:16, 206:25

**service** [3] - 56:5, 56:24, 57:3

**serving** [2] - 56:19, 217:11

**session** [13] - 42:2, 42:6, 42:7, 42:8, 42:19, 43:1, 43:15, 43:19, 44:4, 46:13, 90:11, 98:9, 195:17

**set** [1] - 148:11

**seven** [1] - 213:21

**seventh** [1] - 37:17

**several** [4] - 74:18, 78:13, 83:6, 119:5

**sex** [5] - 193:12, 193:14, 193:22, 193:25, 194:25

**shall** [1] - 48:11

**SHALL** [1] - 5:6

**shame** [1] - 44:23

**share** [4] - 13:1, 72:18, 96:23, 132:5

**shared** [4] - 36:22, 60:1, 177:7, 215:23

**shares** [1] - 144:5

**SHERMAN** [2] - 1:2, 226:2

**shorter** [2] - 19:8, 19:10

**Shorthand** [2] - 1:20, 226:13

**shortly** [1] - 147:9

**show** [7] - 12:13, 68:16, 69:24, 135:15, 153:21, 164:7, 215:8

**showed** [1] - 73:15

**showing** [2] - 39:8, 214:20

**sic** [2] - 158:25, 170:18

**side** [1] - 13:22

**sign** [2] - 172:7, 177:10

**Signature** [1] - 5:13

**signature** [6] - 150:6, 165:4, 196:2, 202:17, 225:4, 226:21

**SIGNATURE** [2] - 5:16, 224:1

**signed** [10] - 10:14, 10:17, 70:16, 80:21, 155:21, 163:21, 166:6, 175:12, 176:15

**similar** [5] - 28:14, 57:15, 83:16, 113:9, 137:20

**simplest** [1] - 192:21

**simply** [9] - 75:6, 133:11, 133:23, 134:14,

134:19, 191:22, 212:10, 215:19, 221:6

**Sincerely** [1] - 150:4

**single** [8] - 26:19, 30:9, 30:10, 30:11, 30:12, 72:12, 129:5, 220:2

**sit** [5] - 61:4, 79:16, 84:7, 113:15, 188:4

**sitting** [2] - 8:4, 8:5

**situation** [7] - 57:20, 100:9, 129:4, 129:7, 129:16, 131:20, 152:6

**six** [3] - 22:7, 37:17, 213:21

**size** [2] - 150:23, 169:22

**skip** [1] - 49:6

**skipping** [1] - 114:24

**slightly** [4] - 19:8, 112:20, 186:19, 198:15

**slip** [2] - 102:5, 109:23

**Slottow** [10] - 3:23, 84:17, 96:12, 97:21, 136:14, 138:6, 142:1, 142:8, 142:17, 148:14

**Slottow's** [1] - 154:19

**small** [7] - 36:17, 45:19, 49:11, 86:17, 169:10, 190:2, 208:8

**smaller** [2] - 24:10, 28:7

**SMT** [57] - 3:15, 18:16, 18:22, 18:24, 19:3, 19:18, 21:21, 21:24, 22:18, 24:6, 24:10, 24:14, 25:2, 25:3, 25:8, 25:13, 27:14, 28:15, 28:21, 41:22, 42:16, 43:20, 43:23, 43:25, 44:4, 44:6, 44:8, 44:18, 44:19,

45:8, 46:12, 47:4,
54:7, 60:25,
70:15, 84:16,
90:11, 106:9,
110:5, 110:11,
110:18, 110:20,
110:21, 110:23,
111:1, 111:5,
111:7, 111:10,
111:20, 112:7,
208:2, 208:5,
208:14, 210:22,
212:9
  **SMT-announce**
[3] - 208:2, 208:5,
208:14
  **SMT-announce
@lists.
societymusictheory
.org** [1] - 110:11
  **so-called** [4] -
88:19, 122:18,
182:20, 183:7
  **so..** [4] - 47:18,
48:9, 88:9, 94:22
  **social** [3] - 6:14,
138:17, 152:21
  **societies** [2] -
211:11, 212:6
  **Society** [11] -
18:24, 21:21,
34:13, 34:19,
41:25, 43:10,
112:8, 123:18,
132:12, 140:1,
155:19
  **society** [1] -
134:4
  **soften** [1] - 77:4
  **softly)..** [1] -
87:4
  **solely** [3] - 68:4,
194:24, 199:8
  **solicit** [8] - 22:1,
22:3, 22:11,
22:13, 22:23,
100:13, 108:16,
108:22
  **soliciting** [3] -
101:15, 109:2,
113:24
  **solidarity** [2] -
165:10, 181:12
  **someone** [29] -
47:12, 61:5,
64:17, 66:20,
68:4, 72:17,
73:17, 76:7,
112:2, 122:23,
131:3, 131:8,

131:9, 133:25,
134:12, 134:15,
134:19, 145:2,
175:15, 192:7,
192:8, 198:20,
199:25, 200:5,
217:13, 218:20
  **sometime** [2] -
15:21, 84:9
  **sometimes** [5] -
22:11, 74:10,
83:18, 83:24,
84:1
  **Sometimes** [2] -
29:23, 143:22
  **somewhat** [4] -
18:22, 52:18,
64:12, 150:13
  **somewhere** [3] -
30:18, 30:20,
52:3
  **soon** [2] - 46:25,
119:19
  **sorry** [45] -
11:16, 12:5, 20:6,
24:22, 34:16,
37:1, 40:7, 43:16,
47:13, 47:19,
48:10, 63:8,
68:11, 84:15,
91:19, 91:21,
93:11, 102:12,
107:19, 108:19,
112:21, 125:22,
130:4, 135:6,
135:12, 141:12,
143:22, 150:15,
151:19, 156:24,
164:3, 173:19,
173:23, 178:9,
193:15, 193:16,
195:6, 201:1,
205:18, 205:21,
208:18, 208:22,
214:24, 215:5,
216:1
  **Sorry** [16] - 12:4,
34:16, 46:9, 54:4,
93:24, 95:7,
145:16, 145:21,
150:20, 182:3,
191:6, 204:16,
205:21, 208:15,
213:7, 218:4
  **sort** [13] - 66:24,
73:5, 74:17,
97:19, 122:8,
123:14, 128:13,
136:19, 139:17,
153:1, 184:23,

219:13, 219:22
  **sound** [1] -
213:10
  **sounds** [5] -
24:16, 25:1,
63:14, 178:5,
213:5
  **sources** [1] -
213:14
  **Soviet** [1] - 18:9
  **spans** [1] -
102:15
  **speakers** [1] -
45:23
  **speaking** [4] -
73:4, 91:18,
91:19, 121:12
  **special** [1] -
24:24
  **specialist** [2] -
108:13, 218:24
  **specific** [40] -
32:1, 42:12, 46:1,
59:7, 59:14,
60:16, 61:5, 67:6,
70:13, 71:24,
74:21, 76:1, 77:7,
86:5, 100:17,
101:3, 101:13,
102:3, 122:11,
129:4, 129:7,
129:24, 130:14,
131:7, 131:12,
147:7, 153:5,
166:1, 167:13,
172:9, 179:9,
180:17, 183:4,
188:9, 188:12,
188:16, 196:18,
200:11, 200:13
  **specifically** [12]
- 48:17, 66:6,
69:4, 76:23,
139:25, 147:12,
171:16, 178:19,
178:21, 179:2,
188:6, 213:12
  **Specifically** [1] -
171:7
  **specifics** [1] -
60:23
  **Spectrum** [27] -
44:13, 44:15,
44:17, 45:9,
45:11, 45:14,
45:24, 45:25,
46:24, 47:9,
47:10, 47:11,
47:23, 48:16,
48:22, 48:23,

49:1, 49:21,
49:22, 50:5,
51:19, 53:2,
90:16, 91:4,
98:10, 132:7,
143:3
  **speculate** [3] -
70:12, 75:24,
123:9
  **speculating** [1] -
129:15
  **speculation** [1] -
219:24
  **spend** [1] -
202:21
  **spent** [2] -
161:23, 161:24
  **spoken** [1] -
149:11
  **Staff** [1] - 160:4
  **staff** [5] -
122:16, 142:18,
161:13, 202:4,
209:19
  **stamped** [1] -
85:10
  **stand** [2] -
165:9, 181:12
  **standard** [1] -
35:10
  **standardized** [1]
- 28:22
  **standards** [1] -
160:22
  **standing** [2] -
43:7, 98:14
  **stands** [3] -
18:24, 46:21,
58:24
  **start** [3] -
115:19, 151:7,
151:18
  **started** [4] -
22:17, 38:10,
189:21, 189:22
  **starts** [3] -
167:25, 202:23,
208:11
  **state** [10] - 6:10,
56:22, 58:3, 65:9,
197:15, 203:8,
210:11, 210:17,
212:20, 212:21
  **STATE** [2] -
225:10, 225:25
  **State** [2] - 1:20,
226:14
  **Statement** [4] -
4:11, 167:18,
169:8, 174:16

  **statement** [31] -
10:20, 10:21,
41:13, 61:21,
62:3, 62:15,
70:16, 104:17,
165:1, 168:6,
169:14, 169:16,
172:7, 173:10,
173:14, 173:21,
174:25, 175:7,
175:12, 175:19,
176:12, 176:16,
177:11, 178:3,
178:6, 178:10,
180:16, 181:5,
181:10, 182:12
  **statements** [4] -
66:9, 71:14,
104:5, 177:12
  **States** [2] - 16:1,
65:5
  **states** [3] -
114:7, 169:3,
178:19
  **STATES** [2] -
1:1, 226:1
  **stating** [4] -
61:15, 71:18,
143:15, 179:10
  **Station** [2] -
2:10, 227:13
  **statistical** [4] -
65:3, 65:7, 65:8,
65:13
  **statistics** [1] -
65:16
  **status** [1] -
110:15
  **stay** [4] - 58:9,
127:25, 128:18,
155:25
  **stays** [1] - 58:23
  **stenotype** [1] -
1:21
  **step** [1] - 111:21
  **Stephen** [11] -
84:17, 96:12,
97:21, 136:14,
138:6, 142:1,
142:7, 142:9,
142:17, 148:14,
154:19
  **steps** [1] - 21:8
  **stereotypes** [1] -
182:7
  **stereotyping** [1]
- 182:11
  **stick** [1] - 26:14
  **still** [16] - 7:11,
15:9, 15:12,

15:22, 16:24,
18:23, 21:18,
21:20, 28:12,
97:23, 154:22,
155:1, 189:14,
189:15, 191:5,
211:9
  **Still** [1] - 43:19
  **Stipulations.....**
..........................
  **..** [1] - 3:4
  **STM** [1] - 84:25
  **Stoia** [1] - 81:16
  **Stop** [1] - 112:22
  **stopped** [1] -
72:21
  **stopping** [7] -
72:4, 72:7, 72:9,
72:12, 72:15,
72:19, 73:25
  **STOWERS** [2] -
94:5, 94:10
  **Stowers** [4] -
2:15, 94:5,
207:14, 227:18
  **strange** [2] -
110:23, 147:6
  **Stravinsky** [1] -
213:17
  **stricken** [1] -
94:25
  **strike** [8] -
11:24, 32:22,
34:11, 123:16,
131:1, 133:1,
133:7, 221:23
  **Strike** [2] -
180:18, 188:19
  **string** [4] -
144:8, 146:3,
207:13, 207:21
  **strongly** [1] -
121:19
  **structural** [3] -
81:6, 125:7,
133:12
  **structure** [6] -
78:11, 79:2,
79:12, 125:12,
126:4, 126:8
  **student** [15] -
10:15, 10:20,
58:6, 58:11,
58:23, 88:1,
115:22, 122:23,
123:20, 165:19,
165:24, 169:24,
173:12, 174:8,
177:11
  **student's** [1] -

*ELLEN BAKULINA, Ph.D.    10/16/2024*

180:21
**students** [13] - 10:16, 55:22, 56:9, 56:15, 57:25, 70:15, 163:22, 165:10, 173:15, 181:12, 185:14, 200:20, 212:1
**students'** [6] - 165:15, 166:10, 169:16, 170:7, 171:24, 172:7
**Students'** [1] - 181:5
**Studies** [73] - 10:20, 59:24, 60:7, 61:12, 68:8, 72:5, 72:10, 72:20, 75:22, 76:17, 78:4, 79:4, 80:8, 80:12, 81:24, 82:10, 82:19, 83:1, 83:12, 86:3, 88:20, 95:22, 96:19, 97:5, 97:8, 100:13, 101:22, 105:8, 108:17, 108:23, 109:3, 111:17, 113:5, 113:18, 115:6, 122:16, 123:20, 124:12, 125:5, 127:12, 129:9, 134:8, 138:1, 140:3, 140:22, 143:17, 148:6, 152:1, 155:20, 160:13, 160:14, 163:7, 164:21, 165:2, 165:11, 167:19, 169:8, 173:11, 174:5, 181:14, 181:16, 187:21, 188:21, 189:3, 197:3, 197:25, 201:7, 202:25, 204:6, 206:21, 207:16, 209:19, 222:6
**studies** [7] - 65:7, 114:17, 212:4, 212:17, 214:6, 218:16, 221:25
**style** [1] - 121:20
**styled** [1] - 1:17
**subfield** [1] - 202:2

**subject** [6] - 9:25, 32:4, 63:12, 129:25, 130:1, 171:23
**subjected** [9] - 34:14, 40:3, 40:22, 40:24, 41:3, 41:15, 41:16, 76:5, 76:18
**submission** [5] - 19:16, 23:20, 26:8, 31:4, 49:25
**submissions** [8] - 24:17, 24:25, 33:15, 37:18, 38:14, 38:17, 40:15, 100:18
**submissive** [1] - 98:2
**submit** [8] - 19:6, 19:11, 22:15, 29:12, 47:19, 48:12, 114:20, 115:3
**submitted** [12] - 27:3, 27:21, 28:25, 33:25, 47:12, 47:17, 47:22, 47:24, 48:7, 50:5, 88:18, 226:19
**submitting** [1] - 25:2
**subparagraph** [1] - 206:5
**Subpoena** [1] - 5:8
**subscribed** [1] - 225:18
**subsequent** [1] - 95:20
**substance** [5] - 77:10, 77:12, 118:6, 122:13, 142:25
**substantive** [1] - 77:21
**suggest** [7] - 79:24, 91:1, 96:15, 158:11, 169:12, 169:15, 191:17
**suggested** [4] - 12:15, 77:4, 77:14, 176:22
**suggesting** [1] - 200:1
**suggestion** [2] - 187:8, 197:11

**suggestions** [5] - 21:7, 77:18, 77:20, 95:2, 169:10
**suggests** [4] - 91:13, 104:2, 104:8, 104:13
**sum** [1] - 110:19
**summarize** [1] - 183:15
**summarizes** [1] - 180:7
**summarizing** [1] - 155:9
**summary** [1] - 181:2
**summer** [1] - 161:23
**summertime** [1] - 162:2
**Sunday** [9] - 42:10, 92:1, 92:6, 144:10, 146:21, 147:1, 157:23, 158:4, 158:20
**supervised** [1] - 118:2
**support** [5] - 101:24, 102:4, 172:15, 177:10, 181:2
**supported** [3] - 103:5, 115:13, 154:13
**supportive** [4] - 153:25, 154:7, 154:9, 154:10
**suppose** [1] - 65:21
**supposed** [2] - 78:17, 127:5
**supremacy** [2] - 133:12, 133:18
**surprise** [1] - 108:1
**Surprisingly** [1] - 134:10
**surrounding** [2] - 124:11, 137:25
**suspicion** [1] - 59:2
**Suzannah** [4] - 153:23, 153:25, 154:2, 154:8
**Suzanne** [1] - 153:23
**switch** [1] - 59:4
**switched** [3] - 58:7, 58:8, 59:1
**sworn** [3] - 1:17,

6:6, 226:16
**symposium** [5] - 114:9, 127:7, 143:1, 143:3, 143:6
**Symposium** [22] - 61:13, 72:25, 73:14, 74:8, 74:19, 74:20, 75:21, 76:16, 80:11, 80:25, 100:14, 113:25, 115:7, 124:7, 125:25, 126:13, 143:17, 146:14, 156:5, 168:10, 177:20, 182:14
**system** [1] - 53:21
**System** [2] - 2:16, 227:19
**systemic** [2] - 181:21, 181:25

## T

**TAKEN** [1] - 5:6
**talks** [1] - 90:15, 180:25, 201:21
**Taruskin** [2] - 143:4, 143:5
**taught** [3] - 219:5, 219:9, 219:24
**teach** [1] - 17:9
**teaches** [2] - 219:15, 219:25
**teaching** [5] - 82:3, 161:24, 185:10, 219:22, 219:23
**team** [1] - 141:5
**techniques** [2] - 199:11, 220:24
**Telephone** [6] - 2:5, 2:11, 2:18, 227:8, 227:14, 227:21
**tenure** [4] - 54:17, 54:19, 54:22, 97:22
**term** [5] - 57:18, 57:19, 198:9, 210:12, 212:22
**terms** [5] - 21:20, 21:21, 57:3, 64:6, 168:14
**testified** [10] -

6:35, 16:30, 69:1, 90:13, 94:21, 134:21, 154:23, 168:8, 169:13, 183:6
**testify** [3] - 8:18, 10:1, 183:12
**testimony** [11] - 13:18, 31:16, 31:21, 61:5, 77:23, 153:7, 159:8, 179:24, 219:15, 226:18, 226:24
**testing** [1] - 183:21
**Texas** [36] - 1:21, 2:11, 2:16, 2:17, 2:17, 15:8, 15:9, 15:13, 15:23, 15:25, 21:16, 33:16, 34:1, 54:13, 57:7, 82:4, 82:12, 85:18, 128:12, 142:11, 159:20, 160:10, 163:12, 165:8, 170:5, 173:8, 204:24, 216:19, 218:22, 222:13, 226:14, 227:14, 227:19, 227:20, 227:20, 228:13
**text** [5] - 19:23, 114:6, 114:7, 114:13, 150:23
**Textbook** [9] - 18:1, 18:8, 20:20, 23:16, 27:8, 32:11, 33:9, 33:24, 34:7
**Thad** [3] - 2:3, 227:3, 227:6
**THE** [36] - 1:1, 2:2, 2:8, 6:2, 36:24, 50:14, 50:19, 50:20, 50:23, 68:11, 80:1, 80:4, 85:4, 94:4, 105:15, 119:20, 120:2, 120:11, 120:18, 120:21, 130:11, 157:3, 157:7, 157:10, 173:3, 182:3, 195:10, 195:13, 223:5, 223:8, 223:13, 225:10, 225:25,

226:1, 227:5, 227:11
**themselves** [6] - 49:24, 73:1, 73:2, 73:14, 95:5, 125:9
**Theoretical** [1] - 18:9
**Theoria** [30] - 3:14, 21:13, 22:15, 24:8, 33:11, 34:13, 34:20, 35:5, 35:15, 35:20, 35:25, 37:24, 38:4, 38:8, 39:3, 39:5, 39:12, 39:14, 40:12, 40:21, 41:1, 41:14, 99:4, 99:7, 99:14, 99:18, 99:20, 99:24, 100:2, 100:10
**theorist** [5] - 21:24, 54:9, 108:6, 108:12, 211:11
**theorists** [5] - 21:22, 24:18, 35:4, 54:6, 67:25
**Theory** [36] - 18:15, 18:24, 20:10, 21:21, 23:3, 23:25, 24:10, 32:12, 32:13, 33:10, 34:13, 34:19, 35:6, 36:1, 41:25, 43:10, 46:7, 46:21, 46:22, 47:11, 49:22, 52:13, 53:1, 90:15, 91:4, 98:10, 112:9, 115:23, 132:7, 132:12, 140:2, 143:3, 155:20, 160:18, 165:9, 170:19
**theory** [40] - 10:16, 16:8, 16:17, 22:18, 30:24, 53:13, 62:4, 62:15, 62:16, 62:19, 62:25, 63:1, 63:3, 63:5, 63:6, 63:15, 63:17, 63:21, 64:6, 65:15, 65:20, 66:5, 68:1,

71:25, 73:7,
103:14, 132:19,
132:23, 133:2,
133:10, 133:12,
133:18, 134:13,
136:4, 210:11,
210:17, 211:1,
211:7, 212:20,
219:25
  **Theory's** [4] -
45:15, 51:5,
123:19, 132:5
  **Therefore** [2] -
6:24, 95:16
  **therein** [1] -
225:20
  **thesis** [16] -
115:24, 116:2,
116:6, 116:15,
117:9, 117:21,
117:25, 118:2,
118:3, 118:7,
118:9, 118:14,
119:8, 121:12,
121:13, 122:14
  **thinking** [3] -
121:20, 122:3,
143:1
  **thinks** [1] -
163:3
  **Third** [1] -
177:10
  **third** [8] - 30:7,
69:14, 69:16,
71:10, 78:7, 78:8,
99:21
  **thirties** [1] -
78:19
  **THIS** [1] - 5:6
  **thoughts** [4] -
69:2, 104:14,
104:15, 114:25
  **thread** [15] -
106:21, 107:11,
137:14, 139:8,
140:13, 142:2,
142:3, 144:5,
144:6, 144:20,
144:24, 145:2,
145:5, 185:19,
185:25
  **threads** [1] -
136:21
  **three** [21] -
11:23, 21:5,
22:21, 23:9,
30:14, 32:17,
37:17, 45:7,
47:24, 69:12,
70:23, 79:13,

79:17, 80:10,
80:17, 81:3, 81:8,
81:11, 163:18,
170:9, 170:10
  **throughout** [1] -
128:2
  **Thursday** [1] -
42:10
  **tie** [1] - 79:19
  **ties** [1] - 62:19
  **Tim** [3] - 57:1,
93:3, 138:6
  **timely** [2] -
145:12, 145:23
  **Timothy** [106] -
2:22, 53:10,
53:23, 53:24,
54:2, 54:21,
54:25, 55:2,
55:11, 56:8,
56:15, 56:20,
56:23, 57:6,
57:24, 58:4,
58:16, 58:21,
59:1, 59:3, 59:8,
59:15, 59:23,
60:8, 60:11,
60:16, 61:2, 61:6,
61:17, 61:25,
64:24, 66:4, 66:9,
66:12, 67:11,
68:6, 68:24,
69:15, 69:18,
70:5, 70:9, 70:17,
72:3, 76:3, 76:15,
76:25, 83:7,
83:17, 84:14,
85:12, 87:25,
88:18, 92:6, 92:9,
93:6, 93:19,
94:14, 94:15,
95:11, 96:11,
97:20, 101:7,
101:20, 103:5,
105:21, 107:9,
108:14, 109:2,
109:6, 109:9,
116:8, 122:19,
122:24, 123:18,
124:1, 136:15,
139:18, 140:25,
141:21, 144:9,
148:16, 148:25,
154:24, 178:11,
178:14, 178:16,
179:16, 182:13,
189:5, 189:10,
189:19, 190:11,
190:14, 190:25,
191:8, 191:10,

192:9, 192:13,
193:6, 193:10,
194:3, 201:5,
202:3, 209:17,
209:25, 212:12
  **TIMOTHY** [2] -
1:3, 226:3
  **Timothy's** [1] -
76:15
  **tiny** [1] - 134:14
  **tired** [2] -
173:23, 213:6
  **title** [4] - 35:19,
35:24, 36:10,
45:14
  **Title** [7] - 3:14,
193:5, 193:15,
193:18, 193:22,
194:12, 194:17
  **titled** [1] - 45:15
  **titling** [1] -
131:14
  **TJ** [1] - 94:15
  **TLJ** [1] - 94:13
  **TLJ0019** [1] -
94:15
  **TO** [2] - 5:6, 5:11
  **today** [25] - 7:8,
8:18, 9:9, 9:19,
10:1, 11:10,
11:12, 11:14,
11:18, 12:1, 12:5,
12:13, 13:18,
31:21, 39:17,
61:4, 79:16, 84:7,
113:15, 154:24,
159:8, 179:24,
188:4, 196:1,
197:2
  **Today** [2] - 6:2,
11:14
  **today's** [2] -
10:4, 10:11
  **together** [12] -
54:24, 55:5,
55:14, 55:25,
56:3, 57:1,
128:19, 128:21,
128:23, 132:9,
153:18, 156:15
  **tonal** [3] - 67:7,
214:4, 214:14
  **tone** [2] - 77:8,
77:10
  **took** [5] - 42:7,
54:12, 79:9,
83:21, 176:22
  **tools** [1] - 219:1
  **top** [6] - 90:2,
90:6, 110:3,

111:14, 144:8,
148:16
  **topic** [9] - 52:25,
53:12, 71:19,
75:5, 83:15,
117:22, 117:24,
123:12, 131:11
  **topics** [4] -
83:15, 83:19,
123:15, 129:12
  **towards** [5] -
67:1, 67:4, 68:17,
70:25, 154:6
  **track** [1] -
156:24
  **tracks** [1] - 25:1
  **Tradition** [1] -
18:10
  **traditional** [1] -
214:7
  **trained** [1] -
219:2
  **training** [1] -
218:18
  **transcript** [4] -
13:24, 199:19,
226:17, 226:19
  **transgender** [1]
- 131:10
  **transition** [3] -
80:7, 115:17,
163:16
  **treat** [1] - 56:15
  **treated** [1] - 56:9
  **trial** [3] - 5:21,
183:23, 223:11
  **tried** [1] - 36:18
  **tropes** [2] -
182:8, 182:11
  **trouble** [1] -
42:13
  **true** [9] - 65:10,
67:3, 74:13,
191:1, 199:23,
201:15, 225:5,
226:18
  **trust** [1] - 176:5
  **truth** [3] - 65:13,
191:15, 191:18
  **truthfully** [2] -
8:18, 9:19
  **try** [14] - 7:15,
7:17, 7:19, 40:10,
41:9, 41:10, 45:1,
57:16, 66:25,
87:9, 151:1,
188:11, 195:18,
202:18
  **trying** [21] -
24:23, 65:24,

68:23, 68:24,
69:3, 77:22, 87:1,
95:3, 95:7,
102:14, 106:19,
150:17, 164:18,
166:4, 169:18,
174:1, 192:22,
205:11, 205:21,
215:23, 220:21
  **turn** [1] - 77:1
  **twelfth** [1] -
160:12
  **twentieth** [2] -
212:2, 213:19
  **twice** [4] - 47:24,
48:7, 48:11,
108:10
  **Twitter** [1] -
128:3
  **two** [30] - 22:7,
25:1, 29:18,
29:22, 29:24,
30:5, 33:9, 37:17,
46:5, 51:1, 66:11,
69:13, 89:4,
152:3, 163:17,
182:17, 189:12,
191:14, 193:3,
197:6, 203:2,
203:23, 206:1,
207:7, 212:13,
214:19, 215:1,
215:16, 216:4,
216:12
  **type** [4] - 82:15,
129:24, 131:7,
131:11
  **typically** [2] -
52:7, 219:5

# U

  **U.S** [1] - 212:1
  **ultimately** [1] -
184:18
  **um-hum** [1] - 7:6
  **Um-hum** [118] -
6:13, 6:21, 8:8,
11:6, 13:3, 13:16,
15:11, 22:5, 22:9,
24:7, 25:17,
25:23, 26:6,
26:16, 29:15,
30:2, 33:8, 33:12,
33:22, 37:14,
41:23, 42:21,
45:12, 45:17,
46:10, 46:13,
48:2, 48:19,
51:16, 55:13,

56:1, 56:12, 57:2,
60:5, 62:1, 62:14,
63:11, 68:2,
71:12, 73:12,
73:19, 74:7, 77:6,
78:10, 83:4,
83:22, 84:6,
85:13, 88:3, 88:6,
89:6, 89:20, 90:1,
90:8, 90:21, 93:2,
96:24, 100:15,
100:23, 102:17,
121:18, 121:21,
124:9, 124:20,
128:25, 132:8,
132:13, 137:10,
137:16, 137:18,
138:8, 140:14,
141:1, 143:14,
145:9, 145:22,
146:6, 146:9,
148:17, 150:3,
151:20, 152:4,
152:11, 153:3,
153:11, 153:14,
155:2, 156:13,
159:14, 162:3,
163:1, 163:7,
167:22, 172:18,
176:21, 178:4,
183:19, 184:20,
185:3, 185:11,
186:9, 187:12,
188:15, 190:8,
198:10, 199:5,
200:18, 200:24,
201:3, 203:12,
207:6, 207:23,
209:4, 211:8,
211:15, 211:23,
217:24, 218:12
  **unable** [2] -
123:25, 183:12
  **unacceptable**
[8] - 166:14,
166:23, 168:19,
171:9, 178:21,
179:4, 179:12,
180:1
  **unclear** [9] -
11:16, 78:12,
79:2, 79:12,
125:11, 126:3,
126:8, 150:13,
177:8
  **uncomfortable**
[3] - 190:2, 191:4,
194:11
  **undated** [1] -
173:14

**Undated** [1] - 4:17
**under** [6] - 8:19, 15:16, 18:1, 44:19, 97:19, 225:21
**underlying** [1] - 103:9
**undersigned** [1] - 165:7
**understandable** [1] - 14:13
**understood** [9] - 8:13, 63:6, 130:22, 131:16, 162:19, 166:21, 220:17, 220:23, 221:10
**unethical** [4] - 155:12, 190:19, 191:5
**unexpected** [1] - 191:9
**unfortunate** [1] - 96:4
**Unfortunately** [2] - 126:6, 158:7
**unfortunately** [6] - 27:17, 76:20, 129:15, 131:25, 150:15, 219:19
**UNIDENTIFIED** [1] - 91:16
**unique** [1] - 145:4
**UNITED** [2] - 1:1, 226:1
**United** [2] - 16:1, 65:4
**universal** [2] - 192:6, 217:19
**universe** [3] - 212:14, 212:15
**University** [33] - 2:16, 3:16, 15:13, 16:2, 16:13, 16:16, 21:16, 33:16, 34:1, 44:20, 45:10, 49:5, 49:18, 54:13, 57:6, 82:4, 82:11, 85:17, 128:12, 159:19, 160:10, 160:17, 163:12, 165:8, 170:5, 173:8, 200:16, 200:19, 204:23, 216:18, 218:22, 222:13, 227:19

**university** [1] - 16:3
**unless** [2] - 29:12, 196:7
**unpleasant** [1] - 162:24
**unprofessional** [3] - 133:9, 133:15, 133:23
**unrelated** [1] - 191:7
**unsigned** [1] - 5:21
**UNT** [66] - 3:11, 3:13, 3:20, 3:22, 3:24, 4:2, 4:4, 4:6, 4:8, 4:12, 4:14, 4:16, 4:16, 4:18, 4:20, 10:14, 10:16, 17:11, 21:17, 32:25, 33:3, 33:14, 54:5, 55:17, 56:5, 80:21, 84:10, 89:9, 89:13, 95:14, 102:5, 102:7, 110:1, 137:3, 144:12, 145:10, 146:22, 150:5, 150:12, 160:14, 162:6, 162:18, 162:25, 163:6, 165:1, 167:18, 169:8, 170:5, 170:17, 172:22, 173:10, 177:13, 181:8, 185:19, 190:13, 191:3, 192:2, 198:24, 198:25, 204:10, 204:12, 207:1, 208:11, 209:3, 216:20, 218:20
**untrue** [1] - 158:14
**unusual** [5] - 58:21, 58:25, 84:24, 85:1, 217:9
**unwilling** [1] - 190:15
**up** [33] - 9:4, 37:23, 45:7, 50:25, 57:10, 57:11, 61:23, 75:11, 85:3, 87:2, 93:6, 95:7, 102:6, 105:14, 110:19, 112:20, 113:14,

116:7, 122:16, 128:9, 145:2, 145:6, 151:23, 162:4, 184:1, 185:18, 193:16, 195:8, 208:9, 213:2, 214:3, 214:24, 216:1
**upcoming** [1] - 95:21
**urged** [1] - 77:11
**URL** [1] - 49:7
**usual** [4] - 38:22, 38:23, 114:12, 217:5
**utterance** [1] - 69:14
**utterances** [1] - 69:2

**V**

**vague** [2] - 107:19, 188:8
**Vaguely** [1] - 147:3
**valid** [1] - 81:19
**value** [2] - 61:24, 71:8
**variety** [2] - 114:24, 115:7
**various** [6] - 17:2, 56:19, 105:21, 143:9, 164:24, 213:22
**verbal** [3] - 7:13, 83:14, 83:15
**verbally** [1] - 96:9
**verbiage** [1] - 169:13
**version** [13] - 14:10, 14:11, 19:9, 28:11, 46:20, 46:23, 52:15, 95:18, 95:20, 113:9, 113:13, 173:12
**versions** [3] - 14:9, 46:4, 52:24
**versus** [2] - 64:1, 134:20
**via** [1] - 209:8
**viability** [2] - 210:12, 212:22
**victim** [1] - 140:21
**Video** [1] - 2:24
**videographer**

[1] - 94:3
**VIDEOGRAPHER** [16] - 2:23, 6:2, 50:20, 50:23, 80:1, 80:4, 94:4, 120:18, 120:21, 157:7, 157:10, 195:10, 195:13, 223:5, 223:8, 223:13
**VIDEOTAPED** [2] - 1:9, 1:15
**view** [7] - 36:19, 63:9, 69:9, 73:24, 75:20, 102:22, 131:23
**viewpoint** [1] - 101:3
**viewpoints** [10] - 101:2, 101:9, 101:15, 101:21, 102:1, 103:6, 104:16, 104:23, 115:7, 159:10
**views** [3] - 104:10, 123:7, 123:25
**virtual** [3] - 12:13, 12:18, 208:24
**visit** [2] - 55:2, 55:9
**visiting** [1] - 17:10
**Vista** [1] - 228:13
**VOICE** [1] - 91:16
**voice** [2] - 93:16, 94:9
**Volume** [50] - 3:14, 10:17, 10:19, 36:1, 39:23, 39:25, 40:11, 40:21, 41:14, 61:13, 75:21, 78:8, 82:23, 83:1, 83:8, 83:12, 88:25, 96:18, 97:2, 97:5, 98:9, 108:17, 108:22, 109:12, 113:4, 113:19, 114:19, 115:7, 119:12, 124:7, 124:11, 124:15, 124:21, 127:12, 129:8, 134:7, 138:1, 149:6, 162:23, 163:5,

164:21, 174:4, 182:7, 196:20, 196:23, 196:24, 197:6, 210:18, 214:2, 214:3
**volume** [13] - 23:3, 36:11, 39:20, 40:1, 40:11, 51:24, 60:7, 73:6, 73:23, 79:10, 156:9, 160:12, 214:18
**volumes** [2] - 214:17, 214:19
**vote** [2] - 190:15, 190:24
**voted** [2] - 191:11, 191:14
**vs** [2] - 1:5, 226:5
**vulnerable** [4] - 130:3, 134:18, 135:25, 136:4

**W**

**wait** [6] - 46:3, 91:3, 91:14, 95:17, 96:14, 187:20
**Wait** [5] - 46:5, 47:25, 55:16, 86:22, 99:6
**waived** [1] - 5:13
**walk** [1] - 150:21
**Walls** [32] - 88:1, 91:10, 115:18, 115:20, 115:22, 116:14, 116:18, 116:20, 116:23, 117:8, 118:2, 118:13, 118:16, 118:18, 119:6, 119:10, 119:14, 120:24, 121:8, 122:9, 122:18, 123:1, 123:16, 123:17, 123:24, 136:15, 138:20, 139:4, 140:10, 140:20, 144:15, 145:11
**walls** [1] - 138:25
**Walls'** [1] - 121:12
**wants** [2] - 12:22, 141:4
**Warner** [1] - 2:24

**Warwick** [2] - 190:23, 191:13
**ways** [3] - 26:3, 189:11, 197:6
**weak** [8] - 135:10, 135:13, 135:14, 135:16, 135:19, 135:23, 136:1, 136:10
**weaker** [1] - 136:7
**weakness** [1] - 135:15
**Website** [1] - 3:15
**website** [7] - 29:12, 45:8, 45:10, 49:6, 49:7, 49:15, 49:20
**Wed** [1] - 4:13
**Wednesday** [1] - 6:2
**weekend** [1] - 42:15
**weeks** [1] - 84:9
**welcome** [2] - 95:18, 158:12
**welcomed** [1] - 101:1
**welcomes** [2] - 114:10
**well-known** [3] - 200:6, 200:8, 215:6
**Wells** [1] - 116:11
**Wen** [8] - 106:12, 106:15, 106:24, 107:10, 108:2, 108:4, 108:21, 201:4
**Western** [5] - 63:22, 64:10, 64:12, 64:15, 65:23
**WHALEY** [1] - 228:12
**whatnot** [2] - 19:24, 30:13
**White** [4] - 45:15, 51:5, 131:14, 132:6
**white** [21] - 62:20, 62:23, 63:2, 67:18, 131:4, 131:8, 131:16, 131:18, 131:19, 131:21, 132:18, 132:21, 132:23, 133:2,

133:12, 133:17, 134:11, 197:7, 202:1, 214:10

**whiteness** [1] - 133:12

**whites** [1] - 132:24

**whole** [8] - 10:24, 10:25, 51:24, 65:4, 110:4, 132:18, 142:19, 196:16

**wider** [2] - 168:1, 169:19

**William** [3] - 16:11, 109:10, 109:20

**willing** [1] - 104:16

**wing** [1] - 164:10

**winter** [2] - 80:8, 112:14

**wish** [2] - 95:17, 215:10

**WITNESS** [10] - 36:24, 50:14, 50:19, 68:11, 119:20, 120:2, 120:11, 157:3, 182:3, 224:2

**witness** [11] - 1:16, 18:7, 32:8, 91:20, 121:7, 173:9, 176:19, 223:2, 226:16, 226:18

**Witness** [2] - 1:22, 5:12

**Witness's** [1] - 5:12

**witness,for** [1] - 226:21

**witnessed** [1] - 122:12

**woman** [8] - 121:14, 131:10, 191:23, 192:11, 194:3, 194:6, 194:7, 194:25

**women** [8] - 61:22, 190:25, 191:12, 194:20, 197:8, 199:3, 201:22, 214:12

**word** [16] - 19:20, 20:13, 20:19, 57:9, 57:13, 57:21, 98:2, 118:5,

124:15, 131:25, 135:23, 154:7, 162:24, 181:15, 193:14, 213:3

**wording** [4] - 61:19, 102:3, 135:13, 177:3

**words** [9] - 19:20, 19:23, 20:14, 28:16, 28:17, 65:24, 169:14, 176:20, 176:21

**world** [5] - 128:19, 128:20, 211:10, 212:4, 212:5

**worry** [1] - 198:17

**worrying** [1] - 139:9

**worthy** [2] - 177:22, 177:25

**WRIGHT** [2] - 1:6, 226:6

**write** [7] - 29:25, 30:7, 38:22, 38:24, 97:10, 156:2, 169:6

**writes** [6] - 139:8, 145:22, 146:4, 146:17, 146:21, 162:12

**writing** [8] - 70:13, 90:21, 117:21, 148:25, 149:13, 149:15, 150:17, 184:16

**writings** [2] - 60:25, 130:25

**written** [7] - 28:9, 28:10, 28:12, 176:6, 177:12, 182:13, 219:18

**wrote** [10] - 65:2, 65:9, 66:23, 101:11, 149:21, 151:4, 157:20, 183:2, 203:20, 205:20

## Y

**year** [13] - 19:4, 19:20, 26:13, 27:18, 42:16, 72:24, 82:14, 99:6, 99:9, 115:24, 143:3,

157:24, 185:8

**years** [13] - 19:19, 25:14, 39:22, 54:10, 78:13, 78:15, 119:6, 179:20, 179:21, 187:21, 211:6

**yesterday** [1] - 183:20

**yielded** [1] - 30:6

**Yiyi** [2] - 58:2, 58:4

**youngest** [1] - 211:12

**yourself** [8] - 40:1, 53:12, 53:15, 53:16, 75:13, 155:21, 161:21, 216:15

## Z

**Zoom** [4] - 12:17, 183:8, 186:14, 216:8

**ZOOM** [1] - 1:9