*Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24*      1

<pre>
 1              UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF
 2                   SHERMAN DIVISION

 3  TIMOTHY JACKSON,              )
                                  )
 4       Plaintiff,               )
                                  )
 5  vs.                           )  CASE NO. 4:21-CV-00033-ALM
                                  )
 6  LAURA WRIGHT, et al.,         )
                                  )
 7       Defendants.              )

 8  ************************************************************

 9          VIDEOTAPED ZOOM ORAL DEPOSITION OF

10           REBECCA GEOFFROY-SCHWINDEN, Ph.D.

11                 September 27, 2024

12                 (Reported Remotely)

13  ************************************************************

14       VIDEOTAPED ORAL DEPOSITION OF REBECCA GEOFFROY-

15  SCHWINDEN, Ph.D., produced as a witness at the instance

16  of the plaintiff and duly sworn, was taken in the

17  above-styled and -numbered cause on the 27th day of

18  September, 2024, from 1:33 p.m. to 4:38 p.m., before

19  Kim D. Carrell, Certified Shorthand Reporter in and for

20  the State of Texas, reported remotely by computerized

21  stenotype machine at the University of North Texas

22  System, 801 North Texas Boulevard, Gateway Suite #308,

23  Denton, Texas, pursuant to the Federal Rules of Civil

24  Procedure and the provisions stated on the record or

25  attached hereto.
</pre>

                              APPEARANCES

FOR THE PLAINTIFF:

     Mr. Michael Thad Allen
     ALLEN LAW, LLC
     P.O. Box 404
     Quaker Hill, CT 06375
     Telephone: 860.772.4738 - Fax: 860.469.2783
     E-mail: M.allen@allen-lawfirm.com


FOR THE DEFENDANTS:

     Ms. Mary Quimby
     Assistant Attorney General
     General Litigation Division
     P.O. Box 12548, Capital Station
     Austin, Texas 78711
     Telephone: 512.463.2120 - Fax: 512.320.0667
     E-mail: Mary.Quimby@oag.texas.gov

        - and -

     Mr. Renaldo Stowers  (Appearing Live)
     University of North Texas System
     Office of General Counsel
     801 North Texas Boulevard
     Denton, Texas 76201
     Telephone: 940.565.2717 - Fax: 940.369.7026
     E-mail: Renaldo.Stowers@untsystem.edu


ALSO PRESENT:

     Mr. Timothy Jackson, Plaintiff


VIDEOGRAPHER:

     Mr. Jason Warner
     Legal Video Group
     lvg.dallas@gmail.com
     214-598-5229

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24    3

1                    I N D E X

2                                              PAGE

3        Appearances.................................    2

4        Exhibit index..............................    4

5        Stipulations...............................    5

6   REBECCA GEOFFROY-SCHWINDEN, Ph.D.

7        Direct Examination by Mr. Allen...........    6

8

9

10  Changes and Signature Pages.....................  124

11  Reporter's Certificate..........................  126

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBITS

2    NUMBER              DESCRIPTION              MARKED

3    Exhibit 1    Re-Notice of Taking Deposition........    7

4    Exhibit 2    Emails Re: Grad Student Statement on
                  JSS (UNT 000355 - 000356).............   53
5
     Exhibit 3    Ad Hoc Review Panel Report (Exhibit D)
6                 (JACKSON000208 - 000233)..............   66

7
     Exhibit 4    Email Chain Ending 7-30-20, Ragland to
8                 Geoffroy-Schwinden, et al.
                  (UNT 000276 - 000288)................   72
9
     Exhibit 5    Email Re: Faculty Statement on Journal
10                of Schenkerian Studies, 7-30-20
                  (UNT 000425).........................   78
11
     Exhibit 6    Emails Re: Journal of Schenkerian
12                Studies, 7-29-20
                  (UNT 000377 - 000378)................   82
13
     Exhibit 7    Email, 7-30-20, Geoffroy-Schwinden to
14                Brand (UNT 000417)...................   86

15   Exhibit 8    Drafts of the Faculty Statement
                  (UNT 000427 - 000431)................   90
16
     Exhibit 9    Students' Statement Linked to Draft
17                Faculty Statement....................   97

18

19

20

21

22

23

24

25

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*      5

```
 1              A G R E E M E N T S

 2  DEPOSITION OF:  REBECCA GEOFFROY-SCHWINDEN, Ph.D.

 3  DATE:  SEPTEMBER 27, 2024

 4  CAUSE NO. 4:21-CV-00033-ALM

 5  THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:

 6          (X)   Notice
            ( )   Agreement
 7          ( )   Court Order
            ( )   Subpoena
 8          (X)   Rules of Federal Civil Procedure

 9
    ORIGINAL TO:
10
            ( )   Witness
11          (X)   Witness's attorney   (Ms. Quimby)
            ( )   Producing attorney
12          ( )   Signature waived

13
    NUMBER OF DAYS FOR SIGNATURE
14
            ( )   20 days
15          (X)   30 days
            ( )   Other:
16

17  MISCELLANEOUS:

18          ( )   Any objection made by one party good for
                  all parties.
19
            (X)   An unsigned copy may be used at any trial,
20                hearing, or arbitration proceedings.

21

22

23

24

25
```

```
1              P R O C E E D I N G S
2              THE VIDEOGRAPHER:  Today is September 27,
3  2024.  The time to 1:33 p.m.  We are on the record.
4              REBECCA GEOFFROY-SCHWINDEN, Ph.D.,
5  having been first duly sworn, testified as follows:
6                        EXAMINATION
7  BY MR. ALLEN:
8       Q.   Professor Geoffroy-Schwinden, can I ask you
9  to state your full name for the record, please?
10      A.   Sure.  It's Rebecca Dowd Geoffroy-Schwinden.
11      Q.   How would you like me to refer to you today?
12      A.   You can call me Dr. Geoffroy-Schwinden.
13      Q.   Okay.  If I say Professor Geoffroy-Schwinden,
14  would that be okay, too?
15      A.   Yeah, that's fine.
16      Q.   I can't promise I won't mix them up, so I want
17  to try to get that in ahead of time.
18      A.   Okay.
19              MR. ALLEN:  Can the attorneys of record
20  put their appearances in the record?
21              My name is Michael Thad Allen for the
22  Plaintiff, Timothy Jackson.  And I'm here with my
23  client, Timothy Jackson, today.
24              MS. QUIMBY:  My name is Mary Quimby.  I'm
25  an Assistant Attorney General with the Texas Attorney
```

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

 1  General's office.  I represent the Defendants in this

 2  matter, and Dr. Geoffroy-Schwinden in this deposition.

 3             MR. STOWERS:  Renaldo Stowers, Deputy

 4  General Counsel, University of North Texas System.

 5             (Deposition Exhibit Number 1 marked.)

 6      Q.   Dr. Geoffroy-Schwinden, I'm going to introduce

 7  an exhibit, which will happen from time to time in the

 8  course of this deposition.  I'll be presenting you

 9  documents, asking you questions about them.

10             And the first thing I want to do is introduce

11  what's called a notice of deposition, and then I'll

12  explain some of the sort of loose rules of the road for

13  conducting the deposition.

14             Can I ask you if you can see that exhibit,

15  please?

16      A.   Yes.  I see the top of the page.

17      Q.   Okay.  Now, this is a good tutorial.  If, at

18  any time, you want more time to read an exhibit, I am

19  going to try to dump them in the chat, so that your

20  attorney can also share them with you simultaneously if

21  that's more convenient for you.  But feel free to ask

22  me at any time to navigate through, if you want to read

23  something, you need more time to read.  No one wants

24  you to answer a question when you haven't been able to

25  read the document that you are being asked about.  Is

 1  that clear?

 2      A.   Yes.

 3      Q.   Do you recognize this document?  And I'm just

 4  going to scroll down to the bottom of page 1.  You'll

 5  see it has two pages, so I'm going to scroll to the next

 6  page.  And that's all there is to it.

 7           Have you had a chance to review this document?

 8      A.   You know, I don't think I have.  Can I have a

 9  moment, please?

10      Q.   Absolutely.

11      A.   And then can you scroll down, please?  Okay.

12      Q.   So just to restate the question, do you

13  recognize this re-notice of taking deposition?

14      A.   Yes, yes.

15      Q.   And is it accurate to say you appeared today in

16  response to this re-notice of taking deposition?

17      A.   Yes.

18      Q.   Okay.  And I don't have any further questions

19  about that document.  We're just going to introduce it

20  into the record.

21           And then, of course, let me go over some of

22  the other sort of loose rules of the road here.

23           Can I ask you to state for the record

24  anything, to your knowledge, that would prevent you

25  from testifying truthfully today?

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

```
 1        A.    No, there's nothing.
 2        Q.    You are not on any medications that would
 3   affect your memory?
 4        A.    No.
 5        Q.    You are not suffering from an illness or a
 6   mental condition that would affect your ability to
 7   testify?
 8        A.    No.
 9        Q.    Thank you.  As I ask you questions, your
10   attorney may object from time to time.  In fact, it's
11   almost inevitable that that will happen.  This is part
12   of building the record for the Court.  As you probably
13   already understand, this is a very formal conversation
14   meant to create a record for the Court and meant to
15   discover what you would say when you testify at trial.
16   The objections are part of building that record.  It
17   does not relieve you of the obligation to answer the
18   question, however.  Is that clear?
19        A.    Yes.
20        Q.    There are some few exceptions, like
21   attorney-client privilege, and they will be very clear
22   if they come up, which they usually don't, because your
23   attorney will almost certainly instruct you not to answer
24   the question.  But for the most part, unless that comes
25   up, you will have to answer questions that are asked
```

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

 1  despite objections.  Okay?

 2      A.    Okay.

 3      Q.    Likewise, because it's a formal record for

 4  the Court, there are many things we do in ordinary

 5  conversations that are obviously normal.  We nod our

 6  heads, we say um-hum and uh-huh.  But for the purposes

 7  of the court reporter's ability to keep a clean record,

 8  I need to ask you to answer audibly to my questions

 9  today; is that clear?

10      A.    Yes.

11      Q.    Likewise, I'll try to answer audibly and ask

12  questions clearly.  However, you may want clarification

13  of questions from time to time, and that is perfectly

14  normal and acceptable.  So if, at any time, you want

15  clarification of what I've asked you, please interrupt

16  me.  It's not anything that is taken against the

17  witness.  I'd much rather have you answering a clear

18  stated question than one that you don't understand

19  obviously.  Is that clear?

20      A.    Yes.

21      Q.    By the same token, if you do not ask me for

22  a clarification, I will assume that you understand the

23  question as asked.  Is that also clear?

24      A.    Yes.

25      Q.    Thank you.  Now, I'll just ask you -- and I'll

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*

 1  try to abide by the same rules, that we not talk over

 2  each other.  That's probably the last rule of the road.

 3  Is that clear?

 4      A.    Yes.

 5      Q.    All right.  Can you explain for the record what

 6  you have done to prepare for today's deposition?

 7      A.    I met with my attorneys.

 8      Q.    I'm not going to ask you what you discussed

 9  with them, but I am entitled to know approximately how

10  long you met with your attorneys.

11      A.    Maybe -- I think it was maybe three hours.

12      Q.    Uh-huh.  Did you review any documents in

13  preparation for this testimony?

14      A.    Yes.

15      Q.    What documents did you review in preparation

16  for your testimony today?

17      A.    I reviewed the faculty statement on the Journal

18  of Schenkerian Studies and the grad students' statement

19  that that faculty statement linked to.

20      Q.    Any other documents that you reviewed in

21  preparation for testimony today?

22      A.    No.

23      Q.    Okay.  Did you talk to anyone else in addition

24  to your attorneys?

25      A.    About what?

1      Q.    About this deposition.

2      A.    No.

3      Q.    So I assume there was no one else in the room

4  with you and your attorneys when you were speaking with

5  them, correct?

6      A.    There was no one else in the room.

7      Q.    Okay.  All right.  I just briefly want to ask

8  you some questions about your career, your education,

9  background, things that you would likely have put on

10  your curriculum vitae and things like that.

11          Can I just ask you to state for the record

12  your educational career or the milestones in your

13  educational career starting with your undergraduate

14  degree up through whatever the last degree you have

15  received, including the school, the year, and the

16  nature of the degree?

17      A.    Okay.  I graduated from Penn State University -

18  Schreyer Honors College in 2007 with degrees with

19  distinction in history and international studies and

20  minors in French and music.

21          I earned a Master of Arts degree in Musicology

22  from Duke University in 2011 and a Ph.D. in Musicology

23  from Duke University in 2015, with a graduate certificate

24  in history and anthropology.

25      Q.    So the Duke degrees were primarily in

1  musicology.  Did I understand that correctly?

2       A.    Not quite, because I also did -- the degrees

3  were in musicology, but I also did the graduate

4  certificate in history and anthropology.  So I did take

5  history and anthropology coursework, as well.

6       Q.    Okay.  Are there any other degrees,

7  certificates, anything of that nature, that you've

8  earned up to the present?

9       A.    I did get a certificate in college -- oh, wait,

10 no, I didn't.  No, that's it.

11      Q.    Okay.  So you graduated in 2011 with your

12 master's in musicology.  Was that part of a continuous

13 program that you continued through right up to the end

14 of your Ph.D.?

15      A.    Yes.  So I started -- I started at Duke in 2009

16 and got the master's in 2011, along the way to the Ph.D.

17 that I got in 2015.

18      Q.    So it sounds like there was two years between

19 your degree at Penn State in history and international

20 studies with -- did you say a minor in French and music?

21      A.    That's correct.

22      Q.    And in 2009, you started the Duke graduate

23 program.  What did you do in those intervening two

24 years?

25      A.    I worked as a legal assistant.

1      Q.    Why didn't you become a lawyer is the obvious

2  question.

3      A.    I mean, look what I'm missing out on.

4      Q.    Okay.  And so I assume that was for a law firm

5  of some sort?

6      A.    It was.

7      Q.    Okay.  So in the same way that you've just

8  described your educational career, can you describe the

9  course of your professional career in academia, starting

10  with your graduation in 2015 from Duke?

11      A.    Sure.  So I graduated in May of 2015 from Duke,

12  and I drove to Texas in July, and I started working as an

13  assistant professor in music history at the University of

14  North Texas in Denton.  And I was in that position until

15  I was promoted to associate professor with tenure in

16  2021, June 2021, I think.

17      Q.    Um-hum.  And have you been promoted to full

18  professor?

19      A.    Nope.

20      Q.    And you remain an associate professor at this

21  time, right?

22      A.    Yes.

23      Q.    And it's only been, it sounds like, three years

24  since you were granted tenure?

25      A.    Yes, that's correct.

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*

```
 1        Q.    Okay, great.  Do you have any administrative
 2   duties at the University of North Texas?
 3        A.    Since the -- well, in the fall of '22, school
 4   year '22-'23, and now '24-'25, I'm the program
 5   coordinator of an undergraduate degree.
 6        Q.    What's the undergraduate degree that you're
 7   coordinating or working with?
 8        A.    It's called -- I am coordinating it now.
 9        Q.    Okay.
10        A.    But it didn't seem clear, because last year,
11   I was on leave, so I wasn't doing that work last year.
12   It's called Critical Studies in Music and Society.
13        Q.    And you said you went on leave.  Was that a
14   sabbatical?
15        A.    It was -- well, it was -- I was on a hundred
16   percent research, because I had a research fellowship for
17   the year, so...
18        Q.    Who granted the fellowship?
19        A.    The National Endowment for the Humanities and
20   the Hagley Museum and Library.
21        Q.    Well, congratulations.
22        A.    Thank you.
23        Q.    Have you been granted any other awards,
24   fellowships, scholarships, things of that nature, not
25   including scholarships you might have had as a graduate
```

1   student, but as a professor?

2        A.    Yes, I have.

3        Q.    Can you state them for the record, please?

4        A.    How -- how down in the weeds do you want me to

5   get?  Because it could be like an annoying list of like

6   small EBT grants.  I may not remember them all.

7        Q.    No, not the travel --

8        A.    Not that I'm so prolific, but...

9        Q.    -- the travel to the music history conference

10  in Odessa or something like that.

11       A.    Yeah.

12       Q.    Let's say anything that would have granted you

13  time off or travel visiting professorships, something of

14  that nature.  A Fulbright -- a significant grant, if we

15  can understand one.

16       A.    Anything that gave me time off.  The only thing

17  is the NEH fellowship that I had last year that gave me

18  time off.  I've had some funding to do like summer

19  research that was -- some of it was internal from UNT.  I

20  had another NEH summer stipends to do research abroad.

21  But those, they didn't grant me time off.

22       Q.    I understand.  In that leave, that time you had

23  leave on the NEH grant, did you leave the University of

24  North Texas and go somewhere else to do your studies and

25  research?

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

```
1        A.    Um-hum, yes.  I was away.

2        Q.    Was that when you were affiliated with the

3   Hagley Museum?

4        A.    Yes.

5        Q.    And I believe that's also affiliated with the

6   University of Delaware.  Am I wrong?

7        A.    I think they maybe have some programming with

8   them.  They have some programming with them, but I didn't

9   do anything with the University of Delaware.

10       Q.    Okay.  So your primary affiliation was the

11  Hagley Museum?

12       A.    Yes.  Well, it's an NEH Hagley fellowship.

13       Q.    Oh, wow.

14       A.    So it's an NEH site-specific fellowship.

15       Q.    Yeah.

16       A.    So you know, yeah.  I was doing my research

17  at Hagley.  I lived there.

18       Q.    Um-hum.  And just because the jury and the

19  Court may not know what the Hagley Museum is, can you

20  just briefly describe in two or three sentences what

21  the Hagley Museum is?

22       A.    Sure.  It is the location of the DuPont

23  family's original gunpowder mill that opened in 1802.

24  And it's now a museum and library.  And the museum is

25  dedicated to American technological innovation.  And
```

1  the library is mostly about the history of business.

2      Q.   Um-hum.  Thank you.

3      A.   Sure.

4      Q.   Approx -- can you just state for the record

5  your publication record?  Articles, books, articles in

6  edited books, anything of that nature?

7      A.   I will do -- yeah, I'll try my best.

8      Q.   Please.

9      A.   So my book is -- what would you like?  Like the

10 titles?  The --

11     Q.   Well, let's start.  Let's start -- that's

12 probably too much of a mouthful, so let me strike that

13 question, and I'll ask you in series.

14     A.   Okay.

15     Q.   How many articles have you published as a --

16 I guess you're a music historian.  Is that what you would

17 describe yourself as?

18     A.   Yes.  I'm a music historian.

19     Q.   And other witnesses have testified that the

20 division you are in is the Music History, Theory, and

21 Ethnomusicology division, and that is split up itself

22 into three different subparts, and you're in the history

23 one?

24     A.   That's correct.

25     Q.   Okay.  And so as a music historian, or as an

1  academic in general, can you explain how many articles

2  you've published, please?

3        A.    Five in peer-reviewed journals.

4        Q.    Um-hum.  Have you published any articles that

5  were not peer reviewed?

6        A.    Like in a -- in a journal, or like what kind of

7  publication do you mean?

8        Q.    Well, it's sort of a question for you.  I don't

9  know because I'm not a music historian.  I'm asking you

10  if you've published peer-reviewed articles or articles

11  that were not subject to peer review.

12        A.    Not that came out in a journal, not that came

13  out in a scholarly journal.

14        Q.    Okay.  It sounds like you have published

15  articles that were not subjected to the peer review.

16  So where did they appear?

17        A.    Well, what I'm thinking of is a -- like a

18  newsletter from a society.

19        Q.    Okay.

20        A.    That would be done under editorial review, so

21  not an academic journal.

22        Q.    By editorial review, do you mean that the

23  editors of that publication did work with you, reviewed

24  it, perhaps made suggestions, and it was eventually

25  published?

 1        A.    For this newsletter, yeah.  So it's kind of

 2    more like a newspaper or a magazine.  Like it doesn't

 3    have like a review process because it's just -- you know,

 4    it's a scholarly newsletter.

 5        Q.    Sure.  Is that something you would put in

 6    your CV?

 7        A.    I put it under scholarly.  I put it under

 8    like a separate category, because it's not peer reviewed,

 9    yeah.

10        Q.    Right, right.  Have you published articles in

11    scholarly books?

12        A.    Yes.  Like do you mean like book chapters in an

13    edited volume?

14        Q.    An edited volume, book chapters of any sort.

15    And I'm going to ask you if you've published a book in a

16    second.  I just want to know if you've published portions

17    of a book, a chapter, article, however you want to

18    characterize it.

19        A.    Yeah, I have.

20        Q.    Uh-huh.  And was that -- well, let me back up.

21              When you say peer review, what do you mean by

22    that?

23        A.    So when I say peer review, I mean that -- I

24    just mean to say that it got sent out to people who

25    wrote reports on it and give a review -- recommendation

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

```
 1  about whether it should be published or not, and then
 2  send it back.
 3       Q.   Right.  And was that process double-blind?
 4       A.   For which publication?
 5       Q.   For the peer-reviewed publications that you
 6  listed.  I believe, five.  Well, you haven't list them,
 7  but you named the number five.  Were those blind peer
 8  review?
 9       A.   Yes, they were all -- those were blind peer
10  reviews.
11       Q.   And by blind peer review, you understand
12  that we mean where neither the reviewer, nor you as the
13  author, are supposed to know each other's identity,
14  right?
15       A.   That's usually what we mean by blind peer
16  review.
17       Q.   Okay.
18       A.   Yeah, you don't know the writer or the
19  reviewer.
20       Q.   Okay.  So I should have asked that at the
21  beginning, but now fast-forward to the articles you've
22  published in a book.  What review process were those
23  subjected to?
24       A.   It was different for different books.
25       Q.   Um-hum.  Well, let's back up and ask, how
```

1  many of those have you published?  Not books.  I mean,

2  articles in books.

3      A.   Sorry.  I'm kind of drawing a blank.  I --

4  books in circulation.  Okay, I remember.  I knew I was

5  forgetting one.  I think -- I'm sorry.  I would have to

6  look at my CV.  I think I've published three.

7      Q.   And were those subjected to any kind of review?

8      A.   They definitely went through review.

9      Q.   Were they reviewed by the editor of the volume?

10     A.   I'd have to take them each individually --

11     Q.   Okay.

12     A.   -- and try to remember.

13     Q.   So let's -- yeah.  Let's do that then.

14     A.   Okay.

15     Q.   What was the first in time?  That's probably

16  the hardest to remember because it was longer ago.  But

17  we'll start with that for lack of a better system.

18     A.   Okay.  So that one was about digital approaches

19  to historical acoustemologies.  Roughly, that was the

20  title.

21     Q.   Cosmologies?

22     A.   No.  That would be funny.  Acoustemologies.

23     Q.   Acoustemologies, sorry.  And how was that

24  one reviewed before publication?

25     A.   You know, I don't totally remember.  I

1  wrote -- like I was writing that when I was graduating

2  from grad school, and it's all a little fuzzy.  But I

3  will say that I remember going back and forth several,

4  several times with the editors of the volume.

5      Q.    Um-hum.

6      A.    And I know that that whole volume was peer-

7  reviewed, but I do not remember.  I don't remember the

8  process.

9      Q.    Yeah, that's fine.

10     A.    Okay.

11     Q.    And again, incidentally, if you don't know

12  something, you don't know.  So you can just say you don't

13  know.

14     A.    Oh, okay.  Well, I feel bad.  You are asking

15  me, so...

16     Q.    No.  Well, I might feel bad, too, but we can

17  only ask for what you know.

18          So the second article in time, what was that?

19     A.    Okay.  I think the second one was in a volume

20  called like Musical and Theatrical Circulations in

21  Eighteenth-Century Europe.

22     Q.    Um-hum.

23     A.    And it was about the building of the Paris

24  Conservatory's first music library.

25     Q.    Um-hum.  And about what year did that come out,

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1   give or take, if you know?

2        A.    I think it came out in 2018.

3        Q.    Okay.  And do you recall the process of review

4   that that article was subjected to?

5        A.    I don't recall much about it.  I do -- I do

6   believe I remember getting like a reader's report that

7   was specific to my chapter, like a blind reader's report

8   that was very specific to my chapter.  And I don't know

9   about the process that the full book went through

10  because, you know, that's the editor's thing.

11       Q.    Um-hum, right.  Sure, sure.  And the last

12  article you published in a scholarly volume or book?

13       A.    That was more recent, in a Bloomsbury Handbook

14  of Art and Music.

15       Q.    And was that subjected to peer review?

16       A.    That was -- all of my back and forth was

17  peer-reviewed by the editors.  And then they managed --

18  I don't know what they were doing with the review process

19  because, again, it's the editor's thing.  So they managed

20  all of that peer review and funneled the -- I guess the

21  information to me.

22       Q.    So they may have subjected it to some review

23  process that you weren't privy to.  But as far as you

24  knew, you were communicating with the editor, or editors,

25  if there's more than one directly, right?

 1      A.    Well, Bloomsbury Handbooks go through peer
 2 review, I mean --
 3      Q.    No, I know, I know.  I'm not suggesting they
 4 don't.
 5      A.    -- but I'm the one communicating with the
 6 editors.
 7      Q.    Okay.  And you don't remember getting sort of a
 8 blind report on that one?
 9      A.    No.
10      Q.    Okay.  Have you ever published a monograph?
11      A.    Yes.
12      Q.    And what's that book?
13      A.    It's called From Servant to Savant.  And it was
14 published with Oxford in 2022.
15      Q.    And was that accepted for publication at the
16 time you were going up for tenure?
17      A.    It was.  I'm trying -- it was.  I'm trying to
18 remember if I had the final -- I had a contract.  I'm
19 trying to remember if they had gone through that last
20 level where they talk to the board at the publisher.
21      Q.    Right.
22      A.    But I had -- it was under contract when I went
23 up for tenure.
24      Q.    Sure.  And have you published a scholarly
25 book since that time?

1        A.    No, I wish I were that prolific.

2        Q.    Okay, good.  So as you probably have gathered,

3    this lawsuit is about what I will call the Schenker

4    controversy surrounding the Journal of Schenkerian

5    Studies that used to be published by the University of

6    North Texas Press.  If I say the Schenker controversy,

7    do you know what I'm talking about?

8        A.    No, because -- well, could you be more specific

9    about what that comprises?

10       Q.    Sure.  You know the Journal of Schenkerian

11   Studies, correct?

12       A.    Yes.

13       Q.    Now, I know you're a music historian and

14   not a music theorist.  But I'll ask you, what is your

15   understanding of what the Journal of Schenkerian Studies

16   published?

17       A.    Articles to do with Schenkerian analysis.

18       Q.    And were you aware that the -- excuse me.

19   Strike that, please.

20             Were you aware that the Journal of Schenkerian

21   Studies published a Volume 12 in July of 2020 -- 2020,

22   yeah?

23       A.    Yes.

24       Q.    Did you -- are you a member of the Society

25   for Music Theory?

1          A.    No.

2          Q.    Was it in any way part of your academic

3    activities to -- let me strike that.

4               In the course of your academic studies in

5    2019, 2020, were you aware of a plenary talk by the

6    New York Hunter College, the City University of New

7    York Hunter College, Professor Philip Ewell, who gave

8    a plenary address in February of 2019?

9          A.    I had heard people say that he had.

10          Q.    Did you ever read a version of that plenary

11    address that was published in Spectrum?  I believe the

12    journal is called Spectrum maintained by the Society for

13    Music Theory.

14          A.    No, I never did.

15          Q.    Did you listen to Professor Ewell's talk when

16    it was posted online?

17          A.    No.

18          Q.    Did you understand that the Journal of

19    Schenkerian Studies published the Symposium in response

20    to Philip Ewell's, let's say, for lack of a better word,

21    scholarship?

22          A.    Do you mean their response to the -- to this

23    talk you were asking me about?

24          Q.    That's what I'm trying to find out, what you

25    know about it.  Right?  So the Volume 12 publishes the

 1  Symposium, right?

 2      A.   Yes.

 3      Q.   And as you understood it at the time, what was

 4  that Symposium about?

 5      A.   It was about Professor Ewell's talk, I guess,

 6  yeah.  Or just about his work, yeah.

 7      Q.   And his talk at the Society for Music Theory

 8  conference in 2019?

 9      A.   Yeah.  I think so, yeah.

10      Q.   Okay.  How did you learn about -- well, let

11  me strike that.

12           At some point, did you come to learn that

13  there was a controversy surrounding Volume 12 of the

14  Journal of Schenkerian Studies?

15      A.   I learned that a lot of people were talking

16  about it, yes.

17      Q.   Um-hum.  When?

18      A.   I don't remember the date.

19      Q.   Do you remember how you learned?

20      A.   I do.

21      Q.   Can you explain for the record how you learned

22  about this controversy?

23      A.   I got a text message about it.

24      Q.   From whom?

25      A.   From April Prince.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

1          Q.    Who is April Prince?

2          A.    She's a -- at the time, was a senior lecturer.

3     Now, she's a principal lecturer of music history at the

4     University of North Texas.

5          Q.    Is she a colleague then?

6          A.    Yes.

7          Q.    Okay.  What did she say in these text message

8     exchanges with you?

9          A.    I don't remember the details of what she said

10    about it.  She just forwarded a picture of like people's

11    Twitter posts.

12         Q.    So it was -- was it your understanding from

13    your communications with -- did you say April Prince?

14    Did I get her name right?

15         A.    Um-hum.

16         Q.    So you understood from April Prince that, for

17    lack of a better word, it was blowing up on Twitter?

18         A.    Well, I didn't know exactly what was going

19    on.  I just knew people were talking about UNT on

20    Twitter, like a couple of people.  You know what I mean?

21    I mean, I did not know the extent of it or anything.

22         Q.    Okay.

23         A.    So at that time, I didn't know if it was like

24    one person or not.

25         Q.    Sure.  And if I said this was July 2020, late

 1  July 2020, does that sound accurate to you?  Does that

 2  help refresh your memory of when this was?

 3      A.   Yeah, late July 2020 sounds correct.  I just do

 4  not remember the dates.  I mean, I was -- yeah.

 5      Q.   And backing -- oh, sorry.  Were you finished?

 6      A.   No, that's good.

 7      Q.   I was breaking that rule of interrupting you.

 8  See?  I apologize.

 9           So backing up to the Journal of Schenkerian

10  Studies, please tell the Court how you understood the

11  Journal of Schenkerian Studies was organized.

12      A.   I did not know.

13      Q.   Okay.

14      A.   I didn't know.  I knew it was published out

15  of our department, and it was published out of the music

16  theory area, but I didn't know about its organization

17  honestly.

18      Q.   Okay.  Are you aware that there's another music

19  theory journal published by the University of North Texas

20  Press that's also published out of the MHTE?

21      A.   Yes, I think Theoria.  Is that what you're

22  referring to?  Yes, I've heard of it.

23      Q.   That's a nice guess.

24      A.   Yeah.

25      Q.   And who edits that?

1       A.    I don't know.  Do you mean now or then?

2       Q.    Either one.

3             Who edited in 2020, if you know?

4       A.    I don't know.  I don't know.

5       Q.    Okay.  All right.  Do I understand by your

6  answers that you don't really read Theoria either for

7  your work?

8       A.    Yeah, you do.  Yes, that's correct.  I do not.

9       Q.    And of course, I'm not imputing some sort of

10 ignorance to you.  It's not in your field, right?

11      A.    Correct, yeah.  I read musicology, music

12 history journals.  I do not regularly read music theory

13 journals, no.

14      Q.    Okay.  And since you didn't know who the editor

15 was in 2020, I suppose it would be accurate to say that

16 you don't know how Theoria was organized either?

17      A.    I have no idea.  No, I don't know.

18      Q.    Okay.  All right.  So let's go then to the time

19 you first learned that there was something being said on

20 Twitter about UNT and the Journal of Schenkerian Studies

21 when you were corresponding with your friend, April

22 Prince, or I'll say colleague, let's say.  What happened

23 after that?

24            MS. QUIMBY:  Objection, form.

25      A.    Do you mean that day or --

1      Q.    Well, in as much detail as you can remember
2  now, what happened next?  You know, what happened next
3  with regard to this issue that was brewing over the
4  Journal of Schenkerian Studies?
5              MS. QUIMBY:  Objection, form.
6      A.    I mean, I don't know over all.  Do you want
7  like a timeline of the day or --
8      Q.    Not so much the day.  Just you know, your
9  experience of what was happening.  I mean, I understand
10 it's now what, four years later, so you're unlikely to
11 say, oh, my gosh, at 2:00 p.m. on July 27th or something.
12 It's not about that.  Trust me.  I just am trying to find
13 out what you remember about how this controversy
14 developed.
15     A.    I might need some prompting if you could help
16 me.
17     Q.    Sure.  Let's ask a few more questions, and
18 maybe that will help jog your memory.
19     A.    Yeah, yeah.
20     Q.    Do you remember what the Journal was accused of
21 doing that made people so, I don't know, exercised on
22 Twitter?
23             MS. QUIMBY:  Objection, form.
24     A.    Well, I didn't read -- you know, I didn't read
25 a lot of it.  So I'm not on social media, so I didn't

 1  read many -- I know, I'm like my husband says.

 2  But I didn't read a lot of those tweets or anything; just

 3  the ones, the couple that were sent to me.  And they know

 4  they were upset about, you know, the response to Ewell,

 5  I guess.

 6      Q.    Un-hum.  And I understood from what you said

 7  earlier that you had never read the version of Philip

 8  Ewell's plenary address that was published in Spectrum,

 9  correct?

10      A.    That's correct.

11      Q.    And you never viewed his talk at the SMT 2019

12  plenary session?

13      A.    That's correct.

14      Q.    Did you read Volume 12 of the Journal of

15  Schenkerian Studies?

16      A.    I skimmed parts of it and read parts of it.

17      Q.    Can you describe in as much detail as you can

18  remember what parts you skimmed and what parts you read?

19      A.    Yeah, inasmuch as I can remember.  I looked

20  at Nick Stoia's article.  He actually ended up as a

21  professor at Duke after I left there, and so I looked at

22  Nick Stoia's article.  That wasn't part of the Symposium,

23  but I had opened the journal, so I looked at Nick's

24  article.

25      Q.    Did he publish one of the mainline articles?

Rebecca Geoffroy-Schwinden, Ph.D.       9/27/24

 1  I'll say -- I'll just represent for the record, there
 2  were three articles that were more or less ordinary,
 3  vanilla, peer-reviewed articles, and then there was the
 4  Symposium, which was separate.  Does that correspond to
 5  your memory of the journal?
 6            MS. QUIMBY:  Objection, form.
 7       Q.   Volume 12, I mean.
 8       A.   I don't remember the number.  But I know --
 9  like I know there were articles that didn't have to do
10  with the Symposium.
11       Q.   Okay.  And Nick Stoia's article was one of
12  those?
13       A.   I believe so, yeah.
14       Q.   Okay.  What was your impression of that
15  article?
16       A.   I thought it was good.  I thought it was good.
17  Nick does good work.
18       Q.   Do you know him otherwise?
19       A.   No, I don't.  No.  I mean, I met him in passing
20  at Duke when he was interviewing, I think, maybe.
21       Q.   Uh-huh.
22       A.   But that's all.  So anyway, I remember Nick's
23  article being in it.
24       Q.   And did it strike you that Nick Stoia's article
25  was below the standards you would expect of an academic

```
 1   journal in the music field?
 2               MS. QUIMBY:  Objection, form.
 3        A.    I mean, I don't remember.  Are you asking me to
 4   like go into detail about my evaluation of Nick's
 5   article?  I mean, I looked at Nick's article.
 6        Q.    No.  Just in general terms, in reviewing Nick
 7   Stoia's article --
 8        A.    Uh-huh.
 9        Q.    -- did you have any concerns for the quality of
10   scholarship that was appearing to the Journal of
11   Schenkerian Studies?
12        A.    Okay.  I didn't -- okay.  Let's not overstate
13   how much I read the journal.  I didn't really review it,
14   so I don't feel comfortable, on record, talking about
15   Nick Stoia's work from four years ago.
16        Q.    Yeah, that's fine.
17        A.    Yeah.
18        Q.    Nothing alarmed you that this piece by Nick
19   Stoia was somehow egregiously poor quality or something
20   of that nature, did it?
21               MS. QUIMBY:  Objection, form.
22        A.    I just don't remember.
23        Q.    Okay.  What else did you read or skim in the
24   journal --
25        A.    The Symposium.
```

1        Q.    The Symposium?  Did you read all of the

2   Symposium?

3        A.    I read some of it.  I skimmed some of it.

4        Q.    Okay.  What did you read?  Let's start with

5   that.  Do you remember which articles you read in

6   particular?

7        A.    I read an article by my colleague, Tim Jackson.

8        Q.    Um-hum.

9        A.    I remember reading a piece that was anonymous.

10  I know I looked at a piece that referenced things about

11  Abraham Lincoln.

12       Q.    Um-hum.

13       A.    I don't -- I don't really remember the other

14  details.

15       Q.    Okay.  And do you remember anything about the

16  articles you skimmed?

17       A.    What about them?

18       Q.    Which ones they were, who the authors were.

19       A.    Like I said, I remember that I looked at Tim's.

20  I remember that there was an anonymous one.

21       Q.    Okay.

22       A.    I haven't gone back to it since 2020.

23       Q.    And I understand.

24       A.    Yeah.

25       Q.    I'm just trying to find out what you know.

```
 1        A.   Yeah, yeah.  No, no, I know.

 2        Q.   So did you form an impression in that, you

 3   know, late summer, early fall of 2020, as to what this

 4   controversy was about?

 5             MS. QUIMBY:  Objection, form.

 6        A.   Which controversy?

 7        Q.   Sorry.  The controversy over Volume 12 of the

 8   Journal of Schenkerian Studies.

 9        A.   Do you mean like before, like when it came out,

10   or --

11        Q.   Well, sure.  Let's start with July.

12   July 2020.

13        A.   Okay.

14        Q.   Before the end of July, did you form an

15   understanding of what the controversy surrounding

16   Volume 12 of the Journal of Schenkerian Studies was

17   about?

18        A.   Yeah.  I mean, I knew people were talking about

19   it, yeah.

20        Q.   And what were the specific criticisms they

21   had of the Journal of Schenkerian Studies by the end of

22   July?

23             MS. QUIMBY:  Objection, form.

24        A.   Whose criticisms?

25        Q.   Well, that's what I'm trying to find out.
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

1  Were there criticisms being leveled at the Journal of

2  Schenkerian Studies in July of 2020?

3      A.    I believe so.

4      Q.    And do you remember in any detail what they

5  were?

6      A.    I remember that there was concern about its

7  contents.

8      Q.    And what were the concerns about its contents?

9      A.    The way that it went after Ewell and the way

10  that it dealt with race.

11      Q.    Um-hum.  And when you read the articles that

12  you read -- I understood -- I understand you didn't read

13  everything carefully, so it's not about that.  But in

14  what you did read, did you personally form an opinion

15  about the way it went after Ewell?

16      A.    Yeah.

17      Q.    And what was your impression and understanding,

18  as an academic music historian, of the way in which

19  Volume 12 of Schenkerian Studies -- or of the Journal of

20  Schenkerian Studies went after Ewell?

21      A.    I guess it was more just that he wasn't there.

22      Q.    Can you explain what you mean by that?  He

23  wasn't there?

24      A.    That there wasn't -- he wasn't part of the

25  issue.

1      Q.   The volume part?

2      A.   Yes.

3      Q.   And how about the second thing you mentioned,

4    dealing with race?  Did you form an understanding as an

5    academic music historian about how the Volume 12 of the

6    Journal of Schenkerian Studies dealt with race?

7      A.   Yes.

8      Q.   And what was your understanding of how the

9    Journal of Schenkerian Studies in July of 2020 had dealt

10   with race?

11            MS. QUIMBY:  Objection, form.

12     A.   Sorry.  Can you repeat the question?

13     Q.   Sure.  What was your understanding at that time

14   by the end of -- say, July 2020, of how the Journal of

15   Schenkerian Studies had dealt with race?

16            MS. QUIMBY:  Objection, form.

17     A.   Dealt with it?  Would you be able to rephrase

18   that?

19     Q.   Well, sure.  I was trying to use the words you

20   used when you were explaining what about the contents of

21   Volume 12 seemed to be creating controversy in July of

22   2020.  And I believe you said the way it went after

23   Ewell was one thing, and the way it dealt with race was

24   another.

25     A.   Well, those were -- so that was my response

1  to what -- like what people were talking about, about the

2  issue.

3      Q.   Okay, sure.  And then I still want to know what

4  your understanding of those issues was from your own

5  personal engagement with Volume 12 of the Journal of

6  Schenkerian Studies, and so that's why I'm asking.

7           Did you form an understanding of how Volume 12

8  dealt with race, in your words?

9      A.   Well, it wasn't -- it didn't seem like it was

10 situated in the scholarly literature about race.

11     Q.   All of Volume 12 or specific articles?

12     A.   Just some of them.

13     Q.   Uh-huh.  And was the article you reviewed by

14 Timothy Jackson one of those?

15     A.   Yes.

16     Q.   Okay.  So was there anything else that you

17 remember?  I want to come back to that in a second.  But

18 is there anything else, besides the way the volume went

19 after Ewell and the way the volume dealt with race, that

20 you remember being controversial in that July of 2020

21 time frame?

22     A.   Well, also, the having the anonymity of

23 authors.

24     Q.   How many authors were published anonymously?

25     A.   I think one.

1        Q.    Um-hum.  And what were -- what, to your

2   knowledge, were people saying in the field about

3   publishing an anonymous author?

4              MS. QUIMBY:  Objection, form.

5        A.    I might be conflating what I was thinking and

6   what other people were thinking, because I don't remember

7   specifically what people said.  I think it was just...

8        Q.    That's fine.

9        A.    Yeah.

10       Q.    Yeah.  So what did you think about an anonymous

11  piece being published in the Journal of Schenkerian

12  Studies?

13       A.    I was surprised.

14       Q.    And why were you surprised?

15       A.    You don't see that in peer-reviewed journals.

16       Q.    So were you aware that the Society for Music

17  Theory circulated, or at least people within the Society

18  for Music Theory circulated a petition condemning

19  Volume 12 of the Journal of Schenkerian Studies?

20       A.    I was aware of that, yes.

21       Q.    And it was signed by the vast majority of

22  members of the society?

23             MS. QUIMBY:  Objection, form.

24       A.    I don't know how many people signed it.

25       Q.    Do you remember it being a lot?

1        A.    Like compared to what?  Our societies are
2    really small.
3        Q.    I think Philip Ewell testified that it was
4    something like 900 people signed this.
5        A.    I have no idea about the number.
6        Q.    Well, I'm representing that to you, that it was
7    somewhere in the neighborhood of 900.
8        A.    Well, you can represent anything, but I don't
9    remember that.
10       Q.    I'm not saying that you do, and I'm not saying
11   it's from your personal experience.  But what I am going
12   to ask you is, does that sound like a lot of scholars?
13       A.    I don't know.  It depends if you're in a field
14   of 50,000 or two.
15       Q.    Well, you just said that your fields are very
16   small, right?
17       A.    Well, they feel that way.
18       Q.    Is music theory a pretty small field in your
19   experience?
20       A.    I mean, you know what?  I'm going to step
21   back from what I said because I genuinely do not know --
22       Q.    Okay.
23       A.    -- how many people are in the Society for Music
24   Theory.  I don't know how many people are music theorists
25   who identify that way.  I really just don't know.

 1      Q.    Okay.  No, that's fine.

 2            Was there any similar initiative in any kind

 3   of professional society for music history that you had

 4   more personal experience with?

 5                  MS. QUIMBY:  Objection, form.

 6      A.    There was nothing circulated about -- I'm

 7   trying -- there was nothing like a petition or anything

 8   in the American Musicological Society, no.

 9      Q.    Okay.  But it surprised you that there was

10   anonymous -- that some author had sought to publish

11   anonymously.  You said that, right?

12      A.    Yes.

13      Q.    And you did know that the Society for Music

14   Theory was condemning the volume, correct?

15                  MS. QUIMBY:  Objection, form.

16      A.    Yeah.

17      Q.    So in that light, were you truly surprised that

18   someone would not want to be known to have published a

19   controversial piece in the Journal of Schenkerian

20   Studies?

21                  MS. QUIMBY:  Objection, form.

22      A.    Well, people didn't sign a petition before they

23   did that, so you're kind of reversing the order of what

24   happened.  You are not understanding, so it was --

25      Q.    Okay.  Please help me.

1       A.    Yeah.  No, it was published anonymously, and

2   then the petition came out.  So it doesn't -- it was

3   just the order of events is not making sense to me here.

4       Q.    Oh, I understand.  But you -- so you think that

5   someone who suspected that this would be controversial

6   and then turned out to be correct about that --

7       A.    I have no idea what they suspected.

8       Q.    -- that's somehow surprising?

9       A.    I don't even know who they are.  I don't know

10  what it --

11      Q.    Of course, they're anonymous.  It's just

12  surprising that an anonymous author suspecting something

13  is going to be controversial didn't want to be known,

14  that that surprises you.

15      A.    No.  I just -- you are really speculating.

16  Like --

17      Q.    I'm speculating?

18      A.    -- the deposition.  We're talking -- I don't

19  know what the anonymous author was concerned about.  I

20  don't know who they are.

21      Q.    But you found it strange.  Did you find it

22  unacceptable?

23      A.    Yes.

24      Q.    Why?

25      A.    It's unusual in a peer-reviewed journal to have

1  anonymous publications.

2      Q.    What would -- what do you think would happen if

3  that person was known?

4      A.    I have no idea.

5      Q.    You have absolutely no idea?

6      A.    No, I don't.

7      Q.    Well, you know what happened to Timothy

8  Jackson, right?

9      A.    No, I don't.

10     Q.    You don't?  You were in his department.

11     A.    What do you mean?

12     Q.    Did you -- you don't have any idea what

13  happened to Timothy Jackson?

14     A.    When?  About what?

15     Q.    Like for his publication in Volume 12 of the

16  Journal of Schenkerian Studies.

17     A.    Tim doesn't talk to me.  Please, walk me

18  through it.  Ask me.

19     Q.    Sure.

20     A.    What do you mean?

21     Q.    You have no knowledge of what happened to

22  Timothy Jackson because of his publication in Volume 12

23  of the Journal of Schenkerian Studies.  Is that your

24  testimony today?

25     A.    What do you mean, what happened to him?  I

 1  don't know what happened to him.

 2      Q.    Do you have -- do you have any conception

 3  of the reaction focused on Timothy Jackson after he

 4  published in Volume 12 of the Journal of Schenkerian

 5  Studies?

 6              MS. QUIMBY:  Objection, form.

 7      A.    Like the reaction?  I just need you to break

 8  this down, because I don't know general things about Tim.

 9      Q.    Sure.  I'm not asking for general things

10  about Tim.  I'm asking for specific things about Tim.

11      A.    No, you're not.  You're asking me what happened

12  to him.

13      Q.    How did -- how did people -- how did people in

14  the Society for Music Theory react to Timothy Jackson's

15  publication?

16      A.    They sent out a petition.

17      Q.    Did the petition praise him?

18      A.    I didn't read it.

19      Q.    You don't have any knowledge whether the

20  petition praised him or condemned him?

21      A.    You told me that it condemned the journal

22  issue.

23      Q.    Did graduate students in the Music History,

24  Theory, and Ethnomusicology division write anything about

25  Timothy Jackson's publication in Volume 12 of the Journal

1  of Schenkerian Studies?

2      A.   They put out a statement in response to the

3  journal.

4      Q.   Is that the statement that you reviewed before

5  you sat for this deposition today?

6      A.   Yes.

7      Q.   Do you have any understanding of whether they

8  were praising or condemning Timothy Jackson?

9      A.   Can I look at it?  Just because I want to

10  talk about the specific parts you're referring to.

11      Q.   You've already testified that you reviewed it.

12  Is your testimony today that despite preparing for this

13  deposition and reviewing that document, you cannot

14  testify right now about whether it is positive or

15  negatively disposed towards Timothy Jackson?

16             MS. QUIMBY:  Objection, form.

17      A.   I believe I have a right to look at the

18  document you're asking me about.

19      Q.   No, you must answer the question as asked.

20  Now, if you don't know, that's a perfectly acceptable

21  answer.

22      A.   I mean, so can you repeat your question?

23      Q.   Sure.  As you sit here, having testified that

24  you reviewed the graduate students' statement, do you

25  have any understanding of whether it was negative or

1   positively disposed towards Timothy Jackson for his

2   publication in Volume 12 of the Journal of Schenkerian

3   Studies?

4            MS. QUIMBY:  Objection, form.

5       A.   Negligently or positively disposed.  Like do

6   you mean did it condemn the journal issue?

7       Q.   Let's -- let's start with that.  In your words,

8   did the graduate student statement condemn the journal?

9       A.   Yes, it expressed concerns about the journal

10  issue.

11      Q.   Just concerns, or did it condemn the journal?

12           MS. QUIMBY:  Objection, form.

13      A.   I mean, it raised -- it outlined concerns about

14  the journal issue.

15      Q.   Did it call for Timothy Jackson personally to

16  be disciplined?

17      A.   I really want to look.  I want you to show me

18  that.  I don't want to say something that's wrong, you

19  know.  You put me under a lot of pressure.  And now, I'm

20  like feeling anxious.  So can I look at the document?

21      Q.   Well, we'll get to the document, but I want you

22  to answer the question as asked.

23           Is it your testimony right now that you are

24  refusing to answer that question, that despite reviewing

25  the document --

 1      A.    No, it's not that I'm refusing.  But can you
 2   just rephrase it?
 3      Q.    Sure.  I asked if it was your understanding
 4   that the student statement had called for Timothy Jackson
 5   to be disciplined.
 6      A.    I know it included Tim's name and in relation
 7   to the journal, and I don't remember exactly what they
 8   asked for.
 9      Q.    Okay.  Do you remember exactly what they were
10   concerned about in your -- in your words?
11            MS. QUIMBY:  Objection, form.
12      A.    Like so what they were concerned about with the
13   journal issue?
14      Q.    Sure.  Let's start with that.
15      A.    The way it went after Dr. Ewell.
16      Q.    Um-hum.
17      A.    The way that it dealt with race, yeah.
18      Q.    Anything else?
19      A.    They were the same.
20      Q.    Anything else, as you sit here today, that
21   you remember it going after Timothy Jackson or the
22   journal for?  The student statement?
23            MS. QUIMBY:  Objection, form.
24      A.    Do I remember anything going after Timothy
25   Jackson.  No, I just -- I'm sorry.  I remember that they

1  mentioned him in relation to the journal.

2      Q.    Um-hum.

3      A.    And that they wanted the journal like, yeah.

4      Q.    Wanted the journal like what?

5      A.    Investigated.

6      Q.    All right.  And do you remember the faculty

7  submitting a statement about Timothy Jackson and the

8  journal?

9      A.    Not about Timothy Jackson, no.

10     Q.    Okay.  About the journal?

11     A.    Yes, about the journal.

12     Q.    And who drafted that statement?

13     A.    It was a group effort.

14     Q.    Um-hum.  Were you part of that group?

15     A.    I was.

16     Q.    What was your role in formulating the faculty

17  statement that you just testified about?

18     A.    We all went back and forth on drafts.  So I had

19  worked on one, but I guess typically, most of that

20  is not there.  And so --

21     Q.    Sure.

22     A.    But yeah, we went back and forth on like

23  several drafts, like kind of a collaborative, yes.

24     Q.    Did you have different drafts saved on your

25  work computer?

1        A.   No, not on my work computer.  I don't think
2   on my work computer.  I think the one that I wrote, I
3   had on a Google drive.
4        Q.   Okay.
5        A.   But I think the other ones I just had in emails
6   that had been exchanged.  And so I don't remember if any
7   of them are on my work computer now or were then.
8   I can't remember.
9        Q.   Just backing up, I think one of the things that
10  you said you had thought was unusual was that, in your
11  words, Ewell was not there in Volume 12 of the Journal of
12  Schenkerian Studies; is that right?
13       A.   Um-hum, yes.
14       Q.   Okay.  And by that, you meant he wasn't --
15  something by him wasn't published with these other
16  papers in the Symposium?
17       A.   Yes.
18       Q.   Okay.  Was it your understanding that Ewell was
19  never invited to participate in the Journal?
20       A.   I had no -- I have no idea.
21       Q.   Okay.
22            THE WITNESS:  Do you mind if we take a
23  quick break?
24            MR. ALLEN:  Of course.
25            THE WITNESS:  Just a restroom break.

1  Thank you.

2            MR. ALLEN:  Of course.  I think I should

3  have said, but maybe I didn't.  But you can ask for a

4  break at any time.

5            THE WITNESS:  Okay.

6            MR. ALLEN:  You just have to answer

7  whatever question is in front of you.  So we can go --

8  we can go off the record.

9            THE VIDEOGRAPHER:  Off the record at

10 2:33 p.m.

11            (Recess taken)

12            THE VIDEOGRAPHER:  The time is 2:44.

13 We're on the record.

14    Q.    Thank you.  Just a couple of brief questions,

15 and then we'll move on from that issue of Ewell not being

16 there.

17            Were you aware there was a call for papers

18 that went out to the entire Society for Music Theory

19 soliciting papers for Volume 12 of the Journal of

20 Schenkerian Studies?

21    A.    No.

22    Q.    So you don't have any reason to believe that

23 a call for papers was not received by Philip Ewell?

24            MS. QUIMBY:  Objection, form.

25    A.    I have no idea of Philip Ewell's email.

1         Q.   Okay.  Did you read any of the local press

2    about the controversy surrounding the Volume 12 of the

3    Journal of Schenkerian Studies in the Denton Record

4    Chronicle?

5         A.   No.

6              MR. ALLEN:  Okay.  I'm getting an exhibit

7    ready, and I want to mark as Exhibit 2 for the record,

8    which I'm going to also drop in the chat for your

9    attorney.

10              (Deposition Exhibit Number 2 marked.)

11        Q.   This is an email from Dani Oort, it appears, to

12   Peter Kohanski.  And you are on the cc line.  Do you see

13   that?

14        A.   Yes.

15        Q.   It says -- and it starts off, "Dear Rebecca,

16   thank you for your supportive words."

17        A.   Yep.

18        Q.   And just so -- this is a two-paged document.

19   It has the UNT Bates number 0355.  And you'll see the

20   last page has no content to speak of except for this --

21   what appears to be your -- forwarded to your email; is

22   that right?

23        A.   Yeah.  It looks like my signature line.

24        Q.   Yeah.  So if I hold it here, it cuts off some

25   of your signature block, but this is the entire body of

1   the email thread that I have in Exhibit Number 2.  Do

2   you want a chance to look at that?

3        A.    I do, yeah, because I don't --

4        Q.    Go ahead.

5        A.    Okay.

6        Q.    So it's the nature of emails that they always

7   start at the bottom and go towards the top, so I'm going

8   to start with the last email in the thread.  It's an

9   email from you on July 27th, 2020, to Dani and Peter.

10  It doesn't have who those individuals are.  Do you know

11  who Dani and Peter are?

12       A.    I do.

13       Q.    Can you state for the record who they are?

14       A.    The Dani was a graduate student in the

15  department and Peter continues to be.

16       Q.    And is this Peter Kohanski whose email is in

17  the -- next in the thread?

18       A.    It looks like it.

19       Q.    And Dani Van Oort is the other individual?

20       A.    Yes.

21       Q.    Okay.  So you write to Dani and Peter, "As

22  GAMuT's advisor, I want to thank you for your leadership

23  and for the MHTE graduate students' professionalism

24  in responding to the recent issue of the Journal of

25  Schenkerian Studies.  Indeed, as we learned in the

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

```
 1  diversity and inclusion training last fall, the
 2  department has much work ahead of it, work in which
 3  I hope to take an active role."
 4            Did I read that accurately?
 5       A.   Yes.
 6       Q.   What is -- just for the record, what is the
 7  acronym GAMuT, G-A-M-u-T?
 8       A.   It's the Graduate Association of Musicologists
 9  and Theorists.
10       Q.   So is that a loose -- loosely -- can I loosely
11  describe that as a UNT organization of graduate students
12  in the College of Music?
13       A.   Yes.
14       Q.   Okay.  What leadership were you thanking them
15  for?
16       A.   I don't remember.  I mean, obviously, I'm
17  referring to the journal.  I do not remember.
18       Q.   Do you remember what you were talking about
19  when they were responding to the recent issue of the
20  Journal of Schenkerian Studies here?
21       A.   I don't.
22       Q.   And what did you learn in the diversity and
23  inclusion training of that last fall that you hoped to
24  take an active role in?
25       A.   That the department had much work ahead of it.
```

1        Q.    Like what?  What kind of work?

2        A.    You know, the grad students had a lot of

3   complaints.

4        Q.    Like what?

5        A.    Well, I'm embarrassed to say, I don't remember

6   the details of their complaints.  They were unhappy

7   with -- I don't remember.  I just know that they had

8   complaints, for sure.

9        Q.    And they were complaints about diversity and

10  inclusion?

11       A.    Yeah.  I mean, I guess.

12       Q.    What is it -- what does that mean?  What is

13  diversity at the University of North Texas in 2020?

14       A.    Well, I don't know about UNT's official

15  stance at that time.

16       Q.    Well, this was department -- your department

17  having much work ahead of it, right?

18       A.    That's what that sentence says.

19       Q.    In its diversity and inclusion training last

20  fall at the University of North Texas?

21            MS. QUIMBY:  Objection, form.

22       A.    UNT didn't have -- well, you know, I didn't

23  participate in like university-level training.  What is

24  this?  Sorry.  What did you want me to answer?

25       Q.    Well, I'm trying to figure out what you were

1  saying in July of 2020, right?

2          You say, "Indeed, as we learned in the

3  diversity and inclusion training last fall."

4          And I'm wondering, what does diversity mean in

5  this diversity and inclusion training last fall at the

6  University of North Texas?

7      A.   Oh.  It was just the title of the training that

8  the department had hosted.

9      Q.   Um-hum.  And what was it about?

10     A.   Diversity and inclusion.

11     Q.   What does that mean, diversity and inclusion,

12  in the training?

13     A.   We talked about people feeling not included

14  at work.

15     Q.   Um-hum.

16     A.   People feeling not represented.

17     Q.   Um-hum.

18     A.   Yeah, like it was -- it was kind of like a

19  typical like diversity and inclusion training.

20     Q.   All right.  What does -- what does diversity

21  typically mean then in that training that you experienced

22  back in the fall of what I assume was 2019, right?

23          MS. QUIMBY:  Objection, form.

24     A.   So you want to know what diversity meant in --

25  like in the training that we had?

1      Q.    Yes.

2      A.    Like a variety of people.

3      Q.    A variety of any people?

4      A.    I guess.  I mean, diversity.  Different kinds,

5   you know, purple, green, little.

6      Q.    Um-hum.  And so if we found that diversity

7   and inclusion training, it would be about purple and

8   little people?  Is that what your testimony is?

9      A.    No, no.  But I'm telling you that -- you are

10   asking me in the abstract what the word diversity means.

11   Is there something more specific you want me to explain

12   about the word?

13      Q.    Well, you're getting at the heart of the

14   question.  To me, diversity and inclusion aren't very

15   specific.  So I'm asking you what -- if it was specific

16   enough to have training on it, what was being trained?

17   What were you trained to do?

18      A.    Making people feel welcome in a workplace

19   environment.

20      Q.    Um-hum.  Does writing, you know, statements

21   condemning Timothy Jackson and the Journal of Schenkerian

22   Studies, do you think that was calculated to make him

23   feel included?

24            MS. QUIMBY:  Objection, form.

25      A.    I don't -- I don't know what you mean.

1       Q.    You really don't?  That's your testimony?

2       A.    Yeah, I really don't.

3       Q.    Okay.

4       A.    I'm sorry.

5       Q.    All right.

6       A.    It's Friday afternoon.

7       Q.    You don't remember -- you don't remember what

8  the graduate students' response was at this time that

9  you're writing and thanking them for?

10       A.    No, I don't -- I do not remember what I meant

11  by responding in that -- like with the date and stuff.

12  I just don't.  I don't.

13       Q.    And as an advisor to GAMuT, did you work with

14  them in any capacity to develop a response?

15       A.    No, I did not.  No, I did not.  Not that I

16  remember, no.

17       Q.    Okay.  And then again, this diversity and

18  inclusion training was so memorable, that you really

19  can't remember anything about it, right?

20             MS. QUIMBY:  Objection, form.

21       A.    Well, I told you.  I didn't say I don't

22  remember anything.  I'm just saying like it was just

23  regular diversity and inclusion training.  So we like, I

24  don't know, wrote on Post-It notes on the wall about --

25  like I wrote about a time when someone asked me in the

1  elevator if I was a student, and that made me feel not

2  like a professor, you know, or like things like that.

3  Like I mean, it was like a solid five years ago.

4      Q.   Um-hum.

5      A.   So --

6      Q.   Did they teach you about anything called

7  microaggressions?

8              MS. QUIMBY:  Objection, form.

9      A.   Actually, I'm trying to think.  I don't

10 remember if it was part of that training --

11     Q.   Um-hum.

12     A.   -- day.

13     Q.   So to tie this up, this responding, do you

14 remember at least this much?  That this responding to the

15 recent issue of the Journal of Schenkerian Studies, that

16 involved these same issues that we discussed at the

17 beginning your deposition:  The Symposium, the way

18 it went after Ewell, the way it dealt with race, the

19 anonymous author, the idea that Ewell was not there,

20 those things were what they were responding to as best

21 as you can remember today?

22              MS. QUIMBY:  Objection, form.

23     A.   I don't remember if it was all of those things

24 that they responded to.  So that -- but I -- obviously,

25 I said the issue, so...

1      Q.   Okay.  Do you remember any unique issues that

2 the students were concerned with which weren't part of

3 other people's concerns that you were hearing about

4 either through friends, colleagues, through social media,

5 to the extent it was circulated to you, email, and so

6 forth?

7                MS. QUIMBY:  Objection, form.

8      A.   Like unique, like they were the only ones?

9      Q.   Yes.

10     A.   Like concerns that were particular to them?

11     Q.   Yes.

12     A.   No.  I mean, I -- from what I remember, it

13 was quite similar to the other conversations.

14     Q.   Okay.  Do you remember in those conversations

15 my client, Timothy Jackson, being accused of being a

16 racist?

17                MS. QUIMBY:  Objection, form.

18     A.   I don't remember that specifically.  Like

19 someone -- like which conversations?  Like who are you

20 asking said that Tim was a racist?

21     Q.   Well, you know, because you had the

22 conversations apparently.  You have testified to being

23 in communication with the graduate students, as we've

24 seen in Exhibit 2, as their advisor through GAMuT.

25 You've testified to getting messages in text form from

1  colleagues of yours and other conversations that you

2  were privy to, even if circulated to you secondhand, for

3  instance, Twitter posts that might have been circulated

4  to you by a colleague.

5         So my question is, in the stream of those

6  communications about the Journal of Schenkerian Studies

7  at the end or -- of July, beginning of August, 2020, do

8  you recall Timothy Jackson being accused of being a

9  racist?

10        MS. QUIMBY:  Objection, form.

11     A.   I would just need you to tell me who you're

12  talking about, what conversation, like what exchange.

13  Again, like we're talking four years, so it would be

14  helpful.

15     Q.   Sure.  Okay.  Well, I'm sure it would be.

16  But the problem is I wasn't there and I don't know, so

17  I'm asking you.  Do you remember anyone specifically

18  telling you that?

19     A.   I don't recall specific people calling Tim a

20  racist.

21     Q.   Okay.  Do you recall anyone specifically

22  calling the Journal of Schenkerian Studies racist?

23     A.   Not the overall journal.  I mean, do you mean

24  like the whole journal?  Do you mean like that issue?

25     Q.   Well, that would be a question for you.  If

1  there was such an allegation, accusation being made, I'd

2  be interested to know who said it, what they were talking

3  about.

4      A.   I don't remember specific --

5      Q.   Okay.

6      A.   I do not remember specific people saying that

7  the Journal of Schenkerian Studies was racist.  I don't

8  remember specific people.

9      Q.   Uh-huh.  And again, if you don't know, then

10 that's all -- that's all I want to know.  That's fine.

11     A.   Oh, okay.  Thank you.

12     Q.   Now, I believe you testified that you're a

13 historian of music.  Are you a historian of American

14 forms of music, as well as European forms of music?

15     A.   Well, that's a tricky question, but I do -- I'm

16 a historian of French music.

17     Q.   Uh-huh.

18     A.   And so sometimes, that French music is in the

19 Caribbean and like the mid-Atlantic region.  But I'm a

20 historian of French music.

21     Q.   Do you have any general knowledge, as a music

22 historian, of hip-hop, rap, and American jazz?

23     A.   I'm not in that scholarly conversation.  I

24 mean, I know it exists.

25     Q.   Oh, I know.  I'm not saying you're a

1  specialist.

2       A.   Okay.

3       Q.   But have you read any -- any literature about

4  the history of rap, hip-hop, or American jazz?

5       A.   Maybe like generally, like maybe in some grad

6  courses, stuff like that.

7       Q.   Sure.

8       A.   Like I read recently Daphne Brooks' Liner Notes

9  for the Revolution.  So that's definitely situated in

10  that literature, although it's not -- it's about how

11  Black women were foundational to discourses about rock

12  criticism.  So it doesn't get as much into like rap and

13  hip-hop.

14      Q.   Okay.  I have a -- I have a question, just

15  if you know, again.  Is it controversial in music history

16  that American jazz originated as an African American

17  musical art form?

18      A.   I have no idea.  I'm not going to comment on

19  that as someone who's not in a jazz conversation.

20      Q.   Okay.  And if I asked you the same about

21  hip-hop or rap, you'd answer the same?

22           MS. QUIMBY:  Objection, form.

23      A.   Do you mean if they're foundational to American

24  music?

25      Q.   No, no.  I'm sorry.  Let me rephrase that.

1            Is it at all controversial in music history

2    that hip-hop originated as an African American musical

3    art form?

4        A.    I don't know.

5        Q.    And is it at all controversial in the history

6    of music as you understand it, that rap originated as an

7    African American art form?

8        A.    I don't know.

9        Q.    And you claim to be a historian of music,

10   right?

11            MS. QUIMBY:    Objection, form.

12        A.    Of Eighteenth-Century music, so like Bach to

13   Beethoven, like 1700 to 1804.  But my current book goes

14   up to 1820.

15        Q.    I understand.  So you just have no knowledge

16   of, say, Twentieth-Century musical art forms in the

17   United States?

18        A.    Not on the level of detail that I would feel

19   comfortable talking about in like an expert kind of way.

20   I mean, I could teach some things, but I -- no, hum-um.

21        Q.    Uh-hum.

22        A.    I stick to my expertise.

23            (Deposition Exhibit Number 3 marked.)

24            MR. ALLEN:    I'm going to introduce as

25   Exhibit 3.  This is a report.  I'm just going to

1  represent to you that this is a report that came out in
2  November of 2020.  It was called the Ad Hoc Panel Report
3  about the Journal of Schenkerian Studies.  It has this
4  Exhibit D and these -- this string of gobbledygook at
5  the top because it's been marked by the United States
6  District Court of the Eastern District of Texas.
7          This is the first page because it's been
8  introduced in court, but this is the actual title page to
9  the Ad Hoc Panel Report.
10     Q.   Do you recognize this at all?
11     A.   Not really.
12     Q.   Okay.  And I don't -- do you remember reading
13  the Ad Hoc Panel Report that came out in November of 2020
14  about the Journal of Schenkerian Studies?
15     A.   I didn't read it.
16     Q.   Okay.  So there are various attachments
17  to the report at the end.  And I just want to call your
18  attention to this one.  One thing that's attached is
19  the statement of UNT faculty on Journal of Schenkerian
20  Studies.  Do you see that?  This is captioned in this
21  Exhibit 3 here.
22     A.   Exhibit 4?
23     Q.   Yes.  There's a little bit of confusion.
24     A.   Okay.
25     Q.   And you're right to point this out.

1        A.    Okay.

2        Q.    So this -- these are -- there are several

3    documents attached to the Ad Hoc Panel Report as

4    exhibits.

5        A.    Okay.

6        Q.    I'm introducing the whole thing as an exhibit

7    for the record as Exhibit 3.

8        A.    Oh, okay, okay.

9        Q.    Just to keep everything in one place.

10       A.    Got it.

11       Q.    I'll just tell you, this is an exhibit that's

12   been used in other depositions, so I'm trying to keep

13   things consistent.

14       A.    Okay.

15       Q.    One of the exhibits -- and you're perfectly

16   correct.  There's an Exhibit 1, 2, 3, and so on, to the

17   Ad Hoc Panel Report.  And one of those exhibits is,

18   indeed, marked Exhibit 4 to the Ad Hoc Panel Report.

19             "News from SEM:  General News, Statement of

20   UNT Faculty on Journal of Schenkerian Studies."

21             Did I read that correctly?

22       A.    Yes.

23       Q.    And I believe your name is affixed to this

24   statement, right?

25       A.    Yes.

1        Q.    Do you recognize this statement?

2        A.    Yes.

3        Q.    How -- let me strike that.

4              Explain what role you played in generating

5    this statement of the UNT faculty.

6              MS. QUIMBY:  Objection, form.

7        A.    You know, co-wrote it with colleagues.

8        Q.    And you co-wrote it with colleagues in this end

9    of July time frame?

10       A.    I guess so, yeah.  Yes.

11       Q.    About how long did it take to generate the

12   drafts to the finished product?

13       A.    Well, if memory serves, at least several days.

14   It could have been as much as a week or so.

15       Q.    Okay.

16       A.    Several days, I guess.

17       Q.    Um-hum.  And do you recognize the other people

18   who have signed this document?

19       A.    Yes.

20       Q.    They're all colleagues of yours in the MHTE

21   program, right?

22       A.    They were at the time.  Some of them are no

23   longer there.

24       Q.    Okay.

25       A.    Yeah.

1      Q.    Right, right.  Good to point that out.

2            Now, did you publish this statement as a

3   private citizen?

4            MS. QUIMBY:  Objection, form.

5      A.    What do you mean?

6      Q.    Did you -- let me ask a different question

7   then.

8            Did you publish this statement in your

9   official capacity as a professor of the University of

10   North Texas?

11            MS. QUIMBY:  Objection, form.

12      A.    Well, it's not an official statement from

13   the university.

14      Q.    Okay.  And is it then a statement of you and

15   your colleagues speaking as private citizens?

16            MS. QUIMBY:  Objection, form.

17      A.    We're speaking as colleagues, as colleagues.

18      Q.    Um-hum.  Well, colleagues implies to me that

19   it's in your professional capacity bound together by your

20   common work.  Is that what you mean?

21            MS. QUIMBY:  Objection, form.

22      A.    I mean, we wrote the statement together --

23      Q.    Okay.

24      A.    -- because we share a concern.  We shared a

25   concern.

1          Q.   Um-hum.

2          A.   But it wasn't like UNT's announcement about

3     anything to do with the journal or the College of Music.

4          Q.   Right.  And I think you stated before that

5     you weren't making it as a statement on behalf of the

6     University of North Texas, right?

7          A.   Right.

8          Q.   So my follow-up question, was it your

9     understanding that you were making this statement as

10    a private individual?

11               MS. QUIMBY:  Objection, form.

12         A.   No, that wasn't -- I did not understand

13    this to be like Rebecca Geoffroy's personal views on

14    something.

15         Q.   Okay.  Did you do anything to make clear within

16    the university that you were not publishing this

17    statement as an employee of the State of Texas?

18               MS. QUIMBY:  Objection, form.

19         A.   Did I do anything to make clear that I was

20    not publishing this in the -- that I -- sorry.  The

21    double negative tripped me up.

22         Q.   Yeah.  Let me strike that question.

23         A.   That I was not publishing this as a public

24    employee?

25         Q.   Yes.  Let me strike that question.  I'll try to

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1  formulate it in a less confusing way.  And thank you for

2  pointing that out.

3          Do you recall doing anything at the

4  University of North Texas to make clear that this

5  statement was being made by you and others in such

6  a way that it was not a statement made by you as an

7  employee of the State of Texas, as a public employee,

8  as you just said?

9          MS. QUIMBY:  Objection, form.

10     A.    Did I do anything to make clear that this was

11  not -- did I do anything to make clear to the University

12  of North Texas that this was not a statement made -- I'm

13  sorry.  So you are asking if I communicated with like

14  the General Counsel's Office or like the Dean or --

15     Q.    Anything of that nature, yes.

16     A.    So I mean, I didn't talk to the General

17  Counsel's Office before I sent -- before we were --

18  when we were working on this.

19     Q.    And did you talk to anyone else, like the Dean,

20  the division head, anyone like that?

21     A.    Oh, I mean, during that week --

22     Q.    Um-hum.

23     A.    -- I spoke to the division head and the Dean.

24     Q.    About the nature of this statement, right?

25     A.    Not about the nature of this statement, no.  I

 1  mean, not about the nature of the statement.

 2                    (Deposition Exhibit Number 4 marked.)

 3                    MR. ALLEN:  I'm going to introduce into

 4  the record Exhibit 4.  This is the e-mail chain with

 5  UNT Bates stamp 0276.  This is an email from Catherine

 6  Ragland to, among others, the witness, Rebecca

 7  Geoffroy-Schwinden.

 8       Q.   Do you see this email?

 9       A.   I do, yeah.

10       Q.   Do you remember getting this email?

11       A.   I don't remember, no.

12       Q.   Okay.

13       A.   I'd need to -- I'd need to look at the whole

14  thing because I don't remember it.

15       Q.   I understand.  And it's a rather long email, so

16  I don't want to -- I don't have questions about all

17  of it.

18       A.   Okay.

19       Q.   But I am going to skip down to later in the

20  thread.

21            On the other hand, if you or your attorney

22  wants to see any other aspect of the thread, you're

23  welcome to, and I'm sure your attorney will have a

24  chance to ask you questions later in our deposition.

25  I'm going to -- I'm sorry.  Go ahead.

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

```
 1       A.   No, okay.  Go ahead.

 2       Q.   I'm going to skip down to page 7 of 13 here,

 3  which is right where we are.

 4            This is Ellen Bakulina writing to you and

 5  others.  And she seems to be addressing you personally.

 6  Do you see that?

 7       A.   Yes.

 8       Q.   Do you remember this email from that time?

 9       A.   I don't remember it.

10       Q.   So Ellen Bakulina writes to you, "Do you know

11  if there are any guidelines regarding the 'Open Letter

12  On Anti-Racist Actions' that a group of theorists have

13  posted through SMT announced.  I'm trying to understand

14  if any of those who are associated with JSS (I am no

15  longer -- I have resigned from the editorial board) can

16  sign.  If one wants to sign, is it better to wait until

17  our faculty letter is published?"

18            Did I read that correctly?

19       A.   Yep.

20       Q.   Is she referring to the faculty letter that

21  we just reviewed which was attached to the Ad Hoc Panel

22  Report, the one that I introduced into the record as

23  Exhibit 3?

24            MS. QUIMBY:  Objection, form.

25       A.   So when she says, "If one wants to sign, is
```

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

 1  it better to wait until our faculty letter is published?"

 2       Q.    Yes.

 3       A.    Probably.

 4       Q.    Okay.  You don't have any firm memory if that's

 5  the specific faculty letter that was being generated at

 6  this time that wound up as the attachment to the Ad Hoc

 7  Panel Report?

 8       A.    I don't have a specific memory of the email.

 9       Q.    Okay.  And then it looks like Frank

10  Heidlberger, in an email that spans the page -- do you

11  see this?

12       A.    Um-hum.

13       Q.    And again, I believe you are in here, right

14  here.

15       A.    Yep.

16       Q.    He responds, "Dear Ellen, you can sign anything

17  as an individual as long as it does not reflect any

18  official opinion of the institution.  This also applies

19  to the soon to be published faculty letter."

20            Did I read that correctly?

21       A.    You did.

22       Q.    And then he says, "We, as faculty, cannot

23  represent UNT in this regard.  Any official UNT

24  statement needs to be approved by the Provost office."

25            Right?

1        A.    That's what Frank said.  Frank wrote that.

2        Q.    Do you have any reason to believe that's wrong,

3   that's incorrect?

4        A.    I have no idea.  You'd have to ask Frank.

5        Q.    Okay.  But based on your knowledge of the

6   University of North Texas and its policies, and as an

7   employee there, you don't have any reason to believe

8   he's wrong about that, right?

9        A.    I don't know.

10       Q.    Okay.  And does this help refresh your memory,

11  that the people who signed that statement were talking

12  about whether they were signing as individuals or as

13  official employees of a state institution, the University

14  of North Texas?

15             MS. QUIMBY:  Objection, form.

16       A.    I mean, it doesn't really refresh my memory.

17  I do see that Ellen and Frank have sent these emails.

18  They did send these emails.

19       Q.    So then you weigh in, in this email right here.

20  This is you, correct?

21       A.    Yep.

22       Q.    And this is the official email that you used as

23  a professor at the University of North Texas?

24       A.    Yep.  That's my work address.

25       Q.    Uh-huh.  And this is an email of July 30th,

Rebecca Geoffroy Schwinden, Ph.D.    9/27/24

1  2020, that starts on UNT 280 here, and goes over onto

2  the next page.

3          And you say, "I apologize I don't have any

4  institutional authority on these issues.  I spoke with

5  Warren and John yesterday who said we have a right to

6  speak.  The Dean has not responded to my specific,

7  written email request asking whether our letter breach

8  this policy.  I have added a sentence that you will see

9  momentarily that unequivocally states that we write as

10 individuals and do not represent the university."

11         Did I read that correctly?

12    A.   Yep.

13    Q.   And you included some policy language here,

14 right?

15    A.   Yeah.

16    Q.   Referred to as policy language.

17    A.   I guess, yeah.

18    Q.   Who is Warren?

19    A.   Warren Henry is like an Associate Dean in the

20 College of Music.

21    Q.   Associate Dean of what?

22    A.   I'm a little embarrassed, but I don't remember

23 his exact title.  He's an Assistant Dean of like Academic

24 something.

25    Q.   That's okay.

1        A.    Yeah, like he's the person we go to with

2    issues, so we don't bother the Dean.  So he's just below

3    the Dean.

4        Q.    If you would make that a title, I would think

5    it should be entered into national law.

6        A.    Yeah.

7        Q.    But we'll have to go with that.

8              And John, does this refer to John Richmond?

9        A.    Yeah.  I believe so, yeah.

10       Q.    Okay.  And do you have any memory of what

11   policy of the University of North Texas this comes from?

12       A.    I don't.  And so I guess I said Andrew and

13   Gillian provided it, so I don't know if they would

14   remember which like handbook or something it was pulled

15   from.

16       Q.    Sure, um-hum.  But it was definitely, as you

17   sit here today in your memory, as you remember things

18   today, an official policy of the University that you

19   were relying on there, right?

20       A.    I can't say that I remember that today.

21       Q.    Okay.

22       A.    But I can read the email that's up here and

23   that it was from me.

24             MR. ALLEN:  I'm going to introduce for the

25   record as Exhibit 5 one additional email, which I'm also

 1  going to drop in the chat.  Exhibit 5 is captioned
 2  Faculty Statement on Journal of Schenkerian Studies.
 3                    (Deposition Exhibit Number 5 marked.)
 4      Q.   Did I read that correctly?
 5      A.   Yep.
 6      Q.   And this is sent from you to Dean Richmond on
 7  July 30th, 2020?
 8      A.   Yes.
 9      Q.   And you write to Dean Richmond, "Thank you
10  for taking the time to speak with me yesterday and for
11  understanding our need to speak as individual faculty
12  members to our respective disciplines.  I want to ask
13  explicitly whether our statement will violate UNT
14  Policy 06.035."
15           Did I read that right?
16      A.   Yep.
17      Q.   And what is UNT Policy 06.035?
18      A.   I don't remember.  I don't know the title of it
19  off the top of my head.
20      Q.   And is this the same policy language that
21  you had quoted in the email thread that we looked at as
22  Exhibit 4?
23      A.   Could you toggle back?  Let me just read this
24  here.
25      Q.   Oh, absolutely.

1        A.    Can you go back to the previous?

2        Q.    Yep.  Here is Exhibit 4.

3        A.    It looks the same.  It looks similar, yeah.

4        Q.    And again, I'm not -- if there's a typo or

5   something, I'm not asking about that.  But its origin

6   is from that same policy; is that accurate?

7        A.    I'm not sure, because the policy number isn't

8   in the -- I don't know where Gillian and Andrew pulled

9   the policy language.

10        Q.    Okay.

11        A.    And they didn't -- the policy number wasn't

12   in that previous email.  So like I don't know if it's

13   from like two different handbooks or -- I'm not sure on

14   the policy number.

15        Q.    Okay.  And do you know what Dean Richmond's

16   response was to this?

17        A.    I don't.  I don't even know if he responded.

18        Q.    Okay.  You remember that there were no

19   consequences to you personally for publishing the

20   faculty statement, right?  Is that accurate?

21        A.    I -- you're saying that there were not personal

22   consequences to this statement?

23        Q.    Yes.

24        A.    I feel like there's a lot of personal

25   consequences.  I'm talking to you right now.

```
 1         Q.    Well, you understand --
 2         A.    I do understand.
 3         Q.    -- the faculty statement attacked my client --
 4         A.    No, it didn't.  It questioned the policies --
 5         Q.    -- that resulted in the closure of the journal.
 6         A.    -- around the journal.  You are
 7   mischaracterizing that statement.
 8         Q.    No, I am not.
 9         A.    It doesn't mention Tim Jackson.
10         Q.    I am not, ma'am.
11         A.    Show me Tim Jackson's name.
12         Q.    You make the statement --
13         A.    Show me his name.
14         Q.    All right.  You make the statement -- are you
15   upset?
16         A.    You asked me something personal, so I responded
17   personally.  I was offended.
18         Q.    Do you think the attacks on my client were very
19   personal?
20         A.    I have no idea.  I wasn't part of those.
21         Q.    Did you ever ask my client if he felt
22   personally attacked?
23         A.    He won't -- he doesn't speak to me.
24         Q.    After you signed this statement, he doesn't
25   speak to you?
```

1        A.    He's never spoken to me since then.

2        Q.    Does that surprise you?

3        A.    I don't know.

4        Q.    You signed a statement incorporating the

5    students' statement which called for him to be fired,

6    right?

7        A.    It did not incorporate the students' statement

8    into our statement.

9        Q.    Did Timothy Jackson ever call for you to be

10   fired, Dr. Geoffroy-Schwinden?

11       A.    No.

12       Q.    Did he ever call for you to be investigated?

13       A.    Yes.  I mean, right here, right now, yes.  I am

14   being investigated by you with Tim right there.

15       Q.    Just to be clear, you're being sued for

16   defamation.  Is that clear with you?

17       A.    Yes.  Is that what?

18       Q.    For making false statements about my client.

19   That's what you're being sued for.

20       A.    I realize that that's what I'm being sued for,

21   but it didn't happen.

22       Q.    What didn't happen?

23       A.    I did not make false statements about your

24   client.

25       Q.    Were there consequences for you at the

 1  University of North Texas from the administration for

 2  signing the faculty statement?

 3              MS. QUIMBY:  Objection, form.

 4      A.    Like what kind of consequence?

 5      Q.    Were you placed under investigation, like my

 6  client was?

 7              MS. QUIMBY:  Objection, form.

 8      A.    I wasn't investigated for anything --

 9      Q.    Thank you.

10      A.    -- that I'm aware of.

11      Q.    Good point.

12              MR. ALLEN:  All right.  I want to

13  introduce -- Madam Court Reporter, am I up to Exhibit 6?

14              THE REPORTER:  That's right.

15                  (Deposition Exhibit Number 6 marked.)

16              MR. ALLEN:  I'm going to introduce as

17  Exhibit 6 into the record and also -- sorry about that --

18  drop into the chat an email of July 29th, 2020, captioned

19  Journal of Schenkerian Studies, Geoffroy-Schwinden to

20  Dean John Richmond.

21      Q.    Did I get the caption of the first email right?

22      A.    Sorry.  Re:  Journal of Schenkerian Studies,

23  yes.

24      Q.    Um-hum.  Here's the -- so just so you know,

25  there's nothing on the second page, just like that other

 1 email we looked at.  This is the entirety of the message.
 2 All right.  I'm just going to ask you to look at it.
 3 It's relatively brief.  Let me know when you've had a
 4 chance to look at it.
 5      A.    Okay.
 6      Q.    So you're arranging a meeting with Dean
 7 Richmond on July 29th of 2020, right?
 8      A.    A phone call, it looks like, maybe.
 9      Q.    And did that -- did that phone meeting take
10 place?
11      A.    I did talk to him on the phone.
12      Q.    What did you guys talk about?
13            MS. QUIMBY:  Objection, form.
14      A.    I asked -- I wanted to talk to him, I think,
15 about the statement that we were working on.
16      Q.    Uh-huh.  And what did you tell him about the
17 statement you were working on?
18            MS. QUIMBY:  Objection, form.
19      A.    I don't remember -- I don't remember what
20 I told him.  I don't remember telling him anything
21 specific about it.
22      Q.    Um-hum.
23      A.    To be honest, I remember one -- I don't
24 remember what I said to him.  I guess I was calling
25 him because I just -- I don't know.  I was trying to --

1          Q.    Do you remember -- sorry, go ahead.

2          A.    No, I just -- I don't -- I don't remember

3   what I said to him.

4          Q.    Do you remember what he said to you?

5                MS. QUIMBY:  Objection, form.

6          A.    I remember -- I think I remember one thing he

7   said.

8          Q.    What did -- what did Dean John Richmond say

9   to you on July 29th in this meeting?

10               MS. QUIMBY:  Objection, form.

11         A.    I remember him saying, "Don't proscribe."

12         Q.    Don't proscribe what?  What did he mean by

13  that?

14         A.    I don't know, because that's what he said.

15  And you know how deans talk.  They usually say some

16  things, so that you don't know what they're saying, or

17  maybe you don't know.

18         Q.    Maybe that could be a title of a dean, as

19  well.

20         A.    Yeah.

21         Q.    Okay.  So as you sit here today, you have no

22  specific memory of what John Richmond said to you other

23  than he said, "Don't proscribe"?

24         A.    That's my only memory, like specific memory

25  from that conversation.

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

```
 1                    (Zoom audio distortion)
 2        Q.   Is that right?  I'm sorry.  Did you hear my
 3   question?
 4        A.   Oh, sorry.  No.
 5        Q.   Yeah, I think the -- I think the internet
 6   cut us out there.
 7             I said you remember him saying, "Don't
 8   proscribe."  But as you sit here today, you don't
 9   remember what he specifically meant by that.  Is that
10   your testimony?
11        A.   I'm not -- I'm not sure exactly what he
12   meant by that.
13        Q.   Do you remember being not sure at the time in
14   July when he said that?
15        A.   Yeah.  I mean, like I said, I took it like
16   a kind of typical dean comment, where I'm like that
17   probably means like a lot of things.
18        Q.   Okay.
19             THE WITNESS:  Do you think we could take
20   another brief break?  Because it's been another hour
21   about.
22             MR. ALLEN:  Oh, sure.  I was -- I was just
23   going to go -- I'll tell you what.  Can I introduce one
24   more exhibit?  And then I think this will bring this
25   chapter to a close.
```

*Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24*

```
 1                    THE WITNESS:  Okay.
 2                    MR. ALLEN:  And I don't think it will take
 3  long.  Obviously, Professor Geoffroy-Schwinden, if it
 4  gets too long in the tooth, I'll just call a break.
 5  Okay?
 6                    THE WITNESS:  Okay.
 7                    MR. ALLEN:  But I think we can get through
 8  this real quickly.
 9          I'm going to mark for the record Exhibit 7,
10  which is very short.
11                    (Deposition Exhibit Number 7 marked.)
12     Q.    It's an MHTE individual faculty statement.
13  Geoffroy-Schwinden to Benjamin Brand on July 30th, 2020.
14          Did I read that correctly?
15     A.    Yes, you did.
16     Q.    And it has the UNT Bates stamp number UNT 417.
17  And it has an attachment, which is not part of this
18  exhibit, Individual MHTE Faculty Response.
19          Did I read that correctly?
20     A.    Yes.
21     Q.    So my question for you is, is this the
22  finalized Individual MHTE Faculty Response addressing
23  the Journal of Schenkerian Studies that was sent to your
24  division head, Benjamin Brand, on this day?
25                    MS. QUIMBY:  Objection, form.
```

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

```
1        Q.   Is there something unclear about my question?
2             MR. ALLEN:  I don't know if -- I don't
3   know if I can hear her.  Can other people hear the
4   witness?
5             MS. QUIMBY:  I think she's just thinking.
6             MR. ALLEN:  Oh, okay.  I don't know what's
7   going on.  Should we just take a break, Mary?
8             MS. QUIMBY:  Can you -- okay.  Yeah, I
9   think we may just need to take a break.  I'm sorry.
10             MR. ALLEN:  It seems like another
11   technical difficulty.  So could we go off the record?
12             THE VIDEOGRAPHER:  Off the record at 3:32.
13                  (Recess taken)
14             THE VIDEOGRAPHER:  On the record the 3:33.
15             MR. ALLEN:  Sorry.  Madam Court
16   Reporter, can you read the last question to the
17   witness?
18        Q.   And you may have answered, but we couldn't hear
19   your answer.
20        A.   That's okay.
21        Q.   BY THE REPORTER:
22             QUESTION:  So my question for you is,
23        is this the finalized Individual MHTE Faculty
24        Response addressing the Journal of Schenkerian
25        Studies that was sent to your division head,
```

1    Benjamin Brand, on this day?

2              MS. QUIMBY:  I renew my objection.

3        A.    And I said I didn't know if it was -- I don't

4    know if it's the finalized version.

5        Q.    You don't remember the document name you gave

6    to the final version?

7              MS. QUIMBY:  Objection, form.

8        A.    I don't remember the document name.

9        Q.    Okay.

10       A.    Like the file name.  I don't remember.

11       Q.    Yes.  If there was a file in your papers named

12   Individual MHTE Faculty Response that was the last in

13   time of four drafts, would that be the final faculty

14   statement?

15             MS. QUIMBY:  Objection, form.

16       A.    I don't know.  I don't remember how many

17   versions I had.  I don't remember how many versions, how

18   many I had, how many like other people had, how many

19   Steve Friedson had.  I'm not -- I just don't know based

20   on this email.

21       Q.    So I'm just trying to authenticate when this

22   statement was sent to your department or division head,

23   I suppose.  And I'm talking about in the form that we've

24   discussed embedded in Exhibit 3, which was the Ad Hoc

25   Panel Report.  So do you remember sending this to your

1  department chair, this, meaning the statement of UNT

2  faculty that is embedded in the Exhibit 3, November 25th,

3  2020 Ad Hoc Panel Report.  Do you remember sending that

4  to your division head at any point?

5      A.    I don't remember it.  I don't remember it in

6  particular.

7      Q.    Do you have any reason to believe that this was

8  not at least some version of the faculty statement that

9  you'd been working on with your colleagues?

10              MS. QUIMBY:  Objection, form.

11      A.    It's titled Individual MHTE Faculty

12  Response.pdf.

13      Q.    So that would have been at least some version

14  of the final that ended up in the Ad Hoc Panel Report?

15      A.    I'm not sure because I don't know anything --

16  well, I mean, you showed me the Ad Hoc Panel Report, but

17  I don't if this version -- like I don't know what this

18  attachment is, because it's not open.

19      Q.    That's kind of why I'm asking.

20      A.    And then I don't know if it's the same as the

21  ad hoc.

22      Q.    Okay.  And that's why -- that's why I'm asking

23  you, because I don't know either.  I'm trying to find it.

24      A.    Okay.  That makes two of us.

25              MR. ALLEN:  Yeah, that's fine.  I think

 1  it's time for a break.  Went a little longer than I

 2  thought because of the technical interlude.  And how long

 3  would you like, Mary and Professor Geoffroy-Schwinden?

 4              THE WITNESS:  Could I have, like, 15

 5  minutes?  Would that be okay?

 6              MR. ALLEN:  Yeah.  Sure.  Absolutely.

 7              THE WITNESS:  Okay.  Great.

 8              THE VIDEOGRAPHER:  Off the record at 3:36.

 9                  (Recess taken)

10              THE VIDEOGRAPHER:  The time is 3:45.

11  We're back on the record.

12                  (Deposition Exhibit Number 8 marked.)

13              MR. ALLEN:  I'm going to mark for the

14  record Exhibit 8.

15      Q.   I'm going to represent to you, Professor

16  Geoffroy-Schwinden, that these are going to be four

17  drafts.  You'll see that they begin with Bates number

18  UNT 0427, and they're numbered sequentially 0428, 0429,

19  and 0430, in that order.

20          Now, the file names, as they were disclosed

21  to us, were draft 1, 2, 3, and I believe 4, something of

22  that nature, in series.  So this explains perhaps the

23  nature of my questions about the email that we examined

24  as Exhibit 7.  I'm trying to identify what was

25  specifically sent to Benjamin Brand, because these

 1  documents weren't produced in series with that email.

 2  Does that make sense?

 3      A.    Yeah, um-hum.

 4      Q.    And it will also allow us to explore how this

 5  draft evolved in -- you know, as it was being formulated

 6  by you and your colleagues.

 7      A.    Okay.

 8      Q.    So let me ask if you -- I'm just going to

 9  look at the first page of Exhibit 8 for the time being,

10  because we're going to go through each of them.  Do you

11  recognize this?

12              THE WITNESS:  I don't have it on my

13  screen.

14              MR. ALLEN:  I'm sorry.

15              THE WITNESS:  That's okay.

16              MR. ALLEN:  I took them down, and thank

17  you for pointing that out.

18              THE WITNESS:  Sure.

19      A.    Okay.  So can you -- would you just point

20  out with --

21      Q.    Sure.  This is Exhibit 8 for the record,

22  which I've introduced.  It's four drafts of a statement

23  that was associated with your file in discovery.  These

24  documents are produced with Bates stamps.  These are

25  page numbers that attorneys assign to all of the

1  documents in a series that they produce.  So this was

2  produced as UNT 427 through UNT 431.

3      A.   Okay.

4      Q.   And so, like I said, these were produced as

5  draft 1, draft 2, draft 3, and draft 4.  And it may be

6  that the last one would have the title of the document

7  that it has in this email, but I want to be able to

8  confirm that since you seem to be the one that was

9  sending these and they were produced in your file.

10     A.   Not all of them, though.  So like I don't

11 know -- yeah, I don't know about the file names.  But

12 okay.  Yeah, let's go through it together.

13     Q.   Well, that's fine.  And I don't know either.

14 That's why I want to ask you questions about it.

15     A.   Okay.

16     Q.   All right.  So do you recognize this first

17 statement in the series?

18     A.   To be honest, I don't recog -- I see it.  I

19 don't like recognize it.  But you know, you're showing

20 it to me, and it was produced in discovery, and I --

21 you know, I get that.

22     Q.   Sure.  And so it says the "Statement by the

23 below-signed faculty."

24          Right?

25     A.   It says that, yeah.

1      Q.   So was it -- excuse me.  Is it your
2   understanding, as you sit here today, that this was an
3   intermediate product, the final version of which would
4   be signed by all of the faculty as a faculty statement?
5              MS. QUIMBY:  Objection, form.
6      A.   I'm not sure who saw this version, or I don't
7   know who was -- I don't know.
8      Q.   You may not have even seen this version?  Is
9   that what you're saying?
10      A.   No, I just -- I don't know.  Sorry.  Are you
11   asking me if this was like a media document among faculty
12   or --
13      Q.   Is this a draft -- so it seems to me, and
14   correct me if I'm wrong, your colleagues, those who
15   eventually signed the faculty statement that we've
16   already examined as an attachment to Exhibit 3, which
17   is in the record, this was formulated by the faculty to
18   be a signed statement that was going to be submitted to
19   the administration; is that accurate?
20              MS. QUIMBY:  Objection, form.
21      A.   We weren't -- I don't know what step in the
22   process this version was.  But it wasn't meant for the
23   admini -- and I don't know if it was meant for the
24   administration.  I don't know that we -- because we --
25   there wasn't anything that went to the administration.

1    Q.    And I'm not asking if this is the first draft
2    or second draft.
3    A.    Okay.
4    Q.    I'm just asking a pretty basic question,
5    I hope, is that is this a draft of the statement which
6    was eventually finalized and signed by all of the faculty
7    and sent to the administration?
8              MS. QUIMBY:  Objection, form.
9    A.    I mean, you're showing it to me as having
10   been submitted as one of the drafts.  I can't honestly
11   say that I remember it.  It very well could have been one
12   of the drafts.  I don't know who wrote this.  I don't
13   know who it was shared with.  I don't know where -- you
14   know, I'm not sure.
15   Q.    Yeah.  So do you see these bubbles here?
16   A.    Yeah.
17   Q.    I'm going to open them up in the sidebar.
18   A.    Okay.
19   Q.    Someone seems to have commented on this
20   particular document.
21   A.    Yeah.
22   Q.    And the name associated with these bubbles is
23   Rebecca Geoffroy-Schwinden.
24   A.    Yes.
25   Q.    Do you see that?

1        A.    Yes.

2        Q.    And it's dated July 28th?

3        A.    Uh-huh.

4        Q.    Does this help clarify that you worked on

5   this document?

6        A.    It has comment bubbles in my name, yeah.

7        Q.    Do you have any reason to believe someone else

8   would have used your computer to write those bubbles?

9        A.    No.

10       Q.    Let's look at the statement.

11             Right here, the draft says, "We are dismayed."

12             Right?

13       A.    It says that, yes.

14       Q.    And it talks about "The uncritical,

15   unscholarly, anti-Black racist treatment that he and

16   his pioneering work endured in the recent issue of the

17   Journal of Schenkerian Studies."

18             Right?

19       A.    It says that, yep.

20       Q.    And is that referring to the work of Timothy

21   Jackson, which was published in the Journal of

22   Schenkerian Studies, Volume 12?

23       A.    It doesn't specify that there, no.  It doesn't

24   say Tim Jackson.

25       Q.    It recognizes some, quote, thoughtful

 1  contributions, right?

 2       A.    We recog -- yes.

 3       Q.    What was your understanding of the

 4  contributions that were, quote, thoughtful?

 5       A.    Some of the articles -- some of the articles

 6  were thoughtful, so critical, scholarly.

 7       Q.    Uh-huh.  And what made them thoughtful?

 8       A.    At this point, I don't remember.  I would have

 9  to be presented with them to be -- but I do not remember

10  the specifics at this point.

11       Q.    And here, it says, "We support and believe

12  our graduate students."

13           Right?

14       A.    Yes.

15       Q.    And what was your understanding of what

16  document was linked here?

17       A.    I don't know.  Can you click it?

18       Q.    I can.  If need be, I'll show the -- let me

19  stop sharing for a second, and then I'll re-share.

20           You should now see my entire Chrome website

21  which opened when I clicked that URL that's embedded in

22  the document.

23       A.    Okay.

24       Q.    Do you remember seeing this document, which I'm

25  going to go ahead and mark as Exhibit 9 for the record?

 1  I'm going to download a copy of this and mark it in the

 2  record as Exhibit 9.  Okay?

 3                    (Deposition Exhibit Number 9 marked.)

 4      Q.   Do you recognize Exhibit 9?

 5      A.   I just want to read it to make sure that I --

 6  to make sure that I do.

 7      Q.   I think it just disappeared.

 8      A.   It did.  Oh, there it is.  Okay.

 9      Q.   Some magical powers that Chrome has, I guess,

10  is to make things disappear and reappear.

11      A.   No, I get it.  I get it.

12           So it looks -- it looks like the grad

13  students' statement, this does.

14      Q.   Um-hum.  And --

15      A.   Can I see the second page just to --

16      Q.   Yes, absolutely.

17      A.   Thanks.  Okay.

18      Q.   And I'm just going to represent to you, see how

19  it says page 2 of 2?  So there are no other pages, right?

20      A.   Not here on this document, no.

21      Q.   Right.  So we confirmed that that's the

22  document that was linked in this draft marked UNT 427,

23  right?

24      A.   You said you clicked it and opened that, so...

25      Q.   Yes.

1      A.    Okay.

2      Q.    And again, if I'm trying to pull a fast one on

3  you, your attorney, Mary Quimby, is very competent and

4  she'll catch me, I'm sure.

5      A.    Okay, okay.  I trust her.

6      Q.    And let me scroll up.  This is another

7  exhibit that was attached to the Ad Hoc Panel Report

8  embedded in Exhibit 3.  Confusingly enough, it is also

9  called Exhibit 3, but it's Exhibit 3 to the Ad Hoc Panel

10  Report.

11      A.    Okay.

12      Q.    Is this that same statement that we just

13  clicked on and was embedded in the draft faculty

14  statement?

15           MS. QUIMBY:  I don't -- you haven't

16  changed the exhibit.

17           MR. ALLEN:  Oh, yes, yes.  My mistake.

18      Q.    See here, the header up here is Exhibit 3,

19  November 25, 2020.  And I can scroll to the top just to

20  confirm that this the Ad Hoc Panel Report that we had

21  discussed earlier as Exhibit 3.

22      A.    Okay.

23      Q.    And then we're going down to -- it's Exhibit

24  Pack.  And one of the exhibits is this document.  And I'm

25  just going to ask you to review it in as much detail as

 1  you need to, to confirm or not whether it is the document

 2  that was linked to that URL that we clicked and was

 3  embedded in the Exhibit 9 -- or excuse me, embedded in

 4  Exhibit 8, in which we pulled up online as Exhibit 9.

 5      A.    Could you just scroll down a little, so I could

 6  keep looking at it?

 7      Q.    Yeah, absolutely.

 8      A.    Thank you.  Okay.  So yeah, they look similar,

 9  the linked one and this one.

10      Q.    Okay.  And I'll just briefly pull up Exhibit 9,

11  which should also be visible.  And, again, I'm just going

12  to scroll through it slowly, but it should be enough for

13  you to at least -- is that the same -- to the best of

14  your knowledge, is that the same text?

15      A.    They look similar, yeah.

16      Q.    Okay.  Thank you.  Now, I'm going to direct

17  your attention back to Exhibit 8.

18      A.    Okay.

19      Q.    So this -- this -- in linking the graduate

20  students' statement, it says, "We support and we believe

21  our graduate students.  Read their statement and demands

22  here."

23            Right?

24      A.    Uh-huh.

25      Q.    Now, there's something here about systemic

1  racism and so forth.  This is where you've dropped one

2  comment in.

3          "On the one hand, it seems important to note

4  that 'due process' takes time.  On the other hand, the

5  system affords this opportunity to people who already

6  hold power.  This seems like a special call against Tim

7  that I think we probably should not make in this kind of

8  statement.  Thoughts?"

9          Do you remember making that comment on this

10 draft?

11      A.   I don't remember making that comment.  But it's

12 -- obviously, I did.

13      Q.   What do you mean by, "The system that affords

14 opportunity to people who already hold power"?

15      A.   Well, like the opportunity like I'm having

16 right now to talk to you.

17      Q.   So you think being called to account before the

18 Courts of the United States is a system that affords this

19 opportunity to people who already hold power?

20      A.   Well, I think I'm lucky that I'm able to have a

21 conversation about this.

22      Q.   How is this an opportunity for people who

23 already hold power?

24      A.   Well, I've -- because I'm able to actually have

25 a chance to talk in front of the legal system.

Rebecca Geoffrey Schwinden, Ph.D.        9/27/24

```
 1        Q.    Do you consider yourself someone who already
 2   has power?
 3        A.    I do.
 4        Q.    Do you think due process -- actually, let's
 5   back up.
 6              What do you understand by, quote, due process?
 7        A.    Like having an opportunity to have an
 8   investigation into something.
 9        Q.    Do you know what -- as you understand it, do
10   you know what the elements of due process rights are?
11        A.    Didn't -- didn't make it to law school.
12        Q.    That's fine.
13              And you say here, "This seems like a specific
14   call against Tim."
15              Right?
16        A.    That's what it says.
17        Q.    You also make another bubble comment on the
18   paragraph that follows that.
19              "This issue is born of these divisions where
20   theory is separated from historical and cultural work.
21   Not sure if this is too much, though."
22              MS. QUIMBY:  I'm sorry --
23        A.    Could you open it on the side?  Because it's
24   like cut off on my screen, so I can't see the first part.
25   There we go.  Thank you.
```

Rebecca Geoffroy-Schwinden, Ph.D.        9/27/24

```
 1        Q.    Can you see -- and if it's --
 2        A.    Yep.
 3        Q.    I'm not quite sure how to make this bigger
 4   if --
 5        A.    That's okay.  I can -- I can see it the way
 6   it is.  It's totally fine.
 7        Q.    Okay, great.
 8        A.    It was just cut off before.
 9        Q.    Let me read it again into the record.
10             "This issue is born of these divisions where
11   theory is separated from historical and cultural work.
12   Not sure if this is too much, though."
13             Did I read that right?
14        A.    You read that right.
15        Q.    What did you mean by that?
16        A.    I need to go back to the paragraph it's
17   commenting on.  (Muffled reading)  Okay.
18        Q.    I'm just asking what that meant to you.
19        A.    I'm not trying to be annoying.
20        Q.    No, no, not at all.
21        A.    Could you read on my comment?  I'm sorry.
22        Q.    That's okay.
23        A.    I genuinely am not trying -- I don't know
24   what I mean by this issue here.  Like I don't know if
25   I --
```

1        Q.    Okay.

2        A.    But I think I mean this issue, like the one

3    that I'm commenting on.

4        Q.    And again, if you don't know or you don't

5    remember, then you don't, so you can say that.

6        A.    Okay, okay.

7        Q.    Is that your testimony?  You just don't know

8    what was your thinking at the time when you wrote that?

9        A.    Well, it means what it says in the sense that

10   (as read) There's deeply entrenched boundaries among

11   research into music cultural -- culture, history, and

12   theory that's complicit here.

13             "This issue is born of these divisions."

14             So I guess maybe the issue -- it looks like

15   it's referencing back maybe to the paragraph before.

16       Q.    Where you are talking about practices that

17   protect the systemic racism?  Is that it?

18       A.    I don't know.  I don't know what I mean by this

19   issue.  I'm sorry.

20       Q.    Do you know what you mean by practices that

21   protect the systemic racism?

22             MS. QUIMBY:  Objection, form.

23       Q.    This was highlighted here, right?

24             (As read) Practices that protect the

25   systemic racism (discrimination? Inequality?) Built into

1  institutional walls, which impedes equally -- excuse me,

2  which impedes equally swift official responses to these

3  kinds of crises.

4        A.    Okay.  So what did you want me to answer about

5  that?

6        Q.    Is that what that's referring to when you said

7  this double bubble?

8        A.    You know, it doesn't seem that way actually.

9        Q.    Okay.

10       A.    Those seem unrelated now that I'm -- I mean,

11  but this is me interpreting like kind of on the spot,

12  trying to walk us through it.

13       Q.    And when you say "complicit" here, what do

14  you mean, complicit?  Complicit in what?

15       A.    That's -- that's actually what I'm wondering

16  with you here.  Clearly, this is a draft.  I'm wondering

17  what time I wrote it, and if I did, because if I'm

18  commenting, maybe someone else did.

19       Q.    Sure.  Well, let me -- let me move on and ask

20  this question.

21             Are all of the eventual signatories, were they

22  all working on this draft, commenting on the drafts that

23  were circulating?

24             MS. QUIMBY:  Objection, form.

25       A.    I don't know.  I don't know.

1      Q.    Okay.  All right.  Let me move to the next

2   draft.  Okay?

3           Now, just to avoid clicking each time and

4   introducing all sorts of repetitive exhibits, can we

5   agree that this remains the same embedded link?

6      A.    Am I allowed to ask my attorneys about

7   that?  Because I just don't know if it's okay to assume

8   something like that.  I'm not sure.

9      Q.    Sure, sure.

10     A.    And I know you are not trying to like --

11     Q.    No, no, I'm not.  Well, let's -- I'm going to

12  state for the record that the document, to this extent,

13  speaks for itself.  Anyone can open the link, and that

14  will confirm what is linked there.  All right?  We've

15  already introduced Exhibit 9 into the record, which was

16  the first link.  And that can be confirmed independently

17  of the witness's testimony.

18           But I do want to ask you, Professor

19  Geoffroy-Schwinden, in all drafts of the faculty

20  statement such as you remember them, you understood

21  that they linked to a students' statement, correct?

22     A.    I don't know that all of the drafts did.

23     Q.    Okay.  We will go through them then.

24     A.    Well, I just don't know if these are all of the

25  drafts like from -- yeah.

1        Q.    This says again, "We write in support of our
2   graduate students and the concerns they have expressed
3   here."

4        A.    Okay.

5        Q.    Doesn't that indicate that this is also a
6   student statement, this link?

7        A.    That this is a student statement?

8        Q.    No, that the link -- sorry, my unclarity, and
9   you're right to point it out.

10             "We write in support of our graduate students
11  and the concerns that they have expressed here:"  And
12  then there's a URL.

13             Is it your understanding of this draft, that
14  that also is a link embedding the students' statement, or
15  at least a reference that's embedding it by reference to
16  the students' statement?

17       A.    This link in this draft clicks out to the
18  students' statement, per -- yeah, like per the record,
19  like we've been talking about.

20       Q.    Okay, thanks.  And here, it just says, "We
21  write in support," right?

22       A.    It does say that.

23       Q.    And here, it says, "The undersigned faculty
24  members are dismayed," right?

25       A.    Yep.

1        Q.    There's some things moved around.  That's

2   normal, as you said before, in a draft.  And if you

3   have -- do you have anything else to point out about

4   this draft?

5        A.    No.

6        Q.    I don't believe there are any comments to

7   this draft.  These are just the ones that link on page 1.

8   See?

9        A.    Okay.

10       Q.    So I'll go to the third draft, for some reason

11   in a different font, but that happens.

12       A.    Okay.

13       Q.    "Professor Philip Ewell and his work in the

14   recent issue of the Journal of Schenkerian Studies."

15            Right?

16       A.    That's what that says, yes.

17       Q.    So do you consider denouncing a bit of a

18   stronger form of feeling than dismay?

19            MS. QUIMBY:  Objection, form.

20       A.    I don't -- I don't know.  They're just

21   different verbs.

22       Q.    Sure.  Is denounce stronger than expressing

23   dismay?

24            MS. QUIMBY:  Objection, form.

25       A.    It depends on the scenario.

1        Q.    In this scenario, in this document, do you

2    understand denounce to be stronger than expressing

3    dismay?

4        A.    I'm not sure.  I'm sure it's a point --

5        Q.    Okay.

6        A.    -- that my colleagues thought about because

7    they fight over commas.  But I don't know the intention

8    between the change between those.  I don't remember the

9    intention between that change in verbiage.

10       Q.    Um-hum.  And there's a statement that

11   "The Journal of Schenkerian Studies contained several

12   unresearched statements about Black Americans."

13            Right?

14            MS. QUIMBY:  Objection, form.

15       A.    If that's what that -- what you're highlighting

16   says in the document.

17       Q.    Okay.  And this looks like it's been pretty

18   stable, this paragraph.

19            And then here, once more, "We write in support

20   of the graduate students.  You can find their statement

21   here."

22            And again, there's the URL link, right?

23       A.    Yes.

24       Q.    There's a reference to the "mandatory

25   administrative process to begin to address this problem."

1              Do you know what that refers to?

2       A.    I don't.

3       Q.    Now, this is the last one in the series.

4  And now, the last one is signed by everyone, right?

5       A.    It has a list of signatures.  I'd have to

6  look at the side by side, but it has a list of

7  signatures, yeah.

8       Q.    Absolutely.  And now, it says, "We, the

9  undersigned faculty members stand in solidarity with

10  our graduate students and their letter of condemnation

11  of the Journal of Schenkerian Studies."

12              Did I read that correctly?

13       A.    That's what this draft says.

14       Q.    Do you understand standing in solidarity to be

15  a stronger statement than denounce?

16              MS. QUIMBY:  Objection, form.

17       A.    Well, denounce -- like the way that -- where

18  the verb was situated in the previous draft was referring

19  to the issue.  And solidarity here seems like the verb

20  is -- that this is referring to the graduate students.

21  So this is just a different sentence.

22       Q.    Okay, sure.  Is it more strongly identifying

23  this statement with the letter of condemnation issued by

24  the graduate students?

25              MS. QUIMBY:  Objection, form.

1        A.    I wouldn't say that it more strongly affiliates

2    it with them, no, not necessarily.

3        Q.    Well, this sentence doesn't even mention the

4    student statement, right?  The student letter, as it's

5    referred to.  This is the first sentence of the previous

6    draft.

7        A.    Okay.  Yeah, no.

8        Q.    It doesn't -- that doesn't incorporate anything

9    referring to the students, does it?

10       A.    It does not.

11       Q.    Now, in this fourth version on UNT 430, "The

12   undersigned faculty members stand in solidarity with the

13   graduate students in their letter of condemnation of the

14   Journal of Schenkerian Studies."

15            Right?

16       A.    That's what this version says, yes.

17       Q.    Does this version qualify that statement in any

18   way?

19            MS. QUIMBY:  Objection, form.

20       A.    So you are asking if this version of -- if it

21   qualifies the phrase "stand in solidarity"?

22       Q.    Yes.

23       A.    Not in that sentence.

24       Q.    Okay.  Thank you.  Now, it says something about

25   the epi -- "Epistemic center of the journal lies in a

1 | racist discourse that has no place in any publication."
2 |        What did you mean by the epistemic center?
3 | How did you understand that?
4 |     A.   I think I -- like the knowledge center, like
5 | the idea that held it together.
6 |     Q.   So the idea that held together the Journal of
7 | Schenkerian Studies is inherently racist?  Is that what
8 | you're saying?
9 |     A.   That's not what that sentence says.
10 |     Q.   Well, I'm just trying to figure out what it
11 | means.  If the epistemic center of the journal lies in a
12 | racist discourse, again, what does that mean?
13 |         MS. QUIMBY:  Objection, form.
14 |     A.   Well, it means what it says, I guess.
15 |     Q.   What's an epi -- okay.  What's an epistemic
16 | center?  Maybe you can explain that for the Court.
17 |         MS. QUIMBY:  Objection, form.
18 |     A.   Well, like I just said, it's like the central
19 | -- the central idea that it hangs together on, the
20 | knowledge.
21 |     Q.   Sure.  Isn't the central idea of the Journal
22 | for Schenkerian Studies, as I believe you testified
23 | earlier, Schenkerian analysis?
24 |         MS. QUIMBY:  Objection, form.
25 |     A.   I don't know.  I mean, so the journal, right,

1  that is dedicated to Schenkerian analysis.  And it looks

2  like this sentence is talking about the journal issue, so

3  the specific issue.

4      Q.   Okay.  The journal issue of Volume 12?

5      A.   It's not cited here.

6      Q.   So can you define the epistemic center of

7  the journal issue you are talking about here in this

8  statement?

9           MS. QUIMBY:  Objection, form.

10     A.   I don't -- are you asking like -- I don't --

11 you read the sentence --

12     Q.   Right.

13     A.   -- that the epistemic center of the journal

14 issue lies in a racist discourse, and it continues.  And

15 you asked me what epistemic center meant, and I said my

16 understanding, at least from this perspective, is that it

17 means like the idea that it hung together on.

18          Is that clear for you?

19     Q.   Okay.  Yes, that is clear to me.

20     A.   Okay.

21     Q.   Now, I'm asking you to tell me your

22 understanding of what was that idea that the Volume 12

23 hung together on, in your words?

24     A.   This sentence says, "The epistemic center of

25 the journal issue lies in a racist discourse that has no

1  place in any publication, especially in an academic

2  journal."

3       Q.    Okay, right.  And so racist discourse, maybe we

4  can agree, that's relatively vague and general, right?

5       A.    What do you mean?  How is racist discourse --

6       Q.    I want to know.  What is the -- what is the

7  racist discourse that is the epistemic center of Volume

8  12 of the Journal of Schenkerian Studies?  Can you

9  identify that for me, please?

10      A.    I can't.  I don't have the journal issue in

11 front of me.

12      Q.    And you don't remember what you meant by that

13 at the time when you signed this statement?

14      A.    I don't understand what you're asking me for

15 here.  So -- but the epistemic center of the journal

16 issue lies in a racist discourse.  Okay.  So...

17      Q.    And then instead of saying as the one version

18 that preceded it had said, "We support our graduate

19 students," this statement now says, "We endorse the call

20 for action outlined in our student letter."  Right?

21      A.    That's what that clause says, yes.

22      Q.    And, again, there's the link to the students'

23 letter, correct?

24      A.    Yes.

25      Q.    So the faculty moved from supporting to

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

1  endorsing, correct?

2      A.    Not the letter.  I mean, what do you mean?

3  Like, yes, the word switched from support to endorse.

4      Q.    Okay.

5      A.    But there are other revisions in that

6  paragraph, it appears.

7      Q.    Then it says (as read) which asks the College

8  of Music publicly condemn -- ask that the public -- I'm

9  sorry.

10     A.    That's okay.

11     Q.    I'm going to read it from the top, just so we

12 get it cleanly into the record.

13          "We endorse the call for action outlined in

14 our students' letter" -- the URL follows -- "which asks

15 that the College of Music 'publicly condemn the issue and

16 release it freely online to the public' and 'provide a

17 full public account of the editorial and publication

18 process and its failures.'  Responsible parties must" --

19 be appropriately -- "be held appropriately accountable."

20          Did I read that correctly?

21     A.    Yeah, yeah.

22     Q.    On a third try?

23     A.    That's okay.  It's late and it's Friday.

24     Q.    Yes.  Thank you.

25          So is it your testimony then, as I'm

1  gathering, that you believe this limits the endorsement

2  of the letter?

3        A.    Yes.

4        Q.    How does it limit the endorsement of the

5  letter?

6        A.    I believe that that statement specifies what

7  part of the letter is endorsed.

8        Q.    Does it say which -- only that part which asks?

9  It doesn't say that, right?

10       A.    It says, "We endorse the call for action which

11  asks the College of Music to publicly condemn the issue

12  and release it freely online to the public and provide

13  a" -- public -- "full public account of the editorial

14  and publication process and its failures."

15       Q.    And it's your -- it's your testimony today that

16  this "which asks" limits the entire endorsement?

17       A.    Grammatically, it would appear so.

18       Q.    Well, grammatically, it would appear that it

19  doesn't say only that part which asks, right?  It doesn't

20  say only that part.

21       A.    "Only" does not appear in that paragraph.

22       Q.    Right.  And it doesn't say we partially

23  endorse, right?

24       A.    "Partially" does not appear in that paragraph.

25       Q.    Okay.  Do you recall any discussion among the

1  group of professors generating this statement about how

2  the group should limit its endorsement of the call for

3  action of the students?

4       A.    I don't remember.

5       Q.    I just want to go back now, and this will

6  probably be the last thing I need to talk about, the

7  famous Exhibit 3.

8       A.    Okay.

9       Q.    I just want -- I just want to walk us through

10 the student statement here.  So this is the student

11 statement, which we've discussed before.  What is the

12 call to action here?

13            MS. QUIMBY:  Objection, form.

14       Q.    Is that question unclear to you?

15            If we -- if we skip down to this statement, it

16 says, "We endorse the call for action outlined in our

17 students' letter."

18            Correct?

19       A.    Yep.  That's what that says.

20       Q.    And this is the student letter that was linked

21 to that statement, correct?

22       A.    Um-hum.

23       Q.    So my question is, what is the call to action

24 that is referred to in the faculty statement?

25            MS. QUIMBY:  Objection, form.

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

 1     A.    To publicly condemn the issue and release it

 2  freely online to the public.

 3     Q.    Um-hum.

 4     A.    "Provide a full public account of the editorial

 5  and publication process and its failures."

 6           That's -- those are the ones outlined in the

 7  faculty statement.

 8     Q.    This statement also calls on the University

 9  of North Texas and UNT College of Music to take other

10  actions, right?  It says so right here.  And I'm

11  referring to this sentence under paragraph enumerated

12  number 2 on JACKSON 0226.

13           It says, "We also call on the University of

14  North Texas and the UNT College of Music to take the

15  following actions:"

16           Right?

17     A.    It does say that, yes.

18     Q.    And one of those is to dissolve the journal,

19  right?

20     A.    It says dissolve the journal, yep.

21     Q.    Do you know if that, in fact, took place?

22     A.    No, I don't.

23     Q.    Has the Journal of Schenkerian Studies appeared

24  since July of 2020?

25     A.    I have no idea.  Like I said, never read it,

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1   still don't.

2       Q.   Okay.  Here's something about critically

3   examining the culture of UNT and etc., etc.

4            And then under the paragraph number 3 on the

5   second page of the student statement, it says, "Hold

6   accountable every person responsible for the direction

7   of the publication.  This will involve recognizing both

8   whistleblowers and those who failed to heed them in this

9   process.  This should also extend to investigating past

10  bigoted behaviors by faculty and, by taking this into

11  account, the discipline and potential removal of

12  faculty who used the JSS platform to promote racism.

13  Specifically, the actions of Dr. Jackson -- both past

14  and present -- are particularly racist and unacceptable."

15           Did I read that correctly?

16      A.   You did.

17      Q.   Now, it's your testimony today that you never

18  intended to endorse these statements?

19      A.   No, I didn't -- I didn't -- no, I didn't

20  endorse these statements.

21      Q.   Even though the faculty statement endorses

22  the students' statement, your testimony today is that --

23      A.   I'm sorry, no.  We did not endorse this whole

24  statement, so you've just misstated my testimony today.

25      Q.   No, no, no.  I'm saying even though this

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1  statement endorses the call for action outlined in the

2  student letter, right?

3      A.    It does not endorse the entire call for action.

4      Q.    All right.  Okay, then good.

5      A.    It endorses the call to make it publicly

6  available and -- do you want to repeat that again into

7  the record, or are we good?  Do you want me to finish

8  it?

9      Q.    No, no.  I'm -- let me finish.  And then if you

10 disagree, maybe you can enlighten me.  All right?

11     A.    Okay.  Sounds good.

12     Q.    This faculty statement endorses the call for

13 action outlined in the student letter.

14          So far, so good.  And you are arguing that

15 this subordinate clause, which asks that the College of

16 Music publicly condemn the issue and release it freely

17 online to the public and provide a full public account

18 of the editorial and publication process and its

19 failures, is only thing you endorse in that letter?

20          MS. QUIMBY:  Objection, form.

21     Q.    Is that your testimony today, that you don't

22 endorse the other things, only these two things that you

23 quoted?

24     A.    That's what that sentence grammatically says.

25     Q.    Even though it doesn't say exclusively or

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1  anything limiting it to only these things, that's your

2  testimony, right?

3                    MS. QUIMBY:  Objection, form.

4        A.    I testified that the word "exclusively" does

5  not appear in that sentence.

6        Q.    And you don't -- sorry about that.  I just

7  clicked on it and made my Chrome browser blow up.

8              You agree that this embeds the letter by

9  reference to this URL link, correct?

10       A.    I agree that that -- yes, the URL link is

11  there.

12       Q.    So just the last couple of questions.

13       A.    Um-hum.

14       Q.    Can you identify any concrete actions, past

15  or present, of Timothy Jackson that are particularly

16  racist?

17       A.    I would just say maybe some of the writing in

18  the article.

19       Q.    So his published speech basically, right?

20                    MS. QUIMBY:  Objection, form.

21       A.    Sorry, wait.  No.  Sorry, what do you mean?

22       Q.    Well, I asked if you can identify concrete

23  specific actions of Dr. Jackson, either past or present,

24  that are particularly racist.

25       A.    I would just say some of the writing in the

 1 article.

 2      Q.   Okay.  And besides writing, as you sit here

 3 today, can you identify any specific actions that Dr.

 4 Jackson has committed, either past or present, that are

 5 particularly racist?

 6      A.   Not in my experience, not that I've experienced

 7 personally.

 8      Q.   Okay, thanks.  And if I asked you the same

 9 question about, quote, bigoted behaviors, would your

10 answer be the same?

11      A.   I haven't experienced that personally.

12      Q.   Okay.  Have you witnessed it experienced by

13 others?

14      A.   I have -- no.

15      Q.   Okay.  Now, about the discussions that led to

16 the formulation of this final circulated and published

17 UNT faculty statement, do you recall any expressed

18 discussions about limiting the endorsement of the

19 faculty of the students' statement?

20           MS. QUIMBY:  Objection, form.

21      A.   Do I recall specifically limiting like the

22 length of the statement?

23      Q.   No, no, no.  Sorry.  I wasn't clear, and thanks

24 for interjecting.  And, again, I'm not trying to put

25 words in your mouth, but it seems to me your testimony is

1  this endorsement of the call to action outlined in the

2  students' letter you're testifying is limited to only

3  these things.

4        A.    Yep.

5        Q.    Right?

6        A.    That's correct.

7        Q.    And so my question for you is, were there

8  documents that recorded discussions about the limitations

9  the faculty who signed this letter wished to place on

10  this endorsement for the call for action outlined in the

11  students' letter?

12        A.    I don't remember.

13              MR. ALLEN:  Okay.  Mary, I think I'm done,

14  but I want to look at my notes real quick.  And if I've

15  missed an exhibit or some such thing, and come back on

16  the record.  And we can pass the witness, or maybe I have

17  one or two more questions.  But I think we're almost

18  done, Professor Geoffroy-Schwinden.

19              MS. QUIMBY:  Do you want to just take

20  five?  Do you mind?

21              MR. ALLEN:  Absolutely.  Not more.  I'm

22  going to stay here and just go on mute, but I'll be right

23  here.

24              MS. QUIMBY:  Okay.

25              THE VIDEOGRAPHER:  Off the record at 4:26.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

```
 1                    (Recess taken)
 2               THE VIDEOGRAPHER:  The time is 4:38.
 3   We're on the record.
 4               MR. ALLEN:  I'm going to pass the
 5   witness to Attorney Quimby.
 6               MS. QUIMBY:  I'll reserve my questions for
 7   trial.
 8               MR. ALLEN:  All right.
 9               THE VIDEOGRAPHER:  The time is 4:38.
10   We're off the record.
11                    (Proceedings concluded at 4:38 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1                    CHANGES AND SIGNATURE

2   WITNESS:  REBECCA GEOFFROY-SCHWINDEN, Ph.D.

3   DATE:  SEPTEMBER 27, 2024

4      PAGE/LINE            CHANGE              REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*

1  _____

2       I, REBECCA GEOFFREY-SCHWINDEN, Ph.D., have read the

3  foregoing deposition and hereby affix my signature

4  that same is true and correct, except as noted above.

5

6                              _____

                             REBECCA GEOFFROY-SCHWINDEN, Ph.D.
7

8  THE STATE OF _____)

9  COUNTY OF _____)

10      Before me, _____, on this day
   personally appeared REBECCA GEOFFROY-SCHWINDEN, Ph.D.,
11 known to me or proved to me on the oath of
   _____ or through
12 _____ (description
   of identity card or other document) to be the person
13 whose name is subscribed to the foregoing instrument
   and acknowledged to me that he/she executed the same
14 for the purpose and consideration therein expressed.

15      Given under my hand and seal of office on this

16 _____ day of _____, _____.

17

18

19                              _____

                             NOTARY PUBLIC IN AND FOR
20
                             THE STATE OF _____
21

   My Commission Expires: _____
22

23

24

25

Rebecca Geoffroy-Schwinden, Ph.D.        9/27/24

```
1              UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
2                  SHERMAN DIVISION

3  TIMOTHY JACKSON,              )
                                 )
4       Plaintiff,               )
                                 )
5  vs.                           )  CASE NO. 4:21-CV-00033-ALM
                                 )
6  LAURA WRIGHT, et al.,         )
                                 )
7       Defendants.              )

8

9       _____

10              REPORTER'S CERTIFICATION OF

11  ORAL DEPOSITION OF REBECCA GEOFFROY-SCHWINDEN, Ph.D.

12                 September 27, 2024

13      _____

14

15

16      I, KIM D. CARRELL, a Certified Shorthand Reporter

17  in and for the State of Texas, hereby certify to the

18  following:

19      That the witness, REBECCA GEOFFROY-SCHWINDEN, Ph.D.,

20  was duly sworn and that the transcript of the oral

21  deposition is a true record of the testimony given by the

22  witness;

23      That the deposition transcript was duly submitted

24  on October 30, 2024, to Ms. Mary Quimby, the attorney for

25  the defendants, for examination, signature, and return to
```

Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24

1  me by December 2, 2024;

2       That pursuant to the information given to the

3  deposition officer at the time said testimony was taken,

4  the following includes all partes of record and the

5  amount of time used by each party at the time of the

6  deposition;

7       Mr. Michael Thad Allen - 02 HRS: 34 MIN

8            Attorney for the Plaintiff

9       Ms. Mary Quimby -  00 HRS: 00 MIN

10            Attorney for the Defendants

11

12       I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties or

14  attorneys in the action in which this proceeding was

15  taken, and further that I am not financially or

16  otherwise interested in the outcome of the action.

17       Certified to by me on this 29th day of October,

18  2024.

19

20                    _____
                     Kim D. Carrell, CSR NO. 1184
21                    Date of Expiration: 7-31-26

22                    JULIA WHALEY & ASSOCIATES, INC.
                     2012 Vista Crest Drive
23                    Carrollton, Texas  75007-1640
                     214-668-5578/Fax 972-236-6666
24                    Firm Registration No. 436
                     Certification Expires 10-31-26
25                    Notary Comm. Expires 12-1-25

## #

**#308** [1] - 1:22

## '

**'22** [1] - 15:3
**'22-'23** [1] - 15:4
**'24-'25** [1] - 15:4
**'due** [1] - 100:4
**'Open** [1] - 73:11
**'provide** [1] -
114:16
**'publicly** [1] -
114:15

## 0

**00** [2] - 127:9
**000233).............**
[1] - 4:6
**000276** [1] - 4:8
**000288).............**
. [1] - 4:8
**000355** [1] - 4:4
**000356).............**
[1] - 4:4
**000377** [1] - 4:12
**000378).............**
. [1] - 4:12
**000417).............**
.... [1] - 4:14
**000425).............**
.......... [1] - 4:10
**000427** [1] - 4:15
**000431).............**
. [1] - 4:15
**02** [1] - 127:7
**0226** [1] - 117:12
**0276** [1] - 72:5
**0355** [1] - 53:19
**0427** [1] - 90:18
**0428** [1] - 90:18
**0429** [1] - 90:18
**0430** [1] - 90:19
**06.035** [2] - 78:14,
78:17
**06375** [1] - 2:4

## 1

**1** [7] - 4:3, 7:5,
8:4, 67:16,
90:21, 92:5,
107:7
**10-31-26** [1] -
127:24
**1184** [1] - 127:20
**12** [26] - 26:21,
27:25, 28:13,

**33:14, 34:7,
37:7, 37:16,
38:19, 39:5,
39:21, 40:5,
40:7, 40:11,
41:19, 45:15,
45:22, 46:4,
46:25, 48:2,
51:11, 52:19,
53:2, 95:22,
112:4, 112:22,
113:8
**12-1-25** [1] -
127:25
**124** [1] - 3:10
**12548** [1] - 2:9
**126** [1] - 3:11
**13** [1] - 73:2
**15** [1] - 90:4
**1700** [1] - 65:13
**1802** [1] - 17:23
**1804** [1] - 65:13
**1820** [1] - 65:14
**1:33** [2] - 1:18, 6:3

## 2

**2** [13] - 3:3, 4:4,
53:7, 53:10,
54:1, 61:24,
67:16, 90:21,
92:5, 97:19,
117:12, 127:1
**20** [1] - 5:14
**2007** [1] - 12:18
**2009** [2] - 13:15,
13:22
**2011** [3] - 12:22,
13:11, 13:16
**2012** [1] - 127:22
**2015** [4] - 12:23,
13:17, 14:10,
14:11
**2018** [1] - 24:2
**2019** [5] - 27:5,
27:8, 28:8,
33:11, 57:22
**2020** [30] - 26:21,
27:5, 29:25,
30:1, 30:3, 31:3,
31:15, 36:22,
37:3, 37:12,
38:2, 39:9,
39:14, 39:22,
40:20, 54:9,
56:13, 57:1,
62:7, 66:2,
66:13, 76:1,
78:7, 82:18,
83:7, 86:13,

**89:3, 98:19,
117:24
**2021** [2] - 14:16
**2022** [1] - 25:14
**2024** [9] - 1:11,
1:18, 5:3, 6:3,
124:3, 126:12,
126:24, 127:1,
127:18
**214-598-5229** [1] -
2:23
**214-668-5578/
Fax** [1] - 127:23
**25** [1] - 98:19
**25th** [1] - 89:2
**27** [5] - 1:11, 5:3,
6:2, 124:3,
126:12
**27th** [3] - 1:17,
32:11, 54:9
**280** [1] - 76:1
**28th** [1] - 95:2
**29th** [4] - 82:18,
83:7, 84:9,
127:17
**2:00** [1] - 32:11
**2:33** [1] - 52:10
**2:44** [1] - 52:12

## 3

**3** [19] - 4:5, 65:23,
65:25, 66:21,
67:7, 67:16,
73:23, 88:24,
89:2, 90:21,
92:5, 93:16,
98:8, 98:9,
98:18, 98:21,
116:7, 118:4
**30** [2] - 5:15,
126:24
**30th** [3] - 75:25,
78:7, 86:13
**34** [1] - 127:7
**3:32** [1] - 87:12
**3:33** [1] - 87:14
**3:36** [1] - 90:8
**3:45** [1] - 90:10

## 4

**4** [10] - 3:4, 4:7,
66:22, 67:18,
72:2, 72:4,
78:22, 79:2,
90:21, 92:5
**404** [1] - 2:4
**417** [1] - 86:16
**427** [1] - 92:2,

**97:22
**430** [1] - 110:11
**431** [1] - 92:2
**436** [1] - 127:24
**4:21-CV-00033-
ALM** [3] - 1:5,
5:4, 126:5
**4:26** [1] - 122:25
**4:38** [4] - 1:18,
123:2, 123:9,
123:11

## 5

**5** [5] - 3:5, 4:9,
77:25, 78:1,
78:3
**50,000** [1] - 42:14
**512.320.0667** [1] -
2:10
**512.463.2120** [1] -
2:10
**53** [1] - 4:4

## 6

**6** [5] - 3:7, 4:11,
82:13, 82:15,
82:17
**66** [1] - 4:6

## 7

**7** [6] - 4:3, 4:13,
73:2, 86:9,
86:11, 90:24
**7-29-20** [1] - 4:12
**7-30-20** [3] - 4:7,
4:10, 4:13
**7-31-26** [1] -
127:20
**72** [1] - 4:8
**75007-1640** [1] -
127:23
**76201** [1] - 2:15
**78** [1] - 4:10
**78711** [1] - 2:10

## 8

**8** [7] - 4:15, 90:12,
90:14, 91:9,
91:21, 99:4,
99:17
**801** [2] - 1:22,
2:14
**82** [1] - 4:12
**86** [1] - 4:14
**860.469.2783** [1] -
2:5

**860.772.4738** [1] -
2:5

## 9

**9** [9] - 4:16, 96:25,
97:2, 97:3, 97:4,
99:3, 99:4,
99:10, 105:15
**90** [1] - 4:15
**900** [2] - 42:4,
42:7
**940.369.7026** [1] -
2:15
**940.565.2717** [1] -
2:15
**97** [1] - 4:17
**972-236-6666** [1] -
127:23

## A

**abide** [1] - 11:1
**ability** [2] - 9:6,
10:7
**able** [5] - 7:24,
39:17, 92:7,
100:20, 100:24
**above-styled** [1] -
1:17
**Abraham** [1] -
36:11
**abroad** [1] - 16:20
**absolutely** [4] -
45:5, 78:25,
97:16, 99:7
**Absolutely** [4] -
8:10, 90:6,
109:8, 122:21
**abstract** [1] -
58:10
**academia** [1] -
14:9
**academic** [8] -
19:1, 19:21,
27:2, 27:4,
34:25, 38:18,
39:5, 113:1
**Academic** [1] -
76:23
**acceptable** [2] -
10:14, 47:20
**accepted** [1] -
25:15
**account** [6] -
100:17, 114:17,
115:13, 117:4,
118:11, 119:17
**accountable** [2] -
114:19, 118:6

**accurate** [6] -
8:15, 30:1,
31:15, 79:6,
79:20, 93:19
**accurately** [1] -
55:4
**accusation** [1] -
63:1
**accused** [3] -
32:20, 61:15,
62:8
**acknowledged**
[1] - 125:13
**Acoustemologie
s** [2] - 22:22,
22:23
**acoustemologie
s** [1] - 22:19
**acronym** [1] -
55:7
**action** [14] -
113:20, 114:13,
115:10, 116:3,
116:12, 116:16,
116:23, 119:1,
119:3, 119:13,
122:1, 122:10,
127:14, 127:16
**actions** [6] -
117:10, 117:15,
118:13, 120:14,
120:23, 121:3
**Actions'** [1] -
73:12
**active** [2] - 55:3,
55:24
**activities** [1] -
27:3
**actual** [1] - 66:8
**ad** [1] - 89:21
**Ad** [16] - 4:5, 66:2,
66:9, 66:13,
67:3, 67:17,
67:18, 73:21,
74:6, 88:24,
89:3, 89:14,
89:16, 98:7,
98:9, 98:20
**added** [1] - 76:8
**addition** [1] -
11:23
**additional** [1] -
77:25
**address** [5] -
27:8, 27:11,
33:8, 75:24,
108:25
**addressing** [3] -
73:5, 86:22,
87:24

**admini** [1] - 93:23
**administration** [5] - 82:1, 93:19, 93:24, 93:25, 94:7
**administrative** [2] - 15:1, 108:25
**advisor** [3] - 54:22, 59:13, 61:24
**affect** [2] - 9:3, 9:6
**affiliated** [2] - 17:2, 17:5
**affiliates** [1] - 110:1
**affiliation** [1] - 17:10
**affix** [1] - 125:3
**affixed** [1] - 67:23
**affords** [3] - 100:5, 100:13, 100:18
**African** [3] - 64:16, 65:2, 65:7
**afternoon** [1] - 59:6
**ago** [3] - 22:16, 35:15, 60:3
**agree** [4] - 105:5, 113:4, 120:8, 120:10
**Agreement** [1] - 5:6
**ahead** [9] - 6:17, 54:4, 55:2, 55:25, 56:17, 72:25, 73:1, 84:1, 96:25
**al** [3] - 1:6, 4:8, 126:6
**alarmed** [1] - 35:18
**allegation** [1] - 63:1
**Allen** [3] - 2:3, 6:21, 127:7
**ALLEN** [29] - 2:3, 6:7, 6:19, 51:24, 52:2, 52:6, 53:6, 65:24, 72:3, 77:24, 82:12, 82:16, 85:22, 86:2, 86:7, 87:2, 87:6, 87:10, 87:15, 89:25, 90:6, 90:13, 91:14, 91:16, 98:17, 122:13,

122:21, 123:4, 123:8
**Allen..........** [1] - 3:7
**allow** [1] - 91:4
**allowed** [1] - 105:6
**almost** [3] - 9:11, 9:23, 122:17
**ALSO** [1] - 2:18
**American** [10] - 17:25, 43:8, 63:13, 63:22, 64:4, 64:16, 64:23, 65:2, 65:7
**Americans** [1] - 108:12
**amount** [1] - 127:5
**analysis** [3] - 26:17, 111:23, 112:1
**AND** [2] - 124:1, 125:19
**Andrew** [2] - 77:12, 79:8
**announced** [1] - 73:13
**announcement** [1] - 70:2
**annoying** [2] - 16:5, 102:19
**anonymity** [1] - 40:22
**anonymous** [10] - 36:9, 36:20, 41:3, 41:10, 43:10, 44:11, 44:12, 44:19, 45:1, 60:19
**anonymously** [3] - 40:24, 43:11, 44:1
**answer** [16] - 7:24, 9:17, 9:23, 9:25, 10:8, 10:11, 47:19, 47:21, 48:22, 48:24, 52:6, 56:24, 64:21, 87:19, 104:4, 121:10
**answered** [1] - 87:18
**answering** [1] - 10:17
**answers** [1] - 31:6
**anthropology** [3] - 12:24, 13:4,

13:5
**Anti** [1] - 73:12
**anti** [1] - 95:15
**anti-Black** [1] - 95:15
**Anti-Racist** [1] - 73:12
**anxious** [1] - 48:20
**anyway** [1] - 34:22
**apologize** [2] - 30:8, 76:3
**appear** [6] - 19:16, 115:17, 115:18, 115:21, 115:24, 120:5
**APPEARANCES** [1] - 2:1
**appearances** [1] - 6:20
**Appearances.....** ........................ ... [1] - 3:3
**appeared** [3] - 8:15, 117:23, 125:10
**appearing** [1] - 35:10
**Appearing** [1] - 2:13
**applies** [1] - 74:18
**approaches** [1] - 22:18
**appropriately** [2] - 114:19
**approved** [1] - 74:24
**Approx** [1] - 18:4
**April** [5] - 28:25, 29:1, 29:13, 29:16, 31:21
**arbitration** [1] - 5:20
**area** [1] - 30:16
**arguing** [1] - 119:14
**arranging** [1] - 83:6
**art** [4] - 64:17, 65:3, 65:7, 65:16
**Art** [1] - 24:14
**article** [18] - 20:17, 23:18, 24:4, 24:12, 33:20, 33:22, 33:24, 34:11, 34:15, 34:23, 34:24, 35:5,

35:7, 36:7, 40:13, 120:18, 121:1
**Articles** [2] - 18:5, 26:17
**articles** [20] - 18:5, 18:15, 19:1, 19:4, 19:10, 19:15, 20:10, 21:21, 22:2, 33:25, 34:2, 34:3, 34:9, 36:5, 36:16, 38:11, 40:11, 96:5
**Arts** [1] - 12:21
**aspect** [1] - 72:22
**assign** [1] - 91:25
**Assistant** [3] - 2:8, 6:25, 76:23
**Associate** [2] - 76:19, 76:21
**associate** [2] - 14:15, 14:20
**associated** [3] - 73:14, 91:23, 94:22
**ASSOCIATES** [1] - 127:22
**Association** [1] - 55:8
**assume** [5] - 10:22, 12:3, 14:4, 57:22, 105:7
**Atlantic** [1] - 63:19
**attached** [5] - 1:25, 66:18, 67:3, 73:21, 98:7
**attachment** [4] - 74:6, 86:17, 89:18, 93:16
**attachments** [1] - 66:16
**attacked** [2] - 80:3, 80:22
**attacks** [1] - 80:18
**attention** [2] - 66:18, 99:17
**attorney** [11] - 5:11, 5:11, 7:20, 9:10, 9:21, 9:23, 53:9, 72:21, 72:23, 98:3, 126:24
**Attorney** [6] - 2:8,

6:25, 123:5, 127:8, 127:10
**attorney-client** [1] - 9:21
**attorneys** [8] - 6:19, 11:7, 11:10, 11:24, 12:4, 91:25, 105:6, 127:14
**audibly** [2] - 10:8, 10:11
**audio** [1] - 85:1
**August** [1] - 62:7
**Austin** [1] - 2:10
**authenticate** [1] - 88:21
**author** [6] - 21:13, 41:3, 43:10, 44:12, 44:19, 60:19
**authority** [1] - 76:4
**authors** [3] - 36:18, 40:23, 40:24
**available** [1] - 119:6
**avoid** [1] - 105:3
**awards** [1] - 15:23
**aware** [8] - 26:18, 26:20, 27:5, 30:18, 41:16, 41:20, 52:17, 82:10

---

## B

**Bach** [1] - 65:12
**background** [1] - 12:9
**backing** [3] - 30:5, 30:9, 51:9
**bad** [2] - 23:14, 23:16
**Bakulina** [2] - 73:4, 73:10
**based** [2] - 75:5, 88:19
**basic** [1] - 94:4
**Bates** [5] - 53:19, 72:5, 86:16, 90:17, 91:24
**BE** [1] - 5:5
**become** [1] - 14:1
**Beethoven** [1] - 65:13
**begin** [2] - 90:17, 108:25
**beginning** [3] - 21:21, 60:17,

62:7
**behalf** [1] - 70:5
**behaviors** [2] - 118:10, 121:9
**below** [3] - 34:25, 77:2, 92:23
**below-signed** [1] - 92:23
**Benjamin** [4] - 86:13, 86:24, 88:1, 90:25
**best** [3] - 18:7, 60:20, 99:13
**better** [5] - 22:17, 27:20, 29:17, 73:16, 74:1
**between** [4] - 13:18, 108:8, 108:9
**bigger** [1] - 102:3
**bigoted** [2] - 118:10, 121:9
**bit** [2] - 66:23, 107:17
**Black** [3] - 64:11, 95:15, 108:12
**blank** [1] - 22:3
**blind** [7] - 21:3, 21:7, 21:9, 21:11, 21:15, 24:7, 25:8
**block** [1] - 53:25
**Bloomsbury** [2] - 24:13, 25:1
**blow** [1] - 120:7
**blowing** [1] - 29:17
**board** [2] - 25:20, 73:15
**body** [1] - 53:25
**book** [11] - 18:9, 20:12, 20:14, 20:15, 20:17, 21:22, 24:9, 24:12, 25:12, 25:25, 65:13
**books** [7] - 18:5, 18:6, 20:11, 21:24, 22:1, 22:2, 22:4
**born** [3] - 101:19, 102:10, 103:13
**bother** [1] - 77:2
**bottom** [2] - 8:4, 54:7
**Boulevard** [2] - 1:22, 2:14
**bound** [1] - 69:19
**boundaries** [1] - 103:10

**Box** [2] - 2:4, 2:9
**Brand** [5] - 4:14, 86:13, 86:24, 88:1, 90:25
**breach** [1] - 76:7
**break** [9] - 46:7, 51:23, 51:25, 52:4, 85:20, 86:4, 87:7, 87:9, 90:1
**breaking** [1] - 30:7
**brewing** [1] - 32:3
**brief** [3] - 52:14, 83:3, 85:20
**briefly** [3] - 12:7, 17:20, 99:10
**bring** [1] - 85:24
**Brooks'** [1] - 64:8
**browser** [1] - 120:7
**bubble** [2] - 101:17, 104:7
**bubbles** [4] - 94:15, 94:22, 95:6, 95:8
**building** [3] - 9:12, 9:16, 23:23
**built** [1] - 103:25
**business** [1] - 18:1
**but..** [1] - 16:8
**BY** [2] - 6:7, 87:21

**C**

**calculated** [1] - 58:22
**cannot** [2] - 47:13, 74:22
**capacity** [3] - 59:14, 69:9, 69:19
**Capital** [1] - 2:9
**caption** [1] - 82:21
**captioned** [3] - 66:20, 78:1, 82:18
**card** [1] - 125:12
**career** [5] - 12:8, 12:12, 12:13, 14:8, 14:9
**carefully** [1] - 38:13
**Caribbean** [1] - 63:19
**CARRELL** [1] - 126:16

**Carrell** [2] - 1:19, 127:20
**Carrollton** [1] - 127:23
**CASE** [2] - 1:5, 126:5
**catch** [1] - 98:4
**category** [1] - 20:8
**Catherine** [1] - 72:5
**CAUSE** [1] - 5:4
**cc** [1] - 53:12
**center** [11] - 110:25, 111:2, 111:4, 111:11, 111:16, 112:6, 112:13, 112:15, 112:24, 113:7, 113:15
**central** [3] - 111:18, 111:19, 111:21
**Century** [3] - 23:21, 65:12, 65:16
**certainly** [1] - 9:23
**certificate** [3] - 12:23, 13:4, 13:9
**Certificate..........
.................** [1] - 3:11
**certificates** [1] - 13:7
**Certification** [1] - 127:24
**CERTIFICATION** [1] - 126:10
**Certified** [3] - 1:19, 126:16, 127:17
**certify** [2] - 126:17, 127:12
**chain** [1] - 72:4
**Chain** [1] - 4:7
**chair** [1] - 89:1
**chance** [5] - 8:7, 54:2, 72:24, 83:4, 100:25
**CHANGE** [1] - 124:4
**change** [2] - 108:8, 108:9
**changed** [1] - 98:16
**Changes** [1] - 3:10
**CHANGES** [1] -

124:1
**chapter** [4] - 20:17, 24:7, 24:8, 85:25
**chapters** [2] - 20:12, 20:14
**characterize** [1] - 20:18
**chat** [4] - 7:19, 53:8, 78:1, 82:18
**Chrome** [3] - 96:20, 97:9, 120:7
**Chronicle** [1] - 53:4
**circulated** [7] - 41:17, 41:18, 43:6, 61:5, 62:2, 62:3, 121:16
**circulating** [1] - 104:23
**circulation** [1] - 22:4
**Circulations** [1] - 23:20
**cited** [1] - 112:5
**citizen** [1] - 69:3
**citizens** [1] - 69:15
**City** [1] - 27:6
**Civil** [2] - 1:23, 5:8
**claim** [1] - 65:9
**clarification** [3] - 10:12, 10:15, 10:22
**clarify** [1] - 95:4
**clause** [2] - 113:21, 119:15
**clean** [1] - 10:7
**cleanly** [1] - 114:12
**clear** [19] - 8:1, 9:18, 9:21, 10:9, 10:17, 10:19, 10:23, 11:3, 15:10, 70:15, 70:19, 71:4, 71:10, 71:11, 81:15, 81:16, 112:18, 112:19, 121:23
**Clearly** [1] - 104:16
**clearly** [1] - 10:12
**click** [1] - 96:17
**clicked** [5] - 96:21, 97:24, 98:13, 99:2,

120:7
**clicking** [1] - 105:3
**clicks** [1] - 106:17
**client** [9] - 6:23, 9:21, 61:15, 80:3, 80:18, 80:21, 81:18, 81:24, 82:6
**close** [1] - 85:25
**closure** [1] - 80:5
**co** [2] - 68:7, 68:8
**co-wrote** [2] - 68:7, 68:8
**collaborative** [1] - 50:23
**colleague** [4] - 29:5, 31:22, 36:7, 62:4
**colleagues** [13] - 61:4, 62:1, 68:7, 68:8, 68:20, 69:15, 69:17, 69:18, 89:9, 91:6, 93:14, 108:6
**College** [12] - 12:18, 27:6, 27:7, 55:12, 70:3, 76:20, 114:7, 114:15, 115:11, 117:9, 117:14, 119:15
**college** [1] - 13:9
**comfortable** [2] - 35:14, 65:19
**Comm** [1] - 127:25
**commas** [1] - 108:7
**comment** [8] - 64:18, 85:16, 95:6, 100:2, 100:9, 100:11, 101:17, 102:21
**commented** [1] - 94:19
**commenting** [4] - 102:17, 103:3, 104:18, 104:22
**comments** [1] - 107:6
**Commission** [1] - 125:21
**committed** [1] - 121:4
**common** [1] - 69:20
**communicated** [1] - 71:13

**communicating** [2] - 24:24, 25:5
**communication** [1] - 61:23
**communication s** [2] - 29:13, 62:6
**compared** [1] - 42:1
**competent** [1] - 98:3
**complaints** [4] - 56:3, 56:6, 56:8, 56:9
**complicit** [3] - 103:12, 104:13, 104:14
**Complicit** [1] - 104:14
**comprises** [1] - 26:9
**computer** [5] - 50:25, 51:1, 51:2, 51:7, 95:8
**computerized** [1] - 1:20
**conception** [1] - 46:2
**concern** [3] - 38:6, 69:24, 69:25
**concerned** [4] - 44:19, 49:10, 49:12, 61:2
**concerns** [9] - 35:9, 38:8, 48:9, 48:11, 48:13, 61:3, 61:10, 106:2, 106:11
**concluded** [1] - 123:11
**concrete** [2] - 120:14, 120:22
**condemn** [8] - 48:6, 48:8, 48:11, 114:8, 114:15, 115:11, 117:1, 119:16
**condemnation** [3] - 109:10, 109:23, 110:13
**condemned** [2] - 46:20, 46:21
**condemning** [4] - 41:18, 43:14, 47:8, 58:21
**condition** [1] - 9:6
**conducting** [1] - 7:13
**conference** [2] -

16:9, 28:8
**confirm** [4] - 92:8, 98:20, 99:1, 105:14
**confirmed** [2] - 97:21, 105:16
**conflating** [1] - 41:5
**confusing** [1] - 71:1
**Confusingly** [1] - 98:8
**confusion** [1] - 66:23
**congratulations** [1] - 15:21
**consequence** [1] - 82:4
**consequences** [4] - 79:19, 79:22, 79:25, 81:25
**Conservatory's** [1] - 23:24
**consider** [2] - 101:1, 107:17
**consideration** [1] - 125:14
**consistent** [1] - 67:13
**contained** [1] - 108:11
**content** [1] - 53:20
**contents** [3] - 38:7, 38:8, 39:20
**continued** [1] - 13:13
**continues** [2] - 54:15, 112:14
**continuous** [1] - 13:12
**contract** [2] - 25:18, 25:22
**contributions** [2] - 96:1, 96:4
**controversial** [7] - 40:20, 43:19, 44:5, 44:13, 64:15, 65:1, 65:5
**controversy** [11] - 26:4, 26:6, 28:13, 28:22, 32:13, 37:4, 37:6, 37:7, 37:15, 39:21, 53:2
**convenient** [1] -

*Rebecca Geoffroy-Schwinden, Ph.D.*    *9/27/24*    4

7:21
**conversation** [6] -
9:13, 62:12,
63:23, 64:19,
84:25, 100:21
**conversations** [6]
- 10:5, 61:13,
61:14, 61:19,
61:22, 62:1
**coordinating** [2] -
15:7, 15:8
**coordinator** [1] -
15:5
**copy** [2] - 5:19,
97:1
**Correct** [2] -
31:11, 116:18
**correct** [22] -
12:5, 13:21,
14:25, 18:24,
26:11, 30:3,
31:8, 33:9,
33:10, 33:13,
43:14, 44:6,
67:16, 75:20,
93:14, 105:21,
113:23, 114:1,
116:21, 120:9,
122:6, 125:4
**correctly** [11] -
13:1, 67:21,
73:18, 74:20,
76:11, 78:4,
86:14, 86:19,
109:12, 114:20,
118:15
**correspond** [1] -
34:4
**corresponding**
[1] - 31:21
**Cosmologies** [1]
- 22:21
**counsel** [1] -
127:12
**Counsel** [2] -
2:14, 7:4
**Counsel's** [2] -
71:14, 71:17
**COUNTY** [1] -
125:9
**couple** [4] -
29:20, 33:3,
52:14, 120:12
**course** [8] - 7:8,
8:21, 14:9, 27:4,
31:9, 44:11,
51:24, 52:2
**courses** [1] - 64:6
**coursework** [1] -
13:5

**Court** [10] - 5:7,
9:12, 9:14, 10:4,
17:19, 30:10,
66:6, 82:13,
87:15, 111:16
**court** [2] - 10:7,
66:8
**COURT** [2] - 1:1,
126:1
**Courts** [1] -
100:18
**create** [1] - 9:14
**creating** [1] -
39:21
**Crest** [1] - 127:22
**crises** [1] - 104:3
**critical** [1] - 96:6
**Critical** [1] - 15:12
**critically** [1] -
118:2
**criticism** [1] -
64:12
**criticisms** [3] -
37:20, 37:24,
38:1
**CSR** [1] - 127:20
**CT** [1] - 2:4
**cultural** [3] -
101:20, 102:11,
103:11
**culture** [2] -
103:11, 118:3
**current** [1] - 65:13
**curriculum** [1] -
12:10
**cut** [3] - 85:6,
101:24, 102:8
**cuts** [1] - 53:24
**CV** [2] - 20:6, 22:6

## D

**Dani** [6] - 53:11,
54:9, 54:11,
54:14, 54:19,
54:21
**Daphne** [1] - 64:8
**DATE** [2] - 5:3,
124:3
**Date** [1] - 127:20
**date** [2] - 28:18,
59:11
**dated** [1] - 95:2
**dates** [1] - 30:4
**DAYS** [1] - 5:13
**days** [4] - 5:14,
5:15, 68:13,
68:16
**dealing** [1] - 39:4
**dealt** [9] - 38:10,

39:6, 39:9,
39:15, 39:23,
40:8, 40:19,
49:17, 60:18
**Dealt** [1] - 39:17
**dean** [2] - 84:18,
85:16
**Dean** [15] - 71:14,
71:19, 71:23,
76:6, 76:19,
76:21, 76:23,
77:2, 77:3, 78:6,
78:9, 79:15,
82:20, 83:6,
84:8
**deans** [1] - 84:15
**Dear** [2] - 53:15,
74:16
**December** [1] -
127:1
**dedicated** [2] -
17:25, 112:1
**deeply** [1] -
103:10
**defamation** [1] -
81:16
**Defendants** [4] -
1:7, 7:1, 126:7,
127:10
**DEFENDANTS** [1]
- 2:7
**defendants** [1] -
126:25
**define** [1] - 112:6
**definitely** [3] -
22:8, 64:9,
77:16
**degree** [7] -
12:14, 12:16,
12:21, 13:19,
15:5, 15:6
**degrees** [4] -
12:18, 12:25,
13:2, 13:6
**Delaware** [2] -
17:6, 17:9
**demands** [1] -
99:21
**denounce** [4] -
107:22, 108:2,
109:15, 109:17
**denouncing** [1] -
107:17
**Denton** [4] - 1:23,
2:15, 14:14,
53:3
**department** [10] -
30:15, 45:10,
54:15, 55:2,
55:25, 56:16,

57:8, 88:22,
89:1
**deposition** [18] -
7:2, 7:8, 7:11,
7:13, 8:13, 8:16,
11:6, 12:1,
44:18, 47:5,
47:13, 60:17,
72:24, 125:3,
126:21, 126:23,
127:3, 127:6
**DEPOSITION** [5] -
1:9, 1:14, 5:2,
5:5, 126:11
**Deposition** [9] -
7:5, 53:10,
65:23, 72:2,
78:3, 82:15,
86:11, 90:12,
97:3
**Deposition.......**
[1] - 4:3
**depositions** [1] -
67:12
**Deputy** [1] - 7:3
**describe** [5] -
14:8, 17:20,
18:17, 33:17,
55:11
**described** [1] -
14:8
**description** [1] -
125:12
**DESCRIPTION** [1]
- 4:2
**despite** [3] - 10:1,
47:12, 48:24
**detail** [6] - 32:1,
33:17, 35:4,
38:4, 65:18,
98:25
**details** [3] - 29:9,
36:14, 56:6
**develop** [1] -
59:14
**developed** [1] -
32:14
**different** [9] -
18:22, 21:24,
50:24, 69:6,
79:13, 107:11,
107:21, 109:21
**Different** [1] -
58:4
**difficulty** [1] -
87:11
**digital** [1] - 22:18
**direct** [1] - 99:16
**Direct** [1] - 3:7
**direction** [1] -

118:6
**directly** [1] -
24:25
**disagree** [1] -
119:10
**disappear** [1] -
97:10
**disappeared** [1] -
97:7
**discipline** [1] -
118:11
**disciplined** [2] -
48:16, 49:5
**disciplines** [1] -
78:12
**disclosed** [1] -
90:20
**discourse** [8] -
111:1, 111:12,
112:14, 112:25,
113:3, 113:5,
113:7, 113:16
**discourses** [1] -
64:11
**discover** [1] -
9:15
**discovery** [2] -
91:23, 92:20
**discrimination** [1]
- 103:25
**discussed** [5] -
11:8, 60:16,
88:24, 98:21,
116:11
**discussion** [1] -
115:25
**discussions** [3] -
121:15, 121:18,
122:8
**dismay** [3] -
107:18, 107:23,
108:3
**dismayed** [2] -
95:11, 106:24
**disposed** [3] -
47:15, 48:1,
48:5
**dissolve** [2] -
117:18, 117:20
**distinction** [1] -
12:19
**distortion** [1] -
85:1
**District** [2] - 66:6
**DISTRICT** [4] -
1:1, 1:1, 126:1,
126:1
**diversity** [18] -
55:1, 55:22,
56:9, 56:13,

56:19, 57:3,
57:4, 57:5,
57:11, 57:19,
57:20, 57:24,
58:4, 58:6,
58:10, 58:14,
59:17, 59:23
**Diversity** [1] -
57:10
**division** [9] -
18:20, 18:21,
46:24, 71:20,
71:23, 86:24,
87:25, 88:22,
89:4
**DIVISION** [2] -
1:2, 126:2
**Division** [1] - 2:9
**divisions** [3] -
101:19, 102:10,
103:13
**document** [28] -
7:25, 8:3, 8:7,
8:19, 47:13,
47:18, 48:20,
48:21, 48:25,
53:18, 68:18,
88:5, 88:8, 92:6,
93:11, 94:20,
95:5, 96:16,
96:22, 96:24,
97:20, 97:22,
98:24, 99:1,
105:12, 108:1,
108:16, 125:12
**documents** [9] -
7:9, 11:12,
11:15, 11:20,
67:3, 91:1,
91:24, 92:1,
122:8
**done** [4] - 11:6,
19:20, 122:13,
122:18
**double** [3] - 21:3,
70:21, 104:7
**double-blind** [1] -
21:3
**Dowd** [1] - 6:10
**down** [10] - 8:4,
8:11, 16:4, 46:8,
72:19, 73:2,
91:16, 98:23,
99:5, 116:15
**download** [1] -
97:1
**Dr** [8] - 6:12, 7:2,
7:6, 49:15,
81:10, 118:13,
120:23, 121:3

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*    5

**draft** [26] - 90:21, 91:5, 92:5, 93:13, 94:1, 94:2, 94:5, 95:11, 97:22, 98:13, 100:10, 104:16, 104:22, 105:2, 106:13, 106:17, 107:2, 107:4, 107:7, 107:10, 109:13, 109:18, 110:6
**Draft** [1] - 4:16
**drafted** [1] - 50:12
**Drafts** [1] - 4:15
**drafts** [13] - 50:18, 50:23, 50:24, 68:12, 88:13, 90:17, 91:22, 94:10, 94:12, 104:22, 105:19, 105:22, 105:25
**drawing** [1] - 22:3
**Drive** [1] - 127:22
**drive** [1] - 51:3
**drop** [3] - 53:8, 78:1, 82:18
**dropped** [1] - 100:1
**drove** [1] - 14:12
**due** [3] - 101:4, 101:6, 101:10
**Duke** [9] - 12:22, 12:23, 12:25, 13:15, 13:22, 14:10, 14:11, 33:21, 34:20
**duly** [4] - 1:16, 6:5, 126:20, 126:23
**dump** [1] - 7:19
**DuPont** [1] - 17:22
**during** [1] - 71:21
**duties** [1] - 15:2

**E**

**E-mail** [3] - 2:5, 2:11, 2:16
**e-mail** [1] - 72:4
**early** [1] - 37:3
**earned** [2] - 12:21, 13:8
**EASTERN** [2] - 1:1, 126:1
**Eastern** [1] - 66:6
**EBT** [1] - 16:6
**edited** [4] - 18:6, 20:13, 20:14, 31:3
**editor** [3] - 22:9, 24:24, 31:14
**editor's** [1] - 24:10, 24:19
**editorial** [7] - 19:20, 19:22, 73:15, 114:17, 115:13, 117:4, 119:18
**editors** [5] - 19:23, 23:4, 24:17, 24:24, 25:6
**edits** [1] - 30:25
**education** [1] - 12:8
**educational** [3] - 12:12, 12:13, 14:8
**effort** [1] - 50:13
**egregiously** [1] - 35:19
**Eighteenth** [2] - 23:21, 65:12
**Eighteenth-Century** [2] - 23:21, 65:12
**Either** [1] - 31:2
**either** [7] - 31:6, 31:16, 61:4, 89:23, 92:13, 120:23, 121:4
**elements** [1] - 101:10
**elevator** [1] - 60:1
**Ellen** [4] - 73:4, 73:10, 74:16, 75:17
**Email** [3] - 4:7, 4:9, 4:13
**email** [30] - 52:25, 53:11, 53:21, 54:1, 54:8, 54:9, 54:16, 61:5, 72:5, 72:8, 72:10, 72:15, 73:8, 74:8, 74:10, 75:19, 75:22, 75:25, 76:7, 77:22, 77:25, 78:21, 79:12, 82:18, 82:21, 83:1, 88:20, 90:23, 91:1, 92:7
**Emails** [2] - 4:4, 4:11
**emails** [4] - 51:5, 54:6, 75:17,

**75**:18
**embarrassed** [2] - 56:5, 76:22
**embedded** [8] - 88:24, 89:2, 96:21, 98:8, 98:13, 99:3, 105:5
**embedding** [2] - 106:14, 106:15
**embeds** [1] - 120:8
**employed** [1] - 127:13
**employee** [5] - 70:17, 70:24, 71:7, 75:7
**employees** [1] - 75:13
**end** [7] - 13:13, 37:14, 37:21, 39:14, 62:7, 66:17, 68:8
**ended** [2] - 33:20, 89:14
**Ending** [1] - 4:7
**endorse** [12] - 113:19, 114:3, 114:13, 115:10, 115:23, 116:16, 118:18, 118:20, 118:23, 119:3, 119:19, 119:22
**endorsed** [1] - 115:7
**endorsement** [7] - 115:1, 115:4, 115:16, 116:2, 121:18, 122:1, 122:10
**endorses** [4] - 118:21, 119:1, 119:5, 119:12
**endorsing** [1] - 114:1
**Endowment** [1] - 15:19
**endured** [1] - 95:16
**engagement** [1] - 40:5
**enlighten** [1] - 119:10
**entered** [1] - 77:5
**entire** [5] - 52:18, 53:25, 96:20, 115:16, 119:3
**entirety** [1] - 83:1
**entitled** [1] - 11:9
**entrenched** [1] -

**103**:10
**enumerated** [1] - 117:11
**environment** [1] - 58:19
**epi** [2] - 110:25, 111:15
**Epistemic** [1] - 110:25
**epistemic** [9] - 111:2, 111:11, 111:15, 112:6, 112:13, 112:15, 112:24, 113:7, 113:15
**equally** [2] - 104:1, 104:2
**especially** [1] - 113:1
**et** [3] - 1:6, 4:8, 126:6
**etc** [2] - 118:3
**Ethnomusicology** [2] - 18:21, 46:24
**Europe** [1] - 23:21
**European** [1] - 63:14
**evaluation** [1] - 35:4
**events** [1] - 44:3
**eventual** [1] - 104:21
**eventually** [3] - 19:24, 93:15, 94:6
**evolved** [1] - 91:5
**Ewell** [16] - 27:7, 33:4, 38:9, 38:15, 38:20, 39:23, 40:19, 42:3, 49:15, 51:11, 51:18, 52:15, 52:23, 60:18, 60:19, 107:13
**Ewell's** [5] - 27:15, 27:20, 28:5, 33:8, 52:25
**exact** [1] - 76:23
**exactly** [4] - 29:18, 49:7, 49:9, 85:11
**EXAMINATION** [1] - 6:6
**examination** [1] - 126:25
**Examination** [1] - 3:7

**examined** [2] - 90:23, 93:16
**examining** [1] - 118:3
**except** [2] - 53:20, 125:4
**exceptions** [1] - 9:20
**exchange** [1] - 62:12
**exchanged** [1] - 51:6
**exchanges** [1] - 29:8
**exclusively** [2] - 119:25, 120:4
**excuse** [4] - 26:18, 93:1, 99:3, 104:1
**executed** [1] - 125:13
**exercised** [1] - 32:21
**exhibit** [12] - 3:4, 7:7, 7:14, 7:18, 53:6, 67:6, 67:11, 85:24, 86:18, 98:7, 98:16, 122:15
**Exhibit** [61] - 4:3, 4:4, 4:5, 4:7, 4:9, 4:11, 4:13, 4:15, 4:16, 7:5, 53:7, 53:10, 54:1, 61:24, 65:23, 65:25, 66:4, 66:21, 66:22, 67:7, 67:16, 67:18, 72:2, 72:4, 73:23, 77:25, 78:1, 78:3, 78:22, 79:2, 82:13, 82:15, 82:17, 86:9, 86:11, 88:24, 89:2, 90:12, 90:14, 90:24, 91:9, 91:21, 93:16, 96:25, 97:2, 97:3, 97:4, 98:8, 98:9, 98:18, 98:21, 98:23, 99:3, 99:4, 99:10, 99:17, 105:15, 116:7
**exhibits** [5] - 67:4, 67:15, 67:17, 98:24,

**105**:4
**EXHIBITS** [1] - 4:1
**exists** [1] - 63:24
**expect** [1] - 34:25
**experience** [5] - 32:9, 42:11, 42:19, 43:4, 121:6
**experienced** [4] - 57:21, 121:6, 121:11, 121:12
**expert** [1] - 65:19
**expertise** [1] - 65:22
**Expiration** [1] - 127:20
**Expires** [3] - 125:21, 127:24, 127:25
**explain** [7] - 7:12, 11:5, 19:1, 28:21, 38:22, 58:11, 111:16
**Explain** [1] - 68:4
**explaining** [1] - 39:20
**explains** [1] - 90:22
**explicitly** [1] - 78:13
**explore** [1] - 91:4
**expressed** [5] - 48:9, 106:2, 106:11, 121:17, 125:14
**expressing** [2] - 107:22, 108:2
**extend** [1] - 118:9
**extent** [3] - 29:21, 61:5, 105:12

**F**

**fact** [2] - 9:10, 117:21
**Faculty** [10] - 4:9, 4:15, 4:17, 67:20, 78:2, 86:18, 86:22, 87:23, 88:12, 89:11
**faculty** [42] - 11:17, 11:19, 50:6, 50:16, 66:19, 68:5, 73:17, 73:20, 74:1, 74:5, 74:19, 74:22, 78:11, 79:20,

80:3, 82:2,
86:12, 88:13,
89:2, 89:8,
92:23, 93:4,
93:11, 93:15,
93:17, 94:6,
98:13, 105:19,
106:23, 109:9,
110:12, 113:25,
116:24, 117:7,
118:10, 118:12,
118:21, 119:12,
121:17, 121:19,
122:9
**failed** [1] - 118:8
**failures** [4] -
114:18, 115:14,
117:5, 119:19
**fall** [8] - 15:3,
37:3, 55:1,
55:23, 56:20,
57:3, 57:5,
57:22
**false** [2] - 81:18,
81:23
**family's** [1] -
17:23
**famous** [1] -
116:7
**far** [2] - 24:23,
119:14
**fast** [2] - 21:21,
98:2
**fast-forward** [1] -
21:21
**Fax** [3] - 2:5, 2:10,
2:15
**February** [1] -
27:8
**Federal** [2] - 1:23,
5:8
**fellowship** [5] -
15:16, 15:18,
16:17, 17:12,
17:14
**fellowships** [1] -
15:24
**felt** [1] - 80:21
**few** [2] - 9:20,
32:17
**field** [5] - 31:10,
35:1, 41:2,
42:13, 42:18
**fields** [1] - 42:15
**fight** [1] - 108:7
**figure** [2] - 56:25,
111:10
**file** [6] - 88:10,
88:11, 90:20,
91:23, 92:9,

92:11
**final** [6] - 25:18,
88:6, 88:13,
89:14, 93:3,
121:16
**finalized** [4] -
86:22, 87:23,
88:4, 94:6
**financially** [1] -
127:15
**fine** [10] - 6:15,
23:9, 35:16,
41:8, 43:1,
63:10, 89:25,
92:13, 101:12,
102:6
**finish** [2] - 119:7,
119:9
**finished** [2] -
30:5, 68:12
**fired** [2] - 81:5,
81:10
**firm** [2] - 14:4,
74:4
**Firm** [1] - 127:24
**first** [13] - 6:5,
7:10, 22:15,
23:24, 31:19,
66:7, 82:21,
91:9, 92:16,
94:1, 101:24,
105:16, 110:5
**five** [4] - 21:6,
21:7, 60:3,
122:20
**Five** [1] - 19:3
**focused** [1] - 46:3
**follow** [1] - 70:8
**follow-up** [1] -
70:8
**following** [3] -
117:15, 126:18,
127:4
**follows** [3] - 6:5,
101:18, 114:14
**font** [1] - 107:11
**FOR** [6] - 1:1, 2:2,
2:7, 5:13,
125:19, 126:1
**foregoing** [2] -
125:3, 125:13
**forgetting** [1] -
22:5
**form** [85] - 31:24,
32:5, 32:23,
34:6, 35:2,
35:21, 37:2,
37:5, 37:14,
37:23, 38:14,
39:4, 39:11,

39:16, 40:7,
41:4, 41:23,
43:5, 43:15,
43:21, 46:6,
47:16, 48:4,
48:12, 49:11,
49:23, 52:24,
56:21, 57:23,
58:24, 59:20,
60:8, 60:22,
61:7, 61:17,
61:25, 62:10,
64:17, 64:22,
65:3, 65:7,
65:11, 68:6,
69:4, 69:11,
69:16, 69:21,
70:11, 70:18,
71:9, 73:24,
75:15, 82:3,
82:7, 83:13,
83:18, 84:5,
84:10, 86:25,
88:7, 88:15,
88:23, 89:10,
93:5, 93:20,
94:8, 103:22,
104:24, 107:18,
107:19, 107:24,
108:14, 109:16,
109:25, 110:19,
111:13, 111:17,
111:24, 112:9,
116:13, 116:25,
119:20, 120:3,
120:20, 121:20
**formal** [2] - 9:13,
10:3
**forms** [3] - 63:14,
65:16
**formulate** [1] -
71:1
**formulated** [2] -
91:5, 93:17
**formulating** [1] -
50:16
**formulation** [1] -
121:16
**forth** [6] - 23:3,
24:16, 50:18,
50:22, 61:6,
100:1
**forward** [1] -
21:21
**forwarded** [2] -
29:10, 53:21
**foundational** [2] -
64:11, 64:23
**four** [6] - 32:10,
35:15, 62:13,

88:13, 90:16,
91:22
**fourth** [1] - 110:11
**frame** [2] - 40:21,
68:9
**Frank** [5] - 74:9,
75:1, 75:4,
75:17
**free** [1] - 7:21
**freely** [4] - 114:16,
115:12, 117:2,
119:16
**French** [5] -
12:20, 13:20,
63:16, 63:18,
63:20
**Friday** [2] - 59:6,
114:23
**Friedson** [1] -
88:19
**friend** [1] - 31:21
**friends** [1] - 61:4
**front** [3] - 52:7,
100:25, 113:11
**Fulbright** [1] -
16:14
**full** [7] - 6:9,
14:17, 24:9,
114:17, 115:13,
117:4, 119:17
**funding** [1] -
16:18
**funneled** [1] -
24:20
**funny** [1] - 22:22
**fuzzy** [1] - 23:2

## G

**GAMuT** [3] - 55:7,
59:13, 61:24
**GAMUT** [1] - 55:7
**GAMuT's** [1] -
54:22
**Gateway** [1] -
1:22
**gathered** [1] -
26:2
**gathering** [1] -
115:1
**General** [8] - 2:8,
2:9, 2:14, 6:25,
7:4, 67:19,
71:14, 71:16
**general** [6] - 19:1,
35:6, 46:8, 46:9,
63:21, 113:4
**General's** [1] - 7:1
**generally** [1] -
64:5

**generate** [1] -
68:11
**generated** [1] -
74:5
**generating** [2] -
68:4, 116:1
**genuinely** [2] -
42:21, 102:23
**GEOFFREY** [1] -
125:2
**GEOFFREY-
SCHWINDEN** [1]
- 125:2
**GEOFFROY** [10] -
1:10, 1:14, 3:6,
5:2, 6:4, 124:2,
125:6, 125:10,
126:11, 126:19
**Geoffroy** [18] -
4:8, 4:13, 6:8,
6:10, 6:12, 6:13,
7:2, 7:6, 72:7,
81:10, 82:19,
86:3, 86:13,
90:3, 90:16,
94:23, 105:19,
122:18
**Geoffroy's** [1] -
70:13
**GEOFFROY-
SCHWINDEN** [9]
- 1:10, 3:6, 5:2,
6:4, 124:2,
125:6, 125:10,
126:11, 126:19
**Geoffroy-
Schwinden** [18]
- 4:8, 4:13, 6:8,
6:10, 6:12, 6:13,
7:2, 7:6, 72:7,
81:10, 82:19,
86:3, 86:13,
90:3, 90:16,
94:23, 105:19,
122:18
**Gillian** [2] - 77:13,
79:8
**Given** [1] - 125:15
**given** [2] - 126:21,
127:2
**gobbledygook** [1]
- 66:4
**Google** [1] - 51:3
**gosh** [1] - 32:11
**grad** [5] - 11:18,
23:2, 56:2, 64:5,
97:12
**Grad** [1] - 4:4
**Graduate** [1] -
55:8

**graduate** [23] -
12:23, 13:3,
13:22, 15:25,
46:23, 47:24,
48:8, 54:14,
54:23, 55:11,
59:8, 61:23,
96:12, 99:19,
99:21, 106:2,
106:10, 108:20,
109:10, 109:20,
109:24, 110:13,
113:18
**graduated** [3] -
12:17, 13:11,
14:11
**graduating** [1] -
23:1
**graduation** [1] -
14:10
**Grammatically** [1]
- 115:17
**grammatically** [2]
- 115:18, 119:24
**grant** [3] - 16:14,
16:21, 16:23
**granted** [4] -
14:24, 15:18,
15:23, 16:12
**grants** [1] - 16:6
**great** [3] - 15:1,
90:7, 102:7
**green** [1] - 58:5
**group** [5] - 50:13,
50:14, 73:12,
116:1, 116:2
**Group** [1] - 2:22
**guess** [17] -
18:16, 24:20,
28:5, 30:23,
33:5, 38:21,
50:19, 56:11,
58:4, 68:10,
68:16, 76:17,
77:12, 83:24,
97:9, 103:14,
111:14
**guidelines** [1] -
73:11
**gunpowder** [1] -
17:23
**guys** [1] - 83:12

## H

**Hagley** [7] -
15:20, 17:3,
17:11, 17:12,
17:17, 17:19,
17:21

hand [4] - 72:21,
100:3, 100:4,
125:15
handbook [1] -
77:14
Handbook [1] -
24:13
handbooks [1] -
79:13
Handbooks [1] -
25:1
hangs [1] -
111:19
hardest [1] -
22:16
he/she [1] -
125:13
head [7] - 71:20,
71:23, 78:19,
86:24, 87:25,
88:22, 89:4
header [1] - 98:18
heads [1] - 10:6
hear [4] - 85:2,
87:3, 87:18
heard [2] - 27:9,
30:22
hearing [2] - 5:20,
61:3
heart [1] - 58:13
heed [1] - 118:8
Heidlberger [1] -
74:10
held [3] - 111:5,
111:6, 114:19
help [6] - 30:2,
32:15, 32:18,
43:25, 75:10,
95:4
helpful [1] - 62:14
Henry [1] - 76:19
hereby [2] -
125:3, 126:17
hereto [1] - 1:25
highlighted [1] -
103:23
highlighting [1] -
108:15
Hill [1] - 2:4
hip [5] - 63:22,
64:4, 64:13,
64:21, 65:2
hip-hop [5] -
63:22, 64:4,
64:13, 64:21,
65:2
historian [13] -
18:16, 18:18,
18:25, 19:9,
26:13, 38:18,

39:5, 63:13,
63:16, 63:20,
63:22, 65:9
historical [3] -
22:19, 101:20,
102:11
history [17] -
12:19, 12:24,
13:4, 13:5,
13:19, 14:13,
16:9, 18:1,
18:22, 29:3,
31:12, 43:3,
64:4, 64:15,
65:1, 65:5,
103:11
History [2] -
18:20, 46:23
hoc [1] - 89:21
Hoc [16] - 4:5,
66:2, 66:9,
66:13, 67:3,
67:17, 67:18,
73:21, 74:6,
88:24, 89:3,
89:14, 89:16,
98:7, 98:9,
98:20
hold [5] - 53:24,
100:6, 100:14,
100:19, 100:23
Hold [1] - 118:5
honest [2] -
83:23, 92:18
honestly [2] -
30:17, 94:10
Honors [1] -
12:18
hop [5] - 63:22,
64:4, 64:13,
64:21, 65:2
hope [2] - 55:3,
94:5
hoped [1] - 55:23
hosted [1] - 57:8
hour [1] - 85:20
hours [1] - 11:11
HRS [2] - 127:7,
127:9
hum [45] - 10:6,
14:17, 17:1,
17:18, 18:2,
19:4, 21:25,
23:5, 23:22,
23:25, 24:11,
28:17, 29:15,
33:6, 36:8,
36:12, 38:11,
41:1, 49:16,
50:2, 50:14,

51:13, 57:9,
57:15, 57:17,
58:6, 58:20,
60:4, 60:11,
65:20, 65:21,
68:17, 69:18,
70:1, 71:22,
74:12, 77:16,
82:24, 83:22,
91:3, 97:14,
108:10, 116:22,
117:3, 120:13
hum-um [1] -
65:20
Humanities [1] -
15:19
hundred [1] -
15:15
hung [2] - 112:17,
112:23
Hunter [2] - 27:6,
27:7
husband [1] -
33:1

## I

idea [19] - 31:17,
42:5, 44:7, 45:4,
45:5, 45:12,
51:20, 52:25,
60:19, 64:18,
75:4, 80:20,
111:5, 111:6,
111:19, 111:21,
112:17, 112:22,
117:25
identify [6] -
42:25, 90:24,
113:9, 120:14,
120:22, 121:3
identifying [1] -
109:22
identity [2] -
21:13, 125:12
ignorance [1] -
31:10
illness [1] - 9:5
impedes [2] -
104:1, 104:2
implies [1] - 69:18
important [1] -
100:3
impression [3] -
34:14, 37:2,
38:17
imputing [1] -
31:9
IN [1] - 125:19
inasmuch [1] -

33:19
INC [1] - 127:22
incidentally [1] -
23:11
included [4] -
49:6, 57:13,
58:23, 76:13
includes [1] -
127:4
including [2] -
12:15, 15:25
inclusion [13] -
55:1, 55:23,
56:10, 56:19,
57:3, 57:5,
57:10, 57:11,
57:19, 58:7,
58:14, 59:18,
59:23
incorporate [2] -
81:7, 110:8
incorporating [1]
- 81:4
incorrect [1] -
75:3
indeed [1] - 67:18
Indeed [2] -
54:25, 57:2
independently [1]
- 105:16
index...................
............. [1] - 3:4
indicate [1] -
106:5
Individual [5] -
86:18, 86:22,
87:23, 88:12,
89:11
individual [5] -
54:19, 70:10,
74:17, 78:11,
86:12
individually [1] -
22:10
individuals [3] -
54:10, 75:12,
76:10
inequality [1] -
103:25
inevitable [1] -
9:11
information [2] -
24:21, 127:2
inherently [1] -
111:7
initiative [1] -
43:2
innovation [1] -
17:25
instance [2] -

1:15, 62:3
instead [1] -
113:17
institution [2] -
74:18, 75:13
institutional [2] -
76:4, 104:1
instruct [1] - 9:23
instrument [1] -
125:13
intended [1] -
118:18
intention [2] -
108:7, 108:9
interested [2] -
63:2, 127:16
interjecting [1] -
121:24
interlude [1] -
90:2
intermediate [1] -
93:3
internal [1] -
16:19
international [2] -
12:19, 13:19
internet [1] - 85:5
interpreting [1] -
104:11
interrupt [1] -
10:15
interrupting [1] -
30:7
intervening [1] -
13:23
interviewing [1] -
34:20
introduce [9] -
7:6, 7:10, 8:19,
65:24, 72:3,
77:24, 82:13,
82:16, 85:23
introduced [4] -
66:8, 73:22,
91:22, 105:15
introducing [2] -
67:6, 105:4
investigated [3] -
81:12, 81:14,
82:8
Investigated [1] -
50:5
investigating [1] -
118:9
investigation [2] -
82:5, 101:8
invited [1] - 51:19
involve [1] - 118:7
involved [1] -
60:16

issue [36] - 32:3,
38:25, 40:2,
46:22, 48:6,
48:10, 48:14,
49:13, 52:15,
54:24, 55:19,
60:15, 60:25,
62:24, 95:16,
101:19, 102:10,
102:24, 103:2,
103:13, 103:14,
103:19, 107:14,
109:19, 112:2,
112:3, 112:4,
112:7, 112:14,
112:25, 113:10,
113:16, 114:15,
115:11, 117:1,
119:16
issued [1] -
109:23
issues [5] - 40:4,
60:16, 61:1,
76:4, 77:2
itself [2] - 18:21,
105:13

## J

JACKSON [3] -
1:3, 117:12,
126:3
Jackson [29] -
2:19, 6:22, 6:23,
36:7, 40:14,
45:8, 45:13,
45:22, 46:3,
47:8, 47:15,
48:1, 48:15,
49:4, 49:21,
49:25, 50:7,
50:9, 58:21,
61:15, 62:8,
80:9, 81:9,
95:21, 95:24,
118:13, 120:15,
120:23, 121:4
Jackson's [3] -
46:14, 46:25,
80:11
JACKSON
000208 [1] - 4:6
Jason [1] - 2:21
jazz [4] - 63:22,
64:4, 64:16,
64:19
jog [1] - 32:18
John [6] - 76:5,
77:8, 82:20,
84:8, 84:22

*Rebecca Geoffroy-Schwinden, Ph.D.      9/27/24*      8

**Journal** [63] - 4:9,
4:11, 11:17,
26:4, 26:10,
26:15, 26:20,
27:18, 28:14,
30:9, 30:11,
31:20, 32:4,
32:20, 33:14,
35:10, 37:8,
37:16, 37:21,
38:1, 38:19,
39:6, 39:9,
39:14, 40:5,
41:11, 41:19,
43:19, 45:16,
45:23, 46:4,
46:25, 48:2,
51:11, 51:19,
52:19, 53:3,
54:24, 55:20,
58:21, 60:15,
62:6, 62:22,
63:7, 66:3,
66:14, 66:19,
67:20, 78:2,
82:19, 82:22,
86:23, 87:24,
95:17, 95:21,
107:14, 108:11,
109:11, 110:14,
111:6, 111:21,
113:8, 117:23
**journal** [47] - 19:6,
19:12, 19:13,
19:21, 27:12,
30:19, 33:23,
34:5, 35:1,
35:13, 35:24,
44:25, 46:21,
47:3, 48:6, 48:8,
48:9, 48:11,
48:14, 49:7,
49:13, 49:22,
50:1, 50:3, 50:4,
50:8, 50:10,
50:11, 55:17,
62:23, 62:24,
70:3, 80:5, 80:6,
110:25, 111:11,
111:25, 112:2,
112:4, 112:7,
112:13, 112:25,
113:2, 113:10,
113:15, 117:18,
117:20
**journals** [4] -
19:3, 31:12,
31:13, 41:15
**JSS** [3] - 4:4,
73:14, 118:12

**JULIA** [1] - 127:22
**July** [28] - 14:12,
26:21, 29:25,
30:1, 30:3,
32:11, 37:11,
37:12, 37:14,
37:22, 38:2,
39:9, 39:14,
39:21, 40:20,
54:9, 57:1, 62:7,
68:9, 75:25,
78:7, 82:18,
83:7, 84:9,
85:14, 86:13,
95:2, 117:24
**June** [1] - 14:16
**jury** [1] - 17:18
**just..** [1] - 41:7

---
## K

**keep** [4] - 10:7,
67:9, 67:12,
99:6
**Kim** [2] - 1:19,
127:20
**KIM** [1] - 126:16
**kind** [15] - 19:6,
20:1, 22:3, 22:7,
43:2, 43:23,
50:23, 56:1,
57:18, 65:19,
82:4, 85:16,
89:19, 100:7,
104:11
**kinds** [2] - 58:4,
104:3
**knowledge** [10] -
8:24, 41:2,
45:21, 46:19,
63:21, 65:15,
75:5, 99:14,
111:4, 111:20
**known** [4] - 43:18,
44:13, 45:3,
125:11
**Kohanski** [2] -
53:12, 54:16

---
## L

**lack** [3] - 22:17,
27:20, 29:17
**language** [4] -
76:13, 76:16,
78:20, 79:9
**last** [21] - 11:2,
12:14, 15:10,
15:11, 16:17,
24:11, 25:19,

53:20, 54:8,
55:1, 55:23,
56:19, 57:3,
57:5, 87:16,
88:12, 92:6,
109:3, 109:4,
116:6, 120:12
**late** [4] - 29:25,
30:3, 37:3,
114:23
**LAURA** [2] - 1:6,
126:6
**law** [3] - 14:4,
77:5, 101:11
**LAW** [1] - 2:3
**lawfirm.com** [1] -
2:5
**lawsuit** [1] - 26:3
**lawyer** [1] - 14:1
**leadership** [2] -
54:22, 55:14
**learn** [3] - 28:10,
28:12, 55:22
**learned** [6] -
28:15, 28:19,
28:21, 31:19,
54:25, 57:2
**least** [8] - 41:17,
60:14, 68:13,
89:8, 89:13,
99:13, 106:15,
112:16
**leave** [5] - 15:11,
15:13, 16:22,
16:23
**lecturer** [2] - 29:2,
29:3
**led** [1] - 121:15
**left** [1] - 33:21
**legal** [3] - 2:22,
13:25, 100:25
**length** [1] -
121:22
**less** [2] - 34:2,
71:1
**Letter** [1] - 73:11
**letter** [26] - 73:17,
73:20, 74:1,
74:5, 74:19,
76:7, 109:10,
109:23, 110:4,
110:13, 113:20,
113:23, 114:2,
114:14, 115:2,
115:5, 115:7,
116:17, 116:20,
119:2, 119:13,
119:19, 120:8,
122:2, 122:9,
122:11

**level** [3] - 25:20,
56:23, 65:18
**leveled** [1] - 38:1
**library** [3] - 17:24,
18:1, 23:24
**Library** [1] - 15:20
**lies** [5] - 110:25,
111:11, 112:14,
112:25, 113:16
**light** [1] - 43:17
**likely** [1] - 12:9
**Likewise** [2] -
10:3, 10:11
**limit** [2] - 115:4,
116:2
**limitations** [1] -
122:8
**limited** [1] - 122:2
**limiting** [3] -
120:1, 121:18,
121:21
**limits** [2] - 115:1,
115:16
**Lincoln** [1] -
36:11
**line** [2] - 53:12,
53:23
**Liner** [1] - 64:8
**link** [12] - 105:5,
105:13, 105:16,
106:6, 106:8,
106:14, 106:17,
107:7, 108:22,
113:22, 120:9,
120:10
**linked** [8] - 11:19,
96:16, 97:22,
99:2, 99:9,
105:14, 105:21,
116:20
**Linked** [1] - 4:16
**linking** [1] - 99:19
**list** [4] - 16:5,
21:6, 109:5,
109:6
**listed** [1] - 21:6
**listen** [1] - 27:15
**literature** [3] -
40:10, 64:3,
64:10
**Litigation** [1] - 2:9
**Live** [1] - 2:13
**lived** [1] - 17:17
**LLC** [1] - 2:3
**local** [1] - 53:1
**location** [1] -
17:22
**look** [16] - 14:3,
22:6, 47:9,
47:17, 48:17,

48:20, 54:2,
72:13, 83:2,
83:4, 91:9,
95:10, 99:8,
99:15, 109:6,
122:14
**looked** [8] -
33:19, 33:21,
33:23, 35:5,
36:10, 36:19,
78:21, 83:1
**looking** [1] - 99:6
**looks** [5] - 53:23,
54:18, 74:9,
79:3, 83:8,
97:12, 103:14,
108:17, 112:1
**loose** [3] - 7:12,
8:22, 55:10
**loosely** [2] - 55:10
**lucky** [1] - 100:20
**lvg.dallas@
gmail.com** [1] -
2:22

---
## M

**m.allen@allen** [1]
- 2:5
**m.allen@allen-
lawfirm.com** [1]
- 2:5
**ma'am** [1] - 80:10
**machine** [1] -
1:21
**Madam** [2] -
82:13, 87:15
**magazine** [1] -
20:2
**magical** [1] - 97:9
**mail** [4] - 2:5,
2:11, 2:16, 72:4
**mainline** [1] -
33:25
**maintained** [1] -
27:12
**majority** [1] -
41:21
**managed** [2] -
24:17, 24:19
**mandatory** [1] -
108:24
**mark** [5] - 53:7,
86:9, 90:13,
96:25, 97:1
**marked** [12] - 7:5,
53:10, 65:23,
66:5, 67:18,
72:2, 78:3,
82:15, 86:11,

90:12, 97:3,
97:22
**MARKED** [1] - 4:2
**Mary** [8] - 2:8,
6:24, 87:7, 90:3,
98:3, 122:13,
126:24, 127:9
**Mary.Quimby@
oag.texas.gov**
[1] - 2:11
**Master** [1] - 12:21
**master's** [2] -
13:12, 13:16
**matter** [1] - 7:2
**mean** [76] - 14:3,
19:7, 19:22,
20:12, 20:21,
20:23, 20:24,
21:12, 21:15,
22:1, 25:2,
27:22, 29:20,
29:21, 30:4,
31:1, 31:25,
32:6, 32:9, 34:7,
34:19, 35:3,
35:5, 37:9,
37:18, 38:22,
42:20, 45:11,
45:20, 45:25,
47:22, 48:6,
48:13, 55:16,
56:11, 56:12,
57:4, 57:11,
57:21, 58:4,
58:25, 60:3,
61:12, 62:23,
62:24, 63:24,
64:23, 65:20,
69:5, 69:20,
69:22, 71:16,
71:21, 72:1,
75:16, 81:13,
84:12, 85:15,
89:16, 94:9,
100:13, 102:15,
102:24, 103:2,
103:18, 103:20,
104:10, 104:14,
111:2, 111:12,
111:25, 113:5,
114:2, 120:21
**meaning** [1] -
89:1
**means** [6] - 58:10,
85:17, 103:9,
111:11, 111:14,
112:17
**meant** [12] - 9:14,
51:14, 57:24,
59:10, 85:9,

*Rebecca Geoffroy-Schwinden, Ph.D.          9/27/24*          9

85:12, 93:22,
93:23, 102:18,
112:15, 113:12
**media** [1] - 32:25,
61:4, 93:11
**medications** [1] -
9:2
**meeting** [3] -
83:6, 83:9, 84:9
**member** [1] -
26:24
**members** [5] -
41:22, 78:12,
106:24, 109:9,
110:12
**memorable** [1] -
59:18
**memory** [14] - 9:3,
30:2, 32:18,
34:5, 68:13,
74:4, 74:8,
75:10, 75:16,
77:10, 77:17,
84:22, 84:24
**mental** [1] - 9:6
**mention** [2] -
80:9, 110:3
**mentioned** [2] -
39:3, 50:1
**message** [3] -
28:23, 29:7,
83:1
**messages** [1] -
61:25
**met** [3] - 11:7,
11:10, 34:19
**MHTE** [9] - 30:20,
54:23, 68:20,
86:12, 86:18,
86:22, 87:23,
88:12, 89:11
**Michael** [3] - 2:3,
6:21, 127:7
**microaggressio
ns** [1] - 60:7
**mid** [1] - 63:19
**mid-Atlantic** [1] -
63:19
**might** [5] - 15:25,
23:16, 32:15,
41:5, 62:3
**milestones** [1] -
12:12
**mill** [1] - 17:23
**MIN** [2] - 127:7,
127:9
**mind** [2] - 51:22,
122:20
**minor** [1] - 13:20
**minors** [1] - 12:20

**minutes** [1] - 90:5
**MISCELLANEO
US** [1] - 5:17
**mischaracterizin
g** [1] - 80:7
**missed** [1] -
122:15
**missing** [1] - 14:3
**misstated** [1] -
118:24
**mistake** [1] -
98:17
**mix** [1] - 6:16
**moment** [1] - 8:9
**momentarily** [1] -
76:9
**monograph** [1] -
25:10
**most** [2] - 9:24,
50:19
**mostly** [1] - 18:1
**mouth** [1] -
121:25
**mouthful** [1] -
18:12
**move** [3] - 52:15,
104:19, 105:1
**moved** [2] -
107:1, 113:25
**MR** [29] - 6:7,
6:19, 7:3, 51:24,
52:2, 52:6, 53:6,
65:24, 72:3,
77:24, 82:12,
82:16, 85:22,
86:2, 86:7, 87:2,
87:6, 87:10,
87:15, 89:25,
90:6, 90:13,
91:14, 91:16,
98:17, 122:13,
122:21, 123:4,
123:8
**MS** [83] - 6:24,
31:24, 32:5,
32:23, 34:6,
35:2, 35:21,
37:5, 37:23,
39:11, 39:16,
41:4, 41:23,
43:5, 43:15,
43:21, 46:6,
47:16, 48:4,
48:12, 49:11,
49:23, 52:24,
56:21, 57:23,
58:24, 59:20,
60:8, 60:22,
61:7, 61:17,
62:10, 64:22,

65:11, 68:6,
69:4, 69:11,
69:16, 69:21,
70:11, 70:18,
71:9, 73:24,
75:15, 82:3,
82:7, 83:13,
83:18, 84:5,
84:10, 86:25,
87:5, 87:8, 88:2,
88:7, 88:15,
89:10, 93:5,
93:20, 94:8,
98:15, 101:22,
103:22, 104:24,
107:19, 107:24,
108:14, 109:16,
109:25, 110:19,
111:13, 111:17,
111:24, 112:9,
116:13, 116:25,
119:20, 120:3,
120:20, 121:20,
122:19, 122:24,
123:6
**muffled** [1] -
102:17
**Museum** [5] -
15:20, 17:3,
17:11, 17:19,
17:21
**museum** [2] -
17:24
**music** [36] -
12:20, 13:20,
14:13, 16:9,
18:16, 18:18,
18:25, 19:9,
23:24, 26:13,
26:14, 29:3,
30:15, 30:18,
31:11, 31:12,
35:1, 38:18,
39:5, 42:18,
42:24, 43:3,
63:13, 63:14,
63:16, 63:18,
63:20, 63:21,
64:15, 64:24,
65:1, 65:6, 65:9,
65:12, 103:11
**Music** [22] -
15:12, 18:20,
24:14, 26:25,
27:13, 28:7,
41:16, 41:18,
42:23, 43:13,
46:14, 46:23,
52:18, 55:12,
70:3, 76:20,

114:8, 114:15,
115:11, 117:9,
117:14, 119:16
**musical** [3] -
64:17, 65:2,
65:16
**Musical** [1] -
23:20
**Musicological** [1]
- 43:8
**Musicologists** [1]
- 55:8
**Musicology** [2] -
12:21, 12:22
**musicology** [4] -
13:1, 13:3,
13:12, 31:11
**must** [2] - 47:19,
114:18
**mute** [1] - 122:22

## N

**name** [14] - 6:9,
6:21, 6:24,
29:14, 49:6,
67:23, 80:11,
80:13, 88:5,
88:8, 88:10,
94:22, 95:6,
125:13
**named** [2] - 21:7,
88:11
**names** [2] - 90:20,
92:11
**National** [1] -
15:19
**national** [1] - 77:5
**North** [25] - 1:21,
1:22, 2:13, 2:14,
7:4, 14:14, 15:2,
16:24, 26:6,
29:4, 30:19,
56:13, 56:20,
57:6, 69:10,
70:6, 71:4,
71:12, 75:6,
75:14, 75:23,
77:11, 82:1,
117:9, 117:14
**Notary** [1] -
127:25
**NOTARY** [1] -
125:19
**note** [1] - 100:3
**noted** [1] - 125:4
**notes** [2] - 59:24,
122:14
**Notes** [1] - 64:8
**nothing** [4] - 9:1,
43:6, 43:7,
82:25

**negatively** [1] -
47:15
**Negligently** [1] -
48:5
**NEH** [5] - 16:17,
16:20, 16:23,
17:12, 17:14
**neighborhood** [1]
- 42:7
**never** [7] - 27:14,
33:7, 33:11,
51:19, 81:1,
117:25, 118:17
**New** [2] - 27:6
**News** [2] - 67:19
**newsletter** [3] -
19:18, 20:1,
20:4
**newspaper** [1] -
20:2
**next** [6] - 8:5,
32:2, 54:17,
76:2, 105:1
**nice** [1] - 30:23
**Nick** [8] - 33:20,
33:22, 34:11,
34:17, 34:24,
35:6, 35:15,
35:18
**Nick's** [4] - 33:23,
34:22, 35:4,
35:5
**NO** [4] - 1:5, 5:4,
126:5, 127:20
**normal** [3] - 10:5,
10:14, 107:2
**nature** [13] -
12:16, 13:7,
15:24, 16:14,
18:6, 35:20,
54:6, 71:15,
71:24, 71:25,
72:1, 90:22,
90:23
**navigate** [1] -
7:22
**necessarily** [1] -
110:2
**need** [13] - 7:23,
10:8, 32:15,
46:7, 62:11,
72:13, 78:11,
87:9, 96:18,
99:1, 102:16,
116:6
**needs** [1] - 74:24
**negative** [2] -
47:25, 70:21

**Nothing** [1] -
35:18
**notice** [3] - 7:11,
8:13, 8:16
**Notice** [2] - 4:3,
5:6
**November** [4] -
66:2, 66:13,
89:2, 98:19
**NUMBER** [2] -
4:2, 5:13
**number** [11] -
21:7, 34:8, 42:5,
53:19, 79:7,
79:11, 79:14,
86:16, 90:17,
117:12, 118:4
**Number** [10] - 7:5,
53:10, 54:1,
65:23, 72:2,
78:3, 82:15,
86:11, 90:12,
97:3
**numbered** [2] -
1:17, 90:18
**numbers** [1] -
91:25

## O

**oath** [1] - 125:11
**object** [1] - 9:10
**objection** [2] -
5:18, 88:2
**Objection** [74] -
31:24, 32:5,
32:23, 34:6,
35:2, 35:21,
37:5, 37:23,
39:11, 39:16,
41:4, 41:23,
43:5, 43:15,
43:21, 46:6,
47:16, 48:4,
48:12, 49:11,
49:23, 52:24,
56:21, 57:23,
58:24, 59:20,
60:8, 60:22,
61:7, 61:17,
62:10, 64:22,
65:11, 68:6,
69:4, 69:11,
69:16, 69:21,
70:11, 70:18,
71:9, 73:24,
75:15, 82:3,
82:7, 83:13,
83:18, 84:5,
84:10, 86:25,

88:7, 88:15,
89:10, 93:5,
93:20, 94:8,
103:22, 104:24,
107:19, 107:24,
108:14, 109:16,
109:25, 110:19,
111:13, 111:17,
111:24, 112:9,
116:13, 116:25,
119:20, 120:3,
120:20, 121:20
**objections** [2] -
9:16, 10:1
**obligation** [1] -
9:17
**obvious** [1] - 14:1
**obviously** [5] -
10:5, 10:19,
55:16, 60:24,
100:12
**Obviously** [1] -
86:3
**October** [2] -
126:24, 127:17
**Odessa** [1] -
16:10
**OF** [11] - 1:1, 1:9,
1:14, 5:2, 5:13,
125:8, 125:9,
125:20, 126:1,
126:10, 126:11
**offended** [1] -
80:17
**Office** [3] - 2:14,
71:14, 71:17
**office** [3] - 7:1,
74:24, 125:15
**officer** [1] - 127:3
**official** [9] -
56:14, 69:9,
69:12, 74:18,
74:23, 75:13,
75:22, 77:18,
104:2
**once** [1] - 108:19
**One** [2] - 66:18,
67:15
**one** [51] - 5:18,
7:23, 10:18,
12:3, 12:6,
16:15, 18:23,
22:5, 22:18,
22:24, 23:19,
24:25, 25:5,
25:8, 29:24,
31:2, 33:25,
34:11, 36:20,
39:23, 40:14,
40:25, 50:19,

51:2, 51:9,
66:18, 67:9,
67:17, 73:16,
73:22, 73:25,
77:25, 83:23,
84:6, 85:23,
92:6, 92:8,
94:10, 94:11,
98:2, 98:24,
99:9, 100:1,
100:3, 103:2,
109:3, 109:4,
113:17, 117:18,
122:17
**ones** [6] - 33:3,
36:18, 51:5,
61:8, 107:7,
117:6
**online** [6] - 27:16,
99:4, 114:16,
115:12, 117:2,
119:17
**Oort** [2] - 53:11,
54:19
**open** [4] - 89:18,
94:17, 101:23,
105:13
**opened** [4] -
17:23, 33:23,
96:21, 97:24
**opinion** [2] -
38:14, 74:18
**opportunity** [6] -
100:5, 100:14,
100:15, 100:19,
100:22, 101:7
**ORAL** [3] - 1:9,
1:14, 126:11
**oral** [1] - 126:20
**Order** [1] - 5:7
**order** [3] - 43:23,
44:3, 90:19
**ordinary** [2] -
10:4, 34:2
**organization** [2] -
30:16, 55:11
**organized** [2] -
30:11, 31:16
**origin** [1] - 79:5
**ORIGINAL** [1] -
5:9
**original** [1] -
17:23
**originated** [3] -
64:16, 65:2,
65:6
**otherwise** [2] -
34:18, 127:16
**outcome** [1] -
127:16

**outlined** [9] -
48:13, 113:20,
114:13, 116:16,
117:6, 119:1,
119:13, 122:1,
122:10
**overall** [1] - 62:23
**overstate** [1] -
35:12
**own** [1] - 40:4
**Oxford** [1] - 25:14

## P

**p.m** [6] - 1:18, 6:3,
32:11, 52:10,
123:11
**P.O** [2] - 2:4, 2:9
**Pack** [1] - 98:24
**page** [16] - 7:16,
8:4, 8:6, 53:20,
66:7, 66:8, 73:2,
74:10, 76:2,
82:25, 91:9,
91:25, 97:15,
97:19, 107:7,
118:5
**PAGE** [1] - 3:2
**PAGE/LINE** [1] -
124:4
**paged** [1] - 53:18
**pages** [2] - 8:5,
97:19
**Pages................**
**.....** [1] - 3:10
**Panel** [16] - 4:5,
66:2, 66:9,
66:13, 67:3,
67:17, 67:18,
73:21, 74:7,
88:25, 89:3,
89:14, 89:16,
98:7, 98:9,
98:20
**papers** [5] -
51:16, 52:17,
52:19, 52:23,
88:11
**paragraph** [9] -
101:18, 102:16,
103:15, 108:18,
114:6, 115:21,
115:24, 117:11,
118:4
**Paris** [1] - 23:23
**part** [18] - 9:11,
9:16, 9:24,
13:12, 27:2,
33:22, 38:24,
39:1, 50:14,

60:10, 61:2,
80:20, 86:17,
101:24, 115:7,
115:8, 115:19,
115:20
**partes** [1] - 127:4
**partially** [1] -
115:22
**Partially** [1] -
115:24
**participate** [2] -
51:19, 56:23
**particular** [4] -
36:6, 61:10,
89:6, 94:20
**particularly** [4] -
118:14, 120:15,
120:24, 121:5
**parties** [3] - 5:18,
114:18, 127:13
**parts** [5] - 33:16,
33:18, 47:10
**party** [2] - 5:18,
127:5
**pass** [2] - 122:16,
123:4
**passing** [1] -
34:19
**past** [5] - 118:9,
118:13, 120:14,
120:23, 121:4
**peer** [21] - 19:3,
19:5, 19:10,
19:11, 19:15,
20:8, 20:21,
20:23, 21:5,
21:7, 21:9,
21:11, 21:15,
23:6, 24:15,
24:17, 24:20,
25:1, 34:3,
41:15, 44:25
**peer-reviewed** [7]
- 19:3, 19:10,
21:5, 24:17,
34:3, 41:15,
44:25
**Penn** [2] - 12:17,
13:19
**People** [1] - 57:16
**people** [35] -
20:24, 27:9,
28:15, 29:19,
29:20, 32:21,
37:18, 40:1,
41:2, 41:6, 41:7,
41:17, 41:24,
42:4, 42:23,
42:24, 43:22,
46:13, 57:13,

58:2, 58:3, 58:8,
58:18, 62:19,
63:6, 63:8,
68:17, 75:11,
87:3, 88:18,
100:5, 100:14,
100:19, 100:22
**people's** [2] -
29:10, 61:3
**per** [2] - 106:18
**percent** [1] -
15:16
**perfectly** [3] -
10:13, 47:20,
67:15
**perhaps** [2] -
19:24, 90:22
**person** [5] -
29:24, 45:3,
77:1, 118:6,
125:12
**personal** [8] -
40:5, 42:11,
43:4, 70:13,
79:21, 79:24,
80:16, 80:19
**personally** [9] -
38:14, 48:15,
73:5, 79:19,
80:17, 80:22,
121:7, 121:11,
125:10
**perspective** [1] -
112:16
**Peter** [8] - 53:12,
54:9, 54:11,
54:15, 54:16,
54:21
**petition** [7] -
41:18, 43:7,
43:22, 44:2,
46:16, 46:17,
46:20
**Ph.D** [14] - 1:10,
1:15, 3:6, 5:2,
6:4, 12:22,
13:14, 13:16,
124:2, 125:2,
125:6, 125:10,
126:11, 126:19
**Philip** [7] - 27:7,
27:20, 33:7,
42:3, 52:23,
52:25, 107:13
**phone** [3] - 83:8,
83:9, 83:11
**phrase** [1] -
110:21
**picture** [1] - 29:10
**piece** [5] - 35:18,

36:9, 36:10,
41:11, 43:19
**pioneering** [1] -
95:16
**place** [6] - 67:9,
83:10, 111:1,
113:1, 117:21,
122:9
**placed** [1] - 82:5
**Plaintiff** [5] - 1:4,
2:19, 6:22,
126:4, 127:8
**PLAINTIFF** [1] -
2:2
**plaintiff** [1] - 1:16
**platform** [1] -
118:12
**played** [1] - 68:4
**plenary** [5] - 27:5,
27:8, 27:10,
33:8, 33:12
**point** [11] - 28:12,
66:25, 69:11,
82:11, 89:4,
91:19, 96:8,
96:10, 106:9,
107:3, 108:4
**pointing** [2] -
71:2, 91:17
**policies** [2] - 75:6,
80:4
**policy** [11] - 76:8,
76:13, 76:16,
77:11, 77:18,
78:20, 79:6,
79:7, 79:9,
79:11, 79:14
**Policy** [2] - 78:14,
78:17
**poor** [1] - 35:19
**portions** [1] -
20:16
**position** [1] -
14:14
**positive** [1] -
47:14
**positively** [2] -
48:1, 48:5
**Post** [1] - 59:24
**Post-It** [1] - 59:24
**posted** [2] -
27:16, 73:13
**posts** [2] - 29:11,
62:3
**potential** [1] -
118:11
**power** [5] - 100:6,
100:14, 100:19,
100:23, 101:2
**powers** [1] - 97:9

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24    11*

practices [2] -
103:16, 103:20
**Practices** [1] -
103:24
**praise** [1] - 46:17
**praised** [1] -
46:20
**praising** [1] - 47:8
**preceded** [1] -
113:18
**preparation** [3] -
11:13, 11:15,
11:21
**prepare** [1] - 11:6
**preparing** [1] -
47:12
**PRESENT** [1] -
2:18
**present** [5] - 13:8,
118:14, 120:15,
120:23, 121:4
**presented** [1] -
96:9
**presenting** [1] -
7:8
**Press** [2] - 26:6,
30:20
**press** [1] - 53:1
**pressure** [1] -
48:19
**pretty** [3] - 42:18,
94:4, 108:17
**prevent** [1] - 8:24
**previous** [4] -
79:1, 79:12,
109:18, 110:5
**primarily** [1] -
12:25
**primary** [1] -
17:10
**Prince** [5] - 28:25,
29:1, 29:13,
29:16, 31:22
**principal** [1] -
29:3
**private** [3] - 69:3,
69:15, 70:10
**privilege** [1] -
9:21
**privy** [2] - 24:23,
62:2
**problem** [2] -
62:16, 108:25
**Procedure** [2] -
1:24, 5:8
**proceeding** [1] -
127:14
**proceedings** [1] -
5:20
**Proceedings** [1] -

123:11
**process** [18] -
20:3, 21:3,
21:22, 23:8,
24:3, 24:9,
24:18, 24:23,
93:22, 101:4,
101:6, 101:10,
108:25, 114:18,
115:14, 117:5,
118:9, 119:18
**process'** [1] -
100:4
**produce** [1] - 92:1
**produced** [7] -
1:15, 91:1,
91:24, 92:2,
92:4, 92:9,
92:20
**Producing** [1] -
5:11
**product** [2] -
68:12, 93:3
**professional** [3] -
14:9, 43:3,
69:19
**professionalism**
[1] - 54:23
**Professor** [11] -
6:8, 6:13, 27:7,
27:15, 28:5,
86:3, 90:3,
90:15, 105:18,
107:13, 122:18
**professor** [9] -
14:13, 14:15,
14:18, 14:20,
16:1, 33:21,
60:2, 69:9,
75:23
**professors** [1] -
116:1
**professorships**
[1] - 16:13
**program** [4] -
13:13, 13:23,
15:4, 68:21
**programming** [2]
- 17:7, 17:8
**prolific** [2] - 16:8,
26:1
**promise** [1] - 6:16
**promote** [1] -
118:12
**promoted** [2] -
14:15, 14:17
**prompting** [1] -
32:15
**proscribe** [4] -
84:11, 84:12,

84:23, 85:8
**protect** [3] -
103:17, 103:21,
103:24
**proved** [1] -
125:11
**provide** [2] -
115:12, 119:17
**Provide** [1] -
117:4
**provided** [1] -
77:13
**provisions** [1] -
1:24
**Provost** [1] -
74:24
**public** [11] -
70:23, 71:7,
114:8, 114:17,
115:12, 115:13,
117:2, 117:4,
119:17
**PUBLIC** [1] -
125:19
**public'** [1] -
114:16
**publication** [18] -
18:5, 19:7,
19:23, 21:4,
22:24, 25:15,
45:15, 45:22,
46:15, 46:25,
48:2, 111:1,
113:1, 114:17,
115:14, 117:5,
118:7, 119:18
**publications** [2] -
21:5, 45:1
**publicly** [5] -
114:8, 115:11,
117:1, 119:5,
119:16
**publish** [4] -
33:25, 43:10,
69:2, 69:8
**published** [39] -
18:15, 19:2,
19:4, 19:10,
19:14, 19:25,
20:10, 20:15,
20:16, 21:1,
21:22, 22:1,
22:6, 24:12,
25:10, 25:14,
25:24, 26:5,
26:16, 26:21,
27:11, 27:19,
30:14, 30:15,
30:19, 30:20,
33:8, 40:24,

41:11, 43:18,
44:1, 46:4,
51:15, 73:17,
74:1, 74:19,
95:21, 120:19,
121:16
**publisher** [1] -
25:20
**publishes** [1] -
27:25
**publishing** [5] -
41:3, 70:16,
70:20, 70:23,
79:19
**pull** [2] - 98:2,
99:10
**pulled** [3] - 77:14,
79:8, 99:4
**purple** [2] - 58:5,
58:7
**purpose** [1] -
125:14
**purposes** [1] -
10:6
**pursuant** [2] -
1:23, 127:2
**PURSUANT** [1] -
5:5
**put** [8] - 6:20,
12:9, 20:5, 20:7,
47:2, 48:19,
121:24

## Q

**Quaker** [1] - 2:4
**qualifies** [1] -
110:21
**qualify** [1] -
110:17
**quality** [2] - 35:9,
35:19
**QUESTION** [1] -
87:22
**questioned** [1] -
80:4
**questions** [17] -
7:9, 8:18, 9:9,
9:25, 10:8,
10:12, 10:13,
12:8, 32:17,
52:14, 72:16,
72:24, 90:23,
92:14, 120:12,
122:17, 123:6
**quick** [2] - 51:23,
122:14
**quickly** [1] - 86:8
**QUIMBY** [83] -
6:24, 31:24,

32:5, 32:23,
34:6, 35:2,
35:21, 37:5,
37:23, 39:11,
39:16, 41:4,
41:23, 43:5,
43:15, 43:21,
46:6, 47:16,
48:4, 48:12,
49:11, 49:23,
52:24, 56:21,
57:23, 58:24,
59:20, 60:8,
60:22, 61:7,
61:17, 62:10,
64:22, 65:11,
68:6, 69:4,
69:11, 69:16,
69:21, 70:11,
70:18, 71:9,
73:24, 75:15,
82:3, 82:7,
83:13, 83:18,
84:5, 84:10,
86:25, 87:5,
87:8, 88:2, 88:7,
88:15, 89:10,
93:5, 93:20,
94:8, 98:15,
101:22, 103:22,
104:24, 107:19,
107:24, 108:14,
109:16, 109:25,
110:19, 111:13,
111:17, 111:24,
112:9, 116:13,
116:25, 119:20,
120:3, 120:20,
121:20, 122:19,
122:24, 123:6
**Quimby** [7] - 2:8,
5:11, 6:24, 98:3,
123:5, 126:24,
127:9
**quite** [3] - 13:2,
61:13, 102:3
**quote** [4] - 95:25,
96:4, 101:6,
121:9
**quoted** [2] -
78:21, 119:23

## R

**race** [11] - 38:10,
39:4, 39:6,
39:10, 39:15,
39:23, 40:8,
40:10, 40:19,
49:17, 60:18
**racism** [5] -

100:1, 103:17,
103:21, 103:25,
118:12
**racist** [20] - 61:16,
61:20, 62:9,
62:20, 62:22,
63:7, 95:15,
111:1, 111:7,
111:12, 112:14,
112:25, 113:3,
113:5, 113:7,
113:16, 118:14,
120:16, 120:24,
121:5
**Racist** [1] - 73:12
**Ragland** [2] - 4:7,
72:6
**raised** [1] - 48:13
**rap** [5] - 63:22,
64:4, 64:12,
64:21, 65:6
**rather** [2] - 10:17,
72:15
**Re** [5] - 4:3, 4:4,
4:9, 4:11, 82:22
**re** [3] - 8:13, 8:16,
96:19
**Re-Notice** [1] -
4:3
**re-notice** [2] -
8:13, 8:16
**re-share** [1] -
96:19
**react** [1] - 46:14
**reaction** [2] -
46:3, 46:7
**read** [59] - 7:18,
7:22, 7:23, 7:25,
27:10, 31:6,
31:11, 31:12,
32:24, 33:1,
33:2, 33:7,
33:14, 33:16,
33:18, 35:13,
35:23, 36:1,
36:3, 36:4, 36:5,
36:7, 38:11,
38:12, 38:14,
46:18, 53:1,
55:4, 64:3, 64:8,
66:15, 67:21,
73:18, 74:20,
76:11, 77:22,
78:4, 78:15,
78:23, 86:14,
86:19, 87:16,
97:5, 102:9,
102:13, 102:14,
102:21, 103:10,
103:24, 109:12,

*Rebecca Geoffroy-Schwinden, Ph.D.*          *9/27/24*          12

112:11, 114:7,
114:11, 114:20,
117:25, 118:15,
125:2
**Read** [1] - 99:21
**reader's** [2] -
24:6, 24:7
**reading** [3] - 36:9,
66:12, 102:17
**ready** [1] - 53:7
**real** [2] - 86:8,
122:14
**realize** [1] - 81:20
**really** [12] - 31:6,
35:13, 36:13,
42:2, 42:25,
44:15, 48:17,
59:1, 59:2,
59:18, 66:11,
75:16
**reappear** [1] -
97:10
**REASON** [1] -
124:4
**reason** [6] -
52:22, 75:2,
75:7, 89:7, 95:7,
107:10
**Rebecca** [5] -
6:10, 53:15,
70:13, 72:6,
94:23
**REBECCA** [11] -
1:10, 1:14, 3:6,
5:2, 6:4, 124:2,
125:2, 125:6,
125:10, 126:11,
126:19
**received** [2] -
12:15, 52:23
**recent** [6] - 24:13,
54:24, 55:19,
60:15, 95:16,
107:14
**recently** [1] - 64:8
**Recess** [4] -
52:11, 87:13,
90:9, 123:1
**recog** [1] - 92:18,
96:2
**recognize** [9] -
8:3, 8:13, 66:10,
68:1, 68:17,
91:11, 92:16,
92:19, 97:4
**recognizes** [1] -
95:25
**recognizing** [1] -
118:7
**recommendatio**

**n** [1] - 20:25
**Record** [1] - 53:3
**record** [54] - 1:24,
6:3, 6:9, 6:19,
6:20, 8:20, 8:23,
9:12, 9:14, 9:16,
10:3, 10:7, 11:5,
12:11, 16:3,
18:4, 18:5,
28:21, 34:1,
35:14, 52:8,
52:9, 52:13,
53:7, 54:13,
55:6, 67:7, 72:4,
73:22, 77:25,
82:17, 86:9,
87:11, 87:12,
87:14, 90:8,
90:11, 90:14,
91:21, 93:17,
96:25, 97:2,
102:9, 105:12,
105:15, 106:18,
114:12, 119:7,
122:16, 122:25,
123:3, 123:10,
126:21, 127:4
**recorded** [1] -
122:8
**refer** [2] - 6:11,
77:8
**reference** [4] -
106:15, 108:24,
120:9
**referenced** [1] -
36:10
**referencing** [1] -
103:15
**Referred** [1] -
76:16
**referred** [2] -
110:5, 116:24
**referring** [10] -
30:22, 47:10,
55:17, 73:20,
95:20, 104:6,
109:18, 109:20,
110:9, 117:11
**refers** [1] - 109:1
**reflect** [1] - 74:17
**refresh** [3] - 30:2,
75:10, 75:16
**refusing** [2] -
48:24, 49:1
**regard** [2] - 32:3,
74:23
**regarding** [1] -
73:11
**region** [1] - 63:19
**Registration** [1] -

127:24
**regular** [1] - 59:23
**regularly** [1] -
31:12
**related** [1] -
127:13
**relation** [2] - 49:6,
50:1
**relatively** [2] -
83:3, 113:4
**release** [4] -
114:16, 115:12,
117:1, 119:16
**relieve** [1] - 9:17
**relying** [1] - 77:19
**remain** [1] - 14:20
**remains** [1] -
105:5
**remember** [116] -
16:6, 22:4,
22:12, 22:16,
22:25, 23:3,
23:7, 24:6, 25:7,
25:18, 25:19,
28:18, 28:19,
29:9, 30:4, 32:1,
32:13, 32:20,
33:18, 33:19,
34:8, 34:22,
35:3, 35:22,
36:5, 36:9,
36:13, 36:15,
36:19, 36:20,
38:4, 38:6,
40:17, 40:20,
41:6, 41:25,
42:9, 49:7, 49:9,
49:21, 49:24,
49:25, 50:6,
51:6, 51:8,
55:16, 55:17,
55:18, 56:5,
56:7, 59:7,
59:10, 59:16,
59:19, 59:22,
60:10, 60:14,
60:21, 60:23,
61:1, 61:12,
61:14, 61:18,
62:17, 63:4,
63:6, 63:8,
66:12, 72:10,
72:11, 72:14,
73:8, 73:9,
76:22, 77:14,
77:17, 77:20,
78:18, 79:18,
83:19, 83:20,
83:23, 83:24,
84:1, 84:2, 84:4,

84:6, 84:11,
85:7, 85:9,
85:13, 88:5,
88:8, 88:10,
88:16, 88:17,
88:25, 89:3,
89:5, 94:11,
96:8, 96:9,
96:24, 100:9,
100:11, 103:5,
105:20, 108:8,
113:12, 116:4,
122:12
**Remotely** [1] -
1:12
**remotely** [1] -
1:20
**removal** [1] -
118:11
**Renaldo** [2] -
2:13, 7:3
**Renaldo.**
**Stowers@**
**untsystem.edu**
[1] - 2:16
**renew** [1] - 88:2
**repeat** [3] - 39:12,
47:22, 119:6
**repetitive** [1] -
105:4
**rephrase** [3] -
39:17, 49:2,
64:25
**report** [6] - 24:6,
24:7, 25:8,
65:25, 66:1,
66:17
**Report** [16] - 4:5,
66:2, 66:9,
66:13, 67:3,
67:17, 67:18,
73:22, 74:7,
88:25, 89:3,
89:14, 89:16,
98:7, 98:10,
98:20
**Reported** [1] -
1:12
**reported** [1] -
1:20
**REPORTER** [2] -
82:14, 87:21
**Reporter** [4] -
1:19, 82:13,
87:16, 126:16
**reporter's** [1] -
10:7
**REPORTER'S** [1]
- 126:10
**Reporter's** [1] -

3:11
**reports** [1] - 20:25
**represent** [8] -
7:1, 34:1, 42:8,
66:1, 74:23,
76:10, 90:15,
97:18
**represented** [1] -
57:16
**representing** [1] -
42:6
**request** [1] - 76:7
**research** [7] -
15:16, 16:19,
16:20, 16:25,
17:16, 103:11
**reserve** [1] -
123:6
**resigned** [1] -
73:15
**respective** [1] -
78:12
**responded** [4] -
60:24, 76:6,
79:17, 80:16
**responding** [6] -
54:24, 55:19,
59:11, 60:13,
60:14, 60:20
**responds** [1] -
74:16
**Response** [4] -
86:18, 86:22,
87:24, 88:12
**response** [9] -
8:16, 27:19,
27:22, 33:4,
39:25, 47:2,
59:8, 59:14,
79:16
**Response.pdf** [1]
- 89:12
**responses** [1] -
104:2
**responsible** [1] -
118:6
**Responsible** [1] -
114:18
**restate** [1] - 8:12
**restroom** [1] -
51:25
**resulted** [1] - 80:5
**return** [1] - 126:25
**reversing** [1] -
43:23
**Review** [1] - 4:5
**review** [25] - 8:7,
11:12, 11:15,
19:11, 19:15,
19:20, 19:22,

20:3, 20:21,
20:23, 20:25,
21:8, 21:11,
21:16, 21:22,
22:7, 22:8, 24:3,
24:15, 24:18,
24:20, 24:22,
25:2, 35:13,
98:25
**reviewed** [20] -
11:17, 11:20,
19:3, 19:5,
19:10, 19:23,
20:8, 21:5, 22:9,
22:24, 23:7,
24:17, 34:3,
40:13, 41:15,
44:25, 47:4,
47:11, 47:24,
73:21
**reviewer** [2] -
21:12, 21:19
**reviewing** [3] -
35:6, 47:13,
48:24
**reviews** [1] -
21:10
**revisions** [1] -
114:5
**Revolution** [1] -
64:9
**Richmond** [7] -
77:8, 78:6, 78:9,
82:20, 83:7,
84:8, 84:22
**Richmond's** [1] -
79:15
**rights** [1] - 101:10
**road** [3] - 7:12,
8:22, 11:2
**rock** [1] - 64:11
**role** [4] - 50:16,
55:3, 55:24,
68:4
**room** [2] - 12:3,
12:6
**Roughly** [1] -
22:19
**rule** [2] - 11:2,
30:7
**Rules** [2] - 1:23,
5:8
**rules** [3] - 7:12,
8:22, 11:1

---

**S**

---

**sabbatical** [1] -
15:14
**sat** [1] - 47:5

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*    13

**Savant** [1] - 25:13
**saved** [1] - 50:24
**saw** [1] - 93:6
**scenario** [2] - 107:25, 108:1
**Schenker** [2] - 26:3, 26:6
**Schenkerian** [65] - 4:10, 4:11, 11:18, 26:4, 26:10, 26:15, 26:17, 26:20, 27:19, 28:14, 30:9, 30:11, 31:20, 32:4, 33:15, 35:11, 37:8, 37:16, 37:21, 38:2, 38:19, 38:20, 39:6, 39:9, 39:15, 40:6, 41:11, 41:19, 43:19, 45:16, 45:23, 46:4, 47:1, 48:2, 51:12, 52:20, 53:3, 54:25, 55:20, 58:21, 60:15, 62:6, 62:22, 63:7, 66:3, 66:14, 66:19, 67:20, 78:2, 82:19, 82:22, 86:23, 87:24, 95:17, 95:22, 107:14, 108:11, 109:11, 110:14, 111:7, 111:22, 111:23, 112:1, 113:8, 117:23
**scholarly** [9] - 19:13, 20:4, 20:7, 20:11, 24:12, 25:24, 40:10, 63:23, 96:6
**scholars** [1] - 42:12
**scholarship** [2] - 27:21, 35:10
**scholarships** [2] - 15:24, 15:25
**school** [4] - 12:15, 15:3, 23:2, 101:11
**Schreyer** [1] - 12:18
**SCHWINDEN** [11] - 1:10, 1:15,

3:6, 5:2, 6:4, 124:2, 125:2, 125:6, 125:10, 126:11, 126:19
**Schwinden** [18] - 4:8, 4:13, 6:8, 6:10, 6:12, 6:13, 7:2, 7:6, 72:7, 81:10, 82:19, 86:3, 86:13, 90:3, 90:16, 94:23, 105:19, 122:18
**screen** [2] - 91:13, 101:24
**scroll** [7] - 8:4, 8:5, 8:11, 98:6, 98:19, 99:5, 99:12
**seal** [1] - 125:15
**second** [10] - 20:16, 23:18, 23:19, 39:3, 40:17, 82:25, 94:2, 96:19, 97:15, 118:5
**secondhand** [1] - 62:2
**See** [3] - 30:8, 98:18, 107:8
**see** [23] - 7:14, 7:16, 8:5, 41:15, 53:12, 53:19, 66:20, 72:8, 72:22, 73:6, 74:11, 75:17, 76:8, 90:17, 92:18, 94:15, 94:25, 96:20, 97:15, 97:18, 101:24, 102:1, 102:5
**seeing** [1] - 96:24
**seem** [5] - 15:10, 40:9, 92:8, 104:8, 104:10
**SEM** [1] - 67:19
**send** [2] - 21:2, 75:18
**sending** [3] - 88:25, 89:3, 92:9
**senior** [1] - 29:2
**sense** [3] - 44:3, 91:2, 103:9
**sent** [11] - 20:24, 33:3, 46:16, 71:17, 75:17, 78:6, 86:23, 87:25, 88:22,

90:25, 94:7
**sentence** [13] - 56:18, 76:8, 109:21, 110:3, 110:5, 110:23, 111:9, 112:2, 112:11, 112:24, 117:11, 119:24, 120:5
**sentences** [1] - 17:20
**separate** [2] - 20:8, 34:4
**separated** [2] - 101:20, 102:11
**SEPTEMBER** [2] - 5:3, 124:3
**September** [4] - 1:11, 1:18, 6:2, 126:12
**sequentially** [1] - 90:18
**series** [6] - 18:13, 90:22, 91:1, 92:1, 92:17, 109:3
**Servant** [1] - 25:13
**serves** [1] - 68:13
**session** [1] - 33:12
**several** [6] - 23:3, 23:4, 50:23, 67:2, 68:13, 108:11
**Several** [1] - 68:16
**SHALL** [1] - 5:5
**share** [3] - 7:20, 69:24, 96:19
**shared** [2] - 69:24, 94:13
**sharing** [1] - 96:19
**SHERMAN** [2] - 1:2, 126:2
**short** [1] - 86:10
**Shorthand** [2] - 1:19, 126:16
**Show** [2] - 80:11, 80:13
**show** [2] - 48:17, 96:18
**showed** [1] - 89:16
**showing** [2] - 92:19, 94:9
**side** [3] - 101:23, 109:6
**sidebar** [1] -

94:17
**sign** [5] - 43:22, 73:16, 73:25, 74:16
**signatories** [1] - 104:21
**signature** [4] - 53:23, 53:25, 125:3, 126:25
**Signature** [2] - 3:10, 5:12
**SIGNATURE** [2] - 5:13, 124:1
**signatures** [2] - 109:5, 109:7
**signed** [15] - 41:21, 41:24, 42:4, 68:18, 75:11, 80:24, 81:4, 92:23, 93:4, 93:15, 93:18, 94:6, 109:4, 113:13, 122:9
**significant** [1] - 16:14
**signing** [2] - 75:12, 82:2
**similar** [5] - 43:2, 61:13, 79:3, 99:8, 99:15
**simultaneously** [1] - 7:20
**sit** [7] - 47:23, 49:20, 77:17, 84:21, 85:8, 93:2, 121:2
**site** [1] - 17:14
**site-specific** [1] - 17:14
**situated** [3] - 40:10, 64:9, 109:18
**skim** [1] - 35:23
**skimmed** [4] - 33:16, 33:18, 36:3, 36:16
**skip** [3] - 72:19, 73:2, 116:15
**slowly** [1] - 99:12
**small** [4] - 16:6, 42:2, 42:16, 42:18
**SMT** [2] - 33:11, 73:13
**So..** [1] - 113:16
**so..** [4] - 15:17, 23:15, 60:25, 97:24
**social** [2] - 32:25,

61:4
**societies** [1] - 42:1
**society** [3] - 19:18, 41:22, 43:3
**Society** [11] - 15:12, 26:24, 27:12, 28:7, 41:16, 41:17, 42:23, 43:8, 43:13, 46:14, 52:18
**soliciting** [1] - 52:19
**solid** [1] - 60:3
**solidarity** [5] - 109:9, 109:14, 109:19, 110:12, 110:21
**someone** [8] - 43:18, 44:5, 59:25, 61:19, 64:19, 95:7, 101:1, 104:18
**Someone** [1] - 94:19
**sometimes** [1] - 63:18
**somewhere** [2] - 16:24, 42:7
**soon** [1] - 74:19
**Sorry** [10] - 22:3, 37:7, 39:12, 56:24, 82:22, 87:15, 93:10, 120:21, 121:23
**sorry** [2] - 22:5, 22:23, 30:5, 49:25, 59:4, 64:25, 70:20, 71:13, 72:25, 82:17, 84:1, 85:2, 85:4, 87:9, 91:14, 101:22, 102:21, 103:19, 106:8, 114:9, 118:23, 120:6
**sort** [7] - 7:12, 8:22, 14:5, 19:8, 20:14, 25:7, 31:9
**sorts** [1] - 105:4
**sought** [1] - 43:10
**sound** [2] - 30:1, 42:12
**Sounds** [1] - 119:11
**sounds** [4] - 13:18, 14:23,

19:14, 30:3
**spans** [1] - 74:10
**speaking** [3] - 12:4, 69:15, 69:17
**speaks** [1] - 105:13
**special** [1] - 100:6
**specialist** [1] - 64:1
**specific** [25] - 17:14, 24:7, 24:8, 26:8, 37:20, 40:11, 46:10, 47:10, 58:11, 58:15, 62:19, 63:4, 63:6, 63:8, 74:5, 74:8, 76:6, 83:21, 84:22, 84:24, 101:13, 112:3, 120:23, 121:3
**Specifically** [1] - 118:13
**specifically** [7] - 41:7, 61:18, 62:17, 62:21, 85:9, 90:25, 121:21
**specifics** [1] - 96:10
**specifies** [1] - 115:6
**specify** [1] - 95:23
**Spectrum** [3] - 27:11, 27:12, 33:8
**speculating** [2] - 44:15, 44:17
**speech** [1] - 120:19
**split** [1] - 18:21
**spoken** [1] - 81:1
**spot** [1] - 104:11
**stable** [1] - 108:18
**stamp** [2] - 72:5, 86:16
**stamps** [1] - 91:24
**stance** [1] - 56:15
**stand** [3] - 109:9, 110:12, 110:21
**standards** [1] - 34:25
**standing** [1] - 109:14
**start** [9] - 18:11, 22:17, 36:4, 37:11, 48:7,

*Rebecca Geoffroy-Schwinden, Ph.D.*    *9/27/24*    14

49:14, 54:7,
54:8
**started** [4] -
13:15, 13:22,
14:12
**starting** [2] -
12:13, 14:9
**starts** [2] - 53:15,
76:1
**State** [6] - 1:20,
12:17, 13:19,
70:17, 71:7,
126:17
**STATE** [2] -
125:8, 125:20
**state** [8] - 6:9,
8:23, 12:11,
16:3, 18:4,
54:13, 75:13,
105:12
**statement** [99] -
11:17, 11:18,
11:19, 47:2,
47:4, 47:24,
48:8, 49:4,
49:22, 50:7,
50:12, 50:17,
66:19, 67:24,
68:1, 68:5, 69:2,
69:8, 69:12,
69:14, 69:22,
70:5, 70:9,
70:17, 71:5,
71:6, 71:12,
71:24, 71:25,
72:1, 74:24,
75:11, 78:13,
79:20, 79:22,
80:3, 80:7,
80:12, 80:14,
80:24, 81:4,
81:5, 81:7, 81:8,
82:2, 83:15,
83:17, 86:12,
88:14, 88:22,
89:1, 89:8,
91:22, 92:17,
93:4, 93:15,
93:18, 94:5,
95:10, 97:13,
98:12, 98:14,
99:20, 99:21,
100:8, 105:20,
105:21, 106:6,
106:7, 106:14,
106:16, 106:18,
108:10, 108:20,
109:15, 109:23,
110:4, 110:17,
112:8, 113:13,

113:19, 115:6,
116:1, 116:10,
116:11, 116:15,
116:21, 116:24,
117:7, 117:8,
118:5, 118:21,
118:22, 118:24,
119:1, 119:12,
121:17, 121:19,
121:22
**Statement** [7] -
4:4, 4:9, 4:15,
4:16, 67:19,
78:2, 92:22
**Statement..........
..........** [1] - 4:17
**statements** [6] -
58:20, 81:18,
81:23, 108:12,
118:18, 118:20
**States** [3] - 65:17,
66:5, 100:18
**STATES** [2] - 1:1,
126:1
**states** [1] - 76:9
**Station** [1] - 2:9
**stay** [1] - 122:22
**stenotype** [1] -
1:21
**step** [2] - 42:20,
93:21
**Steve** [1] - 88:19
**stick** [1] - 65:22
**still** [2] - 40:3,
118:1
**stipends** [1] -
16:20
**Stipulations.......
.........................
** [1] - 3:5
**Stoia** [1] - 35:19
**Stoia's** [6] -
33:20, 33:22,
34:11, 34:24,
35:7, 35:15
**stop** [1] - 96:19
**STOWERS** [1] -
7:3
**Stowers** [2] -
2:13, 7:3
**strange** [1] -
44:21
**stream** [1] - 62:5
**Strike** [1] - 26:19
**strike** [7] - 18:12,
27:3, 28:11,
34:24, 68:3,
70:22, 70:25
**string** [1] - 66:4
**stronger** [4] -

107:18, 107:22,
108:2, 109:15
**strongly** [2] -
109:22, 110:1
**student** [17] -
16:1, 48:8, 49:4,
49:22, 54:14,
60:1, 106:6,
106:7, 110:4,
113:20, 116:10,
116:20, 118:5,
119:2, 119:13
**Student** [1] - 4:4
**students** [17] -
46:23, 55:11,
56:2, 61:2,
61:23, 96:12,
99:21, 106:2,
106:10, 108:20,
109:10, 109:20,
109:24, 110:9,
110:13, 113:19,
116:3
**Students'** [1] -
4:16
**students'** [19] -
11:18, 47:24,
54:23, 59:8,
81:5, 81:7,
97:13, 99:20,
105:21, 106:14,
106:16, 106:18,
113:22, 114:14,
116:17, 118:22,
121:19, 122:2,
122:11
**studies** [4] -
12:19, 13:20,
16:24, 27:4
**Studies** [63] -
4:10, 4:12,
11:18, 15:12,
26:5, 26:11,
26:15, 26:21,
27:19, 28:14,
30:10, 30:11,
31:20, 32:4,
33:15, 35:11,
37:8, 37:16,
37:21, 38:2,
38:19, 38:20,
39:6, 39:9,
39:15, 40:6,
41:12, 41:19,
43:20, 45:16,
45:23, 46:5,
47:1, 48:3,
51:12, 52:20,
53:3, 54:25,
55:20, 58:22,

60:15, 62:6,
62:22, 63:7,
66:3, 66:14,
66:20, 67:20,
78:2, 82:19,
82:22, 86:23,
87:25, 95:17,
95:22, 107:14,
108:11, 109:11,
110:14, 111:7,
111:22, 113:8,
117:23
**stuff** [2] - 59:11,
64:6
**styled** [1] - 1:17
**subject** [1] -
19:11
**subjected** [6] -
19:15, 21:23,
22:7, 24:4,
24:15, 24:22
**submitted** [3] -
93:18, 94:10,
126:23
**submitting** [1] -
50:7
**subordinate** [1] -
119:15
**subparts** [1] -
18:22
**Subpoena** [1] -
5:7
**subscribed** [1] -
125:13
**sued** [3] - 81:15,
81:19, 81:20
**suffering** [1] - 9:5
**suggesting** [1] -
25:3
**suggestions** [1] -
19:24
**Suite** [1] - 1:22
**summer** [3] -
16:18, 16:20,
37:3
**support** [8] -
96:11, 99:20,
106:1, 106:10,
106:21, 108:19,
113:18, 114:3
**supporting** [1] -
113:25
**supportive** [1] -
53:16
**suppose** [2] -
31:15, 88:23
**supposed** [1] -
21:13
**surprise** [1] - 81:2
**surprised** [4] -

41:13, 41:14,
43:9, 43:17
**surprises** [1] -
44:14
**surprising** [2] -
44:8, 44:12
**surrounding** [4] -
26:4, 28:13,
37:15, 53:2
**suspected** [2] -
44:5, 44:7
**suspecting** [1] -
44:12
**swift** [1] - 104:2
**switched** [1] -
114:3
**sworn** [3] - 1:16,
6:5, 126:20
**Symposium** [11] -
27:19, 28:1,
28:4, 33:22,
34:4, 34:10,
35:25, 36:1,
36:2, 51:16,
60:17
**System** [3] - 1:22,
2:13, 7:4
**system** [5] -
22:17, 100:5,
100:13, 100:18,
100:25
**systemic** [4] -
99:25, 103:17,
103:21, 103:25

**T**

**TAKEN** [1] - 5:5
**talks** [1] - 95:14
**teach** [2] - 60:6,
65:20
**technical** [2] -
87:11, 90:2
**technological** [1]
- 17:25
**Telephone** [3] -
2:5, 2:10, 2:15
**tenure** [4] - 14:15,
14:24, 25:16,
25:23
**terms** [1] - 35:6
**testified** [11] - 6:5,
18:19, 42:3,
47:11, 47:23,
50:17, 61:22,
61:25, 63:12,
111:22, 120:4
**testify** [3] - 9:7,
9:15, 47:14
**testifying** [2] -

8:25, 122:2
**testimony** [21] -
11:13, 11:16,
11:21, 45:24,
47:12, 48:23,
58:8, 59:1,
85:10, 103:7,
105:17, 114:25,
115:15, 118:17,
118:22, 118:24,
119:21, 120:2,
121:25, 126:21,
127:3
**Texas** [36] - 1:20,
1:21, 1:22, 1:23,
2:10, 2:13, 2:14,
2:15, 6:25, 7:4,
14:12, 14:14,
15:2, 16:24,
26:6, 29:4,
30:19, 56:13,
56:20, 57:6,
66:6, 69:10,
70:6, 70:17,
71:4, 71:7,
71:12, 75:6,
75:14, 75:23,
77:11, 82:1,
117:9, 117:14,
126:17, 127:23
**text** [4] - 28:23,
29:7, 61:25,
99:14
**Thad** [3] - 2:3,
6:21, 127:7
**thanking** [2] -
55:14, 59:9
**THE** [29] - 1:1,
2:2, 2:7, 6:2,
51:22, 51:25,
52:5, 52:9,
52:12, 82:14,
85:19, 86:1,
86:6, 87:12,
87:14, 87:21,
90:4, 90:7, 90:8,
90:10, 91:12,
91:15, 91:18,
122:25, 123:2,
123:9, 125:8,
125:20, 126:1
**Theatrical** [1] -
23:20
**Theoria** [3] -
30:21, 31:6,
31:16
**theorist** [1] -
26:14
**Theorists** [1] -
55:9

**theorists** [2] - 42:24, 73:12
**Theory** [11] - 18:20, 26:25, 27:13, 28:7, 41:17, 41:18, 42:24, 43:14, 46:14, 46:24, 52:18
**theory** [7] - 30:16, 30:19, 31:12, 42:18, 101:20, 102:11, 103:12
**therein** [1] - 125:14
**thinking** [5] - 19:17, 41:5, 41:6, 87:5, 103:8
**third** [2] - 107:10, 114:22
**THIS** [1] - 5:5
**thoughtful** [4] - 95:25, 96:4, 96:6, 96:7
**Thoughts** [1] - 100:8
**thread** [6] - 54:1, 54:8, 54:17, 72:20, 72:22, 78:21
**three** [6] - 11:11, 14:23, 17:20, 18:22, 22:6, 34:2
**tie** [1] - 60:13
**Tim** [13] - 36:7, 45:17, 46:8, 46:10, 61:20, 62:19, 80:9, 80:11, 81:14, 95:24, 100:6, 101:14
**Tim's** [2] - 36:19, 49:6
**timeline** [1] - 32:7
**TIMOTHY** [2] - 1:3, 126:3
**Timothy** [25] - 2:19, 6:22, 6:23, 40:14, 45:7, 45:13, 45:22, 46:3, 46:14, 46:25, 47:8, 47:15, 48:1, 48:15, 49:4, 49:21, 49:24, 50:7, 50:9, 58:21, 61:15, 62:8, 81:9,

95:20, 120:15
**title** [8] - 22:20, 57:7, 66:8, 76:23, 77:4, 78:18, 84:18, 92:6
**titled** [1] - 89:11
**titles** [1] - 18:10
**TO** [2] - 5:5, 5:9
**Today** [1] - 6:2
**today** [24] - 6:11, 6:23, 8:15, 8:25, 10:9, 11:16, 11:21, 45:24, 47:5, 47:12, 49:20, 60:21, 77:17, 77:18, 77:20, 84:21, 85:8, 93:2, 115:15, 118:17, 118:22, 118:24, 119:21, 121:3
**today's** [1] - 11:6
**together** [8] - 69:19, 69:22, 92:12, 111:5, 111:6, 111:19, 112:17, 112:23
**toggle** [1] - 78:23
**token** [1] - 10:21
**took** [3] - 85:15, 91:16, 117:21
**tooth** [1] - 86:4
**top** [6] - 7:16, 54:7, 66:5, 78:19, 98:19, 114:11
**totally** [2] - 22:25, 102:6
**towards** [3] - 47:15, 48:1, 54:7
**trained** [2] - 58:16, 58:17
**training** [16] - 55:1, 55:23, 56:19, 56:23, 57:3, 57:5, 57:7, 57:12, 57:19, 57:21, 57:25, 58:7, 58:16, 59:18, 59:23, 60:10
**transcript** [2] - 126:20, 126:23
**travel** [3] - 16:7, 16:9, 16:13
**treatment** [1] - 95:15
**trial** [3] - 5:19,

9:15, 123:7
**tricky** [1] - 63:15
**tripped** [1] - 70:21
**true** [2] - 125:4, 126:21
**truly** [1] - 43:17
**Trust** [1] - 32:12
**trust** [1] - 98:5
**truthfully** [1] - 8:25
**try** [8] - 6:17, 7:19, 10:11, 11:1, 18:7, 22:12, 70:25, 114:22
**trying** [24] - 25:17, 25:19, 27:24, 32:12, 36:25, 37:25, 39:19, 43:7, 56:25, 60:9, 67:12, 73:13, 83:25, 88:21, 89:23, 90:24, 98:2, 102:19, 102:23, 104:12, 105:10, 111:10, 121:24
**turned** [1] - 44:6
**tutorial** [1] - 7:17
**tweets** [1] - 33:2
**Twentieth** [1] - 65:16
**Twentieth-Century** [1] - 65:16
**Twitter** [6] - 29:11, 29:17, 29:20, 31:20, 32:22, 62:3
**two** [10] - 8:5, 13:18, 13:23, 17:20, 42:14, 53:18, 79:13, 89:24, 119:22, 122:17
**two-paged** [1] - 53:18
**typical** [2] - 57:19, 85:16
**typically** [2] - 50:19, 57:21
**typo** [1] - 79:4

**U**

**Uh-hum** [1] - 65:21
**Um-hum** [39] - 14:17, 17:1, 17:18, 18:2,

19:4, 21:25, 23:5, 23:22, 23:25, 24:11, 28:17, 29:15, 36:8, 36:12, 38:11, 41:1, 49:16, 50:2, 50:14, 51:13, 57:9, 57:15, 57:17, 58:6, 58:20, 60:4, 60:11, 68:17, 69:18, 70:1, 71:22, 74:12, 82:24, 83:22, 97:14, 108:10, 116:22, 117:3, 120:13
**um-hum** [3] - 10:6, 77:16, 91:3
**Un-hum** [1] - 33:6
**unacceptable** [2] - 44:22, 118:14
**unclarity** [1] - 106:8
**unclear** [2] - 87:1, 116:14
**uncritical** [1] - 95:14
**under** [9] - 19:20, 20:7, 25:22, 48:19, 82:5, 117:11, 118:4, 125:15
**undergraduate** [3] - 12:13, 15:5, 15:6
**undersigned** [3] - 106:23, 109:9, 110:12
**understood** [6] - 28:3, 29:16, 30:10, 33:6, 38:12, 105:20
**unequivocally** [1] - 76:9
**unhappy** [1] - 56:6
**unique** [2] - 61:1, 61:8
**UNITED** [2] - 1:1, 126:1
**United** [3] - 65:17, 66:5, 100:18
**University** [30] - 1:21, 2:13, 7:4, 12:17, 12:22, 12:23, 14:13, 15:2, 16:23,

17:6, 17:9, 26:5, 27:6, 29:4, 30:19, 56:13, 56:20, 57:6, 69:9, 70:6, 71:4, 71:11, 75:6, 75:13, 75:23, 77:11, 77:18, 82:1, 117:8, 117:13
**university** [4] - 56:23, 69:13, 70:16, 76:10
**university-level** [1] - 56:23
**unless** [1] - 9:24
**unlikely** [1] - 32:10
**unrelated** [1] - 104:10
**unresearched** [1] - 108:12
**unscholarly** [1] - 95:15
**unsigned** [1] - 5:19
**UNT** [33] - 4:4, 4:8, 4:10, 4:12, 4:14, 4:15, 16:19, 29:19, 31:20, 53:19, 55:11, 56:22, 66:19, 67:20, 68:5, 72:5, 74:23, 76:1, 78:13, 78:17, 86:16, 89:1, 90:18, 92:2, 97:22, 110:11, 117:9, 117:14, 118:3, 121:17
**UNT's** [2] - 56:14, 70:2
**unusual** [2] - 44:25, 51:10
**up** [30] - 6:16, 9:22, 9:25, 12:14, 13:8, 13:13, 18:21, 20:20, 21:25, 25:16, 25:23, 29:17, 30:9, 33:20, 51:9, 60:13, 65:14, 70:8, 70:21, 74:6, 77:22, 82:13, 89:14, 94:17, 98:6, 98:18, 99:4, 99:10, 101:5,

120:7
**upset** [2] - 33:4, 80:15
**URL** [7] - 96:21, 99:2, 106:12, 108:22, 114:14, 120:9, 120:10

**V**

**vague** [1] - 113:4
**Van** [1] - 54:19
**vanilla** [1] - 34:3
**variety** [2] - 58:2, 58:3
**various** [1] - 66:16
**vast** [1] - 41:21
**verb** [2] - 109:18, 109:19
**verbiage** [1] - 108:9
**verbs** [1] - 107:21
**version** [16] - 27:10, 33:7, 88:4, 88:6, 89:8, 89:13, 89:17, 93:3, 93:6, 93:8, 93:22, 110:11, 110:16, 110:17, 110:20, 113:17
**versions** [2] - 88:17
**Video** [1] - 2:22
**VIDEOGRAPHER** [11] - 2:20, 6:2, 52:9, 52:12, 87:12, 87:14, 90:8, 90:10, 122:25, 123:2, 123:9
**VIDEOTAPED** [2] - 1:9, 1:14
**viewed** [1] - 33:11
**views** [1] - 70:13
**violate** [1] - 78:13
**visible** [1] - 99:11
**visiting** [1] - 16:13
**Vista** [1] - 127:22
**vitae** [1] - 12:10
**Volume** [26] - 26:21, 27:25, 28:13, 33:14, 34:7, 37:7, 37:16, 38:19, 39:5, 39:21, 40:5, 40:7, 40:11, 41:19, 45:15, 45:22,

*Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24*     16

46:4, 46:25, 48:2, 51:11, 52:19, 53:2, 95:22, 112:4, 112:22, 113:7
**volume** [11] - 20:13, 20:14, 22:9, 23:4, 23:6, 23:19, 24:12, 39:1, 40:18, 40:19, 43:14
**vs** [2] - 1:5, 126:5

## W

**wait** [4] - 13:9, 73:16, 74:1, 120:21
**waived** [1] - 5:12
**walk** [3] - 45:17, 104:12, 116:9
**wall** [1] - 59:24
**walls** [1] - 104:1
**wants** [4] - 7:23, 72:22, 73:16, 73:25
**Warner** [1] - 2:21
**Warren** [3] - 76:5, 76:18, 76:19
**website** [1] - 96:20
**weeds** [1] - 16:4
**week** [2] - 68:14, 71:21
**weigh** [1] - 75:19
**welcome** [2] - 58:18, 72:23
**WHALEY** [1] - 127:22
**whistleblowers** [1] - 118:8
**whole** [5] - 23:6, 62:24, 67:6, 72:13, 118:23
**wish** [1] - 26:1
**wished** [1] - 122:9
**WITNESS** [12] - 51:22, 51:25, 52:5, 85:19, 86:1, 86:6, 90:4, 90:7, 91:12, 91:15, 91:18, 124:2
**Witness** [1] - 5:10
**witness** [9] - 1:15, 10:17, 72:6, 87:4, 87:17, 122:16, 123:5, 126:19, 126:22
**witness's** [1] -

105:17
**Witness's** [1] - 5:11
**witnessed** [1] - 121:12
**witnesses** [1] - 18:19
**women** [1] - 64:11
**wondering** [3] - 57:4, 104:15, 104:16
**word** [6] - 27:20, 29:17, 58:10, 58:12, 114:3, 120:4
**words** [8] - 39:19, 40:8, 48:7, 49:10, 51:11, 53:16, 112:23, 121:25
**workplace** [1] - 58:18
**wound** [1] - 74:6
**wow** [1] - 17:13
**WRIGHT** [2] - 1:6, 126:6
**write** [9] - 46:24, 54:21, 76:9, 78:9, 95:8, 106:1, 106:10, 106:21, 108:19
**writer** [1] - 21:18
**writes** [1] - 73:10
**writing** [7] - 23:1, 58:20, 59:9, 73:4, 120:17, 120:25, 121:2
**written** [1] - 76:7
**wrote** [12] - 20:25, 23:1, 51:2, 59:24, 59:25, 68:7, 68:8, 69:22, 75:1, 94:12, 103:8, 104:17

## Y

**year** [7] - 12:15, 15:4, 15:10, 15:11, 15:17, 16:17, 23:25
**years** [7] - 13:18, 13:24, 14:23, 32:10, 35:15, 60:3, 62:13
**yesterday** [2] - 76:5, 78:10
**York** [2] - 27:6, 27:7

**yourself** [2] - 18:17, 101:1

## Z

**ZOOM** [1] - 1:9
**Zoom** [1] - 85:1