| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | FOR THE EASTERN DISTRICT OF |
| 2 | SHERMAN DIVISION |

```
 3  TIMOTHY JACKSON,              )
                                 )
 4       Plaintiff,              )
                                 )
 5  vs.                          )  CASE NO. 4:21-CV-00033-ALM
                                 )
 6  LAURA WRIGHT, et al.,        )
                                 )
 7       Defendants.             )
```

8

9  ************************************************************

10              VIDEOTAPED ORAL DEPOSITION OF

11                 BENJAMIN D. BRAND, Ph.D.

12                   September 23, 2024

13  ************************************************************

14

15      VIDEOTAPED ORAL DEPOSITION OF BENJAMIN D. BRAND,

16  Ph.D., produced as a witness at the instance of the

17  Plaintiff and duly sworn, was taken in the above-styled

18  and numbered cause on the 23rd day of September, 2024,

19  from 1:14 p.m. to 6:11 p.m., before Kim D. Carrell,

20  Certified Shorthand Reporter in and for the State of

21  Texas, reported by computerized stenotype machine at

22  the University of North Texas System, 801 North Texas

23  Boulevard, Gateway Suite #308, Denton, Texas, pursuant

24  to the Federal Rules of Civil Procedure and the

25  provisions stated on the record or attached hereto.

1

2                         APPEARANCES

3

4   FOR THE PLAINTIFF:

5        Mr. Michael Thad Allen
         ALLEN LAW, LLC
6        P.O. Box 404
         Quaker Hill, CT 06375
7        Telephone: 860.772.4738
         Fax: 860.469.2783
8        E-mail: M.allen@allen-lawfirm.com

9

10  FOR THE DEFENDANTS:

11       Mr. Benjamin S. Walton
         Assistant Attorney General
12       General Litigation Division
         P.O. Box 12548, Capital Station
13       Austin, Texas 78711
         Telephone: 512.463.2120
14       Fax: 512.320.0667
         E-mail: Benjamin.Walton@oag.texas.gov
15           - and -

16       Mr. Renaldo Stowers
         University of North Texas System
17       Office of General Counsel
         801 North Texas Boulevard
18       Denton, Texas 76201
         Telephone: 940.565.2717
19       Fax: 940.369.7026
         E-mail: Renaldo.Stowers@untsystem.edu

20

21  ALSO PRESENT:

22  VIDEOGRAPHER:

23       Mr. Tony McGough
         Legal Video Group
24       lvg.dallas@gmail.com
         214-598-5229

25

```
 1              I N D E X

 2                                     PAGE

 3  Appearances................................  2

 4  Stipulations...............................  6

 5

 6  BENJAMIN D. BRAND, Ph.D.

 7       Direct Examination by Mr. Allen........  7

 8

 9

10                  EXHIBITS

11

12   NUMBER          DESCRIPTION          MARKED

13  Exhibit 1   Re-Notice of Taking Deposition.....  7

14  Exhibit 2   Letter, 7-31-20, Allen to

15              Wright, et al.

16              (UNT 000157 - 000162).............. 37

17  Exhibit 3   Title Page of Theoria, Volume 26... 47

18  Exhibit 4   Walls Facebook Post

19              (JACKSON 000234 - 000236).......... 56

20  Exhibit 5   Email, 11-17-19, Walls to Jackson

21              (Exhibit G)

22              (JACKSON 000240 - 000244).......... 70

23  Exhibit 6   Material for the Committee

24              Emails

25              (UNT 002645 - UNT 002782).......... 78
```

1    Exhibit 7   Ad Hoc Review Panel Report
2                (Exhibit D)
3                (JACKSON000208 - 000233)........... 84
4     Exhibit 8  Email, 12-11-20, Brand to Jackson
5                (JACKSON 000272)................... 87
6     Exhibit 9  Handwritten Notes, 9-16-20, Ad
7                Hoc Journal Review Committee....... 90
8    Exhibit 10  Emails Re: Questions regarding
9                the JSS
10               (UNT 002539 - 002546)............. 93
11   Exhibit 11  Emails Beginning 7-25-20, Chung
12               to Graf, et al.
13               (UNT 000304 - 000309).............101
14   Exhibit 12  Emails RE: JSS Beginning 7-25-20,
15               Chung to Graf, et al.
16               (UNT 000458 - 000463).............107
17   Exhibit 13  Response Draft, Heidlberger to
18               Brand, 7-27-20
19               (UNT 000472, 000503)..............112
20   Exhibit 14  Emails RE: SMT Exec Board
21               response to JSS Essays
22               (UNT 000480, 000481)..............118
23   Exhibit 15  Statement from the MHTE Graduate
24               Students (Confidential)
25               (Kohanski 000107 - 000110).........122

```
 1  Exhibit 16   MHTE Individual Faculty Statement
 2                Email Cover Page,
 3                Geoffroy-Schwinden to Brand
 4                (UNT 000417).....................127
 5
 6
 7
 8                    REPORTER'S NOTE:
 9      Quotation marks are used for clarity and do not
10            necessarily reflect a direct quote.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    A G R E E M E N T S

 2   DEPOSITION OF:  BENJAMIN D. BRAND, Ph.D.

 3   DATE:  September 23, 2024

 4   CAUSE NO. 4:21-CV-00033-ALM

 5

 6   THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:

 7        (X)  Notice
          ( )  Agreement
 8        ( )  Court Order
          ( )  Subpoena
 9        (X)  Rules of Federal Civil Procedure

10

11   ORIGINAL TO:

12        ( )  Witness
          (X)  Witness's attorney      (Benjamin Walton)
13        ( )  Producing attorney
          ( )  Signature waived
14

15

16   NUMBER OF DAYS FOR SIGNATURE

17        ( )  20 days

18        (X)  30 days

19        ( )  Other:

20

21   MISCELLANEOUS:

22        ( )  Any objection made by one party good for
                all parties.
23
          ( )  An unsigned copy may be used at any trial,
24                hearing, or arbitration proceedings.

25
```

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We're now going on

3    the record.  Today's date is September the 23rd, 2024,

4    and the time is 1:14 p.m.  This is the Video Deposition

5    of Benjamin Brand.

6              If the attorneys present would please state

7    their appearances; after which, the court reporter will

8    swear in the witness.

9              MR. ALLEN:  Michael Thad Allen for the

10   Plaintiff, Timothy Jackson.

11              MR. WALTON:  Ben Walton for the

12   Defendants.

13              MR. STOWERS:  Renaldo Stowers.  I'm an

14   attorney with the University of North Texas System,

15   Office of General Counsel.

16              BENJAMIN D. BRAND, Ph.D.,

17   having been first duly sworn, testified as follows:

18                   DIRECT EXAMINATION

19   BY MR. ALLEN:

20     Q.    Professor Brand, can you state your name for

21   the record, please?

22     A.    Benjamin David Brand.

23     Q.    Thank you.  So I just want to do a few

24   preliminary things on the record.

25                   (Deposition Exhibit Number 1 marked.)

1      Q.    In front of you is an exhibit I've marked

2 Exhibit 1. Do you recognize this document?

3      A.    Yes.

4      Q.    Is it accurate to say that you appeared for

5 today's deposition in response to this document?

6      A.    Yes.

7      Q.    As we go through, I'll ask you to put the

8 exhibits to the side. There may be times where I ask

9 you to retrieve one if we have another question that

10 refers to exhibits we've covered earlier in the

11 deposition. And at the end, the court reporter will

12 have them.

13        Have you ever been deposed before?

14      A.    No.

15      Q.    Is there anything that would interfere with

16 your ability to answer questions truthfully today?

17      A.    No.

18      Q.    You are not on any medications?

19      A.    No.

20      Q.    Not suffering from any illness or mental or

21 physical condition that would impair your ability to

22 testify?

23      A.    No.

24      Q.    Thank you. So from time to time, you may

25 feel that I'm unclear. I've asked a question you don't

1  understand.  Please feel free to interrupt me at any time

2  to ask for clarification.  I will gladly try to rephrase

3  or anything that makes it possible for you to understand

4  the question.  I'd much rather that you answer a question

5  you understand.  However, if you do not interrupt me and

6  ask for clarification, I will assume that you understand

7  the question as asked; is that clear?

8         A.    It is.

9         Q.    Can you please explain what you did today to

10  prepare for the deposition?  Excuse me.

11             Can you please explain what you've done to

12  prepare for today's deposition, with the exception --

13  I'm not asking you to disclose privileged client

14  communications with your attorney.

15         A.    Nothing.

16         Q.    Did you review any documents in preparation for

17  your deposition today?

18         A.    I reviewed notes based on a meeting with my

19  attorney.

20         Q.    When you say notes, were they notes that --

21  were they notes of yours that you created?

22         A.    Yes.

23         Q.    Were they notes of yours that you created with

24  your attorney or previously?

25         A.    With.

1    Q.    And you referred to your attorney.  And I'm
2  just going to ask this, not about the content.  You've
3  indicated that you met with your attorney.  May I ask
4  for approximately how long you met with your attorney?
5    A.    Approximately three hours.
6    Q.    Okay.  Did you discuss with anyone besides your
7  attorney this deposition?
8    A.    Yes.
9    Q.    Can you identify who else you discussed this
10 deposition with?
11    A.    My wife, Alexandra Letvin.
12    Q.    Anyone in addition to your wife?
13    A.    Yes.
14    Q.    Who?
15    A.    Dr. Rebecca Geoffroy-Schwinden.
16    Q.    What did you and Rebecca Geoffroy-Schwinden
17 discuss?
18    A.    I told her that the deposition was occurring at
19 1:00 today, my deposition.
20    Q.    Did you discuss anything else with Professor
21 Geoffroy-Schwinden?
22    A.    No.
23    Q.    Did you share any documents with Professor
24 Geoffroy-Schwinden?
25    A.    No.

BENJAMIN D. REDMOND, Ph.D.    09/23/2024    11

1    Q.    In addition to your wife and Professor
2 Geoffroy-Schwinden, who else have you discussed the
3 deposition with today?  Or not today, excuse me.
4 Today's deposition.
5    A.    I discussed it with my father-in-law and
6 mother-in-law.
7    Q.    And what did you discuss with them?
8    A.    I told them the deposition was occurring.
9    Q.    Is there anything else you discussed with them?
10    A.    No.
11    Q.    Did they give you any advice?
12    A.    No.
13    Q.    Was your wife with you when you had this
14 conversation?
15    A.    Yes.
16    Q.    What did your wife say in that conversation?
17    A.    I don't recall her saying anything.
18    Q.    Is there anyone else, in addition to the
19 individuals you've already named:  Your wife, Professor
20 Geoffroy-Schwinden, your -- it sounds like your mother-
21 and father-in-law?
22    A.    Yes.
23    Q.    Anyone else in addition to that?
24    A.    Not that I recall.
25    Q.    Thank you.  I want to talk about your career

1  and background, so we'll make a transition here.

2         Please briefly describe your career and

3  education, meaning your degrees, credentials, starting

4  with your undergraduate degree up to the present.  I'll

5  ask you about your jobs and so forth subsequently, but

6  I'm just interested now if you could please explain

7  your achievements in terms of academic degrees and

8  credentials.

9      A.    I received a bachelor's degree from the

10  University of Chicago in 1999.  I received a Ph.D. in

11  music from Yale University in 2006.

12      Q.    What was your degree at the University of

13  Chicago?

14      A.    Bachelor of Arts.

15      Q.    And what was your major?

16      A.    Music.

17      Q.    2006 was your Ph.D. at Yale?

18      A.    Correct.

19      Q.    Have you earned any other degrees after the

20  Ph.D.?

21      A.    No.

22      Q.    Did you earn a master's degree at anywhere

23  along the way?

24      A.    No.

25      Q.    What did you do after 2006 when you earned your

1   Ph.D.?

2        A.   Could you be more specific?

3        Q.   In terms of your career, what did you do

4   after 2006 when you earned your Ph.D. from Yale?

5        A.   I became an assistant professor at UNT.

6        Q.   You started at UNT in 2006?

7        A.   Correct.

8        Q.   What was your position?  Assistant professor?

9        A.   Correct.

10       Q.   And what was your field of teaching?

11       A.   Musicology and music history.

12       Q.   Have you published in those fields?

13       A.   I have.

14       Q.   Can you briefly summarize how many articles

15   you've published?

16       A.   No.

17       Q.   Why can't you summarize how many articles

18   you've published?

19       A.   Well, off the top of my head, I couldn't give

20   you a number.

21       Q.   Is it fewer than ten?

22       A.   I would -- I can't give you a specific number

23   at this point.

24       Q.   I'm not asking for a specific number, but I did

25   ask a specific question.  Did you understand that

BENJAMIN D. BRAND, Ph.D.        09/23/2024

```
 1  question?
 2       A.    I did.
 3       Q.    Is it fewer than ten?
 4       A.    I don't know.
 5       Q.    Is it more than ten?
 6       A.    I don't know.
 7       Q.    You have no idea how many articles you've
 8  published?  Is that question not specific enough for you,
 9  Professor Brand?
10       A.    Was that a question?
11       Q.    That was a question.  Would you please answer
12  it?  Was the question not specific enough for you?
13       A.    Could you be more specific?
14       Q.    I said you have no idea how many articles
15  you've published?
16       A.    I do have an idea of how many articles I've
17  published.
18       Q.    Well, please explain for the record what your
19  idea is of how many articles you've published.
20       A.    I would estimate that I've probably published
21  between eight and ten articles.
22       Q.    Thank you.  Were all of those articles peer
23  reviewed?
24       A.    No.
25       Q.    How many articles have you published that are
```

BENJAMIN D. BRAND, Ph.D.    09/23/2024

```
 1  not peer reviewed?

 2        A.    To the best of my recollection, I've

 3  published approximately four articles that are not peer

 4  reviewed.

 5        Q.    So approximately 40 to -- 40% to half of your

 6  articles were not peer reviewed?

 7        A.    That would be an educated guess.

 8        Q.    Did anyone ever accuse you of racism because

 9  you didn't get those articles peer reviewed?

10        A.    No.

11        Q.    Going back to your career at the University of

12  North Texas, have you ever worked for another university

13  besides the University of North Texas in your academic

14  career?

15        A.    Yes.

16        Q.    Where?

17        A.    Berklee College of Music.

18        Q.    When did you work for the Berklee College of

19  Music?

20        A.    2024.

21        Q.    Is that where you work today?  Strike that.

22  Let me go back.

23              In 2006, I believe you said you began as an

24  assistant professor at the University of North Texas,

25  correct?
```

1       A.    Correct.

2       Q.    And you were starting out as a young professor

3  probably somewhere around the age of 30; is that fair?

4       A.    Correct.

5       Q.    Explain for the Court what happened next in

6  your career at the University of North Texas.

7       A.    I was promoted to the rank of associate

8  professor with tenure.

9       Q.    So you earned tenure and became an associate

10 professor in what year?

11      A.    To the best of my recollection, it was 2012.

12      Q.    And does UNT have a system where, after six

13 years, you go out for tenure or you're forced to leave

14 the university?

15      A.    That was my understanding of the situation at

16 the time.

17      Q.    And you then were granted tenure since 2012.

18 How did your career proceed from that point onward?

19      A.    I was promoted to the rank of full professor

20 with tenure.

21      Q.    When?

22      A.    I don't recall the year.

23      Q.    Was it before 2020?

24      A.    Yes.

25      Q.    Was it -- well, when you were promoted to

1  full professor, were you still teaching amongst the

2  faculty?

3      A.    Yes.

4      Q.    At some point, did you take on administrative

5  duties for the University of North Texas?

6      A.    Yes.

7      Q.    Please explain for the record what those duties

8  were and when you took them on.

9      A.    I took on the role of associate director of

10 graduate studies.  I believe that occurred in 2012.

11     Q.    You were associate director of graduate studies

12 about the time you attained the rank of associate

13 professor then, correct?

14     A.    I assumed that role just after I was promoted.

15     Q.    What other roles in the administration of the

16 University of North Texas did you assume and when?

17     A.    I assumed the role of director of graduate

18 studies one year later, so that -- again, to the best

19 of my recollection, that was in 2013.  I served as

20 associate -- interim associate dean of the College of

21 Music.  I believe that was in 2016.  And I served as

22 interim chair of the division of Music History, Theory,

23 and Ethnomusicology.

24     Q.    Can I interrupt you just one second?  Is that

25 abbreviated MHTE?  Music History, Theory, and

 1  Ethnomusicology?

 2       A.   Yes.

 3       Q.   So if we see that acronym in documents, or you

 4  refer to MHTE in testifying, we will know what it refers

 5  to, correct?

 6       A.   Correct.

 7       Q.   Okay.  I'm sorry to interrupt you.  But

 8  sometimes these things come up and are confusing.  I

 9  just wanted to get that out of the way.

10       A.   Um-hum.

11       Q.   So I interrupted you, and please continue.

12       A.   So I served as interim chair of the division of

13  MHTE twice:  Once, I believe, was in 2018, and then once,

14  I believe, was in 2019 or '20.

15       Q.   For one year each?

16       A.   No, for one semester the first time, and for

17  a year the second time.

18       Q.   Okay.  And what did you do next?

19       A.   And then I served a four-year term as chair

20  of the division of MHTE.

21       Q.   And while we're at it, can you explain how

22  the MHTE and the College of Music at the University of

23  North Texas are organized for the Court?

24       A.   Can you repeat the question?

25       Q.   Sure.  You've mentioned the MHTE.

1        A.    Um-hum.

2        Q.    And it's a division, correct?

3        A.    Correct.

4        Q.    Is that the equivalent to a department at

5  many other universities?

6        A.    It is -- it is the rough equivalent of a

7  department.

8        Q.    And it's within the, quote, College of Music at

9  UNT, correct?

10        A.    Correct.

11        Q.    So I would just like to ask you to explain

12  the basic organizational structure of the College of

13  Music at UNT.  It has the MHTE underneath it.

14        A.    Um-hum.

15        Q.    What else is in the College of Music?

16        A.    So the College of Music is divided into a

17  number of different divisions.  I believe that number is

18  seven, and MHTE is one of those divisions.  The division

19  of MHTE is, in turn, divided, into three areas:  Music

20  history, music theory, and ethnomusicology.

21        Q.    Who is the head of each of those subdivisions

22  of MHTE?

23        A.    The faculty member in a given subdivision is

24  the coordinator of that subdivision, and they carry the

25  title of area coordinator.

1    Q.    And then you, as division head, were the next
2 layer above that?

3    A.    No.

4    Q.    Why don't we do this?  Why don't you explain
5 for the record your duties as the division head of MHTE?
6 Who you were responsible to, who was responsible to you,
7 and so forth.

8    A.    I was -- so as chair of the division, I
9 reported directly to the dean of the College of Music.
10 And each faculty member within the division reported to
11 me.

12    Q.    And these program coordinators, is that what
13 you referred to them?

14    A.    Their title is area coordinator.

15    Q.    These area coordinators, who did they report to
16 directly?

17    A.    To me.

18    Q.    They did report to you?  And who was the
19 dean of the College of Music during your tenure as the
20 division head?

21    A.    John Richmond.

22    Q.    Back to your record of publication, when was
23 the last time you published an article?

24    A.    This year.

25    Q.    About how often do you publish articles?

BENJAMIN D. BROND, Ph.D.    09/23/2024

```
 1        A.    I'd say the tempo varies.

 2        Q.    This last article of yours, was it peer

 3   reviewed?

 4        A.    No.

 5        Q.    Do you intend to submit that article for your

 6   annual review?

 7        A.    No.

 8        Q.    At some point, you mentioned you started

 9   working for the Berklee Conservatory?  Did I get that

10   wrong?

11        A.    The title is Berklee College of Music.

12        Q.    And is this -- correct me if I'm wrong.

13   That's in Boston?

14        A.    That's correct.

15        Q.    When did you start working there, and what do

16   you do there?

17        A.    I started working at the Berklee College of

18   Music, I believe, in March of 2024.  And my duties were

19   to teach music history classes.

20        Q.    Have you left the University of North Texas?

21        A.    No.

22        Q.    Are you on sabbatical of some sort?

23        A.    No.

24        Q.    What is the nature of your position formally

25   with Berklee?
```

1      A.    As an -- my -- I serve as an adjunct
2  instructor.
3      Q.    Are you still obligated to teach and so forth
4  at UNT?
5      A.    No.
6      Q.    Have you held any other positions besides those
7  that you've named at the Berklee Conservatory and the
8  University of North Texas?
9      A.    Yes.
10     Q.    Can you please enumerate them?
11     A.    I currently hold the position of senior
12  director of new ventures in digital strategy innovation
13  at UNT.
14     Q.    New ventures?  Is that what you said?
15     A.    Um-hum.
16     Q.    What is that and what is its relationship to
17  UNT?
18     A.    Could you elaborate on relationship?
19     Q.    Well, let's break it into two parts.  Describe
20  for the record what new ventures is.
21     A.    New ventures is potential new projects of
22  the division of digital strategy and innovation we may
23  pursue.
24     Q.    And what is the relationship of new ventures to
25  the larger institution, University of North Texas?

1        A.    The relationship of the position is that it
2    reports to the vice president of digital strategy and
3    innovation.
4        Q.    Is it a center?
5        A.    No.
6        Q.    How long have you been associated with new
7    ventures?
8        A.    I began that position in June of 2023.
9        Q.    So you were the division head in 2020, correct?
10       A.    I was the division chair in 2020.
11       Q.    I'm sorry.  Thanks for correcting me.
12             And do you recall a controversy arising in
13   approximately July of 2020 involving the Journal of
14   Schenkerian Studies?
15       A.    Yes.
16       Q.    Can you explain for the record your
17   understanding of what that controversy was about?
18       A.    My understanding of the controversy is that
19   it centered on the content and the quality of research
20   in a volume of the Journal of Schenkerian Studies.
21       Q.    What about the content of the volume
22   published by the Journal of Schenkerian Studies became
23   controversial at that time?
24       A.    My recollection and my understanding is that
25   a number of the contributions, the articles in the

BENJAMIN D. BRAND, Ph.D.    09/23/2024

 1  Journal, were perceived to be racist.

 2       Q.    Did you read the articles in the Journal --

 3  let's back up a second.

 4            Do you recall what volume of the Journal of

 5  Schenkerian Studies was published in that time period?

 6       A.    To the best of my recollection, the number of

 7  the Journal, the number of the issue of the Journal or

 8  volume of the Journal was 12.

 9       Q.    So if we refer to Volume 12, you'll know I'm

10  talking about that specific publication that came out in

11  July of 2020, right?

12       A.    Yes.

13       Q.    Likewise, just to get some formalities out of

14  the way, if you or I refer to JSS, we'll both know and

15  understand that refers to the Journal of Schenkerian

16  Studies?

17       A.    Yes.

18       Q.    So let me back up and ask it again.  Did you

19  read Volume 12 of the Journal of Schenkerian Studies?

20       A.    I did not read it in its entirety.

21       Q.    Let me be more specific.  In July of 2020, did

22  you read the Journal then, even if you may not have read

23  it in its entirety?

24       A.    In July?

25       Q.    Yes.  How much of it did you read in July?

BENJAMIN D. ARNOLD, Ph.D.    09/23/2024

```
 1        A.    I recall reading two to three contributions.
 2        Q.    Was one of those contributions the contribution
 3   of my client, Timothy Jackson?
 4        A.    It was.
 5        Q.    And did you consider the contribution of
 6   Timothy Jackson to be racist?
 7        A.    As I recall, I didn't believe I had the
 8   expertise, the scholarly expertise, to determine that.
 9        Q.    As the controversy unfolded, what happened?
10        A.    Could you be more specific?
11        Q.    Sure.  Do you recall more or less when
12   the Journal became known?  I'm not sure it was even
13   published, but it started to circulate, correct?
14        A.    Correct.
15        Q.    Do you recall if the whole Journal circulated
16   or only the essays that were labeled as Symposium?
17        A.    I don't recall.
18        Q.    How did you first become aware that the Journal
19   had been released?
20        A.    A faculty member in the division informed me
21   that they had seen a social media post about it.
22        Q.    Who was that faculty member?
23        A.    To my -- to the best of my recollection, it was
24   Dr. Andrew Chung.
25        Q.    Do you know whether Andrew Chung had actually
```

1  participated in the formulation of Volume 12 of the

2  Journal of Schenkerian Studies?

3      A.    I don't recall.

4      Q.    And he brought it to your attention that

5  something was going on in social media.  Is that your

6  testimony, involving the Journal?

7      A.    To the best of my recollection, yes, that is

8  the first I heard about it.

9      Q.    And do you know what social media in

10  particular?

11      A.    I don't recall.

12      Q.    If I said it was Facebook, would that help

13  jog your memory?

14      A.    No.

15      Q.    If I said it was Twitter, would that help jog

16  your memory?

17      A.    No.

18      Q.    Is there any policy that you know of at the

19  University of North Texas that makes social media the

20  editor of any specific journal?

21      A.    No.

22      Q.    Is there any policy of the University of

23  North Texas that makes it imperative to respond to social

24  media in the journals that are published by the

25  University of North Texas?

1      A.    No.

2      Q.    So why did you think that the Journal of

3  Schenkerian Studies -- or, well, let me back up.

4            Did you think you had to respond to this

5  controversy?

6      A.    Could you be more specific about the time

7  frame?

8      Q.    In July.  July 2020, you were informed by

9  Andrew Chung.  That's what you've testified to, correct?

10      A.    Um-hum.

11      Q.    Did any other faculty members bring this to

12  your attention?

13      A.    I don't recall.

14      Q.    So my question is, did you feel you had to

15  respond to this controversy that was brought to your

16  attention by Andrew Chung in this July of 2020 time

17  frame?

18      A.    Yes.

19      Q.    How did you respond?

20      A.    I called my dean.

21      Q.    Dean Richmond?

22      A.    Correct.

23      Q.    What did you say?

24      A.    To the best of my recollection, I said to John

25  that I had been informed that part of an issue or all of

 1  the issue, I don't recall, but at least part of an issue

 2  of JSS was creating a stir on social media, and that I

 3  thought he should be informed about it.

 4      Q.    How did he respond?

 5      A.    To the best of my recollection, he said that he

 6  wanted me to keep him informed.

 7      Q.    Did you?

 8      A.    Yes.

 9      Q.    What did you tell him next as the situation

10  evolved?

11      A.    I told him that I had met with a number of

12  faculty in the theory area to discuss the Journal issue.

13      Q.    What did you discuss with the faculty what

14  you've just described?

15      A.    We discussed the issue, what it was in terms of

16  what --

17      Q.    By issue, do you mean the issue of the

18  Journal or the substantive issue?

19      A.    Sorry.

20      Q.    No, it's just a clarification.

21      A.    Volume.

22      Q.    Hmm?  Oh, thank you.

23      A.    The Volume 12.

24      Q.    Um-hum.

25      A.    That we had discussed the volume in question.

1        Q.    Um-hum.

2        A.    And what the controversy might have been about.

3        Q.    What did the controversy might have been

4    about as you've described?  What did you discuss the

5    controversy being about?

6        A.    As I recall, we discussed that it was likely

7    about Phil Ewell and about race.

8        Q.    Who is Phil Ewell?

9        A.    Phil Ewell is a music theorist.

10       Q.    Do you know where he teaches?

11       A.    As I recall, he teaches at City University.

12       Q.    If I said Hunter College, which is one of the

13   colleges of the City University of New York, does that

14   help refresh your memory?

15       A.    I can't confirm that.

16       Q.    So what did the controversy have to do with

17   Professor Ewell?

18       A.    As I recall, in the meeting, we discussed the

19   fact that a number of the articles or contributions to

20   Volume 12 were critical of Ewell's work, and that would

21   create -- that criticism was creating or was likely

22   creating a response on social media.

23       Q.    Is there any policy or rule that you know

24   of that forbids a professor at the University of North

25   Texas to create a controversy on social media?

BENJAMIN D. BRAND, Ph.D.    09/23/2024

1       A.    Not that I'm aware of.

2       Q.    Are there any policies, to your knowledge, that

3    actually guarantee a professor's right to speak on

4    matters of public concern on social media?

5       A.    There aren't any policies that I'm aware of

6    that speak to that, specifically to that.

7       Q.    You were a department -- or I think you call it

8    a division chair, correct?

9       A.    It's called a division chair, correct.

10       Q.    And in that capacity, weren't you

11   responsible for ensuring that the policies and rules

12   of the University were followed by the faculty under

13   your supervision?

14       A.    Yes.

15       Q.    And you were responsible then for knowing

16   the policies and rules of the University, correct?

17       A.    Define knowing.

18       Q.    You were required to be familiar with them,

19   correct, as a division chair?

20       A.    Yes.

21       Q.    Otherwise, how could you enforce them, right?

22       A.    Um-hum, yes.

23       Q.    Did you begin to receive requests to fire

24   Professor Timothy Jackson in that time frame?

25       A.    In which time frame?

1        Q.    July 2020.  Let me ask a different question.

2        A.    Okay.

3        Q.    In your entire time in the administration of

4   the University of North Texas, how many times had there

5   been demands for a professor to be fired?  I'm talking

6   about your direct knowledge and experience.

7        A.    Um-hum.

8        Q.    How many times?

9        A.    And the time frame that you are looking for

10  is --

11       Q.    Your entire career at the University of North

12  Texas.  Go crazy.  Try to think of examples where people

13  demanded that their colleague be fired.  How many times

14  did that happen?

15       A.    I don't -- I don't have a clear recollection of

16  that having occurred.

17       Q.    So it's safe to say it was very rare, right?

18       A.    I don't have a clear recollection of a

19  faculty member at UNT, in my experience, of them called

20  on to being fired.

21       Q.    So you don't recall people demanding that

22  Timothy Jackson be fired?  Is that your testimony today?

23  This escaped your memory?

24       A.    I don't -- I don't recall the specific demands

25  that were made around that case that I received.

BENJAMIN D. BOUND, Ph.D.     09/23/2024

```
 1        Q.   Do you recall --

 2        A.   At the time.

 3        Q.   Sorry.  I thought you were done.

 4        A.   At that time --

 5        Q.   Right.  We're talking --

 6        A.   -- that I received in July 2020.

 7        Q.   Do you recall demands that the Journal of
 8   Schenkerian Studies be canceled?  Or use whatever
 9   synonym you would like:  Shut down, closed, stopped.

10        A.   I do -- I do recall demands, calls, for the JSS
11   to be shut down.

12        Q.   Do you recall demands for the Center of
13   Schenkerian Studies to be closed?

14        A.   I don't recall whether those demands
15   included the Center.

16        Q.   Who made those demands that you recall?  And
17   we're talking still about July of 2020.

18        A.   As I recall, the dean and myself received
19   emails from a variety of individuals not associated with
20   UNT that were calling for the Journal to be shut down.
21   I do not now recall who they were.  I recall that the
22   graduate students within the division of MHTE issued a
23   statement that, again, to best of my recollection,
24   called for the Journal to be shut down.

25        Q.   You don't remember what other calls were made
```

1  in that so-called statement?  That's the one demand you

2  can remember, in other words?

3      A.    Yes.

4      Q.    How about the faculty?  Did they make any

5  demands?

6      A.    I remember them issuing a statement in that

7  same time frame.

8      Q.    Do you remember what their demands were?

9      A.    No.

10      Q.    Back to Philip Ewell, do you recall -- first of

11  all, let me back up.  Are you a member of the Society of

12  Music Theory?

13      A.    I am not.

14      Q.    So you didn't attend the annual conference of

15  the Society for Music Theory in November of 2019,

16  correct?

17      A.    I do recall attending a meeting of the

18  Society for Music Theory in the late two thousand teens.

19  I don't recall the specific year in which I attended.

20      Q.    Was there a plenary address by Philip Ewell

21  at the conference you attended?

22      A.    To the best of my recollection, there was.

23      Q.    What do you remember about the substance of

24  that plenary address?

25      A.    I did not attend that address.

1    Q.    So you have no firsthand knowledge of this

2 address?

3    A.    Correct.

4    Q.    Do you have any firsthand knowledge of the

5 reaction to his plenary address?  I mean, at the

6 conference, not later.

7    A.    No.

8    Q.    Did you discuss it with anyone?

9    A.    I do recall discussing it in passing with

10 Dr. Stephen Slottow and another music theorist.  I don't

11 recall his name.

12    Q.    What did you discuss with them in as much

13 substance as you can remember?

14    A.    To my recollection, Dr. Slottow mentioned to me

15 that the plenary had occurred and that he thought that

16 Dr. Ewell had, in some way, overstated his case or gone

17 too far.  That's what I remember.

18    Q.    When Dr. Slottow, who is a full professor at

19 UNT at this time?

20    A.    To my recollection, he was not.

21    Q.    What was his rank?

22    A.    Associate professor.

23    Q.    When he made those comments critical of

24 Philip Ewell, did you consider him racist?

25    A.    No.

1      Q.    And this other music theorist whose name
2 escapes you, what did you talk about with that
3 individual?
4      A.    As I recall, that individual essentially
5 listened to Stephen mention in passing this Symposium.
6 I don't recall that individual contributing to the
7 conversation.
8      Q.    Did the other individual seem terribly upset
9 that someone would dare to criticize Philip Ewell?  I'm
10 asking about your direct perception.
11     A.    I wouldn't agree with the characterization that
12 Dr. Slottow was daring to do anything.
13     Q.    Did the other person seem upset?
14     A.    No.
15     Q.    It's normal in academia to criticize other
16 people's work, isn't it?
17     A.    Yes.
18     Q.    This plenary address by Philip Ewell, were you
19 aware it was subsequently published in the music theory
20 journal, Spectrum?
21     A.    I recall learning that it was published
22 somewhere.  I don't recall whether I knew it was Spectrum
23 or not.
24     Q.    What is the journal, Spectrum?  Can you explain
25 briefly for the jury what that is?

BENJAMIN D. BRAND, Ph.D.    09/23/2024

```
 1       A.    My understanding is Spectrum is a music theory
 2   journal.
 3       Q.    Is it one that you read?
 4       A.    No.
 5       Q.    Do you recall any controversy surrounding
 6   Spectrum, that Philip Ewell's article was published
 7   without peer review?
 8       A.    I don't recall knowing that it was published
 9   without peer review.
10       Q.    So I suppose the answer to my question is, no,
11   you never heard of any controversy about that, right?
12       A.    I don't recall anything -- learning of any
13   controversy.
14       Q.    Do you think if there had been a controversy,
15   it would have come to your attention?
16             MR. WALTON:  Form.
17       A.    I don't know.
18       Q.    Do you remember getting a letter from Timothy
19   Jackson's counsel around the end of July 2020?
20       A.    I don't recall such a letter.
21             MR. ALLEN:  I'm going to mark as
22   Exhibit 2 the following document.
23             (Deposition Exhibit Number 2 marked.)
24             THE WITNESS:  Before we get into this
25   document, may I request a break?
```

1              MR. ALLEN:  Do you need a break?
2    Absolutely.  There's no question before the witness.
3    Can we go off the record?
4              THE VIDEOGRAPHER:  We're off the record at
5    2:03 p.m.
6                   (Recess taken)
7              THE VIDEOGRAPHER:  We're back on the
8    record at 2:16 p.m.
9        Q.    So Professor Brand, I wanted to ask you if
10   you recognize this document, Exhibit 2.
11       A.    I do recall receiving this document.
12       Q.    And that's your name in the heading, correct?
13       A.    It is.
14       Q.    Do you know who Laura Wright was in 2020?  Or I
15   mean, I'm sure she still is, but can you say what her
16   position at the University of North Texas was in 2020?
17       A.    As I recall, she was the chair of the board
18   of regents.
19       Q.    Do you have any reason to believe that this
20   letter was not received by the chair of the board of
21   regents?
22       A.    I have no reason to believe it wasn't.
23       Q.    I don't have too many questions about this
24   letter for you.  I just wanted to ask, if you skip down
25   to page 3, you'll see in the upper left-hand corner,

```
 1  there are page numbers?

 2       A.    Um-hum, yes.

 3       Q.    And there are some references to UNT's Policy

 4  6.035.  Do you see that?

 5       A.    Yes.

 6       Q.    Academic Freedom and Academic Responsibility

 7  Policy.

 8       A.    Yes.

 9       Q.    Are you familiar with that policy?

10       A.    I am generally familiar with that policy.

11       Q.    Is that one of the policies you would be

12  responsible for making sure people under your supervision

13  abide by?

14       A.    Yes.

15       Q.    And there's also reference to some grievance

16  policies in the second paragraph.  Do you see that?  I

17  mean, not the second paragraph of the letter, but the

18  one photograph below that, that starts, "The faculty

19  and graduate student."  Do you see the reference to

20  Policy 2.1400?

21       A.    I see the reference.

22       Q.    Do you see the reference to Policy 3.1001?

23       A.    Yes, I see the reference.

24       Q.    And this letter refers to a grievance submitted

25  by Timothy Jackson, correct?
```

1          Do you see the second full paragraph that

2   begins on that page, and if you skip forward to the

3   second sentence, it say, "Therefore, please consider this

4   letter a formal submission of a grievance on behalf of

5   Professor Jackson as provided under UNT's Policy 2.1400"?

6       A.   Correct, I see that.

7       Q.   And also, the 3.1001 employment -- Employee

8   Grievances Policy?

9       A.   Yes.

10      Q.   That's also mentioned?

11      A.   Um-hum.

12      Q.   Was any action taken on Timothy Jackson's

13  grievance?

14      A.   I don't know.

15      Q.   If action had been taken on a grievance

16  submitted by a faculty member under your supervision,

17  would you have learned of it as the division head?

18          MR. WALTON:   Form.

19      Q.   Division chair.  Excuse me.

20      A.   I would normally have been aware of an action

21  that would be taken.

22      Q.   But you don't remember any action being taken

23  in response to this submission of a grievance by Timothy

24  Jackson?

25      A.   I don't recall whether an action was taken or

1   not.

2        Q.    Is it your understanding that the board of

3   regents is responsible for making sure that the policies

4   of the University of North Texas are faithfully

5   implemented?

6        A.    As a faculty member and division chair,

7   I was not fully aware of the function and

8   responsibilities of the board of regents.

9        Q.    Do you remember anyone from the board of

10  regents getting involved in Timothy Jackson's case?

11            Let me strike that question, because I think

12  it was imprecise.

13            I'm referring to -- when I say Timothy

14  Jackson's case, I mean this whole conflict that arose

15  over the Journal of Schenkerian Studies in July of 2020.

16            Is that clear?

17       A.    Yes.

18       Q.    Do you recall anyone from the board of regents

19  doing anything in the time frame July 2020 to the end of

20  2020 concerning this case?

21       A.    I'm not aware of any action that was taken.

22       Q.    Thank you.  Were you concerned that attacks

23  on Timothy Jackson for publications in the Journal of

24  Schenkerian Studies might violate the University of

25  North Texas Academic Freedom Policy?

1       A.    To the best of my recollection, I did
2  not perceive the criticisms that were being made of
3  Volume 12 of the JSS as threats to the UNT Academic
4  Integrity Policy.
5       Q.    Is there an exception to the UNT's Academic
6  Freedom Policy for accusations of racism?
7       A.    Not that I'm aware of.
8       Q.    Going back to Volume 12 of the Journal
9  of Schenkerian Studies, what do you recall the main
10  criticisms of the Journal being?  You've already
11  identified that, I guess, some people from outside
12  the University thought something was racist.  People
13  from within the University, including the graduate
14  students and faculty, were submitting statements.  We
15  will be able to review those in a second.
16       A.    Um-hum.
17       Q.    But I just wanted to ask you, besides attacks
18  on the content of the Journal, what were the criticisms
19  leveled at the University of North Texas Press?  Excuse
20  me.
21       A.    I don't --
22       Q.    Strike that question.
23            What were the -- besides the things we've
24  already discussed, what were the criticisms leveled at
25  the Journal of Schenkerian Studies in this July 2020 to

1   November 2020 time frame?

2       A.    As I recall, one of the main criticisms was

3   that some of the content of the volume was racist; that

4   some of the content of the volume was poorly researched

5   and of lower scholarly quality.  Again, I'm paraphrasing.

6   And that the issue -- sorry.  The volume in question had

7   not gone through a peer-review process.  Those are the

8   three criticisms that I recall.

9       Q.    And I believe you already testified that

10  you couldn't identify what specific content, at least as

11  you read it, was racist, right?  You didn't have the

12  scholarly familiarity with that field or that specialty

13  to make a judgment?

14      A.    As I recall, I didn't feel like I had the

15  scholarly expertise to make a definitive judgment as to

16  whether a certain article was racist or not.

17      Q.    And about the scholarly or not scholarly, do

18  you remember what specifically was considered, quote, not

19  scholarly?

20      A.    I would say the one thing that I recall

21  particularly clearly as an example of the quality of

22  research involved was the citation of a Wikipedia

23  article in one of the contributions.  I believe that

24  contribution was by Dr. Jackson.

25      Q.    Do you agree with that criticism, that a

BENJAMIN D. BOND, Ph.D.    09/23/2024

1  journal that quotes Wikipedia in some shape or form is,
2  per se, not scholarly?
3          MR. WALTON:  Form.
4      Q.    Let me strike that question.
5          So was the -- to the best of your memory, was
6  the criticism that a journal article that cited Wikipedia
7  could not be scholarly?
8      A.    To the best of my memory, that -- my
9  recollection, that was not a-- that was not the
10  criticism being made.
11     Q.    What was the criticism?
12     A.    As I recall, it was the way that the
13  Wikipedia article in question was being used as a
14  definitive source.
15     Q.    Did you read that article and make a
16  determination of how that was being used as a, quote,
17  definitive source, I guess, as you've characterized it?
18     A.    That was one of the articles I've read.
19     Q.    And you've certainly published enough
20  yourself and are familiar enough with scholarship to
21  make a judgment about that, right?
22     A.    I believe so.
23     Q.    So did you find that invocation of Wikipedia,
24  for whatever reason in that article, to be, quote, not
25  scholarly, close quote?

BENJAMIN D. ??AND, Ph.D.    09/23/2024        44

1        A.    As I recall reading that citation in Wikipedia

2   in particular, it struck me as -- as not something that

3   would be within the mainstream of normal scholarly

4   research practice.

5        Q.    Did you ever confirm that it was false in any

6   way?  The quotation to Wikipedia.

7        A.    I don't recall whether it was a quotation of

8   some citation from a Wikipedia page.

9        Q.    Good correction.  Thank you.

10           Did you ever confirm that the information for

11  which Wikipedia was relied on for an authority was false?

12       A.    I don't recall ever having reviewed the

13  Wikipedia page that was cited.

14       Q.    Was there any evidence, to your knowledge, that

15  the information for which Wikipedia was invoked as an

16  authority was somehow false?

17       A.    Could you repeat the question?

18       Q.    Sure.  Let me do a little more work here.

19           You were being bombarded by emails, messages,

20  that this was a controversy, correct?

21           MR. WALTON:  Form.

22       Q.    That there was something wrong with Volume 12

23  of the JSS?

24       A.    I was receiving emails.

25       Q.    And one of the criticisms in these emails was

1 that Jackson had cited Wikipedia and, therefore, was not,
2 quote, scholarly, right?
3      A.    I don't recall whether -- I don't recall
4 whether I received that personally in an email or whether
5 that criticism was leveled more generally in social
6 media.
7      Q.    But you knew that it was being leveled at
8 Professor Jackson, correct?
9      A.    Yeah.
10      Q.    Did it ever come to your attention that there
11 was any information indicating that the information for
12 which Wikipedia was invoked as an authority was actually
13 false?  Was anyone making that claim to the best of your
14 knowledge and memory at that time?
15      A.    My recollection was that at least one scholar
16 in the field had claimed that the Wikipedia article that
17 was cited by Dr. Jackson was -- again, this is my
18 paraphrase -- a superficial treatment of the subject.
19      Q.    Superficial is different than false, correct?
20      A.    Correct.
21      Q.    And who was this scholar who was claiming
22 superficiality in Jackson's work, if you remember?
23            MR. WALTON:  Form.
24      A.    To my recollection, this scholar in question
25 was describing Dr. Jackson's work.  The scholar in

1 question was describing the article, the Wikipedia

2 article, that Jackson was citing.  To the best of my

3 recollection, that was Nicole Diamante.

4      Q.    Is she a UNT faculty member?

5      A.    No.

6      Q.    Do you know where she's working or where she

7 has a position?

8      A.    As I remember, it was the University of

9 Toronto.

10     Q.    Okay.  And then let's move on to this issue

11 of peer review, right?  That was another ground for the

12 attack on the Journal, as you recall?

13     A.    As I recall.

14     Q.    Was there a requirement at the University

15 of North Texas, that everything in the Journal of

16 Schenkerian Studies be peer reviewed?

17     A.    Not that I know of.

18     Q.    Had other journals published by the University

19 of North Texas Press in the area of music published

20 articles that were not peer reviewed?

21     A.    As of -- I can't speak to that.

22     Q.    Are you familiar with a journal called Theoria,

23 I believe, it's pronounced?

24     A.    I am.

25     Q.    Did I pronounce that correctly?

1          A.    I believe you did.

2          Q.    Is that a journal that you regularly review

3    as a scholar?

4          A.    No.

5          Q.    How are you familiar with the journal of

6    Theoria?

7          A.    It's a journal that is published by the UNT

8    Press, and is or at least was at the time edited by

9    Dr. Frank Heidlberger.

10         Q.    Do you know if Dr. Frank Heidlberger has

11   published in his own journal?

12         A.    I believe he has.

13         Q.    Do you know if the journal, Theoria, has a

14   conflict of interest policy published on its website?

15         A.    I do not know.

16         Q.    Do you know if the journal, Theoria, has ever

17   published articles that rely on Wikipedia as a source?

18         A.    I don't know.

19                     (Deposition Exhibit Number 3 marked.)

20                     MR. ALLEN:  I'm going to mark as

21   Exhibit 3 the title page.  And you'll see on the back a

22   Table of Contents of Volume 26 of the journal of Theoria.

23   Now, I know you said you don't regularly read the

24   journal, but I'm going to ask if you read or reviewed,

25   even in a superficial way, Volume 26 of Theoria?

1        A.    I have not read or reviewed this particular

2    volume of Theoria.

3              MR. WALTON:   I just want to note for

4    the record that this particular exhibit doesn't seem to

5    have any Bates numbers on it from either party.

6              MR. ALLEN:   No.  This has been introduced

7    in depositions before this time, including the deposition

8    of Frank Heidlberger, I believe.  In addition, this is a

9    public record that's available, and the Court could take

10   judicial notice of it.  We're happy to produce it,

11   however.

12             MR. WALTON:   No, I just wanted to note

13   that for the record in case anybody's trying to figure

14   out where they were.

15             MR. ALLEN:   Absolutely.  No, I don't know

16   if it's been produced in discovery.  If it has been, I'm

17   not aware of it.  But I don't get the Bates number.

18   Sorry.  This is an inside baseball, Professor Brand.

19        Q.    This came out at roughly the same year, the

20   same time, as the Volume 12 of the Journal of Schenkerian

21   Studies, right?

22        A.    That's what the 2020 year would suggest.

23        Q.    And it publishes an article by Ellen Bakulina

24   and Philip Ewell, correct?

25        A.    Correct.

1      Q.   In fact, two articles by Ellen Bakulina; I
2  suppose an introduction to a section of essays, and also,
3  a main essay, right?
4      A.   I'm sorry.  Could you repeat that?
5      Q.   Sure.  Let me be more specific.
6           Do you see, Ellen Bakulina has an article
7  starting on page 55, right?
8      A.   Correct.
9      Q.   It seems to be six pages, right?
10     A.   Yes.
11     Q.   And then Philip Ewell has an article that
12  starts on page 61, correct?
13     A.   Correct.
14     Q.   Ellen Bakulina has another article that
15  starts on page 85 and goes to 112.
16     A.   Correct.
17     Q.   And then Christopher Segall has another article
18  also in the same journal, correct?
19     A.   Correct.
20     Q.   Now, are you aware that Philip Ewell has
21  testified that these articles were not peer reviewed?
22     A.   I was not aware of Philip Ewell's testimony.
23     Q.   Are you aware that Frank Heidlberger has also
24  testified that these were not peer reviewed?
25     A.   I'm not aware of Frank Heidlberger's testimony.

1      Q.   Do you recall any outcry that this journal,
2   Theoria, was racist for publishing non peer-reviewed
3   articles?

4      A.   I'm not aware of any such outcry.

5      Q.   Should it be subjected to investigation by
6   the University of North Texas?

7              MR. WALTON:  Form.

8      Q.   You understand what I'm asking, right?  Should
9   it, the journal, Theoria, be subjected to investigation
10  by the University of North Texas?  Do you just not
11  understand that question?  I'm only asking because there
12  was an objection to form, so I'm asking you to put on
13  the record whether you understand that question.

14     A.   I understand the question you're asking.

15     Q.   Okay, thank you.  Can you answer it?

16     A.   I do not believe that the journal, Theoria,
17  should be placed under investigation by the University.

18     Q.   Since you were at the 2019 Society for Music
19  Theory conference -- and we talked about the plenary
20  session of Ewell being presented at that time.  And I
21  know you don't remember it being specifically in November
22  of 2019 or whatnot, but I'm going to represent to you
23  that other witnesses have said it was in the first week
24  or two of November, 2019.  Was there any question and
25  answer session for the panelists, to your knowledge?

1       A.    Not to my knowledge.

2       Q.    I was going to say, I know you've said you

3  weren't at that session, so I'm just asking.  If you

4  know, you know.  If you don't, that's a perfectly fine

5  answer.

6             Was there any -- to your knowledge, was there

7  any form for criticism of Philip Ewell's paper at that

8  conference?

9       A.    Not to my knowledge.

10      Q.    Has the Journal of Schenkerian Studies appeared

11  since 2020?

12      A.    Not to my knowledge.

13      Q.    Is there even any editor appointed to the

14  Journal of Schenkerian Studies?

15      A.    Again, not to my knowledge.

16      Q.    For publishing, I guess, an article that

17  referred to Wikipedia for being accused of racist content

18  and for apparently publishing the Symposium without peer

19  review, should the Journal of Schenkerian Studies have

20  been investigated?

21      A.    So could you repeat the question?

22      Q.    Yes.

23            MR. ALLEN:  And I don't want to go off the

24  record, but I'm going to shut off the phone that is

25  ringing in my briefcase.  And I apologize for that.

BENJAMIN D. ZIMOND, Ph.D.    09/23/2024

1  Dr. Brand, I sincerely apologize.

2       Q.    So you've listed the things that you remember

3  as the criticism of the Journal of Schenkerian Studies,

4  correct?  They were -- they cited Wikipedia, which was

5  considered unscholarly, it was not peer reviewed, the

6  Symposium.  And also, that it published racist content.

7  Did I summarize that correctly?

8       A.    As I recall, the three main reasons were the

9  volume included racist content, to the quality of some

10 of the contributions were not -- from a scholarly

11 perspective, were not high, and an illustration of that

12 was the citation of the Wikipedia page.  That's the

13 example that sticks to my mind.

14      Q.    Um-hum.

15      A.    That the journal was not peer reviewed.  And

16 then as I recall, that it was not clear to the reader

17 that it was not peer reviewed.

18      Q.    So should the Journal have been investigated

19 for those apparent indiscretions, let's say?

20      A.    In my opinion, as I recall at the time, my

21 feeling was that there was good reason for the University

22 to investigate the Journal.

23      Q.    And incidentally, referring back to Exhibit 3,

24 do you see any indication on that title page, that the

25 articles by Ellen Bakulina, Philip Ewell, and Christopher

 1  Segall are not peer reviewed?  That's not made clear to

 2  the reader either, is it?

 3      A.    On this title page, I don't see any

 4  indication of that.

 5      Q.    Do you know anywhere else that would be

 6  indicated in the Journal's pages?

 7      A.    I don't know.  But I...

 8      Q.    But you don't think this Journal should be

 9  investigated, only Timothy Jackson's journal, correct?

10              MR. WALTON:  Form.

11      A.    I believe there was good cause to investigate

12  the Journal, the Journal of Schenkerian Studies.

13      Q.    I want to -- we've been talking a lot about

14  July of 2020.

15      A.    Um-hum.

16      Q.    I'd like to turn back the clock a little bit,

17  because this has a pre-history that begins with this talk

18  in November of 2019, and then the Journal organizing the

19  Symposium.

20      A.    Um-hum.

21      Q.    What do you know about the organization of the

22  Symposium after the November of 2019 time frame up to

23  July when it was published?

24      A.    The first time I remember -- I recall learning

25  about the conception of Volume 12 as a response or part

1   of Volume 12 as a response to Philip Ewell's work was in

2   the winter of 2020.

3        Q.    Just because winters are always this way, do

4   you mean like the January to February or March time frame

5   or the back end of the year?

6        A.    January to February of 2020.

7        Q.    And what came to your attention at that time?

8        A.    A graduate student named Levi Walls came to

9   discuss the volume of the Journal with me.

10       Q.    And what did he discuss with you?

11       A.    As I recall, he said to me that he was

12  concerned that some of the articles in the Journal --

13  and this is my paraphrase of my recollections -- that

14  some could be perceived as racist.

15       Q.    Did he say what the content in specific was?

16       A.    I don't recall him getting into specifics.

17       Q.    What else did he discuss with you?

18       A.    As I recall, he said that Dr. Jackson had

19  told him that it wasn't a matter of concern.

20       Q.    What was not a matter of concern?

21       A.    Levi Walls' concerns about the content of the

22  articles should not -- should not concern Levi, that it's

23  not something he should be worried about.  That's my

24  recollection of how Levi was characterizing that

25  interaction with Dr. Jackson.

1      Q.    And your understanding of the conversations was

2  that it was the racist content and Mr. Walls' objection

3  to the, quote, racist content that Timothy Jackson

4  instructed him was not his concern?  Is that

5  what you understood from the conversation?

6      A.    That my recollection is that when Levi

7  described his conversation or conversations with

8  Dr. Jackson about this, Dr. Jackson had said not to

9  worry is what I mean; that it's not -- not for him

10  to be concerned about.

11      Q.    I know.  I guess that's the thing I'm

12  wondering.  What was your understanding of what the "it"

13  was that he wasn't supposed to be concerned about?  Do

14  you see what I mean?  What was the substance of the

15  thing he was not supposed to be concerned about as editor

16  of the JSS?

17      A.    Whether the content was perceived as racist

18  or not.

19      Q.    Did he mention to you specific authors that

20  he was particularly concerned about, that their content

21  was not subtle?

22      A.    I don't remember his mentioning specific

23  authors.

24      Q.    Do you remember the Facebook post by Levi Walls

25  in late July -- I think it was July 27th -- in which he

1   publicly apologized for this work on the Journal?

2        A.    I do remember reading that.

3              MR. ALLEN:  I'm going to introduce into

4   the record as Exhibit 4 a Facebook post by Levi Walls,

5   which has the Bates number JACKSON 234.  It has the date,

6   July 27, 2020, and it's 10:09 p.m.

7                    (Deposition Exhibit Number 4 marked.)

8        Q.    I'm happy to allow you as much time as you want

9   to look this over, but I'm just going to ask you,

10  is this the Facebook post that you remember reading back

11  in the day, in July of 2020?

12       A.    It is the post that I remember reading.

13       Q.    And before we get into this, are there any

14  rules or policies at the University of North Texas

15  against lying about a professor?

16       A.    I'm not aware of any policies that would

17  speak directly to the issue of lying about a faculty

18  member.

19       Q.    Is lying about a faculty member either by a

20  colleague or a graduate student considered professional

21  conduct at the University of North Texas?

22       A.    In my role as a faculty member, as the

23  department chair, I would not have regarded it as

24  professional conduct to lie about a colleague or a

25  faculty member.

BENJAMIN D. TOLAND, Ph.D.    09/23/2024

1    Q.    If you knew a graduate student was lying about

2    a colleague or faculty member, would you subject that

3    student to discipline?

4                MR. WALTON:  Form.

5    A.    I don't believe it would be a faculty member or

6    a department chair to implement that type of discipline.

7    That's not my understanding of the

8    chair's role.

9    Q.    Whose job would it be?

10    A.    I'm sorry.  I'm blanking on the office.  But

11    there is a university office that deals with student

12    disciplinary matters.  It is a university-run office.

13    Q.    You've told me that you're responsible for

14    the enforcement of UNT policies at least within the

15    division that you were the department head of, correct?

16    Or division head, excuse me, correct?

17                MR. WALTON:  Form.

18    Q.    You testified to that earlier, correct?

19    A.    Could you repeat the question?

20    Q.    You testified earlier that as division head

21    of MHTE, you were responsible for enforcing the policies

22    of the University, correct?  Or at least the people under

23    your supervision?

24    A.    Yes.

25    Q.    But now, your testimony is that that wouldn't

1  be something that you would do at least for a student

2  who's lying about a faculty member?

3      A.   As a department chair, I perceive students

4  to be in a different situation than a faculty member

5  vis-a-vis my role as chair, because they were not my

6  direct reports.

7      Q.   So your answer is no, that's not your

8  responsibility?

9      A.   I do not perceive that as being my

10 responsibility.

11     Q.   Let's look at Mr. Walls' post.

12          "I had no control over the content of the

13 journal," he writes in the, looks like, third sentence

14 in.

15          Do you see that?

16     A.   I do.

17     Q.   When he came to you in -- what did you say?

18 In the winter of 2020, right?

19     A.   Um-hum.

20     Q.   Did he complain that he had no control over the

21 content of the journal?

22     A.   I don't remember him making that point, no.

23     Q.   And of course, he's saying this in July of 2020

24 -- excuse me, July 27, 2020, when circumstances have

25 radically changed, correct?

1              MR. WALTON:  Form.

2         A.   Correct.

3         Q.   The Journal is being attacked, as you described

4    earlier, from people outside the University,

5    by a statement issued by the graduate students, by a

6    statement issued by the faculty, and so forth and so on.

7    I know all of those things were happening thick and fast

8    at this time, correct?

9         A.   I did not use the word "attacked."

10        Q.   I'm using it.  Would you not characterize the

11   messages calling for the Journal to be closed as an

12   attack on the Journal?

13        A.   I would characterize it as more of a criticism.

14        Q.   Have you ever heard of a call for a journal

15   to be closed at the University of North Texas before?

16        A.   No.

17        Q.   So this was no ordinary criticism, right?

18        A.   I perceived them as being criticism.

19        Q.   That wasn't my question.  Did you perceive it

20   as an ordinary criticism?

21        A.   I did not perceive it as an ordinary criticism.

22        Q.   But you don't perceive it as an attack on the

23   Journal, right?

24        A.   I don't recall perceiving it as an attack.

25        Q.   So if we skip down to the second paragraph,

BENJAMIN D. BRAND, Ph.D.    09/23/2024

1  there's a sentence that says, "Throughout the process."

2  It begins in the middle of that paragraph.  It's about

3  eight lines up from the bottom.

4       A.    I see the sentence.

5       Q.    "Throughout the process, myself and the editor

6  at the time were to report directly to Timothy Jackson

7  and Stephen Slottow."

8            Did I read that right?

9       A.    You did.

10      Q.    Was that accurate?

11      A.    I can't speak to the accuracy of that

12  statement.

13      Q.    You don't know whether Mr. Walls reported

14  directly to Timothy Jackson or Stephen Slottow?

15      A.    I do not.

16      Q.    You were the division head, correct?

17      A.    I was the division chair.

18      Q.    And he said here, "I feared I could not leave

19  without significant damage to my career."

20            Do you see that at the end of the sentence?

21      A.    I do see that.

22      Q.    Did Mr. Walls discuss this with you in your

23  meeting in the winter of 2020?

24      A.    He did not.

25      Q.    To the best of your knowledge, he only

1  started saying that after the Journal was subjected to

2  what you called, quote, criticism, right?

3       A.    The first time that I recall seeing a

4  characterization of that kind was in his Facebook post.

5       Q.    Thank you.  I'm just going to skip over to

6  the next page, the paragraph that begins at the top of

7  that page, he begins to discuss Philip Ewell's SMT

8  presentation.  Do you see the second sentence that

9  begins on that page?

10      A.    I do.

11      Q.    "However, after Philip Ewell's SMT

12 presentation, Timothy Jackson decided that it was the

13 responsibility of the journal to 'protect Schenkerian

14 analysis.'  Although after serious thought, I essentially

15 agreed with Ewell's talk.  It was not up to me what did

16 or did not go into the journal."

17            Did I read that right?

18      A.    You did.

19      Q.    When Mr. Walls was speaking to you in the

20 winter of 2020, did he convey to you that Jackson was

21 taking this attitude that he had to "protect Schenkerian

22 analysis"?

23      A.    I don't recall him mentioning protection.

24      Q.    Was this the first time you had seen words to

25 that effect?

1      A.    This is the first.  That was the first time I

2  recall seeing words to that effect.

3      Q.    And he goes on to suggest that, quote --

4  I'm looking down, skipping forward another sentence.

5            It says, "I gave comments."

6            Do you see that?

7      A.    I do see that.

8      Q.    "I gave comments to one author, including that

9  they seem to devalue other fields of study; that they

10 cherrypick information to make Schenker appear in a

11 better light and that they confuse cultural appropriation

12 with egalitarianism."

13           Did I read that right?

14     A.    You did.

15     Q.    I don't want to get into whatever he means by

16 cultural appropriation and egalitarianism.  But I want to

17 know if, in the winter of 2020, he talked to you about

18 the journal's contributors to the Symposium cherrypicking

19 information to make Schenker appear in a better light.

20     A.    I don't recall him telling me that.

21     Q.    But it's certainly -- and correct me if I'm

22 wrong.  It's certainly your understanding, from reading

23 this at the time, that he was accusing Timothy Jackson

24 of skewing the contributions in Volume 12 of Schenkerian

25 Studies to support Schenker, right?

1        A.    That would seem to be the point.

2        Q.    Another way to put that is Walls is claiming

3    that he brought criticism to Professor Jackson that was

4    critical of the pro-Schenker papers.

5              And Jackson, at the end of this paragraph,

6    told him, "It was not my job to censor people."

7              Right?

8        A.    My reading of the paragraph is that Walls

9    is claiming that Dr. Jackson didn't want Levi giving

10   negative feedback on each one of the contributions or

11   critical feedback as one of the contributions to the

12   volume.

13       Q.    And that that contribution was, quote,

14   protecting Schenker?

15       A.    The quotation about protecting Schenkerian

16   analysis is one that he ascribes to Dr. Jackson as

17   opposed to the entire volume.

18       Q.    He also says he was critical of an article that

19   was cherrypicking information to make Schenker appear in

20   a better light, right?

21       A.    Correct.

22       Q.    And we would agree probably that if you're just

23   cherrypicking data to make anything look one way or

24   another, that's probably not scholarship, right?

25       A.    Correct.

BENJAMIN D. BRAND, Ph.D.    09/23/2024

1    Q.    And that probably would be a real issue if

2 people were cherrypicking information just to make

3 Schenker appear in a better light, right?

4    A.    Correct.

5    Q.    That would be a virtuous thing to do as a

6 student editor of a journal, to point out someone was

7 doing that, right?

8    A.    To point out that someone was cherrypicking

9 information?

10    Q.    Correct.

11    A.    That would seem to be a virtuous thing to do.

12    Q.    And it would also be probably a not virtuous

13 thing to do or an unvirtuous thing to do, to tell

14 Mr. Walls not to censor people in that light, correct?

15 In that context, that would not be good practice, right?

16    A.    Could you repeat your question?

17    Q.    Sure.  Mr. Walls, in his own apology on

18 Facebook on July 27th, claims that he was being

19 pressured, quote, not to censor the pro-Schenker

20 articles, right?  Or at least one Pro-Schenker article?

21    A.    My reading of this document, and this paragraph

22 in particular, is that Levi Walls is arguing that Dr.

23 Jackson was telling him not to provide critical feedback

24 on this particular article.

25    Q.    That was pro-Schenker, right?

BENJAMIN D. BRAND, Ph.D.    09/23/2024

1        A.    That was cherrypicking data, according to Levi.

2        Q.    Cherrypicking data to what end, Professor

3   Brand?

4        A.    Cherrypicking information to make Schenker

5   appear in a better light, according to Levi's words.

6        Q.    Did you have the impression, after reading

7   the apology by Levi Walls, that the Journal was hostile

8   to pro-Ewell responses?

9        A.    My impression was that that was the case that

10  Levi was at least implicitly making.

11       Q.    And he, quote, essentially agreed with Ewell's

12  talk, right?

13             That's back up there in that sentence that

14  says, "Although after serious thought, I essentially

15  agreed with Ewell's talk."

16             Right?

17       A.    Yes.

18       Q.    Okay.  So then he goes on and says he set up

19  a secret meeting with you, "my department chair."  I

20  guess he calls you the department chair, but I guess you

21  call yourself the division chair, right?

22       A.    That's correct.

23       Q.    And I apologize.  I get them mixed up, too.

24  It's not about that.  I'm just trying to get it straight.

25             He wants you to specifically acknowledge that

1 he came to you as a whistleblower, at least according to

2 him at that time.  Do you remember talking to Mr. Walls

3 about him being a, quote, whistleblower?

4         A.    I don't remember that word coming up.

5         Q.    He also says at the end of that paragraph,

6 "After my warning that Dr. Jackson was woefully ignorant

7 about politically correct discourse and race relations,

8 he rebutted that Dr. Jackson did very well in the recent

9 diversity and inclusion workshops."

10               Is there a policy at the University of North

11 Texas that mandates, quote, politically correct

12 discourse, that you knew of while you were division

13 head?

14         A.    No.

15         Q.    Do you even know what he means by that?

16         A.    About what?

17         Q.    Politically correct discourse.  Let me strike

18 that and ask you this.

19               What does politically correct discourse refer

20 to at the University of North Texas in the division of

21 Music, History, Theory, and Ethnomusicology?

22         A.    That wasn't a phrase, to my knowledge, we

23 used in any official way.

24         Q.    Do you have any idea what Levi Walls meant by

25 that?

1       A.    My recollection and how I understood that
2  phrase is that he was talking about how we talked about
3  race in the academy.

4       Q.    In general, you mean?

5       A.    In general and a higher education context.

6       Q.    And could you explain for the record here what
7  you mean by that?  You lived there as a professional.
8  You work there as a professional.  So explain what that
9  means for the jury.

10      A.    The ways of talking about race that invite
11 conversations in civil discourse and don't alienate
12 people or otherwise end civil discourse.  That would
13 be my understanding.

14      Q.    So is calling for a journal to be closed, as
15 you say, criticism, not an attack, I suppose, does that
16 further the ends of racial discourse in academia in
17 furthering the critical discussion that you just
18 described?

19      A.    I don't think it necessarily furthers or does
20 not further it.

21      Q.    One last question on this, and then we'll
22 move on.

23            See in the next paragraph there?  It's right
24 after "Volume 13" there, right?

25      A.    Um-hum.

1      Q.    It says, "In hindsight, I should have quit
2  the journal in protest."
3            Did I read that right?
4      A.    Yes, you read that right.
5      Q.    And he also says he feared retaliation from
6  Timothy Jackson, right?
7      A.    He does write that.
8      Q.    Do you have any knowledge that Timothy
9  Jackson ever retaliated against Mr. Walls?
10     A.    I have no knowledge of any of such retaliation.
11     Q.    Likewise, I just had a point of clarification.
12  Mr. Walls did quit the Journal, right?
13     A.    My recollection was that he e-mailed me, asking
14  to be reassigned.
15     Q.    You don't understand that as quitting the
16  Journal?
17     A.    He wanted to sever his relationship with the
18  Journal.
19     Q.    And also quit his dissertation advisor
20  relationship with Timothy Jackson, right?
21     A.    I believe that's correct.
22     Q.    And he was reassigned, in fact, right?
23     A.    Correct.
24     Q.    And he's now doing his dissertation with
25  another professor, correct?

1      A.    Correct.

2      Q.    Have there been any consequences for Mr. Walls

3  for quitting the Journal?

4      A.    Not that I'm aware of.

5      Q.    And certainly not from Timothy Jackson as

6  you've already testified, right?

7      A.    Not that I'm aware of.

8            MR. WALTON:  Whenever you get to a

9  stopping point, can we take a break?

10           MR. ALLEN:  Let's do that now because I

11 was going to switch -- can we go off the record, please?

12           THE VIDEOGRAPHER:  We're off the record at

13 3:14 p.m.

14              (Recess taken)

15           THE VIDEOGRAPHER:  We're back on the

16 record at 3:35 p.m.

17              (Deposition Exhibit Number 5 marked.)

18      Q.    Dr. Brand, I've marked for the record

19 Exhibit 5.  This is an email chain with a lead Bates

20 number JACKSON 0240.  It has a big fat Exhibit G on the

21 first page.  That's because this has been introduced into

22 the court record before.  That's why it has that scroll

23 of numbers and letters at the top of the page as well.

24      A.    Um-hum.

25      Q.    I'm going to refer to those page ID numbers

1  on the top of the page.  Since those are the Court's

2  numbers, we're just going to go with those.

3        It's in the nature of emails that they sort

4  of start at the end and go to the beginning, so I'm going

5  to ask you to turn to the back.

6        So we had just got done finishing discussing

7  the apology of Levi Walls on 2020.  These are

8  contemporary emails back in November of '19 between

9  Levi Walls and Professor Jackson, my client.  I'm not

10  saying you've read these or know about them.  I'm putting

11  them in the record to get your testimony on some of the

12  things that are discussed in them.

13        If you look at page 303, do you see that

14  email from Friday, November 15th, 2019, at 10:40 a.m.?

15    A.    I do.

16    Q.    So I'm just going to represent to you, but feel

17  free to fact-check me.  This is the first time in this

18  thread that the issue of the paper at the SMT, or the

19  Society for Music Theory that we've been discussing

20  today, comes up between them, at least in this thread.

21        And Mr. Walls says to Professor Jackson, "I

22  would also be very interested in discussing a particular

23  Schenker paper from SMT.  You've likely heard about it

24  as it caused quite a stir.  I was ambivalent about it

25  because it suggested that analysis that utilizes levels

1  of hierarchy is inherently racist, which strikes me as

2  naive."

3          Did I read that correctly?

4      A.    You did.

5      Q.    Does that sound like someone who essentially

6  agrees with Professor Ewell?

7      A.    It doesn't suggest to me that Levi agreed

8  with Professor Ewell.

9      Q.    Now, if you skip up to the head of 301, you'll

10 see that my client, in a way that you may or may not be

11 familiar with, writes a very long email to his student,

12 Levi Walls.

13          Do you see that?

14     A.    I do.

15     Q.    I don't want you to necessarily read it,

16 although you're free to examine it if you need to.  But

17 he's discussing the talk, which he admits he has not

18 watched yet -- do you see in that first line -- because

19 he was not at the conference.

20          He says, "I presume that you are referring to

21 Ewell's talk.  I have not watched it yet because I

22 suppose that I will find it difficult to put up with.

23 In any event, perhaps a response from the JSS will be

24 warranted."

25          Did I read that correctly?

1          A.    I'm sorry.  Are you on the top of page 301?

2          Q.    Did I make a mistake?  301, in that top.

3    Do you see, there's Timothy Jackson to Levi Walls,

4    November 16th.

5          A.    Yeah, okay.  I see it.  Yes, you read that

6    correctly.

7          Q.    Sorry.  And I'm not trying to lose you in this,

8    but I want to try to avoid reading the whole

9    email.

10         A.    Okay.

11         Q.    So they're talking about various comments.

12   This is the important thing I just wanted to establish.

13   "That Timothy has received from various people out there

14   in the scholarly world."

15               Do you see how he says, "Not everyone who

16   attended the SMT was enthusiastic about Ewell's talk

17   there"?

18         A.    I do see that.

19         Q.    But he prefaces it with he sent this note to

20   other Schenkerian colleagues at UNT, correct?

21         A.    Yes.

22         Q.    Did you remember receiving an email from

23   Timothy Jackson saying not everyone who attended the

24   SMT was enthusiastic about Ewell's talk?

25         A.    I don't recall receiving such a message.

BENJAMIN D. BOUND, Ph.D.      09/23/2024

1      Q.    As part of that message, and I'm not saying you
2   did or did not receive it, so that's not in this message.
3   So I just want to quickly establish that he's forwarding
4   comments he received from a colleague here, and he's
5   talking about commentary that he's received
6   from various colleagues in the field.

7              I just want to ask, is that -- I don't want
8   to misrepresent this to you.  So if you understand this
9   differently, just tell me.  But is that a fair summary
10  of this email?  It's just...

11     A.    I read this as Dr. Jackson forwarding comments
12  he received from an unnamed colleague about the plenary
13  to colleagues at UNT, and then, in turn, forwarding that
14  to the -- or not forwarding, including it in the body.

15     Q.    And as division head at this time -- or
16  division chair, excuse me, do you remember any criticism
17  of Professor Jackson for forwarding this email around
18  to UNT colleagues at the time or anything of that nature
19  in this time frame?

20     A.    I don't recall any criticisms of him doing
21  that.

22     Q.    So I just want to then move up to the next
23  quite lengthy email, and that begins on 299.  This one
24  is from Mr. Walls right back to Timothy Jackson on
25  November 17th, 2019, at 2:55 p.m.

BENJAMIN D. BRAND, Ph.D.    09/23/2024

1              Did I read that correctly?

2      A.    Correct.

3      Q.    And Mr. Walls says, "After watching Ewell's

4  presentation, I wanted to share some of my thoughts with

5  you.  I am sympathetic to his views, but I also have

6  important disagreements.  I am inclined to be against

7  the main points of this paper."

8              Did I read that correctly?

9      A.    Yes.

10     Q.    Now, again, does that strike you as someone who

11  essentially agrees with Ewell?

12     A.    No.

13     Q.    He then goes on to list various points in

14  relatively detailed paragraphs.

15             "Number 1.  Schenker's racist ideologies

16  cannot be divorced from his analytical methods because

17  he believes these views to be centered -- central to his

18  theories."

19             He, referring to Ewell, right?

20             MR. WALTON:  Form.

21     A.    Would you restate the question?

22     Q.    Sure.  At Point Number 1, Mr. Walls writes

23  to his dissertation -- I don't know if it's his

24  dissertation, so strike that question, please.

25             In Numeral 1, Mr. Walls writes to Timothy

BENJAMIN D. 2LAND, Ph.D.    09/23/2024

```
 1   Jackson, "Schenker's racist ideologies cannot be divorced
 2   from his analytical methods because he believes these
 3   views to be central to his theories."
 4            Do you understand the reference to he and
 5   his in that sentence to refer to Ewell?
 6        A.   I'm not sure whom, to whom "his" refers to in
 7   the sentence.
 8        Q.   That's fair enough.
 9            Mr. Walls goes on to say, "I find this point
10   to be problematic and a little naive."
11            Right?
12        A.   Um-hum.
13        Q.   So if anyone is suggesting Schenker's
14   ideologies are racist and cannot be divorced from
15   his analytical methods and so forth, he finds that
16   problematic and a little naive, right?
17        A.   Um-hum.
18        Q.   And then on Number 2, Hierarchical Analysis, he
19   writes, "Hierarchical analysis - in which certain musical
20   elements exert power over others - supports
21   white power structures.  I find it very difficult to
22   swallow this claim."
23            Did I read that right?
24        A.   You did.
25        Q.   And then in the next -- there's another
```

1  four -- numbered four paragraphs.

2          And he goes on, "But I also take issue with

3  the tone of the responses."

4          Here, he's talking about the responses in

5  Timothy Jackson's previous email, right?  Well, let me

6  strike that question.

7          You can look at this as much as you want.  I

8  know this is an email from Walls to Jackson.

9      A.   Correct.

10     Q.   But I just want to get into some of the

11 substance of it.  I just don't want that part to

12 confuse us.

13          Under Number 2, Walls says -- and this is,

14 again, a contemporaneous email within days of the

15 conference, right?

16     A.   Correct.

17     Q.   Number 2 says, "The suggestion that Ewell

18 pushed Schenkerianism as 'the root of all white racism'

19 is a mischaracterization, the aims of which seem to make

20 his paper seem more ridiculous."

21          That doesn't sound uncritical of Ewell, does

22 it?

23          MR. WALTON:  Form.

24     A.   I read that as Levi being critical of whoever

25 wrote "the root of all white racism."  I'm not, at this

 1  point, sure who that is.

 2      Q.    Okay.  How about Number 3?

 3            "While it is odd that Ewell completely

 4  glossed over Schenker's Jewish identity, I worry that

 5  the commenter is suggesting some sort of mutual

 6  exclusivity between Jewishness and racism."

 7            That's not uncritical either, right?  Ewell

 8  completely glossed over Schenker's Jewish identity?

 9      A.    The primary criticism here is for the commenter

10  in question.

11      Q.    Sure.  Isn't this normal academic discourse

12  as you understand it?

13      A.    Yes.

14      Q.    And Mr. Walls seems perfectly capable of that

15  kind of discourse, right?

16      A.    The email exchange, his e-mail to Dr. Jackson

17  suggests that he feels comfortable engaging in this kind

18  of discourse in this context.

19            MR. ALLEN:  Thank you.

20            I'm going to mark for the record Exhibit

21  Number 6.  And this was introduced in the last exhibits.

22  This is this very thick -- so I'm hoping you are familiar

23  with it, and I have one copy for the witness, but I'm

24  going to rely on your other copy from the previous

25  witness.

 1                    MR. WALTON:  Yeah, just as long as you

 2    identify specific Bates numbers.

 3                    MR. ALLEN:  I am going to do that.

 4                    MR. WALTON:  And I'll just follow along.

 5                    MR. ALLEN:  Can I have this marked as

 6    Exhibit Number 6, please, for the record?

 7                         (Deposition Exhibit Number 6 marked)

 8                    MR. WALTON:  It's my understanding this

 9    was marked as Exhibit 4 to Dr. Benjamin Graf's

10    deposition.

11                    MR. ALLEN:  Thank you for that.  I was

12    lost in my folder, and I was in the wrong folder.

13        Q.    So this is an exhibit previously marked as

14    Exhibit 4 in a deposition that took place right before

15    yours, Dr. Brand.  And I'm marking for -- Exhibit 6 for

16    your deposition.  It has the UNT Bates Number 02645.  And

17    it is a string of emails.  And I'm just going to

18    represent to you these were internal correspondence

19    of the Journal that Timothy Jackson submitted to the

20    so-called ad hoc panel which investigated him and the

21    Journal.  I'm not asking you to confirm that.  I'm just

22    representing that for the purpose of our depositions.

23                    I just want to call your attention to page --

24    we're only going to -- I'm only going to ask you one

25    question about this rather extensive collection of

1  documents.

2      If you turn to UNT 2758, please, do you see

3  the email at the top of the page?  And if you peek to the

4  page that ended on the previous page, 2757, you'll see

5  that the email from which the message comes is Levi

6  Walls, my.unt.edu.

7      A.    Um-hum.  I do.

8      Q.    Is that the typical UNT email for a student?

9      A.    Yes.

10     Q.    And it's dated February 13th, correct?

11     A.    Correct.

12     Q.    And I'm just going to represent to you that

13  this would have been in 2020.  Am I mistaken, or is this

14  around the winter timeframe that Mr. Walls would have

15  come to your office?

16     A.    It is.  2020.

17     Q.    Correct?

18     A.    Yeah.

19     Q.    And again, this was presented to the ad hoc

20  panel.

21         And it says, "Dear Dr. Jackson (with Dr. Graf

22  in copy; Dr. Slottow not copied because he asked to be

23  recused)."

24         "Dr. Graf and I were wondering what your

25  thoughts were concerning the submission from Clark,

1 Beaudoin, and Lett.  As you may have seen, these

2 responses are (at least) implicitly anti-Schenkerian.

3 Despite disagreeing with much of what they have to say,

4 Dr. Graf and I think it is important to publish these

5 responses along with the others that we have received

6 (Wiener, Pomeroy, Wen, Cadwallader, etc.)"

7          Did I read that correctly?

8     A.    You did.

9     Q.    And again, does that strike you as someone

10 appealing to Dr. Jackson to, I don't know, suppress the

11 pro-Schenker papers?

12    A.    It does not.

13    Q.    So that representation that Levi Walls makes in

14 July of 2020, would it seem at least probable that he's

15 lying about the whole situation?

16          MR. WALTON:  Objection, form.

17    A.    I can't speak to the intent behind the email.

18    Q.    Is this email consistent with what he said on

19 July 27, 2020?

20    A.    Can you be more specific?

21    Q.    You read in the -- in fact, we spent some time

22 discussing a Facebook post that you read at the time by

23 Levi Walls in which he apologized for even participating

24 in the Journal.  Is that a fair characterization of the

25 Facebook post?

1       A.    Yes.

2       Q.    Just for the record, that's Exhibit 4, the

3  Facebook post, right?  Sorry.  I had to look it back up.

4       A.    Yes.

5       Q.    And we spent some time discussing how Levi

6  Walls characterized his conflict on the Journal as

7  being basically forced to protect the pro-Schenker

8  authors, right?  By being instructed by Dr. Jackson not

9  to censor the pro-Schenker authors?

10      A.    He did describe to Dr. Jackson.

11      Q.    Is this email consistent with what Mr. Walls

12  characterized to the entire music theory public on

13  July 27, 2020?

14      A.    That email, as I read it, addresses articles

15  that Levi Walls is characterizing sympathetic to Ewell.

16            The Facebook post, as I recall, was centering

17  on his conversations or conversation with Dr. Jackson

18  about those contributions that were critical of Ewell.

19      Q.    In other words, the exact opposite, correct?

20      A.    They're speaking to two different sets of

21  contributions.

22      Q.    Correct, the pro-Ewell versus the anti-Ewell

23  one as you just testified.  Let's --  do you recall

24  Mr. Walls ever bringing to anyone's attention things --

25      A.    I don't think he uses the term pro- and

1  anti-Ewell.

2        Q.    No, I'm using that.  Implicitly

3  anti-Schenkerian, you characterize that as pro-Ewell,

4  correct, in your testimony about this email?

5        A.    I believe I just used the word "sympathetic" to

6  Ewell.

7        Q.    Okay.  Let's use your word then, sympathetic to

8  Ewell.  And essays unsympathetic to Ewell; is that fair?

9        A.    Yeah.

10       Q.    You were aware that the Volume 12 Symposium

11  of the Journal of Schenkerian Studies published both pro

12  and con, or as you want to call it, sympathetic and

13  anti-sympathetic, papers to Professor Ewell, correct?

14       A.    Yes.

15       Q.    Isn't that appropriate for a scholarly journal?

16       A.    Yes.

17       Q.    Do you have any knowledge that Mr. Walls shared

18  his contemporaneous emails of any kind in which

19  he was encouraged to censor pro-Ewell or, as you say,

20  paper sympathetic to Ewell in this time frame in the

21  winter/spring of 2020?

22       A.    I have no knowledge of him sharing his

23  e-mail correspondence.

24       Q.    Do you know of any other evidence than Levi

25  Walls' say-so, that he was supposedly encouraged not to

1  censor the pro-Schenkerian or, as you say, the papers
2  that were not sympathetic to Ewell?

3      A.    The only evidence that I'm aware of would be
4  his conversation with me that we discussed previously in
5  this deposition.

6      Q.    Do you recall him -- or excuse me.  You were
7  aware of the November 25th, 2020 Ad Hoc Panel Report,
8  correct?

9      A.    I'm aware of the panel report, that's correct.

10      Q.    Did you read it carefully?

11      A.    I read the report.

12      Q.    Did you read it carefully?

13            MR. WALTON:  Form.

14      A.    I don't recall whether I read it -- I don't
15  recall how carefully I read it.

16      Q.    Do you recall a story attributed to Mr. Walls,
17  that he was forced into Professor Jackson's car and,
18  again, this issue of censorship came up?

19            MR. WALTON:  Form.

20      Q.    Do you recall that story?

21      A.    I recall this being a report -- sorry,
22  the report in the report of a conversation that Levi
23  supposedly had with Dr. Jackson in Dr. Jackson's car.

24      Q.    Is your memory of that story recounted in the
25  Ad Hoc Panel Report, that Professor Jackson was coercing

 1  Mr. Walls?

 2      A.    I remember -- I recall there being some

 3  implication -- well, implication of coercion.  I don't

 4  remember exactly, though.

 5              MR. ALLEN:  Let me mark for the record

 6  Exhibit Number 7.  This will be the Ad Hoc Panel Report.

 7              (Deposition Exhibit Number 7 marked.)

 8      Q.    So if you turn to, let's see, Bates number

 9  JACKSON 216, the panel recounts the story of Mr. Walls.

10      A.    Okay.

11      Q.    So when you read this report, did you

12  understand from the report that Professor Jackson was

13  instructing Mr. Walls not to suppress the anti-Ewell

14  papers or the papers unsympathetic to Ewell?

15      A.    My understanding from this passage of

16  the report, and particularly from the sentence that

17  stated that after raising concerns, he was taken into

18  Dr. Jackson's car where Dr. Jackson told him that it was

19  not his "job to censor people" and that he told -- was

20  told not to do it again -- or he was told not to do it

21  again.

22              My understanding of that sentence is that

23  Levi was alleging that Dr. Jackson was telling him not to

24  provide the critical feedback that he had been given

25  by these other authors.

BENJAMIN D. BRAND, Ph.D.    09/23/2024

```
1         Q.    It doesn't say that, though, does it?  It
2    says it was not his job to censor people, right?
3         A.    That's what the text says.
4         Q.    Isn't that right?  It's not the job of an
5    editor to censor people, correct?
6                   MR. WALTON:  Form.
7         Q.    Is there something funny about that question?
8    Is there a reason you are smiling?
9         A.    Um.
10                  MR. ALLEN:  Do you have something to
11   say, Renaldo?
12                  MR. STOWERS:  We can go off the record.
13                  MR. ALLEN:  We can go off the record,
14   please.
15                  THE VIDEOGRAPHER:  We're off the record at
16   4:05 p.m.
17                      (Recess taken)
18                  THE VIDEOGRAPHER:  We're back on the
19   record at 4:05 p.m.
20                  MR. WALTON:  Object to the form of the
21   question.  It's badgering to the witness.
22        Q.    Were you smiling when you read that,
23   Dr. Brand?
24        A.    I was.
25        Q.    Did me pointing that out seem offensive to you?
```

1    A.    It did not seem offensive, no.

2    Q.    So I just asked if you found it funny.

3    A.    I don't find it funny.

4    Q.    So I'm asking, especially at a state

5  university, isn't it correct that the job of an

6  editor is not to censor people?

7              MR. WALTON:  Form.

8    Q.    I know this is getting long in the tooth,

9  but he's pointing out I'm asking a double negative

10  question, so let me try to rephrase that.

11        It's correct -- it's correct, that especially

12  at a state institution, it is not the job of an editor to

13  censor people, correct?

14              MR. WALTON:  Form.

15    A.    The job of an editor is to provide critical

16  feedback.

17    Q.    Did you see any evidence that critical feedback

18  was not provided to the authors of the

19  Symposium other than whatever Levi Walls was posting

20  on Facebook?

21    A.    Other than Levi Walls' post on Facebook, I have

22  not seen evidence that authors in that volume of

23  JSS were not receiving critical feedback.

24              MR. ALLEN:  Sorry, Dr. Brand.  I'm looking

25  for an exhibit that I wanted to show you.  I'm going to

1  mark for the record as Exhibit Number 8.  This is an

2  email from you, Professor Brand, to Timothy Jackson

3  titled Follow-Up, from December 11th, 2020.

4      A.    Um-hum.

5                    (Deposition Exhibit Number 8 marked.)

6      Q.    It also has the Bates stamp JACKSON 000272.

7            Do you remember this email, Professor Brand?

8      A.    I do.

9      Q.    What was the purpose of your writing this email

10 to Timothy Jackson?

11     A.    Could you restate the question?

12     Q.    What was your purpose of sending this email

13 to Timothy Jackson on December 11th, 2020?

14     A.    To clarify and confirm some points that I had

15 made verbally.

16     Q.    You had met with Timothy Jackson at this

17 time?

18     A.    Over Zoom.

19     Q.    Of course.  It was the COVID era, right?  And

20 was that that same day?

21     A.    I don't recall whether it was the same day

22 or not.

23     Q.    It was within 24 hours of this date?

24     A.    As I recall, it was within 48 hours of the

25 date.

1      Q.    Fair enough.  And you told him that you could
2  not support a plan according to which he would remain
3  involved in the operations of the Journal of Schenkerian
4  Studies, correct?
5            MR. WALTON:  Form.
6      A.    As written in the email, I did tell him that
7  I couldn't support a plan according to which he would
8  remain in the day-to-day operations of the Journal.
9      Q.    And this was based on your reading of the
10  Ad Hoc Panel Report that we had just introduced as
11  Exhibit 7?
12      A.    Correct.
13      Q.    And he also complained to you in that meeting
14  that he was preparing a response, correct?
15      A.    As I recall, he did inform me that he was
16  preparing a response.
17      Q.    And in that first sentence after, you know,
18  bullet point Number 3, you say, "You expressed your
19  desire that I read your response to the panel's report
20  before I make any definitive judgments and, of course, I
21  will read your report carefully when I receive it."
22            Did I read that correctly?
23      A.    Yes.
24      Q.    Did you receive his response?
25      A.    I recall receiving his response.

1      Q.   Did you read it carefully?

2      A.   I read it carefully.

3      Q.   Did you change your position, that you would

4  not support Timothy Jackson's continuing involvement in

5  the Journal?

6      A.   I did not change my position.

7      Q.   Thank you.

8           I want to switch gears and ask you a little

9  bit about the compensation of Mr. Walls when he was

10 in that position as a -- I'm not even sure what you

11 characterize it.  A research assistant or a TA or his

12 paid position as the student editor of JSS.  And maybe

13 you'll help me clarify some of this.

14          I'm introducing Exhibit Number 9.

15               (Deposition Exhibit Number 9 marked.)

16     Q.   I'm going to represent to you that these

17 are notes made by the ad hoc committee based on your

18 meeting with them on that day as far as I can tell.  I

19 acknowledge that you didn't make these notes unless you

20 tell me otherwise.  These are not your notes, are they,

21 Dr. Brand?

22     A.   No.

23     Q.   I just have a specific question.  Again,

24 I'm trying to tease out what Mr. Walls was paid.  So

25 unfortunately, I can't direct you to the Bates numbers

1  because they're printed black on the black bottom of the

2  page.  But I'm going to ask you to go to the fifth page

3  in this stack.  Of course, it's printed back to front.

4  Do you see, there's an underscore "Questions" at the top

5  of the page?

6       A.    Yes.

7       Q.    And it says who -- if I mischaracterize this,

8  I'm just going to ask you to help me, because you were

9  there and apparently discussed this with the committee.

10           They asked, "Who funds journal center on

11 Division's website."

12           And it says, "50% percent FTE position that

13 Brand created.  $12,800 a year, initially assigned to

14 Center, then Brand made editor.  Jackson allegedly using

15 as private research assistant."

16           Did I -- as far as you can tell, did I read

17 that correctly?

18       A.    As far as I can tell.

19       Q.    I understand they're notes.  But my question

20 for you is that 50% FTE, what does that stand for?

21       A.    50% full-time employment.

22       Q.    Was that the compensation that was paid to

23 Mr. Walls?

24       A.    I believe it was.

25       Q.    And you created that position for Mr. Walls

1  as the -- as a compensated position for the assistant

2  editor or the graduate student editor?  Let me strike

3  that.

4           That was a position you created, a 50% FTE for

5  Mr. Walls as the graduate student editor of the Journal

6  of Schenkerian Studies?

7      A.    I don't recall having created a position.  As

8  division chair, it was my responsibility to oversee the

9  accurate compensation of all of our graduate student

10  employees, and so ensuring that whether they're 25 to

11  50 FTE, that's correct, given their responsibility,

12  that they receive a correct compensation.  And at that

13  time, $12,800 per nine month pay period, would have been

14  appropriate.

15      Q.    This is kind of what I'm getting at, the amount

16  of money that it was and that it was the intended

17  compensation for Mr. Walls.

18           If you thought it was insinuating something

19  about you creating that position or not, that wasn't my

20  intention.  But $12,800, to the best of your memory

21  today, that was what he was paid at that time?

22      A.    To the best of my recollection, that's what he

23  was paid.  That was the standard pay rate for a doctoral

24  student who was a graduate student worker, who was a

25  teaching research assistant.

1      Q.    Anyone of Levi Walls' comparable position,

2   right?

3      A.    I'm sorry.  I don't understand.

4      Q.    Sure.  It's called a 50% -- here's what I'm

5   trying to get at.  It's a 50% FTE.  It wasn't just a

6   special arrangement for Walls, because he was this --

7   it's not a special Levi Walls pay.  Anyone who was

8   working 50% time as an FTE would have got the same pay

9   as a graduate student of his comparable rank?

10     A.    Correct.

11     Q.    Okay.  And there was one other thing I think

12  you said is that this was for a nine-month schedule?

13     A.    Correct.

14     Q.    And I don't want to get into the weeds.  But

15  that's basically three-quarters of a year, correct?

16     A.    That's basically correct.

17     Q.    And just -- I know -- I don't want to be

18  tedious about this, but I'm a little bit forced to.

19  That's a half-time equivalent, so it's one-half of a

20  full-time.  But then it's three-quarters of that because

21  it was only nine months; is that fair?

22     A.    Correct, because TAs and RAs don't normally

23  work over the summer.

24             MR. ALLEN:  I just wanted to be clear

25  about that.  And just for the record, that was on the

1  PDF page 5 of a document on which the Bates number's not

2  entirely legible.  So hopefully, that will make enough

3  clarity in the record.

4         I believe that brings us to Exhibit 10.

5         MR. ALLEN:  This is a document that I'm

6  introducing into the record as Exhibit 10.  It's an email

7  from you, Professor Brand, to John Richmond, with a cc to

8  John Ishiyama.  And it has UNT Bates stamp 2539.

9         (Deposition Exhibit Number 10 marked.)

10    Q.    So I just want to look at the cover email here.

11  I think you'll find that much of the rest of it

12  is setting up these questions, and this is the answer

13  to some of these administrators and the ad hoc panel's

14  questions.  But please tell me when you've had a chance

15  to review it.

16    A.    Okay.

17    Q.    So the email that is the first email in Exhibit

18  10, is that an accurate description, to the best of your

19  recollection today, of the compensation in terms of the

20  portions of the full-time employment as you testified

21  earlier, that Levi Walls was paid?

22    A.    Are you referring to the email that I sent?

23    Q.    Yes, the top one.

24         "Dear All, following up on Warren's

25  information."

1             Do you see that one?

2        A.    The RA position was 50%?

3        Q.    Please understand, the other was handwritten

4    notes.  This is in hard copy email.  So it indicates a

5    little bit of background research that you did to make

6    sure you're getting it right; is that accurate?

7        A.    The best of my recollection.

8        Q.    And I'm sorry.  I'm just asking you to

9    confirm that to the best of your knowledge, this is

10   correct.  The 50% FTE was what Mr. Walls was paid.

11       A.    To the best of my knowledge.

12       Q.    Okay.  And also, that this -- there's a sort of

13   spreadsheet that follows.  Do you see that?

14       A.    I do.

15       Q.    That was also describing the position in

16   support of the Journal.  And I think you wrote in that

17   email that it goes back to 2015, right?

18       A.    The data goes back to 2015.

19       Q.    Okay.  And that -- what is the source of that

20   spreadsheet?  I don't know if you want me to characterize

21   it as a spreadsheet.  Is that fair?

22       A.    That's fine.

23       Q.    Can you just tell me what the source is?

24       A.    This is a report based on data that would

25   have been provided through the system that at that time

1  was known as TracDat for accreditation purposes.

2      Q.    Is TracDat some kind of academic institution

3  management software of that nature?

4      A.    Yeah.

5      Q.    Okay.  So -- and then the last question

6  I had, if we move to the very last page, your email

7  characterizes this as the job description for Levi

8  Walls' position as student editor.  Is that an accurate

9  reading of that email?

10     A.    Yes.

11     Q.    And this description appears to be dated

12  December 12th, 2019.  See there at the top?

13     A.    Yes.

14     Q.    Do you remember that being the time when

15  you created this with Professor Slottow and Professor

16  Jackson?

17     A.    I remember, yeah, approximately that time

18  frame, late 2019.

19     Q.    Can you say, as the division head, when

20  Mr. Walls began his official position as student editor

21  and began being paid for it?

22     A.    My recollection was that he started working for

23  the Journal in the fall of 2019, but that his duties in

24  that role had not yet been codified.  And so this

25  document, as I recall, was our effort to do that.

BENJAMIN D. ROUND, Ph.D.    09/23/2024

1        Q.   Was he being paid before this, the 50% FTE?

2        A.   My recollection is that he was being paid

3   something.

4        Q.   Okay.  And of course, before that, the graduate

5   student editor had been Professor Graf,

6   correct?

7        A.   That's my recollection.

8        Q.   And I just want to ask you about Professor

9   Graf.  Was the research assistant position description

10  that you codified here based on what Professor Graf had

11  done for the Journal?

12            Let me ask that a different way.  Was

13  this a codification of what the student editor had done

14  previously?  Namely, Professor Graf?

15       A.   I don't recall.

16       Q.   And in the first bullet point there, it

17  says, "Solicit articles, reviews, and other special

18  contributions for each issue of the journal."

19            Right?

20       A.   Um-hum, yes.

21       Q.   So Professor Walls -- excuse me.  Strike that,

22  please.

23            Mr. Walls, in this written job description,

24  was expected to solicit articles, right?

25       A.   Yes.

1      Q.    And also reviews and other, quote, special
2  contributions for each issue, right?
3      A.    Yes.
4      Q.    Was the publication of the Symposium in
5  Volume 12 inconsistent with this job description?
6      A.    No.
7      Q.    Thank you.  Just -- I wanted to ask a couple of
8  more questions about Benjamin Graf before we leave this
9  subject.
10          Benjamin Graf also came to you at some point
11  and asked to be transitioned off the Journal, right?
12      A.    I don't recall him coming to me and requesting
13  that.
14      Q.    Do you recall any conversations with Professor
15  Graf about moving off the Journal?
16      A.    I do recall discussing the issue with him.
17      Q.    Do you remember what the time frame was?
18      A.    To the best of my recollection, it would have
19  been the fall of 2019.
20      Q.    So is it accurate to state it immediately
21  precedes the appointment and definition of Mr. Walls'
22  job with the Journal?
23      A.    Yes.
24      Q.    And what were the reasons that Professor Graf
25  gave for wanting to step down from the Journal?

BENJAMIN D. WREND, Ph.D.    09/23/2024

1       A.    I don't recall him ever asking me to be taken

2  off or expressing an -- how to say.  I don't recall him

3  making a request of any kind.  What I do recall is having

4  a broader conversation about Dr. Graf's workload.  And

5  my chief concern, as I recall, was that I wanted to make

6  sure that workload was manageable.

7       Q.    And we learned from Dr. Graf today that he

8  teaches a 4/4 load, right?

9       A.    My recollection is that he teaches the

10 equivalent of a 4/4 load.

11      Q.    And you would agree, as someone experienced

12 in academic teaching, that that's a pretty heavy load?

13      A.    It is.

14      Q.    The last thing about this job description, do

15 you see at the bottom, there's a second bullet point,

16 "Other tasks encompass"?

17      A.    Yes.

18      Q.    Do you have an understanding of what

19 "Type-setting examples for journal articles, both

20 music and Schenkerian graphs" means?

21      A.    I have a basic understanding of what that

22 means.

23      Q.    And Mr. Walls was also thought of as someone

24 who would contribute that kind of work to the Center as

25 well as his editorial services to the Journal, right?

1              MR. WALTON:  Form.

2        Q.   Let me try to ask that in a more specific way.

3             If, in addition to the editor, Journal of

4   Schenkerian Studies, that's under Roman Numeral I.

5        A.   Correct.

6        Q.   Roman Numeral II, addressed other duties to the

7   Center.

8        A.   Correct.

9        Q.   And Center refers to Center for Schenkerian

10  Studies, correct?

11       A.   Correct.

12       Q.   Which also was the home for the Journal,

13  correct?

14       A.   My understanding was that the Center and the

15  Journal were linked.

16       Q.   Okay.  And one of his duties for the Center,

17  and I'm sure he did this for the Journal, too, because

18  it says for Journal articles, was type-setting both music

19  and Schenkerian graphs, correct?

20       A.   Yes.

21       Q.   The last question I want to ask about this line

22  of questioning is when Professor Jackson is evaluated is

23  his annual reviews --

24       A.   Um-hum.

25       Q.   -- his work for the Journal, when it was still

1  in publication, and for the Center, was counted as part

2  of his evaluation, was it not?

3        A.    Yes.

4              MR. ALLEN:  And I'm done with that.

5  Thank you.

6              MR. WALTON:  Mr. Allen, if you're about to

7  transition, can we have a bathroom break?

8              MR. ALLEN:  Sure.  Sorry.

9              THE VIDEOGRAPHER:  We're off the record at

10  4:33 p.m.

11                  (Recess taken)

12              THE VIDEOGRAPHER:  We're back on the

13  record at 4:47 p.m.

14              MR. ALLEN:  Professor Brand, I want to

15  go back to something we talked about at the beginning

16  of the deposition, but this time, I want to use some

17  documents to -- maybe we can refresh your memory about

18  who you talked to, when, and where, in that July 25th to

19  end of the month time frame when this entire issue sort

20  of, for lack of a better word, hit the fan.  Okay?

21              So I'd like to mark as Exhibit 11.  This is

22  an email chain that begins, "Dear Diego, Colleagues,"

23  by Timothy Jackson.  It's dated July 26th, 2020, or

24  thereabouts, with UNT Bates stamp 0304.

25                  (Deposition Exhibit Number 11 marked.)

BENJAMIN D. BRAND, Ph.D.         09/23/2024

1      Q.    So in the nature of emails, we'll start at the
2  end, at UNT 309.  Now, some of these emails, I believe,
3  you are on, Professor Brand, and some, I believe, you
4  are not.  But I just -- if you'd bear with me, we'll go
5  through them.
6            This is -- I believe you testified earlier
7  that you were first notified by Andrew Chung of social
8  media reports of the Journal of Schenkerian Studies?
9      A.    That's my recollection.
10     Q.    And if you look at this email from July 25th,
11 2020, it's from Andrew Chung to various people who have
12 been involved in the JSS at this time, right?
13     A.    Um-hum.
14     Q.    And he says, "I apologize for interrupting your
15 weekends, but via Twitter, I have been seeing that there
16 has been some early and vociferous pushback re:
17 The new issue of JSS, with concerns that Philip Ewell
18 wasn't invited to respond, and so forth."
19            Does that refresh your memory of what social
20 media was used to, I guess, ring the alarm?
21     A.    Do you mean the social media platform?
22     Q.    Yes.
23     A.    Again, I don't remember Andrew mentioning a
24 particulate platform in his communication to me, but I
25 do see this here.

BENJAMIN D. BRAND, Ph.D.    09/23/2024

1    Q.    Okay.  You don't -- certainly don't have

2    any reason to think that he would, for any reason,

3    misrepresent that in an email at that time, right?

4    A.    No.

5    Q.    Then they continue to talk about that, and I

6    think you are included at some point.  So if you look

7    up to -- they continue to talk about this, right?

8    A.    Um-hum.

9    Q.    And then if you look at page UNT 306 --

10    A.    Um-hum.

11    Q.    -- do you see the email of July 26th, 2020,

12    at 8:52 a.m. there at the top --

13    A.    Yes.

14    Q.    -- from Diego Cubero to, more or less,

15    everyone?  But for the first time, I believe they put

16    you on the thread.

17    A.    Yes.

18    Q.    And, in fact, in the last sentence of that

19    email, Diego Cubero says, "I have copied Benjamin Brand

20    to make him aware of this situation."

21    A.    Correct.

22    Q.    So this was July 26th, 2020.  To your

23    knowledge, was this the first time you heard about

24    this situation?

25    A.    I seem to recall Andrew reaching out to me

BENJAMIN D. BROWN, Ph.D.        09/23/2024

1  directly on that day, but I may be conflating it with
2  this email chain.
3      Q.   Certainly, if he reached out to you directly,
4  it would have been around this time frame, correct?
5      A.   Yeah.
6      Q.   And then the next email in the thread is on
7  page UNT 305.  It's Sunday, July 26th, 2020.  And you
8  write this email; is that correct?
9      A.   July 26th at 10:17 a.m.?
10      Q.   Yes.
11      A.   Yes.
12      Q.   And what was the purpose of this email?
13      A.   To call an emergency meeting.
14      Q.   Did you have that emergency meeting at
15  4:00 p.m. on Sunday?
16      A.   To my recollection, we did.
17      Q.   What was discussed at the meeting?
18      A.   We discussed Volume 12 of the Journal.  We
19  discussed the overall conception.  I believe we discussed
20  some of the initial reactions to Volume 12 that Andrew
21  had seen on the web, on social media.
22      Q.   Were all of the people in this email thread
23  participants in that meeting at 4:00 on the Sunday,
24  July 26th, 2020?
25      A.   I don't recall Levi Walls having been on

BENJAMIN D. BROD, Ph.D.        09/23/2024

1  that -- on the call.  He's the only one.

2       Q.    Was there any reason to exclude Mr. Walls?

3       A.    If he were excluded, it would have been because

4  he was a graduate student and not a faculty member.

5       Q.    But as you sit here today, you don't remember

6  excluding him?

7       A.    I don't remember specifically excluding him,

8  but I don't remember him attending that call.

9       Q.    Was Professor Jackson included in that call?

10      A.    As I recall, he was.

11      Q.    And then the email that's at the head of

12 this Exhibit 11, that seems to be an email from Timothy

13 Jackson.  Do you remember getting that email?

14      A.    I believe I received this email.

15      Q.    And does this also reflect things that you

16 discussed in the subsequent meeting?

17      A.    My reading of this email is that it was sent

18 after our call, not before.

19            He says, "The intention of the Symposium, as

20 explained in the call."

21            I read that as referring to that call that we

22 had that Sunday evening.

23      Q.    Thank you for clarifying.  Was this --

24 did this serve as a sort of -- at least from Timothy

25 Jackson's perspective, his understanding of what was

1 said in the call or additional information?

2        A.    I don't recall whether Tim said this in the

3 meeting.  I believe it was in the meeting on the Zoom

4 call, but I don't recall whether he provided this or if

5 this was a follow-up where he was providing additional

6 information.

7        Q.    Do you -- let me strike that question.

8            Assuming that the same people to have been in

9 the thread were on this email -- unfortunately, in this

10 version of this document, we don't have the front

11 matter -- do you recall anyone responding to this email

12 saying that's not accurate or that's not true or

13 contradicting what Timothy said in any way?

14        A.    I don't recall any responses to that --

15        Q.    Did either of them --

16        A.    -- point.

17        Q.    I'm sorry.  Did you say something?

18        A.    To that point.

19        Q.    I apologize for interrupting.

20            Did Benjamin Graf write to contradict the

21 line that he and Levi and Stephen Slottow had read

22 through and edited every word of the responses very

23 carefully?

24        A.    To my knowledge -- to my knowledge, neither Ben

25 nor Levi responded at all to this query --

1        Q.    Okay.

2        A.    -- or to this email.

3        Q.    Was there any action item that issued from

4   the emergency meeting on Sunday, January 26th, 2020?

5        A.    To the best of my recollection, the action item

6   for me was to consult with the dean.

7        Q.    Did you consult with the dean that Sunday?

8        A.    I don't recall if I consulted with him on

9   Sunday, but I did consult with him soon thereafter.

10       Q.    What did you -- I think we may have gone over

11  this, but do you recall exactly what you discussed with

12  him in this first consultation after the emergency

13  meeting?

14       A.    I don't remember exactly what I told him.

15  What I do recall is that I said -- that I provided him

16  with the summary of our -- a general summary of the

17  meeting.  I provided him with additional context that I

18  had learned from the meeting.

19              MR. ALLEN:  So continuing with this

20  thread, I'm going to introduce Exhibit Number 12, which

21  is an additional email from Sunday, July 26th, 2020.

22  It has the Bates stamp UNT 458.

23              (Deposition Exhibit Number 12 marked.)

24       Q.    So Professor Brand, before you dig into this

25  one, I'm just going to call your attention to the top of

1  page 0459.  And you see how this email on the top of the

2  thread kind of picks up that same thread and goes in a

3  different direction?  Do you see what I mean?

4       A.    What do you mean by a different direction?

5       Q.    Well, we had that email in Exhibit 11, which

6  has an undated Dear Diego, Colleagues, correct?  That's

7  Timothy's response to this long thread.

8       A.    Correct.

9       Q.    This one, if you look down on Exhibit 11,

10 you'll find that at the bottom, UNT 305, there's your

11 email, "In light of recent developments."

12      A.    Correct.

13      Q.    And then if we flip over to Exhibit 12,

14 you'll see on UNT 0453, that's a response to the same

15 email, correct?

16      A.    Um-hum.

17      Q.    So all I'm saying is -- and this is sort of

18 inevitable with emails.  Sometimes, a fork in the road

19 happens, and this is an email that has some of the same

20 material, but not all of it.  It's not part of the same

21 thread.  That's why I'm introducing it.

22      A.    Okay.

23      Q.    But I am representing to you that the top

24 email, which appears to be from Timothy Jackson to you

25 and others, is in a different response to that thread by

BENJAMIN D. BROOKS, Ph.D.        09/23/2024

1  him, which I would like to talk to you without going

2  through the rest of the stuff in the thread.  Is that

3  fair?

4       A.   Um-hum.

5       Q.   With that said, do you remember getting this

6  email?

7       A.   I don't recall this email specifically, no.

8       Q.   It appears to be one before the emergency

9  meeting, correct?

10      A.   Correct.  It's at 11:00 in the morning.

11      Q.   And I probably should have introduced it first,

12 but here we are.

13           If you could review that email carefully, and

14 then let me ask you just a few questions about it when

15 you're done.

16      A.   Okay.

17      Q.   So Timothy is explaining some of the procedures

18 for developing a symposium, correct?

19      A.   Correct.

20      Q.   So my first question for you would be at

21 4:00, when the faculty convened over the Zoom meeting,

22 were these things -- excuse me, were these same things

23 discussed in the meeting?

24      A.   I don't remember.  I don't recall.

25      Q.   Do you find anything particularly racist

BENJAMIN D. BROWN, Ph.D.          09/23/2024

1  about this email?

2      A.    No.

3      Q.    And the anonymous article that was published in

4  Volume 12 of the Journal of Schenkerian Studies, I

5  believe even earlier, you pointed out that that raised

6  something of a stir, correct?

7      A.    In this deposition?

8      Q.    Yes.  If I'm wrong, don't let me

9  mischaracterize what you're saying.

10     A.    I don't recall mentioning the anonymous

11 contribution.

12     Q.    It was raised as something that was somehow

13 suspect, correct?

14     A.    I do recall that being one of the criticisms

15 leveled at the volume.

16     Q.    So I guess my question for you is in a climate

17 where a series of essays responding to a plenary talk at

18 an annual conference evokes such a vociferous response

19 from almost the entire Society for Music Theory, wouldn't

20 it be reasonable for someone to not want to publish

21 something under their name for fear of retaliation?

22              MR. WALTON:  Form.

23     A.    Well, I don't know for a fact that almost

24 the entire Society for Music Theory did come out in

25 criticism of the volume.  I also can't speak to how

BENJAMIN D. BROOD, Ph.D.        09/23/2024

1   the individual who published anonymously would have

2   perceived deployment at the time they published.

3        Q.    But I'm not asking you to read something with

4   criticism in mind.  I'm asking you, do you consider it

5   reasonable for someone to fear the consequence of

6   publishing under their own name in this kind of

7   polarized climate?  Before you answer, though, I want

8   to bring to your attention -- you were not aware that the

9   SMT, or at least individuals within the SMT, started

10  circulating some sort of petition condemning Professor

11  Jackson and the Journal of Schenkerian Studies?

12              MR. WALTON:  Form.

13       A.    I remember being aware of various calls and

14  petitions.  That one in particular did not stand out in

15  my memory.

16       Q.    That's fair enough.  I believe when we had

17  Professor Ewell testify, he testified that 900 academics

18  signed it or at least put their names to it.  Does that

19  strike you as a very significant number in the field of

20  music theory?

21       A.    It does.

22       Q.    So in that light, assuming Professor Ewell

23  is not wrong about that, is it a perfectly rational

24  response to try to maintain anonymity in the face of

25  such vociferous reaction to criticism of Professor

BENJAMIN D. BRAND, Ph.D.        09/23/2024

1  Ewell?

2             MR. WALTON:  Form.

3       A.    The author in question published anonymously

4  before any of that criticism occurred, so he wasn't --

5  they wouldn't necessarily have anticipated that

6  criticism.

7       Q.    It sounds like by publishing anonymously,

8  they did, right?

9       A.    I can't speak to that.

10      Q.    Then they were probably accurate in that

11 assessment, right?

12      A.    I also can't speak to that.

13             MR. WALTON:  Form.

14      Q.    Well, all of the sudden, everyone was

15 closing the Journal, right?

16             MR. WALTON:  Form.

17      A.    Again, I can't speak to...

18      Q.    As the department chair, that's your testimony?

19 You can't speak to that?

20      A.    That is my testimony as division chair.

21             MR. ALLEN:  I'm going to mark as

22 Exhibit 13 an email from Professor Frank Heidlberger to

23 you, Professor Brand.  And this is dated July 27th, 2020,

24 with UNT Bates mark 472.

25             THE WITNESS:  Um-hum.

BENJAMIN D. BRAND, Ph.D.        09/23/2024

```
1                      (Deposition Exhibit Number 13 marked.)
2                 MR. WALTON:  This is 12, you said?
3                 MR. ALLEN:  I believe it's 13.
4                 MR. WALTON:  Thank you.
5       Q.    Just let me know when you've had a chance to
6  look at it, Professor Brand.
7       A.    Okay.  I read the email.
8       Q.    Do you remember getting this document?
9       A.    I do recall receiving this email.
10      Q.    And here, Professor Heidlberger is talking
11  about recent Facebook posts, right?
12      A.    Yes.
13      Q.    And I know you testified earlier, you didn't
14  remember what social media this criticism began to flow
15  in.  But do you have any reason to doubt that Professor
16  Heidlberger is wrong, that Facebook was another source
17  of social media?
18      A.    I don't.
19      Q.    Did you discuss this with Professor
20  Heidlberger?
21      A.    I don't recall whether we discussed it or
22  not.
23      Q.    He talks about wanting to distance himself from
24  the Journal, right?
25      A.    He describes distancing ourselves.
```

BENJAMIN D. BROTT, Ph.D.    09/23/2024

```
1        Q.    In fact, he says, "We need to distance
2   ourselves from the Journal," right?
3        A.    Yeah.
4        Q.    What did you understand he meant by reference
5   to "we"?
6        A.    My understanding, I believe now that he was
7   referring to theory faculty and perhaps the entire MHTE
8   faculty.
9        Q.    And he's also, in that second to last sentence
10  of that paragraph, afraid that Philip Ewell will withdraw
11  his article from Theoria that was about to be published,
12  right?
13       A.    Correct.
14       Q.    Is it professional behavior for a scholar to
15  withdraw their article from one journal because someone
16  in another journal criticized them?
17       A.    That action does not strike me as
18  unprofessional.
19       Q.    So since there's a double negligent, please
20  allow me to try to rephrase that, and you tell me if I
21  get it right.
22             You think it is professional to cancel the
23  publication of a journal article in one journal just
24  because you were criticized in another journal?
25       A.    My recollection -- my understanding when I read
```

BENJAMIN D. BROAD, Ph.D.        09/23/2024

1  this originally was that the reasons behind Phil Ewell
2  withdrawing an article from Theoria wasn't simply because
3  he was being criticized in the JSS.  And I
4  don't think it, in any way, contravenes the norms of
5  professional ethics or professionalism to withdraw one
6  article in one journal because of concerns about another
7  journal.
8       Q.   Is it professional to cancel a visit to a
9  campus because a journal that's edited by one faculty
10  member at that campus published something that you
11  didn't like?
12       A.   It's -- absolutely.  It is within the bounds of
13  professionalism.
14       Q.   Just take your ball and go home, huh?
15            MR. WALTON:  Form.
16       A.   In my experience, people, scholars, will cancel
17  visits to campuses, and it's not perceived as --
18  I never perceived it necessarily as breaking the bounds
19  of professionalism.
20       Q.   Sure.  They'll cancel visits, but you've heard
21  often that scholars cancel visits to a university because
22  someone somewhere there has published something that
23  hurts their feelings?  They disagree with?
24            MR. WALTON:  Form.
25       Q.   That's normal in your profession?

```
 1        A.    Well, it seems to be within the bounds of
 2   professionalism to have canceled his visit to campus.
 3        Q.    Is that a reason to place the Journal of
 4   Schenkerian Studies under investigation?
 5        A.    The cancellation for the visit?
 6        Q.    Yes.
 7        A.    No.
 8        Q.    Is that a sign that the Journal of Schenkerian
 9   Studies is somehow racist?
10        A.    Again, it being the cancellation of the visit?
11        Q.    Yes.
12        A.    No.
13        Q.    Do you know of any special fragility that
14   Philip Ewell suffered from, that he could not confront
15   people who disagreed with him?
16        A.    No.
17        Q.    Do you know that he had told the Denton
18   Record Chronicle around this time that he felt, quote,
19   dehumanized by the Journal of Schenkerian Studies, or
20   that he would not participate in the Journal of
21   Schenkerian Studies because he would not participate
22   in his own dehumanization?  Were you aware of that?
23        A.    I do recall reading that quote.
24        Q.    Have you seen Philip Ewell since 2020?
25        A.    I've never met Philip Ewell.  To the best of my
```

BENJAMIN D. BROWN, Ph.D.        09/23/2024

1    recollection, I've never met him.

2         Q.   Do you know of any evidence that he suffered,

3    quote, dehumanization?

4         A.   I can't speak to that.

5         Q.   Oh, one more question about this.  There's a

6    statement from the division of Music History, Theory, and

7    Ethnomusicology of the University of North Texas that's

8    attached to this exhibit.  It is UNT 503, so it's not in

9    the series with UNT 472.  But I just wanted to ask you,

10   and I'll just represent to you as far as I can tell,

11   this was the -- this was the attachment that Professor

12   Heidlberger refers to in his email.  And I just want to

13   ask if you can confirm that.  If you can't, that's fine.

14   Just tell me.  But if you can, that would also be

15   helpful.

16        A.   I can't confirm that.

17        Q.   Okay.  Do you recall reading this draft,

18   strictly confidential statement?

19        A.   I recall opening the attachment.  I don't

20   recall what was in it.

21        Q.   And this attachment is labeled on the header,

22   Email Statement Draft and Ideas.

23             Right?

24        A.   Correct.

25             And of course, we know from the previous

BENJAMIN D. BROWN, Ph.D.    09/23/2024

1    exhibit, which was the title page of Theoria, that

2    Professor Ewell did not pull out of Volume 26 in 2020 of

3    Theoria, right?  That's Exhibit 3 we looked at earlier.

4         A.    Correct.

5         Q.    So I suppose Professor Heidlberger's worries

6    were not well founded?

7                   MR. WALTON:  Form.

8         A.    Which specific worries are you referring to?

9         Q.    Well, he says in his email, which is

10   Exhibit 13, that he's afraid that Phil will also

11   withdraw his article if the Theoria that was about to

12   be published, right?

13        A.    Correct.

14        Q.    As it turns out, that was not a well-founded

15   fear, was it?

16                   MR. WALTON:  Form.

17        A.    Fear may or may not have been well-founded, but

18   Phil did not pull out.

19        Q.    So it would seem that sometimes people can

20   overcome their disquiet that people disagree with them to

21   publish in journals that just happen to be edited at the

22   same academic institution where some other journal, I

23   guess, offended his subjective feelings.  That seems to

24   be the case here, doesn't it?

25        A.    Could you restate the question?

BENJAMIN D. BRAND, Ph.D.        09/23/2024

1          Q.    Sure.  Let me put it another way.  The sky

2    didn't fall on Frank Heidlberger, did it?

3                    MR. WALTON:  Form.

4          A.    I don't recall the sky falling on Frank

5    Heidlberger, no.

6                    MR. ALLEN:  I'm going to mark as

7    Exhibit 14 a two-paged email thread with the Bates stamp

8    UNT 480.  This is dated 7-28-2020, from you, Professor

9    Brand, to Professor Heidlberger.

10                   (Deposition Exhibit Number 14 marked.)

11         Q.    So this begins at the end as so many of them

12   do, email threads.  And it's an SMT announcement.  Do you

13   see that?

14         A.    Yes.

15         Q.    And I believe you were subscribed to this

16   as you testified earlier; is that correct?  The SMT

17   Listserv, or did I mess up on that?

18         A.    No, I was not subscribed to the SMT Listserv.

19         Q.    I'm sorry.  I'm probably thinking of Professor

20   Graf.  So you are not subscribed to SMT?

21         A.    No.

22         Q.    Okay.  Were you aware of this circular being

23   sent out on the SMT announce list by the executive board

24   of the Society for Music Theory?

25         A.    I don't recall being aware that -- before

BENJAMIN D. BROWN, Ph.D.    09/23/2024

1  Dr. Heidlberger emailed me.

2      Q.   And your response, after being forwarded

3  this -- forwarded this by Professor Heidlberger on

4  July 27th, is to suggest a meeting, right?

5      A.   Yes.

6      Q.   Did that meeting take place?

7      A.   I do recall the meeting having taken place.

8      Q.   And what did you discuss with Professor

9  Heidlberger?

10     A.   The main -- the one -- this thing that I

11  remember discussing with the dean and Dr. Heidlberger

12  at this meeting was whether it would be best for me to

13  step down as chair of the division.

14     Q.   Why did you contemplate stepping down as

15  chair of the division?

16     A.   The main reason that I provided was -- that

17  I gave Dr. Heidlberger and Dean Richmond was that, as

18  I recall, I said that I had not provided strong

19  leadership to the division and was not providing

20  strong leadership to the division.

21     Q.   And what caused you to think you had not

22  provided strong leadership to the division?

23     A.   As I recall, I was struck at the time by

24  how many people were in pain throughout the division,

25  particularly in the theory area, and I felt like I was

BENJAMIN D. BROOD, Ph.D.        09/23/2024

1  not able to help them.

2       Q.   Did you feel that my client, Timothy Jackson,

3  was in pain?

4       A.   I had not -- I don't recall having spoken to

5  Tim since our meeting on Sunday and this meeting that

6  we had with the dean, the following meeting that I had

7  proposed, so I couldn't speak to his state of mind

8  firsthand.  I do recall thinking that he, like everyone

9  else -- like everyone else in the theory area must be

10 going through a very difficult time.

11      Q.   Were you worried that Frank Heidlberger was

12 in pain?

13      A.   Yes.

14      Q.   What caused Frank Heidlberger's pain so far

15 as you understood?

16      A.   So far as I understood it, the social media,

17 the criticism on social media, and the feeling that I

18 perceived among my colleagues that they didn't know how

19 to react.

20      Q.   It seems that they did know how to react.

21 Right?  They all got together and wrote a statement

22 condemning Timothy Jackson, correct?  Did that cause

23 them pain?

24      A.   I can't -- I don't know.

25      Q.   Did you observe any of your colleagues

1  calling out sick at this time?

2       A.    I don't recall any request for sick leave.

3       Q.    Do you recall any of the participants in JSS,

4  Volume 12, such as Diego Cubero, Andrew Chung, Ellen

5  Bakulina, all of them faculty members at UNT who both

6  participated in the formulation of the call for papers

7  and then signed a petition condemning Timothy Jackson and

8  basically their own work, do you recall them feeling pain

9  about that?

10                 MR. WALTON:  Form.

11      A.    Could you repeat the question, please?

12                 MR. ALLEN:  Let me strike that question.

13 And I'll ask it again when we get to the faculty

14 petition.  Okay?

15                 Let me mark for purposes of the deposition

16 Exhibit Number 15.

17                 (Deposition Exhibit Number 15 marked.)

18      Q.    Exhibit 15 is an email from Peter Kohanski to

19 Dean Richmond, but also ccing you, Professor Brand?

20      A.    Correct.

21      Q.    And I'll just start by asking if you can

22 explain for the record who Peter Kohanski is?

23      A.    Peter Kohanski is a doctoral student in

24 musicology.

25      Q.    Can you -- I just didn't --

```
1        A.    A doctoral student in musicology.

2        Q.    Is he still at the University of North Texas?

3        A.    To the best of my knowledge.

4        Q.    And do you remember receiving this email?

5        A.    I do.

6        Q.    What did you understand was the purpose of this

7  email?

8        A.    I understood the purpose of the email to be

9  delivering the attached statement.

10       Q.    And if you go down to The JSS Moving Forward,

11  do you see that?

12       A.    Is this in the body of the email?

13       Q.    No, I'm sorry.  I'm looking at the statement

14  that's attached.  The email is very brief and it just

15  conveys the statement.  Is that a fair characterization?

16       A.    Yeah.

17       Q.    And if you want more time to look at the

18  so-called statement, please, I'm not trying to rush you

19  through this document.

20       A.    Yeah, I'd like a little bit of time.

21            MR. STOWERS:  Do you want to go off the

22  record, Dr. Brand?

23            MR. ALLEN:  We can go off the record.

24            THE VIDEOGRAPHER:  We're off the record at

25  5:35 p.m.
```

BENJAMIN D. BRAND, Ph.D.          09/23/2024

```
 1                     (Recess taken)
 2                     THE VIDEOGRAPHER:  We're back on the
 3    record at 5:41 p.m.
 4         Q.   For the record, Professor Brand, did you have a
 5    chance to examine Exhibit 15 during our intermission?
 6         A.   I did.  Thank you.
 7         Q.   So I was just going to ask you to look at the
 8    statement where it says JSS Moving Forward.  Do you see
 9    that section?
10         A.   Um-hum.  Yes, I do.
11         Q.   Did you understand by this, that the graduate
12    students of the MHTE, as a body, were calling for the
13    dissolve -- excuse me, the dissolution of the Journal of
14    Schenkerian Studies?
15                     MR. WALTON:  Form.
16         A.   I read this as a call from a cross-section of
17    graduate students within the division calling for the
18    dissolution of JSS.
19         Q.   How many graduate students are there in the
20    MHTE division?
21         A.   To the best of my recollection, there are
22    approximately 40.
23         Q.   Can you look at the bottom of the statement?
24    Approximately how many graduate students have signed on
25    to this statement?
```

BENJAMIN D. BRAND, Ph.D.        09/23/2024

1       A.    Twenty-seven.

2       Q.    So that's the vast majority of the MHTE

3  graduate students?

4             MR. WALTON:   Form.

5       A.    I would characterize that as the majority of

6  the MHTE graduate students.

7       Q.    You said there's about 40 students total?

8       A.    To the best of my recollection.

9       Q.    And that's 27 of them?

10      A.    I believe this is 27.

11      Q.    So that's almost 75 percent, correct?  Plus

12  or minus?

13      A.    Correct.

14      Q.    You don't think that's an overwhelming

15  majority?

16      A.    I wouldn't characterize it as an overwhelming

17  majority.

18      Q.    What do you characterize as an overwhelming

19  majority, Professor Brand?

20      A.    I don't generally characterize anything as

21  an overwhelming majority.  It's not a phrase that I use.

22      Q.    It also included Levi Walls, correct?

23      A.    It does.

24      Q.    So basically, his own graduate student and

25  the editor of the Journal turned against him, Timothy

 1  Jackson?

 2      A.    I believe he did sign a statement.

 3      Q.    And he also called for the dissolution of his

 4  own editorial work, correct, in the form of the Journal

 5  of Schenkerian Studies?

 6      A.    Yes.

 7      Q.    Do you see where it says, "calling for

 8  Dr. Jackson's dismissal"?

 9      A.    I do.

10      Q.    Does this help refresh your memory, that the

11  graduate students were calling for Dr. Jackson to be

12  fired?

13      A.    It does.

14      Q.    They also condemn him for "racist, sexist,

15  and abusive behavior."

16          Do you see that?

17      A.    I do.

18      Q.    Can you identify any behaviors of Timothy

19  Jackson that you know by your direct experience were

20  racist?

21      A.    I cannot identify any of Dr. Jackson's

22  actions or behavior that I know to be racist.

23      Q.    If I asked you the same question about sexist,

24  would your answer be the same?

25      A.    It would.

BENJAMIN D. BAXA, Ph.D.      09/23/2024

1      Q.   I just have one more question about this.
2  They also called for -- under Number 2 of The JSS Moving
3  Forward, they also called for a publicly condemn -- I'll
4  just put this, publicly condemning the issue and
5  releasing it freely online to the public.
6           Do you see that?
7      A.   I do.
8      Q.   Has the Volume 12 of the Journal of Schenkerian
9  Studies been released freely to the public online by the
10 UNT Press?
11     A.   I don't know.
12     Q.   Do you have any knowledge of why they wouldn't
13 release it online?
14     A.   I do recall a conversation with our contact
15 at UNT Press that involved the question of whether to
16 release it with the other volumes of the Journal.  And
17 as I -- as I recall, I asked him at that time not to
18 release it.  I don't recall when that conversation
19 occurred.
20     Q.   Is this Mr. Chrisman?  If I get his name wrong,
21 please correct me.
22     A.   I believe so.
23     Q.   And he's the director of the UNT Press?
24     A.   I believe so.
25     Q.   Just one last question about that.  Do you

1  remember with as much accuracy as you can the time frame

2  for that discussion?

3       A.    I believe it occurred in 2020.

4                 (Deposition Exhibit Number 16 marked.)

5                 MR. ALLEN:  I'm introducing for

6  the record as Exhibit 16 an email from Rebecca

7  Geoffroy-Schwinden to you, Professor Brand.  And the

8  date is July 30th, 2020, at 4:24 p.m.  And it's

9  UNT 417.

10      Q.    Professor Brand, I'm also going to ask you to

11  retrieve Exhibit 7, which is the November 25th Ad Hoc

12  Panel Report, which I'm sure you'll remember from our

13  earlier discussion.

14            And so my question for you is relatively

15  straightforward here.  The Exhibit 16, do you remember

16  getting this email from your colleague, Rebecca

17  Geoffroy-Schwinden?

18      A.    I don't remember getting this email.

19      Q.    You don't have any reason to believe that

20  that's an email you didn't receive, correct?

21      A.    No.

22      Q.    And it says, "Here is the statement."

23            Right?

24      A.    Correct.

25      Q.    Do you have any memory of receiving a statement

BENJAMIN D. BROOKS, Ph.D.        09/23/2024

1  from the MHTE faculty?

2      A.    I do remember reading the statement.  I don't

3  recall how I received it.

4      Q.    So you don't have any reason to believe that

5  this was the email that conveyed to you that statement

6  for the first time, do you?

7      A.    I don't know whether --

8      Q.    If you don't know, you don't know.  That's

9  fine.

10     A.    I don't know whether this is the way I

11  learned about it.

12     Q.    Okay.

13     A.    That I received it or not.

14     Q.    Like I said, that's fair enough.  All we

15  can ask you is what you know.

16           Now, if you look at the UNT November 25th

17  Ad Hoc Panel Report, I believe you'll see that it has

18  exhibits at the end as well.  And there is one that has

19  been published in the public sphere that is attached as

20  Exhibit 4.  Do you see that one, News from SEM?

21     A.    Yes.

22     Q.    And it says, "Statement of UNT Faculty on

23  Journal of Schenkerian Studies"?

24     A.    Yes.

25     Q.    Is that the faculty statement, to the best

1  of your knowledge, which was attached by Professor

2  Geoffroy-Schwinden?

3       A.    To the best of my knowledge, it is.

4       Q.    And I want to direct your attention to the

5  second paragraph where it says, "We endorse the call for

6  action outlined in our students' letter."

7             Do you see that?

8       A.    I do.

9       Q.    Now, do you know which student letter they're

10 referring to?

11      A.    My reading of that sentence, that it refers

12 to the graduate student statement that we were just

13 discussing.

14      Q.    And I'm not trying to trick you into something

15 here because I want you to also look at Exhibit 3.  And

16 I wanted to give you some time to read Exhibit 3 to the

17 Ad Hoc Panel Report carefully, and then I'll ask you some

18 questions about that.  And I'm just going to represent

19 to you that I think there's some differences between

20 Exhibit 3 and the other graduate student statement.  If

21 you want me to tell you what the exhibit was of the

22 graduate student statement --

23      A.    Are you saying the Exhibit 3?

24      Q.    No, sorry.  I'm being unclear, and I apologize.

25            So there's an Exhibit Number 3 to the Ad Hoc

BENJAMIN D. BROOD, Ph.D.        09/23/2024

1   Panel Report.

2        A.    Okay.

3        Q.    Can I call your attention to that?

4        A.    Yes.

5        Q.    And you see, that says, "I am sharing this

6   statement on behalf of a cross-section of graduate

7   students"?

8        A.    Yes.

9        Q.    So what I was asking was a bit unclear, and I

10  apologize for that.  I want you to examine this carefully

11  and compare it to the statement conveyed in Exhibit 15 by

12  Mr. Kohanski that we just examined.  Did I get the

13  exhibit correct?

14       A.    You want me to compare Exhibit 3 and

15  Exhibit 4?

16       Q.    Yes, because I have a question about which

17  graduate student statement they're referring to.

18       A.    Okay.

19       Q.    And it's Exhibit 15 is this one that Kohanski

20  sent to Dean Richmond, which you just testified you

21  received, right, and we went through that one.  Again,

22  I'm not trying to be critical or anything.  I'm just

23  trying to get this straight.

24             And then there's the faculty statement, which

25  incorporates a student statement.  And the students --

BENJAMIN D. BROWN, Ph.D.        09/23/2024

 1  there's another student statement attached to the Ad Hoc
 2  Panel Report.  Can you please, for the record, examine
 3  both of these student statements carefully?  And then I
 4  want to ask you which one is being incorporated in the
 5  faculty statement.  Does that make sense, to the best of
 6  your knowledge?
 7              MR. WALTON:  To clarify, Mr. Allen, are
 8  you talking about Exhibit 3 to the panel report?
 9              MR. ALLEN:  Yes.
10              MR. WALTON:  And then a separate document,
11  Exhibit 15 --
12              MR. ALLEN:  15.
13              MR. WALTON:  -- to this deposition in
14  general?
15              MR. ALLEN:  Correct.  And I apologize that
16  the numbers get confusing.  I'm not -- it's not my
17  intent, but...
18      A.   I've got it.  15.  Okay.
19      Q.   Have you been able to examine those?
20      A.   I briefly examined them.  I'll ask for more
21  time if I need it.
22      Q.   Sure.  So again, my -- I'm just going to
23  refer back to Exhibit Number 7, which is the Ad Hoc
24  Panel Report.  As we've discussed, the faculty statement,
25  which you received, correct?

1      A.    I believe that's the statement that was

2 attached in Rebecca Geoffroy-Schwinden's email, yes.

3      Q.    And this incorporates by reference and URL what

4 they call the student -- the students' letter.  And they

5 endorse the call to action, right?  And then they drop in

6 a URL that links to the students' statement, correct?

7      A.    That's my understanding of what this URL is.

8      Q.    And that brings me to our question.  Is that

9 link to the students' statement, to the best of your

10 knowledge as you remember at the time, the student

11 statement reproduced in the Ad Hoc Panel Report, which

12 was attached as Exhibit -- Ad Hoc Panel Exhibit Number 3,

13 or was that the exhibit that we examined as Exhibit 15 in

14 this deposition, which was conveyed by Peter Kohanski to

15 you and Dean Richmond, if you know?

16      A.    I don't.

17      Q.    Okay.  You can -- this has been trying, I know.

18 Those exhibits, we're done with, as well as with this

19 line of questioning.  Let me -- I just have a few more

20 questions, and then it may be that we will be done.

21      A.    Okay.

22      Q.    So let me know when you've been able to put

23 those aside.

24            So after the Ad Hoc Panel Report came out,

25 after the exhibit email in which you informed Timothy

1  Jackson that you would not support his continued

2  involvement in the Journal, it's my understanding that

3  there was some sort of committee formed to search for a

4  new editor for the Journal of Schenkerian Studies; is

5  that correct?

6        A.    As I recall, the College of Music did form

7  a search committee to search for a new editor.

8        Q.    And if I could just ask you to explain what you

9  know about that process?  Could you do that for the

10 record now, please?

11       A.    My recollection was that the dean charged me

12 with forming a committee and that the committee would be,

13 in turn, responsible for developing a description and a

14 public posting for the position.

15       Q.    And who did you place on that committee?

16       A.    I nominated -- and the dean, as I recall,

17 approved my nominations -- a colleague in choral

18 conducting to chair the committee.  Her first name

19 is Jessica.  I'm blanking on her last name.

20             Dr. Ellen Bakulina was on the committee.

21 Dr. John Ishiyama agreed to serve and was nominated.

22 I don't recall if anyone else was on the committee.

23       Q.    Did that committee identify a new editor for

24 the Journal of Schenkerian Studies?

25       A.    To my knowledge, it never -- it was not --

BENJAMIN D. BRAND, Ph.D.        09/23/2024

1  it never identified or recruited a new editor.

2        Q.    And do you know what, in particular, Defendant

3  Ellen Bakulina did as a member of that committee?

4        A.    To my knowledge, she served as a member of

5  the committee, providing input into the description and

6  helping publicize the job description when it was posted.

7        Q.    Do you know if that committee met on a regular

8  basis?

9        A.    My understanding was that they met regularly in

10  the run-up to the public posting of the position, but met

11  on an as-needed basis after the public posting.

12       Q.    Do you know if they're still meeting?

13       A.    I don't know.

14       Q.    And Ms. Bakulina has departed the University of

15  North Texas, correct?

16       A.    Correct.

17       Q.    And I think she's at a university in Canada

18  now; is that correct?

19       A.    To the best of my knowledge, yes.

20       Q.    Do you know when she left the university?

21       A.    My recollection is that she left in the

22  spring of 2022.

23       Q.    And this was because she got a new job?

24       A.    Correct.

25       Q.    And by that time, there had been no new

BENJAMIN D. BAND, Ph.D.        09/23/2024

 1  editor appointed to the Journal of Schenkerian Studies,

 2  correct?

 3       A.   Correct.

 4       Q.   And I believe you testified earlier that the

 5  Journal of Schenkerian Studies is now, as Dean Richmond

 6  said at our hearing on jurisdiction, finalized, correct?

 7       A.   I can't speak to the current state of things

 8  given that I'm no longer a member of that division or

 9  involved in the Journal of Schenkerian Studies.

10       Q.   When did you depart the College of Music?

11       A.   January 2023.

12       Q.   Why did you leave the College of Music?

13       A.   The primary reason for my departure was

14  my wife, with whom I had been in a long distance

15  relationship for seven years, had gotten a job at

16  Princeton University.  And we decided that we wanted to

17  move to New Jersey.  It was clear that I could not have

18  worked remotely from New Jersey and still be a faculty

19  member of the College of Music.  So I was given another

20  opportunity in the University where I could have and

21  do work remotely.

22       Q.   And you still maintain your position at the

23  University of North Texas in which you work in this

24  remote capacity?

25       A.   I still retain my position as Director of New

1  Ventures.  I'm no longer a faculty member.

2       Q.   I see.  You resigned your faculty position?

3       A.   I did.

4       Q.   And then you have an adjunct position at

5  Berklee Conservatory?

6       A.   At Berklee College of Music, yes.

7       Q.   Thank you.  I'm sorry.  And by the way,

8  congratulations to your wife.  That's an excellent job

9  obviously.

10           And so after this departure from the School of

11  Music, have you had anything further to do with issues

12  surrounding the Journal of Schenkerian Studies?

13      A.   My only engagement with that issue has been

14  a conversation with Associate Dean Warren Henry who had

15  asked me about some general background information about

16  how TA or TF assignments were made in MHTE during my time

17  as chair, and my understanding from that conversation

18  with him was that it was summary background for the case.

19      Q.   Is that the same kind of information we

20  reviewed today in those emails with the ad hoc panel

21  and their notes referring to a 0.5 FTE and so forth and

22  so on?

23      A.   No, we didn't discuss salary.

24      Q.   When was that conversation with -- did you say

25  the assistant dean?

BENJAMIN D. BRAND, Ph.D.        09/23/2024

1        A.    Associate dean for academic affairs.  That was

2  generally within the last month.

3              MR. ALLEN:  Okay.  Can we go off the

4  record, and you and I talk?

5              THE VIDEOGRAPHER:  We're off the record at

6  6:03 p.m.

7                    (Recess taken)

8              THE VIDEOGRAPHER:  We're back on the

9  record at 6:10 p.m.

10             MR. ALLEN:  So as discussed with Counsel

11  while we were off the record, we are going to pass the

12  witness.  However, I reserve the right to ask Professor

13  Brand questions in the future based on documents which

14  were recently disclosed, but we were unable to review,

15  solely concerning the issue of the convening of a

16  committee to hire a replacement editor for the Journal

17  of Schenkerian Studies.  Otherwise, Plaintiff has

18  concluded the deposition on other topics.

19             MR. WALTON:  On behalf of the Defendants,

20  at this time, we would object to a reopening of the

21  deposition based on documents previously provided.  And

22  right now, we will reserve further questions of this

23  witness for the time of trial.

24             MR. ALLEN:  And can we put on the record,

25  Videographer, the running time of this deposition at this

1  time?

2                    THE VIDEOGRAPHER:  I've got 3 hours and 54

3  minutes.

4                    MR. WALTON:  And then we will read and

5  sign.

6                    MR. ALLEN:  No further.

7                    THE VIDEOGRAPHER:  We're off the record at

8  6:11 p.m.

9

10                   (Proceedings concluded at 6:11 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENJAMIN D. BRAND, Ph.D.          09/23/2024

```
 1                 CHANGES AND SIGNATURE

 2   WITNESS:  BENJAMIN D. BRAND, Ph.D.

 3   DATE:  9-23-24

 4   PAGE/LINE          CHANGE              REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

*BENJAMIN D. BRAND, Ph.D.*      *09/23/2024*

1  _____

2  _____

3  _____

4

5       I, BENJAMIN D. BRAND, have read the foregoing

6  deposition and hereby affix my signature that same

7  is true and correct, except as noted above.

8

9                              _____
                               BENJAMIN D. BRAND
10
   THE STATE OF _____)
11 COUNTY OF _____)

12

13       Before me, _____, on this day

14 personally appeared BENJAMIN D. BRAND, known to me or

15 proved to me on the oath of _____ or

16 through _____ (description of

17 identity card or other document) to be the person whose

18 name is subscribed to the foregoing instrument and

19 acknowledged to me that he/she executed the same for

20 the purpose and consideration therein expressed.

21       Given under my hand and seal of office on this

22 _____ day of _____, _____.

23

24                              _____
                               NOTARY PUBLIC IN AND FOR
25                             THE STATE OF _____
                               My Commission Expires: _____

BENJAMIN D. BRAND, Ph.D.          09/23/2024

```
1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF
2                  SHERMAN DIVISION

3  TIMOTHY JACKSON,            )
                               )
4       Plaintiff,             )
                               )
5  vs.                         )  CASE NO. 4:21-CV-00033-ALM
                               )
6  LAURA WRIGHT, et al.,       )
                               )
7       Defendants.            )

8          _____

9            REPORTER'S CERTIFICATION OF

10      ORAL DEPOSITION OF BENJAMIN D. BRAND, Ph.D.

11              September 23, 2024

12         _____

13      I, KIM D. CARRELL, a Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16      That the witness, BENJAMIN D. BRAND, was duly

17  sworn and that the transcript of the oral deposition is

18  a true record of the testimony given by the witness;

19      That the deposition transcript was duly submitted

20  on October 21, 2024, to Mr. Benjamin Walton, the attorney

21  for the defendants, for examination, signature, and

22  return to me by November 22, 2024, (30 days);

23      That pursuant to the information given to the

24  deposition officer at the time said testimony was taken,

25  the following includes all partes of record and the
```

 1  amount of time used by each party at the time of the

 2  deposition;

 3       Michael Thad Allen - 03 HRS: 54 MIN
         Benjamin Walton -  00 HRS: 00 MIN
 4

 5  FOR THE PLAINTIFF:

 6       Mr. Michael Thad Allen
         ALLEN LAW, LLC
 7       P.O. Box 404
         Quaker Hill, CT 06375
 8       Telephone: 860.772.4738
         Fax: 860.469.2783
 9       E-mail: M.allen@allen-lawfirm.com

10

11  FOR THE DEFENDANTS:

12       Mr. Benjamin S. Walton
         Assistant Attorney General
13       General Litigation Division
         P.O. Box 12548, Capital Station
14       Austin, Texas 78711
         Telephone: 512.463.2120
15       Fax: 512.320.0667
         E-mail: Benjamin.Walton@oag.texas.gov
16           - and -

17       Mr. Renaldo Stowers
         University of North Texas System
18       Office of General Counsel
         801 North Texas Boulevard
19       Denton, Texas 76201
         Telephone: 940.565.2717
20       Fax: 940.369.7026
         E-mail: Renaldo.Stowers@untsystem.edu

21

22           I further certify that I am neither counsel for,

23  related to, nor employed by any of the parties or

24  attorneys in the action in which this proceeding was

25  taken, and further that I am not financially or

BENJAMIN D. BROWN, Ph.D.          09/23/2024

 1  otherwise interested in the outcome of the action.

 2       Certified to by me on this 21st day of October,

 3  2024.

 4

 5

 6                            _____
                             Kim D. Carrell, CSR NO. 1184
 7                           Date of Expiration: 7-31-26
                             JULIA WHALEY & ASSOCIATES, INC.
 8                           2012 Vista Crest Drive
                             Carrollton, Texas  75007-1640
 9                           214-668-5578/Fax 972-236-6666
                             JulieTXCSR@gmail.com
10                           Firm registration No. 436
                             Firm registration Expires 5-31-25
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENJAMIN D. BRAND, 3D.          09/23/2024          1

| # |
|---|
| **#308** [1] - 1:23 |

| $ |
|---|
| **$12,800** [3] - 90:13, 91:13, 91:20 |

| ' |
|---|
| **'19** [1] - 70:8 |
| **'20** [1] - 18:14 |
| **'protect** [1] - 61:13 |
| **'the** [1] - 76:18 |

| 0 |
|---|
| **0.5** [1] - 136:21 |
| **00** [2] - 142:3 |
| **000107** [1] - 4:25 |
| **000110)**.......... **122** [1] - 4:25 |
| **000157** [1] - 3:16 |
| **000162)**............ . [1] - 3:16 |
| **000233)**.......... [1] - 4:3 |
| **000234** [1] - 3:19 |
| **000236)**.......... [1] - 3:19 |
| **000240** [1] - 3:22 |
| **000244)**.......... [1] - 3:22 |
| **000272** [1] - 87:6 |
| **000272)**............ ...... [1] - 4:5 |
| **000304** [1] - 4:13 |
| **000309)**............ ..101 [1] - 4:13 |
| **000417)**............ ...........**127** [1] - 5:4 |
| **000458** [1] - 4:16 |
| **000463)**............ ..107 [1] - 4:16 |
| **000472** [1] - 4:19 |
| **000480** [1] - 4:22 |
| **000481)**............ ...118 [1] - 4:22 |
| **000503)**............ ...112 [1] - 4:19 |
| **002539** [1] - 4:10 |
| **002546)**............ . [1] - 4:10 |

| 1 |
|---|
| **002645** [1] - 3:25 |
| **002782)**.......... [1] - 3:25 |
| **0240** [1] - 69:20 |
| **02645** [1] - 78:16 |
| **03** [1] - 142:3 |
| **0304** [1] - 100:24 |
| **0453** [1] - 107:14 |
| **0459** [1] - 107:1 |
| **06375** [2] - 2:6, 142:7 |

| 1 |
|---|
| **1** [6] - 3:13, 7:25, 8:2, 74:15, 74:22, 74:25 |
| **10** [5] - 4:8, 93:4, 93:6, 93:9, 93:18 |
| **10:09** [1] - 56:6 |
| **10:17** [1] - 103:9 |
| **10:40** [1] - 70:14 |
| **11** [6] - 4:11, 100:21, 100:25, 104:12, 107:5, 107:9 |
| **11-17-19** [1] - 3:20 |
| **112** [1] - 49:15 |
| **1184** [1] - 143:6 |
| **11:00** [1] - 108:10 |
| **11th** [2] - 87:3, 87:13 |
| **12** [25] - 4:14, 24:8, 24:9, 24:19, 26:1, 28:23, 29:20, 41:3, 41:8, 44:22, 48:20, 53:25, 54:1, 62:24, 82:10, 97:5, 103:18, 103:20, 106:20, 106:23, 107:13, 109:4, 112:2, 121:4, 126:8 |
| **12-11-20** [1] - 4:4 |
| **12548** [2] - 2:12, 142:13 |
| **12th** [1] - 95:12 |
| **13** [6] - 4:17, 67:24, 111:22, 112:1, 112:3, 117:10 |
| **13th** [1] - 79:10 |
| **14** [3] - 4:20, 118:7, 118:10 |
| **15** [11] - 4:23, |

| 2 |
|---|
| 121:16, 121:17, 121:18, 123:5, 130:11, 130:19, 131:11, 131:12, 131:18, 132:13 |
| **15th** [1] - 70:14 |
| **16** [4] - 5:1, 127:4, 127:6, 127:15 |
| **16th** [1] - 72:4 |
| **17th** [1] - 73:25 |
| **1999** [1] - 12:10 |
| **1:00** [1] - 10:19 |
| **1:14** [2] - 1:19, 7:4 |

| 2 |
|---|
| **2** [9] - 3:3, 3:14, 36:22, 36:23, 37:10, 75:18, 76:13, 76:17, 126:2 |
| **2.1400** [2] - 38:20, 39:5 |
| **20** [1] - 6:17 |
| **2006** [6] - 12:11, 12:17, 12:25, 13:4, 13:6, 15:23 |
| **2012** [4] - 16:11, 16:17, 17:10, 143:8 |
| **2013** [1] - 17:19 |
| **2015** [2] - 94:17, 94:18 |
| **2016** [1] - 17:21 |
| **2018** [1] - 18:13 |
| **2019** [13] - 18:14, 33:15, 50:18, 50:22, 50:24, 53:18, 53:22, 70:14, 73:25, 95:12, 95:18, 95:23, 97:19 |
| **2020** [55] - 16:23, 23:9, 23:10, 23:13, 24:11, 24:21, 27:8, 27:16, 31:1, 32:6, 32:17, 36:19, 37:14, 37:16, 40:15, 40:19, 40:20, 41:25, 42:1, 48:22, 51:11, 53:14, 54:2, 54:6, 56:6, 56:11, 58:18, 58:23, |

| 2 (cont.) |
|---|
| 58:24, 60:23, 61:20, 62:17, 70:7, 79:13, 79:16, 80:14, 80:19, 81:13, 82:21, 83:7, 87:3, 87:13, 100:23, 101:11, 102:11, 102:22, 103:7, 103:24, 106:4, 106:21, 111:23, 115:24, 117:2, 127:3, 127:8 |
| **2022** [1] - 134:22 |
| **2023** [2] - 23:8, 135:11 |
| **2024** [10] - 1:12, 1:18, 6:3, 7:3, 15:20, 21:18, 141:11, 141:20, 141:22, 143:3 |
| **21** [1] - 141:20 |
| **214-598-5229** [1] - 2:24 |
| **214-668-5578/ Fax** [1] - 143:9 |
| **216** [1] - 84:9 |
| **21st** [1] - 143:2 |
| **22** [1] - 141:22 |
| **23** [3] - 1:12, 6:3, 141:11 |
| **234** [1] - 56:5 |
| **23rd** [2] - 1:18, 7:3 |
| **24** [1] - 87:23 |
| **25** [1] - 91:10 |
| **2539** [1] - 93:8 |
| **25th** [5] - 83:7, 100:18, 101:10, 127:11, 128:16 |
| **26** [3] - 47:22, 47:25, 117:2 |
| **26..** [1] - 3:17 |
| **26th** [8] - 100:23, 102:11, 102:22, 103:7, 103:9, 103:24, 106:4, 106:21 |
| **27** [6] - 56:6, 58:24, 80:19, 81:13, 124:9, 124:10 |
| **2757** [1] - 79:4 |
| **2758** [1] - 79:2 |
| **27th** [4] - 55:25, 64:18, 111:23, 119:4 |
| **299** [1] - 73:23 |
| **2:03** [1] - 37:5 |
| **2:16** [1] - 37:8 |

| (unlabeled) |
|---|
| **2:55** [1] - 73:25 |

| 3 |
|---|
| **3** [17] - 3:17, 37:25, 47:19, 47:21, 52:23, 77:2, 88:18, 117:3, 129:15, 129:16, 129:20, 129:23, 129:25, 130:14, 131:8, 132:12, 138:2 |
| **3.1001** [2] - 38:22, 39:7 |
| **30** [3] - 6:18, 16:3, 141:22 |
| **301** [3] - 71:9, 72:1, 72:2 |
| **303** [1] - 70:13 |
| **305** [2] - 103:7, 107:10 |
| **306** [1] - 102:9 |
| **309** [1] - 101:2 |
| **30th** [1] - 127:8 |
| **37** [1] - 3:16 |
| **3:14** [1] - 69:13 |
| **3:35** [1] - 69:16 |

| 4 |
|---|
| **4** [8] - 3:18, 56:4, 56:7, 78:9, 78:14, 81:2, 128:20, 130:15 |
| **4/4** [2] - 98:8, 98:10 |
| **40** [3] - 15:5, 123:22, 124:7 |
| **40%** [1] - 15:5 |
| **404** [2] - 2:6, 142:7 |
| **417** [1] - 127:9 |
| **436** [1] - 143:10 |
| **458** [1] - 106:22 |
| **47** [1] - 3:17 |
| **472** [2] - 111:24, 116:9 |
| **48** [1] - 87:24 |
| **480** [1] - 118:8 |
| **4:00** [3] - 103:15, 103:23, 108:21 |
| **4:05** [2] - 85:16, 85:19 |
| **4:21-CV-00033-ALM** [3] - 1:5, 6:4, 141:5 |
| **4:24** [1] - 127:8 |

| (unlabeled) |
|---|
| **4:33** [1] - 100:10 |
| **4:47** [1] - 100:13 |

| 5 |
|---|
| **5** [4] - 3:20, 69:17, 69:19, 93:1 |
| **5-31-25** [1] - 143:10 |
| **50** [1] - 91:11 |
| **50%** [10] - 90:12, 90:20, 90:21, 91:4, 92:4, 92:5, 92:8, 94:2, 94:10, 96:1 |
| **503** [1] - 116:8 |
| **512.320.0667** [2] - 2:14, 142:15 |
| **512.463.2120** [2] - 2:13, 142:14 |
| **54** [2] - 138:2, 142:3 |
| **55** [1] - 49:7 |
| **56** [1] - 3:19 |
| **5:35** [1] - 122:25 |
| **5:41** [1] - 123:3 |

| 6 |
|---|
| **6** [6] - 3:4, 3:23, 77:21, 78:6, 78:7, 78:15 |
| **6.035** [1] - 38:4 |
| **61** [1] - 49:12 |
| **6:03** [1] - 137:6 |
| **6:10** [1] - 137:9 |
| **6:11** [3] - 1:19, 138:8, 138:10 |

| 7 |
|---|
| **7** [8] - 3:7, 3:13, 4:1, 84:6, 84:7, 88:11, 127:11, 131:23 |
| **7-25-20** [2] - 4:11, 4:14 |
| **7-27-20** [1] - 4:18 |
| **7-28-2020** [1] - 118:8 |
| **7-31-20** [1] - 3:14 |
| **7-31-26** [1] - 143:7 |
| **70** [1] - 3:22 |
| **75** [1] - 124:11 |

**75007-1640** [1] - 143:8
**76201** [2] - 2:18, 142:19
**78** [1] - 3:25
**78711** [2] - 2:13, 142:14

## 8

**8** [3] - 4:4, 87:1, 87:5
**801** [3] - 1:22, 2:17, 142:18
**84** [1] - 4:3
**85** [1] - 49:15
**860.469.2783** [2] - 2:7, 142:8
**860.772.4738** [2] - 2:7, 142:8
**87** [1] - 4:5
**8:52** [1] - 102:12

## 9

**9** [3] - 4:6, 89:14, 89:15
**9-16-20** [1] - 4:6
**9-23-24** [1] - 139:3
**90** [1] - 4:7
**900** [1] - 110:17
**93** [1] - 4:10
**940.369.7026** [2] - 2:19, 142:20
**940.565.2717** [2] - 2:18, 142:19
**972-236-6666** [1] - 143:9

## A

**a.m** [3] - 70:14, 102:12, 103:9
**abbreviated** [1] - 17:25
**abide** [1] - 38:13
**ability** [2] - 8:16, 8:21
**able** [4] - 41:15, 120:1, 131:19, 132:22
**above-styled** [1] - 1:17
**absolutely** [1] - 114:12
**Absolutely** [2] - 37:2, 48:15

**abusive** [1] - 125:15
**academia** [2] - 35:15, 67:16
**academic** [7] - 12:7, 15:13, 77:11, 95:2, 98:12, 117:22, 137:1
**Academic** [5] - 38:6, 40:25, 41:3, 41:5
**academics** [1] - 110:17
**academy** [1] - 67:3
**according** [5] - 65:1, 65:5, 66:1, 88:2, 88:7
**accreditation** [1] - 95:1
**accuracy** [2] - 60:11, 127:1
**accurate** [9] - 8:4, 60:10, 91:9, 93:18, 94:6, 95:8, 97:20, 105:12, 111:10
**accusations** [1] - 41:6
**accuse** [1] - 15:8
**accused** [1] - 51:17
**accusing** [1] - 62:23
**achievements** [1] - 12:7
**acknowledge** [2] - 65:25, 89:19
**acknowledged** [1] - 140:19
**acronym** [1] - 18:3
**action** [13] - 39:12, 39:15, 39:20, 39:22, 39:25, 40:21, 106:3, 106:5, 113:17, 129:6, 132:5, 142:24, 143:1
**actions** [1] - 125:22
**ad** [5] - 78:20, 79:19, 89:17, 93:13, 136:20
**Ad** [15] - 4:1, 4:6, 83:7, 83:25, 84:6, 88:10, 127:11, 128:17,

129:17, 129:25, 131:1, 131:23, 132:11, 132:12, 132:24
**addition** [6] - 10:12, 11:1, 11:18, 11:23, 48:8, 99:3
**additional** [4] - 105:1, 105:5, 106:17, 106:21
**address** [6] - 33:20, 33:24, 33:25, 34:2, 34:5, 35:18
**addressed** [1] - 99:6
**addresses** [1] - 81:14
**adjunct** [2] - 22:1, 136:4
**administration** [2] - 17:15, 31:3
**administrative** [1] - 17:4
**administrators** [1] - 93:13
**admits** [1] - 71:17
**advice** [1] - 11:11
**advisor** [1] - 68:19
**affairs** [1] - 137:1
**affix** [1] - 140:6
**afraid** [2] - 113:10, 117:10
**age** [1] - 16:3
**agree** [4] - 35:11, 42:25, 63:22, 98:11
**agreed** [5] - 61:15, 65:11, 65:15, 71:7, 133:21
**Agreement** [1] - 6:7
**agrees** [2] - 71:6, 74:11
**aims** [1] - 76:19
**al** [5] - 1:6, 3:15, 4:12, 4:15, 141:6
**alarm** [1] - 101:20
**Alexandra** [1] - 10:11
**alienate** [1] - 67:11
**allegedly** [1] -

90:14
**alleging** [1] - 84:23
**Allen** [7] - 2:5, 3:14, 7:9, 100:6, 131:7, 142:3, 142:6
**ALLEN** [39] - 2:5, 7:9, 7:19, 36:21, 37:1, 47:20, 48:6, 48:15, 51:23, 56:3, 69:10, 77:19, 78:3, 78:5, 78:11, 84:5, 85:10, 85:13, 86:24, 92:24, 93:5, 100:4, 100:8, 100:14, 106:19, 111:21, 112:3, 118:6, 121:12, 122:23, 127:5, 131:9, 131:12, 131:15, 137:3, 137:10, 137:24, 138:6, 142:6
**Allen.......** [1] - 3:7
**allow** [2] - 56:8, 113:20
**almost** [3] - 109:19, 109:23, 124:11
**ALSO** [1] - 2:21
**ambivalent** [1] - 70:24
**amount** [2] - 91:15, 142:1
**analysis** [5] - 61:14, 61:22, 63:16, 70:25, 75:19
**Analysis** [1] - 75:18
**analytical** [3] - 74:16, 75:2, 75:15
**AND** [2] - 139:1, 140:24
**Andrew** [10] - 25:24, 25:25, 27:9, 27:16, 101:7, 101:11, 101:23, 102:25, 103:20, 121:4
**announce** [1] - 118:23
**announcement** [1] - 118:12

**annual** [4] - 21:6, 33:14, 99:23, 109:18
**anonymity** [1] - 110:24
**anonymous** [2] - 109:3, 109:10
**anonymously** [3] - 110:1, 111:3, 111:7
**answer** [11] - 8:16, 9:4, 14:11, 36:10, 50:15, 50:25, 51:5, 58:7, 93:12, 110:7, 125:24
**anti** [6] - 80:2, 81:22, 82:1, 82:3, 82:13, 84:13
**anti-Ewell** [3] - 81:22, 82:1, 84:13
**anti-Schenkerian** [2] - 80:2, 82:3
**anti-sympathetic** [1] - 82:13
**anticipated** [1] - 111:5
**apologize** [8] - 51:25, 52:1, 65:23, 101:14, 105:19, 129:24, 130:10, 131:15
**apologized** [2] - 56:1, 80:23
**apology** [3] - 64:17, 65:7, 70:7
**apparent** [1] - 52:19
**appealing** [1] - 80:10
**appear** [5] - 62:10, 62:19, 63:19, 64:3, 65:5
**appearances** [1] - 7:7
**APPEARANCES** [1] - 2:2
**Appearances...**
**.........................**
**.....** [1] - 3:3
**appeared** [3] - 8:4, 51:10, 140:14
**appointed** [2] - 51:13, 135:1
**appointment** [1] - 97:21

**appropriate** [2] - 82:15, 91:14
**appropriation** [2] - 62:11, 62:16
**approved** [1] - 133:17
**arbitration** [1] - 6:24
**area** [7] - 19:25, 20:14, 20:15, 28:12, 46:19, 119:25, 120:9
**areas** [1] - 19:19
**arguing** [1] - 64:22
**arising** [1] - 23:12
**arose** [1] - 40:14
**arrangement** [1] - 92:6
**article** [29] - 20:23, 21:2, 21:5, 36:6, 42:16, 42:23, 43:6, 43:13, 43:15, 43:24, 45:16, 46:1, 46:2, 48:23, 49:6, 49:11, 49:14, 49:17, 51:16, 63:18, 64:20, 64:24, 109:3, 113:11, 113:15, 113:23, 114:2, 114:6, 117:11
**articles** [31] - 13:14, 13:17, 14:7, 14:14, 14:16, 14:19, 14:21, 14:22, 14:25, 15:3, 15:6, 15:9, 20:25, 23:25, 24:2, 29:19, 43:18, 46:20, 47:17, 49:1, 49:21, 50:3, 52:25, 54:12, 54:22, 64:20, 81:14, 96:17, 96:24, 98:19, 99:18
**Arts** [1] - 12:14
**as-needed** [1] - 134:11
**ascribes** [1] - 63:16
**aside** [1] - 132:23
**assessment** [1] - 111:11

**assigned** [1] - 90:13
**assignments** [1] - 136:16
**assistant** [8] - 13:5, 15:24, 89:11, 90:15, 91:1, 91:25, 96:9, 136:25
**Assistant** [3] - 2:11, 13:8, 142:12
**Associate** [3] - 34:22, 136:14, 137:1
**associate** [7] - 16:7, 16:9, 17:9, 17:11, 17:12, 17:20
**associated** [2] - 23:6, 32:19
**ASSOCIATES** [1] - 143:7
**assume** [2] - 9:6, 17:16
**assumed** [2] - 17:14, 17:17
**Assuming** [1] - 105:8
**assuming** [1] - 110:22
**attached** [9] - 1:25, 116:8, 122:9, 122:14, 128:19, 129:1, 131:1, 132:2, 132:12
**attachment** [3] - 116:11, 116:19, 116:21
**attack** [5] - 46:12, 59:12, 59:22, 59:24, 67:15
**attacked** [2] - 59:3, 59:9
**attacks** [2] - 40:22, 41:17
**attained** [1] - 17:12
**attend** [2] - 33:14, 33:25
**attended** [4] - 33:19, 33:21, 72:16, 72:23
**attending** [1] - 33:17, 104:8
**attention** [12] - 26:4, 27:12, 27:16, 36:15,

45:10, 54:7, 78:23, 81:24, 106:25, 110:8, 129:4, 130:3
**attitude** [1] - 61:21
**attorney** [11] - 6:12, 6:13, 7:14, 9:14, 9:19, 9:24, 10:1, 10:3, 10:4, 10:7, 141:20
**Attorney** [2] - 2:11, 142:12
**attorneys** [2] - 7:6, 142:24
**attributed** [1] - 83:16
**Austin** [2] - 2:13, 142:14
**author** [2] - 62:8, 111:3
**authority** [3] - 44:11, 44:16, 45:12
**authors** [7] - 55:19, 55:23, 81:8, 81:9, 84:25, 86:18, 86:22
**available** [1] - 48:9
**avoid** [1] - 72:8
**aware** [27] - 25:18, 30:1, 30:5, 35:19, 39:20, 40:7, 40:21, 41:7, 48:17, 49:20, 49:22, 49:23, 49:25, 50:4, 56:16, 69:4, 69:7, 82:10, 83:3, 83:7, 83:9, 102:20, 110:8, 110:13, 115:22, 118:22, 118:25

## B

**Bachelor** [1] - 12:14
**bachelor's** [1] - 12:9
**background** [4] - 12:1, 94:5, 136:15, 136:18
**badgering** [1] - 85:21
**Bakulina** [9] - 48:23, 49:1, 49:6, 49:14, 52:25,

121:5, 133:20, 134:3, 134:14
**ball** [1] - 114:14
**baseball** [1] - 48:18
**based** [7] - 9:18, 88:9, 89:17, 94:24, 96:10, 137:13, 137:21
**basic** [2] - 19:12, 98:21
**basis** [2] - 134:8, 134:11
**Bates** [15] - 48:5, 48:17, 56:5, 69:19, 78:2, 78:16, 84:8, 87:6, 89:25, 93:1, 93:8, 100:24, 106:22, 111:24, 118:7
**bathroom** [1] - 100:7
**BE** [1] - 6:6
**bear** [1] - 101:4
**Beaudoin** [1] - 80:1
**became** [4] - 13:5, 16:9, 23:22, 25:12
**become** [1] - 25:18
**began** [5] - 15:23, 23:8, 95:20, 95:21, 112:14
**begin** [1] - 30:23
**beginning** [2] - 70:4, 100:15
**Beginning** [2] - 4:11, 4:14
**begins** [9] - 39:2, 53:17, 60:2, 61:6, 61:7, 61:9, 73:23, 100:22, 118:11
**behalf** [3] - 39:4, 130:6, 137:19
**behavior** [3] - 113:14, 125:15, 125:22
**behaviors** [1] - 125:18
**behind** [2] - 80:17, 114:1
**believes** [2] - 74:17, 75:2
**below** [1] - 38:18
**Ben** [2] - 7:11, 105:24

**Benjamin** [12] - 2:11, 6:12, 7:5, 7:22, 78:9, 97:8, 97:10, 102:19, 105:20, 141:20, 142:3, 142:12
**BENJAMIN** [11] - 1:11, 1:15, 3:6, 6:2, 7:16, 139:2, 140:5, 140:9, 140:14, 141:10, 141:16
**Benjamin. Walton@oag. texas.gov** [2] - 2:14, 142:15
**Berklee** [9] - 15:17, 15:18, 21:9, 21:11, 21:17, 21:25, 22:7, 136:5, 136:6
**best** [34] - 15:2, 16:11, 17:18, 24:6, 25:23, 26:7, 27:24, 28:5, 32:23, 33:22, 41:1, 43:5, 43:8, 45:13, 46:2, 60:25, 91:20, 91:22, 93:18, 94:7, 94:9, 94:11, 97:18, 106:5, 115:25, 119:12, 122:3, 123:21, 124:8, 128:25, 129:3, 131:5, 132:9, 134:19
**better** [6] - 62:11, 62:19, 63:20, 64:3, 65:5, 100:20
**between** [5] - 14:21, 70:8, 70:20, 77:6, 129:19
**big** [1] - 69:20
**bit** [6] - 53:16, 89:9, 92:18, 94:5, 122:20, 130:9
**black** [2] - 90:1
**blanking** [2] - 57:10, 133:19
**Board** [1] - 4:20
**board** [7] - 37:17, 37:20, 40:2, 40:8, 40:9, 40:18, 118:23
**body** [3] - 73:14, 122:12, 123:12

**bombarded** [1] - 44:19
**Boston** [1] - 21:13
**bottom** [5] - 60:3, 90:1, 98:15, 107:10, 123:23
**Boulevard** [3] - 1:23, 2:17, 142:18
**bounds** [3] - 114:12, 114:18, 115:1
**Box** [4] - 2:6, 2:12, 142:7, 142:13
**Brand** [35] - 4:4, 4:18, 5:3, 7:5, 7:20, 7:22, 14:9, 37:9, 48:18, 52:1, 65:3, 69:18, 78:15, 85:23, 86:24, 87:2, 87:7, 89:21, 90:13, 90:14, 93:7, 100:14, 101:3, 102:19, 106:24, 111:23, 112:6, 118:9, 121:19, 122:22, 123:4, 124:19, 127:7, 127:10, 137:13
**BRAND** [11] - 1:11, 1:15, 3:6, 6:2, 7:16, 139:2, 140:5, 140:9, 140:14, 141:10, 141:16
**break** [5] - 2:9, 36:25, 37:1, 69:9, 100:7
**breaking** [1] - 114:18
**brief** [1] - 122:14
**briefcase** [1] - 51:25
**briefly** [4] - 12:2, 13:14, 35:25, 131:20
**bring** [2] - 27:11, 110:8
**bringing** [1] - 81:24
**brings** [2] - 93:4, 132:8
**broader** [1] - 98:4
**brought** [3] - 26:4, 27:15, 63:3
**bullet** [3] -

88:18, 96:16, 98:15
**but..** [1] - 131:17
**BY** [1] - 7:19

## C

**Cadwallader** [1] - 80:6
**campus** [3] - 114:9, 114:10, 115:2
**campuses** [1] - 114:17
**Canada** [1] - 134:17
**cancel** [5] - 113:22, 114:8, 114:16, 114:20, 114:21
**canceled** [2] - 32:8, 115:2
**cancellation** [2] - 115:5, 115:10
**cannot** [4] - 74:16, 75:1, 75:14, 125:21
**capable** [1] - 77:14
**capacity** [2] - 30:10, 135:24
**Capital** [2] - 2:12, 142:13
**car** [3] - 83:17, 83:23, 84:18
**card** [1] - 140:17
**career** [9] - 11:25, 12:2, 13:3, 15:11, 15:14, 16:6, 16:18, 31:11, 60:19
**carefully** [11] - 83:10, 83:12, 83:15, 88:21, 89:1, 89:2, 105:23, 108:13, 129:17, 130:10, 131:3
**CARRELL** [1] - 141:13
**Carrell** [2] - 1:19, 143:6
**Carrollton** [1] - 143:8
**carry** [1] - 19:24
**CASE** [2] - 1:5, 141:5
**case** [9] - 31:25, 34:16, 40:10,

BENJAMIN D. BRANDT, Ph.D.        09/23/2024        4

40:14, 40:20,
48:13, 65:9,
117:24, 136:18
**CAUSE** [1] - 6:4
**caused** [3] -
70:24, 119:21,
120:14
**cc** [1] - 93:7
**ccing** [1] -
121:19
**censor** [11] -
63:6, 64:14,
64:19, 81:9,
82:19, 83:1,
84:19, 85:2, 85:5,
86:6, 86:13
**censorship** [1] -
83:18
**center** [2] - 23:4,
90:10
**Center** [10] -
32:12, 32:15,
90:14, 98:24,
99:7, 99:9, 99:14,
99:16, 100:1
**centered** [2] -
23:19, 74:17
**centering** [1] -
81:16
**central** [2] -
74:17, 75:3
**certain** [2] -
42:16, 75:19
**Certainly** [1] -
103:3
**certainly** [5] -
43:19, 62:21,
62:22, 69:5,
102:1
**CERTIFICATIO
N** [1] - 141:9
**Certified** [3] -
1:20, 141:13,
143:2
**certify** [2] -
141:14, 142:22
**chain** [3] -
69:19, 100:22,
103:2
**chair** [28] -
17:22, 18:12,
18:19, 20:8,
23:10, 30:8, 30:9,
30:19, 37:17,
37:20, 39:19,
40:6, 56:23, 57:6,
58:3, 58:5, 60:17,
65:19, 65:20,
65:21, 73:16,
91:8, 111:18,

111:20, 119:13,
119:15, 133:18,
136:17
**chair's** [1] - 57:8
**chance** [3] -
93:14, 112:5,
123:5
**change** [2] -
89:3, 89:6
**CHANGE** [1] -
139:4
**changed** [1] -
58:25
**CHANGES** [1] -
139:1
**characterizatio
n** [4] - 35:11, 61:4,
80:24, 122:15
**characterize** [9]
- 59:10, 59:13,
82:3, 89:11,
94:20, 124:5,
124:16, 124:18,
124:20
**characterized**
[3] - 43:17, 81:6,
81:12
**characterizes**
[1] - 95:7
**characterizing**
[2] - 54:24, 81:15
**charged** [1] -
133:11
**check** [1] - 70:17
**cherrypick** [1] -
62:10
**Cherrypicking**
[2] - 65:2, 65:4
**cherrypicking**
[6] - 62:18, 63:19,
63:23, 64:2, 64:8,
65:1
**Chicago** [2] -
12:10, 12:13
**chief** [1] - 98:5
**choral** [1] -
133:17
**Chrisman** [1] -
126:20
**Christopher** [2]
- 49:17, 52:25
**Chronicle** [1] -
115:18
**Chung** [9] -
4:11, 4:15, 25:24,
25:25, 27:9,
27:16, 101:7,
101:11, 121:4
**circular** [1] -
118:22

**circulate** [1] -
25:13
**circulated** [1] -
25:15
**circulating** [1] -
110:10
**circumstances**
[1] - 58:24
**citation** [4] -
42:22, 44:1, 44:8,
52:12
**cited** [5] - 43:6,
44:13, 45:1,
45:17, 52:4
**citing** [1] - 46:2
**City** [2] - 29:11,
29:13
**civil** [2] - 67:11,
67:12
**Civil** [2] - 1:24,
6:9
**claim** [2] - 45:13,
75:22
**claimed** [1] -
45:16
**claiming** [3] -
45:21, 63:2, 63:9
**claims** [1] -
64:18
**clarification** [4] -
9:2, 9:6, 28:20,
68:11
**clarify** [3] -
87:14, 89:13,
131:7
**clarifying** [1] -
104:23
**clarity** [2] - 5:9,
93:3
**Clark** [1] - 79:25
**classes** [1] -
21:19
**clear** [8] - 9:7,
31:15, 31:18,
40:16, 52:16,
53:1, 92:24,
135:17
**clearly** [1] -
42:21
**client** [5] - 9:13,
25:3, 70:9, 71:10,
120:2
**climate** [2] -
109:16, 110:7
**clock** [1] - 133:6
**close** [1] - 43:25
**closed** [5] -
32:9, 32:13,
59:11, 59:15,
67:14

**closing** [1] -
111:15
**codification** [1]
- 96:13
**codified** [2] -
95:24, 96:10
**coercing** [1] -
83:25
**coercion** [1] -
84:3
**colleague** [8] -
31:13, 56:20,
56:24, 57:2, 73:4,
73:12, 127:16,
133:17
**colleagues** [6] -
72:20, 73:6,
73:13, 73:18,
120:18, 120:25
**Colleagues** [2] -
100:22, 107:6
**collection** [1] -
78:25
**College** [18] -
15:17, 15:18,
17:20, 18:22,
19:8, 19:12,
19:15, 19:16,
20:9, 20:19,
21:11, 21:17,
29:12, 133:6,
135:10, 135:12,
135:19, 136:6
**colleges** [1] -
29:13
**comfortable** [1]
- 77:17
**coming** [2] -
66:4, 97:12
**commentary** [1]
- 73:5
**commenter** [2] -
77:5, 77:9
**comments** [6] -
34:23, 62:5, 62:8,
72:11, 73:4,
73:11
**Commission** [1]
- 140:25
**Committee** [1] -
3:23
**committee** [15] -
89:17, 90:9,
133:3, 133:7,
133:12, 133:15,
133:18, 133:20,
133:22, 133:23,
134:3, 134:5,
134:7, 137:16
**Committee......**

[1] - 4:7
**communicatio
n** [1] - 101:24
**communicatio
ns** [1] - 9:14
**comparable** [2] -
92:1, 92:9
**compare** [2] -
130:11, 130:14
**compensated**
[1] - 91:1
**compensation**
[6] - 89:9, 90:22,
91:9, 91:12,
91:17, 93:19
**complain** [1] -
58:20
**complained** [1] -
88:13
**completely** [2] -
77:3, 77:8
**computerized**
[1] - 1:21
**con** [1] - 82:12
**conception** [2] -
53:25, 103:19
**concern** [6] -
30:4, 54:19,
54:20, 54:22,
55:4, 98:5
**concerned** [6] -
40:22, 54:12,
55:10, 55:13,
55:15, 55:20
**concerning** [3] -
40:20, 79:25,
137:15
**concerns** [4] -
54:21, 84:17,
101:17, 114:6
**concluded** [2] -
137:18, 138:10
**condemn** [2] -
125:14, 126:3
**condemning** [4]
- 110:10, 120:22,
121:7, 126:4
**condition** [1] -
8:21
**conduct** [2] -
56:21, 56:24
**conducting** [1] -
133:18
**conference** [8] -
33:14, 33:21,
34:6, 50:19, 51:8,
71:19, 76:15,
109:18
**Confidential** [1]
- 4:24

**confidential** [1]
- 116:18
**confirm** [8] -
29:15, 44:5,
44:10, 78:21,
87:14, 94:9,
116:13, 116:16
**conflating** [1] -
103:1
**conflict** [3] -
40:14, 47:14,
81:6
**confront** [1] -
115:14
**confuse** [2] -
62:11, 76:12
**confusing** [2] -
18:8, 131:16
**congratulation
s** [1] - 136:8
**consequence**
[1] - 110:5
**consequences**
[1] - 69:2
**Conservatory**
[3] - 21:9, 22:7,
136:5
**consider** [4] -
25:5, 34:24, 39:3,
110:4
**consideration**
[1] - 140:20
**considered** [3] -
42:18, 52:5,
56:20
**consistent** [2] -
80:18, 81:11
**consult** [3] -
106:6, 106:7,
106:9
**consultation** [1]
- 106:12
**consulted** [1] -
106:8
**contact** [1] -
126:14
**contemplate** [1]
- 119:14
**contemporane
ous** [2] - 76:14,
82:18
**contemporary**
[1] - 70:8
**content** [18] -
10:2, 23:19,
23:21, 41:18,
42:3, 42:4, 42:10,
51:17, 52:6, 52:9,
54:15, 54:21,
55:2, 55:3, 55:17,

55:20, 58:12,
58:21
  **Contents** [1] -
47:22
  **context** [4] -
64:15, 67:5,
77:18, 106:17
  **continue** [3] -
18:11, 102:5,
102:7
  **continued** [1] -
133:1
  **continuing** [2] -
89:4, 106:19
  **contradict** [1] -
105:20
  **contradicting**
[1] - 105:13
  **contravenes** [1]
- 114:4
  **contribute** [1] -
98:24
  **contributing** [1]
- 35:6
  **contribution** [5]
- 25:2, 25:5,
42:24, 63:13,
109:11
  **contributions**
[13] - 23:25, 25:1,
25:2, 29:19,
42:23, 52:10,
62:24, 63:10,
63:11, 81:18,
81:21, 96:18,
97:2
  **contributors** [1]
- 62:18
  **control** [2] -
58:12, 58:20
  **controversial**
[1] - 23:23
  **controversy** [16]
- 23:12, 23:17,
23:18, 25:9, 27:5,
27:15, 29:2, 29:3,
29:5, 29:16,
29:25, 36:5,
36:11, 36:13,
36:14, 44:20
  **convened** [1] -
108:21
  **convening** [1] -
137:15
  **conversation**
[14] - 11:14,
11:16, 35:7, 55:5,
55:7, 81:17, 83:4,
83:22, 98:4,
126:14, 126:18,

136:14, 136:17,
136:24
  **conversations**
[5] - 55:1, 55:7,
67:11, 81:17,
97:14
  **convey** [1] -
61:20
  **conveyed** [3] -
128:5, 130:11,
132:14
  **conveys** [1] -
122:15
  **coordinator** [3] -
19:24, 19:25,
20:14
  **coordinators** [2]
- 20:12, 20:15
  **copied** [2] -
79:22, 102:19
  **copy** [5] - 6:23,
77:23, 77:24,
79:22, 94:4
  **corner** [1] -
37:25
  **correct** [88] -
15:25, 17:13,
18:5, 19:2, 19:9,
21:12, 21:14,
23:9, 25:13, 27:9,
30:8, 30:9, 30:16,
30:19, 33:16,
37:12, 38:25,
44:20, 45:8,
45:19, 48:24,
49:12, 49:18,
52:4, 53:9, 57:15,
57:16, 57:18,
57:22, 58:25,
60:16, 60:16,
62:21, 64:14,
65:22, 66:7,
66:11, 66:17,
66:19, 68:21,
68:25, 72:20,
79:10, 81:19,
82:4, 82:13, 83:8,
83:9, 85:5, 86:5,
86:11, 86:13,
88:4, 88:14,
91:11, 91:12,
92:15, 92:16,
94:10, 96:6,
99:10, 99:13,
99:19, 103:4,
103:8, 107:6,
107:15, 108:9,
108:18, 109:6,
109:13, 118:16,
120:22, 124:11,

124:22, 125:4,
126:21, 127:20,
130:13, 131:25,
132:6, 133:5,
134:15, 134:18,
135:2, 135:6,
140:7
  **Correct** [54] -
12:18, 13:7, 13:9,
16:1, 16:4, 18:6,
19:3, 19:10,
25:14, 27:22,
34:3, 39:6, 45:20,
48:25, 49:8,
49:13, 49:16,
49:19, 59:2,
63:21, 63:25,
64:4, 64:10,
68:23, 69:1, 74:2,
76:9, 76:16,
79:11, 79:17,
81:22, 88:12,
92:10, 92:13,
92:22, 99:5, 99:8,
99:11, 102:21,
107:8, 107:12,
108:10, 108:19,
113:13, 116:24,
117:4, 117:13,
121:20, 124:13,
127:24, 131:15,
134:16, 134:24,
135:3
  **correcting** [1] -
23:11
  **correction** [1] -
44:9
  **correctly** [10] -
46:25, 52:7, 71:3,
71:25, 72:6, 74:1,
74:8, 80:7, 88:22,
90:17
  **correspondenc
e** [2] - 78:18,
82:23
  **Counsel** [4] -
2:17, 7:15,
137:10, 142:18
  **counsel** [2] -
36:19, 142:22
  **counted** [1] -
100:1
  **COUNTY** [1] -
140:11
  **couple** [1] - 97:7
  **course** [6] -
58:23, 87:19,
88:20, 90:3, 96:4,
116:25
  **COURT** [2] - 1:1,

141:1
  **Court** [4] - 6:8,
16:5, 18:23, 48:9
  **court** [3] - 7:7,
8:11, 69:22
  **Court's** [1] -
70:1
  **Cover** [1] - 5:2
  **cover** [1] - 93:10
  **covered** [1] -
8:10
  **COVID** [1] -
87:19
  **crazy** [1] - 31:12
  **create** [2] -
29:21, 29:25
  **created** [7] -
9:21, 9:23, 90:13,
90:25, 91:4, 91:7,
95:15
  **creating** [4] -
28:2, 29:21,
29:22, 91:19
  **credentials** [2] -
12:3, 12:8
  **Crest** [1] - 143:8
  **critical** [14] -
29:20, 34:23,
63:4, 63:11,
63:18, 64:23,
67:17, 76:24,
81:18, 84:24,
86:15, 86:17,
86:23, 130:22
  **criticism** [25] -
29:21, 42:25,
43:6, 43:10,
43:11, 45:5, 51:7,
52:3, 59:13,
59:17, 59:18,
59:20, 59:21,
61:2, 63:3, 67:15,
73:16, 77:9,
109:25, 110:4,
110:25, 111:4,
111:6, 112:14,
120:17
  **criticisms** [9] -
41:2, 41:10,
41:18, 41:24,
42:2, 42:8, 44:25,
73:20, 109:14
  **criticize** [2] -
35:9, 35:15
  **criticized** [3] -
113:16, 113:24,
114:3
  **cross** [2] -
123:16, 130:6
  **cross-section**

[2] - 123:16, 130:6
  **CSR** [1] - 143:6
  **CT** [2] - 2:6,
142:7
  **Cubero** [3] -
102:14, 102:19,
121:4
  **cultural** [2] -
62:11, 62:16
  **current** [1] -
135:7

**D**

  **damage** [1] -
60:19
  **dare** [1] - 35:9
  **daring** [1] -
35:12
  **data** [5] - 63:23,
65:1, 65:2, 94:18,
94:24
  **Date** [1] - 143:7
  **DATE** [2] - 6:3,
139:3
  **date** [5] - 7:3,
56:5, 87:23,
87:25, 127:8
  **dated** [5] -
79:10, 95:11,
100:23, 111:23,
118:8
  **David** [1] - 7:22
  **day-to-day** [1] -
88:8
  **DAYS** [1] - 6:16
  **days** [4] - 6:17,
6:18, 76:14,
141:22
  **deals** [1] - 57:11
  **Dean** [7] - 27:21,
119:17, 121:19,
130:20, 132:15,
135:5, 136:14
  **dean** [13] -
17:20, 20:9,
20:19, 27:20,
32:18, 106:6,
106:7, 119:11,
120:6, 133:11,
133:16, 136:25,
137:1
  **Dear** [4] - 79:21,
93:24, 100:22,
107:6
  **December** [3] -
87:3, 87:13,
95:12
  **decided** [2] -

61:12, 135:16
  **Defendant** [1] -
134:2
  **DEFENDANTS**
[2] - 2:10, 142:11
  **Defendants** [4] -
1:7, 7:12, 137:19,
141:7
  **defendants** [1] -
141:21
  **Define** [1] -
30:17
  **definition** [1] -
97:21
  **definitive** [4] -
42:15, 43:14,
43:17, 88:20
  **degree** [4] -
12:4, 12:9, 12:12,
12:22
  **degrees** [3] -
12:3, 12:7, 12:19
  **dehumanizatio
n** [2] - 115:22,
116:3
  **dehumanized**
[1] - 115:19
  **delivering** [1] -
122:9
  **demand** [1] -
33:1
  **demanded** [1] -
31:13
  **demanding** [1] -
31:21
  **demands** [9] -
31:5, 31:24, 32:7,
32:10, 32:12,
32:14, 32:16,
33:5, 33:8
  **Denton** [4] -
1:23, 2:18,
115:17, 142:19
  **depart** [1] -
135:10
  **departed** [1] -
134:14
  **department** [10]
- 19:4, 19:7, 30:7,
56:23, 57:6,
57:15, 58:3,
65:19, 65:20,
111:18
  **departure** [2] -
135:13, 136:10
  **deployment** [1] -
110:2
  **deposed** [1] -
8:13
  **DEPOSITION** [5]

BENJAMIN D. BRAND, PH.D.    09/23/2024    6

- 1:10, 1:15, 6:2, 6:6, 141:10

**Deposition** [17] - 7:4, 7:25, 36:23, 47:19, 56:7, 69:17, 78:7, 84:7, 87:5, 89:15, 93:9, 100:25, 106:23, 112:1, 118:10, 121:17, 127:4

**deposition** [30] - 8:5, 8:11, 9:10, 9:12, 9:17, 10:7, 10:10, 10:18, 10:19, 11:3, 11:4, 11:8, 48:7, 78:10, 78:14, 78:16, 83:5, 100:16, 109:7, 121:15, 131:13, 132:14, 137:18, 137:21, 137:25, 140:6, 141:17, 141:19, 141:24, 142:2

**Deposition....** [1] - 3:13

**depositions** [2] - 48:7, 78:22

**describe** [2] - 12:2, 81:10

**Describe** [1] - 22:19

**described** [5] - 28:14, 29:4, 55:7, 59:3, 67:18

**describes** [1] - 112:25

**describing** [3] - 45:25, 46:1, 94:15

**DESCRIPTION** [1] - 3:12

**description** [11] - 93:18, 95:7, 95:11, 96:9, 96:23, 97:5, 98:14, 133:13, 134:5, 134:6, 140:16

**desire** [1] - 88:19

**Despite** [1] - 80:3

**detailed** [1] - 74:14

**determination** [1] - 43:16

**determine** [1] - 25:8

**devalue** [1] -

62:9

**developing** [2] - 108:18, 133:13

**developments** [1] - 107:11

**Diamante** [1] - 46:3

**Diego** [5] - 100:22, 102:14, 102:19, 107:6, 121:4

**differences** [1] - 129:19

**different** [9] - 19:17, 31:1, 45:19, 58:4, 81:20, 96:12, 107:3, 107:4, 107:25

**differently** [1] - 73:9

**difficult** [3] - 71:22, 75:21, 120:10

**dig** [1] - 106:24

**digital** [3] - 22:12, 22:22, 23:2

**direct** [7] - 5:10, 31:6, 35:10, 58:6, 89:25, 125:19, 129:4

**Direct** [1] - 3:7

**DIRECT** [1] - 7:18

**direction** [2] - 107:3, 107:4

**directly** [7] - 20:9, 20:16, 56:17, 60:6, 60:14, 103:1, 103:3

**director** [5] - 17:9, 17:11, 17:17, 22:12, 126:23

**Director** [1] - 135:25

**disagree** [2] - 114:23, 117:20

**disagreed** [1] - 115:15

**disagreeing** [1] - 80:3

**disagreements** [1] - 74:6

**disciplinary** [1] - 57:12

**discipline** [2] - 57:3, 57:6

**disclose** [1] - 9:13

**disclosed** [1] - 137:14

**discourse** [10] - 66:7, 66:12, 66:17, 66:19, 67:11, 67:12, 67:16, 77:11, 77:15, 77:18

**discovery** [1] - 48:16

**discuss** [17] - 10:6, 10:17, 10:20, 11:7, 28:12, 28:13, 29:4, 34:8, 34:12, 54:9, 54:10, 54:17, 60:22, 61:7, 112:19, 119:8, 136:23

**discussed** [22] - 10:9, 11:2, 11:5, 11:9, 28:15, 28:25, 29:6, 29:18, 41:24, 70:12, 83:4, 90:9, 103:17, 103:18, 103:19, 104:16, 106:11, 108:23, 112:21, 131:24, 137:10

**discussing** [10] - 34:9, 70:6, 70:19, 70:22, 71:17, 80:22, 81:5, 97:16, 119:11, 129:13

**discussion** [3] - 67:17, 127:2, 127:13

**dismissal** [1] - 125:8

**disquiet** [1] - 117:20

**dissertation** [4] - 68:19, 68:24, 74:23, 74:24

**dissolution** [3] - 123:13, 123:18, 125:3

**dissolve** [1] - 123:13

**distance** [3] - 112:23, 113:1, 135:14

**distancing** [1] - 112:25

**DISTRICT** [4] - 1:1, 1:1, 141:1,

141:1

**diversity** [1] - 66:9

**divided** [2] - 19:16, 19:19

**DIVISION** [2] - 1:2, 141:2

**division** [43] - 17:22, 18:12, 18:20, 19:2, 19:18, 20:1, 20:5, 20:8, 20:10, 20:20, 22:22, 23:9, 23:10, 25:20, 30:8, 30:9, 30:19, 32:22, 39:17, 40:6, 57:15, 57:16, 57:20, 60:16, 60:17, 65:21, 66:12, 66:20, 73:15, 73:16, 91:8, 95:19, 111:20, 116:6, 119:13, 119:15, 119:19, 119:20, 119:22, 119:24, 123:17, 123:20, 135:8

**Division** [3] - 2:12, 39:19, 142:13

**Division's** [1] - 90:11

**divisions** [2] - 19:17, 19:18

**divorced** [3] - 74:16, 75:1, 75:14

**doctoral** [3] - 91:23, 121:23, 122:1

**document** [15] - 8:2, 8:5, 36:22, 36:25, 37:10, 37:11, 64:21, 93:1, 93:5, 95:25, 105:10, 112:8, 122:19, 131:10, 140:17

**documents** [7] - 9:16, 10:23, 18:3, 79:1, 100:17, 137:13, 137:21

**done** [9] - 9:11, 32:3, 70:6, 96:11, 96:13, 100:4, 108:15, 132:18, 132:20

**double** [2] -

86:9, 113:19

**doubt** [1] - 112:15

**down** [12] - 32:9, 32:11, 32:20, 32:24, 37:24, 59:25, 62:4, 97:25, 107:9, 119:13, 119:14, 122:10

**Dr** [55] - 10:15, 25:24, 34:10, 34:14, 34:16, 34:18, 35:12, 42:24, 45:17, 45:25, 47:9, 47:10, 52:1, 54:18, 54:25, 55:8, 63:9, 63:16, 64:22, 66:6, 66:8, 69:18, 73:11, 77:16, 78:9, 78:15, 79:21, 79:22, 79:24, 80:4, 80:10, 81:8, 81:10, 81:17, 83:23, 84:18, 84:23, 85:23, 86:24, 89:21, 98:4, 98:7, 119:1, 119:11, 119:17, 122:22, 125:8, 125:11, 125:21, 133:20, 133:21

**draft** [1] - 116:17

**Draft** [2] - 4:17, 116:22

**Drive** [1] - 143:8

**drop** [1] - 132:5

**duly** [4] - 1:17, 7:17, 141:16, 141:19

**during** [3] - 20:19, 123:5, 136:16

**duties** [7] - 17:5, 17:7, 20:5, 21:18, 95:23, 99:6, 99:16

## E

**e-mail** [2] - 77:16, 82:23

**E-mail** [6] - 2:8, 2:14, 2:19, 142:9, 142:15, 142:20

**e-mailed** [1] - 68:13

**early** [1] -

101:16

**earn** [1] - 12:22

**earned** [4] - 12:19, 12:25, 13:4, 16:9

**EASTERN** [2] - 1:1, 141:1

**edited** [4] - 47:8, 105:22, 114:9, 117:21

**editor** [26] - 26:20, 51:13, 55:15, 60:5, 64:6, 85:5, 86:6, 86:12, 86:15, 89:12, 90:14, 91:2, 91:5, 95:8, 95:20, 96:5, 96:13, 99:3, 124:25, 133:4, 133:7, 133:23, 134:1, 135:1, 137:16

**editorial** [2] - 98:25, 125:4

**educated** [1] - 15:7

**education** [2] - 12:3, 67:5

**effect** [2] - 61:25, 62:2

**effort** [1] - 95:25

**egalitarianism** [2] - 62:12, 62:16

**eight** [2] - 14:21, 60:3

**either** [5] - 48:5, 53:2, 56:19, 77:7, 105:15

**elaborate** [1] - 22:18

**elements** [1] - 75:20

**Ellen** [8] - 48:23, 49:1, 49:6, 49:14, 52:25, 121:4, 133:20, 134:3

**email** [84] - 45:4, 69:19, 70:14, 71:11, 72:9, 72:22, 73:10, 73:17, 73:23, 76:5, 76:8, 76:14, 77:16, 79:3, 79:5, 79:8, 80:17, 80:18, 81:11, 81:14, 82:4, 87:2, 87:7, 87:9, 87:12, 88:6, 93:6, 93:10, 93:17, 93:22, 94:4, 94:17, 95:6,

BENJAMIN D. BRAND, Ph.D.        09/23/2024        7

95:9, 100:22,
101:10, 102:3,
102:11, 102:19,
103:2, 103:6,
103:8, 103:12,
103:22, 104:11,
104:12, 104:13,
104:14, 104:17,
105:9, 105:11,
106:2, 106:21,
107:1, 107:5,
107:11, 107:15,
107:19, 107:24,
108:6, 108:7,
108:13, 109:1,
111:22, 112:7,
112:9, 116:12,
117:9, 118:7,
118:12, 121:18,
122:4, 122:7,
122:8, 122:12,
122:14, 127:6,
127:16, 127:18,
127:20, 128:5,
132:2, 132:25

**Email** [4] - 3:20,
4:4, 5:2, 116:22
**emailed** [1] -
119:1
**emails** [12] -
32:19, 44:19,
44:24, 44:25,
70:3, 70:8, 78:17,
82:18, 101:1,
101:2, 107:18,
136:20
**Emails** [5] -
3:24, 4:8, 4:11,
4:14, 4:20
**emergency** [5] -
103:13, 103:14,
106:4, 106:12,
108:8
**employed** [1] -
142:23
**Employee** [1] -
39:7
**employees** [1] -
91:10
**employment** [3]
- 39:7, 90:21,
93:20
**encompass** [1] -
98:16
**encouraged** [2]
- 82:19, 82:25
**end** [14] - 8:11,
36:19, 40:19,
54:5, 60:20, 63:5,
65:2, 66:5, 67:12,

70:4, 100:19,
101:2, 118:11,
128:18
**ended** [1] - 79:4
**endorse** [2] -
129:5, 132:5
**ends** [1] - 67:16
**enforce** [1] -
30:21
**enforcement** [1]
- 57:14
**enforcing** [1] -
57:21
**engagement** [1]
- 136:13
**engaging** [1] -
77:17
**ensuring** [2] -
30:11, 91:10
**enthusiastic** [2]
- 72:16, 72:24
**entire** [8] - 31:3,
31:11, 63:17,
81:12, 100:19,
109:19, 109:24,
113:7
**entirely** [1] -
93:2
**entirety** [2] -
24:20, 24:23
**enumerate** [1] -
22:10
**equivalent** [4] -
19:4, 19:6, 92:19,
98:10
**era** [1] - 87:19
**escaped** [1] -
31:23
**escapes** [1] -
35:2
**especially** [2] -
86:4, 86:11
**essay** [1] - 49:3
**Essays** [1] -
4:21
**essays** [4] -
25:16, 49:2, 82:8,
109:17
**essentially** [6] -
35:4, 61:14,
65:11, 65:14,
71:5, 74:11
**establish** [2] -
72:12, 73:3
**estimate** [1] -
14:20
**et** [5] - 1:6, 3:15,
4:12, 4:15, 141:6
**etc** [1] - 80:6
**ethics** [1] -

114:5
**ethnomusicolo
gy** [1] - 19:20
**Ethnomusicolo
gy** [4] - 17:23,
18:1, 66:21,
116:7
**evaluated** [1] -
99:22
**evaluation** [1] -
100:2
**evening** [1] -
104:22
**event** [1] - 71:23
**evidence** [6] -
44:14, 82:24,
83:3, 86:17,
86:22, 116:2
**evokes** [1] -
109:18
**evolved** [1] -
28:10
**Ewell** [50] - 29:7,
29:8, 29:9, 29:17,
33:10, 33:20,
34:16, 34:24,
35:9, 35:18,
48:24, 49:11,
49:20, 50:20,
52:25, 65:8, 71:6,
71:8, 74:11,
74:19, 75:5,
76:17, 76:21,
77:3, 77:7, 81:15,
81:18, 81:22,
82:1, 82:3, 82:6,
82:8, 82:13,
82:19, 82:20,
83:2, 84:13,
84:14, 101:17,
110:17, 110:22,
111:1, 113:10,
114:1, 115:14,
115:24, 115:25,
117:2
**Ewell's** [14] -
29:20, 36:6,
49:22, 51:7, 54:1,
61:7, 61:11,
61:15, 65:11,
65:15, 71:21,
72:16, 72:24,
74:3
**exact** [1] - 81:19
**exactly** [3] -
84:4, 106:11,
106:14
**Examination** [1]
- 3:7
**EXAMINATION**

[1] - 7:18
**examination** [1]
- 141:21
**examine** [5] -
71:16, 123:5,
130:10, 131:2,
131:19
**examined** [3] -
130:12, 131:20,
132:13
**example** [2] -
42:21, 52:13
**examples** [2] -
31:12, 98:19
**excellent** [1] -
136:8
**except** [1] -
140:7
**exception** [2] -
9:12, 41:5
**exchange** [1] -
77:16
**exclude** [1] -
104:2
**excluded** [1] -
104:3
**excluding** [2] -
104:6, 104:7
**exclusivity** [1] -
77:6
**excuse** [8] -
11:3, 57:16,
58:24, 73:16,
83:6, 96:21,
108:22, 123:13
**Excuse** [3] -
9:10, 39:19,
41:19
**Exec** [1] - 4:20
**executed** [1] -
140:19
**executive** [1] -
118:23
**exert** [1] - 75:20
**exhibit** [10] - 8:1,
48:4, 78:13,
86:25, 116:8,
117:1, 129:21,
130:13, 132:13,
132:25
**Exhibit** [87] -
3:13, 3:14, 3:17,
3:18, 3:20, 3:21,
3:23, 4:1, 4:2,
4:4, 4:6, 4:8,
4:11, 4:14, 4:17,
4:20, 4:23, 5:1,
7:25, 8:2, 36:22,
36:23, 37:10,
47:19, 47:21,

52:23, 56:4, 56:7,
69:17, 69:19,
69:20, 77:20,
78:6, 78:7, 78:9,
78:14, 78:15,
81:2, 84:6, 84:7,
87:1, 87:5, 88:11,
89:14, 89:15,
93:4, 93:6, 93:9,
93:17, 100:21,
100:25, 104:12,
106:20, 106:23,
107:5, 107:9,
107:13, 111:22,
112:1, 117:3,
117:10, 118:7,
118:10, 121:16,
121:17, 121:18,
123:5, 127:4,
127:6, 127:11,
127:15, 128:20,
129:15, 129:16,
129:20, 129:23,
129:25, 130:11,
130:14, 130:15,
130:19, 131:8,
131:11, 131:23,
132:12, 132:13
**exhibits** [5] -
8:8, 8:10, 77:21,
128:18, 132:18
**EXHIBITS** [1] -
3:10
**expected** [1] -
96:24
**experience** [4] -
31:6, 31:19,
114:16, 125:19
**experienced** [1]
- 98:11
**expertise** [3] -
25:8, 42:15
**Expiration** [1] -
143:7
**Expires** [2] -
140:25, 143:10
**Explain** [1] -
16:5
**explain** [14] -
9:9, 9:11, 12:6,
14:18, 17:7,
18:21, 19:11,
20:4, 23:16,
35:24, 67:6, 67:8,
121:22, 133:8
**explained** [1] -
104:20
**explaining** [1] -
108:17
**expressed** [2] -

88:18, 140:20
**expressing** [1] -
98:2
**extensive** [1] -
78:25

# F

**face** [1] - 110:24
**Facebook** [15] -
3:18, 26:12,
55:24, 56:4,
56:10, 61:4,
64:18, 80:22,
80:25, 81:3,
81:16, 86:20,
86:21, 112:11,
112:16
**fact** [8] - 29:19,
49:1, 68:22,
70:17, 80:21,
102:18, 109:23,
113:1
**fact-check** [1] -
70:17
**faculty** [40] -
17:2, 19:23,
20:10, 25:20,
25:22, 27:11,
28:12, 28:13,
30:12, 31:19,
33:4, 38:18,
39:16, 40:6,
41:14, 46:4,
56:17, 56:19,
56:22, 56:25,
57:2, 57:5, 58:2,
58:4, 59:6, 104:4,
108:21, 113:7,
113:8, 114:9,
121:5, 121:13,
128:1, 128:25,
130:24, 131:5,
131:24, 135:18,
136:1, 136:2
**Faculty** [2] - 5:1,
128:22
**Fair** [1] - 88:1
**fair** [11] - 16:3,
73:9, 75:8, 80:24,
82:8, 92:21,
94:21, 108:3,
110:16, 122:15,
128:14
**faithfully** [1] -
40:4
**fall** [3] - 95:23,
97:19, 118:2
**falling** [1] -
118:4

**false** [5] - 44:5, 44:11, 44:16, 45:13, 45:19
**familiar** [8] - 30:18, 38:9, 38:10, 43:20, 46:22, 47:5, 71:11, 77:22
**familiarity** [1] - 42:12
**fan** [1] - 100:20
**far** [7] - 34:17, 89:18, 90:16, 90:18, 116:10, 120:14, 120:16
**fast** [1] - 59:7
**fat** [1] - 69:20
**father** [2] - 11:5, 11:21
**father-in-law** [2] - 11:5, 11:21
**Fax** [6] - 2:7, 2:14, 2:19, 142:8, 142:15, 142:20
**Fear** [1] - 117:17
**fear** [3] - 109:21, 110:5, 117:15
**feared** [2] - 60:18, 68:5
**February** [3] - 54:4, 54:6, 79:10
**Federal** [2] - 1:24, 6:9
**feedback** [7] - 63:10, 63:11, 64:23, 84:24, 86:16, 86:17, 86:23
**feelings** [2] - 114:23, 117:23
**felt** [2] - 115:18, 119:25
**few** [3] - 7:23, 108:14, 132:19
**fewer** [2] - 13:21, 14:3
**field** [5] - 13:10, 42:12, 45:16, 73:6, 110:19
**fields** [2] - 13:12, 62:9
**fifth** [1] - 90:2
**figure** [1] - 48:13
**finalized** [1] - 135:6
**financially** [1] - 142:25
**fine** [4] - 51:4, 94:22, 116:13, 128:9

**finishing** [1] - 70:6
**fire** [1] - 30:23
**fired** [5] - 31:5, 31:13, 31:20, 31:22, 125:12
**Firm** [2] - 143:10, 143:10
**first** [25] - 7:17, 18:16, 25:18, 26:8, 33:10, 50:23, 53:24, 61:3, 61:24, 62:1, 69:21, 70:17, 71:18, 88:17, 93:17, 96:16, 101:7, 102:15, 102:23, 106:12, 108:11, 108:20, 128:6, 133:18
**firsthand** [3] - 34:1, 34:4, 120:8
**flip** [1] - 107:13
**flow** [1] - 112:14
**folder** [2] - 78:12
**Follow** [1] - 87:3
**follow** [2] - 78:4, 105:5
**follow-up** [1] - 105:5
**Follow-Up** [1] - 87:3
**followed** [1] - 30:12
**following** [5] - 36:22, 93:24, 120:6, 141:15, 141:25
**follows** [2] - 7:17, 94:13
**FOR** [8] - 1:1, 2:4, 2:10, 6:16, 140:24, 141:1, 142:5, 142:11
**forbids** [1] - 29:24
**forced** [4] - 16:13, 81:7, 83:17, 92:18
**foregoing** [2] - 140:5, 140:18
**fork** [1] - 107:18
**form** [7] - 43:1, 50:12, 51:7, 80:16, 85:20, 125:4, 133:6
**Form** [32] - 36:16, 39:18, 43:3, 44:21, 45:23, 50:7,

53:10, 57:4, 57:17, 59:1, 74:20, 76:23, 83:13, 83:19, 85:6, 86:7, 86:14, 88:5, 99:1, 109:22, 110:12, 111:2, 111:13, 111:16, 114:15, 114:24, 117:7, 117:16, 118:3, 121:10, 123:15, 124:4
**formal** [1] - 39:4
**formalities** [1] - 24:13
**formally** [1] - 21:24
**formed** [1] - 133:3
**forming** [1] - 133:12
**formulation** [2] - 26:1, 121:6
**forth** [7] - 12:5, 20:7, 22:3, 59:6, 75:15, 101:18, 136:21
**forward** [2] - 39:2, 62:4
**Forward** [3] - 122:10, 123:8, 126:3
**forwarded** [2] - 119:2, 119:3
**forwarding** [5] - 73:3, 73:11, 73:13, 73:14, 73:17
**founded** [3] - 117:6, 117:14, 117:17
**four** [4] - 15:3, 18:19, 76:1
**four-year** [1] - 18:19
**fragility** [1] - 115:13
**frame** [17] - 27:7, 27:17, 30:24, 30:25, 31:9, 33:7, 40:19, 42:1, 53:22, 54:4, 73:19, 82:20, 95:18, 97:17, 100:19, 103:4, 127:1
**Frank** [10] - 47:9, 47:10, 48:8, 49:23, 49:25,

111:22, 118:2, 118:4, 120:11, 120:14
**free** [3] - 9:1, 70:17, 71:16
**Freedom** [3] - 38:6, 40:25, 41:6
**freely** [2] - 126:5, 126:9
**Friday** [1] - 70:14
**front** [3] - 8:1, 90:3, 105:10
**FTE** [9] - 90:12, 90:20, 91:4, 91:11, 92:5, 92:8, 94:10, 96:1, 136:21
**full** [7] - 16:19, 17:1, 34:18, 39:1, 90:21, 92:20, 93:20
**full-time** [3] - 90:21, 92:20, 93:20
**fully** [1] - 40:7
**function** [1] - 40:7
**funds** [1] - 90:10
**funny** [3] - 85:7, 86:2, 86:3
**furthering** [1] - 67:17
**furthers** [1] - 67:19
**future** [1] - 137:13

## G

**Gateway** [1] - 1:23
**gears** [1] - 89:8
**General** [7] - 2:11, 2:12, 2:17, 7:15, 142:12, 142:13, 142:18
**general** [5] - 67:4, 67:5, 106:16, 131:14, 136:15
**generally** [4] - 38:10, 45:5, 124:20, 137:2
**Geoffroy** [11] - 5:3, 10:15, 10:16, 10:21, 10:24, 11:2, 11:20, 127:7, 127:17,

129:2, 132:2
**Geoffroy-Schwinden** [10] - 5:3, 10:15, 10:16, 10:21, 10:24, 11:2, 11:20, 127:7, 127:17, 129:2
**Geoffroy-Schwinden's** [1] - 132:2
**given** [7] - 19:23, 84:24, 91:11, 135:8, 135:19, 141:18, 141:23
**Given** [1] - 140:21
**gladly** [1] - 9:2
**glossed** [2] - 77:4, 77:8
**Graduate** [1] - 4:23
**graduate** [30] - 17:10, 17:11, 17:17, 32:22, 38:19, 41:13, 54:8, 56:20, 57:1, 59:5, 91:2, 91:5, 91:9, 91:24, 92:9, 96:4, 104:4, 123:11, 123:17, 123:19, 123:24, 124:3, 124:6, 124:24, 125:11, 129:12, 129:20, 129:22, 130:6, 130:17
**Graf** [16] - 4:12, 4:15, 79:21, 79:24, 80:4, 96:5, 96:9, 96:10, 96:14, 97:8, 97:10, 97:15, 97:24, 98:7, 105:20, 118:20
**Graf's** [2] - 78:9, 98:4
**granted** [1] - 16:17
**graphs** [2] - 98:20, 99:19
**grievance** [6] - 38:15, 38:24, 39:4, 39:13, 39:15, 39:23
**Grievances** [1] - 39:8
**ground** [1] - 46:11

**Group** [1] - 2:23
**guarantee** [1] - 30:3
**guess** [10] - 15:7, 41:11, 43:17, 51:16, 55:11, 65:20, 101:20, 109:16, 117:23

## H

**half** [3] - 15:5, 92:19
**half-time** [1] - 92:19
**hand** [2] - 37:25, 140:21
**Handwritten** [1] - 4:6
**handwritten** [1] - 94:3
**happy** [2] - 48:10, 56:8
**hard** [1] - 94:4
**he/she** [1] - 140:19
**head** [16] - 13:19, 19:21, 20:1, 20:5, 20:20, 23:9, 39:17, 57:15, 57:16, 57:20, 60:16, 66:13, 71:9, 73:15, 95:19, 104:11
**header** [1] - 116:21
**heading** [1] - 37:12
**heard** [6] - 26:8, 36:11, 59:14, 70:23, 102:23, 114:20
**hearing** [2] - 6:24, 135:6
**heavy** [1] - 98:12
**Heidlberger** [19] - 4:17, 47:9, 47:10, 48:8, 49:23, 111:22, 112:10, 112:16, 112:20, 116:12, 118:2, 118:5, 118:9, 119:1, 119:3, 119:9, 119:11, 119:17, 120:11
**Heidlberger's**

[3] - 49:25, 117:5,
120:14
**held** [1] - 22:6
**help** [7] - 26:12,
26:15, 29:14,
89:13, 90:8,
120:1, 125:10
**helpful** [1] -
116:15
**helping** [1] -
134:6
**Henry** [1] -
136:14
**hereby** [2] -
140:6, 141:14
**hereto** [1] - 1:25
**Hierarchical** [2]
- 75:18, 75:19
**hierarchy** [1] -
71:1
**high** [1] - 52:11
**higher** [1] - 67:5
**Hill** [2] - 2:6,
142:7
**himself** [1] -
112:23
**hindsight** [1] -
68:1
**hire** [1] - 137:16
**history** [4] -
13:11, 19:20,
21:19, 53:17
**History** [4] -
17:22, 17:25,
66:21, 116:6
**hit** [1] - 100:20
**Hmm** [1] - 28:22
**Hoc** [5] - 4:1,
4:7, 83:7, 83:25,
84:6, 88:10,
127:11, 128:17,
129:17, 129:25,
131:1, 131:23,
132:11, 132:12,
132:24
**hoc** [5] - 78:20,
79:19, 89:17,
93:13, 136:20
**hold** [1] - 22:11
**home** [2] -
99:12, 114:14
**hopefully** [1] -
93:2
**hoping** [1] -
77:22
**hostile** [1] - 65:7
**hours** [4] - 10:5,
87:23, 87:24,
138:2
**HRS** [2] - 142:3,

142:3
**hum** [31] - 18:10,
19:1, 19:14,
22:15, 27:10,
28:24, 29:1,
30:22, 31:7, 38:2,
39:11, 41:16,
52:14, 53:15,
53:20, 58:19,
67:25, 69:24,
75:12, 75:17,
79:7, 87:4, 96:20,
99:24, 101:13,
102:8, 102:10,
107:16, 108:4,
111:25, 123:10
**Hunter** [1] -
29:12
**hurts** [1] -
114:23

## I

**I..** [1] - 53:7
**ID** [1] - 69:25
**idea** [5] - 14:7,
14:14, 14:16,
14:19, 66:24
**Ideas** [1] -
116:22
**identified** [2] -
41:11, 134:1
**identify** [6] -
10:9, 42:10, 78:2,
125:18, 125:21,
133:23
**identity** [3] -
77:4, 77:8,
140:17
**ideologies** [3] -
74:15, 75:1,
75:14
**ignorant** [1] -
66:6
**II** [1] - 99:6
**illness** [1] - 8:20
**illustration** [1] -
52:11
**immediately** [1]
- 97:20
**impair** [1] - 8:21
**imperative** [1] -
26:23
**implement** [1] -
57:6
**implemented** [1]
- 40:5
**implication** [2] -
84:3

**implicitly** [2] -
65:10, 80:2
**Implicitly** [1] -
82:2
**important** [3] -
72:12, 74:6, 80:4
**imprecise** [1] -
40:12
**impression** [2] -
65:6, 65:9
**IN** [1] - 140:24
**INC** [1] - 143:7
**incidentally** [1] -
52:23
**inclined** [1] -
74:6
**included** [5] -
32:15, 52:9,
102:6, 104:9,
124:22
**includes** [1] -
141:25
**including** [4] -
41:13, 48:7, 62:8,
73:14
**inclusion** [1] -
66:9
**inconsistent** [1]
- 97:5
**incorporated** [1]
- 131:4
**incorporates** [2]
- 130:25, 132:3
**indicated** [2] -
10:3, 53:6
**indicates** [1] -
94:4
**indicating** [1] -
45:11
**indication** [2] -
52:24, 53:4
**indiscretions** [1]
- 52:19
**Individual** [1] -
5:1
**individual** [5] -
35:3, 35:4, 35:6,
35:8, 110:1
**individuals** [3] -
11:19, 32:19,
110:9
**inevitable** [1] -
107:18
**inform** [1] -
88:15
**information** [16]
- 44:10, 44:15,
45:11, 62:10,
62:19, 63:19,
64:2, 64:9, 65:4,

93:25, 105:1,
105:6, 136:15,
136:19, 141:23
**informed** [6] -
25:20, 27:8,
27:25, 28:3, 28:6,
132:25
**inherently** [1] -
71:1
**initial** [1] -
103:20
**innovation** [3] -
22:12, 22:22,
23:3
**input** [1] - 134:5
**inside** [1] -
48:18
**insinuating** [1] -
91:18
**instance** [1] -
1:16
**institution** [4] -
22:25, 86:12,
95:2, 117:22
**instructed** [2] -
55:4, 81:8
**instructing** [1] -
84:13
**instructor** [1] -
22:2
**instrument** [1] -
140:18
**Integrity** [1] -
41:4
**intend** [1] - 21:5
**intended** [1] -
91:16
**intent** [2] -
80:17, 131:17
**intention** [1] -
91:20, 104:19
**interaction** [1] -
54:25
**interest** [1] -
47:14
**interested** [3] -
12:6, 70:22,
143:1
**interfere** [1] -
8:15
**interim** [3] -
17:20, 17:22,
18:12
**intermission** [1]
- 123:5
**internal** [1] -
78:18
**interrupt** [4] -
9:1, 9:5, 17:24,
18:7

**interrupted** [1] -
18:11
**interrupting** [2] -
101:14, 105:19
**introduce** [2] -
56:3, 106:20
**introduced** [5] -
48:6, 69:21,
77:21, 88:10,
108:11
**introducing** [4] -
89:14, 93:6,
107:21, 127:5
**introduction** [1]
- 49:2
**investigate** [2] -
52:22, 53:11
**investigated** [4]
- 51:20, 52:18,
53:9, 78:20
**investigation** [4]
- 50:5, 50:9,
50:17, 115:4
**invite** [1] - 67:10
**invited** [1] -
101:18
**invocation** [1] -
43:23
**invoked** [2] -
44:15, 45:12
**involved** [6] -
40:10, 42:22,
88:3, 101:12,
126:15, 135:9
**involvement** [2]
- 89:4, 133:2
**involving** [2] -
23:13, 26:6
**Ishiyama** [2] -
93:8, 133:21
**issue** [24] - 24:7,
27:25, 28:1,
28:12, 28:15,
28:17, 28:18,
42:6, 46:10,
56:17, 64:1,
70:18, 76:2,
83:18, 96:18,
97:2, 97:16,
100:19, 101:17,
126:4, 136:13,
137:15
**issued** [4] -
32:22, 59:5, 59:6,
106:3
**issues** [1] -
136:11
**issuing** [1] -
33:6
**item** [2] - 106:3,

106:5

## J

**Jackson** [77] -
3:20, 4:4, 7:10,
25:3, 25:6, 30:24,
31:22, 38:25,
39:5, 39:24,
40:23, 42:24,
45:1, 45:8, 45:17,
46:2, 54:18,
54:25, 55:3, 55:8,
60:6, 60:14,
61:12, 61:20,
62:23, 63:3, 63:5,
63:9, 63:16,
64:23, 66:6, 66:8,
68:6, 68:9, 68:20,
69:5, 70:9, 70:21,
72:3, 72:23,
73:11, 73:17,
73:24, 75:1, 76:8,
77:16, 78:19,
79:21, 80:10,
81:8, 81:10,
81:17, 83:23,
83:25, 84:12,
84:18, 84:23,
87:2, 87:10,
87:13, 87:16,
90:14, 95:16,
99:22, 100:23,
104:9, 104:13,
107:24, 110:11,
120:2, 120:22,
121:7, 125:1,
125:11, 125:19,
133:1
**JACKSON** [9] -
1:3, 3:19, 3:22,
4:5, 56:5, 69:20,
84:9, 87:6, 141:3
**Jackson's** [15] -
36:19, 39:12,
40:10, 40:14,
45:22, 45:25,
53:9, 76:5, 83:17,
83:23, 84:18,
89:4, 104:25,
125:8, 125:21
**JACKSON
000208** [1] - 4:3
**January** [4] -
54:4, 54:6, 106:4,
135:11
**Jersey** [2] -
135:17, 135:18
**Jessica** [1] -
133:19

**Jewish** [2] - 77:4, 77:8

**Jewishness** [1] - 77:6

**job** [17] - 57:9, 63:6, 84:19, 85:2, 85:4, 86:5, 86:12, 86:15, 95:7, 96:23, 97:5, 97:22, 98:14, 134:6, 134:23, 135:15, 136:8

**jobs** [1] - 12:5

**jog** [2] - 26:13, 26:15

**John** [5] - 20:21, 27:24, 93:7, 93:8, 133:21

**journal** [42] - 26:20, 35:20, 35:24, 36:2, 43:1, 43:6, 46:22, 47:2, 47:5, 47:7, 47:11, 47:13, 47:16, 47:22, 47:24, 49:18, 50:1, 50:9, 50:16, 52:15, 53:9, 58:13, 58:21, 59:14, 61:13, 61:16, 64:6, 67:14, 68:2, 82:15, 90:10, 96:18, 98:19, 113:15, 113:16, 113:23, 113:24, 114:6, 114:7, 114:9, 117:22

**Journal** [104] - 4:7, 23:13, 23:20, 23:22, 24:1, 24:2, 24:4, 24:7, 24:8, 24:15, 24:19, 24:22, 25:12, 25:15, 25:18, 26:2, 26:6, 27:2, 28:12, 28:18, 32:7, 32:20, 32:24, 40:15, 40:23, 41:8, 41:10, 41:18, 41:25, 46:12, 46:15, 48:20, 51:10, 51:14, 51:19, 52:3, 52:18, 52:22, 53:8, 53:12, 53:18, 54:9, 54:12, 56:1, 59:3, 59:11, 59:12, 59:23, 61:1, 65:7,

68:12, 68:16, 68:18, 69:3, 78:19, 78:21, 80:24, 81:6, 82:11, 88:3, 88:8, 89:5, 91:5, 94:16, 95:23, 96:11, 97:11, 97:15, 97:22, 97:25, 98:25, 99:3, 99:12, 99:15, 99:17, 99:18, 99:25, 101:8, 103:18, 109:4, 110:11, 111:15, 112:24, 113:2, 115:3, 115:8, 115:19, 115:20, 123:13, 124:25, 125:4, 126:8, 126:16, 128:23, 133:2, 133:4, 133:24, 135:1, 135:5, 135:9, 136:12, 137:16

**journal's** [1] - 62:18

**Journal's** [1] - 53:6

**journals** [3] - 26:24, 46:18, 117:21

**JSS** [20] - 4:9, 4:14, 4:21, 24:14, 28:2, 32:10, 41:3, 44:23, 55:16, 71:23, 86:23, 89:12, 101:12, 101:17, 114:3, 121:3, 122:10, 123:8, 123:18, 126:2

**judgment** [3] - 42:13, 42:15, 43:21

**judgments** [1] - 88:20

**judicial** [1] - 48:10

**JULIA** [1] - 143:7

**JulieTXCSR@ gmail.com** [1] - 143:9

**July** [39] - 23:13, 24:11, 24:21, 24:24, 24:25, 27:8, 27:16, 31:1, 32:6, 32:17, 36:19, 40:15,

40:19, 41:25, 53:14, 53:23, 55:25, 56:6, 56:11, 58:23, 58:24, 64:18, 80:14, 80:19, 81:13, 100:18, 100:23, 101:10, 102:11, 102:22, 103:7, 103:9, 103:24, 106:21, 111:23, 119:4, 127:8

**June** [1] - 23:8

**jurisdiction** [1] - 135:6

**jury** [2] - 35:25, 67:9

**just..** [1] - 73:10

---

## K

**keep** [1] - 28:6

**KIM** [1] - 141:13

**Kim** [2] - 1:19, 143:6

**kind** [11] - 61:4, 77:15, 77:17, 82:18, 91:15, 95:2, 98:3, 98:24, 107:2, 110:6, 136:19

**knowing** [3] - 30:15, 30:17, 36:8

**knowledge** [32] - 30:2, 31:6, 34:1, 34:4, 44:14, 45:14, 50:25, 51:1, 51:6, 51:9, 51:12, 51:15, 60:25, 66:22, 68:8, 68:10, 82:17, 82:22, 94:9, 94:11, 102:23, 105:24, 122:3, 126:12, 129:1, 129:3, 131:6, 132:10, 133:25, 134:4, 134:19

**known** [3] - 25:12, 95:1, 140:14

**Kohanski** [7] - 4:25, 121:18, 121:22, 121:23, 130:12, 130:19, 132:14

---

## L

**labeled** [2] - 25:16, 116:21

**lack** [1] - 100:20

**larger** [1] - 22:25

**last** [13] - 20:23, 21:2, 67:21, 77:21, 95:5, 95:6, 98:14, 99:21, 102:18, 113:9, 126:25, 133:19, 137:2

**late** [3] - 33:18, 55:25, 95:18

**Laura** [1] - 37:14

**LAURA** [2] - 1:6, 141:6

**law** [3] - 11:5, 11:6, 11:21

**LAW** [2] - 2:5, 142:6

**lawfirm.com** [2] - 2:8, 142:9

**layer** [1] - 20:2

**lead** [1] - 69:19

**leadership** [3] - 119:19, 119:20, 119:22

**learned** [4] - 39:17, 98:7, 106:18, 128:11

**learning** [3] - 35:21, 36:12, 53:24

**least** [16] - 28:1, 42:10, 45:15, 47:8, 57:14, 57:22, 58:1, 64:20, 65:10, 66:1, 70:20, 80:2, 80:14, 104:24, 110:9, 110:18

**leave** [5] - 16:13, 60:18, 97:8, 121:2, 135:12

**left** [4] - 21:20, 37:25, 134:20, 134:21

**left-hand** [1] - 37:25

**legal** [1] - 2:23

**legible** [1] - 93:2

**lengthy** [1] - 73:23

**less** [2] - 25:11, 102:14

**Lett** [1] - 80:1

**letter** [10] -

36:18, 36:20, 37:20, 37:24, 38:17, 38:24, 39:4, 129:6, 129:9, 132:4

**Letter** [1] - 3:14

**letters** [1] - 69:23

**Letvin** [1] - 10:11

**leveled** [5] - 41:19, 41:24, 45:5, 45:7, 109:15

**levels** [1] - 70:25

**Levi** [37] - 54:8, 54:21, 54:22, 54:24, 55:6, 55:24, 56:4, 63:9, 64:22, 65:1, 65:7, 65:10, 66:24, 70:7, 70:9, 71:7, 71:12, 72:3, 76:24, 79:5, 80:13, 80:23, 81:5, 81:15, 82:24, 83:22, 84:23, 86:19, 86:21, 92:1, 92:7, 93:21, 95:7, 103:25, 105:21, 105:25, 124:22

**Levi's** [1] - 65:5

**lie** [1] - 56:24

**light** [8] - 62:11, 62:19, 63:20, 64:3, 64:14, 65:5, 107:11, 110:22

**likely** [3] - 29:6, 29:21, 70:23

**Likewise** [2] - 24:13, 68:11

**line** [4] - 71:18, 99:21, 105:21, 132:19

**lines** [1] - 60:3

**link** [1] - 132:9

**linked** [1] - 99:15

**links** [1] - 132:6

**list** [2] - 74:13, 118:23

**listed** [1] - 52:2

**listened** [1] - 35:5

**Listserv** [2] - 118:17, 118:18

**Litigation** [2] - 2:12, 142:13

**lived** [1] - 67:7

**LLC** [2] - 2:5, 142:6

**load** [3] - 98:8, 98:10, 98:12

**look** [17] - 56:9, 58:11, 63:23, 70:13, 76:7, 81:3, 93:10, 101:10, 102:6, 102:9, 107:9, 112:6, 122:17, 123:7, 123:23, 128:16, 129:15

**looked** [1] - 117:3

**looking** [4] - 31:9, 62:4, 86:24, 122:13

**looks** [1] - 58:13

**lose** [1] - 72:7

**lost** [1] - 78:12

**lower** [1] - 42:5

**lvg.dallas@ gmail.com** [1] - 2:24

**lying** [6] - 56:15, 56:17, 56:19, 57:1, 58:2, 80:15

---

## M

**m.allen@allen** [2] - 2:8, 142:9

**m.allen@allen-lawfirm.com** [2] - 2:8, 142:9

**machine** [1] - 1:21

**mail** [8] - 2:8, 2:14, 2:19, 77:16, 82:23, 142:9, 142:15, 142:20

**mailed** [1] - 68:13

**main** [7] - 41:9, 42:2, 49:3, 52:8, 74:7, 119:10, 119:16

**mainstream** [1] - 44:3

**maintain** [2] - 110:24, 135:22

**major** [1] - 12:15

**majority** [6] - 124:2, 124:5, 124:15, 124:17, 124:19, 124:21

**manageable** [1] - 98:6

**management** [1] - 95:3
**mandates** [1] - 66:11
**March** [2] - 21:18, 54:4
**mark** [10] - 36:21, 47:20, 77:20, 84:5, 87:1, 100:21, 111:21, 111:24, 118:6, 121:15
**marked** [21] - 7:25, 8:1, 36:23, 47:19, 56:7, 69:17, 69:18, 78:5, 78:7, 78:9, 78:13, 84:7, 87:5, 89:15, 93:9, 100:25, 106:23, 112:1, 118:10, 121:17, 127:4
**MARKED** [1] - 3:12
**marking** [1] - 78:15
**marks** [1] - 5:9
**master's** [1] - 12:22
**material** [1] - 107:20
**Material** [1] - 3:23
**matter** [3] - 54:19, 54:20, 105:11
**matters** [2] - 30:4, 57:12
**McGough** [1] - 2:23
**mean** [13] - 28:17, 34:5, 37:15, 38:17, 40:14, 54:4, 55:9, 55:14, 67:4, 67:7, 101:21, 107:3, 107:4
**meaning** [1] - 12:3
**means** [5] - 62:15, 66:15, 67:9, 98:20, 98:22
**meant** [2] - 66:24, 113:4
**media** [18] - 25:21, 26:5, 26:9, 26:19, 26:24, 28:2, 29:22, 29:25, 30:4, 45:6,

101:8, 101:20, 101:21, 103:21, 112:14, 112:17, 120:16, 120:17
**medications** [1] - 8:18
**meeting** [29] - 9:18, 29:18, 33:17, 60:23, 65:19, 88:13, 89:18, 103:13, 103:14, 103:17, 103:23, 104:16, 105:3, 106:4, 106:13, 106:17, 106:18, 108:9, 108:21, 108:23, 119:4, 119:6, 119:7, 119:12, 120:5, 120:6, 134:12
**member** [24] - 19:23, 20:10, 25:20, 25:22, 31:19, 33:11, 39:16, 40:6, 46:4, 56:18, 56:19, 56:22, 56:25, 57:2, 57:5, 58:2, 58:4, 104:4, 114:10, 134:3, 134:4, 135:8, 135:19, 136:1
**members** [2] - 27:11, 121:5
**memory** [14] - 26:13, 26:16, 29:14, 31:23, 43:5, 43:8, 45:14, 83:24, 91:20, 100:17, 101:19, 110:15, 125:10, 127:25
**mental** [1] - 8:20
**mention** [2] - 35:5, 55:19
**mentioned** [4] - 18:25, 21:8, 34:14, 39:10
**mentioning** [4] - 55:22, 61:23, 101:23, 109:10
**mess** [1] - 118:17
**message** [4] - 72:25, 73:1, 73:2, 79:5
**messages** [2] - 44:19, 59:11
**met** [9] - 10:3,

10:4, 28:11, 87:16, 115:25, 116:1, 134:7, 134:9, 134:10
**methods** [3] - 74:16, 75:2, 75:15
**MHTE** [22] - 4:23, 5:1, 17:25, 18:4, 18:13, 18:20, 18:22, 18:25, 19:13, 19:18, 19:19, 19:22, 20:5, 32:22, 57:21, 113:7, 123:12, 123:20, 124:2, 124:6, 128:1, 136:16
**Michael** [4] - 2:5, 7:9, 142:3, 142:6
**middle** [1] - 60:2
**might** [3] - 29:2, 29:3, 40:24
**MIN** [2] - 142:3, 142:3
**mind** [3] - 52:13, 110:4, 120:7
**minus** [1] - 124:12
**minutes** [1] - 138:3
**MISCELLANEO US** [1] - 6:21
**mischaracteriz ation** [1] - 76:19
**mischaracteriz e** [2] - 90:7, 109:9
**misrepresent** [2] - 73:8, 102:3
**mistake** [1] - 72:2
**mistaken** [1] - 79:13
**mixed** [1] - 65:23
**money** [1] - 91:16
**month** [4] - 91:13, 92:12, 100:19, 137:2
**months** [1] - 92:21
**morning** [1] - 108:10
**mother** [2] - 11:6, 11:20
**mother-in-law** [1] - 11:6
**move** [5] -

46:10, 67:22, 73:22, 95:6, 135:17
**moving** [1] - 97:15
**Moving** [3] - 122:10, 123:8, 126:2
**MR** [89] - 7:9, 7:11, 7:13, 7:19, 36:16, 36:21, 37:1, 39:18, 43:3, 44:21, 45:23, 47:20, 48:3, 48:6, 48:12, 48:15, 50:7, 51:23, 53:10, 56:3, 57:4, 57:17, 59:1, 69:8, 69:10, 74:20, 76:23, 77:19, 77:8, 78:3, 78:4, 78:5, 78:8, 78:11, 80:16, 83:13, 83:19, 84:5, 85:6, 85:10, 85:12, 85:13, 85:20, 86:7, 86:14, 86:24, 88:5, 92:24, 93:5, 99:1, 100:4, 100:6, 100:8, 100:14, 106:19, 109:22, 110:12, 111:2, 111:13, 111:16, 111:21, 112:2, 112:3, 112:4, 114:15, 114:24, 117:7, 117:16, 118:3, 118:6, 121:10, 121:12, 122:21, 122:23, 123:15, 124:4, 127:5, 131:7, 131:9, 131:10, 131:12, 131:13, 131:15, 137:3, 137:10, 137:19, 137:24, 138:4, 138:6
**music** [14] - 12:11, 13:11, 19:20, 21:19, 29:9, 34:10, 35:1, 35:19, 36:1, 46:19, 81:12, 98:20, 99:18, 110:20
**Music** [32] - 12:16, 15:17, 15:19, 17:21,

17:22, 17:25, 18:22, 19:8, 19:13, 19:15, 19:16, 19:19, 20:9, 20:19, 21:11, 21:18, 33:12, 33:15, 33:18, 50:18, 66:21, 70:19, 109:19, 109:24, 116:6, 118:24, 133:6, 135:10, 135:12, 135:19, 136:6, 136:11
**musical** [1] - 75:19
**Musicology** [1] - 13:11
**musicology** [2] - 121:24, 122:1
**must** [1] - 120:9
**mutual** [1] - 77:5
**my.unt.edu** [1] - 79:6

## N

**naive** [3] - 71:2, 75:10, 75:16
**name** [10] - 7:20, 34:11, 35:1, 37:12, 109:21, 110:6, 126:20, 133:18, 133:19, 140:18
**named** [3] - 11:19, 22:7, 54:8
**Namely** [1] - 96:14
**names** [1] - 110:18
**nature** [5] - 21:24, 70:3, 73:18, 95:3, 101:1
**necessarily** [5] - 5:10, 67:19, 71:15, 111:5, 114:18
**need** [4] - 37:1, 71:16, 113:1, 131:21
**needed** [1] - 134:11
**negative** [2] - 63:10, 86:9
**negligent** [1] - 113:19
**never** [6] -

36:11, 114:18, 115:25, 116:1, 133:25, 134:1
**new** [12] - 22:12, 22:20, 22:21, 22:24, 23:6, 101:17, 133:4, 133:7, 133:23, 134:1, 134:23, 134:25
**New** [6] - 22:14, 22:21, 29:13, 135:17, 135:18, 135:25
**News** [1] - 128:20
**next** [9] - 16:5, 18:18, 20:1, 28:9, 61:6, 67:23, 73:22, 75:25, 103:6
**Nicole** [1] - 46:3
**nine** [3] - 91:13, 92:12, 92:13
**nine-month** [1] - 92:12
**NO** [4] - 1:5, 6:4, 141:5, 143:6
**nominated** [2] - 133:16, 133:21
**nominations** [1] - 133:17
**non** [1] - 50:2
**normal** [4] - 35:15, 44:3, 77:11, 114:25
**normally** [2] - 39:20, 92:22
**norms** [1] - 114:4
**North** [40] - 1:22, 2:16, 2:17, 7:14, 15:12, 15:13, 15:24, 16:6, 17:5, 17:16, 18:23, 21:20, 22:8, 22:25, 26:19, 26:23, 26:25, 29:24, 31:4, 31:11, 37:16, 40:4, 40:25, 41:19, 46:15, 46:19, 50:6, 50:10, 56:14, 56:21, 59:15, 66:10, 66:20, 116:7, 122:2, 134:15, 135:23, 142:17, 142:18
**NOTARY** [1] -

140:24
note [3] - 48:3,
48:12, 72:19
NOTE [1] - 5:8
noted [1] - 140:7
Notes [1] - 4:6
notes [11] - 9:18,
9:20, 9:21, 9:23,
89:17, 89:19,
89:20, 90:19,
94:4, 136:21
Nothing [1] -
9:15
Notice [2] - 3:13,
6:7
notice [1] -
48:10
notified [1] -
101:7
November [14] -
33:15, 42:1,
50:21, 50:24,
53:18, 53:22,
70:8, 70:14, 72:4,
73:25, 83:7,
127:11, 128:16,
141:22
number [15] -
13:20, 13:22,
13:24, 19:17,
23:25, 24:6, 24:7,
28:11, 29:19,
48:17, 56:5,
69:20, 84:8,
110:19
NUMBER [2] -
3:12, 6:16
Number [35] -
7:25, 36:23,
47:19, 56:7,
69:17, 74:15,
74:22, 75:18,
76:13, 76:17,
77:2, 77:21, 78:6,
78:7, 78:16, 84:6,
84:7, 87:1, 87:5,
88:18, 89:14,
89:15, 93:9,
100:25, 106:20,
106:23, 112:1,
118:10, 121:16,
121:17, 126:2,
127:4, 129:25,
131:23, 132:12
number's [1] -
93:1
numbered [2] -
1:18, 76:1
numbers [8] -
38:1, 48:5, 69:23,

69:25, 70:2, 78:2,
89:25, 131:16
Numeral [3] -
74:25, 99:4, 99:6

## O

oath [1] - 140:15
Object [1] -
85:20
object [1] -
137:20
objection [3] -
6:22, 50:12, 55:2
Objection [1] -
80:16
obligated [1] -
22:3
observe [1] -
120:25
obviously [1] -
136:9
occurred [6] -
17:10, 31:16,
34:15, 111:4,
126:19, 127:3
occurring [2] -
10:18, 11:8
October [2] -
141:20, 143:2
odd [1] - 77:3
OF [11] - 1:1,
1:10, 1:15, 6:2,
6:16, 140:10,
140:11, 140:25,
141:1, 141:9,
141:10
offended [1] -
117:23
offensive [2] -
85:25, 86:1
Office [3] - 2:17,
7:15, 142:18
office [5] -
57:10, 57:11,
57:12, 79:15,
140:21
officer [1] -
141:24
official [2] -
66:23, 95:20
often [2] - 20:25,
114:21
Once [1] - 18:13
once [1] - 18:13
One [1] - 67:21
one [54] - 6:22,
8:9, 17:18, 17:24,
18:15, 18:16,

19:18, 25:2,
29:12, 33:1, 36:3,
38:11, 38:18,
42:2, 42:20,
42:23, 43:18,
44:25, 45:15,
62:8, 63:10,
63:11, 63:16,
63:23, 64:20,
73:23, 77:23,
78:24, 81:23,
92:11, 92:19,
93:23, 94:1,
99:16, 104:1,
106:25, 107:9,
108:8, 109:14,
110:14, 113:15,
113:23, 114:5,
114:6, 114:9,
116:5, 119:10,
126:1, 126:25,
128:18, 128:20,
130:19, 130:21,
131:4
one-half [1] -
92:19
online [3] -
126:5, 126:9,
126:13
onward [1] -
16:18
opening [1] -
116:19
operations [2] -
88:3, 88:8
opinion [1] -
52:20
opportunity [1] -
135:20
opposed [1] -
63:17
opposite [1] -
81:19
ORAL [3] - 1:10,
1:15, 141:10
oral [1] - 141:17
Order [1] - 6:8
ordinary [3] -
59:17, 59:20,
59:21
organization [1]
- 53:21
organizational
[1] - 19:12
organized [1] -
18:23
organizing [1] -
53:18
ORIGINAL [1] -
6:11

originally [1] -
114:1
Otherwise [2] -
30:21, 137:17
otherwise [3] -
67:12, 89:20,
143:1
ourselves [2] -
112:25, 113:2
outcome [1] -
143:1
outcry [2] - 50:1,
50:4
outlined [1] -
129:6
outside [2] -
41:11, 59:4
overall [1] -
103:19
overcome [1] -
117:20
oversee [1] -
91:8
overstated [1] -
34:16
overwhelming
[4] - 124:14,
124:16, 124:18,
124:21
own [7] - 47:11,
64:17, 110:6,
115:22, 121:8,
124:24, 125:4

## P

p.m [21] - 1:19,
7:4, 37:5, 37:8,
56:6, 69:13,
69:16, 73:25,
85:16, 85:19,
100:10, 100:13,
103:15, 122:25,
123:3, 127:8,
137:6, 137:9,
138:8, 138:10
P.O [4] - 2:6,
2:12, 142:7,
142:13
page [34] -
37:25, 38:1, 39:2,
44:8, 44:13,
47:21, 49:7,
49:12, 49:15,
52:12, 52:24,
53:3, 61:6, 61:7,
61:9, 69:21,
69:23, 69:25,
70:1, 70:13, 72:1,

78:23, 79:3, 79:4,
90:2, 90:5, 93:1,
95:6, 102:9,
103:7, 107:1,
117:1
PAGE [1] - 3:2
Page [2] - 3:17,
5:2
PAGE/LINE [1] -
139:4
paged [1] -
118:7
pages [2] - 49:9,
53:6
paid [10] - 89:12,
89:24, 90:22,
91:21, 91:23,
93:21, 94:10,
95:21, 96:1, 96:2
pain [6] -
119:24, 120:3,
120:12, 120:14,
120:23, 121:8
panel [6] -
78:20, 79:20,
83:9, 84:9, 131:8,
136:20
Panel [14] - 4:1,
83:7, 83:25, 84:6,
88:10, 127:12,
129:17, 129:17,
130:1, 131:2,
131:24, 132:11,
132:12, 132:24
panel's [2] -
88:19, 93:13
panelists [1] -
50:25
paper [6] - 51:7,
70:18, 70:23,
74:7, 76:20,
82:20
papers [7] -
63:4, 80:11,
82:13, 83:1,
84:14, 121:6
paragraph [13] -
38:16, 38:17,
39:1, 59:25, 60:2,
61:6, 63:5, 63:8,
64:21, 66:5,
67:23, 113:10,
129:5
paragraphs [2] -
74:14, 76:1
paraphrase [2] -
45:18, 54:13
paraphrasing
[1] - 42:5
part [7] - 27:25,

28:1, 53:25, 73:1,
76:11, 100:1,
107:20
partes [1] -
141:25
participants [2]
- 103:23, 121:3
participate [2] -
115:20, 115:21
participated [2]
- 26:1, 121:6
participating [1]
- 80:23
particular [9] -
26:10, 44:2, 48:1,
48:4, 64:22,
64:24, 70:22,
110:14, 134:2
particularly [5] -
42:21, 55:20,
84:16, 108:25,
119:25
particulate [1] -
101:24
parties [2] -
6:22, 142:23
parts [1] - 22:19
party [3] - 6:22,
48:5, 142:1
pass [1] - 137:11
passage [1] -
84:15
passing [2] -
34:9, 35:5
pay [4] - 91:13,
91:23, 92:7, 92:8
PDF [1] - 93:1
peek [1] - 79:3
peer [20] - 14:22,
15:1, 15:3, 15:6,
15:9, 21:2, 36:7,
36:9, 42:7, 46:11,
46:16, 46:20,
49:21, 49:24,
50:2, 51:18, 52:5,
52:15, 52:17,
53:1
peer-review [1] -
42:7
peer-reviewed
[1] - 50:2
people [24] -
31:12, 31:21,
38:12, 41:11,
57:22, 59:4, 63:6,
64:2, 64:14,
67:12, 72:13,
84:19, 85:2, 85:5,
86:6, 86:13,
101:11, 103:22,

105:8, 114:16, 115:15, 117:19, 117:20, 119:24
**People** [1] - 41:12
**people's** [1] - 35:16
**per** [2] - 43:2, 91:13
**perceive** [6] - 41:2, 58:3, 58:9, 59:19, 59:21, 59:22
**perceived** [8] - 24:1, 54:14, 55:17, 59:18, 110:2, 114:17, 114:18, 120:18
**perceiving** [1] - 59:24
**percent** [2] - 90:12, 124:11
**perception** [1] - 35:10
**perfectly** [3] - 51:4, 77:14, 110:23
**perhaps** [2] - 71:23, 113:7
**period** [2] - 24:5, 91:13
**person** [2] - 35:13, 140:17
**personally** [2] - 45:4, 140:14
**perspective** [2] - 52:11, 104:25
**Peter** [4] - 121:18, 121:22, 121:23, 132:14
**petition** [3] - 110:10, 121:7, 121:14
**petitions** [1] - 110:14
**Ph.D** [12] - 1:11, 1:16, 3:6, 6:2, 7:16, 12:10, 12:17, 12:20, 13:1, 13:4, 139:2, 141:10
**Phil** [6] - 29:7, 29:8, 29:9, 114:1, 117:10, 117:18
**Philip** [20] - 33:10, 33:20, 34:24, 35:9, 35:18, 36:6, 48:24, 49:11, 49:20, 49:22,

51:7, 52:25, 54:1, 61:7, 61:11, 101:17, 113:10, 115:14, 115:24, 115:25
**phone** [1] - 51:24
**photograph** [1] - 38:18
**phrase** [3] - 66:22, 67:2, 124:21
**physical** [1] - 8:21
**picks** [1] - 107:2
**place** [5] - 78:14, 115:3, 119:6, 119:7, 133:15
**placed** [1] - 50:17
**Plaintiff** [5] - 1:4, 1:17, 7:10, 137:17, 141:4
**PLAINTIFF** [2] - 2:4, 142:5
**plan** [2] - 88:2, 88:7
**platform** [2] - 101:21, 101:24
**plenary** [8] - 33:20, 33:24, 34:5, 34:15, 35:18, 50:19, 73:12, 109:17
**Plus** [1] - 124:11
**point** [19] - 13:23, 16:18, 17:4, 21:8, 58:22, 63:1, 64:6, 64:8, 68:11, 69:9, 75:9, 77:1, 88:18, 96:16, 97:10, 98:15, 102:6, 105:16, 105:18
**Point** [1] - 74:22
**pointed** [1] - 109:5
**pointing** [2] - 85:25, 86:9
**points** [3] - 74:7, 74:13, 87:14
**polarized** [1] - 110:7
**policies** [11] - 30:2, 30:5, 30:11, 30:16, 38:11, 38:16, 40:3, 56:14, 56:16, 57:14, 57:21
**Policy** [9] - 38:3,

38:7, 38:20, 38:22, 39:5, 39:8, 40:25, 41:4, 41:6
**policy** [7] - 26:18, 26:22, 29:23, 38:9, 38:10, 47:14, 66:10
**politically** [3] - 66:7, 66:11, 66:19
**Politically** [1] - 66:17
**Pomeroy** [1] - 80:6
**poorly** [1] - 42:4
**portions** [1] - 93:20
**position** [29] - 13:8, 21:24, 22:11, 23:1, 23:8, 37:16, 46:7, 89:3, 89:6, 89:10, 89:12, 90:12, 90:25, 91:1, 91:4, 91:7, 91:19, 92:1, 94:2, 94:15, 95:8, 95:20, 96:9, 133:14, 134:10, 135:22, 135:25, 136:2, 136:4
**positions** [1] - 22:6
**possible** [1] - 9:3
**Post** [1] - 3:18
**post** [12] - 25:21, 55:24, 56:4, 56:10, 56:12, 58:11, 61:4, 80:22, 80:25, 81:3, 81:16, 86:21
**posted** [1] - 134:6
**posting** [4] - 86:19, 133:14, 134:10, 134:11
**posts** [1] - 112:11
**potential** [1] - 22:21
**power** [2] - 75:20, 75:21
**practice** [2] - 44:4, 64:15
**pre** [1] - 53:17
**pre-history** [1] - 53:17
**precedes** [1] -

97:21
**prefaces** [1] - 72:19
**preliminary** [1] - 7:24
**preparation** [1] - 9:16
**prepare** [2] - 9:10, 9:12
**preparing** [2] - 88:14, 88:16
**PRESENT** [1] - 2:21
**present** [2] - 7:6, 12:4
**presentation** [3] - 61:8, 61:12, 74:4
**presented** [2] - 50:20, 79:19
**president** [1] - 23:2
**Press** [6] - 41:19, 46:19, 47:8, 126:10, 126:15, 126:23
**pressured** [1] - 64:19
**presume** [1] - 71:20
**pretty** [1] - 98:12
**previous** [4] - 76:5, 77:24, 79:4, 116:25
**previously** [5] - 9:24, 78:13, 83:4, 96:14, 137:21
**primary** [2] - 77:9, 135:13
**Princeton** [1] - 135:16
**printed** [2] - 90:1, 90:3
**private** [2] - 90:15
**privileged** [1] - 9:13
**pro** [13] - 63:4, 64:19, 64:25, 65:8, 80:11, 81:7, 81:9, 81:22, 81:25, 82:3, 82:11, 82:19, 83:1
**Pro** [1] - 64:20
**pro-Ewell** [4] - 65:8, 81:22, 82:3, 82:19
**pro-Schenker** [6] - 63:4, 64:19,

64:25, 80:11, 81:7, 81:9
**Pro-Schenker** [1] - 64:20
**pro-Schenkerian** [1] - 83:1
**probable** [1] - 80:14
**problematic** [2] - 75:10, 75:16
**Procedure** [2] - 1:24, 6:9
**procedures** [1] - 108:17
**proceed** [1] - 66:18
**proceeding** [1] - 142:24
**Proceedings** [1] - 138:10
**proceedings** [1] - 6:24
**process** [4] - 42:7, 60:1, 60:5, 133:9
**produce** [1] - 48:10
**produced** [2] - 1:16, 48:16
**Producing** [1] - 6:13
**profession** [1] - 114:25
**professional** [8] - 56:20, 56:24, 67:7, 67:8, 113:14, 113:22, 114:5, 114:8
**professionalis m** [4] - 114:5, 114:13, 114:19, 115:2
**professor** [15] - 13:5, 13:8, 15:24, 16:2, 16:8, 16:10, 16:19, 17:1, 17:13, 29:24, 31:5, 34:18, 34:22, 56:15, 68:25
**Professor** [65] - 7:20, 10:20, 10:23, 11:1, 11:19, 14:9, 29:17, 30:24, 37:9, 39:5, 45:8, 48:18, 63:3, 65:2, 70:9, 70:21, 71:6, 71:8, 73:17,

82:13, 83:17, 83:25, 84:12, 87:2, 87:7, 93:7, 95:15, 96:5, 96:8, 96:10, 96:14, 96:21, 97:14, 97:24, 99:22, 100:14, 101:3, 104:9, 106:24, 110:10, 110:17, 110:22, 110:25, 111:22, 111:23, 112:6, 112:10, 112:15, 112:19, 116:11, 117:2, 117:5, 118:8, 118:9, 118:19, 119:3, 119:8, 121:19, 123:4, 124:19, 127:7, 127:10, 129:1, 137:12
**professor's** [1] - 30:3
**program** [1] - 20:12
**projects** [1] - 22:21
**promoted** [4] - 16:7, 16:19, 16:25, 17:14
**pronounce** [1] - 46:25
**pronounced** [1] - 46:23
**proposed** [1] - 120:7
**protect** [2] - 61:21, 81:7
**protecting** [2] - 63:14, 63:15
**protection** [1] - 61:23
**protest** [1] - 68:2
**proved** [1] - 140:15
**provide** [3] - 64:23, 84:24, 86:15
**provided** [10] - 39:5, 86:18, 94:25, 105:4, 106:15, 106:17, 119:16, 119:18, 119:22, 137:21
**providing** [3] - 105:5, 119:19, 134:5
**provisions** [1] - 1:25

**public** [9] - 30:4, 48:9, 81:12, 126:5, 126:9, 128:19, 133:14, 134:10, 134:11
**PUBLIC** [1] - 140:24
**publication** [5] - 20:22, 24:10, 97:4, 100:1, 113:23
**publications** [1] - 40:23
**publicize** [1] - 134:6
**publicly** [3] - 56:1, 126:3, 126:4
**publish** [4] - 20:25, 80:4, 109:20, 117:21
**published** [38] - 13:12, 13:15, 13:18, 14:8, 14:15, 14:17, 14:19, 14:20, 14:25, 15:3, 20:23, 23:22, 24:5, 25:13, 26:24, 35:19, 35:21, 36:6, 36:8, 43:19, 46:18, 46:19, 47:7, 47:11, 47:14, 47:17, 52:6, 53:23, 82:11, 109:3, 110:1, 110:2, 111:3, 113:11, 114:10, 114:22, 117:12, 128:19
**publishes** [1] - 48:23
**publishing** [5] - 50:2, 51:16, 51:18, 110:6, 111:7
**pull** [2] - 117:2, 117:18
**purpose** [7] - 78:22, 87:9, 87:12, 103:12, 122:6, 122:8, 140:20
**purposes** [2] - 95:1, 121:15
**PURSUANT** [1] - 6:6
**pursuant** [2] - 1:23, 141:23

**pursue** [1] - 22:23
**pushback** [1] - 101:16
**pushed** [1] - 76:18
**put** [10] - 8:7, 50:12, 63:2, 71:22, 102:15, 110:18, 118:1, 126:4, 132:22, 137:24
**putting** [1] - 70:10

**Q**

**Quaker** [2] - 2:6, 142:7
**quality** [4] - 23:19, 42:5, 42:21, 52:9
**quarters** [2] - 92:15, 92:20
**query** [1] - 105:25
**questioning** [2] - 99:22, 132:19
**questions** [10] - 8:16, 37:23, 93:12, 93:14, 97:8, 108:14, 129:18, 132:20, 137:13, 137:22
**Questions** [2] - 4:8, 90:4
**quickly** [1] - 73:3
**quit** [3] - 68:1, 68:12, 68:19
**quite** [2] - 70:24, 73:23
**quitting** [2] - 68:15, 69:3
**quotation** [3] - 44:6, 44:7, 63:15
**Quotation** [1] - 5:9
**quote** [19] - 5:10, 19:8, 42:18, 43:16, 43:24, 43:25, 45:2, 55:3, 61:2, 62:3, 63:13, 64:19, 65:11, 66:3, 66:11, 97:1, 115:18, 115:23, 116:3
**quotes** [1] - 43:1

**R**

**RA** [1] - 94:2
**race** [4] - 29:7, 66:7, 67:3, 67:10
**racial** [1] - 67:16
**racism** [4] - 15:8, 41:6, 76:25, 77:6
**racism'** [1] - 76:18
**racist** [24] - 24:1, 25:6, 34:24, 41:12, 42:3, 42:11, 42:16, 50:2, 51:17, 52:6, 52:9, 54:14, 55:2, 55:3, 55:17, 71:1, 74:15, 75:1, 75:14, 108:25, 115:9, 125:14, 125:20, 125:22
**radically** [1] - 58:25
**raised** [2] - 109:5, 109:12
**raising** [1] - 84:17
**rank** [5] - 16:7, 16:19, 17:12, 34:21, 92:9
**rare** [1] - 31:17
**RAs** [1] - 92:22
**rate** [1] - 91:23
**rather** [2] - 9:4, 78:25
**rational** [1] - 110:23
**Re** [2] - 3:13, 4:8
**re** [1] - 101:16
**RE** [2] - 4:14, 4:20
**Re-Notice** [1] - 3:13
**reached** [1] - 103:3
**reaching** [1] - 102:25
**react** [2] - 120:19, 120:20
**reaction** [2] - 34:5, 110:25
**reactions** [1] - 103:20
**read** [54] - 24:2, 24:19, 24:20, 24:22, 24:25, 36:3, 42:11, 43:15, 43:18,

47:23, 47:24, 48:1, 60:8, 61:17, 62:13, 68:3, 68:4, 70:10, 71:3, 71:15, 71:25, 72:5, 73:11, 74:1, 74:8, 75:23, 76:24, 80:7, 80:21, 80:22, 81:14, 83:10, 83:11, 83:12, 83:14, 83:15, 84:11, 85:22, 88:19, 88:21, 88:22, 89:1, 89:2, 90:16, 104:21, 105:21, 110:3, 112:7, 113:25, 123:16, 129:16, 138:4, 140:5
**reader** [1] - 52:16, 53:2
**reading** [17] - 25:1, 44:1, 56:2, 56:10, 56:12, 62:22, 63:8, 64:21, 65:6, 72:8, 88:9, 95:9, 104:17, 115:23, 116:17, 128:2, 129:11
**real** [1] - 64:1
**reason** [14] - 37:19, 37:22, 43:24, 52:21, 85:8, 102:2, 104:2, 112:15, 115:3, 119:16, 127:19, 128:4, 135:13
**REASON** [1] - 139:4
**reasonable** [2] - 109:20, 110:5
**reasons** [3] - 52:8, 97:24, 114:1
**reassigned** [2] - 68:14, 68:22
**Rebecca** [5] - 10:15, 10:16, 127:6, 127:16, 132:2
**rebutted** [1] - 66:8
**receive** [6] - 30:23, 73:2, 88:21, 88:24, 91:12, 127:20
**received** [17] -

12:9, 12:10, 31:25, 32:6, 32:18, 37:20, 45:4, 72:13, 73:4, 73:5, 73:12, 80:5, 104:14, 128:3, 128:13, 130:21, 131:25
**receiving** [9] - 37:11, 44:24, 72:22, 72:25, 86:23, 88:25, 112:9, 122:4, 127:25
**recent** [3] - 66:8, 107:11, 112:11
**recently** [1] - 137:14
**Recess** [6] - 37:6, 69:14, 85:17, 100:11, 123:1, 137:7
**recognize** [2] - 8:2, 37:10
**recollection** [41] - 15:2, 16:11, 17:19, 23:24, 24:6, 25:23, 26:7, 27:24, 28:5, 31:15, 31:18, 32:23, 33:22, 34:14, 34:20, 41:1, 43:9, 45:15, 45:24, 46:3, 54:24, 55:6, 67:1, 68:13, 91:22, 93:19, 94:7, 95:22, 96:2, 96:7, 97:18, 98:9, 101:9, 103:16, 106:5, 113:25, 116:1, 123:21, 124:8, 133:11, 134:21
**recollections** [1] - 54:13
**record** [57] - 1:25, 7:3, 7:21, 7:24, 14:18, 17:7, 20:5, 20:22, 22:20, 23:16, 37:3, 37:4, 37:8, 48:4, 48:9, 48:13, 50:13, 51:24, 56:4, 67:6, 69:11, 69:12, 69:16, 69:18, 69:22, 70:11, 77:20, 78:6, 81:2, 84:5, 85:12, 85:13,

85:15, 85:19, 87:1, 92:25, 93:3, 93:6, 100:9, 100:13, 121:22, 122:22, 122:23, 122:24, 123:3, 123:4, 127:6, 131:2, 133:10, 137:4, 137:5, 137:9, 137:11, 137:24, 138:7, 141:18, 141:25
**Record** [1] - 115:18
**recounted** [1] - 83:24
**recounts** [1] - 84:9
**recruited** [1] - 134:1
**recused)** [1] - 79:23
**refer** [7] - 18:4, 24:9, 24:14, 66:19, 69:25, 75:5, 131:23
**reference** [8] - 38:15, 38:19, 38:21, 38:22, 38:23, 75:4, 113:4, 132:3
**references** [1] - 38:3
**referred** [3] - 10:1, 20:13, 51:17
**referring** [11] - 40:13, 52:23, 71:20, 74:19, 93:22, 104:21, 113:7, 117:8, 129:10, 130:17, 136:21
**refers** [8] - 8:10, 18:4, 24:15, 38:24, 75:6, 99:9, 116:12, 129:11
**reflect** [2] - 5:10, 104:15
**refresh** [4] - 29:14, 100:17, 101:19, 125:10
**regarded** [1] - 56:23
**regarding** [1] - 4:8
**regents** [6] - 37:18, 37:21, 40:3, 40:8, 40:10, 40:18

registration [2] - 143:10, 143:10

regular [1] - 134:7

regularly [3] - 47:2, 47:23, 134:9

related [1] - 142:23

relations [1] - 66:7

relationship [7] - 22:16, 22:18, 22:24, 23:1, 68:17, 68:20, 135:15

relatively [2] - 74:14, 127:14

release [3] - 126:13, 126:16, 126:18

released [2] - 25:19, 126:9

releasing [1] - 126:5

relied [1] - 44:11

rely [2] - 47:17, 77:24

remain [2] - 88:2, 88:8

remember [51] - 32:25, 33:2, 33:6, 33:8, 33:23, 34:13, 34:17, 36:18, 39:22, 40:9, 42:18, 45:22, 46:8, 50:21, 52:2, 53:24, 55:22, 55:24, 56:2, 56:10, 56:12, 58:22, 66:2, 66:4, 72:22, 73:16, 84:2, 84:4, 87:7, 95:14, 95:17, 97:17, 101:23, 104:5, 104:7, 104:8, 104:13, 106:14, 108:5, 108:24, 110:13, 112:8, 112:14, 119:11, 122:4, 127:1, 127:12, 127:15, 127:18, 128:2, 132:10

remote [1] - 135:24

remotely [2] - 135:18, 135:21

Renaldo [4] -

2:16, 7:13, 85:11, 142:17

Renaldo.Stowers@untsystem.edu [2] - 2:19, 142:20

reopening [1] - 137:20

repeat [7] - 18:24, 44:17, 49:4, 51:21, 57:19, 64:16, 121:11

rephrase [3] - 9:2, 86:10, 113:20

replacement [1] - 137:16

report [15] - 20:15, 20:18, 60:6, 83:9, 83:11, 83:21, 83:22, 84:11, 84:12, 84:16, 88:19, 88:21, 94:24, 131:8

Report [13] - 4:1, 83:7, 83:25, 84:6, 88:10, 127:12, 128:17, 129:17, 130:1, 131:2, 131:24, 132:11, 132:24

reported [4] - 1:21, 20:9, 20:10, 60:13

reporter [2] - 7:7, 8:11

Reporter [2] - 1:20, 141:13

REPORTER'S [2] - 5:8, 141:9

reports [3] - 23:2, 58:6, 101:8

represent [7] - 50:22, 70:16, 78:18, 79:12, 89:16, 116:10, 129:18

representation [1] - 80:13

representing [2] - 78:22, 107:23

reproduced [1] - 132:11

request [3] - 36:25, 98:3, 121:2

requesting [1] - 97:12

requests [1] - 30:23

required [1] - 30:18

requirement [1] - 46:14

research [8] - 23:19, 42:22, 44:4, 89:11, 90:15, 91:25, 94:5, 96:9

researched [1] - 42:4

reserve [2] - 137:12, 137:22

resigned [1] - 136:2

respond [6] - 26:23, 27:4, 27:15, 27:19, 28:4, 101:18

responded [1] - 105:25

responding [2] - 105:11, 109:17

Response [1] - 4:17

response [18] - 4:21, 8:5, 29:22, 39:23, 53:25, 54:1, 71:23, 88:14, 88:16, 88:19, 88:24, 88:25, 107:7, 107:14, 107:25, 109:18, 110:24, 119:2

responses [7] - 65:8, 76:3, 76:4, 80:2, 80:5, 105:14, 105:22

responsibilities [1] - 40:8

Responsibility [1] - 38:6

responsibility [5] - 58:8, 58:10, 61:13, 91:8, 91:11

responsible [9] - 20:6, 30:11, 30:15, 38:12, 40:3, 57:13, 57:21, 133:13

rest [2] - 93:11, 108:2

restate [3] - 74:21, 87:11, 117:25

retain [1] -

135:25

retaliated [1] - 68:9

retaliation [3] - 68:5, 68:10, 109:21

retrieve [2] - 8:9, 127:11

return [1] - 141:22

Review [2] - 4:1, 4:7

review [12] - 9:16, 21:6, 36:7, 36:9, 41:15, 42:7, 46:11, 47:2, 51:19, 93:15, 108:13, 137:14

reviewed [20] - 9:18, 14:23, 15:1, 15:4, 15:6, 15:9, 21:3, 44:12, 46:16, 46:20, 47:24, 48:1, 49:21, 49:24, 50:2, 52:5, 52:15, 52:17, 53:1, 136:20

reviews [3] - 96:17, 97:1, 99:23

Richmond [8] - 20:21, 27:21, 93:7, 119:17, 121:19, 130:20, 132:15, 135:5

ridiculous [1] - 76:20

ring [1] - 101:20

ringing [1] - 51:25

road [1] - 107:18

role [7] - 17:9, 17:14, 17:17, 56:22, 57:8, 58:5, 95:24

roles [1] - 17:15

Roman [2] - 99:4, 99:6

root [2] - 76:18, 76:25

rough [1] - 19:6

roughly [1] - 48:19

rule [1] - 29:23

Rules [2] - 1:24, 6:9

rules [3] - 30:11, 30:16, 56:14

run [2] - 57:12,

134:10

run-up [1] - 134:10

running [1] - 137:25

rush [1] - 122:18

## S

sabbatical [1] - 21:22

safe [1] - 31:17

salary [1] - 136:23

say-so [1] - 82:25

schedule [1] - 92:12

Schenker [15] - 62:10, 62:19, 62:25, 63:4, 63:14, 63:19, 64:3, 64:19, 64:20, 64:25, 65:4, 70:23, 80:11, 81:7, 81:9

Schenker's [5] - 74:15, 75:1, 75:13, 77:4, 77:8

Schenkerian [54] - 23:14, 23:20, 23:22, 24:5, 24:15, 24:19, 26:2, 27:3, 32:8, 32:13, 40:15, 40:24, 41:9, 41:25, 46:16, 48:20, 51:10, 51:14, 51:19, 52:3, 53:12, 61:13, 61:21, 62:24, 63:15, 72:20, 80:2, 82:3, 82:11, 83:1, 88:3, 91:6, 98:20, 99:4, 99:9, 99:19, 101:8, 109:4, 110:11, 115:18, 115:19, 115:21, 123:14, 125:5, 126:8, 128:23, 133:4, 133:24, 135:1, 135:5, 135:9, 136:12, 137:17

Schenkerianism [1] - 76:18

scholar [6] - 45:15, 45:21,

45:24, 45:25, 47:3, 113:14

scholarly [15] - 25:8, 42:5, 42:12, 42:15, 42:17, 42:19, 43:2, 43:7, 43:25, 44:3, 45:2, 52:10, 72:14, 82:15

scholars [2] - 114:16, 114:21

scholarship [2] - 43:20, 63:24

School [1] - 136:10

Schwinden [10] - 5:3, 10:15, 10:16, 10:21, 10:24, 11:2, 11:20, 127:7, 127:17, 129:2

Schwinden's [1] - 132:2

scroll [1] - 69:22

se [1] - 43:2

seal [1] - 140:21

search [3] - 133:3, 133:7

second [13] - 17:24, 18:17, 24:3, 38:16, 38:17, 39:1, 39:3, 41:15, 59:25, 61:8, 98:15, 113:9, 129:5

secret [1] - 65:19

section [4] - 49:2, 123:9, 123:16, 130:6

See [2] - 67:23, 95:12

see [54] - 18:3, 37:25, 38:4, 38:16, 38:19, 38:21, 38:22, 38:23, 39:1, 39:6, 47:21, 49:6, 52:24, 53:3, 55:14, 58:15, 60:4, 60:20, 60:21, 61:8, 62:6, 62:7, 70:13, 71:10, 71:13, 71:18, 72:3, 72:5, 72:15, 72:18, 79:2, 79:4, 84:8, 86:17, 90:4, 94:1, 94:13, 98:15, 101:25, 102:11,

**107**:1, 107:3,
107:14, 118:13,
122:11, 123:8,
125:7, 125:16,
126:6, 128:17,
128:20, 129:7,
130:5, 136:2
**seeing** [3] -
61:3, 62:2,
101:15
**seem** [13] - 35:8,
35:13, 48:4, 62:9,
63:1, 64:11,
76:19, 76:20,
80:14, 85:25,
86:1, 102:25,
117:19
**Segall** [2] -
49:17, 53:1
**SEM** [1] - 128:20
**semester** [1] -
18:16
**sending** [1] -
87:12
**senior** [1] -
22:11
**sense** [1] - 131:5
**sent** [5] - 72:19,
93:22, 104:17,
118:23, 130:20
**sentence** [16] -
39:3, 58:13, 60:1,
60:4, 60:20, 61:8,
62:4, 65:13, 75:5,
75:7, 84:16,
84:22, 88:17,
102:18, 113:9,
129:11
**separate** [1] -
131:10
**September** [5] -
1:12, 1:18, 6:3,
7:3, 141:11
**series** [2] -
109:17, 116:9
**serious** [2] -
61:14, 65:14
**serve** [3] - 22:1,
104:24, 133:21
**served** [5] -
17:19, 17:21,
18:12, 18:19,
134:4
**services** [1] -
98:25
**session** [3] -
50:20, 50:25,
51:3
**set** [1] - 65:18
**sets** [1] - 81:20

**setting** [3] -
93:12, 98:19,
99:18
**seven** [3] -
19:18, 124:1,
135:15
**sever** [1] - 68:17
**sexist** [2] -
125:14, 125:23
**SHALL** [1] - 6:6
**shape** [1] - 43:1
**share** [2] -
10:23, 74:4
**shared** [1] -
82:17
**sharing** [2] -
82:22, 130:5
**SHERMAN** [2] -
1:2, 141:2
**Shorthand** [2] -
1:20, 141:13
**show** [1] - 86:25
**Shut** [1] - 32:9
**shut** [4] - 32:11,
32:20, 32:24,
51:24
**sick** [2] - 121:1,
121:2
**side** [1] - 8:8
**sign** [3] - 115:8,
125:2, 138:5
**signature** [2] -
140:6, 141:21
**Signature** [1] -
6:13
**SIGNATURE** [2]
- 6:16, 139:1
**signed** [3] -
110:18, 121:7,
123:24
**significant** [2] -
60:19, 110:19
**simply** [1] -
114:2
**sincerely** [1] -
52:1
**sit** [1] - 104:5
**situation** [6] -
16:15, 28:9, 58:4,
80:15, 102:20,
102:24
**six** [2] - 16:12,
49:9
**skewing** [1] -
62:24
**skip** [5] - 37:24,
39:2, 59:25, 61:5,
71:9
**skipping** [1] -
62:4

**sky** [2] - 118:1,
118:4
**Slottow** [9] -
34:10, 34:14,
34:18, 35:12,
60:7, 60:14,
79:22, 95:15,
105:21
**smiling** [2] -
85:8, 85:22
**SMT** [14] - 4:20,
61:7, 61:11,
70:18, 70:23,
72:16, 72:24,
110:9, 118:12,
118:16, 118:18,
118:20, 118:23
**so-called** [3] -
33:1, 78:20,
122:18
**social** [18] -
25:21, 26:5, 26:9,
26:19, 26:23,
28:2, 29:22,
29:25, 30:4, 45:5,
101:7, 101:19,
101:21, 103:21,
112:14, 112:17,
120:16, 120:17
**Society** [8] -
33:11, 33:15,
33:18, 50:18,
70:19, 109:19,
109:24, 118:24
**software** [1] -
95:3
**solely** [1] -
137:15
**Solicit** [1] -
96:17
**solicit** [1] -
96:24
**someone** [12] -
35:9, 64:6, 64:8,
71:5, 74:10, 80:9,
98:11, 98:23,
109:20, 110:5,
113:15, 114:22
**sometimes** [2] -
18:8, 117:19
**Sometimes** [1] -
107:18
**somewhere** [3] -
16:3, 35:22,
114:22
**soon** [1] - 106:9
**Sorry** [7] -
28:19, 32:3,
48:18, 72:7, 81:3,
86:24, 100:8

**sorry** [14] - 18:7,
23:11, 42:6, 49:4,
57:10, 72:1,
83:21, 92:3, 94:8,
105:17, 118:19,
122:13, 129:24,
136:7
**sort** [9] - 21:22,
70:3, 77:5, 94:12,
100:19, 104:24,
107:17, 110:10,
133:3
**sound** [2] - 71:5,
76:21
**sounds** [2] -
11:20, 111:7
**source** [6] -
43:14, 43:17,
47:17, 94:19,
94:23, 112:16
**speaking** [2] -
61:19, 81:20
**special** [5] -
92:6, 92:7, 96:17,
97:1, 115:13
**specialty** [1] -
42:12
**specific** [24] -
13:2, 13:22,
13:24, 13:25,
14:8, 14:12,
14:13, 24:10,
24:21, 25:10,
26:20, 27:6,
31:24, 33:19,
42:10, 49:5,
54:15, 55:19,
55:22, 78:2,
80:20, 89:23,
99:2, 117:8
**specifically** [6] -
30:6, 42:18,
50:21, 65:25,
104:7, 108:7
**specifics** [1] -
54:16
**Spectrum** [5] -
35:20, 35:22,
35:24, 36:1, 36:6
**spent** [2] -
80:21, 81:5
**sphere** [1] -
128:19
**spoken** [1] -
120:4
**spreadsheet** [3]
- 94:13, 94:20,
94:21
**spring** [1] -
134:22

**stack** [1] - 90:3
**stamp** [5] - 87:6,
93:8, 100:24,
106:22, 118:7
**stand** [2] -
90:20, 110:14
**standard** [1] -
91:23
**start** [4] - 21:15,
70:4, 101:1,
121:21
**started** [7] -
13:6, 21:8, 21:17,
25:13, 61:1,
95:22, 110:9
**starting** [3] -
12:3, 16:2, 49:7
**starts** [3] -
38:18, 49:12,
49:15
**State** [2] - 1:20,
141:14
**state** [7] - 7:6,
7:20, 86:4, 86:12,
97:20, 120:7,
135:7
**STATE** [2] -
140:10, 140:25
**statement** [37] -
32:23, 33:1, 33:6,
59:5, 59:6, 60:12,
116:6, 116:18,
120:21, 122:9,
122:13, 122:15,
122:18, 123:8,
123:23, 123:25,
125:2, 127:22,
127:25, 128:2,
128:5, 128:25,
129:12, 129:20,
129:22, 130:6,
130:11, 130:17,
130:24, 130:25,
131:1, 131:5,
131:24, 132:1,
132:6, 132:9,
132:11
**Statement** [4] -
4:23, 5:1, 116:22,
128:22
**statements** [2] -
41:14, 131:3
**STATES** [2] -
1:1, 141:1
**Station** [2] -
2:12, 142:13
**stenotype** [1] -
1:21
**step** [2] - 97:25,
119:13

**Stephen** [5] -
34:10, 35:5, 60:7,
60:14, 105:21
**stepping** [1] -
119:14
**sticks** [1] - 52:13
**still** [10] - 17:1,
22:3, 32:17,
37:15, 99:25,
122:2, 134:12,
135:18, 135:22,
135:25
**Stipulations.....**
**.........................**
**..** [1] - 3:4
**stir** [3] - 28:2,
70:24, 109:6
**stopped** [1] -
32:9
**stopping** [1] -
69:9
**story** [4] - 83:16,
83:20, 83:24,
84:9
**STOWERS** [3] -
7:13, 85:12,
122:21
**Stowers** [3] -
2:16, 7:13,
142:17
**straight** [2] -
65:24, 130:23
**straightforwar**
**d** [1] - 127:15
**strategy** [3] -
22:12, 22:22,
23:2
**strictly** [1] -
116:18
**strike** [12] -
40:11, 43:4,
66:17, 74:10,
74:24, 76:6, 80:9,
91:2, 105:7,
110:19, 113:17,
121:12
**Strike** [3] -
15:21, 41:22,
96:21
**strikes** [1] - 71:1
**string** [1] - 78:17
**strong** [3] -
119:18, 119:20,
119:22
**struck** [2] - 44:2,
119:23
**structure** [1] -
19:12
**structures** [1] -
75:21

**student** [35] -
38:19, 54:8,
56:20, 57:1, 57:3,
57:11, 58:1, 64:6,
71:11, 79:8,
89:12, 91:2, 91:5,
91:9, 91:24, 92:9,
95:8, 95:20, 96:5,
96:13, 104:4,
121:23, 122:1,
124:24, 129:9,
129:12, 129:20,
129:22, 130:17,
130:25, 131:1,
131:3, 132:4,
132:10
**Students** [1] -
4:24
**students** [14] -
32:22, 41:14,
58:3, 59:5,
123:12, 123:17,
123:19, 123:24,
124:3, 124:6,
124:7, 125:11,
130:7, 130:25
**students'** [4] -
129:6, 132:4,
132:6, 132:9
**Studies** [45] -
23:14, 23:20,
23:22, 24:5,
24:16, 24:19,
26:2, 27:3, 32:8,
32:13, 40:15,
40:24, 41:9,
41:25, 46:16,
48:21, 51:10,
51:14, 51:19,
52:3, 53:12,
62:25, 82:11,
88:4, 91:6, 99:4,
99:10, 101:8,
109:4, 110:11,
115:4, 115:9,
115:19, 115:21,
123:14, 125:5,
126:9, 128:23,
133:4, 133:24,
135:1, 135:5,
135:9, 136:12,
137:17
**studies** [3] -
17:10, 17:11,
17:18
**study** [1] - 62:9
**stuff** [1] - 108:2
**styled** [1] - 1:17
**subdivision** [2] -
19:23, 19:24

**subdivisions** [1]
- 19:21
**subject** [3] -
45:18, 57:2, 97:9
**subjected** [3] -
50:5, 50:9, 61:1
**subjective** [1] -
117:23
**submission** [3] -
39:4, 39:23,
79:25
**submit** [1] - 21:5
**submitted** [4] -
38:24, 39:16,
78:19, 141:19
**submitting** [1] -
41:14
**Subpoena** [1] -
6:8
**subscribed** [4] -
118:15, 118:18,
118:20, 140:18
**subsequent** [1] -
104:16
**subsequently**
[2] - 12:5, 35:19
**substance** [4] -
33:23, 34:13,
55:14, 76:11
**substantive** [1] -
28:18
**subtle** [1] -
55:21
**sudden** [1] -
111:14
**suffered** [2] -
115:14, 116:2
**suffering** [1] -
8:20
**suggest** [4] -
48:22, 62:3, 71:7,
119:4
**suggested** [1] -
70:25
**suggesting** [2] -
75:13, 77:5
**suggestion** [1] -
76:17
**suggests** [1] -
77:17
**Suite** [1] - 1:23
**summarize** [3] -
13:14, 13:17,
52:7
**summary** [4] -
73:9, 106:16,
136:18
**summer** [1] -
92:23
**Sunday** [9] -

103:7, 103:15,
103:23, 104:22,
106:4, 106:7,
106:9, 106:21,
120:5
**superficial** [2] -
45:18, 47:25
**Superficial** [1] -
45:19
**superficiality** [1]
- 45:22
**supervision** [4] -
30:13, 38:12,
39:16, 57:23
**support** [6] -
62:25, 88:2, 88:7,
89:4, 94:16,
133:1
**supports** [1] -
75:20
**suppose** [5] -
36:10, 49:2,
67:15, 71:22,
117:5
**supposed** [2] -
55:13, 55:15
**supposedly** [2] -
82:25, 83:23
**suppress** [2] -
80:10, 84:13
**surrounding** [2]
- 36:5, 136:12
**suspect** [1] -
109:13
**swallow** [1] -
75:22
**swear** [1] - 7:8
**switch** [2] -
69:11, 89:8
**sworn** [3] - 1:17,
7:17, 141:17
**sympathetic** [8]
- 74:5, 81:15,
82:5, 82:7, 82:12,
82:13, 82:20,
83:2
**Symposium** [11]
- 25:16, 35:5,
51:18, 52:6,
53:19, 53:22,
62:18, 82:10,
86:19, 97:4,
104:19
**symposium** [1] -
108:18
**synonym** [1] -
32:9
**system** [2] -
16:12, 94:25
**System** [4] -

1:22, 2:16, 7:14,
142:17

## T

**TA** [2] - 89:11,
136:16
**Table** [1] - 47:22
**TAKEN** [1] - 6:6
**talks** [1] - 112:23
**TAs** [1] - 92:22
**tasks** [1] - 98:16
**teach** [2] -
21:19, 22:3
**teaches** [4] -
29:10, 29:11,
98:8, 98:9
**teaching** [4] -
13:10, 17:1,
91:25, 98:12
**tease** [1] - 89:24
**tedious** [1] -
92:18
**teens** [1] - 33:18
**Telephone** [6] -
2:7, 2:13, 2:18,
142:8, 142:14,
142:19
**tempo** [1] - 21:1
**ten** [4] - 13:21,
14:3, 14:5, 14:21
**tenure** [6] - 16:8,
16:9, 16:13,
16:17, 16:20,
20:19
**term** [2] - 18:19,
81:25
**terms** [4] - 12:7,
13:3, 28:15,
93:19
**terribly** [1] - 35:8
**testified** [16] -
7:17, 27:9, 42:9,
49:21, 49:24,
57:18, 57:20,
69:6, 81:23,
93:20, 101:6,
110:17, 112:13,
118:16, 130:20,
135:4
**testify** [2] - 8:22,
110:17
**testifying** [1] -
18:4
**testimony** [11] -
26:6, 31:22,
49:22, 49:25,
57:25, 70:11,
82:4, 111:18,

111:20, 141:18,
141:24
**Texas** [48] -
1:21, 1:22, 1:23,
2:13, 2:16, 2:17,
2:18, 7:14, 15:12,
15:13, 15:24,
16:6, 17:5, 17:16,
18:23, 21:20,
22:8, 22:25,
26:19, 26:23,
26:25, 29:25,
31:4, 31:12,
37:16, 40:4,
40:25, 41:19,
46:15, 46:19,
50:6, 50:10,
56:14, 56:21,
59:15, 66:11,
66:20, 116:7,
122:2, 134:15,
135:23, 141:14,
142:14, 142:17,
142:18, 142:19,
143:8
**text** [1] - 85:3
**TF** [1] - 136:16
**Thad** [4] - 2:5,
7:9, 142:3, 142:6
**THE** [25] - 1:1,
2:4, 2:10, 7:2,
36:24, 37:4, 37:7,
69:12, 69:15,
85:15, 85:18,
100:9, 100:12,
111:25, 122:24,
123:2, 137:5,
137:8, 138:2,
138:7, 140:10,
140:25, 141:1,
142:5, 142:11
**Theoria** [16] -
3:17, 46:22, 47:6,
47:13, 47:16,
47:22, 47:25,
48:2, 50:2, 50:9,
50:16, 113:11,
114:2, 117:1,
117:3, 117:11
**theories** [2] -
74:18, 75:3
**theorist** [3] -
29:9, 34:10, 35:1
**theory** [9] -
19:20, 28:12,
35:19, 36:1,
81:12, 110:20,
113:7, 119:25,
120:9
**Theory** [12] -

17:22, 17:25,
33:12, 33:15,
33:18, 50:19,
66:21, 70:19,
109:19, 109:24,
116:6, 118:24
**thereabouts** [1]
- 100:24
**thereafter** [1] -
106:9
**therefore** [1] -
45:1
**Therefore** [1] -
39:3
**therein** [1] -
140:20
**thick** [2] - 59:7,
77:22
**thinking** [2] -
118:19, 120:8
**third** [1] - 58:13
**THIS** [1] - 6:6
**thoughts** [2] -
74:4, 79:25
**thousand** [1] -
33:18
**thread** [14] -
70:18, 70:20,
102:16, 103:6,
103:22, 105:9,
106:20, 107:2,
107:7, 107:21,
107:25, 108:2,
118:7
**threads** [1] -
118:12
**threats** [1] - 41:3
**three** [7] - 10:5,
19:19, 25:1, 42:8,
52:8, 92:15,
92:20
**three-quarters**
[2] - 92:15, 92:20
**throughout** [1] -
119:24
**Throughout** [2] -
60:1, 60:5
**Tim** [1] - 105:2,
120:5
**timeframe** [1] -
79:14
**TIMOTHY** [2] -
1:3, 141:3
**Timothy** [46] -
7:10, 25:3, 25:6,
30:24, 31:22,
36:18, 38:25,
39:12, 39:23,
40:10, 40:13,
40:23, 53:9, 55:3,

60:6, 60:14,
61:12, 62:23,
68:6, 68:8, 68:20,
69:5, 72:3, 72:13,
72:23, 73:24,
74:25, 76:5,
78:19, 87:2,
87:10, 87:13,
87:16, 89:4,
100:23, 104:12,
104:24, 105:13,
107:24, 108:17,
120:2, 120:22,
121:7, 124:25,
125:18, 132:25
**Timothy's** [1] -
107:7
**title** [7] - 19:25,
20:14, 21:11,
47:21, 52:24,
53:3, 117:1
**Title** [1] - 3:17
**titled** [1] - 87:3
**TO** [2] - 6:6, 6:11
**to..** [1] - 111:17
**today** [14] - 8:16,
9:9, 9:17, 10:19,
11:3, 15:21,
31:22, 70:20,
91:21, 93:19,
98:7, 104:5,
136:20
**Today's** [2] -
7:3, 11:4
**today's** [2] - 8:5,
9:12
**together** [1] -
120:21
**tone** [1] - 76:3
**Tony** [1] - 2:23
**took** [3] - 17:8,
17:9, 78:14
**tooth** [1] - 86:8
**top** [14] - 13:19,
61:6, 69:23, 70:1,
72:1, 72:2, 79:3,
90:4, 93:23,
95:12, 102:12,
106:25, 107:1,
107:23
**topics** [1] -
137:18
**Toronto** [1] -
46:9
**total** [1] - 124:7
**TracDat** [2] -
95:1, 95:2
**transcript** [2] -
141:17, 141:19
**transition** [2] -

12:1, 100:7
**transitioned** [1]
- 97:11
**treatment** [1] -
45:18
**trial** [2] - 6:23,
137:23
**trick** [1] - 129:14
**true** [3] - 105:12,
140:7, 141:18
**truthfully** [1] -
8:16
**Try** [1] - 31:12
**try** [6] - 9:2,
72:8, 86:10, 99:2,
110:24, 113:20
**trying** [10] -
48:13, 65:24,
72:7, 89:24, 92:5,
122:18, 129:14,
130:22, 130:23,
132:17
**turn** [7] - 19:19,
53:16, 70:5,
73:13, 79:2, 84:8,
133:13
**turned** [1] -
124:25
**turns** [1] -
117:14
**Twenty** [1] -
124:1
**Twenty-seven**
[1] - 124:1
**twice** [1] - 18:13
**Twitter** [2] -
26:15, 101:15
**two** [7] - 22:19,
25:1, 33:18, 49:1,
50:24, 81:20,
118:7
**two-paged** [1] -
118:7
**type** [2] - 57:6,
99:18
**Type** [1] - 98:19
**Type-setting** [1]
- 98:19
**type-setting** [1]
- 99:18
**typical** [1] - 79:8

## U

**Um-hum** [31] -
18:10, 19:1,
19:14, 22:15,
27:10, 28:24,
29:1, 30:22, 31:7,

38:2, 39:11,
41:16, 52:14,
53:15, 53:20,
58:19, 67:25,
69:24, 75:12,
75:17, 79:7, 87:4,
96:20, 99:24,
101:13, 102:8,
102:10, 107:16,
108:4, 111:25,
123:10
**unable** [1] -
137:14
**unclear** [3] -
8:25, 129:24,
130:9
**uncritical** [2] -
76:21, 77:7
**undated** [1] -
107:6
**Under** [1] -
76:13
**under** [12] -
30:12, 38:12,
39:5, 39:16,
50:17, 57:22,
99:4, 109:21,
110:6, 115:4,
126:2, 140:21
**undergraduate**
[1] - 12:4
**underneath** [1] -
19:13
**underscore** [1] -
90:4
**understood** [5] -
55:5, 67:1,
120:15, 120:16,
122:8
**unfolded** [1] -
25:9
**unfortunately**
[2] - 89:25, 105:9
**UNITED** [2] -
1:1, 141:1
**universities** [1] -
19:5
**university** [8] -
15:12, 16:14,
57:11, 57:12,
86:5, 114:21,
134:17, 134:20
**University** [53] -
1:22, 2:16, 7:14,
12:10, 12:11,
12:12, 15:11,
15:13, 15:24,
16:6, 17:5, 17:16,
18:22, 21:20,
22:8, 22:25,

26:19, 26:22,
26:25, 29:11,
29:13, 29:24,
30:12, 30:16,
31:4, 31:11,
37:16, 40:4,
40:24, 41:12,
41:13, 41:19,
46:8, 46:14,
46:18, 50:6,
50:10, 50:17,
52:21, 56:14,
56:21, 57:22,
59:4, 59:15,
66:10, 66:20,
116:7, 122:2,
134:14, 135:16,
135:20, 135:23,
142:17
**university-run**
[1] - 57:12
**unless** [1] -
89:19
**unnamed** [1] -
73:12
**unprofessional**
[1] - 113:18
**unscholarly** [1] -
52:5
**unsigned** [1] -
6:23
**unsympathetic**
[2] - 82:8, 84:14
**UNT** [49] - 3:16,
3:25, 4:10, 4:13,
4:16, 4:19, 4:22,
5:4, 13:5, 13:6,
16:12, 19:9,
19:13, 22:4,
22:13, 22:17,
31:19, 32:20,
34:19, 41:3, 46:4,
47:7, 57:14,
72:20, 73:13,
73:18, 78:16,
79:2, 79:8, 93:8,
100:24, 101:2,
102:9, 103:7,
106:22, 107:10,
107:14, 111:24,
116:8, 116:9,
118:8, 121:5,
126:10, 126:15,
126:23, 127:9,
128:16, 128:22
**UNT's** [3] - 38:3,
39:5, 41:5
**unvirtuous** [1] -
64:13
**Up** [1] - 87:3

**up** [26] - 12:4,
18:8, 24:3, 24:18,
27:3, 33:11,
53:22, 60:3,
61:15, 65:13,
65:18, 65:23,
66:4, 70:20, 71:9,
71:22, 73:22,
81:3, 83:18,
93:12, 93:24,
102:7, 105:5,
107:2, 118:17,
134:10
**upper** [1] - 37:25
**upset** [2] - 35:8,
35:13
**URL** [3] - 132:3,
132:6, 132:7
**uses** [1] - 81:25
**utilizes** [1] -
70:25

## V

**varies** [1] - 21:1
**variety** [1] -
32:19
**various** [6] -
72:11, 72:13,
73:6, 74:13,
101:11, 110:13
**vast** [1] - 124:2
**Ventures** [1] -
136:1
**ventures** [6] -
22:12, 22:14,
22:20, 22:21,
22:24, 23:7
**verbally** [1] -
87:15
**version** [1] -
105:10
**versus** [1] -
81:22
**via** [1] - 101:15
**vice** [1] - 23:2
**Video** [2] - 2:23,
7:4
**Videographer**
[1] - 137:25
**VIDEOGRAPH
ER** [16] - 2:22,
7:2, 37:4, 37:7,
69:12, 69:15,
85:15, 85:18,
100:9, 100:12,
122:24, 123:2,
137:5, 137:8,
138:2, 138:7

**VIDEOTAPED**
[2] - 1:10, 1:15
**views** [3] - 74:5,
74:17, 75:3
**violate** [1] -
40:24
**virtuous** [3] -
64:5, 64:11,
64:12
**vis** [2] - 58:5
**vis-a-vis** [1] -
58:5
**visit** [4] - 114:8,
115:2, 115:5,
115:10
**visits** [3] -
114:17, 114:20,
114:21
**Vista** [1] - 143:8
**vociferous** [3] -
101:16, 109:18,
110:25
**Volume** [25] -
3:17, 24:9, 24:19,
26:1, 28:21,
28:23, 29:20,
41:3, 41:8, 44:22,
47:22, 47:25,
48:20, 53:25,
54:1, 62:24,
67:24, 82:10,
97:5, 103:18,
103:20, 109:4,
117:2, 121:4,
126:8
**volume** [16] -
23:20, 23:21,
24:4, 24:8, 28:25,
42:3, 42:4, 42:6,
48:2, 52:9, 54:9,
63:12, 63:17,
86:22, 109:15,
109:25
**volumes** [1] -
126:16
**vs** [2] - 1:5,
141:5

## W

**waived** [1] - 6:13
**Walls** [63] - 3:18,
3:20, 54:8, 55:24,
56:4, 60:13,
60:22, 61:19,
63:2, 63:8, 64:14,
64:17, 64:22,
65:7, 66:2, 66:24,
68:9, 68:12, 69:2,
70:7, 70:9, 70:21,

BENJAMIN D. BRAND, 3RD.      09/23/2024      19

71:12, 72:3,
73:24, 74:3,
74:22, 74:25,
75:9, 76:8, 76:13,
77:14, 79:6,
79:14, 80:13,
80:23, 81:6,
81:11, 81:15,
81:24, 82:17,
83:16, 84:1, 84:9,
84:13, 86:19,
89:9, 89:24,
90:23, 90:25,
91:5, 91:17, 92:6,
92:7, 93:21,
94:10, 95:20,
96:21, 96:23,
98:23, 103:25,
104:2, 124:22
**Walls'** [8] -
54:21, 55:2,
58:11, 82:25,
86:21, 92:1, 95:8,
97:21
**Walton** [6] -
2:11, 6:12, 7:11,
141:20, 142:3,
142:12
**WALTON** [49] -
7:11, 36:16,
39:18, 43:3,
44:21, 45:23,
48:3, 48:12, 50:7,
53:10, 57:4,
57:17, 59:1, 69:8,
74:20, 76:23,
78:1, 78:4, 78:8,
80:16, 83:13,
83:19, 85:6,
85:20, 86:7,
86:14, 88:5, 99:1,
100:6, 109:22,
110:12, 111:2,
111:13, 111:16,
112:2, 112:4,
114:15, 114:24,
117:7, 117:16,
118:3, 121:10,
123:15, 124:4,
131:7, 131:10,
131:13, 137:19,
138:4
**wants** [1] - 65:25
**warning** [1] -
66:6
**warranted** [1] -
71:24
**Warren** [1] -
136:14
**Warren's** [1] -

93:24
**watched** [2] -
71:18, 71:21
**watching** [1] -
74:3
**ways** [1] - 67:10
**web** [1] - 103:21
**website** [2] -
47:14, 90:11
**weeds** [1] -
92:14
**week** [1] - 50:23
**weekends** [1] -
101:15
**well-founded** [2]
- 117:14, 117:17
**Wen** [1] - 80:6
**WHALEY** [1] -
143:7
**whatnot** [1] -
50:22
**whistleblower**
[2] - 66:1, 66:3
**white** [3] -
75:21, 76:18,
76:25
**whole** [4] -
25:15, 40:14,
72:8, 80:15
**Wiener** [1] - 80:6
**wife** [8] - 10:11,
10:12, 11:1,
11:13, 11:16,
11:19, 135:14,
136:8
**Wikipedia** [19] -
42:22, 43:1, 43:6,
43:13, 43:23,
44:1, 44:6, 44:8,
44:11, 44:13,
44:15, 45:1,
45:12, 45:16,
46:1, 47:17,
51:17, 52:4,
52:12
**winter** [6] - 54:2,
58:18, 60:23,
61:20, 62:17,
79:14
**winter/spring**
[1] - 82:21
**winters** [1] -
54:3
**withdraw** [4] -
113:10, 113:15,
114:5, 117:11
**withdrawing** [1]
- 114:2
**witness** [10] -
1:16, 7:8, 37:2,

77:23, 77:25,
85:21, 137:12,
137:23, 141:16,
141:18
**WITNESS** [3] -
36:24, 111:25,
139:2
**Witness** [1] -
6:12
**Witness's** [1] -
6:12
**witnesses** [1] -
50:23
**woefully** [1] -
66:6
**wondering** [1] -
55:12, 79:24
**word** [6] - 59:9,
66:4, 82:5, 82:7,
100:20, 105:22
**words** [5] - 33:2,
61:24, 62:2, 65:5,
81:19
**worker** [1] -
91:24
**workload** [2] -
98:4, 98:6
**workshops** [1] -
66:9
**world** [1] - 72:14
**worried** [2] -
54:23, 120:11
**worries** [2] -
117:5, 117:8
**worry** [2] - 55:9,
77:4
**Wright** [2] -
3:15, 37:14
**WRIGHT** [2] -
1:6, 141:6
**write** [3] - 68:7,
103:8, 105:20
**writes** [5] -
58:13, 71:11,
74:22, 74:25,
75:19
**writing** [1] - 87:9
**written** [2] -
88:6, 96:23
**wrote** [3] -
76:25, 94:16,
120:21

## Y

**Yale** [3] - 12:11,
12:17, 13:4
**year** [13] - 16:10,
16:22, 17:18,

18:15, 18:17,
18:19, 20:24,
33:19, 48:19,
48:22, 54:5,
90:13, 92:15
**years** [2] -
16:13, 135:15
**York** [1] - 29:13
**young** [1] - 16:2
**yourself** [2] -
43:20, 65:21

## Z

**Zoom** [3] -
87:18, 105:3,
108:21