1      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TEXAS
2                SHERMAN DIVISION

3   TIMOTHY JACKSON,            )
                                )
4           Plaintiff,          )
                                )
5   v.                          )  CASE NO.
                                )  4:21-cv-00033-ALM
6   LAURA WRIGHT, et al,        )
                                )
7           Defendants.         )
                                )

8

9

10      ----------------------------------

11              ORAL DEPOSITION OF

12           PETER MICHAEL KOHANSKI

13                MAY 18, 2021

14      ----------------------------------

15

16

17      ORAL DEPOSITION OF PETER MICHAEL KOHANSKI, produced

18   as a witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 18, 2021, from 9:07 a.m. to 11:29 a.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.

Peter Michael Kohanski    5/18/21                    2

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4          MR. MICHAEL THAD ALLEN
           MS. SAMANTHA HARRIS
5          ALLEN LAW, LLC
           P.O. Box 404
6          Quaker Hill, Connecticut 06375
           860.772.4738
7          860.469.2783 Fax
           m.allen@allen-lawfirm.com

8

9    FOR THE DEFENDANTS:

10         MR. MATT BOHUSLAV
           ASSISTANT ATTORNEY GENERAL
11         GENERAL LITIGATION DIVISION
           ATTORNEY GENERAL OF TEXAS
12         P.O. Box 12548, Capitol Station
           Austin, Texas 78711
13         matthew.bohuslav@oag.texas.gov

14   AND

15         MR. RENALDO STOWERS
           SENIOR ASSOCIATE GENERAL COUNSEL
16         UNIVERSITY OF NORTH TEXAS SYSTEM
           OFFICE OF GENERAL COUNSEL
17         1155 Union Circle
           Denton, Texas 76203
18         940.565.2717
           renaldo.stowers@untsystem.edu

19

20   ALSO PRESENT:

21         MR. TIMOTHY JACKSON

22

23

24

25

*Peter Michael Kohanski      5/18/21*

1                              INDEX

2                                                      PAGE

3  Appearances........................................ 2

4  Stipulations....................................... 4

5  PETER MICHAEL KOHANSKI

6       Examination by Mr. Allen...................... 4

7

8  Reporter's Certificate.............................95

9

10

11                            EXHIBITS

12 NO.  DESCRIPTION                                   PAGE

13 Exhibit  1     Subpoena for Peter Kohanski........... 8

14 Exhibit  2     E-mail to Timothy Jackson from the
                  president of GAMuT, July 29, 2020......18
15
   Exhibit  3     Exhibit 3.............................72
16

17

18

19

20

21

22

23

24

25

```
 1                 P R O C E E D I N G S
 2                 PETER MICHAEL KOHANSKI,
 3  having been first duly sworn, testified as follows:
 4                      EXAMINATION
 5  BY MR. ALLEN:
 6      Q.   Good morning, Mr. Kohanski.  As you know, this
 7  is a deposition.  I'm just going to ask you a few
 8  questions to get started and discuss sort of some ground
 9  rules, if you will.  Could you --
10                 MR. ALLEN:  Did you get his full name?
11                 COURT REPORTER:  Yes.
12      Q.   (By Mr. Allen)  Okay.  This is an extension of
13  the Court.  It's a very formal conversation.  There will
14  be times at which counsel may object.  Can I ask you if
15  you're represented by counsel today?
16      A.   Yes.
17      Q.   Who is your attorney?
18      A.   Matt.
19                 MR. ALLEN:  So, Matt, when we -- if I
20  could, when we discussed this, you said you were not
21  representing the witnesses.  Mr. Kohanski's not a party,
22  but the State has stepped in to represent them?
23                 MR. BOHUSLAV:  Yes.
24                 MR. ALLEN:  Okay.  Thank you.
25      Q.   (By Mr. Allen)  So, he -- your counsel -- Mr.
```

*Peter Michael Kohanski    5/18/21*

1  Bohuslav?

2          MR. BOHUSLAV:  Yes.

3      Q.   (By Mr. Allen) -- may object from time to time.

4  This is part of the formality of the proceedings.

5          MR. ALLEN:  Matt, should we agree that all

6  objections, except those as to form, shall be reserved

7  till the time of trial?

8          MR. BOHUSLAV:  Yes.

9      Q.   (By Mr. Allen)  That does not relieve -- so, if

10  he were to object, that does not relieve you of the

11  obligation to answer.  You are obligated to answer

12  questions I ask; however, there may be times when you

13  don't understand my question or I've been incoherent or

14  something like that.  Please feel free to interrupt me

15  and ask for clarification, but if you do not do that, it

16  is understood that I will assume that you did understand

17  the question.

18      A.   (Witness nods head affirmatively.)

19          MR. BOHUSLAV:  Let me ask for

20  clarification.  Your question, reserving objections for

21  time of trial, would you clarify what you mean by that?

22          MR. ALLEN:  I mean that if we want to make

23  substantive objections that go to the relevance or some

24  such thing, those would be reserved till the time of

25  trial.  If you want to object to form, of course, that's

1  the form of which I ask the question, may go to the

2  clarity of the question, whether it calls for

3  speculation, something of that nature, of course, you

4  should raise those objections.

5             MR. BOHUSLAV:  Okay.  Pursuant to the

6  rules.

7             MR. ALLEN:  Correct.

8             MR. BOHUSLAV:  Okay.

9      Q.    (By Mr. Allen) So, Mr. Kohanski, this is also

10 a very important rule.  Remember, this is being recorded

11 and typed, and so things like you nodding your head,

12 although it's clear, I could see what you were

13 answering, it's not clear on the record because you

14 didn't say anything.

15     A.    Okay.

16     Q.    So, I asked you, if you do not ask for

17 clarification, I will assume that you understood the

18 question; is that understood?

19     A.    Yes.

20     Q.    Thank you.  Likewise, I'm going to ask you to

21 wait until I finish my questions, just to avoid any

22 uncertainty.

23     A.    Okay.  Sure.

24     Q.    And, again, that's -- it's normal in the course

25 of a conversation to interject or what not, but I'm just

*Peter Michael Kohanski      5/18/21*

 1  going to ask that you try to abide by those ground rules

 2  so that we can have a very clear record for the Court.

 3      A.    Sure.

 4      Q.    Is there anything that would prevent you from

 5  giving truthful testimony today?

 6      A.    No.

 7      Q.    You are not on any medication?

 8      A.    I am.

 9      Q.    What medication are you on?

10      A.    Zoloft.

11      Q.    What do you take Zoloft for?

12      A.    For depression.

13      Q.    Does that affect your memory in any way?

14      A.    Not that I know of.  I've only just recently

15  started taking it.

16      Q.    Does it affect your ability to give truthful

17  testimony, to the best of your knowledge?

18      A.    No.

19      Q.    Is there anything else that might prevent you

20  from giving clear and truthful testimony, such as an

21  illness, any kind of mental or physical disability?

22      A.    No.

23      Q.    And could I ask what you take the Zoloft for,

24  did you say?

25      A.    For depression.

*Peter Michael Kohanski    5/18/21*

```
 1      Q.    From time to time, I'm going to introduce
 2  exhibits and ask you to look at documents, and we'll
 3  start with this one here.  Give this to you, Matt.  I'll
 4  provide one to your attorney, and, of course, I'll
 5  provide one to the Court Reporter, and I'll provide one
 6  to you.
 7                  (DEPOSITION EXHIBIT 1 MARKED.)
 8      Q.    (By Mr. Allen)  Could I ask you to examine the
 9  document?  And have you had a chance to examine that
10  document, Mr. Kohanski?
11      A.    Yes, I've read all this before in the one that
12  I received.
13      Q.    So, you do recognize the document?
14      A.    I do.
15      Q.    And you recognize it as a subpoena served upon
16  you?
17      A.    Yes.
18      Q.    And have you appeared today in response to this
19  subpoena?
20      A.    Yes.
21      Q.    Thank you.  If I could ask you to turn to --
22  let me ask the Court to mark this as Deposition
23  Exhibit 1, please.  Could you turn to the Exhibit "A" to
24  this document, and proceed to the back page, where it
25  says "Documents Requested"?  Do you see that?
```

*Peter Michael Kohanski      5/18/21*

```
 1       A.    Yes.

 2       Q.    I just want to go through these and ask what

 3  you've done to examine documents or search your records

 4  for documents to produce in response to this subpoena.

 5  As you probably saw, your attorney provided to me some

 6  documents at the beginning of this deposition.  Am I to

 7  understand that these were produced in response to the

 8  subpoena by you?

 9       A.    Yes.

10       Q.    Okay.  And what have you done to look for

11  documents in response to the subpoena request?

12       A.    I've gone through my e-mail, text messages,

13  Facebook messages, I've gone through Teams, Microsoft

14  Teams, and I looked for any documents I had saved on my

15  computer.

16       Q.    Mr. Kohanski, do you use any other social media

17  besides Facebook and Teams?

18       A.    Yes.  Twitter, Instagram.  I did go through

19  Twitter, yeah.

20       Q.    Did you go through your Instagram account?

21       A.    No.

22       Q.    And why is that?

23       A.    There was nothing related to this issue that I

24  posted on my Instagram account ever.

25       Q.    What do you use your Instagram account for?
```

*Peter Michael Kohanski    5/18/21*

1      A.    To post pictures.

2      Q.    What kind of pictures?

3      A.    Personal pictures.

4      Q.    And so, it's your position that there was no

5  content that you posted on Instagram that would have

6  related to these requests.

7      A.    That's correct.

8      Q.    Did you discuss the collection of documents

9  with anyone besides your attorney?

10     A.    Could you clarify that question?

11     Q.    Did you discuss your response to the subpoena,

12  in terms of collecting documents, with anyone other than

13  your attorney?

14     A.    Yes.

15     Q.    Who would you have discussed the collection of

16  documents with, other than your attorney?

17          MR. BOHUSLAV:  Let me ask for -- just so

18  we don't get into attorney/client privilege, we're

19  talking about attorney, meaning myself, or counsel for --

20          MR. ALLEN:  When I refer to his attorney,

21  I'm referring to you, because it's been represented that

22  you are engaged in some sort of legal representation of

23  him, unless I misunderstood.  I do not understand that

24  UNT's counsel is representing him, but if I'm mistaken

25  about that, please clarify.  May I ask Renaldo Stowers,

 1 are you representing the witness?

 2            MR. STOWERS:  We can go off the record, we

 3 can discuss it.

 4            MR. ALLEN:  Well, I think we need it on

 5 the record, because if you are, then I'll respect that

 6 privilege; if not, I'm entitled to ask him what he may

 7 have discussed with you.

 8            MR. STOWERS:  Can we go off the record?

 9            MR. ALLEN:  Sure.

10            (OFF THE RECORD FROM 9:16 TO 9:19 A.M.)

11            MR. ALLEN:  So, we're back on the record.

12 It appears that Mr. Kohanski is represented, in a

13 limited capacity, by the General Counsel's office of the

14 University of Texas.  And, of course, we will respect

15 the privilege of those conversations.

16     Q.   (By Mr. Allen)  But Mr. Kohanski, there was a

17 question which remained unanswered before we went off

18 the record, which was, excluding your counsel, which

19 would be Matt Bohuslav here today, as well as the GC's

20 office, did you consult anyone regarding the collection

21 of documents in response to this subpoena?

22     A.   Can you clarify what you mean by "consult"?

23     Q.   Did you have any discussions with other

24 individuals, excluding your counsel or the GC's office

25 of the University of North Texas, concerning collecting

*Peter Michael Kohanski      5/18/21*

```
 1  documents in response to this subpoena?
 2      A.    Yes.
 3      Q.    And could you identify who you discussed
 4  collecting documents in response to this subpoena with?
 5      A.    My family.
 6      Q.    And could you name the individuals in your
 7  family that you discussed collecting documents with?
 8      A.    Would you like their names or like my
 9  relationship to them?
10      Q.    Let's start with their names.
11      A.    Susan Kohanski, John Kohanski, and Andrew
12  Kohanski.
13      Q.    Are any of these individuals associated with
14  the University of North Texas?
15      A.    No.
16      Q.    Could you identify how Susan Kohanski is
17  related to you?
18      A.    She's my mother.
19      Q.    Is John Kohanski your father?
20      A.    Yes.
21      Q.    And Andrew is --
22      A.    My brother.
23      Q.    And, specifically, what did you discuss with
24  them about collecting documents?
25      A.    I told them what I was doing in response to the
```

*Peter Michael Kohanski      5/18/21*

```
 1  subpoena and collecting documents and how I went about
 2  getting the documents and looking for them.
 3      Q.    Did you have some of your documents with your
 4  family?
 5      A.    Can you clarify?
 6      Q.    I'm just wondering, you said you've discussed
 7  with them collecting the documents, and I am asking
 8  whether the documents collected were deposited or
 9  somehow kept with your family?
10      A.    No.  Unless you count text messages between my
11  family and me.
12      Q.    And were all documents that you identified that
13  were responsive to these requests produced?
14      A.    I'm sorry.  Can you repeat that?
15      Q.    Did you produce all documents you identified
16  that were responsive to these requests?
17      A.    Yes.
18      Q.    And let me clarify, I guess "responsive" is one
19  of those legal terms that's very familiar to lawyers but
20  may not be familiar to you.  By that I mean, are
21  documents indicated that you should collect and produce
22  in response to these requests, making them responsive?
23  Is that clear?
24      A.    Yes.
25      Q.    Thank you.  And -- can we go off the record for
```

*Peter Michael Kohanski      5/18/21*

 1  a second?

 2              MR. BOHUSLAV:  Yes.

 3              (OFF THE RECORD FROM 9:22 TO 9:23 A.M.)

 4       Q.   (By Mr. Allen)  I just wanted to get a little

 5  background, Mr. Kohanski.  Could you explain to me your

 6  relationship to the University of North Texas?

 7       A.   I am a graduate student and a teaching

 8  assistant.

 9       Q.   You're a graduate student in what department?

10       A.   The division of music history, theory and

11  ethnomusicology.

12       Q.   And you also said you're a teaching assistant?

13       A.   Yes.

14       Q.   What do you assist in teaching?

15       A.   I assist with music history classes for music

16  majors.

17       Q.   Are you pursuing a degree?

18       A.   I am.

19       Q.   What degree?

20       A.   Ph.D.

21       Q.   Could you explain to me your educational

22  career, starting -- I'm not interested so much in high

23  school, but if you could tell me where you went to

24  college and your educational history after that point?

25       A.   I went to the Catholic University of America,

 1  and then I started at UNT.

 2       Q.    And could you give me your graduation dates for

 3  any institution you've graduated from in your

 4  educational background?

 5       A.    I graduated from Catholic University in

 6  May 2018.

 7       Q.    Did you take time off between Catholic

 8  University of America and University of North Texas?

 9       A.    No.

10       Q.    What did you study at the Catholic University

11  of America?

12       A.    Music history.

13       Q.    Are you a performer, as well, of music?

14       A.    Not currently.

15       Q.    Have you received any degrees from the

16  University of North Texas, to date?

17       A.    No.

18       Q.    Is it anticipated that you'll get a master's

19  degree?

20       A.    No.

21       Q.    So, you'll -- you'll drive forward to the

22  Ph.D., and you will not collect a master's degree on the

23  way?

24       A.    That's correct.

25       Q.    As is the case in some programs.

Peter Michael Kohanski     5/18/21

```
1         A.    (Witness nods head affirmatively.)
2         Q.    So, you're entering -- I guess, are you
3   completing your third year or your second year, then?
4         A.    I've just completed my third year.
5         Q.    Could you describe to me University of North
6   Texas' program for graduate students as you advance
7   towards the Ph.D.?  What milestones or qualifications do
8   you have to achieve in order to progress in the program?
9         A.    You have to complete your course work, you have
10  to do two language proficiency exams, you need to do
11  your qualifying exams, dissertation.
12        Q.    Have you passed your qualifying exams at this
13  time?
14        A.    I've passed part one.
15        Q.    Can you describe to me that exam and its parts?
16        A.    To clarify, the first part that I took?
17        Q.    You said there was a part one, so I'm just
18  wondering how many parts there are?  Could you just
19  subscribe to me how this exam takes place?  And if you
20  could, in as much detail as possible, describe how the
21  exam works.
22        A.    There are two parts.  I should clarify, this is
23  just for musicology.  There are two parts.  The first
24  part is score I.D., where you get six scores, three from
25  before 1750, three from after 1750, unknown scores, and
```

Peter Michael Kohanski      5/18/21

```
 1  you have to describe them in terms of form, style,
 2  genre, et cetera, and try to identify them.  And then,
 3  the second part are your qualifying exam topics, where
 4  you choose three topics from music history, you come up
 5  with a bibliography on them, you spend the summer
 6  reading that bibliography, and then you write an essay
 7  question on each one of them and do an oral defense of
 8  those essays.
 9       Q.    And the second part that you just described is
10  still in front of you, is that it?
11       A.    Yes.
12       Q.    Will you be working on that this summer?
13       A.    Yes.
14       Q.    Have you finished all of your course work at
15  this time?
16       A.    No.
17       Q.    How much of your course work is left to
18  complete?
19       A.    Six credits.
20       Q.    Is that a semester's worth of work?  Two
21  semesters?  How many semesters do you anticipate taking
22  to finish your six credits?
23       A.    One semester.
24       Q.    Given this training, do you consider yourself
25  an expert in music theory?
```

Peter Michael Kohanski    5/18/21

```
 1      A.    No.
 2                 MR. ALLEN:  I'm going to mark another
 3   exhibit.  This will be marked as Exhibit 2, if you
 4   could.
 5                 (DEPOSITION EXHIBIT 2 MARKED.)
 6      Q.    (By Mr. Allen)  Mr. Kohanski, I want to give
 7   you an opportunity to examine this document.  Is this
 8   your name at the bottom of this first page?
 9      A.    Yes, it is.
10      Q.    Did you compose this -- the material, starting
11   with "Dear colleagues" that follows on this first page?
12      A.    Yes.
13      Q.    And to whom did you send this message?
14      A.    Many graduate students in the division of MHD
15   at UNT.
16      Q.    Many?  Could you be more specific?
17      A.    To the best of my memory right now, it was
18   probably about 40.  But in the documents we provided,
19   there should be an exact number, I believe.
20      Q.    Were there graduate students you excluded from
21   receipt of this message?
22      A.    No.
23      Q.    Is there some sort of -- how did you find all
24   of their contact information to send this message?
25      A.    Together with my colleagues, we came up with as
```

1  many names as we could think of that we know were

2  current students at UNT, and from there, it's -- you can

3  just -- all the e-mail format at UNT is the same, and we

4  could put their e-mails in based on their names.

5      Q.    Was there a central server list that you could

6  just blast out an e-mail to every graduate student of

7  any sort?

8      A.    No.

9      Q.    Okay.  And what was your purpose in sending

10  this message?

11     A.    To solicit signatures to a letter we were

12  sending to the dean of the college of music.

13     Q.    I think you also mentioned that you sent it to

14  graduate students, but also colleagues.  Who were you

15  identifying as colleagues?

16     A.    Graduate students.

17     Q.    Were there any recipients of this, in addition

18  to graduate students that you sent it to?

19            Sorry.  Strike that question, please.

20            I think you had indicated that you composed

21  this with colleagues, correct?

22     A.    Composed what?

23     Q.    This Exhibit 2.

24            MS. HARRIS:  A list of people you sent

25  the --

1        MR. BOHUSLAV:  Please have one attorney

2   asking questions.

3        Q.   (By Mr. Allen)  Let me back up.  Did you

4   compose this message in conjunction with any other

5   individuals?

6        A.   No.

7        Q.   So, you were the sole author of this "Dear

8   colleagues" to the end of the letter.

9        A.   Yes.

10       Q.   And I believe you said you composed a list of

11  graduate students with your colleagues.

12       A.   Yes.

13       Q.   A list of recipients, excuse me, is that

14  correct?

15       A.   Yes.

16       Q.   And who were those colleagues who helped you

17  compile a list of recipients?

18       A.   Bryan Stephens, that's B-R-Y-A-N, Rachel Gain,

19  Salvador Hernandez.  To the best of my knowledge, that

20  might be everyone.  There were certainly more people on

21  the Zoom call where we did that, but I can't think of

22  anyone else, specifically, who was coming up with names.

23       Q.   You mentioned a Zoom call.  When was that Zoom

24  call?

25       A.   I don't know the date.

1      Q.    Do you know more or less the time frame?

2      A.    The end of July 2020.

3      Q.    And who called the Zoom meeting?

4      A.    I don't remember.

5      Q.    Do you have any position of authority among the

6   graduate students?

7      A.    I did.

8      Q.    And could you describe that position for us?

9      A.    At the time, I was president of the graduate

10   association of musicologists and theorists.

11     Q.    Could you describe the duties and obligations

12   of that position?

13     A.    Basically, the day-to-day running of that

14   association; conference planning, financials, running

15   meetings.

16     Q.    What kind of meetings?

17     A.    Normal business meetings that we have

18   throughout the year.

19     Q.    What do these meetings accomplish?

20     A.    Professional development.

21     Q.    Are you responsible for any diversity, equity

22   and inclusion training?

23     A.    Can you define "responsible"?  What do you mean

24   by that?

25     Q.    You said that these meetings take place that

*Peter Michael Kohanski    5/18/21*

1  handle administrative things associated with the
2  graduate program from the graduate student level.  Is
3  that a correct -- is that a correct summary of what you
4  just told me?

5       A.   No.

6       Q.   Could you describe again for me, because I'm
7  confused, honestly.  Could you describe again for me
8  what this committee -- I'm referring to the committee --
9  can you state the name of the committee again?

10      A.   The graduate association of musicologists and
11 theorists.

12      Q.   So will it be clear if I just refer to that as
13 the graduate association, is that fair?

14      A.   You can call it GAMuT.

15      Q.   GAMuT?  Is that G-A-M-U-T?

16      A.   Yeah.

17      Q.   So, GAMuT, could you describe again for me what
18 GAMuT does?

19      A.   It's for professional development and social
20 things and -- yeah.

21      Q.   When you say, "social things," what does that
22 mean?

23      A.   It means sometimes after our meetings, we'll
24 get together and have drinks.

25      Q.   And what do you include within professional

*Peter Michael Kohanski    5/18/21*

1  development?

2       A.    Reading each others' abstracts before we submit

3  to conferences, conference previews.  We invite people

4  to lecture for us or give presentations.

5       Q.    Do you take over any of the responsibility for

6  diversity, equity and inclusion training among the

7  graduate students?

8       A.    No.

9       Q.    Could you turn to the second page of Exhibit

10  No. 2, where it says, "Dear Dean Richmond"?  Who

11  composed this part of the letter?

12       A.    There were several people.

13       Q.    Could you identify them for the Court?

14       A.    Myself, Rachel Gain, Bryan Stevens, Brian

15  Anderson, Jessica Stearns.

16       Q.    How do you spell her name?

17       A.    Her first name or last name?

18       Q.    Both.

19       A.    J-E-S-S-I-C-A S-T-E-A-R-N-S, Robert Anderson,

20  Dani Van Oort.

21       Q.    Could you spell his last name?

22       A.    It's a female, actually.

23       Q.    Oh, so perhaps you should spell -- is that her

24  full name?

25       A.    D-A-N-I space V-A-N-O-O-R-T.  It was seen and

*Peter Michael Kohanski      5/18/21*

1  edited by many -- probably more people than that.  I

2  can't come up with a full list of names, but I believe

3  those people were the main people kind of doing the

4  actual writing of it.

5      Q.   Was there any input from professors?

6      A.   No.

7      Q.   Was there any input from anyone connected to

8  the Society for Music Theory, other than the graduate

9  students you've just named?

10     A.   No.

11     Q.   And Dean Richmond, does that refer to Dean John

12 Richmond?

13     A.   It does.

14     Q.   Of the College of Music?

15     A.   It does.

16     Q.   Thank you.  Of all the people you named, are

17 there any of these individuals who are not graduate

18 students in the College of Music?

19     A.   No.

20     Q.   So, is it safe to say that the letter, if I may

21 refer to this "Dear Dean Richmond" document as a letter,

22 you'll understand what I mean, correct, if I say this is

23 a letter?

24     A.   Yes.

25     Q.   Even though I understand it may have been sent

 1  by e-mail.

 2       A.    Yes.

 3       Q.    So, is it safe to say the letter was a

 4  collective product of this group of graduate students

 5  who are involved in GAMuT?

 6       A.    No.

 7       Q.    Did GAMuT have a hand in drafting this letter?

 8       A.    It was not an official GAMuT activity.

 9       Q.    So, it's your position that this was a private

10  statement or letter drafted by these specific

11  individuals that you've just listed.

12       A.    Sorry.  Can you repeat that?

13       Q.    You said this was not composed as an official

14  letter by GAMuT.  Did I understand that correctly?

15       A.    That's correct.

16       Q.    So, my follow-up question is, in what capacity

17  was this letter drafted by you and the other students?

18       A.    As concerned graduate students and members of

19  the division.

20       Q.    So, that is just as you describe it in the

21  first sentence, "We, a cross-section of graduate

22  students in the Division of Music Theory -- excuse me --

23  Music History, Theory, and Ethnomusicology" are writing,

24  is that correct?

25       A.    Yes.

1      Q.    I want to ask you some specific questions about

2    the document.  It refers, in the second paragraph, to

3    "anti-Black racism and platforming of ad hominem attacks

4    in response to Dr. Philip Ewell's scholarship."  And you

5    also call those "egregious acts".

6                  What anti-Black racism are you identifying

7    in that second paragraph?  Can you explain each thing

8    that you considered an anti-Black racism that you were

9    writing about this there?

10     A.    So, more generally speaking, I'm talking

11   about -- we were talking about Dr. Jackson's article in

12   Volume 12 of the Journal for Schenkerian Studies;

13   specifically, I think we were talking about the

14   pathologization -- pathologizing the black community as

15   a monolith and as anti-Semitic.  Talking about how he

16   said that black people need to be brought up to a

17   standard, a white standard.

18     Q.    What is the white standard that he identified,

19   in your mind?

20     A.    Classical music as the greatest music in the

21   world or the best music in the world.

22     Q.    And you also said he pathologized the black

23   community.  What do you mean by that?

24     A.    I mean, he characterized the black community as

25   somehow intrinsically disordered or inferior because of

1  anti-Semitism.

2      Q.    Do you believe there is no anti-Semitism in the

3  black community?

4      A.    I don't know enough about it.

5      Q.    Do you think it is anti-Black racism to

6  identify or discuss anti-Semitism in the black

7  community?

8      A.    Yes.

9      Q.    Would it be anti-Asian to identify

10 anti-Semitism in the Asian community?

11     A.    If it was done in the way that it was done

12 here.

13     Q.    Would it be anti-White to identify

14 anti-Semitism in a white community?

15     A.    Sorry, can you repeat that?

16     Q.    I think it was pretty clear.  I said, is it

17 anti-White to identify anti-Semitism in a white

18 community?

19     A.    If it was done in the same way it was done

20 here.

21     Q.    Describe the way it was done here by which I

22 understand you're referring to Professor Jackson's

23 article in the Journal of Schenkerian Studies, Volume

24 12.  What way in which it was done here are you

25 referring to?

Peter Michael Kohanski      5/18/21

1        A.    Again, characterizing the black community as a

2   monolith, as something that's collective, and describing

3   anti-Semitism as a characteristic of that collective,

4   and discussing anti-Semitism in a very uncritical way,

5   in a way that cites Wikipedia, and in a way that

6   probably refuses to critically engage a scholarship on

7   hip-hop and rap that I'm sure deals with that issue in a

8   much more nuanced way.

9        Q.    Have you yourself studied the genre of hip-hop

10  and rap?

11       A.    Not in great detail.

12       Q.    Do you deny that there is anti-Semitism

13  expressed in the tradition of rap and hip-hop music?

14       A.    I don't know enough about it.

15       Q.    So you had no basis to form a judgment whether

16  there was anti-Semitism in the rap or hip-hop canon, if

17  you will, is that correct?

18            MR. BOHUSLAV:  Objection, leading.

19       Q.    (By Mr. Allen)  This is a classic example where

20  you're still obligated to answer the question, and the

21  Judge will sort that out.

22            Can I ask the Reporter the read the

23  question, again?

24            (THE RECORD WAS READ BACK.)

25            MR. BOHUSLAV:  Objection, leading to the

Peter Michael Kohanski      5/18/21

```
 1  question.
 2       A.    I suppose that's correct.
 3       Q.    (By Mr. Allen)  I'm curious about this term
 4  "monolithic".  Could you explain what you mean by that?
 5       A.    Yes.  As something that's, like I said,
 6  collective and not -- you know, it's something that can
 7  be supplied to the entire community or considering the
 8  community as a collective without nuance.
 9       Q.    What would you consider nuance?
10       A.    Not saying that something can be applied to all
11  black people.
12       Q.    Is it safe to say it would not be nuance to
13  apply such judgments to an entire field of music, like
14  rap and hip-hop, for instance?
15       A.    Yes.
16       Q.    So if someone argued that, say, classical music
17  was an embodiment of white privilege, would that be
18  lacking in nuance?
19       A.    The way you -- I think there's a more nuanced
20  way to have that discussion than the way you just put
21  it.
22       Q.    That's fine.  I'm just asking you a question.
23  Would it be lacking in nuance to characterize the entire
24  corpus of classical music as an expression of white
25  privilege?
```

Peter Michael Kohanski        5/18/21

1        A.    Yes.

2        Q.    Platforming of ad hominem attacks in response

3   to Dr. Philip Ewell.  Could you explain exactly what you

4   mean by those specific ad hominem attacks in response to

5   Dr. Philip Ewell's scholarship?  That's in that same

6   first sentence.

7        A.    I think it's much of the same thing, in terms

8   of calling him anti-Semitic.

9        Q.    Was he specifically called anti-Semitic in that

10  article by Dr. Jackson, in Volume 12 of the Journal of

11  Schenkerian Studies?

12       A.    I mean, I don't remember the exact phrasing.

13       Q.    Did you remember the exact phrasing when you

14  composed this letter?

15       A.    Yes.

16       Q.    Can I ask, when did you read Dr. Jackson's

17  article in the Journal of Schenkerian Studies, Volume

18  12?

19       A.    July 2020.

20       Q.    Do you remember the day?

21       A.    I don't remember the exact date.

22       Q.    Do you remember -- and I understand the limits

23  of human memory, but I'm just trying to ask you to put

24  it in relation to other events.  Do you remember how

25  long after the journal appeared that you read his

*Peter Michael Kohanski    5/18/21*

```
 1  article?  Dr. Jackson's article, I mean.
 2        A.    It was very soon after the journal came out.
 3        Q.    A matter of days?
 4        A.    Yes.
 5        Q.    Do you remember it being a matter of hours?
 6        A.    Parts of the article I read in a matter of
 7  hours, not the whole thing.
 8        Q.    Do you remember what parts you did not read?
 9        A.    Within a matter of hours, you're saying?
10        Q.    Let's be clear.  I think there's maybe some
11  unclarity.  Do you mean you read it in the course of a
12  few hours?
13        A.    No.  I read parts of the article within a few
14  hours of it kind of appearing, and then I read the whole
15  thing within a couple or a few days after.
16        Q.    When did you begin composing this?  You said in
17  late July, correct?
18        A.    That's correct.
19        Q.    Can I ask you if you began composing this
20  before or after you had read the entire article?
21        A.    After.
22        Q.    Do you think, if you read the article again,
23  you would be able to identify what specific accusations
24  of anti-Semitism were ad hominem attacks in response to
25  Dr. Philip Ewell?
```

1      A.    Yes.

2      Q.    But you just simply can't, given the limits of

3  human memory, identify those at this time, is that

4  correct?

5      A.    That's correct.

6      Q.    You said earlier that it was monolithic, and

7  you would characterize that in negative terms to, I

8  think, refer to whole groups as anti-Semitic, in

9  general.  Am I characterizing that fairly?

10     A.    No.

11     Q.    So, please explain to me again what you mean by

12  "monolithic" with regard to, say, the black community.

13            MR. BOHUSLAV:  Objection, vague.

14     Q.    (By Mr. Allen)  I think it's a vague term, so

15  I'm asking for clarification.

16     A.    To -- to characterize every single black person

17  in the same exact way.

18     Q.    So, it is also impermissible to characterize

19  Philip Ewell as anti-Semitic as an individual, is that

20  correct?

21     A.    Yes.

22     Q.    This refers, in the second sentence -- I'm

23  sorry, we're plowing through this, Mr. Kohanski.  In the

24  second sentence, it says, "egregious acts that go beyond

25  the bounds of academic discourse."  What egregious acts

*Peter Michael Kohanski    5/18/21*

```
 1  are you referring to in this letter?
 2        A.    The perpetuation of anti-Black racism,
 3  platforming of ad hominem attacks.
 4        Q.    So, again, this comes back to statements
 5  published in the Journal of Schenkerian Studies?
 6        A.    Yes, and also the process of its conception.
 7        Q.    Can I ask if you read any of the materials
 8  submitted by Timothy Jackson to the Court detailing the
 9  editorial process of the journal?
10        A.    I believe I read some.
11        Q.    Do you remember what they were?
12        A.    I do not.
13        Q.    Did you read any of the e-mails exchanged back
14  and forth amongst the editorial committee or -- strike
15  that, please.
16              Do you remember reading any of the e-mails
17  exchanged back and forth amongst the editorial staff of
18  the Journal?
19        A.    Sorry.  Were you asking if I remember?
20        Q.    Do you remember reading --
21        A.    Yeah.
22        Q.    -- the e-mails exchanged back and forth between
23  the editorial staff of the Journal of Schenkerian
24  Studies with regard to Volume 12?
25        A.    I don't remember reading those.
```

Peter Michael Kohanski      5/18/21

1     Q.    Had you read them by the time you composed this
2  letter?

3     A.    No.

4     Q.    Were those even available to you by the time
5  you composed this letter?

6     A.    No.

7     Q.    Did reading any of them change your mind about
8  what you had written when you composed this letter?

9     A.    Well, I don't believe I did read them.

10    Q.    Okay.  You had said earlier you read some, but
11 it was my understanding you weren't able to identify
12 exactly what you had read.  What was the source of what
13 you did read?

14    A.    I believe when this lawsuit was first
15 initiated, there was like a Google drive of the
16 complaint going around on the Internet.

17    Q.    And you consulted that?

18    A.    Yes.

19    Q.    But you said you did not read all the exhibits
20 attached to the complaint, is that correct?

21    A.    I believe that's correct.

22    Q.    Can you remember which exhibits you read?

23    A.    I cannot.

24    Q.    Okay.  I'm going to skip down to where you've
25 enumerated three, I think what you call "reprehensible

1   aspects of the journal."  The first is a "Lack of Peer

2   Review."  Are you aware of any other publications in

3   music history, music theory, musicology that are

4   published in scholarly journals without peer review?

5        A.    No.

6        Q.    So, it's your position that all publications in

7   scholarly journals must be subjected to peer review.

8              MR. BOHUSLAV:  Objection, leading.

9        A.    Yes.

10       Q.    (By Mr. Allen)  And why do you believe that the

11  articles in Volume 12 that were connected with the

12  symposium -- incidentally, by "symposium", do you know

13  what I'm referring to?

14       A.    Yes.

15       Q.    What am I referring to when I say "symposium"?

16  This is just part of the format.

17       A.    Volume 12 of the Journal of Schenkerian

18  Studies, the symposium response to Philip Ewell's

19  keynote address.

20       Q.    And we understand that the articles that were

21  published alongside those, that were part of the

22  ordinary course of the journal's scholarly publications,

23  are not part of the symposium.  I think there were three

24  such scholarly articles.

25       A.    Yes.

*Peter Michael Kohanski    5/18/21*

1      Q.    Okay.  Just to be clear.  So, in your view,
2  what is a reprehensible aspect of not subjecting
3  articles to peer review?
4      A.    Not subjecting articles to peer review can --
5  there is a danger that the scholarship will not be
6  rigorous enough and in a way that's generally understood
7  it needs to be in academic discourse.
8      Q.    How would it not be rigorous enough?  Can you
9  just explain that?  What's the mechanism?  How is that
10 supposed to work, in practice?
11     A.    I have never edited articles, I'm not quite
12 sure, it's just something I understand to be a -- you
13 know, a given in academia.
14     Q.    Have you ever published any articles, Mr.
15 Kohanski?
16     A.    No.
17     Q.    Have you ever submitted any articles for peer
18 review to any scholarly publication?
19     A.    No.
20     Q.    So, you have no experience, personally, of peer
21 review or how to manage a journal.
22     A.    No.
23     Q.    But you still believe that these were
24 reprehensible acts in the management of a journal,
25 correct?

1      A.    Yes.

2      Q.    You also mention "Illicit collaboration".  As a

3  particular example, you cite, "Dr. Jackson proceeded to

4  solicit responses from his close and caring colleagues."

5  Is that illicit?  Strike that question, and let me be

6  more precise.  I'm sorry, Mr. Kohanski.

7            Is it illicit collaboration for a member of

8  an editorial staff to solicit articles for a scholarly

9  publication?

10     A.    Well, it's not illegal.

11     Q.    That's not my question.  I asked you if it was

12  an illicit act to solicit contributions to a scholarly

13  journal by its editorial staff?

14     A.    I guess not.

15     Q.    Are you aware that a description of the

16  editor's duties by -- edited by Dr. Benjamin Brand, who

17  is the department chair, I believe, of your department

18  made it a duty of the editor to solicit articles?

19     A.    I was not aware of that.

20     Q.    And you also say it was an illicit

21  collaboration because Dr. Ewell was neither notified nor

22  asked to respond, correct?

23     A.    That is correct.

24     Q.    Were you aware that Dr. Ewell was notified of

25  the upcoming Volume 12 as responses to his paper at the

*Peter Michael Kohanski    5/18/21*

1  Society for Music Theory plenary conference or plenary

2  paper that he delivered in November of 2019?

3      A.   Yes.

4      Q.   So, that's a false statement that he was not

5  notified, correct?

6      A.   That's not false.

7      Q.   How is it not false, if he was notified?

8      A.   Because if it went out on an e-mail list,

9  there's a chance he might not have seen it.

10     Q.   So, it's your position that because he might

11  not have seen something sent to him that he was not

12  notified?

13     A.   But it wasn't sent to him.

14     Q.   That's not my question.  Could you just answer

15  my question?  Your position is this -- well, first of

16  all, what are we talking about?  What is your

17  understanding of what was sent to Dr. Philip Ewell?

18     A.   A call for papers in response to his keynote.

19     Q.   And the keynote, you mean something delivered

20  in November -- I think early November at the Society for

21  Music Theory, correct?

22     A.   Yes.

23     Q.   And that was November 2019, correct?

24     A.   Yes.

25     Q.   So, it's your position that being sent a call

1  for papers is not being notified.

2                MR. BOHUSLAV:  Objection, vague.

3        A.    In this case, yes.

4        Q.    (By Mr. Allen) And it also does not count as

5  being asked to respond that you would receive a call for

6  papers asking you to respond, is that correct?

7                MR. BOHUSLAV:  Objection, vague.

8        A.    In this case, yes.

9        Q.    (By Mr. Allen)  Do you know if there's a

10  requirement in scholarly practice to send personal

11  invitations to authors whose work is being criticized?

12        A.    I don't know if there's a requirement.

13        Q.    Do you know the source of any such requirement,

14  if it should exist?

15        A.    What do you mean by "the source"?

16        Q.    If you were going to look for the sources of

17  these sort of rules you seem to be applying in this

18  letter, against illicit collaboration, against editorial

19  missteps, against lack of peer review, where would you

20  go to look to find those established rules of

21  scholarship, Mr. Kohanski?

22        A.    The general conventions of the field.

23        Q.    What is the source of these general conventions

24  of the field?

25        A.    People.

*Peter Michael Kohanski    5/18/21*

1    Q.    So, can that be more or less reduced to things
2  you've heard from colleagues?
3    A.    No.
4    Q.    Well, what is the source of conventional
5  wisdom?
6    A.    Scholars and academics and the normal
7  functioning of academia.
8    Q.    Who did you consult with regard to lack of peer
9  review, illicit collaboration, and editorial missteps
10  when you composed this letter?
11    A.    Other graduate students.
12    Q.    Do you know if any of them had any experience
13  editing?
14    A.    To my knowledge, no.
15    Q.    How many of them had actually had experience
16  publishing peer reviewed articles?
17    A.    Well, actually -- so, Levi Walls.
18    Q.    Levi Walls -- is it pronounced Levee
19  (Phonetic)?
20    A.    Layvi (Phonetic).
21    Q.    Layvi (Phonetic).  Thank you.  And Mr. Levi
22  Walls was the graduate student editor of the Journal of
23  Schenkerian Studies, correct?
24    A.    I don't know if that's the exact position
25  title, but for all intents and purposes, yes.

Peter Michael Kohanski      5/18/21

 1          Q.    We can agree that he was an editor.

 2          A.    Yes, and a graduate student.

 3          Q.    Okay.  And he was the only one, to your

 4    knowledge, that had experience of editing academic

 5    journals.

 6          A.    Editing academic journals that were anything

 7    other than student -- completely student run or for

 8    graduate students, as in graduate student work was to be

 9    published in those journals.

10                MR. BOHUSLAV:  We're coming up on an hour.

11    Can we take a break, when you get to the stopping point?

12                MR. ALLEN:  Let's go through these points,

13    if you don't mind, Matt, and then, I think we will wrap

14    up relatively soon after that with this line of

15    questioning.

16                MR. BOHUSLAV:  Yeah.  Let's go ahead and

17    take a break right now, if that's okay.

18                MR. ALLEN:  All right.  If someone needs

19    to go to the restroom -- incidentally, Mr. Kohanski, this

20    is before we go off the record.  If at any time you want

21    to break, just feel free to ask for one.

22                THE WITNESS:  Thank you.

23                MR. ALLEN:  So, let's go off the record,

24    then.

25                (OFF THE RECORD FROM 10:01 TO 10:10 A.M.)

Peter Michael Kohanski    5/18/21

```
1        Q.    (By Mr. Allen)  Are you ready, Mr. Kohanski?
2        A.    Yes.
3        Q.    I wanted to follow-up on some questions we
4   asked earlier about you including a cross-section or
5   invoking a cross-section of the graduate students in
6   sending this letter soliciting support.  Did you include
7   graduate students in the music theory program in that?
8        A.    Yes.
9        Q.    How many music theory graduate students are
10  there in the College of Music?
11       A.    I'm not sure.
12       Q.    Is it more than ten?
13       A.    I probably would say it's around ten, yes, no
14  more than fifteen, I would guess.
15       Q.    Did you reach out to all of them?
16       A.    Yes.
17       Q.    And did you include any of them in the drafting
18  of this letter, which is attached to Exhibit 2?
19       A.    Did I include any music theory students?
20       Q.    Yes.
21       A.    Yes.
22       Q.    Whom did you include?
23       A.    Rachel Gain, Bryan Stevens, Justin Sales,
24  Alexandra Rouw, Rouw, I don't quite know how to say her
25  name.  I can't -- to the best of my knowledge, that's
```

1   everyone, but there might have been more, but I can't
2   remember exactly who.
3       Q.    Did they take an active role in helping draft
4   this letter?
5       A.    Rachel Gain and Bryan Stevens did.
6       Q.    I want to go back to the letter, now.  Under
7   numeral 3 there, see it says "editorial missteps"?
8       A.    Uh-huh.
9       Q.    And then, if you skip down, I think it's the
10  third sentence that says, "although Levi or Layvi
11  (Phonetic) --
12      A.    Layvi (Phonetic).
13      Q.    "Although Levi did everything within his power
14  to prevent the publication of racist views -- and you go
15  on to make some other descriptions of what you
16  characterize as editorial missteps.  My question for
17  you, Mr. Kohanski, is what did Levi Walls do that was
18  within his power to prevent the publication of racist
19  views, to your knowledge?
20      A.    He tried to talk to Dr. Jackson about it, and
21  he went to Dr. Brand about it, to raise his concerns
22  about the content of the journal, before it was
23  published.
24      Q.    Are those the two things that you think he did
25  that were within his power?

 1        A.    Yes.

 2        Q.    Did you talk to Mr. Levi Walls about what he

 3   did on the journal?

 4        A.    Yes.

 5        Q.    When?

 6        A.    Again, it was July 2020, right after the

 7   journal came out.

 8        Q.    Did you talk to him in January 2020 about what

 9   he was doing on the journal?

10        A.    No.

11        Q.    Are you aware that that's the time he purported

12   to talk to Benjamin Brand?

13        A.    I didn't know when exactly he talked to Dr.

14   Brand.

15        Q.    And do you know when he purported to talk to

16   Professor Jackson about eliminating so-called racist

17   views from the Journal of Schenkerian Studies?

18        A.    I guess for both of those things, I just knew

19   that it was the spring semester of 2020.

20        Q.    And your source of that was a conversation you

21   had with Mr. Levi Walls himself, correct?

22        A.    It's not like he was telling me it

23   specifically.  He was telling a group of us.

24        Q.    Where was this?

25        A.    On Zoom.

Peter Michael Kohanski    5/18/21

1      Q.    And this was that Zoom call that took place in
2  early -- or excuse me -- late July?
3      A.    No.
4      Q.    When did the Zoom call take place, again?
5  Excuse me.
6      A.    It was late July, but there were several Zoom
7  calls that whole week.  I don't remember specifics of --
8  well, I guess they've all blurred together, is my point.
9      Q.    Well, could you characterize for the Court
10 approximately how many Zoom calls there were?
11 Understanding that you might not be exactly correct,
12 just within a range.
13     A.    Five to ten maybe.
14     Q.    Over the course of how many days?
15     A.    Probably about a week.
16     Q.    So, it sounds like there was almost -- or at
17 the very least a meeting a day, is that correct?
18     A.    Yes.
19     Q.    Maybe sometimes more?
20     A.    Yes.
21     Q.    Was Mr. Levi Walls on all of those calls?
22     A.    No.
23     Q.    How was Mr. Levi Walls invited to participate
24 in these calls?
25     A.    After the journal came out, and we were all

```
 1  reacting very negatively towards it, we decided we
 2  wanted to come together and issue some sort of
 3  statement.  And so, we just -- we tried to invite as
 4  many people as we thought, and, yeah, that's how all
 5  those Zoom calls started.
 6       Q.   Did you, personally, reach out to Mr. Levi
 7  Walls?
 8       A.   At times during that week, yes, but not
 9  necessarily to discuss those two topics that we were
10  just discussing.
11       Q.   What did you discuss with Mr. Walls?
12       A.   He was concerned about the -- about the
13  reactions that were coming up online, and he wanted
14  to -- he wasn't on Twitter, so he wanted me to keep him
15  up to date on those types of things.
16       Q.   Are you on Twitter?  I forget your answer to
17  that.
18       A.   Yes.
19       Q.   And did you produce your Twitter feed in the
20  documents you produced to us?
21       A.   I produced the tweets or -- tweet or tweets
22  that I thought was relevant or responsive, as you would
23  say, yes.
24       Q.   Thank you.  And what did you tell Mr. Walls
25  about what was going on on Twitter?
```

*Peter Michael Kohanski    5/18/21*

1        A.    I told him I believed that the responses to

2   what we had put out were overwhelmingly positive, and

3   that -- I think I tried to reassure him that no one

4   would blame him.

5        Q.    When you say "what we had put out," what are

6   you referring to?

7        A.    The public statement that I believe you have.

8        Q.    Is that this statement?

9        A.    No, it's a different one.

10       Q.    I have another exhibit, and maybe you'll be

11  able to identify that as the statement, but do you

12  recall if that statement that you're referring to is the

13  one that was reproduced as part of the ad hoc panel

14  report?

15       A.    I believe that would be it, yes.

16       Q.    So, let's save that conversation.  I am

17  interested in what you have to say about that, and we'll

18  see if that is the one at a later time.  Was there

19  anything else that you put out that you were reassuring

20  Mr. Levi Walls that the reaction was positive concerning

21  these things?

22       A.    Sorry -- can you --

23       Q.    Yeah.  Please strike that.  That was a terrible

24  question.

25             You earlier said you referred to things you

*Peter Michael Kohanski    5/18/21*

```
 1  had put out on Twitter.  By that, I understand the
 2  graduate students of the College of Music.  And I was
 3  asking what specific things did you put out?  And you
 4  referred to the statement, which hopefully we'll return
 5  to.
 6              I'm now asking, was there anything in
 7  addition to that statement that you put out that you
 8  were reassuring Mr. Walls the response had been positive
 9  to?
10      A.    I don't believe so.
11      Q.    Okay.  And reactions online you had referred to
12  earlier.  What reactions are those?
13      A.    I guess just random tweets from other people in
14  the discipline, in the community, who were supporting us
15  graduate students or who were critical of Volume 12 of
16  JSS.
17      Q.    Were there any individuals involved in the
18  Society for Music Theory outside the community of
19  graduate students at the University of North Texas that
20  were participating in those conversations?
21      A.    I'm sure there were.  I wasn't specifically
22  talking to anyone, I was just looking at tweets, so I'm
23  not quite sure what you mean by conversations, but --
24      Q.    Well, it's a good point.  And you referred to
25  tweets.  Were there other social media involved?
```

*Peter Michael Kohanski    5/18/21*

1          A.    I mean, I posted things on my Facebook page,
2     and, again, any posts that were responsive, I believe
3     I've included in the documents.
4          Q.    So, there's Twitter, Facebook.  Any other
5     social media?
6          A.    I mean, I'm sure I talked about this with
7     people on SnapChat, but those things are gone into
8     oblivion at this point because SnapChat doesn't stay.
9          Q.    Any other social media you can think of?
10         A.    Do you mean where I would have discussed this?
11         Q.    Where these things were discussed that you were
12    in turn discussing with Mr. Walls?
13         A.    I don't believe so, no.
14         Q.    And you had described SnapChat messages as more
15    like self-destructing messages, I suppose, is that fair?
16         A.    Yes.
17         Q.    Did you discuss anything on SnapChat that was
18    different in kind than those things you were discussing
19    on Facebook and on Twitter?
20         A.    No.
21         Q.    Do you remember any specific conversations you
22    had with Mr. Walls at that time that -- by that time, I
23    mean that critical week.  Sounds like after the
24    publication appeared, you began holding at least one
25    Zoom meeting a day.  Do you remember specific

*Peter Michael Kohanski    5/18/21*

```
 1  conversations you had with Mr. Walls?
 2      A.    Yeah.  Again, just he was really concerned
 3  about what this would mean for his future.  And I
 4  probably -- well, probably his mental health, as well.
 5  I remember him being pretty devastated and, yeah, I just
 6  tried to reassure him, and, again, I told him about what
 7  people were saying online.
 8      Q.    And when he -- you said he felt concerned about
 9  his future.  Do you mean about his career?
10      A.    Yes.  I believe so.
11      Q.    Were there anything -- was there any other
12  aspect of his future that he was concerned with, other
13  than his career, based upon your conversations with him?
14            MR. BOHUSLAV:  Objection, calls for
15  speculation.
16      A.    Not that I can remember.
17      Q.    (By Mr. Allen)  Moving into the next list in
18  your statement, there's 1 through 5.
19      A.    Yes.
20      Q.    "The following steps to be taken."  I just want
21  to skip down to No. 2.  Of course, you wanted a public
22  condemnation of the issue, it says here, and release it
23  fully online to the public.  Did I read that correctly?
24      A.    Well, you didn't read it verbatim, I guess,
25  but it was the sentiment.
```

*Peter Michael Kohanski    5/18/21*

```
 1        Q.    No, I don't want to be unclear.  So, it says,
 2   "The JSS Moving Forward."  "Given the egregious behavior
 3   by the JSS and specifically by the advisory board, we
 4   urgently call for the following steps to be taken."
 5              The first one is to dissolve the journal,
 6   so that's not much moving forward, is it?  It's just
 7   simply to call for the journal to be dissolved, is that
 8   correct?
 9        A.    Yes.
10        Q.    So, you wished for it to cease to exist, is
11   that an accurate --
12        A.    Yes.
13        Q.    -- summary?  Good.  Now, I'm looking at No. 2,
14   and it says, "publicly condemn the issue and release it
15   freely online to the public."  Did I read that correctly
16   this time?
17        A.    Yes.
18        Q.    Was the journal released freely to the public?
19        A.    I believe it was.
20        Q.    Do you know of any policy of the journal that
21   was in place to keep its content from being publicly
22   accessible?
23        A.    I do not, no.
24        Q.    You're aware that the journal was published by
25   the University of North Texas Press, correct?
```

1      A.    Yes.

2      Q.    And that's an institution of the University

3  correct?

4      A.    Yes.

5      Q.    Do you know whether the editorial staff

6  controlled whether the University of North Texas Press

7  released it freely to the public or not?

8      A.    I do not know that.

9      Q.    But it was your position when you drafted this

10  statement that it was not being released freely to the

11  public, is that correct?

12     A.    No.

13     Q.    Why did you call for it to be released freely

14  online to the public, if it was already available to the

15  public?

16     A.    We just wanted to make sure it wasn't going to

17  be kind of covered up or shoved aside or hidden.

18     Q.    Did anyone advocate for it to be shoved aside,

19  covered up or hidden?

20     A.    Not to my knowledge, but we were just covering

21  all our bases, I suppose.

22     Q.    Are you aware of any time in the past when

23  public conversations of the University of North Texas

24  Press were covered up, shoved to the side or hidden?

25     A.    No.

1       Q.    And you also call, on No. 3, for a "full,
2   detailed, and public account of the editorial and
3   publication process," do you see that?

4       A.    Yes, I do.

5       Q.    Was that ever provided?

6       A.    Yes.

7       Q.    In what form?

8       A.    The ad hoc review panel convened by the
9   provost.

10      Q.    Did you mean Provost Jennifer Cowley?

11      A.    Yes.

12      Q.    Did you know that Provost Cowley asked
13  Professor Jackson to submit a response to that ad hoc
14  panel report?

15      A.    Yes.

16      Q.    Was that ever made public?

17      A.    Not to my knowledge.  I don't believe I've ever
18  seen it.

19      Q.    So, is it fair to say that you were not
20  familiar with Timothy Jackson's response to the ad hoc
21  panel's report, correct?

22      A.    Yes.  Besides anything I've seen in the lawsuit
23  documents.

24      Q.    Do you know if the University has ever
25  published his response?

Peter Michael Kohanski     5/18/21

```
1         A.    I don't know.
2         Q.    Would it be the position of the graduate
3   students who wrote this statement that that should be
4   disclosed?
5         A.    I believe so.
6         Q.    Well, do you, personally, believe that should
7   be disclosed?
8         A.    Yes.
9         Q.    Do you know why it hasn't been disclosed?
10        A.    I do not know.
11        Q.    Moving down to No. 4, you want to hold
12  accountable every person responsible for the direction
13  of the publication, correct?
14        A.    That's correct.
15        Q.    And you refer to "past bigoted behaviors by
16  faculty."  Did I read that correctly?
17        A.    That's correct.
18        Q.    Could you enumerate for me the past bigoted
19  behaviors of faculty that you are describing here?
20        A.    I don't have very many specifics.  I'm sure
21  other graduate students would be able to talk more about
22  those.  I did -- I will say, however, I did receive one
23  e-mail, when this was happening, from a past student who
24  said -- who is an Asian student, from somewhere in Asia,
25  and he said that Dr. Jackson told him to try speaking
```

Peter Michael Kohanski    5/18/21

1  with rocks in his mouth to help his enunciation and

2  diction and speak English better.

3      Q.    Do you know if this individual could speak

4  English well?

5      A.    I do not know.

6      Q.    Would that be improper, to tell someone that

7  they could learn to improve their English?

8      A.    In the way that he did it, yes.

9      Q.    Why is that?  What in the way he did it, which

10 you heard from the student's e-mail?  What part of that

11 was improper, in your view?

12     A.    I guess I'm not sure how to describe -- or I'm

13 not sure how I can tell someone that telling someone to

14 put rocks in their mouth is improper.

15     Q.    Well, does that mean there's no basis for you

16 to judge it one way or another, since you don't seem to

17 be able to articulate it?

18          MR. BOHUSLAV:  Objection, argumentative;

19 objection, leading.

20     A.    No, I think it's improper.

21     Q.    (By Mr. Allen)  So, what is improper about

22 that?

23     A.    Someone has the potential to get hurt and

24 physically wound themselves by putting rocks in their

25 mouth, and probably using their jaw and I guess chewing

*Peter Michael Kohanski    5/18/21*

1 on them.

2    Q.    Do you know if Dr. Jackson instructed the

3 student to chew on rocks?

4    A.    I don't.

5    Q.    You said earlier that you've learned two

6 foreign languages?  Am I mistaken?

7    A.    Well, I need to learn two foreign languages.

8    Q.    Are you fluent in any foreign languages?

9    A.    No.

10    Q.    Would you consider it harmful to have a native

11 foreign speaker correct your pronunciation in a foreign

12 language?

13    A.    Depends on the way they do it.

14    Q.    How would you prefer that they do it?

15    A.    I suppose in private and from a place of care

16 and helpful -- being helpful.

17    Q.    So, their subjective feelings would be the most

18 important thing, is that it?

19          MR. BOHUSLAV:  Objection, argumentative;

20 objection leading.

21    A.    No, I suppose the most important thing would be

22 the way they go about it.

23    Q.    (By Mr. Allen)  And how should they go about

24 it?

25    A.    By not calling someone out and correcting them

Peter Michael Kohanski    5/18/21

 1  in front of a whole class, as this person told me Dr.

 2  Jackson did.

 3      Q.    Would you agree, Mr. Kohanski, that to teach in

 4  an American university, where the overwhelming language

 5  spoken is English, you would need to speak English

 6  proficiently?

 7      A.    Yes.

 8      Q.    So, wouldn't it be a legitimate part of

 9  graduate training for those students who did not have

10  basic English proficiency to instruct them on their

11  English pronunciation?

12      A.    Well, I would believe if they were already

13  taking classes at UNT, they did have basic English

14  proficiency.

15      Q.    Do you know of any students who don't have

16  basic English proficiency in the musicology program?

17      A.    No.

18      Q.    You mentioned this one e-mail of this student.

19  Did you ever do anything to verify what the student had

20  written?

21      A.    No.

22      Q.    So you just took it as true as you received it,

23  correct?

24      A.    Yes.

25      Q.    Were there any other past bigoted behaviors

*Peter Michael Kohanski    5/18/21*

```
 1  that you can name, specifically?
 2       A.   So, bigoted referring to -- I mean, bigoted
 3  referring to things that have to do with race and
 4  ethnicity or --
 5       Q.   It's your letter.  I'm asking you, what do you
 6  mean by "bigoted" in this sentence, now that you raised
 7  the issue?
 8       A.   Probably having to do with race and ethnicity.
 9       Q.   And what past bigoted behavior, specifically,
10  having to do with race and ethnicity, are you referring
11  to here in this numeral 4?
12       A.   Again, that instance is the only one that I
13  know, specifically, but there -- I believe other
14  graduate students knew more about this or had other
15  experiences that could speak to that more.
16       Q.   And, also, who is the student who supposed -- I
17  guess you characterized him as having to put rocks in
18  his mouth or some such thing.  Who is that student?
19       A.   I don't know their name.  I included the e-mail
20  in the documents.
21       Q.   I'm skipping down.  You specifically called for
22  Dr. Jackson's dismissal.  Do you see that, in Exhibit 2?
23       A.   Yes.  Sorry.
24       Q.   And, again, you say he has a history of racist,
25  sexist and abusive behavior in his many capacities.
```

  1  What capacities are you referring to, Mr. Kohanski?

  2       A.    I believe as a professor of music theory, as an

  3  adviser, an academic adviser, and in his capacity at the

  4  Center for Schenkerian Studies.

  5       Q.    And you're also calling for that center to be

  6  eliminated, as well, correct?

  7       A.    I don't believe so.

  8       Q.    It's okay to -- if it's not there, you can just

  9  say "no".

 10       A.    Yeah, no, I don't believe it's in here.

 11       Q.    So, what racist, sexist and abusive behavior

 12  are you referring to in this sentence, specifically?

 13       A.    For some of them, again, I don't know

 14  specifics.  I've heard from people, from the very first

 15  semester that I came here, that Dr. Jackson is sexist or

 16  has a past history of sexist behaviors.  In terms of

 17  abusive behaviors, the ones listed here pretty much

 18  speak for themselves.

 19       Q.    So, for the most part, the publication of the

 20  Journal of Schenkerian Studies?  Is that what you mean,

 21  when you say it speaks for itself?  What are you

 22  referring to?

 23       A.    Oh, sorry, these points 1, 2, 3.

 24       Q.    Using the CSS -- all right.  Let's get to those

 25  in a second.

 1      A.    Sure.

 2      Q.    You consider the publication of the Volume 12

 3 of the Journal of Schenkerian Studies with the

 4 symposium, which included his article, as a racist,

 5 sexist and abusive behavior?

 6      A.    I consider that racist, yes.

 7      Q.    Okay.  So, let's proceed to the specifics.

 8 First of all, can you tell me what a CSS is?

 9      A.    That's Center for Schenkerian Studies.

10      Q.    I see.  And "RA" means what?

11      A.    Research assistant.

12      Q.    And a research assistant to aid with his

13 personal research.  You consider that a sexist, abusive

14 and racist behavior, correct?

15            MR. BOHUSLAV:  Objection, leading.

16      A.    I consider that an abusive behavior.

17      Q.    (By Mr. Allen)  How is it abusive to have an RA

18 conduct your personal research?

19      A.    Because that wasn't their job.

20      Q.    What was the job of a CSS RA?

21      A.    The job was to help with the Center for

22 Schenkerian Studies, not with Dr. Jackson's personal

23 research.

24      Q.    Do you think there's a clear division between

25 Center for Schenkerian Studies research and personal

*Peter Michael Kohanski    5/18/21*

 1  research that may or may not have been conducted by
 2  Professor Jackson?
 3      A.    Yes.
 4      Q.    What is that difference?  Where does the line
 5  get drawn, Mr. Kohanski?
 6      A.    Well, my point being that the job of a C -- or
 7  the CSS RA I don't think was necessarily to do research,
 8  but things maybe like administrative things or editing,
 9  things like that.  I could be wrong about that, but to
10  my understanding, that's what the job was.
11      Q.    Are you referring to a specific individual in
12  this No. 1?
13      A.    Yes.
14      Q.    Who is that?
15      A.    Yiyi Gao.
16      Q.    Can you spell that name for us?
17      A.    Yeah.  Y-I-Y-I G-A-O.
18      Q.    And do you know what specific personal research
19  she was asked to do that supposedly was not the same as
20  CSS RA work?
21      A.    I do not know.
22      Q.    Have you had conversations with Yiyi Gao about
23  this?
24      A.    No.  I haven't had conversations with her,
25  specifically.

Peter Michael Kohanski    5/18/21

 1        Q.    How did you learn about this supposedly abusive
 2   behavior?
 3        A.    From some of my colleagues.
 4        Q.    Who are they?
 5        A.    Bryan Stevens, Brian Anderson.
 6        Q.    What did they tell you?
 7        A.    Basically, exactly what's here.
 8        Q.    The mere fact that some RA was supposed to be
 9   used to do personal research for a professor to whom
10   they were assigned as a research assistant?
11        A.    I don't think that's a good summary of what's
12   there, because I don't believe she was assigned to Dr.
13   Jackson as a research assistant.
14        Q.    She was assigned to the CSS, that's your
15   understanding?
16        A.    Yes.
17        Q.    Do you believe that some of Professor Jackson's
18   research, personal research, was also part of the work
19   of the CSS?
20        A.    I don't remember specifics -- more specifics
21   than this about what Bryan and Brian told me.  But it is
22   my understanding, generally, from those types of
23   conversations, that she was used for work that she
24   wasn't -- that wasn't part of her job.
25        Q.    And do you know what that work was?  You don't

1   know anything about the specifics of that work, or do

2   you?

3        A.   I don't necessarily remember.  I'm sure at some

4   point I knew about it, but --

5        Q.   And the -- let's move on to the second point,

6   "requiring student work during the summer without pay."

7   Do you know what specific students were required to do

8   work during the summer without pay?

9        A.   These Point 1, 2 and 3 are all related to Yiyi,

10  I believe.

11       Q.   Do you know what work she was required to do

12  during the summer without pay?

13       A.   I don't know if -- I don't know if it ties in

14  with Point 1, his personal research, or if it was just

15  work for the CSS.

16       Q.   Do you think it's common for students to do

17  work over the summer without pay?

18       A.   Not if it's a job that -- not if it's work that

19  has to do with a university position that they should be

20  getting paid for.  It's common for me to do work over

21  the summer on my own research, on my dissertation, or

22  something like that, but if a professor asked me to be a

23  TA for them over the summer without pay, then yeah,

24  that's unusual.

25       Q.   If you were required to complete work that you

Peter Michael Kohanski      5/18/21

 1  had left undone as part of your normal job, would that

 2  be something you would consider abusive?

 3       A.    No, I guess not.

 4       Q.    No. 3 is interesting, Mr. Kohanski.  It

 5  mentions extortion.  Do you agree that extortion refers

 6  to a crime?

 7       A.    I guess so.

 8       Q.    And this refers to grade manipulation.  Let's

 9  take that first.  What grade manipulation do you believe

10  Mr. Jackson engaged in?

11       A.    Again, I don't remember specifics.  This still

12  has to do with Yiyi.

13       Q.    So, you have no personal knowledge of what

14  grades were supposedly manipulated.

15       A.    I did in the summer of 2020, but I don't

16  remember now.

17       Q.    Where would that recording or written record of

18  what you knew in the summer of 2020 exist?

19       A.    There probably isn't one.

20       Q.    But right now, you can't recall what specific

21  manipulation was referred to here.

22       A.    I don't remember, to be honest.

23       Q.    And threats to students' careers and

24  reputations.  If I'm summarizing correctly what you said

25  before, you're still referring only to Yiyi Gao, is that

*Peter Michael Kohanski    5/18/21*

```
 1   correct?

 2        A.    That's correct.

 3        Q.    So, putting "students" in the plural is an

 4   exaggeration, is that correct?

 5        A.    I'm not sure actually.  I'm not sure now if

 6   there were others or not, because I guess we would have

 7   been very specific about saying students, plural, so I

 8   don't know.  But Yiyi is, I guess, the only specific

 9   example I can think of.

10        Q.    So you can't think of another student that you

11   would include in that No. 3 category at this time.

12        A.    That's correct.

13        Q.    How was her -- let's just focus on Yiyi Gao.

14   How was her career and reputation threatened?

15        A.    Again, I can't remember the specifics.

16        Q.    Are there any circumstances in which students'

17   careers and reputations would be legitimately threatened

18   when a professor works with them?

19        A.    Sorry, can you clarify?

20        Q.    Can you identify any circumstances in which it

21   would be legitimate for a student's career and

22   reputation to be threatened in their work with a

23   professor?

24        A.    No.

25        Q.    So, in your view, a student's career and
```

Peter Michael Kohanski    5/18/21

```
 1  reputation should never be threatened in their work with
 2  a professor.
 3      A.    That's correct.
 4      Q.    Even if they fail to perform up to the
 5  standards required by the program?
 6      A.    That's correct.  I don't think it's a
 7  professor's place to do that.
 8      Q.    You don't think it's a professor's place to
 9  evaluate students' work?
10      A.    No.  It is -- it is a professor's place to
11  evaluate students' work, but I don't think it's a
12  professor's -- if they're not performing up to standard,
13  then the professor's job is to help them and not to
14  threaten they're career and say, you're not going to
15  make it, or you're going to fail, or things like that.
16      Q.    Did I understand you correctly --
17            Could you read back his answer, please?
18            (THE RECORD WAS READ BACK.)
19      Q.    (By Mr. Allen)  So, you don't think there are
20  any circumstances in which a professor should fail a
21  student where the student is not meeting expectations.
22      A.    Not in graduate school.
23      Q.    Can a professor ever refuse to work with a
24  student, in your view?
25      A.    Yes.
```

1        Q.    Under what circumstances?

2        A.    If they have too many students currently, or if

3   their research interests completely diverge.

4        Q.    And do you have any knowledge that there was

5   actually extortion involved?

6        A.    Again, that's a very, as you said, kind of a

7   very specific term, and I believe we wouldn't have put

8   it without a good reason.  And I don't think I was the

9   one who used that or who came up with that word or who

10  decided to use that word, again, because other people

11  have much more in depth knowledge about what happened in

12  this specific situation.

13        Q.    But you agree this letter went out under your

14  signature, correct, which is on the first page of

15  Exhibit 2?

16        A.    Yes, that's correct.

17        Q.    Was the -- do you have any memory that the

18  extortion claimed in this No. 3 was sexist?

19        A.    I believe that was part of it, yes.

20        Q.    Do you have any knowledge that Professor

21  Jackson, for example, offered to give or withhold a

22  grade based on sexual favors?

23        A.    No.

24        Q.    Do you know -- do you have any memory of what

25  you were referring to as the sexist behavior that

*Peter Michael Kohanski      5/18/21*

```
 1  constituted extortion here?
 2      A.    I think the point was just that Yiyi's a woman,
 3  and he treated her this way, and that he doesn't treat
 4  men this way.
 5      Q.    Do you know of any other women that he treated
 6  this way?
 7      A.    Not these specific points that we have listed.
 8      Q.    Do you know of any other women that Professor
 9  Jackson has taught or mentored over the years?
10      A.    I guess I know some current students who either
11  want to work with him or are working with him.
12      Q.    And do they complain that he's sexist?
13      A.    I have never had that type of conversation with
14  them, no.
15      Q.    So, when you say -- if you skip to the second
16  to the last sentence of that paragraph, it says, "a
17  pattern of harmful behaviors that disproportionately
18  affected marginalized students."  What harmful behaviors
19  and what marginalized students are you referring to?
20      A.    Harmful behaviors, including the racist, sexist
21  and abusive behaviors and marginalized students, women
22  and people of color.
23      Q.    What women and people of color are you
24  referring to?
25      A.    Again, I don't -- past Yiyi, I really don't
```

Peter Michael Kohanski    5/18/21

 1  know specifics, but more just generally, I feel like

 2  that this is the reputation that Dr. Jackson has.

 3       Q.    You're aware that Dr. Jackson is married to a

 4  Korean woman, correct?

 5       A.    I think I was, yes.

 6       Q.    Does a Korean woman count as a person of color,

 7  in your view?

 8       A.    Yes.

 9       Q.    Do you think his wife is marginalized?

10       A.    I mean, generally, people of color are

11  marginalized in society.

12       Q.    That's not my question.  I asked if you thought

13  Mr. Jackson's wife was marginalized.

14            MR. BOHUSLAV:  Objection, argumentative;

15  objection --

16            MR. ALLEN:  I'm asking him to answer the

17  question, Matt.

18            MR. BOHUSLAV:  Objection, argumentative.

19  You've already answered it; asked and answered.

20            MR. ALLEN:  He has not answered it.  He

21  answered a separate question that he wanted to answer.

22  Could I have you repeat the question to the witness,

23  please?

24            (THE RECORD WAS READ BACK.)

25       A.    Based on the very little I know about her, I

*Peter Michael Kohanski      5/18/21*

1  believe maybe there have been times when she could have

2  been marginalized in society.

3       Q.   (By Mr. Allen)  What are those times?

4       A.   I don't know.

5       Q.   So, you have no personal knowledge.

6       A.   No.

7       Q.   And is the basis of your statement that you

8  just believe people of color are generally marginalized?

9       A.   I believe they can be, yes.

10       Q.   One last thing on this document, addressing the

11  MHTE division's culture.  And MHTE I think is the

12  division, is it not, and it stands for music, history,

13  theory and ethnomusicology?

14       A.   That's correct.

15       Q.   And, again, if I mistake any of these terms,

16  just please point them out, Mr. Kohanski.  The first

17  sentence refers to a problematic culture within our

18  division.  Do you see that?

19       A.   Yes.

20       Q.   Can you describe for the Court what you mean by

21  the problematic culture within the division of MHTE?

22       A.   I think that there are certain general --

23  certain -- sorry.  Some faculty members who are not

24  concerned with things like diversity and inclusion and

25  making meaningful change in the division.

Peter Michael Kohanski    5/18/21

1      Q.    So it comes down to this what you call
2   diversity and inclusion, correct?
3      A.    What do you mean comes down to it?
4      Q.    I'm asking you what the problematic culture --
5   I asked you to describe the problematic culture, and you
6   referred to diversity, equity and inclusion.  Did I
7   mistake that?
8      A.    No.
9      Q.    So, now, I want you to just describe for me
10  what you mean by diversity, equity and inclusion,
11  please.
12     A.    I mean that there are certain faculty members
13  in the division who have racist, sexist, misogynistic,
14  et cetera, behaviors, and I also believe that, as we
15  outlined, that there's a problem with accountability in
16  the division.
17     Q.    And who are these faculty members who are
18  sexist, racist and misogynistic?
19     A.    Dr. Jackson, for one.  And I suppose I've --
20  well, at least exhibit racist, sexist, misogynistic
21  maybe behaviors, I would say.
22     Q.    And are those behaviors what we have already
23  gone through in the detail of this letter?
24     A.    Again, I don't know if I can speak to
25  specifics, because I'm a straight, white man, and I'm

Peter Michael Kohanski      5/18/21

1  privileged, and I necessarily haven't experienced those

2  behaviors from faculty, but there are -- there are

3  faculty in the division, I think, with general

4  reputations that include racism, sexism, et cetera.

5        Q.    And I find this kind of interesting.  You just

6  described yourself as a white, straight man who has

7  privilege, is that it?

8        A.    Yes.

9        Q.    Isn't that a monolithical statement, Mr.

10  Kohanski?

11        A.    I think it's easier to apply monolithical

12  statements to people who have privilege.

13        Q.    And would all white, straight men be included

14  in that category?

15        A.    Yes.  It means the color of their skin or their

16  sexual orientation didn't make things hard for them.

17  I'm not saying life is not hard for them, but --

18        Q.    Do you consider Jews part of that category of

19  white, straight men -- white, Jewish, straight men?

20        A.    I have no idea.

21        Q.    I believe this Exhibit 2 has been marked, and

22  I'm placing it in the exhibit file.  I'm going to give

23  you a last exhibit, if I could have this exhibit marked

24  as Exhibit 3, please.

25                 (DEPOSITION EXHIBIT 3 MARKED.)

*Peter Michael Kohanski      5/18/21*

1        Q.    (By Mr. Allen)  Now, Mr. Kohanski, I'm going to
2   represent to you that this Exhibit 3, which oddly enough
3   the first line says "Exhibit 3," was taken from the ad
4   hoc panel report of the University of North Texas.  Do
5   you know what I'm referring to when I refer to the ad
6   hoc panel report?

7        A.    Yes.

8        Q.    And could you describe for the Court what you
9   understand is the ad hoc panel report?

10       A.    It was a report that was the product of an
11  investigation into the conception and the editorial
12  process of the Journal of Schenkerian Studies, Volume
13  12.

14       Q.    And that was a culmination of policies and
15  administrative actions that you requested the University
16  take with regard to Professor Jackson, correct?

17       A.    Sorry, can you repeat that?

18       Q.    This investigation -- you just described the ad
19  hoc panel's investigation into the journal and Professor
20  Jackson, correct?

21       A.    Yes.

22       Q.    And that was the culmination of things you had
23  asked for, as graduate students, in circulating your
24  letter.

25       A.    In part.

*Peter Michael Kohanski     5/18/21*

```
 1        Q.    The letter in Exhibit 2, correct?

 2        A.    In part.

 3        Q.    So, it's safe to say that was a realization of

 4   one of the things you had asked for.

 5        A.    Yes.

 6        Q.    And one thing -- you'll see this goes back and

 7   front, sorry, on the page, Exhibit 3.  One thing I find

 8   curious is that it's different in form from the one you

 9   first circulated in Exhibit 2.  And revisiting

10   Exhibit 2, it seems to be dated somewhere around

11   July 29th, 2020.

12              And yet this one, which is incorporated in

13   the ad hoc panel report, which I believe appeared on

14   November 25th, 2020, and if I get the date wrong, it's

15   in that time range, is slightly different.

16        A.    Uh-huh.  That's correct.

17        Q.    And so, could you tell me how this document

18   came to be different from the one you circulated in late

19   July?

20        A.    This document was written and circulated first,

21   before the one in Exhibit 2, and our goal with this

22   document was more to issue an apology and to try to

23   ensure an accountability and things like that.

24        Q.    When was this document circulated?  Let me

25   retract that, please.
```

 1              When was this document, Exhibit 3,
 2   circulated first?
 3        A.    Again, that first week in late July.  I don't
 4   remember the exact date, but, again, it was that first
 5   week where all of this happened, in late July of 2020.
 6        Q.    And I'm going to represent to you that the
 7   Journal of Schenkerian Studies released Volume 12
 8   sometime around July 25th, 2020.  Is that your
 9   understanding, as well, Mr. Kohanski?
10        A.    Yes.
11        Q.    And Exhibit 2 was circulated, it would appear,
12   at least by July 29th, 2020, four days later, correct?
13        A.    Yes.
14        Q.    So, is it safe to say this was circulated first
15   sometime between July 25th and July 28th?
16        A.    Yes.
17        Q.    And who authored this publication or -- let's
18   refer to it as the first statement, is that fair?
19        A.    That's fine.
20        Q.    So, Exhibit 3, the first statement, who
21   authored this first statement?
22        A.    To the best of my knowledge -- so, I was not as
23   involved in actually drafting and writing this statement
24   as I was with the second one, so I wasn't in the
25   meetings where that happened, but I believe it was Brian

*Peter Michael Kohanski    5/18/21*

 1  Anderson, Rachel Gain, Salvador Hernandez, Elizabeth
 2  Durrant, that's D-U-R-R-A-N-T.
 3      Q.    What was her first name, again?
 4      A.    Elizabeth.
 5      Q.    Elizabeth?
 6      A.    And I -- to the best of my knowledge, that's
 7  everyone I remember.
 8      Q.    Thank you.  Do you know if these individuals
 9  who drafted the first statement had actually read the
10  Volume 12 symposium of the Journal for Schenkerian
11  Studies?
12      A.    I'm sure they read part or all of it.
13      Q.    At what time did you become involved in
14  drafting these various statements?
15      A.    From the start.  I just wasn't someone who
16  decided or who was involved in actually writing this
17  one.
18      Q.    Were you helping organize that from within the
19  graduate association?
20      A.    Organize what?  I'm sorry.
21      Q.    Sorry.  Organizing the drafting of these
22  statements?  Were you helping organize that?
23      A.    Yes.  As one of the student leaders of the
24  division, yes, I was helping organize all this.
25      Q.    And if you skip down towards the end there,

Peter Michael Kohanski      5/18/21

 1  there's a numeral 3.  See, "hold accountable every
 2  person responsible for the direction of the
 3  publication"?
 4        A.    Yes.
 5        Q.    Is there anything referred to in this paragraph
 6  that we haven't already discussed, in terms of the
 7  second statement, which was Exhibit 2?
 8        A.    No, I don't believe so.
 9        Q.    So, where it says, "specifically, the actions
10  of Dr. Jackson -- both past and present -- are
11  particularly racist and unacceptable," as you sit here
12  today, you can't identify any other actions that Mr. --
13  or excuse me -- Professor Jackson engaged in, other than
14  those we've already discussed.
15        A.    That's correct.
16        Q.    I want to return to this issue of diversity,
17  equity and inclusion, which I believe is also referred
18  to in this first statement.  If you look at the third
19  sentence in that last paragraph, "we gratefully
20  acknowledge the push for inclusion and diversity in
21  academia," do you see that?
22        A.    Yes, I do.
23        Q.    And did I read that correctly?
24        A.    Yes.
25        Q.    Could you explain to me, again, what is meant

*Peter Michael Kohanski    5/18/21*

1 by "diversity and inclusion"?

2     A.    I think, generally speaking, in music academia,

3 the systems that are in place uphold whiteness and favor

4 whiteness, by which I mean white music and white

5 composers as the primary object of study.  And by

6 talking about inclusion and diversity, we need to change

7 that and recognize equality through difference.  That is

8 all musics are no greater and no less than any other

9 one, but they're just as valid in terms of their musical

10 and cultural expression.

11          So, that's on maybe a more cultural level

12 than speaking on a very practical level.  I believe the

13 field is also -- there aren't a lot of people of color

14 in the field or otherwise, you know, minorities and

15 marginalized people, and I believe that needs to change,

16 as well.

17     Q.    How do you intend for the inclusion and

18 diversity initiative you just described to change that

19 fact?

20     A.    Did I describe initiatives?

21     Q.    It sounded to me like you wanted more people of

22 color to be recruited to study this field of study

23 you've chosen for your own scholarship.  Is that a fair

24 characterization?

25     A.    Yes.

1    Q.    And you also wanted to -- and, again, correct

2  me if I'm wrong, but I'm trying to summarize what you

3  said, so I'm not trying to invent things here, but it

4  sounded to me like you also suggested that there should

5  be less emphasis on what you characterize as white music

6  and more emphasis on what you characterize as music of

7  people of color, is that correct?

8    A.    No.

9    Q.    So, could you explain that to me once again?

10   A.    To elevate other musics does not mean to

11 diminish western classical music.  It means -- it means

12 creating a bigger space for everything.

13   Q.    How would you go about accomplishing that

14 bigger space for everything with diversity and inclusion

15 initiatives?

16   A.    I mean, that's in part, I think, a job for

17 people much higher up than me at this point in my life.

18   Q.    Do you know -- sorry.  Go ahead.

19   A.    I mean, I'm only a graduate student.

20   Q.    Do you know of anything Professor Jackson has

21 done to prevent the inclusion of other forms of music in

22 the division?

23   A.    I think Schenkerian analysis is necessarily

24 exclusive.

25   Q.    So, you think Schenkerian analysis is

*Peter Michael Kohanski    5/18/21*

 1  exclusive.  Why is that?

 2      A.    Because it was developed to study a very

 3  specific type of music.  And, again, I'm no expert here,

 4  but based on what I know.

 5      Q.    Were you aware that Heinrich Schenker himself

 6  applied his analysis to black jazz music in the '20s?

 7      A.    I was not.

 8      Q.    Do you think that's impermissible?

 9      A.    I think there's better ways to study jazz

10  music.

11      Q.    So you would like to exclude Schenkerian

12  analysis from the division?

13      A.    No, I didn't say that.

14      Q.    Do you think the application of Schenkerian

15  analysis to music is itself racist?

16      A.    So, are you talking about the theory itself?

17  The analysis itself?

18      Q.    Well, let's start again.  What do you --

19  describe -- you're the graduate student, right?  I can

20  assure you, I am a musical troglodyte, especially

21  compared to you, Mr. Kohanski, so why don't you describe

22  for the Court your understanding of Schenkerian

23  analysis.

24      A.    So, to be honest, I have a very limited

25  understanding of Schenkerian analysis because I've never

Peter Michael Kohanski      5/18/21

1  studied it.  I can, I guess, generally understand the

2  basics, but again, I'm not a theorist.  I'm training to

3  be a historian, so --

4       Q.   So, what are the basics that you understand?

5       A.   That it's taking complex structures and sort of

6  simplifying them.

7       Q.   Simplifying them in what way?

8       A.   I guess showing harmonic progressions and voice

9  leading on a much larger scale, as opposed to, you know,

10 measure by measure or system by system, et cetera.

11      Q.   Sorry.  Go ahead.  Were you going to add

12 something else?

13      A.   Yeah, and I guess everything can be -- again, I

14 am not trained in Schenkerian analysis, but it's my

15 understanding that there's a 1-5-1 chord progression

16 that everything can kind of come down to.

17      Q.   In your view, how is that not inclusive?

18      A.   Because not all music functions that way.

19      Q.   Like, what music does not function that way?

20      A.   Let's say, for example, any -- I would say

21 almost any music that's not western.

22      Q.   And what about that technique that you've

23 described, the Schenkerian analysis in your

24 understanding of it, is not diverse?

25      A.   Because it's specifically used for one -- it --

 1  I know you said Schenker was, you know, used it for

 2  jazz, but I think it valorizes a specific type of music.

 3      Q.    What type of music?

 4      A.    Western music.

 5      Q.    And by that, do you mean music produced primary

 6  by white men?

 7      A.    Primarily, yes.

 8      Q.    Isn't that a monolithic statement, Mr.

 9  Kohanski?

10      A.    Again, I think that when it comes to privilege,

11  we don't necessarily have to be as careful as using

12  monolithic statements.

13      Q.    So it's okay to be monolithic when you're

14  addressing privilege.

15      A.    I think so.

16      Q.    So, given what you said, it sounds to me like

17  you've reached the conclusion that to apply Schenkerian

18  analysis necessarily excludes and diminishes other forms

19  of non-western music, is that fair?

20            MR. BOHUSLAV:  Objection, leading.

21      A.    Can you repeat that?

22      Q.    (By Mr. Allen)  It sounds to me, based on your

23  analysis of Schenkerian studies, as you understand them,

24  to apply this technique necessarily diminishes non-

25  western forms of music.  Is that a fair assessment of

```
 1  what you've said?
 2              MR. BOHUSLAV:  Objection, leading.
 3        A.    To apply it to what?
 4        Q.    (By Mr. Allen)  To apply it at all.  To use
 5  this technique, you said that it's only built for one
 6  form of music, western classical music as commonly
 7  understood by lay people, such as myself.  Am I
 8  summarizing what you said correctly?
 9        A.    Yes.
10        Q.    So given that that is so, to use the system of
11  analysis, Schenkerian analysis in the first place, it
12  sounds to me like it's your view that that diminishes
13  other forms of music that are not classical music.  Is
14  that a fair way to summarize what you've been saying?
15        A.    No.  I don't necessarily think so.
16        Q.    How would it -- how would it be used to elevate
17  non-western forms of music?
18        A.    I don't think it would, actually.
19        Q.    So, to use it inherently would be to diminish
20  those forms of music that are non-western.
21              MR. BOHUSLAV:  Objection, leading.
22        A.    Just by using the method and being -- and using
23  Schenker, it doesn't -- it's more about the systems, and
24  that's like a default, and it's -- right, you can use
25  it, and that's fine, but the emphasis that's placed on
```

*Peter Michael Kohanski    5/18/21*

```
 1  things like that, and the emphasis and the way it
 2  valorizes western music, I think is exclusive.
 3       Q.    (By Mr. Allen)  What's the remedy for that
 4  exclusivity, in your view?
 5       A.    I mean, yeah, using other types of analytical
 6  tools.
 7       Q.    Do you believe that the --
 8       A.    And teaching them to students.  And teaching
 9  them to students in the United States.
10       Q.    What other tools are available, in your view?
11       A.    Tools that are specific to a music that you
12  want to study.
13       Q.    Again, you have to --
14       A.    I mean, I don't know any.  Like, for example,
15  do I know how to analyze traditional Chinese music?  No.
16  But I believe those types of things are things that
17  should be taught.  Some music theory isn't just western
18  music.
19       Q.    So, and again, honestly, Mr. Kohanski, I have
20  so little knowledge of this.  You're actually in the
21  role of an instructor here because I am so ignorant of
22  it.  But are there specifically Chinese techniques that
23  are more suitable to Chinese music?  I'm asking.  That
24  seemed to be what you're implying, so I'm just wondering
25  if that's your position.
```

*Peter Michael Kohanski        5/18/21*

1        A.    Well, that was just an example.

2        Q.    Do you know of such techniques?

3        A.    No.  But I can intuit that there's a better way

4   that is more specific to the music and meets the music

5   more where it's at than -- like to Chinese music than

6   the techniques used in western music theory.

7        Q.    So, would it be ideal, from a pedagogical

8   standpoint or from the standpoint of a graduate student,

9   to study each I guess category of national or ethnic

10  music from within its own body of music theory?

11       A.    No, I think that might get a little chaotic and

12  cluttered, and it might be improbable, I guess, you

13  know, to do that in the course of a two-year program of

14  course work, right?  But I believe that music theory in

15  the United States should not just include western music.

16       Q.    About diversity, equity and inclusion, to step

17  back for a second, what programs have been introduced in

18  the division, the MHTE division, to promote diversity,

19  equity and inclusion?

20       A.    So, in the fall of 2019, we had -- I guess they

21  called it sensitivity training, I don't really know if

22  that's the right word, but we had workshops with the

23  office of or division of diversity, equity and

24  inclusion.  I don't know if that's the right division in

25  the University or if that's right name, but we had that.

 1              We have a reading group that's dedicated to
 2   diversity, equity, inclusion in academia.  And to my
 3   knowledge, those are the only real official programs or
 4   initiatives in the division.
 5       Q.    What did the -- let's take those one at a time.
 6   The division of -- I understand you don't necessarily
 7   know the official administrative name for it, but we'll
 8   say it's the division of DEIs.  Do you know what I'm
 9   referring to when I say that?
10       A.    Yes.
11       Q.    And so the division of DEI sounds like
12   organized some sort of training workshop back in the
13   fall of 2019, correct?
14       A.    That's correct.
15       Q.    Can you describe for me the materials that were
16   used in the training workshop?
17       A.    Oh, gosh, I don't really remember that.
18       Q.    Do you remember any of the takeaway lessons?
19       A.    One of them was on micro-aggressions, and we
20   talked about micro-aggressions.  To be honest, I was
21   kind of underwhelmed with the whole thing, in terms of I
22   wish I had done more and was better, so --
23       Q.    Do you remember why you were, as you described
24   it, underwhelmed?
25       A.    I think -- so, I should clarify.  There were

Peter Michael Kohanski      5/18/21

```
 1  several of these -- like over the course of a semester,
 2  there were several of these workshops.  The faculty did
 3  you two alone, the students did two alone, and then we
 4  did a joint thing together.
 5             And I was mostly underwhelmed with the --
 6  with the faculty meeting, I think, because the people --
 7  that one wasn't required, so I think the people that
 8  needed to be there and learn from it weren't.
 9      Q.    And who were the people that you felt most
10  needed to learn from it?
11      A.    Dr. Jackson, for one, and some other faculty.
12      Q.    Could you name them, please?
13      A.    I think Dr. Illari, Margaret Notley, and I
14  think that's pretty much it.  I mean, Dr. Slottow, but
15  he was there, I believe, and I'm not saying that I
16  believe every one of those individuals I just said are
17  racist or sexist or et cetera, but I think that there
18  were things that they could have learned to be more
19  inclusive and purposely inclusive and diverse and
20  equitable.
21      Q.    And what would those things have been?
22      A.    Well, working on like the isms that I said that
23  exist before, sexism, racism maybe.  But just, I guess,
24  generally -- just generally, I guess, just being more
25  respectful and -- yeah.
```

*Peter Michael Kohanski    5/18/21*

1      Q.    Just generally being more respectful.  Is that

2   your statement of what they could have done to show more

3   dedication to diversity, equity, inclusion?  Am I

4   getting that correct?

5      A.    I mean, no.  That's a terrible way to put it.

6   But I guess this was a long time ago, and I just don't

7   quite remember where my thinking was at that time.  I

8   don't think diversity, equity and inclusion is just --

9   can be watered down to being more respectful, but I

10  think --

11     Q.    And I'm asking you, Mr. Kohanski, I'm not

12  trying to put words in your mouth, you said you were

13  sort of underwhelmed by the diversity, equity and

14  inclusion workshops, correct?

15     A.    Yes.

16     Q.    And were there any other materials that

17  accompanied these diversity, equity and inclusion

18  workshops, such as PowerPoint slides, any sort of

19  written presentations?

20     A.    Yes, there were, probably at all three of them,

21  yeah.

22     Q.    And could you describe those, please, in as

23  much detail as you can, understanding the limit of human

24  memory?  But go ahead.

25     A.    So, at the joint thing between the faculty and

*Peter Michael Kohanski    5/18/21*

1  the students, before that we had asked -- they had asked

2  us to fill out a survey on the climate of the division,

3  and a lot of what they presented there was just the

4  results of the survey.

5      Q.    The two before them, were they accompanied by

6  any other materials?

7      A.    Yeah, they were, and, again, I can't really

8  remember what exactly they were.

9      Q.    Do you know if you got a copy of those

10 materials in any form?

11     A.    I don't believe we got copies of the

12 handouts -- or, I'm sorry, the PowerPoints.  There might

13 have been handouts that they gave us, but I can't,

14 again, quite remember.

15     Q.    Do you have any recollection of who presented

16 these materials?

17     A.    Yes.  Again, they were from that division that

18 I can't remember the name of.  Do you want their names

19 or --

20     Q.    If you know, yes.

21     A.    I think their names were Taraseca and Shawnee

22 (Phonetic) maybe, something like that.  I think she's

23 the head of whatever that I'm thinking of.

24     Q.    This administrative office.

25     A.    Yeah.  And it might have been even a division

*Peter Michael Kohanski    5/18/21*

 1  of that.

 2        Q.    And are those first names, each of them,

 3  Taraseca and Shawnee?

 4        A.    Yeah, they were first names.

 5        Q.    Do you recall either of their last names?

 6        A.    I don't.

 7        Q.    So, you found these materials underwhelming, in

 8  your words, correct?

 9        A.    I should -- I think I found, again, the joint

10  meeting underwhelming.  I -- I found kind of the

11  materials that they gave us to be useful, like I didn't

12  learn things, I learned more maybe about, you know, just

13  how to be more purposefully aware of behaviors that

14  might affect people in negative ways based on their real

15  or perceived identities.

16        Q.    And is that what you were referring to earlier

17  as the kind of material about micro-aggressions?

18        A.    Yeah.  Again, that was the topic of one day,

19  and then there was another -- that was the second day, I

20  believe, and the first day, I can't quite remember what

21  like the overall main topic was.

22        Q.    If I could ask a question about the climate

23  survey.  Was that specifically about the climate of the

24  division itself?

25        A.    Yes.

Peter Michael Kohanski      5/18/21

1     Q.    So, it wasn't the whole university, it was
2  specifically the division.
3     A.    It was for the division.
4     Q.    Was it focused on the faculty, the grad
5  students, or the faculty, grad students and
6  undergraduates, or any combination of them all?  Can you
7  describe that in as much detail as you can?
8     A.    So, there are no undergraduates in my division,
9  to my knowledge.  I don't -- I can't remember if the
10 faculty and the students took different surveys, like
11 one tailored to faculty, one to students, but it was --
12 it was, I think, you know, it had multiple choice
13 questions and then open-ended questions where we could
14 talk about things.
15    Q.    Do you remember, yourself, filling it out?
16    A.    I did fill it out.
17    Q.    Do you have a record of that anywhere?
18    A.    I don't think so, no.
19    Q.    Do you know where such a record would exist?
20    A.    That office or division would have -- a record
21 of my personal --
22    Q.    Yeah.
23    A.    I don't know if they would have a -- like a
24 personal -- well, I don't know if they kept or took or
25 recorded like individual responses with names, but I

Peter Michael Kohanski    5/18/21

```
 1  assume that they would have a record of the results of
 2  that survey.
 3      Q.   You also said there was a reading group.  Could
 4  you describe that for me, please?
 5      A.   Sure.  I guess we met -- started this year, met
 6  a couple or few times this semester, two to three times
 7  this semester, and we'll read things that relate to
 8  diversity, inclusion, equitability, et cetera, in
 9  academia.  Whether that's just general work on something
10  like antiracism or if it's more particular work in that
11  regard by music scholars.
12      Q.   And you said you've met two to three times, is
13  that it?
14      A.   A semester.
15      Q.   A semester.
16      A.   Yes.
17      Q.   When did this begin?
18      A.   In the fall semester of 2020.
19      Q.   Is there a record anywhere of what you've been
20  reading in these reading groups?
21      A.   I'd imagine the organizers would have a list of
22  everything we've read.
23      Q.   Who are the organizers?
24      A.   Rebecca Geoffrey-Schwinden, Andrew Chung, and
25  Miles McLean, I think his name is.
```

*Peter Michael Kohanski      5/18/21*

1     Q.    I recognize two of those names as faculty.  Is
2   the third -- the last name you mentioned was who?
3     A.    Miles McLean.  He is a graduate student in the
4   division.
5     Q.    Is he in any way involved in your graduate
6   association?
7     A.    No.  But he's involved in the other one.
8     Q.    What is the other one?
9     A.    The Student Society for Ethnomusicology at
10   North Texas.
11     Q.    Are you a member of that one, as well?
12     A.    I am not.
13     Q.    You know, the last question I wanted to ask you
14   is, it seems like you were soliciting signatures, at
15   least to Exhibit 2, correct?
16     A.    That is correct.
17     Q.    Do you have a list of all of those signatures
18   anywhere?
19     A.    It's included in the documents we sent.
20     Q.    The ones that you produced in response to the
21   subpoena.
22     A.    That's correct.
23           MR. ALLEN:  Thank you.  I'm going to take
24   a break.  Again, we've been going for another hour.  I
25   think we're almost done.  I just want to check my notes

*Peter Michael Kohanski    5/18/21*

```
 1  and talk to my co-counsel.
 2              MR. BOHUSLAV:  Okay.
 3              MR. ALLEN:  And then we'll -- I guess then
 4  we can reconvene and probably -- I don't know if you'll
 5  want to do any cross examination, but that will be up to
 6  you, Matt.
 7              MR. BOHUSLAV:  Okay.
 8              (OFF THE RECORD FROM 11:19 TO 11:29 A.M.)
 9              (MR. STOWERS IS NOT PRESENT IN ROOM.)
10              MR. ALLEN:  So, Attorney Bohuslav, I have
11  finished my examination of the witness, and I pass the
12  witness to you.
13              MR. BOHUSLAV:  We will reserve for the
14  time of trial.
15              MR. ALLEN:  Thank you.  So, we'll conclude
16  the deposition for you and go off the record.
17              MR. BOHUSLAV:  Okay.
18              (DEPOSITION ADJOURNED AT 11:29 A.M.)
19
20
21
22
23
24
25
```

Peter Michael Kohanski      5/18/21                    95

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                  SHERMAN DIVISION

 3   TIMOTHY JACKSON,            )
                                 )
 4           Plaintiff,          )
                                 )  Case No.
 5   v.                          )
                                 )  4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,        )
                                 )
 7           Defendants.         )

 8

 9           ------------------------------------

10                  DEPOSITION CERTIFICATE

11                PETER MICHAEL KOHANSKI

12                     MAY 18, 2021

13           ------------------------------------

14

15           I, Nita G. Cullen, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18           That the witness, PETER MICHAEL KOHANSKI, was

19   duly sworn by the officer and that the transcript of the

20   oral deposition is a true record of the testimony given

21   by the witness;

22           I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24           ___ was requested by the deponent or a

25   party before the completion of the deposition and is to
```

*Peter Michael Kohanski      5/18/21*

1  be returned within 30 days from date of receipt of the

2  transcript.  If returned, the attached Changes and

3  Signature Page contains any changes and the reasons

4  therefor;

5           X  was not requested by the deponent or a

6  party before the completion of the deposition.

7           I further certify that I am neither attorney

8  or counsel for, nor related to or employed by, any of the

9  parties or attorneys to the action in which this

10 deposition was taken.

11          Further, I am not a relative or employee of

12 any attorney of record in this case, nor am I financially

13 interested in the outcome of the action.

14          Subscribed and sworn to on this 14th day of

15 June, 2021.

16

17

18          _____

19          NITA G. CULLEN, Texas CSR #1563
            Expiration Date:  08-31-2022
20          JULIA WHALEY & ASSOCIATES
            Firm Registration No. 436
21          2012 Vista Crest Drive
            Carrollton, Texas 75007-1640
22          214.668.5578

23

24

25

Peter Michael Kozlowski    5/18/21    1

# #

**#1563** [1] - 96:18

# '

**'20s** [1] - 80:6

# 0

**06375** [1] - 2:6
**08-31-2022** [1] - 96:19

# 1

**1** [8] - 3:13, 8:7, 8:23, 50:18, 59:23, 61:12, 63:9, 63:14
**1-5-1** [1] - 81:15
**10:01** [1] - 41:25
**10:10** [1] - 41:25
**1155** [1] - 2:17
**11:19** [1] - 94:8
**11:29** [3] - 1:20, 94:8, 94:18
**12** [13] - 26:12, 27:24, 30:10, 30:18, 33:24, 35:11, 35:17, 37:25, 48:15, 60:2, 73:13, 75:7, 76:10
**12548** [1] - 2:12
**12750** [1] - 1:23
**1450** [1] - 1:23
**14th** [1] - 96:14
**1750** [2] - 16:25
**18** [3] - 1:13, 1:20, 95:12

# 2

**2** [21] - 3:3, 3:14, 18:3, 18:5, 19:23, 23:10, 42:18, 50:21, 51:13, 58:22, 59:23, 63:9, 67:15,

72:21, 74:1, 74:9, 74:10, 74:21, 75:11, 77:7, 93:15
**2012** [1] - 96:20
**2018** [1] - 15:6
**2019** [4] - 38:2, 38:23, 85:20, 86:13
**2020** [13] - 21:2, 30:19, 44:6, 44:8, 44:19, 64:15, 64:18, 74:11, 74:14, 75:5, 75:8, 75:12, 92:18
**2020......18** [1] - 3:14
**2021** [4] - 1:13, 1:20, 95:12, 96:15
**214.668.5578** [1] - 96:21
**25th** [3] - 74:14, 75:8, 75:15
**28th** [1] - 75:15
**29** [1] - 3:14
**29th** [2] - 74:11, 75:12

# 3

**3** [16] - 3:15, 43:7, 53:1, 59:23, 63:9, 64:4, 65:11, 67:18, 72:24, 72:25, 73:2, 73:3, 74:7, 75:1, 75:20, 77:1
**3.....................
.........72** [1] - 3:15
**30** [1] - 96:1
**30(f)(1** [1] - 95:23

# 4

**4** [4] - 3:4, 3:6, 54:11, 58:11
**40** [1] - 18:18
**404** [1] - 2:5
**436** [1] - 96:20
**4:21-cv-00033
-ALM** [2] -

1:5, 95:5

# 5

**5** [1] - 50:18

# 7

**75007-1640** [1] - 96:21
**76203** [1] - 2:17
**78711** [1] - 2:12

# 8

**8** [1] - 3:13
**860.469.2783** [1] - 2:7
**860.772.4738** [1] - 2:6

# 9

**940.565.2717** [1] - 2:18
**9:07** [1] - 1:20
**9:16** [1] - 11:10
**9:19** [1] - 11:10
**9:22** [1] - 14:3
**9:23** [1] - 14:3

# A

**a.m** [2] - 1:20
**A.M** [5] - 11:10, 14:3, 41:25, 94:8, 94:18
**abide** [1] - 7:1
**ability** [1] - 7:16
**able** [5] - 31:23, 34:11, 47:11, 54:21, 55:17
**above-styled** [1] - 1:19
**abstracts** [1] - 23:2
**abusive** [10] - 58:25, 59:11, 59:17, 60:5, 60:13, 60:16, 60:17, 62:1, 64:2, 68:21
**academia** [6] - 36:13, 40:7, 77:21, 78:2,

86:2, 92:9
**academic** [5] - 32:25, 36:7, 41:4, 41:6, 59:3
**academics** [1] - 40:6
**accessible** [1] - 51:22
**accompanied** [2] - 88:17, 89:5
**accomplish** [1] - 21:19
**accomplishin g** [1] - 79:13
**account** [4] - 9:20, 9:24, 9:25, 53:2
**accountabilit y** [2] - 71:15, 74:23
**accountable** [2] - 54:12, 77:1
**accurate** [1] - 51:11
**accusations** [1] - 31:23
**achieve** [1] - 16:8
**acknowledge** [1] - 77:20
**act** [1] - 37:12
**action** [2] - 96:9, 96:13
**actions** [3] - 73:15, 77:9, 77:12
**active** [1] - 43:3
**activity** [1] - 25:8
**acts** [3] - 32:24, 32:25, 36:24
**acts"** [1] - 26:5
**actual** [1] - 24:4
**ad** [14] - 26:3, 30:2, 30:4, 31:24, 33:3, 47:13, 53:8, 53:13, 53:20, 73:3, 73:5, 73:9, 73:18, 74:13
**add** [1] - 81:11
**addition** [2] - 19:17, 48:7

**address** [1] - 35:19
**addressing** [2] - 70:10, 82:14
**ADJOURNED** [1] - 94:18
**administrativ e** [5] - 22:1, 61:8, 73:15, 86:7, 89:24
**advance** [1] - 16:6
**adviser** [2] - 59:3
**advisory** [1] - 51:3
**advocate** [1] - 52:18
**affect** [3] - 7:13, 7:16, 90:14
**affected** [1] - 68:18
**affirmatively** [2] - 5:18, 16:1
**aggressions** [3] - 86:19, 86:20, 90:17
**ago** [1] - 88:6
**agree** [5] - 5:5, 41:1, 57:3, 64:5, 67:13
**ahead** [4] - 41:16, 79:18, 81:11, 88:24
**aid** [1] - 60:12
**al** [2] - 1:6, 95:6
**Alexandra** [1] - 42:24
**ALLEN** [23] - 2:4, 2:5, 4:5, 4:10, 4:19, 4:24, 5:5, 5:22, 6:7, 10:20, 11:4, 11:9, 11:11, 18:2, 41:12, 41:18, 41:23, 69:16, 69:20, 93:23, 94:3, 94:10, 94:15
**Allen** [27] - 4:12, 4:25, 5:3, 5:9, 6:9, 8:8, 11:16, 14:4, 18:6, 20:3, 28:19,

29:3, 32:14, 35:10, 39:4, 39:9, 42:1, 50:17, 55:21, 56:23, 60:17, 66:19, 70:3, 73:1, 82:22, 83:4, 84:3
**Allen..............
.......... [1] -
3:6**
**almost** [3] - 45:16, 81:21, 93:25
**alone** [2] - 87:3
**alongside** [1] - 35:21
**ALSO** [1] - 2:20
**America** [3] - 14:25, 15:8, 15:11
**American** [1] - 57:4
**analysis** [14] - 79:23, 79:25, 80:6, 80:12, 80:15, 80:17, 80:23, 80:25, 81:14, 81:23, 82:18, 82:23, 83:11
**analytical** [1] - 84:5
**analyze** [1] - 84:15
**AND** [1] - 2:14
**Anderson** [4] - 23:15, 23:19, 62:5, 76:1
**Andrew** [3] - 12:11, 12:21, 92:24
**answer** [8] - 5:11, 28:20, 38:14, 46:16, 66:17, 69:16, 69:21
**answered** [4] - 69:19, 69:20, 69:21
**answering** [1] - 6:13
**anti** [24] - 26:3, 26:6, 26:8, 26:15, 27:1, 27:2, 27:5, 27:6, 27:9, 27:10, 27:13, 27:14, 27:17,

28:3, 28:4, 28:12, 28:16, 30:8, 30:9, 31:24, 32:8, 32:19, 33:2
**anti-Asian** [1] - 27:9
**anti-Black** [5] - 26:3, 26:6, 26:8, 27:5, 33:2
**anti-Semitic** [5] - 26:15, 30:8, 30:9, 32:8, 32:19
**anti-
Semitism** [11] - 27:1, 27:2, 27:6, 27:10, 27:14, 27:17, 28:3, 28:4, 28:12, 28:16, 31:24
**anti-White** [2] - 27:13, 27:17
**anticipate** [1] - 17:21
**anticipated** [1] - 15:18
**antiracism** [1] - 92:10
**apology** [1] - 74:22
**appear** [1] - 75:11
**Appearances**
**....................
....................
.** [1] - 3:3
**appeared** [4] - 8:18, 30:25, 49:24, 74:13
**appearing** [1] - 31:14
**application** [1] - 80:14
**applied** [2] - 29:10, 80:6
**apply** [6] - 29:13, 72:11, 82:17, 82:24, 83:3, 83:4
**applying** [1] - 39:17
**argued** [1] - 29:16
**argumentativ e** [4] - 55:18, 56:19, 69:14, 69:18

*Peter Michael Kozinski    5/18/21*

2

**article** [11] - 26:11, 27:23, 30:10, 30:17, 31:1, 31:6, 31:13, 31:20, 31:22, 60:4
**articles** [11] - 35:11, 35:20, 35:24, 36:3, 36:4, 36:11, 36:14, 36:17, 37:8, 37:18, 40:16
**articulate** [1] - 55:17
**Asia** [1] - 54:24
**Asian** [3] - 27:9, 27:10, 54:24
**aside** [2] - 52:17, 52:18
**aspect** [2] - 36:2, 50:12
**aspects** [1] - 35:1
**assessment** [1] - 82:25
**assigned** [3] - 62:10, 62:12, 62:14
**assist** [2] - 14:14, 14:15
**ASSISTANT** [1] - 2:10
**assistant** [6] - 14:8, 14:12, 60:11, 60:12, 62:10, 62:13
**ASSOCIATE** [1] - 2:15
**associated** [2] - 12:13, 22:1
**ASSOCIATES** [1] - 96:19
**association** [6] - 21:10, 21:14, 22:10, 22:13, 76:19, 93:6
**assume** [3] - 5:16, 6:17, 92:1
**assure** [1] - 80:20
**AT** [1] - 94:18
**attached** [3] - 34:20, 42:18, 96:2
**attacks** [5] -

26:3, 30:2, 30:4, 31:24, 33:3
**attorney** [11] - 4:17, 8:4, 9:5, 10:9, 10:13, 10:16, 10:19, 10:20, 20:1, 96:7, 96:12
**ATTORNEY** [2] - 2:10, 2:11
**Attorney** [1] - 94:10
**attorney/ client** [1] - 10:18
**attorneys** [1] - 96:9
**Austin** [1] - 2:12
**author** [1] - 20:7
**authored** [2] - 75:17, 75:21
**authority** [1] - 21:5
**authors** [1] - 39:11
**available** [3] - 34:4, 52:14, 84:10
**avoid** [1] - 6:21
**aware** [10] - 35:2, 37:15, 37:19, 37:24, 44:11, 51:24, 52:22, 69:3, 80:5, 90:13

## B

**BACK** [3] - 28:24, 66:18, 69:24
**background** [2] - 14:5, 15:4
**based** [6] - 19:4, 50:13, 67:22, 80:4, 82:22, 90:14
**Based** [1] - 69:25
**bases** [1] - 52:21
**basic** [3] - 57:10, 57:13, 57:16
**basics** [2] -

81:2, 81:4
**basis** [3] - 28:15, 55:15, 70:7
**become** [1] - 76:13
**began** [2] - 31:19, 49:24
**begin** [2] - 31:16, 92:17
**beginning** [1] - 9:6
**behavior** [9] - 51:2, 58:9, 58:25, 59:11, 60:5, 60:14, 60:16, 62:2, 67:25
**behaviors** [14] - 54:15, 54:19, 57:25, 59:16, 59:17, 68:17, 68:18, 68:20, 68:21, 71:14, 71:21, 71:22, 72:2, 90:13
**Benjamin** [2] - 37:16, 44:12
**best** [7] - 7:17, 18:17, 20:19, 26:21, 42:25, 75:22, 76:6
**better** [4] - 55:2, 80:9, 85:3, 86:22
**between** [6] - 13:10, 15:7, 33:22, 60:24, 75:15, 88:25
**beyond** [1] - 32:24
**bibliography** [2] - 17:5, 17:6
**bigger** [2] - 79:12, 79:14
**bigoted** [7] - 54:15, 54:18, 57:25, 58:2, 58:6, 58:9
**black** [11] - 26:14, 26:16, 26:22, 26:24, 27:3, 27:6, 28:1, 29:11, 32:12, 32:16, 80:6
**Black** [5] - 26:3, 26:6,

26:8, 27:5, 33:2
**blame** [1] - 47:4
**blast** [1] - 19:6
**blurred** [1] - 45:8
**board** [1] - 51:3
**body** [1] - 85:10
**BOHUSLAV** [31] - 2:10, 4:23, 5:2, 5:8, 5:19, 6:5, 6:8, 10:17, 14:2, 20:1, 28:18, 28:25, 32:13, 35:8, 39:2, 39:7, 41:10, 41:16, 50:14, 55:18, 56:19, 60:15, 69:14, 69:18, 82:20, 83:2, 83:21, 94:2, 94:7, 94:13, 94:17
**Bohuslav** [2] - 5:1, 11:19, 94:10
**bottom** [1] - 18:8
**bounds** [1] - 32:25
**Box** [2] - 2:5, 2:12
**Brand** [4] - 37:16, 43:21, 44:12, 44:14
**break** [4] - 41:11, 41:17, 41:21, 93:24
**Brian** [4] - 23:14, 62:5, 62:21, 75:25
**brother** [1] - 12:22
**brought** [1] - 26:16
**Bryan** [6] - 20:18, 23:14, 42:23, 43:5, 62:5, 62:21
**BRYAN** [1] - 20:18
**built** [1] - 83:5
**business** [1] - 21:17
**BY** [1] - 4:5

## C

**cannot** [1] - 34:23
**canon** [1] - 28:16
**capacities** [2] - 58:25, 59:1
**capacity** [3] - 11:13, 25:16, 59:3
**Capitol** [1] - 2:12
**care** [1] - 56:15
**career** [7] - 14:22, 50:9, 50:13, 65:14, 65:21, 65:25, 66:14
**careers** [2] - 64:23, 65:17
**careful** [1] - 82:11
**caring** [1] - 37:4
**Carrollton** [1] - 96:21
**CASE** [1] - 1:5
**case** [4] - 15:25, 39:3, 39:8, 96:12
**Case** [1] - 95:4
**category** [4] - 65:11, 72:14, 72:18, 85:9
**Catholic** [4] - 14:25, 15:5, 15:7, 15:10
**cease** [1] - 51:10
**Center** [4] - 59:4, 60:9, 60:21, 60:25
**center** [1] - 59:5
**central** [1] - 19:5
**certain** [3] - 70:22, 70:23, 71:12
**certainly** [1] - 20:20
**CERTIFICATE** [1] - 95:10
Certificate.....
...................
.......95 [1] - 3:8
**Certified** [1] - 95:15

**certify** [3] - 95:16, 95:22, 96:7
**cetera** [6] - 17:2, 71:14, 72:4, 81:10, 87:17, 92:8
**chair** [1] - 37:17
**chance** [2] - 8:9, 38:9
**change** [5] - 34:7, 70:25, 78:6, 78:15, 78:18
**Changes** [1] - 96:2
**changes** [1] - 96:3
**chaotic** [1] - 85:11
**characteristic** [1] - 28:3
**characterization** [1] - 78:24
**characterize** [8] - 29:23, 32:7, 32:16, 32:18, 43:16, 45:9, 79:5, 79:6
**characterized** [2] - 26:24, 58:17
**characterizing** [2] - 28:1, 32:9
**check** [1] - 93:25
**chew** [1] - 56:3
**chewing** [1] - 55:25
**Chinese** [4] - 84:15, 84:22, 84:23, 85:5
**choice** [1] - 91:12
**choose** [1] - 17:4
**chord** [1] - 81:15
**chosen** [1] - 78:23
**Chung** [1] - 92:24
**Circle** [1] - 2:17
**circulated** [7] - 74:9, 74:18, 74:20, 74:24,

75:2, 75:11, 75:14
**circulating** [1] - 73:23
**circumstances** [4] - 65:16, 65:20, 66:20, 67:1
**cite** [1] - 37:3
**cites** [1] - 28:5
**City** [1] - 1:23
**Civil** [1] - 1:25
**claimed** [1] - 67:18
**clarification** [4] - 5:15, 5:20, 6:17, 32:15
**clarify** [10] - 5:21, 10:10, 10:25, 11:22, 13:5, 13:18, 16:16, 16:22, 65:19, 86:25
**clarity** [1] - 6:2
**class** [1] - 57:1
**classes** [2] - 14:15, 57:13
**classic** [1] - 28:19
**Classical** [1] - 26:20
**classical** [5] - 29:16, 29:24, 79:11, 83:6, 83:13
**clear** [10] - 6:12, 6:13, 7:2, 7:20, 13:23, 22:12, 27:16, 31:10, 36:1, 60:24
**climate** [3] - 89:2, 90:22, 90:23
**close** [1] - 37:4
**cluttered** [1] - 85:12
**co** [1] - 94:1
**co-counsel** [1] - 94:1
**collaboration** [4] - 37:7, 37:21, 39:18, 40:9
**collaboration"** [1] - 37:2
**colleagues** [11] - 18:11, 18:25, 19:14,

19:15, 19:21, 20:8, 20:11, 20:16, 37:4, 40:2, 62:3

**collect** [2] - 13:21, 15:22

**collected** [1] - 13:8

**collecting** [7] - 10:12, 11:25, 12:4, 12:7, 12:24, 13:1, 13:7

**collection** [3] - 10:8, 10:15, 11:20

**collective** [5] - 25:4, 28:2, 28:3, 29:6, 29:8

**college** [2] - 14:24, 19:12

**College** [4] - 24:14, 24:18, 42:10, 48:2

**color** [9] - 68:22, 68:23, 69:6, 69:10, 70:8, 72:15, 78:13, 78:22, 79:7

**combination** [1] - 91:6

**coming** [3] - 20:22, 41:10, 46:13

**committee** [4] - 22:8, 22:9, 33:14

**common** [2] - 63:16, 63:20

**commonly** [1] - 83:6

**community** [14] - 26:14, 26:23, 26:24, 27:3, 27:7, 27:10, 27:14, 27:18, 28:1, 29:7, 29:8, 32:12, 48:14, 48:18

**compared** [1] - 80:21

**compile** [1] - 20:17

**complain** [1] - 68:12

**complaint** [2] - 34:16, 34:20

**complete** [3] - 16:9, 17:18, 63:25

**completed** [1] - 16:4

**completely** [2] - 41:7, 67:3

**completing** [1] - 16:3

**completion** [2] - 95:25, 96:6

**complex** [1] - 81:5

**compose** [2] - 18:10, 20:4

**composed** [9] - 19:20, 20:10, 23:11, 25:13, 30:14, 34:1, 34:5, 34:8, 40:10

**Composed** [1] - 19:22

**composers** [1] - 78:5

**composing** [2] - 31:16, 31:19

**computer** [1] - 9:15

**conception** [2] - 33:6, 73:11

**concerned** [6] - 25:18, 46:12, 50:2, 50:8, 50:12, 70:24

**concerning** [2] - 11:25, 47:20

**concerns** [1] - 43:21

**conclude** [1] - 94:15

**conclusion** [1] - 82:17

**condemn** [1] - 51:14

**condemnation** [1] - 50:22

**conduct** [1] - 60:18

**conducted** [1] - 61:1

**conference** [3] - 21:14, 23:3, 38:1

**conferences** [1] - 23:3

**confused** [1] -

22:7

**conjunction** [1] - 20:4

**connected** [2] - 24:7, 35:11

**Connecticut** [1] - 2:6

**consider** [9] - 17:24, 29:9, 56:10, 60:2, 60:6, 60:13, 60:16, 64:2, 72:18

**considered** [1] - 26:8

**considering** [1] - 29:7

**constituted** [1] - 68:1

**consult** [3] - 11:20, 11:22, 40:8

**consulted** [1] - 34:17

**contact** [1] - 18:24

**contains** [1] - 96:3

**content** [3] - 10:5, 43:22, 51:21

**contributions** [1] - 37:12

**controlled** [1] - 52:6

**convened** [1] - 53:8

**conventional** [1] - 40:4

**conventions** [2] - 39:22, 39:23

**conversation** [5] - 4:13, 6:25, 44:20, 47:16, 68:13

**conversations** [10] - 11:15, 48:20, 48:23, 49:21, 50:1, 50:13, 52:23, 61:22, 61:24, 62:23

**copies** [1] - 89:11

**copy** [1] - 89:9

**corpus** [1] - 29:24

**Correct** [1] - 6:7

**correct** [68] - 10:7, 15:24, 19:21, 20:14, 22:3, 24:22, 25:15, 25:24, 28:17, 29:2, 31:17, 31:18, 32:4, 32:5, 32:20, 34:20, 34:21, 36:25, 37:22, 37:23, 38:5, 38:21, 38:23, 39:6, 40:23, 44:21, 45:11, 45:17, 51:8, 51:25, 52:3, 52:11, 53:21, 54:13, 54:14, 54:17, 56:11, 57:23, 59:6, 60:14, 65:1, 65:2, 65:4, 65:12, 66:3, 66:6, 67:14, 67:16, 69:4, 70:14, 71:2, 73:16, 73:20, 74:1, 74:16, 75:12, 77:15, 79:1, 79:7, 86:13, 86:14, 88:4, 88:14, 90:8, 93:15, 93:16, 93:22

**correcting** [1] - 56:25

**correctly** [8] - 25:14, 50:23, 51:15, 54:16, 64:24, 66:16, 77:23, 83:8

**COUNSEL** [2] - 2:15, 2:16

**counsel** [9] - 4:14, 4:15, 4:25, 10:19, 10:24, 11:18, 11:24, 94:1, 96:8

**Counsel's** [1] - 11:13

**count** [3] - 13:10, 39:4, 69:6

**County** [1] - 1:24

**couple** [2] - 31:15, 92:6

**course** [15] -

5:25, 6:3, 6:24, 8:4, 11:14, 16:9, 17:14, 17:17, 31:11, 35:22, 45:14, 50:21, 85:13, 85:14, 87:1

**COURT** [3] - 1:1, 4:11, 95:1

**Court** [10] - 4:13, 7:2, 8:5, 8:22, 23:13, 33:8, 45:9, 70:20, 73:8, 80:22

**covered** [3] - 52:17, 52:19, 52:24

**covering** [1] - 52:20

**Cowley** [2] - 53:10, 53:12

**creating** [1] - 79:12

**credits** [2] - 17:19, 17:22

**Crest** [1] - 96:20

**crime** [1] - 64:6

**critical** [2] - 48:15, 49:23

**critically** [1] - 28:6

**criticized** [1] - 39:11

**cross** [4] - 25:21, 42:4, 42:5, 94:5

**cross-section** [3] - 25:21, 42:4, 42:5

**CSR** [2] - 1:21, 96:18

**CSS** [8] - 59:24, 60:8, 60:20, 61:7, 61:20, 62:14, 62:19, 63:15

**Cullen** [2] - 1:21, 95:15

**CULLEN** [1] - 96:18

**culmination** [2] - 73:14, 73:22

**cultural** [2] - 78:10, 78:11

**culture** [5] - 70:11, 70:17, 70:21, 71:4, 71:5

**curious** [1] - 29:3, 74:8

**current** [2] - 19:2, 68:10

**Cutler** [1] - 1:23

**D**

**D-U-R-R-A-N-T** [1] - 76:2

**Dallas** [1] - 1:24

**danger** [1] - 36:5

**Dani** [1] - 23:20

**DANI** [1] - 23:25

**date** [7] - 15:16, 20:25, 30:21, 46:15, 74:14, 75:4, 96:1

**Date** [1] - 96:19

**dated** [1] - 74:10

**dates** [1] - 15:2

**day-to-day** [1] - 21:13

**days** [5] - 31:3, 31:15, 45:14, 75:12, 96:1

**deals** [1] - 28:7

**Dean** [4] - 23:10, 24:11, 24:21

**dean** [1] - 19:12

**Dear** [4] - 18:11, 20:7, 23:10, 24:21

**decided** [3] - 46:1, 67:10, 76:16

**dedicated** [1] - 86:1

**dedication** [1] - 88:3

**default** [1] - 83:24

**DEFENDANTS** [1] - 2:9

**Defendants** [1] - 1:7, 95:7

**defense** [1] - 17:7

**define** [1] - 21:23

**degree** [4] - 14:17, 14:19, 15:19, 15:22

**degrees** [1] - 15:15

**DEI** [1] - 86:11

**DEIs** [1] - 86:8

**delivered** [2] - 38:2, 38:19

**Denton** [1] - 2:17

**deny** [1] - 28:12

**department** [2] - 14:9, 37:17

**deponent** [3] - 95:23, 95:24, 96:5

**deposited** [1] - 13:8

**Deposition** [1] - 8:22

**DEPOSITION** [7] - 1:11, 1:17, 8:7, 18:5, 72:25, 94:18, 95:10

**deposition** [7] - 4:7, 9:6, 94:16, 95:20, 95:25, 96:6, 96:10

**depression** [2] - 7:12, 7:25

**depth** [1] - 67:11

**describe** [22] - 16:5, 16:15, 16:20, 17:1, 21:8, 21:11, 22:6, 22:7, 22:17, 25:20, 55:12, 70:20, 71:5, 71:9, 73:8, 78:20, 80:19, 80:21, 86:15, 88:22, 91:7, 92:4

**Describe** [1] - 27:21

**described** [7] - 17:9, 49:14, 72:6, 73:18, 78:18, 81:23, 86:23

**describing** [2]

Peter Michael Kozinski    5/18/21    4

- 28:2, 54:19
**DESCRIPTION** [1] - 3:12
**description** [1] - 37:15
**descriptions** [1] - 43:15
**destructing** [1] - 49:15
**detail** [5] - 16:20, 28:11, 71:23, 88:23, 91:7
**detailed** [1] - 53:2
**detailing** [1] - 33:8
**devastated** [1] - 50:5
**developed** [1] - 80:2
**development** [3] - 21:20, 22:19, 23:1
**diction** [1] - 55:2
**difference** [2] - 61:4, 78:7
**different** [6] - 47:9, 49:18, 74:8, 74:15, 74:18, 91:10
**diminish** [2] - 79:11, 83:19
**diminishes** [3] - 82:18, 82:24, 83:12
**direction** [2] - 54:12, 77:2
**disability** [1] - 7:21
**discipline** [1] - 48:14
**disclosed** [3] - 54:4, 54:7, 54:9
**discourse** [2] - 32:25, 36:7
**discuss** [9] - 4:8, 10:8, 10:11, 11:3, 12:23, 27:6, 46:9, 46:11, 49:17
**discussed** [10] - 4:20, 10:15, 11:7, 12:3, 12:7, 13:6, 49:10, 49:11, 77:6,

77:14
**discussing** [4] - 28:4, 46:10, 49:12, 49:18
**discussion** [1] - 29:20
**discussions** [1] - 11:23
**dismissal** [1] - 58:22
**disordered** [1] - 26:25
**disproportionately** [1] - 68:17
**dissertation** [2] - 16:11, 63:21
**dissolve** [1] - 51:5
**dissolved** [1] - 51:7
**DISTRICT** [4] - 1:1, 1:1, 95:1, 95:1
**diverge** [1] - 67:3
**diverse** [2] - 81:24, 87:19
**diversity** [21] - 21:21, 23:6, 70:24, 71:2, 71:6, 71:10, 77:16, 77:20, 78:1, 78:6, 78:18, 79:14, 85:16, 85:18, 85:23, 86:2, 88:3, 88:8, 88:13, 88:17, 92:8
**Division** [1] - 25:22
**DIVISION** [3] - 1:2, 2:11, 95:2
**division** [31] - 14:10, 18:14, 25:19, 60:24, 70:12, 70:18, 70:21, 70:25, 71:13, 71:16, 72:3, 76:24, 79:22, 80:12, 85:18, 85:23, 85:24, 86:4, 86:6, 86:8, 86:11, 89:2, 89:17, 89:25,

90:24, 91:2, 91:3, 91:8, 91:20, 93:4
**division's** [1] - 70:11
**document** [13] - 8:9, 8:10, 8:13, 8:24, 18:7, 24:21, 26:2, 70:10, 74:17, 74:20, 74:22, 74:24, 75:1
**documents** [28] - 8:2, 9:3, 9:4, 9:6, 9:11, 9:14, 10:8, 10:12, 10:16, 11:21, 12:1, 12:4, 12:7, 12:24, 13:1, 13:2, 13:3, 13:7, 13:8, 13:12, 13:15, 13:21, 18:18, 46:20, 49:3, 53:23, 58:20, 93:19
**Documents** [1] - 8:25
**done** [12] - 9:3, 9:10, 27:11, 27:19, 27:21, 27:24, 79:21, 86:22, 88:2, 93:25
**down** [10] - 34:24, 43:9, 50:21, 54:11, 58:21, 71:1, 71:3, 76:25, 81:16, 88:9
**Dr** [30] - 26:4, 26:11, 30:3, 30:5, 30:10, 30:16, 31:1, 31:25, 37:3, 37:16, 37:21, 37:24, 38:17, 43:20, 43:21, 44:13, 54:25, 56:2, 57:1, 58:22, 59:15, 60:22, 62:12, 69:2, 69:3, 71:19, 77:10, 87:11, 87:13, 87:14
**draft** [1] - 43:3
**drafted** [4] -

25:10, 25:17, 52:9, 76:9
**drafting** [5] - 25:7, 42:17, 75:23, 76:14, 76:21
**drawn** [1] - 61:5
**drinks** [1] - 22:24
**drive** [2] - 15:21, 34:15
**Drive** [2] - 1:23, 96:20
**duly** [3] - 1:18, 4:3, 95:19
**during** [4] - 46:8, 63:6, 63:8, 63:12
**Durrant** [1] - 76:2
**duties** [2] - 21:11, 37:16
**duty** [1] - 37:18

---

# E

**E-mail** [1] - 3:14
**e-mail** [9] - 9:12, 19:3, 19:6, 25:1, 38:8, 54:23, 55:10, 57:18, 58:19
**e-mails** [4] - 19:4, 33:13, 33:16, 33:22
**early** [2] - 38:20, 45:2
**easier** [1] - 72:11
**EASTERN** [2] - 1:1, 95:1
**edited** [3] - 24:1, 36:11, 37:16
**editing** [3] - 40:13, 41:4, 61:8
**Editing** [1] - 41:6
**editor** [3] - 37:18, 40:22, 41:1
**editor's** [1] - 37:16
**editorial** [13] - 33:9, 33:14,

33:17, 33:23, 37:8, 37:13, 39:18, 40:9, 43:7, 43:16, 52:5, 53:2, 73:11
**educational** [3] - 14:21, 14:24, 15:4
**egregious** [4] - 26:5, 32:24, 32:25, 51:2
**either** [2] - 68:10, 90:5
**elevate** [2] - 79:10, 83:16
**eliminated** [1] - 59:6
**eliminating** [1] - 44:16
**Elizabeth** [3] - 76:1, 76:4, 76:5
**embodiment** [1] - 29:17
**emphasis** [4] - 79:5, 79:6, 83:25, 84:1
**employed** [1] - 96:8
**employee** [1] - 96:11
**end** [3] - 20:8, 21:2, 76:25
**ended** [1] - 91:13
**engage** [1] - 28:6
**engaged** [3] - 10:22, 64:10, 77:13
**English** [9] - 55:2, 55:4, 55:7, 57:5, 57:10, 57:11, 57:13, 57:16
**ensure** [1] - 74:23
**entering** [1] - 16:2
**entire** [4] - 29:7, 29:13, 29:23, 31:20
**entitled** [1] - 11:6
**enumerate** [1] - 54:18
**enumerated** [1] - 34:25
**enunciation**

[1] - 55:1
**equality** [1] - 78:7
**equitability** [1] - 92:8
**equitable** [1] - 87:20
**equity** [13] - 21:21, 23:6, 71:6, 71:10, 77:17, 85:16, 85:19, 85:23, 86:2, 88:3, 88:8, 88:13, 88:17
**especially** [1] - 80:20
**essay** [1] - 17:6
**essays** [1] - 17:8
**established** [1] - 39:20
**et** [8] - 1:6, 17:2, 71:14, 72:4, 81:10, 87:17, 92:8, 95:6
**ethnic** [1] - 85:9
**ethnicity** [3] - 58:4, 58:8, 58:10
**ethnomusicology** [2] - 14:11, 70:13
**Ethnomusicology** [2] - 25:23, 93:9
**evaluate** [2] - 66:9, 66:11
**events** [1] - 30:24
**Ewell** [6] - 30:3, 31:25, 32:19, 37:21, 37:24, 38:17
**Ewell's** [3] - 26:4, 30:5, 35:18
**exact** [7] - 18:19, 30:12, 30:13, 30:21, 32:17, 40:24, 75:4
**exactly** [7] - 30:3, 34:12, 43:2, 44:13, 45:11, 62:7, 89:8

**exaggeration** [1] - 65:4
**exam** [4] - 16:15, 16:19, 16:21, 17:3
**examination** [2] - 94:5, 94:11
**Examination** [1] - 3:6
**EXAMINATION** [1] - 4:4
**examine** [4] - 8:8, 8:9, 9:3, 18:7
**example** [7] - 28:19, 37:3, 65:9, 67:21, 81:20, 84:14, 85:1
**exams** [3] - 16:10, 16:11, 16:12
**except** [1] - 5:6
**exchanged** [3] - 33:13, 33:17, 33:22
**exclude** [1] - 80:11
**excluded** [1] - 18:20
**excludes** [1] - 82:18
**excluding** [2] - 11:18, 11:24
**exclusive** [3] - 79:24, 80:1, 84:2
**exclusivity** [1] - 84:4
**excuse** [4] - 20:13, 25:22, 45:2, 77:13
**Excuse** [1] - 45:5
**Exhibit** [26] - 3:13, 3:14, 3:15, 8:23, 18:3, 19:23, 23:9, 42:18, 58:22, 67:15, 72:21, 72:24, 73:2, 73:3, 74:1, 74:7, 74:9, 74:10, 74:21, 75:1, 75:11, 75:20, 77:7, 93:15
**EXHIBIT** [3] - 8:7, 18:5,

72:25
**exhibit** [6] -
18:3, 47:10,
71:20, 72:22,
72:23
**EXHIBITS** [1] -
3:11
**exhibits** [3] -
8:2, 34:19,
34:22
**exist** [5] -
39:14, 51:10,
64:18, 87:23,
91:19
**expectations**
[1] - 66:21
**experience** [4]
- 36:20,
40:12, 40:15,
41:4
**experienced**
[1] - 72:1
**experiences**
[1] - 58:15
**expert** [2] -
17:25, 80:3
**Expiration** [1]
- 96:19
**explain** [9] -
14:5, 14:21,
26:7, 29:4,
30:3, 32:11,
36:9, 77:25,
79:9
**expressed** [1]
- 28:13
**expression** [2]
- 29:24,
78:10
**extension** [1] -
4:12
**extortion** [5] -
64:5, 67:5,
67:18, 68:1

## F

**Facebook** [5] -
9:13, 9:17,
49:1, 49:4,
49:19
**fact** [2] - 62:8,
78:19
**faculty** [16] -
54:16, 54:19,
70:23, 71:12,
71:17, 72:2,
72:3, 87:2,
87:6, 87:11,
88:25, 91:4,

91:5, 91:10,
91:11, 93:1
**fail** [3] - 66:4,
66:15, 66:20
**fair** [8] - 22:13,
49:15, 53:19,
75:18, 78:23,
82:19, 82:25,
83:14
**fairly** [1] - 32:9
**fall** [3] - 85:20,
86:13, 92:18
**false** [3] - 38:4,
38:6, 38:7
**familiar** [3] -
13:19, 13:20,
53:20
**family** [5] -
12:5, 12:7,
13:4, 13:9,
13:11
**father** [1] -
12:19
**favor** [1] - 78:3
**favors** [1] -
67:22
**Fax** [1] - 2:7
**Federal** [1] -
1:25
**feed** [1] - 46:19
**feelings** [1] -
56:17
**felt** [2] - 50:8,
87:9
**female** [1] -
23:22
**few** [5] - 4:7,
31:12, 31:13,
31:15, 92:6
**field** [6] -
29:13, 39:22,
39:24, 78:13,
78:14, 78:22
**fifteen** [1] -
42:14
**file** [1] - 72:22
**fill** [2] - 89:2,
91:16
**filling** [1] -
91:15
**financially** [1]
- 96:12
**financials** [1] -
21:14
**fine** [3] - 29:22,
75:19, 83:25
**finish** [2] -
6:21, 17:22
**finished** [2] -
17:14, 94:11

**Firm** [1] -
96:20
**first** [33] - 4:3,
16:16, 16:23,
18:8, 18:11,
23:17, 25:21,
30:6, 34:14,
35:1, 38:15,
51:5, 59:14,
64:9, 67:14,
70:16, 73:3,
74:9, 74:20,
75:2, 75:3,
75:4, 75:14,
75:18, 75:20,
75:21, 76:3,
76:9, 77:18,
83:11, 90:2,
90:4, 90:20
**First** [1] - 60:8
**Five** [1] - 45:13
**fluent** [1] -
56:8
**focus** [1] -
65:13
**focused** [1] -
91:4
**follow** [2] -
25:16, 42:3
**follow-up** [2] -
25:16, 42:3
**following** [3] -
50:20, 51:4,
95:17
**follows** [2] -
4:3, 18:11
**FOR** [4] - 1:1,
2:3, 2:9, 95:1
**foreign** [5] -
56:6, 56:7,
56:8, 56:11
**forget** [1] -
46:16
**form** [9] - 5:6,
5:25, 6:1,
17:1, 28:15,
53:7, 74:8,
83:6, 89:10
**formal** [1] -
4:13
**formality** [1] -
5:4
**format** [2] -
19:3, 35:16
**forms** [6] -
79:21, 82:18,
82:25, 83:13,
83:17, 83:20
**forth** [3] -
33:14, 33:17,

33:22
**forward** [2] -
15:21, 51:6
**Forward** [1] -
51:2
**four** [1] - 75:12
**frame** [1] -
21:1
**FRCP** [1] -
95:22
**free** [2] - 5:14,
41:21
**freely** [5] -
51:15, 51:18,
52:7, 52:10,
52:13
**FROM** [4] -
11:10, 14:3,
41:25, 94:8
**front** [3] -
17:10, 57:1,
74:7
**full** [4] - 4:10,
23:24, 24:2,
53:1
**fully** [1] - 50:23
**function** [1] -
81:19
**functioning**
[1] - 40:7
**functions** [1] -
81:18
**future** [3] -
50:3, 50:9,
50:12

## G

**G-A-O** [1] -
61:17
**Gain** [5] -
20:18, 23:14,
42:23, 43:5,
76:1
**GAMUT** [1] -
22:15
**GAMuT** [9] -
3:14, 22:14,
22:15, 22:17,
22:18, 25:5,
25:7, 25:8,
25:14
**Gao** [4] -
61:15, 61:22,
64:25, 65:13
**GC's** [2] -
11:19, 11:24
**GENERAL** [5]
- 2:10, 2:11,
2:11, 2:15,

2:16
**general** [6] -
32:9, 39:22,
39:23, 70:22,
72:3, 92:9
**General** [1] -
11:13
**generally** [11] -
26:10, 36:6,
62:22, 69:1,
69:10, 70:8,
78:2, 81:1,
87:24, 88:1
**genre** [2] -
17:2, 28:9
**Geoffrey** [1] -
92:24
**Geoffrey-
Schwinden**
[1] - 92:24
**Given** [2] -
17:24, 51:2
**given** [5] -
32:2, 36:13,
82:16, 83:10,
95:20
**goal** [1] - 74:21
**Google** [1] -
34:15
**gosh** [1] -
86:17
**grad** [2] - 91:4,
91:5
**grade** [3] -
64:8, 64:9,
67:22
**grades** [1] -
64:14
**Graduate** [1] -
19:16
**graduate** [44] -
14:7, 14:9,
16:6, 18:14,
18:20, 19:6,
19:14, 19:18,
20:11, 21:6,
21:9, 22:2,
22:10, 22:13,
23:7, 24:8,
24:17, 25:4,
25:18, 25:21,
40:11, 40:22,
41:2, 41:8,
42:5, 42:7,
42:9, 48:2,
48:15, 48:19,
54:2, 54:21,
57:9, 58:14,
66:22, 73:23,
76:19, 79:19,

80:19, 85:8,
93:3, 93:5
**graduated** [2] -
15:3, 15:5
**graduation** [1]
- 15:2
**gratefully** [1] -
77:19
**great** [1] -
28:11
**greater** [1] -
78:8
**greatest** [1] -
26:20
**ground** [2] -
4:8, 7:1
**group** [4] -
25:4, 44:23,
86:1, 92:3
**groups** [2] -
32:8, 92:20
**guess** [27] -
13:18, 16:2,
37:14, 42:14,
44:18, 45:8,
48:13, 50:24,
55:12, 55:25,
58:17, 64:3,
64:7, 65:6,
65:8, 68:10,
81:1, 81:8,
81:13, 85:9,
85:12, 85:20,
87:23, 87:24,
88:6, 92:5,
94:3

## H

**hand** [1] - 25:7
**handle** [1] -
22:1
**handouts** [2] -
89:12, 89:13
**hard** [2] -
72:16, 72:17
**harmful** [3] -
56:10, 68:17,
68:18
**Harmful** [1] -
68:20
**harmonic** [1] -
81:8
**HARRIS** [2] -
2:4, 19:24
**head** [4] - 5:18,
6:11, 16:1,
89:23
**health** [1] -
50:4

**heard** [3] -
40:2, 55:10,
59:14
**Heinrich** [1] -
80:5
**help** [3] - 55:1,
60:21, 66:13
**helped** [1] -
20:16
**helpful** [2] -
56:16
**helping** [4] -
43:3, 76:18,
76:22, 76:24
**hereby** [1] -
95:16
**Hernandez** [2]
- 20:19, 76:1
**hidden** [3] -
52:17, 52:19,
52:24
**high** [1] -
14:22
**higher** [1] -
79:17
**Hill** [1] - 2:6
**himself** [2] -
44:21, 80:5
**hip** [5] - 28:7,
28:9, 28:13,
28:16, 29:14
**hip-hop** [5] -
28:7, 28:9,
28:13, 28:16,
29:14
**historian** [1] -
81:3
**History** [1] -
25:23
**history** [9] -
14:10, 14:15,
14:24, 15:12,
17:4, 35:3,
58:24, 59:16,
70:12
**hoc** [9] - 47:13,
53:8, 53:13,
53:20, 73:4,
73:6, 73:9,
73:19, 74:13
**hold** [2] -
54:11, 77:1
**holding** [1] -
49:24
**hominem** [5] -
26:3, 30:2,
30:4, 31:24,
33:3
**honest** [3] -
64:22, 80:24,

86:20
**honestly** [2] -
22:7, 84:19
**hop** [5] - 28:7,
28:9, 28:13,
28:16, 29:14
**hopefully** [1] -
48:4
**hour** [2] -
41:10, 93:24
**hours** [5] -
31:5, 31:7,
31:9, 31:12,
31:14
**human** [3] -
30:23, 32:3,
88:23
**hurt** [1] - 55:23

**I**

**I.D** [1] - 16:24
**idea** [1] - 72:20
**ideal** [1] - 85:7
**identified** [3] -
13:12, 13:15,
26:18
**identify** [14] -
12:3, 12:16,
17:2, 23:13,
27:6, 27:9,
27:13, 27:17,
31:23, 32:3,
34:11, 47:11,
65:20, 77:12
**identifying**
- 19:15, 26:6
**identities** [1] -
90:15
**ignorant** [1] -
84:21
**Illari** [1] - 87:13
**illegal** [1] -
37:10
**Illicit** [1] - 37:2
**illicit** [6] - 37:5,
37:7, 37:12,
37:20, 39:18,
40:9
**illness** [1] -
7:21
**imagine** [1] -
92:21
**impermissibl**
**e** [2] - 32:18,
80:8
**implying** [1] -
84:24
**important** [3] -
6:10, 56:18,

56:21
**improbable** [1]
- 85:12
**improper** [5] -
55:6, 55:11,
55:14, 55:20,
55:21
**improve** [1] -
55:7
**IN** [3] - 1:1,
94:9, 95:1
**incidentally**
[2] - 35:12,
41:19
**include** [8] -
22:25, 42:6,
42:17, 42:19,
42:22, 65:11,
72:4, 85:15
**included** [5] -
49:3, 58:19,
60:4, 72:13,
93:19
**including** [2] -
42:4, 68:20
**inclusion** [22] -
21:22, 23:6,
70:24, 71:2,
71:6, 71:10,
77:17, 77:20,
78:1, 78:6,
78:17, 79:14,
79:21, 85:16,
85:19, 85:24,
86:2, 88:3,
88:8, 88:14,
88:17, 92:8
**inclusive** [3] -
81:17, 87:19
**incoherent** [1]
- 5:13
**incorporated**
[1] - 74:12
**INDEX** [1] - 3:1
**indicated** [2] -
13:21, 19:20
**individual** [4] -
32:19, 55:3,
61:11, 91:25
**individuals** [9]
- 11:24,
12:6, 12:13,
20:5, 24:17,
25:11, 48:17,
76:8, 87:16
**inferior** [1] -
26:25
**information**
[1] - 18:24
**inherently** [1] -

83:19
**initiated** [1] -
34:15
**initiative** [1] -
78:18
**initiatives** [3] -
78:20, 79:15,
86:4
**input** [2] -
24:5, 24:7
**Instagram** [5] -
9:18, 9:20,
9:24, 9:25,
10:5
**instance** [3] -
1:18, 29:14,
58:12
**institution** [2]
- 15:3, 52:2
**instruct** [1] -
57:10
**instructed** [1] -
56:2
**instructor** [1] -
84:21
**intend** [1] -
78:17
**intents** [1] -
40:25
**interested** [3] -
14:22, 47:17,
96:13
**interesting** [2]
- 64:4, 72:5
**interests** [1] -
67:3
**interject** [1] -
6:25
**Internet** [1] -
34:16
**interrupt** [1] -
5:14
**intrinsically**
[1] - 26:25
**introduce** [1] -
8:1
**introduced** [1]
- 85:17
**intuit** [1] - 85:3
**invent** [1] -
79:3
**investigation**
[3] - 73:11,
73:18, 73:19
**invitations** [1]
- 39:11
**invite** [2] -
23:3, 46:3
**invited** [1] -
45:23

**invoking** [1] -
42:5
**involved** [9] -
25:5, 48:17,
48:25, 67:5,
75:23, 76:13,
76:16, 93:5,
93:7
**IS** [1] - 94:9
**isms** [1] -
87:22
**issue** [8] -
9:23, 28:7,
46:2, 50:22,
51:14, 58:7,
74:22, 77:16
**itself** [5] -
59:21, 80:15,
80:16, 80:17,
90:24

**J**

**JACKSON** [3]
- 1:3, 2:21,
95:3
**Jackson** [25] -
3:14, 30:10,
33:8, 37:3,
43:20, 44:16,
53:13, 54:25,
56:2, 57:2,
59:15, 61:2,
62:13, 64:10,
67:21, 68:9,
69:2, 69:3,
71:19, 73:16,
73:20, 77:10,
77:13, 79:20,
87:11
**Jackson's** [9] -
26:11, 27:22,
30:16, 31:1,
53:20, 58:22,
60:22, 62:17,
69:13
**January** [1] -
44:8
**jaw** [1] - 55:25
**jazz** [3] - 80:6,
80:9, 82:2
**Jennifer** [1] -
53:10
**Jessica** [1] -
23:15
**JESSICA** [1] -
23:19
**Jewish** [1] -
72:19
**Jews** [1] -

72:18
**job** [10] -
60:19, 60:20,
60:21, 61:6,
61:10, 62:24,
63:18, 64:1,
66:13, 79:16
**John** [3] -
12:11, 12:19,
24:11
**joint** [3] - 87:4,
88:25, 90:9
**Journal** [15] -
26:12, 27:23,
30:10, 30:17,
33:5, 33:18,
33:23, 35:17,
40:22, 44:17,
59:20, 60:3,
73:12, 75:7,
76:10
**journal** [18] -
30:25, 31:2,
33:9, 35:1,
36:21, 36:24,
37:13, 43:22,
44:3, 44:7,
44:9, 45:25,
51:5, 51:7,
51:18, 51:20,
51:24, 73:19
**journal's** [1] -
35:22
**journals** [5] -
35:4, 35:7,
41:5, 41:6,
41:9
**JSS** [3] -
48:16, 51:2,
51:3
**judge** [1] -
55:16
**Judge** [1] -
28:21
**judgment** [1] -
28:15
**judgments** [1]
- 29:13
**JULIA** [1] -
96:19
**July** [15] -
3:14, 21:2,
30:19, 31:17,
44:6, 45:2,
45:6, 74:11,
74:19, 75:3,
75:5, 75:8,
75:12, 75:15
**June** [1] -
96:15

**Justin** [1] -
42:23

**K**

**keep** [2] -
46:14, 51:21
**kept** [2] - 13:9,
91:24
**keynote** [3] -
35:19, 38:18,
38:19
**kind** [3] -
7:21, 10:2,
21:16, 24:3,
31:14, 49:18,
52:17, 67:6,
72:5, 81:16,
86:21, 90:10,
90:17
**knowledge**
[18] - 7:17,
20:19, 40:14,
41:4, 42:25,
43:19, 52:20,
53:17, 64:13,
67:4, 67:11,
67:20, 70:5,
75:22, 76:6,
84:20, 86:3,
91:9
**KOHANSKI** [6]
- 1:12, 1:17,
3:5, 4:2,
95:11, 95:18
**Kohanski** [32]
- 4:6, 6:9,
8:10, 9:16,
11:12, 11:16,
12:11, 12:12,
12:16, 12:19,
14:5, 18:6,
32:23, 36:15,
37:6, 39:21,
41:19, 42:1,
43:17, 57:3,
59:1, 61:5,
64:4, 70:16,
72:10, 73:1,
75:9, 80:21,
82:9, 84:19,
88:11
**Kohanski's** [1]
- 4:21
**Kohanski.......**
**....** [1] - 3:13
**Korean** [2] -
69:4, 69:6

**L**

**lack** [2] -
39:19, 40:8
**Lack** [1] - 35:1
**lacking** [2] -
29:18, 29:23
**language** [3] -
16:10, 56:12,
57:4
**languages**
- 56:6, 56:7,
56:8
**larger** [1] -
81:9
**last** [9] - 23:17,
23:21, 68:16,
70:10, 72:23,
77:19, 90:5,
93:2, 93:13
**late** [6] - 31:17,
45:2, 45:6,
74:18, 75:3,
75:5
**LAURA** [2] -
1:6, 95:6
**LAW** [1] - 2:5
**Law** [1] - 1:22
**lawfirm.com**
[1] - 2:7
**lawsuit** [2] -
34:14, 53:22
**lawyers** [1] -
13:19
**lay** [1] - 83:7
**Layvi** [4] -
40:20, 40:21,
43:10, 43:12
**leaders** [1] -
76:23
**leading** [10] -
28:18, 28:25,
35:8, 55:19,
56:20, 60:15,
81:9, 82:20,
83:2, 83:21
**learn** [6] -
55:7, 56:7,
62:1, 87:8,
87:10, 90:12
**learned** [3] -
56:5, 87:18,
90:12
**least** [5] -
45:17, 49:24,
71:20, 75:12,
93:15
**lecture** [1] -
23:4
**left** [2] - 17:17,

64:1

**legal** [2] - 10:22, 13:19

**legitimate** [2] - 57:8, 65:21

**legitimately** [1] - 65:17

**less** [4] - 21:1, 40:1, 78:8, 79:5

**lessons** [1] - 86:18

**letter** [27] - 19:11, 20:8, 23:11, 24:20, 24:21, 24:23, 25:3, 25:7, 25:10, 25:14, 25:17, 30:14, 33:1, 34:2, 34:5, 34:8, 39:18, 40:10, 42:6, 42:18, 43:4, 43:6, 58:5, 67:13, 71:23, 73:24, 74:1

**Levee** [1] - 40:18

**level** [3] - 22:2, 78:11, 78:12

**Levi** [12] - 40:17, 40:18, 40:21, 43:10, 43:13, 43:17, 44:2, 44:21, 45:21, 45:23, 46:6, 47:20

**life** [2] - 72:17, 79:17

**Likewise** [1] - 6:20

**limit** [1] - 88:23

**limited** [2] - 11:13, 80:24

**limits** [2] - 30:22, 32:2

**line** [3] - 41:14, 61:4, 73:3

**list** [10] - 19:5, 19:24, 20:10, 20:13, 20:17, 24:2, 38:8, 50:17, 92:21, 93:17

**listed** [3] - 25:11, 59:17, 68:7

**LITIGATION** [1] - 2:11

---

**LLC** [1] - 2:5

**look** [5] - 8:2, 9:10, 39:16, 39:20, 77:18

**looked** [1] - 9:14

**looking** [3] - 13:2, 48:22, 51:13

## M

**m.allen@ allen** [1] - 2:7

**m.allen@ allen- lawfirm.com** [1] - 2:7

**machine** [1] - 1:22

**mail** [10] - 3:14, 9:12, 19:3, 19:6, 25:1, 38:8, 54:23, 55:10, 57:18, 58:19

**mails** [4] - 19:4, 33:13, 33:16, 33:22

**main** [2] - 24:3, 90:21

**majors** [1] - 14:16

**man** [2] - 71:25, 72:6

**manage** [1] - 36:21

**management** [1] - 36:24

**manipulated** [1] - 64:14

**manipulation** [3] - 64:8, 64:9, 64:21

**Margaret** [1] - 87:13

**marginalized** [9] - 68:18, 68:19, 68:21, 69:9, 69:11, 69:13, 70:2, 70:8, 78:15

**mark** [2] - 8:22, 18:2

**marked** [3] - 18:3, 72:21, 72:23

**MARKED** [3] - 8:7, 18:5, 72:25

---

**married** [1] - 69:3

**master's** [2] - 15:18, 15:22

**material** [2] - 18:10, 90:17

**materials** [8] - 33:7, 86:15, 88:16, 89:6, 89:10, 89:16, 90:7, 90:11

**MATT** [1] - 2:10

**Matt** [8] - 4:18, 4:19, 5:5, 8:3, 11:19, 41:13, 69:17, 94:6

**matter** [4] - 31:3, 31:5, 31:6, 31:9

**matthew. bohuslav@ oag.texas. gov** [1] - 2:13

**MAY** [2] - 1:13, 95:12

**McLean** [2] - 92:25, 93:3

**mean** [43] - 5:21, 5:22, 11:22, 13:20, 21:23, 22:22, 24:22, 26:23, 26:24, 29:4, 30:4, 30:12, 31:1, 31:11, 32:11, 38:19, 39:15, 48:23, 49:1, 49:6, 49:10, 49:23, 50:3, 50:9, 53:10, 55:15, 58:2, 58:6, 59:20, 69:10, 70:20, 71:3, 71:10, 71:12, 78:4, 79:10, 79:16, 79:19, 82:5, 84:5, 84:14, 87:14, 88:5

**meaning** [1] - 10:19

**meaningful** [1] - 70:25

**means** [5] - 22:23, 60:10, 72:15, 79:11

**meant** [1] -

---

77:25

**measure** [2] - 81:10

**mechanism** [1] - 36:9

**media** [4] - 9:16, 48:25, 49:5, 49:9

**medication** [2] - 7:7, 7:9

**meeting** [6] - 21:3, 45:17, 49:25, 66:21, 87:6, 90:10

**meetings** [7] - 21:15, 21:16, 21:17, 21:19, 21:25, 22:23, 75:25

**meets** [1] - 85:4

**member** [2] - 37:7, 93:11

**members** [4] - 25:18, 70:23, 71:12, 71:17

**memory** [7] - 7:13, 18:17, 30:23, 32:3, 67:17, 67:24, 88:24

**men** [5] - 68:4, 72:13, 72:19, 82:6

**mental** [2] - 7:21, 50:4

**mention** [1] - 37:2

**mentioned** [4] - 19:13, 20:23, 57:18, 93:2

**mentions** [1] - 64:5

**mentored** [1] - 68:9

**mere** [1] - 62:8

**Merit** [1] - 1:23

**message** [5] - 18:13, 18:21, 18:24, 19:10, 20:4

**messages** [5] - 9:12, 9:13, 13:10, 49:14, 49:15

**met** [3] - 92:5, 92:12

**method** [1] - 83:22

---

**MHD** [1] - 18:14

**MHTE** [4] - 70:11, 70:21, 85:18

**MICHAEL** [7] - 1:12, 1:17, 2:4, 3:5, 4:2, 95:11, 95:18

**micro** [3] - 86:19, 86:20, 90:17

**micro- aggressions** [3] - 86:19, 86:20, 90:17

**Microsoft** [1] - 9:13

**might** [11] - 7:19, 20:20, 38:9, 38:10, 43:1, 45:11, 85:11, 85:12, 89:12, 89:25, 90:14

**Miles** [2] - 92:25, 93:3

**milestones** [1] - 16:7

**mind** [3] - 26:19, 34:7, 41:13

**minorities** [1] - 78:14

**misogynistic** [3] - 71:13, 71:18, 71:20

**missteps** [4] - 39:19, 40:9, 43:7, 43:16

**mistake** [2] - 70:15, 71:7

**mistaken** [2] - 10:24, 56:6

**misunderstood** [1] - 10:23

**monolith** [2] - 26:15, 28:2

**monolithic** [5] - 32:6, 32:12, 82:8, 82:12, 82:13

**monolithic"** [1] - 29:4

**monolithical** [2] - 72:9, 72:11

**morning** [1] - 4:6

**most** [4] -

---

56:17, 56:21, 59:19, 87:9

**mostly** [1] - 87:5

**mother** [1] - 12:18

**mouth** [5] - 55:1, 55:14, 55:25, 58:18, 88:12

**move** [1] - 63:5

**Moving** [3] - 50:17, 51:2, 54:11

**moving** [1] - 51:6

**MR** [58] - 2:4, 2:10, 2:15, 2:21, 4:5, 4:10, 4:19, 4:23, 4:24, 5:2, 5:5, 5:8, 5:19, 5:22, 6:5, 6:7, 6:8, 10:17, 10:20, 11:2, 11:4, 11:8, 11:9, 11:11, 14:2, 18:2, 20:1, 28:18, 28:25, 32:13, 35:8, 39:2, 39:7, 41:10, 41:12, 41:16, 41:18, 41:23, 50:14, 55:18, 56:19, 60:15, 69:14, 69:16, 69:18, 69:20, 82:20, 83:2, 83:21, 93:23, 94:2, 94:3, 94:7, 94:9, 94:10, 94:13, 94:15, 94:17

**MS** [2] - 2:4, 19:24

**multiple** [1] - 91:12

**music** [61] - 14:10, 14:15, 15:13, 17:4, 17:25, 19:12, 26:20, 26:21, 28:13, 29:13, 29:16, 29:24, 35:3, 42:7, 42:9, 42:19, 59:2, 70:12, 78:2, 78:4,

---

79:5, 79:6, 79:11, 79:21, 80:3, 80:6, 80:10, 80:15, 81:18, 81:19, 81:21, 82:2, 82:3, 82:4, 82:5, 82:19, 82:25, 83:6, 83:13, 83:17, 83:20, 84:2, 84:11, 84:15, 84:17, 84:18, 84:23, 85:4, 85:5, 85:6, 85:10, 85:14, 85:15, 92:11

**Music** [11] - 15:12, 24:8, 24:14, 24:18, 25:22, 25:23, 38:1, 38:21, 42:10, 48:2, 48:18

**musical** [2] - 78:9, 80:20

**musicologist s** [2] - 21:10, 22:10

**musicology** [3] - 16:23, 35:3, 57:16

**musics** [2] - 78:8, 79:10

**must** [1] - 35:7

## N

**name** [20] - 4:10, 12:6, 18:8, 22:9, 23:16, 23:17, 23:21, 23:24, 42:25, 58:1, 58:19, 61:16, 76:3, 85:25, 86:7, 87:12, 89:18, 92:25, 93:2

**named** [2] - 24:9, 24:16

**names** [13] - 12:8, 12:10, 19:1, 19:4, 20:22, 24:2, 89:18, 89:21, 90:2, 90:4, 90:5, 91:25, 93:1

**national** [1] -

*Peter Michael Kozlowski    5/18/21*                    8

85:9
**native** [1] -
56:10
**nature** [1] - 6:3
**necessarily**
[10] - 46:9,
61:7, 63:3,
72:1, 79:23,
82:11, 82:18,
82:24, 83:15,
86:6
**need** [6] - 11:4,
16:10, 26:16,
56:7, 57:5,
78:6
**needed** [2] -
87:8, 87:10
**needs** [3] -
36:7, 41:18,
78:15
**negative** [2] -
32:7, 90:14
**negatively** [1]
- 46:1
**never** [4] -
36:11, 66:1,
68:13, 80:25
**next** [1] - 50:17
**NITA** [1] -
96:18
**Nita** [2] - 1:21,
95:15
**NO** [2] - 1:5,
3:12
**no"** [1] - 59:9
**non** [4] -
82:19, 82:24,
83:17, 83:20
**non-western**
[3] - 82:19,
83:17, 83:20
**Normal** [1] -
21:17
**normal** [3] -
6:24, 40:6,
64:1
**North** [12] -
11:25, 12:14,
14:6, 15:8,
15:16, 16:5,
48:19, 51:25,
52:6, 52:23,
73:4, 93:10
**NORTH** [1] -
2:16
**NOT** [1] - 94:9
**notes** [1] -
93:25
**nothing** [1] -
9:23

**notified** [6] -
37:21, 37:24,
38:5, 38:7,
38:12, 39:1
**Notley** [1] -
87:13
**November** [5]
- 38:2,
38:20, 38:23,
74:14
**nuance** [5] -
29:8, 29:9,
29:12, 29:18,
29:23
**nuanced** [2] -
28:8, 29:19
**number** [1] -
18:19
**numbered** [1] -
1:19
**numeral** [3] -
43:7, 58:11,
77:1

## O

**object** [5] -
4:14, 5:3,
5:10, 5:25,
78:5
**objection** [3] -
55:19, 56:20,
69:15
**Objection** [15]
- 28:18,
28:25, 32:13,
35:8, 39:2,
39:7, 50:14,
55:18, 56:19,
60:15, 69:14,
69:18, 82:20,
83:2, 83:21
**objections** [4]
- 5:6, 5:20,
5:23, 6:4
**obligated** [2] -
5:11, 28:20
**obligation** [1] -
5:11
**obligations** [1]
- 21:11
**oblivion** [1] -
49:8
**oddly** [1] -
73:2
**OF** [7] - 1:1,
1:11, 1:17,
2:11, 2:16,
2:16, 95:1
**OFF** [4] -

11:10, 14:3,
41:25, 94:8
**offered** [1] -
67:21
**office** [6] -
11:13, 11:20,
11:24, 85:23,
89:24, 91:20
**OFFICE** [1] -
2:16
**officer** [1] -
95:19
**Offices** [1] -
1:22
**official** [4] -
25:8, 25:13,
86:3, 86:7
**once** [1] - 79:9
**one** [47] - 8:3,
8:4, 8:5,
8:11, 13:18,
16:14, 16:17,
17:7, 20:1,
41:3, 41:21,
47:3, 47:9,
47:13, 47:18,
49:24, 51:5,
54:22, 55:16,
57:18, 58:12,
64:19, 67:9,
71:19, 74:4,
74:6, 74:8,
74:12, 74:18,
74:21, 75:24,
76:17, 76:23,
78:9, 81:25,
83:5, 86:5,
87:7, 87:11,
87:16, 90:18,
91:11, 93:7,
93:8, 93:11
**One** [4] -
17:23, 70:10,
74:7, 86:19
**ones** [2] -
59:17, 93:20
**online** [6] -
46:13, 48:11,
50:7, 50:23,
51:15, 52:14
**Oort** [1] -
23:20
**open** [1] -
91:13
**open-ended**
[1] - 91:13
**opportunity**
[1] - 18:7
**opposed** [1] -
81:9

**oral** [2] - 17:7,
95:20
**ORAL** [2] -
1:11, 1:17
**order** [1] - 16:8
**ordinary** [1] -
35:22
**organize** [3] -
76:18, 76:22,
76:24
**Organize** [1] -
76:20
**organized** [1] -
86:12
**organizers** [2]
- 92:21,
92:23
**Organizing** [1]
- 76:21
**orientation** [1]
- 72:16
**others'** [1] -
23:2
**otherwise** [1] -
78:14
**outcome** [1] -
96:13
**outlined** [1] -
71:15
**outside** [1] -
48:18
**overall** [1] -
90:21
**overwhelmin**
**g** [1] - 57:4
**overwhelmin**
**gly** [1] - 47:2
**own** [3] -
63:21, 78:23,
85:10

## P

**P.O** [2] - 2:5,
2:12
**Page** [1] - 96:3
**PAGE** [2] - 3:2,
3:12
**page** [7] - 8:24,
18:8, 18:11,
23:9, 49:1,
67:14, 74:7
**paid** [1] - 63:20
**panel** [7] -
47:13, 53:8,
53:14, 73:4,
73:6, 73:9,
74:13
**panel's** [2] -
53:21, 73:19

**paper** [2] -
37:25, 38:2
**papers** [3] -
38:18, 39:1,
39:6
**paragraph** [5]
- 26:2, 26:7,
68:16, 77:5,
77:19
**part** [24] - 5:4,
16:14, 16:16,
16:17, 16:24,
17:3, 17:9,
23:11, 35:16,
35:21, 35:23,
47:13, 55:10,
57:8, 59:19,
62:18, 62:24,
64:1, 67:19,
72:18, 73:25,
74:2, 76:12,
79:16
**participate** [1]
- 45:23
**participating**
[1] - 48:20
**particular** [2] -
37:3, 92:10
**particularly** [1]
- 77:11
**parties** [1] -
96:9
**parts** [6] -
16:15, 16:18,
16:22, 16:23,
31:8, 31:13
**Parts** [1] - 31:6
**party** [3] -
4:21, 95:25,
96:6
**pass** [1] -
94:11
**passed** [2] -
16:12, 16:14
**past** [9] -
52:22, 54:15,
54:18, 54:23,
57:25, 58:9,
59:16, 68:25,
77:10
**pathologizati**
**on** [1] - 26:14
**pathologized**
[1] - 26:22
**pathologizin**
**g** [1] - 26:14
**pattern** [1] -
68:17
**pay** [5] - 63:6,
63:8, 63:12,

63:17, 63:23
**pedagogical**
[1] - 85:7
**Peer** [1] - 35:1
**peer** [9] - 35:4,
35:7, 36:3,
36:4, 36:17,
36:20, 39:19,
40:8, 40:16
**people** [31] -
19:24, 20:20,
23:3, 23:12,
24:1, 24:3,
24:16, 26:16,
29:11, 46:4,
48:13, 49:7,
50:7, 59:14,
67:10, 68:22,
68:23, 69:10,
70:8, 72:12,
78:13, 78:15,
78:21, 79:7,
79:17, 83:7,
87:6, 87:7,
87:9, 90:14
**People** [1] -
39:25
**perceived** [1] -
90:15
**perform** [1] -
66:4
**performer** [1] -
15:13
**performing** [1]
- 66:12
**perhaps** [1] -
23:23
**perpetuation**
[1] - 33:2
**person** [5] -
32:16, 54:12,
57:1, 69:6,
77:2
**Personal** [1] -
10:3
**personal** [13] -
39:10, 60:13,
60:18, 60:22,
60:25, 61:18,
62:9, 62:18,
63:14, 64:13,
70:5, 91:21,
91:24
**personally** [3]
- 36:20,
46:6, 54:6
**Peter** [1] - 3:13
**PETER** [6] -
1:12, 1:17,
3:5, 4:2,

95:11, 95:18
**Ph.D** [3] -
14:20, 15:22,
16:7
**Philip** [7] -
26:4, 30:3,
30:5, 31:25,
32:19, 35:18,
38:17
**Phonetic** [3] -
40:19, 43:11,
89:22
**Phonetic)** [3] -
40:20, 40:21,
43:12
**phrasing** [2] -
30:12, 30:13
**physical** [1] -
7:21
**physically** [1] -
55:24
**pictures** [3] -
10:1, 10:2,
10:3
**place** [11] -
16:19, 21:25,
45:1, 45:4,
51:21, 56:15,
66:7, 66:8,
66:10, 78:3,
83:11
**placed** [1] -
83:25
**placing** [1] -
72:22
**Plaintiff** [3] -
1:4, 1:18,
95:4
**PLAINTIFF** [1]
- 2:3
**planning** [1] -
21:14
**Platforming**
[1] - 30:2
**platforming**
[2] - 26:3,
33:3
**plenary** [2] -
38:1
**plowing** [1] -
32:23
**plural** [2] -
65:3, 65:7
**point** [11] -
14:24, 41:11,
45:8, 48:24,
49:8, 61:6,
63:4, 63:5,
68:2, 70:16,
79:17

**Point** [2] - 63:9, 63:14
**points** [3] - 41:12, 59:23, 68:7
**policies** [1] - 73:14
**policy** [1] - 51:20
**position** [14] - 10:4, 21:5, 21:8, 21:12, 25:9, 35:6, 38:10, 38:15, 38:25, 40:24, 52:9, 54:2, 63:19, 84:25
**positive** [3] - 47:2, 47:20, 48:8
**possible** [1] - 16:20
**post** [1] - 10:1
**posted** [3] - 9:24, 10:5, 49:1
**posts** [1] - 49:2
**potential** [1] - 55:23
**power** [3] - 43:13, 43:18, 43:25
**PowerPoint** [1] - 88:18
**PowerPoints** [1] - 89:12
**practical** [1] - 78:12
**practice** [2] - 36:10, 39:10
**precise** [1] - 37:6
**prefer** [1] - 56:14
**PRESENT** [2] - 2:20, 94:9
**present** [1] - 77:10
**presentations** [2] - 23:4, 88:19
**presented** [2] - 89:3, 89:15
**president** [2] - 3:14, 21:9
**Press** [3] - 51:25, 52:6, 52:24
**pretty** [4] -

27:16, 50:5, 59:17, 87:14
**prevent** [5] - 7:4, 7:19, 43:14, 43:18, 79:21
**previews** [1] - 23:3
**Primarily** [1] - 82:7
**primary** [2] - 78:5, 82:5
**private** [2] - 25:9, 56:15
**privilege** [9] - 10:18, 11:6, 11:15, 29:17, 29:25, 72:7, 72:12, 82:10, 82:14
**privileged** [1] - 72:1
**problem** [1] - 71:15
**problematic** [4] - 70:17, 70:21, 71:4, 71:5
**Procedure** [1] - 1:25
**proceed** [2] - 8:24, 60:7
**proceeded** [1] - 37:3
**proceedings** [1] - 5:4
**process** [4] - 33:6, 33:9, 53:3, 73:12
**produce** [4] - 9:4, 13:15, 13:21, 46:19
**produced** [7] - 1:17, 9:7, 13:13, 46:20, 46:21, 82:5, 93:20
**product** [2] - 25:4, 73:10
**Professional** [1] - 21:20
**professional** [2] - 22:19, 22:25
**professor** [8] - 59:2, 62:9, 63:22, 65:18, 65:23, 66:2, 66:20, 66:23
**Professor** [11]

- 27:22, 44:16, 53:13, 61:2, 62:17, 67:20, 68:8, 73:16, 73:19, 77:13, 79:20
**professor's** [5] - 66:7, 66:8, 66:10, 66:12, 66:13
**professors** [1] - 24:5
**proficiency** [4] - 16:10, 57:10, 57:14, 57:16
**proficiently** [1] - 57:6
**program** [7] - 16:6, 16:8, 22:2, 42:7, 57:16, 66:5, 85:13
**programs** [3] - 15:25, 85:17, 86:3
**progress** [1] - 16:8
**progression** [1] - 81:15
**progressions** [1] - 81:8
**promote** [1] - 85:18
**pronounced** [1] - 40:18
**pronunciation** [2] - 56:11, 57:11
**provide** [3] - 8:4, 8:5
**provided** [3] - 9:5, 18:18, 53:5
**provost** [1] - 53:9
**Provost** [2] - 53:10, 53:12
**public** [12] - 47:7, 50:21, 50:23, 51:15, 51:18, 52:7, 52:11, 52:14, 52:15, 52:23, 53:2, 53:16
**publication** [11] - 36:18, 37:9, 43:14, 43:18, 49:24, 53:3, 54:13,

59:19, 60:2, 75:17, 77:3
**publications** [3] - 35:2, 35:6, 35:22
**publicly** [2] - 51:14, 51:21
**published** [8] - 33:5, 35:4, 35:21, 36:14, 41:9, 43:23, 51:24, 53:25
**publishing** [1] - 40:16
**purported** [2] - 44:11, 44:15
**purpose** [1] - 19:9
**purposefully** [1] - 90:13
**purposely** [1] - 87:19
**purposes** [1] - 40:25
**Pursuant** [1] - 6:5
**pursuant** [2] - 1:24, 95:22
**pursuing** [1] - 14:17
**push** [1] - 77:20
**put** [14] - 19:4, 29:20, 30:23, 47:2, 47:5, 47:19, 48:1, 48:3, 48:7, 55:14, 58:17, 67:7, 88:5, 88:12
**putting** [2] - 55:24, 65:3

**Q**

**Quaker** [1] - 2:6
**qualifications** [1] - 16:7
**qualifying** [3] - 16:11, 16:12, 17:3
**questioning** [1] - 41:15
**questions** [8] - 4:8, 5:12, 6:21, 20:2, 26:1, 42:3, 91:13
**quite** [6] -

36:11, 42:24, 48:23, 88:7, 89:14, 90:20

**R**

**RA** [6] - 60:10, 60:17, 60:20, 61:7, 61:20, 62:8
**race** [3] - 58:3, 58:8, 58:10
**Rachel** [5] - 20:18, 23:14, 42:23, 43:5, 76:1
**racism** [7] - 26:3, 26:6, 26:8, 27:5, 33:2, 72:4, 87:23
**racist** [15] - 43:14, 43:18, 44:16, 58:24, 59:11, 60:4, 60:6, 60:14, 68:20, 71:13, 71:18, 71:20, 77:11, 80:15, 87:17
**raise** [2] - 6:4, 43:21
**raised** [1] - 58:6
**random** [1] - 48:13
**range** [2] - 45:12, 74:15
**rap** [5] - 28:7, 28:10, 28:13, 28:16, 29:14
**reach** [2] - 42:15, 46:6
**reached** [1] - 82:17
**reacting** [1] - 46:1
**reaction** [1] - 47:20
**reactions** [3] - 46:13, 48:11, 48:12
**read** [31] - 8:11, 28:22, 30:16, 30:25, 31:6, 31:8, 31:11, 31:13, 31:14, 31:20, 31:22, 33:7, 33:10, 33:13,

34:1, 34:9, 34:10, 34:12, 34:13, 34:19, 34:22, 50:23, 50:24, 51:15, 54:16, 66:17, 76:9, 76:12, 77:23, 92:7, 92:22
**READ** [3] - 28:24, 66:18, 69:24
**reading** [9] - 17:6, 33:16, 33:20, 33:25, 34:7, 86:1, 92:3, 92:20
**Reading** [1] - 23:2
**ready** [1] - 42:1
**real** [2] - 86:3, 90:14
**realization** [1] - 74:3
**really** [5] - 50:2, 68:25, 85:21, 86:17, 89:7
**reason** [1] - 67:8
**reasons** [1] - 96:3
**reassure** [2] - 47:3, 50:6
**reassuring** [2] - 47:19, 48:8
**Rebecca** [1] - 92:24
**receipt** [2] - 18:21, 96:1
**receive** [2] - 39:5, 54:22
**received** [3] - 8:12, 15:15, 57:22
**recently** [1] - 7:14
**recipients** [3] - 19:17, 20:13, 20:17
**recognize** [4] - 8:13, 8:15, 78:7, 93:1
**recollection** [1] - 89:15
**reconvene** [1] - 94:4
**RECORD** [7] - 11:10, 14:3,

28:24, 41:25, 66:18, 69:24, 94:8
**record** [19] - 6:13, 7:2, 11:2, 11:5, 11:8, 11:11, 11:18, 13:25, 41:20, 41:23, 64:17, 91:17, 91:19, 91:20, 92:1, 92:19, 94:16, 95:20, 96:12
**recorded** [2] - 6:10, 91:25
**recording** [1] - 64:17
**records** [1] - 9:3
**recruited** [1] - 78:22
**reduced** [1] - 40:1
**refer** [8] - 10:20, 22:12, 24:11, 24:21, 32:8, 54:15, 73:5, 75:18
**referred** [8] - 47:25, 48:4, 48:11, 48:24, 64:21, 71:6, 77:5, 77:17
**referring** [23] - 10:21, 22:8, 27:22, 27:25, 33:1, 35:13, 35:15, 47:6, 47:12, 58:2, 58:3, 58:10, 59:1, 59:12, 59:22, 61:11, 64:25, 67:25, 68:19, 68:24, 73:5, 86:9, 90:16
**refers** [5] - 26:2, 32:22, 64:5, 64:8, 70:17
**refuse** [1] - 66:23
**refuses** [1] - 28:6
**regard** [5] - 32:12, 33:24, 40:8, 73:16, 92:11
**regarding** [1] -

11:20
**Registration**
[1] - 96:20
**relate** [1] -
92:7
**related** [5] -
9:23, 10:6,
12:17, 63:9,
96:8
**relation** [1] -
30:24
**relationship**
[2] - 12:9,
14:6
**relative** [1] -
96:11
**relatively** [1] -
41:14
**release** [2] -
50:22, 51:14
**released** [5] -
51:18, 52:7,
52:10, 52:13,
75:7
**relevance** [1] -
5:23
**relevant** [1] -
46:22
**relieve** [2] -
5:9, 5:10
**remained** [1] -
11:17
**remedy** [1] -
84:3
**remember** [39]
- 21:4,
30:12, 30:13,
30:20, 30:21,
30:22, 30:24,
31:5, 31:8,
33:11, 33:16,
33:19, 33:20,
33:25, 34:22,
43:2, 45:7,
49:21, 49:25,
50:5, 50:16,
62:20, 63:3,
64:11, 64:16,
64:22, 65:15,
75:4, 76:7,
86:17, 86:18,
86:23, 88:7,
89:8, 89:14,
89:18, 90:20,
91:9, 91:15
**Remember** [1]
- 6:10
**RENALDO** [1]
- 2:15
**Renaldo** [1] -

10:25
**renaldo.
stowers@
untsystem.
edu** [1] - 2:18
**repeat** [6] -
13:14, 25:12,
27:15, 69:22,
73:17, 82:21
**report** [8] -
47:14, 53:14,
53:21, 73:4,
73:6, 73:9,
73:10, 74:13
**reported** [1] -
1:22
**REPORTER**
[1] - 4:11
**Reporter** [3] -
8:5, 28:22,
95:16
**Reporter's** [1]
- 3:8
**reprehensibl
e** [3] - 34:25,
36:2, 36:24
**represent** [3] -
4:22, 73:2,
75:6
**representatio
n** [1] - 10:22
**represented**
[3] - 4:15,
10:21, 11:12
**representing**
[3] - 4:21,
10:24, 11:1
**reproduced**
[1] - 47:13
**reputation** [4]
- 65:14,
65:22, 66:1,
69:2
**reputations** [3]
- 64:24,
65:17, 72:4
**request** [1] -
9:11
**requested** [3] -
73:15, 95:24,
96:5
**Requested** [1]
- 8:25
**requests** [4] -
10:6, 13:13,
13:16, 13:22
**required** [5] -
63:7, 63:11,
63:25, 66:5,
87:7

**requirement**
[3] - 39:10,
39:12, 39:13
**requiring** [1] -
63:6
**Research** [1] -
60:11
**research** [16] -
60:12, 60:13,
60:18, 60:23,
60:25, 61:1,
61:7, 61:18,
62:9, 62:10,
62:13, 62:18,
63:14, 63:21,
67:3
**reserve** [1] -
94:13
**reserved** [2] -
5:6, 5:24
**reserving** [1] -
5:20
**respect** [2] -
11:5, 11:14
**respectful** [3] -
87:25, 88:1,
88:9
**respond** [3] -
37:22, 39:5,
39:6
**response** [21] -
8:18, 9:4,
9:7, 9:11,
10:11, 11:21,
12:1, 12:4,
12:25, 13:22,
26:4, 30:2,
30:4, 31:24,
35:18, 38:18,
48:8, 53:13,
53:20, 53:25,
93:20
**responses** [4]
- 37:4,
37:25, 47:1,
91:25
**responsibility**
[1] - 23:5
**responsible**
[4] - 21:21,
21:23, 54:12,
77:2
**responsive** [6]
- 13:13,
13:16, 13:18,
13:22, 46:22,
49:2
**restroom** [1] -
41:19
**results** [2] -

89:4, 92:1
**retract** [1] -
74:25
**return** [2] -
48:4, 77:16
**returned** [2] -
96:1, 96:2
**Review** [1] -
35:2
**review** [9] -
35:4, 35:7,
36:3, 36:4,
36:18, 36:21,
39:19, 40:9,
53:8
**reviewed** [1] -
40:16
**revisiting** [1] -
74:9
**Richmond** [4]
- 23:10,
24:11, 24:12,
24:21
**rigorous** [2] -
36:6, 36:8
**Robert** [1] -
23:19
**rocks** [5] -
55:1, 55:14,
55:24, 56:3,
58:17
**role** [2] - 43:3,
84:21
**ROOM** [1] -
94:9
**Rouw** [2] -
42:24
**rule** [1] - 6:10
**Rule** [1] -
95:22
**rules** [5] - 4:9,
6:6, 7:1,
39:17, 39:20
**Rules** [1] -
1:25
**run** [1] - 41:7
**running** [2] -
21:13, 21:14

## S

**safe** [5] -
24:20, 25:3,
29:12, 74:3,
75:14
**Sales** [1] -
42:23
**Salvador** [2] -
20:19, 76:1
**SAMANTHA**

[1] - 2:4
**save** [1] -
47:16
**saved** [1] -
9:14
**saw** [1] - 9:5
**scale** [1] - 81:9
**Schenker** [3] -
80:5, 82:1,
83:23
**Schenkerian**
[29] - 26:12,
27:23, 30:11,
30:17, 33:5,
33:23, 35:17,
40:23, 44:17,
59:4, 59:20,
60:3, 60:9,
60:22, 60:25,
73:12, 75:7,
76:10, 79:23,
79:25, 80:11,
80:14, 80:22,
80:25, 81:14,
81:23, 82:17,
82:23, 83:11
**scholarly** [8] -
35:4, 35:7,
35:22, 35:24,
36:18, 37:8,
37:12, 39:10
**Scholars** [1] -
40:6
**scholars** [1] -
92:11
**scholarship**
[6] - 26:4,
28:6, 30:5,
36:5, 39:21,
78:23
**school** [2] -
14:23, 66:22
**Schwinden** [1]
- 92:24
**score** [1] -
16:24
**scores** [2] -
16:24, 16:25
**search** [1] -
9:3
**second** [16] -
14:1, 16:3,
17:3, 17:9,
23:9, 26:2,
26:7, 32:22,
32:24, 59:25,
63:5, 68:15,
75:24, 77:7,
85:17, 90:19
**section** [3] -

25:21, 42:4,
42:5
**See** [1] - 77:1
**see** [10] - 6:12,
8:25, 43:7,
47:18, 53:3,
58:22, 60:10,
70:18, 74:6,
77:21
**seem** [2] -
39:17, 55:16
**self** [1] - 49:15
**self-
destructing**
[1] - 49:15
**semester** [9] -
17:23, 44:19,
59:15, 87:1,
92:6, 92:7,
92:14, 92:15,
92:18
**semester's** [1]
- 17:20
**semesters** [1]
- 17:21
**Semitic** [5] -
26:15, 30:8,
30:9, 32:8,
32:19
**Semitism** [11] -
27:1, 27:2,
27:6, 27:10,
27:14, 27:17,
28:3, 28:4,
28:12, 28:16,
31:24
**send** [3] -
18:13, 18:24,
39:10
**sending** [3] -
19:9, 19:12,
42:6
**SENIOR** [1] -
2:15
**sensitivity** [1]
- 85:21
**sent** [9] -
19:13, 19:18,
19:24, 24:25,
38:11, 38:13,
38:17, 38:25,
93:19
**sentence** [10] -
25:21, 30:6,
32:22, 32:24,
43:10, 58:6,
59:12, 68:16,
70:17, 77:19
**sentiment** [1] -
50:25

**separate** [1] -
69:21
**served** [1] -
8:15
**server** [1] -
19:5
**several** [4] -
23:12, 45:6,
87:1, 87:2
**sexism** [2] -
72:4, 87:23
**sexist** [14] -
58:25, 59:11,
59:15, 59:16,
60:5, 60:13,
67:18, 67:25,
68:12, 68:20,
71:13, 71:18,
71:20, 87:17
**sexual** [2] -
67:22, 72:16
**shall** [1] - 5:6
**Shawnee** [2] -
89:21, 90:3
**SHERMAN** [2]
- 1:2, 95:2
**Shorthand** [1]
- 95:15
**shorthand** [1]
- 1:22
**shoved** [3] -
52:17, 52:18,
52:24
**show** [1] - 88:2
**showing** [1] -
81:8
**side** [1] - 52:24
**Signature** [1] -
96:3
**signature** [2] -
67:14, 95:23
**signatures** [3]
- 19:11,
93:14, 93:17
**simplifying** [1]
- 81:6
**Simplifying** [1]
- 81:7
**simply** [2] -
32:2, 51:7
**single** [1] -
32:16
**sit** [1] - 77:11
**situation** [1] -
67:12
**six** [2] - 16:24,
17:22
**Six** [1] - 17:19
**skin** [1] - 72:15
**skip** [5] -

34:24, 43:9,
50:21, 68:15,
76:25
**skipping** [1] -
58:21
**slides** [1] -
88:18
**slightly** [1] -
74:15
**Slottow** [1] -
87:14
**Smith** [1] -
1:23
**SnapChat** [4] -
49:7, 49:8,
49:14, 49:17
**so-called** [1] -
44:16
**social** [6] -
9:16, 22:19,
22:21, 48:25,
49:5, 49:9
**Society** [5] -
24:8, 38:1,
38:20, 48:18,
93:9
**society** [2] -
69:11, 70:2
**sole** [1] - 20:7
**solicit** [5] -
19:11, 37:4,
37:8, 37:12,
37:18
**soliciting** [2] -
42:6, 93:14
**Someone** [1] -
55:23
**someone** [7] -
29:16, 41:18,
55:6, 55:13,
56:25, 76:15
**sometime** [2] -
75:8, 75:15
**sometimes** [2]
- 22:23,
45:19
**somewhere**
[2] - 54:24,
74:10
**soon** [2] -
31:2, 41:14
**Sorry** [10] -
19:19, 25:12,
27:15, 33:19,
47:22, 58:23,
65:19, 73:17,
76:21, 81:11
**sorry** [9] -
13:14, 32:23,
37:6, 59:23,

70:23, 74:7,
76:20, 79:18,
89:12
**sort** [11] - 4:8,
10:22, 18:23,
19:7, 28:21,
39:17, 46:2,
81:5, 86:12,
88:13, 88:18
**sounded** [2] -
78:21, 79:4
**sounds** [5] -
45:16, 82:16,
82:22, 83:12,
86:11
**Sounds** [1] -
49:23
**source** [6] -
34:12, 39:13,
39:15, 39:23,
40:4, 44:20
**sources** [1] -
39:16
**space** [3] -
23:25, 79:12,
79:14
**speaker** [1] -
56:11
**speaking** [4] -
26:10, 54:25,
78:2, 78:12
**speaks** [1] -
59:21
**specific** [21] -
18:16, 25:10,
26:1, 30:4,
31:23, 48:3,
49:21, 49:25,
61:11, 61:18,
63:7, 64:20,
65:7, 65:8,
67:7, 67:12,
68:7, 80:3,
82:2, 84:11,
85:4
**specifically**
[18] - 12:23,
20:22, 26:13,
30:9, 44:23,
48:21, 51:3,
58:1, 58:9,
58:13, 58:21,
59:12, 61:25,
77:9, 81:25,
84:22, 90:23,
91:2
**specifics** [11] -
45:7, 54:20,
59:14, 60:7,
62:20, 63:1,

64:11, 65:15,
69:1, 71:25
**speculation**
[2] - 6:3,
50:15
**spell** [4] -
23:16, 23:21,
23:23, 61:16
**spend** [1] -
17:5
**spoken** [1] -
57:5
**spring** [1] -
44:19
**staff** [5] -
33:17, 33:23,
37:8, 37:13,
52:5
**standard** [4] -
26:17, 26:18,
66:12
**standards** [1] -
66:5
**standpoint** [1]
- 85:8
**stands** [1] -
70:12
**start** [4] - 8:3,
12:10, 76:15,
80:18
**started** [5] -
4:8, 7:15,
15:1, 46:5,
92:5
**starting** [2] -
14:22, 18:10
**state** [1] - 22:9
**State** [4] -
1:21, 1:24,
4:22, 95:16
**statement** [23]
- 25:10,
38:4, 46:3,
47:7, 47:8,
47:11, 47:12,
48:4, 48:7,
50:18, 52:10,
54:3, 70:7,
72:9, 75:18,
75:20, 75:21,
75:23, 76:9,
77:7, 77:18,
82:8, 88:2
**statements** [5]
- 33:4,
72:12, 76:14,
76:22, 82:12
**States** [2] -
84:9, 85:15
**STATES** [2] -

1:1, 95:1
**Station** [1] -
2:12
**stay** [1] - 49:8
**STEARNS** [1] -
23:19
**Stearns** [1] -
23:15
**step** [1] - 85:16
**Stephens** [1] -
20:18
**stepped** [1] -
4:22
**steps** [2] -
50:20, 51:4
**Stevens** [4] -
23:14, 42:23,
43:5, 62:5
**still** [5] - 17:10,
28:20, 36:23,
64:11, 64:25
**Stipulations..**
**...................**
**...................**
[1] - 3:4
**stopping** [1] -
41:11
**Stowers** [1] -
10:25
**STOWERS** [4]
- 2:15, 11:2,
11:8, 94:9
**straight** [5] -
71:25, 72:6,
72:13, 72:19
**strike** [2] -
33:14, 47:23
**Strike** [2] -
19:19, 37:5
**structures** [1]
- 81:5
**student** [26] -
14:7, 14:9,
19:6, 22:2,
40:22, 41:2,
41:7, 41:8,
54:23, 54:24,
56:3, 57:18,
57:19, 58:16,
58:18, 63:6,
65:10, 66:21,
66:24, 76:23,
79:19, 80:19,
85:8, 93:3
**Student** [1] -
93:9
**student's** [3] -
55:10, 65:21,
65:25
**students** [48] -

16:6, 18:14,
18:20, 19:2,
19:14, 19:16,
19:18, 20:11,
21:6, 23:7,
24:9, 24:18,
25:4, 25:17,
25:18, 25:22,
40:11, 41:8,
42:5, 42:7,
42:9, 42:19,
48:2, 48:15,
48:19, 54:3,
54:21, 57:9,
57:15, 58:14,
63:7, 63:16,
65:3, 65:7,
67:2, 68:10,
68:18, 68:19,
68:21, 73:23,
84:8, 84:9,
87:3, 89:1,
91:5, 91:10,
91:11
**students'** [4] -
64:23, 65:16,
66:9, 66:11
**studied** [2] -
28:9, 81:1
**studies** [1] -
82:23
**Studies** [18] -
26:12, 27:23,
30:11, 30:17,
33:5, 33:24,
35:18, 40:23,
44:17, 59:4,
59:20, 60:3,
60:9, 60:22,
60:25, 73:12,
75:7, 76:11
**study** [8] -
15:10, 78:5,
78:22, 80:2,
80:9, 84:12,
85:9
**style** [1] - 17:1
**styled** [1] -
1:19
**subjected** [1] -
35:7
**subjecting** [2]
- 36:2, 36:4
**subjective** [1]
- 56:17
**submit** [2] -
23:2, 53:13
**submitted** [2] -
33:8, 36:17
**subpoena** [11]

- 8:15, 8:19,
9:4, 9:8,
9:11, 10:11,
11:21, 12:1,
12:4, 13:1,
93:21
**Subpoena** [1] -
3:13
**subscribe** [1] -
16:19
**Subscribed** [1]
- 96:14
**substantive**
[1] - 5:23
**suggested** [1]
- 79:4
**suitable** [1] -
84:23
**Suite** [1] - 1:23
**summarize** [2]
- 79:2, 83:14
**summarizing**
[2] - 64:24,
83:8
**summary** [3] -
22:3, 51:13,
62:11
**summer** [10] -
17:5, 17:12,
63:6, 63:8,
63:12, 63:17,
63:21, 63:23,
64:15, 64:18
**supplied** [1] -
29:7
**support** [1] -
42:6
**supporting** [1]
- 48:14
**suppose** [6] -
29:2, 49:15,
52:21, 56:15,
56:21, 71:19
**supposed** [3] -
36:10, 58:16,
62:8
**supposedly**
[3] - 61:19,
62:1, 64:14
**survey** [4] -
89:2, 89:4,
90:23, 92:2
**surveys** [1] -
91:10
**Susan** [2] -
12:11, 12:16
**sworn** [4] -
1:19, 4:3,
95:19, 96:14
**symposium**

- 8:15, 8:19,
9:4, 9:8,
9:11, 10:11,
11:21, 12:1,
12:4, 13:1,
93:21
**system** [3] -
81:10, 83:10
**SYSTEM** [1] -
2:16
**systems** [2] -
78:3, 83:23

---

**T**

---

**TA** [1] - 63:23
**tailored** [1] -
91:11
**takeaway** [1] -
86:18
**Taraseca** [2] -
89:21, 90:3
**taught** [2] -
68:9, 84:17
**teach** [1] - 57:3
**teaching** [5] -
14:7, 14:12,
14:14, 84:8
**Teams** [3] -
9:13, 9:14,
9:17
**technique** [3] -
81:22, 82:24,
83:5
**techniques** [2]
- 84:22,
85:2, 85:6
**ten** [3] - 42:12,
42:13, 45:13
**term** [3] - 29:3,
32:14, 67:7
**terms** [10] -
10:12, 13:19,
17:1, 30:7,
32:7, 59:16,
70:15, 77:6,
78:9, 86:21
**terrible** [1] -
47:23, 88:5
**testified** [1] -
4:3
**testimony** [4] -
7:5, 7:17,
7:20, 95:20
**TEXAS** [4] -
1:1, 2:11,
2:16, 95:1
**Texas** [19] -
1:21, 1:24,
2:12, 2:17,
11:14, 11:25,
12:14, 14:6,

15:8, 15:16,
48:19, 51:25,
52:6, 52:23,
73:4, 93:10,
95:16, 96:18,
96:21
**Texas'** [1] -
16:6
**text** [2] - 9:12,
13:10
**THAD** [1] - 2:4
**THE** [14] - 1:1,
1:1, 2:3, 2:9,
11:10, 14:3,
28:24, 41:22,
41:25, 66:18,
69:24, 94:8,
95:1, 95:1
**themselves** [2]
- 55:24,
59:18
**theorist** [1] -
81:2
**theorists** [2] -
21:10, 22:11
**theory** [13] -
14:10, 17:25,
35:3, 42:7,
42:9, 42:19,
59:2, 70:13,
80:16, 84:17,
85:6, 85:10,
85:14
**Theory** [6] -
24:8, 25:22,
25:23, 38:1,
38:21, 48:18
**therefor** [1] -
96:4
**they've** [1] -
45:8
**thinking** [2] -
88:7, 89:23
**third** [5] - 16:3,
16:4, 43:10,
77:18, 93:2
**threaten** [1] -
66:14
**threatened** [4]
- 65:14,
65:17, 65:22,
66:1
**threats** [1] -
64:23
**three** [8] -
16:24, 16:25,
17:4, 34:25,
35:23, 88:20,
92:6, 92:12
**throughout** [1]

- 21:18
**ties** [1] - 63:13
**Timothy** [3] -
3:14, 33:8,
53:20
**TIMOTHY** [3] -
1:3, 2:21,
95:3
**title** [1] - 40:25
**TO** [4] - 11:10,
14:3, 41:25,
94:8
**today** [5] -
4:15, 7:5,
8:18, 11:19,
77:12
**together** [4] -
22:24, 45:8,
46:2, 87:4
**Together** [1] -
18:25
**took** [5] -
16:16, 45:1,
57:22, 91:10,
91:24
**tools** [2] -
84:6, 84:10
**Tools** [1] -
84:11
**topic** [2] -
90:18, 90:21
**topics** [3] -
17:3, 17:4,
46:9
**towards** [3] -
16:7, 46:1,
76:25
**tradition** [1] -
28:13
**traditional** [1] -
84:15
**trained** [1] -
81:14
**training** [8] -
17:24, 21:22,
23:6, 57:9,
81:2, 85:21,
86:12, 86:16
**transcript** [2] -
95:19, 96:2
**treat** [1] - 68:3
**treated** [2] -
68:3, 68:5
**trial** [4] - 5:7,
5:21, 5:25,
94:14
**tried** [4] -
43:20, 46:3,
47:3, 50:6
**troglodyte** [1]

- 80:20
**true** [2] -
57:22, 95:20
**truthful** [3] -
7:5, 7:16,
7:20
**try** [4] - 7:1,
17:2, 54:25,
74:22
**trying** [4] -
30:23, 79:2,
79:3, 88:12
**turn** [4] - 8:21,
8:23, 23:9,
49:12
**tweet** [1] -
46:21
**tweets** [5] -
46:21, 48:13,
48:22, 48:25
**Twitter** [9] -
9:18, 9:19,
46:14, 46:16,
46:19, 46:25,
48:1, 49:4,
49:19
**two** [14] -
16:10, 16:22,
16:23, 43:24,
46:9, 56:5,
56:7, 85:13,
87:3, 89:5,
92:6, 92:12,
93:1
**Two** [1] - 17:20
**two-year** [1] -
85:13
**type** [4] -
68:13, 80:3,
82:2, 82:3
**typed** [1] -
6:11
**types** [4] -
46:15, 62:22,
84:5, 84:16

## U

**unacceptable**
[1] - 77:11
**unanswered**
[1] - 11:17
**uncertainty** [1]
- 6:22
**unclarity** [1] -
31:11
**unclear** [1] -
51:1
**uncritical** [1] -
28:4

**Under** [2] -
43:6, 67:1
**under** [1] -
67:13
**undergraduat
es** [2] - 91:6,
91:8
**understood**
[5] - 5:16,
6:17, 6:18,
36:6, 83:7
**underwhelme
d** [4] - 86:21,
86:24, 87:5,
88:13
**underwhelmi
ng** [2] - 90:7,
90:10
**undone** [1] -
64:1
**Union** [1] -
2:17
**UNITED** [2] -
1:1, 95:1
**United** [2] -
84:9, 85:15
**University** [20]
- 11:14,
11:25, 12:14,
14:6, 14:25,
15:5, 15:8,
15:10, 15:16,
16:5, 48:19,
51:25, 52:2,
52:6, 52:23,
53:24, 73:4,
73:15, 85:25
**UNIVERSITY**
[1] - 2:16
**university** [3] -
57:4, 63:19,
91:1
**unknown** [1] -
16:25
**unless** [1] -
10:23
**Unless** [1] -
13:10
**UNT** [5] - 15:1,
18:15, 19:2,
19:3, 57:13
**UNT's** [1] -
10:24
**unusual** [1] -
63:24
**up** [20] - 17:4,
18:25, 20:3,
20:22, 24:2,
25:16, 26:16,
41:10, 41:14,

42:3, 46:13,
46:15, 52:17,
52:19, 52:24,
66:4, 66:12,
67:9, 79:17,
94:5
**upcoming** [1] -
37:25
**uphold** [1] -
78:3
**urgently** [1] -
51:4
**useful** [1] -
90:11

## V

**V-A-N-O-O-R-
T** [1] - 23:25
**vague** [4] -
32:13, 32:14,
39:2, 39:7
**valid** [1] - 78:9
**valorizes** [2] -
82:2, 84:2
**Van** [1] - 23:20
**various** [1] -
76:14
**verbatim** [1] -
50:24
**verify** [1] -
57:19
**view** [9] - 36:1,
55:11, 65:25,
66:24, 69:7,
81:17, 83:12,
84:4, 84:10
**views** [3] -
43:14, 43:19,
44:17
**Vista** [1] -
96:20
**voice** [1] - 81:8
**Volume** [13] -
26:12, 27:23,
30:10, 30:17,
33:24, 35:11,
35:17, 37:25,
48:15, 60:2,
73:12, 75:7,
76:10

## W

**wait** [1] - 6:21
**Walls** [16] -
40:17, 40:18,
40:22, 43:17,
44:2, 44:21,
45:21, 45:23,

46:7, 46:11,
46:24, 47:20,
48:8, 49:12,
49:22, 50:1
**WAS** [3] -
28:24, 66:18,
69:24
**watered** [1] -
88:9
**ways** [2] -
80:9, 90:14
**week** [6] -
45:7, 45:15,
46:8, 49:23,
75:3, 75:5
**western** [11] -
79:11, 81:21,
82:19, 82:25,
83:6, 83:17,
83:20, 84:2,
84:17, 85:6,
85:15
**Western** [1] -
82:4
**WHALEY** [1] -
96:19
**white** [15] -
26:17, 26:18,
27:14, 27:17,
29:17, 29:24,
71:25, 72:6,
72:13, 72:19,
78:4, 79:5,
82:6
**White** [2] -
27:13, 27:17
**whiteness** [2] -
78:3, 78:4
**whole** [7] -
31:7, 31:14,
32:8, 45:7,
57:1, 86:21,
91:1
**wife** [2] - 69:9,
69:13
**Wikipedia** [1] -
28:5
**wisdom** [1] -
40:5
**wish** [1] -
86:22
**wished** [1] -
51:10
**withhold** [1] -
67:21
**witness** [7] -
1:18, 11:1,
69:22, 94:11,
94:12, 95:18,
95:21

**Witness** [2] -
5:18, 16:1
**WITNESS** [1] -
41:22
**witnesses** [1] -
4:21
**woman** [3] -
68:2, 69:4,
69:6
**women** [4] -
68:5, 68:8,
68:21, 68:23
**wondering** [3]
- 13:6,
16:18, 84:24
**word** [3] -
67:9, 67:10,
85:22
**words** [2] -
88:12, 90:8
**works** [2] -
16:21, 65:18
**workshop** [2] -
86:12, 86:16
**workshops** [4]
- 85:22,
87:2, 88:14,
88:18
**world** [2] -
26:21
**worth** [1] -
17:20
**wound** [1] -
55:24
**wrap** [1] -
41:13
**WRIGHT** [2] -
1:6, 95:6
**write** [1] - 17:6
**writing** [5] -
24:4, 25:23,
26:9, 75:23,
76:16
**written** [5] -
34:8, 57:20,
64:17, 74:20,
88:19
**wrote** [1] -
54:3

## Y

**year** [6] - 16:3,
16:4, 21:18,
85:13, 92:5
**years** [2] - 68:9
**Yiyi** [8] - 61:15,
61:22, 63:9,
64:12, 64:25,
65:8, 65:13,

Peter Michael Kohlszki    5/18/21

68:25
**YIYI** [1] - 61:17
**Yiyi's** [1] - 68:2
**yourself** [4] -
17:24, 28:9,
72:6, 91:15

## Z

**Zoloft** [3] -
7:10, 7:11,
7:23
**Zoom** [11] -
20:21, 20:23,
21:3, 44:25,
45:1, 45:4,
45:6, 45:10,
46:5, 49:25