Rachel Gain      5/19/21                                    1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   TIMOTHY JACKSON,              )
                                   )
 4            Plaintiff,           )
                                   )
 5   v.                            )  CASE NO.
                                   )  4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,          )
                                   )
 7            Defendants.          )
                                   )
 8

 9

10        ------------------------------------

11              ORAL DEPOSITION OF

12                 RACHEL GAIN

13                 MAY 19, 2021

14        ------------------------------------

15

16

17       ORAL DEPOSITION OF RACHEL GAIN, produced as a

18   witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 19, 2021, from 1:06 p.m. to 2:49 p.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.
```

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4        MR. MICHAEL THAD ALLEN
         MS. SAMANTHA HARRIS
5        ALLEN LAW, LLC
         P.O. Box 404
6        Quaker Hill, Connecticut 06375
         860.772.4738
7        860.469.2783 Fax
         m.allen@allen-lawfirm.com
8

9   FOR THE DEFENDANTS:

10       MR. MATT BOHUSLAV
         ASSISTANT ATTORNEY GENERAL
11       GENERAL LITIGATION DIVISION
         ATTORNEY GENERAL OF TEXAS
12       P.O. Box 12548, Capitol Station
         Austin, Texas 78711
13       matthew.bohuslav@oag.texas.gov

14  AND

15       MR. RENALDO STOWERS
         SENIOR ASSOCIATE GENERAL COUNSEL
16       UNIVERSITY OF NORTH TEXAS SYSTEM
         OFFICE OF GENERAL COUNSEL
17       940.565.2717
         renaldo.stowers@untsystem.edu
18

19  ALSO PRESENT:

20       MR. TIMOTHY JACKSON

21

22

23

24

25

Rachel Gain    5/19/21

1                           INDEX

2                                               PAGE

3    Appearances........................................ 2

4    Stipulations....................................... 4

5    RACHEL GAIN

6        Examination by Ms. Harris...................... 4

7

8    Reporter's Certificate.............................60

9

10

11                         EXHIBITS

12   NO.  DESCRIPTION                              PAGE

13   Exhibit 35     Notice of Taking Deposition........... 9

14   Exhibit 36     Text Messages - Vivek Virani and
                    Rachel Gain.......................... 9
15
     Exhibit 37     Microsoft Teams conversation..........22
16
     Exhibit 38     News from SEM: General News, Statement
17                  of UNT Faculty on Journal of
                    Schenkerian Studies ..................22
18
     Exhibit 39     Twitter Messages......................51
19

20

21

22

23

24

25

Rachel Gain       5/19/21

```
 1              P R O C E E D I N G S
 2                    RACHEL GAIN,
 3  having been first duly sworn, testified as follows:
 4                    EXAMINATION
 5  BY MS. HARRIS:
 6      Q.   Okay.  Hi, my name is Samantha Harris.  I'm one
 7  of the attorneys for Dr. Jackson, along with my partner.
 8  And have you ever been deposed before?
 9      A.   No.
10      Q.   Okay.  So, it's just going to be a
11  conversation, but it is part of the Court record, that's
12  why she's taking these -- you know, these notes.  And
13  so, this is testimony that will be part of the case.  If
14  at any time anything I'm asking you isn't clear or you
15  need me to clarify or repeat the question, just ask.
16  Your attorney may object from time to time.
17              MS. HARRIS:  Are we going to stipulate,
18  you know, the same things that we have in the previous
19  depositions, that objections except as to form
20  objections will be reserved for the time of trial.
21              MR. BOHUSLAV:  Yes.
22      Q.   (By Ms. Harris)  Okay.  So, he will object, and
23  that objection will go on the record, but it doesn't
24  change your obligation to answer the question.  So, when
25  he objects, it doesn't mean, you know, that you're not
```

1 going to answer, it just means that that objection will
2 be noted, and the Judge can decide what to do with it.
3        A.    (Witness nods head affirmatively.)
4        Q.    So, we'll just start with some background
5 questions.  Is there anything that would prevent you
6 from giving truthful testimony here today?
7        A.    No.
8        Q.    Are you on any medications, or do you have any
9 medical conditions that could potentially interfere with
10 your ability to give truthful testimony?
11       A.    Not that I know of, no.
12       Q.    Okay.  So, just tell me a little bit about your
13 background.  Obviously, now, you're a graduate student
14 at UNT, right?
15       A.    (Witness nods head affirmatively.)
16       Q.    And what, specifically, are you studying?
17       A.    I'm studying music theory.
18       Q.    Music theory.  Okay.  Prior to that, where did
19 you go to college?
20       A.    I did my undergraduate mostly at the University
21 of Birmingham, with one year at the University of
22 Ottawa, and I did a master's degree in music theory at
23 the University of Western Ontario.
24       Q.    Okay.  Now, you said you're studying music
25 theory here at the University of North Texas?

1    A.    Yes.

2    Q.    What year of the program are you in?

3    A.    I just finished my second year.

4    Q.    Okay.  So, you're in the theory department.

5  Have you met Dr. Jackson before?

6    A.    We've been in the same room, I've smiled at him

7  in hallways, but that's the extent of our interactions.

8    Q.    Okay.  So, would you say your interactions with

9  him have been pleasant or --

10    A.    I've had no response from him, so I wouldn't

11  use the word "pleasant".  I'd say absence, really.

12    Q.    Okay.  When did you first learn about the

13  controversy over Volume 12 of the -- I'm going to say

14  the Journal of Schenkerian Studies.  If I call it the

15  JSS here on out, will that be clear?

16    A.    Yes.

17    Q.    And you know what?  I see you nodded and said

18  "yes", and that reminds me of one thing I should have

19  said at the beginning of the deposition, is because this

20  is all going on the record, even if it's just a "yes" or

21  "no" answer, always say "yes" or "no", rather than just

22  nodding, which you didn't do, you said "yes", but it

23  made me think of it.

24    A.    Okay.

25    Q.    So, when did you first learn of the controversy

 1  with Volume 12 of the JSS?

 2        A.    It was, I think, on the Friday evening, which I

 3  believe was the 25th of July, 2020.

 4        Q.    Okay.  And how did you hear about it, first?

 5        A.    On Twitter, people were posting their opinions

 6  on it and screen shots of the passages that they were

 7  offended by.

 8        Q.    Okay.  Have you read Volume 12 of the JSS?

 9        A.    I've read most of it.

10        Q.    Most of it.  Okay.  Have you read Dr. Jackson's

11  article?

12        A.    Yes.

13        Q.    Okay.  And have you listened to Dr. Ewell's

14  talk, the talk that prompted --

15        A.    Yes.

16        Q.    Okay.  So, when you said people were tweeting

17  about it, do you remember who specifically was tweeting

18  that you noticed?

19        A.    Quite a lot of people.  One person comes to

20  mind that I can definitely say did.  The first name's

21  Devon.  I can't remember the entirety of their surname,

22  but it begins with "C-H".  Something like Chalamu or

23  Chalamo (Phonetic).

24        Q.    And is that someone who was also a student at

25  UNT?

```
 1        A.    No.

 2        Q.    Okay.  So, these were people from outside of

 3   the university.

 4        A.    Yes.

 5        Q.    Do you know how they learned about the

 6   controversy?

 7        A.    Some of them had a copy of the journal and had

 8   read it, and others had seen the journal -- the excerpts

 9   that had been sent to them.

10        Q.    Okay.  And when did you first read Dr.

11   Jackson's article?

12        A.    I read the excerpts at the time, and within the

13   next day or two, I read the article.

14        Q.    Okay.  All right.  Terrific.  So, you know, I

15   meant to do this before we did the background, but I'm

16   going to just -- so, I'm going to be introducing some

17   documents throughout.  They're going to be marked as

18   exhibits.

19              So, any document that I'm going to ask you

20   about, I will give you a copy of to familiarize yourself

21   with it.  And the first thing I just want to give you a

22   copy of, and I believe this will be 35, I think, because

23   we're continuing to number the exhibits from previous

24   depositions.

25              This is just the Notice of Deposition that
```

*Rachel Gain      5/19/21*

1  you received, and I just want you to confirm that, you

2  know, you are, in fact, here today in response to this,

3  in order to give testimony in this case.

4       A.    Yeah.

5              (DEPOSITION EXHIBIT 35 MARKED.)

6       Q.   (By Ms. Harris)  All right.  Then, the next

7  document I want to introduce is Exhibit 36, is your

8  tweet where you shared a statement on behalf of -- oh,

9  yes.

10             (DEPOSITION EXHIBIT 36 MARKED.)

11             MR. BOHUSLAV:  Do you happen to have an

12  extra copy?

13      Q.   (By Ms. Harris)  Where you shared these

14  statements.  So, is this, in fact, your tweet, to

15  confirm that this is your tweet from July 27th sharing

16  this statement on behalf of graduate students?

17      A.    I mean, the tweets you put in front of me are

18  Dr. Virani's tweets.

19      Q.    Well, but the one that he re-tweeted.

20      A.    The one that he shares is my tweet.

21      Q.    Okay.  And so -- and how many Twitter followers

22  do you have, do you know?

23      A.    I mean, do you want the number that I have now,

24  or that I had at the time?

25      Q.    If you remember what you had at the time.

*Rachel Cain    5/19/21*

```
 1        A.    A few hundred.  I would have to estimate that
 2   it would be somewhere between maybe 300 and 600, but
 3   that is an estimate.
 4        Q.    And how many do you have, now?
 5        A.    Now, I believe I have approximately 1,100.
 6        Q.    Okay.  So you gained a lot of followers after
 7   this.  Had you read -- on the 27th, when you tweeted
 8   this out, had you read Dr. Jackson's article at that
 9   point?
10        A.    I believe I had.
11        Q.    You believe you had.
12        A.    To the best of my memory.
13        Q.    Okay.  And so, now, I want to share with you,
14   and this is marked as Exhibit 3 because it's already
15   been introduced into the record, this statement.  And is
16   this -- I want to verify with you that this is the
17   version of the statement that you tweeted out on the
18   27th, because there was a later version, as well, which
19   I'll show you when we get to it.
20        A.    Are you able to show me my own tweets, so I can
21   compare this?
22        Q.    We don't have a copy, because your Twitter is
23   private, so we only have the tweets that were produced
24   to us, and it was in the form of a re-tweet.  So, no, I
25   don't, I just have that re-tweet.
```

Rachel Gain     5/19/21

1      A.    I would need the copy of what I tweeted in
2  order to compare and say with absolute certainty that
3  the two versions are the same.
4      Q.    Can you confirm that you have seen this version
5  of the statement, which is the draft that was attached
6  to the ad hoc panel's report on the incident?
7      A.    I couldn't say with absolute certainty that
8  this is word for word the version I've seen.  I wasn't
9  aware that there was supposedly more than one version,
10  but I've probably seen this before.  It looks familiar,
11  but there's a lot of words on that page.
12      Q.    Okay.  Do you -- you know, you mentioned the
13  tweet that you sent.  Did you produce that tweet to your
14  counsel as part of the document production?
15      A.    Yes.
16      Q.    Yes.  Okay.  I don't believe that was in the
17  production we received from UNT of her documents, but I
18  guess we will move on, then.
19            Okay.  So, I am going to -- so, are you
20  aware -- are you familiar with the ad hoc panel report
21  that was issued about the JSS incident?
22      A.    I'm familiar with it.  I'm aware of it.
23      Q.    So, this document was attached as Exhibit 3 to
24  that ad hoc panel report.  Do you have any reason to
25  believe that the ad hoc panel had an erroneous version

Rachel Cain      5/19/21

```
 1  of the statement that was put out by the graduate
 2  students over social media?
 3       A.    No.
 4       Q.    Okay.  So, is it all right, then, if I ask you
 5  some questions about this document?
 6       A.    Yes.
 7       Q.    Okay.  So, do you recall who authored it?  How
 8  it came to be?
 9       A.    Yes.
10       Q.    Okay.  Can you tell me about that process?
11       A.    Originally, five of us drafted an original
12  version, and then it was some kind of Cloud document
13  that could be edited, so additional students came and
14  added their opinions.  And in the process, there may
15  have been a re-drafting.
16       Q.    Okay.  Who were the -- besides yourself, who
17  were the original -- the four other people who
18  originally worked on the statement?
19       A.    It was myself, Brian Anderson, Elizabeth
20  Durrant, Salvador Hernandez and -- who did I already
21  say?
22       Q.    Brian Anderson, Salvador Hernandez.
23       A.    Elizabeth Durrant and -- sorry, I do know the
24  names, just --
25       Q.    Okay.  That's okay.  We can come back to it, if
```

Rachel Gain    5/19/21

```
 1  you recall, you let me know.  And what was the process
 2  for developing this?  Did you meet over Zoom?  Did you
 3  sort of all go into a Cloud document, as you say?
 4       A.    Yes.
 5       Q.    You met over Zoom?
 6       A.    Yes.
 7       Q.    And you had a document -- and you had it open
 8  in the Cloud and were making edits?
 9       A.    Yes.
10       Q.    Okay.  And how was it decided that you would be
11  the one to share it over social media?
12       A.    The first -- at first, Peter said he could do
13  it, as the president of GAMuT, then somebody said, this
14  isn't a GAMuT thing so not necessarily you.  I said it
15  should be a theorist.
16       Q.    And just to clarify, GAMut is the --
17       A.    The Graduate Association of Musicologists and
18  Theorists.
19       Q.    Okay.  So, you said that you said it should be
20  a theorist?
21       A.    I said it should be a theorist, and I think
22  somebody said, maybe it should be Rachel, as I was vice
23  president of GAMuT and within the student society,
24  supposedly the highest ranking theorist, plus, I had a
25  Twitter account dedicated to academia.
```

*Rachel Cain      5/19/21*

```
 1        Q.    Okay.   Were there other theorists involved in
 2   developing this statement?
 3        A.    Yes.
 4        Q.    Okay.   Who were they?
 5        A.    I believe Bryan Stevens was one of the editors.
 6        Q.    Okay.
 7        A.    And -- sorry, I'm trying to remember who's a
 8   theorist and who's a musicologist in our division.
 9   Right this second, he's the only name that comes to
10   mind, but there may have been more theorists.
11        Q.    Okay.   There may have been more theorists, you
12   said?
13        A.    Yes.
14        Q.    Okay.   And did you share it on any platforms
15   other than Twitter?
16        A.    I don't think I did, unless I perhaps linked a
17   link to that perhaps in a Facebook message or an e-mail.
18        Q.    Okay.
19        A.    I'm not certain.
20        Q.    Okay.   When you were producing documents to
21   counsel for this deposition, did you look through
22   Facebook and e-mail and other relevant platforms to see
23   if you had anything responsive?
24        A.    Yes.
25        Q.    Okay.   So, the petition opposes the platforming
```

*Rachel Gain    5/19/21*

 1   of, quote, "racist sentiments in JSS Volume 12."  Can
 2   you tell me, specifically, what sentiments you believe
 3   were racist in the volume?
 4        A.   Yes.  There were a few.  I think, primarily,
 5   the racist stereotype that because Dr. Ewell is black,
 6   he is probably anti-Semitic, as well.  There is also the
 7   extended footnote about how hip hop is misogynistic,
 8   despite having relevance to the paper.  There may have
 9   been something else, but without the document in front
10   of me, I wouldn't be able to say.
11        Q.   Okay.  And how would you define "racist"?
12        A.   I think there's a lot of definitions which are
13   equally valid.  One would be believing that one group is
14   superior over another or that people have
15   characteristics based on their race and that the
16   characteristics of one race might be better than the
17   characteristics of another race, and there's also
18   systemic racism.
19        Q.   And how would you define "systemic racism"?
20        A.   Systemic racism would be the structures the
21   privileged white people have over people of color.
22        Q.   And you mentioned that one of the things that
23   was racist was a statement that there is misogyny in hip
24   hop music.  Do you believe that there is misogyny in hip
25   hop music?

*Rachel Lumsden    5/19/21*

```
 1        A.    I believe there's misogyny in a lot of music.
 2        Q.    Okay.  But do you believe there's misogyny in
 3   hip hop music?
 4        A.    I'd have to listen to some hip hop music to
 5   tell you, but it seems likely.
 6        Q.    Okay.  So, you've never listened to hip hop
 7   music?
 8        A.    I have, but I'm very bad at interpreting lyrics
 9   when I listen to songs.
10        Q.    So, to the best of your knowledge, you have
11   never heard any hip hop lyrics that you would deem
12   misogynistic?
13        A.    I probably have, but I can't recall specific
14   examples.
15        Q.    Okay.  And do you believe that Ewell's
16   criticisms of Heinrich Schenker could have been
17   motivated by anti-Semitism?
18        A.    No.
19        Q.    No.  Okay.  And what's the basis for that
20   belief?
21        A.    I don't believe that Ewell is anti-Semitic, and
22   I believe that the criticisms that he made don't refer
23   or rest on the race of Heinrich Schenker.
24        Q.    So, you don't necessarily believe that
25   criticizing someone who happens to be a member of a
```

 1  specific group indicates a prejudice against that group.

 2      A.    Could you repeat the question, please?

 3      Q.    So, what you're saying is, you know, the fact

 4  that Philip Ewell was criticizing Heinrich Schenker, who

 5  is Jewish, does not imply that his criticism was

 6  motivated by anti-Semitism.

 7      A.    I think, in his case, it did not, but sometimes

 8  people will make criticisms of a person in a group that

 9  are based on racist stereotypes and racism.

10      Q.    And how would you distinguish that?  You know,

11  if a white person were to criticize the paper of a black

12  person, would you assume that to be motivated by racism?

13              MR. BOHUSLAV:  Objection, compound.

14      A.    I think it depends on case by case basis.

15      Q.    (By Ms. Harris)  Okay.  And so, what led you to

16  believe, specifically, that Dr. Jackson's criticism of

17  Ewell's paper was based on racism?

18      A.    Because made ad hominem attacks the --

19  stereotyped the beliefs that on paper Dr. Jackson seems

20  to believe that Dr. Ewell had based solely on his race.

21      Q.    Say that again.  I'm sorry.

22      A.    Which part?

23      Q.    Oh, he made criticisms that seemed to -- or can

24  you read that back to me?

25              (THE RECORD WAS READ BACK.)

Rachel Cain      5/19/21

1        Q.    (By Ms. Harris)  Can you rephrase that?  I
2   don't think I understand what you meant by that.
3        A.    Yes.  Because there is a section of what Dr.
4   Jackson published in which his sole accusation and his
5   sole piece of evidence for Dr. Ewell being an
6   anti-Semite is that he is black.
7        Q.    Okay.  Thank you.  So, do you believe that all
8   racist speech should be censored?
9        A.    No.
10       Q.    Okay.  So, what do you -- where do you draw
11  that line?  Because, obviously, you know, this petition,
12  as we'll discuss, calls for the -- you know, the journal
13  to be -- the article to be retracted.  What do you
14  believe justifies censorship?
15       A.    I reject to that characterization.  We
16  specifically did not ask for it to be retracted.
17       Q.    Okay.  All right.  So, the first thing you did
18  ask for here was that the university publicly condemn
19  the issue and release it freely online to the public,
20  yes?
21       A.    Yes.
22       Q.    Okay.  And the reason you cited for that was a
23  lack of peer review, publication of an anonymous
24  response, and a lack of rigor, yes?
25       A.    Yes.

1      Q.   But what you asked for was that the university

2  release an apology for its content.

3      A.   Yes.

4      Q.   Okay.  So, I'm just a little bit confused there

5  because, you know, if you were upset about the

6  procedure, why did you ask for an apology, not for the

7  procedure but for the content?

8      A.   Because it was the content that was offensive,

9  not the procedure.

10      Q.   Okay.  So, is it fair to say that if you hadn't

11  been upset by the content of the issue, you would not

12  have issued a condemnation of the process?

13      A.   I don't think we'd known about the process or

14  asked about it.  In general, we don't care about what

15  happens at the Journal of Schenkerian Studies, if there

16  isn't a reason given to us to care about it.

17      Q.   Okay.  So, would it be fair to say, then, that

18  your main issue with Volume 12 of the JSS was the

19  content and not the process?

20      A.   No, I'd say it was both.

21      Q.   Okay.  But you just said that it was the

22  content that --

23            MR. HARRIS:  Can you repeat back to me --

24  when I asked -- you were upset about the procedure, but

25  you wanted an apology for the content.  Could you read

*Rachel Gain    5/19/21*

```
 1  me back that answer?
 2              (THE RECORD WAS READ BACK.)
 3      Q.   (By Ms. Harris)  So, you said it was the
 4  content that was offensive, not the procedure, but it's
 5  not fair to characterize that as saying that your
 6  primary issue was with the content?
 7              MR. BOHUSLAV:  Objection, vague.  You can
 8  answer.
 9      A.   Like I said, the content of the journal was
10  offensive, but that doesn't mean that the rest -- the
11  process was not problematic or flawed or other
12  adjectives.  I mean --
13      Q.   Okay.  So, if the process had not been
14  concerning to you, would you have wanted there to be any
15  disciplinary action taken because of the content?
16      A.   I'd have to speculate.  I mean, I don't know.
17  That situation did not arise.
18      Q.   Okay.  You also want the journal released
19  freely online to the public, because you expressed in
20  this petition a concern that the JSS leadership was
21  going to hide the issue.  Did you have any concrete
22  reason to believe they were looking to hide the issue?
23      A.   That's a mischaracterization.  I don't believe
24  we said the JSS leadership were going to hide it, to the
25  best of my memory.
```

Rachel Gain        5/19/21

1          Q.     Hang on.  Let me just pull up this document.

2          A.     You'd have to show me where I said that.

3          Q.     Okay.  So, under No. 1, where it says,

4    "Publicly condemn the issue and release it freely online

5    to the public.  We believe that all contributors should

6    be held fully accountable for their comments, which must

7    not be hidden for the sake of the self-preservation of

8    any involved party."  So, I'm asking, what was your

9    basis for concern that this was going to be hidden from

10   the public?

11         A.     I rejected the characterization that the JSS

12   leadership would try to hide it, but I think it's highly

13   possible that anybody at UNT, at any level, might not

14   want this to be public, if they were ashamed by it.

15         Q.     So, who specifically were you concerned was

16   going to try to hide it?

17         A.     We didn't have a specific person in mind.  Just

18   any interested parties.

19         Q.     Okay.  So, another thing that you believed here

20   is problematic is the fact that the issue included an

21   anonymous response, yes?

22         A.     Yes.

23         Q.     Why do you believe publishing an anonymous

24   response is so problematic?

25         A.     Several reasons.  Firstly, it's not done in

Rachel Gain      5/19/21

1  academia.  The whole point of academic discourse is that
2  you should be able to respond to it, and you should be
3  able to know who you're responding to.  Secondly, if
4  everybody published things anonymously, there would be
5  no accountability.  And I don't think -- if you're not
6  willing to put your name to something, then you
7  shouldn't be publishing it.
8       Q.   Okay.  Do you think there's any legitimate
9  reason that someone might want to publish something
10 anonymously?
11      A.   There might be a legitimate reason, but I don't
12 think that that's a good reason necessarily.  Just
13 because they don't want to publish it doesn't mean that
14 the people in charge of publishing should accept that
15 reason.
16      Q.   Okay.  I have two exhibits that I would like to
17 introduce as, I believe, 37 and 38.  Is that where we
18 are?
19           COURT REPORTER:  Yes.
20           (DEPOSITION EXHIBITS 37 AND 38 MARKED.)
21      Q.   (By Mr. Harris)  Okay.  So, this is Exhibit 37.
22      A.   Okay.
23      Q.   So, is this a chat from a Microsoft Teams
24 meeting that you participated in on July 30th, 2020?
25      A.    It's not a chat, it's a post with comments, but

1  otherwise, yes.

2      Q.   Okay.  So, is this a discussion about how the

3  names of the graduate students should be listed in the

4  letter that was going to go to Dean Richmond?

5      A.   Would you be able to show me what these

6  comments are in response to, in order for me to answer

7  that question?

8      Q.   I mean, it says here, "Jessica Stearns.  I

9  think the names should just be alphabetical.  I don't

10 think the e-mail itself needs to say much, just tell him

11 that you've attached a letter on behalf of the graduate

12 students."

13     A.   Could you repeat your initial question?

14     Q.   Was this a discussion of how the graduate

15 students' names should be listed on the e-mail that went

16 to Dean Richmond on July 30th?

17     A.   Is that the date that the e-mail went to --

18     Q.   Yes.  Yes.  And I do have that exhibit.

19     A.   Could I see it, please?

20     Q.   Yes.  I can introduce it.  At the time -- I

21 guess this will now be Exhibit 38.  There's only one

22 copy of this in the file.  I think it's already been

23 introduced elsewhere.  I think you used it in the last

24 one, which I only have this one copy.  Oh, yes.  I think

25 you're right.  So this, I believe, has already been

*Rachel Gain    5/19/21*

1    introduced as an exhibit.  Let's see here.  Oh, this is

2    it here.  Okay.  So, this is actually Exhibit 34.  I'm

3    sorry, Kohanski 107.  Here you go.

4           A.    Thank you.

5           Q.    So, this is the e-mail to Dean Richmond on

6    July 30th that this exhibit that I just introduced is

7    referring to.  So, here, people asked about redacting

8    the names, if the letter is going to be circulated

9    beyond Dean Richmond, and you suggest saying, maybe

10   just, quote, "we ask that you not share these names in

11   order to protect those who signed."

12               So, why was it that you didn't want the

13   names of the people, the graduate students who signed

14   this letter to appear, if it were circulated beyond Dean

15   Richmond?

16          A.    People were afraid of retaliation from Dr.

17   Jackson.

18          Q.    Okay.  And do you think it's possible that

19   someone who was publishing perhaps an unpopular opinion

20   in a journal might also wish to be anonymous --

21               MR. BOHUSLAV:  Objection -- sorry.

22          Q.    (By Ms. Harris) -- for fear of retaliation?

23               MR. BOHUSLAV:  Objection, calls for

24   speculation.

25          A.    Could you repeat the question, please?

Rachel Gain      5/19/21

1       Q.    (By Ms. Harris)  I asked whether -- you know,

2  you said that you were suggesting that the signatories

3  of this letter's names be kept anonymous, if it were

4  given beyond Dean Richmond, and you stated fear of

5  retaliation as a rationale for wanting to be kept

6  anonymous.  And I'm asking whether you think that

7  someone publishing a response critical of, you know, of

8  someone else in a journal might also fear retaliation?

9            MR. BOHUSLAV:  Objection, calls for

10 speculation.

11      A.    I don't think those are equivalent situations.

12      Q.    (By Ms. Harris)  Okay.  Can you explain why

13 not?

14      A.    Because when you're publishing something in a

15 journal, you're posting that into the public eye,

16 whereas this was some graduate students who did not

17 want -- who are in an institution which had power

18 structures and power dynamics, not a public statement,

19 an e-mail to the dean.

20      Q.    Okay.  So, you're saying -- it's your position

21 that it's legitimate for the graduate students signing

22 their name to a letter denouncing someone else should be

23 kept anonymous, that that's legitimate.

24      A.    Yes.

25      Q.    But that someone wishing to criticize another

Rachel Cain     5/19/21

1  scholar in a journal, should not be kept anonymous --

2  should not be permitted to remain anonymous.

3      A.    Yes.

4      Q.    Okay.  All right.  So, Point 2 of this, going

5  back to what says Exhibit 3 there, because it was

6  Exhibit 3 to the ad hoc panel report.  This is the

7  petition.  It talks about significant irregularities in

8  the editorial process.  Can you explain what those

9  significant irregularities were?

10     A.    Everything I have heard secondhand, so this is

11  what I've been told and my memory of what I've been

12  told.  I was told that every single article that was

13  submitted was accepted, that the editor was not

14  permitted to edit the content of those, that Dr. Ewell

15  was not invited directly to respond.

16             He may have received an e-mail in the SMT

17  list that everybody received asking to respond to his

18  own plenary, but obviously that is not equivalent to an

19  invitation to respond to other people's responses.

20     Q.    Okay.

21     A.    And there were probably some other things, too,

22  that don't come to mind right now.

23     Q.    Okay.  So, you only heard about these alleged

24  irregularities secondhand?

25     A.    Yes.

Rachel Cain    5/19/21

1    Q.   Okay.  So, you have no personal knowledge of
2   whether there were significant irregularities in the
3   editing and production of Volume 12 of the JSS.
4    A.   Those things have, I believe, been proven --
5    Q.   Can you -- you're not answering my question.
6    A.   I was about to.
7    Q.   Okay.  Go ahead.
8    A.   I believe that all of those things have been
9   proven in the -- what was the name of the report?
10    Q.   Okay.  Then, let me ask you this question.  At
11   the time that you tweeted this petition out under your
12   name, you had only secondhand knowledge --
13    A.   Yes.
14    Q.   -- of the significant irregularities -- alleged
15   significant irregularities.  Okay.  Have you had any
16   experience editing an academic journal before?
17    A.   No.
18    Q.   Okay.  Have you had any experience soliciting
19   articles for an academic journal?
20    A.   No.
21    Q.   Okay.  Have you published in an academic
22   journal?
23    A.   No.
24    Q.   Have you reviewed symposia in other academic
25   journals?

Rachel Cain          5/19/21

```
 1        A.    No.
 2        Q.    Okay.  And do you know what the normal process
 3   would be for putting together a symposium issue, like
 4   Volume 12?
 5        A.    I have some knowledge.
 6        Q.    Some knowledge?  Okay.  Tell me what that
 7   process would be.
 8        A.    You would put out a public call for papers.
 9   You would receive some responses, and then you would
10   edit those and publish the ones that were academically
11   rigorous.
12        Q.    Okay.  I would like to -- I'm going to come
13   back to this, but I would like to introduce now as
14   exhibit -- sorry.  Losing track of my papers here.  I'm
15   looking, Mike, for the July 30th version of the
16   statement.
17              MR. ALLEN:  Did you already give it over?
18        Q.    (By Ms. Harris)  I don't think so.  Oh, yes, I
19   did.  Yes, I did.  So, what -- is it Exhibit 34?  Yes.
20   Yes.  Okay.  So, looking at this Exhibit 34, the -- do
21   you have this?  I think maybe it's under that paper.
22   Does that say Kohanski 00107?  Yes.  So, you said that
23   one of the -- well, on here it is.
24              MR. BOHUSLAV:  Could you read the Bates
25   numbers for Exhibit 37, please, the range?
```

1          MS. HARRIS:  It's Kohanski 00107 through
2  000110.
3      Q.   (By Ms. Harris)  Here.
4      A.   Thank you.
5      Q.   Can I have the other one?  Okay.  Thank you.
6  Okay.  So, you had just said previously that one of the
7  problems with -- one of the alleged irregularities with
8  the production of this volume, right, was that all
9  papers had been accepted?
10     A.   To the best of my knowledge, yes.
11     Q.   Okay.  So, I want to direct your attention to
12 Point 1, if you go to this Kohanski 000108, under "lack
13 of peer review", it says that the deadlines were
14 selectively enforced.  What do you mean by, "the
15 deadlines were selectively enforced"?
16     A.   I don't see that on here.
17     Q.   Okay.  Under Point 1, "lack of peer review," if
18 you look at the last sentence, it says, "the deadlines
19 were selectively enforced, which allowed more anti-Ewell
20 submissions to be accepted."
21     A.   I don't have direct knowledge of that.
22     Q.   Okay.  So, you -- you signed your name to this,
23 yes?
24     A.   Yes.
25     Q.   Okay.  But you don't actually have direct

 1  knowledge of whether there were deadlines that were

 2  selectively enforced?

 3       A.    I have a vague memory of secondhand knowledge.

 4       Q.    Okay.  Do you mean by this that there were pro-

 5  Ewell papers that were turned away?

 6       A.    No.

 7       Q.    No.  Okay.  So, what do you mean by it?

 8       A.    I think it means what it says on the paper,

 9  "which allowed more anti-Ewell submissions to be

10  accepted."

11       Q.    So, that would mean that there were pro-Ewell

12  responses that came in after a deadline that were not

13  accepted?

14       A.    No, logically, that doesn't follow.

15       Q.    How so?

16       A.    That makes the assumption that there were --

17  there was the existence of pro-Ewell responses after the

18  deadline.

19       Q.    Well, I'll come back to that.  Okay.  I want to

20  go back now to the first version of the statement that

21  you were looking at, the one that was attached to your

22  Twitter and that is marked as Exhibit 3 to the -- yeah.

23  There you go.

24             So, another thing that this document says

25  is that UNT is a, quote, "toxic culture with respect to

Rachel Gain        5/19/21

1  race, gender and other aspects of diversity."  Is that

2  your position?

3        A.    Yes.

4        Q.    Okay.  And when you say, "other aspects of

5  diversity," what does that mean?

6        A.    Other things that make people diverse; for

7  example, disability.

8        Q.    Okay.  So, tell me more about this.  What do

9  you believe makes the toxic -- what do you believe makes

10  the culture toxic at UNT?

11        A.    There's a lot of evidence that people of color

12  are treated differently to white people, for example.

13        Q.    What type of evidence is that?

14        A.    Encounters with police that have been recorded.

15        Q.    Okay.  So you're saying that UNT's police

16  department is -- there's a toxic culture among the UNT

17  police department?

18        A.    Not necessarily, but that people have been

19  treated differently because of their race.

20        Q.    Okay.  Besides the police department, do you

21  have other examples you can point to of people being

22  treated differently because of their race?

23        A.    Not directly, but, I mean, there definitely are

24  a lot that have been recorded and publicized.

25        Q.    Okay.  But you have no direct knowledge of any

Rachel Gain    5/19/21

```
 1  of these.
 2         A.    I've probably experienced some, but they don't
 3  come to mind immediately.
 4         Q.    Okay.  And then, Point 4 of this document talks
 5  about the need to hold everyone accountable for -- you
 6  know, for the things that happened.
 7         A.    I don't have a Point 4.
 8         Q.    I'm sorry.  Point 3.  Point 3.  That's my
 9  fault.  And it talks about investigating past bigoted
10  behaviors by faculty.  What past bigoted behaviors does
11  this statement refer to?
12         A.    I've heard secondhand evidence of a number of
13  incidents involving Dr. Jackson.
14         Q.    Okay.  Can you tell me about some of the
15  secondhand incidents you've heard about?
16         A.    There are some students who are Korean who say
17  that they were -- I can't remember the exact word,
18  but -- sorry, let me think of the word.  I can't think
19  of the -- an appropriate word to use.
20         Q.    It's okay.  Would it be fair to say that you
21  believe, based on things you've heard secondhand, that
22  Dr. Jackson is biased against Koreans?
23         A.    I wouldn't put it in those words.
24         Q.    What words would you put it in?
25         A.    I would say that Korean people have had
```

*Rachel Gain     5/19/21*

 1  negative experiences with him based on their race and

 2  nationality.

 3      Q.    Okay.  So, when this statement says, "past

 4  bigoted behaviors," it's referring specifically to Dr.

 5  Jackson's treatment of Koreans?

 6      A.    No.

 7      Q.    Okay.  Then, what is it referring to?

 8      A.    A lot of incidents experienced by a lot of

 9  people.

10      Q.    Okay.  Such as what you mentioned, the incident

11  with some Korean students.  What other incidents?

12      A.    I've heard from an African -- well, I've heard

13  third-hand of an African-American student who was

14  treated poorly.

15      Q.    Do you know in what way they were allegedly

16  treated poorly?

17      A.    No.

18      Q.    So, you've heard third-hand --

19      A.    Yes.

20      Q.    -- that Dr. Jackson allegedly treated an

21  African-American student poorly, but you don't know how.

22      A.    That's one example, but I believe those reports

23  are available.

24      Q.    And going back to the Korean students, you

25  would not say that his treatment of Korean students

Rachel Cain      5/19/21

1  falls under the past bigoted behaviors?

2       A.    I believe I found out about that incident after

3  this.  So, this, specifically, does not refer to that,

4  but this is an incident that would fall under that

5  category.

6       Q.    Okay.  So, to the best of your knowledge, the

7  past bigoted behaviors referred to in this report, is a

8  third-hand report of an African-American student who was

9  treated poorly?

10      A.    No.

11      Q.    Can you tell me what it does refer to?

12      A.    If you stop interrupting me, then yes, sorry.

13            MR. ALLEN:  Let's take a break.

14            MS. HARRIS:  Okay.  Would you like a

15  break?

16            THE WITNESS:  I guess.

17            MR. BOHUSLAV:  Let's take a break.

18            (OFF THE RECORD FROM 1:50 TO 1:59 P.M.)

19      Q.    (By Ms. Harris)  So, we just want to sort of

20  circle back and close the loop on these -- the request

21  to investigate past bigoted behaviors by faculty.

22            You had mentioned that you had heard that

23  Dr. Jackson treated some Korean students poorly, but

24  that you had not heard about that at the time, so that

25  this is not -- that was not when you were endorsing the

Rachel Gain    5/19/21

```
 1  statement part of what you meant?
 2       A.    Yes.
 3       Q.    Okay.  But that you had heard third-hand that
 4  he once treated an African-American student poorly in an
 5  unspecified way?
 6       A.    That was also after the fact.  That was not
 7  what I was referring to in this statement.
 8       Q.    Okay.  So, what were you referring to in this
 9  statement?
10       A.    There have been allegations of sexist behavior,
11  for example.
12       Q.    Okay.  By Dr. Jackson, specifically?
13       A.    Yes.
14       Q.    Okay.  Such as what?
15       A.    There was an incident with Dr. Notley, I
16  believe, at -- this was before I was at UNT, so, again,
17  this is secondhand, and this is the best memory I have
18  of what I was told.  At Dr. Graf's defense of his
19  dissertation proposal, a few professors disagreed with
20  part of the proposal, and of all the people that
21  disagreed, Dr. Jackson specifically verbally attacked
22  Dr. Notley, saying that she didn't understand -- it was
23  either music theory or music analysis that she didn't
24  understand, which seemed unfounded seeing as she taught
25  music theory at Yale.
```

*Rachel Gain    5/19/21*

```
 1        Q.    Okay.  And so you believe that this alleged
 2  verbal attack was because she was a woman?
 3        A.    Well, he didn't attack any of the men in the
 4  room who held the exact same belief.
 5        Q.    Okay.  And, again, you heard about this
 6  secondhand, you said?
 7        A.    Yes.  From several people.
 8        Q.    From several people.  So, when you were
 9  endorsing this request for an investigation of past
10  bigoted behaviors, this is what you specifically were
11  thinking of?
12        A.    That's one thing.
13        Q.    Okay.  What else?
14        A.    There is the incident with Yiyi Gao, where I've
15  heard that allegedly Dr. Jackson told her that she had
16  to work for free over summer or he would dock her
17  grades.
18        Q.    Okay.  Do you believe that if a student did not
19  complete the work that they are supposed to complete
20  during the academic year, that it would be reasonable
21  for a faculty member to request that they complete that
22  work over the summer?
23        A.    Well, that would go against the terms of her
24  international student visa.
25        Q.    What are the terms of her international student
```

Rachel Cain       5/19/21

1  visa?

2      A.    That you work 20 hours a week during term time,

3  and if she wasn't employed over the summer, she couldn't

4  do that work, I believe.  I'm not entirely 100 percent

5  solid on all H1-B's requirements, but it seems like that

6  would be something that she couldn't do, seeing as we're

7  employed during a semester to do our work and not during

8  the summer.

9      Q.    And what is it about, as for a dispute over the

10 completion of work, that you believe is bigoted?

11     A.    Well, I don't -- that's not how I would

12 characterize that.

13     Q.    Did you not just say that that was another

14 example of past bigoted behavior?

15     A.    Well, I didn't say that it was a dispute over

16 the completion of work.  That's not my words or --

17     Q.    All right.  How would you characterize that,

18 then?

19     A.    I'd characterize it as Yiyi was told that she

20 needed to work over summer for free and that Dr. Jackson

21 took credit for her work, is what I heard.

22     Q.    Okay.  Who have you heard that from?

23     A.    Yiyi, Bryan Stevens, and David Falterman.

24     Q.    Okay.

25     A.    "David" spelled like David.

Rachel Cain      5/19/21

```
1        Q.   Okay.  Now, going back to this first iteration
2   of the graduate student statement, you also -- the
3   statement also says that "the actions of Dr. Jackson,
4   both past and present, are particularly racist and
5   unacceptable."
6             Now, you've spoken about some incidents
7   that you believe reflect sexism.  Can you tell me what
8   past incidents, specifically, you believe were racist?
9        A.   Well, Yiyi is Chinese, so that incident.
10       Q.   Okay.  So, you believe that because he had some
11  sort of issue with someone Chinese that that means that
12  it was racist?
13       A.   I wouldn't characterize it like that.
14       Q.   How would you characterize it?
15       A.   Well, I don't know, specifically, if that
16  incident was racist, but it seems likely, given what
17  I've heard.  And also, there have been the other past
18  racist incidents that I've mentioned.
19       Q.   What have you heard that make its likely --
20  that makes you believe it is likely that that incident
21  was racist?
22       A.   I don't know how to put a finger on it.  I
23  wouldn't like to speculate.
24       Q.   I'd like you to speculate.
25             MR. BOHUSLAV:  Objection, calls for
```

Rachel Gain      5/19/21

 1  speculation.

 2       Q.    (By Ms. Harris)  There's no prohibition on

 3  speculating.  The Court may or may not decide to use it.

 4  But since you are characterizing this incident as

 5  racist, I would assume you have some reason for doing

 6  so.  I mean, you've clearly speculated in your own mind

 7  and come to the conclusion that this was likely racist,

 8  so I would like to understand your thinking.

 9       A.    I can't be certain that it's racist, but it

10  seems likely.

11       Q.    Why does it seem likely?

12       A.    Because he hasn't done this to people who are

13  white as much.

14       Q.    So, are you aware of people who are white who

15  he has worked with who have had issues with him?

16       A.    Yes, Dr. Jackson has -- Dr. Notley is white.

17       Q.    Okay.  So, what is your basis for believing

18  that he has not done this as frequently to people who

19  are white?

20       A.    I'm not sure if that's what I said.

21       Q.    Can you read back when I asked what makes

22  you -- the most recent time that I asked, "why do you

23  believe this was racist?"  Where she said, "because he

24  hasn't done this to white people"?

25                 (THE RECORD WAS READ BACK.)

```
 1        Q.    (By Ms. Harris)  Yes.  So I'm asking what's
 2   your basis for that belief?
 3        A.    Well, based on the incidents that I've heard,
 4   I've heard of a few white people and a large number of
 5   people of color.
 6        Q.    Okay.  So, a large number of people of color.
 7        A.    Larger.
 8        Q.    So, we have the one African-American student,
 9   we have several Korean students, allegedly.
10   Incidentally, are you aware that Dr. Jackson's wife is
11   Korean?
12        A.    I knew that she was Asian.  I did not know,
13   specifically, that she is Korean.
14        Q.    And are you aware that he has two children who
15   are half Korean?
16        A.    No.
17        Q.    So, we have the several Korean students, we
18   have one African-American student, and we have Yiyi.
19   What other incidents?  You said a large number.
20        A.    I said "larger".
21        Q.    Okay.
22        A.    Not "large".
23        Q.    Okay.  So, are those all of the incidents that
24   you are aware of?
25        A.    Those are the ones that come to mind, and as is
```

Rachel Gain       5/19/21

 1  hopefully evident, I'm not the only author of this
 2  statement, and other people may have been aware of other
 3  incidents.
 4       Q.    But you've endorsed this statement.
 5       A.    Yes, because I trust my colleagues.
 6       Q.    Okay.  This document also refers to
 7  whistleblowers.  Who are the whistleblowers that this
 8  document is referring to?
 9       A.    Levi Walls.
10       Q.    Levi Walls.  And it talks about the people who
11  failed to heed them.  Who is it who allegedly failed to
12  heed the statements of the whistleblowers?
13       A.    Dr. Brand.
14       Q.    Dr. Brand.  Okay.  And when you say -- so,
15  whistleblowers, plural, refers only to Levi Walls?
16       A.    Yes, I believe it's a general use of the term
17  in plural, not specifically saying that it's more than
18  one person.
19       Q.    Okay.  So, now, I would like to return back to
20  the second version of the graduate student statement,
21  the one that was sent to Dean Richmond on July 30th, and
22  which you should have -- yeah, there, as Exhibit 34.
23       A.    Thank you.
24       Q.    So, I noticed that a lot of the language in
25  this has been changed and sort of strengthened since the

Rachel Gain        5/19/21

1  July 27th version that you tweeted.  So, how were those

2  changes made?

3       A.   Well, it's a different statement.

4       Q.   Okay.  So, how was this statement prepared?

5       A.   I believe, to the best of my memory, on another

6  Zoom call with a Cloud document.

7       Q.   And were you a part of that Zoom call?

8       A.   To the best of my memory, yes.

9       Q.   Okay.  Do you remember if there was one call or

10  more than one call?

11       A.   I can't remember.

12       Q.   Okay.  So, this document refers to ad hominem

13  attacks on Philip Ewell.

14       A.   Yes.

15       Q.   Can you give me some examples of what you

16  believe to be ad hominem attacks?

17       A.   Same as anti-Semitic.

18       Q.   Okay.  And you -- am I correct that you said

19  before that you believe it was racist that Dr. Jackson

20  accused Philip Ewell of anti-Semitism because Philip

21  Ewell is black?

22            MR. BOHUSLAV:  Objection, misstates

23  testimony.

24            MS. HARRIS:  Objection, what?

25            MR. BOHUSLAV:  Misstates the testimony.

*Rachel Cain    5/19/21*

1       A.    I didn't say that.  I said that it was because

2  it was based on a racist stereotype that black people

3  are anti-Semitic.

4       Q.    (By Ms. Harris)  Understood.  So, that was --

5  that's the ad hominem attack that you're referring to?

6       A.    I believe so.

7       Q.    Okay.  You also -- this statement also

8  criticizes the fact that the call for papers gave a two-

9  week deadline for responses.  What would be the normal

10  time for a -- length of time for responses in a

11  symposium like this?

12       A.    I don't know, but I would assume longer than

13  two weeks, seeing as you'd have to write an article from

14  scratch and do all the research and writing and

15  finalizing it in a two-week period.

16       Q.    Okay.  So, you don't know, but you would

17  assume.

18       A.    Yes.

19       Q.    Okay.  And, again, going back to this question

20  of the deadlines being selectively enforced, I'd like to

21  know what this means.

22       A.    That was something that my colleagues wrote, I

23  believe.

24       Q.    Okay.  So, do you have any knowledge of whether

25  or not deadlines were selectively enforced?

Rachel Cain      5/19/21

```
 1        A.    I could speculate based on a vague memory that
 2   I have.
 3        Q.    Okay.  Tell me.
 4        A.    I have a vague memory of someone telling me
 5   that the anti-Ewell responses were allowed later than
 6   the deadline.
 7        Q.    Okay.  Do you remember who told you this?
 8        A.    No.
 9        Q.    Okay.  This document also refers to "illicit
10   collaboration".  Can you tell me what the graduate
11   students here, including yourself, meant by "illicit
12   collaboration"?
13        A.    I did not write that sentence, I don't believe,
14   that doesn't sound like something I would write, but I
15   believe that it refers to the fact that the anti-Ewell
16   papers all cite to each other, and, therefore, they must
17   have been privy to what each other were writing.
18        Q.    Okay.  And would that be -- that would be, in
19   your view, illegitimate for academics to share papers
20   with one another prior to publication?
21        A.    No, not at all, but I believe what my
22   colleagues are referring to here is probably the fact
23   that it only happens between people actually against Dr.
24   Ewell rather than for him.
25        Q.    Okay.  But you have no personal knowledge of
```

1  this.

2       A.    No.

3       Q.    Okay.

4       A.    Well, I've read the journal and seen that they

5  cite each other.

6       Q.    Right.  But at the time that you put your name

7  to this, you did not have any evidence of illicit

8  collaboration, other than what you had been told by your

9  fellow graduate students?

10       A.    Everything I have is secondhand, so that is

11  probably an accurate characterization.

12       Q.    Okay.  Ewell -- were you aware that Ewell is

13  referred to in some of the pro-Ewell papers, that he's

14  cited?

15       A.    That's different.

16       Q.    How is that different?

17       A.    Because you're supposed to cite things that

18  have previously been published or previous keynotes,

19  whereas this specifically refers to unpublished

20  citations.

21       Q.    Okay.  So, it's not proper to cite forthcoming

22  works?

23       A.    It can be proper.

24       Q.    What circumstances -- under what circumstances

25  is it proper?

*Rachel Cain    5/19/21*

```
 1        A.    For example, if Dr. Jackson had cited Ewell's
 2   forthcoming article, that would have been proper.
 3        Q.    So, it's proper to cite someone you disagree
 4   with, but not someone you agree with, is that --
 5        A.    No.  That's not what I'm saying.
 6        Q.    Okay.  What are you saying here?
 7        A.    I'm saying that you can site forthcoming
 8   things, but the way it has been characterized to me by
 9   other people who have spoken to me about this issue, is
10   that the people writing against Dr. Ewell share their
11   papers with each other, but not with perhaps, I would
12   guess, the people writing pro-Ewell responses.
13        Q.    And you believe that academics sharing their
14   papers with one another in advance of publication
15   constitutes illicit collaboration?
16              MR. BOHUSLAV:  Objection, asked and
17   answered.
18        A.    No.
19        Q.    (By Ms. Harris)  Okay.  This document also says
20   that Dr. Ewell was not notified about the forthcoming
21   symposium.
22        A.    Where does it say that?
23        Q.    "In stark contrast to this coordinated effort
24   by Dr. Jackson, et al, Dr. Ewell was neither notified
25   nor asked to respond."  It's under "illicit
```

Rachel Cain    5/19/21

```
 1  collaboration".
 2       A.    Yeah?  Do you have a question?
 3       Q.    Well, I asked you, are you aware that it says
 4  that Dr. Ewell was not notified?
 5       A.    I'm aware now that I have it in front of me,
 6  and I've read it.
 7       Q.    Were you aware at the time that you signed your
 8  name to it that it said that?
 9       A.    I mean, I've read the document, but my eyes may
10  have skimmed over a couple of words.  I don't recall
11  reading that before now.
12       Q.    Okay.  Were you aware that Dr. Ewell was sent
13  the call for papers?
14       A.    Well, everybody was sent the call for papers on
15  the list serve.
16       Q.    Were you aware that Dr. Ewell was on the list
17  serve?
18       A.    Yes, but also the list serve goes to a lot of
19  people -- people's junk e-mail, so I didn't know whether
20  he received it.
21       Q.    So, when you endorsed this statement here that
22  Dr. Ewell was not notified, what you're saying was that
23  he was notified, but it may have gone to his junk mail?
24       A.    Or, like I said, I don't remember reading those
25  words.  I think, if I were to write the statement
```

Rachel Gain        5/19/21

1  myself, I may not have used that wording.

2      Q.    Okay.  This also says that Dr. Jackson has a,

3  quote, "history of racist, sexist and abusive behavior."

4  And that is -- let me find it for you.  Let me just pull

5  this up on my computer.  Okay.  So under -- on the page

6  that's labeled Kohanski 000109, under the heading

7  "Calling for Dr. Jackson's Dismissal," it says he should

8  be removed from the faculty, and it says that he has a

9  history of racist, sexist and abusive behaviors in his

10  many capacities.  So, what are his many capacities?

11      A.    I would assume, seeing as these are not my

12  personal testimonies in here, I would assume that the

13  capacities probably refer to him as a teacher, as an

14  advisor, and as somebody in whatever capacity he may be

15  in at the Journal of Schenkerian Studies.  That would be

16  my best guess.

17      Q.    What is an example of abusive behavior that Dr.

18  Jackson has exhibited?

19      A.    I would say telling a student to work for free.

20      Q.    And this, again, is something that you heard

21  secondhand?

22      A.    Yes.

23      Q.    Okay.  This document also accuses Dr. Jackson

24  of extortion.  Are you aware that extortion is a crime?

25      A.    I'm not really up to date with U.S. laws, as a

Rachel Gain        5/19/21

```
 1  recent immigrant.
 2      Q.   Okay.  Is it your position that Timothy Jackson
 3  committed a crime?
 4      A.   I don't know.  I'm not a lawyer.
 5      Q.   Okay.  Do you agree that just -- you know, as a
 6  recent immigrant, you are bound by the laws of the
 7  United States?
 8      A.   Yes.
 9      Q.   Are you aware that falsely accusing someone of
10  a crime is defamation?
11           MR. BOHUSLAV:  Objection, calls for a
12  legal conclusion.
13      A.   Will you repeat the question, please?
14      Q.   (By Ms. Harris)  Are you aware that falsely
15  accusing someone of a crime is defamation?
16           MR. BOHUSLAV:  Objection, calls for a
17  legal opinion.
18      A.   I'm not aware of that.
19      Q.   (By Ms. Harris)  Okay.  Who did Dr. Jackson, in
20  your view, extort?
21      A.   Where does it say "extort" on here?
22      Q.   Under -- No. 3, under "Calling for Dr.
23  Jackson's Dismissal, extortion through grade
24  manipulation and threats to students' careers and
25  reputations."
```

Rachel Gain      5/19/21

1      A.    Could you repeat the question, please?

2      Q.    Who did Dr. Jackson allegedly extort?

3      A.    I believe that refers to Yiyi Gao.

4      Q.    Okay.  And how did he extort her?

5      A.    I've told you what I've heard secondhand.

6  That's the extent of my knowledge that I remember today.

7      Q.    So, you believe that -- you believe that he

8  asked her to work for free, and you believe that asking

9  someone to work for free is extortion?

10     A.    Well, the events as I heard them are that he

11 told her he'd dock her grades, if she did not.  That is

12 what I've heard.

13     Q.    And it says here that "he made threats to

14 someone's career and reputation."  What threats did he

15 make, allegedly, to someone's career and reputation?

16     A.    I don't recall what event that refers to.

17     Q.    Okay.  But your name is on this document.

18     A.    Yes.  And right now, I don't recall what that

19 referred to when we wrote this ten months ago.

20     Q.    Okay.  But you are on the record accusing Dr.

21 Jackson of extortion for reasons you don't remember at

22 this time.

23     A.    Well, I told you it was Yiyi Gao.  I believe

24 that's what that refers to.

25           MS. HARRIS:  Okay.  I would like now to

Rachel Gain      5/19/21

```
 1  introduce another exhibit, and that is -- because we
 2  have gone back to some exhibits, what number is this?
 3  39?
 4                 COURT REPORTER:  38.
 5                 MS. HARRIS:  38.  Okay.
 6      Q.   (By Ms. Harris)  So, this is a statement of
 7  UNT's faculty on the Journal of Schenkerian Studies, and
 8  I would just like to ask you a little bit about what you
 9  know about this document.
10             Do you know whether this was completely
11  initiated by the faculty or whether anyone from GAMuT
12  approached members of the faculty about issuing a
13  statement of support for the graduate students?
14      A.   I don't have knowledge of that -- that I
15  recall, at least.
16      Q.   So, you were never personally involved in
17  asking any faculty to support the graduate student
18  statement?
19      A.   That's correct.
20      Q.   Okay.
21      A.   As far as I can remember.
22                 MS. HARRIS:  Okay.  I have one more
23  exhibit that I would like to introduce here, and that is
24  this, which I guess will be Exhibit 39?  Is that right?
25                 (DEPOSITION EXHIBIT 39 MARKED.)
```

Rachel Gain      5/19/21

```
1        Q.    (By Ms. Harris)  Do you recognize this Twitter
2   exchange?
3        A.    Yes.
4        Q.    Okay.  Who is Samantha Bassler?
5        A.    She is someone I know who is a music theorist.
6        Q.    Okay.  Now, here you say, "Jackson is a POS."
7   Can you explain to the Court what a POS is?
8        A.    "POS" stands for "piece of shit".
9        Q.    Okay.  And you said here that you've made it
10  your life's mission to never even meet him, let alone
11  take a class with him.  At what point did you decide
12  never to meet -- that it was your mission never to meet
13  Dr. Jackson?
14       A.    It was a slight overexaggeration, but probably
15  when -- upon visiting UNT, before enrolling here, I was
16  warned very strongly to never take a class with him and
17  never allow him to have any level of power over me
18  because I'm a woman.
19       Q.    Okay.  Do you remember who told you that?
20       A.    David Falterman.
21       Q.    And why?  Did he explain why?
22       A.    Because he had seen enough evidence of women
23  being mistreated and being victims of a bad power
24  dynamic that he wanted to warn me in advance to not put
25  myself in that situation.
```

1      Q.    What do you mean by "the victims of a bad power

2   dynamic"?

3      A.    I don't know, specifically, all of the events

4   he was referring to, but -- let me think.  Could you

5   repeat the question?

6      Q.    What do you mean when you say "victims of a bad

7   power dynamic"?

8      A.    I think occasionally somebody has more power

9   than another person in an institution, for example,

10  graduate students have very little power, and tenured

11  professors have a lot of power.  And if that professor

12  wishes to use that power dynamic, that can be at the

13  detriment of the graduate student.

14     Q.    Okay.  So, when you came to UNT, you had

15  already decided that you wanted nothing to do with Dr.

16  Jackson?

17     A.    Well, I'd been warned by him, and also other

18  people, that I shouldn't.

19     Q.    Okay.  Who else?  You had mentioned David

20  warned you.  Who else warned you prior to your coming to

21  UNT?

22     A.    I can't remember exactly.  It was when I was at

23  an interview day at Indiana University, and I mentioned

24  I was planning on applying to UNT, and I was told not

25  to, based on Dr. Jackson's reputation.

Rachel Cain    5/19/21

 1      Q.    Okay.  If you've never met him or had a class
 2  with him, how do you know he's a piece of shit?
 3      A.    Because I've heard a lot of stories from people
 4  that I trust.
 5      Q.    Okay.  These are people you know well?
 6      A.    Yes.
 7      Q.    So, at the time that David Falterman and these
 8  other students said this, and you decided you never
 9  wanted to meet Dr. Jackson, did you know those
10  individuals well?
11      A.    Not at the time.  I can't remember exactly who
12  told me at Indiana University, but one of the people it
13  possibly was, but not definitely, is someone I quite
14  know well.  I don't remember if it was him or someone
15  else in the car at the time.
16            But since then, I've grown to know David
17  very well, and since then -- I mean, this statement of
18  events isn't necessarily as linear as it seems in the
19  exhibit.  What exhibit number is this?
20      Q.    This is now 39?  Is that right?
21      A.    My Twitter message is perhaps an over-
22  simplification of the timeline of events, as one might
23  expect in a casual conversation.  But the number of
24  people telling me that increased, and the trust I had in
25  those people increased at the same time.

Rachel Cain      5/19/21

```
 1        Q.    All right.  Is calling someone a piece of shit
 2   ad hominem attack?
 3        A.    Could you define "ad hominem attack"?
 4        Q.    Well, I'd like to go back to the statement you
 5   signed accusing Dr. Jackson of ad hominem attacks.  How
 6   did you -- how would you define "ad hominem attack" in
 7   that document you endorsed?
 8        A.    I believe -- I don't know the legal definition,
 9   off the top of my head.
10        Q.    It's not a legal term.
11        A.    Well, I don't know what -- what would count in
12   a Court of law, off the top of my head.
13        Q.    No.  This isn't -- this is not -- that's not
14   what I asked you.  It's not a legal question.  You
15   signed a document that said that Dr. Jackson had engaged
16   in ad hominem attacks.
17             MR. BOHUSLAV:  I believe you're
18   interrupting her answer.
19        A.    Presumably, it would have to be a dictionary
20   definition in a court of law is what I mean.
21        Q.    (By Ms. Harris)  That's not accurate.  What I'm
22   asking you is --
23             MR. BOHUSLAV:  Can we take a break?
24             MS. HARRIS:  Sure.
25             (OFF THE RECORD FROM 2:26 TO 2:44 P.M.)
```

Rachel Cain        5/19/21

```
 1                   (DR. JACKSON IS NOT PRESENT IN ROOM.)
 2        Q.    (By Ms. Harris)  So, I'd like to go back to the
 3    conversation we were having about this direct message
 4    exchange you had.  And I would like to know, in your
 5    words, what you believe an ad hominem attack is.
 6        A.    I believe the definition is something along the
 7    lines of an attack on a person's character.
 8        Q.    Okay.  So, is calling someone a piece of shit
 9    ad hominem attack?
10        A.    That would follow.
11        Q.    Okay.  Would calling a black person, who you
12    did not know personally, a piece of shit be racist?
13        A.    I think I'd need more context to answer that.
14        Q.    Okay.  So, at this point, we're basically done.
15    I would just sort of like to circle back and ask some
16    sort of closing questions about the different documents
17    we've been over.  Particularly, the July 27th graduate
18    student statement, and the July 30th graduate student
19    statement.
20                   So, we talked about the fact that these
21    petitions condemned the procedures used to publish
22    Volume 12 of the JSS, is that correct?
23        A.    Yes.
24        Q.    Okay.  And you said today that you don't have
25    firsthand knowledge of those procedures, is that
```

Rachel Cain        5/19/21

```
 1  correct?

 2      A.    Yes.

 3      Q.    Okay.  The petitions also refer to the past

 4  bigoted behaviors of UNT faculty.

 5      A.    Yes.

 6      Q.    And you've testified today that you don't have

 7  any firsthand knowledge of past bigoted behaviors by UNT

 8  faculty.

 9      A.    Yes.

10      Q.    Okay.  And this also referred to past racist

11  actions of Dr. Jackson, yes?

12      A.    Could you show me where in the document it says

13  that?

14      Q.    Sure.  It's under -- it is the July 27th

15  petition that's marked Exhibit 3 at the top.  Yeah.

16  That one.

17      A.    Okay.

18      Q.    Says, "Dr. Jackson's actions, both past and

19  present, are racist and unacceptable."  So, is it fair

20  to say that you don't have firsthand knowledge of any

21  past racist actions by Dr. Jackson?

22      A.    Well, seeing as I've never been in the same --

23  or I've never been in a conversation with him, that

24  would follow, yes.

25      Q.    Okay.  And in the July 30th version of the
```

 1  statement, Dr. Jackson is accused of extortion, correct?

 2      A.    Where is this?

 3      Q.    It is on Kohanski 000109, No. 3 under "Calling

 4  for Dr. Jackson's Dismissal.  Extortion through grade

 5  manipulation and threats to students' careers and

 6  reputations."

 7      A.    It does say that.

 8      Q.    Okay.  And is it fair to say that you have no

 9  firsthand knowledge of any extortion by Dr. Jackson?

10      A.    Yes.  I wasn't in the country at the time.

11      Q.    Okay.  But you did sign your name to a

12  statement asking that Dr. Jackson be fired for all of

13  these reasons, yes?

14      A.    Where does it say that he should be fired?

15      Q.    "Calling for Dr. Jackson's Dismissal.  Dr.

16  Jackson should be removed from the UNT faculty."

17      A.    Yes.  I signed a statement saying that it was

18  our opinion that he should be fired.

19      Q.    Okay.

20      A.    Or dismissed, in the words of the statement.

21      Q.    Okay.  And other than his article in the

22  journal, which you have said you've read, would it be

23  fair to say that you called for his termination with no

24  firsthand knowledge of any of the behaviors specified in

25  this petition?

Rachel Gain        5/19/21

```
1        A.    Yes.
2                      MS. HARRIS:  Okay.  Thanks.  That's all.
3                      THE WITNESS:  Okay.  Thank you.
4                      MS. HARRIS:  Do you have any --
5                      MR. BOHUSLAV:  No.  We'll reserve
6    questions for time of trial.
7                      (DEPOSITION ADJOURNED AT 2:49 P.M.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Rachel Gain    5/19/21*

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   TIMOTHY JACKSON,            )
                                 )
 4            Plaintiff,         )
                                 ) Case No.
 5   v.                          )
                                 ) 4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,        )
                                 )
 7            Defendants.        )

 8

 9            -----------------------------------

10                    DEPOSITION CERTIFICATE

11                         RACHEL GAIN

12                        MAY 19, 2021

13            -----------------------------------

14

15            I, Nita G. Cullen, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18            That the witness, RACHEL GAIN, was duly sworn

19   by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by the

21   witness;

22            I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24                    ___ was requested by the deponent or a

25   party before the completion of the deposition and is to
```

1  be returned within 30 days from date of receipt of the

2  transcript.  If returned, the attached Changes and

3  Signature Page contains any changes and the reasons

4  therefor;

5            X  was not requested by the deponent or a

6  party before the completion of the deposition.

7            I further certify that I am neither attorney or

8  counsel for, nor related to or employed by, any of the

9  parties or attorneys to the action in which this

10 deposition was taken.

11            Further, I am not a relative or employee of any

12 attorney of record in this case, nor am I financially

13 interested in the outcome of the action.

14            Subscribed and sworn to on this 15th day of

15 June, 2021.

16

17                    _____

18                    NITA G. CULLEN, Texas CSR #1563
                       Expiration Date:  08-31-2022
19                    JULIA WHALEY & ASSOCIATES
                       Firm Registration No. 436
20                    2012 Vista Crest Drive
                       Carrollton, Texas 75007-1640
21                    214.668.5578

22

23

24

25

Rachel Gais    5/19/21

**#**

**#1563** [1] - 61:17

**0**

**000108** [1] - 29:12
**000109** [2] - 48:6, 58:3
**000110** [1] - 29:2
**00107** [2] - 28:22, 29:1
**06375** [1] - 2:6
**08-31-2022** [1] - 61:18

**1**

**1** [3] - 21:3, 29:12, 29:17
**1,100** [1] - 10:5
**100** [1] - 37:4
**107** [1] - 24:3
**12** [8] - 6:13, 7:1, 7:8, 15:1, 19:18, 27:3, 28:4, 56:22
**12548** [1] - 2:12
**12750** [1] - 1:23
**1450** [1] - 1:23
**15th** [1] - 61:14
**19** [3] - 1:13, 1:20, 60:12
**1:06** [1] - 1:20
**1:50** [1] - 34:18
**1:59** [1] - 34:18

**2**

**2** [2] - 3:3, 26:4
**20** [1] - 37:2
**2012** [1] - 61:19
**2020** [2] - 7:3, 22:24
**2021** [4] - 1:13, 1:20, 60:12, 61:15
**214.668.5578** [1] - 61:20
**22** [1] - 3:17
**25th** [1] - 7:3
**27th** [6] - 9:15, 10:7, 10:18,

42:1, 56:17, 57:14
**2:26** [1] - 55:25
**2:44** [1] - 55:25
**2:49** [2] - 1:20, 59:7

**3**

**3** [10] - 10:14, 11:23, 26:5, 26:6, 30:22, 32:8, 49:22, 57:15, 58:3
**30** [1] - 61:1
**30(f)(1** [1] - 60:23
**300** [1] - 10:2
**30th** [7] - 22:24, 23:16, 24:6, 28:15, 41:21, 56:18, 57:25
**34** [4] - 24:2, 28:19, 28:20, 41:22
**35** [3] - 3:13, 8:22, 9:5
**36** [3] - 3:14, 9:7, 9:10
**37** [5] - 3:15, 22:17, 22:20, 22:21, 28:25
**38** [6] - 3:16, 22:17, 22:20, 23:21, 51:4, 51:5
**39** [5] - 3:18, 51:3, 51:24, 51:25, 54:20

**4**

**4** [4] - 3:4, 3:6, 32:4, 32:7
**404** [1] - 2:5
**436** [1] - 61:19
**4:21-cv-00033-ALM** [2] - 1:5, 60:5

**6**

**600** [1] - 10:2

**7**

**75007-1640** [1] - 61:20
**78711** [1] -

2:12

**8**

**860.469.2783** [1] - 2:7
**860.772.4738** [1] - 2:6

**9**

**9** [2] - 3:13, 3:14
**940.565.2717** [1] - 2:17

**A**

**ability** [1] - 5:10
**able** [5] - 10:20, 15:10, 22:2, 22:3, 23:5
**above-styled** [1] - 1:19
**absence** [1] - 6:11
**absolute** [2] - 11:2, 11:7
**abusive** [3] - 48:3, 48:9, 48:17
**academia** [2] - 13:25, 22:1
**academic** [6] - 22:1, 27:16, 27:19, 27:21, 27:24, 36:20
**academically** [1] - 28:10
**academics** [2] - 44:19, 46:13
**accept** [1] - 22:14
**accepted** [5] - 26:13, 29:9, 29:20, 30:10, 30:13
**account** [1] - 13:25
**accountability** [1] - 22:5
**accountable** [2] - 21:6, 32:5
**accurate** [2] - 45:11, 55:21
**accusation** [1]

- 18:4
**accused** [2] - 42:20, 58:1
**accuses** [1] - 48:23
**accusing** [4] - 49:9, 49:15, 50:20, 55:5
**action** [3] - 20:15, 61:9, 61:13
**actions** [4] - 38:3, 57:11, 57:18, 57:21
**ad** [16] - 11:6, 11:20, 11:24, 11:25, 17:18, 26:6, 42:12, 42:16, 43:5, 55:2, 55:3, 55:5, 55:6, 55:16, 56:5, 56:9
**added** [1] - 12:14
**additional** [1] - 12:13
**adjectives** [1] - 20:12
**ADJOURNED** [1] - 59:7
**advance** [2] - 46:14, 52:24
**advisor** [1] - 48:14
**affirmatively** [2] - 5:3, 5:15
**afraid** [1] - 24:16
**African** [7] - 33:12, 33:13, 33:21, 34:8, 35:4, 40:8, 40:18
**African-American** [6] - 33:13, 33:21, 34:8, 35:4, 40:8, 40:18
**ago** [1] - 50:19
**agree** [2] - 46:4, 49:5
**ahead** [1] - 27:7
**al** [3] - 1:6, 46:24, 60:6
**allegations** [1] - 35:10
**alleged** [4] -

26:23, 27:14, 29:7, 36:1
**allegedly** [7] - 33:15, 33:20, 36:15, 40:9, 41:11, 50:2, 50:15
**ALLEN** [4] - 2:4, 2:5, 28:17, 34:13
**allow** [1] - 52:17
**allowed** [3] - 29:19, 30:9, 44:5
**alone** [1] - 52:10
**alphabetical** [1] - 23:9
**ALSO** [1] - 2:19
**American** [6] - 33:13, 33:21, 34:8, 35:4, 40:8, 40:18
**analysis** [1] - 35:23
**AND** [2] - 2:14, 22:20
**Anderson** [2] - 12:19, 12:22
**anonymous** [9] - 18:23, 21:21, 21:23, 24:20, 25:3, 25:6, 25:23, 26:1, 26:2
**anonymously** [2] - 22:4, 22:10
**answer** [8] - 4:24, 5:1, 6:21, 20:1, 20:8, 23:6, 55:18, 56:13
**answered** [1] - 46:17
**answering** [1] - 27:5
**anti** [12] - 15:6, 16:17, 16:21, 17:6, 18:6, 29:19, 30:9, 42:17, 42:20, 43:3, 44:5, 44:15
**anti-Ewell** [4] - 29:19, 30:9, 44:5, 44:15
**anti-Semite** [1] -

- 18:6
**anti-Semitic** [4] - 15:6, 16:21, 42:17, 43:3
**anti-Semitism** [3] - 16:17, 17:6, 42:20
**apology** [1] - 19:2, 19:6, 19:25
**appear** [1] - 24:14
**Appearances**
........................
........................
. [1] - 3:3
**applying** [1] - 53:24
**approached** [1] - 51:12
**appropriate** [1] - 32:19
**arise** [1] - 20:17
**article** [9] - 7:11, 8:11, 8:13, 10:8, 18:13, 26:12, 43:13, 46:2, 58:21
**articles** [1] - 27:19
**ashamed** [1] - 21:14
**Asian** [1] - 40:12
**aspects** [2] - 31:1, 31:4
**ASSISTANT** [1] - 2:10
**ASSOCIATE** [1] - 2:15
**ASSOCIATES** [1] - 61:18
**Association** [1] - 13:17
**assume** [6] - 17:12, 39:5, 43:12, 43:17, 48:11, 48:12
**assumption** [1] - 30:16
**AT** [1] - 59:7
**attached** [5] - 11:5, 11:23, 23:11, 30:21, 61:2
**attack** [9] -

36:2, 36:3, 43:5, 55:2, 55:3, 55:6, 56:5, 56:7, 56:9
**attacked** [1] - 35:21
**attacks** [5] - 17:18, 42:13, 42:16, 55:5, 55:16
**attention** [1] - 29:11
**attorney** [3] - 4:16, 61:7, 61:12
**ATTORNEY** [2] - 2:10, 2:11
**attorneys** [2] - 4:7, 61:9
**Austin** [1] - 2:12
**author** [1] - 41:1
**authored** [1] - 12:7
**available** [1] - 33:23
**aware** [18] - 11:9, 11:20, 11:22, 39:14, 40:10, 40:14, 40:24, 41:2, 45:12, 47:3, 47:5, 47:7, 47:12, 47:16, 48:24, 49:9, 49:14, 49:18

**B**

**BACK** [3] - 17:25, 20:2, 39:25
**background** [3] - 5:4, 5:13, 8:15
**bad** [4] - 16:8, 52:23, 53:1, 53:6
**based** [10] - 15:15, 17:9, 17:17, 17:20, 32:21, 33:1, 40:3, 43:2, 44:1, 53:25
**basis** [5] - 16:19, 17:14, 21:9, 39:17, 40:2

**Bassler** [1] - 52:4
**Bates** [1] - 28:24
**beginning** [1] - 6:19
**begins** [1] - 7:22
**behalf** [3] - 9:8, 9:16, 23:11
**behavior** [4] - 35:10, 37:14, 48:3, 48:17
**behaviors** [11] - 32:10, 33:4, 34:1, 34:7, 34:21, 36:10, 48:9, 57:4, 57:7, 58:24
**belief** [3] - 16:20, 36:4, 40:2
**beliefs** [1] - 17:19
**best** [9] - 10:12, 16:10, 20:25, 29:10, 34:6, 35:17, 42:5, 42:8, 48:16
**better** [1] - 15:16
**between** [2] - 10:2, 44:23
**beyond** [3] - 24:9, 24:14, 25:4
**biased** [1] - 32:22
**bigoted** [11] - 32:9, 32:10, 33:4, 34:1, 34:7, 34:21, 36:10, 37:10, 37:14, 57:4, 57:7
**Birmingham** [1] - 5:21
**bit** [3] - 5:12, 19:4, 51:8
**black** [6] - 15:5, 17:11, 18:6, 42:21, 43:2, 56:11
**BOHUSLAV** [19] - 2:10, 4:21, 9:11, 17:13, 20:7,

24:21, 24:23, 25:9, 28:24, 34:17, 38:25, 42:22, 42:25, 46:16, 49:11, 49:16, 55:17, 55:23, 59:5
**bound** [1] - 49:6
**Box** [2] - 2:5, 2:12
**Brand** [2] - 41:13, 41:14
**break** [4] - 34:13, 34:15, 34:17, 55:23
**Brian** [2] - 12:19, 12:22
**Bryan** [2] - 14:5, 37:23
**BY** [1] - 4:5

## C

**C-H"** [1] - 7:22
**capacities** [3] - 48:10, 48:13
**capacity** [1] - 48:14
**Capitol** [1] - 2:12
**car** [1] - 54:15
**care** [2] - 19:14, 19:16
**career** [2] - 50:14, 50:15
**careers** [2] - 49:24, 58:5
**Carrollton** [1] - 61:20
**CASE** [1] - 1:5
**Case** [1] - 60:4
**case** [6] - 4:13, 9:3, 17:7, 17:14, 61:12
**casual** [1] - 54:23
**category** [1] - 34:5
**censored** [1] - 18:8
**censorship** [1] - 18:14
**certain** [2] - 14:19, 39:9
**certainty** [2] - 11:2, 11:7
**CERTIFICAT E** [1] - 60:10
**Certificate.....**

**.............................**
**.......60** [1] - 3:8
**Certified** [1] - 60:15
**certify** [3] - 60:16, 60:22, 61:7
**Chalamo** [1] - 7:23
**Chalamu** [1] - 7:22
**change** [1] - 4:24
**changed** [1] - 41:25
**Changes** [1] - 61:2
**changes** [2] - 42:2, 61:3
**character** [1] - 56:7
**characteristic s** [3] - 15:15, 15:16, 15:17
**characterizati on** [3] - 18:15, 21:11, 45:11
**characterize** [6] - 20:5, 37:12, 37:17, 37:19, 38:13, 38:14
**characterized** [1] - 46:8
**characterizin g** [1] - 39:4
**charge** [1] - 22:14
**chat** [2] - 22:23, 22:25
**children** [1] - 40:14
**Chinese** [2] - 38:9, 38:11
**circle** [2] - 34:20, 56:15
**circulated** [2] - 24:8, 24:14
**circumstance s** [2] - 45:24
**citations** [1] - 45:20
**cite** [5] - 44:16, 45:5, 45:17, 45:21, 46:3
**cited** [3] - 18:22, 45:14, 46:1

**City** [1] - 1:23
**Civil** [1] - 1:25
**clarify** [2] - 4:15, 13:16
**class** [3] - 52:11, 52:16, 54:1
**clear** [2] - 4:14, 6:15
**clearly** [1] - 39:6
**close** [1] - 34:20
**closing** [1] - 56:16
**Cloud** [4] - 12:12, 13:3, 13:8, 42:6
**collaboration** [3] - 44:12, 45:8, 46:15
**collaboration "** [2] - 44:10, 47:1
**colleagues** [3] - 41:5, 43:22, 44:22
**college** [1] - 5:19
**color** [4] - 15:21, 31:11, 40:5, 40:6
**coming** [1] - 53:20
**comments** [3] - 21:6, 22:25, 23:6
**committed** [1] - 49:3
**compare** [2] - 10:21, 11:2
**complete** [3] - 36:19, 36:21
**completely** [1] - 51:10
**completion** [4] - 37:10, 37:16, 60:25, 61:6
**compound** [1] - 17:13
**computer** [1] - 48:5
**concern** [2] - 20:20, 21:9
**concerned** [1] - 21:15
**concerning** [1] - 20:14
**conclusion** [2]

- 39:7, 49:12
**concrete** [1] - 20:21
**condemn** [2] - 18:18, 21:4
**condemnatio n** [1] - 19:12
**condemned** [1] - 56:21
**conditions** [1] - 5:9
**confirm** [3] - 9:1, 9:15, 11:4
**confused** [1] - 19:4
**Connecticut** [1] - 2:6
**constitutes** [1] - 46:15
**contains** [1] - 61:3
**content** [12] - 19:2, 19:7, 19:8, 19:11, 19:19, 19:22, 19:25, 20:4, 20:6, 20:9, 20:15, 26:14
**context** [1] - 56:13
**continuing** [1] - 8:23
**contrast** [1] - 46:23
**contributors** [1] - 21:5
**controversy** [3] - 6:13, 6:25, 8:6
**conversation** [4] - 4:11, 54:23, 56:3, 57:23
**conversation. ..........22** [1] - 3:15
**coordinated** [1] - 46:23
**copy** [8] - 8:7, 8:20, 8:22, 9:12, 10:22, 11:1, 23:22, 23:24
**correct** [5] - 42:18, 51:19, 56:22, 57:1, 58:1
**counsel** [3] - 11:14, 14:21,

61:8
**COUNSEL** [2] - 2:15, 2:16
**count** [1] - 55:11
**country** [1] - 58:10
**County** [1] - 1:24
**couple** [1] - 47:10
**court** [1] - 55:20
**Court** [4] - 4:11, 39:3, 52:7, 55:12
**COURT** [4] - 1:1, 22:19, 51:4, 60:1
**credit** [1] - 37:21
**Crest** [1] - 61:19
**crime** [4] - 48:24, 49:3, 49:10, 49:15
**critical** [1] - 25:7
**criticism** [2] - 17:5, 17:16
**criticisms** [4] - 16:16, 16:22, 17:8, 17:23
**criticize** [2] - 17:11, 25:25
**criticizes** [1] - 43:8
**criticizing** [2] - 16:25, 17:4
**CSR** [2] - 1:21, 61:17
**CULLEN** [1] - 61:17
**Cullen** [1] - 1:21, 60:15
**culture** [3] - 30:25, 31:10, 31:16
**Cutler** [1] - 1:23

## D

**Dallas** [2] - 1:24
**date** [3] - 23:17, 48:25, 61:1
**Date** [1] - 61:18

**David** [7] - 37:23, 37:25, 52:20, 53:19, 54:7, 54:16
**days** [1] - 61:1
**deadline** [2] - 30:12, 30:18, 43:9, 44:6
**deadlines** [6] - 29:13, 29:15, 29:18, 30:1, 43:20, 43:25
**Dean** [7] - 23:4, 23:16, 24:5, 24:9, 24:14, 25:4, 41:21
**dean** [1] - 25:19
**decide** [3] - 5:2, 39:3, 52:11
**decided** [3] - 13:10, 53:15, 54:8
**dedicated** [1] - 13:25
**deem** [1] - 16:11
**defamation** [2] - 49:10, 49:15
**Defendants** [1] - 1:7, 60:7
**DEFENDANT S** [1] - 2:9
**defense** [1] - 35:18
**define** [4] - 15:11, 15:19, 55:3, 55:6
**definitely** [3] - 7:20, 31:23, 54:13
**definition** [3] - 55:8, 55:20, 56:6
**definitions** [1] - 15:12
**degree** [1] - 5:22
**denouncing** [1] - 25:22
**department** [4] - 6:4, 31:16, 31:17, 31:20
**deponent** [3] - 60:23, 60:24, 61:5
**deposed** [1] -

4:8
**Deposition** [1] - 8:25
**deposition** [6] - 6:19, 14:21, 60:20, 60:25, 61:6, 61:10
**DEPOSITION** [8] - 1:11, 1:17, 9:5, 9:10, 22:20, 51:25, 59:7, 60:10
**Deposition....** ....... [1] - 3:13
**depositions** [2] - 4:19, 8:24
**DESCRIPTIO N** [1] - 3:12
**despite** [1] - 15:8
**detriment** [1] - 53:13
**developing** [2] - 13:2, 14:2
**Devon** [1] - 7:21
**dictionary** [1] - 55:19
**different** [4] - 42:3, 45:15, 45:16, 56:16
**differently** [3] - 31:12, 31:19, 31:22
**direct** [5] - 29:11, 29:21, 29:25, 31:25, 56:3
**directly** [2] - 26:15, 31:23
**disability** [1] - 31:7
**disagree** [1] - 46:3
**disagreed** [2] - 35:19, 35:21
**disciplinary** [1] - 20:15
**discourse** [1] - 22:1
**discuss** [1] - 18:12
**discussion** [2] - 23:2, 23:14
**Dismissal** [4] - 48:7, 49:23, 58:4, 58:15

**dismissed** [1] - 58:20
**dispute** [2] - 37:9, 37:15
**dissertation** [1] - 35:19
**distinguish** [1] - 17:10
**DISTRICT** [4] - 1:1, 1:1, 60:1, 60:1
**diverse** [1] - 31:6
**diversity** [2] - 31:1, 31:5
**division** [1] - 14:8
**DIVISION** [3] - 1:2, 2:11, 60:2
**dock** [2] - 36:16, 50:11
**document** [25] - 8:19, 9:7, 11:14, 11:23, 12:5, 12:12, 13:3, 13:7, 15:9, 21:1, 30:24, 32:4, 41:6, 41:8, 42:6, 42:12, 44:9, 46:19, 47:9, 48:23, 50:17, 51:9, 55:7, 55:15, 57:12
**documents** [4] - 8:17, 11:17, 14:20, 56:16
**done** [5] - 21:25, 39:12, 39:18, 39:24, 56:14
**Dr** [67] - 4:7, 6:5, 7:10, 7:13, 8:10, 9:18, 10:8, 15:5, 17:16, 17:19, 17:20, 18:3, 18:5, 24:16, 26:14, 32:13, 32:22, 33:4, 33:20, 34:23, 35:12, 35:15, 35:18, 35:21, 35:22, 36:15, 37:20, 38:3, 39:16, 40:10, 41:13,

41:14, 42:19, 44:23, 46:1, 46:10, 46:20, 46:24, 47:4, 47:12, 47:16, 47:22, 48:2, 48:7, 48:17, 48:23, 49:19, 49:22, 50:2, 50:20, 52:13, 53:15, 53:25, 54:9, 55:5, 55:15, 57:11, 57:18, 57:21, 58:1, 58:4, 58:9, 58:12, 58:15
**DR** [1] - 56:1
**draft** [1] - 11:5
**drafted** [1] - 12:11
**drafting** [1] - 12:15
**draw** [1] - 18:10
**Drive** [2] - 1:23, 61:19
**duly** [3] - 1:18, 4:3, 60:18
**during** [4] - 36:20, 37:2, 37:7
**Durrant** [2] - 12:20, 12:23
**dynamic** [4] - 52:24, 53:2, 53:7, 53:12
**dynamics** [1] - 25:18

**E**

**e-mail** [9] - 14:17, 14:22, 23:10, 23:15, 23:17, 24:5, 25:19, 26:16, 47:19
**EASTERN** [2] - 1:1, 60:1
**edit** [2] - 26:14, 28:10
**edited** [1] - 12:13
**editing** [2] - 27:3, 27:16
**editor** [1] - 26:13
**editorial** [1] - 26:8

**editors** [1] - 14:5
**edits** [1] - 13:8
**effort** [1] - 46:23
**either** [1] - 35:23
**Elizabeth** [2] - 12:19, 12:23
**elsewhere** [1] - 23:23
**employed** [3] - 37:3, 37:7, 61:8
**employee** [1] - 61:11
**Encounters** [1] - 31:14
**endorsed** [3] - 41:4, 47:21, 55:7
**endorsing** [2] - 34:25, 36:9
**enforced** [6] - 29:14, 29:15, 29:19, 30:2, 43:20, 43:25
**engaged** [1] - 55:15
**enrolling** [1] - 52:15
**entirely** [1] - 37:4
**entirety** [1] - 7:21
**equally** [1] - 15:13
**equivalent** [1] - 25:11, 26:18
**erroneous** [1] - 11:25
**estimate** [2] - 10:1, 10:3
**et** [3] - 1:6, 46:24, 60:6
**evening** [1] - 7:2
**event** [1] - 50:16
**events** [4] - 50:10, 53:3, 54:18, 54:22
**evidence** [6] - 18:5, 31:11, 31:13, 32:12, 45:7, 52:22
**evident** [1] - 41:1
**Ewell** [28] -

15:5, 16:21, 17:4, 17:20, 18:5, 26:14, 29:19, 30:5, 30:9, 30:11, 30:17, 42:13, 42:20, 42:21, 44:5, 44:15, 44:24, 45:12, 45:13, 46:10, 46:12, 46:20, 46:24, 47:4, 47:12, 47:16, 47:22
**Ewell's** [4] - 7:13, 16:15, 17:17, 46:1
**exact** [2] - 32:17, 36:4
**exactly** [2] - 53:22, 54:11
**EXAMINATIO N** [1] - 4:4
**Examination** [1] - 3:6
**example** [8] - 31:7, 31:12, 33:22, 35:11, 37:14, 46:1, 48:17, 53:9
**examples** [3] - 16:14, 31:21, 42:15
**except** [1] - 4:19
**excerpts** [2] - 8:8, 8:12
**exchange** [2] - 52:2, 56:4
**Exhibit** [20] - 3:13, 3:14, 3:15, 3:16, 3:18, 9:7, 10:14, 11:23, 22:21, 23:21, 24:2, 26:5, 26:6, 28:19, 28:20, 28:25, 30:22, 41:22, 51:24, 57:15
**EXHIBIT** [3] - 9:5, 9:10, 51:25
**exhibit** [8] - 23:18, 24:1, 24:6, 28:14, 51:1, 51:23, 54:19
**exhibited** [1] - 48:18
**failed** [2] -

**EXHIBITS** [2] - 3:11, 22:20
**exhibits** [4] - 8:18, 8:23, 22:16, 51:2
**existence** [1] - 30:17
**expect** [1] - 54:23
**experience** [2] - 27:16, 27:18
**experienced** [2] - 32:2, 33:8
**experiences** [1] - 33:1
**Expiration** [1] - 61:18
**explain** [4] - 25:12, 26:8, 52:7, 52:21
**expressed** [1] - 20:19
**extended** [1] - 15:7
**extent** [2] - 6:7, 50:6
**extort** [4] - 49:20, 49:21, 50:2, 50:4
**Extortion** [1] - 58:4
**extortion** [7] - 48:24, 49:23, 50:9, 50:21, 58:1, 58:9
**extra** [1] - 9:12
**eye** [1] - 25:15
**eyes** [1] - 47:9

**F**

**Facebook** [2] - 14:17, 14:22
**fact** [9] - 9:2, 9:14, 17:3, 21:20, 35:6, 43:8, 44:15, 44:22, 56:20
**Faculty** [1] - 3:17
**faculty** [11] - 32:10, 34:21, 36:21, 48:8, 51:7, 51:11, 51:12, 51:17, 57:4, 57:8, 58:16

41:11
**fair** [7] - 19:10, 19:17, 20:5, 32:20, 57:19, 58:8, 58:23
**fall** [1] - 34:4
**falls** [1] - 34:1
**falsely** [2] - 49:9, 49:14
**Falterman** [3] - 37:23, 52:20, 54:7
**familiar** [3] - 11:10, 11:20, 11:22
**familiarize** [1] - 8:20
**far** [1] - 51:21
**fault** [1] - 32:9
**Fax** [1] - 2:7
**fear** [3] - 24:22, 25:4, 25:8
**Federal** [1] - 1:25
**fellow** [1] - 45:9
**few** [4] - 10:1, 15:4, 35:19, 40:4
**file** [1] - 23:22
**finalizing** [1] - 43:15
**financially** [1] - 61:12
**finger** [1] - 38:22
**finished** [1] - 6:3
**fired** [3] - 58:12, 58:14, 58:18
**Firm** [1] - 61:19
**first** [12] - 4:3, 6:12, 6:25, 7:4, 7:20, 8:10, 8:21, 13:12, 18:17, 30:20, 38:1
**firsthand** [5] - 56:25, 57:7, 57:20, 58:9, 58:24
**Firstly** [1] - 21:25
**five** [1] - 12:11
**flawed** [1] - 20:11
**follow** [3] -

30:14, 56:10, 57:24
**followers** [2] - 9:21, 10:6
**following** [1] - 60:17
**follows** [1] - 4:3
**footnote** [1] - 15:7
**FOR** [4] - 1:1, 2:3, 2:9, 60:1
**form** [2] - 4:19, 10:24
**forthcoming** [4] - 45:21, 46:2, 46:7, 46:20
**four** [1] - 12:17
**FRCP** [1] - 60:22
**free** [5] - 36:16, 37:20, 48:19, 50:8, 50:9
**freely** [3] - 18:19, 20:19, 21:4
**frequently** [1] - 39:18
**Friday** [1] - 7:2
**FROM** [2] - 34:18, 55:25
**front** [3] - 9:17, 15:9, 47:5
**fully** [1] - 21:6

## G

**GAIN** [6] - 1:12, 1:17, 3:5, 4:2, 60:11, 60:18
**Gain................ ...........** [1] - 3:14
**gained** [1] - 10:6
**GAMut** [5] - 13:13, 13:14, 13:16, 13:23, 51:11
**Gao** [3] - 36:14, 50:3, 50:23
**gender** [1] - 31:1
**GENERAL** [5] - 2:10, 2:11, 2:11, 2:15,

2:16
**General** [1] - 3:16
**general** [2] - 19:14, 41:16
**given** [4] - 19:16, 25:4, 38:16, 60:20
**grade** [2] - 49:23, 58:4
**grades** [2] - 36:17, 50:11
**Graduate** [1] - 13:17
**graduate** [19] - 5:13, 9:16, 12:1, 23:3, 23:11, 23:14, 24:13, 25:16, 25:21, 38:2, 41:20, 44:10, 45:9, 51:13, 51:17, 53:10, 53:13, 56:17, 56:18
**Graf's** [1] - 35:18
**group** [4] - 15:13, 17:1, 17:8
**grown** [1] - 54:16
**guess** [6] - 11:18, 23:21, 34:16, 46:12, 48:16, 51:24

## H

**H"** [1] - 7:22
**H1-B's** [1] - 37:5
**half** [1] - 40:15
**hallways** [1] - 6:7
**hand** [4] - 33:13, 33:18, 34:8, 35:3
**Hang** [1] - 21:1
**Harris** [24] - 4:6, 4:22, 9:6, 9:13, 17:15, 18:1, 20:3, 22:21, 24:22, 25:1, 25:12, 28:18, 29:3, 34:19, 39:2, 40:1, 43:4, 46:19, 49:14, 49:19,

51:6, 52:1, 55:21, 56:2
**HARRIS** [13] - 2:4, 4:5, 4:17, 19:23, 29:1, 34:14, 42:24, 50:25, 51:5, 51:22, 55:24, 59:2, 59:4
**Harris............ ...........** [1] - 3:6
**head** [4] - 5:3, 5:15, 55:9, 55:12
**heading** [1] - 48:6
**hear** [1] - 7:4
**heard** [25] - 16:11, 26:10, 26:23, 32:12, 32:15, 32:21, 33:12, 33:18, 34:22, 34:24, 35:3, 36:5, 36:15, 37:21, 37:22, 38:17, 38:19, 40:3, 40:4, 48:20, 50:5, 50:10, 50:12, 54:3
**heed** [2] - 41:11, 41:12
**Heinrich** [3] - 16:16, 16:23, 17:4
**held** [2] - 21:6, 36:4
**hereby** [1] - 60:16
**Hernandez** [2] - 12:20, 12:22
**Hi** [1] - 4:6
**hidden** [2] - 21:7, 21:9
**hide** [5] - 20:21, 20:22, 20:24, 21:12, 21:16
**highest** [1] - 13:24
**highly** [1] - 21:12
**Hill** [1] - 2:6
**hip** [7] - 15:7, 15:23, 15:24, 16:3, 16:4, 16:6, 16:11

**history** [2] - 48:3, 48:9
**hoc** [5] - 11:6, 11:20, 11:24, 11:25, 26:6
**hold** [1] - 32:5
**hominem** [1] - 17:18, 42:12, 42:16, 43:5, 55:2, 55:3, 55:5, 55:6, 55:16, 56:5, 56:9
**hop** [7] - 15:7, 15:24, 15:25, 16:3, 16:4, 16:6, 16:11
**hopefully** [1] - 41:1
**hours** [1] - 37:2
**hundred** [1] - 10:1

## I

**illegitimate** [1] - 44:19
**illicit** [5] - 44:9, 44:11, 45:7, 46:15, 46:25
**immediately** [1] - 32:3
**immigrant** [2] - 49:1, 49:6
**imply** [1] - 17:5
**IN** [3] - 1:1, 56:1, 60:1
**incident** [11] - 11:6, 11:21, 33:10, 34:2, 34:4, 35:15, 36:14, 38:9, 38:16, 38:20, 39:4
**Incidentally** [1] - 40:10
**incidents** [11] - 32:13, 32:15, 33:8, 33:11, 38:6, 38:8, 38:18, 40:3, 40:19, 40:23, 41:3
**included** [1] - 21:20
**including** [1] - 44:11
**increased** [1] - 54:24, 54:25

**INDEX** [1] - 3:1
**Indiana** [2] - 53:23, 54:12
**indicates** [1] - 17:1
**individuals** [1] - 54:10
**initial** [1] - 23:13
**initiated** [1] - 51:11
**instance** [1] - 1:18
**institution** [2] - 25:17, 53:9
**interactions** [2] - 6:7, 6:8
**interested** [2] - 21:18, 61:13
**interfere** [1] - 5:9
**international** [2] - 36:24, 36:25
**interpreting** [1] - 16:8
**interrupting** [2] - 34:12, 55:18
**interview** [1] - 53:23
**introduce** [6] - 9:7, 22:17, 23:20, 28:13, 51:1, 51:23
**introduced** [4] - 10:15, 23:23, 24:1, 24:6
**introducing** [1] - 8:16
**investigate** [1] - 34:21
**investigating** [1] - 32:9
**investigation** [1] - 36:9
**invitation** [1] - 26:19
**invited** [1] - 26:15
**involved** [3] - 14:1, 21:8, 51:16
**involving** [1] - 32:13
**irregularities** [7] - 26:7, 26:9, 26:24, 27:2, 27:14,

27:15, 29:7
**IS** [1] - 56:1
**issue** [11] - 18:19, 19:11, 19:18, 20:6, 20:21, 20:22, 21:4, 21:20, 28:3, 38:11, 46:9
**issued** [2] - 11:21, 19:12
**issues** [1] - 39:15
**issuing** [1] - 51:12
**iteration** [1] - 38:1
**itself** [1] - 23:10

## J

**Jackson** [37] - 4:7, 6:5, 17:19, 18:4, 24:17, 32:13, 32:22, 33:20, 34:23, 35:12, 35:21, 36:15, 37:20, 38:3, 39:16, 42:19, 46:1, 46:24, 48:2, 48:18, 48:23, 49:2, 49:19, 50:2, 50:21, 52:6, 52:13, 53:16, 54:9, 55:5, 55:15, 57:11, 57:21, 58:1, 58:9, 58:12, 58:16
**JACKSON** [4] - 1:3, 2:20, 56:1, 60:3
**Jackson's** [12] - 7:10, 8:11, 10:8, 17:16, 33:5, 40:10, 48:7, 49:23, 53:25, 57:18, 58:4, 58:15
**Jessica** [1] - 23:8
**Jewish** [1] - 17:5
**Journal** [5] - 3:17, 6:14, 19:15, 48:15, 51:7

**journal** [14] - 8:7, 8:8, 18:12, 20:9, 20:18, 24:20, 25:8, 25:15, 26:1, 27:16, 27:19, 27:22, 45:4, 58:22
**journals** [1] - 27:25
**JSS** [15] - 6:15, 7:1, 7:8, 11:21, 15:1, 19:18, 20:20, 20:24, 21:11, 27:3, 56:22
**Judge** [1] - 5:2
**JULIA** [1] - 61:18
**July** [12] - 7:3, 9:15, 22:24, 23:16, 24:6, 28:15, 41:21, 42:1, 56:17, 56:18, 57:14, 57:25
**June** [1] - 61:15
**junk** [2] - 47:19, 47:23
**justifies** [1] - 18:14

## K

**kept** [4] - 25:3, 25:5, 25:23, 26:1
**keynotes** [1] - 45:18
**kind** [1] - 12:12
**knowledge** [20] - 16:10, 27:1, 27:12, 28:5, 28:6, 29:10, 29:21, 30:1, 30:3, 31:25, 34:6, 43:24, 44:25, 50:6, 51:14, 56:25, 57:7, 57:20, 58:9, 58:24
**known** [1] - 19:13
**Kohanski** [6] - 24:3, 28:22, 29:1, 29:12, 48:6, 58:3
**Korean** [11] -

32:16, 32:25, 33:11, 33:24, 33:25, 34:23, 40:9, 40:11, 40:13, 40:15, 40:17
**Koreans** [2] - 32:22, 33:5

**L**

**labeled** [1] - 48:6
**lack** [4] - 18:23, 18:24, 29:12, 29:17
**language** [1] - 41:24
**large** [3] - 40:4, 40:6, 40:19
**large"** [1] - 40:22
**Larger** [1] - 40:7
**larger"** [1] - 40:20
**last** [2] - 23:23, 29:18
**LAURA** [2] - 1:6, 60:6
**LAW** [1] - 2:5
**Law** [1] - 1:22
**law** [2] - 55:12, 55:20
**lawfirm.com** [1] - 2:7
**laws** [2] - 48:25, 49:6
**lawyer** [1] - 49:4
**leadership** [3] - 20:20, 20:24, 21:12
**learn** [2] - 6:12, 6:25
**learned** [1] - 8:5
**least** [1] - 51:15
**led** [1] - 17:15
**legal** [5] - 49:12, 49:17, 55:8, 55:10, 55:14
**legitimate** [4] - 22:8, 22:11, 25:21, 25:23
**length** [1] - 43:10

**letter** [5] - 23:4, 23:11, 24:8, 24:14, 25:22
**letter's** [1] - 25:3
**level** [2] - 21:13, 52:17
**Levi** [3] - 41:9, 41:10, 41:15
**life's** [1] - 52:10
**likely** [7] - 16:5, 38:16, 38:19, 38:20, 39:7, 39:10, 39:11
**line** [1] - 18:11
**linear** [1] - 54:18
**lines** [1] - 56:7
**link** [1] - 14:17
**linked** [1] - 14:16
**list** [4] - 26:17, 47:15, 47:16, 47:18
**listed** [2] - 23:3, 23:15
**listen** [2] - 16:4, 16:9
**listened** [2] - 7:13, 16:6
**LITIGATION** [1] - 2:11
**LLC** [1] - 2:5
**logically** [1] - 30:14
**look** [2] - 14:21, 29:18
**looking** [4] - 20:22, 28:15, 28:20, 30:21
**looks** [1] - 11:10
**loop** [1] - 34:20
**Losing** [1] - 28:14
**lyrics** [2] - 16:8, 16:11

**M**

**m.allen@** **allen** [1] - 2:7
**m.allen@** **allen-** **lawfirm.com** [1] - 2:7

**machine** [1] - 1:22
**mail** [10] - 14:17, 14:22, 23:10, 23:15, 23:17, 24:5, 25:19, 26:16, 47:19, 47:23
**main** [1] - 19:18
**manipulation** [2] - 49:24, 58:5
**marked** [4] - 8:17, 10:14, 30:22, 57:15
**MARKED** [4] - 9:5, 9:10, 22:20, 51:25
**master's** [1] - 5:22
**MATT** [1] - 2:10
**matthew.** **bohuslav@** **oag.texas.** **gov** [1] - 2:13
**MAY** [2] - 1:13, 60:12
**mean** [20] - 4:25, 9:17, 9:23, 20:10, 20:12, 20:16, 22:13, 23:8, 29:14, 30:4, 30:7, 30:11, 31:5, 31:23, 39:6, 47:9, 53:1, 53:6, 54:17, 55:20
**means** [4] - 5:1, 30:8, 38:11, 43:21
**meant** [4] - 8:15, 18:2, 35:1, 44:11
**media** [2] - 12:2, 13:11
**medical** [1] - 5:9
**medications** [1] - 5:8
**meet** [5] - 13:2, 52:10, 52:12, 54:9
**meeting** [1] - 22:24
**member** [2] - 16:25, 36:21
**members** [1] -

51:12
**memory** [9] - 10:12, 20:25, 26:11, 30:3, 35:17, 42:5, 42:8, 44:1, 44:4
**men** [1] - 36:3
**mentioned** [7] - 11:12, 15:22, 33:10, 34:22, 38:18, 53:19, 53:23
**Merit** [1] - 1:23
**message** [3] - 14:17, 54:21, 56:3
**Messages** [1] - 3:14
**Messages......** **..............**
**51** [1] - 3:18
**met** [3] - 6:5, 13:5, 54:1
**MICHAEL** [1] - 2:4
**Microsoft** [2] - 3:15, 22:23
**might** [7] - 15:16, 21:13, 22:9, 22:11, 24:20, 25:8, 54:22
**Mike** [1] - 28:15
**mind** [7] - 7:20, 14:10, 21:17, 26:22, 32:3, 39:6, 40:25
**mischaracteri** **zation** [1] - 20:23
**misogynistic** [2] - 15:7, 16:12
**misogyny** [4] - 15:23, 15:24, 16:1, 16:2
**mission** [2] - 52:10, 52:12
**misstates** [1] - 42:22
**Misstates** [1] - 42:25
**mistreated** [1] - 52:23
**months** [1] - 50:19
**most** [2] - 7:9,

39:22
**Most** [1] - 7:10
**mostly** [1] - 5:20
**motivated** [3] - 16:17, 17:6, 17:12
**move** [1] - 11:18
**MR** [25] - 2:4, 2:10, 2:15, 2:20, 4:21, 9:11, 17:13, 19:23, 20:7, 24:21, 24:23, 25:9, 28:17, 28:24, 34:13, 34:17, 38:25, 42:22, 42:25, 46:16, 49:11, 49:16, 55:17, 55:23, 59:5
**MS** [12] - 2:4, 4:5, 4:17, 29:1, 34:14, 42:24, 50:25, 51:5, 51:22, 55:24, 59:2, 59:4
**music** [13] - 5:17, 5:22, 5:24, 15:24, 15:25, 16:1, 16:3, 16:4, 16:7, 35:23, 35:25, 52:5
**Music** [1] - 5:18
**musicologist** [1] - 14:8
**Musicologist** **s** [1] - 13:17
**must** [2] - 21:6, 44:16

**N**

**name** [11] - 4:6, 14:9, 22:6, 25:22, 27:9, 27:12, 29:22, 45:6, 47:8, 50:17, 58:11
**name's** [1] - 7:20
**names** [8] - 12:24, 23:3, 23:9, 23:15, 24:8, 24:10,

24:13, 25:3
**nationality** [1] - 33:2
**necessarily** [5] - 13:14, 16:24, 22:12, 31:18, 54:18
**need** [4] - 4:15, 11:1, 32:5, 56:13
**needed** [1] - 37:20
**needs** [1] - 23:10
**negative** [1] - 33:1
**never** [12] - 16:6, 16:11, 51:16, 52:10, 52:12, 52:16, 52:17, 54:1, 54:8, 57:22, 57:23
**News** [2] - 3:16
**next** [2] - 8:13, 9:6
**Nita** [2] - 1:21, 60:15
**NITA** [1] - 61:17
**NO** [2] - 1:5, 3:12
**normal** [2] - 28:2, 43:9
**NORTH** [1] - 2:16
**North** [1] - 5:25
**NOT** [1] - 56:1
**noted** [1] - 5:2
**notes** [1] - 4:12
**nothing** [1] - 53:15
**Notice** [2] - 3:13, 8:25
**noticed** [2] - 7:18, 41:24
**notified** [5] - 46:20, 46:24, 47:4, 47:22, 47:23
**Notley** [3] - 35:15, 35:22, 39:16
**number** [9] - 8:23, 9:23, 32:12, 40:4, 40:6, 40:19, 51:2, 54:19,

54:23
**numbered** [1] - 1:19
**numbers** [1] - 28:25

**O**

**object** [2] - 4:16, 4:22
**Objection** [11] - 17:13, 20:7, 24:21, 24:23, 25:9, 38:25, 42:22, 42:24, 46:16, 49:11, 49:16
**objection** [2] - 4:23, 5:1
**objections** [2] - 4:19, 4:20
**objects** [1] - 4:25
**obligation** [1] - 4:24
**obviously** [2] - 18:11, 26:18
**Obviously** [1] - 5:13
**occasionally** [1] - 53:8
**OF** [7] - 1:1, 1:11, 1:17, 2:11, 2:16, 2:16, 60:1
**OFF** [2] - 34:18, 55:25
**offended** [1] - 7:7
**offensive** [3] - 19:8, 20:4, 20:10
**OFFICE** [1] - 2:16
**officer** [1] - 60:19
**Offices** [1] - 1:22
**once** [1] - 35:4
**One** [2] - 7:19, 15:13
**one** [33] - 4:6, 5:21, 6:18, 9:19, 9:20, 11:9, 13:11, 14:5, 15:13, 15:16, 15:22, 23:21, 23:24, 28:23, 29:5, 29:6, 29:7,

30:21, 33:22, 36:12, 40:8, 40:18, 41:18, 41:21, 42:9, 42:10, 44:20, 46:14, 51:22, 54:12, 54:22, 57:16
**ones** [2] - 28:10, 40:25
**online** [3] - 18:19, 20:19, 21:4
**Ontario** [1] - 5:23
**open** [1] - 13:7
**opinion** [3] - 24:19, 49:17, 58:18
**opinions** [2] - 7:5, 12:14
**opposes** [1] - 14:25
**oral** [1] - 60:19
**ORAL** [2] - 1:11, 1:17
**order** [4] - 9:3, 11:2, 23:6, 24:11
**original** [2] - 12:11, 12:17
**Originally** [1] - 12:11
**originally** [1] - 12:18
**otherwise** [1] - 23:1
**Ottawa** [1] - 5:22
**outcome** [1] - 61:13
**outside** [1] - 8:2
**overexaggeration** [1] - 52:14
**own** [3] - 10:20, 26:18, 39:6

**P**

**P.M** [3] - 34:18, 55:25, 59:7
**p.m** [2] - 1:20
**P.O** [2] - 2:5, 2:12
**Page** [1] - 61:3
**page** [2] - 11:11, 48:5

**PAGE** [2] - 3:2, 3:12
**panel** [4] - 11:20, 11:24, 11:25, 26:6
**panel's** [1] - 11:6
**paper** [6] - 15:8, 17:11, 17:17, 17:19, 28:21, 30:8
**papers** [12] - 28:8, 28:14, 29:9, 30:5, 43:8, 44:16, 44:19, 45:13, 46:11, 46:14, 47:13, 47:14
**part** [7] - 4:11, 4:13, 11:14, 17:22, 35:1, 35:20, 42:7
**participated** [1] - 22:24
**particularly** [1] - 38:4
**Particularly** [1] - 56:17
**parties** [2] - 21:18, 61:9
**partner** [1] - 4:7
**party** [3] - 21:8, 60:25, 61:6
**passages** [1] - 7:6
**past** [16] - 32:9, 32:10, 33:3, 34:1, 34:7, 34:21, 36:9, 37:14, 38:4, 38:8, 38:17, 57:3, 57:7, 57:10, 57:18, 57:21
**peer** [3] - 18:23, 29:13, 29:17
**People** [1] - 24:16
**people** [43] - 7:5, 7:16, 7:19, 8:2, 12:17, 15:14, 15:21, 17:8, 22:14, 24:7, 24:13, 31:6, 31:11, 31:12, 31:18, 31:21,

32:25, 33:9, 35:20, 36:7, 36:8, 39:12, 39:14, 39:18, 39:24, 40:4, 40:5, 40:6, 41:2, 41:10, 43:2, 44:23, 46:9, 46:10, 46:12, 47:19, 53:18, 54:3, 54:5, 54:12, 54:24, 54:25
**people's** [2] - 26:19, 47:19
**percent** [1] - 37:4
**perhaps** [5] - 14:16, 14:17, 24:19, 46:11, 54:21
**period** [1] - 43:15
**permitted** [2] - 26:2, 26:14
**person** [8] - 7:19, 17:8, 17:11, 17:12, 21:17, 41:18, 53:9, 56:11
**person's** [1] - 56:7
**personal** [3] - 27:1, 44:25, 48:12
**personally** [2] - 51:16, 56:12
**Peter** [1] - 13:12
**petition** [7] - 14:25, 18:11, 20:20, 26:7, 27:11, 57:15, 58:25
**petitions** [2] - 56:21, 57:3
**Philip** [4] - 17:4, 42:13, 42:20
**Phonetic)** [1] - 7:23
**piece** [6] - 18:5, 52:8, 54:2, 55:1, 56:8, 56:12
**Plaintiff** [3] - 1:4, 1:18, 60:4
**PLAINTIFF** [1]

- 2:3
**planning** [1] - 53:24
**platforming** [1] - 14:25
**platforms** [2] - 14:14, 14:22
**pleasant** [1] - 6:9
**pleasant"** [1] - 6:11
**plenary** [1] - 26:18
**plural** [2] - 41:15, 41:17
**plus** [1] - 13:24
**point** [5] - 10:9, 22:1, 31:21, 52:11, 56:14
**Point** [7] - 26:4, 29:12, 29:17, 32:4, 32:7, 32:8
**police** [4] - 31:14, 31:15, 31:17, 31:20
**poorly** [6] - 33:14, 33:16, 33:21, 34:9, 34:23, 35:4
**POS** [3] - 52:6, 52:7, 52:8
**position** [3] - 25:20, 31:2, 49:2
**possible** [2] - 21:13, 24:18
**possibly** [1] - 54:13
**post** [1] - 22:25
**posting** [2] - 7:5, 25:15
**potentially** [1] - 5:9
**power** [10] - 25:17, 25:18, 52:17, 52:23, 53:1, 53:7, 53:8, 53:10, 53:11, 53:12
**prejudice** [1] - 17:1
**prepared** [1] - 42:4
**PRESENT** [2] - 2:19, 56:1
**present** [2] - 38:4, 57:19

**preservation** [1] - 21:7
**president** [2] - 13:13, 13:23
**Presumably** [1] - 55:19
**prevent** [1] - 5:5
**previous** [3] - 4:18, 8:23, 45:18
**previously** [2] - 29:6, 45:18
**primarily** [1] - 15:4
**primary** [1] - 20:6
**private** [1] - 10:23
**privileged** [1] - 15:21
**privy** [1] - 44:17
**pro** [5] - 30:4, 30:11, 30:17, 45:13, 46:12
**pro-Ewell** [4] - 30:11, 30:17, 45:13, 46:12
**problematic** [3] - 20:11, 21:20, 21:24
**problems** [1] - 29:7
**Procedure** [1] - 1:25
**procedure** [5] - 19:6, 19:7, 19:9, 19:24, 20:4
**procedures** [2] - 56:21, 56:25
**process** [11] - 12:10, 12:14, 13:1, 19:12, 19:13, 19:19, 20:11, 20:13, 26:8, 28:2, 28:7
**produce** [1] - 11:13
**produced** [2] - 1:17, 10:23
**producing** [1] - 14:20
**production** [4] - 11:14, 11:17, 27:3, 29:8

**professor** [1] - 53:11
**professors** [2] - 35:19, 53:11
**program** [1] - 6:2
**prohibition** [1] - 39:2
**prompted** [1] - 7:14
**proper** [5] - 45:21, 45:23, 45:25, 46:2, 46:3
**proposal** [2] - 35:19, 35:20
**protect** [1] - 24:11
**proven** [2] - 27:4, 27:9
**public** [8] - 18:19, 20:19, 21:5, 21:10, 21:14, 25:15, 25:18, 28:8
**publication** [3] - 18:23, 44:20, 46:14
**publicized** [1] - 31:24
**publicly** [2] - 18:18, 21:4
**publish** [4] - 22:9, 22:13, 28:10, 56:21
**published** [4] - 18:4, 22:4, 27:21, 45:18
**publishing** [6] - 21:23, 22:7, 22:14, 24:19, 25:7, 25:14
**pull** [2] - 21:1, 48:4
**pursuant** [2] - 1:24, 60:22
**put** [9] - 9:17, 12:1, 22:6, 28:8, 32:23, 32:24, 38:22, 45:6, 52:24
**putting** [1] - 28:3

**Q**

**Quaker** [1] - 2:6

**questions** [4] - 5:5, 12:5, 56:16, 59:6
**quite** [1] - 54:13
**Quite** [1] - 7:19
**quote** [4] - 15:1, 24:10, 30:25, 48:3

**R**

**race** [9] - 15:15, 15:16, 15:17, 16:23, 17:20, 31:1, 31:19, 31:22, 33:1
**RACHEL** [6] - 1:12, 1:17, 3:5, 4:2, 60:11, 60:18
**Rachel** [2] - 3:14, 13:22
**racism** [6] - 15:18, 15:19, 15:20, 17:9, 17:12, 17:17
**racist** [25] - 15:1, 15:3, 15:5, 15:11, 15:23, 17:9, 18:8, 38:4, 38:8, 38:12, 38:16, 38:18, 38:21, 39:5, 39:7, 39:9, 39:23, 42:19, 43:2, 48:3, 48:9, 56:12, 57:10, 57:19, 57:21
**range** [1] - 28:25
**ranking** [1] - 13:24
**rather** [2] - 6:21, 44:24
**rationale** [1] - 25:5
**re** [4] - 9:19, 10:24, 10:25, 12:15
**re-drafting** [1] - 12:15
**re-tweet** [2] - 10:24, 10:25
**re-tweeted** [1] - 9:19
**read** [17] - 7:8,

7:9, 7:10,
8:8, 8:10,
8:12, 8:13,
10:7, 10:8,
17:24, 19:25,
28:24, 39:21,
45:4, 47:6,
47:9, 58:22
**READ** [3] -
17:25, 20:2,
39:25
**reading** [2] -
47:11, 47:24
**really** [2] -
6:11, 48:25
**reason** [9] -
11:24, 18:22,
19:16, 20:22,
22:9, 22:11,
22:12, 22:15,
39:5
**reasonable** [1]
- 36:20
**reasons** [4] -
21:25, 50:21,
58:13, 61:3
**receipt** [1] -
61:1
**receive** [1] -
28:9
**received** [5] -
9:1, 11:17,
26:16, 26:17,
47:20
**recent** [3] -
39:22, 49:1,
49:6
**recognize** [1] -
52:1
**record** [7] -
4:11, 4:23,
6:20, 10:15,
50:20, 60:20,
61:12
**RECORD** [5] -
17:25, 20:2,
34:18, 39:25,
55:25
**recorded** [2] -
31:14, 31:24
**redacting** [1] -
24:7
**refer** [6] -
16:22, 32:11,
34:3, 34:11,
48:13, 57:3
**referred** [4] -
34:7, 45:13,
50:19, 57:10
**referring** [9] -

24:7, 33:4,
33:7, 35:7,
35:8, 41:8,
43:5, 44:22,
53:4
**refers** [9] -
41:6, 41:15,
42:12, 44:9,
44:15, 45:19,
50:3, 50:16,
50:24
**reflect** [1] -
38:7
**Registration**
[1] - 61:19
**reject** [1] -
18:15
**rejected** [1] -
21:11
**related** [1] -
61:8
**relative** [1] -
61:11
**release** [3] -
18:19, 19:2,
21:4
**released** [1] -
20:18
**relevance** [1] -
15:8
**relevant** [1] -
14:22
**remain** [1] -
26:2
**remember** [16]
- 7:17, 7:21,
9:25, 14:7,
32:17, 42:9,
42:11, 44:7,
47:24, 50:6,
50:21, 51:21,
52:19, 53:22,
54:11, 54:14
**reminds** [1] -
6:18
**removed** [2] -
48:8, 58:16
**RENALDO** [1]
- 2:15
**renaldo.
stowers@
untsystem.
edu** [1] - 2:17
**repeat** [8] -
4:15, 17:2,
19:23, 23:13,
24:25, 49:13,
50:1, 53:5
**rephrase** [1] -
18:1

**report** [7] -
11:6, 11:20,
11:24, 26:6,
27:9, 34:7,
34:8
**reported** [1] -
1:22
**Reporter** [1] -
60:16
**REPORTER**
[2] - 22:19,
51:4
**Reporter's** [1]
- 3:8
**reports** [1] -
33:22
**reputation** [1]
- 50:14,
50:15, 53:25
**reputations** [2]
- 49:25, 58:6
**request** [3] -
34:20, 36:9,
36:21
**requested** [2] -
60:24, 61:5
**requirements**
[1] - 37:5
**research** [1] -
43:14
**reserve** [1] -
59:5
**reserved** [1] -
4:20
**respect** [1] -
30:25
**respond** [5] -
22:2, 26:15,
26:17, 26:19,
46:25
**responding** [1]
- 22:3
**response** [7] -
6:10, 9:2,
18:24, 21:21,
21:24, 23:6,
25:7
**responses** [8]
- 26:19,
28:9, 30:12,
30:17, 43:9,
43:10, 44:5,
46:12
**responsive** [1]
- 14:23
**rest** [2] -
16:23, 20:10
**retaliation** [4] -
24:16, 24:22,
25:5, 25:8

**retracted** [2] -
18:13, 18:16
**return** [1] -
41:19
**returned** [2] -
61:1, 61:2
**review** [3] -
18:23, 29:13,
29:17
**reviewed** [1] -
27:24
**Richmond** [7]
- 23:4,
23:16, 24:5,
24:9, 24:15,
25:4, 41:21
**rigor** [1] -
18:24
**rigorous** [1] -
28:11
**ROOM** [1] -
56:1
**room** [2] - 6:6,
36:4
**Rule** [1] -
60:22
**Rules** [1] -
1:25

## S

**sake** [1] - 21:7
**Salvador** [2] -
12:20, 12:22
**Samantha** [2] -
4:6, 52:4
**SAMANTHA**
[1] - 2:4
**Schenker** [3] -
16:16, 16:23,
17:4
**Schenkerian**
[5] - 3:17,
6:14, 19:15,
48:15, 51:7
**scholar** [1] -
26:1
**scratch** [1] -
43:14
**screen** [1] -
7:6
**second** [3] -
6:3, 14:9,
41:20
**secondhand**
[12] - 26:10,
26:24, 27:12,
30:3, 32:12,
32:15, 32:21,
35:17, 36:6,

45:10, 48:21,
50:5
**Secondly** [1] -
22:3
**section** [1] -
18:3
**see** [5] - 6:17,
14:22, 23:19,
24:1, 29:16
**seeing** [5] -
35:24, 37:6,
43:13, 48:11,
57:22
**seem** [1] -
39:11
**selectively** [6]
- 29:14,
29:15, 29:19,
30:2, 43:20,
43:25
**self** [1] - 21:7
**self-
preservation**
[1] - 21:7
**SEM** [1] - 3:16
**semester** [1] -
37:7
**Semite** [1] -
18:6
**Semitic** [4] -
15:6, 16:21,
42:17, 43:3
**Semitism** [3] -
16:17, 17:6,
42:20
**SENIOR** [1] -
2:15
**sent** [5] - 8:9,
11:13, 41:21,
47:12, 47:14
**sentence** [2] -
29:18, 44:13
**sentiments** [2]
- 15:1, 15:2
**serve** [3] -
47:15, 47:17,
47:18
**several** [4] -
36:7, 36:8,
40:9, 40:17
**Several** [1] -
21:25
**sexism** [1] -
38:7
**sexist** [3] -
35:10, 48:3,
48:9
**share** [6] -
10:13, 13:11,
14:14, 24:10,

44:19, 46:10
**shared** [2] -
9:8, 9:13
**shares** [1] -
9:20
**sharing** [2] -
9:15, 46:13
**SHERMAN** [2]
- 1:2, 60:2
**shit** [4] - 54:2,
55:1, 56:8,
56:12
**shit"** [1] - 52:8
**Shorthand** [1]
- 60:15
**shorthand** [1]
- 1:22
**shots** [1] - 7:6
**show** [5] -
10:19, 10:20,
21:2, 23:5,
57:12
**sign** [1] - 58:11
**signatories** [1]
- 25:2
**signature** [1] -
60:23
**Signature** [1] -
61:3
**signed** [7] -
24:11, 24:13,
29:22, 47:7,
55:5, 55:15,
58:17
**significant** [5]
- 26:7, 26:9,
27:2, 27:14,
27:15
**signing** [1] -
25:21
**simplification**
[1] - 54:22
**single** [1] -
26:12
**site** [1] - 46:7
**situation** [2] -
20:17, 52:25
**situations** [1] -
25:11
**skimmed** [1] -
47:10
**slight** [1] -
52:14
**smiled** [1] - 6:6
**Smith** [1] -
1:23
**SMT** [1] -
26:16
**social** [2] -
12:2, 13:11

**society** [1] -
13:23
**sole** [2] - 18:4,
18:5
**solely** [1] -
17:20
**soliciting** [1] -
27:18
**solid** [1] - 37:5
**someone** [20] -
7:24, 16:25,
22:9, 24:19,
25:7, 25:8,
25:22, 25:25,
38:11, 44:4,
46:3, 46:4,
49:9, 49:15,
50:9, 52:5,
54:13, 54:14,
55:1, 56:8
**sometimes** [1]
- 17:7
**somewhere**
[1] - 10:2
**songs** [1] -
16:9
**sorry** [9] -
12:23, 14:7,
17:21, 24:3,
24:21, 28:14,
32:8, 32:18,
34:12
**sort** [6] - 13:3,
34:19, 38:11,
41:25, 56:15,
56:16
**sound** [1] -
44:14
**specific** [3] -
16:13, 17:1,
21:17
**specifically**
[17] - 5:16,
7:17, 15:2,
17:16, 18:16,
21:15, 33:4,
34:3, 35:12,
35:21, 36:10,
38:8, 38:15,
40:13, 41:17,
45:19, 53:3
**specified** [1] -
58:24
**speculate** [4] -
20:16, 38:23,
38:24, 44:1
**speculated** [1]
- 39:6
**speculating**
[1] - 39:3

speculation [3] - 24:24, 25:10, 39:1
speech [1] - 18:8
spelled [1] - 37:25
spoken [2] - 38:6, 46:9
stands [1] - 52:8
stark [1] - 46:23
start [1] - 5:4
State [3] - 1:21, 1:24, 60:16
Statement [1] - 3:16
statement [38] - 9:8, 9:16, 10:15, 10:17, 11:5, 12:1, 12:18, 14:2, 15:23, 25:18, 28:16, 30:20, 32:11, 33:3, 35:1, 35:7, 35:9, 38:2, 38:3, 41:2, 41:4, 41:20, 42:3, 42:4, 43:7, 47:21, 47:25, 51:6, 51:13, 51:18, 54:17, 55:4, 56:18, 56:19, 58:1, 58:12, 58:17, 58:20
statements [2] - 9:14, 41:12
STATES [2] - 1:1, 60:1
States [1] - 49:7
Station [1] - 2:12
Stearns [1] - 23:8
stereotype [2] - 15:5, 43:2
stereotyped [1] - 17:19
stereotypes [1] - 17:9
Stevens [2] - 14:5, 37:23
stipulate [1] - 4:17
Stipulations..

................... ...................
[1] - 3:4
stop [1] - 34:12
stories [1] - 54:3
STOWERS [1] - 2:15
strengthened [1] - 41:25
strongly [1] - 52:16
structures [2] - 15:20, 25:18
student [19] - 5:13, 7:24, 13:23, 33:13, 33:21, 34:8, 35:4, 36:18, 36:24, 36:25, 38:2, 40:8, 40:18, 41:20, 48:19, 51:17, 53:13, 56:18
students [20] - 9:16, 12:2, 12:13, 23:3, 23:12, 24:13, 25:16, 25:21, 32:16, 33:11, 33:24, 33:25, 34:23, 40:9, 40:17, 44:11, 45:9, 51:13, 53:10, 54:8
students' [3] - 23:15, 49:24, 58:5
Studies [5] - 3:17, 6:14, 19:15, 48:15, 51:7
studying [3] - 5:16, 5:17, 5:24
styled [1] - 1:19
submissions [2] - 29:20, 30:9
submitted [1] - 26:13
Subscribed [1] - 61:14
suggest [1] - 24:9
suggesting [1] - 25:2

Suite [1] - 1:23
summer [5] - 36:16, 36:22, 37:3, 37:8, 37:20
superior [1] - 15:14
support [2] - 51:13, 51:17
supposed [2] - 36:19, 45:17
supposedly [2] - 11:9, 13:24
surname [1] - 7:21
sworn [4] - 1:19, 4:3, 60:18, 61:14
symposia [1] - 27:24
symposium [3] - 28:3, 43:11, 46:21
SYSTEM [1] - 2:16
systemic [2] - 15:18, 15:19
Systemic [1] - 15:20

## T

talks [4] - 26:7, 32:4, 32:9, 41:10
taught [1] - 35:24
teacher [1] - 48:13
Teams [2] - 3:15, 22:23
ten [1] - 50:19
tenured [1] - 53:10
term [3] - 37:2, 41:16, 55:10
termination [1] - 58:23
terms [2] - 36:23, 36:25
Terrific [1] - 8:14
testified [2] - 4:3, 57:6
testimonies [1] - 48:12
testimony [7] - 4:13, 5:6, 5:10, 9:3,

42:23, 42:25, 60:20
TEXAS [4] - 1:1, 2:11, 2:16, 60:1
Texas [7] - 1:21, 1:24, 2:12, 5:25, 60:16, 61:17, 61:20
Text [1] - 3:14
THAD [1] - 2:4
THE [13] - 1:1, 1:1, 2:3, 2:9, 17:25, 20:2, 34:16, 34:18, 39:25, 55:25, 59:3, 60:1, 60:1
theorist [6] - 13:15, 13:20, 13:21, 13:24, 14:8, 52:5
theorists [3] - 14:1, 14:10, 14:11
Theorists [1] - 13:18
theory [7] - 5:17, 5:18, 5:22, 5:25, 6:4, 35:23, 35:25
therefor [1] - 61:4
therefore [1] - 44:16
thinking [2] - 36:11, 39:8
third [4] - 33:13, 33:18, 34:8, 35:3
third-hand [4] - 33:13, 33:18, 34:8, 35:3
threats [4] - 49:24, 50:13, 50:14, 58:5
throughout [1] - 8:17
timeline [1] - 54:22
TIMOTHY [3] - 1:3, 2:20, 60:3
Timothy [1] - 49:2
TO [2] - 34:18, 55:25

today [5] - 5:6, 9:2, 50:6, 56:24, 57:6
together [1] - 28:3
took [1] - 37:21
top [3] - 55:9, 55:12, 57:15
toxic [4] - 30:25, 31:9, 31:10, 31:16
track [1] - 28:14
transcript [2] - 60:19, 61:2
treated [9] - 31:12, 31:19, 31:22, 33:14, 33:16, 33:20, 34:9, 34:23, 35:4
treatment [2] - 33:5, 33:25
trial [2] - 4:20, 59:6
true [1] - 60:20
trust [3] - 41:5, 54:4, 54:24
truthful [2] - 5:6, 5:10
try [2] - 21:12, 21:16
trying [1] - 14:7
turned [1] - 30:5
tweet [8] - 9:8, 9:14, 9:15, 9:20, 10:24, 10:25, 11:13
tweeted [6] - 9:19, 10:7, 10:17, 11:1, 27:11, 42:1
tweeting [2] - 7:16, 7:17
tweets [4] - 9:17, 9:18, 10:20, 10:23
Twitter [9] - 3:18, 7:5, 9:21, 10:22, 13:25, 14:15, 30:22, 52:1, 54:21
two [7] - 8:13, 11:3, 22:16, 40:14, 43:8, 43:13, 43:15

two-week [1] - 43:15
type [1] - 31:13

## U

U.S [1] - 48:25
unacceptable [2] - 38:5, 57:19
under [13] - 21:3, 27:11, 28:21, 29:12, 34:1, 34:4, 45:24, 46:25, 48:5, 48:6, 49:22, 57:14, 58:3
Under [2] - 29:17, 49:22
undergraduate [1] - 5:20
Understood [1] - 43:4
unfounded [1] - 35:24
United [1] - 49:7
UNITED [2] - 1:1, 60:1
university [3] - 8:3, 18:18, 19:1
University [6] - 5:20, 5:21, 5:23, 5:25, 53:23, 54:12
UNIVERSITY [1] - 2:16
unless [1] - 14:16
unpopular [1] - 24:19
unpublished [1] - 45:19
unspecified [1] - 35:5
UNT [16] - 3:17, 5:14, 7:25, 11:17, 21:13, 30:25, 31:10, 31:16, 35:16, 52:15, 53:14, 53:21, 53:24, 57:4, 57:7, 58:16
UNT's [2] - 31:15, 51:7
up [3] - 21:1, 48:5, 48:25

upset [3] - 19:5, 19:11, 19:24

## V

vague [4] - 20:7, 30:3, 44:1, 44:4
valid [1] - 15:13
verbal [1] - 36:2
verbally [1] - 35:21
verify [1] - 10:16
version [12] - 10:17, 10:18, 11:4, 11:8, 11:9, 11:25, 12:12, 28:15, 30:20, 41:20, 42:1, 57:25
versions [1] - 11:3
vice [1] - 13:22
victims [3] - 52:23, 53:1, 53:6
view [2] - 44:19, 49:20
Virani [1] - 3:14
Virani's [1] - 9:18
visa [2] - 36:24, 37:1
visiting [1] - 52:15
Vista [1] - 61:19
Vivek [1] - 3:14
Volume [8] - 6:13, 7:1, 7:8, 15:1, 19:18, 27:3, 28:4, 56:22
volume [2] - 15:3, 29:8

## W

Walls [3] - 41:9, 41:10, 41:15
warn [1] - 52:24
warned [4] - 52:16, 53:17,

Rachel Gaines   5/19/21

53:20
**WAS** [3] -
17:25, 20:2,
39:25
**week** [3] -
37:2, 43:9,
43:15
**weeks** [1] -
43:13
**Western** [1] -
5:23
**WHALEY** [1] -
61:18
**whereas** [2] -
25:16, 45:19
**whistleblowe
rs** [4] - 41:7,
41:12, 41:15
**white** [9] -
15:21, 17:11,
31:12, 39:13,
39:14, 39:16,
39:19, 39:24,
40:4
**whole** [1] -
22:1
**wife** [1] - 40:10
**willing** [1] -
22:6
**wish** [1] -
24:20
**wishes** [1] -
53:12
**wishing** [1] -
25:25
**witness** [3] -
1:18, 60:18,
60:21
**WITNESS** [2] -
34:16, 59:3
**Witness** [2] -
5:3, 5:15
**woman** [2] -
36:2, 52:18
**women** [1] -
52:22
**word** [6] -
6:11, 11:8,
32:17, 32:18,
32:19
**wording** [1] -
48:1
**words** [8] -
11:11, 32:23,
32:24, 37:16,
47:10, 47:25,
56:5, 58:20
**works** [1] -
45:22
**WRIGHT** [2] -

1:6, 60:6
**write** [4] -
43:13, 44:13,
44:14, 47:25
**writing** [4] -
43:14, 44:17,
46:10, 46:12
**wrote** [2] -
43:22, 50:19

## Y

**Yale** [1] - 35:25
**year** [4] - 5:21,
6:2, 6:3,
36:20
**Yiyi** [7] - 36:14,
37:19, 37:23,
38:9, 40:18,
50:3, 50:23
**yourself** [3] -
8:20, 12:16,
44:11

## Z

**Zoom** [4] -
13:2, 13:5,
42:6, 42:7