1          UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TEXAS
2             SHERMAN DIVISION

3  TIMOTHY JACKSON,           *
                              *
4          Plaintiff,         *
                              *
5  VS.                        *  CASE NO. 4:21-CV-00033-ALM
                              *
6  LAURA WRIGHT, ET AL.,      *
                              *
7          Defendants.        *

8

9       _____

10   ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

11                JENNIFER COWLEY

12               SEPTEMBER 26, 2024

13      _____

14

15

16          ORAL AND VIDEOTAPED VIDEOCONFERENCE

17  DEPOSITION of JENNIFER COWLEY, produced at the instance

18  of the Plaintiff, and duly sworn, was taken in the

19  above-styled and numbered cause on the 26th day of

20  September, 2024, from 9:04 a.m. to 2:58 p.m., before

21  Carla A. Sims, AAS, CSR, RPR, in and for the State of

22  Texas, reported by method of machine shorthand, via Zoom

23  videoconference, pursuant to the Federal Texas Rules of

24  Civil Procedure and the provisions stated on the record

25  or attached hereto.

1                 A P P E A R A N C E S

2          ALL PARTIES AND WITNESS APPEARED VIA
                  ZOOM VIDEOCONFERENCE
3

4    COUNSEL FOR THE PLAINTIFF:

5         Mr. Michael Thad Allen
          ALLEN LAW, LLC
6         P.O. Box 404
          Quaker Hill, Connecticut 06375
7         860/772-4738 (tel)
          m.allen@allen-lawfirm.com
8
     COUNSEL FOR THE DEFENDANTS and JENNIFER COWLEY:
9

10        Ms. Mary Quimby
          TEXAS ASSISTANT ATTORNEY GENERAL
          P.O. Box 12548
11        Capitol Station
          Austin, Texas 78711
12        mary.quimby@oag.texas.gov

13   COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:

14        Mr. Renaldo L. Stowers
          DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
15        115 Union Circle No. 310907
          Denton, Texas 76203
16        940/565-2717 (tel)
          renaldo.stowers@untsystem.edu
17
     COUNSEL FOR THE UNIVERSITY OF TEXAS AT ARLINGTON
18
          Mr. Shelby Boseman
19        CHIEF LEGAL OFFICER, THE UNIVERSITY OF TEXAS AT
          ARLINGTON
20        701 South Nedderman Drive
          Arlington, Texas 76019
21        sboseman@uta.edu

22   ALSO PRESENT:

23   VIDEOGRAPHER:

24        Mr. Jason Warner
          Legal Video Group
25        lvg.dallas@gmail.com
          214-598-5229

1                   I N D E X

2                                                    PAGE

3  Appearances...................................   2

4

5  JENNIFER COWLEY

6  Examination by Mr. Allen.......................   5

7

8  Changes and Signature.........................  213

9

10  Reporter's Certificate........................  215

11  Further Certification.........................  217

12

13                 REPORTER'S NOTE

14            Please note that due to the quality

15  of the transmission data for a Zoom videoconference,

16  cross-talk causes audio distortion in the testimony when

17  preparing a videoconference transcript.

18

19                E X H I B I T S

20  NO.    DESCRIPTION                              PAGE

21  1      Deposition Notice.......................  116

22  2      Email...................................  116
         UNT_000568

23
   3      UNT Webpage Printout....................  129
24         UNT_000106

25  4      Allen Law Letter........................  132
         UNT_000157 to UNT_000162

5      Email String...........................  140
       UNT_002453 to UNT_002454

6      Email..................................  142
       UNT_002460

7      Provost Letter.........................  159
       JACKSON000261 to JACKSON000263

8      Center Review Report...................  167
       JACKS_067377 to JACKS_067401

9      Ad Hoc Review Panel Report.............  170
       JACKSON000208 to JACKSON000233

10     Ad Hoc Panel Report Student Statement...  185

11     Deposition of Levi Walls...............  193

12     Provost Letter.........................  198
       JACKSON000271

13     Email..................................  206
       JACKSON000272

```
 1                    P R O C E E D I N G S
 2                 (Time 9:04 a.m.)
 3                 VIDEOGRAPHER:  Today is September 26th,
 4     2024.  The time is 9:04 a.m. Central.  We're on the
 5     record.
 6                 (The witness was sworn)
 7                 MR. ALLEN:  Do you want the attorneys to
 8     all state their name for the record?
 9                 COURT REPORTER:  That would be fine.
10                 MR. ALLEN:  This is Michael Thad Allen for
11     the Plaintiff Timothy Jackson.
12                 MS. QUIMBY:  This is Mary Quimby,
13     Assistant Attorney General with the Texas Attorney
14     General's Office.  I represent the defendants in this
15     matter and Jennifer Cowley in this deposition.
16                 MR. STOWERS:  Renaldo Stowers, Deputy
17     General Counsel for the University of North Texas System.
18                 MR. BOSEMAN:  Shelby Boseman, Chief Legal
19     Officer at the University of Texas at Arlington.
20                 JENNIFER COWLEY,
21     having been first duly sworn, testified as follows:
22                         EXAMINATION
23     BY MR. ALLEN:
24          Q.   Thank you, President Cowley.  As you just
25     heard, I represent Timothy Jackson in this case.  Thank
```

*Jennifer Cowley      09/26/2024*

1  you for attending the deposition today.  Could I just ask

2  you to state your name for the record, please.

3       A.    It's Jennifer Cowley, and last name is spelled

4  C-o-w-l-e-y.

5       Q.    So just as a preliminary matter, I just wanted

6  to go over some of the so-called rules of the road in a

7  deposition.  Have you ever been deposed before?

8       A.    I have.

9       Q.    When were you deposed?

10      A.    I don't recall the exact year.  Around 2018 or

11 2019.

12      Q.    What was the matter in which you were deposed?

13 The case, legal matter?

14      A.    It was a legal matter related to the University

15 of North Texas.

16      Q.    Can you identify the case?

17      A.    I would not be able to give you a case number.

18      Q.    Do you know the parties?

19      A.    I recall generally the nature of the matter but

20 wouldn't be able to give you the exact names.  That would

21 be -- have to be something to look up.

22      Q.    Was the University of North Texas being sued?

23      A.    Yes.

24      Q.    Was the University of North Texas being sued by

25 one of its own employees?

Jennifer Rowley       09/26/2024

```
 1        A.    Yes.

 2        Q.    You don't recall the name of that employee?

 3        A.    I don't remember their exact name.

 4        Q.    If you don't remember their exact name, do you

 5   know the name and as much as you can remember?

 6        A.    They were an employee in the College of

 7   Engineering.

 8        Q.    What was the nature of the suit?  And I'm just

 9   asking for your -- I'm sorry.  I'm just asking for your

10   understanding, not, you know, the legal definition.  But

11   do you understand the -- give me your understanding,

12   please, of the nature of the suit.

13        A.    It was a personnel related lawsuit.

14        Q.    When you say that, personnel related, what do

15   you mean?

16        A.    Related to work conditions.

17        Q.    Was it a discrimination suit?

18        A.    Discrimination was one of the accusations by

19   the plaintiff.

20        Q.    On the basis of what?

21        A.    I believe it was on the basis of national

22   origin.

23        Q.    What was the professor's national -- or excuse

24   me.  Strike that, please.

25              What was the employee's national origin, if you
```

*Jennifer Crawley    09/26/2024*

1  recall.

2       A.    I don't recall their exact national origin.

3       Q.    And the employee we're talking about, just

4  remind me, was the plaintiff or a witness?

5       A.    Can you repeat the question?

6       Q.    The employee in this case that you -- we've

7  been talking about, this was the plaintiff in the case?

8       A.    Correct.

9       Q.    Okay.  So you've mentioned this case in 2018,

10 2019 in which you testified.  Were there any other

11 depositions that you gave in your -- in the past?

12 Excuse me.

13      A.    No.

14      Q.    Well, since you've been deposed before, some of

15 the things I'll say now are probably -- are things that

16 you heard about in your first deposition back in 2018 or

17 2019.  And some of the problems I think we've already

18 encountered, but we'll just go over these rules or

19 instructions, if you will.

20            First I'm going to ask you a question.  Is

21 there anything that would prevent you from testifying

22 truthfully today?

23      A.    No, there is not.

24      Q.    You're not on any medications?

25      A.    No medications.

1      Q.    You're not suffering from an illness or a
2  mental condition that would impair your memory or ability
3  to testify?

4      A.    No.

5      Q.    One thing that may happen from time to time
6  today is your attorney will object.  That's part of
7  creating a record for the court.  It does not relieve you
8  of the obligation to answer the question truthfully. Is
9  that understood?

10     A.    Yes.

11     Q.    There are some few exceptions.  They will be
12  very clear if they come up because your attorney will
13  instruct you not to answer a question.  But those are --
14  usually doesn't come up, but if it does, trust me.  It
15  will be very clear.

16          If you don't understand a question or you want
17  clarification of a question that I ask, please interrupt
18  me at any time.  That's perfectly normal.  It's probably
19  because I posed an unclear question.  And I want you to
20  be able to answer the question clearly as well.  Is that
21  clear?

22     A.    Yes.

23     Q.    By the same token, if you do not ask for
24  clarification of a question, I'll understand from that
25  that you comprehend the question as asked.  Is that

*Jennifer Crawley     09/26/2024*

1   understood?

2        A.    Yes.

3        Q.    Can you explain for the court what you did to

4   prepare for today's deposition but with one exception.

5   I'm not going to ask you what your attorneys and you

6   discussed in terms of legal advice.

7              Although it is not privileged to state that you

8   met with your attorney, I'm not going to ask what they

9   said.  So with that as a caveat, let me rephrase the

10  question.  Can you explain what you have done to prepare

11  for today's deposition?

12       A.    For today's deposition I reviewed the Ad Hoc

13  Review Panel Report that was prepared.

14       Q.    Did you review any other documents?

15       A.    I did not.

16       Q.    And I think we'll get to this, but you're

17  referring to the Ad Hoc Panel Report that was issued on

18  November 25th, 2020?

19       A.    Correct.

20       Q.    Okay.  You didn't review any of your

21  correspondence?

22       A.    I did not.

23       Q.    Did you speak to anyone in preparation for your

24  deposition today?

25       A.    Only legal counsel.

1    Q.    By legal counsel, do you mean Mary Quimby?

2    A.    Correct.

3    Q.    Did you also speak with Renaldo Stowers?

4    A.    I did.

5    Q.    And approximately how long did you meet with

6    your attorneys?

7    A.    An hour or an hour and a half in total.

8    Q.    Was the University of Texas Arlington counsel,

9    I believe Shelby Boseman, in attendance?

10    A.    He was.

11    Q.    Any other attorneys in attendance during your

12    preparation?

13    A.    There was one other, Ben.  I'm sorry.  I don't

14    remember Ben's last name.

15    Q.    If I said Walton, would that refresh your

16    memory?

17    A.    Yes.  That sounds correct.

18    Q.    We probably know Ben Walton better than you do

19    by now.

20    A.    I'm sure.

21    Q.    And all of these attorneys are employed by the

22    State of Texas in one capacity or another?

23    A.    Correct.

24    Q.    To the best of your knowledge, they're all paid

25    for by the taxpayers of Texas?

*Jennifer Cowley     09/26/2024*

```
 1        A.     I couldn't speak to the source of funding for

 2   any individual position.

 3        Q.     Are you aware of any private funding for the

 4   defense of this lawsuit?

 5        A.     I am not.

 6        Q.     I want to ask you now about your career and

 7   qualifications as a kind of introductory part of our

 8   deposition.  But the first question I guess I want to ask

 9   is you were provost in 2020 at the University of North

10   Texas, right?

11        A.     That's correct.

12        Q.     And at some time between now and then, you left

13   the University of North Texas, right?

14        A.     Correct.

15        Q.     Can you state for the record when you left the

16   University of North Texas and why?

17        A.     I left in the year of 2022 to become the

18   President at the University of Texas at Arlington.

19        Q.     Is the University of Texas at Arlington a

20   different university system from the University of North

21   Texas?

22        A.     It is.  That's correct.  It's a different

23   system.

24        Q.     And so just to sum up, they're freestanding

25   university systems, correct?
```

1      A.    Correct.

2      Q.    Since you left in 2022, you were aware of this

3 lawsuit at the time you departed for the University of

4 Texas at Arlington, right?

5      A.    Correct.

6      Q.    Okay.  Can you briefly describe your

7 educational career?  By that I mean the degrees you've

8 earned, what schools you attended, when you graduated

9 starting with your undergraduate degree to the present?

10      A.    Sure.  I received a Bachelor of Science in

11 Political Science from Texas A&M in 1994, a Master's of

12 Urban Planning degree from Texas A&M University in 1996,

13 a Master's of Public Administration degree from the

14 University of North Texas in 1997, a Ph.D. degree from

15 Texas A&M University in 2000.

16          And then later, I believe it was in 2020, a

17 Master's of Interdisciplinary Studies degree from the

18 University of North Texas.

19      Q.    I think you mentioned a Ph.D. at Texas A&M

20 University, right?

21      A.    That's correct.

22      Q.    What was that in?

23      A.    It was in Urban and Regional Science.

24          And I'm going to ask for just a very brief

25 pause so I can shut a door.  There is some noise in the

*Jennifer Crowley      09/26/2024*

1  backgrounded that I'd like to shut out if that's okay.

2      Q.    Before you go, if you want a break at any

3  time -- I should have said this -- feel free to ask.

4  This is appropriate obviously but if you need -- you

5  know, obviously yes.  So do we need to go off the record,

6  or it's just on the other side of the room or whatnot?

7      A.    It's on the other side of the room.  I'll be

8  back in 30 seconds, I think.

9      Q.    Okay.  Yeah.  That's fine.

10     A.    Okay.

11     Q.    Thank you.  So let me see if I've got this

12 right.  You had a poli-sci degree from Texas A&M, your

13 undergraduate degree, in 1994?

14     A.    That's correct.

15     Q.    And that was a BS?

16     A.    Correct.

17     Q.    Then you went on to get a Master's Degree in

18 Urban Planning in 1996?

19     A.    That's correct.

20     Q.    Did I hear rightly that was also at Texas A&M?

21     A.    Correct.

22     Q.    Then immediately thereafter, you got a Master's

23 in Public Administration but this time from the

24 University of North Texas, right?

25     A.    That's correct.

1      Q.    You finished that degree in 1997.

2      A.    Yes.

3      Q.    Then you went to the Ph.D. in Urban and

4  Regional Science.  Is that what it was?

5      A.    That's correct.

6      Q.    And that was also at Texas A&M?

7      A.    That's correct.

8      Q.    You got -- earned that degree in 2000?

9      A.    That's correct.

10      Q.    Did you go directly from the Public

11  Administration program at the University of North Texas

12  after graduation into the Ph.D. program?

13      A.    I did not.  I worked professionally as a city

14  planner for the City of Amarillo for a brief time before

15  I returned to get my Ph.D.

16      Q.    Okay.  So you were not in academia at that

17  time?

18      A.    At what time?

19      Q.    In that period between earning the 1997 Public

20  Administration Degree and returning for your Ph.D.

21      A.    Correct.  In 1997 I was employed by the City of

22  Amarillo.

23      Q.    So then there was about a 20 year period

24  between the Ph.D. and your return to get a Master's in

25  Interdisciplinary Studies?

*Jennifer Cowley    09/26/2024*

1            A.    Correct.

2            Q.    And that last degree was earned at the

3   University of North Texas?

4            A.    That's correct.

5            Q.    And I assume but I'm going to ask was that

6   while you were also working as the provost for the

7   University of North Texas?

8            A.    That's correct.

9            Q.    Okay.  Thank you.  So some of this you've now

10  just answered, but can you describe your professional

11  career in academia starting with your first job and up

12  through the present?

13           A.    Correct.  I worked as a research scientist for

14  Texas A&M University.  And then I went to Ohio State

15  University where I served as a faculty member moving from

16  the rank of assistant professor up to full professor.

17           I served in a variety of administrative roles

18  including as the Head of the City and Regional Planning

19  Program, Associate Dean of the College of Engineering,

20  Vice Provost in the Office of the Provost of Ohio State

21  University.

22           I then left Ohio State University in 2017 to go

23  to the University of North Texas to become the provost

24  where I served for approximately five years before moving

25  to the University of Texas at Arlington in 2022 to become

*Jennifer Crawley    09/26/2024*

1  the president.

2      Q.   So when -- when did you enter the faculty at

3  Ohio State?  What year?

4      A.   2001.

5      Q.   And you were a faculty in what department?

6      A.   City and Regional Planning.

7      Q.   Was that in the Engineering School?

8      A.   It was in the School of Architecture which is

9  in the College of Engineering.

10      Q.   Thank you.  And then you became an associate

11  dean, correct?

12      A.   After I was the Head of the City Planning

13  Program, I became the Associate Dean.

14      Q.   And remind me.  Associate Dean of what?

15      A.   Academic Affairs.

16      Q.   And when did you assume that position?

17      A.   I believe it was around 2011.

18      Q.   And then you became the Vice Provost at the

19  Ohio State University?

20      A.   Yes.

21      Q.   When did you become the -- excuse me -- Vice

22  Provost?

23      A.   2014.

24      Q.   What were your duties as Vice Provost?

25      A.   I had a range of duties that included capital

1  planning for the university as well as responsibility for

2  the regional campuses of the university.

3       Q.    Does capital planning mean overseeing

4  construction of new building, investment in

5  infrastructure, things like that?

6       A.    Correct.  Just to clarify, it would be the

7  planning for those new facilities.

8       Q.    Thank you.  When you took the job at the

9  University of Texas Arlington as president, did you

10 consider that a promotion or an advancement?  Let's say

11 an advancement in your career?

12      A.    It was an advancement opportunity.

13      Q.    Did you receive that advancement opportunity

14 based in part on your track record at the University of

15 North Texas as a provost?

16            MS. QUIMBY:  Objection, form.

17            You can answer.

18      A.    You would have to ask the Board of Regents why

19 they chose to hire me, but I think it is reasonable that

20 my track record was a reason for selection.

21      Q.    (By Mr. Allen) Thank you.  And I'm assuming you

22 did extensive interviews for that job?

23      A.    Correct.

24      Q.    Did they ask you about your experience and

25 accomplishments as the Provost of the University of North

*Jennifer Crawley    09/26/2024*

```
 1   Texas?

 2       A.    Correct.

 3       Q.    Extensively?

 4       A.    In the interviews, I pulled from the range of

 5   experiences across my career at both the University of

 6   North Texas and Ohio State University.

 7       Q.    Did you discuss this lawsuit with anyone at the

 8   University of Texas Arlington during the interview

 9   process?

10       A.    I disclosed any legal matters with the Vice

11   Chancellor of Academic Affairs prior to my hiring.

12       Q.    Did you just disclose it, or was it also

13   discussed?

14       A.    I believe the vice chancellor asked a couple of

15   questions regarding the nature of the matters.

16       Q.    What did you tell him?

17       A.    I described the basics of the case, that there

18   was pending litigation and the basic nature.

19       Q.    Well, why don't you state for the record what

20   you understand the basic nature of the case to be and

21   what parts of that you discussed with the people at

22   University of Texas Arlington?

23             MS. QUIMBY:  Objection, form.

24             You can answer.

25       A.    I explained that it was a matter involving a
```

*Jennifer Crowley    09/26/2024*

1    faculty member who raised concerns about the way that his

2    journal was handled.  And I believe that at the time, I

3    shared an example news article that described the basic

4    nature of Dr. Jackson's arguments.

5         Q.    (By Mr. Allen) Which news article are you

6    referring to?

7         A.    I believe I shared the New York Times article

8    on the matter.

9         Q.    And if you remember, is that the article by

10   Michael Powell, the journalist Michael Powell?

11        A.    I have no recollection of who the author is.

12        Q.    Did you discuss the allegations that Professor

13   Jackson was making concerning the infringement of his

14   First Amendment rights?

15             MS. QUIMBY:  Objection, form.

16             You can answer.

17        A.    I did state that this was a First Amendment

18   case.

19        Q.    (By Mr. Allen) Did you discuss with people at

20   the University of Texas Arlington that the journal

21   Professor Jackson has published has been prevented from

22   further publication by the University of North Texas?

23             MS. QUIMBY:  Objection, form.

24             You can answer.

25        A.    We did not discuss any details.  I did share

1   with Shelby Boseman pending litigation, but that's the

2   only person I had any discussion with.

3       Q.   (By Mr. Allen) And I'm sorry.  I should have

4   said that.  He didn't object or I'm assuming those were

5   not privileged conversations because I'm not asking about

6   it since he's counsel.  But that was during your

7   interview?

8       A.   No.  That was after -- Shelby Boseman was not

9   involved in my interview process.

10      Q.   Okay.

11      A.   It was after I started at UTA.

12      Q.   Okay.  But in your interview process, it was

13  not discussed that the Journal of Schenkerian Studies,

14  which is the journal in question, had ceased publication?

15      A.   There was no detailed conversations about the

16  Journal of Schenkerian Studies or Dr. Jackson.  I simply

17  disclosed that there was pending litigation.

18      Q.   Now, I understand you said before, you're not

19  aware of whether or not the Texas taxpayers pay the four

20  attorneys who are here attending your deposition.  But

21  they do -- you do know that the university -- excuse me.

22  That your salary is paid by the Texas taxpayers, right?

23           MS. QUIMBY:  Objection, form.

24           You can answer.

25      A.   My salary is in part paid by the taxpayers and

1  in part paid by tuition dollars of students who attend

2  the University of Texas at Arlington.

3      Q.    (By Mr. Allen) That they pay to the state,

4  right?

5              MS. QUIMBY:  Objection, form.

6      A.    The students pay those dollars directly to the

7  university.  The university is a state institution.

8      Q.    (By Mr. Allen) Thank you.  Would you answer the

9  same if I asked you about your salary when you were the

10  Provost of the University of North Texas?

11      A.    It would be a similar answer, yes.

12      Q.    And the University of North Texas is also a

13  state institution, right?

14      A.    That's correct.  It's a state supported

15  institution.

16      Q.    I assume over the course of your academic

17  career, going back to that, that you've published

18  scholarship?

19      A.    Correct.

20      Q.    And I understand these are very different

21  fields from the field of music theory.  Can you explain

22  for the record how many publications you have?

23      A.    I couldn't tell you an exact number.  It's many

24  publications, many journal publications and other forms

25  of publications.

Jennifer Crawley    09/26/2024

```
 1      Q.    Sure.  Well, let's start with journal
 2  publications.  And I understand that you may not know the
 3  exact number.  That's perfectly normal.  But could you
 4  just state for the record approximately how many journal
 5  articles you've published in academic journals?
 6      A.    I'll say as an order of magnitude, maybe 40
 7  journal articles.
 8      Q.    And when you said other forms of publications,
 9  have you published chapters in academic books?
10      A.    Yes.
11      Q.    About how many?
12      A.    Maybe half a dozen.
13      Q.    Have you published any academic books?
14      A.    I have.
15      Q.    How many?
16      A.    I've served as the editor for a couple of
17  volumes, maybe four.
18      Q.    And you know as the provost and president of an
19  academic institution what a monograph refers to, right?
20      A.    Yes.
21      Q.    Can you state for the record what academics
22  mean when they say a monograph?
23      A.    A common word would be book that one has
24  published and written themselves or with coauthors.
25      Q.    Okay.  So have you published any monographs?
```

1      A.    I have not.

2      Q.    As opposed to an edited volume of -- it's

3  loosely -- a monograph is usually a book that addresses a

4  specific scholarly subject and coherently by the single

5  author, right?

6      A.    Correct.  With other authors.

7      Q.    Right.  And obviously could coauthor.  But

8  we're not talking about a collection of different essays

9  addressing -- addressing different topics, right?

10      A.    Correct.

11      Q.    And so I only ask that because I think most

12  people who aren't in the world of academia, don't -- you

13  know, they don't just go to the book store and buy a

14  quote "monograph."  So now that that's cleared, did I ask

15  if you've published a monograph?

16      A.    I have not published a monograph.

17      Q.    Okay.  And now, of course, it's obviously an

18  extensive publication record which is unsurprising for

19  someone who's achieved what you have.  Have you ever

20  published articles that were not peer reviewed?

21      A.    I have.

22      Q.    And again I'm not asking for an exact number on

23  the dot, but approximately how many were not peer

24  reviewed?

25      A.    I'll offer some clarification.  So I

1  believe --

2       Q.    Sure.

3       A.    -- one was published in a journal.  I have many

4  that were published for professional publications such as

5  magazines.

6       Q.    I was just going to ask what do you mean by

7  professional publications?

8       A.    For example, professional magazines, news

9  letters, things of that nature that are published by

10  professional societies.  You know, my discipline of city

11  planning, there are people who are city planners that

12  practice professionally, and so it's writing to that

13  professional practice audience.

14       Q.    And so I -- I mean, in a way law school is the

15  same way, right, but at different.  So you -- I'm just

16  trying to get a handle on this.  Do academics also turn

17  to professional publications as a source of scholarship?

18       A.    Depending on their discipline.

19       Q.    Well, in your discipline.

20       A.    In my discipline of city planning, it would be

21  common to write both for a scholarly audience as well as

22  to have publications for a professional audience.  And

23  they would publish in a wide range of outlets, for

24  example, law journals, city planning journals, history

25  journals.  It would range depending on their

 1  specialization.

 2        Q.    And so you -- what you're describing as

 3  professional publications are certainly considered

 4  sources of scholarship among academics in your field.

 5        A.    It would be the application of scholarship to

 6  the professional field so a translation of scholarly work

 7  to a professional audience.

 8        Q.    And approximately how many of these

 9  publications have you published that were professional

10  publications, as you characterized it?

11        A.    Many.

12        Q.    And when we discussed your journal articles,

13  the articles you've had in academic books and the edited

14  volumes, you weren't including these publications

15  earlier?

16        A.    Correct.

17        Q.    Okay.  So about how many of these publications,

18  which are many, I understand that.  Can you just give me

19  a ballpark?

20        A.    If you include technical reports, magazine

21  articles, news letter publications, all of that, 50 plus.

22        Q.    And the one publication in a journal, which was

23  that?  Do you know the -- it seemed like you had a

24  specific publication in mind.  So if that might be one

25  that you actually know the title of, would you state that

1  for the record?

2      A.    You know, I'm not positive the name of the

3  journal, but it was -- the publisher was the University

4  of Southern Mississippi.

5      Q.    When you edited the four volumes of books,

6  explain the peer review process for those four edited

7  volumes.

8      A.    The proposals for articles were peer reviewed,

9  as I recall, and then the articles were submitted for

10  those books.  So we selected which chapter -- which ideas

11  would be the best ideas to include in the book, and then

12  it went through an editorial review process in the

13  creation of those volumes.

14      Q.    What were the presses involved, if you

15  remember?

16      A.    Ohio State University was one of the presses.

17  I would have to look at my CV to review further.

18      Q.    Okay.  And this one journal article that you

19  published that was not peer reviewed, were you ever

20  accused of becoming a racist because you published a

21  non-peer reviewed article?

22          MS. QUIMBY:  Objection, form.

23      A.    No one has reached out to me about that article

24  that I happened to publish.  I should also clarify that I

25  have -- while I was thinking of that specific article, I

*Jennifer Crawley    09/26/2024*

```
1  have also published a small number of law review articles
2  as well.
3      Q.   (By Mr. Allen) Can you explain for the court
4  the difference in the review process for law reviews
5  compared to many other mainstream academic journals?
6      A.    I'm not an attorney that runs a law review, so
7  I can't speak to a high degree of specificity.  But
8  generally speaking, law reviews have a high degree of
9  engagement with students in the review process compared
10 to a journal that goes through peer review with scholars
11 in their field.
12     Q.   It's common for law reviews to be edited by
13 students, correct?
14          MS. QUIMBY:  Objection, form.
15     A.    It absolutely can.  Sorry.  It is entirely
16 possible for a law review to have student editorial.
17     Q.   (By Mr. Allen) To your knowledge, were the law
18 reviews you published in edited by students?
19     A.    I don't have that information.
20     Q.   Do you know what the law reviews are you
21 published in?
22     A.    I would have to look at my CV, but I believe
23 one of them was out of Tulane.  I don't recall the other
24 what you --
25     Q.    And certainly no one ever said you were less of
```

1  a scholar for publishing --
2              MS. QUIMBY:  I'm sorry.  Is she frozen?
3              MR. ALLEN:  I'm sorry.  She looks frozen.
4  Excuse me.
5              MS. QUIMBY:  Yeah.  It's okay.
6              VIDEOGRAPHER:  Off the record, 9:36.
7              MS. QUIMBY:  Can we go off the record?
8              (Recess taken from 9:36 to 9:38)
9              VIDEOGRAPHER:  The time is 9:38.  We're on
10 the record.
11     Q.   (By Mr. Allen) President Cowley, you've never
12 been criticized for publishing --
13             VIDEOGRAPHER:  We lost her again.
14             THE WITNESS:  No.  I'm here.  I can -- I
15 can see you.  Can you hear me?
16             VIDEOGRAPHER:  Hold on one second.
17             (Discussion off the record)
18             VIDEOGRAPHER:  All right.  Good to go.
19 Thank you.  Sorry about that.
20             MR. ALLEN:  May we proceed?  Thank you.
21     Q.   (By Mr. Allen) So my apologies, President
22 Cowley.  So my question -- just following up on your
23 publication and law reviews.  And you had said you had
24 personal knowledge that at least the Tulane law review
25 was edited by a student?

1    A.    I did not say that.  I said that I know that a
2  publication in a law review.  I believed it was out of
3  Tulane.

4    Q.    And you've never been criticized for publishing
5  in a student run journal if the law reviews were student
6  run?

7    A.    The evaluation of my record is based on the
8  quality of the publications and the extent to which
9  people use those publications to further their own
10  scholarship.

11    Q.    Not whether it was peer reviewed or not?

12           MS. QUIMBY:  Objection, form.

13           Go ahead.

14    A.    In my discipline, there would be an expectation
15  of peer review as a significant component of the overall
16  scholarly work.

17    Q.    (By Mr. Allen) I understand but my question was
18  different.  My question was you've never been criticized
19  for publishing a non-peer reviewed article, have you?

20           MS. QUIMBY:  Objection, form.

21           Go ahead.

22    A.    My scholarly record has not been criticized.

23    Q.    (By Mr. Allen) And to your knowledge, you've
24  never been criticized for publishing in a student run
25  journal?

*Jennifer Crowley      09/26/2024*

1          MS. QUIMBY:  Objection, form.

2          Go ahead.

3     A.    I will note that when I went up for full

4  professor that one of the questions that was raised was

5  around the publication that was in that University of

6  Southern Mississippi editorial -- editorial edited volume

7  and why I chose to publish in a journal that was not

8  widely recognized.

9     Q.    (By Mr. Allen) It was because it was not widely

10 recognized was the focus of their critique?

11    A.    The evaluation criteria in my discipline is

12 relative positioning of any particular journals, and this

13 was categorized as a tier three journal in part because

14 it was not peer reviewed and because it had very low

15 recognition.

16    Q.    And just getting back to the law review

17 articles that I guess you said there were three maybe?

18 Am I --

19    A.    I recall writing two.  One of them was

20 republished in another law journal.  So it makes three

21 publications but two articles, as I recall.

22    Q.    Sure, sure.  And I assume that the getting

23 something recognized by having it republished is actually

24 -- distinguishes a publication, right?

25    A.    It could.

*Jennifer Crowley    09/26/2024*

 1     Q.    Were you ever criticized for publishing in law
 2  reviews?
 3     A.    No.  Planning law is an accepted area of
 4  planning practice, and so it was relevant to the work I
 5  was doing.
 6     Q.    And I know you testified that you weren't sure
 7  whether those law reviews were student edited or not, but
 8  do you remember going through a peer review process with
 9  any of those law reviews?
10     A.    I don't recall the details.  In both of those
11  cases, I copublished with attorneys who obviously had far
12  more familiarity with the law review process.
13     Q.    But that wasn't my question.  It was do you
14  remember a peer review process for any of those law
15  review articles?
16     A.    I don't recall that.
17     Q.    You've never edited an academic journal, have
18  you?
19     A.    I have not served as an editor.  I have served
20  on editorial boards.
21     Q.    What were you on the editorial board -- strike
22  that, please.
23           Can you state for the record what academic
24  journals you served on the editorial board for?
25     A.    I would need to look at my CV for more detail,

*Jennifer Crowley    09/26/2024*

1  but an example of one is the Journal of Planning

2  Literature.

3      Q.    When did you serve on the Journal of Planning

4  Literature?

5      A.    Rough time period, maybe 2015 or 2016, and I

6  think I discontinued my service in maybe 2018.

7      Q.    So approximately a two, three year stint?

8      A.    It could have been longer.  I'd have to review

9  my CV for details.

10      Q.    Sure.  Are you familiar with an organization

11  whose acronym is COPE, C-O-P-E?

12      A.    I am.

13      Q.    What does that stand for?

14      A.    I don't recall what it stands for, but it's an

15  organization that provides information about editorial

16  roles in journals.  They're focused on publications.

17  Professional -- I shouldn't say professional

18  publications.  They're an organization that supports

19  publications and advice to those who seek to publish.

20      Q.    If I said it's the Committee On Publication

21  Ethics, would that refresh your memory?

22      A.    Yes.  That sounds very familiar.

23      Q.    When you were serving on the board of editors

24  for the journals that -- and one of which you remembered

25  was the Journal of Planning Literature.  Is that it?

*Jennifer Crowley    09/26/2024*

1      A.    That's correct.

2      Q.    Do you remember them using the Standards of the

3  Committee on Publication Ethics?

4      A.    I would have had to have gone back and reviewed

5  the materials that were provided to all of the editorial

6  board members.  But this journal is considered one of the

7  best in its field and follows common scholarly practices.

8      Q.    So is your answer that you don't remember the

9  Committee on Publication Ethics setting standards for

10  those journals or you weren't -- let me strike that.

11            Do you remember the Committee on Public

12  Education Standards being required for any of the

13  journals you served as a member of the editorial board?

14      A.    I do not recall that.  I do recall expectations

15  of upholding ethics in the publication process.

16      Q.    What was your understanding of, quote, "ethics

17  in the publication process," closed quote?

18      A.    Just as an example in the peer review process,

19  making sure that that was double blind as just an

20  example.

21      Q.    Can you explain for the record what double

22  blind?  I mean that's something -- every academic knows

23  what that means, but people on the jury may not.  So can

24  you please explain what the means?

25      A.    For example, both the author and the reviewer

 1  of the publication would not be known to each other.

 2        Q.    Is it your view that a publication that is not

 3  double blind in the sense of a double anonymous review of

 4  an article is unethical?

 5              MS. QUIMBY:  Objection, form.

 6              Go ahead.

 7        A.    No.  There are many types of publications that

 8  would have different expectations for how they're

 9  produced and what types of reviews they would be

10  undertaking.

11        Q.    (By Mr. Allen) And is there anything wrong with

12  the journal being student edited?

13        A.    There is nothing inherently wrong with having a

14  student edited journal.

15        Q.    It's not unethical to have a student edited

16  journal, right?

17        A.    It would depend on the nature of how that

18  journal was run.

19        Q.    There is nothing inherently wrong with having a

20  student edited journal, right?

21        A.    I'll repeat that it would depend on how that

22  journal was run.

23        Q.    It's a yes or no question, President Cowley.

24  You can't answer it yes or no?

25        A.    Of course I can answer yes and no questions.

*Jennifer Crowley      09/26/2024*

```
1        Q.    The question is pretty simple.  Is there
2   something inherently wrong with having a student edited
3   journal in academia?
4              MS. QUIMBY:  Objection, form.
5              Go ahead.
6        A.    Students can organize and run a journal.
7        Q.   (By Mr. Allen) Ethically, right?
8              MS. QUIMBY:  Objection, form.
9        A.    It is possible for a student run journal to be
10  run in an ethical way.  It would depend on the specific
11  nature of a journal to determine whether it was or was
12  not being conducted in an ethical way.
13       Q.   (By Mr. Allen) Is it ethical for a student
14  editor to lie about the supervisory board of their
15  journal?
16             MS. QUIMBY:  Objection, form.
17       A.    I can't speak to any circumstance that you're
18  providing information about.
19       Q.   (By Mr. Allen) I'm not providing any
20  information.  I'm asking you a question based on your
21  experience of editing academic books, publishing in
22  academic journals, and serving on the editorial board of
23  various journals which you've testified to.  Is it
24  ethical --
25       A.    Can you --
```

1    Q.   Yeah, sure.  Is it ethical for a student editor
2   to lie about the advisory board of their journal?
3              MS. QUIMBY:  Objection, form.
4    A.   There is not sufficient information for me to
5   answer that question.
6    Q.   (By Mr. Allen) Yeah, there is.  I just asked
7   you if a student editor lies about the advisory board of
8   their journal, is that considered ethical in publishing?
9              MS. QUIMBY:  Objection, form.
10   A.   I don't have the circumstances you're referring
11  to, so I cannot answer this question.
12   Q.   (By Mr. Allen) So you're refusing to answer the
13  question if a student editor lies about their advisory
14  board whether that's ethical or not?
15             MS. QUIMBY:  Objection, form.
16   A.   This is context dependent, and you haven't
17  provided any context so I'm not going to answer this
18  question.
19   Q.   (By Mr. Allen) When you were the provost, was
20  the University of North Texas sued for violations of the
21  First Amendment to the United States Constitution?
22   A.   This lawsuit is a First Amendment case.
23   Q.   Were there any others?
24   A.   You said during my time as provost?
25   Q.   Yes.  2020 to 2022.  Was that it?  Did I get

Jennifer Cowley    09/26/2024

1  that right?

2      A.    2017 to 2022.

3      Q.    Oh, yes.  You're correct.  Sorry about that.

4      A.    It's okay.

5      Q.    So from 2017 to 2022, was the University of

6  North Texas sued for violations of the First Amendment to

7  the United States Constitution?

8      A.    I can't recall any specific lawsuits other than

9  this one.

10     Q.    While you were the provost, did the university

11 receive any grievances from faculty for the violation of

12 their First Amendment rights?

13     A.    The grievance process does flow through my

14 office, and some cases would make it to my office.  But

15 as it relates to First Amendment, I don't recall any

16 specific First Amendment cases.

17     Q.    While you were the provost, did the university

18 receive grievances from faculty for the violation of

19 their academic freedom?

20     A.    Not while I was provost.

21     Q.    Based on your experience as provost and now, I

22 suppose, as President of the University of Texas at

23 Arlington, can you state for the record your

24 understanding of how the First Amendment protects the

25 speech rights of faculty?

```
 1                 MS. QUIMBY:  Objection, form.
 2                 You can answer.
 3       A.    Faculty are free to express their viewpoints.
 4  For example, if they wanted to write an article, they
 5  could express what they preferred to express in that
 6  article.
 7       Q.    (By Mr. Allen) And was that how you interpreted
 8  it while you were the Provost of the University of North
 9  Texas?
10       A.    Do you mean in the context of this case?
11       Q.    No.  From 2017 to 2022, before and after.
12       A.    Can you repeat your question?
13       Q.    Sure.  Let's do it this way.  Did you interpret
14  your -- did you -- scratch that, please.
15            Did you interpret the First Amendment rights to
16  free speech to apply differently at the University of
17  North Texas than they do at the University of
18  Arlington -- University of Texas at Arlington?
19       A.    No.
20                 MS. QUIMBY:  Object to form.
21                 Go ahead.
22       A.    No.
23       Q.    (By Mr. Allen) Sorry.  I didn't hear your
24  answer.
25       A.    No.
```

*Jennifer Cowley    09/26/2024*

1      Q.    Thank you.  I'm sorry.  We're all talking over
2  each other.
3      A.    And just to let you know, you're cutting out
4  just a little bit.  So if I ask you to repeat a question,
5  it's just because there is some little missing pieces.
6      Q.    Absolutely.  And that goes under the category
7  of always feel free to interrupt me to ask for
8  clarification.  I don't know why that's happening.  I
9  appreciate you bringing it to my attention though.
10          When you were Provost at the University of
11  North Texas, what limitations did you believe could be
12  placed on the First Amendment for faculty speech?
13          MS. QUIMBY:  Objection, form.
14      A.    So I think there are some differences between
15  academic freedom and freedom of speech.  So, for example,
16  if a faculty member was teaching a science class and they
17  were using class time to speak about a topic that is
18  completely unrelated to the content of the class, that
19  may not be appropriate.
20      Q.    (By Mr. Allen) That's one example.  So let me
21  sum up.  Is this -- just so I can tell if I understand
22  correctly, right.  In general terms, if a professor is
23  opining in class about something completely unrelated to
24  the class, that's not necessarily protected.  Is that
25  your view?

*Jennifer Crowley      09/26/2024*

1        A.    My view would be that the instructor is
2    responsible for teaching the content related to the
3    class.  And if that strays too far and the content is not
4    being covered, that may not be protected under academic
5    freedom.

6        Q.    Would it be protected under the First
7    Amendment?

8              MS. QUIMBY:  Objection, form.

9        Q.    (By Mr. Allen) And understand I'm not asking
10   you to give a legal conclusion.  I'm asking for your
11   understanding as provost.

12       A.    I'm not an attorney, so I would not be able to
13   speak in specificity.  Generally speaking, faculty have
14   the freedom to express their views in public.  Express
15   their views through publications and other outlets.
16   There are some limited occasions such as not teaching the
17   content of a class where their speech may be questioned.

18       Q.    So you mentioned the example of not teaching
19   the content of a class.  Are there other areas in which
20   the right of faculty to speak can be limited despite the
21   First Amendment, as you understood it as provost?

22             MS. QUIMBY:  Objection, form.

23       A.    If there is a specific context in which you're
24   trying to ask, you could ask that.

25       Q.    (By Mr. Allen) Well, I'm asking you.  The

*Jennifer Crowley    09/26/2024*

1  context is your job as provost.  What are the limitations

2  on faculty speech that you were prepared to enforce as

3  provost, notwithstanding the First Amendment?

4      A.    I would reframe it.  My responsibility as the

5  provost is to protect the free speech rights of our

6  faculty and their ability to express themselves in

7  appropriate forums.

8      Q.    Is the speech of professors in academic

9  journals generally understood by you as protected speech?

10      A.    Generally speaking, yes.

11      Q.    So as you sit here today, you are -- excuse me.

12  Can I ask again though as a provost, what limitations

13  besides the teaching content in class that was completely

14  off topic which you explained before.

15  Were there other limitations that you considered to be

16  important for the First Amendment rights of faculty

17  speech?

18            MS. QUIMBY:  Objection, form.

19      A.    I have not witnessed examples of where I felt

20  that faculty did not exercise their free speech rights

21  appropriately.

22      Q.    (By Mr. Allen) So as you sit here today, that's

23  the only example you can give that a teacher might be

24  teaching off topic in class or saying something?

25      A.    That's the example I'm choosing to give, yes.

*Jennifer Crowley    09/26/2024*

1      Q.    And you can't think of any other examples?

2      A.    Not in the moment.

3      Q.    Okay.  Now, you had brought this up before, and
4  I understand that they overlap.  How is academic freedom
5  different from the protections of faculty to speak freely
6  that are granted by the First Amendment?

7                MS. QUIMBY:  Objection, form.

8      A.    Faculty members are employees of a university,
9  and they have certain roles and responsibilities.  There
10  are policies and procedures that govern the roles and
11  responsibilities of a faculty member.

12          What I choose to say is as an individual
13  citizen in social media, out in the world, wherever I
14  want to say it, is distinct and different from my role as
15  a faculty member in an institution where I have a primary
16  responsibility to fulfill the mission of teaching our
17  students, engaging in scholarship, and providing public
18  service.

19          Just as any employee in any organization, I do
20  not have ultimate freedom to say anything that I might
21  wish to say that there are certain expectations of
22  professionalism.  And going back to the example in the
23  classroom that if I am hired to teach city planning, I
24  should be teaching city planning.

25      Q.    (By Mr. Allen) Can you state for the record

 1  what you mean when you, in university documents as

 2  Provost for the University of North Texas, use the term

 3  diversity and inclusion?  What does that mean, diversity

 4  and inclusion?

 5      A.    You would have to refer to any relevant UNT

 6  policy as it relates to any use of those terms.

 7      Q.    So as you sit here today, you don't remember

 8  what you meant when you wrote diversity and inclusion in

 9  documents at the University of North Texas?

10      A.    It would be context dependent.

11      Q.    Depends on what context?

12      A.    For example, the University of North Texas has

13  a diverse student body that is representative of the

14  state of Texas.

15      Q.    When you say diverse student body, what do you

16  mean?  What constitutes this diversity?

17      A.    Age, veteran status, ability or disability,

18  race, gender, so on and so forth.  The students at the

19  University of North Texas come from a diverse set of

20  backgrounds.

21      Q.    When you say ability or disability, do you mean

22  what we -- what we conventionally think of as disability

23  rights?

24      A.    Can you repeat that question, please?

25      Q.    Sorry.  Did I cut out?  Yeah.  When you say

*Jennifer Cowley    09/26/2024*

1  ability or disability, are you referring to things like

2  physical disabilities, mental disabilities, psychiatric

3  conditions, things of that sort?

4      A.    Correct.

5      Q.    Do you understand anything else by the term

6  abilities in that definition you just gave?

7      A.    The university has an office that provides

8  accommodations to students that have a range of

9  conditions that may require some accommodation within the

10  university.

11      Q.    So in terms of diversity, you've mentioned age,

12  veteran status, disability status, race, gender.

13  And I think you said something like backgrounds.

14  Anything else that constitutes diversity at the

15  University of North Texas?

16      A.    I mentioned veteran status.  But there is, of

17  course, intellectual diversity, diversity of thought.

18      Q.    So as provost when -- if you -- it came to your

19  attention that there was uniformity of thought, would

20  that be a concern of yours?

21          MS. QUIMBY:  Objection, form.

22      A.    It would depend on the context.

23      Q.    (By Mr. Allen) Let's say if the -- in the music

24  theory program, if it came to your attention that there

25  was a prevalent orthodoxy among the faculty, would that

*Jennifer Crowley    09/26/2024*

1  be a concern to you as a provost?

2            MS. QUIMBY:  Objection, form.

3        A.    I'm not a music theorist, so I couldn't speak

4  superficially to musicology or music theory.  But just

5  giving a broader example, it's not uncommon in fields to

6  come to a consensus around a particular theory, for

7  example.

8            You know, if you think about the advancement of

9  science, then sometimes there needs to be consensus that

10  this is the correct direction to then advance future

11  directions.  But that's highly dependent on the

12  individual field and different perspectives.

13       Q.    (By Mr. Allen) You mentioned, you know, that a

14  professor shouldn't be teaching off their topic, correct?

15  In class, correct?

16       A.    If I am responsible for teaching a city

17  planning class, then I would expect the content to be

18  related to city planning.  I would not expect that that

19  class would be teaching music theory.

20       Q.    You expect your music theory faculty -- when

21  you were provost, did you expect your university faculty

22  to be expounding on race relations in their classrooms?

23            MS. QUIMBY:  Objection, form.

24       A.    That would be context dependent, so it would be

25  looking at are the learning objectives in the course and

1  how would the professor best deem to achieve those

2  learning outcomes.

3      Q.    (By Mr. Allen) As you understood it, what's the

4  relationship between race relations and music theory as

5  you were managing the university including its music

6  history, ethnomusicology and theory program?

7              MS. QUIMBY:  Objection, form.

8      A.    I'm not a music theorist, so I couldn't speak

9  with specificity about music theory.  It's up to our

10  faculty to determine what are the appropriate, in this

11  case, theorists to be able to study and discuss and

12  connect those things to current day matters might be

13  appropriate.

14      Q.    (By Mr. Allen) So as you sit here today, you

15  are -- is it your testimony that orthodoxy in the music

16  theory program was not a concern of yours?

17              MS. QUIMBY:  Objection, form.

18      A.    I didn't have specific information that would

19  indicate this is or is not an issue.

20      Q.    (By Mr. Allen) And the controversy that

21  surrounded my client didn't provide you to any specific

22  information that there was some sort of orthodoxy in the

23  music theory program?

24              MS. QUIMBY:  Objection, form.

25      A.    I did not have information as such.

*Jennifer Cowley    09/26/2024*

 1        Q.    (By Mr. Allen) Back to the idea of academic
 2   freedom.  As you understood it, were there
 3   responsibilities that went along with the enjoyment of
 4   academic freedom?
 5                MS. QUIMBY:  Objection, form.
 6        A.    Yes.
 7        Q.    (By Mr. Allen) What were those
 8   responsibilities?
 9        A.    With academic freedom comes responsibility to
10   fulfill our mission.  So just going back to the example
11   of teaching, I, as an individual faculty member or any
12   faculty member, are given the freedom to determine what
13   is appropriate to bring into their classroom.
14                But with that comes the responsibility that
15   you're teaching in a way that is going to achieve
16   appropriate learning outcomes for that discipline and
17   helping that student to grow professionally in their
18   knowledge of the subject area.
19        Q.    Was one of the missions of the University of
20   North Texas to combat racism?
21        A.    That is not in the mission.  That's not stated
22   in the mission.
23        Q.    So when you say our mission, what were you
24   referring to?
25        A.    The university's mission statement.

*Jennifer Cowley      09/26/2024*

1        Q.    Can you summarize as best you can what the

2    UNT's mission statement was in the time you were provost?

3        A.    I could not state that word for word but

4    generally speaking to advance the learning of our

5    students, their preparation to launch once they graduate

6    and to foster discovery.

7        Q.    I think you would agree that that mission would

8    be the same for any student regardless of race, right?

9        A.    Correct.

10            MS. QUIMBY:  Objection, form.

11        Q.    (By Mr. Allen) Would you consider it

12    irresponsible in the context of the assertion of academic

13    freedom at the University of North Texas while you were

14    provost to say something that offends the UNT's policies

15    of diversity and inclusion?

16            MS. QUIMBY:  Objection, form.

17        A.    Can you rephrase the question?

18        Q.    (By Mr. Allen) Sure.  Would you consider it

19    irresponsible of a faculty member to criticize UNT's

20    policies of diversity?

21            MS. QUIMBY:  Objection, form.

22            Go ahead.

23        A.    Faculty are free to express criticisms of UNT

24    policies.  There are appropriate shared governance

25    processes for which a faculty can express dissent.

*Jennifer Cowley    09/26/2024*

1    Q.    (By Mr. Allen) And you'd give the same answer
2    if I asked if it was irresponsible to critique UNT
3    policies of, quote, "inclusion" as well, right?
4        A.    Any policy can be critiqued by a faculty
5    member.
6        Q.    And we talked earlier about this concept of
7    diversity.  What -- what about the commitment of the
8    University of North Texas to inclusion?  What did that
9    mean while you were provost?
10       A.    The university's goal is to create a welcoming
11   environment for all students to aim in helping them to
12   feel that they belong at the university and that they
13   feel free to engage with faculty, fellow students, and
14   staff.
15           MR. ALLEN:  I'm sorry, Madam Reporter.
16   Can you read back that answer to me?  I didn't think I
17   heard it.
18           (Requested portion read back)
19       Q.    (By Mr. Allen) So in your view, inclusion means
20   this feeling of belonging for all students --
21           MS. QUIMBY:  Objection, form.
22       Q.    (By Mr. Allen) -- as one -- of one of the
23   components?
24       A.    Well, you haven't pointed to a specific policy
25   that you're referencing.

```
1        Q.    Well, I'm asking you your understanding.  You
2   were there for seven years, right?  No.  2007 --
3        A.    Five years.
4        Q.    Five years.  And other that five years, you
5   don't -- you didn't have an understanding of what
6   inclusion meant?  You need to have the specific policy
7   now?
8        A.    No.  Earlier you referenced and asked about
9   policies, and so I'm just clarifying what your intention
10  is in this question.
11       Q.    I'm trying to find out what you understand by
12  inclusion.  And you mentioned welcoming to all students,
13  fostering a sense of belonging at the university,
14  encouraging students to feel free to engage with faculty,
15  students, and staff, right?
16       A.    Yes.
17       Q.    So I just sort of -- those sound very abstract
18  but very noble.  And I just want to understand what you
19  mean by a student's sense of belonging at the university.
20       A.    I think a successful outcome would be where a
21  student feels a sense of connection, that they may have
22  faculty members that they have felt comfortable working
23  with and engaging with in and outside of the classroom;
24            That they may have a student organization or
25  some kinds of activities on campus for which bring them
```

Jennifer Crowley    09/26/2024                    52

1  joy and connectivity, and they feel like the university

2  is a place where they're thriving.

3      Q.    What does the, you know, ascribed category of

4  race have to do with diversity and inclusion at the

5  University of North Texas, as you understood it?

6            MS. QUIMBY:  Objection, form.

7      A.    Your question is how is race connected to

8  diversity and inclusion at the university?

9      Q.    (By Mr. Allen) Yes.

10     A.    Race is one descriptive category of individuals

11 that attend the university.  The university, for example,

12 is a Hispanic serving institution because of the

13 significant number of Hispanic students who have chosen

14 to attend the University of North Texas.  Race and

15 ethnicity is one form of diversity.

16     Q.    And obviously you would want anyone to feel

17 included on the base of race, right?

18     A.    We would want every student of the University

19 of North Texas to feel included at UNT.

20            MS. QUIMBY:  Can we take a break, please?

21            MR. ALLEN:  Sure.  We've been going about

22 an hour.

23            VIDEOGRAPHER:  Off the record, 10:13.

24            (Recess taken from 10:13 to 10:23)

25            VIDEOGRAPHER:  The time is 10:23.  We're

 1  on the record.

 2      Q.    (By Mr. Allen) Who is John Richmond?

 3      A.    John Richmond is the Dean of the College of

 4  Music at UNT.

 5      Q.    Was he there for your entire tenure as provost?

 6      A.    He was.

 7      Q.    Did he also teach?

 8      A.    I know he has taught in the past.  I'm not

 9  aware of any teaching responsibilities in his capacity as

10  dean.

11      Q.    Was it his obligation to combat racism at the

12  University of North Texas?

13            MS. QUIMBY:  Objection, form.

14      A.    There is no explicit charge to combat racism by

15  any employee at the university.

16      Q.    (By Mr. Allen) Now or then?

17      A.    I have no knowledge of what's happening at the

18  university today.

19      Q.    So when you speak about what is going on at the

20  University of North Texas, you're speaking from your

21  experience from 2017 to 2022, right?

22      A.    Correct.  So I'm not aware that there was a

23  policy that explicitly required individuals to combat

24  racism which is the question you asked.

25      Q.    Would that be within the scope of his job as

 1  the Dean of the School of Music to commit the school to

 2  combating racism?

 3      A.    It is the responsibility of the dean, in his

 4  role in leadership, to support an environment that would

 5  welcome all students.

 6            MR. ALLEN:  Could you read the question

 7  again for the witness?  I don't think she answered my

 8  question.

 9            (Requested portion read back)

10      Q.    (By Mr. Allen) Could you please answer the

11  questions instead of that vague answer you gave before?

12            MS. QUIMBY:  Objection, form.

13      A.    It is the role and responsibility of each dean

14  to make sure that we're creating an environment where all

15  students are welcome.  It would be the purview of each

16  leader to best determine how they would achieve that in

17  their individual unit.

18      Q.    (By Mr. Allen) So in his individual unit, was

19  committing the School of Music to combating racism within

20  his authority as dean?

21            MS. QUIMBY:  Objection, form.

22      A.    I'm not aware of explicit documents or

23  requirements that you're referring to.

24      Q.    (By Mr. Allen) I didn't ask if you were aware

25  of documents.  I asked a pretty simple question.

1              MR. ALLEN:  Can you repeat the question to

2   the witness, please?

3              (Requested portion read back)

4       A.    And I responded it's up to each dean to

5   determine in the best way for which they are going to

6   ensure that there is a welcoming environment for all

7   students.

8       Q.    (By Mr. Allen) So is that, yes, he can do that?

9   Is that your answer?  He may do --

10      A.    He may do what?  Can do what?

11      Q.    Commit the School of Music to combating racism.

12      A.    There is no reason for you to get agitated.

13  This is a professional discussion.

14      Q.    You're not answering my question.  I asked is

15  that then permitted?

16      A.    Is what?  Is what?

17      Q.    Is it permitted to Dean Richmond to commit the

18  School of Music to, quote, "combating racism?"

19      A.    I'm not aware of a commitment that Dean

20  Richmond has made, and you've not provided a specific

21  commitment.  So I can't respond further.

22      Q.    Why can't you respond?  I'm asking you a very

23  simple, straightforward question.  If you are going to

24  refuse to answer the question, just say so.  Is he

25  allowed --

Jennifer Crowley    09/26/2024

```
 1                     (Cross-talk)
 2       A.    You've not worded --
 3       Q.    Is Dean Richmond allowed --
 4       A.    You've not worded the question --
 5       Q.    Was Dean Richmond allowed to commit the School
 6  of Music to, quote, "combating racism" under your
 7  leadership as provost?
 8       A.    As I have stated, the dean, at his discretion,
 9  can best determine the methods and approaches for which
10  he will create a welcoming environment for all students.
11  If racism is, in fact, an issue in the college, it would
12  be his purview to think about how best to address that so
13  that there is a welcoming environment for all students.
14       Q.    So does that mean your answer is yes to that
15  question?
16       A.    I provided my answer.
17       Q.    Were you aware of any racism in the school
18  of -- excuse me -- the College of Music while you were
19  provost?
20       A.    There are from time to time racist incidents
21  that happen across the university.  Those are typically
22  reported into what was at that time -- I won't remember
23  the exact name of the office.
24             But there was an office that took all reports
25  of potential discrimination and investigated those to
```

1  determine if there was an incident of discrimination and

2  the matter would be dealt with.  I'm not familiar with

3  specific examples in the College of Music.

4      Q.    So maybe this has already answered this

5  question, but let me ask it anyway.  My client, Timothy

6  Jackson, did you ever know of any incident that he was

7  investigated for allegations of racism?

8      A.    I am not familiar with any incidents that he

9  may have been named in.

10     Q.    Were you aware of any specific actions that my

11  client was supposed to have engaged in that were

12  considered racist?

13          MS. QUIMBY:  Objection, form.

14     A.    Can you repeat that question?

15     Q.    (By Mr. Allen) Can you identify or do you

16  remember any specific actions that my client supposedly

17  engaged in that were considered racist?

18          MS. QUIMBY:  Objection, form.

19     A.    I understand that concern was raised by the

20  faculty and students that he may have engaged in

21  activities that could be deemed as racist.

22     Q.    (By Mr. Allen) Do you know what specific

23  activities they were referring to?

24     A.    Specifically it was referring to a publication

25  that he had produced a journal article.

1      Q.    So basically publishing something.  That was

2  the only activity that was identified to your office?

3      A.    That is the activity that I am aware of.

4      Q.    So they basically thought his speech was

5  racist.

6            MS. QUIMBY:  Objection, form.

7      A.    I can't speak to what others' thoughts were.

8      Q.    (By Mr. Allen) Well, I'm talking about what was

9  reported to your office.  You heard allegations that he

10  had spoken in a journal article or a publication and that

11  was racist.  Is that fair?

12            MS. QUIMBY:  Objection, form.

13      A.    There was a letter from the students and from

14  the faculty, separate letters, that were shared with my

15  office that raised concerns about the publication of the

16  Journal of Schenkerian Studies as well as concerns about

17  Dr. Jackson's specific journal article.

18      Q.    (By Mr. Allen) Okay.  Thank you.  And just for

19  the record, is that Volume 12 of the Journal of

20  Schenkerian Studies?

21      A.    Correct.

22      Q.    This is maybe a good point to transition to

23  discussing your understanding of the professional

24  standards of scholarship, as they were maintained by the

25  University of North Texas.

1            So let me ask you.  I think we would agree --
2    well, let me just ask that under your leadership as
3    provost, the University of North Texas was committing to
4    upholding the highest professional standards of
5    scholarship, right?
6        A.    It is an expectation of our faculty to engage
7    in scholarship if they're in a tenure system position.
8    And it's an expectation of those who are in positions
9    that engage in scholarship that they should be behaving
10   in professional ways.
11       Q.    And did you expect the University of North
12   Texas press to uphold the highest standards of
13   professional scholarship?
14       A.    The University of North Texas press has a
15   responsibility to make sure that we're producing
16   publications of a professional nature.
17       Q.    Was the University of North Texas press under
18   your authority as provost?
19       A.    The university press reports to the university
20   libraries, and the university libraries reports to the
21   provost office.
22       Q.    Okay.  Incidentally did Dean Richmond report
23   directly to you?
24       A.    Dean Richmond reported at that time directly to
25   me.

1    Q.    And his division chairs reported directly to

2  him.

3    A.    Correct.  That was my understanding, yes.

4    Q.    Good.  Did the University of North Texas strive

5  to hold itself to professional standards that differed

6  from other state universities?

7    A.    That would be context specific.  But generally

8  speaking, the research universities across the state

9  strive to meet the same general professional standards.

10  Not every university is going to have every discipline.

11  And their are variations cross disciplines in terms of

12  expectations.

13    Q.    And to your knowledge, did the University of

14  North Texas press strive to establish different standards

15  than for other comparable publications in whatever fields

16  it was publishing?

17    A.    I can't speak to that.

18    Q.    You didn't supervise the activities of the

19  University of North Texas press in that kind of detail?

20    A.    No, not directly.  That was the purview of the

21  university libraries.

22    Q.    Okay.  Is it unprofessional to publish articles

23  that offend other academics?

24    A.    It is quite common for scholars to engage in

25  disagreements.

1      Q.    Is it quite common for professionally published

2  work to offend other scholars in their field?

3      A.    It is possible for a person to be offended, but

4  I can't speak to any individual.

5      Q.    I'm not asking you to speak to any individual.

6  I'm asking you if, in your experience both as a scholar

7  and academic administrator, it was common for faculty to

8  publish professionally in ways that offended their

9  colleagues?

10          MS. QUIMBY:  Objection, form.

11     A.    I would reframe that to say it is not uncommon

12  for faculty to produce scholarship that may be questioned

13  by others.

14     Q.    (By Mr. Allen) I want you to answer my

15  question, Ms. Cowley.  And I would appreciate it if you

16  don't reframe my question but actually listen and answer

17  the question I asked.  Is that fair?

18     A.    Repeat your question.

19     Q.    Are you going to answer it, or are you going to

20  reframe it?  Can I ask a question and have it answered?

21     A.    You can ask the question.  I will answer to the

22  best of my ability.

23     Q.    In your experience as both a publishing

24  academic and as a university administrator, was it common

25  for scholars to professionally publish articles that

*Jennifer Crowley    09/26/2024*

1   offended their faculty colleagues?

2           MS. QUIMBY:  Objection, form.

3       A.    I take issue with the word offensive.  Is it

4   common for scholars to disagree with each other?

5   Absolutely.  There are varying viewpoints and

6   perspectives on many different issues.  As for offend in

7   my own discipline, I can't think of any article that has

8   offended me.  So it is common?  I can't say to the extent

9   to which it is common.

10      Q.    (By Mr. Allen) Were you aware that Professor

11  Jackson published an article that offended his

12  colleagues?

13      A.    I am aware that Dr. Jackson published an

14  article that raised concerns by his professional society.

15      Q.    You don't know whether it offended the

16  colleagues he had at the University of North Texas?

17      A.    I know that his colleagues expressed concerns.

18  I can't speak to whether they were offended or not.

19      Q.    Is it professional for a faculty to call for

20  their colleague to be fired because they disagree with

21  their viewpoints?

22      A.    That would be context specific.

23      Q.    Was it professional for the UNT faculty to call

24  for Professor Jackson to be fired?

25          MS. QUIMBY:  Objection, form.

Jennifer Crowley        09/26/2024

```
1         A.    It is perfectly reasonable for colleagues to
2    raise concerns about other colleagues to express their
3    viewpoint on any particular colleague's behavior.
4         Q.    (By Mr. Allen) Including calling for them to be
5    fired?
6              MS. QUIMBY:  Objection, form.
7         A.    Any individual could choose to say that I
8    believe a colleague should be fired.
9         Q.    (By Mr. Allen) Sure.  They can choose to say
10   that, but my question is different.  Is it professional
11   conduct for them to call for their colleague to be fired?
12             MS. QUIMBY:  Objection, form.
13        A.    That's context specific.
14        Q.    (By Mr. Allen) I just gave the context.  The
15   faculty of the University of North Texas MHTE program,
16   was that professional conduct for them to call for
17   Professor Jackson to be fired?
18             MS. QUIMBY:  Objection, form.
19        A.    The faculty raised serious concerns regarding
20   the publication of the Journal of Schenkerian Studies.
21   And some of those faculty believed that the publication
22   was so serious that they believed it could result in
23   Dr. Jackson being fired.  That was their viewpoint.
24        Q.    (By Mr. Allen) Of course, it's their viewpoint.
25   But my question is was that professional behavior of them
```

*Jennifer Crowley    09/26/2024*

1  as scholars to call for him to be fired?

2      A.    It's absolutely professional for colleagues to

3  call out and raise concerns about publication practices.

4      Q.    Was it professional for the graduate student,

5  Rachel Gain, to call Professor Jackson a piece of shit?

6              MS. QUIMBY:  Objection, form.

7      A.    I have no knowledge of that statement.

8      Q.    (By Mr. Allen) Assume for me, please, that that

9  did happen.  Would that be professional conduct of a

10  graduate student?

11              MS. QUIMBY:  Objection, form.

12      A.    That would be context specific.

13      Q.    (By Mr. Allen) On Twitter, for instance, would

14  that be professional conduct?

15      A.    If a student is acting in their individual

16  capacity as an individual, they're free to express

17  whatever they wish.

18      Q.    Including insulting their professor, right?

19      A.    That would be their choice.

20      Q.    Would it be professional -- let me strike that.

21              Is it professional as a faculty member to call

22  for an academic publication to be shut down if they

23  disagree with the viewpoints expressed in the

24  publication?

25              MS. QUIMBY:  Objection, form.

1        A.    It could be professional if their concerns are
2   related to the nature in which the publication was
3   produced.
4        Q.    (By Mr. Allen) You called for Professor Jackson
5   and the -- well, let me strike that.
6              You called for the Journal of Schenkerian
7   Studies to be investigated, right?
8        A.    I formed an ad hoc review panel to review the
9   concerns raised by the Society for Music Theory.
10       Q.    So you were investigating the Society for Music
11  Theory?
12              MS. QUIMBY:  Objection, form.
13       A.    No.  To clarify, the Society for Music Theory
14  raised concerns about the production process for Volume
15  12 of the Journal of Schenkerian Studies.  I formed an ad
16  hoc panel to review the concerns that were raised and
17  determine and make recommendations.
18       Q.    (By Mr. Allen) And your understanding of their
19  concerns were only that it was produced in an
20  unprofessional manner?
21              MS. QUIMBY:  Objection, form.
22       A.    That was the charge that I gave to the
23  committee.
24       Q.    (By Mr. Allen) I'm not asking that.  I said the
25  Society for Music Theory, your understanding of their

*Jennifer Cowley      09/26/2024*

```
 1  concerns were that -- were solely that the journal was
 2  not produced in a professional manner?
 3       A.    They had broader concerns.  The concerns that I
 4  chose to charge the ad hoc committee with were
 5  exclusively related to how the journal was produced.
 6       Q.    What were their broader concerns, President
 7  Cowley?
 8       A.    I would have to go back and review their
 9  specific letter that they submitted to the university.
10       Q.    As you sit here today, you can't remember
11  their, quote, "broader concerns," closed quote, as you
12  just characterized them?
13       A.    My recollection was they raised concerns
14  specific to the journal's publication process and that
15  there were concerns regarding some of the journal
16  articles.
17       Q.    What were their concerns concerning some of the
18  journal articles?
19       A.    Again I would have to go back and look at that
20  specific letter that was submitted.
21       Q.    As you sit here today, you can't remember what
22  their broader concerns are or were?  That's your
23  testimony today?
24            MS. QUIMBY:  Objection.
25       A.    Correct.
```

1      Q.    (By Mr. Allen) I'm sorry.  Could you state your

2  answer?  It was just spoken over just by accident. What

3  was your answer?

4      A.    Correct.

5      Q.    Thank you.  You wanted the so-called ad hoc

6  panel to investigate the Journal of Schenkerian Studies,

7  correct?

8      A.    I requested that the ad hoc panel review the

9  production of Volume 12 of the Journal of Schenkerian

10  Studies.

11      Q.    And you specifically instructed them to do so

12  objectively, right?

13      A.    You would have to refer to the specific charge

14  that I gave to the committee.

15      Q.    As you sit here today, you can't remember

16  instructing them to conduct an objective investigation?

17      A.    I would want to look at the specific charge.

18  But the general intention was that they would conduct a

19  review of the production process, focusing on the process

20  and procedures that were used to produce the journal.

21      Q.    Did you -- so that again wasn't my question.

22  And this will take a lot less time if you would answer my

23  question instead of answering the question that you

24  apparently want to answer.

25          I asked about objectivity; do you understand

*Jennifer Cowley    09/26/2024*

```
 1  where it's talking about the objectivity of the
 2  investigation.  And my question is you don't remember
 3  instructing them to give an -- to undertake an objective
 4  investigation?
 5          MS. QUIMBY:  Objection, form.
 6      A.   Again I would want to review the specific
 7  charge that I gave to the ad hoc panel to determine
 8  whether I used the word objective.
 9      Q.   (By Mr. Allen) As a provost instructing a
10  faculty panel to undertake any investigation, were you
11  indifferent to whether they did it objectively or not?
12          MS. QUIMBY:  Objection, form.
13      A.   The expectation is that they would undertake a
14  reasonable review of the matter and draw reasonable
15  conclusions.
16      Q.   (By Mr. Allen) As you used the word, quote,
17  "reasonable," is that the same as objective in your view?
18      A.   You haven't defined the word objective.
19      Q.   Well, that's what I'm trying to ask you about.
20  What do you understand by an objective investigation,
21  President Cowley?
22          MS. QUIMBY:  Objection, form.
23      A.   An objective investigation would review
24  relevant materials and draw reasonable conclusions based
25  on the information that they have gathered in that review
```

1  process.

2     Q.   (By Mr. Allen) Could we agree that disregarding

3  evidence that tended to show that my client, Professor

4  Jackson -- let me strike that.

5        Would you agree that disregarding exculpatory

6  evidence is not objective?

7            MS. QUIMBY:  Objection, form.

8     A.   I can't speak to any specific evidence that the

9  committee did or did not review, so I

10 can't (inaudible).

11           (Cross-talk)

12    Q.   (By Mr. Allen) I'm not asking -- can we

13 just -- can we be clear?  I did no not ask you about

14 that.  This will really take a lot less time if you just

15 answer the question.  I'm asking about standards of

16 university investigations under your leadership as

17 provost in general terms.

18        Is it objective for UNT investigations, in your

19 view, if they disregarded exculpatory evidence?

20           MS. QUIMBY:  Objection, form.

21    A.   Again this is context dependent, so I can't

22 speak to any particular evidence that has or has not been

23 presented to that committee.

24    Q.   (By Mr. Allen) In what context, would

25 disregarding exculpatory evidence be objective?  Maybe

Jennifer Crawley          09/26/2024

 1  you can enlighten me.

 2      A.    I couldn't speak to any specific examples.

 3  You haven't provided appropriate context.

 4      Q.    Can you provide me with any examples in which

 5  disregarding exculpatory evidence would be objective?

 6              MS. QUIMBY:   Objection, form.

 7      A.    If that evidence was falsified.

 8      Q.    (By Mr. Allen) Any other examples of how it

 9  would not be objective to disregard exculpatory evidence?

10      A.    Not that I can think of off the top of my head

11  in the moment.

12      Q.    Would a witness lying to an investigatory panel

13  be an example of how did you put it?  Falsifying

14  evidence?

15              MS. QUIMBY:   Objection, form.

16      A.    That would be context specific, so I can't

17  speak to an individual statement.

18      Q.    (By Mr. Allen) You can't speak to the -- to the

19  -- what your testimony today is that you can't speak to

20  whether lying to an investigation panel would be somehow

21  objective or not?

22      A.    I can't speak to what the nature of a lie would

23  be or the context in which a lie was presented.

24      Q.    So is it your testimony today that there are

25  some context specific situations in which it's okay to

1  lie to an investigation committee?

2       A.    I would need further context.  So in general is

3  lying appropriate?  No.  Is telling someone that you like

4  their tie when you don't really?  Is that a problematic

5  lie?  Perhaps not.  So it really depends on the context

6  and what the communication was to the panel and what the

7  nature of that evidence was.

8       Q.    Did you understand the ad hoc committee to be

9  asking about people's tie colors?

10      A.    No.  I presume they did not ask about tie

11 colors.  I simply provided an example.

12      Q.    Are there any rules or policies of the

13 University of North Texas that would make it a violation

14 for graduate students to lie about their professors in a

15 way that was material?  In a way that compromised and

16 prejudiced them?  Not tie colors and things you just

17 mentioned but about real material situations?

18      A.    I would have to review the Student Code of

19 Conduct to see if there was something -- if there would

20 be something that would be applicable.  But generally

21 speaking, the Student Code of Conduct governs student

22 behaviors.

23      Q.    As you sit here today, you can't remember

24 whether that is against the policies of the University of

25 North Texas?

Jennifer Crowley    09/26/2024

1      A.    I have no details about what lies you're

2 speaking of, so I can't respond further to this question.

3      Q.    Well, I wasn't speaking of a lie in particular.

4 Now I'm asking is that -- is telling a material lie about

5 a professor, would that violate a policy or rule of the

6 university?  And you're saying you don't really know

7 unless, I guess, you went and read some policies.  Is

8 that your answer?

9      A.    My understanding is there is not a specific

10 policy that would state specifically what you have said.

11 Generally speaking, the Student Code of Conduct governs

12 student conduct, but it does not go into that level of

13 detail to say if a student says a lie about a professor,

14 then it would be a violation of the Student Code of

15 Conduct.

16      Q.    In the course of an investigation, is it the

17 responsibility of an investing panel like the ad hoc

18 committee to raise new violations in the course of their

19 investigation if they come across evidence of a different

20 policy violation than they're investigating?

21           MS. QUIMBY:  Objection, form.

22      Q.    (By Mr. Allen) Maybe it's a bad question.  You

23 understand my question?

24      A.    Would you perhaps rephrase it?

25      Q.    Sure.  You convened a so-called ad hoc panel,

*Jennifer Crawley    09/26/2024*

```
 1  right?
 2       A.    Correct.
 3       Q.    To investigate what I believe you said is
 4  Volume 12 of the Journal of Schenkerian Studies, right?
 5       A.    Correct.
 6       Q.    And if in the course of that investigation they
 7  discovered evidence of different policy violations, did
 8  they have an obligation to report those to the
 9  university?  In other words, not about the journal's
10  publication practices but they discovered some or policy
11  violation.  Would you expect those to be brought to your
12  attention?
13            MS. QUIMBY:  Objection, form.
14       A.    That would be context dependent.  So if it was
15  related to the publication of the Journal of Schenkerian
16  Studies and they determined that there was a policy that
17  may have been violated, then, sure, they can bring that
18  forward as part of their recommendations.
19       Q.    (By Mr. Allen) Were they obligated to, or they
20  just can do that if they feel like it?
21       A.    They were responsible for responding to the
22  specific charges that were outlined.  That was their duty
23  and responsibility.
24       Q.    Right.  And I didn't ask about that.  I asked
25  if that was something they must do or something they
```

```
 1  could do.  If they find evidence of another UNT policy
 2  violation, should they bring that to your attention?
 3             MS. QUIMBY:  Objection, form.
 4       A.   Again that's context dependent.  I think could
 5  is the right answer depending on the context.
 6       Q.   (By Mr. Allen) So they had discretion to do
 7  that.  Is that your answer?
 8       A.   Their responsibility was to respond to the
 9  specific charge that was given to them.  Without further
10  context of what you're talking about, I can't respond
11  further.
12       Q.   Is it objective in an investigation to limit
13  yourself strictly to a charge that was given to you such
14  as you gave to the ad hoc panel?
15             MS. QUIMBY:  Objection, form.
16       A.   Can you repeat your question?
17       Q.   (By Mr. Allen) Sure.  Is it the hallmark of an
18  objective investigation to limit the investigation
19  strictly to your charge in the case of the ad hoc panel?
20       A.   That was the responsibility of the ad hoc panel
21  was to respond to those charges.
22       Q.   So your answer is yes?
23             MS. QUIMBY:  Objection, form.
24       A.   The committee produced a report that responded
25  to those charges.
```

Jennifer Cowley       09/26/2024

```
 1        Q.    (By Mr. Allen) So your answer is yes?
 2               MS. QUIMBY:  Objection, form.
 3        A.    I have provided my response.
 4        Q.    (By Mr. Allen) So you're refusing to answer yes
 5   or no?
 6        A.    Correct.
 7        Q.    About the College of Music, can you give -- and
 8   to as your experience as provost, how important is the
 9   College of Music to the University of North Texas?
10               And let me preface that by saying I think at
11   all universities, even the most prestigious, some
12   departments or colleges have more prestige or reputation
13   than others.  And I'm just trying to get you to assess
14   where the College of Music stood in the relative, say,
15   reputational heft of programs at the University of North
16   Texas.
17        A.    Of course, as a provost, we value all academic
18   programs and their contributions.  It's a bit like your
19   children.  You love them all.
20        Q.    Sure.
21        A.    The College of Music has an excellent global
22   reputation and is a point of pride for the university.
23        Q.    More so than other programs?  I mean, I'm not
24   asking you to badmouth other programs, so it's not about
25   that, please.  I'm just trying to get a sense of is it
```

Jennifer Crowley      09/26/2024

 1  more so than other programs, the College of Music?

 2      A.    There are a number of programs that are very

 3  highly ranked across the university and others that do

 4  not have as high of a ranking.  The same is true within

 5  the College of Music; that there is some programs that

 6  are more well known than others.

 7      Q.    How well known is the music theory program at

 8  the University of North Texas compared to peer programs

 9  at other universities?

10      A.    I couldn't speak specifically to the music

11  theory program.  It is the music performance program that

12  is the most well known.

13      Q.    Does it rank highly nationally?

14      A.    Which program?

15      Q.    The one you just mentioned.  The performance

16  program.

17      A.    Yes.

18      Q.    And if you know, how highly is the University

19  of North Texas overall ranked nationally?

20      A.    It would depend on the ranking institution that

21  you were looking at.

22      Q.    Well, I don't know.  U.S. News & World Reports.

23  That's a very common one.

24      A.    I would say that UNT is ranked in the upper

25  200s nationally.

Jennifer Crowley    09/26/2024

1          Q.    And is the College of Music ranked higher than
2    the general ranking of the university?
3          A.    U.S. News & World Report does not rank music
4    schools.
5          Q.    Do you know of any rankings of programs like
6    the College of Music?
7          A.    Billboard magazine, for example, has a ranking
8    of music performance programs.  And if I recall, they're
9    typically ranked the top 25 nationally.
10         Q.    Okay.  So whereas the university is ranked in
11   the, I guess, upper 200s.  Is that how you put it?
12         A.    Yeah.  I think that's fair.
13         Q.    200 and above?
14         A.    That's fair.
15         Q.    But -- so we can at least agree that the
16   College of Music, by ranking 25th and above, is -- has a
17   higher weight, if you want to call it that, than the
18   university as a whole?
19               MS. QUIMBY:  Objection, form.
20         A.    I want to be cautious in how you frame that.
21   The -- there are far fewer music schools than there are
22   universities.  And so it's a relative weighting but --
23         Q.    (By Mr. Allen) Sure.
24         A.    -- generally speaking, the College of Music's
25   reputation exceeds that of the university as a whole.

Jennifer Crawley    09/26/2024

1          Q.    Thank you.  Moving on to this special status at

2    the University of North Texas that it's bestowed on

3    faculty called Distinguished University Research

4    Professor.  Did I get that right?

5          A.    Yes.  That is one of the titles.

6          Q.    Can you explain what a university --

7    Distinguished University Research Professor is?

8          A.    It's a title that is bestowed upon a university

9    professor based on their record of scholarly

10   accomplishments.  It is a committee that reviews

11   nominations each year, and they select faculty that they

12   think best represent the qualifications.

13         Q.    What's the name of the committee, if you know?

14         A.    I don't recall the name of the committee, but

15   it would be something like the Faculty Awards Committee.

16         Q.    Okay.  And do you know how -- excuse me.  Let

17   me back up.  It's not a permanent designation, is it,

18   like an endowed chair?

19         A.    No.  It is up for review periodically, and

20   there is a limit to the number of people in the

21   university that can hold that title.

22         Q.    How many are there total, if you know?

23         A.    I don't recall that number.

24         Q.    Do you know in a ballpark?  Like is it more

25   than ten?

1        A.    I would say it represents no more than one to
2  two percentage of the faculty.
3        Q.    Okay.  How many faculty total at the University
4  of North Texas?
5        A.    Order of magnitude, 1,200, but a portion of
6  those would be tenure system which are the ones that
7  could be potentially eligible for this so, say, 600 or so
8  tenure system faculty.
9        Q.    Okay.  Is a tenure system meaning the same as
10 tenure track?
11       A.    Correct.
12       Q.    Okay.  So of approximately 600 professors --
13 and I understand that's not an exact number -- about one
14 to two would be chosen?  And I'm not trying to put words
15 in your mouth.  Is that correct?  One or two percent
16 would be chosen as Distinguished University Research
17 Professors?
18       A.    You'd have to look at the explicit criteria,
19 but I think it's fair to say that it's a limited number
20 of faculty on the campus.
21       Q.    And, of course, they're spread throughout the
22 disciplines, correct?
23       A.    Correct.  They're not all located in the
24 College of Music.
25       Q.    And here is my followup question.  It's not the

Jennifer Crowley        09/26/2024

 1   case that there is a Distinguished University Research
 2   Professorship designated for each discipline, is it?
 3        A.    Correct.  It's a university-wide designation.
 4        Q.    And it's merit based.
 5        A.    Correct.
 6        Q.    Predominantly based on research achievements.
 7        A.    Correct.
 8        Q.    And you said they are evaluated periodically,
 9   right?
10        A.    Correct.
11        Q.    And do you recall how often they are evaluated
12   to maintain that status?
13        A.    I don't recall the exact number of years but,
14   ballpark, every five or six years.
15        Q.    Okay.  What are the perquisites that come with
16   a Distinguished University Professorship?
17        A.    There is the title of University Distinguished
18   Professor, and then there is a compensation that comes
19   with that recognition.  It's a nominal compensation.
20        Q.    Approximately how much?
21        A.    I'd have to review the criteria.  I don't
22   recall off the top of my head.
23        Q.    You said it's nominal.  Does that mean it's not
24   -- it's not a significant percentage of their salary, for
25   lack of a better metric?

Jennifer Crowley    09/26/2024

```
1        A.    Correct.

2        Q.    Okay.

3        A.    It's an acknowledgment of the recognition and

4   achievement.

5        Q.    Do they get any research funds?

6        A.    I don't recall that.

7        Q.    And in assessing their achievements, when

8   someone goes up for a Distinguished University Research

9   Professorship, are their achievements measured by the

10  standards of their field?

11       A.    Their colleagues would submit a nomination that

12  was positioned around why their scholarship has created

13  substantial impact.

14       Q.    Thank you.  And you're aware that Timothy

15  Jackson was a Distinguished University Research

16  Professor?

17       A.    I am.

18       Q.    And to your knowledge still is, correct?

19       A.    I have no knowledge since I left the university

20  of his particular title.

21       Q.    There is no prohibition at the University of

22  North Texas against professors publishing on issues

23  outside their immediate field of research, right?

24       A.    Correct.

25       Q.    And in fact that's quite normal, isn't it?
```

*Jennifer Crowley    09/26/2024*

1      A.    It's entirely possible for a faculty member to

2    publish outside of their field.  Their annual reviews and

3    promotions would be largely dependent on publications in

4    their field.

5      Q.    Is there a level of scholarly achievement that

6    is required to become a division chair?

7      A.    The qualifications and criteria to become a

8    division chair are not based on a scholarly record.

9      Q.    So is your answer no?

10     A.    Can you repeat the question?

11     Q.    Is there a level of scholarly achievement

12   required to become a division chair?

13     A.    There is not a specific requirement.

14   Generally speaking, a faculty and leadership would be

15   looking for some level of experience that would provide

16   the requisite skills to lead a department.

17     Q.    So is it fair to say a record of scholarly

18   achievement helps but it not the main qualification?

19          MS. QUIMBY:  Objection, form.

20     Q.    (By Mr. Allen) For a division chair.  Excuse

21   me.

22     A.    I would say generally speaking, a preference

23   would be someone who is tenured and achieved the rank of

24   tenure because of their involvement in the promotion and

25   tenure processes.  It's not a requirement, but it would

1  be a preference.

2       Q.    It would be a preference, meaning a scholarly

3  achievement?  I'm just trying to figure out what you mean

4  by it.  That's all.

5       A.    In order to achieve tenure, they would have a

6  record of scholarly achievement.

7       Q.    Okay.  And would the answer be more or less the

8  same if I asked you the same questions about a dean?

9       A.    For a dean it would be a combination of

10  experience in the faculty role and accomplishments as a

11  faculty member combined with leadership experiences.

12       Q.    I did want to ask you a few more questions

13  about the University of North Texas press.

14            MR. ALLEN:  And I was going to suggest,

15  Mary, that I don't think this will take that long and

16  maybe then we can take another break.  It will be in

17  about another hour that's gone by.  Is that something

18  that's fair?

19            MS. QUIMBY:  You're asking to take a break

20  in an hour?

21            MR. ALLEN:  No, no.  After this next set

22  of questions.  Well, I'm mindful that we have gone about

23  another hour, not quite.  And I was going to say I'm

24  going to go through these questions, and then maybe we'll

25  see if that's a time to take a break.

1               MS. QUIMBY:  Yeah.  I think that's fair.

2  I think around 11:30 or 11:15 would be fine.

3               MR. ALLEN:  Okay.

4       Q.   (By Mr. Allen) And again is that okay with you,

5  President Cowley?

6       A.   Yes.  I'd just like a lunch break at some

7  reasonable time from 11:30 to --

8       Q.   Of course.

9       A.   -- to you know --

10      Q.   No one wants you to starve all day.  Certainly

11 not.

12              As much as you know in your time as provost,

13 how was the University of North Texas press organized?

14      A.   During my time as the provost, the university

15 press was under the libraries and operated within the

16 university library.

17      Q.   Do you know anything about its organizational

18 structure?  I mean this is the structure within the

19 university.  I understand that.  The press itself, how

20 was it organized?

21      A.   So the director of the press reported to the

22 dean of the university libraries, I believe.

23      Q.   Who was that?

24      A.   Diana Bruxvoort.

25      Q.   She's the head of the libraries?

```
1        A.    The dean -- she was the dean of the libraries
2   during the time that I was provost or --
3        Q.    Do you know who --
4        A.    -- for a portion of the time that I was
5   provost.
6        Q.    And do you know who was the head of the North
7   Texas press -- University of North Texas press?  Sorry.
8        A.    His name is escaping me in the moment, but I am
9   familiar with him.
10       Q.    If I said Christman, is that the individual?
11       A.    Yes.  That's correct.
12       Q.    Do you know what his responsibilities were?
13       A.    His responsibilities were to administer the UNT
14  press.
15       Q.    And what did those -- what did administering
16  the UNT press involve for him?
17       A.    A range of duties.  For example, they produced
18  certain books.  They had responsibility, for example, for
19  producing the Journal of Schenkerian Studies, the final
20  journal publication, and other -- and other publications.
21       Q.    Approximately how many journals did the
22  University of North Texas press put out?
23       A.    That, I couldn't tell you.
24       Q.    Do you know if they published other journals in
25  the area of music and music theory?
```

1        A.    I couldn't tell you that.

2        Q.    Now, you've already mentioned the case of the

3    Journal of Schenkerian Studies.  If it was genuinely

4    found to have violated some sort of policies of the

5    university, was the University of North Texas press

6    ultimately responsible for that?

7               MS. QUIMBY:  Objection, form.

8        A.    Responsible for what?

9        Q.    (By Mr. Allen) Well, I'm not saying anything

10   specific.  I mean, did the University of North Texas

11   press have any responsibility for exercising oversight of

12   the journals it published?

13       A.    The journal -- I'm sorry.  The UNT press, as I

14   understand it, was responsible for publishing what the

15   editor of the journal provided.  And so they published

16   whatever content was produced by the Journal of

17   Schenkerian Studies.

18              So they served as the publisher.  So one of the

19   questions was around what is their process for review,

20   and I believe that's part of what the ad hoc task force

21   looked at.

22       Q.    And just to clarify, when you say their, who

23   are you referring to?  The university press?

24       A.    Let me --

25       Q.    Or the journal of -- you know what I mean?

*Jennifer Crowley    09/26/2024*

1           MR. ALLEN:  Can you read the answer she
2    gave back?  It's just I don't know who their is, and it's
3    just a point of clarification.
4        A.    Okay.
5               (Requested portion read back)
6        Q.    (By Mr. Allen) So the clarifying question was
7    just their process over the view.  Which -- who were you
8    referring to there?  The university press or the Journal
9    of Schenkerian Studies?
10       A.    Oh, you mean the reference to the ad hoc task
11   force's charge?
12       Q.    Yeah.  So we have got a few layers here.  You
13   had mentioned that they were supposed to review their
14   process for review.
15       A.    The journal.  The journal of --
16              (Cross-talk)
17       Q.    Just the journal?
18       A.    But --
19       Q.    So that --
20       A.    -- as part of that, they interviewed the UNT
21   press to understand their role and involvement.
22       Q.    Okay.  And that's -- that's sort of my followup
23   question.  In general for journals under its label, the
24   University of North Texas press, do you know what their
25   responsibility was for monitoring the processes of those

*Jennifer Cowley    09/26/2024*

1  journals?

2      A.    As I recall, they did not have a direct role in

3  monitoring those processes for the development of the

4  journal.  Their step in the process is once the content

5  was produced, to make sure that it was published.

6      Q.    More like an operations view of it.  Is that

7  fair?

8      A.    You'd have to ask the editor -- I mean the

9  journal publisher more details.  But my general

10  understanding is theirs was an operational role to make

11  sure that the journal's content was published.

12     Q.    Okay.  Now, we've already discussed this

13  Committee On Publication Ethics or called COPE.  And if I

14  say COPE, we'll know what I'm referring to, right?

15     A.    Yes.

16     Q.    Was COPE and its standards required by the

17  University of North Texas press in 2020?

18     A.    I can't speak to that.

19     Q.    Was that something that the so-called ad hoc

20  panel investigated?

21              MS. QUIMBY:  Objection, form.

22     A.    The charge to the committee was not specific to

23  COPE.  The committee in its review -- the ad hoc task

24  force in its review process does reference COPE as it

25  relates to a couple of items that they identified.

1      Q.    (By Mr. Allen) But as you sit here today, you
2  have no knowledge whether the University of North Texas
3  press imposed these COPE standards on journals under its
4  label?

5      A.    I do not.

6      Q.    After this investigation of the Journal for
7  Schenkerian Studies that was conducted by the ad hoc
8  panel, were the COPE standards imposed on the University
9  of North Texas press?

10      A.    No, not to my knowledge.

11      Q.    Do you know -- and this is perhaps similar.
12  But do you know if the University of North Texas press
13  imposed COPE standards on any other journal?  Leave out
14  the JSS, the Journal of Schenkerian Studies.  Were
15  they --

16      A.    I have no knowledge of that.

17      Q.    Okay.  Is there any policy at the University of
18  North Texas while you were there that publications that
19  don't follow COPE should be closed?

20      A.    No.

21      Q.    And do you understand the COPE standards to
22  forbid anonymous publications?

23      A.    The use of anonymous publications is extremely
24  rare and unusual, but I do not believe that the COPE
25  standards say they're not permitted.

*Jennifer Crowley    09/26/2024*

1    Q.    Thank you.  And do you -- do you understand the

2    issue that -- of potential conflict of interest when an

3    editor publishes an article in the journal that is under

4    their control as an editor?

5              MS. QUIMBY:  Objection, form.

6    A.    Can you repeat the question?

7    Q.    (By Mr. Allen) Sure.  Let's strike that

8    question.

9              Let's go back to your experience.  You said you

10   were on the board of editors of at least one journal,

11   right?

12   A.    Correct.

13   Q.    And I think you said more but you only gave one

14   example as one you remembered, right?

15   A.    Correct.

16   Q.    And is there a conflict of interest raised by

17   someone on the board of editors publishing in the journal

18   on which they are one of the board members?

19   A.    It would be a question of how that review

20   process is handled to ensure that there is not a conflict

21   of interest.

22   Q.    Sure.  Do you remember the journals that you

23   worked on as a board member having an express conflict of

24   interest policy?

25   A.    I recall that as a point of conversation in

Jennifer Crowley    09/26/2024

1  training for new board members, but I don't recall

2  specifically whether there was a policy or not.

3      Q.    What was the nature of those discussions?

4  Could you be more specific?  I'm just going back one

5  second.  I want to -- it's -- what was the name of the

6  journal you gave?

7      A.    The Journal of Planning Literature.

8      Q.    And that was one among others.  But the Journal

9  of Planning Literature, so let's focus on that. Were you

10  saying when you were on the board there you did some sort

11  of training?

12      A.    They had -- I'll call it an orientation for new

13  board members.  They held a board meeting and provided an

14  overview of responsibilities and update on the journal's

15  turnaround times and other kinds of facts and details

16  about the journal and then talked about roles and

17  responsibilities as a board -- editorial board member.

18      Q.    And you recalled the issue of this conflict of

19  interest that we've just discussed coming up?

20      A.    I do.

21      Q.    About how long was that meeting?

22      A.    I believe it was a couple of hours long.  But

23  that's been more than a decade ago, so I don't recall

24  specific details.

25      Q.    I understand.  But how long -- inasmuch you can

Jennifer Crowley    09/26/2024

```
 1  remember, how long did they spend talking about conflicts
 2  of interest?
 3      A.   I could not tell you that.
 4      Q.   Do you remember if it was a lengthy
 5  conversation or a short one?
 6      A.   I don't recall any details.  Only that the
 7  topic came up.
 8      Q.   Do you know that board members did publish in
 9  that journal?
10      A.   It would not surprise me that board members
11  published in that journal.  It's one of the top journals
12  in the field.
13      Q.   And wouldn't publication in the journal be seen
14  as a qualification for people who were put on the board?
15           MS. QUIMBY:  Objection, form.
16      A.   I can't know what the editor -- how the editor
17  decided who should be serving on that board.
18      Q.   (By Mr. Allen) And I know you talked about
19  being on the board of that journal, but you also said you
20  had been on the board of editors of other journals. And I
21  know you said you couldn't name them, but does any other
22  conversation about conflict of interest stand out in your
23  work as a board member of those other journals?
24      A.   That was the one that stood out in my mind.  I
25  don't recall others.
```

Jennifer Crowley    09/26/2024

1       Q.    So coming back to COPE.  Sorry.  We did a
2  little bit of a circle there.  Do you understand COPE to
3  forbid the publication by an editor in a journal under
4  their authority?
5              MS. QUIMBY:  Objection.
6       A.    I don't recall that it forbids, but it needs to
7  be carefully managed.
8       Q.    (By Mr. Allen) Do you know what COPE recommends
9  as, quote, "careful management" for those kinds of
10 situations of conflicts of interest?
11      A.    I'd have to go back and review.  I believe that
12 that was a topic that came up in the ad hoc report, but I
13 don't recall the specific details.
14      Q.    And, of course, I'm not talking about the ad
15 hoc report.  I'm talking about COPE.  If you don't know,
16 then that's fine to say so.  So as for editors, let's
17 talk about editors first.  Is it safe to say you don't
18 know in detail what COPE says other than that it should
19 be handled carefully when an editor publishes in their
20 own journal?
21      A.    I think that's an adequate level of detail at
22 this point that I'd want to go back and review those
23 standards.  And if I was the editor of a journal, then I
24 would certainly be looking for counsel and wisdom if I
25 were to pursue something like that.

*Jennifer Crowley    09/26/2024*

```
 1        Q.    And would the same go for a member of the board
 2   of editors?
 3        A.    It would be typical for there to be procedures
 4   or a discussion with the editor about how to handle a
 5   submission.
 6        Q.    Okay.  And to your knowledge, does COPE forbid
 7   non-peer reviewed articles in academic journals?
 8        A.    No.
 9        Q.    Does COPE provide guidelines for who should be
10   invited to publish in an academic journal and under what
11   circumstances?
12              MS. QUIMBY:  Objection, form.
13        A.    No.  I don't believe it goes into that level of
14   specificity.
15        Q.    (By Mr. Allen) Do you know if COPE provides any
16   guidelines on what the meaning of a commentary is in an
17   academic journal?
18        A.    I would have to review COPE guidelines.
19        Q.    But as you sit here today, you're not aware of
20   any?
21              MS. QUIMBY:  Objection, form.
22        A.    Not specifically.
23        Q.    (By Mr. Allen) And if I asked the same question
24   or set of questions about a quote, "symposium," would
25   your answer be the same?
```

1        A.    It would be the same.

2        Q.    Okay.  Have you heard of the Journal of

3    Theoria?  It's spelled like theory but with i-a instead

4    of y on the end.  Theoria.

5        A.    I have heard of it.

6        Q.    What is the Journal of Theoria?

7        A.    That, I couldn't tell you.  Only that it's a

8    journal that's in the College of Music at UNT.

9        Q.    Do you know if it's also published by the

10   University of North Texas press?

11       A.    I have no information on that.

12       Q.    If I was to tell you it is published by the

13   University of North Texas press, can I ask you to assume

14   that it is?

15       A.    If you state it, then I have no reason to

16   believe it's not true.

17       Q.    I'm sure your counsel will point it out to you

18   if I'm misstating something and will have that

19   opportunity.  But my followup question is actually a

20   pretty simple one.

21             As a provost, do you believe that the Journal

22   of Theoria should be subject to different rules for

23   publishing academic articles than the Journal of

24   Schenkerian Studies which is also published by the

25   University of North Texas press?

Jennifer Crowley      09/26/2024

1      A.    I can't speak to that because I don't know what

2  rules or procedures Theoria uses.  I have no familiarity

3  with Theoria other than simply knowing it exists.

4      Q.    Well, you certainly had one journal

5  investigated for its procedures for publishing a

6  symposium in 2020, right?

7      A.    Correct.

8      Q.    Should the Journal of Theoria be subject to

9  different standards than were applied in that

10  investigation?

11            MS. QUIMBY:  Objection, form.

12      A.    If the Society of Music Theory wrote to the

13  university and expressed concerns over that journal, then

14  certainly we would review the -- I would have, as the

15  provost, reviewed that journal and its publication

16  processes.

17      Q.    (By Mr. Allen) But you never heard of the

18  journal for music -- excuse me.  Strike that, please.

19            You never heard of the Society for Music Theory

20  expressing any concerns over the publication of Theoria,

21  right?

22      A.    Correct.  I do not believe my office ever

23  received any complaints regarding Theoria.

24      Q.    And then just back to my previous question.

25  Do you really think there should be different standards

1   for the Journal of Schenkerian Studies than there are for

2   Theoria?

3           MS. QUIMBY:  Objection, form.

4       A.    Different journals will choose different forms

5   of publication whether they're editorial reviewed or peer

6   reviewed and have, you know, a breadth of ways of

7   communicating.  Should they all do that in a professional

8   way?  Yes.

9       Q.    (By Mr. Allen) Should they be subjected to the

10  same standards by the University of North Texas press?

11          MS. QUIMBY:  Objection, form.

12      A.    What do you mean by standards?

13      Q.    (By Mr. Allen) Well, I don't know.  You went in

14  and, you know, investigated one journal but not the

15  other.  That's clear, right?  As you just said, you just

16  testified to that.

17      A.    The reason we investigated the Journal of

18  Schenkerian Studies is because the Society of Music

19  Theory raised explicit concerns regarding the production

20  of Volume 12 of the Journal of Schenkerian Studies.  If

21  any professional society wrote to the university

22  expressing concerns over a publication, then it likewise

23  would have received an investigation.

24          MR. ALLEN:  I'm going to move to strike

25  that answer as completely nonresponsive.

1      Q.    (By Mr. Allen) If you could focus on the
2  question I'm asking, it would go a lot faster.  I know
3  you had the Journal of Schenkerian Studies investigated,
4  and you didn't have the Journal of Theoria investigated.
5  We just have already established that.  What I'm asking
6  is there was an outcome by the ad hoc panel about the
7  Journal of Schenkerian Studies, right?
8      A.    The outcome was recommendations for how the
9  Journal of Schenkerian Studies could improve.
10     Q.    Okay.  And should those same standards of
11 publication be applied to all journals in the College of
12 Music?
13          MS. QUIMBY:  Objection, form.
14     A.    I can't speak to other journals in the College
15 of Music because I'm not familiar with what standards or
16 approach they use.
17     Q.    (By Mr. Allen) Would it be okay under your
18 leadership as provost for there to be double standards?
19 One standard for the Theoria and one standard for the
20 Journal of Schenkerian Studies?
21          MS. QUIMBY:  Objection, form.
22     A.    There are different forms of publication.  I
23 have no knowledge of whether or not these other journals
24 that you speak of have a peer review practice or other
25 practices.

*Jennifer Crawley    09/26/2024*

```
 1        Q.    (By Mr. Allen) So that was never of concern to
 2   you that there might be double standards in the College
 3   of Music?
 4              MS. QUIMBY:  Objection, form.
 5        A.    My concern was specific to the Journal of
 6   Schenkerian Studies and the concerns raised by the
 7   Society of Music Theory.
 8        Q.    (By Mr. Allen) And, you know, while you might
 9   guess by the title Theoria that Theoria is a journal of
10   music theory, right?
11        A.    But is --
12        Q.    It's sort of in the title.
13        A.    But music theory did not raise concerns about
14   Theoria.
15        Q.    Right.  You said that, I think, about six
16   times.  My question is very different though.  Should
17   both journals of music theory be abiding by the same
18   standards that are imposed by the University of North
19   Texas?
20              MS. QUIMBY:  Objection, form.
21        A.    I don't know what standards Theoria uses, so I
22   can't speak to that with more specificity.
23        Q.    (By Mr. Allen) And you remain completely
24   uncurious about it too, don't you?
25              MS. QUIMBY:  Objection, form.
```

1       A.    Mr. Allen, I don't work for the University of
2   North Texas anymore.  My concerns at the present day are
3   focused on my own institution that I work at today.
4       Q.    (By Mr. Allen) And it wouldn't bother you as
5   provost that Theoria went along its merry way doing the
6   same things that the Journal for Schenkerian Studies had
7   done so long as the Society for Music Theory never
8   complained?  That's your testimony today?
9               MS. QUIMBY:  Objection, form.
10      A.    Each of our faculty members is expected to
11  behave in professional ways and uphold standards of their
12  disciplines.  I can't speak to who the person is that's
13  responsible for Theoria or for anything about that
14  journal.
15      Q.    (By Mr. Allen) Are you aware that Theoria
16  published articles without per review?
17      A.    I'm not.  As I have said, I have no knowledge
18  of Theoria other than it is a journal.
19      Q.    So if Theoria is publishing articles without
20  peer review, is that something that would have been a
21  concern to you as the provost if you had known?
22              MS. QUIMBY:  Objection, form.
23      A.    Not necessarily.  If they were producing
24  another form of review such as editorial review and doing
25  that in a professional way, that's not at issue.

*Jennifer Cooley*        *09/26/2024*

```
 1        Q.    (By Mr. Allen) So it can be done in a
 2   professional way to publish articles without peer review,
 3   correct?
 4                MS. QUIMBY:  Objection, form.
 5        A.    Correct.
 6        Q.    (By Mr. Allen) And you're aware that another
 7   author who is not a University of North Texas employee
 8   named Philip Ewell was at the center of this controversy
 9   surrounding the Journal for Schenkerian Studies, right?
10        A.    I am aware that there was a speech that
11   Dr. Ewell -- I believe his name is Ewell -- gave.
12        Q.    It is E-w-e-l-l.
13        A.    Okay.
14        Q.    Just so we're clear.  All right.  And Professor
15   Ewell has testified that his plenary address at the
16   Society of Music Theory was published in a music theory
17   journal called Spectrum which is maintained by the
18   Society for Music Theory.
19        A.    I have no --
20        Q.    I don't suppose -- you don't have any knowledge
21   of that, right?
22        A.    Correct.
23        Q.    And he testified that that article was
24   published without peer review.  Is that proper?
25                MS. QUIMBY:  Objection, form.
```

*Jennifer Stanley      09/26/2024*

1          A.    There is nothing saying that one has to use

2    peer review.  If you're going to choose peer review,

3    editorial review, you know, some other form, then there

4    are professional practices that are associated with how

5    each of those are executed.  I cannot speak to Spectrum

6    or any other journal, as I have no knowledge of those.

7          Q.    (By Mr. Allen) Wouldn't it be a double standard

8    if the Society of Music Theory was complaining about an

9    article critical of Professor Ewell that was published in

10   the Journal for Schenkerian Studies being published

11   without peer review but was happy to publish Philip Ewell

12   without peer review?  Isn't that a double standard?

13              MS. QUIMBY:  Objection, form.

14         A.    I can't speak to that without context.  If the

15   professional standards were being used by another journal

16   that Dr. Ewell published in then --

17         Q.    (By Mr. Allen) We're talking -- just --

18              MR. ALLEN:  I move to strike that as

19   nonresponsive.

20         Q.    (By Mr. Allen) We're talking about the context

21   of whether it was peer reviewed or not.  Is that clear?

22   One article is published by Philip Ewell without peer

23   review in Spectrum, a Journal of Music Theory Society, or

24   the Society for Music Theory.

25              Another is published critical of Philip Ewell

```
 1   by another journal, the Journal of Schenkerian Studies,
 2   without peer review.  But the Society for Music Theory is
 3   terribly upset about the one critical of Philip Ewell.
 4   Isn't that a double standard?
 5             MS. QUIMBY:  Objection, form.
 6        A.   You would have to talk to the Society of Music
 7   Theory.  I can't speak for them.
 8        Q.   (By Mr. Allen) Wouldn't that be relevant to
 9   your ad hoc panel investigation?
10             MS. QUIMBY:  Objection, form.
11        A.   The charge of the panel was specifically to
12   look at the Journal of Schenkerian Studies, not to look
13   at other journals.  They were to look at the practices of
14   how Volume 12 was produced.
15        Q.   (By Mr. Allen) So it wasn't relevant at all to
16   the panel how other journals in the field published.  Is
17   that your testimony today?
18             MS. QUIMBY:  Objection, form.
19        A.   The University of North Texas does not publish
20   Spectrum.
21        Q.   (By Mr. Allen) No.  But you're saying it wasn't
22   relevant to the ad hoc panel's investigation to inform
23   itself about how other journals in music theory publish
24   to determine standards of publication?
25             MS. QUIMBY:  Objection, form.
```

*Jennifer Cooley    09/26/2024*

1      A.    They, as far as I know, did not review

2 other -- other journals in music theory.

3      Q.    (By Mr. Allen) Thank you.  So do you know who

4 the faculty member Frank Heidlberger is in the Department

5 of Music Theory, I believe, at the University of North

6 Texas?

7      A.    I am aware that he is a faculty member in the

8 department.

9      Q.    Do you know him personally, by any chance?

10     A.    I have met him on a handful of occasions.

11     Q.    And incidentally I don't know if the music

12 theory program is a department.  I think former

13 division --

14     A.    They may be called divisions.

15     Q.    It's a division?  Yeah.

16     A.    Yeah.  Those words could be used

17 interchangeably for our purposes.

18     Q.    Okay.  And I just want to apologize if I

19 mischaracterize it.  That's all.

20     A.    Yeah.

21     Q.    But to my -- the best of my knowledge, he works

22 in the Music Theory Department, and he is the editor of

23 Theoria.  Were you aware of that?

24     A.    I was not.

25     Q.    Are you aware that he published Philip Ewell in

*Jennifer Cowley      09/26/2024*

1    Theoria without peer review?

2         A.    I was not.

3         Q.    Without this double blind peer review that

4    we've discussed?

5         A.    I was not.

6              MS. QUIMBY:    Objection, form.

7         Q.    (By Mr. Allen) You have never heard of any

8    complaints that that happened, right?

9         A.    No.

10        Q.    Obviously the Society for Music Theory didn't

11   complain about that or you would have investigated it,

12   right?

13        A.    If I had received a complaint from the Society

14   for Music Theory, we would have reviewed their concerns.

15        Q.    Is it your testimony that that double standard

16   is of no concern to the ad hoc committee either?

17              MS. QUIMBY:    Objection, form.

18        A.    I can't say that there is a double standard.

19   Again I don't have sufficient information to know what

20   Theoria did or did not do.

21        Q.    (By Mr. Allen) So publishing Philip Ewell in

22   Theoria in the same year, 2020, as Timothy Jackson's

23   article came out in the Journal for Schenkerian Studies,

24   both without double blind peer review, that doesn't

25   strike you as a double standard that the SMT complains

*Jennifer Crowley*    09/26/2024

```
 1  about one and not about the other?
 2             MS. QUIMBY:  Objection, form.
 3      A.    That is context dependent.  If proper editorial
 4  review standards were followed, there may be no concern.
 5      Q.    What are the proper editorial review standards
 6  that you would want to be followed in that context?
 7             MS. QUIMBY:  Objection, form.
 8      A.    I would need to see the publication itself to
 9  understand the context with how it presented itself.
10  For example, did it communicate that this was an
11  editorial reviewed piece or not?
12      Q.    (By Mr. Allen) That's something they probably
13  should have done, right?
14      A.    I can't speak to that journal.
15      Q.    You can't speak to that either?  You can just
16  give a yes or no answer.  You can't speak to that either?
17      A.    I can't speak to that.
18      Q.    Do you think it would be relevant for the ad
19  hoc panel, convened to investigate the Journal for
20  Schenkerian Studies, that they inform themselves of
21  Theoria's publication practices?
22      A.    That was not their charge.
23      Q.    So that wouldn't be relevant either, right?
24      A.    That wasn't part of the charge.
25      Q.    Does that mean it's not relevant?
```

*Jennifer Crowley    09/26/2024*

1    A.    I can't speak to that.  It was not part of the

2    explicit charge to the ad hoc task force.

3    Q.    And you wanted them to sort of just follow your

4    orders, right?

5         MS. QUIMBY:  Objection, form.

6    A.    I gave the specific charge to review Volume 12

7    of the Journal of Schenkerian Studies.

8    Q.    (By Mr. Allen) And you wanted them to follow

9    your orders, right?

10   A.    I expected them to follow the specific charge

11   which was to evaluate the Journal of Schenkerian Studies,

12   Volume 12.

13   Q.    Did you have any evidence that they didn't

14   follow your so-called charge?

15   A.    I don't have any evidence of that.

16   Q.    How is a charge different from an order to do

17   something?  Maybe you could explain that to me.  I don't

18   really understand.

19   A.    A committee is often given a charge to say this

20   is what we want you to take on.

21   Q.    And they do it, right?

22   A.    Yes.  Typically the committee would review the

23   matter that they were being asked to review.

24   Q.    And so you want them to do what you tell them

25   to do, right?

*Jennifer Conley    09/26/2024*

1      A.    I want them to review the matter they were
2  asked to review.
3      Q.    Were you aware that Frank Heidlberger published
4  in Theoria, his own journal?
5                MS. QUIMBY:  Objection, form.
6      A.    I have repeatedly told you I have no knowledge
7  of Theoria other than it is a journal that exists, so I
8  have no knowledge.  So this line of questioning, you're
9  free to ask but you're going to get the same response
10 each time that I simply have no knowledge.
11     Q.    (By Mr. Allen) And you didn't inform yourself
12 either, right?
13                MS. QUIMBY:  Objection, form.
14     A.    I have not read Theoria, nor would I have a
15 reason to read Theoria.
16     Q.    (By Mr. Allen) If you knew that Theoria was
17 publishing its editor without a conflict of interest
18 policy, would that be of concern to you as a provost?
19                MS. QUIMBY:  Objection, form.
20     A.    I can't speak to the specific context.
21     Q.    (By Mr. Allen) What more about the context do
22 you need to know?  It has no conflict of interest policy.
23 Please assume that.  And Frank Heidlberger publishes in
24 it.  Please assume that.  That would not be of concern to
25 you as provost when you were having another journal

1    investigated for the same exact thing?

2         A.    If there were serious concerns --

3              MS. QUIMBY:  Form.

4         A.    -- raised then I would have done the same thing

5    I did with the Journal of Schenkerian Studies which is to

6    charge a task force and ask them to review the matter.

7         Q.    (By Mr. Allen) So what you're saying is that

8    you were sort of taking your direction from the Society

9    for Music Theory?

10             MS. QUIMBY:  Objection, form.

11        A.    The Society for Music Theory is the one that

12   raised the concerns about the publication.  As both the

13   university that had editorial as well as publication

14   responsibilities, we reviewed the matter.

15        Q.    (By Mr. Allen) So is your answer yes?  You

16   basically took the cue from the Society for Music Theory?

17             MS. QUIMBY:  Objection, form.

18        A.    I took the concerns raised by the Society of

19   Music Theory and investigated their concerns as it

20   relates to the publication of Volume 12 of the Journal of

21   Schenkerian Studies.

22        Q.    (By Mr. Allen) Were you aware of a single

23   instance in which Theoria, while you were provost,

24   published anything that was considered controversial?

25        A.    I have no knowledge.

*Jennifer Cowley    09/26/2024*

```
 1                      MR. ALLEN:  Can we go off the record,
 2    please?
 3                      VIDEOGRAPHER:  Off the record, 11:36.
 4                      (Recess taken from 11:36 to 11:49)
 5                      VIDEOGRAPHER:  On the record, 11:49.
 6         Q.    (By Mr. Allen) So, President Cowley, I wanted
 7    to go into the Schenker controversy which has been in the
 8    background of all of our questions here.  When did the
 9    controversy surrounding the Journal of Schenkerian
10    Studies first come to your attention as provost?
11                      MS. QUIMBY:  Objection, form.
12         A.    I recall it was around the summer of 2020.
13         Q.    (By Mr. Allen) And how did it come to your
14    attention?
15         A.    The Society for Music Theory issued a letter
16    that was provided to my office, and I understood that
17    there were letters from faculty and students as well.
18         Q.    Did you see any of the faculty or student
19    letters?
20         A.    I did.
21         Q.    When did those come to your attention?
22         A.    It would have been in the same general time
23    period.  I don't recall specific dates.
24         Q.    Do you recall what the student letter said?
25         A.    Not the details.
```

*Jennifer Cooley        09/26/2024*

1        Q.    Do you recall what the faculty letter said?

2        A.    I recall the faculty letter raised concerns

3    relative to the publication of the journal.

4        Q.    Anything else?

5        A.    I believe they also raised some concerns around

6    the treatment of Dr. Ewell's work.

7        Q.    What -- excuse me.  Anything else?

8        A.    That's what I recall at the moment.  If you

9    want to show me the letter, I'd be happy to review it.

10        Q.    Well, one of the purposes is asking what you

11    know and then we can look at -- we may look at it.  I

12    don't know.  But that's one of the purposes now.  Do you

13    remember the faculty letter incorporating the student

14    letter by reference?

15                MS. QUIMBY:  Objection, form.

16        A.    I don't recall that.  There may have been a

17    link.  I don't remember.

18        Q.    (By Mr. Allen) Do you remember learning of the

19    student letter through the faculty letter, by any chance?

20        A.    I don't recall how I learned.

21        Q.    And you said they raised concerns about the way

22    the journal was organized.  Is that -- or something to

23    that effect or run?

24                MS. QUIMBY:  Objection, form.

25        A.    They raised concerns about the publication

Jennifer Cowley      09/26/2024

1  process.

2      Q.   (By Mr. Allen) Okay.  And what were those

3  concerns, to the best of your memory now?

4      A.   That, I don't recall.

5      Q.   And you said they raised concerns about the

6  treatment of Philip Ewell, right?

7             MS. QUIMBY:  Objection.

8      A.   Of his work, of his scholarship.

9      Q.   (By Mr. Allen) And what were those concerns

10  about the treatment of his scholarship?

11      A.   That, I don't recall.

12      Q.   Does the Society for Music Theory have any

13  organizational relationship to UNT?

14      A.   I believe some of our faculty are members of

15  the Society of Music Theory.

16      Q.   Is there any obligation of the University of

17  North Texas to consult the Society for Music Theory?

18      A.   No.  Well, okay.  Let me say in the context of

19  a journal publication, but I don't know whether there is

20  any accreditation or other kinds of professional

21  relationships.  That would live within music theory.

22  That would be a departmental question.

23      Q.   But there is none to your knowledge, right?

24      A.   None to my knowledge.

25      Q.   And you don't remember any of the specific

 1  concerns, I believe you said earlier, that the student
 2  letter raised?
 3      A.    I don't recall the details of the student
 4  letter.
 5      Q.    How were these letters circulated?
 6      A.    You mean -- do you mean how did I receive?
 7      Q.    Well, let me back up.  You're referring to them
 8  as letters, right?  Did you get them as letters?
 9      A.    Could you explain what --
10      Q.    Like in the mail?  Well, I don't know.  Mostly
11  we get letters in the mail.  So you didn't get them in
12  the mail, right?
13      A.    They were emailed.
14      Q.    You got it in email?
15      A.    I believe.
16      Q.    Did you get them on social media?
17      A.    No.
18      Q.    And what -- what occurred next, as you remember
19  it?
20      A.    So I recall at the time, the Society of Music
21  Theory submitted a letter, that the dean made me aware of
22  this letter correspondence.  And I contemplated what
23  appropriate next steps would be.
24      Q.    Had the dean done anything by that time?
25              MS. QUIMBY:  Objection, form.

Jennifer Cowley        09/26/2024

1      A.    I don't recall the exact timeline of who did

2  what when.

3      Q.    (By Mr. Allen) Okay.  I'm going to start

4  introducing some exhibits.

5      A.    Okay.

6      Q.    And perhaps your counsel has advised you about

7  this, but from time to time, I'll present you with

8  documents.  We'll give them an exhibit number.  They get

9  to see them.  You get to see them, and then I'll ask you

10  questions about them.

11      A.    Okay.  I'm going to remove myself from the

12  spotlight to make it easier.  That way I can see whatever

13  it is you're presenting if that's okay.

14      Q.    I still want to see you but, yeah, I mean,

15  obviously I want you to be comfortable.  Can you see the

16  exhibit as I put it on screen?

17      A.    Yes, I can.

18           MR. ALLEN:  Now, I should have introduced

19  this earlier, but I'm introducing for the record Exhibit

20  1, a document that's captioned re: Notice of taking

21  deposition.

22           (Deposition Exhibit No. 1 was marked)

23      Q.    (By Mr. Allen) Do you recognize this document,

24  President Cowley?

25      A.    I do not recognize it.

*Jennifer Cooley      09/26/2024*

1      Q.   Is it your understanding that you appeared at

2   this deposition today in response to this document?

3      A.   I am at this deposition, yes.

4      Q.   Did you respond to the notice of deposition

5   served by plaintiff in this case?

6      A.   My counsel would have helped me with that

7   process.

8           MR. ALLEN:  I'm going to mark for the

9   purposes of the record Exhibit 2.  It's an email from

10  John Richmond on July 31, 2020.

11          (Deposition Exhibit No. 2 was marked)

12     A.   I'll just note that not all of the email is

13  visible because of the way the slider is set up, so it's

14  partially cut off.

15     Q.   (By Mr. Allen) Thanks for pointing that out.

16  I wasn't aware of that, and I'm going to try to fix

17  it -- what we need to do.  Is that all visible now to

18  you?

19     A.   Yes.  It is now.  Thank you.

20     Q.   Okay.  Likewise.  Thanks for pointing that out

21  to me.

22     A.   I have read the document.

23     Q.   Thanks.  Do you remember getting this email?

24     A.   Yes, I do.

25     Q.   And you're on the CC line, right?

*Jennifer Cowley    09/26/2024*

```
 1        A.    Correct.

 2        Q.    And just for the purposes of the record, that

 3   email Jennifer.Cowley@UNT.edu, that was your official

 4   email?

 5        A.    That's correct.

 6        Q.    So if there is any email in the record that has

 7   that email in one of the lines, we can associate that

 8   with you in your position as provost, correct?

 9              MS. QUIMBY:  Objection, form.

10        A.    Generally speaking, yes.  I did receive emails

11   as a faculty member at UNT, but it's unlikely I would

12   have received emails about this matter as a faculty.

13        Q.    (By Mr. Allen) Did you have a separate email as

14   a faculty member?

15        A.    No.  It was the same email address, but

16   students might choose to email me asking questions about

17   planning, that sort of thing.

18        Q.    Did you use any other email to conduct the

19   business of provost?

20        A.    This was my official email as provost.

21        Q.    Okay.  So this is July 31st, 2020, at 9:30 in

22   the morning, more or less, 9:35.  And Dean Richmond is

23   announcing a formal investigation, correct?

24        A.    That's what it appears to say.

25        Q.    Had you discussed this with him beforehand?
```

1      A.    I don't recall the exact timeline of when we

2  spoke, but we did have a conversation about the provost

3  office engaging in a review of the publication.

4      Q.    And just so I understand correctly, did Dean

5  Richmond have independent authority to investigate the

6  Journal of Schenkerian Studies?

7      A.    The college could certainly have the ability to

8  review some matters.  I'm not clear exactly from this

9  email precisely what was intended to be investigated.

10 But the provost's office took the responsibility of

11 forming an ad hoc task force to review the publication of

12 Volume 12.

13     Q.    Okay.  And we'll get to that in a minute.  I

14 guess my question is a little different.  Let me ask a

15 different one.  Dean Richmond of the College of Music,

16 did he have any authority over the University of North

17 Texas press?

18     A.    He does not.

19     Q.    And if you know, could he independently

20 investigate a journal published by the University of

21 North Texas press?

22          MS. QUIMBY:  Objection, form.

23     A.    He would certainly have the ability to have

24 conversations with -- with key members that would be

25 involved in a journal.

*Jennifer Cowley    09/26/2024*

1      Q.    (By Mr. Allen) Let me rephrase the question a
2  bit.  Did he have the authority to conduct an official
3  investigation of a journal published by the University of
4  North Texas press?

5      A.    The journal is in the College of Music, so he
6  would be -- it would be possible for him to review a
7  journal.  What I suspect -- I won't suspect.  I'll leave
8  it at that.

9      Q.    Well, what I'm trying to figure out is if --
10 well, let me ask this.  Was this formal investigation, is
11 he referring to the investigation conducted in
12 conjunction with your office?

13     A.    I can't speak to what Dr. Richmond was
14 communicating in that message.  What I can say is that
15 the provost office was the one who led the review of the
16 Journal of Schenkerian Studies.

17     Q.    Okay.  And if he was -- let me put it this way.
18 If he was stepping beyond his authority and CC'ing you on
19 it as the provost, we would expect you to send an email
20 correcting that's, I guess, exceeding his authority,
21 wouldn't we?

22          MS. QUIMBY:  Objection.

23     Q.    (By Mr. Allen) Let me strike that question.
24 Your attorney is probably correct.

25          If this was improper for him to begin an

1  investigation without your authorization, you certainly

2  would have responded to that, right?

3          MS. QUIMBY:  Objection, form.

4      A.    The dean and I certainly had a conversation

5  regarding what role the provost office would have and the

6  formation of the ad hoc -- that I would take on the

7  formation of an ad hoc task force to review the matter of

8  the journal.

9      Q.    (By Mr. Allen) And did you do that before he

10  made this announcement?

11      A.    The task force commenced in August, so a

12  decision regarding the provost office launching a review

13  would have been roughly around this time.  But it took a

14  couple of weeks to request members to join, to have them

15  accept, and then to launch their first meeting.

16      Q.    Sure.  So what I'm trying to get at is if he's

17  doing this with your authority or not.

18          MS. QUIMBY:  Objection, form.

19      A.    I can't speak to what Dr. Richmond was saying,

20  you know (inaudible).

21      Q.    (By Mr. Allen) Well, you can speak to what's

22  said in the email.  And I'm not interested in what he was

23  saying to you or thinking right that.  I'm asking was

24  this sent with your authority?

25          MS. QUIMBY:  Objection, form.

*Jennifer Crossley    09/26/2024*

1       Q.    (By Mr. Allen) Do you approve of this?

2       A.    Dean Richmond clearly drafted this message.

3  What I'm communicating is the investigation happened

4  through the office of the provost through the ad hoc task

5  force.

6       Q.    But you're not able to testify, as you sit here

7  today, whether when he says we've begun a formal

8  investigation, that that is the same thing as the

9  investigation you authorized through the ad hoc panel?

10      A.    I can't speak to that.

11      Q.    If he was acting outside the scope of his

12  authority, was that something that you would approve?

13            MS. QUIMBY:  Objection, form.

14      A.    The dean and I coordinated so that he was aware

15  that the provost's office would be conducting a review of

16  the Journal of Schenkerian Studies.  I am not aware that

17  he undertook any other investigation outside of what the

18  provost office undertook.

19      Q.    (By Mr. Allen) Is it fair to say since you're

20  CC'd on this email that you knew of the controversy by

21  this time, July 31st?

22            MS. QUIMBY:  Objection, form.

23      A.    I was aware in the summertime, and it seems by

24  this email that certainly I would have been aware by this

25  point in July.

*Jennifer Cooley      09/26/2024*

1      Q.    (By Mr. Allen) Now, it also says, The

2  university, the College of Music, and the Division of

3  Music, Theory, and Ethnomusicology reaffirm our

4  dedication to combating racism on campus and across all

5  academic disciplines.

6            Do you see that line?

7      A.    I do see that line.

8      Q.    What is the, quote, "dedication to combating

9  racism on campus and across all academic disciplines"

10 that he's referring to?

11     A.    I can't speak to that.  You'd have to ask Dean

12 Richmond.

13     Q.    Do you believe he said that as something he was

14 simply making up on the spot?

15            MS. QUIMBY:  Objection, form.

16     A.    I have no knowledge of what Dean Richmond was

17 thinking when he made that statement.

18     Q.    (By Mr. Allen) He's not referring to a policy

19 of the provost's office?

20            MS. QUIMBY:  Objection, form.

21     A.    There is not a policy in the provost office

22 that would directly speak to racism.

23     Q.    (By Mr. Allen) He's not addressing a policy of

24 the president's office?

25            MS. QUIMBY:  Objection, form.

*Jennifer Cooley    09/26/2024*

```
 1        A.    It's unclear what policy he is referring to, if
 2   at all.
 3        Q.    (By Mr. Allen) Was the school dedicated to
 4   combating racism?
 5        A.    That's a conversation you'd have to have with
 6   Dean Richmond.
 7        Q.    Was the university dedicated to combating
 8   racism?
 9        A.    The university was dedicated to filling its
10   mission which we've discussed earlier.
11        Q.    Is he referring to that mission here?
12        A.    It does not appear that he's referring to the
13   mission.
14        Q.    But you don't have any idea what he's referring
15   to then?
16        A.    No.  You would have to speak to Dean Richmond.
17        Q.    Did you understand from this message that
18   investigating the Journal of Schenkerian Studies was part
19   of a dedication to combating racism?
20        A.    I don't recall that conclusion.
21        Q.    The fact that he said that he reaffirms our
22   dedication to combating racism right after he said he was
23   going to investigate the journal leads you to believe
24   they were unconnected?
25              MS. QUIMBY:  Objection, form.
```

*Jennifer Conley        09/26/2024*

1      A.    You would have to speak to Dean Richmond about

2  what his intent was.

3      Q.    (By Mr. Allen) I'm asking what you understood.

4  I didn't ask about his intent.  Could you please answer

5  the question as asked?

6      A.    As I read this email, the part I'm focused on

7  is what was the responsibility of the provost office.

8  The responsibility the provost office took was related to

9  an investigation of the conception and production of the

10  12th Volume of the Journal of Schenkerian Studies.

11      Q.    Could you answer the question I asked you

12  though?

13            MR. ALLEN:  Could you read the question

14  back to the witness?

15            Mary, we're going to be here a very long

16  time if she won't answer the questions.  We're going to

17  be here all day if she continues to make nonresponsive

18  answers, and I'm going to move to strike the answer as

19  nonresponsive.  If she wants to do that, we can do that,

20  but she has to answer the question eventually.  Okay?

21            THE WITNESS:  You need to calm down.

22            MR. ALLEN:  Could you read the question

23  back to me?

24            THE WITNESS:  There is no need to be

25  agitated.  This is a professional dialogue.

```
 1        Q.    (By Mr. Allen) (Inaudible) do not answer
 2   questions that you are asked, Professor Cowley.  Maybe
 3   you can do that at the University of Texas Arlington.
 4   But here I would prefer that you would answer questions
 5   as asked.
 6        A.    And I would prefer --
 7              MR. ALLEN:  Can you read the question?
 8        A.    -- that you calm down and behave in a
 9   professional manner.
10        Q.    (By Mr. Allen) What about my -- what about my
11   behavior do you find unprofessional since this seems to
12   be a big topic as provost of the University of North
13   Texas?
14              MS. QUIMBY:  Can we move on?  Can we move
15   on and reread the question like you've asked a couple
16   seconds ago instead of badgering the witness?
17              MR. ALLEN:  I'm not badgering the witness.
18   She's not answering.
19              Could you reread the question to the
20   witness, please, Madam Court Reporter?
21              (Requested portion read back)
22              MR. ALLEN:  And the question before that
23   was about the email.  Can we go back to that one?
24              (Requested portion read back)
25              MS. QUIMBY:  I'm going to renew my
```

*Jennifer Sealey    09/26/2024*

1  objection to that question.

2      A.    My response is the same as it was before, that

3  the provost office took responsibility for the formal

4  investigation of the conception and production of the

5  12th Volume of the Journal of Schenkerian Studies, and

6  you have seen that charge.  And so from this email, what

7  I take away is my part of the responsibility was the

8  investigation of the Journal of Schenkerian Studies.

9      Q.    (By Mr. Allen) And my question was did you

10  consider the dedication to combating racism unconnected

11  to Dean Richmond's call for a formal investigation?

12              MS. QUIMBY:  Objection, form.

13      A.    I can't draw conclusions of what his intent

14  was.  What I'm telling you is the specific responsibility

15  that the provost office took was related to the

16  investigation of the conception and production of the

17  12th Volume of the Journal of Schenkerian Studies.

18      Q.    (By Mr. Allen) I know.  You've repeated that

19  now, I think, four times.  And I've repeated the question

20  which I want you to ask which is -- which I want you to

21  answer which is not about Dean Richmond's intentions.

22  I'm asking about what you understood.  Is that clear?

23      A.    And I've been clear.

24      Q.    I'm asking about what you understand.  Is that

25  clear?

1      A.    I have been clear.  My answer is clear that the
2   provost office -- my view is what my responsibility was
3   relative to the investigation of the Journal of
4   Schenkerian Studies.
5      Q.    And you understood these to be unconnected, the
6   dedication to combating racism on behalf of the
7   university and the investigation of the Journal of
8   Schenkerian Studies?
9            MS. QUIMBY:  Objection, form.
10     A.    The charge -- the charge to the ad hoc
11  committee was specific to the process and procedures used
12  to produce this volume.  It's not the --
13     Q.    (By Mr. Allen) And the third -- I'm sorry.  I
14  wanted you to finish.
15     A.    No.  That's okay.  You can go ahead.
16     Q.    Okay.  The third sentence says, We likewise
17  remain deeply committed to the highest standards of music
18  scholarship, professional ethics, and academic freedom
19  and academic responsibility.
20           Did I read that correctly?
21     A.    That's what he stated.
22     Q.    Was this also unconnected to the call for a
23  formal investigation?
24           MS. QUIMBY:  Objection, form.
25     A.    As an editor of a journal, there is an academic

*Jennifer Staley      09/26/2024*

1    responsibility that would be relevant.

2         Q.    (By Mr. Allen) So you found the third sentence

3    relevant but not correct?

4              MS. QUIMBY:  Objection, form.

5         A.    A portion of the third sentence is relevant to

6    the investigation that my office undertook.

7         Q.    (By Mr. Allen) Do you know of any document in

8    which you informed Dean Richmond that the second sentence

9    was not something you were going to charge the ad hoc

10   panel with investigating?

11        A.    I did not respond to this email communication,

12   as far as I know.

13        Q.    Did you tell Dean Richmond that the, quote,

14   "dedication to combating racism" was not part of the

15   investigation of Schenkerian Studies?

16             MS. QUIMBY:  Objection, form.

17        A.    I communicated to Dean Richmond what the charge

18   of the committee -- of the ad hoc task force would be.

19        Q.    (By Mr. Allen) Did you communicate to him that

20   the dedication to combating racism was not part of the

21   investigation of the Journal of Schenkerian Studies?

22             MS. QUIMBY:  Objection, form.

23        A.    We did not have that explicit conversation.

24   What I communicated was what the charge would be.

25             MR. ALLEN:  Sorry about that.  I'm going

*Jennifer Cowley     09/26/2024*

```
 1   to mark as Exhibit 3 the following printout -- what

 2   appears to be a printout of the UNT webpage.  At least it

 3   has a URL in the upper right-hand corner which seems to

 4   be cut off actually in the document we have, so I

 5   apologize for that.

 6               (Deposition Exhibit No. 3 was marked)

 7        A.   Okay.

 8        Q.   (By Mr. Allen) I think you're --

 9        A.   The text is readable.

10        Q.   Yes.  I'm just going to put this one away and

11   put it away again.

12        A.    It appears that that's the same language that

13   was in the prior email you showed, but I would have to

14   compare the two to see if they are the same.

15        Q.   Would you like me to post the other Exhibit

16   Number 2 online again so you can see them and compare

17   them?

18        A.   It's only if you think it's relevant.

19        Q.   Well, I think we can move on because the

20   document will show that, but I just have a few brief

21   questions about this.  You agree that this is on the

22   College of Music's website?

23        A.    It appears that it's on the College of Music

24   website, and I have no reason to question that it's not.

25        Q.    And this -- the portion of the URL we have,
```

1  music.UNT.edu, that is the typical web address URL for

2  the College of Music?

3      A.    I have no reason to believe it's not.

4      Q.    And this is also appearing over the name of not

5  only John Richmond but Division Head Benjamin Brand,

6  right?

7      A.    Correct.  Those are the two leaders.

8      Q.    Now, is it your understanding that what goes up

9  on the university's website is an official statement of

10  the university?

11          MS. QUIMBY:  Objection, form.

12     A.    Not necessarily.

13     Q.    (By Mr. Allen) Okay.  And could they do

14  this --

15     A.    It's a statement of those two individuals.

16     Q.    Right.  But it's also being published on the

17  website of the university, right?

18          MS. QUIMBY:  Objection, form.

19     A.    It's on the College of Music's website which is

20  part of the university.

21     Q.    (By Mr. Allen) So this is my question.  Can

22  they publish things, puts things up on the website of the

23  university without your permission?

24     A.    Yes.  Just as every faculty member posts

25  materials on the website without seeking a specific

*Jennifer Cowley      09/26/2024*

1    approval process.

2         Q.    You would agree though this isn't the personal

3    webpage of John Richmond, right?

4         A.    No.

5         Q.    It's not the person --

6         A.    I agree -- I agree with your statement.

7         Q.    It's not the personal webpage of Benjamin

8    Brand, right?

9         A.    Correct.

10        Q.    It's the webpage of the College of Music, an

11   institution within the University of North Texas,

12   correct?

13        A.    That's correct.

14        Q.    Did you know they were putting this up online?

15        A.    I did not.

16        Q.    And they again say they are reaffirming the

17   university, the College of Music, and the Division of

18   Music History, Theory, Ethnomusicology's dedication to

19   combating racism, correct?

20        A.    That is what's stated.

21        Q.    And as the provost, do you know what they're

22   talking about there that they're publishing on the

23   College of Music's webpage?

24        A.    I was not aware that this existed.

25                    MR. ALLEN:  So I'm marking as Exhibit 4

Jennifer Cowley      09/26/2024

```
 1  for the record a letter dated July 31st, 2020, to Laura
 2  Wright, Lesa Roe, John Richmond, Jennifer Cowley, and
 3  Benjamin Brand.
 4              (Deposition Exhibit No. 4 was marked)
 5      Q.   (By Mr. Allen) Do you recognize this letter,
 6  President Cowley?
 7      A.   I recall receiving a letter like this.  I
 8  presume it's the same letter.
 9              MR. ALLEN:  I think she's frozen.  Oh,
10  you're back.
11      Q.   (By Mr. Allen) I believe you answered you do
12  recall receiving the letter?  It's just because you froze
13  on my end.  I didn't hear your answer.
14      A.   Yes.  I believe so.  I haven't seen the
15  contents yet, but I recall receiving a letter like this.
16      Q.   And I'm not trying to keep it from you, and
17  we'll get to that.  But this is -- this is your correct
18  address at the University of North Texas?
19      A.   Correct.  The provost@UNT is a generic provost
20  office email address.
21      Q.   Sure.  Who is Laura Wright?
22      A.   She's the chair -- was the Chair of the Board
23  of Regents at the time for the University of North Texas
24  System.
25      Q.   Do you have any reason to believe that she
```

*Jennifer Cowley    09/26/2024*

1  didn't get this?

2      A.    I would have no reason to believe that.

3      Q.    Did anyone from the Board of Regents, including

4  Laura Wright, ever contact you about the Journal of

5  Schenkerian Studies?

6      A.    No one from the Board of Regents contacted me.

7      Q.    And you have no knowledge of the Board of

8  Regents doing anything about the Journal of Schenkerian

9  Studies controversy summer of 2020?

10      A.    No.  I have no knowledge of that.

11      Q.    Okay.

12      A.    Are you asking me to read a portion of this or

13  would you --

14      Q.    If you want the whole thing, I can even email

15  it to you or something of that nature to your counsel.

16  But I'm going to direct you.  It's not -- it's six pages.

17  But in the interest of moving along, I want to direct

18  your attention to specific parts of it.  Is that fair?

19      A.    Okay.  That's fair.

20      Q.    At any time, President Cowley, (inaudible) more

21  or need more information that's in the letter to inform

22  your testimony, just tell me.  Okay?

23      A.    Okay.

24      Q.    I'm going to go to the first paragraph here.

25      A.    Can you move the arrow to point to whether --

*Jennifer Conley    09/26/2024*

 1  you mean the very first paragraph on the page?

 2      Q.    Yes.

 3      A.    Okay.

 4      Q.    See this one?

 5      A.    Yes.

 6      Q.    I should have been more specific.  Thank you.

 7  And in specific, the letter states, This morning, Dean

 8  Richmond -- sorry.  That wasn't very felicitous since the

 9  pop-up occurred right where I was trying to show you.

10          It says, This morning, Dean John Richmond

11  announced that the school will conduct a full

12  investigation.

13          Do you see that?

14      A.    Yes, I see that.

15      Q.    Do you consider the announcement of a full

16  investigation to be an action of the school?

17              MS. QUIMBY:  Objection, form.

18      Q.    (By Mr. Allen) Let me strike that.  An

19  investigation by the school is an action of the school,

20  right?

21              MS. QUIMBY:  Objection, form.

22      A.    So the way it's phrased here is different than

23  the way it was phrased in the letter that Dean Richmond

24  sent out.  I understand it's a different author, so I

25  understand that.  As we've described before, the

*Jennifer Cowley    09/26/2024*

1  university through the provost office ultimately

2  conducted the investigation.

3      Q.    (By Mr. Allen) Right.  And you consider the

4  investigation to have been an action of the school

5  ultimately, right?

6      A.    It was an action of the provost's office.

7      Q.    Okay.  Thank you.  Now, I just -- I just have a

8  few more brief questions.  Here are some -- actually, why

9  don't you go ahead and read this briefly because the

10 purpose of the letter, as it says, is to, quote, "some

11 attachments" that were attached to this letter which are,

12 I believe, the letters of the students and the faculty

13 that you referred to earlier.

14          But why don't you read them, and then I'll just

15 ask you if that is the case.

16     A.    Can you unhighlight?  That will make it a

17 little easier.  Thank you.

18     Q.    Yeah.  Let me get that.  Is that all on screen

19 for you, President Cowley?

20     A.    It is.  Don't scroll up any more, please.

21     Q.    I will take my hands off the scroll.

22     A.    Okay.  I've read through the indented text on

23 Page 3 at the top.

24     Q.    Okay.

25     A.    If you'd like me to read further, just let me

*Jennifer Greeley      09/26/2024*

1  know.

2      Q.   Well, let's just start with that.  The graduate

3  students sent you a letter or you received something by

4  email from them, correct?

5      A.   It was not directly from the graduate students.

6  But I believe at some point --

7      Q.   Oh, okay.

8      A.   -- Dean Richmond shared the students'

9  statement.

10     Q.   Just if you remember, and I realize it's been a

11 long time, is this a -- is this an excerpt of that

12 communication that you received?

13          MS. QUIMBY:  Objection, form.

14     A.   I don't recall, but I don't have a reason to

15 believe it would not be.

16     Q.   (By Mr. Allen) And that's perfectly fair.  If

17 you could just read the -- I'll move this up so we're

18 just dealing with the second block quote, It's my

19 representation, and in the letter that this is the

20 faculty statement that you received at some point which

21 you also testified to earlier.

22          And I'm just going to ask you if, to the best

23 of your memory, this is an excerpt of that statement you

24 were referring to earlier in your testimony that you

25 received in the summer timeframe?

*Jennifer Cowley*    *09/26/2024*

1      A.    Yes.  I have no reason to believe it's not, and

2    I recall some of the information in here.

3      Q.    Okay.  And then so this brings me to the heart

4    of my question.  This letter raises the issue of whether

5    my client, Timothy Jackson's, rights under UNT's Policy

6    06.035, academic freedom and academic responsibility,

7    were being violated.  Do you see that?

8      A.    Would you like me to read that paragraph?

9      Q.    You can read as much as you like, but I'm just

10   asking to confirm that that was brought to your attention

11   in this letter.

12     A.    Yes.  It exists in this letter.

13     Q.    Okay.  And to your knowledge, was there ever

14   any investigation of the potential violation of my

15   client's academic freedom and academic responsibility

16   (inaudible)?

17              MS. QUIMBY:  Can you repeat that?  I'm

18   sorry.  You just cut out.

19              THE WITNESS:  Yeah.  You cut out.

20     Q.    (By Mr. Allen) I'm sorry.  To your knowledge,

21   was there ever any investigation of the allegations that

22   my client's academic freedom and academic responsibility

23   rights under this policy were being violated?

24     A.    There was not a direct investigation.

25   However, the investigation conducted by my office was

*Jennifer Cowley       09/26/2024*

1  restricted to the editorial and publication processes of

2  the journal and not of Dr. Jackson himself as an

3  individual.

4       Q.    So that wasn't my question.  To your knowledge,

5  was there any investigation of Professor Jackson's

6  allegation that the academic freedom and academic

7  responsibility policy had been violated?

8       A.    No.  There was no formal investigation of his

9  allegations that UNT Policy 06.035 was violated.

10      Q.    Okay.  Now I think we will come to the Ad Hoc

11 Panel Report that you had discussed earlier.

12      A.    Given that it's 12:30 and you're going to be

13 transitioning --

14      Q.    Oh, is it a time for --

15      A.    -- is it an appropriate time for a lunch break?

16      Q.    I'm glad you brought that up and certainly.

17 Why don't we do that, and then I can get the exhibit up

18 and possibly premarked with the court reporter.

19                MR. ALLEN:  Shall we go off the record?

20                VIDEOGRAPHER:  The time is 12:27.

21                (Recess taken form 12:27 to 1:01)

22                VIDEOGRAPHER:  The time is 1:01.  We're on

23 the record.

24                MR. ALLEN:  So I'm going to mark as

25 Exhibit 4 (sic) for the record an email that appears to

*Jennifer Cowley      09/26/2024*

```
 1  be from Jennifer Cowley to John Ishiyama on August 3rd,
 2  2020.
 3       Q.   (By Mr. Allen) Do you see the exhibit?
 4       A.   I do.
 5       Q.   President Cowley?
 6       A.   Yes.
 7                 (Court Reporter made a clarification on
 8                 the exhibit)
 9                 MR. ALLEN:  I mismarked it?
10                 (Court reporter made a clarification on
11                 the exhibit)
12                 MR. ALLEN:  Can we go off the record for a
13  second?
14                 VIDEOGRAPHER:  Off the record, 1:02.
15                 (Recess taken from 1:02 to 1:06)
16                 VIDEOGRAPHER:  On the record, 1:06.
17                 MR. ALLEN:  So after being instructed by
18  the Court Reporter, we were a little off numbered on the
19  exhibits, and I apologize, President Cowley.  I'm going
20  to mark for the record Exhibit 5 and strike the past
21  marking of Exhibit 4.  The exhibit is the same.  It's an
22  email from the witness, Jennifer Cowley, to John Ishiyama
23  on August 3rd, 2020.
24                 (Deposition Exhibit No. 5 was marked)
25       Q.   (By Mr. Allen) Do you see the witness -- excuse
```

*Jennifer Cowley    09/26/2024*

```
 1  me.  Do you see the exhibit, President Cowley?
 2       A.    I do see the exhibit.
 3       Q.    Do you recognize this document?
 4       A.    I do.
 5       Q.    Did you send this email?
 6       A.    Yes, I did.
 7       Q.    And you had discussed earlier that you -- you
 8  know, it takes some time in a large organization to
 9  convene a committee or a panel, as you did in the case of
10  the ad hoc committee.  And is this an email that was sent
11  to Professor Ishiyama convening the committee?
12       A.    It was not yet convening the committee.  It was
13  inviting membership on the ad hoc.
14       Q.    And this is August 3rd, 2020, right?
15       A.    Correct.
16       Q.    So this is three days after that email by John
17  Richmond announcing the investigation of the Journal of
18  Schenkerian Studies and committing the university, the
19  music school, and so forth to combating racism, correct?
20            MS. QUIMBY:  Objection, form.
21       A.    That is what his email said.  That is not what
22  I convened the ad hoc task force to --
23       Q.    (By Mr. Allen) I understand.  Sorry.  I'm going
24  to cut you off.  I understand your testimony.  You have
25  testified to that, but this is three days after John
```

*Jennifer Cowley    09/26/2024*

1    Richmond's announcement, correct?

2         A.    It is three days after John Richmond's

3    announcement.  That is correct.

4         Q.    Okay.

5              MR. ALLEN:  I think I've got the right one

6    here.  Okay.  I'm going to mark -- now I'm going to mark

7    as Exhibit 6 for the record an email from Jennifer Cowley

8    of August 6, 2020, to various professors at the

9    University of North Texas.

10             (Deposition Exhibit No. 6 was marked)

11        Q.    (By Mr. Allen) Have I characterized this

12   document correctly?

13        A.    Yes.

14             MS. QUIMBY:  Can you do me a favor and

15   zoom in just little bit?  The font is a little small.  I

16   can read it, but I'm straining a bit.

17             MR. ALLEN:  Let me see what I can do here.

18             MS. QUIMBY:  If you can.  It's not the end

19   of the world.  I'm just saying if you can zoom a bit.

20             MR. ALLEN:  What I have to do, I think, is

21   make it bigger on screen and then -- is that better?

22             MS. QUIMBY:  Yes.  Perfect.  Thank you.

23        Q.    (By Mr. Allen) And I apologize, President

24   Cowley, but that makes me have to rearrange some things

25   on my screen.

*Jennifer Cowley      09/26/2024*

```
 1        A.   I understand.

 2        Q.   Here we go.  Okay.  Is this the charge that you

 3   discussed before?

 4        A.   No.

 5        Q.   What is this document?

 6        A.   This is an email to panel members notifying

 7   them when we will be meeting and that I'll be issuing the

 8   charge on the 12th.

 9        Q.   Okay.  And so this is three days after you

10   wrote to John Ishiyama, correct?

11        A.   Correct.  I issued invitations to panel

12   members.  They responded back, yes, they would

13   participate.  And once I had a committee, then I issued

14   this -- this email to the panel members.

15        Q.   And are all of the people in the to line, are

16   those professors who have agreed to serve on the panel?

17        A.   They are.  One accepted but then later

18   withdrew.

19        Q.   Can you identify that individual, please?

20        A.   I believe it was Professor Dubrow.

21        Q.   Was Professor Dubrow -- that's the correct

22   pronunciation, I hope.  Was he replaced by a panel

23   member?

24        A.   She was.

25        Q.   Sorry.  She.  Thank you.  And who was she
```

*Jennifer Cowley     09/26/2024*

1   replaced by?

2          A.    It was a faculty member in the College of

3   Business.  His name is escaping me right now, but it

4   would be in the report.

5          Q.    Okay.

6          A.    The Ad Hoc Panel Report.

7          Q.    And except for this other professor, this is

8   the ad hoc panel, correct?

9          A.    Correct.

10         Q.    And I understand you've now said that Dubrow

11  also left for what I assume are unrelated reasons?

12         A.    She chose not to participate in the panel.

13         Q.    Okay.  This is a statement of the University of

14  North Texas regarding the formation of the panel,

15  correct?

16         A.    In the middle of the email, it is the statement

17  that UTA had or -- I'm sorry -- UNT had issued regarding

18  the formation of this panel.

19         Q.    Was the statement issued in another location in

20  addition to this email?

21         A.    It was available for press inquiry if they

22  communicated with the Office of Media Relations.

23         Q.    I see.

24         A.    Or University Communications.

25         Q.    Was it published on the website of the

1  university as Dean Richmond had done with Benjamin Brand

2  in the exhibit we had seen earlier?

3       A.    That, I do not recall.

4       Q.    Okay.  So you state -- is this a statement that

5  you crafted?

6       A.    I crafted with the support of Jim Berscheidt in

7  the Office of University Communications.

8       Q.    Thank you.  And the first line is the

9  university of North Texas -- the first line of the

10  statement -- well, let me scratch that.

11          The second sentence of the statement says, The

12  University of North Texas is committed to academic

13  freedom and the responsibility that goes along with this

14  freedom.  This dedication is consistent with and not in

15  opposition to our commitment to diversity and inclusion

16  and to the highest standards of scholarship and

17  professional ethics.

18          Did I read that right?

19       A.    You did read that correctly.

20       Q.    Okay.  So how -- were you concerned that the

21  investigation of the ad hoc panel might be seen as

22  inconsistent with diversity and inclusion?

23       A.    I'm sorry.

24              MS. QUIMBY:  Renaldo, I don't think you're

25  muted.

1           MR. ALLEN:  No.  I think you're -- I'm

2    sorry.  If you heard that sound in the background, that

3    might be my dog.  I apologize for that.

4           MS. QUIMBY:  I think there was -- I

5    thought I heard someone's voice as well.  I'm sorry.  I

6    didn't mean to interrupt for the sake of interrupting.

7    I just wanted to --

8           MR. ALLEN:  No.  It wasn't -- it wasn't

9    taken that way.

10      Q.   (By Mr. Allen) So I'm just going to --

11      A.   Can you repeat?

12      Q.   -- try to rephrase the question.  Yes.  Thank

13   you, sorry.

14           Why would you put in the statement, This

15   commitment to academic freedom and the responsibility

16   that goes along with this freedom (inaudible) statement

17   about diversity and inclusion?

18      A.   I'm sorry.  You cut out in the middle.  Can you

19   repeat that one more time?

20      Q.   Sure.  Why do you express a commitment to

21   academic freedom and responsibility along with a

22   commitment to diversity and inclusion?  Why is that

23   included there?

24      A.   I'm reflecting back.  It's been, you know, a

25   number of years since I drafted that sentence.  You know,

*Jennifer Ginley      09/26/2024*

```
 1   there were a lot of concerns being raised from different
 2   perspectives and different individuals.
 3          The intent of this particular communication was
 4   to say that the university was going to conduct a review
 5   and that this doesn't -- that this meant that we were
 6   going to look at academic responsibility and make sure
 7   that we're upholding standards.
 8      Q.   How could those be inconsistent with diversity
 9   and inclusion?
10      A.   They might not be.
11      Q.   Was anyone alleging that they were?
12      A.   Was anybody alleging what was?
13      Q.   Was anyone alleging that commitment to
14   diversity and inclusion was somehow inconsistent with the
15   commitment to academic freedom and the responsibility
16   that goes with this freedom?
17      A.   Not that I was aware of.
18      Q.   Why did you put it in the statement then?
19      A.   I can't recall.  That was a number of years
20   ago.
21      Q.   So as you sit here today, you have no idea why
22   you included that verbose statement in the document in
23   Exhibit 6?
24          MS. QUIMBY:  Objection, form.
25      A.   I don't recall the exact reasons that I wrote
```

*Jennifer Cowley       09/26/2024*

```
 1  those particular words.
 2       Q.    (By Mr. Allen) Was anyone arguing that academic
 3  freedom might harm diversity on campus?
 4       A.    No, not that I'm aware of.
 5       Q.    Clearly you would not argue that, say, a racial
 6  minority is somehow harmed by academic freedom, would
 7  you?
 8                 MS. QUIMBY:  Objection, form.
 9       A.    You're asking me to draw a conclusion?
10       Q.    (By Mr. Allen) I'm asking you your
11  understanding as provost.  Clearly you would not argue
12  that academic freedom would somehow harm racial
13  minorities, would you?
14                 MS. QUIMBY:  Objection, form.
15       A.    Yeah.  You're making a statement.
16       Q.    (By Mr. Allen) I'm asking a question.  No.
17  I'm asking a question.  As provost would you understand
18  academic freedom -- let me scratch that.
19            In your understanding as academic -- as the
20  Provost of the University of North Texas, would you not
21  agree that academic freedom would not harm racial
22  minorities?
23                 MS. QUIMBY:  Objection, form.
24       A.    I would say that academic freedom does not have
25  to be inconsistent with a commitment to diversity and
```

*Jennifer Cowley      09/26/2024*

 1  inclusion.

 2      Q.   (By Mr. Allen) Would you agree that academic

 3  freedom does not harm racial minorities?

 4      A.   I would not make that statement.

 5      Q.   You do not agree with that statement?

 6           MS. QUIMBY:  Objection, form.

 7      A.   I do not agree with how you stated that

 8  statement.

 9      Q.   (By Mr. Allen) Do you believe academic freedom

10  harms racial minorities, President Cowley?

11      A.   That's not a statement I would make.

12      Q.   I'm glad.  But you will not make the statement

13  that academic freedom does not harm racial minorities.

14  Is that your testimony today?

15      A.   Yeah.  I would not make that statement.

16      Q.   Can you identify any context in which academic

17  freedom harms racial minorities?

18      A.   You'd have to provide context.

19      Q.   I'm asking you to provide context.  Can you

20  provide any context in which academic freedom would harm

21  racial minorities?

22           MS. QUIMBY:  Objection, form.

23      A.   I'm not going to respond to that question.

24           MR. ALLEN:  I'm sorry.  Did you direct her

25  not to answer?

```
1        A.    No.  I said I'm not going to respond to that
2  question.
3        Q.    (By Mr. Allen) Oh, I thought that was your
4  attorney speaking.  So you're refusing to answer that
5  question.  I see.  Would you agree with the statement
6  that academic freedom does not harm the inclusion of
7  racial minorities at the University of North Texas as
8  provost?
9              MS. QUIMBY:  Objection, form.
10       A.    Your wording is unclear.
11       Q.    (By Mr. Allen) What's unclear about it?
12 Please explain for the record what you find unclear about
13 the question would you agree with the statement that
14 academic freedom does not harm the inclusion of racial
15 minorities at the University of the North Texas?
16       A.    It's wordy and confusing.  Could you simplify
17 your statement?
18       Q.    Do you agree with the statement that the
19 commitment to academic freedom does not harm racial
20 inclusion?
21       A.    I would not make that statement.
22       Q.    Can you think of any context in which academic
23 freedom harms racial inclusion?
24       A.    No.  But if you want to provide an example, I
25 could respond to that.
```

1    Q.    But you can't provide an example yourself in

2  your experience as provost, right?

3    A.    Not off the top of my head.

4    Q.    Can you provide one in your experience as the

5  President of the University of Texas at Arlington?

6              MS. QUIMBY:  Objection, form.

7    A.    Not off the top of my head.

8    Q.    (By Mr. Allen) Why did you choose panel members

9  from outside the College of Music?

10   A.    I purposely chose panel members outside of the

11 College of Music because the content of the journal --

12 journal publications was irrelevant.  It was about how

13 the conceptualization and production of the volume

14 occurred.

15         And therefore selecting committee members that

16 were outside of the College of Music, they brought

17 different perspectives and different experiences relative

18 to production of journals and would not be knowledgeable

19 particularly about Schenkerian Studies.

20   Q.    Was it the content being Schenkerian Studies

21 that you thought was irrelevant to the panel's

22 investigation?

23             MS. QUIMBY:  Objection, form.

24   A.    The charge to the committee was not based on

25 content.  Selecting committee members from outside of the

1  college meant that there was some arm's length distance,
2  and it was unlikely that faculty members and other
3  disciplines would have specific knowledge of the content
4  areas being discussed in the journal.
5      Q.    (By Mr. Allen) Did you ever consider getting a
6  music theorist from outside the University of North Texas
7  to advise the panel?
8      A.    I did not.
9      Q.    And would you answer the same if I said to
10 participate in the panel?  You never thought of including
11 an outside music theorist to participate in the ad hoc
12 panel, right?
13     A.    I considered whether people involved in music
14 should or should not be involved and made the decision
15 that ultimately I felt it was more appropriate to exclude
16 people from the College of Music or music generally.
17     Q.    And is that -- well, strike that and move on.
18         You also said, The panel members who are
19 outside the College of Music will examine objectively the
20 process followed in the contention and production of
21 Volume 12 of the Journal of Schenkerian Studies.
22         Did I read that correctly?
23     A.    Correct.
24     Q.    Are you able to explain now what you meant by
25 objectively?

*Jennifer Gobley    09/26/2024*

```
 1        A.    My expectation is that they would collect
 2   evidence and conduct interviews that would allow them to
 3   draw reasonable conclusions as it relates to the
 4   conception and production of this volume.
 5        Q.    Okay.  Would that meaning of objectively, as
 6   you use it in this statement, would it qualify as
 7   objectively doing their business correctly to ignore
 8   evidence that key witnesses were lying?
 9              MS. QUIMBY:  Objection, form.
10        Q.    (By Mr. Allen) Is that objective?
11        A.    You would have to provide specific evidence
12   that that was the case.
13        Q.    So you can't say, as you sit here today,
14   whether the definition of objective investigation, as you
15   set forth in this statement, would basically condone
16   ignoring a witness -- excuse me -- evidence that a
17   witness was lying?  Is that your testimony?
18              MS. QUIMBY:  Objection, form.
19        A.    Your statement was unclear.
20        Q.    (By Mr. Allen) Okay.
21        A.    It was jumbled.
22        Q.    Yeah.  No.  You're right.  Let me strike that.
23              Are you able to testify today -- let me strike
24   that again.
25              Is it your testimony today that whatever you
```

```
 1   meant by objectively set forth in this email did not

 2   encompass a requirement that the ad hoc panel be

 3   attentive to the fact that witnesses were lying to them?

 4               MS. QUIMBY:  Objection, form.

 5        A.    Participants in the process of being

 6   interviewed would be expected to share information that

 7   they believe to be truthful, and it would be up to the

 8   panel to evaluate the information that they received.

 9        Q.    (By Mr. Allen) So evidence of truth or untruth

10   would be relevant to an objective inquiry, right?

11        A.    Maybe.  Depending on the context.

12        Q.    It would be important to an objective inquiry

13   not to exclude exculpatory evidence, right?

14               MS. QUIMBY:  Objection, form.

15        A.    I can't speak to that.  That's context

16   dependent.

17        Q.    (By Mr. Allen) What -- in what context for the

18   investigation of activities at the University of North

19   Texas would it be appropriate to ignore exculpatory

20   evidence?

21        A.    I'm not suggesting it would be.

22               MS. QUIMBY:  Objection, form.

23        A.    We're talking specifically about this

24   investigation and any --

25        Q.    (By Mr. Allen) No.  That's not true.  Wait.  I
```

*Jennifer Cowley    09/26/2024*

 1  just want to cut you off.  I asked you a specific

 2  question.  Can you name a context in which it would be

 3  relevant to ignore exculpatory context in an

 4  investigation at the University of North Texas?

 5          You supply the context.  Enlighten us what

 6  context would be appropriate in an objective

 7  investigation under your responsibility as provost to

 8  ignore exculpatory information?

 9          MS. QUIMBY:  Objection, form.

10      A.   This is your interview.  If you want to provide

11  further context, you're welcome to.  Otherwise, my answer

12  is no.

13      Q.   (By Mr. Allen) Did you expect the ad hoc panel

14  to ignore exculpatory evidence?

15      A.   My expectation is that the panel would review

16  evidence that was presented and make determinations that

17  would influence their recommendations.

18      Q.   Does this mean you did or did not expect them

19  to ignore exculpatory evidence?

20          MS. QUIMBY:  Objection, form.

21      A.   The panel was charged with reviewing evidence

22  and determining that it's most relevant to support their

23  recommendations -- to support the formation of

24  recommendations.

25      Q.   (By Mr. Allen) Now, you said that the

 1  University of North Texas was, quote, "not investigating

 2  Timothy Jackson," closed quote, right?

 3      A.    The charge of the committee was to review the

 4  conception and production of Volume 12 of the Journal of

 5  Schenkerian Studies.  This professor was involved in the

 6  journal and so would be part of the review process.  But

 7  Dr. Jackson himself was not -- the charge was not about

 8  Dr. Jackson.  It was about the journal.

 9      Q.    And you've said it's not -- you're not

10  investigating the journal, right?  You're just

11  investigating Volume 12.  Was that your testimony?

12      A.    The conception and production of Volume 12.

13      Q.    What policy or rules of the University of North

14  Texas were being followed when this investigation was

15  ordered?

16              MS. QUIMBY:  Objection, form.

17      A.    Part of this review was to determine whether or

18  not there could have been violations of university

19  policy.  University policies are generally fairly broad,

20  and they are not policies specific to journals themselves

21  but could fall under other policies.

22              And so the charge of the ad hoc committee was

23  to make a determination around whether or not there were

24  any issues related to the conception and production of

25  Volume 12 of the Journal of Schenkerian Studies.

Jennifer Cowley          09/26/2024

1          Q.    (By Mr. Allen) Was the so-called ad hoc panel
2    following any established process for investigation
3    established by the University of North Texas?
4          A.    There are specific -- there are specific
5    processes for certain types of policy violations.
6    However, in this case, at the beginning of the process,
7    it was unclear whether there were or were not any policy
8    violations.
9                Therefore, there was not an established
10   procedure for which one would follow.  Hence, I
11   determined the best path forward was to form an ad hoc
12   committee to review this matter.
13         Q.    So the very name ad hoc kind of indicates that
14   there was no policy being applied, right?
15         A.    I wouldn't draw that conclusion.
16               MS. QUIMBY:  Objection.
17         A.    But an ad hoc panel or committee are, from time
18   to time, organized by the provost's office or other
19   offices to review a matter that doesn't clearly fall
20   within a specific policy or procedure.
21         Q.    (By Mr. Allen) Was there ever a rules violation
22   found by the ad hoc panel?
23         A.    The panel did not find that there was a
24   specific policy violation.
25         Q.    Did the ad hoc panel find that Timothy Jackson

*Jennifer Crawley    09/26/2024*

 1  violated any rules of the university?

 2      A.    As I mentioned, their charge was not to review

 3  Dr. Jackson specifically but to review the production of

 4  Volume 12.

 5      Q.    Can you answer my question, please?

 6      A.    Can you repeat your question?

 7            MR. ALLEN:  Can you read the question to

 8  the witness, please, Madam Court Reporter?

 9            (Requested portion read back)

10      A.    Their recommendations were on how the Journal

11  of Schenkerian Studies could be improved, and they were

12  not targeted specifically at Dr. Jackson.  They were

13  targeted at how the journal could be improved.

14      Q.    Does this mean your answer is, no, they didn't

15  find that he violated any rules?

16            MS. QUIMBY:  Objection, form.

17      A.    The committee did not state that there were any

18  specific policy violations by Dr. Jackson.

19      Q.    (By Mr. Allen) Okay.  Thank you.  Now, I

20  believe you've testified that the Ad Hoc Panel Report

21  came out on November 25th of 2020, right?

22      A.    I don't recall the date, but if you say that's

23  when it is, I have no reason to believe otherwise.

24      Q.    And then on September 7th, I believe, in

25  advance of that, did you send a letter to Professor

*Jennifer Cowley    09/26/2024*

 1 | Jackson?
 2 |      A.    Do you have a copy of that letter?
 3 |      Q.    I'm trying to find it.  Yes.
 4 |            MR. ALLEN:  I'm going to mark for the
 5 | record -- now I'm afraid to say where we are.
 6 |            Madam Court Reporter, are we on Exhibit 7?
 7 |            COURT REPORTER:  Yes.  We are on Exhibit
 8 | 7.
 9 |            MR. ALLEN:  Can I mark for the record
10 | Exhibit 7, a letter of September 7, 2020.
11 |            (Deposition Exhibit No. 7 was marked)
12 |      Q.    (By Mr. Allen) And, President Cowley, bear with
13 | me.  I can't stand when people do this to me, but it's
14 | almost inevitable.  I've got to scroll through to show
15 | you your signature.  Okay?  So I'm not trying to make you
16 | cross eyed.
17 |      A.    That is my signature.
18 |      Q.    So now back to the top.  Is it accurate to say
19 | that Exhibit 7, the letter of September 7, 2020, is a
20 | letter sent by you to Timothy Jackson?
21 |      A.    That's correct.
22 |      Q.    I'm sorry.  Did you answer and I didn't hear
23 | it?
24 |      A.    Yes.  I said that's correct.
25 |      Q.    Okay.  I apologize.  I think it -- we had a

Jennifer Ganley      09/26/2024

1  little bit of a delay in the audio feed.

2          So here you tell him -- I'm just going to skip

3  down to the third paragraph -- that the university is not

4  investigating him or the journal, correct?

5      A.   Can I read that paragraph?

6      Q.   Oh, yeah.  I'm not trying to rush you.

7  Please, if you want me to reposition it on the page or

8  whatnot, just tell me.

9      A.   That's okay.  Okay.  I've read that paragraph.

10     Q.   Okay.  And you inform him in the first sentence

11 of that paragraph, The university is investigating

12 neither you nor the Journal of Schenkerian Studies,

13 correct?

14     A.   That's what that sentence states.

15     Q.   But then you go on to say that it is actually

16 investigating Volume 12, right?

17     A.   Correct.  That's correct.

18     Q.   But somehow that's not investigating the

19 journal, right?

20     A.   It's investigating a particular volume of the

21 journal, a particular publication.

22     Q.   And you also say here -- and I'm going to take

23 this off -- The university has discretion, if not the

24 obligation, to look into these circumstances, right?

25     A.   Correct.

*Jennifer Cowley    09/26/2024*

1      Q.    Now, you had the discretion to look into

2   Timothy Jackson's complaints that his colleagues were

3   violating his academic freedom as well, did you not?

4              MS. QUIMBY:  Objection, form.

5      A.    As the provost, I have the ability to look into

6   concerns that a faculty member may raise.

7      Q.    (By Mr. Allen) And you're very concerned to put

8   an end to misinformation and mischaracterization,

9   correct, about this matter, the investigation of the

10  Journal for Schenkerian Studies?

11     A.    Into the mischaracterization about the review

12  of Volume 12 of the Journal of Schenkerian Studies.

13     Q.    Is this a concern about objectivity you're

14  expressing here in this final sentence?  Is that a fair

15  characterization?

16             MS. QUIMBY:  Objection, form.

17     A.    No.

18     Q.    (By Mr. Allen) You raised the issue of the

19  grievance that Timothy Jackson brought to your attention

20  in that letter that we looked at earlier in the

21  deposition which was dated July 31st, 2020, in this final

22  paragraph that begins on this first page, right?

23     A.    Are you referring to his claim related to

24  academic freedom?

25     Q.    Yes.

1        A.    Okay.  Just let me read that paragraph.

2        Q.    I'm going to represent that it goes onto the

3   next page here too, so I'll move it up just a bit.

4   There you go.  I'm sorry.

5        A.    That's okay.  I reached the end of that

6   paragraph.

7        Q.    I'm calling up the letter.  And you -- your

8   statement here is that apparently your counsel, the

9   counsel of the university I assume, pointed out that he

10  could not identify the policy under which he was filing a

11  grievance.  He, meaning Timothy Jackson, is that how you

12  understood that sentence?

13       A.    Correct.

14       Q.    Do you recall that letter referring to the

15  academic freedom policy of the university?

16       A.    I recall a policy number, but we'd have to go

17  back and look at the letter.

18       Q.    And you're sort of anticipating what I was

19  going to do here is -- this is the letter of July 31st,

20  2020, from the law firm Allen Law, LLC, to you, Jennifer

21  Cowley.  Do you remember seeing this exhibit earlier?

22       A.    Yes, I do.

23       Q.    And I apologize to counsel and to you because

24  of the question we have about numbering.  I'm just going

25  to refer to the letter and the record will reflect how it

1  was introduced as an exhibit.  I'm going to skip down to

2  this sentence here.  Do you recall seeing this sentence

3  earlier in the deposition?

4        A.    Let me read it.  I do recall.

5        Q.    Absolutely.

6        A.    But just let me read it.  Okay.  I've read that

7  paragraph.

8        Q.    And I'm going to flip back to Exhibit 7.

9  Isn't it clear that this is a policy identified in that

10 letter that Timothy Jackson alleged was being violated?

11            MS. QUIMBY:  Objection, form.

12       A.    Dr. Jackson or his counsel, whoever drafted the

13 letter.  There is no action so no action had been taken

14 for him to grieve.

15       Q.    (By Mr. Allen) Didn't you read in that letter

16 that the investigation was already announced by Dean

17 Richmond and that the -- I think you testified earlier

18 that an investigation is something that is done by the

19 university, correct?

20       A.    Correct.  But reviewing the publication of a

21 journal issue does not in and of itself constitute a

22 violation of anyone's academic freedom.

23       Q.    Okay.  So your testimony today is that placing

24 the journal under investigation does not count as an

25 action for the purposes of the violation of that policy

 1   that we just discussed?

 2             MS. QUIMBY:   Objection, form.

 3        A.   The journal was not placed under investigation.

 4   There was a review of Volume 12 of that publication.

 5        Q.   (By Mr. Allen) So investigating a volume of a

 6   journal is not investigating the journal.  Is that your

 7   testimony today?

 8        A.   It's not a holistic investigation of a journal.

 9   It is a review of a single publication.

10        Q.   It's still an investigation, right?

11        A.   Correct.

12        Q.   And your testimony today is that that -- that

13   an investigation cannot count as an action that might

14   violate UNT Policy 06.035, academic freedom and academic

15   responsibility?

16        A.   Correct.

17        Q.   Okay.  I think we may be done with this one.

18   Sorry to pause, President Cowley.  I want to make sure I

19   number my exhibits correctly going forward, so I'm trying

20   to be more careful.

21             Did you in advance of convening the ad hoc

22   panel, which I know you've testified there was that email

23   that we looked at but was not the convening of the panel.

24   And I'm not saying that but eventually it was

25   (inaudible).

```
 1                    THE WITNESS:  We can't hear you.

 2                    MS. QUIMBY:  Yeah.  You just froze for a

 3    minute.

 4                    MR. ALLEN:  Sorry.  Am I back on?

 5                    THE WITNESS:  You are now.

 6         Q.    (By Mr. Allen) Sorry.  I wanted to ask you a

 7    question about what happened after the panel was

 8    convened.  And I'm not implying that it was convened on

 9    the day that email was sent to all the members that we

10    discussed, but at some point it was convened, right?

11         A.    Correct.  Are we still referring to this

12    document, or are we moving on to a different topic?

13         Q.    No.  I'm moving on to a slightly different

14    topic.

15         A.    Okay.  Thank you.

16         Q.    I'll put -- I'll put Exhibit 6 back up.  After

17    August 6, at some point the panel was convened, correct?

18         A.    That's correct.

19         Q.    And they met with you in your office, I assume?

20         A.    I believe it was a virtual meeting, but I don't

21    recall the details.

22         Q.    Of course, I forget.  This is the COVID era

23    we're talking about.  So was Timothy Jackson informed in

24    advance that he would have an opportunity to respond to

25    the Ad Hoc Panel Report?
```

*Jennifer Crawley    09/26/2024*

1          A.    I don't recall that.

2          Q.    Eventually you did ask Professor Jackson to

3    respond to the Ad Hoc Panel Report, right?

4          A.    I just want to clarify your question.  Are you

5    asking if he participated in the -- in the ad hoc panel?

6          Q.    Well, I'll strike the question.

7                We'll move on because I think it will come up

8    in the course of other documents.  Let's say before we

9    move on to the actual Ad Hoc Panel Report itself, did you

10   ever as provost express concern about the Journal of

11   Schenkerian Studies before 2020?

12         A.    No.  I'm not sure I knew we had a Journal of

13   Schenkerian Studies before 2020.

14         Q.    And if I ask you the same question about the

15   Center for Schenkerian Studies, did you ever have any

16   concern about the Center for Schenkerian Studies prior to

17   2020?

18         A.    Not concerns but I cannot recall with

19   specificity.  I believe his center may have been up for

20   review, but that may not be true.  So I don't know that I

21   had any concerns, but there is regular review processes

22   that happened related to centers.

23         Q.    And you were aware that had -- the Center for

24   Schenkerian Studies had been reviewed previously,

25   correct?

*Jennifer Cowley      09/26/2024*

 1       A.    Given its length of time, I believe that would

 2  have been true.

 3             MR. ALLEN:  I'm going to mark for the

 4  record Exhibit 8.  This is a Center Review Report period

 5  2013 to 2016 with Bates Number JACKS_067377.

 6             (Deposition Exhibit No. 8 was marked)

 7       Q.    (By Mr. Allen) Is that visible to you,

 8  President Cowley?

 9       A.    It is.

10       Q.    Now, I don't know if you have seen this

11  document before, so I'll just ask do you see center

12  review documents as provost?

13       A.    I typically do not.  Those report to someone in

14  my office.

15       Q.    Okay.

16       A.    And then if there are specific concerns, those

17  could be elevated to me.

18       Q.    How often are centers reviewed?

19       A.    There is a regular review period.  I don't

20  recall the exact time period, but that's in university

21  policy.

22       Q.    Since it's 2013 to 2016 in the title of this,

23  is it a three year review period?

24       A.    I would not be surprised if that was the case.

25       Q.    Okay.  This says reports to, and it clicks the

Jennifer Gauley          09/26/2024

 1  chair box here.  Do you see that?

 2      A.    I do.

 3      Q.    Is that your understanding that the Center for

 4  Schenkerian Studies was supposed to report to the chair

 5  meaning Division Chair Benjamin Brand?

 6      A.    Well, as you see, there are two boxes checked.

 7  One that says it's an academic center that reports

 8  through the provost office, and then it reports to the

 9  chair of the Division of Music History, Theory, and

10  Ethnomusicology.

11      Q.    So was he center, I suppose?  Let's say the

12  center was responsible to reporting both to your office

13  and to the division chair?

14      A.    It would report to the chair on day-to-day

15  matters, and then it would fall under the review of the

16  provost's office as it relates to broader center reviews.

17      Q.    Okay.  And were you aware of other faculty

18  associated with this center?

19      A.    I knew there were faculty related to the

20  center.  A center is not a one person entity.

21      Q.    Right, right.  And I think those -- is it

22  correct to -- I'm sorry.  I can't get -- this is -- one

23  second.  This should do it.  Sorry.  I wanted to get this

24  all on screen at the same time, and Adobe Acrobat wasn't

25  cooperating.

1          This is a spreadsheet, I guess, that was
2    printed out.  Is that how that these documents are
3    maintained by the university?  It's a spreadsheet that
4    you fill in?
5          A.    This looks like a general template.  I don't
6    know if it's the identical template that was used for the
7    later review of his center, but it doesn't look
8    inconsistent with reports I've seen in the past.
9          Q.    Okay.  And there is a -- it says in this
10   section names of center/institute administrators and
11   staff.  And it lists Timothy Jackson, Stephen Slottow,
12   Diego Cubero, and Ellen Bakulina.  Did I -- is that
13   correct?
14         A.    That would appear -- is what appears on the
15   page.
16         Q.    And you don't have any reason to believe this
17   was false, right?
18         A.    No.
19         Q.    Do you know who Benjamin Graf is?
20         A.    Yes.
21         Q.    Was he on faculty at the time you were provost?
22         A.    For a portion of the time that I was provost.
23   I'm not exact certain the exact date he started as a
24   faculty.
25         Q.    Okay.  So the last question I'll ask about

*Jennifer Cooley    09/26/2024*

```
 1  this, I think, is -- which you may have already answered,
 2  and I apologize.  But prior to 2020, no one brought
 3  concerns to your attention that the Center for
 4  Schenkerian Studies was being mismanaged?
 5       A.    No.
 6            MS. QUIMBY:  Objection, form.
 7            MR. ALLEN:  I'm going to mark as -- Madam
 8  Court Reporter, are we up to 9?  Exhibit 9?
 9            COURT REPORTER:  Yes, sir.  Exhibit 9.
10            MR. ALLEN:  I'm going to mark as Exhibit 9
11  the Ad Hoc Review Panel Report, a Review of Conception
12  and Production of Volume 12 of the Journal of Schenkerian
13  Studies dated volume -- dated November 25, 2020.
14            (Deposition Exhibit No. 9 was marked)
15       Q.    (By Mr. Allen) Did I read that correctly?
16       A.    Yes.
17       Q.    And do you recognize this as the Ad Hoc Panel
18  Report that we have discussed previously in our
19  deposition today?
20       A.    Yes, I do.
21       Q.    Thank you.  And it's still your testimony that
22  they weren't investigating Journal of Schenkerian Studies
23  because they were only investigating one volume?
24       A.    The charge to the committee was to review the
25  conception and production of Volume 12.
```

*Jennifer Smiley        09/26/2024*

1        Q.    Now, do you know if this panel report ever made

2    clear to Timothy Jackson in advance that he would be

3    invited to respond?

4                MS. QUIMBY:  Objection, form.

5        A.    I'm not certain.  I know there were some

6    communications such as the letter you showed, but I don't

7    recall specifically.

8        Q.    (By Mr. Allen) Okay.  If that was part of the

9    process of the investigation by the ad hoc panel, would

10   you expect them to put that in the report?

11               MS. QUIMBY:  Objection, form.

12       A.    I would expect that the people that they

13   interviewed as part of their review would be included or

14   referenced in the report.

15       Q.    (By Mr. Allen) But that's not my question.

16   That he would have a chance to respond to the

17   investigation report.  If that was going to be part of

18   the process, would you expect them to put that in the

19   report?

20       A.    Their charge was to provide recommendations to

21   me on their findings.

22       Q.    Yeah.  They have a section that goes background

23   information and scope of review, right?

24       A.    Uh-huh.

25       Q.    You remember reading that, correct?

*Jennifer Crossley   09/26/2024*

```
 1        A.   I do.  I don't recall the details.

 2        Q.   And here it is on Page 3 to 4 of the report,

 3   correct?

 4        A.   Okay, yes.

 5        Q.   Here in our review, To begin, they say we first

 6   reviewed the concerns expressed about the journal's

 7   editorial and review processes raised in public

 8   statements raised by three different groups.

 9             And they list them right here, correct?

10        A.   Yes, they do.

11        Q.   And you understand there were exhibits attached

12   to the Ad Hoc Panel Report that were actually those

13   concerns, those statements of concern that they just

14   referenced in those three numbered paragraphs?

15             MS. QUIMBY:  Objection, form.

16        A.   Yes.  I was aware that those were included as

17   appendices, if you will, to the report.

18        Q.   (By Mr. Allen) And here is -- I'm sorry if this

19   overlaps.  You'll see these stamps at the top of the page

20   or because the document has been filed in court.

21        A.   Okay.

22        Q.   Just so I'm clear about that to you.  And I'm

23   not arguing that those were part of the document.

24        A.   Okay.

25        Q.   Do you see this Exhibit 2 stamp up here?
```

1        A.    Yes, I do.

2        Q.    So this was Exhibit 2 to the Ad Hoc Panel
3   Report, and this is the Executive Board of the Society of
4   Music Theory's statement, right?

5        A.    Yes.  That's what it appears to be.

6        Q.    And the first line says, The Executive Board of
7   the Society for Music Theory condemns the antiblack
8   statements and personal ad hominem attacks on Philip
9   Ewell perpetuated in several essays included in the
10  symposium on Philip Ewell's 2019 SMT plenary paper
11  published by the Journal of Schenkerian Studies, right?

12       A.    You read that correctly.

13       Q.    Did you understand from that -- this is the
14  statement by the SMT which you said prompted you to
15  convene an investigation, right?

16       A.    Correct.

17       Q.    And you understood -- well, let me back up.
18  And you read it, I assume, carefully at the time, right?

19       A.    Correct.

20       Q.    Did you understand from that headline which we
21  just read, the Executive Board of the Society for Music
22  Theory condemns the antiblack statements and personal ad
23  hominem attacks on Philip Ewell.

24            You understood that as indicating their primary
25  concern was with the procedural methods followed by the

*Jennifer Greeley    09/26/2024*

1  journal in publishing Volume 12?

2            MS. QUIMBY:  Objection, form.

3      A.    That is not the conclusion that I drew.

4  Further down in the statement, it specifically --

5      Q.    (By Mr. Allen) We'll get there.  Don't -- I'm

6  just asking.  Look, this will go a lot faster if you just

7  answer the question.  In the first sentence, they're

8  primarily concerned with what they call antiblack

9  statements and personal ad hominem attacks, right?

10     A.    I do not draw the conclusion that that's their

11  primary concern.

12     Q.    Do you think that by putting it in much larger

13  font that the rest of the statement, that that had no

14  meaning to them?

15            MS. QUIMBY:  Objection, form.

16     Q.    (By Mr. Allen) Is that insignificant to you?

17     A.    I cannot draw a conclusion about what the SMT

18  executive board thought.

19     Q.    And you draw no conclusion from the fact that

20  they put that first in their statement?

21     A.    I did not draw a conclusion from that being the

22  first statement.

23     Q.    Then the second statement, the executive

24  board -- excuse me.  There it is again.  Sorry.  No, no.

25  This is the second statement.

*Jennifer Gormley    09/26/2024*

1           The Executive Board of the Society for Music
2    Theory condemns the antiblack statements and personal ad
3    hominem attacks on Philip Ewell perpetuated in the
4    essays.
5           And then they go -- then they say, The
6    conception of the symposium didn't meet ethical and
7    professional scholarly standards, right?
8        A.    Yes.
9        Q.    Were you aware that the Society for Music
10   Theory has its own statements on academic freedom?
11       A.    I don't recall if I was familiar with that or
12   not.
13       Q.    I'm just scrolling through this.  See how this
14   is Exhibit 3 to the Ad Hoc Panel Report?
15       A.    Yes.
16       Q.    And this is the one from the graduate students,
17   right?
18       A.    Correct.
19       Q.    And just really quickly, is this the student
20   statement that you earlier testified you read before you
21   decided to convene the Ad Hoc Panel Report?
22       A.    Yes.
23       Q.    Excuse me.  The ad hoc panel.  I said report
24   but before you convened the ad hoc panel?
25       A.    Correct.

*Jennifer Cooley    09/26/2024*

1      Q.    Thank you.  And as Exhibit 4, they attach this,

2  Statement of UNT faculty on Journal of Schenkerian

3  Studies.  Did I read that correctly?

4      A.    You did.

5      Q.    Is this the statement by the faculty that you

6  read?

7      A.    It appears to be the statement by the faculty.

8  I just want to clarify my recollection is that there were

9  many things that were happening around the same period of

10  time, and so I'm not certain of the date that each

11  individual letter was submitted.  The primary letter that

12  alerted me we needed to undertake a review was from the

13  -- from the Society for Music Theory.

14      Q.    Okay.  Yet this letter was also considered by

15  you at that time, right?

16      A.    This letter was submitted around the time of

17  the convening of the committee.

18      Q.    And I just want to call your attention to this

19  paragraph here.  Have you had a chance to read that

20  paragraph?

21      A.    Give me a moment to read it.  Okay.  I've read

22  that paragraph.

23      Q.    So this is the first paragraph to the faculty

24  statement that we've been talking about.  And I just --

25  well, we'll read it into the record:

*Jennifer Cooley          09/26/2024*

1          We, the undersigned faculty members of the

2    University of North Texas Division of Music History,

3    Theory, and Ethnomusicology stand in solidarity with our

4    graduate students in their letter of condemnation of the

5    Journal of Schenkerian Studies.  We wish to stress that

6    we are speaking for ourselves individually and not on

7    behalf of the university;

8          The forthcoming issue, a set of responses to

9    Dr. Philip Ewell's plenary lecture at the 2019 Society

10   for Music Theory Annual Meeting, is replete with racial

11   stereotypes and tropes and includes personal attacks

12   directed at Dr. Ewell.

13          Did I read that correctly?

14   A.     You read that correctly.

15   Q.     So that's the thing they emphasized first,

16   correct?

17   A.     That's the thing they stated first.

18   Q.     And you didn't think stating something first

19   means you're emphasizing it more than things that come

20   later?

21   A.     I don't draw that conclusion.

22   Q.     Then they say, To be clear, not all responses

23   contain such egregious material.  Some were thoughtful

24   and meaningfully addressed and amplified Dr. Ewell's

25   remarks about systemic racism in the discipline.

Jennifer Greeley        09/26/2024

```
 1              Did I read that correctly?
 2      A.    You read that correctly.
 3      Q.    So did you understand that talks or -- excuse
 4  me -- articles in the symposium of Volume 12 that, quote,
 5  "amplified Dr. Ewell's remarks" were considered by the
 6  faculty not to be egregious?
 7              MS. QUIMBY:  Objection, form.
 8      A.    Could you restate that?
 9      Q.    (By Mr. Allen) Sure.  They say not everything
10  was egregious, right?  Not all responses contain such
11  egregious material, right?
12      A.    I think the sentence you read shares their
13  statement.
14      Q.    And says, Some were thoughtful and meaningfully
15  addressed and amplified Dr. Ewell's remarks, right?
16      A.    That's what the sentence says.
17      Q.    So my question is did you understand from that
18  that the faculty found articles in the symposium not to
19  be egregious when they amplified Dr. Ewell's remarks?
20              MS. QUIMBY:  Objection.
21      A.    I didn't draw any conclusion.
22      Q.    (By Mr. Allen) Only at the end they say,
23  Dr. Ewell was not afforded the opportunity to respond in
24  print.
25              Did I read that correctly?
```

1      A.    You did read that correctly.

2      Q.    And then they also note a lack of clearly

3 defined peer review process which they seem very

4 concerned about, right?

5      A.    Correct.  And then the next paragraph goes on

6 to raise concerns about the editorial and publication

7 process.

8      Q.    I'm going to -- I'm going to get to that.  I

9 want to ask one more question about that.  Were you aware

10 that Dr. Ewell was sent a call for papers as part of the

11 publishing of the symposium?

12            MS. QUIMBY:  Objection, form.

13      A.    I believe I became aware of that at some point.

14 I can't recall if it was in the report or in some other

15 communication.

16      Q.    (By Mr. Allen) Is receiving a call for papers

17 consistent with, quote, "not afforded the opportunity to

18 respond in print"?

19            MS. QUIMBY:  Objection, form.

20      A.    The statement here is what the faculty's

21 perceptions were.

22      Q.    (By Mr. Allen) I know.  I'm asking what your

23 perception is as a lifelong academic published author and

24 provost and now president of a university tasked with

25 producing real knowledge.  Is it consistent with the

*Jennifer Greeley      09/26/2024*

```
 1  statement that Philip Ewell was not afforded the
 2  opportunity to respond in print --
 3       A.    The faculty --
 4       Q.    -- but he got a call for papers?
 5       A.    The faculty raised this as a concern.
 6  Dr. Jackson later conveyed that Dr. Ewell was provided an
 7  opportunity to respond or was received the call.
 8       Q.    Okay.
 9       A.    Those are --
10       Q.    Is that consistent with the statement, He was
11  not afforded the opportunity to respond?  He, Ewell?
12       A.    The faculty raised this as a concern.  They
13  were concerned that he had not been provided an
14  opportunity.
15       Q.    They didn't raise it a -- as a concern.  They
16  say it's a fact, right?  They say it's a fact.
17              MS. QUIMBY:  Objection, form.
18       A.    You would have to ask the faculty members their
19  intent.
20       Q.    (By Mr. Allen) Let's -- let's ask the document
21  that.  I'm not asking about your understanding of their
22  intent.  I'm asking about your understanding.  They say
23  here in black and white, The fact that he was not
24  afforded the opportunity to respond.
25              Did I read that right?
```

*Jennifer Gormley      09/26/2024*

```
 1          A.    You read that.  And then they say --
 2                (Cross-talk)
 3          Q.    But he was --
 4          A.    -- unacceptable.
 5          Q.    -- afforded the opportunity to respond,
 6   correct, based on what you know?
 7                MS. QUIMBY:  Objection, form.
 8          A.    I later came to understand that what you just
 9   stated is true, that he was sent the call.
10          Q.    (By Mr. Allen) So this is basically a lie,
11   correct, about their colleague --
12                MS. QUIMBY:  Objection, form.
13          Q.    (By Mr. Allen) -- Timothy Jackson?
14                MS. QUIMBY:  Objection, form.
15          A.    I would not characterize it that way.  The
16   faculty had a concern.  They raised it.  It was reviewed,
17   and the report finds the conclusions of the ad hoc panel.
18          Q.    (By Mr. Allen) You don't think these faculty
19   members, who are members of the Society for Music Theory,
20   also got the call for papers?
21          A.    I have no knowledge of who received what.
22          Q.    You think they -- is it your impression that
23   they just learned about the call for papers from the Ad
24   Hoc Panel Report?
25                MS. QUIMBY:  Objection, form.
```

*Jennifer Grotzley          09/26/2024*

1        A.    I have no idea what information these faculty

2   members had at the time.

3        Q.    (By Mr. Allen) When you saw that this statement

4   was inconsistent with what they had found by the ad hoc

5   panel, did you find that to be worthy of investigation?

6              MS. QUIMBY:  Objection, form.

7        A.    Why would I investigate the faculty members for

8   making a statement that was not fully true?

9        Q.    (By Mr. Allen) Because they're openly lying

10  about their colleague.

11             MS. QUIMBY:  Objection.

12       Q.    (By Mr. Allen) You don't think that's

13  concerning in an academic department?

14             MS. QUIMBY:  Objection, form.

15       A.    It's not uncommon that one makes a statement

16  that may later be found to be untrue.

17       Q.    (By Mr. Allen) Is it common for faculty under

18  your leadership to make comments that they affirmatively

19  know not to be true?

20       A.    I have no knowledge that they knew that this

21  was untrue.

22       Q.    If a faculty member got the call for papers

23  that they knew was distributed to Philip Ewell and then

24  made the affirmative statement that it was a fact that he

25  was not afforded the opportunity to respond --

*Jennifer Cowley*        *09/26/2024*

```
 1        A.    I'm not going to --

 2        Q.    -- would that be problematic?

 3        A.    I'm not going to go further with this.  I

 4  cannot respond.  You'd have to ask the faculty members

 5  what they did or did not know.

 6        Q.    So you're refusing to answer the question yet

 7  again?

 8        A.    Yes.

 9        Q.    Here, the next paragraph, They endorse the call

10  for action outlined in their student letter.

11              Did I read that correctly?

12        A.    You read that correctly.

13        Q.    And this is a URL right here, correct?

14        A.    That's correct.  There is a URL.

15        Q.    Is it your understanding that that linked to

16  this Exhibit 3 statement by the students?

17              MS. QUIMBY:  Objection, form.

18        A.    I don't know that to be true.  But if you say

19  it is, I have no reason to question that.

20        Q.    (By Mr. Allen) I am just going to stop our

21  share screen for a moment and share -- do you see this?

22  Is it big enough to read for you, President Cowley?

23        A.    It is not large enough to read.  I can see

24  there is a document, but it would need to be enlarged.

25        Q.    Oh, that's maybe too large now.  Do you see
```

Jennifer Cowley        09/26/2024

```
 1  that?

 2       A.   I see that.

 3       Q.   So I'm just going to represent to you that this

 4  is the document that comes up online when I click on that

 5  URL.

 6       A.   Okay.  I have no reason to believe that that's

 7  not the case.

 8       Q.   Is this the same statement that we have seen

 9  attached to the Ad Hoc Panel Report as the student

10  statement?

11            MS. QUIMBY:  Objection, form.

12       A.   It looks similar.  I have no reason to question

13  that it's not the statement.

14            MR. ALLEN:  And I'm just going to let the

15  record reflect that I am going to print this which

16  President Cowley and I have just examined by clicking on

17  that link and send it to the Court Reporter and mark it

18  as -- what are we up to, Madam Reporter?  Exhibit 10?

19            COURT REPORTER:  Yes, sir.  Exhibit 10.

20            (Deposition Exhibit No. 10 was marked)

21            MS. QUIMBY:  Before we go on, can we take

22  a quick five minute break?

23            MR. ALLEN:  Yeah.  That will allow me to

24  get these exhibits.  All right.

25            VIDEOGRAPHER:  Going off the record.
```

1                    (Recess taken from 2:09 to 2:18)

2                    VIDEOGRAPHER:  On the record, 2:18 p.m.

3          Q.    (By Mr. Allen) Do you see Exhibit 9 up again,

4    the Ad Hoc Panel Report, President Cowley?

5          A.    No.  It's showing a statement of UNT faculty.

6          Q.    I understand.  Do you see this is Exhibit 4?

7    I'm going to take you to somewhere else in the --

8          A.    I understand.

9          Q.    -- panel report.  Again my purpose wasn't to

10   confuse you here.  I wanted to get where they say the

11   panel charge, so we're going to go to Page 3, the panel

12   charge.  And I just want to clarify something.  Do you

13   see this is the section on Page 3 of the document --

14         A.    Yes.

15         Q.    -- on the panel charge?

16         A.    Yes.  I see that.

17         Q.    This would have been the charge that you

18   conveyed to the panel, correct?

19         A.    Can I read it, please?

20         Q.    Oh, absolutely.  I didn't mean to rush you

21   through it.

22         A.    Okay.  I have now read that.

23         Q.    So it says here on August 6, 2020, they

24   received the -- an email from you inviting them to be

25   members of the panel, right?

*Jennifer Greeley    09/26/2024*

1      A.    Correct.

2      Q.    That email is going to be attached as Exhibit

3  1, right?

4      A.    I believe so.

5      Q.    And by that, I mean Exhibit 1 to the Ad Hoc

6  Panel Report which we've introduced into the record here

7  for this deposition as Exhibit 9.

8      A.    Okay.

9      Q.    And then they quote in that email, The provost,

10  meaning you, stated that the purpose of the panel was to

11  examine objectively the process -- the processes

12  following -- followed in the conception and production of

13  Volume 12 of the Journal of Schenkerian Studies, right?

14      A.    Correct.

15      Q.    So I just want to take you to Exhibit 1.

16  Scrolling through the document is this one, right?

17      A.    Yes.

18      Q.    And I just want you to confirm -- we talked

19  about this before, I believe.  And I just want to confirm

20  that Exhibit 1 in this Ad Hoc Panel Report is, in fact,

21  the same email as Exhibit 6, I believe we marked in the

22  record earlier, which was your email of August 6, 2020?

23      A.    Can you flip back just so I can confirm?

24      Q.    I can.

25      A.    It does appear to be the same email.  It's just

1   formatted differently.

2        Q.    I apologize.  When working with electronic

3   records, they often go all kinds of sideways directions

4   with regard to format.

5        A.    Yes.

6        Q.    Thank you for that.  So there is only one other

7   thing I want to -- we're going to go really quickly to

8   one section.  So as far as I can tell, there is only one

9   section where they address the content of the journal,

10  and that's in this section.

11       A.    Let me review that.

12       Q.    Absolutely.  And if I can -- well, let me do

13  something which I think will make our life easier.

14       A.    Okay.

15       Q.    Do you remember reading this section of the

16  journal?  I mean, excuse me, of the Ad Hoc Panel --

17       A.    Yes.

18       Q.    -- Report?  And is it the kind of story that

19  kind of stood out in your mind at the time?

20       A.    I couldn't say that.

21       Q.    Okay.  But the story is here that Levi

22  Walls -- and do you know who Levi Walls was?

23       A.    I believe he was a graduate student associated

24  with the journal.

25       Q.    That he was sort of forced into Dr. Jackson's

*Jennifer Greeley    09/26/2024*

1  car and told that it's not his job to censor people,

2  right?

3           MS. QUIMBY:  Objection, form.

4      A.    It states, He stated that after raising

5  concerns, he was taken into Dr. Jackson's car where

6  Dr. Jackson told him it was not his job to censor people

7  and told not to do it again.

8      Q.    (By Mr. Allen) Did you think this was a

9  significant finding by the ad hoc panel?

10     A.    I don't know that I thought about it that way.

11 I was primarily looking at the recommendations that the

12 committee drew based on the evidence they reviewed.

13     Q.    I've always been confused by this passage.  So

14 it says, Dr. Jackson told Levi Walls, one of the graduate

15 students working as an editor on the journal, it's not

16 his job to censor people, right?

17           MS. QUIMBY:  Objection, form.

18     A.    I don't understand what you're asking.

19     Q.    (By Mr. Allen) Well, let me just read it into

20 the record.  The ad hoc panel repeats this story that

21 Levi Walls was taken into Dr. Jackson's car where

22 Dr. Jackson told him that it was not his job to censor

23 people, right?

24           MS. QUIMBY:  Objection, form.

25     A.    That's the statement in the report.

1       Q.    (By Mr. Allen) I'm just curious.  At the

2   University of North Texas, is it somehow the proper job

3   of an editor of a journal to censor people?

4              MS. QUIMBY:  Objection, form.

5       A.    The way you've characterized it, that it is the

6   responsibility of a journal editor to review the content

7   of an article and make recommendations after having

8   reviewed it.

9       Q.    (By Mr. Allen) Well, apparently Levi Walls told

10  them he was instructed not to censor people, right? Isn't

11  that what you understand from this passage?

12             MS. QUIMBY:  Objection, form.

13      A.    That's what it states.

14      Q.    (By Mr. Allen) Did you understand something

15  different from what it states?

16      A.    I draw no conclusion from that statement.

17      Q.    So my question is at the University of North

18  Texas, is it the job of editors to affirmatively censor

19  people?

20      A.    That's not an accurate statement.

21      Q.    Okay.  Thank you.  Well, let me just clarify

22  one last question about that because I didn't make a

23  statement.  I asked a question.  But is your testimony

24  that at the University of North Texas, it is not an

25  accurate statement that editor's job -- the editor's job

*Jennifer Crumley      09/26/2024*

1    is to censor people?

2         A.    The way that's worded is very confusing.

3         Q.    Well, your answer is confusing to me.  That's

4    why I'm trying to ask it again.

5         A.    An editor --

6         Q.    It would help -- can you answer my question yes

7    or no?  That would probably be the easiest way.  At the

8    University of North Texas --

9         A.    No.  Let me -- I hope I can answer this in a

10   clear way.

11        Q.    Sure.

12        A.    The editor's job is to review the articles that

13   are submitted and to make recommendations regarding those

14   articles where applicable.  That may mean further

15   investigation or further explanation of a concept in

16   those articles.  It's not to censor but rather to make an

17   article better and ready for publication.

18        Q.    Okay.  Thank you.  Now, if there was evidence

19   that Levi Walls was lying about this story, would that

20   not be relevant to the investigatory process with the ad

21   hoc panel?

22        A.    I can't --

23              MS. QUIMBY:  Objection, form.

24        A.    I can't speak to Levi Walls beyond what's in

25   this report.

*Jennifer Cowley        09/26/2024*

1      Q.    (By Mr. Allen) I'm not asking you to speak to

2   Levi Walls.  I'm asking you to speak to your standards of

3   objectivity when you convened the ad hoc panel.

4   Would it be consistent with the mission to investigate

5   objectively to disregard evidence that Levi Walls lied

6   about this incident?

7                MS. QUIMBY:  Objection.

8      A.    I don't -- I would need context to understand

9   specifically what Levi Walls said in order to draw any

10  specific conclusion.

11     Q.    (By Mr. Allen) I'm not asking you to comment on

12  the context.  Let's assume that he was lying.

13     A.    I'm not going to make any assumptions.

14     Q.    You're not going to -- okay.

15                MR. ALLEN:  I'm just going to say for the

16  record, Mary, the more she does this, the more it makes

17  it impossible to finish the deposition.  But I'm going to

18  go on --

19                (Cross-talk)

20                THE WITNESS:  That's your choice.

21                MR. ALLEN:  And if need be --

22                THE WITNESS:  You can choose to take as

23  long as you want.

24                MR. ALLEN:  -- I'm going to move for more

25  time from the course -- the court and ask that UNT pay

1  for it because this is incredibly unresponsive, the way

2  she's answered questions the entire deposition.  I'm just

3  putting that on the record.

4             THE WITNESS:  Are you going to move on to

5  another question?

6       Q.    (By Mr. Allen) No.  Since you're insisting on

7  evidence, we're going to go get some more evidence.

8       A.    Okay.  Are you calling this to a close --

9             (Cross-talk)

10      Q.    Is that fair?

11      A.    -- or do you wish to --

12      Q.    No.

13      A.    -- continue the questioning?

14      Q.    We're going to keep going.

15      A.    Okay.  Then ask your next question.

16      Q.    Well, I've got to go the -- I wasn't

17 anticipating that you would want this evidence just so

18 you could answer a simple question, so I'm having to go

19 get the evidence.

20            MR. ALLEN:  Madam Court Reporter, what

21 number of exhibit are up to now?  Exhibit 11?

22            COURT REPORTER:  Yes, sir.  We are on 11.

23            MR. ALLEN:  Sorry, President Cowley.

24 We're almost there.  I just have to keep track of the

25 exhibits.  So I'm marking as Exhibit 11 the deposition

*Jennifer Cowley    09/26/2024*

1  transcript of Levi Walls that was taken on May 18th,

2  2021.

3              (Deposition Exhibit No. 11 was marked)

4      Q.   (By Mr. Allen) I'm going to represent to you

5  that the following testimony that Levi Walls gave under

6  oath, President Cowley, was about the car incident.  So

7  I'm just going to read this as it goes.  Incidentally --

8  the question:

9          There is -- there was an incident discussed by

10  the ad hoc panel in which you apparently sat in Timothy

11  Jackson's car and discussed censorship on the journal.

12          Do you remember that discussion?

13          Yes.

14          All right.  Can you describe that meeting in its

15  entirety?

16          I was on my way to the office which was in Bain.

17  So I was crossing the parking lot, and we ran into each

18  other.

19          And I don't remember what struck up the

20  conversation.  I'm sure it was either about analysis or

21  the journal.  And -- but it began to lightly snow, and he

22  suggested we go into his car.  I, of course, didn't

23  object.  And in the car, we talked about -- I know we

24  talked about Suzanne Clark's contribution.  And I think

25  that's how we got onto the topic of just general

Jennifer Conley    09/26/2024

1 | contributions that we didn't agree with.

2 | So I'm just going to represent for the record

3 | that Suzanne Clark's contribution was very pro Ewell and

4 | affirmed Ewell's point of view.  That's very significant

5 | as we go on.

6 | And he, meaning Jackson, said that we shouldn't

7 | censor people's -- the contents of people's writing.  And

8 | considering that this was the day after my exchange with

9 | Wiener -- Barry Wiener, another author -- I assumed that

10 | was in relation to that, as I was expecting to be

11 | approached about that communication.

12 | Were you ever approached about your

13 | communications with Barry Wiener?

14 | Not explicitly but I took this communication in

15 | the car to be directly related.  And we discussed

16 | censorship before.  And you said to me, you know, at

17 | least at that time agreed that it wasn't the job of the

18 | editor to censor the authors, correct?

19 | The answer of Levi Walls: I told him I agreed.  I

20 | didn't actually agree.  I just said that I agreed because

21 | that was what he wanted.

22 | So you lied, in other words?

23 | Yes.

24 | And Suzanne Clark, was that the name of the

25 | author you remember discussing directly?

*Jennifer Crossley    09/26/2024*

```
 1                  Answer:  Yes.

 2                  Was she pro or anti Ewell?

 3                  She was pro Ewell.

 4                  So this discussion about censorship you had in

 5      the car was actually about Suzanne Clark and not about

 6      Barry Wiener.

 7                  Am I understanding that correctly?

 8                  It started out about Suzanne Clark.

 9                  And the way I remember the conversation, it

10      tilted more about the responses in general.

11                  Did I read that all correctly?

12          A.   Yes.  I believe you read that all correctly.

13          Q.   So did you see that Levi Walls admitted that he

14      lied?

15                  MS. QUIMBY:  Objection, form.

16          A.   What comes across is that he felt uncomfortable

17      telling his faculty supervisor his true opinion.

18          Q.   (By Mr. Allen) Did you see that they were

19      talking about Levi Walls bringing up a pro Ewell author

20      and Timothy Jackson told him not to censor a pro Ewell

21      author?

22                  MS. QUIMBY:  Objection, form.

23          Q.   (By Mr. Allen) Is that what you took away from

24      that?

25                  MS. QUIMBY:  Objection, form.
```

*Jennifer Greeley    09/26/2024*

```
 1       A.    I was not paying attention to the pro or anti.
 2   I was focused on the exchange.
 3       Q.    (By Mr. Allen) You asked for the context, and
 4   here is the context.
 5       A.    Yes.  I understand.
 6       Q.    And he says on Line 25 of Page 97:
 7                    So you lied in other words -- the
 8                    question.
 9              And on Line 1 of Page 98 of the deposition, he
10   says:
11                    Yes.
12       A.    Yes.  I see that.
13       Q.    Does it not matter to you that Levi Walls was
14   lying?
15              MS. QUIMBY:  Objection, form.
16       A.    I don't understand how this is directly
17   relevant to the recommendations of the committee.  What
18   are you trying to ask me?
19       Q.    (By Mr. Allen) Well, you just answered my
20   question.  You don't consider the fact that Levi walls
21   was lying about the incident in the car to be relevant to
22   the panel's decision, correct?
23              MS. QUIMBY:  Objection, form.
24       A.    What I take away is that Mr. Walls shared with
25   the panel his concerns about the content of pieces, that
```

*Jennifer Sealey        09/26/2024*

1  he raised concerns taken into Dr. Jackson's cars.

2  Dr. Jackson told him he was not to censor people which

3  was in the context of what you just shared.  And that

4  largely the content in here is accurate, but there is a

5  point which is not accurate.

6      Q.   (By Mr. Allen) And the point that's not

7  accurate you consider not to be relevant to the

8  investigation.  Is that your testimony?

9      A.   No.  I did not say that.

10     Q.   Okay.

11          MR. ALLEN:  I'm going to mark the next

12 exhibit at this time.  I think we're on Exhibit 12,

13 correct?

14          COURT REPORTER:  Yes, sir.

15          MR. ALLEN:  Thank you, ma'am.

16          Marking Exhibit 12 for the record, a

17 letter of November 30th, 2020.

18          (Deposition Exhibit No. 12 was marked)

19     Q.   (By Mr. Allen) Do you recognize this

20 document --

21     A.   I do recognize --

22     Q.   -- Exhibit 12?

23     A.   -- this document.

24     Q.   You sent this document to Dr. Jackson on

25 November 30th, 2020?

*Jennifer Staley    09/26/2024*

```
 1        A.    Yes.

 2        Q.    And you're writing to share the recommendations

 3   of the ad hoc panel, correct?

 4        A.    Correct.

 5        Q.    The recommendations were what, according to

 6   your letter?

 7        A.    That they're in the attached report.

 8        Q.    Okay.  And you summarize the charge to the

 9   panel in the second paragraph of this letter?

10        A.    Correct.

11        Q.    Was that meant to stand as an accurate

12   representation of the charge that we just examined which

13   was attached as an exhibit to the ad hoc panel report?

14              MS. QUIMBY:  Objection, form.

15        A.    Recall that that was a letter to convene the

16   committee.  It was not the statement of the charge.

17   That letter said that the charge would be issued in

18   the -- in the meeting.

19        Q.    (By Mr. Allen) Is there any document that

20   reflects the charge?

21        A.    The committee report provides a brief summary

22   of the charge but does not go into this level of depth.

23        Q.    So under their section of the charge, right,

24   they attached Exhibit 1 which was your email of

25   August 6, 2020, right?
```

*Jennifer Copley        09/26/2024*

```
 1                    MS. QUIMBY:  Objection, form.
 2         A.    Correct.  I believe they also -- that they made
 3    reference to that, but I don't remember the exact details
 4    of what they wrote in that particular section.
 5         Q.    (By Mr. Allen) Did you take issue with anyone
 6    on the ad hoc panel that they did not include the actual
 7    charge and only include your email of August 6, 2020?
 8         A.    No.  I didn't request changes to their report.
 9         Q.    So there is no record of, I guess, what you
10    consider an error of correcting that error?
11                    MS. QUIMBY:  Objection, form.
12         A.    I didn't consider it an error.
13         Q.    (By Mr. Allen) Okay.  Looking at the third
14    paragraph, you say, The panel has produced the report
15    with findings, right?
16         A.    Correct.
17         Q.    And then you request that Timothy Jackson, as
18    the director for the -- of the Center for Schenkerian
19    Studies, develop a plan to address the recommendations by
20    December 18th and submit that plan to Benjamin Brand and
21    Dean John Richmond for review and approval.
22               Did I summarize that correctly?
23         A.    You did.
24         Q.    And so the deadline was December 18th, 2020?
25         A.    Correct.
```

*Jennifer Cooley     09/26/2024*

1      Q.    Do you recall Timothy Jackson meeting that
2  deadline?
3      A.    I do not recall.  I know that there was some
4  back and forth between he and Dr. Brand, but I don't
5  recall the details.
6      Q.    Timothy Jackson was invited to respond as
7  Director of the Center for Schenkerian Studies to the Ad
8  Hoc Panel Report, correct?
9      A.    This letter tells him he can communicate with
10  his department chair and dean about a plan to respond to
11  the recommendations.
12      Q.    Do you know of any other time before this that
13  Timothy Jackson was invited to respond to the Ad Hoc
14  Panel Report?
15      A.    No, not that I'm aware of or recall.
16      Q.    Okay.  So it's only after the conclusions of
17  the ad hoc panel that he was invited to respond?
18            MS. QUIMBY:  Objection, form.
19      A.    He was not invited to respond.  He was invited
20  to develop a plan to address the recommendations.
21      Q.    (By Mr. Allen) And you think that's different
22  from a (inaudible).  Is that your testimony today?
23      A.    You cut out.
24      Q.    I said your testimony -- I'm sorry that I cut
25  out, but I'll just rephrase it.  So your testimony today

*Jennifer Cowley      09/26/2024*

 1  is that the invitation to provide a, quote, "plan" is
 2  different from an invitation to provide a response?
 3  That's your testimony today?
 4              MS. QUIMBY:  Objection, form.
 5     A.    The -- it depends on what his plan looks like.
 6  If he had particular concerns related to the
 7  recommendations and wanted to provide an alternative,
 8  that would be for him to discuss with he and the chair.
 9     Q.    (By Mr. Allen) Did you ever read the response
10  of Timothy Jackson?
11     A.    I don't recall if I saw that or not.
12     Q.    The Ad Hoc Panel Report was put up on UNT's
13  webpage, right?
14     A.    Yes.
15     Q.    And it's still there to this day, to the best
16  of your knowledge?
17     A.    I have no knowledge of whether it's there or
18  not at this time.
19     Q.    Was it there the entire time you were provost?
20     A.    No.  Because I was provost before this -- the
21  committee report was issued.
22     Q.    Oh, that's a good point.  Of course, I mean
23  during your tenure as provost, as soon as the report was
24  put online, it remained there for the entire time you
25  remained at the University of North Texas?

*Jennifer Cobley*          *09/26/2024*

1      A.    I'm not sure if it was taken down during that

2  time or not, but I know that I requested that it be

3  posted online.

4      Q.    Did you ever post Timothy Jackson's response to

5  the ad hoc panel online?

6      A.    I did not, no.

7      Q.    Is there any reason you did not?

8            MS. QUIMBY:   Objection.

9      A.    This was a university report.  It was made

10  available.  There was no obligation or expectation that

11  we would provide any others' viewpoints or perspectives

12  and post those online.

13      Q.    (By Mr. Allen) Was it a decision you made ahead

14  of time not to post Timothy Jackson's response to the Ad

15  Hoc Panel Report?

16            MS. QUIMBY:   Objection, form.

17      A.    I had no knowledge that he would or would not

18  produce a response to the report.  It's very common that

19  committee reports were posted online, and this ad hoc

20  task force report was posted online.

21      Q.    (By Mr. Allen) And you only invited him here on

22  November 30th to develop a, quote, "plan" to address the

23  recommendations, right?

24            MS. QUIMBY:   Objection.

25      A.    Correct.

1      Q.    (By Mr. Allen) And you didn't -- whatever you

2   call that, a plan, I don't really mind if you call it a

3   plan or response.  But you didn't have any intention of

4   posting that online, right?

5      A.    No.  At this point, this matter moved from the

6   provost's office to the department office.

7      Q.    Meaning it was under the responsibility of

8   Benjamin Brand?

9      A.    Correct.  To work with Benjamin Brand and Dean

10  Richmond and Dr. Jackson to develop a -- to implement the

11  recommendations or develop a plan that was responsive to

12  those recommendations.

13     Q.    Do you know what Benjamin Brand did about the

14  Ad Hoc Panel Report?

15     A.    I'm aware that he reviewed it and had a

16  discussion with Dr. Jackson.

17     Q.    Did he discuss that with you as well?

18     A.    Discuss what?

19     Q.    The conversation he had with Dr. Jackson about

20  the report that you just mentioned.

21     A.    I don't recall.

22     Q.    Is that the kind of thing he would have

23  discussed with his provost?

24           MS. QUIMBY:  Objection, form.

25     A.    A department chair has limited conversations

*Jennifer Greeley    09/26/2024*

1  with the provost.  Typically conversations are with the

2  dean because the dean directly reports to me.  There were

3  on occasions opportunities for Dr. Brand and

4  Dr. Richmond to discuss matters, but I don't recall any

5  details following the issuance of the report.

6      Q.   (By Mr. Allen) Before we go on, did you talk to

7  Dean Richmond about the consequences of the Ad Hoc Panel

8  Report?

9           MS. QUIMBY:  Objection, form.

10     A.   What do you mean by consequences?

11     Q.   (By Mr. Allen) What was going to be done.

12  What was going to be implemented.  Did you ever talk to

13  Dean Richmond about that?

14     A.   Dean Richmond let me know that -- that

15  Dr. Brand had had a conversation that they had asked for

16  this plan, and he talked to me about some next steps.

17     Q.   What were the next steps that Dean Richmond

18  discussed with you?

19           MS. QUIMBY:  Objection, form.  I'm sorry.

20     A.   He mentioned whether or not Dr. Jackson would

21  be the editor or not or what changes might occur in the

22  journal.

23     Q.   (By Mr. Allen) Had any concrete steps that he

24  indicated to you had been decided?

25     A.   I don't recall specifics.

*Jennifer Cowley       09/26/2024*

1      Q.    Okay.  Do you recall more or less the date of

2  this discussion?

3      A.    It seems to me it would have been in December

4  or January.

5      Q.    Okay.  Did he discuss with you the reaffirmed

6  commitment to combating racism?

7              MS. QUIMBY:  Objection, form.

8      A.    We did not have a discussion about that.

9              MR. ALLEN:  I'm going to mark as Exhibit

10  13 an email from Benjamin Brand to Timothy Jackson dated

11  December 11, 2020, for the record.

12              THE WITNESS:  Is it possible to make that

13  just a little bit larger?

14              MR. ALLEN:  Yes.  If you could give me

15  just one second.  Just making sure I don't get my

16  exhibits mixed up again.

17              Madam Court Reporter, we're on the Exhibit

18  13, correct?

19              COURT REPORTER:  Yes.  The one you're

20  marking now is Exhibit 13.

21              MR. ALLEN:  Thank you.

22              (Deposition Exhibit No. 13 was marked)

23      Q.    (By Mr. Allen) So let me see if I can expand

24  this for you, President Cowley.  Is that better?

25      A.    Yes.  That's better.

*Jennifer Scowley    09/26/2024*

1      Q.    And just to make sure I'm not hiding anything

2   from you, I'll represent to you that this was already

3   introduced as a court document as an exhibit.  That's why

4   it has this stuff on here.

5      A.    Okay.

6      Q.    I don't want you to think there is a page I'm

7   not showing you.  Okay?  This is, so far as I know, the

8   whole email.  Now, I know you're not on this email, so I

9   don't expect you to know about it.  But I am going to ask

10  you if you were aware of this email on December 11, 2020?

11     A.    I'm still reading the email.

12     Q.    Okay.  Go ahead.

13     A.    Okay.  I'm sorry.  What was your question?

14     Q.    Were you aware of this email?

15     A.    I don't know that I was aware of the email.  I

16  was aware that there was a meeting that was going to

17  happen between Dr. Brand and Dr. Jackson.

18     Q.    And you don't -- were you aware of the outcome

19  of the meeting?

20     A.    There were several outcomes that were discussed

21  in this particular -- potential outcomes that were

22  discussed in this email.  Is there one in particular

23  you're interested in?

24     Q.    So I'm just trying to find out what you at the

25  time understood as the outcomes that were implemented at

*Jennifer Cooley      09/26/2024*

1    the meeting between Benjamin Brand and Timothy Jackson on

2    December 11, 2020.

3         A.    So I was aware that there was a conversation

4    and there was a discussion about how editorial duties

5    might be handled moving forward.

6         Q.    Do you know what -- beyond that general level,

7    do you know concretely what was the outcome?  What

8    administrative action was proposed at the meeting?

9              MS. QUIMBY:  Objection, form.

10        A.    From reading this email, it looks like there

11   were several different potential outcomes that were

12   discussed, and so I just knew that there were discussions

13   of options.

14        Q.    (By Mr. Allen) And one of the options was

15   Number 3 which was a non-option, right?  Benjamin Brand

16   says, I cannot support a plan according to which you

17   would remain involved in the day-to-day operations of the

18   journal and its editorial process in particular, given

19   the panel's findings of editorial mismanagement of the

20   acronym JSS.

21             Did I read that correctly?

22        A.    You did read that correctly.

23        Q.    And you understood JSS is an acronym for

24   Journal of Schenkerian Studies, right?

25        A.    Yes.  I assume that's the acronym.

*Jennifer Cooley    09/26/2024*

1      Q.    So did you understand by that, as you sit here
2  today, that Timothy Jackson was going to be removed from
3  the JSS?

4      A.    What I read from this is that there are several
5  different options that could include housing the journal
6  elsewhere, starting a new journal, finding an editor and
7  chief, that several different options were outlined.  I
8  don't know what the choice was in terms of the -- at this
9  time from that meeting.

10     Q.    So you find that language ambiguous:  I cannot
11  support a plan according to which you would remain
12  involved in the day-to-day operations of the journal?

13             MS. QUIMBY:  Objection, form.

14     A.    As I read that, I hear the chair saying that
15  keeping the journal as it is and having him as the editor
16  would not be acceptable to Dr. Brand.

17     Q.    (By Mr. Allen) Okay.  Are you aware that the
18  Journal of Schenkerian Studies has never published again?

19     A.    I was not aware of that.  I was aware that
20  there was a call for editors.

21     Q.    Were you aware that Dean Richmond testified in
22  open court that the journal had been, quote, "put on
23  ice," closed quote?

24     A.    No.  I was not aware of that.

25     Q.    Well, I think I know the answer to this, but I

1  want to ask you anyway.  Did you direct the University of

2  North Texas press to cease publication of the journal?

3      A.    I did not.

4      Q.    Okay.  And this -- okay.  I think that will

5  probably be the last exhibit but -- and I only have one

6  more series of questions, and it might be the last

7  question.  Did you have anything to do with the committee

8  allegedly formed to reconstitute the journal at the

9  University of North Texas?

10            MS. QUIMBY:  Objection, form.

11     A.    I have no knowledge of a committee to

12  resubstitute the journal.

13     Q.    (By Mr. Allen) Let me put it in a different way

14  just to make sure we understand what we're talking about.

15  You were aware that a committee was formed to look for a

16  new editor of some sort?

17            MS. QUIMBY:  Objection, form.

18     A.    I don't know that I knew it was a committee.

19  I knew there was an effort to find an editor for the

20  journal and some kind of call for nominations for

21  editors.

22     Q.    (By Mr. Allen) And did you have anything to do

23  with that as provost is my question?

24     A.    I was informed that this was a planned action.

25     Q.    But it wasn't something your office was

*Jennifer Cowley      09/26/2024*

 1  involved in directly?

 2      A.   No.

 3      Q.   Did you have --

 4      A.   Once the report was issued, the actions to move

 5  forward were delegated to the department.

 6      Q.   Okay.

 7           MR. ALLEN:  Okay.  I think I'm going to

 8  pass the witness then, Mary, and you can go ahead and --

 9  I'm going to take this down too.  Excuse me.  Do you want

10  to take a break or --

11           MS. QUIMBY:  Yeah.  Can we just take five,

12  please?

13           MR. ALLEN:  Absolutely.

14           VIDEOGRAPHER:  Off the record, 2:53.

15           (Recess taken from 2:53 to 2:57)

16           VIDEOGRAPHER:  On the record, 2:57 p.m.

17           MS. QUIMBY:  Thank you.  I will reserve my

18  questions for trial.

19           MR. ALLEN:  Okay.  President Cowley, thank

20  you so much for spending the time today sitting for

21  deposition.

22           COURT REPORTER:  Ms. Quimby, do you want

23  to purchase a transcript?

24           VIDEOGRAPHER:  Off the record.

25           COURT REPORTER:  We are still on --

*Jennifer Cowley      09/26/2024*

```
 1                    MS. QUIMBY:  I'm sorry?
 2                    COURT REPORTER:  We are still on the
 3   record.
 4                    Do you want to purchase a transcript?
 5                    MS. QUIMBY:  Yes, please.
 6                    COURT REPORTER:  Okay.  I don't know if I
 7   need to ask Boseman and Stowers.  So if you guys are
 8   there and want a transcript, you need to speak up now.
 9                    MR. BOSEMAN:  No, I do not.  This is
10   Shelby Boseman.  No.  Thank you.
11                    MR. STOWERS:  And no, I do not.  This is
12   Renaldo Stowers.
13                    VIDEOGRAPHER:  You done, Carla?
14                    COURT REPORTER:  Yes.
15                    VIDEOGRAPHER:  Off the record, 2:58.
16                    (Time 2:58 p.m.)
17                    (End of deposition)
18
19
20
21
22
23
24
25
```

*Jennifer Cowley       09/26/2024*

```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:  JENNIFER COWLEY

 3   DATE:  SEPTEMBER 26, 2024

 4   PAGE    LINE    CHANGE                REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

*Jennifer Cowley      09/26/2024*

```
1  _____

2  _____

3

4       I, JENNIFER COWLEY, have read the foregoing

5  deposition and hereby affix my signature that same is

6  true and correct except as noted above.

7
                              _____
8                                  JENNIFER COWLEY

9

10 THE STATE OF _____ )
   COUNTY OF _____ )
11

12      Before me, _____, on this day

13 personally appeared JENNIFER COWLEY, known to me (or

14 proved to me under oath or through _____)

15 (description of identity card or other document) to be

16 the person whose name is subscribed to the foregoing

17 instrument and acknowledged to me that they executed the

18 same for the purposes and consideration therein

19 expressed.

20

21      Given under my hand and seal of office this the

22 _____ day of _____, 2024.

23
                              _____
24                               NOTARY PUBLIC IN AND FOR
                                 THE STATE OF _____
25                               My Commission Expires:____
```

*Jennifer Cowley    09/26/2024*

```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                       SHERMAN DIVISION

 3  TIMOTHY JACKSON,              *
                                  *
 4          Plaintiff,            *
                                  *
 5  VS.                           *  CASE NO. 4:21-CV-00033-ALM
                                  *
 6  LAURA WRIGHT, ET AL.,         *
                                  *
 7          Defendants.           *

 8       _____

 9              REPORTER'S CERTIFICATION

10   ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

11                  JENNIFER COWLEY

12                 SEPTEMBER 26, 2024

13

14       I, CARLA A. SIMS, AAS, CSR, RPR, in and for the

15  State of Texas, hereby certify to the following:

16       That the witness, JENNIFER COWLEY, was duly sworn by

17  me and that the transcript of the oral deposition is a

18  true record of the testimony given by the witness;

19       I further certify that pursuant to FRCP Rule

20  30(f)(1) that the signature of the deponent:

21       _XX__ was requested by the deponent or a party

22  before the completion of the deposition and is to be

23  returned within 30 days from date of receipt of the

24  transcript.

25       If returned, the attached Signature and Corrections
```

*Jennifer Cowley    09/26/2024*

1  pages contain any changes and the reasons therefor;

2        ____ was not requested by the deponent or a party

3  before the completion of the deposition.

4        That the deposition transcript was submitted on

5  October 30, 2024, to Ms. Mary Quimby, attorney for the

6  witness, for examination, signature, and return to me by

7  the 2nd day of December, 2024;

8        That the amount of time used by each party at the

9  deposition is as follows:

10       Mr. Michael Thad Allen..........04 HOURS:38 MINUTES
         Ms. Mary Quimby.................00 HOURS:00 MINUTES
11       Mr. Renaldo L. Stowers..........00 HOURS:00 MINUTES
         Mr. Shelby Boseman..............00 HOURS:00 MINUTES
12

13  COUNSEL FOR THE PLAINTIFF:

14       Mr. Michael Thad Allen
         ALLEN LAW, LLC
15       P.O. Box 404
         Quaker Hill, Connecticut 06375
16       860/772-4738 (tel)
         m.allen@allen-lawfirm.com
17
    COUNSEL FOR THE DEFENDANTS and JENNIFER COWLEY:
18
         Ms. Mary Quimby
19       TEXAS ASSISTANT ATTORNEY GENERAL
         P.O. Box 12548
20       Capitol Station
         Austin, Texas 78711
21       mary.quimby@oag.texas.gov

22  COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:

23       Mr. Renaldo L. Stowers
         DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
24       115 Union Circle No. 310907
         Denton, Texas 76203
25       940/565-2717 (tel)
         renaldo.stowers@untsystem.edu

*Jennifer Crumley      09/26/2024*

```
 1  COUNSEL FOR THE UNIVERSITY OF TEXAS AT ARLINGTON

 2       Mr. Shelby Boseman
         CHIEF LEGAL OFFICER, THE UNIVERSITY OF TEXAS AT
 3       ARLINGTON
         701 South Nedderman Drive
 4       Arlington, Texas 76019
         sboseman@uta.edu
 5

 6       I further certify that I am neither counsel for,

 7  related to, nor employed by any of the parties or

 8  attorneys in the action in which this proceeding was

 9  taken.  Further, I am not a relative or employee of any

10  attorney of record in this cause, nor am I financially or

11  otherwise interested in the outcome of the action.

12       Certified to by me this the 14th day of October,

13  2024.

14

15
                              _____
16                            Carla A. Sims, AAS, RPR
                              Texas CSR No. CSR-6125
17                            Expiration Date:  04-30-26
                              JULIA WHALEY & ASSOCIATES, INC.
18                            2012 Vista Crest Drive
                              Carrollton, Texas  75007-1640
19                            214-668-5578/Fax 972-236-6666
                              JulieTXCSR@gmail.com
20                            Firm registration No. 436
                              Firm registration Expires 5-31-25
21

22

23

24

25
```

*Jennifer Cowley       09/26/2024*

```
1                        FURTHER CERTIFICATION
                    DEPOSITION OF JENNIFER COWLEY
2

3       The original deposition was/was not returned to the

4   deposition officer on the _____ day of _____,

5   20__.

6       If returned, the attached Changes and Signature

7   page contains any changes and the reasons therefor;

8       If returned, the original deposition was delivered

9   to Mr. Michael Thad Allen, Custodial Attorney;

10      That $_____ is the deposition officer's

11  charges to the Plaintiff for preparing the original

12  deposition transcript and any copies of exhibits;

13

14      Certified to by me this _____ day of _____,

15  20__.

16

17

18                          _____
                            JULIA WHALEY & ASSOCIATES, INC.
19                          2012 Vista Crest Drive
                            Carrollton, Texas  75007-1640
20                          214-668-5578/Fax 972-236-6666
                            JulieTXCSR@gmail.com
21                          Firm registration No. 436
                            Firm registration Expires 5-31-25
22

23

24

25
```

## 0

**04-30-26** [1] - 214:17
**06.035** [3] - 136:6, 137:9, 162:14
**06375** [2] - 2:6, 213:15

## 1

**1** [9] - 3:21, 114:20, 114:22, 184:3, 184:5, 184:15, 184:20, 194:9, 196:24
**1,200** [1] - 79:5
**10** [4] - 4:9, 182:18, 182:19, 182:20
**10:13** [2] - 52:23, 52:24
**10:23** [2] - 52:24, 52:25
**11** [8] - 4:10, 190:21, 190:22, 190:25, 191:3, 203:11, 204:10, 205:2
**115** [2] - 2:15, 213:24
**116** [2] - 3:21, 3:22
**11:15** [1] - 84:2
**11:30** [2] - 84:2, 84:7
**11:36** [2] - 110:3, 110:4
**11:49** [2] - 110:4, 110:5
**12** [29] - 4:11, 58:19, 65:15, 67:9, 73:4, 97:20, 103:14, 107:6, 107:12, 109:20, 117:12, 150:21, 154:4, 154:11, 154:12, 154:25, 156:4, 158:16, 159:12, 162:4, 168:12, 168:25, 172:1, 176:4, 184:13, 195:12, 195:16, 195:18, 195:22
**12548** [2] - 2:10, 213:19
**129** [1] - 3:23

## 2

**2** [7] - 3:3, 3:22, 115:9, 115:11, 128:16, 170:25, 171:2
**20** [1] - 15:23
**200** [1] - 77:13
**2000** [2] - 13:15, 15:8
**2001** [1] - 17:4
**2007** [1] - 51:2
**200s** [2] - 76:25, 77:11
**2011** [1] - 17:17
**2012** [2] - 214:18, 215:19
**2013** [2] - 165:5, 165:22
**2014** [1] - 17:23
**2015** [1] - 33:5
**2016** [3] - 33:5, 165:5, 165:22

**12:27** [2] - 137:20, 137:21
**12:30** [1] - 137:12
**12th** [4] - 123:10, 125:5, 125:17, 141:8
**13** [5] - 4:12, 203:10, 203:18, 203:20, 203:22
**132** [1] - 3:25
**140** [1] - 4:1
**142** [1] - 4:3
**14th** [1] - 214:12
**159** [1] - 4:4
**167** [1] - 4:6
**170** [1] - 4:7
**185** [1] - 4:9
**18th** [3] - 191:1, 197:20, 197:24
**193** [1] - 4:10
**198** [1] - 4:11
**1994** [2] - 13:11, 14:13
**1996** [2] - 13:12, 14:18
**1997** [4] - 13:14, 15:1, 15:19, 15:21
**1:01** [2] - 137:21, 137:22
**1:02** [2] - 138:14, 138:15
**1:06** [2] - 138:15, 138:16

## 2017
**2017** [5] - 16:22, 38:2, 38:5, 39:11, 53:21
**2018** [4] - 6:10, 8:9, 8:16, 33:6
**2019** [5] - 6:11, 8:10, 8:17, 171:10, 175:9
**2020** [36] - 10:18, 12:9, 13:16, 37:25, 88:17, 96:6, 105:22, 110:12, 115:10, 116:21, 131:1, 132:9, 138:2, 138:23, 139:14, 140:8, 156:21, 157:10, 157:19, 159:21, 160:20, 164:11, 164:13, 164:17, 168:2, 168:13, 183:23, 184:22, 195:17, 195:25, 196:25, 197:7, 197:24, 203:11, 204:10, 205:2
**2021** [1] - 191:2
**2022** [8] - 12:17, 13:2, 16:25, 37:25, 38:2, 38:5, 39:11, 53:21
**2024** [9] - 1:12, 1:20, 5:4, 210:3, 211:22, 212:12, 213:5, 213:7, 214:13
**206** [1] - 4:12
**20___** [2] - 215:5, 215:15
**213** [1] - 3:8
**214-598-5229** [1] - 2:25
**214-668-5578/Fax** [2] - 214:19, 215:20
**215** [1] - 3:10
**217** [1] - 3:11
**25** [3] - 77:9, 168:13, 194:6
**25th** [3] - 10:18, 77:16, 156:21
**26** [3] - 1:12, 210:3, 212:12
**26th** [2] - 1:19, 5:3
**29** [1] - 213:5
**2:09** [1] - 183:1
**2:18** [2] - 183:1, 183:2

**2:53** [2] - 208:14, 208:15
**2:57** [2] - 208:15, 208:16
**2:58** [3] - 1:20, 209:15, 209:16

## 3

**3** [10] - 3:23, 128:1, 128:6, 134:23, 170:2, 173:14, 181:16, 183:11, 183:13, 205:15
**30** [2] - 14:8, 212:23
**30(f)(1** [1] - 212:20
**30th** [4] - 195:17, 195:25, 200:22, 213:7
**31** [1] - 115:10
**310907** [2] - 2:15, 213:24
**31st** [5] - 116:21, 120:21, 131:1, 159:21, 160:19
**3rd** [3] - 138:1, 138:23, 139:14

## 4

**4** [8] - 3:25, 130:25, 131:4, 137:25, 138:21, 170:2, 174:1, 183:6
**40** [1] - 23:6
**404** [2] - 2:6, 213:15
**436** [2] - 214:20, 215:21
**4:21-CV-00033-ALM** [2] - 1:5, 212:5

## 5

**5** [4] - 3:6, 4:1, 138:20, 138:24
**5-31-25** [2] - 214:20, 215:21
**50** [1] - 26:21

## 6

**6** [12] - 4:3, 140:7, 140:8, 140:10, 145:23, 163:16, 163:17, 183:23, 184:21, 184:22, 196:25, 197:7
**600** [2] - 79:7, 79:12

## 7

**7** [9] - 4:4, 157:6, 157:8, 157:10, 157:11, 157:19, 161:8
**701** [2] - 2:20, 214:3
**75007-1640** [2] - 214:18, 215:19
**76019** [2] - 2:20, 214:4
**76203** [2] - 2:15, 213:24
**78711** [2] - 2:11, 213:20
**7th** [1] - 156:24

## 8

**8** [3] - 4:6, 165:4, 165:6
**860/772-4738** [2] - 2:7, 213:16

## 9

**9** [8] - 4:7, 168:8, 168:9, 168:10, 168:14, 183:3, 184:7
**940/565-2717** [2] - 2:16, 213:25
**97** [1] - 194:6
**972-236-6666** [2] - 214:19, 215:20
**98** [1] - 194:9
**9:04** [3] - 1:20, 5:2, 5:4
**9:30** [1] - 116:21
**9:35** [1] - 116:22
**9:36** [2] - 29:6, 29:8
**9:38** [2] - 29:8, 29:9

## A

**A&M** [8] - 13:11, 13:12, 13:15, 13:19, 14:12, 14:20, 15:6, 16:14
**a.m** [3] - 1:20, 5:2, 5:4
**AAS** [3] - 1:21, 212:14, 214:16
**abiding** [1] - 99:17
**abilities** [1] - 45:6
**ability** [9] - 9:2, 42:6, 44:17, 44:21, 45:1, 61:22, 117:7, 117:23, 159:5
**able** [8] - 6:17, 6:20, 9:20, 41:12, 47:11, 120:6, 150:24, 151:23
**above-styled** [1] - 1:19
**absolutely** [3] - 28:15, 64:2, 183:20
**Absolutely** [5] - 40:6, 62:5, 161:5, 185:12, 208:13
**abstract** [1] - 51:17
**academia** [4] - 15:16, 16:11, 24:12, 36:3
**Academic** [2] - 17:15, 19:11
**academic** [73] - 22:16, 23:5, 23:9, 23:13, 23:19, 26:13, 28:5, 32:17, 32:23, 34:22, 36:21, 36:22, 38:19, 40:15, 41:4, 42:8, 48:9, 49:12, 61:7, 61:24, 64:22, 75:17, 94:7, 94:10, 94:17, 95:23, 121:5, 121:9, 126:18, 126:19, 126:25, 136:6, 136:15, 136:22, 137:6, 143:12, 144:15, 144:21, 145:6,

145:15, 146:2,
146:6, 146:12,
146:18, 146:19,
146:21, 146:24,
147:2, 147:9,
147:13, 147:16,
147:20, 148:6,
148:14, 148:19,
148:22, 159:3,
159:24, 160:15,
161:22, 162:14,
166:7, 173:10,
177:23, 180:13
  **academics** [4] -
23:21, 25:16,
26:4, 60:23
  **accept** [1] -
119:15
  **acceptable** [1] -
206:16
  **accepted** [2] -
32:3, 141:17
  **accident** [1] -
67:2
  **accommodatio
n** [1] - 45:9
  **accommodatio
ns** [1] - 45:8
  **accomplishme
nts** [3] - 18:25,
78:10, 83:10
  **according** [3] -
196:5, 205:16,
206:11
  **accreditation** [1]
- 112:20
  **accurate** [7] -
157:18, 187:20,
187:25, 195:4,
195:5, 195:7,
196:11
  **accusations** [1]
- 7:18
  **accused** [1] -
27:20
  **achieve** [4] -
47:1, 48:15,
54:16, 83:5
  **achieved** [2] -
24:19, 82:23
  **achievement** [6]
- 81:4, 82:5,
82:11, 82:18,
83:3, 83:6
  **achievements**
[3] - 80:6, 81:7,
81:9
  **acknowledged**
[1] - 211:17
  **acknowledgme**

**nt** [1] - 81:3
  **Acrobat** [1] -
166:24
  **acronym** [4] -
33:11, 205:20,
205:23, 205:25
  **acting** [2] -
64:15, 120:11
  **action** [13] -
133:16, 133:19,
134:4, 134:6,
161:13, 161:25,
162:13, 181:10,
205:8, 207:24,
214:8, 214:11
  **actions** [3] -
57:10, 57:16,
208:4
  **activities** [5] -
51:25, 57:21,
57:23, 60:18,
152:18
  **activity** [2] -
58:2, 58:3
  **actual** [2] -
164:9, 197:6
  **Ad** [28] - 4:7,
4:9, 10:12, 10:17,
137:10, 142:6,
156:20, 163:25,
164:3, 164:9,
168:11, 168:17,
170:12, 171:2,
173:14, 173:21,
179:23, 182:9,
183:4, 184:5,
184:20, 185:16,
198:7, 198:13,
199:12, 200:14,
201:14, 202:7
  **ad** [70] - 65:8,
65:15, 66:4, 67:5,
67:8, 68:7, 71:8,
72:17, 72:25,
74:14, 74:19,
74:20, 86:20,
87:10, 88:19,
88:23, 89:7,
93:12, 93:14,
98:6, 103:9,
103:22, 105:16,
106:18, 107:2,
117:11, 119:6,
119:7, 120:4,
120:9, 126:10,
127:9, 127:18,
139:10, 139:13,
139:22, 142:8,
143:21, 150:11,
152:2, 153:13,

154:22, 155:1,
155:11, 155:13,
155:17, 155:22,
155:25, 162:21,
164:5, 169:9,
171:8, 171:22,
172:9, 173:2,
173:23, 173:24,
179:17, 180:4,
186:9, 186:20,
188:20, 189:3,
191:10, 196:3,
196:13, 197:6,
198:17, 200:5,
200:19
  **addition** [1] -
142:20
  **address** [10] -
56:12, 101:15,
116:15, 129:1,
131:18, 131:20,
185:9, 197:19,
198:20, 200:22
  **addressed** [2] -
175:24, 176:15
  **addresses** [1] -
24:3
  **addressing** [3] -
24:9, 121:23
  **adequate** [1] -
93:21
  **administer** [1] -
85:13
  **administering**
[1] - 85:15
  **Administration**
[4] - 13:13, 14:23,
15:11, 15:20
  **administrative**
[2] - 16:17, 205:8
  **administrator**
- 61:7, 61:24
  **administrators**
[1] - 167:10
  **admitted** [1] -
193:13
  **Adobe** [1] -
166:24
  **advance** [6] -
46:10, 49:4,
156:25, 162:21,
163:24, 169:2
  **advancement**
[5] - 18:10, 18:11,
18:12, 18:13,
46:8
  **advice** [2] - 10:6,
33:19
  **advise** [1] -
150:7

  **advised** [1] -
114:6
  **advisory** [3] -
37:2, 37:7, 37:13
  **Affairs** [2] -
17:15, 19:11
  **affirmatively** [2]
- 180:18, 187:18
  **affirmed** [1] -
192:4
  **affix** [1] - 211:5
  **afforded** [7] -
176:23, 177:17,
178:1, 178:11,
178:24, 179:5,
180:25
  **afraid** [1] - 157:5
  **Age** [1] - 44:17
  **age** [1] - 45:11
  **agitated** [2] -
55:12, 123:25
  **ago** [3] - 91:23,
124:16, 145:20
  **agree** [18] - 49:7,
59:1, 69:2, 69:5,
77:15, 128:21,
130:2, 130:6,
146:21, 147:2,
147:5, 147:7,
148:5, 148:13,
148:18, 192:1,
192:20
  **agreed** [4] -
141:16, 192:17,
192:19, 192:20
  **ahead** [12] -
30:13, 30:21,
31:2, 35:6, 36:5,
39:21, 49:22,
126:15, 134:9,
200:13, 204:12,
208:8
  **aim** [1] - 50:11
  **AL** [2] - 1:6,
212:6
  **alerted** [1] -
174:12
  **ALL** [1] - 2:2
  **allegation** [1] -
137:6
  **allegations** [5] -
20:12, 57:7, 58:9,
136:21, 137:9
  **alleged** [1] -
161:10
  **allegedly** [1] -
207:8
  **alleging** [3] -
145:11, 145:12,
145:13

  **Allen** [242] - 2:5,
3:25, 5:10, 18:21,
20:5, 20:19, 21:3,
22:3, 22:8, 28:3,
28:17, 29:11,
29:21, 30:17,
30:23, 31:9,
35:11, 36:7,
36:13, 36:19,
37:6, 37:12,
37:19, 39:7,
39:23, 40:20,
41:9, 41:25,
42:22, 43:25,
45:23, 46:13,
47:3, 47:14,
47:20, 48:1, 48:7,
49:11, 49:18,
50:1, 50:19,
50:22, 52:9, 53:2,
53:16, 54:10,
54:18, 54:24,
55:8, 57:15,
57:22, 58:8,
58:18, 61:14,
62:10, 63:4, 63:9,
63:14, 63:24,
64:8, 64:13, 65:4,
65:18, 65:24,
67:1, 68:9, 68:16,
69:2, 69:12,
69:24, 70:8,
70:18, 72:22,
73:19, 74:6,
74:17, 75:1, 75:4,
77:23, 82:20,
84:4, 86:9, 87:6,
89:1, 90:7, 92:18,
93:8, 94:15,
94:23, 96:17,
97:9, 97:13, 98:1,
98:17, 99:1, 99:8,
99:23, 100:1,
100:4, 100:15,
101:1, 101:6,
102:7, 102:17,
102:20, 103:8,
103:15, 103:21,
104:3, 105:7,
105:21, 106:12,
107:8, 108:11,
108:16, 108:21,
109:7, 109:15,
109:22, 110:6,
110:13, 111:18,
112:2, 112:9,
114:3, 114:23,
115:15, 116:13,
118:1, 118:23,
119:9, 119:21,
120:1, 120:19,

121:1, 121:18,
121:23, 122:3,
123:3, 124:1,
124:10, 125:9,
125:18, 126:13,
127:2, 127:7,
127:19, 128:8,
129:13, 129:21,
131:5, 131:11,
133:18, 134:3,
135:16, 136:20,
138:3, 138:25,
139:23, 140:11,
140:23, 144:10,
146:2, 146:10,
146:16, 147:2,
147:9, 148:3,
148:11, 149:8,
150:5, 151:10,
151:20, 152:9,
152:17, 152:25,
153:13, 153:25,
155:1, 155:21,
156:19, 157:12,
159:7, 159:18,
160:20, 161:15,
162:5, 163:6,
165:7, 168:15,
169:8, 169:15,
170:18, 172:5,
172:16, 176:9,
176:22, 177:16,
177:22, 178:20,
179:10, 179:13,
179:18, 180:3,
180:9, 180:12,
180:17, 181:20,
183:3, 186:8,
186:19, 187:1,
187:9, 187:14,
189:1, 189:11,
190:6, 191:4,
193:18, 193:23,
194:3, 194:19,
195:6, 195:19,
196:19, 197:5,
197:13, 198:21,
199:9, 200:13,
200:21, 201:1,
202:6, 202:11,
202:23, 203:23,
205:14, 206:17,
207:13, 207:22,
213:14, 215:9
  **ALLEN** [61] -
2:5, 5:7, 5:10,
5:23, 29:3, 29:20,
50:15, 52:21,
54:6, 55:1, 83:14,
83:21, 84:3, 87:1,
97:24, 102:18,

110:1, 114:18, 115:8, 123:13, 123:22, 124:7, 124:17, 124:22, 127:25, 130:25, 131:9, 137:19, 137:24, 138:9, 138:12, 138:17, 140:5, 140:17, 140:20, 144:1, 144:8, 147:24, 156:7, 157:4, 157:9, 163:4, 165:3, 168:7, 168:10, 182:14, 182:23, 189:15, 189:21, 189:24, 190:20, 190:23, 195:11, 195:15, 203:9, 203:14, 203:21, 208:7, 208:13, 208:19, 213:14

**Allen..................** ...... [1] - 3:6

**Allen..........04** [1] - 213:10

**allow** [2] - 151:2, 182:23

**allowed** [3] - 55:25, 56:3, 56:5

**almost** [2] - 157:14, 190:24

**ALSO** [1] - 2:22

**alternative** [1] - 199:7

**Amarillo** [2] - 15:14, 15:22

**ambiguous** [1] - 206:10

**Amendment** [16] - 20:14, 20:17, 37:21, 37:22, 38:6, 38:12, 38:15, 38:16, 38:24, 39:15, 40:12, 41:7, 41:21, 42:3, 42:16, 43:6

**amount** [1] - 213:8

**amplified** [4] - 175:24, 176:5, 176:15, 176:19

**analysis** [1] - 191:20

**AND** [6] - 1:10, 1:16, 2:2, 210:1, 211:24, 212:10

**announced** [2] -

133:11, 161:16

**announcement** [4] - 119:10, 133:15, 140:1, 140:3

**announcing** [2] - 116:23, 139:17

**Annual** [1] - 175:10

**annual** [1] - 82:2

**anonymous** [3] - 35:3, 89:22, 89:23

**answer** [74] - 9:8, 9:13, 9:20, 18:17, 19:24, 20:16, 20:24, 21:24, 22:8, 22:11, 34:8, 35:24, 35:25, 37:5, 37:11, 37:12, 37:17, 39:2, 39:24, 50:1, 50:16, 54:10, 54:11, 55:9, 55:24, 56:14, 56:16, 61:14, 61:16, 61:19, 61:21, 67:2, 67:3, 67:22, 67:24, 69:15, 72:8, 74:5, 74:7, 74:22, 75:1, 75:4, 82:9, 83:7, 87:1, 94:25, 97:25, 106:16, 109:15, 123:4, 123:11, 123:16, 123:18, 123:20, 124:1, 124:4, 125:21, 126:1, 131:13, 147:25, 148:4, 150:9, 153:11, 156:5, 156:14, 157:22, 172:7, 181:6, 188:3, 188:6, 188:9, 190:18, 192:19, 206:25

**Answer** [1] - 193:1

**answered** [8] - 16:10, 54:7, 57:4, 61:20, 131:11, 168:1, 190:2, 194:19

**answering** [3] - 55:14, 67:23, 124:18

**answers** [1] - 123:18

**anti** [2] - 193:2, 194:1

**antiblack** [4] - 171:7, 171:22, 172:8, 173:2

**anticipating** [2] - 160:18, 190:17

**anyway** [2] - 57:5, 207:1

**apologies** [1] - 29:21

**apologize** [9] - 104:18, 128:5, 138:19, 140:23, 144:3, 157:25, 160:23, 168:2, 185:2

**appear** [3] - 122:12, 167:14, 184:25

**Appearances...** ......................... ...... [1] - 3:3

**appeared** [2] - 115:1, 211:13

**APPEARED** [1] - 2:2

**appearing** [1] - 129:4

**appendices** [1] - 170:17

**applicable** [2] - 71:20, 188:14

**application** [1] - 26:5

**applied** [3] - 96:9, 98:11, 155:14

**apply** [1] - 39:16

**appreciate** [2] - 40:9, 61:15

**approach** [1] - 98:16

**approached** [2] - 192:11, 192:12

**approaches** [1] - 56:9

**appropriate** [15] - 14:4, 40:19, 42:7, 47:10, 47:13, 48:13, 48:16, 49:24, 70:3, 71:3, 113:23, 137:15, 150:15, 152:19, 153:6

**appropriately** [1] - 42:21

**approval** [2] - 130:1, 197:21

**approve** [2] - 120:1, 120:12

**Architecture** [1] - 17:8

**area** [3] - 32:3, 48:18, 85:25

**areas** [2] - 41:19, 150:4

**argue** [2] - 146:5, 146:11

**arguing** [2] - 146:2, 170:23

**arguments** [1] - 20:4

**ARLINGTON** [4] - 2:17, 2:19, 214:1, 214:3

**Arlington** [18] - 2:20, 5:19, 11:8, 12:18, 12:19, 13:4, 16:25, 18:9, 19:8, 19:22, 20:20, 22:2, 38:23, 39:18, 124:3, 149:5, 214:4

**arm's** [1] - 150:1

**arrow** [1] - 132:25

**article** [25] - 20:3, 20:5, 20:7, 20:9, 27:18, 27:21, 27:23, 27:25, 30:19, 35:4, 39:4, 39:6, 57:25, 58:10, 58:17, 62:7, 62:11, 62:14, 90:3, 101:23, 102:9, 102:22, 105:23, 187:7, 188:17

**articles** [26] - 23:5, 23:7, 24:20, 26:12, 26:13, 26:21, 27:8, 27:9, 28:1, 31:17, 31:21, 32:15, 60:22, 61:25, 66:16, 66:18, 94:7, 95:23, 100:16, 100:19, 101:2, 176:4, 176:18, 188:12, 188:14, 188:16

**ascribed** [1] - 52:3

**assertion** [1] - 49:12

**assess** [1] -

75:13

**assessing** [1] - 81:7

**Assistant** [1] - 5:13

**ASSISTANT** [2] - 2:10, 213:19

**assistant** [1] - 16:16

**Associate** [3] - 16:19, 17:13, 17:14

**associate** [2] - 17:10, 116:7

**associated** [3] - 102:4, 166:18, 185:23

**ASSOCIATES** [2] - 214:17, 215:18

**Assume** [1] - 64:8

**assume** [13] - 16:5, 17:16, 22:16, 31:22, 95:13, 108:23, 108:24, 142:11, 160:9, 163:19, 171:18, 189:12, 205:25

**assumed** [1] - 192:9

**assuming** [2] - 18:21, 21:4

**assumptions** [1] - 189:13

**AT** [4] - 2:17, 2:19, 214:1, 214:2

**attach** [1] - 174:1

**attached** [10] - 1:25, 134:11, 170:11, 182:9, 184:2, 196:7, 196:13, 196:24, 212:25, 215:6

**attachments** [1] - 134:11

**attacks** [5] - 171:8, 171:23, 172:9, 173:3, 175:11

**attend** [3] - 22:1, 52:11, 52:14

**attendance** [2] - 11:9, 11:11

**attended** [1] - 13:8

**attending** [2] -

6:1, 21:20

**attention** [14] - 40:9, 45:19, 45:24, 73:12, 74:2, 110:10, 110:14, 110:21, 132:18, 136:10, 159:19, 168:3, 174:18, 194:1

**attentive** [1] - 152:3

**Attorney** [3] - 5:13, 215:9

**ATTORNEY** [2] - 2:10, 213:19

**attorney** [9] - 9:6, 9:12, 10:8, 28:6, 41:12, 118:24, 148:4, 213:5, 214:10

**attorneys** [8] - 5:7, 10:5, 11:6, 11:11, 11:21, 21:20, 32:11, 214:8

**audience** [4] - 25:13, 25:21, 25:22, 26:7

**audio** [2] - 3:16, 158:1

**August** [10] - 119:11, 138:1, 138:23, 139:14, 140:8, 163:17, 183:23, 184:22, 196:25, 197:7

**Austin** [2] - 2:11, 213:20

**author** [10] - 20:11, 24:5, 34:25, 101:7, 133:24, 177:23, 192:9, 192:25, 193:19, 193:21

**authority** [11] - 54:20, 59:18, 93:4, 117:5, 117:16, 118:2, 118:18, 118:20, 119:17, 119:24, 120:12

**authorization** [1] - 119:1

**authorized** [1] - 120:9

**authors** [2] - 24:6, 192:18

**available** [2] - 142:21, 200:10

**Awards** [1] -

78:15
**aware** [52] -
12:3, 13:2, 21:19,
53:9, 53:22,
54:22, 54:24,
55:19, 56:17,
57:10, 58:3,
62:10, 62:13,
81:14, 94:19,
100:15, 101:6,
101:10, 104:7,
104:23, 104:25,
108:3, 109:22,
113:21, 115:16,
120:14, 120:16,
120:23, 120:24,
130:24, 145:17,
146:4, 164:23,
166:17, 170:16,
173:9, 177:9,
177:13, 198:15,
201:15, 204:10,
204:14, 204:15,
204:16, 204:18,
205:3, 206:17,
206:19, 206:21,
206:24, 207:15

## B

**Bachelor** [1] -
13:10
**background** [3]
- 110:8, 144:2,
169:22
**backgrounded**
[1] - 14:1
**backgrounds**
[2] - 44:20, 45:13
**bad** [1] - 72:22
**badgering** [2] -
124:16, 124:17
**badmouth** [1] -
75:24
**Bain** [1] - 191:16
**Bakulina** [1] -
167:12
**ballpark** [3] -
26:19, 78:24,
80:14
**Barry** [3] -
192:9, 192:13,
193:6
**base** [1] - 52:17
**Based** [1] -
38:21
**based** [11] -
18:14, 30:7,
36:20, 68:24,
78:9, 80:4, 80:6,

82:8, 149:24,
179:6, 186:12
**basic** [3] - 19:18,
19:20, 20:3
**basics** [1] -
19:17
**basis** [2] - 7:20,
7:21
**Bates** [1] - 165:5
**bear** [1] - 157:12
**became** [4] -
17:10, 17:13,
17:18, 177:13
**become** [7] -
12:17, 16:23,
16:25, 17:21,
82:6, 82:7, 82:12
**becoming** [1] -
27:20
**beforehand** [1] -
116:25
**began** [1] -
191:21
**begin** [2] -
118:25, 170:5
**beginning** [1] -
155:6
**begins** [1] -
159:22
**begun** [1] -
120:7
**behalf** [2] -
126:6, 175:7
**behave** [2] -
100:11, 124:8
**behaving** [1] -
59:9
**behavior** [3] -
63:3, 63:25,
124:11
**behaviors** [1] -
71:22
**belong** [1] -
50:12
**belonging** [3] -
50:20, 51:13,
51:19
**Ben** [2] - 11:13,
11:18
**Ben's** [1] - 11:14
**Benjamin** [13] -
129:5, 130:7,
131:3, 143:1,
166:5, 167:19,
197:20, 201:8,
201:9, 201:13,
203:10, 205:1,
205:15
**Berscheidt** [1] -
143:6

**best** [16] - 11:24,
27:11, 34:7, 47:1,
49:1, 54:16, 55:5,
56:9, 56:12,
61:22, 78:12,
104:21, 112:3,
135:22, 155:11,
199:15
**bestowed** [2] -
78:2, 78:8
**better** [6] -
11:18, 80:25,
140:21, 188:17,
203:24, 203:25
**between** [8] -
12:12, 15:19,
15:24, 40:14,
47:4, 198:4,
204:17, 205:1
**beyond** [3] -
118:18, 188:24,
205:6
**big** [2] - 124:12,
181:22
**bigger** [1] -
140:21
**Billboard** [1] -
77:7
**bit** [10] - 40:4,
75:18, 93:2,
118:2, 140:15,
140:16, 140:19,
158:1, 160:3,
203:13
**black** [1] -
178:23
**blind** [5] - 34:19,
34:22, 35:3,
105:3, 105:24
**block** [1] -
135:18
**Board** [9] -
18:18, 131:22,
132:3, 132:6,
132:7, 171:3,
171:6, 171:21,
173:1
**board** [30] -
32:21, 32:24,
33:23, 34:6,
34:13, 36:14,
36:22, 37:2, 37:7,
37:14, 90:10,
90:17, 90:18,
90:23, 91:1,
91:10, 91:13,
91:17, 92:8,
92:10, 92:14,
92:17, 92:19,
92:20, 92:23,

94:1, 172:18,
172:24
**boards** [1] -
32:20
**body** [2] - 44:13,
44:15
**book** [4] - 23:23,
24:3, 24:13,
27:11
**books** [7] - 23:9,
23:13, 26:13,
27:5, 27:10,
36:21, 85:18
**BOSEMAN** [2] -
5:18, 209:9
**Boseman** [8] -
2:18, 5:18, 11:9,
21:1, 21:8, 209:7,
209:10, 214:2
**Boseman........
.....00** [1] - 213:11
**bother** [1] -
100:4
**box** [1] - 166:1
**Box** [4] - 2:6,
2:10, 213:15,
213:19
**boxes** [1] -
166:6
**Brand** [17] -
129:5, 130:8,
131:3, 143:1,
166:5, 197:20,
198:4, 201:8,
201:9, 201:13,
202:3, 202:15,
203:10, 204:17,
205:1, 205:15,
206:16
**breadth** [1] -
97:6
**break** [9] - 14:2,
52:20, 83:16,
83:19, 83:25,
84:6, 137:15,
182:22, 208:10
**brief** [5] - 13:24,
15:14, 128:20,
134:8, 196:21
**briefly** [2] - 13:6,
134:9
**bring** [4] - 48:13,
51:25, 73:17,
74:2
**bringing** [2] -
40:9, 193:19
**brings** [1] -
136:3
**broad** [1] -
154:19

**broader** [6] -
46:5, 66:3, 66:6,
66:11, 66:22,
166:16
**brought** [7] -
43:3, 73:11,
136:10, 137:16,
149:16, 159:19,
168:2
**Bruxvoort** [1] -
84:24
**BS** [1] - 14:15
**building** [1] -
18:4
**Business** [1] -
142:3
**business** [2] -
116:19, 151:7
**buy** [1] - 24:13
**BY** [1] - 5:23

## C

**C-o-w-l-e-y** [1] -
6:4
**calm** [2] -
123:21, 124:8
**campus** [5] -
51:25, 79:20,
121:4, 121:9,
146:3
**campuses** [1] -
18:2
**cannot** [8] -
37:11, 102:5,
162:13, 164:18,
172:17, 181:4,
205:16, 206:10
**capacity** [3] -
11:22, 53:9,
64:16
**capital** [2] -
17:25, 18:3
**Capitol** [2] -
2:11, 213:20
**captioned** [1] -
114:20
**car** [10] - 186:1,
186:5, 186:21,
191:6, 191:11,
191:22, 191:23,
192:15, 193:5,
194:21
**card** [1] - 211:15
**career** [6] - 12:6,
13:7, 16:11,
18:11, 19:5,
22:17
**careful** [2] -

93:9, 162:20
**carefully** [3] -
93:7, 93:19,
171:18
**Carla** [3] - 1:21,
209:13, 214:16
**CARLA** [1] -
212:14
**Carrollton** [2] -
214:18, 215:19
**cars** [1] - 195:1
**case** [23] - 5:25,
6:13, 6:16, 6:17,
8:6, 8:7, 8:9,
19:17, 19:20,
20:18, 37:22,
39:10, 47:11,
74:19, 80:1, 86:2,
115:5, 134:15,
139:9, 151:12,
155:6, 165:24,
182:7
**CASE** [1] - 1:5,
212:5
**cases** [3] -
32:11, 38:14,
38:16
**categorized** [1] -
31:13
**category** [3] -
40:6, 52:3, 52:10
**causes** [1] - 3:16
**cautious** [1] -
77:20
**caveat** [1] - 10:9
**CC** [1] - 115:25
**CC'd** [1] - 120:20
**CC'ing** [1] -
118:18
**cease** [1] - 207:2
**ceased** [1] -
21:14
**censor** [13] -
186:1, 186:6,
186:16, 186:22,
187:3, 187:10,
187:18, 188:1,
188:16, 192:7,
192:18, 193:20,
195:2
**censorship** [3] -
191:11, 192:16,
193:4
**Center** [9] - 4:6,
164:15, 164:16,
164:23, 165:4,
166:3, 168:3,
197:18, 198:7
**center** [11] -
101:8, 164:19,

165:11, 166:7, 166:11, 166:12, 166:16, 166:18, 166:20, 167:7
**center/institute** [1] - 167:10
**centers** [2] - 164:22, 165:18
**Central** [1] - 5:4
**certain** [7] - 43:9, 43:21, 85:18, 155:5, 167:23, 169:5, 174:10
**Certainly** [1] - 84:10
**certainly** [11] - 26:3, 28:25, 93:24, 96:4, 96:14, 117:7, 117:23, 119:1, 119:4, 120:24, 137:16
**Certificate........ ................** [1] - 3:10
**CERTIFICATIO N** [2] - 212:9, 215:1
**Certification..... .....................** [1] - 3:11
**Certified** [2] - 214:12, 215:14
**certify** [3] - 212:15, 212:19, 214:6
**Chair** [2] - 131:22, 166:5
**chair** [15] - 78:18, 82:6, 82:8, 82:12, 82:20, 131:22, 166:1, 166:4, 166:9, 166:13, 166:14, 198:10, 199:8, 201:25, 206:14
**chairs** [1] - 60:1
**chance** [4] - 104:9, 111:19, 169:16, 174:19
**Chancellor** [1] - 19:11
**chancellor** [1] - 19:14
**CHANGE** [1] - 210:4
**Changes** [2] - 3:8, 215:6
**CHANGES** [1] -

210:1
**changes** [4] - 197:8, 202:21, 213:1, 215:7
**chapter** [1] - 27:10
**chapters** [1] - 23:9
**characterizatio n** [1] - 159:15
**characterize** [1] - 179:15
**characterized** [4] - 26:10, 66:12, 140:11, 187:5
**charge** [48] - 53:14, 65:22, 66:4, 67:13, 67:17, 68:7, 74:9, 74:13, 74:19, 87:11, 88:22, 103:11, 106:22, 106:24, 107:2, 107:6, 107:10, 107:14, 107:16, 107:19, 109:6, 125:6, 126:10, 127:9, 127:17, 127:24, 141:2, 141:8, 149:24, 154:3, 154:7, 154:22, 156:2, 168:24, 169:20, 183:11, 183:12, 183:15, 183:17, 196:8, 196:12, 196:16, 196:17, 196:20, 196:22, 196:23, 197:7
**charged** [1] - 153:21
**charges** [4] - 73:22, 74:21, 74:25, 215:11
**checked** [1] - 166:6
**CHIEF** [2] - 2:19, 214:2
**Chief** [1] - 5:18
**chief** [1] - 206:7
**children** [1] - 75:19
**choice** [3] - 64:19, 189:20, 206:8
**choose** [8] - 43:12, 63:7, 63:9, 97:4, 102:2, 116:16, 149:8, 189:22

**choosing** [1] - 42:25
**chose** [5] - 18:19, 31:7, 66:4, 142:12, 149:10
**chosen** [3] - 52:13, 79:14, 79:16
**Christman** [1] - 85:10
**circle** [1] - 93:2
**Circle** [2] - 2:15, 213:24
**circulated** [1] - 113:5
**circumstance** [1] - 36:17
**circumstances** [3] - 37:10, 94:11, 158:24
**citizen** [1] - 43:13
**city** [9] - 15:13, 25:10, 25:11, 25:20, 25:24, 43:23, 43:24, 46:16, 46:18
**City** [15] - 15:14, 15:21, 16:18, 17:6, 17:12
**Civil** [1] - 1:24
**claim** [1] - 159:23
**clarification** [7] - 9:17, 9:24, 24:25, 40:8, 87:3, 138:7, 138:10
**clarify** [8] - 18:6, 27:24, 65:13, 86:22, 164:4, 174:8, 183:12, 187:21
**clarifying** [2] - 51:9, 87:6
**Clark** [3] - 192:24, 193:5, 193:8
**Clark's** [2] - 191:24, 192:3
**class** [13] - 40:16, 40:17, 40:18, 40:23, 40:24, 41:3, 41:17, 41:19, 42:13, 42:24, 46:15, 46:17, 46:19
**classroom** [3] - 43:23, 48:13, 51:23

**classrooms** [1] - 46:22
**clear** [18] - 9:12, 9:15, 9:21, 69:13, 97:15, 101:14, 102:21, 117:8, 125:22, 125:23, 125:25, 126:1, 161:9, 169:2, 170:22, 175:22, 188:10
**cleared** [1] - 24:14
**clearly** [4] - 9:20, 120:2, 155:19, 177:2
**Clearly** [2] - 146:5, 146:11
**click** [1] - 182:4
**clicking** [1] - 182:16
**clicks** [1] - 165:25
**client** [6] - 47:21, 57:5, 57:11, 57:16, 69:3, 136:5
**client's** [2] - 136:15, 136:22
**close** [1] - 190:8
**closed** [5] - 34:17, 66:11, 89:19, 154:2, 206:23
**coauthor** [1] - 24:7
**coauthors** [1] - 23:24
**Code** [4] - 71:18, 71:21, 72:11, 72:14
**coherently** [1] - 24:4
**colleague** [5] - 62:20, 63:8, 63:11, 179:11, 180:10
**colleague's** [1] - 63:3
**colleagues** [10] - 61:9, 62:1, 62:12, 62:16, 62:17, 63:1, 63:2, 64:2, 81:11, 159:2
**collect** [1] - 151:1
**collection** [1] - 24:8
**college** [3] - 56:11, 117:7,

150:1
**College** [37] - 7:6, 16:19, 17:9, 53:3, 56:18, 57:3, 75:7, 75:9, 75:14, 75:21, 76:1, 76:5, 77:1, 77:6, 77:16, 77:24, 79:24, 95:8, 98:11, 98:14, 99:2, 117:15, 118:5, 121:2, 128:22, 128:23, 129:2, 129:19, 130:10, 130:17, 130:23, 142:2, 149:9, 149:11, 149:16, 150:16, 150:19
**colleges** [1] - 75:12
**colors** [3] - 71:9, 71:11, 71:16
**combat** [4] - 48:20, 53:11, 53:14, 53:23
**combating** [18] - 54:2, 54:19, 55:11, 55:18, 56:6, 121:4, 121:8, 122:4, 122:7, 122:19, 122:22, 125:10, 126:6, 127:14, 127:20, 130:19, 139:19, 203:6
**combination** [1] - 83:9
**combined** [1] - 83:11
**comfortable** [2] - 51:22, 114:15
**coming** [2] - 91:19, 93:1
**commenced** [1] - 119:11
**comment** [1] - 189:11
**commentary** [1] - 94:16
**comments** [1] - 180:18
**Commission** [1] - 211:25
**Commit** [1] - 55:11
**commit** [3] - 54:1, 55:17, 56:5
**commitment** [12] - 50:7, 55:19, 55:21, 143:15,

144:15, 144:20, 144:22, 145:13, 145:15, 146:25, 148:19, 203:6
**committed** [2] - 126:17, 143:12
**Committee** [6] - 33:20, 34:3, 34:9, 34:11, 78:15, 88:13
**committee** [44] - 65:23, 66:4, 67:14, 69:9, 69:23, 71:1, 71:8, 72:18, 74:24, 78:10, 78:13, 78:14, 88:22, 88:23, 105:16, 107:19, 107:22, 126:11, 127:18, 139:9, 139:10, 139:11, 139:12, 141:13, 149:15, 149:24, 149:25, 154:3, 154:22, 155:12, 155:17, 156:17, 168:24, 174:17, 186:12, 194:17, 196:16, 196:21, 199:21, 200:19, 207:7, 207:11, 207:15, 207:18
**committing** [3] - 54:19, 59:3, 139:18
**common** [14] - 23:23, 25:21, 28:12, 34:7, 60:24, 61:1, 61:7, 61:24, 62:4, 62:8, 62:9, 76:23, 180:17, 200:18
**communicate** [3] - 106:10, 127:19, 198:9
**communicated** [3] - 127:17, 127:24, 142:22
**communicatin g** [3] - 97:7, 118:14, 120:3
**communicatio n** [7] - 71:6, 127:11, 135:12, 145:3, 177:15, 192:11, 192:14
**communicatio ns** [2] - 169:6, 192:13

**Communications** [2] - 142:24, 143:7
**comparable** [1] - 60:15
**compare** [2] - 128:14, 128:16
**compared** [3] - 28:5, 28:9, 76:8
**compensation** [2] - 80:18, 80:19
**complain** [1] - 105:11
**complained** [1] - 100:8
**complaining** [1] - 102:8
**complains** [1] - 105:25
**complaint** [1] - 105:13
**complaints** [3] - 96:23, 105:8, 159:2
**completely** [5] - 40:18, 40:23, 42:13, 97:25, 99:23
**completion** [2] - 212:22, 213:3
**component** [1] - 30:15
**components** [1] - 50:23
**comprehend** [1] - 9:25
**compromised** [1] - 71:15
**concept** [2] - 50:6, 188:15
**Conception** [1] - 168:11
**conception** [10] - 123:9, 125:4, 125:16, 151:4, 154:4, 154:12, 154:24, 168:25, 173:6, 184:12
**conceptualization** [1] - 149:13
**concern** [21] - 45:20, 46:1, 47:16, 57:19, 99:1, 99:5, 100:21, 105:16, 106:4, 108:18, 108:24, 159:13, 164:10, 164:16, 170:13, 171:25, 172:11, 178:5, 178:12, 178:15, 179:16
**concerned** [5] - 143:20, 159:7, 172:8, 177:4, 178:13
**concerning** [3] - 20:13, 66:17, 180:13
**concerns** [55] - 20:1, 58:15, 58:16, 62:14, 62:17, 63:2, 63:19, 64:3, 65:1, 65:9, 65:14, 65:16, 65:19, 66:1, 66:3, 66:6, 66:11, 66:13, 66:15, 66:17, 66:22, 96:13, 96:20, 97:19, 97:22, 99:6, 99:13, 100:2, 105:14, 109:2, 109:12, 109:18, 109:19, 111:2, 111:5, 111:21, 111:25, 112:3, 112:5, 112:9, 113:1, 145:1, 159:6, 164:18, 164:21, 165:16, 168:3, 170:6, 170:13, 177:6, 186:5, 194:25, 195:1, 199:6
**conclusion** [13] - 41:10, 122:20, 146:9, 155:15, 172:3, 172:10, 172:17, 172:19, 172:21, 175:21, 176:21, 187:16, 189:10
**conclusions** [6] - 68:15, 68:24, 125:13, 151:3, 179:17, 198:16
**concrete** [1] - 202:23
**concretely** [1] - 205:7
**condemnation** [1] - 175:4
**condemns** [3] - 171:7, 171:22, 173:2
**condition** [1] - 9:2
**conditions** [3] -

7:16, 45:3, 45:9
**condone** [1] - 151:15
**Conduct** [4] - 71:19, 71:21, 72:11, 72:15
**conduct** [12] - 63:11, 63:16, 64:9, 64:14, 67:16, 67:18, 72:12, 116:18, 118:2, 133:11, 145:4, 151:2
**conducted** [5] - 36:12, 89:7, 118:11, 134:2, 136:25
**conducting** [1] - 120:15
**confirm** [4] - 136:10, 184:18, 184:19, 184:23
**conflict** [8] - 90:2, 90:16, 90:20, 90:23, 91:18, 92:22, 108:17, 108:22
**conflicts** [2] - 92:1, 93:10
**confuse** [1] - 183:10
**confused** [1] - 186:13
**confusing** [3] - 148:16, 188:2, 188:3
**conjunction** [1] - 118:12
**connect** [1] - 47:12
**connected** [1] - 52:7
**Connecticut** [2] - 2:6, 213:15
**connection** [1] - 51:21
**connectivity** [1] - 52:1
**consensus** [2] - 46:6, 46:9
**consequences** [2] - 202:7, 202:10
**consider** [11] - 18:10, 49:11, 49:18, 125:10, 133:15, 134:3, 150:5, 194:20, 195:7, 197:10, 197:12
**consideration**

[1] - 211:18
**considered** [10] - 26:3, 34:6, 37:8, 42:15, 57:12, 57:17, 109:24, 150:13, 174:14, 176:5
**considering** [1] - 192:8
**consistent** [5] - 143:14, 177:17, 177:25, 178:10, 189:4
**constitute** [1] - 161:21
**constitutes** [2] - 44:16, 45:14
**Constitution** [2] - 37:21, 38:7
**construction** [1] - 18:4
**consult** [1] - 112:17
**contact** [1] - 132:4
**contacted** [1] - 132:6
**contain** [3] - 175:23, 176:10, 213:1
**contains** [1] - 215:7
**contemplated** [1] - 113:22
**content** [18] - 40:18, 41:2, 41:3, 41:17, 41:19, 42:13, 46:17, 86:16, 88:4, 88:11, 149:11, 149:20, 149:25, 150:3, 185:9, 187:6, 194:25, 195:4
**contention** [1] - 150:20
**contents** [2] - 131:15, 192:7
**context** [53] - 37:16, 37:17, 39:10, 41:23, 42:1, 44:10, 44:11, 45:22, 46:24, 49:12, 60:7, 62:22, 63:13, 63:14, 64:12, 69:21, 69:24, 70:3, 70:16, 70:23, 70:25, 71:2, 71:5,

73:14, 74:4, 74:5, 74:10, 102:14, 102:20, 106:3, 106:6, 106:9, 108:20, 108:21, 112:18, 147:16, 147:18, 147:19, 147:20, 148:22, 152:11, 152:15, 152:17, 153:2, 153:3, 153:5, 153:6, 153:11, 189:8, 189:12, 194:3, 194:4, 195:3
**continue** [1] - 190:13
**continues** [1] - 123:17
**contribution** [2] - 191:24, 192:3
**contributions** [2] - 75:18, 192:1
**control** [1] - 90:4
**controversial** [1] - 109:24
**controversy** [6] - 47:20, 101:8, 110:7, 110:9, 120:20, 132:9
**convene** [4] - 139:9, 171:15, 173:21, 196:15
**convened** [9] - 72:25, 106:19, 139:22, 163:8, 163:10, 163:17, 173:24, 189:3
**convening** [5] - 139:11, 139:12, 162:21, 162:23, 174:17
**conventionally** [1] - 44:22
**conversation** [12] - 90:25, 92:5, 92:22, 117:2, 119:4, 122:5, 127:23, 191:20, 193:9, 201:19, 202:15, 205:3
**conversations** [5] - 21:5, 21:15, 117:24, 201:25, 202:1
**conveyed** [2] - 178:6, 183:18
**cooperating** [1] - 166:25
**coordinated** [1]

- 120:14
**COPE** [22] - 33:11, 88:13, 88:14, 88:16, 88:23, 88:24, 89:3, 89:8, 89:13, 89:19, 89:21, 89:24, 93:1, 93:2, 93:8, 93:15, 93:18, 94:6, 94:9, 94:15, 94:18
**copies** [1] - 215:12
**copublished** [1] - 32:11
**copy** [1] - 157:2
**corner** [1] - 128:3
**Correct** [72] - 8:8, 10:19, 11:2, 11:23, 12:14, 13:1, 13:5, 14:16, 14:21, 15:21, 16:1, 16:13, 18:6, 18:23, 19:2, 22:19, 24:6, 24:10, 26:16, 45:4, 49:9, 53:22, 58:21, 60:3, 66:25, 67:4, 73:2, 73:5, 75:6, 79:11, 79:23, 80:3, 80:5, 80:7, 80:10, 81:1, 81:24, 90:12, 90:15, 96:7, 96:22, 101:5, 101:22, 116:1, 129:7, 130:9, 131:19, 139:15, 141:11, 142:9, 150:23, 158:17, 158:25, 160:13, 161:20, 162:11, 162:16, 163:11, 171:16, 171:19, 173:18, 173:25, 177:5, 184:1, 184:14, 196:4, 196:10, 197:2, 197:16, 197:25, 200:25, 201:9
**correct** [72] - 11:17, 12:11, 12:22, 12:25, 13:21, 14:14, 14:19, 14:25, 15:5, 15:7, 15:9, 16:4, 16:8, 17:11, 22:14, 28:13, 34:1, 38:3, 46:10,

46:14, 46:15,
67:7, 79:15,
79:22, 81:18,
85:11, 101:3,
116:5, 116:8,
116:23, 118:24,
127:3, 130:12,
130:13, 130:19,
131:17, 135:4,
139:19, 140:1,
140:3, 141:10,
141:21, 142:8,
142:15, 157:21,
157:24, 158:4,
158:13, 158:17,
159:9, 161:19,
163:17, 163:18,
164:25, 166:22,
167:13, 169:25,
170:3, 170:9,
175:16, 179:6,
179:11, 181:13,
181:14, 183:18,
192:18, 194:22,
195:13, 196:3,
198:8, 203:18,
211:6

**correcting** [2] -
118:20, 197:10

**Corrections** [1] -
212:25

**correctly** [25] -
40:22, 117:4,
126:20, 140:12,
143:19, 150:22,
151:7, 162:19,
168:15, 171:12,
174:3, 175:13,
175:14, 176:1,
176:2, 176:25,
177:1, 181:11,
181:12, 193:7,
193:11, 193:12,
197:22, 205:21,
205:22

**correspondenc
e** [2] - 10:21,
113:22

**Counsel** [1] -
5:17

**counsel** [14] -
10:25, 11:1, 11:8,
21:6, 93:24,
95:17, 114:6,
115:6, 132:15,
160:8, 160:9,
160:23, 161:12,
214:6

**COUNSEL** [10] -
2:4, 2:8, 2:13,

2:14, 2:17,
213:13, 213:17,
213:22, 213:23,
214:1

**count** [2] -
161:24, 162:13

**COUNTY** [1] -
211:10

**couple** [6] -
19:14, 23:16,
88:25, 91:22,
119:14, 124:15

**course** [18] -
22:16, 24:17,
35:25, 45:17,
46:25, 63:24,
72:16, 72:18,
73:6, 75:17,
79:21, 84:8,
93:14, 163:22,
164:8, 189:25,
191:22, 199:22

**court** [8] - 9:7,
10:3, 28:3,
137:18, 170:20,
189:25, 204:3,
206:22

**COURT** [14] -
1:1, 5:9, 157:7,
168:9, 182:19,
190:22, 195:14,
203:19, 208:22,
208:25, 209:2,
209:6, 209:14,
212:1

**Court** [10] -
124:20, 138:7,
138:10, 138:18,
156:8, 157:6,
168:8, 182:17,
190:20, 203:17

**covered** [1] -
41:4

**COVID** [1] -
163:22

**Cowley** [36] -
5:15, 5:24, 6:3,
29:11, 29:22,
35:23, 61:15,
66:7, 68:21, 84:5,
110:6, 114:24,
124:2, 131:2,
131:6, 132:20,
134:19, 138:1,
138:5, 138:19,
138:22, 139:1,
140:7, 140:24,
147:10, 157:12,
160:21, 162:18,
165:8, 181:22,

182:16, 183:4,
190:23, 191:6,
203:24, 208:19

**COWLEY** [13] -
1:11, 1:17, 2:8,
3:5, 5:20, 210:2,
211:4, 211:8,
211:13, 212:11,
212:16, 213:17,
215:1

**crafted** [2] -
143:5, 143:6

**create** [2] -
50:10, 56:10

**created** [1] -
81:12

**creating** [2] -
9:7, 54:14

**creation** [1] -
27:13

**Crest** [2] -
214:18, 215:19

**criteria** [4] -
31:11, 79:18,
80:21, 82:7

**critical** [3] -
102:9, 102:25,
103:3

**criticisms** [1] -
49:23

**criticize** [1] -
49:19

**criticized** [6] -
29:12, 30:4,
30:18, 30:22,
30:24, 32:1

**critique** [2] -
31:10, 50:2

**critiqued** [1] -
50:4

**cross** [3] - 3:16,
60:11, 157:16

**Cross** [6] - 56:1,
69:11, 87:16,
179:2, 189:19,
190:9

**cross-talk** [1] -
3:16

**Cross-talk** [6] -
56:1, 69:11,
87:16, 179:2,
189:19, 190:9

**crossing** [1] -
191:17

**CSR** [3] - 1:21,
212:14, 214:16

**CSR-6125** [1] -
214:16

**Cubero** [1] -
167:12

**cue** [1] - 109:16
**curious** [1] -
187:1
**current** [1] -
47:12
**Custodial** [1] -
215:9
**cut** [10] - 44:25,
115:14, 128:4,
136:18, 136:19,
139:24, 144:18,
153:1, 198:23,
198:24
**cutting** [1] - 40:3
**CV** [4] - 27:17,
28:22, 32:25,
33:9

## D

**data** [1] - 3:15
**date** [5] -
156:22, 167:23,
174:10, 203:1,
212:23
**Date** [1] - 214:17
**DATE** [1] - 210:3
**dated** [5] -
131:1, 159:21,
168:13, 203:10
**dates** [1] -
110:23
**day-to-day** [3] -
166:14, 205:17,
206:12
**days** [5] -
139:16, 139:25,
140:2, 141:9,
212:23
**deadline** [2] -
197:24, 198:2
**dealing** [1] -
135:18
**dealt** [1] - 57:2
**Dean** [38] -
16:19, 17:13,
17:14, 53:3, 54:1,
55:17, 55:19,
56:3, 56:5, 59:22,
59:24, 116:22,
117:4, 117:15,
120:2, 121:11,
121:16, 122:6,
122:16, 123:1,
125:11, 125:21,
127:8, 127:13,
127:17, 133:7,
133:10, 133:23,
135:8, 143:1,

161:16, 197:21,
201:9, 202:7,
202:13, 202:14,
202:17, 206:21
**dean** [19] -
17:11, 53:10,
54:3, 54:13,
54:20, 55:4, 56:8,
83:8, 83:9, 84:22,
85:1, 113:21,
113:24, 119:4,
120:14, 198:10,
202:2
**decade** [1] -
91:23
**December** [6] -
197:20, 197:24,
203:3, 203:11,
204:10, 205:2
**decided** [3] -
92:17, 173:21,
202:24
**decision** [4] -
119:12, 150:14,
194:22, 200:13
**dedicated** [3] -
122:3, 122:7,
122:9
**dedication** [10] -
121:4, 121:8,
122:19, 122:22,
125:10, 126:6,
127:14, 127:20,
130:18, 143:14
**deem** [1] - 47:1
**deemed** [1] -
57:21
**deeply** [1] -
126:17
**DEFENDANTS**
[2] - 2:8, 213:17
**Defendants** [2] -
1:7, 212:7
**defendants** [1] -
5:14
**defense** [1] -
12:4
**defined** [2] -
68:18, 177:3
**definition** [3] -
7:10, 45:6,
151:14
**degree** [12] -
13:9, 13:12,
13:13, 13:14,
13:17, 14:12,
14:13, 15:1, 15:8,
16:2, 28:7, 28:8
**Degree** [2] -
14:17, 15:20

**degrees** [1] -
13:7
**delay** [1] - 158:1
**delegated** [1] -
208:5
**delivered** [1] -
215:8
**Denton** [2] -
2:15, 213:24
**departed** [1] -
13:3
**Department** [2] -
104:4, 104:22
**department** [9] -
17:5, 82:16,
104:8, 104:12,
180:13, 198:10,
201:6, 201:25,
208:5
**departmental**
[1] - 112:22
**departments** [1]
- 75:12
**dependent** [10] -
37:16, 44:10,
46:11, 46:24,
69:21, 73:14,
74:4, 82:3, 106:3,
152:16
**deponent** [3] -
212:20, 212:21,
213:2
**deposed** [4] -
6:7, 6:9, 6:12,
8:14
**Deposition** [15] -
3:21, 4:10,
114:22, 115:11,
128:6, 131:4,
138:24, 140:10,
157:11, 165:6,
168:14, 182:20,
191:3, 195:18,
203:22
**deposition** [35] -
5:15, 6:1, 6:7,
8:16, 10:4, 10:11,
10:12, 10:24,
12:8, 21:20,
114:21, 115:2,
115:3, 115:4,
159:21, 161:3,
168:19, 184:7,
189:17, 190:2,
190:25, 194:9,
208:21, 209:17,
211:5, 212:17,
212:22, 213:3,
213:4, 213:9,
215:3, 215:4,

215:8, 215:10,
215:12
**DEPOSITION** [4]
- 1:10, 1:17,
212:10, 215:1
**depositions** [1]
- 8:11
**depth** [1] -
196:22
**DEPUTY** [2] -
2:14, 213:23
**Deputy** [1] - 5:16
**describe** [3] -
13:6, 16:10,
191:14
**described** [3] -
19:17, 20:3,
133:25
**describing** [1] -
26:2
**description** [1] -
211:15
**DESCRIPTION**
[1] - 3:20
**descriptive** [1] -
52:10
**designated** [1] -
80:2
**designation** [1]
- 78:17, 80:3
**despite** [1] -
41:20
**detail** [5] -
32:25, 60:19,
72:13, 93:18,
93:21
**detailed** [1] -
21:15
**details** [16] -
20:25, 32:10,
33:9, 72:1, 88:9,
91:15, 91:24,
92:6, 93:13,
110:25, 113:3,
163:21, 170:1,
197:3, 198:5,
202:5
**determination**
[1] - 154:23
**determinations**
[1] - 153:16
**determine** [11] -
36:11, 47:10,
48:12, 54:16,
55:5, 56:9, 57:1,
65:17, 68:7,
103:24, 154:17
**determined** [2] -
73:16, 155:11
**determining** [1]

- 153:22
**develop** [5] -
197:19, 198:20,
200:22, 201:10,
201:11
**development** [1]
- 88:3
**dialogue** [1] -
123:25
**Diana** [1] - 84:24
**Diego** [1] -
167:12
**differed** [1] -
60:5
**difference** [1] -
28:4
**differences** [1] -
40:14
**different** [41] -
12:20, 12:22,
22:20, 24:8, 24:9,
25:15, 30:18,
35:8, 43:5, 43:14,
46:12, 60:14,
62:6, 63:10,
72:19, 73:7,
95:22, 96:9,
96:25, 97:4,
98:22, 99:16,
107:16, 117:14,
117:15, 133:22,
133:24, 145:1,
145:2, 149:17,
163:12, 163:13,
170:8, 187:15,
198:21, 199:2,
205:11, 206:5,
206:7, 207:13
**Different** [1] -
97:4
**differently** [2] -
39:16, 185:1
**direct** [6] - 88:2,
132:16, 132:17,
136:24, 147:24,
207:1
**directed** [1] -
175:12
**direction** [2] -
46:10, 109:8
**directions** [2] -
46:11, 185:3
**directly** [13] -
15:10, 22:6,
59:23, 59:24,
60:1, 60:20,
121:22, 135:5,
192:15, 192:25,
194:16, 202:2,
208:1

**director** [2] -
84:21, 197:18
**Director** [1] -
198:7
**disabilities** [2] -
45:2
**disability** [5] -
44:17, 44:21,
44:22, 45:1,
45:12
**disagree** [3] -
62:4, 62:20,
64:23
**disagreements**
[1] - 60:25
**discipline** [11] -
25:10, 25:18,
25:19, 25:20,
30:14, 31:11,
48:16, 60:10,
62:7, 80:2,
175:25
**disciplines** [6] -
60:11, 79:22,
100:12, 121:5,
121:9, 150:3
**disclose** [1] -
19:12
**disclosed** [2] -
19:10, 21:17
**discontinued**
[1] - 33:6
**discovered** [2] -
73:7, 73:10
**discovery** [1] -
49:6
**discretion** [4] -
56:8, 74:6,
158:23, 159:1
**discrimination**
[3] - 7:17, 56:25,
57:1
**Discrimination**
[1] - 7:18
**discuss** [9] -
19:7, 20:12,
20:19, 20:25,
47:11, 199:8,
201:17, 202:4,
203:5
**Discuss** [1] -
201:18
**discussed** [25] -
10:6, 19:13,
19:21, 21:13,
26:12, 88:12,
91:19, 105:4,
116:25, 122:10,
137:11, 139:7,
141:3, 150:4,

162:1, 163:10,
168:18, 191:9,
191:11, 192:15,
201:23, 202:18,
204:20, 204:22,
205:12
**discussing** [2] -
58:23, 192:25
**discussion** [9] -
21:2, 55:13, 94:4,
191:12, 193:4,
201:16, 203:2,
203:8, 205:4
**Discussion** [1] -
29:17
**discussions** [2]
- 91:3, 205:12
**disregard** [2] -
70:9, 189:5
**disregarded** [1]
- 69:19
**disregarding** [4]
- 69:2, 69:5,
69:25, 70:5
**dissent** [1] -
49:25
**distance** [1] -
150:1
**distinct** [1] -
43:14
**Distinguished**
[8] - 78:3, 78:7,
79:16, 80:1,
80:16, 80:17,
81:8, 81:15
**distinguishes**
[1] - 31:24
**distortion** [1] -
3:16
**distributed** [1] -
180:23
**DISTRICT** [4] -
1:1, 1:1, 212:1,
212:1
**diverse** [3] -
44:13, 44:15,
44:19
**diversity** [22] -
44:3, 44:8, 44:16,
45:11, 45:14,
45:17, 49:15,
49:20, 50:7, 52:4,
52:8, 52:15,
143:15, 143:22,
144:17, 144:22,
145:8, 145:14,
146:3, 146:25
**division** [8] -
60:1, 82:6, 82:8,
82:12, 82:20,

104:13, 104:15,
166:13
**Division** [6] -
121:2, 129:5,
130:17, 166:5,
166:9, 175:2
**DIVISION** [2] -
1:2, 212:2
**divisions** [1] -
104:14
**document** [26] -
114:20, 114:23,
115:2, 115:22,
127:7, 128:4,
128:20, 139:3,
140:12, 141:5,
145:22, 163:12,
165:11, 170:20,
170:23, 178:20,
181:24, 182:4,
183:13, 184:16,
195:20, 195:23,
195:24, 196:19,
204:3, 211:15
**documents** [9] -
10:14, 44:1, 44:9,
54:22, 54:25,
114:8, 164:8,
165:12, 167:2
**dog** [1] - 144:3
**dollars** [2] -
22:1, 22:6
**done** [11] -
10:10, 100:7,
101:1, 106:13,
109:4, 113:24,
143:1, 161:18,
162:17, 202:11,
209:13
**door** [1] - 13:25
**dot** [1] - 24:23
**double** [14] -
34:19, 34:21,
35:3, 98:18, 99:2,
102:7, 102:12,
103:4, 105:3,
105:15, 105:18,
105:24, 105:25
**down** [8] -
64:22, 123:21,
124:8, 158:3,
161:1, 172:4,
200:1, 208:9
**dozen** [1] -
23:12
**Dr** [47] - 20:4,
21:16, 58:17,
62:13, 63:23,
101:11, 102:16,
111:6, 118:13,

119:19, 137:2,
154:7, 154:8,
156:3, 156:12,
156:18, 161:12,
175:9, 175:12,
175:24, 176:5,
176:15, 176:19,
176:23, 177:10,
178:6, 185:25,
186:5, 186:6,
186:14, 186:21,
186:22, 195:1,
195:2, 195:24,
198:4, 201:10,
201:16, 201:19,
202:3, 202:4,
202:15, 202:20,
204:17, 206:16
**drafted** [3] -
120:2, 144:25,
161:12
**draw** [14] -
68:14, 68:24,
125:13, 146:9,
151:3, 155:15,
172:10, 172:17,
172:19, 172:21,
175:21, 176:21,
187:16, 189:9
**drew** [2] - 172:3,
186:12
**Drive** [4] - 2:20,
214:3, 214:18,
215:19
**Dubrow** [3] -
141:20, 141:21,
142:10
**due** [1] - 3:14
**duly** [3] - 1:18,
5:21, 212:16
**During** [1] -
84:14
**during** [7] -
11:11, 19:8, 21:6,
37:24, 85:2,
199:23, 200:1
**duties** [4] -
17:24, 17:25,
85:17, 205:4
**duty** [1] - 73:22

---

**E**

---

**E-w-e-l-l** [1] -
101:12
**earned** [3] -
13:8, 15:8, 16:2
**earning** [1] -
15:19
**easier** [3] -

114:12, 134:17,
185:13
**easiest** [1] -
188:7
**EASTERN** [2] -
1:1, 212:1
**edited** [15] -
24:2, 26:13, 27:5,
27:6, 28:12,
28:18, 29:25,
31:6, 32:7, 32:17,
35:12, 35:14,
35:15, 35:20,
36:2
**editing** [1] -
36:21
**editor** [29] -
23:16, 32:19,
36:14, 37:1, 37:7,
37:13, 86:15,
88:8, 90:3, 90:4,
92:16, 93:3,
93:19, 93:23,
94:4, 104:22,
108:17, 126:25,
186:15, 187:3,
187:6, 188:5,
192:18, 202:21,
206:6, 206:15,
207:16, 207:19
**editor's** [3] -
187:25, 188:12
**editorial** [25] -
27:12, 28:16,
31:6, 32:20,
32:21, 32:24,
33:15, 34:5,
34:13, 36:22,
91:17, 97:5,
100:24, 102:3,
106:3, 106:5,
106:11, 109:13,
137:1, 170:7,
177:6, 205:4,
205:18, 205:19
**editors** [10] -
33:23, 90:10,
90:17, 92:20,
93:16, 93:17,
94:2, 187:18,
206:20, 207:21
**Education** [1] -
34:12
**educational** [1] -
13:7
**effect** [1] -
111:23
**effort** [1] -
207:19
**egregious** [5] -

175:23, 176:6,
176:10, 176:11,
176:19
**either** [6] -
105:16, 106:15,
106:16, 106:23,
108:12, 191:20
**electronic** [1] -
185:2
**elevated** [1] -
165:17
**eligible** [1] -
79:7
**Ellen** [1] -
167:12
**elsewhere** [1] -
206:6
**email** [57] -
113:14, 115:9,
115:12, 115:23,
116:3, 116:4,
116:6, 116:7,
116:13, 116:15,
116:16, 116:18,
116:20, 117:9,
118:19, 119:22,
120:20, 120:24,
123:6, 124:23,
125:6, 127:11,
128:13, 131:20,
132:14, 135:4,
137:25, 138:22,
139:5, 139:10,
139:16, 139:21,
140:7, 141:6,
141:14, 142:16,
142:20, 152:1,
162:22, 163:9,
183:24, 184:2,
184:9, 184:21,
184:22, 184:25,
196:24, 197:7,
203:10, 204:8,
204:10, 204:11,
204:14, 204:15,
204:22, 205:10
**Email** [1] - 4:1
**Email**...............
..................... [3] -
3:22, 4:3, 4:12
**emailed** [1] -
113:13
**emails** [2] -
116:10, 116:12
**emphasized** [1]
- 175:15
**emphasizing** [1]
- 175:19
**employed** [3] -
11:21, 15:21,

214:7
**employee** [8] -
7:2, 7:6, 8:3, 8:6,
43:19, 53:15,
101:7, 214:9
**employee's** [1] -
7:25
**employees** [2] -
6:25, 43:8
**encompass** [1] -
152:2
**encountered** [1]
- 8:18
**encouraging** [1]
- 51:14
**end** [6] - 95:4,
131:13, 140:18,
159:8, 160:5,
176:22
**End** [1] - 209:17
**endorse** [1] -
181:9
**endowed** [1] -
78:18
**enforce** [1] -
42:2
**engage** [5] -
50:13, 51:14,
59:6, 59:9, 60:24
**engaged** [3] -
57:11, 57:17,
57:20
**engagement** [1]
- 28:9
**engaging** [3] -
43:17, 51:23,
117:3
**Engineering** [4]
- 7:7, 16:19, 17:7,
17:9
**enjoyment** [1] -
48:3
**enlarged** [1] -
181:24
**Enlighten** [1] -
153:5
**enlighten** [1] -
70:1
**ensure** [2] -
55:6, 90:20
**enter** [1] - 17:2
**entire** [4] - 53:5,
190:2, 199:19,
199:24
**entirely** [2] -
28:15, 82:1
**entirety** [1] -
191:15
**entity** [1] -
166:20

**environment** [6]
- 50:11, 54:4,
54:14, 55:6,
56:10, 56:13
**era** [1] - 163:22
**error** [3] -
197:10, 197:12
**escaping** [2] -
85:8, 142:3
**essays** [3] -
24:8, 171:9,
173:4
**establish** [1] -
60:14
**established** [4] -
98:5, 155:2,
155:3, 155:9
**ET** [2] - 1:6,
212:6
**ethical** [8] -
36:10, 36:12,
36:13, 36:24,
37:1, 37:8, 37:14,
173:6
**Ethically** [1] -
36:7
**Ethics** [4] -
33:21, 34:3, 34:9,
88:13
**ethics** [4] -
34:15, 34:16,
126:18, 143:17
**ethnicity** [1] -
52:15
**Ethnomusicolo
gy** [3] - 121:3,
166:10, 175:3
**ethnomusicolo
gy** [1] - 47:6
**Ethnomusicolo
gy's** [1] - 130:18
**evaluate** [2] -
107:11, 152:8
**evaluated** [2] -
80:8, 80:11
**evaluation** [2] -
30:7, 31:11
**Eventually** [1] -
164:2
**eventually** [2] -
123:20, 162:24
**evidence** [34] -
69:3, 69:6, 69:8,
69:19, 69:22,
69:25, 70:5, 70:7,
70:9, 70:14, 71:7,
72:19, 73:7, 74:1,
107:13, 107:15,
151:2, 151:8,
151:11, 151:16,

152:9, 152:13,
152:20, 153:14,
153:16, 153:19,
153:21, 186:12,
188:18, 189:5,
190:7, 190:17,
190:19
**Ewell** [28] -
101:8, 101:11,
101:15, 102:9,
102:11, 102:16,
102:22, 102:25,
103:3, 104:25,
105:21, 112:6,
171:9, 171:23,
173:3, 175:12,
176:23, 177:10,
178:1, 178:6,
178:11, 180:23,
192:3, 193:2,
193:3, 193:19,
193:20
**Ewell's** [8] -
111:6, 171:10,
175:9, 175:24,
176:5, 176:15,
176:19, 192:4
**exact** [19] - 6:10,
6:20, 7:3, 7:4,
8:2, 22:23, 23:3,
24:22, 56:23,
79:13, 80:13,
109:1, 114:1,
117:1, 145:25,
165:20, 167:23,
197:3
**exactly** [1] -
117:8
**examination** [1]
- 213:6
**EXAMINATION**
[1] - 5:22
**Examination** [1]
- 3:6
**examine** [2] -
150:19, 184:11
**examined** [2] -
182:16, 196:12
**example** [28] -
20:3, 25:8, 25:24,
33:1, 34:18,
34:20, 34:25,
39:4, 40:15,
40:20, 41:18,
42:23, 42:25,
43:22, 44:12,
46:5, 46:7, 48:10,
52:11, 70:13,
71:11, 77:7,
85:17, 85:18,

90:14, 106:10,
148:24, 149:1
**examples** [6] -
42:19, 43:1, 57:3,
70:2, 70:4, 70:8
**exceeding** [1] -
118:20
**exceeds** [1] -
77:25
**excellent** [1] -
75:21
**except** [2] -
142:7, 211:6
**exception** [1] -
10:4
**exceptions** [1] -
9:11
**excerpt** [2] -
135:11, 135:23
**exchange** [2] -
192:8, 194:2
**exclude** [2] -
150:15, 152:13
**exclusively** [1] -
66:5
**exculpatory** [11]
- 69:5, 69:19,
69:25, 70:5, 70:9,
152:13, 152:19,
153:3, 153:8,
153:14, 153:19
**excuse** [13] -
7:23, 17:21,
21:21, 42:11,
56:18, 78:16,
96:18, 111:7,
138:25, 151:16,
172:24, 176:3,
185:16
**Excuse** [5] -
8:12, 29:4, 82:20,
173:23, 208:9
**executed** [2] -
102:5, 211:17
**executive** [2] -
172:18, 172:23
**Executive** [4] -
171:3, 171:6,
171:21, 173:1
**exercise** [1] -
42:20
**exercising** [1] -
86:11
**exhibit** [17] -
114:8, 114:16,
137:17, 138:3,
138:8, 138:11,
138:21, 139:1,
139:2, 143:2,
160:21, 161:1,

190:21, 195:12,
196:13, 204:3,
207:5
**Exhibit** [57] -
114:19, 114:22,
115:9, 115:11,
128:1, 128:6,
128:15, 130:25,
131:4, 137:25,
138:20, 138:21,
138:24, 140:7,
140:10, 145:23,
157:6, 157:7,
157:10, 157:11,
157:19, 161:8,
163:16, 165:4,
165:6, 168:8,
168:9, 168:10,
168:14, 170:25,
171:2, 173:14,
174:1, 181:16,
182:18, 182:19,
182:20, 183:3,
183:6, 184:2,
184:5, 184:7,
184:15, 184:20,
184:21, 190:21,
190:25, 191:3,
195:12, 195:16,
195:18, 195:22,
196:24, 203:9,
203:17, 203:20,
203:22
**exhibits** [8] -
114:4, 138:19,
162:19, 170:11,
182:24, 190:25,
203:16, 215:12
**existed** [1] -
130:24
**exists** [3] - 96:3,
108:7, 136:12
**expand** [1] -
203:23
**expect** [13] -
46:17, 46:18,
46:20, 46:21,
59:11, 73:11,
118:19, 153:13,
153:18, 169:10,
169:12, 169:18,
204:9
**expectation** [7] -
30:14, 59:6, 59:8,
68:13, 151:1,
153:15, 200:10
**expectations** [4]
- 34:14, 35:8,
43:21, 60:12
**expected** [3] -

100:10, 107:10,
152:6
**expecting** [1] -
192:10
**experience** [12] -
18:24, 36:21,
38:21, 53:21,
61:6, 61:23, 75:8,
82:15, 83:10,
90:9, 149:2,
149:4
**experiences** [3]
- 19:5, 83:11,
149:17
**Expiration** [1] -
214:17
**Expires** [3] -
211:25, 214:20,
215:21
**explain** [12] -
10:3, 10:10,
22:21, 27:6, 28:3,
34:21, 34:24,
78:6, 107:17,
113:9, 148:12,
150:24
**explained** [2] -
19:25, 42:14
**explanation** [1] -
188:15
**explicit** [6] -
53:14, 54:22,
79:18, 97:19,
107:2, 127:23
**explicitly** [2] -
53:23, 192:14
**expounding** [1]
- 46:22
**express** [12] -
39:3, 39:5, 41:14,
42:6, 49:23,
49:25, 63:2,
64:16, 90:23,
144:20, 164:10
**Express** [1] -
41:14
**expressed** [5] -
62:17, 64:23,
96:13, 170:6,
211:19
**expressing** [3] -
96:20, 97:22,
159:14
**extensive** [2] -
18:22, 24:18
**Extensively** [1] -
19:3
**extent** [2] - 30:8,
62:8
**extremely** [1] -

89:23
**eyed** [1] - 157:16

---

**F**

---

**facilities** [1] -
18:7
**fact** [11] - 56:11,
81:25, 122:21,
152:3, 172:19,
178:16, 178:23,
180:24, 184:20,
194:20
**facts** [1] - 91:15
**faculty** [96] -
16:15, 17:2, 17:5,
20:1, 38:11,
38:18, 38:25,
40:12, 40:16,
41:13, 41:20,
42:2, 42:6, 42:16,
42:20, 43:5,
43:11, 43:15,
45:25, 46:20,
46:21, 47:10,
48:11, 48:12,
49:19, 49:25,
50:4, 50:13,
51:14, 51:22,
57:20, 58:14,
59:6, 61:7, 61:12,
62:1, 62:19,
62:23, 63:15,
63:19, 63:21,
64:21, 68:10,
78:3, 78:11, 79:2,
79:3, 79:8, 79:20,
82:1, 82:14,
83:10, 83:11,
100:10, 104:4,
104:7, 110:17,
110:18, 111:1,
111:2, 111:13,
111:19, 112:14,
116:11, 116:12,
116:14, 129:24,
134:12, 135:20,
142:2, 150:2,
159:6, 166:17,
166:19, 167:21,
167:24, 174:2,
174:5, 174:7,
174:23, 175:1,
176:6, 176:18,
178:3, 178:5,
178:12, 178:18,
179:16, 179:18,
180:1, 180:7,
180:17, 180:22,
181:4, 183:5,

193:17
**Faculty** [4] -
39:3, 43:8, 49:23,
78:15
**faculty's** [1] -
177:20
**fair** [15] - 58:11,
61:17, 77:12,
77:14, 79:19,
82:17, 83:18,
84:1, 88:7,
120:19, 132:18,
132:19, 135:16,
159:14, 190:10
**fairly** [1] -
154:19
**fall** [3] - 154:21,
155:19, 166:15
**false** [1] - 167:17
**falsified** [1] -
70:7
**Falsifying** [1] -
70:13
**familiar** [7] -
33:10, 33:22,
57:2, 57:8, 85:9,
98:15, 173:11
**familiarity** [2] -
32:12, 96:2
**far** [7] - 32:11,
41:3, 77:21,
104:1, 127:12,
185:8, 204:7
**faster** [2] - 98:2,
172:6
**favor** [1] -
140:14
**Federal** [1] -
1:23
**feed** [1] - 158:1
**felicitous** [1] -
133:8
**fellow** [1] -
50:13
**felt** [4] - 42:19,
51:22, 150:15,
193:16
**few** [5] - 9:11,
83:12, 87:12,
128:20, 134:8
**fewer** [1] - 77:21
**field** [13] - 22:21,
26:4, 26:6, 28:11,
34:7, 46:12, 61:2,
81:10, 81:23,
82:2, 82:4, 92:12,
103:16
**fields** [3] -
22:21, 46:5,
60:15

**figure** [2] - 83:3,
118:9
**filed** [1] - 170:20
**filing** [1] -
160:10
**fill** [1] - 167:4
**filling** [1] - 122:9
**final** [3] - 85:19,
159:14, 159:21
**financially** [1] -
214:10
**findings** [3] -
169:21, 197:15,
205:19
**fine** [4] - 5:9,
14:9, 84:2, 93:16
**finish** [2] -
126:14, 189:17
**finished** [1] -
15:1
**fired** [8] - 62:20,
62:24, 63:5, 63:8,
63:11, 63:17,
63:23, 64:1
**Firm** [4] -
214:20, 214:20,
215:21, 215:21
**firm** [1] - 160:20
**First** [17] - 8:20,
20:14, 20:17,
37:21, 37:22,
38:6, 38:12,
38:15, 38:16,
38:24, 39:15,
40:12, 41:6,
41:21, 42:3,
42:16, 43:6
**first** [2] - 5:21,
8:16, 12:8, 16:11,
93:17, 110:10,
119:15, 132:24,
133:1, 143:8,
143:9, 158:10,
159:22, 170:5,
171:6, 172:7,
172:20, 172:22,
174:23, 175:15,
175:17, 175:18
**Five** [2] - 51:3,
51:4
**five** [5] - 16:24,
51:4, 80:14,
182:22, 208:11
**fix** [1] - 115:16
**flip** [2] - 161:8,
184:23
**flow** [1] - 38:13
**focus** [3] -
31:10, 91:9, 98:1
**focused** [4] -

33:16, 100:3,
123:6, 194:2
**focusing** [1] -
67:19
**follow** [6] -
89:19, 107:3,
107:8, 107:10,
107:14, 155:10
**followed** [6] -
106:4, 106:6,
150:20, 154:14,
171:25, 184:12
**following** [7] -
29:22, 128:1,
155:2, 184:12,
191:5, 202:5,
212:15
**follows** [3] -
5:21, 34:7, 213:9
**followup** [3] -
79:25, 87:22,
95:19
**font** [2] - 140:15,
172:13
**FOR** [11] - 1:1,
2:4, 2:8, 2:13,
2:17, 211:24,
212:1, 213:13,
213:17, 213:22,
214:1
**forbid** [3] -
89:22, 93:3, 94:6
**forbids** [1] - 93:6
**force** [11] -
86:20, 88:24,
107:2, 109:6,
117:11, 119:7,
119:11, 120:5,
127:18, 139:22,
200:20
**force's** [1] -
87:11
**forced** [1] -
185:25
**foregoing** [2] -
211:4, 211:16
**forget** [1] -
163:22
**form** [200] -
18:16, 19:23,
20:15, 20:23,
21:23, 22:5,
27:22, 28:14,
30:12, 30:20,
31:1, 35:5, 36:4,
36:8, 36:16, 37:3,
37:9, 37:15, 39:1,
39:20, 40:13,
41:8, 41:22,
42:18, 43:7,

45:21, 46:2,
46:23, 47:7,
47:17, 47:24,
48:5, 49:10,
49:16, 49:21,
50:21, 52:6,
52:15, 53:13,
54:12, 54:21,
57:13, 57:18,
58:6, 58:12,
61:10, 62:2,
62:25, 63:6,
63:12, 63:18,
64:6, 64:11,
64:25, 65:12,
65:21, 68:5,
68:12, 68:22,
69:7, 69:20, 70:6,
70:15, 72:21,
73:13, 74:3,
74:15, 74:23,
75:2, 77:19,
82:19, 86:7,
88:21, 90:5,
92:15, 94:12,
94:21, 96:11,
97:3, 97:11,
98:13, 98:21,
99:4, 99:20,
99:25, 100:9,
100:22, 100:24,
101:4, 101:25,
102:3, 102:13,
103:5, 103:10,
103:18, 103:25,
105:6, 105:17,
106:2, 106:7,
107:5, 108:5,
108:13, 108:19,
109:10, 109:17,
110:11, 111:15,
111:24, 113:25,
116:9, 117:22,
119:3, 119:18,
119:25, 120:13,
120:22, 121:15,
121:20, 121:25,
122:25, 125:12,
126:9, 126:24,
127:4, 127:16,
127:22, 129:11,
129:18, 133:17,
133:21, 135:13,
137:21, 139:20,
145:24, 146:8,
146:14, 146:23,
147:6, 147:22,
148:9, 149:6,
149:23, 151:9,
151:18, 152:4,
152:14, 152:22,

153:9, 153:20,
154:16, 155:11,
156:16, 159:4,
159:16, 161:11,
162:2, 168:6,
169:4, 169:11,
170:15, 172:2,
172:15, 176:7,
177:12, 177:19,
178:17, 179:7,
179:12, 179:14,
179:25, 180:6,
180:14, 181:17,
182:11, 186:3,
186:17, 186:24,
187:4, 187:12,
188:23, 193:15,
193:22, 193:25,
194:15, 194:23,
196:14, 197:1,
197:11, 198:18,
199:4, 200:16,
201:24, 202:9,
202:19, 203:7,
205:9, 206:13,
207:10, 207:17
    **Form** [1] - 109:3
    **formal** [7] -
116:23, 118:10,
120:7, 125:3,
125:11, 126:23,
137:8
    **format** [1] -
185:4
    **formation** [5] -
119:6, 119:7,
142:14, 142:18,
153:23
    **formatted** [1] -
185:1
    **formed** [4] -
65:8, 65:15,
207:8, 207:15
    **former** [1] -
104:12
    **forming** [1] -
117:11
    **forms** [4] -
22:24, 23:8, 97:4,
98:22
    **forth** [5] - 44:18,
139:19, 151:15,
152:1, 198:4
    **forthcoming** [1]
- 175:8
    **forums** [1] - 42:7
    **forward** [5] -
73:18, 155:11,
162:19, 205:5,
208:5

    **foster** [1] - 49:6
    **fostering** [1] -
51:13
    **four** [5] - 21:19,
23:17, 27:5, 27:6,
125:19
    **frame** [1] - 77:20
    **Frank** [3] -
104:4, 108:3,
108:23
    **FRCP** [1] -
212:19
    **free** [11] - 14:3,
39:3, 39:16, 40:7,
42:5, 42:20,
49:23, 50:13,
51:14, 64:16,
108:9
    **freedom** [45] -
38:19, 40:15,
41:5, 41:14, 43:4,
43:20, 48:2, 48:4,
48:9, 48:12,
49:13, 126:18,
136:6, 136:15,
136:22, 137:6,
143:13, 143:14,
144:15, 144:16,
144:21, 145:15,
145:16, 146:3,
146:6, 146:12,
146:18, 146:21,
146:24, 147:3,
147:9, 147:13,
147:17, 147:20,
148:6, 148:14,
148:19, 148:23,
159:3, 159:24,
160:15, 161:22,
162:14, 173:10
    **freely** [1] - 43:5
    **freestanding** [1]
- 12:24
    **froze** [2] -
131:12, 163:2
    **frozen** [3] - 29:2,
29:3, 131:9
    **fulfill** [2] - 43:16,
48:10
    **full** [4] - 16:16,
31:3, 133:11,
133:15
    **fully** [1] - 180:8
    **funding** [2] -
12:1, 12:3
    **funds** [1] - 81:5
    **FURTHER** [1] -
215:1
    **future** [1] - 46:10

# G

    **Gain** [1] - 64:5
    **gathered** [1] -
68:25
    **gender** [2] -
44:18, 45:12
    **general** [13] -
40:22, 60:9,
67:18, 69:17,
71:2, 77:2, 87:23,
88:9, 110:22,
167:5, 191:25,
193:10, 205:6
    **General** [2] -
5:13, 5:17
    **GENERAL** [4] -
2:10, 2:14,
213:19, 213:23
    **General's** [1] -
5:14
    **generally** [10] -
6:19, 28:8, 42:9,
49:4, 60:7, 71:20,
77:24, 82:22,
150:16, 154:19
    **Generally** [5] -
41:13, 42:10,
72:11, 82:14,
116:10
    **generic** [1] -
131:19
    **genuinely** [1] -
86:3
    **Given** [3] -
137:12, 165:1,
211:21
    **given** [6] -
48:12, 74:9,
74:13, 107:19,
205:18, 212:18
    **glad** [2] -
137:16, 147:12
    **global** [1] -
75:21
    **goal** [1] - 50:10
    **govern** [1] -
43:10
    **governance** [1] -
49:24
    **governs** [2] -
71:21, 72:11
    **graduate** [10] -
49:5, 64:4, 64:10,
71:14, 135:2,
135:5, 173:16,
175:4, 185:23,
186:14
    **graduated** [1] -

13:8
    **graduation** [1] -
15:12
    **Graf** [1] - 167:19
    **granted** [1] -
43:6
    **grievance** [3] -
38:13, 159:19,
160:11
    **grievances** [2] -
38:11, 38:18
    **grieve** [1] -
161:14
    **Group** [1] - 2:24
    **groups** [1] -
170:8
    **grow** [1] - 48:17
    **guess** [9] - 12:8,
31:17, 72:7,
77:11, 99:9,
117:14, 118:20,
167:1, 197:9
    **guidelines** [3] -
94:9, 94:16,
94:18
    **guys** [1] - 209:7

# H

    **half** [2] - 11:7,
23:12
    **hallmark** [1] -
74:17
    **hand** [2] - 128:3,
211:21
    **handful** [1] -
104:10
    **handle** [2] -
25:16, 94:4
    **handled** [4] -
20:2, 90:20,
93:19, 205:5
    **hands** [1] -
134:21
    **happy** [2] -
102:11, 111:9
    **harm** [9] - 146:3,
146:12, 146:21,
147:3, 147:13,
147:20, 148:6,
148:14, 148:19
    **harmed** [1] -
146:6
    **harms** [3] -
147:10, 147:17,
148:23
    **head** [6] - 70:10,
80:22, 84:25,
85:6, 149:3,

149:7
    **Head** [3] - 16:18,
17:12, 129:5
    **headline** [1] -
171:20
    **hear** [7] - 14:20,
29:15, 39:23,
131:13, 157:22,
163:1, 206:14
    **heard** [11] -
5:25, 8:16, 50:17,
58:9, 95:2, 95:5,
96:17, 96:19,
105:7, 144:2,
144:5
    **heart** [1] - 136:3
    **heft** [1] - 75:15
    **Heidlberger** [3] -
104:4, 108:3,
108:23
    **held** [1] - 91:13
    **help** [1] - 188:6
    **helped** [1] -
115:6
    **helping** [2] -
48:17, 50:11
    **helps** [1] - 82:18
    **Hence** [1] -
155:10
    **hereby** [2] -
211:5, 212:15
    **hereto** [1] - 1:25
    **hiding** [1] -
204:1
    **high** [3] - 28:7,
28:8, 76:4
    **higher** [2] - 77:1,
77:17
    **highest** [4] -
59:4, 59:12,
126:17, 143:16
    **highly** [4] -
46:11, 76:3,
76:13, 76:18
    **Hill** [2] - 2:6,
213:15
    **himself** [2] -
137:2, 154:7
    **hire** [1] - 18:19
    **hired** [1] - 43:23
    **hiring** [1] - 19:11
    **Hispanic** [2] -
52:12, 52:13
    **history** [2] -
25:24, 47:6
    **History** [1] -
130:18, 166:9,
175:2
    **Hoc** [28] - 4:7,
4:9, 10:12, 10:17,

137:10, 142:6,
156:20, 163:25,
164:3, 164:9,
168:11, 168:17,
170:12, 171:2,
173:14, 173:21,
179:24, 182:9,
183:4, 184:5,
184:20, 185:16,
198:8, 198:13,
199:12, 200:15,
201:14, 202:7
**hoc** [66] - 65:8,
65:16, 66:4, 67:5,
67:8, 68:7, 71:8,
72:17, 72:25,
74:14, 74:19,
74:20, 86:20,
87:10, 88:19,
88:23, 89:7,
93:12, 93:15,
98:6, 103:9,
103:22, 105:16,
106:19, 107:2,
117:11, 119:6,
119:7, 120:4,
120:9, 126:10,
127:9, 127:18,
139:10, 139:13,
139:22, 142:8,
143:21, 150:11,
152:2, 153:13,
154:22, 155:1,
155:11, 155:13,
155:17, 155:22,
155:25, 162:21,
164:5, 169:9,
173:23, 173:24,
179:17, 180:4,
186:9, 186:20,
188:21, 189:3,
191:10, 196:3,
196:13, 197:6,
198:17, 200:5,
200:19
**hold** [2] - 60:5,
78:21
**Hold** [1] - 29:16
**holistic** [1] -
162:8
**hominem** [4] -
171:8, 171:23,
172:9, 173:3
**hope** [2] -
141:22, 188:9
**hour** [6] - 11:7,
52:22, 83:17,
83:20, 83:23
**hours** [1] - 91:22
**HOURS:00** [3] -

213:10, 213:11,
213:11
**HOURS:38** [1] -
213:10
**housing** [1] -
206:5

# I

**IA** [1] - 95:3
**ice** [1] - 206:23
**idea** [4] - 48:1,
122:14, 145:21,
180:1
**ideas** [2] - 27:10,
27:11
**identical** [1] -
167:6
**identified** [3] -
58:2, 88:25,
161:9
**identify** [5] -
6:16, 57:15,
141:19, 147:16,
160:10
**identity** [1] -
211:15
**ignore** [6] -
151:7, 152:19,
153:3, 153:8,
153:14, 153:19
**ignoring** [1] -
151:16
**illness** [1] - 9:1
**immediate** [1] -
81:23
**immediately** [1]
- 14:22
**impact** [1] -
81:13
**impair** [1] - 9:2
**implement** [1] -
201:10
**implemented** [1]
- 202:12, 204:25
**implying** [1] -
163:8
**important** [3] -
42:16, 75:8,
152:12
**imposed** [4] -
89:3, 89:8, 89:13,
99:18
**impossible** [1] -
189:17
**impression** [1] -
179:22
**improper** [1] -
118:25

**improve** [1] -
98:9
**improved** [2] -
156:11, 156:13
**IN** [1] - 211:24
**inasmuch** [1] -
91:25
**inaudible** [3] -
132:20, 136:16,
144:16
**Inaudible** [1] -
124:1
**inaudible)** [4] -
69:10, 119:20,
162:25, 198:22
**INC** [2] - 214:17,
215:18
**incident** [6] -
57:1, 57:6, 189:6,
191:6, 191:9,
194:21
**incidentally** [1] -
104:11
**Incidentally** [2] -
59:22, 191:7
**incidents** [2] -
56:20, 57:8
**include** [5] -
26:20, 27:11,
197:6, 197:7,
206:5
**included** [8] -
17:25, 52:17,
52:19, 144:23,
145:22, 169:13,
170:16, 171:9
**includes** [1] -
175:11
**Including** [2] -
63:4, 64:18
**including** [5] -
16:18, 26:14,
47:5, 132:3,
150:10
**inclusion** [22] -
44:3, 44:4, 44:8,
49:15, 50:3, 50:8,
50:19, 51:6,
51:12, 52:4, 52:8,
143:15, 143:22,
144:17, 144:22,
145:9, 145:14,
147:1, 148:6,
148:14, 148:20,
148:23
**inconsistent** [4]
- 143:22, 145:8,
145:14, 146:25,
167:8, 180:4
**incorporating**

[1] - 111:13
**incredibly** [1] -
190:1
**indented** [1] -
134:22
**independent** [1]
- 117:5
**independently**
[1] - 117:19
**indicate** [1] -
47:19
**indicated** [1] -
202:24
**indicates** [1] -
155:13
**indicating** [1] -
171:24
**indifferent** [1] -
68:11
**individual** [16] -
12:2, 43:12,
46:12, 48:11,
54:17, 54:18,
61:4, 61:5, 63:7,
64:15, 64:16,
70:17, 85:10,
137:3, 141:19,
174:11
**individually** [1] -
175:6
**individuals** [4] -
52:10, 53:23,
129:15, 145:2
**inevitable** [1] -
157:14
**influence** [1] -
153:17
**inform** [5] -
103:22, 106:20,
108:11, 132:21,
158:10
**information** [18]
- 28:19, 33:15,
36:18, 36:20,
37:4, 47:18,
47:22, 47:25,
68:25, 95:11,
105:19, 132:21,
136:2, 152:6,
152:8, 153:8,
169:23, 180:1
**informed** [3] -
127:8, 163:23,
207:24
**infrastructure**
- 18:5
**infringement** [1]
- 20:13
**inherently** [1] -
35:13, 35:19,

36:2
**inquiry** [3] -
142:21, 152:10,
152:12
**insignificant** [1]
- 172:16
**insisting** [1] -
190:6
**instance** [3] -
1:17, 64:13,
109:23
**instead** [4] -
54:11, 67:23,
95:3, 124:16
**institution** [9] -
22:7, 22:13,
22:15, 23:19,
43:15, 52:12,
76:20, 100:3,
130:11
**instruct** [1] -
9:13
**instructed** [3] -
67:11, 138:17,
187:10
**instructing** [3] -
67:16, 68:3, 68:9
**instructions** [1]
- 8:19
**instructor** [1] -
41:1
**instrument** [1] -
211:17
**insulting** [1] -
64:18
**intellectual** [1] -
45:17
**intended** [1] -
117:9
**intent** [6] -
123:2, 123:4,
125:13, 145:3,
178:19, 178:22
**intention** [3] -
51:9, 67:18,
201:3
**intentions** [1] -
125:21
**interchangeabl**
**y** [1] - 104:17
**Interdisciplinar**
**y** [2] - 13:17,
15:25
**interest** [11] -
90:2, 90:16,
90:21, 90:24,
91:19, 92:2,
92:22, 93:10,
108:17, 108:22,
132:17

**interested** [3] -
119:22, 204:23,
214:11
**interpret** [2] -
39:13, 39:15
**interpreted** [1] -
39:7
**interrupt** [3] -
9:17, 40:7, 144:6
**interrupting** [1] -
144:6
**interview** [5] -
19:8, 21:7, 21:9,
21:12, 153:10
**interviewed** [3] -
87:20, 152:6,
169:13
**interviews** [3] -
18:22, 19:4,
151:2
**introduced** [4] -
114:18, 161:1,
184:6, 204:3
**introducing** [2] -
114:4, 114:19
**introductory** [1]
- 12:7
**investigate** [8] -
67:6, 73:3,
106:19, 117:5,
117:20, 122:23,
180:7, 189:4
**investigated** [13]
- 56:25, 57:7,
65:7, 88:20, 96:5,
97:14, 97:17,
98:3, 98:4,
105:11, 109:1,
109:19, 117:9
**investigating**
[16] - 65:10,
72:20, 122:18,
127:10, 154:1,
154:10, 154:11,
158:4, 158:11,
158:16, 158:18,
158:20, 162:5,
162:6, 168:22,
168:23
**investigation**
[74] - 67:16, 68:2,
68:4, 68:10,
68:20, 68:23,
70:20, 71:1,
72:16, 72:19,
73:6, 74:12,
74:18, 89:6,
96:10, 97:23,
103:9, 103:22,
116:23, 118:3,

118:10, 118:11, 119:1, 120:3, 120:8, 120:9, 120:17, 123:9, 125:4, 125:8, 125:11, 125:16, 126:3, 126:7, 126:23, 127:6, 127:15, 127:21, 133:12, 133:16, 133:19, 134:2, 134:4, 136:14, 136:21, 136:24, 136:25, 137:5, 137:8, 139:17, 143:21, 149:22, 151:14, 152:18, 152:24, 153:4, 153:7, 154:14, 155:2, 159:9, 161:16, 161:18, 161:24, 162:3, 162:8, 162:10, 162:13, 169:9, 169:17, 171:15, 180:5, 188:15, 195:8

**investigations** [2] - 69:16, 69:18
**investigatory** [2] - 70:12, 188:20
**investing** [1] - 72:17
**investment** [1] - 18:4
**invitation** [2] - 199:1, 199:2
**invitations** [1] - 141:11
**invited** [8] - 94:10, 169:3, 198:6, 198:13, 198:17, 198:19, 200:21
**inviting** [2] - 139:13, 183:24
**involve** [1] - 85:16
**involved** [9] - 21:9, 27:14, 117:25, 150:13, 150:14, 154:5, 205:17, 206:12, 208:1
**involvement** [2] - 82:24, 87:21
**involving** [1] - 19:25
**irrelevant** [2] - 149:12, 149:21

**irresponsible** [3] - 49:12, 49:19, 50:2
**Ishiyama** [4] - 138:1, 138:22, 139:11, 141:10
**issuance** [1] - 202:5
**issue** [11] - 47:19, 56:11, 62:3, 90:2, 91:18, 100:25, 136:4, 159:18, 161:21, 175:8, 197:5
**issued** [9] - 10:17, 110:15, 141:11, 141:13, 142:17, 142:19, 196:17, 199:21, 208:4
**issues** [3] - 62:6, 81:22, 154:24
**issuing** [1] - 141:7
**items** [1] - 88:25
**itself** [7] - 60:5, 84:19, 103:23, 106:8, 106:9, 161:21, 164:9

## J

**JACKS_067377** [2] - 4:6, 165:5
**JACKS_067401** [1] - 4:6
**JACKSON** [2] - 1:3, 212:3
**Jackson** [55] - 5:11, 5:25, 20:13, 20:21, 21:16, 57:6, 62:11, 62:13, 62:24, 63:17, 63:23, 64:5, 65:4, 69:4, 81:15, 137:2, 154:2, 154:7, 154:8, 155:25, 156:3, 156:12, 156:18, 157:1, 157:20, 159:19, 160:11, 161:10, 161:12, 163:23, 164:2, 167:11, 169:2, 178:6, 179:13, 186:6, 186:14, 186:22, 192:6, 193:20, 195:2, 195:24, 197:17, 198:1,

198:6, 198:13, 199:10, 201:10, 201:16, 201:19, 202:20, 203:10, 204:17, 205:1, 206:2
**Jackson's** [13] - 20:4, 58:17, 105:22, 136:5, 137:5, 159:2, 185:25, 186:5, 186:21, 191:11, 195:1, 200:4, 200:14
**JACKSON 000208** [1] - 4:8
**JACKSON 000233** [1] - 4:8
**JACKSON 000261** [1] - 4:5
**JACKSON 000263** [1] - 4:5
**JACKSON 000271** [1] - 4:11
**JACKSON 000272** [1] - 4:13
**January** [1] - 203:4
**Jason** [1] - 2:24
**Jennifer** [7] - 5:15, 6:3, 131:2, 138:1, 138:22, 140:7, 160:20
**JENNIFER** [13] - 1:11, 1:17, 2:8, 3:5, 5:20, 210:2, 211:4, 211:8, 211:13, 212:11, 212:16, 213:17, 215:1
**Jennifer.Cowley@UNT.edu** [1] - 116:3
**Jim** [1] - 143:6
**job** [15] - 16:11, 18:8, 18:22, 42:1, 53:25, 186:1, 186:6, 186:16, 186:22, 187:2, 187:18, 187:25, 188:12, 192:17
**John** [14] - 53:2, 53:3, 115:10, 129:5, 130:3, 131:2, 133:10, 138:1, 138:22, 139:16, 139:25, 140:2, 141:10, 197:21
**join** [1] - 119:14

**Journal** [80] - 21:13, 21:16, 33:1, 33:3, 33:25, 58:16, 58:19, 63:20, 65:6, 65:15, 67:6, 67:9, 73:4, 73:15, 85:19, 86:3, 86:16, 87:8, 89:6, 89:14, 91:7, 91:8, 95:2, 95:6, 95:21, 95:23, 96:8, 97:1, 97:17, 97:20, 98:3, 98:4, 98:7, 98:9, 98:20, 99:5, 100:6, 101:9, 102:10, 102:23, 103:1, 103:12, 105:23, 106:19, 107:7, 107:11, 109:5, 109:20, 110:9, 117:6, 118:16, 120:16, 122:18, 123:10, 125:5, 125:8, 125:17, 126:3, 126:7, 127:21, 132:4, 132:8, 139:17, 150:21, 154:4, 154:25, 156:10, 158:12, 159:10, 159:12, 164:10, 164:12, 168:12, 168:22, 171:11, 174:2, 175:5, 184:13, 205:24, 206:18
**journal** [130] - 20:2, 20:20, 21:14, 22:24, 23:1, 23:4, 23:7, 25:3, 26:12, 26:22, 27:3, 27:18, 28:10, 30:5, 30:25, 31:7, 31:13, 31:20, 32:17, 34:6, 35:12, 35:14, 35:16, 35:18, 35:20, 35:22, 36:3, 36:6, 36:9, 36:11, 36:15, 37:2, 37:8, 57:25, 58:10, 58:17, 66:1, 66:5, 66:15, 66:18, 67:20, 85:20, 86:13, 86:15, 86:25, 87:15, 87:17, 88:4, 88:9, 89:13, 90:3, 90:10,

90:17, 91:6, 91:16, 92:9, 92:11, 92:13, 92:19, 93:3, 93:20, 93:23, 94:9, 94:17, 95:8, 96:4, 96:13, 96:15, 96:18, 97:14, 99:9, 100:14, 100:18, 101:17, 102:6, 102:15, 103:1, 106:14, 108:4, 108:7, 108:25, 111:3, 111:22, 112:19, 117:20, 117:25, 118:3, 118:5, 118:7, 119:8, 122:23, 126:25, 137:2, 149:11, 149:12, 150:4, 154:6, 154:8, 154:10, 156:13, 158:4, 158:19, 158:21, 161:21, 161:24, 162:3, 162:6, 162:8, 172:1, 185:9, 185:16, 185:24, 186:15, 187:3, 187:6, 191:11, 191:21, 202:22, 205:18, 206:5, 206:6, 206:12, 206:15, 206:22, 207:2, 207:8, 207:12, 207:20
**journal's** [5] - 66:14, 73:9, 88:11, 91:14, 170:6
**journalist** [1] - 20:10
**journals** [36] - 23:5, 25:24, 25:25, 28:5, 31:12, 32:24, 33:16, 33:24, 34:13, 36:22, 36:23, 42:9, 85:21, 85:24, 86:12, 87:23, 88:1, 89:3, 90:22, 92:11, 92:20, 92:23, 94:7, 97:4, 98:11, 98:14, 98:23, 99:17, 103:13, 103:16, 103:23, 104:2, 149:18,

154:20
**joy** [1] - 52:1
**JSS** [4] - 89:14, 205:20, 205:23, 206:3
**JULIA** [2] - 214:17, 215:18
**JulieTXCSR@gmail.com** [2] - 214:19, 215:20
**July** [7] - 115:10, 116:21, 120:21, 120:25, 131:1, 159:21, 160:19
**jumbled** [1] - 151:21
**jury** [1] - 34:23

## K

**keep** [3] - 131:16, 190:14, 190:24
**keeping** [1] - 206:15
**key** [2] - 117:24, 151:8
**kind** [7] - 12:7, 60:19, 155:13, 185:18, 185:19, 201:22, 207:20
**kinds** [5] - 51:25, 91:15, 93:9, 112:20, 185:3
**knowing** [1] - 96:3
**knowledge** [39] - 11:24, 28:17, 29:24, 30:23, 48:18, 53:17, 60:13, 64:7, 81:18, 81:19, 89:2, 89:10, 89:16, 94:6, 98:23, 100:17, 101:20, 102:6, 104:21, 108:6, 108:8, 108:10, 109:25, 112:23, 112:24, 121:16, 132:7, 132:10, 136:13, 136:20, 137:4, 150:3, 177:25, 179:21, 180:20, 199:16, 199:17, 200:17, 207:11
**knowledgeable** [1] - 149:18

known [6] -
35:1, 76:6, 76:7,
76:12, 100:21,
211:13
knows [1] -
34:22

## L

label [2] - 87:23,
89:4
lack [2] - 80:25,
177:2
language [2] -
128:12, 206:10
large [3] - 139:8,
181:23, 181:25
largely [2] -
82:3, 195:4
larger [2] -
172:12, 203:13
last [7] - 6:3,
11:14, 16:2,
167:25, 187:22,
207:5, 207:6
launch [2] -
49:5, 119:15
launching [1] -
119:12
LAURA [2] - 1:6,
212:6
Laura [3] -
131:1, 131:21,
132:4
law [23] - 25:14,
25:24, 28:1, 28:4,
28:6, 28:8, 28:12,
28:16, 28:17,
28:20, 29:23,
29:24, 30:2, 30:5,
31:16, 31:20,
32:1, 32:3, 32:7,
32:9, 32:12,
32:14, 160:20
Law [2] - 3:25,
160:20
LAW [2] - 2:5,
213:14
lawfirm.com [2]
- 2:7, 213:16
lawsuit [5] -
7:13, 12:4, 13:3,
19:7, 37:22
lawsuits [1] -
38:8
layers [1] -
87:12
lead [1] - 82:16
leader [1] -

54:16
leaders [1] -
129:7
leadership [8] -
54:4, 56:7, 59:2,
69:16, 82:14,
83:11, 98:18,
180:18
leads [1] -
122:23
learned [2] -
111:20, 179:23
learning [5] -
46:25, 47:2,
48:16, 49:4,
111:18
least [5] - 29:24,
77:15, 90:10,
128:2, 192:17
leave [1] - 118:7
Leave [1] - 89:13
lecture [1] -
175:9
led [1] - 118:15
left [7] - 12:12,
12:15, 12:17,
13:2, 16:22,
81:19, 142:11
Legal [1] - 5:18
legal [9] - 2:24,
6:13, 6:14, 7:10,
10:6, 10:25, 11:1,
19:10, 41:10
LEGAL [2] -
2:19, 214:2
length [2] -
150:1, 165:1
lengthy [1] -
92:4
Lesa [1] - 131:2
less [6] - 28:25,
67:22, 69:14,
83:7, 116:22,
203:1
letter [60] -
26:21, 58:13,
66:9, 66:20,
110:15, 110:24,
111:1, 111:2,
111:9, 111:13,
111:14, 111:19,
113:2, 113:4,
113:21, 113:22,
131:1, 131:5,
131:7, 131:8,
131:12, 131:15,
132:21, 133:7,
133:23, 134:10,
134:11, 135:3,
135:19, 136:4,

136:11, 136:12,
156:25, 157:2,
157:10, 157:19,
157:20, 159:20,
160:7, 160:14,
160:17, 160:19,
160:25, 161:10,
161:13, 161:15,
169:6, 174:11,
174:14, 174:16,
175:4, 181:10,
195:17, 196:6,
196:9, 196:15,
196:17, 198:9
Letter...............
........ [1] - 3:25
Letter...............
.......... [2] - 4:4,
4:11
letters [9] - 25:9,
58:14, 110:17,
110:19, 113:5,
113:8, 113:11,
134:12
level [8] - 72:12,
82:5, 82:11,
82:15, 93:21,
94:13, 196:22,
205:6
Levi [18] - 4:10,
185:21, 185:22,
186:14, 186:21,
187:9, 188:19,
188:24, 189:2,
189:5, 189:9,
191:1, 191:5,
192:19, 193:13,
193:19, 194:13,
194:20
libraries [7] -
59:20, 60:21,
84:15, 84:22,
84:25, 85:1
library [1] -
84:16
lie [11] - 36:14,
37:2, 70:22,
70:23, 71:1, 71:5,
71:14, 72:3, 72:4,
72:13, 179:10
lied [4] - 189:5,
192:22, 193:14,
194:7
lies [3] - 37:7,
37:13, 72:1
life [1] - 185:13
lifelong [1] -
177:23
lightly [1] -
191:21

Likewise [1] -
115:20
likewise [2] -
97:22, 126:16
limit [3] - 74:12,
74:18, 78:20
limitations [4] -
40:11, 42:1,
42:12, 42:15
limited [4] -
41:16, 41:20,
79:19, 201:25
Line [2] - 194:6,
194:9
line [8] - 108:8,
115:25, 121:6,
121:7, 141:15,
143:8, 143:9,
171:6
LINE [1] - 210:4
lines [1] - 116:7
link [2] - 111:17,
182:17
linked [1] -
181:15
list [1] - 170:9
listen [1] - 61:16
lists [1] - 167:11
Literature [5] -
33:2, 33:4, 33:25,
91:7, 91:9
litigation [3] -
19:18, 21:1,
21:17
live [1] - 112:21
LLC [3] - 2:5,
160:20, 213:14
located [1] -
79:23
location [1] -
142:19
Look [1] - 172:6
look [19] - 6:21,
27:17, 28:22,
32:25, 66:19,
67:17, 79:18,
103:12, 103:13,
111:11, 145:6,
158:24, 159:1,
159:5, 160:17,
167:7, 207:15
looked [3] -
86:21, 159:20,
162:23
Looking [1] -
197:13
looking [5] -
46:25, 76:21,
82:15, 93:24,
186:11

looks [5] - 29:3,
167:5, 182:12,
199:5, 205:10
loosely [1] -
24:3
lost [1] - 29:13
love [1] - 75:19
low [1] - 31:14
lunch [2] - 84:6,
137:15
lvg.dallas@
gmail.com [1] -
2:25
lying [11] -
70:12, 70:20,
71:3, 151:8,
151:17, 152:3,
180:9, 188:19,
189:12, 194:14,
194:21

## M

m.allen@allen
[2] - 2:7, 213:16
m.allen@allen-
lawfirm.com [2] -
2:7, 213:16
ma'am [1] -
195:15
machine [1] -
1:22
Madam [8] -
50:15, 124:20,
156:8, 157:6,
168:7, 182:18,
190:20, 203:17
magazine [2] -
26:20, 77:7
magazines [2] -
25:5, 25:8
magnitude [2] -
23:6, 79:5
mail [3] - 113:10,
113:11, 113:12
main [1] - 82:18
mainstream [1] -
28:5
maintain [1] -
80:12
maintained [3] -
58:24, 101:17,
167:3
managed [1] -
93:7
management [1]
- 93:9
managing [1] -
47:5

manner [3] -
65:20, 66:2,
124:9
mark [14] -
115:8, 128:1,
137:24, 138:20,
140:6, 157:4,
157:9, 165:3,
168:7, 168:10,
182:17, 195:11,
203:9
marked [14] -
114:22, 115:11,
128:6, 131:4,
138:24, 140:10,
157:11, 165:6,
168:14, 182:20,
184:21, 191:3,
195:18, 203:22
Marking [1] -
195:16
marking [4] -
130:25, 138:21,
190:25, 203:20
Mary [10] - 2:9,
5:12, 11:1, 83:15,
123:15, 189:16,
208:8, 213:5,
213:10, 213:18
mary.quimby@
oag.texas.gov [1]
- 2:12, 213:21
Master's [6] -
13:11, 13:13,
13:17, 14:17,
14:22, 15:24
material [5] -
71:15, 71:17,
72:4, 175:23,
176:11
materials [3] -
34:5, 68:24,
129:25
matter [21] -
5:15, 6:5, 6:12,
6:13, 6:14, 6:19,
19:25, 20:8, 57:2,
68:14, 107:23,
108:1, 109:6,
109:14, 116:12,
119:7, 155:12,
155:19, 159:9,
194:13, 201:5
matters [6] -
19:10, 19:15,
47:12, 117:8,
166:15, 202:4
mean [39] - 7:15,
11:1, 13:7, 18:3,
23:22, 25:6,

25:14, 34:22,
39:10, 44:1, 44:3,
44:16, 44:21,
50:9, 51:19,
56:14, 75:23,
80:23, 83:3,
84:18, 86:10,
86:25, 87:10,
88:8, 97:12,
106:25, 113:6,
114:14, 133:1,
144:6, 153:18,
156:14, 183:20,
184:5, 185:16,
188:14, 199:22,
202:10
 **meaning** [9] -
79:9, 83:2, 94:16,
151:5, 160:11,
166:5, 172:14,
184:10, 192:6
 **Meaning** [1] -
201:7
 **meaningfully** [2]
- 175:24, 176:14
 **means** [4] -
34:23, 34:24,
50:19, 175:19
 **meant** [7] - 44:8,
51:6, 145:5,
150:1, 150:24,
152:1, 196:11
 **measured** [1] -
81:9
 **Media** [1] -
142:22
 **media** [2] -
43:13, 113:16
 **medications** [2]
- 8:24, 8:25
 **meet** [3] - 11:5,
60:9, 173:6
 **Meeting** [1] -
175:10
 **meeting** [13] -
91:13, 91:21,
119:15, 141:7,
163:20, 191:14,
196:18, 198:1,
204:16, 204:19,
205:1, 205:8,
206:9
 **member** [26] -
16:15, 20:1,
34:13, 40:16,
43:11, 43:15,
48:11, 48:12,
49:19, 50:5,
64:21, 82:1,
83:11, 90:23,

91:17, 92:23,
94:1, 104:4,
104:7, 116:11,
116:14, 129:24,
141:23, 142:2,
159:6, 180:22
 **members** [30] -
34:6, 43:8, 51:22,
90:18, 91:1,
91:13, 92:8,
92:10, 100:10,
112:14, 117:24,
119:14, 141:6,
141:12, 141:14,
149:8, 149:10,
149:15, 149:25,
150:2, 150:18,
163:9, 175:1,
178:18, 179:19,
180:2, 180:7,
181:4, 183:25
 **membership** [1]
- 139:13
 **memory** [5] -
9:2, 11:16, 33:21,
112:3, 135:23
 **mental** [2] - 9:2,
45:2
 **mentioned** [14] -
8:9, 13:19, 41:18,
45:11, 45:16,
46:13, 51:12,
71:17, 76:15,
86:2, 87:13,
156:2, 201:20,
202:20
 **merit** [1] - 80:4
 **merry** [1] - 100:5
 **message** [3] -
118:14, 120:2,
122:17
 **met** [3] - 10:8,
104:10, 163:19
 **method** [1] -
1:22
 **methods** [2] -
56:9, 171:25
 **metric** [1] -
80:25
 **MHTE** [1] - 63:15
 **Michael** [7] - 2:5,
5:10, 20:10,
213:10, 213:14,
215:9
 **middle** [2] -
142:16, 144:18
 **might** [15] -
26:24, 42:23,
43:20, 47:12,
99:2, 99:8,

116:16, 143:21,
144:3, 145:10,
146:3, 162:13,
202:21, 205:5,
207:6
 **mind** [4] - 26:24,
92:24, 185:19,
201:2
 **mindful** [1] -
83:22
 **minorities** [9] -
146:13, 146:22,
147:3, 147:10,
147:13, 147:17,
147:21, 148:7,
148:15
 **minority** [1] -
146:6
 **minute** [3] -
117:13, 163:3,
182:22
 **MINUTES** [4] -
213:10, 213:10,
213:11, 213:11
 **mischaracteriz
ation** [2] - 159:8,
159:11
 **mischaracteriz
e** [1] - 104:19
 **misinformation**
[1] - 159:8
 **mismanaged** [1]
- 168:4
 **mismanageme
nt** [1] - 205:19
 **mismarked** [1] -
138:9
 **missing** [1] -
40:5
 **mission** [12] -
43:16, 48:10,
48:21, 48:22,
48:23, 48:25,
49:2, 49:7,
122:10, 122:11,
122:13, 189:4
 **missions** [1] -
48:19
 **Mississippi** [2] -
27:4, 31:6
 **misstating** [1] -
95:18
 **mixed** [1] -
203:16
 **moment** [6] -
43:2, 70:11, 85:8,
111:8, 174:21,
181:21
 **monitoring** [2] -
87:25, 88:3

 **monograph** [6] -
23:19, 23:22,
24:3, 24:14,
24:15, 24:16
 **monographs** [1]
- 23:25
 **morning** [3] -
116:22, 133:7,
133:10
 **most** [4] - 24:11,
75:11, 76:12,
153:22
 **Mostly** [1] -
113:10
 **mouth** [1] -
79:15
 **move** [15] -
97:24, 102:18,
123:18, 124:14,
128:19, 132:25,
135:17, 150:17,
160:3, 164:7,
164:9, 189:24,
190:4, 208:4
 **moved** [1] -
201:5
 **moving** [6] -
16:15, 16:24,
132:17, 163:12,
163:13, 205:5
 **Moving** [1] -
78:1
 **MR** [63] - 5:7,
5:10, 5:16, 5:18,
5:23, 29:3, 29:20,
50:15, 52:21,
54:6, 55:1, 83:14,
83:21, 84:3, 87:1,
97:24, 102:18,
110:1, 114:18,
115:8, 123:13,
123:22, 124:7,
124:17, 124:22,
127:25, 130:25,
131:9, 137:19,
137:24, 138:9,
138:12, 138:17,
140:5, 140:17,
140:20, 144:1,
144:8, 147:24,
156:7, 157:4,
157:9, 163:4,
165:3, 168:7,
168:10, 182:14,
182:23, 189:15,
189:21, 189:24,
190:20, 190:23,
195:11, 195:15,
203:9, 203:14,
203:21, 208:7,

208:13, 208:19,
209:9, 209:11
 **MS** [227] - 5:12,
18:16, 19:23,
20:15, 20:23,
21:23, 22:5,
27:22, 28:14,
29:2, 29:5, 29:7,
30:12, 30:20,
31:1, 35:5, 36:4,
36:8, 36:16, 37:3,
37:9, 37:15, 39:1,
39:20, 40:13,
41:8, 41:22,
42:18, 43:7,
45:21, 46:2,
46:23, 47:7,
47:17, 47:24,
48:5, 49:10,
49:16, 49:21,
50:21, 52:6,
52:20, 53:13,
54:12, 54:21,
57:13, 57:18,
58:6, 58:12,
61:10, 62:2,
62:25, 63:6,
63:12, 63:18,
64:6, 64:11,
64:25, 65:12,
65:21, 66:24,
68:5, 68:12,
68:22, 69:7,
69:20, 70:6,
70:15, 72:21,
73:13, 74:3,
74:15, 74:23,
75:2, 77:19,
82:19, 83:19,
84:1, 86:7, 88:21,
90:5, 92:15, 93:5,
94:12, 94:21,
96:11, 97:3,
97:11, 98:13,
98:21, 99:4,
99:20, 99:25,
100:9, 100:22,
101:4, 101:25,
102:13, 103:5,
103:10, 103:18,
103:25, 105:6,
105:17, 106:2,
106:7, 107:5,
108:5, 108:13,
108:19, 109:3,
109:10, 109:17,
110:11, 111:15,
111:24, 112:7,
113:25, 116:9,
117:22, 118:22,
119:3, 119:18,

119:25, 120:13,
120:22, 121:15,
121:20, 121:25,
122:25, 124:14,
124:25, 125:12,
126:9, 126:24,
127:4, 127:16,
127:22, 129:11,
129:18, 133:17,
133:21, 135:13,
136:17, 139:20,
140:14, 140:18,
140:22, 143:24,
144:4, 145:24,
146:8, 146:14,
146:23, 147:6,
147:22, 148:9,
149:6, 149:23,
151:9, 151:18,
152:4, 152:14,
152:22, 153:9,
153:20, 154:16,
155:16, 156:16,
159:4, 159:16,
161:11, 162:2,
163:2, 168:6,
169:4, 169:11,
170:15, 172:2,
172:15, 176:7,
176:20, 177:12,
177:19, 178:17,
179:7, 179:12,
179:14, 179:25,
180:6, 180:11,
180:14, 181:17,
182:11, 182:21,
186:3, 186:17,
186:24, 187:4,
187:12, 188:23,
189:7, 193:15,
193:22, 193:25,
194:15, 194:23,
196:14, 197:1,
197:11, 198:18,
199:4, 200:8,
200:16, 200:24,
201:24, 202:9,
202:19, 203:7,
205:9, 206:13,
207:10, 207:17,
208:11, 208:17,
209:1, 209:5
 **Music** [75] -
53:4, 54:1, 54:19,
55:11, 55:18,
56:6, 56:18, 57:3,
65:9, 65:10,
65:13, 65:25,
75:7, 75:9, 75:14,
75:21, 76:1, 76:5,
77:1, 77:6, 77:16,

79:24, 95:8,
96:12, 96:19,
97:18, 98:12,
98:15, 99:3, 99:7,
100:7, 101:16,
101:18, 102:8,
102:23, 102:24,
103:2, 103:6,
104:5, 104:22,
105:10, 105:14,
109:9, 109:11,
109:16, 109:19,
110:15, 112:12,
112:15, 112:17,
113:20, 117:15,
118:5, 121:2,
121:3, 128:23,
129:2, 130:10,
130:17, 130:18,
149:9, 149:11,
149:16, 150:16,
150:19, 166:9,
171:4, 171:7,
171:21, 173:1,
173:9, 174:13,
175:2, 175:10,
179:19

**music** [35] -
22:21, 45:23,
46:3, 46:4, 46:19,
46:20, 47:4, 47:5,
47:8, 47:9, 47:15,
47:23, 76:7,
76:10, 76:11,
77:3, 77:8, 77:21,
85:25, 96:18,
99:10, 99:13,
99:17, 101:16,
103:23, 104:2,
104:11, 112:21,
126:17, 139:19,
150:6, 150:11,
150:13, 150:16

**Music's** [4] -
77:24, 128:22,
129:19, 130:23

**music.UNT.edu**
[1] - 129:1

**musicology** [1] -
46:4

**must** [1] - 73:25

**muted** [1] -
143:25

## N

**name** [22] - 5:8,
6:2, 6:3, 7:2, 7:3,
7:4, 7:5, 11:14,
27:2, 56:23,

78:13, 78:14,
85:8, 91:5, 92:21,
101:11, 129:4,
142:3, 153:2,
155:13, 192:24,
211:16

**NAME** [1] -
210:2

**named** [2] -
57:9, 101:8

**names** [2] -
6:20, 167:10

**national** [4] -
7:21, 7:23, 7:25,
8:2

**nationally** [4] -
76:13, 76:19,
76:25, 77:9

**nature** [16] -
6:19, 7:8, 7:12,
19:15, 19:18,
19:20, 20:4, 25:9,
35:17, 36:11,
59:16, 65:2,
70:22, 71:7, 91:3,
132:15

**necessarily** [3] -
40:24, 100:23,
129:12

**Nedderman** [2] -
2:20, 214:3

**need** [16] - 14:4,
14:5, 32:25, 51:6,
71:2, 106:8,
108:22, 115:17,
123:21, 123:24,
132:21, 181:24,
189:8, 189:21,
209:7, 209:8

**needed** [1] -
174:12

**needs** [2] - 46:9,
93:6

**never** [12] -
29:11, 30:4,
30:18, 30:24,
32:17, 96:17,
96:19, 99:1,
100:7, 105:7,
150:10, 206:18

**New** [1] - 20:7

**new** [7] - 18:4,
18:7, 72:18, 91:1,
91:12, 206:6,
207:16

**News** [2] -
76:22, 77:3

**news** [4] - 20:3,
20:5, 25:8, 26:21

**next** [10] - 83:21,

113:18, 113:23,
160:3, 177:5,
181:9, 190:15,
195:11, 202:16,
202:17

**NO** [3] - 1:5,
3:20, 212:5

**noble** [1] - 51:18

**noise** [1] - 13:25

**nominal** [2] -
80:19, 80:23

**nomination** [1] -
81:11

**nominations** [2]
- 78:11, 207:20

**non** [4] - 27:21,
30:19, 94:7,
205:15

**non-option** [1] -
205:15

**non-peer** [3] -
27:21, 30:19,
94:7

**none** [1] -
112:23

**None** [1] -
112:24

**nonresponsive**
[4] - 97:25,
102:19, 123:17,
123:19

**normal** [3] -
9:18, 23:3, 81:25

**NORTH** [4] -
2:13, 2:14,
213:22, 213:23

**North** [109] -
5:17, 6:15, 6:22,
6:24, 12:9, 12:13,
12:16, 12:20,
13:14, 13:18,
14:24, 15:11,
16:3, 16:7, 16:23,
18:15, 18:25,
19:6, 20:22,
22:10, 22:12,
37:20, 38:6, 39:8,
39:17, 40:11,
44:2, 44:9, 44:12,
44:19, 45:15,
48:20, 49:13,
50:8, 52:5, 52:14,
52:19, 53:12,
53:20, 58:25,
59:3, 59:11,
59:14, 59:17,
60:4, 60:14,
60:19, 62:16,
63:15, 71:13,
71:25, 75:9,

75:15, 76:8,
76:19, 78:2, 79:4,
81:22, 83:13,
84:13, 85:6, 85:7,
85:22, 86:5,
86:10, 87:24,
88:17, 89:2, 89:9,
89:12, 89:18,
95:10, 95:13,
95:25, 97:10,
99:18, 100:2,
101:7, 103:19,
104:5, 112:17,
117:16, 117:21,
118:4, 124:12,
130:11, 131:18,
131:23, 140:9,
142:14, 143:9,
143:12, 146:20,
148:7, 148:15,
150:6, 152:18,
153:4, 154:1,
154:13, 155:3,
175:2, 187:2,
187:17, 187:24,
188:8, 199:25,
207:2, 207:9

**NOTARY** [1] -
211:24

**NOTE** [1] - 3:13

**note** [4] - 3:14,
31:3, 115:12,
177:2

**noted** [1] - 211:6

**nothing** [3] -
35:13, 35:19,
102:1

**notice** [2] -
114:20, 115:4

**Notice..............
........** [1] - 3:21

**notifying** [1] -
141:6

**notwithstandin
g** [1] - 42:3

**November** [7] -
10:18, 156:21,
168:13, 195:17,
195:25, 200:22,
213:7

**number** [18] -
6:17, 22:23, 23:3,
24:22, 28:1,
52:13, 76:2,
78:20, 78:23,
79:13, 79:19,
80:13, 114:8,
144:25, 145:19,
160:16, 162:19,
190:21

**Number** [3] -
128:16, 165:5,
205:15

**numbered** [3] -
1:19, 138:18,
170:14

**numbering** [1] -
160:24

## O

**oath** [2] - 191:6,
211:14

**object** [3] - 9:6,
21:4, 191:23

**Object** [1] -
39:20

**objection** [1] -
125:1

**Objection** [204] -
18:16, 19:23,
20:15, 20:23,
21:23, 22:5,
27:22, 28:14,
30:12, 30:20,
31:1, 35:5, 36:4,
36:8, 36:16, 37:3,
37:9, 37:15, 39:1,
40:13, 41:8,
41:22, 42:18,
43:7, 45:21, 46:2,
46:23, 47:7,
47:17, 47:24,
48:5, 49:10,
49:16, 49:21,
50:21, 52:6,
53:13, 54:12,
54:21, 57:13,
57:18, 58:6,
58:12, 61:10,
62:2, 62:25, 63:6,
63:12, 63:18,
64:6, 64:11,
64:25, 65:12,
65:21, 66:24,
68:5, 68:12,
68:22, 69:7,
69:20, 70:6,
70:15, 72:21,
73:13, 74:3,
74:15, 74:23,
75:2, 77:19,
82:19, 86:7,
88:21, 90:5,
92:15, 93:5,
94:12, 94:21,
96:11, 97:3,
97:11, 98:13,
98:21, 99:4,
99:20, 99:25,

100:9, 100:22,
101:4, 101:25,
102:13, 103:5,
103:10, 103:18,
103:25, 105:6,
105:17, 106:2,
106:7, 107:5,
108:5, 108:13,
108:19, 109:10,
109:17, 110:11,
111:15, 111:24,
112:7, 113:25,
116:9, 117:22,
118:22, 119:3,
119:18, 119:25,
120:13, 120:22,
121:15, 121:20,
121:25, 122:25,
125:12, 126:9,
126:24, 127:4,
127:16, 127:22,
129:11, 129:18,
133:17, 133:21,
135:13, 139:20,
145:24, 146:8,
146:14, 146:23,
147:6, 147:22,
148:9, 149:6,
149:23, 151:9,
151:18, 152:4,
152:14, 152:22,
153:9, 153:20,
154:16, 155:16,
156:16, 159:4,
159:16, 161:11,
162:2, 168:6,
169:4, 169:11,
170:15, 172:2,
172:15, 176:7,
176:20, 177:12,
177:19, 178:17,
179:7, 179:12,
179:14, 179:25,
180:6, 180:11,
180:14, 181:17,
182:11, 186:3,
186:17, 186:24,
187:4, 187:12,
188:23, 189:7,
193:15, 193:22,
193:25, 194:15,
194:23, 196:14,
197:1, 197:11,
198:18, 199:4,
200:8, 200:16,
200:24, 201:24,
202:9, 202:19,
203:7, 205:9,
206:13, 207:10,
207:17

**objective** [20] -

67:16, 68:3, 68:8,
68:17, 68:18,
68:20, 68:23,
69:6, 69:18,
69:25, 70:5, 70:9,
70:21, 74:12,
74:18, 151:10,
151:14, 152:10,
152:12, 153:6
**objectively** [9] -
67:12, 68:11,
150:19, 150:25,
151:5, 151:7,
152:1, 184:11,
189:5
**objectives** [1] -
46:25
**objectivity** [4] -
67:25, 68:1,
159:13, 189:3
**obligated** [1] -
73:19
**obligation** [6] -
9:8, 53:11, 73:8,
112:16, 158:24,
200:10
**obviously** [7] -
14:4, 14:5, 24:7,
24:17, 32:11,
52:16, 114:15
**Obviously** [1] -
105:10
**occasions** [3] -
41:16, 104:10,
202:3
**occur** [1] -
202:21
**occurred** [3] -
113:18, 133:9,
149:14
**October** [2] -
213:5, 214:12
**OF** [16] - 1:1,
1:10, 2:13, 2:14,
2:17, 2:19,
211:10, 211:10,
211:24, 212:1,
212:10, 213:22,
213:23, 214:1,
214:2, 215:1
**offend** [3] -
60:23, 61:2, 62:6
**offended** [7] -
61:3, 61:8, 62:1,
62:8, 62:11,
62:15, 62:18
**offends** [1] -
49:14
**offensive** [1] -
62:3

**offer** [1] - 24:25
**office** [44] -
38:14, 45:7,
56:23, 56:24,
58:2, 58:9, 58:15,
59:21, 96:22,
110:16, 117:3,
117:10, 118:12,
118:15, 119:5,
119:12, 120:4,
120:15, 120:18,
121:19, 121:21,
121:24, 123:7,
123:8, 125:3,
125:15, 126:2,
127:6, 131:20,
134:1, 134:6,
136:25, 155:18,
163:19, 165:14,
166:8, 166:12,
166:16, 191:16,
201:6, 207:25,
211:21
**Office** [4] - 5:14,
16:20, 142:22,
143:7
**OFFICER** [2] -
2:19, 214:2
**officer** [1] -
215:4
**Officer** [1] - 5:19
**officer's** [1] -
215:10
**offices** [1] -
155:19
**official** [4] -
116:3, 116:20,
118:2, 129:9
**often** [4] - 80:11,
107:19, 165:18,
185:3
**Ohio** [7] - 16:14,
16:20, 16:22,
17:3, 17:19, 19:6,
27:16
**once** [3] - 49:5,
88:4, 141:13
**Once** [1] - 208:4
**one** [82] - 6:25,
7:18, 10:4, 11:13,
11:22, 23:23,
25:3, 26:22,
26:24, 27:16,
27:18, 27:23,
28:23, 28:25,
29:16, 31:4, 33:1,
33:24, 34:6, 38:9,
40:20, 48:19,
50:22, 52:10,
52:15, 76:15,

76:23, 78:5, 79:1,
79:13, 84:10,
86:18, 90:10,
90:13, 90:14,
90:18, 91:4, 91:8,
92:5, 92:11,
92:24, 95:20,
96:4, 97:14,
98:19, 102:1,
103:3, 106:1,
109:11, 111:10,
111:12, 116:7,
117:15, 118:15,
124:23, 128:10,
132:6, 133:4,
140:5, 144:19,
149:4, 155:10,
162:17, 166:20,
166:22, 168:2,
168:23, 173:16,
177:9, 180:15,
184:16, 185:6,
185:8, 186:14,
187:22, 203:15,
203:19, 204:22,
205:14, 207:5
**One** [7] - 9:5,
31:19, 79:15,
98:19, 102:22,
141:17, 166:7
**ones** [1] - 79:6
**online** [10] -
128:16, 130:14,
182:4, 199:24,
200:3, 200:5,
200:12, 200:19,
200:20, 201:4
**open** [1] -
206:22
**openly** [1] -
180:9
**operated** [1] -
84:15
**operational** [1] -
88:10
**operations** [3] -
88:6, 205:17,
206:12
**opining** [1] -
40:23
**opinion** [1] -
193:17
**opportunities**
[1] - 202:3
**opportunity** [13]
- 18:12, 18:13,
95:19, 163:24,
176:23, 177:17,
178:2, 178:7,
178:11, 178:14,

178:24, 179:5,
180:25
**opposed** [1] -
24:2
**opposition** [1] -
143:15
**option** [1] -
205:15
**options** [4] -
205:13, 205:14,
206:5, 206:7
**oral** [1] - 212:17
**ORAL** [3] - 1:10,
1:16, 212:10
**order** [4] - 23:6,
83:5, 107:16,
189:9
**Order** [1] - 79:5
**ordered** [1] -
154:15
**orders** [2] -
107:4, 107:9
**organization** [6]
- 33:10, 33:15,
33:18, 43:19,
51:24, 139:8
**organizational**
[2] - 84:17, 112:13
**organize** [1] -
36:6
**organized** [4] -
84:13, 84:20,
111:22, 155:18
**orientation** [1] -
91:12
**origin** [3] - 7:22,
7:25, 8:2
**original** [3] -
215:3, 215:8,
215:11
**orthodoxy** [3] -
45:25, 47:15,
47:22
**others'** [2] -
58:7, 200:11
**Otherwise** [1] -
153:11
**otherwise** [2] -
156:23, 214:11
**ourselves** [1] -
175:6
**outcome** [6] -
51:20, 98:6, 98:8,
204:18, 205:7,
214:11
**outcomes** [6] -
47:2, 48:16,
204:20, 204:21,
204:25, 205:11
**outlets** [2] -

25:23, 41:15
**outlined** [3] -
73:22, 181:10,
206:7
**outside** [12] -
51:23, 81:23,
82:2, 120:11,
120:17, 149:9,
149:10, 149:16,
149:25, 150:6,
150:11, 150:19
**overall** [2] -
30:15, 76:19
**overlap** [1] -
43:4
**overlaps** [1] -
170:19
**overseeing** [1] -
18:3
**oversight** [1] -
86:11
**overview** [1] -
91:14
**own** [7] - 6:25,
30:9, 62:7, 93:20,
100:3, 108:4,
173:10

## P

**p.m** [4] - 1:20,
183:2, 208:16,
209:16
**P.O** [4] - 2:6,
2:10, 213:15,
213:19
**PAGE** [3] - 3:2,
3:20, 210:4
**Page** [6] -
134:23, 170:2,
183:11, 183:13,
194:6, 194:9
**page** [8] - 133:1,
158:7, 159:22,
160:3, 167:15,
170:19, 204:6,
215:7
**pages** [2] -
132:16, 213:1
**paid** [4] - 11:24,
21:22, 21:25,
22:1
**Panel** [28] - 4:7,
4:9, 10:13, 10:17,
137:11, 142:6,
156:20, 163:25,
164:3, 164:9,
168:11, 168:17,
170:12, 171:2,

173:14, 173:21,
179:24, 182:9,
183:4, 184:6,
184:20, 185:16,
198:8, 198:14,
199:12, 200:15,
201:14, 202:7
**panel** [81] - 65:8,
65:16, 67:6, 67:8,
68:7, 68:10,
70:12, 70:20,
71:6, 72:17,
72:25, 74:14,
74:19, 74:20,
88:20, 89:8, 98:6,
103:9, 103:11,
103:16, 106:19,
120:9, 127:10,
139:9, 141:6,
141:11, 141:14,
141:16, 141:22,
142:8, 142:12,
142:14, 142:18,
143:21, 149:8,
149:10, 150:7,
150:10, 150:12,
150:18, 152:2,
152:8, 153:13,
153:15, 153:21,
155:1, 155:17,
155:22, 155:23,
155:25, 162:22,
162:23, 163:7,
163:17, 164:5,
169:1, 169:9,
173:23, 173:24,
179:17, 180:5,
183:9, 183:11,
183:15, 183:18,
183:25, 184:10,
186:9, 186:20,
188:21, 189:3,
191:10, 194:25,
196:3, 196:9,
196:13, 197:6,
197:14, 198:17,
200:5
**panel's** [4] -
103:22, 149:21,
194:22, 205:19
**paper** [1] -
171:10
**papers** [6] -
177:10, 177:16,
178:4, 179:20,
179:23, 180:22
**paragraph** [19] -
132:24, 133:1,
136:8, 158:3,
158:5, 158:9,

158:11, 159:22, 160:1, 160:6, 161:7, 174:19, 174:20, 174:22, 174:23, 177:5, 181:9, 196:9, 197:14

**paragraphs** [1] - 170:14

**parking** [1] - 191:17

**Part** [1] - 154:17

**part** [23] - 9:6, 12:7, 18:14, 21:25, 22:1, 31:13, 73:18, 86:20, 87:20, 106:24, 107:1, 122:18, 123:6, 125:7, 127:14, 127:20, 129:20, 154:6, 169:8, 169:13, 169:17, 170:23, 177:10

**partially** [1] - 115:14

**Participants** [1] - 152:5

**participate** [4] - 141:13, 142:12, 150:10, 150:11

**participated** [1] - 164:5

**particular** [15] - 31:12, 46:6, 63:3, 69:22, 72:3, 81:20, 145:3, 146:1, 158:20, 158:21, 197:4, 199:6, 204:21, 204:22, 205:18

**particularly** [1] - 149:19

**PARTIES** [1] - 2:2

**parties** [2] - 6:18, 214:7

**parts** [2] - 19:21, 132:18

**party** [3] - 212:21, 213:2, 213:8

**pass** [1] - 208:8

**passage** [2] - 186:13, 187:11

**past** [4] - 8:11, 53:8, 138:20, 167:8

**path** [1] - 155:11

**pause** [2] -

13:25, 162:18

**pay** [4] - 21:19, 22:3, 22:6, 189:25

**paying** [1] - 194:1

**peer** [32] - 24:20, 24:23, 27:6, 27:8, 27:19, 27:21, 28:10, 30:11, 30:15, 30:19, 31:14, 32:8, 32:14, 34:18, 76:8, 94:7, 97:5, 98:24, 100:20, 101:2, 101:24, 102:2, 102:11, 102:12, 102:21, 102:22, 103:2, 105:1, 105:3, 105:24, 177:3

**pending** [3] - 19:18, 21:1, 21:17

**people** [22] - 19:21, 20:19, 24:12, 25:11, 30:9, 34:23, 78:20, 92:14, 141:15, 150:13, 150:16, 157:13, 169:12, 186:1, 186:6, 186:16, 186:23, 187:3, 187:10, 187:19, 188:1, 195:2

**people's** [3] - 71:9, 192:7

**per** [1] - 100:16

**percent** [1] - 79:15

**percentage** [2] - 79:2, 80:24

**perception** [1] - 177:23

**perceptions** [1] - 177:21

**Perfect** [1] - 140:22

**perfectly** [4] - 9:18, 23:3, 63:1, 135:16

**performance** [3] - 76:11, 76:15, 77:8

**Perhaps** [1] - 71:5

**perhaps** [3] - 72:24, 89:11, 114:6

**period** [9] - 15:19, 15:23, 33:5, 110:23, 165:4, 165:19, 165:20, 165:23, 174:9

**periodically** [2] - 78:19, 80:8

**permanent** [1] - 78:17

**permission** [1] - 129:23

**permitted** [3] - 55:15, 55:17, 89:25

**perpetuated** [2] - 171:9, 173:3

**perquisites** [1] - 80:15

**person** [6] - 21:2, 61:3, 100:12, 130:5, 166:20, 211:16

**personal** [8] - 29:24, 130:2, 130:7, 171:8, 171:22, 172:9, 173:2, 175:11

**personally** [2] - 104:9, 211:13

**personnel** [2] - 7:13, 7:14

**perspectives** [5] - 46:12, 62:6, 145:2, 149:17, 200:11

**Ph.D** [7] - 13:14, 13:19, 15:3, 15:12, 15:15, 15:20, 15:24

**Philip** [15] - 101:8, 102:11, 102:22, 102:25, 103:3, 104:25, 105:21, 112:6, 171:8, 171:10, 171:23, 173:3, 175:9, 178:1, 180:23

**phrased** [2] - 133:22, 133:23

**physical** [1] - 45:2

**piece** [2] - 64:5, 106:11

**pieces** [2] - 40:5, 194:25

**place** [1] - 52:2

**placed** [2] - 40:12, 162:3

**placing** [1] - 161:23

**PLAINTIFF** [2] - 2:4, 213:13

**Plaintiff** [5] - 1:4, 1:18, 5:11, 212:4, 215:11

**plaintiff** [4] - 7:19, 8:4, 8:7, 115:5

**plan** [13] - 197:19, 197:20, 198:10, 198:20, 199:1, 199:5, 200:22, 201:2, 201:3, 201:11, 202:16, 205:16, 206:11

**planned** [1] - 207:24

**planner** [1] - 15:14

**planners** [1] - 25:11

**planning** [12] - 18:1, 18:3, 18:7, 25:11, 25:20, 25:24, 32:4, 43:23, 43:24, 46:17, 46:18, 116:17

**Planning** [11] - 13:12, 14:18, 16:18, 17:6, 17:12, 32:3, 33:1, 33:3, 33:25, 91:7, 91:9

**plenary** [3] - 101:15, 171:10, 175:9

**plus** [1] - 26:21

**point** [18] - 58:22, 75:22, 87:3, 90:25, 93:22, 95:17, 120:25, 132:25, 135:6, 135:20, 163:10, 163:17, 177:13, 192:4, 195:5, 195:6, 199:22, 201:5

**pointed** [2] - 50:24, 160:9

**pointing** [2] - 115:15, 115:20

**poli** [1] - 14:12

**poli-sci** [1] - 14:12

**policies** [13] - 43:10, 49:14,

49:20, 49:24, 50:3, 51:9, 71:12, 71:24, 72:7, 86:4, 154:19, 154:20, 154:21

**Policy** [3] - 136:5, 137:9, 162:14

**policy** [37] - 44:6, 50:4, 50:24, 51:6, 53:23, 72:5, 72:10, 72:20, 73:7, 73:10, 73:16, 74:1, 89:17, 90:24, 91:2, 108:18, 108:22, 121:18, 121:21, 121:23, 122:1, 136:23, 137:7, 154:13, 154:19, 155:5, 155:7, 155:14, 155:20, 155:24, 156:18, 160:10, 160:15, 160:16, 161:9, 161:25, 165:21

**Political** [1] - 13:11

**pop** [1] - 133:9

**pop-up** [1] - 133:9

**portion** [13] - 50:18, 54:9, 55:3, 79:5, 85:4, 87:5, 124:21, 124:24, 127:5, 128:25, 132:12, 156:9, 167:22

**posed** [1] - 9:19

**position** [4] - 12:2, 17:16, 59:7, 116:8

**positioned** [1] - 81:12

**positioning** [1] - 31:12

**positions** [1] - 59:8

**positive** [1] - 27:2

**possible** [6] - 28:16, 36:9, 61:3, 82:1, 118:6, 203:12

**possibly** [1] - 137:18

**post** [4] - 128:15, 200:4, 200:12, 200:14

**posted** [3] - 200:3, 200:19, 200:20

**posting** [1] - 201:4

**posts** [1] - 129:24

**potential** [5] - 56:25, 90:2, 136:14, 204:21, 205:11

**potentially** [1] - 79:7

**Powell** [2] - 20:10

**practice** [4] - 25:12, 25:13, 32:4, 98:24

**practices** [7] - 34:7, 64:3, 73:10, 98:25, 102:4, 103:13, 106:21

**precisely** [1] - 117:9

**Predominantly** [1] - 80:6

**preface** [1] - 75:10

**prefer** [2] - 124:4, 124:6

**preference** [3] - 82:22, 83:1, 83:2

**preferred** [1] - 39:5

**prejudiced** [1] - 71:16

**preliminary** [1] - 6:5

**premarked** [1] - 137:18

**preparation** [3] - 10:23, 11:12, 49:5

**prepare** [2] - 10:4, 10:10

**prepared** [2] - 10:13, 42:2

**preparing** [2] - 3:17, 215:11

**present** [4] - 13:9, 16:12, 100:2, 114:7

**PRESENT** [1] - 2:22

**presented** [4] - 69:23, 70:23, 106:9, 153:16

**presenting** [1] - 114:13

**president** [4] -

17:1, 18:9, 23:18, 177:24
**President** [30] - 5:24, 12:18, 29:11, 29:21, 35:23, 38:22, 66:6, 68:21, 84:5, 110:6, 114:24, 131:6, 132:20, 134:19, 138:5, 138:19, 139:1, 140:23, 147:10, 149:5, 157:12, 162:18, 165:8, 181:22, 182:16, 183:4, 190:23, 191:6, 203:24, 208:19
**president's** [1] - 121:24
**press** [36] - 59:12, 59:14, 59:17, 59:19, 60:14, 60:19, 83:13, 84:13, 84:15, 84:19, 84:21, 85:7, 85:14, 85:16, 85:22, 86:5, 86:11, 86:13, 86:23, 87:8, 87:21, 87:24, 88:17, 89:3, 89:9, 89:12, 95:10, 95:13, 95:25, 97:10, 117:17, 117:21, 118:4, 142:21, 207:2
**presses** [2] - 27:14, 27:16
**prestige** [1] - 75:12
**prestigious** [1] - 75:11
**presume** [2] - 71:10, 131:8
**pretty** [3] - 36:1, 54:25, 95:20
**prevalent** [1] - 45:25
**prevent** [1] - 8:21
**prevented** [1] - 20:21
**previous** [1] - 96:24
**previously** [2] - 164:24, 168:18
**pride** [1] - 75:22
**primarily** [2] -

172:8, 186:11
**primary** [4] - 43:15, 171:24, 172:11, 174:11
**print** [4] - 176:24, 177:18, 178:2, 182:15
**printed** [1] - 167:2
**printout** [2] - 128:1, 128:2
**Printout.............
.......** [1] - 3:23
**private** [1] - 12:3
**privileged** [2] - 10:7, 21:5
**pro** [6] - 192:3, 193:2, 193:3, 193:19, 193:20, 194:1
**problematic** [2] - 71:4, 181:2
**problems** [1] - 8:17
**procedural** [1] - 171:25
**procedure** [2] - 155:10, 155:20
**Procedure** [1] - 1:24
**procedures** [6] - 43:10, 67:20, 94:3, 96:2, 96:5, 126:11
**proceed** [1] - 29:20
**proceeding** [1] - 214:8
**process** [41] - 19:9, 21:9, 21:12, 27:6, 27:12, 28:4, 28:9, 32:8, 32:12, 32:14, 34:15, 34:17, 34:18, 38:13, 65:14, 66:14, 67:19, 69:1, 86:19, 87:7, 87:14, 88:4, 88:24, 90:20, 112:1, 115:7, 126:11, 130:1, 150:20, 152:5, 154:6, 155:2, 155:6, 169:9, 169:18, 177:3, 177:7, 184:11, 188:20, 205:18
**processes** [10] - 49:25, 82:25, 87:25, 88:3,

96:16, 137:1, 155:5, 164:21, 170:7, 184:11
**produce** [4] - 61:12, 67:20, 126:12, 200:18
**produced** [13] - 1:17, 35:9, 57:25, 65:3, 65:19, 66:2, 66:5, 74:24, 85:17, 86:16, 88:5, 103:14, 197:14
**producing** [4] - 59:15, 85:19, 100:23, 177:25
**Production** [1] - 168:12
**production** [17] - 65:14, 67:9, 67:19, 97:19, 123:9, 125:4, 125:16, 149:13, 149:18, 150:20, 151:4, 154:4, 154:12, 154:24, 156:3, 168:25, 184:12
**Professional** [1] - 33:17
**professional** [48] - 16:10, 25:4, 25:7, 25:8, 25:10, 25:13, 25:17, 25:22, 26:3, 26:6, 26:7, 26:9, 33:17, 55:13, 58:23, 59:4, 59:10, 59:13, 59:16, 60:5, 60:9, 62:14, 62:19, 62:23, 63:10, 63:16, 63:25, 64:2, 64:4, 64:9, 64:14, 64:20, 64:21, 65:1, 66:2, 97:7, 97:21, 100:11, 100:25, 101:2, 102:4, 102:15, 112:20, 123:25, 124:9, 126:18, 143:17, 173:7
**professionalis
m** [1] - 43:22
**professionally** [6] - 15:13, 25:12, 48:17, 61:1, 61:8, 61:25
**Professor** [21] - 20:12, 20:21,

62:10, 62:24, 63:17, 64:5, 65:4, 69:3, 78:4, 78:7, 80:18, 81:16, 101:14, 102:9, 124:2, 137:5, 139:11, 141:20, 141:21, 156:25, 164:2
**professor** [12] - 16:16, 31:4, 40:22, 46:14, 47:1, 64:18, 72:5, 72:13, 78:9, 142:7, 154:5
**professor's** [1] - 7:23
**professors** [6] - 42:8, 71:14, 79:12, 81:22, 140:8, 141:16
**Professors** [1] - 79:17
**Professorship** [3] - 80:2, 80:16, 81:9
**program** [13] - 15:11, 15:12, 45:24, 47:6, 47:16, 47:23, 63:15, 76:7, 76:11, 76:14, 76:16, 104:12
**Program** [2] - 16:19, 17:13
**programs** [10] - 75:15, 75:18, 75:23, 75:24, 76:1, 76:2, 76:5, 76:8, 77:5, 77:8
**prohibition** [1] - 81:21
**promotion** [2] - 18:10, 82:24
**promotions** [1] - 82:3
**prompted** [1] - 171:14
**pronunciation** [1] - 141:22
**proper** [4] - 101:24, 106:3, 106:5, 187:2
**proposals** [1] - 27:8
**proposed** [1] - 205:8
**protect** [1] - 42:5
**protected** [4] - 40:24, 41:4, 41:6,

42:9
**protections** [1] - 43:5
**protects** [1] - 38:24
**proved** [1] - 211:14
**provide** [17] - 47:21, 70:4, 82:15, 94:9, 147:18, 147:19, 147:20, 148:24, 149:1, 149:4, 151:11, 153:10, 169:20, 199:1, 199:2, 199:7, 200:11
**provided** [12] - 34:5, 37:17, 55:20, 56:16, 70:3, 71:11, 75:3, 86:15, 91:13, 110:16, 178:6, 178:13
**provides** [4] - 33:15, 45:7, 94:15, 196:21
**providing** [3] - 36:18, 36:19, 43:17
**provisions** [1] - 1:24
**provost** [85] - 12:9, 16:6, 16:23, 18:15, 23:18, 37:19, 37:24, 38:10, 38:17, 38:20, 38:21, 41:11, 41:21, 42:1, 42:3, 42:5, 42:12, 45:18, 46:1, 46:21, 49:2, 49:14, 50:9, 53:5, 56:7, 56:19, 59:3, 59:18, 59:21, 68:9, 69:17, 75:8, 75:17, 84:12, 84:14, 85:2, 85:5, 95:21, 96:15, 98:18, 100:5, 100:21, 108:18, 108:25, 109:23, 110:10, 116:8, 116:19, 116:20, 117:2, 118:15, 118:19, 119:5, 119:12, 120:4, 120:18, 121:21, 123:7, 123:8, 124:12, 125:3,

125:15, 126:2, 130:21, 131:19, 134:1, 146:11, 146:17, 148:8, 149:2, 153:7, 159:5, 164:10, 165:12, 166:8, 167:21, 167:22, 177:24, 184:9, 199:19, 199:20, 199:23, 201:23, 202:1, 207:23
**Provost** [13] - 4:4, 4:11, 16:20, 17:18, 17:22, 17:24, 18:25, 22:10, 39:8, 40:10, 44:2, 146:20
**provost's** [7] - 117:10, 120:15, 121:19, 134:6, 155:18, 166:16, 201:6
**provost@UNT** [1] - 131:19
**psychiatric** [1] - 45:2
**PUBLIC** [1] - 211:24
**Public** [5] - 13:13, 14:23, 15:10, 15:19, 34:11
**public** [3] - 41:14, 43:17, 170:7
**publication** [53] - 20:22, 21:14, 24:18, 26:22, 26:24, 29:23, 30:2, 31:5, 31:24, 34:15, 34:17, 35:1, 35:2, 57:24, 58:10, 58:15, 63:20, 63:21, 64:3, 64:22, 64:24, 65:2, 66:14, 73:10, 73:15, 85:20, 92:13, 93:3, 96:15, 96:20, 97:5, 97:22, 98:11, 98:22, 103:24, 106:8, 106:21, 109:12, 109:13, 109:20, 111:3, 111:25, 112:19, 117:3, 117:11, 137:1,

158:21, 161:20, 162:4, 162:9, 177:6, 188:17, 207:2

**Publication** [4] - 33:20, 34:3, 34:9, 88:13

**publications** [32] - 22:22, 22:24, 22:25, 23:2, 23:8, 25:4, 25:7, 25:17, 25:22, 26:3, 26:9, 26:10, 26:14, 26:17, 26:21, 30:8, 30:9, 31:21, 33:16, 33:18, 33:19, 35:7, 41:15, 59:16, 60:15, 82:3, 85:20, 89:18, 89:22, 89:23, 149:12

**publish** [15] - 25:23, 27:24, 31:7, 33:19, 60:22, 61:8, 61:25, 82:2, 92:8, 94:10, 101:2, 102:11, 103:19, 103:23, 129:22

**published** [50] - 20:21, 22:17, 23:5, 23:9, 23:13, 23:24, 23:25, 24:15, 24:16, 24:20, 25:3, 25:4, 25:9, 26:9, 27:19, 27:20, 28:1, 28:18, 28:21, 61:1, 62:11, 62:13, 85:24, 86:12, 86:15, 88:5, 88:11, 92:11, 95:9, 95:12, 95:24, 100:16, 101:16, 101:24, 102:9, 102:10, 102:16, 102:22, 102:25, 103:16, 104:25, 108:3, 109:24, 117:20, 118:3, 129:16, 142:25, 171:11, 177:23, 206:18

**publisher** [3] - 27:3, 86:18, 88:9

**publishes** [3] - 90:3, 93:19,

108:23

**publishing** [22] - 29:1, 29:12, 30:4, 30:19, 30:24, 32:1, 36:21, 37:8, 58:1, 60:16, 61:23, 81:22, 86:14, 90:17, 95:23, 96:5, 100:19, 105:21, 108:17, 130:22, 172:1, 177:11

**pulled** [1] - 19:4

**purchase** [2] - 208:23, 209:4

**purpose** [3] - 134:10, 183:9, 184:10

**purposely** [1] - 149:10

**purposes** [7] - 104:17, 111:10, 111:12, 115:9, 116:2, 161:25, 211:18

**pursuant** [2] - 1:23, 212:19

**pursue** [1] - 93:25

**purview** [3] - 54:15, 56:12, 60:20

**put** [21] - 70:13, 77:11, 79:14, 85:22, 92:14, 114:16, 118:17, 128:10, 128:11, 144:14, 145:18, 159:7, 163:16, 169:10, 169:18, 172:20, 199:12, 199:24, 206:22, 207:13

**puts** [1] - 129:22

**putting** [3] - 130:14, 172:12, 190:3

## Q

**Quaker** [2] - 2:6, 213:15

**qualification** [2] - 82:18, 92:14

**qualifications** [3] - 12:7, 78:12, 82:7

**qualify** [1] - 151:6

**quality** [2] - 3:14, 30:8

**questioned** [2] - 41:17, 61:12

**questioning** [2] - 108:8, 190:13

**questions** [21] - 19:15, 31:4, 35:25, 54:11, 83:8, 83:12, 83:22, 83:24, 86:19, 94:24, 110:8, 114:10, 116:16, 123:16, 124:2, 124:4, 128:21, 134:8, 190:2, 207:6, 208:18

**quick** [1] - 182:22

**quickly** [2] - 173:19, 185:7

**Quimby** [6] - 2:9, 5:12, 11:1, 208:22, 213:5, 213:18

**QUIMBY** [227] - 5:12, 18:16, 19:23, 20:15, 20:23, 21:23, 22:5, 27:22, 28:14, 29:2, 29:5, 29:7, 30:12, 30:20, 31:1, 35:5, 36:4, 36:8, 36:16, 37:3, 37:9, 37:15, 39:1, 39:20, 40:13, 41:8, 41:22, 42:18, 43:7, 45:21, 46:2, 46:23, 47:7, 47:17, 47:24, 48:5, 49:10, 49:16, 49:21, 50:21, 52:6, 52:20, 53:13, 54:12, 54:21, 57:13, 57:18, 58:6, 58:12, 61:10, 62:2, 62:25, 63:6, 63:12, 63:18, 64:6, 64:11, 64:25, 65:12, 65:21, 66:24, 68:5, 68:12, 68:22, 69:7, 69:20, 70:6, 70:15, 72:21, 73:13, 74:3,

74:15, 74:23, 75:2, 77:19, 82:19, 83:19, 84:1, 86:7, 88:21, 90:5, 92:15, 93:5, 94:12, 94:21, 96:11, 97:3, 97:11, 98:13, 98:21, 99:4, 99:20, 99:25, 100:9, 100:22, 101:4, 101:25, 102:13, 103:5, 103:10, 103:18, 103:25, 105:6, 105:17, 106:2, 106:7, 107:5, 108:5, 108:13, 108:19, 109:3, 109:10, 109:17, 110:11, 111:15, 111:24, 112:7, 113:25, 116:9, 117:22, 118:22, 119:3, 119:18, 119:25, 120:13, 120:22, 121:15, 121:20, 121:25, 122:25, 124:14, 124:25, 125:12, 126:9, 126:24, 127:4, 127:16, 127:22, 129:11, 129:18, 133:17, 133:21, 135:13, 136:17, 139:20, 140:14, 140:18, 140:22, 143:24, 144:4, 145:24, 146:8, 146:14, 146:23, 147:6, 147:22, 148:9, 149:6, 149:23, 151:9, 151:18, 152:4, 152:14, 152:22, 153:9, 153:20, 154:16, 155:16, 156:16, 159:4, 159:16, 161:11, 162:2, 163:2, 168:6, 169:4, 169:11, 170:15, 172:2, 172:15, 176:7, 176:20, 177:12, 177:19, 178:17, 179:7, 179:12, 179:14, 179:25, 180:6, 180:11, 180:14, 181:17, 182:11, 182:21,

186:3, 186:17, 186:24, 187:4, 187:12, 188:23, 189:7, 193:15, 193:22, 193:25, 194:15, 194:23, 196:14, 197:1, 197:11, 198:18, 199:4, 200:8, 200:16, 200:24, 201:24, 202:9, 202:19, 203:7, 205:9, 206:13, 207:10, 207:17, 208:11, 208:17, 209:1, 209:5

**Quimby............ .....00** [1] - 213:10

**quite** [4] - 60:24, 61:1, 81:25, 83:23

**quote** [24] - 24:14, 34:16, 34:17, 50:3, 55:18, 56:6, 66:11, 68:16, 93:9, 94:24, 121:8, 127:13, 134:10, 135:18, 154:1, 154:2, 176:4, 177:17, 184:9, 199:1, 200:22, 206:22, 206:23

## R

**race** [8] - 44:18, 45:12, 46:22, 47:4, 49:8, 52:4, 52:7, 52:17

**Race** [2] - 52:10, 52:14

**Rachel** [1] - 64:5

**racial** [13] - 146:5, 146:12, 146:21, 147:3, 147:10, 147:13, 147:17, 147:21, 148:7, 148:14, 148:19, 148:23, 175:10

**racism** [27] - 48:20, 53:11, 53:14, 53:24, 54:2, 54:19, 55:11, 55:18, 56:6, 56:11, 56:17, 57:7, 121:4, 121:9,

121:22, 122:4, 122:8, 122:19, 122:22, 125:10, 126:6, 127:14, 127:20, 130:19, 139:19, 175:25, 203:6

**racist** [7] - 27:20, 56:20, 57:12, 57:17, 57:21, 58:5, 58:11

**raise** [1] - 63:2, 64:3, 72:18, 99:13, 159:6, 177:6, 178:15

**raised** [30] - 20:1, 31:4, 57:19, 58:15, 62:14, 63:19, 65:9, 65:14, 65:16, 66:13, 90:16, 97:19, 99:6, 109:4, 109:12, 109:18, 111:2, 111:5, 111:21, 111:25, 112:5, 113:2, 145:1, 159:18, 170:7, 170:8, 178:5, 178:12, 179:16, 195:1

**raises** [1] - 136:4

**raising** [1] - 186:4

**ran** [1] - 191:17

**range** [6] - 17:25, 19:4, 25:23, 25:25, 45:8, 85:17

**rank** [4] - 16:16, 76:13, 77:3, 82:23

**ranked** [6] - 76:3, 76:19, 76:24, 77:1, 77:9, 77:10

**ranking** [5] - 76:4, 76:20, 77:2, 77:7, 77:16

**rankings** [1] - 77:5

**rare** [1] - 89:24

**rather** [1] - 188:16

**re** [1] - 114:20

**reached** [2] - 27:23, 160:5

**read** [75] - 50:16,

50:18, 54:6, 54:9,
55:3, 72:7, 87:1,
87:5, 108:14,
108:15, 115:22,
123:6, 123:13,
123:22, 124:7,
124:21, 124:24,
126:20, 132:12,
134:9, 134:14,
134:22, 134:25,
135:17, 136:8,
136:9, 140:16,
143:18, 143:19,
150:22, 156:7,
156:9, 158:5,
158:9, 160:1,
161:4, 161:6,
161:15, 168:15,
171:12, 171:18,
171:21, 173:20,
174:3, 174:6,
174:19, 174:21,
174:25, 175:13,
175:14, 176:1,
176:2, 176:12,
176:25, 177:1,
178:25, 179:1,
181:11, 181:12,
181:22, 181:23,
183:19, 183:22,
186:19, 191:7,
193:11, 193:12,
199:9, 205:21,
205:22, 206:4,
206:14, 211:4
**readable** [1] -
128:9
**reading** [4] -
169:25, 185:15,
204:11, 205:10
**ready** [1] -
188:17
**reaffirm** [1] -
121:3
**reaffirmed** [1] -
203:5
**reaffirming** [1] -
130:16
**reaffirms** [1] -
122:21
**real** [2] - 71:17,
177:25
**realize** [1] -
135:10
**really** [9] -
69:14, 71:4, 71:5,
72:6, 96:25,
107:18, 173:19,
185:7, 201:2
**rearrange** [1] -

140:24
**reason** [17] -
18:20, 55:12,
95:15, 97:17,
108:15, 128:24,
129:3, 131:25,
132:2, 135:14,
136:1, 156:23,
167:16, 181:19,
182:6, 182:12,
200:7
**REASON** [1] -
210:4
**reasonable** [8] -
18:19, 63:1,
68:14, 68:17,
68:24, 84:7,
151:3
**reasons** [4] -
142:11, 145:25,
213:1, 215:7
**recalled** [1] -
91:18
**receipt** [1] -
212:23
**receive** [5] -
18:13, 38:11,
38:18, 113:6,
116:10
**received** [13] -
13:10, 96:23,
97:23, 105:13,
116:12, 135:3,
135:12, 135:20,
135:25, 152:8,
178:7, 179:21,
183:24
**receiving** [4] -
131:7, 131:12,
131:15, 177:16
**Recess** [7] -
29:8, 52:24,
110:4, 137:21,
138:15, 183:1,
208:15
**recognition** [3] -
31:15, 80:19,
81:3
**recognize** [7] -
114:23, 114:25,
131:5, 139:3,
168:17, 195:19,
195:21
**recognized** [3] -
31:8, 31:10,
31:23
**recollection** [3] -
20:11, 66:13,
174:8
**recommendat**

ions [21] - 65:17,
73:18, 98:8,
153:17, 153:23,
153:24, 156:10,
169:20, 186:11,
187:7, 188:13,
194:17, 196:2,
196:5, 197:19,
198:11, 198:20,
199:7, 200:23,
201:11, 201:12
**recommends** [1]
- 93:8
**reconstitute** [1]
- 207:8
**record** [73] -
1:24, 5:5, 5:8,
6:2, 9:7, 12:15,
14:5, 18:14,
18:20, 19:19,
22:22, 23:4,
23:21, 24:18,
27:1, 29:6, 29:7,
29:10, 29:17,
30:7, 30:22,
32:23, 34:21,
38:23, 43:25,
52:23, 53:1,
58:19, 78:9, 82:8,
82:17, 83:6,
110:1, 110:3,
110:5, 114:19,
115:9, 116:2,
116:6, 131:1,
137:19, 137:23,
137:25, 138:12,
138:14, 138:16,
138:20, 140:7,
148:12, 157:5,
157:9, 160:25,
165:4, 174:25,
182:15, 182:25,
183:2, 184:6,
184:22, 186:20,
189:16, 190:3,
192:2, 195:16,
197:9, 203:11,
208:14, 208:16,
208:24, 209:3,
209:15, 212:18,
214:10
**records** [1] -
185:3
**refer** [3] - 44:5,
67:13, 160:25
**reference** [4] -
87:10, 88:24,
111:14, 197:3
**referenced** [3] -
51:8, 169:14,

170:14
**referencing** [1] -
50:25
**referred** [1] -
134:13
**referring** [23] -
10:17, 20:6,
37:10, 45:1,
48:24, 54:23,
57:23, 57:24,
86:23, 87:8,
88:14, 113:7,
118:11, 121:10,
121:18, 122:1,
122:11, 122:12,
122:14, 135:24,
159:23, 160:14,
163:11
**refers** [1] - 23:19
**reflect** [2] -
160:25, 182:15
**reflecting** [1] -
144:24
**reflects** [1] -
196:20
**reframe** [4] -
42:4, 61:11,
61:16, 61:20
**refresh** [2] -
11:15, 33:21
**refuse** [1] -
55:24
**refusing** [4] -
37:12, 75:4,
148:4, 181:6
**regard** [1] -
185:4
**regarding** [10] -
19:15, 63:19,
66:15, 96:23,
97:19, 119:5,
119:12, 142:14,
142:17, 188:13
**regardless** [1] -
49:8
**Regents** [5] -
18:18, 131:23,
132:3, 132:6,
132:8
**regional** [1] -
18:2
**Regional** [4] -
13:23, 15:4,
16:18, 17:6
**registration** [4] -
214:20, 214:20,
215:21, 215:21
**regular** [2] -
164:21, 165:19
**related** [17] -

6:14, 7:13, 7:14,
41:2, 46:18, 65:2,
66:5, 73:15,
123:8, 125:15,
154:24, 159:23,
164:22, 166:19,
192:15, 199:6,
214:7
**Related** [1] -
7:16
**relates** [6] -
38:15, 44:6,
88:25, 109:20,
151:3, 166:16
**relation** [1] -
192:10
**Relations** [1] -
142:22
**relations** [2] -
46:22, 47:4
**relationship** [2]
- 47:4, 112:13
**relationships** [1]
- 112:21
**relative** [7] -
31:12, 75:14,
77:22, 111:3,
126:3, 149:17,
214:9
**relevant** [20] -
32:4, 44:5, 68:24,
103:8, 103:15,
103:22, 106:18,
106:23, 106:25,
127:1, 127:3,
127:5, 128:18,
152:10, 153:3,
153:22, 188:20,
194:17, 194:21,
195:7
**relieve** [1] - 9:7
**remain** [4] -
99:23, 126:17,
205:17, 206:11
**remained** [2] -
199:24, 199:25
**remarks** [4] -
175:25, 176:5,
176:15, 176:19
**remember** [37] -
7:3, 7:4, 7:5,
11:14, 20:9,
27:15, 32:8,
32:14, 34:2, 34:8,
34:11, 44:7,
56:22, 57:16,
66:10, 66:21,
67:15, 68:2,
71:23, 90:22,
92:1, 92:4,

111:13, 111:17,
111:18, 112:25,
113:18, 115:23,
135:10, 160:21,
169:25, 185:15,
191:12, 191:19,
192:25, 193:9,
197:3
**remembered** [2]
- 33:24, 90:14
**remind** [2] - 8:4,
17:14
**remove** [1] -
114:11
**removed** [1] -
206:2
**Renaldo** [7] -
2:14, 5:16, 11:3,
143:24, 209:12,
213:11, 213:23
**renaldo.
stowers@
untsystem.edu**
[2] - 2:16, 213:25
**renew** [1] -
124:25
**Repeat** [1] -
61:18
**repeat** [14] - 8:5,
35:21, 39:12,
40:4, 44:24, 55:1,
57:14, 74:16,
82:10, 90:6,
136:17, 144:11,
144:19, 156:6
**repeated** [2] -
125:18, 125:19
**repeatedly** [1] -
108:6
**repeats** [1] -
186:20
**rephrase** [6] -
10:9, 49:17,
72:24, 118:1,
144:12, 198:25
**replaced** [2] -
141:22, 142:1
**replete** [1] -
175:10
**report** [35] -
59:22, 73:8,
74:24, 93:12,
93:15, 142:4,
165:13, 166:4,
166:14, 169:1,
169:10, 169:14,
169:17, 169:19,
170:2, 170:17,
173:23, 177:14,
179:17, 183:9,

186:25, 188:25,
196:7, 196:13,
196:21, 197:8,
197:14, 199:21,
199:23, 200:9,
200:18, 200:20,
201:20, 202:5,
208:4
   **Report** [29] - 4:9,
10:13, 10:17,
77:3, 137:11,
142:6, 156:20,
163:25, 164:3,
164:9, 165:4,
168:11, 168:18,
170:12, 171:3,
173:14, 173:21,
179:24, 182:9,
183:4, 184:6,
184:20, 185:18,
198:8, 198:14,
199:12, 200:15,
201:14, 202:8
   **Report.............**
[1] - 4:7
   **Report.............**
..... [1] - 4:6
   **reported** [6] -
1:22, 56:22, 58:9,
59:24, 60:1,
84:21
   **reporter** [2] -
137:18, 138:10
   **REPORTER** [12]
- 5:9, 157:7,
168:9, 182:19,
190:22, 195:14,
203:19, 208:22,
208:25, 209:2,
209:6, 209:14
   **Reporter** [11] -
50:15, 124:20,
138:7, 138:18,
156:8, 157:6,
168:8, 182:17,
182:18, 190:20,
203:17
   **Reporter's** [1] -
3:10
   **REPORTER'S**
[2] - 3:13, 212:9
   **reporting** [1] -
166:12
   **Reports** [1] -
76:22
   **reports** [10] -
26:20, 56:24,
59:19, 59:20,
165:25, 166:7,
166:8, 167:8,

200:19, 202:2
   **reposition** [1] -
158:7
   **represent** [8] -
5:14, 5:25, 78:12,
160:2, 182:3,
191:4, 192:2,
204:2
   **representation**
[2] - 135:19,
196:12
   **representative**
[1] - 44:13
   **represents** [1] -
79:1
   **republished** [2]
- 31:20, 31:23
   **reputation** [3] -
75:12, 75:22,
77:25
   **reputational** [1]
- 75:15
   **request** [3] -
119:14, 197:8,
197:17
   **Requested** [7] -
50:18, 54:9, 55:3,
87:5, 124:21,
124:24, 156:9
   **requested** [4] -
67:8, 200:2,
212:21, 213:2
   **require** [1] - 45:9
   **required** [5] -
34:12, 53:23,
82:6, 82:12,
88:16
   **requirement** [3]
- 82:13, 82:25,
152:2
   **requirements**
[1] - 54:23
   **requisite** [1] -
82:16
   **reread** [2] -
124:15, 124:19
   **research** [5] -
16:13, 60:8, 80:6,
81:5, 81:23
   **Research** [6] -
78:3, 78:7, 79:16,
80:1, 81:8, 81:15
   **reserve** [1] -
208:17
   **respond** [29] -
55:21, 55:22,
72:2, 74:8, 74:10,
74:21, 115:4,
127:11, 147:23,
148:1, 148:25,

163:24, 164:3,
169:3, 169:16,
176:23, 177:18,
178:2, 178:7,
178:11, 178:24,
179:5, 180:25,
181:4, 198:6,
198:10, 198:13,
198:17, 198:19
   **responded** [4] -
55:4, 74:24,
119:2, 141:12
   **responding** [1] -
73:21
   **response** [10] -
75:3, 108:9,
115:2, 125:2,
199:2, 199:9,
200:4, 200:14,
200:18, 201:3
   **responses** [4] -
175:8, 175:22,
176:10, 193:10
   **responsibilitie
s** [10] - 43:9,
43:11, 48:3, 48:8,
53:9, 85:12,
85:13, 91:14,
91:17, 109:14
   **responsibility**
[37] - 18:1, 42:4,
43:16, 48:9,
48:14, 54:3,
54:13, 59:15,
72:17, 73:23,
74:8, 74:20,
85:18, 86:11,
87:25, 117:10,
123:7, 123:8,
125:3, 125:7,
125:14, 126:2,
126:19, 127:1,
136:6, 136:15,
136:22, 137:7,
143:13, 144:15,
144:21, 145:6,
145:15, 153:7,
162:15, 187:6,
201:7
   **Responsible** [1]
- 86:8
   **responsible** [7] -
41:2, 46:16,
73:21, 86:6,
86:14, 100:13,
166:12
   **responsive** [1] -
201:11
   **rest** [1] - 172:13
   **restate** [1] -

176:8
   **restricted** [1] -
137:1
   **resubstitute** [1]
- 207:12
   **result** [1] - 63:22
   **return** [2] -
15:24, 213:6
   **returned** [6] -
15:15, 212:23,
212:25, 215:3,
215:6, 215:8
   **returning** [1] -
15:20
   **Review** [6] - 4:6,
4:7, 10:13, 165:4,
168:11
   **review** [111] -
10:14, 10:20,
27:6, 27:12,
27:17, 28:1, 28:4,
28:6, 28:9, 28:10,
28:16, 29:24,
30:2, 30:15,
31:16, 32:8,
32:12, 32:14,
32:15, 33:8,
34:18, 35:3, 65:8,
65:16, 66:8, 67:8,
67:19, 68:6,
68:14, 68:23,
68:25, 69:9,
71:18, 78:19,
80:21, 86:19,
87:13, 87:14,
88:23, 88:24,
90:19, 93:11,
93:22, 94:18,
96:14, 98:24,
100:16, 100:20,
100:24, 101:2,
101:24, 102:2,
102:3, 102:11,
102:12, 102:23,
103:2, 104:1,
105:1, 105:3,
105:24, 106:4,
106:5, 107:6,
107:22, 107:23,
108:1, 108:2,
109:6, 111:9,
111:3, 117:8,
117:11, 118:6,
118:15, 119:7,
119:12, 120:15,
145:4, 153:15,
154:3, 154:6,
154:17, 155:12,
155:19, 156:2,
156:3, 159:11,

162:4, 162:9,
164:20, 164:21,
165:12, 165:19,
165:23, 166:15,
167:7, 168:24,
169:13, 169:23,
170:5, 170:7,
174:12, 177:3,
185:11, 187:6,
188:12, 197:21
   **reviewed** [25] -
10:12, 24:20,
24:24, 27:8,
27:19, 27:21,
30:11, 30:19,
31:14, 34:4, 94:7,
96:15, 97:5, 97:6,
102:21, 105:14,
106:11, 109:14,
164:24, 165:18,
170:6, 179:16,
186:12, 187:8,
201:15
   **reviewer** [1] -
34:25
   **reviewing** [2] -
153:21, 161:20
   **reviews** [14] -
28:4, 28:8, 28:12,
28:18, 28:20,
29:23, 30:5, 32:2,
32:7, 32:9, 35:9,
78:10, 82:2,
166:16
   **Richmond** [41] -
53:2, 53:3, 55:17,
55:20, 56:3, 56:5,
59:22, 59:24,
115:10, 116:22,
117:5, 117:15,
118:13, 119:19,
120:2, 121:12,
121:16, 122:6,
122:16, 123:1,
127:8, 127:13,
127:17, 129:5,
130:3, 131:2,
133:8, 133:10,
133:23, 135:8,
139:17, 143:1,
161:17, 197:21,
201:10, 202:4,
202:7, 202:13,
202:14, 202:17,
206:21
   **Richmond's**
[4] - 125:11, 125:21,
140:1, 140:2
   **right-hand** [1] -
128:3

**rightly** [1] -
14:20
   **rights** [10] -
20:14, 38:12,
38:25, 39:15,
42:5, 42:16,
42:20, 44:23,
136:5, 136:23
   **road** [1] - 6:6
   **Roe** [1] - 131:2
   **role** [8] - 43:14,
54:4, 54:13,
83:10, 87:21,
88:2, 88:10,
119:5
   **roles** [5] - 16:17,
33:16, 43:9,
43:10, 91:16
   **room** [2] - 14:6,
14:7
   **Rough** [1] - 33:5
   **roughly** [1] -
119:13
   **RPR** [3] - 1:21,
212:14, 214:16
   **Rule** [1] - 212:19
   **rule** [1] - 72:5
   **Rules** [1] - 1:23
   **rules** [9] - 6:6,
8:18, 71:12,
95:22, 96:2,
154:13, 155:21,
156:1, 156:15
   **run** [9] - 30:5,
30:6, 30:24,
35:18, 35:22,
36:6, 36:9, 36:10,
111:23
   **runs** [1] - 28:6
   **rush** [2] - 158:6,
183:20

## S

   **safe** [1] - 93:17
   **sake** [1] - 144:6
   **salary** [4] -
21:22, 21:25,
22:9, 80:24
   **sat** [1] - 191:10
   **saw** [2] - 180:3,
199:11
   **sboseman@
uta.edu** [2] - 2:21,
214:4
   **Schenker** [1] -
110:7
   **Schenkerian**
[79] - 21:13,

21:16, 58:16,
58:20, 63:20,
65:6, 65:15, 67:6,
67:9, 73:4, 73:15,
85:19, 86:3,
86:17, 87:9, 89:7,
89:14, 95:24,
97:1, 97:18,
97:20, 98:3, 98:7,
98:9, 98:20, 99:6,
100:6, 101:9,
102:10, 103:1,
103:12, 105:23,
106:20, 107:7,
107:11, 109:5,
109:21, 110:9,
117:6, 118:16,
120:16, 122:18,
123:10, 125:5,
125:8, 125:17,
126:4, 126:8,
127:15, 127:21,
132:5, 132:8,
139:18, 149:19,
149:20, 150:21,
154:5, 154:25,
156:11, 158:12,
159:10, 159:12,
164:11, 164:13,
164:15, 164:16,
164:24, 166:4,
168:4, 168:12,
168:22, 171:11,
174:2, 175:5,
184:13, 197:18,
198:7, 205:24,
206:18
   **scholar** [2] -
29:1, 61:6
   **scholarly** [14] -
24:4, 25:21, 26:6,
30:16, 30:22,
34:7, 78:9, 82:5,
82:8, 82:11,
82:17, 83:2, 83:6,
173:7
   **scholars** [6] -
28:10, 60:24,
61:2, 61:25, 62:4,
64:1
   **scholarship** [17]
- 22:18, 25:17,
26:4, 26:5, 30:10,
43:17, 58:24,
59:5, 59:7, 59:9,
59:13, 61:12,
81:12, 112:8,
112:10, 126:18,
143:16
   **school** [10] -

25:14, 54:1,
56:17, 122:3,
133:11, 133:16,
133:19, 134:4,
139:19
   **School** [7] -
17:7, 17:8, 54:1,
54:19, 55:11,
55:18, 56:5
   **schools** [3] -
13:8, 77:4, 77:21
   **sci** [1] - 14:12
   **science** [2] -
40:16, 46:9
   **Science** [4] -
13:10, 13:11,
13:23, 15:4
   **scientist** [1] -
16:13
   **scope** [3] -
53:25, 120:11,
169:23
   **scratch** [3] -
39:14, 143:10,
146:18
   **screen** [6] -
114:16, 134:18,
140:21, 140:25,
166:24, 181:21
   **scroll** [3] -
134:20, 134:21,
157:14
   **scrolling** [1] -
173:13
   **Scrolling** [1] -
184:16
   **seal** [1] - 211:21
   **second** [11] -
29:16, 91:5,
127:8, 135:18,
138:13, 143:11,
166:23, 172:23,
172:25, 196:9,
203:15
   **seconds** [2] -
14:8, 124:16
   **section** [9] -
167:10, 169:22,
183:13, 185:8,
185:9, 185:10,
185:15, 196:23,
197:4
   **see** [42] - 14:11,
29:15, 71:19,
83:25, 106:8,
110:18, 114:9,
114:12, 114:14,
114:15, 121:6,
121:7, 128:14,
128:16, 133:13,

133:14, 136:7,
138:3, 138:25,
139:1, 139:2,
140:17, 142:23,
148:5, 165:11,
166:1, 166:6,
170:19, 170:25,
181:21, 181:23,
181:25, 182:2,
183:3, 183:6,
183:13, 183:16,
193:13, 193:18,
194:12, 203:23
   **See** [2] - 133:4,
173:13
   **seeing** [2] -
160:21, 161:2
   **seek** [1] - 33:19
   **seeking** [1] -
129:25
   **seem** [1] - 177:3
   **select** [1] - 78:11
   **selected** [1] -
27:10
   **selecting** [1] -
149:15
   **Selecting** [1] -
149:25
   **selection** [1] -
18:20
   **send** [4] -
118:19, 139:5,
156:25, 182:17
   **sense** [5] - 35:3,
51:13, 51:19,
51:21, 75:25
   **sent** [9] -
119:24, 133:24,
135:3, 139:10,
157:20, 163:9,
177:10, 179:9,
195:24
   **sentence** [15] -
126:16, 127:2,
127:5, 127:8,
143:11, 144:25,
158:10, 158:14,
159:14, 160:12,
161:2, 172:7,
176:12, 176:16
   **separate** [2] -
58:14, 116:13
   **SEPTEMBER** [3]
- 1:12, 210:3,
212:12
   **September** [5] -
1:20, 5:3, 156:24,
157:10, 157:19
   **series** [1] -
207:6

   **serious** [3] -
63:19, 63:22,
109:2
   **serve** [2] - 33:3,
141:16
   **served** [10] -
16:15, 16:17,
16:24, 23:16,
32:19, 32:24,
34:13, 86:18,
115:5
   **service** [2] -
33:6, 43:18
   **serving** [4] -
33:23, 36:22,
52:12, 92:17
   **set** [7] - 44:19,
83:21, 94:24,
115:13, 151:15,
152:1, 175:8
   **setting** [1] - 34:9
   **seven** [1] - 51:2
   **several** [5] -
171:9, 204:20,
205:11, 206:4,
206:7
   **Shall** [1] -
137:19
   **share** [5] -
20:25, 152:6,
181:21, 196:2
   **shared** [7] -
20:3, 20:7, 49:24,
58:14, 135:8,
194:24, 195:3
   **shares** [1] -
176:12
   **Shelby** [8] -
2:18, 5:18, 11:9,
21:1, 21:8,
209:10, 213:11,
214:2
   **SHERMAN** [2] -
1:2, 212:2
   **shit** [1] - 64:5
   **short** [1] - 92:5
   **shorthand** [1] -
1:22
   **show** [5] - 69:3,
111:9, 128:20,
133:9, 157:14
   **showed** [2] -
128:13, 169:6
   **showing** [2] -
183:5, 204:7
   **shut** [3] - 13:25,
14:1, 64:22
   **sic** [1] - 137:25
   **side** [2] - 14:6,
14:7

   **sideways** [1] -
185:3
   **signature** [5] -
157:15, 157:17,
211:5, 212:20,
213:6
   **SIGNATURE** [1]
- 210:1
   **Signature** [2] -
212:25, 215:6
   **Signature.........
................** [1] -
3:8
   **significant** [5] -
30:15, 52:13,
82:24, 186:9,
192:4
   **similar** [3] -
22:11, 89:11,
182:12
   **simple** [5] -
36:1, 54:25,
52:23, 95:20,
190:18
   **simplify** [1] -
148:16
   **simply** [5] -
21:16, 71:11,
96:3, 108:10,
121:14
   **Sims** [2] - 1:21,
214:16
   **SIMS** [1] -
212:14
   **single** [3] - 24:4,
109:22, 162:9
   **sit** [14] - 42:11,
42:22, 44:7,
47:14, 66:10,
66:21, 67:15,
71:23, 89:1,
94:19, 120:6,
145:21, 151:13,
206:1
   **sitting** [1] -
208:20
   **situations** [3] -
70:25, 71:17,
93:10
   **six** [3] - 80:14,
99:15, 132:16
   **skills** [1] - 82:16
   **skip** [2] - 158:2,
161:1
   **slider** [1] -
115:13
   **slightly** [1] -
163:13
   **Slottow** [1] -
167:11

   **small** [2] - 28:1,
140:15
   **SMT** [4] -
105:25, 171:10,
171:14, 172:17
   **snow** [1] -
191:21
   **so-called** [6] -
6:6, 67:5, 72:25,
88:19, 107:14,
155:1
   **social** [2] -
43:13, 113:16
   **societies** [1] -
25:10
   **society** [2] -
62:14, 97:21
   **Society** [35] -
65:9, 65:10,
65:13, 65:25,
96:12, 96:19,
97:18, 99:7,
100:7, 101:16,
101:18, 102:8,
102:23, 102:24,
103:2, 103:6,
105:10, 105:13,
109:8, 109:11,
109:16, 109:18,
110:15, 112:12,
112:15, 112:17,
113:20, 171:3,
171:7, 171:21,
173:1, 173:9,
174:13, 175:9,
179:19
   **solely** [1] - 66:1
   **solidarity** [1] -
175:3
   **someone** [6] -
24:19, 71:3, 81:8,
82:23, 90:17,
165:13
   **sometimes** [1] -
46:9
   **somewhere** [1] -
183:7
   **soon** [1] -
199:23
   **Sorry** [16] -
28:15, 29:19,
38:3, 39:23,
44:25, 85:7, 93:1,
127:25, 139:23,
141:25, 162:18,
163:4, 163:6,
166:23, 172:24,
190:23
   **sorry** [28] - 7:9,
11:13, 21:3, 29:2,

29:3, 40:1, 50:15,
67:1, 86:13,
126:13, 133:8,
136:18, 136:20,
142:17, 143:23,
144:2, 144:5,
144:13, 144:18,
147:24, 157:22,
160:4, 166:22,
170:18, 198:24,
202:19, 204:13,
209:1
**sort** [13] - 45:3,
47:22, 51:17,
86:4, 87:22,
91:10, 99:12,
107:3, 109:8,
116:17, 160:18,
185:25, 207:16
**sound** [2] -
51:17, 144:2
**sounds** [2] -
11:17, 33:22
**source** [2] -
12:1, 25:17
**sources** [1] -
26:4
**South** [2] - 2:20,
214:3
**Southern** [2] -
27:4, 31:6
**speaking** [16] -
28:8, 41:13,
42:10, 49:4,
53:20, 60:8,
71:21, 72:2, 72:3,
72:11, 77:24,
82:14, 82:22,
116:10, 148:4,
175:6
**special** [1] - 78:1
**specialization**
[1] - 26:1
**specific** [63] -
24:4, 26:24,
27:25, 36:10,
38:8, 38:16,
41:23, 47:18,
47:21, 50:24,
51:6, 55:20, 57:3,
57:10, 57:16,
57:22, 58:17,
60:7, 62:22,
63:13, 64:12,
66:9, 66:14,
66:20, 67:13,
67:17, 68:6, 69:8,
70:2, 70:16,
70:25, 72:9,
73:22, 74:9,

82:13, 86:10,
88:22, 91:4,
91:24, 93:13,
99:5, 107:6,
107:10, 108:20,
110:23, 112:25,
125:14, 126:11,
129:25, 132:18,
133:6, 133:7,
150:3, 151:11,
153:1, 154:20,
155:4, 155:20,
155:24, 156:18,
165:16, 189:10
**specifically** [12]
- 67:11, 72:10,
76:10, 91:2,
94:22, 103:11,
152:23, 156:3,
156:12, 169:7,
172:4, 189:9
**Specifically** [1] -
57:24
**specificity** [6] -
28:7, 41:13, 47:9,
94:14, 99:22,
164:19
**specifics** [1] -
202:25
**Spectrum** [4] -
101:17, 102:5,
102:23, 103:20
**speech** [13] -
38:25, 39:16,
40:12, 40:15,
41:17, 42:2, 42:5,
42:8, 42:9, 42:17,
42:20, 58:4,
101:10
**spelled** [2] - 6:3,
95:3
**spend** [1] - 92:1
**spending** [1] -
208:20
**spoken** [2] -
58:10, 67:2
**spot** [1] - 121:14
**spotlight** [1] -
114:12
**spread** [1] -
79:21
**spreadsheet** [2]
- 167:1, 167:3
**staff** [3] - 50:14,
51:15, 167:11
**stamp** [1] -
170:25
**stamps** [1] -
170:19
**stand** [5] -

33:13, 92:22,
157:13, 175:3,
196:11
**standard** [8] -
98:19, 102:7,
102:12, 103:4,
105:15, 105:18,
105:25
**Standards** [2] -
34:2, 34:12
**standards** [36] -
34:9, 58:24, 59:4,
59:12, 60:5, 60:9,
60:14, 69:15,
81:10, 88:16,
89:3, 89:8, 89:13,
89:21, 89:25,
93:23, 96:9,
96:25, 97:10,
97:12, 98:10,
98:15, 98:18,
99:2, 99:18,
99:21, 100:11,
102:15, 103:24,
106:4, 106:5,
126:17, 143:16,
145:7, 173:7,
189:2
**stands** [1] -
33:14
**start** [3] - 23:1,
114:3, 135:2
**started** [3] -
21:11, 167:23,
193:8
**starting** [3] -
13:9, 16:11,
206:6
**starve** [1] -
84:10
**state** [25] - 5:8,
6:2, 10:7, 12:15,
19:19, 20:17,
22:3, 22:7, 22:13,
22:14, 23:4,
23:21, 26:25,
32:23, 38:23,
43:25, 44:14,
49:3, 60:6, 60:8,
67:1, 72:10,
95:15, 143:4,
156:17
**STATE** [2] -
211:10, 211:24
**State** [10] - 1:21,
11:22, 16:14,
16:20, 16:22,
17:3, 17:19, 19:6,
27:16, 212:15
**Statement** [1] -

174:2
**statement** [68] -
48:25, 49:2, 64:7,
70:17, 121:17,
129:9, 129:15,
130:6, 135:9,
135:20, 135:23,
142:13, 142:16,
142:19, 143:4,
143:10, 143:11,
144:14, 144:16,
145:18, 145:22,
146:15, 147:4,
147:5, 147:8,
147:11, 147:12,
147:15, 148:5,
148:13, 148:17,
148:18, 148:21,
151:6, 151:15,
151:19, 160:8,
171:4, 171:14,
172:4, 172:13,
172:20, 172:22,
172:23, 172:25,
173:20, 174:5,
174:7, 174:24,
176:13, 177:20,
178:1, 178:10,
180:3, 180:8,
180:15, 180:24,
181:16, 182:8,
182:10, 182:13,
183:5, 186:25,
187:16, 187:20,
187:23, 187:25,
196:16
**Statement..** [1] -
4:9
**statements** [7] -
170:8, 170:13,
171:8, 171:22,
172:9, 173:2,
191:10
**states** [5] -
133:7, 158:14,
186:4, 187:13,
187:15
**States** [2] -
37:21, 38:7
**STATES** [2] -
1:1, 212:1
**stating** [1] -
175:18
**Station** [2] -
2:11, 213:20
**status** [6] -
44:17, 45:12,
45:16, 78:1,
80:12
**step** [1] - 88:4

**Stephen** [1] -
167:11
**stepping** [1] -
118:18
**steps** [4] -
112:23, 202:16,
202:17, 202:23
**stereotypes** [1] -
175:11
**still** [9] - 81:18,
114:14, 162:10,
163:11, 168:21,
199:15, 204:11,
208:25, 209:2
**stint** [1] - 33:7
**stood** [3] -
75:14, 92:24,
185:19
**stop** [1] - 181:20
**store** [1] - 24:13
**story** [4] -
185:18, 185:21,
186:20, 188:19
**Stowers** [6] -
2:14, 5:16, 11:3,
209:7, 209:12,
213:23
**STOWERS** [2] -
5:16, 209:11
**Stowers..........**
**00** [1] - 213:11
**straightforwar**
**d** [1] - 55:23
**straining** [1] -
140:16
**strays** [1] - 41:3
**stress** [1] -
175:5
**strictly** [2] -
74:13, 74:19
**Strike** [2] - 7:24,
96:18
**strike** [17] -
32:21, 34:10,
64:20, 65:5, 69:4,
90:7, 97:24,
102:18, 105:25,
118:23, 123:18,
133:18, 138:20,
150:17, 151:22,
151:23, 164:6
**String...............**
**...........** [1] - 4:1
**strive** [3] - 60:4,
60:9, 60:14
**struck** [1] -
191:19
**structure** [2] -
84:18
**student** [39] -

28:16, 29:25,
30:5, 30:24, 32:7,
35:12, 35:14,
35:15, 35:20,
36:2, 36:9, 36:13,
37:1, 37:7, 37:13,
44:13, 44:15,
48:17, 49:8,
51:21, 51:24,
52:18, 64:4,
64:10, 64:15,
71:21, 72:12,
72:13, 110:18,
110:24, 111:13,
111:19, 113:1,
113:3, 173:19,
181:10, 182:9,
185:23
**Student** [5] -
4:9, 71:18, 71:21,
72:11, 72:14
**student's** [1] -
51:19
**students** [33] -
22:1, 22:6, 28:9,
28:13, 28:18,
43:17, 44:18,
45:8, 49:5, 50:11,
50:13, 50:20,
51:12, 51:14,
51:15, 52:13,
54:5, 54:15, 55:7,
56:10, 56:13,
57:20, 58:13,
71:14, 110:17,
116:16, 134:12,
135:3, 135:5,
173:16, 175:4,
181:16, 186:15
**Students** [1] -
36:6
**students'** [1] -
135:8
**Studies** [81] -
13:17, 15:25,
21:13, 21:16,
58:16, 58:20,
63:20, 65:7,
65:15, 67:6,
67:10, 73:4,
73:16, 85:19,
86:3, 86:17, 87:9,
89:7, 89:14,
95:24, 97:1,
97:18, 97:20,
98:3, 98:7, 98:9,
98:20, 99:6,
100:6, 101:9,
102:10, 103:1,
103:12, 105:23,

106:20, 107:7,
107:11, 109:5,
109:21, 110:10,
117:6, 118:16,
120:16, 122:18,
123:10, 125:5,
125:8, 125:17,
126:4, 126:8,
127:15, 127:21,
132:5, 132:9,
139:18, 149:19,
149:20, 150:21,
154:5, 154:25,
156:11, 158:12,
159:10, 159:12,
164:11, 164:13,
164:15, 164:16,
164:24, 166:4,
168:4, 168:13,
168:22, 171:11,
174:3, 175:5,
184:13, 197:19,
198:7, 205:24,
206:18
  **study** [1] - 47:11
  **stuff** [1] - 204:4
  **styled** [1] - 1:19
  **subject** [4] -
24:4, 48:18,
95:22, 96:8
  **subjected** [1] -
97:9
  **submission** [1] -
94:5
  **submit** [2] -
81:11, 197:20
  **submitted** [8] -
27:9, 66:9, 66:20,
113:21, 174:11,
174:16, 188:13,
213:4
  **subscribed** [1] -
211:16
  **substantial** [1] -
81:13
  **successful** [1] -
51:20
  **sued** [4] - 6:22,
6:24, 37:20, 38:6
  **suffering** [1] -
9:1
  **sufficient** [2] -
37:4, 105:19
  **suggest** [1] -
83:14
  **suggested** [1] -
191:22
  **suggesting** [1] -
152:21
  **suit** [3] - 7:8,

7:12, 7:17
  **sum** [2] - 12:24,
40:21
  **summarize** [3] -
49:1, 196:8,
197:22
  **summary** [1] -
196:21
  **summer** [3] -
110:12, 132:9,
135:25
  **summertime** [1]
- 120:23
  **superficially** [1]
- 46:4
  **supervise** [1] -
60:18
  **supervisor** [1] -
193:17
  **supervisory** [1] -
36:14
  **supply** [1] -
153:5
  **support** [6] -
54:4, 143:6,
153:22, 153:23,
205:16, 206:11
  **supported** [1] -
22:14
  **supports** [1] -
33:18
  **suppose** [3] -
38:22, 101:20,
166:11
  **supposed** [3] -
57:11, 87:13,
166:4
  **supposedly** [1] -
57:16
  **surprise** [1] -
92:10
  **surprised** [1] -
165:24
  **surrounded** [1] -
47:21
  **surrounding** [2]
- 101:9, 110:9
  **suspect** [2] -
118:7
  **Suzanne** [5] -
191:24, 192:3,
192:24, 193:5,
193:8
  **sworn** [4] - 1:18,
5:6, 5:21, 212:16
  **symposium** [7] -
94:24, 96:6,
171:10, 173:6,
176:4, 176:18,
177:11

  **System** [2] -
5:17, 131:24
  **system** [6] -
12:20, 12:23,
59:7, 79:6, 79:8,
79:9
  **systemic** [1] -
175:25
  **systems** [1] -
12:25

## T

  **talks** [1] - 176:3
  **targeted** [2] -
156:12, 156:13
  **task** [12] - 86:20,
87:10, 88:23,
107:2, 109:6,
117:11, 119:7,
119:11, 120:4,
127:18, 139:22,
200:20
  **tasked** [1] -
177:24
  **taught** [1] - 53:8
  **taxpayers** [4] -
11:25, 21:19,
21:22, 21:25
  **teach** [2] -
43:23, 53:7
  **teacher** [1] -
42:23
  **teaching** [14] -
40:16, 41:2,
41:16, 41:18,
42:13, 42:24,
43:16, 43:24,
46:14, 46:16,
46:19, 48:11,
48:15, 53:9
  **technical** [1] -
26:20
  **tel** [4] - 2:7, 2:16,
213:16, 213:25
  **template** [2] -
167:5, 167:6
  **ten** [1] - 78:25
  **tended** [1] - 69:3
  **tenure** [10] -
53:5, 59:7, 79:6,
79:8, 79:9, 79:10,
82:24, 82:25,
83:5, 199:23
  **tenured** [1] -
82:23
  **term** [2] - 44:2,
45:5
  **terms** [7] - 10:6,

40:22, 44:6,
45:11, 60:11,
69:17, 206:8
  **terribly** [1] -
103:3
  **testified** [14] -
5:21, 8:10, 32:6,
36:23, 97:16,
101:15, 101:23,
135:21, 139:25,
156:20, 161:17,
162:22, 173:20,
206:21
  **testify** [3] - 9:3,
120:6, 151:23
  **testifying** [1] -
8:21
  **testimony** [27] -
3:16, 47:15,
66:23, 70:19,
70:24, 100:8,
103:17, 105:15,
132:22, 135:24,
139:24, 147:14,
151:17, 151:25,
154:11, 161:23,
162:7, 162:12,
168:21, 187:23,
191:5, 195:8,
198:22, 198:24,
198:25, 199:3,
212:18
  **TEXAS** [12] -
1:1, 2:10, 2:13,
2:14, 2:17, 2:19,
212:1, 213:19,
213:22, 213:23,
214:1, 214:2
  **Texas** [150] -
1:22, 1:23, 2:11,
2:15, 2:20, 5:13,
5:17, 5:19, 6:15,
6:22, 6:24, 11:8,
11:22, 11:25,
12:10, 12:13,
12:16, 12:18,
12:19, 12:21,
13:4, 13:11,
13:12, 13:14,
13:15, 13:18,
13:19, 14:12,
14:20, 14:24,
15:6, 15:11, 16:3,
16:7, 16:14,
16:23, 16:25,
18:9, 18:15, 19:1,
19:6, 19:8, 19:22,
20:20, 20:22,
21:19, 21:22,
22:2, 22:10,

22:12, 37:20,
38:6, 38:22, 39:9,
39:17, 39:18,
40:11, 44:2, 44:9,
44:12, 44:14,
44:19, 45:15,
48:20, 49:13,
50:8, 52:5, 52:14,
52:19, 53:12,
53:20, 58:25,
59:3, 59:12,
59:14, 59:17,
60:4, 60:14,
60:19, 62:16,
63:15, 71:13,
71:25, 75:9,
75:16, 76:8,
76:19, 78:2, 79:4,
81:22, 83:13,
84:13, 85:7,
85:22, 86:5,
86:10, 87:24,
88:17, 89:2, 89:9,
89:12, 89:18,
95:10, 95:13,
95:25, 97:10,
99:19, 100:2,
101:7, 103:19,
104:6, 112:17,
117:17, 117:21,
118:4, 124:3,
124:13, 130:11,
131:18, 131:23,
140:9, 142:14,
143:9, 143:12,
146:20, 148:7,
148:15, 149:5,
150:6, 152:19,
153:4, 154:1,
154:14, 155:3,
175:2, 187:2,
187:18, 187:24,
188:8, 199:25,
207:2, 207:9,
212:15, 213:20,
213:24, 214:4,
214:16, 214:18,
215:19
  **text** [2] - 128:9,
134:22
  **Thad** [5] - 2:5,
5:10, 213:10,
213:14, 215:9
  **THE** [24] - 1:1,
2:4, 2:8, 2:13,
2:17, 2:19, 29:14,
123:21, 123:24,
136:19, 163:1,
163:5, 189:20,
189:22, 190:4,
203:12, 211:10,

211:24, 212:1,
213:13, 213:17,
213:22, 214:1,
214:2
  **theirs** [1] - 88:10
  **themselves** [4] -
23:24, 42:6,
106:20, 154:20
  **Theoria** [31] -
95:3, 95:4, 95:6,
95:22, 96:2, 96:3,
96:8, 96:20,
96:23, 97:2, 98:4,
98:19, 99:9,
99:14, 99:21,
100:5, 100:13,
100:15, 100:18,
100:19, 104:23,
105:1, 105:20,
105:22, 108:4,
108:7, 108:14,
108:15, 108:16,
109:23
  **Theoria's** [1] -
106:21
  **theorist** [4] -
46:3, 47:8, 150:6,
150:11
  **theorists** [1] -
47:11
  **Theory** [40] -
65:9, 65:11,
65:13, 65:25,
96:12, 96:19,
97:19, 99:7,
100:7, 101:16,
101:18, 102:8,
102:23, 102:24,
103:2, 103:7,
104:5, 104:22,
105:10, 105:14,
109:9, 109:11,
109:16, 109:19,
110:15, 112:12,
112:15, 112:17,
113:21, 121:3,
130:18, 166:9,
171:7, 171:22,
173:2, 173:10,
174:13, 175:3,
175:10, 179:19
  **theory** [23] -
22:21, 45:24,
46:4, 46:6, 46:19,
46:20, 47:4, 47:6,
47:9, 47:16,
47:23, 76:7,
76:11, 85:25,
95:3, 99:10,
99:13, 99:17,

101:16, 103:23,
104:2, 104:12,
112:21
**Theory's** [1] -
171:4
**thereafter** [1] -
14:22
**therefor** [2] -
213:1, 215:7
**Therefore** [1] -
155:9
**therefore** [1] -
149:15
**therein** [1] -
211:18
**thinking** [3] -
27:25, 119:23,
121:17
**third** [6] -
126:13, 126:16,
127:2, 127:5,
158:3, 197:13
**thoughtful** [2] -
175:23, 176:14
**thoughts** [1] -
58:7
**three** [11] -
31:13, 31:17,
31:20, 33:7,
139:16, 139:25,
140:2, 141:9,
165:23, 170:8,
170:14
**thriving** [1] -
52:2
**throughout** [1] -
79:21
**tie** [4] - 71:4,
71:9, 71:10,
71:16
**tier** [1] - 31:13
**tilted** [1] -
193:10
**timeframe** [1] -
135:25
**timeline** [2] -
114:1, 117:1
**Timothy** [29] -
5:11, 5:25, 57:5,
81:14, 105:22,
136:5, 154:2,
155:25, 157:20,
159:2, 159:19,
160:11, 161:10,
163:23, 167:11,
169:2, 179:13,
191:10, 193:20,
197:17, 198:1,
198:6, 198:13,
199:10, 200:4,

200:14, 203:10,
205:1, 206:2
**TIMOTHY** [2] -
1:3, 212:3
**title** [8] - 26:25,
78:8, 78:21,
80:17, 81:20,
99:9, 99:12,
165:22
**titles** [1] - 78:5
**today** [37] - 6:1,
8:22, 9:6, 10:24,
42:11, 42:22,
44:7, 47:14,
53:18, 66:10,
66:21, 66:23,
67:15, 70:19,
70:24, 71:23,
89:1, 94:19,
100:3, 100:8,
103:17, 115:2,
120:7, 145:21,
147:14, 151:13,
151:23, 151:25,
161:23, 162:7,
162:12, 168:19,
198:22, 198:25,
199:3, 206:2,
208:20
**Today** [1] - 5:3
**today's** [3] -
10:4, 10:11,
10:12
**token** [1] - 9:23
**took** [11] - 18:8,
56:24, 109:16,
109:18, 117:10,
119:13, 123:8,
125:3, 125:15,
192:14, 193:23
**top** [9] - 70:10,
77:9, 80:22,
92:11, 134:23,
149:3, 149:7,
157:18, 170:19
**topic** [10] -
40:17, 42:14,
42:24, 46:14,
92:7, 93:12,
124:12, 163:12,
163:14, 191:25
**topics** [1] - 24:9
**total** [3] - 11:7,
78:22, 79:3
**track** [4] - 18:14,
18:20, 79:10,
190:24
**training** [2] -
91:1, 91:11
**transcript** [9] -

3:17, 191:1,
208:23, 209:4,
209:8, 212:17,
212:24, 213:4,
215:12
**transition** [1] -
58:22
**transitioning** [1]
- 137:13
**translation** [1] -
26:6
**transmission**
- 3:15
**treatment** [3] -
111:6, 112:6,
112:10
**trial** [1] - 208:18
**tropes** [1] -
175:11
**true** [12] - 76:4,
95:16, 152:25,
164:20, 165:2,
179:9, 180:8,
180:19, 181:18,
193:17, 211:6,
212:18
**trust** [1] - 9:14
**truth** [1] - 152:9
**truthful** [1] -
152:7
**truthfully** [2] -
8:22, 9:8
**try** [2] - 115:16,
144:12
**trying** [19] -
25:16, 41:24,
51:11, 68:19,
75:13, 75:25,
79:14, 83:3,
118:9, 119:16,
131:16, 133:9,
157:3, 157:15,
158:6, 162:19,
188:4, 194:18,
204:24
**tuition** [1] - 22:1
**Tulane** [3] -
28:23, 29:24,
30:3
**turn** [1] - 25:16
**turnaround** [1] -
91:15
**Twitter** [1] -
64:13
**two** [10] - 31:19,
31:21, 33:7, 79:2,
79:14, 79:15,
128:14, 129:7,
129:15, 166:6
**types** [3] - 35:7,

35:9, 155:5
**typical** [2] -
94:3, 129:1
**Typically** [2] -
107:22, 202:1
**typically** [3] -
56:21, 77:9,
165:13

## U

**U.S** [2] - 76:22,
77:3
**ultimate** [1] -
43:20
**ultimately** [4] -
86:6, 134:1,
134:5, 150:15
**unacceptable**
[1] - 179:4
**unclear** [7] -
9:19, 122:1,
148:10, 148:11,
148:12, 151:19,
155:7
**uncomfortable**
[1] - 193:16
**uncommon** [3] -
46:5, 61:11,
180:15
**unconnected** [4]
- 122:24, 125:10,
126:5, 126:22
**uncurious** [1] -
99:24
**under** [28] -
40:6, 41:4, 41:6,
56:6, 59:2, 59:17,
69:16, 84:15,
87:23, 89:3, 90:3,
93:3, 94:10,
98:17, 136:5,
136:23, 153:7,
154:21, 160:10,
161:24, 162:3,
166:15, 180:17,
191:5, 196:23,
201:7, 211:14,
211:21
**undergraduate**
[2] - 13:9, 14:13
**undersigned** [1]
- 175:1
**understood** [16]
- 9:9, 10:1, 41:21,
42:9, 47:3, 48:2,
52:5, 110:16,
123:3, 125:22,
126:5, 160:12,
171:17, 171:24,

204:25, 205:23
**undertake** [4] -
68:3, 68:10,
68:13, 174:12
**undertaking** [1]
- 35:10
**undertook** [3] -
120:17, 120:18,
127:6
**unethical** [2] -
35:4, 35:15
**unhighlight** [1] -
134:16
**uniformity** [1] -
45:19
**Union** [2] - 2:15,
213:24
**unit** [2] - 54:17,
54:18
**UNITED** [2] -
1:1, 212:1
**United** [3] -
37:21, 38:7
**universities** [5] -
60:6, 60:8, 75:11,
76:9, 77:22
**university** [83] -
12:20, 12:25,
18:1, 18:2, 21:21,
22:7, 38:10,
38:17, 43:8, 44:1,
45:7, 45:10,
46:21, 47:5,
50:12, 51:13,
51:19, 52:1, 52:8,
52:11, 53:15,
53:18, 56:21,
59:19, 59:20,
60:10, 60:21,
61:24, 66:9,
69:16, 72:6, 73:9,
75:22, 76:3, 77:2,
77:10, 77:18,
77:25, 78:6, 78:8,
78:21, 80:3,
81:19, 84:14,
84:16, 84:19,
84:22, 86:5,
86:23, 87:8,
96:13, 97:21,
109:13, 121:2,
122:7, 122:9,
126:7, 129:10,
129:17, 129:20,
129:23, 130:17,
134:1, 139:18,
143:1, 143:9,
145:4, 154:18,
156:1, 158:3,
158:11, 158:23,

160:9, 160:15,
161:19, 165:20,
167:3, 175:7,
177:24, 200:9
**UNIVERSITY** [8]
- 2:13, 2:14, 2:17,
2:19, 213:22,
213:23, 214:1,
214:2
**University** [146] -
5:17, 5:19, 6:14,
6:22, 6:24, 11:8,
12:9, 12:13,
12:16, 12:18,
12:19, 12:20,
13:3, 13:12,
13:14, 13:15,
13:18, 13:20,
14:24, 15:11,
16:3, 16:7, 16:14,
16:15, 16:21,
16:22, 16:23,
16:25, 17:19,
18:9, 18:14,
18:25, 19:5, 19:6,
19:8, 19:22,
20:20, 20:22,
22:2, 22:10,
22:12, 27:3,
27:16, 31:5,
37:20, 38:5,
39:16, 39:17,
39:18, 40:10,
44:2, 44:9, 44:12,
44:19, 45:15,
48:19, 49:13,
50:8, 52:5, 52:14,
52:18, 53:12,
53:20, 58:25,
59:3, 59:11,
59:14, 59:17,
60:4, 60:13,
60:19, 62:16,
63:15, 71:13,
71:24, 75:9,
75:15, 76:8,
76:18, 78:2, 78:3,
78:7, 79:3, 79:16,
80:1, 80:16,
80:17, 81:8,
81:15, 81:21,
83:13, 84:13,
85:7, 85:22, 86:5,
86:10, 87:24,
88:17, 89:2, 89:8,
89:12, 89:17,
95:10, 95:13,
95:25, 97:10,
99:18, 100:1,
101:7, 103:19,

104:5, 112:16,
117:16, 117:20,
118:3, 124:3,
124:12, 130:11,
131:18, 131:23,
140:9, 142:13,
142:24, 143:7,
143:12, 146:20,
148:7, 148:15,
149:5, 150:6,
152:18, 153:4,
154:1, 154:13,
154:19, 155:3,
175:2, 187:2,
187:17, 187:24,
188:8, 199:25,
207:1, 207:9
**university's** [3] -
48:25, 50:10,
129:9
**university-wide**
[1] - 80:3
**unless** [1] - 72:7
**unlikely** [2] -
116:11, 150:2
**unprofessional**
[3] - 60:22, 65:20,
124:11
**unrelated** [3] -
40:18, 40:23,
142:11
**unresponsive**
[1] - 190:1
**unsurprising** [1]
- 24:18
**UNT** [24] - 3:23,
44:5, 49:23, 50:2,
52:19, 53:4,
62:23, 69:18,
74:1, 76:24,
85:13, 85:16,
86:13, 87:20,
95:8, 112:13,
116:11, 128:2,
137:9, 142:17,
162:14, 174:2,
183:5, 189:25
**UNT's** [5] - 49:2,
49:14, 49:19,
136:5, 199:12
**UNT_000106** [1]
- 3:24
**UNT_000157** [1]
- 3:25
**UNT_000162** [1]
- 3:25
**UNT_000568** [1]
- 3:22
**UNT_002453** [1]
- 4:2

**UNT_002454** [1]
- 4:2
**UNT_002460** [1]
- 4:3
**untrue** [2] -
180:16, 180:21
**untruth** [1] -
152:9
**unusual** [1] -
89:24
**up** [47] - 6:21,
9:12, 9:14, 12:24,
16:11, 16:16,
29:22, 31:3,
40:21, 43:3, 47:9,
55:4, 78:17,
78:19, 81:8,
91:19, 92:7,
93:12, 113:7,
115:13, 121:14,
129:8, 129:22,
130:14, 133:9,
134:20, 135:17,
137:16, 137:17,
152:7, 160:3,
160:7, 163:16,
164:7, 164:19,
168:8, 170:25,
171:17, 182:4,
182:18, 183:3,
190:21, 191:19,
193:19, 199:12,
203:16, 209:8
**update** [1] -
91:14
**uphold** [2] -
59:12, 100:11
**upholding** [3] -
34:15, 59:4,
145:7
**upper** [3] -
76:24, 77:11,
128:3
**upset** [1] - 103:3
**Urban** [4] -
13:12, 13:23,
14:18, 15:3
**URL** [6] - 128:3,
128:25, 129:1,
181:13, 181:14,
182:5
**uses** [2] - 96:2,
99:21
**UTA** [2] - 21:11,
142:17

**V**

**vague** [1] -
54:11

**value** [1] - 75:17
**variations** [1] -
60:11
**variety** [1] -
16:17
**various** [2] -
36:23, 140:8
**varying** [1] -
62:5
**verbose** [1] -
145:22
**veteran** [3] -
44:17, 45:12,
45:16
**via** [1] - 1:22
**VIA** [1] - 2:2
**Vice** [5] - 16:20,
17:18, 17:21,
17:24, 19:10
**vice** [1] - 19:14
**Video** [1] - 2:24
**VIDEOCONFE
RENCE** [4] - 1:10,
1:16, 2:2, 212:10
**videoconferen
ce** [3] - 1:23, 3:15,
3:17
**VIDEOGRAPH
ER** [22] - 2:23,
5:3, 29:6, 29:9,
29:13, 29:16,
29:18, 52:23,
52:25, 110:3,
110:5, 137:20,
137:22, 138:14,
138:16, 182:25,
183:2, 208:14,
208:16, 208:24,
209:13, 209:15
**VIDEOTAPED**
[3] - 1:10, 1:16,
212:10
**view** [10] - 35:2,
40:25, 41:1,
50:19, 68:17,
69:19, 87:7, 88:6,
126:2, 192:4
**viewpoint** [3] -
63:3, 63:23,
63:24
**viewpoints** [5] -
39:3, 62:5, 62:21,
64:23, 200:11
**views** [2] -
41:14, 41:15
**violate** [2] -
72:5, 162:14
**violated** [9] -
73:17, 86:4,
136:7, 136:23,

137:7, 137:9,
156:1, 156:15,
161:10
**violating** [1] -
159:3
**violation** [12] -
38:11, 38:18,
71:13, 72:14,
72:20, 73:11,
74:2, 136:14,
155:21, 155:24,
161:22, 161:25
**violations** [8] -
37:20, 38:6,
72:18, 73:7,
154:18, 155:5,
155:8, 156:18
**virtual** [1] -
163:20
**visible** [3] -
115:13, 115:17,
165:7
**Vista** [2] -
214:18, 215:19
**voice** [1] - 144:5
**volume** [9] -
24:2, 31:6,
126:12, 149:13,
151:4, 158:20,
162:5, 168:13,
168:23
**Volume** [27] -
58:19, 65:14,
67:9, 73:4, 97:20,
103:14, 107:6,
107:12, 109:20,
117:12, 123:10,
125:5, 125:17,
150:21, 154:4,
154:11, 154:12,
154:25, 156:4,
158:16, 159:12,
162:4, 168:12,
168:25, 172:1,
176:4, 184:13
**volumes** [5] -
23:17, 26:14,
27:5, 27:7, 27:13
**VS** [2] - 1:5,
212:5

**W**

**Wait** [1] - 152:25
**Walls** [17] -
185:22, 186:14,
186:21, 187:9,
188:19, 188:24,
189:2, 189:5,
189:9, 191:1,

191:5, 192:19,
193:13, 193:19,
194:13, 194:24
**walls** [1] -
194:20
**Walls...............**
[1] - 4:10
**Walton** [2] -
11:15, 11:18
**wants** [2] -
84:10, 123:19
**Warner** [1] -
2:24
**was/was** [1] -
215:3
**ways** [4] - 59:10,
61:8, 97:6,
100:11
**web** [1] - 129:1
**Webpage** [1] -
3:23
**webpage** [6] -
128:2, 130:3,
130:7, 130:10,
130:23, 199:13
**website** [8] -
128:22, 128:24,
129:9, 129:17,
129:19, 129:22,
129:25, 142:25
**weeks** [1] -
119:14
**weight** [1] -
77:17
**weighting** [1] -
77:22
**welcome** [3] -
54:5, 54:15,
153:11
**welcoming** [5] -
50:10, 51:12,
55:6, 56:10,
56:13
**WHALEY** [2] -
214:17, 215:18
**whatnot** [2] -
14:6, 158:8
**whereas** [1] -
77:10
**white** [1] -
178:23
**whole** [4] -
77:18, 77:25,
132:14, 204:8
**wide** [2] - 25:23,
80:3
**widely** [2] - 31:8,
31:9
**Wiener** [4] -
192:9, 192:13,

193:6
**wisdom** [1] -
93:24
**wish** [4] - 43:21,
64:17, 175:5,
190:11
**withdrew** [1] -
141:18
**WITNESS** [12] -
2:2, 29:14,
123:21, 123:24,
136:19, 163:1,
163:5, 189:20,
189:22, 190:4,
203:12, 210:2
**witness** [18] -
5:6, 8:4, 54:7,
55:2, 70:12,
123:14, 124:16,
124:17, 124:20,
138:22, 138:25,
151:16, 151:17,
156:8, 208:8,
212:16, 212:18,
213:6
**witnessed** [1] -
42:19
**witnesses** [2] -
151:8, 152:3
**word** [7] - 23:23,
49:3, 62:3, 68:8,
68:16, 68:18
**worded** [3] -
56:2, 56:4, 188:2
**wording** [1] -
148:10
**words** [6] - 73:9,
79:14, 104:16,
146:1, 192:22,
194:7
**wordy** [1] -
148:16
**works** [1] -
104:21
**World** [2] -
76:22, 77:3
**world** [3] -
24:12, 43:13,
140:19
**worthy** [1] -
180:5
**WRIGHT** [2] -
1:6, 212:6
**Wright** [3] -
131:2, 131:21,
132:4
**write** [2] - 25:21,
39:4
**writing** [4] -
25:12, 31:19,

192:7, 196:2
**written** [1] -
23:24
**wrote** [6] - 44:8,
96:12, 97:21,
141:10, 145:25,
197:4

## X

**XX** [1] - 212:21

## Y

**year** [8] - 6:10,
12:17, 15:23,
17:3, 33:7, 78:11,
105:22, 165:23
**years** [9] -
16:24, 51:2, 51:3,
51:4, 80:13,
80:14, 144:25,
145:19
**York** [1] - 20:7
**yourself** [3] -
74:13, 108:11,
149:1

## Z

**zoom** [2] -
140:15, 140:19
**ZOOM** [1] - 2:2
**Zoom** [2] - 1:22,
3:15