BENJAMIN S. GRAF, Ph.D.        09/23/2024                    1

1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF
2                  SHERMAN DIVISION

3  TIMOTHY JACKSON,                )
                                   )
4       Plaintiff,                 )
                                   )
5  vs.                             )  CASE NO. 4:21-CV-00033-ALM
                                   )
6  LAURA WRIGHT, et al.,           )
                                   )
7       Defendants.                )

8

9  **********************************************************

10             VIDEOTAPED ORAL DEPOSITION OF

11              BENJAMIN S. GRAF, Ph.D.

12                September 23, 2024

13 **********************************************************

14

15      VIDEOTAPED ORAL DEPOSITION OF BENJAMIN S. GRAF,

16 Ph.D., produced as a witness at the instance of the

17 Plaintiff and duly sworn, was taken in the above-styled

18 and numbered cause on the 23rd day of September, 2024,

19 from 9:03 a.m. to 12:08 p.m., before Kim D. Carrell,

20 Certified Shorthand Reporter in and for the State of

21 Texas, reported by computerized stenotype machine at

22 the University of North Texas System, 801 North Texas

23 Boulevard, Gateway Suite #308, Denton, Texas, pursuant

24 to the Federal Rules of Civil Procedure and the

25 provisions stated on the record or attached hereto.

BENJAMIN S. GRAF, Ph.D.          09/23/2024          2

1                          APPEARANCES

2

3  FOR THE PLAINTIFF:

4        Mr. Michael Thad Allen
         ALLEN LAW, LLC
5        P.O. Box 404
         Quaker Hill, CT 06375
6        Telephone: 860.772.4738
         Fax: 860.469.2783
7        E-mail: M.allen@allen-lawfirm.com

8

9  FOR THE DEFENDANTS:

10       Mr. Benjamin S. Walton
         Assistant Attorney General
11       General Litigation Division
         P.O. Box 12548, Capital Station
12       Austin, Texas 78711
         Telephone: 512.463.2120
13       Fax: 512.320.0667
         E-mail: Benjamin.Walton@oag.texas.gov
14
             - and -
15
         Renaldo Stowers
16       University of North Texas System
         Office of General Counsel
17       801 North Texas Boulevard
         Denton, Texas 76201
18       Telephone: 940.565.2717
         Fax: 940.369.7026
19       E-mail: Renaldo.Stowers@untsystem.edu

20

21  ALSO PRESENT:

22  VIDEOGRAPHER:

23       Mr. Tony McGough
         Legal Video Group
24       lvg.dallas@gmail.com
         214-598-5229
25

1                          I N D E X

2                                                    PAGE

3  Appearances.................................    2

4  Stipulations................................    5

5

6  BENJAMIN S. GRAF, Ph.D.

7        Direct Examination by Mr. Allen........   6

8

9

10                      EXHIBITS

11    NUMBER          DESCRIPTION                MARKED

12  Exhibit 1   Re-Notice of Taking Deposition..... 40

13  Exhibit 2   Center Review, Reporting

14              Period: FY2013 - FY2016

15              (JACKS 067377 - 067401)............ 40

16  Exhibit 3   Ad Hoc Review Panel Report

17              (Exhibit D)

18              (JACKSON000208 - 000233)........... 65

19  Exhibit 4   Material for the Committee

20              Emails

21              (UNT 002645 - UNT 002782).......... 79

22  Exhibit 5   Email, 7-24-20, Graf to Chung,

23              et al.

24              (UNT 000439)......................102

25

Exhibit 6   Screenshot of Facebook Post from
            Graf to Ewell, 7-25-20.............104

Exhibit 7   Emails Regarding Meeting With You
            Monday Sept 14 at Noon
            (UNT 002500 - 002505)..............109

Exhibit 8   Emails Regarding JSS
            (JACKS 089828 - 089832)............114

Exhibit 9   Statement From the MHTE Graduate
            Students - Confidential
            (Kohanski 000107 - 000110)........115

Exhibit 10  Emails Regarding Faculty
            Statement on the Recent Issue
            of JSS
            (UNT 000526)......................117

1                    A G R E E M E N T S

2    DEPOSITION OF:  BENJAMIN S. GRAF, Ph.D.

3    DATE:  September 23, 2024

4    CAUSE NO. 4:21-CV-00033-ALM

5

6    THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:

7         (X)  Notice
          ( )  Agreement
8         ( )  Court Order
          ( )  Subpoena
9         (X)  Rules of Federal Civil Procedure

10

11   ORIGINAL TO:

12        ( )  Witness
          (X)  Witness's attorney      (Benjamin Walton)
13        ( )  Producing attorney
          ( )  Signature waived
14

15

16   NUMBER OF DAYS FOR SIGNATURE

17        ( )  20 days

18        (X)  30 days

19        ( )  Other:

20

21   MISCELLANEOUS:

22        ( )  Any objection made by one party good for
               all parties.
23
          ( )  An unsigned copy may be used at any trial,
24             hearing, or arbitration proceedings.

25

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We're now going on the

3  record.  Today's date is September the 23rd, 2024, and

4  the time is 9:03 a.m.  This is the Video Deposition of

5  Benjamin Graf.

6         If the attorneys present could please state

7  their appearances, after which the court reporter will

8  swear in the witness.

9              MR. ALLEN:  Michael Thad Allen for the

10 Plaintiff.

11             MR. WALTON:  Ben Walton for the

12 Defendants.

13             MR. STOWERS:  Renaldo Stowers with the

14 University of North Texas System, Office of General

15 Counsel.

16             BENJAMIN S. GRAF, Ph.D.,

17 having been first duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19 BY MR. ALLEN:

20    Q.    Could you please state your name for the

21 record?

22    A.    Benjamin Graf, G-R-A-F.

23    Q.    You anticipated my next question.

24         Have you ever been deposed before, Professor

25 Graf?

1      A.    No, this is the first.

2      Q.    Okay.  So the first question I'd like to ask,

3  is there anything that would interfere with your ability

4  to answer questions truthfully today?

5      A.    No, not to my knowledge.

6      Q.    You are not on any medications that would

7  affect your memory?

8      A.    No, just coffee.

9      Q.    You don't have any psychiatric or mental

10  condition that would affect your memory or ability to

11  answer questions today?

12      A.    I don't have any psychiatric conditions, no.

13      Q.    Thank you.

14            So if I ask a question at any point today,

15  and you don't understand the question, you want

16  clarification, please don't hesitate to interrupt me

17  at any time.  Is that clear?

18      A.    Yes.

19      Q.    By the same token, if you do not ask for

20  clarification, I'll assume that you understood the

21  question as asked.  Is that also clear?

22      A.    Yes.

23      Q.    Okay.  Please explain what you did to prepare

24  for your deposition today.

25      A.    I had a consultation and coaching with my

1  attorney.

2        Q.    And I'll just also say that I'm not going to

3  ask you what you said or talked about with your attorney.

4  That would be privileged.

5        A.    Okay.

6        Q.    But I would like to know if you consulted any

7  documents in the course of your preparations.

8        A.    Some of the UNT attorneys provided a copy of

9  the faculty statement and the graduate student statement,

10  both of those statements.

11        Q.    By that, do you mean documents that were

12  sent to the dean, Dean John Richmond, in the July 25th

13  to July 30th time frame, with the signatures of the

14  faculty and graduate students on them?

15        A.    I'm not sure if they were provided to the dean

16  or not.  Without looking at it, I wouldn't really -- I'm

17  not sure.

18        Q.    You'll be able to identify those documents when

19  we present them in the course of your deposition, though,

20  correct?

21        A.    Yes.  I couldn't recall every detail just from

22  rote memory, but --

23        Q.    Sure.

24        A.    -- yeah.

25        Q.    And were there any other documents, in addition

BENJAMIN S. JONES, Ph.D.    09/23/2024

1   to what you've called the faculty and graduate student

2   statements?

3        A.    That was all.  Everything else was just a

4   conversation, coaching.

5        Q.    Did you take any notes or create any record

6   of your preparations?

7        A.    I just took some notes on the formalities of

8   the deposition and just the coaching on how to go about,

9   you know, the deposition.

10            MR. ALLEN:  Ben, is it your position that

11  that's work product or attorney-client communications?

12            MR. WALTON:  Yes.  I was just about to

13  instruct the witness.  Whatever notes he may have taken

14  as we were discussing attorney-client communications,

15  those notes are not here, they're not present, and they

16  reflect the work product of Counsel.

17       Q.    Have you talked to anyone else besides your

18  attorney about your deposition today?

19       A.    No.

20       Q.    I want to transition now and begin asking you

21  about your career at the University of North Texas --

22       A.    Okay.

23       Q.    -- and some of the background.

24            Can you just give me a brief summary of your

25  career and education to date, starting with your

1 undergraduate degree?  And by that, I mean, not your work

2 career yet.  We'll get to that.  Your degrees, where you

3 earned them, when.

4         A.   Okay.  So my first degree, my undergraduate

5 degree, was in music education.  And I went to Towson

6 University.

7         Q.   Can you state -- Towson?

8         A.   Towson.  Towson, T-O-W-S-O-N, Maryland.  And

9 that was in music education, instrumental, K through 12

10 certified.

11        Q.   When did you complete that degree?

12        A.   That would be completed in 2008 as far as I can

13 remember on the spot today.

14        Q.   Um-hum.  And that was a BS?  BA?

15        A.   That was a BS as far as I can -- as far as I

16 can remember, that was a BS.

17        Q.   And what did you do next?

18        A.   I took several auditions for graduate

19 schools in trumpet performance, one of those being the

20 University of North Texas.  I also auditioned at Peabody

21 Conservatory and the University of Massachusetts.  And I

22 ended up coming to the University of North Texas.

23        Q.   When did you enter the University of North

24 Texas?

25        A.   The subsequent fall.  So as far as I can recall

1  today, that would be 2008, August.

2        Q.    And what did you -- that degree did you pursue

3  at the University of North Texas?

4        A.    Trumpet performance, Master's of Music.

5        Q.    What kind of career does a Master's in

6  Performance prepare you for, whether it's trumpet or

7  another instrument?

8        A.    A Master's of Music in Performance is

9  oriented toward playing your instrument full-time.

10  And I would -- I would personally also include teaching

11  your instrument.  For example, private lessons would be

12  an example.

13        Q.    Did you complete that degree?

14        A.    Yes.

15        Q.    What year did you complete your Master's in

16  Performance at the University of North Texas?

17        A.    2010.

18        Q.    2010.  And what did you do next after that?

19        A.    So during my performance degree, I got a

20  fellowship for music theory, a teaching fellowship.  And

21  I decided to pivot and change my major for the doctoral

22  level to music theory.

23        Q.    Sorry.  I don't know if I understood.  You

24  changed to a doctorate level degree program?

25        A.    Yes.  I wanted to -- I pivoted my major from

1  performance then to music theory.

2      Q.    And did that mean that you didn't finish the

3  performance degree, or you did?

4      A.    No, I did.

5      Q.    Okay.

6      A.    I did.

7      Q.    All right.  And so approximately what year was

8  that, that you began the Ph.D. program?  In music theory,

9  right?

10      A.    That would be 2010.

11      Q.    Okay.

12      A.    And the boundary between my master's and

13  doctorate is likely a little bit blurred because there

14  were some graduate courses that I think could have

15  counted for both degrees.  I took also some summer

16  classes to catch up in coursework.  I think that's

17  reasonable to say.

18      Q.    And you said you received some sort of

19  fellowship from the University of North Texas, correct?

20      A.    Right.  So I had gotten a TA -- TA/TF position.

21  I can't remember exactly how -- exactly how that went

22  down.  But I had a TA at first.

23      Q.    And what is a TA?

24      A.    Teaching assistant.  So you are not the

25  instructor of record for the course.  And then that

 1  transitioned into a TF position subsequently.

 2      Q.    Which is?

 3      A.    Teaching fellow.

 4      Q.    And how are those different?

 5      A.    The teaching fellow is the instructor of record

 6  for a class, and the teaching assistant, you

 7  are -- is under a supervising faculty member.

 8      Q.    Did you finish your Ph.D.?

 9      A.    Yes.

10      Q.    What year did you finish that?

11      A.    2016 as far as I can recall today.  I'm trying

12  to remember.

13      Q.    During that time, did you work with my client,

14  Timothy Jackson, in any way?

15      A.    Yes, I worked with Dr. Jackson.

16      Q.    Why don't we back up and explain how you first

17  came to know Timothy Jackson.

18      A.    Sure.  I had him as a -- as a professor in

19  class.  Yeah.

20      Q.    Can I ask, was this as a graduate student in

21  the Ph.D. program or already as a Master's in Performance

22  student?

23      A.    That's a good question.  I'm trying to remember

24  the first class I took with Dr. Jackson.  I

25  may have taken one.  I may have taken a class with him

1  during my master's.  But I can't -- I couldn't really

2  pinpoint that for you.  I'm sorry.  I wish I could today.

3  But it would be -- if it wasn't at the end of my

4  master's, it would have been early on in my Ph.D.  Yeah.

5       Q.    And how did your relationship to Professor

6  Jackson evolve?

7       A.    I really learned that -- can you hear me okay?

8  Sorry.  I discovered that he was really a brilliant

9  analyst and a good teacher, I would say.

10      Q.    Analyst of what?

11      A.    Analyst of music theory.  I saw him as an

12  expert that I wanted to study with.

13      Q.    And did you study with him for your Ph.D.?

14      A.    Yes.

15      Q.    And explain for the Court what that means.

16      A.    So for my Ph.D., I would say most doctoral

17 students that I can, you know, recall in the College

18 of Music have a supervising professor for their main

19 project, whether that be a recital or dissertation.

20           In that case -- in my case, that would be

21 a dissertation.  And Dr. Jackson was my dissertation

22 advisor, primary advisor for my -- for my dissertation.

23      Q.    Okay.  And as the supervising primary professor

24 and primary advisor, is that the same thing?

25 Are those just synonyms?

1       A.    Most of the time, I would say that's true.
2  But there could be a circumstance where a professor takes
3  a job at another institution, and then they're left with
4  another professor to do their defense and sign the final
5  document.  I would think in a lot of cases, the person
6  that you're working with on your independent projects
7  would then subsequently be your main advisor for your
8  dissertation.  I think that's reasonable to say.
9       Q.    So Professor Jackson was your Ph.D.
10 dissertation advisor?
11      A.    Yes.
12      Q.    How did you work with him in that capacity?
13      A.    I worked with him very closely.  We spent a lot
14 of time together in private lessons, studying music
15 theory.
16      Q.    Is it fair, within the bounds of a professional
17 relationship, did you get to know
18 Professor Jackson very well?
19      A.    I would say as a professional.  You know, I
20 think we kept it professional.  But of course, when you
21 work with somebody a lot, you did have different levels
22 of professional relationships.
23      Q.    Sure.
24      A.    You know, you could have somebody, you just had
25 a student in class one time.  And then you could have

1  someone who you did private lessons with, and you might

2  consider that person to be closer than a person who was

3  just in your course one time.

4       Q.    How close would you describe your relationship

5  with Professor Jackson?

6       A.    I would say pretty close.  You know, I think I

7  spent a lot of time with him working on my dissertation,

8  a lot of lessons obviously.  And he helped me out a lot,

9  yeah.

10      Q.    Is it fair to say he was a mentor to you?

11      A.    I think he did mentor me specifically --

12  specifically on analyzing music.

13      Q.    And as a music theory Ph.D., that was pretty

14  much the focus of your work, correct?  Analyzing music?

15      A.    I think it was a focus, a focus.  I'll

16  qualify that a little bit and say it was a focus.  I

17  think there's several aspects to a Ph.D., especially

18  in music theory, you know, teaching being one of those

19  aspects, service being one of those aspects, research

20  being another aspect.

21            I think in terms of music analysis,

22  Dr. Jackson, you know, definitely was taking a lead

23  for me.  And I really -- I really respect him for it.

24      Q.    Did you ever meet with Dr. Jackson at this

25  private home?

BENJAMIN S. GRAF, Ph.D.        09/23/2024

```
 1      A.    Yes, a few times.  A few times, I went to his
 2  private home to work on dissertation, have him read some
 3  things that I was working on.
 4      Q.    Did you meet other members of his family, such
 5  as his wife?
 6      A.    Yes.
 7      Q.    Her name is Heejung, right?
 8      A.    Heejung.
 9      Q.    Heejung.  And she's an accomplished pianist
10  herself, correct?
11      A.    Yes.  I would consider her to be accomplished,
12  yes, definitely.
13      Q.    So you got to know the family as well as simply
14  your professor who was your dissertation advisor?
15      A.    Yes, I did know Dr. Jackson's family.  We
16  didn't spend a lot of social time together.  I was only
17  there for my lesson.  But I did know his family, of
18  course.
19      Q.    When you say lesson, what do you mean?
20      A.    A lot of times, I would present something that
21  I wrote, something that I worked on.  And Dr. Jackson
22  would give me feedback on it.
23      Q.    So these weren't piano lessons or musical
24  lessons in that sense?
25      A.    No, no.  They were definitely theory and
```

 1  analysis lessons.

 2      Q.    Did you come to work for the Center of

 3  Schenkerian Studies in any capacity?

 4      A.    I did.

 5      Q.    Could you explain your work for the Center of

 6  Schenkerian Studies?

 7      A.    Sure.  Dr. Jackson and Dr. Slottow approached

 8  me about working with the Journal of Schenkerian Studies

 9  as part of -- during my Ph.D. time.  I don't have the

10  exact date for that, though.  If I knew it, I would say

11  it, but I don't remember the exact date.

12      Q.    But it was in the course of your Ph.D.

13  studies?

14      A.    Yes.

15      Q.    Can you describe the work of the Center as

16  you came to understand it?

17      A.    Good question.  I really didn't design the

18  mission for the Center.  Based on what I know, the name,

19  Schenkerian Studies, you know, that -- to me, that would

20  mean the work of Heinrich Schenker and his students.  But

21  I don't want to elaborate too far because I didn't really

22  craft the mission for the Center as a whole.  Yeah.

23      Q.    I'm asking about your experience.  In your

24  experience, what did the Center do?

25      A.    In my experience, the Center published the

1    Journal for Schenkerian Studies.  That was the one

2    thing that the Center did.  I'm trying to recall other

3    activities.  Maybe you can say -- maybe somebody else

4    would say that the Center would support research projects

5    that were in the Schenkerian area of focus.  That might

6    be something reasonable to say.  But yeah, I'll leave it

7    at that, because like I said, I don't really -- I didn't

8    craft the mission statement or anything like that.

9        Q.    And we'll get to the Journal of Schenkerian

10   Studies in a minute, but one last question on that score.

11           Did you consider your dissertation to have

12   engaged in Schenkerian analysis?

13       A.    Yes.  Schenkerian analysis is a part of my

14   dissertation, yes.

15       Q.    And again, because this is for the Court, they

16   may not know anything about Schenkerian analysis, as have

17   the lawyers before this case.

18       A.    Right, right.

19       Q.    Can you just give a two or three sentence

20   explanation of what Schenkerian analysis is for someone

21   who has absolutely no background in music?

22       A.    That's a really hard question.  I'll try to

23   summarize it as best I can.

24       Q.    Please.

25       A.    Let's see.  Dr. Jackson would be a lot better

1    at this question than I would be.

2            Schenkerian analysis is a way or methodology

3    of approaching music analysis that considers music on

4    structural levels and the insights that one can glean

5    from determining the way those levels are put together

6    and the way that those levels interact.

7        Q.    Are those levels organized in Schenkerian

8    analysis hierarchically?

9        A.    Yeah, a lot of the times.  I mean, I think

10   it depends on how traditional your approach is to

11   Schenkerian analysis.  Some people are more strict.  Some

12   people are more modern.  And just with any theory, you

13   could always have a modern -- more modern approach or

14   more strict traditional approach.  So yeah.

15       Q.    And could I interrupt there and say when you

16   say a modern approach, do you mean by that people in the

17   present adapt, apply differently, try to advance the

18   theory, things of that nature in their studies?

19       A.    Yeah.  I think with any theory or with any

20   methodology, even if it was form analysis or if it was

21   different types of analysis, everyone is going to

22   re-visit that theory and try to clarify and qualify

23   and move forward different aspects of the theory, not

24   necessarily in a critical way.  It could be.  Of course,

25   that's one option, but yeah.  Move forward the theory in

BENJAMIN S. GRAF, Ph.D.      09/23/2024

 1  certain ways.

 2      Q.    And is that what you considered yourself to be

 3  doing in your dissertation?

 4      A.    Yeah, yeah.  In a certain way, I think I did,

 5  yeah.

 6      Q.    Is there anything that prevents a scholar

 7  such as yourself from applying Schenkerian analysis

 8  to Non-Western music?

 9      A.    Is there anything that prevents?  That's also a

10  good question.  I think not necessarily.  It really

11  depends.  That's a really hard question to answer

12  succinctly.  It depends.

13      Q.    Let me put it this way.  Are you aware of music

14  theorists applying Schenkerian analysis to Turkish music,

15  say?

16      A.    I could not cite a study off the top of my head

17  that does that.  But you know, there could be one out

18  there that I'm just not aware of.  I don't -- you know,

19  that's a -- especially music publications that occur in

20  other languages and things, I wouldn't be able to cite it

21  off the top of my head today.

22      Q.    Do you consider your dissertation to have

23  been racist?

24      A.    I think it depends.  That's a hard question to,

25  you know, commit.  I don't think a yes or no would really

1  capture the full answer there.

2      Q.    Were you ever accused of being racist for

3  applying Schenkerian analysis in your dissertation?

4      A.    I was never accused of being racist for

5  applying Schenkerian analysis.

6      Q.    Do you -- were you ever accused of being, I

7  don't know, systemically racist for applying Schenkerian

8  analysis in your dissertation?

9      A.    Not in my dissertation, not that I'm aware

10  of.

11      Q.    And I assume you consider yourself white?

12      A.    I consider myself to be white.

13      Q.    And I don't know.  My guess is Graf is a German

14  name in origin?

15      A.    Austro-Germanic origin, but -- you know, I have

16  various family histories, but...

17      Q.    Sure.  As do most of us.

18          Did you consider yourself to be applying a

19  white racial frame to the study of music?

20      A.    That's a really good question.  I think the

21  idea of a white racial frame is a complicated one that

22  doesn't necessarily tie directly to Schenkerian analysis.

23  I think Schenkerian analysis is a component of something

24  that could be considered heavily Astro-Germanic.

25      Q.    And Heinrich Schenker himself was born in the

1  Austrian Empire, correct?

2      A.    I don't want to commit to a certain biography

3  of Schenker that other people would know better than I

4  would.

5      Q.    That's okay.  I'll strike the question.  We can

6  move on.  That's all right.

7          Let's talk about the Journal of Schenkerian

8  Studies.  When did you come in contact with the Journal

9  of Schenkerian Studies?

10     A.    When did I come in contact with it?  I want

11 to say my first contact with the JSS was probably just

12 reading an article out of it.

13     Q.    And by JSS, you mean the Journal of Schenkerian

14 Studies?

15     A.    Yes, the Journal of Schenkerian Studies would

16 be the JSS.

17     Q.    And if -- if, going forward, either one of us

18 refers to JSS, we'll understand we know what we means,

19 right?

20     A.    Yes.

21     Q.    That's the Journal of Schenkerian Studies?

22     A.    That's fine, yes.

23     Q.    Thank you.

24          Sorry to break in, but this is an example

25 of us talking at the same time, which makes her job

1  terrible.  I do it, too.  I'm just going to try to point

2  it out, and I'm trying to be a good boy.  I'm just going

3  to ask that you try to be a good boy, too.

4           So you said you read an article in the Journal

5  of Schenkerian Studies.  Was this early in your Ph.D.

6  studies?

7       A.    I would say yes, yeah.

8       Q.    And then how did your relationship to the

9  Journal of Schenkerian Studies evolve?

10      A.    In my studies with Dr. Jackson, I gained

11  more expertise in Schenkerian analysis.  And Dr. Jackson

12  approached me about helping out with the -- with the

13  Journal.

14      Q.    When did he approach you about helping out with

15  the Journal?

16      A.    Oh, that's a good question.  I don't really

17  know exactly.

18      Q.    Well, let me put it this way.

19      A.    I know it was in my doctorate, though.

20      Q.    I was going to ask you.  Was it before you

21  finished your doctorate?

22      A.    Before I finished my Ph.D., definitely.

23      Q.    And you finished that in 2016?

24      A.    Yes.

25      Q.    And I believe you said you started that program

BENJAMIN S. GRAF, Ph.D.      09/23/2024

1  in 2010ish?

2      A.    Yes, yes.

3      Q.    And it was after the first few years perhaps?

4      A.    To my recollection, that would be as close as

5  we're probably going to get on the spot.

6      Q.    Yeah.  And I understand the limits of memory

7  and pinpointing time.  Is it fair to say when you had

8  become a mature graduate student, this is when you were

9  solicited to work on that Journal?

10     A.    Yeah, I think there's a certain level of

11 expertise that you would need to be able to work on the

12 Journal, so I think that's fair to say.

13     Q.    Did you approach Professor Jackson to work on

14 the Journal, or vice versa?

15     A.    The way I remember it, Dr. Jackson was seeking

16 help to edit the Journal, but I don't remember exactly

17 how that conversation happened.

18     Q.    And did you say yes?

19     A.    I said yes.

20     Q.    And what was the role for you on the Journal at

21 that time?

22     A.    My role when I started out was part of a team,

23 so I had a co-editor.  His name was Ryan.

24     Q.    Ryan what?

25     A.    Taycher.

BENJAMIN S. GRAF, Ph.D.       09/23/2024

1       Q.    Taycher?

2       A.    I need to spell that out for you probably,

3   don't I?

4       Q.    We can get it.

5       A.    The tough questions of the day, they don't...

6       Q.    We'll get it from another source.

7       A.    Yeah.  His last name is Taycher.  And we

8   were co-editors, and we were tasked with helping out

9   Dr. Jackson with the Journal.

10      Q.    How long did you have the help from this -- or

11  help to the co-editor, Taycher?

12      A.    That's a really good question.  I think I want

13  to say Ryan and I worked together for a year or two.

14      Q.    Um-hum.  And at some point, you became the sole

15  graduate student editor of the Journal, correct?

16      A.    Ryan dropped out.  Ryan dropped out.

17      Q.    Dropped out of the program or just the Journal?

18      A.    He dropped out of his role as co-editor.  And I

19  don't -- I would have to ask Ryan or, you know, you would

20  have to ask Ryan why and all of the reasons why.

21  But yeah, it ended up just being me for a little while

22  there.

23      Q.    And for a little while was how long?  From when

24  to when, if you know?  I mean, I think we know your

25  relationship to the Journal came to an end in 2020,

 1  correct?

 2      A.    Right.

 3      Q.    So about when did you take over the sole

 4  graduate student editorship?

 5      A.    That's a really good question.  I want to

 6  say -- was it before I finished?  It want to say it was

 7  before I finished.  I want to say it was like 2015 or

 8  beginning of 2016, but it would be hard.  I don't want

 9  to commit too closely to a date that I don't remember.

10      Q.    Well, and the title page of the Journal would

11  show when you were the editor, right?

12      A.    Um-hum.  It should, yeah.  You would think you

13  could follow volume by volume and see which ones had two

14  names.

15      Q.    And during the time you were an editor, did you

16  solicit articles for the Journal?

17      A.    At times, but rarely.  It depended.  It

18  depended on the circumstance and certain things, yeah.

19      Q.    But you would do that from time to time?

20      A.    Rarely.  You know, I honestly can't recall a

21  time where -- well, let's think.  I don't think there was

22  a time where I solicited an article by myself that it

23  actually wound up in print.  But it's hard to say.  What

24  is soliciting an article?  I mean, is that just a

25  conversation with somebody at a conference where you say,

1  hey, that was really nice, you should consider submitting

2  that?

3      Q.    Let me ask you.  Would you consider soliciting

4  an article as an editor, not just you --

5      A.    Right.

6      Q.    -- but in your experience as an academic and

7  working with journal editors?  What does that mean in

8  your profession?

9      A.    I think there are different ways of soliciting.

10 A more formal way to me would be writing

11 out an email and describing what the title of the paper

12 was that you are interested in or citing a specific type

13 of research that you would like to solicit.

14          I think also, there's a more informal

15 solicitation that occurs where you may see a paper or

16 hear about some research, and then more informally ask

17 someone in person if they're interested in publishing

18 that.  I think that would be different levels of

19 soliciting articles.

20     Q.    And you've been a credentialed Ph.D. music

21 theorist for almost ten years.  If you finished in 2016,

22 it's now 2024, right?

23     A.    Years, yeah.

24     Q.    And so in your experience, is that normal for

25 editors?

1      A.     I don't know.  I haven't honestly talked to a
2  lot of editors to know.  I don't -- I don't really think
3  I could commit to saying what's normal.  And I think a
4  lot of different publications have different ways of
5  soliciting articles.  And I think that's fair.  I think
6  every, you know, publication could have different ways
7  of approaching it.
8      Q.     Describe what you understand by the peer review
9  process of the Journal of Schenkerian Studies.
10      A.     I really don't have a specific procedure of
11  peer-review process that I can -- that I can recall.
12  Nothing that was really super formalized.
13      Q.     Did you send articles that you wanted to
14  publish out for review?
15      A.     Yes.  A lot of the times, I would send out an
16  article for review.  That's true.
17      Q.     And how would you select the reviewers?
18      A.     What I tried to do as best I could is take
19  someone who had an area of expertise that aligned with
20  the subject matter of a given article.
21      Q.     And the reviewer, would you tell them the
22  name of the author?
23      A.     No.
24      Q.     Would you tell the author the name of the
25  reviewer?

1        A.    No.

2        Q.    And that's called --

3        A.    I mean, I would try not to.  There is a point,

4    some point, where people could figure out who they are

5    based on certain feedback.  Sometimes, based on the

6    feedback, people figure out who each other are.  But I

7    think we try at least to maintain some degree of

8    anonymity.

9        Q.    And that's called double-blind peer review,

10   correct?

11       A.    Double-blind meaning two anonymous peer

12   reviewers.

13       Q.    And even though the author or the reviewer

14   might figure out who the paper was authored by or who the

15   reviewer was, you didn't expressly tell them, correct, as

16   the editor?

17       A.    I would try to avoid that, if possible, you

18   know.

19       Q.    Okay.  How closely did you work with Professor

20   Jackson as editor of the Journal?

21       A.    I would say closely.  But we worked a lot more

22   closely on things like my dissertation than our work on

23   the Journal.

24       Q.    And he -- and you had mentioned Professor

25   Slottow, so let me back up.  Could you state Slottow's

1  full name for the record?  And if you could, spell his

2  last name, because I believe it's a bit unusual, for the

3  court reporter.

4      A.    Sure.  Stephen Slottow, S-L-O-T-T-O-W.  And

5  he also was an advisor to the JSS.

6      Q.    And so he and Professor Jackson were advisory

7  board members, correct?

8      A.    Yes.

9      Q.    And then there was an editorial board, which

10 was much larger, correct?

11     A.    That is correct.

12     Q.    And did you select reviewers principally from

13 the editorial board?

14     A.    As best I could, as best I could.  Sometimes

15 people would be unavailable or they would not be able

16 to -- they would not have time to do a review.  So you

17 would have to do your best to seek out somebody who could

18 actually do the review on something.

19     Q.    But it wasn't a requirement that you be on

20 the editorial board, correct?

21     A.    No, I wouldn't say that it was a requirement to

22 be on the editorial board in my view.

23     Q.    Let's leave out the year 2020 and 2019.  Were

24 you ever told to censor anyone by Professor Jackson

25 during your work on the Journal?

1      A.    No.

2      Q.    Were you ever accused of being racist for

3 anything you published in the Journal?

4      A.    Oh, I didn't publish anything in the Journal.

5      Q.    Not you as an author; you as an editor.

6 Maybe strike that question because you're pointing

7 out an unclear part of it.  Let me ask it a different

8 way.

9           Were you ever accused of being racist for any

10 article that you published as an editor in the Journal?

11      A.    Not that I recall, no.  Not that I recall.

12      Q.    Prior to 2020, do you recall anyone ever

13 accusing the Journal of being systemically racist?

14      A.    No.

15      Q.    And I believe this was before your time, but

16 you know that Professor Philip Ewell published in the

17 Journal of Schenkerian Studies, correct?

18      A.    That was before my time, so I couldn't really

19 speak to that, that well.

20      Q.    You were editor of the Journal, right?

21      A.    Yes.

22      Q.    So you knew that he had published articles

23 before you became editor, correct?

24      A.    That is true.

25      Q.    Did you know those articles?  Did you look

1  through the Journal to determine what articles had been

2  published before?

3       A.   I did not look through every single article

4  that was published before.

5       Q.   Did you -- well, let me ask the question again,

6  though.  Did you know that Philip Ewell had published in

7  the Journal?

8       A.   No.

9       Q.   So I think we've determined that you worked

10 closely with Timothy Jackson on your dissertation.  You

11 knew him well enough to meet with him at his home,

12 correct?

13      A.   That is correct.  I worked with him on my

14 dissertation, and I did do some lessons with him at his

15 house.

16      Q.   You even met his wife who's an accomplished

17 pianist, correct?

18      A.   Correct.

19      Q.   You also worked closely with him on the

20 Journal, correct?

21      A.   That's correct.

22      Q.   Not as closely, you testified, as you did on

23 your dissertation, right?

24      A.   That's true.

25      Q.   You also worked with him to some extent in

 1  the Center for Schenkerian Studies, which published the
 2  Journal?
 3      A.    Right.  That's a little bit hard to pinpoint.
 4  Just saying the Center is a bit broad, I would say.
 5      Q.    Um-hum.
 6      A.    But...
 7      Q.    Yeah.  And Professor Jackson was close enough
 8  to you, and vice versa, that you've called him your
 9  mentor, correct?
10      A.    He definitely mentored me as far as music
11  analysis, yeah.
12      Q.    And did you value that mentorship?
13      A.    Yeah.
14      Q.    Can you state any racist actions that you
15  believe Timothy Jackson committed while you knew him?
16      A.    Any racist actions?  That's a really tough
17  question.  I think it depends.  I think, you know, one
18  thing to clarify, you know, would be what constitutes a
19  racist action.
20      Q.    Well, what constitutes a racist action in
21  your view?
22      A.    I mean, in my opinion, purposefully --
23      Q.    I'm not talking about your opinion.  I'm saying
24  what is a racist action that you would recognize as a
25  racist action?  Like burning a cross on someone's lawn?

BENJAMIN S. GRAF, Ph.D.        09/23/2024

```
 1   Would you recognize that as a racist action?
 2        A.    That seems a bit extreme.
 3        Q.    It's a yes or no question, Professor Graf.
 4        A.    I think the situation is very dependent on
 5   context.
 6        Q.    I'm just going to ask you the yes or no
 7   question again.
 8              Would burning a cross on someone's lawn be a
 9   racist action?
10        A.    I would have to look at the -- review the whole
11   situation in context.
12        Q.    So you can't really identify a racist action
13   from anything else, right?
14        A.    Well, one thing to consider is that what were
15   the race of the people involved and what was the context
16   of that.  You know, if somebody -- if there was a fire,
17   and I had a necklace, a cross necklace, and it fell into
18   the fire, that may not be considered racist.
19        Q.    That's also not burning a cross on someone's
20   lawn, is it?  No reasonable person would consider that
21   burning a cross on someone's lawn.  You know exactly what
22   I'm talking about, burning a cross on someone's lawn,
23   don't you?
24        A.    I don't actually.
25        Q.    You don't?
```

1    A.    No.

2    Q.    That's your testimony today?

3    A.    I think it depends on the situation, that -- it

4 depends.  It really, really depends, without knowing who

5 was involved, what was the reasoning behind it --

6    Q.    Sure.

7    A.    -- I don't -- it's hard to commit without

8 having all of the information in front of me.

9    Q.    So let's go back to Professor Jackson.

10 We've already established that you knew him very well as

11 a dissertation advisee, as a mentee.  You had years of

12 experience working with this man, so you knew the context

13 I'm asking about, and I'm asking you to identify any

14 racist actions that you know of that Professor Jackson

15 committed.

16    A.    I think -- I think there are a lot of factors

17 at play.  Sometimes, if a certain party is excluded based

18 on race, that could be considered by some people to be

19 racist.

20    Q.    Do you know that Jackson ever did that?

21    A.    It would be hard for my position to say exactly

22 what Dr. Jackson did or did not do.

23    Q.    Why?  You worked with him.  You were an

24 editor on the Journal.  You worked with him as a mentee.

25 You were in the same graduate program.  You worked on

1  the Center of Schenkerian Studies and the Journal of

2  Schenkerian Studies.  What more context do you need,

3  Professor Graf, to answer my question?

4       A.    I think it's hard to say what somebody else

5  does on a day-to-day basis.

6       Q.    I'm talking about your direct experience.

7  I'm not asking you to speculate.  I'm asking you, based

8  on your direct experience, knowing Jackson as closely as

9  you did, can you identify any racist actions that the

10 man committed?

11      A.    I don't -- I would have to go through and

12 put myself in Dr. Jackson's shoes and read all of the

13 messages and all of the communications and all of the

14 correspondence.  It's hard -- I can't -- I don't think

15 that it's fair of me to put myself in Dr. Jackson's

16 shoes and say, oh, he did something that was racist.

17 I don't think that's fair of me to say.

18      Q.    It's not fair of you to say he did something

19 racist?

20      A.    There are so many other things to clarify that

21 are important clarifications.

22      Q.    So your answer is it is not fair to say that he

23 did something racist?

24      A.    I think it depends on what your definition of

25 racism is and how you contextualize certain actions and

1  certain statements.

2        Q.    So you can't give a clear answer to that

3  question:  Did Professor Jackson commit a racist action,

4  to your knowledge?

5        A.    I would say that some people would consider the

6  same action to be racist and somebody else consider that

7  action to not be racist.  I think that's --

8        Q.    I'm talking about you.  I don't care what these

9  other people think.  I'm talking about you, Benjamin

10  Graf, a defendant in a civil action.  You realize you're

11  being sued by the University -- excuse

12  me, by my client, Dr. Jackson, right?

13        A.    Yes.

14        Q.    And the taxpayers provided you counsel,

15  correct?

16              MR. WALTON:  Form.  Excuse me.  Object

17  to form.  You are free to respond, if you know.

18        A.    I think that's correct, to my knowledge.

19        Q.    Yes.  And the Attorney General's Office is here

20  defending you today, correct?

21        A.    That's correct.  I know.  Assistant Attorney

22  General, right?

23              MR. WALTON:  You're free to respond to

24  your knowledge.

25        A.    To my best of my knowledge, yes.

1    Q.    So I'm not asking about other people and what

2    they may have thought about Timothy Jackson.  I'm asking

3    about you, Professor Benjamin Graf, a Defendant in this

4    civil action.

5              As you sit here today, can you give me a clear

6    answer to what you know Timothy Jackson, based on your

7    direct experience, to have committed which you consider a

8    racist action?

9    A.    You know, I think based on my understanding, my

10   -- you know, my viewpoint or my opinion of racism, there

11   could be some statements that could be considered racist.

12   That's really all I can say.

13   Q.    And so all you can say is that he spoke from

14   time to time in a way you considered racist?

15   A.    Some statements -- some statements could be

16   considered racist by some people.

17   Q.    I'm not asking about other people, which

18   I've already said.  So again, I want you to focus and

19   concentrate on you.  All right?

20              Enumerate the statements that you believe

21   Timothy Jackson made that are racist.

22   A.    I can't enumerate specific statements.

23              MR. ALLEN:  Can we go off the record,

24   please?

25              THE VIDEOGRAPHER:  We're off the record

 1  at 9:46 a.m.

 2                    (Recess taken)

 3                    THE VIDEOGRAPHER:  We're back on the

 4  record at 9:53 a.m.

 5                    (Deposition Exhibit Number 1 marked.)

 6                    (Deposition Exhibit Number 2 marked.)

 7      Q.   Professor Graf, I've taken the trouble of

 8  marking two exhibits, Exhibit 1 and Exhibit 2, that are

 9  in front of you.  Do you see those documents?

10      A.   Yes.

11      Q.   And I should have done Exhibit 1 earlier, and I

12  apologize.  Do you recognize Exhibit 1?

13      A.   It appears to be the re-notice of taking the

14  deposition.

15      Q.   And it's the re-notice of taking your

16  deposition, correct?

17      A.   Yes, to Benjamin Graf, in care of Benjamin

18  Walton.

19      Q.   And is it accurate to say you've appeared to

20  give live testimony today in response to this re-notice?

21      A.   Yes.

22      Q.   That's all the questions I have for Exhibit 1.

23           And then I wanted to turn to Exhibit 2 that's

24  marked -- or excuse me, that's captioned Center Review,

25  Reporting Period: FY2013 to 2016, right?

1      A.    Center Review, Reporting Period: FY2013 -
2  FY2016.
3      Q.    And not suggesting that you've seen this
4  document before, but I would like to ask you if you have.
5      A.    I have not seen it.
6      Q.    And it is a Center Review of the Center for
7  Schenkerian Studies.  Do you see that in the top line of
8  the first page?
9      A.    It is titled that, yes.  I haven't look through
10 all of the pages, but that's the title.
11     Q.    I understand.  And I just wanted to skip down.
12           If you see in the lower right-hand corner,
13 there are page numbers.  In this case, JACKS 067, blah,
14 blah, blah.
15     A.    Okay.
16     Q.    Those are called Bates numbers.  And they are
17 just continuous pages that run throughout all of the
18 documents in a case.  I just want to be clear what they
19 are.  But I'll be referring to these to guide you to
20 where I want you to look in a document.
21     A.    Okay.
22     Q.    I only have a few questions about this one
23 because, as you've already testified, you haven't seen it
24 before.
25     A.    Okay.

1    Q.    But if you turn to JACKS 067379, that would be
2    page 3 of 25 marked on the document.
3    A.    Okay.
4    Q.    And do you see at the bottom of the page, it
5    says, "Names of people (faculty, students, staff, others)
6    affiliated with Center/Institute," and so forth?
7    A.    Yes, I see that.
8    Q.    On the second line in that section, your name
9    is listed as the current editor, correct?
10    A.    That's correct.
11    Q.    Does that refer to your task as the current
12    editor of the Journal of Schenkerian Studies, to the best
13    of your knowledge?
14    A.    As best I can recall.  I haven't seen this
15    document, but yes.
16    Q.    And who is Yiyi Gao?  Do you see the name right
17    there underneath yours?
18    A.    Yiyi Gao, to my knowledge, was also a doctoral
19    student at the University of North Texas.
20    Q.    Did you work with her at the Center?
21    A.    Honestly, no.
22    Q.    Okay.
23    A.    Not to my capacity with -- as an editor.  No,
24    not that I can recall.
25    Q.    Now, we're going to fast-forward real quick

1  here.  If you could look on page 12 of 25, also

2  designated JACKS 067388.

3      A.    Can you repeat that?  I'm sorry.

4      Q.    12 of 25, also called JACKS 067388, the Bates

5  numbers.

6      A.    Okay.

7      Q.    Did you find it?

8      A.    I think I've got it here.

9      Q.    It also lists your name there as, "Recent

10  Completed Dissertations and Theses by UNT Students

11  Related to the Center's Research Activities."

12          Do you see, you are at the top of the line?

13      A.    Yes, I see my dissertation listed there, at

14  least the bibliographic citation for it.

15      Q.    And that's the title of your completed

16  dissertation?

17      A.    Yes.

18      Q.    And so in your relationship to the Center, was

19  your completion of the dissertation considered one of the

20  contributions of the Center as well as obviously your

21  achievement, but was it considered associated with the

22  Center?

23      A.    I think Dr. Jackson would consider it, yeah,

24  part of the Center.  There might be a tangential research

25  activity.  That would be a good way to put it.

1    Q.    Thank you.  And as we go through exhibits, I'll
2  ask you when we're done with them, to put them to the
3  side.

4    A.    Okay.

5    Q.    Some -- it may come up that we refer back to
6  them, and keep the pages together.  At the end of the
7  deposition, the court reporter will take them.

8         Now, let's also fast forward to the 2019-2020
9  time frame.  In that time frame, did you get to know a
10  fellow graduate student named Levi Walls?

11    A.    I knew Levi Walls, yes.

12    Q.    Levi is how you say his name?

13    A.    Yes.

14    Q.    And how did you make the acquaintance of Levi
15  Walls?

16    A.    That's a good question.  I don't really know
17  when we first met.  But he taught as a teaching fellow at
18  the University of North Texas, and I supervised the TA
19  and TF graduate students.

20    Q.    You were supervising the TA and TF students?

21    A.    Yes.

22    Q.    What job did you have in that capacity?

23    A.    So I coordinate the assignments for ear
24  training teaching.

25    Q.    Say that again.  I just didn't hear.

 1      A.    Coordinate the assignments for ear training
 2  teaching, so --
 3      Q.    Ear training?
 4      A.    Oral skills or ear training is another way to
 5  say it, you might know.
 6      Q.    That's a term of art in music composition,
 7  music instruction?
 8      A.    Yes.
 9      Q.    Okay.  And did you become close to Levi -- Levi
10  Walls?  Excuse me.
11      A.    Maybe.  I guess it depends on what you consider
12  to be close.  We didn't really spend much
13  social time together outside of work situations.
14      Q.    Did you come to work on the Journal of
15  Schenkerian Studies together?
16      A.    Yes.
17      Q.    Describe how you came to work on the Journal of
18  Schenkerian Studies together with Levi Walls.
19      A.    I -- when I restructured my position at UNT
20  with my boss at the time, my chair, Benjamin Brand, we
21  had a conversation about withdrawing me from the Journal
22  of Schenkerian Studies.
23      Q.    What year was this?
24      A.    To the best of my knowledge, this was 2019,
25  fall.

1      Q.    Okay.  Describe your conversations with the

2   department chair, Benjamin Brand, about withdrawing from

3   the Journal.

4      A.    We had a discussion, that we didn't think that

5   it would be the best use of my time at North Texas to

6   be -- to continue to work in this capacity, because I was

7   in a teaching position.

8      Q.    When you say, "this capacity," as the editor of

9   the JSS?

10     A.    The editor of the JSS, correct.

11     Q.    And you just brought up being in a teaching

12   position.  So what teaching position were you in?

13     A.    So my position, still is, a nontenured track

14   position that has no research requirement.

15     Q.    And I should have asked this earlier, but

16   what is the title of that position?

17     A.    I was a visiting lecturer and then a senior

18   lecturer and now a principal lecturer.

19     Q.    Does that come with any job security at the

20   University of North Texas?

21     A.    A visiting lecturer comes with little to no job

22   security.  The senior lecturer comes with some

23   degree of job security.  And the principal lecturer

24   comes with relatively more, but not the most.

25     Q.    The most being a tenured position or what?

1      A.    I think the most would be full professor, the

2  most secure position.  In my opinion, it would be full

3  professor.

4      Q.    Can you just describe briefly for the Court

5  when you achieved those promotions and appointments?

6      A.    Yeah.  That's a good question.  Let's see.

7  I had -- I'm going to do this as best I can.

8          In 2017, I would have been a visiting

9  lecturer.  And then I was able to get that renewed for

10  one more year as a visiting lecturer.  That puts us in

11  2018 fall.

12          And then fall 2019 is when I started having

13  those conversations with my chair about what my position

14  would be more permanently moving forward and what my

15  best role would be at UNT.

16      Q.    And then what time were you promoted to

17  principal lecturer?  I believe that's the title you said.

18      A.    Yeah, that would be fairly recently.  I want to

19  say maybe 2020, but I'm not a hundred percent sure on

20  that.

21      Q.    So let's -- if I say the Schenker controversy,

22  do we understand that I'm referring to the kerfuffle that

23  arose around the Journal of Schenkerian Studies in July

24  of 2020?  Is that fair?

25      A.    Sure.

1          Q.    So this would have been after the Schenker
2     controversy with the Journal of Schenkerian Studies?
3          A.    Man, it's hard to parse that timeline,
4     because I put together a lot of information on materials
5     at different times and then it was submitted to different
6     levels.  And then when you get the promotion, I don't
7     think you get your title changed until the following
8     year, so it did overlap.  I'm totally fine to say that
9     it overlapped.
10         Q.    Let me ask it a different way.  The Schenkerian
11    controversy with the Journal of Schenkerian Studies
12    didn't hinder your promotion to principal lecturer, did
13    it?
14         A.    No, it did not.
15         Q.    Did the role you played in that controversy aid
16    your promotion?
17         A.    I don't think so.  But it's hard to say because
18    I'm not on the promotional committee.
19         Q.    I'm just asking about your direct knowledge.
20    That's fine.
21         A.    Okay.
22         Q.    If you don't know, you don't know.
23         A.    Okay.
24         Q.    So back to your relationship to Levi Walls and
25    your -- Levi Walls, excuse me, and your conversation with

 1  Chair Benjamin Brand, these would have been, I believe
 2  you said, in the mid 2019 time frame?
 3      A.    Fall 2019, correct.
 4      Q.    And what is your teaching load as a lecturer?
 5      A.    My teaching load as a lecturer is four courses
 6  in the fall and four courses in the spring.  I can
 7  elaborate more, if you want, or --
 8      Q.    Do you teach summer courses as well?
 9      A.    I did.  I did at one point, but I haven't in
10  the last few years.  That's variable.
11      Q.    Are those compensated extra?  The summer
12  courses, I mean.
13      A.    Typically, yes.
14      Q.    So is it fair to say in the parlance of
15  academic professionals, that your load is 4/4?
16      A.    Yes.
17      Q.    And you're on a semester system at UNT?
18      A.    Fall and spring.
19      Q.    And we understand that by 4/4 or 2/2 or
20  whatever someone says about a course teaching load, that
21  that means that many courses per each semester, so 4/4
22  being four classes one semester, four classes the next
23  semester, as you've described, correct?
24      A.    That's correct.
25      Q.    Okay.  And again, we're just doing this so it's

1  explained for the Court.

2          So would you rate a 4/4 load in the academic

3  profession as relatively heavy?

4      A.   Tough question.  I think it depends on the

5  nature of the classes you're teaching.  I think it

6  depends on the size of those classes.  I think it

7  depends on the level of those classes.  There are a lot

8  of factors involved.  But on the surface level, I think

9  that's fair, 4/4.

10     Q.   It's certainly more than a 2/1 load, right?

11     A.   That would be a heavier teaching responsibility

12 on the surface level, on the appearance.

13     Q.   Sorry.  A 2/1 load would be heavier than a 4/4

14 load?

15     A.   The 4/4 would be heavier than the 2/1 load.

16     Q.   Thank you for clarifying that.

17     A.   Yes, sorry.  Good clarification.

18     Q.   Okay.  So what sounds to me like a reasonable

19 conversation you were having with your department chair,

20 Benjamin Brand, was that you had a lot of work, correct?

21     A.   Correct.  And part of it was just trying to

22 figure out what exactly my position was going to be

23 moving forward.

24     Q.   Have you ever had any conversations with

25 Benjamin Brand or other professors at UNT about becoming

1  a tenure track faculty member?

2      A.    No, not -- not yet.

3      Q.    And in this fall of 2019 time frame, you wanted

4  to step back from the Journal of Schenkerian Studies,

5  correct?

6      A.    I did.

7      Q.    About how much work was that working for the

8  Journal as the student editor and then cum, I guess,

9  lecturer/editor?

10     A.    Yeah, that's a good question.  It depends on

11 the time.  I think sometimes, there was a lot to do.  But

12 other times, not too much.

13     Q.    So you would rate the work as episodic; is that

14 fair?

15     A.    Sure.

16     Q.    Is it very intense during some of the episodes

17 of work?

18     A.    It can be.

19     Q.    And then other times, there's nothing that you

20 are really doing for the Journal?

21     A.    Right.

22     Q.    The Journal was meant to come out approximately

23 once a year, correct?

24     A.    I think there's some flexibility there, but we

25 could aspire to come out once a year.

1      Q.    Was there ever any complaints from the
2   University of North Texas Press, that it didn't come out
3   more often or anything of that nature?
4      A.    That's hard to -- that's hard to recall.
5      Q.    If you don't recall, that's fine.
6      A.    I don't recall any intense pressures.  Yeah,
7   I'll leave it at that.
8      Q.    Is it fair to say that if the University of
9   North Texas Press was putting intense pressure on you,
10  the editor of the Journal of Schenkerian Studies, that
11  would be something that stood out in your mind?
12     A.    Yeah.
13     Q.    Okay.  Any other things you were discussing
14  with Department Chair Benjamin Brand about transitioning
15  off the Journal in the fall of 2019?
16     A.    Anything else that I discussed.  Really, just
17  it was a conversation about reevaluating my position and
18  giving me an opportunity to step back and not be -- no
19  longer be in the position.
20     Q.    And you had been doing it at that time, I
21  think, something like five years, correct?  Give or take?
22     A.    Give or take, that sounds about right to my
23  knowledge, yes, yes.
24     Q.    Had you -- during those five years, had you
25  found it rewarding?

1        A.    Not particularly, but I don't mean that in an

2   insulting way at all.  I view myself as a teacher.  And I

3   thought that the lecturer position was a good fit for me.

4   That's why -- that's why I stayed with it.

5        Q.    Um-hum.  And the Journal of Schenkerian Studies

6   was more of a research-type activity?

7        A.    Research or maybe service, depending on how you

8   categorize, but certainly not teaching.

9        Q.    And it's fair to say, correct, that the Journal

10  articles that would be produced by the Journal of

11  Schenkerian Studies would count as scholarship, correct?

12              MR. WALTON:  Form.

13       A.    One, depending on how -- which article you

14  are talking about and which -- you know, which specific

15  publication.  Another thing, the aim of the Journal would

16  be to produce scholarship.

17       Q.    Now, I'm just trying to summarize, but is it

18  fair to summarize that your discussion with Benjamin

19  Brand was about withdrawing from the Journal as editor,

20  correct?

21       A.    That was a part of our conversation about the

22  nature of my position moving forward with UNT, yes.  That

23  was one part of it, yeah.

24       Q.    And you had either decided or realized that you

25  were much more dedicated to teaching than the activities

1    of the Journal?

2        A.    Yes, definitely.

3        Q.    And you wanted to concentrate on that, correct?

4        A.    Yes.

5        Q.    Was there any conflict at that time with

6    Timothy Jackson?

7        A.    No.  I wouldn't say there was a big conflict

8    there, no.

9        Q.    Did you want to step down from the Journal of

10   Schenkerian Studies because you thought it was racist?

11       A.    No.

12       Q.    Let's talk about Levi Walls.  I'm trying to get

13   his name right.  I apologize.  Levi Walls.  How did he

14   play in this conversation within Benjamin Brand in the

15   fall of 2019?

16       A.    Oh, well, he was not a part of that initial

17   conversation, because that was just about my job.

18       Q.    Um-hum.

19       A.    Benjamin Brand tasked me with meeting with

20   Dr. Jackson and Dr. Slottow and discussing the

21   editorship.

22             At that point, I was to disclose that I was

23   going to be taking on the teaching responsibility and no

24   longer being the editor of the JSS and prompt them to

25   figure out a path forward that they thought was

1  reasonable.

2      Q.    And you came to a good conclusion as far as you

3  were concerned at that time?

4      A.    I think we came to an okay conclusion.  I

5  wasn't -- at that point, I didn't have as much of a horse

6  in the race, metaphorically speaking.  I was just letting

7  them know that this is the way my position is changing,

8  according to my boss.

9      Q.    Right.

10     A.    So you need to figure out something and what's

11 going to happen.  I don't know how else to say it other

12 than that.

13     Q.    Sure.  And it's -- it's America, right?  You

14 don't have to do something if you want to take another

15 job, correct?

16     A.    Right.  I, you know, really didn't want to

17 offer too many opinions on what the path forward would be

18 if I wasn't going to be involved in that path forward.

19     Q.    And what was the conclusion of your

20 conversations with Professor Jackson and Professor

21 Slottow about this transition?

22     A.    The conclusion that I took away -- I don't know

23 what Dr. Jackson or Dr. Slottow took away, but I

24 can speak to my perspective, which was that Dr. Jackson

25 wanted to keep a graduate student that had expertise in

BENJAMIN S. GRAF, Ph.D.        09/23/2024

 1  Schenkerian analysis in the position, not just a graduate

 2  student, you know, that had a different area of

 3  expertise.  It had to be someone who was studying

 4  Schenkerian analysis, preferably with him that took

 5  over the reins.

 6      Q.    And the Schenkerian analysis is a very

 7  specialized field of study, correct?

 8      A.    I would say, yes.

 9      Q.    And it involves very complicated and

10  specialized graphs?

11      A.    True.

12      Q.    And it involves a certain background knowledge

13  even to understand these graphs?

14      A.    I would say yes.

15      Q.    And even more to draft them?

16      A.    To create them, you have to have lots of study

17  of Schenkerian analysis, yes.

18      Q.    And one of your principal tasks at the Center

19  or at the Journal was to make and create these graphs,

20  correct?

21      A.    We'll have to qualify that one a little bit.

22  I never really made graphs as part of my role as an

23  editor.  As part of my independent research or as part

24  of my work with Dr. Jackson, certainly, that's true.  But

25  I don't think someone who -- someone who works for the

1  Journal would want to be able to read and interpret a

2  basic Schenkerian analysis.  I think that's reasonable.

3       Q.   Was there a type-setting of these graphs

4  involved?

5       A.   Sometimes.  Sometimes, yes.  It depended on the

6  article.

7            MR. WALTON:  Mr. Allen, just for purposes

8  of the record, since we have a witness whose last name is

9  very interesting, can you clarify that these questions

10 you've been asking are graph, G-R-A-P-H?

11           MR. ALLEN:  Yes, sorry.  And so I believe

12 you'll also note -- and thank you.  That didn't even

13 occur to me.

14      Q.   And I certainly wasn't meaning to pun off your

15 name, Professor Graf.  But the way your name is spelled

16 literally means, in German, "count," correct?

17      A.   Correct, rough translation.  Rough translation.

18      Q.   And graph with a PH has nothing to do with

19 that, correct?

20      A.   Correct.

21      Q.   And we've just been talking about the

22 pictograms, if you want to call them that, for these

23 graphs that are made in Schenkerian analysis, right?

24      A.   Yes.

25      Q.   Thank you.

1        A.    Good clarification.

2              MR. ALLEN:    Thanks to Opposing Counsel

3    for bringing that up.

4        Q.    So just back to Levi Walls, do you know what

5    role then he started to play in the Journal going forward

6    from this time where you announced you're stepping back?

7        A.    Yeah.    His role was to take over the reins and

8    communicate with the advisors in order to move forward

9    with the Journal.    That's the way I understood it.

10       Q.    Was there going to be a transition period where

11   you brought him on as a kind of mentor?

12       A.    I can't remember if it was Dr. Brand or

13   Dr. Jackson and Slottow that asked me to help, but one

14   of those people asked me to help.    I can't honestly

15   remember if it was Dr. Brand or Dr. Jackson asked me

16   to show Levi certain things about the Journal.

17       Q.    Based on your direct experience or

18   conversations with Mr. Walls, did he seem enthusiastic

19   about the new position?

20       A.    It's hard to say.    It's hard to say.    I'm not

21   really sure how enthusiastic he was or not.

22       Q.    Did you have any discussions with him about

23   taking on the new position?

24       A.    Very few, very few.

25       Q.    Well, if you can remember back to those few

 1  conversations, what did he say?

 2       A.   I mean, our conversations were very practical.

 3       Q.   Um-hum.

 4       A.   Things like what software would you use to take

 5  an article from manuscript through publication.

 6       Q.   And to cut to the chase, was it focused on the

 7  craft of publishing these articles?

 8       A.   It was a lot more focused on the craft of

 9  publishing the articles than it was the substance or,

10  yeah, the craft of the practical matters.

11       Q.   At any point in this transition time --

12  incidentally, when was it decided -- so there's a

13  transition period.  You announce you are going to

14  withdraw from the Journal.  You talked to Benjamin Brand

15  about that in the fall of 2019, correct?  And then you

16  have a subsequent meeting -- sorry, I just realized I was

17  relying on you nodding your head.

18       A.   Correct.

19       Q.   And then you had a subsequent conversation with

20  Professor Jackson and Professor Slottow?

21       A.   Correct.

22       Q.   And that involved, at some point, having these

23  very practical conversations with Levi Walls, correct?

24       A.   Those happened after.

25       Q.   And at that time when those happened, what time

1  are we talking, if you can remember?  What month? What

2  time period?

3       A.    Let's think.  Probably October, beginning of

4  October, I want to say.

5       Q.    Okay.  Did Professor Walls -- excuse me.  Did

6  Mr. Walls raise any concerns about a power differential

7  between him and Professor Jackson at that time?

8       A.    He did not raise them to me specifically,

9  but -- he may have been concerned about it, but he didn't

10 raise it to me.

11      Q.    Did you raise those issues with him?

12      A.    If I had any issues, I would have brought them

13 straight to Benjamin Brand.

14      Q.    Did you?

15      A.    I want to say that I did.

16      Q.    And what did you say?

17      A.    I'm trying to remember the exact conversation.

18 Benjamin Brand and I talked about possibly having some

19 concerns about the editorship of the Journal being under

20 a graduate student.  And I left it to his discretion

21 at that point because I didn't feel it was my place

22 to comment any further on it.  And it sounded like

23 Dr. Jackson wanted Levi Walls to take over the Journal.

24 That's the best way I can summarize it.

25      Q.    Did you ever speak in your -- I'm talking about

BENJAMIN S. GRAF, Ph.D.    09/23/2024

1    the course of your work on the Journal.

2        A.    Yes.

3        Q.    Did you ever speak with Professor Jackson about

4    his conception of why there should be a graduate student

5    editor?

6        A.    Not extensively.

7        Q.    At all?

8        A.    I mean, I can speculate, but I really don't

9    think that we had a lot of conversations about why there

10   would be a graduate student editor.

11       Q.    Did Timothy Jackson ever tell you he wanted a

12   graduate student editor, so he could dominate the editor?

13       A.    No, I don't think he ever explicitly stated

14   that.

15       Q.    Did he ever say he wanted a graduate student

16   editor, so that that editor could gain experience and

17   connections in the profession?

18       A.    That sounds reasonable.  But I don't know if he

19   ever said it.  That's a good question.

20       Q.    So in -- let's make a transition here to

21   November of 2019.  Do you remember a conference by the

22   Society of Music Theory in 2019 in the November, early

23   November, time frame?

24       A.    I have very, very little memory of it,

25   partially because we had just had our baby girl.

1      Q.    Oh, congratulations.

2      A.    And we tried really hard to get a baby girl.

3  So after that, you know, I did not go to the conference.

4  I was sleeping hardly at all at that point.

5      Q.    As someone who has been there --

6      A.    Yeah.

7      Q.    -- I have a great deal of sympathy for what you

8  were going through.

9            So that was going to be my follow-up question.

10 You did not go to that conference?

11     A.    No.  There was no way.  We were expecting.

12 There was no way I was going to miss.  Family is first

13 priority for me always.

14     Q.    Was this your first child?

15     A.    This was our second.

16     Q.    Second.

17     A.    So we had a young one in addition to the

18 newborn.

19     Q.    And did this -- these family obligations also

20 play a role in your desire to step back from the Journal?

21     A.    I think it definitely played a part, you know,

22 even if it was unstated.  I was trying to really organize

23 my time effectively to keep family and work both, you

24 know, intact.

25     Q.    You do know, however, that there was a plenary

1  session at which a Hunter College professor named Philip

2  Ewell spoke at the Society for Music Theory Conference in

3  November of 2019, right?

4      A.    Yes, I'm aware of that.

5      Q.    Did you ever discuss that paper with Timothy

6  Jackson?

7                  MR. WALTON:   Form.

8      A.    Maybe casually, but I can't recall the

9  specifics.

10     Q.    And when I say paper at a plenary session, do

11 you know what I mean?

12     A.    A conference presentation that's delivered in

13 the style of the paper is what I would take that to mean.

14     Q.    And is that how you understood Professor

15 Ewell's plenary session talk at the Society for Music

16 Theory to the extent that you knew of it?

17     A.    Yeah.   I think I referred to it as a conference

18 presentation.

19     Q.    Um-hum.

20     A.    A conference plenary would be a good way to

21 word it.

22     Q.    Do you remember a great deal of enthusiasm in

23 your field for that talk?

24     A.    It's hard to capture the entire Society for

25 Music Theory.   I can't really speak on behalf of the

1  entire Society for Music Theory.  Some people really

2  liked it and maybe others did not.

3      Q.    Is it fair to say you were aware that it evoked

4  very strong reactions?

5      A.    Maybe.  I mean, personally --

6              THE WITNESS:  Sorry, I just banged the

7  microphone.

8      A.    Personally, I was really just concerned

9  about my daughter, and I wasn't really paying that close

10  attention.  You know, I'm under oath.  And if I'm going

11  to say -- I wasn't paying that close attention to the

12  direct reaction to Ewell's plenary.

13     Q.    That's a perfectly -- I don't mean to -- I'm

14  sorry to interrupt you.  I'm just trying to move us

15  along.  It's perfectly fine to say what you just said.

16  I'm just trying to move us along.

17     A.    Okay.

18     Q.    So as a follow-up question, did you ever talk

19  to Levi Walls about the paper?

20     A.    A little bit.

21     Q.    What did you talk about?

22     A.    I just asked him about his experience or his

23  conversations about the conference.

24     Q.    Um-hum.

25     A.    And he mentioned that Ewell gave a talk.  And

1  we just casually scratched the surface of what the talk

2  was about.  We didn't really get into the details.  We

3  just had a short conversation about it.  It wasn't -- it

4  wasn't too in depth.

5      Q.    Do you remember him ever saying that he

6  realized he agreed with Ewell's paper?

7      A.    I got the -- I got the impression that he was

8  unsure of how he really stood and probably wanted to take

9  some more time to sort out his thoughts.  But yeah,

10  that's really all I can say.

11              (Deposition Exhibit Number 3 marked.)

12      Q.    I want to introduce as Exhibit 3 in the record.

13  This is a document dated November 25th, 2020, called the

14  Ad Hoc Panel Report.  Now, I'm just going to represent to

15  you that it has some stamps on the top.  Do you see that

16  top line with some string of letters and numbers?

17      A.    Yes.

18      Q.    Those are stamped by the Court, and it has

19  Exhibit D because this was previously introduced in the

20  record.

21          But if you look down to the second page, it

22  has the UNT logo, and it says Ad Hoc Panel -- Review

23  Panel.  Do you see that?

24      A.    That is the title, yes.  Ad Hoc Review Panel.

25      Q.    Have you seen this document before?

1        A.    I skimmed it after it came out.

2        Q.    Back in 2020?

3        A.    Yes.

4        Q.    I just want to -- I'm just going to go by the

5   page ID numbers that are in the upper right-hand corner.

6   Do you see those?

7        A.    Yes.

8        Q.    Stamped by the Court.  We're doing this for the

9   Court --

10       A.    Yes.

11       Q.    -- so I guess we'll use their page numbers.

12       A.    Sure.

13       Q.    Can you go to 272, please, Professor Graf?

14       A.    272.  Okay, yeah.

15       Q.    So there's a summary that refers to you here

16   and up to Mr. Walls.

17             It says, Mr. Walls reported to the panel that

18   he raised concerns to Dr. Jackson about the content of

19   the pieces.

20             And do you understand by that, he's referring

21   to pieces that appeared in the Journal of Schenkerian

22   Studies as part of the Symposium in the Volume 12?

23       A.    I didn't write this, but that feels like what

24   he was probably referring to.  It's hard to say, but

25   yeah.

1       Q.    Okay.  And you were working with Mr. Walls on

2  getting the Symposium in 2020 published, correct?

3       A.    Yeah.  I had a very minimal role, but yes.

4       Q.    Well, and I want to get to that in a minute.

5            But I just want -- I just want to make sure

6  we don't get lost in some of the references that are

7  midway through the report.  But I'm going to represent

8  to you that that does refer to the articles that would

9  eventually appear in the Journal of Schenkerian Studies,

10  in the Symposium, in Volume 12.

11            So again, it says, "Mr. Walls reported to the

12  panel that he raised concerns to Dr. Jackson about the

13  content of the pieces as well as the quality of writing

14  in February of 2020.  He stated that after raising

15  concerns, he was taken into Dr. Jackson's car where

16  Dr. Jackson told him that it was not his 'job to

17  censor people' and was told not to do it again.  He --

18  and Dr. Jackson told him that since these were senior

19  scholars, their reputations were enough to vet them.

20  Dr. Graf -- in other words, you -- confirmed that Levi

21  Walls shared information about his encounter with

22  Dr. Jackson around the time of its occurrence."

23            Did I read that correctly?

24       A.    I think there was one thing that you misspoke

25  where it said, he said Dr. Jackson told him.  But other

1   than that, yes.

2        Q.   And I'm not trying to misread it.  In fact, I

3   don't even know how I misread it.  I apologize if I did.

4             But let the record reflect that this relies

5   on either something you or Mr. Walls told the panel

6   about you discussing this, I don't know, gangster-like

7   intimidation scheme of taking Levi Walls -- Levi Walls

8   into Dr. Jackson's car.

9             Is that a kind of fair summary?

10                  MR. WALTON:  Form.

11       A.   I only heard about this through rumors.  I

12  didn't witness the situation.

13       Q.   I'm not asking if you witnessed it, but did you

14  discuss it with Mr. Walls like it says here?

15       A.   As far as I can recall, Levi did bring that

16  to my attention.

17       Q.   What did he say about it?

18       A.   There's not really more that he told me than

19  what's listed in this report.

20       Q.   Do you recall ever talking to Dr. Jackson about

21  censoring authors in the Symposium that appeared in 2020,

22  in Volume 12, of Schenkerian Studies?

23       A.   I don't ever recall talking to Dr. Jackson

24  about censoring.

25       Q.   Do you recall any email correspondence in which

1 Dr. Walls copied you on a discussion of censorship?

2      A.    I may have been copied on an email.  It's

3 really hard to recall exactly.  That's a good question.

4 I don't -- I'm unsure.

5      Q.    And what -- I know you're unsure, so I'm just

6 going to ask you.  To the best of your recollection as

7 you sit here today, what was the suggestion that

8 something be censored?  Whose suggestion was it?  What

9 was supposed to be censored?  Anything you can remember

10 about it.

11      A.    That's a good question.  Levi may have had some

12 concerns about some remarks in the articles.  And what I

13 would have done and what I did is tell him to direct

14 those back to Dr. Jackson or to Dr. Brand if he really

15 had concerns, yeah.

16      Q.    Did he tell you he was forced into

17 Dr. Jackson's car?

18      A.    I don't know.  That's a really hard -- I really

19 didn't think too much -- I really -- without being able

20 to confirm the situation, I didn't think that it was

21 proper to really act on that.

22      Q.    You certainly didn't report it at that time as

23 some kind of harassment, right?

24      A.    No, because I didn't know whether it was true

25 or not.

1        Q.    Mr. Levi Walls is a full-grown man, correct?

2        A.    Yes, as far as I understand.

3        Q.    In your personal experience of Dr. Jackson, is

4   he a physically imposing man?

5        A.    No, not necessarily.

6        Q.    Is he a physically intimidating man?

7        A.    I wouldn't say he's very physically

8   intimidating, no.

9        Q.    He's sort of an elderly professor at this time,

10  isn't he?

11       A.    I don't know how old Dr. Jackson is, but you

12  could say that he's one of the older professors.

13       Q.    And he's bald, correct?

14       A.    Mostly.

15       Q.    With kind of like liver spots on his bald head?

16       A.    Sure.  We'll say 80 percent bald from my

17  perspective, from my angle.

18       Q.    Is it fair to say that he's got a kind of

19  potbelly?

20       A.    A little bit, sure.

21       Q.    Do you find it plausible that he was so

22  intimating, that he could force Mr. Walls into his car?

23       A.    Yeah, I don't know.  That's a tough question.

24  I don't know if he could actually force somebody into his

25  car.  I don't know.

1              THE WITNESS:  I might have to go to the

2    bathroom.

3              MR. ALLEN:  There's no question.  Let's

4    take a break.

5              THE WITNESS:  Okay.

6              THE VIDEOGRAPHER:  We're off the record

7    at 10:34 a.m.

8                   (Recess taken)

9              THE VIDEOGRAPHER:  We're back on the

10   record at 10:45 a.m.

11      Q.   I just have one more question about the car

12   incident that you seem to have talked to with Mr. Walls

13   about or talked about with Mr. Walls.

14           He's been deposed in this case as well, and

15   I'm just going to represent to you that he represented

16   that the author in question that was discussed in the car

17   was Suzanne Clark.

18           Do you remember an article published in the

19   Journal of Schenkerian Studies, in that Symposium, in

20   Volume 12, by Suzanne Clark?

21      A.   I do.  I couldn't recount the details of it.

22      Q.   Do you remember whether she was a advocate --

23   an advocate of Professor Ewell or a critic?

24      A.   I don't really know.

25      Q.   So if Mr. Walls testified that Professor Clark,

1  in her article, were in support of Philip Ewell, you know

2  of no reason to contradict that?

3       A.    I guess not.  I'm not sure what you're asking.

4  Sorry.

5       Q.    Well, Mr. Walls testified that Suzanne Clark

6  was the author they discussed in the car when this issue

7  of censorship or not censorship came up.

8       A.    Okay.

9       Q.    He also testified that Suzanne Clark was a

10 defender of Professor Ewell, or another way you might

11 want to put it is an advocate or supporter of Professor

12 Ewell.  Does that make sense?

13      A.    Okay.  I see that's what he was saying.

14      Q.    Some of the articles in the Symposium were very

15 critical of Professor Ewell, correct?

16      A.    As I recall, yes.

17      Q.    But some were also very supportive of Professor

18 Ewell, right?

19      A.    Yes, I think that's fair to say.

20      Q.    So he was putting the author, Clark, in the

21 supporters of Professor Ewell camp?

22      A.    I guess Levi was, yeah.

23      Q.    I'm just representing that to you, that he

24 testified to that under oath.

25      A.    Okay.

BENJAMIN S. GRAF, Ph.D.        09/23/2024

1       Q.    So if there was discussion of censorship,
2  do you have any reason from Mr. Walls to know why
3  Mr. Walls would have been asking about censoring a
4  pro-Ewell author?
5       A.    I don't really have anything to add to that,
6  no.
7       Q.    You have no knowledge?
8       A.    Sorry.
9       Q.    Would you expect Professor Jackson to want to
10 censor the pro-Ewell authors?
11      A.    Not necessarily.  I think it depends on the
12 article.
13      Q.    What would you understand by censorship in that
14 context?
15      A.    What would I understand by censorship?  There
16 are different definitions.
17      Q.    Well, I'm not interested in all of the
18 definitions in the world.  What definitions would you
19 have understood as the editor of the Journal -- Journal
20 of Schenkerian Studies?
21      A.    Maybe changing some of the wordings of
22 certain sentences.  That could be considered censoring.
23      Q.    Would you ever do that against the will of an
24 author?
25      A.    I don't think it would be -- I think it would

1 depend on the way that it happened.  But I don't think --

2 personally, I would not change somebody's wording without

3 going back and talking to them first.

4        Q.    And you're saying that as someone who was

5 experienced as an editor of the JSS for four or five

6 years, correct?

7        A.    Correct.

8        Q.    And do you know of any reason why it should

9 be considered, quote, racist of Timothy Jackson not to

10 censor a pro-Ewell contributor to the Journal?

11        A.    I think whether you consider something to be

12 racist or not depends on the person that you are asking.

13        Q.    I'm asking you.  Let's ask you.

14        A.    Can you ask it one more time?

15              MR. ALLEN:  Can you read the question

16 back to the witness, Madam Court Reporter?

17        Q.    BY THE REPORTER:

18              QUESTION:  And do you know of any

19      reason why it should be considered, quote, racist

20      of Timothy Jackson not to censor a pro-Ewell

21      contributor to the Journal?

22        A.    I don't think that Dr. Jackson was trying to

23 censor the article.  I don't -- I'm trying to see what

24 you're getting at.  I don't know.

25        Q.    We can agree, right, it's not racist to refuse

BENJAMIN S. GRAF, Ph.D.        09/23/2024

 1  to censor a pro-Ewell contributor, right?  It's a simple

 2  question.  Someone -- okay.  Let's back up.

 3      A.    I think I need more to it, yeah.

 4      Q.    Let's back up.

 5            Philip Ewell, you know him to be a Black

 6  theorist of music, correct?

 7      A.    As far as I recall, yes.

 8      Q.    He's an accomplished cellist as well, correct?

 9      A.    I've never actually been to any of his concerts

10  or recitals.  But from what I can tell, he

11  plays the cello at a really high level.

12      Q.    And he also publishes scholarship at a

13  relatively high level, correct?

14      A.    I would assume so.

15      Q.    And he gave a plenary talk at the Society for

16  Music Theory in November of 2019, which caused quite a

17  stir, correct?

18      A.    Like I said, I don't know exactly the stir,

19  because I was at home a lot of the time.  But I know that

20  he gave the plenary address in the 2019 SMT meeting, yes.

21      Q.    Are you aware that Professor Jackson was

22  accused of censoring authors or trying to censor

23  authors -- let me strike that question.

24            You are aware that Professor Jackson was

25  accused of trying to censor articles in Volume 12 of JSS,

1  correct?

2      A.   I may have been aware of that through just

3  rumors.

4      Q.   And it certainly wouldn't be -- let me put it

5  this way.

6          Dr. Jackson, according to Dr. Levi Walls'

7  testimony, meets with him in a car, in a parking lot

8  somewhere at UNT.  Mr. Walls brings up Suzanne Clark's

9  contribution, which is pro-Ewell.  I don't know what

10 specific criticisms he had, but Professor Jackson said

11 not to censor that pro-Ewell article.  So much is the

12 testimony of Levi Walls.

13         If I'm getting this wrong, Benjamin Walton can

14 correct it on redirect when he examines you.

15         Do you think that was the proper decision for

16 Professor Jackson to make, not to censor a pro-Ewell

17 contributor?

18     A.   It's really hard to say without reading the

19 details of that article and figuring out what the process

20 was leading up to that moment.  That's really all I can

21 say.

22     Q.   Would you be in favor, as the editor of the

23 JSS, of Professor Jackson censoring an article that he

24 didn't agree with, just because he didn't agree with it?

25     A.   I don't think it's fair to censor someone just

 1  based on a simple disagreement.

 2      Q.    And you know that Professor Jackson vehemently

 3  disagreed with Professor Ewell, correct?

 4      A.    I don't really know.  I don't really know

 5  the --

 6      Q.    Did you ever read his article -- sorry to

 7  cut you off, but did you ever read Professor Jackson's

 8  article in the JSS, Volume 12?

 9      A.    I read pieces of it.

10      Q.    Would you characterize it as a criticism of

11  Professor Ewell?

12      A.    I would characterize it as a response that may

13  be considered more critical.

14      Q.    So you would have reason to believe that he did

15  not agree with those who were supporting Professor Ewell,

16  correct?

17      A.    I think there's a lot of nuance there.

18      Q.    What's the nuance?

19      A.    It might be overly generalized to say that he's

20  --

21      Q.    What's the nuance?

22      A.    To say that you're completely in agreement or

23  disagreement might be too simplistic.

24      Q.    Well, he's accused in the Ad Hoc Panel Report

25  of November 25th, 2025 [sic], of basically bullying

1  Mr. Walls into not censoring something that I guess they

2  wanted censored or something, right?

3             MR. WALTON:  Form.

4      A.    I'm just -- the car conversation, I'm just not

5  really sure what lead up to that and why that occurred.

6  And I don't know if that was an attempt at censorship or

7  really not.

8      Q.    Well, let me strike that question and ask you a

9  different question.

10            Don't you think it's significant that the

11  panel should mention that the very thing Professor

12  Jackson was instructing Mr. Walls not to censor were

13  the articles that were pro-Ewell with which he disagreed?

14            MR. WALTON:  Form.

15     A.    The way I understand, the panel was geared

16  towards evaluating the processes that went into the

17  publication.  And as far as the panel understood, that

18  was something worthy of note.

19     Q.    Why wouldn't they mention the fact that he was

20  refusing to censor contrary viewpoints to his own?

21            MR. WALTON:  Form.

22     Q.    Do you have any reason to know why they would

23  do that?

24     A.    I don't really know every -- I don't really

25  know why the panel put certain things into this document

1  and why they left certain things out.

2      Q.    It would certainly be significant in the

3  process of editing a journal if an influential member of

4  the advisory board was trying to squash opinions that he

5  didn't agree with, right?

6              MR. WALTON:  Form.

7      A.    I don't know what the goal of the car

8  conversation was.  I don't -- it may be oversimplifying

9  it to say that it was trying to squash something or

10 censor something.

11             MR. ALLEN:  I'll tell you what.  Let's --

12 I think we're up to 4.  Can I mark as Exhibit 4 for the

13 record, a compendium of emails that begins with UNT Bates

14 number 2645 and has a lead email dated October 17, 2020,

15 from Timothy Jackson to John Ishiyama and others.

16             (Deposition Exhibit Number 4 marked.)

17     Q.    Now, again, Mr. Graf, I'm not suggesting that

18 you have seen this before.  I'm going to represent to you

19 that the people on the "To" line in this email, if you

20 look at Exhibit 4, are the members of the ad hoc panel.

21     A.    I can -- I can't really verify that they were

22 the exact people, but it appears to be so.

23     Q.    And at some point, you met with them, correct?

24     A.    I did meet with the ad hoc panel.

25     Q.    Right.

1      A.    Yeah.  I can't recall the exact names, but I
2  did meet with the ad hoc panel.

3      Q.    So this is an email from Timothy Jackson
4  conveying to them various documents as part of that
5  investigation that you just discussed.  Okay?

6      A.    It appears to be so.

7      Q.    And this included, if you look at number 2 and
8  number 3 in the bullet points that he lists in his cover
9  email.  I'm just representing this to you, and I'm going
10  to ask you about the documents in a second.  These are
11  the internal correspondence of the Journal as you guys
12  put together the Volume 12, the Symposium, that was
13  eventually published in July of 2020.

14          So far, so good?

15      A.    Yeah.  It's titled number 2.  Editorial Process
16  of JSS, Volume 12.

17      Q.    Now, this has various emails between you,
18  Mr. Walls, Mr. Professor Jackson, and various other
19  people as the Journal was going through the ordinary
20  course of its business.

21          So now, I'm going to ask you to turn to
22  UNT 2758 in that packet, if you could, please.

23      A.    Can you say that number one more time?

24      Q.    Yes.  It is 2758.

25      A.    Now, I have 2758 in front of me.

1    Q.    Do you see an email that begins at the very top

2    of that page that says, To Me, benjamingraf@unt.edu?

3    A.    Yes.

4    Q.    And if you just go back to the previous page at

5    the very bottom of 2757, the sender is Levi Walls.  Do

6    you see that?  It's dated February 13th?

7    A.    Yes.

8    Q.    And I'm just going to represent to you that

9    this is 2020.

10    A.    Okay.

11    Q.    10:54 a.m.  Do you see at the bottom of the

12    email that then is finished on 2758, Levi Walls?

13    A.    Yes.

14    Q.    And again, this was provided to the panel,

15    correct?  And I represented that to you and you saw the

16    cover email, right?

17    A.    It appears that this was emailed to the -- to

18    the panel.

19    Q.    So I just want to read the email.  It's to Dear

20    Dr. Jackson with Dr. Graf on copy.

21        Do you see that?

22    A.    Yes.

23    Q.    Do you remember getting this email?

24    A.    Not really.

25    Q.    Do you have any reason to think that you didn't

1  get this email?

2       A.    No.

3       Q.    That is your correct UNT email, right?

4       A.    My email is benjamin.graf.

5       Q.    So this might have been mistyped?

6       A.    It could have been.

7       Q.    Okay.  So -- and Mr. Walls writes, "Dr. Graf

8  and I were wondering what your thoughts were concerning

9  the submissions from Clark, Beaudoin, and Lett."

10          Did I pronounce that name correctly?

11      A.    I don't know.

12      Q.    "As you may have seen, these responses are

13 (At least) implicitly anti-Schenkerian.  Despite

14 disagreeing with much of what they have to say, Dr. Graf

15 and I think it is important to publish these responses

16 along with the others that we have received (Wiener,

17 Pomeroy, Wen, Cadwallader, etc.)"

18          Did I read that correctly?

19      A.    I think so.

20      Q.    Do you remember discussing anti-Schenkerian

21 pieces from Clark, Beaudoin, and Lett with Mr. Walls?

22      A.    I don't remember calling them anti-Schenkerian

23 with Levi.

24      Q.    You didn't call them anti-Schenkerian?

25      A.    I don't think so.

1      Q.   Do you recall Mr. Walls characterizing them as
2 such?
3      A.   I can't really remember that.  Maybe.  That's a
4 good question.
5      Q.   Do you remember Professor Jackson's response to
6 this inquiry?
7      A.   No.
8      Q.   Do you remember Professor Jackson suggesting
9 that the publications of Clark, Beaudoin, and Lett be
10 suppressed in the Journal because they were
11 anti-Schenkerian?
12     A.   I don't recall that, no.
13     Q.   If Professor Jackson had said something of that
14 nature, wouldn't that stand out in your mind?
15     A.   Maybe, but I'm not really sure.
16     Q.   If a senior advisory editor, or excuse me, a
17 board member, editorial board member stepping in to
18 suppress the publications of authors with whom he
19 disagreed, that would be very unusual, correct?
20     A.   Yes.
21     Q.   So if that had happened, doesn't it stand to
22 reason that you would remember that?
23               MR. WALTON:  Form.
24     A.   I don't really remember this type of
25 conversation.

1      Q.   Do you have any reason to think Mr. Levi would
2  make it up?
3      A.   I don't really know the details of what he
4  talked about with Dr. Jackson.  He had a lot more
5  in-person meetings with Dr. Jackson than I had, like I
6  said, because I was trying to do everything to let them
7  handle the business of the Journal.
8      Q.   And Mr. Levi was coming on as the incoming
9  editor?
10      A.   Exactly.
11      Q.   So taking increasing responsibility for things.
12      A.   Yes.  My whole idea was to distance myself from
13  the Journal because of the duties of my position.
14      Q.   Do you know of any evidence that Professor
15  Jackson suggested suppressing the viewpoints of pro-Ewell
16  authors that were submitted to the Journal?
17      A.   Thinking back today, no, I don't know any.
18      Q.   Going back to the Symposium, where did the idea
19  for the Symposium originate?
20      A.   I could not pinpoint that.
21      Q.   Did you discuss that with Mr. Walls at all?
22      A.   The idea of creating a Symposium?
23      Q.   Yes.
24      A.   No.
25      Q.   Do you remember Mr. Walls ever discussing with

1  you the beginnings of the idea for the Symposium?

2      A.    I only remember very little.  Like I said, I

3  was really not sleeping that much at the time due to my

4  daughter, if any of the conversations were rehashing his

5  conversations with Dr. Jackson.

6      Q.    Right.  Well, that's kind of what I'm driving

7  at.  I want to know what Mr. Walls would have said to you

8  about it.

9      A.    Yeah.  That's really hard to recall that.

10     Q.    Okay.  Well, that's okay.  Let me ask some

11 follow-up questions.

12           Do you remember Mr. Walls ever coming to you

13 and complaining that he was being forced to work on the

14 Symposium in the November or December time frame?

15     A.    I don't think he necessarily complained

16 about it.  But I think he was trying to do his job under

17 Dr. Jackson.

18     Q.    I want to talk about the issue of the call

19 for papers.  Do you remember working on a call for papers

20 that went out for the Symposium?

21     A.    I don't think I really worked on the call and

22 put any wording together myself.

23     Q.    You were aware that it was being put together?

24     A.    I was aware that there was a call that was

25 being put together, yeah.

1    Q.    Who worked on it?

2    A.    I'm not really sure.  I want to say

3 Dr. Jackson and maybe Dr. Slottow had put it together.

4 But it's hard for me to pinpoint that, who put together

5 the wording for that call.  Levi may have been involved

6 as well.  I'm not sure.

7    Q.    Do you remember Professor Ellen Bakulina being

8 involved?

9    A.    She may have been involved.  She may have

10 been involved.  I don't know the extent to which she was

11 involved.

12    Q.    Do you remember Diego Cubero, also a professor

13 at UNT, being involved?

14    A.    He could have been involved as well.  I

15 wouldn't be surprised if they were consulted in some

16 way, either informally or formally.

17    Q.    And do you remember Andrew Chung, also a

18 professor at UNT, being involved?

19    A.    It's hard to recall.  Andrew may have been

20 consulted on some level.

21    Q.    Okay.

22    A.    I don't have any -- I can't really -- it's hard

23 for me to confirm and say 100 percent yes or 100 percent

24 no.

25    Q.    Do you remember anyone objecting that Philip

 1  Ewell was not invited?

 2       A.    That's a good question.  I'm just not sure.

 3  I'm just not sure if anyone objected, per se.

 4       Q.    I'm not talking after July 2020.  I'm talking

 5  before July 2020.

 6       A.    I'm not really sure if anyone objected.

 7       Q.    If someone had objected, do you think that

 8  would stand out in your memory?

 9       A.    Maybe.  I don't -- I didn't really see the -- I

10  was trying to not interfere with the proceedings.

11       Q.    I understand.

12             A similar question.  Do you remember anyone

13  wanting to personally invite Philip Ewell to participate

14  in Volume 12 of the Journal of Schenkerian Studies, but

15  being told no?

16       A.    No.  I don't think I remember anybody

17  specifically.

18       Q.    If someone was blocked from reaching out to

19  Philip Ewell in that way, do you think that would stand

20  out in your memory?

21             MR. WALTON:  Form.

22       Q.    If you knew of it?

23       A.    It's possible.  Like I said, I was really

24  trying to not weigh in --

25       Q.    Yeah.

1     A.    -- as much as possible, to just keep my
2  distance on it.
3     Q.    Okay.  Let me ask another question.
4          Are you a member of the Society for Music
5  Theory?
6     A.    Yes.
7     Q.    And do they have a server list?
8     A.    They have a server list.
9     Q.    And is that how the call for papers was
10  disseminated?
11     A.    I'm not sure.  I wasn't actually paying that
12  close attention to the SMT list.  But that is frequently
13  used for that purpose.  If you have a call for papers,
14  you can use the SMT Listserv.
15     Q.    And is every member on the SMT list then a
16  recipient of that call for papers?
17     A.    I'm not sure.  Sometimes, I don't get the
18  Listserv emails.  And I am a member, so I'm not sure.
19  Maybe.
20     Q.    Is it your understanding, as a member of
21  the Society for Music Theory, that the server list is
22  supposed to be received by all of the members?
23     A.    I think the intent is that -- the way I would
24  word it is that people who want to be on the Listserv can
25  request an access to it, and then they would get the

BENJAMIN S. GRAF, Ph.D.        09/23/2024

```
 1  messages for it.
 2      Q.    And if you could turn to UNT page 2663 in
 3  Exhibit Number 4, I believe, it is.  Right?
 4      A.    It's Number 4.  Say the number one more time.
 5      Q.    2663.
 6      A.    Okay.  I'm on 2663 now.
 7      Q.    Do you see the second email in that page?
 8  I believe it's the second email.
 9            It says -- It's headlined, "Call for Papers
10  sent to all the members of SMT."
11            Do you see that?
12      A.    Yes.
13      Q.    And do you see that "To" line says,
14  smt-announce:@societymusictheory.org?
15      A.    Yes.
16      Q.    Is that the server list for the Society of
17  Music Theory?
18      A.    Maybe.  I don't really know.  It appears to be
19  that, but I don't really know the way the email works on
20  that.
21      Q.    And is that -- so you don't remember one way or
22  another if that's the actual email?
23      A.    No, I have no idea.
24      Q.    And if you just review the body of the message,
25  if you could, please.  And my question is
```

1 just going to be, is that the call for papers that you

2 remember being prepared by the Journal at that time?

3     A.    Like I said, I didn't put it together.  But as

4 far as I can tell, this resembles -- this resembles the

5 call for papers.

6     Q.    Okay.  Let's see.  I'm going to ask you to turn

7 to page 2657, please.  This is UNT Bates stamped 2657.

8     A.    Okay.  I'm on it.

9     Q.    Do you see the email at the top of that page?

10 There's -- forget the header there, but there's one

11 that's a headline, "Discussions about the appropriate

12 time for CFP by JSS."

13          Do you see that?

14     A.    "Discussions about the appropriate time for CFP

15 by JSS."  Yes.

16     Q.    I'm just trying to locate you on the page.

17     A.    Sure.

18     Q.    And this appears -- first of all, do you

19 remember this email?

20     A.    Not particularly.

21     Q.    Do you have any reason to believe you did not

22 get this email?

23     A.    No.

24     Q.    And this is an email from Ellen Bakulina on

25 Sunday, December 1st, 2019, to Diego, Levi, me (being

1  Professor Jackson there), Benjamin (being you), and

2  Stephen.  Right?

3      A.    Yeah, it appears to be those recipients.  I'm

4  just in the carbon copy line.

5      Q.    Yep.

6            Professor Bakulina says, "I just had a

7  conversation with a colleague about the SMT plenary

8  session (of which Ewell's talk was part), and he told

9  me what I should have known all along, because this was

10 announced right before the presentations; that the

11 plenary talks will be published in Music Theory

12 Spectrum."

13            Did I read that correctly?

14     A.    You read that correctly.

15     Q.    Were you aware that Professor Ewell's

16 presentation was published in the Music Theory Spectrum

17 journal without peer review?

18     A.    I'm really -- I don't know whether it was or

19 not.

20     Q.    Do you recall anyone complaining that Professor

21 Ewell and his presentation was published in Spectrum

22 without peer review?

23     A.    I don't really know, but I didn't have any

24 conversations either way about that.

25     Q.    Incidentally, can you describe in as brief a

1  detail as you can what Music Theory Spectrum is for the
2  Court?
3        A.    Music Theory Spectrum is the leading journal of
4  the Society for Music Theory, in my opinion.
5        Q.    As someone who was active in that field and
6  also the editor of a specialized journal in music theory,
7  is it unusual for Music Theory Spectrum to publish things
8  without peer review?
9        A.    That would -- from my perspective, I don't know
10  the inner workings of Music Theory Spectrum.  But I would
11  expect them to follow a peer review, some sort of
12  peer-review process.
13        Q.    So if they didn't in the case of Professor
14  Ewell, that would have been a deviation from your
15  expectations of their normal process?
16        A.    As far as I can tell, I don't know what
17  happened with Ewell's article after the plenary.  But
18  you know, my expectation would be that it would go
19  through some sort of vetting or peer-review process.
20        Q.    Okay.  So we skip down.  The next email is
21  December 1st, 2019, at 7:51 p.m.
22             Do you see that?
23        A.    Yes.
24        Q.    And it says, "Dear Bakulina and All.  That does
25  seem to complicate matters a bit."

1          And that's by Levy -- Levi Walls, excuse me.
2    Did I say that right?

3        A.    Yes.

4        Q.    And he seems to also confirm that the
5    announcement was made that these papers would be
6    published in Spectrum before they were even delivered
7    to the panel.

8          That's what Ellen Bakulina described, correct?

9        A.    Yeah, it appears to be in her email.

10       Q.    Then do you remember the subsequent discussion,
11   which is continued by Professor Bakulina, about whether
12   to go forward with the JSS call for papers as planned?

13       A.    I don't really recall a lot of discussion on
14   it.

15       Q.    Okay.  And so the next message is
16   December 1st, 4:53 p.m.  It seems like some of them
17   either might be unusually stamped or they may be out of
18   order.

19       A.    Okay.

20       Q.    But I just want to call your attention to the
21   one that begins at the bottom of that page.  Do you see
22   that?  Ellen Bakulina to Walls, Jackson, Graf, Cubero,
23   Slottow.  And this appears to be two different emails.
24   For some reason, Timothy Jackson is listed twice.  Do you
25   see that?  This is at the bottom of UNT 2657.

1       A.    I see -- oh, yes, I do see that he appears
2    twice there in the "To" line.
3       Q.    That's not important.  The thing I wanted to
4    call your attention to, is that your correct email there
5    that we discussed earlier?
6       A.    That is my correct email.
7       Q.    Okay.  So whenever that email appears in an
8    email, then you received it, correct?
9       A.    Yes.
10       Q.    Okay.  And Timothy then responds, "All things
11    considered, JSS should go forward with the call as
12    planned."
13            Do you see that subsequent email?
14       A.    I do.
15       Q.    At 10:06 p.m.?
16       A.    Yeah.  This is on 2658.
17       Q.    And he says -- I'm going to skip down to,
18    oh, geez, to the sixth line, the body of the email that
19    begins on UNT 2658.  Do you see that "- and we definitely
20    should publish it" line?
21       A.    Yes.
22       Q.    So he says, "We definitely should publish it."
23            He then says, "More responses have promised
24    and have even been requested.  Therefore, if others are
25    interested in responding, but wish to wait for the

 1  published version of Ewell's talk, then they are welcome

 2  to do so, and we should be open to publishing additional

 3  responses to that version in a subsequent issue after the

 4  upcoming one of the Journal of Schenkerian Studies.

 5  Best, Tim."

 6            Did I read that correctly?

 7      A.   Yes, you read that email correctly.

 8      Q.   And do you remember responding to that email?

 9      A.   I don't really remember it.

10      Q.   The next email is from you, correct?

11      A.   Yes.

12      Q.   Do you believe that is not -- has not been sent

13  by you?

14      A.   No, I think I did send that.

15      Q.   And you say, "I agree with Tim."

16            Right?

17      A.   Um-hum.

18      Q.   Did you feel you couldn't say you didn't agree?

19  I mean, strike that question because of the double

20  negative.

21            Did you have any reason to volunteer that

22  information based in coercion of any kind?

23      A.   I didn't really feel comfortable elaborating on

24  my personal viewpoint.

25      Q.   At that time?

1        A.    At that time, no.

2        Q.    Well, I'm asking you to elaborate now.  Is

3    there some reason you felt compelled to chime in at that

4    time that said you agree with Tim?

5        A.    There's no particular reason either way other

6    than it seemed like this is the way Dr. Jackson wanted it

7    to happen, so I felt it was best for me to follow what he

8    wanted to do at that point.

9        Q.    Did you feel you couldn't express dissent?

10       A.    To an extent, yeah.  I didn't really want to

11   express my dissent.

12       Q.    Were you lying when you said you agreed with

13   Timothy Jackson?

14       A.    No.  I just didn't feel like I could fully

15   express myself.

16       Q.    Did you feel the need to express yourself by

17   agreeing with Timothy Jackson at this time when you said

18   you were trying to withdraw as much as possible from the

19   affairs of the Journal?

20       A.    I just had a brief, succinct response that I

21   thought was not going to interfere with the affairs of

22   the Journal from my position of trying to take a step

23   back.

24       Q.    Let me -- one further question about emails

25   in this body of documents that were considered by the

1  University of North Texas so-called ad hoc panel.

2           If you could turn to 2697, please?

3     A.    2697.

4     Q.    And I'm going to direct your attention to an

5  email at the bottom of that page.

6     A.    Sure.

7     Q.    This appears to be an email from you to

8  schenker@unt.edu.  Or no, I guess it's from

9  schenker@unt.edu, right?

10    A.    It is from the official Schenker email.

11    Q.    That was going to be my next question.  That

12  schenker@unt.edu, that's the official email for the

13  editor?

14    A.    I'm not really sure who used that email.  On

15  occasion, I used it as editor, yeah.

16    Q.    And is this an email you sent?

17    A.    It appears to be something that I sent, yes.

18    Q.    And it looks like this is March 14th, 2020, and

19  things are wrapping up with getting the special Symposium

20  out for publication.

21    A.    Yes, I was trying to collect materials from

22  some of the authors, it appears.

23    Q.    Is that why there are three, 1), 2), 3), sort

24  of bullet points that you are asking for the final

25  information?

1        A.    Yes.

2        Q.    And you also say, Levy -- Levi -- excuse me --

3    "Levi Walls has done excellent work on this volume, and

4    the Journal will be in good hands as he takes over sole

5    editorship of the JSS."

6              Right?

7        A.    Yes.

8        Q.    Were you impressed with the work of Levi Walls

9    on the Journal up to this time?

10       A.    I was referring to his work on the software,

11   his familiarity with the process of getting manuscripts

12   into the correct software formatting.

13       Q.    And then you go on -- well, just to follow that

14   up.  And that was all very good work by him, right?

15       A.    The way I understood it, he did a good enough

16   job to take over the reins.  And I really felt like I was

17   done at that point.

18       Q.    And you also commented in this sentence

19   after that.

20              "In my view, the additional content that we

21   collected this winter following Ewell's SMT plenary makes

22   a great addition to an already remarkable publication."

23              Right?

24       A.    Yes.  That was a little bit of -- yes.

25       Q.    Were you lying?

1      A.   No.

2              MR. WALTON:   Form.

3      A.   I wasn't lying.

4      Q.   And you -- finally, you end the email, "Cheers

5  getting this to press."

6          Right?

7      A.   Yes.

8      Q.   You also -- there's an email right below that.

9  It looks like you write to Barry Wiener.  Am I mistaken

10 about that?

11     A.   Let's see.

12     Q.   On March 20th.

13     A.   On March 20th, Ben Graf wrote to Wiener.

14          I don't see an email address from that, but...

15     Q.   It seems to be copied and pasted into this

16 massive document that was submitted to the UNT ad hoc

17 panel.  Do you remember writing and corresponding with

18 Barry Wiener?

19     A.   I don't honestly remember the correspondence

20 with every author, because I was just trying to get them

21 to sign the forms.  You know, my role was very minimal

22 there at the end, just to get everyone to sign their

23 forms.

24     Q.   Um-hum.

25     A.   Get it off to press.

BENJAMIN S. GRAFF, Ph.D.      09/23/2024

1        Q.    Would you say to an author that you had read

2   his piece when you didn't read it?

3        A.    Possibly.

4        Q.    Do you remember doing that for Barry Wiener?

5        A.    I really don't remember Barry's article.  I

6   could not cite specific parts of it.  But a lot of times,

7   when I finished out the publication, I would say thank

8   you for your contribution or something like that.

9        Q.    Do you remember telling the ad hoc panel that

10  you didn't read all of the articles?

11       A.    Yes.

12       Q.    Was that true?

13       A.    That's true.  I did not read every article

14  word-for-word.

15       Q.    Was it expected that you would read the

16  article?

17       A.    I don't think there was a clear expectation.

18       Q.    Was there a division of labor in the Journal

19  for the Symposium?

20       A.    For the Symposium?  Was there a division of

21  labor?  Not really.

22       Q.    Do you know if Mr. Walls read all of the

23  papers?

24       A.    I'm not sure.

25       Q.    Do you know if Professor Jackson was relying on

1  you to read the papers?

2      A.   I don't know what he was relying on.

3      Q.   Do you know if Mr. -- or Professor Jackson was

4  relying on Mr. Walls to read the papers?

5      A.   I don't know for sure.  I don't know for sure

6  what he was relying, no.

7      Q.   If the editor of a journal doesn't read the

8  papers, is that the -- I mean, is that the supervisory

9  board's fault?

10               MR. WALTON:  Form.

11      A.   I'm not sure whose fault it would be for

12  certain things like that.

13               MR. ALLEN:  Let's go off the record,

14  please.

15               THE VIDEOGRAPHER:  We're off the record

16  at 11:28 a.m.

17                    (Recess taken)

18               THE VIDEOGRAPHER:  We're back on the

19  record at 11:39 a.m.

20               MR. ALLEN:  Professor Graf, I just have a

21  few more series of questions, a few more documents, and

22  then I hope to get you off to lunch.

23               I'm going to introduce for the record as

24  Exhibit 5, a document with UNT Bates number 0439.

25               It's an email with the caption, "Benjamin Graf

BENJAMIN S. GRAFF, Ph.D.        09/23/2024

1  to various recipients on July 25th, 2020."

2               (Deposition Exhibit Number 5 marked.)

3       Q.    Can I ask you just to read this document?

4       A.    This is taken from an email.

5               MR. WALTON:  Just to clarify, do you want

6  him to read it to himself or out loud?

7       Q.    No.  Can you just -- I just want you to

8  familiarize yourself with this document, and then I'm

9  going to ask you a few questions.

10      A.    Oh, okay.  Let me read it.

11      Q.    So do you recognize this email?

12      A.    I do recognize it, but it's been a long time

13 since I've seen it.

14      Q.    And is it fair to say that on July 25th,

15 2020, a controversy broke out about the publication of

16 Volume 12 of the JSS, in particular, the Symposium?

17      A.    I can't really speak to the extent of it, but

18 it seems that people have called it a controversy.

19      Q.    And one thing that people objected to was that

20 Professor Ewell was never invited to participate?

21      A.    That's what other people have said that I've

22 heard, yeah.

23      Q.    You don't know of any documents indicating that

24 anyone wanted to exclude Professor Ewell from the

25 responses?

1        A.    That's a good question.  I can't recall today.
2    I wouldn't be able to cite something specifically today.
3        Q.    And here, you are actually advocating that you
4    should send Ewell a copy.  I assume that means a copy of
5    Volume 12?
6        A.    I'm not really sure what it's referring to.
7    Perhaps.
8        Q.    And invite him to respond, correct?
9        A.    Yes.
10        Q.    So you certainly weren't opposed to Professor
11    Ewell participating in the dialogue among scholars that
12    was being published in the Journal of Schenkerian
13    Studies, correct?
14        A.    Yeah.  I don't -- I didn't really make a clear
15    stance either way on that.
16        Q.    Well, this is pretty clear.
17            You say, "I think we should send Ewell a copy
18    and invite him to respond."
19            Right?
20        A.    You were saying respond via the Journal in an
21    informal and formal way.  I didn't really clarify how to
22    go about doing such a thing.
23        Q.    Were you opposed to him responding in the pages
24    of the Journal of Schenkerian Studies?
25        A.    Not necessarily.

1        Q.    Was there anything that made you think it would

2   be a bad idea for Professor Jackson -- excuse me, for

3   Professor Ewell to respond in the pages of the Journal of

4   Schenkerian Studies?

5        A.    I didn't really have a -- as I said before,

6   I was trying to withdraw myself.  I didn't really have a

7   strong opinion that I was going to voice.  I -- yeah.

8                    MR. ALLEN:  Can I -- can I ask what

9   exhibit we're on?  Number 6?  I'm going to introduce as

10  Exhibit 6 for the record what appears to be a Facebook

11  post.

12                    (Deposition Exhibit Number 6 marked.)

13       Q.    Do you recognize this document, Professor Graf?

14  Yes?

15       A.    Yes.

16       Q.    And this is -- this is dated July 25th, 2020,

17  at 9:28 p.m.  Right?

18       A.    Yes.

19       Q.    And it looks like this email from the page

20  before is marked 9:47 p.m.  That was Exhibit 5, correct?

21       A.    Yes.

22       Q.    So these are sent in relatively close proximity

23  to each other, right?

24       A.    Yes.

25       Q.    Is this -- first of all, do you recognize this

BENJAMIN S. GRAFF, Ph.D.        09/23/2024

 1  Facebook post?

 2       A.   I do.

 3       Q.   And did you create the blue bubble there?

 4       A.   Yes.

 5       Q.   And those are your words to Philip Ewell?

 6       A.   This is my message to Phil Ewell.

 7       Q.   Were you friends on Facebook or something of

 8  that nature?

 9       A.   It appears that we were, yes.

10       Q.   So you know you -- you knew you could reach out

11  to him directly at this time?

12       A.   I took it upon myself to reach out to him.

13       Q.   Were you able to reach out to him before this

14  time via Facebook?

15       A.   I'm not really sure.  I'm not really sure what

16  our status was.

17       Q.   When did you become connected to Professor

18  Philip Ewell on Facebook to the best of your knowledge?

19       A.   Just with this message.

20       Q.   Have your ever corresponded with him before?

21       A.   Not that I can recall.

22       Q.   And you say here, "I want to apologize to you

23  and emphasize that although I stepped down and am no

24  longer involved, the JSS would likely welcome a response

25  from you."

BENJAMIN S. GRAY, Ph.D.       09/23/2024

1              Did I read that correctly?

2      A.    Yes.

3      Q.    And you say, "We felt uneasy about the

4  situation from the beginning."

5              Right?

6      A.    Yes.

7      Q.    What did you feel uneasy about?

8      A.    I felt uneasy about the transition from me

9  stepping down and maybe having to step up.

10     Q.    And is that what you told Philip Ewell here?

11     A.    That was one part of it.

12     Q.    But you didn't tell that to Philip Ewell here,

13  did you?

14     A.    No, I didn't feel like it was necessary.

15     Q.    You said, "We got significant pressure from the

16  advisory board and some members of the editorial board."

17              Correct?

18     A.    Yes.

19     Q.    And yet the email we looked at seemed to be Mr.

20  Walls speaking on your behalf, asking about pro-Ewell

21  contributors.

22              Do you remember that email?

23     A.    I think so.

24     Q.    I'm just going to try to find it.  That was the

25  email in the Exhibit 4.  Do you remember that?  From

1  February 13th.

2          Do you remember that email we read when

3  Dr. Graf and I writes Mr. Levi Walls, "Were wondering

4  what your thoughts were concerning the submission from

5  Clark, Beaudoin, and Lett.  And as you may have seen,

6  these responses are at least implicitly

7  anti-Schenkerian."

8          Do you remember that?

9     A.    The way I remember that, that was Levi

10  speaking, not me.

11     Q.    That was Exhibit 4, correct?

12     A.    That was in...

13     Q.    So the controversy, it seemed, at that time was

14  that there were pro-Ewell contributions, correct?

15     A.    Well, that was Levi's wording, so I can't

16  really -- I can't really clarify what he was saying by

17  that.

18     Q.    Did you ever discuss with Professor Ewell what

19  the controversies were inside the editorial staff at this

20  time?

21     A.    Not that I remember.

22     Q.    By this time, I mean July 25th, 2020.

23     A.    No, I hadn't really spoken to Ewell at all

24  until this point.

25     Q.    And in the bottom part of that Facebook post,

BENJAMIN STEGE, Ph.D.        09/23/2024

 1  you say, "JSS advisors mentioned asking you about a

 2  response after your planned visit to UNT."

 3          Do you see that?

 4     A.   Yes.

 5     Q.   Was it your intention to invite Philip Ewell at

 6  this time to give a response to the JSS?

 7     A.   I had heard a rumor about inviting Ewell to be

 8  a guest speaker at UNT.

 9     Q.   Um-hum.  Did you want to invite him to give a

10  response in the pages of JSS?

11     A.   I don't think that was my decision to make.

12     Q.   Did Professor Ewell ever respond to any

13  overtures that he would contribute to the JSS?

14     A.   I'm not sure.

15     Q.   Did you ever get a response other than the one

16  here from Professor Ewell?

17     A.   This is all I can remember, this short

18  conversation.

19     Q.   Did you ever meet with Professor Ewell for

20  lunch as it's discussed in that Facebook post?

21     A.   The only time we met up in person was this past

22  summer actually.  That was it.

23     Q.   Did you discuss anything -- excuse me.  Strike

24  that, please.

25              Did you discuss anything having to do with the

BENJAMIN S. GRAF, Ph.D.       09/23/2024

1   Journal of Schenkerian Studies during that meeting?

2        A.    Not the details of the JSS, no.

3              MR. ALLEN:  I'm going to mark as

4   Exhibit 7 an email thread with the lead email being from

5   Benjamin Graf to John Ishiyama on the 14th of September,

6   2020.  Could I mark that as Exhibit 7 for the record?

7                   (Deposition Exhibit Number 7 marked.)

8        Q.    So Professor Graf, before we get started, I

9   know I'm bouncing around a little bit, but I'm going to

10  take you back to your meeting with the ad hoc panel,

11  which we discussed earlier today.

12       A.    Okay.

13       Q.    Do you recognize this document?

14       A.    Yes.

15       Q.    And is this an email from you to John Ishiyama?

16       A.    Yes, it appears to be.

17       Q.    And you knew at this time that John Ishiyama

18  was the head of the so-called ad hoc panel, correct?

19       A.    Right.

20       Q.    And what was the purpose of your sending this

21  email to Professor Ishiyama?

22       A.    I'm not really sure.  It seemed like I was just

23  saying thank you for your time.

24       Q.    You said you felt better about having spoken

25  about it, correct?  Incidentally, did you know that they

1 were taking notes on their meeting with you?

2       A.    I wasn't sure, but I guess they probably did.

3       Q.    Did they -- sorry.  I didn't mean to interrupt

4 you.

5       A.    Given their output, it seems like they probably

6 did take notes.

7       Q.    Did they ever share their notes with you to

8 seek any clarification if they were correct or anything

9 of that nature?

10      A.    I don't think so.

11      Q.    Did they tell you they were recording the

12 conversation they had with you in any way?

13      A.    I'm not sure.

14      Q.    You don't remember that they did, though?

15      A.    I don't really know if they did or did not.

16      Q.    So this email refers to something you attached.

17 Do you see that?

18      A.    Yes.

19      Q.    Do you know what --

20      A.    I don't see the attachment there, but yes.

21      Q.    Right.  That's what I'm going to ask you about.

22            Do you know what was attached?

23      A.    No, I can't remember what was attached to that.

24      Q.    So if you skip to the -- in the nature of

25 emails, let's say skip to the bottom, 2504, UNT 2504.

BENJAMIN S. GRAF, Ph.D.        09/23/2024

 1  There's an email that begins on the previous page from

 2  John Ishiyama to you.  Do you see that one?

 3       A.    Does it begin, Dear Professor Graf?

 4       Q.    Yes.  Now, do you remember this being an email

 5  that invites you to meet with the ad hoc panel?

 6       A.    Yes.

 7       Q.    And then if you skip to the very end of the

 8  document, the last page marked UNT 2505, there's -- so a

 9  standalone, what looks like an email from Timothy Jackson

10  or at least a text with Tim at the bottom.

11            "All the best, Tim."

12             Do you see that?

13       A.    Yes.

14       Q.    Now, that is in series with the previous

15  documents.  And so I'm just going to represent to you

16  that it's often in the nature of emails that the big

17  body of the email is followed by the attachment.

18       A.    Yes.

19       Q.    So my question is to try to confirm if that was

20  the attachment that you referred to in the header email.

21       A.    I don't really know today thinking back on it.

22  I was just trying to do what the panel asked of me.

23       Q.    Do you remember sending this text to the panel?

24       A.    Not really.

25       Q.    It says, "The responses, which if you read

1  them, were pretty well evenly split between pro- and

2  contra-, and published in the Symposium back-to-back in

3  alternation so as to present a balanced picture of the

4  results of the call for comments."

5          Did I read that correctly?

6      A.   Yes.

7      Q.   Do you believe that's an accurate

8  representation by Timothy Jackson of the work of the

9  editorial board on the Symposium?

10     A.   It's hard to say.  Without having more of a

11  hand in it, I don't really know if you could say they

12  were evenly split.

13     Q.   You don't remember how many were pro and how

14  many were con?

15     A.   No.

16     Q.   Do you remember the Journal rejecting any

17  pro-Ewell comments?

18     A.   I don't remember that, no.

19     Q.   And Timothy Jackson says, "The majority of the

20  authors are well-known, highly seasoned scholars, ranging

21  from the Chair of the Harvard Music Department to the

22  authors of books on Schenker and Schenkerian analysis."

23          Did I read that right?

24     A.   Yes.

25     Q.   In your experience as editor of the Journal

1  of Schenkerian Studies and as an expert in this field,

2  with a dissertation in music theory, is that correct?

3       A.   I don't know exact bios of all of them.

4       Q.   Do you have any reason to think it's not

5  correct?

6       A.   No, I can't recall whether it's correct or not.

7       Q.   And to end this, though, do you have any reason

8  to think -- strike that, please.

9            Is this the full email?  Do you remember any

10 other parts of this email?

11      A.   I don't remember.

12           MR. ALLEN:  I'm going to mark as

13 Exhibit 8 for the record.  This is an email -- this is

14 an email with the Bates stamp JACKS 089828.  It has the

15 heading, Timothy Jackson to Diego Cubero.  And cc'd,

16 among others, are also yourself, Benjamin Graf.

17           (Deposition Exhibit Number 8 marked.)

18      Q.   So I just want to go over this quickly.  But

19 I'm going to draw your attention to the third paragraph

20 in that top line email.

21           Is that the same text, which we just read,

22 that seems to have been collected by the ad hoc panel?

23      A.   It appears to be.

24      Q.   And there is other -- there are other parts of

25 that email here on the email of July 26th, 2020, right?

1          A.    Yeah.

2          Q.    Do you have any reason to -- strike that.

3                Can you give any reason why the full email

4    wasn't included to the ad hoc panel?

5          A.    I don't really know.

6          Q.    If an email was excerpted, that would have been

7    you who excerpted it and sent it to the panel, correct?

8          A.    That could have been.  I was just trying to

9    address what the panel was asking.

10         Q.    Why would that cause you to excerpt only a

11   portion of an email rather than including the whole

12   email?

13         A.    I'm not really sure.  You'd have to ask the

14   panel.

15         Q.    In the top line email there, Timothy Jackson

16   represents to Diego and his colleagues, "To reply

17   directly to your query:  Stephen, Ben, Levi, and I read

18   through and edited every word of the responses very

19   carefully."

20                Right?  Didn't he say that?

21         A.    I see that.

22         Q.    But that doesn't appear in the portion of the

23   email sent to the ad hoc panel, right?

24         A.    No.

25         Q.    This is the last series of questions.  Every

 1  deposition has the best part at the end.

 2       A.   Sure.

 3            MR. ALLEN:  I'm going to mark as

 4  Exhibit -- I think we're up to Exhibit 9.  Am I correct?

 5            THE REPORTER:  Yes.

 6            (Deposition Exhibit Number 9 marked.)

 7       Q.   I'm going to mark as Exhibit 9 an email from

 8  Peter Kohanski to Benjamin Brand.

 9            Now, you'll see a little funny stamp down in

10  the corner.  That's because this was previously used as

11  an exhibit when we deposed a fellow professor in your

12  department named Heidlberger, I believe.  That shouldn't

13  concern us here.  I'm just going to ask you really quick.

14  Do you recognize this at all?

15       A.   No.

16       Q.   Can you skip down to the next page?  Do you see

17  where is says, "Dear Dean Richmond"?

18       A.   Yes.

19       Q.   Now, I just want you to read this -- let me ask

20  you to do this.

21            Can you read the first two paragraphs and just

22  answer if you think you've received or read this before?

23       A.   I have seen it before.

24       Q.   When did you see this before?

25       A.   I saw this.  I read through this document as

1 | part of my preparations for today.

2 |     Q.   Okay.  Had you seen it back in 2020?

3 |     A.   I had seen it back in 2020, although it would

4 | be hard for me to pinpoint the exact context.

5 |     Q.   Did you ever support the graduate students in

6 | their circulation of this petition?

7 |     A.   No.  But I think it would need more

8 | clarification.

9 |             MR. ALLEN:  All right.  Let me mark as

10 | Exhibit Number --

11 |     Q.   Professor Graf, did I mark that as Exhibit 9?

12 |     A.   This is Exhibit 9.

13 |             MR. ALLEN:  I'm going to mark as

14 | Exhibit 10 -- this is an email from you, Professor Graf,

15 | on July 30th, 2020, at 3:10 p.m., to various faculty

16 | members.

17 |             (Deposition Exhibit Number 10 marked.)

18 |     Q.   And while I ask you questions about this,

19 | I'm going to ask you to go into the stack and pull up

20 | Exhibit 3, which is the November 25th, 2023, Ad Hoc Panel

21 | Report.  And you'll see at the end, there are various

22 | exhibits to that report.  If you turn to the back.

23 |     A.   Are you referring to Exhibit 3?

24 |     Q.   I am.  I'm referring to the exhibits at the

25 | back.  And then I want to ask you some questions about

1    the document I've just designated as Exhibit 10.  Oh,

2    excuse me.  Did I get that wrong?  No.  It is Exhibit 10.

3              So first of all, Exhibit 10, do you recognize

4    this document?

5         A.   Yes.

6         Q.   And what is this document?

7         A.   This is an email about a faculty statement.

8         Q.   And is that faculty statement that you are

9    pleased to sign, as it says in that first line, is that

10   the exhibit to the Ad Hoc Panel Report, which was

11   attached as their Exhibit 4?

12              MR. WALTON:  Do you have a page number?

13              MR. ALLEN:  Thank you.  I do.

14        Q.   It's JACKSON 228 as Bates number.

15        A.   Yes.

16        Q.   So you're at JACKSON 228, correct?

17        A.   Yes.

18        Q.   And that is your signature on this long list of

19   people who signed this letter, correct?

20        A.   Yes, I signed this statement.

21        Q.   You're sort of sixth in position, I suppose?

22        A.   Yeah.

23        Q.   And this is the statement that's referred to in

24   Exhibit 10, correct?

25        A.   As far as I understand it, yes.

1        Q.    All right.  And Exhibit -- well, excuse me.
2   This attachment to the Ad Hoc Panel Report has the
3   header, "Statement of UNT Faculty on Journal of
4   Schenkerian Studies."
5             Right?
6        A.    Yes, in the ad hoc exhibit.
7        Q.    And it's dated July 30th, 2020, in this
8   form?
9                    MR. WALTON:  Form.
10        Q.    In this form that, it's reprinted by the
11   university's ad hoc panel, it says at the top, "Statement
12   of UNT faculty on Journal of Schenkerian Studies, Friday,
13   July 31st, 2020."
14             Do you see that?
15        A.    Yes, July 31st, 2020.
16        Q.    Okay.  And if you skip to the second paragraph,
17   it says, "We endorse the call for action outlined in our
18   students' letter."
19             Do you see that?
20        A.    Yes.
21        Q.    It has a URL embedded, correct?
22        A.    Yes.
23        Q.    And is it your understanding that this
24   faculty statement was expressly referring to the student
25   petition?

1       A.    It would seem so.

2       Q.    So --

3       A.    I didn't actually write this, but --

4       Q.    But you did sign it, correct?

5       A.    It seems so, yes.

6       Q.    And by doing that, you particularly, as an

7   individual, endorsed what was said in that statement, the

8   faculty statement?

9       A.    I did sign the faculty statement, yes.

10      Q.    So my next question is if you skip forward in

11  the exhibits to the UNT ad hoc panel report to JACKSON

12  226, there's something captioned Exhibit 3 by the ad hoc

13  panel.  Do you see that?

14      A.    Yes.

15      Q.    And it says, "I am sharing this statement on

16  behalf of a cross section of graduate students in the

17  division of music history, theory, and ethnomusicology."

18            Can you confirm that that is the student

19  statement, which is the URL link embedded in the faculty

20  statement?

21      A.    It looks like it is.

22      Q.    Do you have any reason to think that is not the

23  case?

24      A.    No.

25      Q.    I believe that statement is still up online.

*BENJAMIN S. GRAB, Ph.D.      09/23/2024*

```
 1  So if we clicked on the URL, we could get it again unless
 2  it's been taken down.  Correct?
 3       A.    Right.  I don't really know.
 4       Q.    So your intention was also to endorse the
 5  call for action outlined in that student letter that is
 6  attached to the Ad Hoc Panel Report?
 7       A.    Yeah.  I think the intent was just to support
 8  our graduate students.
 9       Q.    Do you know what the call for action outlined
10  in the student letter was?
11       A.    I knew some of it, but not the exact specifics.
12       Q.    Had you read it in its entirety before you
13  signed the faculty statement?
14       A.    It's hard to say, but I think yes.
15             MR. ALLEN:  I think I can pass the
16  witness now, Ben.
17             MR. WALTON:  We'll reserve.
18             MR. ALLEN:  Okay.
19             THE VIDEOGRAPHER:  We're off the record
20  at 12:08 p.m.
21
22             (Proceedings concluded at 12:08 p.m.)
23
24
25
```

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*    121

1                    CHANGES AND SIGNATURE

2    WITNESS:  BENJAMIN S. GRAF, Ph.D.

3    DATE:  9-23-24

4    PAGE/LINE            CHANGE                REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

BENJAMIN S. GRAF, Ph.D.          09/23/2024

1  _____

2  _____

3  _____

4       I, BENJAMIN S. GRAF, have read the foregoing

5  deposition and hereby affix my signature that same

6  is true and correct, except as noted above.

7

8                           _____

9                                BENJAMIN S. GRAF

10  THE STATE OF _____)
    COUNTY OF _____)

11

12       Before me, _____, on this day

13  personally appeared BENJAMIN S. GRAF, known to me or

14  proved to me on the oath of _____ or

15  through _____ (description of

16  identity card or other document) to be the person whose

17  name is subscribed to the foregoing instrument and

18  acknowledged to me that he/she executed the same for

19  the purpose and consideration therein expressed.

20       Given under my hand and seal of office on this

21  _____ day of _____, _____.

22

23                           _____

24                           NOTARY PUBLIC IN AND FOR
                             THE STATE OF _____
25                           My Commission Expires:_____

<pre>
1                  UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF
2                       SHERMAN DIVISION

3  TIMOTHY JACKSON,              )
                                 )
4       Plaintiff,               )
                                 )
5  vs.                           )  CASE NO. 4:21-CV-00033-ALM
                                 )
6  LAURA WRIGHT, et al.,         )
                                 )
7       Defendants.              )

8       _____

9              REPORTER'S CERTIFICATION OF

10     ORAL DEPOSITION OF BENJAMIN S. GRAF, Ph.D.

11               September 23, 2024

12      _____
</pre>

13     I, KIM D. CARRELL, a Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16     That the witness, BENJAMIN S. GRAF, was duly

17  sworn and that the transcript of the oral deposition is

18  a true record of the testimony given by the witness;

19     That the deposition transcript was duly submitted

20  on October 21, 2024, to Mr. Benjamin Walton, the attorney

21  for the witness,for examination, signature, and return to

22  me by November 22, 2024, (30 days);

23     That pursuant to the information given to the

24  deposition officer at the time said testimony was taken,

25  the following includes all partes of record and the

1  amount of time used by each party at the time of the

2  deposition;

3       Michael Thad Allen - 02 HRS: 37 MIN
        Benjamin Walton -  00 HRS: 00 MIN
4
   FOR THE PLAINTIFF:
5       Mr. Michael Thad Allen
        ALLEN LAW, LLC
6       P.O. Box 404
        Quaker Hill, CT 06375
7       Telephone: 860.772.4738
        Fax: 860.469.2783
8       E-mail: M.allen@allen-lawfirm.com

9

10 FOR THE DEFENDANTS:

11      Mr. Benjamin S. Walton
        Assistant Attorney General
12      General Litigation Division
        P.O. Box 12548, Capital Station
13      Austin, Texas 78711
        Telephone: 512.463.2120
14      Fax: 512.320.0667
        E-mail: Benjamin.Walton@oag.texas.gov
15
             - and -
16
        Renaldo Stowers
17      University of North Texas System
        Office of General Counsel
18      801 North Texas Boulevard
        Denton, Texas 76201
19      Telephone: 940.565.2717
        Fax: 940.369.7026
20      E-mail: Renaldo.Stowers@untsystem.edu

21

22      I further certify that I am neither counsel for,

23 related to, nor employed by any of the parties or

24 attorneys in the action in which this proceeding was

25 taken, and further that I am not financially or

*BENJAMIN S. CARP, Ph.D.*          *09/23/2024*

1  otherwise interested in the outcome of the action.

2       Certified to by me on this 21st day of October,

3  2024.

4

5

6

7                              _____
                               Kim D. Carrell, CSR NO. 1184
7                              Date of Expiration: 7-31-26
                               **JULIA WHALEY & ASSOCIATES, INC.**
8                              2012 Vista Crest Drive
                               Carrollton, Texas  75007-1640
9                              214-668-5578/Fax 972-236-6666
                               JulieTXCSR@gmail.com
10                             Firm registration No. 436
                               Firm registration Expires 5-31-25
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENJAMIN S. GRAF, ETAL.        09/23/2024                    1

# #

**#308** [1] - 1:23

# '

**'job** [1] - 67:16

# 0

**00** [2] - 124:3
**000107** [1] - 4:10
**000110).........
115** [1] - 4:10
**000233).........
[1]** - 3:18
**000439).........
..........102** [1] -
3:24
**000526).........
..........117** [1] -
4:14
**002500** [1] - 4:5
**002505).........
...109** [1] - 4:5
**002645** [1] - 3:21
**002782).........** [1]
- 3:21
**02** [1] - 124:3
**0439** [1] - 101:24
**06375** [2] - 2:5,
124:6
**067** [1] - 41:13
**067377** [1] - 3:15
**067379** [1] - 42:1
**067388** [2] -
43:2, 43:4
**067401).........
[1]** - 3:15
**089828** [2] - 4:7,
113:14
**089832).........
114** [1] - 4:7

# 1

**1** [7] - 3:12, 40:5,
40:8, 40:11,
40:12, 40:22,
97:23
**10** [7] - 4:11,
116:14, 116:17,
117:1, 117:2,
117:3, 117:24
**100** [2] - 86:23
**10:06** [1] - 94:15
**10:34** [1] - 71:7

**10:45** [1] - 71:10
**10:54** [1] - 81:11
**1184** [1] - 125:6
**11:28** [1] -
101:16
**11:39** [1] -
101:19
**12** [14] - 10:9,
43:1, 43:4, 66:22,
67:10, 68:22,
71:20, 75:25,
77:8, 80:12,
80:16, 87:14,
102:16, 103:5
**12548** [2] - 2:11,
124:12
**12:08** [3] - 1:19,
120:20, 120:22
**13th** [2] - 81:6,
107:1
**14** [1] - 4:4
**14th** [2] - 97:18,
109:5
**17** [1] - 79:14
**1st** [3] - 90:25,
92:21, 93:16

# 2

**2** [8] - 3:3, 3:13,
40:6, 40:8, 40:23,
80:7, 80:15,
97:23
**2/1** [3] - 50:10,
50:13, 50:15
**2/2** [1] - 49:19
**20** [1] - 5:17
**2008** [2] - 10:12,
11:1
**2010** [3] - 11:17,
11:18, 12:10
**2010ish** [1] -
25:1
**2012** [1] - 125:8
**2015** [1] - 27:7
**2016** [5] - 13:11,
24:23, 27:8,
28:21, 40:25
**2017** [1] - 47:8
**2018** [1] - 47:11
**2019** [16] -
31:23, 45:24,
47:12, 49:2, 49:3,
51:3, 52:15,
54:15, 59:15,
61:21, 61:22,
63:3, 75:16,
75:20, 90:25,
92:21

**2019-2020** [1] -
44:8
**2020** [28] -
26:25, 31:23,
32:12, 47:19,
47:24, 65:13,
66:2, 67:2, 67:14,
68:21, 79:14,
80:13, 81:9, 87:4,
87:5, 97:18,
102:1, 102:15,
104:16, 107:22,
109:6, 113:25,
116:2, 116:3,
116:15, 118:7,
118:13, 118:15
**2023** [1] - 116:20
**2024** [9] - 1:12,
1:18, 5:3, 6:3,
28:22, 123:11,
123:20, 123:22,
125:3
**2025** [1] - 77:25
**20th** [2] - 99:12,
99:13
**21** [1] - 123:20
**214-598-5229** [1]
- 2:24
**214-668-5578/
Fax** [1] - 125:9
**21st** [1] - 125:2
**22** [1] - 123:22
**226** [1] - 119:12
**228** [2] - 117:14,
117:16
**23** [3] - 1:12, 5:3,
123:11
**23rd** [2] - 1:18,
6:3
**25** [3] - 42:2,
43:1, 43:4
**2504** [2] - 110:25
**2505** [1] - 111:8
**25th** [8] - 8:12,
65:13, 77:25,
102:1, 102:14,
104:16, 107:22,
116:20
**2645** [1] - 79:14
**2657** [3] - 90:7,
93:25
**2658** [2] - 94:16,
94:19
**2663** [3] - 89:2,
89:5, 89:6
**2697** [2] - 97:2,
97:3
**26th** [1] - 113:25
**272** [2] - 66:13,
66:14

**2757** [1] - 81:5
**2758** [4] - 80:22,
80:24, 80:25,
81:12

# 3

**3** [9] - 3:16, 42:2,
65:11, 65:12,
80:8, 97:23,
116:20, 116:23,
119:12
**30** [2] - 5:18,
123:22
**30th** [3] - 8:13,
116:15, 118:7
**31st** [2] - 118:13,
118:15
**37** [1] - 124:3
**3:10** [1] - 116:15

# 4

**4** [10] - 3:19,
79:12, 79:16,
79:20, 89:3, 89:4,
106:25, 107:11,
117:11
**4/4** [7] - 49:15,
49:19, 49:21,
50:2, 50:9, 50:13,
50:15
**40** [2] - 3:12,
3:15
**404** [2] - 2:5,
124:6
**436** [1] - 125:10
**4:21-CV-00033-
ALM** [3] - 1:5, 5:4,
123:5
**4:53** [1] - 93:16

# 5

**5** [5] - 3:4, 3:22,
101:24, 102:2,
104:20
**5-31-25** [1] -
125:10
**512.320.0667** [2]
- 2:13, 124:14
**512.463.2120** [2]
- 2:12, 124:13

# 6

**6** [5] - 3:7, 4:1,

**104:9, 104:10,
104:12**
**65** [1] - 3:18

# 7

**7** [4] - 4:3, 109:4,
109:6, 109:7
**7-24-20** [1] -
3:22
**7-25-20...........
104** [1] - 4:2
**7-31-26** [1] -
125:7
**75007-1640** [1] -
125:8
**76201** [2] - 2:17,
124:18
**78711** [2] - 2:12,
124:13
**79** [1] - 3:21
**7:51** [1] - 92:21

# 8

**8** [3] - 4:6,
113:13, 113:17
**80** [1] - 70:16
**801** [3] - 1:22,
2:17, 124:18
**860.469.2783** [2]
- 2:6, 124:7
**860.772.4738** [2]
- 2:6, 124:7

# 9

**9** [6] - 4:8, 115:4,
115:6, 115:7,
116:11, 116:12
**9-23-24** [1] -
121:3
**940.369.7026** [2]
- 2:18, 124:19
**940.565.2717** [2]
- 2:18, 124:19
**972-236-6666** [1]
- 125:9
**9:03** [2] - 1:19,
6:4
**9:28** [1] - 104:17
**9:46** [1] - 40:1
**9:47** [1] - 104:20
**9:53** [1] - 40:4

# A

**a.m** [9] - 1:19,
6:4, 40:1, 40:4,
71:7, 71:10,
81:11, 101:16,
101:19
**ability** [2] - 7:3,
7:10
**able** [9] - 8:18,
21:20, 25:11,
31:15, 47:9, 57:1,
69:19, 103:2,
105:13
**above-styled** [1]
- 1:17
**absolutely** [1] -
19:21
**academic** [3] -
28:6, 49:15, 50:2
**access** [1] -
88:25
**accomplished**
[4] - 17:9, 17:11,
33:16, 75:8
**according** [2] -
55:8, 76:6
**accurate** [2] -
40:19, 112:7
**accused** [8] -
22:2, 22:4, 22:6,
32:2, 32:9, 75:22,
75:25, 77:24
**accusing** [1] -
32:13
**achieved** [1] -
47:5
**achievement** [1]
- 43:21
**acknowledged**
[1] - 122:18
**acquaintance**
[1] - 44:14
**act** [1] - 69:21
**action** [18] -
34:19, 34:20,
34:24, 34:25,
35:1, 35:9, 35:12,
38:3, 38:6, 38:7,
38:10, 39:4, 39:8,
118:17, 120:5,
120:9, 124:24,
125:1
**actions** [5] -
34:14, 34:16,
36:14, 37:9,
37:25
**active** [1] - 92:5
**Activities** [1] -

43:11
**activities** [2] -
19:3, 53:25
**activity** [2] -
43:25, 53:6
**actual** [1] -
89:22
**Ad** [9] - 3:16,
65:14, 65:22,
65:24, 77:24,
116:20, 117:10,
118:2, 120:6
**ad** [16] - 79:20,
79:24, 80:2, 97:1,
99:16, 100:9,
109:10, 109:18,
111:5, 113:22,
114:4, 114:23,
118:6, 118:11,
119:11, 119:12
**adapt** [1] - 20:17
**add** [1] - 73:5
**addition** [3] -
8:25, 62:17,
98:22
**additional** [2] -
95:2, 98:20
**address** [3] -
75:20, 99:14,
114:9
**advance** [1] -
20:17
**advisee** [1] -
36:11
**advisor** [7] -
14:22, 14:24,
15:7, 15:10,
17:14, 31:5
**advisors** [2] -
58:8, 108:1
**advisory** [4] -
31:6, 79:4, 83:16,
106:16
**advocate** [3] -
71:22, 71:23,
72:11
**advocating** [1] -
103:3
**affairs** [2] -
96:19, 96:21
**affect** [2] - 7:7,
7:10
**affiliated** [1] -
42:6
**affix** [1] - 122:5
**agree** [8] -
74:25, 76:24,
77:15, 79:5,
95:15, 95:18,
96:4

**agreed** [2] -
65:6, 96:12
**agreeing** [1] -
96:17
**Agreement** [1] -
5:7
**agreement** [1] -
77:22
**aid** [1] - 48:15
**aim** [1] - 53:15
**al** [3] - 1:6, 3:23,
123:6
**aligned** [1] -
29:19
**Allen** [5] - 2:4,
6:9, 57:7, 124:3,
124:5
**ALLEN** [22] -
2:4, 6:9, 6:19,
9:10, 39:23,
57:11, 58:2, 71:3,
74:15, 79:11,
101:13, 101:20,
104:8, 109:3,
113:12, 115:3,
116:9, 116:13,
117:13, 120:15,
120:18, 124:5
**Allen.......** [1] -
3:7
**almost** [1] -
28:21
**ALSO** [1] - 2:21
**alternation** [1] -
112:3
**America** [1] -
55:13
**amount** [1] -
124:1
**analysis** [28] -
16:21, 18:1,
19:12, 19:13,
19:16, 19:20,
20:2, 20:3, 20:8,
20:11, 20:20,
20:21, 21:7,
21:14, 22:3, 22:5,
22:8, 22:22,
22:23, 24:11,
34:11, 56:1, 56:4,
56:6, 56:17, 57:2,
57:23, 112:22
**analyst** [1] -
14:9
**Analyst** [2] -
14:10, 14:11
**analyzing** [1] -
16:12
**Analyzing** [1] -
16:14

**AND** [2] - 121:1,
122:23
**Andrew** [2] -
86:17, 86:19
**angle** [1] - 70:17
**announce** [1] -
59:13
**announce:@
societymusictheory
.org** [1] - 89:14
**announced** [2] -
58:6, 91:10
**announcement**
[1] - 93:5
**anonymity** [1] -
30:8
**anonymous** [1] -
30:11
**answer** [9] - 7:4,
7:11, 21:11, 22:1,
37:3, 37:22, 38:2,
39:6, 115:22
**anti** [6] - 82:13,
82:20, 82:22,
82:24, 83:11,
107:7
**anti-
Schenkerian** [6] -
82:13, 82:20,
82:22, 82:24,
83:11, 107:7
**anticipated** [1] -
6:23
**apologize** [4] -
40:12, 54:13,
68:3, 105:22
**appear** [2] -
67:9, 114:22
**appearance** [1] -
50:12
**APPEARANCE
S** [1] - 2:1
**appearances** [1]
- 6:7
**Appearances...
..............................
..... ** [1] - 3:3
**appeared** [4] -
40:19, 66:21,
68:21, 122:13
**apply** [1] - 20:17
**applying** [6] -
21:7, 21:14, 22:3,
22:5, 22:7, 22:18
**appointments**
[1] - 47:5
**approach** [6] -
20:10, 20:13,
20:14, 20:16,
24:14, 25:13

**approached** [2]
- 18:7, 24:12
**approaching** [2]
- 20:3, 29:7
**appropriate** [2] -
90:11, 90:14
**arbitration** [1] -
5:24
**area** [3] - 19:5,
29:19, 56:2
**arose** [1] - 47:23
**art** [1] - 45:6
**article** [25] -
23:12, 24:4,
27:22, 27:24,
28:4, 29:16,
29:20, 32:10,
33:3, 53:13, 57:6,
59:5, 71:18, 72:1,
73:12, 74:23,
76:11, 76:19,
76:23, 77:6, 77:8,
92:17, 100:5,
100:13, 100:16
**articles** [16] -
27:16, 28:19,
29:5, 29:13,
32:22, 32:25,
33:1, 53:10, 59:7,
59:9, 67:8, 69:12,
72:14, 75:25,
78:13, 100:10
**aspect** [1] -
16:20
**aspects** [4] -
16:17, 16:19,
20:23
**aspire** [1] -
51:25
**assignments** [2]
- 44:23, 45:1
**assistant** [2] -
12:24, 13:6
**Assistant** [3] -
2:10, 38:21,
124:11
**associated** [1] -
43:21
**ASSOCIATES**
[1] - 125:7
**assume** [4] -
7:20, 22:11,
75:14, 103:4
**Astro** [1] - 22:24
**Astro-
Germanic** [1] -
22:24
**attached** [6] -
1:25, 110:16,
110:22, 110:23,

117:11, 120:6
**attachment** [4] -
110:20, 111:17,
111:20, 118:2
**attempt** [1] -
78:6
**attention** [8] -
64:10, 64:11,
68:16, 88:12,
93:20, 94:4, 97:4,
113:19
**attorney** [8] -
5:12, 5:13, 8:1,
8:3, 9:11, 9:14,
9:18, 123:20
**Attorney** [4] -
2:10, 38:19,
38:21, 124:11
**attorney-client**
[2] - 9:11, 9:14
**attorneys** [3] -
6:6, 8:8, 124:24
**auditioned** [1] -
10:20
**auditions** [1] -
10:18
**August** [1] -
11:1
**Austin** [2] - 2:12,
124:13
**Austrian** [1] -
23:1
**Austro** [1] -
22:15
**Austro-
Germanic** [1] -
22:15
**author** [11] -
29:22, 29:24,
30:13, 32:5,
71:16, 72:6,
72:20, 73:4,
73:24, 99:20,
100:1
**authored** [1] -
30:14
**authors** [9] -
68:21, 73:10,
75:22, 75:23,
83:18, 84:16,
97:22, 112:20,
112:22
**avoid** [1] - 30:17
**aware** [11] -
21:13, 21:18,
22:9, 63:4, 64:3,
75:21, 75:24,
76:2, 85:23,
85:24, 91:15

**B**

**BA** [1] - 10:14
**baby** [2] - 61:25,
62:2
**back-to-back** [1]
- 112:2
**background** [3]
- 9:23, 19:21,
56:12
**bad** [1] - 104:2
**Bakulina** [7] -
86:7, 90:24, 91:6,
92:24, 93:8,
93:11, 93:22
**balanced** [1] -
112:3
**bald** [3] - 70:13,
70:15, 70:16
**banged** [1] -
64:6
**Barry** [3] - 99:9,
99:18, 100:4
**Barry's** [1] -
100:5
**Based** [2] -
18:18, 58:17
**based** [8] - 30:5,
36:17, 37:7, 39:6,
39:9, 77:1, 95:22
**basic** [1] - 57:2
**basis** [1] - 37:5
**Bates** [7] -
41:16, 43:4,
79:13, 90:7,
101:24, 113:14,
117:14
**bathroom** [1] -
71:2
**BE** [1] - 5:6
**Beaudoin** [4] -
82:9, 82:21, 83:9,
107:5
**became** [2] -
26:14, 32:23
**become** [3] -
25:8, 45:9,
105:17
**becoming** [1] -
50:25
**began** [1] - 12:8
**begin** [2] - 9:20,
111:3
**beginning** [3] -
27:8, 60:3, 106:4
**beginnings** [1] -
85:1
**begins** [5] -
79:13, 81:1,

93:21, 94:19,
111:1
    **behalf** [3] -
63:25, 106:20,
119:16
    **behind** [1] - 36:5
    **below** [1] - 99:8
    **Ben** [5] - 6:11,
9:10, 99:13,
114:17, 120:16
    **Benjamin** [29] -
2:10, 5:12, 6:5,
6:22, 38:9, 39:3,
40:17, 45:20,
46:2, 49:1, 50:20,
50:25, 52:14,
53:18, 54:14,
54:19, 59:14,
60:13, 60:18,
76:13, 91:1,
101:25, 109:5,
113:16, 115:8,
123:20, 124:3,
124:11
    **BENJAMIN** [11] -
1:11, 1:15, 3:6,
5:2, 6:16, 121:2,
122:4, 122:8,
122:13, 123:10,
123:16
    benjamin.graf
[1] - 82:4
    **Benjamin.**
**Walton@oag.**
**texas.gov** [2] -
2:13, 124:14
    benjamingraf@
unt.edu [1] - 81:2
    **best** [18] - 19:23,
29:18, 31:14,
31:17, 38:25,
42:12, 42:14,
45:24, 46:5, 47:7,
47:15, 60:24,
69:6, 96:7,
105:18, 111:11,
115:1
    **Best** [1] - 95:5
    **better** [3] -
19:25, 23:3,
109:24
    **between** [4] -
12:12, 60:7,
80:17, 112:1
    **bibliographic**
[1] - 43:14
    **big** [2] - 54:7,
111:16
    **biography** [1] -
23:2

    **bios** [1] - 113:3
    **bit** [12] - 12:13,
16:16, 31:2, 34:3,
34:4, 35:2, 56:21,
64:20, 70:20,
92:25, 98:24,
109:9
    **Black** [1] - 75:5
    **blah** [3] - 41:13,
41:14
    **blind** [2] - 30:9,
30:11
    **blocked** [1] -
87:18
    **blue** [1] - 105:3
    **blurred** [1] -
12:13
    **board** [11] -
31:7, 31:9, 31:13,
31:20, 31:22,
79:4, 83:17,
106:16, 112:9
    **board's** [1] -
101:9
    **body** [4] - 89:24,
94:18, 96:25,
111:17
    **books** [1] -
112:22
    **born** [1] - 22:25
    **boss** [2] - 45:20,
55:8
    **bottom** [9] -
42:4, 81:5, 81:11,
93:21, 93:25,
97:5, 107:25,
110:25, 111:10
    **Boulevard** [3] -
1:23, 2:17,
124:18
    **bouncing** [1] -
109:9
    **boundary** [1] -
12:12
    **bounds** [1] -
15:16
    **Box** [4] - 2:5,
2:11, 124:6,
124:12
    **boy** [2] - 24:2,
24:3
    **Brand** [16] -
45:20, 46:2, 49:1,
50:20, 50:25,
52:14, 53:19,
54:14, 54:19,
58:12, 58:15,
59:14, 60:13,
60:18, 69:14,
115:8

    **break** [2] -
23:24, 71:4
    **brief** [3] - 9:24,
91:25, 96:20
    **briefly** [1] - 47:4
    **brilliant** [1] -
14:8
    **bring** [1] - 68:15
    **bringing** [1] -
58:3
    **brings** [1] - 76:8
    **broad** [1] - 34:4
    **broke** [1] -
102:15
    **brought** [3] -
46:11, 58:11,
60:12
    **BS** [3] - 10:14,
10:15, 10:16
    **bubble** [1] -
105:3
    **bullet** [2] - 80:8,
97:24
    **bullying** [1] -
77:25
    **burning** [5] -
34:25, 35:8,
35:19, 35:21,
35:22
    **business** [2] -
80:20, 84:7
    **but..** [2] - 22:16,
99:14
    **But..** [1] - 34:6
    **BY** [2] - 6:19,
74:17

    **C**

    **Cadwallader** [1]
- 82:17
    **camp** [1] - 72:21
    **capacity** [6] -
15:12, 18:3,
42:23, 44:22,
46:6, 46:8
    **Capital** [2] -
2:11, 124:12
    **caption** [1] -
101:25
    **captioned** [2] -
40:24, 119:12
    **capture** [2] -
22:1, 63:24
    **car** [11] - 67:15,
68:8, 69:17,
70:22, 70:25,
71:11, 71:16,
72:6, 76:7, 78:4,

79:7
    **carbon** [1] - 91:4
    **card** [1] - 122:16
    **care** [2] - 38:8,
40:17
    **career** [4] - 9:21,
9:25, 10:2, 11:5
    **carefully** [1] -
114:19
    **CARRELL** [1] -
123:13
    **Carrell** [2] -
1:19, 125:6
    **Carrollton** [1] -
125:8
    **case** [8] - 14:20,
19:17, 41:13,
41:18, 71:14,
92:13, 119:23
    **CASE** [2] - 1:5,
123:5
    **cases** [1] - 15:5
    **casually** [2] -
63:8, 65:1
    **catch** [1] - 12:16
    **categorize** [1] -
53:8
    **CAUSE** [1] - 5:4
    **caused** [1] -
75:16
    **cc'd** [1] - 113:15
    **cellist** [1] - 75:8
    **cello** [1] - 75:11
    **censor** [15] -
31:24, 67:17,
73:10, 74:10,
74:20, 74:23,
75:1, 75:22,
75:25, 76:11,
76:16, 76:25,
78:12, 78:20,
79:10
    **censored** [3] -
69:8, 69:9, 78:2
    **censoring** [7] -
68:21, 68:24,
73:3, 73:22,
75:22, 76:23,
78:1
    **censorship** [7] -
69:1, 72:7, 73:1,
73:13, 73:15,
78:6
    **Center** [23] -
3:13, 18:2, 18:5,
18:15, 18:18,
18:22, 18:24,
18:25, 19:2, 19:4,
34:1, 34:4, 37:1,
40:24, 41:1, 41:6,

42:20, 43:18,
43:20, 43:22,
43:24, 56:18
    **Center's** [1] -
43:11
    **Center/**
**Institute** [1] - 42:6
    **certain** [15] -
21:1, 21:4, 23:2,
25:10, 27:18,
30:5, 36:17,
37:25, 38:1,
56:12, 58:16,
73:22, 78:25,
79:1, 101:12
    **certainly** [8] -
50:10, 53:8,
56:24, 57:14,
69:22, 76:4, 79:2,
103:10
    **CERTIFICATIO**
**N** [1] - 123:9
    **certified** [1] -
10:10
    **Certified** [3] -
1:20, 123:13,
125:2
    **certify** [2] -
123:14, 124:22
    **CFP** [2] - 90:12,
90:14
    **chair** [4] - 45:20,
46:2, 47:13,
50:19
    **Chair** [3] - 49:1,
52:14, 112:21
    **CHANGE** [1] -
121:4
    **change** [2] -
11:21, 74:2
    **changed** [2] -
11:24, 48:7
    **CHANGES** [1] -
121:1
    **changing** [2] -
55:7, 73:21
    **characterize** [2]
- 77:10, 77:12
    **characterizing**
[1] - 83:1
    **chase** [1] - 59:6
    **Cheers** [1] - 99:4
    **child** [1] - 62:14
    **chime** [1] - 96:3
    **Chung** [2] -
3:22, 86:17
    **circulation** [1] -
116:6
    **circumstance**
[2] - 15:2, 27:18

    **citation** [1] -
43:14
    **cite** [4] - 21:16,
21:20, 100:6,
103:2
    **citing** [1] - 28:12
    **civil** [2] - 38:10,
39:4
    **Civil** [2] - 1:24,
5:9
    **clarification** [6] -
7:16, 7:20, 50:17,
58:1, 110:8,
116:8
    **clarifications** [1]
- 37:21
    **clarify** [7] -
20:22, 34:18,
37:20, 57:9,
102:5, 103:21,
107:16
    **clarifying** [1] -
50:16
    **Clark** [10] -
71:17, 71:20,
71:25, 72:5, 72:9,
72:20, 82:9,
82:21, 83:9,
107:5
    **Clark's** [1] - 76:8
    **class** [5] - 13:6,
13:19, 13:24,
13:25, 15:25
    **classes** [6] -
12:16, 49:22,
50:5, 50:6, 50:7
    **clear** [8] - 7:17,
7:21, 38:2, 39:5,
41:18, 100:17,
103:14, 103:16
    **clicked** [1] -
120:1
    **client** [4] - 9:11,
9:14, 13:13,
38:12
    **close** [10] - 16:4,
16:6, 25:4, 34:7,
45:9, 45:12, 64:9,
64:11, 88:12,
104:22
    **closely** [9] -
15:13, 27:9,
30:19, 30:21,
30:22, 33:10,
33:19, 33:22,
37:8
    **closer** [1] - 16:2
    **co** [4] - 25:23,
26:8, 26:11,
26:18

BENJAMIN S. GRAF, ETC.    09/23/2024    4

co-editor [3] - 25:23, 26:11, 26:18

co-editors [1] - 26:8

coaching [3] - 7:25, 9:4, 9:8

coercion [1] - 95:22

coffee [1] - 7:8

colleague [1] - 91:7

colleagues [1] - 114:16

collect [1] - 97:21

collected [2] - 98:21, 113:22

College [2] - 14:17, 63:1

comfortable [1] - 95:23

coming [3] - 10:22, 84:8, 85:12

comment [1] - 60:22

commented [1] - 98:18

comments [2] - 112:4, 112:17

Commission [1] - 122:24

commit [6] - 21:25, 23:2, 27:9, 29:3, 36:7, 38:3

committed [4] - 34:15, 36:15, 37:10, 39:7

committee [1] - 48:18

Committee [1] - 3:19

communicate [1] - 58:8

communications [3] - 9:11, 9:14, 37:13

compelled [1] - 96:3

compendium [1] - 79:13

compensated [1] - 49:11

complained [1] - 85:15

complaining [2] - 85:13, 91:20

complaints [1] - 52:1

complete [3] - 10:11, 11:13, 11:15

Completed [1] - 43:10

completed [2] - 10:12, 43:15

completely [1] - 77:22

completion [1] - 43:19

complicate [1] - 92:25

complicated [2] - 22:21, 56:9

component [1] - 22:23

composition [1] - 45:6

computerized [1] - 1:21

con [1] - 112:14

concentrate [2] - 39:19, 54:3

conception [1] - 61:4

concern [1] - 115:13

concerned [3] - 55:3, 60:9, 64:8

concerning [2] - 82:8, 107:4

concerns [7] - 60:6, 60:19, 66:18, 67:12, 67:15, 69:12, 69:15

concerts [1] - 75:9

concluded [1] - 120:22

conclusion [4] - 55:2, 55:4, 55:19, 55:22

condition [1] - 7:10

conditions [1] - 7:12

Conference [1] - 63:2

conference [8] - 27:25, 61:21, 62:3, 62:10, 63:12, 63:17, 63:20, 64:23

Confidential [1] - 4:9

confirm [5] - 69:20, 86:23, 93:4, 111:19,

119:18

confirmed [1] - 67:20

conflict [2] - 54:5, 54:7

congratulations [1] - 62:1

connected [1] - 105:17

connections [1] - 61:17

Conservatory [1] - 10:21

consider [17] - 16:2, 17:11, 19:11, 21:22, 22:11, 22:12, 22:18, 28:1, 28:3, 35:14, 35:20, 38:5, 38:6, 39:7, 43:23, 45:11, 74:11

consideration [1] - 122:19

considered [15] - 21:2, 22:24, 35:18, 36:18, 39:11, 39:14, 39:16, 43:19, 43:21, 73:22, 74:9, 74:19, 77:13, 94:11, 96:25

considers [1] - 20:3

constitutes [2] - 34:18, 34:20

consultation [1] - 7:25

consulted [3] - 8:6, 86:15, 86:20

contact [3] - 23:8, 23:10, 23:11

content [3] - 66:18, 67:13, 98:20

context [7] - 35:5, 35:11, 35:15, 36:12, 37:2, 73:14, 116:4

contextualize [1] - 37:25

continue [1] - 46:6

continued [1] - 93:11

continuous [1] - 41:17

contra [1] - 112:2

contradict [1] - 72:2

contrary [1] - 78:20

contribute [1] - 108:13

contribution [2] - 76:9, 100:8

contributions [2] - 43:20, 107:14

contributor [4] - 74:10, 74:21, 75:1, 76:17

contributors [1] - 106:21

controversies [1] - 107:19

controversy [7] - 47:21, 48:2, 48:11, 48:15, 102:15, 102:18, 107:13

conversation [19] - 9:4, 25:17, 27:25, 45:21, 48:25, 50:19, 52:17, 53:21, 54:14, 54:17, 59:19, 60:17, 65:3, 78:4, 79:8, 83:25, 91:7, 108:18, 110:12

conversations [13] - 46:1, 47:13, 50:24, 55:20, 58:18, 59:1, 59:2, 59:23, 61:9, 64:23, 85:4, 85:5, 91:24

conveying [1] - 80:4

coordinate [1] - 44:23

Coordinate [1] - 45:1

copied [3] - 69:1, 69:2, 99:15

copy [7] - 5:23, 8:8, 81:20, 91:4, 103:4, 103:17

corner [3] - 41:12, 66:5, 115:10

Correct [9] - 33:18, 50:21, 57:17, 57:20, 59:18, 59:21, 74:7, 106:17,

120:2

correct [89] - 8:20, 12:19, 16:14, 17:10, 23:1, 26:15, 27:1, 30:10, 30:15, 31:7, 31:10, 31:11, 31:20, 32:17, 32:23, 33:12, 33:13, 33:17, 33:20, 33:21, 34:9, 38:15, 38:18, 38:20, 38:21, 40:16, 42:9, 42:10, 46:10, 49:3, 49:23, 49:24, 50:20, 51:5, 51:23, 52:21, 53:9, 53:11, 53:20, 54:3, 55:15, 56:7, 56:10, 57:16, 57:19, 59:15, 59:23, 67:2, 70:1, 70:13, 72:15, 74:6, 75:6, 75:8, 75:13, 75:17, 76:1, 76:14, 77:3, 77:16, 79:23, 81:15, 82:3, 83:19, 93:8, 94:4, 94:6, 94:8, 95:10, 98:12, 103:8, 103:13, 104:20, 107:11, 107:14, 109:18, 109:25, 110:8, 113:2, 113:5, 113:6, 114:7, 115:4, 117:16, 117:19, 117:24, 118:21, 119:4, 122:6

correctly [9] - 67:23, 82:10, 82:18, 91:13, 91:14, 95:6, 95:7, 106:1, 112:5

corresponded [1] - 105:20

correspondence [4] - 37:14, 68:25, 80:11, 99:19

corresponding [1] - 99:17

counsel [2] - 38:14, 124:22

Counsel [5] - 2:16, 6:15, 9:16,

58:2, 124:17

count [2] - 53:11, 57:16

counted [1] - 12:15

COUNTY [1] - 122:10

course [11] - 8:7, 8:19, 12:25, 15:20, 16:3, 17:18, 18:12, 20:24, 49:20, 61:1, 80:20

courses [6] - 12:14, 49:5, 49:6, 49:8, 49:12, 49:21

coursework [1] - 12:16

Court [10] - 5:8, 14:15, 19:15, 47:4, 50:1, 65:18, 66:8, 66:9, 74:16, 92:2

COURT [2] - 1:1, 123:1

court [3] - 6:7, 31:3, 44:7

cover [2] - 80:8, 81:16

craft [5] - 18:22, 19:8, 59:7, 59:8, 59:10

create [4] - 9:5, 56:16, 56:19, 105:3

creating [1] - 84:22

credentialed [1] - 28:20

Crest [1] - 125:8

critic [1] - 71:23

critical [3] - 20:24, 72:15, 77:13

criticism [1] - 77:10

criticisms [1] - 76:10

cross [7] - 34:25, 35:8, 35:17, 35:19, 35:21, 35:22, 119:16

CSR [1] - 125:6

CT [2] - 2:5, 124:6

Cubero [3] - 86:12, 93:22, 113:15

BENJAMIN S. GRAF. 09/23/2024 5

**cum** [1] - 51:8
**current** [2] - 42:9, 42:11
**cut** [2] - 59:6, 77:7

# D

**DATE** [2] - 5:3, 121:3
**Date** [1] - 125:7
**date** [5] - 6:3, 9:25, 18:10, 18:11, 27:9
**dated** [5] - 65:13, 79:14, 81:6, 104:16, 118:7
**daughter** [2] - 64:9, 85:4
**day-to-day** [1] - 37:5
**DAYS** [1] - 5:16
**days** [3] - 5:17, 5:18, 123:22
**deal** [2] - 62:7, 63:22
**dean** [2] - 8:12, 8:15
**Dean** [2] - 8:12, 115:17
**Dear** [4] - 81:19, 92:24, 111:3, 115:17
**December** [4] - 85:14, 90:25, 92:21, 93:16
**decided** [3] - 11:21, 53:24, 59:12
**decision** [2] - 76:15, 108:11
**dedicated** [1] - 53:25
**defendant** [1] - 38:10
**Defendant** [1] - 39:3
**Defendants** [3] - 1:7, 6:12, 123:7
**DEFENDANTS** [2] - 2:9, 124:10
**defender** [1] - 72:10
**defending** [1] - 38:20
**defense** [1] - 15:4
**definitely** [9] -

16:22, 17:12, 17:25, 24:22, 34:10, 54:2, 62:21, 94:19, 94:22
**definition** [1] - 37:24
**definitions** [3] - 73:16, 73:18
**degree** [11] - 10:1, 10:4, 10:5, 10:11, 11:2, 11:13, 11:19, 11:24, 12:3, 30:7, 46:23
**degrees** [2] - 10:2, 12:15
**delivered** [2] - 63:12, 93:6
**Denton** [3] - 1:23, 2:17, 124:18
**department** [3] - 46:2, 50:19, 115:12
**Department** [2] - 52:14, 112:21
**depended** [3] - 27:17, 27:18, 57:5
**dependent** [1] - 35:4
**deposed** [3] - 6:24, 71:14, 115:11
**DEPOSITION** [5] - 1:10, 1:15, 5:2, 5:6, 123:10
**deposition** [14] - 7:24, 8:19, 9:8, 9:9, 9:18, 40:14, 40:16, 44:7, 115:1, 122:5, 123:17, 123:19, 123:24, 124:2
**Deposition** [11] - 6:4, 40:5, 40:6, 65:11, 79:16, 102:2, 104:12, 109:7, 113:17, 115:6, 116:17
**Deposition....** [1] - 3:12
**depth** [1] - 65:4
**Describe** [3] - 29:8, 45:17, 46:1
**describe** [4] - 16:4, 18:15, 47:4, 91:25
**described** [2] -

49:23, 93:8
**describing** [1] - 28:11
**description** [1] - 122:15
**DESCRIPTION** [1] - 3:11
**design** [1] - 18:17
**designated** [2] - 43:2, 117:1
**desire** [1] - 62:20
**Despite** [1] - 82:13
**detail** [2] - 8:21, 92:1
**details** [5] - 65:2, 71:21, 76:19, 84:3, 109:2
**determine** [1] - 33:1
**determined** [1] - 33:9
**determining** [1] - 20:5
**deviation** [1] - 92:14
**dialogue** [1] - 103:11
**Diego** [4] - 86:12, 90:25, 113:15, 114:16
**different** [17] - 13:4, 15:21, 20:21, 20:23, 28:9, 28:18, 29:4, 29:6, 32:7, 48:5, 48:10, 56:2, 73:16, 78:9, 93:23
**differential** [1] - 60:6
**differently** [1] - 20:17
**Direct** [1] - 3:7
**direct** [8] - 37:6, 37:8, 39:7, 48:19, 58:17, 64:12, 69:13, 97:4
**DIRECT** [1] - 6:18
**directly** [3] - 22:22, 105:11, 114:17
**disagreed** [3] - 77:3, 78:13, 83:19
**disagreeing** [1] -

82:14
**disagreement** [2] - 77:1, 77:23
**disclose** [1] - 54:22
**discovered** [1] - 14:8
**discretion** [1] - 60:20
**discuss** [6] - 63:5, 68:14, 84:21, 107:18, 108:23, 108:25
**discussed** [7] - 52:16, 71:16, 72:6, 80:5, 94:5, 108:20, 109:11
**discussing** [6] - 9:14, 52:13, 54:20, 68:6, 82:20, 84:25
**discussion** [6] - 46:4, 53:18, 69:1, 73:1, 93:10, 93:13
**discussions** [1] - 58:22
**Discussions** [2] - 90:11, 90:14
**disseminated** [1] - 88:10
**dissent** [2] - 96:9, 96:11
**dissertation** [25] - 14:19, 14:21, 14:22, 15:8, 15:10, 16:7, 17:2, 17:14, 19:11, 19:14, 21:3, 21:22, 22:3, 22:8, 22:9, 30:22, 33:10, 33:14, 33:23, 36:11, 43:13, 43:16, 43:19, 113:2
**Dissertations** [1] - 43:10
**distance** [2] - 84:12, 88:2
**DISTRICT** [4] - 1:1, 1:1, 123:1, 123:1
**Division** [2] - 2:11, 124:12
**division** [3] - 100:18, 100:20, 119:17
**DIVISION** [2] - 1:2, 123:2
**doctoral** [3] -

11:21, 14:16, 42:18
**doctorate** [4] - 11:24, 12:13, 24:19, 24:21
**document** [20] - 15:5, 41:4, 41:20, 42:2, 42:15, 65:13, 65:25, 78:25, 99:16, 101:24, 102:3, 102:8, 104:13, 109:13, 111:8, 115:25, 117:1, 117:4, 117:6, 122:16
**documents** [12] - 8:7, 8:11, 8:18, 8:25, 40:9, 41:18, 80:4, 80:10, 96:25, 101:21, 102:23, 111:15
**dominate** [1] - 61:12
**don't..** [1] - 26:5
**done** [5] - 40:11, 44:2, 69:13, 98:3, 98:17
**double** [2] - 30:9, 95:19
**Double** [1] - 30:11
**double-blind** [1] - 30:9
**Double-blind** [1] - 30:11
**down** [11] - 12:22, 41:11, 54:9, 65:21, 92:20, 94:17, 105:23, 106:9, 115:9, 115:16, 120:2
**Dr** [62] - 13:15, 13:24, 14:21, 16:22, 16:24, 17:15, 17:21, 18:7, 19:25, 24:10, 24:11, 25:15, 26:9, 36:22, 37:12, 37:15, 38:12, 43:23, 54:20, 55:23, 55:24, 56:24, 58:12, 58:13, 58:15, 60:23, 66:18, 67:12, 67:15, 67:16, 67:18, 67:20, 67:22,

67:25, 68:8, 68:20, 68:23, 69:1, 69:14, 69:17, 70:3, 70:11, 74:22, 76:6, 81:20, 82:7, 82:14, 84:4, 84:5, 85:5, 85:17, 86:3, 96:6, 107:3
**draft** [1] - 56:15
**draw** [1] - 113:19
**Drive** [1] - 125:8
**driving** [1] - 85:6
**dropped** [3] - 26:16, 26:18
**Dropped** [1] - 26:17
**due** [1] - 85:3
**duly** [4] - 1:17, 6:17, 123:16, 123:19
**during** [8] - 11:19, 14:1, 18:9, 27:15, 31:25, 51:16, 52:24, 109:1
**During** [1] - 13:13
**duties** [1] - 84:13

# E

**E-mail** [6] - 2:7, 2:13, 2:19, 124:8, 124:14, 124:20
**ear** [3] - 44:23, 45:1, 45:4
**Ear** [1] - 45:3
**early** [3] - 14:4, 24:5, 61:22
**earned** [1] - 10:3
**EASTERN** [2] - 1:1, 123:1
**edit** [1] - 25:16
**edited** [1] - 114:18
**editing** [1] - 79:3
**editor** [40] - 25:23, 26:11, 26:15, 26:18, 27:11, 27:15, 28:4, 30:16, 30:20, 32:5, 32:10, 32:20, 32:23, 36:24, 42:9, 42:12, 42:23, 46:8,

BENJAMIN S. GRAF, 9/23/2024                                    6

46:10, 51:8, 52:10, 53:19, 54:24, 56:23, 61:5, 61:10, 61:12, 61:16, 73:19, 74:5, 76:22, 83:16, 84:9, 92:6, 97:13, 97:15, 101:7, 112:25
  **editorial** [8] - 31:9, 31:13, 31:20, 31:22, 83:17, 106:16, 107:19, 112:9
  **Editorial** [1] - 80:15
  **editors** [4] - 26:8, 28:7, 28:25, 29:2
  **editorship** [4] - 27:4, 54:21, 60:19, 98:5
  **education** [3] - 9:25, 10:5, 10:9
  **effectively** [1] - 62:23
  **either** [8] - 23:17, 53:24, 68:5, 86:16, 91:24, 93:17, 96:5, 103:15
  **elaborate** [3] - 18:21, 49:7, 96:2
  **elaborating** [1] - 95:23
  **elderly** [1] - 70:9
  **Ellen** [4] - 86:7, 90:24, 93:8, 93:22
  **email** [77] - 28:11, 68:25, 69:2, 79:14, 79:19, 80:3, 80:9, 81:1, 81:12, 81:16, 81:19, 81:23, 82:1, 82:3, 82:4, 89:7, 89:8, 89:19, 89:22, 90:9, 90:19, 90:22, 90:24, 92:20, 93:9, 94:4, 94:6, 94:7, 94:8, 94:13, 94:18, 95:7, 95:8, 95:10, 97:5, 97:7, 97:10, 97:12, 97:14, 97:16, 99:4, 99:8, 99:14, 101:25, 102:4, 102:11,

104:19, 106:19, 106:22, 106:25, 107:2, 109:4, 109:15, 109:21, 110:16, 111:1, 111:4, 111:9, 111:17, 111:20, 113:9, 113:10, 113:13, 113:14, 113:20, 113:25, 114:3, 114:6, 114:11, 114:12, 114:15, 114:23, 115:7, 116:14, 117:7
  **Email** [1] - 3:22
  **emailed** [1] - 81:17
  **Emails** [4] - 3:20, 4:3, 4:6, 4:11
  **emails** [7] - 79:13, 80:17, 88:18, 93:23, 96:24, 110:25, 111:16
  **embedded** [2] - 118:21, 119:19
  **emphasize** [1] - 105:23
  **Empire** [1] - 23:1
  **employed** [1] - 124:23
  **encounter** [1] - 67:21
  **end** [9] - 14:3, 26:25, 44:6, 99:4, 99:22, 111:7, 113:7, 115:1, 116:21
  **ended** [2] - 10:22, 26:21
  **endorse** [2] - 118:17, 120:4
  **endorsed** [1] - 119:7
  **engaged** [1] - 19:12
  **enter** [1] - 10:23
  **enthusiasm** [1] - 63:22
  **enthusiastic** [2] - 58:18, 58:21
  **entire** [2] - 63:24, 64:1
  **entirety** [1] - 120:12
  **Enumerate** [1] - 39:20
  **enumerate** [1] -

39:22
  **episodes** [1] - 51:16
  **episodic** [1] - 51:13
  **especially** [2] - 16:17, 21:19
  **established** [1] - 36:10
  **et** [3] - 1:6, 3:23, 123:6
  **etc** [1] - 82:17
  **ethnomusicolo gy** [1] - 119:17
  **evaluating** [1] - 78:16
  **evenly** [2] - 112:1, 112:12
  **eventually** [1] - 67:9, 80:13
  **evidence** [1] - 84:14
  **evoked** [1] - 64:3
  **evolve** [2] - 14:6, 24:9
  **Ewell** [52] - 4:2, 32:16, 33:6, 63:2, 64:25, 71:23, 72:1, 72:10, 72:12, 72:15, 72:18, 72:21, 73:4, 73:10, 74:10, 74:20, 75:1, 75:5, 76:9, 76:11, 76:16, 77:3, 77:11, 77:15, 78:13, 84:15, 87:1, 87:13, 87:19, 91:21, 92:14, 102:20, 102:24, 103:4, 103:11, 103:17, 104:3, 105:5, 105:6, 105:18, 106:10, 106:12, 106:20, 107:14, 107:18, 107:23, 108:5, 108:7, 108:12, 108:16, 108:19, 112:17
  **Ewell's** [8] - 63:15, 64:12, 65:6, 91:8, 91:15, 92:17, 95:1, 98:21
  **exact** [8] - 18:10, 18:11, 60:17, 79:22, 80:1,

113:3, 116:4, 120:11
  **Exactly** [1] - 84:10
  **exactly** [9] - 12:21, 24:17, 25:16, 35:21, 36:21, 50:22, 69:3, 75:18
  **EXAMINATION** [1] - 6:18
  **examination** [1] - 123:21
  **Examination** [1] - 3:7
  **examines** [1] - 76:14
  **example** [3] - 11:11, 11:12, 23:24
  **excellent** [1] - 98:3
  **except** [1] - 122:6
  **excerpt** [1] - 114:10
  **excerpted** [2] - 114:6, 114:7
  **exclude** [1] - 102:24
  **excluded** [1] - 36:17
  **excuse** [11] - 38:11, 40:24, 48:25, 60:5, 83:16, 93:1, 98:2, 104:2, 108:23, 117:2, 118:1
  **Excuse** [2] - 38:16, 45:10
  **executed** [1] - 122:18
  **exhibit** [4] - 104:9, 115:11, 117:10, 118:6
  **Exhibit** [56] - 3:12, 3:13, 3:16, 3:17, 3:19, 3:22, 4:1, 4:3, 4:6, 4:8, 4:11, 40:5, 40:6, 40:8, 40:11, 40:12, 40:22, 40:23, 65:11, 65:12, 65:19, 79:12, 79:16, 79:20, 89:3, 101:24, 102:2, 104:10, 104:12, 104:20, 106:25, 107:11, 109:4,

109:6, 109:7, 113:13, 113:17, 115:4, 115:6, 115:7, 116:10, 116:11, 116:12, 116:14, 116:17, 116:20, 116:23, 117:1, 117:2, 117:3, 117:11, 117:24, 118:1, 119:12
  **exhibits** [5] - 40:8, 44:1, 116:22, 116:24, 119:11
  **EXHIBITS** [1] - 3:10
  **expect** [2] - 73:9, 92:11
  **expectation** [2] - 92:18, 100:17
  **expectations** [1] - 92:15
  **expected** [1] - 100:15
  **expecting** [1] - 62:11
  **experience** [14] - 18:23, 18:24, 18:25, 28:6, 28:24, 36:12, 37:6, 37:8, 39:7, 58:17, 61:16, 64:22, 70:3, 112:25
  **experienced** [1] - 74:5
  **expert** [2] - 14:12, 113:1
  **expertise** [5] - 24:11, 25:11, 29:19, 55:25, 56:3
  **Expiration** [1] - 125:7
  **Expires** [2] - 122:24, 125:10
  **explain** [4] - 7:23, 13:16, 14:15, 18:5
  **explained** [1] - 50:1
  **explanation** [1] - 19:20
  **explicitly** [1] - 61:13
  **express** [4] - 96:9, 96:11, 96:15, 96:16
  **expressed** [1] -

122:19
  **expressly** [2] - 30:15, 118:24
  **extensively** [1] - 61:6
  **extent** [5] - 33:25, 63:16, 86:10, 96:10, 102:17
  **extra** [1] - 49:11
  **extreme** [1] - 35:2

---

## F

  **Facebook** [8] - 4:1, 104:10, 105:1, 105:7, 105:14, 105:18, 107:25, 108:20
  **fact** [2] - 68:2, 78:19
  **factors** [2] - 36:16, 50:8
  **Faculty** [2] - 4:11, 118:3
  **faculty** [15] - 8:9, 8:14, 9:1, 13:7, 42:5, 51:1, 116:15, 117:7, 117:8, 118:12, 118:24, 119:8, 119:9, 119:19, 120:13
  **fair** [22] - 15:16, 16:10, 25:7, 25:12, 29:5, 37:15, 37:17, 37:18, 37:22, 47:24, 49:14, 50:9, 51:14, 52:8, 53:9, 53:18, 64:3, 68:9, 70:18, 72:19, 76:25, 102:14
  **fairly** [1] - 47:18
  **fall** [9] - 10:25, 45:25, 47:11, 47:12, 49:6, 51:3, 52:15, 54:15, 59:15
  **Fall** [2] - 49:3, 49:18
  **familiarity** [1] - 98:11
  **familiarize** [1] - 102:8
  **Family** [1] - 62:12

**family** [7] - 17:4,
17:13, 17:15,
17:17, 22:16,
62:19, 62:23
**far** [16] - 10:12,
10:15, 10:25,
13:11, 18:21,
34:10, 55:2,
68:15, 70:2, 75:7,
78:17, 80:14,
90:4, 92:16,
117:25
**fast** [2] - 42:25,
44:8
**fast-forward** [1]
- 42:25
**fault** [2] - 101:9,
101:11
**favor** [1] - 76:22
**Fax** [6] - 2:6,
2:13, 2:18, 124:7,
124:14, 124:19
**February** [3] -
67:14, 81:6,
107:1
**Federal** [2] -
1:24, 5:9
**feedback** [3] -
17:22, 30:5, 30:6
**fell** [1] - 35:17
**fellow** [5] - 13:3,
13:5, 44:10,
44:17, 115:11
**fellowship** [3] -
11:20, 12:19
**felt** [6] - 96:3,
96:7, 98:16,
106:3, 106:8,
109:24
**few** [11] - 17:1,
25:3, 41:22,
49:10, 58:24,
58:25, 101:21,
102:9
**field** [4] - 56:7,
63:23, 92:5,
113:1
**figure** [6] - 30:4,
30:6, 30:14,
50:22, 54:25,
55:10
**figuring** [1] -
76:19
**final** [2] - 15:4,
97:24
**finally** [1] - 99:4
**financially** [1] -
124:25
**fine** [5] - 23:22,
48:8, 48:20, 52:5,

64:15
**finish** [3] - 12:2,
13:8, 13:10
**finished** [8] -
24:21, 24:22,
24:23, 27:6, 27:7,
28:21, 81:12,
100:7
**fire** [2] - 35:16,
35:18
**Firm** [2] -
125:10, 125:10
**first** [19] - 6:17,
7:1, 7:2, 10:4,
12:22, 13:16,
13:24, 23:11,
25:3, 41:8, 44:17,
62:12, 62:14,
74:3, 90:18,
104:25, 115:21,
117:3, 117:9
**fit** [1] - 53:3
**five** [5] - 52:21,
52:24, 74:5
**flexibility** [1] -
51:24
**focus** [6] -
16:14, 16:15,
16:16, 19:5,
39:18
**focused** [2] -
59:6, 59:8
**follow** [7] -
27:13, 62:9,
64:18, 85:11,
92:11, 96:7,
98:13
**follow-up** [3] -
62:9, 64:18,
85:11
**followed** [1] -
111:17
**following** [4] -
48:7, 98:21,
123:15, 123:25
**follows** [1] -
6:17
**FOR** [8] - 1:1,
2:3, 2:9, 5:16,
122:23, 123:1,
124:4, 124:10
**force** [2] - 70:22,
70:24
**forced** [2] -
69:16, 85:13
**foregoing** [2] -
122:4, 122:17
**forget** [1] - 90:10
**form** [4] - 20:20,
38:17, 118:8,

118:10
**Form** [13] -
38:16, 53:12,
63:7, 68:10, 78:3,
78:14, 78:21,
79:6, 83:23,
87:21, 99:2,
101:10, 118:9
**formal** [2] -
28:10, 103:21
**formalities** [1] -
9:7
**formalized** [1] -
29:12
**formally** [1] -
86:16
**formatting** [1] -
98:12
**forms** [2] -
99:21, 99:23
**forth** [1] - 42:6
**forward** [16] -
20:23, 20:25,
23:17, 42:25,
44:8, 47:14,
50:23, 53:22,
54:25, 55:17,
55:18, 58:5, 58:8,
93:12, 94:11,
119:10
**four** [5] - 49:5,
49:6, 49:22, 74:5
**frame** [9] - 8:13,
22:19, 22:21,
44:9, 49:2, 51:3,
61:23, 85:14
**free** [2] - 38:17,
38:23
**frequently** [1] -
88:12
**Friday** [1] -
118:12
**friends** [1] -
105:7
**front** [3] - 36:8,
40:9, 80:25
**full** [8] - 11:9,
22:1, 31:1, 47:1,
47:2, 70:1, 113:9,
114:3
**full-grown** [1] -
70:1
**full-time** [1] -
11:9
**fully** [1] - 96:14
**funny** [1] - 115:9
**FY2013** [3] -
3:14, 40:25, 41:1
**FY2016** [2] -
3:14, 41:2

**G**

**G-R-A-F** [1] -
6:22
**gain** [1] - 61:16
**gained** [1] -
24:10
**gangster** [1] -
68:6
**gangster-like** [1]
- 68:6
**Gao** [2] - 42:16,
42:18
**Gateway** [1] -
1:23
**geared** [1] -
78:15
**geez** [1] - 94:18
**General** [8] -
2:10, 2:11, 2:16,
6:14, 38:22,
124:11, 124:12,
124:17
**General's** [1] -
39:19
**generalized** [1] -
77:19
**German** [2] -
22:13, 57:16
**Germanic** [2] -
22:15, 22:24
**girl** [2] - 61:25,
62:2
**Given** [2] -
110:5, 122:20
**given** [3] -
29:20, 123:18,
123:23
**glean** [1] - 20:4
**goal** [1] - 79:7
**Graduate** [1] -
4:8
**graduate** [22] -
8:9, 8:14, 9:1,
10:18, 12:14,
13:20, 25:8,
26:15, 27:4,
36:25, 44:10,
44:19, 55:25,
56:1, 60:20, 61:4,
61:10, 61:12,
61:15, 116:5,
119:16, 120:8
**GRAF** [11] -
1:11, 1:15, 3:6,
5:2, 6:16, 121:2,
122:4, 122:8,
122:13, 123:10,
123:16

**Graf** [31] - 3:22,
4:2, 6:5, 6:22,
6:25, 22:13, 35:3,
37:3, 38:10, 39:3,
40:7, 40:17,
57:15, 66:13,
67:20, 79:17,
81:20, 82:7,
82:14, 93:22,
99:13, 101:20,
101:25, 104:13,
107:3, 109:5,
109:8, 111:3,
113:16, 116:11,
116:14
**graph** [2] -
57:10, 57:18
**GRAPH** [1] -
57:10
**graphs** [6] -
56:10, 56:13,
56:19, 56:22,
57:3, 57:23
**great** [2] - 62:7,
63:22, 98:22
**Group** [1] - 2:23
**grown** [1] - 70:1
**guess** [9] -
22:13, 45:11,
51:8, 66:11, 72:3,
72:22, 78:1, 97:8,
110:2
**guest** [1] - 108:8
**guide** [1] - 41:19
**guys** [1] - 80:11

**H**

**hand** [4] - 41:12,
66:5, 112:11,
122:20
**handle** [1] - 84:7
**hands** [1] - 98:4
**harassment** [1] -
69:23
**hard** [29] -
19:22, 21:11,
21:24, 27:8,
27:23, 34:3, 36:7,
36:21, 37:4,
37:14, 48:3,
48:17, 52:4,
58:20, 62:2,
63:24, 66:24,
69:3, 69:18,
76:18, 85:9, 86:4,
86:19, 86:22,
112:10, 116:4,
120:14

**hardly** [1] - 62:4
**Harvard** [1] -
112:21
**he/she** [1] -
122:18
**head** [5] - 21:16,
21:21, 59:17,
70:15, 109:18
**header** [3] -
90:10, 111:20,
118:3
**heading** [1] -
113:15
**headline** [1] -
90:11
**headlined** [1] -
89:9
**hear** [3] - 14:7,
28:16, 44:25
**heard** [3] -
68:11, 102:22,
108:7
**hearing** [1] -
5:24
**heavier** [3] -
50:11, 50:13,
50:15
**heavily** [1] -
22:24
**heavy** [1] - 50:3
**Heejung** [1] -
17:7, 17:8, 17:9
**Heidlberger** [1] -
115:12
**Heinrich** [2] -
18:20, 22:25
**help** [5] - 25:16,
26:10, 26:11,
58:13, 58:14
**helped** [1] - 16:8
**helping** [3] -
24:12, 24:14,
26:8
**hereby** [2] -
122:5, 123:14
**hereto** [1] - 1:25
**herself** [1] -
17:10
**hesitate** [1] -
7:16
**hierarchically**
[1] - 20:8
**high** [2] - 75:11,
75:13
**highly** [1] -
112:20
**Hill** [2] - 2:5,
124:6
**himself** [2] -
22:25, 102:6

BENJAMIN S. GRAF, ETAL.      09/23/2024                    8

**hinder** [1] - 48:12

**histories** [1] - 22:16

**history** [1] - 119:17

**Hoc** [9] - 3:16, 65:14, 65:22, 65:24, 77:24, 116:20, 117:10, 118:2, 120:6

**hoc** [16] - 79:20, 79:24, 80:2, 97:1, 99:16, 100:9, 109:10, 109:18, 111:5, 113:22, 114:4, 114:23, 118:6, 118:11, 119:11, 119:12

**home** [4] - 16:25, 17:2, 33:11, 75:19

**honestly** [4] - 27:20, 29:1, 58:14, 99:19

**Honestly** [1] - 42:21

**hope** [1] - 101:22

**horse** [1] - 55:5

**house** [1] - 33:15

**HRS** [2] - 124:3, 124:3

**hum** [12] - 10:14, 26:14, 27:12, 34:5, 53:5, 54:18, 59:3, 63:19, 64:24, 95:17, 99:24, 108:9

**hundred** [1] - 47:19

**Hunter** [1] - 63:1

**I**

**ID** [1] - 66:5

**idea** [7] - 22:21, 84:12, 84:18, 84:22, 85:1, 89:23, 104:2

**identify** [4] - 8:18, 35:12, 36:13, 37:9

**identity** [1] - 122:16

**implicitly** [2] - 82:13, 107:6

**important** [3] -

**37**:21, 82:15, 94:3

**imposing** [1] - 70:4

**impressed** [1] - 98:8

**impression** [1] - 65:7

**IN** [1] - 122:23

**in-person** [1] - 84:5

**in..** [1] - 107:12

**INC** [1] - 125:7

**incident** [1] - 71:12

**incidentally** [1] - 59:12

**Incidentally** [2] - 91:25, 109:25

**include** [1] - 11:10

**included** [2] - 80:7, 114:4

**includes** [1] - 123:25

**including** [1] - 114:11

**incoming** [1] - 84:8

**increasing** [1] - 84:11

**independent** [2] - 15:6, 56:23

**indicating** [1] - 102:23

**individual** [1] - 119:7

**influential** [1] - 79:3

**informal** [2] - 28:14, 103:21

**informally** [2] - 28:16, 86:16

**information** [6] - 36:8, 48:4, 67:21, 95:22, 97:25, 123:23

**initial** [1] - 54:16

**inner** [1] - 92:10

**inquiry** [1] - 83:6

**inside** [1] - 107:19

**insights** [1] - 20:4

**instance** [1] - 1:16

**institution** [1] - 15:3

**instruct** [1] - 9:13

**instructing** [1] - 78:12

**instruction** [1] - 45:7

**instructor** [2] - 12:25, 13:5

**instrument** [4] - 11:7, 11:9, 11:11, 122:17

**instrumental** [1] - 10:9

**insulting** [1] - 53:2

**intact** [1] - 62:24

**intense** [3] - 51:16, 52:6, 52:9

**intent** [2] - 88:23, 120:7

**intention** [2] - 108:5, 120:4

**interact** [1] - 20:6

**interested** [5] - 28:12, 28:17, 73:17, 94:25, 125:1

**interesting** [1] - 57:9

**interfere** [3] - 7:3, 87:10, 96:21

**internal** [1] - 80:11

**interpret** [1] - 57:1

**interrupt** [4] - 7:16, 20:15, 64:14, 110:3

**intimating** [1] - 70:22

**intimidating** [2] - 70:6, 70:8

**intimidation** [1] - 68:7

**introduce** [3] - 65:12, 101:23, 104:9

**introduced** [1] - 65:19

**investigation** [1] - 80:5

**invite** [5] - 87:13, 103:8, 103:18, 108:5, 108:9

**invited** [2] - 87:1, 102:20

**invites** [1] - 111:5

**inviting** [1] - 108:7

**involved** [15] - 35:15, 36:5, 50:8, 55:18, 57:4, 59:22, 86:5, 86:8, 86:9, 86:10, 86:11, 86:13, 86:14, 86:18, 105:24

**involves** [2] - 56:9, 56:12

**Ishiyama** [6] - 79:15, 109:5, 109:15, 109:17, 109:21, 111:2

**issue** [3] - 72:6, 85:18, 95:3

**Issue** [1] - 4:12

**issues** [2] - 60:11, 60:12

**J**

**JACKS** [7] - 3:15, 4:7, 41:13, 42:1, 43:2, 43:4, 113:14

**JACKSON** [5] - 1:3, 117:14, 117:16, 119:11, 123:3

**Jackson** [99] - 13:14, 13:15, 13:17, 13:24, 14:6, 14:21, 15:9, 15:18, 16:5, 16:22, 16:24, 17:21, 18:7, 19:25, 24:10, 24:11, 25:13, 25:15, 26:9, 30:20, 31:6, 31:24, 33:10, 34:7, 34:15, 36:9, 36:14, 36:20, 36:22, 37:8, 38:3, 38:12, 39:2, 39:6, 39:21, 43:23, 54:6, 54:20, 55:20, 55:23, 55:24, 56:24, 58:13, 58:15, 59:20, 60:7, 60:23, 61:3, 61:11, 63:6, 66:18, 67:12, 67:16, 67:18, 67:22, 67:25, 68:20, 68:23, 69:14, 70:3, 70:11, 73:9, 74:9,

**74**:20, 74:22, 75:21, 75:24, 76:6, 76:10, 76:16, 76:23, 77:2, 78:12, 79:15, 80:3, 80:18, 81:20, 83:8, 83:13, 84:4, 84:5, 84:15, 85:5, 85:17, 86:3, 91:1, 93:22, 93:24, 96:6, 96:13, 96:17, 100:25, 101:3, 104:2, 111:9, 112:8, 112:19, 113:15, 114:15

**Jackson's** [8] - 17:15, 37:12, 37:15, 67:15, 68:8, 69:17, 77:7, 83:5

**JACKSON 000208** [1] - 3:18

**job** [10] - 15:3, 23:25, 44:22, 46:19, 46:21, 46:23, 54:17, 55:15, 85:16, 98:16

**John** [6] - 8:12, 79:15, 109:5, 109:15, 109:17, 111:2

**journal** [6] - 28:7, 79:3, 91:17, 92:3, 92:6, 101:7

**Journal** [100] - 18:8, 19:1, 19:9, 23:7, 23:8, 23:13, 23:15, 23:21, 24:4, 24:9, 24:13, 24:15, 25:9, 25:12, 25:14, 25:16, 25:20, 26:9, 26:15, 26:17, 26:25, 27:10, 27:16, 29:9, 30:20, 30:23, 31:25, 32:3, 32:4, 32:10, 32:13, 32:17, 32:20, 33:1, 33:7, 33:20, 34:2, 36:24, 37:1, 42:12, 45:14, 45:17, 45:21, 46:3, 47:23, 48:2, 48:11, 51:4, 51:8, 51:20, 51:22,

**52**:10, 52:15, 53:5, 53:9, 53:10, 53:15, 53:19, 54:1, 54:9, 56:19, 57:1, 58:5, 58:9, 58:16, 59:14, 60:19, 60:23, 61:1, 62:20, 66:21, 67:9, 71:19, 73:19, 74:10, 74:21, 80:11, 80:19, 83:10, 84:7, 84:13, 84:16, 87:14, 90:2, 95:4, 96:19, 96:22, 98:4, 98:9, 100:18, 103:12, 103:20, 103:24, 104:3, 109:1, 112:16, 112:25, 118:3, 118:12

**JSS** [27] - 4:6, 4:13, 23:11, 23:13, 23:16, 23:18, 31:5, 46:9, 46:10, 54:24, 74:5, 75:25, 76:23, 77:8, 80:16, 90:12, 90:15, 93:12, 94:11, 98:5, 102:16, 105:24, 108:1, 108:6, 108:10, 108:13, 109:2

**JULIA** [1] - 125:7

**JulieTXCSR@ gmail.com** [1] - 125:9

**July** [15] - 8:12, 8:13, 47:23, 80:13, 87:4, 87:5, 102:1, 102:14, 104:16, 107:22, 113:25, 116:15, 118:7, 118:13, 118:15

**K**

**keep** [4] - 44:6, 55:25, 62:23, 88:1

**kept** [1] - 15:20

**kerfuffle** [1] - 47:22

**KIM** [1] - 123:13

**Kim** [2] - 1:19,

125:6
**kind** [8] - 11:5, 58:11, 68:9, 69:23, 70:15, 70:18, 85:6, 95:22
**knowing** [2] - 36:4, 37:8
**knowledge** [13] - 7:5, 38:4, 38:18, 38:24, 38:25, 42:13, 42:18, 45:24, 48:19, 52:23, 56:12, 73:7, 105:18
**known** [3] - 91:9, 112:20, 122:13
**Kohanski** [2] - 4:10, 115:8

## L

**labor** [2] - 100:18, 100:21
**languages** [1] - 21:20
**larger** [1] - 31:10
**last** [7] - 19:10, 26:7, 31:2, 49:10, 57:8, 111:8, 114:25
**LAURA** [2] - 1:6, 123:6
**LAW** [2] - 2:4, 124:5
**lawfirm.com** [2] - 2:7, 124:8
**lawn** [5] - 34:25, 35:8, 35:20, 35:21, 35:22
**lawyers** [1] - 19:17
**lead** [4] - 16:22, 78:5, 79:14, 109:4
**leading** [2] - 76:20, 92:3
**learned** [1] - 14:7
**least** [5] - 30:7, 43:14, 82:13, 107:6, 111:10
**leave** [3] - 19:6, 31:23, 52:7
**lecturer** [13] - 46:17, 46:18, 46:21, 46:22, 46:23, 47:9,

47:10, 47:17, 48:12, 49:4, 49:5, 53:3
**lecturer/editor** [1] - 51:9
**left** [3] - 15:3, 60:20, 79:1
**legal** [1] - 2:23
**lesson** [2] - 17:17, 17:19
**lessons** [8] - 11:11, 15:14, 16:1, 16:8, 17:23, 17:24, 18:1, 33:14
**Lett** [4] - 82:9, 82:21, 83:9, 107:5
**letter** [4] - 117:19, 118:18, 120:5, 120:10
**letters** [1] - 65:16
**letting** [1] - 55:6
**level** [9] - 11:22, 11:24, 25:10, 50:7, 50:8, 50:12, 75:11, 75:13, 86:20
**levels** [7] - 15:21, 20:4, 20:5, 20:6, 20:7, 28:18, 48:6
**Levi** [39] - 44:10, 44:11, 44:12, 44:14, 45:9, 45:18, 48:24, 48:25, 54:12, 54:13, 58:4, 58:16, 59:23, 60:23, 64:19, 67:20, 68:7, 68:15, 69:11, 70:1, 72:22, 76:6, 76:12, 81:5, 81:12, 82:23, 84:1, 84:8, 86:5, 90:25, 93:1, 98:2, 98:3, 98:8, 107:3, 107:9, 114:17
**Levi's** [1] - 107:15
**Levy** [2] - 93:1, 98:2
**likely** [2] - 12:13, 105:24
**limits** [1] - 25:6
**line** [13] - 41:7, 42:8, 43:12, 65:16, 79:19,

89:13, 91:4, 94:2, 94:18, 94:20, 113:20, 114:15, 117:9
**link** [1] - 119:19
**list** [7] - 88:7, 88:8, 88:12, 88:15, 88:21, 89:16, 117:18
**listed** [4] - 42:9, 43:13, 68:19, 93:24
**lists** [2] - 43:9, 80:8
**Listserv** [3] - 88:14, 88:18, 88:24
**literally** [1] - 57:16
**Litigation** [2] - 2:11, 124:12
**live** [1] - 40:20
**liver** [1] - 70:15
**LLC** [2] - 2:4, 124:5
**load** [9] - 49:4, 49:5, 49:15, 49:20, 50:2, 50:10, 50:13, 50:14, 50:15
**locate** [1] - 90:16
**logo** [1] - 65:22
**look** [9] - 32:25, 33:3, 35:10, 41:9, 41:20, 43:1, 65:21, 79:20, 80:7
**looked** [1] - 106:19
**looking** [1] - 8:16
**looks** [5] - 97:18, 99:9, 104:19, 111:9, 119:21
**lost** [1] - 67:6
**loud** [1] - 102:6
**lower** [1] - 41:12
**lunch** [2] - 101:22, 108:20
**lvg.dallas@ gmail.com** [1] - 2:24
**lying** [3] - 96:12, 98:25, 99:3

## M

**m.allen@allen** [2] - 2:7, 124:8
**m.allen@allen-lawfirm.com** [2] - 2:7, 124:8
**machine** [1] - 1:21
**Madam** [1] - 74:16
**mail** [6] - 2:7, 2:13, 2:19, 124:8, 124:14, 124:20
**main** [2] - 14:18, 15:7
**maintain** [1] - 30:7
**major** [2] - 11:21, 11:25
**majority** [1] - 112:19
**man** [5] - 36:12, 37:10, 70:1, 70:4, 70:6
**Man** [1] - 48:3
**manuscript** [1] - 59:5
**manuscripts** [1] - 98:11
**March** [3] - 97:18, 99:12, 99:13
**mark** [9] - 79:12, 109:3, 109:6, 113:12, 115:3, 115:7, 116:9, 116:11, 116:13
**MARKED** [1] - 3:11
**marked** [14] - 40:5, 40:6, 40:24, 42:2, 65:11, 79:16, 102:2, 104:12, 104:20, 109:7, 111:8, 113:17, 115:6, 116:17
**marking** [1] - 40:8
**Maryland** [1] - 10:8
**Massachusetts** [1] - 10:21
**massive** [1] - 99:16
**Master's** [5] - 11:4, 11:5, 11:8, 11:15, 13:21

**master's** [3] - 12:12, 14:1, 14:4
**Material** [1] - 3:19
**materials** [2] - 48:4, 97:21
**matter** [1] - 29:20
**matters** [2] - 59:10, 92:25
**mature** [1] - 25:8
**McGough** [1] - 2:23
**mean** [25] - 8:11, 10:1, 12:2, 17:19, 18:20, 20:9, 20:16, 23:13, 26:24, 27:24, 28:7, 30:3, 34:22, 49:12, 53:1, 59:2, 61:8, 63:11, 63:13, 64:5, 64:13, 95:19, 101:8, 107:22, 110:3
**meaning** [2] - 30:11, 57:14
**means** [5] - 14:15, 23:18, 49:21, 57:16, 103:4
**meant** [1] - 51:22
**medications** [1] - 7:6
**meet** [7] - 16:24, 17:4, 33:11, 79:24, 80:2, 108:19, 111:5
**Meeting** [1] - 4:3
**meeting** [6] - 54:19, 59:16, 75:20, 109:1, 109:10, 110:1
**meetings** [1] - 84:5
**meets** [1] - 76:7
**member** [9] - 13:7, 51:1, 79:3, 83:17, 88:4, 88:15, 88:18, 88:20
**members** [7] - 17:4, 31:7, 79:20, 88:22, 89:10, 106:16, 116:16
**memory** [7] - 7:7, 7:10, 8:22, 25:6, 61:24, 87:8, 87:20

**mental** [1] - 7:9
**mentee** [2] - 36:11, 36:24
**mention** [2] - 78:11, 78:19
**mentioned** [3] - 30:24, 64:25, 108:1
**mentor** [4] - 16:10, 16:11, 34:9, 58:11
**mentored** [1] - 34:10
**mentorship** [1] - 34:12
**message** [4] - 89:24, 93:15, 105:6, 105:19
**messages** [2] - 37:13, 89:1
**met** [4] - 33:16, 44:17, 79:23, 108:21
**metaphorically** [1] - 55:6
**methodology** [2] - 20:2, 20:20
**MHTE** [1] - 4:8
**Michael** [5] - 2:4, 6:9, 124:3, 124:5
**microphone** [1] - 64:7
**mid** [1] - 49:2
**midway** [1] - 67:7
**might** [11] - 16:1, 19:5, 30:14, 43:24, 45:5, 71:1, 72:10, 77:19, 77:23, 82:5, 93:17
**MIN** [2] - 124:3, 124:3
**mind** [2] - 52:11, 83:14
**minimal** [2] - 67:3, 99:21
**minute** [2] - 19:10, 67:4
**MISCELLANEO US** [1] - 5:21
**misread** [2] - 68:2, 68:3
**miss** [1] - 62:12
**mission** [3] - 18:18, 18:22, 19:8
**misspoke** [1] - 67:24
**mistaken** [1] -

99:9
  **mistyped** [1] -
82:5
  **modern** [4] -
20:12, 20:13,
20:16
  **moment** [1] -
76:20
  **Monday** [1] - 4:4
  **month** [1] - 60:1
  **most** [6] - 14:16,
22:17, 46:24,
46:25, 47:1, 47:2
  **Most** [1] - 15:1
  **Mostly** [1] -
70:14
  **move** [5] -
20:23, 23:6, 58:8,
64:14, 64:16
  **Move** [1] - 20:25
  **moving** [3] -
47:14, 50:23,
53:22
  **MR** [41] - 6:9,
6:11, 6:13, 6:19,
9:10, 9:12, 38:16,
38:23, 39:23,
53:12, 57:7,
57:11, 58:2, 63:7,
68:10, 71:3,
74:15, 78:3,
78:14, 78:21,
79:6, 79:11,
83:23, 87:21,
99:2, 101:10,
101:13, 101:20,
102:5, 104:8,
109:3, 113:12,
115:3, 116:9,
116:13, 117:12,
117:13, 118:9,
120:15, 120:17,
120:18
  **music** [29] -
10:5, 10:9, 11:20,
11:22, 12:1, 12:8,
14:11, 15:14,
16:12, 16:13,
16:14, 16:18,
16:21, 19:21,
20:3, 21:8, 21:13,
21:14, 21:19,
22:19, 28:20,
34:10, 45:6, 45:7,
75:6, 92:6, 113:2,
119:17
  **Music** [20] -
11:4, 11:8, 14:18,
61:22, 63:2,
63:15, 63:25,

64:1, 75:16, 88:4,
88:21, 89:17,
91:11, 91:16,
92:1, 92:3, 92:4,
92:7, 92:10,
112:21
  **musical** [1] -
17:23

## N

  **name** [20] - 6:20,
17:7, 18:18,
22:14, 25:23,
26:7, 29:22,
29:24, 31:1, 31:2,
42:8, 42:16, 43:9,
44:12, 54:13,
57:8, 57:15,
82:10, 122:17
  **named** [3] -
44:10, 63:1,
115:12
  **Names** [1] - 42:5
  **names** [2] -
27:14, 80:1
  **nature** [9] -
20:18, 50:5, 52:3,
53:22, 83:14,
105:8, 110:9,
110:24, 111:16
  **necessarily** [7] -
20:24, 21:10,
22:22, 70:5,
73:11, 85:15,
103:25
  **necessary** [1] -
106:14
  **necklace** [2] -
35:17
  **need** [7] - 25:11,
26:2, 37:2, 55:10,
75:3, 96:16,
116:7
  **negative** [1] -
95:20
  **never** [4] - 22:4,
56:22, 75:9,
102:20
  **new** [2] - 58:19,
58:23
  **newborn** [1] -
62:18
  **next** [10] - 6:23,
10:17, 11:18,
49:22, 92:20,
93:15, 95:10,
97:11, 115:16,
119:10
  **nice** [1] - 28:1

**NO** [4] - 1:5, 5:4,
123:5, 125:6
  **Non** [1] - 21:8
  **Non-Western** [1]
- 21:8
  **nontenured** [1] -
46:13
  **Noon** [1] - 4:4
  **normal** [3] -
28:24, 29:3,
92:15
  **North** [21] - 1:22,
2:16, 2:17, 6:14,
9:21, 10:20,
10:22, 10:23,
11:3, 11:16,
12:19, 42:19,
44:18, 46:5,
46:20, 52:2, 52:9,
97:1, 124:17,
124:18
  **NOTARY** [1] -
122:23
  **note** [2] - 57:12,
78:18
  **noted** [1] - 122:6
  **notes** [7] - 9:5,
9:7, 9:13, 9:15,
110:1, 110:6,
110:7
  **Nothing** [1] -
29:12
  **nothing** [2] -
51:19, 57:18
  **notice** [3] -
40:13, 40:15,
40:20
  **Notice** [2] - 3:12,
5:7
  **November** [10] -
61:21, 61:22,
61:23, 63:3,
65:13, 75:16,
77:25, 85:14,
116:20, 123:22
  **nuance** [3] -
77:17, 77:18,
77:21
  **number** [9] -
79:14, 80:7, 80:8,
80:15, 80:23,
89:4, 101:24,
117:12, 117:14
  **Number** [14] -
40:5, 40:6, 65:11,
79:16, 89:3, 89:4,
102:2, 104:9,
104:12, 109:7,
113:17, 115:6,
116:10, 116:17

**NUMBER** [2] -
3:11, 5:16
  **numbered** [1] -
1:18
  **numbers** [6] -
41:13, 41:16,
43:5, 65:16, 66:5,
66:11

## O

  **oath** [3] - 64:10,
72:24, 122:14
  **Object** [1] -
38:16
  **objected** [4] -
87:3, 87:6, 87:7,
102:19
  **objecting** [1] -
86:25
  **objection** [1] -
5:22
  **obligations** [1] -
62:19
  **obviously** [2] -
16:8, 43:20
  **occasion** [1] -
97:15
  **occur** [2] -
21:19, 57:13
  **occurred** [1] -
78:5
  **occurrence** [1] -
67:22
  **occurs** [1] -
28:15
  **October** [5] -
60:3, 60:4, 79:14,
123:20, 125:2
  **OF** [11] - 1:1,
1:10, 1:15, 5:2,
5:16, 122:10,
122:10, 122:24,
123:1, 123:9,
123:10
  **offer** [1] - 55:17
  **office** [1] -
122:20
  **Office** [4] - 2:16,
6:14, 38:19,
124:17
  **officer** [1] -
123:24
  **official** [2] -
97:10, 97:12
  **often** [2] - 52:3,
111:16
  **old** [1] - 70:11
  **older** [1] - 70:12

**once** [2] - 51:23,
51:25
  **one** [41] - 5:22,
10:19, 13:25,
15:25, 16:3,
16:18, 16:19,
19:1, 19:10, 20:4,
20:25, 21:17,
22:21, 23:17,
34:17, 35:14,
41:22, 43:19,
47:10, 49:9,
49:22, 53:23,
56:18, 56:21,
58:13, 62:17,
67:24, 70:12,
71:11, 74:14,
80:23, 89:4,
89:21, 90:10,
93:21, 95:4,
96:24, 102:19,
106:11, 108:15,
111:2
  **One** [1] - 53:13
  **ones** [1] - 27:13
  **online** [1] -
119:25
  **open** [1] - 95:2
  **opinion** [6] -
34:22, 34:23,
39:10, 47:2, 92:4,
104:7
  **opinions** [2] -
55:17, 79:4
  **opportunity** [1] -
52:18
  **opposed** [2] -
103:10, 103:23
  **Opposing** [1] -
58:2
  **option** [1] -
20:25
  **ORAL** [3] - 1:10,
1:15, 123:10
  **Oral** [1] - 45:4
  **oral** [1] - 123:17
  **order** [2] - 58:8,
93:18
  **Order** [1] - 5:8
  **ordinary** [1] -
80:19
  **organize** [1] -
62:22
  **organized** [1] -
20:7
  **oriented** [1] -
11:9
  **origin** [2] -
22:14, 22:15
  **ORIGINAL** [1] -

5:11
  **originate** [1] -
84:19
  **otherwise** [1] -
125:1
  **outcome** [1] -
125:1
  **outlined** [3] -
118:17, 120:5,
120:9
  **output** [1] -
110:5
  **outside** [1] -
45:13
  **overlap** [1] -
48:8
  **overlapped** [1] -
48:9
  **overly** [1] -
77:19
  **oversimplifyin**
**g** [1] - 79:8
  **overtures** [1] -
108:13
  **own** [1] - 78:20

## P

  **p.m** [9] - 1:19,
92:21, 93:16,
94:15, 104:17,
104:20, 116:15,
120:20, 120:22
  **P.O** [4] - 2:5,
2:11, 124:6,
124:12
  **packet** [1] -
80:22
  **PAGE** [1] - 3:2
  **page** [23] -
27:10, 41:8,
41:13, 42:2, 42:4,
43:1, 65:21, 66:5,
66:11, 81:2, 81:4,
89:2, 89:7, 90:7,
90:9, 90:16,
93:21, 97:5,
104:19, 111:1,
111:8, 115:16,
117:12
  **PAGE/LINE** [1] -
121:4
  **pages** [6] -
41:10, 41:17,
44:6, 103:23,
104:3, 108:10
  **panel** [30] -
66:17, 67:12,
68:5, 78:11,

BENJAMIN S. GRAF, 9/23/2024                                    11

78:15, 78:17, 78:25, 79:20, 79:24, 80:2, 81:14, 81:18, 93:7, 97:1, 99:17, 100:9, 109:10, 109:18, 111:5, 111:22, 111:23, 113:22, 114:4, 114:7, 114:9, 114:14, 114:23, 118:11, 119:11, 119:13
**Panel** [10] - 3:16, 65:14, 65:22, 65:23, 65:24, 77:24, 116:20, 117:10, 118:2, 120:6
**paper** [8] - 28:11, 28:15, 30:14, 63:5, 63:10, 63:13, 64:19, 65:6
**papers** [13] - 85:19, 88:9, 88:13, 88:16, 90:1, 90:5, 93:5, 93:12, 100:23, 101:1, 101:4, 101:8
**Papers** [1] - 89:9
**paragraph** [2] - 113:19, 118:16
**paragraphs** [1] - 115:21
**parking** [1] - 76:7
**parlance** [1] - 49:14
**parse** [1] - 48:3
**part** [20] - 18:9, 19:13, 25:22, 32:7, 43:24, 50:21, 53:21, 53:23, 54:16, 56:22, 56:23, 62:21, 66:22, 80:4, 91:8, 106:11, 107:25, 115:1, 116:1
**partes** [1] - 123:25
**partially** [1] - 61:25
**participate** [2] - 87:13, 102:20
**participating** [1] - 103:11
**particular** [2] -

96:5, 102:16
**particularly** [3] - 53:1, 90:20, 119:6
**parties** [2] - 5:22, 124:23
**parts** [3] - 100:6, 113:10, 113:24
**party** [3] - 5:22, 36:17, 124:1
**pass** [1] - 120:15
**past** [1] - 108:21
**pasted** [1] - 99:15
**path** [3] - 54:25, 55:17, 55:18
**paying** [3] - 64:9, 64:11, 88:11
**Peabody** [1] - 10:20
**peer** [10] - 29:8, 29:11, 30:9, 30:11, 91:17, 91:22, 92:8, 92:11, 92:12, 92:19
**peer-review** [3] - 29:11, 92:12, 92:19
**people** [25] - 20:11, 20:12, 20:16, 23:3, 30:4, 30:6, 31:15, 35:15, 36:18, 38:5, 38:9, 39:1, 39:16, 39:17, 42:5, 58:14, 64:1, 79:19, 79:22, 80:19, 88:24, 102:18, 102:19, 102:21, 117:19
**people'** [1] - 67:17
**per** [2] - 49:21, 87:3
**percent** [4] - 47:19, 70:16, 86:23
**perfectly** [2] - 64:13, 64:15
**performance** [5] - 10:19, 11:4, 11:19, 12:1, 12:3
**Performance** [4] - 11:6, 11:8, 11:16, 13:21
**perhaps** [1] - 25:3
**Perhaps** [1] -

103:7
**Period** [3] - 3:14, 40:25, 41:1
**period** [3] - 58:10, 59:13, 60:2
**permanently** [1] - 47:14
**person** [9] - 15:5, 16:2, 28:17, 35:20, 74:12, 84:5, 108:21, 122:16
**personal** [2] - 70:3, 95:24
**Personally** [1] - 64:8
**personally** [5] - 11:10, 64:5, 74:2, 87:13, 122:13
**perspective** [3] - 55:24, 70:17, 92:9
**Peter** [1] - 115:8
**petition** [2] - 116:6, 118:25
**PH** [1] - 57:18
**Ph.D** [21] - 1:11, 1:16, 3:6, 5:2, 6:16, 12:8, 13:8, 13:21, 14:4, 14:13, 14:16, 15:9, 16:13, 16:17, 18:9, 18:12, 24:5, 24:22, 28:20, 121:2, 123:10
**Phil** [1] - 105:6
**Philip** [13] - 32:16, 33:6, 63:1, 72:1, 75:5, 86:25, 87:13, 87:19, 105:5, 105:18, 106:10, 106:12, 108:5
**physically** [3] - 70:4, 70:6, 70:7
**pianist** [2] - 17:9, 33:17
**piano** [1] - 17:23
**pictograms** [1] - 57:22
**picture** [1] - 112:3
**piece** [1] - 100:2
**pieces** [5] - 66:19, 66:21, 67:13, 77:9, 82:21
**pinpoint** [5] -

14:2, 34:3, 84:20, 86:4, 116:4
**pinpointing** [1] - 25:7
**pivot** [1] - 11:21
**pivoted** [1] - 11:25
**place** [1] - 60:21
**PLAINTIFF** [2] - 2:3, 124:4
**Plaintiff** [4] - 1:4, 1:17, 6:10, 123:4
**planned** [3] - 93:12, 94:12, 108:2
**plausible** [1] - 70:21
**play** [4] - 36:17, 54:14, 58:5, 62:20
**played** [2] - 48:15, 62:21
**playing** [1] - 11:9
**plays** [1] - 75:11
**pleased** [1] - 117:9
**plenary** [11] - 62:25, 63:10, 63:15, 63:20, 64:12, 75:15, 75:20, 91:7, 91:11, 92:17, 98:21
**point** [16] - 7:14, 24:1, 26:14, 30:3, 30:4, 49:9, 54:22, 55:5, 59:11, 59:22, 60:21, 62:4, 79:23, 96:8, 98:17, 107:24
**pointing** [1] - 32:6
**points** [2] - 80:8, 97:24
**Pomeroy** [1] - 82:17
**portion** [2] - 114:11, 114:22
**position** [26] - 9:10, 12:20, 13:1, 36:21, 45:19, 46:7, 46:12, 46:13, 46:14, 46:16, 46:25, 47:2, 47:13, 50:22, 52:17, 52:19, 53:3, 53:22, 55:7, 56:1,

58:19, 58:23, 84:13, 96:22, 117:21
**possible** [4] - 30:17, 87:23, 88:1, 96:18
**Possibly** [1] - 100:3
**possibly** [1] - 60:18
**Post** [1] - 4:1
**post** [4] - 104:11, 105:1, 107:25, 108:20
**potbelly** [1] - 70:19
**power** [1] - 60:6
**practical** [3] - 59:2, 59:10, 59:23
**preferably** [1] - 56:4
**preparations** [3] - 8:7, 9:6, 116:1
**prepare** [2] - 7:23, 11:6
**prepared** [1] - 90:2
**present** [6] - 6:6, 8:19, 9:15, 17:20, 20:17, 112:3
**PRESENT** [1] - 2:21
**presentation** [4] - 63:12, 63:18, 91:16, 91:21
**presentations** [1] - 91:10
**press** [2] - 99:5, 99:25
**Press** [2] - 52:2, 52:9
**pressure** [2] - 52:9, 106:15
**pressures** [1] - 52:6
**pretty** [4] - 16:6, 16:13, 103:16, 112:1
**prevents** [2] - 21:6, 21:9
**previous** [3] - 81:4, 111:1, 111:14
**previously** [2] - 65:19, 115:10
**primary** [3] - 14:22, 14:23, 14:24
**principal** [5] -

46:18, 46:23, 47:17, 48:12, 56:18
**principally** [1] - 31:12
**print** [1] - 27:23
**priority** [1] - 62:13
**private** [5] - 11:11, 15:14, 16:1, 16:25, 17:2
**privileged** [1] - 8:4
**pro** [15] - 73:4, 73:10, 74:10, 74:20, 75:1, 76:9, 76:11, 76:16, 78:13, 84:15, 106:20, 107:14, 112:1, 112:13, 112:17
**pro-Ewell** [13] - 73:4, 73:10, 74:10, 74:20, 75:1, 76:9, 76:11, 76:16, 78:13, 84:15, 106:20, 107:14, 112:17
**procedure** [1] - 29:10
**Procedure** [2] - 1:24, 5:9
**proceeding** [1] - 124:24
**Proceedings** [1] - 120:22
**proceedings** [2] - 5:24, 87:10
**Process** [1] - 80:15
**process** [8] - 29:9, 29:11, 76:19, 79:3, 92:12, 92:15, 92:19, 98:11
**processes** [1] - 78:16
**produce** [1] - 53:16
**produced** [2] - 1:16, 53:10
**Producing** [1] - 5:13
**product** [2] - 9:11, 9:16
**profession** [3] - 28:8, 50:3, 61:17
**professional** [4] - 15:16, 15:19, 15:20, 15:22

BENJAMIN S. GRAF - 9/23/2024                          09/23/2024                    12

**professionals** [1] - 49:15
**professor** [13] - 13:18, 14:18, 14:23, 15:2, 15:4, 17:14, 47:1, 47:3, 63:1, 70:9, 86:12, 86:18, 115:11
**Professor** [79] - 6:24, 14:5, 15:9, 15:18, 16:5, 25:13, 30:19, 30:24, 31:6, 31:24, 32:16, 34:7, 35:3, 36:9, 36:14, 37:3, 38:3, 39:3, 40:7, 55:20, 57:15, 59:20, 60:5, 60:7, 61:3, 63:14, 66:13, 71:23, 71:25, 72:10, 72:11, 72:15, 72:17, 72:21, 73:9, 75:21, 75:24, 76:10, 76:16, 76:23, 77:2, 77:3, 77:7, 77:11, 77:15, 78:11, 80:18, 83:5, 83:8, 83:13, 84:14, 86:7, 91:1, 91:6, 91:15, 91:20, 92:13, 93:11, 100:25, 101:3, 101:20, 102:20, 102:24, 103:10, 104:2, 104:3, 104:13, 105:17, 107:18, 108:12, 108:16, 108:19, 109:8, 109:21, 111:3, 116:11, 116:14
**professors** [2] - 50:25, 70:12
**program** [6] - 11:24, 12:8, 13:21, 24:25, 26:17, 36:25
**project** [1] - 14:19
**projects** [2] - 15:6, 19:4
**promised** [1] - 94:23
**promoted** [1] - 47:16
**promotion** [3] - 48:6, 48:12,

48:16
**promotional** [1] - 48:18
**promotions** [1] - 47:5
**prompt** [1] - 54:24
**pronounce** [1] - 82:10
**proper** [2] - 69:21, 76:15
**proved** [1] - 122:14
**provided** [4] - 8:8, 8:15, 38:14, 81:14
**provisions** [1] - 1:25
**proximity** [1] - 104:22
**psychiatric** [2] - 7:9, 7:12
**PUBLIC** [1] - 122:23
**publication** [8] - 29:6, 53:15, 59:5, 78:17, 97:20, 98:22, 100:7, 102:15
**publications** [4] - 21:19, 29:4, 83:9, 83:18
**publish** [6] - 29:14, 32:4, 82:15, 92:7, 94:20, 94:22
**published** [19] - 18:25, 32:3, 32:10, 32:16, 32:22, 33:2, 33:4, 33:6, 34:1, 67:2, 71:18, 80:13, 91:11, 91:16, 91:21, 93:6, 95:1, 103:12, 112:2
**publishes** [1] - 75:12
**publishing** [4] - 28:17, 59:7, 59:9, 95:2
**pull** [1] - 116:19
**pun** [1] - 57:14
**purpose** [3] - 88:13, 109:20, 122:19
**purposefully** [1] - 34:22
**purposes** [1] - 57:7
**pursuant** [2] -

1:23, 123:23
**PURSUANT** [1] - 5:6
**pursue** [1] - 11:2
**put** [18] - 20:5, 21:13, 24:18, 37:12, 37:15, 43:25, 44:2, 48:4, 72:11, 76:4, 78:25, 80:12, 85:22, 85:23, 85:25, 86:3, 86:4, 90:3
**puts** [1] - 47:10
**putting** [2] - 52:9, 72:20

---

**Q**

**Quaker** [2] - 2:5, 124:6
**qualify** [3] - 16:16, 20:22, 56:21
**quality** [1] - 67:13
**query** [1] - 114:17
**QUESTION** [1] - 74:18
**questions** [12] - 7:4, 7:11, 26:5, 40:22, 41:22, 57:9, 85:11, 101:21, 102:9, 114:25, 116:18, 116:25
**quick** [2] - 42:25, 115:13
**quickly** [1] - 113:18
**quite** [1] - 75:16
**quote** [2] - 74:9, 74:19

---

**R**

**race** [3] - 35:15, 36:18, 55:6
**racial** [2] - 22:19, 22:21
**racism** [2] - 37:25, 39:10
**racist** [36] - 21:23, 22:2, 22:4, 22:7, 32:2, 32:9, 32:13, 34:14, 34:16, 34:19, 34:20, 34:24,

34:25, 35:1, 35:9, 35:12, 35:18, 36:14, 36:19, 37:9, 37:16, 37:19, 37:23, 38:3, 38:6, 38:7, 39:8, 39:11, 39:14, 39:16, 39:21, 54:10, 74:9, 74:12, 74:19, 74:25
**raise** [4] - 60:6, 60:8, 60:10, 60:11
**raised** [2] - 66:18, 67:12
**raising** [1] - 67:14
**ranging** [1] - 112:20
**rarely** [1] - 27:17
**Rarely** [1] - 27:20
**rate** [2] - 50:2, 51:13
**rather** [1] - 114:11
**re** [4] - 20:22, 40:13, 40:15, 40:20
**Re** [1] - 3:12
**re-notice** [3] - 40:13, 40:15, 40:20
**Re-Notice** [1] - 3:12
**re-visit** [1] - 20:22
**reach** [3] - 105:10, 105:12, 105:13
**reaching** [1] - 87:18
**reaction** [1] - 64:12
**reactions** [1] - 64:4
**read** [40] - 17:2, 24:4, 37:12, 57:1, 67:23, 74:15, 77:6, 77:7, 77:9, 81:19, 82:18, 91:13, 91:14, 95:6, 95:7, 100:1, 100:2, 100:10, 100:13, 100:15, 100:22, 101:1, 101:4, 101:7, 102:3, 102:6, 102:10, 106:1,

107:2, 111:25, 112:5, 112:23, 113:21, 114:17, 115:19, 115:21, 115:22, 115:25, 120:12, 122:4
**reading** [2] - 23:12, 76:18
**real** [1] - 42:25
**realize** [1] - 38:10
**realized** [3] - 53:24, 59:16, 65:6
**really** [107] - 8:16, 14:1, 14:7, 14:8, 16:23, 18:17, 18:21, 19:7, 19:22, 21:10, 21:11, 21:25, 22:20, 24:16, 26:12, 27:5, 28:1, 29:2, 29:10, 29:12, 32:18, 34:16, 35:12, 36:4, 39:12, 44:16, 45:12, 51:20, 55:16, 56:22, 58:21, 61:8, 62:2, 62:22, 63:25, 64:1, 64:8, 64:9, 65:2, 65:8, 65:10, 68:18, 69:3, 69:14, 69:18, 69:19, 69:21, 71:24, 73:5, 75:11, 76:18, 76:20, 77:4, 78:5, 78:7, 78:24, 79:21, 81:24, 83:3, 83:15, 83:24, 84:3, 85:3, 85:9, 85:21, 86:2, 86:22, 87:6, 87:9, 87:23, 89:18, 89:19, 91:18, 91:23, 93:13, 95:9, 95:23, 96:10, 97:14, 98:16, 100:5, 100:21, 102:17, 103:6, 103:14, 103:21, 104:5, 104:6, 105:15, 107:16, 107:23, 109:22, 110:15, 111:21, 111:24, 112:11, 114:5, 114:13, 115:13,

120:3
**Really** [1] - 52:16
**reason** [19] - 72:2, 73:2, 74:8, 74:19, 77:14, 78:22, 81:25, 83:22, 84:1, 90:21, 93:24, 95:21, 96:3, 96:5, 113:4, 113:7, 114:2, 114:3, 119:22
**REASON** [1] - 121:4
**reasonable** [8] - 12:17, 15:8, 19:6, 35:20, 50:18, 55:1, 57:2, 61:18
**reasoning** [1] - 36:5
**reasons** [1] - 26:20
**received** [5] - 12:18, 82:16, 88:22, 94:8, 115:22
**Recent** [2] - 4:12, 43:9
**recently** [1] - 47:18
**Recess** [3] - 40:2, 71:8, 101:17
**recipient** [1] - 88:16
**recipients** [2] - 91:3, 102:1
**recital** [1] - 14:19
**recitals** [1] - 75:10
**recognize** [10] - 34:24, 35:1, 40:12, 102:11, 102:12, 104:13, 104:25, 109:13, 115:14, 117:3
**recollection** [2] - 25:4, 69:6
**record** [27] - 1:25, 6:3, 6:21, 9:5, 12:25, 13:5, 31:1, 39:23, 39:25, 40:4, 57:8, 65:12, 65:20, 68:4, 71:6, 71:10, 79:13, 101:13, 101:15, 101:19, 101:23, 104:10,

109:6, 113:13,
120:19, 123:18,
123:25
  **recording** [1] -
110:11
  **recount** [1] -
71:21
  **redirect** [1] -
76:14
  **reevaluating** [1]
- 52:17
  **refer** [3] - 42:11,
44:5, 67:8
  **references** [1] -
67:6
  **referred** [3] -
63:17, 111:20,
117:23
  **referring** [9] -
41:19, 47:22,
66:20, 66:24,
98:10, 103:6,
116:23, 116:24,
118:24
  **refers** [3] -
23:18, 66:15,
110:16
  **reflect** [2] - 9:16,
68:4
  **refuse** [1] -
74:25
  **refusing** [1] -
78:20
  **Regarding** [3] -
4:3, 4:6, 4:11
  **registration** [2] -
125:10, 125:10
  **rehashing** [1] -
85:4
  **reins** [3] - 56:5,
58:7, 98:16
  **rejecting** [1] -
112:16
  **related** [1] -
124:23
  **Related** [1] -
43:11
  **relationship** [7]
- 14:5, 15:17,
16:4, 24:8, 26:25,
43:18, 48:24
  **relationships** [1]
- 15:22
  **relatively** [4] -
46:24, 50:3,
75:13, 104:22
  **relies** [1] - 68:4
  **relying** [5] -
59:17, 100:25,
101:2, 101:4,

101:6
  **remarkable** [1] -
98:22
  **remarks** [1] -
69:12
  **remember** [65] -
10:13, 10:16,
12:21, 13:12,
13:23, 18:11,
25:15, 25:16,
27:9, 58:12,
58:15, 58:25,
60:1, 60:17,
61:21, 63:22,
65:5, 69:9, 71:18,
71:22, 81:23,
82:20, 82:22,
83:3, 83:5, 83:8,
83:22, 83:24,
84:25, 85:2,
85:12, 85:19,
86:7, 86:12,
86:17, 86:25,
87:12, 87:16,
89:21, 90:2,
90:19, 93:10,
95:8, 95:9, 99:17,
99:19, 100:4,
100:5, 100:9,
106:22, 106:25,
107:2, 107:8,
107:9, 107:21,
108:17, 110:14,
110:23, 111:4,
111:23, 112:13,
112:16, 112:18,
113:9, 113:11
  **Renaldo** [3] -
2:15, 6:13,
124:16
  **Renaldo.
Stowers@
untsystem.edu**
[2] - 2:19, 124:20
  **renewed** [1] -
47:9
  **repeat** [1] - 43:3
  **reply** [1] -
114:16
  **Report** [7] -
3:16, 65:14,
77:24, 116:21,
117:10, 118:2,
120:6
  **report** [5] - 67:7,
68:19, 69:22,
116:22, 119:11
  **reported** [3] -
1:21, 66:17,
67:11

  **REPORTER** [2] -
74:17, 115:5
  **Reporter** [3] -
1:20, 74:16,
123:13
  **reporter** [3] -
6:7, 31:3, 44:7
  **REPORTER'S**
[1] - 123:9
  **Reporting** [3] -
3:13, 40:25, 41:1
  **represent** [6] -
65:14, 67:7,
71:15, 79:18,
81:8, 111:15
  **representation**
[1] - 112:8
  **represented** [2]
- 71:15, 81:15
  **representing** [2]
- 72:23, 80:9
  **represents** [1] -
114:16
  **reprinted** [1] -
118:10
  **reputations** [1] -
67:19
  **request** [1] -
88:25
  **requested** [1] -
94:24
  **requirement** [3]
- 31:19, 31:21,
46:14
  **Research** [2] -
43:11, 53:7
  **research** [8] -
16:19, 19:4,
28:13, 28:16,
43:24, 46:14,
53:6, 56:23
  **research-type**
[1] - 53:6
  **resembles** [2] -
90:4
  **reserve** [1] -
120:17
  **respect** [1] -
16:23
  **respond** [7] -
38:17, 38:23,
103:8, 103:18,
103:20, 104:3,
108:12
  **responding** [3] -
94:25, 95:8,
103:23
  **responds** [1] -
94:10
  **response** [9] -

40:20, 77:12,
83:5, 96:20,
105:24, 108:2,
108:6, 108:10,
108:15
  **responses** [8] -
82:12, 82:15,
94:23, 95:3,
102:25, 107:6,
111:25, 114:18
  **responsibility**
[3] - 50:11, 54:23,
84:11
  **restructured** [1]
- 45:19
  **results** [1] -
112:4
  **return** [1] -
123:21
  **review** [15] -
29:8, 29:11,
29:14, 29:16,
30:9, 31:16,
31:18, 35:10,
89:24, 91:17,
91:22, 92:8,
92:11, 92:12,
92:19
  **Review** [7] -
3:13, 3:16, 40:24,
41:1, 41:6, 65:22,
65:24
  **reviewer** [4] -
29:21, 29:25,
30:13, 30:15
  **reviewers** [4] -
29:17, 30:12,
31:12
  **rewarding** [1] -
52:25
  **Richmond** [3] -
8:12, 115:17
  **right-hand** [2] -
41:12, 66:5
  **role** [11] - 25:20,
25:22, 26:18,
47:15, 48:15,
56:22, 58:5, 58:7,
62:20, 67:3,
99:21
  **rote** [1] - 8:22
  **rough** [1] - 57:17
  **Rough** [1] -
57:17
  **Rules** [2] - 1:24,
5:9
  **rumor** [1] -
108:7
  **rumors** [2] -
68:11, 76:3

  **run** [1] - 41:17
  **Ryan** [7] - 25:23,
25:24, 26:13,
26:16, 26:19,
26:20

## S

  **S-L-O-T-T-O-W**
[1] - 31:4
  **saw** [3] - 14:11,
81:15, 115:25
  **scheme** [1] -
68:7
  **Schenker** [7] -
18:20, 22:25,
23:3, 47:21, 48:1,
97:10, 112:22
  **schenker@unt.
edu** [3] - 97:8,
97:9, 97:12
  **Schenkerian**
[75] - 18:3, 18:6,
18:8, 18:19, 19:1,
19:5, 19:9, 19:12,
19:13, 19:16,
19:20, 20:2, 20:7,
20:11, 21:7,
21:14, 22:3, 22:5,
22:7, 22:22,
22:23, 23:7, 23:9,
23:13, 23:15,
23:21, 24:5, 24:9,
24:11, 29:9,
32:17, 34:1, 37:1,
37:2, 41:7, 42:12,
45:15, 45:18,
45:22, 47:23,
48:2, 48:10,
48:11, 51:4,
52:10, 53:5,
53:11, 54:10,
56:1, 56:4, 56:6,
56:17, 57:2,
57:23, 66:21,
67:9, 68:22,
71:19, 73:20,
82:13, 82:20,
82:22, 82:24,
83:11, 87:14,
95:4, 103:12,
103:24, 104:4,
107:7, 109:1,
112:22, 113:1,
118:4, 118:12
  **scholar** [1] -
21:6
  **scholars** [3] -
67:19, 103:11,
112:20

  **scholarship** [3] -
53:11, 53:16,
75:12
  **schools** [1] -
10:19
  **score** [1] - 19:10
  **scratched** [1] -
65:1
  **Screenshot** [1] -
4:1
  **se** [1] - 87:3
  **seal** [1] - 122:20
  **seasoned** [1] -
112:20
  **second** [7] -
42:8, 62:15,
65:21, 80:10,
89:7, 89:8,
118:16
  **Second** [1] -
62:16
  **section** [2] -
42:8, 119:16
  **secure** [1] - 47:2
  **security** [3] -
46:19, 46:22,
46:23
  **see** [50] - 19:25,
27:13, 28:15,
40:9, 41:7, 41:12,
42:4, 42:7, 42:16,
43:12, 43:13,
47:6, 65:15,
65:23, 66:6,
72:13, 74:23,
81:1, 81:6, 81:11,
81:21, 87:9, 89:7,
89:11, 89:13,
90:6, 90:9, 90:13,
92:22, 93:21,
93:25, 94:1,
94:13, 94:19,
99:11, 99:14,
108:3, 110:17,
110:20, 111:2,
111:12, 114:21,
115:9, 115:16,
115:24, 116:21,
118:14, 118:19,
119:13
  **seek** [2] - 31:17,
110:8
  **seeking** [1] -
25:15
  **seem** [4] - 58:18,
71:12, 92:25,
119:1
  **select** [2] -
29:17, 31:12
  **semester** [4] -

49:17, 49:21, 49:22, 49:23
**send** [5] - 29:13, 29:15, 95:14, 103:4, 103:17
**sender** [1] - 81:5
**sending** [2] - 109:20, 111:23
**senior** [4] - 46:17, 46:22, 67:18, 83:16
**sense** [2] - 17:24, 72:12
**sent** [8] - 8:12, 89:10, 95:12, 97:16, 97:17, 104:22, 114:7, 114:23
**sentence** [2] - 19:19, 98:18
**sentences** [1] - 73:22
**Sept** [1] - 4:4
**September** [6] - 1:12, 1:18, 5:3, 6:3, 109:5, 123:11
**series** [3] - 101:21, 111:14, 114:25
**server** [4] - 88:7, 88:8, 88:21, 89:16
**service** [2] - 16:19, 53:7
**session** [4] - 63:1, 63:10, 63:15, 91:8
**setting** [1] - 57:3
**several** [2] - 10:18, 16:17
**SHALL** [1] - 5:6
**share** [1] - 110:7
**shared** [1] - 67:21
**sharing** [1] - 119:15
**SHERMAN** [2] - 1:2, 123:2
**shoes** [2] - 37:12, 37:16
**short** [2] - 65:3, 108:17
**Shorthand** [2] - 1:20, 123:13
**show** [2] - 27:11, 58:16
**sic** [1] - 77:25
**side** [1] - 44:3
**sign** [6] - 15:4,

99:21, 99:22, 117:9, 119:4, 119:9
**Signature** [1] - 5:13
**signature** [3] - 117:18, 122:5, 123:21
**SIGNATURE** [2] - 5:16, 121:1
**signatures** [1] - 8:13
**signed** [3] - 117:19, 117:20, 120:13
**significant** [3] - 78:10, 79:2, 106:15
**similar** [1] - 87:12
**simple** [2] - 75:1, 77:1
**simplistic** [1] - 77:23
**simply** [1] - 17:13
**single** [1] - 33:3
**sit** [2] - 39:5, 69:7
**situation** [6] - 35:4, 35:11, 36:3, 68:12, 69:20, 106:4
**situations** [1] - 45:13
**sixth** [2] - 94:18, 117:21
**size** [1] - 50:6
**skills** [1] - 45:4
**skimmed** [1] - 66:1
**skip** [9] - 41:11, 92:20, 94:17, 110:24, 110:25, 111:7, 115:16, 118:16, 119:10
**sleeping** [2] - 62:4, 85:3
**Slottow** [10] - 18:7, 30:25, 31:4, 54:20, 55:21, 55:23, 58:13, 59:20, 86:3, 93:23
**Slottow's** [1] - 30:25
**SMT** [7] - 75:20, 88:12, 88:14, 88:15, 89:10, 91:7, 98:21

smt [1] - 89:14
**smt-announce:** @societymusictheory.org [1] - 89:14
**so-called** [2] - 97:1, 109:18
**social** [2] - 17:16, 45:13
**Society** [10] - 61:22, 63:2, 63:15, 63:24, 64:1, 75:15, 88:4, 88:21, 89:16, 92:4
**software** [3] - 59:4, 98:10, 98:12
**sole** [3] - 26:14, 27:3, 98:4
**solicit** [2] - 27:16, 28:13
**solicitation** [1] - 28:15
**solicited** [2] - 25:9, 27:22
**soliciting** [5] - 27:24, 28:3, 28:9, 28:19, 29:5
**someone** [14] - 16:1, 19:20, 28:17, 29:19, 49:20, 56:3, 56:25, 62:5, 74:4, 76:25, 87:7, 87:18, 92:5
**Someone** [1] - 75:2
**Sometimes** [6] - 30:5, 31:14, 36:17, 57:5, 88:17
**sometimes** [1] - 51:11
**somewhere** [1] - 76:8
**sorry** [8] - 14:2, 43:3, 50:17, 57:11, 59:16, 64:14, 77:6, 110:3
**Sorry** [7] - 11:23, 14:8, 23:24, 50:13, 64:6, 72:4, 73:8
**sort** [7] - 12:18, 65:9, 70:9, 92:11, 92:19, 97:23, 117:21
**sounded** [1] -

60:22
**sounds** [3] - 50:18, 52:22, 61:18
**source** [1] - 26:6
**speaker** [1] - 108:8
**speaking** [3] - 55:6, 106:20, 107:10
**special** [1] - 97:19
**specialized** [3] - 56:7, 56:10, 92:6
**specific** [6] - 28:12, 29:10, 39:22, 53:14, 76:10, 100:6
**specifically** [5] - 16:11, 16:12, 60:8, 87:17, 103:2
**specifics** [2] - 63:9, 120:11
**Spectrum** [8] - 91:12, 91:16, 91:21, 92:1, 92:3, 92:7, 92:10, 93:6
**speculate** [2] - 37:7, 61:8
**spell** [2] - 26:2, 31:1
**spelled** [1] - 57:15
**spend** [2] - 17:16, 45:12
**spent** [2] - 15:13, 16:7
**split** [2] - 112:1, 112:12
**spoken** [2] - 107:23, 109:24
**spot** [2] - 10:13, 25:5
**spots** [1] - 70:15
**spring** [2] - 49:6, 49:18
**squash** [2] - 79:4, 79:9
**stack** [1] - 116:19
**staff** [2] - 42:5, 107:19
**stamp** [2] - 113:14, 115:9
**stamped** [2] - 65:18, 90:7, 93:17
**Stamped** [1] - 66:8

**stamps** [1] - 65:15
**stance** [1] - 103:15
**stand** [4] - 83:14, 83:21, 87:8, 87:19
**standalone** [1] - 111:9
**started** [5] - 24:25, 25:22, 47:12, 58:5, 109:8
**starting** [1] - 9:25
**STATE** [2] - 122:10, 122:24
**State** [2] - 1:20, 123:14
**state** [5] - 6:6, 6:20, 10:7, 30:25, 34:14
**statement** [16] - 8:9, 19:8, 117:7, 117:8, 117:20, 117:23, 118:24, 119:7, 119:8, 119:9, 119:15, 119:19, 119:20, 119:25, 120:13
**Statement** [4] - 4:8, 4:12, 118:3, 118:11
**statements** [8] - 8:10, 9:2, 38:1, 39:11, 39:15, 39:20, 39:22
**STATES** [2] - 1:1, 123:1
**Station** [2] - 2:11, 124:12
**status** [1] - 105:16
**stayed** [1] - 53:4
**stenotype** [1] - 1:21
**step** [6] - 51:4, 52:18, 54:9, 62:20, 96:22, 106:9
**Stephen** [3] - 31:4, 91:2, 114:17
**stepped** [1] - 105:23
**stepping** [3] - 58:6, 83:17, 106:9
**still** [2] - 46:13, 119:25

**Stipulations.....**
**.........................**
**..** [1] - 3:4
**stir** [2] - 75:17, 75:18
**stood** [2] - 52:11, 65:8
**Stowers** [3] - 2:15, 6:13, 124:16
**STOWERS** [1] - 6:13
**straight** [1] - 60:13
**strict** [2] - 20:11, 20:14
**strike** [7] - 23:5, 32:6, 75:23, 78:8, 95:19, 113:8, 114:2
**Strike** [1] - 108:23
**string** [1] - 65:16
**strong** [2] - 64:4, 104:7
**structural** [1] - 20:4
**student** [22] - 8:9, 9:1, 13:20, 13:22, 15:25, 25:8, 26:15, 27:4, 42:19, 44:10, 51:8, 55:25, 56:2, 60:20, 61:4, 61:10, 61:12, 61:15, 118:24, 119:18, 120:5, 120:10
**students** [9] - 8:14, 14:17, 18:20, 42:5, 44:19, 44:20, 116:5, 119:16, 120:8
**Students** [2] - 4:9, 43:10
**students'** [1] - 118:18
**Studies** [45] - 18:3, 18:6, 18:8, 18:19, 19:1, 19:10, 23:8, 23:9, 23:14, 23:15, 23:21, 24:5, 24:9, 29:9, 32:17, 34:1, 37:1, 37:2, 41:7, 42:12, 45:15, 45:18, 45:22, 47:23, 48:2, 48:11, 51:4,

52:10, 53:5,
53:11, 54:10,
66:22, 67:9,
68:22, 71:19,
73:20, 87:14,
95:4, 103:13,
103:24, 104:4,
109:1, 113:1,
118:4, 118:12
**studies** [4] -
18:13, 20:18,
24:6, 24:10
**study** [6] -
14:12, 14:13,
21:16, 22:19,
56:7, 56:16
**studying** [2] -
15:14, 56:3
**style** [1] - 63:13
**styled** [1] - 1:17
**subject** [1] -
29:20
**submission** [1] -
107:4
**submissions** [1]
- 82:9
**submitted** [4] -
48:5, 84:16,
99:16, 123:19
**submitting** [1] -
28:1
**Subpoena** [1] -
5:8
**subscribed** [1] -
122:17
**subsequent** [6] -
10:25, 59:16,
59:19, 93:10,
94:13, 95:3
**subsequently**
[2] - 13:1, 15:7
**substance** [1] -
59:9
**succinct** [1] -
96:20
**succinctly** [1] -
21:12
**sued** [1] - 38:11
**suggested** [1] -
84:15
**suggesting** [3] -
41:3, 79:17, 83:8
**suggestion** [2] -
69:7, 69:8
**Suite** [1] - 1:23
**summarize** [4] -
19:23, 53:17,
53:18, 60:24
**summary** [3] -
9:24, 66:15, 68:9

**summer** [4] -
12:15, 49:8,
49:11, 108:22
**Sunday** [1] -
90:25
**super** [1] - 29:12
**supervised** [1] -
44:18
**supervising** [4] -
13:7, 14:18,
14:23, 44:20
**supervisory** [1] -
101:8
**support** [4] -
19:4, 72:1, 116:5,
120:7
**supporter** [1] -
72:11
**supporters** [1] -
72:21
**supporting** [1] -
77:15
**supportive** [1] -
72:17
**suppose** [1] -
117:21
**supposed** [2] -
69:9, 88:22
**suppress** [1] -
83:18
**suppressed** [1] -
83:10
**suppressing** [1]
- 84:15
**surface** [3] -
50:8, 50:12, 65:1
**surprised** [1] -
86:15
**Suzanne** [5] -
71:17, 71:20,
72:5, 72:9, 76:8
**swear** [1] - 6:8
**sworn** [3] - 1:17,
6:17, 123:17
**sympathy** [1] -
62:7
**Symposium** [19]
- 66:22, 67:2,
67:10, 68:21,
71:19, 72:14,
80:12, 84:18,
84:19, 84:22,
85:1, 85:14,
85:20, 97:19,
100:19, 100:20,
102:16, 112:2,
112:9
**synonyms** [1] -
14:25
**system** [1] -

49:17
**System** [4] -
1:22, 2:16, 6:14,
124:17
**systemically** [2]
- 22:7, 32:13

---

**T**

---

**TA** [5] - 12:20,
12:22, 12:23,
44:18, 44:20
**TA/TF** [1] - 12:20
**TAKEN** [1] - 5:6
**talks** [1] - 91:11
**tangential** [1] -
43:24
**task** [1] - 42:11
**tasked** [2] -
26:8, 54:19
**tasks** [1] - 56:18
**taught** [1] -
44:17
**taxpayers** [1] -
38:14
**Taycher** [4] -
25:25, 26:1, 26:7,
26:11
**teach** [1] - 49:8
**teacher** [2] -
14:9, 53:2
**teaching** [19] -
11:10, 11:20,
13:5, 13:6, 16:18,
44:17, 44:24,
45:2, 46:7, 46:11,
46:12, 49:4, 49:5,
49:20, 50:5,
50:11, 53:8,
53:25, 54:23
**Teaching** [2] -
12:24, 13:3
**team** [1] - 25:22
**Telephone** [6] -
2:6, 2:12, 2:18,
124:7, 124:13,
124:19
**ten** [1] - 28:21
**tenure** [1] - 51:1
**tenured** [1] -
46:25
**term** [1] - 45:6
**terms** [1] - 16:21
**terrible** [1] - 24:1
**testified** [7] -
6:17, 33:22,
41:23, 71:25,
72:5, 72:9, 72:24
**testimony** [6] -

36:2, 40:20, 76:7,
76:12, 123:18,
123:24
**Texas** [29] -
1:21, 1:22, 1:23,
2:12, 2:16, 2:17,
2:17, 6:14, 9:21,
10:20, 10:22,
10:24, 11:3,
11:16, 12:19,
42:19, 44:18,
46:5, 46:20, 52:2,
52:9, 97:1,
123:14, 124:13,
124:17, 124:18,
124:18, 125:8
**text** [3] - 111:10,
111:23, 113:21
**TF** [3] - 13:1,
44:19, 44:20
**Thad** [4] - 2:4,
6:9, 124:3, 124:5
**THE** [21] - 1:1,
2:3, 2:9, 6:2,
39:25, 40:3, 64:6,
71:1, 71:5, 71:6,
71:9, 74:17,
101:15, 101:18,
115:5, 120:19,
122:10, 122:24,
123:1, 124:4,
124:10
**theorist** [2] -
28:21, 75:6
**theorists** [1] -
21:14
**Theory** [16] -
61:22, 63:2,
63:16, 63:25,
64:1, 75:16, 88:5,
88:21, 89:17,
91:11, 91:16,
92:1, 92:3, 92:4,
92:7, 92:10
**theory** [18] -
11:20, 11:22,
12:1, 12:8, 14:11,
15:15, 16:13,
16:18, 17:25,
20:12, 20:18,
20:19, 20:22,
20:23, 20:25,
92:6, 113:2,
119:17
**Therefore** [1] -
94:24
**therein** [1] -
122:19
**Theses** [1] -
43:10

**Thinking** [1] -
84:17
**thinking** [1] -
111:21
**third** [1] - 113:19
**THIS** [1] - 5:6
**thoughts** [3] -
65:9, 82:8, 107:4
**thread** [1] -
109:4
**three** [2] - 19:19,
97:23
**throughout** [1] -
41:17
**tie** [1] - 22:22
**Tim** [5] - 95:5,
95:15, 96:4,
111:10, 111:11
**timeline** [1] -
48:3
**TIMOTHY** [2] -
1:3, 123:3
**Timothy** [23] -
13:14, 13:17,
33:10, 34:15,
39:2, 39:6, 39:21,
54:6, 61:11, 63:5,
74:9, 74:20,
79:15, 80:3,
93:24, 94:10,
96:13, 96:17,
111:9, 112:8,
112:19, 113:15,
114:15
**title** [8] - 27:10,
28:11, 41:10,
43:15, 46:16,
47:17, 48:7,
65:24
**titled** [2] - 41:9,
80:15
**TO** [2] - 5:6, 5:11
**today** [21] - 7:4,
7:11, 7:14, 7:24,
9:18, 10:13, 11:1,
13:11, 14:2,
21:21, 36:2,
38:20, 39:5,
40:20, 69:7,
84:17, 103:1,
103:2, 109:11,
111:21, 116:1
**Today's** [1] - 6:3
**together** [16] -
15:14, 17:16,
20:5, 26:13, 44:6,
45:13, 45:15,
45:18, 48:4,
80:12, 85:22,
85:23, 85:25,

86:3, 86:4, 90:3
**token** [1] - 7:19
**Tony** [1] - 2:23
**took** [8] - 9:7,
10:18, 12:15,
13:24, 55:22,
55:23, 56:4,
105:12
**top** [11] - 21:16,
21:21, 41:7,
43:12, 65:15,
65:16, 81:1, 90:9,
113:20, 114:15,
118:11
**totally** [1] - 48:8
**tough** [3] - 26:5,
34:16, 70:23
**Tough** [1] - 50:4
**toward** [1] - 11:9
**towards** [1] -
78:16
**Towson** [4] -
10:5, 10:7, 10:8
**TOWSON** [1] -
10:8
**track** [2] - 46:13,
51:1
**traditional** [2] -
20:10, 20:14
**training** [4] -
44:24, 45:1, 45:3,
45:4
**transcript** [2] -
123:17, 123:19
**transition** [7] -
9:20, 55:21,
58:10, 59:11,
59:13, 61:20,
106:8
**transitioned** [1]
- 13:1
**transitioning** [1]
- 52:14
**translation** [2] -
57:17
**trial** [1] - 5:23
**tried** [2] - 29:18,
62:2
**trouble** [1] - 40:7
**true** [10] - 15:1,
29:16, 32:24,
33:24, 56:24,
69:24, 100:12,
100:13, 122:6,
123:18
**True** [1] - 56:11
**Trumpet** [1] -
11:4
**trumpet** [2] -
10:19, 11:6

BENJAMIN S. GRAF, ET AL.        09/23/2024        16

**truthfully** [1] - 7:4
**try** [10] - 19:22, 20:17, 20:22, 24:1, 24:3, 30:3, 30:7, 30:17, 106:24, 111:19
**trying** [30] - 13:11, 13:23, 19:2, 24:2, 50:21, 53:17, 54:12, 60:17, 62:22, 64:14, 64:16, 68:2, 74:22, 74:23, 75:22, 75:25, 79:4, 79:9, 84:6, 85:16, 87:10, 87:24, 90:16, 96:18, 96:22, 97:21, 99:20, 104:6, 111:22, 114:8
**Turkish** [1] - 21:14
**turn** [7] - 40:23, 42:1, 80:21, 89:2, 90:6, 97:2, 116:22
**twice** [2] - 93:24, 94:2
**two** [7] - 19:19, 26:13, 27:13, 30:11, 40:8, 93:23, 115:21
**type** [4] - 28:12, 53:6, 57:3, 83:24
**type-setting** [1] - 57:3
**types** [1] - 20:21
**Typically** [1] - 49:13

## U

**Um-hum** [12] - 10:14, 26:14, 27:12, 34:5, 53:5, 54:18, 59:3, 63:19, 64:24, 95:17, 99:24, 108:9
**unavailable** [1] - 31:15
**unclear** [1] - 32:7
**under** [6] - 13:7, 60:19, 64:10, 72:24, 85:16, 122:20
**undergraduate**

[2] - 10:1, 10:4
**underneath** [1] - 42:17
**understood** [7] - 7:20, 11:23, 58:9, 63:14, 73:19, 78:17, 98:15
**uneasy** [3] - 106:3, 106:7, 106:8
**UNITED** [2] - 1:1, 123:1
**University** [20] - 1:22, 2:16, 6:14, 9:21, 10:6, 10:20, 10:21, 10:22, 10:23, 11:3, 11:16, 12:19, 38:11, 42:19, 44:18, 46:20, 52:2, 52:8, 97:1, 124:17
**university's** [1] - 118:11
**unless** [1] - 120:1
**unsigned** [1] - 5:23
**unstated** [1] - 62:22
**unsure** [3] - 65:8, 69:4, 69:5
**UNT** [32] - 3:21, 3:24, 4:5, 4:14, 8:8, 43:10, 45:19, 47:15, 49:17, 50:25, 53:22, 65:22, 76:8, 79:13, 80:22, 82:3, 86:13, 86:18, 89:2, 90:7, 93:25, 94:19, 99:16, 101:24, 108:2, 108:8, 110:25, 111:8, 118:3, 118:12, 119:11
**unusual** [3] - 31:2, 83:19, 92:7
**unusually** [1] - 93:17
**up** [29] - 10:22, 12:16, 13:16, 26:21, 27:23, 30:25, 44:5, 46:11, 58:3, 62:9, 64:18, 66:16, 72:7, 75:2, 75:4, 76:8, 76:20, 78:5, 79:12, 84:2,

85:11, 97:19, 98:9, 98:14, 106:9, 108:21, 115:4, 116:19, 119:25
**upcoming** [1] - 95:4
**upper** [1] - 66:5
**URL** [3] - 118:21, 119:19, 120:1

## V

**value** [1] - 34:12
**variable** [1] - 49:10
**various** [7] - 22:16, 80:4, 80:17, 80:18, 102:1, 116:15, 116:21
**vehemently** [1] - 77:2
**verify** [1] - 79:21
**versa** [2] - 25:14, 34:8
**version** [2] - 95:1, 95:3
**vet** [1] - 67:19
**vetting** [1] - 92:19
**via** [2] - 103:20, 105:14
**vice** [2] - 25:14, 34:8
**Video** [2] - 2:23, 6:4
**VIDEOGRAPH ER** [9] - 2:22, 6:2, 39:25, 40:3, 71:6, 71:9, 101:15, 101:18, 120:19
**VIDEOTAPED** [2] - 1:10, 1:15
**view** [4] - 31:22, 34:21, 53:2, 98:20
**viewpoint** [2] - 39:10, 95:24
**viewpoints** [2] - 78:20, 84:15
**visit** [2] - 20:22, 108:2
**visiting** [4] - 46:17, 46:21, 47:8, 47:10
**Vista** [1] - 125:8
**voice** [1] - 104:7

**Volume** [11] - 66:22, 67:10, 68:22, 71:20, 75:25, 77:8, 80:12, 80:16, 87:14, 102:16, 103:5
**volume** [3] - 27:13, 98:3
**volunteer** [1] - 95:21
**vs** [2] - 1:5, 123:5

## W

**wait** [1] - 94:25
**waived** [1] - 5:13
**Walls** [56] - 44:10, 44:11, 44:15, 45:10, 45:18, 48:24, 48:25, 54:12, 54:13, 58:4, 58:18, 59:23, 60:5, 60:6, 60:23, 64:19, 66:16, 66:17, 67:1, 67:11, 67:21, 68:5, 68:7, 68:14, 69:1, 70:1, 70:22, 71:12, 71:13, 71:25, 72:5, 73:2, 73:3, 76:8, 76:12, 78:1, 78:12, 80:18, 81:5, 81:12, 82:7, 82:21, 83:1, 84:25, 85:7, 85:12, 93:1, 93:22, 98:3, 98:8, 100:22, 101:4, 106:20, 107:3
**Walls'** [1] - 76:6
**WALTON** [20] - 6:11, 9:12, 38:16, 38:23, 53:12, 57:7, 63:7, 68:10, 78:3, 78:14, 78:21, 79:6, 83:23, 87:21, 99:2, 101:10, 102:5, 117:12, 118:9, 120:17
**Walton** [8] - 2:10, 5:12, 6:11, 40:18, 76:13, 123:20, 124:3, 124:11
**ways** [4] - 21:1,

28:9, 29:4, 29:6
**weigh** [1] - 87:24
**welcome** [2] - 95:1, 105:24
**well-known** [1] - 112:20
**Wen** [1] - 82:17
**Western** [1] - 21:8
**WHALEY** [1] - 125:7
**white** [4] - 22:11, 22:12, 22:19, 22:21
**whole** [4] - 18:22, 35:10, 84:12, 114:11
**Wiener** [5] - 82:16, 99:9, 99:13, 99:18, 100:4
**wife** [2] - 17:5, 33:16
**winter** [1] - 98:21
**wish** [2] - 14:2, 94:25
**withdraw** [3] - 59:14, 96:18, 104:6
**withdrawing** [3] - 45:21, 46:2, 53:19
**WITNESS** [4] - 64:6, 71:1, 71:5, 121:2
**Witness** [9] - 5:12
**witness** [9] - 1:16, 6:8, 9:13, 57:8, 68:12, 74:16, 120:16, 123:16, 123:18
**Witness's** [1] - 5:12
**witness,for** [1] - 123:21
**witnessed** [1] - 68:13
**wondering** [2] - 82:8, 107:3
**word** [5] - 63:21, 88:24, 100:14, 114:18
**word-for-word** [1] - 100:14
**wording** [4] - 74:2, 85:22, 86:5, 107:15

**wordings** [1] - 73:21
**words** [2] - 67:20, 105:5
**workings** [1] - 92:10
**works** [2] - 56:25, 89:19
**world** [1] - 73:18
**worthy** [1] - 78:18
**wound** [1] - 27:23
**wrapping** [1] - 97:19
**WRIGHT** [2] - 1:6, 123:6
**write** [3] - 66:23, 99:9, 119:3
**writes** [2] - 82:7, 107:3
**writing** [3] - 28:10, 67:13, 99:17
**wrote** [2] - 17:21, 99:13

## Y

**year** [10] - 11:15, 12:7, 13:10, 26:13, 31:23, 45:23, 47:10, 48:8, 51:23, 51:25
**Years** [1] - 28:23
**years** [7] - 25:3, 28:21, 36:11, 49:10, 52:21, 52:24, 74:6
**Yiyi** [2] - 42:16, 42:18
**young** [1] - 62:17
**yourself** [7] - 21:2, 21:7, 22:11, 22:18, 96:16, 102:8, 113:16