**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| TIMOTHY JACKSON, <br> *Plaintiff*, | § <br> § <br> § | |
| v. | § <br> § | Civil Action No. 4:21-cv-00033 |
| LAURA WRIGHT, MILTON B. LEE, MELISA DENIS, MARY DENNY, DANIEL FEEHAN, A.K. MAGO, CARLOS MUNGUIA, AND G. BRINT RYAN, each in their official capacities as members of the board of regents for the University of North Texas System; RACHEL GAIN; ELLEN BAKULINA; ANDREW CHUNG; DIEGO CUBERO; STEVEN FRIEDSON; REBECCA DOWD GEOFFROY-SCHWINDEN; BENJAMIN GRAF; FRANK HEIDLBERGER; BERNARDO ILLARI; JUSTIN LAVACEK; PETER MONDELLI; MARGARET NOTLEY; APRIL L. PRINCE; CATHY RAGLAND; GILLIAN ROBERTSON; HENDRIK SCHULZE; VIVEK VIRANI; AND BRIAN F. WRIGHT, <br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |

---

**DEFAMATION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT APPENDIX**

---

Defendants' Objections and Answers to Plaintiff's Second Set of Interrogatories ........... Appx.001

Plaintiff's Responses to Defendants' First Interrogatories ................................. Appx.009

UNT 1090-1115 ...................................................................... Appx.016

Bakulina deposition excerpts ........................................................ Appx.042

Chung deposition excerpts .......................................................... Appx.048

Cubero deposition excerpts ......................................................... Appx.052

Gain deposition excerpts ........................................................... Appx.056

Geoffroy-Schwinden deposition excerpts ............................................. Appx.066

Graf deposition excerpts ...................................................................................Appx.074

Heidlberger deposition excerpts ......................................................................Appx.078

Jackson deposition excerpts.............................................................................Appx.081

Kohanski deposition excerpts ..........................................................................Appx.088

Slottow deposition excerpts .............................................................................Appx.093

Walls deposition excerpts .................................................................................Appx.097

Slottow deposition exhibit ...............................................................................Appx.101

Tweet thread.......................................................................................................Appx.105

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033-ALM |
| | § | |
| LAURA WRIGHT, et al., | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS' OBJECTIONS AND ANSWERS TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES**

---

To:    Plaintiff Timothy Jackson, by and through his counsel of record, Michael Thad Allen, ALLEN LAW, LLC, PO Box 404, Quaker Hill, CT 06375.

Defendants serve these Objections and Answers to Plaintiff's Second Set of Interrogatories, pursuant to the Federal Rules of Civil Procedure.

APPX.001

Respectfully submitted.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

_____ */s/ Mary B. Quimby* _____
**BENJAMIN S. WALTON**
*Lead Attorney*
Texas Bar No. 24075241
**MARY B. QUIMBY**
Texas Bar No. 24132506
Assistant Attorneys General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov
mary.quimby@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2024, a true and correct copy of this document was served via e-mail to the following counsel of record:

Michael Thad Allen, Esq.
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

***Counsel for Plaintiff***

_____/s/ Mary B. Quimby_____
**MARY B. QUIMBY**
Assistant Attorney General

APPX.003

## DEFENDANTS' OBJECTIONS AND ANSWERS
## TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

**INTERROGATORY 11:** The Ad Hoc Panel Report incorporates an "Exhibit 3" that refers both to "bigoted behaviors by faculty" as well as states that "Specifically, the actions of [Plaintiff] Dr. Jackson—both past and present—are particularly racist and unacceptable"; therefore, please identify any witness, whom you contend can identify Plaintiff's "racist actions" or "racist behaviors" at any time, past or present, and for each such witness, please state the following:

a. The specific action or behavior that the witness identifies as "racist";
b. The specific time, date, and location that the supposed "racist" actions or behavior occurred;
c. The nature of the action that the witness claims is "racist"; and
d. Any documents that the witness claims substantiate the assertion that the specific action was "racist."

**ANSWER:** Defendants object to this interrogatory to the extent it may be interpreted to seek information regarding the identity of witnesses that Defendants may seek to call at trial, because such a request seeks information protected by the attorney client and work product privileges. Defendants will provide their witness list in accordance with the rules and orders of the Court.

To the extent this interrogatory may be interpreted to seek information regarding these individuals' factual knowledge, Defendants object because this information is not within Defendant's possession or control. Specifically, Defendants do not have possession or control over third parties' knowledge regarding the statements in Exhibit 3. Defendants cannot compel unnamed witnesses to provide information regarding their potential knowledge about the statements in Exhibit 3. Objecting further, Defendants state that Plaintiff has equal access and ability to obtain this information.

Defendants also objects to this request as disproportionate to the needs to the case. Specifically, knowledge of third-party witnesses who believe Plaintiff has engaged in racist actions or behaviors is not relevant to Plaintiff's defamation claim against the Defendants.

Subject to and without waiving the objection, see response to interrogatory #12, and additionally the deposition testimony of Levi Walls, Rachel Gain, and Peter Kohanski, and documents produced by those witnesses.

See also documents produced with these interrogatory responses. Defendants will supplement if additional information becomes available.

**INTERROGATORY 12:** Not limited as to time, for each Individual Defendant, identify any specific action or behavior of Plaintiff Timothy Jackson that the Individual Defendant claims is or was "racist," and for each such Individual Defendant, please state the following:

a. The specific action or behavior that the Individual Defendant identifies as "racist";

APPX.004

b. The specific time, date, and location that the supposed "racist" action or behavior occurred;

c. The nature of the action that the Individual Defendant claims is "racist"; and

d. Any documents that the Individual Defendant claims substantiate the assertion that the specific action was "racist."

As to ELLEN BAKULINA:

As to ANDREW CHUNG:

As to DIEGO CUBERO:

As to STEVEN FRIEDSON:

As to REBECCA DOWD GEOFFROY-SCHWINDEN:

As to RACHEL GAIN:

As to BENJAMIN GRAF:

As to FRANK HEIDLBERGER:

As to BERNARDO ILLARI:

As to JUSTIN LAVACEK:

As to PETER MONDELLI:

As to MARGARET NOTLEY:

As to APRIL L. PRINCE:

As to CATHY RAGLAND:

As to GILLIAN ROBERTSON:

As to HENDRIK SCHULZE:

As to VIVEK VIRANI:

As to BRIAN F. WRIGHT:

**ANSWER:**  Defendants object to this interrogatory because it is overly broad and unduly burdensome.  For example, it is not limited in time, and Professor Jackson has worked at UNT for decades.  Defendants further object to this interrogatory because as to all the Individual Defendants who are faculty members at UNT (i.e., every Individual Defendant besides Rachel Gain), the

APPX.005

interrogatory seeks information not relevant to any party's claim or defense and not reasonably calculated to lead to the discovery of admissible evidence. None of the Individual Defendants who are faculty members accused Professor Jackson of any "racist" action or behavior.

Defendant also objects to this interrogatory as better suited as a deposition question. Indeed, eight of the identified Defendants below have been deposed in this case, thus Plaintiff had the opportunity to pose this question in their depositions.

Subject to and without waiving the foregoing objections, Defendants state as follows:

As to ELLEN BAKULINA: See Deposition Testimony.

As to ANDREW CHUNG:  See Deposition Testimony.

As to DIEGO CUBERO:  Sections of Timothy Jackson's response in Vol. 12 of the Journal for Schenkerian Studies base his argument on racial stereotypes and tropes. Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist, other than what I identified in my deposition testimony.

As to STEVEN FRIEDSON: Timothy Jackson's response in Vol. 12 of the Journal for Schenkerian Studies expressed racist sentiment insofar as his main argument relies on racial tropes and stereotypes. Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to REBECCA DOWD GEOFFROY-SCHWINDEN: See Deposition Testimony.

As to RACHEL GAIN:  See Deposition Testimony.

As to BENJAMIN GRAF: See Deposition Testimony.

As to FRANK HEIDLBERGER: Some of the content in Dr. Jackson's article in Vol. 12 of the Journal of Schenkerian Studies could be read as "racist" by generalizing the presumed social behavior of Black individuals and families. Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist." *See also* Deposition Testimony.

As to BERNARDO ILLARI: See faculty statement. Defendants will supplement if additional responsive information becomes available.

As to JUSTIN LAVACEK:  Some of Timothy Jackson's response in Vol. 12 of the Journal of Schenkerian Studies have possible racist foundation. For example: "He [Ewell] is uninterested in bringing Blacks up to 'standard' so they can compete"; "African Americans have the right to embrace their own culture as precious—i.e. rap music, hip hop, etc.—and study and teach it in universities so that the products of the 'defective,' 'racist' White culture—i.e., classical music—can be shunted aside"; "Be that as it may, I would like to propose that genuine solutions lie elsewhere, especially by the African American Community establishing different priorities, by addressing the deficiency of background in classical music caused by few opportunities for serious

APPX.006

training, and by the removal of systemic barriers in American society at large"; and "a fundamental reason for the paucity of African American women and men in the field of music theory is that few grow up in homes where classical music is profoundly valued…" Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to PETER MONDELLI: See faculty statement. Defendants will supplement if additional responsive information becomes available.

As to MARGARET NOTLEY: See faculty statement. Defendants will supplement if additional responsive information becomes available.

As to APRIL L. PRINCE:  Portions of Timothy Jackson's written response in Vol. 12 of the Journal of Schenkerian Studies express racist stereotypes and tropes. For example: "[h]e [Ewell] is uninterested in bringing Blacks up to "standard" so they can compete"; and "[a]s I see it, a fundamental reason for the paucity of African American women and men in the field of music theory is that few grow up in homes where classical music is profoundly valued, and therefore they lack the necessary background." Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to CATHY RAGLAND:  Sections of Timothy Jackson's response in Vol. 12 of the Journal for Schenkerian Studies include racists stereotypes and tropes.  Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to GILLIAN ROBERTSON: The manner in which Timothy Jackson constructed his response in Vol. 12 of the Journal of Schenkerian Studies could be considered "racist." Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to HENDRIK SCHULZE:   Timothy Jackson's response in Vol. 12 of the Journal for Schenkerian Studies expressed racist overtones insofar as his main argument relies on racial tropes and stereotypes.  Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to VIVEK VIRANI: Timothy Jackson's response in Vol. 12 of the Journal for Schenkerian Studies posits that a scholar's argument regarding an historical figure should be dismissed and the motives for making the argument should be assessed or presumed based on the scholar's race. Otherwise, I am not aware of other actions or behaviors by Dr. Jackson that could be considered "racist."

As to BRIAN F. WRIGHT: Dr. Jackson's published article in Vol. 12 of the Journal for Schenkerian Studies includes multiple racist statements and assumptions.  For example, his argument implies that because Dr. Ewell is Black, his critiques should be understood as a form of "Black anti-Semitism." Dr. Jackson then diagnoses what he sees as some of the "toxic" characteristics of contemporary African American culture, which he writes "[includes] the obnoxious lyrics of some hip-hop songs, etc." I believe this statement is racist for multiple reasons. In yet another example, Dr. Jackson writes that as "[he] see[s] it, a fundamental reason for the paucity of African American women and men in the field of music theory is that few grow up in

homes where classical music is profoundly valued." This is an exceptionally broad claim about Black culture, one that Dr. Jackson does not attempt to substantiate.

APPX.008

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| TIMOTHY JACKSON, | |
| Plaintiff, | |
| v. | |
| LAURA WRIGHT, MILTON B. LEE, MELISA DENIS, MARY DENNY, DANIEL FEEHAN, A.K. MAGO, CARLOS MUNGUIA, AND G. BRINT RYAN, each in their official capacities as members of the Board of Regents for the University of North Texas System; RACHEL GAIN; ELLEN BAKULINA; ANDREW CHUNG; DIEGO CUBERO; STEVEN FRIEDSON; REBECCA DOWD GEOFFROY-SCHWINDEN; BENJAMIN GRAF; FRANK HEIDLBERGER; BERNARDO ILLARI; JUSTIN LAVACEK; PETER MONDELLI; MARGARET NOTLEY; APRIL L. PRINCE; CATHY RAGLAND; GILLIAN ROBERTSON; HENDRIK SCHULZE; VIVEK VIRANI; and BRIAN F. WRIGHT, | Case No. 4:21-cv-00033-ALM<br><br>DATE: <u>April 16, 2024</u> |
| Defendants. | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST INTERROGATORIES**

In compliance with Fed. R. Civ. P. 33, Plaintiff Timothy Jackson responds to Defendants

First Set of Interrogatories as follows.

### I. INTERROGATORY RESPONSES

**INTERROGATORY NO. 1:** If you have been a party to any other legal proceeding (including but not limited to any other lawsuit, criminal proceeding, divorce proceeding, or bankruptcy proceeding), then for each such proceeding, identify a court or other tribunal where the proceeding was filed, the cause number, the nature of the claims involved, and how the proceeding was resolved (or if the proceeding is not resolved, its current status).

APPX.009

further objects that this Interrogatory is vague and ambiguous and nearly incomprehensible. Plaintiff objects that this Interrogatory calls for a legal conclusion as to what constitutes a binding admission, which Plaintiff is not required to proffer in response to an interrogatory. The proper vehicle for requesting admissions of a party is Fed. R. Civ. P. 36, not interrogatory requests.

Without waiving the foregoing objections, Plaintiff hereby incorporates by reference all objections and responses to Interrogatories No. 4-7 and refers Defendants to his responses and objections to Interrogatories No. 4-7.

**INTERROGATORY NO. 14:**   Identify each written, audio, or otherwise recorded Statement (whether from you or from any other witness or individual) that contains any material or information relating to the defamation or retaliation you allege in this lawsuit, your criticism of Philip Ewell, the publication of Volume 12 of the Journal of Schenkerian Studies, or any of your claims or alleged damages in this lawsuit.

### Response and Objection No. 14

OBJECTION: Plaintiff objects to this Interrogatory is vague and ambiguous to the extent it requires him to speculate about what Defendants do or do not consider related to defamation or retaliation, and in addition, the final clause of the Interrogatory is nearly incomprehensible. Plaintiff also objects on the ground that this Interrogatory calls for information protected by the attorney-client privilege, work product doctrine, or other applicable privilege.

Without waiving the foregoing objections, Plaintiff answers as follows:

1. Timothy L. Jackson, "The Schenker Controversy," Quillette Magazine, December 20, 2021 https://quillette.com/2021/12/20/the-schenker-controversy/.

2. Volume 12, Journal of Schenkerian Studies, University of North Texas Press, July 25, 2020.

3. Samantha Harris, "At the University of North Texas the Mob Comes Calling for a Music Theorist," National Review, July 31, 2020 https://www.nationalreview.com/2020/07/at-the-

13

university-of-north-texas-the-mob-comes-calling-for-a-music-theorist/

https://www.nas.org/blogs/article/an-initial-victory-for-unt-professor-timothy-jackson.

4.  Michael Powell, "Obscure Musicology Journal Sparks Battles over Race and Free Speech," New York Times, February 14, 2021

https://www.nytimes.com/2021/02/14/arts/musicology-journal-race-free-speech.html.

5.  Timothy L. Jackson, Interview recorded November 9, 2023

https://www.youtube.com/watch?v=k4zKDEDzgM4&t=93s.

6.  David, Randall, "An Initial Victory for UNT Professor Timothy Jackson," National Association of Scholars, January 20, 2022. https://www.nas.org/blogs/article/an-initial-victory-for-unt-professor-timothy-jackson

7.  Ricki Hollander, "White Supremacy and the Jews: the Dispute Over a Music Theorist," CAMERA, May 26, 2022 https://www.camera.org/article/white-supremacy-and-the-jews-the-dispute-over-a-musical-theorist/ .

8.  Timothy L. Jackson, "Will CUNY Continue to Become a Post-Truth Antisemitic University?," Jewish Journal, July 6, 2022

https://jewishjournal.com/commentary/opinion/349854/will-cuny-continue-to-become-a-post-truth-antisemitic-university/.

9.  Timothy L. Jackson, "And Then the Anti-racists Came for the Jewish Music Theorist Heinrich Schenker - and Me," Times of Israel, June 2, 2022 https://blogs.timesofisrael.com/and-then-the-anti-racists-came-for-the-jewish-music-theorist-heinrich-schenker-and-me,.

10.  Bruno Chaouat, "The Attack on Timothy Jackson is an Assault on Liberal Education," Quillette Magazine, 9 February 2021 https://quillette.com/2021/02/09/the-attack-on-timothy-jackson-is-an-assault-on-liberal-education/<https://quillette.com/2021/02/09/the-attack-on-timothy-jackson-is-an-assault-on-liberal-education/>.

14

11.  Bruno Chaouat, "Color Blind and Tone Deaf," First Things, December 2020 https://www.firstthings.com/article/2020/12/colorblind-and-tone-deaf<https://www.firstthings.com/article/2020/12/colorblind-and-tone-deaf .

12.  Andrew Mark Miller, "Texas Professor Sues University After Being Punished for Saying Music Theory isn't Racist," Fox News, February 13, 2022 https://www.foxnews.com/politics/texas-professor-sues-univ-after-being-punished-saying-music-theory-isnt-racist Andrew Mark Miller, February 13, 2022.

13.  Timothy L. Jackson, "Nazism, Anti-Semitism, and Today's Islamo-fascism at American Universities," Minding the Campus, December 15, 2023 https://www.mindingthecampus.org/2023/12/15/nazism-anti-semitism-and-todays-islamo-fascism-at-american-universities/ .

14.  Timothy L. Jackson, "A Cancelled Professor Reflects on Academic Nazism," White Rose Magazine, November 17, 2023 https://whiterosemagazine.com/a-cancelled-professor-reflects-on-academic-nazism/ .

15.  George Leef, "When Music Professors Suffer Woke Attacks," National Review, December 15, 2023 https://www.nationalreview.com/corner/when-music-professors-suffer-woke-attacks/ .

16.  Laura Kipnis, "Academe is a Hotbed of Craven Snitches," Chronicle of Higher Education, March 17, 2022 https://www.chronicle.com/article/academe-is-a-hotbed-of-craven-snitches .

17.  Heather MacDonald, "Classical Music's Suicide Pact," City Journal, Summer 2021 https://www.city-journal.org/article/classical-musics-suicide-pact-part-2, .

18.  William Jacobson, "Prof. Timothy Jackson's Free Speech and Defamation Case Can move Forward Court Rules," Legal Insurrection, January 22, 2022

15

https://legalinsurrection.com/2022/01/cancel-culture-win-u-north-texas-prof-timothy-jacksons-free-speech-and-defamation-case-can-move-forward-court-rules/ .

19.  Terrance Kible, "Appeals Court Rules Texas Board of Regents Members Not Immune from Suit by Professor Whose First Amendment Rights Allegedly Were Violated," Legal Insurrection, September 25, 2023 https://legalinsurrection.com/2023/09/appeals-court-texas-board-of-regents-members-not-immune-from-suit-by-prof-whose-first-amendment-rights-allegedly-were-violated/ .

20.  George Leef, "The Woke Mob in Academia is Coming for Music Too," Legal Insurrection, December 19, 2023 https://legalinsurrection.com/2023/12/the-woke-mob-in-academia-is-coming-for-music-too/.

21.  Lucinda Breeding, "Court Denies UNT's Motion to Dismiss Lawsuit Against Music Theory Professor Accused of Racism," September 21, 2023 https://www.keranews.org/news/2023-09-21/court-denies-unts-motion-to-dismiss-lawsuit-against-music-theory-professor-accused-of-racism .

22.  Norman Lebrecht, "A Cancelled Music Professor Speaks Out," Slipped Disc, August 4, 2020 https://slippedisc.com/2020/08/a-cancelled-music-professor-speaks-out/ .

23.  Norman Lebrecht, "Evidence that Clears Heinrich Schenker of Alleged Racism," Slipped Disc, December 13, 2021 https://slippedisc.com/2021/12/evidence-that-clears-heinrich-schenker-of-alleged-racism/ .

24.  Jillian Nachtigal, "Professor Who Sued University Has Preliminary Win in Court," North Texas Daily, https://www.ntdaily.com/news/professor-who-sued-university-has-preliminary-win-in-court/article_063a9e48-fd98-5bf9-ad45-c5471163f2c9.html,

25. John McWhorter, "Is Musicology Racist?," New York Times, May 16, 2023 https://www.nytimes.com/2023/05/16/opinion/musicology-

APPX.013

racism.html?action=click&module=Well&pgtype=Homepage&section=Opinion&fbclid=IwAR192

geTDKrF534-YmTIIQcc-1IUilivYWE3UpIV9JIXPJOVW_Yo8ygUmLk

26. Barry Wiener, Review of Ewell, "An Egregious Misreading of History,"

https://quillette.com/2023/06/07/an-egregious-misreading-of-history/ Quillette Magazine, June 7,

2023.

27. Timothy L. Jackson, "When You Cannot Create New Music: A Warning from History,"

White Rose Magazine, April 1, 2024 https://whiterosemagazine.com/when-you-cannot-create-new-

music-a-warning-from-history/

INTERROGATORY NO. 15:  Identify each person you contend will substantiate, corroborate, or otherwise support your claims as alleged in your Complaint (ECF No. 1).

**Response and Objection No. 15**

OBJECTION: Plaintiff objects to this Interrogatory is vague and ambiguous to the extent it

requires Timothy Jackson to speculate as to whom among the Defendants and UNT employees will

corroborate or otherwise support his claims prior to full disclosure of discovery in this case.

Plaintiff objects that he will identify all witnesses he intends to call at trial to prove his claims at such

time as the Court orders pretrial disclosures, and he is not required to do so prior to such time.

Plaintiff also objects that this Interrogatory calls for conclusions of law which Plaintiff is not

required to proffer in response to interrogatories.

Without waiving the foregoing objections, Plaintiff refers Defendants to his initial

mandatory disclosures, dated May 3, 2021 and Defendants' undated initial mandatory disclosures.

Plaintiff reserves the right to supplement his response to this Interrogatory.

**INTERROGATORY NO. 16:**    Identify each individual from whom you solicited a response or to whom you extended an invitation to respond to Phillip Ewell's plenary address entitled "Music Theory's White Racial Frame," regardless of whether the individual actually responded and regardless of whether the individual's response was published in Volume 12 of the Journal of Schenkerian Studies, including the name, email addresses, and telephone/cell phone numbers of each individual, and the nature of your relationship with each individual.

17

Without waiving the foregoing objection, Plaintiff responds that he will produce his current curriculum vita which lists all of his publications to date, and that his publications have, furthermore, already been submitted to Defendants as part of annual reviews and renewal of contract, and to that extent are already known to Defendants.

Plaintiff further responds that his article "A Preliminary Response to Ewell," Journal of Schenkerian Studies, v. 12, 157-166, continues to be censored and suppressed by Defendants.

### VERIFICATION

I do solemnly declare and affirm under the penalty of perjury that the foregoing Responses to Interrogatories are true and correct to the best of my knowledge, information, and belief.

Timothy Jackson

Respectfully submitted as to objections,

DATE: April 16, 2024

/s/Michael Thad Allen

Michael Thad Allen, Esq.
D. Conn. Bar No. CT29813
admitted *pro hac vice*
Lead Attorney
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT  06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
m.allen@allen-lawfirm.com

*for PLAINTIFF*

20

Open Letter on Antiracist Actions Within SMT

**Anyone may sign this document via the Google Forms link at the end of the letter text. In the first 10 days after publishing, this letter received more than 900 signatures. We are still accepting signatures, but since the rate of signing has lowered significantly we'll only update the letter once per week. Thank you for your support!**

At the Plenary Session of the Society for Music Theory's 2019 meeting, Philip Ewell, Yayoi Uno Everett, Ellie Hisama, and Joseph Straus powerfully demonstrated how systemic racism, sexism, and ableism animate musical discourse. They spoke not only with candor and wisdom, but also with exceptional courage. The *Journal of Schenkerian Studies*, in Volume 12, has just published a number of vitriolic responses to a single aspect of one presentation—under the pretense of scholarly debate, no less—and the ensuing scandal has diverted our field's focus from the structural critiques made in the plenary. The journal's violation of academic standards of peer review, its singling out of Prof. Ewell while denying him a chance to respond, and the language of many of its essays constitute anti-Black racism. These actions provide further evidence of the structural force of white supremacy in our discipline. While this episode is the most recent, and perhaps the most illustrative, the treatment Prof. Ewell received from the *Journal of Schenkerian Studies* is only the latest instance of systemic racism that marginalized Society members have faced for many years.

We applaud the recent statement of the Executive Board of the Society for Music Theory. To aid the Executive Board in their aim to "determine further actions," we the undersigned advocate for the following:

1. A public statement from the President, authorized by the Executive Board and in accordance with the Policy on Public Statements, that SMT acknowledges the following three points: (a) that American music theory is historically rooted in white supremacy, the racist idea that whites are superior to nonwhites, (b) that these white supremacist roots have resulted in racist policies that have benefitted whites and whiteness while disadvantaging nonwhites and nonwhiteness, and (c) that these racist policies have resulted in injustices suffered by BIPOC at all stages of their careers. Further, we call upon the President, with the authorization of the Executive Board, to apologize to all BIPOC who have suffered such injustices, without equivocation.

2. A demonstration of support by the Society for the graduate students of the University of North Texas Department of Music History, Theory, and Ethnomusicology in their call for accountability. We recommend that this support take the form of a letter to UNT Press demanding a full and truthful account of recent editorial processes at the *Journal of Schenkerian Studies*. This account should include information pertaining to which

APPX.016
UNT_001090

authors submitted works through the call for responses and which were invited to participate individually, a description of the peer review process, details of which members of the editorial board, advisory board, and journal staff viewed submissions before publication, and an explanation of how certain authors were able to separate their roles as academic advisors to the editorial staff from their roles as authors.

3. The establishment of an Ombudsperson position or committee that advocates on behalf of those disadvantaged by imbalances of power in cases of conflict and misconduct related to journal editing, publications, conferences, governance, and teaching, since SMT has a role to play in promoting its policies for all members in all professional situations.

4. A statement that calls upon Society members to resign from the editorial board of the *Journal of Schenkerian Studies*, as the journal's recent comportment is incompatible with the SMT Policy on Ethics.

5. An amendment to the SMT Policy on Harassment, as it pertains to publication, to apply to members' behavior in all their scholarly endeavors, not only in SMT publications, discussion groups, and interest group interactions.

6. A censure of the advisory board of the *Journal of Schenkerian Studies*, pursuant to relevant portions of the SMT Mission Statement, Policy on Ethics, and Policy on Harassment, as the Society's policies have no meaning if violations do not invite censure. In particular, the Policy on Harassment states that "cases of proven offenses" will result in "revocation of membership and honors."

7. That all members of the society, as individuals, confront the ways we ourselves have sustained systems of racism and sexism through our own scholarship and pedagogy. The adoption of the above points is not a substitute for this self-reflection. That self-reflection will be aided by recent studies and works on antiracism, such as those Harvard has compiled and those in the Chronicle of Higher Education. Members affiliated with an institution of higher learning can likely contact staff members dedicated to antiracist training and pedagogy. Project Spectrum's keynote address at the 2020 MTSNYS conference also outlines important steps that individual theorists can take toward enacting change in our field.

It is only through acknowledgment and sustained, careful reflection that we can truly begin to address these issues as an academic community. As a starting point, each music theorist must ask themselves: What books and articles do I read? What scholars do I cite in my own research? What music do I analyze in my research and in my classes? What readings do I assign in my classes? What interest groups am I involved with? What committees do I serve on and what is the racial and gender makeup of those committees? What students do I mentor? In short, we all need to ask ourselves: What have I done as an individual to perpetuate existing white supremacist systems of power and inequity in our field? Probing these questions in our work individually is essential to our collective reckoning.

This document was collaboratively authored by eight music theorists who identify as white: Edward Klorman, Stephen Lett, Rachel Lumsden, Mitch Ohriner, Cora S. Palfy, Nathan Pell, Chris Segall, and Daniel Shanahan. As is too often the case, white racial activism relies on uncredited labor by BIPOC. This document has benefitted from criticism, editing, and authorship by Philip Ewell, Anna Gawboy, Jennifer Iverson, Vivian Luong, and Toru Momii. Its failings rest with the initial authors.

We also believe that there is broad support within the music theory community and beyond for the views expressed in this letter. If you would like to show your solidarity, please add your name by filling out the form found at the following link.

**Complete the form here and your name will be added alphabetically on the next daily update.**

https://forms.gle/wvLpit67oZU9rDE39

Signed,

Damien Abner, Riverside City College
Rosa Abrahams, Ursinus College
Ruard Absaroka, University of Salzburg
Giulia Accornero, Harvard University
Stefanie Acevedo, University of Dayton
Byron Adams, University of California, Riverside
George Adams, University of Chicago
Byron Adams, UC Riverside
Kyle Adams, Jacobs School of Music, Indiana University
Elisa Corona Aguilar, NYU Student
Aisha Ahmad-Post, Colorado Springs, CO
Brian Alegant, Oberlin College Conservatory
Makulumy Alexander-Hills, Columbia University
Khyam Allami, Doctoral Researcher, Royal Birmingham Conservatoire, Birmingham City University, UK
Michael Allemana, University of Chicago
Emily Ruth Allen, Florida State University
Esme Allen-Creighton, North York Suzuki School of Music
Penrose Allphin, University of Massachusetts, Amherst
Andrés R. Amado, University of Texas Rio Grande Valley

Matt Ambrosio, Lawrence University

Drake Andersen, Vassar College

Clovis de Andre, Faculdade Cantareira (São Paulo, Brazil)

Christopher Antila, RILM (Répertoire International de Littérature Musicale)

Spencer Arias, Michigan State University

Daniel Arthurs, University of Tulsa

Sean Atkinson, Texas Christian University

Robin Attas, Queen's University

Jacqueline Avila, University of Tennessee

William R. Ayers, University of Central Florida

Andrew Aziz, San Diego State University

Michael Baker, University of Kentucky

Ben Baker, Eastman School of Music

David John Baker, London, UK

Sara Bakker, Utah State University

Twila Bakker, Edmonton, Alberta

Ellen Bakulina, University of North Texas

Ellen Bakulina, University of North Texas

Lara Safinaz Balikci, McGill University

Doug Balliett, The Juilliard School

Brad Balliett, New York, NY

Marcos Balter, University of California, San Diego

Sam Baltimore, Retired

Lisa Barg, McGill University

Alyssa Barna, University of Minnesota

Jessica Barnett, SUNY Fredonia

Matthew Barnson, SUNY Stony Brook

Daniel Barolsky, Beloit College

Christopher Bartlette, Binghamton University

Samantha Bassler, New York University, Steinhardt Dept of Music and Performing Arts Professions

Eliot Bates, The Graduate Center, CUNY

Inessa Bazayev, Louisiana State University

Melinda Beasi, Easthampton, MA

Richard Beaudoin, Dartmouth College

Jennifer Beavers, University of Texas at San Antonio

Rachel Becker, Boise State University

Adam Behan, University of Cambridge

Owen Belcher, University of Missouri Kansas City

Matthew Bell, Tallahassee, FL

Vincent Pérez Benítez, Penn State University

Lauren Bennati, University of Wisconsin-Milwaukee

Michael Bennett, Graduate student, Stony Brook University

William Bennett, Harvard University

Linda Berna, Chicago College of Performing Arts at Roosevelt University

Zachary Bernstein, Eastman School of Music, University of Rochester

Michael Berry, University of Washington

David Carson Berry, University of Cincinnati, College-Conservatory of Music

Nilanjana Bhattacharjya , Arizona State University

Nicole Biamonte, McGill University

Ian Biddle, Newcastle University, UK

Benjamin Bierman, John Jay College, CUNY

Stefanie Bilidas, University of Texas at Austin

Sebastian Bisciglia, University of Toronto

Wendelin Bitzan, Robert Schumann Hochschule Düsseldorf, Germany

Nicolas Bizub, University of Cincinnati College-Conservatory of Music

Andrew Blake, Eastman School of Music, University of Rochester

Damian Blättler, Rice University

Dan Blim, Denison University

Morgan Block, University of Arizona

Chandler Blount, Florida State University

Michael S. Boerner, Stony Brook University

Breighan Boeskool , Granger, IN

Claire Boge, Miami University (Oxford, Ohio)

Jacob Bohan, Charlotte, North Carolina

Christine Boone, University of North Carolina Asheville

David Borgo, UC San Diego

Jack Boss, University of Oregon

Mauro Botelho, Davidson College

Beau Bothwell, Kalamazoo College

Janet Bourne, University of California, Santa Barbara

Sara Bowden, Northwestern University

Lynette Bowring, Yale University

Douglas Boyce, George Washington University

Clifton Boyd, Yale University

Michael Boyd, Chatham University

Matthew Boyle, University of Alabama

Antares Boyle, Portland State University

APPX.020
UNT_001094

Penny Brandt , University of Texas at Austin
Andre Bregegere, William Paterson University
Matt Brennan, University of Glasgow
Zachary Bresler, University of Agder, Kristiansand, Norway
David Bretherton, University of Southampton
Amelia Brey, The Juilliard School
Seth Brodsky, University of Chicago
Christopher Brody, University of Louisville
Per Broman, Bowling Green State University
Erin M. Brooks, State University of New York-Potsdam
Eliza Brown, DePauw University
Jenine Brown, Peabody Conservatory of the Johns Hopkins Univ.
Matthew Brown, Eastman School of Music
Andrea Brown, University of Maryland
Michael Bruschi, Yale University
Michael Buchler, Florida State University
James Buhler, University of Texas at Austin
Carl Burdick, University of Cincinnati
Samantha Burgess, Ohio State University
Geoffrey Burleson, Hunter College-CUNY
L. Poundie Burstein, CUNY
Patricia Burt, University of Delaware
Mark J. Butler, Northwestern University
David Byrne, University of Manitoba
Thomas Cabaniss, The Juilliard School, New York, NY
Stephen Cabell, Occidental College
Ian Calhoun, University of North Texas
Andrea Calilhanna, Western Sydney University, MARCS Institute for Brain, Behaviour and Development
Michael Callahan, Michigan State University
Clifton Callender, Florida State University
Melissa Camp, University of North Carolina, Chapel Hill
Lee Cannon-Brown, Harvard University
Ellon D Carpenter, Arizona State University, Emerita
Daphne GA Carr, NYU FAS Music
Carolyn Carrier, Philadelphia, PA
Rebecca Carroll, Rutgers University
James Carroll, Springfield, MA
Daniel Carsello, Temple University

Antonio Cascelli, Maynooth University

James P Cassaro , University of Pittsburgh

Zosha Di Castri, Columbia University

Devin Chaloux, New Hampshire

Samuel Chan, New York University

Aditya Chander, Yale University

Varun Chandrasekhar, The University of Minnesota

Dustin Chau, University of Chicago

Damian Cheek, University of Arkansas - Fort Smith

Timothy K. Chenette, Utah State University

William Cheng, Dartmouth College

Hon Ki Cheung, University of Minnesota

Adrian P. Childs, University of Georgia

Matt Chiu, Eastman School of Music

Hiroaki Cho, Brown University

Andrew Chung, University of North Texas

Amy Cimini, UC San Diego

Alice Clark, Loyola University New Orleans

Caryl Clark, University of Toronto

Timothy Clarkson , Sydney Conservatorium of Music, Sydney University

Seth Cluett, Columbia University

Jacob A. Cohen, Oberlin College

Sara Jo Cohen, University of Michigan Press

Christa Cole, Indiana University

Carla Colletti, Webster University

Adam Collins, University of Montana

Henri Colombat, McGill University

John Combs, Florida State University

Jade Conlee, Yale University

Corrina Connor , Victoria University of Wellington, New Zealand

Karen M. Cook, University of Hartford

Robert C. Cook, Louisville CO (University of Iowa, emeritus)

Margaret Cormier, McGill University

David Cortello, Catawba Valley Community College, Hickory, North Carolina

Evan Cortens, Mount Royal University

Nicole Cosme, Yale University

Alyssa Cottle, Harvard University

Benjamin Court, UCLA

Alexander Cowan, Harvard University

Georgia Cowart, Cleveland

Arnie Cox, Oberlin College & Conservatory

Daniel Cox, Yale

Maxe Crandall, Stanford University

Hannah N. Crider, Florida State University

Stephen A. Crist, Emory University

Luis Cruz, Rutgers University

Diego Cubero, University of North Texas

Alejandro Cueto, University of Texas at Austin

Nick Curry, Harvard Law School

David Damschroder, University of Minnesota

Joe Davies, University of Oxford

Joe Davies , University of Oxford

James Q. Davies, UC Berkeley

Stacey Davis, University of Texas at San Antonio

Angharad Davis, Yale University

Hannah Davis-Abraham, University of Toronto

Laina Dawes, Columbia University

Greg Decker, Bowling Green State University (Ohio)

Kyle DeCoste, Columbia University

Rob Deemer, State University of New York at Fredonia

Galen DeGraf, Columbia University

Tomoko Deguchi, Winthrop University

Michael Dekovich, University of Oregon

Hayden Denesha, Rock Hill Symphony Orchestra

Jay Derderian, Composer - Portland, Oregon

Johanna Devaney, Brooklyn College and CUNY Graduate Center

Dana DeVlieger, University of Delaware

Joshua DeVries, University of Michigan

David Dewar, University of Bristol, UK

Emily DeWoolfson, Temple University

Thomas Dickinson, South Carolina Governor's School for the Arts and Humanities

Brittni Leigh Dixon, Florida State University

Kendall Durelle Briggs, DMA, Professor of Music, The Juilliard School

Benjamin Dobbs, Furman University

Julia Doe, Columbia University

Brianne Dolce, Institute of Historical Research

James Donaldson, McGill University

Sahara Donna, University of North Texas

Luka Douridas, RILM (Répertoire International de Littérature Musicale)
Eric Drott, University of Texas at Austin
Aleksandra (Sasha) Drozzina, Toronto, ON
Daniel Nicolae Dubei, New York City, NY
Michèle Duguay, The Graduate Center, CUNY
Ben Duinker, University of Toronto
Craig Duke, Indiana University
Philip Duker, University of Delaware
Melissa Dunphy, Rutgers University
Jonathan Dunsby, Eastman School of Music
Jacques Dupuis, Brandeis University
Dave Easley, Oklahoma City University
Michael Ebie, Michigan State University
Ryan Ebright, Bowling Green State University
Lindsey Eckenroth, Brooklyn College, CUNY
Ethan Edl, Yale University
Lolita Emmanuel, Sydney Conservatorium of Music, University of Sydney
Laura Emmery, Emory University
Neal Endicott, Michigan State University
Christopher Endrinal, Florida Gulf Coast University
Clare Sher Ling Eng, Belmont University
Nora Engebretsen, Bowling Green State University
Tom Erbe, UC San Diego
Walter Everett, University of Michigan
Sara Everson, Florida State University
Philip Ewell, Hunter College
Samuel Falotico, University of Colorado Boulder
David Falterman, Eastman School of Music, University of Rochester
Tobias Fasshauer, Berlin University of the Arts
Joe Feagin, Texas A&M University
Fred Fehleisen, The Juilliard School
Brent Ferguson, Washburn University and MidAmerica Nazarene University
Matthew Ferrandino, University of Kansas
Abigail Fine, University of Oregon
Stanley Ralph Fink, Florida State University
Aaron Flagg, The Juilliard School
Amy Fleming, Baylor University
Nathan Fleshner, University of Tennessee
J. Wesley Flinn, University of Minnesota Morris

Rebecca Flore, University of Chicago
David Walter Floyd, Champaign, IL
Gretchen Foley, University of Nebraska-Lincoln
Mike Ford, Columbia University
Jane Forner, Columbia University
Karen Fournier , University of Michigan @ Ann Arbor
Elizabeth Fox, University of Toronto
Aaron Andrew Fox, Dept. of Music, Columbia University
Kelly Francis, Kennesaw State University
Peter Franck, Western University
Kristin M. Franseen, Carleton University and University of Ottawa
Walter Frisch, Columbia University
Simon Frisch, The Juilliard School
Louise Fristensky, The University of North Texas
Johanna Frymoyer, University of Notre Dame
Dr Sophie Fuller, Trinity Laban Conservatoire of Music and Dance, UK
Anna Fulton, Grand Valley State University
Alison Furlong, Columbus, OH
Joshua Gailey, Seattle, WA
Rachel Gain, University of North Texas
Michael Gallope, University of Minnesota
Bronwen Garand-Sheridan , Yale
Orlando Jacinto Garcia, Florida International University
Sarah Gates, Northwestern University
Leslie Gay, University of Tennessee, Knoxville
David Geary, Wake Forest University
Molly Gebrian, University of Arizona
Robin Gebrian, West Hartford CT
William van Geest, University of Michigan
Ian Gerg, Southeastern Oklahoma State University
Sarah Gerk, Binghamton University
Emily Gertsch , University of Georgia
Elaine Fitz Gibbon, Harvard University
Jeffrey L. Gillespie , Butler University
Mylene Gioffredo, Universite de Metz
Irene Girton, Occidental College
Jon-Tomas Godin, Brandon University
Keir GoGwilt, UC San Diego
Daniel Goldberg, University of Connecticut

Halina Goldberg, Indiana University, Bloomington

Rachel May Golden, University of Tennessee

K. E. Goldschmitt, Wellesley College

Grace Gollmar, University of Texas at Austin

Stephen Gomez-Peck, The Graduate Center, CUNY

Juan Gonzalez, Alumni

Sumanth Gopinath, University of Minnesota Twin Cities

Stephen Gosden, University of North Florida

Gillian L. Gower, University of Denver/University of Edinburgh

Naomi Graber, University of Georgia

Thomas Gracy, Boston University

Benjamin Graf, University of North Texas

Aaron Grant, Missouri Western State University

Roger Mathew Grant, Wesleyan University

Julianne Grasso, University of Texas at Austin

Ashley A. Greathouse , PhD Candidate, University of Cincinnati

Andrew Green, University of Glasgow

Laura Gayle Green, Florida State University

Hannah Greene, Yale College (alum)

Stefan Greenfield-Casas, Northwestern University

phillip greenlief, oakland, ca

Jess Griggs, Austin, TX

Michelle L Grosser, University of Toronto

Bree Kathleen Guerra, University of Texas at Austin

Jeannie Ma. Guerrero, Rochester, NY

Massimo Guida, Toronto

Massimiliano Guido, Pavia University, Italy

Stephanie Gunst, independent scholar, Charlottesville, VA

Toni Haastrup, UK

Sara Haefeli, Ithaca College, Editor of the Journal of Music History Pedagogy

Zaki Hagins, Conservatorium Maastricht

Lauren Halsey, University of Washington

Elizabeth Hambleton, UCSB

Chelsey hamm, Christopher Newport University

Scott Hanenberg, Virginia Tech

Mena Mark Hanna, Barenboim-Said Akademie, Berlin

Marc Hannaford, University of Michigan

Calder Hannan, Columbia University

Kristi Hardman, The Graduate Center, CUNY

APPX.026
UNT_001100

Matthew Harikian, University of Minnesota

J. Tanner Harrod, Graduate Student, University of Nebraska-Lincoln

Lauren Hartburg, Florida State University

Dr. Daniel Hartley, Trinity Laban Conservatoire of Music & Dance

Robert Hasegawa, McGill University

Amy Hatch, University of North Texas/University of Texas at Arlington

Stan Hawkins, University of Oslo and University of Agder, Norway

Midavi Hayden, Independent Artist-Scholar; Cincinnati, OH

Martin Hebel, University of Cincinnati College-Conservatory of Music

Garrett Hecker, Santa Fe College (Gainesville, FL)

Nicola Leonard Hein, Columbia University New York

Haley Heinricks, Harvard University

David Heinsen, University of Texas at Austin

Bill Heinze, University of Minnesota

Salvador Hernandez, University of North Texas

Matthias Heyman, University of Antwerp, Belgium

Laura Hibbard, University of Connecticut

Andrew Hicks, Cornell University

Orit Hilewicz, Eastman School of Music

Ann Hiloski-Fowler , West Chester University of Pennsylvania

Ellie M. Hisama, Columbia University

Jocelyn Ho, UCLA

Hubert Ho, Northeastern University

Trevor Hofelich, Florida State University

John Hollenbeck, Schulich School of Music, McGill University

Kevin Holm-Hudson, University of Kentucky

Julian Bennett Holmes, Manhattan School of Music; Columbia University

Heather Holmquest, Nazareth College

Knut Holtstraeter, University of Freiburg, Germany

Tanya Honerman, University of Kansas

Erika Supria Honisch, Stony Brook University

Jason Hooper, University of Massachusetts Amherst

Fred Hosken, Northwestern University

Rachel Hottle, McGill University

Blake Howe, Louisiana State University

Alison Howell, Rutgers University

Madeleine Howey, Indiana University

Amanda Hsieh, University of Toronto

Charles Hsueh, Stony Brook University

Daniel Huang, University of Cincinnati College-Conservatory of Music

Stephen S. Hudson, University of Richmond

Bryn Hughes, The University of Lethbridge

Tim Hughes, The London College of Music

James Humberstone, Sydney Conservatorium of Music, The University of Sydney

Eric Hung, Music of Asian America Research Center

Kyle Hutchinson,

Liam Hynes-Tawa, Yale University

Brendan Ige, Eastern Michigan University

Sarah Iker, Massachusetts Institute of Technology

Mark Inchoco, University of California, Riverside

Tom Ingram, Winnipeg, MB

Lauren Irschick, Eastman School of Music

Thomas Irvine, University of Southampton

Eric Isaacson, Indiana University Jacobs School of Music

Velia Ivanova, Columbia University

Roman Ivanovitch, Indiana University

Jennifer Iverson, University of Chicago

Joseph R Jakubowski , Harvard University

Joseph Jakubowski, Harvard University

Donald James, Boston College

Mark Janello, Peabody Conservatory, Johns Hopkins University

Freya Jarman, University of Liverpool, UK

Jason Jedlicka, Cleveland Institute of Music

J. Daniel Jenkins, University of South Carolina

Stephanie Jensen-Moulton, Brooklyn College, CUNY

Emily John, Special Music School, NYC, Queens College  - CUNY

James A. John, Aaron Copland School of Music, Queens College-CUNY

Tom Johnson, contingent faculty

Lindsay Johnson, University of Maryland, Baltimore County

Erin Johnson-Williams, Durham University

Blair Johnston, Indiana University

Erin Johnston, The Graduate Center, CUNY

Evan Jones, Florida State University

Alexandrea Jonker, McGill University

Tamyka Jordon, Louisiana State University

Patricia Julien, University of Vermont

Sylvia Kahan, College of Staten Island and Graduate Center, CUNY

Elyse Kahler, University of Texas at Arlington

Noah Kahrs, Eastman School of Music

Peter Kaminsky, University of Connecticut - Storrs

Seth Keele, University of North Texas

Robert T. Kelley, Lander University

Laura L. Kelly, University of Texas at San Antonio

Matthew Kennedy, University of South Florida

Colin Kennedy, Washington, DC

Emily Kenyon, South Country Central School District

Marissa Kerbel, University of Cincinnati

Linda Kernohan, The Ohio State University, Otterbein University

Daniel Ketter, Daniel Ketter

Dr. Ildar D. Khannanov, Peabody Institute, Johns Hopkins University

Wes Khurana, University of Toronto

Marianne Kielian-Gilbert, Indiana University

Marina Kifferstein, CUNY Graduate Center

Catrina Kim, University of North Carolina at Greensboro

Jesse Kinne, Louisiana Tech University

Jesse Kiser, University at Buffalo

Michael L. Klein, Temple University

Joshua Klopfenstein , University of Chicago

Edward Klorman, McGill University

Andrew J Kluth, Case Western Reserve University

Corissa Knecht, University of Arizona

Douglas Knehans, College-Conservatory of Music, Cincinnati, OH

Andrew Knight-Hill, University of Greenwich, UK

Kristina Knowles, Arizona State University

Melinda Knowling, Univeristy of North Texas

Jon Kochavi, Swarthmore College

Emily Koh, University of Georgia

Tatiana Koike, Yale University

Adam J. Kolek, Rowan University

Robert Komaniecki, University of Iowa

Kevin Korsyn, University of Michigan

Ryan Kosseff-Jones, Geneva, NY

Stephen M. Kovaciny, Madison, WI

Sarah Koval, Harvard University

Mariusz Kozak, Columbia University

Reiner Krämer, University of Northern Colorado

Joseph Kraus, Florida State University

Hanisha Kulothparan, Michigan State University
Jonathan Kulp , University of Louisiana at Lafayette
Anita Kumar, Georgia State University
Jaclyn Noel Kurtz, Cuyahoga Falls, Ohio
Darren A. LaCour, Lindenwood University
Eric Lai, Baylor University
Hei-Yeung John Lai, University of British Columbia
steven laitz, the Juilliard School
Nathan Lam, Massachusetts Institute of Technology
George Tsz-Kwan Lam, Hong Kong Baptist University
Wing Lau, University of Arkansas
Heather Laurel, Independent Scholar (Mannes/CUNY Alum)
Justin Lavacek, University of North Texas
Megan Lavengood, George Mason University
TJ Laws-Nicola , University of Kansas
Kara Yoo Leaman, Oberlin College & Conservatory
Gavin Lee, Soochow University
Dickie Lee, University of Georgia
Christina Lee, Mannes College - The New School, The Juilliard School, CUNY Graduate Center
Frank Lehman, Tufts University
Marc LeMay, Georgia State University
Jordan Lenchitz , Florida State University
Chris Lennard, The University of Texas at Austin
Rebecca Lentjes, RILM Abstracts of Music Literature
Kendra Preston Leonard, Silent Film Sound and Music Archive
Stephen Lett, University of Saskatchewan
Anne Levitsky, Dixie State University
Tamara Levitz, UCLA
Benjamin R. Levy, University of California, Santa Barbara
Michael Lewanski, Depaul University, School of Music
Edwin Li, Harvard University
Pengcheng Li, The Graduate Center, CUNY
Siv B. Lie, University of Maryland
Stephen F. Lilly, Minneapolis, MN
Stephanie Lind, Queen's University (Canada)
Sarah Allison Lindmark, University of North Carolina, Chapel Hill
Peng Liu, University of Texas at Austin
Kerrith Livengood, University of Illinois
Zachary Lloyd, Florida State University

Judy Lochhead, Stony Brook University
Charity Lofthouse, Hobart and William Smith Colleges, Geneva, NY
Megan Long, Oberlin College
James A. Long, Oakland University
Rebecca J. Long, University of Louisville
Gerardo (Gerry) Lopez, Michigan State University
Eduardo López-Dabdoub, Florida State University
Ralph Lorenz, Syracuse University
Sarah Louden, New York University Steinhardt
Gabriel Lubell, Indiana University Jacobs School of Music
Ann E Lucas, Associate Professor of Music, Boston College
Olivia R. Lucas, Louisiana State University
Nicholas Luciano, Greensboro, NC
Rachel Lumsden, Florida State University
Justin Lundberg, Chicago
Siriana Lundgren, Harvard University
Vivian Luong, University of Saskatchewan
Matthew Lyons, University of Texas at Austin
Megan Lyons, University of Connecticut
Yiqing Ma, University of Michigan
James MacKay, Loyola University New Orleans
Barbara Dobbs Mackenzie, RILM, Brook Center, CUNY Graduate Center
Julian Maddox, Cleveland Institute of Music
Alejandro L. Madrid, Cornell University
Andrus Madsen, Newton Baroque
Erin K. Maher, Delaware Valley University
Su Yin Mak, The Chinese University of Hong Kong
Victoria Malawey, Macalester College (St. Paul, MN)
Anabel Maler, University of Iowa
Noriko Manabe, Temple University
Kate Mancey, Harvard University
Rachel Mann, University of Texas Rio Grande Valley
Dr. Nicole Marchesseau, McMaster University
Elizabeth Margulis, Princeton University
Sarah Marlowe, Eastman School of Music
Jennifer Martin, University of Wisconsin-Milwaukee
Caitlin Martinkus, Virginia Tech
David Marvel, University of Oklahoma
William Marvin, Eastman School of Music

APPX.031
UNT_001105

Elizabeth Marvin, Eastman School of Music

Will Mason, Wheaton College

Steven D. Mathews, University of Cincinnati

T.J. Mattson, University of North Texas

Fred Everett Maus, Department of Music, University of Virginia

Paula Maust, University of Maryland, Baltimore County

Panayotis Mavromatis, New York University

Horace Maxile, Baylor University

Braden Maxwell, Eastman School of Music

Susan McClary, Case Western Reserve University

Ryan McClelland, University of Toronto

Michael McClimon, Philadelphia, PA

Sarah McConnell , University of Alaska Fairbanks

Patrick McCreless, Yale University

Stephen McFall, Indiana University

Cana F. McGhee, Harvard University

Claire McGinn, University of York

Eric McKee, Penn State University

Tim McKinney, Baylor University

Elizabeth McLain, Virginia Tech

Myles McLean, University of North Texas

Ken McLeod, University of Toronto

Andrew Mead, Jacobs School of Music, Indiana University

Andrew Mead, Indiana University

Elizabeth Medina-Gray, Ithaca College

Sarah Mendes, University of Texas at Austin

Sadie Menicanin, University of Toronto

Lila Meretzky, Yale University

Kathryn Renae Metcalf, Japan

Mark Micchelli, University of Pittsburgh

Garrett Michaelsen, University of Massachusetts Lowell

Jason Louis Mile, London, ON

Emily Milius, University of Oregon

Natalie Miller, Princeton University

McKensie Miller, Chapman University

Brian A. Miller, Yale University

Connor Milstead, St. Mary's College of Maryland

Helen Julia Minors, Kingston University, London

Nathaniel Mitchell, Princeton University

Toru Momii, Columbia University

Peter Mondelli, University of North Texas

Dayna Mondelli, Independent Proofreader and Copyeditor

Eugene Montague, George Washington University

Luiz Felipe Stellfeld Monteiro, Escola de Música e Belas Artes do Paraná (EMBAP), Curitiba, Brazil

Steven Moon, University of Pittsburgh

Steven Vande Moortele, University of Toronto

Rebecca Moranis, University of Toronto

Kacie Morgan, UCLA

Alexander Morgan, New York

Landon Morrison, Harvard University

Brian Moseley, SUNY Buffalo

Imani Danielle Mosley, University of Florida

Tahirih Motazedian, Vassar College

Andre Mount, Crane School of Music, SUNY Potsdam

Reinaldo Moya , Augsburg University, Minneapolis, Minnesota

Dorian Mueller, University of Michigan

Stephen Muir, University of Leeds, UK

Scott Murphy, University of Kansas

Alana Murphy, CUNY Graduate Center/ RILM

Barbara Murphy, University of Tennessee-Knoxville

Nancy Murphy, University of Houston

Estelle Murphy, Maynooth University, Ireland

Derek J. Myler, Eastman School of Music

Robert Nance, University of North Texas

Jessica Narum, Baldwin Wallace University

Meghan Naxer, Oregon State University

Jocelyn Neal, University of North Carolina at Chapel Hill

Severine Neff, University of North Carolina at Chapel Hill, Emeritus

Dr. Lisa Neher, Portland, OR

Christoph Neidhöfer, McGill University

Trevor R. Nelson, Eastman School of Music--University of Rochester

Anna Rose Nelson, University of Michigan

Joshua Neumann , University of Florida

Bryce Newcomer, Xavier University

Neil Newton, Los Angeles, CA

Patrick Nickleson, Queen's University

Demi Nicks, The Graduate Center, CUNY

Maggie Nicks, Florida State University
Jack Haig Nighan, Indiana University
Drew Nobile, University of Oregon
Michael Norris, Victoria University of Wellington
Felipe Ledesma Núñez, Harvard University
Shaugn O'Donnell, The City College, CUNY
William O'Hara, Gettysburg College
Russell O'Rourke, Columbia University
Jennifer Oates, Queens College, CUNY
Chelsea Oden, University of Oregon
Judith Ofcarcik, Fort Hays State University
Mitch Ohriner, University of Denver
Hideaki Onishi, Singapore
Dani Van Oort, University of North Texas
Michael Oravitz, University of Northern Colorado
Jeremy Orosz, University of Memphis
David Orvek, Indiana University
Mariam Osman, Indiana University
Anna-Elena Pääkkölä, Åbo Akademi University, Finland
Kirsten Paige, Stanford University
Cora S. Palfy, Elon University
James Palmer, Vancouver, Canada
Jinny Park, Indiana University
Hyeonjin Park, UCLA
Joon Park, University of Arkansas
Sarah Parkin, London, UK
Laurel Parsons, University of Alberta
Daniel Partridge, Portland State University
Morgan Patrick, Northwestern University
Andrew Pau, Oberlin College & Conservatory
William Pearson, DePauw University
Robert D. Pearson, Emory University
Jacy Pedersen, University of Cincinnati
Julie Pedneault-Deslauriers, University of Ottawa
Crystal Peebles, Ithaca College
Nathan Pell, Nathan Pell
Rich Pellegrin, University of Florida
Anna C. Peloso, Indiana University, Jacobs School of Music
Naomi Perley, RILM

Jeffrey Perry, Louisiana State University
Lukas Perry, Eastman School of Music, University of Rochester
Becky Perry, Lawrence University
V Spike Peterson, University of Arizona
Marie-Ève Piché, McGill University
Marcelle Pierson, University of Pittsburgh
Miriam Piilonen, Northwestern University
John R. Pippen, Colorado State University
Chad Polk, Cleveland Institute of Music
Cayenna Ponchione-Bailey, University of Oxford
Mariana Poole, Elon University
Ève Poudrier, University of British Columbia
Andrew S. Powell, Independent Scholar (University of Kansas alum)
Sarah Pozderac-Chenevey, Independent scholar, Akron, OH
Roxane Prevost, University of Ottawa
Simon Prosser, The Graduate Center, CUNY
Jasbir Puar, Rutgers University
Joel Puckett, Peabody Conservatory, Johns Hopkins University
Katherine Pukinskis, Amherst College
Michael Puri, University of Virginia
Ian Quinn, Yale University
Steven Rahn, University of Texas at Austin
Shanika Ranasinghe, Royal Holloway, University of London
Richard Randall, Carnegie Mellon University
Jacob Reed, University of Chicago
S. Alexander Reed, Associate Professor, Ithaca College
John S. Reef, Nazareth College
Sam Reenan, Eastman School of Music
Alan Reese, Cleveland Institute of Music
Alex Rehding, Harvard University
Samuel Reich, Denison University/University of Cincinnati
Molly Reid, Appalachian State University
Connor Reinman, Indiana University
Christopher Reynolds, UC Davis
Anne-Marie Reynolds, Juilliard School
Adam Ricci, UNC Greensboro
Mark Richardson, East Carolina University
Melanie Richter-Montpetit, University of Sussex
Deborah Rifkin, Ithaca College

Steven Rings, University of Chicago

Marianna Ritchey, University of Massachusetts, Amherst

Blake Ritchie, Rutgers University

S R I Rizvi, Sahibganj College, Sahibganj, Jharkhand, India

Malia Jade Roberson, California State University, Channel Islands

Brian Robison, Northeastern University

Joti Rockwell, Pomona College

Stephen Rodgers, University of Oregon

Lynne Rogers, Mannes School of Music at The New School

Jillian C. Rogers, Indiana University

Allyson Rogers, McGill University

J. Griffith Rollefson, University College Cork

Jena Root, Youngstown State University (Ohio)

Adam Rosado, Iona College

Rachel Rosenman, Harvard University

Joshua Rosner, McGill University

Martin Ross, Western University

Jade Roth, McGill University

Paul N Roth, University of San Diego California

Katrina Roush, University of Texas Rio Grande Valley

Charles Roush, University of Texas Rio Grande Valley

Toby W. Rush, University of Dayton

Declan Ryan, DePaul University School of Music

Eron F. S. , Eastman School of Music

Siavash Sabetrohani, University of Chicago

Siavash Sabetrohani , University of Chicago

Alex Sallade, The Ohio State University

Keith Salley, Shenandoah University

Mark Sallmen, University of Toronto

Cristina Saltos , University of Texas at Austin

Frank Samarotto , Indiana University Bloomington

Lanier Sammons, California State University, Monterey Bay

Alexander Sanchez-Behar, Texas A&M University-Kingsville

Olga Sánchez-Kisielewska, University of Chicago

Felicia Sandler, New England Conservatory

Giorgio Sanguinetti, University of Rome "Tor Vergata"

Matthew Leslie Santana, UC San Diego

Matthew C. Saunders, Lakeland Community College (Kirtland, Ohio)

Isaac Schankler, Cal Poly Pomona

Andrew Schartmann, New England Conservatory

James Schippers, Michigan State University

Alexandria Schneider, University of Kansas

Katherine Schofield, King's College London

Peter Schubert, McGill University

Matthew D. M. Schullman, University of Oklahoma (Norman)

Scott Schumann, Central Michigan University

Emily Schwitzgebel, Northwestern University

Travis Scott, Xavier University of Louisiana

Jo Collinson Scott, Reader in Music, University of the West of Scotland

Derek B. Scott, University of Leeds, UK

Tyler M. Secor, University of Cincinnati College Conservatory of Music

Chris Segall, University of Cincinnati

Kate Sekula, University of Science and Arts of Education

Ian Sewell, Columbia University

Douglas Shadle, Vanderbilt University

Kayla Shaeffer, Florida State University

Jennifer Shafer, University of Delaware

Daniel Shanahan, The Ohio State University

August A. Sheehy, Stony Brook University

Jack Sheinbaum, University of Denver

Braxton D. Shelley, Harvard University

Joel T. Shelton, Elon University

Lauren Shepherd, Columbia University

Christopher Sherwood-Gabrielson, University of Michigan

Julissa Shinsky, University of Texas at Austin

Rachel Short, Shenandoah Conservatory

Tessa Shune , Chapman University

Abigail D. Shupe, Colorado State University

Max Silva, University of Chicago

Rebecca Simpson-Litke, University of Manitoba

Peter Sloan, UC San Diego

Jeremy W. Smith, University of Louisville

Stephen Decatur Smith, Stony Brook University

Kelli Smith-Biwer, University of North Carolina - Chapel Hill

Sean R. Smither, The Juilliard School

Peter Smucker, Stetson University

Jennifer Snodgrass, Appalachian State University

Alexandra Sobrino, Miami, Florida

Danielle Sofer, LGBTQ+ Music Study Group
Emma Soldaat, University of Toronto
Jason Solomon, Agnes Scott College
Jessica Sommer, Ball State University
Jonathan De Souza, University of Western Ontario
Stephen Spencer, The Graduate Center, CUNY
Mark Spicer, Hunter College and the Graduate Center, CUNY
Scott Spiegelberg, DePauw University
Martha Sprigge, University of California, Santa Barbara
Ron Squibbs, University of Connecticut
Alexander Stalarow, San Francisco Conservatory of Music
Jonathan Arthur Stallings, University of California San Diego
Justin Stanley, University of Oregon
Deborah Stein, New England Conservatory of Music
Anna Stephan-Robinson, West Liberty University
Jonathan Sterne, McGill University
Daniel Stevens, University of Delaware
Bryan Stevens, University of North Texas
Joseph Stiefel, Indiana University
Philip Stoecker, Hofstra University
Nicholas Stoia, Duke University
Jordan Carmalt Stokes, West Chester University of Pennsylvania
Chris Stover, University of Oslo
Eva-Maria van Straaten, Georg-August University Göttingen, Germany
Jeremy Strachan, Queen's University
Joseph Straus, CUNY Graduate Center
Ofir Stroh, Blair School of Music
Cara Stroud, Michigan State University
Greg Stuart, University of South Carolina
Jacob David Sudol, Florida International University
Rina Sugawara, University of Chicago
James Sullivan, Michigan State University
Peter M. Susser, Columbia University
Kaitlyn Swaim, University of North Texas
Kevin Swinden, Wilfrid Laurier University
Kelly Symons, Ottawa
Victor Szabo, Hampden-Sydney College
Kristin Taavola, University of Denver
Lina Sofia Tabak, CUNY Graduate Center

Carlos Pérez Tabares, University of Michigan

Ivan Tan, Brown University

Daphne Tan, University of Toronto

Nicholas Ivan Tapia, St. Mary's University (Music Education)

Jeremy Tatar, McGill University

Benjamin Tausig, SUNY Stony Brook

Ryan Taycher, Roosevelt University

Timothy D. Taylor, UCLA

Charles Taylor, University of New Orleans

Blake Taylor, University of Connecticut

Emma Taylor, The Hartt School at the University of Hartford

Samuel Teeple, The Graduate Center, CUNY

Wilfrido Terrazas, University of California, San Diego

Loretta Terrigno, The Juilliard School

Bryan Terry, McGill University

Florian Thalmann, Kyoto University

Robert Gross, Board Certified Music Therapist, Denton, TX

Midge Thomas, Connecticut College

Sean Emmett Thompson, San Francisco State University

Alexis Millares Thomson, University of Toronto

Emmi Tinajero, University of North Texas

Spencer Topel, Brooklyn, New York

Peter van Tour, Norwegian Academy of Music, Oslo

Sylvie Tran, University of Michigan

Emily Lamb Truell, Indiana University

Caitlan Truelove, Graduate Student, University of Cincinnati

Dale Trumbore, Los Angeles, CA

Tobias Tschiedl, McGill University

Cynthia Johnston Turner, University of Georgia

Isabel Tweraser, Florida State University

Kristian Twombly, Chair, St Cloud State University

Dr. Finn Upham, McGill University, Schulich School of Music

Elizabeth Randell Upton , UCLA

Diane Urista, Cleveland Institute of Music

Stephanie Venturino, Eastman School of Music

Vivek Virani, University of North Texas

Samantha Waddell, Michigan State University

Ben Wadsworth, Kennesaw State University

Steve Waksman, Smith College

Daniel K.S. Walden, University of Oxford

Kristen Wallentinsen, Rutgers University

Zachary Wallmark, University of Oregon

Levi Walls, University of North Texas

Robert Walser, Case Western Reserve University

Jordan Walsh, University of Texas at Austin

Aleisha Ward, National Library of New Zealand

Evan Ware, California State Polytechnic University, Pomona

Lindsay Warrenburg, Boston, MA

Hannah Waterman, Stony Brook University

Laura Watson , Maynooth University, Ireland

Andrew H. Weaver, The Catholic University of America

Miriam Brack Webber, Bemidji State University

Katelin Webster, The Ohio State University

Joelle Welling, University of Calgary

Robert Wells, University of Mary Washington

Allison Wente, Elon University

Marianne Wheeldon, University of Texas at Austin

Andrew Malilay White, University of Chicago

Christopher White, University of Massachusetts Amherst

Jason White, Wilfrid Laurier University

Juliet White-Smith, The Ohio State University

Ryan Whittington, Florida State University

Anya Wilkening, Columbia University

Ann Marie Willer, (formerly) University of North Texas

Matthew Williams, University at Buffalo

Dr. Natalie Williams, (formerly) North Park University

Justin Williams , University of Bristol (UK)

Jeff Williams, Harvard University

Ruthie Williamson, Indiana University Kelley School of Business

Julianna Willson, Eastman School of Music

Lauren Wilson, Eastman School of Music

Imogen Wilson, Columbia University

Christopher Witulski , Bowling Green State University

Elizabeth L. Wollman, Baruch College, CUNY

Kathryn Woodard, Philadelphia, PA

Chelsea N Wright, University of Oregon

Robert B. Wrigley, The Graduate Center, CUNY

Alice Xue, CUNY

Jessica Findley Yang, University of Tennessee - Knoxville

Rachel Yoder, DigiPen Institute of Technology

Michelle Yom, CUNY Graduate Center

Anna Yu Wang, Harvard University

Jeff Yunek, Kennesaw State University

Jason Yust, Boston University

Anna Zayaruznaya, Yale University

Emily Zazulia, University of California, Berkeley

Lawrence Zbikowski, University of Chicago Department of Music

Kamil zeglen, Chapman university

Spencer Zembrodt, Florence, KY (SUNY Fredonia, 2018)

Xieyi (Abby) Zhang, Georgia State University

Rosalind Zhang, Toronto

Shelley Zhang , University of Pennsylvania

Zhuo Zhao, Rutgers University

Julie Zhu, Stanford University

*ELLEN BAKULINA, PH.D.    10/16/2024*    1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF
 2                   SHERMAN DIVISION

 3   TIMOTHY JACKSON,            )
                                 )
 4       Plaintiff,              )
                                 )
 5   vs.                         )  CASE NO. 4:21-CV-00033-ALM
                                 )
 6   LAURA WRIGHT, et al.,       )
                                 )
 7       Defendants.             )

 8   ******************************************

 9        VIDEOTAPED ZOOM ORAL DEPOSITION OF

10             ELLEN BAKULINA, PH.D.

11               October 16, 2024

12             (Reported Remotely).

13

14   ******************************************

15       VIDEOTAPED ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.,

16   produced as a witness at the instance of the Plaintiff

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 16th day of October, 2024,

19   from 9:03 a.m. to 3:54 p.m., before Kim D. Carrell,

20   Certified Shorthand Reporter in and for the State of

21   Texas, reported remotely by computerized stenotype

22   machine at the physical location of the Witness, Ellen

23   Bakulina, Ph.D., in Montreal, Canada, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

*ELLEN BAKULINA, PH.D.    10/16/2024*    2

```
 1              APPEARANCES

 2   FOR THE PLAINTIFF:

 3   Michael Thad Allen
     ALLEN LAW, LLC
 4   P.O. Box 404
     Quaker Hill, CT 06375
 5   Telephone: 860.772.4738
     Fax: 860.469.2783
 6   E-mail: M.allen@allen-lawfirm.com

 7

 8   FOR THE DEFENDANTS:

 9   Mary Quimby
     Assistant Attorney General
10   General Litigation Division
     P.O. Box 12548, Capital Station
11   Austin, Texas 78711
     Telephone: 512.463.2120
12   Fax: 512.320.0667
     E-mail: Mary.Quimby@oag.texas.gov
13

14        - and -

15   Renaldo Stowers  (Appearing Live)
     Cari Jacoby
16   University of North Texas System
     Office of General Counsel
17   801 North Texas Boulevard
     Denton, Texas 76201
18   Telephone: 940.565.2717
     Fax: 940.369.7026
19   E-mail: Renaldo.Stowers@untsystem.edu
     cari.jacoby@untsystem.edu
20

21   ALSO PRESENT:

22   Timothy Jackson, Plaintiff

23   VIDEOGRAPHER:

24   Mr. Jason Warner
     Legal Video Group
25   lvg.dallas@gmail.com
     214-598-5229
```

*ELLEN BAKULINA, PH.D.    10/16/2024*    3

```
 1                 I N D E X

 2                                              PAGE

 3   Appearances................................  2

 4   Stipulations...............................  5

 5   ELLEN BAKULINA, PH.D.

 6       Direct Examination by Mr. Allen........  6

 7   Reporter's Certificate.....................227

 8                  EXHIBITS

 9   NUMBER          DESCRIPTION           MARKED

10   Exhibit 1   Re-Notice of Taking Deposition..... 13

11   Exhibit 2   Bakulina CV
                 (UNT 005258 - 005267)............. 14
12
     Exhibit 3   Bakulina CV with Highlights
13               (UNT 005257 - 005267)............. 31

14   Exhibit 4   Title Page, List of Articles,
                 Theoria, Volume 26, 2020.......... 35
15
     Exhibit 5   Excerpt from SMT Website, Oxford
16               University Press Academic, and
                 Ewell Article..................... 45
17
     Exhibit 6   Email, Not everyone was
18               enthusiastic about Ewell's talk
                 (JACKS 086826).................... 85
19
     Exhibit 7   Email, Material for the Committee
20               (UNT 002645 - 002782)............. 88

21   Exhibit 8   Email, 12-11-19, Jackson to
                 Bakulina, et al.
22               (UNT 000563 - 000566)............106

23   Exhibit 9   Email, 7-25-20, Slottow
                 to Jackson, et al
24               (UNT 000300 - 000303)............137

25
```

*ELLEN BAKULINA, PH.D.    10/16/2024*    4

```
 1   Exhibit 10   Email Chain Ending Jackson to
                  Cubero, et al.
 2                (UNT 000304 - 000309)............144

 3   Exhibit 11   Letter, 7-29-20, Bakulina to
                  Richmond
 4                (UNT 000116 - 000309)............150

 5   Exhibit 12   Email, 7-29-20, Bakulina to
                  Brand, et al.
 6                (UNT 000488)....................158

 7   Exhibit 13   Email, 7-31-20, Richmond to
                  Music Faculty, et al.
 8                (UNT 000568)....................160

 9   Exhibit 14   Ad Hoc Review Panel Report
                  (Exhibit D)
10                (JACKSON000208 - 000233)........164

11   Exhibit 15   Email Chain, Re: Statement on
                  JSS Issue
12                (UNT 000363)....................175

13   Exhibit 16   Email Chain Re: Meeting with
                  Journal Review Panel, Wed.
14                Sept. 16
                  (UNT 002509)....................186
15
     Exhibit 17   Email Chain Re: Talk with the
16                UNT Ad Hoc Journal Review Panel
                  (UNT 002555)....................196
17
     Exhibit 18   Undated Letter, Bakulina to
18                Richmond
                  (UNT 002559 - 002561)...........203
19
     Exhibit 19   Email Chain Ending 5-17-21,
20                Brand to Cowley, et al.
                  (UNT 005054 - 005055)...........208
21
22
23
24
25
```

ELLEN BAKULINA, PH.D.    10/16/2024

57

1   committees where Tim Jackson and I were on together.
2       Q.    Um-hum.
3       A.    But in terms of service on committees, I don't
4   recall anything problematic.  It was okay.
5       Q.    Thank you.  Do you have any knowledge of
6   Timothy Jackson committing extorsion at the University
7   of North Texas?
8             MS. QUIMBY:  Objection, form.
9       A.    I don't know the word "extorsion."  May I
10  be allowed to look it up in a dictionary?  What is
11  extorsion?  I can look it up --
12      Q.    Well, do you know the -- do you know the
13  English word "blackmail"?
14      A.    Could you -- I think, but I'm not 100 percent.
15      Q.    It's a similar --
16      A.    Could you try to explain?  Is it an anonymous
17  thing?
18      Q.    Well, it's a legal term, but it's also
19  generally colloquial term.  So usually what I do in this
20  situation is ask you if you have an understanding of it,
21  and you are telling me you don't know what the word
22  "extortion" means, right?
23      A.    Correct, I don't.
24      Q.    Okay.  Do you have any knowledge of Timothy
25  Jackson mistreating graduate students in any way?

ELLEN BAKULINA, PH.D.    10/16/2024

58

1             MS. QUIMBY:  Objection, form.
2       A.    I have to think.  Possibly, yes.  Yiyi Gao.
3       Q.    Please state for the record how you think
4   Timothy Jackson mistreated Yiyi Gao.
5       A.    I don't know how he mistreated or whether he
6   did.  But I know that she was his student for some time.
7   And in 2000, I think, 18, she switched advisors.
8   Actually, she switched to me.  I know she didn't want
9   to stay with Jackson, Dr. Jackson, as her advisor
10  anymore.  I don't know what happened.
11      Q.    Okay.  And was she a doctoral student?
12      A.    Yes.
13      Q.    Did she complete her dissertation with you?
14      A.    Yes.
15      Q.    And to the extent that you knew about her
16  relationship with Timothy Jackson, you heard that from
17  her?
18            MS. QUIMBY:  Objection, form.
19      A.    Actually, I haven't heard anything from her.
20  She didn't tell me.  I just know the fact that she left
21  Timothy Jackson as her advisor, and that's highly unusual
22  to leave an advisor.  More often than not, a graduate
23  student stays with the same advisor.  So just the fact
24  alone that she had left an advisor stands out.
25  It's very unusual.

ELLEN BAKULINA, PH.D.    10/16/2024

59

1       Q.    At the time that she switched from Timothy
2   Jackson to you as her advisor, did you have any suspicion
3   that Timothy Jackson had engaged in any criminal activity
4   that led her to switch?
5             MS. QUIMBY:  Objection, form.
6       A.    Definitely not.  I was not.
7       Q.    Okay.  Can you identify any specific actions
8   that Timothy Jackson committed that you identify as
9   racist?
10            MS. QUIMBY:  Objection, form.
11      A.    I have to think.  Could you repeat the
12  question?
13      Q.    Sure.  Can you -- or please identify for the
14  record any specific actions that you claim were racist
15  that were committed by Timothy Jackson.
16      A.    Is a journal article -- does a journal article
17  count as an action?
18      Q.    Well, it would be what you understand it to be.
19  If you want to say that publishing a journal article was
20  something that he did that was racist, you can say that
21  for the record.
22            MS. QUIMBY:  Objection, form.
23      A.    Yes.  Some of the things that Timothy Jackson
24  published in his 2020 Journal of Schenkerian Studies
25  article, I believe are racist.  That is my own opinion.

ELLEN BAKULINA, PH.D.    10/16/2024

60

1   That's not something that I shared with, you know,
2   anyone.  It's my personal opinion.
3       Q.    I understand that.  And we'll talk about that
4   in a second.
5       A.    Um-hum.
6       Q.    In addition to publishing an article in the
7   2020 volume of the Journal of Schenkerian Studies, are
8   there any other actions that Timothy Jackson engaged in
9   that you would identify as racist actions?
10      A.    No.
11      Q.    Are there any behaviors that Timothy Jackson
12  has engaged in that, to your knowledge, are racist?
13      A.    No.
14            MS. QUIMBY:  Objection, form.
15      Q.    Have you ever been told by any individual
16  that Timothy Jackson engaged in specific actions that
17  were racist?
18            MS. QUIMBY:  Objection, form.
19      A.    I think the best answer would be I don't
20  remember.
21      Q.    Okay.  Do you not remember because it didn't
22  happen, or do you not remember because it may have
23  happened and you just can't recall the specifics of it?
24      A.    Yes, it's the latter.  There has been a lot
25  of discussion of what happened in SMT and writings and

APPX.043

ELLEN BAKULINA, PH.D.    10/16/2024

61

1 behavior of many people, including Philip Ewell,
2 including many, many people, including Timothy Jackson.
3 And I cannot remember everything that was said.
4      Q.  Okay.  But as you sit here today, you can't
5 give specific testimony about behaviors that someone
6 told you about that were racist regarding Timothy
7 Jackson?
8      A.  No.  I cannot, no.
9           MS. QUIMBY:  Objection, form.
10     Q.  Thank you.  Let's go back to what you said
11 about the 2020 article in the Journal of Schenkerian
12 Studies.  Are you referring to the article he published
13 in the Symposium of Volume 12?
14     A.  Yes.
15     Q.  What -- and I understand you're stating that
16 it's your opinion.  So what, in your opinion, was racist
17 that Timothy Jackson published in his 2020 article?
18     A.  So I'm going to go by my memory, which means
19 that it may not be exact wording.
20     Q.  That's fine.
21     A.  But the statement about the paucity of the
22 Black women and men being due to the fact that these
23 people grow up in homes that don't have enough -- that
24 don't value classical music enough.  So that's an
25 approximate quote from Timothy Jackson's article.

ELLEN BAKULINA, PH.D.    10/16/2024

62

1      Q.  Um-hum.
2      A.  And in my personal opinion, that is racist,
3 because the implication of this statement, of this
4 sentence, is that music theory is inherently based on
5 classical music, on the culture of classical music, of
6 the principles and history of classical music.  And
7 Dr. Jackson doesn't actually say which classical music.
8           Because, in fact, Europe is not the only
9 place on earth that has classical music.  There are many
10 different cultures that have music that they would call
11 classical.  For example, there is such a thing as Indian
12 classical music.  But I'm going to infer from context
13 that Dr. Jackson refers to European classical music.
14     Q.  Um-hum.
15     A.  And so this statement by him, that music theory
16 depends or the practice of music theory depends
17 on how much classical music or how much exposure to
18 classical music its practitioners have had in their
19 childhood ties the discipline of music theory to music
20 by -- primarily by white people.  I understand that
21 European classical music includes some nonwhite persons,
22 composers before and so on, but it is primarily culture
23 of white European people.
24           And that, I think, is a racist idea, because
25 music theory as a field, in my opinion, is and should

ELLEN BAKULINA, PH.D.    10/16/2024

63

1 be a theory of all music, not only classical, not only
2 European, not only white people, not only nonwhite
3 people.  Music theory, as a discipline, should be based
4 or related to any music from this planet.  So the
5 practice of music theory and the disciplinary basis of
6 music theory should not be understood in relation to
7 European classical music alone.
8      Q.  So I'm sorry.  Were you done?
9      A.  To understand it that way, in my view, is
10 racist.
11     Q.  Um-hum.  And have you published on that
12 subject?
13     A.  No.
14     Q.  It sounds like you have just made an argument
15 that music theory should address all music, correct?
16           MS. QUIMBY:  Objection, form.
17     A.  I didn't say that.  Music theory, as a
18 discipline, should be open to addressing music from
19 anywhere on the planet.
20     Q.  So wouldn't that mean that a Black scholar who
21 wanted to enter the field of music theory should address
22 the field of Western classical music?
23           MS. QUIMBY:  Objection, form.
24     A.  Could you repeat?  I think I'm confused by
25 the formulation wouldn't, because if it's like yes or

ELLEN BAKULINA, PH.D.    10/16/2024

64

1 no, I'm confused about the positive versus negative.
2      Q.  Well, let's -- let's take Philip Ewell as
3 an example.
4      A.  Sure.
5      Q.  He was a colleague of yours, right?
6      A.  In terms of music theory as a field, yes.
7      Q.  And you know him personally, correct?
8      A.  Oh, yes, I know him quite closely.
9      Q.  And you know him to have engaged with the field
10 of Western classical music as well, right?
11     A.  Yes, if you include Russian in the category
12 of Western, which, in my opinion, is somewhat ambiguous.
13     Q.  Should a Black musical scholar such as Philip
14 Ewell, to be a practicing academic, be in a position to
15 address Western classical music?
16           MS. QUIMBY:  Objection, form.
17     A.  I'm in no position to dictate whether someone
18 should address something.  So if I say that a Black
19 person should address something or should not address
20 something would be extremely arrogant because I think a
21 Black scholar, just like any scholar, should address
22 whatever they feel like addressing.  They should not be
23 limited.
24     Q.  Do you recall Timothy Jackson making an
25 argument that on average, Black families did or did not

APPX_044

*ELLEN BAKULINA, PH.D.    10/16/2024*

65

1 expose their children to classical music?

2    **A.** I -- he wrote it in the article, yes.

3    **Q.** Do you know of any statistical or empirical

4 evidence that Black families as a whole in the United

5 States exposed their children to classical music?

6          MS. QUIMBY: Objection, form.

7    **A.** I'm not familiar with any statistical studies,

8 but also I'm not a statistical scholar, no.

9    **Q.** You have no basis to state that what he wrote

10 is not true then?

11          MS. QUIMBY: Objection, form.

12    **A.** I have no basis. But my argument is not about

13 statistical truth. My argument is about the relationship

14 that he has created between the discipline of music

15 theory and exposure to classical European music. My

16 argument is not about statistics. My argument is about

17 the relationship.

18    **Q.** In addition to -- I think you said in

19 identifying what you found racist in the 2020 article was

20 that the paucity of Black scholars in music theory was

21 due to the -- I suppose however you want to characterize

22 it, the lack of Black scholars' engagement or Black

23 citizens' perhaps engagement with Western classical

24 music. I'm not trying to put words in your mouth. But

25 that's one of the racist things you found in the article,

*ELLEN BAKULINA, PH.D.    10/16/2024*

66

1 right?

2          MS. QUIMBY: Objection, form.

3    **A.** Yes. And what I'm finding racist is the

4 relationship that Timothy Jackson creates between

5 practicing music theory as a discipline and classical

6 European music specifically. That's what I find

7 problematic.

8    **Q.** In addition to that claim, what other

9 statements by Timothy Jackson in his 2020 article did

10 you find, quote, racist?

11    **A.** There are two more, and I want to qualify.

12 One is actually not by Timothy Jackson himself. It's

13 actually by Schenker, and Dr. Jackson quotes Schenker at

14 some point in the 2020 article. And the quote is, and

15 again, I'm paraphrasing, that Schenker is saying that any

16 person who practices the rules -- not rules. Any person

17 who practices the laws of classical music or something

18 like that can be a great musician, something to that

19 effect. And that's actually an example of a colorblind

20 racism, which is when someone says I don't care which

21 race this or that person is. I just care what they do.

22 That's colorblind racism. But that's actually a code

23 from Schenker. It's not what Jackson himself wrote.

24 However, I do think that Dr. Jackson quoted that as sort

25 of a way to try to absolve Schenker. That, you know,

*ELLEN BAKULINA, PH.D.    10/16/2024*

67

1 Schenker, towards the end of his life, thought that

2 everyone was equal, so he became less racist. I don't

3 know if it's true. Maybe it's true that Schenker

4 became less racist towards the end of his life. That's

5 possible. But I'm not actually making that claim. But

6 I don't think that this specific quote, that anyone who

7 practices the laws of, you know, of tonal music can

8 become a great musician. I don't think that this

9 removes racism. I think that this actually exemplifies

10 colorblind racism.

11    **Q.** Do you understand Timothy Jackson to be arguing

12 that Black Americans cannot master classical music?

13          MS. QUIMBY: Objection, form.

14    **A.** No, that's not what he ever saw or what he ever

15 said.

16    **Q.** And by this colorblind racism idea, do you mean

17 that, for instance, judging musicians on the basis of

18 their merit alone, whether they're Black, white, BIPOC,

19 whatever, from whatever country, from whatever historical

20 national background, that's racist?

21          MS. QUIMBY: Objection, form.

22    **A.** I'm not saying it. But it has been argued.

23 And yes, I -- for the moment, I think I would adopt that,

24 yes. I think the concept of colorblind racism, I got

25 that from the work of Ibram Kendi, one of the theorists

*ELLEN BAKULINA, PH.D.    10/16/2024*

68

1 of critical race theory.

2    **Q.** Um-hum.

3    **A.** And that is the idea of colorblind racism: that

4 judging someone solely on the basis of merit without

5 considering their race is colorblind racism.

6    **Q.** And do you believe Timothy Jackson was

7 expressing this, quote, colorblind racism in his 2020

8 article in the Journal of Schenkerian Studies?

9    **A.** He endorsed --

10          MS. QUIMBY: Objection, form.

11          THE WITNESS: I'm so sorry. I constantly

12 speak too fast.

13          MS. QUIMBY: That's okay.

14    **A.** Jackson quotes Schenker who exhibits colorblind

15 racism. And in my understanding, Jackson -- the purpose

16 of this quote was to show that Schenker became less

17 racist towards the end of his life.

18    **Q.** And that's also something, in your opinion,

19 is racist in the 2020 article, right?

20          MS. QUIMBY: Objection, form.

21    **A.** It would depend on how to define racism, in

22 my opinion.

23    **Q.** Well, that's what I'm trying to get at.

24 We're trying to identify in Timothy Jackson's 2020

25 article what, in your opinion, is racist, which is

ELLEN BAKULINA, PH.D.    10/16/2024

69

1  something you've already testified to; that you found
2  the article to have committed thoughts or utterances
3  that you found racist.  And I'm trying to identify
4  specifically what you mean.
5      So far, you've identified what you call the
6  paucity of Black scholars in the academic discipline of
7  music.  You've also identified this quote from Schenker
8  that seems to be used by Professor Jackson to endorse
9  colorblind racism in your view.
10     Did I get that right so far?
11     A.   Yes, that's correct.  Yes, yes, yes.
12     Q.   You also mentioned that there were three and
13  we've gone through two.  So I was going to ask if you can
14  identify the third concept or utterance that you found
15  racist in Timothy Jackson's 2020 article.
16     A.   The third one, I won't say -- I will not say
17  that it is racist, but I find it highly problematic.
18  It's the passage where Timothy Jackson discusses the
19  Black on Jew antisemitism.  And I know that this problem
20  exists, but the problem in Jackson's article is that he
21  places Ewell's -- Philip Ewell's ideas in the context of
22  antisemitism.  And I think I should not say that, in
23  itself, is racist.  But the objective here seems to be
24  to show that Philip Ewell is antisemitic.  And that, in
25  itself, is not racism.  But it is an attack on Philip

ELLEN BAKULINA, PH.D.    10/16/2024

70

1  Ewell.  And in my opinion, that's a problem.  So I guess
2  I should not say that, in itself, it's racist, but I find
3  it to be problematic.
4      Q.   Was it problematic when Philip Ewell attacked
5  Timothy Jackson as racist?
6          MS. QUIMBY:  Objection, form.
7      A.   I don't remember that Philip Ewell ever did
8  that.
9      Q.   Was it racist for others to attack Timothy
10  Jackson as racist?
11         MS. QUIMBY:  Objection, form.
12     A.   I cannot speculate like that.  I'd have to see
13  specific context, a specific piece of writing.  I cannot
14  hypothesize like this.
15     Q.   Were you aware that the SMT graduate students
16  who signed the statement calling for the cancellation of
17  the Journal and that a discipline of Timothy Jackson
18  accused him of being racist?
19         MS. QUIMBY:  Objection, form.
20     A.   If I might look at the letter again right now,
21  then I might be able to answer more precisely.
22     Q.   Okay.  We'll get to that later.  But just the
23  three things that you've identified as -- I guess you
24  said racist, but also problematic in the 2020 article
25  is that he discussed Black American antisemitism towards

ELLEN BAKULINA, PH.D.    10/16/2024

71

1  Jews.  Did I get that right?
2      A.   Yes.
3      Q.   He discussed a quote from Schenker that you
4  felt problematically endorsed colorblind racism?
5      A.   Yes.
6      Q.   And also, he identified the paucity of the
7  Black scholars in music as due to a failure of the Black
8  community to value classical music.
9      A.   Yes.
10     Q.   About the third element, identifying
11  antisemitism in the Black community --
12     A.   Um-hum.
13     Q.   -- are you aware of any articles published, any
14  scholarship indicating that his statements about
15  antisemitism in the Black community are empirically
16  false?
17         MS. QUIMBY:  Objection, form.
18     A.   I'm not stating that it is empirically false.
19  In fact, Dr. Jackson cites articles about this topic,
20  about Black antisemitism.  So there are publications.
21  I haven't read them, but I know that they exist.
22  He cites them.  So it's not empirically false.  The
23  problem that I see is not empirical.  The problem that I
24  see is that he connects a specific scholar who is arguing
25  for changes in music theory to deal with antisemitism.

ELLEN BAKULINA, PH.D.    10/16/2024

72

1  That is the problem.  It's not empirical.
2      Q.   Is that -- the problems that you identified in
3  the 2020 article by Timothy Jackson, do those justify
4  stopping the publication of the Journal of Schenkerian
5  Studies?
6          MS. QUIMBY:  Objection, form.
7      A.   Do they justify stopping the publication of the
8  Journal?  I'm not sure.  It's a very big question.
9  The stopping of the publication of the Journal of
10  Schenkerian Studies was related to many problems.
11  They're very complicated.  I cannot relate of the
12  stopping of that publication to a single problem.
13     Q.   Well, why don't you name the problems with
14  the publishing of the Journal that you think led to this
15  stopping of its publication?
16     A.   Okay.  In my opinion, so this is not in -- this
17  is not someone else's opinion, right?  This is not
18  something that I share with others.  It's my own opinion.
19     In my honest opinion, what led to the stopping
20  of Journal of Schenkerian Studies publication -- by the
21  way, I don't know if it has -- if it has been stopped
22  forever.  I don't know what's going on right now.
23     But what led to the interruption of its
24  publication in the year 2020 was the fact that many
25  authors, not all, but many authors in the 2020 Symposium

*ELLEN BAKULINA, PH.D.    10/16/2024*

225

```
 1    _____
 2    _____
 3        I, ELLEN BAKULINA, have read the foregoing
 4    deposition and hereby affix my signature that same
 5    is true and correct, except as noted above.
 6
 7                    _____
 8                    ELLEN BAKULINA
 9
10    THE STATE OF _____)
11    COUNTY OF _____)
12
13        Before me, _____, on this
14    day personally appeared ELLEN BAKULINA, known to me or
15    proved to me on the oath of _____ or
16    through _____ (description of
17    identity card or other document) to be the person whose
18    name is subscribed to the foregoing instrument and
19    acknowledged to me that he/she executed the same for
20    the purpose and consideration therein expressed.
21        Given under my hand and seal of office on this
22    _____ day of _____, _____.
23
24                    _____
                      NOTARY PUBLIC IN AND FOR
25                    THE STATE OF _____
                      My Commission Expires: _____
```

*ELLEN BAKULINA, PH.D.    10/16/2024*

226

```
 1            UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF
 2                  SHERMAN DIVISION
 3    TIMOTHY JACKSON,         )
                               )
 4        Plaintiff,           )
                               )
 5    vs.              ) CASE NO. 4:21-CV-00033-ALM
                               )
 6    LAURA WRIGHT, et al.,    )
                               )
 7        Defendants.          )
 8    _____
 9        REPORTER'S CERTIFICATION OF
10        ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.
11              October 16, 2024
12    _____
13        I, KIM D. CARRELL, a Certified Shorthand Reporter
14    in and for the State of Texas, hereby certify to the
15    following:
16        That the witness, ELLEN BAKULINA, was duly sworn
17    and that the transcript of the oral deposition is a
18    true record of the testimony given by the witness;
19        That the deposition transcript was duly submitted
20    on November, 12, 2024, to Mary Quimby, attorney for the
21    witness,for examination, signature, and return to me by
22    December 16, 2024;
23        That pursuant to the information given to the
24    deposition officer at the time said testimony was taken,
25    the following includes all partes of record and the
```

*ELLEN BAKULINA, PH.D.    10/16/2024*

227

```
 1    amount of time used by each party at the time of the
 2    deposition;
 3        Michael Thad Allen - 05 HRS: 49 MIN
          Mary Quimby  - 00 HRS: 00 MIN
 4
 5    FOR THE PLAINTIFF:
 6        Michael Thad Allen
          ALLEN LAW, LLC
 7        P.O. Box 404
          Quaker Hill, CT 06375
 8        Telephone: 860.772.4738
          Fax: 860.469.2783
 9        E-mail: M.allen@allen-lawfirm.com
10
11    FOR THE DEFENDANTS:
12        Mary Quimby
          Assistant Attorney General
13        General Litigation Division
          P.O. Box 12548, Capital Station
14        Austin, Texas 78711
          Telephone: 512.463.2120
15        Fax: 512.320.0667
          E-mail: Mary.Quimby@oag.texas.gov
16
17        - and -
18        Renaldo Stowers  (Appearing Live)
          Cari Jacoby
19        University of North Texas System
          Office of General Counsel
20        801 North Texas Boulevard
          Denton, Texas 76201
21        Telephone: 940.565.2717
          Fax: 940.369.7026
22        E-mail: Renaldo.Stowers@untsystem.edu
          cari.jacoby@untsystem.edu
23
24        I further certify that I am neither counsel for,
25    related to, nor employed by any of the parties or
```

*ELLEN BAKULINA, PH.D.    10/16/2024*

228

```
 1    attorneys in the action in which this proceeding was
 2    taken, and further that I am not financially or
 3    otherwise interested in the outcome of the action.
 4        Certified to by me on this 12th day of November,
 5    2024.
 6
 7
 8
 9
10
11                    _____
                      Kim D. Carrell, CSR NO. 1184
12                    Date of Expiration: 7-31-26
                      JULIA WHALEY & ASSOCIATES, INC.
13                    2012 Vista Crest Drive
                      Carrollton, Texas  75007-1640
14                    214-668-5578/Fax 972-236-6666
                      JulieTXCSR@gmail.com
15                    Firm registration No. 436
                      Firm registration Expires 5-31-25
16
17
18
19
20
21
22
23
24
25
```

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   TIMOTHY JACKSON,           X
                                X
 4         Plaintiff,           X
                                X
 5   VS.                        X CASE ACTION
                                X NO.: 4:21-cv-00033-ALM
 6   LAURA WRIGHT, ET AL.,      X
                                X
 7         Defendants.          X

 8

 9   ------------------------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF

11                   ANDREW JAY CHUNG

12                    October 15, 2024

13                   (Reported Remotely)

14   ------------------------------------------------
15
16          ORAL AND VIDEOTAPED DEPOSITION OF ANDREW JAY
17   CHUNG, produced as a witness at the instance of the
18   Plaintiff, and duly sworn, was taken in the above-styled
19   and numbered cause on October 15, 2024, from 9:05 a.m. to
20   12:46 p.m., via Zoom, before JENNIFER L. SANDERS, CSR in
21   and for the State of Texas, reported by machine
22   shorthand, the witness located in Worcester,
23   Massachusetts, pursuant to the Federal Rules of Civil
24   Procedure and the provisions stated on the record and/or
25   attached hereto.
```

2

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3         MR. MICHAEL THAD ALLEN
           Allen Harris, PLLC
 4         PO Box 404
           Quaker Hill, Connecticut 06375
 5         Office:  860-499-3399
           Fax:  860-481-7899
 6         Email:  mallen@allenharrislaw.com

 7
     FOR THE DEFENDANTS:
 8
           MS. MARY QUIMBY
 9         Assistant Attorney General
           General Litigation Division
10         P.O. Box 12548
           Austin, Texas 78711-2548
11         Office:  512-463-2100
           Email:  mary.quimby@oag.texas.gov
12
13   FOR UNIVERSITY OF NORTH TEXAS

14         MR. RENALDO L. STOWERS
           MS. CARI JACOBY
15         UNT System
           Office of General Counsel
16         801 North Texas Boulevard
           Denton, Texas 76201
17         Office:  940-565-2717
           Fax:  940-369-7026
18         Email:  renaldo.stowers@untsystem.edu
           Email:  cari.jacoby@untsystem.edu
19
20   THE VIDEOGRAPHER:

21         Mr. Adam Scozzari
           Legal Video Group
22         Office:  214-598-5229
           Email:  lvg.dallas@gmail.com
23
24
25
```

3

```
 1                  I N D E X

                                              PAGE
 2   Appearances..........................................   2

 3   Exhibit Index........................................   4

 4   Agreements...........................................   5

 5

 6   ANDREW JAY CHUNG

 7       Examination by Mr. Allen.........................   6

 8

 9   Changes and Signature................................ 148

10   Reporter's Certificate............................... 150
```

4

```
 1                  E X H I B I T S
 2   NUMBER        DESCRIPTION                       PAGE

 3   1    Re-Notice of Taking Deposition.................   9

 4   2    Curriculum Vitae...............................  11

 5   3    Complication of Two Websites and One Journal
          Article concerning the Journal Spectrum........  23
 6
     4    Email from Timothy Jackson to Stephen
 7        Slottow, et al., dated 12/11/19, and other
          email (UNT 563-566)............................  50
 8
     5    Email from Stephen Slottow to Timothy
 9        Jackson, et al., dated 7/25/20, and other
          email (UNT 300-303)............................  63
10
     6    Material for the Committee (UNT 2645-2782).....  80
11
     7    Email from Timothy Jackson to others dated
12        7/26/20, and other email (UNT 304-309)........  84

13   8    Open Letter on anti-racist Actions Within SMT
          (UNT 1090-1115)................................ 100
14
     9    Ad Hoc Review Panel Report of Review of
15        Conception and Production of Volume 12 of the
          Journal of Schenkerian Studies dated 11/25/20
16        (Jackson 208-233)............................. 117

17   10   Email from Music Information dated 1/5/22
          (UNT 5521-5522)............................... 133
18
     11   Email from Music Information dated 11/23/21
19        (UNT5523-5525)................................ 135

20   12   Facebook Post by Levi Walls dated 7/27/20
          (Jackson 234-236)............................. 137
21
     13   Email from Ellen Bakulina dated 7/29/20....... 143
22
23
24
25
```

17

1  journal reviewers knew my name.  It's often -- in a small
2  field, it's pretty easy to infer who an author is.
3      Q.   Sure.  So let me just summarize, if possible.
4  A double blind peer-review process means that both the
5  author of an article and the outside reviewers of the
6  author -- of the article remain anonymous to each other,
7  correct?
8      A.   Correct.
9      Q.   And to the best of your knowledge, these
10 peer-reviewed articles were double blind peer reviewed?
11     A.   To the best of my knowledge.  My expectation is
12 that they were all double blind peer reviewed.
13     Q.   Have you ever published articles that are not
14 peer reviewed?
15     A.   Articles, no.
16     Q.   Textbook chap- -- go ahead.  I'm sorry.
17     A.   On articles, no.  I've done some journalistic
18 writing, but that's, I think, a different matter.
19     Q.   In this book chapter you've listed in your CV,
20 "Consonance and Dissonance," do you see where that is on
21 the -- it looks like second page of Exhibit 2?
22     A.   Correct.
23     Q.   Was that peer reviewed?
24     A.   That was editor reviewed.
25     Q.   And could you describe that process in brief

18

1  for the record?
2      A.   Editor review is -- is a standard that is often
3  used for edited collections that are published as books
4  where book chapters are solicited from authors by a team
5  of editors, and the pieces are reviewed by the editors.
6      Q.   And I believe you said you had -- how did you
7  describe your non-peer reviewed publication efforts?
8  Something like journalistic or popular or something of
9  that nature?
10     A.   Yeah.  Journalistic writing.
11     Q.   Where are those in your CV, if they are?
12     A.   They should be in other writings.
13     Q.   Is that this portion on the bottom of Page 2?
14     A.   Yes.  The -- yeah.  The bottom two items, in
15 *The Wire* and *icareifyoulisten.com*.  Yeah.  Those are --
16 those are -- those are journalistic writings.
17     Q.   And then what is the History of Music Theory
18 blog?  You've listed a publication under other writings,
19 "Colonial Organology and Ornithology in Richard Ligon's
20 Acoustics of Anthropological Difference."  Did I read
21 that right?
22     A.   Correct.  Yes.  That is a blog post that
23 solicits short pieces, short reflections having to do
24 with the history of music theory.
25     Q.   Okay.  Do you retain any kind of institutional

19

1  affiliation with Wesleyan University?
2      A.   Nope.
3      Q.   When did your association with Wesleyan end?
4          MS. QUIMBY:  Objection; form.
5      A.   My association with Wesleyan University ended
6  when my visiting appointment was over in May -- let's see
7  -- 2019.
8      Q.   (BY MR. ALLEN)  Okay.  Sorry if I pause between
9  exhibits.  It's because I'm keeping track of them and
10 keeping track of their files names so I can circulate
11 them eventually to the reporter.
12         Are you familiar with a music theory journal
13 called *Spectrum*?
14     A.   You are referring to *Music Theory Spectrum*.
15 Yes.
16     Q.   Can you describe what *Music Theory Spectrum* is
17 for the record, please?
18     A.   For the record, *Music Theory Spectrum* is, I
19 believe, one of the official publications of the Society
20 for Music Theory.
21     Q.   What's the Society for Music Theory?
22     A.   The Society for Music Theory is a professional
23 society of music theorists.
24     Q.   Do you belong to the Society for Music Theory?
25     A.   I am -- I am currently a member of the SMT.

20

1  That is the Society for Music Theory.
2      Q.   And I believe you just used its acronym SMT,
3  right?
4      A.   Uh-huh.
5      Q.   So if we say "SMT" we'll both understand we're
6  refer to Society for Musical Theory, right?
7      A.   Correct.  Music --
8      Q.   Thank you.  Society for Music Theory just for
9  the record.  Thank you.
10     A.   Correct.
11     Q.   How important is the Society for Music Theory
12 in your field?
13         MS. QUIMBY:  Objection; form.
14         Go ahead.
15     A.   It is -- it is the primary U.S.-based
16 professional association and conference organizing body
17 in the field.
18     Q.   (BY MR. ALLEN)  And you consider yourself a
19 music theorist, right?
20     A.   At times.  I certainly --
21     Q.   How about --
22     A.   -- teach in the music theory departments.
23     Q.   Okay.  Do you teach classes in music theory?
24     A.   I teach classes in music theory.
25     Q.   Did your -- do your publications -- your

121

```
 1      A.  What do you mean by an assertion of fact?
 2      Q.  Well, this is the language that you signed on
 3  to.  "The fact that he was not afforded the opportunity
 4  to respond in print is unacceptable," correct?
 5      A.  Yes.  That -- that was our surmise to the best
 6  of our knowledge, that he was not contacted to respond to
 7  the -- the pieces that were published in Volume 12.
 8      Q.  Were you aware that Benjamin Graf contacted
 9  Philip Ewell to invite him to respond?
10          MS. QUIMBY:  Objection; form.
11      A.  I was not.
12      Q.  (BY MR. ALLEN)  Benjamin Graf signed this
13  letter as well, right?
14      A.  Yes.  I see his name there.
15      Q.  You don't recall anyone pointing out that
16  Philip Ewell also received the SMT invitation to
17  contribute to Volume 12?
18          MS. QUIMBY:  Objection; form.
19      A.  I don't believe that that counts as an
20  invitation to respond to the -- the -- the pieces that
21  were solicited for the journal.  That's a somewhat
22  different matter of being invited to contribute to the --
23  the pieces that were initially collected.
24      Q.  (BY MR. ALLEN)  So only a personal invitation
25  would have, quote, afforded the opportunity to respond in
```

122

```
 1  print according to your testimony?
 2          MS. QUIMBY:  Objection; form.
 3      A.  Well, that is -- that is the implicit and
 4  specific meaning of that remark in the -- in the letter.
 5      Q.  (BY MR. ALLEN)  That's the implicit meaning is
 6  what you're saying?
 7      A.  That is what I'm saying.
 8      Q.  It doesn't say that though, does it?
 9      A.  Debatable.
10      Q.  It actually says, "He was not afforded the
11  opportunity to respond in print," right?
12      A.  That is -- that is the denotation of that
13  sentence, yeah.
14      Q.  Was there anything that prevented you from
15  qualifying that in -- along the lines of:  He wasn't
16  provided a personal engraved invitation or something of
17  that nature?
18          MS. QUIMBY:  Objection; form.
19      A.  An engraved invitation?  What does that mean?
20      Q.  (BY MR. ALLEN)  There's no qualifying language
21  to this factual statement indicating that there is some
22  sort of hidden, implicit meaning, is there?
23          MS. QUIMBY:  Objection; form.
24      A.  There's no qualifying remark, no.
25      Q.  (BY MR. ALLEN)  All right.  Then you also
```

123

```
 1  say -- you endorse the call for action outlined in the
 2  students letter, right?
 3      A.  Uh-huh.
 4      Q.  Right here?
 5      A.  Uh-huh.
 6      Q.  So let's talk about the students letter.
 7      A.  Okay.
 8      Q.  Which was incorporated by reference through
 9  that URL link, right, into the --
10      A.  Right.
11          MS. QUIMBY:  Objection; form.
12      Q.  (BY MR. ALLEN) -- the faculty letter?
13          MS. QUIMBY:  Objection; form.
14      A.  Correct.
15      Q.  (BY MR. ALLEN)  Thank you.  So let's see.  Here
16  you endorse this, that it was platforming racist
17  sentiments, the Journal of Schenkerian Studies?
18          MS. QUIMBY:  Objection; form.
19      A.  What's the question, please?  Sorry.
20      Q.  (BY MR. ALLEN)  You endorse this part of the
21  letter that the Journal of Schenkerian Studies was
22  platforming, quote, racist sentiments?
23          MS. QUIMBY:  Objection; form.
24      A.  I certainly endorse that the students were
25  appalled, that they perceived such to be the case.  I
```

124

```
 1  think that to many people's reasonable judgments
 2  racially -- racially incentives -- racially incentive --
 3  racially insensitive sentiments appeared in the journal.
 4  That was also my understanding.  That was also my
 5  opinion, yes.
 6      Q.  (BY MR. ALLEN)  You also endorsed this
 7  statement, "The students have absolutely no say in the
 8  content of the JSS."
 9          MS. QUIMBY:  Objection; form.
10      Q.  (BY MR. ALLEN)  Right here.  That's a factual
11  statement, right, Professor Chung?
12          MS. QUIMBY:  Objection; form.
13      A.  What's a factual statement, the statement that
14  students have --
15      Q.  (BY MR. ALLEN)  "Students have absolutely no
16  say in the content of the JSS," right?
17          MS. QUIMBY:  Objection; form.
18      A.  I believe that students -- yeah.  I believe
19  that students generally believe they don't have ultimate
20  final say over what goes into the journal.
21      Q.  (BY MR. ALLEN)  You've never discussed that
22  with Mr. Walls, right?
23      A.  I -- I know so little about Schenkerian studies
24  and the Journal of Schenkerian Studies that this hasn't
25  come up in our discussions.
```

149

```
1    _____
2    _____
3    _____
4    _____
5    _____
6         I, ANDREW JAY CHUNG, have read the foregoing
     deposition and hereby affix my signature that same is
7    true and correct, except as noted above.

8

9

10                    _____
                      ANDREW JAY CHUNG

11

12   STATE OF _____)

13   COUNTY OF _____)

14        Before me, _____, on this day
     personally appeared ANDREW JAY CHUNG, known to me (or
15   proved to me under oath or through
     _____) (description of identity
16   card or other document)) to be the person whose name is
     subscribed to the foregoing instrument and acknowledged
17   to me that they executed the same for the purposes and
     consideration therein expressed.
18        Given under my hand and seal of office this
     _____ day of _____, _____.
19

20

21                    _____
                      NOTARY PUBLIC IN AND FOR
22                    THE STATE OF _____
                      COMMISSION EXPIRES: _____
23

24
25
```

151

```
1    That the amount of time used by each party at
2    the deposition is as follows:
3         MR. MICHAEL THAD ALLEN:  3 Hour(s) 10 Minute(s)

4

5         That pursuant to information given to the
6    Deposition officer at the time said testimony was taken,
7    the following includes counsel for all parties of record:
8    FOR THE PLAINTIFF:

9         MR. MICHAEL THAD ALLEN
          Allen Harris, PLLC
10        PO Box 404
          Quaker Hill, Connecticut 06375
11        Office:  860-499-3399
          Fax:  860-481-7899
12        Email:  mallen@allenharrislaw.com

13

14   FOR THE DEFENDANT:

15        MS. MARY QUIMBY
          Assistant Attorney General
          General Litigation Division
16        P.O. Box 12548
          Austin, Texas 78711-2548
17        Office:  512-463-2100
          Email:  mary.quimby@oag.texas.gov

18

19        That $_____ is the deposition officer's
20   charges to Mr. Michael Thad Allen, Attorney for
21   Plaintiff, for preparing the original deposition
22   transcript and any copies of exhibits;
23        I further certify that I am neither counsel
24   for, related to, nor employed by any of the parties or
25   attorneys in the action in which this proceeding was
```

150

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
2                      SHERMAN DIVISION

3    TIMOTHY JACKSON,            X
                                 X
4         Plaintiff,            X
                                 X
5    VS.                         X CASE ACTION
                                 X NO.: 4:21-cv-00033-ALM
6    LAURA WRIGHT, ET AL.,       X
                                 X
7         Defendants.            X

8    -------------------------------------------------

9              REPORTER'S CERTIFICATION
10           DEPOSITION OF ANDREW JAY CHUNG
11                  October 15, 2024
12                (Reported Remotely)
13   -------------------------------------------------

14

15        I, Jennifer L. Sanders, Certified Shorthand
16   Reporter in and for the State of Texas, hereby certify to
17   the following:
18        That the witness, ANDREW JAY CHUNG, was duly
19   sworn by the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by the
21   witness;
22        That the deposition transcript was submitted on
23   _____ to Ms. Mary Quimby, attorney for
24   ANDREW JAY CHUNG, for examination, signature and return
25   to me by _____;
```

152

```
1    taken, and further that I am not financially or otherwise
2    interested in the outcome of the action.
3         Certified to by me this _____ day of
4    _____, _____.
5

6                    _____

7                    JENNIFER L. SANDERS, CSR No. 5091
                     Expiration Date:  10/31/26
7                    JULIA WHALEY & ASSOCIATES
8                    2012 Vista Crest Drive
                     Carrollton, Texas 75007
9                    Firm Registration No. 436
10                   214-668-5578 (Office)
                     214-236-6666 (Fax)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Diego Enrique Cubero Hernandez     09/26/2024*     1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF TEXAS
                    SHERMAN DIVISION
 3  TIMOTHY JACKSON,              *
 4         Plaintiff,             *
 5  VS.                           *  CASE NO. 4:21-CV-00033-ALM
 6  LAURA WRIGHT, ET AL.,         *
 7         Defendants.            *
 8  _____
 9
10  ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
11                   DIEGO CUBERO
12                 SEPTEMBER 26, 2024
13
14  _____
15
16            ORAL AND VIDEOTAPED VIDEOCONFERENCE
17  DEPOSITION of DIEGO CUBERO, produced at the instance of
18  the Plaintiff, and duly sworn, was taken in the
19  above-styled and numbered cause on the 26th day of
20  September, 2024, from 3:14 p.m. to 5:52 p.m., before
21  Carla A. Sims, AAS, CSR, RPR, in and for the State of
22  Texas, reported by method of machine shorthand, via Zoom
23  videoconference, pursuant to the Federal Texas Rules of
24  Civil Procedure and the provisions stated on the record
25  or attached hereto.
```

*Diego Enrique Cubero Hernandez     09/26/2024*     2

```
 1              A P P E A R A N C E S
 2         ALL PARTIES AND WITNESS APPEARED VIA
                 ZOOM VIDEOCONFERENCE
 3
 4  COUNSEL FOR THE PLAINTIFF:
 5      Mr. Michael Thad Allen
        ALLEN LAW, LLC
 6      P.O. Box 404
        Quaker Hill, Connecticut 06375
 7      860/772-4738 (tel)
        m.allen@allen-lawfirm.com
 8
    COUNSEL FOR THE DEFENDANTS and DIEGO CUBERO:
 9
10      Ms. Mary Quimby
        TEXAS ASSISTANT ATTORNEY GENERAL
11      P.O. Box 12548
        Capitol Station
12      Austin, Texas 78711
        mary.quimby@oag.texas.gov
13  COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:
14      Mr. Renaldo L. Stowers
        DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
15      115 Union Circle No. 310907
        Denton, Texas 76203
16      940/565-2717 (tel)
        renaldo.stowers@untsystem.edu
17
    ALSO PRESENT:
18
    VIDEOGRAPHER:
19
        Mr. Jason Warner
20      Legal Video Group
        lvg.dallas@gmail.com
21      214-598-5229
22
23
24
25
```

*Diego Enrique Cubero Hernandez     09/26/2024*     3

```
 1                   I N D E X
 2                                          PAGE
 3  Appearances.....................................  2
 4
 5  DIEGO CUBERO
 6  Examination by Mr. Allen........................  5
 7
 8  Changes and Signature...........................  95
 9  Reporter's Certificate..........................  97
10  Further Certification...........................  99
11
12
13
14
15
16
17
18
19
20
21             REPORTER'S NOTE
22             Please note that due to the quality
23  of the transmission data for a Zoom videoconference,
24  cross-talk causes audio distortion in the testimony when
25  preparing a videoconference transcript.
```

*Diego Enrique Cubero Hernandez     09/26/2024*     4

```
 1                E X H I B I T S
 2  NO.      DESCRIPTION                      PAGE
 3  1    Deposition Notice......................  15
 4  2    JSS Editorial Board Contact Information.  16
         UNT_000109
 5
 6  3    Ad Hoc Review Panel Report.............  42
         JACKSON000208 to JACKSON000233
 7  4    Ad Hoc Panel Report Student Statement...  44
 8  5    Email String...........................  68
         UNT_000458 to UNT_000463
 9
10  6    Email String...........................  87
         UNT_000452
11  7    Email String...........................  91
         UNT_000304 to UNT_000309
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Diego Enrique Cubero Hernandez    09/26/2024

45

1    Q.    (By Mr. Allen) Where is the qualification?
2    A.    If you can show me that previous document, I'll
3    tell you.
4    Q.    Okay.  Let's -- I will and I want to save that
5    thought.  But first I want to call -- you asked me -- we
6    brought this up because I was asking you to identify
7    racist actions of Timothy Jackson.
8    And this is something that the students say
9    about Timothy Jackson and you incorporate it by reference
10    in your publication to the UNT faculty letter.  Do you see
11    this right here under Number 3?  Hold accountable every
12    person responsible?
13    A.    Uh-huh.
14    Q.    This should also extend to investigating past
15    bigoted behaviors by faculty and by taking this into
16    account the discipline and potential removal of faculty
17    who use the JSS platform to promote racism.
18    Specifically the actions of Dr. Jackson both past and
19    present are particularly racist and unacceptable.
20    So what I'm asking you is what specific actions
21    can you identify by Dr. Jackson that are racist?
22    MS. QUIMBY:  Objection, form.
23    A.    By referring to this document, which I did not
24    write, I -- by actions, I'm not sure I cannot -- I cannot
25    speak to the -- for the students.

Diego Enrique Cubero Hernandez    09/26/2024

46

1    Q.    (By Mr. Allen) I'm not asking you to speak for
2    the students.  I'm just asking what you know.  Do you
3    have any direct knowledge of actions by Timothy Jackson
4    which are racist?
5    MS. QUIMBY:  Objection, form.
6    A.    The -- what I understand right now, as I read
7    this document, is that my understanding is that the
8    students are referring to the publication of the Journal
9    of Schenkerian Studies.  That's my current understanding
10    of it.
11    Q.    (By Mr. Allen) Okay.
12    A.    But again I'm speculating because I did not
13    write it so...
14    Q.    Right.  And I'm not asking you to speculate
15    about what the students thought or conceived of.  I'm
16    asking you do you have any direct knowledge of actions,
17    specific actions, that Timothy Jackson committed that you
18    consider racist?
19    MS. QUIMBY:  Objection, form.
20    A.    I believe that there is -- I recollect there is
21    passages in his publication that were perceived as
22    racist.
23    Q.    (By Mr. Allen) Okay.  Besides what he published
24    in writing, and I assume you're referring to Volume 12 of
25    the Journal of Schenkerian Studies?

Diego Enrique Cubero Hernandez    09/26/2024

47

1    A.    Yes.
2    Q.    Okay.  So we've identified that.  Is there any
3    action besides speaking through a journal that you would
4    identify as racist by Timothy Jackson?
5    MS. QUIMBY:  Objection, form.
6    A.    A question involving a remark involving race
7    that was -- it was a long time ago.  It's when
8    Dr. Jackson alluded that a certain person didn't have a
9    position because he was white, and that to me seemed --
10    that could be construed as racist.  But I don't -- I
11    don't read that paragraph thinking about that particular
12    action.
13    Q.    (By Mr. Allen) I'm sorry.  You strategically
14    cut out just when you said that very important thing you
15    just said.  So there was a person in the past, and
16    timothy Jackson suggested that he didn't get a position.
17    And what did you say after that?
18    MS. QUIMBY:  Objection, form.
19    A.    Yeah.  I didn't strategically cut out.  I think
20    it's the internet.
21    Q.    (By Mr. Allen) No, no.  Not you.  It was the
22    internet.  I'm not saying you did it.  It's just I
23    couldn't hear.  I really honestly couldn't hear it so I'm
24    asking you.
25    A.    There was -- and this is going a long time ago,

Diego Enrique Cubero Hernandez    09/26/2024

48

1    and I'm just trying to remember the moment where Dr.
2    Jackson -- Dr. Jackson mentioned to me that a certain
3    faculty member, you know, might not have this position
4    because he was white.
5    I took to mean -- the way I took this is that
6    it was a little bit -- I took it as kind of something
7    that could be interpreted there as racist.
8    Q.    It could be interpreted as racist?
9    A.    Yes.
10    Q.    A comment about a white faculty member?
11    A.    Well, the implication being that -- that -- and
12    this was my understanding of this moment of this long
13    time ago.  It was a moment that just stuck with me.  That
14    -- that this person was being treated -- treated unfairly
15    because they were white, and there was an interesting
16    hire of people that were not.
17    Q.    Say that again.  What was the last part?
18    A.    It was -- it was -- I understood it as a
19    comment that reflected more on passing judgment on this
20    person based on being white rather than it was not about
21    the -- the skills of this particular person.
22    MR. ALLEN:  Can we go off the record?
23    MS. QUIMBY:  Sure.
24    VIDEOGRAPHER:  Off the record, 4:22.
25    (Recess taken from 4:22 to 4:31)

APPX-053

49

1    VIDEOGRAPHER:  The time is 4:31.  We're on
2  The record.
3    Q.    (By Mr. Allen) Thank you, Professor Cubero, for
4  allowing me to take that break.  I believe you were
5  saying that sometime ago, Timothy Jackson had made a
6  comment about a white professor who he thought did not
7  get a job or something.  Could you explain that again?
8    A.    Yes.  That a while back, he made a comment as
9  to a white person not getting a job because --
10    Q.    Because of race?
11    A.    Because of race.  And that it's something since
12  you asked me what actions that could be construed as
13  racist, I didn't take it to mean that that is what --
14  what The student response was referring to and nor did I
15  endorse that.
16    Q.    Okay.  And how long ago was this statement by
17  Timothy Jackson that you remember?
18    A.    I don't remember.  I really don't.
19    Q.    Was it in The 2020 timeframe?
20    A.    I don't think so.
21    Q.    Okay.  Do you consider yourself Latino?
22    A.    Yes.  I consider myself of white race and
23  Latino ethnicity.
24    Q.    Has Timothy Jackson ever expressed anything
25  racist towards you for your national origins?

50

1    A.    Not that comes to mind.
2    Q.    And he was on faculty at The time you were
3  hired, correct?
4    A.    That's correct.
5    Q.    Was he part of The hiring process?
6    A.    I believe he was in The search committee, but I
7  don't recall.
8    Q.    Did you have any indication that you were
9  discriminated against by Timothy Jackson individually?
10    A.    No.
11    Q.    Have you ever witnessed Timothy Jackson
12  discriminate against a black American?
13    MS. QUIMBY:  Objection, form.
14    A.    I believe that The -- some of The statements
15  might have -- in his journal, in The journal, 12 Volume,
16  are construed as -- can be construed as racist.
17    Q.    (By Mr. Allen) Okay.  But I'm asking you a
18  little bit different question.  Have you ever witnessed
19  Timothy Jackson discriminate against a black American
20  like in hiring, anything of that nature?
21    MS. QUIMBY:  Objection, form.
22    A.    Since you gave The example, I would say
23  I don't --
24    MR. ALLEN:  He's frozen.
25    A.    I don't recall he discriminating against a

51

1  black American in a hiring scenario.
2    Q.    (By Mr. Allen) So you wanted to go back to this
3  statement.  I think you said something about what you did
4  or did not endorse, correct?
5    A.    Yes.
6    MS. QUIMBY:  Objection, form.
7    Q.    (By Mr. Allen) And were you directing my
8  attention to this document in saying that?  This is The
9  Statement of UNT Faculty on Journal of Schenkerian
10  Studies that's attached to Exhibit 3 in The record.
11    MS. QUIMBY:  Can you show The document?
12    MR. ALLEN:  I am so sorry.  I thought it
13  was up, and, of course, it was not.
14    Q.    (By Mr. Allen) Here it is again, Exhibit 3.
15    A.    Yes.  So I forget your question but, yes, that
16  is The document.
17    Q.    Well, before we broke, you said you did not
18  endorse The statement in The record, The student
19  statement which was introduced as Exhibit 4, which
20  identifies, quote, "racist actions" or words to that
21  effect.  And you said I didn't endorse that part of The
22  student statement and you wanted to refer to this
23  document.
24    And I promised you we would come back to talk
25  about it, so I'm now putting Exhibit 3 back up and asking

52

1  you to show me why you believe you did not endorse The
2  student letter in that regard.
3    A.    In this document The way I currently understand
4  it is that it's endorsing a call to action meaning that
5  The College of Music probably condemn that it shouldn't
6  release freely online to the public and to provide a
7  public account of the editorial publication process and
8  its failures.
9    So I see that as what this -- currently that's
10  how I see it as this statement is endorsing those two
11  action points.
12    Q.    Okay.  And nothing more?  That's your -- is
13  that your testimony?  That you weren't endorsing anything
14  more than publically condemning The issue and asking that
15  it be released freely online to The public, and you
16  weren't endorsing anything other than what's in
17  quotations?
18    A.    That is how I read The statement currently.  I
19  cannot go back to my mindset.
20    Q.    Sure.  Can you point to any language in The
21  sentence here that was published that says you only
22  endorse those quoted sections?
23    A.    Can you repeat your question, please?
24    Q.    Sure.  Point to language in this statement of
25  UNT faculty on Journal of Schenkerian Studies that

1  Corrections pages contain any changes and the reasons
2  therefor;
3      _____ was not requested by the deponent or a party
4  before the completion of the deposition.
5      That the deposition transcript was submitted on
6  October 30, 2024, to Ms. Mary Quimby, attorney for the
7  witness, for examination, signature, and return to me by
8  the 2nd day of December, 2024;
9      That the amount of time used by each party at the
10  deposition is as follows:
11      Mr. Michael Thad Allen..........02 HOURS:15 MINUTES
        Ms. Mary Quimby.................00 HOURS:00 MINUTES
12      Mr. Renaldo L. Stowers..........00 HOURS:00 MINUTES
13  COUNSEL FOR THE PLAINTIFF:
14      Mr. Michael Thad Allen
        ALLEN LAW, LLC
15      P.O. Box 404
        Quaker Hill, Connecticut 06375
16      860/772-4738 (tel)
        m.allen@allen-lawfirm.com
17
        COUNSEL FOR THE DEFENDANTS and DIEGO CUBERO:
18
        Ms. Mary Quimby
19      TEXAS ASSISTANT ATTORNEY GENERAL
        P.O. Box 12548
20      Capitol Station
        Austin, Texas 78711
21      mary.quimby@oag.texas.gov
22  COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:
23      Mr. Renaldo L. Stowers
        DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
24      115 Union Circle No. 310907
        Denton, Texas 76203
25      940/565-2717 (tel)
        renaldo.stowers@untsystem.edu

---

1              FURTHER CERTIFICATION
              DEPOSITION OF DIEGO CUBERO
2
3      The original deposition was/was not returned to the
4  deposition officer on the _____ day of _____,
5  2024.
6      If returned, the attached Changes and Signature
7  page contains any changes and the reasons therefor;
8      If returned, the original deposition was delivered
9  to Mr. Michael Thad Allen, Custodial Attorney;
10      That $_____ is the deposition officer's
11  charges to the Plaintiff for preparing the original
12  deposition transcript and any copies of exhibits;
13
14      Certified to by me this _____ day of _____,
15  202__.
16
17
18
19      _____
20      JULIA WHALEY & ASSOCIATES, INC.
        2012 Vista Crest Drive
        Carrollton, Texas  75007-1640
21      214-668-5578/Fax 972-236-6666
        JulieTXCSR@gmail.com
22      Firm registration No. 436
        Firm registration Expires 5-31-25
23
24
25

---

1      I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
4  taken.  Further, I am not a relative or employee of any
5  attorney of record in this cause, nor am I financially or
6  otherwise interested in the outcome of the action.
7      Certified to by me this the 14th day of October,
8  2024.
9
10
11      _____
        Carla A. Sims, AAS, RPR
12      Texas CSR No. CSR-6125
        Expiration Date:  04-30-26
13      JULIA WHALEY & ASSOCIATES, INC.
        2012 Vista Crest Drive
14      Carrollton, Texas  75007-1640
        214-668-5578/Fax 972-236-6666
15      JulieTXCSR@gmail.com
        Firm registration No. 436
        Firm registration Expires 5-31-25
16
17
18
19
20
21
22
23
24
25

**APPX-055**

*Rachel Gain    5/19/21*    1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                    SHERMAN DIVISION

 3   TIMOTHY JACKSON,          )
                               )
 4            Plaintiff,       )
                               )
 5   v.                        ) CASE NO.
                               ) 4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,      )
                               )
 7            Defendants.      )
                               )
 8

 9

10   ------------------------------------

11            ORAL DEPOSITION OF

12               RACHEL GAIN

13               MAY 19, 2021

14   ------------------------------------

15

16

17      ORAL DEPOSITION OF RACHEL GAIN, produced as a

18   witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 19, 2021, from 1:06 p.m. to 2:49 p.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.
```

*Rachel Gain    5/19/21*    3

```
 1                    INDEX

 2                                          PAGE

 3   Appearances.........................................2

 4   Stipulations........................................4

 5   RACHEL GAIN

 6       Examination by Ms. Harris.......................4

 7

 8   Reporter's Certificate.............................60

 9

10

11                   EXHIBITS

12   NO.  DESCRIPTION                           PAGE

13   Exhibit 35   Notice of Taking Deposition............ 9

14   Exhibit 36   Text Messages - Vivek Virani and
                  Rachel Gain......................... 9
15
     Exhibit 37   Microsoft Teams conversation..........22
16
     Exhibit 38   News from SEM: General News, Statement
17                of UNT Faculty on Journal of
                  Schenkerian Studies ..................22
18
     Exhibit 39   Twitter Messages......................51
19
```
```
20

21

22

23

24

25
```

*Rachel Gain    5/19/21*    2

```
 1            A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:
 4       MR. MICHAEL THAD ALLEN
         MS. SAMANTHA HARRIS
 5       ALLEN LAW, LLC
         P.O. Box 404
 6       Quaker Hill, Connecticut 06375
         860.772.4738
 7       860.469.2783 Fax
         m.allen@allen-lawfirm.com
 8

 9   FOR THE DEFENDANTS:

10       MR. MATT BOHUSLAV
         ASSISTANT ATTORNEY GENERAL
11       GENERAL LITIGATION DIVISION
         ATTORNEY GENERAL OF TEXAS
12       P.O. Box 12548, Capitol Station
         Austin, Texas 78711
13       matthew.bohuslav@oag.texas.gov

14   AND

15       MR. RENALDO STOWERS
         SENIOR ASSOCIATE GENERAL COUNSEL
16       UNIVERSITY OF NORTH TEXAS SYSTEM
         OFFICE OF GENERAL COUNSEL
17       940.565.2717
         renaldo.stowers@untsystem.edu
18

19   ALSO PRESENT:

20       MR. TIMOTHY JACKSON
```
```
21

22

23

24

25
```

*Rachel Gain    5/19/21*

4

```
 1            P R O C E E D I N G S

 2               RACHEL GAIN,

 3   having been first duly sworn, testified as follows:

 4               EXAMINATION

 5   BY MS. HARRIS:

 6       Q.   Okay.  Hi, my name is Samantha Harris.  I'm one

 7   of the attorneys for Dr. Jackson, along with my partner.

 8   And have you ever been deposed before?

 9       A.   No.

10       Q.   Okay.  So, it's just going to be a

11   conversation, but it is part of the Court record, that's

12   why she's taking these -- you know, these notes.  And

13   so, this is testimony that will be part of the case.  If

14   at any time anything I'm asking you isn't clear or you

15   need me to clarify or repeat the question, just ask.

16   Your attorney may object from time to time.

17               MS. HARRIS:  Are we going to stipulate,

18   you know, the same things that we have in the previous

19   depositions, that objections except as to form

20   objections will be reserved for the time of trial.

21               MR. BOHUSLAV:  Yes.

22       Q.   (By Ms. Harris)  Okay.  So, he will object, and

23   that objection will go on the record, but it doesn't

24   change your obligation to answer the question.  So, when

25   he objects, it doesn't mean, you know, that you're not
```

Rachel Gain    5/19/21

5

1  going to answer, it just means that that objection will
2  be noted, and the Judge can decide what to do with it.
3       A.    (Witness nods head affirmatively.)
4       Q.    So, we'll just start with some background
5  questions.  Is there anything that would prevent you
6  from giving truthful testimony here today?
7       A.    No.
8       Q.    Are you on any medications, or do you have any
9  medical conditions that could potentially interfere with
10 your ability to give truthful testimony?
11      A.    Not that I know of, no.
12      Q.    Okay.  So, just tell me a little bit about your
13 background.  Obviously, now, you're a graduate student
14 at UNT, right?
15      A.    (Witness nods head affirmatively.)
16      Q.    And what, specifically, are you studying?
17      A.    I'm studying music theory.
18      Q.    Music theory.  Okay.  Prior to that, where did
19 you go to college?
20      A.    I did my undergraduate mostly at the University
21 of Birmingham, with one year at the University of
22 Ottawa, and I did a master's degree in music theory at
23 the University of Western Ontario.
24      Q.    Okay.  Now, you said you're studying music
25 theory here at the University of North Texas?

Rachel Gain    5/19/21

7

1  with Volume 12 of the JSS?
2       A.    It was, I think, on the Friday evening, which I
3  believe was the 25th of July, 2020.
4       Q.    Okay.  And how did you hear about it, first?
5       A.    On Twitter, people were posting their opinions
6  on it and screen shots of the passages that they were
7  offended by.
8       Q.    Okay.  Have you read Volume 12 of the JSS?
9       A.    I've read most of it.
10      Q.    Most of it.  Okay.  Have you read Dr. Jackson's
11 article?
12      A.    Yes.
13      Q.    Okay.  And have you listened to Dr. Ewell's
14 talk, the talk that prompted --
15      A.    Yes.
16      Q.    Okay.  So, when you said people were tweeting
17 about it, do you remember who specifically was tweeting
18 that you noticed?
19      A.    Quite a lot of people.  One person comes to
20 mind that I can definitely say did.  The first name's
21 Devon.  I can't remember the entirety of their surname,
22 but it begins with "C-H".  Something like Chalamu or
23 Chalamo (Phonetic).
24      Q.    And is that someone who was also a student at
25 UNT?

Rachel Gain    5/19/21

6

1       A.    Yes.
2       Q.    What year of the program are you in?
3       A.    I just finished my second year.
4       Q.    Okay.  So, you're in the theory department.
5  Have you met Dr. Jackson before?
6       A.    We've been in the same room, I've smiled at him
7  in hallways, but that's the extent of our interactions.
8       Q.    Okay.  So, would you say your interactions with
9  him have been pleasant or --
10      A.    I've had no response from him, so I wouldn't
11 use the word "pleasant".  I'd say absence, really.
12      Q.    Okay.  When did you first learn about the
13 controversy over Volume 12 of the -- I'm going to say
14 the Journal of Schenkerian Studies.  If I call it the
15 JSS here on out, will that be clear?
16      A.    Yes.
17      Q.    And you know what?  I see you nodded and said
18 "yes", and that reminds me of one thing I should have
19 said at the beginning of the deposition, is because this
20 is all going on the record, even if it's just a "yes" or
21 "no" answer, always say "yes" or "no", rather than just
22 nodding, which you didn't do, you said "yes", but it
23 made me think of it.
24      A.    Okay.
25      Q.    So, when did you first learn of the controversy

Rachel Gain    5/19/21

8

1       A.    No.
2       Q.    Okay.  So, these were people from outside of
3  the university.
4       A.    Yes.
5       Q.    Do you know how they learned about the
6  controversy?
7       A.    Some of them had a copy of the journal and had
8  read it, and others had seen the journal -- the excerpts
9  that had been sent to them.
10      Q.    Okay.  And when did you first read Dr.
11 Jackson's article?
12      A.    I read the excerpts at the time, and within the
13 next day or two, I read the article.
14      Q.    Okay.  All right.  Terrific.  So, you know, I
15 meant to do this before we did the background, but I'm
16 going to just -- so, I'm going to be introducing some
17 documents throughout.  They're going to be marked as
18 exhibits.
19            So, any document that I'm going to ask you
20 about, I will give you a copy of to familiarize yourself
21 with it.  And the first thing I just want to give you a
22 copy of, and I believe this will be 35, I think, because
23 we're continuing to number the exhibits from previous
24 depositions.
25            This is just the Notice of Deposition that

Rachel Gain    5/19/21

9

1  you received, and I just want you to confirm that, you
2  know, you are, in fact, here today in response to this,
3  in order to give testimony in this case.
4        A.   Yeah.
5             (DEPOSITION EXHIBIT 35 MARKED.)
6        Q.   (By Ms. Harris)  All right.  Then, the next
7  document I want to introduce is Exhibit 36, is your
8  tweet where you shared a statement on behalf of -- oh,
9  yes.
10            (DEPOSITION EXHIBIT 36 MARKED.)
11            MR. BOHUSLAV:  Do you happen to have an
12 extra copy?
13       Q.   (By Ms. Harris)  Where you shared these
14 statements.  So, is this, in fact, your tweet, to
15 confirm that this is your tweet from July 27th sharing
16 this statement on behalf of graduate students?
17       A.   I mean, the tweets you put in front of me are
18 Dr. Virani's tweets.
19       Q.   Well, but the one that he re-tweeted.
20       A.   The one that he shares is my tweet.
21       Q.   Okay.  And so -- and how many Twitter followers
22 do you have, do you know?
23       A.   I mean, do you want the number that I have now,
24 or that I had at the time?
25       Q.   If you remember what you had at the time.

Rachel Gain    5/19/21

10

1        A.   A few hundred.  I would have to estimate that
2  it would be somewhere between maybe 300 and 600, but
3  that is an estimate.
4        Q.   And how many do you have, now?
5        A.   Now, I believe I have approximately 1,100.
6        Q.   Okay.  So you gained a lot of followers after
7  this.  Had you read -- on the 27th, when you tweeted
8  this out, had you read Dr. Jackson's article at that
9  point?
10       A.   I believe I had.
11       Q.   You believe you had.
12       A.   To the best of my memory.
13       Q.   Okay.  And so, now, I want to share with you,
14 and this is marked as Exhibit 3 because it's already
15 been introduced into the record, this statement.  And is
16 this -- I want to verify with you that this is the
17 version of the statement that you tweeted out on the
18 27th, because there was a later version, as well, which
19 I'll show you when we get to it.
20       A.   Are you able to show me my own tweets, so I can
21 compare this?
22       Q.   We don't have a copy, because your Twitter is
23 private, so we only have the tweets that were produced
24 to us, and it was in the form of a re-tweet.  So, no, I
25 don't, I just have that re-tweet.

Rachel Gain    5/19/21

11

1        A.   I would need the copy of what I tweeted in
2  order to compare and say with absolute certainty that
3  the two versions are the same.
4        Q.   Can you confirm that you have seen this version
5  of the statement, which is the draft that was attached
6  to the ad hoc panel's report on the incident?
7        A.   I couldn't say with absolute certainty that
8  this is word for word the version I've seen.  I wasn't
9  aware that there was supposedly more than one version,
10 but I've probably seen this before.  It looks familiar,
11 but there's a lot of words on that page.
12       Q.   Okay.  Do you -- you know, you mentioned the
13 tweet that you sent.  Did you produce that tweet to your
14 counsel as part of the document production?
15       A.   Yes.
16       Q.   Yes.  Okay.  I don't believe that was in the
17 production we received from UNT of her documents, but I
18 guess we will move on, then.
19            Okay.  So, I am going to -- so, are you
20 aware -- are you familiar with the ad hoc panel report
21 that was issued about the JSS incident?
22       A.   I'm familiar with it.  I'm aware of it.
23       Q.   So, this document was attached as Exhibit 3 to
24 that ad hoc panel report.  Do you have any reason to
25 believe that the ad hoc panel had an erroneous version

Rachel Gain    5/19/21

12

1  of the statement that was put out by the graduate
2  students over social media?
3        A.   No.
4        Q.   Okay.  So, is it all right, then, if I ask you
5  some questions about this document?
6        A.   Yes.
7        Q.   Okay.  So, do you recall who authored it?  How
8  it came to be?
9        A.   Yes.
10       Q.   Okay.  Can you tell me about that process?
11       A.   Originally, five of us drafted an original
12 version, and then it was some kind of Cloud document
13 that could be edited, so additional students came and
14 added their opinions.  And in the process, there may
15 have been a re-drafting.
16       Q.   Okay.  Who were the -- besides yourself, who
17 were the original -- the four other people who
18 originally worked on the statement?
19       A.   It was myself, Brian Anderson, Elizabeth
20 Durrant and -- who did I already say?
21       Q.   Brian Anderson, Salvador Hernandez.
22       A.   Elizabeth Durrant and -- sorry, I do know the
23 names, just --
24       Q.   Okay.  That's okay.  We can come back to it, if

13

1   you recall, you let me know.  And what was the process
2   for developing this?  Did you meet over Zoom?  Did you
3   sort of all go into a Cloud document, as you say?
4       A.   Yes.
5       Q.   You met over Zoom?
6       A.   Yes.
7       Q.   And you had a document -- and you had it open
8   in the Cloud and were making edits?
9       A.   Yes.
10      Q.   Okay.  And how was it decided that you would be
11  the one to share it over social media?
12      A.   The first -- at first, Peter said he could do
13  it, as the president of GAMuT, then somebody said, this
14  isn't a GAMuT thing so not necessarily you.  I said it
15  should be a theorist.
16      Q.   And just to clarify, GAMut is the --
17      A.   The Graduate Association of Musicologists and
18  Theorists.
19      Q.   Okay.  So, you said that you said it should be
20  a theorist?
21      A.   I said it should be a theorist, and I think
22  somebody said, maybe it should be Rachel, as I was vice
23  president of GAMuT and within the student society,
24  supposedly the highest ranking theorist, plus, I had a
25  Twitter account dedicated to academia.

14

1       Q.   Okay.  Were there other theorists involved in
2   developing this statement?
3       A.   Yes.
4       Q.   Okay.  Who were they?
5       A.   I believe Bryan Stevens was one of the editors.
6       Q.   Okay.
7       A.   And -- sorry, I'm trying to remember who's a
8   theorist and who's a musicologist in our division.
9   Right this second, he's the only name that comes to
10  mind, but there may have been more theorists.
11      Q.   Okay.  There may have been more theorists, you
12  said?
13      A.   Yes.
14      Q.   Okay.  And did you share it on any platforms
15  other than Twitter?
16      A.   I don't think I did, unless I perhaps linked a
17  link to that perhaps in a Facebook message or an e-mail.
18      Q.   Okay.
19      A.   I'm not certain.
20      Q.   Okay.  When you were producing documents to
21  counsel for this deposition, did you look through
22  Facebook and e-mail and other relevant platforms to see
23  if you had anything responsive?
24      A.   Yes.
25      Q.   Okay.  So, the petition opposes the platforming

15

1   of, quote, "racist sentiments in JSS Volume 12."  Can
2   you tell me, specifically, what sentiments you believe
3   were racist in the volume?
4       A.   Yes.  There were a few.  I think, primarily,
5   the racist stereotype that because Dr. Ewell is black,
6   he is probably anti-Semitic, as well.  There is also the
7   extended footnote about how hip hop is misogynistic,
8   despite having relevance to the paper.  There may have
9   been something else, but without the document in front
10  of me, I wouldn't be able to say.
11      Q.   Okay.  And how would you define "racist"?
12      A.   I think there's a lot of definitions which are
13  equally valid.  One would be believing that one group is
14  superior over another or that people have
15  characteristics based on their race and that the
16  characteristics of one race might be better than the
17  characteristics of another race, and there's also
18  systemic racism.
19      Q.   And how would you define "systemic racism"?
20      A.   Systemic racism would be the structures the
21  privileged white people have over people of color.
22      Q.   And you mentioned that one of the things that
23  was racist was a statement that there is misogyny in hip
24  hop music.  Do you believe that there is misogyny in hip
25  hop music?

16

1       A.   I believe there's misogyny in a lot of music.
2       Q.   Okay.  But do you believe there's misogyny in
3   hip hop music?
4       A.   I'd have to listen to some hip hop music to
5   tell you, but it seems likely.
6       Q.   Okay.  So, you've never listened to hip hop
7   music?
8       A.   I have, but I'm very bad at interpreting lyrics
9   when I listen to songs.
10      Q.   So, to the best of your knowledge, you have
11  never heard any hip hop lyrics that you would deem
12  misogynistic?
13      A.   I probably have, but I can't recall specific
14  examples.
15      Q.   Okay.  And do you believe that Ewell's
16  criticisms of Heinrich Schenker could have been
17  motivated by anti-Semitism?
18      A.   No.
19      Q.   No.  Okay.  And what's the basis for that
20  belief?
21      A.   I don't believe that Ewell is anti-Semitic, and
22  I believe that the criticisms that he made don't refer
23  or rest on the race of Heinrich Schenker.
24      Q.   So, you don't necessarily believe that
25  criticizing someone who happens to be a member of a

*Rachel Gain    5/19/21*

17

1  specific group indicates a prejudice against that group.

2      A.  Could you repeat the question, please?

3      Q.  So, what you're saying is, you know, the fact

4  that Philip Ewell is criticizing Heinrich Schenker, who

5  is Jewish, does not imply that his criticism was

6  motivated by anti-Semitism.

7      A.  I think, in his case, it did not, but sometimes

8  people will make criticisms of a person in a group that

9  are based on racist stereotypes and racism.

10     Q.  And how would you distinguish that?  You know,

11  if a white person were to criticize the paper of a black

12  person, would you assume that to be motivated by racism?

13         MR. BOHUSLAV:  Objection, compound.

14     A.  I think it depends on case by case basis.

15     Q.  (By Ms. Harris)  Okay.  And so, what led you to

16  believe, specifically, that Dr. Jackson's criticism of

17  Ewell's paper was based on racism?

18     A.  Because made ad hominem attacks the --

19  stereotyped the beliefs that on paper Dr. Jackson seems

20  to believe that Dr. Ewell had based solely on his race.

21     Q.  Say that again.  I'm sorry.

22     A.  Which part?

23     Q.  Oh, he made criticisms that seemed to -- or can

24  you read that back to me?

25         (THE RECORD WAS READ BACK.)

*Rachel Gain    5/19/21*

18

1      Q.  (By Ms. Harris)  Can you rephrase that?  I

2  don't think I understand what you meant by that.

3      A.  Yes.  Because there is a section of what Dr.

4  Jackson published in which his sole accusation and his

5  sole piece of evidence for Dr. Ewell being an

6  anti-Semite is that he is black.

7      Q.  Okay.  Thank you.  So, do you believe that all

8  racist speech should be censored?

9      A.  No.

10     Q.  Okay.  So, what do you -- where do you draw

11  that line?  Because, obviously, you know, this petition,

12  as we'll discuss, calls for the -- you know, the journal

13  to be -- the article to be retracted.  What do you

14  believe justifies censorship?

15     A.  I reject to that characterization.  We

16  specifically did not ask for it to be retracted.

17     Q.  Okay.  All right.  So, the first thing you did

18  ask for here was that the university publicly condemn

19  the issue and release it freely online to the public,

20  yes?

21     A.  Yes.

22     Q.  Okay.  And the reason you cited for that was a

23  lack of peer review, publication of an anonymous

24  response, and a lack of rigor, yes?

25     A.  Yes.

*Rachel Gain    5/19/21*

19

1      Q.  But what you asked for was that the university

2  release an apology for its content.

3      A.  Yes.

4      Q.  Okay.  So, I'm just a little bit confused there

5  because, you know, if you were upset about the

6  procedure, why did you ask for an apology, not for the

7  procedure but for the content?

8      A.  Because it was the content that was offensive,

9  not the procedure.

10     Q.  Okay.  So, is it fair to say that if you hadn't

11  been upset by the content of the issue, you would not

12  have issued a condemnation of the process?

13     A.  I don't think we'd known about the process or

14  asked about it.  In general, we don't care about what

15  happens at the Journal of Schenkerian Studies, if there

16  isn't a reason given to us to care about it.

17     Q.  Okay.  So, would it be fair to say, then, that

18  your main issue with Volume 12 of the JSS was the

19  content and not the process?

20     A.  No, I'd say it was both.

21     Q.  Okay.  But you just said that it was the

22  content that --

23         MR. HARRIS:  Can you repeat back to me --

24  when I asked -- you were upset about the procedure, but

25  you wanted an apology for the content.  Could you read

*Rachel Gain    5/19/21*

20

1  me back that answer?

2         (THE RECORD WAS READ BACK.)

3      Q.  (By Ms. Harris)  So, you said it was the

4  content that was offensive, not the procedure, but it's

5  not fair to characterize that as saying that your

6  primary issue was with the content?

7         MR. BOHUSLAV:  Objection, vague.  You can

8  answer.

9      A.  Like I said, the content of the journal was

10  offensive, but that doesn't mean that the rest -- the

11  process was not problematic or flawed or other

12  adjectives.  I mean --

13     Q.  Okay.  So, if the process had not been

14  concerning to you, would you have wanted there to be any

15  disciplinary action taken because of the content?

16     A.  I'd have to speculate.  I mean, I don't know.

17  That situation did not arise.

18     Q.  Okay.  You also want the journal released

19  freely online to the public, because you expressed in

20  this petition a concern that the JSS leadership was

21  going to hide the issue.  Did you have any concrete

22  reason to believe they were looking to hide the issue?

23     A.  That's a mischaracterization.  I don't believe

24  we said the JSS leadership were going to hide it, to the

25  best of my memory.

Rachel Gain    5/19/21

33

1  negative experiences with him based on their race and
2  nationality.
3      Q.   Okay.  So, when this statement says, "past
4  bigoted behaviors," it's referring specifically to Dr.
5  Jackson's treatment of Koreans?
6      A.   No.
7      Q.   Okay.  Then, what is it referring to?
8      A.   A lot of incidents experienced by a lot of
9  people.
10     Q.   Okay.  Such as what you mentioned, the incident
11 with some Korean students.  What other incidents?
12     A.   I've heard from an African -- well, I've heard
13 third-hand of an African-American student who was
14 treated poorly.
15     Q.   Do you know in what way they were allegedly
16 treated poorly?
17     A.   No.
18     Q.   So, you've heard third-hand --
19     A.   Yes.
20     Q.   -- that Dr. Jackson allegedly treated an
21 African-American student poorly, but don't know how.
22     A.   That's one example, but I believe those reports
23 are available.
24     Q.   And going back to the Korean students, you
25 would not say that his treatment of Korean students

Rachel Gain    5/19/21

34

1  falls under the past bigoted behaviors?
2      A.   I believe I found out about that incident after
3  this.  So, this, specifically, does not refer to that,
4  but this is an incident that would fall under that
5  category.
6      Q.   Okay.  So, to the best of your knowledge, the
7  past bigoted behaviors referred to in this report, is a
8  third-hand report of an African-American student who was
9  treated poorly?
10     A.   No.
11     Q.   Can you tell me what it does refer to?
12     A.   If you stop interrupting me, then yes, sorry.
13          MR. ALLEN:  Let's take a break.
14          MS. HARRIS:  Okay.  Would you like a
15 break?
16          THE WITNESS:  I guess.
17          MR. BOHUSLAV:  Let's take a break.
18          (OFF THE RECORD FROM 1:50 TO 1:59 P.M.)
19     Q.   (By Ms. Harris)  So, we just want to sort of
20 circle back and close the loop on these -- the request
21 to investigate past bigoted behaviors by faculty.
22          You had mentioned that you had heard that
23 Dr. Jackson treated some Korean students poorly, but
24 that you had not heard about that at the time, so that
25 this is not -- that was not when you were endorsing the

Rachel Gain    5/19/21

35

1  statement part of what you meant?
2      A.   Yes.
3      Q.   Okay.  But that you had heard third-hand that
4  he once treated an African-American student poorly in an
5  unspecified way?
6      A.   That was also after the fact.  That was not
7  what I was referring to in this statement.
8      Q.   Okay.  So, what were you referring to in this
9  statement?
10     A.   There have been allegations of sexist behavior,
11 for example.
12     Q.   Okay.  By Dr. Jackson, specifically?
13     A.   Yes.
14     Q.   Okay.  Such as what?
15     A.   There was an incident with Dr. Notley, I
16 believe, at -- this was before I was at UNT, so, again,
17 this is secondhand, and this is the best memory I have
18 of what I was told.  At Dr. Graf's defense of his
19 dissertation proposal, a few professors disagreed with
20 part of the proposal, and of all the people that
21 disagreed, Dr. Jackson specifically verbally attacked
22 Dr. Notley, saying that she didn't understand -- it was
23 either music theory or music analysis that she didn't
24 understand, which seemed unfounded seeing as she taught
25 music theory at Yale.

Rachel Gain    5/19/21

36

1      Q.   Okay.  And so you believe that this alleged
2  verbal attack was because she was a woman?
3      A.   Well, he didn't attack any of the men in the
4  room who held the exact same belief.
5      Q.   Okay.  And, again, you heard about this
6  secondhand, you said?
7      A.   Yes.  From several people.
8      Q.   From several people.  So, when you were
9  endorsing this request for an investigation of past
10 bigoted behaviors, this is what you specifically were
11 thinking of?
12     A.   That's one thing.
13     Q.   Okay.  What else?
14     A.   There is the incident with Yiyi Gao, where I've
15 heard that allegedly Dr. Jackson told her that she had
16 to work for free over summer or he would dock her
17 grades.
18     Q.   Okay.  Do you believe that if a student did not
19 complete the work that they are supposed to complete
20 during the academic year, that it would be reasonable
21 for a faculty member to request that they complete that
22 work over the summer?
23     A.   Well, that would go against the terms of her
24 international student visa.
25     Q.   What are the terms of her international student

Rachel Gain    5/19/21

37

1  visa?

2       A.    That you work 20 hours a week during term time,

3  and if she wasn't employed over the summer, she couldn't

4  do that work, I believe.  I'm not entirely 100 percent

5  solid on all H1-B's requirements, but it seems like that

6  would be something that she couldn't do, seeing as we're

7  employed during a semester to do our work and not during

8  the summer.

9       Q.    And what is it about, as for a dispute over the

10 completion of work, that you believe is bigoted?

11      A.    Well, I don't -- that's not how I would

12 characterize that.

13      Q.    Did you not just say that that was another

14 example of past bigoted behavior?

15      A.    Well, I didn't say that it was a dispute over

16 the completion of work.  That's not my words or --

17      Q.    All right.  How would you characterize that,

18 then?

19      A.    I'd characterize it as Yiyi was told that she

20 needed to work over summer for free and that Dr. Jackson

21 took credit for her work, is what I heard.

22      Q.    Okay.  Who have you heard that from?

23      A.    Yiyi, Bryan Stevens, and David Falterman.

24      Q.    Okay.

25      A.    "David" spelled like David.

---

Rachel Gain    5/19/21

38

1       Q.    Okay.  Now, going back to this first iteration

2  of the graduate student statement, you also -- the

3  statement also says that "the actions of Dr. Jackson,

4  both past and present, are particularly racist and

5  unacceptable."

6             Now, you've spoken about some incidents

7  that you believe reflect sexism.  Can you tell me what

8  past incidents, specifically, you believe were racist?

9       A.    Well, Yiyi is Chinese, so that incident.

10      Q.    Okay.  So, you believe that because he had some

11 sort of issue with someone Chinese that that means that

12 it was racist?

13      A.    I wouldn't characterize it like that.

14      Q.    How would you characterize it?

15      A.    Well, I don't know, specifically, if that

16 incident was racist, but it seems likely, given what

17 I've heard.  And also, there have been the other past

18 racist incidents that I've mentioned.

19      Q.    What have you heard that make its likely --

20 that makes you believe it is likely that that incident

21 was racist?

22      A.    I don't know how to put a finger on it.  I

23 wouldn't like to speculate.

24      Q.    I'd like you to speculate.

25             MR. BOHUSLAV:  Objection, calls for

---

Rachel Gain    5/19/21

39

1  speculation.

2       Q.    (By Ms. Harris)  There's no prohibition on

3  speculating.  The Court may or may not decide to use it.

4  But since you are characterizing this incident as

5  racist, I would assume you have some reason for doing

6  so.  I mean, you've clearly speculated in your own mind

7  and come to the conclusion that this was likely racist,

8  so I would like to understand your thinking.

9       A.    I can't be certain that it's racist, but it

10 seems likely.

11      Q.    Why does it seem likely?

12      A.    Because he hasn't done this to people who are

13 white as much.

14      Q.    So, are you aware of people who are white who

15 he has worked with who have had issues with him?

16      A.    Yes, Dr. Jackson has -- Dr. Notley is white.

17      Q.    Okay.  So, what is your basis for believing

18 that he has not done this as frequently to people who

19 are white?

20      A.    I'm not sure if that's what I said.

21      Q.    Can you read back when I asked what makes

22 you -- the most recent time that I asked, "why do you

23 believe this was racist?"  Where she said, "because he

24 hasn't done this to white people"?

25             (THE RECORD WAS READ BACK.)

---

Rachel Gain    5/19/21

40

1       Q.    (By Ms. Harris)  Yes.  So I'm asking what's

2  your basis for that belief?

3       A.    Well, based on the incidents that I've heard,

4  I've heard of a few white people and a large number of

5  people of color.

6       Q.    Okay.  So, a large number of people of color.

7       A.    Larger.

8       Q.    So, we have the one African-American student,

9  we have several Korean students, allegedly.

10 Incidentally, are you aware that Dr. Jackson's wife is

11 Korean?

12      A.    I knew that she was Asian.  I did not know,

13 specifically, that she is Korean.

14      Q.    And are you aware that he has two children who

15 are half Korean?

16      A.    No.

17      Q.    So, we have the several Korean students, we

18 have one African-American student, and we have Yiyi.

19 What other incidents?  You said a large number.

20      A.    I said "larger".

21      Q.    Okay.

22      A.    Not "large".

23      Q.    Okay.  So, are those all of the incidents that

24 you are aware of?

25      A.    Those are the ones that come to mind, and as is

---

Rachel Gain    5/19/21

41

1  hopefully evident, I'm not the only author of this
2  statement, and other people may have been aware of other
3  incidents.
4      Q.    But you've endorsed this statement.
5      A.    Yes, because I trust my colleagues.
6      Q.    Okay.  This document also refers to
7  whistleblowers.  Who are the whistleblowers that this
8  document is referring to?
9      A.    Levi Walls.
10     Q.    Levi Walls.  And it talks about the people who
11 failed to heed them.  Who is it who allegedly failed to
12 heed the statements of the whistleblowers?
13     A.    Dr. Brand.
14     Q.    Dr. Brand.  Okay.  And when you say -- so,
15 whistleblowers, plural, refers only to Levi Walls?
16     A.    Yes, I believe it's a general use of the term
17 in plural, not specifically saying that it's more than
18 one person.
19     Q.    Okay.  So, now, I would like to return back to
20 the second version of the graduate student statement,
21 the one that was sent to Dean Richmond on July 30th, and
22 which you should have -- yeah, there, as Exhibit 34.
23     A.    Thank you.
24     Q.    So, I noticed that a lot of the language in
25 this has been changed and sort of strengthened since the

Rachel Gain    5/19/21

42

1  July 27th version that you tweeted.  So, how were those
2  changes made?
3      A.    Well, it's a different statement.
4      Q.    Okay.  So, how was this statement prepared?
5      A.    I believe, to the best of my memory, on another
6  Zoom call with a Cloud document.
7      Q.    And were you a part of that Zoom call?
8      A.    To the best of my memory, yes.
9      Q.    Okay.  Do you remember if there was one call or
10 more than one call?
11     A.    I can't remember.
12     Q.    Okay.  So, this document refers to ad hominem
13 attacks on Philip Ewell.
14     A.    Yes.
15     Q.    Can you give me some examples of what you
16 believe to be ad hominem attacks?
17     A.    Same as anti-Semitic.
18     Q.    Okay.  And you -- am I correct that you said
19 before that you believe it was racist that Dr. Jackson
20 accused Philip Ewell of anti-Semitism because Philip
21 Ewell is black?
22              MR. BOHUSLAV:  Objection, misstates
23 testimony.
24              MS. HARRIS:  Objection, what?
25              MR. BOHUSLAV:  Misstates the testimony.

Rachel Gain    5/19/21

43

1      A.    I didn't say that.  I said that it was because
2  it was based on a racist stereotype that black people
3  are anti-Semitic.
4      Q.    (By Ms. Harris)  Understood.  So, that was --
5  that's the ad hominem attack that you're referring to?
6      A.    I believe so.
7      Q.    Okay.  You also -- this statement also
8  criticizes the fact that the call for papers gave a two-
9  week deadline for responses.  What would be the normal
10 time for a -- length of time for responses in a
11 symposium like this?
12     A.    I don't know, but I would assume longer than
13 two weeks, seeing as you'd have to write an article from
14 scratch and do all the research and writing and
15 finalizing it in a two-week period.
16     Q.    Okay.  So, you don't know, but you would
17 assume.
18     A.    Yes.
19     Q.    Okay.  And, again, going back to this question
20 of the deadlines being selectively enforced, I'd like to
21 know what this means.
22     A.    That was something that my colleagues wrote, I
23 believe.
24     Q.    Okay.  So, do you have any knowledge of whether
25 or not deadlines were selectively enforced?

Rachel Gain    5/19/21

44

1      A.    I could speculate based on a vague memory that
2  I have.
3      Q.    Okay.  Tell me.
4      A.    I have a vague memory of someone telling me
5  that the anti-Ewell responses were allowed later than
6  the deadline.
7      Q.    Okay.  Do you remember who told you this?
8      A.    No.
9      Q.    Okay.  This document also refers to "illicit
10 collaboration".  Can you tell me what the graduate
11 students here, including yourself, meant by "illicit
12 collaboration"?
13     A.    I did not write that sentence, I don't believe,
14 that doesn't sound like something I would write, but I
15 believe that it refers to the fact that the anti-Ewell
16 papers all cite to each other, and, therefore, they must
17 have been privy to what each other were writing.
18     Q.    Okay.  And would that be -- that would be, in
19 your view, illegitimate for academics to share papers
20 with one another prior to publication?
21     A.    No, not at all, but I believe what my
22 colleagues are referring to here is probably the fact
23 that it only happens between people actually against Dr.
24 Ewell rather than for him.
25     Q.    Okay.  But you have no personal knowledge of

1    correct?

2        A.    Yes.

3        Q.    Okay.  The petitions also refer to the past

4    bigoted behaviors of UNT faculty.

5        A.    Yes.

6        Q.    And you've testified today that you don't have

7    any firsthand knowledge of past bigoted behaviors by UNT

8    faculty.

9        A.    Yes.

10       Q.    Okay.  And this also referred to past racist

11   actions of Dr. Jackson, yes?

12       A.    Could you show me where in the document it says

13   that?

14       Q.    Sure.  It's under -- it is the July 27th

15   petition that's marked Exhibit 3 at the top.  Yeah.

16   That one.

17       A.    Okay.

18       Q.    Says, "Dr. Jackson's actions, both past and

19   present, are racist and unacceptable."  So, is it fair

20   to say that you don't have firsthand knowledge of any

21   past racist actions by Dr. Jackson?

22       A.    Well, seeing as I've never been in the same --

23   or I've never been in a conversation with him, that

24   would follow, yes.

25       Q.    Okay.  And in the July 30th version of the

1    statement, Dr. Jackson is accused of extortion, correct?

2        A.    Where is this?

3        Q.    It is on Kohanski 000109, No. 3 under "Calling

4    for Dr. Jackson's Dismissal.  Extortion through grade

5    manipulation and threats to students' careers and

6    reputations."

7        A.    It does say that.

8        Q.    Okay.  And is it fair to say that you have no

9    firsthand knowledge of any extortion by Dr. Jackson?

10       A.    Yes.  I wasn't in the country at the time.

11       Q.    Okay.  But you did sign your name to a

12   statement asking that Dr. Jackson be fired for all of

13   these reasons, yes?

14       A.    Where does it say that he should be fired?

15       Q.    "Calling for Dr. Jackson's Dismissal.  Dr.

16   Jackson should be removed from the UNT faculty."

17       A.    Yes.  I signed a statement saying that it was

18   our opinion that he should be fired.

19       Q.    Okay.

20       A.    Or dismissed, in the words of the statement.

21       Q.    Okay.  And other than his article in the

22   journal, which you have said you've read, would it be

23   fair to say that you called for his termination with no

24   firsthand knowledge of any of the behaviors specified in

25   this petition?

1        A.    Yes.

2              MS. HARRIS:  Okay.  Thanks.  That's all.

3              THE WITNESS:  Okay.  Thank you.

4              MS. HARRIS:  Do you have any --

5              MR. BOHUSLAV:  No.  We'll reserve

6    questions for time of trial.

7              (DEPOSITION ADJOURNED AT 2:49 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION

3    TIMOTHY JACKSON,            )
                                 )
4         Plaintiff,             )
                                 ) Case No.
5    v.                          )
                                 ) 4:21-cv-00033-ALM
6    LAURA WRIGHT, et al,        )
                                 )
7         Defendants.            )

8

9         ----------------------------------

10             DEPOSITION CERTIFICATE
11                   RACHEL GAIN
12                  MAY 19, 2021
13        ----------------------------------

14

15       I, Nita G. Cullen, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18       That the witness, RACHEL GAIN, was duly sworn

19   by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by the

21   witness;

22       I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24       ___ was requested by the deponent or a

25   party before the completion of the deposition and is to

Rachel Gain        5/19/21                    61

1   be returned within 30 days from date of receipt of the
2   transcript. If returned, the attached Changes and
3   Signature Page contains any changes and the reasons
4   therefor;
5         X  was not requested by the deponent or a
6   party before the completion of the deposition.
7       I further certify that I am neither attorney or
8   counsel for, nor related to or employed by, any of the
9   parties or attorneys to the action in which this
10   deposition was taken.
11       Further, I am not a relative or employee of any
12   attorney of record in this case, nor am I financially
13   interested in the outcome of the action.
14      Subscribed and sworn to on this 15th day of
15   June, 2021.
16
17      _____
18      NITA G. CULLEN, Texas CSR #1563
        Expiration Date: 08-31-2022
        JULIA WHALEY & ASSOCIATES
19      Firm Registration No. 436
         2012 Vista Crest Drive
20      Carrollton, Texas 75007-1640
        214.668.5578
21
22
23
24
25

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24    1

```
 1               UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF
 2                  SHERMAN DIVISION

 3  TIMOTHY JACKSON,        )
                           )
 4      Plaintiff,          )
                           )
 5  vs.                     )  CASE NO. 4:21-CV-00033-ALM
                           )
 6  LAURA WRIGHT, et al.,   )
                           )
 7      Defendants.         )
 8  *********************************************

 9      VIDEOTAPED ZOOM ORAL DEPOSITION OF

10       REBECCA GEOFFROY-SCHWINDEN, Ph.D.

11              September 27, 2024

12              (Reported Remotely)

13  *********************************************

14      VIDEOTAPED ORAL DEPOSITION OF REBECCA GEOFFROY-

15  SCHWINDEN, Ph.D., produced as a witness at the instance

16  of the plaintiff and duly sworn, was taken in the

17  above-styled and -numbered cause on the 27th day of

18  September, 2024, from 1:33 p.m. to 4:38 p.m., before

19  Kim D. Carrell, Certified Shorthand Reporter in and for

20  the State of Texas, reported remotely by computerized

21  stenotype machine at the University of North Texas

22  System, 801 North Texas Boulevard, Gateway Suite #308,

23  Denton, Texas, pursuant to the Federal Rules of Civil

24  Procedure and the provisions stated on the record or

25  attached hereto.
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24    2

```
 1                  APPEARANCES

 2  FOR THE PLAINTIFF:

 3      Mr. Michael Thad Allen
        ALLEN LAW, LLC
 4      P.O. Box 404
        Quaker Hill, CT 06375
 5      Telephone: 860.772.4738 - Fax: 860.469.2783
        E-mail: M.allen@allen-lawfirm.com

 6

 7  FOR THE DEFENDANTS:

 8      Ms. Mary Quimby
        Assistant Attorney General
 9      General Litigation Division
        P.O. Box 12548, Capital Station
10      Austin, Texas 78711
        Telephone: 512.463.2120 - Fax: 512.320.0667
11      E-mail: Mary.Quimby@oag.texas.gov

12           - and -

13      Mr. Renaldo Stowers   (Appearing Live)
        University of North Texas System
14      Office of General Counsel
        801 North Texas Boulevard
15      Denton, Texas 76201
        Telephone: 940.565.2717 - Fax: 940.369.7026
16      E-mail: Renaldo.Stowers@untsystem.edu

17

18  ALSO PRESENT:

19      Mr. Timothy Jackson, Plaintiff

20

    VIDEOGRAPHER:
21
        Mr. Jason Warner
22      Legal Video Group
        lvg.dallas@gmail.com
23      214-598-5229

24

25
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24    3

```
 1                    I N D E X

 2                                               PAGE

 3  Appearances.................................   2

 4  Exhibit index...............................   4

 5  Stipulations................................   5

 6  REBECCA GEOFFROY-SCHWINDEN, Ph.D.

 7      Direct Examination by Mr. Allen..........   6

 8

 9

10  Changes and Signature Pages.....................  124

11  Reporter's Certificate..........................  126

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24    4

```
 1                    EXHIBITS

 2  NUMBER          DESCRIPTION              MARKED

 3  Exhibit 1   Re-Notice of Taking Deposition........    7

 4  Exhibit 2   Emails Re: Grad Student Statement on
                JSS (UNT 000355 - 000356)............   53
 5
    Exhibit 3   Ad Hoc Review Panel Report (Exhibit D)
 6              (JACKSON000208 - 000233)..............   66
 7
    Exhibit 4   Email Chain Ending 7-30-20, Ragland to
 8              Geoffroy-Schwinden, et al.
                (UNT 000276 - 000288)................   72
 9
    Exhibit 5   Email Re: Faculty Statement on Journal
10              of Schenkerian Studies, 7-30-20
                (UNT 000425)........................   78
11
    Exhibit 6   Emails Re: Journal of Schenkerian
12              Studies, 7-29-20
                (UNT 000377 - 000378)................   82
13
    Exhibit 7   Email, 7-30-20, Geoffroy-Schwinden to
14              Brand (UNT 000417)...................   86
15  Exhibit 8   Drafts of the Faculty Statement
                (UNT 000427 - 000431)................   90
16
    Exhibit 9   Students' Statement Linked to Draft
17              Faculty Statement....................   97
18
19
20
21
22
23
24
25
```

APPX.066

65

1    Is it at all controversial in music history
2  that hip-hop originated as an African American musical
3  art form?
4        A.    I don't know.
5        Q.    And is it at all controversial in the history
6  of music as you understand it, that rap originated as an
7  African American art form?
8        A.    I don't know.
9        Q.    And you claim to be a historian of music,
10 right?
11             MS. QUIMBY:  Objection, form.
12       A.    Of Eighteenth-Century music, so like Bach to
13 Beethoven, like 1700 to 1804.  But my current book goes
14 up to 1820.
15       Q.    I understand.  So you just have no knowledge
16 of, say, Twentieth-Century musical art forms in the
17 United States?
18       A.    Not on the level of detail that I would feel
19 comfortable talking about in like an expert kind of way.
20 I mean, I could teach some things, but I -- no, hum-um.
21       Q.    Uh-hum.
22       A.    I stick to my expertise.
23             (Deposition Exhibit Number 3 marked.)
24             MR. ALLEN:  I'm going to introduce as
25 Exhibit 3.  This is a report.  I'm just going to

66

1  represent to you that this is a report that came out in
2  November of 2020.  It was called the Ad Hoc Panel Report
3  about the Journal of Schenkerian Studies.  It has this
4  Exhibit D and these -- this string of gobbledygook at
5  the top because it's been marked by the United States
6  District Court of the Eastern District of Texas.
7        This is the first page because it's been
8  introduced in court, but this is the actual title page to
9  the Ad Hoc Panel Report.
10       Q.    Do you recognize this at all?
11       A.    Not really.
12       Q.    Okay.  And I don't -- do you remember reading
13 the Ad Hoc Panel Report that came out in November of 2020
14 about the Journal of Schenkerian Studies?
15       A.    I didn't read it.
16       Q.    Okay.  So there are various attachments
17 to the report at the end.  And I just want to call your
18 attention to this one.  One thing that's attached is
19 the statement of UNT faculty on Journal of Schenkerian
20 Studies.  Do you see that?  This is captioned in this
21 Exhibit 3 here.
22       A.    Exhibit 4?
23       Q.    Yes.  There's a little bit of confusion.
24       A.    Okay.
25       Q.    And you're right to point this out.

67

1        A.    Okay.
2        Q.    So this -- these are -- there are several
3  documents attached to the Ad Hoc Panel Report as
4  exhibits.
5        A.    Okay.
6        Q.    I'm introducing the whole thing as an exhibit
7  for the record as Exhibit 3.
8        A.    Oh, okay, okay.
9        Q.    Just to keep everything in one place.
10       A.    Got it.
11       Q.    I'll just tell you, this is an exhibit that's
12 been used in other depositions, so I'm trying to keep
13 things consistent.
14       A.    Okay.
15       Q.    One of the exhibits -- and you're perfectly
16 correct.  There's an Exhibit 1, 2, 3, and so on, to the
17 Ad Hoc Panel Report.  And one of those exhibits is,
18 indeed, marked Exhibit 4 to the Ad Hoc Panel Report.
19       "News from SEM:  General News, Statement of
20 UNT Faculty on Journal of Schenkerian Studies."
21       Did I read that correctly?
22       A.    Yes.
23       Q.    And I believe your name is affixed to this
24 statement, right?
25       A.    Yes.

68

1        Q.    Do you recognize this statement?
2        A.    Yes.
3        Q.    How -- let me strike that.
4        Explain what role you played in generating
5  this statement of the UNT faculty.
6             MS. QUIMBY:  Objection, form.
7        A.    You know, co-wrote it with colleagues.
8        Q.    And you co-wrote it with colleagues in this end
9  of July time frame?
10       A.    I guess so, yeah.  Yes.
11       Q.    About how long did it take to generate the
12 drafts to the finished product?
13       A.    Well, if memory serves, at least several days.
14 It could have been as much as a week or so.
15       Q.    Okay.
16       A.    Several days, I guess.
17       Q.    Um-hum.  And do you recognize the other people
18 who have signed this document?
19       A.    Yes.
20       Q.    They're all colleagues of yours in the MHTE
21 program, right?
22       A.    They were at the time.  Some of them are no
23 longer there.
24       Q.    Okay.
25       A.    Yeah.

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

77

1    A.    Yeah, like he's the person we go to with
2  issues, so we don't bother the Dean.  So he's just below
3  the Dean.
4    Q.    If you would make that a title, I would think
5  it should be entered into national law.
6    A.    Yeah.
7    Q.    But we'll have to go with that.
8          And John, does this refer to John Richmond?
9    A.    Yeah.  I believe so, yeah.
10   Q.    Okay.  And do you have any memory of what
11 policy of the University of North Texas this comes from?
12   A.    I don't.  And so I guess I said Andrew and
13 Gillian provided it, so I don't know if they would
14 remember which like handbook or something it was pulled
15 from.
16   Q.    Sure, um-hum.  But it was definitely, as you
17 sit here today in your memory, as you remember things
18 today, an official policy of the University that you
19 were relying on there, right?
20   A.    I can't say that I remember that today.
21   Q.    Okay.
22   A.    But I can read the email that's up here and
23 that it was from me.
24         MR. ALLEN:  I'm going to introduce for the
25 record as Exhibit 5 one additional email, which I'm also

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

78

1  going to drop in the chat.  Exhibit 5 is captioned
2  Faculty Statement on Journal of Schenkerian Studies.
3         (Deposition Exhibit Number 5 marked.)
4    Q.    Did I read that correctly?
5    A.    Yep.
6    Q.    And this is sent from you to Dean Richmond on
7  July 30th, 2020?
8    A.    Yes.
9    Q.    And you write to Dean Richmond, "Thank you
10 for taking the time to speak with me yesterday and for
11 understanding our need to speak as individual faculty
12 members to our respective disciplines.  I want to ask
13 explicitly whether our statement will violate UNT
14 Policy 06.035."
15         Did I read that right?
16   A.    Yep.
17   Q.    And what is UNT Policy 06.035?
18   A.    I don't remember.  I don't know the title of it
19 off the top of my head.
20   Q.    And is this the same policy language that
21 you had quoted in the email thread that we looked at as
22 Exhibit 4?
23   A.    Could you toggle back?  Let me just read this
24 here.
25   Q.    Oh, absolutely.

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

79

1    A.    Can you go back to the previous?
2    Q.    Yep.  Here is Exhibit 4.
3    A.    It looks the same.  It looks similar, yeah.
4    Q.    And again, I'm not -- if there's a typo or
5  something, I'm not asking about that.  But its origin
6  is from that same policy; is that accurate?
7    A.    I'm not sure, because the policy number isn't
8  in the -- I don't know where Gillian and Andrew pulled
9  the policy language.
10   Q.    Okay.
11   A.    And they didn't -- the policy number wasn't
12 in that previous email.  So like I don't know if it's
13 from like two different handbooks or -- I'm not sure on
14 the policy number.
15   Q.    Okay.  And do you know what Dean Richmond's
16 response was to this?
17   A.    I don't.  I don't even know if he responded.
18   Q.    Okay.  You remember that there were no
19 consequences to you personally for publishing the
20 faculty statement, right?  Is that accurate?
21   A.    I -- you're saying that there were not personal
22 consequences to this statement?
23   Q.    Yes.
24   A.    I feel like there's a lot of personal
25 consequences.  I'm talking to you right now.

Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24

80

1    Q.    Well, you understand --
2    A.    I do understand.
3    Q.    -- the faculty statement attacked my client --
4    A.    No, it didn't.  It questioned the policies --
5    Q.    -- that resulted in the closure of the journal.
6    A.    -- around the journal.  You are
7  mischaracterizing that statement.
8    Q.    No, I am not.
9    A.    It doesn't mention Tim Jackson.
10   Q.    I am not, ma'am.
11   A.    Show me Tim Jackson's name.
12   Q.    You make the statement --
13   A.    Show me his name.
14   Q.    All right.  You make the statement -- are you
15 upset?
16   A.    You asked me something personal, so I responded
17 personally.  I was offended.
18   Q.    Do you think the attacks on my client were very
19 personal?
20   A.    I have no idea.  I wasn't part of those.
21   Q.    Did you ever ask my client if he felt
22 personally attacked?
23   A.    He won't -- he doesn't speak to me.
24   Q.    After you signed this statement, he doesn't
25 speak to you?

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

81

1    A.    He's never spoken to me since then.

2    Q.    Does that surprise you?

3    A.    I don't know.

4    Q.    You signed a statement incorporating the

5    students' statement which called for him to be fired,

6    right?

7    A.    It did not incorporate the students'

8    statement into our statement.

9    Q.    Did Timothy Jackson ever call for you to be

10    fired, Dr. Geoffroy-Schwinden?

11    A.    No.

12    Q.    Did he ever call for you to be investigated?

13    A.    Yes.  I mean, right here, right now, yes.  I am

14    being investigated by you with Tim right there.

15    Q.    Just to be clear, you're being sued for

16    defamation.  Is that clear with you?

17    A.    Yes.  Is that what?

18    Q.    For making false statements about my client.

19    That's what you're being sued for.

20    A.    I realize that that's what I'm being sued for,

21    but it didn't happen.

22    Q.    What didn't happen?

23    A.    I did not make false statements about your

24    client.

25    Q.    Were there consequences for you at the

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

82

1    University of North Texas from the administration for

2    signing the faculty statement?

3         MS. QUIMBY:  Objection, form.

4    A.    Like what kind of consequence?

5    Q.    Were you placed under investigation, like my

6    client was?

7         MS. QUIMBY:  Objection, form.

8    A.    I wasn't investigated for anything --

9    Q.    Thank you.

10    A.    -- that I'm aware of.

11    Q.    Good point.

12         MR. ALLEN:  All right.  I want to

13    introduce -- Madam Court Reporter, am I up to Exhibit 6?

14         THE REPORTER:  That's right.

15         (Deposition Exhibit Number 6 marked.)

16         MR. ALLEN:  I'm going to introduce as

17    Exhibit 6 into the record and also -- sorry about that --

18    drop into the chat an email of July 29th, 2020, captioned

19    Journal of Schenkerian Studies, Geoffroy-Schwinden to

20    Dean John Richmond.

21    Q.    Did I get the caption of the first email right?

22    A.    Sorry.  Re:  Journal of Schenkerian Studies,

23    yes.

24    Q.    Um-hum.  Here's the -- so just so you know,

25    there's nothing on the second page, just like that other

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

83

1    email we looked at.  This is the entirety of the message.

2    All right.  I'm just going to ask you to look at it.

3    It's relatively brief.  Let me know when you've had a

4    chance to look at it.

5    A.    Okay.

6    Q.    So you're arranging a meeting with Dean

7    Richmond on July 29th of 2020, right?

8    A.    A phone call, it looks like, maybe.

9    Q.    And did that -- did that phone meeting take

10    place?

11    A.    I did talk to him on the phone.

12    Q.    What did you guys talk about?

13         MS. QUIMBY:  Objection, form.

14    A.    I asked -- I wanted to talk to him, I think,

15    about the statement that we were working on.

16    Q.    Uh-huh.  And what did you tell him about the

17    statement you were working on?

18         MS. QUIMBY:  Objection, form.

19    A.    I don't remember -- I don't remember what

20    I told him.  I don't remember telling him anything

21    specific about it.

22    Q.    Um-hum.

23    A.    To be honest, I remember one -- I don't

24    remember what I said to him.  I guess I was calling

25    him because I just -- I don't know.  I was trying to --

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

84

1    Q.    Do you remember -- sorry, go ahead.

2    A.    No, I just -- I don't -- I don't remember

3    what I said to him.

4    Q.    Do you remember what he said to you?

5         MS. QUIMBY:  Objection, form.

6    A.    I remember -- I think I remember one thing he

7    said.

8    Q.    What did -- what did Dean John Richmond say

9    to you on July 29th in this meeting?

10         MS. QUIMBY:  Objection, form.

11    A.    I remember him saying, "Don't proscribe."

12    Q.    Don't proscribe what?  What did he mean by

13    that?

14    A.    I don't know, because that's what he said.

15    And you know how deans talk.  They usually say some

16    things, so that you don't know what they're saying, or

17    maybe you don't know.

18    Q.    Maybe that could be a title of a dean, as

19    well.

20    A.    Yeah.

21    Q.    Okay.  So as you sit here today, you have no

22    specific memory of what John Richmond said to you other

23    than he said, "Don't proscribe"?

24    A.    That's my only memory, like specific memory

25    from that conversation.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

85

1    (Zoom audio distortion)

2    Q.   Is that right?  I'm sorry.  Did you hear my

3    question?

4    A.   Oh, sorry.  No.

5    Q.   Yeah, I think the -- I think the internet

6    cut us out there.

7    I said you remember him saying, "Don't

8    proscribe."  But as you sit here today, you don't

9    remember what he specifically meant by that.  Is that

10   your testimony?

11   A.   I'm not -- I'm not sure exactly what he

12   meant by that.

13   Q.   Do you remember being not sure at the time in

14   July when he said that?

15   A.   Yeah.  I mean, like I said, I took it like

16   a kind of typical dean comment, where I'm like that

17   probably means like a lot of things.

18   Q.   Okay.

19        THE WITNESS:  Do you think we could take

20   another brief break?  Because it's been another hour

21   about.

22        MR. ALLEN:  Oh, sure.  I was -- I was just

23   going to go -- I'll tell you what.  Can I introduce one

24   more exhibit?  And then I think this will bring this

25   chapter to a close.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

86

1        THE WITNESS:  Okay.

2        MR. ALLEN:  And I don't think it will take

3    long.  Obviously, Professor Geoffroy-Schwinden, if it

4    gets too long in the tooth, I'll just call a break.

5    Okay?

6        THE WITNESS:  Okay.

7        MR. ALLEN:  But I think we can get through

8    this real quickly.

9    I'm going to mark for the record Exhibit 7,

10   which is very short.

11   (Deposition Exhibit Number 7 marked.)

12   Q.   It's an MHTE individual faculty statement.

13   Geoffroy-Schwinden to Benjamin Brand on July 30th, 2020.

14   Did I read that correctly?

15   A.   Yes, you did.

16   Q.   And it has the UNT Bates stamp number UNT 417.

17   And it has an attachment, which is not part of this

18   exhibit, Individual MHTE Faculty Response.

19   Did I read that correctly?

20   A.   Yes.

21   Q.   So my question for you is, is this the

22   finalized Individual MHTE Faculty Response addressing

23   the Journal of Schenkerian Studies that was sent to your

24   division head, Benjamin Brand, on this day?

25        MS. QUIMBY:  Objection, form.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

87

1    Q.   Is there something unclear about my question?

2        MR. ALLEN:  I don't know if -- I don't

3    know if I can hear her.  Can other people hear the

4    witness?

5        MS. QUIMBY:  I think she's just thinking.

6        MR. ALLEN:  Oh, okay.  I don't know what's

7    going on.  Should we just take a break, Mary?

8        MS. QUIMBY:  Can you -- okay.  Yeah, I

9    think we may just need to take a break.  I'm sorry.

10        MR. ALLEN:  It seems like another

11   technical difficulty.  So could we go off the record?

12        THE VIDEOGRAPHER:  Off the record at 3:32.

13   (Recess taken)

14        THE VIDEOGRAPHER:  On the record the 3:33.

15        MR. ALLEN:  Sorry.  Madam Court

16   Reporter, can you read the last question to the

17   witness?

18   Q.   And you may have answered, but we couldn't hear

19   your answer.

20   A.   That's okay.

21   Q.   BY THE REPORTER:

22   QUESTION:  So my question for you is,

23   is this the finalized Individual MHTE Faculty

24   Response addressing the Journal of Schenkerian

25   Studies that was sent to your division head,

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

88

1    Benjamin Brand, on this day?

2        MS. QUIMBY:  I renew my objection.

3    A.   And I said I didn't know if it was -- I don't

4    know if it's the finalized version.

5    Q.   You don't remember the document name you gave

6    to the final version?

7        MS. QUIMBY:  Objection, form.

8    A.   I don't remember the document name.

9    Q.   Okay.

10   A.   Like the file name.  I don't remember.

11   Q.   Yes.  If there was a file in your papers named

12   Individual MHTE Faculty Response that was the last in

13   time of four drafts, would that be the final faculty

14   statement?

15        MS. QUIMBY:  Objection, form.

16   A.   I don't know.  I don't remember how many

17   versions I had.  I don't remember how many versions, how

18   many I had, how many like other people had, how many

19   Steve Friedson had.  I'm not -- I just don't know based

20   on this email.

21   Q.   So I'm just trying to authenticate when this

22   statement was sent to your department or division head,

23   I suppose.  And I'm talking about in the form that we've

24   discussed embedded in Exhibit 3, which was the Ad Hoc

25   Panel Report.  So do you remember sending this to your

113

1  place in any publication, especially in an academic
2  journal."
3  **Q.**  Okay, right.  And so racist discourse, maybe we
4  can agree, that's relatively vague and general, right?
5  **A.**  What do you mean?  How is racist discourse --
6  **Q.**  I want to know.  What is the -- what is the
7  racist discourse that is the epistemic center of Volume
8  12 of the Journal of Schenkerian Studies?  Can you
9  identify that for me, please?
10  **A.**  I can't.  I don't have the journal issue in
11  front of me.
12  **Q.**  And you don't remember what you meant by that
13  at the time when you signed this statement?
14  **A.**  I don't understand what you're asking me for
15  here.  So -- but the epistemic center of the journal
16  issue lies in a racist discourse.  Okay.  So...
17  **Q.**  And then instead of saying as the one version
18  that preceded it had said, "We support our graduate
19  students," this statement now says, "We endorse the call
20  for action outlined in our student letter."  Right?
21  **A.**  That's what that clause says, yes.
22  **Q.**  And, again, there's the link to the students'
23  letter, correct?
24  **A.**  Yes.
25  **Q.**  So the faculty moved from supporting to

114

1  endorsing, correct?
2  **A.**  Not the letter.  I mean, what do you mean?
3  Like, yes, the word switched from support to endorse.
4  **Q.**  Okay.
5  **A.**  But there are other revisions in that
6  paragraph, it appears.
7  **Q.**  Then it says (as read) which asks the College
8  of Music publicly condemn -- ask that the public -- I'm
9  sorry.
10  **A.**  That's okay.
11  **Q.**  I'm going to read it from the top, just so we
12  get it cleanly into the record.
13      "We endorse the call for action outlined in
14  our students' letter" -- the URL follows -- "which asks
15  that the College of Music 'publicly condemn the issue and
16  release it freely online to the public' and 'provide a
17  full public account of the editorial and publication
18  process and its failures.'  Responsible parties must" --
19  be appropriately -- "be held appropriately accountable."
20      Did I read that correctly?
21  **A.**  Yeah, yeah.
22  **Q.**  On a third try?
23  **A.**  That's okay.  It's late and it's Friday.
24  **Q.**  Yes.  Thank you.
25      So is it your testimony then, as I'm

115

1  gathering, that you believe this limits the endorsement
2  of the letter?
3  **A.**  Yes.
4  **Q.**  How does it limit the endorsement of the
5  letter?
6  **A.**  I believe that that statement specifies what
7  part of the letter is endorsed.
8  **Q.**  Does it say which -- only that part which asks?
9  It doesn't say that, right?
10  **A.**  It says, "We endorse the call for action which
11  asks the College of Music to publicly condemn the issue
12  and release it freely online to the public and provide
13  a" -- public -- "full public account of the editorial
14  and publication process and its failures."
15  **Q.**  And it's your -- it's your testimony today that
16  this "which asks" limits the entire endorsement?
17  **A.**  Grammatically, it would appear so.
18  **Q.**  Well, grammatically, it would appear that it
19  doesn't say only that part which asks, right?  It doesn't
20  say only that part.
21  **A.**  "Only" does not appear in that paragraph.
22  **Q.**  Right.  And it doesn't say we partially
23  endorse, right?
24  **A.**  "Partially" does not appear in that paragraph.
25  **Q.**  Okay.  Do you recall any discussion among the

116

1  group of professors generating this statement about how
2  the group should limit its endorsement of the call for
3  action of the students?
4  **A.**  I don't remember.
5  **Q.**  I just want to go back now, and this will
6  probably be the last thing I need to talk about, the
7  famous Exhibit 3.
8  **A.**  Okay.
9  **Q.**  I just want -- I just want to walk us through
10  the student statement here.  So this is the student
11  statement, which we've discussed before.  What is the
12  call to action here?
13      MS. QUIMBY:  Objection, form.
14  **Q.**  Is that question unclear to you?
15      If we -- if we skip down to this statement, it
16  says, "We endorse the call for action outlined in our
17  students' letter."
18      Correct?
19  **A.**  Yep.  That's what that says.
20  **Q.**  And this is the student letter that was linked
21  to that statement, correct?
22  **A.**  Um-hum.
23  **Q.**  So my question is, what is the call to action
24  that is referred to in the faculty statement?
25      MS. QUIMBY:  Objection, form.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

117

1    **A.**   To publicly condemn the issue and release it
2    freely online to the public.
3    **Q.**   Um-hum.
4    **A.**   "Provide a full public account of the editorial
5    and publication process and its failures."
6         That's -- those are the ones outlined in the
7    faculty statement.
8    **Q.**   This statement also calls on the University
9    of North Texas and UNT College of Music to take other
10   actions, right?  It says so right here.  And I'm
11   referring to this sentence under paragraph enumerated
12   number 2 on JACKSON 0226.
13        It says, "We also call on the University of
14   North Texas and the UNT College of Music to take the
15   following actions:"
16        Right?
17   **A.**   It does say that, yes.
18   **Q.**   And one of those is to dissolve the journal,
19   right?
20   **A.**   It says dissolve the journal, yep.
21   **Q.**   Do you know if that, in fact, took place?
22   **A.**   No, I don't.
23   **Q.**   Has the Journal of Schenkerian Studies appeared
24   since July of 2020?
25   **A.**   I have no idea.  Like I said, never read it,

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

118

1    still don't.
2    **Q.**   Okay.  Here's something about critically
3    examining the culture of UNT and etc., etc.
4         And then under the paragraph number 3 on the
5    second page of the student statement, it says, "Hold
6    accountable every person responsible for the direction
7    of the publication.  This will involve recognizing both
8    whistleblowers and those who failed to heed them in this
9    process.  This should also extend to investigating past
10   bigoted behaviors by faculty and, by taking this into
11   account, the discipline and potential removal of
12   faculty who used the JSS platform to promote racism.
13   Specifically, the actions of Dr. Jackson -- both past
14   and present -- are particularly racist and unacceptable."
15        Did I read that correctly?
16   **A.**   You did.
17   **Q.**   Now, it's your testimony today that you never
18   intended to endorse these statements?
19   **A.**   No, I didn't -- I didn't -- no, I didn't
20   endorse these statements.
21   **Q.**   Even though the faculty statement endorses
22   the students' statement, your testimony today is that --
23   **A.**   I'm sorry, no.  We did not endorse this whole
24   statement, so you've just misstated my testimony today.
25   **Q.**   No, no, no.  I'm saying even though this

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

119

1    statement endorses the call for action outlined in the
2    student letter, right?
3    **A.**   It does not endorse the entire call for action.
4    **Q.**   All right.  Okay, then good.
5    **A.**   It endorses the call to make it publicly
6    available and -- do you want to repeat that again into
7    the record, or are we good?  Do you want me to finish
8    it?
9    **Q.**   No, no.  I'm -- let me finish.  And then if you
10   disagree, maybe you can enlighten me.  All right?
11   **A.**   Okay.  Sounds good.
12   **Q.**   This faculty statement endorses the call for
13   action outlined in the student letter.
14        So far, so good.  And you are arguing that
15   this subordinate clause, which asks that the College of
16   Music publicly condemn the issue and release it freely
17   online to the public and provide a full public account
18   of the editorial and publication process and its
19   failures, is only thing you endorse in that letter?
20        MS. QUIMBY:  Objection, form.
21   **Q.**   Is that your testimony today, that you don't
22   endorse the other things, only these two things that you
23   quoted?
24   **A.**   That's what that sentence grammatically says.
25   **Q.**   Even though it doesn't say exclusively or

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

120

1    anything limiting it to only these things, that's your
2    testimony, right?
3         MS. QUIMBY:  Objection, form.
4    **A.**   I testified that the word "exclusively" does
5    not appear in that sentence.
6    **Q.**   And you don't -- sorry about that.  I just
7    clicked on it and made my Chrome browser blow up.
8         You agree that this embeds the letter by
9    reference to this URL link, correct?
10   **A.**   I agree that that -- yes, the URL link is
11   there.
12   **Q.**   So just the last couple of questions.
13   **A.**   Um-hum.
14   **Q.**   Can you identify any concrete actions, past
15   or present, of Timothy Jackson that are particularly
16   racist?
17   **A.**   I would just say maybe some of the writing in
18   the article.
19   **Q.**   So his published speech basically, right?
20        MS. QUIMBY:  Objection, form.
21   **A.**   Sorry, wait.  No.  Sorry, what do you mean?
22   **Q.**   Well, I asked if you can identify concrete
23   specific actions of Dr. Jackson, either past or present,
24   that are particularly racist.
25   **A.**   I would just say some of the writing in the

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*

127

1   I, REBECCA GEOFFREY-SCHWINDEN, Ph.D., have read the
2   foregoing deposition and hereby affix my signature
3   that same is true and correct, except as noted above.
4
5
6   _____
    REBECCA GEOFFROY-SCHWINDEN, Ph.D.
7
8   THE STATE OF _____)
9   COUNTY OF _____)
10      Before me, _____, on this day
    personally appeared REBECCA GEOFFROY-SCHWINDEN, Ph.D.,
11  known to me or proved to me on the oath of
    _____ or through
12  _____ (description
    of identity card or other document) to be the person
13  whose name is subscribed to the foregoing instrument
    and acknowledged to me that he/she executed the same
14  for the purpose and consideration therein expressed.
15      Given under my hand and seal of office on this
16  _____ day of _____, _____.
17
18  _____
19      NOTARY PUBLIC IN AND FOR
20      THE STATE OF _____
21  My Commission Expires: _____
22
23
24
25

---

me by December 2, 2024;
2       That pursuant to the information given to the
3   deposition officer at the time said testimony was taken,
4   the following includes all partes of record and the
5   amount of time used by each party at the time of the
6   deposition;
7       Mr. Michael Thad Allen - 02 HRS: 34 MIN
8           Attorney for the Plaintiff
9       Ms. Mary Quimby -  00 HRS: 00 MIN
10          Attorney for the Defendants
11
12      I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties or
14  attorneys in the action in which this proceeding was
15  taken, and further that I am not financially or
16  otherwise interested in the outcome of the action.
17      Certified to by me on this 29th day of October,
18  2024.
19
20  _____
    Kim D. Carrell, CSR NO. 1184
    Date of Expiration: 7-31-26
21
22  JULIA WHALEY & ASSOCIATES, INC.
23  2012 Vista Crest Drive
    Carrollton, Texas  75007-1640
    214-668-5578/Fax 972-236-6666
24  Firm Registration No. 436
    Certification Expires 10-31-26
25  Notary Comm. Expires 12-1-25

---

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*

126

1       UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF
2               SHERMAN DIVISION
3   TIMOTHY JACKSON,            )
                                )
4       Plaintiff,              )
                                )
5   vs.                 ) CASE NO. 4:21-CV-00033-ALM
                                )
6   LAURA WRIGHT, et al.,       )
                                )
7       Defendants.             )
8
9   _____
10          REPORTER'S CERTIFICATION OF
11  ORAL DEPOSITION OF REBECCA GEOFFROY-SCHWINDEN, Ph.D.
12              September 27, 2024
13  _____
14
15
16      I, KIM D. CARRELL, a Certified Shorthand Reporter
17  in and for the State of Texas, hereby certify to the
18  following:
19      That the witness, REBECCA GEOFFROY-SCHWINDEN, Ph.D.,
20  was duly sworn and that the transcript of the oral
21  deposition is a true record of the testimony given by the
22  witness;
23      That the deposition transcript was duly submitted
24  on October 30, 2024, to Ms. Mary Quimby, the attorney for
25  the defendants, for examination, signature, and return to

*BENJAMIN S. GRAF, Ph.E.    09/23/2024*    1

```
 1                UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF
 2                      SHERMAN DIVISION

 3   TIMOTHY JACKSON,            )
                                 )
 4        Plaintiff,             )
                                 )
 5   vs.                         )  CASE NO. 4:21-CV-00033-ALM
                                 )
 6   LAURA WRIGHT, et al.,       )
                                 )
 7        Defendants.            )

 8

 9   *****************************************************

10            VIDEOTAPED ORAL DEPOSITION OF

11                 BENJAMIN S. GRAF, Ph.D.

12                  September 23, 2024

13   *****************************************************

14

15        VIDEOTAPED ORAL DEPOSITION OF BENJAMIN S. GRAF,

16   Ph.D., produced as a witness at the instance of the

17   Plaintiff and duly sworn, was taken in the above-styled

18   and numbered cause on the 23rd day of September, 2024,

19   from 9:03 a.m. to 12:08 p.m., before Kim D. Carrell,

20   Certified Shorthand Reporter in and for the State of

21   Texas, reported by computerized stenotype machine at

22   the University of North Texas System, 801 North Texas

23   Boulevard, Gateway Suite #308, Denton, Texas, pursuant

24   to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.
```

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*    2

```
 1                    APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4      Mr. Michael Thad Allen
        ALLEN LAW, LLC
 5      P.O. Box 404
        Quaker Hill, CT 06375
 6      Telephone: 860.772.4738
        Fax: 860.469.2783
 7      E-mail: M.allen@allen-lawfirm.com

 8

 9   FOR THE DEFENDANTS:

10      Mr. Benjamin S. Walton
        Assistant Attorney General
11      General Litigation Division
        P.O. Box 12548, Capital Station
12      Austin, Texas 78711
        Telephone: 512.463.2120
13      Fax: 512.320.0667
        E-mail: Benjamin.Walton@oag.texas.gov
14
             - and -
15
        Renaldo Stowers
16      University of North Texas System
        Office of General Counsel
17      801 North Texas Boulevard
        Denton, Texas 76201
18      Telephone: 940.565.2717
        Fax: 940.369.7026
19      E-mail: Renaldo.Stowers@untsystem.edu

20

21   ALSO PRESENT:

22   VIDEOGRAPHER:

23      Mr. Tony McGough
        Legal Video Group
24      lvg.dallas@gmail.com
        214-598-5229
25
```

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*    3

```
 1                 I N D E X

 2                                          PAGE

 3   Appearances...................................  2

 4   Stipulations..................................  5

 5

 6   BENJAMIN S. GRAF, Ph.D.

 7        Direct Examination by Mr. Allen........  6

 8

 9

10                    EXHIBITS

11   NUMBER        DESCRIPTION          MARKED

12   Exhibit 1  Re-Notice of Taking Deposition..... 40

13   Exhibit 2  Center Review, Reporting
14             Period: FY2013 - FY2016
15             (JACKS 067377 - 067401)............ 40

16   Exhibit 3  Ad Hoc Review Panel Report
17             (Exhibit D)
18             (JACKSON000208 - 000233)........... 65

19   Exhibit 4  Material for the Committee
20             Emails
21             (UNT 002645 - UNT 002782).......... 79

22   Exhibit 5  Email, 7-24-20, Graf to Chung,
23             et al.
24             (UNT 000439)......................102

25
```

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*    4

```
 1   Exhibit 6   Screenshot of Facebook Post from

 2              Graf to Ewell, 7-25-20.............104

 3   Exhibit 7   Emails Regarding Meeting With You

 4              Monday Sept 14 at Noon

 5              (UNT 002500 - 002505)..............109

 6   Exhibit 8   Emails Regarding JSS

 7              (JACKS 089828 - 089832)............114

 8   Exhibit 9   Statement From the MHTE Graduate

 9              Students - Confidential

10              (Kohanski 000107 - 000110)........115

11   Exhibit 10  Emails Regarding Faculty

12              Statement on the Recent Issue

13              of JSS

14              (UNT 000526)......................117

15

16

17

18

19

20

21

22

23

24

25
```

**APPX-074**

37

1  the Center of Schenkerian Studies and the Journal of
2  Schenkerian Studies.  What more context do you need,
3  Professor Graf, to answer my question?
4      A.    I think it's hard to say what somebody else
5  does on a day-to-day basis.
6      Q.    I'm talking about your direct experience.
7  I'm not asking you to speculate.  I'm asking you, based
8  on your direct experience, knowing Jackson as closely as
9  you did, can you identify any racist actions that the
10  man committed?
11     A.    I don't -- I would have to go through and
12  put myself in Dr. Jackson's shoes and read all of the
13  messages and all of the communications and all of the
14  correspondence.  It's hard -- I can't -- I don't think
15  that it's fair of me to put myself in Dr. Jackson's
16  shoes and say, oh, he did something that was racist.
17  I don't think that's fair of me to say.
18     Q.    It's not fair of you to say he did something
19  racist?
20     A.    There are so many other things to clarify that
21  are important clarifications.
22     Q.    So your answer is it is not fair to say that he
23  did something racist?
24     A.    I think it depends on what your definition of
25  racism is and how you contextualize certain actions and

39

1      Q.    So I'm not asking about other people and what
2  they may have thought about Timothy Jackson.  I'm asking
3  about you, Professor Benjamin Graf, a Defendant in this
4  civil action.
5            As you sit here today, can you give me a clear
6  answer to what you know Timothy Jackson, based on your
7  direct experience, to have committed which you consider a
8  racist action?
9      A.    You know, I think based on my understanding, my
10  -- you know, my viewpoint or my opinion of racism, there
11  could be some statements that could be considered racist.
12  That's really all I can say.
13     Q.    And so all you can say is that he spoke from
14  time to time in a way you considered racist?
15     A.    Some statements -- some statements could be
16  considered racist by some people.
17     Q.    I'm not asking about other people, which
18  I've already said.  So again, I want you to focus and
19  concentrate on you.  All right?
20           Enumerate the statements that you believe
21  Timothy Jackson made that are racist.
22     A.    I can't enumerate specific statements.
23           MR. ALLEN:  Can we go off the record,
24  please?
25           THE VIDEOGRAPHER:  We're off the record

38

1  certain statements.
2      Q.    So you can't give a clear answer to that
3  question:  Did Professor Jackson commit a racist action,
4  to your knowledge?
5      A.    I would say that some people would consider the
6  same action to be racist and somebody else consider that
7  action to not be racist.  I think that's --
8      Q.    I'm talking about you.  I don't care what these
9  other people think.  I'm talking about you, Benjamin
10  Graf, a defendant in a civil action.  You realize you're
11  being sued by the University -- excuse
12  me, by my client, Dr. Jackson, right?
13     A.    Yes.
14     Q.    And the taxpayers provided you counsel,
15  correct?
16           MR. WALTON:  Form.  Excuse me.  Object
17  to form.  You are free to respond, if you know.
18     A.    I think that's correct, to my knowledge.
19     Q.    Yes.  And the Attorney General's Office is here
20  defending you today, correct?
21     A.    That's correct.  I know.  Assistant Attorney
22  General, right?
23           MR. WALTON:  You're free to respond to
24  your knowledge.
25     A.    To my best of my knowledge, yes.

40

1  at 9:46 a.m.
2           (Recess taken)
3           THE VIDEOGRAPHER:  We're back on the
4  record at 9:53 a.m.
5           (Deposition Exhibit Number 1 marked.)
6           (Deposition Exhibit Number 2 marked.)
7      Q.    Professor Graf, I've taken the trouble of
8  marking two exhibits, Exhibit 1 and Exhibit 2, that are
9  in front of you.  Do you see those documents?
10     A.    Yes.
11     Q.    And I should have done Exhibit 1 earlier, and I
12  apologize.  Do you recognize Exhibit 1?
13     A.    It appears to be the re-notice of taking the
14  deposition.
15     Q.    And it's the re-notice of taking your
16  deposition, correct?
17     A.    Yes, to Benjamin Graf, in care of Benjamin
18  Walton.
19     Q.    And is it accurate to say you've appeared to
20  give live testimony today in response to this re-notice?
21     A.    Yes.
22     Q.    That's all the questions I have for Exhibit 1.
23           And then I wanted to turn to Exhibit 2 that's
24  marked -- or excuse me, that's captioned Center Review,
25  Reporting Period:  FY2013 to 2016, right?

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*

**121**

1          CHANGES AND SIGNATURE

2    WITNESS:  BENJAMIN S. GRAF, Ph.D.

3    DATE:  9-23-24

4    PAGE/LINE       CHANGE          REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

---

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*

**122**

1    _____

2    _____

3    _____

4        I, BENJAMIN S. GRAF, have read the foregoing

5    deposition and hereby affix my signature that same

6    is true and correct, except as noted above.

7

8        _____

9                BENJAMIN S. GRAF

10   THE STATE OF _____)

     COUNTY OF _____)

11

12       Before me, _____, on this day

13   personally appeared BENJAMIN S. GRAF, known to me or

14   proved to me on the oath of _____ or

15   through _____ (description of

16   identity card or other document) to be the person whose

17   name is subscribed to the foregoing instrument and

18   acknowledged to me that he/she executed the same for

19   the purpose and consideration therein expressed.

20       Given under my hand and seal of office on this

21   _____ day of _____, _____.

22

23       _____

24              NOTARY PUBLIC IN AND FOR

            THE STATE OF _____

25          My Commission Expires:_____

---

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*

**123**

1          UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF

2                SHERMAN DIVISION

3    TIMOTHY JACKSON,          )

                               )

4        Plaintiff,        )

                               )

5    vs.               ) CASE NO. 4:21-CV-00033-ALM

                               )

6    LAURA WRIGHT, et al.,     )

                               )

7        Defendants.       )

8    _____

9        REPORTER'S CERTIFICATION OF

10      ORAL DEPOSITION OF BENJAMIN S. GRAF, Ph.D.

11           September 23, 2024

12   _____

13       I, KIM D. CARRELL, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16       That the witness, BENJAMIN S. GRAF, was duly

17   sworn and that the transcript of the oral deposition is

18   a true record of the testimony given by the witness;

19       That the deposition transcript was duly submitted

20   on October 21, 2024, to Mr. Benjamin Walton, the attorney

21   for the witness,for examination, signature, and return to

22   me by November 22, 2024, (30 days);

23       That pursuant to the information given to the

24   deposition officer at the time said testimony was taken,

25   the following includes all partes of record and the

---

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*

**124**

1    amount of time used by each party at the time of the

2    deposition;

3        Michael Thad Allen - 02 HRS: 37 MIN

         Benjamin Walton -  00 HRS: 00 MIN

4

     FOR THE PLAINTIFF:

5        Mr. Michael Thad Allen

         ALLEN LAW, LLC

6        P.O. Box 404

         Quaker Hill, CT 06375

7        Telephone: 860.772.4738

         Fax: 860.469.2783

8        E-mail: M.allen@allen-lawfirm.com

9

10   FOR THE DEFENDANTS:

11       Mr. Benjamin S. Walton

         Assistant Attorney General

12       General Litigation Division

         P.O. Box 12548, Capital Station

13       Austin, Texas 78711

         Telephone: 512.463.2120

14       Fax: 512.320.0667

         E-mail: Benjamin.Walton@oag.texas.gov

15

16         - and -

17       Renaldo Stowers

         University of North Texas System

18       Office of General Counsel

         801 North Texas Boulevard

19       Denton, Texas 76201

         Telephone: 940.565.2717

20       Fax: 940.369.7026

         E-mail: Renaldo.Stowers@untsystem.edu

21

22       I further certify that I am neither counsel for,

23   related to, nor employed by any of the parties or

24   attorneys in the action in which this proceeding was

25   taken, and further that I am not financially or

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*

125

1  otherwise interested in the outcome of the action.

2      Certified to by me on this 21st day of October,

3  2024.

4

5

6      _____

       Kim D. Carrell, CSR NO. 1184

7      Date of Expiration: 7-31-26

       JULIA WHALEY & ASSOCIATES, INC.

8      2012 Vista Crest Drive

       Carrollton, Texas  75007-1640

9      214-668-5578/Fax 972-236-6666

       JulieTXCSR@gmail.com

10     Firm registration No. 436

       Firm registration Expires 5-31-25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Frank Heidlberger    5/19/21*    1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF TEXAS
                         SHERMAN DIVISION
 3   TIMOTHY JACKSON,          )
                               )
 4           Plaintiff,        )
                               )
 5   v.                        )  CASE NO.
                               )  4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,      )
                               )
 7           Defendants.       )
                               )
 8
 9
10          ------------------------------------
11                    ORAL DEPOSITION OF
12                    FRANK HEIDLBERGER
13                       MAY 19, 2021
14          ------------------------------------
15
16
17          ORAL DEPOSITION OF FRANK HEIDLBERGER, produced as a
18   witness at the instance of the Plaintiff, and duly
19   sworn, was taken in the above-styled and numbered cause
20   on May 19, 2021, from 9:10 a.m. to 11:56 a.m., before
21   Nita G. Cullen, CSR in and for the State of Texas,
22   reported by machine shorthand, at the Law Offices of
23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City
24   of Dallas, County of Dallas, State of Texas, pursuant to
25   the Federal Rules of Civil Procedure.
```

*Frank Heidlberger    5/19/21*    3

```
 1                        INDEX
 2                                              PAGE
 3   Appearances.........................................2
 4   Stipulations........................................4
 5   FRANK HEIDLBERGER
 6       Examination by Mr. Allen........................4
 7       Examination by Mr. Bohuslav....................85
 8
 9
10   Reporter's Certificate.............................86
11
12                      EXHIBITS
13   NO.  DESCRIPTION                               PAGE
14   Exhibit 24   Notice of Taking Deposition.......... 7
     Exhibit 25   Statement from the Division of Music
15                History, Theory and Ethnomusicology of
                  the University of North Texas..........34
16   Exhibit 26   E-mail to Benjamin Brand, 7/27/2020...34
     Exhibit 27   E-mail to Frank Heidlberger,
17                7/28/2020.............................53
     Exhibit 28   E-mail to Benjamin Brand, 7/27/2020...56
18   Exhibit 29   Music History, Theory, and
                  Ethnomusicology - Theoria.............58
19   Exhibit 30   E-mail to Timothy Jackson,
                  September 14, 2016....................68
20   Exhibit 31   E-mail to Dr. Jackson,
                  September 17, 2018....................73
21   Exhibit 32   E-mail to Peter Kohanski,
                  July 30, 2020.........................74
22   Exhibit 33   News from SEM: General News...........78
     Exhibit 34   E-mail to John Richmond,
23                July 30, 2020.........................80
24
25
```

*Frank Heidlberger    5/19/21*    2

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       MR. MICHAEL THAD ALLEN
         MS. SAMANTHA HARRIS
 5       ALLEN LAW, LLC
         P.O. Box 404
 6       Quaker Hill, Connecticut 06375
         860.772.4738
 7       860.469.2783 Fax
         m.allen@allen-lawfirm.com
 8
 9   FOR THE DEFENDANTS:
10       MR. MATT BOHUSLAV
         ASSISTANT ATTORNEY GENERAL
11       GENERAL LITIGATION DIVISION
         ATTORNEY GENERAL OF TEXAS
12       P.O. Box 12548, Capitol Station
         Austin, Texas 78711
13       matthew.bohuslav@oag.texas.gov
14   AND
15       MR. RENALDO STOWERS
         SENIOR ASSOCIATE GENERAL COUNSEL
16       UNIVERSITY OF NORTH TEXAS SYSTEM
         OFFICE OF GENERAL COUNSEL
17       1155 Union Circle
         Denton, Texas 76203
18       940.565.2717
         renaldo.stowers@untsystem.edu
19
20   ALSO PRESENT:
21       MR. TIMOTHY JACKSON
22
23
24
25
```

*Frank Heidlberger    5/19/21*

4

```
 1              P R O C E E D I N G S
 2                 FRANK HEIDLBERGER,
 3   having been first duly sworn, testified as follows:
 4                   EXAMINATION
 5   BY MR. ALLEN:
 6       Q.   Mr. Heidlberger, my name is Michael Allen.  I'm
 7   counsel to Timothy Jackson.  Have you ever been deposed
 8   before, sir?
 9       A.   No.
10       Q.   So, I'm just going to go over a few ground
11   rules.  This is a relatively formal conversation.  A
12   deposition, although it's taking place in a private
13   office here, is actually an extension of the Court.  The
14   purpose of depositions is both to find out what you
15   know, obviously, and also to find out what you would say
16   at trial.
17            I'll start with a few preliminary
18   questions.  Is there anything that would prevent you
19   from giving truthful testimony today?
20       A.   No.
21       Q.   Are you taking any medication that might affect
22   your memory or ability to testify truthfully?
23       A.   No.
24       Q.   Are you ill in any way?
25       A.   I have Type 1 diabetes, that might affect over
```

Frank Heidlberger    5/19/21

49

1    Q.    (By Mr. Allen)  Did you agree with the
2    characterization presented in social media about Volume
3    12 that it's articles were racist?
4        A.    I agreed to the extent that some sections of
5    specific articles could be interpreted as racist, yes.
6        Q.    And could you identify, if you can remember,
7    the explicitly racist statements in some of the
8    articles?  And here I'm quoting from your statement
9    here, if you look down page -- the page marked UNT 503,
10   in the middle of that paragraph, it says, "main points
11   of criticism are the short response time for the call
12   for papers, the inconsistent solicitation of responses,
13   and the explicitly racist statements in some of the
14   articles."  So, I'm asking, what would you identify as
15   the explicitly racist statements in some of the
16   articles?
17              MR. BOHUSLAV:  I'm going to object to you
18   asking him about a document.  Could you show him the
19   document, please --
20              MR. ALLEN:  He has the document.
21              MR. BOHUSLAV:  -- you're asking about the
22   articles?
23              MR. ALLEN:  I asked him if he remembers
24   which statements he's explicitly identifying.  I
25   understand your objection, and it's on the record.

Frank Heidlberger    5/19/21

50

1        A.    I can name examples of racist statements, but
2    I'm not saying in this -- in this text that there are
3    racist statements in there.  I'm saying that these are
4    main points of criticism in the social media statements.
5    So, I'm not explicitly agreeing with them.  I see that
6    this -- these points of criticism come up: among them,
7    the criticism of racist statements.
8        Q.    (By Mr. Allen)  And you did agree, however,
9    that some of the articles had made racist statements.  I
10   believe you testified about that earlier, correct?
11       A.    The term "racist" is an inappropriate reduction
12   of the problem here, and some statements were simply
13   superficial.  And from the perspective of implicit white
14   supremacy, but not necessarily racist as against a
15   certain person with a certain background, and that is
16   maybe implicit of the author, the black music theorist
17   Ewell.
18              But more obvious, it is the appropriateness
19   or inappropriateness of statements at stake here.  And
20   that was handled within a very wide range and often
21   inappropriate range in some of the articles, with one
22   exception, and that is, unfortunately, Dr. Jackson's
23   article.
24              When I read it -- sorry.  I want to shorten
25   the answer down here.  The third third of the article,

Frank Heidlberger    5/19/21

51

1    roughly, it's a long article, and he put a lot of work
2    into that.  The third third of the article moves from
3    the genre of a scholarly, well-researched article to an
4    inappropriate, opinionated, editorial-like statement,
5    using words like "the blacks," and I'm quoting here,
6    that are not up to speed, in terms of cultural education
7    with western music, and bringing in a whole complicated
8    matter in that of black anti-Semitism, implying that
9    Ewell has something to do with it, because why would it
10   be in a response to Ewell's article?
11              And that I thought was not well thought
12   through, not substantiated by the quotes, even if he
13   quotes some articles about -- including that Wikipedia,
14   and should have been seriously edited by somebody
15   involved in JSS.
16       Q.    Do you consider that part -- the last third of
17   the article, I believe you referred to, right?
18       A.    Roughly.
19       Q.    Do you consider that last third racist?
20       A.    I consider it as written so that it can be
21   interpreted as racist.
22       Q.    Have you -- in your personal experience with
23   Timothy Jackson since approximately the year 2000, I
24   believe, do you have any direct experience of him being
25   a racist?

Frank Heidlberger    5/19/21

52

1        A.    I think you asked that before, and my clear
2    answer was no.
3        Q.    Can I ask, what was the intended effect of
4    sending these statements to Dr. Benjamin Brand?
5        A.    Dr. Brand often refers to me as an advisor, as
6    a senior advisor with difficult decisions to make, and
7    here I took the initiative to send him some ideas that
8    might come up in an upcoming discourse.  It was just
9    meant privately and confidentially, as it is shown in
10   that sense, never that it is published.
11              I wrote this down in five minutes.  I had
12   other things to do, but I saw the Facebook thing that --
13   the avalanche of trouble coming towards us.  And I said,
14   hey, do something.  This is just a summary, take it or
15   dump it, and, you know, that's all.
16       Q.    In your experience at UNT, has there ever been
17   a time before where the department was forced or
18   decided -- strike that, please.
19              Was there ever a time before at UNT, in
20   your experience, where the department decided to take
21   action, purely based on social media reactions to what a
22   scholar had written?
23              MR. BOHUSLAV:  Objection, assumes facts
24   not in evidence.
25       A.    I'm not aware of any.

Frank Heidlberger    5/19/21

85

1  Professor Heidlberger, I've shown you Exhibit 32.

2        Do you have your own copy?

3        MR. ALLEN:  I do, but if you would

4  characterize the exhibit to the Court, I think it would

5  help us.

6     Q.   (By Mr. Bohuslav)  Okay.  I'm showing you

7  what's been marked as Exhibit 32.  I'll represent to

8  you, it's the faculty statement in July of 2020.  Is

9  that a fair characterization?

10    A.   Yes.

11    Q.   Okay.  When you signed this document, in July

12  of 2020, did you agree with all the statements it

13  contains?

14    A.   Yes.

15    Q.   And to this day, do you continue to agree with

16  all the statements in that document?

17    A.   Yes.

18        MR. BOHUSLAV:  Okay.  I'll pass the

19  witness.

20        MR. ALLEN:  No further questions.  We can

21  close the deposition.

22        (DEPOSITION ADJOURNED AT 12:09 P.M.)

23

24

25

---

Frank Heidlberger    5/19/21

87

1  be returned within 30 days from date of receipt of the

2  transcript.  If returned, the attached Changes and

3  Signature Page contains any changes and the reasons

4  therefor;

5        X  was not requested by the deponent or a

6  party before the completion of the deposition.

7        I further certify that I am neither attorney

8  or counsel for, nor related to or employed by, any of the

9  parties or attorneys to the action in which this

10  deposition was taken.

11        Further, I am not a relative or employee of any

12  attorney of record in this case, nor am I financially

13  interested in the outcome of the action.

14        Subscribed and sworn to on this 17th day of

15  June, 2021.

16

17        _____

          NITA G. CULLEN, Texas CSR #1563

18        Expiration Date:  08-31-2022

          JULIA WHALEY & ASSOCIATES

19        Firm Registration No. 436

            2012 Vista Crest Drive

20        Carrollton, Texas 75007-1640

          214.668.5578

21

22

23

24

25

---

Frank Heidlberger    5/19/21

86

1        IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF TEXAS

2            SHERMAN DIVISION

3  TIMOTHY JACKSON,          )

                            )

4      Plaintiff,        )

                        ) Case No.

5  v.                 )

                    ) 4:21-cv-00033-ALM

6  LAURA WRIGHT, et al,      )

                        )

7      Defendants.      )

8

9     ------------------------------------

10        DEPOSITION CERTIFICATE

11        FRANK HEIDLBERGER

12         MAY 19, 2021

13    ------------------------------------

14

15    I, Nita G. Cullen, Certified Shorthand Reporter in

16  and for the State of Texas, hereby certify to the

17  following:

18    That the witness, FRANK HEIDLBERGER, was duly sworn

19  by the officer and that the transcript of the oral

20  deposition is a true record of the testimony given by

21  the witness;

22    I further certify that pursuant to FRCP Rule

23  30(f)(1) that the signature of the deponent:

24    _____ was requested by the deponent or a

25  party before the completion of the deposition and is to

---

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. |
| VS. | § | |
| | § | 4:21-cv-00033-ALM |
| LAURA WRIGHT, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY JACKSON, Ph.D.

SEPTEMBER 24, 2024

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        The Oral and Videotaped Deposition of

TIMOTHY JACKSON, Ph.D., produced as a witness at the

instance of the defendants, and duly sworn, was taken in

the above-styled and numbered cause on SEPTEMBER 24,

2024, from 9:07 a.m. to 6:22 p.m., before Nicole A.

Hatler, CSR No. 11275 in and for the State of Texas,

reported by machine shorthand, at the University of

North Texas System, 801 North Texas Blvd, Gateway Suite

308, Denton, TX 76201.


---oOo---

195

1  thought about it, the more I thought that in the -- in
2  the speaking of -- in the spirit of dialectics, which I
3  consider essential for all serious scholarship, there
4  should be pros and cons.
5          So I thought that it wasn't be great if I
6  just contacted the cons, but that we would send out a
7  general call for contributions to the symposium, and
8  that would enable people who were in favor of Ewell's
9  talk and his points and his point of view, and that we
10  would publish both without censorship and let the public
11  decide.  Because I'm of the view more speech is better
12  is the way to get to the truth, not censoring people.
13      Q.  And how was it determined whether those
14  responses would or would not be peer reviewed?
15      A.  Well, we -- we weren't -- you see, we were
16  asking for people to respond in a sense of not writing
17  an article about it -- not writing a peer reviewed
18  article about it, but just expressing their opinions
19  about Ewell's thesis because it was really quite
20  controversial, and that was the spirit of the call.
21      Q.  I see.
22          Do you recall having any conversations with
23  Mr. Walls about whether these responses would be peer
24  reviewed?
25      A.  No.

196

1      Q.  Okay.  Do you recall Dr. Slottow ever
2  mentioning the idea of peer reviewing them?
3      A.  No.
4      Q.  Who -- when you refer to the call, are you
5  referring to the written call for submissions that was
6  sent out through the SMT list serve?
7      A.  Yes.
8      Q.  Who drafted that call?
9      A.  Not me.  It was drafted I think by other
10  people.  Probably by Ben Graf and Levy Walls, and
11  maybe -- we had input in it.  We -- we they began with
12  the draft, and then Dr. Slottow and I gave our two cents
13  worth.  I don't believe they took all of our
14  suggestions, but they basically sent it out having
15  absorbed some thoughts from us and from other faculty,
16  actually.
17      I -- I wanted to -- because I knew this
18  would be controversial, although I never had any inkling
19  of how controversy it would be, I wanted to consult all
20  the faculty in the music theory area who had any
21  experience with Schenkerian analysis.  And so I asked
22  Diego Cubero and Olga, who calls herself Ellen,
23  Velikanova for their input.  And also we asked some
24  other people in the faculty for their input into the
25  call and how to frame it so that it would be as neutral

197

1  but also -- yeah, as neutral and properly focused as
2  possible.  So that it would attract pros and cons.
3      Q.  Do you recall any specific edits or suggestions
4  that you suggested that call that were not incorporated?
5      A.  I think there was a few, but you know what?  I
6  wasn't going to quibble about it.
7      Q.  Do you recall what they were?
8      A.  No.
9      Q.  Okay.
10      A.  We just -- I just -- I remember saying to
11  myself, well, maybe this isn't quite what we should do,
12  but let's let it go.  Let -- let -- let the chips fall
13  where they may.
14      Q.  Had you discussed the idea of publishing
15  responses to Ewell's address with any Schenkerian
16  scholars before that call went out?
17      A.  Yes.
18      Q.  Who had you discussed it with?
19      A.  Oh, a whole bunch of people.  A whole group of
20  scholars.
21      Q.  And was it through one-on-one contact with
22  them --
23      A.  Yes.
24      Q.  -- or was it through a group communication?
25      A.  No, it was through one-on-one.

198

1      Q.  And did --
2      A.  And, you see, what happened was that -- that
3  was the initial plan, was to, in fact, ask the
4  Schenkerian scholars what they thought.  And then I --
5  in the course of doing that, I recognized that that was
6  unfair.  I thought that was unfair.  So that's when I
7  felt that we should really branch out and -- and issue
8  the call through the SMT for all sundry to respond.
9      Q.  Before the SMT call went out, had you discussed
10  this idea of responses with anyone who was sympathetic?
11      A.  I don't know who was sympathetic exactly,
12  really.  I didn't have any idea, and I still don't
13  because not all the Schenkerians that I contacted wanted
14  to submit responses.  So some of them may well be
15  sympathetic.
16      Q.  You just don't know?
17      A.  I can guess a few of them, but I'm not sure.
18  But they declined.
19      Q.  So you don't know what their response would
20  have been had they agreed to write one?
21      A.  I'm not a prophet.  No.
22      Q.  All right.
23      A.  But once we decided to go with the call, I felt
24  very comfortable about the whole thing because I thought
25  it was fair.  In other words, I thought that once we had

219

1    A.   Yeah.
2    Q.   And what did you find?
3    A.   I found all kinds of statements about me that I
4 thought were incorrect.
5    Q.   Statements by other student besides Rachel
6 Gain?
7    A.   Right.
8    Q.   And -- and did you not sue those other
9 students?
10    A.   I think that the feeling was that they were not
11 quite as complicit in disseminating the -- the petition
12 or the essence of these documents as she was.  I felt
13 that she really did take a leading role in that.
14    Q.   Are there any -- are there any statements
15 that -- that Rachel Gain either made or disseminated
16 that you felt were defamatory other than what we have
17 here as Exhibit 1?
18         MR. ALLEN:  Objection.
19         THE WITNESS:  Yeah.
20    Q.   BY MR. WALTON:  Can you describe what
21 statements Rachel Gain made that you're suing her for?
22    A.   The statements that she made -- well, I'm
23 talking about these statement that were disseminated by
24 Rachel Gain, okay.  But there are other statements that
25 she made that were disseminated online that were not

220

1 only defamatory, but also insulting.
2    Q.   Can you describe for the jury what statements
3 that Rachel Gain -- what statements you're suing her for
4 making?
5         MR. ALLEN:  Objection.
6         THE WITNESS:  I'm suing her for
7 disseminating the statements that are contained in the
8 petition, this being a kind of petition.  Okay.
9    Q.   BY MR. WALTON:  I see.
10    A.   Along with the faculty who endorsed that
11 petition.  So it's really a double whammy.
12    Q.   Who -- who sent you information about Rachel
13 Gain's statements?
14    A.   Various colleagues.
15    Q.   Did any of them indicate that they agreed with
16 what she's saying?
17    A.   No.  They were astonished.
18    Q.   Are you aware of anyone else that has reshared
19 Rachel Gain's comments online?
20    A.   I believe so.  There are people who have
21 reshared all that.
22    Q.   And why did you not also sue them?
23    A.   Because I didn't -- as I said before, I didn't
24 feel that they had played a crucial role in the initial
25 dissemination of these allegations.

221

1    Q.   In Exhibit 1 -- I'm sure there's a lot of stuff
2 in here that you disagree with, but what -- what do you
3 believe in Exhibit 1 constitutes defamation against you?
4         MR. ALLEN:  Objection.
5         THE WITNESS:  So I would say that there are
6 different degrees and types of defamation.  There are
7 just statements here which are plain false but just
8 untrue.  And then there are statements which are
9 interpretive of what I wrote or I would consider
10 misinterpretive of what I and other people wrote, and
11 deliberately so.
12         So there are different levels, let's say,
13 of defamation here.  There are some where I -- where
14 they impute to me false statements -- or they're
15 false -- factually false statements about me.  I can
16 give you some examples, if you want.
17    Q.   BY MR. WALTON:  Sure.  Let's just -- is there
18 anything in the -- in the opening two paragraphs that
19 you believe is defamatory?
20    A.   Yes.
21    Q.   What do you believe is defamatory?
22    A.   Okay.  So recent perpetuation of anti-black
23 racism.  Where -- I'm trying to figure out what that
24 refers to.
25         If I might answer you this way, my article

222

1 was read by the most distinguished black music theorist
2 in this country, Cofegawa, who Ewell cites on a number
3 of occasions.  And I have a letter from him stating that
4 he read my article and found nothing objectionable in
5 it.  So I consider that statement, "perpetuation of
6 anti-black racism," to be false.
7    Q.   Did you --
8    A.   Can I continue a little bit or not?
9    Q.   In just a moment.  I just -- did you interpret
10 this statement to be regarding your article in the
11 symposium?
12    A.   Not just mine, but all -- all the negative
13 ones -- let's say all those critical of Professor Ewell.
14 I don't see how that, necessarily -- a criticism of
15 another scholar's work, black or white, constitutes
16 anti-black racism.
17    Q.   So just to step back for a moment, if someone
18 believes that something is racist, are they -- are they
19 free to say so?
20    A.   I suppose they can.  There's no law that says
21 they can't, right.  But when they assert something as a
22 fact that may not be a fact or isn't a fact, then it
23 becomes -- it can add up.  Like there's a lot of things
24 here that can add up to defamation.
25    Q.   Is -- if -- if Rachel Gain had believed that

243

1  Rachel Gain said that you believe was defamatory that
2  was different from what we've talked about already?
3      A. Not really.
4      Q. Okay.
5      A. I would have to go through all of the many
6  e-mails that have been provided to the court and also
7  the Twitter feeds and Facebook statements. There's
8  other statements, but I don't carry those all around in
9  my head.
10     Q. Nothing stands out to you in your memory right
11  now?
12     A. Right now, no, but there's quite a bit here any
13  way.
14     Q. Dr. Jackson, I'm going to share with you what's
15  been marked as Exhibit 2.
16     (Exhibit 2 was marked for identification.)
17     Q. BY MR. WALTON: It's -- for a second time, it's
18  my understanding that this is a copy of the statement
19  that was released by certain faculty members within the
20  college and music.
21         Is that your understanding?
22     A. Correct.
23     Q. Do you believe that anything in this statement
24  is defamatory against you?
25     A. I do.

244

1      Q. What?
2      A. So the problem here is we endorse the call for
3  action outlined in our student's letter, and then the --
4  the address is given to the statements that the student
5  generated. So when you endorse something, you endorse
6  it. So that means that you agree with it and that you
7  undersign it, so to speak. That's what endorsement
8  means.
9      Q. That's what you believe endorsement means?
10     A. It's not what I believe it means. It's what it
11  means. To endorse a statement is to affix your seal of
12  approval to that statement.
13     Q. Now, this -- these words here say "we enforce
14  the call for action."
15         What is your understanding of the call for
16  action?
17     A. So that was the version of -- it's not the same
18  thing as this letter here.
19     Q. I see.
20     A. It's a different document.
21     Q. Let me see if we can figure out what that
22  document is.
23     (Exhibit 3 was marked for identification.)
24     Q. BY MR. WALTON: There we go. I'm going to hand
25  you what has been marked as Exhibit 3 to your

245

1  deposition. And I know --
2      A. But this is not the document either.
3      Q. I understand. We'll get there. This --
4  this -- the cover page here is the report produced by
5  the ad hoc review panel.
6      A. Right.
7      Q. I'm going to ask you to turn to the page number
8  at the bottom right-hand corner --
9      A. Right.
10     Q. -- that says UNT 00189.
11     A. Right.
12     Q. And it continues on to 190.
13     A. Right.
14     Q. This is marked as Exhibit 3 that was attached
15  to that panel report. Is this the document that you
16  believe was linked by this URL in the faculty statement?
17     A. I believe it was, yes.
18     Q. Okay. So what is your understanding then of
19  the call for action that the faculty statement is
20  referring to?
21     A. I believe it's Exhibit 3.
22     Q. Is there any -- is there any part of this
23  Exhibit 3 that you believe constitutes a call for
24  action?
25     A. Well, it's not labeled that here, but I believe

246

1  that's what they're referring to, unless I've confused
2  the different variants of these documents.
3      Q. Okay. You can go back to our Exhibit 2, the
4  faculty statement --
5      A. Right.
6      Q. -- for just a moment.
7         Other than the sentence that you described,
8  is there any other statement in -- within this statement
9  that you believe is a false statement of fact?
10     A. Yes.
11     Q. What?
12     A. "A set of responses to Dr. Philip Ewell's
13  plenary lecture at the 2019 society for music theory
14  annual meeting is" replete -- "replete with racial
15  stereotyping and tropes."
16         I disagree. I think it's false.
17     Q. If someone were to believe that there is
18  content within the symposium that constituted a racial
19  stereotype, should they be allowed to express that
20  opinion?
21     MR. ALLEN: Objection.
22     THE WITNESS: I think they should. But can
23  I add one thing or not?
24     Q. BY MR. WALTON: Well, I have one more follow-up
25  question to that.

**263**

1  student statement that I believe you testified you
2  believe this may have been the statement that Rachel
3  Gain was disseminating in some form?
4      A. And it was then disseminated here.
5      Q. Okay. Is there -- is there anything in this
6  statement that you feel is a false statement of fact
7  that is not contained in the examples we already talked
8  about?
9      A. All right. That wasn't already in an earlier
10  stage?
11      Q. That's right. That we haven't already
12  discussed based on another document.
13      A. All right. Well, where it says "we would like
14  to make it clear that the JSS is not a graduate student
15  journal," I think that's only true in terms of the later
16  version of it, when Dr. Graf was made the editor. You
17  see, because he was no longer a student when Dr. Graf
18  was made the editor. So that was true, but before that,
19  it's false.
20      Q. So do you believe that this statement was
21  defamatory against you?
22      A. I'm not sure that it's defamatory against me,
23  but it's not true.
24      Q. Okay.
25      A. Or let's put it this way. It needed

**264**

1  qualification.
2      Q. Sure.
3      A. It was only true for a short time.
4      Q. Are there any other false statements in here
5  that --
6      A. So -- yes. So "Many of us recently discovered
7  the journal is presented as a graduate student run in
8  some context. In fact, there is little student
9  involvement beyond copy editing, and students have
10  absolutely no say in the context of JSS."
11      False. Students did have a lot of say. In
12  fact, up until quite recently, they were making the
13  decisions, really. We weren't micromanaging as you
14  know, as I already told you.
15      Q. Do you believe that this false statement was
16  defamatory against you?
17      A. It is slightly so because we did not determine
18  the content of the articles that were published. We
19  advised the students, but we did not determine it. That
20  is why this statement is problematical.
21      Q. Any other false statements in this version?
22      A. So "Allowed faculty to platform racism in our
23  name." That's only true if you accept that the -- that
24  this issue of the journal did platform racism. But if
25  it didn't, then that's not true.

**265**

1      All right. So clear lack of academic
2  rigor. So because of the horrendous lack of peer review
3  publication of anonymous response and clear lack of
4  academic rigor, this issue of JSS should release an
5  apology, blah, blah, blah.
6      Lack of academic rigor. Well, then you
7  would have to say the same about Ewell's publication in
8  Spectrum. It wasn't peer reviewed either. And you'd
9  have to say the say thing about his presentation in the
10  SMT. It wasn't peer reviewed either. So you'd have to
11  say the same thing about those journals and
12  presentations.
13      Q. So do you believe this statement is false or
14  merely unfair to only apply to the volume 12?
15      A. Well, I think that the demand is -- to publicly
16  condemn the issue is based on a false -- is a false
17  statement about academic rigor because the journal
18  proceeded in the same way that the so-called industry
19  standard journal proceeded in this very case.
20      Q. Are there any other statements in this document
21  that you believe are false that are above and beyond
22  doubt the statements we've already looked at?
23      A. Well, under point one at the bottom of the
24  page --
25      Q. Yes.

**266**

1      A. -- "The JSS has demonstrated that it does not
2  meet the standards of a peer-reviewed publication." No,
3  the JSS did not demonstrate that. That's not an
4  argument that the JSS made. That's false.
5      Q. All right. Any other false statements in here?
6      A. No. The rest are already --
7      Q. Okay.
8      A. -- we've already covered them.
9      Let's look at the last page. Sorry.
10      Q. Of course. Of course.
11      A. Go to page 190. "UNT has gained a reputation
12  as an institution with a toxic culture when it comes to
13  issues of race, gender, and other aspects of diversity."
14  I think that's false.
15      Q. Are you aware of the reputation that UNT has on
16  social media?
17      A. Well, I don't know, but I have to say that I
18  don't -- I don't -- I've never heard that UNT has a
19  reputation as an institution with a toxic culture. No
20  one's ever told me that. I have no evidence for that.
21  I don't -- I don't know if it's true or false, but I
22  somehow doubt it.
23      Q. Any other false statements here?
24      A. So not beyond what we already talked about.
25  But the past bigoted behavior by faculty, and then we

267

1  have the -- specifically the actions Dr. Jackson, both
2  past and present, are particularly racist and
3  unacceptable. So I'd like to know what actions -- I
4  believe this to be a false statement because there are
5  no actions, past or present, that are racist and
6  unacceptable.
7       Q. And you would have the same contentions about
8  these statements as you had about the --
9       A. Previous --
10      Q. -- statements in Exhibit 1?
11      A. Yes.
12      Q. Okay. Anything else on this page?
13      A. I'm trying to determine -- well, the last
14  penultimate sentence, "We will strive to change the
15  toxic culture at UNT." I don't know that -- I don't
16  agree that there is a toxic culture at UNT. I think
17  that's a false charge.
18          I believe that -- I've never seen any --
19  any action, past or present, by any faculty member
20  against any student of color within my department. I
21  have never heard any racist statements against black
22  people, against Hispanics, against Asians, against Jews
23  from any member of the faculty or from any student, for
24  that matter. So I challenge that statement. I do not
25  believe it to be true. I believe it to be false.

268

1       Q. And for the record, similar to some of the
2  questions that I asked you earlier, with regard to this
3  statement, if there was a student that believed the
4  culture at UNT was toxic, would you agree that the
5  student should be able to express that opinion?
6          MR. ALLEN: Objection.
7          THE WITNESS: I would agree that the
8  student should object or express the objection, but that
9  the student should bring concrete evidence of, let's
10  say, actions. This -- this says the actions of Dr.
11  Jackson are both -- past and present, are particularly
12  racist and unacceptable.
13          Which actions did I take against students
14  that were racist? For me, that implies -- saying, you
15  know, that -- making statements against students who
16  were on the basis of race or taking any kind of adverse
17  action against a student on the basis of race, I would
18  find that unacceptable. As a professor, I would find
19  that totally unacceptable. But I haven't found any
20  documentation that shows any such actions on my part.
21      Q. BY MR. WALTON: For the -- so for the
22  defendants that you've named in this lawsuit for
23  defamation, except for Rachel Gain, it's my
24  understanding that all of those other defendants are
25  faculty members or were faculty members at UNT at the

269

1  time of July 2020.
2       Is that consistent with your understanding?
3       A. Yes.
4       Q. As of -- well, has any of those individuals
5  ever called you a racist?
6       A. Only through the endorsement of the document,
7  but that's enough. In my opinion, if you endorse a
8  document that state somebody is a racist, that means
9  you, personally, endorse that document.
10      Q. I think we're getting close here. I have one
11  more -- oops, there we go -- exhibit for you.
12      (Exhibit 4 was marked for identification.)
13          MR. ALLEN: What am I marking? I'm sorry.
14  Up to --
15          MR. WALTON: We are marking as Exhibit 4.
16          MR. ALLEN: Thanks.
17          MR. WALTON: I'm handing this to the
18  witness.
19      Q. BY MR. WALTON: And I apologize. It's not a
20  Bates numbered copy. But, Dr. Jackson, it's my
21  understanding that this is a copy of your response that
22  appeared in volume 12 of the JSS. If you want to take a
23  quick minute to verify that, that's perfectly fine.
24      A. Uh-huh.
25      Q. Does this appear to be a copy of your article?

270

1       A. It does.
2       Q. I want to ask you to turn to page 164 on --
3          MR. ALLEN: 164, you're going to?
4       Q. BY MR. WALTON: Yes. On the -- the top of the
5  page, the internal journal pagination numbers, since we
6  don't have Bates labels. Page 164, the -- at the very
7  top of the page, this sentence that first begins there
8  says, "African-Americans have the right to embrace their
9  own culture as precious."
10          What do you mean by "their own culture"?
11      A. So I mean there what I specify, rap music, hip
12  hop, et cetera. That's what I mean. In other words,
13  genres -- especially genres that come out of the
14  African-American culture. And I should have included
15  jazz there, too, and other forms of music that
16  originated in the black community here in America.
17      Q. And I guess what research did you perform to --
18  to verify what aspects of music are or are not aspects
19  of African-American culture?
20      A. Well, I'm not an expert in African-American
21  music, but definitely I think there's a broad consensus
22  that jazz, rap music, and certain kinds of hip hop music
23  as well as all genres that originated in the
24  African-American community and which are widely regarded
25  as the culture that has grown up in the African-American

295

1    I, TIMOTHY JACKSON, Ph.D., have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6    _____
     TIMOTHY JACKSON, Ph.D.
7
8    THE STATE OF _____)
9    COUNTY OF _____)
10       Before me _____ on this day
11    personally appeared TIMOTHY JACKSON, Ph.D., known to me
12    (or proved to me under the oath or through
13    _____) (description of identity card or
14    other document) to be the person whose name is
15    subscribed to the foregoing instrument and acknowledged
16    to me that they executed the same for the purposes and
17    consideration therein expressed.
18       Given under my hand and seal of office this
19    _____ day of _____, 2024.
20
21
22    _____
      NOTARY PUBLIC IN AND FOR
23
24    THE STATE OF _____
25

296

1         UNITED STATES DISTRICT COURT
2         EASTERN DISTRICT OF TEXAS
3            SHERMAN DIVISION
     TIMOTHY JACKSON,     §
4                         §
        Plaintiff,        §
5                         § Civil Action No.
        VS.               §
6                         § 4:21-cv-00033-ALM
     LAURA WRIGHT, et al.,    §
7                         §
        Defendants.       §
8                         §
9
10        REPORTER'S CERTIFICATION
11        ORAL AND VIDEOTAPED
12    DEPOSITION OF TIMOTHY JACKSON, Ph.D.
13         SEPTEMBER 24, 2024
14
15       I, Nicole A. Hatler, Certified Shorthand
16    Reporter No. 11275 in and for the State of Texas, hereby
17    certify to the following:
18       That the witness, TIMOTHY JACKSON, Ph.D., was
19    duly sworn by the officer and that the transcript of the
20    oral deposition is a true record of the testimony given
21    by the witness;
22       That the original deposition transcript was
23    delivered to October 17, 2024;
24       That the copy of this certificate was served
25    on all parties and/or the witness shown herein on

297

1    November 16, 2024;
2        I further certify that pursuant to FRCP Rule
3    30(f)(1) that the signature of the deponent:
4        __X__ was requested by the deponent or a part
5    before the completion of the deposition and that the
6    signature is to be before any notary public and returned
7    within 30 days from the date of receipt of the
8    transcript. If returned, the attached Changes and
9    Signature Page contains any changes and the reasons
10    therefore:
11        _____ was not requested by the deponent or a
12    part before the completion of the deposition.
13        I further certify I am neither counsel for,
14    related to, nor employed by any of the parties or
15    attorneys in the action in which this proceeding was
16    taken, and further that I am not financially or
17    otherwise interested in the outcome of the action.
18        Certified to by me this 17th day of OCTOBER,
19    2024.
20
21
22    _____
      Nicole A. Hatler, Texas CSR 11275
23    Expiration Date: 11/30/24
      Integrity Legal Support Solutions
24    9901 Brodie Ln., #160-400
      Austin, TX 78748
25    (512) 320-8609
      www.integritylegal.support

*Peter Michael Kohanski    5/18/21*    1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3   TIMOTHY JACKSON,          )
                              )
 4          Plaintiff,         )
                              )
 5   v.                        )  CASE NO.
                              )  4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,       )
                              )
 7          Defendants.        )
                              )
 8

 9

10        -----------------------------------

11             ORAL DEPOSITION OF

12            PETER MICHAEL KOHANSKI

13               MAY 18, 2021

14        -----------------------------------

15

16

17        ORAL DEPOSITION OF PETER MICHAEL KOHANSKI, produced

18   as a witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 18, 2021, from 9:07 a.m. to 11:29 a.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.
```

*Peter Michael Kohanski    5/18/21*    3

```
 1                     INDEX

 2                                              PAGE

 3   Appearances.........................................  2

 4   Stipulations........................................  4

 5   PETER MICHAEL KOHANSKI

 6      Examination by Mr. Allen.........................  4

 7

 8   Reporter's Certificate..............................95

 9

10

11                    EXHIBITS

12   NO.  DESCRIPTION                              PAGE

13   Exhibit  1    Subpoena for Peter Kohanski............  8

14   Exhibit  2    E-mail to Timothy Jackson from the
                  president of GAMuT, July 29, 2020......18
15   Exhibit  3    Exhibit 3.............................72

16
```
```
17

18

19

20

21

22

23

24

25
```

*Peter Michael Kohanski    5/18/21*    2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4       MR. MICHAEL THAD ALLEN
         MS. SAMANTHA HARRIS
 5       ALLEN LAW, LLC
         P.O. Box 404
 6       Quaker Hill, Connecticut 06375
         860.772.4738
 7       860.469.2783 Fax
         m.allen@allen-lawfirm.com
 8

 9   FOR THE DEFENDANTS:

10       MR. MATT BOHUSLAV
         ASSISTANT ATTORNEY GENERAL
11       GENERAL LITIGATION DIVISION
         ATTORNEY GENERAL OF TEXAS
12       P.O. Box 12548, Capitol Station
         Austin, Texas 78711
13       matthew.bohuslav@oag.texas.gov

14   AND

15       MR. RENALDO STOWERS
         SENIOR ASSOCIATE GENERAL COUNSEL
16       UNIVERSITY OF NORTH TEXAS SYSTEM
         OFFICE OF GENERAL COUNSEL
17       1155 Union Circle
         Denton, Texas 76203
18       940.565.2717
         renaldo.stowers@untsystem.edu
19

20   ALSO PRESENT:

21       MR. TIMOTHY JACKSON

22

23

24

25
```

*Peter Michael Kohanski    5/18/21*

4

```
 1              P R O C E E D I N G S

 2          PETER MICHAEL KOHANSKI,

 3   having been first duly sworn, testified as follows:

 4              EXAMINATION

 5   BY MR. ALLEN:

 6      Q.   Good morning, Mr. Kohanski.  As you know, this

 7   is a deposition.  I'm just going to ask you a few

 8   questions to get started and discuss sort of some ground

 9   rules, if you will.  Could you --

10          MR. ALLEN:  Did you get his full name?

11          COURT REPORTER:  Yes.

12      Q.   (By Mr. Allen)  Okay.  This is an extension of

13   the Court.  It's a very formal conversation.  There will

14   be times at which counsel may object.  Can I ask you if

15   you're represented by counsel today?

16      A.   Yes.

17      Q.   Who is your attorney?

18      A.   Matt.

19          MR. ALLEN:  So, Matt, when we -- if I

20   could, when we discussed this, you said you were not

21   representing the witnesses.  Mr. Kohanski's not a party,

22   but the State has stepped in to represent them?

23          MR. BOHUSLAV:  Yes.

24          MR. ALLEN:  Okay.  Thank you.

25      Q.   (By Mr. Allen)  So, he -- your counsel -- Mr.
```

Peter Michael Kohanski    5/18/21

53

1    Q.    And you also call, on No. 3, for a "full,
2    detailed, and public account of the editorial and
3    publication process," do you see that?
4    A.    Yes, I do.
5    Q.    Was that ever provided?
6    A.    Yes.
7    Q.    In what form?
8    A.    The ad hoc review panel convened by the
9    provost.
10    Q.    Did you mean Provost Jennifer Cowley?
11    A.    Yes.
12    Q.    Did you know that Provost Cowley asked
13    Professor Jackson to submit a response to that ad hoc
14    panel report?
15    A.    Yes.
16    Q.    Was that ever made public?
17    A.    Not to my knowledge.  I don't believe I've ever
18    seen it.
19    Q.    So, is it fair to say that you were not
20    familiar with Timothy Jackson's response to the ad hoc
21    panel's report, correct?
22    A.    Yes.  Besides anything I've seen in the lawsuit
23    documents.
24    Q.    Do you know if the University has ever
25    published his response?

Peter Michael Kohanski    5/18/21

54

1    A.    I don't know.
2    Q.    Would it be the position of the graduate
3    students who wrote this statement that that should be
4    disclosed?
5    A.    I believe so.
6    Q.    Well, do you, personally, believe that should
7    be disclosed?
8    A.    Yes.
9    Q.    Do you know why it hasn't been disclosed?
10    A.    I do not know.
11    Q.    Moving down to No. 4, you want to hold
12    accountable every person responsible for the direction
13    of the publication, correct?
14    A.    That's correct.
15    Q.    And you refer to "past bigoted behaviors by
16    faculty."  Did I read that correctly?
17    A.    That's correct.
18    Q.    Could you enumerate for me the past bigoted
19    behaviors of faculty that you are describing here?
20    A.    I don't have very many specifics.  I'm sure
21    other graduate students would be able to talk more about
22    those.  I did -- I will say, however, I did receive one
23    e-mail, when this was happening, from a past student who
24    said -- who is an Asian student, from somewhere in Asia,
25    and he said that Dr. Jackson told him to try speaking

Peter Michael Kohanski    5/18/21

55

1    with rocks in his mouth to help his enunciation and
2    diction and speak English better.
3    Q.    Do you know if this individual could speak
4    English well?
5    A.    I do not know.
6    Q.    Would that be improper, to tell someone that
7    they could learn to improve their English?
8    A.    In the way that he did it, yes.
9    Q.    Why is that?  What in the way he did it, which
10    you heard from the student's e-mail?  What part of that
11    was improper, in your view?
12    A.    I guess I'm not sure how to describe -- or I'm
13    not sure how I can tell someone that telling someone to
14    put rocks in their mouth is improper.
15    Q.    Well, does that mean there's no basis for you
16    to judge it one way or another, since you don't seem to
17    be able to articulate it?
18         MR. BOHUSLAV:  Objection, argumentative;
19    objection, leading.
20    A.    No, I think it's improper.
21    Q.    (By Mr. Allen)  So, what is improper about
22    that?
23    A.    Someone has the potential to get hurt and
24    physically wound themselves by putting rocks in their
25    mouth, and probably using their jaw and I guess chewing

Peter Michael Kohanski    5/18/21

56

1    on them.
2    Q.    Do you know if Dr. Jackson instructed the
3    student to chew on rocks?
4    A.    I don't.
5    Q.    You said earlier that you've learned two
6    foreign languages?  Am I mistaken?
7    A.    Well, I need to learn two foreign languages.
8    Q.    Are you fluent in any foreign languages?
9    A.    No.
10    Q.    Would you consider it harmful to have a native
11    foreign speaker correct your pronunciation in a foreign
12    language?
13    A.    Depends on the way they do it.
14    Q.    How would you prefer that they do it?
15    A.    I suppose in private and from a place of care
16    and helpful -- being helpful.
17    Q.    So, their subjective feelings would be the most
18    important thing, is that it?
19         MR. BOHUSLAV:  Objection, argumentative;
20    objection, leading.
21    A.    No, I suppose the most important thing would be
22    the way you go about it.
23    Q.    (By Mr. Allen)  And how should they go about
24    it?
25    A.    By not calling someone out and correcting them

1    Q.    (By Mr. Allen)  Now, Mr. Kohanski, I'm going to
2    represent to you that this Exhibit 3, which oddly enough
3    the first line says "Exhibit 3," was taken from the ad
4    hoc panel report of the University of North Texas.  Do
5    you know what I'm referring to when I refer to the ad
6    hoc panel report?
7    A.    Yes.
8    Q.    And could you describe for the Court what you
9    understand is the ad hoc panel report?
10    A.    It was a report that was the product of an
11    investigation into the conception and the editorial
12    process of the Journal of Schenkerian Studies, Volume
13    12.
14    Q.    And that was a culmination of policies and
15    administrative actions that you requested the University
16    take with regard to Professor Jackson, correct?
17    A.    Sorry, can you repeat that?
18    Q.    This investigation -- you just described the ad
19    hoc panel's investigation into the journal and Professor
20    Jackson, correct?
21    A.    Yes.
22    Q.    And that was the culmination of things you had
23    asked for, as graduate students, in circulating your
24    letter.
25    A.    In part.

1    Q.    The letter in Exhibit 2, correct?
2    A.    In part.
3    Q.    So, it's safe to say that was a realization of
4    one of the things you had asked for.
5    A.    Yes.
6    Q.    And one thing -- you'll see this goes back and
7    front, sorry, on the page, Exhibit 3.  One thing I find
8    curious is that it's different in form from the one you
9    first circulated in Exhibit 2.  And revisiting
10    Exhibit 2, it seems to be dated somewhere around
11    July 29th, 2020.
12    And yet this one, which is incorporated in
13    the ad hoc panel report, which I believe appeared on
14    November 25th, 2020, and if I get the date wrong, it's
15    in that time range, is slightly different.
16    A.    Uh-huh.  That's correct.
17    Q.    And so, could you tell me how this document
18    came to be different from the one you circulated in late
19    July?
20    A.    This document was written and circulated first,
21    before the one in Exhibit 2, and our goal with this
22    document was more to issue an apology and to try to
23    ensure an accountability and things like that.
24    Q.    When was this document circulated?  Let me
25    retract that, please.

1    When was this document, Exhibit 3,
2    circulated first?
3    A.    Again, that first week in late July.  I don't
4    remember the exact date, but, again, it was that first
5    week where all of this happened, in late July of 2020.
6    Q.    And I'm going to represent to you that the
7    Journal of Schenkerian Studies released Volume 12
8    sometime around July 25th, 2020.  Is that your
9    understanding, as well, Mr. Kohanski?
10    A.    Yes.
11    Q.    And Exhibit 2 was circulated, it would appear,
12    at least by July 29th, 2020, four days later, correct?
13    A.    Yes.
14    Q.    So, is it safe to say this was circulated first
15    sometime between July 25th and July 28th?
16    A.    Yes.
17    Q.    And who authored this publication or -- let's
18    refer to it as the first statement, is that fair?
19    A.    That's fine.
20    Q.    So, Exhibit 3, the first statement, who
21    authored this first statement?
22    A.    To the best of my knowledge -- so, I was not as
23    involved in actually drafting and writing this statement
24    as I was with the second one, so I wasn't in the
25    meetings where that happened, but I believe it was Brian

1    Anderson, Rachel Gain, Salvador Hernandez, Elizabeth
2    Durrant, that's D-U-R-R-A-N-T.
3    Q.    What was her first name, again?
4    A.    Elizabeth.
5    Q.    Elizabeth?
6    A.    And I -- to the best of my knowledge, that's
7    everyone I remember.
8    Q.    Thank you.  Do you know if these individuals
9    who drafted the first statement had actually read the
10    Volume 12 symposium of the Journal for Schenkerian
11    Studies?
12    A.    I'm sure they read part or all of it.
13    Q.    At what time did you become involved in
14    drafting these various statements?
15    A.    From the start.  I just wasn't someone who
16    decided or who was involved in actually writing this
17    one.
18    Q.    Were you helping organize that from within the
19    graduate association?
20    A.    Organize what?  I'm sorry.
21    Q.    Sorry.  Organizing the drafting of these
22    statements?  Were you helping organize that?
23    A.    Yes.  As one of the student leaders of the
24    division, yes, I was helping organize all this.
25    Q.    And if you skip down towards the end there,

Peter Michael Kohanski    5/18/21

77

1  there's a numeral 3. See, "hold accountable every
2  person responsible for the direction of the
3  publication"?
4      A.   Yes.
5      Q.   Is there anything referred to in this paragraph
6  that we haven't already discussed, in terms of the
7  second statement, which was Exhibit 2?
8      A.   No, I don't believe so.
9      Q.   So, where it says, "specifically, the actions
10 of Dr. Jackson -- both past and present -- are
11 particularly racist and unacceptable," as you sit here
12 today, you can't identify any other actions that Mr. --
13 or excuse me -- Professor Jackson engaged in, other than
14 those we've already discussed.
15     A.   That's correct.
16     Q.   I want to return to this issue of diversity,
17 equity and inclusion, which I believe is also referred
18 to in this first statement. If you look at the third
19 sentence in that last paragraph, "we gratefully
20 acknowledge the push for inclusion and diversity in
21 academia," do you see that?
22     A.   Yes, I do.
23     Q.   And did I read that correctly?
24     A.   Yes.
25     Q.   Could you explain to me, again, what is meant

Peter Michael Kohanski    5/18/21

78

1  by "diversity and inclusion"?
2      A.   I think, generally speaking, in music academia,
3  the systems that are in place uphold whiteness and favor
4  whiteness, by which I mean white music and white
5  composers as the primary object of study. And by
6  talking about inclusion and diversity, we need to change
7  that and recognize equality through difference. That is
8  all musics are no greater and no less than any other
9  one, but they're just as valid in terms of their musical
10 and cultural expression.
11         So, that's on maybe a more cultural level
12 than speaking on a very practical level. I believe the
13 field is also -- there aren't a lot of people of color
14 in the field or otherwise, you know, minorities and
15 marginalized people, and I believe that needs to change,
16 as well.
17     Q.   How do you intend for the inclusion and
18 diversity initiative you just described to change that
19 fact?
20     A.   Did I describe initiatives?
21     Q.   It sounded to me like you wanted more people of
22 color to be recruited to study this field of study
23 you've chosen for your own scholarship. Is that a fair
24 characterization?
25     A.   Yes.

Peter Michael Kohanski    5/18/21

79

1      Q.   And you also wanted to -- and, again, correct
2  me if I'm wrong, but I'm trying to summarize what you
3  said, so I'm not trying to invent things here, but it
4  sounded to me like you also suggested that there should
5  be less emphasis on what you characterize as white music
6  and more emphasis on what you characterize as music of
7  people of color, is that correct?
8      A.   No.
9      Q.   So, could you explain that to me once again?
10     A.   To elevate other musics does not mean to
11 diminish western classical music. It means -- it means
12 creating a bigger space for everything.
13     Q.   How would you go about accomplishing that
14 bigger space for everything with diversity and inclusion
15 initiatives?
16     A.   I mean, that's in part, I think, a job for
17 people much higher up than me at this point in my life.
18     Q.   Do you know -- sorry. Go ahead.
19     A.   I mean, I'm only a graduate student.
20     Q.   Do you know of anything Professor Jackson has
21 done to prevent the inclusion of other forms of music in
22 the division?
23     A.   I think Schenkerian analysis is necessarily
24 exclusive.
25     Q.   So, you think Schenkerian analysis is

Peter Michael Kohanski    5/18/21

80

1  exclusive. Why is that?
2      A.   Because it was developed to study a very
3  specific type of music. And, again, I'm no expert here,
4  but based on what I know.
5      Q.   Were you aware that Heinrich Schenker himself
6  applied his analysis to black jazz music in the '20s?
7      A.   I was not.
8      Q.   Do you think that's impermissible?
9      A.   I think there's better ways to study jazz
10 music.
11     Q.   So you would like to exclude Schenkerian
12 analysis from the division?
13     A.   No, I didn't say that.
14     Q.   Do you think the application of Schenkerian
15 analysis to music is itself racist?
16     A.   So, are you talking about the theory itself?
17 The analysis itself?
18     Q.   Well, let's start again. What do you --
19 describe -- you're the graduate student, right? I can
20 assure you, I am a musical troglodyte, especially
21 compared to you, Mr. Kohanski, so why don't you describe
22 for the Court your understanding of Schenkerian
23 analysis.
24     A.   So, to be honest, I have a very limited
25 understanding of Schenkerian analysis because I've never

Peter Michael Kohanski    5/18/21

93

1    Q.    I recognize two of those names as faculty.  Is

2    the third -- the last name you mentioned was who?

3    A.    Miles McLean.  He is a graduate student in the

4    division.

5    Q.    Is he in any way involved in your graduate

6    association?

7    A.    No.  But he's involved in the other one.

8    Q.    What is the other one?

9    A.    The Student Society for Ethnomusicology at

10    North Texas.

11    Q.    Are you a member of that one, as well?

12    A.    I am not.

13    Q.    You know, the last question I wanted to ask you

14    is, it seems like you were soliciting signatures, at

15    least to Exhibit 2, correct?

16    A.    That is correct.

17    Q.    Do you have a list of all of those signatures

18    anywhere?

19    A.    It's included in the documents we sent.

20    Q.    The ones that you produced in response to the

21    subpoena.

22    A.    That's correct.

23    MR. ALLEN:  Thank you.  I'm going to take

24    a break.  Again, we've been going for another hour.  I

25    think we're almost done.  I just want to check my notes

---

Peter Michael Kohanski    5/18/21

94

1    and talk to my co-counsel.

2    MR. BOHUSLAV:  Okay.

3    MR. ALLEN:  And then we'll -- I guess then

4    we can reconvene and probably -- I don't know if you'll

5    want to do any cross examination, but that will be up to

6    you, Matt.

7    MR. BOHUSLAV:  Okay.

8    (OFF THE RECORD FROM 11:19 TO 11:29 A.M.)

9    (MR. STOWERS IS NOT PRESENT IN ROOM.)

10    MR. ALLEN:  So, Attorney Bohuslav, I have

11    finished my examination of the witness, and I pass the

12    witness to you.

13    MR. BOHUSLAV:  We will reserve for the

14    time of trial.

15    MR. ALLEN:  Thank you.  So, we'll conclude

16    the deposition for you and go off the record.

17    MR. BOHUSLAV:  Okay.

18    (DEPOSITION ADJOURNED AT 11:29 A.M.)

19

20

21

22

23

24

25

---

Peter Michael Kohanski    5/18/21

95

1    IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

2    SHERMAN DIVISION

3    TIMOTHY JACKSON,          )

)

4    Plaintiff,      )

) Case No.

5    v.                    )

) 4:21-cv-00033-ALM

6    LAURA WRIGHT, et al,      )

)

7    Defendants.      )

8

9    -----------------------------------

10    DEPOSITION CERTIFICATE

11    PETER MICHAEL KOHANSKI

12    MAY 18, 2021

13    -----------------------------------

14

15    I, Nita G. Cullen, Certified Shorthand

16    Reporter in and for the State of Texas, hereby certify

17    to the following:

18    That the witness, PETER MICHAEL KOHANSKI, was

19    duly sworn by the officer and that the transcript of the

20    oral deposition is a true record of the testimony given

21    by the witness;

22    I further certify that pursuant to FRCP Rule

23    30(f)(1) that the signature of the deponent:

24    ____ was requested by the deponent or a

25    party before the completion of the deposition and is to

---

Peter Michael Kohanski    5/18/21

96

1    be returned within 30 days from date of receipt of the

2    transcript.  If returned, the attached Changes and

3    Signature Page contains any changes and the reasons

4    therefor;

5    X  was not requested by the deponent or a

6    party before the completion of the deposition.

7    I further certify that I am neither attorney

8    or counsel for, nor related to or employed by, any of the

9    parties or attorneys to the action in which this

10    deposition was taken.

11    Further, I am not a relative or employee of

12    any attorney of record in this case, nor am I financially

13    interested in the outcome of the action.

14    Subscribed and sworn to on this 14th day of

15    June, 2021.

16

17

18    _____

NITA G. CULLEN, Texas CSR #1563

19    Expiration Date:  08-31-2022

JULIA WHALEY & ASSOCIATES

20    Firm Registration No. 436

2012 Vista Crest Drive

21    Carrollton, Texas 75007-1640

214.668.5578

22

23

24

25

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON,                )
                               )
          Plaintiff,           )
                               )
VS.                            ) CIVIL ACTION
                               )
LAURA WRIGHT, ET AL.           ) NO.: 4:21-cv-00033-ALM
                               )
          Defendants.          )
                               )
                               )

---------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN SLOTTOW, PhD

NOVEMBER 7, 2024

---------------------------------

     ORAL AND VIDEOTAPED DEPOSITION OF STEPHEN

SLOTTOW, PhD, produced as a witness at the instance

of the DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on November 7, 2024,

from 8:31 a.m. to 4:41 p.m., via Zoom teleconference

before Vanessa J. Theisen, CSR in and for the State

of Texas, and RPR, reported by machine shorthand, at

the University of North Texas System, 801 North Texas

Boulevard, Gateway Suite #340, Denton, Texas 76201,

pursuant to the Federal Rules of Civil Procedure and

any provisions stated on the record or attached

hereto.

26

1 opportunity given for a response.
2       Usually at a plenary address there's
3 some room for questions and responses afterwards.
4 But this plenary address, since he was one of, I
5 think, three or four people who was talking on
6 different topics, there were no question-and-answer
7 periods.
8       And then, very unusually, there was
9 no -- there were no articles.  There was no response
10 in the journals.  There was nothing.  There was no
11 opportunity to give any response.  So the Journal of
12 Schenkerian Studies decided that we would post a
13 response and solicit articles from music theorists,
14 including us, Dr. Jackson and myself, whoever wanted
15 to respond.
16       This led to -- we were -- since Ewell
17 was accusing Heinrich Schenker of being a racist and
18 that his racism was affecting his music theory,
19 therefore, he was promulgating a racist music theory,
20 and it was certainly the kiss of death to be in any
21 way associated with racism, the school was terribly,
22 terribly embarrassed and then afraid of bad publicity
23 and reacted to that.  That's what I mean.
24    Q.  Who at the school was -- reacted, as you
25 say?

27

1    A.  Well, I know that Dr. Brand did and the dean
2 did.  And beyond that, I don't know for certain.
3    Q.  How do you know that Dr. Brand and the dean
4 did?
5    A.  Because it was -- as I said, it was
6 Dr. Brand, with consultation from the dean, who told
7 us that we would no longer be handling the journal
8 and the center.
9    Q.  He told you that?
10    A.  Well, he told Tim -- he told Dr. Jackson
11 that, I think.  I don't think he told me directly,
12 and I got it from Dr. Jackson, certainly.
13    Q.  Okay.  So you said Dr. Brand and the dean at
14 the time.  Was the dean John Richmond by chance?
15    A.  I don't -- I'm not sure if the dean -- if it
16 was Richmond or Scott.  I -- for some reason I think
17 it was Richmond, but I'm not entirely sure.  I think
18 it was John Richmond.
19    Q.  Do you think they had reason to be
20 embarrassed?
21    A.  Well, administrators are always terribly
22 concerned with the reputation of their programs and
23 the schools, and they're very sensitive to bad
24 publicity, so they probably did.  We were certainly
25 getting plenty of bad publicity.

28

1    Q.  Do you think the college's reputation was
2 damaged by the journal?
3    A.  I don't know.  If music theory -- the
4 division of music history and ethnomusicology, they
5 were certainly on the receiving end of a lot of
6 disapproval, so they certainly thought they were.
7 Perhaps their reputation was damaged by those who
8 were outraged that we would criticize Philip Ewell's
9 opinions.
10    Q.  Who are you talking about when you say, "by
11 those who were outraged that you would criticize
12 Philip Ewell's opinions"?
13    A.  Music theorists, musicologists, people
14 like -- people like -- people who would -- wrote
15 blogs on music.
16       If you look on YouTube, there is an
17 awful lot of support for Ewell's views, and, mixed
18 with that, would be attacks on Dr. Jackson, to some
19 extent me, and sort of by reflection, on the music
20 theory department of UNT -- not department -- area,
21 yes.  It was a big kerfuffle, yes.
22    Q.  And so was this coming from outside of UNT,
23 inside of UNT?
24    A.  Well, it was certainly coming from outside
25 of UNT, but it was coming from inside UNT also,

29

1 because a petition was put together by the majority
2 of UNT -- well, of faculty of the division of music
3 history, music theory, and ethnomusicology
4 attacking -- and also a separate petition by GAMuT,
5 which is a graduate student organization of the
6 division, attacking the -- criticizing the journal
7 and criticizing Dr. Jackson, in particular, of
8 essentially being a racist.  And I think the student
9 petition demanded his ouster from the university.
10       And a lot of the music theory facul --
11 the music theory and history -- well, the faculty of
12 the division signed this -- not everyone did.  And
13 all of those people are now defendants in
14 Dr. Jackson's suit.  Well, all of the faculty and one
15 student who's no longer a student at UNT.  She's at
16 Yale.
17    Q.  Uh-huh.
18    A.  What was the question?
19    Q.  I'm sorry, I don't recall either.
20       MS. QUIMBY:  Court reporter, could you
21 please read it back?
22       THE REPORTER:  Yes, give me just a
23 second.
24       MS. QUIMBY:  Yes, thank you.
25       THE REPORTER:  "And so was this coming

30

1  from outside of UNT, inside of UNT?"
2      A.  Oh, yes.  So it was coming from -- what I
3  was describing is what was coming from inside UNT.  I
4  think before I was describing what was coming from
5  outside.
6      Q.  So the YouTube posts and blogs posts you
7  described earlier, that was from outside of UNT?
8      A.  Yes.
9      Q.  Okay.  You described both -- you described
10  petitions of both the faculty and the students,
11  correct?
12      A.  Well, students through the student
13  organization called GAMuT.  I forget exactly what
14  GAMuT stands for, but it's an association of music
15  history, theory -- music history and theory graduate
16  students.
17      Q.  What about it was a petition, or why did you
18  use the word "petition"?
19      A.  Is it not a good word?  A document that
20  people signed onto requesting, nay demanding.  I
21  think "petition" is a fine -- is appropriate.
22      Q.  I wasn't questioning you.  I'm just curious
23  about why you chose that word, that's all.
24      A.  I think because that's what it was.
25      Q.  That's fair.  So you described the faculty

31

1  petition -- and I believe both of the petitions -- as
2  attacking Dr. Jackson.  Is that right?
3      A.  Yes.  I think myself to some extent but
4  mainly Dr. Jackson.
5      Q.  What about the faculty petition attacked
6  Dr. Jackson, if you recall?
7      A.  Well, what about them?  What do you mean?
8      Q.  Why could you say that they were -- why do
9  you use the word "attack"?
10      A.  Well, they were attacked.  They were a harsh
11  criticism.  They -- I don't think they demanded he be
12  fired like the graduate student petition, but they
13  were decrying his temerity in publishing such an
14  issue and making what they conceived of as personal
15  attacks on Philip Ewell in his own article -- one of
16  the articles is his -- and basically taking Ewell's
17  side in all this and saying that Schenker was a
18  racist and that Dr. Jackson was a racist for
19  defending Schenker, and it was all quite disgraceful.
20      Q.  And you said the majority of faculty signed
21  that, correct?
22      A.  Of music history and theory faculty, yes.
23      Q.  Is that yeah the MHTE?
24      A.  Yes.
25      Q.  Can we use -- if we use that acronym, will

32

1  you --
2      A.  Yeah, I was trying to remember it.  MHTE,
3  yes.
4      Q.  Do you remember who didn't of the MHTE
5  faculty?
6      A.  Yes, well I --
7          MR. ALLEN:  Objection.  Form.
8      A.  -- I don't remember everyone who didn't, but
9  the three people who didn't was me, Dr. Heetderks,
10  and Dr. Schwartz.
11      Q.  (BY MS. QUIMBY)  How many total faculty do
12  you recall --
13      A.  I don't recall.
14      Q.  -- in the MHTE at that time?
15      A.  I don't know how many there are.  As I said,
16  I'm not very good with dates and numbers.
17      Q.  Okay.  No problem.
18      A.  I would just -- I would have to go to a
19  register and count them.
20      Q.  You said Dr. Heetderks and Schwarz and
21  yourself, correct?
22      A.  Us three for sure.  I -- they're the only
23  three I can think of.
24      Q.  Do you remember receiving an email from
25  someone else on the faculty circulating that

33

1  petition?
2      A.  Dr. Geoffroy-Schwinden, I think, is the one
3  who started it.
4      Q.  Uh-huh.
5      A.  And I did get emails from her, asking me to
6  sign it.
7      Q.  Did you respond?
8      A.  Yeah.  I think I said no, I wouldn't sign
9  it.
10      Q.  Did you object to any of the content in the
11  letter that was being circulated?
12      A.  Yeah, almost all of it.
13      Q.  Did you tell her that?
14      A.  Yeah, I think I did.  I said I didn't want
15  to sign it for two reasons.  Because, one, being in
16  the center, I thought it would be rather hypocritical
17  to protest actions that I was a part of and sort of
18  ridiculous.  I didn't use that word.
19          And the other was that I did not believe
20  in the charges that were being made.  I did not think
21  it was a -- that it was a rac -- that Dr. Jackson or
22  the journal was being racist in any way by discussing
23  and soliciting responses.
24          The only responses officially that
25  existed at the time -- there was this strained

166

1        CHANGES AND SIGNATURE
2  WITNESS NAME:  STEPHEN SLOTTOW, PhD
3  DATE OF DEPOSITION:  NOVEMBER 7, 2024
4  PAGE       LINE       CHANGE       REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

167

1        I, STEPHEN SLOTTOW, PhD, have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted above.
4
5        _____
6              STEPHEN SLOTTOW, PhD
7  THE STATE OF _____ )
8  COUNTY OF _____ )
9        Before me, _____, on this day
10 personally appeared STEPHEN SLOTTOW, PhD, known to me
11 (or proved to me under oath or through
12 _____) (description of identity card or
13 other document) to be the person whose name is
14 subscribed to the foregoing instrument and
15 acknowledged to me that he executed the same for the
16 purposes and consideration therein expressed.
17
18        Given under my hand and seal of office, this
19 _____ day of _____, _____.
20
21        _____
22              NOTARY PUBLIC IN AND FOR
23              THE STATE OF _____
24 My commission expires: _____
25 _____ No Changes Made _____ Amendment Sheet(s) Attached

168

1        THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2              SHERMAN DIVISION
3  TIMOTHY JACKSON,        )
                           )
4        Plaintiff,   )
                      )
5  VS.              ) CIVIL ACTION
                    )
6  LAURA WRIGHT, ET AL.    ) NO.: 4:21-cv-00033-ALM
                          )
7        Defendants.  )
8
        REPORTER'S CERTIFICATION OF THE ORAL
9      DEPOSITION OF STEPHEN SLOTTOW, PhD
              NOVEMBER 7, 2024
10
11        I, Vanessa J. Theisen, a Certified
12 Shorthand Reporter in and for the State of Texas,
13 hereby certify to the following:
14        That the witness, STEPHEN SLOTTOW, PhD,
15 was duly sworn by the officer and that the transcript
16 of the oral deposition is a true record of the
17 testimony given by the witness;
18        That the original deposition was delivered
19 to Mr. Patrick Todd to obtain witness's signature.
20        That a copy of this certificate was served
21 on all parties and/or the witness shown herein on
22 November 11, 2024.
23        I further certify that pursuant to FRCP
24 Rule 30(3) that the signature of the deponent:
25        _XX_ was requested by the deponent or a

169

1  party before the completion of the deposition and
2  that the signature is to be before any notary public
3  and returned within 30 days from date of receipt of
4  the transcript.
5        If returned, the attached Changes and
6  Signature Page contains any changes and the reasons
7  therefore:
8        ____ was not requested by the deponent or
9  a party before the completion of the deposition.
10       I further certify that I am neither
11 counsel for, related to, nor employed by any of the
12 parties or attorneys in the action in which this
13 proceeding was taken, and further that I am not
14 financially or otherwise interested in the outcome of
15 the action.
16       Certified to by me on this, the 11th day
17 of November, 2024.
18
19       _____
20       VANESSA J. THEISEN, Texas CSR, RPR
         Texas Cert No. 3238
         Expiration Date:  10/31/25
21       Integrity Legal Support Solutions
         Firm Registration No. 528
22       9901 Brodie Ln., Ste. 160-400
         Austin, Texas 78748
23       (512) 320-8690
         www.integritylegal.support
24
25

*Levi Nigem Xenon Walls    5/18/21*    1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        SHERMAN DIVISION

 3   TIMOTHY JACKSON,          )
                               )
 4          Plaintiff,         )
                               )
 5   v.                        ) CASE NO.
                               ) 4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,      )
                               )
 7          Defendants.        )
                               )
 8

 9

10         -----------------------------------

11               ORAL DEPOSITION OF

12            LEVI NIGEM XENON WALLS

13                  MAY 18, 2021

14         -----------------------------------

15

16

17        ORAL DEPOSITION OF LEVI NIGEM XENON WALLS, produced

18   as a witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 18, 2021, from 12:57 p.m. to 4:52 p.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.
```

---

*Levi Nigem Xenon Walls    5/18/21*    3

```
 1                      INDEX

 2                                               PAGE

 3   Appearances..........................................2

 4   Stipulations.........................................4

 5   LEVI NIGEM XENON WALLS

 6      Examination by Mr. Allen.........................4

 7   Reporter's Certificate.............................143

 8

 9                     EXHIBITS
10   NO.  DESCRIPTION                               PAGE
     Exhibit  4   Subpoena to Testify for Levi Walls.....6
11   Exhibit  5   Text Messages between Levi and Chris...11
     Exhibit  6   Text Messages between Nate, Brian,
12                Jessica, and E.....................34
     Exhibit  7   E-mail to Benjamin Brand, dated
13                7/26/2020.........................45
     Exhibit  8   E-mail to Benjamin Brand, dated
14                January 9, 2020...................50
     Exhibit  9   E-mail to Ellen Bakuline, dated
15                July 25, 2020.....................62
     Exhibit 10   Facebook Post by Levi Walls, July 27...70
16   Exhibit 11   Letter to Dr. Jackson from Levi Walls..85
     Exhibit 12   Letter to Dr. Jackson from Levi Walls..87
17   Exhibit 13   E-mail to Stephen Slottow, 12/19/2019..89
     Exhibit 14   E-mail to JSS Authors and Advisory
18                Board, March 14, 2020..............93
     Exhibit 15   E-mail dated March 10, 2020, to
19                Schenker, me.......................99
     Exhibit 16   E-mail to Levi Walls, March 13, 2020..101
20   Exhibit 17   E-mail to Dr. Jackson, February 13....108
     Exhibit 18   Call For Papers, December 17, 2019....110
21   Exhibit 19   Members of the Editorial Board
                  Correspondence re. Call for Papers,
22                November 25-December 1, 2019.......113
     Exhibit 20   Response to Ewell, November 19, 2019..122
23   Exhibit 21   Meeting, November 15, 2019..........126
     Exhibit 22   E-mail to Dr. Jackson, November 18,
24                2019...............................130
     Exhibit 23   E-mail to Tim, Stephen, and Benjamin,
25                April 22, 2019....................133
```

---

*Levi Nigem Xenon Walls    5/18/21*    2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4      MR. MICHAEL THAD ALLEN
        MS. SAMANTHA HARRIS
 5      ALLEN LAW, LLC
        P.O. Box 404
 6      Quaker Hill, Connecticut 06375
        860.772.4738
 7      860.469.2783 Fax
        m.allen@allen-lawfirm.com
 8

 9   FOR THE DEFENDANTS:

10      MR. MATT BOHUSLAV
        ASSISTANT ATTORNEY GENERAL
11      GENERAL LITIGATION DIVISION
        ATTORNEY GENERAL OF TEXAS
12      P.O. Box 12548, Capitol Station
        Austin, Texas 78711
13      matthew.bohuslav@oag.texas.gov

14   AND

15      MR. RENALDO STOWERS
        SENIOR ASSOCIATE GENERAL COUNSEL
16      UNIVERSITY OF NORTH TEXAS SYSTEM
        OFFICE OF GENERAL COUNSEL
17      1155 Union Circle
        Denton, Texas 76203
18      940.565.2717
        renaldo.stowers@untsystem.edu
19

20   ALSO PRESENT:

21      MR. TIMOTHY JACKSON

22

23

24

25
```

---

*Levi Nigem Xenon Walls    5/18/21*
4

```
 1              P R O C E E D I N G S

 2              LEVI NIGEM XENON WALLS,

 3   having been first duly sworn, testified as follows:

 4              EXAMINATION

 5   BY MR. ALLEN:

 6      Q.   Mr. Walls, my name is Michael Allen, I'm an

 7   attorney for Timothy Jackson.  I just wanted to talk

 8   about some things preliminarily.  This will be a very

 9   formal conversation, but it's a conversation

10   nonetheless.  The deposition is an extension of the

11   Court, and the purpose of the deposition is to find out

12   what evidence you have and what you would say at trial.

13              So, a couple ground rules.  If I -- if I

14   say anything that's unclear to you, please feel free to

15   interrupt me and ask for clarification.  It's more than

16   possible that it's my unclarity, my incompetence at

17   forming a good question.  So, I wouldn't want you to

18   answer a question you didn't understand, is that clear?

19      A.   Yes.

20      Q.   So, as a corollary to that, if you don't ask

21   for a clarification, I'll assume you understand my

22   question; is that also clear?

23      A.   Yes.

24              MR. ALLEN:  Matt, in the last deposition

25   we agreed that all objections except those that go to
```

1  responses.

2  **Q.**  It was certainly a lot of work for you, right?

3  **A.**  Sure.

4  **Q.**  It would seem that you worked very hard on this

5  project, correct?

6  **A.**  Well, it was my job.

7  **Q.**  Were you -- did anyone comment about your hard

8  work on the project at the time, that it was deficient

9  in any way or that you weren't holding up your end?

10  **A.**  No.  I think I did well in typesetting the

11  articles and getting rid of typos and, you know, looking

12  at structure.

13  **Q.**  And Levi Walls, reading your name "Levi" on the

14  next page, page 6.  I'm sorry to call you by your first

15  name, but it's just that's the name on the thread, no

16  disrespect intended.  You know, about two sentences

17  down, it says, "I like the job in general, because I

18  love editing and being involved in research, but I'm not

19  in a position to go against the people who control the

20  journal."  You see that?

21  **A.**  Yes.

22  **Q.**  Describe your position on the journal and how

23  you felt you were able to discuss the initiatives of the

24  journal with other people on the editorial board for me.

25  **A.**  Well, when it came to discussions of what

1  should and shouldn't go into the journal, even if I had

2  reservations, I generally kept them to myself.

3  **Q.**  Describe your interactions with authors in the

4  editorial process.  How did you interact with the

5  authors?

6  **A.**  Mostly, I gave comments on readability and if

7  there was something that they wrote that I thought was,

8  you know, clumsy or awkward, well, I wouldn't have said

9  "clumsy" to them, that would have come off as rude.  But

10  if the wording was somehow unclear, I would have

11  suggested an alternate wording.  And, obviously, if they

12  were clear typos, I would have suggested changing those.

13  Generally, closest I got to content, at

14  least in the -- you know, well, I suppose in both the

15  large scale articles and the symposium would be comments

16  about, like, argumentative structure.  Like, if I saw an

17  argument that just rhetorically wasn't clear, but that

18  really doesn't have much to do with like the content of

19  it.

20  The closest I got to talking about content

21  was with one of the contributors, Barry Wiener.  And I

22  expressed some concern over the tone.  But after that, I

23  stopped doing that.

24  **Q.**  And this was an author you now characterize as

25  having published a racist article, correct?

1  **A.**  Yes.

2  **Q.**  And did you recognize his article as racist at

3  the time?

4  **A.**  Yes.

5  **Q.**  And did you leave any writing indicating that

6  you felt his article was racist?

7  **A.**  I did not tell him that his article was racist.

8  I said that the tone was -- I don't recall exactly what

9  I said, but I think I said something along the lines

10  that the tone was confrontational and that his arguments

11  would come out better if it was not as confrontational

12  or if he was less, I don't know, confrontational towards

13  left politics?

14  **Q.**  Is it racist to be confrontational, is that

15  what you mean?

16  **A.**  I don't believe it's racist to be

17  confrontational in itself.  I believe it's racist to say

18  something along the lines of, left politics being part

19  of reeducation camps.

20  **Q.**  Did his article say that?

21  **A.**  I believe that was in that article.  I could be

22  mistaken, it could have been in another article.

23  **Q.**  And you write here, in fact, you have the

24  exhibit, "I also don't want to lose my job."  Do you see

25  where you said that?

1  **A.**  Yes.

2  **Q.**  Did anyone ever threaten you with losing your

3  job at the journal?

4  **A.**  No.

5  **Q.**  In fact, you quit you said, I think, July 29th,

6  2020, if I'm not mistaken, or thereabouts?

7  **A.**  Yes.  And I was encouraged to leave by Benjamin

8  Brand.

9  **Q.**  Benjamin Brand being the department chair or

10  division chair MHTE.

11  **A.**  Yes.

12  **Q.**  I'm always afraid I'm transposing the letters.

13  So, he essentially told you to leave the job, is that

14  it?

15  **A.**  He didn't tell me to leave the job, but he knew

16  I was unhappy in the job, especially in the recent

17  months leading up to July.  Really, from November to

18  July.  Pre-November, pre-SMT, I was actually rather

19  happy with the job, just working on those three academic

20  articles.

21  And up to that point, the input from the

22  editorial board was a lot less.  It was after the SMT

23  that it became very micromanaged, and that's about the

24  point where I started to dislike the job.

25  So, Brand knowing that I was already

Levi Nigem Xenon Walls   5/18/21

45

1  unhappy in the job and had already been concerned about
2  my name being attached to something that was racist,
3  encouraged me to leave the position.  And, mainly, did
4  that by saying that my funding would be okay if I did,
5  that I would have a position as a TA, which was my main
6  concern.
7      Q.   Which is what you've done now, correct?  You've
8  continued as a TA, correct?
9      A.   Yes.
10     Q.   And no one was issuing statements for you to be
11 fired, correct?
12     A.   No.
13     Q.   And it was -- you were becoming dissatisfied
14 with the job, you said from November up through July, so
15 sounds like from the Philip Ewell talk through the
16 publication of the journal and the resulting fallout,
17 because of the racist content of the journal.
18     A.   Yes.
19          (DEPOSITION EXHIBIT 7 MARKED.)
20     Q.   (By Mr. Allen)  I think you're on this e-mail,
21 Mr. Walls.  Is this your e-mail, LeviWalls@my.unt.edu?
22     A.   Yes.
23     Q.   Do you recall this e-mail?
24     A.   Yes, I do.
25     Q.   And isn't it true that this e-mail discusses

Levi Nigem Xenon Walls   5/18/21

46

1  having a response from Ewell and others who might want
2  to respond to the symposium in a Volume 13?
3      A.   I have to remind myself everything that was
4  said in this e-mail.  Could I just have a moment to
5  review it?
6      Q.   Of course.  Of course.  I should have said that
7  at the beginning, and I'm sure your attorney would have
8  objected if I forced you to comment on a document that
9  you couldn't read.  If at any time you need time to
10 examine a document, please just say so.
11     A.   All right.  What was your question?
12     Q.   So, this e-mail discusses having a response
13 from Ewell, as well as others, to the symposium in
14 Volume 13, which would have appeared in the next
15 subsequent volume of the Journal for Schenkerian
16 Studies, correct?
17     A.   Yes.
18     Q.   Do you know if a call for papers ever went out?
19     A.   For Volume 13?
20     Q.   Correct.
21     A.   Not that I know of.
22     Q.   Why not?
23     A.   I mean, I assume if it went out, it would have
24 went out to SMT list, but I actually don't keep track of
25 it -- SMT list, that is.

Levi Nigem Xenon Walls   5/18/21

47

1      Q.   But you know for a fact no call for papers for
2  a Volume 13, as a kind of follow-up to the symposium
3  ever went out.
4      A.   I don't know that for a fact.  I just haven't
5  seen one.  As far as I know, no call ever went out for
6  Volume 13.
7      Q.   Did you prepare any such call for papers?
8      A.   No.
9      Q.   You participated directly in the call for
10 papers that went out for the symposium, correct?
11     A.   Yes.
12     Q.   Isn't this a normal part of editorial practice,
13 to call for responses to controversial articles that
14 have been published?
15     A.   To the best of my knowledge, I think that's
16 normal, although I got a sense from other people that
17 what would have been more standard would have been to
18 specifically invite Ewell from the beginning.
19     Q.   Do you know that Ewell was not invited to
20 participate in the symposium?
21     A.   He wasn't directly or explicitly invited.
22     Q.   Was he invited in some way?
23     A.   It is true that the call went out general or
24 generally through the SMT list, I think, and so,
25 theoretically, he might have had access to the call, if

Levi Nigem Xenon Walls   5/18/21

48

1  he keeps track of the SMT list, which I mean, I imagine
2  he does, but he wouldn't have been invited specifically.
3      Q.   Do you know if Ewell participated in any of the
4  authors' publications that were pro-Ewell that appeared
5  in the symposium, by either consulting with them or
6  reading their papers in advance or in any form like
7  that?  Did you have any knowledge of that, as an editor?
8      A.   I think one of the articles mentioned in --
9  sorry -- acknowledgments that they consulted with Ewell,
10 just asking his opinion on what they wrote, but I
11 don't -- I want to say Lett's, that could be wrong.
12 Stephen Lett.
13     Q.   Stephen Lett's publication, is that what you're
14 referring to?
15     A.   Yes.  I believe that was the one with the
16 acknowledgment mentioning that they ran it by Ewell for
17 comments.
18     Q.   So if someone said Ewell had no notice that the
19 symposium was going to be published, that would be
20 false, correct?
21          MR. BOHUSLAV:  Objection, calls for
22 speculation.
23     A.   I think he had notice, but it seemed to me --
24 and, again, I don't really know Ewell's frame of mind --
25 it seems as if he wanted a direct invitation, that if

Levi Nigem Xenon Walls    5/18/21

141

1    there's something I'm forgetting, okay?

2        MR. BOHUSLAV:  Okay.

3        (OFF THE RECORD FROM 4:46 TO 4:51 P.M.)

4    Q.    (By Mr. Allen) Mr. Walls, I just had one last

5    question, and it goes back to the meeting in the car you

6    had with Professor Jackson, which you described in the

7    middle of a snowstorm in February at some point.  Did I

8    characterize that correctly?

9    A.    I wouldn't call it a snowstorm.  It was just

10   lightly snowing.

11   Q.    And did you go into the car to escape the

12   weather?

13   A.    That was how he suggested it.

14   Q.    Did he use force in any way?

15   A.    No.

16   Q.    Did he use coercion in any way?

17   A.    No.  I could have said "no".

18   Q.    Thank you.  And so, he didn't threaten you, if

19   you did not go into his car.

20   A.    No.  But he suggested that we go into the car,

21   and I just have trouble saying no to people who are my

22   advisor.  And so, even though I was uncomfortable, I

23   went into the car.

24   Q.    But you said you could have said no, correct?

25   A.    Yes.

Levi Nigem Xenon Walls    5/18/21

142

1        MR. ALLEN:  Okay.  That's all.  I pass the

2    witness to you, Mr. Bohuslav.

3        MR. BOHUSLAV:  We'll reserve till time of

4    trial.

5        MR. ALLEN:  Thank you so much.  Thank you

6    for your time.  Good luck with your graduate studies.

7        (DEPOSITION ADJOURNED AT 4:52 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Levi Nigem Xenon Walls    5/18/21

143

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2            SHERMAN DIVISION

3    TIMOTHY JACKSON,           )
                               )
4        Plaintiff,       )
                             ) Case No.
5    v.                      )
                             ) 4:21-cv-00033-ALM
6    LAURA WRIGHT, et al,       )
                               )
7        Defendants.       )
                             )

8

9    ---------------------------------

10        DEPOSITION CERTIFICATE

11        LEVI NIGEM XENON WALLS

12            MAY 18, 2021

13   ---------------------------------

14

15   I, Nita G. Cullen, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18   That the witness, LEVI NIGEM XENON WALLS, was

19   duly sworn by the officer and that the transcript of the

20   oral deposition is a true record of the testimony given

21   by the witness;

22   I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24   ____ was requested by the deponent or a

25   party before the completion of the deposition and is to

Levi Nigem Xenon Walls    5/18/21

144

1    be returned within 30 days from date of receipt of the

2    transcript.  If returned, the attached Changes and

3    Signature Page contains any changes and the reasons

4    therefor;

5    X  was not requested by the deponent or a

6    party before the completion of the deposition.

7    I further certify that I am neither attorney

8    or counsel for, nor related to or employed by, any of the

9    parties or attorneys to the action in which this

10   deposition was taken.

11   Further, I am not a relative or employee of

12   any attorney of record in this case, nor am I financially

13   interested in the outcome of the action.

14   Subscribed and sworn to on this 14th day of

15   June, 2021.

16

17

18   _____

     NITA G. CULLEN, Texas CSR #1563

19   Expiration Date:  08-31-2022

     JULIA WHALEY & ASSOCIATES

20   Firm Registration No. 436

         2012 Vista Crest Drive

21   Carrollton, Texas 75007-1640

     214.668.5578

22

23

24

25

# *Journal of Schenkerian Studies*

***Editor***    Benjamin Graf
***Assistant Editor***    Levi Walls

### *Editorial Board*

Mark Anson-Cartwright
Benjamin Ayotte
Ellen Bakulina
David Beach
Charles Burkhart
L. Poundie Burstein
Allen Cadwallader
Diego Cubero
William Drabkin
David Gagné
Yosef Goldenberg
Graham Hunt
Timothy L. Jackson
Roger Kamien
Wayne Petty
William Renwick
Frank Samarotto
Carl Schachter
Hedi Siegel
Peter H. Smith
David Stern
Lauri Suurpää
Stephen Slottow

### *Advisory Board*

Timothy L. Jackson
Stephen Slottow



**Exhibit**
**Stephen Slottow, Ph.D.**

**2**

11/07/024 VT

**APPX.101**

### *About the Journal*

The *Journal of Schenkerian Studies* (ISSN 1558-268X) is a peer-reviewed journal published annually by the Center for Schenkerian Studies and the University of North Texas Press under the guidance of Timothy Jackson, Stephen Slottow, and an expert editorial board. The journal features articles on all facets of Schenkerian thought, including theory, analysis, pedagogy, and historical aspects and reviews of relevant publications.

For new orders and back issues, please contact:

Texas A&M University Press Consortium
John H. Lindsey Building
Lewis Street
4354 TAMU
College Station, Texas 77843-4354

Main Press Phone:
979-845-1436
Main Press Fax:
979-847-8752
Orders Toll Free (U.S. Only):
800-826-8911

### *Article Submissions and Editorial Correspondence*

Article submissions are accepted year round. For submission guidelines visit:
http://www.music.unt.edu/mhte/node/54

Please send article submissions and editorial correspondence to the editor at the following address:

*Journal of Schenkerian Studies*
Levi Walls, Editor
UNT College of Music
1155 Union Circle #311367
Denton, TX 76203-5017
Email correspondence: schenker@unt.edu

### *Copyright*

© 2019 Center for Schenkerian Studies. All rights reserved. No part of this publication may be copied, reproduced, transmitted, or stored in any way without the written consent of the Center for Schenkerian Studies and the University of North Texas Press. Photocopying content for personal use is permitted for libraries and other users registered with the Copyright Clearance Center (CCC), 222 Rosewood Drive, Danvers, MA 01923 (www.copyright.com).

# *Journal of Schenkerian Studies*

**VOLUME 12**                                                    **2019**

## CONTENTS

JOHN KOSLOVSKY
Schenkerizing *Tristan*, Past and Present ...................................................................... 1

BRYAN J. PARKHURST
The Hegelian Schenker, The Un-Schenkerian Hegel, and How to Be a Dialectician about Music ..................................................................................................................... 55

NICHOLAS STOIA
The Tour-of-Keys Model and the Prolongational Structure in Sonata-Form Movements by Haydn and Mozart ................................................................................................... 79

Symposium on Philip Ewell's SMT 2019 Plenary Paper, "Music Theory's White Racial Frame"............................................................................................................... 125–214

INTRODUCTION ............................................................................................. 125

DAVID BEACH
Schenker–Racism–Context .................................................................................. 127

RICHARD BEAUDOIN
After Ewell: Music Theory and "Monstrous Men" ............................................ 129

JACK BOSS
Response to P. Ewell ............................................................................................. 133

CHARLES BURKHART
Response to Philip Ewell .................................................................................... 135

ALLEN CADWALLADER
A Response to Philip Ewell ................................................................................ 137

SUZANNAH CLARK
Patterns of Exclusion in Schenkerian Theory and Analysis ............................... 141

NICHOLAS COOK
Response to Philip Ewell ................................................................................... 153

TIMOTHY L. JACKSON
A Preliminary Response to Ewell ...................................................................... 157

STEPHEN LETT
De-Scripting Schenker, Scripting Music Theory ............................................... 167

RICH PELLEGRIN
Detail, Reduction, and Organicism: A Response to Philip Ewell ...................... 173

BOYD POMEROY
Schenker, Schenkerian Theory, Ideology, and Today's Music Theory
Curricula ........................................................................................................... 179

CHRISTOPHER SEGALL
Prolongational Analysis without Beams and Slurs: A View from Russian Music
Theory ............................................................................................................... 183

STEPHEN SLOTTOW
An Initial Response to Philip Ewell .................................................................. 189

BARRY WIENER
Philip Ewell's White Racial Frame ................................................................... 195

ANONYMOUS
An Anonymous Response to Philip Ewell .......................................................... 207

BIBLIOGRAPHY FOR THE RESPONSES ....................................................... 209

CONTRIBUTORS ............................................................................................. 215

# Tweet



**dr little ferret, phd**
@imanimosley                                    ⌄

as per always, this conversation is
more complicated than it seems. it's
been brought to my attention that
the editors of JSS are grad students/
junior scholars, etc. please let us
remember their precarity when
addressing how something like this
can come to fruition.

10:49 · 26/07/2020 · Twitter for iPad

4 Retweets and comments  30 Likes

            

 Megan Lavengood @meganlave... · 5m ⌄

  Tweet your reply

            

UNT_001317
APPX.105

# Tweet



**Megan Lavengood** @meganlave... · 5m
Replying to @imanimosley

The journal is "run by" grad students but their editorial and advisory boards are mainly tenured senior scholars.

💬 3    🔁    ♡ 12    ⬆



**Megan Lavengood** @meganlave... · 3m

I haven't been involved in a student run journal myself but to me this signals that the grunt work (soliciting submissions, administration, line edits) is done by grad students but the burden of peer reviewing and such can be squarely put on the shoulders of the boards

💬    🔁    ♡ 6    ⬆



**Mariusz Kozak** @prof_kozak · 8m
Replying to @imanimosley

I was told the same, but these are not junior scholars

mhte.music.unt.edu/editorial-board

💬 2    🔁    ♡ 5    ⬆



Tweet your reply

   

UNT_001318
APPX.106

# Tweet



**Sam Reenan** @sam_reenan · 7m     ⌄
This brings up a really important
question, which is whether these essays
even were peer reviewed. If they were,
how did the editorial board fail so hard. If
they weren't, it's a damn shame that
senior scholars would manipulate their
power to espouse such views.

💬 1          ⟲          ♡ 3          ⬆



**Mariusz Kozak** @prof_kozak · 6m     ⌄
The same people who wrote the essays
are on the editorial board 🤷‍♂️

💬          ⟲          ♡ 5          ⬆



**Daniel Shanahan** @danielshan... · 12m     ⌄
Replying to @imanimosley

I would argue that this is another reason
that Johnson (a senior scholar at their
institution and likely their advisor)
choosing to publish those viewpoints
there is such an unscholarly abuse of
power.

💬 1          ⟲ 2          ♡ 7          ⬆



Tweet your reply

🏠          🔍          🔔          ✉

UNT_001319
APPX.107

# Tweet



**Replying to @imanimosley**

I would argue that this is another reason that Johnson (a senior scholar at their institution and likely their advisor) choosing to publish those viewpoints there is such an unscholarly abuse of power.

💬 1     🔁 2     ♡ 7     ⬆️



**Megan Lavengood** @meganlave... · 2m ∨
*Jackson but more importantly, it sure looks that way doesn't it!?

💬     🔁     ♡ 2     ⬆️



**Louise Fristensky** @RamblingL... · 12m ∨
**Replying to @imanimosley**

(I'm a grad student. But also, one assumes they have an advisory professor or something?)

💬 1     🔁     ♡ 2     ⬆️



**Megan Lavengood** @meganlave... · 5m ∨
Two in fact!

💬     🔁     ♡ 1     ⬆️



Tweet your reply

               

UNT_001320
APPX.108

Case 4:21-cv-00142-ALM Document 83-6

# Tweet



**Robert Komaniecki**
@Komaniecki_R

Getting a sense of some of the inner workings of the Journal of Schenkerian studies: A former UNT student told me that when they worked on the journal, several of the board members were dead



 Tweet your reply

   

UNT_001321
APPX.109



**Peter's post**



hole of threads and tweets trying to get the whole picture lol

33 m    Like    Reply    1

 Write a reply...



**Ben Graf**

I'm ashamed to be associated with it, I'm really torn up about the whole issue.  Levi and I are caught in a crossfire and I'm glad to be done my association with it.

24 m    **Like**    Reply    3



**Peter Kohanski**

I thought of you guys and was worried you had to get caught up in it. I'm so sorry for the position you must've been in, it doesn't sound fair and must've been really difficult. I know this had to have come from higher ups.

17 m    Like    Reply

Write a reply...

 Write a comment...    GIF 

                

UNT_001322
APPX.110



**Chris Brody** @chrisbrodyMT · 15m ⌄
People are saying JSS is a "grad student journal." A possibly helpful clarification: "grad student journal" can mean several things. Type 1: run by grad students, peer review done by grad students, intended exclusively for grad students to publish in. (not JSS)

 1             2      



**Chris Brody** @chrisbrodyMT · 15m ⌄
Type 2: Peer review is done by PhD-holders, but otherwise run by grad students who make serious, significant decisions about the editorial direction of the journal (e.g. Intégral, ITR)

 1             2      



**Chris Brody** @chrisbrodyMT · 15m ⌄
Type 3: Editorial gruntwork is done by grad students, one of whom may have the title of editor, but peer review AND basically all other serious decisions are made by a PhD-holding editorial board (and may not even be endorsed by the



Tweet your reply

                  

# Thread

made by a PhD-holding editorial board
(and may not even be endorsed by the
"editors" who must carry out their
directions)

💬 1          ⟲          ♡ 2          ⬆️

**Chris Brody**
@chrisbrodyMT

*I could be wrong here* but my
impression is that JSS is closest to
type 3. So please keep that in mind
when deciding who deserves to
"face consequences"—those who
are responsible, on paper, for some
decisions may have been put in a
vulnerable, professionally impossible
situation

14:42 · 26/07/2020 · Twitter Web App

Tweet your reply

UNT_001324
APPX.112