**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| TIMOTHY JACKSON,<br>*Plaintiff,*<br><br>v.<br><br>LAURA WRIGHT, MILTON B. LEE,<br>MELISA DENIS, MARY DENNY,<br>DANIEL FEEHAN, A.K. MAGO,<br>CARLOS MUNGUIA, AND G.<br>BRINT RYAN, each in their official<br>capacities as members of the board of<br>regents for the University of North<br>Texas System; RACHEL GAIN;<br>ELLEN BAKULINA; ANDREW<br>CHUNG; DIEGO CUBERO; STEVEN<br>FRIEDSON; REBECCA DOWD<br>GEOFFROY-SCHWINDEN;<br>BENJAMIN GRAF; FRANK<br>HEIDLBERGER; BERNARDO<br>ILLARI; JUSTIN LAVACEK; PETER<br>MONDELLI; MARGARET NOTLEY;<br>APRIL L. PRINCE; CATHY<br>RAGLAND; GILLIAN ROBERTSON;<br>HENDRIK SCHULZE; VIVEK<br>VIRANI; AND BRIAN F. WRIGHT,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:21-cv-00033 |

## THE BOARD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
RALPH MOLINA
Deputy First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil Litigation
KIMBERLY GDULA
Chief, General Litigation

MARY B. QUIMBY
Texas Bar No. 24132506
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | Fax: (512) 320-0667
mary.quimby@oag.texas.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iv

STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT ........................ 2

INTRODUCTION ........................................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 3

    A.    Philip Ewell's plenary address, the JSS's response, and the resulting controversy ....................................................................................................... 3

    B.    UNT's response to the controversy .......................................................... 5

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT & AUTHORITIES ................................................................................. 10

    I.    Jackson lacks standing to sue the Board Defendants ................................. 11

    A.    Jackson's alleged injury is not traceable to the Board Defendants ......... 11

    B.    The Board Defendants cannot provide redress for Jackson's injury ....... 14

    II.    For similar reasons, Jackson's claim does not pass the Ex parte Young exception and his claims against the Board Defendants are barred by sovereign immunity .................................................................................... 17

    A.    Jackson does not seek the right remedy. .................................................. 18

    III.    Jackson's First Amendment retaliation claim fails. .................................. 20

    A.    The alleged adverse actions were not caused by Jackson's criticisms of Professor Ewell. .................................................................................... 22

        1.    UNT would have taken same actions regardless of Jackson's criticisms of Dr. Ewell. ...................................................................... 25

        2.    UNT's interest in promoting scholarship outweighs Jackson's interest in publishing the JSS without adhering to accepted scholarly standards. .............................................................................. 27

            i.    Volume 12 caused legitimate disruption ........................................... 27

            ii.    UNT's response to the disruption was reasonable. ........................... 29

                a.    The degree to which the employee's activity involved a matter of public concern. ............................................................ 30

                b.    The time, place, and manner of the employee's activity .................... 31

CONCLUSION .............................................................................................................. 33

CERTIFICATE OF SERVICE ...................................................................................... 35

# TABLE OF AUTHORITIES

**Federal Cases**

*Alden v. Maine*,
  527 U.S. 706, 713 (1999)............................................................................................ 17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................... 10

*Anderson v. Valdez*,
  845 F.3d 580 (5th Cir. 2016) ...................................................................................... 20

*Brooks v. Houston Indep. Sch. Dist.*,
  86 F. Supp. 3d 577 (S.D. Tex. 2015) .......................................................................... 10

*Buchanan v. Alexander*,
  919 F.3d 847 (5th Cir. 2019) ...................................................................................... 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................... 10

*City of Los Angeles v. Lyons*,
  461 U.S. 95, 102 (1983).............................................................................................. 12

*Danos v. Jones*,
  652 F.3d 577 (5th Cir. 2011) ...................................................................................... 18

*Davis v. McKinney*,
  518 F.3d 304 (5th Cir. 2008) ...................................................................................... 28

*Duke v. N. Tex. State Univ.*,
  469 F.2d 829 (5th Cir. 1972) ........................................................................ 21, 22, 27

*Ex parte Young*,
  209 U.S. 123 (1983)........................................................................................ 17, 18, 19

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*,
  528 U.S. 167, 180–81 (2000)....................................................................................... 11

*Grogan v. Lane*,
  617 F. App'x 288 (5th Cir. 2015)........................................................................ 26, 28

*Hafer v. Melo*,
  502 U.S. 21, 25 (1991)................................................................................................. 17

*Hardesty v. Cochran*,
  621 F. App'x 771 (5th Cir. 2015) ............................................................................... 24

*Heim v. Daniel*,
  81 F.4th 212 (2nd Cir. 2023) ..................................................................................... 32

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) .................................................................................. 19

*James v. Collin Cnty.*,
  535 F.3d 365 (5th Cir. 2008) ...................................................................................... 23

*Jones v. Matkin*,
  623 F.Supp.3d 774 (E.D. Tex. 2022)............................................................... 20, 22, 24

*Jordan v. Ector Cnty.*,
  516 F.3d 290 (5th Cir. 2008) ...................................................................................... 28

*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) ..................................................... 20, 29, 30, 31

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949)..................................................................................... 18

*Legacy Cmty. Health Servs., Inc. v. Smith*,
   881 F.3d 358, 366 (5th Cir. 2018) ................................................................ 11

*Lewis v. Casey*,
   518 U.S. 343 (1996)..................................................................................... 11

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)..................................................................................... 11

*Meyers ex rel. Benzing v. Texas*,
   410 F.3d 236 (5th Cir. 2005) ......................................................................... 9

*Mote v. Walthall*,
   No. 4:16-CV-00203, 2017 WL 2651705 (E.D. Tex. June 20, 2017)................ 20

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978)..................................................................................... 21

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) ........................................................................ 14

*P.R. Aqueduct & Sewer Auth. V. Metcalf & Eddy, Inc.*,
   506 U.S. 139 (1993)..................................................................................... 18

*Pastorek v. Trail*,
   248 F.3d 1140 (5th Cir. 2001) ...................................................................... 22

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*,
   391 U.S.  563 (1968)............................................................................... 20, 26

*Port Auth. Trans-Hudson Corp. v. Feeney*,
   495 U.S. 299, 304 (1990).............................................................................. 17

*Raj v. La. State Univ.*,
   714 F.3d 322 (5th Cir. 2013) ........................................................................ 17

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) ......................................................................... 9

*Religion Found. v. Abbott*,
   955 F.3d 417 (5th Cir. 2020) ........................................................................ 18

*Richardson v. Tex. Sec'y of State*,
   978 F.3d 220 (5th Cir. 2020) ................................................................... 18, 19

*Speech First v. Fenves*,
   979 F.3d 319 (5th Cir. 2020). ....................................................................... 11

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)................................................................................... 12, 16

*Stringer v. Whitley*,
   942 F.3d 715, 720 (5th Cir. 2019) ................................................................. 12

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..................................................................................... 13

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ........................................................................ 10

*U.S. v. Nat'l Treasury Emp. Union*,
   513 U.S. 454 (1995)..................................................................................... 26

*Va. Office for Protection & Advocacy v. Stewart*,
   563 U.S. 247 (2011)..................................................................................... 17

*Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*,
 535 U.S. 635 (2002) ............................................................................. 17
*Vojvodich v. Lopez*,
 48 F.3d 879 (5th Cir. 1995) ................................................................. 26
*Warnock v. Pecos Cnty.*,
 88 F.3d 341 (5th Cir. 1996) ................................................................... 9
*Williamson v. Tucker*,
 645 F.2d 404 (5th Cir. 1981) ............................................................... 10
*Zapata v. Smith*,
 437 F.2d 1024 (5th Cir. 1971) ............................................................. 18

**Statutes**
TEX. EDUC. CODE. 105.101(b)(3)-(4) ........................................................... 19

**Rules**
Fed. R. Civ. P. 56(a) .................................................................................. 10

**Other Authorities**
chrome
 extension://efaidnbmnnnibpcajpcglclefindmkaj/https://vpaa.unt.edu/files/faculty_search_com
 mittee_guide_approved_final_9.1.2024.pdf ...................................... 16
https://www.untsystem.edu/board-regents/regents-rules.php ...................... 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033 |
| | § | |
| LAURA WRIGHT, MILTON B. LEE, | § | |
| MELISA DENIS, MARY DENNY, | § | |
| DANIEL FEEHAN, A.K. MAGO, | § | |
| CARLOS MUNGUIA, AND G. | § | |
| BRINT RYAN, each in their official | § | |
| capacities as members of the board of | § | |
| regents for the University of North | § | |
| Texas System; RACHEL GAIN; | § | |
| ELLEN BAKULINA; ANDREW | § | |
| CHUNG; DIEGO CUBERO; STEVEN | § | |
| FRIEDSON; REBECCA DOWD | § | |
| GEOFFROY-SCHWINDEN; | § | |
| BENJAMIN GRAF; FRANK | § | |
| HEIDLBERGER; BERNARDO | § | |
| ILLARI; JUSTIN LAVACEK; PETER | § | |
| MONDELLI; MARGARET NOTLEY; | § | |
| APRIL L. PRINCE; CATHY | § | |
| RAGLAND; GILLIAN ROBERTSON; | § | |
| HENDRIK SCHULZE; VIVEK | § | |
| VIRANI; AND BRIAN F. WRIGHT, | § | |
| | § | |
| *Defendants.* | § | |

---

**THE BOARD DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Defendants, Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, and G. Brint Ryan, each in their official capacities as members of the Board of Regents for the University of North Texas ("UNT") System ("Board Defendants") file

this Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56.

**STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT**

1.  Can Jackson establish that UNT officials retaliated against him for criticizing Philip Ewell, causing him harm that the Board Defendants can remedy by ordering the officials to stop retaliating against him?

2.  Does the harm Jackson alleges still pose a substantial risk of injury, now that Benjamin Brand is no longer the Chair of the Department of Music History Theory and Ethnomusicology?

3.  Can Jackson establish that the examination into Volume 12 of the JSS's publication process was on account of Jackson's criticisms of Philip Ewell?

4.  Can the Board Defendants establish that they would have taken the same action regardless of Jackson's criticisms of Philip Ewell?

5.  Can the Board Defendants establish that UNT's interest in examining how Volume 12 of the JSS was published outweighs Jackson's interest in publishing the journal without adhering to scholarly standards?

**INTRODUCTION**

Professor Timothy Jackson is a UNT faculty member who brings a claim for First Amendment retaliation against the Board Defendants. Professor Jackson alleges that after the Journal on Schenkerian Studies ("JSS") published Volume 12, which contained a "Symposium" of an undisputably controversial collection of articles, the Board Defendants retaliated against him for his article which criticized Philip Ewell, a scholar at a different university, by taking the JSS away from him. In reality, following Volume 12's publication, UNT convened a panel of disinterested but accomplished scholars to review the publication process of Volume 12. The panel found, among other things, that he JSS suffered from editorial mismanagement, and recommended changes for its improvement, namely hiring an editor who was a tenured faculty member. UNT's attempts to find an editor have not been successful, therefore the JSS has paused its publishing.

The record demonstrates that UNT's actions were not based on Jackson's criticisms of Ewell, and that Jackson has not been banned from the JSS. Further, remedying this "harm" would require the Board Defendants not only to involve itself in hiring matters at UNT, which it does not do, but also that they materialize a tenured faculty member interested in the editor job. Accordingly, for the reasons set forth below, Professor Jackson's First Amendment retaliation claim fails and must be dismissed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  Philip Ewell's plenary address, the JSS's response, and the resulting controversy.[1]

On or about November 9, 2019, Professor Philip Ewell of Hunter College of the City University of New York delivered a plenary address at the Society for Music Theory ("SMT")[2] conference, titled "Music Theory's White Racial Frame." Doc. 1 ¶ 30-31. Ewell also published a paper based on the address. *Id.*, Doc. 8-1.

In his address and paper, Ewell argued for rethinking and restructuring some of the institutions in the field of music theory – particularly its reliance on the analytical framework developed by Heinrich Schenker - "in hopes of increasing the number of persons of color in music theory, thus enriching the racial diversity of our field." Doc. 8-1 at 2. Professor Ewell addressed Schenker's documented racism, and urged music theorists to consider how his racism may have infiltrated his music theory. *Id.* at 6–16. Schenker, a late 19th century/early 20th century music theorist, is the namesake of the Journal of Schenkerian Studies ("JSS").

In response to Professor Ewell's plenary address, Professor Jackson decided to organize a

---

[1] The factual context in section A also appears as section A in the Defamation Defendants' MSJ.
[2] SMT is the primary U.S.-based professional association and conference organizing body in the field of music theory. *See* APPX.044, 20:15-17; https://societymusictheory.org/about (last accessed November 18, 2024).

formal response in Volume 12 of the JSS. Doc. 1 ¶ 44. Initially, Jackson's plan was to solicit responses to Ewell's address specifically from Schenkerian scholars. APPX.082, 198:2-8. To be fair, Jackson and the editorial staff of the JSS decided to send a call for papers to members of the Society for Music Theory. *Id.*, APPX.082, 196:4-25, 197:1-2. On July 24, 2020, the Journal published a "Symposium" of articles responding to Dr. Ewell's address. Doc. 1 ¶ 44. Jackson authored one of the articles entitled "A Preliminary Response to Ewell." *See* Doc. 1-4 at 33–42.

Jackson's article, among others in the Symposium, contained statements which many of Jackson's colleagues and students within the MHTE, and members of SMT, found troubling. Doc. 1-5 at 19-23, APPX.001-026.

Almost immediately after Volume 12 was published, it became the center of a social media controversy, in part because of the statements many perceived to be racial stereotypes and tropes, and in part because of the perception that the Symposium was not published pursuant to typical scholarly standards. Doc. 1-5 p. 19-23, APPX.058, 7:1-7, *see also e.g.* APPX.123-130. Soon after the controversy erupted, the JSS's graduate student editor-in-training,[3] Levi Walls, resigned from the journal. APPX.105-106, 44:5-25, 45:1-6.

On July 27, 2020, SMT's executive board issued a "response to essays in the Journal of Schenkerian Studies Vol. 12" (the "SMT Response"). Doc. 1-5 at 19-, APPX. 054, 171:1-16. The statement condemned the "anti-Black statements and ad hominem attacks on Phillip Ewell" contained in the Symposium. *Id.* It asserted that the Symposium "failed to meet the ethical, professional, and scholarly standards of our discipline." *Id.* In particular, SMT's Response identified instances of professional misconduct exhibited in the Symposium, including that the

---

[3] Walls was listed as the "assistant editor" on Volume 12's masthead. APPX. 087:16-24; APPX.098-101.

submissions were not peer reviewed, that an anonymous submission was published, and the JSS did not appear to invite Dr. Ewell to respond to the essays addressing his work. *Id*. It also stated that the misconduct identified in the production of Volume 12 enabled overtly racist behavior. *Id*. Around the same time, MHTE students authored a statement addressing Volume 12 (the "Student Statement,") and MHTE faculty authored a letter doing the same (the "Faculty Statement."). Doc. 1-5 p. 20-21 and 22-23, respectively.

**B. UNT's response to the controversy.**

The SMT Response prompted Dr. Jennifer Cowley, then UNT's Provost, to convene an ad hoc review panel (the "panel") to review the publication process used by the editorial staff of the JSS to publish Volume 12. APPX. 054, 171:1-16.; APPX.050, 97:17-23. The panel was convened in early August and officially given its "charge" on August 14, 2020. Doc. 1-5 at 3. The charge states that the panel was to examine "objectively the processes followed in the conception and production of Volume 12 of the [JSS]. The panel will seek to understand whether the standards of best practice in scholarly publication were observed and will recommend strategies to improve editorial processes where warranted." *Id*. Dr. Cowley's intent in convening and charging the panel was to review the production process of Volume 12. APPX.049-050, 67:5-10, 97:17-23.

All of the panel members had extensive experience in academic publishing and were deliberately chosen from outside of the CoM so that they would not have any familiarity with the JSS's content. Doc. 1-5 at 18; APPX.051, 149:24-25, 150:1-16.

The panel interviewed 11 individuals involved with the JSS, including but not limited to Benjamin Graf, then-outgoing editor; Walls; Jackson; Slottow, Jackson's co-advisory editor; Benjamin Brand, the former MHTE Chair; John Richmond, the Dean of the CoM; and Defendants Diego Cubero and Ellen Bakulina, who were on the JSS's editorial board at the time. Doc. 1-5 at

2-3.

The panel reviewed the concerns expressed in the SMT's Response, as well as the Faculty Statement and Student Statement, because the statements "appeared to be representative of the broader public concerns expressed about the JSS Volume 12," reflected the reaction of the leadership of the profession, and reflected concerns of the students and faculty member familiar with music theory and the JSS. *Id*.

Accordingly, the panel structured its review around three topics: 1) whether Volume 12 was subjected to a method of peer review consistent with best practices for scholarly publications; 2) the circumstances surrounding the anonymous contribution; and 3) the circumstances surrounding the decision not to invite Ewell to respond in the Symposium to the essays that discussed his work. Doc. 1-5 at p. 4-5.

In addition, the panel reviewed the general review processes employed by the JSS and found that no formal written process existed. *Id*. at p. 4, 6. Both Jackson and Dr. Slottow related to the panel that the JSS had never published a special section like the Symposium before. *Id*. Jackson has since confirmed that the JSS had no written or standard procedures for editorial review on the JSS. APPX.081, 168:23-25, 169:1-11.

The Panel found that the JSS managerial structure typically included a graduate student editor, except for Graf who served as the editor both while he was a graduate student and later when he graduated and became a lecturer, and an "editorial advisory board" comprised of Professors Jackson and Slottow who provided "guidance" for the journal. Doc. 1-5 at 5, 7. The editorial board was a group of prominent Schenkerian scholars who "didn't do much," were not consulted on much, and were there for prestige. APPX.088, 38:6-18.  Historically, all the editors of the Journal have been students of Jackson. Doc. 1-5 at 7.  Graf and Walls reported being

uncomfortable in making decisions and recommendations that ran counter to the preferences of Jackson, their major faculty advisor. Doc. 1-5 at 9-10.

The panel found that the JSS's editorial structure, specifically that it was run by a graduate student or junior faculty member, was problematic and created a power asymmetry. *Id.* It also found the JSS lacked procedures to ensure transparent review processes, and a policy on avoiding conflicts of interest that arise when a member of the editorial board publishes in the journal. *Id.*

Regarding the peer review issue, the panel found the Symposium was not subjected to peer review, or even complete editor review, which was not the best practice.[4] Doc. 1-5 p. 10-11, 12-14. The panel also determined that the Journal lacked any written procedure to ensure that transparent review processes are conducted. *Id.* at 12–14. The panel concluded that the review of, and criteria for inclusion for, the articles in Volume 12 did not meet "an established or accepted criterion for judging publishable merit in a reputable academic journal." *Id.* at 14.

Finally, the panel found the anonymous article was published because the author was fearful of retaliation, which also was not best practice. Doc. 1-5 p. 11-12. The panel also found that there was no plan to invite Dr. Ewell to respond until *after* Volume 12 was published, and after the controversy erupted. *Id.* 12-13.

Accordingly, the panel recommended that the JSS make the following changes before publishing another volume: 1) change the editorial structure; 2) create written policies for peer review processes, and processes for special sections like the Symposium; and 3) define the

---

[4] Specifically, the panel found that Jackson represented that all of the articles that were published in the Symposium underwent an "editor review," meaning each article was reviewed by Jackson, Slottow, Graf, and Walls. Doc. 1-5 at p. 7. However, based on information from Slottow, Graf, and Walls – the panel determined that this was not true. *Id.* Indeed, Slottow and Graf have confirmed that they did not review each submission. APPX.064, 100:9-17; APPX.089, 74:3-18, 75:8-11.

relationship between the editor, editorial board, MHTE, and UNT press. *Id.*

On November 30, 2020, Dr. Cowley wrote to Jackson to share the panel's recommendations and asked that he develop a plan to address the recommendations to share with Dr. Brand and Dean Richmond. Doc 1-21.

Jackson responded by submitting a proposal that adopted the main recommendations of the panel. *See* Doc. 1-23 at p. 4-5. He agreed that the Journal should publish transparent explanations of the editorial process. *Id.* at 4. He agreed that the Journal should restructure the editor-in-chief position and editorial board. *Id.* This restructuring would adopt the panel's recommendation of hiring a tenured faculty member "whether at UNT or at an outside institution" to be the editor. *Id.* Jackson agreed that the Journal should include a "conflict of interest" statement as recommended by the panel whenever a member of the editorial board or the Editor-in-Chief publishes an article in its pages. *Id.* Jackson confirmed that the Journal will not in the future publish anonymous contributions. *Id.* Finally, Jackson proposed that should the Journal publish a "symposium" in the future, it should publish an explanation for the symposium and how the process for reviewing submissions were handled in order to serve the interests of transparency recommended by the panel. *Id.* at 5.

Before Jackson communicated this plan, in an email dated December 11, 2020, Dr. Brand expressed that he could not support a plan according to which Jackson would be involved in the day-to-day operations of the JSS because of the panel's findings of editorial mismanagement. Doc. 1-22. In Jackson's words, Dr. Brand's stance was based on the fact that he had committed "editorial malpractice."[5] APPX.083, 261:5-11.

---

[5] Jackson also characterizes that the decision was "taken by the administration," but there is nothing in the record to suggest that anyone but Dr. Brand expressed any such statements.

On March 2, 2021, Dr. Cowley notified Jackson that UNT was moving forward with a "plan to ensure that the JSS remains a prominent venue for peer-reviewed scholarship of the highest quality." APPX.027. To that end, she charged the MHTE with launching a national search for a new full-time tenured faculty member to be the editor-in-chief of the JSS. *Id*., APPX.055, 206:17-20, 207:18-24, 208:4-5. The makeup of the editorial board going forward, and publication of the next volume of the JSS, would be placed in the hands of the new editor. *Id*. Once chosen, the new editor would work with MHTE leadership to determine the JSS's relationship with the MHTE. *Id*.

The committee to find the new editor was convened, and a call for applications was communicated through SMT in May 2021. APPX.032, 208:2-5, APPX.036-037. In total, the committee received two applications, and neither applicant was chosen for the position. APPX.032, APPX. 034, 207:2-9, 216:21-25. Jackson did not apply for the position, although nothing prevented him from doing so. APPX.033, 209:5-25, 210:1-13.

## STANDARD OF REVIEW

Rule 12(b)(1) provides for dismissal due to a "lack of subject-matter jurisdiction." Dismissal under Rule 12(b)(1) is appropriate if a claim is barred by Eleventh Amendment immunity. *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240–41 (5th Cir. 2005); *Warnock v. Pecos Cnty.*, 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1)"). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A court may dismiss under Rule 12(b)(1) "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by

undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

A defendant is entitled to summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The plaintiff then bears the burden to "make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Id.* at 322. To meet this burden, a plaintiff "must identify specific evidence in the record and articulate how that evidence supports [his] claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015).

The substantive law governing a plaintiff's claims determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, a factual dispute is "genuine" *only* "if the evidence is such that a reasonable jury could return a verdict for the [plaintiff]." *Id.* A plaintiff "must set forth specific facts showing that there is a genuine issue for trial." *Id.* Importantly, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotation marks omitted).

## ARGUMENT & AUTHORITIES

Jackson's First Amendment retaliation claim fails to sue the right defendants for the right remedy, and thus he lacks standing to bring the claim, and the claim is barred by sovereign immunity. Further, Jackson cannot establish that the alleged adverse actions were taken because

of his criticisms of Ewell. Even if he could do so, UNT's interest in addressing the unscholarly publication process used to publish the Symposium outweighs Jackson's interest in publishing his opinions in an academic journal without adhering to accepted scholarly standards. For these reasons discussed more fully below, Professor Jackson's First Amendment retaliation claim must be dismissed.

## I.    Jackson lacks standing to sue the Board Defendants.

To establish standing, a plaintiff must show: (1) an injury-in-fact that is (2) fairly traceable to the defendant's challenged action (causation) and that is (3) redressable by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). All three requirements are "an indispensable part of the plaintiff's case," and the party seeking to invoke federal jurisdiction bears the burden to establish them. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, the record demonstrates that Jackson cannot establish any of the three requirements.

### A.  Jackson's alleged injury is not traceable to the Board Defendants.

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal quotation marks omitted). "'[S]tanding is not dispensed in gross'; a party must have standing to challenge each 'particular inadequacy in government administration.'" *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357-58 & n. 6 (1996)); *see also* U.S. Const. art. III, § 2, cl. 1. Specifically, a plaintiff has suffered an injury in fact if he: (1) has an intention to engage in action affected with a constitutional interest; (2) this conduct is proscribed by the policy in question; and (3) the threat of future enforcement of the policy is substantial.

11

*Speech First v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

"Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). "Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id.* (internal quotation marks and citations omitted). For an alleged future injury to support standing to seek equitable relief based on past conduct, a plaintiff must demonstrate that "there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). For a threatened future injury to satisfy the imminence requirement, there must be at least a substantial risk that the injury will occur. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

At the motion to dismiss stage, this court and the Fifth Circuit found that Jackson's allegations that UNT, and specifically Dr. Brand, have "taken the JSS away from him" was sufficient to allege a substantial risk of injury that could be redressed. Doc. 57-1 p. 9. Jackson invariably alleges that Dr. Brand "fired" him from the JSS when he stated, on December 11, 2020, "I cannot support a plan according to which you would remain involved in the day-to-day operations of the journal, and its editorial processes in particular, given the panel's findings of editorial mismanagement of the JSS."[6] Doc. 1-22. According to Plaintiff, Dr. Brand, in this single statement, has caused him substantial risk of future injury. As discussed below, Dr. Brand's

---

[6] The Board Defendants do not concede that Dr. Brand's statement was a threat to block Jackson from future participation in the JSS due to his protected speech – indeed, Dr. Brand explicitly states that his reason for declining to support Jackson's future with the JSS is his history of editorial mismanagement. The plain language of the email also indicates that his decision was not final, and that he and Jackson would continue to discuss the matter going forward.

statement was not the real cause of the "pause" of the JSS, nor can it be going forward, as Dr. Brand is no longer the chair of the MHTE.

The reason the JSS is "paused," and thus Jackson's future role in the JSS has not been identified, is because there is no editor. The reason the JSS does not have an editor is because, as aptly stated by Professor Slottow, post-Volume 12, it is a "radioactive turd" that nobody in the music theory community wants to touch. APPX.093-094, 95:5-11, 99:22-25.

At the publication of Volume 12, the JSS's editors were Benjamin Graf, a graduate student and lecturer who was the outgoing editor; and graduate student Levi Walls. APPX.087:16-24; APPX.091, 83:6-9; APPX.098-101. Graf was not going to continue as editor after Volume 12 regardless, and all parties agree that the JSS's model of having a student editor was not tenable. *Id.*, Doc. 1-5 at 14, Doc. 1-23 at 3. Particularly, Jackson himself stated that if the JSS was to continue publishing potentially controversial content like it did in the Symposium, the editor needed to be a tenured faculty member who was willing to take on the responsibility for any attendant fallout. Doc. 1-23 at 3. Levi Walls, as a student, was not able to fill that role, nor was he willing. As a result of the music theory community's near universal shock at some of the racially charged content and unscholarly nature of the process used to publish the Symposium, Levi Walls stepped down as editor, at least in part to salvage his career as a music theorist. APPX.105-107, 44:5-25, 45:1-18, 55:20-24.

That the publication of the JSS remains "paused" is not for lack of effort on UNT and the MHTE's part: a committee was constituted to undertake a national search for an editor, a call for editors was formulated and circulated through SMT and otherwise, and two people applied. APPX.027, APPX.033-034, 207:2-9, 208:2-5, 209:5-25, 210:1-13, 216:21-25. APPX.036-037, Jackson, nor Slottow, have applied, though nothing prevents them from doing so. *Id.*

The policies directing the JSS going forward, and Jackson's role in the future of the JSS, are to be decided by the new editor. There is thus no current *policy* proscribing Jackson's publishing, and any risk of future "injury" is entirely too speculative to confer standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

### B. The Board Defendants cannot provide redress for Jackson's injury.

Importantly, Dr. Brand's "threat" of injury to Dr. Jackson cannot actualize until the JSS hires an editor. Indeed, Dr. Brand's "threat" of injury to Dr. Jackson cannot actualize at all because he is no longer the Chair of the MHTE, and thus no longer has a say in the path forward for the JSS. APPX.039, 22:11-13. Dr. Brand started a new position of Senior Director of New Ventures in Digital Strategy Innovation at UNT. APPX.039, 22:11-25, 23:1-8.[7] There is no evidence in the record to suggest that Dr. Brand intends to, or has the authority to, provide any further input on a plan for the JSS when a new editor is hired. Nor is there evidence that the MHTE's current chair, David Heetderks, has any intent to inhibit Jackson's future participation in the JSS. There is no policy[8] posing a substantial risk of injury, let alone one that the Board Defendants were required to countermand.[9]

The JSS's existential crisis is ongoing because it has no editor, and thus cannot publish anything of any repute. APPX.093, 96:5-10. Jackson has requested that this Court order the Board

---

[7] *See also* https://digitalstrategy.unt.edu/about/staff.html (last accessed November 18, 2024)

[8] Regents Rule 4.302.4 mandates UNT's president to "develop procedures and standards" regarding "conditions of employment in conformity with law." *See* Regents Rules Chapter 4, https://www.untsystem.edu/board-regents/regents-rules.php. (last accessed December 20, 2024). Similarly, and as discussed below, the Academic Freedom policy defines the obligations associated with academic freedom Neither of these policies have prevented Jackson from publishing, nor do they require the Board to intervene and "stop" retaliation just because he alleged retaliation had occurred.

[9] Doing so would effectively require the Board Defendants to decide that Jackson's First Amendment rights were being violated, despite all of the evidence to the contrary, as discussed more fully in subsection III below.

Defendants return the JSS to the "status quo" and allow him to reconstitute the editorial board. Going back to the status quo would require this Court to force a junior faculty member, Graf, and a student, Walls, to step back into positions they resigned from, and for Walls's part because of damage Volume 12 caused to his reputation. APPX.098-101, APPX.105-107, 44:5-25, 45:1-18, 55:20-24. This is untenable, nor can the Board Defendants be required to exercise their authority in this manner. Thus, the lack of causation problem further crystallizes in Jackson's inability to establish redressability.

The Board Defendants cannot be ordered to take such affirmative action that is beyond their authority in the first place. *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001). The Board of Regents of UNT has set certain rules regarding faculty employment. *See* Regents Rules Chapter 6.[10] These rules delegate to each UNT institution the obligation to publish policies and procedures related to faculty hiring, among other employment matters. *Id*. at 6.201 ("[e]ach Institution shall adopt and publish policies and procedures specifically related to faculty hiring, promotion, tenure, evaluation, leave, compensation, governance, discipline, a faculty grievance process..."). These responsibilities do not allow for the Board Defendants to force someone to take an empty position, nor do any UNT policies flowing from the Board policy. This Court cannot force the Board to require a Graf and/or Walls to take a job that they do not want.

Even taking Jackson's request to mean that he is asking that this Court order the Board Defendants to make the JSS operational (i.e. by allowing him to reconstitute the board), that still requires the Board Defendants to appoint a faculty editor.[11] This "relief" has already been

---

[10] https://www.untsystem.edu/board-regents/regents-rules.php (last accessed December 20, 2024).

[11] There is nothing preventing Jackson from being involved in reconstituting the editorial board once an editor is in place. It is up to the new editor to determine Jackson's involvement on the editorial board or otherwise. APPX.027.

undertaken by UNT: it convened a committee to secure a new editor, which was not successful. The Board Defendants cannot produce a willing candidate out of thin air and place that person in the job, and thus cannot redress Jackson's alleged injury. There is no evidence that Jackson was prevented from applying to the position, or that he was otherwise blocked from participating in the search. APPX.033, 209:5-25, 210:1-13. Jackson has indicated that he had at least one candidate in mind for the potential editorship, and nothing prevented him from recommending that person (or others) to the committee, or from encouraging people to apply for the position. Doc. 1-23 p. 3. Whether the person Jackson identified actually wants the job is a different question.

Even if he were allowed to "reconstitute" the board, Jackson also cannot personally appoint the new editor, whether the faculty member is employed by UNT or another university. A faculty member cannot hire another faculty member. Identifying, and hiring for, a faculty vacancy is squarely within the purview of the dean of the college and the Provost.[12]

Assuming for the sake of argument that the Board Defendants could bestow an editor upon the JSS, there is nothing to suggest that this hypothetical editor, or anyone else who currently has the discretion over the operation of the JSS going forward (Dean Richmond and Chair Heetderks), would "continue" to retaliate against Jackson. The only order this Court can make – to order the Board Defendants to require Dr. Brand, an individual who no longer has any say over what happens to the JSS – to "stop retaliating" against Jackson, will achieve nothing. Dr. Brand cannot impose his suggestion that he cannot support Jackson's involvement in the day-to-day operations from afar, and thus the risk for future injury has completely dissipated. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) (relief that does not remedy the injury suffered cannot bootstrap a

---

[12]*See* Faculty Search Committee Guide at p. 3: chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://vpaa.unt.edu/files/faculty_search_committee_guide_approved_final_9.1.2024.pdf

plaintiff into federal court.).

Jackson was thus not removed from the JSS; his non-involvement is not traceable to the Board Defendants; there is currently no substantial risk of injury; and even if the alleged risk of injury wrought by Dr. Brand's statement was still an issue, the Board Defendants cannot be ordered to materialize an editor for the JSS. Jackson cannot demonstrate standing and this court lacks jurisdiction over his First Amendment retaliation claim against the Board Defendants.

## II.     For similar reasons, Jackson's claim does not pass the Ex parte Young exception and his claims against the Board Defendants are barred by sovereign immunity.

This Court should also dismiss Jackson's claims for lack of subject-matter jurisdiction because Jackson's claims are barred by sovereign immunity. An official-capacity suit against a state officer is a suit against the state, and the official is entitled to the state's sovereign immunity absent a clearly stated waiver or consent to suit by the State of Texas or valid abrogation by Congress.[13] *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Sovereign immunity squarely applies to the official-capacity claim brought here against the Board Defendants. Plaintiffs may seek to avoid sovereign immunity by invoking the *Ex parte Young* doctrine, which provides a limited exception for claims seeking prospective injunctive relief, 209 U.S. 123 (1983), but that limited exception does not apply here.

For *Ex parte Young* to apply, three general criteria must be satisfied: (1) a "plaintiff must name individual state officials as defendants in their official capacities," *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); (2) the plaintiff must "allege[ ] an ongoing violation of federal

---

[13] While the Supreme Court has "sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity' . . . [as] convenient shorthand," the phrase is "something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). For the sake of consistency and accuracy, this brief will utilize the phrase "sovereign immunity."

law," *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); and (3) the relief sought must be "properly characterized as prospective," *id.* The *Ex parte Young* doctrine "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation …" *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011).

As an initial matter, while neither this Court nor the Fifth Circuit explicitly stated that Jackson's claims that undoubtedly past-actions such as the panel's investigation are not actionable, Defendants submit that this Court and the Fifth Circuit have been clear about what allegedly prospective injuries Jackson may seek relief for: his alleged continuing ban from the JSS. Defendants will not reiterate at length its arguments that Jackson cannot pursue a remedy declaring the ad hoc panel's investigation, report, agreed-upon recommendations, or any other past actions, as violative of federal law. *P.R. Aqueduct & Sewer Auth. V. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Religion Found. v. Abbott*, 955 F.3d 417, 421 (5th Cir. 2020) (holding that a retrospective declaration of rights is improper even where the plaintiff otherwise seeks prospective relief).

### A. Jackson does not seek the right remedy.

Like Jackson has not identified an injury that can be redressed by the Board Defendants, he also has not identified a proper remedy for *Ex parte Young* purposes.

*Ex parte Young* permits a federal court to command only that state officials "refrain from violating federal law." *Stewart*, 563 U.S. at 255. As discussed above, any order that would provide Jackson with relief would require the Board Defendants to affirmatively exercise their discretion as overseers of UNT System in a certain way. *Ex parte Young* does not authorize them to do so.

18

*Ex parte Young* does not extend to allowing a federal court to order an official to exercise sovereign power by taking an official act. *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971); *see Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020) (citing *Young*, 209 U.S. at 158). That is because "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of," then the underlying fiction of *Ex parte Young* does not apply because the order "will require affirmative action by the sovereign." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n.11 (1949); *see also, e.g.*, *Richardson*, 978 F.3d at 242; *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011); *Zapata*, 437 F.2d at 1025-26.

As stated above, Jackson's requested redress requires appointing an editor through official processes, and would therefore require the Board Defendants to not only exercise discretion over the MHTE explicitly delegated to the provost and dean, it would require the Board to come up with an editor.

Even if a federal court may affirmatively order officials to perform some ministerial functions, it cannot order state officials to exercise the State's sovereign power by performing their discretionary duties in a particular way. *See Richardson*, 978 F.3d at 242. *Ex parte Young* itself found there to be "no doubt that the court cannot control the exercise of the discretion of an officer." *Ex parte Young*, 209 U.S. at 158. And that has remained the law for over a century. *Richardson*, 978 F.3d at 241. Indeed, "[a]ny such relief would . . . raise[] serious federalism concerns." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1257 (11th Cir. 2020). State law gives the Board Defendants the authority to direct, govern, operate, support, maintain, manage, and control the system, including by employing and discharging personnel, including faculty, to carry out the board's powers and duties; and adopt rules and policies for the administration of the board's powers and duties. TEX. EDUC. CODE. 105.101(b)(3)-(4). State law doesn't define how the Board

must oversee filling faculty or editor vacancies, for example, but gives them discretion to delegate such authority and promulgate rules and policies for exercising that authority. Ordering the Board Defendants to affirmatively exercise their discretion in appointing an editor, or indeed finding a willing editor at all for the JSS is discretionary, and probably impossible and thus cannot be ordered by this Court.

Jackson has not identified the right remedy and therefore has not met the *Ex parte Young* exception to strip the Board Defendants of their sovereign immunity. His First Amendment retaliation claim must be dismissed for this additional reason.

## III.    **Jackson's First Amendment retaliation claim fails**.

If this Court finds Jackson's First Amendment retaliation claim clears the foregoing jurisdictional hurdles, it nonetheless fails on the merits.

Under the test for a First Amendment retaliation claim, a plaintiff must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on matter of public concern; (3) his interest in the speech outweighs the government interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action. *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) In public employment cases, the *Pickering* balancing test is implicated in the third step. *Kinney v. Weaver*, 367 F.3d 337, 360-361 (5th Cir. 2004); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S.  563, 568 (1968); *See also Jones v. Matkin*, 623 F.Supp.3d 774, 783 (E.D. Tex. 2022) (the question of whether the defendant's actions were motivated by the plaintiff's speech requires balancing) (quoting *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019)). Under *Pickering*, if a defendant can show that the plaintiff's interest in speaking was outweighed by the defendant's interest in addressing that speech, there is no constitutional violation. *Id*.

Regarding the fourth element, the plaintiff bears the burden of establishing that his protected conduct was a substantial or motivating factor in the alleged adverse action. *Mote v. Walthall*, No. 4:16-CV-00203, 2017 WL 2651705 at *6 (E.D. Tex. June 20, 2017). If the employer can show that they would have taken the same action regardless of protected conduct, there is no constitutional violation. *Id*. An employee may refute that showing by presenting evidence that the employer's explanation is pretext. *Id* at *7.

Jackson alleges that he was "fired" from his job as an advisory editor of the JSS, and that UNT continues to exclude him from the JSS on account of his past criticisms of Professor Ewell. *See* Doc. 16-0, p. 8-9, 16. As addressed above, Jackson has not been "fired" and the Board Defendants do not concede that he has suffered any adverse action. The steps UNT took following the publication of Volume 12 were in an effort to repair the reputation of the JSS, and by extension, UNT's and the MHTE's, not to address Jackson's criticisms of Ewell.

The publication of Volume 12, and the aftermath, put UNT in an extremely difficult position. Countless scholars from inside and outside of UNT were critical of the JSS for publishing the Symposium in an unethical and unscholarly manner. Doc. 1-5 pp. 19-23, APPX.001-026. Contrary to Jackson's arguments – the record does not support that UNT "caved" to the calls to terminate him and dissolve the JSS, but rather took a measured approach to triage the reputations of all involved and associated with publishing Volume 12.

Jackson argues that as a result of UNT's actions, he can no longer publish in the JSS. The facts reveal that it was Jackson's own actions, in publishing the Symposium in an unscholarly manner, that made the JSS "radioactive," and has made attracting an editor virtually impossible. APPX.093, 95:5-11. Taking into account the interest of all of UNT's students and faculty, not just Professor Jackson's, UNT was obligated to examine the process that allowed the Symposium to

21

be published. APPX.053, 158:22-25.

As set forth below, UNT's actions were not motivated by Jacksons speech, and his First Amendment retaliation argument fails for that reason alone. Further, balancing Jackson's interests against UNT's requires a finding that UNT did not violate Jackson's First Amendment rights.

### A. The alleged adverse actions were not caused by Jackson's criticisms of Professor Ewell.

As an initial matter, for context, Defendants will address the past actions of Dr. Cowley's convening the ad hoc panel, the ad hoc panel's examination and recommendations, and subsequent measures by Dr. Cowley. Defendants note that these actions are not actionable because they are situated firmly in the past and cannot be remedied with prospective injunctive relief. *See* Doc. 57-1 at 9 (describing Jackson's alleged continuing and future injuries as being banned from the JSS).

The content of a plaintiff's speech cannot always be extricated from academic decisions, nor do they have to be under the First Amendment. *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 837-838 (5th Cir. 1972); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[i]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."). Reasonable restraints of professional actions cannot be defeated by pointing to the fact that communication is involved. *Pastorek v. Trail*, 248 F.3d 1140, at *5 (5th Cir. 2001). Without evidence of intent to discriminate based on the content of the speech, the fact that the content of the plaintiff's speech "could have" played *some role* in a university's academic decision is not a First Amendment violation. *Duke*, 469 F.2d at 837-838.

The Board Defendants recognize that the content of the Symposium cannot be completely extricated from the discussion of the publication process of Volume 12. But it does not have to be. *Id*. There is no evidence of an intent to retaliate against Jackson based on his criticisms of Professor

22

Ewell, therefore there is no First Amendment violation. *Id.* (plaintiff bears the burden to show evidence of content-based discriminatory intent.). *Matkin*, 623 F.Supp.3d at 783.

Dr. Cowley was motivated to examine Volume 12 as a result of the SMT's concerns about the perceived problems with the publication process, not Jackson's speech. APPX.049, 65:6-11. It follows, and the evidence shows, that she convened the panel to review how Volume 12 was published. APPX.049-050, 67:5-10, 97:17-23.

The ad hoc panel's review did not target Jackson, and the resulting recommendations were about how the JSS could comply with academic publishing best practices before its next issue, not about Jackson specifically. APPX.052, 154:3-25, 155:25, 156:1-4. The panel did not address Jackson's criticisms of Dr. Ewell, or any of the Symposium's content. Doc. 1-5. Indeed, Dr. John Ishiyama, the "lead" member of the panel, testified that the content of Volume 12 and the surrounding controversy was of no consequence to the panel, the panel did not know what Dr. Ewell's talk was about, and that he did not read a single article in Volume 12. APPX.119-120, 87:11-19, 96:3-4.

Following the panel's recommendations, Dr. Cowley requested that Jackson come up with a plan to implement the panel's recommendations, all of which he agreed with, before publishing the next volume of the JSS. Doc. 1-21, Doc. 1-23. Jackson agreed that the JSS needed a new editor, and a committee to find a new editor was convened shortly thereafter. APPX.027. The foregoing shows a concerted effort to undertake a legitimate review of the production process of Volume 12 irrespective of Professor Jackson's views on Professor Ewell's talk, and to involve Jackson in the path forward. There is no evidence of an intent to banish Jackson from the JSS based on his criticisms of Ewell.

While Dr. Brand expressed reservations about the level of Jackson's participation in the

JSS moving forward, his input was not the only input relevant to the future of the JSS. Doc. 1-22, APPX.027. Dr. Brand's reservation was based on the editorial mismanagement revealed by the ad hoc panel's report, not based on Jackson's criticisms of Ewell. Doc. 1-22, APPX.041, 88:6-12. Dr. Brand has never expressed disapproval of Jackson's criticisms of Ewell, or the content of the Symposium more generally. Dr. Brand did not have the scholarly expertise in Schenkerian analysis to make a judgment regarding whether Jackson's, or any article in the Symposium, was racist. APPX.040, 42:9-16. There is simply no evidence indicating that his action was motivated by anything other than the editorial mismanagement of the JSS. *See James v. Collin Cnty.*, 535 F.3d 365, 377 (5th Cir. 2008) (plaintiff's speculation that he was terminated in retaliation for exposing his supervisor's wrongdoing could not support his First Amendment retaliation claim).

Finding an intent to discriminate based on content requires much more than the record reveals in this case. In *Hardesty v. Cochran*, for example, the defendants explicitly told the plaintiff that they were displeased with the content of his speech and threatened to terminate him if he continued to speak about the forbidden topic. *Hardesty v. Cochran* 621 F. App'x 771, 774 (5th Cir. 2015). Further, following plaintiff's speech, the defendants voted to give all other employees a raise except the plaintiff, and eventually terminated him explicitly due to his speech. *Id*. at 779. The evidence supported the conclusion that there was no evidence that the plaintiff was terminated for any reason other than his speech. *Id* at 781. The opposite is true here: the *only* reasons given for the ad hoc panel's investigation and subsequent actions was to determine the process used for Volume 12's publication and remedy the findings of unscholarly work.

The panel report, recommendations, and subsequent directions to implement the recommendations do not show that the ad hoc panel, Cowley, or Dr. Brand recommended a disbanding of the JSS at all, let alone based on Jackson's criticisms of Professor Ewell. Jackson

24

was consulted on how to implement the recommendations, he agreed that a faculty editor was needed, thus the MHTE undertook a plan to search for that editor. Jackson cannot meet the threshold requirement of establishing that his speech caused the harm he alleges, and therefore his claim fails.

### 1. UNT would have taken same actions regardless of Jackson's criticisms of Dr. Ewell.

After a plaintiff shows that their protected speech was a motivating factor in the adverse employment decision, the defendant has the opportunity of showing, by a preponderance of the evidence, that it would have taken the same action regardless. *Matkin*, 623 F. Supp. 3d at 785–86. Even if Jackson could show that his criticisms of Dr. Ewell motivated UNT's actions (which Defendants do not concede), his claim still fails because UNT would have taken the same course of action regardless.

The impetus for the ad hoc panel's recommended changes was a finding of editorial mismanagement on the JSS, which led to publishing the Symposium using sub-par standards for a self-described peer-reviewed academic journal. *See* APPX. 101-104. Primarily, the ad hoc panel found the JSS's structure of having a graduate student-editor, and Jackson and Slottow as "advisory" editors, resulted in a "power asymmetry" in the management of the journal. Doc. 1-5 p. 9. This was reported by Walls, Slottow, Graf, and members of the editorial board – virtually everyone but Jackson. *Id*. Specifically, the ad hoc panel found that because the student editors were always students of Jackson's, it made it very difficult for them to contradict his wishes or express their concerns about the editorial processes. *Id*. Walls and Graf relayed to the ad hoc panel that this was especially true in publishing the Symposium. *Id*. at p. 10.

Testimony elicited in the instant matter corroborates the ad hoc panel's conclusion. Slottow testified that Walls certainly felt a power imbalance and that affected his role as the assistant editor

of Volume 12. APPX.093, 96:16-5, 97:1-22; APPX.095-096, 136:16-25, 137:1-4, 138:3-21, 140:10-23. Graf testified that he had raised concerns about the power imbalance inherent in the editorship structure even prior to Volume 12. APPX.062, 60:17-24. Graf and Walls had discussions regarding their precarious positions as editors – specifically that Jackson and Slottow were Graf's dissertation advisors when he was a student, and as a junior-faculty member, they were his senior colleagues on promotion committees and had a significant stake in his employment. APPX.103-105, 31:22-25, 32:1-7, 41:13-25, 42:1-2. APPX.111-117. Graf also testified that he could not express his thoughts on the direction of Volume 12. APPX.063, 96:2-15. Walls testified that he feared retaliation from Jackson if he went against his wishes, and if he had reservations about what was published in the Symposium, he kept it to himself. APPX.104-105, 40:22-25, 41:1-2, APPX.108-109, 80:2-25, 81:1-4.

Ellen Bakulina, a member of the editorial board, testified that she went against her better judgment and did not insist on inviting Professor Ewell to engage in the Symposium because of her status as a junior faculty member to Jackson and Slottow. APPX.029, 97:7-25, 98:1-6. She also stated that it was obvious that Walls could not make decisions about the JSS independently because Jackson was his dissertation advisor. APPX.030, 122:15-25, 123:1-4; *See also* APPX.045, 68:7-9 (stating it is understood that there is always a power differential between students and professors); APPX.046, 69:19-22 (students choose their words around their professors "if they're smart."). And Slottow has acknowledged that in retrospect, he should have counseled that Professor Ewell be asked to participate, and that the responses be peer-reviewed. APPX.092, 92:10-15.

The ad hoc panel's investigation revealed that the JSS was in need of a change in structure, which Jackson agreed to implement. Doc. 1-23. The findings and subsequent recommendations

had nothing to do with Jackson's criticisms of Professor Ewell.

### 2. UNT's interest in promoting scholarship outweighs Jackson's interest in publishing the JSS without adhering to accepted scholarly standards.

Government employers "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *U.S. v. Nat'l Treasury Emp. Union*, 513 U.S. 454, 465 (1995). "When a court is required to determine the validity of such a restraint, it must 'arrive at a balance between the interests of the [employee], a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering*, 391 U.S. at 568. "This analysis in reality is a sliding scale or spectrum upon which 'public concern' is weighed against disruption." *Vojvodich v. Lopez*, 48 F.3d 879, 885 (5th Cir. 1995).

### i. Volume 12 caused legitimate disruption

First, this Court can find there is ample evidence that Volume 12 caused disruption to UNT's operations that warranted action. *Grogan v. Lane,* 617 F. App'x 288, 291 (5th Cir. 2015) (quoting *Vojvodich*, 48 F.3d at 884)).

In *Duke*, the Fifth Circuit found the dismissal of a teaching assistant for making profanity-laden speeches that criticized the administration and university policies was not a First Amendment violation because there was ample evidence that the university dismissed her in order to protect its right to maintain a competent faculty and perpetuate confidence in the university. *Duke*, 469 F.2d at 839-40. Similar circumstances present here: UNT acted to examine Volume 12 of the JSS following the external and internal outcry that the Journal failed to adhere to scholarly practices in publishing the Symposium, in an effort to address the impact to UNT's reputation, and the reputation of Jackson's colleagues and students.

In addition to SMT's Response, SMT circulated an "open letter" criticizing Volume 12, to which approximately *900 members* of the professional community signed.[14] APPX.001-026. This letter makes apparent that a large cross section Jackson's professional community found the Symposium, and the way in which was published, to be objectionable. *See* APPX. 001 ("The [JSS] has just published a number of vitriolic responses…under the guise of scholarly debate…the [JSS]'s violation of academic standards of peer review, its singling out of Prof. Ewell while denying him a chance to respond…constitute anti-black racism."). Slottow testified that UNT had reason to be embarrassed following the publication of Volume 12 because of the following "bad publicity." APPX.086, 27:19-25. Indeed, he acknowledged that the criticism circulating on the internet about the Symposium reflected upon UNT. APPX.086, 28:3-21.

Walls also repeatedly expressed concern for the impact his involvement with the Symposium had and will continue to have on his reputation, and that he was most worried about UNT's reputation in the aftermath. *See e.g.* APPX.107, 55:20-24. Frank Heidlberger also described the internet's response to Volume 12 as the "avalanche coming towards us," and expressed his fears to Dr. Brand that the opinions circulated on the internet about the Symposium, in particular the incorrect handling of editorial procedures, could be imputed to UNT, and impact MHTE students. APPX.068-069, 35:3-25, 36:1-25, 37:1-12, APPX.071-072, 52: 5-15, 55:3-11, APPX.074-075, APPX.076-077. Dr. Bakulina testified that Volume 12 created an "objectionable public image of UNT." APPX.031, 162:23-25, 163:2-6. The SMT Response, the Student Statement, and the Faculty Letter echo these concerns. Doc. 1-5 at 19-23.

The facts show ample disruption, and potential for continued disruption, to UNT's

---

[14] The Board Defendants have not counted the number of signatures on the letter but note that there are approximately 21 pages of signatures, with approximately 40 signatures per page.

reputation, and thus its operations, if the Symposium's issues went unaddressed.

ii.     **UNT's response to the disruption was reasonable.**

Next, to balancing. *Pickering* balancing includes a non-exhaustive list of factors to consider in the balancing test, relevant here: (1) the degree to which the employee's activity involved a matter of public concern; and (2) the time, place, and manner of the employee's activity. *Grogan* 716 F. App'x at 291-92.

Before this Court turns to these factors, though, especially relevant in this case is that UNT's action in response to the Symposium is less severe than many cases that undertake *Pickering* balancing. In many such cases, the defendant's response to the plaintiff's speech is termination. *See e.g. Jordan v. Ector Cnty.* 516 F.3d 290, 301 (5th Cir. 2008) (the causation prong of the First Amendment retaliation test "asks whether the employee *would have been fired* the employee regardless of the protected conduct) *Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008). Here, while Jackson has characterized UNT's action as "firing him" from his advisory role on the JSS, there is no question that he was not actually terminated. He is still a faculty member and retains his title of distinguished university research professor.

In a similar vein, courts often weigh the public employee's interest in *suppressing* speech against the plaintiff's interest in speaking. *See Kinney* at 362. In *Kinney*, the Fifth Circuit weighed the defendants' alleged actions in mounting a campaign of "economic retaliation" against plaintiffs by orchestrating a boycott of their classes and attempting to terminate them, against the plaintiffs' interests in testifying as experts in excessive force cases. *Kinney*, 367 F.3d at 351. The court balanced the defendant's interest in *suppressing* the plaintiffs' speech – that is, stopping them from testifying about excessive force in the future, against the plaintiffs' interest in continuing to testify. *Id*.

But here – as addressed above, the Defendants intent was not to *suppress* any future speech by Jackson or the JSS. The Defendants' interest was to ensure that UNT produced scholarship that adhered to ethical and scholarly practices in the future, which required a restructuring of the journal. After the fallout from the Symposium, the former editor, Graf, officially moved on from the JSS, and the incoming editor, Walls, understandably walked away from the wreckage. APPX.107, 55:20-24. The JSS was left without an editor, which everyone agreed should be a faculty member. Doc. 1-23, APPX.027. UNT has conducted a *national search* for the editor, which has been unsuccessful. APPX.032, 208:2-5, APPX.036-037. If the goal was really to suppress the JSS, why go through all of the effort to investigate the editorial practices, come up with recommendations, and engage in a national search for a new editor?

Ultimately: Defendants undertook a review of Volume 12 with the intent that it continue to publish the JSS and did not terminate Professor Jackson in an effort to suppress his speech. Defendants urge this Court to consider this additional context when weighing the following balancing factors.

### a.  The degree to which the employee's activity involved a matter of public concern.

This is not the typical First Amendment retaliation case in which a public employee seeks to inform the public about some sort of wrongdoing by government official, agency, or the like. *See Kinney* 367 F.3d 337, 362 (this court has emphasized the great First Amendment significance of speech bearing on official misconduct.).

There is no doubt that Professor Ewell's plenary address, and the responses in the Symposium, cover an extremely esoteric topic, the debate on which is not widely consumed, nor is of significant public interest. Jackson himself has compared Shenkerian analysis to quantum mechanics. APPX.079-080, 17:21-25, 18:1-4. However, Defendants do not suggest that there is

no social value in producing scholarship on Heinrich Schenker or Schenkerian analysis. And Defendants do not seek to devalue the importance this scholarship plays in Jackson's life or in the music theory community.

Rather, Defendants urge that the value to Jackson is not the only "value" that matters. The personal value to Jackson must not be put on a pedestal at the cost of the reputation of UNT, the CoM, and the students and faculty of the MHTE. UNT's Academic Freedom policy clearly states that such freedom carries with it special responsibilities correlative with rights, and that faculty members' special position in the community imposes special obligations. *See* Doc. 44-1 Ex. B. It reminds faculty members that the *public may judge* their profession *and UNT* based on their speech. *Id*. Dr. Cowley, as Provost, was in charge of implementing and enforcing this policy, and did so by taking a measured approach to the "kerfuffle" caused by Volume 12. APPX.086, 28:16-21. UNT's legitimate concerns to protect the interests of *all* of its faculty members, and its students, looms large.

**b.  The time, place, and manner of the employee's activity**.

The "place" in which the Symposium was published is also of importance here: it is a journal associated with UNT, and published by the UNT Press. UNT's name is bound up with the JSS, thus any and all criticisms regarding the level of scholarship displayed in the Symposium reflect on UNT. *See* APPX.031, 162:23-25, 163:2-6; APPX.068-069, 35:3-25, 36:1-25, 37:1-12; APPX.072, 55:3-11; APPX.074-075; APPX.076-077.

In *Kinney*, the court found that the plaintiffs' expert testimony regarding excessive force did not reflect on the defendants or otherwise legitimately impact defendant's operations in large part because the testimony was given in a case in a different county hundreds of miles away and factually had nothing to do with the defendant. *Kinney*, 367 F.3d at 365. In particular, the court

found that the defendant saw a need to suppress speech whenever and wherever a police officer testified against police officers – i.e. that they were really interested in enforcing a "code of silence." *Id.*

The same cannot be said here. The unscholarly nature in which the Symposium was published reflected directly upon UNT, the CoM, the MHTE, and all of its constituents. Insisting that the JSS – a peer-reviewed academic journal – adhere to scholarly best practices moving forward is not a "code of silence" (and does not cast a "pall of orthodoxy"). To the contrary, adopting the Panel's recommendations that serve to promote the academic rigor and integrity of the JSS amplifies the prestige of the speech published in its pages.

Subjecting the Symposium to a different review process would not necessarily have changed its content. *See* APPX.070, 42:14-25, 43:1-25, 44:1-5 (describing the Symposium articles as more than responses, but scholarly articles in their own right, which required peer review for the sake of healthy discourse, and also that the Symposium's publication was absolutely necessary and appropriate.). It would not have removed Jackson's criticisms of Ewell from its pages. Nor will insisting on adhering to written editorial procedures, including when and what to peer review, "censor" the JSS's content in the future. *See* APPX.090, 78:24-25, 79:1-6 (stating that peer review is not censorship and is actually viewed as prestigious, and further observing that without peer review just "any old thing" can be published.). Inviting Professor Ewell to respond to the responses to his talk *before* the Symposium was published likewise would not have resulted in "censoring" the Symposium's content. APPX.092, 93:4-11 (inviting Ewell to respond would have been the better approach). Nor will imposing a requirement to engage scholars in that manner going forward.

Academic freedom does not come without obligations. It encompasses a university's

obligation to insist on processes that protect academic and scholarly standards. *Heim v. Daniel*, 81 F.4th 212, 231 (2nd Cir. 2023). Jackson shirked his obligations, and thus put his colleagues and students in jeopardy, when he published the Symposium using his own improvised processes which were a departure from well-established academic standards, and indeed the JSS's standard procedures. Just as Professor Jackson has the right to publish his opinions in Volume 12, UNT has the right to examine concerns that Volume 12 did not follow accepted scholarly practices and recommend changes to the JSS's methods accordingly. Doing so was not violative of Professor Jackson's First Amendment rights.

To the extent the Board Defendants had the authority to ensure their policies and UNT policies were followed, and thus the authority to countermand the alleged accumulation of actions resulting in a "policy" to disallow Jackson from publishing in the JSS, such authority did not require them to find a First Amendment violation where none existed. As a matter of law, they were not required to agree, without taking steps to review what occurred, that UNT actions vis-à-vis the JSS violated their policies, the law, or Jackson's rights; nor were they required to stop UNT from taking actions that did not violate Jackson's rights. Accordingly, Jackson's First Amendment claim must be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiff Timothy Jackson's First Amendment retaliation claim in its entirety.

Respectfully submitted.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

_____/s/ Mary B. Quimby_____
**BENJAMIN S. WALTON**
*Lead Attorney*
Texas Bar No. 24075241
**MARY B. QUIMBY**
Texas Bar No. 24132506
Assistant Attorneys General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov
mary.quimby@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, a true and correct copy of this document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

Michael Thad Allen, Esq.
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

***Counsel for Plaintiff***

_____*/s/ Mary B. Quimby*_____
**MARY B. QUIMBY**
Assistant Attorney General