# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, <br> *Plaintiff*, | § <br> § <br> § | |
| v. | § <br> § | Civil Action No. 4:21-cv-00033 |
| LAURA WRIGHT, MILTON B. LEE, MELISA DENIS, MARY DENNY, DANIEL FEEHAN, A.K. MAGO, CARLOS MUNGUIA, AND G. BRINT RYAN, each in their official capacities as members of the board of regents for the University of North Texas System; RACHEL GAIN; ELLEN BAKULINA; ANDREW CHUNG; DIEGO CUBERO; STEVEN FRIEDSON; REBECCA DOWD GEOFFROY-SCHWINDEN; BENJAMIN GRAF; FRANK HEIDLBERGER; BERNARDO ILLARI; JUSTIN LAVACEK; PETER MONDELLI; MARGARET NOTLEY; APRIL L. PRINCE; CATHY RAGLAND; GILLIAN ROBERTSON; HENDRIK SCHULZE; VIVEK VIRANI; AND BRIAN F. WRIGHT, <br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |

---

## BOARD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT APPENDIX

---

UNT 1090-1115 ...................................................................................................Appx.001

UNT 5061 ...........................................................................................................Appx.027

Bakulina deposition excerpts ...............................................................................Appx.028

Bakulina deposition exhibit 19 ............................................................................Appx.036

Brand deposition excerpts ....................................................................................Appx.038

Chung deposition excerpts ...................................................................................Appx.043

Cowley deposition excerpts .................................................................................Appx.048

Gain deposition excerpts .....................................................................................Appx.057

Graf deposition excerpts ....................................................................................Appx.061

Heidlberger deposition excerpts ......................................................................Appx.067

Heidlberger deposition exhibit 26....................................................................Appx.074

Heidlberger deposition exhibit 27....................................................................Appx.076

Jackson deposition excerpts...............................................................................Appx.078

Slottow deposition excerpts ...............................................................................Appx.085

Slottow deposition exhibit 2 ..............................................................................Appx.098

Walls deposition excerpts ...................................................................................Appx.102

Walls deposition exhibits.....................................................................................Appx.111

Ishiyama deposition excerpts.............................................................................Appx.118

Tweet thread............................................................................................................Appx.123

Open Letter on Antiracist Actions Within SMT

**Anyone may sign this document via the Google Forms link at the end of the letter text. In the first 10 days after publishing, this letter received more than 900 signatures. We are still accepting signatures, but since the rate of signing has lowered significantly we'll only update the letter once per week. Thank you for your support!**

At the Plenary Session of the Society for Music Theory's 2019 meeting, Philip Ewell, Yayoi Uno Everett, Ellie Hisama, and Joseph Straus powerfully demonstrated how systemic racism, sexism, and ableism animate musical discourse. They spoke not only with candor and wisdom, but also with exceptional courage. The *Journal of Schenkerian Studies*, in Volume 12, has just published a number of vitriolic responses to a single aspect of one presentation—under the pretense of scholarly debate, no less—and the ensuing scandal has diverted our field's focus from the structural critiques made in the plenary. The journal's violation of academic standards of peer review, its singling out of Prof. Ewell while denying him a chance to respond, and the language of many of its essays constitute anti-Black racism. These actions provide further evidence of the structural force of white supremacy in our discipline. While this episode is the most recent, and perhaps the most illustrative, the treatment Prof. Ewell received from the *Journal of Schenkerian Studies* is only the latest instance of systemic racism that marginalized Society members have faced for many years.

We applaud the recent statement of the Executive Board of the Society for Music Theory. To aid the Executive Board in their aim to "determine further actions," we the undersigned advocate for the following:

1. A public statement from the President, authorized by the Executive Board and in accordance with the Policy on Public Statements, that SMT acknowledges the following three points: (a) that American music theory is historically rooted in white supremacy, the racist idea that whites are superior to nonwhites, (b) that these white supremacist roots have resulted in racist policies that have benefitted whites and whiteness while disadvantaging nonwhites and nonwhiteness, and (c) that these racist policies have resulted in injustices suffered by BIPOC at all stages of their careers. Further, we call upon the President, with the authorization of the Executive Board, to apologize to all BIPOC who have suffered such injustices, without equivocation.

2. A demonstration of support by the Society for the graduate students of the University of North Texas Department of Music History, Theory, and Ethnomusicology in their call for accountability. We recommend that this support take the form of a letter to UNT Press demanding a full and truthful account of recent editorial processes at the *Journal of Schenkerian Studies*. This account should include information pertaining to which

authors submitted works through the call for responses and which were invited to participate individually, a description of the peer review process, details of which members of the editorial board, advisory board, and journal staff viewed submissions before publication, and an explanation of how certain authors were able to separate their roles as academic advisors to the editorial staff from their roles as authors.

3. The establishment of an Ombudsperson position or committee that advocates on behalf of those disadvantaged by imbalances of power in cases of conflict and misconduct related to journal editing, publications, conferences, governance, and teaching, since SMT has a role to play in promoting its policies for all members in all professional situations.

4. A statement that calls upon Society members to resign from the editorial board of the *Journal of Schenkerian Studies*, as the journal's recent comportment is incompatible with the SMT Policy on Ethics.

5. An amendment to the SMT Policy on Harassment, as it pertains to publication, to apply to members' behavior in all their scholarly endeavors, not only in SMT publications, discussion groups, and interest group interactions.

6. A censure of the advisory board of the *Journal of Schenkerian Studies*, pursuant to relevant portions of the SMT Mission Statement, Policy on Ethics, and Policy on Harassment, as the Society's policies have no meaning if violations do not invite censure. In particular, the Policy on Harassment states that "cases of proven offenses" will result in "revocation of membership and honors."

7. That all members of the society, as individuals, confront the ways we ourselves have sustained systems of racism and sexism through our own scholarship and pedagogy. The adoption of the above points is not a substitute for this self-reflection. That self-reflection will be aided by recent studies and works on antiracism, such as those Harvard has compiled and those in the Chronicle of Higher Education. Members affiliated with an institution of higher learning can likely contact staff members dedicated to antiracist training and pedagogy. Project Spectrum's keynote address at the 2020 MTSNYS conference also outlines important steps that individual theorists can take toward enacting change in our field.

It is only through acknowledgment and sustained, careful reflection that we can truly begin to address these issues as an academic community. As a starting point, each music theorist must ask themselves: What books and articles do I read? What scholars do I cite in my own research? What music do I analyze in my research and in my classes? What readings do I assign in my classes? What interest groups am I involved with? What committees do I serve on and what is the racial and gender makeup of those committees? What students do I mentor? In short, we all need to ask ourselves: What have I done as an individual to perpetuate existing white supremacist systems of power and inequity in our field? Probing these questions in our work individually is essential to our collective reckoning.

This document was collaboratively authored by eight music theorists who identify as white: Edward Klorman, Stephen Lett, Rachel Lumsden, Mitch Ohriner, Cora S. Palfy, Nathan Pell, Chris Segall, and Daniel Shanahan. As is too often the case, white racial activism relies on uncredited labor by BIPOC. This document has benefitted from criticism, editing, and authorship by Philip Ewell, Anna Gawboy, Jennifer Iverson, Vivian Luong, and Toru Momii. Its failings rest with the initial authors.

We also believe that there is broad support within the music theory community and beyond for the views expressed in this letter. If you would like to show your solidarity, please add your name by filling out the form found at the following link.

**Complete the form here and your name will be added alphabetically on the next daily update.**

[https://forms.gle/wvLpit67oZU9rDE39](https://forms.gle/wvLpit67oZU9rDE39)

Signed,

Damien Abner, Riverside City College
Rosa Abrahams, Ursinus College
Ruard Absaroka, University of Salzburg
Giulia Accornero, Harvard University
Stefanie Acevedo, University of Dayton
Byron Adams, University of California, Riverside
George Adams, University of Chicago
Byron Adams, UC Riverside
Kyle Adams, Jacobs School of Music, Indiana University
Elisa Corona Aguilar, NYU Student
Aisha Ahmad-Post, Colorado Springs, CO
Brian Alegant, Oberlin College Conservatory
Makulumy Alexander-Hills, Columbia University
Khyam Allami, Doctoral Researcher, Royal Birmingham Conservatoire, Birmingham City University, UK
Michael Allemana, University of Chicago
Emily Ruth Allen, Florida State University
Esme Allen-Creighton, North York Suzuki School of Music
Penrose Allphin, University of Massachusetts, Amherst
Andrés R. Amado, University of Texas Rio Grande Valley

Matt Ambrosio, Lawrence University

Drake Andersen, Vassar College

Clovis de Andre, Faculdade Cantareira (São Paulo, Brazil)

Christopher Antila, RILM (Répertoire International de Littérature Musicale)

Spencer Arias, Michigan State University

Daniel Arthurs, University of Tulsa

Sean Atkinson, Texas Christian University

Robin Attas, Queen's University

Jacqueline Avila, University of Tennessee

William R. Ayers, University of Central Florida

Andrew Aziz, San Diego State University

Michael Baker, University of Kentucky

Ben Baker, Eastman School of Music

David John Baker, London, UK

Sara Bakker, Utah State University

Twila Bakker, Edmonton, Alberta

Ellen Bakulina, University of North Texas

Ellen Bakulina, University of North Texas

Lara Safinaz Balikci, McGill University

Doug Balliett, The Juilliard School

Brad Balliett, New York, NY

Marcos Balter, University of California, San Diego

Sam Baltimore, Retired

Lisa Barg, McGill University

Alyssa Barna, University of Minnesota

Jessica Barnett, SUNY Fredonia

Matthew Barnson, SUNY Stony Brook

Daniel Barolsky, Beloit College

Christopher Bartlette, Binghamton University

Samantha Bassler, New York University, Steinhardt Dept of Music and Performing Arts Professions

Eliot Bates, The Graduate Center, CUNY

Inessa Bazayev, Louisiana State University

Melinda Beasi, Easthampton, MA

Richard Beaudoin, Dartmouth College

Jennifer Beavers, University of Texas at San Antonio

Rachel Becker, Boise State University

Adam Behan, University of Cambridge

Owen Belcher, University of Missouri Kansas City

Matthew Bell, Tallahassee, FL
Vincent Pérez Benítez, Penn State University
Lauren Bennati, University of Wisconsin-Milwaukee
Michael Bennett, Graduate student, Stony Brook University
William Bennett, Harvard University
Linda Berna, Chicago College of Performing Arts at Roosevelt University
Zachary Bernstein, Eastman School of Music, University of Rochester
Michael Berry, University of Washington
David Carson Berry, University of Cincinnati, College-Conservatory of Music
Nilanjana Bhattacharjya , Arizona State University
Nicole Biamonte, McGill University
Ian Biddle, Newcastle University, UK
Benjamin Bierman, John Jay College, CUNY
Stefanie Bilidas, University of Texas at Austin
Sebastian Bisciglia, University of Toronto
Wendelin Bitzan, Robert Schumann Hochschule Düsseldorf, Germany
Nicolas Bizub, University of Cincinnati College-Conservatory of Music
Andrew Blake, Eastman School of Music, University of Rochester
Damian Blättler, Rice University
Dan Blim, Denison University
Morgan Block, University of Arizona
Chandler Blount, Florida State University
Michael S. Boerner, Stony Brook University
Breighan Boeskool , Granger, IN
Claire Boge, Miami University (Oxford, Ohio)
Jacob Bohan, Charlotte, North Carolina
Christine Boone, University of North Carolina Asheville
David Borgo, UC San Diego
Jack Boss, University of Oregon
Mauro Botelho, Davidson College
Beau Bothwell, Kalamazoo College
Janet Bourne, University of California, Santa Barbara
Sara Bowden, Northwestern University
Lynette Bowring, Yale University
Douglas Boyce, George Washington University
Clifton Boyd, Yale University
Michael Boyd, Chatham University
Matthew Boyle, University of Alabama
Antares Boyle, Portland State University

Penny Brandt , University of Texas at Austin

Andre Bregegere, William Paterson University

Matt Brennan, University of Glasgow

Zachary Bresler, University of Agder, Kristiansand, Norway

David Bretherton, University of Southampton

Amelia Brey, The Juilliard School

Seth Brodsky, University of Chicago

Christopher Brody, University of Louisville

Per Broman, Bowling Green State University

Erin M. Brooks, State University of New York-Potsdam

Eliza Brown, DePauw University

Jenine Brown, Peabody Conservatory of the Johns Hopkins Univ.

Matthew Brown, Eastman School of Music

Andrea Brown, University of Maryland

Michael Bruschi, Yale University

Michael Buchler, Florida State University

James Buhler, University of Texas at Austin

Carl Burdick, University of Cincinnati

Samantha Burgess, Ohio State University

Geoffrey Burleson, Hunter College-CUNY

L. Poundie Burstein, CUNY

Patricia Burt, University of Delaware

Mark J. Butler, Northwestern University

David Byrne, University of Manitoba

Thomas Cabaniss, The Juilliard School, New York, NY

Stephen Cabell, Occidental College

Ian Calhoun, University of North Texas

Andrea Calilhanna, Western Sydney University, MARCS Institute for Brain, Behaviour and Development

Michael Callahan, Michigan State University

Clifton Callender, Florida State University

Melissa Camp, University of North Carolina, Chapel Hill

Lee Cannon-Brown, Harvard University

Ellon D Carpenter, Arizona State University, Emerita

Daphne GA Carr, NYU FAS Music

Carolyn Carrier, Philadelphia, PA

Rebecca Carroll, Rutgers University

James Carroll, Springfield, MA

Daniel Carsello, Temple University

Antonio Cascelli, Maynooth University

James P Cassaro , University of Pittsburgh

Zosha Di Castri, Columbia University

Devin Chaloux, New Hampshire

Samuel Chan, New York University

Aditya Chander, Yale University

Varun Chandrasekhar, The University of Minnesota

Dustin Chau, University of Chicago

Damian Cheek, University of Arkansas - Fort Smith

Timothy K. Chenette, Utah State University

William Cheng, Dartmouth College

Hon Ki Cheung, University of Minnesota

Adrian P. Childs, University of Georgia

Matt Chiu, Eastman School of Music

Hiroaki Cho, Brown University

Andrew Chung, University of North Texas

Amy Cimini, UC San Diego

Alice Clark, Loyola University New Orleans

Caryl Clark, University of Toronto

Timothy Clarkson , Sydney Conservatorium of Music, Sydney University

Seth Cluett, Columbia University

Jacob A. Cohen, Oberlin College

Sara Jo Cohen, University of Michigan Press

Christa Cole, Indiana University

Carla Colletti, Webster University

Adam Collins, University of Montana

Henri Colombat, McGill University

John Combs, Florida State University

Jade Conlee, Yale University

Corrina Connor , Victoria University of Wellington, New Zealand

Karen M. Cook, University of Hartford

Robert C. Cook, Louisville CO (University of Iowa, emeritus)

Margaret Cormier, McGill University

David Cortello, Catawba Valley Community College, Hickory, North Carolina

Evan Cortens, Mount Royal University

Nicole Cosme, Yale University

Alyssa Cottle, Harvard University

Benjamin Court, UCLA

Alexander Cowan, Harvard University

Georgia Cowart, Cleveland
Arnie Cox, Oberlin College & Conservatory
Daniel Cox, Yale
Maxe Crandall, Stanford University
Hannah N. Crider, Florida State University
Stephen A. Crist, Emory University
Luis Cruz, Rutgers University
Diego Cubero, University of North Texas
Alejandro Cueto, University of Texas at Austin
Nick Curry, Harvard Law School
David Damschroder, University of Minnesota
Joe Davies, University of Oxford
Joe Davies , University of Oxford
James Q. Davies, UC Berkeley
Stacey Davis, University of Texas at San Antonio
Angharad Davis, Yale University
Hannah Davis-Abraham, University of Toronto
Laina Dawes, Columbia University
Greg Decker, Bowling Green State University (Ohio)
Kyle DeCoste, Columbia University
Rob Deemer, State University of New York at Fredonia
Galen DeGraf, Columbia University
Tomoko Deguchi, Winthrop University
Michael Dekovich, University of Oregon
Hayden Denesha, Rock Hill Symphony Orchestra
Jay Derderian, Composer - Portland, Oregon
Johanna Devaney, Brooklyn College and CUNY Graduate Center
Dana DeVlieger, University of Delaware
Joshua DeVries, University of Michigan
David Dewar, University of Bristol, UK
Emily DeWoolfson, Temple University
Thomas Dickinson, South Carolina Governor's School for the Arts and Humanities
Brittni Leigh Dixon, Florida State University
Kendall Durelle Briggs, DMA, Professor of Music, The Juilliard School
Benjamin Dobbs, Furman University
Julia Doe, Columbia University
Brianne Dolce, Institute of Historical Research
James Donaldson, McGill University
Sahara Donna, University of North Texas

Luka Douridas, RILM (Répertoire International de Littérature Musicale)
Eric Drott, University of Texas at Austin
Aleksandra (Sasha) Drozzina, Toronto, ON
Daniel Nicolae Dubei, New York City, NY
Michèle Duguay, The Graduate Center, CUNY
Ben Duinker, University of Toronto
Craig Duke, Indiana University
Philip Duker, University of Delaware
Melissa Dunphy, Rutgers University
Jonathan Dunsby, Eastman School of Music
Jacques Dupuis, Brandeis University
Dave Easley, Oklahoma City University
Michael Ebie, Michigan State University
Ryan Ebright, Bowling Green State University
Lindsey Eckenroth, Brooklyn College, CUNY
Ethan Edl, Yale University
Lolita Emmanuel, Sydney Conservatorium of Music, University of Sydney
Laura Emmery, Emory University
Neal Endicott, Michigan State University
Christopher Endrinal, Florida Gulf Coast University
Clare Sher Ling Eng, Belmont University
Nora Engebretsen, Bowling Green State University
Tom Erbe, UC San Diego
Walter Everett, University of Michigan
Sara Everson, Florida State University
Philip Ewell, Hunter College
Samuel Falotico, University of Colorado Boulder
David Falterman, Eastman School of Music, University of Rochester
Tobias Fasshauer, Berlin University of the Arts
Joe Feagin, Texas A&M University
Fred Fehleisen, The Juilliard School
Brent Ferguson, Washburn University and MidAmerica Nazarene University
Matthew Ferrandino, University of Kansas
Abigail Fine, University of Oregon
Stanley Ralph Fink, Florida State University
Aaron Flagg, The Juilliard School
Amy Fleming, Baylor University
Nathan Fleshner, University of Tennessee
J. Wesley Flinn, University of Minnesota Morris

Rebecca Flore, University of Chicago
David Walter Floyd, Champaign, IL
Gretchen Foley, University of Nebraska-Lincoln
Mike Ford, Columbia University
Jane Forner, Columbia University
Karen Fournier , University of Michigan @ Ann Arbor
Elizabeth Fox, University of Toronto
Aaron Andrew Fox, Dept. of Music, Columbia University
Kelly Francis, Kennesaw State University
Peter Franck, Western University
Kristin M. Franseen, Carleton University and University of Ottawa
Walter Frisch, Columbia University
Simon Frisch, The Juilliard School
Louise Fristensky, The University of North Texas
Johanna Frymoyer, University of Notre Dame
Dr Sophie Fuller, Trinity Laban Conservatoire of Music and Dance, UK
Anna Fulton, Grand Valley State University
Alison Furlong, Columbus, OH
Joshua Gailey, Seattle, WA
Rachel Gain, University of North Texas
Michael Gallope, University of Minnesota
Bronwen Garand-Sheridan , Yale
Orlando Jacinto Garcia, Florida International University
Sarah Gates, Northwestern University
Leslie Gay, University of Tennessee, Knoxville
David Geary, Wake Forest University
Molly Gebrian, University of Arizona
Robin Gebrian, West Hartford CT
William van Geest, University of Michigan
Ian Gerg, Southeastern Oklahoma State University
Sarah Gerk, Binghamton University
Emily Gertsch , University of Georgia
Elaine Fitz Gibbon, Harvard University
Jeffrey L. Gillespie , Butler University
Mylene Gioffredo, Universite de Metz
Irene Girton, Occidental College
Jon-Tomas Godin, Brandon University
Keir GoGwilt, UC San Diego
Daniel Goldberg, University of Connecticut

Halina Goldberg, Indiana University, Bloomington

Rachel May Golden, University of Tennessee

K. E. Goldschmitt, Wellesley College

Grace Gollmar, University of Texas at Austin

Stephen Gomez-Peck, The Graduate Center, CUNY

Juan Gonzalez, Alumni

Sumanth Gopinath, University of Minnesota Twin Cities

Stephen Gosden, University of North Florida

Gillian L. Gower, University of Denver/University of Edinburgh

Naomi Graber, University of Georgia

Thomas Gracy, Boston University

Benjamin Graf, University of North Texas

Aaron Grant, Missouri Western State University

Roger Mathew Grant, Wesleyan University

Julianne Grasso, University of Texas at Austin

Ashley A. Greathouse , PhD Candidate, University of Cincinnati

Andrew Green, University of Glasgow

Laura Gayle Green, Florida State University

Hannah Greene, Yale College (alum)

Stefan Greenfield-Casas, Northwestern University

phillip greenlief, oakland, ca

Jess Griggs, Austin, TX

Michelle L Grosser, University of Toronto

Bree Kathleen Guerra, University of Texas at Austin

Jeannie Ma. Guerrero, Rochester, NY

Massimo Guida, Toronto

Massimiliano Guido, Pavia University, Italy

Stephanie Gunst, independent scholar, Charlottesville, VA

Toni Haastrup, UK

Sara Haefeli, Ithaca College, Editor of the Journal of Music History Pedagogy

Zaki Hagins, Conservatorium Maastricht

Lauren Halsey, University of Washington

Elizabeth Hambleton, UCSB

Chelsey hamm, Christopher Newport University

Scott Hanenberg, Virginia Tech

Mena Mark Hanna, Barenboim-Said Akademie, Berlin

Marc Hannaford, University of Michigan

Calder Hannan, Columbia University

Kristi Hardman, The Graduate Center, CUNY

Matthew Harikian, University of Minnesota

J. Tanner Harrod, Graduate Student, University of Nebraska-Lincoln

Lauren Hartburg, Florida State University

Dr. Daniel Hartley, Trinity Laban Conservatoire of Music & Dance

Robert Hasegawa, McGill University

Amy Hatch, University of North Texas/University of Texas at Arlington

Stan Hawkins, University of Oslo and University of Agder, Norway

Midavi Hayden, Independent Artist-Scholar; Cincinnati, OH

Martin Hebel, University of Cincinnati College-Conservatory of Music

Garrett Hecker, Santa Fe College (Gainesville, FL)

Nicola Leonard Hein, Columbia University New York

Haley Heinricks, Harvard University

David Heinsen, University of Texas at Austin

Bill Heinze, University of Minnesota

Salvador Hernandez, University of North Texas

Matthias Heyman, University of Antwerp, Belgium

Laura Hibbard, University of Connecticut

Andrew Hicks, Cornell University

Orit Hilewicz, Eastman School of Music

Ann Hiloski-Fowler , West Chester University of Pennsylvania

Ellie M. Hisama, Columbia University

Jocelyn Ho, UCLA

Hubert Ho, Northeastern University

Trevor Hofelich, Florida State University

John Hollenbeck, Schulich School of Music, McGill University

Kevin Holm-Hudson, University of Kentucky

Julian Bennett Holmes, Manhattan School of Music; Columbia University

Heather Holmquest, Nazareth College

Knut Holtstraeter, University of Freiburg, Germany

Tanya Honerman, University of Kansas

Erika Supria Honisch, Stony Brook University

Jason Hooper, University of Massachusetts Amherst

Fred Hosken, Northwestern University

Rachel Hottle, McGill University

Blake Howe, Louisiana State University

Alison Howell, Rutgers University

Madeleine Howey, Indiana University

Amanda Hsieh, University of Toronto

Charles Hsueh, Stony Brook University

Daniel Huang, University of Cincinnati College-Conservatory of Music

Stephen S. Hudson, University of Richmond

Bryn Hughes, The University of Lethbridge

Tim Hughes, The London College of Music

James Humberstone, Sydney Conservatorium of Music, The University of Sydney

Eric Hung, Music of Asian America Research Center

Kyle Hutchinson,

Liam Hynes-Tawa, Yale University

Brendan Ige, Eastern Michigan University

Sarah Iker, Massachusetts Institute of Technology

Mark Inchoco, University of California, Riverside

Tom Ingram, Winnipeg, MB

Lauren Irschick, Eastman School of Music

Thomas Irvine, University of Southampton

Eric Isaacson, Indiana University Jacobs School of Music

Velia Ivanova, Columbia University

Roman Ivanovitch, Indiana University

Jennifer Iverson, University of Chicago

Joseph R Jakubowski , Harvard University

Joseph Jakubowski, Harvard University

Donald James, Boston College

Mark Janello, Peabody Conservatory, Johns Hopkins University

Freya Jarman, University of Liverpool, UK

Jason Jedlicka, Cleveland Institute of Music

J. Daniel Jenkins, University of South Carolina

Stephanie Jensen-Moulton, Brooklyn College, CUNY

Emily John, Special Music School, NYC, Queens College  - CUNY

James A. John, Aaron Copland School of Music, Queens College-CUNY

Tom Johnson, contingent faculty

Lindsay Johnson, University of Maryland, Baltimore County

Erin Johnson-Williams, Durham University

Blair Johnston, Indiana University

Erin Johnston, The Graduate Center, CUNY

Evan Jones, Florida State University

Alexandrea Jonker, McGill University

Tamyka Jordon, Louisiana State University

Patricia Julien, University of Vermont

Sylvia Kahan, College of Staten Island and Graduate Center, CUNY

Elyse Kahler, University of Texas at Arlington

Noah Kahrs, Eastman School of Music
Peter Kaminsky, University of Connecticut - Storrs
Seth Keele, University of North Texas
Robert T. Kelley, Lander University
Laura L. Kelly, University of Texas at San Antonio
Matthew Kennedy, University of South Florida
Colin Kennedy, Washington, DC
Emily Kenyon, South Country Central School District
Marissa Kerbel, University of Cincinnati
Linda Kernohan, The Ohio State University, Otterbein University
Daniel Ketter, Daniel Ketter
Dr. Ildar D. Khannanov, Peabody Institute, Johns Hopkins University
Wes Khurana, University of Toronto
Marianne Kielian-Gilbert, Indiana University
Marina Kifferstein, CUNY Graduate Center
Catrina Kim, University of North Carolina at Greensboro
Jesse Kinne, Louisiana Tech University
Jesse Kiser, University at Buffalo
Michael L. Klein, Temple University
Joshua Klopfenstein , University of Chicago
Edward Klorman, McGill University
Andrew J Kluth, Case Western Reserve University
Corissa Knecht, University of Arizona
Douglas Knehans, College-Conservatory of Music, Cincinnati, OH
Andrew Knight-Hill, University of Greenwich, UK
Kristina Knowles, Arizona State University
Melinda Knowling, Univeristy of North Texas
Jon Kochavi, Swarthmore College
Emily Koh, University of Georgia
Tatiana Koike, Yale University
Adam J. Kolek, Rowan University
Robert Komaniecki, University of Iowa
Kevin Korsyn, University of Michigan
Ryan Kosseff-Jones, Geneva, NY
Stephen M. Kovaciny, Madison, WI
Sarah Koval, Harvard University
Mariusz Kozak, Columbia University
Reiner Krämer, University of Northern Colorado
Joseph Kraus, Florida State University

APPX.014
UNT_001103

Hanisha Kulothparan, Michigan State University

Jonathan Kulp , University of Louisiana at Lafayette

Anita Kumar, Georgia State University

Jaclyn Noel Kurtz, Cuyahoga Falls, Ohio

Darren A. LaCour, Lindenwood University

Eric Lai, Baylor University

Hei-Yeung John Lai, University of British Columbia

steven laitz, the Juilliard School

Nathan Lam, Massachusetts Institute of Technology

George Tsz-Kwan Lam, Hong Kong Baptist University

Wing Lau, University of Arkansas

Heather Laurel, Independent Scholar (Mannes/CUNY Alum)

Justin Lavacek, University of North Texas

Megan Lavengood, George Mason University

TJ Laws-Nicola , University of Kansas

Kara Yoo Leaman, Oberlin College & Conservatory

Gavin Lee, Soochow University

Dickie Lee, University of Georgia

Christina Lee, Mannes College - The New School, The Juilliard School, CUNY Graduate Center

Frank Lehman, Tufts University

Marc LeMay, Georgia State University

Jordan Lenchitz , Florida State University

Chris Lennard, The University of Texas at Austin

Rebecca Lentjes, RILM Abstracts of Music Literature

Kendra Preston Leonard, Silent Film Sound and Music Archive

Stephen Lett, University of Saskatchewan

Anne Levitsky, Dixie State University

Tamara Levitz, UCLA

Benjamin R. Levy, University of California, Santa Barbara

Michael Lewanski, Depaul University, School of Music

Edwin Li, Harvard University

Pengcheng Li, The Graduate Center, CUNY

Siv B. Lie, University of Maryland

Stephen F. Lilly, Minneapolis, MN

Stephanie Lind, Queen's University (Canada)

Sarah Allison Lindmark, University of North Carolina, Chapel Hill

Peng Liu, University of Texas at Austin

Kerrith Livengood, University of Illinois

Zachary Lloyd, Florida State University

Judy Lochhead, Stony Brook University
Charity Lofthouse, Hobart and William Smith Colleges, Geneva, NY
Megan Long, Oberlin College
James A. Long, Oakland University
Rebecca J. Long, University of Louisville
Gerardo (Gerry) Lopez, Michigan State University
Eduardo López-Dabdoub, Florida State University
Ralph Lorenz, Syracuse University
Sarah Louden, New York University Steinhardt
Gabriel Lubell, Indiana University Jacobs School of Music
Ann E Lucas, Associate Professor of Music, Boston College
Olivia R. Lucas, Louisiana State University
Nicholas Luciano, Greensboro, NC
Rachel Lumsden, Florida State University
Justin Lundberg, Chicago
Siriana Lundgren, Harvard University
Vivian Luong, University of Saskatchewan
Matthew Lyons, University of Texas at Austin
Megan Lyons, University of Connecticut
Yiqing Ma, University of Michigan
James MacKay, Loyola University New Orleans
Barbara Dobbs Mackenzie, RILM, Brook Center, CUNY Graduate Center
Julian Maddox, Cleveland Institute of Music
Alejandro L. Madrid, Cornell University
Andrus Madsen, Newton Baroque
Erin K. Maher, Delaware Valley University
Su Yin Mak, The Chinese University of Hong Kong
Victoria Malawey, Macalester College (St. Paul, MN)
Anabel Maler, University of Iowa
Noriko Manabe, Temple University
Kate Mancey, Harvard University
Rachel Mann, University of Texas Rio Grande Valley
Dr. Nicole Marchesseau, McMaster University
Elizabeth Margulis, Princeton University
Sarah Marlowe, Eastman School of Music
Jennifer Martin, University of Wisconsin-Milwaukee
Caitlin Martinkus, Virginia Tech
David Marvel, University of Oklahoma
William Marvin, Eastman School of Music

APPX.016
UNT_001105

Elizabeth Marvin, Eastman School of Music

Will Mason, Wheaton College

Steven D. Mathews, University of Cincinnati

T.J. Mattson, University of North Texas

Fred Everett Maus, Department of Music, University of Virginia

Paula Maust, University of Maryland, Baltimore County

Panayotis Mavromatis, New York University

Horace Maxile, Baylor University

Braden Maxwell, Eastman School of Music

Susan McClary, Case Western Reserve University

Ryan McClelland, University of Toronto

Michael McClimon, Philadelphia, PA

Sarah McConnell , University of Alaska Fairbanks

Patrick McCreless, Yale University

Stephen McFall, Indiana University

Cana F. McGhee, Harvard University

Claire McGinn, University of York

Eric McKee, Penn State University

Tim McKinney, Baylor University

Elizabeth McLain, Virginia Tech

Myles McLean, University of North Texas

Ken McLeod, University of Toronto

Andrew Mead, Jacobs School of Music, Indiana University

Andrew Mead, Indiana University

Elizabeth Medina-Gray, Ithaca College

Sarah Mendes, University of Texas at Austin

Sadie Menicanin, University of Toronto

Lila Meretzky, Yale University

Kathryn Renae Metcalf, Japan

Mark Micchelli, University of Pittsburgh

Garrett Michaelsen, University of Massachusetts Lowell

Jason Louis Mile, London, ON

Emily Milius, University of Oregon

Natalie Miller, Princeton University

McKensie Miller, Chapman University

Brian A. Miller, Yale University

Connor Milstead, St. Mary's College of Maryland

Helen Julia Minors, Kingston University, London

Nathaniel Mitchell, Princeton University

Toru Momii, Columbia University
Peter Mondelli, University of North Texas
Dayna Mondelli, Independent Proofreader and Copyeditor
Eugene Montague, George Washington University
Luiz Felipe Stellfeld Monteiro, Escola de Música e Belas Artes do Paraná (EMBAP), Curitiba, Brazil
Steven Moon, University of Pittsburgh
Steven Vande Moortele, University of Toronto
Rebecca Moranis, University of Toronto
Kacie Morgan, UCLA
Alexander Morgan, New York
Landon Morrison, Harvard University
Brian Moseley, SUNY Buffalo
Imani Danielle Mosley, University of Florida
Tahirih Motazedian, Vassar College
Andre Mount, Crane School of Music, SUNY Potsdam
Reinaldo Moya , Augsburg University, Minneapolis, Minnesota
Dorian Mueller, University of Michigan
Stephen Muir, University of Leeds, UK
Scott Murphy, University of Kansas
Alana Murphy, CUNY Graduate Center/ RILM
Barbara Murphy, University of Tennessee-Knoxville
Nancy Murphy, University of Houston
Estelle Murphy, Maynooth University, Ireland
Derek J. Myler, Eastman School of Music
Robert Nance, University of North Texas
Jessica Narum, Baldwin Wallace University
Meghan Naxer, Oregon State University
Jocelyn Neal, University of North Carolina at Chapel Hill
Severine Neff, University of North Carolina at Chapel Hill, Emeritus
Dr. Lisa Neher, Portland, OR
Christoph Neidhöfer, McGill University
Trevor R. Nelson, Eastman School of Music--University of Rochester
Anna Rose Nelson, University of Michigan
Joshua Neumann , University of Florida
Bryce Newcomer, Xavier University
Neil Newton, Los Angeles, CA
Patrick Nickleson, Queen's University
Demi Nicks, The Graduate Center, CUNY

Maggie Nicks, Florida State University
Jack Haig Nighan, Indiana University
Drew Nobile, University of Oregon
Michael Norris, Victoria University of Wellington
Felipe Ledesma Núñez, Harvard University
Shaugn O'Donnell, The City College, CUNY
William O'Hara, Gettysburg College
Russell O'Rourke, Columbia University
Jennifer Oates, Queens College, CUNY
Chelsea Oden, University of Oregon
Judith Ofcarcik, Fort Hays State University
Mitch Ohriner, University of Denver
Hideaki Onishi, Singapore
Dani Van Oort, University of North Texas
Michael Oravitz, University of Northern Colorado
Jeremy Orosz, University of Memphis
David Orvek, Indiana University
Mariam Osman, Indiana University
Anna-Elena Pääkkölä, Åbo Akademi University, Finland
Kirsten Paige, Stanford University
Cora S. Palfy, Elon University
James Palmer, Vancouver, Canada
Jinny Park, Indiana University
Hyeonjin Park, UCLA
Joon Park, University of Arkansas
Sarah Parkin, London, UK
Laurel Parsons, University of Alberta
Daniel Partridge, Portland State University
Morgan Patrick, Northwestern University
Andrew Pau, Oberlin College & Conservatory
William Pearson, DePauw University
Robert D. Pearson, Emory University
Jacy Pedersen, University of Cincinnati
Julie Pedneault-Deslauriers, University of Ottawa
Crystal Peebles, Ithaca College
Nathan Pell, Nathan Pell
Rich Pellegrin, University of Florida
Anna C. Peloso, Indiana University, Jacobs School of Music
Naomi Perley, RILM

APPX.019
UNT_001108

Jeffrey Perry, Louisiana State University
Lukas Perry, Eastman School of Music, University of Rochester
Becky Perry, Lawrence University
V Spike Peterson, University of Arizona
Marie-Ève Piché, McGill University
Marcelle Pierson, University of Pittsburgh
Miriam Piilonen, Northwestern University
John R. Pippen, Colorado State University
Chad Polk, Cleveland Institute of Music
Cayenna Ponchione-Bailey, University of Oxford
Mariana Poole, Elon University
Ève Poudrier, University of British Columbia
Andrew S. Powell, Independent Scholar (University of Kansas alum)
Sarah Pozderac-Chenevey, Independent scholar, Akron, OH
Roxane Prevost, University of Ottawa
Simon Prosser, The Graduate Center, CUNY
Jasbir Puar, Rutgers University
Joel Puckett, Peabody Conservatory, Johns Hopkins University
Katherine Pukinskis, Amherst College
Michael Puri, University of Virginia
Ian Quinn, Yale University
Steven Rahn, University of Texas at Austin
Shanika Ranasinghe, Royal Holloway, University of London
Richard Randall, Carnegie Mellon University
Jacob Reed, University of Chicago
S. Alexander Reed, Associate Professor, Ithaca College
John S. Reef, Nazareth College
Sam Reenan, Eastman School of Music
Alan Reese, Cleveland Institute of Music
Alex Rehding, Harvard University
Samuel Reich, Denison University/University of Cincinnati
Molly Reid, Appalachian State University
Connor Reinman, Indiana University
Christopher Reynolds, UC Davis
Anne-Marie Reynolds, Juilliard School
Adam Ricci, UNC Greensboro
Mark Richardson, East Carolina University
Melanie Richter-Montpetit, University of Sussex
Deborah Rifkin, Ithaca College

Steven Rings, University of Chicago

Marianna Ritchey, University of Massachusetts, Amherst

Blake Ritchie, Rutgers University

S R I Rizvi, Sahibganj College, Sahibganj, Jharkhand, India

Malia Jade Roberson, California State University, Channel Islands

Brian Robison, Northeastern University

Joti Rockwell, Pomona College

Stephen Rodgers, University of Oregon

Lynne Rogers, Mannes School of Music at The New School

Jillian C. Rogers, Indiana University

Allyson Rogers, McGill University

J. Griffith Rollefson, University College Cork

Jena Root, Youngstown State University (Ohio)

Adam Rosado, Iona College

Rachel Rosenman, Harvard University

Joshua Rosner, McGill University

Martin Ross, Western University

Jade Roth, McGill University

Paul N Roth, University of San Diego California

Katrina Roush, University of Texas Rio Grande Valley

Charles Roush, University of Texas Rio Grande Valley

Toby W. Rush, University of Dayton

Declan Ryan, DePaul University School of Music

Eron F. S. , Eastman School of Music

Siavash Sabetrohani, University of Chicago

Siavash Sabetrohani , University of Chicago

Alex Sallade, The Ohio State University

Keith Salley, Shenandoah University

Mark Sallmen, University of Toronto

Cristina Saltos , University of Texas at Austin

Frank Samarotto , Indiana University Bloomington

Lanier Sammons, California State University, Monterey Bay

Alexander Sanchez-Behar, Texas A&M University-Kingsville

Olga Sánchez-Kisielewska, University of Chicago

Felicia Sandler, New England Conservatory

Giorgio Sanguinetti, University of Rome "Tor Vergata"

Matthew Leslie Santana, UC San Diego

Matthew C. Saunders, Lakeland Community College (Kirtland, Ohio)

Isaac Schankler, Cal Poly Pomona

Andrew Schartmann, New England Conservatory
James Schippers, Michigan State University
Alexandria Schneider, University of Kansas
Katherine Schofield, King's College London
Peter Schubert, McGill University
Matthew D. M. Schullman, University of Oklahoma (Norman)
Scott Schumann, Central Michigan University
Emily Schwitzgebel, Northwestern University
Travis Scott, Xavier University of Louisiana
Jo Collinson Scott, Reader in Music, University of the West of Scotland
Derek B. Scott, University of Leeds, UK
Tyler M. Secor, University of Cincinnati College Conservatory of Music
Chris Segall, University of Cincinnati
Kate Sekula, University of Science and Arts of Education
Ian Sewell, Columbia University
Douglas Shadle, Vanderbilt University
Kayla Shaeffer, Florida State University
Jennifer Shafer, University of Delaware
Daniel Shanahan, The Ohio State University
August A. Sheehy, Stony Brook University
Jack Sheinbaum, University of Denver
Braxton D. Shelley, Harvard University
Joel T. Shelton, Elon University
Lauren Shepherd, Columbia University
Christopher Sherwood-Gabrielson, University of Michigan
Julissa Shinsky, University of Texas at Austin
Rachel Short, Shenandoah Conservatory
Tessa Shune , Chapman University
Abigail D. Shupe, Colorado State University
Max Silva, University of Chicago
Rebecca Simpson-Litke, University of Manitoba
Peter Sloan, UC San Diego
Jeremy W. Smith, University of Louisville
Stephen Decatur Smith, Stony Brook University
Kelli Smith-Biwer, University of North Carolina - Chapel Hill
Sean R. Smither, The Juilliard School
Peter Smucker, Stetson University
Jennifer Snodgrass, Appalachian State University
Alexandra Sobrino, Miami, Florida

Danielle Sofer, LGBTQ+ Music Study Group
Emma Soldaat, University of Toronto
Jason Solomon, Agnes Scott College
Jessica Sommer, Ball State University
Jonathan De Souza, University of Western Ontario
Stephen Spencer, The Graduate Center, CUNY
Mark Spicer, Hunter College and the Graduate Center, CUNY
Scott Spiegelberg, DePauw University
Martha Sprigge, University of California, Santa Barbara
Ron Squibbs, University of Connecticut
Alexander Stalarow, San Francisco Conservatory of Music
Jonathan Arthur Stallings, University of California San Diego
Justin Stanley, University of Oregon
Deborah Stein, New England Conservatory of Music
Anna Stephan-Robinson, West Liberty University
Jonathan Sterne, McGill University
Daniel Stevens, University of Delaware
Bryan Stevens, University of North Texas
Joseph Stiefel, Indiana University
Philip Stoecker, Hofstra University
Nicholas Stoia, Duke University
Jordan Carmalt Stokes, West Chester University of Pennsylvania
Chris Stover, University of Oslo
Eva-Maria van Straaten, Georg-August University Göttingen, Germany
Jeremy Strachan, Queen's University
Joseph Straus, CUNY Graduate Center
Ofir Stroh, Blair School of Music
Cara Stroud, Michigan State University
Greg Stuart, University of South Carolina
Jacob David Sudol, Florida International University
Rina Sugawara, University of Chicago
James Sullivan, Michigan State University
Peter M. Susser, Columbia University
Kaitlyn Swaim, University of North Texas
Kevin Swinden, Wilfrid Laurier University
Kelly Symons, Ottawa
Victor Szabo, Hampden-Sydney College
Kristin Taavola, University of Denver
Lina Sofia Tabak, CUNY Graduate Center

Carlos Pérez Tabares, University of Michigan
Ivan Tan, Brown University
Daphne Tan, University of Toronto
Nicholas Ivan Tapia, St. Mary's University (Music Education)
Jeremy Tatar, McGill University
Benjamin Tausig, SUNY Stony Brook
Ryan Taycher, Roosevelt University
Timothy D. Taylor, UCLA
Charles Taylor, University of New Orleans
Blake Taylor, University of Connecticut
Emma Taylor, The Hartt School at the University of Hartford
Samuel Teeple, The Graduate Center, CUNY
Wilfrido Terrazas, University of California, San Diego
Loretta Terrigno, The Juilliard School
Bryan Terry, McGill University
Florian Thalmann, Kyoto University
Robert Gross, Board Certified Music Therapist, Denton, TX
Midge Thomas, Connecticut College
Sean Emmett Thompson, San Francisco State University
Alexis Millares Thomson, University of Toronto
Emmi Tinajero, University of North Texas
Spencer Topel, Brooklyn, New York
Peter van Tour, Norwegian Academy of Music, Oslo
Sylvie Tran, University of Michigan
Emily Lamb Truell, Indiana University
Caitlan Truelove, Graduate Student, University of Cincinnati
Dale Trumbore, Los Angeles, CA
Tobias Tschiedl, McGill University
Cynthia Johnston Turner, University of Georgia
Isabel Tweraser, Florida State University
Kristian Twombly, Chair, St Cloud State University
Dr. Finn Upham, McGill University, Schulich School of Music
Elizabeth Randell Upton , UCLA
Diane Urista, Cleveland Institute of Music
Stephanie Venturino, Eastman School of Music
Vivek Virani, University of North Texas
Samantha Waddell, Michigan State University
Ben Wadsworth, Kennesaw State University
Steve Waksman, Smith College

Daniel K.S. Walden, University of Oxford

Kristen Wallentinsen, Rutgers University

Zachary Wallmark, University of Oregon

Levi Walls, University of North Texas

Robert Walser, Case Western Reserve University

Jordan Walsh, University of Texas at Austin

Aleisha Ward, National Library of New Zealand

Evan Ware, California State Polytechnic University, Pomona

Lindsay Warrenburg, Boston, MA

Hannah Waterman, Stony Brook University

Laura Watson , Maynooth University, Ireland

Andrew H. Weaver, The Catholic University of America

Miriam Brack Webber, Bemidji State University

Katelin Webster, The Ohio State University

Joelle Welling, University of Calgary

Robert Wells, University of Mary Washington

Allison Wente, Elon University

Marianne Wheeldon, University of Texas at Austin

Andrew Malilay White, University of Chicago

Christopher White, University of Massachusetts Amherst

Jason White, Wilfrid Laurier University

Juliet White-Smith, The Ohio State University

Ryan Whittington, Florida State University

Anya Wilkening, Columbia University

Ann Marie Willer, (formerly) University of North Texas

Matthew Williams, University at Buffalo

Dr. Natalie Williams, (formerly) North Park University

Justin Williams , University of Bristol (UK)

Jeff Williams, Harvard University

Ruthie Williamson, Indiana University Kelley School of Business

Julianna Willson, Eastman School of Music

Lauren Wilson, Eastman School of Music

Imogen Wilson, Columbia University

Christopher Witulski , Bowling Green State University

Elizabeth L. Wollman, Baruch College, CUNY

Kathryn Woodard, Philadelphia, PA

Chelsea N Wright, University of Oregon

Robert B. Wrigley, The Graduate Center, CUNY

Alice Xue, CUNY

Jessica Findley Yang, University of Tennessee - Knoxville
Rachel Yoder, DigiPen Institute of Technology
Michelle Yom, CUNY Graduate Center
Anna Yu Wang, Harvard University
Jeff Yunek, Kennesaw State University
Jason Yust, Boston University
Anna Zayaruznaya, Yale University
Emily Zazulia, University of California, Berkeley
Lawrence Zbikowski, University of Chicago Department of Music
Kamil zeglen, Chapman university
Spencer Zembrodt, Florence, KY (SUNY Fredonia, 2018)
Xieyi (Abby) Zhang, Georgia State University
Rosalind Zhang, Toronto
Shelley Zhang , University of Pennsylvania
Zhuo Zhao, Rutgers University
Julie Zhu, Stanford University



OFFICE OF THE PROVOST & ACADEMIC AFFAIRS

March 2, 2021

Dear Dr. Jackson,

Thank you for your response to the Ad Hoc Panel's Report of Review of Conception and Production of Vol. 12 of the *Journal of Schenkerian Studies* (JSS). I was heartened that you accepted some of the panel's recommendations, including: 1) the publication of a clear and transparent explanation for the journal's editorial process; 2) the appointment of an editor-in-chief who is a full-time tenured faculty member; and 3) the inclusion of a conflict-of-interest statement concerning submissions by editorial staff and members of the editorial board. I also note that you did not address the panel's fourth recommendation, which concerns issues of governance and oversight. Furthermore, you reserved the right for the journal to publish contributions that are not peer reviewed. It is important that faculty in the division and college who have an interest in the journal share an understanding of the credibility these changes will bring to the journal.

The university is moving forward with a plan to ensure that the JSS remains a prominent venue for peer-reviewed scholarship of the highest quality. In consultation with Dean John Richmond and Chair Benjamin Brand, I am charging the Division of Music History, Theory, and Ethnomusicology to launch a national search for a new editor-in-chief who is a full-time tenured faculty member preferably at an R1 university or comparable conservatory of music. This editor then will determine the membership of the JSS editorial board, recruiting new members as needed and renewing existing members as appropriate. In close collaboration with the board, the new editor will establish clear and transparent guidelines concerning the governance structure of the journal and its editorial, review, and publication practices, including the board's oversight role and whether the journal will publish contributions that are not peer reviewed. I expect these guidelines to comport well with the publication standards of *A Short Guide to Ethical Editing for New Editors* of the Council for Publication Ethics. The editor and board will be responsible for defining a timeline, selection of articles and other details related to the publication of the next volume of the JSS. The editor and board also will consult with Dean Richmond and Chair Brand to define the future relationship of the JSS with the College of Music, the Division of Music History, Theory, and Ethnomusicology, and the UNT Press; and on the opportunities for our graduate students to participate in the editorial process.

Dean Richmond, Chair Brand, and I are eager to see the *Journal of Schenkerian Studies* continue to make important contributions to the discipline of music theory. We are confident it will do so through the university's course of action outlined above. Thank you, once again, for participating in this review process.

Sincerely,

Jennifer Cowley, PhD
Provost and Vice President for Academic Affairs

**APPX.027**

*ELLEN BAKULINA, PH.D.    10/16/2024*    1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
 2                  SHERMAN DIVISION

 3   TIMOTHY JACKSON,              )
                                  )
 4        Plaintiff,              )
                                  )
 5   vs.                          )  CASE NO. 4:21-CV-00033-ALM
                                  )
 6   LAURA WRIGHT, et al.,        )
                                  )
 7        Defendants.             )

 8   *********************************************

 9        VIDEOTAPED ZOOM ORAL DEPOSITION OF

10              ELLEN BAKULINA, PH.D.

11                 October 16, 2024

12              (Reported Remotely).

13

14   *********************************************

15        VIDEOTAPED ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.,

16   produced as a witness at the instance of the Plaintiff

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 16th day of October, 2024,

19   from 9:03 a.m. to 3:54 p.m., before Kim D. Carrell,

20   Certified Shorthand Reporter in and for the State of

21   Texas, reported remotely by computerized stenotype

22   machine at the physical location of the Witness, Ellen

23   Bakulina, Ph.D., in Montreal, Canada, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

*ELLEN BAKULINA, PH.D.    10/16/2024*    2

```
 1                   APPEARANCES

 2   FOR THE PLAINTIFF:

 3     Michael Thad Allen
       ALLEN LAW, LLC
 4     P.O. Box 404
       Quaker Hill, CT 06375
 5     Telephone: 860.772.4738
       Fax: 860.469.2783
 6     E-mail: M.allen@allen-lawfirm.com

 7

 8   FOR THE DEFENDANTS:

 9     Mary Quimby
       Assistant Attorney General
10     General Litigation Division
       P.O. Box 12548, Capital Station
11     Austin, Texas 78711
       Telephone: 512.463.2120
12     Fax: 512.320.0667
       E-mail: Mary.Quimby@oag.texas.gov
13
            - and -
14
15     Renaldo Stowers  (Appearing Live)
       Cari Jacoby
16     University of North Texas System
       Office of General Counsel
17     801 North Texas Boulevard
       Denton, Texas 76201
18     Telephone: 940.565.2717
       Fax: 940.369.7026
19     E-mail: Renaldo.Stowers@untsystem.edu
       cari.jacoby@untsystem.edu
20
21   ALSO PRESENT:

22     Timothy Jackson, Plaintiff

23   VIDEOGRAPHER:

24     Mr. Jason Warner
       Legal Video Group
25     lvg.dallas@gmail.com
       214-598-5229
```

*ELLEN BAKULINA, PH.D.    10/16/2024*    3

```
 1                   I N D E X

 2                                              PAGE
```

```
 3   Appearances...................................  2

 4   Stipulations..................................  5

 5   ELLEN BAKULINA, PH.D.

 6      Direct Examination by Mr. Allen........  6

 7   Reporter's Certificate....................... 227

 8                   EXHIBITS

 9   NUMBER           DESCRIPTION            MARKED

10   Exhibit 1   Re-Notice of Taking Deposition..... 13

11   Exhibit 2   Bakulina CV
                 (UNT 005258 - 005267)............. 14
12
     Exhibit 3   Bakulina CV with Highlights
13               (UNT005257 - 005267)............. 31

14   Exhibit 4   Title Page, List of Articles,
                 Theoria, Volume 26, 2020.......... 35
15
     Exhibit 5   Excerpt from SMT Website, Oxford
16               University Press Academic, and
                 Ewell Article..................... 45
17
     Exhibit 6   Email, Not everyone was
18               enthusiastic about Ewell's talk
                 (JACKS 086826).................... 85
19
     Exhibit 7   Email, Material for the Committee
20               (UNT 002645 - 002782)............ 88

21   Exhibit 8   Email, 12-11-19, Jackson to
                 Bakulina, et al.
22               (UNT 000563 - 000566)............106

23   Exhibit 9   Email, 7-25-20, Slottow
                 to Jackson, et al
24               (UNT 000300 - 000303)............137

25
```

*ELLEN BAKULINA, PH.D.    10/16/2024*    4

```
 1   Exhibit 10  Email Chain Ending Jackson to
                 Cubero, et al.
 2               (UNT 000304 - 000309)............144

 3   Exhibit 11  Letter, 7-29-20, Bakulina to
                 Richmond
 4               (UNT 000116 - 000309)............150

 5   Exhibit 12  Email, 7-29-20, Bakulina to
                 Brand, et al.
 6               (UNT 000488).....................158

 7   Exhibit 13  Email, 7-31-20, Richmond to
                 Music Faculty, et al.
 8               (UNT 000568).....................160

 9   Exhibit 14  Ad Hoc Review Panel Report
                 (Exhibit D)
10               (JACKSON000208 - 000233)..........164

11   Exhibit 15  Email Chain, Re: Statement on
                 JSS Issue
12               (UNT 000363).....................175

13   Exhibit 16  Email Chain Re: Meeting with
                 Journal Review Panel, Wed.
14               Sept. 16
                 (UNT 002509).....................186
15
     Exhibit 17  Email Chain Re: Talk with the
16               UNT Ad Hoc Journal Review Panel
                 (UNT 002555).....................196
17
     Exhibit 18  Undated Letter, Bakulina to
18               Richmond
                 (UNT 002559 - 002561)............203
19
     Exhibit 19  Email Chain Ending 5-17-21,
20               Brand to Cowley, et al.
                 (UNT 005054 - 005055)............208
21
22
23
24
25
```

ELLEN BAKULINA, PH.D.    10/16/2024

97

1  possible that we interacted between his plenary address
2  and the publication of Volume 12 of JSS, yes.
3      Q.   Did anything prevent you from reaching out to
4  Philip Ewell individually and inviting him to participate
5  in Volume 12 of the Journal of Schenkerian Studies?
6           MS. QUIMBY:  Objection, form.
7      A.   I think my membership on the Journal of
8  Schenkerian Studies board prevented me from inviting him
9  personally to.  So I would not -- I felt I could not
10  invite him and say like, hey, Phil, do you want to write
11  a response to the responses or response to something?  I
12  could not.  I felt I could not invite him on my own like
13  this because I was a member of JSS board.
14      Q.   What prevented you, as a member of the JSS
15  board, from inviting Philip Ewell personally?
16      A.   What prevented me was that as a board member, I
17  was -- I thought at least, maybe it was a wrong
18  perception, but I felt like as a board member, JSS
19  board member, I was sort of under the directions of its
20  advisory board, which, at that time, was Timothy Jackson
21  and Stephen Slottow.  And because I was less empowered
22  in the division, meaning that I did not have tenure and
23  they both did and still do --
24      Q.   Uh-huh.
25      A.   -- I didn't feel enough independence to do what

ELLEN BAKULINA, PH.D.    10/16/2024

98

1  I wanted to do.  I felt like I needed to -- obey is not
2  the right word.  To -- I felt submissive, I guess,
3  because I was afraid basically of being too independent.
4  I was afraid to say things to the advisory board, that
5  they would not -- I thought they would not necessarily
6  like what I did.
7      Q.   That didn't prevent you from raising the
8  issue that they should delay the publication of
9  Volume 12 because the plenary session was going to be
10  published in Music Theory Spectrum, did it?
11           MS. QUIMBY:  Objection, form.
12      A.   That did not prevent me, correct.
13      Q.   And you had just been at a talk in November
14  of 2019 where Philip Ewell received a standing ovation,
15  right?
16           MS. QUIMBY:  Objection, form.
17      A.   Yes.
18      Q.   Did you feel an inability to speak to Philip
19  Ewell in any way?
20           MS. QUIMBY:  Objection, form.
21      A.   No.
22      Q.   Did you feel there was a, quote, power
23  differential, between you and Philip Ewell as scholars
24  in the field?
25           MS. QUIMBY:  Objection, form.

ELLEN BAKULINA, PH.D.    10/16/2024

99

1      A.   In the scholars of the field, yes.  I think,
2  yes.
3      Q.   But yet you felt that you could speak to him
4  about issues concerning publication in Theoria, right?
5           MS. QUIMBY:  Objection, form.
6      A.   Wait.  Was it the same year?
7      Q.   The Theoria article came out in 2020, right?
8           MS. QUIMBY:  Objection, form.
9      A.   The same year?
10           MS. QUIMBY:  Objection, form.
11      A.   Yes.  But it doesn't mean that the discussion
12  happened at the same time.
13      Q.   Well, any discussions you had with Philip Ewell
14  over anything related to the publication in Theoria, did
15  you feel somehow intimidated by him?
16           MS. QUIMBY:  Objection, form.
17      A.   No, I did not feel intimidated by Philip Ewell
18  with respect to publication in Theoria mostly because he
19  was not in a position to give me any directions.  His
20  article and my article in Theoria were on par with each
21  other and the third one by Segall.  We were on par with
22  each other.  And I might not remember perfectly well,
23  but I don't think Philip Ewell and I discussed much with
24  respect to articles in Theoria.  I would not discuss with
25  him.  I would discuss it with the editor.

ELLEN BAKULINA, PH.D.    10/16/2024

100

1      Q.   Were you intimidated by Frank Heidlberger as
2  the editor of the journal Theoria?
3           MS. QUIMBY:  Objection, form.
4      A.   Intimidated by the fact that he was the
5  editor or by something that he said?
6      Q.   By the fact that he was the editor.
7      A.   No, not really.
8      Q.   Okay.
9      A.   I was not in any situation with respect to my
10  publication in Theoria that would create any problematic
11  events, no.
12      Q.   When you were formulating the call for papers
13  of the Journal of Schenkerian Studies to solicit articles
14  for the Symposium --
15      A.   Um-hum.
16      Q.   -- do you recall any discussion about whether
17  there should be a specific ideological focus of the
18  submissions?
19           MS. QUIMBY:  Objection, form.
20      A.   I remember that the call for responses.  Now, I
21  don't actually remember the final form of the call for
22  responses.
23      Q.   Um-hum.
24      A.   But one of the drafts of the call for
25  responses, I remember seeing that email stated

ELLEN BAKULINA, PH.D.    10/16/2024

121

1    Q.    And I just had a few more questions about that,
2    and then we'll move on to talking about the Schenker
3    controversy.
4    A.    Sure.
5    Q.    But I just -- if you could, for the record, can
6    you identify anytime before July of 2020 when you were
7    the direct witness to Professor Jackson exercising
8    disproportionate power over Mr. Walls?
9         MS. QUIMBY:  Objection, form.  Excuse me.
10   Only indirectly.  And so this is a little   bit of a
11   guess.  But I will say, because I think it is relevant,
12   I'm speaking of Walls' master's thesis.  So   his
13   master's thesis is an analysis of an opera, Schenkerian
14   analysis of an opera by a woman composer, French, from
15   the nineteenth century.  Schenkerian analysis of large
16   portions of music.  First of all, it's very difficult.
17   And I applaud Levi for doing that.  It's hard to do.
18   Q.    Um-hum.
19   A.    It seemed to be very strongly influenced by Dr.
20   Jackson's thinking and intellectual style.
21   Q.    Um-hum.
22   A.    Because Jackson did an analysis of an opera
23   around that time.  I think he did -- well, I won't.  I
24   won't say things that I don't remember exactly.  But he
25   did an analysis of an opera.  And he genuinely likes

ELLEN BAKULINA, PH.D.    10/16/2024

122

1    doing Schenkerian analysis of extremely large portions
2    of music, including operas.  And when I was working with
3    Levi, it occurred to me more than once.  I was thinking,
4    is it possible that he did all of this on his own?  Like
5    how much is this influenced by Jackson?  So this is the
6    only thing I can say.  It looked like it was heavily
7    influenced by Jackson.  How much it was -- how much, you
8    know, was it influenced or was it more Dr. Jackson sort
9    of dictating more what to do to Levi Walls, I don't know.
10   Q.    Okay.
11   A.    So it's not about, you know, a specific
12   interaction that I witnessed.  It's something that I can
13   only guess based on the intellectual substance of that
14   thesis.
15   Q.    And in your interactions with the editorial
16   staff of the Journal of Schenkerian Studies leading up to
17   the issuing of call for papers, did you have any direct
18   knowledge of Levi Walls being affected by a so-called
19   power differential between him and Timothy Jackson?
20   A.    The power differential was obvious.  I
21   was not aware of any incidents, no.  But the power
22   differential was obvious because the fact that the
23   Journal editor was the student of someone on the advisory
24   board, Timothy Jackson, it was obvious that Jackson at
25   least would have an influence on the editor.  So it was

ELLEN BAKULINA, PH.D.    10/16/2024

123

1    obvious that the editor, Walls, would not be independent
2    in making his decisions.  He was obviously dependent on
3    his -- on Jackson primarily because Jackson was his
4    advisor.
5    Q.    Was he so dependent on Professor Jackson as his
6    advisor that it prohibited him from expressing
7    independent views on Philip Ewell's work?
8         MS. QUIMBY:  Objection, form.
9    A.    I don't know.  I can't speculate about that.
10   Q.    Okay.
11   A.    But I think it's possible, because the
12   topic is extremely sensitive.  And I know from personal
13   experience that it's not easy to have objective opinions,
14   and it's easy to sort of feel intimidated when it comes
15   to sensitive topics.
16   Q.    Do you think Professor Walls -- strike that.
17        Do you think Mr. Walls was more intimidated by
18   Timothy Jackson or more intimidated by the Society for
19   Music Theory's open letter condemning the Journal of
20   Schenkerian Studies that he edited as a student editor?
21        MS. QUIMBY:  Objection, form.
22   A.    I don't know.  I am in no position to judge
23   about his -- how he feels or felt.  I don't know.
24   Q.    You said you were close to Mr. Walls.  Did
25   he ever discuss feeling unable to express his views on

ELLEN BAKULINA, PH.D.    10/16/2024

124

1    Timothy Jackson with you?
2         MS. QUIMBY:  Objection, form.
3    A.    No, never.
4    Q.    Thank you.  Let's talk about the Schenker
5    controversy.  And by Schenker controversy, do you
6    understand I mean the controversy that erupted in July
7    of 2020 when Volume 12, and especially the Symposium,
8    came to light for the first time?
9    A.    Um-hum.
10   Q.    Okay.  When did you personally realize there
11   was going to be a controversy surrounding Volume 12 of
12   the Journal of Schenkerian Studies?
13        MS. QUIMBY:  Objection, form.
14   A.    When I saw Facebook post that described the
15   Volume 12 as -- as problematic.  It used the word
16   "racist."  Racist, yeah.
17   Q.    Who was the -- who was the author of the
18   Facebook post that you read, if you recall?
19   A.    Christopher Segall.
20   Q.    Um-hum.  Was Christopher Segall a contributor
21   to Volume 12?
22   A.    Yes.
23   Q.    Do you remember Christopher Segall complaining
24   that there was anything racist about the process before
25   he published?

*ELLEN BAKULINA, PH.D.    10/16/2024*

161

1    **A.**   Yes.

2    **Q.**   I have just one -- well, a couple of questions.

3  You would have received this email as well, right?

4          MS. QUIMBY:  Objection, form.

5    **A.**   I don't know.  I'm not listed -- oh, I'm

6  listed.  I think so.  As I said, it's difficult to

7  remember everything.

8    **Q.**   What is the musicfaculty@unt.edu, if you

9  know?

10    **A.**   I should have been part of that, yes.

11    **Q.**   Okay.  Is it your understanding that these

12  are collective emails that go out to all members of

13  faculty, all members of music staff, music adjuncts?

14    **A.**   Yes.

15    **Q.**   And you're, of course, on faculty at this time,

16  right?

17    **A.**   Yes.

18    **Q.**   And you said you were in Montreal?

19    **A.**   Yes.

20    **Q.**   Did you retire there because of -- not

21  retire, but did you remove yourself to Montreal

22  because of COVID?

23    **A.**   No.  It's because I spent every summer in

24  Montreal.  In fact, anytime I was not teaching, I spent

25  in Montreal, because of my family.

---

*ELLEN BAKULINA, PH.D.    10/16/2024*

162

1    **Q.**   Oh, great.  And so, of course, it was

2  summertime.  It was the end of July?

3    **A.**   Um-hum, yes.

4    **Q.**   You weren't on a faculty appointment up there

5  of any kind, right?

6    **A.**   I was on faculty at UNT.  I did not work

7  anywhere else.

8    **Q.**   Okay.  I meant in Montreal, so thanks.

9    All right.  So there is no reason to believe

10  that you would not have received this email?

11    **A.**   No, there is no reason.

12    **Q.**   Okay.  When Dean Richmond writes that the

13  College of Music reaffirms the dedication to combating

14  racism, what was your understanding of what he was

15  referring to?

16          MS. QUIMBY:  Objection, form.

17    **A.**   My understanding was that he confirmed that

18  inclusion was important at UNT.

19    **Q.**   And why was he, as you understood it,

20  reaffirming this dedication to combating racism in

21  this announcement?

22          MS. QUIMBY:  Objection, form.

23    **A.**   This is because Volume 12 of JSS created an --

24  what's the word -- not unpleasant, objectionable public

25  image of UNT.

---

*ELLEN BAKULINA, PH.D.    10/16/2024*

163

1    **Q.**   Um-hum.

2    **A.**   Because it's important not only what every

3  individual thinks what inclusion means, what racism

4  means, and so on, but also the public image of something.

5  So when Volume 12 of JSS came out, the public image of

6  UNT was affected, and this is what this email was about.

7    **Q.**   Um-hum.  Was the Journal of Schenkerian Studies

8  ever published again after July 31st, 2020, to your

9  knowledge?

10    **A.**   To my knowledge, no.

11    **Q.**   Do you think that reflected well on the

12  University of North Texas?

13          MS. QUIMBY:  Objection, form.

14    **A.**   I don't know.  It's -- the question is too

15  general.  I don't know.

16    **Q.**   I'm going to transition to talking about what

17  two documents that you referred to.  Well, actually, all

18  three documents besides some of the email correspondence

19  that you referred to when I asked you what documents you

20  had looked at to prepare for your deposition.  This would

21  be the petition signed by faculty, the petition signed by

22  students, and the Ad Hoc Panel Report of November 25th,

23  2020.  So I'm going to mark for the record the Ad Hoc

24  Panel Report.

25         (Deposition Exhibit Number 14 marked.)

---

*ELLEN BAKULINA, PH.D.    10/16/2024*

164

1         MR. ALLEN:  And you'll have to give me a

2  second here.  I seem to have lost it.  Where did it go?

3  I'm going to need a second to -- sorry.  I had this

4  exhibit, and now I don't seem to have it anymore.  I

5  think this is it.  Okay.  I apologize, Professor

6  Bakulina.  One of the deposition exhibits I was going

7  to show you, I misplaced, and I'm finding it again.

8    **Q.**   So I'm marking for the record as Exhibit 14,

9  the Ad Hoc Panel Report.  And I'm also going to publish

10  that into the chat.  We're just going to wing this.

11    All right.  So we're not going to go through

12  the entire report.  But the report had attached to it

13  certain exhibits of its own that I have marked as part

14  of the entire report.  I'm only doing this because that

15  keeps them all in one place.  But for our purposes, I

16  want to call your attention to a document that was

17  attached to the Ad Hoc Panel Report.  And again, I'm not

18  trying to hide anything.

19    Do you recognize this document as the Ad Hoc

20  Panel Report of Review of Conception and Production of

21  Volume 12 of the Journal of Schenkerian Studies dated

22  November 25, 2020, correct?

23    **A.**   Yes.  Yes, I do.

24    **Q.**   And do you recall that various documents

25  were appended to the end of that report, including

---

ELLEN BAKULINA, PH.D.    10/16/2024

205

1    A.    Okay.

2    Q.    And the fact is that's why I'm asking, because

3  I don't know.  It's in close proximity to Exhibit 17,

4  which is an email, including an attachment, that is

5  referred to in the letter -- excuse me, in the email

6  as "the letter I sent to Dean Richmond on July 29th,

7  2020."

8         Okay.  And then later in the record, but a

9  few pages only, we find this.  But of course, if it was

10 an attachment, it doesn't say I am an attachment.  Do

11 you know what I mean?  I'm just trying to see --

12   A.    Oh, I see, I see, I see.  So you are asking if

13 this is part of my report?  Can I look once again at my

14 report to Dean Richmond?

15   Q.    Absolutely.

16   A.    Whatever that was the report for, I don't know.

17   Q.    The previous exhibit?

18   A.    I'm sorry.  My English is getting --

19   Q.    I understand.

20   A.    The thing that I wrote for the Dean Richmond.

21   Q.    I'm sorry.  Yes.  Sorry, I'm trying to find it.

22 It is just going to take me one second.  That is not the

23 correct one.  I know it's in here.  Hold on.

24        Here it is.  I believe it's Exhibit 11.  Do

25 you recall examining --

---

ELLEN BAKULINA, PH.D.    10/16/2024

206

1    A.    Yes.  I recall examining it like an hour or two

2  ago.

3    Q.    And I would represent to you that at least

4  the portions I've highlighted from July 29th, 2020 to

5  subparagraph (a), beginning on November 15th, 2019, are

6  more or less identical except for the date which somehow

7  got lost to this exhibit?

8    A.    Yes.  It's part of the same thing.  I agree.

9    Q.    Okay.  Thank you.

10   A.    Yes.

11   Q.    I don't have any further questions about that.

12 I just wanted to authenticate that for the record,

13 Professor Bakulina.

14        So after the ad hoc panel issued its report,

15 which we've already examined to some extent and has been

16 introduced as an exhibit in this deposition, what

17 happened next?

18        MS. QUIMBY:  Objection, form.

19   A.    I understand you are asking about the Journal.

20   Q.    Yes.  What first activities did you engage in

21 concerning the Journal of Schenkerian Studies after

22 November 2020?

23   A.    I see.  I was invited by the dean, I think, the

24 dean to serve on a search committee that looked for

25 a new editor.  And I served on that until the time I left

---

ELLEN BAKULINA, PH.D.    10/16/2024

207

1  UNT.

2    Q.    And what did you do as a person on the search

3  committee?

4    A.    So first, we formulated a description of the

5  position.

6    Q.    Um-hum.

7    A.    And then we received, I think, two

8  applications.  I don't have it anymore.  And we

9  reviewed the applications.

10        (Deposition Exhibit Number 19 marked.)

11        MR. ALLEN:  I do want to ask you about

12 that.  I just want to mark for the record Exhibit 19.

13 Exhibit 19 is an email string from Benjamin Brand and

14 Jennifer Cowley, Renaldo Stowers, John Richmond.  And

15 then it looks like it attaches a call for applications,

16 Editor of Journal of Schenkerian Studies.

17        Do you recognize this email?

18        MS. QUIMBY:  Objection, form.

19   A.    I see.  I don't recognize this email.  I

20 don't know if I received it.

21   Q.    And I see that you are not on the string.  So

22 if your answer is no, that's a perfectly fine answer.

23   A.    Um-hum.

24   Q.    Do you see this next email is, in Exhibit 19 is

25 --

---

ELLEN BAKULINA, PH.D.    10/16/2024

208

1    A.    Yes.

2    Q.    -- from SMT-announce on behalf of Bakulina,

3  Ellen.  And this is your email, correct?

4    A.    Yes, so I guess I was the one who sent it to

5  SMT-announce.

6    Q.    And it's dated May 15th, 2021, right?

7    A.    Yes.

8    Q.    And I know this is small, so I'm going to blow

9  it up a little bit here.  Can you read that?

10   A.    Yes, I can.

11   Q.    It starts UNT 5054, and it continues over

12 the next page, right?  And I'm going to get rid of this

13 highlight.  What is this Dear Colleagues document that

14 you have circulated to the SMT-announce list?

15   A.    Sorry.  Let me read.  One minute.

16   A.    Yeah.

17   A.    Seeking applications.

18   Q.    Hold on.  I just -- I'm sorry.  That wasn't

19 intentional.

20   A.    No problem.  Okay.  That's a different

21 document, right?

22   Q.    My apologies.  This should be it.  I'm sorry.

23 I opened a new document, and it jumped out of the way.

24 It's one of the perils of virtual depositions, so please

25 have as much time as you want to examine this document.

*ELLEN BAKULINA, PH.D.    10/16/2024*

209

1    **A.**   Okay.  Yes, I am ready for questions.

2    **Q.**   Okay.  And I just want to scan down to the next

3    page, which goes over to UNT 5055.

4    **A.**   Um-hum.

5    **Q.**   And I just -- to highlight here, your name is

6    at the bottom where it says, "Inquiries, nominations, and

7    application materials should be directed to the search

8    committee chair Jessica Nápoles via email.  Search

9    committee members include:"

10       And your name is listed as the first member,

11   correct?

12   **A.**   Yes.

13   **Q.**   What is this document?

14   **A.**   It's the call for applications.

15   **Q.**   Call for applications for a new editor?

16   **A.**   Yes.

17   **Q.**   And was it your understanding that Timothy

18   Jackson could not serve on the Journal of Schenkerian

19   Studies editorial staff?

20   **A.**   No.  It was not my understanding that he

21   could not serve on this.

22   **Q.**   That was not communicated to you by Benjamin

23   Brand?

24       MS. QUIMBY:  Objection, form.

25   **A.**   It was never formulated that Timothy Jackson

*ELLEN BAKULINA, PH.D.    10/16/2024*

210

1    cannot apply for this.

2    **Q.**   Okay.  And it says -- I'm just looking at the

3    second sentence that begins, "We hope."

4       Do you see that?

5    **A.**   Yes.

6    **Q.**   Right here?

7    **A.**   Yes, yes.  I do, I do.

8    **Q.**   I just wanted to read that into the record.

9       "We hope that the new editor or editors will

10   help rejuvenate the journal, redefine it in light of the

11   current state of music theory as a field, and restructure

12   and rebrand it to promote its long term viability."

13       Did I read that correctly?

14   **A.**   Yes.

15   **Q.**   Can you tell me, as a member of the search

16   committee, what you meant by redefine the Journal in the

17   light of the current state of music theory as a field?

18   **A.**   Because Volume 12 of the Journal was involved

19   with Philip Ewell's ideas, I think that redefining the

20   journal would deal with redefining it in relation to

21   ideas of antiracism and redefining it with respect to

22   the growing diversity of SMT.  And also, redefining it

23   with respect to the growing globalization of our field.

24   **Q.**   Uh-huh.

25   **A.**   Because our field -- I mean, JSS is an American

*ELLEN BAKULINA, PH.D.    10/16/2024*

211

1    publication.  And for a time, American music theory was

2    relatively, not entirely, but relatively isolated.  And

3    there were real reasons for it.  I'm

4    not criticizing it right now.  But there came a time

5    gradually, but especially maybe, I will say maybe 20

6    years ago, 15 years, where it was no longer just American

7    music theory.

8    **Q.**   Um-hum.

9    **A.**   And the field was changing and is still

10   changing globally around the world.  And so there are

11   music theorist societies now in many countries.  There

12   are some in Asia, and those are some of the youngest

13   ones.  There is one in Russia.  There are some in Europe.

14   And some of them are older and some are  those are newer.

15   **Q.**   Um-hum.

16   **A.**   And more -- more than all of that, there's more

17   and more interaction.  So the field is being globalized.

18   And to me, the rejuvenation of the Journal mentioned in

19   this call for applications means that Schenkerian

20   analysis, if it is to continue existing,

21   it will continue existing in this new and much larger

22   cultural context.

23   **Q.**   Um-hum.

24   **A.**   Not the context -- not necessarily or not only

25   the context, you know, of former Schenker followers or

*ELLEN BAKULINA, PH.D.    10/16/2024*

212

1    Schenker students coming to the U.S.  That was extremely

2    important to the twentieth century, but no longer there.

3    You know, how does the Journal and how does the area of

4    Schenkerian studies exist in a more globalized world, in

5    a world where all of these different cultures and all of

6    these different countries and societies in the different

7    countries interact and languages interact and ideas

8    interact.  And there is, of course, also, yes, greater

9    racial and gender and other diversity in SMT itself in

10   America.  And that's really a context that simply did

11   not exist some time ago.  And I don't think this ever

12   says that Timothy Jackson cannot do it or cannot apply

13   for it.  This is more about really two things:  The role

14   of the Journal in the new universe, may I say, and the

15   role of the new universe or the changing universe,

16   changing global intellectual context, in relation to

17   what exists in Schenkerian studies nowadays.

18   **Q.**   Okay.  And following after the clause that

19   calls for the redefining of the Journal in the current

20   state of music theory as a field -- in the light of the

21   current state of -- it says, "restructure and rebrand

22   the Journal to promote its long term viability."

23       If I asked you what that meant, would your

24   answer be more or less the same?

25   **A.**   Yes, but it also would be more, and I can --

*ELLEN BAKULINA, PH.D.    10/16/2024*

213

1    Q.    Please.

2    A.    Rebrand.  I think I -- somebody did not come up

3    with this word, but I can tell you what I understand by

4    it.

5        (Cat sounds)

6    Q.    She's tired at the end of the day, too, I

7    think.  Sorry, I interrupted you.  So we were asking --

8    you were going to define what your understanding of

9    rebranding a journal was.  I apologize.  I couldn't

10   resist with the cat sound.

11   A.    No problem.  The contents of a journal -- and

12   I'm not specifically talking about JSS, any journal or

13   any conference, there are things that are being analyzed,

14   pieces that are being analyzed, sources that are being

15   cited.  In a way, that is the branding.  You know, so if

16   I read a journal whose latest issue analyzes, let's say,

17   I don't know, Stravinsky, Bartók, and I don't know,

18   Rochberg or somebody like that, my first thought would

19   be that it's a journal on twentieth century art music.

20   If I need a journal that, you know, has in its latest

21   issue, I don't know, seven articles out of which six

22   are on various genres of popular music, I will probably

23   think that it's a journal on popular music or something

24   like that.

25       And I think that -- so I haven't reviewed

*ELLEN BAKULINA, PH.D.    10/16/2024*

214

1    the last issues of JSS, of course, not counting

2    Volume 12.  But I think that most people agree that

3    existing materials in JSS up to Volume 12 are mostly on

4    European music of the tonal era.  Is that logical?  Well,

5    that's the things that Schenker analyzed primarily.  So

6    yes, a Journal of Schenkerian studies following in the

7    traditional Schenker logically seems completely good.

8        However, I also think that if the readership

9    of the journal made an effort to include pieces that go

10   beyond the, you know, white male, European composers of

11   certain centuries and made greater effort to publish

12   about the book of women, for example, or to publish

13   about, I don't know, an article about perhaps fully

14   tonal work by a -- non-like composer or American

15   composers.  You know, there's more diversity there than

16   Europe.  And that would also encourage more diversity in

17   future volumes.  So to me, rebranding means, you know,

18   changing the contents of -- let's say, one volume or

19   two volumes would change how these journals would be

20   perceived in the future and showing the direction.

21   Q.    So the new direction really had to embrace

22   new content of the kind you've described?

23   A.    Yes, to me.

24   Q.    Yes.  And sorry.  To follow up on something you

25   said earlier, you said to your knowledge, the committee

*ELLEN BAKULINA, PH.D.    10/16/2024*

215

1    received two applications?

2    A.    Yes.

3    Q.    Who applied?

4    A.    I don't remember the names.  I am so very

5    sorry.  I honestly don't recall the names.  Both of

6    them are not well-known scholars in the field, which I

7    personally like that fact.  That means that, you know,

8    people who haven't yet had an opportunity to show their

9    work a lot or their qualifications a lot would have an

10   opportunity to work.  That's all I can say.  I wish I

11   could recall the names.

12   Q.    Were there documents reflecting the

13   applications of these individuals?

14   A.    They were CDs in both cases.

15   Q.    Were there any other documents that concerned

16   these two applications that you know of?

17   A.    Let's see.  There would be a -- there would

18   be the -- I don't remember if the cover of the CD would

19   be a separate documents.  Or maybe the cover was simply

20   the email itself.  Give me one minute, please.

21   Q.    Can you just describe what you are doing there?

22   A.    I'm reading the exhibit, the document that

23   you've shared, because I'm trying to see if we asked for

24   cover letter and CD separately or were they the same.

25   Okay.  It would be here.  Correct, thank you.  At least

*ELLEN BAKULINA, PH.D.    10/16/2024*

216

1    up to there, I'm sorry.  I guess the cover letter for CD

2    was separate, okay, but I don't recall the details.

3    Q.    Do you recall internal communications of the

4    committee about these two applications?

5    A.    Yes.  We -- yes.

6    Q.    Would you have met to discuss them in person?

7    A.    No.  I was during the pandemic.

8    Q.    Uh-huh.  By Zoom?

9    A.    It was by email.

10   Q.    Okay.  And so there would also be email

11   correspondence among the committee members reflecting

12   these two allocations, right?

13       MS. QUIMBY:  Objection, form.

14   A.    I think so.

15   Q.    Okay.  And you read those emails yourself,

16   correct?

17       MS. QUIMBY:  Objection, form.

18   Q.    At least as long as you were at the University

19   of North Texas, right?

20   A.    As long as I was at UNT, yes.

21   Q.    And are you -- do you have any knowledge of why

22   neither of these applicants were appointed?

23   A.    I remember that one of them didn't have enough

24   experience in editorial work, or maybe both, but the

25   other one, I don't recall.

ELLEN BAKULINA, PH.D.    10/16/2024

225

```
1    _____

2    _____

3        I, ELLEN BAKULINA, have read the foregoing

4    deposition and hereby affix my signature that same

5    is true and correct, except as noted above.

6

7        _____

8                ELLEN BAKULINA

9

10   THE STATE OF _____)

11   COUNTY OF _____)

12

13       Before me, _____, on this

14   day personally appeared ELLEN BAKULINA, known to me or

15   proved to me on the oath of _____ or

16   through _____ (description of

17   identity card or other document) to be the person whose

18   name is subscribed to the foregoing instrument and

19   acknowledged to me that he/she executed the same for

20   the purpose and consideration therein expressed.

21       Given under my hand and seal of office on this

22   _____ day of _____, _____.

23

24       _____

                NOTARY PUBLIC IN AND FOR

25              THE STATE OF _____

                My Commission Expires: _____
```

ELLEN BAKULINA, PH.D.    10/16/2024

226

```
1            UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF

2                 SHERMAN DIVISION

3    TIMOTHY JACKSON,        )
                            )
4        Plaintiff,         )
                            )
5    vs.            ) CASE NO. 4:21-CV-00033-ALM
                            )
6    LAURA WRIGHT, et al.,   )
                            )
7        Defendants.        )

8        _____

9        REPORTER'S CERTIFICATION OF

10      ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.

11              October 16, 2024

12      _____

13       I, KIM D. CARRELL, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16       That the witness, ELLEN BAKULINA, was duly sworn

17   and that the transcript of the oral deposition is a

18   true record of the testimony given by the witness;

19       That the deposition transcript was duly submitted

20   on November, 12, 2024, to Mary Quimby, attorney for the

21   witness,for examination, signature, and return to me by

22   December 16, 2024;

23       That pursuant to the information given to the

24   deposition officer at the time said testimony was taken,

25   the following includes all partes of record and the
```

ELLEN BAKULINA, PH.D.    10/16/2024

227

```
1    amount of time used by each party at the time of the

2    deposition;

3        Michael Thad Allen - 05 HRS: 49 MIN

         Mary Quimby  - 00 HRS: 00 MIN

4

5    FOR THE PLAINTIFF:

6        Michael Thad Allen

         ALLEN LAW, LLC

7        P.O. Box 404

         Quaker Hill, CT 06375

8        Telephone: 860.772.4738

         Fax: 860.469.2783

9        E-mail: M.allen@allen-lawfirm.com

10

11   FOR THE DEFENDANTS:

12       Mary Quimby

         Assistant Attorney General

13       General Litigation Division

         P.O. Box 12548, Capital Station

14       Austin, Texas 78711

         Telephone: 512.463.2120

15       Fax: 512.320.0667

         E-mail: Mary.Quimby@oag.texas.gov

16

17        - and -

18       Renaldo Stowers  (Appearing Live)

         Cari Jacoby

19       University of North Texas System

         Office of General Counsel

20       801 North Texas Boulevard

         Denton, Texas 76201

21       Telephone: 940.565.2717

         Fax: 940.369.7026

22       E-mail: Renaldo.Stowers@untsystem.edu

         cari.jacoby@untsystem.edu

23

24       I further certify that I am neither counsel for,

25   related to, nor employed by any of the parties or
```

ELLEN BAKULINA, PH.D.    10/16/2024

228

```
1    attorneys in the action in which this proceeding was

2    taken, and further that I am not financially or

3    otherwise interested in the outcome of the action.

4        Certified to by me on this 12th day of November,

5    2024.

6

7

8

9

10

11       _____

         Kim D. Carrell, CSR NO. 1184

12       Date of Expiration: 7-31-26

         JULIA WHALEY & ASSOCIATES, INC.

13       2012 Vista Crest Drive

         Carrollton, Texas  75007-1640

14       214-668-5578/Fax 972-236-6666

         JulieTXCSR@gmail.com

15       Firm registration No. 436

         Firm registration Expires 5-31-25

16

17

18

19

20

21

22

23

24

25
```

Message

| | |
|---|---|
| **From:** | Brand, Benjamin [Benjamin.Brand@unt.edu] |
| **Sent:** | 5/17/2021 4:51:46 PM |
| **To:** | Cowley, Jennifer [Jennifer.Cowley@unt.edu]; Stowers, Renaldo [Renaldo.Stowers@untsystem.edu]; Richmond, John [John.Richmond@unt.edu] |
| **Subject:** | FW: [Smt-Announce] Call for Applications: Editor of the Journal of Schenkerian Studies |

Dear Jennifer, John, and Renaldo,

The call for applications for a new editor of the JSS has been publicized on the SMT email list. Applications are due July 30. The search committee will begin its review of them shortly thereafter.

All the best,
Benjamin

Benjamin Brand, Ph.D.
Pronouns: he, him, his | Professor of Music History
Chair, Division of Music History, Theory, and Ethnomusicology
College of Music | University of North Texas | (940) 536-3561



---

**From:** Smt-announce <smt-announce-bounces@lists.societymusictheory.org> on behalf of Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Sent:** Saturday, May 15, 2021 4:22 PM
**To:** smt-announce@lists.societymusictheory.org <smt-announce@lists.societymusictheory.org>
**Cc:** Napoles, Jessica <Jessica.Napoles@unt.edu>
**Subject:** [EXT] [Smt-Announce] Call for Applications: Editor of the Journal of Schenkerian Studies

Dear Colleagues,

The University of North Texas (UNT) is seeking applications for a new editor or editorial team for the *Journal of Schenkerian Studies*. Editor(s) will serve a 3-year term, beginning (tentatively) no later than January 2022. We hope that the new editor(s) will help rejuvenate the journal, redefine it in light of the current state of music theory as a field, and restructure and rebrand it to promote its long term viability. We are open to the possibility of teams of co-editors, and/or editors with associate editors, applying for the editorial role. The relationships between the journal and its institutional stakeholders can be examined and revised where appropriate.

The Journal of Schenkerian Studies is the only peer-reviewed research journal featuring articles on all facets of Schenkerian thought, including theory, analysis, pedagogy, historical aspects, and reviews of relevant publications. It currently is published annually by the Center for Schenkerian Studies and the University of North Texas Press.

Previous issues of the journal can be found here:
https://digital.library.unt.edu/explore/collections/JSCS

The University of North Texas Press co-publishes the journal with the Center and/or journal editor. The Press receives final print-ready files from the Editor and arranges for print publication and dissemination to subscribers for each annual issue. Within one year of print publication the journal is loaded with the UNT Libraries for open access.

**Job description/responsibilities**:

The editor is responsible for developing a process for determining editorial board membership, terms and length of service, and restructuring of journal guidelines. The editor will also ensure a fair and high-quality peer review of articles written in (or related to) the traditions of prolongational analysis.

The journal is expected to abide by the Committee on Publications Ethics (COPE) guidelines regarding best practices in editorial management.
https://publicationethics.org/files/COPE_G_A4_SG_Ethical_Editing_May19_SCREEN_AW-website.pdf

**Minimum Qualifications**:
    A record of sustained, high-quality research publication in peer-reviewed research journals
    Expertise in Schenkerian analysis/Schenkerian studies

**Preferred Qualification**:
    Editorial experience, as either an editor or an editorial board member of a research journal

Applications should include:
    a cover letter with expression of interest in the position, including the candidate's goals for the journal
    a curriculum vitae, including all contact information for the applicant
    a list of 3 references with current contact information

Inquiries, nominations, and application materials should be directed to the search committee chair, Jessica Nápoles via email at Jessica.Napoles@unt.edu. Search committee members include:

Dr. Ellen Bakulina, Assistant Professor of Music Theory, UNT
Mr. Ron Chrisman, Director, UNT Press
Dr. Graham Hunt, Professor of Music Theory, UT Arlington
Dr. John Ishiyama, University Distinguished Research Professor of Political Science, UNT
Dr. Jessica Nápoles, Associate Professor of Choral Music Education, UNT

All applications must be submitted electronically in a single .pdf. Review of applications begins July 30th and will remain open until filled.

UNT_005055

BENJAMIN D. BRAND, Ph.D.    09/23/2024    1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF
                     SHERMAN DIVISION
 3   TIMOTHY JACKSON,            )
 4        Plaintiff,             )
 5   vs.                         )  CASE NO. 4:21-CV-00033-ALM
 6   LAURA WRIGHT, et al.,       )
 7        Defendants.            )
 8
 9   ****************************************
10         VIDEOTAPED ORAL DEPOSITION OF
11             BENJAMIN D. BRAND, Ph.D.
12               September 23, 2024
13   ****************************************
14
15       VIDEOTAPED ORAL DEPOSITION OF BENJAMIN D. BRAND,
16   Ph.D., produced as a witness at the instance of the
17   Plaintiff and duly sworn, was taken in the above-styled
18   and numbered cause on the 23rd day of September, 2024,
19   from 1:14 p.m. to 6:11 p.m., before Kim D. Carrell,
20   Certified Shorthand Reporter in and for the State of
21   Texas, reported by computerized stenotype machine at
22   the University of North Texas System, 801 North Texas
23   Boulevard, Gateway Suite #308, Denton, Texas, pursuant
24   to the Federal Rules of Civil Procedure and the
25   provisions stated on the record or attached hereto.
```

BENJAMIN D. BRAND, Ph.D.    09/23/2024    2

```
 1
 2                    APPEARANCES
 3
 4   FOR THE PLAINTIFF:
 5        Mr. Michael Thad Allen
          ALLEN LAW, LLC
 6        P.O. Box 404
          Quaker Hill, CT 06375
 7        Telephone: 860.772.4738
          Fax: 860.469.2783
 8        E-mail: M.allen@allen-lawfirm.com
 9
10   FOR THE DEFENDANTS:
11        Mr. Benjamin S. Walton
          Assistant Attorney General
12        General Litigation Division
          P.O. Box 12548, Capital Station
13        Austin, Texas 78711
          Telephone: 512.463.2120
14        Fax: 512.320.0667
          E-mail: Benjamin.Walton@oag.texas.gov
15           - and -
16        Mr. Renaldo Stowers
          University of North Texas System
17        Office of General Counsel
          801 North Texas Boulevard
18        Denton, Texas 76201
          Telephone: 940.565.2717
19        Fax: 940.369.7026
          E-mail: Renaldo.Stowers@untsystem.edu
20
21   ALSO PRESENT:
22   VIDEOGRAPHER:
23        Mr. Tony McGough
          Legal Video Group
24        lvg.dallas@gmail.com
          214-598-5229
25
```

BENJAMIN D. BRAND, Ph.D.    09/23/2024    3

```
 1                    I N D E X
 2                                            PAGE
 3   Appearances.................................  2
 4   Stipulations................................  6
 5
 6   BENJAMIN D. BRAND, Ph.D.
 7       Direct Examination by Mr. Allen........  7
 8
 9
10                    EXHIBITS
11
12   NUMBER         DESCRIPTION            MARKED
13   Exhibit 1   Re-Notice of Taking Deposition.....  7
14   Exhibit 2   Letter, 7-31-20, Allen to
15               Wright, et al.
16               (UNT 000157 - 000162)............. 37
17   Exhibit 3   Title Page of Theoria, Volume 26... 47
18   Exhibit 4   Walls Facebook Post
19               (JACKSON 000234 - 000236).......... 56
20   Exhibit 5   Email, 11-17-19, Walls to Jackson
21               (Exhibit G)
22               (JACKSON 000240 - 000244).......... 70
23   Exhibit 6   Material for the Committee
24               Emails
25               (UNT 002645 - UNT 002782).......... 78
```

BENJAMIN D. BRAND, Ph.D.    09/23/2024    4

```
 1   Exhibit 7   Ad Hoc Review Panel Report
 2               (Exhibit D)
 3               (JACKSON000208 - 000233)........... 84
 4   Exhibit 8   Email, 12-11-20, Brand to Jackson
 5               (JACKSON 000272)................... 87
 6   Exhibit 9   Handwritten Notes, 9-16-20, Ad
 7               Hoc Journal Review Committee....... 90
 8   Exhibit 10  Emails Re: Questions regarding
 9               the JSS
10               (UNT 002539 - 002546).............. 93
11   Exhibit 11  Emails Beginning 7-25-20, Chung
12               to Graf, et al.
13               (UNT 000304 - 000309)..............101
14   Exhibit 12  Emails RE: JSS Beginning 7-25-20,
15               Chung to Graf, et al.
16               (UNT 000458 - 000463)..............107
17   Exhibit 13  Response Draft, Heidlberger to
18               Brand, 7-27-20
19               (UNT 000472, 000503)...............112
20   Exhibit 14  Emails RE: SMT Exec Board
21               response to JSS Essays
22               (UNT 000480, 000481)...............118
23   Exhibit 15  Statement from the MHTE Graduate
24               Students (Confidential)
25               (Kohanski 000107 - 000110)........122
```

APPX 038

21

1    A.    I'd say the tempo varies.

2    Q.    This last article of yours, was it peer

3    reviewed?

4    A.    No.

5    Q.    Do you intend to submit that article for your

6    annual review?

7    A.    No.

8    Q.    At some point, you mentioned you started

9    working for the Berklee Conservatory?  Did I get that

10   wrong?

11   A.    The title is Berklee College of Music.

12   Q.    And is this -- correct me if I'm wrong.

13   That's in Boston?

14   A.    That's correct.

15   Q.    When did you start working there, and what do

16   you do there?

17   A.    I started working at the Berklee College of

18   Music, I believe, in March of 2024.  And my duties were

19   to teach music history classes.

20   Q.    Have you left the University of North Texas?

21   A.    No.

22   Q.    Are you on sabbatical of some sort?

23   A.    No.

24   Q.    What is the nature of your position formally

25   with Berklee?

22

1    A.    As an -- my -- I serve as an adjunct

2    instructor.

3    Q.    Are you still obligated to teach and so forth

4    at UNT?

5    A.    No.

6    Q.    Have you held any other positions besides those

7    that you've named at the Berklee Conservatory and the

8    University of North Texas?

9    A.    Yes.

10   Q.    Can you please enumerate them?

11   A.    I currently hold the position of senior

12   director of new ventures in digital strategy innovation

13   at UNT.

14   Q.    New ventures?  Is that what you said?

15   A.    Um-hum.

16   Q.    What is that and what is its relationship to

17   UNT?

18   A.    Could you elaborate on relationship?

19   Q.    Well, let's break it into two parts.  Describe

20   for the record what new ventures is.

21   A.    New ventures is potential new projects of

22   the division of digital strategy and innovation we may

23   pursue.

24   Q.    And what is the relationship of new ventures to

25   the larger institution, University of North Texas?

23

1    A.    The relationship of the position is that it

2    reports to the vice president of digital strategy and

3    innovation.

4    Q.    Is it a center?

5    A.    No.

6    Q.    How long have you been associated with new

7    ventures?

8    A.    I began that position in June of 2023.

9    Q.    So you were the division head in 2020, correct?

10   A.    I was the division chair in 2020.

11   Q.    I'm sorry.  Thanks for correcting me.

12         And do you recall a controversy arising in

13   approximately July of 2020 involving the Journal of

14   Schenkerian Studies?

15   A.    Yes.

16   Q.    Can you explain for the record your

17   understanding of what that controversy was about?

18   A.    My understanding of the controversy is that

19   it centered on the content and the quality of research

20   in a volume of the Journal of Schenkerian Studies.

21   Q.    What about the content of the volume

22   published by the Journal of Schenkerian Studies became

23   controversial at that time?

24   A.    My recollection and my understanding is that

25   a number of the contributions, the articles in the

24

1    Journal, were perceived to be racist.

2    Q.    Did you read the articles in the Journal --

3    let's back up a second.

4         Do you recall what volume of the Journal of

5    Schenkerian Studies was published in that time period?

6    A.    To the best of my recollection, the number of

7    the Journal, the number of the issue of the Journal or

8    volume of the Journal was 12.

9    Q.    So if we refer to Volume 12, you'll know I'm

10   talking about that specific publication that came out in

11   July of 2020, right?

12   A.    Yes.

13   Q.    Likewise, just to get some formalities out of

14   the way, if you or I refer to JSS, we'll both know and

15   understand that refers to the Journal of Schenkerian

16   Studies?

17   A.    Yes.

18   Q.    So let me back up and ask it again.  Did you

19   read Volume 12 of the Journal of Schenkerian Studies?

20   A.    I did not read it in its entirety.

21   Q.    Let me be more specific.  In July of 2020, did

22   you read the Journal then, even if you may not have read

23   it in its entirety?

24   A.    In July?

25   Q.    Yes.  How much of it did you read in July?

41

1    A.    To the best of my recollection, I did
2  not perceive the criticisms that were being made of
3  Volume 12 of the JSS as threats to the UNT Academic
4  Integrity Policy.
5    Q.    Is there an exception to the UNT's Academic
6  Freedom Policy for accusations of racism?
7    A.    Not that I'm aware of.
8    Q.    Going back to Volume 12 of the Journal
9  of Schenkerian Studies, what do you recall the main
10  criticisms of the Journal being?  You've already
11  identified that, I guess, some people from outside
12  the University thought something was racist.  People
13  from within the University, including the graduate
14  students and faculty, were submitting statements.  We
15  will be able to review those in a second.
16    A.    Um-hum.
17    Q.    But I just wanted to ask you, besides attacks
18  on the content of the Journal, what were the criticisms
19  leveled at the University of North Texas Press?  Excuse
20  me.
21    A.    I don't --
22    Q.    Strike that question.
23        What were the -- besides the things we've
24  already discussed, what were the criticisms leveled at
25  the Journal of Schenkerian Studies in this July 2020 to

42

1  November 2020 time frame?
2    A.    As I recall, one of the main criticisms was
3  that some of the content of the volume was racist; that
4  some of the content of the volume was poorly researched
5  and of lower scholarly quality.  Again, I'm paraphrasing.
6  And that the issue -- sorry.  The volume in question had
7  not gone through a peer-review process.  Those are the
8  three criticisms that I recall.
9    Q.    And I believe you already testified that
10  you couldn't identify what specific content, at least as
11  you read it, was racist, right?  You didn't have the
12  scholarly familiarity with that field or that specialty
13  to make a judgment?
14    A.    As I recall, I didn't feel like I had the
15  scholarly expertise to make a definitive judgment as to
16  whether a certain article was racist or not.
17    Q.    And about the scholarly or not scholarly, do
18  you remember what specifically was considered, quote, not
19  scholarly?
20    A.    I would say the one thing that I recall
21  particularly clearly as an example of the quality of
22  research involved was the citation of a Wikipedia
23  article in one of the contributions.  I believe that
24  contribution was by Dr. Jackson.
25    Q.    Do you agree with that criticism, that a

43

1  journal that quotes Wikipedia in some shape or form is,
2  per se, not scholarly?
3        MR. WALTON:  Form.
4    Q.    Let me strike that question.
5        So was the -- to the best of your memory, was
6  the criticism that a journal article that cited Wikipedia
7  could not be scholarly?
8    A.    To the best of my memory, that -- my
9  recollection, that was not a-- that was not the
10  criticism being made.
11    Q.    What was the criticism?
12    A.    As I recall, it was the way that the
13  Wikipedia article in question was being used as a
14  definitive source.
15    Q.    Did you read that article and make a
16  determination of how that was being used as a, quote,
17  definitive source, I guess, as you've characterized it?
18    A.    That was one of the articles I've read.
19    Q.    And you've certainly published enough
20  yourself and are familiar enough with scholarship to
21  make a judgment about that, right?
22    A.    I believe so.
23    Q.    So did you find that invocation of Wikipedia,
24  for whatever reason in that article, to be, quote, not
25  scholarly, close quote?

44

1    A.    As I recall reading that citation in Wikipedia
2  in particular, it struck me as -- as not something that
3  would be within the mainstream of normal scholarly
4  research practice.
5    Q.    Did you ever confirm that it was false in any
6  way?  The quotation to Wikipedia.
7    A.    I don't recall whether it was a quotation of
8  some citation from a Wikipedia page.
9    Q.    Good correction.  Thank you.
10        Did you ever confirm that the information for
11  which Wikipedia was relied on for an authority was false?
12    A.    I don't recall ever having reviewed the
13  Wikipedia page that was cited.
14    Q.    Was there any evidence, to your knowledge, that
15  the information for which Wikipedia was invoked as an
16  authority was somehow false?
17    A.    Could you repeat the question?
18    Q.    Sure.  Let me do a little more work here.
19        You were being bombarded by emails, messages,
20  that this was a controversy, correct?
21        MR. WALTON:  Form.
22    Q.    That there was something wrong with Volume 12
23  of the JSS?
24    A.    I was receiving emails.
25    Q.    And one of the criticisms in these emails was

BENJAMIN D. BRAND, Ph.D.    09/23/2024

85

1  Q.  It doesn't say that, though, does it?  It
2  says it was not his job to censor people, right?
3  A.  That's what the text says.
4  Q.  Isn't that right?  It's not the job of an
5  editor to censor people, correct?
6  MR. WALTON:  Form.
7  Q.  Is there something funny about that question?
8  Is there a reason you are smiling?
9  A.  Um.
10  MR. ALLEN:  Do you have something to
11  say, Renaldo?
12  MR. STOWERS:  We can go off the record.
13  MR. ALLEN:  We can go off the record,
14  please.
15  THE VIDEOGRAPHER:  We're off the record at
16  4:05 p.m.
17  (Recess taken)
18  THE VIDEOGRAPHER:  We're back on the
19  record at 4:05 p.m.
20  MR. WALTON:  Object to the form of the
21  question.  It's badgering the witness.
22  Q.  Were you smiling when you read that,
23  Dr. Brand?
24  A.  I was.
25  Q.  Did me pointing that out seem offensive to you?

BENJAMIN D. BRAND, Ph.D.    09/23/2024

86

1  A.  It did not seem offensive, no.
2  Q.  So I just asked if you found it funny.
3  A.  I don't find it funny.
4  Q.  So I'm asking, especially at a state
5  university, isn't it correct that the job of an
6  editor is not to censor people?
7  MR. WALTON:  Form.
8  Q.  I know this is getting long in the tooth,
9  but he's pointing out I'm asking a double negative
10  question, so let me try to rephrase that.
11  It's correct -- it's correct that especially
12  at a state institution, it is not the job of an editor to
13  censor people, correct?
14  MR. WALTON:  Form.
15  A.  The job of an editor is to provide critical
16  feedback.
17  Q.  Did you see any evidence that critical feedback
18  was not provided to the authors of the
19  Symposium other than whatever Levi Walls was posting
20  on Facebook?
21  A.  Other than Levi Walls' post on Facebook, I have
22  not seen evidence that authors in that volume of
23  JSS were not receiving critical feedback.
24  MR. ALLEN:  Sorry, Dr. Brand.  I'm looking
25  for an exhibit that I wanted to show you.  I'm going to

BENJAMIN D. BRAND, Ph.D.    09/23/2024

87

1  mark for the record as Exhibit Number 8.  This is an
2  email from you, Professor Brand, to Timothy Jackson
3  titled Follow-Up, from December 11th, 2020.
4  A.  Um-hum.
5  (Deposition Exhibit Number 8 marked.)
6  Q.  It also has the Bates stamp JACKSON 000272.
7  Do you remember this email, Professor Brand?
8  A.  I do.
9  Q.  What was the purpose of your writing this email
10  to Timothy Jackson?
11  A.  Could you restate the question?
12  Q.  What was your purpose of sending this email
13  to Timothy Jackson on December 11th, 2020?
14  A.  To clarify and confirm some points that I had
15  made verbally.
16  Q.  You had met with Timothy Jackson at this
17  time?
18  A.  Over Zoom.
19  Q.  Of course.  It was the COVID era, right?  And
20  was that that same day?
21  A.  I don't recall whether it was the same day
22  or not.
23  Q.  It was within 24 hours of this date?
24  A.  As I recall, it was within 48 hours of the
25  date.

BENJAMIN D. BRAND, Ph.D.    09/23/2024

88

1  Q.  Fair enough.  And you told him that you could
2  not support a plan according to which he would remain
3  involved in the operations of the Journal of Schenkerian
4  Studies, correct?
5  MR. WALTON:  Form.
6  A.  As written in the email, I did tell him that
7  I couldn't support a plan according to which he would
8  remain in the day-to-day operations of the Journal.
9  Q.  And this was based on your reading of the
10  Ad Hoc Panel Report that we had just introduced as
11  Exhibit 7?
12  A.  Correct.
13  Q.  And he also complained to you in that meeting
14  that he was preparing a response, correct?
15  A.  As I recall, he did inform me that he was
16  preparing a response.
17  Q.  And in that first sentence after, you know,
18  bullet point Number 3, you say, "You expressed your
19  desire that I read your response to the panel's report
20  before I make any definitive judgments and, of course, I
21  will read your report carefully when I receive it."
22  Did I read that correctly?
23  A.  Yes.
24  Q.  Did you receive his response?
25  A.  I recall receiving his response.

*BENJAMIN D. BRAND, Ph.D.    09/23/2024*

141

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF
              SHERMAN DIVISION
 3   TIMOTHY JACKSON,            )
                                 )
 4       Plaintiff,         )
                                 )
 5   vs.                )  CASE NO. 4:21-CV-00033-ALM
                                 )
 6   LAURA WRIGHT, et al.,       )
                                 )
 7       Defendants.        )
 8   _____
 9        REPORTER'S CERTIFICATION OF
10     ORAL DEPOSITION OF BENJAMIN D. BRAND, Ph.D.
11            September 23, 2024
12   _____
13       I, KIM D. CARRELL, a Certified Shorthand Reporter
14   in and for the State of Texas, hereby certify to the
15   following:
16       That the witness, BENJAMIN D. BRAND, was duly
17   sworn and that the transcript of the oral deposition is
18   a true record of the testimony given by the witness;
19       That the deposition transcript was duly submitted
20   on October 21, 2024, to Mr. Benjamin Walton, the attorney
21   for the defendants, for examination, signature, and
22   return to me by November 22, 2024, (30 days);
23       That pursuant to the information given to the
24   deposition officer at the time said testimony was taken,
25   the following includes all partes of record and the
```

*BENJAMIN D. BRAND, Ph.D.    09/23/2024*

142

```
 1   amount of time used by each party at the time of the
 2   deposition:
 3       Michael Thad Allen - 03 HRS: 54 MIN
         Benjamin Walton -  00 HRS: 00 MIN
 4
 5   FOR THE PLAINTIFF:
 6       Mr. Michael Thad Allen
         ALLEN LAW, LLC
 7       P.O. Box 404
         Quaker Hill, CT 06375
 8       Telephone: 860.772.4738
         Fax: 860.469.2783
 9       E-mail: M.allen@allen-lawfirm.com
10
11   FOR THE DEFENDANTS:
12       Mr. Benjamin S. Walton
         Assistant Attorney General
13       General Litigation Division
         P.O. Box 12548, Capital Station
14       Austin, Texas 78711
         Telephone: 512.463.2120
15       Fax: 512.320.0667
         E-mail: Benjamin.Walton@oag.texas.gov
16           - and -
17       Mr. Renaldo Stowers
         University of North Texas System
18       Office of General Counsel
         801 North Texas Boulevard
19       Denton, Texas 76201
         Telephone: 940.565.2717
20       Fax: 940.369.7026
         E-mail: Renaldo.Stowers@untsystem.edu
21
22       I further certify that I am neither counsel for,
23   related to, nor employed by any of the parties or
24   attorneys in the action in which this proceeding was
25   taken, and further that I am not financially or
```

*BENJAMIN D. BRAND, Ph.D.    09/23/2024*

143

```
 1   otherwise interested in the outcome of the action.
 2       Certified to by me on this 21st day of October,
 3   2024.
 4
 5
 6           _____
           Kim D. Carrell, CSR NO. 1184
 7         Date of Expiration: 7-31-26
           JULIA WHALEY & ASSOCIATES, INC.
 8         2012 Vista Crest Drive
           Carrollton, Texas  75007-1640
 9         214-668-5578/Fax 972-236-6666
           JulieTXCSR@gmail.com
10         Firm registration No. 436
           Firm registration Expires 5-31-25
11
12
```

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    SHERMAN DIVISION

 3    TIMOTHY JACKSON,          X
                                X
 4            Plaintiff,        X
                                X
 5    VS.                       X CASE ACTION
                                X NO.: 4:21-cv-00033-ALM
 6    LAURA WRIGHT, ET AL.,     X
                                X
 7            Defendants.       X

 8

 9    ------------------------------------------

10        ORAL AND VIDEOTAPED DEPOSITION OF

11              ANDREW JAY CHUNG

12              October 15, 2024

13              (Reported Remotely)

14    ------------------------------------------
15
16        ORAL AND VIDEOTAPED DEPOSITION OF ANDREW JAY
17    CHUNG, produced as a witness at the instance of the
18    Plaintiff, and duly sworn, was taken in the above-styled
19    and numbered cause on October 15, 2024, from 9:05 a.m. to
20    12:46 p.m., via Zoom, before JENNIFER L. SANDERS, CSR in
21    and for the State of Texas, reported by machine
22    shorthand, the witness located in Worcester,
23    Massachusetts, pursuant to the Federal Rules of Civil
24    Procedure and the provisions stated on the record and/or
25    attached hereto.
```

3

```
 1                  I N D E X

                                              PAGE

 2    Appearances............................    2

 3    Exhibit Index..........................    4

 4    Agreements.............................    5

 5

 6    ANDREW JAY CHUNG

 7      Examination by Mr. Allen.............    6

 8

 9    Changes and Signature..................  148

10    Reporter's Certificate.................  150
```

2

```
 1              A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3        MR. MICHAEL THAD ALLEN
          Allen Harris, PLLC
 4        PO Box 404
          Quaker Hill, Connecticut 06375
 5        Office:  860-499-3399
          Fax:     860-481-7899
 6        Email:  mallen@allenharrislaw.com

 7
      FOR THE DEFENDANTS:
 8
          MS. MARY QUIMBY
 9        Assistant Attorney General
          General Litigation Division
10        P.O. Box 12548
          Austin, Texas 78711-2548
11        Office:  512-463-2100
          Email:  mary.quimby@oag.texas.gov
12
13    FOR UNIVERSITY OF NORTH TEXAS

14        MR. RENALDO L. STOWERS
          MS. CARI JACOBY
15        UNT System
          Office of General Counsel
16        801 North Texas Boulevard
          Denton, Texas 76201
17        Office:  940-565-2717
          Fax:     940-369-7026
18        Email:  renaldo.stowers@untsystem.edu
          Email:  cari.jacoby@untsystem.edu
19
20    THE VIDEOGRAPHER:

21        Mr. Adam Scozzari
          Legal Video Group
22        Office:  214-598-5229
          Email:  lvg.dallas@gmail.com
23
24
25
```

4

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| | E X H I B I T S | |
| 1 | Re-Notice of Taking Deposition................. | 9 |
| 2 | Curriculum Vitae................................ | 11 |
| 3 | Complication of Two Websites and One Journal Article concerning the Journal *Spectrum*........ | 23 |
| 4 | Email from Timothy Jackson to Stephen Slottow, et al., dated 12/11/19, and other email (UNT 563-566)............................. | 50 |
| 5 | Email from Stephen Slottow to Timothy Jackson, et al., dated 7/25/20, and other email (UNT 300-303)............................. | 63 |
| 6 | Material for the Committee (UNT 2645-2782)..... | 80 |
| 7 | Email from Timothy Jackson to others dated 7/26/20, and other email (UNT 304-309)......... | 84 |
| 8 | Open Letter on anti-racist Actions Within SMT (UNT 1090-1115)................................ | 100 |
| 9 | Ad Hoc Review Panel Report of Review of Conception and Production of Volume 12 of the Journal of Schenkerian Studies dated 11/25/20 (Jackson 208-233)............................... | 117 |
| 10 | Email from Music Information dated 1/5/22 (UNT 5521-5522)................................ | 133 |
| 11 | Email from Music Information dated 11/23/21 (UNT5523-5525)................................. | 135 |
| 12 | Facebook Post by Levi Walls dated 7/27/20 (Jackson 234-236)............................... | 137 |
| 13 | Email from Ellen Bakulina dated 7/29/20........ | 143 |

**17**

1  journal reviewers knew my name. It's often -- in a small
2  field, it's pretty easy to infer who an author is.
3      Q.   Sure.  So let me just summarize, if possible.
4  A double blind peer-review process means that both the
5  author of an article and the outside reviewers of the
6  author -- of the article remain anonymous to each other,
7  correct?
8      A.   Correct.
9      Q.   And to the best of your knowledge, these
10 peer-reviewed articles were double blind peer reviewed?
11     A.   To the best of my knowledge.  My expectation is
12 that they were all double blind peer reviewed.
13     Q.   Have you ever published articles that are not
14 peer reviewed?
15     A.   Articles, no.
16     Q.   Textbook chap- -- go ahead.  I'm sorry.
17     A.   On articles, no.  I've done some journalistic
18 writing, but that's, I think, a different matter.
19     Q.   In this book chapter you've listed in your CV,
20 "Consonance and Dissonance," do you see where that is on
21 the -- it looks like second page of Exhibit 2?
22     A.   Correct.
23     Q.   Was that peer reviewed?
24     A.   That was editor reviewed.
25     Q.   And could you describe that process in brief

**18**

1  for the record?
2      A.   Editor review is -- is a standard that is often
3  used for edited collections that are published as books
4  where book chapters are solicited from authors by a team
5  of editors, and the pieces are reviewed by the editors.
6      Q.   And I believe you said you had -- how did you
7  describe your non-peer reviewed publication efforts?
8  Something like journalistic or popular or something of
9  that nature?
10     A.   Yeah.  Journalistic writing.
11     Q.   Where are those in your CV, if they are?
12     A.   They should be in other writings.
13     Q.   Is that this portion on the bottom of Page 2?
14     A.   Yes.  The -- yeah.  The bottom two items, in
15 *The Wire* and *icareifyoulisten.com*.  Yeah.  Those are --
16 those are -- those are journalistic writings.
17     Q.   And then what is the History of Music Theory
18 blog?  You've listed a publication under other writings,
19 "Colonial Organology and Ornithology in Richard Ligon's
20 Acoustics of Anthropological Difference."  Did I read
21 that right?
22     A.   Correct.  Yes.  That is a blog post that
23 solicits short pieces, short reflections having to do
24 with the history of music theory.
25     Q.   Okay.  Do you retain any kind of institutional

**19**

1  affiliation with Wesleyan University?
2      A.   Nope.
3      Q.   When did your association with Wesleyan end?
4          MS. QUIMBY:  Objection; form.
5      A.   My association with Wesleyan University ended
6  when my visiting appointment was over in May -- let's see
7  -- 2019.
8      Q.   (BY MR. ALLEN)  Okay.  Sorry if I pause between
9  exhibits.  It's because I'm keeping track of them and
10 keeping track of their files names so I can circulate
11 them eventually to the reporter.
12         Are you familiar with a music theory journal
13 called *Spectrum*?
14     A.   You are referring to *Music Theory Spectrum*.
15 Yes.
16     Q.   Can you describe what *Music Theory Spectrum* is
17 for the record, please?
18     A.   For the record, *Music Theory Spectrum* is, I
19 believe, one of the official publications of the Society
20 for Music Theory.
21     Q.   What's the Society for Music Theory?
22     A.   The Society for Music Theory is a professional
23 society of music theorists.
24     Q.   Do you belong to the Society for Music Theory?
25     A.   I am -- I am currently a member of the SMT.

**20**

1  That is the Society for Music Theory.
2      Q.   And I believe you just used its acronym SMT,
3  right?
4      A.   Uh-huh.
5      Q.   So if we say "SMT" we'll both understand we're
6  refer to Society for Musical Theory, right?
7      A.   Correct.  Music --
8      Q.   Thank you.  Society for Music Theory just for
9  the record.  Thank you.
10     A.   Correct.
11     Q.   How important is the Society for Music Theory
12 in your field?
13         MS. QUIMBY:  Objection; form.
14         Go ahead.
15     A.   It is -- it is the primary U.S.-based
16 professional association and conference organizing body
17 in the field.
18     Q.   (BY MR. ALLEN)  And you consider yourself a
19 music theorist, right?
20     A.   At times.  I certainly --
21     Q.   How about --
22     A.   -- teach in the music theory departments.
23     Q.   Okay.  Do you teach classes in music theory?
24     A.   I teach classes in music theory.
25     Q.   Did your -- do your publications -- your

65

1    reaction on Facebook?  This is the next email in the
2    chain.
3        A.  I don't -- I don't recall it, per se.  But
4    it's -- it's here in the email thread.  Yes, I believe is
5    it.
6        Q.  And do you have any knowledge of Facebook --
7    the social media platform Facebook serving any role in
8    the editorial process of journals at the University of
9    North Texas Press?
10       A.  I know of no such practice.
11       Q.  Is Facebook a particularly scholarly forum?
12       A.  It is not.
13       Q.  And here's the second email from you, I
14   believe, a little bit later in the evening at 8:32.
15   "Please feel free to forward this message to anyone you
16   think would be appropriate."  Right?
17       A.  Correct.
18       Q.  So is it fair to say that you were bringing
19   your colleagues -- to your colleagues attention this --
20   what seemed to be a rapidly developing controversy?
21           MS. QUIMBY:  Objection; form.
22       A.  Yes.  A rapidly developing potential for
23   controversy.
24       Q.  (BY MR. ALLEN)  Okay.  Did it develop into a
25   full-blown controversy?

66

1           MS. QUIMBY:  Objection; form.
2        A.  I think that most people would agree that it
3    developed into -- into a point of contention, yes.
4        Q.  (BY MR. ALLEN)  Thank you.  So here's an email
5    on July 25 at about 9:00, 8:55 p.m., by Levi Walls.  Do
6    you see that email in Exhibit 5?
7        A.  Yes.
8        Q.  And this is a student who would become your
9    graduate student or at least in your role as a
10   dissertation advisor.  Can I ask you to read that email
11   carefully, please?
12       A.  Okay.  I'm finished reading.
13       Q.  Sure.  I just have a question in the first
14   sentence.  Well, in the second sentence actually.  He
15   says, "I just heard about this."  Referring to what you
16   and Ellen Bakulina have identified.  Is that your
17   understanding of the email?
18       A.  Correct.
19       Q.  Would you have received this email at the time?
20       A.  I believe I did receive this, yes.
21       Q.  I only ask because, unlike some of the other
22   emails, it doesn't seem to have the full received line on
23   it.
24           He then goes on, Mr. Walls, to say, "It's very
25   worrying, especially as I don't want my career to be

67

1    ruined before it properly began.  I have a family to take
2    care of now.  I'm also confused about what exactly people
3    want."
4           Did I read that right?
5        A.  Correct.
6        Q.  How did you understand what Mr. Walls was
7    particularly afraid of at this time?
8           MS. QUIMBY:  Objection; form.
9        A.  With the caveat that, you know, I don't have
10   omniscient access to the internal --
11       Q.  (BY MR. ALLEN)  Sure.
12       A.  -- cognition of others, I believe that Levi, in
13   his position as student editor or assistant editor or
14   editor of the journal, was worried about being --
15   being -- about his reputation being jeopardized by
16   association with the -- the controversy in regards to the
17   journal.
18       Q.  And have you and he talked about that
19   subsequently as his dissertation advisor?
20       A.  I don't believe so.
21       Q.  In your role as his dissertation advisor have
22   you witnessed any harm that has come to his career
23   because he participated in the *Journal of Schenkerian
24   Studies*?
25           MS. QUIMBY:  Objection.

68

1        A.  Not to my knowledge.
2        Q.  (BY MR. ALLEN)  And did you understand this
3    email to be expressing his fear of some sort of, quote,
4    power differential between him and Professor Timothy
5    Jackson?
6           MS. QUIMBY:  Objection; form.
7        A.  Power differential?  I mean, there's always a
8    power differential between students and professors.
9    That's understood.
10       Q.  (BY MR. ALLEN)  Sure.  Do you -- do you
11   understand him to be expressing in this email, especially
12   did you understand at the time -- let me strike that
13   question, ask this.
14           Did you understand at the time that Mr. Levi
15   Walls was objecting to a so-called power differential
16   between him and Professor Jackson in this email?
17           MS. QUIMBY:  Objection; form.
18       A.  In this email I don't recall -- I -- I don't
19   believe that he was expressing sentiments related to a
20   power differential, no.
21       Q.  (BY MR. ALLEN)  Picking up on what you said
22   about the inherent difference between a dissertation
23   advisor and the student, the graduate student, that
24   there's an inherent power differential, that so-called
25   power differential exists between you and Mr. Walls now,

69

1  right?

2      A.  In any student-teacher relationship, a power

3  differential exists.

4      Q.  Sure.  Is it your experience of Professor

5  Walls -- excuse me.  Strike that, please.

6      Is it your experience of Mr. Walls that this

7  power differential prevents him from exercising his own

8  agency in your relationship to him?

9          MS. QUIMBY:  Objection; form.

10     A.  I mean, strictly speaking -- strictly speaking,

11  no.  But teachers are -- you know, teachers are

12  considered -- are considered influential authorities on

13  topics.  Students often feel pressure to take the advice

14  or take the recommendations of their professors.

15     Q.  (BY MR. ALLEN)  I'm talking about your direct

16  experience of Mr. Walls.  In your experience with him as

17  his dissertation advisor, do you feel that he's reluctant

18  to speak his mind to you?

19     A.  Not more than any other students.  I -- you

20  know, students choose their words carefully around their

21  advisors if they're -- if they are smart.  As they would

22  with any authorities in a supervisory capacity over them.

23     Q.  And when you were a graduate student at Yale,

24  did this power differential affect you in your

25  relationship with your dissertation advisor?

70

1          MS. QUIMBY:  Objection; form.

2      A.  Of course.  This power differential, like I

3  said, is in every student-teacher relationship.

4      Q.  (BY MR. ALLEN)  Would you state for the record

5  whether you believe that, quote, power differential

6  affected your ability to think independently in your own

7  dissertation

8          MS. QUIMBY:  Objection; form.

9      A.  I don't believe that it affected my ability to

10  think independently.  But, of course, I received advice

11  and cautions that I would not have known to be cognizant

12  of from the dissertation advisor who I had who was in a

13  position of greater power over me in that relationship.

14     Q.  (BY MR. ALLEN)  Is it fair to say that's

15  inherent in the mentor/mentee relationship?

16     A.  That is inherent to the mentor/mentee

17  relationship.

18     Q.  So your answer is yes?

19     A.  Yes.

20     Q.  Thank you.  And just back to Mr. Walls, you

21  don't -- you don't have any reason to think that he's so

22  weak that he has no independent will as your dissertation

23  advisee, do you?

24     A.  I have no reason to believe such a thing.

25     Q.  Did you ever witness him to be bereft of an

71

1  independent will when he worked with [audio cut out]?

2          THE REPORTER:  You cut out at the end.

3          MR. ALLEN:  Let me rephrase.

4      Q.  (BY MR. ALLEN)  Did you have any reason to

5  believe, at the time these emails were being sent back

6  and forth, that Mr. Walls was bereft of his independent

7  will in working with Professor Jackson?

8          MS. QUIMBY:  Objection; form.

9      A.  I have no knowledge of the dynamics of -- of

10  Professor Jackson's advisory -- dissertation advisory

11  capacity, dissertation relationship -- dissertation

12  advisory relationship with Levi Walls.

13     Q.  (BY MR. ALLEN)  In these emails that were

14  exchanged back and forth in which Mr. Walls took part,

15  did you have reason to believe that he had been bereft of

16  his own independent will in his work on the *Journal of

17  Schenkerian Studies*?

18          MS. QUIMBY:  Objection; form.

19     A.  I do not believe that he was bereft of his own

20  independent will.

21     Q.  (BY MR. ALLEN)  Thank you.  And just to follow

22  up on your relationship with Mr. Walls, how close would

23  you describe your relationship with mentee and advisee of

24  Mr. Walls at this time?

25     A.  Somewhat close.  We correspond maybe once a

72

1  month, once every two months.

2      Q.  I assume you have a residence somewhere in the

3  -- in the Denton area near the University of North Texas,

4  correct?

5      A.  At the moment, no.

6      Q.  While you were teaching at the University of

7  North Texas, do you live in the Dallas area?

8      A.  While teaching and -- so not -- meaning not

9  this year, prior to this year --

10     Q.  Yes.

11     A.  -- and after this year, yes, I have had a

12  residence in -- around Dallas.

13     Q.  Have you had Mr. Walls over to your home?

14     A.  Nope.

15     Q.  Have you ever visited Mr. Walls at his home?

16     A.  Nope.

17     Q.  Do you primarily meet in your office at UNT?

18     A.  Primarily, yes.

19     Q.  Is Mr. Walls in residence at the -- in Dallas?

20     A.  Currently, no.

21          MS. QUIMBY:  Object to form.

22     Q.  (BY MR. ALLEN)  Where is he now?

23     A.  Mr. Walls is in residence in California while

24  writing his dissertation.

25     Q.  And do you know when he left for California?

149

```
 1  _____
 2  _____
 3  _____
 4  _____
 5  _____
 6        I, ANDREW JAY CHUNG, have read the foregoing
    deposition and hereby affix my signature that same is
 7  true and correct, except as noted above.
 8
 9
10                    _____
                      ANDREW JAY CHUNG
11
12  STATE OF _____)
13  COUNTY OF _____)
14      Before me, _____, on this day
    personally appeared ANDREW JAY CHUNG, known to me (or
15  proved to me under oath or through
    _____) (description of identity
16  card or other document)) to be the person whose name is
    subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
    consideration therein expressed.
18      Given under my hand and seal of office this
    _____ day of _____, _____.
19
20
21                    _____
                      NOTARY PUBLIC IN AND FOR
22                    THE STATE OF _____
                      COMMISSION EXPIRES: _____
23
24
25
```

151

```
 1      That the amount of time used by each party at
    the deposition is as follows:
 2
 3      MR. MICHAEL THAD ALLEN:  3 Hour(s), 10 Minute(s)
 4
 5      That pursuant to information given to the
 6  Deposition officer at the time said testimony was taken,
 7  the following includes counsel for all parties of record:
 8  FOR THE PLAINTIFF:
 9      MR. MICHAEL THAD ALLEN
        Allen Harris, PLLC
10      PO Box 404
        Quaker Hill, Connecticut 06375
11      Office:  860-499-3399
        Fax:  860-481-7899
12      Email:  mallen@allenharrislaw.com
13
    FOR THE DEFENDANT:
14
        MS. MARY QUIMBY
15      Assistant Attorney General
        General Litigation Division
16      P.O. Box 12548
        Austin, Texas 78711-2548
17      Office:  512-463-2100
        Email:  mary.quimby@oag.texas.gov
18
19      That $_____ is the deposition officer's
20  charges to Mr. Michael Thad Allen, Attorney for
21  Plaintiff, for preparing the original deposition
22  transcript and any copies of exhibits;
23      I further certify that I am neither counsel
24  for, related to, nor employed by any of the parties or
25  attorneys in the action in which this proceeding was
```

150

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
 2                 SHERMAN DIVISION
 3  TIMOTHY JACKSON,            X
                                X
 4        Plaintiff,            X
                                X
 5  VS.                         X CASE ACTION
                                X NO.: 4:21-cv-00033-ALM
 6  LAURA WRIGHT, ET AL.,       X
                                X
 7        Defendants.           X
 8  --------------------------------------------------
 9          REPORTER'S CERTIFICATION
10        DEPOSITION OF ANDREW JAY CHUNG
11             October 15, 2024
12            (Reported Remotely)
13  --------------------------------------------------
14
15      I, Jennifer L. Sanders, Certified Shorthand
16  Reporter in and for the State of Texas, hereby certify to
17  the following:
18      That the witness, ANDREW JAY CHUNG, was duly
19  sworn by the officer and that the transcript of the oral
20  deposition is a true record of the testimony given by the
21  witness;
22      That the deposition transcript was submitted on
23  _____ to Ms. Mary Quimby, attorney for
24  ANDREW JAY CHUNG, for examination, signature and return
25  to me by _____;
```

152

```
 1  taken, and further that I am not financially or otherwise
 2  interested in the outcome of the action.
 3      Certified to by me this _____ day of
 4  _____, _____.
 5
 6                    _____
                      JENNIFER L. SANDERS, CSR No. 5091
 7                    Expiration Date:  10/31/26
                      JULIA WHALEY & ASSOCIATES
 8                    2012 Vista Crest Drive
                      Carrollton, Texas 75007
 9                    Firm Registration No. 436
10                    214-668-5578 (Office)
                      214-236-6666 (Fax)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Jennifer Cowley   09/26/2024*                                                            1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF TEXAS
                   SHERMAN DIVISION
 3   TIMOTHY JACKSON,                    *
                                         *
 4             Plaintiff,                *
                                         *
 5   VS.                                 *  CASE NO. 4:21-CV-00033-ALM
                                         *
 6   LAURA WRIGHT, ET AL.,               *
                                         *
 7             Defendants.               *
 8
 9            _____
10   ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
11                  JENNIFER COWLEY
12                 SEPTEMBER 26, 2024
13            _____
14
15
16             ORAL AND VIDEOTAPED VIDEOCONFERENCE
17   DEPOSITION of JENNIFER COWLEY, produced at the instance
18   of the Plaintiff, and duly sworn, was taken in the
19   above-styled and numbered cause on the 26th day of
20   September, 2024, from 9:04 a.m. to 2:58 p.m., before
21   Carla A. Sims, AAS, CSR, RPR, in and for the State of
22   Texas, reported by method of machine shorthand, via Zoom
23   videoconference, pursuant to the Federal Texas Rules of
24   Civil Procedure and the provisions stated on the record
25   or attached hereto.
```

*Jennifer Cowley   09/26/2024*                                                            3

```
 1                      I N D E X
 2                                              PAGE
 3   Appearances...................................    2
 4
 5   JENNIFER COWLEY
 6   Examination by Mr. Allen.....................    5
 7
 8   Changes and Signature........................  213
 9
10   Reporter's Certificate.......................  215
11   Further Certification........................  217
12
13                   REPORTER'S NOTE
14           Please note that due to the quality
15   of the transmission data for a Zoom videoconference,
16   cross-talk causes audio distortion in the testimony when
17   preparing a videoconference transcript.
18
19                   E X H I B I T S
20   NO.    DESCRIPTION                            PAGE
21   1      Deposition Notice.....................  116
               UNT_000568
22   2      Email.................................  116
23             UNT_000568
24   3      UNT Webpage Printout..................  129
               UNT_000106
25   4      Allen Law Letter......................  132
               UNT_000157 to UNT_000162
```

*Jennifer Cowley   09/26/2024*                                                            2

```
 1              A P P E A R A N C E S
 2      ALL PARTIES AND WITNESS APPEARED VIA
               ZOOM VIDEOCONFERENCE
 3
 4   COUNSEL FOR THE PLAINTIFF:
 5      Mr. Michael Thad Allen
        ALLEN LAW, LLC
 6      P.O. Box 404
        Quaker Hill, Connecticut 06375
 7      860/772-4738 (tel)
        m.allen@allen-lawfirm.com
 8
     COUNSEL FOR THE DEFENDANTS and JENNIFER COWLEY:
 9
10      Ms. Mary Quimby
        TEXAS ASSISTANT ATTORNEY GENERAL
11      P.O. Box 12548
        Capitol Station
12      Austin, Texas 78711
        mary.quimby@oag.texas.gov
13   COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:
14      Mr. Renaldo L. Stowers
        DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
15      115 Union Circle No. 310907
        Denton, Texas 76203
16      940/565-2717 (tel)
        renaldo.stowers@untsystem.edu
17
     COUNSEL FOR THE UNIVERSITY OF TEXAS AT ARLINGTON
18
19      Mr. Shelby Boseman
        CHIEF LEGAL OFFICER, THE UNIVERSITY OF TEXAS AT
20      ARLINGTON
        701 South Nedderman Drive
        Arlington, Texas 76019
21      sboseman@uta.edu
22   ALSO PRESENT:
23   VIDEOGRAPHER:
24      Mr. Jason Warner
        Legal Video Group
25      lvg.dallas@gmail.com
        214-598-5229
```

*Jennifer Cowley   09/26/2024*                                                            4

```
 1
 5   Email String............................  140
 2      UNT_002453 to UNT_002454
 6   Email...................................  142
 3      UNT_002460
 4
 7   Provost Letter..........................  159
 5      JACKSON000261 to JACKSON000263
 8   Center Review Report....................  167
 6      JACKS_067377 to JACKS_067401
 7
 9   Ad Hoc Review Panel Report..............  170
 8      JACKSON000208 to JACKSON000233
10   Ad Hoc Panel Report Student Statement...  185
11   Deposition of Levi Walls................  193
12   Provost Letter..........................  198
        JACKSON000271
12
13   Email...................................  206
        JACKSON000272
14
15
16
17
18
19
20
21
22
23
24
25
```

1      **A.**   It could be professional if their concerns are
2    related to the nature in which the publication was
3    produced.
4      **Q.**   (By Mr. Allen) You called for Professor Jackson
5    and the -- well, let me strike that.
6      You called for the Journal of Schenkerian
7    Studies to be investigated, right?
8      **A.**   I formed an ad hoc review panel to review the
9    concerns raised by the Society for Music Theory.
10      **Q.**   So you were investigating the Society for Music
11    Theory?
12           MS. QUIMBY:  Objection, form.
13      **A.**   No.  To clarify, the Society for Music Theory
14    raised concerns about the production process for Volume
15    12 of the Journal of Schenkerian Studies.  I formed an ad
16    hoc panel to review the concerns that were raised and
17    determine and make recommendations.
18      **Q.**   (By Mr. Allen) And your understanding of their
19    concerns were only that it was produced in an
20    unprofessional manner?
21           MS. QUIMBY:  Objection, form.
22      **A.**   That was the charge that I gave to the
23    committee.
24      **Q.**   (By Mr. Allen) I'm not asking that.  I said the
25    Society for Music Theory, your understanding of their

1    concerns were that -- were solely that the journal was
2    not produced in a professional manner?
3      **A.**   They had broader concerns.  The concerns that I
4    chose to charge the ad hoc committee with were
5    exclusively related to how the journal was produced.
6      **Q.**   What were their broader concerns, President
7    Cowley?
8      **A.**   I would have to go back and review their
9    specific letter that they submitted to the university.
10      **Q.**   As you sit here today, you can't remember
11    their, quote, "broader concerns," closed quote, as you
12    just characterized them?
13      **A.**   My recollection was they raised concerns
14    specific to the journal's publication process and that
15    there were concerns regarding some of the journal
16    articles.
17      **Q.**   What were their concerns concerning some of the
18    journal articles?
19      **A.**   Again I would have to go back and look at that
20    specific letter that was submitted.
21      **Q.**   As you sit here today, you can't remember what
22    their broader concerns are or were?  That's your
23    testimony today?
24           MS. QUIMBY:  Objection.
25      **A.**   Correct.

1      **Q.**   (By Mr. Allen) I'm sorry.  Could you state your
2    answer?  It was just spoken over just by accident.  What
3    was your answer?
4      **A.**   Correct.
5      **Q.**   Thank you.  You wanted the so-called ad hoc
6    panel to investigate the Journal of Schenkerian Studies,
7    correct?
8      **A.**   I requested that the ad hoc panel review the
9    production of Volume 12 of the Journal of Schenkerian
10    Studies.
11      **Q.**   And you specifically instructed them to do so
12    objectively, right?
13      **A.**   You would have to refer to the specific charge
14    that I gave to the committee.
15      **Q.**   As you sit here today, you can't remember
16    instructing them to conduct an objective investigation?
17      **A.**   I would want to look at the specific charge.
18    But the general intention was that they would conduct a
19    review of the production process, focusing on the process
20    and procedures that were used to produce the journal.
21      **Q.**   Did you -- so that again wasn't my question.
22    And this will take a lot less time if you would answer my
23    question instead of answering the question that you
24    apparently want to answer.
25      I asked about objectivity; do you understand

1    where it's talking about the objectivity of the
2    investigation.  And my question is you don't remember
3    instructing them to give an -- to undertake an objective
4    investigation?
5      **A.**   Again I would want to review the specific
6    charge that I gave to the ad hoc panel to determine
7    whether I used the word objective.
8      **Q.**   (By Mr. Allen) As a provost instructing a
9    faculty panel to undertake any investigation, were you
10    indifferent to whether they did it objectively or not?
11           MS. QUIMBY:  Objection, form.
12      **A.**   The expectation is that they would undertake a
13    reasonable review of the matter and draw reasonable
14    conclusions.
15      **Q.**   (By Mr. Allen) As you used the word, quote,
16    "reasonable," is that the same as objective in your view?
17      **A.**   You haven't defined the word objective.
18      **Q.**   Well, that's what I'm trying to ask you about.
19    What do you understand by an objective investigation,
20    President Cowley?
21           MS. QUIMBY:  Objection, form.
22      **A.**   An objective investigation would review
23    relevant materials and draw reasonable conclusions based
24    on the information that they have gathered in that review

1  for the Journal of Schenkerian Studies than there are for
2  Theoria?
3          MS. QUIMBY:  Objection, form.
4      A.    Different journals will choose different forms
5  of publication whether they're editorial reviewed or peer
6  reviewed and have, you know, a breadth of ways of
7  communicating.  Should they all do that in a professional
8  way?  Yes.
9      Q.    (By Mr. Allen) Should they be subjected to the
10  same standards by the University of North Texas press?
11          MS. QUIMBY:  Objection, form.
12      A.    What do you mean by standards?
13      Q.    (By Mr. Allen) Well, I don't know.  You went in
14  and, you know, investigated one journal but not the
15  other.  That's clear, right?  As you just said, you just
16  testified to.
17      A.    The reason we investigated the Journal of
18  Schenkerian Studies is because the Society of Music
19  Theory raised explicit concerns regarding the production
20  of Volume 12 of the Journal of Schenkerian Studies.  If
21  any professional society wrote to the university
22  expressing concerns over a publication, then it likewise
23  would have received an investigation.
24          MR. ALLEN:  I'm going to move to strike
25  that answer as completely nonresponsive.

1      Q.    (By Mr. Allen) If you could focus on the
2  question I'm asking, it would go a lot faster.  I know
3  you had the Journal of Schenkerian Studies investigated,
4  and you didn't have the Journal of Theoria investigated.
5  We just have already established that.  What I'm asking
6  is there was an outcome by the ad hoc panel about the
7  Journal of Schenkerian Studies, right?
8      A.    The outcome was recommendations for how the
9  Journal of Schenkerian Studies could improve.
10      Q.    Okay.  And should those same standards of
11  publication be applied to all journals in the College of
12  Music?
13          MS. QUIMBY:  Objection, form.
14      A.    I can't speak to other journals in the College
15  of Music because I'm not familiar with what standards or
16  approach they use.
17      Q.    (By Mr. Allen) Would it be okay under your
18  leadership as provost for there to be double standards?
19  One standard for the Theoria and one standard for the
20  Journal of Schenkerian Studies?
21          MS. QUIMBY:  Objection, form.
22      A.    There are different forms of publication.  I
23  have no knowledge of whether or not these other journals
24  that you speak of have a peer review practice or other
25  practices.

1      Q.    (By Mr. Allen) So that was never of concern to
2  you that there might be double standards in the College
3  of Music?
4          MS. QUIMBY:  Objection, form.
5      A.    My concern was specific to the Journal of
6  Schenkerian Studies and the concerns raised by the
7  Society of Music Theory.
8      Q.    (By Mr. Allen) And, you know, while you might
9  guess by the title Theoria that Theoria is a journal of
10  music theory, right?
11      A.    But is --
12      Q.    It's sort of in the title.
13      A.    But music theory did not raise concerns about
14  Theoria.
15      Q.    Right.  You said that, I think, about six
16  times.  My question is very different though.  Should
17  both journals of music theory be abiding by the same
18  standards that are imposed by the University of North
19  Texas?
20          MS. QUIMBY:  Objection, form.
21      A.    I don't know what standards Theoria uses, so I
22  can't speak to that with more specificity.
23      Q.    (By Mr. Allen) And you remain completely
24  uncurious about it too, don't you?
25          MS. QUIMBY:  Objection, form.

1      A.    Mr. Allen, I don't work for the University of
2  North Texas anymore.  My concerns at the present day are
3  focused on my own institution that I work at today.
4      Q.    (By Mr. Allen) And it wouldn't bother you as
5  provost that Theoria went along its merry way doing the
6  same things that the Journal for Schenkerian Studies had
7  done so long as the Society for Music Theory never
8  complained?  That's your testimony today?
9          MS. QUIMBY:  Objection, form.
10      A.    Each of our faculty members is expected to
11  behave in professional ways and uphold standards of their
12  disciplines.  I can't speak to who the person is that's
13  responsible for Theoria or for anything about that
14  journal.
15      Q.    (By Mr. Allen) Are you aware that Theoria
16  published articles without per review?
17      A.    I'm not.  As I have said, I have no knowledge
18  of Theoria other than it is a journal.
19      Q.    So if Theoria is publishing articles without
20  peer review, is that something that would have been a
21  concern to you as the provost if you had known?
22          MS. QUIMBY:  Objection, form.
23      A.    Not necessarily.  If they were producing
24  another form of review such as editorial review and doing
25  that in a professional way, that's not at issue.

Jennifer Cowley    09/26/2024

149

1    Q.    But you can't provide an example yourself in

2    your experience as provost, right?

3    A.    Not off the top of my head.

4    Q.    Can you provide one in your experience as the

5    President of the University of Texas at Arlington?

6        MS. QUIMBY:  Objection, form.

7    A.    Not off the top of my head.

8    Q.    (By Mr. Allen) Why did you choose panel members

9    from outside the College of Music?

10    A.    I purposely chose panel members outside of the

11    College of Music because the content of the journal --

12    journal publications was irrelevant.  It was about how

13    the conceptualization and production of the volume

14    occurred.

15        And therefore selecting committee members that

16    were outside of the College of Music, they brought

17    different perspectives and different experiences relative

18    to production of journals and would not be knowledgeable

19    particularly about Schenkerian Studies.

20    Q.    Was it the content being Schenkerian Studies

21    that you thought was irrelevant to the panel's

22    investigation?

23        MS. QUIMBY:  Objection, form.

24    A.    The charge to the committee was not based on

25    content.  Selecting committee members from outside of the

Jennifer Cowley    09/26/2024

150

1    college meant that there was some arm's length distance,

2    and it was unlikely that faculty members and other

3    disciplines would have specific knowledge of the content

4    areas being discussed in the journal.

5    Q.    (By Mr. Allen) Did you ever consider getting a

6    music theorist from outside the University of North Texas

7    to advise the panel?

8    A.    I did not.

9    Q.    And would you answer the same if I said to

10    participate in the panel?  You never thought of including

11    an outside music theorist to participate in the ad hoc

12    panel, right?

13    A.    I considered whether people involved in music

14    should or should not be involved and made the decision

15    that ultimately I felt it was more appropriate to exclude

16    people from the College of Music or music generally.

17    Q.    And is that -- well, strike that and move on.

18        You also said, The panel members who are

19    outside the College of Music will examine objectively the

20    process followed in the contention and production of

21    Volume 12 of the Journal of Schenkerian Studies.

22        Did I read that correctly?

23    A.    Correct.

24    Q.    Are you able to explain now what you meant by

25    objectively?

Jennifer Cowley    09/26/2024

151

1    A.    My expectation is that they would collect

2    evidence and conduct interviews that would allow them to

3    draw reasonable conclusions as it relates to the

4    conception and production of this volume.

5    Q.    Okay.  Would that meaning of objectively, as

6    you use it in this statement, would it qualify as

7    objectively doing their business correctly to ignore

8    evidence that key witnesses were lying?

9        MS. QUIMBY:  Objection, form.

10    Q.    (By Mr. Allen) Is that objective?

11    A.    You would have to provide specific evidence

12    that that was the case.

13    Q.    So you can't say, as you sit here today,

14    whether the definition of objective investigation, as you

15    set forth in this statement, would basically condone

16    ignoring a witness -- excuse me -- evidence that a

17    witness was lying?  Is that your testimony?

18        MS. QUIMBY:  Objection, form.

19    A.    Your statement was unclear.

20    Q.    (By Mr. Allen) Okay.

21    A.    It was jumbled.

22    Q.    Yeah.  No.  You're right.  Let me strike that.

23        Are you able to testify today -- let me strike

24    that again.

25        Is it your testimony today that whatever you

Jennifer Cowley    09/26/2024

152

1    meant by objectively set forth in this email did not

2    encompass a requirement that the ad hoc panel be

3    attentive to the fact that witnesses were lying to them?

4        MS. QUIMBY:  Objection, form.

5    A.    Participants in the process of being

6    interviewed would be expected to share information that

7    they believe to be truthful, and it would be up to the

8    panel to evaluate the information that they received.

9    Q.    (By Mr. Allen) So evidence of truth or untruth

10    would be relevant to an objective inquiry, right?

11    A.    Maybe.  Depending on the context.

12    Q.    It would be important to an objective inquiry

13    not to exclude exculpatory evidence, right?

14        MS. QUIMBY:  Objection, form.

15    A.    I can't speak to that.  That's context

16    dependent.

17    Q.    (By Mr. Allen) What -- in what context for the

18    investigation of activities at the University of North

19    Texas would it be appropriate to ignore exculpatory

20    evidence?

21    A.    I'm not suggesting it would be.

22        MS. QUIMBY:  Objection, form.

23    A.    We're talking specifically about this

24    investigation and any --

25    Q.    (By Mr. Allen) No.  That's not true.  Wait.  I

Jennifer Cowley    09/26/2024

153

1  just want to cut you off. I asked you a specific
2  question. Can you name a context in which it would be
3  relevant to ignore exculpatory context in an
4  investigation at the University of North Texas?
5  You supply the context. Enlighten us what
6  context would be appropriate in an objective
7  investigation under your responsibility as provost to
8  ignore exculpatory information?
9  MS. QUIMBY: Objection, form.
10  A.  This is your interview. If you want to provide
11  further context, you're welcome to. Otherwise, my answer
12  is no.
13  Q.  (By Mr. Allen) Did you expect the ad hoc panel
14  to ignore exculpatory evidence?
15  A.  My expectation is that the panel would review
16  evidence that was presented and make determinations that
17  would influence their recommendations.
18  Q.  Does this mean you did or did not expect them
19  to ignore exculpatory evidence?
20  MS. QUIMBY: Objection, form.
21  A.  The panel was charged with reviewing evidence
22  and determining that it's most relevant to support their
23  recommendations -- to support the formation of
24  recommendations.
25  Q.  (By Mr. Allen) Now, you said that the

---

Jennifer Cowley    09/26/2024

154

1  University of North Texas was, quote, "not investigating
2  Timothy Jackson," closed quote, right?
3  A.  The charge of the committee was to review the
4  conception and production of Volume 12 of the Journal of
5  Schenkerian Studies. This professor was involved in the
6  journal and so would be part of the review process. But
7  Dr. Jackson himself was not -- the charge was not about
8  Dr. Jackson. It was about the journal.
9  Q.  And you've said it's not -- you're not
10  investigating the journal, right? You're just
11  investigating Volume 12. Was that your testimony?
12  A.  The conception and production of Volume 12.
13  Q.  What policy or rules of the University of North
14  Texas were being followed when this investigation was
15  ordered?
16  MS. QUIMBY: Objection, form.
17  A.  Part of this review was to determine whether or
18  not there could have been violations of university
19  policy. University policies are generally fairly broad,
20  and they are not policies specific to journals themselves
21  but could fall under other policies.
22  And so the charge of the ad hoc committee was
23  to make a determination around whether or not there were
24  any issues related to the conception and production of
25  Volume 12 of the Journal of Schenkerian Studies.

---

Jennifer Cowley    09/26/2024

155

1  Q.  (By Mr. Allen) Was the so-called ad hoc panel
2  following any established process for investigation
3  established by the University of North Texas?
4  A.  There are specific -- there are specific
5  processes for certain types of policy violations.
6  However, in this case, at the beginning of the process,
7  it was unclear whether there were or were not any policy
8  violations.
9  Therefore, there was not an established
10  procedure for which one would follow. Hence, I
11  determined the best path forward was to form an ad hoc
12  committee to review this matter.
13  Q.  So the very same name ad hoc kind of indicates that
14  there was no policy being applied, right?
15  A.  I wouldn't draw that conclusion.
16  MS. QUIMBY: Objection.
17  A.  But an ad hoc panel or committee are, from time
18  to time, organized by the provost's office or other
19  offices to review a matter that doesn't clearly fall
20  within a specific policy or procedure.
21  Q.  (By Mr. Allen) Was there ever a rules violation
22  found by the ad hoc panel?
23  A.  The panel did not find that there was a
24  specific policy violation.
25  Q.  Did the ad hoc panel find that Timothy Jackson

---

Jennifer Cowley    09/26/2024

156

1  violated any rules of the university?
2  A.  As I mentioned, their charge was not to review
3  Dr. Jackson specifically but to review the production of
4  Volume 12.
5  Q.  Can you answer my question, please?
6  A.  Can you repeat your question?
7  MR. ALLEN: Can you read the question to
8  the witness, please, Madam Court Reporter?
9  (Requested portion read back)
10  A.  Their recommendations were on how the Journal
11  of Schenkerian Studies could be improved, and they were
12  not targeted specifically at Dr. Jackson. They were
13  targeted at how the journal could be improved.
14  Q.  Does this mean your answer is, no, they didn't
15  find that he violated any rules?
16  MS. QUIMBY: Objection, form.
17  A.  The committee did not state that there were any
18  specific policy violations by Dr. Jackson.
19  Q.  (By Mr. Allen) Okay. Thank you. Now, I
20  believe you've testified that the Ad Hoc Panel Report
21  came out on November 25th of 2020, right?
22  A.  I don't recall the date, but if you say that's
23  when it is, I have no reason to believe otherwise.
24  Q.  And then on September 7th, I believe, in
25  advance of that, did you send a letter to Professor

Jennifer Cowley    09/26/2024

157

1  Jackson?

2      A.   Do you have a copy of that letter?

3      Q.   I'm trying to find it.  Yes.

4          MR. ALLEN:  I'm going to mark for the

5  record -- now I'm afraid to say where we are.

6          Madam Court Reporter, are we on Exhibit 7?

7          COURT REPORTER:  Yes.  We are on Exhibit

8  7.

9          MR. ALLEN:  Can I mark for the record

10  Exhibit 7, a letter of September 7, 2020.

11         (Deposition Exhibit No. 7 was marked)

12     Q.   (By Mr. Allen) And, President Cowley, bear with

13  me.  I can't stand when people do this to me, but it's

14  almost inevitable.  I've got to scroll through to show

15  you your signature.  Okay?  So I'm not trying to make you

16  cross eyed.

17     A.   That is my signature.

18     Q.   So now back to the top.  Is it accurate to say

19  that Exhibit 7, the letter of September 7, 2020, is a

20  letter sent by you to Timothy Jackson?

21     A.   That's correct.

22     Q.   I'm sorry.  Did you answer and I didn't hear

23  it?

24     A.   Yes.  I said that's correct.

25     Q.   Okay.  I apologize.  I think it -- we had a

---

Jennifer Cowley    09/26/2024

158

1  little bit of a delay in the audio feed.

2          So here you tell him -- I'm just going to skip

3  down to the third paragraph -- that the university is not

4  investigating him or the journal, correct?

5      A.   Can I read that paragraph?

6      Q.   Oh, yeah.  I'm not trying to rush you.

7  Please, if you want me to reposition it on the page or

8  whatnot, just tell me.

9      A.   That's okay.  Okay.  I've read that paragraph.

10     Q.   Okay.  And you inform him in the first sentence

11  of that paragraph, The university is investigating

12  neither you nor the Journal of Schenkerian Studies,

13  correct?

14     A.   That's what that sentence states.

15     Q.   But then you go on to say that it is actually

16  investigating Volume 12, right?

17     A.   Correct.  That's correct.

18     Q.   But somehow that's not investigating the

19  journal, right?

20     A.   It's investigating a particular volume of the

21  journal, a particular publication.

22     Q.   And you also say here -- and I'm going to take

23  this off -- The university has discretion, if not the

24  obligation, to look into these circumstances, right?

25     A.   Correct.

---

Jennifer Cowley    09/26/2024

159

1      Q.   Now, you had the discretion to look into

2  Timothy Jackson's complaints that his colleagues were

3  violating his academic freedom as well, did you not?

4          MS. QUIMBY:  Objection, form.

5      A.   As the provost, I have the ability to look into

6  concerns that a faculty member may raise.

7      Q.   (By Mr. Allen) And you're very concerned to put

8  an end to misinformation and mischaracterization,

9  correct, about this matter, the investigation of the

10  Journal for Schenkerian Studies?

11     A.   Into the mischaracterization about the review

12  of Volume 12 of the Journal of Schenkerian Studies.

13     Q.   Is this a concern about objectivity you're

14  expressing here in this final sentence?  Is that a fair

15  characterization?

16         MS. QUIMBY:  Objection, form.

17     A.   No.

18     Q.   (By Mr. Allen) You raised the issue of the

19  grievance that Timothy Jackson brought to your attention

20  in that letter that we looked at earlier in the

21  deposition which was dated July 31st, 2020, in this final

22  paragraph that begins on this first page, right?

23     A.   Are you referring to his claim related to

24  academic freedom?

25     Q.   Yes.

---

Jennifer Cowley    09/26/2024

160

1      A.   Okay.  Just let me read that paragraph.

2      Q.   I'm going to represent that it goes onto the

3  next page here too, so I'll move it up just a bit.

4  There you go.  I'm sorry.

5      A.   That's okay.  I reached the end of that

6  paragraph.

7      Q.   I'm calling up the letter.  And you -- your

8  statement here is that apparently your counsel, the

9  counsel of the university I assume, pointed out that he

10  could not identify the policy under which he was filing a

11  grievance.  He, meaning Timothy Jackson, is that how you

12  understood that sentence?

13     A.   Correct.

14     Q.   Do you recall that letter referring to the

15  academic freedom policy of the university?

16     A.   I recall a policy number, but we'd have to go

17  back and look at the letter.

18     Q.   And you're sort of anticipating what I was

19  going to do here is -- this is the letter of July 31st,

20  2020, from the law firm Allen Law, LLC, to you, Jennifer

21  Cowley.  Do you remember seeing this exhibit earlier?

22     A.   Yes, I do.

23     Q.   And I apologize to counsel and to you because

24  of the question we have about numbering.  I'm just going

25  to refer to the letter and the record will reflect how it

---

APPX.053

*Jennifer Cowley    09/26/2024*

169

1    **Q.**    Now, do you know if this panel report ever made

2    clear to Timothy Jackson in advance that he would be

3    invited to respond?

4        MS. QUIMBY:  Objection, form.

5    **A.**    I'm not certain.  I know there were some

6    communications such as the letter you showed, but I don't

7    recall specifically.

8    **Q.**    (By Mr. Allen) Okay.  If that was part of the

9    process of the investigation by the ad hoc panel, would

10    you expect them to put that in the report?

11        MS. QUIMBY:  Objection, form.

12    **A.**    I would expect that the people that they

13    interviewed as part of their review would be included or

14    referenced in the report.

15    **Q.**    (By Mr. Allen) But that's not my question.

16    That he would have a chance to respond to the

17    investigation report.  If that was going to be part of

18    the process, would you expect them to put that in the

19    report?

20    **A.**    Their charge was to provide recommendations to

21    me on their findings.

22    **Q.**    Yeah.  They have a section that goes background

23    information and scope of review, right?

24    **A.**    Uh-huh.

25    **Q.**    You remember reading that, correct?

---

*Jennifer Cowley    09/26/2024*

170

1    **A.**    I do.  I don't recall the details.

2    **Q.**    And here it is on Page 3 to 4 of the report,

3    correct?

4        Okay, yes.

5    **Q.**    Here in our review, To begin, they say we first

6    reviewed the concerns expressed about the journal's

7    editorial and review processes raised in public

8    statements raised by three different groups.

9        And they list them right here, correct?

10    **A.**    Yes, they do.

11    **Q.**    And you understand there were exhibits attached

12    to the Ad Hoc Panel Report that were actually those

13    concerns, those statements of concern that they just

14    referenced in those three numbered paragraphs?

15        MS. QUIMBY:  Objection, form.

16    **A.**    Yes.  I was aware that those were included as

17    appendices, if you will, to the report.

18    **Q.**    (By Mr. Allen) And here is -- I'm sorry if this

19    overlaps.  You'll see these stamps at the top of the page

20    or because the document has been filed in court.

21    **A.**    Okay.

22    **Q.**    Just so I'm clear about that to you.  And I'm

23    not arguing that those were part of the document.

24    **A.**    Okay.

25    **Q.**    Do you see this Exhibit 2 stamp up here?

---

*Jennifer Cowley    09/26/2024*

171

1    **A.**    Yes, I do.

2    **Q.**    So this was Exhibit 2 to the Ad Hoc Panel

3    Report, and this is the Executive Board of the Society of

4    Music Theory's statement, right?

5    **A.**    Yes.  That's what it appears to be.

6    **Q.**    And the first line says, The Executive Board of

7    the Society for Music Theory condemns the antiblack

8    statements and personal ad hominem attacks on Philip

9    Ewell perpetuated in several essays included in the

10    symposium on Philip Ewell's 2019 SMT plenary paper

11    published by the Journal of Schenkerian Studies, right?

12    **A.**    You read that correctly.

13    **Q.**    Did you understand from that -- this is the

14    statement by the SMT which you said prompted you to

15    convene an investigation, right?

16    **A.**    Correct.

17    **Q.**    And you understood -- well, let me back up.

18    And you read it, I assume, carefully at the time, right?

19    **A.**    Correct.

20    **Q.**    Did you understand from that headline which we

21    just read, the Executive Board of the Society for Music

22    Theory condemns the antiblack statements and personal ad

23    hominem attacks on Philip Ewell.

24        You understood that as indicating their primary

25    concern was with the procedural methods followed by the

---

*Jennifer Cowley    09/26/2024*

172

1    journal in publishing Volume 12?

2        MS. QUIMBY:  Objection, form.

3    **A.**    That is not the conclusion that I drew.

4    Further down in the statement, it specifically --

5    **Q.**    (By Mr. Allen) We'll get there.  Don't -- I'm

6    just asking.  Look, this will go a lot faster if you just

7    answer the question.  In the first sentence, they're

8    primarily concerned with what they call antiblack

9    statements and personal ad hominem attacks, right?

10    **A.**    I do not draw the conclusion that that's their

11    primary concern.

12    **Q.**    Do you think that by putting it in much larger

13    font that rest of the statement, that that had no

14    meaning to them?

15        MS. QUIMBY:  Objection, form.

16    **Q.**    (By Mr. Allen) Is that insignificant to you?

17    **A.**    I cannot draw a conclusion about what the SMT

18    executive board thought.

19    **Q.**    And you draw no conclusion from the fact that

20    they put that first in their statement?

21    **A.**    I did not draw a conclusion from that being the

22    first statement.

23    **Q.**    Then the second statement, the executive

24    board -- excuse me.  There it is again.  Sorry.  No, no.

25    This is the second statement.

---

*Jennifer Cowley     09/26/2024*

205

1  the meeting between Benjamin Brand and Timothy Jackson on
2  December 11, 2020.
3      **A.**  So I was aware that there was a conversation
4  and there was a discussion about how editorial duties
5  might be handled moving forward.
6      **Q.**  Do you know what -- beyond that general level,
7  do you know concretely what was the outcome?  What
8  administrative action was proposed at the meeting?
9          MS. QUIMBY:  Objection, form.
10     **A.**  From reading this email, it looks like there
11 were several different potential outcomes that were
12 discussed, and so I just knew that there were discussions
13 of options.
14     **Q.**  (By Mr. Allen) And one of the options was
15 Number 3 which was a non-option, right?  Benjamin Brand
16 says, I cannot support a plan according to which you
17 would remain involved in the day-to-day operations of the
18 journal and its editorial process in particular, given
19 the panel's findings of editorial mismanagement of the
20 acronym JSS.
21     Did I read that correctly?
22     **A.**  You did read that correctly.
23     **Q.**  And you understood JSS is an acronym for
24 Journal of Schenkerian Studies, right?
25     **A.**  Yes.  I assume that's the acronym.

*Jennifer Cowley     09/26/2024*

206

1      **Q.**  So did you understand by that, as you sit here
2  today, that Timothy Jackson was going to be removed from
3  the JSS?
4      **A.**  What I read from this is that there are several
5  different options that could include housing the journal
6  elsewhere, starting a new journal, finding an editor and
7  chief, that several different options were outlined.  I
8  don't know what the choice was in terms of the -- at this
9  time from that meeting.
10     **Q.**  So you find that language ambiguous:  I cannot
11 support a plan according to which you would remain
12 involved in the day-to-day operations of the journal?
13         MS. QUIMBY:  Objection, form.
14     **A.**  As I read that, I hear the chair saying that
15 keeping the journal as it is and having him as the editor
16 would not be acceptable to Dr. Brand.
17     **Q.**  (By Mr. Allen) Okay.  Are you aware that the
18 Journal of Schenkerian Studies has never published again?
19     **A.**  I was not aware of that.  I was aware that
20 there was a call for editors.
21     **Q.**  Were you aware that Dean Richmond testified in
22 open court that the journal had been, quote, "put on
23 ice," closed quote?
24     **A.**  No.  I was not aware of that.
25     **Q.**  Well, I think I know the answer to this, but I

*Jennifer Cowley     09/26/2024*

207

1  want to ask you anyway.  Did you direct the University of
2  North Texas press to cease publication of the journal?
3      **A.**  I did not.
4      **Q.**  Okay.  And this -- okay.  I think that will
5  probably be the last exhibit but -- and I only have one
6  more series of questions, and it might be the last
7  question.  Did you have anything to do with the committee
8  allegedly formed to reconstitute the journal at the
9  University of North Texas?
10         MS. QUIMBY:  Objection, form.
11     **A.**  I have no knowledge of a committee to
12 resubstitute the journal.
13     **Q.**  (By Mr. Allen) Let me put it in a different way
14 just to make sure we understand what we're talking about.
15 You were aware that a committee was formed to look for a
16 new editor of some sort?
17         MS. QUIMBY:  Objection, form.
18     **A.**  I don't know that I knew it was a committee.
19 I knew there was an effort to find an editor for the
20 journal and some kind of call for nominations for
21 editors.
22     **Q.**  (By Mr. Allen) And did you have anything to do
23 with that as provost is my question?
24     **A.**  I was informed that this was a planned action.
25     **Q.**  But it wasn't something your office was

*Jennifer Cowley     09/26/2024*

208

1  involved in directly?
2      **A.**  No.
3      **Q.**  Did you have --
4      **A.**  Once the report was issued, the actions to move
5  forward were delegated to the department.
6      **Q.**  Okay.
7          MR. ALLEN:  Okay.  I think I'm going to
8  pass the witness then, Mary, and you can go ahead and --
9  I'm going to take this down too.  Excuse me.  Do you want
10 to take a break or --
11         MS. QUIMBY:  Yeah.  Can we just take five,
12 please?
13         MR. ALLEN:  Absolutely.
14         VIDEOGRAPHER:  Off the record, 2:53.
15     (Recess taken from 2:53 to 2:57)
16         VIDEOGRAPHER:  On the record, 2:57 p.m.
17         MS. QUIMBY:  Thank you.  I will reserve my
18 questions for trial.
19         MR. ALLEN:  Okay.  President Cowley, thank
20 you so much for spending the time today sitting for
21 deposition.
22         COURT REPORTER:  Ms. Quimby, do you want
23 to purchase a transcript?
24         VIDEOGRAPHER:  Off the record.
25         COURT REPORTER:  We are still on --

1 pages contain any changes and the reasons therefor;
2    _____ was not requested by the deponent or a party
3 before the completion of the deposition.
4    That the deposition transcript was submitted on
5 October 30, 2024, to Ms. Mary Quimby, attorney for the
6 witness, for examination, signature, and return to me by
7 the 2nd day of December, 2024;
8    That the amount of time used by each party at the
9 deposition is as follows:
10    Mr. Michael Thad Allen..........04 HOURS:38 MINUTES
      Ms. Mary Quimby.................00 HOURS:00 MINUTES
11    Mr. Renaldo L. Stowers..........00 HOURS:00 MINUTES
      Mr. Shelby Boseman..............00 HOURS:00 MINUTES
12
13 COUNSEL FOR THE PLAINTIFF:
14    Mr. Michael Thad Allen
      ALLEN LAW, LLC
15    P.O. Box 404
      Quaker Hill, Connecticut 06375
16    860/772-4738 (tel)
      m.allen@allen-lawfirm.com
17
18 COUNSEL FOR THE DEFENDANTS and JENNIFER COWLEY:

   Ms. Mary Quimby
19 TEXAS ASSISTANT ATTORNEY GENERAL
   P.O. Box 12548
20 Capitol Station
   Austin, Texas 78711
21 mary.quimby@oag.texas.gov
22 COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:
23    Mr. Renaldo L. Stowers
      DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
24    115 Union Circle No. 310907
      Denton, Texas 76203
25    940/565-2717 (tel)
      renaldo.stowers@untsystem.edu

214

1 COUNSEL FOR THE UNIVERSITY OF TEXAS AT ARLINGTON

2    Mr. Shelby Boseman
       CHIEF LEGAL OFFICER, THE UNIVERSITY OF TEXAS AT
3    ARLINGTON
     701 South Nedderman Drive
4    Arlington, Texas 76019
     sboseman@uta.edu

5
6    I further certify that I am neither counsel for,
7 related to, nor employed by any of the parties or
8 attorneys in the action in which this proceeding was
9 taken.  Further, I am not a relative or employee of any
10 attorney of record in this cause, nor am I financially or
11 otherwise interested in the outcome of the action.
12    Certified to by me this the 14th day of October,
13 2024.
14
15
                 _____
16    Carla A. Sims, AAS, RPR
      Texas CSR No. CSR-6125
17    Expiration Date:  04-30-26
      JULIA WHALEY & ASSOCIATES, INC.
18    2012 Vista Crest Drive
      Carrollton, Texas  75007-1640
19    214-668-5578/Fax 972-236-6666
      JulieTXCSR@gmail.com
20    Firm registration No. 436
      Firm registration Expires 5-31-25
21
22
23
24
25

215

1           FURTHER CERTIFICATION
          DEPOSITION OF JENNIFER COWLEY

2
3    The original deposition was/was not returned to the
4 deposition officer on the _____ day of _____,
5 20__.
6    If returned, the attached Changes and Signature
7 page contains any changes and the reasons therefor;
8    If returned, the original deposition was delivered
9 to Mr. Michael Thad Allen, Custodial Attorney;
10    That $_____ is the deposition officer's
11 charges to the Plaintiff for preparing the original
12 deposition transcript and any copies of exhibits;
13
14    Certified to by me this _____ day of _____,
15 20__.
16
17
18                 _____
      JULIA WHALEY & ASSOCIATES, INC.
19    2012 Vista Crest Drive
      Carrollton, Texas  75007-1640
20    214-668-5578/Fax 972-236-6666
      JulieTXCSR@gmail.com
21    Firm registration No. 436
      Firm registration Expires 5-31-25
22
23
24
25

APPX.056

*Rachel Gain    5/19/21*                              1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE EASTERN DISTRICT OF TEXAS
                        SHERMAN DIVISION
 3   TIMOTHY JACKSON,              )
 4            Plaintiff,           )
 5   v.                           )  CASE NO.
                                   )  4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,          )
 7            Defendants.          )
 8
 9
10        -----------------------------------
11               ORAL DEPOSITION OF
12                   RACHEL GAIN
13                  MAY 19, 2021
14        -----------------------------------
15
16
17        ORAL DEPOSITION OF RACHEL GAIN, produced as a
18   witness at the instance of the Plaintiff, and duly
19   sworn, was taken in the above-styled and numbered cause
20   on May 19, 2021, from 1:06 p.m. to 2:49 p.m., before
21   Nita G. Cullen, CSR in and for the State of Texas,
22   reported by machine shorthand, at the Law Offices of
23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City
24   of Dallas, County of Dallas, State of Texas, pursuant to
25   the Federal Rules of Civil Procedure.
```

*Rachel Gain    5/19/21*                              2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      MR. MICHAEL THAD ALLEN
        MS. SAMANTHA HARRIS
 5      ALLEN LAW, LLC
        P.O. Box 404
 6      Quaker Hill, Connecticut 06375
        860.772.4738
 7      860.469.2783 Fax
        m.allen@allen-lawfirm.com
 8
 9   FOR THE DEFENDANTS:
10      MR. MATT BOHUSLAV
        ASSISTANT ATTORNEY GENERAL
11      GENERAL LITIGATION DIVISION
        ATTORNEY GENERAL OF TEXAS
12      P.O. Box 12548, Capitol Station
        Austin, Texas 78711
13      matthew.bohuslav@oag.texas.gov
14   AND
15      MR. RENALDO STOWERS
        SENIOR ASSOCIATE GENERAL COUNSEL
16      UNIVERSITY OF NORTH TEXAS SYSTEM
        OFFICE OF GENERAL COUNSEL
17      940.565.2717
        renaldo.stowers@untsystem.edu
18
19   ALSO PRESENT:
20      MR. TIMOTHY JACKSON
21
22
23
24
25
```

*Rachel Gain    5/19/21*                              3

```
 1                      INDEX
 2                                              PAGE
 3   Appearances.......................................  2
 4   Stipulations......................................  4
 5   RACHEL GAIN
 6       Examination by Ms. Harris.....................  4
 7
 8   Reporter's Certificate............................ 60
 9
10
11                    EXHIBITS
12   NO.  DESCRIPTION                               PAGE
13   Exhibit 35   Notice of Taking Deposition...........  9
14   Exhibit 36   Text Messages - Vivek Virani and
                  Rachel Gain..........................  9
15
     Exhibit 37   Microsoft Teams conversation.......... 22
16
     Exhibit 38   News from SEM: General News, Statement
17                of UNT Faculty on Journal of
                  Schenkerian Studies ................. 22
18
     Exhibit 39   Twitter Messages..................... 51
19
20
21
22
23
24
25
```

*Rachel Gain    5/19/21*

4

```
 1              P R O C E E D I N G S
 2              RACHEL GAIN,
 3   having been first duly sworn, testified as follows:
 4              EXAMINATION
 5   BY MS. HARRIS:
 6       Q.   Okay.  Hi, my name is Samantha Harris.  I'm one
 7   of the attorneys for Dr. Jackson, along with my partner.
 8   And have you ever been deposed before?
 9       A.   No.
10       Q.   Okay.  So, it's just going to be a
11   conversation, but it is part of the Court record, that's
12   why she's taking these -- you know, these notes.  And
13   so, this is testimony that will be part of the case.  If
14   at any time anything I'm asking you isn't clear or you
15   need me to clarify or repeat the question, just ask.
16   Your attorney may object from time to time.
17              MS. HARRIS:  Are we going to stipulate,
18   you know, the same things that we have in the previous
19   depositions, that objections except as to form
20   objections will be reserved for the time of trial.
21              MR. BOHUSLAV:  Yes.
22       Q.   (By Ms. Harris)  Okay.  So, he will object, and
23   that objection will go on the record, but it doesn't
24   change your obligation to answer the question.  So, when
25   he objects, it doesn't mean, you know, that you're not
```

Rachel Gain   5/19/21

5

1   going to answer, it just means that that objection will
2   be noted, and the Judge can decide what to do with it.
3       A.   (Witness nods head affirmatively.)
4       Q.   So, we'll just start with some background
5   questions.  Is there anything that would prevent you
6   from giving truthful testimony here today?
7       A.   No.
8       Q.   Are you on any medications, or do you have any
9   medical conditions that could potentially interfere with
10  your ability to give truthful testimony?
11      A.   Not that I know of, no.
12      Q.   Okay.  So, just tell me a little bit about your
13  background.  Obviously, now, you're a graduate student
14  at UNT, right?
15      A.   (Witness nods head affirmatively.)
16      Q.   And what, specifically, are you studying?
17      A.   I'm studying music theory.
18      Q.   Music theory.  Okay.  Prior to that, where did
19  you go to college?
20      A.   I did my undergraduate mostly at the University
21  of Birmingham, with one year at the University of
22  Ottawa, and I did a master's degree in music theory at
23  the University of Western Ontario.
24      Q.   Okay.  Now, you said you're studying music
25  theory here at the University of North Texas?

Rachel Gain   5/19/21

6

1       A.   Yes.
2       Q.   What year of the program are you in?
3       A.   I just finished my second year.
4       Q.   Okay.  So, you're in the theory department.
5   Have you met Dr. Jackson before?
6       A.   We've been in the same room, I've smiled at him
7   in hallways, but that's the extent of our interactions.
8       Q.   Okay.  So, would you say your interactions with
9   him have been pleasant or --
10      A.   I've had no response from him, so I wouldn't
11  use the word "pleasant".  I'd say absence, really.
12      Q.   Okay.  When did you first learn about the
13  controversy over Volume 12 of the -- I'm going to say
14  the Journal of Schenkerian Studies.  If I call it the
15  JSS here on out, will that be clear?
16      A.   Yes.
17      Q.   And you know what?  I see you nodded and said
18  "yes", and that reminds me of one thing I should have
19  said at the beginning of the deposition, is because this
20  is all going on the record, even if it's just a "yes" or
21  "no" answer, always say "yes" or "no", rather than just
22  nodding, which you didn't do, you said "yes", but it
23  made me think of it.
24      A.   Okay.
25      Q.   So, when did you first learn of the controversy

Rachel Gain   5/19/21

7

1   with Volume 12 of the JSS?
2       A.   It was, I think, on the Friday evening, which I
3   believe was the 25th of July, 2020.
4       Q.   Okay.  And how did you hear about it, first?
5       A.   On Twitter, people were posting their opinions
6   on it and screen shots of the passages that they were
7   offended by.
8       Q.   Okay.  Have you read Volume 12 of the JSS?
9       A.   I've read most of it.
10      Q.   Most of it.  Okay.  Have you read Dr. Jackson's
11  article?
12      A.   Yes.
13      Q.   Okay.  And have you listened to Dr. Ewell's
14  talk, the talk that prompted --
15      A.   Yes.
16      Q.   Okay.  So, when you said people were tweeting
17  about it, do you remember who specifically was tweeting
18  that you noticed?
19      A.   Quite a lot of people.  One person comes to
20  mind that I can definitely say did.  The first name's
21  Devon.  I can't remember the entirety of his surname,
22  but it begins with "C-H".  Something like Chalamu or
23  Chalamo (Phonetic).
24      Q.   And is that someone who was also a student at
25  UNT?

Rachel Gain   5/19/21

8

1       A.   No.
2       Q.   Okay.  So, these were people from outside of
3   the university.
4       A.   Yes.
5       Q.   Do you know how they learned about the
6   controversy?
7       A.   Some of them had a copy of the journal and had
8   read it, and others had seen the journal -- the excerpts
9   that had been sent to them.
10      Q.   Okay.  And when did you first read Dr.
11  Jackson's article?
12      A.   I read the excerpts at the time, and within the
13  next day or two, I read the article.
14      Q.   Okay.  All right.  Terrific.  So, you know, I
15  meant to do this before we did the background, but I'm
16  going to just -- so, I'm going to be introducing some
17  documents throughout.  They're going to be marked as
18  exhibits.
19           So, any document that I'm going to ask you
20  about, I will give you a copy of to familiarize yourself
21  with it.  And the first thing I just want to give you a
22  copy of, and I believe this will be 35, I think, because
23  we're continuing to number the exhibits from previous
24  depositions.
25           This is just the Notice of Deposition that

*Rachel Gain    5/19/21*

57

1  correct?

2  **A.**  Yes.

3  **Q.**  Okay.  The petitions also refer to the past

4  bigoted behaviors of UNT faculty.

5  **A.**  Yes.

6  **Q.**  And you've testified today that you don't have

7  any firsthand knowledge of past bigoted behaviors by UNT

8  faculty.

9  **A.**  Yes.

10  **Q.**  Okay.  And this also referred to past racist

11  actions of Dr. Jackson, yes?

12  **A.**  Could you show me where in the document it says

13  that?

14  **Q.**  Sure.  It's under -- it is the July 27th

15  petition that's marked Exhibit 3 at the top.  Yeah.

16  That one.

17  **A.**  Okay.

18  **Q.**  Says, "Dr. Jackson's actions, both past and

19  present, are racist and unacceptable."  So, is it fair

20  to say that you don't have firsthand knowledge of any

21  past racist actions by Dr. Jackson?

22  **A.**  Well, seeing as I've never been in the same --

23  or I've never been in a conversation with him, that

24  would follow, yes.

25  **Q.**  Okay.  And in the July 30th version of the

---

*Rachel Gain    5/19/21*

58

1  statement, Dr. Jackson is accused of extortion, correct?

2  **A.**  Where is this?

3  **Q.**  It is on Kohanski 000109, No. 3 under "Calling

4  for Dr. Jackson's Dismissal.  Extortion through grade

5  manipulation and threats to students' careers and

6  reputations."

7  **A.**  It does say that.

8  **Q.**  Okay.  And is it fair to say that you have no

9  firsthand knowledge of any extortion by Dr. Jackson?

10  **A.**  Yes.  I wasn't in the country at the time.

11  **Q.**  Okay.  But you did sign your name to a

12  statement asking that Dr. Jackson be fired for all of

13  these reasons, yes?

14  **A.**  Where does it say that he should be fired?

15  **Q.**  "Calling for Dr. Jackson's Dismissal.  Dr.

16  Jackson should be removed from the UNT faculty."

17  **A.**  Yes.  I signed a statement saying that it was

18  our opinion that he should be fired.

19  **Q.**  Okay.

20  **A.**  Or dismissed, in the words of the statement.

21  **Q.**  Okay.  And other than his article in the

22  journal, which you have said you've read, would it be

23  fair to say that you called for his termination with no

24  firsthand knowledge of any of the behaviors specified in

25  this petition?

---

*Rachel Gain    5/19/21*

59

1  **A.**  Yes.

2  MS. HARRIS:  Okay.  Thanks.  That's all.

3  THE WITNESS:  Okay.  Thank you.

4  MS. HARRIS:  Do you have any --

5  MR. BOHUSLAV:  No.  We'll reserve

6  questions for time of trial.

7  (DEPOSITION ADJOURNED AT 2:49 P.M.)

---

*Rachel Gain    5/19/21*

60

1  IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

2  SHERMAN DIVISION

3  TIMOTHY JACKSON,              )
                              )

4      Plaintiff,                )
                              ) Case No.

5  v.                          )
                              ) 4:21-cv-00033-ALM

6  LAURA WRIGHT, et al,        )
                              )

7      Defendants.              )

8

9  ------------------------------------

10  DEPOSITION CERTIFICATE

11  RACHEL GAIN

12  MAY 19, 2021

13  ------------------------------------

14

15      I, Nita G. Cullen, Certified Shorthand

16  Reporter in and for the State of Texas, hereby certify

17  to the following:

18      That the witness, RACHEL GAIN, was duly sworn

19  by the officer and that the transcript of the oral

20  deposition is a true record of the testimony given by the

21  witness;

22      I further certify that pursuant to FRCP Rule

23  30(f)(1) that the signature of the deponent:

24      ____ was requested by the deponent or a

25  party before the completion of the deposition and is to

---

Rachel Gain    5/19/21

61

1  be returned within 30 days from date of receipt of the
2  transcript.  If returned, the attached Changes and
3  Signature Page contains any changes and the reasons
4  therefor;
5       X  was not requested by the deponent or a
6  party before the completion of the deposition.
7       I further certify that I am neither attorney or
8  counsel for, nor related to or employed by, any of the
9  parties or attorneys to the action in which this
10 deposition was taken.
11      Further, I am not a relative or employee of any
12 attorney of record in this case, nor am I financially
13 interested in the outcome of the action.
14       Subscribed and sworn to on this 15th day of
15 June, 2021.
16
17 _____

18  NITA G. CULLEN, Texas CSR #1563
    Expiration Date:  08-31-2022
    JULIA WHALEY & ASSOCIATES
19  Firm Registration No. 436
       2012 Vista Crest Drive
20  Carrollton, Texas 75007-1640
    214.668.5578
21
22
23
24
25

APPX-060

---

BENJAMIN S. GRAF, Ph.D.    09/23/2024    1

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF
 2                    SHERMAN DIVISION

 3  TIMOTHY JACKSON,              )
                                 )
 4       Plaintiff,              )
                                 )
 5  vs.                          )  CASE NO. 4:21-CV-00033-ALM
                                 )
 6  LAURA WRIGHT, et al.,         )
                                 )
 7       Defendants.             )

 8

 9  ***************************************************

10         VIDEOTAPED ORAL DEPOSITION OF

11             BENJAMIN S. GRAF, Ph.D.

12              September 23, 2024

13  ***************************************************

14

15       VIDEOTAPED ORAL DEPOSITION OF BENJAMIN S. GRAF,

16  Ph.D., produced as a witness at the instance of the

17  Plaintiff and duly sworn, was taken in the above-styled

18  and numbered cause on the 23rd day of September, 2024,

19  from 9:03 a.m. to 12:08 p.m., before Kim D. Carrell,

20  Certified Shorthand Reporter in and for the State of

21  Texas, reported by computerized stenotype machine at

22  the University of North Texas System, 801 North Texas

23  Boulevard, Gateway Suite #308, Denton, Texas, pursuant

24  to the Federal Rules of Civil Procedure and the

25  provisions stated on the record or attached hereto.
```

---

BENJAMIN S. GRAF, Ph.D.    09/23/2024    3

```
 1                    I N D E X

 2                                          PAGE

 3  Appearances...................................  2

 4  Stipulations..................................  5

 5

 6  BENJAMIN S. GRAF, Ph.D.

 7       Direct Examination by Mr. Allen........  6

 8

 9

10                   EXHIBITS

11  NUMBER          DESCRIPTION          MARKED

12  Exhibit 1  Re-Notice of Taking Deposition..... 40

13  Exhibit 2  Center Review, Reporting

14             Period: FY2013 - FY2016

15             (JACKS 067377 - 067401)........... 40

16  Exhibit 3  Ad Hoc Review Panel Report

17             (Exhibit D)

18             (JACKSON000208 - 000233)........... 65

19  Exhibit 4  Material for the Committee

20             Emails

21             (UNT 002645 - UNT 002782).......... 79

22  Exhibit 5  Email, 7-24-20, Graf to Chung,

23             et al.

24             (UNT 000439)......................102

25
```

---

BENJAMIN S. GRAF, Ph.D.    09/23/2024    2

```
 1                  APPEARANCES

 2

 3  FOR THE PLAINTIFF:

 4      Mr. Michael Thad Allen
        ALLEN LAW, LLC
 5      P.O. Box 404
        Quaker Hill, CT 06375
 6      Telephone: 860.772.4738
        Fax: 860.469.2783
 7      E-mail: M.allen@allen-lawfirm.com

 8

 9  FOR THE DEFENDANTS:

10      Mr. Benjamin S. Walton
        Assistant Attorney General
11      General Litigation Division
        P.O. Box 12548, Capital Station
12      Austin, Texas 78711
        Telephone: 512.463.2120
13      Fax: 512.320.0667
        E-mail: Benjamin.Walton@oag.texas.gov
14
             - and -
15
        Renaldo Stowers
16      University of North Texas System
        Office of General Counsel
17      801 North Texas Boulevard
        Denton, Texas 76201
18      Telephone: 940.565.2717
        Fax: 940.369.7026
19      E-mail: Renaldo.Stowers@untsystem.edu

20

21  ALSO PRESENT:

22  VIDEOGRAPHER:

23      Mr. Tony McGough
        Legal Video Group
24      lvg.dallas@gmail.com
        214-598-5229
25
```

---

BENJAMIN S. GRAF, Ph.D.    09/23/2024    4

```
 1  Exhibit 6   Screenshot of Facebook Post from

 2              Graf to Ewell, 7-25-20.............104

 3  Exhibit 7   Emails Regarding Meeting With You

 4              Monday Sept 14 at Noon

 5              (UNT 002500 - 002505).............109

 6  Exhibit 8   Emails Regarding JSS

 7              (JACKS 089828 - 089832)...........114

 8  Exhibit 9   Statement From the MHTE Graduate

 9              Students - Confidential

10              (Kohanski 000107 - 000110)........115

11  Exhibit 10  Emails Regarding Faculty

12              Statement on the Recent Issue

13              of JSS

14              (UNT 000526)......................117

15

16

17

18

19

20

21

22

23

24

25
```

**APPX.061**

57

1    Journal would want to be able to read and interpret a
2    basic Schenkerian analysis.  I think that's reasonable.
3         Q.    Was there a type-setting of these graphs
4    involved?
5         A.    Sometimes.  Sometimes, yes.  It depended on the
6    article.
7              MR. WALTON:  Mr. Allen, just for purposes
8    of the record, since we have a witness whose last name is
9    very interesting, can you clarify that these questions
10   you've been asking are graph, G-R-A-P-H?
11             MR. ALLEN:  Yes, sorry.  And so I believe
12   you'll also note -- and thank you.  That didn't even
13   occur to me.
14        Q.    And I certainly wasn't meaning to pun off your
15   name, Professor Graf.  But the way your name is spelled
16   literally means, in German, "count," correct?
17        A.    Correct, rough translation.  Rough translation.
18        Q.    And graph with a PH has nothing to do with
19   that, correct?
20        A.    Correct.
21        Q.    And we've just been talking about the
22   pictograms, if you want to call them that, for these
23   graphs that are made in Schenkerian analysis, right?
24        A.    Yes.
25        Q.    Thank you.

58

1         A.    Good clarification.
2              MR. ALLEN:  Thanks to Opposing Counsel
3    for bringing that up.
4         Q.    So just back to Levi Walls, do you know what
5    role then he started to play in the Journal going forward
6    from this time where you announced you're stepping back?
7         A.    Yeah.  His role was to take over the reins and
8    communicate with the advisors in order to move forward
9    with the Journal.  That's the way I understood it.
10        Q.    Was there going to be a transition period where
11   you brought him on as a kind of mentor?
12        A.    I can't remember if it was Dr. Brand or
13   Dr. Jackson and Slottow that asked me to help, but one
14   of those people asked me to help.  I can't honestly
15   remember if it was Dr. Brand or Dr. Jackson asked me
16   to show Levi certain things about the Journal.
17        Q.    Based on your direct experience or
18   conversations with Mr. Walls, did he seem enthusiastic
19   about the new position?
20        A.    It's hard to say.  It's hard to say.  I'm not
21   really sure how enthusiastic he was or not.
22        Q.    Did you have any discussions with him about
23   taking on the new position?
24        A.    Very few, very few.
25        Q.    Well, if you can remember back to those few

59

1    conversations, what did he say?
2         A.    I mean, our conversations were very practical.
3         Q.    Um-hum.
4         A.    Things like what software would you use to take
5    an article from manuscript through publication.
6         Q.    And to cut to the chase, was it focused on the
7    craft of publishing these articles?
8         A.    It was a lot more focused on the craft of
9    publishing the articles than it was the substance or,
10   yeah, the craft of the practical matters.
11        Q.    At any point in this transition time --
12   incidentally, when was it decided -- so there's a
13   transition period.  You announce you are going to
14   withdraw from the Journal.  You talked to Benjamin Brand
15   about that in the fall of 2019, correct?  And then you
16   have a subsequent meeting -- sorry, I just realized I was
17   relying on you nodding your head.
18        A.    Correct.
19        Q.    And then you had a subsequent conversation with
20   Professor Jackson and Professor Slottow?
21        A.    Correct.
22        Q.    And that involved, at some point, having these
23   very practical conversations with Levi Walls, correct?
24        A.    Those happened after.
25        Q.    And at that time when those happened, what time

60

1    are we talking, if you can remember?  What month?  What
2    time period?
3         A.    Let's think.  Probably October, beginning of
4    October, I want to say.
5         Q.    Okay.  Did Professor Walls -- excuse me.  Did
6    Mr. Walls raise any concerns about a power differential
7    between him and Professor Jackson at that time?
8         A.    He did not raise them to me specifically,
9    but -- he may have been concerned about it, but he didn't
10   raise it to me.
11        Q.    Did you raise those issues with him?
12        A.    If I had any issues, I would have brought them
13   straight to Benjamin Brand.
14        Q.    Did you?
15        A.    I want to say that I did.
16        Q.    And what did you say?
17        A.    I'm trying to remember the exact conversation.
18   Benjamin Brand and I talked about possibly having some
19   concerns about the editorship of the Journal being under
20   a graduate student.  And I left it to his discretion
21   at that point because I didn't feel it was my place
22   to comment any further on it.  And it sounded like
23   Dr. Jackson wanted Levi Walls to take over the Journal.
24   That's the best way I can summarize it.
25        Q.    Did you ever speak in your -- I'm talking about

BENJAMIN S. GRAF, Ph.D.    09/23/2024

93

1    And that's by Levy -- Levi Walls, excuse me.
2 Did I say that right?
3    A.    Yes.
4    Q.    And he seems to also confirm that the
5 announcement was made that these papers would be
6 published in Spectrum before they were even delivered
7 to the panel.
8    That's what Ellen Bakulina described, correct?
9    A.    Yeah, it appears to be in her email.
10    Q.    Then do you remember the subsequent discussion,
11 which is continued by Professor Bakulina, about whether
12 to go forward with the JSS call for papers as planned?
13    A.    I don't really recall a lot of discussion on
14 it.
15    Q.    Okay.  And so the next message is
16 December 1st, 4:53 p.m.  It seems like some of them
17 either might be unusually stamped or they may be out of
18 order.
19    A.    Okay.
20    Q.    But I just want to call your attention to the
21 one that begins at the bottom of that page.  Do you see
22 that?  Ellen Bakulina to Walls, Jackson, Graf, Cubero,
23 Slottow.  And this appears to be two different emails.
24 For some reason, Timothy Jackson is listed twice.  Do you
25 see that?  This is at the bottom of UNT 2657.

BENJAMIN S. GRAF, Ph.D.    09/23/2024

94

1    A.    I see -- oh, yes, I do see that he appears
2 twice there in the "To" line.
3    Q.    That's not important.  The thing I wanted to
4 call your attention to, is that your correct email there
5 that we discussed earlier?
6    A.    That is my correct email.
7    Q.    Okay.  So whenever that email appears in an
8 email, then you received it, correct?
9    A.    Yes.
10    Q.    Okay.  And Timothy then responds, "All things
11 considered, JSS should go forward with the call as
12 planned."
13    Do you see that subsequent email?
14    A.    I do.
15    Q.    At 10:06 p.m.?
16    A.    Yeah.  This is on 2658.
17    Q.    And he says -- I'm going to skip down to,
18 oh, geez, to the sixth line, the body of the email that
19 begins on UNT 2658.  Do you see that "- and we definitely
20 should publish it" line?
21    A.    Yes.
22    Q.    So he says, "We definitely should publish it."
23    He then says, "More responses have promised
24 and have even been requested.  Therefore, if others are
25 interested in responding, but wish to wait for the

BENJAMIN S. GRAF, Ph.D.    09/23/2024

95

1 published version of Ewell's talk, then they are welcome
2 to do so, and we should be open to publishing additional
3 responses to that version in a subsequent issue after the
4 upcoming one of the Journal of Schenkerian Studies.
5 Best, Tim."
6    Did I read that correctly?
7    A.    Yes, you read that email correctly.
8    Q.    And do you remember responding to that email?
9    A.    I don't really remember it.
10    Q.    The next email is from you, correct?
11    A.    Yes.
12    Q.    Do you believe that is not -- has not been sent
13 by you?
14    A.    No, I think I did send that.
15    Q.    And you say, "I agree with Tim."
16    Right?
17    A.    Um-hum.
18    Q.    Did you feel you couldn't say you didn't agree?
19 I mean, strike that question because of the double
20 negative.
21    Did you have any reason to volunteer that
22 information based in coercion of any kind?
23    A.    I didn't really feel comfortable elaborating on
24 my personal viewpoint.
25    Q.    At that time?

BENJAMIN S. GRAF, Ph.D.    09/23/2024

96

1    A.    At that time, no.
2    Q.    Well, I'm asking you to elaborate now.  Is
3 there some reason you felt compelled to chime in at that
4 time that said you agree with Tim?
5    A.    There's no particular reason either way other
6 than it seemed like this is the way Dr. Jackson wanted it
7 to happen, so I felt it was best for me to follow what he
8 wanted to do at that point.
9    Q.    Did you feel you couldn't express dissent?
10    A.    To an extent, yeah.  I didn't really want to
11 express my dissent.
12    Q.    Were you lying when you said you agreed with
13 Timothy Jackson?
14    A.    No.  I just didn't feel like I could fully
15 express myself.
16    Q.    Did you feel the need to express yourself by
17 agreeing with Timothy Jackson at this time when you said
18 you were trying to withdraw as much as possible from the
19 affairs of the Journal?
20    A.    I just had a brief, succinct response that I
21 thought was not going to interfere with the affairs of
22 the Journal from my position of trying to take a step
23 back.
24    Q.    Let me -- one further question about emails
25 in this body of documents that were considered by the

BENJAMIN S. GRAF, Ph.D.    09/23/2024

97

1    University of North Texas so-called ad hoc panel.
2            If you could turn to 2697, please?
3        A.    2697.
4        Q.    And I'm going to direct your attention to an
5    email at the bottom of that page.
6        A.    Sure.
7        Q.    This appears to be an email from you to
8    schenker@unt.edu.  Or no, I guess it's from
9    schenker@unt.edu, right?
10       A.    It is from the official Schenker email.
11       Q.    That was going to be my next question.  That
12   schenker@unt.edu, that's the official email for the
13   editor?
14       A.    I'm not really sure who used that email.  On
15   occasion, I used it as editor, yeah.
16       Q.    And is this an email you sent?
17       A.    It appears to be something that I sent, yes.
18       Q.    And it looks like this is March 14th, 2020, and
19   things are wrapping up with getting the special Symposium
20   out for publication.
21       A.    Yes, I was trying to collect materials from
22   some of the authors, it appears.
23       Q.    Is that why there are three, 1), 2), 3), sort
24   of bullet points that you are asking for the final
25   information?

BENJAMIN S. GRAF, Ph.D.    09/23/2024

98

1        A.    Yes.
2        Q.    And you also say, Levy -- Levi -- excuse me --
3    "Levi Walls has done excellent work on this volume, and
4    the Journal will be in good hands as he takes over sole
5    editorship of the JSS."
6            Right?
7        A.    Yes.
8        Q.    Were you impressed with the work of Levi Walls
9    on the Journal up to this time?
10       A.    I was referring to his work on the software,
11   his familiarity with the process of getting manuscripts
12   into the correct software formatting.
13       Q.    And then you go on -- well, just to follow that
14   up.  And that was all very good work by him, right?
15       A.    The way I understood it, he did a good enough
16   job to take over the reins.  And I really felt like I was
17   done at that point.
18       Q.    And you also commented in this sentence
19   after that.
20            "In my view, the additional content that we
21   collected this winter following Ewell's SMT plenary makes
22   a great addition to an already remarkable publication."
23            Right?
24       A.    Yes.  That was a little bit of -- yes.
25       Q.    Were you lying?

BENJAMIN S. GRAF, Ph.D.    09/23/2024

99

1        A.    No.
2            MR. WALTON:  Form.
3        A.    I wasn't lying.
4        Q.    And you -- finally, you end the email, "Cheers
5    getting this to press."
6            Right?
7        A.    Yes.
8        Q.    You also -- there's an email right below that.
9    It looks like you write to Barry Wiener.  Am I mistaken
10   about that?
11       A.    Let's see.
12       Q.    On March 20th.
13       A.    On March 20th, Ben Graf wrote to Wiener.
14            I don't see an email address from that, but...
15       Q.    It seems to be copied and pasted into this
16   massive document that was submitted to the UNT ad hoc
17   panel.  Do you remember writing and corresponding with
18   Barry Wiener?
19       A.    I don't honestly remember the correspondence
20   with every author, because I was just trying to get them
21   to sign the forms.  You know, my role was very minimal
22   there at the end, just to get everyone to sign their
23   forms.
24       Q.    Um-hum.
25       A.    Get it off to press.

BENJAMIN S. GRAF, Ph.D.    09/23/2024

100

1        Q.    Would you say to an author that you had read
2    his piece when you didn't read it?
3        A.    Possibly.
4        Q.    Do you remember doing that for Barry Wiener?
5        A.    I really don't remember Barry's article.  I
6    could not cite specific parts of it.  But a lot of times,
7    when I finished out the publication, I would say thank
8    you for your contribution or something like that.
9        Q.    Do you remember telling the ad hoc panel that
10   you didn't read all of the articles?
11       A.    Yes.
12       Q.    Was that true?
13       A.    That's true.  I did not read every article
14   word-for-word.
15       Q.    Was it expected that you would read the
16   article?
17       A.    I don't think there was a clear expectation.
18       Q.    Was there a division of labor in the Journal
19   for the Symposium?
20       A.    For the Symposium?  Was there a division of
21   labor?  Not really.
22       Q.    Do you know if Mr. Walls read all of the
23   papers?
24       A.    I'm not sure.
25       Q.    Do you know if Professor Jackson was relying on

*BENJAMIN S. GRAF, Ph.D.   09/23/2024*

121

```
1              CHANGES AND SIGNATURE
2  WITNESS:  BENJAMIN S. GRAF, Ph.D.
3  DATE:  9-23-24
4  PAGE/LINE      CHANGE           REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

*BENJAMIN S. GRAF, Ph.D.   09/23/2024*

122

```
1  _____
2  _____
3  _____
4      I, BENJAMIN S. GRAF, have read the foregoing
5  deposition and hereby affix my signature that same
6  is true and correct, except as noted above.
7
8            _____
9                  BENJAMIN S. GRAF
10 THE STATE OF _____)
   COUNTY OF _____)
11
12     Before me, _____, on this day
13 personally appeared BENJAMIN S. GRAF, known to me or
14 proved to me on the oath of _____ or
15 through _____ (description of
16 identity card or other document) to be the person whose
17 name is subscribed to the foregoing instrument and
18 acknowledged to me that he/she executed the same for
19 the purpose and consideration therein expressed.
20     Given under my hand and seal of office on this
21 _____ day of _____, _____.
22
23          _____
24          NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
25          My Commission Expires:_____
```

*BENJAMIN S. GRAF, Ph.D.   09/23/2024*

123

```
1            UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
2                  SHERMAN DIVISION
3  TIMOTHY JACKSON,          )
                             )
4      Plaintiff,            )
                             )
5  vs.                       ) CASE NO. 4:21-CV-00033-ALM
                             )
6  LAURA WRIGHT, et al.,     )
                             )
7      Defendants.           )
8  _____
9        REPORTER'S CERTIFICATION OF
10    ORAL DEPOSITION OF BENJAMIN S. GRAF, Ph.D.
11            September 23, 2024
12 _____
13     I, KIM D. CARRELL, a Certified Shorthand Reporter
14 in and for the State of Texas, hereby certify to the
15 following:
16     That the witness, BENJAMIN S. GRAF, was duly
17 sworn and that the transcript of the oral deposition is
18 a true record of the testimony given by the witness;
19     That the deposition transcript was duly submitted
20 on October 21, 2024, to Mr. Benjamin Walton, the attorney
21 for the witness,for examination, signature, and return to
22 me by November 22, 2024, (30 days);
23     That pursuant to the information given to the
24 deposition officer at the time said testimony was taken,
25 the following includes all parties of record and the
```

*BENJAMIN S. GRAF, Ph.D.   09/23/2024*

124

```
1  amount of time used by each party at the time of the
2  deposition;
3     Michael Thad Allen - 02 HRS: 37 MIN
      Benjamin Walton -  00 HRS: 00 MIN
4
5  FOR THE PLAINTIFF:
      Mr. Michael Thad Allen
6     ALLEN LAW, LLC
      P.O. Box 404
      Quaker Hill, CT 06375
7     Telephone: 860.772.4738
      Fax: 860.469.2783
8     E-mail: M.allen@allen-lawfirm.com
9
10 FOR THE DEFENDANTS:
11    Mr. Benjamin S. Walton
      Assistant Attorney General
12    General Litigation Division
      P.O. Box 12548, Capital Station
13    Austin, Texas 78711
      Telephone: 512.463.2120
14    Fax: 512.320.0667
      E-mail: Benjamin.Walton@oag.texas.gov
15
      - and -
16
      Renaldo Stowers
17    University of North Texas System
      Office of General Counsel
18    801 North Texas Boulevard
      Denton, Texas 76201
19    Telephone: 940.565.2717
      Fax: 940.369.7026
20    E-mail: Renaldo.Stowers@untsystem.edu
21
22    I further certify that I am neither counsel for,
23 related to, nor employed by any of the parties or
24 attorneys in the action in which this proceeding was
25 taken, and further that I am not financially or
```

*BENJAMIN S. GRAF, Ph.D.    09/23/2024*

125

1    otherwise interested in the outcome of the action.

2        Certified to by me on this 21st day of October,

3    2024.

4

5

6    _____

      Kim D. Carrell, CSR NO. 1184

7    Date of Expiration: 7-31-26

      JULIA WHALEY & ASSOCIATES, INC.

8    2012 Vista Crest Drive

      Carrollton, Texas  75007-1640

9    214-668-5578/Fax 972-236-6666

      JulieTXCSR@gmail.com

10   Firm registration No. 436

      Firm registration Expires 5-31-25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPX 066

*Frank Heidlberger    5/19/21*    1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF TEXAS
                    SHERMAN DIVISION
 3  TIMOTHY JACKSON,          )
                             )
 4          Plaintiff,        )
                             )
 5  v.                        ) CASE NO.
                             ) 4:21-cv-00033-ALM
 6  LAURA WRIGHT, et al,       )
                             )
 7          Defendants.       )
                             )
 8
 9
10  -----------------------------------
11          ORAL DEPOSITION OF
12          FRANK HEIDLBERGER
13            MAY 19, 2021
14  -----------------------------------
15
16
17      ORAL DEPOSITION OF FRANK HEIDLBERGER, produced as a
18  witness at the instance of the Plaintiff, and duly
19  sworn, was taken in the above-styled and numbered cause
20  on May 19, 2021, from 9:10 a.m. to 11:56 a.m., before
21  Nita G. Cullen, CSR in and for the State of Texas,
22  reported by machine shorthand, at the Law Offices of
23  Cutler Smith, 12750 Merit Drive, Suite 1450, in the City
24  of Dallas, County of Dallas, State of Texas, pursuant to
25  the Federal Rules of Civil Procedure.
```

*Frank Heidlberger    5/19/21*    3

```
 1                    INDEX
 2                                              PAGE
 3  Appearances.........................................2
 4  Stipulations........................................4
 5  FRANK HEIDLBERGER
 6      Examination by Mr. Allen........................4
 7      Examination by Mr. Bohuslav...................85
 8
 9
10  Reporter's Certificate.............................86
11
12                   EXHIBITS
13  NO.  DESCRIPTION                              PAGE
14  Exhibit 24   Notice of Taking Deposition........... 7
    Exhibit 25   Statement from the Division of Music
15               History, Theory and Ethnomusicology of
                 the University of North Texas..........34
16  Exhibit 26   E-mail to Benjamin Brand, 7/27/2020....34
    Exhibit 27   E-mail to Frank Heidlberger,
17               7/28/2020.............................53
    Exhibit 28   E-mail to Benjamin Brand, 7/27/2020....56
18  Exhibit 29   Music History, Theory, and
                 Ethnomusicology - Theoria.............58
19  Exhibit 30   E-mail to Timothy Jackson,
                 September 14, 2016....................68
20  Exhibit 31   E-mail to Dr. Jackson,
                 September 17, 2018....................73
21  Exhibit 32   E-mail to Peter Kohanski,
                 July 30, 2020........................74
22  Exhibit 33   News from SEM: General News..........78
    Exhibit 34   E-mail to John Richmond,
23               July 30, 2020........................80
24
25
```

*Frank Heidlberger    5/19/21*    2

```
 1              A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4      MR. MICHAEL THAD ALLEN
        MS. SAMANTHA HARRIS
 5      ALLEN LAW, LLC
        P.O. Box 404
 6      Quaker Hill, Connecticut 06375
        860.772.4738
 7      860.469.2783 Fax
        m.allen@allen-lawfirm.com
 8
 9  FOR THE DEFENDANTS:
10      MR. MATT BOHUSLAV
        ASSISTANT ATTORNEY GENERAL
11      GENERAL LITIGATION DIVISION
        ATTORNEY GENERAL OF TEXAS
12      P.O. Box 12548, Capitol Station
        Austin, Texas 78711
13      matthew.bohuslav@oag.texas.gov
14  AND
15      MR. RENALDO STOWERS
        SENIOR ASSOCIATE GENERAL COUNSEL
16      UNIVERSITY OF NORTH TEXAS SYSTEM
        OFFICE OF GENERAL COUNSEL
17      1155 Union Circle
        Denton, Texas 76203
18      940.565.2717
        renaldo.stowers@untsystem.edu
19
20  ALSO PRESENT:
21      MR. TIMOTHY JACKSON
22
23
24
25
```

*Frank Heidlberger    5/19/21*

4

```
 1              P R O C E E D I N G S
 2              FRANK HEIDLBERGER,
 3  having been first duly sworn, testified as follows:
 4              EXAMINATION
 5  BY MR. ALLEN:
 6      Q.   Mr. Heidlberger, my name is Michael Allen.  I'm
 7  counsel to Timothy Jackson.  Have you ever been deposed
 8  before, sir?
 9      A.   No.
10      Q.   So, I'm just going to go over a few ground
11  rules.  This is a relatively formal conversation.  A
12  deposition, although it's taking place in a private
13  office here, is actually an extension of the Court.  The
14  purpose of depositions is both to find out what you
15  know, obviously, and also to find out what you would say
16  at trial.
17          I'll start with a few preliminary
18  questions.  Is there anything that would prevent you
19  from giving truthful testimony today?
20      A.   No.
21      Q.   Are you taking any medication that might affect
22  your memory or ability to testify truthfully?
23      A.   No.
24      Q.   Are you ill in any way?
25      A.   I have Type 1 diabetes, that might affect over
```

33

1    sorry.

2        Q.    Was this a Jewish composer, by any chance, or

3    something of that nature?

4        A.    I can't confirm that.

5        Q.    And regardless of the name of the composer,

6    those were archival resources that were located at the

7    center, is that it?

8        A.    Again, I am sorry to be unspecific here, but I

9    think so.  It could have been related to material that

10   the center has gathered, but I'm not entirely sure.

11       Q.    Is it by any chance the name Gunther Raphael?

12       A.    Yes.  Raphael, yes.

13       Q.    Could you pronounce that and spell it for the

14   Court?

15       A.    Okay.  Gunther Raphael.  So, that is G-U-N-T --

16   maybe T-H-E-R, Gunther, and then R-A-P-H-A-E-L.

17       Q.    And I guess my last question, I just mean it to

18   be a "yes" or "no" question, if a scholar were to access

19   archival materials of the center and publish something

20   about that, does that make that the center's work, or is

21   that simply the scholar's individual work, in the eyes

22   of the scholarly community in which you're embedded?

23       A.    That's not a "yes, no" question.

24       Q.    It's good that you point that out.  Let me

25   rephrase it.  If a scholar accesses the scholarly

34

1    archives of the center and then publishes something that

2    is the scholar's work on that, is that considered the

3    work of the center?

4        A.    No.

5        (DEPOSITION EXHIBIT 25 MARKED.)

6            (MS. HARRIS RE-ENTERS ROOM.)

7            MR. ALLEN:  And could I have this exhibit

8    marked as 26?

9        (DEPOSITION EXHIBIT 26 MARKED.)

10       Q.    (By Mr. Allen)  And please let me know when

11   you've had a chance to examine it.

12       A.    Yes.

13       Q.    So, these are two documents, and I'm just going

14   to direct your attention to the bottom right of the

15   document.  Each one has a UNT number, and I'm just going

16   to represent to you that in the course of litigation,

17   attorneys will mark all exhibits with page numbers that

18   have to do with all the documents produced in the case.

19        So, the UNT designation indicates that this

20   was produced by the University of North Texas as part of

21   this litigation.  And I was going to ask you if you

22   recognize these documents, first of all?

23       A.    Yes.

24       Q.    And I see the date was July 27th, 2020, on

25   Exhibit 26, and it seems to be an e-mail from you to

35

1    Benjamin Brand, is that correct?

2        A.    Yes.

3        Q.    What was your purpose in writing this e-mail to

4    Benjamin Brand?  And as part of that explanation, could

5    you explain for the Court who Benjamin Brand is?

6        A.    Benjamin Brand is the current chair of the

7    Division of Music History, Theory and Ethnomusicology,

8    and as such, my successor in that field.

9        Q.    And what was your purpose in sending him this

10   e-mail?

11       A.    I sent this e-mail in consequence of emerging

12   concerns by colleagues, partially expressed in e-mails,

13   partially expressed in -- as far as I remember, in --

14   mostly in Facebook, of which one Facebook post by Ed

15   Klorman came up, who singled out the case as we know it.

16        Publication of JSS articles with

17   problematic formulations, and the reactions to this post

18   as they were posted as comments in the bottom of the

19   Facebook posts saying things like, well, I hate to say,

20   but I'm a UNT alumnus or, look at these guys, their MHTE

21   mission statement states that they are fair and

22   non-racist, and then they produce something like that.

23        In other words, the generalization of one

24   particular problematic case as one may interpret that of

25   people involved being interpreted as a general opinion

36

1    of the division and the theory area as a whole, which

2    would be a wrong interpretation, and my sense that we

3    have to react against this misinterpretation of the work

4    of my colleagues in the division and in the field.

5        Q.    You've mentioned a couple terms that I don't

6    understand, a problematic case or one case that we know

7    of.  What are you referring to, when you -- speaking in

8    these general terms?

9        A.    Yes.  I refer to the case that some articles in

10   the Journal of Schenkerian Studies that represent the

11   colloquium as a response to Phil Ewell was not well

12   edited, not edited to the standards of peer reviewed,

13   scholarly journals, but represent opinions, partially

14   even anonymous opinions in a way that is not appropriate

15   for a scholarly journal.

16        And that's not my opinion.  That's what I

17   saw in the reactions -- in the public reactions in the

18   field that this was seen as the problem.  So the problem

19   of incorrect handling of editorial procedures of a

20   scholarly journal.  It's not a newspaper.  It's not an

21   opinion paper.

22        And second, the nature of those problematic

23   statements supporting -- and again, that is the

24   perspective that others implemented into this situation,

25   that the articles do exactly that what Phil Ewell tried

1  to fight, and that is the white framing of music theory
2  in terms of repertoire, in terms of the interpretation
3  of repertoire and of methodologies, particularly
4  Schenkerian analysis.  And that is -- yeah.  That's my
5  point.
6      Q.   So, I want to ask you, you're referring to the
7  symposium published in Volume 12 of the Journal of
8  Schenkerian Studies, correct?
9      A.   That is correct.
10     Q.   And that is distinct from other articles
11  published in that very same volume, correct?
12     A.   Correct.
13     Q.   Let me ask a preliminary question.  Have you
14  ever heard any criticism of articles, besides the
15  symposium, published by the Journal of Schenkerian
16  Studies for what you've characterized as incorrect
17  handling of editorial opinions?
18     A.   No.
19     Q.   Not even in Volume 12, correct?
20     A.   No.
21     Q.   And could I ask you, as both an experienced
22  academic and also as the editor of a journal yourself,
23  are you aware that journals would publish symposia?
24     A.   Yes.
25     Q.   Could you give some examples, just based on

1      A.   Well, the small scale type of response that I
2  refer to, I did this in Theoria about Aspect of
3  Historical Music Theory, modal theory of the 16th
4  century.  There are two perspectives as to how much
5  tonal aspects of music theory has influenced the
6  understanding of modes, which are a medieval way of
7  explaining the musical scales, can be seen.
8           And there are basically two opinions, I
9  guess, or whether this influence of tonal impact us
10  there.  So, I had a discussion like that.  So, what I
11  did is, when I got a response, I said, okay, I will
12  publish this in the next issue.  I informed the author
13  and told him, okay -- and I informed the --
14  respondent that I will share this answer with the
15  author, giving him the opportunity to directly respond
16  to the response.
17          And I got the response, both where I
18  checked them carefully for accuracy and no personal or
19  any kind of inappropriate wording and published them
20  both in the following volume.
21     Q.   Did you send them out for peer review?
22     A.   No.
23     Q.   Have you ever solicited such responses
24  yourself, as an editor?
25     A.   No.

1  your own personal experience?
2      A.   It is usually, in a much smaller scale, a
3  direct response to an article published in a previous
4  volume, and you open up the perspective for people who
5  want to respond, usually criticize statements in a given
6  article, that then causes a response by another author.
7           So, it is not usually a collection of
8  articles, but a response to previously published
9  articles in the same journal.
10     Q.   Are you aware of journals that would have
11  published responses to, other than an article published
12  in a previous volume of the journal, as you've
13  characterized it?
14     A.   Sorry.  Could you repeat this, please?
15     Q.   Let me see if I can -- I want to see if I
16  understand what you said.  So, it sounds to me like you
17  are aware of symposia published by other journals in
18  which there is a collection of perspectives published in
19  response to an article, but you characterize the article
20  as usually in a previous volume of that very self same
21  journal.
22     A.   Yes.
23     Q.   And let me pause to ask, can you explain or
24  state any specific examples of journals that have done
25  that, that you know of?

1      Q.   Have you ever published such a response,
2  personally, as an author, either in Theoria or any other
3  journal?
4      A.   Response to criticism on one of my articles,
5  yes.
6      Q.   Was that peer reviewed?
7      A.   No.
8      Q.   Was the criticism, to your knowledge, peer
9  reviewed that you were responding to?
10     A.   They were marked as letters to the editor, and
11  they are usually not peer reviewed, so they were
12  specifically not articles, but letters.
13     Q.   And was that -- incidentally, can you identify
14  the publication for the Court?
15     A.   It was the Journal, the Clarinet, the Journal
16  of the International Clarinet Association, which is not
17  a peer reviewed journal.
18     Q.   That's not a peer reviewed journal.  To your
19  knowledge, do these kinds of exchanges occur in
20  otherwise peer reviewed journals?
21     A.   Yes, they do.
22     Q.   You also raise an issue of scale with regard
23  to -- is it clear -- if I refer to the Journal of
24  Schenkerian Studies as JSS, or simply the journal, will
25  you understand what I'm discussing?

Frank Heidlberger   5/19/21

41

1    **A.**   Yes.

2    **Q.**   So, in the JSS, you refer to the scale of the

3    symposium.  Do I get that -- did I understand correctly?

4    **A.**   I used the term the scale merely within the

5    context of the 16th century modal theory that I

6    explained.  So the musical scale is usually a number of

7    notes within an octave, either a half tone or a whole

8    tone apart from each other that define various modes.

9    So, it is the interpretation of musical scales.  I only

10   used that term in that context.

11   **Q.**   I'm glad you cleared that up.  And you said

12   that the symposium, which was this collection of papers

13   published in Volume 12 of the journal, was seen by

14   colleagues as supporting exactly the kind of approach to

15   music theory that Philip Ewell was trying to fight.

16          My understanding is that you're referring

17   to Philip Ewell, a professor at Hunter College, and his

18   plenary address to the Society for Music Theory that

19   took place in the beginning of November 2019.  Is that

20   correct, just to clear that up?

21   **A.**   I think it was in November 2019, if I'm

22   correct.  And yes, the answer is yes.

23   **Q.**   And is that impermissible to oppose Philip

24   Ewell's scholarship on music theory in the way that it

25   was done in the symposium?

Frank Heidlberger   5/19/21

42

1    **A.**   Absolutely not.  If it is done in the right

2    way, I would absolutely support it, and I think it's a

3    healthy way of getting a discourse going or keeping a

4    discourse that was in the field.

5    **Q.**   And what specifically, if there was a wrong way

6    that was done in the journal, what specifically was the

7    wrong way, and what was the right way that should have

8    been followed?

9          MR. BOHUSLAV:  Objection, compound.

10   **A.**   I was present at Phil Ewell's presentation and

11   was delighted by the rhetorical elegance of his

12   presentation, and at the same --

13   **Q.**   Go ahead, please.

14   **A.**   I was delighted by the rhetorical elegance and

15   his presentations and shocked, at the same time, by his

16   blunt simplification of very complex historical facts.

17   My first private thoughts that I didn't share with

18   anyone was, oh, my God, how will Tim Jackson react to

19   this?  He has to react.

20          And so I thought, he has a journal, and he

21   will do the right things to prevent a platform for open

22   discussion of these points.

23   **Q.**   Can I interject?  Did you just say, "prevent a

24   platform"?

25   **A.**   "Provide."

Frank Heidlberger   5/19/21

43

1    **Q.**   "Provide."  Thank you.

2    **A.**   At the same time, I was very concerned and was

3    thinking, oh, my God, hopefully he does it politically

4    correctly with all the steps involved.  These were my

5    private thoughts because I know Tim Jackson in the best

6    sense and respect his work.  But I knew that needs very,

7    very careful consideration and constant oversight from

8    the highest level: in other words, from Tim Jackson

9    himself.

10          Don't get the student involved and the

11   whatever, you know, lecturer who was the previous editor

12   who was involved in this, and discuss it explicitly with

13   the board.  That is major.  Even asking to the point

14   just, you know, by courtesy to say, you know, okay,

15   we -- I plan something that might be very controversial.

16   Do you agree with me doing this address to the board

17   members?

18          So, assuming all that, and a very strict

19   selective and peer reviewed process with regard to these

20   responses, because they are not responses, they are on

21   their own right reactive scholarly articles towards the

22   main point of Ewell's statements.

23          Given that, it would be absolutely

24   productive and healthy and correct to do this kind in

25   this journal, which is dedicated to Schenkerian studies.

Frank Heidlberger   5/19/21

44

1    Unfortunately, in the process of seeing the announcement

2    published, and then seeing, once the volume was

3    published, the introduction to the symposium, I was very

4    disappointed and see that this was not handled

5    correctly.

6    **Q.**   And you made a distinction between reactive

7    scholarly articles, not responses.  Could you be more

8    specific about what the difference is between those two?

9    **A.**   It was my understanding that Dr. Jackson opened

10   up the JSS primarily to write substantial articles about

11   the points that Dr. Ewell raised in his presentation.

12   If I remember correctly, in the call for papers, that

13   was kind of left open in a way that it also could

14   include immediate reactions, which then were published

15   actually as, you know, one, two paragraphs of some sort,

16   what kind of nonsense Ewell's thing is, you know, how

17   productive that kind of publication is is another

18   question.  But it -- just from the status and the

19   character of the journal, I assumed that these will be

20   substantial articles.

21   **Q.**   Is there any requirement, that you know of,

22   that a journal like the JSS not publish responses to a

23   paper such as Philip Ewell's?

24   **A.**   Formally, no.

25   **Q.**   You also said that you were at once impressed

49

1    Q.   (By Mr. Allen)  Did you agree with the
2    characterization presented in social media about Volume
3    12 that it's articles were racist?
4    A.   I agreed to the extent that some sections of
5    specific articles could be interpreted as racist, yes.
6    Q.   And could you identify, if you can remember,
7    the explicitly racist statements in some of the
8    articles?  And here I'm quoting from your statement
9    here, if you look down page -- the page marked UNT 503,
10   in the middle of that paragraph, it says, "main points
11   of criticism are the short response time for the call
12   for papers, the inconsistent solicitation of responses,
13   and the explicitly racist statements in some of the
14   articles."  So, I'm asking, what would you identify as
15   the explicitly racist statements in some of the
16   articles?
17          MR. BOHUSLAV:  I'm going to object to you
18   asking him about a document.  Could you show him the
19   document, please --
20          MR. ALLEN:  He has the document.
21          MR. BOHUSLAV:  -- you're asking about the
22   articles?
23          MR. ALLEN:  I asked him if he remembers
24   which statements he's explicitly identifying.  I
25   understand your objection, and it's on the record.

50

1    A.   I can name examples of racist statements, but
2    I'm not saying in this -- in this text that there are
3    racist statements in there.  I'm saying that these are
4    main points of criticism in the social media statements.
5    So, I'm not explicitly agreeing with them.  I see that
6    this -- these points of criticism come up: among them,
7    the criticism of racist statements.
8    Q.   (By Mr. Allen) And you did agree, however,
9    that some of the articles had made racist statements.  I
10   believe you testified about that earlier, correct?
11   A.   The term "racist" is an inappropriate reduction
12   of the problem here, and some statements were simply
13   superficial.  And from the perspective of implicit white
14   supremacy, but not necessarily racist as against a
15   certain person with a certain background, and that is
16   maybe implicit of the author, the black music theorist
17   Ewell.
18          But more obvious, it is the appropriateness
19   or inappropriateness of statements at stake here.  And
20   that was handled within a very wide range and often
21   inappropriate range in some of the articles, with one
22   exception, and that is, unfortunately, Dr. Jackson's
23   article.
24          When I read it -- sorry.  I want to shorten
25   the answer down here.  The third third of the article,

51

1    roughly, it's a long article, and he put a lot of work
2    into that.  The third third of the article moves from
3    the genre of a scholarly, well-researched article to an
4    inappropriate, opinionated, editorial-like statement,
5    using words like "the blacks," and I'm quoting here,
6    that are not up to speed, in terms of cultural education
7    with western music, and bringing in a whole complicated
8    matter in that of black anti-Semitism, implying that
9    Ewell has something to do with it, because why would it
10   be in a response to Ewell's article?
11          And that I thought was not well thought
12   through, not substantiated by the quotes, even if he
13   quotes some articles about -- including that Wikipedia,
14   and should have been seriously edited by somebody
15   involved in JSS.
16   Q.   Do you consider that part -- the last third of
17   the article, I believe you referred to, right?
18   A.   Roughly.
19   Q.   Do you consider that last third racist?
20   A.   I consider it as written so that it can be
21   interpreted as racist.
22   Q.   Have you -- in your personal experience with
23   Timothy Jackson since approximately the year 2000, I
24   believe, do you have any direct experience of him being
25   a racist?

52

1    A.   I think you asked that before, and my clear
2    answer was no.
3    Q.   Can I ask, what was the intended effect of
4    sending these statements to Dr. Benjamin Brand?
5    A.   Dr. Brand often refers to me as an advisor, as
6    a senior advisor with difficult decisions to make, and
7    here I took the initiative to send him some ideas that
8    might come up in an upcoming discourse.  It was just
9    meant privately and confidentially, as it is shown in
10   that sense, never that it is published.
11          I wrote this down in five minutes.  I had
12   other things to do, but I saw the Facebook thing that --
13   the avalanche of trouble coming towards us.  And I said,
14   hey, do something.  This is just a summary, take it or
15   dump it, and, you know, that's all.
16   Q.   In your experience at UNT, has there ever been
17   a time before where the department was forced or
18   decided -- strike that, please.
19          Was there ever a time before at UNT, in
20   your experience, where the department decided to take
21   action, purely based on social media reactions to what a
22   scholar had written?
23          MR. BOHUSLAV:  Objection, assumes facts
24   not in evidence.
25   A.   I'm not aware of any.

Frank Heidlberger    5/19/21

53

1       MR. ALLEN:  I'm going to mark this as
2  Exhibit 27.
3       (DEPOSITION EXHIBIT 27 MARKED.)
4       Q.    (By Mr. Allen)  Do you recognize this document,
5  Professor Heidlberger?
6       A.    Yes, I think so, yes.
7       Q.    And is this an e-mail from Benjamin Brand that
8  you received on July 28th, 2020?
9       A.    Yes.
10       Q.    And it states, "I think it would be helpful for
11  the two of us to have a meeting with the dean today to
12  discuss what's ongoing at SMT and the possible
13  reputational impact on MHTE and UNT music theory."  Did
14  I read that correctly?
15       A.    Correct.
16       Q.    Did you, in fact, meet with the dean on that
17  day?
18       A.    Yes.
19       Q.    Can you explain the substance of your meeting
20  with the dean on that day?
21       A.    It was an informal meeting by Zoom simply to
22  explain my point of view from inside the field.  Both
23  Dr. Brand and Dr. Richmond are from outside the field,
24  are not music theorists, and I'm very familiar with SMT
25  and the persons involved in this kind of discussion.

Frank Heidlberger    5/19/21

54

1       And this is information we exchanged.  This
2  was all.  It was not at all discussed what the
3  consequences will be and such because that in due course
4  is a matter of the higher administration and of the
5  dean.
6       Q.    And was the information you discussed
7  summarized in your statement that we have examined as
8  Exhibits 25 and 26?
9       A.    Yes.
10       Q.    But as you just stated, there was no potential
11  action discussed in that Zoom meeting?
12       A.    Correct.
13       Q.    What did you mean by reputational impact on the
14  MHTE and UNT music theory division?
15       A.    Music theory is a comparatively small field,
16  particularly in the level we are playing in this field.
17  There are probably two handfuls of institutions that
18  provide Ph.Ds in music theory, which means they are
19  forming the future generation of professors, and we are
20  competing on that level with schools that are, by
21  nature, of a higher status.
22       I'm talking about flagship schools, like
23  University of Michigan, Florida State University, and
24  then even into the elite schools, like Yale and
25  University of Chicago.  And we compete directly with

Frank Heidlberger    5/19/21

55

1  these schools for students and applicants, and it is a
2  small field, everybody knows everybody.
3       And if something goes off track, it
4  immediately damages the field, and not just the field of
5  music theory, but within the institution.  And with the
6  situation -- the vulnerable situation we are in as UNT,
7  representing music so much on a national level.  And
8  that is something I got very aware of as administrator
9  and was very much eager to protect us, just for the sake
10  of success of our students, our current students, our
11  future students, and our junior faculty.
12       Because by that time we had -- of our
13  eleven full-time music theorists, we have five tenure
14  track people who were scared to death by any kind of
15  this problematic interpretation of what is going on in
16  Denton, Texas.
17       Q.    By "problematic interpretation of what is going
18  on in Denton, Texas," do you mean the accusations of
19  racism being leveled against Timothy Jackson,
20  individually?
21       A.    Correct.
22       Q.    And I see that in this call to a meeting, which
23  resulted in the Zoom meeting, you also attach an SMT
24  announcement from July 27th, 2020.  Am I correct to
25  interpret this as a statement by the Society for Music

Frank Heidlberger    5/19/21

56

1  Theory, in this exhibit?
2       A.    Yes.
3       Q.    Were you in communication with the individual
4  at the Society for Music Theory who drafted this
5  statement?
6       A.    No.
7       Q.    Did they contact you at any time to discuss the
8  developments at the University of North Texas?
9       A.    No.
10       Q.    How did you come to have this statement?
11       A.    In the Facebook post by Ed Klorman, which must
12  have been on this July 27th, where he outlined the case
13  kind of for the Facebook public, but also on other
14  public medium, and I included that in my documentation,
15  one comment was from the current -- or from the back
16  then I think president or board member of SMT saying
17  exactly this, oh, we are preparing a statement.  So that
18  was published publicly on Facebook as a comment and
19  that's all where my knowledge comes from.
20       (DEPOSITION EXHIBIT 28 MARKED.)
21       Q.    (By Mr. Allen)  Professor Heidlberger, do you
22  recognize this document?
23       A.    Yes.
24       Q.    You have mentioned some of these individuals
25  before, but I'm referring to Nicole Biamonte and Ed

Frank Heidlberger    5/19/21

85

1    Professor Heidlberger, I've shown you Exhibit 32.
2         Do you have your own copy?
3         MR. ALLEN:  I do, but if you would
4    characterize the exhibit to the Court, I think it would
5    help us.
6         Q.    (By Mr. Bohuslav)  Okay.  I'm showing you
7    what's been marked as Exhibit 32.  I'll represent to
8    you, it's the faculty statement in July of 2020.  Is
9    that a fair characterization?
10        A.    Yes.
11        Q.    Okay.  When you signed this document, in July
12   of 2020, did you agree with all the statements it
13   contains?
14        A.    Yes.
15        Q.    And to this day, do you continue to agree with
16   all the statements in that document?
17        A.    Yes.
18             MR. BOHUSLAV:  Okay.  I'll pass the
19   witness.
20             MR. ALLEN:  No further questions.  We can
21   close the deposition.
22             (DEPOSITION ADJOURNED AT 12:09 P.M.)
23
24
25

Frank Heidlberger    5/19/21

87

1    be returned within 30 days from date of receipt of the
2    transcript.  If returned, the attached Changes and
3    Signature Page contains any changes and the reasons
4    therefor;
5         X  was not requested by the deponent or a
6    party before the completion of the deposition.
7         I further certify that I am neither attorney
8    or counsel for, nor related to or employed by, any of the
9    parties or attorneys to the action in which this
10   deposition was taken.
11        Further, I am not a relative or employee of any
12   attorney of record in this case, nor am I financially
13   interested in the outcome of the action.
14        Subscribed and sworn to on this 17th day of
15   June, 2021.
16
17        _____
18        NITA G. CULLEN, Texas CSR #1563
         Expiration Date:  08-31-2022
         JULIA WHALEY & ASSOCIATES
19       Firm Registration No. 436
              2012 Vista Crest Drive
20       Carrollton, Texas 75007-1640
         214.668.5578
21
22
23
24
25

Frank Heidlberger    5/19/21

86

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                SHERMAN DIVISION
3    TIMOTHY JACKSON,          )
                               )
4         Plaintiff,           )
                               ) Case No.
5    v.                        )
                               ) 4:21-cv-00033-ALM
6    LAURA WRIGHT, et al,      )
                               )
7         Defendants.          )
8
9    ------------------------------------
10              DEPOSITION CERTIFICATE
11                FRANK HEIDLBERGER
12                 MAY 19, 2021
13   ------------------------------------
14
15        I, Nita G. Cullen, Certified Shorthand Reporter in
16   and for the State of Texas, hereby certify to the
17   following:
18        That the witness, FRANK HEIDLBERGER, was duly sworn
19   by the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
21   the witness;
22        I further certify that pursuant to FRCP Rule
23   30(f)(1) that the signature of the deponent:
24        ____ was requested by the deponent or a
25   party before the completion of the deposition and is to

**Response draft**

Heidlberger, Frank <Frank.Heidlberger@unt.edu>
Mon 7/27/2020 4:32 PM
**To:** Brand, Benjamin <Benjamin.Brand@unt.edu>

▌ 1 attachments (151 KB)
Statement draft and ideas.docx;

Dear Benjamin
As mentioned I am sending you the attached draft. It is by no means meant as something
publishable but includes some thoughts for a specific response about the values and ethics
of the MHTE faculty. Recent FB posts indicate that all of us, or at least Theory faculty, could
be pulled into a very negative reputation. Phil just posted on FB that he canceled his visit to
UNT, quoting his message to Ellen and Stephen, talking about the situation with "your
journal." This is why we need to distance ourselves from the journal. If not institutionally
since this won't be possible, then individually. I as faculty member do not want to be
associated with any of this, damaging my reputation and acceptance in the field. I am afraid
that Phil now also withdraws his article from Theoria that was about to be published. I
haven't heard from him yet.
Let me know what you think.
[I wanted to edit the draft before sending it to you, but I have something else that needs
immediate attention, so please take it as is]
Frank

Dr. Frank Heidlberger
Professor of Music Theory
Music Theory Area Coordinator
University of North Texas
College of Music
1155, Union Circle # 311367
Denton, TX 76203
U.S.A.
Phone: (940) 369-7542
Fax (940) 565-2002



Deposition Exhibit

Nita Cullen

**APPX.074**

**UNT 000472**

Statement from the Division of Music History, Theory and Ethnomusicology of the University of North Texas

In light of the current discourse of "White Framing of Music Theory," the Journal of Schenkerian Studies published response articles about Phil Ewell's presentation at SMT [title], now also available as an article in MTO [...]. The call for papers, the editorial process and the content of some of the articles published by JSS have been strongly criticized on social media, particularly Facebook and Twitter. Main points of criticism are the short response time for the Call for papers, the inconsistent solicitation of responses, and the explicitly racist statements in some of the articles representing exactly the "white framing" that Dr. Ewell is fighting against. This criticism of the handling of this important topic by the Journal of Schenkerian Studies and the content of some of its responses cannot remain uncommented by the Division of Music History, Theory and Ethnomusicology, which formally houses the Center of Schenkerian Studies and its journal.

The Division, and its theory faculty in particular wishes to clarify that the opinions represented by the Journal of Schenkerian Studies do not represent the work ethics and scholarly standards held up by the faculty as a whole. The theory area and the division is deeply concerned and distances itself from the editorial processing and content of this volume. The upper administration of UNT is aware of the situation and will react appropriately.

The theory area consists of 11 full-time faculty members that perform work on the highest level of scholarly rigor and with a deep understanding of the importance of diversifying the field regarding areas of research and personnel. The theory area has diversified its curriculum toward non-Western and non-classical music, integrating these topics into its undergraduate core as well as its Master's and Doctoral programs. The area has successfully implemented a sprit of openness and communication along with its sister disciplines of Musicology and Ethnomusicology, encouraging cross-disciplinary studies related to gender, race and social studies in music. The student body of the UNT College of Music is highly diverse and the MHTE division strongly supports these students in pursuing their goals toward a professional training in music.

Racism and "white framing" do not have a space at UNT and its academic units, as it is expressed in the mission statement of MHTE [...]. The faculty of the theory area, the MHTE Division, and the College of Music of UNT welcomes the critical discourse that supports a strong rejection of any racist or otherwise motivated exclusion of individuals from academia and promotes a diverse approach to its fields and topics.

....

### Re: [EXT] [Smt-Announce] SMT Exec Board response to JSS Essays

Brand, Benjamin <Benjamin.Brand@unt.edu>
Tue 7/28/2020 8:20 AM
To: Heidlberger, Frank <Frank.Heidlberger@unt.edu>

Thanks for this. I think it would be helpful for the two of us to have a meeting with the dean today to discuss what's going on at SMT and the possible reputational impact on MHTE and UNT music theory. Are you free to meet this afternoon?

Benjamin Brand, Ph.D.

Pronouns: he, him, his | Professor of Music History

Chair, Division of Music History, Theory, and Ethnomusicology

College of Music | University of North Texas | (940) 536-3561



**From:** Frank Heidlberger <Frank.Heidlberger@unt.edu>
**Date:** Monday, July 27, 2020 at 10:06 PM
**To:** "Brand, Benjamin" <Benjamin.Brand@unt.edu>
**Subject:** Fw: [EXT] [Smt-Announce] SMT Exec Board response to JSS Essays

In case you haven't gotten this...

Dr. Frank Heidlberger
Professor of Music Theory
Music Theory Area Coordinator
University of North Texas
College of Music
1155, Union Circle # 311367
Denton, TX 76203
U.S.A.
Phone: (940) 369-7542
Fax (940) 565-2002



**From:** Smt-announce <smt-announce-bounces@lists.societymusictheory.org> on behalf of Society for Music Theory <societymusictheory@gmail.com>
**Sent:** Monday, July 27, 2020 6:55 PM
**To:** smt-announce@lists.societymusictheory.org <smt-announce@lists.societymusictheory.org>
**Subject:** [EXT] [Smt-Announce] SMT Exec Board response to JSS Essays

The Executive Board of the Society for Music Theory condemns the anti-Black statements and personal ad hominem attacks on Philip Ewell perpetuated in several essays included in the "Symposium on Philip Ewell's 2019 SMT Plenary Paper" published by the Journal of Schenkerian Studies.

The conception and execution of this symposium failed to meet the ethical, professional, and scholarly standards of our discipline. Some contributions violate our Society's policies on harassment and ethics.

APPX.076    UNT 000480

As reported by participants, the journal's advisory board did not subject submissions to the normal processes of peer review, published an anonymously authored contribution, and did not invite Ewell to respond in a symposium of essays that discussed his own work. Such behaviors are silencing, designed to exclude and to replicate a culture of whiteness. These are examples of professional misconduct, which in this case enables overtly racist behavior. We humbly acknowledge that we have much work to do to dismantle the whiteness and systemic racism that deeply shape our discipline. The Executive Board is committed to making material interventions to foster anti-racism and support BIPOC scholars in our field, and is meeting without delay to determine further actions.

Patricia Hall, President
Robert Hatten, Past-President
Gretchen Horlacher, Vice President
Philip Stoecker, Secretary
Jocelyn Neal, Treasurer
Inessa Bazayev
Anna Gawboy
Julian Hook
Jennifer Iverson
Nancy Yunhwa Rao
Leigh VanHandel

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

TIMOTHY JACKSON,            §
                           §
                           §
        Plaintiff,         §
                           § Civil Action No.
VS.                        §
                           §  4:21-cv-00033-ALM
LAURA WRIGHT, et al.,      §
                           §
        Defendants.        §
                           §

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY JACKSON, Ph.D.

SEPTEMBER 24, 2024

*********************************************

        The Oral and Videotaped Deposition of

TIMOTHY JACKSON, Ph.D., produced as a witness at the

instance of the defendants, and duly sworn, was taken in

the above-styled and numbered cause on SEPTEMBER 24,

2024, from 9:07 a.m. to 6:22 p.m., before Nicole A.

Hatler, CSR No. 11275 in and for the State of Texas,

reported by machine shorthand, at the University of

North Texas System, 801 North Texas Blvd, Gateway Suite

308, Denton, TX 76201.


---oOo---

14

1  school.  It's, sort of, like a vast -- it's very similar
2  to Harvard.
3      Q.  Okay.
4      A.  So I spent three years there getting a
5  bachelor's degree in composition.
6      Q.  So you got your bachelor's degree in three
7  years?
8      A.  Yes.
9      Q.  And then -- now, it seems that at Juilliard you
10  were more focused on piano performance --
11      A.  Right.
12      Q.  -- and in college, you were more focused on
13  composition by then.
14      A.  Right.
15      Q.  Why the shift?
16      A.  I always wanted to be a composer, but unlike
17  Mozart, who was already a composer at the age of 6, I
18  was just a pianist as a kid, all right.  And I wanted to
19  learn how to compose.
20          So I had composed a little bit on the side,
21  and I remember that, in order to apply to McGill, I had
22  to provide a portfolio of compositions.  And I did, and
23  I got in.  And it was a very, very challenging program,
24  I can tell you.  The first day I was in classes, the
25  professor sat with six students who were accepted down

15

1  at a table just like this one -- and this was my very
2  first day at university -- and he said, "At the end of
3  the first year, there will be one of you sitting at this
4  table."
5          So everybody looked at everybody else like
6  they were on a sinking ship, but I was the only
7  survivor.
8      Q.  And after three years, when you graduated with
9  your bachelor's, did you go into another graduate study
10  program or did you obtain employment somewhere?
11      A.  No.  I -- I -- it's very hard to get a
12  degree -- I mean to get a job just with a bachelor's
13  degree, especially in this field.  So no, I -- I thought
14  about what I wanted to do, and I -- I decided to go to
15  Toronto -- University of Toronto for a year to begin a
16  master's degree.
17          And I started studying Schenkerian analysis
18  in Toronto with a very, very amazing teacher by the name
19  of Edward Laufer.  And unfortunately, Laufer didn't have
20  his doctorate, so he wasn't allowed to teach graduate
21  courses.  So I studied surreptitiously with him.  And
22  that's when I decided, with his help, to apply to go to
23  Queens College in New York City.
24          And that's when I -- I went, basically.
25  That's when I immigrated from Canada, sort of, de facto.

16

1      Q.  Sure.
2      A.  So I went to the Queens College for two years
3  to get a master's degree.
4      Q.  So you did get a master's degree from Queens?
5      A.  Yes.
6      Q.  And what was that master's degree in?
7      A.  It was in music theory, but I began in
8  composition.  I actually originally applied in
9  composition, but while I was at Queens, I studied with a
10  very famous -- another Schenkerian who was there by the
11  name of Carl Schachter, and I realized that my real
12  interest was in music theory and Schenkerian theory, in
13  particular, so I switched.
14      Q.  What was it about Schenkerian theory that
15  attracted you?
16      A.  Well, I believe that Schenker was the Einstein
17  of music theory and that his approach makes it possible
18  to understand music in a certain way that allows us to
19  really understand what the composers were thinking when
20  they wrote the music.  So what is the underlying
21  compositional idea?  What is the underlying
22  philosophical idea behind the music?  That was
23  fascinating to me, so I decided that that was going to
24  be my life's vocation.
25      Q.  And, sort of, for a laymen who is a

17

1  nonmusician, certainly a nontheorist, how would you
2  describe Schenkerian analysis in just a couple of
3  sentences?
4      A.  Well, it's impossible to really describe it.  I
5  mean, it's like saying how would you describe
6  Einsteinian physics in a couple of sentences, right.
7  You're not going to learn it while standing on one foot,
8  I can tell you that.  And there's an enormous learning
9  curve.  It's not something that you can pick up in one
10  semester.
11          So it really is a very intricate and
12  technical understanding of music that requires, really,
13  years of study with the very best teachers.  And so,
14  some of my teachers said to me that it takes about six
15  years of intense study to get to the point where you're
16  an independent scholar in this field, and I found that
17  to be, basically, true.  So it took me about six years
18  of intense study before I really could feel that I knew
19  something about Schenkerian analysis.  And I'm still
20  learning, actually.
21      Q.  So -- so is it fair to say that, in your
22  understanding, Schenkerian analysis is -- is really not
23  something that -- that the average person could
24  understand until they studied it for a long time?
25      A.  Right.

18

1    Q. Okay.
2    A. That's true.  It's like quantum mechanics.  You
3  know, you can't just walk off the street and understand
4  it.
5    Q. So after you graduated with your master's at
6  Queens, did you pursue any other education or did you
7  pursue employment?
8    A. No.  I was still not ready for the job market.
9  So I continued into the graduate center at CUNY, which
10  is their doctoral program in music theory.  And also
11  after spending two -- doing two years of course work
12  there, I decided that I wanted to write my dissertation
13  on the composer Richard Strauss, who was a famous German
14  composer, and also that I wanted to study in Europe
15  because I felt that the American system -- or American
16  education system, as wonderful as it was, didn't offer a
17  full perspective on German music, and that was my main
18  interest.
19        So I decided to go to Bavaria in Germany,
20  and I got a scholarship from the -- it's called the
21  German Academic Exchange Fellowship Program.  And the
22  scholarship allowed me to go to Munich.  I lived in the
23  Olympic village, that -- they took the little houses
24  that were made for the athletes and converted them into
25  student housing.  So I lived there for a year.

19

1        And at the same time, I -- I took a
2  course -- or courses at the Bavarian Academy of Arts and
3  Sciences, and I also pursued my research for my
4  dissertation in Garmisch-Partenkirchen, in Richard
5  Strauss' personal house.  I -- I had made arrangements
6  to study there.  And so, I actually had the great
7  privilege of working at his desk and going through his
8  private papers for my dissertation.
9    Q. And just for the record, is it fair to say that
10  Richard Strauss was a German composer from the romantic
11  era?
12    A. Well, he -- he died in 1948, but some people
13  talk about the long 19th century.  He was, basically,
14  a -- some people saw him as a relic of the 19th century,
15  but I thought he was very interesting and worthy of
16  study.  So that's why I wrote my dissertation on his
17  last work.
18    Q. So would you classify Richard Strauss as
19  romantic or post romantic?
20    A. Post romantic would be good.  That's a good
21  point, yeah.
22    Q. Okay.  Okay.  And it's your understanding he
23  was a German composer?
24    A. Oh, yes.
25    Q. All right.  How long did you study in Munich?

20

1    A. So I spent a year there and then I went back to
2  New York to finish my doctorate and wrap up everything.
3  I've oversimplified a little bit because I commuted
4  sometimes between New York and Germany.
5    Q. Sure.
6    A. But I finished my doctoral degree at CUNY, and
7  while I was in Germany doing my doctoral research, I was
8  already thinking that I'd like to -- to go back to
9  Europe, but this time I wanted to go to Austria.  And
10  so, what I did was I had spied out manuscripts for Anton
11  Bruckner, another well-known 19-century composer, and I
12  had come up with a research project based on Bruckner.
13  And so, I applied for another year, but this time from
14  the Austrian government, to spend a year looking at
15  Bruckner manuscripts.
16        So I was very lucky to win that, and I
17  spent a year in Vienna.  And that was a very wonderful
18  year, because by that time, my German was getting
19  better, really pretty good.  And that was good because
20  Austria speaks a slightly different German than --
21  than -- than Germany does.  They have a -- it's almost
22  like Texas, but even more so.
23        So if people from Germany, especially
24  northern Germany, hear Austrians speaking, the
25  difference is even bigger than people, let's say, from

21

1  Boston coming down here and hearing a Texas accent.
2  It's quite different, and my ears became attuned to
3  Austrian dialect and to Viennese dialect, which is quite
4  different.  And so, that was good -- so I could navigate
5  my way through Austria.
6        And it was a very, very wonderful
7  experience for me, I have to say.  I -- I didn't just
8  look at Bruckner there.  I did a lot of things.  And I
9  traveled also.  I went to the communist part of Europe
10  because Europe was still communist at that time.  And I
11  went to Poland and looked at manuscripts there and so
12  forth.
13        And then I went back to Canada and I taught
14  for a year at the University of Toronto.  My mentor,
15  Edward Laufer, helped me win another grant, which was a
16  teaching and research grant.  So I taught part-time at
17  the university and I worked on my project -- on my
18  Bruckner project.
19    Q. And when --
20    A. And then in 1998 -- no.  Sorry earlier than
21  that.  1994 or '3.  I can't remember now exact time, but
22  I got my first job, finally.
23    Q. Okay.  What year was it that you earned your
24  doctorate degree?
25    A. 1988.

167

1  got to listen -- just because you're a student, you got
2  to do what we say.  That -- that wasn't the atmosphere.
3      Q.  Do you recall any instances where a student
4  editor wanted to publish -- wanted to accept for
5  publication a submission where you or Professor Slottow
6  disagreed?
7      A.  No.  Except for that one case which I
8  mentioned, the David Beech situation.
9      Q.  I see.
10          And was that an example of where a student
11  editor was going to reject it, but you asked them to --
12      A.  Right.
13      Q.  -- to wait?
14          Okay.  Let me flip the -- the previous
15  question and ask it the other way.  Are you aware of any
16  instances other than that where a student editor was
17  inclined to reject a submission for publication but you
18  or Dr. Slottow disagreed with that?
19      A.  No.
20      Q.  Okay.  For submissions that were going to be
21  published as peer reviewed submissions in the JSS, who
22  decided how many reviewers to put on an article and who
23  those reviewers were going to be?
24      A.  Usually that was the student editors who were
25  doing that, and they were receiving the comments, not me

168

1  or Slottow.  I think that in a few cases where there
2  were -- we weren't sure, that we looked at the comments,
3  all of us.  But usually it was pretty clear cut.
4      Q.  The student editors, would they send -- would
5  they send submissions to other members of the editorial
6  board for peer review?
7      A.  Uh-huh.  If it was appropriate.
8      Q.  I see.
9      A.  In other words, if it was in their sphere of
10  interest.
11      Q.  Sure.
12      A.  That was the preferred thing.
13      Q.  Are you aware of -- of when articles would be
14  peer reviewed by reviewers that were not on the
15  editorial board of the JSS?
16      A.  There were has a few cases, I think, where that
17  happened because we didn't have anybody on the board who
18  was a specialist in that particular field.  So I'm
19  pretty sure that in one or two cases, people were asked
20  to review things who weren't on the board officially.
21      Q.  Sure.  How did the student editors know,
22  basically, how to do their job?
23      Were there -- were there some sort of
24  written procedures for them to follow?
25      A.  Not really.  We -- we supervised them.  So

169

1  let's say you were asking about how did they know where
2  to send their things out for review.  So when we had our
3  meetings, we would brainstorm, this article is probably
4  good for these readers.  And they, basically, learned
5  how to do it on the job.  They didn't have like a code
6  of conduct or a code of rule book.
7          We didn't have a rule book that said, you
8  know, now you must do this, now you must do that.  But
9  we -- that was our job.  Our job, like Slottow and me,
10  was to supervise and make sure that things went well in
11  terms of the protocols.
12      Q.  Who chose the editorial board members?
13      A.  Well, Slottow and I did it at the very outset,
14  when we -- when we set up the journal.  And then over
15  the years -- over the 20 years that we published the
16  journal, some people died and other people were added.
17      Q.  So when a -- when someone was appointed to --
18  accepted the invitation to serve on the editorial board
19  for the JSS, were there any term limits on that?
20      A.  No.
21      Q.  Was there ever any period of reevaluation?
22      A.  Not really.  The -- we thought, though, that it
23  was -- it was too big.  After a while it -- we decided
24  it that it was too big, and I think our intention was to
25  prune it down.  But we didn't really do that.

170

1      Q.  Who decided it was too big?
2      A.  Well, we kind of, selectively felt that way,
3  especially Slottow seemed to think it was too big.  I
4  really didn't mind one way or the other because I think
5  that the more people you have, the better because you
6  can have more specialties.
7      Q.  How many -- well, was there ever anyone who
8  asked or chose to leave or resign from the editorial
9  board?
10      A.  After the appearance of the Ewell symposium, if
11  we want to call it that, I received -- I think two or
12  three people wrote in saying they wanted to resign.
13      Q.  And about how many editors were on the board at
14  that time?
15      A.  Well, it wasn't editors.  These were on the
16  editorial board -- they were like the advisory board.
17  Yeah.
18      Q.  Excuse me.
19      A.  Yeah.
20      Q.  How many people were on the editorial board at
21  that time?
22      A.  So you mean me, Slottow, or -- Lavi Wells and
23  Benjamin Grand -- Benjamin Graf -- I mean.  I'm sorry --
24  Benjamin Graf.
25      Q.  And what was the --

195

1  thought about it, the more I thought that in the -- in
2  the speaking of -- in the spirit of dialectics, which I
3  consider essential for all serious scholarship, there
4  should be pros and cons.
5          So I thought that it wasn't be great if I
6  just contacted the cons, but that we would send out a
7  general call for contributions to the symposium, and
8  that would enable people who were in favor of Ewell's
9  talk and his points and his point of view, and that we
10 would publish both without censorship and let the public
11 decide.  Because I'm of the view more speech is better
12 is the way to get to the truth, not censoring people.
13     Q.  And how was it determined whether those
14 responses would or would not be peer reviewed?
15     A.  Well, we -- we weren't -- you see, we were
16 asking for people to respond in a sense of not writing
17 an article about it -- not writing a peer reviewed
18 article about it, but just expressing their opinions
19 about Ewell's thesis because it was really quite
20 controversial, and that was the spirit of the call.
21     Q.  I see.
22          Do you recall having any conversations with
23 Mr. Walls about whether these responses would be peer
24 reviewed?
25     A.  No.

196

1      Q.  Okay.  Do you recall Dr. Slottow ever
2  mentioning the idea of peer reviewing them?
3      A.  No.
4      Q.  Who -- when you refer to the call, are you
5  referring to the written call for submissions that was
6  sent out through the SMT list serve?
7      A.  Yes.
8      Q.  Who drafted that call?
9      A.  Not me.  It was drafted I think by other
10 people.  Probably by Ben Graf and Levy Walls, and
11 maybe -- we had input in it.  We -- we they began with
12 the draft, and then Dr. Slottow and I gave our two cents
13 worth.  I don't believe they took all of our
14 suggestions, but they basically sent it out having
15 absorbed some thoughts from us and from other faculty,
16 actually.
17     I -- I wanted to -- because I knew this
18 would be controversial, although I never had any inkling
19 of how controversy it would be, I wanted to consult all
20 the faculty in the music theory area who had any
21 experience with Schenkerian analysis.  And so I asked
22 Diego Cubero and Olga, who calls herself Ellen,
23 Velikanova for their input.  And also we asked some
24 other people in the faculty for their input into the
25 call and how to frame it so that it would be as neutral

197

1  but also -- yeah, as neutral and properly focused as
2  possible.  So that it would attract pros and cons.
3      Q.  Do you recall any specific edits or suggestions
4  that you suggested that call that were not incorporated?
5      A.  I think there was a few, but you know what?  I
6  wasn't going to quibble about it.
7      Q.  Do you recall what they were?
8      A.  No.
9      Q.  Okay.
10     A.  We just -- I just -- I remember saying to
11 myself, well, maybe this isn't quite what we should do,
12 but let's let it go.  Let -- let -- let the chips fall
13 where they may.
14     Q.  Had you discussed the idea of publishing
15 responses to Ewell's address with any Schenkerian
16 scholars before that call went out?
17     A.  Yes.
18     Q.  Who had you discussed it with?
19     A.  Oh, a whole bunch of people.  A whole group of
20 scholars.
21     Q.  And was that through one-on-one contact with
22 them --
23     A.  Yes.
24     Q.  -- or was it through a group communication?
25     A.  No, it was through one-on-one.

198

1      Q.  And did --
2      A.  And, you see, what happened was that -- that
3  was the initial plan, was to, in fact, ask the
4  Schenkerian scholars what they thought.  And then I --
5  in the course of doing that, I recognized that that was
6  unfair.  I thought that was unfair.  So that's when I
7  felt that we should really branch out and -- and issue
8  the call through the SMT for all sundry to respond.
9      Q.  Before the SMT went out, had you discussed
10 this idea of responses with anyone who was sympathetic?
11     A.  I don't know who was sympathetic exactly,
12 really.  I didn't have any idea, and I still don't
13 because not all the Schenkerians that I contacted wanted
14 to submit responses.  So some of them may well be
15 sympathetic.
16     Q.  You just don't know?
17     A.  I can guess a few of them, but I'm not sure.
18 But they declined.
19     Q.  So you don't know what their response would
20 have been had they agreed to write one?
21     A.  I'm not a prophet.  No.
22     Q.  All right.
23     A.  But once we decided to go with the call, I felt
24 very comfortable about the whole thing because I thought
25 it was fair.  In other words, I thought that once we had

259

1 conversations to base that on?

2    A. No.

3    Q. Okay.

4    A. Because the dean never consulted me before

5 issuing that statement.

6    Q. And just for the record, do you have any

7 specific document to support that belief?

8      MR. ALLEN: Objection.

9      THE WITNESS: No, I don't. I don't think

10 so. I have the dean's statement, which I received along

11 with all the other people in the school of music.

12    Q. BY MR. WALTON: Similar question for -- I'll

13 just say for the dean statement, but the decision by the

14 university, whoever made the decision to institute this

15 ad hoc review panel, did anyone ever tell you that that

16 was done in response to the student statement or the

17 faculty statement?

18    A. I don't think it was explicitly indicated in

19 the document, although I can't remember that for sure.

20 In other words, nobody came and said, okay, because of

21 these publicized statements, we are going to create the

22 ad hoc committee to do this investigation.

23      But what happened was that the students and

24 faculty called for such a committee, and the

25 administration succeeded to that demand and did call the

260

1 committee into effect. So could I say that there's a

2 kind of logic there between the call for the

3 investigation and the issuing of the promise to -- to

4 have an investigation and then the actual investigation?

5 It would seem like there is a connection, you know.

6    Q. And I'm just asking, in addition to what you've

7 just described, are there any specific conversations or

8 documents that you believe exist that make that

9 connection explicit?

10      MR. ALLEN: Objection.

11      THE WITNESS: I don't know of those because

12 the Dean never contacted me --

13    Q. BY MR. WALTON: Okay.

14    A. -- to ask me about anything.

15    Q. When you got the -- when you saw the report

16 from the panel --

17    A. Yes.

18    Q. -- did you have any conversations with anyone

19 about whether or how to implement the recommendations in

20 that report?

21    A. Yes.

22    Q. What were those conversations?

23    A. Well, I -- I actually talked with various

24 people about the -- the recommendations for the journal

25 going forward on, because it wasn't clear that -- at

261

1 this point, if I'm not mistaken, it wasn't clear that

2 they were actually going to shut the journal down. That

3 was made clear later by Dr. Brand.

4    Q. And how did Dr. Brand communicate that?

5    A. He communicated it in writing as well as

6 verbally. So in one of our legal documents here we

7 actually quoted Dr. Brand's statement saying that I was

8 no longer going to be connected to the journal in any

9 way, shape, or form because of my editorial malpractice,

10 if you will, and that that was a decision that had been,

11 obviously, taken by the administration.

12    Q. You took Dr. Brand's e-mail to mean that that

13 was already a hard and fast decision?

14    A. Yes, it was expressed in that manner.

15    Q. And did you have any --

16    A. That I was removed from the journal.

17    Q. And did you ever hear any or see any statement

18 from Dr. Brand that -- that a decision had been made not

19 simply to remove you, but to shut the whole journal

20 down?

21    A. No. I did not receive such a statement. It

22 seemed like they wanted to hire a new editor, which was

23 what they tried to do.

24    Q. Okay. After you got that e-mail from Dr. Brand

25 about your ongoing involvement in the journal that you

262

1 just described, did you attempt to have any further

2 conversation with him about that?

3    A. No.

4    Q. Why not?

5    A. It seemed like -- I mean, it didn't just seem

6 like it. A decision was taken. What -- what would I

7 have gone to see him about?

8      MR. WALTON: Let's go ahead and go off the

9 record and take a break.

10      MR. ALLEN: Okay.

11      THE VIDEOGRAPHER: We're off the record at

12 5:17 p.m.

13    (A recess was held from 5:17 p.m. to 5:33 p.m.)

14      THE VIDEOGRAPHER: We're back on the record

15 at 5:33 p.m.

16    Q. BY MR. WALTON: Dr. Jackson, we're back after a

17 break. Are you ready to proceed?

18    A. Ready.

19    Q. If you look at Exhibit 3, the ad hoc review

20 panel report, and you flip back to Exhibit 3 -- to the

21 Exhibit 3.

22    A. Wait a second. I'm confused.

23    Q. Page 189.

24    A. Oh, here. Yes, yes.

25    Q. And this is the -- this is a version of a

295

1    I, TIMOTHY JACKSON, Ph.D., have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6    _____
     TIMOTHY JACKSON, Ph.D.
7
8    THE STATE OF _____)
9    COUNTY OF _____)
10        Before me _____ on this day
11    personally appeared TIMOTHY JACKSON, Ph.D., known to me
12    (or proved to me under the oath or through
13    _____) (description of identity card or
14    other document) to be the person whose name is
15    subscribed to the foregoing instrument and acknowledged
16    to me that they executed the same for the purposes and
17    consideration therein expressed.
18        Given under my hand and seal of office this
19    _____ day of _____, 2024.
20
21
22    _____
     NOTARY PUBLIC IN AND FOR
23
24    THE STATE OF _____
25

296

1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF TEXAS
3           SHERMAN DIVISION
     TIMOTHY JACKSON,    §
4                         §
        Plaintiff,       §
5        VS.              §   Civil Action No.
                         §
6                        §  4:21-cv-00033-ALM
     LAURA WRIGHT, et al.,   §
7                         §
        Defendants.      §
8                        §
9
10        REPORTER'S CERTIFICATION
11        ORAL AND VIDEOTAPED
12    DEPOSITION OF TIMOTHY JACKSON, Ph.D.
13        SEPTEMBER 24, 2024
14
15    I, Nicole A. Hatler, Certified Shorthand
16    Reporter No. 11275 in and for the State of Texas, hereby
17    certify to the following:
18        That the witness, TIMOTHY JACKSON, Ph.D., was
19    duly sworn by the officer and that the transcript of the
20    oral deposition is a true record of the testimony given
21    by the witness;
22        That the original deposition transcript was
23    delivered to October 17, 2024;
24        That the copy of this certificate was served
25    on all parties and/or the witness shown herein on

297

1    November 16, 2024;
2        I further certify that pursuant to FRCP Rule
3    30(f)(1) that the signature of the deponent:
4        __X__ was requested by the deponent or a part
5    before the completion of the deposition and that the
6    signature is to be before any notary public and returned
7    within 30 days from the date of receipt of the
8    transcript. If returned, the attached Changes and
9    Signature Page contains any changes and the reasons
10    therefore:
11        _____ was not requested by the deponent or a
12    part before the completion of the deposition.
13        I further certify I am neither counsel for,
14    related to, nor employed by any of the parties or
15    attorneys in the action in which this proceeding was
16    taken, and further that I am not financially or
17    otherwise interested in the outcome of the action.
18        Certified to by me this 17th day of OCTOBER,
19    2024.
20
21
22    _____
23    Nicole A. Hatler, Texas CSR 11275
     Expiration Date: 11/30/24
     Integrity Legal Support Solutions
24    9901 Brodie Ln., #160-400
     Austin, TX 78748
25    (512) 320-8609
     www.integritylegal.support

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON,           )
                           )
            Plaintiff,     )
                           )
VS.                        ) CIVIL ACTION
                           )
LAURA WRIGHT, ET AL.       ) NO.: 4:21-cv-00033-ALM
                           )
            Defendants.    )
                           )
                           )

---------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN SLOTTOW, PhD

NOVEMBER 7, 2024

---------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF STEPHEN

SLOTTOW, PhD, produced as a witness at the instance

of the DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on November 7, 2024,

from 8:31 a.m. to 4:41 p.m., via Zoom teleconference

before Vanessa J. Theisen, CSR in and for the State

of Texas, and RPR, reported by machine shorthand, at

the University of North Texas System, 801 North Texas

Boulevard, Gateway Suite #340, Denton, Texas 76201,

pursuant to the Federal Rules of Civil Procedure and

any provisions stated on the record or attached

hereto.

26

1  opportunity given for a response.
2        Usually at a plenary address there's
3  some room for questions and responses afterwards.
4  But this plenary address, since he was one of, I
5  think, three or four people who was talking on
6  different topics, there were no question-and-answer
7  periods.
8        And then, very unusually, there was
9  no -- there were no articles.  There was no response
10  in the journals.  There was nothing.  There was no
11  opportunity to give any response.  So the Journal of
12  Schenkerian Studies decided that we would post a
13  response and solicit articles from music theorists,
14  including us, Dr. Jackson and myself, whoever wanted
15  to respond.
16        This led to -- we were -- since Ewell
17  was accusing Heinrich Schenker of being a racist and
18  that his racism was affecting his music theory,
19  therefore, he was promulgating a racist music theory,
20  and it was certainly the kiss of death to be in any
21  way associated with racism, the school was terribly,
22  terribly embarrassed and then afraid of bad publicity
23  and reacted to that.  That's what I mean.
24    Q.  Who at the school was -- reacted, as you
25  say?

27

1    A.  Well, I know that Dr. Brand did and the dean
2  did.  And beyond that, I don't know for certain.
3    Q.  How do you know that Dr. Brand and the dean
4  did?
5    A.  Because it was -- as I said, it was
6  Dr. Brand, with consultation from the dean, who told
7  us that we would no longer be handling the journal
8  and the center.
9    Q.  He told you that?
10    A.  Well, he told Tim -- he told Dr. Jackson
11  that, I think.  I don't think he told me directly,
12  and I got it from Dr. Jackson, certainly.
13    Q.  Okay.  So you said Dr. Brand and the dean at
14  the time.  Was the dean John Richmond by chance?
15    A.  I don't -- I'm not sure if the dean -- if it
16  was Richmond or Scott.  I -- for some reason I think
17  it was Richmond, but I'm not entirely sure.  I think
18  it was John Richmond.
19    Q.  Do you think they had reason to be
20  embarrassed?
21    A.  Well, administrators are always terribly
22  concerned with the reputation of their programs and
23  the schools, and they're very sensitive to bad
24  publicity, so they probably did.  We were certainly
25  getting plenty of bad publicity.

28

1    Q.  Do you think the college's reputation was
2  damaged by the journal?
3    A.  I don't know.  If music theory -- the
4  division of music history and ethnomusicology, they
5  were certainly on the receiving end of a lot of
6  disapproval, so they certainly thought they were.
7  Perhaps their reputation was damaged by those who
8  were outraged that we would criticize Philip Ewell's
9  opinions.
10    Q.  Who are you talking about when you say, "by
11  those who were outraged that you would criticize
12  Philip Ewell's opinions"?
13    A.  Music theorists, musicologists, people
14  like -- people like -- people who would -- wrote
15  blogs on music.
16        If you look on YouTube, there is an
17  awful lot of support for Ewell's views, and, mixed
18  with that, would be attacks on Dr. Jackson, to some
19  extent me, and sort of by reflection, on the music
20  theory department of UNT -- not department -- area,
21  yes.  It was a big kerfuffle, yes.
22    Q.  And so was this coming from outside of UNT,
23  inside of UNT?
24    A.  Well, it was certainly coming from outside
25  of UNT, but it was coming from inside UNT also,

29

1  because a petition was put together by the majority
2  of UNT -- well, of faculty of the division of music
3  history, music theory, and ethnomusicology
4  attacking -- and also a separate petition by GAMuT,
5  which is a graduate student organization of the
6  division, attacking the -- criticizing the journal
7  and criticizing Dr. Jackson, in particular, of
8  essentially being a racist.  And I think the student
9  petition demanded his ouster from the university.
10        And a lot of the music theory facul --
11  the music theory and history -- well, the faculty of
12  the division signed this -- not everyone did.  And
13  all of those people are now defendants in
14  Dr. Jackson's suit.  Well, all of the faculty and one
15  student who's no longer a student at UNT.  She's at
16  Yale.
17    Q.  Uh-huh.
18    A.  What was the question?
19    Q.  I'm sorry, I don't recall either.
20        MS. QUIMBY:  Court reporter, could you
21  please read it back?
22        THE REPORTER:  Yes, give me just a
23  second.
24        MS. QUIMBY:  Yes, thank you.
25        THE REPORTER:  "And so was this coming

34

1  silence for a long time -- after Ewell's SMT address
2  and the article based on it that appeared in Music
3  Theory Online, and I think the actual address he gave
4  verbatim also appeared in, I think, Music Theory
5  Spectrum.  I'm not sure which one appeared in which.
6      Q.  Did that -- did the verbatim publishing of
7  his speech and the publishing of his paper occur
8  before or after Volume 12 was published?
9      A.  I think it occurred after.  We had a
10  recording of the speech, and we transcribed the
11  recording and were responding to that.
12          Somewhere along the line an article
13  based and expanding his SMT talk appeared in either
14  Journal -- either Music Theory Spectrum or Music
15  Theory Online.  I don't think that was out -- I don't
16  think that was published yet when this came out, but
17  I might be wrong.  Yeah.
18      Q.  When you published Volume 12, were you aware
19  that those were forthcoming?
20      A.  I was aware that there was an article
21  expanding the talk that was forthcoming, yes.
22      Q.  Did you consider waiting until that was
23  published to publish the responses to his talk?
24      A.  We might have, but I don't think we
25  considered it very much.  We felt that some sort of a

35

1  response to the talk, which was -- I mean, it's the
2  main -- it's the annual meeting of the major
3  professional society for music theory with a huge
4  attendance and huge publicity.  It had been followed
5  by this very strange vacuum of no response.  I think
6  we felt that it was more important to have some
7  response out there.  At least that's my recollection.
8      Q.  Okay.  Back to the student who has been sued
9  in this lawsuit, Rachel Gain.  Do you know her?
10      A.  Not well.  She was a student in a class of
11  mine.  Well, I didn't know her personally outside of
12  that.
13      Q.  Okay.  If you will bear with me a moment, I
14  have an exhibit I want to show you.  It is part of
15  the Journal of Schenkerian Studies, which you have
16  there in front of you.
17          MR. ALLEN:  Is it part of Volume 12?
18          MS. QUIMBY:  Yes, I'm sorry.
19          MR. ALLEN:  Uh-huh.
20          MS. QUIMBY:  Okay.  I'm marking this as
21  Exhibit 1, and I'll share that with you momentarily,
22  Mike, in the chat.
23          MR. ALLEN:  I'm not trying to hasten the
24  process.
25          THE REPORTER:  I think we already have

36

1  an Exhibit 1, so let's mark that as Exhibit 2.
2          MS. QUIMBY:  I'm sorry, this will be
3  Exhibit 2.
4          MR. ALLEN:  Exhibit 2, right?  Exhibit 1
5  is the full --
6          MS. QUIMBY:  You can hang onto that.
7          MR. ALLEN:  -- print copy of the Volume
8  12.
9          THE WITNESS:  You might want to change
10  the number.
11          MS. QUIMBY:  Actually, the Exhibit 1, is
12  that the full volume?
13          MR. ALLEN:  Which he referred to in the
14  course of the deposition, yes.
15          (Exhibit 2 marked.)
16      Q.  (BY MS. QUIMBY)  Dr. Slottow, I'll have you
17  just take a look at that while I'm putting this in
18  the Zoom chat.
19      A.  Okay.
20          MS. QUIMBY:  Mike, do you see that there
21  in the chat?
22          MR. ALLEN:  I just did get it, yep.
23          MS. QUIMBY:  Would you prefer that I
24  also share -- I don't know -- now I'm getting
25  feedback.

37

1          MR. ALLEN:  We just got an echo.  Did
2  you hear that?
3          MS. QUIMBY:  Yeah, for some reason my
4  laptop audio turned on.
5          MR. ALLEN:  So this will be Exhibit 2,
6  sorry, for the record?
7          MS. QUIMBY:  Yes.  Are you okay to just
8  view it -- download it and pull it up that way?
9          MR. ALLEN:  Yes, that's perfectly fine.
10  I can see it here, yeah.
11          MS. QUIMBY:  Okay.
12      Q.  (BY MS. QUIMBY)  Okay, Dr. Slottow.  Have
13  you had a chance to look at this?
14      A.  Yeah.
15      Q.  What is it?
16      A.  Well, it's the list of -- the first page is
17  a list of the editorial board, the editor, assistant
18  editor, advisory board.  The second is information
19  about the journal with phone numbers and addresses
20  and fax numbers.  Then there is the table of
21  contents.  That's it.
22      Q.  Okay.  And to your understanding, this is
23  from Volume 12, correct?
24      A.  Yes.
25      Q.  Okay.  So you're listed there both on the

Stephen Slottow, Ph.D. - 11/7/2024

---

**38**

1  editorial board and as the -- part of the advisory
2  board, correct?
3      A.  I seem to be, yes.
4      Q.  Can you explain to me the -- your role on
5  the editorial board first?
6      A.  Well, the editorial board was just a whole
7  group of mainly prominent Schenkerian scholars,
8  who -- they didn't do much.  They weren't consulted
9  much.  But they were there to -- they could provide
10  some responses to the direction and actions of the
11  journal.  They were partly there for prestige.  I'm
12  not sure why I'm on there, actually.
13          That's some of the people there, such as
14  L. Poundie Burstein, Allen Cadwallader, David Beach,
15  Charles Burkhart, Carl Schachter were very prominent
16  -- were and are very prominent scholars.  The
17  advisory board are people who were actually in charge
18  of the journal.
19      Q.  Okay.  I'm going to ask you more about that
20  in a moment.  But you said the editorial board, they
21  weren't consulted on much.  Were they consulted at
22  all?
23      A.  Well, they certainly weighed in after Volume
24  12 came out.  In fact, a number of them resigned.
25      Q.  Do you recall who resigned?

---

**39**

1      A.  L. Poundie Burstein resigned --
2      Q.  Uh-huh.
3      A.  -- for sure.  Frank Samarotto resigned.
4  Diego Cubero probably resigned.  Ellen Bakulina, I
5  think, resigned.  Mark Anson-Cartwright may have done
6  so, yes.
7      Q.  What were they -- so they weren't -- so you
8  said they were consulted after Volume 12 was
9  published, correct?
10      A.  Well, they weren't --
11      Q.  Or they weighed in, I think you said.
12      A.  They weighed in.
13          THE REPORTER:  Okay.  Hang on.  I can't
14  get your answer and -- okay.
15          THE WITNESS:  What?
16          MS. QUIMBY:  We were talking over each
17  other, so the court reporter is just reminding us to
18  not do that.  That's my fault.  Thank you.
19      A.  They weighed in.
20      Q.  (BY MS. QUIMBY)  Okay.
21      A.  Now, I don't know whether Dr. Jackson
22  consulted with them about the idea of soliciting
23  articles in response to Ewell's address or not.  I
24  can't recall.
25      Q.  Did you consult with them?

---

**40**

1      A.  No, no.  Even though I was officially listed
2  as codirector, something like that.  I think -- I
3  think in reality Dr. Jackson was the motive force and
4  the main director of the center.  I mean, it was his
5  project from the start.
6      Q.  Uh-huh.
7      A.  So I viewed myself as sort of -- my role was
8  secondary to his.
9      Q.  And I think you described earlier that the
10  center or at least the journal was created about the
11  time that you started?
12      A.  Yeah, because Volume 1 -- I was involved in
13  Volume 1, so I think they had the idea of the
14  journal, and part of my role was to help make it
15  real.
16      Q.  Uh-huh.  Did Dr. Jackson create both the
17  center and the journal?
18      A.  Well, he certainly created the center.  I
19  mean, because it was already there --
20      Q.  Uh-huh.
21      A.  -- when I came in.  The journal was an idea
22  that was to be one of the activities of the center.
23  But it -- it had not been actualized.
24      Q.  Okay.  How and when did it become
25  actualized, if you recall?

---

**41**

1      A.  Well, it would have been shortly after I
2  joined.  So that would probably be around 2002, 2003.
3  I don't know what date the first volume came out.  I
4  have it at home, but I didn't think to bring it.
5          Actually, I should be able to tell you.
6  That's interesting.  Volume 1 actually came out in
7  fall 2005.  So it was later than I thought.
8      Q.  Back to this Exhibit 2 here.  Can you
9  describe your role as an advisory board member?
10      A.  It's hard to remember specifics after some
11  years.  I was -- I was involved in decisions of the
12  center.  For instance, the decision to -- I was
13  certainly involved in soliciting articles and reviews
14  for the journal.  I was certainly involved in the
15  idea of putting together a Ewell, Philip Ewell,
16  special edition.
17          I was involved in policy.  Since I had
18  entered UNT, part of my job was to do with the
19  center, specifically with the journal.  I was
20  probably more involved in things that -- issues
21  having to do with the journal than, say, putting on
22  concerts or making CDs.  Dr. Jackson tended to be
23  much more involved in those than I was.
24      Q.  The concerts and the CDs?
25      A.  Yeah.

---

74

```
1    Q. -- responses?
2    A. No, no.
3    Q. Did you read them at the time?
4    A. No, I looked -- you know, I would -- some of
5    them I read completely. Some of them I just sort of
6    browsed through. Some of them were very short. Some
7    are much longer.
8    Q. Was it expected or were you expected to read
9    all of them before the volume was published?
10    A. It was expected that I look at them. I'm
11    not sure it was expected that I read every word.
12    Q. Did you read any of them in their entirety?
13    A. Yes, I did.
14    Q. Did you provide feedback on any of them?
15    A. No, I wasn't asked to. Well, yes, I did,
16    actually. I -- well, both Benjamin Graf and I
17    provided a lot of feedback on Dr. Jackson's, which is
18    viewed as somewhat problematical.
19    Q. What is viewed as somewhat problematical,
20    the...
21    A. Well, I think what we found problematical is
22    there were a lot of derogatory -- as I recall, there
23    were a lot of derogatory references to
24    ethnomusicologists and ethnomusicology. And
25    we worked hard at getting --
```

75

```
1    THE REPORTER: I'm sorry, to what?
2    "There was a lot of derogatory references to"?
3    THE WITNESS: Ethnomusicology.
4    THE REPORTER: Ethno?
5    THE WITNESS: It's one word,
6    ethnomusicology.
7    THE REPORTER: Thank you.
8    A. So we certainly worked a lot on that one.
9    Of course, I worked a lot on my own article. I think
10    those were the only ones that I had some critiques
11    of.
12    Q. What is ethnomusicology?
13    A. Ethnomusicology began as sort of the
14    academic formal study of nonwestern music. So these
15    none -- like -- or nonwestern classical musics. So
16    music of Africa, music of Indonesia or, within North
17    America, you might say pop music or American Indian
18    music or -- especially when it started, musicology,
19    music theory were mainly sort of western classical
20    music. So musics outside that and especially musics
21    from outside of European culture, you might say,
22    were -- had this -- fell under the catch-all
23    ethnomusicology.
24    In practice, it was sort of a
25    combination and remains so of formal music study,
```

76

```
1    like musicology plus anthropology. So there are
2    anthropologically-oriented ethnomusicologists and --
3    well, most of them are, and some which are more music
4    theory, musicology oriented. But the subject matter
5    tends to be different from music theory and
6    musicology, per se.
7    But all this is getting blurred because
8    you find music theorists doing nonwestern music or
9    nonwestern classical music. So all these boundaries
10    are -- have shifted quite a lot.
11    Q. Okay. So what was written in Dr. Jackson's
12    article about ethnomusicology that you're describing
13    that you recall?
14    A. I can't really recall. It's just that there
15    were a lot of -- there seemed to be a lot of
16    derogatory references to it. And my recollection is
17    that Benjamin and I were afraid that these would be
18    taken as, well, criticisms of ethnomusicology and
19    ethnomusicologists, and they weren't necessary, and
20    we didn't want them in there.
21    I'm not sure how accurate my
22    recollection is, but that is what it is.
23    Q. Were you requesting or recommending changes
24    to the substance of the article?
25    A. Yeah, we wanted those to be tempered down or
```

77

```
1    removed. I think in the end they were removed for
2    the most part.
3    Q. Would you describe that as censorship?
4    A. No. Because we were -- when you send an
5    article out for review and changes and suggestions,
6    that's not censorship. That's the function of the
7    reviewer.
8    When -- so we were doing essentially the
9    same function. We had no -- we had no power to make
10    those changes, just to make our case to Dr. Jackson.
11    We thought it was a -- they were a bad idea, you
12    know, those -- those things.
13    Q. I think you just described the peer review
14    process of sending things out, correct?
15    A. Yes, but the -- if we're asked to read over
16    an article -- I think Dr. Jackson asked us to read
17    over his article and give responses -- then we would
18    give responses.
19    Q. In the peer review process, were substantive
20    changes recommended?
21    A. Oh, I don't know, because --
22    MR. ALLEN: Objection.
23    A. -- I was -- the editor was the one who
24    primarily read the peer reviews.
25    Q. (BY MS. QUIMBY) Uh-huh.
```

78

1    A. We were only called in when the editor felt
2  it was necessary, which was -- didn't happen, or it
3  didn't happen very much. So I don't know.
4    Q. In your experience of engaging in the peer
5  review process of your own articles, were you -- did
6  you engage in substantive changes in that process
7  ever?
8    A. Well, I was asked to at times. Often the
9  author can argue against changes --
10    Q. Uh-huh.
11    A. -- that the peer reviewer or some of these
12  peer reviewers want to make.
13        In my case, I have done that, because
14  especially if you're doing an analytical article, the
15  peer reviewer may have a different interpretation of
16  the piece than you have. And if you incorporate too
17  many of their changes, your entire argument, your
18  entire interpretation might be gone; you've simply
19  substituted it with theirs.
20    Q. Uh-huh.
21    A. It's not your article anymore. So I have
22  argued successfully for the most part on a number of
23  occasions.
24    Q. Is peer review a form of censorship?
25    A. No, no. It's -- in fact, it's viewed as a

79

1  prestigious thing. An article that appears in a
2  peer-reviewed journal has more -- a higher reputation
3  than an article that does not because in the article,
4  if it's not, the idea is that just any old thing can
5  get published in the journal. It's not subject to
6  inspection from someone who is a specialist.
7    Q. So I want to -- can you describe how the
8  articles that were published in the symposium were
9  chosen? I understand you may not have read them all.
10    A. No, I really can't because I wasn't involved
11  in that.
12    Q. Did you -- were you involved in soliciting
13  responses?
14    A. No.
15    Q. Who -- did anyone solicit responses?
16    A. The editor, I think, solicited responses. I
17  think Dr. Jackson also solicited responses.
18    Q. When we're talking about the editor, are we
19  talking about Ben Graf or Levi Walls or both?
20    A. I would say Ben Graf. I mean, Levi might
21  have written the letter, but I would suspect that,
22  being a -- Levi, being sort of an apprenticeship
23  learn-on-the-job role, that anything of that sort
24  would have come more from Ben.
25        But I know that Dr. Jackson did suggest

80

1  to certain people that they submit responses or if I
2  don't know, I assume and strongly suspect so.
3    Q. And you said Ben Graf also may have provided
4  feedback on Dr. Jackson's article?
5    A. He did.
6    Q. Okay.
7    A. We both did.
8    Q. And I'm sorry if you may have answered this,
9  but do you recall any other feedback you provided
10  besides the feedback about ethnomusicology or
11  musicologists?
12    A. I don't recall that there was more. I mean,
13  it took some work to get those done, because
14  Dr. Jackson was resistant to making those changes, so
15  we had to apply a certain amount of persuasion.
16        As in my own case, suggesting changes
17  doesn't equate to the author making those changes.
18    Q. In the peer review process I think you
19  described as -- is it required that suggested changes
20  be adopted?
21    A. That depends on the journal and the
22  editorial policy. If you're lucky, the editor -- the
23  editor of the journal will permit you to make a plea
24  of conscience and say, "If I make these changes, it's
25  no longer my article; it's their article," and let

81

1  you -- let you publish with that disagreement.
2        But some journals I think will say, "You
3  have to implement these changes or we won't publish
4  your article," and then you -- that's that.
5    Q. Was it a policy of the JSS to require
6  changes suggested in the peer review process to be
7  adopted?
8    A. I don't know because that was the editor's
9  job, and the editor handled it seemingly very well,
10  and we -- he seldom felt it was necessary to consult
11  us.
12    Q. So was it -- was there a written policy
13  addressing that one way or the other?
14    A. Oh, I'm sure there was, and that would be up
15  to the discretion of the editor.
16        The editor had considerable power in the
17  journal. It wasn't just a matter of doing the work;
18  it was also making a lot of the decisions. If the
19  editor saw fit to consult Dr. Jackson and I or if we
20  felt we really needed to consult with the editor,
21  that would happen. But it would not automatically
22  happen.
23    Q. Is that true for -- that the editor had a
24  lot of power, is that true for the symposium of
25  Volume 12?

82

```
1      A.  Yeah, I would say so.  I think it's
2   generally the case that the editor is the one who
3   makes most of the decisions.
4      Q.  Do you recall telling the ad hoc panel that
5   you and Dr. Jackson kind of took over on the
6   symposium part of the Volume 12?
7      A.  Took over?  What do you mean "took over"?
8      Q.  I believe those are words that you used.
9      A.  I wonder what I meant by that.
10         MR. ALLEN:  Objection.
11     A.  I don't think we took over at all.
12     Q.  (BY MS. QUIMBY)  Do you recall telling the
13  ad hoc panel that?
14     A.  I don't --
15         MR. ALLEN:  Objection.
16     A.  I don't recall.  I mean, we do have notes
17  from the ad hoc panel, which I've looked over, but
18  not thoroughly.  I don't know if it's -- I don't
19  think something like that is mentioned, but I'm not
20  sure.
21     Q.  Was there anything about -- strike that.
22         Was there ever a time before publishing
23  or before Volume 12 was published that the editorship
24  of the journal or the structure of it was discussed
25  or discussed that it needed to be changed?
```

84

```
1      A.  No.
2      Q.  Okay.
3      A.  I've met him because Ellen -- well, Ellen
4   Bakulina, who was on our faculty for some years, just
5   left to go to McGill, was a friend of his.  I don't
6   think I've ever talked to him.  So I guess the answer
7   is no.
8      Q.  Were you involved in the creation of the
9   call for papers for the symposium issue?
10     A.  No.  Well, no, no.  The editor and the
11  assistant editor came up with that.  I wasn't -- I
12  saw it, but I wasn't involved in it.
13     Q.  For the sym -- go ahead.
14     A.  I guess I could have been involved in it if
15  I had an objection to it.
16     Q.  Do you recall having an objection to it?
17     A.  No, no.  I mean, I recall that I did not
18  have an objection to it.
19     Q.  Do you recall how many responses or -- were
20  received?
21     A.  I don't know because they would come in to
22  the editor.  They wouldn't come in to either
23  Dr. Jackson or to me.
24     Q.  Were all of the responses that you received
25  published?
```

83

```
1      A.  No.
2          MR. ALLEN:  Objection.
3      A.  I mean, we were in a period of transition as
4   it was.
5      Q.  (BY MS. QUIMBY)  What do you mean by that?
6      A.  Well, as I said, Ben Graf was the editor,
7   but Levi was being groomed, so to speak, as the next
8   editor; therefore, we have "assistant editor" on the
9   masthead.
10         THE REPORTER:  I'm sorry, "an assistant
11  editor on the"?
12         THE WITNESS:  The masthead.
13         THE REPORTER:  Masthead, thank you.
14     Q.  (BY MS. QUIMBY)  Before Volume 12, though,
15  was it ever discussed that the structure -- the
16  editorial structure be changed?
17     A.  No.  That was the model from the beginning.
18  It seemed to work very well.  Ben Graf was, as Colin
19  Davis had been before him, superb at his job.  We had
20  nothing to complain about.  There didn't seem to be
21  any reason -- he was not complaining.  Didn't seem to
22  be any reason to change that.  And it was part of the
23  conception of the journal from the outset.
24     Q.  Switching gears a little bit, do you know
25  Philip Ewell personally?
```

85

```
1      A.  I don't know.  That would be a good question
2   to ask Levi Walls or Ben Graf.
3      Q.  Do you recall the -- that there was a
4   deadline in the call for papers?
5      A.  There was a deadline, and it was a close
6   deadline, as I recall.  A little too close for
7   comfort.  I know that some people complained about
8   it.  We weren't giving them enough time.
9      Q.  What was too close for comfort about that?
10     A.  I don't re -- I think it was three weeks or
11  something like that.  It was just -- that's very
12  short.  I think it's mainly because we were looking
13  at a publication deadline from UNT Press.  But, yeah,
14  there was definitely a deadline.  There has to be a
15  deadline.  It's unworkable if there's not.
16     Q.  You said that it was about three weeks that
17  you recall?
18     A.  I think so, but I'm not sure.
19     Q.  How long --
20     A.  That's just an impression.
21     Q.  How long would a normal deadline be?
22     A.  Well, normally -- normally, a journal is not
23  going to have a deadline.  I mean -- well, I don't
24  know.
25         Usually, with journals, people send in
```

90

1  and he was asking about editorial policies and
2  etcetera.
3      Q.  Were you truthful in your interview?
4      A.  Yeah, as -- to my knowledge, yeah.
5      Q.  Do you recall describing the symposium as a
6  visceral reaction to the Ewell -- Dr. Ewell's talk?
7      A.  Visceral reaction?  Well, the notes that
8  were taken -- I see that there were notes taken on
9  the interview.  They were certainly not written by
10 me.
11     Q.  Uh-huh.
12     A.  And they were certainly not language that I
13 would usually use.  I don't think I would say
14 "visceral reaction" because they weren't.
15     Q.  How would you describe it, then?
16     A.  Well, it's a reaction to Ewell's allegations
17 involving Heinrich Schenker and Schenkerian analysis.
18 Visceral implies a sort of like a scream of pain from
19 the guts.  Hopefully they weren't that; they were
20 more considered.  And, besides, not all of them were
21 critical of Dr. Ewell either.  So I would not
22 describe it as a visceral reaction.
23         I didn't -- I don't think I would use
24 those words, but who knows?  It's possible.
25     Q.  Do you recall expressing -- and maybe not in

91

1  these words, but that more caution should have been
2  exercised in publishing --
3      A.  Yes, I did --
4      Q.  -- this symposium?
5      A.  -- because I did not anticipate the
6  reaction.  It took me by surprise.  I thought that a
7  lot of what Dr. Ewell was saying was outrageous and
8  hypocritical because he said, "I hope we can save
9  Schenkerian analysis."
10         Save Schenkerian analysis from what?
11 Well, from Dr. Ewell's attacks.  That's from what.
12 It didn't need to be saved before.
13         So to take this sort of sanctimonious --
14 "I'm only here to save Schenkerian analysis from its
15 enemies of whom I am the main person," I thought it
16 was a little hard to swallow and of their -- and so I
17 think hypocritical is the word I would use for some
18 of what he said.
19         What was the question?
20     Q.  I don't -- I asked if you recall expressing
21 that more caution should have been --
22     A.  Oh, yes.
23     Q.  -- exercised?
24     A.  Yes.  I was -- I went off on a tangent.
25         I did not anticipate the reaction that

92

1  Dr. Ewell would be looked upon as a victim and we
2  would be looked upon as oppressors and racists
3  because I thought a lot of what Ewell was saying was
4  outrageous and ill-founded.  So I was taken aback by
5  the -- and had I anticipated such a reaction, I would
6  have counseled a great deal more caution in what the
7  journal did.
8      Q.  Would you have read all of the responses
9  before they were published?
10     A.  Probably, but what I probably would have
11 done differently was that I -- in retrospect, I would
12 have counseled that we ask Dr. Ewell to participate
13 as a respondent, and I probably would have counseled
14 that in this case everything be peer-reviewed.  But I
15 did not anticipate that -- that response.
16     Q.  You just mentioned Dr. Ewell, you would have
17 invited him.  So was he invited into the process at
18 all?
19     A.  No.  Well, he was invited only to the extent
20 that he could have submitted --
21     Q.  Uh-huh.
22     A.  -- an article of his own, and -- like anyone
23 else.  He was certainly aware of the call for papers,
24 but he wasn't invited as a respondent to the papers.
25     Q.  A respondent to the responses.  Is that --

93

1      A.  Yeah.
2      Q.  Why would he have responded to his own
3  paper?
4      A.  Well, it does seem sort of illogical when
5  you put it that way.  But that's the extent, that he
6  was not invited in any special role at all.
7          In retrospect, after the response to the
8  journal, he probably -- I would feel -- I don't know
9  how if Dr. Jackson would, but I would feel that that
10 would have been the better approach and more cautious
11 approach.
12     Q.  So we talked about that Benjamin Graf, you
13 think he resigned as the editor.  What about Levi
14 Walls?  Did he resign, or do you know what happened
15 to that role?
16     A.  Levi was attacked -- Levi was attacked, as
17 was Dr. Jackson, and to some extent, me, as being the
18 assistant editor and the one who signed, I think, the
19 call for papers.  And then I think the -- there was
20 something here that was sort of a little introduction
21 to the symposium that he might have signed saying
22 something about, "We welcome," you know, "all
23 opinions."
24         Oh, yes.  This introduction to the
25 symposium, he wrote that, though he didn't sign it.

94

```
 1   He came in for a lot of criticism.  As a graduate
 2   student, he was afraid that he would be -- his career
 3   would be adversely affected or ruined entirely, and
 4   he -- well, he did a number of things.  He went
 5   online and kind of said he was bullied into doing
 6   certain things, I think, by Dr. Jackson, or made to
 7   do certain things or felt he had no choice, and he
 8   resigned as editor in chief in an attempt to
 9   forestall further negative reaction which could hurt
10   his career.
11       Q.  Do you think he was justified in being
12   afraid for his career?
13       A.  Oh, yeah, sure.  Definitely.  And look what
14   happened to Dr. Jackson.  All of that as a result of
15   this issue and of his article in this issue.
16           I was attacked, certainly have been
17   attacked in Ewell's recent book.  And since -- in the
18   United States especially, not so much in Europe or
19   Britain, anyone accused of racism in the academic
20   circles is sort of assumed guilty.  And -- yeah, he
21   had reason to be afraid, certainly.
22       Q.  So he resigned, as I understand and you have
23   testified, and Dr. Graf resigned.  So effectively
24   there's no editor?
25       A.  Well, at that point, I don't know if there
```

95

```
 1   was any journal or any center anymore.  I'm not sure
 2   exactly what happened first.  But at a certain point
 3   there was nothing left to be editor of.
 4       Q.  Why do you say that?
 5       A.  Because the journal was taken away from us
 6   by the college.  They tried, naively, to find someone
 7   who would take the journal on, maybe someone from
 8   another school.  Of course -- well, I wasn't on the
 9   search committee, but, evidently no one would touch
10   it with a 10-foot pole.  It was radioactive at that
11   point.
12       Q.  What do you mean that it was taken away from
13   you?
14       A.  The journal was part of the center.  The
15   center was part of the -- and the school said that we
16   were -- we could no longer publish the journal and
17   that the center is in abeyance.
18       Q.  And I think you testified earlier that your
19   knowledge of this is through Dr. Jackson, correct?
20       A.  Well, it was widely known.  I mean, things
21   get out fast, but I don't recall what any of the
22   administration -- I don't think any of the
23   administration told me directly, because Dr. Jackson
24   was certainly viewed as sort of the main person
25   responsible for the center.  It was -- it had always
```

96

```
 1   been sort of his project, fundamentally.
 2       Q.  So if there's no editor -- let's just say,
 3   for example, the journal still exists.
 4           MR. ALLEN:  Objection.
 5       Q.  (BY MS. QUIMBY)  Could it be -- could it
 6   publish anything without editors?
 7       A.  No.
 8       Q.  Okay.
 9       A.  I mean, not with any degree of repute.  No
10   one would take it seriously.
11       Q.  Do you think Volume 12 or the symposium
12   damaged UNT's reputation?
13       A.  I don't know, but there's a good chance of
14   it.  I mean, certainly UNT was reacting to the
15   possibility that it would.
16       Q.  Are you -- so Levi Walls' resignation, are
17   you -- did he do that on his own accord, do you know?
18       A.  I'm sure he did it on his own accord.  He
19   was trying to remove himself from a toxic situation
20   as much as he could.
21           Levi was viewing himself very much as a
22   victim, I think, in particular.  And he was trying to -- and he was being
23   particular.  And he was trying to -- and he was being
24   attacked and criticized by the -- certainly by the
25   online music theory community, and he was scared,
```

97

```
 1   with reason.
 2       Q.  Do you think he was wrong in being a victim
 3   or feeling like a victim?
 4       A.  No, he was -- well, of Dr. Jackson?  I don't
 5   think he was a victim of Dr. Jackson.
 6           Levi was -- Levi was not -- my
 7   perception was that Levi was not very assertive.
 8   Levi was slow to argue back.  If he really felt
 9   something was wrong, he might say something, but he
10   wouldn't stick to his guns.  He felt very much
11   that -- in a subservient position, far more than any
12   of the previous editors had done.  I mean, I don't
13   think that any of our previous editors felt
14   especially they had to take -- be subservient or feel
15   they had to do something which is against their
16   conscience.
17           I don't think that Ben Graf felt that
18   way, but I think I read somewhere that he said he
19   did.  Maybe in a deposition; I don't know.  But that
20   wasn't my perception.
21           But Levi did.  He was not very -- he
22   felt he was -- his role was a subservient one.
23       Q.  So you described the committee that was put
24   together to find a new editor, correct, or you
25   mentioned that?
```

98

1    A. I alluded to it, yeah. I wasn't part of it.
2    Q. Uh-huh. Is there anything preventing you
3  from applying to be the editor?
4    A. The editor of what? There's nothing left.
5    Q. Well, isn't the committee searching for an
6  editor?
7    A. Oh, that's -- that disbanded probably years
8  ago.
9    Q. Before it disbanded.
10    A. Well, you don't apply to be. You're
11 appointed to it, probably by the dean. You can't
12 apply to be on it. You can, but it's not going to do
13 anything.
14        You don't volunteer to -- it was a
15 search committee. You don't volunteer for search
16 committees, or there's no reason to.
17    Q. I meant apply for the position of editor.
18    A. That would be a rather absurd thing to do
19 because I had already been so involved in it, they
20 would want a clean sweep.
21    Q. Is it -- did they tell you that? Did they
22 say you can't?
23    A. No, but it's obvious.
24    Q. How is it --
25    A. It would be like Dr. Jackson applying to be

99

1  the editor of the journal or Ben Graf. I mean, the
2  idea was to preserve the journal, but to disassociate
3  it with anyone it had be associated with and maybe
4  even hand it off to a different school. It didn't go
5  anywhere.
6        In any case, we weren't approached
7  certainly. I mean, I guess there's nothing to
8  prevent us from -- I mean, there was a public search.
9  You know, "We're looking for someone to take over the
10 editors of the journal," and I suppose Dr. Jackson or
11 I or Ben could have written in, but it wouldn't have
12 gotten to first base. I mean, you generally don't
13 apply for things where you feel you have no choice of
14 acceptance because that wasn't the reason it was
15 being advertised.
16        Evidently -- I mean, nothing came of it,
17 and I don't know -- I wouldn't be surprised if no one
18 applied, but I wouldn't know, because I wasn't on the
19 search committee.
20    Q. I think you described it as radioactive, the
21 journal. What do you mean by that?
22    A. The journal was now associated with racism
23 and with acting unfairly to poor Dr. Ewell and
24 deficient editorial practices, and it was just like
25 this sort of radioactive turd.

100

1    Q. Why do you think it was associated with
2  racism?
3    A. Well, you looked at this exhibit, didn't
4  you?
5    Q. I'm asking you.
6        MR. ALLEN: Can you state for the record
7  which exhibit you're referring to, please?
8        THE WITNESS: It says 3.
9        MR. ALLEN: Thank you. And is that the
10 faculty petition?
11        THE WITNESS: Yes.
12    A. "The forthcoming issue is replete with
13 racial stereotyping and tropes and include personal
14 attacks directed at Dr. Ewell." Yeah.
15        MS. QUIMBY: Can you read back my
16 question, please?
17        THE REPORTER: The witness's mic is
18 getting very, very quiet. Was it getting quiet for
19 anyone else?
20        MR. ALLEN: I'm good. I was having
21 trouble hearing Mary, but I think it was the way she
22 turned her head when she turned to you.
23        THE REPORTER: Okay. Here's the
24 question: "Why do you think it was associated with
25 racism?"

101

1    A. So, in addition to this, I mean, Ewell's
2  contention was that Schenker was a racist, that his
3  racism had infected his views (phonetic) of theory,
4  which I deny, by the way, and that -- then that
5  the Journal of Schenkerian Studies, by criticizing
6  Ewell, was racist in doing so.
7        So each side is accusing the other of
8  being racist for different reasons. In a sense, the
9  Journal of Schenkerian Studies is being accused of
10 being racist for criticizing Philip Ewell's
11 accusations that Schenker was racist. So a lot of
12 racism.
13    Q. (BY MS. QUIMBY) Was the criticism of
14 racism, did that come from other than just the
15 faculty petition and the student petition as you've
16 described them?
17    A. Yeah, yeah.
18    Q. Where else did it come from?
19    A. Online chatter, and there was an SMT talk
20 list where there was a lot -- or SMT discussion list.
21 SMT being the Society for Music Theory.
22        THE REPORTER: Okay. I need to pause.
23 He's very, very quiet on my end.
24        MR. ALLEN: They both are. I don't know
25 what happened in that transition.

134

1  article about black anti-Semitism --
2      Q. Uh-huh.
3      A. -- would certainly be construed as racist by
4  some key people.  I would not because I think it's a
5  phenomena that exists.
6      Q. Uh-huh.  Did anyone actually take issue with
7  its factual basis?
8      A. Not to my -- well, not to my knowledge, no.
9      Q. I believe Timothy Jackson also argued that
10  black children are, on average, not exposed to the
11  tradition of western classical music --
12      A. I think --
13      Q. -- in comparison to other groups of people
14  in the United States?
15      A. Yeah, I think he did say that.
16      Q. And do you recall that being -- him being
17  accused of being racist because he wrote that?
18      A. I don't recall any specific instance, but
19  it's a case where he well might be.
20      Q. Has anyone, to your knowledge in the
21  Schenker kerfuffle that you have identified, ever
22  published any factual refutation of that assertion?
23      A. No, I don't think that anyone has.
24      Q. Do you know if it's in fact true?
25      A. I don't know if it's true.  I would assume

135

1  that Dr. Jackson has his own reasons for --
2      Q. Okay.
3      A. -- saying it, but I wouldn't care to defend
4  that as a true or false assertion.
5      Q. Okay.  That's fine.  But you don't know of
6  anyone in the controversy that actually tried to
7  refute with facts Timothy Jackson's argument that
8  this is actually a cultural phenomenon in the United
9  States?
10      A. I don't know of anyone who has done that.
11  But also, I made a conscious decision to stop
12  involving myself at a certain point --
13      Q. I understand.
14      A. -- in reading the back-and-forth on it.  So
15  to my knowledge, no.
16      Q. Thank you.  You talked quite a bit in your
17  testimony about Mr. Levi Walls and Benjamin Graf, the
18  two editors of the Journal for Schenkerian Studies
19  back in 2020, and I want to ask you if you worked at
20  all with Levi Walls in the lead-up to the publication
21  of the Volume 12 of the Journal of Schenkerian
22  Studies?
23      A. No.  Benjamin Graf, yes.  I mean, I've known
24  him for a long time as a student and colleague.
25      Q. Uh-huh.

136

1      A. Levi Walls I did not know that well.  He was
2  a student in my Schenker class.
3      Q. Uh-huh.
4      A. And then I had some contact with him when
5  this issue was being put together, mainly emails.  He
6  would email Ben Graf and Tim Jackson and me --
7      Q. Sure.
8      A. -- and we would go back and forth, but that
9  was about it.
10      Q. Okay.  And do you remember him ever
11  expressing a view before the publication came out on
12  the quality of Philip Ewell's scholarship?
13      MS. QUIMBY:  Objection.  Form.
14      A. No, no.
15      Q. (BY MR. ALLEN)  Okay.  That's fine.
16      Now, you -- I think you characterized
17  Levi Walls -- and I'm not trying to put words in your
18  mouth, but something of a weak person?
19      A. Well, it's -- yeah, don't put words in my
20  mouth.
21      I wouldn't say -- he was -- he was not
22  as assertive or as self-confident as the previous
23  editors had been.  And he was more inclined to feel
24  that he had to do what -- most specifically, what
25  Dr. Jackson told him to do, that that was his role.

137

1      I don't think that Ben Graf or Colin
2  or -- who was the first editor?  The name escapes
3  me -- really felt that way.  They would argue back if
4  they really felt --
5      Q. Uh-huh.
6      A. -- something was the wrong thing to do and
7  they had a better idea.
8      Levi would only argue to a certain
9  extent, and then he would say, well -- and then he
10  would stop.  So he was more prone to viewing himself
11  as a -- sort of a functionary under authority --
12      Q. Uh-huh.
13      A. -- than the previous editors were.  And then
14  he wasn't a full-fledged editor too.  I mean, he was
15  sort of an editor-in-training.  So he was also under
16  the authority of Benjamin Graf to some extent too.
17      Q. Sure.  And in your view --
18      A. It was --
19      Q. Sorry.
20      A. It was an apprenticeship.
21      Q. Okay.  And in your view, was there a power
22  differential between Benjamin Graf and Levi Walls?
23      A. Well, there was, because Benjamin was the
24  very experienced editor, and Levi was just coming in
25  and learning the job.  I don't think it was a

138

1  problematic power issue -- power imbalance.
2      Q.  Okay.
3      A.  The power imbalance he felt between him and
4  Timothy Jackson was a much more powerful and
5  problematic one.
6      Q.  Well, why was it problematic?
7      A.  Because he felt -- I think he felt he was
8  under Dr. Jackson's control, as I said, in a way the
9  other editors did not and that --
10     Q.  Uh-huh.
11     A.  -- he had sort of had to do what Dr. Jackson
12  said even if he disapproved of it.  He would -- he
13  would kowtow in a certain way.
14     Q.  And yet that didn't prevent him from
15  condemning Professor Jackson in July of 2020, did it?
16     A.  Well, that was -- that was after the
17  publication of the journal, right?
18     Q.  Yes.
19     A.  No, he -- you might say he turned on
20  Dr. Jackson then because he felt that Dr. Jackson was
21  instrumental in possibly destroying his career.
22     Q.  Do you think he feared Dr. Jackson or the
23  larger community of society of music theory
24  professors who were agitating against the journal at
25  that time?

139

1      A.  Well, he certainly feared the larger
2  community to the extent the larger community was
3  pointing to him as the editor and saying, "This is
4  your fault" --
5      Q.  Uh-huh.
6      A.  -- but he blamed Dr. Jackson to a large
7  extent for that situation.
8      Q.  And you said -- I forget how you put it, but
9  he felt dominated or something like that by Timothy
10  Jackson?
11     A.  Yes.
12     Q.  What specific observations did you -- you
13  know, what specific events or emails or utterances by
14  Levi Walls gave you that impression?  And I'm talking
15  about before the journal came out.
16     A.  Well, it was in -- before it was published,
17  you mean?
18     Q.  Yes, correct.  Before his grand, you know,
19  renunciation of his position and condemnation of
20  Timothy Jackson and claiming that he had been stuck
21  in a car by some gangster-like professor and all this
22  stuff.
23         MS. QUIMBY:  Objection.  Form.
24     A.  Yeah, I don't -- he never talked to me about
25  that last point.  I do know he did send an email out

140

1  to Dr. Jackson and me and Ben arguing before
2  publication that we should invite Philip Ewell in as
3  a respondent and that -- and that -- well, I argued
4  against it because I told him what I told you, which
5  is that in my experience, the traditional way to
6  handle these things is that the criticized scholar
7  would write a letter to the editor, and it would be
8  dealt with in that way.
9      Q.  Uh-huh.
10     A.  It turns out that there evidently was also a
11  practice of doing just what Levi suggested, but I
12  somehow didn't know about it.  I hadn't had
13  experience with that.
14         So I argued against that, and then
15  Dr. Jackson agreed with me.  And then Levi -- in
16  retrospect, as I said, I think that would have been a
17  good idea.  But Levi then just let the matter drop.
18  He -- you know, "If Dr. Jackson and Dr. Slottow say
19  no, then I've done what I could.  I'm not going to
20  press the issue.  I'm not going to continue to argue
21  for it."  He just let it drop.  So he brought it up,
22  but he let it go fairly easily.  That's one instance
23  I can remember.
24     Q.  Was he ever ordered by Timothy Jackson to
25  censor anyone?

141

1      A.  Not to my knowledge, no.  It would seem very
2  uncharacteristic.
3         What do you mean "censor anyone"?
4      Q.  I don't know.  That's the word he used,
5  right, that he was directed, quote, "not to censor
6  someone that he wanted to censor," or something of
7  that nature.
8      A.  Are you saying that I said that?
9      Q.  I'm asking you.  I'm asking you if you ever
10  heard Timothy Jackson direct Levi Walls to censor
11  someone?
12     A.  No.
13     Q.  Had -- did you ever --
14     A.  I'm not even sure what that means.
15     Q.  Did you ever witness -- okay.  Sorry, go
16  ahead.
17     A.  Like -- no, I never heard anything of that
18  nature, and this context, I'm not even sure what that
19  would mean.
20     Q.  So you don't even know what Levi Walls is
21  talking about?
22     A.  Well, I don't know that he had used that
23  term, and I'm not sure -- unless -- without knowing
24  more --
25     Q.  Yeah.

166

1    CHANGES AND SIGNATURE
2  WITNESS NAME:  STEPHEN SLOTTOW, PhD
3  DATE OF DEPOSITION:  NOVEMBER 7, 2024
4  PAGE    LINE    CHANGE    REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

167

1        I, STEPHEN SLOTTOW, PhD, have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted above.
4
5        _____
          STEPHEN SLOTTOW, PhD
6
7  THE STATE OF _____ )
8  COUNTY OF _____ )
9        Before me, _____, on this day
10  personally appeared STEPHEN SLOTTOW, PhD, known to me
11  (or proved to me under oath or through
12  _____) (description of identity card or
13  other document) to be the person whose name is
14  subscribed to the foregoing instrument and
15  acknowledged to me that he executed the same for the
16  purposes and consideration therein expressed.
17
18        Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21        _____
          NOTARY PUBLIC IN AND FOR
22
23        THE STATE OF _____
24  My commission expires: _____
25  ____ No Changes Made ____ Amendment Sheet(s) Attached

168

1        THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2        SHERMAN DIVISION
3  TIMOTHY JACKSON,        )
                           )
4        Plaintiff,   )
                           )
5  VS.              ) CIVIL ACTION
                           )
6  LAURA WRIGHT, ET AL.    ) NO.: 4:21-cv-00033-ALM
                           )
7        Defendants.  )
8
        REPORTER'S CERTIFICATION OF THE ORAL
9      DEPOSITION OF STEPHEN SLOTTOW, PhD
            NOVEMBER 7, 2024
11        I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14        That the witness, STEPHEN SLOTTOW, PhD,
15  was duly sworn by the officer and that the transcript
16  of the oral deposition is a true record of the
17  testimony given by the witness;
18        That the original deposition was delivered
19  to Mr. Patrick Todd to obtain witness's signature.
20        That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  November 11, 2024.
23        I further certify that pursuant to FRCP
24  Rule 30(3) that the signature of the deponent:
25        _XX_ was requested by the deponent or a

169

1  party before the completion of the deposition and
2  that the signature is to be before any notary public
3  and returned within 30 days from date of receipt of
4  the transcript.
5        If returned, the attached Changes and
6  Signature Page contains any changes and the reasons
7  therefore:
8        ____ was not requested by the deponent or
9  a party before the completion of the deposition.
10        I further certify that I am neither
11  counsel for, related to, nor employed by any of the
12  parties or attorneys in the action in which this
13  proceeding was taken, and further that I am not
14  financially or otherwise interested in the outcome of
15  the action.
16        Certified to by me on this, the 11th day
17  of November, 2024.
18
19        _____
20        VANESSA J. THEISEN, Texas CSR, RPR
          Texas Cert No. 3238
          Expiration Date:  10/31/25
21        Integrity Legal Support Solutions
          Firm Registration No. 528
22        9901 Brodie Ln., Ste. 160-400
          Austin, Texas 78748
23        (512) 320-8690
          www.integritylegal.support
24
25

# *Journal of Schenkerian Studies*

***Editor***    Benjamin Graf
***Assistant Editor***    Levi Walls

### *Editorial Board*

Mark Anson-Cartwright
Benjamin Ayotte
Ellen Bakulina
David Beach
Charles Burkhart
L. Poundie Burstein
Allen Cadwallader
Diego Cubero
William Drabkin
David Gagné
Yosef Goldenberg
Graham Hunt
Timothy L. Jackson
Roger Kamien
Wayne Petty
William Renwick
Frank Samarotto
Carl Schachter
Hedi Siegel
Peter H. Smith
David Stern
Lauri Suurpää
Stephen Slottow

### *Advisory Board*

Timothy L. Jackson
Stephen Slottow



**Exhibit**
**Stephen Slottow, Ph.D.**

**2**

11/07/024 VT

exhibitsticker.com

**APPX.098**

### *About the Journal*

The *Journal of Schenkerian Studies* (ISSN 1558-268X) is a peer-reviewed journal published annually by the Center for Schenkerian Studies and the University of North Texas Press under the guidance of Timothy Jackson, Stephen Slottow, and an expert editorial board. The journal features articles on all facets of Schenkerian thought, including theory, analysis, pedagogy, and historical aspects and reviews of relevant publications.

For new orders and back issues, please contact:

Texas A&M University Press Consortium
John H. Lindsey Building
Lewis Street
4354 TAMU
College Station, Texas 77843-4354

Main Press Phone:
979-845-1436
Main Press Fax:
979-847-8752
Orders Toll Free (U.S. Only):
800-826-8911

### *Article Submissions and Editorial Correspondence*

Article submissions are accepted year round. For submission guidelines visit:
http://www.music.unt.edu/mhte/node/54

Please send article submissions and editorial correspondence to the editor at the following address:

*Journal of Schenkerian Studies*
Levi Walls, Editor
UNT College of Music
1155 Union Circle #311367
Denton, TX 76203-5017
Email correspondence: schenker@unt.edu

### *Copyright*

© 2019 Center for Schenkerian Studies. All rights reserved. No part of this publication may be copied, reproduced, transmitted, or stored in any way without the written consent of the Center for Schenkerian Studies and the University of North Texas Press. Photocopying content for personal use is permitted for libraries and other users registered with the Copyright Clearance Center (CCC), 222 Rosewood Drive, Danvers, MA 01923 (www.copyright.com).

# *Journal of Schenkerian Studies*

**VOLUME 12**                                             **2019**

## CONTENTS

JOHN KOSLOVSKY
Schenkerizing *Tristan*, Past and Present ...................................................................... 1

BRYAN J. PARKHURST
The Hegelian Schenker, The Un-Schenkerian Hegel, and How to Be a Dialectician about Music ...................................................................................................................... 55

NICHOLAS STOIA
The Tour-of-Keys Model and the Prolongational Structure in Sonata-Form Movements by Haydn and Mozart ..................................................................................................... 79

Symposium on Philip Ewell's SMT 2019 Plenary Paper, "Music Theory's White Racial Frame"............................................................................................................... 125–214

INTRODUCTION ............................................................................................. 125

DAVID BEACH
Schenker–Racism–Context .................................................................................. 127

RICHARD BEAUDOIN
After Ewell: Music Theory and "Monstrous Men" ............................................ 129

JACK BOSS
Response to P. Ewell .............................................................................................. 133

CHARLES BURKHART
Response to Philip Ewell ..................................................................................... 135

ALLEN CADWALLADER
A Response to Philip Ewell .................................................................................. 137

SUZANNAH CLARK
Patterns of Exclusion in Schenkerian Theory and Analysis ............................... 141

NICHOLAS COOK
Response to Philip Ewell .................................................................................... 153

TIMOTHY L. JACKSON
A Preliminary Response to Ewell ....................................................................... 157

STEPHEN LETT
De-Scripting Schenker, Scripting Music Theory ................................................ 167

RICH PELLEGRIN
Detail, Reduction, and Organicism: A Response to Philip Ewell ....................... 173

BOYD POMEROY
Schenker, Schenkerian Theory, Ideology, and Today's Music Theory
Curricula .......................................................................................................... 179

CHRISTOPHER SEGALL
Prolongational Analysis without Beams and Slurs: A View from Russian Music
Theory .............................................................................................................. 183

STEPHEN SLOTTOW
An Initial Response to Philip Ewell .................................................................... 189

BARRY WIENER
Philip Ewell's White Racial Frame .................................................................... 195

ANONYMOUS
An Anonymous Response to Philip Ewell .......................................................... 207

BIBLIOGRAPHY FOR THE RESPONSES ....................................................... 209

CONTRIBUTORS ................................................................................................ 215

---

*Levi Nigem Xenon Walls    5/18/21*    1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                       SHERMAN DIVISION

 3   TIMOTHY JACKSON,          )
                               )
 4            Plaintiff,       )
                               )
 5   v.                        )  CASE NO.
                               )  4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,      )
                               )
 7            Defendants.      )
                               )
 8

 9

10        -----------------------------------

11              ORAL DEPOSITION OF

12           LEVI NIGEM XENON WALLS

13                MAY 18, 2021

14        -----------------------------------

15

16

17        ORAL DEPOSITION OF LEVI NIGEM XENON WALLS, produced

18   as a witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 18, 2021, from 12:57 p.m. to 4:52 p.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.
```

---

*Levi Nigem Xenon Walls    5/18/21*    3

```
 1                        INDEX

 2                                              PAGE

 3   Appearances.........................................2

 4   Stipulations........................................4

 5   LEVI NIGEM XENON WALLS

 6        Examination by Mr. Allen.......................4

 7   Reporter's Certificate............................143

 8

 9                      EXHIBITS

10   NO.  DESCRIPTION                               PAGE

11   Exhibit  4    Subpoena to Testify for Levi Walls.... 6
     Exhibit  5    Text Messages between Levi and Chris...11
12   Exhibit  6    Text Messages between Nate, Brian,
                   Jessica, and E...................34
13   Exhibit  7    E-mail to Benjamin Brand, dated
                   7/26/2020.....................45
14   Exhibit  8    E-mail to Benjamin Brand, dated
                   January 9, 2020...................50
15   Exhibit  9    E-mail to Ellen Bakuline, dated
                   July 25, 2020....................62
16   Exhibit 10    Facebook Post by Levi Walls, July 27...70
     Exhibit 11    Letter to Dr. Jackson from Levi Walls..85
17   Exhibit 12    Letter to Dr. Jackson from Levi Walls..87
     Exhibit 13    E-mail to Stephen Slottow, 12/19/2019..89
18   Exhibit 14    E-mail to JSS Authors and Advisory
                   Board, March 14, 2020.............93
19   Exhibit 15    E-mail dated March 10, 2020, to
                   Schenker, me.....................99
20   Exhibit 16    E-mail to Levi Walls, March 13, 2020..101
     Exhibit 17    E-mail to Dr. Jackson, February 13....108
21   Exhibit 18    Call For Papers, December 17, 2019....110
     Exhibit 19    Members of the Editorial Board
22                 Correspondence re. Call for Papers,
                   November 25-December 1, 2019.......113
23   Exhibit 20    Response to Ewell, November 19, 2019..122
     Exhibit 21    Meeting, November 15, 2019..........126
24   Exhibit 22    E-mail to Dr. Jackson, November 18,
                   2019.......................130
25   Exhibit 23    E-mail to Tim, Stephen, and Benjamin,
                   April 22, 2019....................133
```

---

*Levi Nigem Xenon Walls    5/18/21*    2

```
 1             A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        MR. MICHAEL THAD ALLEN
          MS. SAMANTHA HARRIS
 5        ALLEN LAW, LLC
          P.O. Box 404
 6        Quaker Hill, Connecticut 06375
          860.772.4738
 7        860.469.2783 Fax
          m.allen@allen-lawfirm.com
 8

 9   FOR THE DEFENDANTS:

10        MR. MATT BOHUSLAV
          ASSISTANT ATTORNEY GENERAL
11        GENERAL LITIGATION DIVISION
          ATTORNEY GENERAL OF TEXAS
12        P.O. Box 12548, Capitol Station
          Austin, Texas 78711
13        matthew.bohuslav@oag.texas.gov

14   AND

15        MR. RENALDO STOWERS
          SENIOR ASSOCIATE GENERAL COUNSEL
16        UNIVERSITY OF NORTH TEXAS SYSTEM
          OFFICE OF GENERAL COUNSEL
17        1155 Union Circle
          Denton, Texas 76203
18        940.565.2717
          renaldo.stowers@untsystem.edu
19

20   ALSO PRESENT:

21        MR. TIMOTHY JACKSON

22

23

24

25
```

---

*Levi Nigem Xenon Walls    5/18/21*

4

```
 1              P R O C E E D I N G S

 2            LEVI NIGEM XENON WALLS,

 3   having been first duly sworn, testified as follows:

 4                    EXAMINATION

 5   BY MR. ALLEN:

 6        Q.   Mr. Walls, my name is Michael Allen, I'm an

 7   attorney for Timothy Jackson.  I just wanted to talk

 8   about some things preliminarily.  This will be a very

 9   formal conversation, but it's a conversation

10   nonetheless.  The deposition is an extension of the

11   Court, and the purpose of the deposition is to find out

12   what evidence you have and what you would say at trial.

13            So, a couple ground rules.  If I -- if I

14   say anything that's unclear to you, please feel free to

15   interrupt me and ask for clarification.  It's more than

16   possible that it's my unclarity, my incompetence at

17   forming a good question.  So, I wouldn't want you to

18   answer a question you didn't understand, is that clear?

19        A.   Yes.

20        Q.   So, as a corollary to that, if you don't ask

21   for a clarification, I'll assume you understand my

22   question; is that also clear?

23        A.   Yes.

24            MR. ALLEN:  Matt, in the last deposition

25   we agreed that all objections except those that go to
```

1  technique of analyzing music and scholars who try to
2  advance or think of the theory behind the technique, or
3  am I misunderstanding that?
4      A.   I don't think I'm making that distinction.  I
5  just think that there is a spectrum -- as with any
6  research interest, there's a spectrum of, you know,
7  where people are, in terms of their relationship to
8  Schenkerian analysis.
9          Some people are interested in it, but don't
10 rely on it very often or very much for their analyses,
11 whereas some people do Schenkerian analysis and only
12 Schenkerian analysis.
13     Q.   And of those people, the latter category, who
14 do primarily or only Schenkerian analysis, can you name
15 any in the United States that are not on the board of
16 the Journal of Schenkerian Studies?
17     A.   I don't think so.  Granted, I don't know every
18 music theorist in the country.
19     Q.   Of course.  Let me ask a follow-up question.
20 You know, how large of a community would you estimate
21 that community of scholars is, within general terms?
22 I'm not asking for an exact number, but can you estimate
23 for me about how many of th0se, I guess you might have
24 described them as hard core Schenkerians, if you will.
25     A.   Really, I have no idea in terms of a number.  I

1  think that the number has gotten smaller over the years,
2  whereas Schenkerian analysis was incredibly popular in
3  the '80s and '90s, including at institutions like CUNY
4  and Mann's.  I think that the number has dwindled over
5  the last few decades.  But in terms of a current number,
6  I really have no idea how to quantify it.
7      Q.   Well, let me put it this way.  Is it over 100?
8      A.   I think it's safe to say that it would be over
9  100.
10     Q.   And, I mean, in your rough estimation, how many
11 music theorists are there employed at academic
12 institutions throughout the United States?
13         MR. BOHUSLAV:  Objection, calls for
14 speculation.
15     A.   I honestly have no idea how many academics
16 there are in music employed in the United States.
17     Q.   (By Mr. Allen)  What's the primary academic
18 organization for or professional society for music
19 theorists in the United States?
20     A.   The Society for Music Theory.
21     Q.   Is there any other?
22     A.   I mean, there are obvious organizations that
23 would rank below that, in terms of importance.  Well, I
24 suppose I'm mainly thinking of conferences, because I
25 was about to say -- name a few conferences, like EuroMAC

1  or International Conference on Musical Forum, but those
2  aren't really a society in the way that SMT is a
3  society.
4      Q.   How large is the Society for Music Theory?
5      A.   I don't know how large it is, in terms of
6  number of members.  I recall at some point seeing the
7  statistics, probably at an SMT meeting, but I have -- I
8  could not even make a guess, in terms of how many
9  members there are.  Maybe two or 3,000, but that seems
10 like an overestimate.
11     Q.   And do you have knowledge -- do you know
12 whether Schenkerians are a minority of those members?
13 And by that I mean the hard core Schenkerians whom you
14 described earlier.
15     A.   Yeah.  I would say that they would be a
16 minority, if we're talking about hard core Schenkerians.
17     Q.   A small minority or a sizeable minority?
18         MR. BOHUSLAV:  Objection, vague.
19     A.   I would really go in between those two.  I
20 wouldn't say it's a small minority, but I think it would
21 be too far to say it was sizeable minority.
22     Q.   (By Mr. Allen)  I want to call your attention
23 to Exhibit 5, again.  There's a blue bubble underneath
24 that much larger bubble of yours.  It seems to be
25 Benjamin Graf speaking again.  And he says, "I agree,

1  and I am in a similar position.  I was editor when Tim
2  Jackson and Stephen Slottow were my dissertation
3  advisors.  Now, they are my colleagues and on promotions
4  committees, et cetera, that have a significant stake in
5  my employment.  Volume 12 was largely ready before the
6  SMT and I was passing the baton to Levi when these ideas
7  came up."
8          I'm curious about what he means, if you
9  know, where he says, "they are my colleagues and on
10 promotions committees, et cetera, that have a
11 significant stake in my employment."
12         What is he discussing there with you and
13 Chris Segall?
14         MR. BOHUSLAV:  Objection, calls for
15 speculation.
16     Q.   (By Mr. Allen)  You were a party to this
17 conversation, were you not?
18     A.   Yes.
19     Q.   So, how did you interpret what Benjamin Graf
20 was saying?
21     A.   I assume, since he is tenure track, I believe,
22 that he would rely on colleagues like Tim Jackson and
23 Stephen Slottow, rely on their good impressions in order
24 to advance his career.
25     Q.   Do you know of any instance in which Timothy

37

1  bubbles.

2     A.   Uh-huh.

3     Q.   I believe Benjamin Graf is saying, "it's

4  blowing up and honestly we never even wanted to do it,

5  but it's my dissertation advisor and higher ranking

6  colleague, plus we wanted to publish supporting essays."

7  Did I read that correctly?

8     A.   Yes.

9     Q.   And you recognize that as Benjamin Graf

10  speaking to you and Chris Segall, right?

11     A.   Yes.

12     Q.   What's he referring to, "we never even wanted

13  to do it, and we wanted to publish supporting essays?

14          MR. BOHUSLAV:  Objection, calls for

15  speculation.

16     A.   I believe he's talking about the -- not

17  plenary -- the -- sorry -- the responses to Ewell --

18  symposium, sorry, the word just flew out of my head.

19     Q.   (By Mr. Allen)  And just to be clear, that's

20  the symposium, which was the given in November of 2019,

21  published in Volume 12 of the Journal of Schenkerian

22  Studies?

23     A.   Yes.

24     Q.   Is it fair if we just refer to that by

25  shorthand as just "the symposium", for the rest of the

38

1  deposition?

2     A.   Sure.

3     Q.   Okay.  Thanks.  Again, you understood Benjamin

4  Graf to be saying we never even wanted to do the

5  symposium, correct?

6     A.   I believe so.

7     Q.   And "we wanted to publish supporting essays."

8  What does he mean -- how did you understand that to

9  mean, "we wanted to publish supporting essays"?

10     A.   I believe what he meant was that if the

11  symposium was going to go ahead, that our preference

12  would have been for there to be plenty of essays in

13  support of Ewell, rather than it just being Schenkerian

14  after Schenkerian.

15     Q.   Is it possible to be a Schenkerian and be pro

16  Ewell?

17     A.   Sure.  I think so.

18     Q.   And is it possible to be pro Ewell and be, you

19  know, pro Schenkerian analysis?

20     A.   I think that as Ewell has done, you can admit

21  that Schenkerian analysis has analytical uses, but also

22  that it has a history with a race that's very

23  questionable and deserves to be questioned.

24          And so, I don't think that there is this

25  necessity to be black and white, in which you're either

39

1  a Ewell supporter or you're a person who does

2  Schenkerian analysis.

3     Q.   Skipping to the next page here, if you could.

4  I'm on page 5, now.  You contribute to the conversation.

5  "I can see that -- referring to what was coming before

6  it -- "definitely not something I or Ben considered.  We

7  were about to finish the journal, which was supposed to

8  be published in November or early December, when the

9  advisory board got really gungho about a response to

10  Ewell.  And so, we made the deadline very short."

11          Can you describe what you're referring to

12  in that statement?

13     A.   So, I think Chris had expressed the relief that

14  the very short deadline at a busy time of the year,

15  around Christmas, was strategically done in order to

16  limit the number of responses.  So, in other words, in

17  order to limit the number of pro Ewell responses.  And I

18  said that I could see that reasoning, but it wasn't

19  something that Graf or I had considered.

20          The reasoning at the time had just been

21  that the journal was basically done at the end of the

22  year, and then the SMT in November happened.  And

23  suddenly, there was this new section of the journal that

24  we had to do, and so in order to salvage somewhat of a

25  deadline, since it was supposed to be a 2020 journal,

40

1  the call was just made very short.

2     Q.   Did other people at the journal discuss

3  manipulating the deadline to exclude pro Ewell points of

4  view?

5     A.   No.

6     Q.   And you also say, if you skip down one bubble

7  after Benjamin Graf's blue bubble there, it says,

8  "Volume 13 would have been preferable," correct?

9     A.   Yes.

10     Q.   Is that something you argued for at the time?

11     A.   I don't think I argued for putting the

12  symposium in Volume 13.  I think the view at the time

13  was that it was timely for it to go in Volume 12.

14     Q.   And what would make it timely?  Can you

15  describe the thought process of you, as an editor, of

16  are what you were fielding as questions by anyone on the

17  editorial board?  What was making it timely?

18     A.   Well, if there was going to be a symposium

19  based on Ewell's talk, it would make sense for it to

20  occur a month or two after Ewell's talk, rather than a

21  year and month after Ewell's talk.

22          On the other hand, putting it in Volume 13,

23  even though it would have been delayed, would have been

24  preferable from the standpoint that there would have

25  been more time to, you know, allow people to write

1   responses.

2      Q.  It was certainly a lot of work for you, right?

3      A.  Sure.

4      Q.  It would seem that you worked very hard on this

5   project, correct?

6      A.  Well, it was my job.

7      Q.  Were you -- did anyone comment about your hard

8   work on the project at the time, that it was deficient

9   in any way or that you weren't holding up your end?

10     A.  No.  I think I did well in typesetting the

11  articles and getting rid of typos and, you know, looking

12  at structure.

13     Q.  And Levi Walls, reading your name "Levi" on the

14  next page, page 6.  I'm sorry to call you by your first

15  name, but it's just that's the name on the thread, no

16  disrespect intended.  You know, about two sentences

17  down, it says, "I like the job in general, because I

18  love editing and being involved in research, but I'm not

19  in a position to go against the people who control the

20  journal."  You see that?

21     A.  Yes.

22     Q.  Describe your position on the journal and how

23  you felt you were able to discuss the initiatives of the

24  journal with other people on the editorial board for me.

25     A.  Well, when it came to discussions of what

1   should and shouldn't go into the journal, even if I had

2   reservations, I generally kept them to myself.

3      Q.  Describe your interactions with authors in the

4   editorial process.  How did you interact with the

5   authors?

6      A.  Mostly, I gave comments on readability and if

7   there was something that they wrote that I thought was,

8   you know, clumsy or awkward, well, I wouldn't have said

9   "clumsy" to them, that would have come off as rude.  But

10  if the wording was somehow unclear, I would have

11  suggested an alternate wording.  And, obviously, if they

12  were clear typos, I would have suggested changing those.

13      Generally, closest I got to content, at

14  least in the -- you know, well, I suppose in both the

15  large scale articles and the symposium would be comments

16  about, like, argumentative structure.  Like, if I saw an

17  argument that just rhetorically wasn't clear, but that

18  really doesn't have much to do with like the content of

19  it.

20      The closest I got to talking about content

21  was with one of the contributors, Barry Wiener.  And I

22  expressed some concern over the tone.  But after that, I

23  stopped doing that.

24      Q.  And this was an author you now characterize as

25  having published a racist article, correct?

1      A.  Yes.

2      Q.  And did you recognize his article as racist at

3   the time?

4      A.  Yes.

5      Q.  And did you leave any writing indicating that

6   you felt his article was racist?

7      A.  I did not tell him that his article was racist.

8   I said that the tone was -- I don't recall exactly what

9   I said, but I think I said something along the lines

10  that the tone was confrontational and that his arguments

11  would come out better if it was not as confrontational

12  or if he was less, I don't know, confrontational towards

13  left politics?

14      Q.  Is it racist to be confrontational, is that

15  what you mean?

16      A.  I don't believe it's racist to be

17  confrontational in itself.  I believe it's racist to say

18  something along the lines of, left politics being part

19  of reeducation camps.

20      Q.  Did his article say that?

21      A.  I believe that was in that article.  I could be

22  mistaken, it could have been in another article.

23      Q.  And you write here, in fact, you have the

24  exhibit, "I also don't want to lose my job."  Do you see

25  where you said that?

1      A.  Yes.

2      Q.  Did anyone ever threaten you with losing your

3   job at the journal?

4      A.  No.

5      Q.  In fact, you quit you said, I think, July 29th,

6   2020, if I'm not mistaken, or thereabouts?

7      A.  Yes.  And I was encouraged to leave by Benjamin

8   Brand.

9      Q.  Benjamin Brand being the department chair or

10  division chair MHTE.

11     A.  Yes.

12     Q.  I'm always afraid I'm transposing the letters.

13  So, he essentially told you to leave the job, is that

14  it?

15     A.  He didn't tell me to leave the job, but he knew

16  I was unhappy in the job, especially in the recent

17  months leading up to July.  Really, from November to

18  July.  Pre-November, pre-SMT, I was actually rather

19  happy with the job, just working on those three academic

20  articles.

21      And up to that point, the input from the

22  editorial board was a lot less.  It was after the SMT

23  that it became very micromanaged, and that's about the

24  point where I started to dislike the job.

25      So, Brand knowing that I was already

1 unhappy in the job and had already been concerned about
2 my name being attached to something that was racist,
3 encouraged me to leave the position. And, mainly, did
4 that by saying that my funding would be okay if I did,
5 that I would have a position as a TA, which was my main
6 concern.

7    Q.   Which is what you've done now, correct? You've

8 continued as a TA, correct?

9    A.   Yes.

10    Q.   And no one was issuing statements for you to be

11 fired, correct?

12    A.   No.

13    Q.   And it was -- you were becoming dissatisfied

14 with the job, you said from November up through July, so

15 sounds like from the Philip Ewell talk through the

16 publication of the journal and the resulting fallout,

17 because of the racist content of the journal.

18    A.   Yes.

19         (DEPOSITION EXHIBIT 7 MARKED.)

20    Q.   (By Mr. Allen) I think you're on this e-mail,

21 Mr. Walls. Is this your e-mail, LeviWalls@my.unt.edu?

22    A.   Yes.

23    Q.   Do you recall this e-mail?

24    A.   Yes, I do.

25    Q.   And isn't it true that this e-mail discusses

1 having a response from Ewell and others who might want

2 to respond to the symposium in a Volume 13?

3    A.   I have to remind myself everything that was

4 said in this e-mail. Could I just have a moment to

5 review it?

6    Q.   Of course. Of course. I should have said that

7 at the beginning, and I'm sure your attorney would have

8 objected if I forced you to comment on a document that

9 you couldn't read. If at any time you need time to

10 examine a document, please just say so.

11    A.   All right. What was your question?

12    Q.   So, this e-mail discusses having a response

13 from Ewell, as well as others, to the symposium in

14 Volume 13, which would have appeared in the next

15 subsequent volume of the Journal for Schenkerian

16 Studies, correct?

17    A.   Yes.

18    Q.   Do you know if a call for papers ever went out?

19    A.   For Volume 13?

20    Q.   Correct.

21    A.   Not that I know of.

22    Q.   Why not?

23    A.   I mean, I assume if it went out, it would have

24 went out to SMT list, but I actually don't keep track of

25 it -- SMT list, that is.

1    Q.   But you know for a fact no call for papers for

2 a Volume 13, as a kind of follow-up to the symposium

3 ever went out.

4    A.   I don't know that for a fact. I just haven't

5 seen one. As far as I know, no call ever went out for

6 Volume 13.

7    Q.   Did you prepare any such call for papers?

8    A.   No.

9    Q.   You participated directly in the call for

10 papers that went out for the symposium, correct?

11    A.   Yes.

12    Q.   Isn't this a normal part of editorial practice,

13 to call for responses to controversial articles that

14 have been published?

15    A.   To the best of my knowledge, I think that's

16 normal, although I got a sense from other people that

17 what would have been more standard would have been to

18 specifically invite Ewell from the beginning.

19    Q.   Do you know that Ewell was not invited to

20 participate in the symposium?

21    A.   He wasn't directly or explicitly invited.

22    Q.   Was he invited in some way?

23    A.   It is true that the call went out general or

24 generally through the SMT list, I think, and so,

25 theoretically, he might have had access to the call, if

1 he keeps track of the SMT list, which I mean, I imagine

2 he does, but he wouldn't have been invited specifically.

3    Q.   Do you know if Ewell participated in any of the

4 authors' publications that were pro-Ewell that appeared

5 in the symposium, by either consulting with them or

6 reading their papers in advance or in any form like

7 that? Did you have any knowledge of that, as an editor?

8    A.   I think one of the articles mentioned in --

9 sorry -- acknowledgments that they consulted with Ewell,

10 just asking his opinion on what they wrote, but I

11 don't -- I want to say Lett's, that could be wrong.

12 Stephen Lett.

13    Q.   Stephen Lett's publication, is that what you're

14 referring to?

15    A.   Yes. I believe that was the one with the

16 acknowledgment mentioning that they ran it by Ewell for

17 comments.

18    Q.   So if someone said Ewell had no notice that the

19 symposium was going to be published, that would be

20 false, correct?

21         MR. BOHUSLAV: Objection, calls for

22 speculation.

23    A.   I think he had notice, but it seemed to me --

24 and, again, I don't really know Ewell's frame of mind --

25 it seems as if he wanted a direct invitation, that if

1    specific theoretical issues, but they chose to
2    specifically focus on just the direction that the
3    plenary took, in terms of like being on social issues or
4    being left of center.
5        Q.    Do you consider, for instance, Philip Ewell's
6    views to be left of center?
7        A.    Yes.
8        Q.    Do you consider them to be moderate views?
9        A.    Yeah.  I would say that they're moderate.
10       Q.    How would you characterize his paper in its
11   substance?  If you could summarize his paper in three
12   sentences, how would you summarize it?
13       A.    I mean, that's quite a task.  But I would say
14   that primarily his paper focused on the -- really,
15   the -- what's the word I'm looking for?  I suppose the
16   debt that music theory has, and to a somewhat lesser
17   extent musicology, the debt that it has to white
18   supremacist narratives, mainly seen through issues of
19   canon, what works and are aren't focused on in academia.
20   And as a part of that, he focused on Schenker as a case
21   study, since Schenker is a widely practiced methodology
22   in North America.
23       Q.    And is the objection to those opinions what
24   you're referring to here?  I'm looking at the second
25   sentence, which is quite long, but I'm going to -- look

1    where it refers to Burkhart, Eric Wen and Damschroder,
2    and you say, "who I know to have particularly vitriolic
3    opinions about Ewell and his paper."  Is it the
4    objection to those ideas which you summarized what you
5    meant when you wrote that to your chair, Benjamin Brand?
6            MR. BOHUSLAV:  Objection, vague, compound.
7        A.    Could you re -- or could you be a little bit
8    more clear?
9        Q.    (By Mr. Allen)  Sure.  I'll just withdraw the
10   question, please.
11           Let me read the sentence.  "Even though we
12   put out a CFP that I specifically framed in a way that
13   emphasizes that responses should be thoughtful and
14   neutral in tone, Dr. Jackson has been privately
15   soliciting responses from people (Burkhart, Eric Wen,
16   Damschroder) who I know to have particularly vitriolic
17   opinions about Ewell and his paper."  Did I read that
18   correctly?
19       A.    Yes.
20       Q.    And you wrote that, right?
21       A.    Yes.
22       Q.    And the particularly vitriolic opinions about
23   Ewell and his paper, those you were identifying as the
24   opinions of the hard core Schenkerians, among whom many
25   were on the board of the Journal for Schenkerian

1    Studies, correct?
2        A.    Yes.
3        Q.    And they were reacting to what you
4    characterized as the content of Ewell's paper, as you
5    just summarized, correct?
6        A.    Yes.
7        Q.    Did this meeting take place between you and Dr.
8    Brand?
9        A.    Yes.
10       Q.    And what did you discuss in that meeting?
11       A.    I told him that I was worried about what the
12   journal was going to print, because it seemed as if
13   people were really angry about Ewell's paper, and I
14   didn't want the journal to print anything explicitly
15   racist or implicitly racist, and I was afraid that they
16   were going to, and so I just told him that I was worried
17   about that.
18       Q.    Were you worried about the effect this would
19   have on your career, too?
20       A.    Yeah.  I was worried.  I was a little bit more
21   worried about the reputation of the school and the
22   departments, but I was also worried about my own
23   reputation as being someone who -- whose name would be
24   on the journal.
25       Q.    What else did you talk about with Dr. Brand?

1        A.    I mean, it wasn't a really long meeting.  I
2    don't recall exactly how long it was, maybe 20 minutes,
3    and so that's mainly what we stuck to.  He did express
4    the idea that there wasn't much to worry about and that
5    I shouldn't be very worried, that if -- you know, if the
6    journal did express racist -- people who contributed to
7    the journal expressed racist beliefs, then those were
8    their beliefs and not necessarily my own.
9        Q.    Did he express any desire or need to eliminate
10   the journal at that time?
11       A.    No.
12       Q.    Did he express any belief or desire to remove
13   Timothy Jackson from the editorial board?
14       A.    No.
15       Q.    To remove Stephen Slottow from the editorial
16   board?
17       A.    No.
18       Q.    To replace you with a tenured faculty member in
19   any way?
20       A.    No.
21       Q.    And was there anything else you discussed with
22   Benjamin Brand in that 20-minute meeting?
23       A.    Let me think.  We did briefly discuss the -- as
24   I understood it, the history of Dr. Jackson's
25   understanding of race, and that I didn't have a lot of

77

1   discourse?

2       A.   Well, there were a few instances.  At one

3   point, when discussing Meyerbeer Opera, he used the term

4   negro, not necessarily in a case that would have been

5   warranted historically.  And in another case, he

6   expressed worry about when he was in school being mugged

7   by black people when he was carrying around his scores.

8   That he carried scores around New York a lot, and he

9   would see black people look at him a certain way and

10  would be worried that he was going to be mugged, which

11  seemed incredibly ignorant.

12      Q.   When was this, like in the 1970s, 1980s, do you

13  know?

14      A.   I don't recall exactly when he went to school,

15  but I would guess 1980s.

16      Q.   Do you know what the crime rates were at that

17  time?

18      A.   Nope.

19      Q.   Do you think there's any objective basis to

20  fear that he might be mugged on the streets of New York

21  in the 1980s?

22      A.   I think that there is a basis to fear mugging

23  anywhere in the U.S., in any state at any time, but not

24  specifically by one group over another.

25      Q.   So, you would believe that it is racist to

78

1   believe that statistics showing that certain groups of

2   people are more likely, on average, to commit crimes

3   than other groups would not be a rational basis for

4   opinions.

5       A.   Yes.

6       Q.   Whether or not those statistics have any basis

7   in reality.

8       A.   Yes.

9       Q.   And that was part of Jackson's woeful ignorance

10  about politically correct discourse, correct?

11      A.   Yes.

12      Q.   And you would believe that any professor, not

13  just Professor Jackson, should hue and observe

14  politically correct discourse, is that your basic

15  belief?

16      A.   Yes.

17      Q.   And is there anything in the category race

18  relations that you believe is included in politically

19  correct discourse that we haven't discussed as part of

20  politically correct discourse?

21           MR. BOHUSLAV:  Objection, vague.

22      A.   Yeah, I'm a little turned around by that

23  question.  Could you rephrase it?

24      Q.   (By Mr. Allen)  Yeah.  Let me strike that

25  question.  What I'm trying to get at, Mr. Walls, is

79

1   we've discussed politically correct discourse, and you

2   say in your sentence, politically correct discourse and

3   race relations.  What I'm trying to ask you is, what are

4   you referring to in the phrase "race relations" that we

5   have not discussed in terms of politically correct

6   discourse?

7       A.   I suppose just defining race relations would be

8   the really relating to societal structure, including

9   things like hegemony, like which classes of people tend

10  to get resources and which don't.  That's, I think, what

11  I meant by race relations.

12      Q.   So, differences in the distribution of wealth,

13  is that what you mean?

14      A.   Yes, among other things.

15      Q.   What other factors do you mean by hegemony?

16  I'm really unsure what hegemony means.

17      A.   Just basically the status quo.  In this case,

18  the -- really the uneven distribution of wealth

19  following as -- what's the word -- as a consequence of

20  an entire group of people having been enslaved 200 years

21  ago.

22      Q.   And by that, you mean black Americans.

23      A.   Yes.

24      Q.   And anything else you mean by hegemony in race

25  relations?

80

1       A.   I suppose not.

2       Q.   You also say -- I'm skipping down yet again to

3   the bottom of that page -- "I feared retaliation from

4   Timothy Jackson because" -- let me start that again.  "I

5   feared retaliation from Timothy Jackson: He is an

6   incredibly well-connected and influential figure in

7   Schenkerian circles."

8            So, I think you had expressed in that first

9   text message thread with Christopher Segall that you

10  feared retaliation, correct?

11      A.   Yes.

12      Q.   And you're repeating that fear here.

13      A.   Yes.

14      Q.   And I believe that this being July 27th is

15  approximately the same time frame, is that correct?

16      A.   Yes.

17      Q.   And we established already that you can't

18  really identify any specific incident in which you were

19  retaliated against, correct?

20      A.   No.  Because I was very careful not to give him

21  reason to retaliate against me up until that point.

22      Q.   So, your position is that you might have been

23  retaliated against, but for not saying things or

24  something of that nature.

25      A.   I was sure I would have been.

*Levi Nigem Xenon Walls    5/18/21*

81

1    **Q.    What made you sure?**

2    **A.    Talking to people who have been retaliated**

3    **against, and just knowing -- just how he is, in terms of**

4    **getting his own way about things.**

5    Q.    Who had Timothy Jackson retaliated against in

6    the past?

7    A.    Yiyi Gao.

8    Q.    Anyone else you can think of?

9    A.    I don't remember her last name, but a previous

10    Schenker RA, Rachel something.

11    Q.    Would it be Rachel Gain?

12    A.    It was not Rachel Gain.

13    Q.    So, you can't remember the name of this other

14    Schenker RA?

15    A.    I don't recall her last name.  We never really

16    spoke in person.  I was just told about their problems

17    from another person, David Falterman, who also

18    expressed -- expressed grievances about retaliation.

19    Q.    David Falterman?

20    A.    David.

21    Q.    David.

22    A.    Yeah.

23    Q.    Can you spell his last name, if you know it?

24    A.    F-A-L-T-E-R-M-A-N.

25    Q.    And would the Rachel be Rachel Anderson, by any

---

*Levi Nigem Xenon Walls    5/18/21*

82

1    chance?

2    A.    I'm really not sure.

3    Q.    So, you can't identify the second person,

4    correct?

5    A.    I just simply don't remember their last name.

6    Q.    And you knew about it only through other people

7    telling you things.

8    A.    I knew about it through David, who talked to

9    them.

10    Q.    And do you know if David Falterman -- if David

11    Falterman experienced any retaliation?

12    A.    He said that he did, although he didn't go into

13    detail.

14    Q.    And do you know any of the details about the

15    supposed retaliation against the Schenker RA?

16    A.    I don't know the specific details.

17    Q.    How about Yiyi Gao, what do you know about

18    supposed retaliation against this individual?

19    A.    That one, I know more about.  I know that there

20    was a point where they were asked to keep typesetting

21    materials after an independent study had ended, and they

22    couldn't because they were going home to see family.

23    And when they said that, Dr. Jackson retroactively

24    changed their passing grade to a failing grade.

25    Q.    And do you know if this is documented anywhere?

---

*Levi Nigem Xenon Walls    5/18/21*

83

1    A.    I'm sure it is because the issue was, as I

2    understand, taken up with administration.

3    Q.    So, this was vetted with the administration, as

4    far as you know?

5    A.    As far as I know.

6    Q.    Do you agree that a student should not get a

7    passing grade for work that's not passing?

8    A.    But the work was passing.  That's why I got a

9    passing grade.

10    Q.    How do you know that?

11    A.    Because I got a passing grade.

12    Q.    I thought you said it was changed from a

13    passing to failing grade.

14    A.    It was changed from a passing to failing grade,

15    when the student didn't do what they wanted -- what Dr.

16    Jackson wanted.

17    Q.    What was that?

18    A.    To keep typesetting materials after the

19    independent study had ended.

20    Q.    So, your view is or your understanding of this

21    so-called retaliation was requiring a student to keep

22    typesetting work after a semester had ended for which

23    they got a passing grade.

24    A.    Yes.  A student should not be ordered to

25    continue work that they are no longer getting school

---

*Levi Nigem Xenon Walls    5/18/21*

84

1    credits for.

2    Q.    So, she should have got a non-passing grade and

3    not have been afforded the opportunity to finish that

4    work.  Is that what you understand?

5    A.    They got a passing grade because I assume they

6    finished the work or else they wouldn't have gotten a

7    passing grade.  It's only when they refused to keep

8    doing work that they were given a failing grade.

9    Q.    Do you have any knowledge of whether the work

10    up to that point was unsatisfactory or not?

11    A.    No.  I assume it was just by virtue of the fact

12    that it was given a passing grade.

13    Q.    So, the basic point is, you don't really

14    understand the circumstances that led to this passing

15    grade supposedly being given, correct?

16    A.    I don't know all the circumstances, I just know

17    that it was wrong.

18    Q.    And did you hear this from Yiyi Gao directly?

19    A.    I don't remember who I heard it from.  It might

20    have been from Yiyi, or it might have been from a mutual

21    friend.

22    Q.    So, you can't identify now where you heard

23    this.

24    A.    I think it was Yiyi, I'm just not 100 percent

25    certain.

1    there's something I'm forgetting, okay?

2         MR. BOHUSLAV:  Okay.

3         (OFF THE RECORD FROM 4:46 TO 4:51 P.M.)

4    Q.    (By Mr. Allen) Mr. Walls, I just had one last

5    question, and it goes back to the meeting in the car you

6    had with Professor Jackson, which you described in the

7    middle of a snowstorm in February at some point.  Did I

8    characterize that correctly?

9    A.    I wouldn't call it a snowstorm.  It was just

10   lightly snowing.

11   Q.    And did you go into the car to escape the

12   weather?

13   A.    That was how he suggested it.

14   Q.    Did he use force in any way?

15   A.    No.

16   Q.    Did he use coercion in any way?

17   A.    No.  I could have said "no".

18   Q.    Thank you.  And so, he didn't threaten you, if

19   you did not go into his car.

20   A.    No.  But he suggested that we go into the car,

21   and I just have trouble saying no to people who are my

22   advisor.  And so, even though I was uncomfortable, I

23   went into the car.

24   Q.    But you said you could have said no, correct?

25   A.    Yes.

1         MR. ALLEN:  Okay.  That's all.  I pass the

2    witness to you, Mr. Bohuslav.

3         MR. BOHUSLAV:  We'll reserve till time of

4    trial.

5         MR. ALLEN:  Thank you so much.  Thank you

6    for your time.  Good luck with your graduate studies.

7         (DEPOSITION ADJOURNED AT 4:52 P.M.)

1         IN THE UNITED STATES DISTRICT COURT

     FOR THE EASTERN DISTRICT OF TEXAS

         SHERMAN DIVISION

2

3    TIMOTHY JACKSON,          )

                               )

4         Plaintiff,           )

                               ) Case No.

5    v.                        )

                               ) 4:21-cv-00033-ALM

6    LAURA WRIGHT, et al,      )

                               )

7         Defendants.          )

                               )

8

9    ----------------------------------

10        DEPOSITION CERTIFICATE

11        LEVI NIGEM XENON WALLS

12            MAY 18, 2021

13   ----------------------------------

14

15        I, Nita G. Cullen, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18        That the witness, LEVI NIGEM XENON WALLS, was

19   duly sworn by the officer and that the transcript of the

20   oral deposition is a true record of the testimony given

21   by the witness;

22        I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24        ____ was requested by the deponent or a

25   party before the completion of the deposition and is to

1    be returned within 30 days from date of receipt of the

2    transcript.  If returned, the attached Changes and

3    Signature Page contains any changes and the reasons

4    therefor;

5        X  was not requested by the deponent or a

6    party before the completion of the deposition.

7        I further certify that I am neither attorney

8    or counsel for, nor related to or employed by, any of the

9    parties or attorneys to the action in which this

10   deposition was taken.

11        Further, I am not a relative or employee of

12   any attorney of record in this case, nor am I financially

13   interested in the outcome of the action.

14        Subscribed and sworn to on this 14th day of

15   June, 2021.

16

17

18   _____

     NITA G. CULLEN, Texas CSR #1563

19   Expiration Date:  08-31-2022

     JULIA WHALEY & ASSOCIATES

20   Firm Registration No. 436

         2012 Vista Crest Drive

21   Carrollton, Texas 75007-1640

     214.668.5578

22

23

24

25



**Levi, Chris**
Active Now

You created this group

7/25/20, 10:45 PM

Levi, Chris and I wanted to start a thread so that we can discuss some of the matters with JSS

Levi
Hi Chris and Ben. I'm glad we can talk!

So he understands that this was not our idea and that it came from the advisory board.
Chris, we are open to discussion because we really were not at the forefront of this initiative

I have to go to sleep now, I'm in another time zone.

But I'm glad we can talk

Levi
Oh, I thought we were going to talk now

Chris
Great, thanks for setting up this chat! We can just talk tomorrow if you like.

Levi
Oh, alright. No problem

Chris
Or Levi, just you and me.

Levi
Do you mind, Ben?

UNT_000442



Deposition Exhibit

5

Nita Cullen



**Levi, Chris**
Active Now

I don't mind!

Levi

Alright. Hi Chris. So, I want to let you know that I'm really on twitter's side for most of this. I don't have twitter, but I've been seeing a lot of the criticism, which is very justified. If it were up to me, people on the advisory board would not be allowed to publish in the journal, because that kind of destroys all accountability. I must admit, that I'm new to all of this. I assumed what would happen would be that we would have a second round of responses (responses to responses) at which point Phil would be able to respond (which is something that Ben and I really wanted).

Chris

Hey Levi, I really enjoyed working with you on my essay. It seems clear that you're in a precarious position as a graduate student editor. Any red flags that come up, you probably aren't in a position to do anything about.

Yes exactly Levi

Chris

I can definitely say that I assumed that Phil was involved in some sort of way.

I agree and I'm in a similar position. I was editor when Tim Jackson and Stephen Slottow were my dissertation advisors. Now, they are my colleagues and on promotions committees, etc. that have a significant stake in my employment. Volume 12 was largely ready before the SMT and I was passing the baton to Levi when these ideas came up.

Chris

Definitely. Totally clear as well.

So what do you guys know about the invitations for rebuttals to Phil's talk?

UNT_000443



**Levi, Chris**
Active Now

Someone I know was directly invited to submit something, but he declined.

Levi and I were the ones that sought out to make a call, and we actually tried to solicit more women and PoC!

I know Tim solicited dome on his own. But for us, we can't go in and intercept his emails to people

Some*

**Levi**
I did not know about rebuttals. What venue were those in? I assume they are forthcoming.

Chris do you mean responses to Ewell?

**Chris**
By rebuttals I mean all the negative essays in Volume 12.

Or responses to JSS?

My guess is that Tim Jackson solicited a lot on his own.  But, it's hard to trace because if he wrote people via his own email and encouraged them to submit then Levi won't know

**Levi**
Oh, I see. No, I hadn't heard. Obviously, any debate is great. I know Ben and I were hoping for as many positive responses as possible in the JSS volume. But a significant portion of people that submitted were in the other camp.

**Chris**
Got it! It's crazy that you guys as editors didn't even know that some responses were solicited behind the scenes.

UNT_000444

APPX.113



**Levi, Chris**
Active Now

were solicited behind the scenes.

I totally agree; we wanted to see more

It's blowing up and honestly we never even wanted to do it

But it's my dissertation advisor and higher ranking colleague, plus we wanted to publish supporting essays

I would nominate a name change for the center and the JSS— by the way

I think with the current advisors it would possibly not pass

Levi
I would as well. Jackson and Slottow would not allow it though.

So that's the battle we are fighting

Chris
You guys are definitely in a really difficult position here. I can tell you that when I first saw the CFP—with its very fast deadline at a very busy time of year—I assumed it was constructed to discourage submissions. The Journal of Schenkerian Studies is already a very conservative journal. Prior to its founding in 2006, and especially in the 1980s and '90s, there was no need for a Journal of Schenkerian Studies because Music Theory Spectrum was already effectively a journal of Schenkerian studies. So given the venue and the CFP, I was assuming negative responses. That's part of why I was motivated to contribute. I wanted there to be something in support of Phil.

Levi
I can see that. Definitely not something I or Ben considered. We were about to finish the journal, which was supposed to be published in November or early December, when the advisory board got really gungho about a response to Ewell.

UNT_000445



**Levi, Chris**
Active Now

Levi
I can see that. Definitely not something I or Ben considered. We were about to finish the journal, which was supposed to be published in November or early December, when the advisory board got really gungho about a response to Ewell. And so, we made the deadline very short.

I definitely see your point!! We are so so happy you wrote.    Part of the reason we had a shorter call is because we had vol 12 ready and we needed to get it to our publishers.  We should have usher the whole thing to volume 13!! I think you should write the letter, but address the advisory board, and state how the editors were in a compromised position.

Levi
Yes, putting it in volume 13 would have been preferable.

Pushed* the whole thing

Chris I have to go, but thank you for hearing us out.  There needs to be action here and I am glad we talked. I want to continue but it is really late here

Levi
No worries, Ben.

Chris
Totally fine, Ben. Thanks for reaching out.

Levi, are you in any position at all to distance yourself from the journal issue?

And it's okay if that's impossible. Ben's suggestion to state that you were in a compromised position will work.

Levi
I tried to do that with the opening to the symposium. I tried to do it in such a way

UNT_000446



**Levi, Chris**
Active Now

Levi

I tried to do that with the opening to the symposium. I tried to do it in such a way that I wasn't explicitly stating that I was opposed to the responses from most of the Schenkerians. Over the course of all this, I feel like I'm between a rock and a hard place. I like the job in general, because I love editing and being involved in research, but I'm not in a position to go against the people who control the journal. As the editor of the journal going forward, I really want to take it in a better direction. But I'm worried that I can't.

Levi

And I also don't want to lose my job because I have a baby to support. So I don't know what to do.

Chris

Then I think the best thing we can do is to really clarify in the letter that the editors are a graduate student and recent graduate, and that it's the advisory board who makes all the decisions. Any condemnation must be directed at the advisory board.

Levi

I know that Dr. Jackson stated in an email chain that he wanted any emails to be directed toward him. I mean, I'm sure he will get them anyway (as his contribution was pretty horrendous). I'm being quite candid with you; lately I've been trying to figure out how to distance myself from him (because he's my advisor) without causing any fallout. This is all just so much.

Chris

It may be best for the advisory board to resign. The open letter may well call for that, I don't know.

7/27/20, 1:51 AM

Chris

Hey Ben, hey Levi. Would you feel comfortable confirming some information I

UNT_000447



**Levi, Chris**
Active Now

7/27/20, 1:51 AM

Chris

Hey Ben, hey Levi. Would you feel comfortable confirming some information I received? Apparently some contributors, those that Tim Jackson reached out to directly, were allowed to submit their essays as late as mid-March. Is that true? Again, it's okay if you don't feel comfortable responding.

Chris

Also, one suggestion that's come up is for SMT to create a policy for supervising grad student journal editors.

7/27/20, 5:30 AM

Levi

Hey, sorry for the late response. I'm not sure what the latest submission was that he asked us to take. I know that the journal was already submitted to the publisher by mid March, so maybe late February or early March at the latest. But yes, we were told to take late submissions without questions. He had a general disregard for deadlines. I can't say that it was 100 percent tailored towards authors of his choosing because he had us take Clark's submission late, but certainly the positive articles were more observant of the deadline. And also, I don't think Clark was more than a few days late, if I remember correctly. Does that help? I think that, had there been guidelines like that in order, the experience at the journal would have been much better for me. So I hope that they continue to pursue that.

7/27/20, 7:02 AM

Yes

7/27/20, 8:53 AM

Chris

Thank you both. I have this information from a couple of sources now, so if I mention the late deadline, I won't have to implicate any single source. Much appreciated.

UNT_000448

*John Toaru Ishiyama, Ph.D.    9/27/24*    1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
 2                  SHERMAN DIVISION

 3   TIMOTHY JACKSON,           )
                                )
 4         Plaintiff,           )
                                )
 5   vs.                        )  CASE NO. 4:21-CV-00033-ALM
                                )
 6   LAURA WRIGHT, et al.,      )
                                )
 7         Defendants.          )

 8   ***********************************************

 9         VIDEOTAPED ZOOM ORAL DEPOSITION OF

10            JOHN TOARU ISHIYAMA, Ph.D.

11               September 27, 2024

12             (Reported Remotely)

13   ***********************************************

14      VIDEOTAPED ORAL DEPOSITION OF JOHN TOARU ISHIYAMA,

15   Ph.D., produced as a witness at the instance of the

16   Plaintiff and duly sworn, was taken in the above-styled

17   and -numbered cause on the 27th day of September, 2024,

18   from 9:13 a.m. to 12:35 p.m., before Kim D. Carrell,

19   Certified Shorthand Reporter in and for the State of

20   Texas, reported remotely by computerized stenotype

21   machine at the University of North Texas System,

22   801 North Texas Boulevard, Gateway Suite #308, Denton,

23   Texas, pursuant to the Federal Rules of Civil Procedure

24   and the provisions stated on the record or attached

25   hereto.
```

---

*John Toaru Ishiyama, Ph.D.    9/27/24*    2

```
 1              APPEARANCES

 2  FOR THE PLAINTIFF:

 3     Mr. Michael Thad Allen
       ALLEN LAW, LLC
 4     P.O. Box 404
       Quaker Hill, CT 06375
 5     Telephone: 860.772.4738 - Fax: 860.469.2783
       E-mail: m.allen@allen-lawfirm.com
 6
 7  FOR THE DEFENDANTS:

 8     Ms. Mary Quimby
       Assistant Attorney General
 9     General Litigation Division
       P.O. Box 12548, Capital Station
10     Austin, Texas 78711
       Telephone: 512.463.2120 - Fax: 512.320.0667
11     E-mail: Mary.Quimby@oag.texas.gov

12        - and -

13     Mr. Renaldo Stowers  (Appearing Live)
       University of North Texas System
14     Office of General Counsel
       801 North Texas Boulevard
15     Denton, Texas 76201
       Telephone: 940.565.2717 - Fax: 940.369.7026
16     E-mail: Renaldo.Stowers@untsystem.edu

17
18  ALSO PRESENT:  Jason Warner, Videographer
                   lvg.dallas@gmail.com
19
20
21
22
23
24
25
```

---

*John Toaru Ishiyama, Ph.D.    9/27/24*    3

```
 1              I N D E X
                                        PAGE
 2
    Appearances.............................  2
 3
    Stipulations............................  5
 4
    JOHN TOARU ISHIYAMA, Ph.D.
 5
       Direct Examination by Mr. Allen.......  6
 6
 7  Corrections and Changes.................  129

 8  Reporter's Certificate..................  131

 9
                  EXHIBITS
10
    NUMBER        DESCRIPTION          MARKED
11
    Exhibit 1   Re-Notice of Taking Deposition........  7
12
    Exhibit 2   Email Chain Ending 8-3-20, Cowley to
13              Ishiyama, Request to Serve on Ad Hoc
                Review Panel
14              (UNT 002453 - 002454)...............  20

15  Exhibit 3   Ad Hoc Review Panel Report (Exhibit D)
                (JACKSON000208 - 000233)............  23
16
    Exhibit 4   COPE Guidelines: A Short Guide to
17              Ethical Editing for New Editors
                (UNT 003303 - 003314)...............  34
18
    Exhibit 5   Theoria Title Page, List of Articles,
19              Directions to Contributors, Volume
                26-2020.............................  43
20
    Exhibit 6   Emails ending 10-14-20, Ishiyama to
21              Jackson, et al. RE: Talk With UNT Ad
                Hoc Journal Review Panel
22              (UNT 002634 - 002635)...............  50

23  Exhibit 7   Handwritten Notes, 9-16-20, Ad Hoc
                Journal Review Committee............  63
24
    Exhibit 8   Potential Questions for Benjamin Brand
25              Chair of the Division of History,
                Theory & Ethnomusicology............  68
```

---

*John Toaru Ishiyama, Ph.D.    9/27/24*    4

```
 1
 2  Exhibit 9    PLoS Medicine Article, What Should
                 Be Done to Tackle Ghostwriting in
 3               the Medical Literature............  71

 4  Exhibit 10   Walls Facebook Post
                 (JACKSON 000234 - 000236)..........  81
 5
 6  Exhibit 11   Email Chain ending 9-30-20, Walls
                 to Ishiyama
 7               (UNT 002533)......................  83

 8  Exhibit 12   Jackson Materials for the
                 Committee
 9               (UNT 002645 - 002782).............  99

10  Exhibit 13   Email, 10-2-20, Ishiyama to
                 TitleIX, et al. Reporting on an
11               Incident
                 (UNT 003435).....................  117
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

APPX.118

*John Toaru Ishiyama, Ph.D.    9/27/24*

85

1    **A.**    Yes.  I don't recall him specifically saying it

2    to us in our testimony, but he did seem to indicate that

3    he had little control over the content.

4    **Q.**    Did -- sorry, go ahead.

5    **A.**    Even as editor.

6    **Q.**    He also said he was -- it was an extremely

7    shameful position to be the editor at the Journal of

8    Schenkerian Studies?

9        MS. QUIMBY:  Objection, form.

10    **A.**    He may have.  I do not recall.  But it's his

11    testimony and it appears here in writing, so...

12    **Q.**    And you received this email, right?

13    **A.**    Yes, although I don't exactly specifically

14    word for word what the email said, but...

15    **Q.**    He also went on to give some concrete examples.

16    For instance here, let's just read this, which I'm going

17    to highlight briefly for the purpose of our testimony.

18        "For the first few months, the job seemed fine

19    as I got to work with three articles on various topics.

20    Typesetting and offering clarity related edits."

21    **A.**    Um-hum.

22    **Q.**    However, after Philip Ewell's SMT presentation,

23    Timothy Jackson decided that it was the responsibility of

24    the Journal to, quote, protect Schenkerian analysis.

25        "Although, after serious thought, I

*John Toaru Ishiyama, Ph.D.    9/27/24*

86

1    essentially agreed with Ewell's talk.  It was not up to

2    me what did or did not go into the journal.  After seeing

3    some of the responses, I started to become incredibly

4    worried.  I gave comments to one author, including

5    that they seemed to devalue other fields of study, that

6    they cherrypicked information to make Schenker appear

7    in a better light, and that they confused cultural

8    appropriation with egalitarianism.  Shortly after, I was

9    told by Timothy Jackson (my superior in at least three

10    senses: A tenured faculty member who ran the journal and

11    also served as my academic advisor) that it was not my

12    job to censor people.  After this, things continued to

13    go in a direction that I found to be disgusting."

14        Did I read that correctly?

15    **A.**    Yes, you did.

16    **Q.**    Did that implicate the processes by which the

17    journal was published?

18    **A.**    Well, some of it did.  Not -- much of

19    it had to do with the content.  Again, which I have to

20    reiterate, we ignored the content of the articles and

21    what was being said.  But the power differential between

22    Levi Walls who's officially the editor of the journal --

23    **Q.**    Sure.

24    **A.**    -- and the actual process by which decisions

25    were made, that is -- that is something that we did

*John Toaru Ishiyama, Ph.D.    9/27/24*

87

1    consider.

2    **Q.**    Okay.  And did you include that in the Ad Hoc

3    Panel Report?

4    **A.**    Yes, the power differential is clearly

5    indicated as a problem with the journal.  It has been a

6    problem for some time.

7    **Q.**    And it caused him not to be able to assert his

8    own editorial views; is that correct?

9    **A.**    That would be true.  That's also something that

10    Dr. Graf said as well, the previous editor.

11    **Q.**    And now, I know you didn't, as you say

12    apparently, address the content of the journal.  That

13    was a matter of indifference to you, I suppose.  But he

14    also says here that he thought he essentially agreed with

15    Philip Ewell's talk.

16    **A.**    That may be true.  I do not know what Philip

17    Ewell's talk was about, nor did -- not did most all of

18    our committee -- I think our committee members didn't

19    know either.

20    **Q.**    I'm not imputing -- I'm not imputing to your

21    knowledge of -- in fact, you've testified that the

22    knowledge of the actual controversy was a matter of

23    indifference to the panel, right?

24    **A.**    Yes, absolutely.

25    **Q.**    I think you -- so you've already stated that, I

*John Toaru Ishiyama, Ph.D.    9/27/24*

88

1    think, more than once.  So I understand that's your

2    testimony.

3    **A.**    Um-hum.

4    **Q.**    But here, this witness, a very key witness, can

5    we agree, the student editor of the journal?

6    **A.**    I would say a witness, not a key witness.

7    We had multiple bits of evidence, multiple pieces of

8    evidence that we considered.

9    **Q.**    Oh, I don't deny that.  But he's --

10    **A.**    I would not say he's the key witness.

11    **Q.**    He was an important witness.  Would you

12    disagree?

13    **A.**    I would say he is a witness.

14    **Q.**    Just a witness among others, right?

15    **A.**    Among others, yes.

16    **Q.**    That's your testimony today?

17    **A.**    Yes.

18    **Q.**    And he's telling you, as a member of the ad hoc

19    panel, that he essentially agreed with Philip Ewell's

20    talk, and he relates how this complicated his work as

21    the editor of the journal, right?

22        MS. QUIMBY:  Objection, form.

23    **A.**    I cannot infer that was his meeting, but that

24    was irrelevant to us.

25    **Q.**    It's certainly part of an editor's task to

*John Toaru Ishiyama, Ph.D.     9/27/24*

93

1    Q.    I see.

2    A.    Not on content.

3    Q.    And I've always been puzzled by this section,

4    Professor Ishiyama, because is it ever the job of an

5    editor of a journal to censor people?

6          MS. QUIMBY: Objection, form.

7    A.    Again, it could depend on what you mean by

8    censor.

9    Q.    Well, you put it in your report, so that's

10   why I'm asking you.

11   A.    Well, no.  This is a quote.  It's in the

12   report, but it a quote from what Dr. Jackson was

13   reported to say.

14   Q.    Sure.

15   A.    I don't think we need -- I would ask perhaps

16   the plaintiff to define that.

17   Q.    Well, they had a chance to depose Professor

18   Jackson.  But again, we're talking about the Ad Hoc Panel

19   Report.  And I'm asking --

20   A.    Okay.  This is a quote.  Again, this is a

21   quote.

22   Q.    Oh, I understand.  It's a quote that you placed

23   in the Ad Hoc Panel Report, right?

24   A.    As dutifully reflecting what the testimony

25   said.

*John Toaru Ishiyama, Ph.D.     9/27/24*

94

1    Q.    Of Levi Walls.

2    A.    Of Levi Walls, yes.

3    Q.    And now, I want to ask a follow-up question.

4          In your experience and expertise as an

5    academic editor of journals, can you identify a context

6    in which it's appropriate for an editor to censor people?

7          MS. QUIMBY: Objection, form.

8    A.    I don't think -- it depends on what you mean by

9    censor.  If you mean the job is to edit and marshal the

10   peer-review process, then yes, that is the responsibility

11   of the editor.  But censorship is not something we

12   consider.

13   Q.    Is it -- is it appropriate for an academic

14   editor to censor for viewpoints?

15   A.    I'm not going to venture an opinion.  I would,

16   myself, not do that.  I don't think censorship is part of

17   the discussion.  Rather, it's the editor's job to make

18   sure the pear-review process had integrity.

19   Q.    Okay.

20   A.    That it is peer reviewed.

21   Q.    And not to short-circuit the peer-review

22   process by telling an author that they may or may not

23   express a certain view?

24   A.    Well, I mean, it depends.  If this is --

25   if the argument is that these pieces were edited --

*John Toaru Ishiyama, Ph.D.     9/27/24*

95

1    editorial review, then the editor does have the

2    responsibility to review a piece.  But I don't understand

3    the status of these articles, if they were peer reviewed

4    or if they were editor reviewed.  It seems confusing.

5    Q.    I understand.  Sure, I understand.  Although

6    you were given an extensive packet of e-mails that were,

7    more or less, comprehensive, detailing the communications

8    between the editorial staff that led to the publication

9    of these articles, right?

10   A.    Yes.

11   Q.    I'm going to represent to you, because you've

12   said the content of the publication didn't matter to you

13   supposedly.

14   A.    It did not.

15   Q.    There was a paper delivered by this public

16   intellectual music theory professor from New York named

17   Philip Ewell.  He gave a plenary presentation at the

18   Society for Music Theory that was very well received, but

19   nonetheless, controversial.  Then the call for papers

20   went out for the Journal of Schenkerian Studies for

21   soliciting responses to this article -- or excuse me, to

22   this presentation at this Society for Music Theory.  The

23   papers that were published in Volume 12 in the Symposium

24   were roughly split between people who were pro-Ewell and

25   people who were anti-Ewell.

*John Toaru Ishiyama, Ph.D.     9/27/24*

96

1          Do you have any information to suggest that

2    my summary to you is wrong in any way?

3    A.    I have no idea what the content of the journal

4    was.

5    Q.    Okay, good.

6    A.    I don't even know if some were pro.  I have not

7    read a single piece.  I'm not even sure what Philip Ewell

8    said, as I've said before.

9    Q.    So you didn't read a single one of the

10   contributions in Volume 12 of the Journal of Schenkerian

11   Studies?

12   A.    No, no.

13         MS. QUIMBY:  Objection.

14         Renaldo, please.  I think I'm having a -- on

15   my end, I'm having freezing.  Is that mine freezing?  I

16   can see myself kind of jump around on the screen.  I just

17   want to kind sure my objections were heard.  I don't know

18   that I was able to get them in because of the --

19         MR. ALLEN:  I'm seeing you freezing, too,

20   Mary.  So I know what you mean.  If you want to -- I

21   don't know.  Was it to form?  Now, she's totally frozen.

22         THE VIDEOGRAPHER:  Do you want to go off

23   the record?

24         MR. ALLEN:  Sure.

25         THE VIDEOGRAPHER:  Off the record at

*John Toaru Ishiyama, Ph.D.     9/27/24*

128

1        MR. ALLEN:  Okay.  I'm going to pass the

2   witness, Mary.

3        MS. QUIMBY:  I'll reserve my questions

4   for trial.

5        MR. ALLEN:  Thank you, Professor

6   Ishiyama.

7        (No deletions.)

8        THE VIDEOGRAPHER:  Off the record at

9   12:35.

10        (Proceedings concluded at 12:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

*John Toaru Ishiyama, Ph.D.     9/27/24*

130

1
_____
2

3        I, JOHN TOARU ISHIYAMA, Ph.D., have read the

4   foregoing deposition and hereby affix my signature that

5   same is true and correct, except as noted above.

6

7

8
_____
              JOHN TOARU ISHIYAMA, Ph.D.

9

10   THE STATE OF _____)

11   COUNTY OF _____)

12        Before me, _____, on this day

13   personally appeared JOHN TOARU ISHIYAMA, Ph.D., known to
     me or proved to me on the oath of _____

14   or through _____ (description of
     identity card or other document) to be the person whose

15   name is subscribed to the foregoing instrument and
     acknowledged to me that he/she executed the same for the

16   purpose and consideration therein expressed.

17        Given under my hand and seal of office on this

18   _____ day of _____, _____.

19

20
_____
              NOTARY PUBLIC IN AND FOR

21           THE STATE OF _____

22   My Commission Expires: _____

23

24

25

---

*John Toaru Ishiyama, Ph.D.     9/27/24*

129

1                 CHANGES AND SIGNATURE

2   WITNESS: JOHN TOARU ISHIYAMA, Ph.D.

3   DATE:  SEPTEMBER 27, 2024

4   PAGE/LINE        CHANGE        REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

---

*John Toaru Ishiyama, Ph.D.     9/27/24*

131

1           UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF

2                SHERMAN DIVISION

3   TIMOTHY JACKSON,           )
                               )

4       Plaintiff,         )
                               )

5   vs.                  ) CASE NO. 4:21-CV-00033-ALM
                               )

6   LAURA WRIGHT, et al.,      )
                               )

7       Defendants.          )

8   _____

9        REPORTER'S CERTIFICATION OF

10   ORAL DEPOSITION OF JOHN TOARU ISHIYAMA, Ph.D.

11          September 27, 2024

12   _____

13        I, KIM D. CARRELL, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16        That the witness, JOHN TOARU ISHIYAMA, Ph.D., was

17   duly sworn and that the transcript of the oral deposition

18   is a true record of the testimony given by the witness;

19        That the deposition transcript was duly submitted

20   on October 28, 2024, to Ms. Mary Quimby, for examination,

21   signature, and return to me by November 27, 2024;

22        That pursuant to the information given to the

23   deposition officer at the time said testimony was taken,

24   the following includes all parties of record and the

25   amount of time used by each party at the time of the

*John Toaru Ishiyama, Ph.D.    9/27/24*

```
 1   deposition;
 2        Mr. Michael Thad Allen - 02 HRS: 47 MIN
                Attorney for the Plaintiff
 3
          Ms. Mary Quimby -  00 HRS: 00 MIN
 4              Attorney for the Defendants

 5        I further certify that I am neither counsel for,
 6   related to, nor employed by any of the parties or
 7   attorneys in the action in which this proceeding was
 8   taken, and further that I am not financially or
 9   otherwise interested in the outcome of the action.
10        Certified to by me on this 28th day of October,
11   2024.
12
13
                    _____
14                  Kim D. Carrell, CSR NO. 1184
                    Date of Expiration: 7-31-26
15
                    JULIA WHALEY & ASSOCIATES, INC.
16                  2012 Vista Crest Drive
                    Carrollton, Texas  75007-1640
17                  214-668-5578/Fax 972-236-6666
                    Firm Registration No. 436
18                  Certification Expires 10-31-26
                    Notary Comm. Expires 12-1-25
19
20
21
22
23
24
25
```

APPX 122

# Tweet



**dr little ferret, phd**
@imanimosley

as per always, this conversation is more complicated than it seems. it's been brought to my attention that the editors of JSS are grad students/ junior scholars, etc. please let us remember their precarity when addressing how something like this can come to fruition.

10:49 · 26/07/2020 · Twitter for iPad

**4** Retweets and comments **30** Likes

   

 Megan Lavengood @meganlave... · 5m

 Tweet your reply

   

UNT_001317
APPX.123

< **Tweet**

 **Megan Lavengood** @meganlave... · 5m ∨
Replying to @imanimosley

The journal is "run by" grad students but their editorial and advisory boards are mainly tenured senior scholars.

💬 3          ↻          ♡ 12          ⬆️

 **Megan Lavengood** @meganlave... · 3m ∨
I haven't been involved in a student run journal myself but to me this signals that the grunt work (soliciting submissions, administration, line edits) is done by grad students but the burden of peer reviewing and such can be squarely put on the shoulders of the boards

💬          ↻          ♡ 6          ⬆️

 **Mariusz Kozak** @prof_kozak · 8m          ∨
Replying to @imanimosley

I was told the same, but these are not junior scholars

mhte.music.unt.edu/editorial-board

💬 2          ↻          ♡ 5          ⬆️

 Tweet your reply

🏠          🔍          🔔          ✉️

# Tweet



**Sam Reenan** @sam_reenan · 7m  
This brings up a really important question, which is whether these essays even were peer reviewed. If they were, how did the editorial board fail so hard. If they weren't, it's a damn shame that senior scholars would manipulate their power to espouse such views.

💬 1          🔁          ♡ 3          ⬆️



**Mariusz Kozak** @prof_kozak · 6m  
The same people who wrote the essays are on the editorial board 🤷‍♂️

💬          🔁          ♡ 5          ⬆️



**Daniel Shanahan** @danielshan... · 12m
Replying to @imanimosley

I would argue that this is another reason that Johnson (a senior scholar at their institution and likely their advisor) choosing to publish those viewpoints there is such an unscholarly abuse of power.

💬 1          🔁 2          ♡ 7          ⬆️



Tweet your reply

                              

UNT_001319
APPX.125

# Tweet



**Replying to @imanimosley**

I would argue that this is another reason that Johnson (a senior scholar at their institution and likely their advisor) choosing to publish those viewpoints there is such an unscholarly abuse of power.

💬 1          🔁 2          ♡ 7          ⬆



**Megan Lavengood** @meganlave... · 2m ⌄
*Jackson but more importantly, it sure looks that way doesn't it!?

💬          🔁          ♡ 2          ⬆



**Louise Fristensky** @RamblingL... · 12m ⌄
**Replying to @imanimosley**

(I'm a grad student. But also, one assumes they have an advisory professor or something?)

💬 1          🔁          ♡ 2          ⬆



**Megan Lavengood** @meganlave... · 5m ⌄
Two in fact!

💬          🔁          ♡ 1          ⬆

 Tweet your reply

                              

UNT_001320
APPX.126

**Tweet**



**Robert Komaniecki**
@Komaniecki_R

Getting a sense of some of the inner workings of the Journal of Schenkerian studies: A former UNT student told me that when they worked on the journal, several of the board members were dead



 Tweet your reply

UNT_001321
APPX.127

# Peter's post

hole of threads and tweets trying to get the whole picture lol

33 m    Like    Reply     1

 Write a reply...



**Ben Graf**
I'm ashamed to be associated with it, I'm really torn up about the whole issue.  Levi and I are caught in a crossfire and I'm glad to be done my association with it.

24 m    **Like**    Reply     3



**Peter Kohanski**
I thought of you guys and was worried you had to get caught up in it. I'm so sorry for the position you must've been in, it doesn't sound fair and must've been really difficult. I know this had to have come from higher ups.

17 m    Like    Reply

 Write a reply...

 Write a comment...     GIF   

         

UNT_001322
APPX.128




**Chris Brody** @chrisbrodyMT · 15m ⌄
People are saying JSS is a "grad student journal." A possibly helpful clarification: "grad student journal" can mean several things. Type 1: run by grad students, peer review done by grad students, intended exclusively for grad students to publish in. (not JSS)

 1         2    



**Chris Brody** @chrisbrodyMT · 15m ⌄
Type 2: Peer review is done by PhD-holders, but otherwise run by grad students who make serious, significant decisions about the editorial direction of the journal (e.g. Intégral, ITR)

 1         2    



**Chris Brody** @chrisbrodyMT · 15m ⌄
Type 3: Editorial gruntwork is done by grad students, one of whom may have the title of editor, but peer review AND basically all other serious decisions are made by a PhD-holding editorial board (and may not even be endorsed by the



Tweet your reply

            

UNT_001323
APPX.129

made by a PhD-holding editorial board (and may not even be endorsed by the "editors" who must carry out their directions)



**Chris Brody**
@chrisbrodyMT

*I could be wrong here* but my impression is that JSS is closest to type 3. So please keep that in mind when deciding who deserves to "face consequences"—those who are responsible, on paper, for some decisions may have been put in a vulnerable, professionally impossible situation

14:42 · 26/07/2020 · Twitter Web App

Tweet your reply

UNT_001324
APPX.130