UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| Timothy Jackson, <br><br>                     Plaintiff, <br><br> v. <br><br> **Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**, Defendants. | Case No. 4:21-cv-00033-ALM |

**PLAINTIFF TIMOTHY JACKSON'S OPPOSITION TO DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PLAINTIFF TIMOTHY JACKSON'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT .................................................................................................................i

**TABLE OF CONTENTS** .............................................................................................................ii

**TABLE OF AUTHORITIES** .......................................................................................................iv

    I.    FACTUAL BACKGROUND ...............................................................................................1

      A.   The Schenker Controversy .......................................................................................2

      B.   Levi Walls and Timothy Jackson Conceive the Symposium ...............................5

      C.   Graduate Student Editor Levi Walls Quits, Lies about His Mentor Timothy Jackson, and Cowers before the Social Media Mob ............................................7

      D.   Dean John Richmond and Department Chair Benjamin Brand Announce the Investigation of the JSS in the Name of "Combating Racism" ....................9

      E.   Provost Cowley Convenes the Pretextual "Ad Hoc Panel" ...........................12

      F.   The Regents Defendants' Plenary Authority¶...................................................16

      G.   The So-Called "Ad Hoc Panel" Ignores Relevant Evidence .......................17

      H.   Provost Cowley Turns over the JSS to the College of Music and Refuses to Publish Jackson's Response ...........................................................................21

      I.   UNT's State-Enforced Dogma Turns the JSS into a "Radioactive Turd"................25

   II.   ARGUMENT CONCERNING JACKSON'S FIRST AMENDMENT CLAIM ..........................28

      A.   The Regents are Proper Defendants under the Legal Fiction of *Ex Parte Young*..28

         1)  *The Regents Are Proper Defendants*.............................................................28

         2)  *Jackson Seeks to Be Restored to his Position on the JSS Advisory Board* ......................30

         3)  *Jackson Satisfies Redressability* .................................................................32

         4)  *The State of Texas' Sovereign Immunity Defense Was Also Already Decided* ..............................33

      B.   Jackson's First Amendment Retaliation Claim Should Proceed................................34

         1)  *The Fifth Circuit's Standard for First Amendment Retaliation* ......................................34

         2)  *Jackson Suffered an Adverse Action and Spoke on a Matter of Public Concern* .............................36

         3)  *Evidence Demonstrates that UNT Removed Jackson from the JSS Advisory Board, Humiliated, and Defamed him Because of his Protected Speech*........................................37

         4)  *The Pretextual "Ad Hoc Panel"* .................................................................41

         5)  *The Only Disruption Experienced at UNT Was the Cancellation of the JSS*................................43

III.    OPPOSITION TO DEFAMATION DEFENDANT'S MOTION FOR SUMMARY JUDGMENT 45

IV.    ARGUMENT CONCERNING PROFESSOR JACKSON'S DEFAMATION CLAIM ................. 48

A.    Individual Defendants Acted with Actual Malice ................................ 48

B.    The Individual Defendants Clearly Referenced Jackson Directly ............................. 51

C.    Jackson Is a Private Individual ................................................ 53

D.    The Individual Defendants' "Opinion" Defense Must Fail .......................... 57

E.    The Individual Defendants' Statements of Fact Are Actionable ................. 59

V.    CONCLUSION ................................................................... 60

Certificate of Service ................................................................ 62

# TABLE OF AUTHORITIES

## Cases

*Adams v. Starside Custom Builders, LLC*, No. 05-15-01162-CV, 2018 Tex. App. LEXIS 10104 (Tex. App. Dec. 7, 2018) ........................................................................................................................ 51, 53

*Bailey v. Iles*, 87 F.4th 275 (5th Cir. 2023) ........................................................................................ 36

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), cert. denied, 140 S. Ct. 432, 205 L. Ed. 2d 264 (2019).................................................................................................................................... 35, 43

*Butowsky v. Folkenflik*, No. 4:18CV442, 2019 U.S. Dist. LEXIS 104297 (E.D. Tex. Apr. 17, 2019) ...................................................................................................................... 51, 53

*Butts v. Martin*, 877 F.3d 571 (5th Cir. 2017) ................................................................................ 38

*Casso v. Brand*, 776 S.W.2d 551 (Tex. 1989) .................................................................................. 48

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) .............................................................. 28, 29

*Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)................................. 34

*D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429 (Tex. 2017).......................................... 51

*Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018) ................................................. 51

*Dearman v. Stone Cty. Sch. Dist.*, 832 F.3d 577 (5th Cir. 2016) .................................................... 38

*Duke v. N. Tex. State Univ.*, 469 F.2d 829 (5th Cir. 1972)............................................................ 40

*Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908).................................. 16, 28, 33

*FCC v. League of Women Voters of California*, 468 U.S. 364, 104 S. Ct. 3106, 82 L. Ed. 2d 278 (1984)............................................................................................................................................. 35

*Francis v. Phx. Capital Grp. Holdings, LLC*, No. 05-22-01260-CV, 2023 Tex. App. LEXIS 6732 (Tex. App. Aug. 29, 2023)........................................................................................................... 53

*Gertz v. Robert Welch, Inc*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)................... 55

*Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423 (1985)............................................................ 33

*Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) ......................... 33

*Greer v. Abraham*, 489 S.W.3d 440 (Tex. 2016)............................................................................ 48

*Harte-Hanks Comm'ns v. Connaughton*, 491 U.S. 657, 109 S. Ct. 2678, 2686 (1989)........... 48, 51

*Haverda v. Hays Cty.*, 723 F.3d 586 (5th Cir. 2013) ...................................................................... 37

*Haverkamp v. Linthicum*, 6 F.4th 662 (5th Cir. 2021) (per curiam) .............................................28

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 U.S. Dist. LEXIS 43617 (E.D. Tex. Mar. 11, 2022) ...................................................................... 35, 36

*Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.*, 242 S.W.3d 518 (Tex.App.—El Paso 2007, no pet.)............................................................................................................53

*Hurst v. Lee Cnty.*, 764 F.3d 480 (5th Cir. 2014) .....................................................................35

*Hutchinson v. Proxmire*, 443 U.S. 111, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979) ................................ 55, 58

*Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023)................................................ 16, 28, 29, 31

*Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex. Jan. 18, 2022)............................................................................ 15, 28, 30, 32

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020).........................................34

*Jones v. Matkin*, 623 F. Supp. 3d 774 (E.D. Tex. 2022) .................................................. 41, 44

*Juarez v. Aguilar*, 666 F.3d 325 (5th Cir. 2011)........................................................................36

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) .......................................................................36

*Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967)..................................43

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004)......................................................................45

*Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023) .........................................58

*McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 131 L. Ed. 2d 426, 115 S. Ct. 1511 (1995) ...................35

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...............................................................44

*Meyer v. Grant*, 486 U.S. 414, 100 L. Ed. 2d 425, 108 S. Ct. 1886, 1892 (1988)........................................35

*Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014) ................................................................29

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)........................................................................................................................38

*O'Brien.  Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969) ............................................58

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S. Ct. 1912 (1978)........................................41

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) ........................................................32

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993)........................................................................................................................31

*Papasan v. Allain*, 478 U.S. 265, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)..............................33

*Petrie v. City of Grapevine*, 904 F. Supp. 2d 569 (N.D. Tex. 2012) ................................................34

*Polk City Publ'g Co. v. Coleman*, 668 S.W.3d 385 (Tex. App. 2021)............................................54

*Richardson v. Hughs*, 978 F.3d 220 (5th Cir. 2020) ........................................................................34

*Sabal v. Anti-Defamation League*, No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 78354 (N.D. Tex. Apr. 30, 2024). ....................................................................................................................................59

*San Diego v. Roe*, 543 U.S. 77, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)....................................44

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ....................................................34

*St. Amant v. Thompson*, 390 U.S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968).........................48

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir. 1987) ........................................................................54

*Tesla, Inc. v. NLRB*, 120 F.4th 433 (5th Cir. 2024) ........................................................................44

*Time, Inc. v. Firestone*, 424 U.S. 448, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976) .............................56

*Trotter v. Jack Anderson Enters.*, 818 F.2d 431 (5th Cir. 1987)............................................... 54, 55

*United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968)......................................................58

*Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 131 S. Ct. 1632, 179 L. Ed. 2d 675 (2011)............31

*Vice v. Kasprzak*, 318 S.W.3d 1 (Tex. App. 2009) ........................................................... 51, 52, 53

*Waldbaum v. Fairchild Publications*, 627 F.2d 1287 (D.C.Cir. 1980) ...............................56, 57, 58

*Waters v. Metro. State Univ.*, 91 F. Supp. 2d 1287 (D. Minn. 2000) ..............................................43

*Weber v. Fernandez*, No. 02-18-00275-CV, 2019 Tex. App. LEXIS 2487 (Tex. App. Mar. 28, 2019)..............................................................................................................................................50

*Wetherbe v. Tex. Tech University him SYS.*, No. 5:15-CV-119-Y, 2016 U.S. Dist. LEXIS 44301 (N.D. Tex. Mar. 31, 2016) ..............................................................................................................36

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568 (Tex. 1998) ..........................................................55

*Whitney v. California*, 274 U.S. 357, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) ..................................44

Woods v. Smith, 60 F.3d 1161 (5th Cir. 1995) .................................................................................38

**Statutes**

§ 105.101 ................................................................................................................ 16, 29

Tex. Civ. Prac. & Rem. Code § 27.001 ................................................................................53

Tex. Ed. L. § 105.051 ...................................................................................... 16, 29, 32

**Rules**

RR § 03.801 ............................................................................................... 16, 17, 29, 30

I. **FACTUAL BACKGROUND**

Plaintiff Timothy Jackson respectfully submits this Response in opposition to the Defendants' two motions for summary judgment.  ECF No. 83 and 84.  Professor Jackson is Distinguished University Research Professor of Music Theory at the University of North Texas ("UNT") College of Music, in the Division of Music History, Theory, and Ethnomusicology ("MHTE").  (ECF No. 1-1, submitted in the Plaintiff's Record Appendix as **Exhibit A**, ¶ 1.)  He has also directed the Center for Schenkerian Studies ("CSS").  (Id., ¶ 4.)

The CSS was the institutional home of the Journal of Schenkerian Studies ("JSS"), which Jackson founded over 20 years ago.  (Id., ¶ 4.)  Until its abrupt cancellation after July 25, 2020, Timothy Jackson served as founding member of JSS's Advisory Board.  (Id.)  The JSS is dedicated to the theory and methods of the Jewish-Austrian intellectual, Heinrich Schenker (1868-1935), sometimes referred to as the "Albert Einstein" music theory.  (Id., ¶¶ 11-14.)

From the beginning (ca: 2002), the Advisory Board selected the JSS's Editorial Board and selected and trained the editor-in-chief (traditionally, but not always, a graduate student).  (**Exhibit D** at UNT_000848; **Exhibit B** ("Jackson Dep"), 167:21-168:16; 170:15-172: 24; 157:22-25; **Exhibit GG**, ("Slottow Dep"), 67:20-69:24.)  The Editorial Board served as a larger pool of reviewers to peer-review articles, but the JSS' S operations fell to the Advisory Board (Timothy Jackson and Steven Slottow) and the editor (or sometimes coeditors).  (Jackson Dep, 164:2-6; 167:4-20; 173:6-14.)  UNT can provide no evidence that this organizational structure ever caused any controversy, that the Advisory Board lacked authority to constitute the JSS, or to manage its operations.  The University of North Texas Press ("UNT Press") has always published the JSS, which is an institution of UNT.  (See e.g., **Exhibit B** at UNT_000849.)

After July 25, 2020, a controversy engulfed the JSS and Professor Jackson, when he published an article in a Symposium in the JSS, Volume 12.  (**Exhibit D**.)  The Symposium

consisted of 15 articles, roughly evenly split over the question of whether Schenkerian analysis must be reformed to become "anti-racist." (Id.) This controversy has been summarized to the Court before, with ample admissible evidence. (ECF No. 1-1-ECF No. 1-23.)

No sooner did the Symposium appear than MHTE faculty and graduate students circulated petitions clamoring for Professor Jackson to be fired, the CSS to be closed, and the JSS to be canceled. (Id.) The background to this defamatory campaign was set forth in Professor Jackson's Motion for Summary Judgment As to Defamation Claims. ECF No. 80 at Page ID #: 1313-1325, which is here incorporated by reference. Jackson was permanently removed from the JSS's Advisory Board, and UNT, a state actor, insured that the JSS was not published again. (**Exhibit U**.)

## A. The Schenker Controversy

The Symposium responded to a plenary talk at the 2019 annual conference of the Society for Music Theory ("SMT") by City University of New York Professor Philip Ewell, who "identifies" as black. (**Exhibit F** ("Ewell Dep"), 24:4-25:3.) The title was "Music Theory's White Racial Frame." (Id., 24:17-18) In particular, Ewell attacked Heinrich Schenker for supposedly linking "racial hierarchy, national hierarchies, and Schenker's beliefs about the hierarchy of [musical] tone." (Id., 133:9-12.) Only a brief summary need be provided here, but within the MHTE and the SMT Ewell's ideas have achieved the status of gospel, which UNT enforced with all the full authority of the State of Texas under the banner, variously, of "anti-racism" or "diversity, equity, inclusion, and belonging." (See e.g., **Exhibit G** ("Bakulina Dep"), 72:19-73:8; 73:16-18; 74:16-25; 75:1-3.)

In sum, because Schenker believed that a hierarchy of tones is inherent in any musical art form, so Professor Ewell argues, this somehow "keep[s] in place racialized systems that benefit whites and whiteness." (**Exhibit H** at PDF p. 11.) In Schenker Documents Online ("SDO"), an archive of Schenker's works and Apocrypha, Professor Ewell purports to have identified "57 results" for the word "race." (**Exhibit HH** at 8.) Assuming each of these references to "race"

2

appears on a unique page, this would be less than .0005% of the SDO's 130,000 pages of Schenker manuscripts.   (**Exhibit II.**)  Yet at UNT's "antiracist" acolytes of Ewell, this is proof that "Schenker was a highly racialized individual and often mentions race in his plentiful writings…"

(**Exhibit HH** at 8.)

Defendant Bakulina, who, unlike other witnesses, left UNT for greener pastures, gave candid testimony about why the JSS had to be shut down.  She says the quiet part out loud:

> . . . what led to the stopping of Journal of Schenkerian Studies publication . . . was the fact that many authors, not all, but many authors in the 2020 Symposium positioned themselves in -- as antagonists of Ewell. . . . They were opposed or at least they did not like to see someone arguing for changes and for inclusivity and to make the field more open. . . .
>
> The problem in this case is not only the fact that those articles were not peer reviewed.  It's the fact that these articles, this Symposium, most articles in the 2020 JSS Symposium remained polemically in relation to Philip Ewell's keynote. They were directed at a specific person who identifies as Black, Philip Ewell, they're meant in opposition, and they're arguing against things that Philip Ewell said. In this sense, they are polemical. So that's one problem.
>
> The second problem is that they're polemical in relation to an extremely sensitive issue, which is the issue of race, identity, inclusion, belonging.

(Bakulina Dep, 72:19-73:8; 73:16-18; 74:16-25; 75:1-3.)  The JSS had to be shuttered because nothing but obeisance to "extremely sensitive" DEI issues was permitted.  (Id.)  And City University of New York Professor Philip Ewell, apparently because he "identifies as Black," also had to be treated as a magical being whose gospel may not be questioned at UNT.  (Id.)

Professor Jackson sinned against the gospel of Ewell and swiftly suffered damnation.

Of course, disputes over ideas (whether brilliant or crackbrained) are common in any academic discipline.  Normally scholars settle these disputes with principled debate and evidence. What distinguished the Schenker controversy was the State of Texas' effort, along with private parties like the SMT, to suppress any criticism of Ewell and the hypocritical justifications for this suppression.

Professor Jackson and, at least at first, the editorial staff of the JSS simply did not heed this message.  As UNT Professor Steven Slottow described it, "Ewell gave a talk at SMT, to which there was no opportunity to respond."  (**Exhibit JJ** at UNT_000300; **Exhibit K** ("Chung Dep"), 76:7-16; Ewell Dep, 145:21-146:12.)  No criticism was allowed when the SMT later published Ewell's plenary talk without peer review in the journal *Spectrum*.  (Ewell Dep, 33:17-36:13; 258:6-10; **Exhibit L** ("Brand Dep"), 36:5-13; Bakulina Dep, 51:3-17; **Exhibit H**.)  The fact that *Spectrum* published Philip Ewell without peer review is also significant.  The SMT holds out *Spectrum* as a journal that practices "blind review" (i.e., double-blind peer review).  (Bakulina Dep, 49:1-3; 49:20-50 1; **Exhibit H**.)  But no one cared that Ewell was permitted to condemn the entire tradition of Western music theory as "racist" and "white supremacist" in the absence of peer review.  The only outcry came when Timothy Jackson criticized Ewell and the tradition of Western classical music.

It was also perfectly acceptable at UNT that Defendant Frank Heidelberger published Philip Ewell without peer review in the pages of *Theoria*, another UNT Press journal for music theory.  (**Exhibit KK;** Ewell Dep, 124:11-17; 125:15-18.)[1]  Ewell published his article without peer review in *Theoria* in the same year (2020) that Jackson's critique of Ewell came out in the JSS.  (Id.; Ewell Dep, 125:18; 126:2-8; **Exhibit CC** ("Heidlberger Dep"), 39:21-40:6; 60:4-64:1; Bakulina Dep, 23:2-7; 32:3-7.)

*Theoria* states unambiguously: "All submissions will be peer reviewed…" (Heidlberger Dep, 17:4-11; **Exhibit KK** at 157.)  Nevertheless, *Theoria*, like many other academic journals, routinely publishes articles without peer review.  (See e.g., Heidlberger, 39:21-40:7; 60:2-20.)  Defendant Heidlberger has also published Defendant Chung (2024) and Defendant Bakulina (2020) in *Theoria* without peer review.  (Chung Dep, 39:6-8; Bakulina Dep, 23:2-7; 32:3-7.)  No one ever accused Heidlberger, Chung, or Bakulina, much less Philip Ewell, of "racism" or "editorial malpractice" for

---

[1] Ewell, Harmonic Functionalism and Russian Music Theory: a Primer, Theoria, 26(2020), 61-84.

publishing such articles.  (Bakulina Dep, 34:24-35:2; Chung Dep, 39:21-24; Heidlberger Dep, 63:22-64:4.)  UNT never felt obliged to investigate these publications or investigate Heidelberger.  (Id.)

**B.  Levi walls and Timothy Jackson conceive the Symposium**

Almost immediately after the Symposium appeared (on a Saturday), Defendant Chung (who had worked on the call for papers soliciting contributions to the Symposium) emailed the editorial staff, "via twitter, I have been seeing that there has been some early and vociferous pushback re: the new issue of JSS. . ."  (**Exhibit JJ** at UNT_000302.)  Defendant Bakulina added, "I see something similar on Facebook."  (Id.)  No UNT policy makes social media some sort of editorial authority over academic journals.  (Brand Dep, 26:18-21.)  Nevertheless, the fact that a conniption on social media among music academics prompted Division Head Brand to call an "emergency meeting" on Sunday (July 26, 2020).  (Brand Dep, 103:6-21.)

The student editor, Levi Walls, also expressed concern.

> I don't want my career to be ruined before it properly began.  I have a family to take care of now.  I'm also confused about what exactly people want the responses were to Ewell's paper.  Did Ewell want to respond to his own paper?

(**Exhibit JJ** at UNT_000301.)

To that point, Walls had only expressed respectful criticism of Ewell.  Prior to the Schenker controversy, Walls' demonstrated independent thought and intellectual curiosity.  (See e.g., ECF No. 1-2 (submitted for convenience as **Exhibit LL**) at JACKSON 000005- JACKSON000010.)  In fact, it was Walls who first raised Ewell's plenary talk with Professor Jackson in the first place.  (**Exhibit LL** at JACKSON00005.)  Walls also went out of his way to send Professor Jackson affectionate, personal notes.  (**Exhibit M**.)  Walls wrote Jackson within a week of Ewell's plenary address, "I would also be very interested in discussing a particular Schenker paper [Ewell's] from SMT . . . it suggested that analysis that utilizes levels of hierarchy is inherently racist, which strikes me as naïve." (**Exhibit LL** at JACKSON000005.)



Walls followed up three days later,

> [Ewell's] paper's willful ignorance of Schenker's Jewish identity is indeed troubling. . . . [H]is claim that the entire theoretical world view—and by extension those who helped spread it—is racist becomes very problematic when we consider the intimate connection between [S]chenkerian analysis and the Jewish identity.  I think that it is possible to address biases in Schenker studies (and academia in general) and advocate for increased transparency without demonizing an entire methodology (especially one with strong Jewish roots). Ewell's talk certainly failed in that regard.

(Id. at JACKSON000007.)  After going back and forth, Professor Jackson suggested, "it occurred to me that it might be appropriate for the Journal [of Schenkerian Studies] to solicit responses to Ewell from a number of prominent Schenkerian's - if they would be willing to reply - and publish a small collection.  What do you think of this idea?"  (Id. at JACKSON000008; Jackson Dep, 193:19-194:13.)  Walls was enthusiastic: "I agree that a response in the JSS would be very appropriate. It would be nice to have it for the upcoming issue, although it is very forthcoming (around mid-December)."  (Id. at JACKSON000009.)

Over the following months, Walls as well as Defendant Graf, Defendant Bakulina, Defendant Cubero, and Defendant Chung all worked out a call for papers or were directly aware of it before it issued at the end of December 2020 to solicit contributions for the special Symposium. (ECF No. 1-11 (submitted for convenience as **Exhibit NN)**; **Exhibit D**; **Exhibit EE** ("Graf Dep"), 85:18-25; Chung Dep, 49:12-21; **Exhibit OOO** ("Cubero Dep"), 54:14-55:3; Bakulina Dep, 83:5-8.)  These were intended to be opinion pieces, not subjected to peer review, and the idea of a

"Symposium," as Walls and Professor Jackson conceived it, was loosely based on Plato's Socratic dialogue by that name. (Jackson Dep, 203:4-10.) The idea was that different speakers would contribute and "argu[e] among themselves." (Jackson Dep, 203:22-24.) The JSS would provide the forum that the SMT refused to allow. (**Exhibit JJ** at UNT_000300.) In contemporary documents, no evidence suggests Levi Walls was somehow cowed by Professor Jackson.

## C. Graduate Student Editor Levi Walls Quits, Lies about His Mentor Timothy Jackson, and Cowers before the Social Media Mob

The social media mob that materialized almost instantaneously after Volume 12 appeared changed everything. According to the State of Texas, the impermissible viewpoints that Professor Jackson expressed in his contribution to the Symposium were as follows:

- Couching Professor Ewell's statements about Schenker in "black antisemitism";

- Stating that Ewell is uninterested in bringing "blacks" up to "standard" so that they can compete;

- Labeling elements of black culture as "toxic," calling the lyrics of hip-hop songs "obnoxious";

- Positing that the paucity of black people in music theory is due the fact that they do not grow up in homes where classical music is valued.

ECF No 83 at Page ID #: 3806. Of course this bears only a remote relationship to what Professor Jackson actually wrote. (Compare **Exhibit D** at UNT_001008-UNT_001023.) As Levi Walls remarked at the time, which appears to remain true today, "people seem to be speculating about the journal without actually reading it." (**Exhibit JJ** at UNT_000301.)

But Walls quickly changed his tune and resolved to lie about Professor Jackson and even about his own hard work on the journal. He published a self-flagellating apologia of on Facebook (July 27, 2020). (ECF No. 1-6, submitted for convenience as **Exhibit OO**.) Among other things, Walls stated the following, obvious misrepresentations:

- He had "essentially agreed with Ewell's talk."

7

- He had "no control over the content of the journal."

- He "feared [he] could not leave [the student editorship of the JSS] without significant damage to my career.

- Contributors "cherry picked information to make Schenker appear in a better light."

- Timothy Jackson rejected his editorial input on criticisms of Ewell and told him "it was not [Walls'] job to censor people."

- He found the direction of the JSS "disgusting."

- He met with Division Head Brand as a "whistleblower."

- "Dr. Jackson was willfully ignorant about politically correct discourse."

- He feared "retaliation" from Professor Jackson.

- He was "dumbfounded" and disgusted by Jackson's [unspecified] "harmful rhetoric."

(Id.)  When Walls' internal correspondence with the JSS editorial staff from before July 25, 2020 was shown to Division Head Brand (who personally cancelled the Journal and Timothy Jackson's role on it), not even Brand could believe that Walls had "agreed with Professor Ewell"; that Walls had been forced to suppress pro-Ewell authors; or that Walls had been so intimidated by Jackson that he could not discuss scholarship with him.  (Brand Dep, 70:21-8; 74:3-12; 76:17-25; 77:2-18; 79:24-81:18.)  Walls lied to appease the mob.  (Id. at 81:11-18.)  Indeed, Walls admitted at deposition that he is a liar.  (**Exhibit PP**, ("Walls Dep"), 97:22-98:1.)

Of course, in the zeal to cancel the JSS at UNT, the obvious fact that Walls was lying about Professor Jackson did not matter.  No one bothered to ask whether Walls was lying.  Division Head Brand agreed that lying about a faculty member by a colleague or graduate student would be considered unprofessional conduct at UNT (Brand Dep, 56:19-25); but Brand did not consider it his job to implement "that type of discipline."  (Id. at 57:1-8.)  Instead, apparently, he considered it his job to cancel the JSS.  Not only did Brand call an "emergency meeting" on a Sunday within two days of the social media mob clamoring for the JSS to be closed; in less than a week after the Symposium

8

went public (July 25, 2020), Brand and Dean John Richmond announced that UNT would investigate the JSS in the name of "combating racism" (July 31, 2020). (Brand Dep, 103:6-16; **Exhibit QQ**.)

Thus, as already set forth in Professor Jackson's Motion for Summary Judgment on Defamation Claims, the Individual Defendants denounced Professor Jackson in multiple petitions not only as a "racist"; but they also accused him of nonexistent "racist actions" and "racist behaviors" as well as "extortion." They also demanded the JSS to be shuttered and the CSS be closed. (ECF No. 80 at Page ID#1317-1323.) UNT quickly obliged. (Brand Dep, 126:8-18; **Exhibit U**.) The JSS never published again.

### D. Dean John Richmond and Department Chair Benjamin Brand Announce the Investigation of the JSS in the Name of "Combatting Racism"

Nothing is clearer than the straight line running from Timothy Jackson's publication in the JSS Symposium, his abrupt cancelation as Advisory Board member, and the suppression of the JSS. Professor Jackson's thought crimes had to be silenced.

As already recounted in Professor Jackson's Memorandum in support of his Motion for Summary Judgment as to Liability for Defamation (ECF No. 80), which is here incorporated by reference, on July 25, 2020, Defendant Andrew Chung noticed (and brought to Division Head Brand's attention) that chatter on Twitter and Facebook had started "vociferous pushback" against the Symposium for its content. (Chung Dep, 60: 6-17, **Exhibit JJ** at UNT_000302; Brand Dep, 101:10-102:3.) Then Division Head Brand called his emergency meeting in which Defendants discussed these initial accusations that the Symposium was "racist." (Brand Dep, 103:6-21; **Exhibit RR** at UNT_000305.) Soon thereafter Brand consulted with Dean Richmond. (Brand Dep, 106:3-9.)

The next day after the emergency meeting (July 27, 2020), Defendant Gain started bandying about a graduate student petition on Twitter with Defendant Virani, who also blasted out quotations from a parallel faculty petition. (**Exhibit I**.) At least some faculty received versions of the graduate-student petition that same day (July 27, 2020). (**Exhibit SS**.) Defendant Gain had already predetermined that Professor Jackson was a "piece of shit"—based on rumor, while avoiding any direct experience of Professor Jackson. (**Exhibit P** ("Gain Dep"), 52:6- 54:4.) In fact, she was out of the country at the time and had no direct knowledge of anything. (Id., 58:8-10.) But she was content to label Professor Jackson a "racist" and defame him on social media. (Id., 58:11-59:1)

MHTE graduate students formally circulated a final, signed petition to Dean John Richmond and Department Chair Benjamin Brand on July 30, 2020 at 2:08 pm. (**Exhibit AA**.) There are two versions of the graduate-student petition. The first even accused Timothy Jackson of the crime of "extortion." (**Exhibit O**.) But both called for Timothy Jackson to be punished and fired and for the JSS to be squelched for daring to criticize Philip Ewell. (**Exhibit A** at Page ID #282-283; **Exhibit O**.) The second graduate-student petition was eventually attached to the so-called "Ad Hoc Panel Report," discussed below. (**Exhibit C** at Page ID #: 282-283.)

Before this, at least by January 29, 2020, the author of a parallel faculty petition, Defendant Rebecca Geoffrey-Schwinden, met with Dean Richmond to discuss drafts of the parallel faculty petition. (**Exhibit TT**; **Exhibit UU**; **Exhibit J** ("Geoffrey-Schwinden Dep"), 78:3-16; 82:16-83:16.) Dean Richmond and Division Head Brand received a final, signed copy of the faculty petition on July 30, 2020 at 4:24 pm. (**Exhibit Q**; Geoffrey-Schwinden Dep, 86:9-89:24; Brand Dep, 127:5-128:13; 131:22-132:2.) The faculty petition demanded thought policing of the "epistemic center of the journal," which the faculty denounced as "racist discourse," and the faculty expressly endorsed the student's petition, which they incorporated by reference. (**Exhibit C** at Page ID #: 284-285.)

10

The next morning (July 31, 2020, 9:35 am), Dean Richmond and Division Head Brand announced:

> The University of North Texas College of Music has begun a formal investigation into the conception and production of the 12th volume of the *Journal of Schenkerian Studies*, which is published by the Center for Schenkerian Studies and UNT Press. The University, the College of Music, and the Division of Music History, Theory, and Ethnomusicology reaffirm our dedication to combating racism on campus and across all academic disciplines. We likewise remain deeply committed to the highest standards of music scholarship, professional ethics, academic freedom, and academic responsibility.

(**Exhibit QQ**.)  Thus, less than a week after Professor Jackson's article appeared in the Symposium, he and the JSS were placed under investigation, supposedly to "combat[] racism."

This was obviously an attack upon Jackson's viewpoints, in particular, and upon the JSS more generally for protected speech.  UNT, backed with the full authority of the State of Texas, announced its burning need to "combat[] racism" within less than 48 hours of Dean Richmond receiving repeated (false and malicious) petitions accusing Timothy Jackson of "racist" "actions" and "behaviors," and no less, "extortion."  What should have been simply an academic dispute between scholars was now, in the eyes of UNT, some sort of hate crime.  (See ECF No. 82, § A.)  There is no other explanation for Dean Richmond's and Division Head Brand's quasi-confessional need to "reaffirm" of their purported "dedication" to "combating racism."

The social media mob's concern with the "conception and production" of the JSS, as ginned up by Defendant Rachel Gain and others, was that the "epistemic center of the Journal issue lies in a racist discourse that has no place in any . . . academic journal."  (**Exhibit I**.)  To crack down on this impermissible discourse and signal supposed "antiracist" virtue to all the world, Dean Richmond and Division Head Brand announced their crack down on the College of Music's website, an announcement which, until recently, stayed there throughout this litigation.  (**Exhibit T**.)  Just three days later (August 3, 2020), Provost Jennifer Cowley promptly convened a so-called "Ad Hoc Panel" (the "Panel") to investigate the JSS.  (**Exhibit VV**; **Exhibit WW**.)

Of course, the only alleged "racism" UNT's bureaucrats have ever identified is Timothy Jackson's protected speech. See e.g. ECF No. 83 at Page ID #3806. Although this claim is in itself preposterous; more properly, the only substance to Defendants' accusations of "racism" boils down to nothing more than resentment that Jackson and the JSS criticized Philip Ewell. (See e.g., **Exhibit DD** ("Cowley Dep"), 57:15-58:3.) As Division Head Brand testified, "It's normal in academia to criticize other people's work," but at UNT there is apparently an exception if one criticizes Philip Ewell; this is considered "platforming" racism. (See Brand Dep, 35:15-17; Bakulina Dep, 72:19-73:8; 73:16-18; 74:16-25; 75:1-3.)

### E. Provost Cowley Convenes the Pretextual "Ad Hoc Panel"

The intensely personal impact of this onslaught on Professor Jackson should not be ignored. In the days following the social media mob's attack, he began shaking uncontrollably and had to be hospitalized (on July 30, 2020.). (**Exhibit XX**.) The day that UNT announced that it would investigate Jackson and the JSS (July 31, 2020), Jackson had his counsel send UNT a letter warning of legal action if UNT continued to violate his academic freedom and First Amendment rights. (ECF No. 1-16 (re-submitted for convenience as **Exhibit YY**) at Page ID #322-327.)

The letter was sent to Defendant Laura Wright, Chair of the Board Of Regents, as well as to the Chancellor, Provost, Dean Richmond, and Division Head Brand. (Id. at Page ID #322.) The letter identified UNT's Policy 06.035, which ensures "[t]he right to academic freedom and the demands of academic responsibility apply equally to all faculty members at UNT." (Id. at Page ID #324; **Exhibit ZZ**.)

UNT's policy defines, "Academic Freedom" as "the right of members of the academy to study, discuss, investigate, teach, conduct research and/or creative activity, and publish, perform, and/or display their scholarship freely as appropriate to their respective UNT-assigned roles and responsibilities." (**Exhibit ZZ**.) Among other things, Policy 06.035 requires "respect for diverse

12

personalities, perspectives, styles and demographic characteristics, and maintenance of an atmosphere of civility"—regardless of race. (Id.)

UNT's Policy 06.035 does not provide a carveout for occasions in which a social media mob suddenly clamors "racism" because a professor's publication hurts the subjective feelings of faculty or graduate students. (Id.) Policy 06.035 does not provide a carveout that entitles some scholars to academic freedom because of their race, whereas others may not speak because they are "white," or Jewish, or any other racial category. (Id.) The policy does not suggest that anyone needs to be protected on account of their race from scholarly debate. (Id.)

Timothy Jackson formally requested that UNT initiate a grievance process to protect him from the violation of the academic freedom policy, to protect him from the defamatory faculty and graduate-student onslaught, and to protect him from Dean Richmond and Division Head Brand's announced investigation to suppress the JSS and his viewpoints. (**Exhibit YY**.)

But UNT had no interest in protecting academic freedom or free speech. Provost Cowley believes that academic freedom and responsibility "might not be" consistent with "diversity and inclusion." (Cowley Dep, 145:3-10.) At deposition, Provost Cowley also could not agree that "academic freedom does not harm racial minorities"; although she refused to identify a context in which academic freedom would or could harm racial minorities. (Cowley Dep, 147:16-23; 148:18-21.) No fewer than four attorneys, all paid for by Texas taxpayers, defended Provost Cowley's deposition. (Id., at 21:18-22:7.). Yet Provost Cowley still could not answer how academic freedom somehow harms (rather than protects) racial minorities. (Cowley Dep, 147:16-23; 148:18-21.)

In 2020, Provost Cowley ignored Timothy Jackson's attorney letter for over a month. (ECF No. 1-17 at Page ID #329 (re-submitted for convenience as **Exhibit AAA**). By comparison, Provost Cowley rushed to stand up the improvised "Ad Hoc Panel" to investigate Jackson and the JSS immediately after Dean Richmond' announced the urgent need to "combat[] racism." (**Exhibit**

**VV**; **Exhibit WW**.)  However, Provost Cowley could not be bothered to respond to Professor

Jackson.  Of course, no faculty or administrators who suppressed the JSS were ever "investigated"

for violating any UNT policy.

Provost Cowley answered Jackson's letter only on September 9, 2020, long after the so-

called "Ad Hoc Panel" began its pretextual investigation.  (**Exhibit AAA**.)  Nominally, Provost

Cowley stated that UNT "is investigating neither you nor the Journal of Schenkerian Studies."  (Id.)

But in classic bureaucratic doublespeak, she then said the University was investigating Volume 12 of

the JSS.  (Id.)  Apparently, at UNT, investigating a single volume of the JSS and Timothy Jackson's

role in it, does not count as investigating the Journal or Timothy Jackson's role in it.  As the so-

called "Ad Hoc Panel Report" eventually made clear, only Timothy Jackson was singled out for

criticism.  (**Exhibit C**.)

Provost Cowley brushed aside Jackson's request for a grievance process, nominally because

his attorney's letter "could not identify the policy under which [Jackson] was filing a grievance."

(Id.)  Of course the documents announcing the investigation of the JSS and Timothy Jackson in the

name of "combating racism" do not identify any UNT policies.  (**Exhibit VV**; **Exhibit WW**;

**Exhibit T**.)  UNT has never identified what rules, process, or policies the so-called "Ad Hoc Panel"

was supposed to apply.  (**Exhibit BBB** at UNT_002635.)  The reason given to ignore Professor

Jackson's grievance was obviously pretextual.  (**Exhibit AAA**.)  It was also obviously false, by the

plain language of Professor Jackson's attorney's letter.  The letter expressly referred to UNT's

academic freedom policy, 06.035 (among others).  (**Exhibit YY** at Page ID #322-327.)  Professor

Cowley also represented that "the letter did not identify a personnel action related to reappointment,

tenure, promotion, or a ***term of condition of employment*** against you."  (Id. at Page ID #329;

**Exhibit AAA**.)  Clearly, serving as Advisory Board member and founding member of the editorial

staff of the JSS was a "term of condition of employment" for Professor Jackson at UNT-- which

14

Division Chair Brand hastened to "put on ice"—and never changed his position.  (Brand Dep, 88:1-89:6; *Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at 8 and n.2 (E.D. Tex. Jan. 18, 2022).)  Clearly, shutting down an academic journal was also an onslaught against academic freedom.  Just not to Provost Cowley.

As quickly became evident, UNT's zeal to suppress the JSS required Provost Cowley and the "Ad Hoc Panel" to make things up as they went along.  Provost Cowley issued a charge to the Panel on August 6, 2020, again filled with bureaucratic doublespeak.  The charge states in relevant part:

> The university has appointed a five-member multidisciplinary panel of University of North Texas faculty experienced in the editing and production of scholarly journals. The panel members, who are outside the College of Music, will examine objectively the processes followed in the conception and production of volume 12 of the Journal of Schenkerian Studies.
>
> The panel will seek to understand whether the standards of best practice in scholarly publication were observed and will recommend strategies to improve editorial processes where warranted. Upon completion of its investigation, the panel will issue a report to UNT Provost Jennifer Cowley. The report will be made public.

(**Exhibit WW**.)  The charge expressly excluded any response from Jackson, which is ironic.  One of the chief lies told about Jackson and the JSS was that Philip Ewell was denied an opportunity to respond to his critics in the pages of the JSS.  (See e.g., **Exhibit C** at Page ID #284.)

Cowley expressly charged the panel with "objectively" examining the JSS.  (**Exhibit WW; Exhibit C** at Page ID #: 267, 284.)  At deposition, however, Provost Cowley could not give a coherent explanation of what she meant by "objective," which she claimed was somehow "context dependent."  (Cowley Dep, 68:16-70:11.)  She could not answer whether it was "objective" to disregard exculpatory evidence.  (Cowley Dep, 69:18-23.)  Nor could Provost Cowley say whether a witness who lied to an investigatory panel would be an example of falsifying evidence.  (Id. at 70:12-71:11.)  "Objective" came to mean, in this "context," coming up with any possible reason, whether plausible or not, to suppress Professor Jackson's viewpoints and the JSS.

**F.  The Regents Defendants' Plenary Authority¶**

Before delving into the so-called "Ad Hoc Panel" Report, Plaintiff must address (briefly) the facts that establish the Regents' plenary authority over UNT as well as their direct role in the facts and circumstances of this Case.  This is because Defendants yet again dispute whether the Regents are proper Defendants under *Ex parte Young*, 209 U.S. 123 (1908) as well as the prospective relief sought by Professor Jackson.  This is also despite the Fifth Circuit already disposing of this issue. *Jackson v. Wright*, 82 F.4th 362, 365 (5th Cir. 2023).

Policies, in the form of the Regents Rules of the University of North Texas System ("RR") and the Texas Education Law, bestow plenary authority on the Regents Defendants to restore Jackson's role on the JSS editorial board.  See e.g., Tex. Ed. L. § 105.051; § 105.101(a).  The Regents Rules incorporate this plenary authority under RR § 03.801(1): "the Board may direct, govern, operate, support, maintain, manage, and control the System and the Institutions."  (**Exhibit CCC**.)

It cannot be disputed that the CSS, JSS, UNT Press, and the College of Music are "institutions" of the University of North Texas System under the Regents authority.  The Regents Defendants also have the authority to "employ and discharge personnel, including faculty, to carry out the Board's powers and duties" (RR § 03.801(2)(c)); "adopt rules and policies for the administration of the Board's powers and duties" (RR § 03.801(2)(d)); and "perform other acts that contribute to the development of the System or the Institutions or the welfare of students of the Institutions."  RR § 03.801(2)(g).

It is inexplicable that the State of Texas argues that the Regents Defendants have no such authority.  Cf. ECF No. 84 Page ID #3946.

As already noted, the Regents (in particular the Chair Laura Wright) received a copy of Timothy Jackson's attorney letter of July 31, 2020.  (**Exhibit YY**.)  No witness, including Provost Cowley, has expressed a reason to believe that the Regents did not receive this letter.  (Cowley Dep,

130:25-132:2; Brenda Dep, 37:9-22.)  The Regents did nothing.  (Cowley Dep, 132:3-10.)  More properly, the Regents sat idly by while UNT suppressed the JSS and Professor Jackson's speech.

### G.  The So-Called "Ad Hoc Panel" Ignores Relevant Evidence

In practice, the functional head of the so-called "Ad Hoc Panel" was Professor John Ishiyama.  Professor Ishiyama managed all of the Panel's correspondence, invited all witnesses to interviews, and oversaw the compilation of the final report.  (Compare **Exhibit DDD** ("Ishiyama Dep"), 24:15-16.)  Ishiyama is a UNT Distinguished University Research Professor.  (Ishiyama Dep, 14:21-23.)  But Professor Ishiyama has no subject matter expertise in music theory of any kind, specifically not in Schenkerian analysis.  (Bakulina Dep, 221:14-222:1.)

Professor Jackson asked Ishiyama (October 13, 2020), "Can you tell me what standard of evaluation or policies of the University of North Texas the Ad Hoc Journal Review Panel is applying in its review of the JSS?"  (**Exhibit BBB** at UNT_002635.)  All Ishiyama could refer to was "the standards as indicated by" the Committee of Publication Ethics ("COPE").  (Id.)  COPE[2] is obviously neither a policy of UNT, nor were or are COPE principles required by the UNT Press.  (Ishiyama Dep, 62:62-24; 65:6-12; Cowley Dep, 88:16-18.)  In the face of Ishiyama's evasion, Jackson asked Ishiyama what specific policies of COPE the Panel was applying.  (**Exhibit BBB** at UNT_002634.)  Jackson also asked the Panel to "discuss how to maintain the integrity of an academic journal in the face of widespread calls for censorship and the repression of unpopular viewpoints."  (Id.)  Ironically, "editorial independence" is an important policy of COPE, which seeks to guarantee editorial independence.  (See e.g., **Exhibit EEE** at UNT_003310.)

But Professor Ishiyama brushed off Professor Jackson's question about academic freedom, "The panel's charge is narrow--to only investigate the journal's editorial processes, including management, peer review, and other processes related to journal production."  (**Exhibit BBB**.)

---

[2] The website of COPE is available here: https://publicationethics.org/  It is not accessible without a membership.

This foreshadowed the Panel's stubborn intolerance for relevant evidence. To begin with, the Panel selectively applied COPE standards. COPE's ethical guidelines clearly emphasize that editorial independence must be safeguarded, yet the Panel showed no interest in how Provost Cowley, Dean Richmond, and Division Head Brand's intervention in the JSS's affairs violated COPE principles. (Compare **Exhibit EEE**, *supra*.) No "standards" of COPE support convening special "panels" to investigate a journal simply because one or another of its articles offend some readers. (Id.)

Another COPE principal that the Panel ignored was its Guidelines 8 on the "peer-review process." (Id., at UNT_003309.) COPE states that peer review should be "appropriate for your journal/field of work and resources for such systems available." (Id.) However, Professor Ishiyama testified that the Panel was not obligated to compare the JSS to the practices of other music-theory journals like *Theoria*, also published within the College of Music. (Ishiyama Dep, 67:22-68:3.) The Panel "did not think that was relevant and part of the charge." (Ishiyama Dep, 35:8-12.) The fact that journals like *Spectrum* or *Theoria* published authors, including Philip Ewell, without peer review somehow did not matter— which only makes sense if the so-called "Ad Hoc Panel" was pretextual.

The Panel ignored other evidence. For example, the Panel did not even consider the JSS's call for papers for the Symposium. (Ishiyama Dep, 48:20-25; 111:4-8.) Timothy Jackson provided voluminous correspondence that laid bare the internal workings of the JSS's staff as it edited and published the Symposium (from its conception in November 2019 to its finalization in March 2020). (**Exhibit FFF**.) This correspondence documented the student editor, Levi Walls' blatant lies about Jackson, including lies Walls told to the Panel. (See *supra*, § C and id., e.g., at UNT_002705, UNT_002707.) By way of example, Walls represented to the Panel that Jackson had somehow forced him into his car, upbraided Walls, and told him "to make Schenker appear in a better light" including by forbidding the censorship of ***anti-Ewell*** papers. (**Exhibit FFF** at UNT_002770; **Exhibit C** at JACKSON000216; **Exhibit O**; **Exhibit NNN**.) The contemporaneous documents

reveal what Walls (and Defendant Graf) actually asked Jackson whether or not they should criticize authors who "are (at least) implicitly **anti-Schenkerian,**" that is, the very opposite of what Walls told the Panel, i.e. **pro -Ewell**. (**Exhibit FFF** at UNT_002758; Walls Dep, 96:16-98:15.)

The actual evidence shows that Jackson and Walls did discuss the Symposium in his car on one February day, but the motive was hardly as sinister as the Panel reported in order to smear Jackson. Jackson and Walls had simply sought refuge from the weather in Jackson's car, from a light snowfall (according to Walls) or because it had begun to rain (according to Jackson's recollection). (Walls Dep, 97:3-4; **Exhibit A**, ¶ 85, Page ID#38.) They discussed the specific contribution of **pro-Ewell** author Suzanne Clark. (Walls Dep, 98:2-6.) Thus, when Jackson advised Walls that their job was not to censor authors, he was expressly disallowing censorship of **pro-Ewell** viewpoints, viewpoints for which Jackson held antipathy. In the end, Walls admitted, "I lied" about this incident. (Id., at 97:25-98:1; Brand Dep, 79:24-80:12; 81:11-21.) To Ishiyama and the Panel, however, it was more important to perpetuate the falsehood that Jackson was a domineering gangster-like figure who coerced Walls into repressing criticism of Heinrich Schenker. (**Exhibit C** at Page ID #: 272.)

Rather than examine actual evidence, Ishiyama had a ready-made, one-size-fits-all excuse for Levi Walls's self-serving, deceitful behavior. There was a "power differential." (Ishiyama Dep, 108:4-12.) This "power differential" between Jackson and Walls turned all evidence into its opposite. Ample evidence, for example, showed that Walls' July 27, 2020 Facebook apologia misrepresented that he had "no control over the content of the journal," that he was a "whistleblow[er]," that he had "essentially agreed with Ewell's talk," and that Jackson forced him not to "censor" pro-Schenker/anti-Ewell contributions. (**Exhibit O**.) However, Ishiyama testified that the Panel did not read Walls' Facebook apology of July 27, 2020; Walls' histrionic resignation from the JSS was not relevant. (Ishiyama Dep, 78:25-26:6.)

19

Worse, the Panel's almost magical summoning of the "power differential" remade cowardice and duplicity into affirmative evidence that Walls was dominated by Timothy Jackson. (**Exhibit C** at Page ID #273.) The "power differential" rendered the hapless Walls incapable of "assert[ing] his own editorial views." (Ishiyama Dep, 87:7-10.) Walls said at the time that he thought "a response in the JSS would be very appropriate." (See Ishiyama Dep, 104:20-105:5; **Exhibit FFF** (submitted to the Panel) at UNT_002709.) To Ishiyama this was just "indicative of the power differential in the sense that Mr. Walls, even if he did object, would not have expressed it to his dissertation advisor." (Ishiyama Dep, 105:16-19.) In other words, Walls' lies became evidence of the "power differential" rather than, say, evidence of lies.

This pretextual excuse fit every context. But it only ever applied to Jackson. (Ishiyama Dep, 85:18-87:10.) Professor Ishiyama denied, for example, that there was a "power differential" between Walls and himself, a Distinguished University Research Professor. (Ishiyama Dep, 108:9-109:4.) Professor Ishiyama could not answer whether there was a "power differential" between Mr. Walls and Dean John Richmond of the College of Music. (Ishiyama Dep, 109:11-23.) Ishiyama did not "know for sure" if there was an inherent "power differential" between Division Head Brand and Walls. (109:24-110:8.) Ishiyama refused to "speculate" whether a "power differential" prompted Levi Walls to change his story on July 27, 2020 after almost the entire Society for Music Theory attacked Jackson and the JSS. (Ishiyama Dep, 106:6-13.) Ishiyama and the Panel did not consider the "substance of the controversy" and opined that "no evidence" indicated pressure on Walls because of the smear campaign against the JSS. (Ishiyama Dep, 107:5-108: 2.)

As already noted above, contemporary documents showed that Walls was terrified, not of Jackson, but of the social media mob that broke out on Twitter and Facebook after July 25, 2020: "I just heard about this [objections to the Symposium]. It's very worrying, especially as I don't want my career to be ruined before it properly began. . . ." (**Exhibit JJ** at UNT_000301.) Walls current

20

dissertation advisor Defendant Chung testified, "Walls was clearly panicking because he feared his reputation was jeopardized by being associated with the JSS." (Chung Dep, 66:24-67:17.) Walls was terrified of being associated with Jackson and the unorthodox viewpoints expressed in the pages of the JSS; he was hardly afraid of a "power differential" between him and Jackson. (Chung Dep, 68:2-20 (referring to **Exhibit JJ**.) But to Ishiyama and the Panel, contemporaneous evidence of Walls' actual state of mind was "irrelevant." (Ishiyama Dep, 107:23-108:2.) The "power differential" filled in all the gaps.

Prior to the Schenker controversy, contemporaneous documentation provided to the Panel also showed that Walls was capable of independent thought in his discussions with Professor Jackson (and anyone else). Division Head Brand admitted that Walls "seem[ed] perfectly capable of" normal academic discourse with Professor Jackson when Brand was compelled to actually confront evidence at deposition. (See e.g., Brand Dep, 73:22-77:18, quote 77:11-18, **Exhibit HHH** at JACKSON000241- JACKSON000242.) Likewise, Defendant Chung, Walls' current dissertation advisor, testified that Walls was no more reluctant to speak his mind than any other student. (Chung Dep, 69:16-19.) Chung had "no reason to believe," either with himself or at the time of the Symposium, that Walls "[wa]s so weak that he has no independent will as [a] dissertation advisee." (Id.70:20-24; 71:13-20.)

Yet Ishiyama and the Panel dismissed "evidence that Levi Walls was lying" because "it . . . demonstrate[d] the power differential" between Jackson and Walls. (Ishiyama Dep, 108:4-12.) And any evidence suggesting that Walls lied shamelessly to protect his career, per Ishiyama, was only "minor" compared to other supposed "problems we had pointed out with JSS." (Id., at 108:11-12.)

## H. Provost Cowley Turns over the JSS to the College of Music and Refuses to Publish Jackson's Response

The so-called "Ad Hoc Panel" submitted its report on November 25, 2020, and UNT immediately published it online, where it remained throughout this litigation until recently. (**Exhibit**

**C**.)  The report is riddled with misrepresentations, like "[n]o documents were provided that described the normal review process," not to mention the bogus story about Jackson forcing Levi Walls into his car.  (Id. at Page ID#: 270, 272.)  Of course, Jackson provided the JSS's with over 130 pages of internal correspondence documenting the editorial process for the Symposium, but this was ignored, especially the evidence that Levi Walls was simply lying about the suppression of viewpoints critical of Heinrich Schenker.  (See e.g., **Exhibit FFF** at UNT_002758.)  The eventual Report does not refer to a single document from Professor Jackson's submission to the Panel.  The Panel repeated the canard that Jackson dismissed Walls' editorial concerns about "several of the contributions"; whereas, in actuality, Jackson deferred to Walls' and Graf's concerns that the JSS ***should not*** be censoring ***pro-Ewell*** papers.  (**Exhibit C** at Page ID #: 272.)

The Report showcased what he called "structural flaws" in the "power disparity" between the graduate-student editor and the advisory board, particularly Jackson.  (**Exhibit C** at Page ID #: 273.)  Although Benjamin Graf was already a professor, he was also afflicted by "this power differential."  (Ishiyama Dep, 106:10-13.)  But Ishiyama "can't say what it caused him to do."  (Ishiyama Dep, 106:15.)  Ishiyama also "can't speculate" whether a "power differential . . . prompted Levi Walls to change his story on July 27, 2020"—that is, the day Walls issued his apologia.  (Ishiyama Dep, 106:6-10; compare, **Exhibit O**.)

The Panel also established clear double standards that applied to Professor Jackson and the JSS but to no one else at the University of North Texas.  The Panel condemned the JSS and Jackson for having no "clear procedures that ensure that potential conflicts of interest in the review process . . . with regard to editor (or editorial advisor) self-publication."  (Id. at Page ID #: 274.)  Of course,

neither Defendant Heidlberger's journal, *Theoria*,[3] nor the SMT journal, *Spectrum*,[4] have such policies. (**Exhibit H**; **Exhibit KK**.)  Contrary to COPE's principles, the Panel disregarded the norms of publication in the field of music theory.  (Ishiyama Dep, 35:8-12; 67:22-68:3.)

Likewise, the Panel condemned Professor Jackson and the JSS for having "no written procedures … to ensure that transparent peer review processes are conducted."  (**Exhibit C** at Page ID #: 274.)  Of course, once again, neither *Theoria* nor *Spectrum* have this either.  (**Exhibit H**; **Exhibit KK**.)  In fact, Division Head Brand testified that he was unaware if the UNT Press even required peer review for journals.  (Brand Dep, 46:14-21.)

In his interview with the Panel, Professor Jackson referred to the Symposium contributions to Volume 12 as "commentaries," although he and Walls had titled the special section of the JSS a "Symposium."  (**Exhibit C** at Page ID #: 275.)  Of course, the articles were commentaries on Professor Philip Ewell's plenary address at the 2019 SMT conference.  (**Exhibit D**.)  But the Panel expressed its displeasure with Jackson's use of the word "commentaries."  (**Exhibit C** at Page ID #: 275.)  Bizarrely, the Panel remarked that "these pieces really were much more like a symposium"— which was exactly what Jackson and the editorial staff named their special section.  (Id.)  This too was some sort of failing to lay at Jackson's feet.  (Id.)  The Panel would go to any lengths, however specious, including ignoring evidence, to condemn Jackson.  The Panel concluded, "we do not find that the standards of best practice in scholarly publications were observed in the publication of Volume 12 of the JSS."  (**Exhibit C** at Page ID #: 277.)

---

[3] UNT has no such information on *Theoria's* website: https://digital.library.unt.edu/explore/collections/THRJL/; https://music.unt.edu/mhte/theoria/index.html.  Theoria merely holds out that "All submissions will be peer reviewed for their scholarly quality, clarity and originality. Only high-level professional research materials will be considered. PhD candidates in the related disciplines are particularly encouraged to submit articles." (https://music.unt.edu/mhte/theoria/call-articles.html.)
[4] Spectrum states only "*Music Theory Spectrum* practices blind review. For this reason, authors should avoid identifying themselves, directly or indirectly, in the submission itself, confining such identification to an accompanying cover letter." (**Exhibit H**.)

UNT then published this contribution to the smear campaign against Professor Jackson on the University of North Texas website, where it remained until recently.[5]  (Cowley Dep, 199:12-14.) Provost Cowley asked Jackson, and Jackson alone, to respond to the Panel's report—another indication of how pretextual Defendants' denial is that Jackson was somehow not the target of the so-called "Ad Hoc Panel."  (ECF No. 1-21 (resubmitted for convenience as **Exhibit GGG**).) Jackson responded (December 18, 2020) by giving an accurate account of Symposium's genesis. (ECF Note. 1-23 (the "Response," resubmitted here for convenience as **Exhibit III**.)  But Professor Jackson's Response was never made public by UNT and suppressed.  (Cowley Dep, 199:200:4-6.)

The State of Texas represents to this Court that Professor agreed with the so-called "Ad Hoc Panel" in his Response.  ECF No. 84 Page ID #: 3954.  No reasonable reading can support this gloss.  Professor Jackson emphasized that "reform of the editorial structure is clearly necessary now because, unexpectedly and precipitously, the Journal has become the focus of an assault on academic freedom and free expression. . ."  (Id. at Page ID #: 347.)  The Response also argued repeatedly that the so-called "Ad Hoc Panel" Report was "a pretext for viewpoint discrimination"; and Professor Jackson complained of the "pretextual nature of the Panel's attack on me."  (Quotations, see id. at Page ID #: 347, 350; see also 348, 354, 364.)  In fact, the Response dedicates an entire Section C to "The Pretextual Nature of the Report." (Id. at Page ID #: 366-67.)

Of course, one of the main defamatory objections to the Symposium was that Professor Ewell was somehow excluded from the pages of the JSS (a false claim when made), and that this was some sort of manifestation of "racism."  (See **Exhibit C** at 284; Cowley Dep, 177:8-179:9.)  Yet when it came to responding to such false accusations, UNT would not publish Professor Jackson's Response to his critics on its webpage.  (Cowley Dep, 201:1-6.)  "There was no obligation or

---

[5] According to the Internet archive, Way Back Machine, these websites were removed sometime after May 24, 2024.  See https://web.archive.org/web/20250000000000*/https://music.unt.edu/schenkerian-journal-statement.

expectation that we would provide any others' viewpoints or perspectives and post those online,"
explained Provost Cowley.  (Cowley Dep, 200:9-12.)  In fact, Provost Cowley never recalled reading
the Response; in other words she ignored it.  (Cowley Dep, 199:9-11.)  Division Head Brand did not
even bother to wait for Timothy Jackson's before formally removing him from the Journal.
(**Exhibit U**, Brand Dep, 87:1-88:12.)  And Brand did not change his position on this issue even after
he received Jackson's Response.  (Brand Dep, 89:3-6; Cowley Dep, 201:1-206:16.)  Provost Cowley
delegated any final decision on the Report to the MHTE, meaning Brand, and understood, "keeping
the journal as it is and having him [Jackson] as the editor would not be acceptable."  (Id. and Cowley
Dep, 206:15-16.)

**I.    UNT's State-Enforced Dogma Turns the JSS into a "Radioactive Turd"**

In addition to canceling Professor Jackson's association with the JSS, UNT went through the
motions of seeking a new editor for the JSS.  (Bakulina Dep, 206:14-25.)  Bizarrely, the State of
Texas now blames Timothy Jackson for not applying for this position.  See ECF Note.84 at Page ID
#: 3940, 3947.  This ignores the fact that Jackson had proposed a new editorial staff for the JSS in
his Response.  The section titled, "JSS's Plan for Reorganization Necessary **to Confront Viewpoint
Discrimination**" (emph. added) not only indicates that Jackson was prepared to reconstitute the
JSS but that a qualified academic editor was willing to step into the breach.  (**Exhibit III** at
JACKSON000274-JACKSON000276.)  Jackson submitted this proposal less than a month after the
so-called "Ad Hoc Panel" Report.  (Exhibit A at Page ID #: 51, ¶ 147.)  But UNT did not want to
confront viewpoint discrimination; as quickly became clear, UNT wanted to impose viewpoint
discrimination on the JSS.

UNT asked Defendant Bakulina to serve on the search committee, although she had signed
the faculty petition calling for Jackson to be disciplined and the JSS to be closed.  (Bakulina Dep,

206:25-207:1.)  Other than posting a job description on UNT's website, there is no evidence that the committee actually did anything.  (**Exhibit JJJ**.)

UNT did not even get around this until May 2021.  (Id.)  This foot dragging is unsurprising. Professor Stephen Slotow (formerly a member of the JSS advisory board) testified, "it [the search] didn't go anywhere" and "nothing came of it." (Slottow Depos, 99:4-19.)  This is because UNT had made the JSS a "radioactive turd." (Slottow Dep, 99:25.)

In addition, as already indicated, Defendant Bakulina has testified that UNT's purpose was to correct the JSS's lamentable unpopular viewpoints, in particular its dissent from the gospel of Philip Ewell.  (Bakulina Dep, 72:19-73:8; 73:16-18; 74:16-25; 75:1-3.)  As she explained, at UNT, shutting down an academic journal counts as "mak[ing] the field more open."  (Id. at 72:19-73:8.)

By Defendant Bakulina's admission, the search committee's task was to "redefine" and "rebrand [the JSS]."  (Bakulina Dep, 210:9-12 and **Exhibit JJJ**).  That meant imposing "ideas of antiracism" and correct thinking "with respect to racial and gender diversity," rather than Schenkerian analysis, European music, or, as Bakulina explained, "you know, white male, European composers of certain centuries." (Bakulina Dep, 210:21; 212:8-9; 214:2-11).

In other words, UNT's pretextual search committee converted the JSS into a "radioactive turd" by "rebranding" it as some sort of politically correct journal of music theory.  According to Bakulina, the State of Texas' new direction for the JSS had "to embrace new content of [this] kind..." which she vaguely defined as "diversity." (Bakulina Dep, 213:11-214:23).  Ironically, one article slated for publication in the suppressed Volume 13 was authored by the non-Western Professor Mehmet Yueksal of Gazi Üniversitesi of Ankara, Turkey.  In the name of "antiracism," that article never saw the light of day, but Professor Jackson has submitted it in the record here with permission of the author.  (**Exhibit KKK**.)  Apparently, canceling the publication of a non-Western, Muslim author qualifies as "diversity" and "antiracism" at UNT.

The JSS was and remains highly respected by black musicians and scholars, including the black composer Kevin Scott and Princeton's Hughes-Rogers Professor of Music (emeritus) Kofi Agawu (an immigrant to the United States from Ghana),[6] who wrote to Jackson:

> When I first read the JSS issue [Symposium], I found myself nodding in agreement with many of the points you made in your response to Ewell. So I was truly astonished to see the subsequent attacks on you.

(See **Exhibit LLL** (Lucinda Breeding, UNT Professor accused of racism continues lawsuit against the University, August 15, 2021, Denton Record-Chronicle;[7] **Exhibit MMM**.)

Aside from Philip Ewell's pontifications, is hard to escape the impression that the Schenker controversy was otherwise about UNT's overwhelmingly white faculty patting themselves on the back for their supposed "antiracism" in ruining a colleague and his journal. There has been no increase in recruitment of black graduates students since the JSS was canceled. (Jackson Dep, 281:11-16.) Unsurprisingly, given its commitment to viewpoint suppression and orthodoxy, it is no easier now than before to recruit black professors to MHTE since the JSS stopped publication. (Id., 282:17-283:2.)

Defendant Bakulina testified that two candidates applied for the "rebranded" JSS editor position, but UNT cannot produce any documentation that this is true.[8] (Bakulina Dep, 207:7-9.) There is no evidence that anyone wants to edit a "rebranded" race-identity-inclusion-belonging journal rather than a serious Journal dedicated to substantive music theory. The search was always pretextual.

---

[6] See https://dof.princeton.edu/people/kofi-agawu.

[7] Also avail. at avail. at https://dentonrc.com/education/unt-professor-accused-of-racism-continues-lawsuit-against-the-university/article_4b1a53c8-f613-5cbc-84c5-164e818ae689.html

[8] Bakulina could not remember the names of the supposed applicants, but she was certain there would be substantial documentation of their applications. (Bakulina Dep, 215:4-216:20.) UNT should not be allowed to come to Court now arguing some sort of good-faith application process garnered legitimate applications. Defendants have either withheld these documents or they simply do not exist. (Compare ECF No. 84 at Page ID #3940.)

## II.   ARGUMENT CONCERNING JACKSON'S FIRST AMENDMENT CLAIM

### A.  The Regents are Proper Defendants under the Legal Fiction of *Ex Parte Young*

The State of Texas challenges Professor Jackson's standing, his appropriate prospective relief, and whether the UNT Regents Laura Wright, Milton B. Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, and G. Brint Ryan are proper Defendants to be sued in their official capacity ("Board Defendants" or the "Regents").  The State already lost these arguments twice.  See *Jackson v. Wright*, 2022 U.S. Dist. LEXIS 8684, 2022 WL 179277 (E.D. Tex., Jan. 18, 2022) *aff'd*, 82 F.4th 362, 365 (5th Cir. 2023).

Yet now the State of Texas beats this dead horse one more time.

*1)  The Regents Are Proper Defendants*

As the Fifth Circuit has ruled, notwithstanding sovereign immunity, *Ex parte Young*, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908) creates "the legal fiction that a sovereign state cannot act unconstitutionally, and therefore, when a state actor enforces an unconstitutional law, he is stripped of his official clothing and becomes a private person subject to suit." *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (quoting *Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (per curiam).)  "[A] plaintiff must sue the right defendants and ask for the right remedy.  Here, Jackson has done both."  Id.

State officers sued, here the Regents, must have "some connection" with the enforcement of the challenged law or policy.  Id. (quoting *Ex parte Young*, 209 U.S. at 157).  But all that is required is "a mere 'scintilla of "enforcement" by the relevant state official with respect to the challenged law.'" *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019).  As the Fifth Circuit has already determined:

> Here, the Board defendants have the required 'scintilla of enforcement' due to their governing authority over UNT. The Board defendants nowhere deny that their governing authority satisfies the 'scintilla of enforcement' standard; in fact, they never even acknowledge that standard in their opening brief.

*Jackson v. Wright*, 82 F.4th at 367 (citing the Regents Rules, e.g. **Exhibit CCC**).  The State of Texas all but ignores the controlling authority of *Jackson v. Wright*, 82 F.4th 362 in their brief.  ECF No. 84. But pretending that binding authority does not exist does not make it so.

Here, the Regents have more than a "general duty to see that the laws of the state are implemented."  Cf. *City of Austin*, 943 F.3d at 999-1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).  Indeed both the Regents Rules and Texas statute grant the Regents plenary authority over UNT and its employees.  See § I.F, *supra.*  "The organization, control, and management of the University of North Texas System and each component institution of the system is vested in a board of nine regents . . ."  Tex. Ed. L. § 105.051.  "The board may direct, govern, operate, support, maintain, manage, and control the system."  Tex. Ed. L. § 105.101(a).  The Regents Rules incorporate this obligation under RR § 03.801(1).  Therefore, the Fifth Circuit already held that the UNT Regents "have direct governing authority over the UNT officials that are allegedly continuing to violate Jackson's First Amendment rights, including authority to countermand the decisions of the subordinate UNT officials."  *Jackson v. Wright*, 82 F.4th at 368.

The letter Jackson sent on January 31, 2020 was especially persuasive to the Court of Appeals as connecting the Regents to his injury.  This was not just notice pleading.  The letter was in the record before the Court of Appeals; it is undisputed.  (ECF No. 1-16; **Exhibit CCC**.)  UNT's do-nothing Regents "themselves ignored [the] letter Jackson wrote to the Chair of the Board, notifying them of his removal from the Journal and seeking relief from the Board for the ongoing violation of his First Amendment rights."  *Jackson v. Wright*, 82 F.4th at 368.

In that letter, Jackson expressly demanded that UNT initiate a grievance to vindicate UNT's Policy 06.035, among other things.  (**Exhibit CCC**.)  Provost Cowley took the stance that Jackson "could not identify the policy under which [Jackson] was filing a grievance."  (**Exhibit AAA**.)  This

29

was evidently because Cowley does not believe that "academic freedom" is consistent with civil rights.  (Cowley Dep, 147:16-23; 148:18-21.)

The do-nothing Regents sat idly by.

Therefore, it cannot be disputed that the Regents have plenary authority to restore the JSS to publication by re-establishing Jackson as Advisory Board member with authority to carry out his duties, as he had done before, to select an editor of the JSS.  Since the State of Texas continues to dispute that the Regents are proper *Ex Parte Young* defendants, the Court should dispose of this issue once and for all by ordering the State of Texas to identify a proper defendant(s) and allow Plaintiff to amend.  Otherwise, Defendants will continue to waste this Court's and the Fifth Circuit's time by raising this issue over and over.

   2)  *Jackson Seeks to Be Restored to his Position on the JSS Advisory Board*

In this third bite at the *Ex Parte Young* apple, the State of Texas advances the strawman argument that Jackson wants to force UNT to appoint a new editor to the JSS through its pretextual search committee.  They argue this is not prospective relief and therefore disallowed.

This is a strawman argument.  Jackson seeks to enjoin Defendants from their ongoing interference with the JSS's Advisory Board, which had always appointed the JSS's Editorial Board and chosen the editor in the past.  Jackson seeks to enjoin his removal from the JSS and other adverse employment actions imposed on him.  UNT has also stripped him of a one-course remission and a .50 FTE Research Assistant.  In consequence, prospective articles in the JSS pipeline (to publish in Volume 13) remain "on ice."  *Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *19 n.3 (E.D. Tex. Jan. 18, 2022) (finding "work described as currently 'on ice' refers specifically to the pieces stalled in the publication process that Plaintiff planned to publish in the Journal's thirteenth volume") (see also **Exhibit KKK** (unpublished article by non-Western article suppressed by UNT's cancellation of the JSS).

True enough. The "*Ex Parte Young* doctrine 'applies only to prospective relief' and 'does not permit judgments against state officers declaring that they violated federal law in the past.'" *Jackson v. Wright*, 82 F.4th at 368 (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993)). But the Fifth Circuit has already ruled that Professor Jackson properly requests at least the following relief:

> i. declare that the university and its administrators are violating Professor Jackson's rights under the First and Fourteenth Amendments by retaliating against him for his criticism of Phillip Ewell.
>
> ii. enjoin the members of the Board of Regents, along with their employees and subordinates, from taking any adverse action against Professor Jackson in response to the publication of the symposium or his criticisms of Professor Ewell.

*Jackson v. Wright*, 82 F.4th at 368. "And Jackson's request for injunctive relief is also prospective given it would restrain the Board defendants from taking future actions that violate Jackson's rights." Id. (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255, 131 S. Ct. 1632, 179 L. Ed. 2d 675 (2011) ("[W]hen a federal court commands a state official to do nothing more than refrain from violating the law, he is not the State for sovereign-immunity purposes.").

The State of Texas argues that, because the previous Division Head Benjamin Brand no longer works for UNT, Professor Jackson somehow has no viable remedy. Therefore UNT may continue to squelch the journal. In their view, the problem is that Jackson was not "fired"; the "real cause" is the absence of an editor, which by legerdemain only UNT's pretextual search committee is allowed to appoint. ECF No. 84 at Page ID #: 3944.

But it was always the JSS Advisory Board that had the authority to appoint the Editorial Board and selected the editor, which UNT cannot dispute. (Jackson Dep, 167:21-168:16; 170:15-172: 24; 157:22-25; Slottow Dep, 67:20-69:24.) But for UNT's interference with Jackson's authority as founding Advisory Board member, the JSS would be publishing today. Indeed, Jackson's response to the so-called "Ad Hoc Panel" expressly called for the authority to reconstitute a Board

31

and recruit an Editor, specifically to insulate the JSS from state-enforced dogma and abrogation of academic freedom. (See e.g., **Exhibit III** at PageID #: 349.)

Instead, by Dean Richmond's admission in open court (i.e. not in mere pleadings), the "pieces set for publication in the thirteenth volume of the Journal are frozen in the editing stages because, as UNT put it, the Journal is 'on ice,' or, in other words, at a functional standstill." *Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *9 (E.D. Tex. Jan. 18, 2022).

### 3) *Jackson Satisfies Redressability*

The State of Texas invokes *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) to support an argument that UNT may suppress the JSS because Jackson fails to satisfy the "redressability" requirement for Article III standing. This is just as perplexing as the State of Texas' tilting at windmills against the Fifth Circuit's law of this case.

*Okpalobi* addressed a Louisiana statute providing a private right of action against doctors who perform abortions. It has nothing to do with the Texas Education Law—or any Texas law. Under that Louisiana statute, the court found that defendants, the Governor and Attorney General of Louisiana, "ha[d] no power to redress the asserted injuries, [and] [i]n fact, no state official ha[d] any duty or ability to do anything." *Okpalobi*, 244 F.3d at 427. Here, as already demonstrated, the Texas Education Law and Regents Rules vest the Regents with plenary authority over UNT and its employees. See e.g. Tex. Ed. L. § 105.051; **Exhibit CCC**. If *Okpalobi* has any relevance, it demonstrates that "redressability" may be fulfilled by statutory authority—which was lacking in that case but clearly present here.

Like the State of Texas' other arguments about jurisdiction, the State of Texas provides no authority for this Court to overturn its previous or the Fifth Circuit's binding precedent.

4)  *The State of Texas' Sovereign Immunity Defense Was Also Already Decided*

The State of Texas also asks this Court to reverse the binding Fifth Circuit decision in this case because Professor Jackson purportedly fails to seek the "right remedy."  ECF No. 84 at Page ID # 3949.  In other words, Texas wants Jackson's case thrown out because **their** remedy as they have define it is allegedly untenable, but they do not address either the injury Jackson actually suffered or the remedy he **actually seeks** — annul his ouster from the Advisory Board.

First, with respect to prospective injunctive relief and sovereign immunity under *Ex Parte Young*, "the line between the permissible and the forbidden is fuzzy."  *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020).  There is no bright line such as that which the State of Texas urges this Court to draw.  "In discerning on which side of that line a particular case falls, [the Fifth Circuit] look[s] to the substance rather than to the form of the relief sought and will be guided by the policies underlying . . . *Young*."  Id. (quoting *Papasan v. Allain*, 478 U.S. 265, 279, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)).  Importantly, prospective relief "of the sort awarded in *Ex Parte Young* gives life to the Supremacy Clause[9] [and] [r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law."  *Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 426, 88 L. Ed. 2d 371 (1985).

But the State of Texas is also wrong on the facts.  As already stated above, Professor Jackson asks this Court to enjoin UNT and the Regents from obstructing his authority as Advisory Board member of the JSS.  There is no "vacancy" to fill other than the one that matters most: the vacancy created by UNT's removal of Jackson from the JSS and UNT's destruction of the JSS Advisory Board.

---

[9] This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Texas stretches two inapposite election-law cases to cover the proposition that this Court may not order the Regents or UNT to act, where sovereign discretion is reserved for their discretionary authority. *Richardson v. Hughs*, 978 F.3d 220 (5th Cir. 2020); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) (applying irrelevant Florida statutory law); see also ECF No. 84 at Page ID #: 3950. Neither case addresses the First Amendment, and this misdirection cannot alter the undisputed facts in this case.

It was and is Professor Jackson's discretion that UNT has short-circuited. It was his discretion as Advisory Board member and *primus unter pares* on the JSS's editorial staff, not to mention as author. There was never a UNT "search committee" prior to the elimination of Professor Jackson from the JSS. The "search committee" is itself purely the creature of UNT's efforts to quash viewpoints it does not like in the name of "antiracism" and mushy minded concepts of "diversity," "inclusion," and "belonging"—as "search committee" member Defendant Bakulina testified. (Bakulina Dep, 72:19-73:8; 73:16-18; 74:16-25; 75:1-3.)

**B.  Jackson's First Amendment Retaliation Claim Should Proceed**

*1)  The Fifth Circuit's Standard for First Amendment Retaliation*

The Supreme Court has made it clear that a "government employer 'cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Petrie v. City of Grapevine*, 904 F. Supp. 2d 569, 576 (N.D. Tex. 2012) (quoting *Connick v. Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687, 75 L. Ed. 2d 708 (1983)). Here, Professor Jackson and the JSS's frank discussion of race in music theory is core political speech, based as it was on evidence and argument on a matter of public concern. See e.g. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022) (reversing District Court's denial of preliminary injunction to halt public university policy targeting "'verbal, physical, electronic or other conduct' based on 'race' and 'ethnicity'" among other sensitive political campus issues).

Importantly, political speech is entitled to greater protection than any other form of protected speech. See *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 131 L. Ed. 2d 426, 115 S. Ct. 1511, 1519 (1995) ("No form of speech is entitled to greater constitutional protection than [core political speech]"); *Meyer v. Grant*, 486 U.S. 414, 421, 100 L. Ed. 2d 425, 108 S. Ct. 1886, 1892 (1988) (stating First Amendment protection at its zenith when protecting "core political speech"); *FCC v. League of Women Voters of California*, 468 U.S. 364, 375-376, 104 S. Ct. 3106, 3114-3115, 82 L. Ed. 2d 278 (1984) (noting political speech "is entitled to the most exacting degree of First Amendment protection").

To prove that university officials retaliated against Professor Jackson for his protected speech, he "must show that

> (1) he suffered an adverse employment decision;
>
> (2) his speech involved a matter of public concern;
>
> (3) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and
>
> (4) the protected speech motivated [UNT's] conduct.

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 U.S. Dist. LEXIS 43617, at *16-*17, *19-*20 (E.D. Tex. Mar. 11, 2022) (finding First Amendment protection for UNT Professor fired him under Provost Cowley's administration for his critique of a flyer about so-called "microaggressions," because his criticism "transcended personal interest" reflecting "protest of . . . present-day political correctness . . . an issue of contentious cultural debate") (quoting *Hurst v. Lee Cnty.*, 764 F.3d 480, 484 (5th Cir. 2014)). See also *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019), cert. denied, 140 S. Ct. 432, 205 L. Ed. 2d 264 (2019) ("To establish a § 1983 claim for violation of the First Amendment right to free speech, [plaintiffs] must show that (1) they were disciplined or fired for speech that is a matter of public concern, and (2) their interest in the speech outweighed the university's interest in regulating the speech").

As to causation, Jackson need only show that Defendants' actions caused "an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and the defendants' adverse actions **were substantially motivated** against the plaintiffs' exercise of constitutionally protected conduct" (emph. added). *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)). That is, Professor Jackson is not required to show, per Defendants, that there is "no evidence" that adverse action was taken against him "for any reason other than his speech." ECF No. 84 at Page ID #: 3955. Jackson is only required to show that his protected speech "motivated" UNT's retaliation. *Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011) (causation element is whether "protected speech motivated the defendant's conduct"); *Hiers v. Board of Regents*, 2022 U.S. Dist. LEXIS 43617, at *17.

He can show this by evidence that UNT's retaliatory adverse actions "would chill a person of ordinary firmness from continuing to engage in that activity." See *Bailey v. Iles*, 87 F.4th at 289; *Keenan v. Tejeda*, 290 F.3d at 258.

　　2)  *Jackson Suffered an Adverse Action and Spoke on a Matter of Public Concern*

Other than conclusory, castoff statements, Defendants do not dispute the first or second element of First Amendment retaliation. Compare ECF No. 84 at Page ID #3952. They concede, as they must, that the Schenker controversy involved Professor Jackson's speech on a matter of public concern and that Jackson suffered adverse employment actions.

"The question then becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Wetherbe v. Tex. Tech University him SYS.*, No. 5:15-CV-119-Y, 2016 U.S. Dist. LEXIS 44301, at *12 (N.D. Tex. Mar. 31, 2016), *rev'd on other grounds*, 699 F. App'x 297 (5th Cir. 2017) (reversing district court's holding that plaintiff's beliefs were not constitutionally protected).

And treating Professor Jackson differently from other members of the public is exactly what UNT has done.  Defendant Heidlberger's UNT Press journal, *Theoria*, has freely published authors without peer review, including City University of New York Professor Philip Ewell.  UNT does not care about that.  Heidlberger has self published in his journal.  UNT does not care about that. *Theoria* does not apply COPE guidelines or any other high-minded concepts suddenly so important to UNT's so-called "Ad Hoc Panel."  UNT does not care about that.

There has never been an outcry to close *Theoria* or investigate *Theoria* in the name of "combating racism."  There has never been a "search committee" convened to select an editor who will toe the line of UNT's politically correct dogma for *Theoria*.  Simply put, UNT and all Defendants adore academic journals that publish Professor Ewell without peer review.  The one thing you may not do is provide a forum to criticize Professor Ewell in a UNT Press journal.

3) *Evidence Demonstrates that UNT Removed Jackson from the JSS Advisory Board, Humiliated, and Defamed him Because of his Protected Speech*

With the evidence now in, the State of Texas argues that Jackson's protected speech did not cause the adverse actions UNT imposed upon him.  ECF No. 84 at Page ID #3953.  Yet the State of Texas also "recognize[s] that the content of the Symposium cannot be completely extricated from the discussion of the publication process of Volume 12."  Id.  In other words, the State of Texas admits that Jackson's protected speech was a motivating factor in UNT's adverse employment actions.  But, so argues the State of Texas, UNT "does not have to" extricate Jackson's substantive speech from the excuses supplied to justify suppressing Jackson's speech and the JSS.  Id.

As a threshold matter, "summary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate."  *Haverda v. Hays Cty.*, 723 F.3d 586, 595 (5th Cir. 2013).  Where, as here, Professor Jackson successfully shows that he engaged in protected speech and that it was a substantial motivation for the adverse actions against him, "[t]hen, the burden shifts to the School . . . to show by a preponderance of the evidence that it would have come to the same

37

conclusion regarding [Professor Jackson's conditions of employment] even in the absence of the protected conduct." *Dearman v. Stone Cty.* Sch. Dist., 832 F.3d 577, 581 (5th Cir. 2016) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)).

But UNT's attempts to justify the adverse actions it has imposed upon Jackson fail.

Jackson may rely upon "direct evidence of motivation" as well as "a chronology of events from which retaliation may plausibly be inferred." *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017) (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). Here, almost immediately upon the publication of Jackson's unpopular viewpoints in the Symposium, UNT's graduate students and faculty began to circulate petitions attacking the content of his publication as "racist," as did the Society for Music Theory. (**Exhibit C** at Page ID #: 281-285.) Their primary focus was Professor Jackson's speech. The procedural niceties which UNT seized upon in its pretextual "Ad Hoc Panel" were both misrepresented in these petitions and attacks and were always ancillary to the visceral animosity directed at Jackson's ideas, for example the falsehood that Professor Ewell was excluded from the pages of the JSS.

The first line of the SMT petition was to condemn the so-called "anti-Black statements and personal ad hominem attacks on Philip Ewell perpetuated in several essays. . ." (Id. at Page ID #: 281.) Only then, did the SMT purport to criticize the absence of "peer review" as "professional misconduct." (Id.) Of course, this was hypocritical. The SMT published Philip Ewell's plenary address without peer review in the pages of its journal *Spectrum*. The SMT redoubled its emphasis on protected speech in closing, pontificating: "We humbly acknowledge that we have much work to do to dismantle the whiteness and systemic racism that deeply shape our discipline." (Id.)

The graduate students also began their petition by targeting the "egregious statements written by UNT faculty" and the JSS's supposed "platforming of racist sentiments." (**Exhibit C** at Page ID #: 282.) Then, as Defendant Heidlberger admitted at deposition, the faculty fully

"endorse[d]" the students' petition.  (Heidlberger Dep, 76:1-2.)  The faculty petition also began by criticizing the substantive "responses to Dr. Philip Ewell' is plenary lecture at the 2019 Society for Music Theory annual meeting" as "replete with racial stereotyping and tropes"; and attack the "epistemic center of the [JSS] in a racist discourse…"  (**Exhibit C** at Page ID #: 284.)

The Symposium became public on a Saturday.  Division Head Brand, with the full knowledge of Dean John Richmond, called an emergency meeting that very Sunday to address the erupting Schenker controversy.  Almost immediately, Brand and Richmond announced an investigation in the name of "combating racism."  (**Exhibit T**; **Exhibit QQ**.)  Understandably, given that Professor Jackson immediately threat of legal action to protect his First Amendment rights, Provost Cowley made a pretense of convening a so-called "Ad Hoc Panel," purportedly to investigate "narrowly" the "standards of best practice in scholarly publication" in the "concept of production of volume 12 of the [JSS]."  (**Exhibit C** at Page ID #: 280.)  Suddenly "combating racism" nominally disappeared, but Dean Richmond and Division Head Brand's announcement that "combating racism" was the actual goal remained on the UNT official website.  (**Exhibit T**; **Exhibit QQ**.)

The JSS never published again.  And Division Head Brand ensured that neither the Symposium nor Jackson's Response was publicly available online.

Rather than restore the Advisory Board to its former authority to select a new editor after Levi Walls quit (without consequences), UNT made a show of appointing a "search committee" to find a new editor.  It proceeded to do exactly nothing.  Or, more properly, the only thing the new search committee did was impose a litmus test for what Levi Walls called "politically correct discourse and race relations."  (**Exhibit OO** at JACKSON000235; Bakulina Dep, 72:19-73:8; 73:16-18; 74:16-25; 75:1-3.)  The court need go no further than Professor Slottow's testimony as to whether UNT's actions would deter an individual of reasonable firmness from speaking.  UNT's

viewpoint discrimination turned the JSS into a "radioactive turd," and no one wanted anything to do with it.  (Slottow Dep, 95:5-11.)

And once again, every single reason given for the supposed "malpractice" of the JSS was practiced by *Theoria*: lack of peer review (so long as one published Philip Ewell), citation to Wikipedia, editor self publication, not to mention Defendant Heidlberger's publication of close colleagues such as Defendant Bakulina or Defendant Chung without peer review, and any number of other faux derelictions.  The obvious reason is that no one cared about these issues.  What they cared about was that anyone dared to criticize Philip Ewell's gospel of "antiracism."  Meanwhile, UNT ignored Professor Jackson's grievance for the violation of academic freedom.  Provost Cowley gave the duplicitous response that Jackson never mentioned what policy he wanted UNT to enforce (and then later claimed that academic freedom just might not be consistent with minority rights).  Then there is the so-called "Ad Hoc Panel's" pretextual investigation based—not on relevant evidence, to which Professor Ishiyama and the Panel demonstrated a consistent aversion—but on the pretense of invisible but somehow omnipresent "power disparity."

The Regents invoke *Duke v. N. Tex. State Univ.*, 469 F.2d 829 (5th Cir. 1972) for the argument that "academic discussions can't always be extricated from academic decisions."  ECF No. 84 at Page ID #: 3953.  But the plaintiff in that case was a student/teaching assistant who failed to enroll in the requisite number of course hours and distinguished herself by prolific use of what we would now call "F-bombs."  See e.g. *Duke*, 469 F.2d at 837, 840 (student "referred to the Board of Regents as a 'stupid bunch of m   f   s' and that she stated that the girls would be locked up in the dorms like a bunch of whores").  Her generally disorderly conduct had nothing to do with the serious academic publishing at issue here.  Not even the State of Texas argues that Jackson did anything similar to the plaintiff in *Duke*.  Moreover, the teaching assistant in *Duke* received a full

40

hearing, representation by counsel, and cross-examination; not the kabuki theater of the so-called "Ad Hoc Panel," with its willful blindness to relevant evidence. Id. at 832.

More puzzling is the Regents' invocation of *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S. Ct. 1912 (1978). *Ohralik* is a commercial speech case with no relevance here. And, finally, Defendants lean on *Jones v. Matkin*, 623 F. Supp. 3d 774 (E.D. Tex. 2022). But that case supports Professor Jackson. In *Jones*, Jones was a professor at a state college. Id. at 779. She spoke publicly about reopening after the COVID pandemic, about her objection to Confederate monuments in Dallas, Texas, and about unionization. Id. at 779-780. She was then non-renewed. Id. The state college argued that her criticism of its COVID-19 reopening plan was speech in furtherance of her official duties and thus, the state could do whatever it wanted by nonrenewing her. Id. at 784. The court disagreed and found that the Plaintiff met her burden of establishing a material issue of fact that the state college retaliated in violation of the First Amendment. Id. at 786.

In fact, Jackson's Response to the so-called "Ad Hoc Panel" Report is similar to *Jones* to the extent that he criticized UNT's failure to support academic freedom, refused to repent for his sins against the gospel of Philip Ewell, and condemned UNT's pretextual reasons for suppressing the JSS. Despite his constructive recommendations for new editors, which he had formerly had the authority to appoint, UNT ignored his suggestions in favor of "rebranding" the JSS is a journal of politically correct music studies. Bakulina Dep, (Bakulina Dep, 210:9-21; 212:8-9; 214:2-11and **Exhibit JJJ**). The JSS had to be remade in the image of DEI or die. And it is now dead. UNT suppressed Jackson's Response, and he had to bring this civil action in order to make it public. See ECF No.1-1-1-28.

*4) The Pretextual "Ad Hoc Panel"*

The Regents' aver that they would have run down the JSS regardless of Timothy Jackson's protected speech. This argument borders on the frivolous.

41

We know that UNT would not have taken the same actions against the JSS regardless of Jackson's criticisms of Professor Ewell because it did not do so with regard to a similarly situated journal, *Theoria*. And it never voiced opposition to any of the JSS's practices before Timothy Jackson committed what UNT viewed as thought crimes. The Symposium was not "subpar." It was exactly or even more rigorous than publishing Philip Ewell in *Theoria* or the SMT *Spectrum*.

The only thing UNT can fall back on is a so-called "power disparity," which it invokes to explain what is usually understood by any reasonable person as "lying." Like every other criticism of the JSS, no so-called "power disparity" ever attracted attention before Jackson's viewpoints suddenly became controversial. Prior to the Schenker controversy, the JSS Advisory Board had suggested keeping Benjamin Graf as editor, by then a professor, but Division Head Brand vetoed this and insisted on appointing Walls as a new graduate student editor. (See e.g., **Exhibit III** at JACKSON000274.)

The State of Texas invokes the "power disparity," as did the "Ad Hoc Panel," as some sort of magical force that renders full-grown adults such as Defendant Bakulina, Defendant Chung, Defendant Graf, Defendant Cubero, and Walls somehow bereft of agency. (ECF Note. 84 at Page ID #: 3957; compare Graf Dep, 69:16-70:25.) These academics are now presented as cowering before Jackson—who, it must be noted, is hardly an intimidating individual, "with liver spots on his bald head" and a "potbelly." (Graf Dep, 69:16-70:25.) But in 2020 these academic colleagues, some of them his mentees, somehow found the courage to publicly call him a "racist" and clamor for his dismissal. Somehow "power disparity " only prevented them from speaking their mind ***to*** Professor Jackson. It somehow never prevented them from speaking their mind ***against*** Professor Jackson.

Even if the Court credits this argument, which it should not, it remains a matter of fact for the jury. "Power disparity" sometimes arises in sexual harassment cases, for instance between a student paramour and an older professor. In *Waters v. Metro. State Univ.*, 91 F. Supp. 2d 1287 (D.

42

Minn. 2000) for example, the Court denied summary judgment on a sexual harassment claim against the university where, "[t]o distinguish between an actual desire for a relationship on one hand, and a mere acquiescence to tendered sexual advances on the other, it is necessary to consider the power disparity between the individuals involved." Id. at 1291. However, the court found, that "analysis typically turns on determinations of credibility and should be left to a trier of fact." Id.

This Court should recognize the Regents' "power-disparity" argument for what it is: a *deus ex machina* dragged upon stage to excuse hypocrisy and intellectual cowardice. It was not Jackson's coercive power that prompted Levi Walls or anyone else to denounce Jackson, the JSS, and their own hard work and intellectual interests in the Schenker controversy; it was quite obviously the hysteria that gripped the SMT and the social media mob that arrayed against the JSS.

    5) *The Only Disruption Experienced at UNT Was the Cancellation of the JSS*

Defendants now claim that the Schenker controversy somehow caused "disruption." To the contrary, other than the cancellation of the JSS, the State of Texas cannot point to any disruption at UNT. Their brief is devoid of any evidence of impaired efficiency after the Schenker controversy compared to before.

If the court were to make such a finding, it would simply reward that which our Supreme Court's First Amendment jurisprudence abhors. Namely it will cast "a pall of orthodoxy" over UNT. *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (quoting *Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967).) For example, as evidence of disruption, the State of Texas argues that the "Internet" caused a controversy (according to Defendant Frank Heidelberger). ECF Note. Page ID at #3959. Yet no Defendant or direct witness has testified that the "Internet" is some sort of accepted editorial authority over academic journals at UNT. Somehow, however, it is a "disruption" to kowtow to the "Internet" when it comes to the JSS.

43

There is no legitimate state interest in squelching free expression. "'[T]he remedy' for bad speech, after all, should be 'more speech, not enforced silence.'" *Tesla, Inc. v. NLRB*, 120 F.4th 433, 438 (5th Cir. 2024) (quoting *Whitney v. California*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring)).

As Defendants own authority indicates, "[t]here is considerable value . . . in encouraging, rather than inhibiting, speech by public employees." *Jones v. Matkin*, 623 F. Supp. 3d 774, 785 (E.D. Tex. 2022). "The value is two-fold, stemming from both 'the public's interest in receiving informed opinion' as well as 'employee's own right to disseminate it.'" Id. (quoting *San Diego v. Roe*, 543 U.S. 77, 82, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)). "[P]ublic universities do not have a license to act as classroom thought police." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *La Unión del Pueblo Entero v. Abbott*, 2024 U.S. Dist. LEXIS 180102, at *115 (W.D. Tex. Sep. 28, 2024) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994).)

Clearly, the interest of the Texas taxpayers lies in the State ceasing to enforce dogma concerning "microaggressions," vague notions of "diversity," or "belonging," and instead encouraging intellectual creativity and tolerance. The public's interest is far better served by UNT becoming a real university again. Almost laughably, UNT claims an interest in ensuring scholarship that adheres to ethical, scholarly practices. ECF No. Page ID #3961. This is simply absurd. The journal *Theoria* does exactly what the JSS did. If UNT's truly had a newfound passion for "ethical and scholarly practices"; it would apply the same standards to all UNT Press journals. At the very least, this remains an issue of fact for the jury.

UNT vaguely refers to "special responsibilities correlated with rights" and "faculty members' special position in the community." ECF No. Page ID #: 3962. They cannot say what this means,

44

because it means nothing.  By contrast, the petitions circulated against Professor Jackson make clear exactly what Defendants mean: no one may criticize the gospel of Ewell.

Furthermore, the State of Texas' own authority indicates that vague incantations of motherhood concepts like "community" are not strong enough state interest to defeat Jackson's and the public's interest in free speech.  Invoking pious "principles of cooperative responsibility and trust" or "interests in loyalty and esprit de corps," even in law enforcement where lives really are at stake, "sweeps so broadly [ and does] not … legitimately trump compelling interests in speaking on matters of public concern." *Kinney v. Weaver*, 367 F.3d 337, 365-367 (5th Cir. 2004).

As a last Hail Mary, the State of Texas invokes time-manner-place restrictions.  ECF No. 84 at Page ID #: 3962-3963.  But Texas articulates no coherent standard nor identifies the time, manner, or place it is even talking about.  The State again invokes *Kinney*, which **affirms** the denial of summary judgment against the state on First Amendment retaliation.  The State of Texas yet again repeats the patently false statement that Ewell was not welcome to respond to his critics in the pages of the JSS.  Record evidence clearly indicates the opposite, which Defendants Cubero, Bakulina, Graf, and Chung knew at the time.

It is also silly to argue that Professor Jackson put "colleagues and students in jeopardy."  Id. at Page ID at 3964.  UNT identifies no "jeopardy."  The quitter, Walls, defamed his dissertation advisor without consequences; Professor Bakulina got another and better job; and Cubero, Graf, and Chung were promoted.  Defendant Heidlberger continues to publish articles without peer review in *Theoria*.

## III.    OPPOSITION TO DEFAMATION DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The background for Plaintiff Timothy Jackson's response in opposition to the Defamation Defendants Motion for Summary Judgment is set forth in detail in his Motion for Summary Judgment as to Defamation and is supported by his record appendix.  ECF No. 80-82.  Where

appropriate, Plaintiff will refer to record evidence demonstrating that no disputed facts indicate that the Individual Defendants may escape liability for defamation.

Defendants' challenge the following statements as non-defamatory as a matter of law:

1. "Many of us recently discovered the journal is present as graduate student run in some contexts; in fact, there is little student involvement beyond copy-editing, and students have absolutely no say in the content of the JSS";

2. "[T]he publication of this issue demonstrates that the JSS, through its supervision of academic processes, is not in fact peer reviewed and lacks rigor";

3. "UNT has gained a reputation as an institution with a toxic culture when it comes to issues of race, gender, and other aspects of diversity";

4. "Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable."

The graduate student petition that was eventually attached to the so-called "Ad Hoc Panel" Report set forth each of these statements. (**Exhibit C** at Page ID #: 282.) The sentence immediately following Statement 1 is, however, omitted. It specifically calls out Professor Jackson by name: "In fact, outside of the advisory board (and in particular Dr. Jackson), we have no clear understanding of who oversaw the publication of the responses to the plenary session." (Id.) The Individual Defendants ignore the specific factual accusation that Professor Jackson committed extortion, which Rachel Gain asserted in another graduate student petition. (**Exhibit O** at Page ID #: 452.) To be clear, Professor Jackson does not that Statements No. 2 and 3 are actionable, although No. 2 is certainly false and No. 3 is clearly true, but not for the reasons the State of Texas, Regents, and Defamation Defendants advance here. See e.g. *Hiers*, 2022 U.S. Dist. LEXIS 43617, at *20 (E.D. Tex. Mar. 11, 2022) (noting toxic culture of "present-day political correctness" at UNT).

The clear context throughout all petitions was that Professor Jackson was responsible for thought crimes in the pages of the JSS, most particularly his own article, and that he should therefore be cashiered and the JSS closed. (Id.) But the petitioners could not restrain themselves to critiquing ideas; they had to go further and accused Professor Jackson of "actions" and "extortion."

46

As already briefed, all faculty Defendants expressly endorsed the student statement that is attached to the so-called "Ad Hoc Panel" Report.  ECF No. 80 at Page ID #: 1330-1334.  The faculty petition states:

- We, the undersigned faculty members of the University of North Texas Division of Music History, Theory, and Ethnomusicology, stand in solidarity with our graduate students in their letter of condemnation of the Journal of Schenkerian Studies.

- We endorse the call for action outlined in our students' letter (https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view)

And

- Responsible parties must be held appropriately accountable.

(**Exhibit C** at Page ID #: 284.)

The only "responsible party" identified by name who was supposedly in need of punishment was, of course, Professor Jackson.  This is clear in the students' "call for action," particularly their third call for action, which warrants quotation in full:

> 3. Hold accountable every person responsible for the direction of the publication. This will involve recognizing both whistleblowers and those who failed to heed them in this process. This should also extend to investigating past bigoted behaviors by faculty and, by taking this into account, the discipline and potential removal of faculty who used the JSS platform to promote racism. Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable.

(**Exhibit C** at Page ID #: 283.)

The Court need not speculate whether the faculty endorsed this statement or not, or to whom the Defendants refer.  Defendant Heidlberger admitted at deposition:

> They [the graduate students] made the public statement expressing their distance from the handling of the JSS **by Dr. Jackson**. They do it in their words, but the principal content of that statement is something **we endorsed with this letter** [i.e., the faculty petition].

(Emph. added; Heidlberger Dep, 76:9-13.)

Defendant Heidlberger did not equivocate or claim that a dependent clause somehow qualified his or the faculty's endorsement of the defamatory statement.  (Id.)  Heidlberger also did not equivocate that the faculty petition referred to anyone other than "Dr. Jackson."  (Id.)  These admissions are particularly important.  Heidlberger was deposed very early in the litigation (May 19, 2021) before this Court's decision on the jurisdictional motion to dismiss and before the Fifth Circuit appeal, which forestalled discovery for over a year.  Heidlberger therefore testified in close proximity to the events themselves—and before witnesses received extensive coaching from defense counsel.  Only later did witnesses pretend they had not endorsed the student petition, a position no contemporaneous documents support.  See ECF No. 80 at Page ID #: 1330-1334.

IV.  **ARGUMENT CONCERNING PROFESSOR JACKSON'S DEFAMATION CLAIM**

### A.  Individual Defendants Acted with Actual Malice

"Actual malice" is a legal term of art divorced from its common-sense meaning.  "'Actual malice' in [defamation] does not mean bad motive or ill will."  *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016.  In defamation, actual malice means "knowledge of, or reckless disregard for, the falsity of a statement."  "Recklessness" has also wandered from its common-sense meaning.  Defamation recklessness means the defendant must have "entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968).

Thus, the Individual Defendants' bad faith, hypocrisy, or ill will is not necessarily "actual malice" in defamation.  *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989) (unlike common-law malice, it does not include ill-will, spite, or evil motive).  "[T]he constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff."  *Greer,* 489 S.W.3d at 444.  However, a plaintiff can "prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."  *Harte-Hanks Comm'ns v. Connaughton*, 491 U.S. 657, 668, 109 S. Ct. 2678, 2686 (1989)

(citations and quotations omitted, affirming finding of actual malice against public figure).  Although a mere failure to investigate is not sufficient, evidence of an intent to avoid the truth is. "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."  Id. (quoting *St. Amant* at 732.)

Here, there is actual malice for defamation purposes.  The faculty Defendants admit they had no knowledge of extortion, racist "actions" or "racist behaviors" of Timothy Jackson.  (See **Exhibit FF**, Answers No. 12 Geoffrey-Schwinden Dep, 62: 19-20; 120:25-121:7; 21:8-14; Chung Dep, 130:12-18; Heidlberger Dep, 9:9-14; 81:14-83:2.)  The Defamation Defendants endorsed and republished defamatory statements accusing Professor Jackson of heinous "actions" with affirmative knowledge that the republication was false.  (**Exhibit C** at Page ID #: 284.)

The graduate student, Defendant Rachel Gain, admitted that she avoided Professor Jackson. (Gain Dep, 52:9-54:4.)  She admittedly avoided any factual information about Jackson.  The Court should also weigh her evasive mendacity at deposition, which was evident throughout her testimony. (Gain Dep.)  But Gain was happy to defame Professor Jackson by publicly blasting out the student petition on Twitter, accusing him of "extortion," and calling him a "piece of shit." (Gain Dep, 9:6-20, **Exhibit I**.)  She testified that she had no direct knowledge of the following factual statements:

- The specific "procedures used to publish Volume 12 of JSS."

- "[B]igoted behaviors of UNT faculty."

- "Dr. Jackson's actions, both past and present, [that] are racist and unacceptable."

- "Extortion through grade manipulation, threats to students' careers and reputations."

(Id. at 56:20-57:2; 57:6-9; 57:18-24; 58:3-10.)  In fact, Defendant Gain avers that she "wasn't in the country at the time."  (Id. at 58:10.)  Gain's zeal to destroy Professor Jackson's career is matched only by her zeal to avoid any contamination from the truth.  This satisfies the standard articulated in *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668, 109 S. Ct. 2678, 2686 (1989).

All that the Individual Defendants can come up with to underpin their repeated cries of "racism" is that Jackson criticized Professor Ewell and hurt their subjective feelings. See ECF No. 83 at Page ID #: 3806. In other words, Professor Jackson engaged in protected speech. (**Exhibit FF**, Answer No. 12.) Provost Cowley confirmed this. Provost Cowley could only identify "publication" as a specific activity that could be deemed "racist." (**Exhibit DD** ("Cowley Dep"), 57:15-58:3.)

But to the extent Individual Defendants characterize "speech" as "racist" action, this defies common sense. No reasonable person can read the various petitions calculated to ruin Professor Jackson and believe references to (unspecified but sinister) "racist" actions and behaviors are synonymous with his speech. This is not a case where the Court is asked to distinguish technical legal definitions to justify a finding of defamation at odds with common sense English. Compare *Weber v. Fernandez*, No. 02-18-00275-CV, 2019 Tex. App. LEXIS 2487, at *1-*2 (Tex. App. Mar. 28, 2019) (rejecting actual malice where falsehood turned on definitions of closely related statutory crimes of "robbery" (which the defamed public figure did not commit) and "theft" (which he did) because although the alleged defamers' "mischaracterizations appear blatant to lawyers and judges . . . we do not analyze the statements through a lens so finely tuned to the intricacies of the law [but] on whether the statements were substantially true as perceived by a person of ordinary intelligence").

In this case, the Individual Defendants smeared Jackson by intentionally accusing him of *actions,* of "racism" in deed, not merely in thought or word—only because he said things they did not like. The Individual Defendants' knowing, willful collapse of the distinction between speaking and acting is not arcane or esoteric, nor is it inadvertent. Every person of ordinary intelligence understands that saying and doing are not the same—which is also well-established in our jurisprudence. See ECF No. 80 at Page ID #: 1334-1336. Pretending they are the same, as Defendants do here, is itself evidence of their actual malice. The Individual Defendants' bad faith

conflation of "action" with "speech" is an "obvious reason[] to doubt the veracity of the . . .

reports." *Harte-Hanks Commc'ns*, 491 U.S. at 688.

Because Professor Jackson is a private individual, he should not be held to the "actual

malice" standard; but even if the Court applies the "actual malice" standard, undisputed evidence

and party admissions show that the Individual Defendants accused Professor Jackson of nonexistent

"actions" they knew never happened.

### B. The Individual Defendants Clearly Referenced Jackson Directly

Jackson's name is splashed all over the defamatory publication's at issue in this case. Yet the

Individual Defendants express confusion about whom, exactly, they targeted. This flies in the face

of the plain language of the documents, their context, as well as party admissions.

A defamatory statement "must be defamatory concerning the plaintiff." *Dall. Morning News,

Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018). "Whether a plaintiff is referenced in a statement is a

question of law." *Vice v. Kasprzak*, 318 S.W.3d 1, 13 (Tex. App. 2009). See also *Adams v. Starside

Custom Builders, LLC*, No. 05-15-01162-CV, 2018 Tex. App. LEXIS 10104, at *25 (Tex. App. Dec. 7,

2018) (same, affirming denial of TCPA motion to dismiss in relevant part).

As with all elements of defamation, courts are instructed to "construe the publication[s] as a

whole in light of the surrounding circumstances based upon how a person of ordinary intelligence

would perceive it.'" *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017); see also

*Butowsky v. Folkenflik*, No. 4:18CV442, 2019 U.S. Dist. LEXIS 104297, at *104 (E.D. Tex. Apr. 17,

2019) (criticizing defendants' "focus on whether the Plaintiff is referenced in the individual

statements rather than in the reports **as a whole**" (emph. added)). Thus, Texas defamation law

requires the Court to interpret the statements in their full context.

Determining whom a defamatory statement "concerns" is also "objective, not subjective."

Id. Professor Jackson "need not prove that the defendant[s] intended to refer to him"—although

there can be little doubt of that here.  *Vice v. Kasprzak*, 318 S.W.3d at 13.  "[A] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer."  Id. (quoting Restatement (2d) of Torts §564 564 (1977)).  Here, Defendant Heidlberger provides a party admission that the graduate student petition "express[ed] their distance from the handling of the JSS by Dr. Jackson."  (Heidlberger Dep, 76:9-10.)  In addition, one of the graduate student petitions refers to Jackson 13 times, alleges he "exercised control over editorial decisions," and expressly states, "Dr. Jackson should be removed from the UNT faculty because [of]… extortion…" among other things.  (**Exhibit O** at Page ID#: 451-452.).  Kofi Agawu was not in any doubt either, writing to Jackson: "I was truly astonished to see the subsequent attacks on you."  (**Exhibit MMM** at JACKS_151905.)

The second graduate student petition "concerned" Jackson by naming him three times, including:

- We would like to make it clear that the JSS is not a graduate student journal; since 2010 (Vol. 4), it has been run primarily by Drs. Timothy Jackson and Stephen Slottow.

(ECF No. at Page ID #282.)  Although Professor Slottow is also mentioned, this petition only singles out Professor Jackson's supposed malign influence:

- In fact, outside of the advisory board (***and in particular Dr. Jackson***), we have no clear understanding of who oversaw the publication of the responses to the plenary session.

(Emph. added; Id.)  Finally, this graduate student petition refers to "past bigoted behaviors by faculty," but concludes by identifying only Professor Jackson:

- Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable.

(Id. at Page ID #283.)

As for the faculty petition, "[i]t is not necessary that the plaintiff be specifically named in the communication to be defamatory." *Butowsky v. Folkenflik*, 2019 U.S. Dist. LEXIS 104297, at *104 (citing *Vice v. Kasprzak*, 318 S.W.3d 1, 13 (Tex. App. [1st Dist.] 2009)); *Adams v. Starside Custom Builders, LLC*, 2018 Tex. App. LEXIS 10104, at *25 (same). The faculty knew to whom their petition referred because they expressly endorsed the graduate student petition.

The Individual Defendants fall back on the argument that a defamatory statement must point to the plaintiff "and *no one else*" (emph. in orig.). ECF No. 83 at Page ID #: 3792-3793 (citing *Adams*, 2018 WL 6427640 at*10; *Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.*, 242 S.W.3d 518, 4 (Tex.App.—El Paso 2007, no pet.). But it is the defamatory statement that must refer to the Plaintiff, not everything in an entire publication that contains the defamation. The Court should not transform the "concerning Plaintiff" element into an escape hatch, so defamers can then evade liability by randomly mentioning other individuals in addition to the target of their defamation.

For example, in *Francis v. Phx. Capital Grp. Holdings, LLC*, No. 05-22-01260-CV, 2023 Tex. App. LEXIS 6732 (Tex. App. Aug. 29, 2023) (reversing dismissal of defamation claim), the defendant referred to Phoenix, a company and appellee/plaintiff below; to an individual, Ferrari, falsely identified with corporate fraud; and to the company's CEO, an individual distinct from Ferrari. Id. at *4. The multiple entities and individuals did not defeat the defamation claim on a special motion to dismiss under the Tex. Civ. Prac. & Rem. Code § 27.001, et seq. ("TCPA").

No reasonable person could read the graduate student and faculty petitions, let alone the entire context, and conclude that Professor Jackson was not singled out for defamation.

## C.  Jackson Is a Private Individual

This Court should hold that Jackson is a private individual and not a limited-purpose public figure. The State of Texas contradicts itself concerning Professor Jackson's role in the Schenker controversy. In briefing the First Amendment claim, the State of Texas argues, "There is no doubt

that Professor Ewell's plenary address, and the responses in the Symposium, cover an extremely esoteric topic, the debate on which is not widely consumed, nor is of significant public interest." ECF No. 84 at Page ID #3961. On the defamation claims, however, Defendants reverse course. Suddenly the Schenker controversy "involves the music theory community . . . [and] countless others from inside and outside of the music community . . . on social media." ECF No. 83 at Page ID #2802. The State of Texas can't have it both ways.

This standard for whether defamation plaintiffs are public or private figures has remained unchanged since *Trotter v. Jack Anderson Enters.*, 818 F.2d 431 (5th Cir. 1987). "Limited-purpose public figures achieve their status by thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. at 433 (quotations omitted). The Fifth Circuit and Texas state courts adopted a three-part test from the DC Circuit:

> (1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;
>
> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
>
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

Id. (citing *Tavoulareas v. Piro*, 817 F.2d 762, 772-773 (D.C.Cir. 1987) (*en banc*)); see also *Polk City Publ'g Co. v. Coleman*, 668 S.W.3d 385, 393-94 (Tex. App. 2021)1, rev'd on other grounds, 685 S.W.3d 71 (Tex. 2024).

The key element here is "public." The Schenker controversy would remain an obscure academic debate but for the Individual Defendants' sudden moral panic, their compulsive misrepresentations of Jackson, and UNT's punishment of Jackson for his thought crimes. Defendants, not Jackson, pushed this into the public sphere. Although Jackson's speech addressed an undeniable matter of public concern, this is not the same as a "public controversy" in

defamation.  See e.g., *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979) (finding no public figure where plaintiff "at no time assumed any role of public prominence… [and] [n]either his applications for federal grants nor his publications in professional journals can be said to have invited that degree of public attention and comment on his receipt of federal grants essential to meet the public figure level") (citing *Gertz v. Robert Welch, Inc*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)).

Furthermore, despite Professor Jackson's prolific publication record, he is like the plaintiff in *Gertz*.  The Supreme Court held the petitioner Elmer Gertz was not a public figure despite being "long . . .  active in community and professional affairs"; despite serving "as an officer of local civic groups and of various professional organizations"; and despite "publish[ing] several books and articles on legal subjects." *Gertz*, 418 U.S. at 351.  Gertz "had achieved no general fame or notoriety in the community. None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population."  Id. at 351-352.  The difference, if any, is that almost every private citizen has some intuitive understanding of Gertz's prominence as a lawyer; whereas musicology is completely inscrutable to most Americans (and most lawyers!).

To find a "public controversy" under the *Trotter* standard, the public's "general concern or interest will not suffice." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998) (quoting *Trotter* at 1297).  "The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  Id. Importantly, Defendants "cannot invoke the public-figure defense if the allegedly defamatory articles ***themselves turned [Jackson] into a public figure***" (emph in orig.).  *Trotter* at 434.  But that is exactly what happened here.

No one cared about the Schenker controversy until UNT's canceled Professor Jackson and the JSS and UNT's outrageous conduct attracted national attention. The Supreme Court is clear, however, that private concerns or disagreements do not become public controversies simply because they attract attention. *Time, Inc. v. Firestone*, 424 U.S. 448, 454-55, 96 S. Ct. 958, 965-66, 47 L. Ed. 2d 154 (1976). A "public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1296 (D.C.Cir. 1980). Outside of "direct participants" in the esoteric Schenker controversy, exactly no one was interested in or understood Schenkerian analysis. The Symposium did address issues of public concern, to be sure: whether Schenkerian analysis was somehow inherently white supremacist—a "racial stereotype and trope" if there ever was one, but which is apparently okay to direct at white people when uttered by Philip Ewell or his acolytes. Compare ECF No. 83 at Page ID #3806. But speech delivered on an issue of public concern does not somehow guarantee public concern for that specific speech.

Here, the Court must address a tiny community, albeit an international one, of esoteric music theorists. Unsurprisingly, despite the self-importance of some protagonists in this debate, nothing indicates that the great American civil-rights heroes marched across the Edmund Pettus Bridge to vindicate Schenkerian analysis. It is equally absurd, and no evidence suggests, that Bull Connor wished to defend the virtues of a late 19th-century/early 20th-century Austrian Jew like Schenker. The Court should not measure the public stature of Professor Jackson by the inflated self-regard of academia, which is an occupational hazard among professors.

What catapulted the JSS and Jackson to national consciousness, to the extent it did, was UNT's suppression of free speech. This and other episodes have made made UNT into a caricature

of "cancel culture."[10]  This was clear in the pages of the *New York Times*' article about the Schenker controversy, "*Obscure Musicology Journal Sparks Battles over Race and Free Speech*."[11] As the article's title makes clear, the JSS and Jackson were otherwise "obscure."  What made news was UNT's suppression of academic freedom as well as its own hypocrisy in doing so.

"[T]he judge must examine whether persons actually were discussing some specific question."  *Waldbaum*, 627 F.2d at 1297.  The answer here is, No.  The topic of the larger controversy has nothing to do with the scholarly world in which Jackson had made his way to a modicum of prominence.  The real topic was never Jackson's scholarship.  The real subject matter was and is whether UNT and its faculty and graduate students may be allowed to lie shamelessly about Professor Jackson without consequences.  Had the topic actually been scholarship, the Individual Defendants could have taken up the pen against the Symposium with actual evidence.  They have never even tried.  They merely hollered "racism" and began making things up about him.

In this area, Jackson is not a public figure.  The lesser negligence standard should apply.

## D. The Individual Defendants' "Opinion" Defense Must Fail

Here, party admissions indicate that each Individual Defendant denies knowledge of any "racist actions" or "behaviors" of Timothy Jackson.  (**Exhibit FF**, Answer No. 12.)  Their statements to the contrary were therefore objectively false when made.

As some sort of affirmative defense, the State of Texas urges this Court to conflate speech with action.  The Individual Defendants use euphemisms like "platform racist sentiments" (i.e.,

---

[10] See e.g., Simone Carter, Composer's Racist Views Spark Debate in Music Theory Community, Dallas Observer, August 4, 2020 (observing belief that "debate over Schenker's past is another example of 'cancel culture' going too far"). Aval. at https://www.dallasobserver.com/news/unt-professor-sparks-controversy-over-racism-in-music-theory-world-11932353; Thomas Lindsay, University Sued for Violating Music Prof's Free-Speech, Real Clear Education, March 31, 2021 (writing lead sentence, "Cancel Culture is spreading across the country faster than you can say, "Down with the First Amendment"), avail. at
https://www.realcleareducation.com/articles/2021/03/31/university_sued_for_violating_music_profs_free_speech_110560.html
[11] New York Times, February 14, 2021, avail. at https://www.nytimes.com/2021/02/14/arts/musicology-journal-race-free-speech.html.

speech and publication) to convey that speaking is really doing something concrete, invariably mean and nasty, but in any case akin to building a physical structure.

Collapsing the distinction between speech and action, however, dissolves every legal curb that First Amendment law necessarily imposes on defamation law—because it makes speech punishable as action. This is what Defendants' petitions brayed for. But defamation is confined by First Amendment law precisely because "[a] vital part of open public debate is deciding what should be debated. No arm of the government, including the judiciary, should be able to set society's agenda." *Waldbaum*, 627 F.2d at 1297 (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S. Ct. 2675, 2688, 61 L. Ed. 2d 411 (1979)). Defendants' bad-faith redefinition of "speech" as "action" would drag speech into the realm of "action" so that UNT may punish ideas that it does not like—as if they were traffic violations.

But every reasonable person understands, as does the law, that speaking and doing are not the same. See e.g. *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968), *O'Brien. Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969).

Professor Jackson's defamation claim is also distinct from *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023). There, the defendant Dickson and his advocacy organization were pro-life, and they demonized pro-choice rivals as "murdere[rs]." Id. at 359. The Texas Supreme Court held that this was protected opinion in the abortion debate. Dickson and his nonprofit were tireless, if perhaps breathless, lobbyists for change and were "free to speak, write or publish [their] opinions on any subject." Id. at 357-358. But *Lilith Fund* does not fashion an expansive affirmative defense for lying about ordinary citizens or colleagues just because one considers oneself an "advocate." Compare ECF No. 83 at Page ID #3797. There is also a difference between the contested meaning of abortion and murder, at issue in *Lilith Fund*, and imputing (unspecified) "actions" or "racist" behavior to Professor Jackson, who had authored

publications with which the Individual Defendants disagree.  Dickson referred to specific, identifiable, real behavior, abortion, which, in his view, is murder.  Here, Defendants point to none.  Political advocacy is also different from scampering off to someone's supervisor with a petition to get him fired on the basis of falsehoods.  The Court should reject Defendants' invitation to build up *Lilith* into a blanket exemption for "advocacy" or "exhortatory" language from defamation liability.

Furthermore, unlike abortion—about which reasonable minds may disagree—the objective distinction between speech and action is rooted in common sense.  The reasonable person, the vantage this Court must adopt, can only understand Defendants' condemnations of racist "actions" and "behaviors" to refer to actual, nefarious, concrete actions, not mere words.  Conflating speech with action is not "merely an opinion masquerading as fact," as Defendants protest.  Cf. ECF No. Page ID #: 13791.  "Texas law makes clear that this determination depends on context, which may reveal that an opinion instead functions as a factual assertion."  *Sabal v. Anti-Defamation League*, No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 78354, at *12 (N.D. Tex. Apr. 30, 2024).  To hold otherwise collapses the difference between speaking and doing.

### E.  The Individual Defendants' Statements of Fact Are Actionable

As already briefed, the Individual Defendants' have made statements of facts, subject to proof or disproof, which are false and caused him damage.  ECF No. 80.  However, in their counter motion, Defendants cannot resist misrepresenting Professor Jackson's publication.

Without explaining its relevance, they "reiterate" some "racial stereotypes and tropes" that Jackson supposedly purveyed in the JSS.  ECF No. 83 at Page ID #: 3806  As "evidence," the Defendants never cite anything Timothy Jackson actually wrote.  (**Exhibit D** at UNT_001008-UNT_001017).

They do invoke the so-called "Ad Hoc Panel" Report.  This is ironic.  UNT never ceases to protest that the Panel did not address substance; the pretext was always: "[w]e were not interested in

the content of the journal, only the processes used." ECF No. 83 at Page ID #: 3806 (citing as authority ECF No. 1-5; quote from Ishiyama Dep, 80:16-17). Yet now Defendants argue that, after all, the Panel Report somehow proves "racial stereotypes" in the content of Jackson's article.

The State of Texas also invokes subjective feelings expressed about "racism" by Defendant Rachel Gain. (ECF No. 83-2, citing APPX.059 at 15:4-10.) As always, the conclusory condemnations of Jackson's ideas are unsupported by empirical evidence or textual analysis.

To be clear, as he testified at deposition, Professor Jackson does not ask this Court to wade into the Schenker controversy and adjudicate who was right or wrong. Professor Jackson believes that anyone "ha[s] the right to express their views without censorship." (Jackson Dep, 247:17-19.) The point is to protect academic debate from defamation and Defendants' contempt for the First Amendment and academic freedom.

## V.  CONCLUSION

Based on the foregoing, the Court should hold that Professor Jackson is and was a private individual defamed by the Individual Defendants and that the context of the Individual Defendants' defamatory statements indicate that Professor Jackson was their direct target. The Court should reject the proffered defense of "opinion" based in the Individual Defendants' badfaith collapse of any distinction between speaking and doing, a distinction rooted both in the common sense of any reasonable person as well as in well-established constitutional law.

The Court should therefore deny the Defamation Defendants' Motion for Summary Judgment in its entirety and enter summary judgment for the Plaintiff Timothy Jackson based on undisputed facts.

The Court should also deny the Board Defendants' Motion for Summary Judgment and order Professor Jackson's First Amendment retaliation claim to be tried.

Respectfully submitted,

DATE: January 17, 2025

/s/ Michael Thad Allen

Michael Thad Allen, Esq.
D. Conn. Bar No. CT29813
admitted *pro hac vice*
Lead Attorney
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT  06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
Texas Bar No. 24075463
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

for PLAINTIFF

### CERTIFICATE OF SERVICE

I hereby certify that on the date specified in the caption of this document, I electronically filed the foregoing with the Clerk of Court, to be served on all parties of record via the CM/ECF system.

/s/Michael Thad Allen
Michael Thad Allen