# EXHIBIT GG

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON,              )
                             )
            Plaintiff,        )
                             )
VS.                           ) CIVIL ACTION
                             )
LAURA WRIGHT, ET AL.          ) NO.: 4:21-cv-00033-ALM
                             )
            Defendants.       )
                             )
                             )

---------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN SLOTTOW, PhD

NOVEMBER 7, 2024

---------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF STEPHEN

SLOTTOW, PhD, produced as a witness at the instance

of the DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on November 7, 2024,

from 8:31 a.m. to 4:41 p.m., via Zoom teleconference

before Vanessa J. Theisen, CSR in and for the State

of Texas, and RPR, reported by machine shorthand, at

the University of North Texas System, 801 North Texas

Boulevard, Gateway Suite #340, Denton, Texas 76201,

pursuant to the Federal Rules of Civil Procedure and

any provisions stated on the record or attached

hereto.

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4        Mr. Michael Thad Allen (via Zoom)
         ALLEN LAW, LLC
5        P.O. Box 404
         Quaker Hill, CT 06375
6        (860) 772-4738
         Mallen@allenharrislaw.com

7

8   FOR THE DEFENDANTS LAURA WRIGHT, ET AL:

9        Ms. Mary B. Quimby
         Assistant Attorney General
10       OFFICE OF THE ATTORNEY GENERAL
         General Litigation Division
11       P.O. Box 12548, Capitol Station
         Austin, TX 78711-2548
12       (512) 463-2120
         Mary.quimby@oag.texas.gov

13

14  FOR THE WITNESS:

15       Mr. Patrick Todd
         OFFICE OF THE ATTORNEY GENERAL
16       Administrative Law Division
         P.O. Box 12548, Capitol Station
17       Austin, TX 78711-2548
         (512) 936-1660
18       Patrick.Todd@oag.texas.gov

19
    ALSO PRESENT:
20
         Mr. Phil Hall, Videographer
21       Mr. Timothy Jackson (via Zoom)
         Mr. Justin Foster
22       Mr. Renaldo Stowers
         Ms. Vanessa J. Theisen, Court Reporter (via Zoom)
23

24

25

```
 1                          INDEX
                                                    PAGE
 2   Appearances..................................   2

 3   STEPHEN SLOTTOW, PhD

 4        EXAMINATION BY MS. QUIMBY.................   5
          EXAMINATION BY MR. ALLEN.................. 104
 5        FURTHER EXAMINATION BY MS. QUIMBY......... 157
          FURTHER EXAMINATION BY MR. ALLEN.......... 161
 6

 7   Changes and Signature......................... 166
     Reporter's Certificate........................ 168
 8

 9                         EXHIBITS

10   NO.       DESCRIPTION                         PAGE

11
     1         Curriculum Vitae of
12             Dr. Stephen Slottow................... 15

13   2         Journal of Schenkerian Studies
               Masthead
14             UNT_000848 - 0851..................... 36

15   3         MHTE Faculty Response
               UNT_000432 - 0433..................... 87
16
     4         UNT College of Music Faculty and
17             Staff Retreat Invitation
               UNT_005523 - 5525.....................106
18
     5         November 25, 2020 Ad Hoc Panel Report
19             Jackson000208 - 0233..................146

20

21

22

23   REPORTER'S NOTE
     Quotation marks are used for clarity and do not
24   necessarily reflect a direct quote.

25
```

 1          THE VIDEOGRAPHER:  Here begins the

 2   deposition of Dr. Stephen Slottow, Ph.D., relative to

 3   a case styled Timothy Jackson versus Laura Wright, et

 4   al, filed in the United States District Court,

 5   Eastern District of Texas, Sherman Division, Civil

 6   Action No. 4:21-cv-00033-ALM.

 7              Counsel, at this time would you please

 8   -- the time is 8:31 a.m., and we are on the record.

 9              Counsel, at this time would you please

10   state your appearances for the record.

11              MS. QUIMBY:  Yes, Mary Quimby for the

12   defendant.

13              MR. ALLEN:  Michael Thad Allen --

14              MR. TODD:  Pat Todd.

15              MR. ALLEN:  -- for the plaintiff,

16   Timothy Jackson.

17              MR. TODD:  Patrick Todd for the witness.

18              THE VIDEOGRAPHER:  Thank you.

19              MR. ALLEN:  I'm sorry, Patrick.  I spoke

20   over you.

21              MR. TODD:  Sorry.

22              THE VIDEOGRAPHER:  Thank you.  At this

23   time would the court reporter please swear in the

24   witness.

25

```
 1              STEPHEN SLOTTOW, PhD,

 2   having been first duly sworn, testified as follows:

 3                    EXAMINATION

 4   BY MS. QUIMBY:

 5        Q.  Okay.  Good morning, Mr. Slottow.  Is that

 6   how you pronounce your last name?

 7        A.  Yes.

 8        Q.  Okay, great.  We're here today -- I'm going

 9   to ask you a couple of questions about the Journal of

10   Schenkerian Studies and your role in that --

11        A.  Uh-huh.

12        Q.  -- journal and related matters.  But first I

13   want to go over some preliminary ground rules for

14   depositions.

15              First, you were just sworn in by the

16   court reporter there on that screen.  Do you

17   understand that you've taken an oath and are

18   obligated to tell the truth today?

19        A.  As I remember it.  All these events took

20   place some years ago.

21        Q.  Sure.  Have you taken any medication that

22   would inhibit your memory today?

23        A.  No.

24        Q.  Is there anything else that would inhibit

25   your memory or ability to tell the truth today?
```

Stephen Slottow, Ph.D. - 11/7/2024

6

1    A.  Age, the fact that all this happened three

2  or four years ago and I haven't thought much about it

3  since.

4    **Q.  Okay.  Understood.**

5    A.  And I haven't done more than cursorily look

6  over these documents, because I finished a project

7  only last night, and my request for a postponement

8  was not approved.

9    **Q.  What documents did you review?**

10    A.  The ones that were sent to me.  They're here

11  in this pile.  Do you want me to describe each one of

12  them?

13    **Q.  If you don't mind, I would appreciate it.**

14    A.  Questions for Slottow, Confidential

15  Attorney-Client Privileged --

16              MR. TODD:  Objection.  Privileged.  Do

17  not answer it.

18              THE WITNESS:  Huh?

19              MR. TODD:  Do not answer that.  Those

20  are -- that's attorney-client privileged documents.

21              MS. QUIMBY:  Are they documents that

22  have been --

23              MR. TODD:  They're from me.

24              MS. QUIMBY:  Okay.  Are they documents

25  that have been produced in this matter?

 1          MR. TODD:  Some of them might have, but

 2  those notes from me are my notes to my client.

 3      Q.  (BY MS. QUIMBY)  Okay.  I'm not asking you

 4  to describe the notes from your attorney to you.

 5      A.  I don't know which ones are the notes from

 6  the attorney to me.  I just have a pile of these

 7  documents.  I'm not sure which ones you're talking

 8  about.

 9      Q.  Okay.  How many documents do you have there?

10      A.  Seven.

11      Q.  Okay.  If there is a "UNT" -- do you see at

12  the bottom of that first document there is a "UNT" at

13  the bottom?

14      A.  Yes.

15      Q.  That means it was produced in this matter.

16  Can you describe each of the documents that have the

17  UNT insignia at the bottom of the page?

18      A.  One says, "Questions for Slottow" beginning,

19  "What is your role" --

20          MR. TODD:  Those are my notes, so not

21  that document.  That doesn't have UNT on it.

22          THE WITNESS:  It does.

23          MS. QUIMBY:  It does.

24          MR. TODD:  Does it?

25          THE WITNESS:  Yes.

1          MR. TODD:  Never mind.  Go ahead.

2      A.  Okay.  One that says, "Questions for

3  Slottow," with seven points; Confidential

4  Attorney-Client Privileged Communication.

5      **Q.  I'm not asking about that one.**

6      A.  Oh, that's right.  There's no UNT.

7          An invitation to a college of music

8  retreat at the Gateway Center Ballroom.  I don't know

9  why this is here.

10     **Q.  Okay.**

11     A.  Another Questions for Slottow.

12     **Q.  If you don't mind, could you -- what is the**

13 **number on that one?**

14     A.  002640.

15     **Q.  Okay.  Thank you.**

16     A.  The next page -- do you want -- just want

17 the numbers from now on?

18     **Q.  That would be helpful.**

19     A.  Okay.  The next one is 002642, 002644,

20 00300.  Each page is a different number.

21     **Q.  Right.  You can just tell me the first page**

22 **of each document.**

23     A.  One is -- this one is -- this once does not

24 have a -- do you just want the ones that have a UNT

25 number?

1    Q.  Is that one labeled Exhibit D?

2    A.  Yes.

3    Q.  Can you flip to the next page?  Okay.  Is

4  that the ad hoc review panel report, to your

5  knowledge?

6              MR. TODD:  That's what it appears to be.

7    A.  Yeah.

8    Q.  (BY MS. QUIMBY)  Okay.

9    A.  005523, and that's it.

10   Q.  What is that last one, if you could describe

11  it briefly for me.

12   A.  This is a college of music retreat on

13  inclusion, diversity, equity, and access.  I don't

14  know why it's here.

15   Q.  Okay.  Thank you.

16   A.  And then I brought along my own copy of the

17  Journal of Schenkerian Studies Volume 12 because I

18  have an article I might want to refer to.

19   Q.  And is that -- that is the full print

20  version of the --

21   A.  Right.

22   Q.  -- Volume 12, correct?

23   A.  Uh-huh.

24   Q.  Okay.  Thank you.

25              In addition -- besides conversations

1    with your attorney about this deposition, have you

2    talked to anyone else about this deposition?  And

3    that includes Mr. Todd and Mr. Foster.

4        A.  That it's happening, you mean?

5        Q.  I mean -- yes.

6        A.  Well, I mentioned to my husband that I'm

7    going to a deposition.  Tim Jackson knows.

8        Q.  Uh-huh.

9        A.  In fact, he's listening in.  I think that's

10   it.

11       Q.  Did you talk to Dr. Jackson about the

12   deposition other than that you were attending?

13       A.  No.

14       Q.  Okay.  Anyone else?

15       A.  Well, he told me he was going to listen in

16   on Zoom, but that's it.  I was not sure what was

17   proper to discuss with him, so I did not say anything

18   else.

19            No, I don't think there's been anyone

20   else.

21       Q.  Okay.  Got it.  Thank you.

22            We have a videographer here, a court

23   reporter who is here virtually.  She's going to be

24   taking down what you say today, so I would just ask

25   that you use verbal responses instead of nodding.  So

Stephen Slattow, Ph.D. - 11/7/2024

11

```
 1   far so good.  But just, you know, if I -- if you nod

 2   your head or something at some point today and I ask

 3   you to give a verbal answer, I'm not trying to be

 4   rude.  It's just we want to make sure we have a clear

 5   record for the court reporter.

 6        A.  If I nod, it will be accompanied with a

 7   verbal answer.

 8        Q.  Sure.  If you need a break today, let me

 9   know.  We'll probably take a break about every hour

10   or so.  If you need one more often, just let me know,

11   and we can take a break.

12        A.  Okay.  I cannot go beyond 11:30, though.

13        Q.  I understand that, yes.

14        A.  Okay.

15        Q.  One other thing about making a clear record

16   for the court reporter is that I ask that you wait

17   until I finish asking my question before you begin

18   answering, because if we're talking over each other,

19   she can't take down both of us talking at once.

20             Have you ever had your deposition taken

21   before?

22        A.  No.

23        Q.  Have you ever testified in court?

24        A.  As a witness?

25        Q.  Yes.
```

 1      A.   No.

 2      Q.   Have you ever testified in court otherwise?

 3      A.   I've been on juries, but that's it.

 4      Q.   Okay.  Understood.

 5           Okay.  Briefly, I'm going to ask you

 6  some questions about your background.  This is just

 7  to have an understanding of your role at UNT and how

 8  you got here.

 9           So how long have you been a professor at

10  the University of North Texas in the college of

11  music?

12      A.   In the rank -- the rank of professor or

13  teaching at UNT?

14      Q.   If you don't mind just walking me through

15  when you first started teaching here and when you

16  moved up in the ranks, if --

17      A.   Yeah, that's on the CV.

18           So I began as a lecturer in Sep -- 2001

19  for one year.  Then I was an assistant professor from

20  2002 to 2008.  I was an associate professor from 2008

21  to 2020, and I was a full professor, am a full

22  professor, from 2020 to the present.

23      Q.   Okay.  So you attained the rank of full

24  professor in 2020?

25      A.   Yes, in September.

 1      Q.  Okay.  Are you tenured?

 2      A.  Yes.

 3      Q.  How long have you been tenured?

 4      A.  Well, that came with associate professor, so

 5  that would be since 2008.

 6      Q.  Okay.  So you started in 2001 as a lecturer,

 7  you said, correct?

 8      A.  Uh-huh.

 9      Q.  Briefly, before we talk more about your

10  history at UNT, what degree do you hold?

11      A.  I have a bachelor's degree from Cleveland

12  State University, a master's degree from Queens

13  College, and a doctorate from the City University of

14  New York.

15      Q.  And what are each of those degrees in?

16      A.  The bachelor's is in music history.  The

17  master's and the doctorate are in music theory.  I

18  don't know if they -- I think you just get a

19  degree -- I don't think you get actually a degree in

20  music theory.  I think you get a degree in music, and

21  it's like the specialization is music theory or

22  something.  I would have to look on the diploma.

23              The master's was en-route master's from

24  Queens.  So the way the City University works is

25  that -- of New York works is that you can either

 1    enter and get an en-route master's, so it's -- or

 2    else you can get an actual master's after two years.

 3              So with the en-route master's you have

 4    to take a test or write a paper, and I was in that

 5    program.  It's the preferred one, actually.  So you

 6    enter with a bachelor's, and then you go all the way

 7    to the PhD, and on the way you get an en-route

 8    master's.

 9        **Q.  I see.  Okay.  So was it effectively a PhD**

10    **program that you had to earn your master's before you**

11    **did the PhD, but you --**

12        A.  No.  That's the point of getting the

13    en-route master's is that you -- it's a PhD program

14    you enter with the bachelor's degree.

15        **Q.  Uh-huh, okay.  When did you earn your**

16    **bachelor's degree?**

17        A.  That was -- let's see.  When did I earn it?

18    I don't know.  It's not really written down here.

19        **Q.  That you recall.  If you don't recall right**

20    **now, that's okay.**

21        A.  Hold on.

22        **Q.  For the record, too, I'll let you keep**

23    **looking, but I would like to get a copy of the CV,**

24    **and we can use that as an exhibit.**

25        A.  Sure.  I can either send an electronic copy

Stephen Slattow, Ph.D. - 11/7/2024

15

1  or someone can copy this.

2      Q.  We'll copy it on our break or something.

3          (Exhibit 1 identified.)

4      A.  I don't know exactly when I got my

5  bachelor's.  Some time elapsed between getting my

6  bachelor's and entering the doctoral program, so I'm

7  not sure.

8      Q.  Do you remember when you earned your

9  master's or PhD?

10      A.  Well, the PhD was earned -- oh, let's see --

11  I think about 2000.  That's -- yeah.

12      Q.  What did you do between earning your

13  bachelor's and going for your master's?

14      A.  I was a working musician in Cleveland,

15  playing in a bluegrass band.  I was a fiddler and a

16  banjo player.  And I kept on doing that for a while,

17  so there was a hiatus.  After I got my bachelor's, I

18  wasn't sure what to do next.  So that's what I did.

19      Q.  Are you from Cleveland?

20      A.  No.

21      Q.  Where are you from?

22      A.  Urbana, Illinois.

23      Q.  Okay.  I ask because I'm from Ohio.

24          Before you joined at UNT, did you have

25  any other jobs in academia?

```
 1          A.  I don't think so, no.
 2          Q.  When you joined UNT in 2001 as a lecturer --
 3   well, let me ask it this way:  At some point you
 4   became involved in the Center for Schenkerian
 5   Studies, correct?
 6          A.  Right.
 7          Q.  Do you know when you joined or became a part
 8   of the center?
 9          A.  Well, that happened when -- well, it didn't
10   happen when I was a lecturer, but it happened when I
11   became an assistant professor.
12              One of the responsibilities of the job
13   was actually to be involved -- Dr. Jackson wanted
14   someone to help him with the center, someone who was
15   experienced in Schenkerian analysis.  So in addition
16   to the usual things of teaching, research, service,
17   etcetera, one of the responsibilities, as I recall
18   it, was to be involved in the center.
19          Q.  Who gave you that, we'll call it, job or a
20   role?
21          A.  Well, I don't know, because that's --
22   that's -- the search committee determined the
23   parameters of what I was to do.  I was not privy to
24   the search committee, of course.  But since
25   Dr. Jackson was the head of the center, the idea
```

1    probably came from him.

2        Q.  When you say, "the search committee," what

3    are you talking about?

4        A.  Well, when you apply for an academic job,

5    there is a search committee, a faculty, who evaluate

6    who -- from the -- from the applications, they

7    evaluate who is going to go to the next step of being

8    interviewed.  And they handle the interviews, and

9    they are the ones that make the short list, and they

10   are the ones who pick who is to get the job.

11            Now, the candidate is not privy to the

12   deliberations of the search committee, of course.

13       Q.  Sure.

14       A.  So anything they did is -- I wasn't there

15   for.

16       Q.  Sure.  So what is -- can you describe the

17   Center of Schenkerian Studies for me?

18       A.  Well, at that time, it was pretty much a

19   project of Dr. Jackson's, and it included a journal,

20   a -- putting on concerts, producing sound recordings,

21   CDs.  I think that's about it.  Certain --

22   far-flung --

23       Q.  Uh-huh.

24       A.  -- Schenkerian activities having to do with

25   Schenkerian analysis.

1      I think I was hired -- I think one of my

2  responsibilities was the journal specifically.

3      **Q.  Within the center?**

4      A.  Yes, within the center.

5      **Q.  Okay.  So that kind of leads me to my next**

6  **question.  What exactly did you do in the center or**

7  **the journal or if they're related?**

8      A.  Well, in the beginning, I handled the

9  journal.  The journal had an editor; Jennifer Sadoff

10  was her name.  But I actually handled the business

11  side of the journal, taking care of subscribers,

12  keeping records, correspondence, etcetera, keeping

13  the files.  And then I was also consulted on other

14  business of the journal.  I'm not sure what my

15  "rank" --

16      **Q.  Uh-huh.**

17      A.  -- quote-unquote was.

18          Eventually, I found that the business

19  side -- taking care of the business side while

20  teaching was really too much and too complicated.  So

21  we -- that was taken over by UNT press.

22          And then at some point I became kind

23  of -- I was never the editor.  The editor of the

24  journal was always a student, and they made -- they

25  had really most of the power about what was going

1  into the journal.

2          Where was I?  At some point, I became

3  sort of supervisor of the -- under Tim Jackson, sort

4  of supervisor of the -- not supervisor, director of

5  the center.  Then that was changed to codirector.  It

6  was just a name change.  My responsibilities didn't

7  change.

8          I can't really tell you exactly when

9  these things happened.  And then I stayed with that

10  role.

11     **Q.  I have a few follow-up questions.  So**

12  **Jennifer Sadoff, you said she was the editor when you**

13  **started?**

14     A.  She was the first editor.  I think that

15  actually the journal started when I came in.

16     **Q.  Okay.**

17     A.  Because I was there when Issue 1 was

18  produced.

19     **Q.  And that would have been about, what, 2002?**

20     A.  Well, it would have been shortly after I

21  started.  So on -- let's see.  Yeah, probably around

22  2002, 2003.

23     **Q.  So was Ms. Sadoff a student?**

24     A.  Yeah, she was, I think, a -- she was a music

25  theory major, I think, and she played bassoon as

Stephen Slattow, Ph.D. - 11/7/2024

20

```
1   well.

2       Q.  Okay.

3       A.  She was there for some years.

4       Q.  And you said -- and I understand if you

5   don't know when this occurred, but UNT Press took

6   over the business side.  Is that right?

7       A.  Yeah, after some years.  I can't tell you

8   when.  I don't know.

9       Q.  So after the UNT Press took over the

10  business side of things, what was your role then?

11      A.  Just to help run the center in terms of

12  policy, along with Tim Jackson.

13      Q.  What do you mean by "policy"?

14      A.  Questions that came up about whether the

15  center -- whether there's going to be a theme issue

16  of the journal or a concert or -- the center had to

17  sort of justify its existence to UNT.  There were

18  regular meetings, like every year, I think, that we

19  had to report to -- give a report to show that we

20  were a center, a UNT center, and we put those

21  together jointly, things like that.

22      Q.  Okay.  Did you have -- within the center

23  were there any other employees of the center?

24      A.  Well, first of all, we weren't paid.

25      Q.  Sure.
```

1    A.  So in a sense there were no employees of the
2  center.
3        Q.  Uh-huh.
4    A.  There was Tim, there was me, there was the
5  editor of the journal.  I think that's it.
6        Q.  Was the editor of the journal -- you said
7  they were always a student?
8    A.  Uh-huh.
9        Q.  Were they paid?
10   A.  No.  Well, they got a stipend.
11       Q.  Uh-huh.
12   A.  They were a fellow, I think.  They had a
13  fellowship or half a fellowship, so they were paid
14  through the college of music, yes.
15       Q.  Okay.  And you said you were -- you
16  eventually had the title of codirector.  Do you
17  remember what the title was before that?
18   A.  No.  I don't even know if it was codirector,
19  actually.  That's what it amounted to.
20           It's possible it's on the journal.
21  Let's see.  It says, "Advisory Board, Timothy L.
22  Jackson, Stephen Slottow," but I'm pretty sure that
23  "codirector" was in there somewhere.
24           As I say, that was some years ago, and I
25  haven't thought that much about it.

1      MR. ALLEN:  Can we have the witness

2  identify for the record what document he's consulting

3  and have that marked or whatever.  I think it's the

4  Volume 12, but I don't know what he's consulting.

5      THE WITNESS:  This is Volume 12 of the

6  Journal of Schenkerian Studies.

7      MS. QUIMBY:  Thank you.

8      MR. ALLEN:  Should we mark that as an

9  exhibit?  Do you want to mark it as an exhibit or

10  just have the record reflect that he consulted the

11  print copy of that?

12      MS. QUIMBY:  I think we'll just -- we

13  won't mark it as an exhibit for now.

14      MR. ALLEN:  Okay.

15      MS. QUIMBY:  It's the physical copy, the

16  book copy, so we'll just note for the record that

17  it's been referenced.

18      MR. ALLEN:  That's fine.

19      MS. QUIMBY:  Okay.

20      MR. ALLEN:  Thank you.  Sorry to

21  interrupt.

22      MS. QUIMBY:  No problem.

23  **Q.  (BY MS. QUIMBY)  So how long were you**

24  **involved in both the center and/or the journal?**

25      A.  Well, they were -- I was involved in both

1  starting when I was starting as assistant professor.

2      Q.  Uh-huh.

3      A.  So that would probably be 2002, and then the

4  Volume 12 of the journal was the last issue of the

5  journal, after which things fell apart.

6              I have the date of the journal, which is

7  2019, but I can't tell you exactly when that took

8  place.  Often the dates of journals are not the

9  actual -- the actual dates.

10     Q.  So correct me if I'm wrong, but you ended

11 your involvement after the Volume 12 was published?

12     A.  Yes.  Not immediately.  After Volume 12

13 published, there was a huge foofaraw and hue and cry,

14 and UNT got cold feet and sort of withdrew the

15 support for the center.

16             It took a while, and there was this ad

17 hoc review, and the whole thing began -- and they

18 basically took the center away from us, especially

19 away from Dr. Jackson.  And I think at that point I

20 felt there was nothing to be gained by continuing in

21 this sort of fictitious role of codirector.  Of what?

22 Who knows.  So I told Dr. Jackson I was withdrawing

23 at that time.

24     Q.  Okay.  Do you recall when that was?

25     A.  No.  I'm really -- I really am very bad at

1    dates.  Since there was no reason to make

2    chronological notes, I did not do so.

3        Q.  When you say -- you said "they" -- I believe

4    you used "they" withdrew support for the center.  Who

5    is "they"?

6        A.  "They" is the college of music of UNT.

7        Q.  Do you know who made that decision?

8        A.  Well, certainly Benjamin Brand, who was the

9    division chair of music history, theory, and

10   ethnomusicology, was probably the main person, but I

11   don't think he would have the power -- well, maybe he

12   would.  But he probably did not do it just himself.

13   Probably the dean was involved.  I'm not sure who the

14   dean was at the time.  It might have been Jim Scott,

15   or it might not have.

16            I don't know who else was involved.  I

17   mean, we were not involved.  We were just told.

18       Q.  What were you told?

19       A.  Well, I wasn't told anything, Tim was --

20   Dr. Jackson was told that the journal was essentially

21   being -- he could correct me if I have this wrong --

22   taken out of the hands of the center, of our hands,

23   and the university did not know what -- the college

24   of music didn't know what they were going to do with

25   it.  They tried various things.  It's essentially

1   defunct at this point.

2       Q.  Is your statement that they withdrew support

3   for the center based on what you've heard from

4   Timothy Jackson?

5       A.  Well, mainly, but it was widely known.  Yes.

6       Q.  How did you -- okay, so mainly.  But is

7   there any other way you came to that knowledge?

8       A.  I don't really remember.  I mean, it might

9   have been communicated to both of us, but the college

10  of music did not want to be embarrassed, further

11  embarrassed, by the reaction to Volume 12, and they

12  simply said we're -- "it's not yours any longer."

13          I don't know -- did I get that from

14  Dr. Jackson or from -- I think it was mainly from

15  Dr. Jackson.  I can't recall more precisely.

16      Q.  You said the college was embarrassed.  What

17  do you mean by that?

18      A.  The reviews of -- the articles on Philip

19  Ewell's address to the -- he was part of the plenary

20  address at the Society of Music Theory annual meeting

21  where he attacked, among other things, Schenkerian

22  analysis in a particularly, I would say -- well, I

23  can't think of the word.

24          Anyway, we -- he was giving -- and it

25  created a huge stir, and there was no -- there was no

1    opportunity given for a response.

2              Usually at a plenary address there's

3    some room for questions and responses afterwards.

4    But this plenary address, since he was one of, I

5    think, three or four people who was talking on

6    different topics, there were no question-and-answer

7    periods.

8              And then, very unusually, there was

9    no -- there were no articles.  There was no response

10   in the journals.  There was nothing.  There was no

11   opportunity to give any response.  So the Journal of

12   Schenkerian Studies decided that we would post a

13   response and solicit articles from music theorists,

14   including us, Dr. Jackson and myself, whoever wanted

15   to respond.

16             This led to -- we were -- since Ewell

17   was accusing Heinrich Schenker of being a racist and

18   that his racism was affecting his music theory,

19   therefore, he was promulgating a racist music theory,

20   and it was certainly the kiss of death to be in any

21   way associated with racism, the school was terribly,

22   terribly embarrassed and then afraid of bad publicity

23   and reacted to that.  That's what I mean.

24        Q.  Who at the school was -- reacted, as you

25   say?

Stephen Slattow, Ph.D. - 11/7/2024

27

1     A.  Well, I know that Dr. Brand did and the dean

2  did.  And beyond that, I don't know for certain.

3     **Q.  How do you know that Dr. Brand and the dean**

4  **did?**

5     A.  Because it was -- as I said, it was

6  Dr. Brand, with consultation from the dean, who told

7  us that we would no longer be handling the journal

8  and the center.

9     **Q.  He told you that?**

10    A.  Well, he told Tim -- he told Dr. Jackson

11 that, I think.  I don't think he told me directly,

12 and I got it from Dr. Jackson, certainly.

13    **Q.  Okay.  So you said Dr. Brand and the dean at**

14 **the time.  Was the dean John Richmond by chance?**

15    A.  I don't -- I'm not sure if the dean -- if it

16 was Richmond or Scott.  I -- for some reason I think

17 it was Richmond, but I'm not entirely sure.  I think

18 it was John Richmond.

19    **Q.  Do you think they had reason to be**

20 **embarrassed?**

21    A.  Well, administrators are always terribly

22 concerned with the reputation of their programs and

23 the schools, and they're very sensitive to bad

24 publicity, so they probably did.  We were certainly

25 getting plenty of bad publicity.

1      Q.  Do you think the college's reputation was

2  damaged by the journal?

3      A.  I don't know.  If music theory -- the

4  division of music history and ethnomusicology, they

5  were certainly on the receiving end of a lot of

6  disapproval, so they certainly thought they were.

7  Perhaps their reputation was damaged by those who

8  were outraged that we would criticize Philip Ewell's

9  opinions.

10      Q.  Who are you talking about when you say, "by

11  those who were outraged that you would criticize

12  Philip Ewell's opinions"?

13      A.  Music theorists, musicologists, people

14  like -- people like -- people who would -- wrote

15  blogs on music.

16          If you look on YouTube, there is an

17  awful lot of support for Ewell's views, and, mixed

18  with that, would be attacks on Dr. Jackson, to some

19  extent me, and sort of by reflection, on the music

20  theory department of UNT -- not department -- area,

21  yes.  It was a big kerfuffle, yes.

22      Q.  And so was this coming from outside of UNT,

23  inside of UNT?

24      A.  Well, it was certainly coming from outside

25  of UNT, but it was coming from inside UNT also,

Stephen Slottow, Ph.D. - 11/7/2024

29

1    because a petition was put together by the majority

2    of UNT -- well, of faculty of the division of music

3    history, music theory, and ethnomusicology

4    attacking -- and also a separate petition by GAMuT,

5    which is a graduate student organization of the

6    division, attacking the -- criticizing the journal

7    and criticizing Dr. Jackson, in particular, of

8    essentially being a racist.  And I think the student

9    petition demanded his ouster from the university.

10                And a lot of the music theory facul --

11   the music theory and history -- well, the faculty of

12   the division signed this -- not everyone did.  And

13   all of those people are now defendants in

14   Dr. Jackson's suit.  Well, all of the faculty and one

15   student who's no longer a student at UNT.  She's at

16   Yale.

17        Q.  Uh-huh.

18        A.  What was the question?

19        Q.  I'm sorry, I don't recall either.

20                MS. QUIMBY:  Court reporter, could you

21   please read it back?

22                THE REPORTER:  Yes, give me just a

23   second.

24                MS. QUIMBY:  Yes, thank you.

25                THE REPORTER:  "And so was this coming

1  from outside of UNT, inside of UNT?"

2      A.  Oh, yes.  So it was coming from -- what I

3  was describing is what was coming from inside UNT.  I

4  think before I was describing what was coming from

5  outside.

6      **Q.  So the YouTube posts and blogs posts you**

7  **described earlier, that was from outside of UNT?**

8      A.  Yes.

9      **Q.  Okay.  You described both -- you described**

10 **petitions of both the faculty and the students,**

11 **correct?**

12     A.  Well, students through the student

13 organization called GAMuT.  I forget exactly what

14 GAMuT stands for, but it's an association of music

15 history, theory -- music history and theory graduate

16 students.

17     **Q.  What about it was a petition, or why did you**

18 **use the word "petition"?**

19     A.  Is it not a good word?  A document that

20 people signed onto requesting, nay demanding.  I

21 think "petition" is a fine -- is appropriate.

22     **Q.  I wasn't questioning you.  I'm just curious**

23 **about why you chose that word, that's all.**

24     A.  I think because that's what it was.

25     **Q.  That's fair.  So you described the faculty**

1    petition -- and I believe both of the petitions -- as

2    attacking Dr. Jackson.  Is that right?

3         A.  Yes.  I think myself to some extent but

4    mainly Dr. Jackson.

5         Q.  What about the faculty petition attacked

6    Dr. Jackson, if you recall?

7         A.  Well, what about them?  What do you mean?

8         Q.  Why could you say that they were -- why do

9    you use the word "attack"?

10         A.  Well, they were attacked.  They were a harsh

11    criticism.  They -- I don't think they demanded he be

12    fired like the graduate student petition, but they

13    were decrying his temerity in publishing such an

14    issue and making what they conceived of as personal

15    attacks on Philip Ewell in his own article -- one of

16    the articles is his -- and basically taking Ewell's

17    side in all this and saying that Schenker was a

18    racist and that Dr. Jackson was a racist for

19    defending Schenker, and it was all quite disgraceful.

20         Q.  And you said the majority of faculty signed

21    that, correct?

22         A.  Of music history and theory faculty, yes.

23         Q.  Is that yeah the MHTE?

24         A.  Yes.

25         Q.  Can we use -- if we use that acronym, will

1    you --

2        A.  Yeah, I was trying to remember it.  MHTE,

3    yes.

4        Q.  Do you remember who didn't of the MHTE

5    faculty?

6        A.  Yes, well I --

7            MR. ALLEN:  Objection.  Form.

8        A.  -- I don't remember everyone who didn't, but

9    the three people who didn't was me, Dr. Heetderks,

10   and Dr. Schwartz.

11       Q.  (BY MS. QUIMBY)  How many total faculty do

12   you recall --

13       A.  I don't recall.

14       Q.  -- in the MHTE at that time?

15       A.  I don't know how many there are.  As I said,

16   I'm not very good with dates and numbers.

17       Q.  Okay.  No problem.

18       A.  I would just -- I would have to go to a

19   register and count them.

20       Q.  You said Dr. Heetderks and Schwarz and

21   yourself, correct?

22       A.  Us three for sure.  I -- they're the only

23   three I can think of.

24       Q.  Do you remember receiving an email from

25   someone else on the faculty circulating that

1   petition?

2        A.  Dr. Geoffroy-Schwinden, I think, is the one

3   who started it.

4        Q.  **Uh-huh.**

5        A.  And I did get emails from her, asking me to

6   sign it.

7        Q.  **Did you respond?**

8        A.  Yeah.  I think I said no, I wouldn't sign

9   it.

10       Q.  **Did you object to any of the content in the**

11  **letter that was being circulated?**

12       A.  Yeah, almost all of it.

13       Q.  **Did you tell her that?**

14       A.  Yeah, I think I did.  I said I didn't want

15  to sign it for two reasons.  Because, one, being in

16  the center, I thought it would be rather hypocritical

17  to protest actions that I was a part of and sort of

18  ridiculous.  I didn't use that word.

19              And the other was that I did not believe

20  in the charges that were being made.  I did not think

21  it was a -- that it was a rac -- that Dr. Jackson or

22  the journal was being racist in any way by discussing

23  and soliciting responses.

24              The only responses officially that

25  existed at the time -- there was this strained

1  silence for a long time -- after Ewell's SMT address

2  and the article based on it that appeared in Music

3  Theory Online, and I think the actual address he gave

4  verbatim also appeared in, I think, Music Theory

5  Spectrum.  I'm not sure which one appeared in which.

6      **Q.  Did that -- did the verbatim publishing of**

7  **his speech and the publishing of his paper occur**

8  **before or after Volume 12 was published?**

9      A.  I think it occurred after.  We had a

10  recording of the speech, and we transcribed the

11  recording and were responding to that.

12          Somewhere along the line an article

13  based and expanding his SMT talk appeared in either

14  Journal -- either Music Theory Spectrum or Music

15  Theory Online.  I don't think that was out -- I don't

16  think that was published yet when this came out, but

17  I might be wrong.  Yeah.

18      **Q.  When you published Volume 12, were you aware**

19  **that those were forthcoming?**

20      A.  I was aware that there was an article

21  expanding the talk that was forthcoming, yes.

22      **Q.  Did you consider waiting until that was**

23  **published to publish the responses to his talk?**

24      A.  We might have, but I don't think we

25  considered it very much.  We felt that some sort of a

Stephen Slattow, Ph.D. - 11/7/2024

35

 1   response to the talk, which was -- I mean, it's the

 2   main -- it's the annual meeting of the major

 3   professional society for music theory with a huge

 4   attendance and huge publicity.  It had been followed

 5   by this very strange vacuum of no response.  I think

 6   we felt that it was more important to have some

 7   response out there.  At least that's my recollection.

 8        Q.  Okay.  Back to the student who has been sued

 9   in this lawsuit, Rachel Gain.  Do you know her?

10        A.  Not well.  She was a student in a class of

11   mine.  Well, I didn't know her personally outside of

12   that.

13        Q.  Okay.  If you will bear with me a moment, I

14   have an exhibit I want to show you.  It is part of

15   the Journal of Schenkerian Studies, which you have

16   there in front of you.

17             MR. ALLEN:  Is it part of Volume 12?

18             MS. QUIMBY:  Yes, I'm sorry.

19             MR. ALLEN:  Uh-huh.

20             MS. QUIMBY:  Okay.  I'm marking this as

21   Exhibit 1, and I'll share that with you momentarily,

22   Mike, in the chat.

23             MR. ALLEN:  I'm not trying to hasten the

24   process.

25             THE REPORTER:  I think we already have

1  an Exhibit 1, so let's mark that as Exhibit 2.

2              MS. QUIMBY:  I'm sorry, this will be

3  Exhibit 2.

4              MR. ALLEN:  Exhibit 2, right?  Exhibit 1

5  is the full --

6              MS. QUIMBY:  You can hang onto that.

7              MR. ALLEN:  -- print copy of the Volume

8  12.

9              THE WITNESS:  You might want to change

10 the number.

11             MS. QUIMBY:  Actually, the Exhibit 1, is

12 that the full volume?

13             MR. ALLEN:  Which he referred to in the

14 course of the deposition, yes.

15             (Exhibit 2 marked.)

16     **Q.  (BY MS. QUIMBY)  Dr. Slottow, I'll have you**

17 **just take a look at that while I'm putting this in**

18 **the Zoom chat.**

19     A.  Okay.

20             MS. QUIMBY:  Mike, do you see that there

21 in the chat?

22             MR. ALLEN:  I just did get it, yep.

23             MS. QUIMBY:  Would you prefer that I

24 also share -- I don't know -- now I'm getting

25 feedback.

Stephen Slattow, Ph.D. - 11/7/2024

37

1              MR. ALLEN:  We just got an echo.  Did

2    you hear that?

3              MS. QUIMBY:  Yeah, for some reason my

4    laptop audio turned on.

5              MR. ALLEN:  So this will be Exhibit 2,

6    sorry, for the record?

7              MS. QUIMBY:  Yes.  Are you okay to just

8    view it -- download it and pull it up that way?

9              MR. ALLEN:  Yes, that's perfectly fine.

10   I can see it here, yeah.

11             MS. QUIMBY:  Okay.

12        Q.  (BY MS. QUIMBY)  Okay, Dr. Slottow.  Have

13   you had a chance to look at this?

14        A.  Yeah.

15        Q.  What is it?

16        A.  Well, it's the list of -- the first page is

17   a list of the editorial board, the editor, assistant

18   editor, advisory board.  The second is information

19   about the journal with phone numbers and addresses

20   and fax numbers.  Then there is the table of

21   contents.  That's it.

22        Q.  Okay.  And to your understanding, this is

23   from Volume 12, correct?

24        A.  Yes.

25        Q.  Okay.  So you're listed there both on the

 1  **editorial board and as the -- part of the advisory**

 2  **board, correct?**

 3       A.  I seem to be, yes.

 4       **Q.  Can you explain to me the -- your role on**

 5  **the editorial board first?**

 6       A.  Well, the editorial board was just a whole

 7  group of mainly prominent Schenkerian scholars,

 8  who -- they didn't do much.  They weren't consulted

 9  much.  But they were there to -- they could provide

10  some responses to the direction and actions of the

11  journal.  They were partly there for prestige.  I'm

12  not sure why I'm on there, actually.

13           That's some of the people there, such as

14  L. Poundie Burstein, Allen Cadwallader, David Beach,

15  Charles Burkhart, Carl Schachter were very prominent

16  -- were and are very prominent scholars.  The

17  advisory board are people who were actually in charge

18  of the journal.

19       **Q.  Okay.  I'm going to ask you more about that**

20  **in a moment.  But you said the editorial board, they**

21  **weren't consulted on much.  Were they consulted at**

22  **all?**

23       A.  Well, they certainly weighed in after Volume

24  12 came out.  In fact, a number of them resigned.

25       **Q.  Do you recall who resigned?**

```
 1        A.  L. Poundie Burstein resigned --

 2        Q.  Uh-huh.

 3        A.  -- for sure.  Frank Samarotto resigned.

 4  Diego Cubero probably resigned.  Ellen Bakulina, I

 5  think, resigned.  Mark Anson-Cartwright may have done

 6  so, yes.

 7        Q.  What were they -- so they weren't -- so you

 8  said they were consulted after Volume 12 was

 9  published, correct?

10        A.  Well, they weren't --

11        Q.  Or they weighed in, I think you said.

12        A.  They weighed in.

13              THE REPORTER:  Okay.  Hang on.  I can't

14  get your answer and -- okay.

15              THE WITNESS:  What?

16              MS. QUIMBY:  We were talking over each

17  other, so the court reporter is just reminding us to

18  not do that.  That's my fault.  Thank you.

19        A.  They weighed in.

20        Q.  (BY MS. QUIMBY)  Okay.

21        A.  Now, I don't know whether Dr. Jackson

22  consulted with them about the idea of soliciting

23  articles in response to Ewell's address or not.  I

24  can't recall.

25        Q.  Did you consult with them?
```

```
 1        A.  No, no.  Even though I was officially listed
 2   as codirector, something like that.  I think -- I
 3   think in reality Dr. Jackson was the motive force and
 4   the main director of the center.  I mean, it was his
 5   project from the start.
 6        Q.  Uh-huh.
 7        A.  So I viewed myself as sort of -- my role was
 8   secondary to his.
 9        Q.  And I think you described earlier that the
10   center or at least the journal was created about the
11   time that you started?
12        A.  Yeah, because Volume 1 -- I was involved in
13   Volume 1, so I think they had the idea of the
14   journal, and part of my role was to help make it
15   real.
16        Q.  Uh-huh.  Did Dr. Jackson create both the
17   center and the journal?
18        A.  Well, he certainly created the center.  I
19   mean, because it was already there --
20        Q.  Uh-huh.
21        A.  -- when I came in.  The journal was an idea
22   that was to be one of the activities of the center.
23   But it -- it had not been actualized.
24        Q.  Okay.  How and when did it become
25   actualized, if you recall?
```

```
 1        A.  Well, it would have been shortly after I
 2   joined.  So that would probably be around 2002, 2003.
 3   I don't know what date the first volume came out.  I
 4   have it at home, but I didn't think to bring it.
 5              Actually, I should be able to tell you.
 6   That's interesting.  Volume 1 actually came out in
 7   fall 2005.  So it was later than I thought.
 8        Q.  Okay.  Back to this Exhibit 2 here.  Can you
 9   describe your role as an advisory board member?
10        A.  It's hard to remember specifics after some
11   years.  I was -- I was involved in decisions of the
12   center.  For instance, the decision to -- I was
13   certainly involved in soliciting articles and reviews
14   for the journal.  I was certainly involved in the
15   idea of putting together a Ewell, Philip Ewell,
16   special edition.
17              I was involved in policy.  Since I had
18   entered UNT, part of my job was to do with the
19   center, specifically with the journal.  I was
20   probably more involved in things that -- issues
21   having to do with the journal than, say, putting on
22   concerts or making CDs.  Dr. Jackson tended to be
23   much more involved in those than I was.
24        Q.  The concerts and the CDs?
25        A.  Yeah.
```

1    Q.  Let me just stop you real quick before you

2  go on.

3              So the advisory board, was that for the

4  Journal of Schenkerian Studies?

5    A.  No, it was for the center --

6    Q.  Okay.

7    A.  -- as a whole.  No, no.  It's actually --

8  well, in here it says it was for the journal,

9  advisory board for the journal.  So, yes, for the

10  journal, I would say, at least as regards this

11  exhibit.

12    Q.  So if I asked what was your role as an

13  advisory board member for the journal, is your answer

14  different?

15    A.  No.

16    Q.  Okay.  You described policy.  You were

17  involved in policy, I think you said.  What do you

18  mean by that?

19    A.  Well, the policy that went into Volume 12,

20  for instance.  The decision to do a Philip Ewell

21  response feature, that's certainly a matter of

22  policy.

23              If we had -- if we had -- if we were

24  going to invite -- I was also involved in the lecture

25  committee, so if we were going to invite someone -- a

43

```
 1   Schenkerian talk in the lecture committee, I was
 2   certainly involved in that.
 3            Now, that wasn't really an activity of
 4   the journal or the center.  That was the lecture
 5   committee that...
 6       Q.  So what was --
 7       A.  That's all I can think of.
 8       Q.  -- the policy that you're referencing?
 9       A.  What I'm referencing is the policy to do a
10   Philip Ewell-featured journal in Volume 12.  That's
11   an example.
12            Other than that, it was more the -- I
13   was involved in the journal.  The editor had the main
14   responsibility, though I would certainly be consulted
15   on who to pick for reviews, who to pick -- who would
16   be good people to approach and doing a review of
17   submissions, whether for when Dr. -- when Edward
18   Laufer died, we did a special issue of responses to
19   his work.  I was certainly involved in that decision.
20            We had a special issue of intersections
21   between Schenkerian and neo-Riemannian theory that
22   was mainly Jennifer Sadoff's project, but I was
23   certainly involved in approving it and giving it the
24   go-ahead.  Things of that sort.
25       Q.  Okay.
```

1    A.  But mainly involved in the journal, with the

2  journal.

3    **Q.  Okay.  So you said the policy of the special**

4  **edition addressing Ewell's talk.  What do you -- I'm**

5  **having a hard time understanding what exactly the**

6  **policy is that you're referencing.**

7    A.  The policy was the decision.

8    **Q.  Okay.  Was there a written policy that you**

9  **followed to -- in making that decision?**

10    A.  No.  No, no, no?  It's -- by "policy," I

11  just mean what the journal was going to do.

12    **Q.  Okay.  Okay.**

13    A.  It's not more exact than that.

14    **Q.  So your role on the advisory board, was it**

15  **the same as Dr. Jackson's role on the advisory board?**

16    A.  After a while, officially.  But I think in

17  practice it was a secondary role.  I felt Dr. Jackson

18  had the lead, and I kind of would work with him.  But

19  I always regarded the whole center was his project,

20  and so I think my main role was to support or argue

21  with or work with him in activities of the center.

22    **Q.  What did he do as the lead, as you**

23  **described, that you didn't do?**

24    A.  Well, he would generally initiate things.

25  He -- of course, the question would be better

1  directed towards him, but he would come up with

2  ideas, inviting people to give talks.

3          I think the idea of the Edward Laufer

4  issue was his idea or maybe we -- it was both of our

5  ideas.  I mean, it was -- the whole center was very

6  much his project from the start, so if the idea is to

7  maybe solicit or ask if people would be interested in

8  submitting an article on specific topics that were

9  their specialty, that might have been his idea, that

10  kind of thing.

11      **Q.  Did he come up with the topics for each**

12  **journal?**

13      A.  No.  Most of the journals didn't have

14  topics.

15      **Q.  Uh-huh.**

16      A.  A few had themes, but most did not.  Most

17  was just the usual procedure of people writing in

18  with article submissions.  Sometimes there would be

19  topics.  For in -- the topics wouldn't necessarily be

20  the whole journal.  I mean, in Volume 12, the Philip

21  Ewell part is not the whole journal.  It's a section

22  of the journal.

23          With the Laufer edition, that was --

24  well, that might have been the whole journal,

25  actually.  That they were -- no, not every journal

1   had a theme.  Some did.

2        Q.  Okay.  The Edward Laufer edition you've

3   described, was that described as a festschrift?  And

4   I probably didn't pronounce that correctly --

5        A.  I think you did --

6        Q.  -- but I think you know what I'm talking

7   about.

8        A.  -- actually.  Yeah, that --

9             THE REPORTER:  Can you say that again?

10  "Was that described as a"?

11            MS. QUIMBY:  Festschrift?

12            THE REPORTER:  Thank you.

13            MR. ALLEN:  Shall we spell it for the

14  reporter?

15            THE REPORTER:  Yes, please.

16            MS. QUIMBY:  I can try.

17            MR. ALLEN:  I'll try -- I'll type it in

18  the chat.  How's that?

19            THE REPORTER:  Thank you.

20            MS. QUIMBY:  Dr. Slottow might be better

21  at spelling it than me.

22            THE WITNESS:  If I were going to spell

23  it, I would probably look it up first, because I'm

24  not sure of the spelling either.

25            MS. QUIMBY:  I believe it's F-E-T-S --

 1                    THE WITNESS:  No, it's fest.

 2                    MS. QUIMBY:  Fest.

 3                    THE WITNESS:  So it's probably F-E-S-T.

 4  My guess would be -- let's see -- schrift,

 5  S-C-H-R-I-F-T maybe.

 6                    MS. QUIMBY:  I think that's good enough.

 7                    THE REPORTER:  Okay.  Yeah.  I can look

 8  it up from there.  Thank you.

 9                    THE WITNESS:  It's a German word.

10      **Q.  (BY MS. QUIMBY)  What does that mean?  What**

11  **is a festschrift?**

12      A.  It's a collection of articles in tribute to

13  a scholar, usually one of some fame and usually

14  someone who has recently died.

15      **Q.  Are they critical of the person?**

16      A.  Generally, no, or, if they are, they're very

17  mild.  They're generally in the nature of an informed

18  scholarly tribute, but they may also contain articles

19  on a topic that the recipient of the festschrift

20  would have been interested in or a specialty of.

21      **Q.  Uh-huh.**

22      A.  So if someone was -- you know, worked in a

23  special -- worked in sonata form, so some articles

24  would be about the scholar, the scholar's work.  Some

25  might be mild critiques in a benign way.  Some might

 1  be someone else's research on sonata form, and the

 2  connection would be -- it would be a topic --

 3      Q.  Uh-huh.

 4      A.  -- that the festschrift or recipient would

 5  have worked in.

 6      Q.  Was the --

 7      A.  They -- they're --

 8      Q.  Go ahead.

 9      A.  -- tributes.  They're scholarly tributes.

10      Q.  Was the festschrift you did on Laufer

11  critical of him?

12      A.  No, I don't think there were any critical

13  articles.  I think it was the usual mix of short

14  reminiscences about him --

15      Q.  Uh-huh.

16      A.  -- from people who knew him.  Some

17  appraisals of his work, some -- I can't recall

18  exactly what was in there.  It's usually a mixture of

19  these things.

20      Q.  Sure.  Were they positive appraisals of his

21  work?

22      A.  Yes.  I can't think of anyone who had a

23  negative thing to say about Edward Laufer.

24      Q.  Was the festschrift peer-reviewed?

25      A.  No, they're usually not.  I think the

1    tradition is that they not be peer-reviewed.  They

2    have a kind of a personal tone to them.

3        **Q.  Uh-huh.  Are you aware of any comparable**

4    **journals that have published a festschrift on others?**

5        A.  Oh, lots of them.  Well, festschrifts can

6    appear as standalone volumes --

7        **Q.  Uh-huh.**

8        A.  -- like books or yearbooks or as journals.

9    There have been a number of them.  I don't think I

10   can cite any specific ones.

11              When a famous scholar like a famous

12   music theorist dies, there's likely to appear some

13   sort of a festschrift in some form or at least a

14   section of a journal, say a mini festschrift devoted

15   to that person.

16              It's -- as I said, I don't think I

17   remember specific examples, but it's pretty common.

18       **Q.  Uh-huh.  Okay, that was kind of my question.**

19              **I just have a couple more questions and**

20   **then we can take a break.**

21              **If you'll -- I'll ask you to turn to the**

22   **second page of Exhibit 2, please.  And the Bates**

23   **number on that is UNT 849.**

24       A.  Yeah.

25       **Q.  Okay.  Do you see that first paragraph**

1    there?

2         A.  Uh-huh.

3         Q.  And that says, "The Journal of Schenkerian

4    Studies is a peer-reviewed journal published annually

5    by the Center for Schenkerian Studies," correct?

6         A.  Yeah.

7         Q.  Okay.

8         A.  And the University of North Texas.

9         Q.  Right.  I didn't read the entire sentence,

10   but -- so the statement represents that this

11   Volume 12 is peer-reviewed, correct?

12        A.  Well, that's what it says, yes.  Well, it

13   says the center -- it says the journal is

14   peer-reviewed.  It doesn't specifically say Volume

15   12.

16        Q.  Do you see anything on these two pages that

17   I've -- or, I guess it's four pages of Exhibit 2 that

18   say that it's not peer-reviewed?

19        A.  No.  They don't say -- no.  But, as we know,

20   that the articles and the festschrift were not

21   peer-reviewed.

22        Q.  Was the --

23        A.  Or I -- it's not a festschrift.  It's a --

24   what do I call it -- a symposium.

25        Q.  Sure.  Okay.  One more question and we can

1    take -- a couple more questions perhaps.

2              So when you -- when you started at UNT,

3    was Dr. Jackson tenured?  Do you know?

4        A.  Yeah, well, yes.

5        Q.  Okay.  Was he a mentor to you?

6        A.  No, not really.  We had both been mentored

7    from some of the same people.  Both of us are

8    graduates of the City University of New York.

9        Q.  Uh-huh.

10       A.  Both of us were close students of Carl

11   Schachter.  Yes, mainly of Carl Schachter.

12             I would not call Dr. Jackson -- I got

13   certainly some advice from him, but I didn't view him

14   as a mentor, and I don't think he viewed himself as a

15   mentor.

16       Q.  Okay.  That brought up one more question.

17             So the editorial board, I understand --

18   I'm sorry, now I can't find his name -- Carl

19   Schachter was on the editorial board of the JSS,

20   correct?

21       A.  Yes.

22       Q.  How did -- how was the editorial board

23   comprised, if you recall?

24       A.  I don't really --

25             MR. ALLEN:  Objection.

Stephen Slattow, Ph.D. - 11/7/2024

52

1    Q.  (BY MS. QUIMBY)  You can answer.

2    A.  And what was the objection?

3    Q.  It's just for the record.

4    A.  As I said before, I thought the editorial

5    board was there largely for purposes of prestige.

6    There are some very famous and all of them reputable

7    Schenkerians on the editorial board.

8            I don't think they did all that much.  I

9    had answered this question before.

10    Q.  Okay.  I'll stop you.  I'm sorry.  My

11    question probably wasn't clear enough, then.

12            How did these people listed here come to

13    serve on the board?  Did you ask them to or --

14    A.  Well, Dr. Jackson asked them to.  In some

15    cases I was consulted.  I think, as I said, he was

16    concerned to get as many famous Schenkerian scholars

17    on here to help to give the journal some weight.

18            I think he asked most of them.  In fact,

19    I think most of them were already there early on, but

20    I don't think they were consulted all that much.

21    Q.  Okay.

22            MS. QUIMBY:  I think it's a good time to

23    take a break.

24            THE VIDEOGRAPHER:  We're off the record

25    at 9:40 a.m.

1    MR. ALLEN:  How long do you need?  Are

2   we off the record?

3    MS. QUIMBY:  Yes.

4    (Recess 9:40 a.m. to 9:55 a.m.)

5    THE VIDEOGRAPHER:  We're back on the

6   record at 9:55 a.m.

7    Q.  (BY MS. QUIMBY)  Okay, Dr. Slottow.  So I

8   wanted to go back to something you said earlier about

9   the policies.

10    Did the JSF -- JSS -- and I'm talking

11   specifically about the journal --

12    A.  Uh-huh.

13    Q.  -- not the center.  Did the JSS have any

14   written policies?

15    A.  Not that I know of.

16    Q.  Okay.  So I'll have you look at Exhibit 2

17   again.

18    A.  Which one is Exhibit 2?

19    Q.  That one that says Exhibit 1 on it,

20   confusingly.

21    A.  Yes.

22    Q.  That is Exhibit 2.

23    A.  Yes, Exhibit 1 is Exhibit 2.

24    MR. ALLEN:  Sorry, I'm not laughing at

25   the witness.

                    MS. QUIMBY:  It's okay.  You can laugh

at me.

                    MR. ALLEN:  I'm not laughing at you

either.

    **Q.  (BY MS. QUIMBY)  So we've talked about the**

**editorial board and the advisory board, and now I**

**would like to ask you some questions about the editor**

**and assistant editor.**

    A.  Yeah.

    **Q.  So here the editor is listed as Benjamin**

**Graf, correct?**

    A.  Yes.

    **Q.  At the time that Volume 12 was published,**

**was Benjamin Graf a student?**

    A.  Yes, I think he -- well, had he graduated?

I think he was still a student.  But he was, he was

close to graduation.

    **Q.  Okay.**

    A.  But he may have graduated in -- I'm actually

not exactly sure when he graduated.

    **Q.  Okay.  And was Levi Walls there, was he a**

**student, the assistant editor?**

    A.  Levi was a student, yes.

    **Q.  What was the -- can you describe the editor**

**position versus the assistant editor position?**

1    A.  We never had an assistant editor position

2 before, to my knowledge.  The editor is the one who

3 really did most of the work of the journal.  The

4 editor would communicate with the authors, would --

5 often the editor would be very involved in

6 typesetting the journal, although I think that --

7 yeah, I think that remained the case.  I don't think

8 the UNT Press did that.

9         The editor would certainly be very

10 involved with -- would be involved in acceptances

11 and -- if we got a journal submission, we would

12 either accept it, reject it, or say it needs more

13 work.  So accepted provisionally --

14    **Q.  Uh-huh.**

15    A.  -- upon condition of revisions.  The editor

16 would be involved in mailing the journals out.

17         We didn't have, you know, a big staff of

18 people.  So the editor is really the key person.

19 We -- Dr. Jackson and I sort of stood behind the

20 editor.  The editor was the person who was -- did the

21 most work on the journals.

22         Now, you asked about assistant editor as

23 well.  Now, the only reason we -- to my recollection,

24 the only reason we have an assistant editor at all is

25 because Benjamin had, I think, announced that he

1   didn't want to continue being the editor, I believe,

2   after this journal, partly because he was graduating.

3   And so Levi was going to be the next editor.  And so

4   he was on as -- he was sort of an apprentice to learn

5   how to be the editor from Benjamin Graf while he was

6   still there.  That was his role.

7        **Q.  Besides this instance of Benjamin Graf**

8   **serving as the editor and Levi Walls serving as the**

9   **assistant editor, was such an apprenticeship ever --**

10  **had ever happened before --**

11       A.  I don't think so. --

12       **Q.  -- in the journal?**

13       A.  I don't think so.  We had an editor.  We

14  didn't have an assistant one until now, until this

15  issue.  That's my recollection.

16       **Q.  And, I'm sorry, you may have already**

17  **answered this question, and I'm -- so do you**

18  **understand or do you recall why in this particular**

19  **time there were this apprenticeship set up?**

20       A.  I did just answer that.  Because Benjamin

21  Graf -- usually someone served as editor for a long

22  time.

23       **Q.  Uh-huh.**

24       A.  Benjamin Graf certainly had.  And since he

25  announced he was -- did not want to continue, partly

1  because he was graduating and would no longer be a

2  student -- the editor had to be a student.  This is a

3  model -- this model is not unique to the Journal of

4  Schenkerian Studies, by the way -- we needed to bring

5  someone else in as editor, so Levi was there as an

6  apprentice in the classical sense.

7      **Q.  What was your understanding of why Benjamin**

8  **Graf didn't want to serve as editor anymore?**

9      A.  He was going to graduate.

10     **Q.  Okay.**

11     A.  He couldn't be editor if he wasn't a

12 student.

13     **Q.  Okay.  Isn't it -- wouldn't that be true for**

14 **all of the editors, though?  Eventually they would**

15 **graduate and no longer be able to --**

16     A.  Yeah, but he was going to graduate very,

17 very -- if he hadn't already graduated, which he may

18 have, he was going to graduate very, very soon.  And

19 it would have been untenable for him to continue, and

20 I don't think he wanted to continue anyway.  It's a

21 lot of work.  It's a lot of time.  He had done it for

22 some years.

23     **Q.  How many years, do you recall?**

24     A.  I don't know.  Four, five, perhaps more.  He

25 was certainly the editor when the Laufer issue came

Stephen Slattow, Ph.D. - 11/7/2024

58

1   out.

2       Q.  Do you remember what volume that was?

3       A.  No.  We didn't have that many editors.

4   We -- Benjamin was the third.  They typically stayed

5   in that position for some years.

6       Q.  Were they always PhD students or were --

7       A.  Yes, they were always doctoral students.

8       Q.  And you described that the editor did most

9   of the work.  Did that include choosing what articles

10  were published?

11      A.  No, because -- they might have a say, but

12  when a submission came in, typically, especially if

13  it wasn't festschrift or some kind of symposium

14  thing, we would send it out for review.

15      Q.  Uh-huh.

16      A.  The reviewer, if it didn't pass review,

17  well, it didn't get published in the journal.  If it

18  did pass review, and -- well, if there were changes

19  that needed to be made, usually the editor would be

20  the one to look over the alterations and make sure

21  they were okay.

22              I don't think it was usually sent back

23  to the reviewer.  And then the editor would make

24  the -- I think the choice of what articles were going

25  to be in which edition of the journal, because you

1  could have things accepted, but it may not appear in

2  that issue because it was already full.

3       **Q.  So who did make the decision about what was**

4  **published and what wasn't?**

5       A.  Well, I tried to answer that:  The reviewer,

6  but after that, the editor.  The editor -- if it

7  passed review, I think the editor, with consultation

8  with Dr. Jackson and I, would make that decision.

9       **Q.  And when you say, "the reviewer," can you**

10  **describe what you mean -- who you mean by that?**

11       A.  The academic reviewer.  An article would be

12  sent out to someone with a specialty in that topic

13  who would agree to review the article and to give

14  their opinion on whether it was good enough to be

15  published.  And whether -- and in any case, whether

16  there were alterations that needed to be made or

17  things that needed to be expanded or questionable

18  statements or procedures.  And that's all the

19  responsibility of the reviewer.  That's what "send

20  the submission out for review" means.

21            I think typically there would be one

22  reviewer per article.

23       **Q.  Are you describing the peer review process?**

24       A.  Yes.

25       **Q.  Okay.  And did -- how are the reviewers**

1    chosen?

2        A.  Well, we try -- well, one function of the

3    editorial board that I've -- didn't think to mention

4    before is that they supplied a pool of people who

5    could be reviewers.  That was actually a prime

6    function.

7            Now, we could also get -- no, you don't

8    get paid for reviewing --

9        Q.  Uh-huh.

10       A.  -- for doing an academic review.  It's

11   volunteer.  So I think that if you were on the

12   editorial board, you were expected to be available to

13   review.

14           I don't know if all of our reviewers are

15   on the editorial board, but a lot of them were.  Some

16   people were on the board just for prestige.  They

17   never reviewed.  Carl Schachter didn't.

18       Q.  Uh-huh.

19       A.  I guess I lost track of the question again.

20       Q.  That's okay.  Did you -- so you were on the

21   editorial board.  Did you ever review articles?

22       A.  No.  I'm not really sure why I'm on the

23   editorial board.  Dr. Jackson is on the editorial

24   board too.  I'm not sure why we had a double

25   function.  I don't think it meant very much.  But --

1  sorry, repeat the question.

2      Q.  I think you've answered it.  My question was

3  had you reviewed.

4      A.  No.

5      Q.  You're on the editorial board --

6      A.  No, it would have been a --

7      Q.  -- so did you review anything?

8      A.  -- kind of conflict.  I was never asked to

9  review --

10          THE REPORTER:  I need you to -- hang on.

11  I need you to start your answer over again.  Y'all

12  were over-talking each other.

13      A.  I was never asked to review an article.

14      Q.  (BY MS. QUIMBY)  Do you know if Dr. Jackson

15  ever reviewed articles?

16      A.  I don't think he did.  I don't know for

17  sure, but I would be very surprised if he had.  They

18  were typically sent out to someone else.

19      Q.  Who may have been on the editorial board but

20  may not have?

21      A.  Right.

22      Q.  Okay.  So can you describe or -- how you

23  came up with the idea to publish this symposium in

24  Volume 12?

25      A.  Well, it was the next volume of the journal.

1  We felt that since there was not -- very strangely,

2  after such a provocative address by Philip Ewell

3  where he kind viciously attacks and hypocritically,

4  if I might add, attacks a very important music

5  theorist whose methodology is still being used in a

6  very active way, there was no response.  There was no

7  response at the conference.  There was no response in

8  the journal.  It's almost like everyone was afraid to

9  say anything.  I think they were, actually.

10           And as the Journal of Schenkerian

11  Studies, we felt if anyone was going to respond to a

12  concerted attack on Schenkerian theory, it should be

13  us.  I mean, it's in our name, for Pete's sake.

14  That's how the idea came about.

15       Q.  Whose idea was it?

16       A.  Well, I think that Dr. Jackson and I had the

17  idea probably more or less simultaneously.  The

18  editor, Benjamin Graf, may have had the idea too.  I

19  mean, it was kind of obviously our role to do so if

20  no one else was going to, and it didn't look like

21  anyone else was.

22       Q.  When was the -- Dr. Ewell's talk given?  Do

23  you recall?

24       A.  I don't recall the date.  It's in

25  probably -- it was in November, but probably the

1    same -- probably the same year the journal came out

2    or the -- this issue of the journal came out or very

3    close thereto.

4        Q.  **If I said November of 2019, does that sound**

5    **familiar?**

6        A.  Well, that would be plausible.

7        Q.  **How soon after the talk was given did**

8    **you-all come up with the idea to do the symposium?**

9        A.  I don't really remember.  I think we

10   waited -- I think the idea was in our minds that we

11   might do it, and I think we kind of waited to see

12   whether anyone was -- else was -- whether there was

13   actually going to be any response, print response.

14   So I don't -- it was probably no more than a month.

15       Q.  **So you were expecting a response from**

16   **elsewhere within a month?**

17       A.  I think the possibility was in our minds

18   from the start.  But I think that we also looked to

19   see whether there would be some response to such a

20   provocative attack in such a major venue.  And I

21   think we thought it was -- I thought it was strange

22   that there was nothing at all.

23       Q.  **Did you attend the talk?**

24       A.  You know, I was at the session at the

25   plenary address, but that year the plenary address

 1   had three or four short talks.  I wasn't actually

 2   present at his talk.  I was present at the one before

 3   his talk, maybe the one after his talk.  But I

 4   certainly heard about it.

 5        Q.  How did you hear about it?

 6        A.  Because there everyone was talking about it

 7   at the conference, and it was recorded, too.

 8        Q.  Okay.  So why was it called a "symposium"?

 9   What is a symposium?

10        A.  I'm not sure who came up with the word.

11   It's a group of responses.  A symposium is usually

12   like a graduate symposium, a rather high-level course

13   on a certain topic or a group of people putting

14   their -- I'm not saying this well -- their input in a

15   certain topic.  So symposium would presuppose a sort

16   of high level of skill and reputation and people who

17   were qualified to comment on the talk.

18              So "symposium" is maybe an old-fashioned

19   kind of a word but not entirely out of place.

20        Q.  Were symposia generally peer-reviewed?

21        A.  I have no idea.  I mean, I'm not sure if

22   symposia is actually a kind of word of -- the word

23   that's usually used.  I don't know because I don't

24   think of there being a class of journal -- a group of

25   articles called symposia.  I don't know.  It's the

1   common word for that kind of thing.

2        **Q.  Is there another word you would use to**

3   **describe the symposium that was published in Volume**

4   **12?**

5        A.  No, I think symp -- I can't think of a

6   one-word synonym.  You could say a group of articles

7   in response to, but that has a lot of words.

8        **Q.  Uh-huh.**

9        A.  Symposia is -- symposium is one word, so

10  that's an advantage.

11       **Q.  And the symposium wasn't peer-reviewed,**

12  **correct?**

13       A.  No.

14       **Q.  Why wasn't it peer-reviewed?**

15       A.  I think that we generally had a sort of

16  tradition at the journal of when we had a group of

17  articles in response to or about a single topic, like

18  the -- that they were not peer-reviewed.

19            And there was an element of time also.

20  We -- the journal comes out -- came out only once a

21  year, and UNT Press did have deadlines, and we wanted

22  to get something out that year, not wait a

23  whole additional year.  But there was a kind of

24  tradition at the journal that they would not be.

25       **Q.  What else had the journal published that**

1    wasn't peer-reviewed that's similar to this

2    symposium?

3        A.  The Laufer festschrift, certainly.  And then

4    there was one on neo-Riemannian theory and

5    Schenkerian analysis.  Now, I'm not sure if that was

6    peer-reviewed or not.  I think those were the only

7    ones.

8        Q.  Have you personally published elsewhere or

9    in other academic journals?

10       A.  Yeah.

11       Q.  How many articles have you published that

12   are peer-reviewed?

13       A.  Well, luckily, I can count them up.

14       Q.  Do you mind letting me know what you're --

15   what page you're on so I can follow along?

16       A.  3.

17       Q.  Okay.

18       A.  There is a section called Articles --

19           MR. ALLEN:  Mary, for the record, this

20   is his CV he's consulting during his testimony?

21           MS. QUIMBY:  This is Exhibit 1, his CV,

22   that I -- we have not shared in the chat yet because

23   I do not -- I will share in the chat right now.

24           MR. ALLEN:  I think we're getting --

25   maybe we can talk when we're off record about the

 1  numbering of exhibits.  There just seems to be

 2  some -- I didn't even know that that had been --

 3          MS. QUIMBY:  It hasn't.  If you will

 4  give me a second, I'm going to share it with you.

 5          THE WITNESS:  The number is 18.

 6      **Q.  (BY MS. QUIMBY)  Okay.  How many have you**

 7  **published that aren't peer-reviewed, if you have?**

 8      A.  I assume most of them -- I think almost all

 9  of them were peer-reviewed.  Let's see.  One, two --

10  two of them at least were not.  I think that 16 were

11  and two weren't.

12      **Q.  Okay.  Thank you.**

13          MS. QUIMBY:  Can we go off the record

14  just for a second so I can...

15          THE VIDEOGRAPHER:  We're off the record

16  at 10:16 a.m.

17          (Brief pause.)

18          THE VIDEOGRAPHER:  We're back on the

19  record at 10:17 a.m.

20      **Q.  (BY MS. QUIMBY)  Okay, Dr. Slottow.  So did**

21  **you -- was Dr. Jackson ever the editor of the JSS?**

22      A.  No.

23      **Q.  Were you ever the editor?**

24      A.  No.  The editors had to be students.

25      **Q.  Did you ever want to be the editor?**

 1        A.  No, I did not.

 2        Q.  Did that ever come up about you potentially

 3   being the editor?

 4        A.  No, it never came up.  The model was the

 5   editor would be a graduate student.

 6        Q.  Who came up with that model?

 7        A.  Well, it was the model that was used in

 8   Theory and Practice, the music theory journal of the

 9   Eastman School of Music, and it may be more places

10   than that.  But we adopted that model.  So the editor

11   was never faculty.

12        Q.  Is "we" yourself and Dr. Jackson?

13        A.  Huh?

14        Q.  You said, "we adopted that model."  Are you

15   talking about yourself and Dr. Jackson?

16        A.  Yes.

17        Q.  Why did you decide to adopt that model?

18        A.  I don't know.  It just seemed like a good

19   model that worked at -- it worked at Eastman.  It was

20   a way of kind of a form of -- it had certain

21   advantages for the editor.  They got a lot of

22   professional experience.  They had to interact with

23   professionals in the field; interact rather closely.

24   They became known, as opposed to just being sort of

25   anonymous graduate students.

1          As editors, they also probably did

2   develop a certain authority possibly.  It was --

3   there was a side, a training side also.  It was

4   considered that it could be -- that the graduate

5   student, in addition to the monetary stipend, would

6   get a certain amount of useful experience from it.

7        **Q.  How was Levi Walls chosen as the assistant**

8   **editor?**

9        A.  I'm not sure.  I was not happy with that

10  choice.  I think Dr. Jackson possibly -- probably in

11  conferral with Benjamin Graf chose Levi as the

12  editor-to-be.

13          I did not have any alternate choices,

14  but I did not -- I didn't think Levi could write very

15  well, and I thought to be an editor you had to be

16  able to write well.

17          Also, Levi was not self-assertive or

18  confident.  He -- Benjamin Graf and our previous

19  editor, Colin Davis and, in fact, our first editor,

20  Jennifer, were far more confident in themselves than

21  Levi was.

22          So I kind of went along with it because

23  I couldn't think of an alternative.  But I wasn't

24  happy with it.

25        **Q.  Okay.  You described an editor's role**

 1  earlier as one of them being typesetting.  Can --
 2  what is typesetting?
 3      A.  Well, putting the article into the form it
 4  appears in the journal.  The words and the examples
 5  on the page, using whatever program, computer
 6  program, was in use.  That's what I mean.
 7              All books, articles, newspapers,
 8  magazines are typeset.  Of course, the word kind of
 9  harkens back to where people actually physically
10  placed type in the form, but that's changed.  But we
11  still use that word.
12      Q.  Out of the 18 articles you identified that
13  you published, how many were published in the Journal
14  of Schenkerian studies?
15      A.  One.
16      Q.  Which one was that?
17      A.  That was "Analytic Process in Schenkerian
18  Pedagogy:  An Introspective Exercise;" was published
19  in the very first edition in 2005.
20      Q.  Did you publish a response in the symposium?
21      A.  Oh, that's true.  I did that also.  That was
22  a very short but well -- direct response, yes.  So I
23  guess I would have to say two.
24      Q.  Do you know if Dr. Jackson published any
25  articles himself in the JSS?

       1        A.  Well, he published a very long article in
       2   the Laufer festschrift.
       3        Q.  Uh-huh.
       4        A.  So long, it was almost book-like.  And one
       5   of the responsibilities of Benjamin Graf was to get
       6   him to finish it because he was stalling.  He was
       7   sort of stuck or stalling, and that's also an
       8   editor's responsibility.
       9             In addition to that one -- I don't know
      10   if there were others.
      11        Q.  I want to go back to something you talked
      12   about a little bit ago before we looked at your CV.
      13             If there had been more time to publish
      14   Volume 12, would the symposium have been
      15   peer-reviewed?
      16             MR. ALLEN:  Objection --
      17             THE WITNESS:  I don't know.  I don't
      18   know.  I really don't know.
      19        Q.  (BY MS. QUIMBY)  And I think you answered
      20   this earlier, but did you-all discuss subjecting the
      21   responses to peer review?
      22        A.  I don't recall that we did, but we may have.
      23   As I say, my memory of those events is somewhat hazy
      24   because I've not thought about them that much.
      25   Dr. Jackson has thought about them, for obvious

1  reasons.  But I don't think so.

2      Q.  Do you think they should have been

3  peer-reviewed?

4      A.  In retrospect, yes, because of what --

5  because of the follow-up.  But at the time we were

6  following our, I would say, traditional policy of not

7  peer reviewing such articles.

8      Q.  What do you mean by "traditional policy"?

9      A.  Well, we didn't -- the articles in the

10 festschrift were not reviewed, the -- peer-reviewed.

11 The -- and this wasn't a festschrift, but it was a

12 sort of more personal thing.  People's -- in addition

13 to more formal articles, people were giving their

14 sort of personal responses to Ewell's address, and we

15 generally did not subject those types of things to

16 peer review.

17     Q.  Besides the festschrift, was there any other

18 example of that?

19     A.  Well, yes, there was the edition -- the

20 issue exploring the intersections between

21 neo-Riemannian theory and Schenkerian theory, and I

22 don't really know if that was peer-reviewed or not.

23     Q.  Were the responses in the symposium critical

24 of Dr. Ewell?

25     A.  Some were and some weren't.

Stephen Slattow, Ph.D. - 11/7/2024

73

1    Q.  How many were?  Do you recall?

2    A.  I don't know.  I would have to count them.

3  The call that Levi -- the call for papers that Levi

4  sent out emphasized that we wanted -- we would accept

5  both things, critical or in favor and anything in

6  between.  I would have to sort of count them.  It

7  would take a while.  I don't know if it's worth the

8  time to do that.  If you want me to, I will try.

9    Q.  That's okay.  Actually, if you'll -- you can

10  go ahead and take a look and see if you can recall

11  from looking at the --

12    A.  Does someone have a pencil?  I don't want to

13  mark this up with pen.

14    Q.  I have -- if you -- you can mark on

15  Exhibit --

16        MR. TODD:  2.

17    Q.  -- 2.

18    A.  That's okay.  I can -- you mean Exhibit 2

19  which is called Exhibit 1?

20    Q.  Correct.

21    A.  That's a nice twist there.  Some of them I

22  don't actually know.

23    Q.  Well, let me -- we can stop there.  So did

24  you read all of the --

25    A.  No.

1      Q.  -- responses?

2      A.  No, no.

3      Q.  Did you read them at the time?

4      A.  No, I looked -- you know, I would -- some of

5  them I read completely.  Some of them I just sort of

6  browsed through.  Some of them were very short.  Some

7  are much longer.

8      Q.  Was it expected or were you expected to read

9  all of them before the volume was published?

10     A.  It was expected that I look at them.  I'm

11 not sure it was expected that I read every word.

12     Q.  Did you read any of them in their entirety?

13     A.  Yes, I did.

14     Q.  Did you provide feedback on any of them?

15     A.  No, I wasn't asked to.  Well, yes, I did,

16 actually.  I -- well, both Benjamin Graf and I

17 provided a lot of feedback on Dr. Jackson's, which is

18 viewed as somewhat problematical.

19     Q.  What is viewed as somewhat problematical,

20 the...

21     A.  Well, I think what we found problematical is

22 there were a lot of derogatory -- as I recall, there

23 were a lot of derogatory references to

24 ethnomusicologists and ethnomusicology.  And

25 we worked hard at getting --

1            THE REPORTER:  I'm sorry, to what?

2    "There was a lot of derogatory references to"?

3            THE WITNESS:  Ethnomusicology.

4            THE REPORTER:  Ethno?

5            THE WITNESS:  It's one word,

6    ethnomusicology.

7            THE REPORTER:  Thank you.

8        A.  So we certainly worked a lot on that one.

9    Of course, I worked a lot on my own article.  I think

10   those were the only ones that I had some critiques

11   of.

12       **Q.  What is ethnomusicology?**

13       A.  Ethnomusicology began as sort of the

14   academic formal study of nonwestern music.  So these

15   none -- like -- or nonwestern classical musics.  So

16   music of Africa, music of Indonesia or, within North

17   America, you might say pop music or American Indian

18   music or -- especially when it started, musicology,

19   music theory were mainly sort of western classical

20   music.  So musics outside that and especially musics

21   from outside of European culture, you might say,

22   were -- had this -- fell under the catch-all

23   ethnomusicology.

24            In practice, it was sort of a

25   combination and remains so of formal music study,

1    like musicology plus anthropology.  So there are

2    anthropologically-oriented ethnomusicologists and --

3    well, most of them are, and some which are more music

4    theory, musicology oriented.  But the subject matter

5    tends to be different from music theory and

6    musicology, per se.

7              But all this is getting blurred because

8    you find music theorists doing nonwestern music or

9    nonwestern classical music.  So all these boundaries

10   are -- have shifted quite a lot.

11       Q.  Okay.  So what was written in Dr. Jackson's

12   article about ethnomusicology that you're describing

13   that you recall?

14       A.  I can't really recall.  It's just that there

15   were a lot of -- there seemed to be a lot of

16   derogatory references to it.  And my recollection is

17   that Benjamin and I were afraid that these would be

18   taken as, well, criticisms of ethnomusicology and

19   ethnomusicologists, and they weren't necessary, and

20   we didn't want them in there.

21              I'm not sure how accurate my

22   recollection is, but that is what it is.

23       Q.  Were you requesting or recommending changes

24   to the substance of the article?

25       A.  Yeah, we wanted those to be tempered down or

77

1  removed.  I think in the end they were removed for

2  the most part.

3       Q.  Would you describe that as censorship?

4       A.  No.  Because we were -- when you send an

5  article out for review and changes and suggestions,

6  that's not censorship.  That's the function of the

7  reviewer.

8            When -- so we were doing essentially the

9  same function.  We had no -- we had no power to make

10 those changes, just to make our case to Dr. Jackson.

11 We thought it was a -- they were a bad idea, you

12 know, those -- those things.

13      Q.  I think you just described the peer review

14 process of sending things out, correct?

15      A.  Yes, but the -- if we're asked to read over

16 an article -- I think Dr. Jackson asked us to read

17 over his article and give responses -- then we would

18 give responses.

19      Q.  In the peer review process, were substantive

20 changes recommended?

21      A.  Oh, I don't know, because --

22            MR. ALLEN:  Objection.

23      A.  -- I was -- the editor was the one who

24 primarily read the peer reviews.

25      Q.  (BY MS. QUIMBY)  Uh-huh.

1    A.  We were only called in when the editor felt

2  it was necessary, which was -- didn't happen, or it

3  didn't happen very much.  So I don't know.

4    **Q.  In your experience of engaging in the peer**

5  **review process of your own articles, were you -- did**

6  **you engage in substantive changes in that process**

7  **ever?**

8    A.  Well, I was asked to at times.  Often the

9  author can argue against changes --

10    **Q.  Uh-huh.**

11    A.  -- that the peer reviewer or some of these

12  peer reviewers want to make.

13            In my case, I have done that, because

14  especially if you're doing an analytical article, the

15  peer reviewer may have a different interpretation of

16  the piece than you have.  And if you incorporate too

17  many of their changes, your entire argument, your

18  entire interpretation might be gone; you've simply

19  substituted it with theirs.

20    **Q.  Uh-huh.**

21    A.  It's not your article anymore.  So I have

22  argued successfully for the most part on a number of

23  occasions.

24    **Q.  Is peer review a form of censorship?**

25    A.  No, no.  It's -- in fact, it's viewed as a

1  prestigious thing.  An article that appears in a

2  peer-reviewed journal has more -- a higher reputation

3  than an article that does not because in the article,

4  if it's not, the idea is that just any old thing can

5  get published in the journal.  It's not subject to

6  inspection from someone who is a specialist.

7      **Q.  So I want to -- can you describe how the**

8  **articles that were published in the symposium were**

9  **chosen?  I understand you may not have read them all.**

10     A.  No, I really can't because I wasn't involved

11  in that.

12     **Q.  Did you -- were you involved in soliciting**

13  **responses?**

14     A.  No.

15     **Q.  Who -- did anyone solicit responses?**

16     A.  The editor, I think, solicited responses.  I

17  think Dr. Jackson also solicited responses.

18     **Q.  When we're talking about the editor, are we**

19  **talking about Ben Graf or Levi Walls or both?**

20     A.  I would say Ben Graf.  I mean, Levi might

21  have written the letter, but I would suspect that,

22  being a -- Levi, being sort of an apprenticeship

23  learn-on-the-job role, that anything of that sort

24  would have come more from Ben.

25          But I know that Dr. Jackson did suggest

1  to certain people that they submit responses or if I

2  don't know, I assume and strongly suspect so.

3       Q.  And you said Ben Graf also may have provided

4  feedback on Dr. Jackson's article?

5       A.  He did.

6       Q.  Okay.

7       A.  We both did.

8       Q.  And I'm sorry if you may have answered this,

9  but do you recall any other feedback you provided

10 besides the feedback about ethnomusicology or

11 musicologists?

12      A.  I don't recall that there was more.  I mean,

13 it took some work to get those done, because

14 Dr. Jackson was resistant to making those changes, so

15 we had to apply a certain amount of persuasion.

16           As in my own case, suggesting changes

17 doesn't equate to the author making those changes.

18      Q.  In the peer review process I think you

19 described as -- is it required that suggested changes

20 be adopted?

21      A.  That depends on the journal and the

22 editorial policy.  If you're lucky, the editor -- the

23 editor of the journal will permit you to make a plea

24 of conscience and say, "If I make these changes, it's

25 no longer my article; it's their article," and let

1    you -- let you publish with that disagreement.

2              But some journals I think will say, "You

3    have to implement these changes or we won't publish

4    your article," and then you -- that's that.

5        **Q.  Was it a policy of the JSS to require**

6    **changes suggested in the peer review process to be**

7    **adopted?**

8        A.  I don't know because that was the editor's

9    job, and the editor handled it seemingly very well,

10   and we -- he seldom felt it was necessary to consult

11   us.

12       **Q.  So was it -- was there a written policy**

13   **addressing that one way or the other?**

14       A.  Oh, I'm sure there was, and that would be up

15   to the discretion of the editor.

16             The editor had considerable power in the

17   journal.  It wasn't just a matter of doing the work;

18   it was also making a lot of the decisions.  If the

19   editor saw fit to consult Dr. Jackson and I or if we

20   felt we really needed to consult with the editor,

21   that would happen.  But it would not automatically

22   happen.

23       **Q.  Is that true for -- that the editor had a**

24   **lot of power, is that true for the symposium of**

25   **Volume 12?**

 1      A.  Yeah, I would say so.  I think it's

 2  generally the case that the editor is the one who

 3  makes most of the decisions.

 4      **Q.  Do you recall telling the ad hoc panel that**

 5  **you and Dr. Jackson kind of took over on the**

 6  **symposium part of the Volume 12?**

 7      A.  Took over?  What do you mean "took over"?

 8      **Q.  I believe those are words that you used.**

 9      A.  I wonder what I meant by that.

10              MR. ALLEN:  Objection.

11      A.  I don't think we took over at all.

12      **Q.  (BY MS. QUIMBY)  Do you recall telling the**

13  **ad hoc panel that?**

14      A.  I don't --

15              MR. ALLEN:  Objection.

16      A.  I don't recall.  I mean, we do have notes

17  from the ad hoc panel, which I've looked over, but

18  not thoroughly.  I don't know if it's -- I don't

19  think something like that is mentioned, but I'm not

20  sure.

21      **Q.  Was there anything about -- strike that.**

22              **Was there ever a time before publishing**

23  **or before Volume 12 was published that the editorship**

24  **of the journal or the structure of it was discussed**

25  **or discussed that it needed to be changed?**

```
 1        A.   No.

 2              MR. ALLEN:  Objection.

 3        A.   I mean, we were in a period of transition as

 4   it was.

 5        Q.   (BY MS. QUIMBY)  What do you mean by that?

 6        A.   Well, as I said, Ben Graf was the editor,

 7   but Levi was being groomed, so to speak, as the next

 8   editor; therefore, we have "assistant editor" on the

 9   masthead.

10              THE REPORTER:  I'm sorry, "an assistant

11   editor on the"?

12              THE WITNESS:  The masthead.

13              THE REPORTER:  Masthead, thank you.

14        Q.   (BY MS. QUIMBY)  Before Volume 12, though,

15   was it ever discussed that the structure -- the

16   editorial structure be changed?

17        A.   No.  That was the model from the beginning.

18   It seemed to work very well.  Ben Graf was, as Colin

19   Davis had been before him, superb at his job.  We had

20   nothing to complain about.  There didn't seem to be

21   any reason -- he was not complaining.  Didn't seem to

22   be any reason to change that.  And it was part of the

23   conception of the journal from the outset.

24        Q.   Switching gears a little bit, do you know

25   Philip Ewell personally?
```

Stephen Slattow, Ph.D. - 11/7/2024

84

```
1        A.  No.

2        Q.  Okay.

3        A.  I've met him because Ellen -- well, Ellen

4   Bakulina, who was on our faculty for some years, just

5   left to go to McGill, was a friend of his.  I don't

6   think I've ever talked to him.  So I guess the answer

7   is no.

8        Q.  Were you involved in the creation of the

9   call for papers for the symposium issue?

10       A.  No.  Well, no, no.  The editor and the

11  assistant editor came up with that.  I wasn't -- I

12  saw it, but I wasn't involved in it.

13       Q.  For the sym -- go ahead.

14       A.  I guess I could have been involved in it if

15  I had an objection to it.

16       Q.  Do you recall having an objection to it?

17       A.  No, no.  I mean, I recall that I did not

18  have an objection to it.

19       Q.  Do you recall how many responses or -- were

20  received?

21       A.  I don't know because they would come in to

22  the editor.  They wouldn't come in to either

23  Dr. Jackson or to me.

24       Q.  Were all of the responses that you received

25  published?
```

1     A.  I don't know.  That would be a good question

2  to ask Levi Walls or Ben Graf.

3     **Q.  Do you recall the -- that there was a**

4  **deadline in the call for papers?**

5     A.  There was a deadline, and it was a close

6  deadline, as I recall.  A little too close for

7  comfort.  I know that some people complained about

8  it.  We weren't giving them enough time.

9     **Q.  What was too close for comfort about that?**

10    A.  I don't re -- I think it was three weeks or

11 something like that.  It was just -- that's very

12 short.  I think it's mainly because we were looking

13 at a publication deadline from UNT Press.  But, yeah,

14 there was definitely a deadline.  There has to be a

15 deadline.  It's unworkable if there's not.

16    **Q.  You said that it was about three weeks that**

17 **you recall?**

18    A.  I think so, but I'm not sure.

19    **Q.  How long --**

20    A.  That's just an impression.

21    **Q.  How long would a normal deadline be?**

22    A.  Well, normally -- normally, a journal is not

23 going to have a deadline.  I mean -- well, I don't

24 know.

25           Usually, with journals, people send in

1   submissions --

2       Q.  Uh-huh.

3       A.  -- and they go through the peer review

4   process, and then the editor will say, "Okay, we

5   accept it," if they accept it.  "And we can put it in

6   this issue" or "We might have to wait until the next

7   issue."

8               Now, if there is a special section, as

9   there was here, then there would be a deadline.  And

10  I would think that you would have to have -- any

11  journal that has a special section like that would

12  have to have a deadline because it's going to be

13  published at some point; it's not going to be in

14  every issue.

15      Q.  Uh-huh.  How long does the peer review

16  process take normally?

17      A.  As long as it takes the peer reviewer to do

18  it.  It depends on the peer reviewer.  Sometimes the

19  peer reviewer appears to have fallen asleep and to an

20  extended sleep of several year -- months.  And then

21  you have to -- editor has to nudge the peer reviewer

22  and say, "Have you gotten to that peer review yet?"

23      Q.  Uh-huh.

24      A.  "When are you going to do it?"  In extreme

25  conditions, you would then conclude they're not going

Stephen Slattow, Ph.D. - 11/7/2024

87

 1  to do it, and you would have to give it to someone

 2  else.  You try to avoid that.

 3      **Q.  Okay.  I think we can take a brief break.**

 4              THE VIDEOGRAPHER:  We're off the record

 5  at 10:47 a.m.

 6              (Recess 10:47 a.m. to 10:58 a.m.).

 7              (Exhibit 3 marked.)

 8              THE VIDEOGRAPHER:  We're back on the

 9  record at 10:58 p.m.

10      **Q.  (BY MS. QUIMBY)  Okay.  Thank you,**

11  **Dr. Slottow.  I have now marked Exhibit 3.  I'm --**

12              MS. QUIMBY:  It is Exhibit 3, right?

13              THE REPORTER:  Yes.

14              MS. QUIMBY:  Okay.

15      **Q.  (BY MS. QUIMBY)  I'll have you take a look**

16  **at that.**

17      A.  Oh, yes.  It's been a while.

18              MR. ALLEN:  Mary, can you put that in

19  the chat?

20              MS. QUIMBY:  I don't have it at the

21  moment, but it's on the way, so I will have it to you

22  momentarily.

23              MR. ALLEN:  Okay.

24      **Q.  (BY MS. QUIMBY)  Let me know when you're**

25  **finished reviewing.**

 1    A.  Okay.  (Reading document.)  I forgot it was

 2  as bad as this.

 3              THE REPORTER:  I'm sorry, I can't hear

 4  you.  Is your microphone way down on your shirt?  Can

 5  you move it up some?

 6              THE WITNESS:  Can you hear now?

 7              THE REPORTER:  Yes, thank you.

 8    A.  (Reading document.)  Okay, I'm done.

 9    **Q.  (BY MS. QUIMBY)  Do you recognize this**

10  **document?**

11    A.  Oh, yes.

12    **Q.  What is it?**

13    A.  It is the protest made by faculty in support

14  of the student protest as response to the symposium.

15    **Q.  You've described it as "protest."  What do**

16  **you mean -- why are you using the word "protest"?**

17    A.  Because it's protesting against what is

18  alleged to be the egregious material which -- and

19  systematic racism which is contained therein.

20    **Q.  I believe you described earlier in the**

21  **deposition that this attacked Dr. Jackson, correct?**

22    A.  Well, it doesn't -- this -- the student

23  version mentions Dr. Jackson by name, and, as I

24  recall, demands that he be fired.  This is the

25  faculty one, which is a little -- which does not.

1      Q.   Okay.  Does it -- does this letter state

2  that Dr. Jackson is a racist?

3      A.   Well, his name is not mentioned.

4      Q.   Okay.  Have you ever heard any of these

5  signatories in this letter, these faculty members,

6  have you ever heard any of them call Dr. Jackson a

7  racist?

8      A.   They would never say -- they would never

9  been so uncouth as to mention -- especially to me,

10  since I was involved with the journal, to say that.

11      Q.   Okay.

12      A.   Yeah.

13      Q.   Okay.  That's all the questions I have about

14  this document for now.

15           Going back to -- I had asked you

16  something earlier about if you remembered stating

17  something to the ad hoc panel, but I wanted to ask,

18  do you remember being interviewed by the ad hoc

19  panel?

20      A.   Yes.

21      Q.   Do you remember -- what do you remember

22  about that interview?

23      A.   Well, I remember the head of the panel -- I

24  forget his name -- talking to me for a long time.  I

25  think it was on Zoom.  And I answered his questions,

1  and he was asking about editorial policies and

2  etcetera.

3      **Q.  Were you truthful in your interview?**

4      A.  Yeah, as -- to my knowledge, yeah.

5      **Q.  Do you recall describing the symposium as a**

6  **visceral reaction to the Ewell -- Dr. Ewell's talk?**

7      A.  Visceral reaction?  Well, the notes that

8  were taken -- I see that there were notes taken on

9  the interview.  They were certainly not written by

10  me.

11      **Q.  Uh-huh.**

12      A.  And they were certainly not language that I

13  would usually use.  I don't think I would say

14  "visceral reaction" because they weren't.

15      **Q.  How would you describe it, then?**

16      A.  Well, it's a reaction to Ewell's allegations

17  involving Heinrich Schenker and Schenkerian analysis.

18  Visceral implies a sort of like a scream of pain from

19  the guts.  Hopefully they weren't that; they were

20  more considered.  And, besides, not all of them were

21  critical of Dr. Ewell either.  So I would not

22  describe it as a visceral reaction.

23          I didn't -- I don't think I would use

24  those words, but who knows?  It's possible.

25      **Q.  Do you recall expressing -- and maybe not in**

1    **these words, but that more caution should have been**

2    **exercised in publishing --**

3        A.  Yes, I did --

4        **Q.  -- this symposium?**

5        A.  -- because I did not anticipate the

6    reaction.  It took me by surprise.  I thought that a

7    lot of what Dr. Ewell was saying was outrageous and

8    hypocritical because he said, "I hope we can save

9    Schenkerian analysis."

10            Save Schenkerian analysis from what?

11   Well, from Dr. Ewell's attacks.  That's from what.

12   It didn't need to be saved before.

13            So to take this sort of sanctimonious --

14   "I'm only here to save Schenkerian analysis from its

15   enemies of whom I am the main person," I thought it

16   was a little hard to swallow and of their -- and so I

17   think hypocritical is the word I would use for some

18   of what he said.

19            What was the question?

20       **Q.  I don't -- I asked if you recall expressing**

21   **that more caution should have been --**

22       A.  Oh, yes.

23       **Q.  -- exercised?**

24       A.  Yes.  I was -- I went off on a tangent.

25            I did not anticipate the reaction that

1   Dr. Ewell would be looked upon as a victim and we

2   would be looked upon as oppressors and racists

3   because I thought a lot of what Ewell was saying was

4   outrageous and ill-founded.  So I was taken aback by

5   the -- and had I anticipated such a reaction, I would

6   have counseled a great deal more caution in what the

7   journal did.

8       Q.  **Would you have read all of the responses**

9   **before they were published?**

10      A.  Probably, but what I probably would have

11  done differently was that I -- in retrospect, I would

12  have counseled that we ask Dr. Ewell to participate

13  as a respondent, and I probably would have counseled

14  that in this case everything be peer-reviewed.  But I

15  did not anticipate that -- that response.

16      Q.  **You just mentioned Dr. Ewell, you would have**

17  **invited him.  So was he invited into the process at**

18  **all?**

19      A.  No.  Well, he was invited only to the extent

20  that he could have submitted --

21      Q.  **Uh-huh.**

22      A.  -- an article of his own, and -- like anyone

23  else.  He was certainly aware of the call for papers,

24  but he wasn't invited as a respondent to the papers.

25      Q.  **A respondent to the responses.  Is that --**

1    A.   Yeah.

2        **Q.   Why would he have responded to his own**

3    **paper?**

4        A.   Well, it does seem sort of illogical when

5    you put it that way.  But that's the extent, that he

6    was not invited in any special role at all.

7             In retrospect, after the response to the

8    journal, he probably -- I would feel -- I don't know

9    if Dr. Jackson would, but I would feel that that

10   would have been the better approach and more cautious

11   approach.

12       **Q.   So we talked about that Benjamin Graf, you**

13   **think he resigned as the editor.  What about Levi**

14   **Walls?  Did he resign, or do you know what happened**

15   **to that role?**

16       A.   Levi was attacked -- Levi was attacked, as

17   was Dr. Jackson, and to some extent, me, as being the

18   assistant editor and the one who signed, I think, the

19   call for papers.  And then I think the -- there was

20   something here that was sort of a little introduction

21   to the symposium that he might have signed saying

22   something about, "We welcome," you know, "all

23   opinions."

24             Oh, yes.  This introduction to the

25   symposium, he wrote that, though he didn't sign it.

1  He came in for a lot of criticism.  As a graduate

2  student, he was afraid that he would be -- his career

3  would be adversely affected or ruined entirely, and

4  he -- well, he did a number of things.  He went

5  online and kind of said he was bullied into doing

6  certain things, I think, by Dr. Jackson, or made to

7  do certain things or felt he had no choice, and he

8  resigned as editor in chief in an attempt to

9  forestall further negative reaction which could hurt

10  his career.

11      Q.  **Do you think he was justified in being**

12  **afraid for his career?**

13      A.  Oh, yeah, sure.  Definitely.  And look what

14  happened to Dr. Jackson.  All of that as a result of

15  this issue and of his article in this issue.

16          I was attacked, certainly have been

17  attacked in Ewell's recent book.  And since -- in the

18  United States especially, not so much in Europe or

19  Britain, anyone accused of racism in the academic

20  circles is sort of assumed guilty.  And -- yeah, he

21  had reason to be afraid, certainly.

22      Q.  **So he resigned, as I understand and you have**

23  **testified, and Dr. Graf resigned.  So effectively**

24  **there's no editor?**

25      A.  Well, at that point, I don't know if there

1   was any journal or any center anymore.  I'm not sure

2   exactly what happened first.  But at a certain point

3   there was nothing left to be editor of.

4       Q.  Why do you say that?

5       A.  Because the journal was taken away from us

6   by the college.  They tried, naively, to find someone

7   who would take the journal on, maybe someone from

8   another school.  Of course -- well, I wasn't on the

9   search committee, but, evidently no one would touch

10  it with a 10-foot pole.  It was radioactive at that

11  point.

12      Q.  What do you mean that it was taken away from

13  you?

14      A.  The journal was part of the center.  The

15  center was part of the -- and the school said that we

16  were -- we could no longer publish the journal and

17  that the center is in abeyance.

18      Q.  And I think you testified earlier that your

19  knowledge of this is through Dr. Jackson, correct?

20      A.  Well, it was widely known.  I mean, things

21  get out fast, but I don't recall what any of the

22  administration -- I don't think any of the

23  administration told me directly, because Dr. Jackson

24  was certainly viewed as sort of the main person

25  responsible for the center.  It was -- it had always

 1  been sort of his project, fundamentally.

 2      Q.  So if there's no editor -- let's just say,

 3  for example, the journal still exists.

 4          MR. ALLEN:  Objection.

 5      Q.  (BY MS. QUIMBY)  Could it be -- could it

 6  publish anything without editors?

 7      A.  No.

 8      Q.  Okay.

 9      A.  I mean, not with any degree of repute.  No

10  one would take it seriously.

11      Q.  Do you think Volume 12 or the symposium

12  damaged UNT's reputation?

13      A.  I don't know, but there's a good chance of

14  it.  I mean, certainly UNT was reacting to the

15  possibility that it would.

16      Q.  Are you -- so Levi Walls' resignation, are

17  you -- did he do that on his own accord, do you know?

18      A.  I'm sure he did it on his own accord.  He

19  was trying to remove himself from a toxic situation

20  as much as he could.

21          Levi was viewing himself very much as a

22  victim, I think, a victim of Dr. Jackson in

23  particular.  And he was trying to -- and he was being

24  attacked and criticized by the -- certainly by the

25  online music theory community, and he was scared,

1   with reason.

2       Q.  Do you think he was wrong in being a victim

3   or feeling like a victim?

4       A.  No, he was -- well, of Dr. Jackson?  I don't

5   think he was a victim of Dr. Jackson.

6               Levi was -- Levi was not -- my

7   perception was that Levi was not very assertive.

8   Levi was slow to argue back.  If he really felt

9   something was wrong, he might say something, but he

10  wouldn't stick to his guns.  He felt very much

11  that -- in a subservient position, far more than any

12  of the previous editors had done.  I mean, I don't

13  think that any of our previous editors felt

14  especially they had to take -- be subservient or feel

15  they had to do something which is against their

16  conscience.

17              I don't think that Ben Graf felt that

18  way, but I think I read somewhere that he said he

19  did.  Maybe in a deposition; I don't know.  But that

20  wasn't my perception.

21              But Levi did.  He was not very -- he

22  felt he was -- his role was a subservient one.

23      Q.  So you described the committee that was put

24  together to find a new editor, correct, or you

25  mentioned that?

Stephen Slattow, Ph.D. - 11/7/2024

98

1        A.  I alluded to it, yeah.  I wasn't part of it.

2        Q.  **Uh-huh.  Is there anything preventing you**

3   **from applying to be the editor?**

4        A.  The editor of what?  There's nothing left.

5        Q.  **Well, isn't the committee searching for an**

6   **editor?**

7        A.  Oh, that's -- that disbanded probably years

8   ago.

9        Q.  **Before it disbanded.**

10       A.  Well, you don't apply to be.  You're

11  appointed to it, probably by the dean.  You can't

12  apply to be on it.  You can, but it's not going to do

13  anything.

14            You don't volunteer to -- it was a

15  search committee.  You don't volunteer for search

16  committees, or there's no reason to.

17       Q.  **I meant apply for the position of editor.**

18       A.  That would be a rather absurd thing to do

19  because I had already been so involved in it, they

20  would want a clean sweep.

21       Q.  **Is it -- did they tell you that?  Did they**

22  **say you can't?**

23       A.  No, but it's obvious.

24       Q.  **How is it --**

25       A.  It would be like Dr. Jackson applying to be

1    the editor of the journal or Ben Graf.  I mean, the

2    idea was to preserve the journal, but to disassociate

3    it with anyone it had be associated with and maybe

4    even hand it off to a different school.  It didn't go

5    anywhere.

6              In any case, we weren't approached

7    certainly.  I mean, I guess there's nothing to

8    prevent us from -- I mean, there was a public search.

9    You know, "We're looking for someone to take over the

10   editors of the journal," and I suppose Dr. Jackson or

11   I or Ben could have written in, but it wouldn't have

12   gotten to first base.  I mean, you generally don't

13   apply for things where you feel you have no choice of

14   acceptance because that wasn't the reason it was

15   being advertised.

16             Evidently -- I mean, nothing came of it,

17   and I don't know -- I wouldn't be surprised if no one

18   applied, but I wouldn't know, because I wasn't on the

19   search committee.

20        **Q.  I think you described it as radioactive, the**

21   **journal.  What do you mean by that?**

22        A.  The journal was now associated with racism

23   and with acting unfairly to poor Dr. Ewell and

24   deficient editorial practices, and it was just like

25   this sort of radioactive turd.

Stephen Slattow, Ph.D. - 11/7/2024

100

```
1      Q.   Why do you think it was associated with
2   racism?
3      A.   Well, you looked at this exhibit, didn't
4   you?
5      Q.   I'm asking you.
6              MR. ALLEN:  Can you state for the record
7   which exhibit you're referring to, please?
8              THE WITNESS:  It says 3.
9              MR. ALLEN:  Thank you.  And is that the
10  faculty petition?
11             THE WITNESS:  Yes.
12     A.   "The forthcoming issue is replete with
13  racial stereotyping and tropes and include personal
14  attacks directed at Dr. Ewell."  Yeah.
15             MS. QUIMBY:  Can you read back my
16  question, please?
17             THE REPORTER:  The witness's mic is
18  getting very, very quiet.  Was it getting quiet for
19  anyone else?
20             MR. ALLEN:  I'm good.  I was having
21  trouble hearing Mary, but I think it was the way she
22  turned her head when she turned to you.
23             THE REPORTER:  Okay.  Here's the
24  question:  "Why do you think it was associated with
25  racism?"
```

 1      A.  So, in addition to this, I mean, Ewell's

 2  contention was that Schenker was a racist, that his

 3  racism had infected his views (phonetic) of theory,

 4  which I deny, by the way, and that -- and then that

 5  the Journal of Schenkerian Studies, by criticizing

 6  Ewell, was racist in doing so.

 7           So each side is accusing the other of

 8  being racist for different reasons.  In a sense, the

 9  Journal of Schenkerian Studies is being accused of

10  being racist for criticizing Philip Ewell's

11  accusations that Schenker was racist.  So a lot of

12  racism.

13      **Q.  (BY MS. QUIMBY)  Was the criticism of**

14  **racism, did that come from other than just the**

15  **faculty petition and the student petition as you've**

16  **described them?**

17      A.  Yeah, yeah.

18      **Q.  Where else did it come from?**

19      A.  Online chatter, and there was an SMT talk

20  list where there was a lot -- or SMT discussion list.

21  SMT being the Society for Music Theory.

22           THE REPORTER:  Okay.  I need to pause.

23  He's very, very quiet on my end.

24           MR. ALLEN:  They both are.  I don't know

25  what happened in that transition.

1          THE VIDEOGRAPHER:  Off the record at

2  11:22 a.m.

3          (Discussion off the record.)

4          THE VIDEOGRAPHER:  We're back on the

5  record at 11:23 a.m.

6      **Q.  (BY MS. QUIMBY)  Okay.  Thank you.  I just**

7  **have one follow-up item.  You mentioned, I think,**

8  **Dr. Graf's deposition testimony?**

9      A.  Well, I know that he did a deposition.  I

10  think Dr. Jackson told me at one point.

11      **Q.  Have you read the deposition transcript?**

12      A.  No.  I guess -- I guess, if I wanted to,

13  there is a way I could, but I don't know what that

14  way is, and I haven't tried to.

15      **Q.  What did Dr. Jackson tell you about the**

16  **deposition?**

17      A.  Well, that he had done one.  I don't recall

18  him saying anything else about it.  I try not to ask

19  very much about depositions if people mention them

20  because whether they are private or not, I kind of

21  regard them as -- I'm a little cautious about getting

22  into depositions, because I -- well, whether they are

23  or not, I consider them to be somewhat privileged

24  information.

25          In any case, I don't recall him saying

1    anything else about Dr. Graf's deposition.  He

2    probably did, but I don't recall what.

3        Q.  Okay.

4              MS. QUIMBY:  I'll pass the witness.

5        A.  We -- Dr. Jackson and I generally do not

6    talk much about depositions and his case.

7        Q.  Okay.

8        A.  Because -- partly because I don't really

9    want to.

10       Q.  Okay.  Thank you.

11             MS. QUIMBY:  I'll pass the witness.

12             MR. ALLEN:  So since the witness needs

13   to go, and it's -- it looks like it's 11:25.  Is that

14   right?

15             MR. TODD:  Yeah.

16             THE WITNESS:  Well, we could, I guess,

17   extend it a little bit, 10 minutes maybe.

18             MR. ALLEN:  Yeah, and I have more than

19   ten minutes.  So I'm going to continue -- I'm going

20   to ask to continue the deposition.

21             I think it's best, Professor Slottow, if

22   we can come back at 3, just so that everything is

23   fresh in everyone's mind --

24             THE WITNESS:  Okay.

25             MR. ALLEN:  -- your time, of course.

1  And that would have the advantage for you is that it

2  would be over.

3            THE WITNESS:  Yes, I would like that.

4            MR. ALLEN:  Okay.  Why don't we do that?

5            THE WITNESS:  Do you know approximately

6  how long you might take?

7            MR. ALLEN:  I can't predict, but it's

8  not going to be -- I would hope we could do it in an

9  hour.

10            THE WITNESS:  Okay.  I can come back at

11  3.

12            MR. ALLEN:  Okay.  Can we go off the

13  record?

14            (Recess 11:26 a.m. to 3:03 p.m.)

15            THE VIDEOGRAPHER:  We're back on the

16  record at 3:03 p.m.

17                    EXAMINATION

18  BY MR. ALLEN:

19       Q.  Good afternoon, Professor Slottow.  My name

20  is Michael Allen, and I represent Timothy Jackson, as

21  you probably remember from the first part of the day.

22       A.  Yes, I've known that for some while now.

23       Q.  I believe you testified earlier today that

24  you had worked for the Center for Schenkerian Studies

25  and obviously had worked on the editorial staff in

Stephen Slattow, Ph.D. - 11/7/2024

105

1   various capacities for the Journal of Schenkerian

2   Studies, which was housed in the center.  Is that

3   accurate?

4        A.  I don't know about the editorial staff.

5   Really, the editorial staff consists of the editor,

6   and, if there is an assistant editor, that person

7   too.  That's the editorial staff.

8        Q.  And you were on -- you were on the advisory

9   board, correct?

10       A.  Yeah.

11       Q.  Okay.

12       A.  I think that's what they call it.

13       Q.  Yeah.  And, again, I'm not trying to

14  mischaracterize your testimony.  I'm just trying to

15  get us on the same page, figuratively speaking, here.

16       A.  Yeah, somewhere I have -- yes, I'm on the --

17  I was on the advisory board.

18       Q.  And did you list your service on the

19  advisory board of the Journal of Schenkerian Studies

20  in any of your papers when annual review time came

21  around at UNT?

22       A.  Yes.  Every time under Service.  I don't

23  know if I specifically mentioned advisory board, but

24  I probably said, "Codirector" or "Assistant director

25  of the Center for Schenkerian Studies with special

Stephen Slottow, Ph.D. - 11/7/2024

106

1    responsibilities towards the journal," something like

2    that, because that was a large part of my service

3    component.

4        Q.   Okay.   That was what I was going to ask you.

5    You were evaluated based on that contribution to

6    service to the University of North Texas?

7        A.   Well, and the other service I did --

8        Q.   Yeah.

9        A.   -- committee work, etcetera.

10        Q.   Sure, okay.

11             (Exhibit 4 marked.)

12             Now, I've had marked for the record, as

13    we talked before we went on the record, Exhibit 4.

14        A.   What is Exhibit 4 again, the invitation?

15        Q.   It's an email sent on November 23rd, 2021,

16    captioned, "Retreat Invitation and RSVP."

17        A.   Yeah, that's it.

18        Q.   It has the UNT Bates number 05523.  Did I

19    characterize that correctly, Professor Slottow?

20        A.   Yes.

21        Q.   So I have a few questions to ask you about

22    this.

23             Do you remember getting this email and

24    notification?

25        A.   Well, there is a faculty retreat every

Stephen Slattow, Ph.D. - 11/7/2024

107

 1  year --

 2      Q.  Uh-huh.

 3      A.  -- which all faculty are invited, so I

 4  probably did get it.  I don't know if I attended.  I

 5  probably didn't attend that one.  I stopped attending

 6  these after two or three years.

 7      Q.  Okay.  So you didn't attend this one so far

 8  as you remember?

 9      A.  Yes.

10      Q.  Do you know anything about the institution

11  that's announced in this faculty retreat?

12              MS. QUIMBY:  Objection.  Form.

13      A.  What institution?

14      Q.  (BY MR. ALLEN)  Yeah, sure.  Let me direct

15  your attention to the bottom of that second page of

16  Exhibit 4.  It says, "Afa Dworkin."  Do you see that

17  in kind of large letters?

18      A.  Yes, I see it.

19      Q.  And do you see that she's the president and

20  artistic director of Sphinx Organization, as it says

21  on the exhibit?

22      A.  Yep.

23      Q.  So that was my question.  Do you know

24  anything about the Sphinx Organization?

25      A.  Not at all, nor about her.

1    Q.  Okay.  That was going to be my follow-up

2  question.  All right.  So you can put that exhibit

3  aside, then.

4           You also discussed some of the bad

5  publicity focused on the journal, and also, I suppose

6  we would say bad publicity for Timothy Jackson as

7  well.  Do you remember testifying to aspects of that?

8    A.  You mean here in this deposition?

9    Q.  Earlier today, yeah.

10   A.  Yes, also bad publicity focused on me.

11   Q.  Of course.  And that was going to be my -- a

12  follow-up question would be you -- how many years

13  have you worked as a music theorist?

14   A.  What did I say?  I think it's about 23 or 24

15  at this point.  Let's see.  I began in 19 -- well,

16  are we counting the years I was a graduate student or

17  after graduation?

18   Q.  Well, I guess it's a question for you

19  because you're -- you know your career and the people

20  in it better than anyone at the table.

21   A.  Because I did teach as an adjunct while I

22  was a grad student.

23   Q.  Is it safe to say you've been active as an

24  academic music theorist for over a quarter of a

25  century?

1    A.  Well, starting in 1992, yes, that would be

2  about 32 years if we count my adjunct teaching.

3    **Q.  And do you have a -- do you feel that you**

4  **have a firm sense of the reputation of various**

5  **colleagues and academics in the field?**

6    A.  The ones I know --

7    **Q.  Uh-huh.**

8    A.  -- yes.  There is a lot I don't know.

9  There's -- but --

10    **Q.  Uh-huh.**

11    A.  -- yeah.  I mean, to the degree that I know

12  of them and their work, yeah.

13    **Q.  And you certainly know Timothy Jackson,**

14  **correct?**

15    A.  I certainly know him.

16    **Q.  So -- and I believe you testified earlier**

17  **that the Journal of Schenkerian Studies is now, for**

18  **lack of a better word, defunct?**

19    A.  Defunct would be the word.

20    **Q.  Okay.**

21    A.  I don't know if it has any theoretical

22  existence at the moment or not.  It certainly has no

23  tangible existence.

24    **Q.  You don't know of any publication of the**

25  **Journal of Schenkerian Studies after July of 2020, do**

1    you?

2        A.  Well, now we're getting into dates again.

3    I'm not good on dates.

4        **Q.  Well, let me just represent to you that**

5    **journal Volume 12, JSS Volume 12 came out in July**

6    **of 2020.**

7        A.  That was the last one.

8        **Q.  And there hasn't been one since, has there?**

9        A.  No.

10       **Q.  Did the -- when the Journal of Schenkerian**

11   **Studies ceased to exist, based on your knowledge of**

12   **your field and your colleagues, did that damage**

13   **Timothy Jackson's reputation?**

14       A.  Yes, quite definitely.  The -- not just

15   because it ceased to exist; because of the reason it

16   ceased to exist.  And Tim --

17       **Q.  And -- go ahead.**

18       A.  -- Dr. Jackson was part of that reason,

19   essential part of that reason.

20       **Q.  And that reason being the accusations of**

21   **racism flying around?**

22       A.  Yes.  Partly because -- partly because of

23   the -- well, what I've already talked about before,

24   Ewell's accusations that in criticizing his

25   accusations of racist, we were demonstrating and

1  proving his accusations of racist, of criticism

2  equaling racism, per se.

3      **Q.  Uh-huh.**

4      A.  But part of it is because of the nature of

5  Tim's own essay in the journal, which was sort of

6  wide-ranging and -- while I haven't read it for a

7  long time but --

8      **Q.  Uh-huh.**

9      A.  -- it certainly seemed to find fault with

10  Philip Ewell, and I think it mentioned he was not --

11  sort of ungrateful to his teacher, Allen Forte, and I

12  think bringing up anti-Semitism, black anti-Semitism,

13  I think, was in there.  He was very frank about his

14  views, and it was sort of wide-ranging.

15              So part of it was the nature of his

16  article in addition to just the general issue, Volume

17  12, itself.

18      **Q.  And just for the record, you're flipping**

19  **through the pages of Volume 12 there, right?**

20      A.  Yeah, I'm actually trying to find --

21      **Q.  That's all right.**

22      A.  -- his article.

23      **Q.  Yep.**

24      A.  It's right here.

25      **Q.  And I'm not going to ask you, except for**

 1    maybe general questions, about his article.  But let

 2    me ask a follow-up question.  What's the usual way

 3    for scholars in music theory to address their

 4    critics?

 5         A.  Their critics?  Well, usually, if someone

 6    writes, say, a critical article in a journal, there's

 7    usually a letter to the editor in the next issue that

 8    finds -- that takes objection to the article,

 9    sometimes in rather strong and pointed terms, and

10    that is published as a follow-up.

11         Q.  Uh-huh.

12         A.  And actually this -- and that can also cause

13    another follow-up, and this sort of thing can work

14    through various issues of the journal, though it

15    doesn't have to.

16              In my experience, that's the usual way

17    these things are handled.

18         Q.  And I think you testified earlier that

19    Philip Ewell published a book eventually addressing

20    some of this -- at least somewhat addressing this

21    controversy in which he actually criticized you,

22    correctly -- I mean, am I correct about that?

23         A.  Yes.  I acted in bad faith.  I purposely

24    chose --

25         Q.  I'm sorry, can I interrupt you?  Do you mean

1    he argues you acted in bad faith, or are you

2    testifying that you acted in bad faith?

3        A.  He states I acted in bad faith in regard to

4    the visit we were trying to arrange, his planned

5    visit to UNT.

6            I'm not exactly sure what he meant

7    because I chose not to -- I chose not to read that

8    book.

9        Q.  Uh-huh.

10       A.  I did not want to get sidetracked from my

11   current work into this sort of -- I can't read

12   Ewell's work, especially Ewell's work about me

13   personally, without getting very involved in it.  And

14   despite Tim's urging, I simply decided I would not

15   read it.  And except for a quick skim, I have not

16   read it.

17       Q.  Uh-huh.  And you were familiar enough with

18   his work that he published the plenary talk of

19   November 2019 in the journal Spectrum, right?

20       A.  Music Theory Spectrum, yes.

21       Q.  I'm just going to represent to you that

22   Philip Ewell has represented that that was not

23   peer-reviewed; the publication of his plenary talk in

24   Spectrum was not peer-reviewed.

25       A.  Well, I'm --

1    Q.  Was that your understanding as well?

2    A.  Well, if anyone would know, he would know.

3  So I have no reason to doubt what he says.

4    Q.  In the field of music theory, was there any

5  outcry when his work was published without peer

6  review?

7    A.  It was not.  Generally, it is not -- if it's

8  true that it was not peer-reviewed, it's not

9  generally known, because it's -- it should have been

10  peer-reviewed.  It's the usual practice if -- with an

11  article especially in a journal as prestigious as

12  Music Theory Spectrum, which is one of the two

13  flagship journals, two or three, of the discipline

14  that everything would be peer-reviewed.

15    Q.  Uh-huh.

16    A.  So if it wasn't -- and if he says it wasn't,

17  then it wasn't -- then I would say very few people

18  know that.  And I think if it was known, it would

19  not -- I don't know what the reaction would be.

20    Q.  Do you recall Philip Ewell ever saying -- in

21  the midst of this, I believe you called it a

22  kerfuffle over the Journal of Schenkerian Studies, do

23  you recall Philip Ewell ever saying publicly words to

24  the effect that he had also published aspects of his

25  work without peer review?

```
 1                MS. QUIMBY:  Objection.  Form.
 2        A.  I don't recall him saying anything of the
 3   sort or writing anything of the sort that I've read.
 4        Q.  (BY MR. ALLEN)  You do recall criticism of
 5   JSS that the symposium had been published without
 6   peer review, right?
 7        A.  Quite a lot.  There was a lot of criticism,
 8   both internal at UNT and external, that these were
 9   not peer-reviewed articles, and they all should have
10   been peer-reviewed.
11        Q.  But yet you don't know of any criticism of
12   theory the journal Spectrum -- what did you say, it's
13   Society for Music Theory Spectrum?
14        A.  It's called Music Theory Spectrum.
15        Q.  Music Theory Spectrum, thank you, sir.
16        A.  And there is compan -- there's an online
17   companion journal, which is called Music --
18        Q.  Right.
19        A.  -- Theory Online.
20        Q.  Understood.  Thank you.
21                THE REPORTER:  I'm sorry, it's called
22   what?  The journal online is called?
23                THE WITNESS:  What?
24                MR. ALLEN:  What's the name?
25                THE WITNESS:  Oh, the online is --
```

1              THE REPORTER:  Y'all need to --

2              THE WITNESS:  The online is called Music

3    Theory Online.

4              THE REPORTER:  Thank you.

5              THE WITNESS:  The print journal is

6    called Music Theory Spectrum.

7         **Q.  (BY MR. ALLEN)  In fact, in your entire**

8    **career, has there ever been a journal that has been**

9    **forced out of circulation in any kind of controversy**

10   **like this besides the Journal of Schenkerian Studies?**

11        A.  Not to my --

12             MS. QUIMBY:  Objection.  Form.

13        A.  Not to my knowledge.

14        **Q.  (BY MR. ALLEN)  Okay.  And you certainly**

15   **know of most of the prominent journals of music**

16   **theory in your field, correct?**

17        A.  Yes, but not necessarily the ones going back

18   40, 50 years.  I'm not acquainted with --

19        **Q.  Yeah.**

20        A.  -- every journal.  But I don't know of a

21   parallel case.

22        **Q.  Uh-huh.**

23        A.  And I will say also, it's -- no, I'm not

24   going to say that.

25        **Q.  That's fine.  I believe you testified**

1  earlier that you were basically in on the ground

2  floor of the founding of the Journal of Schenkerian

3  Studies when you joined the University of North Texas

4  faculty, right?

5      A.  Yes.

6      Q.  Before July of 2020, which is when Volume 12

7  first became known to the public of music theorists,

8  were there ever any complaints about how the Journal

9  of Schenkerian Studies was organized?

10     A.  I can't think of any at all.  It was a very

11 small journal, a very specialized journal.  I don't

12 think that many people who were not interested in

13 Schenkerian analysis would have necessarily even

14 known about it.  UNT Press didn't sell very many

15 copies.

16     Q.  Right.

17     A.  I cannot think of any negative comments from

18 anyone about it.  It was not -- it did not have a

19 high profile, you see.  I'm not sure a lot of

20 people --

21     Q.  Yeah.

22     A.  -- paid attention to it who weren't

23 Schenkerians themselves --

24     Q.  Uh-huh.

25     A.  -- and there's not a ton of those around.

Stephen Slattow, Ph.D. - 11/7/2024

118

```
1      Q.  And among the people who are either
2  considering themselves Schenkerian or at least have
3  some expertise in that field, in your experience,
4  what was the reputation of the journal of Schenkerian
5  Studies among that group?
6      A.  Well, that group hasn't talked to me about
7  their -- what they felt --
8      Q.  Uh-huh.
9      A.  -- the reputation was.  But I would say -- I
10  mean, at that time Schenkerian analysis was one of
11  the methodologies of choice for analyzing tonal
12  music.
13      Q.  Uh-huh.
14      A.  And even though the other music theory
15  journals would publish Schenkerian articles, they
16  published many other methodologies as well.
17      Q.  Uh-huh.
18      A.  The Journal of Schenkerian Studies was the
19  only journal that specialized in that.  So it was --
20  I think it was a welcome outlet to submit Schenkerian
21  work to really --
22      Q.  Uh-huh.
23      A.  -- the only one that had that as its central
24  focus.  And the -- I think that -- I think it had a
25  good reputation.
```

Stephen Slattow, Ph.D. - 11/7/2024

119

1          Indeed, Philip Ewell also published a

2    Schenkerian article in the journal.  So he evidently

3    thought well enough of them of it.  But I think it

4    had a good reputation.

5          Q.  Okay.  Besides Philip Ewell, do you know if

6    any of the critics of Timothy Jackson and his article

7    in Volume 12, have they taken up those criticisms in

8    print?

9          A.  Well, I've seen various -- online I've seen

10   various online journals that were critical and some

11   that were not at all critical of the Journal of

12   Schenkerian Studies and the Volume 12.  In print, I

13   think most of it was coming from Philip Ewell.  I

14   can't --

15         Q.  Uh-huh.

16         A.  -- it's quite possible that other -- that

17   sort of contra Center for Schenkerian Studies

18   articles exist, but I don't know.  If they do -- I'm

19   not sure if they do; I'm not sure what they are.

20         Q.  Uh-huh.

21         A.  The only ones I'm aware of were written by

22   Philip Ewell himself.

23         Q.  But to your knowledge, is there anything

24   preventing either your colleagues or any other

25   scholars in the field from addressing their

1    criticisms of Timothy Jackson's scholarship opinions,

2    whatever he published in any journal, but especially

3    Volume 12 of the Journal of Schenkerian Studies in

4    other venues like Spectrum, like Music Theory Online,

5    or --

6        A.  Is there anything --

7        Q.  -- the normal course of scholarship?

8        A.  Is there anything preventing that?

9        Q.  Yeah.

10       A.  No, I would say that since Ewell's articles

11   have proven so influential and, you might say,

12   popular, I would expect more people to jump on the

13   bandwagon.

14       Q.  Uh-huh.

15       A.  And maybe they have.  But, if so, I'm not

16   aware of it.

17       Q.  Okay.  And are you familiar with a journal

18   also published by the University of North Texas

19   called Theoria?

20       A.  Yes.

21       Q.  Have you ever published in that journal?

22       A.  I actually have, yes.

23       Q.  Was your article peer-reviewed in Theoria?

24       A.  I don't know.  It was a review --

25       Q.  Uh-huh.

1    A.  -- of a book on set theory.  I don't know

2  whether Frank Heidelberger sent it out for review.  I

3  suspect, since it was a review itself rather than a

4  full-fledged article on its own, I suspect he

5  didn't - --

6    Q.  Uh-huh.

7    A.  -- but I certainly didn't hear back from any

8  reviewers.

9    Q.  Uh-huh.  Okay.

10   A.  I heard no feedback, which would suggest to

11  me he probably didn't send it out.

12   **Q.  Okay.  And I'm just going to also represent**

13  **to you that in 2020, the same year that Volume 12 of**

14  **the Journal of Schenkerian Studies actually came out,**

15  **even though I know it says 2019, but it actually came**

16  **out in July of 2020.  That same year, 2020, Theoria**

17  **published Philip Ewell and Ellen Bakulina in its**

18  **pages in the volume that came out that year.  Were**

19  **you aware of those articles?**

20   A.  I must have been, yes.

21   **Q.  And --**

22   A.  Well, I don't know.  No, I'm not sure if I

23  was or not.  I didn't pay that much attention to what

24  Theoria was publishing.

25   **Q.  And do you read it on a reg --**

```
 1        A.   I may not have been.

 2        Q.   Do you read it on a regular basis?

 3        A.   I don't read Theoria very much.

 4        Q.   Okay.

 5        A.   It focuses on the history of music theory,

 6   and that's not one of the topics I do much work in.

 7        Q.   Okay.

 8        A.   I'm not uninterested in it, but it's not a

 9   specialty of mine --

10        Q.   Fair enough.

11        A.   -- so I don't make a point to read it.

12        Q.   Is it your understanding that Theoria holds

13   itself out as a peer-reviewed journal?

14        A.   I think it does, yes.

15        Q.   And, again, I'm just going to represent to

16   you that both Philip Ewell and Ellen Bakulina have

17   testified that those articles published in 2020 in

18   Theoria were not subjected to double-blind peer

19   review.  And then my follow-up question is were you

20   aware of any controversy surrounding Theoria because

21   they published authors without peer review?

22        A.   If they published authors without peer

23   review, word did not get out about it.  I'm sure that

24   neither Philip Ewell or certainly -- Ellen Bakulina

25   was a good friend of mine; I never heard anything
```

Stephen Slattow, Ph.D. - 11/7/2024

123

1    from her.  I don't think they would be -- they would

2    want to tell people that because it would be

3    assumed --

4         Q.  Uh-huh.

5         A.  -- that it was peer-reviewed and something

6    that gets published as a peer-reviewed article is

7    more prestigious than something which is not.

8         Q.  Sure.

9         A.  So if that happened, I don't think it was

10   generally known, and I would be surprised if they

11   would have told many people about it.  And I would be

12   very surprised if Theoria received any criticism on

13   that account because I think they would be rather

14   careful not to let it be known.  They wouldn't

15   advertise the fact.

16        Q.  And in your view, is that deceptive?

17        A.  That would get down to does -- Theoria is

18   widely regarded as a peer-reviewed journal.

19        Q.  Uh-huh.

20        A.  I don't know whether it says specifically

21   that their articles are peer-reviewed.

22              Deceptive or not, that's a sort of

23   touchy question.  I would say that Dr. Heidlberger,

24   the editor, did not address -- did not address that

25   question.  I mean, it was sort of assumed --

Stephen Slattow, Ph.D. - 11/7/2024

124

1     Q.  Uh-huh.

2     A.  -- that like all reputable scholarly

3 journals, their articles are peer-reviewed.  And

4 certainly I would -- probably a respectable number of

5 items in Theoria were sent out for peer review.  But

6 since I didn't work with Dr. Heidlberger on it or

7 talk about the issues, I never knew or even really

8 wondered what the percentage was.  So I don't know if

9 it's deceptive.  If it's deceptive, it's sort of

10 deceptive in a passive kind of way.

11     Q.  Uh-huh.

12     A.  He let the impression stand.

13     Q.  Let me follow up with this:  Do you

14 remember -- well, let me strike that question and

15 phrase it differently.

16          In the -- back in the time frame July,

17 fall of 2020, when the, what you've called a

18 kerfuffle first arose over the Journal of Schenkerian

19 Studies, did Frank Heidlberger criticize the

20 symposium because it wasn't peer-reviewed, if you

21 recall?

22     A.  I don't recall him criticizing it.  I don't

23 recall him taking an active part in the kerfuffle.

24     Q.  How about if I asked the same question about

25 Ellen Bakulina?

1       A.   Well, I think Ellen and I think Frank both

2   signed that faculty petition.

3       Q.   **Uh-huh.**

4       A.   So you could say that that's an active role,

5   but I don't think that either of them were

6   particularly outspoken to me about it.  I know that

7   Dr. Heidlberger thought that it was just going way,

8   way over the top.  I'm not sure what Ellen thought.

9   I don't know if I can --

10      Q.   **And is it in your --**

11      A.   -- say much beyond that.

12      Q.   **Can I just interrupt you for a second?  Is**

13  **it the usual practice of scholars who think someone**

14  **has published something that's way over the top to**

15  **call for the journal to be canceled?**

16      A.   No.

17      Q.   **Back to Philip Ewell, you had mentioned this**

18  **call for papers that went out; there was a short**

19  **deadline, and there was a need to get these papers**

20  **out, or a perceived need to get these papers out**

21  **quickly.  Do you remember talking about that earlier**

22  **today?**

23      A.   Yeah.

24      Q.   **And you even today talked about the**

25  **customary process that you know in the field of**

1    should an author feel something is unfair or missed,

2    they have a criticism or an axe to grind, they often

3    write a letter to the editor of a journal, things of

4    that nature.  Do you remember talking about that?

5        A.  Yeah, that's been -- in my experience -- of

6    course --

7        Q.  Uh-huh.

8        A.  -- I'm 70 years old now, but in my

9    experience, that's the usual way such things are

10   handled.

11       Q.  And when you were participating in the

12   process that led to the call for papers for Volume 12

13   of JSS and the symposium, was there any discussion

14   internal to the journal that you were aware of

15   intended to exclude Philip Ewell?

16              MS. QUIMBY:  Objection.  Form.

17       A.  Exclude him from what?

18       Q.  (BY MS. QUIMBY)  From publishing in the

19   pages of the Journal of Schenkerian Studies about

20   the, whatever you want to call it, the kerfuffle, the

21   Schenkerian controversy?

22       A.  No.

23              MS. QUIMBY:  Objection.  Form.

24       A.  If he had sent something in, of course, it

25   would have been considered, I would think, like any

 1    other submission.  On the other hand, we did not

 2    invite him specifically.

 3         Q.  (BY MR. ALLEN)  Is it accurate to say that

 4    he was not given an opportunity to respond?

 5         A.  Well, he wasn't shown -- respond to what?  I

 6    mean, he wasn't shown -- you mean, in issue --

 7    in Volume 12?

 8         Q.  Well, let me strike that.  But he could have

 9    responded.  He could have published something in

10    Volume 12 if he had wanted to, right?

11         A.  Oh, yeah.  Sure.

12         Q.  He got the call for papers, right?

13         A.  Yes, but I'm not sure what he would have

14    responded to because until Volume 12 came out, he

15    would not have known what was in Volume 12.

16         Q.  Sure.  But it wasn't the case that he was

17    not given an opportunity to respond, correct?

18         A.  "Respond" is a strange word.  Respond to

19    what?

20         Q.  Well, good question.  We'll look at that in

21    a minute.

22              But let me put it this way:  Was there

23    ever any effort to exclude Philip Ewell from

24    publishing in the symposium?

25         A.  There was no effort to exclude him.

1      Q.  Uh-huh.

2      A.  He had, after all, published in the journal

3  before, for what that's worth.  He would have been

4  treated like any other submitter.

5      Q.  Uh-huh.

6      A.  But there was also no effort to invite him

7  as a formal responder to the articles that were

8  printed, so he was treated like everyone else.

9      **Q.  Uh-huh.  And, being treated like everyone**

10 **else through an invitation to submit an article and**

11 **so forth with a call for papers, that's not the same**

12 **as being denied an opportunity to respond, correct?**

13             MS. QUIMBY:  Objection.  Form.

14     A.  The problem is the word "respond."  I mean,

15 he could have, like anyone else, like all the --

16     Q.  Uh-huh.

17     A.  -- people who did publish in the symposium,

18 he could have written something and submitted it to

19 the journal.

20     Q.  Uh-huh.

21     A.  And, no, those -- those items were a

22 response.  Not to the journal, but they were a

23 response to Philip Ewell's plenary address at the SMT

24 conference.

25     Q.  Uh-huh.

1    A.  Now, he could have -- but they -- none of it

2    was a response to what was published in the journal

3    because the journal has to -- hadn't been published

4    yet.

5        Q.  Uh-huh.

6        A.  And Philip Ewell could no more respond to

7    what was in the journal than anyone else because it

8    wasn't published yet unless various contributors had

9    sent him copies of the articles -- their

10   soon-to-be-published articles privately, which they

11   may well have done, some of them.

12              I know that a number of contributors --

13   at least I've heard that a number of contributors who

14   thought that the journal was treating Philip Ewell

15   unfairly, complained to him before the issue was

16   published.

17       Q.  Did he ever reach out, to your knowledge, to

18   the journal to make a contribution?

19       A.  No.  No, not that --

20       Q.  Were you aware that --

21       A.  -- Volume 12.

22       Q.  Were you aware that he told the Denton

23   Record-Chronicle that he would refuse to read the

24   articles in Volume 12?

25       A.  Yes, I am aware of that, but he's since

Stephen Slattow, Ph.D. - 11/7/2024

130

1   changed his mind, evidently.

2       Q.  You think that was just posturing?

3       A.  I think there was a good element of

4   posturing in there.  He -- I mean, that comment is

5   very disdainful, you know.  "Whatever they say about

6   me, they're racists, and it's not worth reading about

7   them.  And I refuse to dirty my hands in reading any

8   of these articles," is sort of the subtext.

9               But then when his book came out, he was

10  quite clear that he had read all the articles, and he

11  responded to a good many of them.  So he seems to

12  have changed his mind.

13      Q.  Incidentally, are you on the board of

14  editors of any other journal?

15      A.  No, I'm not even on the board of editors of

16  this journal now.

17      Q.  I understand.  Were you ever the editor of

18  an academic journal?

19      A.  No.

20      Q.  Sorry if you're hearing my dog in the

21  background.  She's stretching.  I apologize.

22              So in your experience as an author and

23  also in your experience in the Journal of Schenkerian

24  Studies and observing your colleagues in the field,

25  is it common for journal editors to solicit articles?

1    A.  Well, certain -- well, in the Journal of

2    Schenkerian Studies, it's certainly not uncommon for,

3    say, Tim to go to someone he knew was, say, working

4    on the Felix Saltzer, Influential Student of Schenker

5    and suggest that an article might be submitted or

6    the -- certainly that's something that Dr. Jackson

7    would do.

8                I think that Dr. Heidlberger would also

9    solicit articles.  I mean, he's the one that asked me

10   to write a review on this book on set theory.

11       Q.  Uh-huh.

12       A.  He put together a symposium on Russian

13   music.

14       Q.  Uh-huh.

15       A.  Philip Ewell was one of the contributors.

16   That's something that Dr. Heidlberger put together,

17   and he would probably certainly have been active in

18   soliciting contributors.

19       Q.  If fact, that's the one published in 2020

20   with Ellen Bakulina in it as well, right?  It

21   addressed Russian music?

22       A.  Yes, the one that were -- a number of

23   articles were evidently --

24       Q.  Yes.

25       A.  -- not peer-reviewed.

1    Q.  I believe Chris Segall published in that

2   section, too, correct?

3    A.  Yes.  So those are -- other music theory

4   journals, I don't know because I don't know --

5    Q.  That's all right.

6    A.  -- the editors, and I'm not sure what they

7   do.

8    Q.  And if you don't know, you don't know, and

9   that's a perfectly fine answer.  I just want to know

10   for the purpose of the record.

11         So a similar question addressing special

12   topics, and you've already identified another

13   journal, Theoria, which solicited contributions on a

14   special topic concerning Russian music.  So my

15   follow-up question is is it normal in the field in

16   which you're a scholar for editors to organize

17   publications around special topics in a journal?

18    A.  Yes, that's quite usual.

19    Q.  And did anyone ever object to that in your

20   field before July 2020, when the kerfuffle erupted

21   over the Journal of Schenkerian Studies?

22    A.  No, I don't -- I don't know of any instance

23   or anyone who objected to a special topic.

24    Q.  And was your colleague Frank Heidlberger

25   ever accused of being a racist for organizing a

1    special topics journal?

2        A.  Well, I would say certainly not.

3        Q.  **Was he ever accused of being a racist**

4    **because he didn't subject every single article to**

5    **peer review?**

6        A.  As far as I know, no.  Of course, the lack

7    of peer review wasn't in itself the reason why

8    Dr. Jackson was accused of being a racist.  It was a

9    contributing factor.

10       Q.  **And speaking of racism, are you aware -- can**

11   **you name any specific actions that Timothy Jackson**

12   **has ever done which you would characterize as racist?**

13       A.  Me?  No.

14       Q.  **And if I asked you if you can name or are**

15   **aware of any specific acts that Timothy Jackson has**

16   **committed that would constitute extortion, what would**

17   **you say?**

18       A.  Extortion?

19       Q.  **Yes.**

20       A.  That's a very wild claim.  I can't -- no,

21   certainly not.  I can't imagine what that would be

22   referring to.

23       Q.  **Thank you.**

24       A.  But I will say, getting back to the racism

25   question, that some of the things he said in his

1 article about black anti-Semitism --

2     Q.  Uh-huh.

3     A.  -- would certainly be construed as racist by

4 some key people.  I would not because I think it's a

5 phenomena that exists.

6     Q.  Uh-huh.  Did anyone actually take issue with

7 its factual basis?

8     A.  Not to my -- well, not to my knowledge, no.

9     Q.  I believe Timothy Jackson also argued that

10 black children are, on average, not exposed to the

11 tradition of western classical music --

12     A.  I think --

13     Q.  -- in comparison to other groups of people

14 in the United States?

15     A.  Yeah, I think he did say that.

16     Q.  And do you recall that being -- him being

17 accused of being racist because he wrote that?

18     A.  I don't recall any specific instance, but

19 it's a case where he well might be.

20     Q.  Has anyone, to your knowledge in the

21 Schenker kerfuffle that you have identified, ever

22 published any factual refutation of that assertion?

23     A.  No, I don't think that anyone has.

24     Q.  Do you know if it's in fact true?

25     A.  I don't know if it's true.  I would assume

1  that Dr. Jackson has his own reasons for --

2      Q.  Okay.

3      A.  -- saying it, but I wouldn't care to defend

4  that as a true or false assertion.

5      Q.  Okay.  That's fine.  But you don't know of

6  anyone in the controversy that actually tried to

7  refute with facts Timothy Jackson's argument that

8  this is actually a cultural phenomenon in the United

9  States?

10      A.  I don't know of anyone who has done that.

11  But also, I made a conscious decision to stop

12  involving myself at a certain point --

13      Q.  I understand.

14      A.  -- in reading the back-and-forth on it.  So

15  to my knowledge, no.

16      Q.  Thank you.  You talked quite a bit in your

17  testimony about Mr. Levi Walls and Benjamin Graf, the

18  two editors of the Journal for Schenkerian Studies

19  back in 2020, and I want to ask you if you worked at

20  all with Levi Walls in the lead-up to the publication

21  of the Volume 12 of the Journal of Schenkerian

22  Studies?

23      A.  No.  Benjamin Graf, yes.  I mean, I've known

24  him for a long time as a student and colleague.

25      Q.  Uh-huh.

```
 1        A.  Levi Walls I did not know that well.  He was
 2   a student in my Schenker class.
 3        Q.  Uh-huh.
 4        A.  And then I had some contact with him when
 5   this issue was being put together, mainly emails.  He
 6   would email Ben Graf and Tim Jackson and me --
 7        Q.  Sure.
 8        A.  -- and we would go back and forth, but that
 9   was about it.
10        Q.  Okay.  And do you remember him ever
11   expressing a view before the publication came out on
12   the quality of Philip Ewell's scholarship?
13             MS. QUIMBY:  Objection.  Form.
14        A.  No, no.
15        Q.  (BY MR. ALLEN)  Okay.  That's fine.
16             Now, you -- I think you characterized
17   Levi Walls -- and I'm not trying to put words in your
18   mouth, but something of a weak person?
19        A.  Well, it's -- yeah, don't put words in my
20   mouth.
21             I wouldn't say -- he was -- he was not
22   as assertive or as self-confident as the previous
23   editors had been.  And he was more inclined to feel
24   that he had to do what -- most specifically, what
25   Dr. Jackson told him to do, that that was his role.
```

```
 1            I don't think that Ben Graf or Colin
 2   or -- who was the first editor?  The name escapes
 3   me -- really felt that way.  They would argue back if
 4   they really felt --
 5       Q.  Uh-huh.
 6       A.  -- something was the wrong thing to do and
 7   they had a better idea.
 8            Levi would only argue to a certain
 9   extent, and then he would say, well -- and then he
10   would stop.  So he was more prone to viewing himself
11   as a -- sort of a functionary under authority --
12       Q.  Uh-huh.
13       A.  -- than the previous editors were.  And then
14   he wasn't a full-fledged editor too.  I mean, he was
15   sort of an editor-in-training.  So he was also under
16   the authority of Benjamin Graf to some extent too.
17       Q.  Sure.  And in your view --
18       A.  It was --
19       Q.  Sorry.
20       A.  It was an apprenticeship.
21       Q.  Okay.  And in your view, was there a power
22   differential between Benjamin Graf and Levi Walls?
23       A.  Well, there was, because Benjamin was the
24   very experienced editor, and Levi was just coming in
25   and learning the job.  I don't think it was a
```

1   problematic power issue -- power imbalance.

2       Q.  Okay.

3       A.  The power imbalance he felt between him and

4   Timothy Jackson was a much more powerful and

5   problematic one.

6       Q.  Well, why was it problematic?

7       A.  Because he felt -- I think he felt he was

8   under Dr. Jackson's control, as I said, in a way the

9   other editors did not and that --

10      Q.  Uh-huh.

11      A.  -- he had sort of had to do what Dr. Jackson

12  said even if he disapproved of it.  He would -- he

13  would kowtow in a certain way.

14      Q.  And yet that didn't prevent him from

15  condemning Professor Jackson in July of 2020, did it?

16      A.  Well, that was -- that was after the

17  publication of the journal, right?

18      Q.  Yes.

19      A.  No, he -- you might say he turned on

20  Dr. Jackson then because he felt that Dr. Jackson was

21  instrumental in possibly destroying his career.

22      Q.  Do you think he feared Dr. Jackson or the

23  larger community of society of music theory

24  professors who were agitating against the journal at

25  that time?

1    A.  Well, he certainly feared the larger

2    community to the extent the larger community was

3    pointing to him as the editor and saying, "This is

4    your fault" --

5        Q.  Uh-huh.

6        A.  -- but he blamed Dr. Jackson to a large

7    extent for that situation.

8        Q.  And you said -- I forget how you put it, but

9    he felt dominated or something like that by Timothy

10   Jackson?

11       A.  Yes.

12       Q.  What specific observations did you -- you

13   know, what specific events or emails or utterances by

14   Levi Walls gave you that impression?  And I'm talking

15   about before the journal came out.

16       A.  Well, it was in -- before it was published,

17   you mean?

18       Q.  Yes, correct.  Before his grand, you know,

19   renunciation of his position and condemnation of

20   Timothy Jackson and claiming that he had been stuck

21   in a car by some gangster-like professor and all this

22   stuff.

23            MS. QUIMBY:  Objection.  Form.

24       A.  Yeah, I don't -- he never talked to me about

25   that last point.  I do know he did send an email out

1  to Dr. Jackson and me and Ben arguing before

2  publication that we should invite Philip Ewell in as

3  a respondent and that -- and that -- well, I argued

4  against it because I told him what I told you, which

5  is that in my experience, the traditional way to

6  handle these things is that the criticized scholar

7  would write a letter to the editor, and it would be

8  dealt with in that way.

9      Q.  Uh-huh.

10     A.  It turns out that there evidently was also a

11 practice of doing just what Levi suggested, but I

12 somehow didn't know about it.  I hadn't had

13 experience with that.

14          So I argued against that, and then

15 Dr. Jackson agreed with me.  And then Levi -- in

16 retrospect, as I said, I think that would have been a

17 good idea.  But Levi then just let the matter drop.

18 He -- you know, "If Dr. Jackson and Dr. Slottow say

19 no, then I've done what I could.  I'm not going to

20 press the issue.  I'm not going to continue to argue

21 for it."  He just let it drop.  So he brought it up,

22 but he let it go fairly easily.  That's one instance

23 I can remember.

24     Q.  Was he ever ordered by Timothy Jackson to

25 censor anyone?

Stephen Slattow, Ph.D. - 11/7/2024

141

```
 1        A.  Not to my knowledge, no.  It would seem very
 2   uncharacteristic.
 3              What do you mean "censor anyone"?
 4        Q.  I don't know.  That's the word he used,
 5   right, that he was directed, quote, "not to censor
 6   someone that he wanted to censor," or something of
 7   that nature.
 8        A.  Are you saying that I said that?
 9        Q.  I'm asking you.  I'm asking you if you ever
10   heard Timothy Jackson direct Levi Walls to censor
11   someone?
12        A.  No.
13        Q.  Had -- did you ever --
14        A.  I'm not even sure what that means.
15        Q.  Did you ever witness -- okay.  Sorry, go
16   ahead.
17        A.  Like -- no, I never heard anything of that
18   nature, and this context, I'm not even sure what that
19   would mean.
20        Q.  So you don't even know what Levi Walls is
21   talking about?
22        A.  Well, I don't know that he had used that
23   term, and I'm not sure -- unless -- without knowing
24   more --
25        Q.  Yeah.
```

1     A.  -- the context of that comment, I don't know

2  what he was talking about.

3     **Q.  And I'm just going to phrase the same**

4  **question more or less upside down.  But did you ever**

5  **witness Timothy Jackson direct or order Levi Walls**

6  **not to censor someone, this idea of censorship?**

7     A.  No.  No, no, the issue never came up that I

8  was aware of at all.

9     **Q.  Uh-huh.**

10     A.  And, again, I'm not sure what that means.

11  Censor what?  Censor who?  I mean, who...

12     **Q.  It's certainly not the job of an editor of**

13  **any journal to censor people, right?**

14     A.  Well, granted that I don't even know what

15  that means -- what it would mean, I would say no.

16  But I don't know -- if he made that comment, I don't

17  know what he was talking about.  I would need more

18  context.

19     **Q.  Okay.  You also talked about Benjamin Graf**

20  **and yourself providing feedback to Timothy Jackson in**

21  **his contribution to Volume 12.**

22     A.  Yeah.

23     **Q.  Do you recall talking about that?**

24     A.  Yes.

25     **Q.  We already discussed that there was a power**

1  differential between Benjamin Graf and Timothy

2  Jackson, right?

3      A.  Yes, because ultimately Jackson was sort of

4  the head of the Center for Schenkerian studies, and

5  it was his project.  So there is a power -- there

6  definitely was a power differential.  We sort of

7  acted within that.

8      Q.  Did that prevent Benjamin Graf in any way

9  from expressing his criticism of Timothy Jackson's

10  work?

11     A.  Well, in my experience, no.  And, in fact,

12  he did -- we both did offer rather, you know,

13  explicit critiques of Timothy Jackson's work,

14  specifically in his article for Volume 12.

15     Q.  Uh-huh.

16     A.  And if Benjamin Graf has said that it did, I

17  wasn't aware of it, and he didn't say it to me.

18     Q.  And, in fact, I think you testified Timothy

19  Jackson eventually accepted that criticism that you

20  were -- you and Benjamin Graf were providing?

21     A.  Yeah.  He pretty much cut most of that out.

22  There were other things I guess we probably could

23  have and should have criticized him, but we spent

24  most of our effort on that.  He was stubborn about

25  it, you see, and so we had to expend some energy in

1  making our case.

2       Q.  Sure.  I want to call your attention back to

3  Exhibit 3.  Can you get Exhibit 3 in front of you

4  again?  I think it's only two pages.

5       A.  Is that the letter from UNT faculty members?

6       Q.  Yes.

7       A.  Yeah, I've got it here.

8       Q.  And I just want to direct your attention

9  to -- the first sentence says, "We, the undersigned

10  faculty members of the University of North Texas

11  Division of Music History, Theory, and

12  Ethnomusicology, stand in solidarity with our

13  graduate students in their letter of condemnation of

14  the Journal of Schenkerian Studies."

15          Did I read that correctly?

16       A.  Yes.

17       Q.  Do you understand that letter of

18  condemnation to be incorporated by reference in that

19  https internet link that's in the middle of the page?

20          MS. QUIMBY:  Objection.  Form.

21       A.  I haven't clicked on that link.  I'm not

22  sure where that link goes.  It says the students'

23  letter can be found in the link.

24       Q.  (BY MR. ALLEN)  Okay.

25       A.  I've read the letter.  I mean, I read the

1  letter at the time.

2      Q.  Sure.  And the -- you don't have any reason

3  to believe that that link wasn't to the student

4  letter that we're both referring to, which you've

5  also referred to as the student petition, right?

6                  MR. TODD:  Objection.  Form.

7      A.  I have no reason for supposing that because

8  I haven 't clicked on the link.  I don't know where

9  it goes.

10     Q.  (BY MR. ALLEN)  That's fine.  We could do

11 that, but I don't want to really waste our time doing

12 that.

13     A.  I know where it says it goes.

14     Q.  Yeah.  And you did refer to the student

15 letter as a student petition earlier, right?

16     A.  Yeah, yeah.

17     Q.  And let's look at that second paragraph.

18              It says, "We endorse the call for action

19 outlined in our students' letter," right?

20     A.  Uh-huh.

21     Q.  And then in the final sentence of that

22 paragraph, it says, "Responsible parties must be held

23 appropriately accountable," right?

24     A.  Yes.

25     Q.  And in the student letter, as you remember

Stephen Slattow, Ph.D. - 11/7/2024

146

1  it, who was being singled out to be called into

2  account?

3              MS. QUIMBY:  Objection.  Form.

4       A.  Well, it was both Dr. Jackson and, to a

5  lesser extent, myself.  But Dr. Jackson more -- it

6  was a stronger accusation against him.

7              MR. ALLEN:  Why don't we just put in the

8  record the student letter, just so we're not being

9  vague about anything.  Let me -- you'll have to just

10 give me a second.

11      A.  Yeah, I haven't seen it since then.

12             MR. ALLEN:  This will be Exhibit 5 I'm

13 going to mark for the record, and this will be the

14 last exhibit we look at, Professor Slottow.

15             (Exhibit 5 marked.)

16      Q.  (BY MR. ALLEN) You will see that Exhibit 5

17 is the November 25th, 2020 ad hoc panel report.

18      A.  Well, I don't -- I don't see it at all.

19      Q.  I know.  You don't see it right here.  And

20 I'm going to share it with you.

21             MR. ALLEN:  I don't know.  He doesn't

22 have a screen.  How should we do -- should we go off

23 the record for a second?

24             THE VIDEOGRAPHER:  We're off the record

25 at 3:59 p.m.

```
 1                    (Recess 3:59 p.m. to 4:12 p.m.)

 2                    THE VIDEOGRAPHER:  We are back on the

 3   record at 4:12 p.m.

 4        Q.  (BY MR. ALLEN)  Dr. Slottow, I've introduced

 5   into the record Exhibit 5, and I'm just going to

 6   represent to you that Exhibit 5 is the ad hoc panel

 7   report which has been discussed in earlier

 8   depositions and throughout this litigation, and it's

 9   dated November 25th, 2020.

10                    I'm not going to ask you questions about

11   the entire report, but I want you to focus on one

12   portion of it, which begins on the Bates-numbered

13   page Jackson 226, and it is an exhibit that was

14   attached to the ad hoc panel report.

15        A.  Wait a moment.  I do not have this exhibit

16   in front of me.  I -- wait.  Oh, I see -- unless

17   it's -- unless it's part -- oh, okay.  Wait a minute.

18   This is -- the student petition, the student letter I

19   read is attached to the ad hoc review panel.  So --

20        Q.  Yes.

21        A.  -- now here --

22        Q.  And it's only that student petition that I

23   want to focus on, okay?

24        A.  Okay.  Well, I am -- I have -- I just read

25   that.  I have that in front of me.
```

Stephen Slattow, Ph.D. - 11/7/2024

148

Q.  Well, and my question, for the record, was going to be do you recognize the document --

A.  Yes.

Q.  -- that begins, "I am sharing this statement on behalf of a cross-section of graduate students in the Division of Music History, Theory, and Ethnomusicology"?

A.  Yes, I do recognize it.

Q.  And is that the student petition that you had referred to earlier in your deposition?

A.  Yes, it is.

Q.  So now we're going to do a little flipping back and forth between exhibits, and I want to refer your attention back to Exhibit 3, which was the faculty letter we just talked about.

A.  I've got it here.

Q.  And we read that paragraph that begins, "We endorse the call for action outlined in our students' letter."

A.  Yeah.  Let's see.  Where -- where is --

Q.  That's -- the second paragraph begins --

A.  Yes.

Q.  -- "We endorse the call for action."

A.  Right.

Q.  So my question is in the student letter,

1  which we've just introduced into the record as part

2  of Exhibit 5, can you identify what you understand as

3  the call for action?

4      A.  Well, it's the numbered elements.

5          1. Publicly condemn the issue and

6  release it freely online to the public.

7          2. Provide a full public account of the

8  editorial and publication process and its failures.

9          And then next, Dissolve the Journal of

10  Schenkerian Studies.

11     Q.  Uh-huh.

12     A.  And then, Critically examine the culture in

13  UNT, the College of Music, the MHTE Division, and act

14  to change the culture.

15          And three, Hold accountable every person

16  responsible for the direction of the publication.

17          It certainly is characterized by sort of

18  overblown exaggeration, yes.  That's what I --

19     Q.  And in that --

20     A.  That's what I would say is the call for

21  action.

22     Q.  And in that last number 3 that you just read

23  that said, "Hold accountable every person responsible

24  for the direction of the publication" --

25     A.  Right.

1          Q.  -- it also says in the last sentence,

2   "Specifically the actions of Dr. Jackson -- both past

3   and present -- are particularly racist and

4   unacceptable," right?

5          A.  Yes.

6          Q.  And then --

7          A.  And then it goes out of its way to praise

8   Philip Ewell.

9          Q.  Sure.  And so the last question would be

10  about Exhibit 3.

11              When you have been asked questions about

12  this document, Exhibit 3, by the state's attorney

13  Mary Quimby, she had asked you if this identifies

14  Timothy Jackson in the quote "faculty statement"?

15         A.  Not in the faculty statement.

16         Q.  But it does refer to the student letter and

17  incorporates it by reference, right?

18         A.  Yes.

19              MS. QUIMBY:  Objection.  Form.

20         Q.  (BY MR. ALLEN)  And does that, quote,

21  "Endorsed student letter" refer to Timothy Jackson

22  directly by name?

23              MS. QUIMBY:  Objection.  Form.

24         A.  The student letter does.  The faculty letter

25  does not.

```
 1        Q.  (BY MR. ALLEN)  And when it says,
 2   "Responsible parties must be held appropriately
 3   accountable" in Exhibit 3 -- you see that last
 4   sentence of the second paragraph?
 5        A.  The last sentence?  Yes.
 6        Q.  Of the -- it says, "Responsible parties must
 7   be held appropriately accountable."
 8        A.  That's not --
 9        Q.  Do you understa --
10        A.  -- the last sentence.  You mean --
11             THE REPORTER:  I'm sorry?
12             THE WITNESS:  That's not the last
13   sentence.
14        Q.  That's the last sentence of the second
15   paragraph I was referring to.
16        A.  The last sentence is "Specifically, the
17   actions of Dr. Jackson," etcetera.
18        Q.  Oh, I'm sorry.  I meant Exhibit 3.  I'm
19   trying to --
20        A.  Oh.
21        Q.  -- link -- I'm trying to get some clear -- a
22   clear record of your understanding of how these two
23   documents interact, because obviously the -- as
24   you've already testified, the faculty petition refers
25   to the student petition, right?
```

1    A.  Yes.

2       Q.  And it incorporates it through a URL or

3   website link, right?

4    A.  Right.

5       Q.  And the last sentence of that second

6   paragraph of the faculty petition says, "Responsible

7   parties must be held appropriately accountable,"

8   right?

9    A.  Yes, it does.

10      Q.  And if you then refer to Exhibit 5, which is

11  the student petition, what is your understanding of

12  who is referred to as the responsible parties that

13  need to be held appropriately accountable?

14              MS. QUIMBY:  Objection.  Form.

15      A.  Well, certainly it focuses on Dr. Jackson,

16  but it also says, "every person responsible," and

17  casting a wide net.  But Dr. Jackson is the only

18  name -- person's name which is mentioned there.

19      Q.  In that specific numbered call for action,

20  right?

21      A.  Yes.  He --

22      Q.  Now, are you -- sorry, I didn't mean to cut

23  you off.

24      A.  Yes, he seemed to be the prime mover here.

25      Q.  And are you mentioned by name in the student

1  petition?

2      A.  Yes, I am, actually.

3      Q.  And that's in the third paragraph, right, of

4  Exhibit No. 5, the student petition?

5      A.  Yes.

6      Q.  And it says it's -- it says, "We would like

7  to make it clear that the JSS is not a graduate

8  student journal; since 2010 (Vol.4), it has been run

9  primarily by Drs. Timothy Jackson and Stephen

10  Slottow."

11     A.  Right.

12     Q.  Did I read that right?

13     A.  Yeah.

14     Q.  Is that an accurate, factual statement about

15  the journal?

16     A.  Yeah, because Dr. Jackson and I were

17  co-directors or director and assistant director.  So

18  I would say as far as it goes, it's accurate, as far

19  as the editorial direction.

20     Q.  How about the -- in the next sentence where

21  it says, "Students have absolutely no say in the

22  content of the JSS"?

23     A.  Well, some students do.  The students who

24  are on the staff, you might say, of the journal.

25  Certainly Benjamin Graf and Levi Walls are involved

1  and do have -- they are -- yeah, there is student

2  involvement.  In fact, it acknowledges that.

3           We never said it was a student-run

4  journal, I mean, like run by the -- a mass of

5  students.  It has a student editor, in this case a

6  student assistant editor.  So, yeah.

7       **Q.  Did Levi Walls have absolutely no say in the**

8  **content of the JSS?**

9       A.  I would not say that's true at all.

10      **Q.  That's false, right?**

11      A.  I would say so, yes.

12      **Q.  Okay.  Thank you.**

13           **So flipping back to Exhibit 3, I want to**

14  **just ask one last question about the final sentence**

15  **of the first paragraph of the student -- excuse me --**

16  **the faculty petition, Exhibit 3.**

17      A.  Of the faculty petition, okay.

18      **Q.  You see it says, "The fact that he was not**

19  **afforded the opportunity to respond in print is**

20  **unacceptable, as is the lack of a clearly defined**

21  **peer-review process."**

22      A.  Uh-huh.

23      **Q.  Did I read that correctly?**

24      A.  Yes.

25      **Q.  Who is "he" in that sentence; the fact that**

1  "he" was not afforded the opportunity to respond in

2  print is unacceptable.

3      A.  That would be Dr. Ewell.

4      Q.  And is that factually accurate, that he was

5  not afforded the opportunity to respond in print?

6              MS. QUIMBY:  Objection.  Form.

7      A.  Well, that gets back to that "respond."  I

8  mean --

9      Q.  (BY MR. ALLEN)  Yeah.

10     A.  -- he was not invited to respond as a

11  responder to the items in the symposium.  So he was

12  invited, like anyone else, to submit an article or a

13  submission to the journal.

14     Q.  Isn't it true that the only way he was

15  denied an opportunity to respond, if he had even

16  wanted to, was because UNT refuses to publish the

17  journal anymore, right?

18              MS. QUIMBY:  Objection.  Form.

19     Q.  (BY MR. ALLEN)  I mean, otherwise the

20  journal would have been happy to publish him?

21              MS. QUIMBY:  Objection.  Form.

22     A.  The journal would have been happy to publish

23  anything that he sent in in response to the call for

24  papers of Volume 12?  Is that what you mean?

25     Q.  (BY MR. ALLEN)  Yes.

Stephen Slattow, Ph.D. - 11/7/2024

156

1      A.  If it had been accepted and if it had come

2  from Philip Ewell, I can't imagine it would not have

3  been.  Yes, we certainly would have been happy to

4  publish it.

5      **Q.  Okay.  And to that extent, the statement**

6  **that he was not afforded the opportunity to respond**

7  **in print is unaccept -- that being unacceptable,**

8  **that's false, right?**

9              MS. QUIMBY:  Objection.  Form.

10     A.  To that extent, yes.  But the word "respond"

11 is still a problematical word.

12     **Q.  (BY MR. ALLEN)  Okay.**

13     A.  Because we don't know what he would be

14 responding to, other than a call for papers in

15 response to his SMT plenary address.

16     **Q.  It doesn't say that he wasn't invited**

17 **personally, does it?**

18     A.  No.  It says he was not afforded the

19 opportunity to respond in print.  I know what that

20 means.  I know what they meant by that, but as for

21 what it actually -- that's what it says.

22     **Q.  Okay.**

23              MR. ALLEN:  If you want to redirect,

24 Mary, I'm going to pass the witness.  I have no

25 further questions.

Stephen Slattow, Ph.D. - 11/7/2024

 1                    MS. QUIMBY:  Okay.  Can we take just

 2    five minutes, please.

 3                    MR. ALLEN:  Absolutely.

 4                    THE VIDEOGRAPHER:  Okay.  We're off the

 5    record at 4:24 p.m.

 6                    (Recess 4:24 p.m. to 4:31 p.m.)

 7                    THE VIDEOGRAPHER:  Back on the record at

 8    4:31 p.m.

 9                         FURTHER EXAMINATION

10    BY MS. QUIMBY:

11        **Q.  Okay.  Dr. Slottow, I'll have you look at**

12    **the student statement again.  And you stated, "I know**

13    **what they mean."**

14        A.  Well, I was talking about the faculty

15    statement --

16        **Q.  I'm sorry, the faculty --**

17        A.  -- when I said that.

18        **Q.  Okay.  What do --**

19                    MR. ALLEN:  Are we on Exhibit 3, then,

20    or Exhibit 5?

21                    MS. QUIMBY:  That would then be

22    Exhibit 3.

23                    MR. ALLEN:  Okay, thank you.

24        A.  I think I said that about -- did I say that

25    about responsible parties must be held appropriately

1 accountable, or was it about something else?

2     Q.  **It was about the response issue.**

3     A.  Well, can you point to a specific -- I think

4 I was referring to a specific sentence.  Do you

5 remember what it was?

6     Q.  **"Responsible parties must be held**

7 **appropriately accountable," at the end of the second**

8 **paragraph.**

9     A.  Yes.  Well, it's a general -- I thought --

10 it would have made more sense in the context of

11 what -- who is Tim Jackson's attorney?  What's his

12 name?

13          MR. ALLEN:  Michael Allen.

14     A.  -- what Michael Allen said.  Now, what was

15 he getting at, he was trying to get at?  I forget.

16          Let me reread the paragraph.

17          Well, I'm not sure exactly what I meant

18 then because it was in response to something that

19 Michael Allen said.

20          MS. QUIMBY:  Could we read back

21 that part of the transcript, please?

22          (Background noise.)

23          THE REPORTER:  I'm sorry?

24          MS. QUIMBY:  Could we read back that

25 last question and answer before we went off the

1    record?

2                THE REPORTER:   The last question is:

3                **Q.  It doesn't say that he wasn't**

4    **invited personally, does it?**

5                A.   No.   It said he was not afforded the

6    opportunity to respond in print.   I know what that

7    means.   I know what they meant by that, but as for

8    what it actually -- that's what it says.

9        A.   I think I was referring to a sentence with

10   the word "respond" in it.   It wasn't that sent -- it

11   wasn't in the sentence --

12       **Q.  Right.**

13       A.   The one -- it was the last sentence of the

14   first paragraph.

15       **Q.  Now that you've heard that response -- your**

16   **response again, do you now know -- can you now answer**

17   **the question of what you meant when you said, "I know**

18   **what they mean"?**

19       A.   Yeah, it meant that we did not -- the

20   journal did not invite Dr. Ewell to provide a

21   response to each of the items in the symposium.

22   That's what they meant.

23       **Q.  Okay.   And do you agree with what**

24   **Dr. Jackson said in his article, particularly the**

25   **point regarding black anti-Semitism?**

1    A.  Well --

2              MR. ALLEN:  Objection.

3    A.  -- for the first part, do I agree with what

4  he says in his article, I wouldn't even answer that

5  without having -- rereading the article.  It's been

6  years.  And he says a lot about black anti-Semitism.

7              Well, there are -- certainly are pockets

8  of black anti-Semitism, and there are certainly

9  instances of synagogues being burnt down by some

10  black people.  Those are facts which have been

11  reported on.  So I think some of that is around, yes.

12    **Q.  (BY MS. QUIMBY)  And what about what he said**

13  **in the article that black children are not exposed to**

14  **classical music?**

15    A.  I don't know if that's true or not.  I don't

16  know what he has -- what Dr. Jackson supports that

17  with, and I wouldn't venture to agree or disagree

18  with that statement.

19    **Q.  Would you expect that statement to be**

20  **supported in an academic journal in a scholarly**

21  **article?**

22    A.  I wouldn't venture to say.  I don't know.  I

23  mean, it's too speculative.  Would I expect it to be

24  supported if someone had done a study on it?  I don't

25  know.  I would have to wait to see if someone does do

1  a study on it.  Until then, I'm not going to express

2  an opinion.  I think it's -- it's a sort of statement

3  that I don't think should be made without some

4  evidence.

5        Q.  Okay.  Thank you.

6              MS. QUIMBY:  I will pass the witness.

7              MR. ALLEN:  Sure.

8                  FURTHER EXAMINATION

9  BY MR. ALLEN:

10       Q.  I just have one more question about the last

11  sentence of the first paragraph in Exhibit 3, the

12  fact that he was not afforded the opportunity to

13  respond in print is unacceptable, right?

14       A.  Right.

15       Q.  You said you know what they mean.

16       A.  Yeah.

17       Q.  And you even explained to the state's

18  attorney, Mary Quimby, what your understanding was,

19  right?

20       A.  Right.

21       Q.  And my question for you is there's been a

22  lot of discussion about what they meant after this

23  faculty petition was published, right?

24              MS. QUIMBY:  Objection.  Form.

25       A.  Wait a minute.  After this faculty -- what

1  was published?  It circulated among faculty.  It --

2      Q.  (BY MR. ALLEN)  Sure.

3      A.  -- certainly has appeared in court.  What do

4  you mean was published?

5      Q.  So I'll just represent for the record -- and

6  I'm not trying to make you a legal beagle or

7  anything, but in defamation law, something is

8  published when it's disclosed to another party, like

9  a third party.

10     A.  Okay.

11     Q.  Not necessarily having to be published in a

12 journal or newspaper, all right?

13             So when I -- so maybe I shouldn't use

14 this jargon.  I should say, "when this was

15 circulated."  This was circulated at the time in

16 July 2020, correct?

17     A.  As far as --

18             MS. QUIMBY:  Objection.  Form.

19     A.  I don't know the exact date.  I would have

20 to depend on you.

21     Q.  (BY MR. ALLEN) But you remember receiving a

22 copy of it and being asked to sign it, right?

23     A.  Yes.

24     Q.  At that time was it explained to you what

25 they actually meant by this last sentence?  Do you

1  remember --

2      A.  No, because --

3      Q.  -- anything to that effect?

4      A.  -- it wasn't explained because I felt I

5  knew -- I felt that what they meant was obvious.

6      Q.  And all of that what you just said about

7  this statement, that wasn't said in the actual

8  petition that was circulated to you, was it?

9      A.  It's not spelled out into any greater

10  degree, no.  I mean, this is the faculty petition,

11  yes.

12      Q.  Uh-huh.  All right.

13      A.  I think --

14          MR. ALLEN:  I have no --

15      Q.  Go ahead.

16      A.  I think that whoever put it together

17  expected it to be obvious, and I think it is obvious.

18          I would say it clearly refers to the

19  fact that Dr. Ewell was not invited to respond to the

20  items in the symposium.  And that was a common and

21  much repeated criticism at the time.

22      Q.  Wasn't the criticism that was common --

23  wasn't a criticism that was common and repeated at

24  the time that he was excluded from the journal?

25          MS. QUIMBY:  Objection.  Form.

1    A.  I don't recall that it was put in those

2  terms to me, no.

3    **Q.  Okay.**

4        MR. ALLEN:  I don't have --

5    **Q.  I'm sorry.  Go ahead.**

6    A.  If anyone said that, I would say it would

7  amount to the same thing.  He wasn't invited to

8  respond to the items in the symposium, and that is

9  what was referred to.

10   **Q.  Okay.**

11       MR. ALLEN:  I don't have any further

12  questions.

13       MS. QUIMBY:  Okay.  Thank you.

14       THE VIDEOGRAPHER:  Do you need to get

15  anything on the record before we go off?

16       THE REPORTER:  Go ahead, Phil?

17       THE VIDEOGRAPHER:  I was just asking if

18  you need to get anything on the record before we go

19  off.

20       THE REPORTER:  I do, thank you.

21       Read and sign, do you want him to waive,

22  or do you want him to read and sign?

23       MR. TODD:  Yeah, we would request that

24  we be allowed to review the transcript, Rule

25  30(e)(1).

1          THE REPORTER:  And, Mr. Allen, do you

2  want a copy of the depo?

3          MR. ALLEN:  I'll just need a transcript

4  only.

5          THE REPORTER:  No video.  Is that what

6  you're saying?

7          MR. ALLEN:  Yes.

8          THE REPORTER:  Okay.  All right.  I

9  think that's it.  We can go off the record.

10          THE VIDEOGRAPHER:  Off the record at

11  4:41 p.m.

12          (Deposition concluded at 4:41 p.m.)

13

14

15                    *    *    *    *    *

16

17

18

19

20

21

22

23

24

25

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME:  STEPHEN SLOTTOW, PhD

 3    DATE OF DEPOSITION:  NOVEMBER 7, 2024

 4    PAGE          LINE          CHANGE          REASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

1          I, STEPHEN SLOTTOW, PhD, have read the

2     foregoing deposition and hereby affix my signature

3     that same is true and correct, except as noted above.

4

5                              _____

                                STEPHEN SLOTTOW, PhD

6

7     THE STATE OF _____ )

8     COUNTY OF _____ )

9          Before me, _____, on this day

10    personally appeared STEPHEN SLOTTOW, PhD, known to me

11    (or proved to me under oath or through

12    _____) (description of identity card or

13    other document) to be the person whose name is

14    subscribed to the foregoing instrument and

15    acknowledged to me that he executed the same for the

16    purposes and consideration therein expressed.

17

18         Given under my hand and seal of office, this

19    _____ day of _____, _____.

20

21                              _____

                                NOTARY PUBLIC IN AND FOR

22

23                              THE STATE OF _____

24    My commission expires: _____

25    _____ No Changes Made _____ Amendment Sheet(s) Attached

```
 1              THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3  TIMOTHY JACKSON,            )
                               )
 4              Plaintiff,      )
                               )
 5  VS.                        ) CIVIL ACTION
                               )
 6  LAURA WRIGHT, ET AL.       ) NO.: 4:21-cv-00033-ALM
                               )
 7              Defendants.     )

 8
           REPORTER'S CERTIFICATION OF THE ORAL
 9          DEPOSITION OF STEPHEN SLOTTOW, PhD
                  NOVEMBER 7, 2024
10

11         I, Vanessa J. Theisen, a Certified

12  Shorthand Reporter in and for the State of Texas,

13  hereby certify to the following:

14         That the witness, STEPHEN SLOTTOW, PhD,

15  was duly sworn by the officer and that the transcript

16  of the oral deposition is a true record of the

17  testimony given by the witness;

18         That the original deposition was delivered

19  to Mr. Patrick Todd to obtain witness's signature.

20         That a copy of this certificate was served

21  on all parties and/or the witness shown herein on

22  November 11, 2024.

23         I further certify that pursuant to FRCP

24  Rule 30(3) that the signature of the deponent:

25              _XX_ was requested by the deponent or a
```

Stephen Slattow, Ph.D. - 11/7/2024

169

1   party before the completion of the deposition and

2   that the signature is to be before any notary public

3   and returned within 30 days from date of receipt of

4   the transcript.

5           If returned, the attached Changes and

6   Signature Page contains any changes and the reasons

7   therefore:

8           _____ was not requested by the deponent or

9   a party before the completion of the deposition.

10          I further certify that I am neither

11  counsel for, related to, nor employed by any of the

12  parties or attorneys in the action in which this

13  proceeding was taken, and further that I am not

14  financially or otherwise interested in the outcome of

15  the action.

16          Certified to by me on this, the 11th day

17  of November, 2024.

18

19  _____

    VANESSA J. THEISEN, Texas CSR, RPR
20  Texas Cert No. 3238
    Expiration Date:  10/31/25
21  Integrity Legal Support Solutions
    Firm Registration No. 528
22  9901 Brodie Ln., Ste. 160-400
    Austin, Texas 78748
23  (512) 320-8690
    www.integritylegal.support

24

25