# EXHIBIT DDD

<pre>
 1            UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
 2                 SHERMAN DIVISION

 3   TIMOTHY JACKSON,            )
                                 )
 4        Plaintiff,             )
                                 )
 5   vs.                         )   CASE NO. 4:21-CV-00033-ALM
                                 )
 6   LAURA WRIGHT, et al.,       )
                                 )
 7        Defendants.            )

 8   ********************************************************

 9           VIDEOTAPED ZOOM ORAL DEPOSITION OF

10              JOHN TOARU ISHIYAMA, Ph.D.

11                  September 27, 2024

12                  (Reported Remotely)

13   ********************************************************
</pre>

14      VIDEOTAPED ORAL DEPOSITION OF JOHN TOARU ISHIYAMA,

15   Ph.D., produced as a witness at the instance of the

16   Plaintiff and duly sworn, was taken in the above-styled

17   and -numbered cause on the 27th day of September, 2024,

18   from 9:13 a.m. to 12:35 p.m., before Kim D. Carrell,

19   Certified Shorthand Reporter in and for the State of

20   Texas, reported remotely by computerized stenotype

21   machine at the University of North Texas System,

22   801 North Texas Boulevard, Gateway Suite #308, Denton,

23   Texas, pursuant to the Federal Rules of Civil Procedure

24   and the provisions stated on the record or attached

25   hereto.

1                          APPEARANCES

2   FOR THE PLAINTIFF:

3        Mr. Michael Thad Allen
         ALLEN LAW, LLC
4        P.O. Box 404
         Quaker Hill, CT 06375
5        Telephone: 860.772.4738 - Fax: 860.469.2783
         E-mail: m.allen@allen-lawfirm.com
6

7   FOR THE DEFENDANTS:

8        Ms. Mary Quimby
         Assistant Attorney General
9        General Litigation Division
         P.O. Box 12548, Capital Station
10       Austin, Texas 78711
         Telephone: 512.463.2120 - Fax: 512.320.0667
11       E-mail: Mary.Quimby@oag.texas.gov

12           - and -

13       Mr. Renaldo Stowers  (Appearing Live)
         University of North Texas System
14       Office of General Counsel
         801 North Texas Boulevard
15       Denton, Texas 76201
         Telephone: 940.565.2717 - Fax: 940.369.7026
16       E-mail: Renaldo.Stowers@untsystem.edu

17

18   ALSO PRESENT:   Jason Warner, Videographer
                     lvg.dallas@gmail.com
19

20

21

22

23

24

25

1              I N D E X

                                        PAGE
2

        Appearances............................    2
3
        Stipulations...........................    5
4
   JOHN TOARU ISHIYAMA, Ph.D.
5
          Direct Examination by Mr. Allen.......   6
6

7  Corrections and Changes....................... 129

8  Reporter's Certificate........................ 131

9
                    EXHIBITS
10
       NUMBER          DESCRIPTION          MARKED
11
Exhibit 1   Re-Notice of Taking Deposition........   7

Exhibit 2   Email Chain Ending 8-3-20, Cowley to
            Ishiyama, Request to Serve on Ad Hoc
            Review Panel
            (UNT 002453 - 002454)................  20

Exhibit 3   Ad Hoc Review Panel Report (Exhibit D)
            (JACKSON000208 - 000233)............  23

Exhibit 4   COPE Guidelines: A Short Guide to
            Ethical Editing for New Editors
            (UNT 003303 - 003314)................  34

Exhibit 5   Theoria Title Page, List of Articles,
            Directions to Contributors, Volume
            26-2020.............................  43

Exhibit 6   Emails ending 10-14-20, Ishiyama to
            Jackson, et al. RE: Talk With UNT Ad
            Hoc Journal Review Panel
            (UNT 002634 - 002635)................  50

Exhibit 7   Handwritten Notes, 9-16-20, Ad Hoc
            Journal Review Committee.............  63

Exhibit 8   Potential Questions for Benjamin Brand
            Chair of the Division of History,
            Theory & Ethnomusicology.............  68
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*John Toaru Ishiyama, Ph.D.    9/27/24*    4

 1

 2  Exhibit 9      PLoS Medicine Article, What Should
                  Be Done to Tackle Ghostwriting in
 3                the Medical Literature............. 71

 4  Exhibit 10     Walls Facebook Post
                  (JACKSON 000234 - 000236).......... 81
 5
    Exhibit 11     Email Chain ending 9-30-20, Walls
 6                to Ishiyama
                  (UNT 002533)...................... 83
 7
    Exhibit 12     Jackson Materials for the
 8                Committee
                  (UNT 002645 - 002782)............. 99
 9
    Exhibit 13     Email, 10-2-20, Ishiyama to
10                TitleIX, et al. Reporting on an
                  Incident
11                (UNT 003435).....................117

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1               A G R E E M E N T S

 2   DEPOSITION OF:  JOHN TOARU ISHIYAMA, Ph.D.

 3   DATE:  September 27, 2024

 4   CAUSE NO. 4:21-CV-00033-ALM

 5   THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:

 6           (X)   Notice
             ( )   Agreement
 7           ( )   Court Order
             ( )   Subpoena
 8           (X)   Rules of Federal Civil Procedure

 9

10   ORIGINAL TO:

11           ( )   Witness
             (X)   Witness's attorney  (Ms. Quimby)
12           ( )   Producing attorney
             ( )   Signature waived
13

14   NUMBER OF DAYS FOR SIGNATURE

15           ( )   20 days
             (X)   30 days
16           ( )   Other:

17

     MISCELLANEOUS:
18
             ( )   Any objection made by one party good for
19                 all parties.

20           (X)   An unsigned copy may be used at any trial,
                   hearing, or arbitration proceedings.
21

22

23

24

25
```

John Toaru Ishiyama, Ph.D.    9/27/24

```
1              P R O C E E D I N G S
2              THE VIDEOGRAPHER:  Today is September
3  27th, 2024.  The time is 9:13 a.m.  We're on the record.
4                   (Witness Sworn)
5              MR. ALLEN:  Shall the attorneys state
6  their name for the record?
7              THE REPORTER:  Yes.
8              MR. ALLEN:  My name is Michael Thad
9  Allen for the Plaintiff, Timothy Jackson.
10             MS. QUIMBY:  My name is Mary Quimby.
11 I'm an Assistant Attorney General with the Texas Attorney
12 General's Office.  I represent the Defendants in this
13 matter and Dr. Ishiyama in this deposition.
14             MR. STOWERS:  I'm Renaldo Stowers, Deputy
15 General Counsel for the University of North Texas System.
16             MR. ALLEN:  I believe in attendance is
17 also my client, Timothy Jackson.  At least I believe I
18 saw him pop into the Zoom.
19             JOHN TOARU ISHIYAMA, Ph.D.,
20 having been first duly sworn, testified as follows:
21                DIRECT EXAMINATION
22 BY MR. ALLEN:
23     Q.   Good morning, Professor Ishiyama.
24     A.   Good morning.
25     Q.   Can you please state your full name for the
```

 1  record.

 2      A.    John Toaru Ishiyama.

 3      Q.    Can you spell that just for the record, please.

 4      A.    J-O-H-N, middle name is Toaru, T-O-A-R-U,

 5  last name, Ishiyama, I-S-H-I-Y-A-M-A.

 6              MR. ALLEN:  Thank you.  From time to

 7  time, I will be introducing exhibits, and I don't know

 8  where the share button -- there, it must be down here.

 9  There, it is.  I'm going to mark for the record

10  Exhibit 1.

11              (Deposition Exhibit Number 1 marked.)

12      Q.    Can you see this exhibit clearly, Professor

13  Ishiyama?

14      A.    Yes, the top part.

15      Q.    Okay.  And I wanted to introduce some of the

16  rules of the road for a deposition.

17              One of them is just exactly what you just did.

18  If you need, at any point, to examine an exhibit, a

19  portion that I don't have on screen, given that this is

20  a virtual deposition, just ask.  Obviously, no one wants

21  you to be answering questions about a deposition exhibit

22  that you can't see.

23              In this case, I'll scroll down.  This is the

24  entirety of the text on page 1.  And you'll see on page 2

25  are some signature blocks and so forth.

1          Have you had a chance to examine this exhibit?

2     A.   Not closely.

3     Q.   Would you like some additional time to examine

4  the exhibit?

5     A.   Could you scroll down a bit?  A bit further?

6  Yes, I've reviewed it.

7     Q.   And I'll represent to you that there is no

8  further text or pages to this document.

9          Is it accurate to say that you appeared for

10  today's deposition in response to this document,

11  Exhibit 1?

12     A.   Yes.

13     Q.   All right.  I don't have any further questions

14  to ask you about that exhibit.

15          Some other rules of the road, so to speak.

16  If, from time to time, you don't understand a question

17  that I've asked, please feel free to interrupt me at

18  any time.  Ask for clarification.  That's perfectly

19  acceptable.  Is that understood?

20     A.   Yes.

21     Q.   Likewise, if you do not ask for clarification

22  of a question, I will understand that you are

23  understanding the question as asked.  Is that clear?

24     A.   Yes.

25     Q.   Is there anything that would interfere with

*John Toaru Ishiyama, Ph.D.      9/27/24*

1  your ability to answer questions truthfully today,

2  Dr. Ishiyama?

3      A.   No.  But I would say that the audio is not

4  really great on this end.

5      Q.   All right.  So if, at any time, you can't hear

6  me or need me to speak up, I would ask you to just simply

7  interrupt me and tell me so.  Can you do that for me?

8      A.   Yes.

9      Q.   Another thing we have to do during a deposition

10 is there are many verbal or nonverbal cues that we use in

11 everyday conversation that I want us to avoid in the

12 deposition, because it prevents the court reporter from

13 making a clean record.  So if you could please answer

14 audibly things like yes or no instead of um-hum or

15 nodding your head, that is necessary for the court

16 reporter.  Is that clear?

17     A.   Yes.

18     Q.   Thank you.  From time to time, your attorney,

19 Mary Quimby, may object.  That does not relieve you of

20 the obligation to answer a question that is before you,

21 with some few exceptions, which will be very clear.

22 For instance, attorney-client privilege.

23          In those cases, I have no doubt that Attorney

24 Quimbly -- Quimby, excuse me, will instruct you not to

25 answer.  So like I said, it will be very clear.

1  Otherwise, you are required to answer the questions as

2  put to you notwithstanding any objection that your

3  attorney may make.  Is that also clear?

4      A.    Yes.

5      Q.    Also, this was sort of something that has

6  already happened, I think.  If, at any time, you need

7  a break, please feel free to ask.  We can break in the

8  deposition at any time.  However, I would ask that you

9  answer any question that is before you.  Is that also

10  clear?

11      A.    Yes.

12      Q.    Okay.  Thank you.  Have you ever been deposed

13  before, Professor Ishiyama?

14      A.    Yes.

15      Q.    When were you deposed before?

16      A.    When I was 17 years old.  It involved a civil

17  case.  I was involved in a car accident.

18      Q.    Is it fair to say that was an ordinary tort?

19            MS. QUIMBY:  Form.

20      A.    I'm not sure what you mean by tort.

21      Q.    Okay.  Were you the plaintiff?

22      A.    No.

23      Q.    Were you a witness?

24      A.    No.

25      Q.    What was your role in that litigation?

John Toaru Ashoyama, Ph.D.    9/27/24

1      A.    The plaintiff was suing my family for an
2 accident that happened.  But we -- yes, that was the
3 deposition.  It was found in our favor, though.
4      Q.    Okay.  Besides this car accident litigation
5 when you were 17 years old, have you been in any other
6 depositions?
7      A.    No.
8      Q.    Can you explain what you have done to prepare
9 for today's deposition?
10      A.    I have been asked to reread the report we
11 submitted.  I've done so.
12      Q.    Are you referring to the November 25, 2020
13 Ad Hoc Panel Report?
14      A.    Yes.
15      Q.    I believe we'll get to that today.
16           Were there any other documents that you
17 consulted in preparation for your deposition today?
18      A.    No.
19      Q.    Did you talk to anyone in preparation for
20 your deposition today?
21      A.    The attorneys and I spoke a few days ago
22 prior to this, but that's it.
23      Q.    Okay.  And I was going to say, I'm not -- I'm
24 going to ask you what you spoke to your attorneys about.
25      A.    Um-hum.

1      Q.    And you said that's it.  So I assume you have
2 not spoken to any other person in preparation for your
3 deposition?
4      A.    No, I have not.
5      Q.    Did you talk to anyone else about your
6 deposition?
7      A.    No, I have not.
8      Q.    Okay.  Approximately how long did you meet with
9 your attorneys?
10     A.    I don't actually recall the actual amount of
11 time.  It was on a Zoom or Teams.  I think it was a
12 couple of hours.
13     Q.    Okay.  Thank you.  I want to transition now to
14 talk about your career and publications and things that
15 have made up the substance of your academic career.
16     A.    Um-hum.
17     Q.    Can you briefly describe your educational
18 career?  I mean, the degrees you've earned, the
19 institutions you've earned them at, and so forth,
20 starting with your undergraduate degree?
21     A.    Um-hum.  I have a BA in political science and
22 history from Bowling Green State University, a Master's
23 degree in Russian history from the University of
24 Michigan, and a Ph.D. in political science from Michigan
25 State University.

1      Q.    When was the -- I think you may have said, but
2    can you remind me when you earned your Bachelor's of --
3    did you say Bachelor's of Arts in Bowling Green?
4      A.    Yes, that would be 1982.  My Master's degree
5    from the University of Michigan was in 1985.  And my
6    Ph.D. was completed in 1992 from Michigan State
7    University.
8      Q.    Did you work between your completion of the
9    Bachelor's degree at Bowling Green and your Master's
10   degree --
11     A.    No.
12     Q.    -- before you entered that program?
13     A.    I worked simultaneously.
14     Q.    What was your employment at that time?
15     A.    I was a chef.
16     Q.    Now, there seems to be very little time between
17   your Master's degree and the completion of your Ph.D.
18   Did you work between those two degrees?
19     A.    Only simultaneously part-time.  But actually,
20   my Master's was 1985.  My Ph.D. was 1992.  So seven years
21   passed.
22          Also, I did work as a professor at Truman
23   State University between 1990 and 1992.  I had achieved
24   the all but dissertation status, and they had hired me.
25   And then subsequent to my finishing, they hired me

 1  full-time.

 2      Q.    So that's going to be a good transition to the

 3  next question I was going to ask.  But before I do, are

 4  there any other credentials or degrees you've earned

 5  along the way since 1992?

 6      A.    No.

 7      Q.    And I was going to ask if you could describe

 8  your professional career in academia:  What jobs you've

 9  held, what capacity, from, it looks like, 1990, when you

10  started working for Truman University to the present.

11      A.    Yes.  I was -- my first 18 years in my career,

12  from 1990 to 2008, I was an assistant, associate, and

13  full professor at Truman State University in 2008.  I

14  came to the University of North Texas as a full professor

15  and have been here since.

16      Q.    And do I understand you are a political

17  scientist also at the University of North Texas?

18      A.    Yes.

19      Q.    What is your title at the University of

20  North Texas today?

21      A.    My official title is University Distinguished

22  Research Professor and Chair of the Department of

23  Political Science.

24      Q.    When did you become the chair of the Department

25  of Political Science?

1        A.    In 2022.

2        Q.    So that was after the -- what I'll just call

3    the Schenker controversy that we are going to talk about

4    today.  Would that be correct?

5        A.    Yes.

6        Q.    In 2020, what was your position at the

7    University of North Texas?  Were you a distinguished

8    university research professor at that time?

9        A.    Yes, I was.

10        Q.    When were you distinguished with that title?

11        A.    I do not recall the exact year, but it's been

12    quite some time.  I believe it was 2012, but I'm not

13    entirely sure about that date.  It is on my curriculum

14    vitae, though.

15        Q.    I understand.  Is it safe to say you've been

16    a distinguished research professor for over ten years?

17        A.    Yes, I think some of that would be accurate.

18        Q.    Were you the chair of the department of

19    poli-sci before 2022 in any capacity at any time?

20        A.    No.

21        Q.    Okay.  Have you had any other roles in the

22    administration at the University of North Texas?

23        A.    Not at the university level.  In my department,

24    I was a graduate -- the director of

25    graduate studies from 2019 until 2022.

1    Q.    Have you worked with many graduate students

2  in your capacity as a full professor?

3    A.    Yes.

4    Q.    How many graduate students have you produced in

5  terms of students who completed their Ph.D.s with you as

6  their primary dissertation advisor?

7    A.    I have 14 completed Ph.D. dissertations.  I

8  currently have six who I chair their committees.  I have

9  served on over 30 committees in some capacity.  In terms

10  of chairing the dissertations, it's 14.

11    Q.    And have you been successful placing the Ph.D.

12  students that have completed their degrees under your

13  mentorship in jobs?

14    A.    Yes.  All but one who's currently on the

15  market.

16    Q.    Very good.  Within -- not to the exact number,

17  but within reason, how many publications do you have to

18  your credit, Professor Ishiyama?

19    A.    Well, I have 10 books, 171 peer-reviewed

20  journal articles, and 39 peer-reviewed book chapters.

21    Q.    Have you ever published articles that are not

22  peer reviewed?

23    A.    No.  I mean, I would not call them articles.

24  There have been research reports.  There have been

25  summaries of conference proceedings, but I don't call

1  those articles.

2      Q.    I'm sure you've published numerous book reviews

3  as well, right?

4      A.    Yes, probably close to 70.

5      Q.    So of the 171 articles you mentioned, all of

6  those are peer reviewed in academic journals?

7      A.    Yes, they are.

8      Q.    Have you been the editor of -- edited volumes?

9  A book essentially, edited volume?

10     A.    Yes, I edited four edited volumes.

11     Q.    And have you served as the editor of an

12  academic journal?

13     A.    Yes, twice.

14     Q.    Can you state the name of the journals you have

15  served as editor?

16     A.    I was editor-in-chief of the American Political

17  Science Review, which is the leading journal

18  of our discipline, the most cited in the world, from 2012

19  until 2016.

20          From 2004 until 2012, I was editor-in-chief

21  and founding editor of the Journal of Political Science

22  Education, which is the second of the suite of journals

23  authored by the American Political Science Association.

24  I was also founding editor of that journal.

25     Q.    So I think you said you started in 2004, so

 1  it was founded in 2004?

 2       A.    Yes, it was.

 3       Q.    Okay.  Well, let's start with the American

 4  Political Science Review.  Did I get that right?

 5       A.    That's correct.

 6       Q.    While you were the editor, did you ever publish

 7  any articles that were not peer reviewed?

 8       A.    Never, no.  And --

 9       Q.    And when you were -- I'm sorry.  Please go

10  ahead.

11       A.    No.  There was a time the APSR published book

12  reviews, but they stopped doing that in 2011.  But in the

13  APSR, there were no non peer-reviewed articles.

14       Q.    And what about the political science education

15  journal that you mentioned?

16       A.    No.

17       Q.    From 2004 to 2012, did you publish any articles

18  as the editor-in-chief, which were not peer reviewed?

19       A.    No, none.

20       Q.    Okay.  So as you know, we are here to discuss

21  an academic journal that was published by the University

22  of North Texas Press called Journal of Schenkerian

23  Studies.  And I wanted to ask you when you learned that

24  there was a controversy surrounding the Journal of

25  Schenkerian Studies.

1          MS. QUIMBY:  Objection, form.

2     A.    Only after Provost Cowley told us.  I had

3  been unaware before that.

4     Q.    Have you had any collegial relationships in the

5  College of Music?

6     A.    No.

7     Q.    And you didn't hear about that controversy from

8  any media source?

9     A.    No.

10    Q.    Approximately when did you hear from Provost

11 Cowley that there was a controversy surrounding the

12 Journal of Schenkerian Studies?

13    A.    In August of 2020.

14    Q.    And can you summarize your understanding at

15 that time of what the controversy was about?

16         MS. QUIMBY:  Objection, form.

17    A.    I actually am not really sure what the

18 controversy was about.  I had heard there was some

19 debate at their conference, there was some controversy

20 involving a scholar who gave a talk, and then there was

21 the Journal had published something that was criticized

22 heavily.  But that's about all I knew.  I don't make it

23 a point of following these kinds of debates in other

24 disciplines.

25    Q.    I understand.  How did Professor Cowley reach

1  out to you?

2       A.    Provost Cowley sent a message.  I don't now

3  recall if it was a phone message or an email, but asking

4  if we would serve on some committee.  I was unsure.  And

5  she would give us details once we met.  But I don't

6  exactly recall how she communicated that, if it were --

7  I believe it was an email, but I'm not entirely sure.

8                    (Deposition Exhibit Number 2 marked.)

9                    MR. ALLEN:  Okay.  I'm going to mark for

10 the record Exhibit 2.  And I've just publish that to the

11 website here.

12      Q.    Do you see that exhibit?

13      A.    Yes.

14                    MR. ALLEN:  And I have to -- give me a

15 sec here.  I'm trying to mark these as we go, so that I

16 do not lose track.

17            So this is an email from Jennifer Cowley,

18 Exhibit 2, dated August 3rd, 2020.  It's to you,

19 Professor Ishiyama, as well as another recipient on

20 the cc line.

21            Does this help refresh your memory of when you

22 first learned about the committee you would serve on?

23      A.    Yes.  As I said, August 2020.  And I wouldn't

24 definitely entirely recall, but it was an email, yes.

25      Q.    And so this is the email where Provost Cowley

1  first reached out to you?

2      A.    Yes.

3      Q.    Okay.  And after Professor Cowley reached out

4  to you and the committee was formed, what was your --

5  but before you starting doing your work, what was your

6  understanding of your task?

7      A.    Our understanding, after meeting a few --

8  some days after this email, was that we were to review

9  the processes, editorial processes, of the Journal of

10 Schenkerian Studies to see whether it comported with

11 the recommended best practices in journal publishing.

12     Q.    All right.  Was that -- did Provost Cowley

13 refer to that as the charge of the committee?

14     A.    Yes, she did.

15     Q.    Okay.  And how did you -- how did she

16 communicate the charge of the committee to you?

17     A.    She met with us in a face-to-face meeting,

18 and that is where she gave the committee the charge.

19     Q.    Was that charge summarized or committed to

20 writing in any way?  Let me strike that question.

21          Professor Ishiyama, can you explain if that

22 charge was committed to writing?

23     A.    I believe it was.  I think there was -- she had

24 written a follow-up to tell us what the charge was. And

25 it was, again, to review the processes employed with the

John Toaru Ishiyama, Ph.D.    9/27/24

1  Journal and also specifically with Volume 12, if I

2  recall.

3      Q.    Okay.  Now, did she -- let me see if I

4  understood you correctly.  Did you just -- did you

5  intend to say that she communicated to you the

6  processes that had been used by the Journal --

7      A.    No.

8      Q.    -- or her understanding of them?

9      A.    No.  We --

10     Q.    I must have misunderstood.

11     A.    She wanted a --

12     Q.    Can you state for the record -- yeah, go ahead.

13  I see.  That was the subject of your review?

14     A.    Yes.

15     Q.    Okay.  And you nodded.  Can you just state for

16  the record your answer?

17             MR. ALLEN:  I'm sorry.  Did people hear

18  him or is it -- we may not be able to hear you.

19     A.    The answer is yes.

20             MR. ALLEN:  Okay.  Thank you, Professor

21  Ishiyama.

22          So I'm going to mark for the record Exhibit 3.

23               (Deposition Exhibit Number 3 marked.)

24     Q.    I'm just going to state for the record,

25  Professor Ishiyama, this has some text along the top

1 line.  Those are stamps that are placed on the document

2 by the United States District Court for the Eastern

3 District of Texas.  They were not added by either your

4 counsel or by me.  And this is -- this has to do with

5 the way the document has already been used in court.

6          But just in interest of fairness, I just

7 wanted to show you that, so you didn't think there was

8 something that I was hiding from you.  Is that fair?

9          Here is the title page.  Is this the Ad Hoc

10 Review Panel Report of November 25th, 2020, that you

11 mentioned in the introductory phase of our deposition?

12     A.    Yes.

13     Q.    Were you the author of this report?

14               MS. QUIMBY:  I think there's something --

15               MR. ALLEN:  I cannot hear him.

16          Professor Ishiyama, I don't know what's going

17 on, but I can't hear you.

18               THE WITNESS:  Shall I repeat my answer

19 then?

20               MR. ALLEN:  Now, I can hear you.

21     Q.    Yes.  Can you repeat your answer for the

22 record?

23     A.    This doc -- and the answer was no.  This

24 document was collectively written by the committee as a

25 whole.  We all contributed to it.  I don't think it's

 1  accurate to say I'm the author.

 2      Q.   Okay.  Were you the -- did you draft the
 3  first rough draft?

 4      A.   No, I actually did not.  Matthew Truelove took
 5  the first draft, although it evolved over time because
 6  the committee reviewed it again and again and again, so
 7  it's quite different from the first draft.  But Matthew
 8  Lemberger-Truelove took the first draft.

 9      Q.   Okay.  What was your role on the committee?
10  Did you have a specific title or a specific role?

11      A.   No.  In fact, I would say that I had asked
12  the provost not to make me chair, because that would be a
13  condition of my service.  I had no official role on the
14  committee other than being a part of it.

15      Q.   Who was the chair of the committee, if there
16  was one?

17      A.   There was no chair of the committee.

18      Q.   Let me -- I'm just going to skip through the
19  document right now.  We'll have a chance to come back
20  to it.  I'm not going to ask you to review it in its
21  entirety at this time.  I want to skip to some of the
22  exhibits that were included in the Ad Hoc Panel Report,
23  Exhibit 3, that are attached to the end.  Here's the
24  exhibits designation page.  Do you remember that being a
25  part of the Ad Hoc Panel Report?

 1      A.   Yes, it was attached after we had completed and
 2  submitted the report.
 3      Q.   And then the first exhibit is this email.  Do
 4  you see that on screen, Professor Ishiyama?
 5      A.   Yes.  It's a bit small, but yes, I do see it.
 6      Q.   Would it help me -- excuse me.  Would it help
 7  you if I expanded it a little bit?
 8      A.   Yes.
 9      Q.   Is that easier to read?
10      A.   Yes.
11      Q.   So I just had a couple of brief questions.
12  You had mentioned there was a follow-up email concerning
13  the charge to the committee.  You believe that the charge
14  was committed to writing in some form.  And my question
15  for you, is this the email that committed the charge to
16  the panel in writing?
17           MS. QUIMBY:  Objection, form.
18      A.   I am not -- if this was the charge, but it
19  certainly includes the charge of what the committee was
20  supposed to do.
21      Q.   Where does it include the charge?
22      A.   The University of -- after -- in this
23  paragraph, I think that begins with, "The University has
24  appointed a five-member multidisciplinary panel.  The
25  panel members, who are outside the College of Music,

1  will examine objectively the processes followed in the

2  conception and production of volume 12 of the Journal of

3  Schenkerian Studies.  The panel will seek to understand

4  whether the standards of best practice in scholarly

5  publication were observed and will recommend strategy

6  to improve the editorial processes where warranted."

7          That would be the charge.

8      Q.   Is it your testimony today that -- I'm

9  highlighting what I believe you just read.  Did I

10  highlight that correctly?

11      A.   Yes.  And at the end of it, it said that a

12  report -- that we should submit a report, and the report

13  will be made public.  That is, as I understand it, being

14  the charge to the committee.

15      Q.   These two paragraphs, one above and one below,

16  that are also in italics, were those also part of the

17  charge?

18      A.   I do not recall that.  I -- we focused

19  exclusively on the paragraph that said what the committee

20  or the panel would be doing.

21      Q.   Uh-huh.  The -- and I should have asked this

22  first off.  You do remember receiving this email on

23  August 5th, 2020, correct?

24      A.   Yes.

25      Q.   What was your understanding of what this

John Toaru Ishiyama, Ph.D.     9/27/24

1  email meant in the paragraph that starts off, "The

2  University of North Texas is committed to academic

3  freedom and the responsibility that goes along with

4  this freedom."

5      A.    I don't actually -- we didn't interpret that.

6  I don't -- I'm not the one who wrote it, so I guess

7  Provost Cowley would be the better person to answer that.

8  But we were focused on the second paragraph.  That was

9  the charge.  The entire focus of our committee was on

10 the charge.

11     Q.    So you didn't consider this part of the

12 obligations or duties of the ad hoc panel, this first

13 sentence that I just read.

14            "The University of North Texas is committed to

15 academic freedom and the responsibility that goes along

16 with this freedom."

17     A.    That was not what the committee was charged

18 to determine.

19     Q.    Okay.  And does that go for the second sentence

20 here in that paragraph?

21            "This dedication is consistent with and

22 not in opposition to our commitment to diversity and

23 inclusion into the highest standards of scholarship

24 and professional ethics."

25     A.    No.  The committee did not consider that

John Toaru Katayama, Ph.D.      9/27/24

1  because that was the statement made by the provost.
2  Again, we focused entirely on the charge of the
3  committee.

4      Q.    Okay.  And I think you've indicated what
5  the answer will be to this question, but I've just
6  highlighted the paragraph that follows what you've
7  identified as the charge to the committee that reads,
8  "The Journal of Schenkerian Studies has made many
9  contributions to the understanding of music theory,
10 to offer music theorists the opportunity to share and
11 defend diverse viewpoints under the most rigorous
12 academic standards and ethics."

13         Did I read that correctly?

14     A.    Yes.

15     Q.    And do I understand from your testimony that
16 this was also not considered by the panel as something
17 they were charged with investigating concerning the
18 Journal of Schenkerian Studies?

19     A.    Yes, we did not consider this.

20     Q.    Okay, thank you.  So it is fair to say, and
21 correct me if I'm wrong, that you considered the charge
22 very narrow in scope?

23         MS. QUIMBY:  Objection, form.

24     A.    We considered the charge, the specific
25 instructions, the charge from the provost, which is

1 represented by the paragraph that I highlighted.

2      Q.    And my question was, you considered that very

3 narrow in scope?

4      A.    Yes.  Very narrow, along with, as we

5 understood, this charge to be; that it was about

6 editorial processes.

7      Q.    And do you recall my client, Timothy Jackson,

8 asking the panel about the scope of the investigation

9 being conducted by the ad hoc panel?

10      A.    Yes, I do.  And we had told him exactly what

11 I'm telling you.

12      Q.    That the scope was narrow and it was confined

13 to this paragraph --

14      A.    Um-hum.

15      Q.    -- that we just read?

16      A.    Yes.

17      Q.    Okay.  At any time, did the panel stray from

18 this narrow focus in its duties?  Excuse me, strike that.

19           At any time, did the panel stray from this

20 narrow focus in carrying out its duties?

21      A.    No.  I was insistent on that.

22      Q.    Thank you.  Were you aware that the

23 investigation had already been announced in the

24 College of Music by Dean John Richmond?

25                MS. QUIMBY:  Objection, form.

1    A.    No, I was not.  And John Richmond did not
2    mention this to us when he testified before the
3    committee.

4    Q.    Did you ask him?

5    A.    No.

6    Q.    Do you think that would be relevant to the
7    committee?

8    A.    No.

9    Q.    Were you aware that the College of Music had
10   put the fact that there would be an investigation of the
11   Journal of Schenkerian Studies up on the official website
12   of the College of Music?

13   A.    No, I was not.

14   Q.    Did you think that would be relevant to the
15   committee?

16   A.    No, it would not be, given our charge.

17   Q.    At some point, you referenced -- you,
18   meaning the committee in general, Professor Ishiyama,
19   the standards of COPE, C-O-P-E.  Do you recognize that
20   acronym?

21   A.    Yes.  It stands for the Council on Publication
22   Ethics.

23   Q.    Is it -- sorry.  Just for clarification, is
24   it council or committee?

25   A.    I believe -- I do not recall exactly what the C

1  stands for.  It could be either.  But we call it COPE.

2  Those of us who are editors call it COPE.

3       Q.   Okay.  And I don't mean to quibble.  I just

4  want to make a clear record for the Court.

5       A.   Um-hum.

6       Q.   And what was your understanding of the standard

7  of COPE?

8       A.   They have multiple standards.  I'm not sure

9  which ones you would like me to refer to.

10      Q.   Which ones were you applying when you analyzed

11 the Journal of Schenkerian Studies?

12      A.   COPE, among many things, says that the review

13 processes should be made public and available to those

14 who are submitting their articles and those who are

15 reviewing.  COPE also has fairly strict guidelines

16 about self-publication and also what constitutes

17 adequate peer review.  And they are particularly

18 mindful of self-publication by editors.  They have

19 other things --

20      Q.   By self-publication -- sorry, go ahead.

21      A.   They have other standards regarding anonymous

22 authors.  And also, if something is not peer reviewed,

23 the requirement that there is some disclaimer that

24 publicly appears in that journal.  But there are

25 multiple standards that COPE puts forward that we all

1  subscribe to.

2      Q.    When you say, "we all," who are you referring

3  to?

4      A.    At least all of the journal editors who were in

5  that room were familiar with COPE.  I would -- and I

6  cannot speak to all editors in the world.  But I would

7  suggest that the major publishers all abide by COPE.

8      Q.    When did COPE come into being, if you know?

9      A.    I do not recall.  It has been around for

10  some time, but I could not tell you when it was founded.

11      Q.    Do you recall Timothy Jackson asking about

12  the nature of the COPE standards that the panel was

13  applying?

14      A.    I do not recall specifically, but I believe

15  he did ask about them.  He appeared to be unaware what

16  those standards were.

17      Q.    And what did you provide to him?

18      A.    I gave -- we gave him the website and the

19  PDF document that outlined COPE standards for editors.

20      Q.    Does COPE have a standard concerning how

21  contributors to a volume, an edition, a symposium, a

22  commentary should be invited?

23      A.    No, it doesn't have that as its editorial

24  process.  It does, however, have requirements about the

25  review and especially peer review.

1        Q.    Um-hum.  Let's start with peer review.  What do

2   you understand as -- because you have to understand, the

3   jury is probably not familiar with what academics mean by

4   peer review.  So could you just explain what a journal

5   editor means by peer review?

6        A.    Well, there are multiple forms of peer

7   review.  I can speak to the ones of the journal that I

8   edited.  It's called double-blind peer review, meaning

9   that the author nor the reviewer knows the identity of

10  the other.  Minimally, we applied at least two reviews

11  of every article.  And oftentimes, more.

12       Q.    And there's been some confusion among

13  witnesses, understandably so, that double-blind means

14  only two people.  But if there were three reviewers, it

15  would be triple-blind.  But I understand what you're

16  saying is the double refers to the fact that both the

17  reviewer and the author are not permitted to know the

18  identity of the other to facilitate an impartial review.

19  Is that a fair summary of double-blind peer review?

20       A.    Yes, it is.

21       Q.    Did you do any survey of other journals in the

22  music theory field to determine whether it was common

23  practice in music theory not to subject some articles to

24  peer review?

25       A.    No, we did not.  We were asked to -- in our

```
 1  estimation and our experience, whether we thought that
 2  best practices were being followed, that did not extend
 3  to us conducting a survey.
 4              MR. ALLEN:  I'm going to mark for the
 5  record -- am I up to Exhibit 4, Madam Court Reporter?
 6              THE REPORTER:  Yes.
 7              (Deposition Exhibit Number 4 marked.)
 8      Q.   So I've marked as Exhibit 4 for the record a
 9  document which is called COPE Guidelines:  A short guide
10  to ethical editing for new editors.
11           Did I read that correctly, Professor Ishiyama?
12      A.   Yes.
13      Q.   Do you recognize this document?
14      A.   Yes.
15      Q.   Was this a document relied upon by the
16  committee to inform them of guidelines and practices,
17  standards of COPE?
18      A.   I would have to look through it all again.
19  But yes, I believe so.
20      Q.   Okay.  And I was hoping we would find an answer
21  here to our committee versus council question,
22  but I don't see anything particularly.  That's fine.
23  We will go to -- there's a section that's titled The
24  Peer-Review Process.
25           Do you see that?
```

1        A.    Yes.

2        Q.    Does COPE require a sort of one-size-fits-all

3   peer-review process?

4        A.    No.

5        Q.    And, in fact, it says here --

6        A.    You asked me about my experience, so -- but no,

7   they do not.

8        Q.    Yeah.  Well, I also asked you about whether you

9   surveyed journals in the music theory area to determine

10  what peer review methods were used in that field, right?

11       A.    No.  We did not, because we did not think

12  that was relevant and part of the charge.

13       Q.    Thank you.

14       A.    The charge was that we viewed in our experience

15  whether best practices were being followed.

16       Q.    Did you expect the music theory journal to

17  follow the best practices of a political science

18  journal?

19       A.    I expect all journals to follow best practices

20  to guarantee a transparent review process that is with

21  integrity and that there is the -- that they follow

22  the guidelines of COPE, but also make sure that

23  self-publication is not one of those things.

24       Q.    So here, under the peer-review process,

25  Number 8, it says, "Adopt a peer-review process

John Toaru Matsuyama, Ph.D.     9/27/24

 1  that is appropriate for your journal/field of work and

 2  resources/systems available."

 3          Did I read that correctly?

 4      A.   Yes.  May I ask?  The second line, the

 5  clarification about the number of reviewers.  So it does

 6  suggest that reviewers should be used, and they should

 7  be anonymous.

 8      Q.   What did you do to determine what peer-review

 9  process was appropriate for the Journal of Schenkerian

10  Studies?

11      A.   We were not asked to determine what is

12  appropriate, but what was inappropriate.  And so given

13  our experience as editors, what standards we would apply

14  to evaluating whether those recommended standards were

15  followed, I don't believe they were.

16      Q.   In your expertise as an editor, is it your view

17  that any academic journal that publishes an article

18  without peer review or without clearly -- let me strike

19  that and ask this in two parts.

20          Based on your experience as an editor and the

21  tasks you were asked to carry through as part of the ad

22  hoc panel --

23      A.   Um-hum.

24      Q.   -- was it your view that an academic journal

25  that did not have a transparent process or peer review

1  was not appropriate for academic publication?

2       A.    I would not make a blanket statement like that.

3  But if the journal is representing the publications as

4  peer-reviewed journal articles, then I certainly do think

5  they should follow some process of -- that is typical for

6  peer review.  You know, many journals I know publish

7  other things other than peer-reviewed journal articles,

8  such as opinion editorial pieces or other items like book

9  reviews.  But if they represent these as peer-reviewed

10  journal articles, they should be peer reviewed.

11       Q.    Where did Timothy Jackson represent the

12  Symposium in Volume 12 of the Journal of Schenkerian

13  Studies as peer reviewed, to your knowledge?

14       A.    If it appeared in the journal, the suggestion

15  is that it was peer reviewed if the journal claimed it

16  was a peer-reviewed journal.  Now, symposium are not

17  separate from that standard.

18       Q.    So a journal that claims to be a peer-reviewed

19  journal, but publishes articles that are not peer

20  reviewed, without a transparent process, that would be

21  inappropriate in your view?

22       A.    This they -- only if they did not clearly

23  indicate in the section of the journal that this was not

24  peer reviewed.

25       Q.    And there's been some discussion in our --

 1  among our witnesses that we've deposed in this case that
 2  just as you've said, Professor Ishiyama, there are
 3  different kinds of review and so forth, unsurprising in
 4  the academic field, I think.  So I want to ask you a
 5  question about one type of -- I'll just call it vetting
 6  of publications that's come up.  It's when a presentation
 7  is submitted for consideration to a conference and
 8  subsequently published in a journal.  Is that a common
 9  practice in academia?
10             MS. QUIMBY:  Objection, form.
11       A.    I do not know if it's common, but I have
12  heard of it, that the presidential addresses are
13  published in journals, but there's always a clear marker
14  saying that this has not been peer reviewed and was a
15  public presentation at a conference.
16       Q.    And if that's not given, is that inappropriate
17  for such a publication?
18       A.    I don't understand.  Could you repeat the
19  question?  I don't actually understand it.
20       Q.    Sure, sure.  And this is a great example of
21  asking for clarification, so thanks.
22             You just described several kinds of papers
23  that might be published in a journal, which were given
24  as conference presentations.  Did I understand your
25  testimony right?

John Toaru Ashiyama, Ph.D.      9/27/24

1        A.    Well, I would have to say what I'm aware of
2   is that sometimes, presidential addresses, that if you're
3   president of an association, that it will be published in
4   a journal, but there's a clear indication in the journal
5   that this is a presidential address and stands different
6   from the other peer-reviewed articles that appear in the
7   journal.
8        Q.    And if there is no such clear transparent
9   declaration, that's inappropriate, right?
10             MS. QUIMBY:  Objection, form.
11       A.    I -- well, inappropriate?  I would say it's not
12  a best practice, clearly not a best practice.
13       Q.    Well, and I guess you are now saying you can
14  identify things that are not best practice.  And when
15  we talked about peer review concerning the Journal of
16  Schenkerian Studies, you said your task was to identify
17  what was inappropriate, right?  So that's the source of
18  my question.  Go ahead.
19       A.    The charge didn't mention inappropriate.  It
20  said whether or not the Journal followed best practices,
21  and we stuck to that.  Whether or not it was appropriate,
22  I think, is not the question.  The question is given our
23  experience, did the Journal follow best practices in
24  terms of publishing.
25       Q.    Okay.  So I'm asking you to clarify your

*John Toaru Aoyama, Ph.D.*     *9/27/24*

1  testimony then.  Before, I asked you what you did to

2  find out what the appropriate processes for the Journal

3  of Schenkerian Studies were to peer review articles,

4  and you said that wasn't your task.  Your task was to

5  determine what was inappropriate.  Do you remember saying

6  that?

7      A.   I do not recall.  But we're sticking straight

8  to what the charge was, and I want to stick to that

9  charge.  That's what we were asked to do.

10     Q.   Okay.  And you stuck to that charge in all

11 respects, right?

12     A.   Yes, yes.

13     Q.   So there's another kind of conference

14 proceedings that are published, at least among witnesses

15 that we've deposed have testified to, and I would like

16 to ask you about that.  That's where people apply to a

17 conference committee or whatever to present at the

18 conference, and then subsequently, those papers are

19 published in a journal.

20          The process that's been described -- I'm just

21 going to represent this to you -- someone will submit

22 something like a 450-word précis, maybe a bibliography,

23 something of that nature, which explains the kind of

24 paper they want to give.  That will be reviewed by a

25 conference program committee.  It will be accepted.  Then

John Toaru Aoyama, Ph.D.      9/27/24

1  a discussion will be had with an editor of a journal of

2  one kind or another, and the paper presented at the

3  conference will be worked up into a full-length article

4  and published.  Are you familiar with that kind of review

5  process?

6      A.    I am aware that these happen, but I think

7  that you are referring to conference proceedings, and

8  it's conference proceedings, which is the first part.

9  Whether or not they're published in a journal is subject

10  to peer review in the second part.  So I think these

11  seem to be conflated.  Conference proceedings are very

12  different than journal --

13      Q.    I'm not talking about publishing straight

14  up conference proceedings.  So please understand, I'm

15  talking about where someone gets their paper in, presents

16  it.  It's recruited by an editor for publication in a

17  journal, whether specialized or general.  It doesn't

18  matter.  Then that paper is published in the journal.

19          My question then is that does not count,

20  according to you, as peer review, correct?

21      A.    No, that's incorrect.  That is incorrect.

22  These -- from what I'm aware of, papers that are

23  recruited from a conference by an editor to appear in

24  a special issue still undergo peer review in my

25  experience on this several times.

1    Q.   Okay.  I'm sorry -- I'm sorry to interrupt,

2   Professor Ishiyama.  And I try not to do that.  But I

3   actually wasn't asking that, so I wanted to be more clear

4   and then give you a chance to answer.

5         What I mean is the second phase, what I think

6   you called the second phase -- there's the presentation

7   that's the first phase.  Then there's a subsequent

8   publication in a journal where the presentation is

9   worked up into a longer piece and published.

10        At the second phase in the examples that we

11  have heard in deposition, there is no double-blind peer

12  review, but the article is published anyway in a journal.

13  And let me back up and ask, are you familiar with that

14  process?

15   A.   No.  Given my experience, no.

16   Q.   Okay.  And what I just described, a

17  précis reviewed by a program committee, then articles

18  subsequently published in a journal without double-blind

19  peer review, would you count that as a peer-reviewed

20  article?

21   A.   By précis, you mean the same thing as a journal

22  article?  Because there are many publications that are

23  not journal articles, that are summaries of something --

24   Q.   No.

25   A.   -- or proceedings or recordings.

1    Q.   No, not a summary.  I'm going to describe the

2  exact situation.  I am.

3    A.   Hmm.

4    Q.   Well, I'll tell you what.  I'll make this a

5  little bit easier by giving a concrete example; is that

6  fair?

7    A.   Certainly, yes.

8              (Deposition Exhibit Number 5 marked.)

9              MR. ALLEN:  I'm going to mark for the

10  record as Exhibit 5 the title page of Volume 26, 2020, of

11  the journal published by the University of North Texas

12  Press, Theoria.  This is also edited by a professor at

13  the University of North Texas named Frank Heidlberger.

14  And this is the title page of that volume.  Do you see

15  the exhibit, Professor Ishiyama, Exhibit 5?

16    A.   If that's the title page, I do see.

17    Q.   And I'm just scrolling down.  It does clearly

18  list an advisory board.  Do you see that?

19    A.   Yes, yes.

20    Q.   And that it's published by the University of

21  North Texas.  We see that here at the bottom of the first

22  page, right?

23    A.   Yes.

24    Q.   Now, I'm just scrolling down for you to give

25  you -- all I have here is the title page.  Obviously, I'm

1  not going to ask you in deposition time to read a full

2  journal article.  But this is the title page of Theoria,

3  Historical Aspect of Music Theory, Volume 26, 2020, and

4  the title page includes articles, right?

5       A.   Yes.  That's what the title says.

6       Q.   And I'm just -- and I know the entire journal

7  isn't here for your perusal.  But do you see any clear

8  indication in the title page that any of these articles

9  have not been subjected to peer review?

10              MS. QUIMBY:  Objection, form.

11       A.   Can you -- can you scroll down, so I may see

12  the entire --

13       Q.   Yeah, there's not much left.  See?

14       A.   There is no note indicated, because this is

15  only an excerpt from a particular issue.  There's nothing

16  in notes, no disclaimer, nothing else.  It's hard for me

17  to determine just based upon --

18       Q.   Okay.  To my knowledge -- to my knowledge,

19  there is not.  But if there is, I'm sure your attorney,

20  Mary Quimby, will be able to point that out for the

21  Court.  I'm going to ask you -- well, I think we can

22  agree, on this title page, there is no such designation,

23  correct?

24       A.   Those designations don't necessarily appear on

25  the title page.  Sometimes, they're in the second page.

John Toaru Akiyama, Ph.D.      9/27/24

```
 1  Sometimes, they're in the note to that particular
 2  article.
 3       Q.    Okay.
 4       A.    But no, I don't see anything here.  But I'll
 5  trust that you've read it, so...
 6       Q.    Well, and maybe we will go back and read
 7  it and educate ourselves.  But I want to ask you some
 8  questions about what you consider to be peer reviewed
 9  and what you don't.
10       A.    Um-hum.
11       Q.    There's a Russian music theory panel listed
12  that starts on page 55 of this journal.  Do you see that?
13       A.    Yes, I do.
14       Q.    And there's an article published by Ellen
15  Bakulina, who is a faculty member at the University of
16  North Texas and a colleague of Frank Heidlberger.
17       A.    Yes.
18       Q.    The editor of this journal.
19       A.    Yes.
20       Q.    There's Philip Ewell.  There's been a
21  longer piece by Ellen Bakulina and then an article by
22  Christopher Segall.  And I'm going to represent to you
23  that those were all part of this Russian music theory
24  panel.  Okay?
25       A.    Um-hum, yes.
```

1      Q.    And testimony has indicated that these were

2    reviewed in exactly the way that I have informed you;

3    that there was an abstract or précis or whatever you want

4    to call it, a short description of what someone wanted

5    to give as a conference paper submitted to the program

6    committee of the SMT.  Do you know what the SMT stands

7    for, just so we avoid confusion?

8      A.    I believe it stands for the Society of Music

9    Theory.

10     Q.    Correct.  So in 2018, this was a panel

11   presented at the conference, an annual conference.

12   Afterwards, these articles were recruited to the

13   journal.  They were built up from the conference papers

14   into longer articles.  It looks like Philip Ewell's

15   article here is approximately 24 pages, 23 or 24 pages,

16   and published, but there was no double-blind peer review

17   before these articles appeared in the journal.

18     A.    Um-hum, yes.

19     Q.    Those are the -- those are the facts that I'm

20   summarizing to you.  Now, my question, and I'm sorry for

21   being a bit long on that, is based on your expertise,

22   would you consider that peer review?

23               MS. QUIMBY:  Objection, form.

24     A.    Now, peer review is a review by peers in the

25   field.

1       Q.   Correct.

2       A.   I think what you are referring to is what we

3  call editor reviews, which are not the same standard as a

4  peer-reviewed article.

5       Q.   Okay.

6       A.   These are generally reviewed by the editor

7  along with multiple others or several others on the

8  editorial board who review it.  Now, I'm not sure if

9  that's what happened here.  But that could happen, an

10  editor review process, but not necessarily a peer-review

11  process.

12      Q.   If an editor held out these articles as, quote,

13  peer reviewed, in your view, would that be appropriate?

14            MS. QUIMBY:  Objection, form.

15      A.   Well, just like I don't want to say anything

16  about judgment of whether it's appropriate or not, but

17  it's not best practice.  It really is not.  If you want

18  to represent it as peer-reviewed, it's not.

19      Q.   That's all I'm trying to get at.  You wouldn't

20  consider articles published in the way that I've just

21  described to be fully peer-reviewed in the sense of

22  double-blind peer review that we've discussed, correct?

23            MS. QUIMBY:  Objection, form.

24      A.   That's true.  And if it's represented as peer

25  reviewed, then that would be inaccurate.

1      Q.    Okay.  And just to sew up this line of

2   questioning, that would be true for any journal, any

3   academic journal, correct?

4      A.    No.  Some journals, they say -- they

5   represent themselves as peer reviewed.  And they say

6   it's peer reviewed unless, if it is not, then it's

7   clearly indicated somewhere that it was either editor

8   reviewed or not reviewed at all.

9      Q.    So that would -- the process we've just

10   described would not be best practice for a peer-reviewed

11   academic journal?

12      A.    True.  If they are representing the contents as

13   peer reviewed, this would not be best practice.

14      Q.    Okay.  Now, for the Symposium in Volume 12

15   of the Journal of Schenkerian Studies, is it your

16   understanding and your expertise, that if the call for

17   papers had clearly indicated that the Symposium would

18   not be peer reviewed, that would be best practice?

19            MS. QUIMBY:  Objection, form.

20      A.    I have not seen the call papers, but I couldn't

21   say.

22      Q.    You've never seen the call for papers that

23   the Journal of Schenkerian Studies sent out to solicit

24   articles?

25      A.    I do believe -- I do not recall seeing it.

John Toaru Ishiyama, Ph.D. 9/27/24

49

 1  But perhaps among the volume of materials we reviewed,

 2  it was there.  But I do not recall seeing, if we did,

 3  that there was a specific thing that this would not be

 4  peer reviewed.  But again, this is four years ago.

 5       Q.    I'm not saying it did.  I'm saying if it had,

 6  that would be appropriate?

 7            MS. QUIMBY:  Objection, form.

 8       A.    If it had -- may I ask for clarification?  If

 9  it had included a counterfactual, because it may not

10  have, if it had, would that be --

11       Q.    I'm not asking you that.  Yeah, so it sounded

12  to me like your testimony was that journals should be

13  very clear about how they're reviewing or not reviewing

14  works.  And as long as they do that and are aboveboard

15  and it's transparent, then that's best practice in the

16  academic journal industry, for lack of a better word.

17       A.    Yes, I would -- I would think so, yes.  But it

18  should be included in the journal itself.

19       Q.    Right.  And that -- to make sure which

20  papers -- is it a fair analogy to say the customer,

21  namely, the reader, needs to know what they're getting?

22       A.    It should be transparent, yes.

23            MR. ALLEN:  Okay.  I want to mark for

24  the record Exhibit 6.

25            (Deposition Exhibit Number 6 marked.)

1        Q.    Can you see this email, Professor Ishiyama,

2   that I'm marking as Exhibit 6 for the record?  It's from

3   you, John Ishiyama, to Timothy Jackson, with what I take

4   to be the members of the ad hoc panel on the CC line as

5   well as an attorney named Renaldo Stowers who's in the

6   room with you, and myself, Michael Allen.

7             Did I read that correctly?

8        A.    Yes.

9        Q.    Do you recognize this email?

10       A.    Yes.

11       Q.    And it's October 4th -- excuse me,

12  October 14th, 2020, right?

13       A.    Yes.

14       Q.    Now, I hope you'll bear with me.  And I'm going

15  to do something which I confess to you drives me crazy

16  when people scroll through documents in front of my eyes.

17  It makes me cross-eyed.  But I'm going to have to do it

18  to bring you down to the previous message.  It's

19  in the nature of emails that they go from backwards

20  forwards.  And you see Timothy Jackson emailed you on

21  Wednesday, October 14th, in the email at the bottom of

22  this page?

23       A.    There is another -- at the bottom, there's one

24  that says October 13th.  Are you referring to one that's

25  not on bottom, but above it?  That one there.

1       Q.    Yeah.  Now, I'm happy to give you -- this is
2  the whole email string.  If you want to review it all,
3  I'm not trying to hide it from you.

4       A.    Um-hum.

5       Q.    But I'm not going to be asking you questions
6  about this.  Of course, your attorney can come back
7  around and ask questions about it if she so chooses.

8       A.    Um-hum.

9       Q.    So I just want to take you back up here.  I
10 mean, is it fair to say these are emails conducted in
11 the ordinary course of business of the ad hoc panel as
12 you understood it?

13      A.    In communication and response to Dr. Jackson,
14 yes.

15      Q.    Yeah.  And of course, you were the one who
16 received this email and maintained it in your email,
17 correct?

18      A.    Yes, I did.

19      Q.    And this was just the ordinary kinds of emails
20 you would be exchanging on a regular basis with people
21 you were interviewing and other members of the committee,
22 right?

23      A.    As far as it pertains to the committee's work,
24 yes.

25      Q.    Thank you.  So here, Timothy Jackson, I'm just

1  talking about this email which I've highlighted for you,

2  Wednesday, October 14th, 2020, he asks, "Thanks for this,

3  John" -- referring to a previous email.  "I have looked

4  at the COPE website, and they seem to have quite a few

5  policy statements mostly geared to coping with research

6  fraud and plagiarism issues.  Are there specific policies

7  of COPE that the ad hoc committee thinks are relevant

8  here?  I hope the panel is also prepared to discuss how

9  to maintain the integrity of an academic journal in

10 the face of widespread calls for censorship and the

11 repression of unpopular viewpoints.  Will the panel be

12 addressing that?  Thanks, Tim."

13         Did I read that correctly into the record?

14 A.    Yes.

15 Q.    Okay.  And is it fair to say that you then

16 answered by explaining the nature of COPE to Tim in that

17 first numbered paragraph, numeral 1?

18 A.    Yes.

19 Q.    And you linked the website of the COPE,

20 right?

21 A.    Yes.

22 Q.    And then consistent with your --

23 A.    It also has the PDF.  It also has the PDF.

24 Q.    Is that where that PDF that we marked as the

25 previous Exhibit Number 4 came from?

 1        A.    Yes, as far as I recall.

 2        Q.    Is that the PDF you are referring to or a

 3   different one?

 4        A.    Yes, this one.

 5        Q.    Exhibit 4?  Is that yes?

 6              MR. ALLEN:  Did I not hear that, Kim?

 7        A.    Yes.

 8        Q.    Thank you.  And could you read paragraph 2 into

 9   the record, which I think you've testified to before, but

10   I would just like you to read this answer

11   to Timothy Jackson's question about academic freedom

12   into the record for us.

13              MS. QUIMBY:  Objection, form.

14        A.    Can I ask for a clarification?  Paragraph 2

15   does not refer to academic freedom at all.

16        Q.    Did you see here that Timothy asked the

17   question, Timothy Jackson, "I hope the panel is also

18   prepared to discuss how to maintain the integrity of

19   an academic journal in the face of widespread calls for

20   censorship and the repression of unpopular viewpoints.

21   Will the panel be addressing that?"

22              And you've already testified that I read that

23   correctly.  Am I mistaken, that paragraph 2 of your

24   response to Timothy's email, Timothy Jackson's email,

25   did not respond to that question?

John Toaru Ishiyama, Ph.D.      9/27/24

1      A.   No, it did respond to the question.  You asked
2  me if it included a mention of academic freedom, and it
3  does not.  It was in response, saying clearly that the
4  answer is no.
5           "The panel's charge is narrow, to only
6  investigate the journal's editorial processes including
7  management, peer review, and other processes related to
8  journal production.  The focus of our questions will only
9  be on these issues.  You are free to add information that
10  you believe the panel should know after we have had the
11  opportunity to ask our questions."
12      Q.   Okay.  And I believe you've already answered my
13  question.  That was your response to Timothy's question,
14  whether you would be investigating the infringement of
15  his academic freedom?
16           MS. QUIMBY:  Objection, form.
17      A.   Again, our charge was very narrow, and we stuck
18  to it.
19      Q.   Okay.  And I'm just trying to build the record
20  of the documents that establish what you were doing in
21  the ad hoc committee.  And I know that was consistent
22  with your previous testimony.  So this is simply part of
23  the process, Professor Ishiyama.
24      A.   Um-hum, okay.
25      Q.   I wasn't -- I wasn't suggesting that you were

 1  misrepresenting something here.

 2              MS. QUIMBY:  Can we take a break?  It's

 3  been about an hour.

 4              MR. ALLEN:  You know, I had not been

 5  aware of that, and I've just been charging through.

 6  And that's fine.  Shall we go off the record?

 7              MS. QUIMBY:  Yes.

 8              THE VIDEOGRAPHER:  Off the record at

 9  10:21.

10              (Recess taken)

11              THE VIDEOGRAPHER:  The time is 10:37.

12  We're on the record.

13       Q.    Thank you, Professor Ishiyama.  I want to go

14  back to Exhibit 3, which is the Ad Hoc Panel Report, and

15  I wanted to ask you another question about the charge

16  that you testified to earlier in Exhibit 3.

17              In the charge that you read into the record,

18  you were instructed to examine objectively the processes

19  followed in the conception and production of Volume 12

20  of the Journal of Schenkerian Studies, right?

21       A.    Yes.

22       Q.    Can you explain for the Court what you

23  understood as an objective investigation?

24       A.    Well, given the charge, it was to evaluate the

25  processes that were listed by the Journal in terms of

*John Toaru Ishiyama, Ph.D.      9/27/24*

1  editing Volume 12.  In light of our experience as editor,

2  that we should only focus on the charge, which was to

3  investigate the processes, and not the influence by other

4  things related to the production of Volume 12.

5      Q.    And is it objective, in your understanding of

6  research or investigations, to ignore exculpatory

7  evidence?

8           MS. QUIMBY:  Objection, form.

9      A.    I think objectively means that you view the

10 evidence without prejudice, without preconceived notions.

11 That's how I understand objectively.

12     Q.    So my question was, is it objective to ignore

13 exculpatory evidence?

14           MS. QUIMBY:  Objection, form.

15     A.    I don't think that is how I would define

16 objective.

17     Q.    Okay.

18     A.    It may not be best research practice; but

19 that's not, in my view, how you define objective.

20     Q.    Is it acceptable in an objective investigation

21 to ignore exculpatory evidence?

22     A.    Again, it's not related to objectivity.  It may

23 not be good research practice.  That would be perhaps

24 mentioned in the peer-review process.  But in terms of

25 objectivity, I take that to mean that you do not consider

John Toaru Ishiyama, Ph.D.        9/27/24

1  things outside of the charge that might influence and

2  prejudice your decision.

3       Q.    Would considering exculpatory evidence

4  prejudice your decision?

5             MS. QUIMBY:  Objection, form.

6       A.    That's not what we mean by objectivity.

7       Q.    Well, I wasn't asking you about that.  I was

8  asking you about the statement you just made about not

9  considering anything that would prejudice your decision.

10  I believe you said something to that effect, right?

11      A.    But I said that was for peer-review processes.

12  That's not good research effort.  But your question was

13  about objectivity, and I answered that.

14      Q.    Okay.  And I'm following up with a question

15  about your methods of conducting the investigation in the

16  ad hock panel.

17      A.    Um-hum.

18      Q.    Would you consider it best practices for the ad

19  hoc panel to ignore exculpatory evidence?

20            MS. QUIMBY:  Objection, form.

21      A.    I do not believe we ignored such evidence.

22  But no, I don't think we ignored such evidence.

23      Q.    And you would not consider that best practices

24  if evidence was ignored?

25      A.    We were not asked about best practices about

1  how we did the review process.  We were asked to judge

2  the best practices of the Journal of Schenkerian Studies.

3       Q.    I understand that.  I'm asking you.  So could

4  you answer the question as asked?

5       A.    I'm not sure of the question.

6            MR. ALLEN:  Madam Court Reporter, could

7  you read the previous question back to the witness?

8       Q.    BY THE REPORTER:

9            QUESTION:  Would you consider it best

10       practices for the ad hoc panel to ignore

11       exculpatory evidence?

12       A.    If we did that.  I don't not think that is what

13  happened.

14       Q.    Right.  That's not my question.  I understand

15  that you deny that happened.  My question is would that

16  be best practice --

17       A.    You are asking me what I believe is best

18  practice.  I don't -- I don't think I should venture

19  an opinion about that.  I told you that research

20  practices, we do not ignore evidence.  But you are

21  asking specifically about the activities of the panel,

22  and I think I've answered that.

23       Q.    No, I think you have not.  I think you have not

24  answered whether it would be best practice for a panel

25  such as your ad hoc panel to ignore exculpatory evidence.

 1  We can agree, can we not, Professor

 2  Ishiyama --

 3       A.    We did not.

 4       Q.    Can we agree that the ad hoc panel should not

 5  ignore exculpatory evidence?

 6                 MS. QUIMBY:  Objection, form.

 7       A.    No, I don't agree to that because we did not do

 8  that.  I'm very narrow in terms of what we did, not

 9  speculate on whether or not something happened.

10       Q.    I'm not asking you to speculate.  I'm asking

11  you to tell me precisely for the record your methods.

12       A.    Are you asking for my opinion, sir?

13       Q.    I'm asking for your understanding of what

14  your task was.  If you want to characterize that as your

15  opinion, that's fine with me.  Your understanding of your

16  task as a member of the ad hoc panel was that it would

17  be -- it would not be best practice to ignore exculpatory

18  evidence.  Can we agree on that?

19       A.    But the charge -- your question started with

20  objectivity.

21       Q.    Yes.

22       A.    Not best practice.  I'm not sure how they're

23  related.

24       Q.    You brought up best practice, sir.  So that's

25  why I was asking you that question.

1        A.    Well, that's beyond the scope of the charge.

2        Q.    Well, I'm not asking you only about the scope

3   of the charge.  I'm asking you about your approach of the

4   investigation in the ad hoc panel.

5        A.    We considered all of the evidence objectively,

6   meaning that without prejudice and without preconceived

7   notion, that's how we proceeded.

8        Q.    Okay.  Did you invite Timothy Jackson in

9   advance to respond to the investigation report that you

10  eventually produced?

11              MS. QUIMBY:  Objection, form.

12       A.    We asked him to testify.  We did not ask him to

13  respond to the report.  That was not part of our charge.

14       Q.    Were you aware that Timothy Jackson did respond

15  to the report?

16       A.    He did send us a message.  The committee

17  reviewed it and determined that this evidence actually

18  did not affect our assessment of the general review

19  processes, which was our focus.

20       Q.    What evidence are you referring to?

21       A.    Well, the fact that there was nothing

22  produced that demonstrated what the review process was.

23  Dr. Jackson had sent us a large group of emails, which

24  we surveyed carefully, and could not determine what the

25  review process was for Volume 12.

1            Also, that there was self-publication by the

2    editor with no clear evidence that there were special

3    precautions to prevent a conflict of interest and that

4    the head made a decision regarding publication of an

5    anonymous contributor, but we didn't focus too much on

6    that because that does happen as long as there's some

7    message or information provided in the journal that

8    there's a reason why they're doing -- the editor's doing

9    that.  That did not appear.  So that's what we were

10   looking at.

11      Q.    Are you referring to the -- I'm just trying to

12   figure out what documents you are referring to, and I

13   think we'll get to these.  But are you referring to an

14   email Timothy Jackson sent you with attachments in

15   advance of his interview or shortly after his interview

16   in the midst of the investigation, or -- and this is the

17   question about the response -- are you referring to

18   documents sent to you after the investigation was

19   complete?

20      A.    You know, I don't -- I'm not -- I don't recall

21   four years ago exactly the sequence.  I do know that

22   Dr. Jackson had sent us something that was a body of

23   emails that he said would outline the review process.

24   We did review that, and there was no evidence that

25   indicated that there was a clear review process.  So I'm

John Toaru Ishiyama, Ph.D.     9/27/24

```
 1  referring partially to that.  I cannot recall in what
 2  sequence those appeared.
 3       Q.   Okay.  Hopefully, we'll clear this up later.
 4  I think I know which documents you are referring to.  And
 5  when we come to those, hopefully, we can clear that up.
 6            I want to return to the COPE principles, if
 7  I could for a moment.  I believe you did say you
 8  interviewed the individuals at the University of North
 9  Texas who were responsible for operating the University
10  of North Texas Press?
11       A.   Yes.  I don't recall their names right now, but
12  yes.
13       Q.   Was one named Chrisman, if that helps you
14  recall?
15       A.   I did not hear the name.  Could you repeat it?
16  One was named who?
17       Q.   Chrisman.  Chrisman.  C-H --
18       A.   I don't recall that name.
19       Q.   Okay, that's fine.  Were COPE principles
20  required by the University of North Texas Press?
21       A.   I am not aware if they have.  Requirement is
22  not what COPE recommends.  It's best practices that they
23  seek editors to pursue.  I'm unaware of what the
24  University of North Texas requires.
25       Q.   You do know that the University of North Texas
```

 1  published the Journal of Schenkerian Studies, right?

 2       A.    That, I do know, yes.

 3                   (Deposition Exhibit Number 7 marked.)

 4                   MR. ALLEN:  Let me -- sorry.  I'm going

 5  to mark for the record as Exhibit 7 a document that is

 6  dated in handwriting September 16, 2020 and Journal

 7  Review #2.

 8       Q.    And I'm going to represent to you, Professor

 9  Ishiyama, that to the best of my knowledge, these are

10  notes of a Professor Wallach who was on the program --

11  excuse me, the ad hoc committee.  Do you recognize the

12  handwriting by any chance?

13       A.    No, I do not.

14       Q.    Did members of the ad hoc panel share their

15  notes with each other?

16       A.    No.  We actually discussed in our meetings our

17  points.  We did not share the notes.

18       Q.    Okay.  So what we have here are one individual

19  on the panel's notes.  And I want to ask you a few

20  questions to see if you recall the things that are

21  recorded in these contemporaneous notes being discussed

22  by the ad hoc panel.  I'm obviously not trying to

23  attribute this to you, just so we're clear.  It does

24  refer to Ron Chrisman here and Karen DeVinney.

25                   Do you see that at the top?

1      A.    Yes.

2      Q.    Does that help refresh your memory as to who

3   the individuals were who were operating the University of

4   North Texas Press?

5      A.    Yes, it does.  I had misheard you say before

6   Christmas, but Chrisman sounds more familiar.

7      Q.    Okay.  Understandable.  Just real quick,

8   something I know is probably not within the purview of

9   your investigation or at least at the Center, but there's

10  a note here that after one year, there should be or there

11  was a free online upon access in the library.  Do you

12  remember the UNT Press discussing how the University

13  Press made the Journal available to the public in this

14  way?

15             MS. QUIMBY:  Objection, form.

16      A.    No, I don't.  But they were talking about their

17  production processes may be part of it.

18      Q.    You don't have any reason to believe this was

19  not accurate?

20      A.    No.  But I can't be sure, because these are not

21  my notes.

22      Q.    I understand, sir.

23      A.    And I -- they talked a lot about production.

24             MR. ALLEN:  Now, unfortunately, I can't

25  refer to Bates numbers here, Attorney Quimby.  But I'm

 1  turning to page 3, I believe, of the PDF.

 2      Q.    There's a number of circled numbers, and

 3  I'm going to draw your attention, if I may, Professor

 4  Ishiyama, to number 3.

 5      A.    Um-hum.

 6      Q.    It appears that there is some discussion of the

 7  committee on publication ethics noted here.  See?

 8      A.    Um-hum, yes.

 9      Q.    And it says, "Did not put in contract.  Do that

10  in the future."

11          Did I read that correctly?

12      A.    Yes.

13      Q.    Do you remember discussing that the contracts

14  with the journals that were published by the University

15  of North Texas Press did not have COPE principles in

16  their contracts?

17              MS. QUIMBY:  Objection, form.

18      A.    I recall that Ron Chrisman did talk about the

19  production process and mentioned that COPE principles

20  should be in future activities of the UNT Press.

21          However, you know, being part of a contract is

22  not normally the case with most journals.  Rather, these

23  are best practices that editors should pursue.  And I

24  think the fact that it was not in the contract is not

25  that unusual for most journals, although journals do

1  abide by the guidelines that they wish to be reputable.

2       Q.    And did you find any evidence that the Journal

3  of Schenkerian Studies as not reputable, sir?

4       A.    If you -- if, in evaluating again, not the

5  journal, but the processes that were used, did not

6  comport to best practices in journal editing.

7       Q.    Did you have any evidence that that affected

8  the reputation of the articles published by the Journal

9  of Schenkerian Studies?

10       A.    We were not asked to evaluate the reputation of

11  the Journal, nor the articles that appeared, only on the

12  processes used.

13       Q.    Well, that's not my question.  I just asked in

14  the course of your investigation, did any evidence come

15  forward that indicated that the articles published in the

16  Journal of Schenkerian Studies were not esteemed in the

17  field?

18                  MS. QUIMBY:  Objection, form.

19       A.    No.

20       Q.    Back to what appears to be the people who ran

21  in the press statements to the ad hoc panel, it also

22  records that what they had discussed, COPE principles not

23  really being in the contracts, but maybe should be in the

24  future, how the contracts were structured.  It appears

25  that Ron Chrisman said this is the standard practice for

1  the press at that time, right?  Do you remember him

2  saying that?

3              MS. QUIMBY:  Objection, form.

4      A.    That specific statement, I don't recall.  But

5  he may have.

6      Q.    Okay.  There's also mention of another journal

7  in the College of Music.  Did you remember talking about

8  that with the University of North Texas Press?

9              MS. QUIMBY:  Objection, form.

10     A.    I do not recall that specific statement.  But

11 since he was talking about the operations of the press,

12 he may have mentioned it.

13     Q.    You don't have any reason to believe that's not

14 Theoria, the title page we examined previously, right?

15             MS. QUIMBY:  Objection, form.

16     A.    I would not know.

17     Q.    Okay.  Do you have any knowledge of whether the

18 University of North Texas Press now requires COPE

19 principles for the journals it publishes?

20     A.    No.  Again, our focus was only on producing the

21 report.  I have not followed things since.

22     Q.    Okay.  And you didn't think it was your

23 obligation to compare the Journal of Schenkerian Studies

24 to the practices of a journal like Theoria in the same

25 department, in the same field, right?

1    A.    No.  We were asked to evaluate using our
2  experiences objectively, the practices of the Journal
3  of Schenkerian Studies.
4                  MR. ALLEN:  I'm going to mark for the
5  record as Exhibit 8 another set of notes from your ad hoc
6  panel.
7                  (Deposition Exhibit Number 8 marked.)
8    Q.    Do you see -- I'll just state for the record
9  this begins UNT 003301.
10   A.    Yes.
11   Q.    And I'll just ask if you know whose notes these
12  are.
13   A.    I believe these were the sort of list of
14  questions that we came up with.  And in order to pursue
15  our interviews, we had collectively wrote this.  And then
16  I believe I typed it up and circulated it.
17   Q.    Okay.  And it seems like under these questions
18  for Ron Chrisman and Karen DeVinney, there are some typed
19  in notes here.
20   A.    Yes.
21   Q.    Do you see those?
22   A.    Yes.
23   Q.    And so my question for you is, do you know what
24  these notes represent?
25   A.    I would have to look at them carefully.

1        Q.    Can I ask you to read this block right here?

2        A.    Notes from -- okay.

3             "Notes from the Committee on Publication

4   Ethics.  Although UNT Press may not be part of COPE, they

5   should abide by these standards, especially these two --

6   the first relates to 'anonymous' authorship and the

7   second deals with editors publishing in their own

8   journals."

9             And then there's a quote.

10            "'Journals should adopt and promote an

11  authorship policy that is appropriate to the field of

12  research.  Your procedures should encourage appropriate

13  authorship attribution and discourage guest and ghost

14  authorships.  These will vary from journal to journal

15  but might include:

16            1) requiring statements of each individual's

17  contribution to the research and publication.

18            • Use checklists to prevent ghost authorship,

19  See for example, PLoS journals.

20            • Requiring all authors to sign an authorship

21  declaration.

22            • Including all authors in communications,

23  acknowledging receipt of a submission, not just the

24  corresponding author.

25            • Clearly specifying authorship criteria in

1  the Instructions to Authors.'"

2      Q.   Okay.  And just to ask you again, now that

3  you've read it, do you recall writing that, or was that

4  one of the other ad hoc panel members?

5      A.   I do not recall.  It may have been me, but I

6  cannot recall.  These are spontaneous notes, so I do not

7  know, and they're typed.

8      Q.   I understand.  What is ghost authorship?

9      A.   Ghost authorship is something that PLoS uses to

10  identify anonymous ownership, meaning they use a

11  pseudonym instead of their real name, or even saying

12  anonymous.  That would be ghost authorship.

13      Q.   What is PLoS, P-L-O-S?

14      A.   I do not recall what the acronym stands for,

15  but it is a journal that is published open access in

16  Europe.  And they have developed guidelines on ghost

17  authorship that COPE recommended consulting, so as an

18  example.

19      Q.   And your understanding of ghost authorship was

20  that it's a form of anonymous publication, like, say, I

21  don't know, for lack of a better analogy, adopting some

22  kind of pseudonym on social media or some such thing?

23      A.   Yes, that's accurate.  I would consider that

24  a form -- a form of ghost authorship.

25      Q.   And I'm just going to represent to you that

1  if you click on this link, and we can do that if you

2  want, and I'll ask your attorney to verify that with you.

3  I'm just going to represent that the following document

4  is accessible at that website URL.  And I'm going to mark

5  it as Exhibit 9 for the record.

6                    (Deposition Exhibit Number 9 marked.)

7                    MS. QUIMBY:  I meant to ask this before

8  we got started again.  Are you able to send the documents

9  in the chat, so that the witness is able to better access

10 them?

11                   MR. ALLEN:  I hadn't thought of that,

12 but that is a great idea.

13                   MS. QUIMBY:  It may prevent the

14 scrolling.

15                   MR. ALLEN:  I think I can just plop

16 them in there, and thanks for that suggestion.

17          As your attorney indicated, I'm putting this

18 in the chat, Professor Ishiyama.  It should have arrived.

19 It's a rather large document.

20                   THE WITNESS:  Can we open it in the chat

21 or --

22                   MS. QUIMBY:  I believe you may have to

23 download it, and then open it as opposed to what I just

24 said.

25                   THE WITNESS:  May we go off the record?

```
 1                  MR. ALLEN:  Please.
 2                  THE VIDEOGRAPHER:  Off the record at
 3    11:00.
 4                      (Recess taken)
 5                  THE VIDEOGRAPHER:  On the record at
 6    11:04.
 7        Q.   Okay.  Professor Ishiyama, I just had a --
 8    and sorry the document is so large.  But I just had a
 9    question on the first page.
10        A.   Um-hum.
11        Q.   A series of questions.  Can you read the
12    title of this article into the record?
13        A.   Yeah.  What Should Be Done To Tackle
14    Ghostwriting In The Medical Literature.
15        Q.   Is it your understanding, as a member of the ad
16    hoc panel, that there was significant differences between
17    medical literature and articles published in music
18    theory, such as in the Journal of Schenkerian Studies?
19        A.   No.
20        Q.   Okay.
21        A.   Well, are you referring to this particular
22    article or --
23        Q.   Well, in general, what you know of medical
24    publications or scientific publications.  For example,
25    let me ask you a specific example.  Is it your
```

1  understanding that it's common in medical or

2  scientific journals to publish with multiple authors?

3       A.   I can't say for sure.  But you know, because

4  it's not my field.

5       Q.   Sure.

6       A.   But I understand that that is common.

7       Q.   And did you understand from your experience

8  investigating the Journal for Schenkerian Studies that

9  most authors single author their articles in music

10  theory, at least in the Journal of Schenkerian Studies?

11            MS. QUIMBY:  Objection, form.

12       A.   I don't know about that.

13       Q.   That's not something the ad hoc panel

14  considered?

15            MS. QUIMBY:  Objection, form.

16       A.   No.

17       Q.   And I think your attorney is raising a good

18  objection, so I'm going to rephrase the question just for

19  the purpose of the records and get a clean answer, and

20  we'll move on.

21            So the ad hoc panel did not consider the

22  differences between multi-authored articles and science

23  and a single authored article -- single author articles

24  in music theory to be relevant to its investigation?

25            MS. QUIMBY:  Objection, form.

1      A.   No.  That was not relevant to our charge.

2      Q.   Okay.  So I also wanted to draw your attention

3  to the definition of ghostwriting that's on the first

4  page of this article.

5      A.   Um-hum.

6      Q.   And see if that helps clarify what that meant

7  to the ad hoc panel.  I just have highlighted briefly two

8  sentences that I'm going to read into the introductory

9  paragraph, which is in bold.

10           "Ghost writing occurs when someone makes

11  substantial contributions to a manuscript without

12  attribution or disclosure."

13           Did I read that correctly?

14     A.   Yes.

15     Q.   And then out of this article, on the top of the

16  second column to the right, the lead sentence says,

17  "Ghost authorship exists when someone as made substantial

18  contributions to writing a manuscript and this role is

19  not mentioned in the manuscript itself."

20           Did I read that right?

21     A.   Yes.

22     Q.   Is that really what you understood as anonymous

23  publication?

24     A.   No.  But part of it was also misappropriation

25  of authorship.  Anonymous is not necessarily the

1  appropriation of authorship.  And COPE used this link

2  as an example, not exclusively for the entire world, but

3  this would be an example of how you might tackle the

4  issue of ghostwriting.  Ghostwriting, as you pointed out,

5  deals with misappropriation of authorship, including

6  having a senior scholar taking credit for something

7  someone else wrote.  We took it as very broadly.

8       Q.   Like a graduate student writes something, and

9  the senior scholar, perhaps the dissertation advisor or

10 something, appro -- (Zoom audio distortion) -- as their

11 then work?

12      A.   I would think that's what this article deals

13 with.  Yes, I think that's what this article is referring

14 to, although there are other forms of misappropriation.

15      Q.   And that's not so much anonymous publishing,

16 I think you would agree, as it is bordering on

17 plagiarism or research misconduct, right?

18           MS. QUIMBY:  Objection, form.

19      A.   I think -- I think misappropriation can take a

20 variety of forms.  Anonymous publishing is, you know --

21 as I mentioned in the report, does happen.

22      Q.   Sure.  But my follow-up question and the last

23 question on this was did you find any evidence in your

24 investigation that there was ghost publishing, this kind

25 of misappropriation that we've just discussed on the

*John Toaru Ishiyama, Ph.D.    9/27/24*

1  first page of this article?

2      A.    Not in terms -- not in terms of how this was

3  defined.  But again, it was the link that was provided

4  for informational purposes.  We did not use this

5  particular definition that is used here to assess the

6  use of anonymous authorship.

7      Q.    Okay.  But you still found it relevant

8  to refer to standards for medical publications when

9  evaluating the Journal of Schenkerian Studies, correct?

10     A.    Well, there's a link provided by COPE that here

11  are some suggestions to consider, as an example.

12     Q.    And this was the one that was on that link

13  page, correct?

14     A.    That's right.

15     Q.    Okay.  I am getting back to the famous -- no.

16  Where was my exhibit here?  I want to get back to the

17  Ad Hoc Panel Report and have us go through some of the

18  substance of it, Professor Ishiyama.

19     A.    Yes.

20     Q.    And then we may be able to get through this by

21  your 12:00 and hopefully finish.  I don't know, but I'm

22  going to try to do that.

23     A.    Okay.

24     Q.    And that was Exhibit 3.  Okay.  So let me ask

25  you, before we go into the substance of the Ad Hoc Panel

John Toaru Katsuyama, Ph.D.      9/27/24

```
 1  Report --
 2       A.   Excuse me.  Is this -- what I'm seeing is not
 3  the Ad Hoc Panel Report.
 4       Q.   I'm sorry.  It actually is.  That was way back
 5  to Exhibit 1, which we were talking about.  See?
 6       A.   Yes.
 7       Q.   Again, this is a perfect example of
 8  interrupting me if you need clarification.  Thank you.
 9            I wanted to ask if the ad hoc panel
10  interviewed the graduate student editor, Levi Walls?
11       A.   Yes, we did.
12       Q.   And about graduate student editorships, is
13  that, in and of itself, inappropriate?
14                 MS. QUIMBY:  Objection, form.
15       A.   It depends on the journal.
16       Q.   What does it depend on?
17       A.   Well, if it is a student journal, I'm
18  familiar with those, we've had experiences of having
19  graduate students being the lead editor.  But these often
20  only publish student publications, like other graduate
21  students, other universities, or other undergraduates.
22  Generally speaking, it's not the case that I'm aware of
23  that a journal that publishes peer-reviewed articles
24  from senior scholars is edited by a student.
25       Q.   And did you find that to be concealed by the
```

```
 1  Journal in any way?
 2              MS. QUIMBY:  Objection, form.
 3       A.   On the webpage, no.  But it seemed strange that
 4  an editor, a graduate student, would be making
 5  the sole decisions about whether or not it should be
 6  published when the submissions were largely from
 7  non-graduate students or senior scholars.
 8       Q.   And did my client, Timothy Jackson, ever give
 9  you an explanation for why the Journal of Schenkerian
10  Studies had been edited by graduate students?
11              MS. QUIMBY:  Objection, form.
12       A.   He said that was the tradition.  And there was
13  no reason to question that tradition, but we found it
14  odd.
15       Q.   Did you find that it had compromised the
16  quality of articles in the Journal?
17       A.   We didn't assess the quality of articles in the
18  Journal, but we did not think it was best practice since,
19  I think as we indicated in the report, the editors, or
20  the most recent ones, were students of
21  Dr. Jackson's.
22       Q.   And why was that a problem?
23       A.   Because it doesn't allow for independence of
24  action on the editors in charge of making decisions on
25  publications.  It is an odd arrangement.
```

1        Q.    And when you interviewed Levi Walls -- I

2   suppose his pronunciation is Levi Walls, I believe, one

3   witness said.  What did he say to the ad hoc panel?

4        A.    Well, I don't recall his entire testimony,

5   but his -- he did talk about this sense of an unequal

6   relationship between the editor, which included Benjamin

7   Graf as well, and the editorial advisory board.  The

8   editorial advisory board, if not the editorial board,

9   included Dr. Jackson and his colleague, Dr. Slottow.

10  Levi Walls, I believe, said that he felt uncomfortable

11  because he did not have the independence to make

12  judgments and that these were largely -- especially

13  regarding the Volume 4, these decisions were not made by

14  him as editor.  And Benjamin Graf also supported that

15  assessment of a sort of unequal distribution of power

16  among the editorial advisory board, meaning Dr. Jackson

17  and Dr. Slottow, and then the editors.

18       Q.    Just a point of clarification, I believe you

19  misspoke and said Volume 4.  Did you mean Volume 12?

20       A.    I mean Volume 12.  Yeah, sorry.

21       Q.    Yeah.  Just -- just for the record.

22            I think the Ad Hoc Panel Report used the word

23  or phrase "power differential."

24       A.    Yes.

25       Q.    Okay.  Levi Walls, were you aware that Levi

1   Walls had published a public apology on July 27th about

2   his role in the Journal of Schenkerian Studies?

3        A.    He -- he mentioned it in his testimony.  We did

4   not read that.

5        Q.    That was not read?

6        A.    No.

7        Q.    Were you aware that it was in the packet of

8   documents that had been provided by Timothy Jackson?

9        A.    I think -- well, if you are referring to the

10  apology, he did mention that in his testimony.  But it

11  had to do -- we had understood it was an apology for

12  what was produced.  And that he, as editor, felt some

13  responsibility because on paper, he is the

14  decision-maker.

15       Q.    Sure.

16       A.    We were not interested in the content of the

17  journal, only the processes used.  We didn't pay a great

18  deal of attention to that.

19                    (Deposition Exhibit Number 10 marked.)

20                    MR. ALLEN:   I'm going to mark as

21  Exhibit 10 for the record a Facebook post by Levi Walls

22  dated July 27th, 2020.

23       Q.    And this may be very short, Professor Ishiyama,

24  because I'm just going to ask you if you ever recall

25  seeing this in any form, whether in the -- on Facebook or

1  in a printout or some sort of screen shot, do you recall

2  seeing this?  I'm happy to allow you to read it.  It goes

3  on for some three pages.

4      A.    I don't recall, because I usually don't follow

5  Facebook, so I couldn't say that.  It may have been in

6  the packet of materials that Levi submitted, but I can't

7  be sure.  If you give me a moment, I can read it.

8      Q.    Why don't you read the first two paragraphs

9  there, and then give me an assessment of whether you had

10 read it as part of the investigation, if you know?

11     A.    These seem to be introductory paragraphs as

12 opposed to more substantive information.  I think I'd

13 probably need to read the rest, too.

14     Q.    Can I fast-forward to page 2, and you can read

15 that or --

16     A.    Yes.

17     Q.    I'm sorry.  I didn't -- of course, maybe this

18 is easier.  I just plopped it in the -- I just plopped it

19 in the chat for your review there as well.

20     A.    Um-hum.  Now, was the question do I recognize

21 this or any content or part of it?

22     Q.    My question is if you remember reviewing

23 this Facebook apology that Levi Walls had published on

24 July 27th, 2020, which was directly before your panel

25 in early August, and if that was part of the

 1  investigation.

 2      A.    I think we were aware of it.  But as I

 3  indicated, much of it related to the content of the

 4  Journal issue.

 5      Q.    Okay.

 6      A.    We were not interested in the content of the

 7  journal issue, only the process that was followed.

 8      Q.    I see.  He does discuss certain things

 9  related to the process, however, does he not?

10      A.    Yes, he did.

11      Q.    He says, "I have no control over the content of

12  the journal."

13            Right?

14      A.    That demonstrated the power asymmetry that we

15  had mentioned in the report.  And also, the passage that

16  Dr. Jackson is the one who made decisions, not Levi, or

17  Ben Graf before him.

18      Q.    And here, this second page that you had

19  perused, he said he gave comments to one author --

20      A.    Um-hum.

21      Q.    -- including that they seemed to devalue other

22  fields of study and that they cherrypicked information to

23  make Schenker appear in a better light, and that they

24  confused cultural appropriation with egalitarianism.

25            Doesn't that bear on the process for

 1  publication?

 2          MS. QUIMBY:  Objection, form.

 3      A.   That was his -- that was his evaluation of the

 4  review process.  And he did testify.  Much of this, he

 5  repeated --

 6      Q.   Okay.

 7      A.   -- in his testimony to us, so...

 8      Q.   Okay, good.  That's -- you were aware of it, as

 9  you said.

10          MR. ALLEN:  Let me see if I can find the

11  exhibit.  I'm going to mark for the record Exhibit 11.

12              (Deposition Exhibit Number 11 marked.)

13      Q.   This is an email from Levi Walls to you,

14  Professor Ishiyama, on September 30th, 2020.

15      A.   Um-hum.

16      Q.   It's in rather fine print.  Just so you know,

17  there's not much more to this.  It's UNT 2533.  It looks

18  like you're setting up a Zoom meeting with Mr. Walls at

19  2:15 of that day.  And it looks like he sent this to you

20  around that time, at least judging from the time stamp of

21  14:24.

22          Did I read that correctly?

23      A.   Can you scroll down again, so I can look at the

24  date and time of the previous one?

25      Q.   Sure.

John Toaru Katayama, Ph.D.      9/27/24

1      A.    Okay.  2:43.  We would like to meet with you.

2 And then if you can scroll back for a moment.  And that

3 is military time at 2:24; is that correct?  Oh.

4 September 24th and then September 30th.  Yes, okay.

5      Q.    So it looks like --

6      A.    So it was afterwards.

7      Q.    Okay, good.  That was going to be my question.

8 Did you receive this before or after the meeting.

9      A.    Um-hum.

10      Q.    And so he's -- he's basically -- well, have you

11 had a chance to review this before I ask you questions

12 about it?

13      A.    Well, no, I have not reviewed it.  He did send

14 it to me.  I recall that.  And I do recall that much of

15 it was just a repeat of what he apparently had said in

16 his Facebook post.  But you know, this is how we became

17 aware of it.  And he felt like he needed to follow up on

18 our meeting.

19      Q.    Right.  And he said, "I have no control over

20 the content of the journal."

21           Right?

22           MS. QUIMBY:  Objection.

23      A.    I believe -- I'm not recalling exactly his

24 words, but I think he did seem to suggest that, yes.

25      Q.    See that, what I've just highlighted?

1    A.    Yes.  I don't recall him specifically saying it

2    to us in our testimony, but he did seem to indicate that

3    he had little control over the content.

4        Q.    Did -- sorry, go ahead.

5        A.    Even as editor.

6        Q.    He also said he was -- it was an extremely

7    shameful position to be the editor at the Journal of

8    Schenkerian Studies?

9              MS. QUIMBY:  Objection, form.

10       A.    He may have.  I do not recall.  But it's his

11   testimony and it appears here in writing, so...

12       Q.    And you received this email, right?

13       A.    Yes, although I don't recall specifically

14   word for word what the email said, but...

15       Q.    He also went on to give some concrete examples.

16   For instance here, let's just read this, which I'm going

17   to highlight briefly for the purpose of our testimony.

18             "For the first few months, the job seemed fine

19   as I got to work with three articles on various topics.

20   Typesetting and offering clarity related edits."

21       A.    Um-hum.

22       Q.    However, after Philip Ewell's SMT presentation,

23   Timothy Jackson decided that it was the responsibility of

24   the Journal to, quote, protect Schenkerian analysis.

25             "Although, after serious thought, I

1  essentially agreed with Ewell's talk.  It was not up to

2  me what did or did not go into the journal.  After seeing

3  some of the responses, I started to become incredibly

4  worried.  I gave comments to one author, including

5  that they seemed to devalue other fields of study, that

6  they cherrypicked information to make Schenker appear

7  in a better light, and that they confused cultural

8  appropriation with egalitarianism.  Shortly after, I was

9  told by Timothy Jackson (my superior in at least three

10  senses: A tenured faculty member who ran the journal and

11  also served as my academic advisor) that it was not my

12  job to censor people.  After this, things continued to

13  go in a direction that I found to be disgusting."

14            Did I read that correctly?

15       A.    Yes, you did.

16       Q.    Did that implicate the processes by which the

17  journal was published?

18       A.    Well, some of it did.  Not -- much of

19  it had to do with the content.  Again, which I have to

20  reiterate, we ignored the content of the articles and

21  what was being said.  But the power differential between

22  Levi Walls who's officially the editor of the journal --

23       Q.    Sure.

24       A.    -- and the actual process by which decisions

25  were made, that is -- that is something that we did

 1  consider.

 2      Q.   Okay.  And did you include that in the Ad Hoc

 3  Panel Report?

 4      A.   Yes, the power differential is clearly

 5  indicated as a problem with the journal.  It has been a

 6  problem for some time.

 7      Q.   And it caused him not to be able to assert his

 8  own editorial views; is that correct?

 9      A.   That would be true.  That's also something that

10  Dr. Graf said as well, the previous editor.

11      Q.   And now, I know you didn't, as you say

12  apparently, address the content of the journal.  That

13  was a matter of indifference to you, I suppose.  But he

14  also says here that he thought he essentially agreed with

15  Philip Ewell's talk.

16      A.   That may be true.  I do not know what Philip

17  Ewell's talk was about, nor did -- not did most all of

18  our committee -- I think our committee members didn't

19  know either.

20      Q.   I'm not imputing -- I'm not imputing to your

21  knowledge of -- in fact, you've testified that the

22  knowledge of the actual controversy was a matter of

23  indifference to the panel, right?

24      A.   Yes, absolutely.

25      Q.   I think you -- so you've already stated that, I

1  think, more than once.  So I understand that's your

2  testimony.

3        A.    Um-hum.

4        Q.    But here, this witness, a very key witness, can

5  we agree, the student editor of the journal?

6        A.    I would say a witness, not a key witness.

7  We had multiple bits of evidence, multiple pieces of

8  evidence that we considered.

9        Q.    Oh, I don't deny that.  But he's --

10        A.    I would not say he's the key witness.

11        Q.    He was an important witness.  Would you

12  disagree?

13        A.    I would say he is a witness.

14        Q.    Just a witness among others, right?

15        A.    Among others, yes.

16        Q.    That's your testimony today?

17        A.    Yes.

18        Q.    And he's telling you, as a member of the ad hoc

19  panel, that he essentially agreed with Philip Ewell's

20  talk, and he relates how this complicated his work as

21  the editor of the journal, right?

22                    MS. QUIMBY:  Objection, form.

23        A.    I cannot infer that was his meeting, but that

24  was irrelevant to us.

25        Q.    It's certainly part of an editor's task to

John Toaru Ishiyama, Ph.D.      9/27/24

```
 1   shepherd the content of articles, so that they address
 2   the purpose of a journal, its field, topics, ideas in a
 3   field, things of that nature, correct?
 4                  MS. QUIMBY:  Objection, form.
 5        A.   Could you repeat that?  I'm not exactly
 6   sure --
 7        Q.   Sure.  Let me -- let me draw an analogy.
 8             Is it true, sir, that you can separate content
 9   from the procedures of editorship so cleanly as you seem
10   to imply?  For instance, when you were the editor of the
11   poli-science journals, political science journals, if
12   someone had sent in an article in sociology, would you
13   have exercised content control over those kinds of
14   submissions?
15                  MS. QUIMBY:  Objection, form.
16        A.   If it did fit the mission of our journal,
17   editors do do that.  But it has to be the mission of
18   the journal.
19        Q.   And so isn't it fair to say that Levi Walls'
20   preoccupation with content and the procedures for
21   critiquing authors' work, asking them to make changes,
22   isn't that the ordinary, day in and day out workaday
23   work of a journal editor?
24                  MS. QUIMBY:  Objection, form.
25        A.   Well, I can't speak for all of the -- you're
```

 1 | asking about my experience?
 2 |     Q.    Yes.
 3 |     A.    No, I think that --
 4 |     Q.    Okay.
 5 |     A.    -- this rejects if it's inappropriate for
 6 | our journal, meaning it does not fit the mission of the
 7 | journal, or if it's essentially a very poorly written
 8 | piece that would not stand peer review.
 9 |     Q.    Right.
10 |     A.    That's not about content.
11 |     Q.    It could be rejected at the gate, so to speak.
12 |     A.    Yes.
13 |     Q.    I'm going to back to Exhibit 3, the ad hoc
14 | panel.
15 |          MR. ALLEN:  I'm sorry.  Attorney Quimby,
16 | I realized that I failed to push send.  I not only have
17 | to drop it into the chat, but now, I'm going to push
18 | send.  Sorry about that.
19 |     Q.    I just sent the Exhibit 3, the Ad Hoc Panel
20 | Report, over.
21 |     A.    Okay.
22 |     Q.    Now, this is -- I'm forwarding -- I'm
23 | fast-forwarding to a section of the Ad Hoc Panel Report
24 | which begins with this heading:  The Editorial and Review
25 | Processes Employed for Volume 12.

John Toaru Ichiyama, Ph.D.      9/27/24

1              Do you remember that this section was drafted

2  as part of the Ad Hoc Panel Report of November 25, 2020?

3       A.   Yes, it was.

4       Q.   And just scrolling through, you have a

5  subsection:  Editorial and Review Processes, correct?

6       A.   Yes.

7       Q.   And then this section, before it closes and

8  moves on to the publication and anonymously authored

9  contribution, relates a relatively peculiar episode.

10      A.   Yes.

11      Q.   Can you read the two paragraphs that begin,

12 "Levi Walls informed the panel," through the end of this

13 subsection?

14      A.   "Levi Walls informed the panel that he read

15 each piece, but had multiple concerns, as the editor,

16 about proceeding with several of the contributions.  He

17 said he shared these concerns with Dr. Benjamin Brand

18 (the Division Head of MHTE) and Dr. Graf, and then

19 directly with Dr. Jackson.  However, he said these

20 concerns were dismissed by Dr. Jackson."

21             "Mr. Walls reported to the panel that he

22 raised concerns to Dr. Jackson about the content of the

23 pieces as well as the quality of writing in February

24 2020.  He stated that after raising concern, he was taken

25 into Dr. Jackson's car, where Dr. Jackson told him that

*John Toaru Ishiyama, Ph.D.    9/27/24*

1  it was not his 'job to censor people' and was told not to

2  do it again.  He said Dr. Jackson informed him that since

3  these were senior scholars, their reputations were enough

4  to vet them.  Dr. Graf confirmed that Levi Walls shared

5  information about his encounter with Dr. Jackson around

6  the time of its occurrence.  This was followed by the

7  final decision, made by Dr. Jackson (according to both

8  Dr. Graf and Mr. Walls) to proceed with the publication

9  of several of the pieces without substantial

10  modifications."

11      Q.    And so this touches on both consent and

12  editorial practices.  And I was just wondering what your

13  understanding was at the time of what he was being asked

14  to censor or not censor.  What was this issue of

15  censorship about?

16              MS. QUIMBY:  Objection, form.

17      A.    I do not know what Dr. Jackson meant, censored.

18      Q.    Well, what was -- what was your understanding

19  of what student editor Levi Walls was bringing to

20  Dr. Jackson for clarification about what should be

21  censored or not censored?

22              MS. QUIMBY:  Objection, form.

23      A.    I do not -- I do not know.  Again --

24      Q.    Okay.

25      A.    -- I think this was entirely on process.

*John Toaru Ishiyama, Ph.D.    9/27/24*

```
 1      Q.    I see.

 2      A.    Not on content.

 3      Q.    And I've always been puzzled by this section,

 4  Professor Ishiyama, because is it ever the job of an

 5  editor of a journal to censor people?

 6            MS. QUIMBY:  Objection, form.

 7      A.    Again, it could depend on what you mean by

 8  censor.

 9      Q.    Well, you put it in your report, so that's

10  why I'm asking you.

11      A.    Well, no.  This is a quote.  It's in the

12  report, but it's a quote from what Dr. Jackson was

13  reported to say.

14      Q.    Sure.

15      A.    I don't think we need -- I would ask perhaps

16  the plaintiff to define that.

17      Q.    Well, they had a chance to depose Professor

18  Jackson.  But again, we're talking about the Ad Hoc Panel

19  Report.  And I'm asking --

20      A.    Okay.  This is a quote.  Again, this is a

21  quote.

22      Q.    Oh, I understand.  It's a quote that you placed

23  in the Ad Hoc Panel Report, right?

24      A.    As dutifully reflecting what the testimony

25  said.
```

John Toaru Matsuyama, Ph.D.   9/27/24

1        Q.   Of Levi Walls.

2        A.   Of Levi Walls, yes.

3        Q.   And now, I want to ask a follow-up question.

4             In your experience and expertise as an

5   academic editor of journals, can you identify a context

6   in which it's appropriate for an editor to censor people?

7                   MS. QUIMBY:  Objection, form.

8        A.   I don't think -- it depends on what you mean by

9   censor.  If you mean the job is to edit and marshal the

10  peer-review process, then yes, that is the responsibility

11  of the editor.  But censorship is not something we

12  consider.

13       Q.   Is it -- is it appropriate for an academic

14  editor to censor for viewpoints?

15       A.   I'm not going to venture an opinion.  I would,

16  myself, not do that.  I don't think censorship is part of

17  the discussion.  Rather, it's the editor's job to make

18  sure the pear-review process had integrity.

19       Q.   Okay.

20       A.   That it is peer reviewed.

21       Q.   And not to short-circuit the peer-review

22  process by telling an author that they may or may not

23  express a certain view?

24       A.   Well, I mean, it depends.  If this is --

25  if the argument is that these pieces were edited --

1  editorial review, then the editor does have the

2  responsibility to review a piece.  But I don't understand

3  the status of these articles, if they were peer reviewed

4  or if they were editor reviewed.  It seems confusing.

5        Q.    I understand.  Sure, I understand.  Although

6  you were given an extensive packet of e-mails that were,

7  more or less, comprehensive, detailing the communications

8  between the editorial staff that led to the publication

9  of these articles, right?

10       A.    Yes.

11       Q.    I'm going to represent to you, because you've

12  said the content of the publication didn't matter to you

13  supposedly.

14       A.    It did not.

15       Q.    There was a paper delivered by this public

16  intellectual music theory professor from New York named

17  Philip Ewell.  He gave a plenary presentation at the

18  Society for Music Theory that was very well received, but

19  nonetheless, controversial.  Then the call for papers

20  went out for the Journal of Schenkerian Studies for

21  soliciting responses to this article -- or excuse me, to

22  this presentation at this Society for Music Theory.  The

23  papers that were published in Volume 12 in the Symposium

24  were roughly split between people who were pro-Ewell and

25  people who were anti-Ewell.

1           Do you have any information to suggest that
2  my summary to you is wrong in any way?
3       A.   I have no idea what the content of the journal
4  was.
5       Q.   Okay, good.
6       A.   I don't even know if some were pro.  I have not
7  read a single piece.  I'm not even sure what Philip Ewell
8  said, as I've said before.
9       Q.   So you didn't read a single one of the
10  contributions in Volume 12 of the Journal of Schenkerian
11  Studies?
12      A.   No, no.
13           MS. QUIMBY:  Objection.
14           Renaldo, please.  I think I'm having a -- on
15  my end, I'm having freezing.  Is that mine freezing?  I
16  can see myself kind of jump around on the screen.  I just
17  want to kind sure my objections were heard.  I don't know
18  that I was able to get them in because of the --
19           MR. ALLEN:  I'm seeing you freezing, too,
20  Mary.  So I know what you mean.  If you want to -- I
21  don't know.  Was it to form?  Now, she's totally frozen.
22           THE VIDEOGRAPHER:  Do you want to go off
23  the record?
24           MR. ALLEN:  Sure.
25           THE VIDEOGRAPHER:  Off the record at

 1 | 11:39.

 2 |                    (Recess taken)

 3 |                    THE VIDEOGRAPHER:  The time is 11:48.

 4 | We're on the record.

 5 |      Q.   I think we were here.  Thanks for your

 6 | patience, Professor Ishiyama.  I'm trying to share again

 7 | Exhibit Number 3.  I believe we were here, right?  And we

 8 | were talking about the car story?

 9 |      A.   Yes.

10 |      Q.   Okay.  Just about Professor Graf and his

11 | role in editing the journal, how did you understand

12 | Professor Graf's role in your investigation?

13 |      A.   Professor Graf, who had been a graduate student

14 | editor prior to getting his Ph.D. and then being

15 | appointed lecturer in the department, was the editor up

16 | until Volume 12.  And he was also part of the editing of

17 | the three articles that appeared in the volume that had

18 | nothing to do with the -- whatever it is -- Symposium.

19 |      Q.   Um-hum.

20 |      A.   And then Levi Walls took -- was responsible for

21 | the remaining articles that appeared in the Symposium.

22 |      Q.   And did you understand from Professor Graf that

23 | he had also suffered from what you called a power

24 | differential and had sort of no sort of authority to

25 | discuss or do the normal work of editing with the

1  journal?

2             MS. QUIMBY:  Objection, form.

3        A.    Dr. Graf had mentioned the power differential.

4  And he said that it was problematic, as I recall.  I

5  would not know if suffering was the word he used, but he

6  did mention that as part of an issue.

7        Q.    Did he say words to the effect that he felt

8  he couldn't say no?

9             MS. QUIMBY:  Objection, form.

10        A.    I do not recall if he said those words.  But he

11  did feel that there was some asymmetry in terms of

12  decisions about editing journal articles.

13             MR. ALLEN:  Okay.  Well, let me take

14  this down and put it in the chat.  I think is what I

15  want.  Let me introduce the next exhibit.  Are we on

16  Exhibit 12 for the record?

17             THE REPORTER:  Yes.

18             (Deposition Exhibit Number 12 marked.)

19        Q.    I've marked an exhibit as Exhibit 12, Professor

20  Ishiyama.  And I'm going to also try to put it in the

21  chat here for your counsel.

22             This is -- Exhibit 12 is an email from Timothy

23  Jackson to you, Professor Ishiyama, as well as the other

24  members of the ad hoc panel, on October 17, 2020.

25             Did I read that right?

```
 1        A.    Yes.

 2        Q.    And he purports to attach letters and

 3   documents.

 4              Do you see that?

 5        A.    Yes.

 6        Q.    Do you remember getting this email?

 7        A.    No, I do not.  I mean, we probably did receive

 8   it.  It's a fairly short message, and attachments, but I

 9   do not recall specifically getting it.  But I do believe

10   we did.

11        Q.    And the attachments are -- it looks like

12   someone named Chaouat -- I don't even want to attempt

13   to pronounce that name.  I'm looking at the first

14   attachment.

15              The second attachment is Editorial Process of

16   JSS Volume 12 condensed.

17              There's a Revised Levi Walls Documentation,

18   October 4th, 2020, document.

19              And letter to UNT committee.

20              Do you remember receiving attachments that

21   are described in that attachment line?

22              MS. QUIMBY:  Objection, form.

23        A.    I don't specifically recall.  But the -- it was

24   sent to us, and I'm sure we read it.

25        Q.    Now, I'm not trying to catch you out.  You said
```

1  this is a short message, but I just wanted to call your

2  attention to the fact that it's actually a very, very,

3  very long message because the attachments are so long.

4      A.    Yes.

5      Q.    So again, I'm not trying to hoodwink you there,

6  but there is a large number of documents. And do you

7  remember looking through these documents?

8      A.    I do recall the email chain, which was

9  purportedly to document the review process for Journal

10  Volume 12. I do recall that we went through this fairly

11  carefully, including using text analysis, looking for

12  mentions of the term "commentary," which is something

13  that Dr. Jackson said this was. But yes, we do look at

14  this.

15      Q.    Is the -- is the Journal of Schenkerian

16  Studies, Volume 12, did it publish those articles that

17  were at the center of the controversy as, quote,

18  commentaries?

19      A.    I do not recall. I remember that the journal

20  itself indicated that it was a Symposium. That, we knew.

21      Q.    Now, I just want to call your attention briefly

22  to a few emails between professor -- excuse me, Levi

23  Walls, the student editor of the Journal or the oncoming

24  student editor, and Professor Timothy Jackson

25  at the inception of the Symposium that was eventually

*John Toaru Koyama, Ph.D.    9/27/24*

1  published in Volume 12.  I'm going to call your attention

2  to UNT page 2705.  And my question is, how will I

3  navigate there.  Here we go.  I've -- these are

4  represented by Professor Jackson as emails between him

5  and Mr. Walls.

6       A.    Um-hum.

7       Q.    Do you see those in Exhibit 12?

8       A.    Are you -- there are two of them.

9       Q.    Yes.

10       A.    One is November 15th, 2019, at 10:40 a.m.

11  And then there's one above that says "to me."

12       Q.    Yes, and do you see, this is by Levi.

13       A.    Yeah, yeah.  Yes.

14       Q.    Here -- well, I'll ask you to -- and this is

15  also by Mr. Walls.  Can I ask you just to read these two

16  emails?

17       A.    Would you like me to start with the top one and

18  then move down?

19       Q.    It seems that that is first in time, so let's

20  go with that.

21       A.    Okay.

22            "Dear Dr. Jackson.  Hope you are well!  When

23  would you like to get together to talk about Bach?

24  Unfortunately, I haven't had any time devoted to Berlioz

25  lately, as I've been swamped with classes and private

1  teaching.  But I would be happy to discuss the Passion

2  in more detail.  Of course, you've dedicated considerably

3  more time to it than I have, but I can surely follow you

4  and share any thoughts/questions!  At the moment, I can't

5  leave Denton Thursday through Sunday because my wife

6  takes the car to work all day.  But I can travel Monday

7  through Wednesday, or meet on campus any day."

8          The second email, also entitled "to me" from

9  November 15th, 2019 at 10:40 a.m.

10          It says, "I would also be very interested in

11  discussing a particular Schenker paper from SMT.  You've

12  likely heard about it, as it caused quite a stir.  I was

13  very ambivalent about it because it suggested that

14  analysis that utilizes levels of hierarchy is inherently

15  racist, which strikes me as naive.  Reinhold --"

16      Q.    You can stop reading there.

17      A.    Okay.

18      Q.    So the paper he's referring to is the paper

19  by Philip Ewell delivered at SMT, which in the email

20  we examined that he sent to the ad hoc panel here,

21  Exhibit 11 --

22      A.    Um-hum.

23      Q.    -- he declared that he essentially agreed with.

24  Do you remember him saying that to the ad hoc panel in

25  that email?

```
 1                  MS. QUIMBY:  Objection, form.
 2        A.    I do recall him recounting that, yes.
 3        Q.    And here, he says it strikes him as naive,
 4   correct?  In Exhibit 12, on UNT page 02705?
 5                  MS. QUIMBY:  Objection, form.
 6        A.    Let me examine.  Naive.  Where -- okay,
 7   "Which strikes me as naive."
 8               Yes, I see that.
 9        Q.    Thank you.  Now, of course, this wouldn't
10   have been considered relevant by the ad hoc panel,
11   that he seemed to be misrepresenting a paper that he
12   essentially agreed with.  But in internal correspondence
13   within the journal, he characterized the same paper as
14   naive.
15                  MS. QUIMBY:  Objection, form.
16        A.    Is there a question?  Was there a question?
17   I didn't hear it.
18        Q.    Yes.  This -- this kind of information would
19   not have been considered relevant by the panel, the ad
20   hoc panel, right?
21        A.    No, no.
22                  MS. QUIMBY:  Objection, form.
23        A.    Okay.  That's all I need to know.
24               There's another email.  This one, a few days
25   later, on November 18th, 2020 -- excuse me.  This is
```

1  2019.  And I'm just going to represent to you that this

2  is within days of the presentation of Professor Philip

3  Ewell's paper at the Society for Music Theory, which was

4  a plenary talk, which kicked off this entire controversy.

5              And here, he says that "The paper's willful

6  ignorance of Schenker's Jewish identity is indeed deeply

7  troubling.  That seems to mark it as implicitly

8  antisemitic at the very least."

9              Did I read that correctly?

10              MS. QUIMBY:  Objection, form.

11     A.    Yes.

12     Q.    And in your view, is that consistent with

13  someone who essentially agrees with a paper, that they

14  declare it's implicitly antisemitic?

15              MS. QUIMBY:  Objection, form.

16     A.    We did not consider this.  It was beyond the

17  scope of our investigation.

18     Q.    Okay.  This was considered irrelevant, right?

19     A.    Yes, it was.

20              MS. QUIMBY:  Objection, form.

21     Q.    He also says here, "But his" -- meaning Ewell's

22  -- "claim that the entire theoretical world view, and by

23  extension, those who helped spread it, is racist becomes

24  very problematic when we consider the intimate connection

25  between Schenkerian analysis and the Jewish identity."

```
 1              This observation was also irrelevant to the
 2    ad hoc panel, right?
 3        A.    Yes.
 4              MS. QUIMBY:  Objection, form.
 5        Q.    Skipping down, next, we have a November 19th,
 6    2019 email in which Timothy Jackson raises the issue.
 7              "For the first time, it occurred to me that
 8    it might be appropriate for the journal to solicit
 9    responses."
10              Did I read that correctly?
11        A.    Yes.
12        Q.    Let me ask you a few questions about
13    solicitation.  Is it appropriate for editors of
14    peer-reviewed journals to solicit submissions of
15    articles?
16              MS. QUIMBY:  Objection, form.
17        A.    Yes, but not responses to -- I mean, I don't
18    know about appropriate.  But this is generally we solicit
19    contributions for special issues.  That is common.
20        Q.    Okay.  I'm just going to skip down.  Here's
21    another -- in red, another email from Levi Walls
22    November 19.  November 19, 2019.
23              He says, "Dear Dr. Jackson, I agree that a
24    response in the JSS would be very appropriate.  It would
25    be nice to have it for the upcoming issue, although it
```

 1  is very forthcoming (around mid-December).  A response in
 2  issue 13 would, of course, be quite late.  Did you have
 3  any particular Schenkerians in mind?"
 4           Did I read that correctly?
 5      A.   Yes.
 6      Q.   And I have a question about what you've
 7  characterized as a, quote, power differential, that
 8  apparently you believe, if I read the Ad Hoc Panel Report
 9  correctly, infected the relationship between Professor
10  Jackson and Levi Walls.  Given the give and take between
11  these two music theorists, one, the professor, the other,
12  the student editor, does this indicate that Mr. Walls had
13  no control?  Is it consistent with what he said in his
14  email to you that he had no control?
15           MS. QUIMBY:  Objection, form.
16      A.   I think it is indicative of the power
17  differential in the sense that Mr. Walls, even if he did
18  object, would not have expressed it to his dissertation
19  advisor.  That is the power differential.
20      Q.   So that -- so he was either concealing things
21  from Professor Jackson -- well, let me ask this in two
22  parts.
23           You believe it's possible that the power
24  differential caused him to conceal things from Professor
25  Jackson?

*John Toaru Oyama, Ph.D.    9/27/24*

```
 1                    MS. QUIMBY:  Objection, form.
 2          A.    I don't know about concealing, but he may not
 3    have sought to antagonize Dr. Jackson.
 4          Q.    And in that -- if that same -- or let me strike
 5    that, please.
 6                    Did you consider whether there was a power
 7    differential that prompted Levi Walls to change his
 8    story on July 27th of 2020?
 9                    MS. QUIMBY:  Objection, form.
10          A.    I can't speculate on that.  But the fact
11    that this power differential existed between a graduate
12    student and his dissertation advisor, that affected
13    Dr. Graf as well.
14          Q.    Did you ever -- sorry.
15          A.    So I can't say what it caused him to do.
16          Q.    So do you recall reading any messages from Levi
17    Walls in which he was concerned about the future of his
18    career when the Journal of Schenkerian Studies was
19    attacked by almost the entire Society for Music Theory?
20                    MS. QUIMBY:  Objection, form.
21          A.    I don't specifically recall.  I do recall that
22    there was something to that effect, but I cannot quote
23    you when or where.  But there definitely was some concern
24    expressed by this.
25          Q.    And was that prompted by a fear -- in your
```

1  understanding, would that have been prompted by a fear

2  that he would have been retaliated against in some way by

3  Professor Jackson?

4              MS. QUIMBY:  Objection, form.

5       A.   I cannot say that he used the term

6  "retaliation," but I think there was some -- he did use

7  the term "pressure."  Both he and Dr. Graf used to term

8  "pressure."

9       Q.   But the only pressure they identified was the

10 pressure supposedly exerted by Dr. Jackson, right?

11             MS. QUIMBY:  Objection, form.

12      A.   That, I cannot say.  I think that Mr. Walls did

13 mention feeling discomfort as to the controversy,

14 although we did not consider the, you know, substance

15 of the controversy.

16      Q.   Oh, of course.  You didn't consider whether the

17 scholars who were objecting to the publication of

18 the Journal of Schenkerian Studies and Volume 12 might

19 have been put -- might be putting pressure on Levi Walls?

20             MS. QUIMBY:  Objection, form.

21      A.   We -- we don't know.  We had no evidence to

22 that effect.

23      Q.   And that's fine.  And this correspondence

24 in Exhibit 12, which we've just read on UNT page 2709,

25 that was also irrelevant to the ad hoc panel's

1  investigation?

2      A.    Yes.

3              MS. QUIMBY:  Objection, form.

4      Q.    Thank you.  Was evidence that Levi Walls was

5  lying about the episode in the car that you summarized in

6  the Ad Hoc Panel Report, would that have been relevant to

7  the ad hoc panel?

8              MS. QUIMBY:  Objection, form.

9      A.    In a bit, although it did demonstrate the power

10 differential.  But there was other things that we

11 considered for that.  And also, it was minor compared

12 to the other problems we had pointed out with JSS.

13     Q.    And for you, in that room when you

14 interviewed -- I guess it was a Zoom room when you

15 interviewed --

16     A.    It was a Zoom, yes.

17     Q.    -- Professor Walls -- I mean, Levi Walls.  Was

18 there a power differential between you and Mr. Walls?

19     A.    I have no control over Mr. Walls' future.  I

20 would say not.  I'm not on his committee.  I'm not in

21 his field.  I don't review his work.  I'm not his

22 dissertation chair, so I do not believe he felt a power

23 differential.

24     Q.    You don't -- you don't believe there was

25 a power differential between you, a distinguished

*John Toaru Aoyama, Ph.D.      9/27/24*

```
 1  university research professor, and a graduate student,
 2  Levi Walls?
 3              MS. QUIMBY:  Objection, form.
 4       A.   No.
 5       Q.   Okay.
 6       A.   No, I do not.
 7       Q.   And that was not considered relevant in your ad
 8  hoc panel investigation?
 9              MS. QUIMBY:  Objection, form.
10       A.   No, it was not.
11       Q.   Is there a power differential between
12  Mr. Walls and Dean John Richmond of the College of
13  Music?
14              MS. QUIMBY:  Objection, form.
15       A.   I cannot answer that.  I do not know.
16       Q.   You don't know if there's a power differential
17  between the dean of a College of Music and a graduate
18  student within the College of Music?
19              MS. QUIMBY:  Objection, form.
20       A.   I can't speculate.  But I would imagine if the
21  dean had control over funding and other sources that he
22  depended on, perhaps so.  But I cannot testify to that.
23  I do not know their relationship.
24       Q.   Can you testify to whether there was an
25  inherent power differential between the division head of
```

*John Toaru Ishiyama, Ph.D.    9/27/24*

```
 1  MHTE, Benjamin Brand, and a graduate student within MHTE,
 2  Levi Walls?
 3            MS. QUIMBY:  Objection, form.
 4       A.   I do not know for sure since I'm not familiar
 5  with their relationship.  But again, the same answer as
 6  it applied to the dean.  If the division head had some
 7  influence over funding or other things, perhaps so.  But
 8  the division head is not the student dissertation chair.
 9       Q.   I didn't suggest he was.  I was just asking
10  about whether or not there was a power differential,
11  right?  And you're saying you don't -- you can't really
12  speak to that?
13       A.   No.  Yes.
14       Q.   Again, in this packet of information you got
15  from Timothy Jackson, let's see.  One last question on
16  this, and I think we will be done with this packet.
17            I'm going to call your attention to UNT 2663.
18  Do you see how this has Call For Papers here?
19       A.   Yes.
20       Q.   And again, we had talked about the call for
21  papers that was sent out by the Journal of Schenkerian
22  Studies earlier.  And you had testified, I believe, that
23  you could no longer remember whether you had or had not
24  read it, right?
25       A.   This was part -- this is part of the big
```

1   collection of emails that Dr. Jackson sent to us?

2       Q.    Yes.

3       A.    We did review this.

4       Q.    Okay.  So you recall reviewing the call for

5   papers?

6               MS. QUIMBY:  Objection, form.

7       A.    Yes, although not in great detail, but we did

8   review this.

9       Q.    Okay.

10      A.    Especially that referred not to the substance,

11  but only the process.

12      Q.    I understand.  And did you understand it was

13  sent to a server list in which members of the Society for

14  Music Theory all had access?

15              MS. QUIMBY:  Objection, form.

16      A.    We did not consider that, but it does appear so

17  on the heading.

18      Q.    And one of the allegations, just flipping back

19  over to -- I believe it was Exhibit 3, is it not?  The

20  Ad Hoc Panel Report?  No, wait.  Yes, it is.

21              I'm running through it to the exhibit that was

22  the UNT faculty statement.  Do you see this in the ad hoc

23  panel report, which you attached as Exhibit 4 to that

24  report?

25              MS. QUIMBY:  Objection, form.

 1          A.    Yes, I see it.

 2          Q.    And here, it says, "He" -- meaning Philip Ewell

 3    -- "was not afforded the opportunity to respond

 4    in print."

 5               Did I read that correctly?

 6          A.    Yes.

 7          Q.    And so I'm flipping back over to our

 8    Exhibit 12, the call for papers.  Isn't that a false

 9    statement if Philip Ewell received the call for papers?

10    Was there anything about that, that didn't invite him to

11    respond?

12               MS. QUIMBY:  Objection, form.

13          A.    I don't believe so.  Because generally, when

14    you have a response or rejoinder, the off-beat person is

15    directly invited by the editor, not in the general call

16    to the society.

17          Q.    So you're saying it was not best practice to do

18    it that way, right?

19               MS. QUIMBY:  Objection, form.

20          A.    I didn't hear the question.  Could you repeat

21    that?  You broke up.

22          Q.    Yeah, sorry.  I'm just trying to summarize.

23    Your testimony is that it was not best practice to send

24    out a call for papers rather than a direct invitation?

25               MS. QUIMBY:  Objection, form.

*John Toaru Yoshiyama, Ph.D.    9/27/24*

1        A.    We did not say that one substituted for the

2   other.  But generally, what we had said is the invitation

3   should go to the author, and there should be author

4   specific an opportunity for a rejoinder.

5        Q.    Okay.  And -- but it's not true, what the

6   faculty statement says, that Philip Ewell was not

7   afforded an opportunity to respond in print, was it?

8                    MS. QUIMBY:  Objection, form.

9        A.    I can't testify to that.  But I think they

10  meant he was not directly contacted by the editor.

11       Q.    But they didn't write that in their faculty

12  statement that you attached as an exhibit to the Ad Hoc

13  Panel Report, did they?

14                    MS. QUIMBY:  Objection, form.

15       A.    I cannot surmise that -- what their intention

16  was and how they expressed it, but...

17       Q.    I'm not asking about that.  I'm asking about

18  them not writing that -- the statement is very factual

19  and clearcut.

20            They write in Exhibit 3 in the UNT faculty

21  statement, "The fact that he was not afforded the

22  opportunity to respond."

23            Right?  They say, "He was not afforded the

24  opportunity to respond," right?

25       A.    Yes.

1          MS. QUIMBY:  Objection, form.

2     Q.    That's not qualified by saying he was not

3  offered the opportunity to respond in print by engraved

4  invitation, by direct solicitation, by direct invitation.

5  It doesn't have anything to do -- it doesn't say anything

6  about that, does it?

7          MS. QUIMBY:  Objection, form.

8     A.    Well, apparently, it doesn't.  But I -- again,

9  best practice would be that the editor directly invites

10  the person who's going to author the rejoinder.  And that

11  a general call to the society is really not -- it's a

12  poor substitute.

13     Q.    Okay.  And you knew from your interviews and

14  perusal of the records given to you by Timothy Jackson

15  that the Journal had nothing against inviting Professor

16  Ewell to respond to Volume 12, right?

17          MS. QUIMBY:  Objection, form.

18     A.    Had nothing against it.  I think we did find

19  actually that they did not invite directly Professor

20  Ewell.

21     Q.    Do you remember discussing that they had

22  entertained the possibility of inviting Professor Ewell

23  to contribute to the next volume, so that he could

24  address the responses?

25          MS. QUIMBY:  Objection, form.

1        A.    I recall in our interviews, Professor Slottow

2   had mentioned that.  Yes, I do remember that.

3        Q.    Okay, okay.  I'm going to pull these down

4   for a sec.

5             Just one more thing, if you don't mind.  I

6   know it's past 12:00.  But I believe I can get to one

7   last thing, Professor Ishiyama, and we will be done.  Do

8   you mind -- do you mind going forward with that, or do

9   you want a break?

10       A.    No, we can -- we can go forward with it.

11            MR. ALLEN:  Okay.  I'm going to mark for

12   the record Exhibit 13.

13            (Deposition Exhibit Number 13 marked.)

14       Q.    And I'm going to plop it in the chat as well.

15   Now, I've got to get my share thing going on.

16            This is an email from UNT's records disclosed

17   to us, I believe, from your file.

18       A.    Um-hum.

19       Q.    Given the page number, UNT 3435.

20       A.    Yes.

21       Q.    And do you remember drafting this email,

22   Professor Ishiyama?

23       A.    Yes.

24       Q.    What was the purpose of this email?

25       A.    Professor Bakulina, in an unsolicited way, had

1   an event that happened.  We are required by law to report

2   this.

3        Q.    What is "this"?

4        A.    And that it happened.

5        Q.    Can you describe "this" for the record, what

6   you mean by that?

7        A.    This event that she shared with us, which had

8   to deal with some instances of unethical behavior towards

9   her as the email indicates.  She recounted that to us in

10  our interview with her, and we are required by law to

11  report this.  So I dutifully did that.

12       Q.    So she recounted that Timothy Jackson had made

13  her feel, quote, uncomfortable on several occasions.  Is

14  that it?

15       A.    Yes.

16       Q.    And I'll get to the second part in a second.

17            All right.  Is there a rule or policy against

18  making a colleague feel uncomfortable?

19                 MS. QUIMBY:  Objection, form.

20       A.    That, I cannot say.  But we are required for

21  any report related to these matters to report it to the

22  Title IX Coordinator.  That is required.  It's been very

23  clear to us that we are required to do that.

24       Q.    And what is the unethical behavior towards her

25  that you were reporting?

 1         A.    I do not recall exactly.  She discussed some
 2   things.  We told her that we would have to report this to
 3   the Title IX Coordinator and she continued.  I do not
 4   know the -- I don't recall the details.
 5         Q.    And there were also, supposedly in 2016,
 6   which would have been four years before this time,
 7   inappropriate questions and comments about her health.
 8   Is that what it says here?
 9         A.    I recall she did say something to that effect.
10   I do not remember the details.
11         Q.    What makes a question or comment about
12   someone's health, quote, inappropriate?
13         A.    I do not know.  But that was her claim.  And
14   we're required by law to report it.
15         Q.    What law are you referring to?
16         A.    I do not -- that, I cannot quote.  But we have
17   been told as faculty members, that if there are reports
18   of any kind of harassment, that we need to report that,
19   and we're required to report it.  That was -- that was
20   shared with me.  I cannot tell you the exact.
21         Q.    How did you interpret -- so you interpret
22   anytime someone makes comments that makes someone feel
23   uncomfortable as harassment?  Is that your testimony?
24         A.    No.  We interpreted her report to us.  We just
25   said she made a report to us.  We're required to report

1  it.  We do not judge what the content is.  That is not

2  our place.  It would be the Title IX Coordinator.

3       Q.    And I guess it's supposedly harassment where

4  you have a reporting that it was discussed with her the

5  confidential proceedings about her interview for the

6  position she currently held at that time?

7                 MS. QUIMBY:  Objection, form.

8       Q.    Is that what you understood you were reporting?

9       A.    We are reporting what she related to us after

10  we told her that it would have to be shared with the

11  Title IX Coordinator.  We're compelled by law to do so.

12       Q.    And yet you can't name the law that compels you

13  to report the time --

14       A.    I'm not a lawyer, sir.

15       Q.    Can I -- can I --

16       A.    So I do not know.

17       Q.    You're going to have to let me finish my

18  question.

19       A.    Well, I'm --

20       Q.    I'm trying not to speak over you, and I'd just

21  appreciate that you let me finish.

22       A.    Certainly.

23       Q.    So you can't name the law which required you to

24  report someone feeling, quote, uncomfortable?

25                 MS. QUIMBY:  Objection, form.

 1      A.    No, I cannot.  I cannot specifically cite the
 2 law.  But we were told, and in our training, that we
 3 would have to deal with this -- deal with this directly.
 4 My colleagues all understood it that way, too.
 5      Q.    Oh, I'm sure they did.  This was signed.
 6 Well, it's not signed by all of them.  It's signed by
 7 you or at least in the signature block.  But it's cc'd
 8 to all of them, correct?
 9      A.    That's correct.
10      Q.    So they were all behind reporting Timothy
11 Jackson for making someone feel uncomfortable?
12              MS. QUIMBY:  Objection, form.
13      A.    As she related to us, the words she used.
14      Q.    Is it that -- the woman that made this
15 reportable to the Title IX Coordinator?
16              MS. QUIMBY:  Objection, form.
17      A.    No.  This was related to us, and we had to
18 report it.
19      Q.    Okay.  So when Ellen Bakulina signed a
20 petition, which we've already reviewed, which endorsed
21 the call for action of graduate students who were calling
22 for Timothy Jackson to be fired, don't you think that
23 made Timothy Jackson feel uncomfortable?
24              MS. QUIMBY:  Objection, form.
25      A.    I would not know.

1        Q.    That never occurred to you to ask?

2                    MS. QUIMBY:  Objection, form.

3        A.    No, it would not.  It was irrelevant to our

4   investigation.  We were compelled, again, to report this

5   by law.  Even though I can't cite the law, that is what

6   had been communicated to us by the University.

7        Q.    If it -- is it just because someone tells you

8   something, you are required to report?  Is that your

9   understanding?

10       A.    That is our understanding.  We do not make

11   judgments about the content.

12       Q.    Are you not required to report it if

13   something comes to your attention --

14                    MS. QUIMBY:  Objection, form.

15       Q.    -- whether they tell you it or not, that you

16   learn of something?  You're not required to report it if

17   you learn of something?  Only when someone tells you

18   something, even if it be secondhand?

19                    MS. QUIMBY:  Objection, form.

20       A.    I think it depends.  If it's specifically

21   directed to us to report it --

22       Q.    Sure.

23       A.    -- then we don't really go through hearsay or

24   other things, I mean, or rumors.  This is something that

25   we did because she was aware that we would have to do

1  this, and we did.

2       Q.    Did she ask you to report it?

3       A.    We told her we had to.

4             MS. QUIMBY:  Objection, form.

5       Q.    Did she ask you to report it?

6             MS. QUIMBY:  Objection, form.

7       A.    No, but we said we had to.

8       Q.    And you have described repeatedly that the

9  scope of your investigation was very narrow, focused on

10  the publication and review in the Journal, right?

11      A.    Yes.

12      Q.    But when someone reports vague feelings

13  of discomfort, you reported that to the Title IX

14  Coordinator, so that Timothy Jackson faced a Title IX

15  complaint, correct?

16            MS. QUIMBY:  Objection, form.

17      A.    Yes, as we were required again --

18      Q.    Okay.

19      A.    -- by law.

20      Q.    Sure.  You don't feel you were required by law

21  to report threats of retaliation against Timothy Jackson

22  for violation of his First Amendment rights, did you?

23            MS. QUIMBY:  Objection, form.

24      A.    That was beyond the scope of our investigation.

25  We only did this because Professor Bakulina told us

1  directly.

2       Q.    And Timothy Jackson told you directly that

3  he was facing threats of retaliation of his First

4  Amendment rights, did he not?

5                 MS. QUIMBY:   Objection, form.

6       A.    Which was irrelevant to our investigation

7  again.

8       Q.    And the First Amendment of law -- okay, sorry.

9  I over-spoke.  Go ahead.

10      A.    Yeah.  That was irrelevant to our

11  investigation.  Title IX, I think, and I cannot be sure,

12  but it's specific to these kinds of issues of harassment

13  and sexual harassment.  We have no -- there's nothing

14  that talks about threats because of First Amendment

15  freedom.  I do not know the law specifically, but that's

16  what we were told.

17      Q.    You do know the First Amendment is a law of the

18  United States, right?

19      A.    Absolutely.  It is part of the First Amendment

20  of the Constitution.

21      Q.    And you did know that there was an academic

22  freedom policy at the University of North Texas?

23      A.    Yes, was.

24      Q.    Timothy Jackson did complain to you that his

25  rights under that policy were being violated, right?

1          MS. QUIMBY:  Objection, form.

2      A.    But that was irrelevant to our investigation.

3  It was only on process.  You know, if he had written to

4  us and said, that complaint would not be going to the

5  Title IX Coordinator.

6      Q.    You also were aware that he was being

7  threatened with adverse employment actions by the

8  graduate students and by his faculty colleagues, right?

9          MS. QUIMBY:  Objection, form.

10     A.    Yes.  But that's not -- we didn't pay any

11 attention to that.  We actually ignored all of it.

12     Q.    I'm just trying to get a sense of how the ad

13 hoc panel worked.  So all of those -- all of those

14 things which we've named -- First Amendment retaliation,

15 violation of the academic freedom policy, the harassment

16 of Timothy Jackson by calling for him to be fired, and

17 so forth, all of that was not relevant to the panel,

18 correct?

19     A.    Yes, not relevant.

20     Q.    But when there was a complaint that could be

21 filed against Timothy Jackson, that was required by law.

22 That's your testimony?

23     A.    That was our understanding of the five members

24 of the panel.

25              MR. ALLEN:  Okay, okay.  It's about --

 1 can we go off the record, please?

 2                    THE VIDEOGRAPHER:  Off the record at

 3 12:25.

 4                         (Recess taken)

 5                    THE VIDEOGRAPHER:  The time is 12:30.

 6 We're on the record.

 7      Q.   Thank you, Professor Ishiyama.  I just have one

 8 last short series of questions.  At least that

 9 is my intention, that they be short.  I'm going to call

10 your attention back to Exhibit 9, which was introduced

11 into the record.  Do you remember looking at the title

12 page and table of contents of Volume 26 of Theoria from

13 2020?

14      A.   Yes.

15      Q.   And don't let me mischaracterize your

16 testimony, but I believe you testified that there might

17 be a representation somewhere in the journal of the

18 methods of review of the articles or things of that

19 nature, right?

20                    MS. QUIMBY:  Objection, form.

21      Q.   Other than on the title page?

22      A.   There might be.  I do not know.  I mean, there

23 should be something.

24      Q.   So in the intervening time, we were able to

25 find the page where the review processes of the Journal

1  were discussed, and that's what I would like to ask you a

2  few questions about.

3       A.   Okay.

4            MR. ALLEN:  So I've taken the liberty of

5  adding a third page to Exhibit 5.  Hold on.  I think I'm

6  getting mixed up.  I want to correct the record.  I

7  believe I was referring to the past exhibit by its

8  wrong identification number.

9            I'm discussing Exhibit 5.  Theoria, Volume 26,

10  2020, for the record.  I'm just skipping down.  I've

11  taken the liberty of adding the third page to this

12  exhibit, which formerly had only two pages.  And this is

13  the appendix, page 157, which has the Theoria journal's

14  Directions to Contributors.  And I'm not asking you to

15  verify that.  I want your opinion as an expert and member

16  of the ad hoc panel about this in the journal of Theoria.

17       Q.   It represents that review articles of books

18  related to the history of music -- it refers to "review

19  articles of books related to the history of music theory

20  and analysis."

21            Right?

22       A.   Yes.

23            MS. QUIMBY:  Objection, form.

24       Q.   And panel -- panel presentations to a

25  conference that was simply published as expanded

*John Toaru Ishiyama, Ph.D.    9/27/24*

1  articles in a journal would not count as review

2  articles typically, right?

3                  MS. QUIMBY:  Objection, form.

4        A.    I think it would depend on how they defined it.

5        Q.    What is a review article typically understood

6  as in a scholarly journal?

7        A.    Well, again, I can only speak to my field --

8        Q.    Sure.

9        A.    -- and the field of the other five people on

10  the committee.  But review articles are often collections

11  of books that are reviewed, often critically by an

12  author, and to reveal the state of the art in the field.

13        Q.    Right.  And if we skip back to the title page,

14  which I'm going to -- just by the titles.  And I know

15  you are not a music theorist or a student of Russian

16  music.  But did these titles suggest to you as an

17  experienced academic who's been an editor of political

18  science journals and other academic publications, that

19  these are review articles?

20                  MS. QUIMBY:  Objection, form.

21        A.    I couldn't say until I read them, so it's

22  hard to determine just based on the title.

23        Q.    So here, it also says, "All submissions will be

24  peer reviewed for their scholarly quality, clarity, and

25  originality.  Only high level professional research

 1  materials will be considered.  Ph.D. candidates and
 2  junior faculty in the related disciplines are
 3  particularly encouraged to submit articles."
 4          Did I read that correctly?
 5      A.   Yes.
 6      Q.   Would that lead you to believe that Theoria,
 7  the other journal published in the College of Music under
 8  the umbrella of the University of North Texas Press,
 9  would subject all of its articles to peer review?
10          MS. QUIMBY:  Objection, form.
11      A.   That would be -- that's the statement they
12  make, so I don't know if they did.
13          But they say, "All submissions will be peer
14  reviewed."
15      Q.   And that doesn't suggest that there's a
16  separate kind of track for publishing papers that were
17  expanded into articles after a professional conference,
18  does it?
19          MS. QUIMBY:  Objection, form.
20      A.   Well, so it suggests that those submissions
21  also be peer-reviewed.
22      Q.   Okay.  And would you understand the peer-review
23  process to be double-blind?  The double-blind peer-review
24  process we discussed earlier?
25      A.   It is the standard.

1                MR. ALLEN:  Okay.  I'm going to pass the

2    witness, Mary.

3                MS. QUIMBY:  I'll reserve my questions

4    for trial.

5                MR. ALLEN:  Thank you, Professor

6    Ishiyama.

7                    (No deletions.)

8                THE VIDEOGRAPHER:  Off the record at

9    12:35.

10                   (Proceedings concluded at 12:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Toaru Ishiyama, Ph.D.        9/27/24

1                    CHANGES AND SIGNATURE

2    WITNESS:  JOHN TOARU ISHIYAMA, Ph.D.

3    DATE:  SEPTEMBER 27, 2024

4      PAGE/LINE            CHANGE              REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1  _____

2  _____

3      I, JOHN TOARU ISHIYAMA, Ph.D., have read the

4  foregoing deposition and hereby affix my signature that

5  same is true and correct, except as noted above.

6

7

8                              _____

                               JOHN TOARU ISHIYAMA, Ph.D.
9

10 THE STATE OF _____)

11 COUNTY OF _____)

12     Before me, _____, on this day
   personally appeared JOHN TOARU ISHIYAMA, Ph.D., known to
13 me or proved to me on the oath of _____
   or through _____ (description of
14 identity card or other document) to be the person whose
   name is subscribed to the foregoing instrument and
15 acknowledged to me that he/she executed the same for the
   purpose and consideration therein expressed.

16
       Given under my hand and seal of office on this
17
   _____ day of _____, _____.
18

19

20                              _____
                               NOTARY PUBLIC IN AND FOR
21                             THE STATE OF _____

22 My Commission Expires: _____

23

24

25

```
1              UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF
2                   SHERMAN DIVISION
3   TIMOTHY JACKSON,            )
                                )
4        Plaintiff,             )
                                )
5   vs.                         )  CASE NO. 4:21-CV-00033-ALM
                                )
6   LAURA WRIGHT, et al.,       )
                                )
7        Defendants.            )
```

8        _____

9              REPORTER'S CERTIFICATION OF

10      ORAL DEPOSITION OF JOHN TOARU ISHIYAMA, Ph.D.

11              September 27, 2024

12       _____

13       I, KIM D. CARRELL, a Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16       That the witness, JOHN TOARU ISHIYAMA, Ph.D., was

17   duly sworn and that the transcript of the oral deposition

18   is a true record of the testimony given by the witness;

19       That the deposition transcript was duly submitted

20   on October 28, 2024, to Ms. Mary Quimby, for examination,

21   signature, and return to me by November 27, 2024;

22       That pursuant to the information given to the

23   deposition officer at the time said testimony was taken,

24   the following includes all partes of record and the

25   amount of time used by each party at the time of the

 1  deposition;

 2      Mr. Michael Thad Allen - 02 HRS: 47 MIN
            Attorney for the Plaintiff
 3
        Ms. Mary Quimby -  00 HRS: 00 MIN
 4            Attorney for the Defendants

 5      I further certify that I am neither counsel for,

 6  related to, nor employed by any of the parties or

 7  attorneys in the action in which this proceeding was

 8  taken, and further that I am not financially or

 9  otherwise interested in the outcome of the action.

10      Certified to by me on this 28th day of October,

11  2024.

12

13

14                          _____
                            Kim D. Carrell, CSR NO. 1184
                            Date of Expiration: 7-31-26
15
                            JULIA WHALEY & ASSOCIATES, INC.
16                          2012 Vista Crest Drive
                            Carrollton, Texas  75007-1640
17                          214-668-5578/Fax 972-236-6666
                            Firm Registration No. 436
18                          Certification Expires 10-31-26
                            Notary Comm. Expires 12-1-25
19

20

21

22

23

24

25

*John Toaru Ishiyama, Ph.D.    9/27/24    1*

## #

**#2** [1] - 63:7
**#308** [1] - 1:22

## '

**'anonymous'** [1] - 69:6
**'job** [1] - 92:1
**'Journals** [1] - 69:10

## 0

**00** [2] - 132:3
**000233)...........** [1] - 3:15
**000234** [1] - 4:4
**000236)........** [1] - 4:4
**002453** [1] - 3:14
**002454)...........** . [1] - 3:14
**002533)...........** ....... [1] - 4:6
**002634** [1] - 3:22
**002635)...........** . [1] - 3:22
**002645** [1] - 4:8
**002782)...........** [1] - 4:8
**003301** [1] - 68:9
**003303** [1] - 3:17
**003314)...........** . [1] - 3:17
**003435)...........** .........117 [1] - 4:11
**02** [1] - 132:2
**02705** [1] - 102:4
**06375** [1] - 2:4

## 1

**1** [8] - 3:11, 7:10, 7:11, 7:24, 8:11, 52:17, 69:16, 77:5
**10** [4] - 4:4, 16:19, 80:19, 80:21
**10-14-20** [1] - 3:20
**10-2-20** [1] - 4:9
**10-31-26** [1] - 132:18
**10:21** [1] - 55:9
**10:37** [1] - 55:11
**10:40** [2] - 101:10, 102:9
**11** [4] - 4:5, 83:11,

83:12, 102:21
**1184** [1] - 132:14
**11:00** [1] - 72:3
**11:04** [1] - 72:6
**11:39** [1] - 97:1
**11:48** [1] - 97:3
**12** [29] - 4:7, 22:1, 26:2, 37:12, 48:14, 55:19, 56:1, 56:4, 60:25, 79:19, 79:20, 90:25, 95:23, 96:10, 97:16, 98:16, 98:18, 98:19, 98:22, 99:16, 100:10, 100:16, 101:1, 101:7, 102:4, 107:18, 107:24, 112:8, 114:16
**12-1-25** [1] - 132:18
**12548** [1] - 2:9
**129** [1] - 3:7
**12:00** [2] - 76:21, 115:6
**12:25** [1] - 124:3
**12:30** [1] - 124:5
**12:35** [3] - 1:18, 128:9, 128:10
**13** [4] - 4:9, 105:2, 115:12, 115:13
**131** [1] - 3:8
**13th** [1] - 50:24
**14** [2] - 16:7, 16:10
**14:24** [1] - 83:21
**14th** [3] - 50:12, 50:21, 52:2
**157** [1] - 125:13
**15th** [2] - 101:10, 102:9
**16** [1] - 63:6
**17** [3] - 10:16, 11:5, 98:24
**171** [2] - 16:19, 17:5
**18** [1] - 14:11
**18th** [1] - 102:25
**19** [2] - 104:22
**1982** [1] - 13:4
**1985** [2] - 13:5, 13:20
**1990** [3] - 13:23, 14:9, 14:12
**1992** [4] - 13:6, 13:20, 13:23, 14:5
**19th** [1] - 104:5

## 2

**2** [10] - 3:2, 3:12, 7:24, 20:8, 20:10, 20:18, 53:8, 53:14, 53:23, 81:14
**20** [2] - 3:14, 5:15
**2004** [4] - 17:20, 17:25, 18:1, 18:17
**2008** [2] - 14:12, 14:13
**2011** [1] - 18:12
**2012** [5] - 15:12, 17:18, 17:20, 18:17, 132:16
**2016** [2] - 17:19, 117:5
**2018** [1] - 46:10
**2019** [6] - 15:25, 101:10, 102:9, 103:1, 104:6, 104:22
**2020** [23] - 11:12, 15:6, 19:13, 20:18, 20:23, 23:10, 26:23, 43:10, 44:3, 50:12, 52:2, 63:6, 80:22, 81:24, 83:14, 91:2, 91:24, 98:24, 99:18, 102:25, 106:8, 124:13, 125:10
**2022** [3] - 15:1, 15:19, 15:25
**2024** [9] - 1:11, 1:17, 5:3, 6:3, 129:3, 131:11, 131:20, 131:21, 132:11
**214-668-5578/ Fax** [1] - 132:17
**23** [2] - 3:15, 46:15
**24** [2] - 46:15
**24th** [1] - 84:4
**25** [2] - 11:12, 91:2
**2533** [1] - 83:17
**25th** [1] - 23:10
**26** [4] - 43:10, 44:3, 124:12, 125:9
**26-2020...........** ........... [1] - 3:19
**2663** [1] - 110:17

## 3

**3** [14] - 3:15, 22:22, 22:23, 24:23, 55:14, 55:16, 65:1, 65:4, 76:24, 90:13, 90:19, 97:7, 111:19, 113:20
**30** [2] - 5:15, 16:9
**30th** [2] - 83:14, 84:4
**34** [1] - 3:17
**3435** [1] - 115:19
**39** [1] - 16:20
**3rd** [1] - 20:18

## 4

**4** [9] - 3:16, 34:5, 34:7, 34:8, 52:25, 53:5, 79:13, 79:19, 111:23
**404** [1] - 2:4
**43** [1] - 3:19
**436** [1] - 132:17
**450-word** [1] - 40:22
**47** [1] - 132:2
**4:21-CV-00033-ALM** [3] - 1:5, 5:4, 131:5
**4th** [2] - 50:11, 99:18

## 5

**5** [7] - 3:3, 3:18, 43:8, 43:10, 43:15, 125:5, 125:9
**50** [1] - 3:22
**512.320.0667** [1] - 2:10

**512.463.2120** [1] - 2:10
**55** [1] - 45:12
**5th** [1] - 26:23

## 6

**6** [6] - 3:5, 3:20, 49:24, 49:25, 50:2
**63** [1] - 3:23
**68** [1] - 3:25

## 7

**7** [4] - 3:11, 3:23, 63:3, 63:5
**7-31-26** [1] - 132:14
**70** [1] - 17:4
**71** [1] - 4:3
**75007-1640** [1] - 132:16
**76201** [1] - 2:15
**78711** [1] - 2:10

## 8

**8** [4] - 3:24, 35:25, 68:5, 68:7
**8-3-20** [1] - 3:12
**801** [2] - 1:22, 2:14
**81** [1] - 4:4
**83** [1] - 4:6
**860.469.2783** [1] - 2:5
**860.772.4738** [1] - 2:5

## 9

**9** [4] - 4:2, 71:5, 71:6, 124:10
**9-16-20** [1] - 3:23
**9-30-20** [1] - 4:5
**940.369.7026** [1] - 2:15
**940.565.2717** [1] - 2:15
**972-236-6666** [1] - 132:17
**99** [1] - 4:8
**9:13** [2] - 1:18, 6:3

## A

**a.m** [4] - 1:18, 6:3, 101:10, 102:9
**abide** [3] - 32:7,

66:1, 69:5
**ability** [1] - 9:1
**able** [8] - 22:18, 44:20, 71:8, 71:9, 76:20, 87:7, 96:18, 124:24
**above-styled** [1] - 1:16
**aboveboard** [1] - 49:14
**Absolutely** [1] - 122:19
**absolutely** [1] - 87:24
**abstract** [1] - 46:3
**academia** [2] - 14:8, 38:9
**academic** [27] - 12:15, 17:6, 17:12, 18:21, 27:2, 27:15, 28:12, 36:17, 36:24, 37:1, 38:4, 48:3, 48:11, 49:16, 52:9, 53:11, 53:15, 53:19, 54:2, 54:15, 86:11, 94:5, 94:13, 122:21, 123:15, 126:17, 126:18
**academics** [1] - 33:3
**acceptable** [2] - 8:19, 56:20
**accepted** [1] - 40:25
**access** [4] - 64:11, 70:15, 71:9, 111:14
**accessible** [1] - 71:4
**accident** [3] - 10:17, 11:2, 11:4
**according** [2] - 41:20, 92:7
**accurate** [5] - 8:9, 15:17, 24:1, 64:19, 70:23
**achieved** [1] - 13:23
**acknowledged** [1] - 130:15
**acknowledging** [1] - 69:23
**acronym** [2] - 30:20, 70:14

**action** [4] - 78:24, 119:21, 132:7, 132:9
**actions** [1] - 123:7
**activities** [2] - 58:21, 65:20
**actual** [3] - 12:10, 86:24, 87:22
**Ad** [23] - 3:13, 3:15, 3:21, 3:23, 11:13, 23:9, 24:22, 24:25, 55:14, 76:17, 76:25, 77:3, 79:22, 87:2, 90:19, 90:23, 91:2, 93:18, 93:23, 105:8, 108:6, 111:20, 113:12
**ad** [40] - 27:12, 29:9, 36:21, 50:4, 51:11, 52:7, 54:21, 57:16, 57:18, 58:10, 58:25, 59:4, 59:16, 60:4, 63:11, 63:14, 63:22, 66:21, 68:5, 70:4, 72:15, 73:13, 73:21, 74:7, 77:9, 79:3, 88:18, 90:13, 98:24, 102:20, 102:24, 102:10, 102:19, 104:2, 107:25, 108:7, 109:7, 111:22, 123:12, 125:16
**add** [1] - 54:9
**added** [1] - 23:3
**adding** [2] - 125:5, 125:11
**additional** [1] - 8:3
**address** [4] - 39:5, 87:12, 89:1, 114:24
**addresses** [2] - 38:12, 39:2
**addressing** [2] - 52:12, 53:21
**adequate** [1] - 31:17
**administration** [1] - 15:22
**Adopt** [1] - 35:25
**adopt** [1] - 69:10

**adopting** [1] - 70:21
**advance** [2] - 60:9, 61:15
**adverse** [1] - 123:7
**advisor** [5] - 16:6, 75:9, 86:11, 105:19, 106:12
**advisory** [4] - 43:18, 79:7, 79:8, 79:16
**affect** [1] - 60:18
**affected** [2] - 66:7, 106:12
**affix** [1] - 130:4
**afforded** [4] - 112:3, 113:7, 113:21, 113:23
**Afterwards** [1] - 46:12
**afterwards** [1] - 84:6
**ago** [3] - 11:21, 49:4, 61:21
**agree** [8] - 44:22, 59:1, 59:4, 59:7, 59:18, 75:16, 88:5, 104:23
**agreed** [5] - 86:1, 87:14, 88:19, 102:23, 102:12
**Agreement** [1] - 5:6
**agrees** [1] - 103:13
**ahead** [6] - 18:10, 22:12, 31:20, 39:18, 85:4, 122:9
**al** [4] - 1:6, 3:21, 4:10, 131:6
**allegations** [1] - 111:18
**Allen** [4] - 2:3, 6:9, 50:6, 132:2
**ALLEN** [35] - 2:3, 6:5, 6:8, 6:16, 6:22, 7:6, 20:9, 20:14, 22:17, 22:20, 23:15, 23:20, 34:4, 43:9, 49:23, 53:6, 55:4, 58:6, 63:4, 64:24, 68:4, 71:11, 71:15, 72:1, 80:20, 83:10, 90:15, 96:19, 96:24, 98:13,

115:11, 123:25, 125:4, 128:1, 128:5
**Allen.......** [1] - 3:5
**allow** [2] - 78:23, 81:2
**almost** [1] - 106:19
**ALSO** [1] - 2:18
**ambivalent** [1] - 102:13
**Amendment** [7] - 121:22, 122:4, 122:8, 122:14, 122:17, 122:19, 123:14
**American** [3] - 17:16, 17:23, 18:3
**amount** [2] - 12:10, 131:25
**analogy** [3] - 49:20, 70:21, 89:7
**analysis** [5] - 85:24, 100:11, 102:14, 103:25, 125:20
**analyzed** [1] - 31:10
**AND** [2] - 129:1, 130:20
**announced** [1] - 29:23
**annual** [1] - 46:11
**Anonymous** [2] - 74:25, 75:20
**anonymous** [9] - 31:21, 36:7, 61:5, 70:10, 70:12, 70:20, 74:22, 75:15, 76:6
**anonymously** [1] - 91:8
**answer** [21] - 9:1, 9:13, 9:20, 9:25, 10:1, 10:9, 22:16, 22:19, 23:18, 23:21, 23:23, 27:7, 28:5, 34:20, 42:4, 53:10, 54:4, 58:4, 73:19, 109:15, 110:5
**answered** [5] - 52:16, 54:12, 57:13, 58:22, 58:24

**answering** [1] - 7:21
**antagonize** [1] - 106:3
**anti** [1] - 95:25
**anti-Ewell** [1] - 95:25
**antisemitic** [2] - 103:8, 103:14
**anytime** [1] - 117:22
**anyway** [1] - 42:12
**apology** [4] - 80:1, 80:10, 80:11, 81:23
**appear** [7] - 39:6, 41:23, 44:24, 61:9, 82:23, 86:6, 111:16
**APPEARANCES** [1] - 2:1
**Appearances..... ........................** [1] - 3:2
**appeared** [9] - 8:9, 32:15, 37:14, 46:17, 62:2, 66:11, 97:17, 97:21, 130:12
**Appearing** [1] - 2:13
**appendix** [1] - 125:13
**applied** [2] - 33:10, 110:6
**apply** [2] - 36:13, 40:16
**applying** [2] - 31:10, 32:13
**appointed** [2] - 25:24, 97:15
**appreciate** [1] - 118:21
**appro** [1] - 75:10
**approach** [1] - 60:3
**appropriate** [17] - 36:1, 36:9, 36:12, 37:1, 39:21, 40:2, 47:13, 47:16, 49:6, 69:11, 69:12, 94:6, 94:13, 104:8, 104:13, 104:18, 104:24
**appropriation** [3] - 75:1, 82:24,

86:8
**APSR** [2] - 18:11, 18:13
**arbitration** [1] - 5:20
**area** [1] - 35:9
**argument** [1] - 94:25
**arrangement** [1] - 78:25
**arrived** [1] - 71:18
**art** [1] - 126:12
**Article** [1] - 4:2
**article** [23] - 33:11, 36:17, 41:3, 42:12, 42:20, 42:22, 44:2, 45:2, 45:14, 45:21, 46:15, 47:4, 72:12, 72:22, 73:23, 74:4, 74:15, 75:12, 75:13, 76:1, 89:12, 95:21, 126:5
**articles** [56] - 16:20, 16:21, 16:23, 17:1, 17:5, 18:7, 18:13, 18:17, 31:14, 33:23, 37:4, 37:7, 37:10, 37:19, 39:6, 40:3, 42:17, 42:23, 44:4, 44:8, 46:12, 46:14, 46:17, 47:12, 47:20, 48:24, 66:8, 66:11, 66:15, 72:17, 73:9, 73:22, 73:23, 77:23, 78:16, 78:17, 85:19, 86:20, 89:1, 95:3, 95:9, 97:17, 97:21, 98:12, 100:16, 104:15, 124:18, 125:17, 125:19, 126:1, 126:2, 126:10, 126:19, 127:3, 127:9, 127:17
**Articles** [1] - 3:18
**Arts** [1] - 13:3
**Aspect** [1] - 44:3
**assert** [1] - 87:7
**assess** [2] - 76:5,

78:17
**assessment** [3] - 60:18, 79:15, 81:9
**Assistant** [2] - 2:8, 6:11
**assistant** [1] - 14:12
**associate** [1] - 14:12
**ASSOCIATES** [1] - 132:15
**Association** [1] - 17:23
**association** [1] - 39:3
**assume** [1] - 12:1
**asymmetry** [2] - 82:14, 98:11
**attach** [1] - 99:2
**attached** [5] - 1:24, 24:23, 25:1, 111:23, 113:12
**attachment** [3] - 99:14, 99:15, 99:21
**attachments** [5] - 61:14, 99:8, 99:11, 99:20, 100:3
**attacked** [1] - 106:19
**attempt** [1] - 99:12
**attendance** [1] - 6:16
**attention** [10] - 65:3, 74:2, 80:18, 100:2, 100:21, 101:1, 110:17, 120:13, 123:11, 124:10
**Attorney** [8] - 2:8, 6:11, 9:23, 64:25, 90:15, 132:2, 132:4
**attorney** [11] - 5:11, 5:12, 9:18, 9:22, 10:3, 44:19, 50:5, 51:6, 71:2, 71:17, 73:17
**attorney-client** [1] - 9:22
**attorneys** [5] - 6:5, 11:21, 11:24, 12:9, 132:7
**attribute** [1] -

63:23
**attribution** [2] - 69:13, 74:12
**audibly** [1] - 9:14
**audio** [2] - 9:3, 75:10
**August** [5] - 19:13, 20:18, 20:23, 26:23, 81:25
**Austin** [1] - 2:10
**author** [14] - 23:13, 24:1, 33:9, 33:17, 69:24, 73:9, 73:23, 82:19, 86:4, 94:22, 113:3, 114:10, 126:12
**authored** [4] - 17:23, 73:22, 73:23, 91:8
**authority** [1] - 97:24
**authors** [5] - 31:22, 69:20, 69:22, 73:2, 73:9
**Authors** [1] - 70:1
**authors'** [1] - 89:21
**authorship** [17] - 69:6, 69:11, 69:13, 69:18, 69:20, 69:25, 70:8, 70:9, 70:12, 70:17, 70:19, 70:24, 74:17, 74:25, 75:1, 75:5, 76:6
**authorships** [1] - 69:14
**available** [3] - 31:13, 36:2, 64:13
**avoid** [2] - 9:11, 46:7
**aware** [16] - 29:22, 30:9, 39:1, 41:6, 41:22, 55:5, 60:14, 62:21, 77:22, 79:25, 80:7, 82:2, 83:8, 84:17, 120:25, 123:6

**B**

**BA** [1] - 12:21

**Bach** [1] - 101:23
**Bachelor's** [3] - 13:2, 13:3, 13:9
**backwards** [1] - 50:19
**Bakulina** [5] - 45:15, 45:21, 115:25, 119:19, 121:25
**Based** [1] - 36:20
**based** [3] - 44:17, 46:21, 126:22
**basis** [1] - 51:20
**Bates** [1] - 64:25
**BE** [1] - 5:5
**bear** [2] - 50:14, 82:25
**beat** [1] - 112:14
**became** [1] - 84:16
**become** [2] - 14:24, 86:3
**becomes** [1] - 103:23
**begin** [1] - 91:11
**begins** [3] - 25:23, 68:9, 90:24
**behavior** [2] - 116:8, 116:24
**behind** [1] - 119:10
**below** [1] - 26:15
**Ben** [1] - 82:17
**Benjamin** [5] - 3:24, 79:6, 79:14, 91:17, 110:1
**Berlioz** [1] - 101:24
**best** [36] - 21:11, 26:4, 34:2, 35:15, 35:17, 35:19, 39:12, 39:14, 39:20, 39:23, 47:17, 48:10, 48:13, 48:18, 49:15, 56:18, 57:18, 57:23, 57:25, 58:2, 58:9, 58:16, 58:17, 58:24, 59:17, 59:22, 59:24, 62:22, 63:9, 65:23, 66:6, 78:18, 112:17, 112:23, 114:9
**better** [6] - 27:7, 49:16, 70:21,

71:9, 82:23, 86:7
**between** [21] - 13:8, 13:16, 13:18, 13:23, 72:16, 73:22, 79:6, 86:21, 95:8, 95:24, 100:22, 101:4, 103:25, 105:9, 105:10, 106:11, 108:18, 108:25, 109:11, 109:17, 109:25
**beyond** [3] - 60:1, 103:16, 121:24
**bibliography** [1] - 40:22
**big** [1] - 110:25
**bit** [7] - 8:5, 25:5, 25:7, 43:5, 46:21, 108:9
**bits** [1] - 88:7
**blanket** [1] - 37:2
**blind** [10] - 33:8, 33:13, 33:15, 33:19, 42:11, 42:18, 46:16, 47:22, 127:23
**block** [2] - 69:1, 119:7
**blocks** [1] - 7:25
**board** [6] - 43:18, 47:8, 79:7, 79:8, 79:16
**body** [1] - 61:22
**bold** [1] - 74:9
**book** [5] - 16:20, 17:2, 17:9, 18:11, 37:8
**books** [4] - 16:19, 125:17, 125:19, 126:11
**bordering** [1] - 75:16
**bottom** [4] - 43:21, 50:21, 50:23, 50:25
**Boulevard** [2] - 1:22, 2:14
**Bowling** [3] - 12:22, 13:3, 13:9
**Box** [2] - 2:4, 2:9
**Brand** [3] - 3:24, 91:17, 110:1
**break** [4] - 10:7, 55:2, 115:9
**brief** [1] - 25:11
**briefly** [4] - 12:17,

74:7, 85:17, 100:21
**bring** [1] - 50:18
**bringing** [1] - 92:19
**broadly** [1] - 75:7
**broke** [1] - 112:21
**brought** [1] - 59:24
**build** [1] - 54:19
**built** [1] - 46:13
**business** [1] - 51:11
**but..** [2] - 85:14, 113:16
**button** [1] - 7:8
**BY** [2] - 6:22, 58:8

**C**

**C-O-P-E** [1] - 30:19
**campus** [1] - 102:7
**candidates** [1] - 127:1
**cannot** [17] - 23:15, 32:6, 62:1, 70:6, 88:23, 106:22, 107:5, 107:12, 109:15, 109:22, 113:15, 116:20, 117:16, 117:20, 119:1, 122:11
**can't** [1] - 102:4
**capacity** [4] - 14:9, 15:19, 16:2, 16:9
**Capital** [1] - 2:9
**car** [6] - 10:17, 11:4, 91:25, 97:8, 102:6, 108:5
**card** [1] - 130:14
**career** [6] - 12:14, 12:15, 12:18, 14:8, 14:11, 106:18
**carefully** [1] - 60:24, 68:25, 100:11
**Carrell** [2] - 1:18, 132:14
**CARRELL** [1] - 131:13
**Carrollton** [1] - 132:16
**carry** [1] - 36:21
**carrying** [1] -

29:20
**case** [5] - 7:23, 10:17, 38:1, 65:22, 77:22
**CASE** [2] - 1:5, 131:5
**cases** [1] - 9:23
**catch** [1] - 99:25
**CAUSE** [1] - 5:4
**caused** [4] - 87:7, 102:12, 105:24, 106:15
**cc** [1] - 20:20
**CC** [1] - 50:4
**cc'd** [1] - 119:7
**censor** [9] - 86:12, 92:1, 92:14, 93:5, 93:8, 94:6, 94:9, 94:14
**censored** [3] - 92:17, 92:21
**censorship** [5] - 52:10, 53:20, 92:15, 94:11, 94:16
**Center** [1] - 64:9
**center** [1] - 100:17
**certain** [2] - 82:8, 94:23
**Certainly** [1] - 43:7, 118:22
**certainly** [1] - 25:19, 37:4, 88:25
**Certificate.......... .............** [1] - 3:8
**CERTIFICATION** [1] - 131:9
**Certification** [1] - 132:18
**Certified** [3] - 1:19, 131:13, 132:10
**certify** [2] - 131:14, 132:5
**CH** [1] - 62:17
**chain** [1] - 100:8
**Chain** [2] - 3:12, 4:5
**chair** [8] - 14:24, 15:18, 16:8, 24:12, 24:15, 24:17, 108:22, 110:8
**Chair** [2] - 3:25, 14:22
**chairing** [1] -

16:10
**chance** [6] - 8:1, 24:19, 42:4, 63:12, 84:11, 93:17
**change** [1] - 106:7
**CHANGE** [1] - 129:4
**changes** [1] - 89:21
**CHANGES** [1] - 129:1
**Changes............. .........** [1] - 3:7
**Chaouat** [1] - 99:12
**chapters** [1] - 16:20
**characterize** [1] - 59:14
**characterized** [2] - 102:13, 105:7
**charge** [43] - 21:13, 21:16, 21:18, 21:19, 21:22, 21:24, 25:13, 25:15, 25:18, 25:19, 25:21, 26:7, 26:14, 26:17, 27:9, 27:10, 28:2, 28:7, 28:21, 28:24, 28:25, 29:5, 30:16, 35:12, 35:14, 39:19, 40:8, 40:9, 40:10, 54:5, 54:17, 55:15, 55:17, 55:24, 56:2, 57:1, 59:19, 60:1, 60:3, 60:13, 74:1, 78:24
**charged** [2] - 27:17, 28:17
**charging** [1] - 55:5
**chat** [8] - 71:9, 71:18, 71:20, 81:19, 90:17, 98:14, 98:21, 115:14
**checklists** [1] - 69:18
**chef** [1] - 13:15
**cherrypicked** [2] - 82:22, 86:6
**chief** [3] - 17:16,

17:20, 18:18
**chooses** [1] - 51:7
**Chrisman** [8] - 62:13, 62:17, 63:24, 64:6, 65:18, 66:25, 68:18
**Christmas** [1] - 64:6
**Christopher** [1] - 45:22
**circled** [1] - 65:2
**circuit** [1] - 94:21
**circulated** [1] - 68:16
**cite** [2] - 119:1, 120:5
**cited** [1] - 17:18
**Civil** [2] - 1:23, 5:8
**civil** [1] - 10:16
**claim** [2] - 103:22, 117:13
**claimed** [1] - 37:15
**claims** [1] - 37:18
**clarification** [10] - 8:18, 8:21, 30:23, 36:5, 38:21, 49:8, 53:14, 77:8, 79:18, 92:20
**clarify** [2] - 39:25, 74:6
**clarity** [2] - 85:20, 126:24
**classes** [1] - 101:25
**clean** [2] - 9:13, 73:19
**cleanly** [1] - 89:9
**clear** [19] - 8:23, 9:16, 9:21, 9:25, 10:3, 10:10, 31:4, 38:13, 39:4, 39:8, 42:3, 44:7, 49:13, 61:2, 61:25, 62:3, 62:5, 63:23, 116:23
**clearcut** [1] - 113:19
**Clearly** [1] - 69:25
**clearly** [9] - 7:12, 36:18, 37:22, 39:12, 43:17, 48:7, 48:17, 54:3, 87:4
**click** [1] - 71:1

**client** [4] - 6:17, 9:22, 29:7, 78:8
**close** [1] - 17:4
**closely** [1] - 8:2
**closes** [1] - 91:7
**colleague** [3] - 45:16, 79:9, 116:18
**colleagues** [2] - 119:4, 123:8
**collection** [1] - 111:1
**collections** [1] - 126:10
**collectively** [2] - 23:24, 68:15
**College** [10] - 19:5, 25:25, 29:24, 30:9, 30:12, 67:7, 109:12, 109:17, 109:18, 127:7
**collegial** [1] - 19:4
**column** [1] - 74:16
**Comm** [1] - 132:18
**comment** [1] - 117:11
**commentaries** [1] - 100:18
**commentary** [2] - 32:22, 100:12
**comments** [4] - 82:19, 86:4, 117:7, 117:22
**Commission** [1] - 130:22
**commitment** [1] - 27:22
**committed** [6] - 21:19, 21:22, 25:14, 25:15, 27:2, 27:14
**committee** [43] - 20:4, 20:22, 21:4, 21:13, 21:16, 21:18, 23:24, 24:6, 24:9, 24:14, 24:15, 24:17, 25:13, 25:19, 26:14, 26:19, 27:9, 27:17, 27:25, 28:3, 28:7, 30:3, 30:7, 30:15, 30:18, 30:24, 34:16, 34:21, 40:17, 40:25, 42:17,

46:6, 51:21, 52:7, 54:21, 60:16, 63:11, 65:7, 87:18, 99:19, 108:20, 126:10
**Committee** [2] - 4:8, 69:3
**committee's** [1] - 51:23
**Committee......... ....** [1] - 3:23
**committees** [2] - 16:8, 16:9
**common** [6] - 33:22, 38:8, 38:11, 73:1, 73:6, 104:19
**communicate** [1] - 21:16
**communicated** [3] - 20:6, 22:5, 120:6
**communication** [1] - 51:13
**communications** [2] - 69:22, 95:7
**compare** [1] - 67:23
**compared** [1] - 108:11
**compelled** [2] - 118:11, 120:4
**compels** [1] - 118:12
**complain** [1] - 122:24
**complaint** [3] - 121:15, 123:4, 123:20
**complete** [1] - 61:19
**completed** [5] - 13:6, 16:5, 16:7, 16:12, 25:1
**completion** [2] - 13:8, 13:17
**complicated** [1] - 88:20
**comport** [1] - 66:6
**comported** [1] - 21:10
**comprehensive** [1] - 95:7
**compromised** [1] - 78:15
**computerized** [1] - 1:20
**conceal** [1] -

105:24
**concealed** [1] - 77:25
**concealing** [2] - 105:20, 106:2
**conception** [2] - 26:2, 55:19
**concern** [2] - 91:24, 106:23
**concerned** [1] - 106:17
**concerning** [4] - 25:12, 28:17, 32:20, 39:15
**concerns** [4] - 91:15, 91:17, 91:20, 91:22
**concluded** [1] - 128:10
**concrete** [2] - 43:5, 85:15
**condensed** [1] - 99:16
**condition** [1] - 24:13
**conducted** [2] - 29:9, 51:10
**conducting** [2] - 34:3, 57:15
**Conference** [1] - 41:11
**conference** [20] - 16:25, 19:19, 38:7, 38:15, 38:24, 40:13, 40:17, 40:18, 40:25, 41:3, 41:7, 41:8, 41:14, 41:23, 46:5, 46:11, 46:13, 125:25, 127:17
**confess** [1] - 50:15
**confidential** [1] - 118:5
**confined** [1] - 29:12
**confirmed** [1] - 92:4
**conflated** [1] - 41:11
**conflict** [1] - 61:3
**confused** [2] - 82:24, 86:7
**confusing** [1] - 95:4
**confusion** [2] - 33:12, 46:7
**connection** [1] -

103:24
**consent** [1] - 92:11
**consider** [21] - 27:11, 27:25, 28:19, 45:8, 46:22, 47:20, 56:25, 57:18, 57:23, 58:9, 70:23, 73:21, 76:11, 87:1, 94:12, 103:16, 103:24, 106:6, 107:14, 107:16, 111:16
**considerably** [1] - 102:2
**consideration** [2] - 38:7, 130:15
**considered** [13] - 28:16, 28:21, 28:24, 29:2, 60:5, 73:14, 88:8, 102:10, 102:19, 103:18, 108:11, 109:7, 127:1
**considering** [2] - 57:3, 57:9
**consistent** [5] - 27:21, 52:22, 54:21, 103:12, 105:13
**constitutes** [1] - 31:16
**Constitution** [1] - 122:20
**consulted** [1] - 11:17
**consulting** [1] - 70:17
**contacted** [1] - 113:10
**contemporaneous** [1] - 63:21
**content** [21] - 80:16, 81:21, 82:3, 82:6, 82:11, 84:20, 85:3, 86:19, 86:20, 87:12, 89:1, 89:8, 89:13, 89:20, 90:10, 91:22, 93:2, 95:12, 96:3, 118:1, 120:11
**contents** [2] - 48:12, 124:12
**context** [1] - 94:5

**continued** [2] - 86:12, 117:3
**contract** [3] - 65:9, 65:21, 65:24
**contracts** [4] - 65:13, 65:16, 66:23, 66:24
**contribute** [1] - 114:23
**contributed** [1] - 23:25
**contribution** [2] - 69:17, 91:9
**contributions** [6] - 28:9, 74:11, 74:18, 91:16, 96:10, 104:19
**contributor** [1] - 61:5
**contributors** [1] - 32:21
**Contributors** [2] - 3:19, 125:14
**control** [8] - 82:11, 84:19, 85:3, 89:13, 105:13, 105:14, 108:19, 109:21
**controversial** [1] - 95:19
**controversy** [12] - 15:3, 18:24, 19:7, 19:11, 19:15, 19:18, 19:19, 87:22, 100:17, 103:4, 107:13, 107:15
**conversation** [1] - 9:11
**Coordinator** [7] - 116:22, 117:3, 118:2, 118:11, 119:15, 121:14, 123:5
**COPE** [33] - 3:16, 30:19, 31:1, 31:2, 31:7, 31:12, 31:15, 31:25, 32:5, 32:7, 32:8, 32:12, 32:19, 32:20, 34:9, 34:17, 35:2, 35:22, 52:4, 52:7, 52:16, 52:19, 62:6, 62:19, 62:22, 65:15, 65:19, 66:22, 67:18,

69:4, 70:17, 75:1, 76:10
**coping** [1] - 52:5
**copy** [1] - 5:20
**correct** [22] - 15:4, 18:5, 26:23, 28:21, 41:20, 44:23, 47:22, 48:3, 51:17, 76:9, 76:13, 84:3, 87:8, 89:3, 91:5, 102:4, 119:8, 119:9, 121:15, 123:18, 125:6, 130:5
**Correct** [2] - 46:10, 47:1
**corrections** [1] - 3:7
**correctly** [18] - 22:4, 26:10, 28:13, 34:11, 36:3, 50:7, 52:13, 53:23, 65:11, 74:13, 83:22, 86:14, 103:9, 104:10, 105:4, 105:9, 112:5, 127:4
**correspondence** [2] - 102:12, 107:23
**corresponding** [1] - 69:24
**Council** [1] - 30:21
**council** [2] - 30:24, 34:21
**counsel** [3] - 23:4, 98:21, 132:5
**Counsel** [2] - 2:14, 6:15
**count** [3] - 41:19, 42:19, 126:1
**counterfactual** [1] - 49:9
**COUNTY** [1] - 130:11
**couple** [2] - 12:12, 25:11
**course** [9] - 51:6, 51:11, 51:15, 66:14, 81:17, 102:2, 102:9, 105:2, 107:16
**court** [3] - 9:12, 9:15, 23:5
**COURT** [2] - 1:1,

131:1
**Court** [7] - 5:7, 23:2, 31:4, 34:5, 44:21, 55:22, 58:6
**Cowley** [10] - 3:12, 19:2, 19:11, 19:25, 20:2, 20:17, 20:25, 21:3, 21:12, 27:7
**crazy** [1] - 50:15
**credentials** [1] - 14:4
**credit** [2] - 16:18, 75:6
**Crest** [1] - 132:16
**criteria** [1] - 69:25
**critically** [1] - 126:11
**criticized** [1] - 19:21
**critiquing** [1] - 89:21
**cross** [1] - 50:17
**cross-eyed** [1] - 50:17
**CSR** [1] - 132:14
**CT** [1] - 2:4
**cues** [1] - 9:10
**cultural** [2] - 82:24, 86:7
**curriculum** [1] - 15:13
**customer** [1] - 49:20

**D**

**Date** [1] - 132:14
**DATE** [2] - 5:3, 129:3
**date** [2] - 15:13, 83:24
**dated** [3] - 20:18, 63:6, 80:22
**DAYS** [1] - 5:14
**days** [6] - 5:15, 5:15, 11:21, 21:8, 102:24, 103:2
**deal** [4] - 80:18, 116:8, 119:3
**deals** [3] - 69:7, 75:5, 75:12
**dean** [3] - 109:17, 109:21, 110:6
**Dean** [2] - 29:24, 109:12
**Dear** [1] - 101:22,

104:23
**debate** [1] - 19:19
**debates** [1] - 19:23
**December)** [1] - 105:1
**decided** [1] - 85:23
**decision** [6] - 57:2, 57:4, 57:9, 61:4, 80:14, 92:7
**decision-maker** [1] - 80:14
**decisions** [6] - 78:5, 78:24, 79:13, 82:16, 86:24, 98:12
**declaration** [2] - 39:9, 69:21
**declare** [1] - 103:14
**declared** [1] - 102:23
**dedicated** [1] - 102:2
**dedication** [1] - 27:21
**deeply** [1] - 103:6
**defend** [1] - 28:11
**DEFENDANTS** [1] - 2:7
**Defendants** [4] - 1:7, 6:12, 131:7, 132:4
**define** [3] - 56:15, 56:19, 93:16
**defined** [2] - 76:3, 126:4
**definitely** [2] - 20:24, 106:23
**definition** [2] - 74:3, 76:5
**degree** [6] - 12:20, 12:23, 13:4, 13:9, 13:10, 13:17
**degrees** [4] - 12:18, 13:18, 14:4, 16:12
**deletions** [1] - 128:7
**delivered** [2] - 95:15, 102:19
**demonstrate** [1] - 108:9
**demonstrated** [2] - 60:22, 82:14
**Denton** [3] - 1:22, 2:15, 102:5

**deny** [2] - 58:15, 88:9
**department** [4] - 15:18, 15:23, 67:25, 97:15
**Department** [2] - 14:22, 14:24
**depended** [1] - 109:22
**depose** [1] - 93:17
**deposed** [4] - 10:12, 10:15, 38:1, 40:15
**DEPOSITION** [5] - 1:9, 1:14, 5:2, 5:5, 131:10
**deposition** [22] - 6:13, 7:16, 7:20, 7:21, 8:10, 9:9, 9:12, 10:8, 11:3, 11:9, 11:17, 11:20, 12:3, 12:6, 23:11, 42:11, 44:1, 130:4, 131:17, 131:19, 131:23, 132:1
**Deposition** [13] - 7:11, 20:8, 22:23, 34:7, 43:8, 49:25, 63:3, 68:7, 71:6, 80:19, 83:12, 98:18, 115:13
**Deposition.......** [1] - 3:11
**depositions** [1] - 11:6
**Deputy** [1] - 6:14
**describe** [4] - 12:17, 14:7, 43:1, 116:5
**described** [7] - 38:22, 40:20, 42:16, 47:21, 48:10, 99:21, 121:8
**description** [2] - 46:4, 130:13
**DESCRIPTION** [1] - 3:10
**designation** [2] - 24:24, 44:22
**designations** [1] - 44:24
**detail** [2] - 102:2, 111:7
**detailing** [1] - 95:7

**details** [3] - 20:5, 117:4, 117:10
**determine** [9] - 27:18, 33:22, 35:9, 36:8, 36:11, 40:5, 44:17, 60:24, 126:22
**determined** [1] - 60:17
**devalue** [2] - 82:21, 86:5
**developed** [1] - 70:16
**DeVinney** [2] - 63:24, 68:18
**devoted** [1] - 101:24
**differences** [2] - 72:16, 73:22
**different** [5] - 24:7, 38:3, 39:5, 41:12, 53:3
**differential** [19] - 79:23, 86:21, 87:4, 97:24, 98:3, 105:7, 105:17, 105:19, 105:24, 106:7, 106:11, 108:10, 108:18, 108:23, 108:25, 109:11, 109:16, 109:25, 110:10
**DIRECT** [1] - 6:21
**direct** [3] - 112:24, 114:4
**Direct** [1] - 3:5
**directed** [1] - 120:21
**direction** [1] - 86:13
**Directions** [2] - 3:19, 125:14
**directly** [9] - 81:24, 91:19, 112:15, 113:10, 114:9, 114:19, 119:3, 122:1, 122:2
**director** [1] - 15:24
**disagree** [1] - 88:12
**discipline** [1] - 17:18
**disciplines** [2] - 19:24, 127:2
**disclaimer** [2] - 31:23, 44:16

**disclosed** [1] - 115:16
**disclosure** [1] - 74:12
**discomfort** [2] - 107:13, 121:13
**discourage** [1] - 69:13
**discuss** [6] - 18:20, 52:8, 53:18, 82:8, 97:25, 102:1
**discussed** [9] - 47:22, 63:16, 63:21, 66:22, 75:25, 117:1, 118:4, 125:1, 127:24
**discussing** [5] - 64:12, 65:13, 102:11, 114:21, 125:9
**discussion** [4] - 37:25, 41:1, 65:6, 94:17
**disgusting** [1] - 86:13
**dismissed** [1] - 91:20
**dissertation** [7] - 13:24, 16:6, 75:9, 105:18, 106:12, 108:22, 110:8
**dissertations** [2] - 16:7, 16:10
**Distinguished** [1] - 14:21
**distinguished** [4] - 15:7, 15:10, 15:16, 108:25
**distortion** [1] - 75:10
**distribution** [1] - 79:15
**DISTRICT** [4] - 1:1, 1:1, 131:1, 131:1
**District** [2] - 23:2, 23:3
**diverse** [1] - 28:11
**diversity** [1] - 27:22
**division** [3] - 109:25, 110:6, 110:8
**Division** [3] - 2:9, 3:25, 91:18
**DIVISION** [2] - 1:2, 131:2

**doc** [1] - 23:23
**document** [17] - 8:8, 8:10, 23:1, 23:5, 23:24, 24:19, 32:19, 34:9, 34:13, 34:15, 63:5, 71:3, 71:19, 72:8, 99:18, 100:9, 130:14
**Documentation** [1] - 99:17
**documents** [11] - 11:16, 50:16, 54:20, 61:12, 61:18, 62:4, 71:8, 80:8, 99:3, 100:6, 100:7
**Done** [2] - 4:2, 72:13
**done** [4] - 11:8, 11:11, 110:16, 115:7
**double** [10] - 33:8, 33:13, 33:16, 33:19, 42:11, 42:18, 46:16, 47:22, 127:23
**double-blind** [9] - 33:8, 33:13, 33:19, 42:11, 42:18, 46:16, 47:22, 127:23
**doubt** [1] - 9:23
**down** [14] - 7:8, 7:23, 8:5, 43:17, 43:24, 44:11, 50:18, 83:23, 98:14, 101:18, 104:5, 104:20, 115:3, 125:10
**download** [1] - 71:23
**Dr** [36] - 6:13, 9:2, 51:13, 60:23, 61:22, 78:21, 79:9, 79:16, 79:17, 82:16, 87:10, 91:17, 91:18, 91:19, 91:20, 91:22, 91:25, 92:2, 92:4, 92:5, 92:7, 92:8, 92:17, 92:20, 93:12, 98:3, 100:13, 101:22, 104:23, 106:3, 106:13, 107:7, 107:10, 111:1

**draft** [5] - 24:2, 24:3, 24:5, 24:7, 24:8
**drafted** [1] - 91:1
**drafting** [1] - 115:21
**draw** [3] - 65:3, 74:2, 89:7
**Drive** [1] - 132:16
**drives** [1] - 50:15
**drop** [1] - 90:17
**duly** [4] - 1:16, 6:20, 131:17, 131:19
**during** [1] - 9:9
**duties** [3] - 27:12, 29:18, 29:20
**dutifully** [2] - 93:24, 116:11

## E

**E-mail** [3] - 2:5, 2:11, 2:19
**e-mails** [1] - 95:6
**early** [1] - 81:25
**earned** [4] - 12:18, 12:19, 13:2, 14:4
**easier** [3] - 25:9, 43:5, 81:18
**Eastern** [1] - 23:2
**EASTERN** [2] - 1:1, 131:1
**edit** [1] - 94:9
**edited** [9] - 17:8, 17:9, 17:10, 33:8, 43:12, 77:24, 78:10, 94:25
**editing** [7] - 34:10, 56:1, 66:6, 97:11, 97:16, 97:25, 98:12
**Editing** [1] - 3:17
**edition** [1] - 32:21
**editor** [55] - 17:8, 17:11, 17:15, 17:16, 17:20, 17:21, 17:24, 18:6, 18:18, 33:5, 36:16, 36:20, 41:1, 41:16, 41:23, 45:18, 47:3, 47:6, 47:10, 47:12, 48:7, 56:1, 61:2, 77:10, 77:19,

78:4, 79:6, 79:14, 80:12, 85:5, 85:7, 86:22, 87:10, 88:5, 88:21, 89:10, 89:23, 91:15, 92:19, 93:5, 94:5, 94:6, 94:11, 94:14, 95:1, 95:4, 97:14, 97:15, 100:23, 100:24, 105:12, 112:15, 113:10, 114:9, 126:17
**editor's** [3] - 61:8, 88:25, 94:17
**editor-in-chief** [3] - 17:16, 17:20, 18:18
**Editorial** [3] - 90:24, 91:5, 99:15
**editorial** [15] - 21:9, 26:6, 29:6, 32:23, 37:8, 47:8, 54:6, 79:7, 79:8, 79:16, 87:8, 92:12, 95:1, 95:8
**Editors** [1] - 3:17
**editors** [15] - 31:2, 31:18, 32:4, 32:6, 32:19, 34:10, 36:13, 62:23, 65:23, 69:7, 78:19, 78:24, 79:17, 89:17, 104:13
**editorship** [1] - 89:9
**editorships** [1] - 77:12
**edits** [1] - 85:20
**educate** [1] - 45:7
**Education** [1] - 17:22
**education** [1] - 18:14
**educational** [1] - 12:17
**effect** [5] - 57:10, 98:7, 106:22, 107:22, 117:9
**effort** [1] - 57:12
**egalitarianism** [1] - 82:24, 86:8
**either** [5] - 23:3, 31:1, 48:7, 87:19, 105:20

**Ellen** [3] - 45:14, 45:21, 119:19
**email** [39] - 20:3, 20:7, 20:17, 20:24, 20:25, 21:8, 25:3, 25:12, 25:15, 26:22, 27:1, 50:1, 50:9, 50:21, 51:2, 51:16, 52:1, 52:3, 53:24, 61:14, 83:13, 85:12, 85:14, 98:22, 99:6, 100:8, 102:8, 102:19, 102:25, 104:24, 104:6, 104:21, 105:14, 115:16, 115:21, 115:24, 116:9
**Email** [3] - 3:12, 4:5, 4:9
**emailed** [1] - 50:20
**Emails** [1] - 3:20
**emails** [9] - 50:19, 51:10, 51:19, 60:23, 61:23, 100:22, 101:4, 101:16, 111:1
**employed** [2] - 21:25, 132:6
**Employed** [1] - 90:25
**employment** [2] - 13:14, 123:7
**encounter** [1] - 92:5
**encourage** [1] - 69:12
**encouraged** [1] - 127:3
**end** [5] - 9:4, 24:23, 26:11, 91:12, 96:15
**ending** [2] - 3:20, 4:5
**Ending** [1] - 3:12
**endorsed** [1] - 119:20
**engraved** [1] - 114:3
**entered** [1] - 13:12
**entertained** [1] - 114:22
**entire** [8] - 27:9, 44:6, 44:12, 75:2, 79:4,

103:4, 103:22, 106:19
**entirely** [5] - 15:13, 20:7, 20:24, 28:2, 92:25
**entirety** [2] - 7:24, 24:21
**entitled** [1] - 102:8
**episode** [2] - 91:9, 108:5
**Especially** [1] - 111:10
**especially** [3] - 32:25, 69:5, 79:12
**essentially** [8] - 17:9, 86:1, 87:14, 88:19, 90:7, 102:23, 102:12, 103:13
**establish** [1] - 54:20
**esteemed** [1] - 66:16
**estimation** [1] - 34:1
**et** [4] - 1:6, 3:21, 4:10, 131:6
**ethical** [1] - 34:10
**Ethical** [1] - 3:17
**Ethics** [2] - 30:22, 69:4
**ethics** [3] - 27:24, 28:12, 65:7
**Ethnomusicolog y.............** [1] - 3:25
**Europe** [1] - 70:16
**evaluate** [3] - 55:24, 66:10, 68:1
**evaluating** [3] - 36:14, 66:4, 76:9
**evaluation** [1] - 83:3
**event** [2] - 116:1, 116:7
**eventually** [2] - 60:10, 100:25
**everyday** [1] - 9:11
**evidence** [27] - 56:7, 56:10, 56:13, 56:21, 57:3, 57:19, 57:21, 57:22, 57:24, 58:11,

58:20, 58:25, 59:5, 59:18, 60:5, 60:17, 60:20, 61:2, 61:24, 66:2, 66:7, 66:14, 75:23, 88:7, 88:8, 107:21, 108:4
**evolved** [1] - 24:5
**Ewell** [12] - 45:20, 95:17, 95:24, 95:25, 96:7, 102:19, 112:2, 112:9, 113:6, 114:16, 114:20, 114:22
**Ewell's** [8] - 46:14, 85:22, 86:1, 87:15, 87:17, 88:19, 103:3, 103:21
**exact** [4] - 15:11, 16:16, 43:2, 117:20
**exactly** [9] - 7:17, 20:6, 29:10, 30:25, 46:2, 61:21, 84:23, 89:5, 117:1
**examination** [1] - 131:20
**Examination** [1] - 3:5
**EXAMINATION** [1] - 6:21
**examine** [6] - 7:18, 8:1, 8:3, 26:1, 55:18, 102:6
**examined** [2] - 67:14, 102:20
**example** [10] - 38:20, 43:5, 69:19, 70:18, 72:24, 72:25, 75:2, 75:3, 76:11, 77:7
**examples** [2] - 42:10, 85:15
**except** [1] - 130:5
**exceptions** [1] - 9:21
**excerpt** [1] - 44:15
**exchanging** [1] - 51:20
**exclusively** [2] - 26:19, 75:2
**exculpatory** [9] -

56:6, 56:13,
56:21, 57:3,
57:19, 58:11,
58:25, 59:5,
59:17
**excuse** [7] - 9:24,
25:6, 50:11,
63:11, 95:21,
100:22, 102:25
**Excuse** [2] -
29:18, 77:2
**executed** [1] -
130:15
**exercised** [1] -
89:13
**exerted** [1] -
107:10
**Exhibit** [68] -
3:11, 3:12, 3:15,
3:16, 3:18, 3:20,
3:23, 3:24, 4:2,
4:4, 4:5, 4:7,
4:9, 7:10, 7:11,
8:11, 20:8,
20:10, 20:18,
22:22, 22:23,
24:23, 34:5,
34:7, 34:8, 43:8,
43:10, 43:15,
49:24, 49:25,
50:2, 52:25,
53:5, 55:14,
55:16, 63:3,
63:5, 68:5, 68:7,
71:5, 71:6,
76:24, 77:5,
80:19, 80:21,
83:11, 83:12,
90:13, 90:19,
97:7, 98:16,
98:18, 98:19,
98:22, 101:7,
102:21, 102:4,
107:24, 111:19,
111:23, 112:8,
113:20, 115:12,
115:13, 124:10,
125:5, 125:9
**exhibit** [17] - 7:12,
7:18, 7:21, 8:1,
8:4, 8:14, 20:12,
25:3, 43:15,
76:16, 83:11,
98:15, 98:19,
111:21, 113:12,
125:7, 125:12
**EXHIBITS** [1] -
3:9
**exhibits** [3] - 7:7,
24:22, 24:24

existed [1] -
106:11
**exists** [1] - 74:17
**expanded** [3] -
25:7, 125:25,
127:17
**expect** [2] - 35:16,
35:19
**experience** [12] -
34:1, 35:6,
35:14, 36:13,
36:20, 39:23,
41:25, 42:15,
56:1, 73:7, 90:1,
94:4
**experienced** [1] -
126:17
**experiences** [2] -
68:2, 77:18
**expert** [1] -
125:15
**expertise** [4] -
36:16, 46:21,
48:16, 94:4
**Expiration** [1] -
132:14
**Expires** [3] -
130:22, 132:18,
132:18
**explain** [4] - 11:8,
21:21, 33:4,
55:22
**explaining** [1] -
52:16
**explains** [1] -
40:23
**explanation** [1] -
78:9
**express** [1] -
94:23
**expressed** [4] -
105:18, 106:24,
113:16, 130:15
**extend** [1] - 34:2
**extension** [1] -
103:23
**extensive** [1] -
95:6
**extremely** [1] -
85:6
**eyed** [1] - 50:17
**eyes** [1] - 50:16

# F

**face** [4] - 21:17,
52:10, 53:19
**face-to-face** [1] -
21:17
**Facebook** [6] -

4:4, 80:21,
80:25, 81:5,
81:23, 84:16
**faced** [1] - 121:14
**facilitate** [1] -
33:18
**facing** [1] - 122:3
**fact** [10] - 24:11,
30:10, 33:16,
35:5, 60:21,
65:24, 87:21,
100:2, 106:10,
113:21
**facts** [1] - 46:19
**factual** [1] -
113:18
**faculty** [9] -
45:15, 86:10,
111:22, 113:6,
113:11, 113:20,
117:17, 123:8,
127:2
**failed** [1] - 90:16
**fair** [9] - 10:18,
23:8, 28:20,
33:19, 43:6,
49:20, 51:10,
52:15, 89:19
**fairly** [3] - 31:15,
99:8, 100:10
**fairness** [1] - 23:6
**false** [1] - 112:8
**familiar** [7] - 32:5,
33:3, 41:4,
42:13, 64:6,
77:18, 110:4
**family** [1] - 11:1
**famous** [1] -
76:15
**far** [2] - 51:23,
53:1
**fast** [2] - 81:14,
90:23
**fast-forward** [1] -
81:14
**fast-forwarding**
[1] - 90:23
**favor** [1] - 11:3
**Fax** [3] - 2:5, 2:10,
2:15
**fear** [2] - 106:25,
107:1
**February** [1] -
91:23
**Federal** [2] - 1:23,
5:8
**feelings** [1] -
121:12
**felt** [5] - 79:10,
80:12, 84:17,

98:7, 108:22
**few** [10] - 9:21,
11:21, 21:7,
52:4, 63:19,
85:18, 100:22,
102:24, 104:12,
125:2
**field** [14] - 33:22,
35:10, 38:4,
46:25, 66:17,
67:25, 69:11,
73:4, 89:2, 89:3,
108:21, 126:7,
126:9, 126:12
**fields** [2] - 82:22,
86:5
**figure** [1] - 61:12
**file** [1] - 115:17
**filed** [1] - 123:21
**final** [1] - 92:7
**financially** [1] -
132:8
**fine** [7] - 34:22,
55:6, 59:15,
62:19, 83:16,
85:18, 107:23
**finish** [3] - 76:21,
118:17, 118:21
**finishing** [1] -
13:25
**fired** [2] - 119:22,
123:16
**Firm** [1] - 132:17
**first** [24] - 6:20,
14:11, 20:22,
21:1, 24:3, 24:5,
24:7, 24:8, 25:3,
26:22, 27:12,
41:8, 42:7,
43:21, 52:17,
69:6, 72:9, 74:3,
76:1, 81:8,
85:18, 99:13,
101:19, 104:7
**First** [7] - 121:22,
122:3, 122:8,
122:14, 122:17,
122:19, 123:14
**fit** [2] - 89:16, 90:6
**fits** [1] - 35:2
**five** [3] - 25:24,
123:23, 126:9
**five-member** [1] -
25:24
**flipping** [2] -
111:18, 112:7
**focus** [8] - 27:9,
29:18, 29:20,
54:8, 56:2,
60:19, 61:5,

67:20
**focused** [4] -
26:18, 27:8,
28:2, 121:9
**follow** [12] -
21:24, 25:12,
35:17, 35:19,
35:21, 37:5,
39:23, 75:22,
81:4, 84:17,
94:3, 102:3
**follow-up** [4] -
21:24, 25:12,
75:22, 94:3
**followed** [9] -
26:1, 34:2,
35:15, 36:15,
39:20, 55:19,
67:21, 82:7,
92:6
**following** [5] -
19:23, 57:14,
71:3, 131:15,
131:24
**follows** [2] - 6:20,
28:6
**FOR** [6] - 1:1, 2:2,
2:7, 5:14,
130:20, 131:1
**foregoing** [2] -
130:4, 130:14
**form** [110] - 19:1,
19:16, 25:14,
25:17, 28:23,
29:25, 38:10,
39:10, 44:10,
46:23, 47:14,
47:23, 48:19,
49:7, 53:13,
54:16, 56:8,
56:14, 57:5,
57:20, 59:6,
60:11, 64:15,
65:17, 66:18,
67:3, 67:9,
67:15, 70:20,
70:24, 73:11,
73:15, 73:25,
75:18, 77:14,
78:2, 78:11,
80:25, 83:2,
85:9, 88:22,
89:4, 89:15,
89:24, 92:16,
92:22, 93:6,
94:7, 96:21,
98:2, 98:9,
99:22, 102:1,
102:5, 102:15,
102:22, 103:10,

103:15, 103:20,
104:4, 104:16,
105:15, 106:1,
106:9, 106:20,
107:4, 107:11,
107:20, 108:3,
108:8, 109:3,
109:9, 109:14,
109:19, 110:3,
111:6, 111:15,
111:25, 112:12,
112:19, 112:25,
113:8, 113:14,
114:1, 114:7,
114:17, 114:25,
116:19, 118:7,
118:25, 119:12,
119:16, 119:24,
120:2, 120:14,
120:19, 121:4,
121:6, 121:16,
121:23, 122:5,
123:1, 123:9,
124:20, 125:23,
126:3, 126:20,
127:10, 127:19
**Form** [1] - 10:19
**formed** [1] - 21:4
**formerly** [1] -
125:12
**forms** [3] - 33:6,
75:14, 75:20
**forth** [4] - 7:25,
12:19, 38:3,
123:17
**forthcoming** [1] -
105:1
**forward** [5] -
31:25, 66:15,
81:14, 115:8,
115:10
**forwarding** [2] -
90:22, 90:23
**forwards** [1] -
50:20
**founded** [2] -
18:1, 32:10
**founding** [2] -
17:21, 17:24
**four** [4] - 17:10,
49:4, 61:21,
117:6
**Frank** [2] - 43:13,
45:16
**fraud** [1] - 52:6
**free** [4] - 8:17,
10:7, 54:9,
64:11
**freedom** [11] -
27:3, 27:4,

27:15, 27:16, 53:11, 53:15, 54:2, 54:15, 122:15, 122:22, 123:15
**freezing** [3] - 96:15, 96:19
**front** [1] - 50:16
**frozen** [1] - 96:21
**full** [7] - 6:25, 14:1, 14:13, 14:14, 16:2, 41:3, 44:1
**full-length** [1] - 41:3
**full-time** [1] - 14:1
**fully** [1] - 47:21
**funding** [2] - 109:21, 110:7
**future** [5] - 65:10, 65:20, 66:24, 106:17, 108:19

### G

**gate** [1] - 90:11
**Gateway** [1] - 1:22
**geared** [1] - 52:5
**general** [6] - 30:18, 41:17, 60:18, 72:23, 112:15, 114:11
**General** [5] - 2:8, 2:9, 2:14, 6:11, 6:15
**General's** [1] - 6:12
**generally** [4] - 47:6, 104:18, 112:13, 113:2
**Generally** [1] - 77:22
**ghost** [8] - 69:13, 69:18, 70:8, 70:12, 70:16, 70:19, 70:24, 75:24
**Ghost** [3] - 70:9, 74:10, 74:17
**ghostwriting** [2] - 74:3, 75:4
**Ghostwriting** [3] - 4:2, 72:14, 75:4
**Given** [4] - 42:15, 105:10, 115:19, 130:16
**given** [11] - 7:19, 30:16, 36:12, 38:16, 38:23,

39:22, 55:24, 95:6, 114:14, 131:18, 131:22
**graduate** [19] - 15:24, 15:25, 16:1, 16:4, 75:8, 77:10, 77:12, 77:19, 77:20, 78:4, 78:7, 78:10, 97:13, 106:11, 109:1, 109:17, 110:1, 119:21, 123:8
**Graf** [13] - 79:7, 79:14, 82:17, 87:10, 91:18, 92:4, 92:8, 97:10, 97:13, 97:22, 98:3, 106:13, 107:7
**Graf's** [1] - 97:12
**great** [5] - 9:4, 38:20, 71:12, 80:17, 111:7
**Green** [3] - 12:22, 13:3, 13:9
**group** [1] - 60:23
**guarantee** [1] - 35:20
**guess** [4] - 27:6, 39:13, 108:14, 118:3
**guest** [1] - 69:13
**guide** [1] - 34:9
**Guide** [1] - 3:16
**guidelines** [5] - 31:15, 34:16, 35:22, 66:1, 70:16
**Guidelines** [2] - 3:16, 34:9

### H

**hand** [1] - 130:16
**handwriting** [2] - 63:6, 63:12
**Handwritten** [1] - 3:23
**happy** [3] - 51:1, 81:2, 102:1
**harassment** [6] - 117:18, 117:23, 118:3, 122:12, 122:13, 123:15
**hard** [2] - 44:16, 126:22
**he/she** [1] - 130:15
**head** [5] - 9:15,

61:4, 109:25, 110:6, 110:8
**Head** [1] - 91:18
**heading** [2] - 90:24, 111:17
**health** [2] - 117:7, 117:12
**hear** [12] - 9:5, 19:7, 19:10, 22:17, 22:18, 23:15, 23:17, 23:20, 53:6, 62:15, 102:17, 112:20
**heard** [5] - 19:18, 38:12, 42:11, 96:17, 102:12
**hearing** [1] - 5:20
**hearsay** [1] - 120:23
**heavily** [1] - 19:22
**Heidlberger** [2] - 43:13, 45:16
**held** [3] - 14:9, 47:12, 118:6
**help** [4] - 20:21, 25:6, 64:2
**helped** [1] - 103:23
**helps** [2] - 62:13, 74:6
**hereby** [2] - 130:4, 131:14
**hereto** [1] - 1:25
**hide** [1] - 51:3
**hiding** [1] - 23:8
**hierarchy** [1] - 102:14
**high** [1] - 126:25
**highest** [1] - 27:23
**highlight** [2] - 26:10, 85:17
**highlighted** [5] - 28:6, 29:1, 52:1, 74:7, 84:25
**highlighting** [1] - 26:9
**Hill** [1] - 2:4
**hired** [2] - 13:24, 13:25
**Historical** [1] - 44:3
**history** [4] - 12:22, 12:23, 125:18, 125:19
**History** [1] - 3:25
**Hmm** [1] - 43:3
**hoc** [39] - 27:12, 29:9, 36:22,

50:4, 51:11, 52:7, 54:21, 57:19, 58:10, 58:25, 59:4, 59:16, 60:4, 63:11, 63:14, 63:22, 66:21, 68:5, 70:4, 72:16, 73:13, 73:21, 74:7, 77:9, 79:3, 88:18, 90:13, 98:24, 102:20, 102:24, 102:10, 102:20, 104:2, 107:25, 108:7, 109:8, 111:22, 123:13, 125:16
**Hoc** [23] - 3:13, 3:15, 3:21, 3:23, 11:13, 23:9, 24:22, 24:25, 55:14, 76:17, 76:25, 77:3, 79:22, 87:2, 90:19, 90:23, 91:2, 93:18, 93:23, 105:8, 108:6, 111:20, 113:12
**hock** [1] - 57:16
**Hold** [1] - 125:5
**hoodwink** [1] - 100:5
**hope** [3] - 50:14, 52:8, 53:17
**Hope** [1] - 101:22
**Hopefully** [1] - 62:3
**hopefully** [2] - 62:5, 76:21
**hoping** [1] - 34:20
**hour** [1] - 55:3
**hours** [1] - 12:12
**HRS** [2] - 132:2, 132:3
**hum** [29] - 9:14, 11:25, 12:16, 12:21, 29:14, 31:5, 33:1, 36:23, 45:10, 45:25, 46:18, 51:4, 51:8, 54:24, 57:17, 65:5, 65:8, 72:10, 74:5, 81:20, 82:20, 83:15, 84:9, 85:21, 88:3, 97:19, 101:6,

102:22, 115:18

### I

**I-S-H-I-Y-A-M-A** [1] - 7:5
**idea** [2] - 71:12, 96:3
**ideas** [1] - 89:2
**identification** [1] - 125:8
**identified** [2] - 28:7, 107:9
**identify** [4] - 39:14, 39:16, 70:10, 94:5
**identity** [5] - 33:9, 33:18, 103:6, 103:25, 130:14
**ignorance** [1] - 103:6
**ignore** [9] - 56:6, 56:12, 56:21, 57:19, 58:10, 58:20, 58:25, 59:5, 59:17
**ignored** [5] - 57:21, 57:22, 57:24, 86:20, 123:11
**imagine** [1] - 109:20
**impartial** [1] - 33:18
**implicate** [1] - 86:16
**implicitly** [2] - 103:7, 103:14
**imply** [1] - 89:10
**important** [1] - 88:11
**improve** [1] - 26:6
**imputing** [1] - 87:20
**IN** [1] - 130:20
**inaccurate** [1] - 47:25
**inappropriate** [12] - 36:12, 37:21, 38:16, 39:9, 39:11, 39:17, 39:19, 40:5, 77:13, 90:5, 117:7, 117:12
**INC** [1] - 132:15
**inception** [1] - 100:25
**Incident** [1] - 4:10
**include** [3] - 25:21, 69:15,

87:2
**included** [6] - 24:22, 49:9, 49:18, 54:2, 79:6, 79:9
**includes** [1] - 25:19, 44:4, 131:24
**Including** [1] - 69:22
**including** [5] - 54:6, 75:5, 82:21, 86:4, 100:11
**inclusion** [1] - 27:23
**incorrect** [2] - 41:21
**incredibly** [1] - 86:3
**indeed** [1] - 103:6
**independence** [2] - 78:23, 79:11
**indicate** [3] - 37:23, 85:2, 105:12
**indicated** [12] - 28:4, 44:14, 46:1, 48:7, 48:17, 61:25, 66:15, 71:17, 78:19, 82:3, 87:5, 100:20
**indicates** [1] - 116:9
**indication** [2] - 39:4, 44:8
**indicative** [1] - 105:16
**indifference** [2] - 87:13, 87:23
**individual** [1] - 63:18
**individuals** [2] - 62:8, 64:3
**individual's** [1] - 69:16
**industry** [1] - 49:16
**infected** [1] - 105:9
**infer** [1] - 88:23
**influence** [3] - 56:3, 57:1, 110:7
**inform** [1] - 34:16
**information** [10] - 54:9, 61:7, 81:12, 82:22, 86:6, 92:5, 96:1,

102:18, 110:14,
131:22
**informational** [1]
- 76:4
**informed** [4] -
46:2, 91:12,
91:14, 92:2
**infringement** [1] -
54:14
**inherent** [1] -
109:25
**inherently** [1] -
102:14
**insistent** [1] -
29:21
**instance** [4] -
1:15, 9:22,
85:16, 89:10
**instances** [1] -
116:8
**instead** [2] - 9:14,
70:11
**institutions** [1] -
12:19
**instruct** [1] - 9:24
**instructed** [1] -
55:18
**Instructions** [1] -
70:1
**instructions** [1] -
28:25
**instrument** [1] -
130:14
**integrity** [4] -
35:21, 52:9,
53:18, 94:18
**intellectual** [1] -
95:16
**intend** [1] - 22:5
**intention** [2] -
113:15, 124:9
**interest** [2] - 23:6,
61:3
**interested** [4] -
80:16, 82:6,
102:10, 132:9
**interfere** [1] - 8:25
**internal** [1] -
102:12
**interpret** [3] -
27:5, 117:21
**interpreted** [1] -
117:24
**interrupt** [3] -
8:17, 9:7, 42:1
**interrupting** [1] -
77:8
**intervening** [1] -
124:24
**interview** [4] -

61:15, 116:10,
118:5
**interviewed** [5] -
62:8, 77:10,
79:1, 108:14,
108:15
**interviewing** [1] -
51:21
**interviews** [3] -
68:15, 114:13,
115:1
**intimate** [1] -
103:24
**introduce** [2] -
7:15, 98:15
**introduced** [1] -
124:10
**introducing** [1] -
7:7
**introductory** [3] -
23:11, 74:8,
81:11
**investigate** [2] -
54:6, 56:3
**investigating** [3] -
28:17, 54:14,
73:8
**investigation** [26]
- 29:8, 29:23,
30:10, 55:23,
56:20, 57:15,
60:4, 60:9,
61:16, 61:18,
64:9, 66:14,
73:24, 75:24,
81:10, 82:1,
97:12, 103:17,
108:1, 109:8,
120:4, 121:9,
121:24, 122:6,
122:11, 123:2
**investigations** [1]
- 56:6
**invitation** [4] -
112:24, 113:2,
114:4
**invite** [1] - 60:8,
112:10, 114:19
**invited** [2] -
32:22, 112:15
**invites** [1] - 114:9
**inviting** [2] -
114:15, 114:22
**involved** [2] -
10:16, 10:17
**involving** [1] -
19:20
**irrelevant** [8] -
88:24, 103:18,
104:1, 107:25,

120:3, 122:6,
122:10, 123:2
**ISHIYAMA** [11] -
1:10, 1:14, 3:4,
5:2, 6:19, 129:2,
130:3, 130:8,
130:12, 131:10,
131:16
**Ishiyama** [43] -
3:13, 3:20, 4:6,
4:9, 6:13, 6:23,
7:2, 7:5, 7:13,
9:2, 10:13,
16:18, 20:19,
21:21, 22:21,
22:25, 23:16,
25:4, 30:18,
34:11, 38:2,
42:2, 43:15,
50:1, 50:3,
54:23, 55:13,
59:2, 63:9, 65:4,
71:18, 72:7,
76:18, 80:23,
83:14, 93:4,
97:6, 98:20,
98:23, 115:7,
115:22, 124:7,
128:6
**issue** [10] - 41:24,
44:15, 75:4,
82:4, 82:7,
92:14, 98:6,
104:6, 104:25,
105:2
**issues** [4] - 52:6,
54:9, 104:19,
122:12
**italics** [1] - 26:16
**items** [1] - 37:8
**itself** [4] - 49:18,
74:19, 77:13,
100:20
**IX** [9] - 116:22,
117:3, 118:2,
118:11, 119:15,
121:13, 121:14,
122:11, 123:5

## J

**Jackson** [61] -
3:21, 4:7, 6:9,
6:17, 29:7,
32:11, 37:11,
50:3, 50:20,
51:13, 51:25,
53:17, 60:8,
60:14, 60:23,
61:14, 61:22,

78:8, 79:9,
79:16, 80:8,
82:16, 85:23,
86:9, 91:19,
91:20, 91:22,
91:25, 92:2,
92:5, 92:7,
92:17, 92:20,
93:12, 93:18,
98:23, 100:13,
100:24, 101:4,
101:22, 104:6,
104:23, 105:10,
105:21, 105:25,
106:3, 107:3,
107:10, 110:15,
111:1, 114:14,
116:12, 119:11,
119:22, 119:23,
121:14, 121:21,
122:2, 122:24,
123:16, 123:21
**JACKSON** [3] -
1:3, 4:4, 131:3
**Jackson's** [3] -
53:11, 53:24,
78:21
**JACKSON
000208** [1] - 3:15
**Jackson's** [1] -
91:25
**Jason** [1] - 2:18
**Jennifer** [1] -
20:17
**Jewish** [2] -
103:6, 103:25
**job** [5] - 85:18,
86:12, 93:4,
94:9, 94:17
**jobs** [2] - 14:8,
16:13
**John** [6] - 7:2,
29:24, 30:1,
50:3, 52:3,
109:12
**JOHN** [12] - 1:10,
1:14, 3:4, 5:2,
6:19, 7:4, 129:2,
130:3, 130:8,
130:12, 131:10,
131:16
**Journal** [58] -
3:21, 3:23,
17:21, 18:22,
18:24, 19:12,
19:21, 21:9,
22:1, 22:6, 26:2,
28:8, 28:18,
30:11, 31:11,
36:9, 37:12,

39:15, 39:20,
39:23, 40:2,
48:15, 48:23,
55:20, 55:25,
58:2, 63:1, 63:6,
64:13, 66:2,
66:8, 66:11,
66:16, 67:23,
68:2, 72:18,
73:8, 73:10,
76:9, 78:1, 78:9,
78:16, 78:18,
80:2, 82:4, 85:7,
85:24, 95:20,
96:10, 100:9,
100:15, 100:23,
106:18, 107:18,
110:21, 114:15,
121:10, 124:25
**journal** [98] -
16:20, 17:12,
17:17, 17:24,
18:15, 18:21,
21:11, 31:24,
32:4, 33:4, 33:7,
35:16, 35:18,
36:17, 36:24,
37:3, 37:4, 37:7,
37:10, 37:14,
37:15, 37:16,
37:18, 37:19,
37:23, 38:8,
38:23, 39:4,
39:7, 40:19,
41:1, 41:9,
41:12, 41:17,
41:18, 42:8,
42:12, 42:18,
42:21, 42:23,
43:11, 44:2,
44:6, 45:12,
45:18, 46:13,
46:17, 48:2,
48:3, 48:11,
49:16, 49:18,
52:9, 53:19,
54:8, 61:7, 66:5,
66:6, 67:6,
67:24, 69:14,
70:15, 77:15,
77:17, 77:23,
80:17, 82:7,
82:12, 84:20,
86:2, 86:10,
86:17, 86:22,
87:5, 87:12,
88:5, 88:21,
89:2, 89:16,
89:18, 89:23,
90:6, 90:7, 93:5,
96:3, 97:11,

98:1, 98:12,
100:19, 102:13,
104:8, 124:17,
125:16, 126:1,
126:6, 127:7
**journal's** [2] -
54:6, 125:13
**journal/field** [1] -
36:1
**journals** [23] -
17:6, 17:14,
17:22, 33:21,
35:9, 35:19,
37:6, 38:13,
48:4, 49:12,
65:14, 65:22,
65:25, 67:19,
69:8, 69:19,
73:2, 89:11,
94:5, 104:14,
126:18
**JSS** [3] - 99:16,
104:24, 108:12
**judge** [2] - 58:1,
118:1
**judging** [1] -
83:20
**judgment** [1] -
47:16
**judgments** [2] -
79:12, 120:11
**JULIA** [1] - 132:15
**July** [4] - 80:1,
80:22, 81:24,
106:8
**jump** [1] - 96:16
**junior** [1] - 127:2
**jury** [1] - 33:3

## K

**Karen** [2] - 63:24,
68:18
**key** [3] - 88:4,
88:6, 88:10
**kicked** [1] - 103:4
**KIM** [1] - 131:13
**Kim** [3] - 1:18,
53:6, 132:14
**kind** [11] - 40:13,
40:23, 41:2,
41:4, 70:22,
75:24, 96:16,
96:17, 102:18,
117:18, 127:16
**kinds** [6] - 19:23,
38:3, 38:22,
51:19, 89:13,
122:12
**knowledge** [7] -

37:13, 44:18, 63:9, 67:17, 87:21, 87:22

**known** [1] - 130:12

**knows** [1] - 33:9

## L

**lack** [2] - 49:16, 70:21

**large** [4] - 60:23, 71:19, 72:8, 100:6

**largely** [2] - 78:6, 79:12

**last** [5] - 7:5, 75:22, 110:15, 115:7, 124:8

**late** [1] - 105:2

**lately** [1] - 101:25

**LAURA** [2] - 1:6, 131:6

**law** [16] - 116:1, 116:10, 117:14, 117:15, 118:11, 118:12, 118:23, 119:2, 120:5, 121:19, 121:20, 122:8, 122:15, 122:17, 123:21

**LAW** [1] - 2:3

**lawfirm.com** [1] - 2:5

**lawyer** [1] - 118:14

**lead** [3] - 74:16, 77:19, 127:6

**leading** [1] - 17:17

**learn** [2] - 120:16, 120:17

**learned** [2] - 18:23, 20:22

**least** [11] - 6:17, 32:4, 33:10, 40:14, 64:9, 73:10, 83:20, 86:9, 103:8, 119:7, 124:8

**leave** [1] - 102:5

**lecturer** [1] - 97:15

**led** [1] - 95:8

**left** [1] - 44:13

**Lemberger** [1] - 24:8

**Lemberger-Truelove** [1] - 24:8

**length** [1] - 41:3

**less** [1] - 95:7

**letter** [1] - 99:19

**letters** [1] - 99:2

**level** [2] - 15:23, 126:25

**levels** [1] - 102:14

**Levi** [32] - 77:10, 79:1, 79:2, 79:10, 79:25, 80:21, 81:6, 81:23, 82:16, 83:13, 86:22, 89:19, 91:12, 91:14, 92:4, 92:19, 94:1, 94:2, 97:20, 99:17, 100:22, 101:12, 104:21, 105:10, 106:7, 106:16, 107:19, 108:4, 108:17, 109:2, 110:2

**liberty** [2] - 125:4, 125:11

**library** [1] - 64:11

**light** [3] - 56:1, 82:23, 86:7

**likely** [1] - 102:12

**Likewise** [1] - 8:21

**line** [6] - 20:20, 23:1, 36:4, 48:1, 50:4, 99:21

**link** [5] - 71:1, 75:1, 76:3, 76:10, 76:12

**linked** [1] - 52:19

**list** [3] - 43:18, 68:13, 111:13

**List** [1] - 3:18

**listed** [2] - 45:11, 55:25

**Literature** [1] - 72:14

**literature** [1] - 72:17

**Literature...........** . [1] - 4:3

**Litigation** [1] - 2:9

**litigation** [2] - 10:25, 11:4

**Live** [1] - 2:13

**LLC** [1] - 2:3

**look** [4] - 34:18, 68:25, 83:23, 100:13

**looked** [1] - 52:3

**looking** [5] - 61:10, 99:13,

100:7, 100:11, 124:11

**looks** [6] - 14:9, 46:14, 83:17, 83:19, 84:5, 99:11

**lose** [1] - 20:16

**lvg.dallas@ gmail.com** [1] - 2:18

**lying** [1] - 108:5

## M

**m.allen@allen** [1] - 2:5

**m.allen@allen-lawfirm.com** [1] - 2:5

**machine** [1] - 1:21

**Madam** [2] - 34:5, 58:6

**mail** [3] - 2:5, 2:11, 2:16

**mails** [1] - 95:6

**maintain** [2] - 52:9, 53:18

**maintained** [1] - 51:16

**major** [1] - 32:7

**maker** [1] - 80:14

**management** [1] - 54:7

**manuscript** [3] - 74:11, 74:18, 74:19

**mark** [14] - 7:9, 20:9, 20:15, 22:22, 34:4, 43:9, 49:23, 63:5, 68:4, 71:4, 80:20, 83:11, 103:7, 115:11

**MARKED** [1] - 3:10

**marked** [16] - 7:11, 20:8, 22:23, 34:7, 34:8, 43:8, 49:25, 52:24, 63:3, 68:7, 71:6, 80:19, 83:12, 98:18, 98:19, 115:13

**marker** [1] - 38:13

**market** [1] - 16:15

**marking** [1] - 50:2

**marshal** [1] - 94:9

**Mary** [8] - 2:8,

6:10, 9:19, 44:20, 96:20, 128:2, 131:20, 132:3

**Mary.Quimby@ oag.texas.gov** [1] - 2:11

**Master's** [5] - 12:22, 13:4, 13:9, 13:17, 13:20

**materials** [3] - 49:1, 81:6, 127:1

**Materials** [1] - 4:7

**matter** [5] - 6:13, 41:18, 87:13, 87:22, 95:12

**matters** [1] - 116:21

**Matthew** [2] - 24:4, 24:7

**mean** [23] - 10:20, 12:18, 16:23, 31:3, 33:3, 42:5, 42:21, 51:10, 56:25, 57:6, 79:19, 79:20, 93:7, 94:8, 94:9, 94:24, 96:20, 99:7, 104:17, 108:17, 116:6, 120:24, 124:22

**meaning** [8] - 30:18, 33:8, 60:6, 70:10, 79:16, 90:6, 103:21, 112:2

**means** [3] - 33:5, 33:13, 56:9

**meant** [5] - 27:1, 71:7, 74:6, 92:17, 113:10

**media** [2] - 19:8, 70:22

**medical** [4] - 72:17, 72:23, 73:1, 76:8

**Medical** [2] - 4:3, 72:14

**Medicine** [1] - 4:2

**meet** [3] - 12:8, 84:1, 102:7

**meeting** [6] - 21:7, 21:17, 83:18, 84:8, 84:18, 88:23

**meetings** [1] - 63:16

**member** [7] -

25:24, 45:15, 59:16, 72:15, 86:10, 88:18, 125:15

**members** [10] - 25:25, 50:4, 51:21, 63:14, 70:4, 87:18, 98:24, 111:13, 117:17, 123:23

**memory** [2] - 20:21, 64:2

**mention** [7] - 30:2, 39:19, 54:2, 67:6, 80:10, 98:6, 107:13

**mentioned** [13] - 17:5, 18:15, 23:11, 25:12, 56:24, 65:19, 67:12, 74:19, 75:21, 80:3, 82:15, 98:3, 115:2

**mentions** [1] - 100:12

**mentorship** [1] - 16:13

**message** [8] - 20:2, 20:3, 50:18, 60:16, 61:7, 99:8, 100:1, 100:3

**messages** [1] - 106:16

**met** [2] - 20:5, 21:17

**methods** [4] - 35:10, 57:15, 59:11, 124:18

**MHTE** [3] - 91:18, 110:1

**Michael** [4] - 2:3, 6:8, 50:6, 132:2

**Michigan** [4] - 12:24, 13:5, 13:6

**mid** [1] - 105:1

**mid-December)** [1] - 105:1

**middle** [1] - 7:4

**midst** [1] - 61:16

**might** [9] - 38:23, 57:1, 69:15, 75:3, 104:8, 107:18, 107:19, 124:16, 124:22

**military** [1] - 84:3

**MIN** [2] - 132:2,

132:3

**mind** [4] - 105:3, 115:5, 115:8

**mindful** [1] - 31:18

**mine** [1] - 96:15

**Minimally** [1] - 33:10

**minor** [1] - 108:11

**misappropriatio n** [5] - 74:24, 75:5, 75:14, 75:19, 75:25

**MISCELLANEO US** [1] - 5:17

**mischaracterize** [1] - 124:15

**misconduct** [1] - 75:17

**misheard** [1] - 64:5

**misrepresenting** [2] - 55:1, 102:11

**mission** [3] - 89:16, 89:17, 90:6

**misspoke** [1] - 79:19

**mistaken** [1] - 53:23

**misunderstood** [1] - 22:10

**mixed** [1] - 125:6

**modifications** [1] - 92:10

**moment** [4] - 62:7, 81:7, 84:2, 102:4

**Monday** [1] - 102:6

**months** [1] - 85:18

**morning** [2] - 6:23, 6:24

**most** [7] - 17:18, 28:11, 65:22, 65:25, 73:9, 78:20, 87:17

**mostly** [1] - 52:5

**move** [2] - 73:20, 101:18

**moves** [1] - 91:8

**MR** [35] - 6:5, 6:8, 6:14, 6:16, 6:22, 7:6, 20:9, 20:14, 22:17, 22:20, 23:15, 23:20, 34:4, 43:9, 49:23, 53:6,

55:4, 58:6, 63:4, 64:24, 68:4, 71:11, 71:15, 72:1, 80:20, 83:10, 90:15, 96:19, 96:24, 98:13, 115:11, 123:25, 125:4, 128:1, 128:5

**MS** [115] - 6:10, 10:19, 19:1, 19:16, 23:14, 25:17, 28:23, 29:25, 38:10, 39:10, 44:10, 46:23, 47:14, 47:23, 48:19, 49:7, 53:13, 54:16, 55:2, 55:7, 56:8, 56:14, 57:5, 57:20, 59:6, 60:11, 64:15, 65:17, 66:18, 67:3, 67:9, 67:15, 71:7, 71:13, 71:22, 73:11, 73:15, 73:25, 75:18, 77:14, 78:2, 78:11, 83:2, 84:22, 85:9, 88:22, 89:4, 89:15, 89:24, 92:16, 92:22, 93:6, 94:7, 96:13, 98:2, 98:9, 99:22, 102:1, 102:5, 102:15, 102:22, 103:10, 103:15, 103:20, 104:4, 104:16, 105:15, 106:1, 106:9, 106:20, 107:4, 107:11, 107:20, 108:3, 108:8, 109:3, 109:9, 109:14, 109:19, 110:3, 111:6, 111:15, 111:25, 112:12, 112:19, 112:25, 113:8, 113:14, 114:1, 114:7, 114:17, 114:25, 116:19, 118:7, 118:25, 119:12, 119:16, 119:24, 120:2, 120:14, 120:19, 121:4, 121:6,

121:16, 121:23, 122:5, 123:1, 123:9, 124:20, 125:23, 126:3, 126:20, 127:10, 127:19, 128:3

**multi** [1] - 73:22

**multi-authored** [1] - 73:22

**multidisciplinary** [1] - 25:24

**multiple** [8] - 31:8, 31:25, 33:6, 47:7, 73:2, 88:7, 91:15

**Music** [17] - 19:5, 25:25, 29:24, 30:9, 30:12, 44:3, 46:8, 67:7, 95:18, 95:22, 103:3, 106:19, 109:13, 109:17, 109:18, 111:14, 127:7

**music** [17] - 28:9, 28:10, 33:22, 33:23, 35:9, 35:16, 45:11, 45:23, 72:17, 73:9, 73:24, 95:16, 105:11, 125:18, 125:19, 126:15, 126:16

**must** [2] - 7:8, 22:10

## N

**Naive** [1] - 102:6

**naive** [4] - 102:15, 102:3, 102:7, 102:14

**name** [14] - 6:6, 6:8, 6:10, 6:25, 7:4, 7:5, 17:14, 62:15, 62:18, 70:11, 99:13, 118:12, 118:23, 130:14

**named** [7] - 43:13, 50:5, 62:13, 62:16, 95:16, 99:12, 123:14

**namely** [1] - 49:21

**names** [1] - 62:11

**narrow** [10] - 28:22, 29:3, 29:4, 29:12, 29:18, 29:20,

54:5, 54:17, 59:8, 121:9

**nature** [6] - 32:12, 40:23, 50:19, 52:16, 89:3, 124:19

**navigate** [1] - 101:3

**necessarily** [3] - 44:24, 47:10, 74:25

**necessary** [1] - 9:15

**need** [8] - 7:18, 9:6, 10:6, 77:8, 81:13, 93:15, 102:23, 117:18

**needed** [1] - 84:17

**needs** [1] - 49:21

**Never** [1] - 18:8

**never** [2] - 48:22, 120:1

**New** [2] - 3:17, 95:16

**new** [1] - 34:10

**next** [4] - 14:3, 98:15, 104:5, 114:23

**nice** [1] - 104:25

**NO** [4] - 1:5, 5:4, 131:5, 132:14

**non** [2] - 18:13, 78:7

**non-graduate** [1] - 78:7

**none** [1] - 18:19

**nonetheless** [1] - 95:19

**nonverbal** [1] - 9:10

**normal** [1] - 97:25

**normally** [1] - 65:22

**North** [28] - 1:21, 1:22, 2:13, 2:14, 6:15, 14:14, 14:17, 14:20, 15:7, 15:22, 18:22, 27:2, 27:14, 43:11, 43:13, 43:21, 45:16, 62:8, 62:10, 62:20, 62:24, 62:25, 64:4, 65:15, 67:8, 67:18, 122:22, 127:8

**NOTARY** [1] - 130:20

**Notary** [1] - 132:18

**note** [3] - 44:14, 45:1, 64:10

**noted** [2] - 65:7, 130:5

**Notes** [3] - 3:23, 69:2, 69:3

**notes** [12] - 44:16, 63:10, 63:15, 63:17, 63:19, 63:21, 64:21, 68:5, 68:11, 68:19, 68:24, 70:6

**nothing** [7] - 44:15, 44:16, 60:21, 97:18, 114:15, 114:18, 122:13

**Notice** [2] - 3:11, 5:6

**notion** [1] - 60:7

**notions** [1] - 56:10

**notwithstanding** [1] - 10:2

**November** [10] - 11:12, 23:10, 91:2, 101:10, 102:9, 102:25, 104:5, 104:22, 131:21

**number** [7] - 16:16, 36:5, 65:2, 65:4, 100:6, 115:19, 125:8

**Number** [16] - 7:11, 20:8, 22:23, 34:7, 35:25, 43:8, 49:25, 52:25, 63:3, 68:7, 71:6, 80:19, 83:12, 97:7, 98:18, 115:13

**NUMBER** [2] - 3:10, 5:14

**numbered** [2] - 1:17, 52:17

**numbers** [2] - 64:25, 65:2

**numeral** [1] - 52:17

**numerous** [1] - 17:2

## O

**oath** [1] - 130:13

**object** [2] - 9:19, 105:18

**objecting** [1] - 107:17

**Objection** [106] - 19:1, 19:16, 25:17, 28:23, 29:25, 38:10, 39:10, 44:10, 46:23, 47:14, 47:23, 48:19, 49:7, 53:13, 54:16, 56:8, 56:14, 57:5, 57:20, 59:6, 60:11, 64:15, 65:17, 66:18, 67:3, 67:9, 67:15, 73:11, 73:15, 73:25, 75:18, 77:14, 78:2, 78:11, 83:2, 84:22, 85:9, 88:22, 89:4, 89:15, 89:24, 92:16, 92:22, 93:6, 94:7, 96:13, 98:2, 98:9, 99:22, 102:1, 102:5, 102:15, 102:22, 103:10, 103:15, 103:20, 104:4, 104:16, 105:15, 106:1, 106:9, 106:20, 107:4, 107:11, 107:20, 108:3, 108:8, 109:3, 109:9, 109:14, 109:19, 110:3, 111:6, 111:15, 111:25, 112:12, 112:19, 112:25, 113:8, 113:14, 114:1, 114:7, 114:17, 114:25, 116:19, 118:7, 118:25, 119:12, 119:16, 119:24, 120:2, 120:14, 120:19, 121:6, 121:16, 121:23, 123:1, 123:9, 124:20, 125:23, 126:3, 126:20,

127:10, 127:19

**objection** [3] - 5:18, 10:2, 73:18

**objections** [1] - 96:17

**objective** [6] - 55:23, 56:5, 56:12, 56:16, 56:19, 56:20

**objectively** [6] - 26:1, 55:18, 56:9, 56:11, 60:5, 68:2

**objectivity** [5] - 56:22, 56:25, 57:6, 57:13, 59:20

**obligation** [2] - 9:20, 67:23

**obligations** [1] - 27:12

**observation** [1] - 104:1

**observed** [1] - 26:5

**obviously** [1] - 63:22

**Obviously** [2] - 7:20, 43:25

**occasions** [1] - 116:13

**occurred** [2] - 104:7, 120:1

**occurrence** [1] - 92:6

**occurs** [1] - 74:10

**October** [9] - 50:11, 50:12, 50:21, 50:24, 52:2, 98:24, 99:18, 131:20, 132:10

**odd** [2] - 78:14, 78:25

**OF** [11] - 1:1, 1:9, 1:14, 5:2, 5:14, 130:10, 130:11, 130:20, 131:1, 131:9, 131:10

**off-beat** [1] - 112:14

**offer** [1] - 28:10

**offered** [1] - 114:3

**offering** [1] - 85:20

**office** [1] - 130:16

**Office** [2] - 2:14, 6:12

**officer** [1] -

131:23
**official** [3] - 14:21, 24:13, 30:11
**officially** [1] - 86:22
**often** [3] - 77:19, 126:10, 126:11
**oftentimes** [1] - 33:11
**old** [2] - 10:16, 11:5
**once** [2] - 20:5, 88:1
**oncoming** [1] - 100:23
**One** [4] - 7:17, 62:16, 101:10, 110:15
**one** [37] - 5:18, 7:20, 16:14, 24:16, 26:15, 27:6, 35:2, 35:23, 38:5, 41:2, 50:23, 50:24, 50:25, 51:15, 53:3, 53:4, 62:13, 63:18, 64:10, 70:4, 76:12, 79:2, 82:16, 82:19, 83:24, 86:4, 96:9, 101:11, 101:17, 102:24, 105:11, 111:18, 113:1, 115:5, 115:6, 124:7
**one-size-fits-all** [1] - 35:2
**ones** [4] - 31:9, 31:10, 33:7, 78:20
**online** [1] - 64:11
**open** [3] - 70:15, 71:20, 71:23
**operating** [2] - 62:9, 64:3
**operations** [1] - 67:11
**opinion** [6] - 37:8, 58:19, 59:12, 59:15, 94:15, 125:15
**opportunity** [8] - 28:10, 54:11, 112:3, 113:4, 113:7, 113:22, 113:24, 114:3
**opposed** [2] -

71:23, 81:12
**opposition** [1] - 27:22
**oral** [1] - 131:17
**ORAL** [3] - 1:9, 1:14, 131:10
**Order** [1] - 5:7
**order** [1] - 68:14
**ordinary** [4] - 10:18, 51:11, 51:19, 89:22
**ORIGINAL** [1] - 5:10
**originality** [1] - 126:25
**Otherwise** [1] - 10:1
**otherwise** [1] - 132:9
**ourselves** [1] - 45:7
**outcome** [1] - 132:9
**outline** [1] - 61:23
**outlined** [1] - 32:19
**outside** [2] - 25:25, 57:1
**over-spoke** [1] - 122:9
**own** [2] - 69:7, 87:8
**ownership** [1] - 70:10

# P

**p.m** [2] - 1:18, 128:10
**P.O** [2] - 2:4, 2:9
**packet** [5] - 80:7, 81:6, 95:6, 110:14, 110:16
**page** [36] - 7:24, 23:9, 24:24, 43:10, 43:14, 43:16, 43:22, 43:25, 44:2, 44:4, 44:8, 44:22, 44:25, 45:12, 50:22, 65:1, 67:14, 72:9, 74:4, 76:1, 76:13, 81:14, 82:18, 101:2, 102:4, 107:24, 115:19, 124:12, 124:21, 124:25, 125:5, 125:11, 125:13, 126:13

**PAGE** [1] - 3:1
**Page** [1] - 3:18
**PAGE/LINE** [1] - 129:4
**pages** [5] - 8:8, 46:15, 81:3, 125:12
**panel** [66] - 25:16, 25:24, 25:25, 26:3, 26:20, 27:12, 28:16, 29:8, 29:9, 29:17, 29:19, 32:12, 36:22, 45:11, 45:24, 46:10, 50:4, 51:11, 52:8, 52:11, 53:17, 53:21, 54:10, 57:16, 57:19, 58:10, 58:21, 58:24, 58:25, 59:4, 59:16, 60:4, 63:14, 63:22, 66:21, 68:6, 70:4, 72:16, 73:13, 73:21, 74:7, 77:9, 79:3, 81:24, 87:23, 88:19, 90:14, 91:12, 91:14, 91:21, 98:24, 102:20, 102:24, 102:10, 102:19, 102:20, 104:2, 108:7, 109:8, 111:23, 123:13, 123:17, 123:24, 125:16, 125:24
**Panel** [22] - 3:13, 3:15, 3:21, 11:13, 23:10, 24:22, 24:25, 55:14, 76:17, 76:25, 77:3, 79:22, 87:3, 90:19, 90:23, 93:23, 105:8, 108:6, 111:20, 113:13
**panel's** [3] - 54:5, 63:19, 107:25
**paper** [14] - 40:24, 41:2, 41:15, 41:18, 46:5, 80:13, 95:15, 102:11, 102:18, 102:11, 102:13,

103:3, 103:13
**paper's** [1] - 103:5
**Papers** [1] - 110:18
**papers** [16] - 38:22, 40:18, 41:22, 46:13, 48:17, 48:20, 48:22, 49:20, 95:19, 95:23, 110:21, 111:5, 112:8, 112:9, 112:24, 127:16
**Paragraph** [1] - 53:14
**paragraph** [12] - 25:23, 26:19, 27:1, 27:8, 27:20, 28:6, 29:1, 29:13, 52:17, 53:8, 53:23, 74:9
**paragraphs** [4] - 26:15, 81:8, 81:11, 91:11
**part** [29] - 7:14, 13:19, 24:14, 24:25, 26:16, 27:11, 35:12, 36:21, 41:8, 41:10, 45:23, 54:22, 60:13, 64:17, 65:21, 69:4, 74:24, 81:10, 81:21, 81:25, 88:25, 91:2, 94:16, 97:16, 98:6, 110:25, 116:16, 122:19
**part-time** [1] - 13:19
**partes** [1] - 131:24
**partially** [1] - 62:1
**particular** [6] - 44:15, 45:1, 72:21, 76:5, 102:11, 105:3
**particularly** [3] - 31:17, 34:22, 127:3
**parties** [2] - 5:19, 132:6
**parts** [2] - 36:19, 105:22
**party** [2] - 5:18, 131:25
**pass** [1] - 128:1

**passage** [1] - 82:15
**passed** [1] - 13:21
**Passion** [1] - 102:1
**past** [2] - 115:6, 125:7
**patience** [1] - 97:6
**pay** [2] - 80:17, 123:10
**PDF** [6] - 32:19, 52:23, 52:24, 53:2, 65:1
**pear** [1] - 94:18
**pear-review** [1] - 94:18
**peculiar** [1] - 91:9
**Peer** [1] - 34:24
**peer** [79] - 16:19, 16:20, 16:22, 17:6, 18:7, 18:13, 18:18, 31:17, 31:22, 32:25, 33:1, 33:4, 33:5, 33:6, 33:8, 33:19, 33:24, 35:3, 35:10, 35:24, 35:25, 36:8, 36:18, 36:25, 37:4, 37:6, 37:7, 37:9, 37:10, 37:13, 37:15, 37:16, 37:18, 37:19, 37:24, 38:14, 39:6, 39:15, 40:3, 41:10, 41:20, 41:24, 42:11, 42:19, 44:9, 45:8, 46:16, 46:22, 46:24, 47:4, 47:10, 47:13, 47:18, 47:21, 47:22, 47:24, 48:5, 48:6, 48:10, 48:13, 48:18, 49:4, 54:7, 56:24, 57:11, 77:23, 90:8, 94:10, 94:20, 94:21, 95:3, 104:14, 126:24, 127:9, 127:13, 127:21, 127:22, 127:23
**Peer-Review** [1] - 34:24

**peer-review** [11] - 35:3, 35:24, 35:25, 36:8, 47:10, 56:24, 57:11, 94:10, 94:21, 127:22, 127:23
**peer-reviewed** [17] - 16:19, 16:20, 18:13, 37:4, 37:7, 37:9, 37:16, 37:18, 39:6, 42:19, 47:4, 47:18, 47:21, 48:10, 77:23, 104:14, 127:21
**peers** [1] - 46:24
**people** [12] - 22:17, 33:14, 40:16, 50:16, 51:20, 66:20, 86:12, 93:5, 94:6, 95:24, 95:25, 126:9
**people'** [1] - 92:1
**perfect** [1] - 77:7
**perfectly** [1] - 8:18
**perhaps** [6] - 49:1, 56:23, 75:9, 93:15, 109:22, 110:7
**permitted** [1] - 33:17
**person** [5] - 12:2, 27:7, 112:14, 114:10, 130:14
**personally** [1] - 130:12
**pertains** [1] - 51:23
**perusal** [2] - 44:7, 114:14
**perused** [1] - 82:19
**petition** [1] - 119:20
**Ph.D** [19] - 1:10, 1:15, 3:4, 5:2, 6:19, 12:24, 13:6, 13:17, 13:20, 16:7, 16:11, 97:14, 127:1, 129:2, 130:3, 130:8, 130:12, 131:10, 131:16
**Ph.D.s** [1] - 16:5
**phase** [5] - 23:11,

42:5, 42:6, 42:7,
42:10
**Philip** [13] - 45:20,
46:14, 85:22,
87:15, 87:16,
88:19, 95:17,
96:7, 102:19,
103:2, 112:2,
112:9, 113:6
**phone** [1] - 20:3
**phrase** [1] - 79:23
**piece** [6] - 42:9,
45:21, 90:8,
91:15, 95:2,
96:7
**pieces** [5] - 37:8,
88:7, 91:23,
92:9, 94:25
**place** [1] - 118:2
**placed** [2] - 23:1,
93:22
**placing** [1] -
16:11
**plagiarism** [2] -
52:6, 75:17
**plaintiff** [3] -
10:21, 11:1,
93:16
**PLAINTIFF** [1] -
2:2
**Plaintiff** [5] - 1:4,
1:16, 6:9, 131:4,
132:2
**plenary** [2] -
95:17, 103:4
**plop** [2] - 71:15,
115:14
**plopped** [2] -
81:18
**PLOS** [1] - 70:13
**PLoS** [4] - 4:2,
69:19, 70:9,
70:13
**point** [5] - 7:18,
19:23, 30:17,
44:20, 79:18
**pointed** [2] - 75:4,
108:12
**points** [1] - 63:17
**poli** [2] - 15:19,
89:11
**poli-sci** [1] -
15:19
**poli-science** [1] -
89:11
**policies** [1] - 52:6
**policy** [6] - 52:5,
69:11, 116:17,
122:22, 122:25,
123:15

**Political** [6] -
14:23, 14:25,
17:16, 17:21,
17:23, 18:4
**political** [7] -
12:21, 12:24,
14:16, 18:14,
35:17, 89:11,
126:17
**poor** [1] - 114:12
**poorly** [1] - 90:7
**pop** [1] - 6:18
**portion** [1] - 7:19
**position** [3] -
15:6, 85:7,
118:6
**possibility** [1] -
114:22
**possible** [1] -
105:23
**Post** [1] - 4:4
**post** [2] - 80:21,
84:16
**Potential** [1] -
3:24
**power** [21] -
79:15, 79:23,
82:14, 86:21,
87:4, 97:23,
98:3, 105:7,
105:16, 105:19,
105:23, 106:6,
106:11, 108:9,
108:18, 108:22,
108:25, 109:11,
109:16, 109:25,
110:10
**practice** [24] -
26:4, 33:23,
38:9, 39:12,
39:14, 47:17,
48:10, 48:13,
48:18, 49:15,
56:18, 56:23,
58:16, 58:18,
58:24, 59:17,
59:22, 59:24,
66:25, 78:18,
112:17, 112:23,
114:9
**practices** [20] -
21:11, 34:2,
34:16, 35:15,
35:17, 35:19,
39:20, 39:23,
57:18, 57:23,
57:25, 58:2,
58:10, 58:20,
62:22, 65:23,
66:6, 67:24,

68:2, 92:12
**precautions** [1] -
61:3
**precisely** [1] -
59:11
**preconceived**
- 56:10, 60:6
**prejudice** [5] -
56:10, 57:2,
57:4, 57:9, 60:6
**preoccupation**
[1] - 89:20
**preparation** [3] -
11:17, 11:19,
12:2
**prepare** [1] - 11:8
**prepared** [2] -
52:8, 53:18
**PRESENT** [1] -
2:18
**present** [2] -
14:10, 40:17
**presentation** [8] -
38:6, 38:15,
42:6, 42:8,
85:22, 95:17,
95:22, 103:2
**presentations** [2]
- 38:24, 125:24
**presented** [2] -
41:2, 46:11
**presents** [1] -
41:15
**president** [1] -
39:3
**presidential** [3] -
38:12, 39:2,
39:5
**Press** [13] - 18:22,
43:12, 62:10,
62:20, 64:4,
64:12, 64:13,
65:15, 65:20,
67:8, 67:18,
69:4, 127:8
**press** [3] - 66:21,
67:1, 67:11
**pressure** [5] -
107:7, 107:8,
107:9, 107:10,
107:19
**prevent** [3] - 61:3,
69:18, 71:13
**prevents** [1] -
9:12
**previous** [7] -
50:18, 52:3,
52:25, 54:22,
58:7, 83:24,
87:10

**previously** [1] -
67:14
**primary** [1] - 16:6
**principles** [6] -
62:6, 62:19,
65:15, 65:19,
66:22, 67:19
**print** [4] - 83:16,
112:4, 113:7,
114:3
**printout** [1] - 81:1
**private** [1] -
101:25
**privilege** [1] -
9:22
**pro** [2] - 95:24,
96:6
**pro-Ewell** [1] -
95:24
**problem** [3] -
78:22, 87:5,
87:6
**problematic** [2] -
98:4, 103:24
**problems** [1] -
108:12
**Procedure** [2] -
1:23, 5:8
**procedures** [3] -
69:12, 89:9,
89:20
**proceed** [1] - 92:8
**proceeded** [1] -
60:7
**proceeding** [2] -
91:16, 132:7
**proceedings** [9] -
5:20, 16:25,
40:14, 41:7,
41:8, 41:11,
41:14, 42:25,
118:5
**Proceedings** [1] -
128:10
**Process** [2] -
34:24, 99:15
**process** [37] -
32:24, 35:3,
35:20, 35:24,
35:25, 36:9,
36:25, 37:5,
37:20, 40:20,
41:5, 42:14,
47:10, 47:11,
48:9, 54:23,
56:24, 58:1,
60:22, 60:25,
61:23, 61:25,
65:19, 82:7,
82:9, 82:25,

83:4, 86:24,
92:25, 94:10,
94:18, 94:22,
100:9, 111:11,
123:3, 127:23,
127:24
**Processes** [2] -
90:25, 91:5
**processes** [22] -
21:9, 21:25,
22:6, 26:1, 26:6,
29:6, 31:13,
40:2, 54:6, 54:7,
55:18, 55:25,
56:3, 57:11,
60:19, 64:17,
66:5, 66:12,
80:17, 86:16,
124:25
**produced** [5] -
1:15, 16:4,
60:10, 60:22,
80:12
**producing** [1] -
67:20
**Producing** [1] -
5:12
**production** [7] -
26:2, 54:8,
55:19, 56:4,
64:17, 64:23,
65:19
**professional** [4] -
14:8, 27:24,
126:25, 127:17
**Professor** [57] -
6:23, 7:12,
10:13, 14:22,
16:18, 19:25,
20:19, 21:3,
21:21, 22:20,
22:25, 23:16,
25:4, 30:18,
34:11, 38:2,
42:2, 43:15,
50:1, 54:23,
55:13, 59:1,
63:8, 63:10,
65:3, 71:18,
72:7, 76:18,
80:23, 83:14,
93:4, 93:17,
97:6, 97:10,
97:12, 97:13,
97:22, 98:19,
98:23, 100:24,
101:4, 103:2,
105:9, 105:21,
105:24, 107:3,
108:17, 114:15,

114:19, 114:22,
115:1, 115:7,
115:22, 115:25,
121:25, 124:7,
128:5
**professor** [11] -
13:22, 14:13,
14:14, 15:8,
15:16, 16:2,
43:12, 95:16,
100:22, 105:11,
109:1
**program** [5] -
13:12, 40:25,
42:17, 46:5,
63:10
**promote** [1] -
69:10
**prompted** [3] -
106:7, 106:25,
107:1
**pronounce** [1] -
99:13
**pronunciation** [1]
- 79:2
**protect** [1] - 85:24
**proved** [1] -
130:13
**provide** [1] -
32:17
**provided** [4] -
61:7, 76:3,
76:10, 80:8
**provisions** [1] -
1:24
**Provost** [6] - 19:2,
19:10, 20:2,
20:25, 21:12,
27:7
**provost** [3] -
24:12, 28:1,
28:25
**précis** [4] - 40:22,
42:17, 42:21,
46:3
**pseudonym** [2] -
70:11, 70:22
**public** [6] - 26:13,
31:13, 38:15,
64:13, 80:1,
95:15
**PUBLIC** [1] -
130:20
**Publication** [2] -
30:21, 69:3
**publication** [22] -
26:5, 31:16,
31:18, 31:20,
35:23, 37:1,
38:17, 41:16,

42:8, 61:1, 61:4, 65:7, 69:17, 70:20, 74:23, 83:1, 91:8, 92:8, 95:8, 95:12, 107:17, 121:10

**publications** [11] - 12:14, 16:17, 37:3, 38:6, 42:22, 72:24, 76:8, 77:20, 78:25, 126:18

**publicly** [1] - 31:24

**publish** [7] - 18:6, 18:17, 20:10, 37:6, 73:2, 77:20, 100:16

**published** [36] - 16:21, 17:2, 18:11, 18:21, 19:21, 38:8, 38:13, 38:23, 39:3, 40:14, 40:19, 41:4, 41:9, 41:18, 42:9, 42:12, 42:18, 43:11, 43:20, 45:14, 46:16, 47:20, 63:1, 65:14, 66:8, 66:15, 70:15, 72:17, 78:6, 80:1, 81:23, 86:17, 95:23, 101:1, 125:25, 127:7

**publishers** [1] - 32:7

**publishes** [4] - 36:17, 37:19, 67:19, 77:23

**publishing** [8] - 21:11, 39:24, 41:13, 69:7, 75:15, 75:20, 75:24, 127:16

**pull** [1] - 115:3

**purportedly** [1] - 100:9

**purports** [1] - 99:2

**purpose** [5] - 73:19, 85:17, 89:2, 115:24, 130:15

**purposes** [1] - 76:4

**pursuant** [2] - 1:23, 131:22

**PURSUANT** [1] - 5:5

**pursue** [3] - 62:23, 65:23, 68:14

**purview** [1] - 64:8

**push** [2] - 90:16, 90:17

**put** [7] - 10:2, 30:10, 65:9, 93:9, 98:14, 98:20, 107:19

**puts** [1] - 31:25

**putting** [2] - 71:17, 107:19

**puzzled** [1] - 93:3

# Q

**Quaker** [1] - 2:4

**qualified** [1] - 114:2

**quality** [4] - 78:16, 78:17, 91:23, 126:24

**QUESTION** [1] - 58:9

**questioning** [1] - 48:2

**Questions** [1] - 3:24

**questions** [20] - 7:21, 8:13, 9:1, 10:1, 25:11, 45:8, 51:5, 51:7, 54:8, 54:11, 63:20, 68:14, 68:17, 72:11, 84:11, 104:12, 117:7, 124:8, 125:2, 128:3

**quibble** [1] - 31:3

**quick** [1] - 64:7

**Quimbly** [1] - 9:24

**QUIMBY** [115] - 6:10, 10:19, 19:1, 19:16, 23:14, 25:17, 28:23, 29:25, 38:10, 39:10, 44:10, 46:23, 47:14, 47:23, 48:19, 49:7, 53:13, 54:16, 55:2, 55:7, 56:8, 56:14, 57:5, 57:20, 59:6, 60:11, 64:15, 65:17, 66:18, 67:3, 67:9,

67:15, 71:7, 71:13, 71:22, 73:11, 73:15, 73:25, 75:18, 77:14, 78:2, 78:11, 83:2, 84:22, 85:9, 88:22, 89:4, 89:15, 89:24, 92:16, 92:22, 93:6, 94:7, 96:13, 98:2, 98:9, 99:22, 102:1, 102:5, 102:15, 102:22, 103:10, 103:15, 103:20, 104:4, 104:16, 105:15, 106:1, 106:9, 106:20, 107:4, 107:11, 107:20, 108:3, 108:8, 109:3, 109:9, 109:14, 109:19, 110:3, 111:6, 111:15, 111:25, 112:12, 112:19, 112:25, 113:8, 113:14, 114:1, 114:7, 114:17, 114:25, 116:19, 118:7, 118:25, 119:12, 119:16, 119:24, 120:2, 120:14, 120:19, 121:4, 121:6, 121:16, 121:23, 122:5, 123:1, 123:9, 124:20, 125:23, 126:3, 126:20, 127:10, 127:19, 128:3

**Quimby** [10] - 2:8, 5:11, 6:10, 9:19, 9:24, 44:20, 64:25, 90:15, 131:20, 132:3

**quite** [5] - 15:12, 24:7, 52:4, 102:12, 105:2

**quote** [15] - 47:12, 69:9, 85:24, 93:11, 93:12, 93:20, 93:21, 93:22, 100:17, 105:7, 106:22, 116:13, 117:12, 117:16, 118:24

# R

**racist** [2] - 102:15, 103:23

**raised** [1] - 91:22

**raises** [1] - 104:6

**raising** [2] - 73:17, 91:24

**ran** [2] - 66:20, 86:10

**rather** [3] - 71:19, 83:16, 112:24

**Rather** [2] - 65:22, 94:17

**RE** [1] - 3:21

**Re** [1] - 3:11

**Re-Notice** [1] - 3:11

**reach** [1] - 19:25

**reached** [2] - 21:1, 21:3

**read** [52] - 25:9, 26:9, 27:13, 28:13, 29:15, 34:11, 36:3, 44:1, 45:5, 45:6, 50:7, 52:13, 53:8, 53:10, 53:22, 55:17, 58:7, 65:11, 69:1, 70:3, 72:11, 74:8, 74:13, 74:20, 80:4, 80:5, 81:2, 81:7, 81:8, 81:10, 81:13, 81:14, 83:22, 85:16, 86:14, 91:11, 91:14, 96:7, 96:9, 98:25, 99:24, 101:15, 103:9, 104:10, 105:4, 105:8, 107:24, 110:24, 112:5, 126:21, 127:4, 130:3

**reader** [1] - 49:21

**reading** [2] - 102:16, 106:16

**reads** [1] - 28:7

**real** [2] - 64:7, 70:11

**realized** [1] - 90:16

**really** [8] - 9:4, 19:17, 47:17, 66:23, 74:22, 110:11, 114:11, 120:23

**REASON** [1] - 129:4

**reason** [5] - 16:17, 61:8, 64:18, 67:13, 78:13

**recalling** [1] - 84:23

**receipt** [1] - 69:23

**receive** [2] - 84:8, 99:7

**received** [4] - 51:16, 85:12, 95:18, 112:9

**receiving** [2] - 26:22, 99:20

**recent** [1] - 78:20

**Recess** [4] - 55:10, 72:4, 97:2, 124:4

**recipient** [1] - 20:19

**recognize** [5] - 30:19, 34:13, 50:9, 63:11, 81:20

**recommend** [1] - 26:5

**recommended** [3] - 21:11, 36:14, 70:17

**recommends** [1] - 62:22

**record** [54] - 1:24, 6:3, 6:6, 7:1, 7:3, 7:9, 9:13, 20:10, 22:12, 22:16, 22:22, 22:24, 23:22, 31:4, 34:5, 34:8, 43:10, 49:24, 50:2, 52:13, 53:9, 53:12, 54:19, 55:6, 55:8, 55:12, 55:17, 59:11, 63:5, 68:5, 68:8, 71:5, 71:25, 72:2, 72:5, 72:12, 79:21, 80:21, 83:11, 96:23, 96:25, 97:4, 98:16, 115:12, 116:5, 124:1, 124:2, 124:6, 124:11, 125:6, 125:10, 128:8, 131:18, 131:24

**recorded** [1] -

63:21

**recordings** [1] - 42:25

**records** [4] - 66:22, 73:19, 114:14, 115:16

**recounted** [2] - 116:9, 116:12

**recounting** [1] - 102:2

**recruited** [3] - 41:16, 41:23, 46:12

**red** [1] - 104:21

**refer** [6] - 21:13, 31:9, 53:15, 63:24, 64:25, 76:8

**referenced** [1] - 30:17

**referred** [1] - 111:10

**referring** [20] - 11:12, 32:2, 41:7, 47:2, 50:24, 52:3, 53:2, 60:20, 61:11, 61:12, 61:13, 61:17, 62:1, 62:4, 72:21, 75:13, 80:9, 102:18, 117:15, 125:7

**refers** [2] - 33:16, 125:18

**reflecting** [1] - 93:24

**refresh** [2] - 20:21, 64:2

**regarding** [3] - 31:21, 61:4, 79:13

**Registration** [1] - 132:17

**regular** [1] - 51:20

**Reinhold** [1] - 102:15

**reiterate** [1] - 86:20

**rejected** [1] - 90:11

**rejects** [1] - 90:5

**rejoinder** [3] - 112:14, 113:4, 114:10

**related** [15] - 54:7, 56:4, 56:22, 59:23, 82:3, 82:9, 85:20, 116:21, 118:9,

119:13, 119:17,
125:18, 125:19,
127:2, 132:6
**relates** [3] - 69:6,
88:20, 91:9
**relationship** [4] -
79:6, 105:9,
109:23, 110:5
**relationships** [1] -
19:4
**relatively** [1] -
91:9
**relevant** [13] -
30:6, 30:14,
35:12, 52:7,
73:24, 74:1,
76:7, 102:10,
102:19, 108:6,
109:7, 123:17,
123:19
**relied** [1] - 34:15
**relieve** [1] - 9:19
**remaining** [1] -
97:21
**remember** [20] -
24:24, 26:22,
40:5, 64:12,
65:13, 67:1,
67:7, 81:22,
91:1, 99:6,
99:20, 100:7,
100:19, 102:24,
110:23, 114:21,
115:2, 115:21,
117:10, 124:11
**remind** [1] - 13:2
**Remotely** [1] -
1:12
**remotely** [1] -
1:20
**Renaldo** [4] -
2:13, 6:14, 50:5,
96:14
**Renaldo.
Stowers@
untsystem.edu**
[1] - 2:16
**repeat** [7] - 23:18,
23:21, 38:18,
62:15, 84:15,
89:5, 112:20
**repeated** [1] -
83:5
**repeatedly** [1] -
121:8
**rephrase** [1] -
73:18
**report** [39] -
11:10, 23:13,
25:2, 26:12,

60:9, 60:13,
60:15, 67:21,
75:21, 78:19,
82:15, 93:9,
93:12, 111:23,
111:24, 116:1,
116:11, 116:21,
117:2, 117:14,
117:18, 117:19,
117:24, 117:25,
118:13, 118:24,
119:18, 120:4,
120:8, 120:12,
120:16, 120:21,
121:2, 121:5,
121:21
**Report** [20] - 3:15,
11:13, 23:10,
24:22, 24:25,
55:14, 76:17,
77:1, 77:3,
79:22, 87:3,
90:20, 90:23,
91:2, 93:19,
93:23, 105:8,
108:6, 111:20,
113:13
**reportable** [1] -
119:15
**Reported** [1] -
1:12
**reported** [4] -
1:20, 91:21,
93:13, 121:13
**REPORTER** [4] -
6:7, 34:6, 58:8,
98:17
**reporter** [2] -
9:12, 9:16
**Reporter** [4] -
1:19, 34:5, 58:6,
131:13
**REPORTER'S** [1]
- 131:9
**Reporter's** [1] -
3:8
**reporting** [5] -
116:25, 118:4,
118:8, 118:9,
119:10
**Reporting** [1] -
4:10
**reports** [3] -
16:24, 117:17,
121:12
**represent** [14] -
6:12, 8:7, 37:9,
37:11, 40:21,
45:22, 47:18,
48:5, 63:8,

68:24, 70:25,
71:3, 95:11,
103:1
**representation**
[1] - 124:17
**represented** [3] -
29:1, 47:24,
101:4
**representing** [2] -
37:3, 48:12
**represents** [1] -
125:17
**repression** [2] -
52:11, 53:20
**reputable** [2] -
66:1, 66:3
**reputation** [2] -
66:8, 66:10
**reputations** [1] -
92:3
**Request** [1] - 3:13
**require** [1] - 35:2
**required** [17] -
10:1, 62:20,
116:1, 116:10,
116:20, 116:22,
116:23, 117:14,
117:19, 117:25,
118:23, 120:8,
120:12, 120:16,
121:17, 121:20,
123:21
**requirement** [1] -
31:23
**Requirement** [1] -
62:21
**requirements** [1]
- 32:24
**requires** [2] -
62:24, 67:18
**requiring** [1] -
69:16
**Requiring** [1] -
69:20
**reread** [1] - 11:10
**Research** [1] -
14:22
**research** [14] -
15:8, 15:16,
16:24, 52:5,
56:6, 56:18,
56:23, 57:12,
58:19, 69:12,
69:17, 75:17,
109:1, 126:25
**reserve** [1] -
128:3
**resources/
systems** [1] -
36:2

**respects** [1] -
40:11
**respond** [12] -
53:25, 54:1,
60:9, 60:13,
60:14, 112:3,
112:11, 113:7,
113:22, 113:24,
114:3, 114:16
**response** [9] -
8:10, 51:13,
53:24, 54:3,
54:13, 61:17,
104:24, 105:1,
112:14
**responses** [5] -
86:3, 95:21,
104:9, 104:17,
114:24
**responsibility** [6]
- 27:3, 27:15,
80:13, 85:23,
94:10, 95:2
**responsible** [2] -
62:9, 97:20
**rest** [1] - 81:13
**retaliated** [1] -
107:2
**retaliation** [4] -
107:6, 121:21,
122:3, 123:14
**return** [2] - 62:6,
131:21
**reveal** [1] - 126:12
**review** [79] - 21:8,
21:25, 22:13,
24:20, 31:12,
31:17, 32:25,
33:1, 33:4, 33:5,
33:7, 33:8,
33:18, 33:19,
33:24, 35:3,
35:10, 35:20,
35:24, 35:25,
36:8, 36:18,
36:25, 37:6,
38:3, 39:15,
40:3, 41:4,
41:10, 41:20,
41:24, 42:12,
42:19, 44:9,
46:16, 46:22,
46:24, 47:8,
47:10, 47:22,
51:2, 54:7,
56:24, 57:11,
58:1, 60:18,
60:22, 60:25,
61:23, 61:24,
61:25, 81:19,

83:4, 84:11,
90:8, 94:10,
94:18, 94:21,
95:1, 95:2,
100:9, 108:21,
111:3, 111:8,
121:10, 124:18,
124:25, 125:17,
125:18, 126:1,
126:5, 126:10,
126:19, 127:9,
127:22, 127:23
**Review** [11] -
3:13, 3:15, 3:21,
3:23, 17:17,
18:4, 23:10,
34:24, 63:7,
90:24, 91:5
**reviewed** [54] -
8:6, 16:19,
16:20, 16:22,
17:6, 18:7,
18:13, 18:18,
24:6, 31:22,
37:4, 37:7, 37:9,
37:10, 37:13,
37:15, 37:16,
37:18, 37:20,
37:24, 38:14,
39:6, 40:24,
42:17, 42:19,
45:8, 46:2, 47:4,
47:6, 47:13,
47:18, 47:21,
47:25, 48:5,
48:6, 48:8,
48:10, 48:13,
48:18, 49:1,
49:4, 60:17,
77:23, 84:13,
94:20, 95:3,
95:4, 104:14,
119:20, 126:11,
126:24, 127:14,
127:21
**reviewer** [2] -
33:9, 33:17
**reviewers** [3] -
33:14, 36:5,
36:6
**reviewing** [5] -
31:15, 49:13,
81:22, 111:4
**reviews** [5] - 17:2,
18:12, 33:10,
37:9, 47:3
**Revised** [1] -
99:17
**Richmond** [3] -
29:24, 30:1,

109:12
**rights** [3] -
121:22, 122:4,
122:25
**rigorous** [1] -
28:11
**road** [2] - 7:16,
8:15
**role** [8] - 10:25,
24:9, 24:10,
24:13, 74:18,
80:2, 97:11,
97:12
**roles** [1] - 15:21
**Ron** [4] - 63:24,
65:18, 66:25,
68:18
**room** [4] - 32:5,
50:6, 108:13,
108:14
**rough** [1] - 24:3
**roughly** [1] -
95:24
**rule** [1] - 116:17
**rules** [2] - 7:16,
8:15
**Rules** [2] - 1:23,
5:8
**rumors** [1] -
120:24
**running** [1] -
111:21
**Russian** [4] -
12:23, 45:11,
45:23, 126:15

---

**S**

**safe** [1] - 15:15
**saw** [1] - 6:18
**Schenker** [4] -
15:3, 82:23,
86:6, 102:11
**Schenker's** [1] -
103:6
**Schenkerian** [38]
- 18:22, 18:25,
19:12, 21:10,
26:3, 28:8,
28:18, 30:11,
31:11, 36:9,
37:12, 39:16,
40:3, 48:15,
48:23, 55:20,
58:2, 63:1, 66:3,
66:9, 66:16,
67:23, 68:3,
72:18, 73:8,
73:10, 76:9,
78:9, 80:2, 85:8,

85:24, 95:20,
96:10, 100:15,
103:25, 106:18,
107:18, 110:21
**Schenkerians** [1]
- 105:3
**scholar** [3] -
19:20, 75:6,
75:9
**scholarly** [3] -
26:4, 126:6,
126:24
**scholars** [4] -
77:24, 78:7,
92:3, 107:17
**scholarship** [1] -
27:23
**sci** [1] - 15:19
**science** [8] -
12:21, 12:24,
18:14, 35:17,
73:22, 89:11,
126:18
**Science** [6] -
14:23, 14:25,
17:17, 17:21,
17:23, 18:4
**scientific** [2] -
72:24, 73:2
**scientist** [1] -
14:17
**scope** [9] - 28:22,
29:3, 29:8,
29:12, 60:1,
60:2, 103:17,
121:9, 121:24
**screen** [4] - 7:19,
25:4, 81:1,
96:16
**scroll** [6] - 7:23,
8:5, 44:11,
50:16, 83:23,
84:2
**scrolling** [4] -
43:17, 43:24,
71:14, 91:4
**seal** [1] - 130:16
**sec** [2] - 20:15,
115:4
**second** [16] -
17:22, 27:8,
27:19, 36:4,
41:10, 42:5,
42:6, 42:10,
44:25, 69:7,
74:16, 82:18,
99:15, 102:8,
116:16
**secondhand** [1] -
120:18

**section** [6] -
34:23, 37:23,
90:23, 91:1,
91:7, 93:3
**see** [39] - 7:12,
7:22, 7:24,
20:12, 21:10,
22:3, 22:13,
25:4, 25:5,
34:22, 34:25,
43:14, 43:16,
43:18, 43:21,
44:7, 44:11,
45:4, 45:12,
50:1, 50:20,
53:16, 63:20,
63:25, 68:8,
68:21, 74:6,
82:8, 83:10,
93:1, 96:16,
99:4, 101:7,
101:12, 102:8,
110:15, 110:18,
111:22, 112:1
**See** [5] - 44:13,
65:7, 69:19,
77:5, 84:25
**seeing** [7] - 48:25,
49:2, 77:2,
80:25, 81:2,
86:2, 96:19
**seek** [2] - 26:3,
62:23
**seem** [6] - 41:11,
52:4, 81:11,
84:24, 85:2,
89:9
**Segall** [1] - 45:22
**self** [5] - 31:16,
31:18, 31:20,
35:23, 61:1
**self-publication**
[5] - 31:16,
31:18, 31:20,
35:23, 61:1
**send** [6] - 60:16,
71:8, 84:13,
90:16, 90:18,
112:23
**senior** [5] - 75:6,
75:9, 77:24,
78:7, 92:3
**sense** [4] - 47:21,
79:5, 105:17,
123:12
**senses** [1] - 86:10
**sent** [14] - 20:2,
48:23, 60:23,
61:14, 61:18,
61:22, 83:19,

89:12, 90:19,
99:24, 102:20,
110:21, 111:1,
111:13
**sentence** [3] -
27:13, 27:19,
74:16
**sentences** [1] -
74:8
**separate** [3] -
37:17, 89:8,
127:16
**September** [9] -
1:11, 1:17, 5:3,
6:2, 63:6, 83:14,
84:4, 131:11
**SEPTEMBER** [1] -
129:3
**sequence** [2] -
61:21, 62:2
**series** [2] - 72:11,
124:8
**serious** [1] -
85:25
**serve** [2] - 20:4,
20:22
**Serve** [1] - 3:13
**served** [4] - 16:9,
17:11, 17:15,
86:11
**server** [1] -
111:13
**service** [1] - 24:13
**set** [1] - 68:5
**setting** [1] - 83:18
**seven** [1] - 13:20
**several** [6] -
38:22, 41:25,
47:7, 91:16,
92:9, 116:13
**sew** [1] - 48:1
**sexual** [1] -
122:13
**SHALL** [1] - 5:5
**Shall** [3] - 6:5,
23:18, 55:6
**shameful** [1] -
85:7
**share** [7] - 7:8,
28:10, 63:14,
63:17, 97:6,
102:4, 115:15
**shared** [5] -
91:17, 92:4,
116:7, 117:20,
118:10
**shepherd** [1] -
89:1
**SHERMAN** [2] -
1:2, 131:2

**short** [8] - 34:9,
46:4, 80:23,
94:21, 99:8,
100:1, 124:8,
124:9
**Short** [1] - 3:16
**short-circuit** [1] -
94:21
**Shorthand** [2] -
1:19, 131:13
**Shortly** [1] - 86:8
**shortly** [1] - 61:15
**shot** [1] - 81:1
**show** [1] - 23:7
**sign** [1] - 69:20
**signature** [4] -
7:25, 119:7,
130:4, 131:21
**Signature** [1] -
5:12
**SIGNATURE** [2] -
5:14, 129:1
**signed** [4] -
119:5, 119:6,
119:19
**significant** [1] -
72:16
**simply** [3] - 9:6,
54:22, 125:25
**simultaneously**
[2] - 13:13,
13:19
**single** [5] - 73:9,
73:23, 96:7,
96:9
**situation** [1] -
43:2
**six** [1] - 16:8
**size** [1] - 35:2
**skip** [4] - 24:18,
24:21, 104:20,
126:13
**skipping** [1] -
125:10
**Skipping** [1] -
104:5
**Slottow** [3] - 79:9,
79:17, 115:1
**small** [1] - 25:5
**SMT** [5] - 46:6,
85:22, 102:11,
102:19
**so...** [3] - 45:5,
83:7, 85:11
**social** [1] - 70:22
**society** [2] -
112:16, 114:11
**Society** [6] - 46:8,
95:18, 95:22,
103:3, 106:19,

111:13
**sociology** [1] -
89:12
**sole** [1] - 78:5
**solicit** [4] - 48:23,
104:8, 104:14,
104:18
**solicitation** [2] -
104:13, 114:4
**soliciting** [1] -
95:21
**someone** [16] -
40:21, 41:15,
46:4, 74:10,
74:17, 75:7,
89:12, 99:12,
103:13, 117:22,
118:24, 119:11,
120:7, 120:17,
121:12
**Sometimes** [2] -
44:25, 45:1
**sometimes** [1] -
39:2
**somewhere** [2] -
48:7, 124:17
**Sorry** [1] - 90:18
**sorry** [17] - 18:9,
22:17, 30:23,
31:20, 42:1,
46:20, 63:4,
72:8, 77:4,
79:20, 81:17,
85:4, 90:15,
106:14, 112:22,
122:8
**sort** [7] - 10:5,
35:2, 68:13,
79:15, 81:1,
97:24
**sought** [1] - 106:3
**sounded** [1] -
49:11
**sounds** [1] - 64:6
**source** [2] - 19:8,
39:17
**sources** [1] -
109:21
**speaking** [1] -
77:22
**special** [3] -
41:24, 61:2,
104:19
**specialized** [1] -
41:17
**specific** [10] -
24:10, 28:24,
49:3, 52:6, 67:4,
67:10, 72:25,
113:4, 122:12

**specifically** [11] -
22:1, 32:14,
58:21, 85:1,
85:13, 99:9,
99:23, 106:21,
119:1, 120:20,
122:15
**specifying** [1] -
69:25
**speculate** [4] -
59:9, 59:10,
106:10, 109:20
**spell** [1] - 7:3
**split** [1] - 95:24
**spoken** [1] - 12:2
**spontaneous** [1] -
70:6
**spread** [1] -
103:23
**staff** [1] - 95:8
**stamp** [1] - 83:20
**stamps** [1] - 23:1
**stand** [1] - 90:8
**standard** [8] -
31:6, 32:20,
37:17, 47:3,
66:25, 127:25
**standards** [15] -
26:4, 27:23,
28:12, 30:19,
31:8, 31:21,
31:25, 32:12,
32:16, 32:19,
34:17, 36:13,
36:14, 69:5,
76:8
**stands** [6] -
30:21, 31:1,
39:5, 46:6, 46:8,
70:14
**start** [3] - 18:3,
33:1, 101:17
**started** [5] -
14:10, 17:25,
59:19, 71:8,
86:3
**starting** [1] -
12:20, 21:5
**starts** [2] - 27:1,
45:12
**State** [7] - 1:19,
12:22, 12:25,
13:6, 13:23,
14:13, 131:14
**state** [8] - 6:5,
6:25, 17:14,
22:12, 22:15,
22:24, 68:8,
126:12
**STATE** [2] -

130:10, 130:20
**statement** [12] - 28:1, 37:2, 57:8, 67:4, 67:10, 111:22, 112:9, 113:6, 113:12, 113:18, 113:21, 127:11
**statements** [3] - 52:5, 66:21, 69:16
**States** [2] - 23:2, 122:18
**STATES** [2] - 1:1, 131:1
**Station** [1] - 2:9
**status** [2] - 13:24, 95:3
**stenotype** [1] - 1:20
**stick** [1] - 40:8
**sticking** [1] - 40:7
**still** [2] - 41:24, 76:7
**Stipulations.......** ...................... [1] - 3:3
**stir** [1] - 102:12
**stop** [1] - 102:16
**stopped** [1] - 18:12
**story** [2] - 97:8, 106:8
**Stowers** [3] - 2:13, 6:14, 50:5
**STOWERS** [1] - 6:14
**straight** [2] - 40:7, 41:13
**strange** [1] - 78:3
**strategy** [1] - 26:5
**stray** [2] - 29:17, 29:19
**strict** [1] - 31:15
**strike** [4] - 21:20, 29:18, 36:18, 106:4
**strikes** [3] - 102:15, 102:3, 102:7
**string** [1] - 51:2
**structured** [1] - 66:24
**stuck** [3] - 39:21, 40:10, 54:17
**student** [19] - 75:8, 77:10, 77:12, 77:17, 77:20, 77:24, 78:4, 88:5,

92:19, 97:13, 100:23, 100:24, 105:12, 106:12, 109:1, 109:18, 110:1, 110:8, 126:15
**students** [11] - 16:1, 16:4, 16:5, 16:12, 77:19, 77:21, 78:7, 78:10, 78:20, 119:21, 123:8
**Studies** [36] - 18:23, 18:25, 19:12, 21:10, 26:3, 28:8, 28:18, 30:11, 31:11, 36:10, 37:13, 39:16, 40:3, 48:15, 48:23, 55:20, 58:2, 63:1, 66:3, 66:9, 66:16, 67:23, 68:3, 72:18, 73:8, 73:10, 76:9, 78:10, 80:2, 85:8, 95:20, 96:11, 100:16, 106:18, 107:18, 110:22
**studies** [1] - 15:25
**study** [2] - 82:22, 86:5
**styled** [1] - 1:16
**subject** [4] - 22:13, 33:23, 41:9, 127:9
**subjected** [1] - 44:9
**submission** [1] - 69:23
**submissions** [6] - 78:6, 89:14, 104:14, 126:23, 127:13, 127:20
**submit** [3] - 26:12, 40:21, 127:3
**submitted** [6] - 11:11, 25:2, 38:7, 46:5, 81:6, 131:19
**submitting** [1] - 31:14
**Subpoena** [1] - 5:7
**subscribe** [1] - 32:1

**subscribed** [1] - 130:14
**subsection** [2] - 91:5, 91:13
**subsequent** [2] - 13:25, 42:7
**subsequently** [5] - 38:8, 40:18, 42:18
**substance** [5] - 12:15, 76:18, 76:25, 107:14, 111:10
**substantial** [3] - 74:11, 74:17, 92:9
**substantive** [1] - 81:12
**substitute** [1] - 114:12
**substituted** [1] - 113:1
**successful** [1] - 16:11
**suffered** [1] - 97:23
**suffering** [1] - 98:5
**suggest** [7] - 32:7, 36:6, 84:24, 96:1, 110:9, 126:16, 127:15
**suggested** [1] - 102:13
**suggesting** [1] - 54:25
**suggestion** [2] - 37:14, 71:16
**suggestions** [1] - 76:11
**suggests** [1] - 127:20
**suing** [1] - 11:1
**Suite** [1] - 1:22
**suite** [1] - 17:22
**summaries** [2] - 16:25, 42:23
**summarize** [2] - 19:14, 112:22
**summarized** [2] - 21:19, 108:5
**summarizing** [1] - 46:20
**summary** [3] - 33:19, 43:1, 96:2
**Sunday** [1] - 102:5
**superior** [1] - 86:9

**supported** [1] - 79:14
**suppose** [2] - 79:2, 87:13
**supposed** [1] - 25:20
**supposedly** [4] - 95:13, 107:10, 117:5, 118:3
**surely** [1] - 102:3
**surmise** [1] - 113:15
**surrounding** [2] - 18:24, 19:11
**survey** [2] - 33:21, 34:3
**surveyed** [2] - 35:9, 60:24
**swamped** [1] - 101:25
**sworn** [3] - 1:16, 6:20, 131:17
**Sworn** [1] - 6:4
**Symposium** [8] - 37:12, 48:14, 48:17, 95:23, 97:18, 97:21, 100:20, 100:25
**symposium** [2] - 32:21, 37:16
**System** [3] - 1:21, 2:13, 6:15

# T

**table** [1] - 124:12
**Tackle** [2] - 4:2, 72:13
**tackle** [1] - 75:3
**TAKEN** [1] - 5:5
**talks** [1] - 122:14
**task** [7] - 21:6, 39:16, 40:4, 59:14, 59:16, 88:25
**tasks** [1] - 36:21
**teaching** [1] - 102:1
**Teams** [1] - 12:11
**Telephone** [3] - 2:5, 2:10, 2:15
**ten** [1] - 15:16
**tenured** [1] - 86:10
**term** [4] - 100:12, 107:5, 107:7
**terms** [9] - 16:5, 16:9, 39:24, 55:25, 56:24, 59:8, 76:2,

98:11
**testified** [9] - 6:20, 30:2, 40:15, 53:9, 53:22, 55:16, 87:21, 110:22, 124:16
**testify** [5] - 60:12, 83:4, 109:22, 109:24, 113:9
**testimony** [23] - 26:8, 28:15, 38:25, 40:1, 46:1, 49:12, 54:22, 79:4, 80:3, 80:10, 83:7, 85:2, 85:11, 85:17, 88:2, 88:16, 93:24, 112:23, 117:23, 123:22, 124:16, 131:18, 131:23
**Texas** [36] - 1:20, 1:21, 1:22, 1:23, 2:10, 2:13, 2:14, 2:15, 6:11, 6:15, 14:14, 14:17, 14:20, 15:7, 15:22, 18:22, 23:3, 27:2, 27:14, 43:11, 43:13, 43:21, 45:16, 62:9, 62:10, 62:20, 62:24, 62:25, 64:4, 65:15, 67:8, 67:18, 122:22, 127:8, 131:14, 132:16
**text** [4] - 7:24, 8:8, 22:25, 100:11
**Thad** [3] - 2:3, 6:8, 132:2
**THE** [24] - 1:1, 2:2, 2:7, 6:2, 6:7, 23:18, 34:6, 55:8, 55:11, 58:8, 71:20, 71:25, 72:2, 72:5, 96:22, 96:25, 97:3, 98:17, 124:2, 124:5, 128:8, 130:10, 130:20, 131:1
**themselves** [1] - 48:5
**theoretical** [1] - 103:22

**Theoria** [10] - 3:18, 43:12, 44:2, 67:14, 67:24, 124:12, 125:9, 125:13, 125:16, 127:6
**theorist** [1] - 126:15
**theorists** [2] - 28:10, 105:11
**Theory** [8] - 3:25, 44:3, 46:9, 95:18, 95:22, 103:3, 106:19, 111:14
**theory** [12] - 28:9, 33:22, 33:23, 35:9, 35:16, 45:11, 45:23, 72:18, 73:10, 73:24, 95:16, 125:19
**therein** [1] - 130:15
**thinks** [1] - 52:7
**third** [2] - 125:5, 125:11
**THIS** [1] - 5:5
**thoughts/ questions** [1] - 102:4
**threatened** [1] - 123:7
**threats** [3] - 121:21, 122:3, 122:14
**three** [5] - 33:14, 81:3, 85:19, 86:9, 97:17
**Thursday** [1] - 102:5
**Tim** [2] - 52:12, 52:16
**TIMOTHY** [2] - 1:3, 131:3
**Timothy** [34] - 6:9, 6:17, 29:7, 32:11, 37:11, 50:3, 50:20, 51:25, 53:11, 53:16, 53:17, 53:24, 60:8, 60:14, 61:14, 78:8, 80:8, 85:23, 86:9, 98:22, 100:24, 104:6, 110:15, 114:14, 116:12, 119:10, 119:22, 119:23, 121:14,

121:21, 122:2, 122:24, 123:16, 123:21
Timothy's [2] - 53:24, 54:13
Title [10] - 3:18, 116:22, 117:3, 118:2, 118:11, 119:15, 121:13, 121:14, 122:11, 123:5
title [21] - 14:19, 14:21, 15:10, 23:9, 24:10, 43:10, 43:14, 43:16, 43:25, 44:2, 44:4, 44:5, 44:8, 44:22, 44:25, 67:14, 72:12, 124:11, 124:21, 126:13, 126:22
titled [1] - 34:23
TitleIX [1] - 4:10
titles [2] - 126:14, 126:16
TO [2] - 5:5, 5:10
TOARU [12] - 1:10, 1:14, 3:4, 5:2, 6:19, 7:4, 129:2, 130:3, 130:8, 130:12, 131:10, 131:16
Toaru [2] - 7:2, 7:4
today [8] - 9:1, 11:15, 11:17, 11:20, 14:20, 15:4, 26:8, 88:16
Today [1] - 6:2
today's [2] - 8:10, 11:9
together [1] - 101:23
took [4] - 24:4, 24:8, 75:7, 97:20
top [5] - 7:14, 22:25, 63:25, 74:15, 101:17
topics [2] - 85:19, 89:2
tort [2] - 10:18, 10:20
totally [1] - 96:21
touches [1] - 92:11
towards [2] - 116:8, 116:24

track [2] - 20:16, 127:16
tradition [2] - 78:12, 78:13
training [1] - 119:2
transcript [2] - 131:17, 131:19
transition [2] - 12:13, 14:2
transparent [6] - 35:20, 36:25, 37:20, 39:8, 49:15, 49:22
travel [1] - 102:6
trial [2] - 5:20, 128:4
triple [1] - 33:15
triple-blind [1] - 33:15
troubling [1] - 103:7
true [8] - 47:24, 48:2, 87:9, 87:16, 89:8, 113:5, 130:5, 131:18
True [1] - 48:12
Truelove [2] - 24:4, 24:8
Truman [3] - 13:22, 14:10, 14:13
trust [1] - 45:5
truthfully [1] - 9:1
try [3] - 42:2, 76:22, 98:20
trying [12] - 20:15, 47:19, 51:3, 54:19, 61:11, 63:22, 97:6, 99:25, 100:5, 112:22, 118:20, 123:12
turning [1] - 65:1
twice [1] - 17:13
two [14] - 13:18, 26:15, 33:10, 33:14, 36:19, 69:5, 74:7, 81:8, 91:11, 101:8, 101:15, 105:11, 105:21, 125:12
type [1] - 38:5
typed [3] - 68:16, 68:18, 70:7
Typesetting [1] - 85:20
typical [1] - 37:5
typically [2] -

126:2, 126:5

**U**

um-hum [1] - 9:14
Um-hum [28] - 11:25, 12:16, 12:21, 29:14, 31:5, 33:1, 36:23, 45:10, 45:25, 46:18, 51:4, 51:8, 54:24, 57:17, 65:5, 65:8, 72:10, 74:5, 81:20, 82:20, 83:15, 84:9, 85:21, 88:3, 97:19, 101:6, 102:22, 115:18
umbrella [1] - 127:8
unaware [3] - 19:3, 32:15, 62:23
uncomfortable [7] - 79:10, 116:13, 116:18, 117:23, 118:24, 119:11, 119:23
under [7] - 16:12, 28:11, 35:24, 68:17, 122:25, 127:7, 130:16
undergo [1] - 41:24
undergraduate [1] - 12:20
undergraduates [1] - 77:21
Understandable [1] - 64:7
understandably [1] - 33:13
understood [10] - 8:19, 22:4, 29:5, 51:12, 55:23, 74:22, 80:11, 118:8, 119:4, 126:5
unequal [2] - 79:5, 79:15
unethical [2] - 116:8, 116:24
Unfortunately [1] - 101:24
unfortunately [1] - 64:24
UNITED [2] - 1:1, 131:1

United [2] - 23:2, 122:18
universities [1] - 77:21
university [3] - 15:8, 15:23, 109:1
University [39] - 1:21, 2:13, 6:15, 12:22, 12:23, 12:25, 13:5, 13:7, 13:23, 14:10, 14:13, 14:14, 14:17, 14:19, 14:21, 15:7, 15:22, 18:21, 25:22, 25:23, 27:2, 27:14, 43:11, 43:13, 43:20, 45:15, 62:8, 62:9, 62:20, 62:24, 62:25, 64:3, 64:12, 65:14, 67:8, 67:18, 120:6, 122:22, 127:8
unless [1] - 48:6
unpopular [2] - 52:11, 53:20
unsigned [1] - 5:20
unsolicited [1] - 115:25
unsure [1] - 20:4
unsurprising [1] - 38:3
UNT [20] - 3:14, 3:17, 3:21, 3:22, 4:6, 4:8, 4:11, 64:12, 65:20, 68:9, 69:4, 83:17, 99:19, 101:2, 102:4, 107:24, 110:17, 111:22, 113:20, 115:19
UNT's [1] - 115:16
unusual [1] - 65:25
up [28] - 9:6, 12:15, 21:24, 25:12, 30:11, 34:5, 38:6, 41:3, 41:14, 42:9, 42:13, 46:13, 48:1, 51:9, 57:14, 59:24, 62:3, 62:5, 68:14, 68:16,

75:22, 83:18, 84:17, 86:1, 94:3, 97:15, 112:21, 125:6
upcoming [1] - 104:25
URL [1] - 71:4
uses [1] - 70:9
utilizes [1] - 102:14

**V**

vague [1] - 121:12
variety [1] - 75:20
various [1] - 85:19
vary [1] - 69:14
venture [2] - 58:18, 94:15
verbal [1] - 9:10
verify [2] - 71:2, 125:15
versus [1] - 34:21
vet [1] - 92:4
vetting [1] - 38:5
VIDEOGRAPHER [11] - 6:2, 55:8, 55:11, 72:2, 72:5, 96:22, 96:25, 97:3, 124:2, 124:5, 128:8
Videographer [1] - 2:18
VIDEOTAPED [2] - 1:9, 1:14
view [9] - 36:16, 36:24, 37:21, 47:13, 56:9, 56:19, 94:23, 103:12, 103:22
viewed [1] - 35:14
viewpoints [4] - 28:11, 52:11, 53:20, 94:14
views [1] - 87:8
violated [1] - 122:25
violation [2] - 121:22, 123:15
virtual [1] - 7:20
Vista [1] - 132:16
vitae [1] - 15:14
volume [7] - 17:9, 26:2, 32:21, 43:14, 49:1, 97:17, 114:23
Volume [26] - 3:19, 22:1,

37:12, 43:10, 44:3, 48:14, 55:19, 56:1, 56:4, 60:25, 79:13, 79:19, 79:20, 90:25, 95:23, 96:10, 97:16, 99:16, 100:10, 100:16, 101:1, 107:18, 114:16, 124:12, 125:9
volumes [2] - 17:8, 17:10
vs [2] - 1:5, 131:5

**W**

wait [1] - 111:20
waived [1] - 5:12
Wallach [1] - 63:10
Walls [41] - 4:4, 4:5, 77:10, 79:1, 79:2, 79:10, 79:25, 80:1, 80:21, 81:23, 83:13, 83:18, 86:22, 91:12, 91:14, 91:21, 92:4, 92:8, 92:19, 94:1, 94:2, 97:20, 99:17, 100:23, 101:5, 101:15, 104:21, 105:10, 105:12, 105:17, 106:7, 106:17, 107:12, 107:19, 108:4, 108:17, 108:18, 109:2, 109:12, 110:2
Walls' [2] - 89:19, 108:19
wants [1] - 7:20
Warner [1] - 2:18
warranted [1] - 26:6
webpage [1] - 78:3
website [6] - 20:11, 30:11, 32:18, 52:4, 52:19, 71:4
Wednesday [3] - 50:21, 52:2, 102:7
WHALEY [1] - 132:15
whole [2] - 23:25,

51:2
**widespread** [2] - 52:10, 53:19
**wife** [1] - 102:5
**willful** [1] - 103:5
**wish** [1] - 66:1
**WITNESS** [4] - 23:18, 71:20, 71:25, 129:2
**Witness** [2] - 5:11, 6:4
**witness** [16] - 1:15, 10:23, 58:7, 71:9, 79:3, 88:4, 88:6, 88:10, 88:11, 88:13, 88:14, 128:2, 131:16, 131:18
**Witness's** [1] - 5:11
**witnesses** [3] - 33:13, 38:1, 40:14
**woman** [1] - 119:14
**wondering** [1] - 92:12
**word** [5] - 49:16, 79:22, 85:14, 98:5
**words** [4] - 84:24, 98:7, 98:10, 119:13
**workaday** [1] - 89:22
**works** [1] - 49:14
**world** [4] - 17:18, 32:6, 75:2, 103:22
**worried** [1] - 86:4
**WRIGHT** [2] - 1:6, 131:6
**write** [2] - 113:11, 113:20
**writes** [1] - 75:8
**writing** [10] - 21:20, 21:22, 25:14, 25:16, 70:3, 74:10, 74:18, 85:11, 91:23, 113:18
**written** [4] - 21:24, 23:24, 90:7, 123:3
**wrote** [3] - 27:6, 68:15, 75:7

## Y

**year** [2] - 15:11, 64:10
**years** [8] - 10:16, 11:5, 13:20, 14:11, 15:16, 49:4, 61:21, 117:6
**York** [1] - 95:16

## Z

**Zoom** [6] - 6:18, 12:11, 75:10, 83:18, 108:14, 108:16
**ZOOM** [1] - 1:9

## ●

• [4] - 69:18, 69:20, 69:22, 69:25