## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

TIMOTHY JACKSON,
    *Plaintiff*,

v.

LAURA WRIGHT, MILTON B. LEE, MELISA DENIS, MARY DENNY, DANIEL FEEHAN, A.K. MAGO, CARLOS MUNGUIA, AND G. BRINT RYAN, each in their official capacities as members of the board of regents for the University of North Texas System; RACHEL GAIN; ELLEN BAKULINA; ANDREW CHUNG; DIEGO CUBERO; STEVEN FRIEDSON; REBECCA DOWD GEOFFROY-SCHWINDEN; BENJAMIN GRAF; FRANK HEIDLBERGER; BERNARDO ILLARI; JUSTIN LAVACEK; PETER MONDELLI; MARGARET NOTLEY; APRIL L. PRINCE; CATHY RAGLAND; GILLIAN ROBERTSON; HENDRIK SCHULZE; VIVEK VIRANI; AND BRIAN F. WRIGHT,
    *Defendants*.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 4:21-cv-00033

---

## THE DEFAMATION DEFENDANTS' RESPONSE TO PLAINTIFF TIMOTHY JACKSON'S MOTION FOR SUMMARY JUDGMENT ON DEFAMATION LIABILITY APPENDIX

---

Ellen Bakulina, Ph.D. deposition excerpts ................................................................. Appx.001-007

Andrew Jay Chung deposition excerpts ..................................................................... Appx.008-012

Andrew Jay Chung deposition Exhibit 9 .................................................................. Appx.013-039

Diego Cubero deposition excerpts ............................................................................ Appx.040-046

Rachel Gain deposition excerpts .............................................................................. Appx.047-052

John Ishiyama, Ph.D. deposition excerpts ................................................................ Appx.053-056

Timothy Jackson deposition excerpts ....................................................................... Appx.057-061

Peter Kohanski deposition excerpts ........................................................... Appx.062-066

Rebecca Geoffroy-Schwinden, Ph.D. deposition excerpts ....................................... Appx.067-077

Stephen Slottow, Ph.D. deposition excerpts ........................................................... Appx.078-085

```
 1              UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF
 2                   SHERMAN DIVISION

 3  TIMOTHY JACKSON,           )
                               )
 4       Plaintiff,            )
                               )
 5  vs.                        )  CASE NO. 4:21-CV-00033-ALM
                               )
 6  LAURA WRIGHT, et al.,      )
                               )
 7       Defendants.           )

 8  *****************************************************

 9         VIDEOTAPED ZOOM ORAL DEPOSITION OF

10              ELLEN BAKULINA, PH.D.

11                 October 16, 2024

12               (Reported Remotely).

13

14  *****************************************************

15      VIDEOTAPED ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.,

16  produced as a witness at the instance of the Plaintiff

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 16th day of October, 2024,

19  from 9:03 a.m. to 3:54 p.m., before Kim D. Carrell,

20  Certified Shorthand Reporter in and for the State of

21  Texas, reported remotely by computerized stenotype

22  machine at the physical location of the Witness, Ellen

23  Bakulina, Ph.D., in Montreal, Canada, pursuant to the

24  Federal Rules of Civil Procedure and the provisions

25  stated on the record or attached hereto.
```

```
 1                    APPEARANCES

 2  FOR THE PLAINTIFF:

 3    Michael Thad Allen
      ALLEN LAW, LLC
 4    P.O. Box 404
      Quaker Hill, CT 06375
 5    Telephone: 860.772.4738
      Fax: 860.469.2783
 6    E-mail: M.allen@allen-lawfirm.com

 7

 8  FOR THE DEFENDANTS:

 9    Mary Quimby
      Assistant Attorney General
10    General Litigation Division
      P.O. Box 12548, Capital Station
11    Austin, Texas 78711
      Telephone: 512.463.2120
12    Fax: 512.320.0667
      E-mail: Mary.Quimby@oag.texas.gov
13
             - and -
14
15    Renaldo Stowers  (Appearing Live)
      Cari Jacoby
16    University of North Texas System
      Office of General Counsel
17    801 North Texas Boulevard
      Denton, Texas 76201
18    Telephone: 940.565.2717
      Fax: 940.369.7026
19    E-mail: Renaldo.Stowers@untsystem.edu
              cari.jacoby@untsystem.edu
20

21  ALSO PRESENT:

22    Timothy Jackson, Plaintiff

23  VIDEOGRAPHER:

24    Mr. Jason Warner
      Legal Video Group
25    lvg.dallas@gmail.com
      214-598-5229
```

```
 1                    I N D E X

 2                                            PAGE

 3  Appearances.................................   2

 4  Stipulations................................   5

 5  ELLEN BAKULINA, PH.D.

 6     Direct Examination by Mr. Allen........   6

 7  Reporter's Certificate...................... 227

 8                    EXHIBITS

 9   NUMBER            DESCRIPTION          MARKED

10  Exhibit 1   Re-Notice of Taking Deposition.....  13

11  Exhibit 2   Bakulina CV
                (UNT 005258 - 005267).............  14
12
    Exhibit 3   Bakulina CV with Highlights
13              (UNT 005257 - 005267).............  31

14  Exhibit 4   Title Page, List of Articles,
                Theoria, Volume 26, 2020..........  35
15
    Exhibit 5   Excerpt from SMT Website, Oxford
16              University Press Academic, and
                Ewell Article.....................  45
17
    Exhibit 6   Email, Not everyone was
18              enthusiastic about Ewell's talk
                (JACKS 086826)....................  85
19
    Exhibit 7   Email, Material for the Committee
20              (UNT 002645 - 002782).............  88

21  Exhibit 8   Email, 12-11-19, Jackson to
                Bakulina, et al.
22              (UNT 000563 - 000566).............106

23  Exhibit 9   Email, 7-25-20, Slottow
                to Jackson, et al
24              (UNT 000300 - 000303).............137

25
```

```
 1  Exhibit 10   Email Chain Ending Jackson to
                 Cubero, et al.
 2               (UNT 000304 - 000309).............144

 3  Exhibit 11   Letter, 7-29-20, Bakulina to
                 Richmond
 4               (UNT 000116 - 000309).............150

 5  Exhibit 12   Email, 7-29-20, Bakulina to
                 Brand, et al.
 6               (UNT 000488)......................158

 7  Exhibit 13   Email, 7-31-20, Richmond to
                 Music Faculty, et al.
 8               (UNT 000568)......................160

 9  Exhibit 14   Ad Hoc Review Panel Report
                 (Exhibit D)
10               (JACKSON000208 - 000233)..........164

11  Exhibit 15   Email Chain, Re: Statement on
                 JSS Issue
12               (UNT 000363 - 000363).............175

13  Exhibit 16   Email Chain Re: Meeting with
                 Journal Review Panel, Wed.
14               Sept. 16
                 (UNT 002509)......................186
15
    Exhibit 17   Email Chain Re: Talk with the
16               UNT Ad Hoc Journal Review Panel
                 (UNT 002555)......................196
17
    Exhibit 18   Undated Letter, Bakulina to
18               Richmond
                 (UNT 002559 - 002561).............203
19
    Exhibit 19   Email Chain Ending 5-17-21,
20               Brand to Cowley, et al.
                 (UNT 005054 - 005055).............208

21
22
23
24
25
```

APPX.001

*ELLEN BAKULINA, PH.D.    10/16/2024*

93

1    **A.**    "From Benjamin Graf's email."

2    **Q.**    Um-hum.

3    **A.**    "I agree with Tim. We should go forward with

4    the call and be open to publishing more on this matter in

5    future publications."

6    **Q.**    And just to back up to the email Timothy

7    Jackson had sent the day before, he also addressed

8    whether there could be the possibility of additional

9    responses, correct?

10    **A.**    Let's see. Give me a minute. Yes.

11    MS. QUIMBY: I'm sorry. Before we

12    continue, can we take a moment to clarify who spoke on

13    the record just a minute ago? It's my understanding

14    that it wasn't Renaldo, and I'm not sure.

15    MR. ALLEN: I honestly don't know. If

16    they want -- I mean, it was a male voice.

17    MS. QUIMBY: I'd just like to clarify for

18    the record who that was.

19    MR. ALLEN: It wasn't -- Timothy, are you

20    on? Did you speak? Or was it Cari Jacoby? Cari Jacoby

21    is probably a female?

22    MS. QUIMBY: It was not Cari.

23    MS. JACOBY: I'm a female.

24    MR. ALLEN: Thank you. Sorry.

25    MR. JACKSON: I didn't speak. I did not

---

*ELLEN BAKULINA, PH.D.    10/16/2024*

94

1    speak.

2    MR. ALLEN: Adam Scozzari would be the

3    videographer, and I can't believe that --

4    THE VIDEOGRAPHER: I've been muted.

5    MR. STOWERS: This is Renaldo Stowers.

6    I was muted, and it wasn't me.

7    MR. ALLEN: I'm the only one in my house

8    right now, and I think you all are familiar with my

9    voice, so it certainly wasn't me. So I don't know.

10    MR. STOWERS: Is there anybody else who

11    has access who is on here other than T --

12    MS. QUIMBY: I was going to ask you who

13    TLJ is. I saw that earlier.

14    MR. ALLEN: That should be Timothy, right?

15    Timothy, are you TJ -- TLJ0019?

16    MR. JACKSON: I am. But I don't know if

17    my audio was off. I can only say that it wasn't me who

18    spoke.

19    MR. ALLEN: All right. Well, I'm not sure

20    who else it would have been then, but there is no one

21    else in my home. I don't -- Dr. Bakulina testified that

22    the only one else with her is her cat, so...

23    MS. QUIMBY: Yeah.

24    MR. ALLEN: Mary, if you want -- for

25    the record, if you want to have that stricken from the

---

*ELLEN BAKULINA, PH.D.    10/16/2024*

95

1    record -- or I don't know what you want to do to address

2    that. I'm open to suggestions.

3    MS. QUIMBY: I was just trying to clarify.

4    MR. ALLEN: No, obviously. I asked at

5    that time if the person would identify themselves, and

6    no one spoke, so I'm not sure what was going on there.

7    **Q.**    Sorry. I'm trying to pick up where we left

8    off, Professor Bakulina. I want to get you back on

9    screen. There we go.

10    "So I was just going to say that the day

11    before Timothy Jackson had addressed the issue that

12    more responses have promise."

13    I'm just reading into the record a portion of

14    that email on Bates page UNT 2658.

15    "More responses have promised and have even

16    been -- and even been requested. Therefore, if others

17    are interested in responding, but wish to wait for the

18    published version of Ewell's talk, then they are welcome

19    to do so, and which should be open to publishing

20    additional responses to that version in a subsequent

21    issue after the upcoming one of the Journal of

22    Schenkerian Studies."

23    Did I read that right?

24    **A.**    I think so, yes.

25    **Q.**    Was there any objection at this time that

---

*ELLEN BAKULINA, PH.D.    10/16/2024*

96

1    Philip Ewell had not been personally invited?

2    MS. QUIMBY: Objection, form.

3    **A.**    As much as I recall, no. And that's very

4    unfortunate. I regret this personally.

5    **Q.**    You didn't object to Philip Ewell not being

6    personally invited in 2019, did you?

7    MS. QUIMBY: Objection, form.

8    **A.**    I think I might have mentioned something

9    verbally, and I don't recall if it was in any of the

10    emails. But I mentioned Philip Ewell to one of the

11    people involved, maybe to Timothy Jackson, maybe to

12    Stephen Slottow. I don't recall what I said, but I

13    think that I mentioned something. I greatly regret at

14    this point that I did not explicitly ask to wait or to --

15    that I did not explicitly suggest to ask for Philip

16    Ewell's response to the responses.

17    **Q.**    Did you speak to Philip Ewell before

18    the publication of the Volume 12 of the Journal of

19    Schenkerian Studies after his plenary talk and before

20    its publication?

21    **A.**    I have to think, because Philip Ewell and I had

22    a lot of exchanges about many things because we

23    share an important research area.

24    **Q.**    Um-hum.

25    **A.**    And I didn't recall the details, but it is

---

APPX.002

ELLEN BAKULINA, PH.D.     10/16/2024

97

1  possible that we interacted between his plenary address
2  and the publication of Volume 12 of JSS, yes.
3      Q.   Did anything prevent you from reaching out to
4  Philip Ewell individually and inviting him to participate
5  in Volume 12 of the Journal of Schenkerian Studies?
6          MS. QUIMBY:  Objection, form.
7      A.   I think my membership on the Journal of
8  Schenkerian Studies board prevented me from inviting him
9  personally to.  So I would not -- I felt I could not
10  invite him and say like, hey, Phil, do you want to write
11  a response to the responses or response to something?  I
12  could not.  I felt I could not invite him on my own like
13  this because I was a member of JSS board.
14     Q.   What prevented you, as a member of the JSS
15  board, from inviting Philip Ewell personally?
16     A.    What prevented me was that as a board member, I
17  was -- I thought at least, maybe it was a wrong
18  perception, but I felt like as a board member, JSS
19  board member, I was sort of under the directions of its
20  advisory board, which, at that time, was Timothy Jackson
21  and Stephen Slottow.  And because I was less empowered
22  in the division, meaning that I did not have tenure and
23  they both did and still do --
24     Q.   Uh-huh.
25     A.   -- I didn't feel enough independence to do what

ELLEN BAKULINA, PH.D.     10/16/2024

98

1  I wanted to do.  I felt like I needed to -- obey is not
2  the right word.  To -- I felt submissive, I guess,
3  because I was afraid basically of being too independent.
4  I was afraid to say things to the advisory board, that
5  they would not -- I thought they would not necessarily
6  like what I did.
7      Q.   That didn't prevent you from raising the
8  issue that they should delay the publication of
9  Volume 12 because the plenary session was going to be
10  published in Music Theory Spectrum, did it?
11         MS. QUIMBY:  Objection, form.
12     A.   That did not prevent me, correct.
13     Q.   And you had just been at a talk in November
14  of 2019 where Philip Ewell received a standing ovation,
15  right?
16         MS. QUIMBY:  Objection, form.
17     A.   Yes.
18     Q.   Did you feel an inability to speak to Philip
19  Ewell in any way?
20         MS. QUIMBY:  Objection, form.
21     A.   No.
22     Q.   Did you feel there was a, quote, power
23  differential, between you and Philip Ewell as scholars
24  in the field?
25         MS. QUIMBY:  Objection, form.

ELLEN BAKULINA, PH.D.     10/16/2024

99

1      A.   In the scholars of the field, yes.  I think,
2  yes.
3      Q.   But yet you felt that you could speak to him
4  about issues concerning publication in Theoria, right?
5          MS. QUIMBY:  Objection, form.
6      A.   Wait.  Was it the same year?
7      Q.   The Theoria article came out in 2020, right?
8          MS. QUIMBY:  Objection, form.
9      Q.   The same year?
10         MS. QUIMBY:  Objection, form.
11     A.   Yes.  But it doesn't mean that the discussion
12  happened at the same time.
13     Q.   Well, any discussions you had with Philip Ewell
14  over anything related to the publication in Theoria, did
15  you feel somehow intimidated by him?
16         MS. QUIMBY:  Objection, form.
17     A.   No, I did not feel intimidated by Philip Ewell
18  with respect to publication in Theoria mostly because he
19  was not in a position to give me any directions.  His
20  article and my article in Theoria were on par with each
21  other and the third one by Segall.  We were on par with
22  each other.  And I might not remember perfectly well,
23  but I don't think Philip Ewell and I discussed much with
24  respect to articles in Theoria.  I would not discuss with
25  him.  I would discuss it with the editor.

ELLEN BAKULINA, PH.D.     10/16/2024

100

1      Q.   Were you intimidated by Frank Heidlberger as
2  the editor of the journal Theoria?
3          MS. QUIMBY:  Objection, form.
4      A.   Intimidated by the fact that he was the
5  editor or by something that he said?
6      Q.   By the fact that he was the editor.
7      A.   No, not really.
8      Q.   Okay.
9      A.   I was not in any situation with respect to my
10  publication in Theoria that would create any problematic
11  events, no.
12     Q.   When you were formulating the call for papers
13  of the Journal of Schenkerian Studies to solicit articles
14  for the Symposium --
15     A.   Um-hum.
16     Q.   -- do you recall any discussion about whether
17  there should be a specific ideological focus of the
18  submissions?
19         MS. QUIMBY:  Objection, form.
20     A.   I remember that the call for responses.  Now, I
21  don't actually remember the final form of the call for
22  responses.
23     Q.   Um-hum.
24     A.   But one of the drafts of the call for
25  responses, I remember seeing that email stated

ELLEN BAKULINA, PH.D.    10/16/2024

165

1 this statement of UNT faculty on Journal of Schenkerian
2 Studies?
3     A.    Yes.
4     Q.    And the first signature on this document is
5 yours, Ellen Bakulina, correct?
6     A.    Yes.
7     Q.    And it says, "We the undersigned faculty
8 members of the University of North Texas Division of
9 Music History, Theory, and Ethnomusicology stand in
10 solidarity with our graduate students in their letter
11 of condemnation of the Journal of Schenkerian Studies."
12     Correct?
13     A.    Yes.
14     Q.    And then it goes on to say, "We endorse the
15 call for action outlined in our students' letter."
16     Do you see that in the second paragraph?
17     A.    Yes.
18     Q.    And what document is linked here?
19     A.    The student letter.
20     Q.    And is that also appended to the Ad Hoc Panel
21 Report as, quote, Exhibit 3 to the Ad Hoc Panel Report
22 here?
23     A.    It looks like it.  We have -- yes, that's the
24 student letter, it seems, yes.
25     Q.    Do you want some more time to review it?

ELLEN BAKULINA, PH.D.    10/16/2024

166

1     A.    If you ask a specific question, I will review
2 it.
3     Q.    Okay.  We will get to it, but I'm just
4 trying to authenticate that this has been incorporated
5 by reference at least through this link, in your letter
6 that you signed.
7     A.    Yes.
8     MS. QUIMBY:  Form.
9     Q.    And that you say, "We enforce the call for
10 action outlined in our students' letter," right here,
11 right?
12     And this also asserts in the last sentence of
13 this paragraph, "The fact that he was not afforded the
14 opportunity to respond in print is unacceptable, as is
15 the lack of a clearly defined peer-review process."
16     Did I read that last sentence correctly?
17     A.    Yes.
18     Q.    Who is "he" in this sentence?
19     A.    "He" would be referring to the last person
20 named by name, which is Ewell.
21     Q.    So that should be understood to read the fact
22 that Philip Ewell was not afforded the opportunity to
23 respond in print is unacceptable?
24     A.    Yes.
25     Q.    And you knew that Philip Ewell was going to

ELLEN BAKULINA, PH.D.    10/16/2024

167

1 receive the call for papers just like anyone else,
2 correct?
3     MS. QUIMBY:  Objection, form.
4     A.    Yes.  But the call for papers did not include
5 him.  Yes, of course, Ewell would have received the call
6 for papers, the call for responses.  What the call for
7 responses says, however, is we are asking whatever --
8 we're inviting whatever responses to Ewell's paper.
9     Now, Ewell would not normally respond to his
10 own paper, to his own presentation.  What we should
11 have done as, you know, people who drafted the call
12 for responses or call for papers, was to give Ewell a
13 specific opportunity to respond to the responses.  That's
14 something to which he could have properly said, you know,
15 yes, I want to respond to the responses, or no, I don't
16 want to respond to the responses.
17     Q.    And all of that which you just explained, is
18 that stated anywhere in this Statement of UNT Faculty on
19 Journal of Schenkerian Studies?
20     A.    It is implied where it says -- can you make
21 it bigger?
22     Q.    Um-hum.  Is that readable?  I can make it
23 bigger one more click, I believe --
24     A.    I can --
25     Q.    -- but it starts to come out of the screen if I

ELLEN BAKULINA, PH.D.    10/16/2024

168

1 do it any bigger.  Let me make it just a little wider.
2     A.    -- explain to you.  Thank you.
3     So what I just said is not stated in the
4 letter.
5     To me, what I just said is implied in the
6 statement, "He was not afforded the opportunity to
7 respond in print."
8     Q.    I believe you've already testified that no
9 one expressed the intention of excluding Philip Ewell's
10 response to the Symposium, correct?
11     MS. QUIMBY:  Objection, form.
12     A.    The call for papers was not phrased so as to
13 include Philip Ewell himself, so as to include him in
14 terms of response to responses.
15     Q.    But it doesn't say that the fact is that the
16 call for papers didn't mention Philip Ewell explicitly,
17 right?  That's not what this says.
18     It says, "The fact that he was not afforded
19 the opportunity to respond in print is unacceptable."
20     Right?
21     MS. QUIMBY:  Objection, form.
22     A.    Well, you quoted correctly.  What's the
23 question again?
24     Q.    Well, this doesn't say something to the effect
25 of the call for papers didn't mention Philip Ewell by

APPX.004

169

1    name, does it?

2                MS. QUIMBY:  Objection, form.

3         A.    So this letter states that he was not

4    afforded an opportunity to respond.  To me, this refers

5    to the fact that the call for responses did not offer an

6    opportunity for Ewell to write a response to responses.

7         Q.    And did you participate in the drafting of this

8    UNT Faculty Statement on Journal of Schenkerian Studies?

9         A.    I remember reading a draft and maybe making

10   small suggestions, but I was not the one who drafted the

11   letter.

12        Q.    Did you ever suggest that anyone add all of the

13   verbiage that you just testified was implied in this

14   statement to the letter in actual words?

15        A.    No, I did not suggest that.

16        Q.    Now, I want to go to the students' statement,

17   and we'll ask some questions about that.  Let me see.  I

18   think this is a better -- I'm just trying to make this

19   easy for you to read.  But if I make it just a bit wider,

20   is it possible for you to see all of this now?

21        A.    Yes.  Very good, thank you.

22        Q.    Is this a good size for the font?

23        A.    Yes, excellent.

24        Q.    Okay.  So what, in this student letter, is

25   the call for action?

170

1                MS. QUIMBY:  Objection, form.

2         A.    Call for action.  It's a little bit later, if

3    you scroll a little bit down.

4         Q.    Okay.  Here it says, "We also call on the

5    University of North Texas and the UNT College of Music to

6    take the following action:"

7              Is that part of the students' call for action?

8         A.    I think so.  Scroll further.

9         Q.    And then they have three bullet points, if you

10   want to call them that, or three numbered paragraphs in

11   here, right?

12        A.    Right.

13        Q.    One is dissolve the JSS, correct?

14        A.    Yes.  That's one of the actions, yes.  So

15   that's the call for actions, correct.

16        Q.    And also, critically examine the culture of

17   UNT, the COM, which I think means College of Music, and

18   the MHTE, which means School of Musicology [sic] History,

19   Theory, and Ethnomusicology; is that right?

20        A.    Yes.

21        Q.    And they want something to do with changing our

22   culture, right?

23        A.    Yes.

24        Q.    And is this also part of the call for action?

25              "Hold accountable every person responsible for

171

1    the direction of the publication."

2         A.    Yes, definitely.

3         Q.    And that includes, "This should also extend to

4    investigating past bigoted behaviors by faculty and by

5    taking this into account, the discipline and potential

6    removal of faculty who used the JSS platform to promote

7    racism.  Specifically, the actions of Dr. Jackson, both

8    past and present, are particularly racist and

9    unacceptable."

10             Did I read that correctly?

11        A.    You read that correctly.

12        Q.    Okay.  Do you recall any internal

13   correspondence between you and any other faculty discussing

14   limitations on your endorsement of the faculty petition?

15                MS. QUIMBY:  Objection, form.

16        A.    I don't recall discussing specifically

17   limitations.

18        Q.    Do you have any memory of any limitations on

19   the faculty endorsement that you insisted on at the time?

20                MS. QUIMBY:  Objection, form.

21        A.    No, I don't remember.  I don't recall.

22        Q.    If there are emails that are discussing that

23   subject, namely, limitations on the endorsements of the

24   students' letter, do you have any reason to believe that

25   they would give a misleading account of the faculty

172

1    discussions at that time?

2                MS. QUIMBY:  Objection, form.

3         A.    Limitations?  What limitations?  Could you

4    rephrase the question, please?

5         Q.    Sure.  Did you -- were there any discussions

6    among the faculty, for instance, saying I don't want to

7    sign the students' statement because I don't want to go

8    this full distance, or I don't want to endorse this

9    specific part of the letter, or I want to choose this to

10   emphasize and not that?  Any discussions of that nature

11   that you recall from that time period in July of 2020?

12                MS. QUIMBY:  Objection, form.

13        A.    We certainly discussed the details.  I don't

14   recall what the details were.  But the -- we -- when the

15   faculty let us say that we support the call for action,

16   I remember that we agreed that people should be

17   accountable.

18        Q.    Um-hum.

19        A.    Responsible parties should be held accountable.

20   And to me, accountable is responsible.

21        Q.    Okay.

22        A.    And the examining the culture of UNT was

23   definitely a part of what we discussed for sure.

24                MR. ALLEN:  Okay.  I'm going to mark for

25   the record -- well, let's see again.  I'll publish this

ELLEN BAKULINA, PH.D.    10/16/2024

177

1  what I said?  I think they did because --
2  **Q.**  Okay.
3  **A.**  -- this wording is not in the final draft.
4  **Q.**  Okay.
5  **A.**  I guess, yes.
6  **Q.**  And then second, you take issue apparently with
7  the last phrase, "Dismantle and to rebuild our shared
8  institutions," which you found unclear, right?
9  **A.**  Yes.
10  **Q.**  Third, you say, "I cannot sign in support of
11  the student statement.  For one reason, that statement
12  mentions, 'We condemn the egregious statements written by
13  UNT faculty members within this publication.'"
14     Right?
15  **A.**  Okay.  Give me one second.  We condemn the
16  egregious... I see.  Yes, okay.  Yeah, correct.
17  **Q.**  And so then, that was in line with the
18  July 29, 2020 letter we reviewed earlier in which you
19  had analyzed five different contributions to the
20  Symposium, right?
21  **A.**  Yes.
22  **Q.**  And you felt some were worthy publications
23  and some were not?
24     MS. QUIMBY:  Objection, form.
25  **A.**  I don't think worthy of publication is what I

ELLEN BAKULINA, PH.D.    10/16/2024

178

1  meant.  I meant more my personal agreement.
2  **Q.**  Okay.  And from the looks of the final
3  statement, we just examined in Exhibit 14 --
4  **A.**  Um-hum.
5  **Q.**  -- it sounds like this change was also
6  adopted by the faculty in their final statement,
7  correct?
8     MS. QUIMBY:  Objection, form.
9  **A.**  Yes, because -- sorry.
10  **Q.**  But the final statement did maintain its
11  endorsement of the condemnation of Timothy Jackson in
12  particular, correct?
13     MS. QUIMBY:  Objection, form.
14  **A.**  We never endorsed the condemnation of Timothy
15  Jackson.  I don't know if there was such a thing as
16  condemnation of Timothy Jackson.
17  **Q.**  So if you look at Exhibit 14 where it says,
18  "Hold accountable every person responsible," and it
19  specifically states, "the actions of Dr. Jackson,
20  both pass and present, are particularly racist and
21  unacceptable," you don't think that specifically
22  condemns Professor Jackson?
23     MS. QUIMBY:  Objection, form.
24  **A.**  The faculty letter does not endorse his
25  opinion.  The faculty letter endorses a call for action,

ELLEN BAKULINA, PH.D.    10/16/2024

179

1  and that's not the same as condemnation of something.
2  **Q.**  You don't think specifically the actions of Dr.
3  Jackson, both past and present, are particularly racist
4  and unacceptable is a condemnation?
5     MS. QUIMBY:  Objection, form.
6  **A.**  I mean that our faculty letter does not endorse
7  that.
8  **Q.**  Well, I understand you're saying that after
9  talking to your lawyers.  I'm asking you a specific
10  question, whether stating in this letter, "The actions
11  of Dr. Jackson, both pass and present, are particularly
12  racist and unacceptable," to the condemnation of
13  Professor Jackson?
14     MS. QUIMBY:  Objection, form.
15  **A.**  I'm not sure, because people can change.
16  What if Timothy Jackson changes and we -- I don't think
17  it's -- I don't think this condemns a person.  I think
18  this definitely gives an opinion about the actions of a
19  person, but condemn the person is something different.
20  You know, I have changed through the years, and another
21  person can change through the years.  I don't think
22  this is -- I don't agree that this is condemnation of
23  a person.
24  **Q.**  Okay.  So it's your testimony today that
25  declaring "the actions of Dr. Jackson, both past and

ELLEN BAKULINA, PH.D.    10/16/2024

180

1  present, to be particularly racist and unacceptable,"
2  does not condemn him, his past actions, both past and
3  present?
4  **A.**  Correct.  I think this does not condemn him
5  as a person.
6  **Q.**  Okay.  So we will go back now to Exhibit 15.
7  What you were saying here, or at least what it summarizes
8  you having said, is there anything in this that limits --
9  I don't know, maybe we'll call it criticism then, of
10  Professor Jackson's racism and his actions, both past
11  and present, is that ever addressed in any of this right
12  here?
13     MS. QUIMBY:  Objection, form.
14  **A.**  Let's see.  Okay.  So please repeat your
15  question.
16  **Q.**  Is there anything in this statement that limits
17  the criticism of Dr. Jackson's specific --
18  excuse me.  Strike that.
19     Is there anything in this discussion that
20  expresses the intention to limit the endorsement of the
21  student's criticism of Dr. Jackson's, quote, racist
22  actions, both past and present?
23     MS. QUIMBY:  Objection, form.
24  **A.**  Is there anything that limits -- no, there is
25  nothing that limits.  This talks about the articles and

*ELLEN BAKULINA, PH.D.     10/16/2024*

225

```
 1  _____
 2  _____
 3      I, ELLEN BAKULINA, have read the foregoing
 4  deposition and hereby affix my signature that same
 5  is true and correct, except as noted above.
 6
 7          _____
 8              ELLEN BAKULINA
 9
10  THE STATE OF _____)
11  COUNTY OF _____)
12
13      Before me, _____, on this
14  day personally appeared ELLEN BAKULINA, known to me or
15  proved to me on the oath of _____ or
16  through _____ (description of
17  identity card or other document) to be the person whose
18  name is subscribed to the foregoing instrument and
19  acknowledged to me that he/she executed the same for
20  the purpose and consideration therein expressed.
21      Given under my hand and seal of office on this
22  _____ day of _____, _____.
23
24          _____
                NOTARY PUBLIC IN AND FOR
                THE STATE OF _____
25              My Commission Expires: _____
```

*ELLEN BAKULINA, PH.D.     10/16/2024*

226

```
 1          UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF
 2              SHERMAN DIVISION
 3  TIMOTHY JACKSON,         )
                            )
 4      Plaintiff,          )
                            )
 5  vs.             ) CASE NO. 4:21-CV-00033-ALM
                            )
 6  LAURA WRIGHT, et al.,    )
                            )
 7      Defendants.         )
 8  _____
 9      REPORTER'S CERTIFICATION OF
10      ORAL DEPOSITION OF ELLEN BAKULINA, PH.D.
11              October 16, 2024
12  _____
13      I, KIM D. CARRELL, a Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16      That the witness, ELLEN BAKULINA, was duly sworn
17  and that the transcript of the oral deposition is a
18  true record of the testimony given by the witness;
19      That the deposition transcript was duly submitted
20  on November, 12, 2024, to Mary Quimby, attorney for the
21  witness, for examination, signature, and return to me by
22  December 16, 2024;
23      That pursuant to the information given to the
24  deposition officer at the time said testimony was taken,
25  the following includes all partes of record and the
```

*ELLEN BAKULINA, PH.D.     10/16/2024*

227

```
 1  amount of time used by each party at the time of the
 2  deposition;
 3      Michael Thad Allen - 05 HRS: 49 MIN
        Mary Quimby  - 00 HRS: 00 MIN
 4
 5  FOR THE PLAINTIFF:
 6      Michael Thad Allen
        ALLEN LAW, LLC
 7      P.O. Box 404
        Quaker Hill, CT 06375
 8      Telephone: 860.772.4738
        Fax: 860.469.2783
 9      E-mail: M.allen@allen-lawfirm.com
10
11  FOR THE DEFENDANTS:
12      Mary Quimby
        Assistant Attorney General
13      General Litigation Division
        P.O. Box 12548, Capital Station
14      Austin, Texas 78711
        Telephone: 512.463.2120
15      Fax: 512.320.0667
        E-mail: Mary.Quimby@oag.texas.gov
16
17      - and -
18      Renaldo Stowers  (Appearing Live)
        Cari Jacoby
19      University of North Texas System
        Office of General Counsel
20      801 North Texas Boulevard
        Denton, Texas 76201
21      Telephone: 940.565.2717
        Fax: 940.369.7026
22      E-mail: Renaldo.Stowers@untsystem.edu
        cari.jacoby@untsystem.edu
23
24      I further certify that I am neither counsel for,
25  related to, nor employed by any of the parties or
```

*ELLEN BAKULINA, PH.D.     10/16/2024*

228

```
 1  attorneys in the action in which this proceeding was
 2  taken, and further that I am not financially or
 3  otherwise interested in the outcome of the action.
 4      Certified to by me on this 12th day of November,
 5  2024.
 6
 7
 8
 9
10
11          _____
12          Kim D. Carrell, CSR NO. 1184
            Date of Expiration: 7-31-26
13          JULIA WHALEY & ASSOCIATES, INC.
14          2012 Vista Crest Drive
            Carrollton, Texas  75007-1640
15          214-668-5578/Fax 972-236-6666
            JulieTXCSR@gmail.com
16          Firm registration No. 436
            Firm registration Expires 5-31-25
17
18
19
20
21
22
23
24
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3    TIMOTHY JACKSON,            X
                                  X
 4            Plaintiff,          X
                                  X
 5    VS.                         X CASE ACTION
                                  X NO.: 4:21-cv-00033-ALM
 6    LAURA WRIGHT, ET AL.,       X
                                  X
 7            Defendants.         X

 8

 9    ------------------------------------------------

10         ORAL AND VIDEOTAPED DEPOSITION OF

11                   ANDREW JAY CHUNG

12                   October 15, 2024

13                  (Reported Remotely)

14    ------------------------------------------------
15
16         ORAL AND VIDEOTAPED DEPOSITION OF ANDREW JAY
17    CHUNG, produced as a witness at the instance of the
18    Plaintiff, and duly sworn, was taken in the above-styled
19    and numbered cause on October 15, 2024, from 9:05 a.m. to
20    12:46 p.m., via Zoom, before JENNIFER L. SANDERS, CSR in
21    and for the State of Texas, reported by machine
22    shorthand, the witness located in Worcester,
23    Massachusetts, pursuant to the Federal Rules of Civil
24    Procedure and the provisions stated on the record and/or
25    attached hereto.
```

```
 1                 A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3         MR. MICHAEL THAD ALLEN
           Allen Harris, PLLC
 4         PO Box 404
           Quaker Hill, Connecticut 06375
 5         Office:  860-499-3399
           Fax:  860-481-7899
 6         Email:  mallen@allenharrislaw.com

 7
      FOR THE DEFENDANTS:
 8
           MS. MARY QUIMBY
 9         Assistant Attorney General
           General Litigation Division
10         P.O. Box 12548
           Austin, Texas 78711-2548
11         Office:  512-463-2100
           Email:  mary.quimby@oag.texas.gov
12
13    FOR UNIVERSITY OF NORTH TEXAS

14         MR. RENALDO L. STOWERS
           MS. CARI JACOBY
15         UNT System
           Office of General Counsel
16         801 North Texas Boulevard
           Denton, Texas 76201
17         Office:  940-565-2717
           Fax:  940-369-7026
18         Email:  renaldo.stowers@untsystem.edu
           Email:  cari.jacoby@untsystem.edu
19
20    THE VIDEOGRAPHER:

21         Mr. Adam Scozzari
           Legal Video Group
22         Office:  214-598-5229
           Email:  lvg.dallas@gmail.com
23
24
25
```

```
                                                        3
 1                    I N D E X

                                                     PAGE
 2    Appearances.........................................  2

 3    Exhibit Index.......................................  4

 4    Agreements..........................................  5

 5

 6    ANDREW JAY CHUNG

 7         Examination by Mr. Allen.......................  6

 8

 9    Changes and Signature.............................. 148

10    Reporter's Certificate............................. 150
```

```
                                                        4
 1    NUMBER          E X H I B I T S              PAGE
 2    NUMBER          DESCRIPTION                  PAGE

 3    1    Re-Notice of Taking Deposition.................  9

 4    2    Curriculum Vitae.............................. 11

 5    3    Complication of Two Websites and One Journal
           Article concerning the Journal Spectrum........ 23
 6
 7    4    Email from Timothy Jackson to Stephen
           Slottow, et al., dated 12/11/19, and other
 8         email (UNT 563-566)........................... 50

 9    5    Email from Stephen Slottow to Timothy
           Jackson, et al., dated 7/25/20, and other
10         email (UNT 300-303)........................... 63

11    6    Material for the Committee (UNT 2645-2782)..... 80

12    7    Email from Timothy Jackson to others dated
           7/26/20, and other email (UNT 304-309)......... 84
13
14    8    Open Letter on anti-racist Actions Within SMT
           (UNT 1090-1115)............................... 100
15
16    9    Ad Hoc Review Panel Report of Review of
           Conception and Production of Volume 12 of the
           Journal of Schenkerian Studies dated 11/25/20
           (Jackson 208-233)............................. 117

17    10   Email from Music Information dated 1/5/22
           (UNT 5521-5522)............................... 133
18
19    11   Email from Music Information dated 11/23/21
           (UNT5523-5525)................................ 135

20    12   Facebook Post by Levi Walls dated 7/27/20
           (Jackson 234-236)............................. 137
21
      13   Email from Ellen Bakulina dated 7/29/20........ 143
22
23
24
25
```

117

1  open letter on anti-racist actions?

2    A.  I do not recall when that was.

3    Q.  Was it before or after the July 25 emails that

4  we had examined earlier?

5    A.  It -- it has to have been after.

6    Q.  Okay.  Is it safe to say it was before the end

7  of July, if you know?

8    MS. QUIMBY:  Objection; form.

9    A.  It's not safe to say that.  It was before -- I

10  don't know.  It was before the beginning of 2024.  I do

11  not recall the time when this letter was circulated.

12    Q.  (BY MR. ALLEN)  It certainly would have been in

13  2020, right?

14    A.  It would have been in 2020 after July.

15    Q.  Okay.

16    A.  That's my assumption.

17    Q.  And that's fine.  I understand the limits of

18  memory.

19    MR. ALLEN:  I'm going to mark for the

20  record as Exhibit 9 a document captioned ad hoc panel --

21  Ad Hoc Review Panel Report of Review of Conception and

22  Production of Volume 12 of the *Journal of Schenkerian*

23  *Studies*, and it is dated November 25, 2020.

24    (Exhibit No. 9 marked.)

25    Q.  (BY MR. ALLEN)  I'm going to represent to you,

118

1  Professor Chung, that this is a report that was issued by

2  a so-called ad hoc panel convened to investigate the

3  *Journal of Schenkerian Studies,* supposedly objectively,

4  and charged with that by Jennifer Cowley, your former

5  provost.

6    You had already testified that you did not read

7  this document, so I'm not going to ask you to comment on

8  it.  But it does have, as exhibits, at the very end

9  various attachments, and it's those that I would like to

10  talk about.

11    A.  Okay.

12    Q.  This is one captioned Statement of UNT Faculty

13  on *Journal of Schenkerian Studies*, and it's signed by

14  you.  Do you see that?

15    A.  Correct.

16    Q.  Do you recognize this attachment -- I'm not

17  asking you about the -- total report, just this

18  attachment.  Do you recognize this attachment?

19    A.  Yes.

20    Q.  And what is this Statement of UNT Faculty on

21  *Journal of Schenkerian Studies* in Exhibit 9?

22    A.  I take it as an expression of disapprobation

23  towards some of the contents of JSS Volume 12.

24    Q.  And -- let me see if we can...

25    Here you also say you stand in solidarity with

119

1  your graduate students in their letter condemning the

2  *Journal of Schenkerian Studies*, right?

3    A.  That is what that says, correct.

4    Q.  What does that refer to?

5    A.  What does what refer to?

6    Q.  The letter of condemnation that the graduate

7  students apparently wrote concerning the *Journal of*

8  *Schenkerian Studies.*

9    A.  Well, that is referring to, I believe, the

10  document in the second link.

11    Q.  The link right here that I am --

12    A.  Correct.

13    Q.  Oops.  I just launched it.

14    I'm highlighting it here.  It follows in the

15  second paragraph after the statement, "We endorse the

16  call for action outlined in our student letter"?

17    A.  Yeah.

18    Q.  That URL?

19    A.  Yeah.  Correct.

20    Q.  And I am just going to represent to you that

21  that URL would lead to this attachment to Exhibit 9.

22    A.  Correct.

23    Q.  Is this the letter you remember endorsing?

24    MS. QUIMBY:  Objection; form.

25    A.  This is the letter to which we -- we refer in

120

1  the faculty letter.

2    Q.  (BY MR. ALLEN)  Okay.  Again, it says here

3  the -- referring to Volume 12 of the *Journal of*

4  *Schenkerian Studies*, "It's replete with racial

5  stereotypes and tropes," right?

6    A.  Correct.

7    Q.  And those were the same disparaging comments

8  you believe were also what you were thinking about when

9  you signed the SMT letter -- the SMT open letter?

10    A.  Correct.

11    Q.  Were there any others that you were thinking of

12  when you signed this -- you were referring to when you

13  signed this letter?

14    A.  Not that I recall.

15    Q.  Okay.  And then you say in this letter you've

16  signed of UNT faculty, "The fact that he was not afforded

17  the opportunity to respond in print in unacceptable, as

18  is the lack of a clearly defined peer-review process."

19    Did I read that correctly?

20    A.  Correct.

21    Q.  Who does "he" refer to in that sentence?

22    A.  Professor Ewell.

23    Q.  And so you're making an assertion of fact that

24  he was not afforded the opportunity to respond in print,

25  right?

125

1    Q.   Okay.  Good.  Did you consider this part that
2    you endorsed, "Publicly condemn the issue and release it
3    free online to the public"?
4        MS. QUIMBY:  Objection; form.
5    A.   I endorse the ability of the students to -- to,
6    you know, make these kinds of calls.
7    Q.   (BY MR. ALLEN)  Sure.
8    A.   Express their voices like this.
9    Q.   Uh-huh.  But that's not what your letter says,
10   is it?  It says, "We endorse the call for action outlined
11   in our students letter," right?
12       MS. QUIMBY:  Objection; form.
13   A.   I took that -- I took that as, you know,
14   endorsing their general sentiments through the letter.  I
15   certainly endorse their rights to express themselves and
16   to -- to declare their opinions and to ask for certain
17   kinds of actions.
18   Q.   (BY MR. ALLEN)  Incidentally, they also called
19   for providing a full public account of the editorial and
20   publication process and its failures, right?
21   A.   Correct.
22   Q.   And you endorsed that call for action?
23       MS. QUIMBY:  Objection; form.
24   A.   Sure.  I think when a journal is asked to -- to
25   clarify its procedures in the name of transparency, I

126

1    don't see why that's an objectionable thing to ask for.
2    I certainly -- I endorse that.
3    Q.   (BY MR. ALLEN)  Would a full public account of
4    the editorial and publication processes be objective,
5    using the words of Jennifer Cowley here, if it excluded
6    indications that Levi Walls was lying about his
7    relationship with Professor Jackson?
8        MS. QUIMBY:  Objection; form.
9    A.   I'm not sure -- I'm not sure under -- can
10   you -- I'm sorry, I think I lost my train of thought --
11   Q.   (BY MR. ALLEN)  Sure.
12   A.   -- in the middle of your question.
13   Q.   That's fine.
14       MR. ALLEN:  Please restate the question to
15   the witness, Madam Court Reporter.
16       (Requested portion was read.)
17   A.   I mean, I'm -- I'm -- I was not privy to the --
18   privy to the -- the conversations of -- having to do with
19   the editorial board.  I am not privy to understanding or
20   whether Levi was speaking truthfully or mendaciously some
21   point or another.  I don't have any insight into that
22   question.
23   Q.   (BY MR. ALLEN)  And did know that this
24   Exhibit 9, the ad hoc panel report, was published online
25   and remains online by the University of North Texas,

127

1    right?
2        MS. QUIMBY:  Objection; form.
3    A.   I was not aware of that.
4    Q.   (BY MR. ALLEN)  Did you know that Timothy
5    Jackson wrote a response to this report?
6    A.   No.  I knew of no such writing.
7    Q.   Are you aware of any calls at the University of
8    North Texas to provide a, quote, full public account of
9    the editorial and publication process so that it includes
10   Timothy Jackson's response?
11       MS. QUIMBY:  Objection; form.
12   A.   I am not aware.
13   Q.   (BY MR. ALLEN)  Okay.  Now, another thing they
14   called for, the graduate students, is to dissolve the
15   JSS, right?
16   A.   Uh-huh.
17   Q.   And we've already established that the JSS has
18   not published since the time of the publication of these
19   statements, correct?
20   A.   Sure.
21   Q.   So that succeeded, correct?
22       MS. QUIMBY:  Objection; form.
23   A.   That's debatable.  I mean, journals can stop
24   publishing for all sorts of reasons other than
25   dissolution.

128

1    Q.   (BY MR. ALLEN)  But you do know that it hasn't
2    published again, right?
3    A.   That doesn't imply being dissolved.  I do know
4    it has stopped publication, yes.
5    Q.   Are you aware of any editorial board
6    constituted at the present time that is in the process of
7    publishing the *Journal of Schenkerian Studies*?
8    A.   No such board exists to my knowledge.  I could
9    be wrong.
10   Q.   But you think it's still a matter of mystery as
11   to whether the JSS has dissolved?
12       MS. QUIMBY:  Objection; form.
13   A.   I never said such a thing.  I said the
14   process --
15   Q.   (BY MR. ALLEN)  Let's skip down -- I'm sorry.
16   Go ahead.
17   A.   I said the JSS very clearly has stopped
18   publishing.  Whether it was dissolved, per se, I'm not
19   privy to such information.
20   Q.   Number 3 here -- I don't know why I can't get
21   it -- grab it.  But do you see this in highlight?
22   A.   Yes.
23   Q.   It says, "Hold accountable every person
24   responsible for the direction of the publication.  This
25   will involve recognizing both whistleblowers and those

**129**

1    who failed to heed them in this process."
2        Do you know who is being referred to there as
3    a, quote, whistleblower?
4    **A. Specifically, no.**
5    Q. You didn't bother to find that out before you,
6    quote, endorsed the call for action in this letter?
7        MS. QUIMBY: Objection; form.
8    **A. I endorse students abilities to make these kind**
9    **of calls. I endorse students, you know, abilities to ask**
10   **for more transparency.**
11   Q. (BY MR. ALLEN) Did you make any effort to find
12   out who the so-called whistleblowers were?
13   **A. I did not.**
14   Q. It also goes on to say, "This should also
15   extend to investigating past bigoted behaviors by faculty
16   and, by taking this into account, the discipline and
17   potential removal of faculty who use the JSS platform to
18   promote racism. Specifically, the actions of
19   Dr. Jackson -- both past and present -- are particularly
20   racist and unacceptable."
21       Did I read that right?
22   **A. That is what the document says, correct.**
23   Q. Did you investigate the truth or falsehood of
24   any of those statements before signing the faculty
25   statement?

**130**

1        MS. QUIMBY: Objection; form.
2    **A. Here I defer to people with more institutional**
3    **knowledge than -- than I have.**
4    Q. (BY MR. ALLEN) I'm asking you about what you
5    did before you signed the statement. Did you look into
6    whether Timothy Jackson had engaged in specific racist
7    actions before endorsing the student statement with your
8    signature?
9    **A. If such things -- if such things have been**
10   **alleged, then they should be investigated.**
11   Q. No, that's not my question.
12       My question is: Did you do anything to confirm
13   that Timothy Jackson had committed some sort of racist
14   action before you endorsed the faculty statement with
15   your signature which incorporated by reference this call
16   to action?
17       MS. QUIMBY: Objection; form.
18   **A. I did not.**
19   Q. (BY MR. ALLEN) Okay. Do you recall there
20   being any discussion amongst you as faculty [audio cut
21   out] about -- you know, limitations about what you
22   wished?
23       (Reporter clarification.)
24   Q. (BY MR. ALLEN) Do you recall in this July 2020
25   time frame while you were formulating -- you -- the

**131**

1    faculty, meaning you the faculty, were formulating this
2    statement of UNT faculty on the *Journal of Schenkerian*
3    *Studies* you discussed with your colleagues your
4    limitations on what you were choosing to endorse and what
5    not to endorse in the student statement?
6        MS. QUIMBY: Objection.
7    **A. But limitations are always implicit. As a**
8    **professor, you never endorse everything that students say**
9    **because by -- by virtue of the fact that they are**
10   **students. This is a general endorsement, not a**
11   **line-by-line-type of endorsement.**
12   Q. (BY MR. ALLEN) So my question was different.
13       My question is: Do you recall any discussions
14   with your fellow faculty members about what you were
15   endorsing and what you weren't endorsing?
16   **A. No.**
17   Q. Okay. Do you know of any documents that would
18   help refresh your memory of any such conversations?
19   **A. At the moment I do not recall.**
20   Q. I just have one more line of questioning about
21   what I'll just loosely call the diversity, equity, and
22   inclusion policies at the University of North Texas
23   back in -- back in this time frame.
24       But before we start that, can you just explain
25   for the record what you understand by diversity at the

**132**

1    University of North Texas?
2    **A. Openness to a wide variety of viewpoints.**
3    **Openness to, you know, recognizing the dignity of**
4    **multiple aesthetic cultures. Openness to, for instance,**
5    **being equally welcoming to students of all ethnic**
6    **backgrounds and faculty as well.**
7    Q. And could we throw in gender as well, equally
8    welcoming to all?
9    **A. Yes.**
10   Q. Okay. And, just similarly, can you describe
11   for the record what you understand by inclusion as used
12   at the University of North Texas?
13   **A. In University language, my understanding is**
14   **that these -- these diversity and inclusion,**
15   **particularly, have much of the same denotation.**
16   **Inclusion refers to, you know, allowing equal access for**
17   **voices from different sorts of perspectives to -- to take**
18   **part in classroom and, you know, administrative and**
19   **pedagogical conversations.**
20   Q. So I'm not trying to put words in your mouth,
21   but does that mean sort of everything you described as
22   diversity plus making sure those groups or individuals
23   that were encompassed within the diverse umbrella were
24   also included in the educational programs of the
25   University?

149

```
 1  _____
 2  _____
 3  _____
 4  _____
 5  _____
 6       I, ANDREW JAY CHUNG, have read the foregoing
    deposition and hereby affix my signature that same is
 7  true and correct, except as noted above.

 8

 9

10                    _____
                      ANDREW JAY CHUNG
11

12  STATE OF _____)

13  COUNTY OF _____)

14       Before me, _____, on this day
    personally appeared ANDREW JAY CHUNG, known to me (or
15  proved to me under oath or through
    _____) (description of identity
16  card or other document)) to be the person whose name is
    subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
    consideration therein expressed.
18       Given under my hand and seal of office this
    _____ day of _____, _____.
19

20

21                    _____
                      NOTARY PUBLIC IN AND FOR
22                    THE STATE OF _____
                      COMMISSION EXPIRES: _____
23

24
25
```

150

```
 1             IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3  TIMOTHY JACKSON,          X
                              X
 4       Plaintiff,           X
                              X
 5  VS.                       X CASE ACTION
                              X NO.: 4:21-cv-00033-ALM
 6  LAURA WRIGHT, ET AL.,     X
                              X
 7       Defendants.          X

 8  ----------------------------------------------------

 9            REPORTER'S CERTIFICATION
10         DEPOSITION OF ANDREW JAY CHUNG
11                October 15, 2024
12              (Reported Remotely)
13  ----------------------------------------------------

14

15       I, Jennifer L. Sanders, Certified Shorthand
16  Reporter in and for the State of Texas, hereby certify to
17  the following:
18       That the witness, ANDREW JAY CHUNG, was duly
19  sworn by the officer and that the transcript of the oral
20  deposition is a true record of the testimony given by the
21  witness;
22       That the deposition transcript was submitted on
23  _____ to Ms. Mary Quimby, attorney for
24  ANDREW JAY CHUNG, for examination, signature and return
25  to me by _____;
```

151

```
 1       That the amount of time used by each party at
 2  the deposition is as follows:
 3       MR. MICHAEL THAD ALLEN:  3 Hour(s), 10 Minute(s)

 4

 5       That pursuant to information given to the
 6  Deposition officer at the time said testimony was taken,
 7  the following includes counsel for all parties of record:
 8  FOR THE PLAINTIFF:

 9       MR. MICHAEL THAD ALLEN
         Allen Harris, PLLC
10       PO Box 404
         Quaker Hill, Connecticut 06375
11       Office:  860-499-3399
         Fax:  860-481-7899
12       Email:  mallen@allenharrislaw.com

13

14  FOR THE DEFENDANT:

15       MS. MARY QUIMBY
         Assistant Attorney General
         General Litigation Division
16       P.O. Box 12548
         Austin, Texas 78711-2548
17       Office:  512-463-2100
         Email:  mary.quimby@oag.texas.gov

18

19       That $_____ is the deposition officer's
20  charges to Mr. Michael Thad Allen, Attorney for
21  Plaintiff, for preparing the original deposition
22  transcript and any copies of exhibits;
23       I further certify that I am neither counsel
24  for, related to, nor employed by any of the parties or
25  attorneys in the action in which this proceeding was
```

152

```
 1  taken, and further that I am not financially or otherwise
 2  interested in the outcome of the action.
 3       Certified to by me this _____ day of
 4  _____, _____.

 5

 6                    _____
                      JENNIFER L. SANDERS, CSR No. 5091
 7       Expiration Date:  10/31/26
         JULIA WHALEY & ASSOCIATES
 8       2012 Vista Crest Drive
         Carrollton, Texas 75007
 9       Firm Registration No. 436
         214-668-5578 (Office)
10       214-236-6666 (Fax)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT D

APPX.013

CHUNG

**EXHIBIT**
**9**

Jennifer Sanders, CSR

Oct 15, 2024

# AD HOC REVIEW PANEL



# REPORT OF REVIEW OF CONCEPTION AND PRODUCTION OF VOL. 12 OF THE JOURNAL OF SCHENKERIAN STUDIES

NOVEMBER 25, 2020

JACKSON000208

APPX.014

# Table of Contents

Executive Summary…...………………………………………………………2

The Panel Charge ........................................................................................ 3

Background Information & Scope of Review ................................................. 3

     Our Review ........................................................................................ 4

     Report Structure ................................................................................. 4

The Current Editorial Structure and General Review Processes ........................ 5

     JSS Managerial Structure ..................................................................... 5

     JSS General Review Process .................................................................. 6

The Editorial and Review Processes Employed for Volume 12 ......................... 6

     The "Special Section" of Volume 12 ....................................................... 6

     The Editorial and Review Processes ....................................................... 7

     Publication of Submissions by Dr. Jackson and Dr. Slottow ...................... 8

The Publication of an Anonymously Authored Contribution .............................. 8

Absence of Contribution from Dr. Ewell to the Special Section ......................... 9

Findings ...................................................................................................... 9

Recommendations ....................................................................................... 13

Exhibits……………………………………………………………………15

JACKSON000209

APPX.015

**Executive Summary**

This is a report by the five-member Ad Hoc Journal Review Panel, comprised of UNT faculty members outside of the College of Music, who are current or former editors of scholarly journals. The panel was charged with examining the processes followed in the conception and production of Volume 12 of the *Journal of Schenkerian Studies* (JSS), especially whether the standards of best scholarly practice were followed. Further, the panel was to make recommendation to improve editorial processes, where warranted.

After an extensive review of documents and interviews of eleven (11) individuals, including the principals involved in the conception and publication of Volume 12, the panel identifies significant problems with the editorial management structure of JSS as well as with the review processes employed by the journal for the special section in Volume 12.

In sum, we do not find that the standards of best practice in scholarly publication were observed in the production of Volume 12 of the JSS. The panel recommends

1. Changing the editorial structure of JSS
2. Making clear and transparent all editorial and review processes
3. Defining clearly the relationships between the journal editorial team and the editorial board, MHTE, and the UNT Press.

JACKSON000210

APPX.016

**Report of the Journal of Schenkerian Studies Ad Hoc Review Panel**

**The Panel's Charge**

The Ad Hoc Journal Review Panel is comprised of five faculty members who either currently serve, or have served, as scholarly journal editors. Members are: Jincheng Du, Professor of Materials Science and Engineering and Editor of *the Journal of American Ceramic Society*; Francisco Guzman, Professor of  Marketing and current Coeditor-in-Chief of the *Journal of Product & Brand Management*;  John Ishiyama, University Distinguished Research Professor of Political Science and former Editor-in-Chief of the *American Political Science Review* and the *Journal of Political Science Education*; Matthew Lemberger-Truelove, Professor of Counseling and current Editor of the *Journal of Counseling & Development*; and Jennifer Wallach, Professor of History, Chair of the Department of History and former Editor of *History Compass*.

On August 6, 2020, we received an email from Provost Jennifer Cowley that invited the members of the panel (all of who are faculty members from outside of the University of North Texas College of Music) to serve. In that email the Provost stated that the purpose of the panel was to examine "objectively the processes followed in the conception and production of Volume 12 of the *Journal of Schenkerian Studies* (JSS). The panel will seek to understand whether the standards of best practice in scholarly publication were observed and will recommend strategies to improve editorial processes where warranted." (Exhibit 1).

Our panel met with Provost Jennifer Cowley on August 12, 2020. At that meeting we were formerly charged by the Provost.  This report includes a review of the managerial, editorial, and review processes employed by the JSS, and an examination of how those practices related to the production of Volume 12.

**Background Information & Scope of Review**

Given that the panel's charge was provided to the complete panel on August 14, 2020 (Dr. Francisco Guzman was added to the panel on that date) and that the Fall semester began on August 24, the panel members agreed to have our first organizational meetings after the semester began. Our first meeting was held on September 1, 2020. Between September 1 and October 15, we interviewed a total of eleven (11) individuals who had knowledge about the production of Volume 12, as well as of the general editorial and review processes employed by the journal. These included the journal's most recent editors (Dr. Benjamin Graf and Mr. Levi Walls), members of the editorial advisory team (Dr. Timothy Jackson and Dr. Stephen Slottow), representatives of the UNT Press (Mr. Ron Chrisman and Ms. Karen DeVinney)[1], the Division Head of Music History, Theory, and Ethnomusicology (hereafter referred to as MHTE) (Dr. Benjamin Brand), and the Dean of the UNT College of Music (Dr. John Richmond). Further,

---

[1] The UNT Press publishes the *Journal of Schenkerian Studies*.

JACKSON000211

APPX.017

we interviewed three former members of the JSS editorial board (Dr. Ellen Bakulina and Dr. Diego Cubero) both faculty members of the UNT College of Music, and Dr. Graham Hunt, Professor and Associate Chair of Department of Music at the University of Texas at Arlington. All interviews were conducted virtually, via ZOOM. The panel also reviewed documents that were shared by the interviewees.

*Our Review*

To begin, we first reviewed the concerns expressed about the journal's editorial and review processes raised in public statements issued by three different groups:

> 1) the statement issued by the Executive Board of the Society of Music Theory (SMT) https://societymusictheory.org/announcement/executive-board-response-journal-schenkerian-studies-vol-12-2020-07; (Exhibit 2)

> 2) the statement of a group of graduate students from the Division of MHTE https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view?show_popup=false; (Exhibit 3)

> 3) a statement in support of the graduate student statement made by faculty members of the Division of MHTE https://www.ethnomusicology.org/news/519784/Statement-of-UNT-Faculty-on-Journal-of-Schenkerian-Studies.htm. (Exhibit 4).

We examined these statements because they appeared to be representative of the broader public concerns expressed about the JSS Volume 12 and were the first to be publicly issued since its publication. These statements were authored by the major professional society of Music Theory (the executive board of SMT), and graduate students and faculty members from the Division of MHTE. The SMT statement reflects the reaction of the leadership of the profession, and the statements by the UNT MHTE faculty and graduate students represents the concerns of members of the UNT community familiar with music theory and the JSS.

All three statements raised serious concerns about the editorial and review practices employed by JSS. Given that our panel's charge was to focus on the concerns expressed about the editorial and review processes employed by the journal, we structured our review around three issues:1) whether the journal's editorial team subjected submissions to Volume 12 to a process of peer review consistent with the standards of best practice in scholarly publication; 2) the circumstances surrounding the journal's publication of an anonymously authored contribution; and 3) the circumstances surrounding the JSS's decision not to invite the individual whose presentation at the SMT conference was the subject of Volume 12, Dr. Phillip Ewell, to respond in the symposium to the essays that discussed his work.

*Report Structure*

We report the results of our review in four sections:

- the general editorial and review processes employed by JSS;
- the editorial and review processes used for Volume 12;

JACKSON000212

APPX.018

- the process that led to the publication of an anonymously authored contribution; and
- the decision not to invite the scholar whose presentation was the topic of part of Volume 12 to respond to the essays that discussed his work

### *The Current Editorial Structure and General Review Processes*

To assess whether the editorial and peer review processes employed by JSS meet "standards of best practice in scholarly publication" (as stated in the panel's charge) it is important to outline the current editorial managerial and review processes used by JSS.

#### *JSS Managerial Structure*

Based upon our review of the journal's website (https://mhte.music.unt.edu/journal-schenkerian-studies), which only describes the submission process, and our interviews with the editors and the editorial advisory board, the journal's managerial structure includes an editor, [previously Dr. Benjamin Graf, who was to be succeeded by Levi Walls], an "editorial advisory board" comprised of Dr. Jackson and Dr. Slottow, who provide "guidance" for the journal, and an editorial board made up of scholars in the field who are often asked to review manuscripts. The editorial board has no supervisory role and is not provided with annual journal status reports. It appears that its function is to provide a pool of potential reviewers for submitted manuscripts.

The editor of the journal has always been a graduate student, except Benjamin Graf, who was a graduate student when he started the editor of JSS in 2014 and earned his PhD from UNT MHTE in May 2016 and is currently employed as a Lecturer by the Division. Although the justification as provided by the editorial advisors was that JSS is a "student run journal" (although Dr. Ben Graf was appointed as a UNT Senior Lecturer in Fall 2017 and was therefore not a student for volume 12) which is designed to provide editorial experience for graduate students, Dr. Slottow and Dr Jackson stated that the journal actually publishes mostly works from established scholars rather than students. The panel was told that the student-editors largely made all decisions regarding publication of manuscripts.

It appears that historically all the editors of JSS have been students of Dr. Jackson. The editors who were interviewed by the panel reported that they were uncomfortable in making decisions and recommendations that ran counter to the preferences of Dr. Jackson, their major faculty advisor. In part, Dr. Graf and Mr. Walls said to us that this situation made it difficult to raise objections relating to concerns about the submissions to the symposium section of Volume 12.[2] According to the editors, as well as to Dr. Slottow, Dr. Jackson "took the lead" on this section

---

[2] Dr. Jackson said that this portion of Vol 12 is "like a commentary" section in his meeting with our panel. However, this was not called a commentary section when the volume was published. Rather, in the table of contents the section containing the pieces about Dr. Ewell's talk are labeled "symposium" (Exhibit 5). The panel notes there is no special marker in Volume 12, including in the symposium section, that designates any piece as a "commentary."

JACKSON000213

APPX.019

in Volume 12.[3] Drs. Slottow and Jackson said that this was the first time the journal had published such a special section.[4]

*JSS General Review Process*

In terms of the general review processes used by JSS, no written processes for review were provided to the panel and after questioning the editors, no such document exists. However, the editors and editorial advisors described the general review process as involving recruiting two reviewers (sometimes from the editorial board but at times recruited from outside the editorial board) who would provide a report to the editors and then a decision was made whether to accept, reject, or invite a revise and resubmission of the piece. Dr. Graf told the committee that rejection was a very rare occurrence.

No documents were provided that described the normal review process, although Dr. Jackson provided us with a collection of emails that he said outlined the review process for what he referred to as the "commentary" section of Volume 12. These emails however only generally discussed the special section in Volume 12 and did not lay out specifically the review procedures to be employed for these essays.

**The Editorial and Review Processes Employed for Volume 12**

As to the review process employed for Volume 12, Dr. Jackson told us that this type of special section had never been done by JSS before.[5] Volume 12 also included three "regular" articles (a term used by Dr. Graf), which had been peer reviewed and were scheduled to be published in Volume 12. The processing of these articles had been completed by November 2019. For these three articles, Dr. Graf was designated as the editor. For the special section (referred to as a symposium in the table of contents for Volume 12), Levi Walls was designated as the editor.

*The "Special Section" of Volume 12*

In our discussion with Drs. Jackson and Slottow, both said they felt the need to include articles responding to "attacks" on Schenkerian scholars by Dr. Ewell in his plenary talk at the SMT conference, and that JSS was the appropriate venue for such responses. In explaining this decision, both Dr. Jackson and Dr. Slottow noted that unlike prior plenaries at SMT where a

---

[3] In his interview with the panel, Dr. Jackson repeatedly referred to the section as a "commentary" section suggesting that this meant that the essays did not require peer review. Yet in the email correspondence sent by him to others discussing this section, prior to our interview with him, the term "symposium" or "symposia" is mentioned 22 times, but the term "commentary" is not mentioned at all.

[4] There had been previous volumes where the entire volume was dedicated to a special topic, but not a section of a regular volume. For purpose of this report, the term "special section" will be used to refer to the section of Volume 12 containing the essays that respond to Dr. Ewell's presentation. Where pertinent, the report will use the words "symposium" and "commentary."

[5] Commentary sections vary from journal to journal, but they generally involve commentaries provided about articles that are published by the journal. A symposium on the other hand refers to a section of a journal that includes several short articles built around a particular topic.

6

JACKSON000214

**APPX.020**

question and answer session was held after the talk was completed, no such session occurred after Dr. Ewell's talk. Thus, they said they believed that it was necessary that a response be made to Dr. Ewell's talk as soon as possible, and that those responses should appear in JSS. According to Benjamin Graf, who was then editor of JSS, three (3) "normal" articles had already been completed or nearly completed by December, which would have been the normal number of articles published in a journal volume.[6]

However, Dr. Jackson said that after Dr. Ewell's talk, he believed it necessary to include responses to the talk in Volume 12. Thus, a special call for submissions that would respond to Dr. Ewell's talk was distributed at the end of December 2019, and an expedited process was initiated to process the submissions quickly. The deadline set in the call for submissions was January 20, 2020. (Exhibit 6). In short, a call for contributions was made at the end of December, with the intention of completing the entire process by March 2020, (i.e., within roughly three months).

*The Editorial and Review Processes*

Mr. Levi Walls, who was slotted to succeed Dr. Graf as editor, was charged with editing the special section of Volume 12. Mr. Walls reported that the pieces that were published as part of this section were not subject to peer review, and this was confirmed by Drs. Graf, Slottow, and Jackson. Dr. Jackson stated that since the pieces were meant to be "commentaries" and not "normal articles," they did not require peer review. He explained that peer review was unnecessary because: 1) the contributors were all very notable scholars in the field and their reputations were sufficient to guarantee the quality of the contributions;[7] and 2) all of the editors (which we understand to mean Drs. Jackson, Slottow, Walls, and Graf) read every piece suggesting that these contributions were "editor reviewed."

---

[6] According to the representatives of the UNT Press, Ron Chrisman and Karen DeVinney the deadline for the UNT Press to receive articles for publication in Volume 12 was March 2020.

[7] According to Levi Walls, the standard used to assess the quality of the contributions in the special section of Volume 12 was the reputation of the author of the contribution. In other words, other normally used criteria for evaluation of contributions to JSS were not used for the special section. Mr. Walls shared with us an excerpt from an email where Dr. Jackson responded to questions about the review process for the contributions to the special section:

> "The majority of the authors are well-known, highly seasoned scholars, ranging from the Chair of the Harvard Music Department to the authors of books on Schenker and Schenkerian analysis. If you want to use the word "vetting" in this context of allowing distinguished scholars to communicate their views, then you can say that the respondents were "vetted" on the basis of their academic qualifications. The distinguished pedigrees of the contributors is supported by their short biographies at the end of the issue."

JACKSON000215

**APPX.021**

However, Dr. Graf and Dr. Slottow said that they did not read every contribution. Both said they only read a few, in contrast to the claim made by Dr. Jackson that all the editors read every contribution.

Levi Walls informed the panel that he read each piece but had multiple concerns, as the editor, about proceeding with several of the contributions. He said he shared these concerns with Dr. Benjamin Brand (the Division Head of MHTE) and Dr. Graf, and then directly with Dr. Jackson. However, he said these concerns were dismissed by Dr. Jackson.[8]

Mr. Walls reported to the panel that he raised concerns to Dr. Jackson about the content of the pieces as well as the quality of writing in February 2020. He stated that after raising concerns, he was taken into Dr. Jackson's car, where Dr. Jackson told him that it was not his "job to censor people" and was told not to do it again. He said Dr. Jackson told him that since these were senior scholars, their reputations were enough to vet them. Dr. Graf confirmed that Levi Walls shared information about his encounter with Dr. Jackson around the time of its occurrence.  This was followed by the final decision, made by Dr. Jackson (according to both Dr. Graf and Mr. Walls) to proceed with the publication of several of the pieces without substantial modifications.

*Publication of Submissions by Dr. Jackson and Dr. Slottow*

Both Dr. Jackson and Dr. Slottow contributed pieces to the special section of Volume 12. When asked about precautions taken to prevent a potential conflict of interest that arose with the publication of papers by Dr. Jackson and Dr. Slottow in Volume 12 (since Dr. Jackson made the final decision on publication), none of the editors, nor the editorial advisors, could identify any special precautions employed to address these potential conflicts of interest.

### The Publication of an Anonymously Authored Contribution

Our panel also reviewed the process that led to the publication of an anonymously authored contribution. The panel noted, first, anonymous contributions, although uncommon, are not unprecedented in academic journal publishing. Several notable examples exist historically. For instance, an article in an International Relations journal, *Foreign Affairs,* was authored by a person who was assigned the pseudonym "X" in 1947.[9] In 2000, in the field of Political Science, there was a contribution critical of the *American Political Science Review* authored by an individual using the pseudonym "Mr. Perestroika." Although not an academic journal, an editorial in the *New York Times* last year, which was highly critical of the President Donald Trump administration, was purportedly written by an "insider" and was authored anonymously. Thus, there are some limited precedents where editors allow anonymously authored contributions.

---

[8]  Dr. Brand confirmed this meeting with Levi Walls when we interviewed him. Dr. Graf confirmed the existence of email communications between him and Mr. Walls about Mr. Walls' concerns.

[9] The author later was identified as George Kennan, a United States diplomat.

8

JACKSON000216

The editorial advisory team of Drs. Jackson and Slottow apparently made the decision to proceed with publication of the anonymous piece. Levi Walls informed the panel that he raised concerns about this contribution with Dr. Jackson. The panel asked the editorial advisors the reason for allowing the publication of an anonymously authored contribution. Dr Jackson informed the panel that anonymity was granted because the author of that piece feared retaliation that would jeopardize the author's career. He reported that the author was a junior scholar.[10]

### Absence of Contributions from Dr. Ewell to the "commentary" section

The panel asked the editors (Dr. Graf and Mr. Walls) and the editorial advisors (Drs. Jackson and Slottow) why Dr. Ewell was not invited to respond to the contributions in Volume 12, and whether that had been considered. All of them replied that inviting Dr. Ewell had not been considered until controversy arose concerning the volume in the summer of 2020. Only then did the idea emerge that perhaps Dr. Ewell could be invited to respond in Volume 13. However, that was not part of the original plan and was only considered as an option once the controversy over the contents of Volume 12 escalated.

Further, both Dr. Jackson and Dr. Slottow said that they believed that since Dr. Ewell had been given an uninterrupted opportunity to express his viewpoints at the SMT conference, commentators on Dr. Ewell's talk should also have the opportunity to express their views freely. Thus, Dr. Ewell was not invited for that reason. In retrospect, Dr. Slottow expressed regret about that decision.

### Findings

After completing our review regarding the four concerns listed above, we find the following:

1) In general terms, there are several structural problems with the editorial and review processes employed by the journal generally and Volume 12 specifically.

   a. There is a structural flaw in the power disparity between the JSS editor (a graduate student or former graduate student) and the editorial advisor, Dr. Jackson. In many ways this created a fundamental power asymmetry in the management of the journal. This was acknowledged in an interview by Dr. Slottow when he acknowledged that this "power imbalance" was a major problem with the journal. This was also observed by the current journal editors and other members of the editorial board

   Indeed, since the editors were invariably students of Dr. Jackson, this made it very difficult for the editors to contradict his wishes. Both the editors, Dr. Graf and Mr. Walls, reported to us they felt unable to voice their concerns about the

---

[10] The committee did not ask the name of the author and the committee was not provided any documents about the identity of the author.

JACKSON000217

APPX.023

editorial process in general and that this was especially true for the "commentary" section of Volume 12.

This arrangement also exposed the graduate student editors to potential negative consequences, particularly if controversy arose over what was published (e.g. Volume 12). The editor should not have been a graduate student, especially for a potentially very controversial issue.

b. There are no clear procedures that ensure that potential conflicts of interest in the review process are avoided with regard to editor (or editorial advisor) self-publication. As one widely known and authoritative organization that provides guidance for journal editors and publishers, the Committee on Publication Ethics (COPE 2019, 7), states, a "journal must have a procedure for handling submissions from editors or members of the editorial board that will ensure that the peer review is handled independently of the author/editor."[11] Moreover, COPE recommends that if an editor publishes in their own journal that the process is clearly described in a note in the volume once the paper is published. Given the structure of editorial management of the journal, the panel does not believe that procedures to ensure the avoidance of conflicts of interest have been adopted or followed in the publication of any volume of the JSS, including Volume 12.

c. There are no written procedures employed by JSS to ensure that transparent review processes are conducted. This practice is not consistent with standards for editorial management. COPE recommends that "all peer review processes must be transparently described and well managed. Journals should provide training for editors and reviewers and have policies on diverse aspects of peer review, especially with respect to adoption of appropriate models of review and processes for handling conflicts of interest, appeals and disputes that may arise in peer review" (https://publicationethics.org/peerreview). There is no evidence that this was the general practice employed at JSS, or the practice employed for Volume 12.

2) The editorial and review processes used for Volume 12.

a. The special section for Volume 12 was conceived between late December 2019, when a call for contributions was issued, and March (the planned date for

---

[11] The Committee on Publication Ethics (COPE) is a nonprofit organization whose mission is to define best practices in the ethics of scholarly publishing and to assist editors, publishers, etc. to achieve this. COPE also has links with the *Council of Science Editors*, the *European Association of Science Editors*, the *International Society of Managing and Technical Editors*, the *World Association of Medical Editors*, *Open Access Scholarly Publishers Association*, *Directory of Open Access Journals*, and the *Association of Learned and Professional Society Publishers*. It is also used as guidelines for major university publishers such as Cambridge University Press and Oxford University Press.

JACKSON000218

APPX.024

completion).  No defined procedures for the special section were established. This is unusual given that this was the first time such a section had been included in JSS, and the editorial team knew, or reasonably should have anticipated, that it would be controversial. There is no evidence that the editorial team engaged in a careful deliberative process in laying out how such a special section would be put together. Although in the experiences of members of the panel there is no universal standard that governs procedures for journal special sections, the fact that the editorial team had not carefully laid out a plan as to how to process contributions, at the very least, indicates a lapse in judgment and decision making.

b.  In the panel's meeting with Dr. Jackson, he indicated that the symposium in Volume 12 more closely reflects what is customarily understood as a "commentary" section in academic journals. Although Dr Jackson contended that the contributions in response to Dr. Ewell's presentation are consistent with commentary pieces, as noted in footnote 5 above, these pieces really were much more like a symposium. Commentaries are generally seen as referring to papers already published in the journal, not on topics such as that addressed in volume 12.[12] In any case, there is nothing to indicate that these contributions were part of an *a priori* planned "commentary" section, but rather was a symposium. Symposia in journals, at least the ones with which the expert panel are familiar, are subject to peer review. This clearly did not happen in Volume 12.

There is a precedence in academic journal publishing for "editorial reviews," which is generally limited to Book Reviews. However, these require multiple

---

[12] This finding is based on the panel's experience as well as our review of "commentary" sections of numerous journals in a variety of academic fields. Although not a collectively exhaustive list, the following exemplify what is generally meant by the term. A commentary is defined by the journal *Music Theory Online* (an SMT publication) as "focused on a particular article or other published item" in the journal (https://mtosmt.org/docs/authors.html#Submit). This conceptualization of commentaries is shared across disciplines. A journal in health studies defines a commentary as "generally short, and usually blends scholarship and opinion that comment on a newly published article" by the journal (*International Journal of Qualitative Studies on Health and Well-being* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4789530/). Similarly a journal in the social sciences, the *Journal of Inequalities and Applications*, defines a commentary as a response to articles published in that journal or "short (2-3 pages maximum), narrowly focused articles that are responses of recently published articles that are interesting enough to warrant further comment or explanation."
https://journalofinequalitiesandapplications.springeropen.com/submission-guidelines/preparing-your-manuscript/commentary ). In many journals the commentaries are peer reviewed. In others, such as the latter, the commentaries are editor reviewed. What appeared in Volume 12 of JSS do not generally qualify as commentaries, at least in the sense of the way "commentary" is used in many scholarly journals with which the panel is familiar (including the *American Political Science Review*).

JACKSON000219

members of the editorial team to agree to publication to ensure that conflicts of interest do not jeopardize the integrity of the publication process.

However, in the case of the essays that commented on Dr. Ewell's talk, there appears to have been no peer or complete editorial review of the pieces published. Although Dr. Jackson stated several times that all of the essays were reviewed by all of the editors and editorial advisors, at least two of them said they had not read all of the essays, and Levi Walls said he raised significant concerns about several essays (including concerns about the content of the essays and the quality of the writing)  but those concerns were later dismissed by Dr. Jackson. Only Dr. Jackson states that he reviewed all the pieces, but he also said that his editorial criteria were the academic status and reputation of the contributors. [13] This may be the criteria for inclusion in a newsletter or a generally unreviewed electronic posting, but this is not an established or accepted criterion for judging publishable merit in a reputable academic journal.

3)  The publication of an anonymously authored contribution.

   a.  As noted above, Dr Jackson justified publication of an anonymously authored piece because the author was fearful of retaliation. Regarding this situation, COPE acknowledges that there are no clear guidelines as a journal publishing standard regarding publishing anonymously. However, COPE observes that publishing anonymously is typically not permitted by publishers because of concerns about author transparency and because publishers believe that they should publish in the highest ethical regard. This is also the panel members' experience-- publishers do not favor publishing anonymously because of concerns about author transparency. COPE acknowledges that in rare cases papers can be published anonymously where an author is at risk of physical danger or is in fear for his/her life if his/her name were to be published or associated with specific criticism. COPE, however, acknowledges that a decision to publish anonymously solely because of possible damage to the author's career is ultimately up to the editor, but cautions: "Is the editor confident that he/she is knowledgeable in this specific discipline that he can make such an editorial judgment?"        (https://publicationethics.org/case/anonymity-versus-author-transparency).

   b.  In the view of the panel the reasoning for this decision could have been communicated to readers of JSS via an editorial note that explained the decision to publish a contribution anonymously (without details that would compromise

---

[13] The members of the panel are not aware of this criterion being used in determining whether submissions should be published in a journal, particularly one that represents itself as peer reviewed, unless Volume 12 contained a disclaimer stating that this volume was not peer reviewed (which it did not).

JACKSON000220

APPX.026

the identity of the author). No such explanatory note was provided in Volume 12.

4) Absence of invitation for Dr. Ewell to respond to the contributions to the "commentary" section.

    a. Although generally it is a practice among the academic journals with which the panel is familiar, that when there are specific sections of a journal that are devoted to discussing a particular author's works, the author whose work is being discussed/critiqued is generally invited to provide a rejoinder. This does not necessarily have to be in the issue in which the critique appears (although that is a good editorial practice), the critiqued author should at least be afforded the opportunity in the issue immediately following and should be informed of that opportunity.

    b. However, there is no indication that the journal editorial team intended on inviting Dr. Ewell to provide such a rejoinder in the initial planning for the "commentary" section of Volume 12. This was only discussed after the volume was released in the Summer of 2020.

In sum, based on the above, we do not find that the standards of best practice in scholarly publication were observed in the production of Volume 12 of the JSS.

In addition to our findings above, the panel also notes that there appears to be no oversight mechanisms concerning the operations of JSS. The members of the JSS editorial board we interviewed reported that they have received no updates nor reports on the operations of the journal. These reports typically include the number of manuscripts received, the number processed, the average time for completion of reviews (including invitations to revise and resubmit pieces), the number of manuscripts accepted, average time for processing of accepted manuscripts and demographic characteristics of authors, as well as other information as required by the publisher or supervising professional society (or the university in this case). This is what is contained in a typical report, but such reports do not appear to exist. It is a common practice for many journals to provide such periodic reports.

**Recommendations**

The panel was also asked to make recommendations, where warranted.[14] Several individuals we interviewed stated that the JSS plays an important role in the field of Music Theory and is one of the only outlets for the publication of works employing Schenkerian analysis. The panel thus recommends continuation of the journal.

However, we recommend that fundamental structural changes be made to the journal

---

[14] The panel is aware there have been calls for the dissolution of JSS.

JACKSON000221

**APPX.027**

1. The journal implement the necessary reforms before another volume is published. These include:
   a. Changing the editorial structure
   b. Making clear and transparent all editorial and review processes
   c. Defining clearly the relationships between the editors of the journal and the editorial board, MHTE, and the UNT Press.

2. We do not believe that the current editorial management structure is viable or sufficient for a healthy academic journal. There should be an editor who is (or who are) a full-time faculty member, preferably a tenured faculty member. It is possible that a graduate student could act as "associate editor" or "editorial assistant", thus continuing the functions of the previous "editor" position at JSS (to provide the student with professional experiences), but decisions regarding manuscripts should only be made by the faculty editor.

   We recommend that this editor be provided with a term in office of three years, with the possibility of renewal. This will help institutionalize editorial accountability.

   It may be worth considering selecting an editor (or perhaps co-editors) who is/are not a faculty member(s) in MHTE at UNT. We recommend that consideration be given for the possibility of an editor recruited from outside of MHTE and/or UNT. These measures will help reassure public audiences of UNT's commitment to the reform of the journal.

3. All procedures regarding peer review processes, and special sections, should be written down and made publicly available. Further procedures to avoid potential conflicts of interest should be clearly laid out (including precautions regarding editor self-publication).

4. The editorial board should have oversight over the journal, and regular annual reports on the activities of the journal should be provided to the editorial board and the UNT Press. In addition, the term of office for editor should be fixed, after which time the UNT Press should review what has been accomplished during the term. Further, if a student editorial assistant is to be appointed at UNT, there should be frequent consultations regarding the graduate assistantship provided to the journal by MHTE, and related financial issues with the Division Head of MHTE.

**References**

Committee on Publications Ethics (COPE) 2019.  *GUIDELINES: A Short guide to ethical editing for new editors.* At https://publicationethics.org/files/COPE_G_A4_SG_Ethical_Editing_May19_SCREEN_AW-website.pdf, accessed October 1, 2020.

JACKSON000222
APPX.028

# Exhibits

JACKSON000223
**APPX.029**

EXHIBIT 1

**Ad Hoc Panel Communication**

Cowley, Jennifer <Jennifer.Cowley@unt.edu>
Thu 8/6/2020 4:55 PM
**To:** Wallach, Jennifer <Jennifer.Wallach@unt.edu>; Ishiyama, John <John.Ishiyama@unt.edu>; Du, Jincheng <Jincheng.Du@unt.edu>; Lemberger-Truelove, Matthew <Matthew.Lemberger-truelove@unt.edu>; Dubrow, Jehanne <Jehanne.Dubrow@unt.edu>

Dear Panel Members,

First a thank you for agreeing to serve on the Ad Hoc Panel that will be convening next week. I will be sharing your charge when we meet on the 12th.

I am sharing with you the following statement that UNT has issued regarding the formation of this panel.

*The University of North Texas is committed to academic freedom and the responsibility that goes along with this freedom. This dedication is consistent with, and not in opposition to, our commitment to diversity and inclusion and to the highest standards of scholarship and professional ethics.*

*The university has appointed a five-member multidisciplinary panel of University of North Texas faculty experienced in the editing and production of scholarly journals. The panel members, who are outside the College of Music, will examine objectively the processes followed in the conception and production of volume 12 of the Journal of Schenkerian Studies. The panel will seek to understand whether the standards of best practice in scholarly publication were observed, and will recommend strategies to improve editorial processes where warranted. Upon completion of its investigation, the panel will issue a report to UNT Provost Jennifer Cowley. The report will be made public.*

*The Journal of Schenkerian Studies has made many contributions to the understanding of music theory. We will continue to offer music theorists the opportunity to share and defend diverse viewpoints under the most rigorous academic standards and ethics.*

I wanted to alert you that the publication of this journal volume has generated significant media interest. While you have not specifically been named, should you be contacted by a member of the media, you can refer any inquiry to Jim.Berscheidt@unt.edu in University Communications.

Sincerely,
Jennifer Cowley, PhD
Provost and Vice President for Academic Affairs
University of North Texas
Jennifer.cowley@unt.edu
940-565-2550



The Executive Board of the Society for Music Theory condemns the anti-Black statements and personal ad hominem attacks on Philip Ewell perpetuated in several essays included in the "Symposium on Philip Ewell's 2019 SMT Plenary Paper" published by the *Journal of Schenkerian Studies*.





ABOUT ⌄    INTEREST GROUPS    PUBLICATIONS    GRANTS AND AWARDS ⌄    DONATE

ANNUAL MEETINGS    EVENTS    COMMUNITY    JOBS    RESOURCES    MEMBERSHIP PORTAL



The Executive Board of the Society for Music Theory condemns the anti-Black statements and personal ad hominem attacks on Philip Ewell perpetuated in several essays included in the "Symposium on Philip Ewell's 2019 SMT Plenary Paper" published by the *Journal of Schenkerian Studies*.

The conception and execution of this symposium failed to meet the ethical, professional, and scholarly standards of our discipline. Some contributions violate our Society's policies on harassment and ethics.

As reported by participants, the journal's advisory board did not subject submissions to the normal processes of peer review, published an anonymously authored contribution, and did not invite Ewell to respond in a symposium of essays that discussed his own work. Such behaviors are silencing, designed to exclude and to replicate a culture of whiteness. These are examples of professional misconduct, which in this case enables overtly racist behavior. We humbly acknowledge that we have much work to do to dismantle the whiteness and systemic racism that deeply shape our discipline. The Executive Board is committed to making material interventions to foster anti-racism and support BIPOC scholars in our field, and is meeting without delay to determine further actions.

- Patricia Hall, President
- Robert Hatten, Past-President
- Gretchen Horlacher, Vice President
- Philip Stoecker, Secretary
- Jocelyn Neal, Treasurer
- Inessa Bazayev
- Anna Gawboy

JACKSON000225

APPX.031

EXHIBIT 3

I am sharing this statement on behalf of a cross-section of graduate students in the Division of Music History, Theory, and Ethnomusicology (MHTE) at the University of North Texas, the department which is responsible for publishing the Journal of Schenkerian Studies (JSS).

We are appalled by the journal's platforming of racist sentiments in response to Dr. Philip Ewell's plenary address at the Society of Music Theory annual meeting in 2019. Furthermore, we condemn the egregious statements written by UNT faculty members within this publication. We stand in solidarity with Dr. Philip Ewell and his goals to address systemic racism in and beyond the field of music theory.

As graduate students at UNT, we are compelled to provide further context and to demand action to effect meaningful change. We would like to make it clear that the JSS is not a graduate student journal; since 2010 (Vol. 4), it has been run primarily by Drs. Timothy Jackson and Stephen Slottow. Many of us recently discovered that the journal is presented as graduate-student run in some contexts; in fact, there is little student involvement beyond copy-editing, and students have absolutely no say in the content of the JSS. In fact, outside of the advisory board (and in particular Dr. Jackson), we have no clear understanding of who oversaw the publication of the responses to the plenary session. As we join the search for answers to these issues, we will be working both publicly and privately to change every part of the MHTE Division and College of Music (CoM) at UNT that allowed faculty to platform racism in our name.

To this end, we as UNT graduate students demand the Journal of Schenkerian Studies should immediately take the following steps, and we call on the UNT College of Music and university at large to ensure these steps are taken.

1. **Publicly condemn the issue and release it freely online to the public.** Given the horrendous lack of peer review, publication of an anonymous response, and clear lack of academic rigor, this issue of the JSS should release an apology for its content and promote transparency by granting the public access to it. We believe that all contributors should be held fully accountable for their comments, which must not be hidden for the sake of the self-preservation of any involved parties. Furthermore, we must learn from these mistakes rather than attempt to erase them. By making this volume accessible to the public with a disclaimer from the CoM, we hope to enable all scholars to address this problematic "discourse."

2. **Provide a full public account of the editorial and publication process, and its failures**. Throughout the publication of this issue, significant irregularities occurred in the acceptance and solicitation processes, whether individuals with the title of editor were permitted to edit content, and how the contents of Issue 12 were approved by any responsible oversight process. JSS must make a public account of the process so individuals who intentionally subverted academic discourse can be held accountable by their respective institutions.

We also call on the University of North Texas and the UNT College of Music to take the following actions.

1. **Dissolve the JSS.** The JSS has demonstrated that it does not meet the standards of a peer-reviewed publication. The publication of this issue demonstrates that the JSS, through its subversion of academic processes, is not in fact peer reviewed and lacks rigor. The basis of academic discourse is trust and authenticity, and the JSS has violated that trust. Without accountability and responsible scholarship, there is no reason for it to exist.

JACKSON000226

2.   **Critically examine the culture in UNT, the CoM, and the MHTE Division, and act to change our culture.** UNT has gained a reputation as an institution with a toxic culture when it comes to issues of race, gender, and other aspects of diversity. Although we would like to imagine that these problems are behind us, the JSS has proven that our department's culture remains toxic, and it needs to change. While we as graduate students are working to change the culture, the university must be a part of the solution. If institutional inertia impedes this change, UNT and the College of Music are a part of the problem, not the solution.

3.   **Hold accountable every person responsible for the direction of the publication.** This will involve recognizing both whistleblowers and those who failed to heed them in this process. This should also extend to investigating past bigoted behaviors by faculty and, by taking this into account, the discipline and potential removal of faculty who used the JSS platform to promote racism.  Specifically, the actions of Dr. Jackson—both past and present—are particularly racist and unacceptable.

We sincerely apologize to Dr. Philip Ewell for these racist attacks on his scholarship and character. We firmly support Dr. Ewell, and his call to critically examine the racial frameworks in which Schenkerian analysis and other theories were developed. We gratefully acknowledge the push for inclusion and diversity in academia, and his continued work for diversity and anti-racism in the field of music theory, which he advocated for in his 2019 SMT plenary address.  In the weeks, months, and years ahead, we will strive to change the toxic culture at UNT. We recognize that this will be difficult work, and we are prepared to fight for inclusivity now and in the future.

JACKSON000227

APPX.033

EXHIBIT 4

# News from SEM: General News

 **Email to a Friend**

## Statement of UNT Faculty on Journal of Schenkerian Studies

**Friday, July 31, 2020**   (0 Comments)
Posted by: Stephen Stuempfle

Share |

We, the undersigned faculty members of the University of North Texas Division of Music History, Theory, and Ethnomusicology, stand in solidarity with our graduate students in their letter of condemnation of the *Journal of Schenkerian Studies*. We wish to stress that we are speaking for ourselves individually and not on behalf of the university. The forthcoming issue— a set of responses to Dr. Philip Ewell's plenary lecture at the 2019 Society for Music Theory annual meeting (https://vimeo.com/372726003)—is replete with racial stereotyping and tropes, and includes personal attacks directed at Dr. Ewell. To be clear, not all responses contain such egregious material; some were thoughtful, and meaningfully addressed and amplified Dr. Ewell's remarks about systemic racism in the discipline. But the epistemic center of the journal issue lies in a racist discourse that has no place in any publication, especially an academic journal. The fact that he was not afforded the opportunity to respond in print is unacceptable, as is the lack of a clearly defined peer-review process.

We endorse the call for action outlined in our students' letter (https://drive.google.com/file/d/1PekRT8tr5RXWRTW6Bqdaq57svqBRRcQK/view), which asks that the College of Music "publicly condemn the issue and release it freely online to the public" and "provide a full public account of the editorial and publication process, and its failures." Responsible parties must be held appropriately accountable.

The treatment of Prof. Ewell's work provides an example of the broader system of oppression built into the academic and legal institutions in which our disciplines exist. As faculty at the College of Music we must all take responsibility for not only publicly opposing racism in any form, but to address and eliminate systematic racism within our specific disciplines.

Dr. Ellen Bakulina, Assistant Professor, Music Theory

Andrew Chung, Ph.D., Assistant Professor, Music Theory

Dr. Diego Cubero, Assistant Professor, Music Theory

Steven Friedson, University Distinguished Research Professor, Ethnomusicology/Ethnomusicology Area Coordinator

Rebecca Dowd Geoffroy-Schwinden, Ph.D., Assistant Professor, Music History

Benjamin Graf, Ph.D., Senior Lecturer, Music Theory

Dr. Frank Heidlberger, Professor, Music Theory/Music Theory Area Coordinator

Bernardo Illari, Associate Professor, Music History

Dr. Justin Lavacek, Assistant Professor, Music Theory

Dr. Peter Mondelli, Associate Professor, Music History

Dr. Margaret Notley, Professor of Music/Coordinator of Music History Area

Dr. April L. Prince, Principal Lecturer, Music History

Cathy Ragland, Ph.D., Associate Professor, Ethnomusicology

Dr. Gillian Robertson, Senior Lecturer, Music Theory

Dr. Hendrik Schulze, Associate Professor, Music History

JACKSON000228

**APPX.034**

Vivek Virani, Ph.D. Assistant Professor, Ethnomusicology and Music Theory

Dr. Brian F. Wright Assistant Professor, Music History

Add Comment

« Back to Index

JACKSON000229

APPX.035

EXHIBIT 5

# *Journal of Schenkerian Studies*

**VOLUME 12**                                                    **2019**

## CONTENTS

JOHN KOSLOVSKY
Schenkerizing *Tristan*, Past and Present ................................................................... 1

BRYAN J. PARKHURST

The Hegelian Schenker, The Un-Schenkerian Hegel, and How to Be a Dialectician
about Music .......................................................................................................... 55

NICHOLAS STOIA

The Tour-of-Keys Model and the Prolongational Structure in Sonata-Form Movements
by Haydn and Mozart ........................................................................................... 79

Symposium on Philip Ewell's SMT 2019 Plenary Paper, "Music Theory's White Racial
Frame"...................................................................................................... 125–214

    INTRODUCTION ........................................................................................... 125

    DAVID BEACH
    Schenker–Racism–Context .............................................................................. 127

    RICHARD BEAUDOIN
    After Ewell: Music Theory and "Monstrous Men" ........................................... 129

    JACK BOSS
    Response to P. Ewell ...................................................................................... 133

    CHARLES BURKHART
    Response to Philip Ewell .................................................................................. 135

    ALLEN CADWALLADER
    A Response to Philip Ewell .............................................................................. 137

JACKSON000230

**APPX.036**

SUZANNAH CLARK
Patterns of Exclusion in Schenkerian Theory and Analysis ............................... 141

NICHOLAS COOK
Response to Philip Ewell ................................................................. 153

TIMOTHY L. JACKSON
A Preliminary Response to Ewell ..................................................... 157

STEPHEN LETT
De-Scripting Schenker, Scripting Music Theory ................................. 167

RICH PELLEGRIN
Detail, Reduction, and Organicism: A Response to Philip Ewell ....................... 173

BOYD POMEROY
Schenker, Schenkerian Theory, Ideology, and Today's Music Theory
Curricula ................................................................................... 179

CHRISTOPHER SEGALL
Prolongational Analysis without Beams and Slurs: A View from Russian Music
Theory ...................................................................................... 183

STEPHEN SLOTTOW
An Initial Response to Philip Ewell .................................................. 189

BARRY WIENER
Philip Ewell's White Racial Frame ................................................... 195

ANONYMOUS
An Anonymous Response to Philip Ewell .......................................... 207

BIBLIOGRAPHY FOR THE RESPONSES .................................... 209

CONTRIBUTORS ....................................................................... 215

JACKSON000231

APPX.037

EXHIBIT 6

*Journal of Schenkerian Studies* vol. 12 (2019) Call for Papers

The SMT plenary presentation given by Philip Ewell, "Music Theory's White Racial Frame," has inspired a good deal of debate within the theory community, especially regarding the possible relationship between Schenkerian methodology and the white racial frame[1] (as suggested in the following quote from Ewell):

> "The best example through which to examine our white frame is through Heinrich Schenker, a fervent racist, whose racism undoubtedly influenced his music theory, yet it gets whitewashed for general consumption......In his voluminous writings, Schenker often mentions white and black as modifiers for human races.....As with the inequality of races, Schenker believed in the inequality of tones. Here we begin to see how Schenker's racism pervaded his music theories. In short, neither racial classes, nor pitch classes, were equal in Schenker's theories. He uses the same language to express these beliefs.....his sentiment is clear: blacks must be controlled by whites. Similarly, Schenker believed notes from the fundamental structure must control other notes."

As a journal dedicated to Schenkerian studies, we find it important to foster discussion on these issues. As part of volume 12, we invite interested parties to submit essay responses to Ewell's paper. The *Journal of Schenkerian Studies* takes no official stance on the issues addressed by Ewell, and we hope to publish a variety of thoughts and perspectives. Submissions must adhere to the following guidelines:

1. Essays should be 1,000 to 3,000 words in length.
2. In order to leave sufficient time for editorial work, submissions must observe a strict deadline of January 20, 2020.

Any questions or concerns regarding submissions may be directed at the editors (Schenker@unt.edu).

Please refer to Ewell's abstract, as well as links to the presentation slides and video recording (listed below):

### Music Theory's White Racial Frame
Philip Ewell (Hunter College and The Graduate Center, CUNY)

For over twenty years music theory has tried to diversify with respect to race, yet the field today remains remarkably white. SMT's most recent report on demographics shows that 90.4 percent of full-time employees in music theory are white, while 93.9 percent of associate/full professors are. Aside from this literal whiteness, there exists a figurative and even more deep-seated whiteness in music theory. This is the whiteness—which manifests itself in the composers we choose to represent our field inside and outside of the classroom, and in the theorists that we elevate to the top of our discipline—that one must practice, regardless of one's own personal racial identity, in order to call oneself a music theorist. Thus, for example, I am a black person,

---

[1] Coined by sociologist Joe Feagin in 2006, the term "white racial frame" refers to the "broad worldview [that is] essential to the routine legitimation, scripting, and maintenance of systemic racism in the United States."

JACKSON000232

APPX.038

but I am also a practitioner of "white music theory." In this presentation, a critical-race examination of the field of music theory, I try to come to terms with music theory's whiteness, both literal and figurative. By drawing on the writings of sociologists Joe Feagin and Eduardo Bonilla-Silva, among others, I posit that there exists a "white racial frame" (Feagin) in music theory that is structural and institutionalized. Further, I highlight certain racialized structures which "exist because they benefit members of the dominant white race" (Bonilla-Silva). Ultimately, I argue that only through a deframing and reframing of this white racial frame will we begin to see positive racial changes in music theory.

PowerPoint slides: http://philipewell.com/wp-content/uploads/2019/11/SMT-Plenary-Slides.pdf

Video recording: https://vimeo.com/372726003

JACKSON000233

APPX.039

*Diego Enrique Cubero Hernandez    09/26/2024*    1

```
 1                 UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    SHERMAN DIVISION
   TIMOTHY JACKSON,             *
 3                             *
             Plaintiff,        *
 4                             *
   VS.                         *  CASE NO. 4:21-CV-00033-ALM
 5                             *
   LAURA WRIGHT, ET AL.,       *
 6                             *
             Defendants.       *
 7
 8        _____
 9
10    ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
11                     DIEGO CUBERO
12                 SEPTEMBER 26, 2024
13
14        _____
15
16             ORAL AND VIDEOTAPED VIDEOCONFERENCE
17  DEPOSITION of DIEGO CUBERO, produced at the instance of
18  the Plaintiff, and duly sworn, was taken in the
19  above-styled and numbered cause on the 26th day of
20  September, 2024, from 3:14 p.m. to 5:52 p.m., before
21  Carla A. Sims, AAS, CSR, RPR, in and for the State of
22  Texas, reported by method of machine shorthand, via Zoom
23  videoconference, pursuant to the Federal Texas Rules of
24  Civil Procedure and the provisions stated on the record
25  or attached hereto.
```

*Diego Enrique Cubero Hernandez    09/26/2024*    3

```
 1                     I N D E X
 2                                         PAGE
 3  Appearances...................................   2
 4
 5  DIEGO CUBERO
 6  Examination by Mr. Allen.....................   5
 7
 8  Changes and Signature........................  95
 9  Reporter's Certificate.......................  97
10  Further Certification........................  99
11
12
13
14
15
16
17
18
19
20
21             REPORTER'S NOTE
22             Please note that due to the quality
23  of the transmission data for a Zoom videoconference,
24  cross-talk causes audio distortion in the testimony when
25  preparing a videoconference transcript.
```

*Diego Enrique Cubero Hernandez    09/26/2024*    2

```
 1              A P P E A R A N C E S
 2       ALL PARTIES AND WITNESS APPEARED VIA
                ZOOM VIDEOCONFERENCE
 3
 4  COUNSEL FOR THE PLAINTIFF:
 5       Mr. Michael Thad Allen
         ALLEN LAW, LLC
 6       P.O. Box 404
         Quaker Hill, Connecticut 06375
 7       860/772-4738 (tel)
         m.allen@allen-lawfirm.com
 8
   COUNSEL FOR THE DEFENDANTS and DIEGO CUBERO:
 9
10       Ms. Mary Quimby
         TEXAS ASSISTANT ATTORNEY GENERAL
11       P.O. Box 12548
         Capitol Station
12       Austin, Texas 78711
         mary.quimby@oag.texas.gov
13  COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:
14       Mr. Renaldo L. Stowers
         DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
15       115 Union Circle No. 310907
         Denton, Texas 76203
16       940/565-2717 (tel)
         renaldo.stowers@untsystem.edu
17
   ALSO PRESENT:
18
   VIDEOGRAPHER:
19
         Mr. Jason Warner
20       Legal Video Group
         lvg.dallas@gmail.com
21       214-598-5229
22
23
24
25
```

*Diego Enrique Cubero Hernandez    09/26/2024*
4

```
 1                  E X H I B I T S
 2  NO.     DESCRIPTION                          PAGE
 3  1    Deposition Notice......................  15
 4  2    JSS Editorial Board Contact Information.  16
         UNT_000109
 5
 6  3    Ad Hoc Review Panel Report.............  42
         JACKSON000208 to JACKSON000233
 7  4    Ad Hoc Panel Report Student Statement...  44
 8  5    Email String...........................  68
         UNT_000458 to UNT_000463
 9
10  6    Email String...........................  87
         UNT_000452
11  7    Email String...........................  91
         UNT_000304 to UNT_000309
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

49

1    VIDEOGRAPHER:  The time is 4:31.  We're on
2  The record.
3    Q.    (By Mr. Allen) Thank you, Professor Cubero, for
4  allowing me to take that break.  I believe you were
5  saying that sometime ago, Timothy Jackson had made a
6  comment about a white professor who he thought did not
7  get a job or something.  Could you explain that again?
8    A.    Yes.  That a while back, he made a comment as
9  to a white person not getting a job because --
10    Q.    Because of race?
11    A.    Because of race.  And that it's something since
12  you asked me what actions that could be construed as
13  racist, I didn't take it to mean that that is what --
14  what The student response was referring to and nor did I
15  endorse that.
16    Q.    Okay.  And how long ago was this statement by
17  Timothy Jackson that you remember?
18    A.    I don't remember.  I really don't.
19    Q.    Was it in The 2020 timeframe?
20    A.    I don't think so.
21    Q.    Okay.  Do you consider yourself Latino?
22    A.    Yes.  I consider myself of white race and
23  Latino ethnicity.
24    Q.    Has Timothy Jackson ever expressed anything
25  racist towards you for your national origins?

50

1    A.    Not that comes to mind.
2    Q.    And he was on faculty at The time you were
3  hired, correct?
4    A.    That's correct.
5    Q.    Was he part of The hiring process?
6    A.    I believe he was in The search committee, but I
7  don't recall.
8    Q.    Did you have any indication that you were
9  discriminated against by Timothy Jackson individually?
10    A.    No.
11    Q.    Have you ever witnessed Timothy Jackson
12  discriminate against a black American?
13    MS. QUIMBY:  Objection, form.
14    A.    I believe that The -- some of The statements
15  might have -- in his journal, in The journal, 12 Volume,
16  are construed as -- can be construed as racist.
17    Q.    (By Mr. Allen) Okay.  But I'm asking you a
18  little bit different question.  Have you ever witnessed
19  Timothy Jackson discriminate against a black American
20  like in hiring, anything of that nature?
21    MS. QUIMBY:  Objection, form.
22    A.    Since you gave The example, I would say
23  I don't --
24    MR. ALLEN:  He's frozen.
25    A.    I don't recall he discriminating against a

51

1  black American in a hiring scenario.
2    Q.    (By Mr. Allen) So you wanted to go back to this
3  statement.  I think you said something about what you did
4  or did not endorse, correct?
5    A.    Yes.
6    MS. QUIMBY:  Objection, form.
7    Q.    (By Mr. Allen) And were you directing my
8  attention to this document in saying that?  This is The
9  Statement of UNT Faculty on Journal of Schenkerian
10  Studies that's attached to Exhibit 3 in The record.
11    MS. QUIMBY:  Can you show The document?
12    MR. ALLEN:  I am so sorry.  I thought it
13  was up, and, of course, it was not.
14    Q.    (By Mr. Allen) Here it is again, Exhibit 3.
15    A.    Yes.  So I forget your question but, yes, that
16  is The document.
17    Q.    Well, before we broke, you said you did not
18  endorse The statement in The record, The student
19  statement which was introduced as Exhibit 4, which
20  identifies, quote, "racist actions" or words to that
21  effect.  And you said I didn't endorse that part of The
22  student statement and you wanted to refer to this
23  document.
24    And I promised you we would come back to talk
25  about it, so I'm now putting Exhibit 3 back up and asking

52

1  you to show me why you believe you did not endorse The
2  student letter in that regard.
3    A.    In this document The way I currently understand
4  it is that it's endorsing a call to action meaning that
5  The College of Music probably condemn that it shouldn't
6  release freely online to the public and to provide a
7  public account of the editorial publication process and
8  its failures.
9    So I see that as what this -- currently that's
10  how I see it as this statement is endorsing those two
11  action points.
12    Q.    Okay.  And nothing more?  That's your -- is
13  that your testimony?  That you weren't endorsing anything
14  more than publically condemning The issue and asking that
15  it be released freely online to The public, and you
16  weren't endorsing anything other than what's in
17  quotations?
18    A.    That is how I read The statement currently.  I
19  cannot go back to my mindset.
20    Q.    Sure.  Can you point to any language in The
21  sentence here that was published that says you only
22  endorse those quoted sections?
23    A.    Can you repeat your question, please?
24    Q.    Sure.  Point to language in this statement of
25  UNT faculty on Journal of Schenkerian Studies that

53

1 indicates that you endorse exclusively those two

2 passages.

3     A.   The way I read it is that The clause that

4 starts which asks is explaining what is being endorsed in

5 The call for action.

6     Q.   Okay. And you don't deny that -- oh, go

7 ahead --

8     A.   Yeah. So which asks, I see it as a restrictive

9 clause.

10     Q.   Okay. And you say which asks, that you argue

11 restricts your endorsement only to those two quotations?

12           MS. QUIMBY: Objection, form.

13     A.   The way I interpret that sentence is that it's

14 serving to show what it's endorsing.

15     Q.   (By Mr. Allen) Okay. And you don't -- you

16 don't deny that this URL incorporates The students'

17 statement in its entirety into your letter, do you?

18           MS. QUIMBY: Objection, form.

19     A.   That URL links The statement.

20     Q.   (By Mr. Allen) Okay.

21     A.   That we -- whose to actions we are endorsing.

22     Q.   Okay. Is there anything else you want to

23 testify to in this document which you argue limits its

24 endorsement of the students statement?

25           MS. QUIMBY: Objection, form.

54

1     A.   Nothing is coming to mind.

2     Q.   (By Mr. Allen) Okay.

3     A.   Currently.

4     Q.   Sure. You worked on The Journal of Schenkerian

5 Studies when they were formulating a call for paper --

6 papers for Volume 12, correct?

7           MS. QUIMBY: Objection, form.

8     A.   I was an editorial board member when it was a

9 call for, yeah.

10     Q.   (By Mr. Allen) Okay. And I'm specifically

11 focusing on the call for papers that was fashioned in The

12 late -- late months of 2019.

13           (Court Reporter requested clarification)

14     Q.   (By Mr. Allen) I'm focusing on the call for

15 papers that The Journal of Schenkerian Studies was

16 drafting and sent out in The last months of 2019,

17 November December.

18           (Court Reporter requested clarification)

19           THE WITNESS: I was an editorial board

20 member. Apologies.

21           COURT REPORTER: I'm so sorry. Thank you.

22           THE WITNESS: Soft spoken by nature.

23     Q.   (By Mr. Allen) And you participated in The

24 formulation of The call for papers, correct?

25     A.   I was asked for feedback.

55

1     Q.   Okay. Is that participation?

2     A.   I guess. That's -- that's how I would

3 ordinarily construe it as, yes, I provided feedback.

4     Q.   Okay. And you knew that The call for papers

5 went out on The SMT server list, correct?

6           MS. QUIMBY: Objection, form.

7     A.   I cannot know for certain where it was -- what

8 it was -- where it was sent out so...

9     Q.   (By Mr. Allen) Are you a member of The Society

10 for Music Theory in 2020? Or were you? Excuse me.

11     A.   Yes.

12     Q.   Did you receive emails from a server list that

13 was maintained by The Society for Music Theory?

14     A.   I may or may not. I don't remember. I get a

15 lot of emails. That's my second email address so...

16     Q.   Okay. How did you understand that The call for

17 papers in which you participated formulating was

18 distributed?

19     A.   To -- how it was distributed, or what? Can you

20 repeat your question? Sorry.

21     Q.   Yes. How was The call for papers distributed?

22     A.   I don't know for sure so...

23     Q.   You had no personal knowledge of that?

24     A.   No.

25     Q.   Okay. And just one last question. Is that

56

1 because you may have known but forgot, or you just were

2 simply not involved in that part of it?

3     A.   So if it was distributed through music theory,

4 a society threads on TIE (phonetic) would probably have

5 received that email. But again I get a lot, so there is

6 some that's quite an active society. So sorry. I forgot

7 your question. That is The kind of The knowledge to

8 which I have how it was distributed.

9     Q.   Well, did you know that Levi Walls or Levi

10 Walls, I suppose his name is pronounced. Levi Walls

11 distributed the call for papers?

12           MS. QUIMBY: Objection, form.

13     A.   I don't know who distributed. I think it was

14 an email from him that he asked me about The call for

15 papers, but I don't know who distributed and how it was

16 distributed.

17     Q.   (By Mr. Allen) Okay. All right. That's fine.

18 Did you ever learn after July 25th, 2020, that Philip

19 Ewell had announced that he would refuse to read Volume

20 12 of The Journal of Schenkerian Studies?

21     A.   I don't recall learning that.

22     Q.   Okay. You don't recall any controversy over

23 Philip Ewell refusing to read The Journal of Schenkerian

24 Studies, do you?

25           MS. QUIMBY: Objection, form.

1  questioning what The editorial process was, and that's
2  what our letter endorsed.  The knowing -- finding out
3  what The process was.
4      Q.    Well, I'm just going to put Exhibit 3 up online
5  again.  Well, I read this, but I want you to help.  As
6  far as I can tell, they had these criticisms in The
7  faculty statement which you signed.  But I'm happy for
8  you to read this again and tell me what criticisms of The
9  editorial process were being raised by The UNT faculty at
10  that time?
11      A.    The part they highlighted, it raises the -- to
12  read it, The fact that he -- that he, being Dr. Ewell,
13  was not afforded an opportunity to respond in print.  So
14  that's being a criticism.
15      Q.    And --
16      A.    And The lack --
17      Q.    -- the lack of peer review?
18      A.    Yes.  That's what The -- that's what The
19  statement says.
20      Q.    So I believe now I have three criticisms
21  according to what you remember and are testifying to, so
22  just correct me if I'm wrong.  But one was that they
23  published an anonymous article, right?  The other was --
24  you were nodding.  Did you answer audibly?
25      A.    Yes, yes.  I forgot that was a --

1      Q.    That's fine.  I do it too.  That Philip Ewell
2  allegedly was not afforded an opportunity to respond.
3  That was this second one.  And that there was no peer
4  review or lack of clearly defined peer review.  Is that
5  The sum total of The criticisms that you remember?
6          MS. QUIMBY: Objection, form.
7      A.    Those are The ones that come to mind from The
8  moment -- from The document you're showing me and from my
9  personal recollection that I just told you about, The
10  anonymous article.
11      Q.    (By Mr. Allen) Okay.  And The last question on
12  this is as you sit here today, can you remember any other
13  criticisms of The procedures that The JSS used to produce
14  Volume 12 of The Journal of Schenkerian Studies?
15          MS. QUIMBY: Objection, form.
16      A.    Those The ones that come to mind.  Sorry.  I
17  started thinking about The question and forgot The
18  question.  Sorry.  I hope this answered.  So these are
19  The three that come to mind at this moment, those three.
20      Q.    (By Mr. Allen) And you can't remember anything
21  else at this time?
22          MS. QUIMBY: Objection, form.
23      A.    No.
24      Q.    (By Mr. Allen) Okay.
25      A.    Because at 5:00 o'clock, I start --

1      Q.    Yeah.  It's okay.  And I actually think we're
2  going to be done relatively soon.
3          So if Philip Ewell received the call for
4  papers, is it true that he was not afforded The
5  opportunity to respond in print?
6          MS. QUIMBY: Objection, form.
7      A.    The -- if I recall correctly, The call for
8  papers were essays in response to his -- to his plenary
9  lecture.
10      Q.    (By Mr. Allen) Sure.
11      A.    So from The way I read it, it would be odd that
12  Dr. Ewell would respond to himself.
13      Q.    I agree with you.  But if he received the call
14  for papers like everyone else, is it true that he did not
15  get The opportunity to respond in print?
16          MS. QUIMBY: Objection, form.
17      A.    Sorry.  There was a -- sorry.  I construed it
18  that he was not able to respond to The articles that were
19  written -- to The essays that were written in response to
20  his essay.
21      Q.    (By Mr. Allen) But to your point, could he
22  respond before they were even written?
23      A.    It could be -- he could respond before they're
24  published.
25      Q.    And that's what you think they mean here -- you

1  mean here when you signed this statement?
2      A.    Yes.
3      Q.    Is that said any -- is that said anywhere in
4  this sentence?
5      A.    The way I interpret that sentence is that he
6  was not given The opportunity to respond to The essays
7  that were written as a response to his plenary lecture.
8      Q.    It doesn't say that here, does it?
9      A.    We like nice sentences.  But, yeah, The fact
10  that he was not afforded The opportunity to respond in
11  print.  So by response, their response, I mean respond to
12  The essays that were written.  That's how I understand
13  this.
14      Q.    But again that's not stated in this letter, is
15  it?
16          MS. QUIMBY: Objection, form.
17      A.    It's The way -- it's The way I understand The
18  sentence.
19      Q.    (By Mr. Allen) I'm sorry.  I didn't hear what
20  you just said because of The --
21      A.    It is the way I understand The sentence as
22  written.  That's what it takes to be submitted.
23      Q.    My question was a simple one.  That what you
24  understand, what you've just explained is not written in
25  this document, is it?

Diego Enrique Cubero Hernandez    09/26/2024

65

1       MS. QUIMBY:  Objection, form.

2       **A.**   I think it's written in The document because if
3   I were reading it, and I'm currently reading, that's how
4   I would read it.

5       **Q.**   (By Mr. Allen) That it doesn't say he was not
6   afforded The opportunity to respond in print, but that it
7   actually says that he was not afforded the opportunity to
8   respond in print to The responses?

9       MS. QUIMBY:  Objection, form.

10      **Q.**   (By Mr. Allen) That's what you think it says?

11      MS. QUIMBY:  Objection, form.

12      **A.**   I take it -- I take it that its meaning is that
13  he was not afforded opportunity to respond in print to
14  The responses.  That's what I believe is The meaning of
15  The sentence.

16      **Q.**   (By Mr. Allen) Okay.

17      **A.**   As that would be quite funky.

18      **Q.**   Or it could be a lie, right?

19      **A.**   Excuse me?

20      **Q.**   It could be a lie as well that it's actually a
21  misrepresentation because Philip Ewell was given a
22  response to respond to The SMT call for papers like
23  everyone else.

24      MS. QUIMBY:  Objection, form.

25      **Q.**   (By Mr. Allen) That's also an interpretation

Diego Enrique Cubero Hernandez    09/26/2024

66

1   that someone could read into The sentence, couldn't they?

2       MS. QUIMBY:  Objection, form.

3       **A.**   I cannot speak to The way other people read it.
4   I can speak to The way I read it.

5       **Q.**   (By Mr. Allen) Sure.

6       **A.**   And it is that -- again I'll repeat myself.
7   That he was not afforded The opportunity to respond to
8   The essays written in response to his plenary lecture.

9       **Q.**   Do you know of any documents in the
10  correspondence of the Journal for Schenkerian Studies
11  that indicated if Philip Ewell submitted something that
12  they would not publish it?

13      MS. QUIMBY:  Objection, form.

14      **A.**   I don't know of any such document.

15      **Q.**   (By Mr. Allen) Do you know of documents in
16  which The editorial staff discussed inviting Philip Ewell
17  to respond after The responses in Volume 12 were
18  published?

19      MS. QUIMBY:  Objection, form.

20      **A.**   Sorry.  It's late and probably even later for
21  y'all since you have been doing this for a while.  Can
22  you repeat your question?

23      **Q.**   (By Mr. Allen) Sure.  Do you know of documents
24  in which The editorial staff discussed inviting Philip
25  Ewell to respond once Volume 12 had been published?  In

Diego Enrique Cubero Hernandez    09/26/2024

67

1   other words, once The responses in Volume 12, The
2   symposium, had appeared in print, do you know of any
3   documents in which they discussed inviting Philip Ewell
4   to respond to those already published articles?

5       **A.**   None come to my mind at this moment.

6       **Q.**   Okay.  Thank you.  I think we only have two
7   more things, and then I think we'll be done if I'm not
8   mistaken.

9       **A.**   Hydration.

10      **Q.**   Yes, please.  I don't want you to be
11  dehydrated.

12      **A.**   I brought it soon, but this is more dehydrating
13  than anything.

14      MR. ALLEN:  I'm going to mark for The
15  record as Exhibit 5.  Am I correct?

16      COURT REPORTER:  Yes, sir.

17      MR. ALLEN:  Thank you.

18      (Deposition Exhibit No. 5 was marked)

19      **Q.**   (By Mr. Allen) Sorry, Professor Cubero.  But
20  I've been getting it wrong too many times, so I'm always
21  asking for confirmation.

22      This is an email.  Exhibit 5 is an email thread
23  that begins -- well, The top lead email is
24  July 26, 2020.  Do you remember getting this email,
25  Professor Cubero?

Diego Enrique Cubero Hernandez    09/26/2024

68

1       **A.**   Do you mind if I read it?  I read slowly.  And
2   I'm tired, so I'll read slowly.

3       **Q.**   No.  I don't know.  Would you like it this size
4   so it all fits on one page or larger and then I'll just
5   --

6       **A.**   Either way.  That's good, that's good.

7       **Q.**   Okay.  And I don't want you to spend too much
8   time on this but the -- because it goes -- see, it goes
9   six pages.  But I'm not going to ask you about every
10  email.  There is only a couple where you are relevant to
11  The discussion.

12      But if you could read The beginning email
13  enough to get a sense of an answer to my question whether
14  you received it and remember it, please.  Just tell me
15  when you're through.

16      **A.**   I read it as far as you're showing so...

17      **Q.**   Okay.  Do you remember receiving this email?

18      **A.**   No.  That doesn't mean I didn't receive it
19  because I am there.

20      **Q.**   All right.  Look, I understand.  I'm just --
21  I'm just trying to ask questions for The purpose of
22  discovery here.  And this is your email right here,
23  correct?

24      **A.**   Yes.

25      **Q.**   And is that The email you used to

Diego Enrique Cubero Hernandez     09/26/2024

93

1  for what must have been a long afternoon.  I appreciate

2  your testimony today.

3            THE WITNESS:  Thank you.  I hope you have

4  a good day.

5            VIDEOGRAPHER:  Off The record, 5:52.

6       (Time 5:52 p.m.)

7       (End of deposition)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Diego Enrique Cubero Hernandez     09/26/2024

95

1  _____

2  _____

3

4       I, DIEGO CUBERO, have read the foregoing deposition

5  and hereby affix my signature that same is true and

6  correct except as noted above.

7

8            _____

8                 DIEGO CUBERO

9

10  THE STATE OF _____ )

10                                )

10  COUNTY OF _____ )

11

12       Before me, _____, on this day

13  personally appeared DIEGO CUBERO, known to me (or proved

14  to me under oath or through _____)

15  (description of identity card or other document) to be

16  the person whose name is subscribed to the foregoing

17  instrument and acknowledged to me that they executed the

18  same for the purposes and consideration therein

19  expressed.

20

21       Given under my hand and seal of office this the

22  _____ day of _____, 2024.

23

24            _____

24            NOTARY PUBLIC IN AND FOR

24            THE STATE OF _____

25            My Commission Expires:_____

Diego Enrique Cubero Hernandez     09/26/2024

94

1            CHANGES AND SIGNATURE

2  WITNESS NAME:  DIEGO CUBERO

3  DATE:  SEPTEMBER 26, 2024

4  PAGE   LINE   CHANGE            REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Diego Enrique Cubero Hernandez     09/26/2024

96

1            UNITED STATES DISTRICT COURT

1            FOR THE EASTERN DISTRICT OF

2            TEXASSHERMAN DIVISION

3  TIMOTHY JACKSON,        *

3                           *

4       Plaintiff,          *

4                           *

5  VS.                *  CASE NO.  4:21-CV-00033-ALM

5                           *

6  LAURA WRIGHT, ET AL.,   *

6                           *

7       Defendants.        *

8

8  _____

9

10            REPORTER'S CERTIFICATION

11  ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

12                 DIEGO CUBERO

13            SEPTEMBER 26, 2024

14  _____

15       I, CARLA A. SIMS, AAS, CSR, RPR, in and for the

16  State of Texas, hereby certify to the following:

17       That the witness, DIEGO CUBERO, was duly sworn by me

18  and that the transcript of the oral deposition is a true

19  record of the testimony given by the witness;

20       I further certify that pursuant to FRCP Rule

21  30(f)(1) that the signature of the deponent:

22       _XX__ was requested by the deponent or a party

23  before the completion of the deposition and is to be

24  returned within 30 days from date of receipt of the

25  transcript.  If returned, the attached Signature and

97

1  Corrections pages contain any changes and the reasons
2  therefor;
3      _____ was not requested by the deponent or a party
4  before the completion of the deposition.
5      That the deposition transcript was submitted on
6  October 30, 2024, to Ms. Mary Quimby, attorney for the
7  witness, for examination, signature, and return to me by
8  the 2nd day of December, 2024;
9      That the amount of time used by each party at the
10 deposition is as follows:
11     Mr. Michael Thad Allen..........02 HOURS:15 MINUTES
       Ms. Mary Quimby.................00 HOURS:00 MINUTES
12     Mr. Renaldo L. Stowers..........00 HOURS:00 MINUTES
13 COUNSEL FOR THE PLAINTIFF:
14     Mr. Michael Thad Allen
       ALLEN LAW, LLC
15     P.O. Box 404
       Quaker Hill, Connecticut 06375
16     860/772-4738 (tel)
       m.allen@allen-lawfirm.com
17
   COUNSEL FOR THE DEFENDANTS and DIEGO CUBERO:
18
       Ms. Mary Quimby
19     TEXAS ASSISTANT ATTORNEY GENERAL
       P.O. Box 12548
20     Capitol Station
       Austin, Texas 78711
21     mary.quimby@oag.texas.gov
22 COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:
23     Mr. Renaldo L. Stowers
       DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
24     115 Union Circle No. 310907
       Denton, Texas 76203
25     940/565-2717 (tel)
       renaldo.stowers@untsystem.edu

99

1              FURTHER CERTIFICATION
             DEPOSITION OF DIEGO CUBERO
2
3      The original deposition was/was not returned to the
4  deposition officer on the _____ day of _____,
5  2024.
6      If returned, the attached Changes and Signature
7  page contains any changes and the reasons therefor;
8      If returned, the original deposition was delivered
9  to Mr. Michael Thad Allen, Custodial Attorney;
10     That $_____ is the deposition officer's
11 charges to the Plaintiff for preparing the original
12 deposition transcript and any copies of exhibits;
13
14     Certified to by me this _____ day of _____,
15 202__.
16
17
18
19     _____
       JULIA WHALEY & ASSOCIATES, INC.
20     2012 Vista Crest Drive
       Carrollton, Texas  75007-1640
21     214-668-5578/Fax 972-236-6666
       JulieTXCSR@gmail.com
22     Firm registration No. 436
       Firm registration Expires 5-31-25
23
24
25

98

1      I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
4  taken.  Further, I am not a relative or employee of any
5  attorney of record in this cause, nor am I financially or
6  otherwise interested in the outcome of the action.
7      Certified to by me this the 14th day of October,
8  2024.
9
10
       _____
11     Carla A. Sims, AAS, RPR
       Texas CSR No. CSR-6125
12     Expiration Date:  04-30-26
       JULIA WHALEY & ASSOCIATES, INC.
13     2012 Vista Crest Drive
       Carrollton, Texas  75007-1640
14     214-668-5578/Fax 972-236-6666
       JulieTXCSR@gmail.com
15     Firm registration No. 436
       Firm registration Expires 5-31-25
16
17
18
19
20
21
22
23
24
25

*Rachel Gain    5/19/21*    1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       SHERMAN DIVISION

 3   TIMOTHY JACKSON,           )
                                )
 4            Plaintiff,        )
                                )
 5   v.                         ) CASE NO.
                                ) 4:21-cv-00033-ALM
 6   LAURA WRIGHT, et al,       )
                                )
 7            Defendants.       )
                                )
 8

 9

10   ------------------------------------

11             ORAL DEPOSITION OF

12               RACHEL GAIN

13               MAY 19, 2021

14   ------------------------------------

15

16

17        ORAL DEPOSITION OF RACHEL GAIN, produced as a

18   witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on May 19, 2021, from 1:06 p.m. to 2:49 p.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the Law Offices of

23   Cutler Smith, 12750 Merit Drive, Suite 1450, in the City

24   of Dallas, County of Dallas, State of Texas, pursuant to

25   the Federal Rules of Civil Procedure.
```

---

*Rachel Gain    5/19/21*    3

```
 1                        INDEX

 2                                              PAGE

 3   Appearances..........................................2

 4   Stipulations.........................................4

 5   RACHEL GAIN

 6        Examination by Ms. Harris.......................4

 7

 8   Reporter's Certificate..............................60

 9

10

11                       EXHIBITS

12   NO.  DESCRIPTION                                PAGE

13   Exhibit 35   Notice of Taking Deposition...........9

14   Exhibit 36   Text Messages - Vivek Virani and
                  Rachel Gain...........................9
15
     Exhibit 37   Microsoft Teams conversation..........22
16
     Exhibit 38   News from SEM: General News, Statement
17                of UNT Faculty on Journal of
                  Schenkerian Studies ..................22
18
     Exhibit 39   Twitter Messages......................51
19

20

21

22

23

24

25
```

---

*Rachel Gain    5/19/21*    2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        MR. MICHAEL THAD ALLEN
          MS. SAMANTHA HARRIS
 5        ALLEN LAW, LLC
          P.O. Box 404
 6        Quaker Hill, Connecticut 06375
          860.772.4738
 7        860.469.2783 Fax
          m.allen@allen-lawfirm.com
 8

 9   FOR THE DEFENDANTS:

10        MR. MATT BOHUSLAV
          ASSISTANT ATTORNEY GENERAL
11        GENERAL LITIGATION DIVISION
          ATTORNEY GENERAL OF TEXAS
12        P.O. Box 12548, Capitol Station
          Austin, Texas 78711
13        matthew.bohuslav@oag.texas.gov

14   AND

15        MR. RENALDO STOWERS
          SENIOR ASSOCIATE GENERAL COUNSEL
16        UNIVERSITY OF NORTH TEXAS SYSTEM
          OFFICE OF GENERAL COUNSEL
17        940.565.2717
          renaldo.stowers@untsystem.edu
18

19   ALSO PRESENT:

20        MR. TIMOTHY JACKSON

21

22

23

24

25
```

---

*Rachel Gain    5/19/21*    4

```
 1              P R O C E E D I N G S

 2              RACHEL GAIN,

 3   having been first duly sworn, testified as follows:

 4              EXAMINATION

 5   BY MS. HARRIS:

 6        Q.   Okay.  Hi, my name is Samantha Harris.  I'm one

 7   of the attorneys for Dr. Jackson, along with my partner.

 8   And have you ever been deposed before?

 9        A.   No.

10        Q.   Okay.  So, it's just going to be a

11   conversation, but it is part of the Court record, that's

12   why she's taking these -- you know, these notes.  And

13   so, this is testimony that will be part of the case.  If

14   at any time anything I'm asking you isn't clear or you

15   need me to clarify or repeat the question, just ask.

16   Your attorney may object from time to time.

17              MS. HARRIS:  Are we going to stipulate,

18   you know, the same things that we have in the previous

19   depositions, that objections except as to form

20   objections will be reserved for the time of trial.

21              MR. BOHUSLAV:  Yes.

22        Q.   (By Ms. Harris)  Okay.  So, he will object, and

23   that objection will go on the record, but it doesn't

24   change your obligation to answer the question.  So, when

25   he objects, it doesn't mean, you know, that you're not
```

37

1  visa?

2      A.    That you work 20 hours a week during term time,

3  and if she wasn't employed over the summer, she couldn't

4  do that work, I believe.  I'm not entirely 100 percent

5  solid on all H1-B's requirements, but it seems like that

6  would be something that she couldn't do, seeing as we're

7  employed during a semester to do our work and not during

8  the summer.

9      Q.    And what is it about, as for a dispute over the

10  completion of work, that you believe is bigoted?

11      A.    Well, I don't -- that's not how I would

12  characterize that.

13      Q.    Did you not just say that that was another

14  example of past bigoted behavior?

15      A.    Well, I didn't say that it was a dispute over

16  the completion of work.  That's not my words or --

17      Q.    All right.  How would you characterize that,

18  then?

19      A.    I'd characterize it as Yiyi was told that she

20  needed to work over summer for free and that Dr. Jackson

21  took credit for her work, is what I heard.

22      Q.    Okay.  Who have you heard that from?

23      A.    Yiyi, Bryan Stevens, and David Falterman.

24      Q.    Okay.

25      A.    "David" spelled like David.

38

1      Q.    Okay.  Now, going back to this first iteration

2  of the graduate student statement, you also -- in the

3  statement also says that "the actions of Dr. Jackson,

4  both past and present, are particularly racist and

5  unacceptable."

6            Now, you've spoken about some incidents

7  that you believe reflect sexism.  Can you tell me what

8  past incidents, specifically, you believe were racist?

9      A.    Well, Yiyi is Chinese, so that incident.

10      Q.    Okay.  So, you believe that because he had some

11  sort of issue with someone Chinese that that means that

12  it was racist?

13      A.    I wouldn't characterize it like that.

14      Q.    How would you characterize it?

15      A.    Well, I don't know, specifically, if that

16  incident was racist, but it seems likely, given what

17  I've heard.  And also, there have been the other past

18  racist incidents that I've mentioned.

19      Q.    What have you heard that make its likely --

20  that makes you believe it is likely that that incident

21  was racist?

22      A.    I don't know how to put a finger on it.  I

23  wouldn't like to speculate.

24      Q.    I'd like you to speculate.

25            MR. BOHUSLAV:  Objection, calls for

39

1  speculation.

2      Q.    (By Ms. Harris)  There's no prohibition on

3  speculating.  The Court may or may not decide to use it.

4  But since you are characterizing this incident as

5  racist, I would assume you have some reason for doing

6  so.  I mean, you've clearly speculated in your own mind

7  and come to the conclusion that this was likely racist,

8  so I would like to understand your thinking.

9      A.    I can't be certain that it's racist, but it

10  seems likely.

11      Q.    Why does it seem likely?

12      A.    Because he hasn't done this to people who are

13  white as much.

14      Q.    So, are you aware of people who are white who

15  he has worked with who have had issues with him?

16      A.    Yes, Dr. Jackson has -- Dr. Notley is white.

17      Q.    Okay.  So, what is your basis for believing

18  that he has not done this as frequently to people who

19  are white?

20      A.    I'm not sure if that's what I said.

21      Q.    Can you read back when I asked what makes

22  you -- the most recent time that I asked, "why do you

23  believe this was racist?"  Where she said, "because he

24  hasn't done this to white people"?

25            (THE RECORD WAS READ BACK.)

40

1      Q.    (By Ms. Harris)  Yes.  So I'm asking what's

2  your basis for that belief?

3      A.    Well, based on the incidents that I've heard,

4  I've heard of a few white people and a large number of

5  people of color.

6      Q.    Okay.  So, a large number of people of color.

7      A.    Larger.

8      Q.    So, we have the one African-American student,

9  we have several Korean students, allegedly.

10  Incidentally, are you aware that Dr. Jackson's wife is

11  Korean?

12      A.    I knew that she was Asian.  I did not know,

13  specifically, that she is Korean.

14      Q.    And are you aware that he has two children who

15  are half Korean?

16      A.    No.

17      Q.    So, we have the several Korean students, we

18  have one African-American student, and we have Yiyi.

19  What other incidents?  You said a large number.

20      A.    I said "larger".

21      Q.    Okay.

22      A.    Not "large".

23      Q.    Okay.  So, are those all of the incidents that

24  you are aware of?

25      A.    Those are the ones that come to mind, and as is

1    this.

2        A.    No.

3        Q.    Okay.

4        A.    Well, I've read the journal and seen that they

5    cite each other.

6        Q.    Right.  But at the time that you put your name

7    to this, you did not have any evidence of illicit

8    collaboration, other than what you had been told by your

9    fellow graduate students?

10       A.    Everything I have is secondhand, so that is

11   probably an accurate characterization.

12       Q.    Okay.  Ewell -- were you aware that Ewell is

13   referred to in some of the pro-Ewell papers, that he's

14   cited?

15       A.    That's different.

16       Q.    How is that different?

17       A.    Because you're supposed to cite things that

18   have previously been published or previous keynotes,

19   whereas this specifically refers to unpublished

20   citations.

21       Q.    Okay.  So, it's not proper to cite forthcoming

22   works?

23       A.    It can be proper.

24       Q.    What circumstances -- under what circumstances

25   is it proper?

1        A.    For example, if Dr. Jackson had cited Ewell's

2    forthcoming article, that would have been proper.

3        Q.    So, it's proper to cite someone you disagree

4    with, but not someone you agree with, is that --

5        A.    No.  That's not what I'm saying.

6        Q.    Okay.  What are you saying here?

7        A.    I'm saying that you can site forthcoming

8    things, but the way it has been characterized to me by

9    other people who have spoken to me about this issue, is

10   that the people writing against Dr. Ewell share their

11   papers with each other, but not with perhaps, I would

12   guess, the people writing pro-Ewell responses.

13       Q.    And you believe that academics sharing their

14   papers with one another in advance of publication

15   constitutes illicit collaboration?

16            MR. BOHUSLAV:  Objection, asked and

17   answered.

18       A.    No.

19       Q.    (By Ms. Harris)  Okay.  This document also says

20   that Dr. Ewell was not notified about the forthcoming

21   symposium.

22       A.    Where does it say that?

23       Q.    "In stark contrast to this coordinated effort

24   by Dr. Jackson, et al, Dr. Ewell was neither notified

25   nor asked to respond."  It's under "illicit

1    collaboration".

2        A.    Yeah?  Do you have a question?

3        Q.    Well, I asked you, are you aware that it says

4    that Dr. Ewell was not notified?

5        A.    I'm aware now that I have it in front of me,

6    and I've read it.

7        Q.    Were you aware at the time that you signed your

8    name to it that it said that?

9        A.    I mean, I've read the document, but my eyes may

10   have skimmed over a couple of words.  I don't recall

11   reading that before now.

12       Q.    Okay.  Were you aware that Dr. Ewell was sent

13   the call for papers?

14       A.    Well, everybody was sent the call for papers on

15   the list serve.

16       Q.    Were you aware that Dr. Ewell was on the list

17   serve?

18       A.    Yes, but also the list serve goes to a lot of

19   people -- people's junk e-mail, so I didn't know whether

20   he received it.

21       Q.    So, when you endorsed this statement here that

22   Dr. Ewell was not notified, what you're saying was that

23   he was notified, but it may have gone to his junk mail?

24       A.    Or, like I said, I don't remember reading those

25   words.  I think, if I were to write the statement

1    myself, I may not have used that wording.

2        Q.    Okay.  This also says that Dr. Jackson has a,

3    quote, "history of racist, sexist and abusive behavior."

4    And that is -- let me find it for you.  Let me just pull

5    this up on my computer.  Okay.  So under -- on the page

6    that's labeled Kohanski 000109, under the heading

7    "Calling for Dr. Jackson's Dismissal," it says he should

8    be removed from the faculty, and it says that he has a

9    history of racist, sexist and abusive behaviors in his

10   many capacities.  So, what are his many capacities?

11       A.    I would assume, seeing as these are not my

12   personal testimonies in here, I would assume that the

13   capacities probably refer to him as a teacher, as an

14   advisor, and as somebody in whatever capacity he may be

15   in at the Journal of Schenkerian Studies.  That would be

16   my best guess.

17       Q.    What is an example of abusive behavior that Dr.

18   Jackson has exhibited?

19       A.    I would say telling a student to work for free.

20       Q.    And this, again, is something that you heard

21   secondhand?

22       A.    Yes.

23       Q.    Okay.  This document also accuses Dr. Jackson

24   of extortion.  Are you aware that extortion is a crime?

25       A.    I'm not really up to date with U.S. laws, as a

49

1  recent immigrant.

2  **Q.**  Okay.  Is it your position that Timothy Jackson

3  committed a crime?

4  **A.**  I don't know.  I'm not a lawyer.

5  **Q.**  Okay.  Do you agree that just -- you know, as a

6  recent immigrant, you are bound by the laws of the

7  United States?

8  **A.**  Yes.

9  **Q.**  Are you aware that falsely accusing someone of

10  a crime is defamation?

11  MR. BOHUSLAV:  Objection, calls for a

12  legal conclusion.

13  **A.**  Will you repeat the question, please?

14  **Q.**  (By Ms. Harris)  Are you aware that falsely

15  accusing someone of a crime is defamation?

16  MR. BOHUSLAV:  Objection, calls for a

17  legal opinion.

18  **A.**  I'm not aware of that.

19  **Q.**  (By Ms. Harris)  Okay.  Who did Dr. Jackson, in

20  your view, extort?

21  **A.**  Where does it say "extort" on here?

22  **Q.**  Under -- No. 3, under "Calling for Dr.

23  Jackson's Dismissal, extortion through grade

24  manipulation and threats to students' careers and

25  reputations."

50

1  **A.**  Could you repeat the question, please?

2  **Q.**  Who did Dr. Jackson allegedly extort?

3  **A.**  I believe that refers to Yiyi Gao.

4  **Q.**  Okay.  And how did he extort her?

5  **A.**  I've told you what I've heard secondhand.

6  That's the extent of my knowledge that I remember today.

7  **Q.**  So, you believe that -- you believe that he

8  asked her to work for free, and you believe that asking

9  someone to work for free is extortion?

10  **A.**  Well, the events as I heard them are that he

11  told her he'd dock her grades, if she did not.  That is

12  what I've heard.

13  **Q.**  And it says here that "he made threats to

14  someone's career and reputation."  What threats did he

15  make, allegedly, to someone's career and reputation?

16  **A.**  I don't recall what event that refers to.

17  **Q.**  Okay.  But your name is on this document.

18  **A.**  Yes.  And right now, I don't recall what that

19  referred to when we wrote this ten months ago.

20  **Q.**  Okay.  But you are on the record accusing Dr.

21  Jackson of extortion for reasons you don't remember at

22  this time.

23  **A.**  Well, I told you it was Yiyi Gao.  I believe

24  that's what that refers to.

25  MS. HARRIS:  Okay.  I would like now to

51

1  introduce another exhibit, and that is -- because we

2  have gone back to some exhibits, what number is this?

3  39?

4  COURT REPORTER:  38.

5  MS. HARRIS:  38.  Okay.

6  **Q.**  (By Ms. Harris)  So, this is a statement of

7  UNT's faculty on the Journal of Schenkerian Studies, and

8  I would just like to ask you a little bit about what you

9  know about this document.

10  Do you know whether this was completely

11  initiated by the faculty or whether anyone from GAMuT

12  approached members of the faculty about issuing a

13  statement of support for the graduate students?

14  **A.**  I don't have knowledge of that -- that I

15  recall, at least.

16  **Q.**  So, you were never personally involved in

17  asking any faculty to support the graduate student

18  statement?

19  **A.**  That's correct.

20  **Q.**  Okay.

21  **A.**  As far as I can remember.

22  MS. HARRIS:  Okay.  I have one more

23  exhibit that I would like to introduce here, and that is

24  this, which I guess will be Exhibit 39?  Is that right?

25  (DEPOSITION EXHIBIT 39 MARKED.)

52

1  **Q.**  (By Ms. Harris)  Do you recognize this Twitter

2  exchange?

3  **A.**  Yes.

4  **Q.**  Okay.  Who is Samantha Bassler?

5  **A.**  She is someone I know who is a music theorist.

6  **Q.**  Okay.  Now, here you say, "Jackson is a POS."

7  Can you explain to the Court what a POS is?

8  **A.**  "POS" stands for "piece of shit".

9  **Q.**  Okay.  And you said here that you've made it

10  your life's mission to never even meet him, let alone

11  take a class with him.  At what point did you decide

12  never to meet -- that it was your mission never to meet

13  Dr. Jackson?

14  **A.**  It was a slight overexaggeration, but probably

15  when -- upon visiting UNT, before enrolling here, I was

16  warned very strongly to never take a class with him and

17  never allow him to have any level of power over me

18  because I'm a woman.

19  **Q.**  Okay.  Do you remember who told you that?

20  **A.**  David Falterman.

21  **Q.**  And why?  Did he explain why?

22  **A.**  Because he had seen enough evidence of women

23  being mistreated and being victims of a bad power

24  dynamic that he wanted to warn me in advance to not put

25  myself in that situation.

*Rachel Gain    5/19/21*

57

1  correct?

2      A.   Yes.

3      Q.   Okay.  The petitions also refer to the past

4  bigoted behaviors of UNT faculty.

5      A.   Yes.

6      Q.   And you've testified today that you don't have

7  any firsthand knowledge of past bigoted behaviors by UNT

8  faculty.

9      A.   Yes.

10     Q.   Okay.  And this also referred to past racist

11  actions of Dr. Jackson, yes?

12     A.   Could you show me where in the document it says

13  that?

14     Q.   Sure.  It's under -- it is the July 27th

15  petition that's marked Exhibit 3 at the top.  Yeah.

16  That one.

17     A.   Okay.

18     Q.   Says, "Dr. Jackson's actions, both past and

19  present, are racist and unacceptable."  So, is it fair

20  to say that you don't have firsthand knowledge of any

21  past racist actions by Dr. Jackson?

22     A.   Well, seeing as I've never been in the same --

23  or I've never been in a conversation with him, that

24  would follow, yes.

25     Q.   Okay.  And in the July 30th version of the

---

*Rachel Gain    5/19/21*

58

1  statement, Dr. Jackson is accused of extortion, correct?

2      A.   Where is this?

3      Q.   It is on Kohanski 000109, No. 3 under "Calling

4  for Dr. Jackson's Dismissal.  Extortion through grade

5  manipulation and threats to students' careers and

6  reputations."

7      A.   It does say that.

8      Q.   Okay.  And is it fair to say that you have no

9  firsthand knowledge of any extortion by Dr. Jackson?

10     A.   Yes.  I wasn't in the country at the time.

11     Q.   Okay.  But you did sign your name to a

12  statement asking that Dr. Jackson be fired for all of

13  these reasons, yes?

14     A.   Where does it say that he should be fired?

15     Q.   "Calling for Dr. Jackson's Dismissal.  Dr.

16  Jackson should be removed from the UNT faculty."

17     A.   Yes.  I signed a statement saying that it was

18  our opinion that he should be fired.

19     Q.   Okay.

20     A.   Or dismissed, in the words of the statement.

21     Q.   Okay.  And other than his article in the

22  journal, which you have said you've read, would it be

23  fair to say that you called for his termination with no

24  firsthand knowledge of any of the behaviors specified in

25  this petition?

---

*Rachel Gain    5/19/21*

59

1      A.   Yes.

2           MS. HARRIS:  Okay.  Thanks.  That's all.

3           THE WITNESS:  Okay.  Thank you.

4           MS. HARRIS:  Do you have any --

5           MR. BOHUSLAV:  No.  We'll reserve

6  questions for time of trial.

7           (DEPOSITION ADJOURNED AT 2:49 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

*Rachel Gain    5/19/21*

60

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS

2                    SHERMAN DIVISION

3  TIMOTHY JACKSON,            )
                               )

4      Plaintiff,              )
                               )  Case No.

5  v.                          )
                               )  4:21-cv-00033-ALM

6  LAURA WRIGHT, et al,        )
                               )

7      Defendants.             )

8

9      -----------------------------------

10          DEPOSITION CERTIFICATE

11               RACHEL GAIN

12             MAY 19, 2021

13     -----------------------------------

14

15          I, Nita G. Cullen, Certified Shorthand

16  Reporter in and for the State of Texas, hereby certify

17  to the following:

18          That the witness, RACHEL GAIN, was duly sworn

19  by the officer and that the transcript of the oral

20  deposition is a true record of the testimony given by the

21  witness;

22          I further certify that pursuant to FRCP Rule

23  30(f)(1) that the signature of the deponent:

24      ____ was requested by the deponent or a

25  party before the completion of the deposition and is to

---

Rachel Gain    5/19/21

61

1  be returned within 30 days from date of receipt of the
2  transcript.  If returned, the attached Changes and
3  Signature Page contains any changes and the reasons
4  therefor;
5          X  was not requested by the deponent or a
6  party before the completion of the deposition.
7          I further certify that I am neither attorney or
8  counsel for, nor related to or employed by, any of the
9  parties or attorneys to the action in which this
10 deposition was taken.
11         Further, I am not a relative or employee of any
12 attorney of record in this case, nor am I financially
13 interested in the outcome of the action.
14          Subscribed and sworn to on this 15th day of
15 June, 2021.
16
17 _____

        NITA G. CULLEN, Texas CSR #1563
18      Expiration Date:  08-31-2022
        JULIA WHALEY & ASSOCIATES
19      Firm Registration No. 436
          2012 Vista Crest Drive
20      Carrollton, Texas 75007-1640
        214.668.5578
21
22
23
24
25

APPX.052

*John Toaru Ishiyama, Ph.D.    9/27/24    1*

```
 1              UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF
 2                  SHERMAN DIVISION

 3   TIMOTHY JACKSON,               )
                                    )
 4        Plaintiff,                )
                                    )
 5   vs.                            ) CASE NO. 4:21-CV-00033-ALM
                                    )
 6   LAURA WRIGHT, et al.,          )
                                    )
 7        Defendants.               )
 8   **************************************************
 9         VIDEOTAPED ZOOM ORAL DEPOSITION OF
10             JOHN TOARU ISHIYAMA, Ph.D.
11                September 27, 2024
12               (Reported Remotely)
13   **************************************************
14        VIDEOTAPED ORAL DEPOSITION OF JOHN TOARU ISHIYAMA,
15   Ph.D., produced as a witness at the instance of the
16   Plaintiff and duly sworn, was taken in the above-styled
17   and -numbered cause on the 27th day of September, 2024,
18   from 9:13 a.m. to 12:35 p.m., before Kim D. Carrell,
19   Certified Shorthand Reporter in and for the State of
20   Texas, reported remotely by computerized stenotype
21   machine at the University of North Texas System,
22   801 North Texas Boulevard, Gateway Suite #308, Denton,
23   Texas, pursuant to the Federal Rules of Civil Procedure
24   and the provisions stated on the record or attached
25   hereto.
```

*John Toaru Ishiyama, Ph.D.    9/27/24    2*

```
 1                  APPEARANCES

 2   FOR THE PLAINTIFF:

 3     Mr. Michael Thad Allen
       ALLEN LAW, LLC
 4     P.O. Box 404
       Quaker Hill, CT 06375
 5     Telephone: 860.772.4738 - Fax: 860.469.2783
       E-mail: m.allen@allen-lawfirm.com
 6
 7   FOR THE DEFENDANTS:

 8     Ms. Mary Quimby
       Assistant Attorney General
 9     General Litigation Division
       P.O. Box 12548, Capital Station
10     Austin, Texas 78711
       Telephone: 512.463.2120 - Fax: 512.320.0667
11     E-mail: Mary.Quimby@oag.texas.gov

12        - and -

13     Mr. Renaldo Stowers  (Appearing Live)
       University of North Texas System
14     Office of General Counsel
       801 North Texas Boulevard
15     Denton, Texas 76201
       Telephone: 940.565.2717 - Fax: 940.369.7026
16     E-mail: Renaldo.Stowers@untsystem.edu

17
18   ALSO PRESENT:  Jason Warner, Videographer
                    lvg.dallas@gmail.com
19
20
21
22
23
24
25
```

*John Toaru Ishiyama, Ph.D.    9/27/24    3*

```
 1                   I N D E X
                                              PAGE
 2
     Appearances............................    2
 3
     Stipulations...........................    5
 4
     JOHN TOARU ISHIYAMA, Ph.D.
 5
        Direct Examination by Mr. Allen........   6
 6
 7   Corrections and Changes.................. 129

 8   Reporter's Certificate................... 131

 9
                    EXHIBITS
10
     NUMBER        DESCRIPTION          MARKED
11
     Exhibit 1   Re-Notice of Taking Deposition........   7
12
     Exhibit 2   Email Chain Ending 8-3-20, Cowley to
13               Ishiyama, Request to Serve on Ad Hoc
                 Review Panel
14               (UNT 002453 - 002454)................  20

15   Exhibit 3   Ad Hoc Review Panel Report (Exhibit D)
                 (JACKSON000208 - 000233).............  23
16
     Exhibit 4   COPE Guidelines: A Short Guide to
17               Ethical Editing for New Editors
                 (UNT 003303 - 003314)................  34
18
     Exhibit 5   Theoria Title Page, List of Articles,
19               Directions to Contributors, Volume
                 26-2020..............................  43
20
     Exhibit 6   Emails ending 10-14-20, Ishiyama to
21               Jackson, et al. RE: Talk With UNT Ad
                 Hoc Journal Review Panel
22               (UNT 002634 - 002635)................  50

23   Exhibit 7   Handwritten Notes, 9-16-20, Ad Hoc
                 Journal Review Committee.............  63
24
     Exhibit 8   Potential Questions for Benjamin Brand
25               Chair of the Division of History,
                 Theory & Ethnomusicology.............  68
```

*John Toaru Ishiyama, Ph.D.    9/27/24    4*

```
 1
 2   Exhibit 9    PLoS Medicine Article, What Should
                  Be Done to Tackle Ghostwriting in
 3                the Medical Literature............. 71

 4   Exhibit 10   Walls Facebook Post
                  (JACKSON 000234 - 000236).......... 81
 5
 6   Exhibit 11   Email Chain ending 9-30-20, Walls
                  to Ishiyama
                  (UNT 002533)...................... 83
 7
 8   Exhibit 12   Jackson Materials for the
                  Committee
                  (UNT 002645 - 002782)............. 99
 9
10   Exhibit 13   Email, 10-2-20, Ishiyama to
                  TitleIX, et al. Reporting on an
                  Incident
11                (UNT 003435)......................117
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

112

1    A.    Yes, I see it.

2    Q.    And here, it says, "He" -- meaning Philip Ewell

3    -- "was not afforded the opportunity to respond

4    in print."

5        Did I read that correctly?

6    A.    Yes.

7    Q.    And so I'm flipping back over to our

8    Exhibit 12, the call for papers.  Isn't that a false

9    statement if Philip Ewell received the call for papers?

10    Was there anything about that, that didn't invite him to

11    respond?

12        MS. QUIMBY:  Objection, form.

13    A.    I don't believe so.  Because generally, when

14    you have a response or rejoinder, the off-beat person is

15    directly invited by the editor, not in the general call

16    to the society.

17    Q.    So you're saying it was not best practice to do

18    it that way, right?

19        MS. QUIMBY:  Objection, form.

20    A.    I didn't hear the question.  Could you repeat

21    that?  You broke up.

22    Q.    Yeah, sorry.  I'm just trying to summarize.

23    Your testimony is that it was not best practice to send

24    out a call for papers rather than a direct invitation?

25        MS. QUIMBY:  Objection, form.

113

1    A.    We did not say that one substituted for the

2    other.  But generally, what we had said is the invitation

3    should go to the author, and there should be author

4    specific an opportunity for a rejoinder.

5    Q.    Okay.  And -- but it's not true, what the

6    faculty statement says, that Philip Ewell was not

7    afforded an opportunity to respond in print, was it?

8        MS. QUIMBY:  Objection, form.

9    A.    I can't testify to that.  But I think they

10    meant he was not directly contacted by the editor.

11    Q.    But they didn't write that in their faculty

12    statement that you attached as an exhibit to the Ad Hoc

13    Panel Report, did they?

14        MS. QUIMBY:  Objection, form.

15    A.    I cannot surmise that -- what their intention

16    was and how they expressed it, but...

17    Q.    I'm not asking about that.  I'm asking about

18    them not writing that -- the statement is very factual

19    and clearcut.

20        They write in Exhibit 3 in the UNT faculty

21    statement, "The fact that he was not afforded the

22    opportunity to respond."

23        Right?  They say, "He was not afforded the

24    opportunity to respond," right?

25    A.    Yes.

114

1        MS. QUIMBY:  Objection, form.

2    Q.    That's not qualified by saying he was not

3    offered the opportunity to respond in print by engraved

4    invitation, by direct solicitation, by direct invitation.

5    It doesn't have anything to do -- it doesn't say anything

6    about that, does it?

7        MS. QUIMBY:  Objection, form.

8    A.    Well, apparently, it doesn't.  But I -- again,

9    best practice would be that the editor directly invites

10    the person who's going to author the rejoinder.  And that

11    a general call to the society is really not -- it's a

12    poor substitute.

13    Q.    Okay.  And you knew from your interviews and

14    perusal of the records given to you by Timothy Jackson

15    that the Journal had nothing against inviting Professor

16    Ewell to respond to Volume 12, right?

17        MS. QUIMBY:  Objection, form.

18    A.    Had nothing against it.  I think we did find

19    actually that they did not invite directly Professor

20    Ewell.

21    Q.    Do you remember discussing that they had

22    entertained the possibility of inviting Professor Ewell

23    to contribute to the next volume, so that he could

24    address the responses?

25        MS. QUIMBY:  Objection, form.

115

1    A.    I recall in our interviews, Professor Slottow

2    had mentioned that.  Yes, I do remember that.

3    Q.    Okay, okay.  I'm going to pull these down

4    for a sec.

5        Just one more thing, if you don't mind.  I

6    know it's past 12:00.  But I believe I can get to one

7    last thing, Professor Ishiyama, and we will be done.  Do

8    you mind -- do you mind going forward with that, or do

9    you want a break?

10    A.    No, we can -- we can go forward with it.

11    MR. ALLEN:  Okay.  I'm going to mark for

12    the record Exhibit 13.

13        (Deposition Exhibit Number 13 marked.)

14    Q.    And I'm going to plop it in the chat as well.

15    Now, I've got to get my share thing going on.

16        This is an email from UNT's records disclosed

17    to us, I believe, from your file.

18    A.    Um-hum.

19    Q.    Given the page number, UNT 3435.

20    A.    Yes.

21    Q.    And do you remember drafting this email,

22    Professor Ishiyama?

23    A.    Yes.

24    Q.    What was the purpose of this email?

25    A.    Professor Bakulina, in an unsolicited way, had

*John Toaru Ishiyama, Ph.D.   9/27/24*

128

1    MR. ALLEN:  Okay.  I'm going to pass the

2  witness, Mary.

3    MS. QUIMBY:  I'll reserve my questions

4  for trial.

5    MR. ALLEN:  Thank you, Professor

6  Ishiyama.

7    (No deletions.)

8    THE VIDEOGRAPHER:  Off the record at

9  12:35.

10    (Proceedings concluded at 12:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

*John Toaru Ishiyama, Ph.D.   9/27/24*

130

1

2

3    I, JOHN TOARU ISHIYAMA, Ph.D., have read the

4  foregoing deposition and hereby affix my signature that

5  same is true and correct, except as noted above.

6

7

8    _____

     JOHN TOARU ISHIYAMA, Ph.D.

9

10  THE STATE OF _____)

11  COUNTY OF _____)

12    Before me, _____, on this day

13  personally appeared JOHN TOARU ISHIYAMA, Ph.D., known to
    me or proved to me on the oath of _____

14  or through _____ (description of
    identity card or other document) to be the person whose

15  name is subscribed to the foregoing instrument and
    acknowledged to me that he/she executed the same for the

16  purpose and consideration therein expressed.

17    Given under my hand and seal of office on this

18  _____ day of _____, _____.

19

20    _____
      NOTARY PUBLIC IN AND FOR

21    THE STATE OF _____

22  My Commission Expires: _____

23

24

25

---

*John Toaru Ishiyama, Ph.D.   9/27/24*

129

1    CHANGES AND SIGNATURE

2  WITNESS: JOHN TOARU ISHIYAMA, Ph.D.

3  DATE:  SEPTEMBER 27, 2024

4  PAGE/LINE    CHANGE    REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

---

*John Toaru Ishiyama, Ph.D.   9/27/24*

131

1    UNITED STATES DISTRICT COURT

     FOR THE EASTERN DISTRICT OF

2    SHERMAN DIVISION

3  TIMOTHY JACKSON,         )
                           )

4    Plaintiff,        )
                           )

5  vs.              ) CASE NO. 4:21-CV-00033-ALM
                           )

6  LAURA WRIGHT, et al.,    )
                           )

7    Defendants.         )

8    _____

9    REPORTER'S CERTIFICATION OF

10    ORAL DEPOSITION OF JOHN TOARU ISHIYAMA, Ph.D.

11    September 27, 2024

12    _____

13    I, KIM D. CARRELL, a Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16    That the witness, JOHN TOARU ISHIYAMA, Ph.D., was

17  duly sworn and that the transcript of the oral deposition

18  is a true record of the testimony given by the witness;

19    That the deposition transcript was duly submitted

20  on October 28, 2024, to Ms. Mary Quimby, for examination,

21  signature, and return to me by November 27, 2024;

22    That pursuant to the information given to the

23  deposition officer at the time said testimony was taken,

24  the following includes all parties of record and the

25  amount of time used by each party at the time of the

---

*John Ibaru Ishiyama, Ph.D.  5/21/24*

132

1   deposition;
2        Mr. Michael Thad Allen - 02 HRS: 47 MIN
              Attorney for the Plaintiff
3
         Ms. Mary Quimby -  00 HRS: 00 MIN
4             Attorney for the Defendants

5        I further certify that I am neither counsel for,
6   related to, nor employed by any of the parties or
7   attorneys in the action in which this proceeding was
8   taken, and further that I am not financially or
9   otherwise interested in the outcome of the action.
10       Certified to by me on this 28th day of October,
11  2024.
12
13

14                  _____
                    Kim D. Carrell, CSR NO. 1184
                    Date of Expiration: 7-31-26
15
                    JULIA WHALEY & ASSOCIATES, INC.
16                  2012 Vista Crest Drive
                    Carrollton, Texas  75007-1640
17                  214-668-5578/Fax 972-236-6666
                    Firm Registration No. 436
18                  Certification Expires 10-31-26
                    Notary Comm. Expires 12-1-25
19
20
21
22
23
24
25

APPX 056

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. |
| VS. | § | |
| | § | 4:21-cv-00033-ALM |
| LAURA WRIGHT, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY JACKSON, Ph.D.

SEPTEMBER 24, 2024

*********************************************


          The Oral and Videotaped Deposition of

TIMOTHY JACKSON, Ph.D., produced as a witness at the

instance of the defendants, and duly sworn, was taken in

the above-styled and numbered cause on SEPTEMBER 24,

2024, from 9:07 a.m. to 6:22 p.m., before Nicole A.

Hatler, CSR No. 11275 in and for the State of Texas,

reported by machine shorthand, at the University of

North Texas System, 801 North Texas Blvd, Gateway Suite

308, Denton, TX 76201.


                    ---oOo---

191

1    Q. And were you teaching a two plus two?
2    A. Yes.
3    Q. Because of the one course remission?
4    A. Yes.
5    Q. And then after the rest of your colleagues in
6  theory were reduced to a two plus two, what was your
7  teaching load then?
8    A. It was still two plus two.
9    Q. And that was in 2018?
10    A. I think so. Well, yeah, I know it was two plus
11  two, but I wanted to get another course remission
12  because I was still doing my work on the journal and I
13  felt that was right, but I didn't get that.
14    Q. Did you discuss that with Dr. Brand?
15    A. No.
16    Q. Why not?
17    A. I really can't tell you why I didn't do it, but
18  I didn't.
19    Q. So have you been teaching --
20    A. It wasn't -- can I -- I'm sorry. It wasn't --
21  in other words, it wasn't that long that I was teaching
22  more than I should have been. It was only like maybe
23  two semesters.
24    Q. Since 2018, have you been teaching a two plus
25  two course load?

192

1    A. Yes. And then for those -- before the journal
2  was -- or before I was canceled, I was managing the
3  journal and teaching two plus two. So I was doing
4  both/and.
5    Q. And is that -- going back to roughly 2008 or '9
6  when you first received a one-course remission, is it
7  your recollection that since that time, you were
8  teaching a two plus two course load?
9         Is that your recollection?
10    A. Oh, yeah, yeah.
11    Q. Okay.
12    A. Not only is it my recollection. It's a fact.
13    Q. Okay. All right.
14       MR. WALTON: I think we've been going
15  almost an hour. I'm about to shift gears, so why don't
16  we just take a quick break here?
17       MR. ALLEN: It's exactly on the button
18  3:00.
19       THE VIDEOGRAPHER: We're off the record at
20  3:00 p.m.
21    (A recess was held from 3:00 p.m. at 3:11 p.m.)
22       THE VIDEOGRAPHER: We're back on the record
23  at 3:00 p.m.
24    Q. BY MR. WALTON: Dr. Jackson --
25    A. Could I clarify my last response a little bit

193

1  to your last question?
2    Q. You know, for sake of time, your attorney will
3  certainly have an opportunity to ask you questions after
4  I'm through.
5    A. Okay. Sure.
6    Q. But since I'm already a little bit behind my
7  own schedule --
8    A. Okay. Go ahead. Go ahead.
9    Q. -- I want to make sure we'll get through it as
10  efficiently as possible.
11    A. Yeah.
12    Q. But rest assured, your attorney will have
13  whatever opportunity that he --
14    A. Well, it's not him so much as me.
15    Q. And -- but I wanted to just ask you a few
16  questions now about volume 12 --
17    A. Right.
18    Q. -- of JSS.
19       Whose -- whose idea -- or how did the idea
20  for the symposium originate?
21    A. So it actually came from my student, Ravi
22  Walls, actually.
23    Q. And why do you say that?
24    A. Because he suggested it --
25    Q. How so?

194

1    A. -- and I thought about it, and I thought it was
2  a good idea.
3       Because we were communicating back and
4  forth about the symposium -- I mean about the plenary
5  speeches. He asked me if I had heard about the speech
6  by Ewell because he knew that I was a Schenkerian
7  scholar, and he asked me if -- what I thought of it.
8  And I said I had to look at it, watch the speech, and
9  then I would respond.
10       And so, I did, and then he and I, kind of,
11  tossed some ideas and he -- about symposium talking
12  about getting different people to respond. First, the
13  idea was different than what happened.
14    Q. The -- the initial idea where he first proposed
15  it, was that an oral conversation or in writing?
16    A. Both written and oral.
17    Q. Do you recall which came first?
18    A. No.
19    Q. Okay.
20    A. But probably written.
21    Q. Okay. And how did that idea -- well, how did
22  it start, and how did it end up with what the symposium
23  was?
24    A. Well, the initial concept was for me to contact
25  Schenkerian scholars and get their input, but the more I

195

1 thought about it, the more I thought that in the -- in
2 the speaking of -- in the spirit of dialectics, which I
3 consider essential for all serious scholarship, there
4 should be pros and cons.
5         So I thought that it wasn't be great if I
6 just contacted the cons, but that we would send out a
7 general call for contributions to the symposium, and
8 that would enable people who were in favor of Ewell's
9 talk and his points and his point of view, and that we
10 would publish both without censorship and let the public
11 decide. Because I'm of the view more speech is better
12 is the way to get to the truth, not censoring people.
13       Q. And how was it determined whether those
14 responses would or would not be peer reviewed?
15       A. Well, we -- we weren't -- you see, we were
16 asking for people to respond in a sense of not writing
17 an article about it -- not writing a peer reviewed
18 article about it, but just expressing their opinions
19 about Ewell's thesis because it was really quite
20 controversial, and that was the spirit of the call.
21       Q. I see.
22         Do you recall having any conversations with
23 Mr. Walls about whether these responses would be peer
24 reviewed?
25       A. No.

196

1       Q. Okay. Do you recall Dr. Slottow ever
2 mentioning the idea of peer reviewing them?
3       A. No.
4       Q. Who -- when you refer to the call, are you
5 referring to the written call for submissions that was
6 sent out through the SMT list serve?
7       A. Yes.
8       Q. Who drafted that call?
9       A. Not me. It was drafted I think by other
10 people. Probably by Ben Graf and Levy Walls, and
11 maybe -- we had input in it. We -- we they began with
12 the draft, and then Dr. Slottow and I gave our two cents
13 worth. I don't believe they took all of our
14 suggestions, but they basically sent it out having
15 absorbed some thoughts from us and from other faculty,
16 actually.
17         I -- I wanted to -- because I knew this
18 would be controversial, although I never had any inkling
19 of how controversy it would be, I wanted to consult all
20 the faculty in the music theory area who had any
21 experience with Schenkerian analysis. And so I asked
22 Diego Cubero and Olga, who calls herself Ellen,
23 Velikanova for their input. And also we asked some
24 other people in the faculty for their input into the
25 call and how to frame it so that it would be as neutral

197

1 but also -- yeah, as neutral and properly focused as
2 possible. So that it would attract pros and cons.
3       Q. Do you recall any specific edits or suggestions
4 that you suggested that call that were not incorporated?
5       A. I think there was a few, but you know what? I
6 wasn't going to quibble about it.
7       Q. Do you recall what they were?
8       A. No.
9       Q. Okay.
10       A. We just -- I just -- I remember saying to
11 myself, well, maybe this isn't quite what we should do,
12 but let's let it go. Let -- let -- let the chips fall
13 where they may.
14       Q. Had you discussed the idea of publishing
15 responses to Ewell's address with any Schenkerian
16 scholars before that call went out?
17       A. Yes.
18       Q. Who had you discussed it with?
19       A. Oh, a whole bunch of people. A whole group of
20 scholars.
21       Q. And was that through one-on-one contact with
22 them --
23       A. Yes.
24       Q. -- or was it through a group communication?
25       A. No, it was through one-on-one.

198

1       Q. And did --
2       A. And, you see, what happened was that -- that
3 was the initial plan, was to, in fact, ask the
4 Schenkerian scholars what they thought. And then I --
5 in the course of doing that, I recognized that that was
6 unfair. I thought that was unfair. So that's when I
7 felt that we should really branch out and -- and issue
8 the call through the SMT for all sundry to respond.
9       Q. Before the SMT call went out, had you discussed
10 this idea of responses with anyone who was sympathetic?
11       A. I don't know who was sympathetic exactly,
12 really. I didn't have any idea, and I still don't
13 because not all the Schenkerians that I contacted wanted
14 to submit responses. So some of them may well be
15 sympathetic.
16       Q. You just don't know?
17       A. I can guess a few of them, but I'm not sure.
18 But they declined.
19       Q. So you don't know what their response would
20 have been had they agreed to write one?
21       A. I'm not a prophet. No.
22       Q. All right.
23       A. But once we decided to go with the call, I felt
24 very comfortable about the whole thing because I thought
25 it was fair. In other words, I thought that once we had

203

1 well.

2 Q. Who did you send it to?

3 A. So I sent it to professor Aton Agmine, who is a

4 very distinguished Schenkerian at Kharline University

5 [phonetic] in Israel. And I sent it to one other

6 person. I'm trying to think who it was. I can't

7 remember right now. And I also got detailed feedback.

8 So from those two scholars, I did. Yeah.

9 Q. Was any of that feedback what you regarded as

10 critical?

11 A. Yes.

12 Q. And how did you respond to their critical

13 feedback?

14 A. So none of it was critical insofar as my

15 critique of Ewell, but some of it was more like, you

16 need to change this or fix that, or there were little

17 mistakes and things in my -- in my paper -- in my

18 response which needed correcting.

19     So they, very kindly, went through

20 carefully with a fine tooth comb -- tooth comb and

21 corrected all those things. And we did -- they did talk

22 about my -- my paper, but nobody ever said anything

23 about it being racist. There was never any indication

24 that these readers thought it was racist.

25 Q. Was there ever any suggestion or request made

204

1 to provide additional citations or sources?

2 A. Nope. It wasn't a scholarly paper in the same

3 sense that a journal article would be.

4 Q. Who -- who came up with the idea of calling it

5 a symposium?

6 A. I think it was a joint idea because it was

7 based on Plato's symposium. I don't know if you're

8 aware of that, but there's a famous dialogue -- well,

9 it's more than a dialogue about Love by Plato, which is

10 called the symposium.

11 Q. Are you familiar with how the word "symposium"

12 is used within modern academia?

13 A. Yes. To a certain degree, but -- but --

14 Q. And what is your --

15 A. -- I felt that the -- the title that we came up

16 was more in the spirit of Plato's symposium --

17 Q. I see.

18 A. -- where -- where you have different points of

19 view. You see, that -- that's what the whole purpose of

20 Plato's dialogues really is, is that you have different

21 speakers and each speaker comes to the symposium with a

22 different idea of what love is. And so, they're all

23 fighting among themselves and arguing among themselves.

24 So that was the reason for the title.

25 Q. And in your opinion, did the word "symposium"

205

1 communicate whether the submissions were or were not

2 peer reviewed?

3 A. No. That was never an issue because, as I

4 think I've said several times already, that the whole

5 point of it was not to write articles that would be peer

6 reviewed, but to solicit reactions to a very

7 controversial paper and very controversial thesis. That

8 was the point, not to write scholarly articles that need

9 to be peer reviewed.

10 Q. Who decided to accept or publish the anonymous

11 submission?

12 A. We all did. I mean, nobody objected.

13 Q. Who received that submission?

14 A. I did.

15 Q. Was it made by a student?

16 A. It was made by somebody who just finished.

17 Q. Were they yet on faculty at an institution?

18 A. No. And that was the reason that they wanted

19 to remain anonymous, was because they were very worried

20 that, if they were identified, they would never find a

21 job.

22 Q. Other than the call through the SMT list serve,

23 did you have any communications with Phillip Ewell

24 regarding the intention to publish responses in a

25 symposium?

206

1 A. No.

2 Q. Why did you not reach out to Phillip Ewell

3 individually or personally?

4 A. I didn't feel that that was my responsibility.

5 Q. The author of the anonymous piece, what was

6 that individual's reputation in the music theory

7 community as you understood it to exist at the time?

8 A. Who, the person who want anonymity?

9 Q. That's right.

10 A. Well, he had just finished his doctoral

11 dissertation and was hooking for jobs, so that was

12 his -- he was the most junior person who responded to

13 this, in other words, by a long shot. Because almost

14 all the other people were either assistant professors or

15 associate professors or full professors. He was the

16 only person who responded and who wanted to respond who

17 did not have a job.

18 Q. Are you aware of any scholarly publications

19 that that individual had previously published?

20 A. I'm trying to think. Right now, I can't think

21 of any.

22 Q. That's fine.

23 A. He was fresh out of graduate school.

24 Q. As you sit here today, is there anything about

25 the publication process for the symposium that you would

295

1    I, TIMOTHY JACKSON, Ph.D., have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6    _____
     TIMOTHY JACKSON, Ph.D.
7
8    THE STATE OF _____)
9    COUNTY OF _____)
10        Before me _____ on this day
11   personally appeared TIMOTHY JACKSON, Ph.D., known to me
12   (or proved to me under the oath or through
13   _____) (description of identity card or
14   other document) to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
16   to me that they executed the same for the purposes and
17   consideration therein expressed.
18        Given under my hand and seal of office this
19   _____ day of _____, 2024.
20
21
22   _____
     NOTARY PUBLIC IN AND FOR
23
24   THE STATE OF _____
25

296

1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF TEXAS
3           SHERMAN DIVISION
     TIMOTHY JACKSON,      §
4                          §
        Plaintiff,         §
5                          § Civil Action No.
        VS.                §
6                          § 4:21-cv-00033-ALM
     LAURA WRIGHT, et al., §
7                          §
        Defendants.        §
8                          §
9
10        REPORTER'S CERTIFICATION
11        ORAL AND VIDEOTAPED
12   DEPOSITION OF TIMOTHY JACKSON, Ph.D.
13        SEPTEMBER 24, 2024
14
15        I, Nicole A. Hatler, Certified Shorthand
16   Reporter No. 11275 in and for the State of Texas, hereby
17   certify to the following:
18        That the witness, TIMOTHY JACKSON, Ph.D., was
19   duly sworn by the officer and that the transcript of the
20   oral deposition is a true record of the testimony given
21   by the witness;
22        That the original deposition transcript was
23   delivered to October 17, 2024;
24        That the copy of this certificate was served
25   on all parties and/or the witness shown herein on

297

1    November 16, 2024;
2        I further certify that pursuant to FRCP Rule
3    30(f)(1) that the signature of the deponent:
4        __X__ was requested by the deponent or a part
5    before the completion of the deposition and that the
6    signature is to be before any notary public and returned
7    within 30 days from the date of receipt of the
8    transcript. If returned, the attached Changes and
9    Signature Page contains any changes and the reasons
10   therefore:
11        _____ was not requested by the deponent or a
12   part before the completion of the deposition.
13        I further certify I am neither counsel for,
14   related to, nor employed by any of the parties or
15   attorneys in the action in which this proceeding was
16   taken, and further that I am not financially or
17   otherwise interested in the outcome of the action.
18        Certified to by me this 17th day of OCTOBER,
19   2024.
20
21
22   _____
23   Nicole A. Hatler, Texas CSR 11275
     Expiration Date: 11/30/24
24   Integrity Legal Support Solutions
     9901 Brodie Ln., #160-400
     Austin, TX 78748
25   (512) 320-8609
     www.integritylegal.support

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE EASTERN DISTRICT OF TEXAS
                         SHERMAN DIVISION
 3  TIMOTHY JACKSON,          )
 4          Plaintiff,        )
                              )
 5  v.                        )  CASE NO.
                              )  4:21-cv-00033-ALM
 6  LAURA WRIGHT, et al,      )
                              )
 7          Defendants.       )
                              )
 8
 9
10       ------------------------------------
11                  ORAL DEPOSITION OF
12               PETER MICHAEL KOHANSKI
13                    MAY 18, 2021
14       ------------------------------------
15
16
17       ORAL DEPOSITION OF PETER MICHAEL KOHANSKI, produced
18  as a witness at the instance of the Plaintiff, and duly
19  sworn, was taken in the above-styled and numbered cause
20  on May 18, 2021, from 9:07 a.m. to 11:29 a.m., before
21  Nita G. Cullen, CSR in and for the State of Texas,
22  reported by machine shorthand, at the Law Offices of
23  Cutler Smith, 12750 Merit Drive, Suite 1450, in the City
24  of Dallas, County of Dallas, State of Texas, pursuant to
25  the Federal Rules of Civil Procedure.
```

```
 1                        INDEX
 2                                                  PAGE
 3  Appearances.......................................... 2
 4  Stipulations......................................... 4
 5  PETER MICHAEL KOHANSKI
 6      Examination by Mr. Allen......................... 4
 7
 8  Reporter's Certificate...............................95
 9
10
11                      EXHIBITS
12  NO.  DESCRIPTION                                    PAGE
13  Exhibit  1   Subpoena for Peter Kohanski............ 8
14  Exhibit  2   E-mail to Timothy Jackson from the
                 president of GAMuT, July 29, 2020......18
15  Exhibit  3   Exhibit 3...............................72
16
17
18
19
20
21
22
23
24
25
```

```
 1              A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4      MR. MICHAEL THAD ALLEN
        MS. SAMANTHA HARRIS
 5      ALLEN LAW, LLC
        P.O. Box 404
 6      Quaker Hill, Connecticut 06375
        860.772.4738
 7      860.469.2783 Fax
        m.allen@allen-lawfirm.com
 8
 9  FOR THE DEFENDANTS:
10      MR. MATT BOHUSLAV
        ASSISTANT ATTORNEY GENERAL
11      GENERAL LITIGATION DIVISION
        ATTORNEY GENERAL OF TEXAS
12      P.O. Box 12548, Capitol Station
        Austin, Texas 78711
13      matthew.bohuslav@oag.texas.gov
14  AND
15      MR. RENALDO STOWERS
        SENIOR ASSOCIATE GENERAL COUNSEL
16      UNIVERSITY OF NORTH TEXAS SYSTEM
        OFFICE OF GENERAL COUNSEL
17      1155 Union Circle
        Denton, Texas 76203
18      940.565.2717
        renaldo.stowers@untsystem.edu
19
20  ALSO PRESENT:
21      MR. TIMOTHY JACKSON
22
23
24
25
```

 1              P R O C E E D I N G S
 2          PETER MICHAEL KOHANSKI,
 3  having been first duly sworn, testified as follows:
 4                   EXAMINATION
 5  BY MR. ALLEN:
 6      Q.  Good morning, Mr. Kohanski.  As you know, this
 7  is a deposition.  I'm just going to ask you a few
 8  questions to get started and discuss sort of some ground
 9  rules, if you will.  Could you --
10          MR. ALLEN:  Did you get his full name?
11          COURT REPORTER:  Yes.
12      Q.  (By Mr. Allen)  Okay.  This is an extension of
13  the Court.  It's a very formal conversation.  There will
14  be times at which counsel may object.  Can I ask you if
15  you're represented by counsel today?
16      A.  Yes.
17      Q.  Who is your attorney?
18      A.  Matt.
19          MR. ALLEN:  So, Matt, when we -- if I
20  could, when we discussed this, you said you were not
21  representing the witnesses.  Mr. Kohanski's not a party,
22  but the State has stepped in to represent them?
23          MR. BOHUSLAV:  Yes.
24          MR. ALLEN:  Okay.  Thank you.
25      Q.  (By Mr. Allen)  So, he -- your counsel -- Mr.

21

1    Q.    Do you know more or less the time frame?

2    A.    The end of July 2020.

3    Q.    And who called the Zoom meeting?

4    A.    I don't remember.

5    Q.    Do you have any position of authority among the

6    graduate students?

7    A.    I did.

8    Q.    And could you describe that position for us?

9    A.    At the time, I was president of the graduate

10   association of musicologists and theorists.

11   Q.    Could you describe the duties and obligations

12   of that position?

13   A.    Basically, the day-to-day running of that

14   association: conference planning, financials, running

15   meetings.

16   Q.    What kind of meetings?

17   A.    Normal business meetings that we have

18   throughout the year.

19   Q.    What do these meetings accomplish?

20   A.    Professional development.

21   Q.    Are you responsible for any diversity, equity

22   and inclusion training?

23   A.    Can you define "responsible"?  What do you mean

24   by that?

25   Q.    You said that these meetings take place that

22

1    handle administrative things associated with the

2    graduate program from the graduate student level.  Is

3    that a correct -- is that a correct summary of what you

4    just told me?

5    A.    No.

6    Q.    Could you describe again for me, because I'm

7    confused, honestly.  Could you describe again for me

8    what this committee -- I'm referring to the committee --

9    can you state the name of the committee again?

10   A.    The graduate association of musicologists and

11   theorists.

12   Q.    So will it be clear if I just refer to that as

13   the graduate association, is that fair?

14   A.    You can call it GAMuT.

15   Q.    GAMuT?  Is that G-A-M-U-T?

16   A.    Yeah.

17   Q.    So, GAMuT, could you describe again for me what

18   GAMuT does?

19   A.    It's for professional development and social

20   things and -- yeah.

21   Q.    When you say, "social things," what does that

22   mean?

23   A.    It means sometimes after our meetings, we'll

24   get together and have drinks.

25   Q.    And what do you include within professional

23

1    development?

2    A.    Reading each others' abstracts before we submit

3    to conferences, conference previews.  We invite people

4    to lecture for us or give presentations.

5    Q.    Do you take over any of the responsibility for

6    diversity, equity and inclusion training among the

7    graduate students?

8    A.    No.

9    Q.    Could you turn to the second page of Exhibit

10   No. 2, where it says, "Dear Dean Richmond"?  Who

11   composed this part of the letter?

12   A.    There were several people.

13   Q.    Could you identify them for the Court?

14   A.    Myself, Rachel Gain, Bryan Stevens, Brian

15   Anderson, Jessica Stearns.

16   Q.    How do you spell her name?

17   A.    Her first name or last name?

18   Q.    Both.

19   A.    J-E-S-S-I-C-A S-T-E-A-R-N-S, Robert Anderson,

20   Dani Van Oort.

21   Q.    Could you spell his last name?

22   A.    It's a female, actually.

23   Q.    Oh, so perhaps you should spell -- is that her

24   full name?

25   A.    D-A-N-I space V-A-N-O-O-R-T.  It was seen and

24

1    edited by many -- probably more people than that.  I

2    can't come up with a full list of names, but I believe

3    those people were the main people kind of doing the

4    actual writing of it.

5    Q.    Was there any input from professors?

6    A.    No.

7    Q.    Was there any input from anyone connected to

8    the Society for Music Theory, other than the graduate

9    students you've just named?

10   A.    No.

11   Q.    And Dean Richmond, does that refer to Dean John

12   Richmond?

13   A.    It does.

14   Q.    Of the College of Music?

15   A.    It does.

16   Q.    Thank you.  Of all the people you named, are

17   there any of these individuals who are not graduate

18   students in the College of Music?

19   A.    No.

20   Q.    So, is it safe to say that the letter, if I may

21   refer to this "Dear Dean Richmond" document as a letter,

22   you'll understand what I mean, correct, if I say this is

23   a letter?

24   A.    Yes.

25   Q.    Even though I understand it may have been sent

1    research that may or may not have been conducted by
2    Professor Jackson?
3        A.    Yes.
4        Q.    What is that difference?  Where does the line
5    get drawn, Mr. Kohanski?
6        A.    Well, my point being that the job of a C -- or
7    the CSS RA I don't think was necessarily to do research,
8    but things maybe like administrative things or editing,
9    things like that.  I could be wrong about that, but to
10   my understanding, that's what the job was.
11       Q.    Are you referring to a specific individual in
12   this No. 1?
13       A.    Yes.
14       Q.    Who is that?
15       A.    Yiyi Gao.
16       Q.    Can you spell that name for us?
17       A.    Yeah.  Y-I-Y-I G-A-O.
18       Q.    And do you know what specific personal research
19   she was asked to do that supposedly was not the same as
20   CSS RA work?
21       A.    I do not know.
22       Q.    Have you had conversations with Yiyi Gao about
23   this?
24       A.    No.  I haven't had conversations with her,
25   specifically.

1        Q.    How did you learn about this supposedly abusive
2    behavior?
3        A.    From some of my colleagues.
4        Q.    Who are they?
5        A.    Bryan Stevens, Brian Anderson.
6        Q.    What did they tell you?
7        A.    Basically, exactly what's here.
8        Q.    The mere fact that some RA was supposed to be
9    used to do personal research for a professor to whom
10   they were assigned as a research assistant?
11       A.    I don't think that's a good summary of what's
12   there, because I don't believe she was assigned to Dr.
13   Jackson as a research assistant.
14       Q.    She was assigned to the CSS, that's your
15   understanding?
16       A.    Yes.
17       Q.    Do you believe that some of Professor Jackson's
18   research, personal research, was also part of the work
19   of the CSS?
20       A.    I don't remember specifics -- more specifics
21   than this about what Bryan and Brian told me.  But it is
22   my understanding, generally, from those types of
23   conversations, that she was used for work that she
24   wasn't -- that wasn't part of her job.
25       Q.    And do you know what that work was?  You don't

1    know anything about the specifics of that work, or do
2    you?
3        A.    I don't necessarily remember.  I'm sure at some
4    point I knew about it, but --
5        Q.    And the -- let's move on to the second point,
6    "requiring student work during the summer without pay."
7    Do you know what specific students were required to do
8    work during the summer without pay?
9        A.    These Point 1, 2 and 3 are all related to Yiyi,
10   I believe.
11       Q.    Do you know what work she was required to do
12   during the summer without pay?
13       A.    I don't know if -- I don't know if it ties in
14   with Point 1, his personal research, or if it was just
15   work for the CSS.
16       Q.    Do you think it's common for students to do
17   work over the summer without pay?
18       A.    Not if it's a job that -- not if it's work that
19   has to do with a university position that they should be
20   getting paid for.  It's common for me to do work over
21   the summer on my own research, on my dissertation, or
22   something like that, but if a professor asked me to be a
23   TA for them over the summer without pay, then yeah,
24   that's unusual.
25       Q.    If you were required to complete work that you

1    had left undone as part of your normal job, would that
2    be something you would consider abusive?
3        A.    No, I guess not.
4        Q.    No. 3 is interesting, Mr. Kohanski.  It
5    mentions extortion.  Do you agree that extortion refers
6    to a crime?
7        A.    I guess so.
8        Q.    And this refers to grade manipulation.  Let's
9    take that first.  What grade manipulation do you believe
10   Mr. Jackson engaged in?
11       A.    Again, I don't remember specifics.  This still
12   has to do with Yiyi.
13       Q.    So, you have no personal knowledge of what
14   grades were supposedly manipulated.
15       A.    I did in the summer of 2020, but I don't
16   remember now.
17       Q.    Where would that recording or written record of
18   what you knew in the summer of 2020 exist?
19       A.    There probably isn't one.
20       Q.    But right now, you can't recall what specific
21   manipulation was referred to here.
22       A.    I don't remember, to be honest.
23       Q.    And threats to students' careers and
24   reputations.  If I'm summarizing correctly what you said
25   before, you're still referring only to Yiyi Gao, is that

65

1    correct?

2        A.    That's correct.

3        Q.    So, putting "students" in the plural is an

4    exaggeration, is that correct?

5        A.    I'm not sure actually.  I'm not sure now if

6    there were others or not, because I guess we would have

7    been very specific about saying students, plural, so I

8    don't know.  But Yiyi is, I guess, the only specific

9    example I can think of.

10        Q.    So you can't think of another student that you

11    would include in that No. 3 category at this time?

12        A.    That's correct.

13        Q.    How was her -- let's just focus on Yiyi Gao.

14    How was her career and reputation threatened?

15        A.    Again, I can't remember the specifics.

16        Q.    Are there any circumstances in which students'

17    careers and reputations would be legitimately threatened

18    when a professor works with them?

19        A.    Sorry, can you clarify?

20        Q.    Can you identify any circumstances in which it

21    would be legitimate for a student's career and

22    reputation to be threatened in their work with a

23    professor?

24        A.    No.

25        Q.    So, in your view, a student's career and

66

1    reputation should never be threatened in their work with

2    a professor.

3        A.    That's correct.

4        Q.    Even if they fail to perform up to the

5    standards required by the program?

6        A.    That's correct.  I don't think it's a

7    professor's place to do that.

8        Q.    You don't think it's a professor's place to

9    evaluate students' work?

10        A.    No.  It is -- it is a professor's place to

11    evaluate students' work, but I don't think it's a

12    professor's -- if they're not performing up to standard,

13    then the professor's job is to help them and not to

14    threaten they're career and say, you're not going to

15    make it, or you're going to fail, or things like that.

16        Q.    Did I understand you correctly --

17            Could you read back his answer, please?

18            (THE RECORD WAS READ BACK.)

19        Q.    (By Mr. Allen)  So you don't think there are

20    any circumstances in which a professor should fail a

21    student where the student is not meeting expectations.

22        A.    Not in graduate school.

23        Q.    Can a professor ever refuse to work with a

24    student, in your view?

25        A.    Yes.

67

1        Q.    Under what circumstances?

2        A.    If they have too many students currently, or if

3    their research interests completely diverge.

4        Q.    And do you have any knowledge that there was

5    actually extortion involved?

6        A.    Again, that's a very, as you said, kind of a

7    very specific term, and I believe we wouldn't have put

8    it without a good reason.  And I don't think I was the

9    one who used that or who came up with that word or who

10    decided to use that word, again, because other people

11    have much more in depth knowledge about what happened in

12    this specific situation.

13        Q.    But you agree this letter went out under your

14    signature, correct, which is on the first page of

15    Exhibit 2?

16        A.    Yes, that's correct.

17        Q.    Was the -- do you have any memory that the

18    extortion claimed in this No. 3 was sexist?

19        A.    I believe that was part of it, yes.

20        Q.    Do you have any knowledge that Professor

21    Jackson, for example, offered to give or withhold a

22    grade based on sexual favors?

23        A.    No.

24        Q.    Do you know -- do you have any memory of what

25    you were referring to as the sexist behavior that

68

1    constituted extortion here?

2        A.    I think the point was just that Yiyi's a woman,

3    and he treated her this way, and that he doesn't treat

4    men this way.

5        Q.    Do you know of any other women that he treated

6    this way?

7        A.    Not these specific points that we have listed.

8        Q.    Do you know of any other women that Professor

9    Jackson has taught or mentored over the years?

10        A.    I guess I know some current students who either

11    want to work with him or are working with him.

12        Q.    And do they complain that he's sexist?

13        A.    I have never had that type of conversation with

14    them, no.

15        Q.    So, when you say -- if you skip to the second

16    to the last sentence of that paragraph, it says, "a

17    pattern of harmful behaviors that disproportionately

18    affected marginalized students."  What harmful behaviors

19    and what marginalized students are you referring to?

20        A.    Harmful behaviors, including the racist, sexist

21    and abusive behaviors and marginalized students, women

22    and people of color.

23        Q.    What women and people of color are you

24    referring to?

25        A.    Again, I don't -- past Yiyi, I really don't

Peter Michael Kohanski    5/18/21

93

1    Q.   I recognize two of those names as faculty.  Is

2    the third -- the last name you mentioned was who?

3    A.   Miles McLean.  He is a graduate student in the

4    division.

5    Q.   Is he in any way involved in your graduate

6    association?

7    A.   No.  But he's involved in the other one.

8    Q.   What is the other one?

9    A.   The Student Society for Ethnomusicology at

10   North Texas.

11   Q.   Are you a member of that one, as well?

12   A.   I am not.

13   Q.   You know, the last question I wanted to ask you

14   is, it seems like you were soliciting signatures, at

15   least to Exhibit 2, correct?

16   A.   That is correct.

17   Q.   Do you have a list of all of those signatures

18   anywhere?

19   A.   It's included in the documents we sent.

20   Q.   The ones that you produced in response to the

21   subpoena.

22   A.   That's correct.

23        MR. ALLEN:  Thank you.  I'm going to take

24   a break.  Again, we've been going for another hour.  I

25   think we're almost done.  I just want to check my notes

Peter Michael Kohanski    5/18/21

94

1    and talk to my co-counsel.

2        MR. BOHUSLAV:  Okay.

3        MR. ALLEN:  And then we'll -- I guess then

4    we can reconvene and probably -- I don't know if you'll

5    want to do any cross examination, but that will be up to

6    you, Matt.

7        MR. BOHUSLAV:  Okay.

8        (OFF THE RECORD FROM 11:19 TO 11:29 A.M.)

9        (MR. STOWERS IS NOT PRESENT IN ROOM.)

10        MR. ALLEN:  So, Attorney Bohuslav, I have

11   finished my examination of the witness, and I pass the

12   witness to you.

13        MR. BOHUSLAV:  We will reserve for the

14   time of trial.

15        MR. ALLEN:  Thank you.  So, we'll conclude

16   the deposition for you and go off the record.

17        MR. BOHUSLAV:  Okay.

18        (DEPOSITION ADJOURNED AT 11:29 A.M.)

19

20

21

22

23

24

25

Peter Michael Kohanski    5/18/21

95

1        IN THE UNITED STATES DISTRICT COURT

       FOR THE EASTERN DISTRICT OF TEXAS

2            SHERMAN DIVISION

3    TIMOTHY JACKSON,          )

                          )

4       Plaintiff,    )

                          ) Case No.

5    v.                    )

                          ) 4:21-cv-00033-ALM

6    LAURA WRIGHT, et al,      )

                          )

7       Defendants.      )

8

9    -----------------------------------

10        DEPOSITION CERTIFICATE

11        PETER MICHAEL KOHANSKI

12           MAY 18, 2021

13   -----------------------------------

14

15        I, Nita G. Cullen, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   to the following:

18        That the witness, PETER MICHAEL KOHANSKI, was

19   duly sworn by the officer and that the transcript of the

20   oral deposition is a true record of the testimony given

21   by the witness;

22        I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24        ___ was requested by the deponent or a

25   party before the completion of the deposition and is to

Peter Michael Kohanski    5/18/21

96

1    be returned within 30 days from date of receipt of the

2    transcript.  If returned, the attached Changes and

3    Signature Page contains any changes and the reasons

4    therefor;

5        _X_ was not requested by the deponent or a

6    party before the completion of the deposition.

7        I further certify that I am neither attorney

8    or counsel for, nor related to or employed by, any of the

9    parties or attorneys to the action in which this

10   deposition was taken.

11        Further, I am not a relative or employee of

12   any attorney of record in this case, nor am I financially

13   interested in the outcome of the action.

14        Subscribed and sworn to on this 14th day of

15   June, 2021.

16

17

18        _____

        NITA G. CULLEN, Texas CSR #1563

19        Expiration Date:  08-31-2022

        JULIA WHALEY & ASSOCIATES

20        Firm Registration No. 436

            2012 Vista Crest Drive

21        Carrollton, Texas 75007-1640

        214.668.5578

22

23

24

25

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*    1

```
 1              UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF
 2                  SHERMAN DIVISION

 3  TIMOTHY JACKSON,            )
                               )
 4      Plaintiff,             )
                               )
 5  vs.                        )  CASE NO. 4:21-CV-00033-ALM
                               )
 6  LAURA WRIGHT, et al.,      )
                               )
 7      Defendants.            )
 8  ****************************************************

 9       VIDEOTAPED ZOOM ORAL DEPOSITION OF

10        REBECCA GEOFFROY-SCHWINDEN, Ph.D.

11              September 27, 2024

12              (Reported Remotely)

13  ****************************************************

14       VIDEOTAPED ORAL DEPOSITION OF REBECCA GEOFFROY-

15  SCHWINDEN, Ph.D., produced as a witness at the instance

16  of the plaintiff and duly sworn, was taken in the

17  above-styled and -numbered cause on the 27th day of

18  September, 2024, from 1:33 p.m. to 4:38 p.m., before

19  Kim D. Carrell, Certified Shorthand Reporter in and for

20  the State of Texas, reported remotely by computerized

21  stenotype machine at the University of North Texas

22  System, 801 North Texas Boulevard, Gateway Suite #308,

23  Denton, Texas, pursuant to the Federal Rules of Civil

24  Procedure and the provisions stated on the record or

25  attached hereto.
```

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*    2

```
 1              APPEARANCES

 2  FOR THE PLAINTIFF:

 3      Mr. Michael Thad Allen
        ALLEN LAW, LLC
 4      P.O. Box 404
        Quaker Hill, CT 06375
 5      Telephone: 860.772.4738 - Fax: 860.469.2783
        E-mail: M.allen@allen-lawfirm.com

 6
 7  FOR THE DEFENDANTS:

 8      Ms. Mary Quimby
        Assistant Attorney General
 9      General Litigation Division
        P.O. Box 12548, Capital Station
10      Austin, Texas 78711
        Telephone: 512.463.2120 - Fax: 512.320.0667
11      E-mail: Mary.Quimby@oag.texas.gov

12          - and -

13      Mr. Renaldo Stowers  (Appearing Live)
        University of North Texas System
14      Office of General Counsel
        801 North Texas Boulevard
15      Denton, Texas 76201
        Telephone: 940.565.2717 - Fax: 940.369.7026
16      E-mail: Renaldo.Stowers@untsystem.edu

17
18  ALSO PRESENT:

19      Mr. Timothy Jackson, Plaintiff

20
    VIDEOGRAPHER:
21
        Mr. Jason Warner
22      Legal Video Group
        lvg.dallas@gmail.com
23      214-598-5229

24
25
```

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*    3

```
 1                  I N D E X

 2                                              PAGE

 3  Appearances.................................    2

 4  Exhibit Index...............................    4

 5  Stipulations................................    5

 6  REBECCA GEOFFROY-SCHWINDEN, Ph.D.

 7      Direct Examination by Mr. Allen..........    6

 8
 9
10  Changes and Signature Pages.....................  124

11  Reporter's Certificate..........................  126
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24*    4

```
 1              EXHIBITS

 2  NUMBER          DESCRIPTION          MARKED

 3  Exhibit 1   Re-Notice of Taking Deposition........    7

 4  Exhibit 2   Emails Re: Grad Student Statement on
                JSS (UNT 000355 - 000356)............   53
 5
    Exhibit 3   Ad Hoc Review Panel Report (Exhibit D)
 6              (JACKSON000208 - 000233)..............   66
 7
    Exhibit 4   Email Chain Ending 7-30-20, Ragland to
 8              Geoffroy-Schwinden, et al.
                (UNT 000276 - 000288)................   72
 9
    Exhibit 5   Email Re: Faculty Statement on Journal
10              of Schenkerian Studies, 7-30-20
                (UNT 000425)........................   78
11
    Exhibit 6   Emails Re: Journal of Schenkerian
12              Studies, 7-29-20
                (UNT 000377 - 000378)................   82
13
    Exhibit 7   Email, 7-30-20, Geoffroy-Schwinden to
14              Brand (UNT 000417)...................   86
15  Exhibit 8   Drafts of the Faculty Statement
                (UNT 000427 - 000431)................   90
16
    Exhibit 9   Students' Statement Linked to Draft
17              Faculty Statement....................   97
18
19
20
21
22
23
24
25
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

49

1    **A.**    No, it's not that I'm refusing.  But can you
2    just rephrase it?
3        **Q.**    Sure.  I asked if it was your understanding
4    that the student statement had called for Timothy Jackson
5    to be disciplined.
6        **A.**    I know it included Tim's name and in relation
7    to the journal, and I don't remember exactly what they
8    asked for.
9        **Q.**    Okay.  Do you remember exactly what they were
10   concerned about in your -- in your words?
11            MS. QUIMBY:  Objection, form.
12       **A.**    Like so what they were concerned about with the
13   journal issue?
14       **Q.**    Sure.  Let's start with that.
15       **A.**    The way it went after Dr. Ewell.
16       **Q.**    Um-hum.
17       **A.**    The way that it dealt with race, yeah.
18       **Q.**    Anything else?
19       **A.**    They were the same.
20       **Q.**    Anything else, as you sit here today, that
21   you remember it going after Timothy Jackson or the
22   journal for?  The student statement?
23            MS. QUIMBY:  Objection, form.
24       **A.**    Do I remember anything going after Timothy
25   Jackson.  No, I just -- I'm sorry.  I remember that they

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

50

1    mentioned him in relation to the journal.
2        **Q.**    Um-hum.
3        **A.**    And that they wanted the journal like, yeah.
4        **Q.**    Wanted the journal like what?
5        **A.**    Investigated.
6        **Q.**    All right.  And do you remember the faculty
7    submitting a statement about Timothy Jackson and the
8    journal?
9        **A.**    Not about Timothy Jackson, no.
10       **Q.**    Okay.  About the journal?
11       **A.**    Yes, about the journal.
12       **Q.**    And who drafted that statement?
13       **A.**    It was a group effort.
14       **Q.**    Um-hum.  Were you part of that group?
15       **A.**    I was.
16       **Q.**    What was your role in formulating the faculty
17   statement that you just testified about?
18       **A.**    We all went back and forth on drafts.  So I had
19   worked on one, but I guess typically, most of that
20   is not there.  And so --
21       **Q.**    Sure.
22       **A.**    But yeah, we went back and forth on like
23   several drafts, like kind of a collaborative, yes.
24       **Q.**    Did you have different drafts saved on your
25   work computer?

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

51

1    **A.**    No, not on my work computer.  I don't think
2    on my work computer.  I think the one that I wrote, I
3    had on a Google drive.
4        **Q.**    Okay.
5        **A.**    But I think the other ones I just had in emails
6    that had been exchanged.  And so I don't remember if any
7    of them are on my work computer now or were then.
8    I can't remember.
9        **Q.**    Just backing up, I think one of the things that
10   you said you had thought was unusual was that, in your
11   words, Ewell was not there in Volume 12 of the Journal of
12   Schenkerian Studies; is that right?
13       **A.**    Um-hum, yes.
14       **Q.**    Okay.  And by that, you meant he wasn't --
15   something by him wasn't published with these other
16   papers in the Symposium?
17       **A.**    Yes.
18       **Q.**    Okay.  Was it your understanding that Ewell was
19   never invited to participate in the Journal?
20       **A.**    I had no -- I have no idea.
21       **Q.**    Okay.
22            THE WITNESS:  Do you mind if we take a
23   quick break?
24            MR. ALLEN:  Of course.
25            THE WITNESS:  Just a restroom break.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

52

1    Thank you.
2            MR. ALLEN:  Of course.  I think I should
3    have said, but maybe I didn't.  But you can ask for a
4    break at any time.
5            THE WITNESS:  Okay.
6            MR. ALLEN:  You just have to answer
7    whatever question is in front of you.  So we can go --
8    we can go off the record.
9            THE VIDEOGRAPHER:  Off the record at
10   2:33 p.m.
11       (Recess taken)
12            THE VIDEOGRAPHER:  The time is 2:44.
13   We're on the record.
14       **Q.**    Thank you.  Just a couple of brief questions,
15   and then we'll move on from that issue of Ewell not being
16   there.
17       Were you aware there was a call for papers
18   that went out to the entire Society for Music Theory
19   soliciting papers for Volume 12 of the Journal of
20   Schenkerian Studies?
21       **A.**    No.
22       **Q.**    So you don't have any reason to believe that
23   a call for papers was not received by Philip Ewell?
24            MS. QUIMBY:  Objection, form.
25       **A.**    I have no idea of Philip Ewell's email.

89

1  department chair, this, meaning the statement of UNT
2  faculty that is embedded in the Exhibit 3, November 25th,
3  2020 Ad Hoc Panel Report.  Do you remember sending that
4  to your division head at any point?
5        A.   I don't remember it.  I don't remember it in
6  particular.
7        Q.   Do you have any reason to believe that this was
8  not at least some version of the faculty statement that
9  you'd been working on with your colleagues?
10            MS. QUIMBY:  Objection, form.
11       A.   It's titled Individual MHTE Faculty
12 Response.pdf.
13       Q.   So that would have been at least some version
14 of the final that ended up in the Ad Hoc Panel Report?
15       A.   I'm not sure because I don't know anything --
16 well, I mean, you showed me the Ad Hoc Panel Report, but
17 I don't if this version -- like I don't know what this
18 attachment is, because it's not open.
19       Q.   That's kind of why I'm asking.
20       A.   And then I don't know if it's the same as the
21 ad hoc.
22       Q.   Okay.  And that's why -- that's why I'm asking
23 you, because I don't know either.  I'm trying to find it.
24       A.   Okay.  That makes two of us.
25            MR. ALLEN:  Yeah, that's fine.  I think

90

1  it's time for a break.  Went a little longer than I
2  thought because of the technical interlude.  And how long
3  would you like, Mary and Professor Geoffroy-Schwinden?
4            THE WITNESS:  Could I have, like, 15
5  minutes?  Would that be okay?
6            MR. ALLEN:  Yeah.  Sure.  Absolutely.
7            THE WITNESS:  Okay.  Great.
8            THE VIDEOGRAPHER:  Off the record at 3:36.
9        (Recess taken)
10           THE VIDEOGRAPHER:  The time is 3:45.
11 We're back on the record.
12       (Deposition Exhibit Number 8 marked.)
13           MR. ALLEN:  I'm going to mark for the
14 record Exhibit 8.
15       Q.   I'm going to represent to you, Professor
16 Geoffroy-Schwinden, that these are going to be four
17 drafts.  You'll see that they begin with Bates number
18 UNT 0427, and they're numbered sequentially 0428, 0429,
19 and 0430, in that order.
20       Now, the file names, as they were disclosed
21 to us, were draft 1, 2, 3, and I believe 4, something of
22 that nature, in series.  So this explains perhaps the
23 nature of my questions about the email that we examined
24 as Exhibit 7.  I'm trying to identify what was
25 specifically sent to Benjamin Brand, because these

91

1  documents weren't produced in series with that email.
2  Does that make sense?
3        A.   Yeah, um-hum.
4        Q.   And it will also allow us to explore how this
5  draft evolved in -- you know, as it was being formulated
6  by you and your colleagues.
7        A.   Okay.
8        Q.   So let me ask you if you -- I'm just going to
9  look at the first page of Exhibit 8 for the time being,
10 because we're going to go through each of them.  Do you
11 recognize this?
12            THE WITNESS:  I don't have it on my
13 screen.
14            MR. ALLEN:  I'm sorry.
15            THE WITNESS:  That's okay.
16            MR. ALLEN:  I took them down, and thank
17 you for pointing that out.
18            THE WITNESS:  Sure.
19       A.   Okay.  So can you -- would you just point
20 out with --
21       Q.   Sure.  This is Exhibit 8 for the record,
22 which I've introduced.  It's four drafts of a statement
23 that was associated with your file in discovery.  These
24 documents are produced with Bates stamps.  These are
25 page numbers that attorneys assign to all of the

92

1  documents in a series that they produce.  So this was
2  produced as UNT 427 through UNT 431.
3        A.   Okay.
4        Q.   And so, like I said, these were produced as
5  draft 1, draft 2, draft 3, and draft 4.  And it may be
6  that the last one would have the title of the document
7  that it has in this email, but I want to be able to
8  confirm that since you seem to be the one that is
9  sending these and they were produced in your file.
10       A.   Not all of them, though.  So like I don't
11 know -- yeah, I don't know about the file names.  But
12 okay.  Yeah, let's go through it together.
13       Q.   Well, that's fine.  And I don't know either.
14 That's why I want to ask you questions about it.
15       A.   Okay.
16       Q.   All right.  So do you recognize this first
17 statement in the series?
18       A.   To be honest, I don't recog -- I see it.  I
19 don't like recognize it.  But you know, you're showing
20 it to me, and it was produced in discovery, and I --
21 you know, I get that.
22       Q.   Sure.  And so it says the "Statement by the
23 below-signed faculty."
24       Right?
25       A.   It says that, yeah.

93

1    Q.    So was it -- excuse me.  Is it your

2    understanding, as you sit here today, that this was an

3    intermediate product, the final version of which would

4    be signed by all of the faculty as a faculty statement?

5           MS. QUIMBY:  Objection, form.

6    A.    I'm not sure who saw this version, or I don't

7    know who was -- I don't know.

8    Q.    You may not have even seen this version?  Is

9    that what you're saying?

10   A.    No, I just -- I don't know.  Sorry.  Are you

11   asking me if this was like a media document among faculty

12   or --

13   Q.    Is this a draft -- so it seems to me, and

14   correct me if I'm wrong, your colleagues, those who

15   eventually signed the faculty statement that we've

16   already examined as an attachment to Exhibit 3, which

17   is in the record, this was formulated by the faculty to

18   be a signed statement that was going to be submitted to

19   the administration; is that accurate?

20          MS. QUIMBY:  Objection, form.

21   A.    We weren't -- I don't know what step in the

22   process this version was.  But it wasn't meant for the

23   admini -- and I don't know if it was meant for the

24   administration.  I don't know that we -- because we --

25   there wasn't anything that went to the administration.

94

1    Q.    And I'm not asking if this is the first draft

2    or second draft.

3    A.    Okay.

4    Q.    I'm just asking a pretty basic question,

5    I hope, is that is this a draft of the statement which

6    was eventually finalized and signed by all of the faculty

7    and sent to the administration?

8           MS. QUIMBY:  Objection, form.

9    A.    I mean, you're showing it to me as having

10   been submitted as one of the drafts.  I can't honestly

11   say that I remember it.  It very well could have been one

12   of the drafts.  I don't know who wrote this.  I don't

13   know who it was shared with.  I don't know where -- you

14   know, I'm not sure.

15   Q.    Yeah.  So do you see these bubbles here?

16   A.    Yeah.

17   Q.    I'm going to open them up in the sidebar.

18   A.    Okay.

19   Q.    Someone seems to have commented on this

20   particular document.

21   A.    Yeah.

22   Q.    And the name associated with these bubbles is

23   Rebecca Geoffroy-Schwinden.

24   A.    Yes.

25   Q.    Do you see that?

95

1    A.    Yes.

2    Q.    And it's dated July 28th?

3    A.    Uh-huh.

4    Q.    Does this help clarify that you worked on

5    this document?

6    A.    It has comment bubbles in my name, yeah.

7    Q.    Do you have any reason to believe someone else

8    would have used your computer to write those bubbles?

9    A.    No.

10   Q.    Let's look at the statement.

11         Right here, the draft says, "We are dismayed."

12         Right?

13   A.    It says that, yes.

14   Q.    And it talks about "The uncritical,

15   unscholarly, anti-Black racist treatment that he and

16   his pioneering work endured in the recent issue of the

17   Journal of Schenkerian Studies."

18         Right?

19   A.    It says that, yep.

20   Q.    And is that referring to the work of Timothy

21   Jackson, which was published in the Journal of

22   Schenkerian Studies, Volume 12?

23   A.    It doesn't specify that there, no.  It doesn't

24   say Tim Jackson.

25   Q.    It recognizes some, quote, thoughtful

96

1    contributions, right?

2    A.    We recog -- yes.

3    Q.    What was your understanding of the

4    contributions that were, quote, thoughtful?

5    A.    Some of the articles -- some of the articles

6    were thoughtful, so critical, scholarly.

7    Q.    Uh-huh.  And what made them thoughtful?

8    A.    At this point, I don't remember.  I would have

9    to be presented with them to be -- but I do not remember

10   the specifics at this point.

11   Q.    And here, it says, "We support and believe

12   our graduate students."

13         Right?

14   A.    Yes.

15   Q.    And what was your understanding of what

16   document was linked here?

17   A.    I don't know.  Can you click it?

18   Q.    I can.  If need be, I'll show the -- let me

19   stop sharing for a second, and then I'll re-share.

20         You should now see my entire Chrome website

21   which opened when I clicked that URL that's embedded in

22   the document.

23   A.    Okay.

24   Q.    Do you remember seeing this document, which I'm

25   going to go ahead and mark as Exhibit 9 for the record?

*Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24*

97

1   I'm going to download a copy of this and mark it in the

2   record as Exhibit 9.  Okay?

3           (Deposition Exhibit Number 9 marked.)

4       Q.   Do you recognize Exhibit 9?

5       A.   I just want to read it to make sure that I --

6   to make sure that I do.

7       Q.   I think it just disappeared.

8       A.   It did.  Oh, there it is.  Okay.

9       Q.   Some magical powers that Chrome has, I guess,

10  is to make things disappear and reappear.

11      A.   No, I get it.  I get it.

12       So it looks -- it looks like the grad

13  students' statement, this does.

14      Q.   Um-hum.  And --

15      A.   Can I see the second page just to --

16      Q.   Yes, absolutely.

17      A.   Thanks.  Okay.

18      Q.   And I'm just going to represent to you, see how

19  it says page 2 of 2?  So there are no other pages, right?

20      A.   Not here on this document, no.

21      Q.   Right.  So we confirmed that that's the

22  document that was linked in this draft marked UNT 427,

23  right?

24      A.   You said you clicked it and opened that, so...

25      Q.   Yes.

*Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24*

98

1       A.   Okay.

2       Q.   And again, if I'm trying to pull a fast one on

3   you, your attorney, Mary Quimby, is very competent and

4   she'll catch me, I'm sure.

5       A.   Okay, okay.  I trust her.

6       Q.   And let me scroll up.  This is another

7   exhibit that was attached to the Ad Hoc Panel Report

8   embedded in Exhibit 3.  Confusingly enough, it is also

9   called Exhibit 3, but it's Exhibit 3 to the Ad Hoc Panel

10  Report.

11      A.   Okay.

12      Q.   Is this that same statement that we just

13  clicked on and was embedded in the draft faculty

14  statement?

15      MS. QUIMBY:  I don't -- you haven't

16  changed the exhibit.

17      MR. ALLEN:  Oh, yes, yes.  My mistake.

18      Q.   See here, the header up here is Exhibit 3,

19  November 25, 2020.  And I can scroll to the top just to

20  confirm that this the Ad Hoc Panel Report that we had

21  discussed earlier as Exhibit 3.

22      A.   Okay.

23      Q.   And then we're going down to -- it's Exhibit

24  Pack.  And one of the exhibits is this document.  And I'm

25  just going to ask you to review it in as much detail as

*Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24*

99

1   you need to, to confirm or not whether it is the document

2   that was linked to that URL that we clicked and was

3   embedded in the Exhibit 9 -- or excuse me, embedded in

4   Exhibit 8, in which we pulled up online as Exhibit 9.

5       A.   Could you just scroll down a little, so I could

6   keep looking at it?

7       Q.   Yeah, absolutely.

8       A.   Thank you.  Okay.  So yeah, they look similar,

9   the linked one and this one.

10      Q.   Okay.  And I'll just briefly pull up Exhibit 9,

11  which should also be visible.  And, again, I'm just going

12  to scroll through it slowly, but it should be enough for

13  you to at least -- is that the same -- to the best of

14  your knowledge, is that the same text?

15      A.   They look similar, yeah.

16      Q.   Okay.  Thank you.  Now, I'm going to direct

17  your attention back to Exhibit 8.

18      A.   Okay.

19      Q.   So this -- this -- in linking the graduate

20  students' statement, it says, "We support and we believe

21  our graduate students.  Read their statement and demands

22  here."

23       Right?

24      A.   Uh-huh.

25      Q.   Now, there's something here about systemic

*Rebecca Geoffroy-Schwinden, Ph.D.     9/27/24*

100

1   racism and so forth.  This is where you've dropped one

2   comment in.

3       "On the one hand, it seems important to note

4   that 'due process' takes time.  On the other hand, the

5   system affords this opportunity to people who already

6   hold power.  This seems like a special call against Tim

7   that I think we probably should not make in this kind of

8   statement.  Thoughts?"

9       Do you remember making that comment on this

10  draft?

11      A.   I don't remember making that comment.  But it's

12  -- obviously, I did.

13      Q.   What do you mean by, "The system that affords

14  opportunity to people who already hold power"?

15      A.   Well, like the opportunity like I'm having

16  right now to talk to you.

17      Q.   So you think being called to account before the

18  Courts of the United States is a system that affords this

19  opportunity to people who already hold power?

20      A.   Well, I think I'm lucky that I'm able to have a

21  conversation about this.

22      Q.   How is this an opportunity for people who

23  already hold power?

24      A.   Well, I've -- because I'm able to actually have

25  a chance to talk in front of the legal system.

APPX 071

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

101

1    Q.   Do you consider yourself someone who already
2    has power?
3    A.   I do.
4    Q.   Do you think due process -- actually, let's
5    back up.
6         What do you understand by, quote, due process?
7    A.   Like having an opportunity to have an
8    investigation into something.
9    Q.   Do you know what -- as you understand it, do
10   you know what the elements of due process rights are?
11   A.   Didn't -- didn't make it to law school.
12   Q.   That's fine.
13        And you say here, "This seems like a specific
14   call against Tim."
15        Right?
16   A.   That's what it says.
17   Q.   You also make another bubble comment on the
18   paragraph that follows that.
19        "This issue is born of these divisions where
20   theory is separated from historical and cultural work.
21   Not sure if this is too much, though."
22        MS. QUIMBY:  I'm sorry --
23   A.   Could you open it on the side?  Because it's
24   like cut off on my screen, so I can't see the first part.
25   There we go.  Thank you.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

102

1    Q.   Can you see -- and if it's --
2    A.   Yep.
3    Q.   I'm not quite sure how to make this bigger
4    if --
5    A.   That's okay.  I can -- I can see it the way
6    it is.  It's totally fine.
7    Q.   Okay, great.
8    A.   It was just cut off before.
9    Q.   Let me read it again into the record.
10        "This issue is born of these divisions where
11   theory is separated from historical and cultural work.
12   Not sure if this is too much, though."
13        Did I read that right?
14   A.   You read that right.
15   Q.   What did you mean by that?
16   A.   I need to go back to the paragraph it's
17   commenting on.  (Muffled reading)  Okay.
18   Q.   I'm just asking what that meant to you.
19   A.   I'm not trying to be annoying.
20   Q.   No, no, not at all.
21   A.   Could you read on my comment?  I'm sorry.
22   Q.   That's okay.
23   A.   I genuinely am not trying -- I don't know
24   what I mean by this issue.  Like I don't know if
25   I --

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

103

1    Q.   Okay.
2    A.   But I think I mean this issue, like the one
3    that I'm commenting on.
4    Q.   And again, if you don't know or you don't
5    remember, then you don't, so you can say that.
6    A.   Okay, okay.
7    Q.   Is that your testimony?  You just don't know
8    what was your thinking at the time when you wrote that?
9    A.   Well, it means what it says in the sense that
10   (as read) There's deeply entrenched boundaries among
11   research into music cultural -- culture, history, and
12   theory that's complicit here.
13        "This issue is born of these divisions."
14        So I guess maybe the issue -- it looks like
15   it's referencing back maybe to the paragraph before.
16   Q.   Where you are talking about practices that
17   protect the systemic racism?  Is that it?
18   A.   I don't know.  I don't know what I mean by this
19   issue.  I'm sorry.
20   Q.   Do you know what you mean by practices that
21   protect the systemic racism?
22        MS. QUIMBY:  Objection, form.
23   Q.   This was highlighted here, right?
24        (As read) Practices that protect the
25   systemic racism (discrimination? Inequality?) Built into

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

104

1    institutional walls, which impedes equally -- excuse me,
2    which impedes equally swift official responses to these
3    kinds of crises.
4    A.   Okay.  So what did you want me to answer about
5    that?
6    Q.   Is that what that's referring to when you said
7    this double bubble?
8    A.   You know, it doesn't seem that way actually.
9    Q.   Okay.
10   A.   Those seem unrelated now that I'm -- I mean,
11   but this is me interpreting like kind of on the spot,
12   trying to walk us through it.
13   Q.   And when you say "complicit" here, what do
14   you mean, complicit?  Complicit in what?
15   A.   That's -- that's actually what I'm wondering
16   with you here.  Clearly, this is a draft.  I'm wondering
17   what time I wrote it, and if I did, because if I'm
18   commenting, maybe someone else did.
19   Q.   Sure.  Well, let me -- let me move on and ask
20   this question.
21        Are all of the eventual signatories, were they
22   all working on this draft, commenting on the drafts that
23   were circulating?
24        MS. QUIMBY:  Objection, form.
25   A.   I don't know.  I don't know.

APPX.072

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

105

1    Q.    Okay.  All right.  Let me move to the next

2    draft.  Okay?

3        Now, just to avoid clicking each time and

4    introducing all sorts of repetitive exhibits, can we

5    agree that this remains the same embedded link?

6    A.    Am I allowed to ask my attorneys about

7    that?  Because I just don't know if it's okay to assume

8    something like that.  I'm not sure.

9    Q.    Sure, sure.

10   A.    And I know you are not trying to like --

11   Q.    No, no, I'm not.  Well, let's -- I'm going to

12   state for the record that the document, to this extent,

13   speaks for itself.  Anyone can open the link, and that

14   will confirm what is linked there.  All right?  We've

15   already introduced Exhibit 9 into the record, which was

16   the first link.  And that can be confirmed independently

17   of the witness's testimony.

18       But I do want to ask you, Professor

19   Geoffroy-Schwinden, in all drafts of the faculty

20   statement such as you remember them, you understood

21   that they linked to a students' statement, correct?

22   A.    I don't know that all of the drafts did.

23   Q.    Okay.  We will go through them then.

24   A.    Well, I just don't know if these are all of the

25   drafts like from -- yeah.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

106

1    Q.    This says again, "We write in support of our

2    graduate students and the concerns they have expressed

3    here."

4    A.    Okay.

5    Q.    Doesn't that indicate that this is also a

6    student statement, this link?

7    A.    That this is a student statement?

8    Q.    No, that the link -- sorry, my unclarity, and

9    you're right to point it out.

10       "We write in support of our graduate students

11   and the concerns that they have expressed here:"  And

12   then there's a URL.

13       Is it your understanding of this draft, that

14   that also is a link embedding the students' statement, or

15   at least a reference that's embedding it by reference to

16   the students' statement?

17   A.    This link in this draft clicks out to the

18   students' statement, per -- yeah, like per the record,

19   like we've been talking about.

20   Q.    Okay, thanks.  And here, it just says, "We

21   write in support," right?

22   A.    It does say that.

23   Q.    And here, it says, "The undersigned faculty

24   members are dismayed," right?

25   A.    Yep.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

107

1    Q.    There's some things moved around.  That's

2    normal, as you said before, in a draft.  And if you

3    have -- do you have anything else to point out about

4    this draft?

5    A.    No.

6    Q.    I don't believe there are any comments to

7    this draft.  These are just the ones that link on page 1.

8    See?

9    A.    Okay.

10   Q.    So I'll go to the third draft, for some reason

11   in a different font, but that happens.

12   A.    Okay.

13   Q.    "Professor Philip Ewell and his work in the

14   recent issue of the Journal of Schenkerian Studies."

15       Right?

16   A.    That's what that says, yes.

17   Q.    So do you consider denouncing a bit of a

18   stronger form of feeling than dismay?

19             MS. QUIMBY:  Objection, form.

20   A.    I don't -- I don't know.  They're just

21   different verbs.

22   Q.    Sure.  Is denounce stronger than expressing

23   dismay?

24             MS. QUIMBY:  Objection, form.

25   A.    It depends on the scenario.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

108

1    Q.    In this scenario, in this document, do you

2    understand denounce to be stronger than expressing

3    dismay?

4    A.    I'm not sure.  I'm sure it's a point --

5    Q.    Okay.

6    A.    -- that my colleagues thought about because

7    they fight over commas.  But I don't know the intention

8    between the change between those.  I don't remember the

9    intention between that change in verbiage.

10   Q.    Um-hum.  And there's a statement that

11   "The Journal of Schenkerian Studies contained several

12   unresearched statements about Black Americans."

13       Right?

14             MS. QUIMBY:  Objection, form.

15   A.    If that's what that -- what you're highlighting

16   says in the document.

17   Q.    Okay.  And this looks like it's been pretty

18   stable, this paragraph.

19       And then here, once more, "We write in support

20   of the graduate students.  You can find their statement

21   here."

22       And again, there's the URL link, right?

23   A.    Yes.

24   Q.    There's a reference to the "mandatory

25   administrative process to begin to address this problem."

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

109

1    Do you know what that refers to?

2    A.    I don't.

3    Q.    Now, this is the last one in the series.

4    And now, the last one is signed by everyone, right?

5    A.    It has a list of signatures.  I'd have to

6    look at the side by side, but it has a list of

7    signatures, yeah.

8    Q.    Absolutely.  And now, it says, "We, the

9    undersigned faculty members stand in solidarity with

10    our graduate students and their letter of condemnation

11    of the Journal of Schenkerian Studies."

12    Did I read that correctly?

13    A.    That's what this draft says.

14    Q.    Do you understand standing in solidarity to be

15    a stronger statement than denounce?

16    MS. QUIMBY:  Objection, form.

17    A.    Well, denounce -- like the way that -- where

18    the verb was situated in the previous draft was referring

19    to the issue.  And solidarity here seems like the verb

20    is -- that this is referring to the graduate students.

21    So this is just a different sentence.

22    Q.    Okay, sure.  Is it more strongly identifying

23    this statement with the letter of condemnation issued by

24    the graduate students?

25    MS. QUIMBY:  Objection, form.

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

110

1    A.    I wouldn't say that it more strongly affiliates

2    it with them, no, not necessarily.

3    Q.    Well, this sentence doesn't even mention the

4    student statement, right?  The student letter, as it's

5    referred to.  This is the first sentence of the previous

6    draft.

7    A.    Okay.  Yeah, no.

8    Q.    It doesn't -- that doesn't incorporate anything

9    referring to the students, does it?

10    A.    It does not.

11    Q.    Now, in this fourth version on UNT 430, "The

12    undersigned faculty members stand in solidarity with the

13    graduate students in their letter of condemnation of the

14    Journal of Schenkerian Studies."

15    Right?

16    A.    That's what this version says, yes.

17    Q.    Does this version qualify that statement in any

18    way?

19    MS. QUIMBY:  Objection, form.

20    A.    So you are asking if this version of -- if it

21    qualifies the phrase "stand in solidarity"?

22    Q.    Yes.

23    A.    Not in that sentence.

24    Q.    Okay.  Thank you.  Now, it says something about

25    the epi -- "Epistemic center of the journal lies in a

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

111

1    racist discourse that has no place in any publication."

2    What did you mean by the epistemic center?

3    How did you understand that?

4    A.    I think I -- like the knowledge center, like

5    the idea that held it together.

6    Q.    So the idea that held together the Journal of

7    Schenkerian Studies is inherently racist?  Is that what

8    you're saying?

9    A.    That's not what that sentence says.

10    Q.    Well, I'm just trying to figure out what it

11    means.  If the epistemic center of the journal lies in a

12    racist discourse, again, what does that mean?

13    MS. QUIMBY:  Objection, form.

14    A.    Well, it means what it says, I guess.

15    Q.    What's an epi -- okay.  What's an epistemic

16    center?  Maybe you can explain that for the Court.

17    MS. QUIMBY:  Objection, form.

18    A.    Well, like I just said, it's like the central

19    -- the central idea that it hangs together on, the

20    knowledge.

21    Q.    Sure.  Isn't the central idea of the Journal

22    for Schenkerian Studies, as I believe you testified

23    earlier, Schenkerian analysis?

24    MS. QUIMBY:  Objection, form.

25    A.    I don't know.  I mean, so the journal, right,

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

112

1    that is dedicated to Schenkerian analysis.  And it looks

2    like this sentence is talking about the journal issue, so

3    the specific issue.

4    Q.    Okay.  The journal issue of Volume 12?

5    A.    It's not cited here.

6    Q.    So can you define the epistemic center of

7    the journal issue you are talking about here in this

8    statement?

9    MS. QUIMBY:  Objection, form.

10    A.    I don't -- are you asking like -- I don't --

11    you read the sentence --

12    Q.    Right.

13    A.    -- that the epistemic center of the journal

14    issue lies in a racist discourse, and it continues.  And

15    you asked me what epistemic center meant, and I said my

16    understanding, at least from this perspective, is that it

17    means like the idea that it hung together on.

18    Is that clear for you?

19    Q.    Okay.  Yes, that is clear to me.

20    A.    Okay.

21    Q.    Now, I'm asking you to tell me your

22    understanding of what was that idea that the Volume 12

23    hung together on, in your words?

24    A.    This sentence says, "The epistemic center of

25    the journal issue lies in a racist discourse that has no

113

1  place in any publication, especially in an academic

2  journal."

3      Q.   Okay, right.  And so racist discourse, maybe we

4  can agree, that's relatively vague and general, right?

5      A.   What do you mean?  How is racist discourse --

6      Q.   I want to know.  What is the -- what is the

7  racist discourse that is the epistemic center of Volume

8  12 of the Journal of Schenkerian Studies?  Can you

9  identify that for me, please?

10     A.   I can't.  I don't have the journal issue in

11  front of me.

12     Q.   And you don't remember what you meant by that

13  at the time when you signed this statement?

14     A.   I don't understand what you're asking me for

15  here.  So -- but the epistemic center of the journal

16  issue lies in a racist discourse.  Okay.  So...

17     Q.   And then instead of saying as the one version

18  that preceded it had said, "We support our graduate

19  students," this statement now says, "We endorse the call

20  for action outlined in our student letter."  Right?

21     A.   That's what that clause says, yes.

22     Q.   And, again, there's the link to the students'

23  letter, correct?

24     A.   Yes.

25     Q.   So the faculty moved from supporting to

114

1  endorsing, correct?

2      A.   Not the letter.  I mean, what do you mean?

3  Like, yes, the word switched from support to endorse.

4      Q.   Okay.

5      A.   But there are other revisions in that

6  paragraph, it appears.

7      Q.   Then it says (as read) which asks the College

8  of Music publicly condemn -- ask that the public -- I'm

9  sorry.

10     A.   That's okay.

11     Q.   I'm going to read it from the top, just so we

12  get it cleanly into the record.

13         "We endorse the call for action outlined in

14  our students' letter" -- the URL follows -- "which asks

15  that the College of Music 'publicly condemn the issue and

16  release it freely online to the public' and 'provide a

17  full public account of the editorial and publication

18  process and its failures.'  Responsible parties must" --

19  be appropriately -- "be held appropriately accountable."

20         Did I read that correctly?

21     A.   Yeah, yeah.

22     Q.   On a third try?

23     A.   That's okay.  It's late and it's Friday.

24     Q.   Yes.  Thank you.

25         So is it your testimony then, as I'm

115

1  gathering, that you believe this limits the endorsement

2  of the letter?

3      A.   Yes.

4      Q.   How does it limit the endorsement of the

5  letter?

6      A.   I believe that that statement specifies what

7  part of the letter is endorsed.

8      Q.   Does it say which -- only that part which asks?

9  It doesn't say that, right?

10     A.   It says, "We endorse the call for action which

11  asks the College of Music to publicly condemn the issue

12  and release it freely online to the public and provide

13  a" -- public -- "full public account of the editorial

14  and publication process and its failures."

15     Q.   And it's your -- it's your testimony today that

16  this "which asks" limits the entire endorsement?

17     A.   Grammatically, it would appear so.

18     Q.   Well, grammatically, it would appear that it

19  doesn't say only that part which asks, right?  It doesn't

20  say only that part.

21     A.   "Only" does not appear in that paragraph.

22     Q.   Right.  And it doesn't say we partially

23  endorse, right?

24     A.   "Partially" does not appear in that paragraph.

25     Q.   Okay.  Do you recall any discussion among the

116

1  group of professors generating this statement about how

2  the group should limit its endorsement of the call for

3  action of the students?

4      A.   I don't remember.

5      Q.   I just want to go back now, and this will

6  probably be the last thing I need to talk about, the

7  famous Exhibit 3.

8      A.   Okay.

9      Q.   I just want -- I just want to walk us through

10  the student statement here.  So this is the student

11  statement, which we've discussed before.  What is the

12  call to action here?

13         MS. QUIMBY:  Objection, form.

14     Q.   Is that question unclear to you?

15     A.   If we -- if we skip down to this statement, it

16  says, "We endorse the call for action outlined in our

17  students' letter."

18         Correct?

19     A.   Yep.  That's what that says.

20     Q.   And this is the student letter that was linked

21  to that statement, correct?

22     A.   Um-hum.

23     Q.   So my question is, what is the call to action

24  that is referred to in the faculty statement?

25         MS. QUIMBY:  Objection, form.

APPX.075

117

1    **A.**   To publicly condemn the issue and release it
2    freely online to the public.
3    **Q.**   Um-hum.
4    **A.**   "Provide a full public account of the editorial
5    and publication process and its failures."
6         That's -- those are the ones outlined in the
7    faculty statement.
8    **Q.**   This statement also calls on the University
9    of North Texas and UNT College of Music to take other
10   actions, right?  It says so right here.  And I'm
11   referring to this sentence under paragraph enumerated
12   number 2 on JACKSON 0226.
13        It says, "We also call on the University of
14   North Texas and the UNT College of Music to take the
15   following actions:"
16        Right?
17   **A.**   It does say that, yes.
18   **Q.**   And one of those is to dissolve the journal,
19   right?
20   **A.**   It says dissolve the journal, yep.
21   **Q.**   Do you know if that, in fact, took place?
22   **A.**   No, I don't.
23   **Q.**   Has the Journal of Schenkerian Studies appeared
24   since July of 2020?
25   **A.**   I have no idea.  Like I said, never read it,

118

1    still don't.
2    **Q.**   Okay.  Here's something about critically
3    examining the culture of UNT and etc., etc.
4         And then under the paragraph number 3 on the
5    second page of the student statement, it says, "Hold
6    accountable every person responsible for the direction
7    of the publication.  This will involve recognizing both
8    whistleblowers and those who failed to heed them in this
9    process.  This should also extend to investigating past
10   bigoted behaviors by faculty and, by taking this into
11   account, the discipline and potential removal of
12   faculty who used the JSS platform to promote racism.
13   Specifically, the actions of Dr. Jackson -- both past
14   and present -- are particularly racist and unacceptable."
15        Did I read that correctly?
16   **A.**   You did.
17   **Q.**   Now, it's your testimony today that you never
18   intended to endorse these statements?
19   **A.**   No, I didn't -- I didn't -- no, I didn't
20   endorse these statements.
21   **Q.**   Even though the faculty statement endorses
22   the students' statement, your testimony today is that --
23   **A.**   I'm sorry, no.  We did not endorse this whole
24   statement, so you've just misstated my testimony today.
25   **Q.**   No, no, no.  I'm saying even though this

119

1    statement endorses the call for action outlined in the
2    student letter, right?
3    **A.**   It does not endorse the entire call for action.
4    **Q.**   All right.  Okay, then good.
5    **A.**   It endorses the call to make it publicly
6    available and -- do you want to repeat that again into
7    the record, or are we good?  Do you want me to finish
8    it?
9    **Q.**   No, no.  I'm -- let me finish.  And then if you
10   disagree, maybe you can enlighten me.  All right?
11   **A.**   Okay.  Sounds good.
12   **Q.**   This faculty statement endorses the call for
13   action outlined in the student letter.
14        So far, so good.  And you are arguing that
15   this subordinate clause, which asks that the College of
16   Music publicly condemn the issue and release it freely
17   online to the public and provide a full public account
18   of the editorial and publication process and its
19   failures, is only thing you endorse in that letter?
20        MS. QUIMBY:  Objection, form.
21   **Q.**   Is that your testimony today, that you don't
22   endorse the other things, only these two things that you
23   quoted?
24   **A.**   That's what that sentence grammatically says.
25   **Q.**   Even though it doesn't say exclusively or

120

1    anything limiting it to only these things, that's your
2    testimony, right?
3         MS. QUIMBY:  Objection, form.
4    **A.**   I testified that the word "exclusively" does
5    not appear in that sentence.
6    **Q.**   And you don't -- sorry about that.  I just
7    clicked on it and made my Chrome browser blow up.
8         You agree that this embeds the letter by
9    reference to this URL link, correct?
10   **A.**   I agree that that -- yes, the URL link is
11   there.
12   **Q.**   So just the last couple of questions.
13   **A.**   Um-hum.
14   **Q.**   Can you identify any concrete actions, past
15   or present, of Timothy Jackson that are particularly
16   racist?
17   **A.**   I would just say maybe some of the writing in
18   the article.
19   **Q.**   So his published speech basically, right?
20        MS. QUIMBY:  Objection, form.
21   **A.**   Sorry, wait.  No.  Sorry, what do you mean?
22   **Q.**   Well, I asked if you can identify concrete
23   specific actions of Dr. Jackson, either past or present,
24   that are particularly racist.
25   **A.**   I would just say some of the writing in the

APPX.076

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

125

```
 1
 2      I, REBECCA GEOFFREY-SCHWINDEN, Ph.D., have read the
 3   foregoing deposition and hereby affix my signature
 4   that same is true and correct, except as noted above.
 5
 6      _____
        REBECCA GEOFFROY-SCHWINDEN, Ph.D.
 7
 8   THE STATE OF _____)
 9   COUNTY OF _____)
10      Before me, _____, on this day
        personally appeared REBECCA GEOFFROY-SCHWINDEN, Ph.D.,
11   known to me or proved to me on the oath of
        _____ or through
12   _____ (description
        of identity card or other document) to be the person
13   whose name is subscribed to the foregoing instrument
        and acknowledged to me that he/she executed the same
14   for the purpose and consideration therein expressed.
15      Given under my hand and seal of office on this
16   _____ day of _____, _____.
17
18      _____
19      NOTARY PUBLIC IN AND FOR
20      THE STATE OF _____
21
     My Commission Expires: _____
22
23
24
25
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

127

```
 1   me by December 2, 2024;
 2      That pursuant to the information given to the
 3   deposition officer at the time said testimony was taken,
 4   the following includes all partes of record and the
 5   amount of time used by each party at the time of the
 6   deposition;
 7      Mr. Michael Thad Allen - 02 HRS: 34 MIN
 8         Attorney for the Plaintiff
 9      Ms. Mary Quimby -  00 HRS: 00 MIN
10         Attorney for the Defendants
11
12      I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   taken, and further that I am not financially or
16   otherwise interested in the outcome of the action.
17      Certified to by me on this 29th day of October,
18   2024.
19
20      _____
        Kim D. Carrell, CSR NO. 1184
        Date of Expiration: 7-31-26
21
22      JULIA WHALEY & ASSOCIATES, INC.
23      2012 Vista Crest Drive
        Carrollton, Texas  75007-1640
        214-668-5578/Fax 972-236-6666
24      Firm Registration No. 436
        Certification Expires 10-31-26
25      Notary Comm. Expires 12-1-25
```

Rebecca Geoffroy-Schwinden, Ph.D.    9/27/24

126

```
 1      UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF
 2      SHERMAN DIVISION
 3   TIMOTHY JACKSON,          )
                               )
 4      Plaintiff,             )
                               )
 5   vs.               ) CASE NO. 4:21-CV-00033-ALM
                               )
 6   LAURA WRIGHT, et al.,     )
                               )
 7      Defendants.            )
 8
 9      _____
10         REPORTER'S CERTIFICATION OF
11   ORAL DEPOSITION OF REBECCA GEOFFROY-SCHWINDEN, Ph.D.
12            September 27, 2024
13      _____
14
15
16      I, KIM D. CARRELL, a Certified Shorthand Reporter
17   in and for the State of Texas, hereby certify to the
18   following:
19      That the witness, REBECCA GEOFFROY-SCHWINDEN, Ph.D.,
20   was duly sworn and that the transcript of the oral
21   deposition is a true record of the testimony given by the
22   witness;
23      That the deposition transcript was duly submitted
24   on October 30, 2024, to Ms. Mary Quimby, the attorney for
25   the defendants, for examination, signature, and return to
```

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON,                    )
                                    )
                Plaintiff,          )
                                    )
VS.                                 )  CIVIL ACTION
                                    )
LAURA WRIGHT, ET AL.                )  NO.: 4:21-cv-00033-ALM
                                    )
                Defendants.         )
                                    )
                                    )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN SLOTTOW, PhD

NOVEMBER 7, 2024

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF STEPHEN

SLOTTOW, PhD, produced as a witness at the instance

of the DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on November 7, 2024,

from 8:31 a.m. to 4:41 p.m., via Zoom teleconference

before Vanessa J. Theisen, CSR in and for the State

of Texas, and RPR, reported by machine shorthand, at

the University of North Texas System, 801 North Texas

Boulevard, Gateway Suite #340, Denton, Texas 76201,

pursuant to the Federal Rules of Civil Procedure and

any provisions stated on the record or attached

hereto.

90

1 and he was asking about editorial policies and
2 etcetera.
3    Q. Were you truthful in your interview?
4    A. Yeah, as -- to my knowledge, yeah.
5    Q. Do you recall describing the symposium as a
6 visceral reaction to the Ewell -- Dr. Ewell's talk?
7    A. Visceral reaction? Well, the notes that
8 were taken -- I see that there were notes taken on
9 the interview. They were certainly not written by
10 me.
11    Q. Uh-huh.
12    A. And they were certainly not language that I
13 would usually use. I don't think I would say
14 "visceral reaction" because they weren't.
15    Q. How would you describe it, then?
16    A. Well, it's a reaction to Ewell's allegations
17 involving Heinrich Schenker and Schenkerian analysis.
18 Visceral implies a sort of like a scream of pain from
19 the guts. Hopefully they weren't that; they were
20 more considered. And, besides, not all of them were
21 critical of Dr. Ewell either. So I would not
22 describe it as a visceral reaction.
23        I didn't -- I don't think I would use
24 those words, but who knows? It's possible.
25    Q. Do you recall expressing -- and maybe not in

91

1 these words, but that more caution should have been
2 exercised in publishing --
3    A. Yes, I did --
4    Q. -- this symposium?
5    A. -- because I did not anticipate the
6 reaction. It took me by surprise. I thought that a
7 lot of what Dr. Ewell was saying was outrageous and
8 hypocritical because he said, "I hope we can save
9 Schenkerian analysis."
10        Save Schenkerian analysis from what?
11 Well, from Dr. Ewell's attacks. That's from what.
12 It didn't need to be saved before.
13        So to take this sort of sanctimonious --
14 "I'm only here to save Schenkerian analysis from its
15 enemies of whom I am the main person," I thought it
16 was a little hard to swallow and of their -- and so I
17 think hypocritical is the word I would use for some
18 of what he said.
19        What was the question?
20    Q. I don't -- I asked if you recall expressing
21 that more caution should have been --
22    A. Oh, yes.
23    Q. -- exercised?
24    A. Yes. I was -- I went off on a tangent.
25        I did not anticipate the reaction that

92

1    A. Dr. Ewell would be looked upon as a victim and we
2 would be looked upon as oppressors and racists
3 because I thought a lot of what Ewell was saying was
4 outrageous and ill-founded. So I was taken aback by
5 the -- and had I anticipated such a reaction, I would
6 have counseled a great deal more caution in what the
7 journal did.
8    Q. Would you have read all of the responses
9 before they were published?
10    A. Probably, but what I probably would have
11 done differently was that I -- in retrospect, I would
12 have counseled that we ask Dr. Ewell to participate
13 as a respondent, and I probably would have counseled
14 that in this case everything be peer-reviewed. But I
15 did not anticipate that -- that response.
16    Q. You just mentioned Dr. Ewell, you would have
17 invited him. So was he invited into the process at
18 all?
19    A. No. Well, he was invited only to the extent
20 that he could have submitted --
21    Q. Uh-huh.
22    A. -- an article of his own, and -- like anyone
23 else. He was certainly aware of the call for papers,
24 but he wasn't invited as a respondent to the papers.
25    Q. A respondent to the responses. Is that --

93

1    A. Yeah.
2    Q. Why would he have responded to his own
3 paper?
4    A. Well, it does seem sort of illogical when
5 you put it that way. But that's the extent, that he
6 was not invited in any special role at all.
7        In retrospect, after the response to the
8 journal, he probably -- I would feel -- I don't know
9 if Dr. Jackson would, but I would feel that that
10 would have been the better approach and more cautious
11 approach.
12    Q. So we talked about that Benjamin Graf, you
13 think he resigned as the editor. What about Levi
14 Walls? Did he resign, or do you know what happened
15 to that role?
16    A. Levi was attacked -- Levi was attacked, as
17 was Dr. Jackson, and to some extent, me, as being the
18 assistant editor and the one who signed, I think, the
19 call for papers. And then I think the -- there was
20 something here that was sort of a little introduction
21 to the symposium that he might have signed saying
22 something about, "We welcome," you know, "all
23 opinions."
24        Oh, yes. This introduction to the
25 symposium, he wrote that, though he didn't sign it.

142

1     A. -- the context of that comment, I don't know
2  what he was talking about.
3     Q. And I'm just going to phrase the same
4  question more or less upside down. But did you ever
5  witness Timothy Jackson direct or order Levi Walls
6  not to censor someone, this idea of censorship?
7     A. No. No, no, the issue never came up that I
8  was aware of at all.
9     Q. Uh-huh.
10    A. And, again, I'm not sure what that means.
11 Censor what? Censor who? I mean, who...
12    Q. It's certainly not the job of an editor of
13 any journal to censor people, right?
14    A. Well, granted that I don't even know what
15 that means -- what it would mean, I would say no.
16 But I don't know -- if he made that comment, I don't
17 know what he was talking about. I would need more
18 context.
19    Q. Okay. You also talked about Benjamin Graf
20 and yourself providing feedback to Timothy Jackson in
21 his contribution to Volume 12.
22    A. Yeah.
23    Q. Do you recall talking about that?
24    A. Yes.
25    Q. We already discussed that there was a power

143

1  differential between Benjamin Graf and Timothy
2  Jackson, right?
3     A. Yes, because ultimately Jackson was sort of
4  the head of the Center for Schenkerian studies, and
5  it was his project. So there is a power -- there
6  definitely was a power differential. We sort of
7  acted within that.
8     Q. Did that prevent Benjamin Graf in any way
9  from expressing his criticism of Timothy Jackson's
10 work?
11    A. Well, in my experience, no. And, in fact,
12 he did -- we both did offer rather, you know,
13 explicit critiques of Timothy Jackson's work,
14 specifically in his article for Volume 12.
15    Q. Uh-huh.
16    A. And if Benjamin Graf has said that it did, I
17 wasn't aware of it, and he didn't say it to me.
18    Q. And, in fact, I think you testified Timothy
19 Jackson eventually accepted that criticism that you
20 were -- you and Benjamin Graf were providing?
21    A. Yeah. He pretty much cut most of that out.
22 There were other things I guess we probably could
23 have and should have criticized him, but we spent
24 most of our effort on that. He was stubborn about
25 it, you see, and so we had to expend some energy in

144

1  making our case.
2     Q. Sure. I want to call your attention back to
3  Exhibit 3. Can you get Exhibit 3 in front of you
4  again? I think it's only two pages.
5     A. Is that the letter from UNT faculty members?
6     Q. Yes.
7     A. Yeah, I've got it here.
8     Q. And I just want to direct your attention
9  to -- the first sentence says, "We, the undersigned
10 faculty members of the University of North Texas
11 Division of Music History, Theory, and
12 Ethnomusicology, stand in solidarity with our
13 graduate students in their letter of condemnation of
14 the Journal of Schenkerian Studies."
15         Did I read that correctly?
16    A. Yes.
17    Q. Do you understand that letter of
18 condemnation to be incorporated by reference in that
19 https internet link that's in the middle of the page?
20         MS. QUIMBY: Objection. Form.
21    A. I haven't clicked on that link. I'm not
22 sure where that link goes. It says the students'
23 letter can be found in the link.
24    Q. (BY MR. ALLEN) Okay.
25    A. I've read the letter. I mean, I read the

145

1  letter at the time.
2     Q. Sure. And the -- you don't have any reason
3  to believe that that link wasn't to the student
4  letter that we're both referring to, which you've
5  also referred to as the student petition, right?
6         MR. TODD: Objection. Form.
7     A. I have no reason for supposing that because
8  I haven 't clicked on the link. I don't know where
9  it goes.
10    Q. (BY MR. ALLEN) That's fine. We could do
11 that, but I don't want to really waste our time doing
12 that.
13    A. I know where it says it goes.
14    Q. Yeah. And you did refer to the student
15 letter as a student petition earlier, right?
16    A. Yeah, yeah.
17    Q. And let's look at that second paragraph.
18         It says, "We endorse the call for action
19 outlined in our students' letter," right?
20    A. Uh-huh.
21    Q. And then in the final sentence of that
22 paragraph, it says, "Responsible parties must be held
23 appropriately accountable," right?
24    A. Yes.
25    Q. And in the student letter, as you remember

146

1  it, who was being singled out to be called into
2  account?
3          MS. QUIMBY:  Objection.  Form.
4      A.  Well, it was both Dr. Jackson and, to a
5  lesser extent, myself.  But Dr. Jackson more -- it
6  was a stronger accusation against him.
7          MR. ALLEN:  Why don't we just put in the
8  record the student letter, just so we're not being
9  vague about anything.  Let me -- you'll have to just
10 give me a second.
11     A.  Yeah, I haven't seen it since then.
12         MR. ALLEN:  This will be Exhibit 5 I'm
13 going to mark for the record, and this will be the
14 last exhibit we look at, Professor Slottow.
15         (Exhibit 5 marked.)
16     Q.  (BY MR. ALLEN)  You will see that Exhibit 5
17 is the November 25th, 2020 ad hoc panel report.
18     A.  Well, I don't -- I don't see it at all.
19     Q.  I know.  You don't see it right here.  And
20 I'm going to share it with you.
21         MR. ALLEN:  I don't know.  He doesn't
22 have a screen.  How should we do -- should we go off
23 the record for a second?
24         THE VIDEOGRAPHER:  We're off the record
25 at 3:59 p.m.

147

1          (Recess 3:59 p.m. to 4:12 p.m.)
2          THE VIDEOGRAPHER:  We are back on the
3  record at 4:12 p.m.
4      Q.  (BY MR. ALLEN)  Dr. Slottow, I've introduced
5  into the record Exhibit 5, and I'm just going to
6  represent to you that Exhibit 5 is the ad hoc panel
7  report which has been discussed in earlier
8  depositions and throughout this litigation, and it's
9  dated November 25th, 2020.
10         I'm not going to ask you questions about
11 the entire report, but I want you to focus on one
12 portion of it, which begins on the Bates-numbered
13 page Jackson 226, and it is an exhibit that was
14 attached to the ad hoc panel report.
15     A.  Wait a moment.  I do not have this exhibit
16 in front of me.  I -- wait.  Oh, I see -- unless
17 it's -- unless it's part -- oh, okay.  Wait a minute.
18 This is -- the student petition, the student letter I
19 read is attached to the ad hoc review panel.  So --
20     Q.  Yes.
21     A.  -- now here --
22     Q.  And it's only that student petition that I
23 want to focus on, okay?
24     A.  Okay.  Well, I am -- I have -- I just read
25 that.  I have that in front of me.

148

1      Q.  Well, and my question, for the record, was
2  going to be do you recognize the document --
3      A.  Yes.
4      Q.  -- that begins, "I am sharing this statement
5  on behalf of a cross-section of graduate students in
6  the Division of Music History, Theory, and
7  Ethnomusicology"?
8      A.  Yes, I do recognize it.
9      Q.  And is that the student petition that you
10 had referred to earlier in your deposition?
11     A.  Yes, it is.
12     Q.  So now we're going to do a little flipping
13 back and forth between exhibits, and I want to refer
14 your attention back to Exhibit 3, which was the
15 faculty letter we just talked about.
16     A.  I've got it here.
17     Q.  And we read that paragraph that begins, "We
18 endorse the call for action outlined in our students'
19 letter."
20     A.  Yeah.  Let's see.  Where -- where is --
21     Q.  That's -- the second paragraph begins --
22     A.  Yes.
23     Q.  -- "We endorse the call for action."
24     A.  Right.
25     Q.  So my question is in the student letter,

149

1  which we've just introduced into the record as part
2  of Exhibit 5, can you identify what you understand as
3  the call for action?
4      A.  Well, it's the numbered elements.
5          1. Publicly condemn the issue and
6  release it freely online to the public.
7          2. Provide a full public account of the
8  editorial and publication process and its failures.
9          And then next, Dissolve the Journal of
10 Schenkerian Studies.
11     Q.  Uh-huh.
12     A.  And then, Critically examine the culture in
13 UNT, the College of Music, the MHTE Division, and act
14 to change the culture.
15         And three, Hold accountable every person
16 responsible for the direction of the publication.
17         It certainly is characterized by sort of
18 overblown exaggeration, yes.  That's what I --
19     Q.  And in that --
20     A.  That's what I would say is the call for
21 action.
22     Q.  And in that last number 3 that you just read
23 that said, "Hold accountable every person responsible
24 for the direction of the publication" --
25     A.  Right.

150

1    Q. -- it also says in the last sentence,
2  "Specifically the actions of Dr. Jackson -- both past
3  and present -- are particularly racist and
4  unacceptable," right?
5    A. Yes.
6    Q. And then --
7    A. And then it goes out of its way to praise
8  Philip Ewell.
9    Q. Sure. And so the last question would be
10  about Exhibit 3.
11        When you have been asked questions about
12  this document, Exhibit 3, by the state's attorney
13  Mary Quimby, she had asked you if this identifies
14  Timothy Jackson in the quote "faculty statement"?
15    A. Not in the faculty statement.
16    Q. But it does refer to the student letter and
17  incorporates it by reference, right?
18    A. Yes.
19        MS. QUIMBY: Objection. Form.
20    Q. (BY MR. ALLEN) And does that, quote,
21  "Endorsed student letter" refer to Timothy Jackson
22  directly by name?
23        MS. QUIMBY: Objection. Form.
24    A. The student letter does. The faculty letter
25  does not.

151

1    Q. (BY MR. ALLEN) And when it says,
2  "Responsible parties must be held appropriately
3  accountable" in Exhibit 3 -- you see that last
4  sentence of the second paragraph?
5    A. The last sentence? Yes.
6    Q. Of the -- it says, "Responsible parties must
7  be held appropriately accountable."
8    A. That's not --
9    Q. Do you understa --
10    A. -- the last sentence. You mean --
11        THE REPORTER: I'm sorry?
12        THE WITNESS: That's not the last
13  sentence.
14    Q. That's the last sentence of the second
15  paragraph I was referring to.
16    A. The last sentence is "Specifically, the
17  actions of Dr. Jackson," etcetera.
18    Q. Oh, I'm sorry. I meant Exhibit 3. I'm
19  trying to --
20    A. Oh.
21    Q. -- link -- I'm trying to get some clear -- a
22  clear record of your understanding of how these two
23  documents interact, because obviously the -- as
24  you've already testified, the faculty petition refers
25  to the student petition, right?

152

1    A. Yes.
2    Q. And it incorporates it through a URL or
3  website link, right?
4    A. Right.
5    Q. And the last sentence of that second
6  paragraph of the faculty petition says, "Responsible
7  parties must be held appropriately accountable,"
8  right?
9    A. Yes, it does.
10    Q. And if you then refer to Exhibit 5, which is
11  the student petition, what is your understanding of
12  who is referred to as the responsible parties that
13  need to be held appropriately accountable?
14        MS. QUIMBY: Objection. Form.
15    A. Well, certainly it focuses on Dr. Jackson,
16  but it also says, "every person responsible," and
17  casting a wide net. But Dr. Jackson is the only
18  name -- person's name which is mentioned there.
19    Q. In that specific numbered call for action,
20  right?
21    A. Yes. He --
22    Q. Now, are you -- sorry, I didn't mean to cut
23  you off.
24    A. Yes, he seemed to be the prime mover here.
25    Q. And are you mentioned by name in the student

153

1  petition?
2    A. Yes, I am, actually.
3    Q. And that's in the third paragraph, right, of
4  Exhibit No. 5, the student petition?
5    A. Yes.
6    Q. And it says it's -- it says, "We would like
7  to make it clear that the JSS is not a graduate
8  student journal; since 2010 (Vol.4), it has been run
9  primarily by Drs. Timothy Jackson and Stephen
10  Slottow."
11    A. Right.
12    Q. Did I read that right?
13    A. Yeah.
14    Q. Is that an accurate, factual statement about
15  the journal?
16    A. Yeah, because Dr. Jackson and I were
17  co-directors or director and assistant director. So
18  I would say as far as it goes, it's accurate, as far
19  as the editorial direction.
20    Q. How about the -- in the next sentence where
21  it says, "Students have absolutely no say in the
22  content of the JSS"?
23    A. Well, some students do. The students who
24  are on the staff, you might say, of the journal.
25  Certainly Benjamin Graf and Levi Walls are involved

158

1  accountable, or was it about something else?
2      Q.  It was about the response issue.
3      A.  Well, can you point to a specific -- I think
4  I was referring to a specific sentence.  Do you
5  remember what it was?
6      Q.  "Responsible parties must be held
7  appropriately accountable," at the end of the second
8  paragraph.
9      A.  Yes.  Well, it's a general -- I thought --
10  it would have made more sense in the context of
11  what -- who is Tim Jackson's attorney?  What's his
12  name?
13      MR. ALLEN:  Michael Allen.
14      A.  -- what Michael Allen said.  Now, what was
15  he getting at, he was trying to get at?  I forget.
16      Let me reread the paragraph.
17      Well, I'm not sure exactly what I meant
18  then because it was in response to something that
19  Michael Allen said.
20      MS. QUIMBY:  Could we read back
21  that part of the transcript, please?
22      (Background noise.)
23      THE REPORTER:  I'm sorry?
24      MS. QUIMBY:  Could we read back that
25  last question and answer before we went off the

159

1  record?
2      THE REPORTER:  The last question is:
3      Q.  It doesn't say that he wasn't
4  invited personally, does it?
5      A.  No.  It said he was not afforded the
6  opportunity to respond in print.  I know what that
7  means.  I know what they meant by that, but as for
8  what it actually -- that's what it says.
9      A.  I think I was referring to a sentence with
10  the word "respond" in it.  It wasn't that sent -- it
11  wasn't in the sentence --
12      Q.  Right.
13      A.  The one -- it was the last sentence of the
14  first paragraph.
15      Q.  Now that you've heard that response -- your
16  response again, do you now know -- can you now answer
17  the question of what you meant when you said, "I know
18  what they mean"?
19      A.  Yeah, it meant that we did not -- the
20  journal did not invite Dr. Ewell to provide a
21  response to each of the items in the symposium.
22  That's what they meant.
23      Q.  Okay.  And do you agree with what
24  Dr. Jackson said in his article, particularly the
25  point regarding black anti-Semitism?

160

1      A.  Well --
2      MR. ALLEN:  Objection.
3      A.  -- for the first part, do I agree with what
4  he says in his article, I wouldn't even answer that
5  without having -- rereading the article.  It's been
6  years.  And he says a lot about black anti-Semitism.
7      Well, there are -- certainly are pockets
8  of black anti-Semitism, and there are certainly
9  instances of synagogues being burnt down by some
10  black people.  Those are facts which have been
11  reported on.  So I think some of that is around, yes.
12      Q.  (BY MS. QUIMBY)  And what about what he said
13  in the article that black children are not exposed to
14  classical music?
15      A.  I don't know if that's true or not.  I don't
16  know what he has -- what Dr. Jackson supports that
17  with, and I wouldn't venture to agree or disagree
18  with that statement.
19      Q.  Would you expect that statement to be
20  supported in an academic journal in a scholarly
21  article?
22      A.  I wouldn't venture to say.  I don't know.  I
23  mean, it's too speculative.  Would I expect it to be
24  supported if someone had done a study on it?  I don't
25  know.  I would have to wait to see if someone does do

161

1  a study on it.  Until then, I'm not going to express
2  an opinion.  I think it's -- it's a sort of statement
3  that I don't think should be made without some
4  evidence.
5      Q.  Okay.  Thank you.
6      MS. QUIMBY:  I will pass the witness.
7      MR. ALLEN:  Sure.
8      FURTHER EXAMINATION
9  BY MR. ALLEN:
10      Q.  I just have one more question about the last
11  sentence of the first paragraph in Exhibit 3, the
12  fact that he was not afforded the opportunity to
13  respond in print is unacceptable, right?
14      A.  Right.
15      Q.  You said you know what they mean.
16      A.  Yeah.
17      Q.  And you even explained to the state's
18  attorney, Mary Quimby, what your understanding was,
19  right?
20      A.  Right.
21      Q.  And my question for you is there's been a
22  lot of discussion about what they meant after this
23  faculty petition was published, right?
24      MS. QUIMBY:  Objection.  Form.
25      A.  Wait a minute.  After this faculty -- what

162

1  was published?  It circulated among faculty.  It --
2      Q.  (BY MR. ALLEN)  Sure.
3      A.  -- certainly has appeared in court.  What do
4  you mean was published?
5      Q.  So I'll just represent for the record -- and
6  I'm not trying to make you a legal beagle or
7  anything, but in defamation law, something is
8  published when it's disclosed to another party, like
9  a third party.
10     A.  Okay.
11     Q.  Not necessarily having to be published in a
12  journal or newspaper, all right?
13         So when I -- so maybe I shouldn't use
14  this jargon.  I should say, "when this was
15  circulated."  This was circulated at the time in
16  July 2020, correct?
17     A.  As far as --
18         MS. QUIMBY:  Objection.  Form.
19     A.  I don't know the exact date.  I would have
20  to depend on you.
21     Q.  (BY MR. ALLEN) But you remember receiving a
22  copy of it and being asked to sign it, right?
23     A.  Yes.
24     Q.  At that time was it explained to you what
25  they actually meant by this last sentence?  Do you

163

1  remember --
2      A.  No, because --
3      Q.  -- anything to that effect?
4      A.  -- it wasn't explained because I felt I
5  knew -- I felt that what they meant was obvious.
6      Q.  And all of that what you just said about
7  this statement, that wasn't said in the actual
8  petition that was circulated to you, was it?
9      A.  It's not spelled out into any greater
10  degree, no.  I mean, this is the faculty petition,
11  yes.
12     Q.  Uh-huh.  All right.
13     A.  I think --
14         MR. ALLEN:  I have no --
15     Q.  Go ahead.
16     A.  I think that whoever put it together
17  expected it to be obvious, and I think it is obvious.
18         I would say it clearly refers to the
19  fact that Dr. Ewell was not invited to respond to the
20  items in the symposium.  And that was a common and
21  much repeated criticism at the time.
22     Q.  Wasn't the criticism that was common --
23  wasn't a criticism that was common and repeated at
24  the time that he was excluded from the journal?
25         MS. QUIMBY:  Objection.  Form.

164

1      A.  I don't recall that it was put in those
2  terms to me, no.
3      Q.  Okay.
4         MR. ALLEN:  I don't have --
5      Q.  I'm sorry.  Go ahead.
6      A.  If anyone said that, I would say it would
7  amount to the same thing.  He wasn't invited to
8  respond to the items in the symposium, and that is
9  what was referred to.
10     Q.  Okay.
11         MR. ALLEN:  I don't have any further
12  questions.
13         MS. QUIMBY:  Okay.  Thank you.
14         THE VIDEOGRAPHER:  Do you need to get
15  anything on the record before we go off.
16         THE REPORTER:  Go ahead, Phil?
17         THE VIDEOGRAPHER:  I was just asking if
18  you need to get anything on the record before we go
19  off.
20         THE REPORTER:  I do, thank you.
21         Read and sign, do you want him to waive,
22  or do you want him to read and sign?
23         MR. TODD:  Yeah, we would request that
24  we be allowed to review the transcript, Rule
25  30(e)(1).

165

1         THE REPORTER:  And, Mr. Allen, do you
2  want a copy of the depo?
3         MR. ALLEN:  I'll just need a transcript
4  only.
5         THE REPORTER:  No video.  Is that what
6  you're saying?
7         MR. ALLEN:  Yes.
8         THE REPORTER:  Okay.  All right.  I
9  think that's it.  We can go off the record.
10         THE VIDEOGRAPHER:  Off the record at
11  4:41 p.m.
12         (Deposition concluded at 4:41 p.m.)
13
14
15         * * * * *
16
17
18
19
20
21
22
23
24
25

166

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  STEPHEN SLOTTOW, PhD
3  DATE OF DEPOSITION:  NOVEMBER 7, 2024
4  PAGE     LINE     CHANGE     REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

167

1        I, STEPHEN SLOTTOW, PhD, have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted above.
4
5                _____
                 STEPHEN SLOTTOW, PhD
6
7  THE STATE OF _____ )
8  COUNTY OF _____ )
9        Before me, _____, on this day
10  personally appeared STEPHEN SLOTTOW, PhD, known to me
11  (or proved to me under oath or through
12  _____) (description of identity card or
13  other document) to be the person whose name is
14  subscribed to the foregoing instrument and
15  acknowledged to me that he executed the same for the
16  purposes and consideration therein expressed.
17
18        Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21                _____
                 NOTARY PUBLIC IN AND FOR
22
23                THE STATE OF _____
24  My commission expires: _____
25  _____ No Changes Made _____ Amendment Sheet(s) Attached

168

1        THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2            SHERMAN DIVISION
3  TIMOTHY JACKSON,        )
                           )
4        Plaintiff,   )
                           )
5  VS.              ) CIVIL ACTION
                           )
6  LAURA WRIGHT, ET AL.     ) NO.: 4:21-cv-00033-ALM
                           )
7        Defendants.  )
8
          REPORTER'S CERTIFICATION OF THE ORAL
9         DEPOSITION OF STEPHEN SLOTTOW, PhD
              NOVEMBER 7, 2024
11        I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14        That the witness, STEPHEN SLOTTOW, PhD,
15  was duly sworn by the officer and that the transcript
16  of the oral deposition is a true record of the
17  testimony given by the witness;
18        That the original deposition was delivered
19  to Mr. Patrick Todd to obtain witness's signature.
20        That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  November 11, 2024.
23        I further certify that pursuant to FRCP
24  Rule 30(3) that the signature of the deponent:
25  _XX_ was requested by the deponent or a

169

1  party before the completion of the deposition and
2  that the signature is to be before any notary public
3  and returned within 30 days from date of receipt of
4  the transcript.
5        If returned, the attached Changes and
6  Signature Page contains any changes and the reasons
7  therefore:
8        _____ was not requested by the deponent or
9  a party before the completion of the deposition.
10        I further certify that I am neither
11  counsel for, related to, nor employed by any of the
12  parties or attorneys in the action in which this
13  proceeding was taken, and further that I am not
14  financially or otherwise interested in the outcome of
15  the action.
16        Certified to by me on this, the 11th day
17  of November, 2024.
18
19        _____
20        VANESSA J. THEISEN, Texas CSR, RPR
          Texas Cert No. 3238
          Expiration Date:  10/31/25
21        Integrity Legal Support Solutions
          Firm Registration No. 528
22        9901 Brodie Ln., Ste. 160-400
          Austin, Texas 78748
23        (512) 320-8690
          www.integritylegal.support
24
25