UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **Timothy Jackson**, <br><br> Plaintiff, <br><br> v. <br><br> **Laura Wright**, **Milton B. Lee**, **Melisa Denis**, **Mary Denny**, **Daniel Feehan**, **A.K. Mago**, **Carlos Munguia**, and **G. Brint Ryan**, each in their official capacities as members of the Board of Regents for the University of North Texas System; **Rachel Gain**; **Ellen Bakulina**; **Andrew Chung**; **Diego Cubero**; **Steven Friedson**; **Rebecca Dowd Geoffroy-Schwinden**; **Benjamin Graf**; **Frank Heidlberger**; **Bernardo Illari**; **Justin Lavacek**; **Peter Mondelli**; **Margaret Notley**; **April L. Prince**; **Cathy Ragland**; **Gillian Robertson**; **Hendrik Schulze**; **Vivek Virani**; and **Brian F. Wright**, Defendants. | Case No. 4:21-cv-00033-ALM |

**PLAINTIFF TIMOTHY JACKSON'S REPLY
IN SUPPORT OF HIS
<u>MOTION FOR SUMMARY JUDGMENT AS TO DEFAMATION</u>**

**I.    NO BLANKET DEFAMATION IMMUNITY FOR "EXHORTATION" OR "ADVOCACY"**

The Defamation Defendants and the State of Texas urge this Court to interpret *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023) as a new standard for Texas defamation law that exempts "exhortatory" or "advocacy" language from defamation. The Texas Supreme Court's earlier case, *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002), demonstrates that this is erroneous. See also e.g., *Sabal v. Anti-Defamation League*, No. 4:23-cv-01002-O, 2024 U.S. Dist. LEXIS 225829, at *16 (N.D. Tex. Dec. 13, 2024) (post-*Lilith*, denying summary judgment in part to organization with advocacy mission to "strategically monitor, expose and disrupt extremist threats").

1

In *Bentley*, a Texas judge sued a community talkshow host and "soapbox orator" for defamation because the talkshow host maligned him as "corrupt." *Bentley*, 94 S.W.3d at 584. There can be no doubt that the talkshow host was an "advocate" and used "exhortatory" language. The talkshow host wished to smear the judge as "dishonest, unethical, shady, and unscrupulous," not unlike how Defendants smear Professor Jackson as "racist." Id. at 582. And just like the Defamation Defendants here, the *Bentley* defendant could not resist making things up. Id. After a thorough review of the defense of "opinion" under Texas law, the court held that a "soap box, electronic or wooden, does not lift a speaker above the law of liability for defamation." Id. at 585. Obviously, the Texas Supreme Court did not intend to create a blanket exemption for "exhortatory" or "advocacy" language.

20 years later, *Lilith* itself emphasized that *Bentley* was good law. *Lilith Fund*, 662 S.W.3d at 368-369. *Lilith* also emphasized the important distinction between action or "conduct," on one hand, and mere opinion, which *Bentley* had explored at such length. *Bentley* and *Lilith* indicate that "opinion" always lies in the province of speech, but action does not. See e.g., *Bentley*, 94 S.W.3d at 580 ("the Constitution protects statements that cannot reasonably be interpreted as stating actual facts about an individual made in debate over public matters. . .") (cleaned up). The Texas Supreme Court found it important that the defendants in *Lilith*, pro-life activists "d[id] not . . . falsely convey[] that [the defamation plaintiffs] had engaged **in particular conduct** when they had not" (emph. added). In addition, *Lilith* held that the abortion debate is such well-trodden ground that anyone would understand that activists were "advanc[ing] long-standing arguments." Id. at 368.

There was no similar "long-standing" argument about whether Heinrich Schenker's complex graphs of the structure of musical thought and the operation of tonal hierarchy in symphony music (or other musical art forms) somehow perpetuate "white supremacy," or somehow oppress black Americans. To ordinary observers, the viewpoint from which this Court must rule on defamation,

2

these allegations are patently absurd. They are just as absurd as other eructations of so-called "antiracism": say, for example, that offering law students fried chicken is "structural and systemic racism";[1] or that the term "field work" in the social sciences conveys "racist connotations related to slavery";[2] or that the "okay sign," which is also almost universally used as an emoji "👌," is somehow a symbol of "white power."[3] This Court should not mistake deranged, hallucinatory interpretations of matters of public concern, such as Defendants' analysis of racism, as indicia of how reasonable people of ordinary intelligence commonly discuss or understand such matters.

In short, Defendants may be entitled to their opinions, rooted in whatever they mean by "antiracism." But "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts," it remains actionable. *Bentley*, 94 S.W.3d at 580. Although *Bentley* addressed a public figure, which Jackson is not, its ruling applies equally to a private figures:

> There is a broad distinction between fair and legitimate discussion . . . and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the . . . character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured.

*Bently*, 94 S.W.3d at 582-583 (quoting *A. H. Belo & Co. v. Looney*, 112 Tex. 160, 246 S.W. 777, 783 (Tex. 1922) (quoting *Negley v. Farrow*, 60 Md. 158 (1883)).

"Aspers[ing] the character" is exactly what Defendants did to Professor Jackson. And smearing him as a "racist"— rather than, say, engaging in debate—was never enough. It was never enough to attack his ideas, his evidence, his reasoning—that might have yielded scholarship, after all.

---

[1] Email from Yale Law student sparks national discussion on racism and free speech, Yale News, October 19, 2021 avail. at https://yaledailynews.com/blog/2021/10/19/email-from-yale-law-student-sparks-national-discussion-on-racism-and-free-speech/.
[2] Giulia Heyward, A USC office removes 'field' from its curriculum, citing possible racist connotations, NPR, January 14, 2023, avail. at https://www.npr.org/2023/01/14/1148470571/usc-office-removes-field-from-curriculum-racist
[3] Anti-Defamation League, hate symbol, Okay Hand Gesture: Racist Hand Signs, avail. at https://www.adl.org/resources/hate-symbol/okay-hand-gesture.

Defendants had to attribute to Jackson "actions" and "behaviors" which they knew did not exist. This cannot be excused as "exhortation" or "advocacy."

Defendant Gain did one better. With admittedly no knowledge, she circulated ignorant and baseless accusations that Jackson was guilty of "extortion," a crime which she did not even pretend to understand, based on "facts" she had no direct knowledge of. Furthermore, Defendant Gain's "extortion" petition was not even public "exhortation" or "advocacy." It was private conniving to get Professor Jackson fired.

## II.   NO DEFENSE OF TRUTH FOR EXTORTION

In addition to party admissions that there is no evidence of extortion, the evidence also shows that Defendant Rachel Gain's defamatory "extortion" statement was born of the petty grievances of coddled graduate students. It is certainly not based in "truth."

Peter Kohanski, the President of the Graduate Association of Musicologists and Theorists (MHTE's grad-student organization), insisted that there are no circumstances in which a professor should fail a graduate student who is not meeting expectations. (Kohanski Dep, 66:19-22.) The MHTE graduate students obviously felt that they could not be and should not be accountable for poor work. Defendant Gain called this "extortion," but only "heard secondhand" about Jackson's grading; saying, "[t]hat's the extent of my knowledge…. [and] [she] wasn't in the country at the time." (Gain Dep, 50:2-19; 57:22-58:10.) Likewise, Kohanski did not "remember" what "specific [grade] manipulation was referred to" in the student petition accusing Jackson of extortion. (Kohanski Dep, 64:20-22.)

Gain now asserts that her subjective beliefs about grading entitle her to the defense of "truth." ECF No. 92 at Page ID #: 5222-5223. Defendants argue that Gain is entitled to her subjective beliefs that "extortion" really means "grade manipulation," which, to the graduate students of MHTE, really means being graded at all. Id. at Page ID #: 5222. But there is no

evidence of grade manipulation. It is also important to see, in full, what Gain actually said about "extortion" in her evasive and un-credible testimony:

> Q. … This document also accuses Dr. Jackson of extortion. Are you aware that extortion is a crime?
>
> A. I'm not really up to date with U.S. laws, as a recent immigrant.
>
> Q. Okay. Is it your position that Timothy Jackson committed a crime?
>
> A. I don't know. I'm not a lawyer.
>
> Q. Okay. Do you agree that just -- you know, as a recent immigrant, you are bound by the laws of the United States?
>
> A. Yes.
>
> Q. Are you aware that falsely accusing someone of a crime is defamation?
>
> A. Will you repeat the question, please?
>
> Q. Are you aware that falsely accusing someone of a crime is defamation?
>
> A. I'm not aware of that.
>
> Q. Okay. Who did Dr. Jackson, in your view, extort?
>
> A. Where does it say 'extort" on here?
>
> Q. Under -- No. 3, under "Calling for Dr. Jackson's Dismissal, extortion through grade manipulation and threats to students' careers and reputations."
>
> A. Could you repeat the question, please?
>
> Q. Who did Dr. Jackson allegedly extort?
>
> A. I believe that refers to Yiyi Gao.
>
> Q. Okay. And how did he extort her?
>
> A. I've told you what I've heard secondhand. That's the extent of my knowledge that I remember today.

(**Exhibit P**, Gain Dep, 48:23-50:6.) There can thus be no Defense of "truth" for Defendant Gain.

The basis for Gain's accusation of "extortion" was nothing more than subjective impressions, malicious rumors, and innuendo. She also opined that asking a student to complete

5

work at another time that the student was supposed to complete during the academic year would "go against the terms of [the student's] international student visa." (Gain Dep, 36:18-24.) By contrast, MHTE grad-student President Kohanski "guess[ed] not" when asked whether it was abusive to be required to complete work that had been left undone. (Kohanski Dep, 21:9-10; 63:25-64:3.) Gain's equivocation that she is "not a lawyer," was "not aware of that," and "really not up to date with U.S. laws…" is itself evidence that she had ample reason to doubt her "factual" assertions, and not just about "extortion." (Id. at 48:23-25; 49:4.)

### III. DEFAMATORY STATEMENT THAT JACKSON WAS GUILTY OF "EXTORTION" IS SUBJECT TO THE NEGLIGENCE STANDARD

There can also be no dispute that the student petition accusing Professor Jackson of the crime of "extortion," which Defendant Rachel Gain drafted at least in part, does not target Professor Jackson as a "limited public figure." **(Exhibit N**, Kohanski Dep, 23:9-15; **Exhibit O** at Page ID #451-453.) It defames Professor Jackson as a private citizen. Therefore, the negligence standard applies.

Even if the Court were to find that an obscure scholarly debate in Schenkerian studies somehow elevates Professor Jackson to the status of "limited public figure," Defendant Gain's defamatory statement of "extortion," circulated to his bosses, is a private communication calculated to ruin a private figure. It did not even concern the Schenker controversy. It concerned alleged grade manipulation, which testimony makes clear meant, to the graduate students, holding them to any consistent standards.

Again, based on Defendants' own authority, the standard for finding a limited public figure has three parts:

> (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

6

> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
>
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (citing *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir.1987); *Waldbaum v. Fairchild Publ'ns, Inc.* 627 F.2d 1287, 1296-98, 201 U.S. App. D.C. 301 (D.C.Cir.1980)).

Here, the first element is the most important, and defendants cannot satisfy it. "[T]he judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice." *Polk Cty. Publ'g Co. v. Coleman*, 668 S.W.3d 385, 393-94 (Tex. App. 2021), rev'd on other grounds, 685 S.W.3d 71 (Tex. 2024) (quoting *WFAA-TV* at 572); see also *NRA of Am. v. Ackerman McQueen, Inc.*, No. 3:19-CV-2074-G, 2021 U.S. Dist. LEXIS 153421, at *37 (N.D. Tex. Aug. 16, 2021) (same). Furthermore, "a person's voluntary participation in one or more aspects of a multifaceted public controversy does not necessarily render that person a limited public figure for every constituent 'sub-controversy.'" *NRA of Am.* at *37-*38.

The "extortion" issue is just such a private "sub-controversy."

There is no evidence that "extortion" or MHTE grading practices were discussed in the public sphere. Whatever one makes of the controversy surrounding Heinrich Schenker, Professor Jackson as Schenker's scholarly paladin, or Philip Ewell's "white racial frame," "extortion" in grading practices at UNT played no role in that controversy. There was no media coverage. Nothing suggests that the public cared about or had any way to know about UNT's over-privileged graduate students' caviling about their entitlement to inflated grades. This was not "public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution." *WFAA-TV, 978* S.W.2d at 571.

Therefore, the "extortion" statement fails element (1) of the *WFAA-TV/Trotter* standard. His claims fall under the negligence standard for defamation.

## IV. SCHOLARLY JOURNAL ARTICLES DO NOT CREATE A "LIMITED PUBLIC FIGURE"

Defendants assert (not without contradicting themselves) that Professor Jackson is a "limited public figure" because he published extensively in the esoteric field of music theory. But, at most, Jackson had gained prominence as a scholar in his field. Multiple cases hold that publications in academic fields, even in fields that percolate into public awareness, do not transform an individual into a "limited public figure."

Professor Jackson already briefed the Supreme Court's precedent on this issue in *Gertz v. Robert Welch*, 418 U.S. 323, 351-352, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) and *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979). These cases date back to the 1970s, however. Professor Jackson expands that analysis here to show that this remains good law in both federal and state courts.

For example, in *Croce v. Sanders*, 459 F. Supp. 3d 997, 1014-17 (S.D. Ohio 2020), the District Court found a defamation plaintiff, Dr. Croce, to be a private figure. This was despite the good Doctor's own estimation that he was "considered like the Pope of … genetics…"; a "pioneer"; "one of the world's most distinguished scientific researchers…"; and, no less, "one of the most cited scientists in the world." Id. at 1014. Just like Professor Jackson here, Dr. Croce was dragged into a controversy over alleged misconduct in scientific research and publishing. Id. at 1015. Cancer research "is a matter of great public importance"; and "Dr. Croce published articles in scientific, peer-review journals," but "not in media of general public circulation." Id. His academic publications did not make him a limited public figure.

The court also held, "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Id.

8

(quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167, 99 S. Ct. 2701, 61 L. Ed. 2d 450 (1979).)  "Nor can [Defendants and the State of Texas] create their own defamation defense by dragging someone 'unwillingly' into a public controversy."  Id. (quoting *Wolston* at 168.)

Here, Jackson was a private individual building his reputation within an academic niche.  But when colleagues and students suddenly shrieked, "Racism!"—and only then—was Jackson dragged into the public realm.  See also *Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476 (Minn. 1985) (holding individual plaintiff was "private figure" where he publicly solicited investment which the court found comparable to specialized publications in the *Gertz/Hutchinson* line of cases); *Sam Reuber v. United States*, No. 82-1033, 1982 U.S. Dist. LEXIS 18382, at *5 (D.D.C. Aug. 25, 1982) (finding "plaintiff's general research and writings in his chosen profession are not sufficient to elevate him to the status of public figure" and "[p]laintiff's prominence and reputation among those involved in plaintiff's narrow field of study do not trigger application of the heightened standard").

Professor Jackson was a private figure and is entitled to judgment as a matter of law under the negligence standard.

### V. DEFENDANTS ARE NOT ENTITLED TO SPEAK "*THEIR*" TRUTH; ONLY OBJECTIVE TRUTH COUNTS AS AN AFFIRMATIVE DEFENSE

The faculty Defamation Defendants claim the defense of truth with regard to the statement, which they assert in their own words as "fact," that Philip Ewell "was not afforded the opportunity to respond in print [i.e., in the pages of JSS]."  (**Exhibit C** at Page ID #284.)  This statement does not say that Jackson failed to personally invite Philip Ewell.  (Compare ECF No. 92 at Page ID #5215.)  This statement does not say that the JSS call for papers failed to mention Philip Ewell explicitly (it did).  (Compare **Exhibit G**, Bakulina Dep, 168:168:15-23.)  Defendants categorically stated that Philip Ewell was not afforded the opportunity to respond in print.

As Defendant Bakulina testified, none of the extra verbiage Defendants would now read into this statement actually appears in the statement.  Bakulina, for example, did not "ever suggest that

9

anyone add all of the verbiage" that she and Defendants now claims is "implied." (Bakulina Dep, 169:12-15; **Exhibit DDD**, Ishiyama Dep, 116:2-8.) Even Professor Ishiyama, the architect of the pretextual "Ad Hoc Panel," admitted that this statement is false if Philip Ewell received the JSS call for papers. (Ishiyama Dep, 114:7-13.)

Defendants ask the Court to read invisible words into their defamatory statement of "fact." That is not the law. The standard this Court must apply is the hypothetical reasonable reader of ordinary intelligence. This means asking "how a 'hypothetical reasonable reader' would understand the publication, and not how any particular reader actually understood it." *USA Today v. Ryan, LLC*, No. 09-22-00432-CV, 2024 Tex. App. LEXIS 3054, at *33 (Tex. App. May 2, 2024) (citations omitted). The standard is more appropriately the typical juror, and not the esoteric community of music theorists who defamed Jackson.

It would never occur to a hypothetical reader of ordinary intelligence to read nonexistent words into Defendants' defamatory statements. Obviously, Defendants knew that Professor Ewell was perfectly welcome to respond in the pages of the JSS. (Ishiyama Dep, 114:13-115:2.) This was discussed at the time, including by Levi Walls. The JSS editorial staff thought it "is perfectly reasonable, and I don't think anyone would have a problem with that [i.e. publishing Ewell]." (**Exhibit JJ** at UNT_000301.) The context makes clear that if Defendants implied anything, it was clearly not the verbiage they testified to *post hoc*. It was simply this: they wanted their readers to infer that Jackson excluded a black man, Philip Ewell, because Jackson is allegedly "racist"—for which there is no evidence. The State of Texas just repackages this malicious aspersion. They now say Jackson "was silencing" and the JSS call for papers was "designed to exclude." ECF No. 92 at Page ID #: 5215. But if there was one individual who was never silent, it has been Philip Ewell.

## VI.   CONCLUSION

For the foregoing reasons, the Court should enter summary judgment against Defendants.

10

|  |  |
|---|---|
|  | Respectfully submitted, |
| DATE: January 24, 2025 | /s/Michael Thad Allen |
|  | Michael Thad Allen, Esq.<br>D. Conn. Bar No. CT29813<br>admitted *pro hac vice*<br>Lead Attorney<br>ALLEN LAW, LLC<br>PO Box 404<br>Quaker Hill, CT  06375<br>(860) 772-4738 (phone)<br>(860) 469-2783 (fax)<br>mallen@allenharrislaw.com |
|  | Jonathan Mitchell<br>Texas Bar No. 24075463<br>MITCHELL LAW PLLC<br>111 Congress Avenue, Suite 400<br>Austin, Texas 78701<br>(512) 686-3940 (phone)<br>(512) 686-3941 (fax)<br>jonathan@mitchell.law |
|  | for PLAINTIFF |

## CERTIFICATE OF SERVICE

I hereby certify that on the date specified in the caption of this document, I electronically filed the foregoing with the Clerk of Court, to be served on all parties of record via the CM/ECF system.

/s/Michael Thad Allen
Michael Thad Allen