UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033 |
| | § | |
| LAURA WRIGHT, et al., | § | JURY |
| | § | |
| *Defendants.* | § | |

**REPLY IN SUPPORT OF DEFAMATION DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Jackson has not demonstrated falsity of the allegedly defamatory statements; therefore his defamation claim fails for that reason alone. He also fails to establish that he is a private figure instead of a limited purpose public figure, and fails to demonstrate that the Defamation Defendants acted maliciously *or* negligently. For the reasons set forth in the Defamation Defendants' MSJ, their Response to Jackson's MSJ, and herein, Jackson's defamation claim must be dismissed.

**ARGUMENT & AUTHORITIES**[1]

**I.   Jackson has not demonstrated falsity.**

The question of whether something is a statement of fact, or non-verifiable and non-actionable opinion, is a question of law. *Dallas Morning News v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018).

Jackson has not demonstrated that the statements he alleges are defamatory are false – the students' opinion that he engaged in racist actions, and that Ewell was not invited (by the JSS) to

---

[1] Like in his Motion for Summary Judgment on the defamation claim, Jackson's "factual background" in his Response contains a significant amount of argument. The inaccurate assertions are not limited to the ones addressed herein.

1

respond in print.[2] In his Response, Jackson does little more than repeat the red herrings that these statements are false because Jackson's speech does not count as an "action;" and that Ewell received the general call for papers that the entire music theory community received, therefore he was "invited to respond in print." As argued in the Defamation Defendants' Response to Jackson's Motion for Summary Judgment (the "Response"), these arguments are not supported by the text of the Student Petition or Faculty Petition, or the evidence. *See* Doc. 92 at pp. 15-19.

Jackson does not argue that the Student and Faculty Petitions are anything but a list of demands supported by opinions. He does not argue that a reasonable reader would not understand the Petitions to be petitions, based on the language used, the context of all of the statements in the petitions, and the context of the Schenker controversy. Rather, he argues that this case is not like *Lilith Fund* because in that case, the defendant identified specific, identifiable, "real behavior," that he believed was "murder;" but here the students did not specifically identify Jackson's racist actions in their Petition.[3] *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023). Jackson thereby suggests that the students were required to state the basis for their opinion in the Petition in order for their opinions to be protected.[4] *Lilith Fund* does not so hold. Further, Jackson

---

[2] As stated in the Defamation Defendants' Response, even if the statement about Ewell's opportunity to respond in print is only substantially true and not *literally* true, it is still not defamatory. *See* Doc. 92 at p. 18.

[3] In *Lilith Fund*, Dickson does not specifically identify plaintiffs' specific behavior that he thought was murderous. *Lilith Fund*, 662 S.W.3d at 358-59. Rather, the language of his statements and the context fills the reader in that Dickson's opinion was that the plaintiffs' pro-choice advocacy, indeed their mere existence, was tantamount to "murder." *Id*. at 368.

[4] Jackson concludes that his own article in Volume 12 follows this rule, asserting it is protected speech because it is "based on evidence." *See* Doc. 89 at p. 34. For example, Jackson concludes that Ewell is antisemitic without citing supporting evidence. Doc. 82-4 at UNT 1013. He simply cites data stating that there is a high incident of antisemitism among black people, points out that Ewell, a black man, criticized Schenker, who was Jewish, and surmises that "Ewell's denunciation of Schenker and Schenkerians may be seen as part and parcel of the much broader current of Black anti-Semitism." *Id*. He does not cite to any "evidence" showing Ewell himself is an antisemite,

himself argues that Student Petition's "primary focus was Jackson's speech," showing that a reasonable reader could determine that the students were referring to his article. Doc. 89 at p. 38.

Jackson is asking this Court to stand in judgment of the students and tell them both that their opinions are wrong, and that they were wrong to express them. *Lilith Fund*, 662 S.W.3d at 362. He is asking this Court to stand in judgment of the Faculty Defendants and tell them that they were wrong for supporting their students' right to express their opinion. *Id.*, *See also* Doc. 83-2, Defamation Defs'. MSJ APPX. 050, 123:24-124:5. The Defamation Defendants respectfully request that this Court uphold their rights and not indulge such an unconstitutional request.

### I.      Jackson is a limited purpose public figure

Like the issue of falsity, the question of public figure status is one of law for courts to decide. *WFAA-TV v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

A public controversy based on an esoteric topic is still a public controversy, and Jackson points to no law stating otherwise. Jackson argues that he is a private individual, not a limited purpose public figure, because the Schenker controversy would have remained "an obscure academic debate" but-for the Defamation Defendants' "moral panic." As demonstrated below, the Schenker controversy existed well before the Defamation Defendants entered the conversation.

To restate the *Trotter/Waldbaum* elements, to be a limited purpose public figure: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of the resolution; (2) the plaintiff must have had more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participating in the controversy. *Trotter v.*

---

other than by virtue of being black. Indeed, others have assessed Ewell's criticism of Schenker, and Jackson's article, and found Jackson did not present information in his article to warrant such a conclusion. REPLY APPX.002, 71:13-72:1.; Doc. 83-2, Defamation Defs'. MSJ APPX.046.

3

*Jack Anderson Enters.*, 818 F.2d 431 (5th Cir. 1987). All three elements are met here.[5]

In *Trotter*, the Fifth Circuit found that limited purpose public figures achieve their status by thrusting themselves to the forefront of a public controversy *in order to influence the resolution of the issues involved*. 978 S.W.2d at 572. To identify and determine the contours of the controversy, the judge must examine whether persons actually were discussing some specific question, a general concern or interest will not suffice. *Id*. Despite Jackson attempts to downplay the status of the "Schenker controversy" as a public controversy, and his role in it, the evidence shows that Jackson's own actions placed him at the forefront of the *specific discussion* about "whiteness" in the field of music theory. Jackson cannot dispute that the purpose of Volume 12 was to *influence* music theorists against Ewell's arguments.

In *McLemore*, the plaintiff was a journalist who inserted himself into the Branch Davidian controversy in Waco, Texas, and was blamed, at least in part, for the failure of the Bureau of Alcohol, Tobacco, Firearms' ("ATF") mission to invade the compound. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 570-71 (Tex. 1998). He sued a rival television station for publishing a story about his role in the debacle. *Id*. The court of appeals found that the controversy at issue was limited only to the plaintiff's ethical standards as a journalist, therefore he was a private individual. *Id*. at 572. The Texas Supreme Court disagreed, finding instead that the controversy was much broader and encompassed the question of the local media's role in the ATF's failed mission, and ultimately concluded that the plaintiff was a limited purpose public figure. *Id*. at 572-73.

---

[5]Jackson does not dispute the second and third element except to restate his argument that the Defamation Defendants caused the Schenker controversy to be public, therefore the Defamation Defendants refer to their MSJ for the argument and support relating to the final two elements. *See* Doc. 83 at p. 18.

Here too, the Schenker controversy is much broader than what Jackson presents. It started with Ewell's SMT address in 2019, which Jackson describes as the impetus for Volume 12. *See e.g.* Doc. 1 ¶¶ 30-35, REPLY APPX.039-040,129:16-130:06. Jackson compares Ewell to Joseph Stalin, noting that his talk was well received but not by all, and those who did not agree with it were afraid to speak out. *Id*. Schenkerians began discussing Ewell's talk behind the scenes, and Volume 12 arose as the outlet for those who did not agree with Ewell to "stand up and question [Ewell's] assertions" in print. REPLY APPX.038-040, 124:5-126:18, 129:16-130:06; Doc. 89 at p. 7 ("[t]he JSS would provide the forum that the SMT refused to allow.") As Jackson oft argues in one way or another – **his denunciation of Ewell** [in Volume 12] "incited an academic mob" and UNT **joined** the witch hunt. Doc. 1 at p.2.

The timeline of the Schenker controversy also indicates it was a public controversy pre-Petitions. Jackson acknowledges criticism of Volume 12 began appearing on social media on July 25, basically as soon as it was published. He testified that he first heard about the criticism about Volume 12 through friends who alerted him to "an attack on Twitter against the [S]ymposium." REPLY APPX.041, 207:20-24. He testified that this criticism was coming from *outside* of UNT, from people who he assumed were "Ewell's friends and colleagues and students *at other places* and people, generally, sympathetic to [Ewell's] point of view." REPLY APPX.041, 208:6-12; Doc. 1 ¶¶ 52-53.

Defendant Gain learned of the Schenker controversy on July 25, 2020 when she observed "quite a lot of people" from outside of UNT posting their opinions about Volume 12 on Twitter. Doc. 84-2, Board Defs'. MSJ APPX.058, 6:25-7:19. Also on July 25, Defendant Chung notified his colleagues of the "vociferous pushback" regarding Volume 12 on Twitter, Defendant Bakulina noted she saw the same thing on Facebook, and Defendant Cubero stated that the issue grabbed

5

the attention of SMT's Committee on Diversity. Doc. 89 at p. 9, APPX.004, 137:12-138:18, REPLY APPX.007, REPLY APPX.009. The backlash was already so bad that Walls was worried that his career would be ruined because his name was attached to the JSS. REPLY APPX.046, 62:21-63:15.

The criticism continued and intensified on July 26. REPLY APPX.051-053. Defendant Heidlberger identified criticism of Volume 12 from outside of UNT, including a Facebook post (that appeared on or before the morning of July 27 and garnered significant attention and comments) by prominent music theorist Edward Klorman, which identified Jackson's article as the "core of racism." REPLY APPX.054-065.

On July 27, 2020, the Student Petition was posted on Twitter.[6] SMT's Response was circulated on the same day.[7] The Faculty Petition came days later on July 31. Doc. 1-5 at 22-23. The Defamation Defendants did not cause the Schenker controversy, they merely circulated their respective Petitions to distance themselves from what they believed to be the unscholarly rhetoric in Volume 12. Doc. 1-5, at pp. 20-23, REPLY APPX.030, 75:6-10. All of the *Trotter* elements are met.

Jackson should not be allowed to downplay his role in the Schenker controversy so that he can more easily accuse the Defamation Defendants. Jackson's ability to respond to Ewell is protected, but so too is the Defamation Defendants' ability to weigh in without liability for their opinions. Jackson must prove the Defamation Defendants acted with actual malice. For the reasons stated in the Defamation Defendants' MSJ, their Response, and below, he has not done so.

---

[6] At the earliest, it appears that the Student Petition was circulated to faculty members around 5:00 PM. REPLY APPX.066, REPLY APPX.050.
[7] *See* https://x.com/SMT_musictheory/status/1287918277667192833?mx=2 (last accessed January 23, 2025).

## II. Jackson has not demonstrated that the Defamation Defendants acted maliciously or negligently.

Setting the issue of falsity aside, most of the remaining points raised by Jackson regarding actual malice are addressed in the Defamation Defendants' Response and will be reiterated only briefly here. For the sake of completeness, Defamation Defendants will address that Jackson has not demonstrated they acted maliciously *or* negligently.

Negligence requires the plaintiff to show that the defendant knew or should have known the statement at issue was *false* unless the content of the statement would not warn a reasonably prudent publisher of its defamatory potential. *D Magazine Partners L.P. v. Rosenthal*, 529 S.W.3d 429, 440 (Tex. 2017).

First, regarding the Faculty Defendants' inability to identify Jackson's extortion, the Faculty Petition did not link to the (First) Student Petition, therefore they cannot be held liable for its contents, including the statement about extortion. *See* Doc. 92 at pp. 5-9. The students did not publish the statement maliciously or negligently because they had reliable knowledge of, and no reason to doubt, its truth. *Id*.

Regarding Defendant Gain specifically, Jackson concludes that she "avoided the truth" but fails to identify what information she avoided. He concludes that she lied,[8] citing to her testimony in which she describes that she learned about Jackson's reputation for mistreating women and therefore did not want to meet him or take a class with him, as evidence that she admitted that she avoided factual information about Jackson. REPLY APPX.014-015, 52:9-54:4. This argument that she "avoided the truth" about Jackson is not supported by the testimony Jackson cites, or otherwise.

---

[8] Jackson states that Defendant Heidlberger's testimony is more reliable than some of the other Defamation Defendants' because it was taken early in the case and therefore there was less opportunity for defense counsel to interfere. Doc. 89 at pp. 42-43. Apparently, this logic does not apply to Defendant Gain, who, like Defendant Heidlberger, was deposed on May 19, 2021. *See* Doc. 84-2, Board Defs'. MSJ APPX. 067; MSJ APPX.057.

Next, Jackson's proposed speech vs. actions distinction is also not supported by the text of the Student Petition (the only petition that references Jackson's "racist actions"). Jackson suggests that the students used the word "actions" to deliberately mislead, but there is nothing in the text of the Student Petition that indicates that the students intended to employ a purely legal distinction to *specifically exclude* Jackson's statements as an example of an action. *See* Doc. 92 at pp. 19-20. Nor is there any evidence that the Faculty Defendants read the Student Petition to make such a distinction and decided to join in on the alleged deceit by "endorsing" it. *See* Doc. 92 at p. 12.

The Student Petition, culminating in the "call to action" in which the "racist actions" statement appears, is meant to be a list of demands. *See* Doc. 1-5 at 20-21, Doc. 92 at pp. 10, 21-22. The students' opinion that Jackson has engaged in racist actions provides context and an explanation as to why they are making their demands, and is clearly not a list of facts. *Id*; *Compare Bentley v. Bunton*, 94 S.W.3d 561, 584 (Tex. 2002) (clear import of the defendant's statements, where he insisted he could "prove" his opinions, was that the plaintiff was corrupt as a matter of verifiable fact.).

The Faculty Defendants have also been clear about their intent to endorse only the two elements of the "call for action" actually stated in the Faculty Petition. *See* Doc. 92 at pp. 12-15. There is nothing in their Petition that would have tipped them off that anyone would read their "endorsement" in this manner and find something defamatory in it.

Jackson points to Defendant Heidlberger's deposition testimony for the proposition that he made a "party admission" that the Faculty Petition endorsed the entire Student Petition. In reality, Defendant Heidlberger confirmed that his signature was on the Faculty Petition, and thus he endorsed it. REPLY APPX.030, 75:6-15. He goes on to confirm that he endorsed the specific portion of the Student Petition stated in the Faculty Petition – "which asks that the College of

8

Music publicly condemn the issue and release freely online to the public and provide a full public account of the editorial and publication processes, and its failures. Responsible parties must be held appropriately accountable." REPLY APPX.030, 75:16-76:13. To the extent that Defendant Heidlberger's testimony is any more reliable than the other Faculty Defendants deposed in this matter, it corroborates their testimony and the text itself: the Faculty Defendants endorsed only the two points of the call to action that are actually stated in the Faculty Petition.

Jackson's argument that the students purposely "collapsed" the inapplicable legal distinction between speech and actions to "lie" about their *opinion* that Jackson engaged in racist actions is unsupported by the text and the evidence. Any argument that the Faculty Defendants intended to adopt this "gist" is also unsupported. *See* Doc. 92 at pp 12-15.

Finally, regarding the statement about Ewell's invitation to respond in print, Ewell was not invited to respond in print because receiving the general call for papers was no such "invitation." *See* Doc. 92 at pp. 15-18. People with an understanding of the Schenker controversy know exactly what the Faculty Defendants meant by this statement – that he was not invited to respond to the *responses* to the call for papers in Volume 12. *See* Doc. 92 at pp. 15-19. For example, Slottow testified that he knew this statement meant that the JSS did not invite Dr. Ewell to provide a response to each of the items in the symposium. REPLY APPX.044,159:19-22.

Slottow (and Jackson) even had an opportunity to "correct" this statement before the Faculty Petition was published. Defendant Geoffroy-Schwinden circulated a draft of the petition to *all* MHTE faculty members, including Jackson and Slottow, and neither of them spoke up and said that the statement was false or misleading. *See* REPLY APPX.016-028, REPLY APPX.042, 251:22-253:1; Doc. 83-2, Defamation Defs'. MSJ APPX.095, 32:24-33:23. Nor did anyone else express that the statement was false or misleading. Slottow testified that he discussed the Faculty

Petition with Geoffroy-Schwinden and told her he would not sign because he thought it was hypocritical to protest actions that he was a part of, and that he did not agree that the journal was being racist. Doc. 83-2, Defamation Defs'. MSJ APPX.095, 32:24-33:23. He did not state that the statement about Ewell's opportunity to respond in print was wrong. *Compare Beneficient v. Gladstone*, No. 6:23-cv-376-JDK, 2024 WL 2338256 at *11 (E.D. Tex. May 22, 2024) (defendant acted maliciously where the plaintiff informed him of specific factual errors both before and after its publications.). The argument that the Faculty Defendants made this statement maliciously (or negligently) is belied by the record.

## CONCLUSION

The Defamation Defendants have demonstrated as a matter of law that the allegedly defamatory statements are not false, but rather opinions and a list of demands not actionable in defamation. The Defamation Defendants have also demonstrated as a matter of law that they did not act maliciously or negligently in writing the statements in their respective Petitions. Jackson has not met his burden to refute these arguments and the supporting evidence, therefore his defamation claim must be dismissed.

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

         */s/ Mary B. Quimby*
**BENJAMIN S. WALTON**
*Lead Attorney*
Texas Bar No. 24075241
**MARY B. QUIMBY**
Texas Bar No. 24132506
Assistant Attorneys General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov
mary.quimby@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

 I hereby certify that on January 24, 2025, a true and correct copy of this document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

Michael Thad Allen, Esq.
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

***Counsel for Plaintiff***

            */s/ Mary B. Quimby*
            **MARY B. QUIMBY**
            Assistant Attorney General