UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033 |
| | § | |
| LAURA WRIGHT, et al., | § | JURY |
| | § | |
| *Defendants.* | § | |

---

**THE DEFAMATION DEFENDANTS' AND BOARD DEFENDANTS' REPLIES IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JDUGMENT APPENDIX[1]**

---

Ellen Bakulina, Ph.D. deposition excerpts .......... Appx.001-004

Andrew Jay Chung deposition Exhibit 7 .......... Appx.005-010

Jennifer Cowley deposition excerpts .......... Appx.011-012

Rachel Gain deposition excerpts .......... Appx.013-015

Rebecca Geoffroy-Schwinden, Ph.D. deposition excerpts .......... Appx.016-028

Frank Heidlberger deposition excerpts .......... Appx.029-030

John Ishiyama, Ph.D. deposition excerpts .......... Appx.031-036

Timothy Jackson deposition excerpts .......... Appx.037-042

Stephen Slottow, Ph.D. deposition excerpts .......... Appx.043-044

Levi Walls deposition excerpts .......... Appx.045-049

UNT 1142 .......... Appx.050

UNT 449-451 .......... Appx. 051-053

UNT 491-502 .......... Appx.054-065

UNT 11048 .......... Appx. 066

[1] The Defamation Defendants and Board Defendants filed separate Replies to Jackson's Response, but use this joint Appendix to support both briefs.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
SHERMAN DIVISION

TIMOTHY JACKSON, )
Plaintiff, )
vs. ) CASE NO. 4:21-CV-00033-ALM
LAURA WRIGHT, et al., )
Defendants. )

*******************************************************

VIDEOTAPED ZOOM ORAL DEPOSITION OF
ELLEN BAKULINA, PH.D.
October 16, 2024
(Reported Remotely).

*******************************************************

VIDEOTAPED ORAL DEPOSITION OF ELLEN BAKULINA, PH.D., produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 16th day of October, 2024, from 9:03 a.m. to 3:54 p.m., before Kim D. Carrell, Certified Shorthand Reporter in and for the State of Texas, reported remotely by computerized stenotype machine at the physical location of the Witness, Ellen Bakulina, Ph.D., in Montreal, Canada, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFF:

Michael Thad Allen
ALLEN LAW, LLC
P.O. Box 404
Quaker Hill, CT 06375
Telephone: 860.772.4738
Fax: 860.469.2783
E-mail: M.allen@allen-lawfirm.com

FOR THE DEFENDANTS:

Mary Quimby
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capital Station
Austin, Texas 78711
Telephone: 512.463.2120
Fax: 512.320.0667
E-mail: Mary.Quimby@oag.texas.gov

- and -

Renaldo Stowers (Appearing Live)
Cari Jacoby
University of North Texas System
Office of General Counsel
801 North Texas Boulevard
Denton, Texas 76201
Telephone: 940.565.2717
Fax: 940.369.7026
E-mail: Renaldo.Stowers@untsystem.edu
cari.jacoby@untsystem.edu

ALSO PRESENT:

Timothy Jackson, Plaintiff

VIDEOGRAPHER:

Mr. Jason Warner
Legal Video Group
lvg.dallas@gmail.com
214-598-5229

I N D E X

| | PAGE |
|---|---|
| Appearances.................................. | 2 |
| Stipulations................................. | 5 |
| ELLEN BAKULINA, PH.D. | |
| Direct Examination by Mr. Allen........ | 6 |
| Reporter's Certificate........................ | 227 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Re-Notice of Taking Deposition..... | 13 |
| Exhibit 2 | Bakulina CV (UNT 005258 - 005267).............. | 14 |
| Exhibit 3 | Bakulina CV with Highlights (UNT 005257 - 005267).............. | 31 |
| Exhibit 4 | Title Page, List of Articles, Theoria, Volume 26, 2020........... | 35 |
| Exhibit 5 | Excerpt from SMT Website, Oxford University Press Academic, and Ewell Article...................... | 45 |
| Exhibit 6 | Email, Not everyone was enthusiastic about Ewell's talk (JACKS 086826)...................... | 85 |
| Exhibit 7 | Email, Material for the Committee (UNT 0002645 - 002782)............. | 88 |
| Exhibit 8 | Email, 12-11-19, Jackson to Bakulina, et al. (UNT 000563 - 000566)............. | 106 |
| Exhibit 9 | Email, 7-25-20, Slottow to Jackson, et al. (UNT 000300 - 000303)............. | 137 |

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 10 | Email Chain Ending Jackson to Cubero, et al. (UNT 000304 - 000309)............. | 144 |
| Exhibit 11 | Letter, 7-29-20, Bakulina to Richmond (UNT 000116 - 000309)............. | 150 |
| Exhibit 12 | Email, 7-29-20, Bakulina to Brand, et al. (UNT 000488)...................... | 158 |
| Exhibit 13 | Email, 7-31-20, Richmond to Music Faculty, et al. (UNT 000568)...................... | 160 |
| Exhibit 14 | Ad Hoc Review Panel Report (Exhibit D) (JACKSON000208 - 000233).......... | 164 |
| Exhibit 15 | Email Chain, Re: Statement on JSS Issue (UNT 000361 - 000363)............. | 175 |
| Exhibit 16 | Email Chain Re: Meeting with Journal Review Panel, Wed. Sept. 16 (UNT 002509)...................... | 186 |
| Exhibit 17 | Email Chain Re: Talk with the UNT Ad Hoc Journal Review Panel (UNT 002555)...................... | 196 |
| Exhibit 18 | Undated Letter, Bakulina to Richmond (UNT 002559 - 002561)............. | 203 |
| Exhibit 19 | Email Chain Ending 5-17-21, Brand to Cowley, et al. (UNT 005054 - 005055)............. | 208 |

something you've already testified to; that you found the article to have committed thoughts or utterances that you found racist. And I'm trying to identify specifically what you mean.

So far, you've identified what you call the paucity of Black scholars in the academic discipline of music. You've also identified this quote from Schenker that seems to be used by Professor Jackson to endorse colorblind racism in your view.

Did I get that right so far?

A. Yes, that's correct. Yes, yes, yes.

Q. You also mentioned that there were three and we've gone through two. So I was going to ask if you can identify the third concept or utterance that you found racist in Timothy Jackson's 2020 article.

A. The third one, I won't say -- I will not say that it is racist, but I find it highly problematic. It's the passage where Timothy Jackson discusses the Black on Jew antisemitism. And I know that this problem exists, but the problem in Jackson's article is that he places Ewell's -- Philip Ewell's ideas in the context of antisemitism. And I think I should not say that, in itself, is racist. But the objective here seems to be to show that Philip Ewell is antisemitic. And that, in itself, is not racism. But it is an attack on Philip

Ewell. And in my opinion, that's a problem. So I guess I should not say that, in itself, it's racist, but I find it to be problematic.

Q. Was it problematic when Philip Ewell attacked Timothy Jackson as racist?

MS. QUIMBY: Objection, form.

A. I don't remember that Philip Ewell ever did that.

Q. Was it racist for others to attack Timothy Jackson as racist?

MS. QUIMBY: Objection, form.

A. I cannot speculate like that. I'd have to see specific context, a specific piece of writing. I cannot hypothesize like this.

Q. Were you aware that the SMT graduate students who signed the statement calling for the cancellation of the Journal and that a discipline of Timothy Jackson accused him of being racist?

MS. QUIMBY: Objection, form.

A. If I might look at the letter again right now, then I might be able to answer more precisely.

Q. Okay. We'll get to that later. But just the three things that you've identified as -- I guess you said racist, but also problematic in the 2020 article is that he discussed Black American antisemitism towards

Jews. Did I get that right?

A. Yes.

Q. He discussed a quote from Schenker that you felt problematically endorsed colorblind racism?

A. Yes.

Q. And also, he identified the paucity of the Black scholars in music as due to a failure of the Black community to value classical music.

A. Yes.

Q. About the third element, identifying antisemitism in the Black community --

A. Um-hum.

Q. -- are you aware of any articles published, any scholarship indicating that his statements about antisemitism in the Black community are empirically false?

MS. QUIMBY: Objection, form.

A. I'm not stating that it is empirically false. In fact, Dr. Jackson cites articles about this topic, about Black antisemitism. So there are publications. I haven't read them, but I remember that they exist. He cites them. So it's not empirically false. The problem that I see is not empirical. The problem that I see is that he connects a specific scholar who is arguing for changes in music theory to deal with antisemitism.

That is the problem. It's not empirical.

Q. Is that -- the problems that you identified in the 2020 article by Timothy Jackson, do those justify stopping the publication of the Journal of Schenkerian Studies?

MS. QUIMBY: Objection, form.

A. Do they justify stopping the publication of the Journal? I'm not sure. It's a very big question. The stopping of the publication of the Journal of Schenkerian Studies was related to many problems. They're very complicated. I cannot relate of the stopping of that publication to a single problem.

Q. Well, why don't you name the problems with the publishing of the Journal that you think led to this stopping of its publication?

A. Okay. In my opinion, so this is not in -- this is not someone else's opinion, right? This is not something that I share with others. It's my own opinion.

In my honest opinion, what led to the stopping of Journal of Schenkerian Studies publication -- by the way, I don't know if it has -- if it has been stopped forever. I don't know what's going on right now.

But what led to the interruption of its publication in the year 2020 was the fact that many authors, not all, but many authors in the 2020 Symposium

positioned themselves in -- as antagonists of Ewell. And in so doing, they positioned themselves as antagonists of changes in the discipline. And I'm not speaking of just any one article or any one person, but more as the sort of philosophical core of that volume. And so to understand what I just said, we need to understand what was happening in music theory around that time, right before the pandemic in 2019.

What Ewell, in his keynote address in 2019 did was he argued in favor of changes in the field. And those changes would be to make the field more inclusive.

**Q.** Um-hum.

**A.** And the fact that so many authors in the 2020 JSS Symposium positioned themselves in a position to this, showed that these authors were opposed to these changes. They were opposed or at least they did not like to see someone arguing for changes and for inclusivity and to make the field more open.

**Q.** Um-hum.

**A.** So the problems are really disciplinary and they're quite broad. So it's not any one article.

**Q.** Okay. And in addition to -- I think what you called a philosophical core of the volume, what other problems were there with the Journal that, in your view, justified its stopping publication? Or I think you

characterized it the interruption of the Journal in 2020.

**A.** Yes.

MS. QUIMBY: Objection, form.

**A.** Yes. I do think that the lack of peer review for those articles --

**Q.** Um-hum.

**A.** -- in the Symposium were also part of the problem. So let me explain more.

Yes. I completely understand that sometimes, even in journals that are generally peer reviewed, some articles are not peer reviewed. We've already discussed that. And yes, that is true. I don't know if it's a good thing, but it's a realty. Most articles are peer reviewed, some aren't.

The problem in this case is not only the fact that those articles were not peer reviewed. It is sort of a combination of several things. It's the fact that these articles, this Symposium, most articles in the 2020 JSS Symposium remained polemically in relation to Philip Ewell's keynote. They were directed at a specific person who identifies as Black, Philip Ewell, they're meant in opposition, and they're arguing against things that Philip Ewell said. In this sense, they are polemical. So that's one problem.

The second problem is that they're polemical in relation to an extremely sensitive issue, which is the issue of race, identity, inclusion, belonging. And with all of that, with this extremely painful and sensitive topic, these articles were not peer reviewed. So the problem is not simply the lack of peer review. The problem is the combination of the lack of peer review with the sensitive and painful and polemical nature of many of these articles. Not all, but many.

**Q.** All right. Now, in your experience as a scholar and some -- well, let me back up.

You've reviewed articles for journals before yourself, haven't you?

**A.** Yes.

**Q.** So you know the entire process, from the front end to the back end, as an author and as a reviewer, and now as a member of the editorial board of at least one journal, right?

**A.** Correct.

**Q.** So in your view, how would peer review have changed the Volume 20 Symposium of the Journal of Schenkerian Studies?

MS. QUIMBY: Form.

**A.** You are asking me to speculate. And I should not do it, but I can say what I would have done if I was

asked to peer review, if you tell me which specific article.

**Q.** Well, let's take Timothy Jackson's article. How do you think it would be different if it was subjected to peer review?

MS. QUIMBY: Objection, form.

**A.** To my peer review or someone else's peer review? Because every person is different.

**Q.** Well, you've said that it was especially important to peer review the articles, because they were addressing polemically controversial ideas published by a Black person, Philip Ewell, arguing against a Black person on issues of race that are very sensitive and painful. So how would that be different? How would Timothy's journal article and -- how would Timothy Jackson's Journal article in 2020 in the Symposium of the Journal of Schenkerian Studies be different if it was subjected to peer review?

MS. QUIMBY: Objection, form.

**A.** I think that unfortunately, the question is too general, and it asks me to hypothesize about what would have happened, but I don't know who would do it. If you ask me about what I specifically would do, I could actually answer.

**Q.** If you were asked to peer review Timothy

again, you as well as others on July 25th, 2020. Do you remember getting this email from Andrew Chung? This is on page UNT 0302.
A. Okay. One minute for reading. Okay, yeah.
Q. Do you remember getting this email from Andrew Chung?
A. For some reason, I don't. I thought that my first -- I first was in contact with the scandal that erupted on Facebook.
Q. Um-hum.
A. But I don't remember this email.
Q. Oh, well. In fact, you respond, it looks like, relatively quickly. This is at 7:00 p.m. that Andrew Chung sends you this email in this thread that is Exhibit 10.
A. Um-hum.
Q. And then you answer at 8:31 p.m., right?
A. Um-hum.
Q. And you say, "Thanks so much for alerting us. I see something similar on Facebook."
Right?
A. Yes.
Q. So my question for you, is it accurate that this is the first time, reflected in these emails, that you were becoming aware of a controversy surrounding

Volume 12 of the Journal of Schenkerian Studies?
A. Yes.
Q. Okay. And then if we -- yeah, Andrew Chung asks in the next email, I think he's asked if you should forward it. By you, they should be informed and involved. You say about Tim Jackson and Stephen Slottow, right?
A. Um-hum.
Q. And he responds, "Yes, please forward this message to anyone you think would be appropriate."
Right?
A. Yes.
Q. And then you do so in the following e-mail on Saturday, July 25th, at 6:37 p.m. Right?
A. Okay, yes.
Q. And you emphasize that you completely agree with Andrew, that the social media response is getting serious and should somehow be addressed. Right?
A. Yes, yes.
Q. Thank you. And then Mr. Walls chimes in, correct?
MS. QUIMBY: Objection, form.
A. Uh-huh. Okay, yes.
Q. Do you remember getting this email on July 25th from Mr. Levi walls?

A. In fact, I don't. But I can't deny the existence of this email. I just don't remember reading it, hum-um.
Q. Okay. Do you remember Mr. Walls being concerned for his career at this time?
A. Oh, yes, absolutely. He even -- yes, definitely, yes.
Q. And so in this email, in the thread, he writes, "I just heard about this. It's very worrying especially as I don't want my career to be ruined before it properly began. I have a family to take care of now. I'm also confused about what exactly people want."
Did I read the first sentences of this email correctly?
A. Yes.
Q. Was it your understanding -- is it your understanding now that he feared some sort of reaction because of the power differential between him and Timothy Jackson at this time?
MS. QUIMBY: Objection, form.
Q. That he's expressing here?
MS. QUIMBY: Objection, form.
A. Let's see. It is clear that he's afraid for his career in general. It's not clear that he's specifically afraid of Dr. Jackson, no.

Q. Is he afraid of the reaction of the Society for Music Theory and the community of scholars that are objecting to the Journal of Schenkerian Studies at this time?
MS. QUIMBY: Objection, form.
A. What is the previous email? If I read the previous email, let's see. Yeah, okay, okay. Could we go back to Levi?
Q. Yes. So just to be clear, this previous email sent by you on July 25th, you did send it to Levi Walls as well, right?
A. Yes.
Q. And then this is the next email in the thread?
A. Um-hum.
Q. So it's reasonable to understand that he's reacting to your email, correct?
A. Yes.
MS. QUIMBY: Objection, form.
Q. And my question is, do you understand from reading this email by Levi Walls, that he's concerned that he will be the victim of a reaction by the people who are objecting to the Journal of Schenkerian Studies?
MS. QUIMBY: Objection, form.
A. I think that is fair to say, yes.
Q. And then Timothy responds in the next email --

CHUNG
EXHIBIT
7
Jennifer Sanders, CSR
Oct 15, 2024

Dear Diego, Colleagues,

It turns out that the Symposium is now already available as a Google doc on line.

Diego, to reply directly to your query: Stephen, Ben, Levi, and I read through and edited every word of the responses very carefully. I want to stress that these responses were not articles to be sent out for blind review. Rather, they were responses to Ewell's "Plenary Session" critique of Schenker, Schenkerians, and Schenkerian theory by identified authors (with one exception, already explained). The intention of the Symposium, as explained in the call, was to allow scholars to express their views freely and honestly, and without ideological censorship, as long as they remained focused on the relevant issues. As I understand it, all were contributed by university professors, holders of earned doctorates in music theory, and sometimes authors of books and textbooks. We also combined all of the scholarly apparatus into a single bibliography.

The responses, which, if you read them, were pretty well evenly split between pro- and contra-, and published in the Symposium back-to-back in alternation so as to present a balanced picture of the results of the call for comments. The majority of the authors are well-known, highly seasoned scholars, ranging from the Chair of the Harvard Music Department to the authors of books on Schenker and Schenkerian analysis. If you want to use the word "vetting" in this context of allowing distinguished scholars to communicate their views, then you can say that the respondents were "vetted" on the basis of their academic qualifications. The distinguished pedigrees of the contributors is supported by their short biographies at the end of the issue.

All the best,

Tim

On Sun, Jul 26, 2020 at 12:52 PM Cubero, Diego <Diego.Cubero@unt.edu> wrote:
I, too, want to know who vetted the responses before publication?

**From:** "Heidlberger, Frank" <Frank.Heidlberger@unt.edu>
**Date:** Sunday, July 26, 2020 at 12:25 PM
**To:** "Slottow, Stephen" <Stephen.Slottow@unt.edu>, "Brand, Benjamin" <Benjamin.Brand@unt.edu>, Diego Cubero <Diego.Cubero@unt.edu>, "Graf, Benjamin" <Benjamin.Graf@unt.edu>, "Chung, Andrew" <Andrew.Chung@unt.edu>, "Walls, Levi" <LeviWalls@my.unt.edu>, "Bakulina, Ellen" <Ellen.Bakulina@unt.edu>, Timothy Jackson [redacted]
**Subject:** Re: JSS

Ok, thanks for all the information, particularly the twitter conversation. On Facebook, Chris Segall's last post and the ensuing comments are insightful (and concerning). Still: I NEED TO READ THE ARTICLES, particularly this ominous "anonymous" one.
**Can somebody please send me a pdf version of the issue RIGHT NOW!**
And, who vetted the responses before publication?

I agree with all colleagues stating that this is a serious issue.
Frank

Dr. Frank Heidlberger
Professor of Music Theory
Music Theory Area Coordinator
University of North Texas
College of Music
1155, Union Circle # 311367
Denton, TX 76203
U.S.A.
Phone: (940) 369-7542
Fax (940) 565-2002

---

**From:** Slottow, Stephen <Stephen.Slottow@unt.edu>
**Sent:** Sunday, July 26, 2020 12:16 PM
**To:** Brand, Benjamin <Benjamin.Brand@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Chung, Andrew <Andrew.Chung@unt.edu>; Walls, Levi <LeviWalls@my.unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Timothy Jackson [redacted]; Heidlberger, Frank <Frank.Heidlberger@unt.edu>
**Subject:** Re: JSS

Please disregard my earlier email--I found a way to sufficiently expand the responses.

-sps

---

**From:** Brand, Benjamin <Benjamin.Brand@unt.edu>
**Sent:** Sunday, July 26, 2020 10:17 AM
**To:** Cubero, Diego <Diego.Cubero@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Chung, Andrew <Andrew.Chung@unt.edu>; Walls, Levi <LeviWalls@my.unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Timothy Jackson [redacted]; Slottow, Stephen <Stephen.Slottow@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>
**Subject:** Re: JSS

Dear Colleagues,

In light of recent developments, I would like to call an emergency meeting for this afternoon at 4:00pm (central time). I apologize for taking your time on a weekend, but this simply can't wait until Monday. The Zoom meeting ID is: 939 5729 3080. I will send you a calendar invite as well. Please do you utmost to attend.

Sincerely,
Benjamin

Benjamin Brand, Ph.D.
Pronouns: he, him, his | Professor of Music History

Chair, Division of Music History, Theory, and Ethnomusicology
College of Music | University of North Texas | (940) 536-3561

**From:** "Cubero, Diego" <Diego.Cubero@unt.edu>
**Date:** Sunday, July 26, 2020 at 8:52 AM
**To:** Benjamin Graf <Benjamin.Graf@unt.edu>, Andrew Chung <Andrew.Chung@unt.edu>, "Walls, Levi" <LeviWalls@my.unt.edu>, Ellen Bakulina <Ellen.Bakulina@unt.edu>, Timothy Jackson [REDACTED], Stephen Slottow <Stephen.Slottow@unt.edu>, "Brand, Benjamin" <Benjamin.Brand@unt.edu>
**Subject:** Re: JSS

Good morning, colleagues:

I agree that this is a serious situation. I am neither on Twitter nor Facebook, but I can say that the issues has grabbed the attention of the Society for Music Theory's Committee on Diversity. While the situation most immediately involves the Journal's editorial staff and the authors of some of the essays, I think it also affects the reputation of our program as a whole. I have copied Benjamin Brand to make him aware of this situation.

Diego

**From:** "Graf, Benjamin" <Benjamin.Graf@unt.edu>
**Date:** Saturday, July 25, 2020 at 9:47 PM
**To:** "Chung, Andrew" <Andrew.Chung@unt.edu>, "Walls, Levi" <LeviWalls@my.unt.edu>, "Bakulina, Ellen" <Ellen.Bakulina@unt.edu>, Timothy Jackson [REDACTED], "Slottow, Stephen" <Stephen.Slottow@unt.edu>
**Cc:** Diego Cubero <Diego.Cubero@unt.edu>
**Subject:** Re: JSS

Yes, we need to respond!! This is getting out of hand quickly.
I think we should send Ewell a copy and invite him to respond.
There are some misconceptions floating around that need to be addressed.
For example, I was under the impression that we were going to have a discussion with Ewell about his racial studies work. I was looking forward to it!
A lot of those commenting have not read the issue, it could help to release it.
I only have my cell with me, so apologize for the brevity and lack of formality.
Best,
Ben

Benjamin Graf, Ph.D.

University of North Texas

Music History, Theory and Ethnomusicology

Office: MU215

---

**From:** Chung, Andrew <Andrew.Chung@unt.edu>
**Sent:** Saturday, July 25, 2020 9:12:37 PM
**To:** Walls, Levi <LeviWalls@my.unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Timothy Jackson [redacted]; Slottow, Stephen <Stephen.Slottow@unt.edu>
**Cc:** Graf, Benjamin <Benjamin.Graf@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>
**Subject:** RE: JSS

Dear all,

I agree with Levi that a well-considered and timely response seems important. From what I have been seeing, people on social media are not happy that there is not a published response-to-the-responses written by Ewell at the invitation of JSS, and have concerns that the journal published an anonymous article whatever the merits and complexities for doing so. I think it would be wise to address this carefully and promptly because I wouldn't want to see a negative consequence from this for Levi based on hasty assumptions from the social media-verse.

Best,
Andrew

**From:** Walls, Levi <LeviWalls@my.unt.edu>
**Sent:** Saturday, July 25, 2020 8:56 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Timothy Jackson [redacted]; Slottow, Stephen <Stephen.Slottow@unt.edu>
**Cc:** Chung, Andrew <Andrew.Chung@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>
**Subject:** Re: JSS

Hi all,

I just heard about this. It's very worrying, especially as I don't want my career to be ruined before it properly began. I have a family to take care of now. I'm also confused about what exactly people want. The responses were to Ewell's paper. Did Ewell want to respond to his own paper? If he wants to respond to the responses to his paper, then that is perfectly reasonable, and I don't think anyone would have a problem with that. We could publish something in the upcoming volume, if that is what people want. But he couldn't have responded to responses that hadn't yet come out. Since the journal printed every response that we got, it should go without saying that we weren't interested in presenting a one-sided picture. Quite the opposite. We emphasized in the CFP that we wanted a wide range of views.

At the moment, people seem to be speculating about the journal without actually reading it. Maybe we should consider releasing it online early, so that misinformation does not spread.

I really hope all this can be resolved somehow.

Regards,

Levi Walls

---

**From:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Sent:** Saturday, July 25, 2020 6:37 PM
**To:** Timothy Jackson [redacted]; Slottow, Stephen <Stephen.Slottow@unt.edu>; Walls, Levi <LeviWalls@my.unt.edu>
**Cc:** Chung, Andrew <Andrew.Chung@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>
**Subject:** Re: JSS

Dear Tim, Stephen, Levi, CC Andrew, Ben, Diego,

Please see below a message from Andrew Chung about a serious situation that has come up in connection with the latest issue of JSS. I completely agree with Andrew that the social media response is getting serious and should be somehow addressed. I don't have a Twitter account, but I am on Facebook and I am currently following (and taking a modest part in) a discussion there.

All best,
-Ellen

---

**From:** Chung, Andrew <Andrew.Chung@unt.edu>
**Sent:** Saturday, July 25, 2020 8:32 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>
**Subject:** RE: JSS

Dear Ellen and colleagues,

Yes, please feel free to forward this message to anyone you think would be appropriate.

Best,
Andrew

**From:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Sent:** Saturday, July 25, 2020 8:31 PM
**To:** Chung, Andrew <Andrew.Chung@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>
**Subject:** Re: JSS

Hi Andrew and all,

Thanks so much for alerting us. I see something similar on Facebook. Do I have your permission to forward this message to Tim Jackson, Stephen Slottow, and Levi Walls (the current editor)? They should be informed and involved.

Thanks,
-Ellen

---

**From:** Chung, Andrew <Andrew.Chung@unt.edu>
**Sent:** Saturday, July 25, 2020 7:08 PM
**To:** Graf, Benjamin <Benjamin.Graf@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Subject:** JSS

Dear colleagues,

I apologize for interrupting your weekends, but via twitter, I have been seeing that there has been some early and vociferous pushback re: the new issue of JSS, with concerns that Phillip Ewell wasn't invited to respond and that there is an anonymous contribution (are these still true? The last information I became privy to about the issue was in March). I imagine this is something JSS would want to address carefully especially in light of the past three months or so if this isn't already on the radar of everyone involved in JSS, since, from the looks of the social media attention it is possible that the situation could get serious.

Respectfully,
Andrew

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON, *
Plaintiff, *
VS. * CASE NO. 4:21-CV-00033-ALM
LAURA WRIGHT, ET AL., *
Defendants. *

---

ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
JENNIFER COWLEY
SEPTEMBER 26, 2024

---

ORAL AND VIDEOTAPED VIDEOCONFERENCE DEPOSITION of JENNIFER COWLEY, produced at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 26th day of September, 2024, from 9:04 a.m. to 2:58 p.m., before Carla A. Sims, AAS, CSR, RPR, in and for the State of Texas, reported by method of machine shorthand, via Zoom videoconference, pursuant to the Federal Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

ALL PARTIES AND WITNESS APPEARED VIA
ZOOM VIDEOCONFERENCE

COUNSEL FOR THE PLAINTIFF:

Mr. Michael Thad Allen
ALLEN LAW, LLC
P.O. Box 404
Quaker Hill, Connecticut 06375
860/772-4738 (tel)
m.allen@allen-lawfirm.com

COUNSEL FOR THE DEFENDANTS and JENNIFER COWLEY:

Ms. Mary Quimby
TEXAS ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Capitol Station
Austin, Texas 78711
mary.quimby@oag.texas.gov

COUNSEL FOR THE UNIVERSITY OF NORTH TEXAS:

Mr. Renaldo L. Stowers
DEPUTY GENERAL COUNSEL, UNIVERSITY OF NORTH TEXAS
115 Union Circle No. 310907
Denton, Texas 76203
940/565-2717 (tel)
renaldo.stowers@untsystem.edu

COUNSEL FOR THE UNIVERSITY OF TEXAS AT ARLINGTON

Mr. Shelby Boseman
CHIEF LEGAL OFFICER, THE UNIVERSITY OF TEXAS AT ARLINGTON
701 South Nedderman Drive
Arlington, Texas 76019
sboseman@uta.edu

ALSO PRESENT:

VIDEOGRAPHER:

Mr. Jason Warner
Legal Video Group
lvg.dallas@gmail.com
214-598-5229

I N D E X

| | PAGE |
|---|---|
| Appearances.................................... | 2 |
| JENNIFER COWLEY | |
| Examination by Mr. Allen........................ | 5 |
| Changes and Signature........................... | 213 |
| Reporter's Certificate.......................... | 215 |
| Further Certification........................... | 217 |

REPORTER'S NOTE

Please note that due to the quality of the transmission data for a Zoom videoconference, cross-talk causes audio distortion in the testimony when preparing a videoconference transcript.

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Deposition Notice....................... | 116 |
| 2 | Email.................................. UNT_000568 | 116 |
| 3 | UNT Webpage Printout.................... UNT_000106 | 129 |
| 4 | Allen Law Letter........................ UNT_000157 to UNT_000162 | 132 |

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 5 | Email String........................... UNT_002453 to UNT_002454 | 140 |
| 6 | Email.................................. UNT_002460 | 142 |
| 7 | Provost Letter......................... JACKSON000261 to JACKSON000263 | 159 |
| 8 | Center Review Report................... JACKS_067377 to JACKS_067401 | 167 |
| 9 | Ad Hoc Review Panel Report............. JACKSON000208 to JACKSON000233 | 170 |
| 10 | Ad Hoc Panel Report Student Statement... | 185 |
| 11 | Deposition of Levi Walls................ | 193 |
| 12 | Provost Letter......................... JACKSON000271 | 198 |
| 13 | Email.................................. JACKSON000272 | 206 |

Q. So coming back to COPE. Sorry. We did a little bit of a circle there. Do you understand COPE to forbid the publication by an editor in a journal under their authority?
MS. QUIMBY: Objection.
A. I don't recall that it forbids, but it needs to be carefully managed.
Q. (By Mr. Allen) Do you know what COPE recommends as, quote, "careful management" for those kinds of situations of conflicts of interest?
A. I'd have to go back and review. I believe that that was a topic that came up in the ad hoc report, but I don't recall the specific details.
Q. And, of course, I'm not talking about the ad hoc report. I'm talking about COPE. If you don't know, then that's fine to say so. So as for editors, let's talk about editors first. Is it safe to say you don't know in detail what COPE says other than that it should be handled carefully when an editor publishes in their own journal?
A. I think that's an adequate level of detail at this point that I'd want to go back and review those standards. And if I was the editor of a journal, then I would certainly be looking for counsel and wisdom if I were to pursue something like that.

Q. And would the same go for a member of the board of editors?
A. It would be typical for there to be procedures or a discussion with the editor about how to handle a submission.
Q. Okay. And to your knowledge, does COPE forbid non-peer reviewed articles in academic journals?
A. No.
Q. Does COPE provide guidelines for who should be invited to publish in an academic journal and under what circumstances?
MS. QUIMBY: Objection, form.
A. No. I don't believe it goes into that level of specificity.
Q. (By Mr. Allen) Do you know if COPE provides any guidelines on what the meaning of a commentary is in an academic journal?
A. I would have to review COPE guidelines.
Q. But as you sit here today, you're not aware of any?
MS. QUIMBY: Objection, form.
A. Not specifically.
Q. (By Mr. Allen) And if I asked the same question or set of questions about a quote, "symposium," would your answer be the same?

A. It would be the same.
Q. Okay. Have you heard of the Journal of Theoria? It's spelled like theory but with i-a instead of y on the end. Theoria.
A. I have heard of it.
Q. What is the Journal of Theoria?
A. That, I couldn't tell you. Only that it's a journal that's in the College of Music at UNT.
Q. Do you know if it's also published by the University of North Texas press?
A. I have no information on that.
Q. If I was to tell you it is published by the University of North Texas press, can I ask you to assume that it is?
A. If you state it, then I have no reason to believe it's not true.
Q. I'm sure your counsel will point it out to you if I'm misstating something and will have that opportunity. But my followup question is actually a pretty simple one.
As a provost, do you believe that the Journal of Theoria should be subject to different rules for publishing academic articles than the Journal of Schenkerian Studies which is also published by the University of North Texas press?

A. I can't speak to that because I don't know what rules or procedures Theoria uses. I have no familiarity with Theoria other than simply knowing it exists.
Q. Well, you certainly had one journal investigated for its procedures for publishing a symposium in 2020, right?
A. Correct.
Q. Should the Journal of Theoria be subject to different standards than were applied in that investigation?
MS. QUIMBY: Objection, form.
A. If the Society of Music Theory wrote to the university and expressed concerns over that journal, then certainly we would review the -- I would have, as the provost, reviewed that journal and its publication processes.
Q. (By Mr. Allen) But you never heard of the journal for music -- excuse me. Strike that, please.
You never heard of the Society for Music Theory expressing any concerns over the publication of Theoria, right?
A. Correct. I do not believe my office ever received any complaints regarding Theoria.
Q. And then just back to my previous question. Do you really think there should be different standards

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON, Plaintiff,

v.

LAURA WRIGHT, et al, Defendants.

CASE NO. 4:21-cv-00033-ALM

----------------------------------

ORAL DEPOSITION OF
RACHEL GAIN
MAY 19, 2021

----------------------------------

ORAL DEPOSITION OF RACHEL GAIN, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on May 19, 2021, from 1:06 p.m. to 2:49 p.m., before Nita G. Cullen, CSR in and for the State of Texas, reported by machine shorthand, at the Law Offices of Cutler Smith, 12750 Merit Drive, Suite 1450, in the City of Dallas, County of Dallas, State of Texas, pursuant to the Federal Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL THAD ALLEN
MS. SAMANTHA HARRIS
ALLEN LAW, LLC
P.O. Box 404
Quaker Hill, Connecticut 06375
860.772.4738
860.469.2783 Fax
m.allen@allen-lawfirm.com

FOR THE DEFENDANTS:

MR. MATT BOHUSLAV
ASSISTANT ATTORNEY GENERAL
GENERAL LITIGATION DIVISION
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711
matthew.bohuslav@oag.texas.gov

AND

MR. RENALDO STOWERS
SENIOR ASSOCIATE GENERAL COUNSEL
UNIVERSITY OF NORTH TEXAS SYSTEM
OFFICE OF GENERAL COUNSEL
940.565.2717
renaldo.stowers@untsystem.edu

ALSO PRESENT:

MR. TIMOTHY JACKSON

INDEX

| | PAGE |
|---|---|
| Appearances......................................... | 2 |
| Stipulations........................................ | 4 |
| RACHEL GAIN | |
| Examination by Ms. Harris........................ | 4 |
| Reporter's Certificate............................... | 60 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Notice of Taking Deposition............ | 9 |
| Exhibit 36 | Text Messages - Vivek Virani and Rachel Gain............................ | 9 |
| Exhibit 37 | Microsoft Teams conversation........... | 22 |
| Exhibit 38 | News from SEM: General News, Statement of UNT Faculty on Journal of Schenkerian Studies ................... | 22 |
| Exhibit 39 | Twitter Messages....................... | 51 |

P R O C E E D I N G S

RACHEL GAIN,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. HARRIS:

**Q.** Okay. Hi, my name is Samantha Harris. I'm one of the attorneys for Dr. Jackson, along with my partner. And have you ever been deposed before?

**A.** No.

**Q.** Okay. So, it's just going to be a conversation, but it is part of the Court record, that's why she's taking these -- you know, these notes. And so, this is testimony that will be part of the case. If at any time anything I'm asking you isn't clear or you need me to clarify or repeat the question, just ask. Your attorney may object from time to time.

MS. HARRIS: Are we going to stipulate, you know, the same things that we have in the previous depositions, that objections except as to form objections will be reserved for the time of trial.

MR. BOHUSLAV: Yes.

**Q.** (By Ms. Harris) Okay. So, he will object, and that objection will go on the record, but it doesn't change your obligation to answer the question. So, when he objects, it doesn't mean, you know, that you're not

recent immigrant.
Q. Okay. Is it your position that Timothy Jackson committed a crime?
A. I don't know. I'm not a lawyer.
Q. Okay. Do you agree that just -- you know, as a recent immigrant, you are bound by the laws of the United States?
A. Yes.
Q. Are you aware that falsely accusing someone of a crime is defamation?
MR. BOHUSLAV: Objection, calls for a legal conclusion.
A. Will you repeat the question, please?
Q. (By Ms. Harris) Are you aware that falsely accusing someone of a crime is defamation?
MR. BOHUSLAV: Objection, calls for a legal opinion.
A. I'm not aware of that.
Q. (By Ms. Harris) Okay. Who did Dr. Jackson, in your view, extort?
A. Where does it say "extort" on here?
Q. Under -- No. 3, under "Calling for Dr. Jackson's Dismissal, extortion through grade manipulation and threats to students' careers and reputations."

A. Could you repeat the question, please?
Q. Who did Dr. Jackson allegedly extort?
A. I believe that refers to Yiyi Gao.
Q. Okay. And how did he extort her?
A. I've told you what I've heard secondhand. That's the extent of my knowledge that I remember today.
Q. So, you believe that -- you believe that he asked her to work for free, and you believe that asking someone to work for free is extortion?
A. Well, the events as I heard them are that he told her he'd dock her grades, if she did not. That is what I've heard.
Q. And it says here that "he made threats to someone's career and reputation." What threats did he make, allegedly, to someone's career and reputation?
A. I don't recall what event that refers to.
Q. Okay. But your name is on this document.
A. Yes. And right now, I don't recall what that referred to when we wrote this ten months ago.
Q. Okay. But you are on the record accusing Dr. Jackson of extortion for reasons you don't remember at this time.
A. Well, I told you it was Yiyi Gao. I believe that's what that refers to.
MS. HARRIS: Okay. I would like now to

introduce another exhibit, and that is -- because we have gone back to some exhibits, what number is this? 39?
COURT REPORTER: 38.
MS. HARRIS: 38. Okay.
Q. (By Ms. Harris) So, this is a statement of UNT's faculty on the Journal of Schenkerian Studies, and I would just like to ask you a little bit about what you know about this document.
Do you know whether this was completely initiated by the faculty or whether anyone from GAMuT approached members of the faculty about issuing a statement of support for the graduate students?
A. I don't have knowledge of that -- that I recall, at least.
Q. So, you were never personally involved in asking any faculty to support the graduate student statement?
A. That's correct.
Q. Okay.
A. As far as I can remember.
MS. HARRIS: Okay. I have one more exhibit that I would like to introduce here, and that is this, which I guess will be Exhibit 39? Is that right?
(DEPOSITION EXHIBIT 39 MARKED.)

Q. (By Ms. Harris) Do you recognize this Twitter exchange?
A. Yes.
Q. Okay. Who is Samantha Bassler?
A. She is someone I know who is a music theorist.
Q. Okay. Now, here you say, "Jackson is a POS." Can you explain to the Court what a POS is?
A. "POS" stands for "piece of shit".
Q. Okay. And you said here that you've made it your life's mission to never even meet him, let alone take a class with him. At what point did you decide never to meet -- that it was your mission never to meet Dr. Jackson?
A. It was a slight overexaggeration, but probably when -- upon visiting UNT, before enrolling here, I was warned very strongly to never take a class with him and never allow him to have any level of power over me because I'm a woman.
Q. Okay. Do you remember who told you that?
A. David Falterman.
Q. And why? Did he explain why?
A. Because he had seen enough evidence of women being mistreated and being victims of a bad power dynamic that he wanted to warn me in advance to not put myself in that situation.

Q. What do you mean by "the victims of a bad power dynamic"?
A. I don't know, specifically, all of the events he was referring to, but -- let me think. Could you repeat the question?
Q. What do you mean when you say "victims of a bad power dynamic"?
A. I think occasionally somebody has more power than another person in an institution, for example, graduate students have very little power, and tenured professors have a lot of power. And if that professor wishes to use that power dynamic, that can be at the detriment of the graduate student.
Q. Okay. So, when you came to UNT, you had already decided that you wanted nothing to do with Dr. Jackson?
A. Well, I'd been warned by him, and also other people, that I shouldn't.
Q. Okay. Who else? You had mentioned David warned you. Who else warned you prior to your coming to UNT?
A. I can't remember exactly. It was when I was at an interview day at Indiana University, and I mentioned I was planning on applying to UNT, and I was told not to, based on Dr. Jackson's reputation.

Q. Okay. If you've never met him or had a class with him, how do you know he's a piece of shit?
A. Because I've heard a lot of stories from people that I trust.
Q. Okay. These are people you know well?
A. Yes.
Q. So, at the time that David Falterman and these other students said this, and you decided you never wanted to meet Dr. Jackson, did you know those individuals well?
A. Not at the time. I can't remember exactly who told me at Indiana University, but one of the people it possibly was, but not definitely, is someone I quite know well. I don't remember if it was him or someone else in the car at the time.
But since then, I've grown to know David very well, and since then -- I mean, this statement of events isn't necessarily as linear as it seems in the exhibit. What exhibit number is this?
Q. This is now 39? Is that right?
A. My Twitter message is perhaps an over-simplification of the timeline of events, as one might expect in a casual conversation. But the number of people telling me that increased, and the trust I had in those people increased at the same time.

Q. All right. Is calling someone a piece of shit ad hominem attack?
A. Could you define "ad hominem attack"?
Q. Well, I'd like to go back to the statement you signed accusing Dr. Jackson of ad hominem attacks. How did you -- how would you define "ad hominem attack" in that document you endorsed?
A. I believe -- I don't know the legal definition, off the top of my head.
Q. It's not a legal term.
A. Well, I don't know what -- what would count in a Court of law, off the top of my head.
Q. No. This isn't -- this is not -- that's not what I asked you. It's not a legal question. You signed a document that said that Dr. Jackson had engaged in ad hominem attacks.
MR. BOHUSLAV: I believe you're interrupting her answer.
A. Presumably, it would have to be a dictionary definition in a court of law is what I mean.
Q. (By Ms. Harris) That's not accurate. What I'm asking you is --
MR. BOHUSLAV: Can we take a break?
MS. HARRIS: Sure.
(OFF THE RECORD FROM 2:26 TO 2:44 P.M.)

(DR. JACKSON IS NOT PRESENT IN ROOM.)
Q. (By Ms. Harris) So, I'd like to go back to the conversation we were having about this direct message exchange you had. And I would like to know, in your words, what you believe an ad hominem attack is.
A. I believe the definition is something along the lines of an attack on a person's character.
Q. Okay. So, is calling someone a piece of shit ad hominem attack?
A. That would follow.
Q. Okay. Would calling a black person, who you did not know personally, a piece of shit be racist?
A. I think I'd need more context to answer that.
Q. Okay. So, at this point, we're basically done. I would just sort of like to circle back and ask some sort of closing questions about the different documents we've been over. Particularly, the July 27th graduate student statement, and the July 30th graduate student statement.
So, we talked about the fact that these petitions condemned the procedures used to publish Volume 12 of the JSS, is that correct?
A. Yes.
Q. Okay. And you said today that you don't have firsthand knowledge of those procedures, is that

**Subject:** Re: Faculty Statement on the Recent issue of JSS
**Date:** Thursday, July 30, 2020 at 4:10:12 PM Central Daylight Time
**From:** Ragland, Catherine
**To:** Geoffroy-Schwinden, Rebecca, Prince, April, Bakulina, Ellen, Heidlberger, Frank, Robertson, Gillian, Schulze, Hendrik, Cubero, Diego, Virani, Vivek, Friedson, Steven, Notley, Margaret
**CC:** Mondelli, Peter, Illari, Bernardo, Wright, Brian, Heetderks, David, Schwarz, David, Lavacek, Justin, Graf, Benjamin, Slottow, Stephen, Timothy Jackson, Chung, Andrew

Titles, that is.

Cathy Ragland, PhD
Pronouns: she/her/hers
Associate Professor, Ethnomusicology
Faculty Affiliate, Latina/o and Mexican-American Studies; Women's and Gender Studies
College of Music, University of North Texas
Division of Music History, Theory, and Ethnomusicology
1155 Union Circle #311367
Denton, TX 76203
Author, *Música Norteña: Mexican Migrants Creating a Nation between Nations*
Editor, Sonic Crossings Book Series, UNT Press

---

**From:** Ragland, Catherine <Catherine.Ragland@unt.edu>
**Sent:** Thursday, July 30, 2020 4:08 PM
**To:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Prince, April <April.Prince@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Yes, Oh I see. I thought you were not listing any earea coordinators. Sorry.

Cathy

Cathy Ragland, PhD
Pronouns: she/her/hers
Associate Professor, Ethnomusicology
Faculty Affiliate, Latina/o and Mexican-American Studies; Women's and Gender Studies
College of Music, University of North Texas
Division of Music History, Theory, and Ethnomusicology
1155 Union Circle #311367
Denton, TX 76203
Author, *Música Norteña: Mexican Migrants Creating a Nation between Nations*

GEOFFROY-SCHWINDEN
EXHIBIT
4
Kim Carrell, CSR
Sep 27, 2024

Editor, Sonic Crossings Book Series, UNT Press

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 4:07 PM
**To:** Ragland, Catherine <Catherine.Ragland@unt.edu>; Prince, April <April.Prince@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Isn't Frank the Theory area coordinator and Steve Ethnomusicology?

---

**From:** Ragland, Catherine <Catherine.Ragland@unt.edu>
**Sent:** Thursday, July 30, 2020 4:07 PM
**To:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Prince, April <April.Prince@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Rebecca,
Frank is also listed as area coordinator in the version I have.

Cathy

Cathy Ragland, PhD
Pronouns: she/her/hers
Associate Professor, Ethnomusicology
Faculty Affiliate, Latina/o and Mexican-American Studies; Women's and Gender Studies
College of Music, University of North Texas
Division of Music History, Theory, and Ethnomusicology
1155 Union Circle #311367
Denton, TX 76203
Author, *Música Norteña: Mexican Migrants Creating a Nation between Nations*
Editor, Sonic Crossings Book Series, UNT Press

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 4:04 PM
**To:** Prince, April <April.Prince@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear all,

Here is the FINAL VERSION of the statement (with Steve's corrected title, I hope). Thank you all again, and please do share as you see fit. This is, after all, our *individual* opinions.

All the best,
Rebecca

---

**From:** Prince, April <April.Prince@unt.edu>
**Sent:** Thursday, July 30, 2020 4:02 PM
**To:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Thank you, again, Rebecca. Yes, I think we should share with student organizations.

All best,
ap
~
April L. Prince, Ph.D.
Senior Lecturer, Music History
Division of Music History, Theory, and Ethnomusicology
University of North Texas College of Music

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 3:50:20 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson,

Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

All, there *will be* a revised version as I realized I had put Steve's coordinator title! Please let me know if you see other issues.

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 3:45 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear all,

I have a final question: should I share this with SSENT and GAMuT at 4?

Best,
Rebecca

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 3:24 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear all,

Please find the PDF version of our response attached for dissemination via our disciplines' appropriate channels. Frank will send via SMT, April via AMS Humanities Commons, and Cathy via SEM.

Can the responsible parties agree to disseminate at 4pm so that if there is some major error in this PDF, I can be alerted at once. My attention to detail is likely limited right now. Please read this one more time. And I apologize in advance if I've missed your title (or lack thereof) preference.

I am grateful that we are saying *something*. It is not perfect, and it could not be. But I hope that we can continue to have the meaningful dialogues that I have had with so many of you individually on the phone since Sunday morning. Thank you for any compromises you've made to see the greater importance of speaking together.

I cannot promise you anything about UNT's position on our statement. But I sent you the policy, which you can read for yourself. I am going to send it to the Dean at 4pm.

All best,
Rebecca

---

**From:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Sent:** Thursday, July 30, 2020 3:15 PM
**To:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Thanks so much! It seems to each one of us has the right to express opinion as an individual.

Best,
-Ellen

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 3:12 PM
**To:** Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin

<Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

I apologize, I don't have any institutional authority on these issues.

I spoke with Warren and John yesterday who said we have a right to speak. The Dean has not responded to my specific, written e-mail request asking whether our letter breach this policy. I have added a sentence that you will see momentarily that unequivocally states that we write as individuals and do not represent the university.

Here is the policy language and I thank Andrew and Gillian for providing it to me:
"Members of the academic community at UNT may publically [sic.] express their opinions as privately engaged citizens, separate from the opinions formulated from their use of the reliable methods of their discipline. When they do so, they are expected to clarify that they are not official spokespersons for UNT; and they are not permitted to use official letterhead or other university resources."

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 3:03 PM
**To:** Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

I don't understand Ellen's question.

---

**From:** Heidlberger, Frank <Frank.Heidlberger@unt.edu>
**Sent:** Thursday, July 30, 2020 2:58 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear Ellen
You can sign anything as an individual, as long as it does not reflect any official opinion of the institution. This also applies to the soon to be published faculty letter. We, as faculty, cannot

represent UNT in this regard. Any official UNT statement needs to be approved by the Provost office. Rebecca knows more about this as she has studied the official policy which is pretty strict. Rebecca, maybe you can chip in.
Frank

Dr. Frank Heidlberger
Professor of Music Theory
Music Theory Area Coordinator
University of North Texas
College of Music
1155, Union Circle # 311367
Denton, TX 76203
U.S.A.
Phone: (940) 369-7542
Fax (940) 565-2002

---

**From:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Sent:** Thursday, July 30, 2020 2:49 PM
**To:** Robertson, Gillian <Gillian.Robertson@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Rebecca and all,

Do you know if there are any guidelines regarding the "Open Letter on Anti-Racist Actions" that a group of theorists have posted through SMT-announce? I'm trying to understand if any of those who were associated with JSS (I am no longer--I have resigned from the editorial board) can sign. If one wants to sign, is it better to wait until our faculty letter is published?

Thanks,
-Ellen

---

**From:** Robertson, Gillian <Gillian.Robertson@unt.edu>
**Sent:** Thursday, July 30, 2020 1:59 PM
**To:** Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin

<Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear Rebecca and all,

Please add me as a signatory. You may format my name as "Dr. Gillian Robertson, Senior Lecturer, Music Theory." Thanks to all who have contributed to the drafting/revisions of this letter.

Best,
Gillian

**Gillian Robertson, Ph.D.** || Senior Lecturer of Music Theory || University of North Texas
Office: MU260A || Email: gillian.robertson@unt.edu

---

**From:** Schulze, Hendrik <Hendrik.Schulze@unt.edu>
**Sent:** Thursday, July 30, 2020 1:10 PM
**To:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** AW: Faculty Statement on the Recent issue of JSS

Dear Rebecca and dear all,

please sign me to the letter as well -- Dr. Hendrik Schulze, Associate Professor, Music History. And thank you for the effort on behalf of us!

All best,
Hendrik.

Dr. Hendrik Schulze
Associate Professor, Music History
University of North Texas College of Music
1155 Union Circle #311367
Denton, TX 76203-5017
940-369-8057

---

**Von:** Bakulina, Ellen <Ellen.Bakulina@unt.edu>
**Gesendet:** Donnerstag, 30. Juli 2020 12:59
**An:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Schulze, Hendrik

<Hendrik.Schulze@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Betreff:** Re: Faculty Statement on the Recent issue of JSS

Dear Rebecca and all,

Thank you for revising the letter! Please add me as a signatory, as "Dr. Ellen Bakulina, assistant professor, music theory."

Best,
-Ellen

---

**From:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>
**Sent:** Thursday, July 30, 2020 12:16 PM
**To:** Cubero, Diego <Diego.Cubero@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Thank you to the twelve people who have responded so far. I have incorporated Eileen's revision.

Please tell me how you would like your name formatted, otherwise I am taking as it is written in your signature line, and below your name "rank, area." This means some people have "Dr." before their names and some do not. I am noting area coordinators.

Thank you, again!

All best,
Rebecca

---

**From:** Cubero, Diego <Diego.Cubero@unt.edu>
**Sent:** Thursday, July 30, 2020 11:59 AM
**To:** Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian

<Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear Rebecca,

Thank you for your work in this statement. Please add me as a signatory.

Diego

---

**From:** "Virani, Vivek" <Vivek.Virani@unt.edu>
**Date:** Thursday, July 30, 2020 at 11:23 AM
**To:** "Ragland, Catherine" <Catherine.Ragland@unt.edu>, "Heidlberger, Frank" <Frank.Heidlberger@unt.edu>, "Friedson, Steven" <Steven.Friedson@unt.edu>, "Geoffroy-Schwinden, Rebecca" <Rebecca.Geoffroy-Schwinden@unt.edu>, "Notley, Margaret" <Margaret.Notley@unt.edu>
**Cc:** "Mondelli, Peter" <Peter.Mondelli@unt.edu>, "Prince, April" <April.Prince@unt.edu>, "Schulze, Hendrik" <Hendrik.Schulze@unt.edu>, "Illari, Bernardo" <Bernardo.Illari@unt.edu>, "Wright, Brian" <Brian.Wright@unt.edu>, Diego Cubero <Diego.Cubero@unt.edu>, "Heetderks, David" <David.Heetderks@unt.edu>, "Schwarz, David" <David.Schwarz@unt.edu>, "Bakulina, Ellen" <Ellen.Bakulina@unt.edu>, "Lavacek, Justin" <Justin.Lavacek@unt.edu>, "Graf, Benjamin" <Benjamin.Graf@unt.edu>, "Robertson, Gillian" <Gillian.Robertson@unt.edu>, "Slottow, Stephen" <Stephen.Slottow@unt.edu>, Timothy Jackson [redacted], "Chung, Andrew" <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Thank you very much to everyone for the time and thought put into drafting this statement.

I would like to be added as a signatory.

Vivek

---

**From:** Ragland, Catherine <Catherine.Ragland@unt.edu>
**Sent:** Thursday, July 30, 2020 10:46 AM
**To:** Heidlberger, Frank <Frank.Heidlberger@unt.edu>; Friedson, Steven <Steven.Friedson@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [redacted]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Frank, so glad you shared this with Eileen.
Thank you very much!

Cathy

Cathy Ragland, PhD
Pronouns: she/her/hers
Associate Professor, Ethnomusicology
Faculty Affiliate, Latina/o and Mexican-American Studies; Women's and Gender Studies
College of Music, University of North Texas
Division of Music History, Theory, and Ethnomusicology
1155 Union Circle #311367
Denton, TX 76203
Author, *Música Norteña: Mexican Migrants Creating a Nation between Nations*
Editor, Sonic Crossings Book Series, UNT Press

---

**From:** Heidlberger, Frank <Frank.Heidlberger@unt.edu>
**Sent:** Thursday, July 30, 2020 10:38 AM
**To:** Friedson, Steven <Steven.Friedson@unt.edu>; Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>
**Cc:** Ragland, Catherine <Catherine.Ragland@unt.edu>; Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Dear Rebecca, and all
I enthusiastically endorse this letter. Please attach my name to the letter.
I shared the draft with our previous chair, Eileen Hayes, who is leading the anti-racism efforts as president of CMS. This is what she responded:

"Thanks for sharing. This is fantastic! I am extremely proud to be associated with a division that would offer such a statement. [...].
... last sentence: "...to address and eliminate systemic racism within our specific disciplines." You have really given me great hope this morning, with your letter. I was also proud of SMT's statement posted to Facebook. This is a period in which we are experiencing numerous trials, many of them centered around race. The MHTE letter makes me proud that I have lived to see such a statement issued from a College of Music."

I support her suggestion for editing the last sentence. Please do so.

Thanks for your support,
Frank

Dr. Frank Heidlberger
Professor of Music Theory
Music Theory Area Coordinator

University of North Texas
College of Music
1155, Union Circle # 311367
Denton, TX 76203
U.S.A.
Phone: (940) 369-7542
Fax (940) 565-2002

---

**From:** Friedson, Steven <Steven.Friedson@unt.edu>
**Sent:** Thursday, July 30, 2020 9:58 AM
**To:** Geoffroy-Schwinden, Rebecca <Rebecca.Geoffroy-Schwinden@unt.edu>; Notley, Margaret <Margaret.Notley@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>
**Cc:** Ragland, Catherine <Catherine.Ragland@unt.edu>; Mondelli, Peter <Peter.Mondelli@unt.edu>; Prince, April <April.Prince@unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Schulze, Hendrik <Hendrik.Schulze@unt.edu>; Illari, Bernardo <Bernardo.Illari@unt.edu>; Wright, Brian <Brian.Wright@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Heetderks, David <David.Heetderks@unt.edu>; Schwarz, David <David.Schwarz@unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Lavacek, Justin <Justin.Lavacek@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Robertson, Gillian <Gillian.Robertson@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Timothy Jackson [REDACTED]; Chung, Andrew <Andrew.Chung@unt.edu>
**Subject:** Re: Faculty Statement on the Recent issue of JSS

Rebecca,

Thank you for your work on this issue. Please attach my name to the letter.

Steve

Steven Friedson
University Distinguished Research Professor
P.O. Box 313367
University of North Texas
Denton, Texas 76203-1367
Email: steven.friedson@unt.edu

---

**From:** "Geoffroy-Schwinden, Rebecca" <Rebecca.Geoffroy-Schwinden@unt.edu>
**Date:** Thursday, July 30, 2020 at 9:53 AM
**To:** Steven Friedson <Steven.Friedson@unt.edu>, "Notley, Margaret" <Margaret.Notley@unt.edu>, "Heidlberger, Frank" <Frank.Heidlberger@unt.edu>
**Cc:** "Ragland, Catherine" <Catherine.Ragland@unt.edu>, "Mondelli, Peter" <Peter.Mondelli@unt.edu>, "Prince, April" <April.Prince@unt.edu>, "Virani, Vivek" <Vivek.Virani@unt.edu>, "Schulze, Hendrik" <Hendrik.Schulze@unt.edu>, "Illari, Bernardo" <Bernardo.Illari@unt.edu>, "Wright, Brian" <Brian.Wright@unt.edu>, "Cubero, Diego" <Diego.Cubero@unt.edu>, "Heetderks, David" <David.Heetderks@unt.edu>, "Schwarz, David" <David.Schwarz@unt.edu>, "Bakulina, Ellen" <Ellen.Bakulina@unt.edu>, "Lavacek, Justin" <Justin.Lavacek@unt.edu>, "Graf, Benjamin" <Benjamin.Graf@unt.edu>, "Robertson, Gillian" <Gillian.Robertson@unt.edu>, "Slottow, Stephen" <Stephen.Slottow@unt.edu>, Timothy Jackson

[REDACTED], "Chung, Andrew" <Andrew.Chung@unt.edu>
**Subject:** Faculty Statement on the Recent issue of JSS

Dear all,

Please check that I have not missed anyone from your area in the addresses above. I do not have an official list of our division.

Attached is a document that reflects our combined response to the symposium. I have tried my very best to harmonize and nuance this response so that many of you will feel comfortable signing. Unfortunately, we do not have more time to deliberate, to be frank, *this is far too late*. This story is on NPR.

Please let me know by 3pm Central Time today whether you want your name attached to it.

I grateful for all of your conversations and I know that many of us are feeling a lot of pain right now. Let's end this deafening silence from our faculty and move forward together.

All best,
Rebecca

Rebecca Dowd Geoffroy-Schwinden, Ph.D.
Assistant Professor, Music History
Division of Music History, Theory, and Ethnomusicology
University of North Texas College of Music
Rebecca.Geoffroy-Schwinden@unt.edu

Vice-President, Society for Eighteenth-Century Music

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON, )
Plaintiff, )
v. ) CASE NO.
) 4:21-cv-00033-ALM
LAURA WRIGHT, et al, )
Defendants. )

-----------------------------------

ORAL DEPOSITION OF
FRANK HEIDLBERGER
MAY 19, 2021

-----------------------------------

ORAL DEPOSITION OF FRANK HEIDLBERGER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on May 19, 2021, from 9:10 a.m. to 11:56 a.m., before Nita G. Cullen, CSR in and for the State of Texas, reported by machine shorthand, at the Law Offices of Cutler Smith, 12750 Merit Drive, Suite 1450, in the City of Dallas, County of Dallas, State of Texas, pursuant to the Federal Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL THAD ALLEN
MS. SAMANTHA HARRIS
ALLEN LAW, LLC
P.O. Box 404
Quaker Hill, Connecticut 06375
860.772.4738
860.469.2783 Fax
m.allen@allen-lawfirm.com

FOR THE DEFENDANTS:

MR. MATT BOHUSLAV
ASSISTANT ATTORNEY GENERAL
GENERAL LITIGATION DIVISION
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711
matthew.bohuslav@oag.texas.gov

AND

MR. RENALDO STOWERS
SENIOR ASSOCIATE GENERAL COUNSEL
UNIVERSITY OF NORTH TEXAS SYSTEM
OFFICE OF GENERAL COUNSEL
1155 Union Circle
Denton, Texas 76203
940.565.2717
renaldo.stowers@untsystem.edu

ALSO PRESENT:

MR. TIMOTHY JACKSON

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | 4 |
| FRANK HEIDLBERGER | |
| Examination by Mr. Allen | 4 |
| Examination by Mr. Bohuslav | 85 |
| Reporter's Certificate | 86 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 24 | Notice of Taking Deposition | 7 |
| Exhibit 25 | Statement from the Division of Music History, Theory and Ethnomusicology of the University of North Texas | 34 |
| Exhibit 26 | E-mail to Benjamin Brand, 7/27/2020 | 34 |
| Exhibit 27 | E-mail to Frank Heidlberger, 7/28/2020 | 53 |
| Exhibit 28 | E-mail to Benjamin Brand, 7/27/2020 | 56 |
| Exhibit 29 | Music History, Theory, and Ethnomusicology - Theoria | 58 |
| Exhibit 30 | E-mail to Timothy Jackson, September 14, 2016 | 68 |
| Exhibit 31 | E-mail to Dr. Jackson, September 17, 2018 | 73 |
| Exhibit 32 | E-mail to Peter Kohanski, July 30, 2020 | 74 |
| Exhibit 33 | News from SEM: General News | 78 |
| Exhibit 34 | E-mail to John Richmond, July 30, 2020 | 80 |

P R O C E E D I N G S

FRANK HEIDLBERGER,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ALLEN:

**Q.** Mr. Heidlberger, my name is Michael Allen. I'm counsel to Timothy Jackson. Have you ever been deposed before, sir?
**A.** No.
**Q.** So, I'm just going to go over a few ground rules. This is a relatively formal conversation. A deposition, although it's taking place in a private office here, is actually an extension of the Court. The purpose of depositions is both to find out what you know, obviously, and also to find out what you would say at trial.
I'll start with a few preliminary questions. Is there anything that would prevent you from giving truthful testimony today?
**A.** No.
**Q.** Are you taking any medication that might affect your memory or ability to testify truthfully?
**A.** No.
**Q.** Are you ill in any way?
**A.** I have Type 1 diabetes, that might affect over

Q. Is it sexist to ask that female students in music theory at the University of North Texas fulfill their obligations as TAs?
A. No.
(DEPOSITION EXHIBIT 31 MARKED.)
Q. (By Mr. Allen) I'm going to mark one more exhibit, and I think we're up to 31. And Professor Heidlberger, I am going to represent to you that this may be a document you have not seen, but I would like you to examine it anyway, and I would ask you to examine simply the first e-mail.
A. Uh-huh.
Q. This appears to be an e-mail from Louisa Gao to Timothy Jackson. So, my first question for you is, Louisa Gao, is that the same individual we've been referring to as Yiyi Gao?
A. I don't know. I assume so. I've never seen the word Louisa with regard to her.
Q. But this e-mail is signed "Yiyi Gao", correct?
A. Yes.
Q. Were you aware of any problem between Yiyi Gao and Professor Jackson in the September 2018 timeframe?
A. No.
Q. Do you see that this says, "I would like to apologize for withdrawing from the project," in that

first line?
A. Uh-huh, yeah.
Q. Do you know what project that refers to?
A. Not specifically. I assume her dissertation.
Q. But you have no direct knowledge.
A. No.
Q. And you see that she says, "I apologize again, last semester I did not balance my schedule as well and did not meet with you weekly. Sorry again for problems that I mentioned above." Correct?
A. Uh-huh.
Q. Would you understand that as an apology, Professor Heidlberger?
A. Yes.
Q. And I understand you were not aware of this e-mail. Part of the purpose of discovery is to find out what you know, sir.
A. Right. No, I am not -- have no idea of that.
(DEPOSITION EXHIBIT 32 MARKED.)
Q. (By Mr. Allen) Professor Heidlberger, I am marking an exhibit as Exhibit No. 32.
Did I give you one, Matt?
MR. BOHUSLAV: Thanks. Do you have another exhibit marked one?
MR. ALLEN: That's my mistake, Matt.

Q. (By Mr. Allen) Professor Heidlberger, do you recognize this document?
A. Yes.
Q. Can you describe this document for the Court, please?
A. This is the statement by a majority of the faculty of the Division of Music History, Theory and Ethnomusicology, distancing them from statements and procedures practiced regarding the Journal of Schenkerian Studies, and touts Dr. Ewell, in particular.
Q. At the bottom of Kohanski 114, is that your name appearing there?
A. Yes.
Q. So you endorsed this letter.
A. Yes.
Q. And you endorsed the call for action outlined in our students' letter, as referred to in the second paragraph of that document, which asks "that the College of Music "publicly condemn the issue and release it freely online to the public and provide a full public account of the editorial and publication process, and its failures. Responsible parties must be held appropriately accountable." Did I read that correctly? Let the record reflect, I'm pointing to the witness to the second paragraph.

A. Okay. Yeah. Endorse -- we endorse the call, yes. Yes. Yes. Uh-huh. That's correct.
Q. What is the student letter referred to in the statement that you signed that is Exhibit 32?
A. Sorry, I don't have the -- where is the student letter?
Q. Well, that's what I'm asking you. What student letter are you referring to in endorsing?
A. They made the public statement expressing their distance from the handling of the JSS by Dr. Jackson. They do it in their words, but the principal content of that statement is something we endorsed with this letter.
Q. Do you recall the University of North Texas ad hoc panel report of November 25th, 2020?
A. Vaguely, yeah.
Q. Did you read it?
A. I did read it, yeah.
Q. Do you recall that this letter by the faculty, which you signed in addition to the other faculty, was attached to that ad hoc panel report?
A. No.
Q. I'm going to present to you an exhibit marked Exhibit 3. And Matt, this is from yesterday. Is it okay that I present this to the witness?

John Toaru Ishiyama, Ph.D. 9/27/24 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
SHERMAN DIVISION

TIMOTHY JACKSON, )
Plaintiff, )
vs. ) CASE NO. 4:21-CV-00033-ALM
LAURA WRIGHT, et al., )
Defendants. )

*********************************************************

VIDEOTAPED ZOOM ORAL DEPOSITION OF
JOHN TOARU ISHIYAMA, Ph.D.
September 27, 2024
(Reported Remotely)

*********************************************************

VIDEOTAPED ORAL DEPOSITION OF JOHN TOARU ISHIYAMA, Ph.D., produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and -numbered cause on the 27th day of September, 2024, from 9:13 a.m. to 12:35 p.m., before Kim D. Carrell, Certified Shorthand Reporter in and for the State of Texas, reported remotely by computerized stenotype machine at the University of North Texas System, 801 North Texas Boulevard, Gateway Suite #308, Denton, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

John Toaru Ishiyama, Ph.D. 9/27/24 2

APPEARANCES

FOR THE PLAINTIFF:

Mr. Michael Thad Allen
ALLEN LAW, LLC
P.O. Box 404
Quaker Hill, CT 06375
Telephone: 860.772.4738 - Fax: 860.469.2783
E-mail: m.allen@allen-lawfirm.com

FOR THE DEFENDANTS:

Ms. Mary Quimby
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capital Station
Austin, Texas 78711
Telephone: 512.463.2120 - Fax: 512.320.0667
E-mail: Mary.Quimby@oag.texas.gov

- and -

Mr. Renaldo Stowers (Appearing Live)
University of North Texas System
Office of General Counsel
801 North Texas Boulevard
Denton, Texas 76201
Telephone: 940.565.2717 - Fax: 940.369.7026
E-mail: Renaldo.Stowers@untsystem.edu

ALSO PRESENT: Jason Warner, Videographer
lvg.dallas@gmail.com

John Toaru Ishiyama, Ph.D. 9/27/24 3

I N D E X

| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | 5 |
| JOHN TOARU ISHIYAMA, Ph.D. | |
| Direct Examination by Mr. Allen | 6 |
| Corrections and Changes | 129 |
| Reporter's Certificate | 131 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Re-Notice of Taking Deposition | 7 |
| Exhibit 2 | Email Chain Ending 8-3-20, Cowley to Ishiyama, Request to Serve on Ad Hoc Review Panel (UNT 002453 - 002454) | 20 |
| Exhibit 3 | Ad Hoc Review Panel Report (Exhibit D) (JACKSON000208 - 000233) | 23 |
| Exhibit 4 | COPE Guidelines: A Short Guide to Ethical Editing for New Editors (UNT 003303 - 003314) | 34 |
| Exhibit 5 | Theoria Title Page, List of Articles, Directions to Contributors, Volume 26-2020 | 43 |
| Exhibit 6 | Emails ending 10-14-20, Ishiyama to Jackson, et al. RE: Talk With UNT Ad Hoc Journal Review Panel (UNT 002634 - 002635) | 50 |
| Exhibit 7 | Handwritten Notes, 9-16-20, Ad Hoc Journal Review Committee | 63 |
| Exhibit 8 | Potential Questions for Benjamin Brand Chair of the Division of History, Theory & Ethnomusicology | 68 |

John Toaru Ishiyama, Ph.D. 9/27/24 4

| | | |
|---|---|---|
| Exhibit 9 | PLoS Medicine Article, What Should Be Done to Tackle Ghostwriting in the Medical Literature | 71 |
| Exhibit 10 | Walls Facebook Post (JACKSON 000234 - 000236) | 81 |
| Exhibit 11 | Email Chain ending 9-30-20, Walls to Ishiyama (UNT 002533) | 83 |
| Exhibit 12 | Jackson Materials for the Committee (UNT 002645 - 002782) | 99 |
| Exhibit 13 | Email, 10-2-20, Ishiyama to TitleIX, et al. Reporting on an Incident (UNT 003435) | 117 |

Julia Whaley & Associates 214-668-5578 Page 1 to 4 of 102

APPX.031

A. Yes, it was attached after we had completed and submitted the report.
Q. And then the first exhibit is this email. Do you see that on screen, Professor Ishiyama?
A. Yes. It's a bit small, but yes, I do see it.
Q. Would it help me -- excuse me. Would it help you if I expanded it a little bit?
A. Yes.
Q. Is that easier to read?
A. Yes.
Q. So I just had a couple of brief questions. You had mentioned there was a follow-up email concerning the charge to the committee. You believe that the charge was committed to writing in some form. And my question for you, is this the email that committed the charge to the panel in writing?
MS. QUIMBY: Objection, form.
A. I am not -- if this was the charge, but it certainly includes the charge of what the committee was supposed to do.
Q. Where does it include the charge?
A. The University of -- after -- in this paragraph, I think that begins with, "The University has appointed a five-member multidisciplinary panel. The panel members, who are outside the College of Music, will examine objectively the processes followed in the conception and production of volume 12 of the Journal of Schenkerian Studies. The panel will seek to understand whether the standards of best practice in scholarly publication were observed and will recommend strategy to improve the editorial processes where warranted."
That would be the charge.
Q. Is it your testimony today that -- I'm highlighting what I believe you just read. Did I highlight that correctly?
A. Yes. And at the end of it, it said that a report -- that we should submit a report, and the report will be made public. That is, as I understand it, being the charge to the committee.
Q. These two paragraphs, one above and one below, that are also in italics, were those also part of the charge?
A. I do not recall that. I -- we focused exclusively on the paragraph that said what the committee or the panel would be doing.
Q. Uh-huh. The -- and I should have asked this first off. You do remember receiving this email on August 5th, 2020, correct?
A. Yes.
Q. What was your understanding of what this email meant in the paragraph that starts off, "The University of North Texas is committed to academic freedom and the responsibility that goes along with this freedom."
A. I don't actually -- we didn't interpret that. I don't -- I'm not the one who wrote it, so I guess Provost Cowley would be the better person to answer that. But we were focused on the second paragraph. That was the charge. The entire focus of our committee was on the charge.
Q. So you didn't consider this part of the obligations or duties of the ad hoc panel, this first sentence that I just read.
"The University of North Texas is committed to academic freedom and the responsibility that goes along with this freedom."
A. That was not what the committee was charged to determine.
Q. Okay. And does that go for the second sentence here in that paragraph?
"This dedication is consistent with and not in opposition to our commitment to diversity and inclusion into the highest standards of scholarship and professional ethics."
A. No. The committee did not consider that because that was the statement made by the provost. Again, we focused entirely on the charge of the committee.
Q. Okay. And I think you've indicated what the answer will be to this question, but I've just highlighted the paragraph that follows what you've identified as the charge to the committee that reads, "The Journal of Schenkerian Studies has made many contributions to the understanding of music theory, to offer music theorists the opportunity to share and defend diverse viewpoints under the most rigorous academic standards and ethics."
Did I read that correctly?
A. Yes.
Q. And do I understand from your testimony that this was also not considered by the panel as something they were charged with investigating concerning the Journal of Schenkerian Studies?
A. Yes, we did not consider this.
Q. Okay, thank you. So it is fair to say, and correct me if I'm wrong, that you considered the charge very narrow in scope?
MS. QUIMBY: Objection, form.
A. We considered the charge, the specific instructions, the charge from the provost, which is

John Toaru Ishiyama, Ph.D. 9/27/24
29

represented by the paragraph that I highlighted.
Q. And my question was, you considered that very narrow in scope?
A. Yes. Very narrow, along with, as we understood, this charge to be; that it was about editorial processes.
Q. And do you recall my client, Timothy Jackson, asking the panel about the scope of the investigation being conducted by the ad hoc panel?
A. Yes, I do. And we had told him exactly what I'm telling you.
Q. That the scope was narrow and it was confined to this paragraph --
A. Um-hum.
Q. -- that we just read?
A. Yes.
Q. Okay. At any time, did the panel stray from this narrow focus in its duties? Excuse me, strike that.
At any time, did the panel stray from this narrow focus in carrying out its duties?
A. No. I was insistent on that.
Q. Thank you. Were you aware that the investigation had already been announced in the College of Music by Dean John Richmond?
MS. QUIMBY: Objection, form.

John Toaru Ishiyama, Ph.D. 9/27/24
30

A. No, I was not. And John Richmond did not mention this to us when he testified before the committee.
Q. Did you ask him?
A. No.
Q. Do you think that would be relevant to the committee?
A. No.
Q. Were you aware that the College of Music had put the fact that there would be an investigation of the Journal of Schenkerian Studies up on the official website of the College of Music?
A. No, I was not.
Q. Did you think that would be relevant to the committee?
A. No, it would not be, given our charge.
Q. At some point, you referenced -- you, meaning the committee in general, Professor Ishiyama, the standards of COPE, C-O-P-E. Do you recognize that acronym?
A. Yes. It stands for the Council on Publication Ethics.
Q. Is it -- sorry. Just for clarification, is it council or committee?
A. I believe -- I do not recall exactly what the C

John Toaru Ishiyama, Ph.D. 9/27/24
31

stands for. It could be either. But we call it COPE. Those of us who are editors call it COPE.
Q. Okay. And I don't mean to quibble. I just want to make a clear record for the Court.
A. Um-hum.
Q. And what was your understanding of the standard of COPE?
A. They have multiple standards. I'm not sure which ones you would like me to refer to.
Q. Which ones were you applying when you analyzed the Journal of Schenkerian Studies?
A. COPE, among many things, says that the review processes should be made public and available to those who are submitting their articles and those who are reviewing. COPE also has fairly strict guidelines about self-publication and also what constitutes adequate peer review. And they are particularly mindful of self-publication by editors. They have other things --
Q. By self-publication -- sorry, go ahead.
A. They have other standards regarding anonymous authors. And also, if something is not peer reviewed, the requirement that there is some disclaimer that publicly appears in that journal. But there are multiple standards that COPE puts forward that we all

John Toaru Ishiyama, Ph.D. 9/27/24
32

subscribe to.
Q. When you say, "we all," who are you referring to?
A. At least all of the journal editors who were in that room were familiar with COPE. I would -- and I cannot speak to all editors in the world. But I would suggest that the major publishers all abide by COPE.
Q. When did COPE come into being, if you know?
A. I do not recall. It has been around for some time, but I could not tell you when it was founded.
Q. Do you recall Timothy Jackson asking about the nature of the COPE standards that the panel was applying?
A. I do not recall specifically, but I believe he did ask about them. He appeared to be unaware what those standards were.
Q. And what did you provide to him?
A. I gave -- we gave him the website and the PDF document that outlined COPE standards for editors.
Q. Does COPE have a standard concerning how contributors to a volume, an edition, a symposium, a commentary should be invited?
A. No, it doesn't have that as its editorial process. It does, however, have requirements about the review and especially peer review.

Julia Whaley & Associates 214-668-5578 Page 29 to 32 of 102
APPX.033

John Toaru Ishiyama, Ph.D. 9/27/24
53

A. Yes, as far as I recall.
Q. Is that the PDF you are referring to or a different one?
A. Yes, this one.
Q. Exhibit 4? Is that yes?
MR. ALLEN: Did I not hear that, Kim?
A. Yes.
Q. Thank you. And could you read paragraph 2 into the record, which I think you've testified to before, but I would just like you to read this answer to Timothy Jackson's question about academic freedom into the record for us.
MS. QUIMBY: Objection, form.
A. Can I ask for a clarification? Paragraph 2 does not refer to academic freedom at all.
Q. Did you see here that Timothy asked the question, Timothy Jackson, "I hope the panel is also prepared to discuss how to maintain the integrity of an academic journal in the face of widespread calls for censorship and the repression of unpopular viewpoints. Will the panel be addressing that?"
And you've already testified that I read that correctly. Am I mistaken, that paragraph 2 of your response to Timothy's email, Timothy Jackson's email, did not respond to that question?

John Toaru Ishiyama, Ph.D. 9/27/24
54

A. No, it did respond to the question. You asked me if it included a mention of academic freedom, and it does not. It was in response, saying clearly that the answer is no.
"The panel's charge is narrow, to only investigate the journal's editorial processes including management, peer review, and other processes related to journal production. The focus of our questions will only be on these issues. You are free to add information that you believe the panel should know after we have had the opportunity to ask our questions."
Q. Okay. And I believe you've already answered my question. That was your response to Timothy's question, whether you would be investigating the infringement of his academic freedom?
MS. QUIMBY: Objection, form.
A. Again, our charge was very narrow, and we stuck to it.
Q. Okay. And I'm just trying to build the record of the documents that establish what you were doing in the ad hoc committee. And I know that was consistent with your previous testimony. So this is simply part of the process, Professor Ishiyama.
A. Um-hum, okay.
Q. I wasn't -- I wasn't suggesting that you were

John Toaru Ishiyama, Ph.D. 9/27/24
55

misrepresenting something here.
MS. QUIMBY: Can we take a break? It's been about an hour.
MR. ALLEN: You know, I had not been aware of that, and I've just been charging through. And that's fine. Shall we go off the record?
MS. QUIMBY: Yes.
THE VIDEOGRAPHER: Off the record at 10:21.
(Recess taken)
THE VIDEOGRAPHER: The time is 10:37. We're on the record.
Q. Thank you, Professor Ishiyama. I want to go back to Exhibit 3, which is the Ad Hoc Panel Report, and I wanted to ask you another question about the charge that you testified to earlier in Exhibit 3.
In the charge that you read into the record, you were instructed to examine objectively the processes followed in the conception and production of Volume 12 of the Journal of Schenkerian Studies, right?
A. Yes.
Q. Can you explain for the Court what you understood as an objective investigation?
A. Well, given the charge, it was to evaluate the processes that were listed by the Journal in terms of

John Toaru Ishiyama, Ph.D. 9/27/24
56

editing Volume 12. In light of our experience as editor, that we should only focus on the charge, which was to investigate the processes, and not the influence by other things related to the production of Volume 12.
Q. And is it objective, in your understanding of research or investigations, to ignore exculpatory evidence?
MS. QUIMBY: Objection, form.
A. I think objectively means that you view the evidence without prejudice, without preconceived notions. That's how I understand objectively.
Q. So my question was, is it objective to ignore exculpatory evidence?
MS. QUIMBY: Objection, form.
A. I don't think that is how I would define objective.
Q. Okay.
A. It may not be best research practice; but that's not, in my view, how you define objective.
Q. Is it acceptable in an objective investigation to ignore exculpatory evidence?
A. Again, it's not related to objectivity. It may not be good research practice. That would be perhaps mentioned in the peer-review process. But in terms of objectivity, I take that to mean that you do not consider

Julia Whaley & Associates 214-668-5578 Page 53 to 56 of 102
APPX.034

John Toaru Ishiyama, Ph.D. 9/27/24
57

things outside of the charge that might influence and prejudice your decision.
Q. Would considering exculpatory evidence prejudice your decision?
MS. QUIMBY: Objection, form.
A. That's not what we mean by objectivity.
Q. Well, I wasn't asking you about that. I was asking you about the statement you just made about not considering anything that would prejudice your decision. I believe you said something to that effect, right?
A. But I said that was for peer-review processes. That's not good research effort. But your question was about objectivity, and I answered that.
Q. Okay. And I'm following up with a question about your methods of conducting the investigation in the ad hock panel.
A. Um-hum.
Q. Would you consider it best practices for the ad hoc panel to ignore exculpatory evidence?
MS. QUIMBY: Objection, form.
A. I do not believe we ignored such evidence. But no, I don't think we ignored such evidence.
Q. And you would not consider that best practices if evidence was ignored?
A. We were not asked about best practices about

John Toaru Ishiyama, Ph.D. 9/27/24
58

how we did the review process. We were asked to judge the best practices of the Journal of Schenkerian Studies.
Q. I understand that. I'm asking you. So could you answer the question as asked?
A. I'm not sure of the question.
MR. ALLEN: Madam Court Reporter, could you read the previous question back to the witness?
Q. BY THE REPORTER:
QUESTION: Would you consider it best practices for the ad hoc panel to ignore exculpatory evidence?
A. If we did that. I don't not think that is what happened.
Q. Right. That's not my question. I understand that you deny that happened. My question is would that be best practice --
A. You are asking me what I believe is best practice. I don't -- I don't think I should venture an opinion about that. I told you that research practices, we do not ignore evidence. But you are asking specifically about the activities of the panel, and I think I've answered that.
Q. No, I think you have not. I think you have not answered whether it would be best practice for a panel such as your ad hoc panel to ignore exculpatory evidence.

John Toaru Ishiyama, Ph.D. 9/27/24
59

We can agree, can we not, Professor Ishiyama --
A. We did not.
Q. Can we agree that the ad hoc panel should not ignore exculpatory evidence?
MS. QUIMBY: Objection, form.
A. No, I don't agree to that because we did not do that. I'm very narrow in terms of what we did, not speculate on whether or not something happened.
Q. I'm not asking you to speculate. I'm asking you to tell me precisely for the record your methods.
A. Are you asking for my opinion, sir?
Q. I'm asking for your understanding of what your task was. If you want to characterize that as your opinion, that's fine with me. Your understanding of your task as a member of the ad hoc panel was that it would be -- it would not be best practice to ignore exculpatory evidence. Can we agree on that?
A. But the charge -- your question started with objectivity.
Q. Yes.
A. Not best practice. I'm not sure how they're related.
Q. You brought up best practice, sir. So that's why I was asking you that question.

John Toaru Ishiyama, Ph.D. 9/27/24
60

A. Well, that's beyond the scope of the charge.
Q. Well, I'm not asking you only about the scope of the charge. I'm asking you about your approach of the investigation in the ad hoc panel.
A. We considered all of the evidence objectively, meaning that without prejudice and without preconceived notion, that's how we proceeded.
Q. Okay. Did you invite Timothy Jackson in advance to respond to the investigation report that you eventually produced?
MS. QUIMBY: Objection, form.
A. We asked him to testify. We did not ask him to respond to the report. That was not part of our charge.
Q. Were you aware that Timothy Jackson did respond to the report?
A. He did send us a message. The committee reviewed it and determined that this evidence actually did not affect our assessment of the general review processes, which was our focus.
Q. What evidence are you referring to?
A. Well, the fact that there was nothing produced that demonstrated what the review process was. Dr. Jackson had sent us a large group of emails, which we surveyed carefully, and could not determine what the review process was for Volume 12.

Julia Whaley & Associates 214-668-5578 Page 57 to 60 of 102
APPX.035

Also, that there was self-publication by the editor with no clear evidence that there were special precautions to prevent a conflict of interest and that the head made a decision regarding publication of an anonymous contributor, but we didn't focus too much on that because that does happen as long as there's some message or information provided in the journal that there's a reason why they're doing -- the editor's doing that. That did not appear. So that's what we were looking at.

**Q.** Are you referring to the -- I'm just trying to figure out what documents you are referring to, and I think we'll get to these. But are you referring to an email Timothy Jackson sent you with attachments in advance of his interview or shortly after his interview in the midst of the investigation, or -- and this is the question about the response -- are you referring to documents sent to you after the investigation was complete?

**A.** You know, I don't -- I'm not -- I don't recall four years ago exactly the sequence. I do know that Dr. Jackson had sent us something that was a body of emails that he said would outline the review process. We did review that, and there was no evidence that indicated that there was a clear review process. So I'm

referring partially to that. I cannot recall in what sequence those appeared.

**Q.** Okay. Hopefully, we'll clear this up later. I think I know which documents you are referring to. And when we come to those, hopefully, we can clear that up.

I want to return to the COPE principles, if I could for a moment. I believe you did say you interviewed the individuals at the University of North Texas who were responsible for operating the University of North Texas Press?

**A.** Yes. I don't recall their names right now, but yes.

**Q.** Was one named Chrisman, if that helps you recall?

**A.** I did not hear the name. Could you repeat it? One was named who?

**Q.** Chrisman. Chrisman. C-H --

**A.** I don't recall that name.

**Q.** Okay, that's fine. Were COPE principles required by the University of North Texas Press?

**A.** I am not aware if they have. Requirement is not what COPE recommends. It's best practices that they seek editors to pursue. I'm unaware of what the University of North Texas requires.

**Q.** You do know that the University of North Texas

published the Journal of Schenkerian Studies, right?

**A.** That, I do know, yes.

(Deposition Exhibit Number 7 marked.)

MR. ALLEN: Let me -- sorry. I'm going to mark for the record as Exhibit 7 a document that is dated in handwriting September 16, 2020 and Journal Review #2.

**Q.** And I'm going to represent to you, Professor Ishiyama, that to the best of my knowledge, these are notes of a Professor Wallach who was on the program -- excuse me, the ad hoc committee. Do you recognize the handwriting by any chance?

**A.** No, I do not.

**Q.** Did members of the ad hoc panel share their notes with each other?

**A.** No. We actually discussed in our meetings our points. We did not share the notes.

**Q.** Okay. So what we have here are one individual on the panel's notes. And I want to ask you a few questions to see if you recall the things that are recorded in these contemporaneous notes being discussed by the ad hoc panel. I'm obviously not trying to attribute this to you, just so we're clear. It does refer to Ron Chrisman here and Karen DeVinney.

Do you see that at the top?

**A.** Yes.

**Q.** Does that help refresh your memory as to who the individuals were who were operating the University of North Texas Press?

**A.** Yes, it does. I had misheard you say before Christmas, but Chrisman sounds more familiar.

**Q.** Okay. Understandable. Just real quick, something I know is probably not within the purview of your investigation or at least at the Center, but there's a note here that after one year, there should be or there was a free online upon access in the library. Do you remember the UNT Press discussing how the University Press made the Journal available to the public in this way?

MS. QUIMBY: Objection, form.

**A.** No, I don't. But they were talking about their production processes may be part of it.

**Q.** You don't have any reason to believe this was not accurate?

**A.** No. But I can't be sure, because these are not my notes.

**Q.** I understand, sir.

**A.** And I -- they talked a lot about production.

MR. ALLEN: Now, unfortunately, I can't refer to Bates numbers here, Attorney Quimby. But I'm

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. |
| VS. | § | |
| | § | 4:21-cv-00033-ALM |
| LAURA WRIGHT, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY JACKSON, Ph.D.

SEPTEMBER 24, 2024

******************************************

The Oral and Videotaped Deposition of TIMOTHY JACKSON, Ph.D., produced as a witness at the instance of the defendants, and duly sworn, was taken in the above-styled and numbered cause on SEPTEMBER 24, 2024, from 9:07 a.m. to 6:22 p.m., before Nicole A. Hatler, CSR No. 11275 in and for the State of Texas, reported by machine shorthand, at the University of North Texas System, 801 North Texas Blvd, Gateway Suite 308, Denton, TX 76201.

---oOo---

okay. I think I already said that.
Q. Are there any other committees that you have served on in the last four years?
A. No.
Q. And are there any other -- is there anything else you've done in the last four years to respond to a call or otherwise express interest in serving on a committee that we haven't already talk about?
A. That we haven't talked about, no.
Q. And forgive me if I already asked this, but -- right -- the DMA committee that you're currently serving on --
A. Yes.
Q. -- were you appointed or elected?
A. Probably appointed because I don't know of any election that took place to do that. I think that the chair -- the current chair who replaced Brand wanted to make use of my expertise because I serve as the faculty advisor for a number of students taking DMA degrees at UNT, and I have a lot of experience directing those kinds of dissertations. He wanted to get me on that committee for that reason.
Q. And has he expressed that to you?
A. No.
Q. So just to be clear, do you know, one way or

the other, whether you were appointed or elected?
A. I believe that he appointed me to replace a person who is on leave.
Q. And I'm just trying to understand, what is it that makes you believe that you were appointed instead of elected?
A. Because I don't recall any election. There's no election, that I know of, that resulted me -- these were all decided by the administrators.
Q. As far as you know?
A. As far as I know.
Q. Okay.
A. With the one exception, it may be that the PAC, at some point, was an elected position, but I don't have the evidence in front of me.
Q. Okay. The attorney who contacted CUNY suggesting that there were insufficiencies with Ewell's research, how did you learn that he had contacted CUNY?
A. Because he told me, and he had sent me a copy of the letter that he had sent to them.
Q. When was your first communication with -- what was his name again? I'm sorry.
A. Scott Thruwald.
Q. Scott Thruwald?
A. We went to school together. So it would have

been, I don't know, 30 years ago.
Q. When was --
A. 30 -- 35 years ago.
Q. Sure. Let me be more specific.
When was your first communication with him about concerns with Ewell's research?
A. It was after Ewell gave his talk.
Q. In 2019?
A. Yes. Because Thruwald and I were both alumni of the same program because, and although Thruwald was not a music theorist, he was very appalled by what Ewell was claiming to be fact. And so, he actually wrote an article of his own which he published on the -- on the web about it, and in this article he makes various points about the facts -- the historical facts that Ewell had distorted. And so --
Q. This is something that Freewall self-published on the web?
A. I think so. Yes. I believe so. I don't remember whether he actually published anything in a journal or in a -- you know, in as -- in a magazine. I don't know. But -- but I do know that he sent me a copy of his critique.
Q. Did you edit that --
A. There were several -- several critiques that he

published, actually.
Q. Did you edit or give any feedback on that?
A. No. He -- he did it on his own recognizance, so to speak.
Q. Did you see a draft of what he submitted to CUNY before he sent it?
A. Of the letter?
Q. Yes.
A. Yes.
Q. Did you give any feedback on that draft?
A. Not really. It, basically, said what I would have said, too.
Q. Did he ever express to you why he wanted to take it upon himself to contact CUNY with that letter?
A. Yes.
Q. What did he say?
A. He said that he felt that Ewell had behaved in a manner that was academic fraud and that he felt -- that was his term, actually -- that it was important to point out to CUNY that -- that what Ewell was -- was saying and was publicizing about Schachter and Schenkerians was, in fact, a form of -- of fraud.
Q. Did you agree with that?
A. Yes. And also, that -- the reason that he did that was that -- I guess I can provide more detailed

information about this.

The reason that he did that was because he was a student of Barry S. Brook, which was the chairman of the department when we were both students there. And Barry was a very -- Barry Brook was a very distinguished musicologist. And so, there is a center at CUNY named after Barry S. Brook. Barry was also one of my teachers, and I respected him a lot. And so, when Barry died, they -- they named the center after him.

On its website, the center published an interview with Ewell and a, kind of, fluff piece about Ewell and made statements about Schenker that were, in our view, patently false. And that was the reason why Scott Thruwald wrote the letter to CUNY. And he also asked them to -- if my memory serves me correctly, to investigate the matter and also to remove this article which claimed falsely that Schenker was a enthusiastic supporter of Hitler.

Q. In your opinion, did -- did Freewalled [sic] --
A. Thruwald.
Q. Thruwald?
A. Yeah.
Q. Did Mr. Thruwald do anything to defame Philip Ewell?
A. No. He simply stated what Ewell said.

Q. And in your opinion, did Philip Ewell do anything to defame Heinrich Schenker?
A. Yes, absolutely.
Q. How so?
A. So in his various articles and communications, he claims that Schenker was a virulent racist. Those are his words. And he also claimed that he was a supporter of Hitler. Those are also words that he said in this interview that was published on CUNY's website.

Perhaps my experience as a student and as a professor in Germany is relevant to this is because I can read and speak German fairly well. And I read Schenker's -- most of it, before it was even put on the web, in the original German.

And so, with having read those 4,000 page diary, I knew that what Ewell was saying was absolutely false because there are clear statements in Schenker's diary and clear statements in his letters that he was not a supporter of Hitler. On the contrary, as a Jewish person, he recognized that Hitler was very dangerous.

And this is true at a very early page -- sorry -- stage in Hitler's career, already in 1923, when -- when Schenker saw the begins of the Nazi party, he made a clear statement that he was afraid of what this could portend to the Jewish people.

Q. So let me go back to something -- I think we touched on this earlier, but --
A. May I interrupt just for one second?
Q. If there's something you'd like to add, that's fine.
A. Yeah, there is. That these statements in Schenker's diary and his -- are absolutely crystal clear. There's no doubt about them, not at all. And if you read Schenker's writings in the original, not in translations that may contain errors, you will have no doubt in your mind about the truth of what I just said.
Q. So -- so that leads me to ask, if someone were to submit to an academic journal an article that says Heinrich Schenker was pro Nazi, what should the editors of that journal do? Should they publish it or not?
A. They have every right to publish it, okay. That's his opinion. They -- they -- they do have every right to publish it. I would not suppress opposite points of view. What -- what I think is important is to allow full public debate as to whether or not what Ewell has alleged is true.
Q. And -- and then just to circle back to it, do you believe those statements, though -- for example, Heinrich Schenker was pro Nazi, do you believe that those statements are false?

A. Absolutely.
Q. And are they defamatory?
A. To some degree they are, yes. Because -- because Schenker was Jewish, and as a Jew, he was very sensitive about anti-Semitism. And since the Nazis, right from the beginning, were very anti-Semitic, saying that Schenker as a Jew was a supporter of the very people that ended up murdering his wife is defamatory. And the same is true for his students, most of whom were Jewish.

And the same, may I add, with all due respect, is true of my entire family on my mother's side, which was murdered in the Holocaust. So I do believe that the statement were false and defamatory at the same time.
Q. Is that part of what motivated volume 12 of the JSS?
A. It was part of it, to allow people who disagreed to -- to say something because no questioning or no push back of any kind was allowed after Ewell's speech.

So when Ewell says that his work was well received, it reminds me of Stalin. You know, people were afraid to stop clapping after Stalin gave his speech. No one wanted to be the first person to do that

because they were afraid, and the same thing was true here. His speech was well received by certain people. But by people who were in the know and who knew that the speech was -- contained defamatory and false statements, it was not well received. But there was no way for those people to stand up and question his assertions.

Q. Were any of those people present at the live plenary lecture that Ewell gave in the fall of 2019?

A. Yes.

Q. Who?

A. Various colleagues of mine and students.

Q. Roughly, in estimate, how many people do you know who were at that plenary address live who strongly disagreed with Ewell's presentation?

A. About three that I can say for sure.

Q. Okay. And are those three --

A. But there were more than I knew, because people came forward to participate in the symposium, but they weren't all there. They -- they -- the thing was put online -- the speech was put online. And so, all of these people who disagreed were not necessarily present in the room, but they watched it later. And then some people contacted me about it. Yes.

Q. These three individuals that you happen to know about who were actually present during the live

presentation but disagreed --

A. Yeah.

Q. -- were they faculty members or students?

A. Both.

Q. Well, then let's walk through each of the three of them. Can you just give me their name and whether they were --

A. I don't want to give names. I'm sorry about that, but I don't. Because one of them is a student or was a student at the time, and, I'm sorry, I don't want to endanger these people.

Q. Well -- and if your attorney wants to designate this portion of a transcript as confidential for reasons, then he certainly has right to ask the court to do that. But for purposes of your testimony here today, you are under oath, and you are required to say what you know.

A. Okay. Well, I don't know what --

MR. ALLEN: And even though your question is pending, can we go off the record briefly?

MR. WALTON: Yeah. That's fine.

MR. ALLEN: Because I think we can solve this --

THE VIDEOGRAPHER: Counsel, let me go off the record. We're off the record at 12:32 p.m.

(A recess was held from 12:32 p.m. to 12:34 p.m.)

THE VIDEOGRAPHER: We're back on the record at 12:34 p.m.

MR. ALLEN: And just for the record, I have -- this is Attorney Allen. I have consulted with Attorney Walton in this brief intermission, and we have agreed to designate the subsequent part of the transcript confidential, subject to a confidentiality order that we will negotiate after this deposition within a reasonable time frame. And I will ask that we also undesignate it when this part of the testimony is through.

(Confidential beginning on Page 132 line 15 and ending on page 134 line 18.)

Q.

(Confidential beginning on Page 132 line 15 and ending on page 134 line 18.)

Q. BY MR. WALTON: And, Dr. Jackson, do you want to go for a few more minutes or would you like to take a break?

A. Sure. I'm ready -- I'm happy to go on.

MR. WALTON: Okay. All right.

do differently?
A. No.
Q. How did you first hear about criticism against volume 12?
A. Oh, I think some colleagues of mine started forwarding Twitter commentary.
Q. Do you recall which colleagues?
A. No. And then --
Q. I'm sorry. Just to clarify, are you on Twitter?
A. No.
Q. Okay. Have you ever had a Twitter account?
A. No.
Q. And have you ever had a Facebook account?
A. I have one, but I've never used it.
Q. Okay. Do you have any other social media accounts?
A. I do not and never have.
Q. Okay. Then -- I'm sorry.
Go back to how did you first hear about criticism against volume 12?
A. I think I just said that friends of mine contacted me and said there -- it looks like there's a Twitter -- an attack on Twitter against the symposium.
Q. And what was your understanding of where these

criticisms were coming from?
A. What do you mean?
Q. Were they coming from people within UMT or outside of UNT?
A. Outside.
Q. Was it your understanding that they were coming from the SMT or just from individual -- individuals at large?
A. They were coming mostly what I thought was from Ewell's friends and colleagues and students at other places and people, generally, sympathetic to his point of view.
Q. What did you do in response to that?
A. Nothing.
Q. Did you discuss any of those criticisms with Dr. Slottow?
A. At some point, yes, but I can't remember exactly when.
Q. Did you --
A. Yes, actually, they were discussed. Because I got a message from Lavi Walls of all people that said, what do they want? Do they want us to have Ewell respond to himself? He -- in other words, the question really was he was complaining that he wasn't invited specially to participate. And we had never said that he

couldn't. In fact, if he had wanted to, he could have. But we -- we felt it was kind of strange for someone to respond to themselves.
Q. When did you first hear that the -- that there were graduate students that were putting forth a statement in -- in response to volume 12?
A. You know, I can't -- it's all a bit of a blur at that point, but it was shortly after the Twitter storm started, right.
Q. And do you recall whether you became aware of the student statements or the faculty statement first?
A. No.
Q. After you were made aware of those statements, did you discuss them with anyone?
A. My wife mostly.
Q. Did you discuss them with Dr. Slottow?
A. A little bit. We -- we were both kind of surprised, to say the least.
Q. What was your understanding of how Dr. Slottow responded?
A. He was very freighted. I think he was very afraid.
Q. Was that your response?
A. In the very beginning, yes.
Q. And then how did that change over time?

A. Well, I decided that I should seek expert advice -- legal advice. I communicated with my sister, who's also a professor, and it seemed like there were other professors around the country at that time -- because it was just after the Floyd situation -- that I should consult with them and see what was the best way forward.
So I called the professor in California who had been canceled and who had sought legal counsel, and he gave me the name of Michael Allen's firm. And so, I called Michael and --
Q. And without -- and without divulging any conversations you had with his firm at that point --
A. Right. Okay.
Q. -- let me just ask you, do you recall when you first contacted Mr. Allen's firm?
A. It was shortly after the Twitter storm. So probably -- well, a couple of days later. So it happened around, if I -- I'm trying to remember -- maybe July of 2020, the end of July. So probably around that time, I contacted Michael Allen's firm.
Q. Do you recall whether it was before or after you learned of the student or faculty statement?
A. No.
Q. And do you recall whether it was before or

free to say so?
MR. ALLEN: Objection.
THE WITNESS: I think I've answered that already.
Q. BY MR. WALTON: Well, with respect to the other statements, I just wanted to see if your answer was the same for this one.
A. It's the same.
Q. Okay.
A. They can express that opinion.
Q. Any other false statements in Exhibit 2 that you see?
A. No, not that I would argue with.
Q. And there are -- there are quite a number of names here attached to this statement.
A. They're all faculty members at UMT.
Q. Okay. And it's my understanding that -- that each of these individuals has been made a defendant in this lawsuit.
Is that consistent with your understanding?
A. Correct.
Q. Did you speak to any of these individuals about this statement after you have seen it?
MR. ALLEN: Objection.
THE WITNESS: No.

Q. BY MR. WALTON: Why not?
A. Nobody reached out to talk to me, and just like Ewell, I didn't reach out to them either.
Q. Do you recall being included on e-mails where the faculty were discussing edits to this statement?
A. No. I was not included on those discussions, but I was included on a few e-mails where they were voting to accept this statement.
Q. So the e-mails you recall being included on were the e-mails about voting, not editing?
A. Mostly, yes.
Q. Okay. But at that point, you didn't reach out to any of these individuals to discuss what they were doing as far as this statement was concerned?
MR. ALLEN: Objection.
THE WITNESS: No.
Q. BY MR. WALTON: Do you know why they included you on those e-mails?
A. Probably by mistake.
Q. And what makes you say that?
A. Why would I want to vote on my own censor?
Why would I want to contribute to my own censoring.
Q. So you didn't view this as an invitation for you to respond and offer feedback?

A. No.
MR. ALLEN: Objection.
Q. BY MR. WALTON: Other than what is contained in this faculty statement by Exhibit 2, do you believe that these individuals have defamed you in any other way?
A. Yes.
Q. How so?
A. I think that, by offering to assume the editorship of the journal in my place, that Ellen Velikanova suggested that she believed all of these allegations and that she thought it was her place to indicate to the field her endorsement of them by taking my place.
Q. And --
A. And I feel that -- that's maybe a personal feeling, rather than an objective one, like what we've been talking about so far, but that's my -- the way I see it.
Q. And did Professor Velikanova make any statements in that regard that you felt were defamatory statements?
A. Not the statements --
MR. ALLEN: Objection.
THE WITNESS: -- themselves, no. But the very fact that she chaired the search for my

replacement, which was publicly shared, suggested that she herself believed these statements to be true.
Q. BY MR. WALTON: Other than that what you just described, is there anything else that any of these individuals have said or disseminated that you believe is defamatory against you?
MR. ALLEN: Objection.
THE WITNESS: There are, but I don't know them all. I don't know all the statements that were disseminated, so I can't answer that question fully.
Q. BY MR. WALTON: Are you able to -- right now to identify any of such statements?
MR. ALLEN: Objection.
THE WITNESS: Right now, no.
Q. BY MR. WALTON: Where do you believe such statements exist?
A. Online.
Q. On social media or otherwise?
A. Yeah, social media.
Q. Have you seen any of them?
A. Yes.
Q. Whose accounts?
A. That, I can't tell you right now. I'd have to go back and look.
Q. Of these individual faculty members whose names

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON, )
Plaintiff, )
VS. ) CIVIL ACTION
LAURA WRIGHT, ET AL. ) NO.: 4:21-cv-00033-ALM
Defendants. )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN SLOTTOW, PhD

NOVEMBER 7, 2024

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF STEPHEN SLOTTOW, PhD, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on November 7, 2024, from 8:31 a.m. to 4:41 p.m., via Zoom teleconference before Vanessa J. Theisen, CSR in and for the State of Texas, and RPR, reported by machine shorthand, at the University of North Texas System, 801 North Texas Boulevard, Gateway Suite #340, Denton, Texas 76201, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

accountable, or was it about something else?
Q. It was about the response issue.
A. Well, can you point to a specific -- I think I was referring to a specific sentence. Do you remember what it was?
Q. "Responsible parties must be held appropriately accountable," at the end of the second paragraph.
A. Yes. Well, it's a general -- I thought -- it would have made more sense in the context of what -- who is Tim Jackson's attorney? What's his name?
MR. ALLEN: Michael Allen.
A. -- what Michael Allen said. Now, what was he getting at, he was trying to get at? I forget.
Let me reread the paragraph.
Well, I'm not sure exactly what I meant then because it was in response to something that Michael Allen said.
MS. QUIMBY: Could we read back that part of the transcript, please?
(Background noise.)
THE REPORTER: I'm sorry?
MS. QUIMBY: Could we read back that last question and answer before we went off the

record?
THE REPORTER: The last question is:
Q. It doesn't say that he wasn't invited personally, does it?
A. No. It said he was not afforded the opportunity to respond in print. I know what that means. I know what they meant by that, but as for what it actually -- that's what it says.
A. I think I was referring to a sentence with the word "respond" in it. It wasn't that sent -- it wasn't in the sentence --
Q. Right.
A. The one -- it was the last sentence of the first paragraph.
Q. Now that you've heard that response -- your response again, do you now know -- can you now answer the question of what you meant when you said, "I know what they mean"?
A. Yeah, it meant that we did not -- the journal did not invite Dr. Ewell to provide a response to each of the items in the symposium. That's what they meant.
Q. Okay. And do you agree with what Dr. Jackson said in his article, particularly the point regarding black anti-Semitism?

A. Well --
MR. ALLEN: Objection.
A. -- for the first part, do I agree with what he says in his article, I wouldn't even answer that without having -- rereading the article. It's been years. And he says a lot about black anti-Semitism.
Well, there are -- certainly are pockets of black anti-Semitism, and there are certainly instances of synagogues being burnt down by some black people. Those are facts which have been reported on. So I think some of that is around, yes.
Q. (BY MS. QUIMBY) And what about what he said in the article that black children are not exposed to classical music?
A. I don't know if that's true or not. I don't know what he has -- what Dr. Jackson supports that with, and I wouldn't venture to agree or disagree with that statement.
Q. Would you expect that statement to be supported in an academic journal in a scholarly article?
A. I wouldn't venture to say. I don't know. I mean, it's too speculative. Would I expect it to be supported if someone had done a study on it? I don't know. I would have to wait to see if someone does do

a study on it. Until then, I'm not going to express an opinion. I think it's -- it's a sort of statement that I don't think should be made without some evidence.
Q. Okay. Thank you.
MS. QUIMBY: I will pass the witness.
MR. ALLEN: Sure.
FURTHER EXAMINATION
BY MR. ALLEN:
Q. I just have one more question about the last sentence of the first paragraph in Exhibit 3, the fact that he was not afforded the opportunity to respond in print is unacceptable, right?
A. Right.
Q. You said you know what they mean.
A. Yeah.
Q. And you even explained to the state's attorney, Mary Quimby, what your understanding was, right?
A. Right.
Q. And my question for you is there's been a lot of discussion about what they meant after this faculty petition was published, right?
MS. QUIMBY: Objection. Form.
A. Wait a minute. After this faculty -- what

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TIMOTHY JACKSON, Plaintiff,

v. CASE NO. 4:21-cv-00033-ALM

LAURA WRIGHT, et al, Defendants.

-----------------------------------

ORAL DEPOSITION OF
LEVI NIGEM XENON WALLS
MAY 18, 2021

-----------------------------------

ORAL DEPOSITION OF LEVI NIGEM XENON WALLS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on May 18, 2021, from 12:57 p.m. to 4:52 p.m., before Nita G. Cullen, CSR in and for the State of Texas, reported by machine shorthand, at the Law Offices of Cutler Smith, 12750 Merit Drive, Suite 1450, in the City of Dallas, County of Dallas, State of Texas, pursuant to the Federal Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL THAD ALLEN
MS. SAMANTHA HARRIS
ALLEN LAW, LLC
P.O. Box 404
Quaker Hill, Connecticut 06375
860.772.4738
860.469.2783 Fax
m.allen@allen-lawfirm.com

FOR THE DEFENDANTS:

MR. MATT BOHUSLAV
ASSISTANT ATTORNEY GENERAL
GENERAL LITIGATION DIVISION
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711
matthew.bohuslav@oag.texas.gov

AND

MR. RENALDO STOWERS
SENIOR ASSOCIATE GENERAL COUNSEL
UNIVERSITY OF NORTH TEXAS SYSTEM
OFFICE OF GENERAL COUNSEL
1155 Union Circle
Denton, Texas 76203
940.565.2717
renaldo.stowers@untsystem.edu

ALSO PRESENT:

MR. TIMOTHY JACKSON

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | 4 |
| LEVI NIGEM XENON WALLS | |
| Examination by Mr. Allen | 4 |
| Reporter's Certificate | 143 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 4 | Subpoena to Testify for Levi Walls | 6 |
| Exhibit 5 | Text Messages between Levi and Chris | 11 |
| Exhibit 6 | Text Messages between Nate, Brian, Jessica, and E | 34 |
| Exhibit 7 | E-mail to Benjamin Brand, dated 7/26/2020 | 45 |
| Exhibit 8 | E-mail to Benjamin Brand, dated January 9, 2020 | 50 |
| Exhibit 9 | E-mail to Ellen Bakuline, dated July 25, 2020 | 62 |
| Exhibit 10 | Facebook Post by Levi Walls, July 27 | 70 |
| Exhibit 11 | Letter to Dr. Jackson from Levi Walls | 85 |
| Exhibit 12 | Letter to Dr. Jackson from Levi Walls | 87 |
| Exhibit 13 | E-mail to Stephen Slottow, 12/19/2019 | 89 |
| Exhibit 14 | E-mail to JSS Authors and Advisory Board, March 14, 2020 | 93 |
| Exhibit 15 | E-mail dated March 10, 2020, to Schenker, me | 99 |
| Exhibit 16 | E-mail to Levi Walls, March 13, 2020 | 101 |
| Exhibit 17 | E-mail to Dr. Jackson, February 13 | 108 |
| Exhibit 18 | Call For Papers, December 17, 2019 | 110 |
| Exhibit 19 | Members of the Editorial Board Correspondence re. Call for Papers, November 25-December 1, 2019 | 113 |
| Exhibit 20 | Response to Ewell, November 19, 2019 | 122 |
| Exhibit 21 | Meeting, November 15, 2019 | 126 |
| Exhibit 22 | E-mail to Dr. Jackson, November 18, 2019 | 130 |
| Exhibit 23 | E-mail to Tim, Stephen, and Benjamin, April 22, 2019 | 133 |

P R O C E E D I N G S

LEVI NIGEM XENON WALLS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ALLEN:

**Q.** Mr. Walls, my name is Michael Allen, I'm an attorney for Timothy Jackson. I just wanted to talk about some things preliminarily. This will be a very formal conversation, but it's a conversation nonetheless. The deposition is an extension of the Court, and the purpose of the deposition is to find out what evidence you have and what you would say at trial.

So, a couple ground rules. If I -- if I say anything that's unclear to you, please feel free to interrupt me and ask for clarification. It's more than possible that it's my unclarity, my incompetence at forming a good question. So, I wouldn't want you to answer a question you didn't understand, is that clear?

**A.** Yes.

**Q.** So, as a corollary to that, if you don't ask for a clarification, I'll assume you understand my question; is that also clear?

**A.** Yes.

MR. ALLEN: Matt, in the last deposition, we agreed that all objections except those that go to

word, because then you could be a white person and say, I identify as Asian, which wouldn't make you a person of color. So, I suppose it comes down to -- I mean, it's difficult to define, because race is just such a difficult issuing, but I suppose it comes down to phenotype, physical look, and also just heritage, but I'm not an expert on race theory.

**Q.** It seems like what you're saying is it's very difficult to define what race is, is that fair?

**A.** Yeah.

**Q.** How did Timothy Jackson fail to engage this topic, in your view?

**A.** He thought that a person of color meant, specifically, a black person.

**Q.** What did he say that led you to believe that he thought a person of color meant specifically a black person?

**A.** Because I mentioned that my wife and forthcoming child were people of color, and he said that he didn't know my wife was black.

**Q.** Did he mention to you that his wife was Korean?

**A.** I know his wife is Korean.

**Q.** You knew that independently, right?

**A.** Yes.

**Q.** Do you think that Professor Jackson considers

his wife a person of color?

MR. BOHUSLAV: Objection, calls for speculation.

**A.** I remember at the time him remarking, oh, well, then my children are people of color. It seemed like a new revelation to him.

**Q.** (By Mr. Allen) So, he discussed this directly with you, that his wife was a person of color and his children were mixed race.

**A.** Yes.

**Q.** Going back to our friend Benjamin Brand, the department chair or division chair, I just wanted to ask, is there anything else you can remember discussing with Benjamin Brand in this January time frame in which you sent Benjamin Brand the e-mails in Exhibit 8?

**A.** To the best of my memory, that was everything we talked about in that 20 or so minutes.

MR. ALLEN: I'm going to mark this as Exhibit 9, please.

(DEPOSITION EXHIBIT 9 MARKED.)

**Q.** (By Mr. Allen) Do you recognize the second e-mail in this page? It starts, "From: Walls, Levi," which is the way e-mail always does these things. Do you recognize this e-mail?

**A.** Yes.

**Q.** It's July 25th, 2020, correct?

**A.** Yes.

**Q.** Rather late in the evening, 8:56 p.m.

**A.** Uh-huh.

**Q.** You say, "I just heard about this." What are you referring to?

**A.** I think I'm referring to the Twitter backlash.

**Q.** Twitter backlash to what?

**A.** To Volume 12.

**Q.** And you say, "it's very worrying, especially as I don't want my career to be ruined before it properly began." Can I ask you why would you be worried that your career might be ruined before it properly began?

**A.** Because my name was attached to a journal that printed explicitly racist comments.

**Q.** And it sounds like you were concerned for your family, and you were also, you say, confused about exactly what people want. "The responses were to Ewell's paper. Did Ewell want to respond to his own paper?" You see where you said that? Those were your words, right?

**A.** Yes.

**Q.** So, at the time you wrote this, you clearly did not have the impression that there was anything wrong to staging responses in the way the journal had gone about

it, correct?

MR. BOHUSLAV: Objection, form.

**A.** The only thing that I failed to understand at that time was that there was something wrong with not like specifically inviting Ewell to issue a response.

**Q.** (By Mr. Allen) So, what kind of invitation do you think would have been required?

**A.** A direct one.

**Q.** What kind of direct one? Could you describe it in its form? If you could do everything over again, what would you have presented to Professor Ewell at Hunter College?

**A.** Well, I can't do everything over again, but I think what a direct invitation would have looked like is from somebody at the journal saying, we are publishing -- or no, not eliciting. We are seeking responses to your paper and would like to know if you would also like to be involved.

**Q.** And you write, "I don't think anyone would have a problem with that," correct?

**A.** Yes.

**Q.** So, there was no one at the journal who had voiced any objection to Ewell responding to any of the responses or material that was published in the symposium, correct?

certainly floated among the editorial board or people who were more involved in the editorial board like --

Q. And it made sense to wait to bring Ewell into the process until we actually knew -- you -- or we meaning you, the people on the editorial staff, and the population at large would read the journal, what had actually been said in the symposium, correct?

A. I mean, I thought at the time, but having talked to people who are more knowledgeable than myself in how journals should be run, I understand now that it would have been more proper and ethical to invite him immediately to take part.

Q. And who told you that that would be the most proper approach?

A. I talked to a few people who expressed that. I know Stephen Lett said that. And I think it might have come up when I talked to the ad hoc committee, all of them being people who are knowledgeable in how journals should be run.

Q. So, they told that to you in the ad hoc committee, rather than you telling them things? Is that what I'm to understand, at least about that specific topic?

A. Well, I mean, they weren't feeding me words, if that's what you mean. They were just saying, because

that topic came up, and I think they said something along the lines of that that was an unusual practice.

MR. ALLEN: Can I have this marked, please?

(DEPOSITION EXHIBIT 10 MARKED.)

Q. (By Mr. Allen) And, Mr. Walls, do you recognize this exhibit?

A. Yes.

Q. Can you describe this exhibit?

A. This was my public response after the backlash on July 27th.

Q. And it looks like this is two days after Exhibit 9, correct?

A. Yes.

Q. And in Exhibit 9, you had openly expressed concern for your career due to the backlash. And two days later at about 10 o'clock p.m., you posted this to Facebook.

A. Yes.

Q. Were there any other venues that you published this document?

A. No, just Facebook. That's the only social media I have.

Q. And you say -- I'm looking down three, four sentences. "I had no control over the content of the

journal."

A. Yes.

Q. And you also say, "I am guilty of complicity because I remained in the position after I realized that my whistleblowing efforts were for naught," right?

A. Yes.

Q. And what whistleblowing efforts are you referring to there?

A. Going to talk to Brand.

Q. Were there any other whistleblowing efforts you engaged in?

A. No, I just talked to Brand.

Q. And with Brand, you discussed what we've already gone over with regard to those e-mails, correct?

A. Yes.

Q. And you also say at the bottom of that first page, "I feared I could not leave without significant damage to my career."

A. Yes.

Q. Yet now you have left the journal, correct?

A. Yes.

Q. But instead of damage to your career, you just transitioned into a TA-ship, correct?

MR. BOHUSLAV: Objection, leading.

A. I did go into a TA-ship, but the state of my

career is yet to be seen, because my career arguably has not started.

Q. (By Mr. Allen) And did you ever approach Timothy Jackson with these concerns?

A. No.

Q. Now, you say here, if I skip down to the next page, about six lines down, it says, "although after serious thought, I essentially agreed with Ewell's talk." Do you still stand by that statement as true?

A. Yes.

Q. And I'm skipping forward. "I gave comments to one author, including that they seemed to devalue other fields of study, that they cherrypicked information to make Schenker appear in a better light, and that they confused cultural appropriation with egalitarianism."

And then, shortly thereafter, you were told by Timothy Jackson that it was not your job to censor people. Can you describe those interactions and who the author is you are discussing there, and just the general substance of that conversation or series of conversations?

A. The author I'm discussing is Wiener, Barry Wiener, and they were the one that I gave comments to, specifically about the contents, and they were very displeased with it and forwarded it to Jackson saying

that, basically, we can't let the other side win. And the next day, I was told that it wasn't our job to censor people's beliefs in the journal.

**Q.** And who were you told it wasn't your job to censor beliefs in the journal?

**A.** Dr. Jackson.

**Q.** And did you agree with that statement?

**A.** I did.

**Q.** You agreed that it was not the job to censor authors of the journal, is that it?

**A.** I agreed, even though I didn't believe it, but I said, all right, that sounds fine.

**Q.** And were you ever told that that was a wrong decision?

**A.** By who?

**Q.** That's what I'm wondering. I don't know. Were you ever told that that was the wrong position to take, that there should have been censorship of people who were expressing views which you've described in this deposition as racist?

**A.** I mean, I think that there should have been censorship.

**Q.** Has anyone shared that view with you?

**A.** I mean, I'm sure a few people have. People generally believe that the things written in the journal

shouldn't have been able to be published, the racist comments.

**Q.** So, there was a decision made in the journal not to censor people, correct?

**A.** Yes.

**Q.** And was this decision applied both to the pro-Ewell and anti-Ewell papers?

**A.** Yes.

**Q.** Was there any impulse within the community of the editorial board to censor the pro-Ewell responses?

**A.** No.

**Q.** And, in fact, each one of those that was submitted was published, correct?

**A.** Yes.

**Q.** So, do you disagree with Professor Jackson, that it was not your job to censor people?

**A.** I disagree with Dr. Jackson that it wasn't the job of an editor to censor explicitly racist comments.

**Q.** And did any faculty members of UNT express that similar view to you?

**A.** I think Ben Graf agreed with me, when we talked about it, but I didn't really -- except for a few e-mails around this time, I didn't really discuss it very much with other faculty at UNT.

**Q.** Was there ever any discussion with Andrew

Chung?

**A.** Only in this e-mail, and it was one of the more recent exhibits, there was Chung and Bakulina and Heidlberger, I think, on the -- attached to the e-mail.

**Q.** And did you discuss it with Ellen Bakulina?

**A.** Again, only in the context of this e-mail that everyone was attached to.

**Q.** And how about Diego Cubero?

**A.** Only in that group e-mail.

**Q.** You also say, skipping down to the next paragraph, "I was worried about the potential dangers that the journal posed for the College of Music and for rational discourse in music theory."

Can you explain what you meant by that? What are the potential dangers that the journal posed for the College of Music and for rational discourse in music theory?

**A.** Well, the journal's representative of the college, being a journal that's printed out of the College of Music. And so, really, any -- anything that the journal does wrong will reflect badly on the college, but will also reflect badly on just the field of music theory, in general, which is certainly what happened, considering that Volume 12 of the JSS basically ruins the credibility that -- any credibility

that Schenkerian analysis could ever have.

**Q.** So, it's your view that the symposium ruined the credibility of Schenkerian analysis throughout the United States?

**A.** Absolutely.

**Q.** And, therefore, you believe that what the graduate students eventually called for at UNT, that the journal be eliminated, that is a worthy goal.

**A.** Yes.

**Q.** And you also say here, "Dr. Jackson was woefully ignorant about politically correct discourse and race relations," right? Do you see that?

**A.** Yes.

**Q.** What do you mean, "politically correct discourse"? Can you describe what you mean by that?

**A.** I was thinking specifically of just knowing the very basic terminology around race, like what a person of color is.

**Q.** And you hold by your previous statement that Timothy Jackson does not know, or at least until this conversation you referred to, did not know what a person of color is.

**A.** It appeared that way.

**Q.** Anything else that you consider Timothy Jackson's woeful ignorance of politically correct

each other. And I don't remember what struck up the conversation, I'm sure it was either about analysis or the journal, and -- but it began to lightly snow, and he suggested we go in his car. I, of course, didn't object. And in the car, we talked about -- I know we talked about Suzanne Clark's contribution, and I think that's how we got onto the topic of just general contributions that we didn't agree with.

And he said that we shouldn't censor people's -- the contents of people's writing. And considering that this was the day after my exchange with Wiener, I assumed that it was in relation to that, as I was expecting to be approached about that communication.

**Q.** Were you ever approached about your communications with Barry Wiener?

**A.** Not explicitly, but I took this communication in the car to be directly related to that.

**Q.** And we discussed censorship before, and you said to me -- you, at least at that time, agreed that it wasn't the job of the editor to censor the authors, correct?

**A.** I told him I agreed. I didn't actually agree. I just said that I agreed because that was what he wanted.

**Q.** So, you lied, in other words.

**A.** Yes.

**Q.** And Suzanne Clark, was that the name of the author you remember discussing directly?

**A.** Yes.

**Q.** Was she pro or anti-Ewell?

**A.** She was pro-Ewell.

**Q.** So, this discussion about censorship you had in the car was actually about Suzanne Clark, not about Barry Wiener. Am I understanding that correctly?

**A.** It started out about Suzanne Clark, and the way I remember the conversation, it tilted more about the responses, in general.

**Q.** Was the clear message that you shouldn't censor Suzanne Clark, as well?

**A.** Yes.

**Q.** And now you believe that was wrong, that you should have censored people like Wiener, but not censored people like Clark.

**A.** I don't think there's anything in Clark's response that merited censorship.

**Q.** But my question was, now you believe differently, that you should have censored people like Barry Wiener and not censored people like Clark, correct?

**A.** I always believed that Barry Wiener should have

been censored.

**Q.** So that vitriolic opinions that were anti-Ewell should have been censored, correct?

**A.** If they were racist, then I believed that they should be censored, because that's not something that should have a place in a respected academic journal.

MR. ALLEN: Can I have that marked as an exhibit? That will be Exhibit 15.

(DEPOSITION EXHIBIT 15 MARKED.)

**Q.** (By Mr. Allen) Do you recognize this e-mail, Mr. Walls?

**A.** Yes.

**Q.** Can you identify who this e-mail is to?

**A.** This e-mail is to Jack Boss.

**Q.** I have to admit that's an awesome name to have, don't you agree? He is definitely the boss. He seems to be at the University of Oregon, is that correct, given his e-mail?

**A.** Yes.

**Q.** What position does he have at the University of Oregon?

**A.** Well, it says here, Professor of Music Theory and Composition.

**Q.** Was he a contributor to the symposium?

**A.** Yes.

**Q.** And I see that he is the Chair of SMT Publications Committee. Do you see that?

**A.** Yes.

**Q.** Do you know what he does in that position?

**A.** I don't really, no.

**Q.** And was his contribution published?

**A.** Yes.

**Q.** Was his contribution censored in any way?

**A.** No.

**Q.** Were there substantive critiques of his position by Timothy Jackson that he was forced to incorporate into his contribution?

**A.** Could you -- sorry. Could you ask that again?

**Q.** Were there any substantive critiques of Jack Boss' pro-Ewell contribution that he was forced to incorporate from Timothy Jackson?

**A.** Not that I know of.

**Q.** Do you recall at any time getting any communication from Jack Boss objecting to the way in which the symposium was put together?

**A.** No. The few times we spoke, it was just about the typesetting of this example and probably some like general copy editing stuff.

**Q.** And before July 2020, did he object to the call for papers?

CONFIDENTIAL

## Re: Today

Kohanski, Peter <PeterKohanski@my.unt.edu>
Mon 27/07/2020 17:10
**To:** Kohanski, Peter <PeterKohanski@my.unt.edu>

P.S. I forgot to add my thanks to those who labored writing the statement(s) and apology. Rachel shared the statement on Twitter and it's already getting serious notice and a positive reception. Well done to all!

---

**From:** Kohanski, Peter <PeterKohanski@my.unt.edu>
**Sent:** Monday, July 27, 2020 5:09 PM
**To:** Kohanski, Peter <PeterKohanski@my.unt.edu>
**Subject:** Re: Today

Dear all,

Please find attached the public statement that was issued on behalf of the MHTE grad students. A formal apology will be sent to Dr. Ewell shortly. Another statement that we all have the opportunity to sign will be sent to the dean hopefully by Wednesday. Keep an eye out for that by checking the team.

All best,
Peter

---

**From:** Kohanski, Peter
**Sent:** Sunday, July 26, 2020 7:18 PM
**To:** Kohanski, Peter <PeterKohanski@my.unt.edu>
**Subject:** Today

Dear GAMuT Members,

I wanted to provide you an update on today's situation regarding the Journal for Schenkerian Studies. For those of you who don't know, the most recent issue of the journal was dedicated in large part to responding to Dr. Phil Ewell's plenary keynote on whiteness and music theory at the most recent meeting of the SMT (see his work here: https://musictheoryswhiteracialframe.wordpress.com/). In addition to not including Dr. Ewell's own work or responses in the journal, some of the articles were blatantly racist. This last point is obviously of chief concern since the journal is published and edited at UNT by MHTE faculty members (among others). The issue has received intense backlash from the academic music community yesterday and today.

I heard reactions from many of you and emailed Dr. Brand expressing to him your anger and concerns. I just spoke with him and can report the following to you:

He has been in discussion with the College of Music administration and the theory area all day regarding this. Because the conversation is ongoing he was not able to read me in on any steps that are being taken to address this situation. I realize that this is frustrating, since for many of us it's obvious what needs to be done. But just know that they are moving quickly to deal with this.

I heard from some of you the concern that UNT's reputation was now at stake, which could affect our standing once we are in the job market. Dr. Brand shares this concern and assured me that he and other faculty will do everything they can to preserve our reputation and protect us as graduate students from the fallout.

## Re: [EXT] Fwd: Beethoven and Ewell drama

Slottow, Stephen <Stephen.Slottow@unt.edu>

Sun 7/26/2020 11:50 AM

**To:** Timothy Jackson [redacted]; Brand, Benjamin <Benjamin.Brand@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Chung, Andrew <Andrew.Chung@unt.edu>; Walls, Levi <LeviWalls@my.unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>

I find that Steven Hahn's twitter excerpts are too small for me to read. Is there any way to enlarge them?

-sps

---

**From:** Timothy Jackson [redacted]
**Sent:** Sunday, July 26, 2020 11:18 AM
**To:** Brand, Benjamin <Benjamin.Brand@unt.edu>; Cubero, Diego <Diego.Cubero@unt.edu>; Graf, Benjamin <Benjamin.Graf@unt.edu>; Chung, Andrew <Andrew.Chung@unt.edu>; Walls, Levi <LeviWalls@my.unt.edu>; Bakulina, Ellen <Ellen.Bakulina@unt.edu>; Slottow, Stephen <Stephen.Slottow@unt.edu>; Heidlberger, Frank <Frank.Heidlberger@unt.edu>
**Subject:** [EXT] Fwd: Beethoven and Ewell drama

Dear Colleagues,

I asked Stephen Hahn if he could collect the Twitter discussion in an email to send to us.
---------- Forwarded message ---------
From: **Stephen Hahn** [redacted]
Date: Sun, Jul 26, 2020 at 10:35 AM
Subject: Re: Beethoven and Ewell drama
To: Timothy Jackson [redacted]

This is on Twitter and Facebook, by the way.

On Sun, Jul 26, 2020 at 11:33 AM Stephen Hahn [redacted] wrote:

> I also shared a google doc containing contents of a thread by Chris Segall. This isn't everything. There's a lot. You might want to set up a quick dummy account just to take a look.
>
> On Sun, Jul 26, 2020 at 11:31 AM Stephen Hahn [redacted] wrote:

**APPX.051**

**UNT_000449**



**APPX.052**

**UNT_000450**



On Sun, Jul 26, 2020 at 8:54 AM Timothy Jackson [REDACTED] wrote:

> Dear Stephen,
>
> Can you please put the "drama" in an email and send it to me. That would be helpful.
>
> Best, Tim
>
> On Sun, Jul 26, 2020 at 12:51 AM Stephen Hahn [REDACTED] wrote:
>
>> Dear Dr. Jackson,
>>
>> Thank you for the analysis of the Beethoven! I'm going to try and absorb as much as I can tomorrow. I've had my hands full with computer work and personal troubles. If you have time, I'd love to talk over zoom again sometime soon.
>>
>> I've been looking at all the strange drama going around social media concerning the JSS. Please let me know if there's anything I can do to help. I care deeply about the future of Schenkerian analysis studies and hope this can be resolved as peacefully as possible.
>>
>> I think Levi told you, we've updated the JSS website recently, just making it a bit more stylish. If there's anything else we should add or change, please let us know.
>>
>> All the best,
>> Stephen

**APPX.053**
**UNT_000451**

**Edward Klorman**

14h ·

I write this message as someone for whom studies in Schenkerian analysis were a foundational part of my musical education. I treasure the four semesters I studied analysis with Carl Schachter (a wonderful, encouraging, and generous mentor to me), and I learned an enormous amount from an extended period working closely with my dissertation supervisor, William Rothstein. I presented my research at the Fifth International Schenker Symposium, published the paper in an online proceedings volume, and regularly teach a course on Schenkerian theory and analysis that is required for nearly all music theory majors. Having made my first (rudimentary, very bad) graphic analysis at the age of 14, I could fairly say that I've been invested in this analytical method for a long time and that it was a significant part of my formation as a musician.

I spent several hours yesterday and today reading the latest issue of the Journal of Schenkerian Studies (JSS), which was devoted to a series of responses to a presentation given at the 2019 SMT conference by my friend and former colleague Phil Ewell. I am dismayed but not surprised by the deep-seated anti-Black racism undergirding several of the contributions. One essay (written by a member of the journal's advisory board, who is a Distinguished Professor and who holds degrees from my present institution and my doctoral institution) faults Phil Ewell's work on critical race theory for failing to "bring Blacks up to 'standard' so they can compete" in musical scholarship, and proceeds to fault the "African American Community" for its "deficiency of background in classical music." I could quote many such outrageous passages from several of the essays within the volume (indeed, many such passages have been circulating on social media this weekend).

These racist ideas have no place in a scholarly journal; the advisory board of the JSS should be ashamed of the essays that attack Phil with anti-Black racist language. Indeed, many of the essays exemplify the very sort of whitewashing, white fragility, and white racial frame correctly diagnosed by Phil Ewell both in his 20-minute SMT presentation and in the more extended version of his research recently published in Music Theory Online (available here: https://bit.ly/3eWtnOg). An important context for understanding the vitriolic response to Phil's work is to consider that he is part of the 1% of Black scholars in the Society for Music Theory, an organization in which 83.7% of the membership identifies as white. Beyond the overt racism, the ad hominem attacks in several of the essays exemplify the very sort of insider/outsider culture that has long been pervasive in certain Schenkerian circles (including around the programming of the International Schenker Symposia, which have heavily featured male presenters and presenters who are students of the most influential Schenkerian scholars). It is this quality that has at times made the community of Schenkerian scholars feel like an exclusive, members-only club than like an inclusive scholarly discipline.

As many readers of this post are aware, the JSS essays arose through a call for submissions that appeared in mid-January 2020 with just a two-week deadline. I can only conclude that this turn of events was designed to prevent authors from having any meaningful time to reflect on Phil Ewell's presentation (from November 2019) and on the critical race theory he draws from. Although the call for submissions claimed the issue would be an "exchange of ideas," offering an "informed debate" with "a variety of thoughts and perspectives," Phil was not granted the

opportunity to respond to the essays, which would be a standard and essential part of any meaningful, honest scholarly debate about his work. It should be noted that one essay was published anonymously; anonymous critiques may be commonplace on internet message boards, but they have no place in honest scholarly discourse.

I have thought a great deal about Phil's important research since his presentation last November. I will continue to reflect on it, including on my own positionality in a field that is heavily dominated by white men researching European classical music. Here are a few steps I plan to take in the near term:

(1) I will be writing to the SMT leadership to call on them to take appropriate action to censure the racist language and ideas that appeared in this JSS issue, which have no place in our field. We can debate "a variety of thoughts and perspectives" while excluding racist ones.

(2) I am told that an open letter is being written by several colleagues at other institutions. I plan to contact these authors, offer to contribute to the letter, and to sign it.

(3) I will discontinue work on an essay that I had been preparing for submission to JSS, as it is a journal with which I do not wish to be associated. I will also advocate for my institution to discontinue its subscription to JSS. This is not a recommendation I make lightly (as I broadly support the free exchange of ideas, even ideas I may disagree with). But if JSS is willing to publish overtly racist language and ideas, then it would be appropriate to divest from supporting it with our subscription fees and submissions.

(4) I will advocate for my institution to invite Phil Ewell for a presentation and/or residency. I will prioritize advocating for other guests who can promote a more inclusive approach to music scholarship at my institution.

(5) I will advocate for the course that I regularly teach on Schenkerian analysis to be significantly recast and broadened, probably along the lines proposed by Chris Segall in his thoughtful contribution to the JSS issue. I am next scheduled to teach the course in January, and a full recasting of the course may not be possible by then (given the time frame and limited access to library resources during the COVID crisis), but I commit to making some significant changes to the design of the course already by January (as a first step toward a broader recasting by the next time I might teach the course).

(6) I will continue reading about anti-racism and thinking about how racism and white supremacy are integrated into the history and present of my discipline. Phil's research uses Heinrich Schenker's writings and reception as a case study for the white racial frame in my discipline. It would be instructive to consider the implications of his work more broadly.

Music Theory and the White Racial Frame * Philip A. EwellDOI: 10.30535/mto.26.2.4 PDF text | PDF examples Received June 2019 Volume 26, Number 2, September 2020 Copyright © 2020 Society for Music Theory Not everything that is faced can be changed; but nothing can be changed until it is faced. (Bald...

mtosmt.org
MTO 26.2: Ewell, Music Theory and the White Racial Frame
Music Theory and the White Racial Frame * Philip A. EwellDOI: 10.30535/mto.26.2.4 PDF text | PDF examples Received June 2019 Volume…

Music Theory and the White Racial Frame * Philip A. EwellDOI: 10.30535/mto.26.2.4 PDF text | PDF examples Received June 2019 Volume 26, Number 2, September 2020 Copyright © 2020 Society for Music Theory Not everything that is faced can be changed; but nothing can be changed until it is faced. (Bald...

204Inessa Bazayev, Chris Segall and 202 others
51 Comments4 Shares
Like
CommentShare

**Comments**

- 

  Fred Everett Maus This response is exemplary. Much gratitude and admiration to you.

  2

- •

  Like

- · Reply
- · 14h
- · Edited

- 

Gretchen Horlacher Such a thoughtful, beautiful response. Know that the SMT board is working on a response as well.
9

- •

  Like

- · Reply
- · 14h

- 

John Mac Master Thank you Edward Klorman for this thoughtful and proactive response. I'm honoured to call you friend and colleague. We are graced by your leadership.
1

- •

  Like

- · Reply
- · 14h

- 

Ben Bierman I really appreciate your response Edward Klorman. We all have a lot of work to do, much of it is self-examination and broadening of our own perpspectives. But, as you say, we all also must speak out and represent a new and improved path for our scholar…See More
2

- •

  Like

- · Reply
- · 14h
- · Edited

- 

Elizabeth Marvin This is a thoughtful, admirable response, Ed. I have not read the articles in JSS yet, but I will now. I am shocked that they would publish an anonymous article, and provide no opportunity for Philip Ewell to respond. This does not make for responsible scholarship.
5

- •

  Like

- · Reply
- · 14h

Nathan Pell replied
· 1 Reply

- 

Anna Wang I'm thankful for and inspired by the stand you are taking.
1

- •

  Like

- · Reply
- · 14h

- 

Richard Kessler Good for you Ed. I am sorry to hear what's happened here.

- •

  Like

- · Reply
- · 13h

- 

Daniel Ketter Thanks for sharing this thoughtful, principled response

- •

  Like

- · Reply
- · 13h

- 

Jeremy Orosz Thanks for speaking up, and for withdrawing a planned submission to JSS. The journal, at least under its current leadership, simply needs to be boycotted. And I second all of the other steps you suggest as well.

- •

  Like

- · Reply
- · 13h

- 

Edward Klorman Hi all, thanks for the kind and supportive comments. The best thing to do (instead of keeping the focus on me) is to read or reread Philip Ewell's article. Then watch the MTSNYS keynote by members of Project Spectrum: Clifton Boyd, Catrina Kim, and Alissandra Ree…See More
13

- •

  Like

- · Reply
- · 13h
- · Edited

Julia Bullard replied
· 1 Reply

- 

Edward Klorman Philip Ewell, I'm sorry I neglected to tag you in the post above. Also, wishing you and Marina a happy anniversary!
2

- •

  Like

- · Reply
- · 13h

- 

Andrus Madsen I'm not really in the position to defend the position I am going to take with any kind of real academic rigor, but I think it is fair to say that the whole Schenkerian system is a system that has a tendency to make German music look good under observat…See More
3

- •

  Like

- · Reply
- · 13h

Edward Klorman replied
· 2 Replies 5h

- 

Juanita Marchand Knight Thank you! This means a lot.

- •

  Like

- · Reply
- · 12h

- 

Mike Papapavlou Bravo Edward!

- •

  Like

- · Reply
- · 11h

- 

James Parsons A most odd thing (perversely ironic, I'd say) about the university that runs JSS. Here is the mission statement of the academic area in question: "To advance scholarly discourse about music in all its cultural and intellectual diversity." Quoted from: https://mhte.music.unt.edu/mhte

- mhte.music.unt.edu

MHTE | Music History, Theory, and Ethnomusicology
MHTE | Music History, Theory, and Ethnomusicology

- Like
- · Reply
- · 11h

Tim Hughes replied
· 1 Reply 2hTim Hughes One of my alma maters, I'm sorry to say. It's funny that I studied Schenkerian Analysis there with John Covach who, needless to say, had a very different attitude than the two advisory board members who are now on the faculty there have expressed in this issue of JSS.

- 

Sumanth Gopinath Thanks, Ed, for your very thoughtful response.
2

- •

  Like

- · Reply
- · 10h

Edward Klorman replied
· 1 Reply 5h

- 

Suyin Mak I just started reading the JSS articles and like you am doing a lot of reflection

- •

  Like

- · Reply
- · 8h

- 

Cecilia Oinas Is it possible to read the JSS online?

- •

  Like

- · Reply
- · 5h

Edward Klorman replied
· 7 Replies 1h

- 

Bob Hasegawa Thanks, Ed, for this nuanced and thoughtful response. My own music theory training was also largely Schenker-based, and I do think there's still an important place for prolongational ideas in tonal theory… perhaps with Schenker's problematic legacy bet…See More
6

- •

  Like

- · Reply
- · 5h

Edward Klorman replied
· 6 Replies 42m

- 

Anne Stone Thank you Ed.

- •

  Like

- · Reply
- · 3h

-

Dominique Labelle "Colorblind racism is the most significant form of racism in music theory's white racial frame and has been used for decades to dismiss those who wish to cite our racialized

structures and ideologies." The problem is always worse when not seen. Thank you for sharing, Ed.
2

- •

  Like

- · Reply
- · 3h

- 

Kelly Symons I have not finished reading your post, and I am EXCITED. I want more. Yes to bringing this up, and speaking it loudly. I don't know anything about it, and am excited at learning more. I LOVE Schenkerian analysis. I am going to read the rest of your post, and the article you've linked to. I want to know more.

- •

  Like

- · Reply
- · 3h

- 

Peter Knapp Ed, while I am not in scholar in this field, I am appreciative of your thoughtful comments re these issues. I am also encouraged by your openness to share your "plan of action" that grows out of these reflections. 👍🏻👍🏻
(Note- you make a BHS principal proud.)

- •

  Like

- · Reply
- · 3h
- · Edited

- 

Edward Smaldone Is it possible to access the recommendations of Chris Segall? I have my own ideas I plan to implement in my own teaching, but would be interested to have guidance.
1

- •

  Like

- · Reply
- · 2h
- · Edited

Tim Hughes replied
· 3 Replies 1h

- 

Maryse Legault WoW! Can't wait to read that!

- •

  Like

- · Reply
- · 2h

•
Johnandrew Slominski You're doing the important work, Ed: work that is principled, ethical, kind, critical, and frankly, damned uncomfortable. But it matters deeply, and we can't move forward in scholarship or humanity without it. I, too, have been steeped in a Schenkerian bath, and it's an uncomfortable place at the moment. Thankfully we have people like Philip Ewell to provoke meaningful dialogue and change.

- •

  Like

- · Reply
- · 2h
- · Edited

Edward Klorman replied
· 1 Reply 1h

- 

Adria Benjamin Thank you, Ed, for this and all of the actions you will be taking.

- •

  Like

- · Reply
- · 54m

- 

  Joon Park Thank you Ed for your thoughtful writing. Last semester when I was teaching a course that supposed to be the Schenker class, I ended the course by showing Phillip's SMT talk in class. I am planning to include more embodiment theory in place of Schenkerian concepts next time.

  - Like
  - · Reply
  - · 1m

**Re: Journal of Schenkerian Studies**

Van Oort, Dani <DanielleVanOort@my.unt.edu>
Mon 7/27/2020 5:19 PM

**To:** SSENT <ssent@myunt.onmicrosoft.com>
**Cc:** Virani, Vivek <Vivek.Virani@unt.edu>; Ragland, Catherine <Catherine.Ragland@unt.edu>

Dear all,

Thank you to those of you who participated in our very long and ongoing discussion this afternoon. Here is our contribution to the debate: https://twitter.com/RachelGainMusic/status/1287865730063462402. We will also be sending an apology email directly to Dr. Ewell momentarily, which you SSENT students can view in the Microsoft MHTE Team.

I am proud that we have come together so rapidly to denounce the racist remarks and tones made by many scholars of the recent JSS publication. Please continue to show your support and stand up for the diversity and inclusion that Dr. Ewell calls for not just in music theory, but across all disciplines of our division. Thank you!

Regards,

Dani Van Oort
DanielleVanOort@my.unt.edu

---

**From:** Ragland, Catherine <Catherine.Ragland@unt.edu>
**Sent:** Monday, July 27, 2020 10:11 AM
**To:** Key, Stacey <StaceyKey@my.unt.edu>; Virani, Vivek <Vivek.Virani@unt.edu>; Van Oort, Dani <DanielleVanOort@my.unt.edu>; SSENT <ssent@myunt.onmicrosoft.com>
**Subject:** Re: Journal of Schenkerian Studies

Thanks for sending this Stacey, I wanted to read this as well. I have communicated with Dr. Brand about how we should address these concerns. I imagine other faculty members have contacted him well.

Cathy Ragland, PhD
Pronouns: she/her/hers
Associate Professor, Ethnomusicology
Faculty Affiliate, Latina/o and Mexican-American Studies; Women's and Gender Studies
College of Music, University of North Texas
Division of Music History, Theory, and Ethnomusicology
1155 Union Circle #311367
Denton, TX 76203
Author, *Música Norteña: Mexican Migrants Creating a Nation between Nations*
Editor, Sonic Crossings Book Series, UNT Press

---

**From:** Key, Stacey <StaceyKey@my.unt.edu>
**Sent:** Monday, July 27, 2020 10:03 AM
**To:** Virani, Vivek <Vivek.Virani@unt.edu>; Van Oort, Dani <DanielleVanOort@my.unt.edu>; SSENT <ssent@myunt.onmicrosoft.com>