UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TIMOTHY JACKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-00033 |
| | § | |
| LAURA WRIGHT, et al., | § | JURY |
| | § | |
| Defendants. | § | |

**REPLY IN SUPPORT OF BOARD DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Jackson has not demonstrated that the Board Defendants' actions were motivated by his criticisms of Ewell, nor has he refuted the Board Defendants' evidence that Volume 12 caused disruption that warranted the ad hoc panel's review of Volume 12's publication process, and the results which warranted the implementation of the ad hoc panel's subsequent recommendations. For the reasons set forth in the Board Defendants' MSJ and herein, Jackson's First Amendment retaliation claim against the Board Defendants must be dismissed.

The Board Defendants are not attempting to circumvent the Fifth Circuit's opinion stating that the Board Defendants have the authority to countermand any retaliation wrought by UNT officials. Rather, the Board Defendants point out that the evidence that has been developed since the opinion – primarily that Dr. Brand no longer has any say in the future of the JSS, and that MHTE has undertaken a search for an editor of the JSS, to demonstrate that an order to countermand retaliation would be fruitless.

1

## ARGUMENT & AUTHORITIES[1]

**I.   Jackson has not demonstrated that his speech motivated UNT's actions.**

Initially, the Board Defendants note that Jackson's reliance on Defendant Bakulina's testimony, which he summarized as "the JSS had to be shuttered because nothing but obeisance to 'extremely sensitive' DEI issues was permitted," as proof of retaliatory motive, is unwarranted. Jackson leaves out that before making the quoted statement, Bakulina stated that "[t]he stopping of the publication of the [JSS] was related to many problems. They're very complicated. I cannot relate of the stopping of that publication to a single problem." REPLY APPX.002-003, 72:7-73:21. She went on to explain that in her opinion, which was not shared by others, the problem was that many of the authors in Volume 12 positioned themselves as antagonists of Ewell and thus antagonists of change; and that most of the articles related to Ewell polemically *as a person*. REPLY APPX.002-003, 72:7-75:9. She did not say that the JSS was shuttered because it did not uphold DEI initiatives, she stated that in *her opinion not shared by others*, the resistance to change and personal attacks in Volume 12 were problematic. *Id*.

In his "factual background," Jackson presents a number of arguments about Provost Cowley, the ad hoc panel, and Levi Walls's allegedly duplicitous actions. Specifically, he argues that Provost Cowley did not investigate Theoria, that she did not heed his "grievance;" and that the panel ignored evidence showing Walls lied, and ignored evidence showing there was no power disparity in the JSS. According to Jackson, all of this is evidence of UNT's motive to retaliate against him for criticizing Ewell. As set forth below, these arguments are based on Jackson's personal conclusions-not facts-and do not demonstrate Cowley's or the ad hoc panel's "motive."

---

[1] Like in his Motion for Summary Judgment on the defamation claim, Jackson's "factual background" in his Response contains a significant amount of argument. The inaccurate assertions are not limited to the ones addressed herein.

Jackson argues that he can prove UNT was motivated to retaliate him based on his speech by demonstrating that UNT's actions would chill a person of ordinary firmness from continuing to engage in that activity, citing *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2024) (finding that the defendant admitted the plaintiff's arrest was based in part on his speech, and separately finding that the plaintiff's speech was chilled when he deleted the Facebook post at issue in response to the arrest.). He is effectively asking this Court to deduce UNT's motivations based on his personal conclusions about, and reactions to, UNT's actions. In so doing, he collapses the third and fourth elements in a manner not supported in the cases he cites, or by logic.

### A. Provost Cowley's actions were not motivated by Jackson's criticisms of Ewell.

First, Jackson in effect argues that the JSS and Theoria had the same or similar editorial standards: they both published articles that were not peer reviewed; both allowed the editors to self-publish; and neither apply COPE guidelines; therefore, the fact that Theoria was not also reviewed by the ad hoc panel proves UNT's motive was to silence Jackson for criticizing Ewell.

But Provost Cowley instituted the ad hoc panel's review of the JSS specifically because of SMT's Response to Volume 12. Doc. 84-2, Board Defs'. MSJ APPX.049, 65:6-11. SMT did not publish a "Response" about any volume published by Theoria, therefore no volume of Theoria was reviewed. REPLY APPX.012, 96:12-16. Provost Cowley specifically testified that had a professional society raised similar issues about Theoria, she would have taken similar action. *Id*. Provost Cowley had no knowledge of Theoria's editorial practices before this lawsuit, and indeed only knew that the journal existed, and nothing more about it. REPLY APPX.012, 95:2-96:3. Jackson believes that the SMT's Response specifically about Volume 12 should have prompted UNT to review all journals published by UNT Press. But his beliefs are not indicative of retaliatory motive.

Jackson also argues that because Provost Cowley "ignored his grievance" in which he alleged that the Student and Faculty Petitions, and the investigation of the JSS announced by Dean Richmond,[2] violated his academic freedom, she was clearly motivated to suppress his speech, not uphold UNT's academic standards. *See* Doc. 89-20. Jackson insinuates that the investigation of Volume 12 altered the terms conditions and privileges of his employment, and therefore Cowley's statement that he had not identified an adverse action was a "lie." But Texas law is clear that an investigation, without more, is not an adverse employment action. *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000). There is no dispute that on July 31, when Jackson made his grievance, the ad hoc panel had not even been convened, let alone completed its review of Volume 12. *See* Doc. 89-20, Doc. 1-5 (the ad hoc panel's report was issued on November 25, 2020). Nor had Dr. Brand weighed in about his recommendation for the future of the JSS. Doc. 1-22 (Brand emailed Jackson about his recommendation on December 11, 2020).[3] There was no adverse employment action to grieve, therefore Cowley's failure to find anything to grieve was not a "lie."

### B. The ad hoc panel's actions were not motivated by Jackson's criticisms of Ewell.

Next, Jackson argues that UNT's motive is evidenced by the pretextual nature of the ad hoc panel. Specifically, he argues that the panel ignored the documents he submitted to the panel and "evidence" showing that Walls is a liar and that there was no power disparity in the JSS.

To start, Ishiyama testified that the panel reviewed and considered all of the evidence Jackson submitted. REPLY APPX.035, 60:5-62:2. Further, Jackson spends a significant amount of time railing against Levi Walls, his *former student*, invariably calling him a defamer, quitter, liar, and duplicitous coward. But he does not present any evidence showing that Walls lied. It is

---

[2] The evidence shows that the ad hoc panel's review of the JSS was not a result of Dean Richmond's announcement. Doc. 84-2, Board Defs'. MSJ APPX. 049, 65:6-11; REPLY APPX.033, 29:22-30:8.

[3] The Board Defendants do not concede that the ad hoc panel's, or Dr. Brand's actions were based on Jackson's criticisms of Ewell.

therefore not clear to what end these insults serve – other than to show why Walls felt he could not disagree with Jackson, why he feared Jackson would retaliate against him, and why the ad hoc panel believed Walls when he described the power balance within the JSS. Doc. 84-2, Board Defs'. MSJ APPX.104-105, 40:22-25, 41:1-2; Board Defs.' MSJ APPX.108-109, 80:2-25, 81:1-4.

Jackson's arguments that Walls is a liar and the ad hoc panel's finding of power disparity in the JSS was a farce, revolve around the infamous "car incident." In Jackson's telling, he and Walls sat in Jackson's car, and in the course of their discussion of Volume 12, Walls stated he wanted to "censor" a pro-Ewell article (Suzannah Clark's), which Jackson righteously forbade him from doing. Notably, Jackson relies on Walls's testimony to tell this story, leaving out important details and misconstruing others.

First, Walls describes that he received a contribution from Barry Wiener, and expressed to Weiner some concerns that he had about the tone of his article. Walls depo. Doc. 83-2, Defamation Defs'. MSJ APPX.098, 42:6-43:7. Walls stated he believed the submission was racist, but he did not express that explicitly to Wiener. *Id*. Wiener was displeased with Walls's comments and expressed as much to Jackson. REPLY APPX.047-048, 72:11-73:14. The day after Walls's exchange with Wiener, he and Jackson sat in Jackson's car and discussed contributions that they did not agree with generally, including but not limited to Suzannah Clark's. REPLY APPX.049, 97:1-98:12 Jackson stated that the JSS should not censor people's writing, and Walls assumed he was referencing the exchange with Wiener. *Id*. Walls stated his agreement at the time that submissions should not be "censored" because it was "what [Jackson] wanted," and admitted that his agreement with Jackson was a "lie." *Id*. To summarize: according to Walls, the discussion of "censorship" primarily related to an anti-Ewell submission, and he "lied" to Jackson to appease him.

5

Jackson uses his telling of this incident to support his argument that he did not dismiss Walls's editorial concerns, but rather, Jackson "deferred" to Walls's concern that the JSS should not censor pro-Ewell papers. And thus, there could not have been a power disparity between Jackson and Walls, therefore the fact that the ad hoc panel found one is pretextual.

Jackson also points to an email from Walls in which, in Jackson's telling, "Walls and Graf asked whether or not they should criticize anti-Schenkerian authors." *See* Doc. 89 at p. 19. The email itself does not support such a reading – Walls asks Jackson about his thoughts about publishing anti-Schenkerian submission, which he concluded, despite his disagreement with what they said, were important to publish. *See* Doc. 90-6 at UNT 2758. Jackson's suggestion that he had to walk Walls and Graf away from criticizing Ewell's supporters is the only canard here. Indeed, Jackson's mashup of selectively cut and pasted emails does not include his response to Walls; therefore, it is impossible to conclude based on this record that he discouraged Walls and Graf from discouraging anti-Schenkerian responses.

Not only is this telling inaccurate, the ad hoc panel's finding of a power disparity is not based on this single car incident, nor was it based on only Walls's statements. As stated in the Board Defendants' MSJ, Walls's telling of *his experience* of the power disparity was corroborated by Graf and Slottow – everyone on the JSS editorial staff but Jackson. *See* Doc. 84 at p. 26; Doc. 84-2, Board Defs'. MSJ APPX.104-105, 40:22-25, 41:1-2, APPX.108-109, 80:2-25, 81:1-4. Walls also testified that he feared retaliation from Jackson if he went against his wishes, so he kept his reservations about Volume 12 to himself. *Id*.

Jackson further tries to discredit the panel's review by stating they only selectively applied the COPE guidelines, and Ishiyama did not heed his request to "discuss how to maintain the integrity of an academic journal." But Ishiyama unequivocally testified that the panel consciously

6

confined their review to Provost Cowley's charge and structured their review around three issues: 1) peer review; 2) the anonymous author; and 3) the decision not to invite Ewell to respond. REPLY APPX.032-033, 28:20-29:21; Doc. 1-5 at p. 5. Thus, all of the COPE guidelines were not implicated. Further, the fact that the panel did not defer to Jackson's wishes does not show a retaliatory motive.[4]

Jackson's argument about the power disparity is in effect, this: Walls did not tell me that he felt I had significant power over him and his career and the potential to ruin it, therefore he lied and there was no power disparity. His argument about Cowley and the ad hoc panel's "pretext" is similar: they did not use my evidence to discredit Walls, therefore they ignored it and their actions were a pretext for punishing me for criticizing Ewell.

Not only are these conclusions unsupported, they fail to explain why Cowley and Ishiyama would retaliate against him for criticizing Ewell. He does not refute, for example, Cowley's testimony about her reason for convening the panel, or Ishiyama's testimony that the ad hoc panel did not read the articles in Volume 12. Doc. 84-2, Board Defs'. MSJ APPX.049, 65:6-11; Doc. 84-2, Board Defs'. MSJ APPX. 119-120, 87:11-19, 96:3-4. Jackson has also failed to demonstrate that they were motivated to avenge Ewell and retaliate against him, even secretly. There is simply no evidence that Cowley or Ishiyama were followers of Ewell's thesis or arguments. Jackson has not demonstrated that UNT's actions were motivated by his criticism of Ewell, and his claim fails.

### I. Jackson has not refuted that Volume 12 caused disruption.

On the issue of the disruption caused by Volume 12, Jackson argues that it did not cause any inefficiency, without refuting the evidence of disruption, or addressing *Pickering* balancing.

---

[4] At deposition, Ishiyama was asked if the panel would "investigate[] the infringement of his academic freedom." REPLY APPX.034, 54:12-18. But Jackson's allegation was that the panel's investigation itself was an infringement of his academic freedom, so it is not clear how, or why, it would investigate such an issue, or the issue of how to "maintain the integrity of the journal."

For example, Jackson insinuates that UNT illogically invoked "time-place-manner" restrictions, ignoring the part of the *Pickering* balancing test requiring consideration of the time, place, and manner of the speech at issue. *See* Doc. 84 at p. 31-32. To reiterate what the Board Defendants state in their MSJ: the fact that Jackson exercised his free speech through a UNT sponsored journal is paramount. *See* Doc. 84 at pp. 31-33; *See also Connick v. Myers*, 461 U.S. 138, 153 (1983) (the fact that the plaintiff exercised her rights to free speech at the office supported the defendant's fears that the functioning of the office was endangered.).

Jackson dismisses the harm Volume 12 caused UNT's reputation as silly, citing to the accomplishments achieved by Walls and some of the Defamation Defendants as proof that Volume 12 did not harm UNT's reputation. But the question is: at the time, did UNT have a legitimate reason to review Volume 12 in light of the fact that it reflected not just upon Jackson, but all of his colleagues and UNT? Based on the evidence, the Court can answer this question in the affirmative. *See* Doc. 84 at p. 28.

UNT was not obligated to wait to address Volume 12 until, for example, it turned out that Walls could not get a job upon achieving his Ph.D. (which was years away), or until the College of Music's reputation diminished in some quantifiable manner due to widely known criticism of the unscholarly nature of Volume 12, a product of UNT. *Kinney v. Weaver*, 367 F.3d 337, 362-363 (5th Cir. 2004) (defendants' burden was to demonstrate that they could reasonably think that their interest in maintaining effective training for officers was threatened by the plaintiff's speech); *Connick*, 461 U.S. at 151-152 (employer does not have to allow events to unfold to the extent that the disruption in the office is manifest before acting.).

Volume 12 was imputed to UNT from the outset – especially Walls and Graf. *See* Doc. 84 at pp. 27-29.  UNT's response was not to retaliate against Jackson – but to address, via the ad hoc

panel's review, how Volume 12 came to be published, thereby addressing the unscholarly nature of Volume 12, and its reflection on UNT. *See* Doc. 84 at pp. 27-31. The Board Defendants are not asking this Court to give deference to *unfounded* predictions of harm, but legitimate ones. *Bevill v. Wheeler*, 103 F.4th 363, 379 (5th Cir. 2024).[5] The ad hoc panel's recommendations for publishing the JSS *going forward* were justified and should not be subordinated to Jackson's interests.

This court can find that the Board Defendants have articulated relevant, cognizable interests in UNT's review of Volume 12 (and making recommendations accordingly) that outweigh Jackson's interest in publishing without regard for scholarly standards and the impact his speech may have on his employer, colleagues, and students.

## CONCLUSION

Jackson is asking this court to prioritize his rights over those of this colleagues and students because he argues, without evidence, that UNT's actions were motivated by his criticisms of Ewell. To reiterate the Board Defendants' MSJ: they were not required to agree with Jackson's view that the review of Volume 12 was based on his criticisms of Ewell. Cowley and the panel took measures to divorce the *content* of Jackson's criticism of Ewell from their review. Jackson has not refuted the evidence showing they succeeded, or demonstrated that his interests outweigh UNT's, therefore his claim must be dismissed.

---

[5] In *Bevill*, the court found that that the plaintiff's speech about public officials and a police department did not cause disruption because the plaintiff's statements could have been "clarified and address as warranted" short of terminating the plaintiff. *Id*. That is exactly the case here: the ad hoc panel was convened to address that Volume 12, and its mistakes, were *avoidably* being imputed to UNT, Jackson's colleagues, and his students.

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

　　*/s/ Mary B. Quimby*
**BENJAMIN S. WALTON**
*Lead Attorney*
Texas Bar No. 24075241
**MARY B. QUIMBY**
Texas Bar No. 24132506
Assistant Attorneys General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711
(512) 463-2120 – Phone
(512) 320-0667 – Fax
benjamin.walton@oag.texas.gov
mary.quimby@oag.texas.gov

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

    I hereby certify that on January 24, 2025, a true and correct copy of this document was electronically filed using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

Michael Thad Allen, Esq.
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738 (phone)
(860) 469-2783 (fax)
mallen@allenharrislaw.com

Jonathan Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

***Counsel for Plaintiff***

                              */s/ Mary B. Quimby*
                             **MARY B. QUIMBY**
                             Assistant Attorney General